# EXHIBIT B



## WILCOX & FETZER LTD.

# CONFIDENTIAL

In The Matter Of:

# American Home Mortgage Holdings, Inc., et al.

Case No. 07-11047 (CSS)

Bret W. Fernandes

January 15, 2009

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

American Home Mortgage Holdings, Inc., et al.

```
                                                              Page 1
 1              IN THE UNITED STATES BANKRUPTCY COURT

 2                   FOR THE DISTRICT OF DELAWARE

 3

 4    In re:                      ) CONFIDENTIAL
                                  ) Pages 175-176
 5    AMERICAN HOME MORTGAGE      )
      HOLDINGS, INC., a Delaware  )
 6    Corporation, et al.,        ) Chapter 11
                                  )
 7         Debtors.               ) Case No. 07-11047 (CSS)

 8

 9            Deposition of BRET W. FERNANDES, taken
      pursuant to notice at the law offices of
10    Zuckerman Spaeder LLP, 919 Market Street,
      Suite 990, Wilmington, Delaware, beginning at
11    2:00 p.m., on Thursday, January 15, 2009, before
      Terry Barbano Burke, RMR-CRR and Notary Public.

12    APPEARANCES:

13         JOHN T. DORSEY, ESQUIRE
           PATRICK A. JACKSON, ESQUIRE
14         Young Conaway Stargatt & Taylor, LLP
             The Brandywine Building
15           1000 West Street, 17th Floor
             Wilmington, Delaware  19801
16           For the Debtors

17         EDWARD L. SCHNITZER, ESQUIRE
           HAHN & HESSEN, LLP
18           488 Madison Avenue
             New York, New York  10022
19           For the Creditors' Committee

20

21

22                    WILCOX & FETZER
          1330 King Street - Wilmington Delaware  19801
23                    (302) 655-0477
                      www.wilfet.com
24
```

American Home Mortgage Holdings, Inc., et al.

Page 2

1  APPEARANCES (cont'd):
2      THOMAS G. MACAULEY, ESQUIRE
       ZUCKERMAN SPAEDER LLP
3      919 Market Street, Suite 990
       Wilmington, Delaware 19899
4      -and-
       STEPHEN A. WEISBROD, ESQUIRE
5      H. HUNTER WINSTEAD, ESQUIRE
       GILBERT OSHINSKY LLP
6      1100 New York Avenue, NW, Suite 1700
       Washington, DC 20005
7      For the Borrowers' Committee
8
                - - -
9
10         BRET W. FERNANDES,
11   the deponent herein, having first been
12   duly sworn on oath, was examined and
13   testified as follows:
14         MR. WEISBROD: Why don't we identify
15   everyone for the record.
16         I'm Stephen Weisbrod. I'm co-counsel
17   for the borrowers' committee. I am with the law
18   firm Gilbert Oshinsky in Washington, DC.
19         MR. WINSTEAD: Hunter Winstead of
20   Gilbert Oshinsky for the borrowers' committee.
21         MR. MACAULEY: Thomas Macauley,
22   Zuckerman Spaeder, borrowers' committee.
23         MR. JACKSON: Patrick Jackson, Young
24   Conaway Stargatt & Taylor, for the debtors.

Page 3

1         MR. SCHNITZER: Edward Schnitzer,
2    Hahn & Hessen, for the creditors' committee.
3         MR. DORSEY: John Dorsey, Young
4    Conaway, for the debtors.
5         THE WITNESS: Bret Fernandes.
6         (Fernandes-1 was marked for
7    identification.)
8    BY MR. WEISBROD:
9      Q. Mr. Fernandes, do you see before you
10   Fernandes Exhibit 1, the Amended Notice of
11   Deposition?
12     A. Yes.
13     Q. Have you seen this before?
14     A. Yes, I believe so.
15     Q. This is a deposition notice pursuant to
16   Bankruptcy Rule 7030(b)(6) and Federal Rule of
17   Civil Procedure 30(b)(6) that requires the
18   debtors to designate a witness on various topics
19   listed on Exhibit A.
20         Have you seen Exhibit A before?
21     A. I have.
22     Q. Have you been designated by the debtors?
23     A. I have.
24         MR. DORSEY: For the record, I'll

Page 4

1    note we did file a designation and objection
2    indicating Mr. Fernandes was designated as the
3    witness.
4         MR. WEISBROD: You filed it?
5         MR. DORSEY: Well, we served it. We
6    did not file it.
7         MR. WEISBROD: On us?
8         MR. JACKSON: It should have been by
9    e-mail. I can send you the non-executed version
10   of it for content. I apologize for that.
11   BY MR. WEISBROD:
12     Q. Mr. Fernandes, let's start with questions
13   about any possible estimates of borrower claims
14   that you may be aware of.
15         Who at the debtors currently keeps
16   track of borrower claims at or for the debtors?
17     A. There are multiple people involved in the
18   claims tracking and review process. The debtors,
19   as well as some of the debtors' professionals,
20   including colleagues of mine. Depending on the
21   nature of the claim, it would fall into a
22   different person's category.
23     Q. You mentioned colleagues of yours. What
24   firm are you with?

Page 5

1      A. I'm with Zolfo Cooper.
2      Q. What kind of firm is that?
3      A. Bankruptcy -- advisory firm. We largely
4    do bankruptcy-related work, turnarounds,
5    restructurings.
6      Q. Who do you typically represent?
7      A. Usually debtors' side representation. We
8    have some creditors' side clients as well, but
9    the majority of our business is on the company
10   side.
11     Q. Creditor side, including representation
12   of banks?
13     A. On occasion, yes.
14     Q. Any banks that are creditors in this
15   case?
16     A. I don't know. I'd have to go look.
17     Q. Focusing specifically on borrower claims
18   based on allegedly illegal loan origination, who
19   keeps track of that?
20         MR. DORSEY: Objection to the form.
21   BY MR. WEISBROD:
22     Q. You can answer.
23     A. I don't have the specific name at the
24   company.

2 (Pages 2 to 5)

Wilcox and Fetzer, Ltd.          Registered Professional Reporters          302-655-0477

OBC 00506

Electronically signed by Terry Burke (301-319-005-7649)     e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 58

1  document itself. Don't answer the question. Ask
2  an accurate question and he can answer it.
3      MR. WEISBROD: I'm not going to give
4  up until you answer.
5      MR. DORSEY: He did answer it, so
6  let's move on. He's not going to answer it
7  again.
8  BY MR. WEISBROD:
9      Q. This says, "The Chapter 11 filing and
10 process should not directly impact you if you
11 currently have a mortgage with American Home
12 Mortgage."
13      You see that; right?
14     A. I do.
15     Q. Are bar dates things that impact
16 creditors?
17     MR. DORSEY: Objection. Asked and
18 answered.
19     THE WITNESS: Yes, bar dates are.
20 BY MR. WEISBROD:
21     Q. I'm going to move on to the topic of
22 sales manuals and scripts. Were you designated
23 to testify about the search for sales manual and
24 scripts?

Page 59

1     A. I was designated.
2     Q. How did the debtors go about searching
3  for sales manuals and scripts when the sales
4  borrowers' committee asked for them?
5     A. We asked all remaining senior employees,
6  which include Damian Voulo, Chris Cavaco, Carlo
7  Colagiacomo, and a number of other people, a
8  couple of other people -- there's not that many
9  that remain -- what they were aware of, what
10 existed out there. And they produced everything,
11 or they said that they produced everything that
12 they were aware of.
13     Q. Do you know how they searched for
14 documents?
15     A. I do not. Chris Colagiacomo, I know, is
16 a senior vice president of IT. I presume he had
17 some system searches he could do. Other than
18 that, I don't know what techniques they used to
19 produce.
20     Q. Did anybody search through hard copies of
21 documents?
22     A. I presume they did. I have not verified
23 that, but I certainly asked that people did.
24     Q. You asked them to do that?

Page 60

1     A. I had asked them to look at all sources,
2  yes.
3     Q. Was there a sales department at one time?
4     A. Yes.
5     Q. What happened to the sales department?
6     A. I don't know that it was called the sales
7  department but, yes, it was.
8     Q. What was the department called?
9     A. I don't know.
10    Q. Marketing or sales or something like
11 that?
12    A. Perhaps. I'm not certain.
13        But yeah, there was a department or
14 function related to that.
15    Q. What happened to the documents from that
16 department?
17    A. I don't know.
18    Q. Does anybody know?
19    A. I don't know what someone else might
20 know.
21    MR. WEISBROD: Let's show the sales
22 manual we got. This is 6.
23        (Fernandes-6 was marked for
24 identification.)

Page 61

1  BY MR. WEISBROD:
2     Q. This is a document that on its cover
3  says "Power ARM Selling Skills (PASS) Developed
4  for American Home Mortgage Sales by Training and
5  Performance Improvement."
6        Do you see that?
7     A. I do.
8     Q. What is American Home Mortgage sales?
9     A. I don't know.
10    Q. Was there a department called American
11 Home Mortgage Sales?
12    A. There may have been.
13    Q. There may have been?
14    A. There may have been. I don't know.
15    Q. Had you heard of that before?
16    A. I'm not familiar with that exact term or
17 department. It is not familiar to me.
18    Q. How about training and performance
19 improvement, have you ever heard of that?
20    A. No.
21    Q. Have you ever seen this document before?
22    A. I don't believe so.
23    Q. Did anyone ever ask you to review a sales
24 manual provided by the borrowers' committee?

16 (Pages 58 to 61)

Wilcox and Fetzer, Ltd.   Registered Professional Reporters   302-655-0477

OBC 00520

Electronically signed by Terry Burke (301-319-005-7649)   e511e62c-ad65-4055-822a-91979ecc1cc4

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 62

1   A. No.
2   Q. How would one go about trying to
3   determine who, if anyone, within American Home
4   had access to this document?
5   A. I'm not certain.
6   Q. You don't know if --
7   A. Just --
8   Q. Go ahead.
9   A. Just by asking around and perhaps a
10  system search, looking for the title of the
11  document. That would make sense to me.
12  Q. Let's look through the document briefly.
13      Could you look at Page 3 of the
14  document. It says Power ARM Misconceptions at
15  the top.
16      Do you see that?
17  A. Yes, I do.
18  Q. Do you know what a Power ARM is?
19  A. No, actually.
20  Q. Is it a form of payment option ARM?
21      MR. DORSEY: He just said he doesn't
22  know what it is.
23  BY MR. WEISBROD:
24  Q. Is it a form of payment option ARM?

Page 63

1       MR. DORSEY: Objection to form.
2       THE WITNESS: I don't know. The
3   reference to ARM is there. I'm not familiar with
4   the tag "power."
5   BY MR. WEISBROD:
6   Q. You do know that American Home sold
7   various payment option ARMs with various
8   tradenames; right?
9   A. Yes.
10  Q. Let's look at Page 4, and this is still
11  in the Power ARM misconception section. Do you
12  see in top it says in quotes, "This product is
13  only for the well-to-do"?
14      That's in quotes; right?
15  A. Yes.
16  Q. And then there is not in quotes
17  additional information about who might benefit
18  from the Power ARM product; right?
19  A. Yes.
20  Q. And it says, "This product can be
21  appreciated by any income level. Listed below
22  are types of people that can benefit from the
23  Power ARM."
24      Do you see that?

Page 64

1   A. Yes.
2   Q. It includes a long list of people.
3   A. Yeah. I mean that's what I answered
4   previously. I wasn't suggesting that I think
5   these people benefit, but I read that, okay.
6   Q. I'm not asking you to endorse this
7   statement. Do you see that retired people are on
8   the list?
9   A. I do.
10  Q. And active stock market investors are on
11  the list, do you see that?
12  A. I do.
13  Q. Why did you make that comment, I'm not
14  suggesting that I think this is appropriate for
15  all these people, or whatever it is you said?
16  A. Because I felt like you asked the
17  question three times and I didn't want to
18  misunderstand you in what I answered on the first
19  round.
20  Q. Do you think that actually payment option
21  ARMs are not necessarily appropriate for some of
22  these types of people?
23  A. I don't think that.
24  Q. Do you have an opinion about whether

Page 65

1   payment option ARMs --
2   A. I don't have an opinion on that.
3   Q. Let's look at Page 57.
4       Do you have 57 in your copies?
5   A. I do.
6   Q. Page 57 has a heading "overcoming
7   objections."
8       Do you see that?
9   A. Yes.
10  Q. And it says, "Borrowers can have
11  objections to this new product. The table below
12  displays some common objections heard from
13  borrowers and some responses to help the
14  borrowers overcome their objections."
15      Do you see that?
16  A. Yes.
17  Q. One objection listed in the second row of
18  this table is, "This could result in negative
19  amortization."
20      Do you see that?
21  A. Yes.
22  Q. And then there's a column with responses
23  to the objections.
24      Do you see the column?

17 (Pages 62 to 65)

American Home Mortgage Holdings, Inc., et al.
Bret W. Fernandes

Page 66

1   A. Yes.
2   Q. And the response to that objection
3   was, "I think of this as deferred interest rather
4   than negative amortization."
5        Do you see that?
6   A. I do.
7   Q. And it goes on.
8        Can you read that whole response?
9   A. Aloud?
10  Q. No. Just to yourself.
11  A. (Pause.)
12       Okay.
13  Q. If someone in your family were getting a
14  sales pitch for a payment option ARM, how would
15  you react if the sales person said, "I think of
16  this as deferred interest rather than negative
17  amortization"?
18       MR. DORSEY: Objection. Outside the
19  scope of the 30(b)(6). Your notice was for
20  documents.
21       MR. WEISBROD: That's fine.
22       MR. DORSEY: Not his interpretation
23  of those documents.
24       MR. WEISBROD: That's fine.

Page 67

1   BY MR. WEISBROD:
2   Q. Have you seen any documents with sales
3   pitches regarding payment option ARMs?
4   A. No, I have not. Not in -- no.
5   Q. Other than this one?
6   A. Other than this one and what was
7   otherwise produced, but I didn't look in any
8   detail at them at all.
9   Q. Have you seen any documents that list the
10  types of borrowers to whom American Home
11  employees should try to sell payment option ARMs,
12  other than this document?
13  A. No, I haven't.
14  Q. Is there anything else that you think
15  that you or your team might do to try to locate
16  sales manuals or sales pitches?
17  A. Nothing comes to mind, and I'm open to
18  suggestions if someone has one. We certainly
19  tried to find all that we could.
20  Q. Are there any former employees who you
21  think might be more familiar than the existing
22  employees are with the sales manuals and sales
23  scripts?
24  A. Undoubtedly there are.

Page 68

1   Q. Who?
2   A. I'm not sure who those people would be.
3   As part of the production request, I know there
4   was a list of names for people from various
5   departments, and those are being pulled together,
6   so that might be more telling than anything I
7   could share with you.
8   Q. How are you collecting the information
9   about the former employees who may have
10  knowledge?
11  A. Again, it's the gentleman who, Paul
12  Moran, who has inherited the payroll function,
13  who now has the employees records and related org
14  charts, et cetera. He's pulling them. Chris
15  Cavaco, the gentleman on the IT front, is working
16  with him to help identify those.
17  Q. Anyone else?
18  A. I don't believe so.
19  Q. Do you recall the names of any particular
20  individual who might have greater knowledge about
21  sales practices?
22  A. I don't.
23  Q. Topic No. 4 was generally about knowledge
24  of illegal practices? Do you remember that

Page 69

1   topic?
2   A. To the extent I read this, yes.
3   Q. Have you been designated on that topic?
4   A. I have.
5   Q. Have you ever seen a document that
6   troubled you in the sense that it made you think
7   American Home might have been engaged in improper
8   loan origination practices?
9   A. No, I have not.
10       MR. DORSEY: Objection to form.
11  BY MR. WEISBROD:
12  Q. You have never seen one?
13  A. No, I haven't.
14  Q. Have you ever seen a document that caused
15  you to think American Home might have been
16  engaged in illegal servicing practices?
17       MR. DORSEY: Objection to form.
18       THE WITNESS: No, I haven't.
19  BY MR. WEISBROD:
20  Q. Have you ever heard anyone other than me
21  suggest that American Home may have been engaged
22  in illegal origination or servicing practices?
23  A. Only by way of people referencing some of
24  the borrower claims that were filed, but nothing

18 (Pages 66 to 69)

American Home Mortgage Holdings, Inc., et al.

Page 190

1  State of Delaware )
                    )
2  New Castle County )
3
           CERTIFICATE OF REPORTER
4
   I, Terry B. Burke, RMR-CRR and Notary
5  Public, do hereby certify that there came before
   me on Thursday, January 15, 2009, the deponent
6  herein, BRET W. FERNANDES, who was duly
   sworn by me and thereafter examined by
7  counsel for the respective parties; that the
   questions asked of said deponent and the answers
8  given were taken down by me in Stenotype notes
   and thereafter transcribed by use of
9  computer-aided transcription and computer printer
   under my direction.
10
           I further certify that the foregoing is a
11 true and correct transcript of the testimony
   given at said examination of said witness.
12
           I further certify that reading and signing
13 of the deposition were waived by the deponent and
   counsel.
14
           I further certify that I am not counsel,
15 attorney, or relative of either party, or
   otherwise interested in the event of this suit.
16
17
18
           Terry Barbano Burke, RMR-CRR
19         Certification No. 233-RPR
           (Expires January 31, 2011)
20
   DATED:
21
22
23
24