UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
                               .
IN RE:                         .      Chapter 11
                               .
American Home Mortgage, Inc.,  .
                               .
          Debtor(s).           .      Bankruptcy #07-11047 (CSS)
```
.......................................................

Wilmington, DE
February 17, 2009
11:00 a.m.

TRANSCRIPT OF MOTIONS HEARING
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:

For The Debtor(s):          Nathan D. Grow, Esq.
                            Young Conaway Stargatt
                            & Taylor, LLP
                            The Brandywine Bldg.
                            1000 West Street-17th Fl.
                            Wilmington, DE 19801

                            Sean M. Beach, Esq.
                            Young Conaway Stargatt
                            & Taylor, LLP
                            The Brandywine Bldg.
                            1000 West Street-17th Fl.
                            Wilmington, DE 19801

For American Home Mortgage: Victoria Counihan, Esq.
Servicing/Acquisition       Greenberg Traurig, LLP
                            The Nemours Building
                            1007 North Orange Street
                            Wilmington, DE 19801

```
For The Official Committee:   David Carickhoff, Esq.
of Unsecured Creditors        Blank Rome, LLP
                              Chase Manhattan Centre
                              1201 Market street-Ste. 800
                              Wilmington, DE 19801

For The Borrowers Committee:  Thomas Macauley, Esq.
                              Zuckerman Spaeder, LLP
                              919 Market Street-Ste. 990
                              Wilmington, DE 19801

                              Stephen A. Weisbrod, Esq.
                              Gilbert Oshinsky
                              Ste. 700
                              1100 New York Ave., NW
                              Washington, DE 20005

For Nathan & Lillian Frieder: Carl N. Kunz, III, Esq.
                              Morris James, LLP
                              500 Delaware Ave.-Ste. 1500
                              Wilmington, DE 19801

For Mark & Kelly Watson:      Daniel K. Hogan, Esq.
                              The Hogan Firm
                              1311 Delaware Ave.
                              Wilmington, DE 19806

(Via telephone)

For The Official Committee:   Mark S. Indelicato, Esq.
of Unsecured Creditors        Hahn & Hessen, LLP
                              488 Madison Ave.
                              New York, NY 10022

For Bank of America           Ana M. Alfonso, Esq.
                              Kaye Scholer
                              425 Park Ave.
                              New York, NY 10022

For ABN AMRO Bank, NV:        Fred Neufeld, Esq.
                              Milbank Tweed Hadley & McCloy
                              601 S. Figueroa St.-30th Fl.
                              Los Angeles, CA 90017

                              Robert J. Moore, Esq.
                              Milbank Tweed Hadley & McCloy
                              601 S. Figueroa St.-30th Fl.
                              Los Angeles, CA 90017
```

3

Audio Operator:                    Jennifer Pasierb

Transcribing Firm:                 Writer's Cramp, Inc.
                                   6 Norton Rd.
                                   Monmouth Jct., NJ 08852
                                   732-329-0191

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Good morning.

3          MR. GROW:  Good morning, Your Honor.  Nathan Grow of

4    Young Conaway Stargatt and Taylor on behalf of the Debtors.

5    Your Honor, referring to the Notice of Amended Agenda that was

6    filed for today, items 1 through 22 have been adjourned or

7    resolved.  Items 23 and 24, the Debtor submitted Certificates

8    of No Objection with respect to these items.

9          THE COURT:  I have signed those orders this morning.

10         MR. GROW:  Great, thank you, Your Honor.  Item 25 has

11   been resolved in principle.  The Debtors are working to come to

12   an agreement to either submit a Form of Order, or to negotiate

13   a withdrawal of this, but this is not going forward today.

14         THE COURT:  All right.

15         MR. GROW:  That brings us to item 26 on the agenda,

16   which is the Debtor's Twenty-Eighth Omnibus Non-Substantive

17   Objection to Claims.  And, Your Honor, unless you have any

18   preliminary questions, we've revised the Forms of Order, and if

19   I may approach, Your Honor, I can hand up the revised Forms of

20   Order and blacklines.

21         THE COURT:  Okay, I had no questions.

22         MR. GROW:  Okay.

23     (Mr. Grow approaches bench)

24         THE COURT:  Thank you.

25         MR. GROW:  Okay, Your Honor, with the Court's

1    permission, I'd just like to run through some of the responses

2    we received and adjustments we made to the Forms of Order.

3                THE COURT:  Okay.

4                MR. GROW:  First of all, the Debtors have withdrawn

5    the objection with respect to the Proofs of Claim filed by

6    Westridge II & III, LLC, Arden Realty Limited Partnership, the

7    Yakima County Treasurer, and Mark and Kelly Watson.  And

8    Debtors seek to have the objection adjourned with respect to DB

9    Structured Products, Inc., and the City of New York Department

10   of Finance.

11               THE COURT:  Okay.

12               MR. GROW:  To discuss item 12, referring to Exhibit R

13   to the agenda, which shows the responses received to the

14   Twenty-Eighth Omnibus Objection, item 12 is a response filed by

15   Besson Appraisals.  We also received an informal response from

16   Skillsoft.  These fall under the same category.  The Debtors

17   objected to their claims on the basis that they were filed

18   after the applicable bar date, but upon further review, and as

19   these parties pointed out, their claims are actually amendments

20   of previously filed claims.  So we've adjusted the Form of

21   Order to withdraw the objection with respect to the claims, the

22   later filed claims of Besson Appraisals and Skillsoft, and

23   instead, we've included the earlier filed claims on the amended

24   claims exhibit.  So for Besson Appraisals and Skillsoft, we've

25   added claims 2156 and 7943 to Exhibit A to the Order Sustaining

1  the Twenty-Eighth Omnibus Objection.

2           THE COURT:  Okay.

3           MR. GROW:  And we've also included a note in the

4  order with respect to Skill Soft that the Debtors will not

5  object to claim 10390 as late filed, but the Debtors otherwise

6  reserve their right to object on any basis.

7           THE COURT:  All right.

8           MR. GROW:  Okay, we also received an informal

9  response from Nathan and Lillian Frieder.  The Debtors had

10  objected to claims 6149 and 10277, as amended by 10371.

11  Counsel to the Frieders is in the Court today, and they do not

12  have an objection as to this -- to the relief requested, but

13  they want to make a brief representation on the record.

14           THE COURT:  All right, Mr. Kunz, good morning.

15           MR. KUNZ:  Good morning, Your Honor.  Carl Kunz on

16  behalf of Nathan and Lillian Frieder.  Your Honor, after

17  receiving the objection, we spoke with Counsel for the Debtors

18  and resolved to, basically, that 1031, although it was filed

19  with the Court and not with Epic, would still be considered the

20  surviving claim, and that the Debtors would not object to it

21  based on either timeliness, or the fact that it was filed with

22  the Court instead of with Epic, although they're reserving all

23  rights to object to the claim on further grounds.  With that

24  resolution and just the confirmation that that's the agreement

25  with the Debtor's counsel, I think we're resolved.

1          THE COURT:  All right, thank you.

2          MR. KUNZ:   Thank you.

3          THE COURT:  Mr. Grow?

4          MR. GROW:  Yes, that's correct.

5          THE COURT:  All right, thank you.

6          MR. GROW:  Okay, item 1 on Exhibit R is a response

7   that we received from Theresa Riccio.  The Debtors objected to

8   her claim on the basis that she didn't file any supporting

9   documentation with her claim.  As a response, she simply re-

10  filed her claim along with a HELOC statement, showing a balance

11  owed to AHM on her HELOC account.  She provided no other

12  explanation.  So the Debtors requested the objection be

13  sustained, notwithstanding her response, since the only

14  documentation that she's submitting now shows that -- an amount

15  owing by her to American Home Mortgage, rather than by American

16  Home Mortgage to her.

17         THE COURT:  Anyone here on her behalf?

18         ALL:  (No verbal response).

19         THE COURT:  Hearing none, the Court will sustain the

20  objection.

21         MR. GROW:  Okay, thank you, Your Honor.  We have

22  several responses filed by Claimants where the Debtors had

23  objected to assign or reassign these Claimants' claims to a

24  different case number.  So I'm gonna refer to these in groups

25  here.  Items 2, 7, 8, and 11 on Exhibit R, the Claimants filed

1   responses that merely consent to the reassignment.

2             THE COURT:  Okay.

3             MR. GROW:  Items 3, 9, and 11, the Claimants filed

4   responses merely reasserting the substantive bases of their

5   claim, not addressing the fact that the Claimants are

6   reassigning their claim.

7             THE COURT:  Okay.

8             MR. GROW:  Item #6, the Claimant filed a response,

9   obviously confused, thinking that the objection was referring

10  to another claim that she had filed.  Her response says that

11  her claim should be against Corp; that's what the Debtors are

12  seeking with respect to this claim.

13            THE COURT:  Okay.

14            MR. GROW:  So with respect to these Claimants, we've

15  done our best to send e-mails, leave messages to contact these

16  people to help them understand what the objection is, but

17  apparently, judging by the responses, they really don't have an

18  objection as to the relief that's requested.

19            THE COURT:  All right.  I'll overrule those

20  objections, face not necessary.

21            MR. GROW:  Okay, and then one last response is item

22  #5 --

23            THE COURT:  Right.

24            MR. GROW:  -- filed by Washington Mutual.  The

25  Debtors objected to several of their claims as amended and

1   superseded by later claims.  At the request of Washington

2   Mutual's counsel, we've added a provision to the order stating

3   that the Debtors are prohibited from objecting to the later-

4   filed claims as being filed late, after the applicable bar

5   date, and the Debtors reserve the right to object to these

6   claims on any other basis.

7           THE COURT:  These are the 10574 series?

8           MR. GROW:  That's right.

9           THE COURT:  Okay.

10          MR. GROW:  And counsel to Washington Mutual also

11  pointed out to us that their later-filed claims, the ones

12  referenced there in the order, the amount listed on the Proof

13  of Claim form is not the actual amount that they were trying to

14  assert.  Later on in their claim –- the amount asserted on the

15  face of their Proof of Claim is 3 million and change.  Later on

16  in their Proof of Claim in an attachment, the amount is 7

17  million and change, and I think it may have been just a

18  scrivener's error on the Proof of Claim form.  They ask that we

19  change the amount on the exhibits to the Claim Objections.

20  Essentially, this is gonna be an issue they need to take up

21  with our claims agent.  They have their policies about

22  reflecting claim amounts on the register and -- so they just

23  wanted me to put on the record that they don't think the amount

24  of their claim is what is listed on the exhibits to the Claim

25  Objections.

1           THE COURT:  Okay, there's an inconsistency between --

2           MR. GROW:  What they think they claimed and what the

3  --

4           THE COURT:  -- the document that they signed under

5  oath --

6           MR. GROW:  Right.

7           THE COURT:  -- and the attachments that they attached

8  under oath?

9           MR. GROW:  Correct.

10          THE COURT:  Okay, so it's a were-they-lying-then-or-

11 are-they-lying-now issue.  All right, I understand.

12          MR. GROW:  Just a typographical error, most likely.

13          THE COURT:  Oh, you're so kind, okay.

14          MR. GROW:  Okay, Your Honor, that -- those are all

15 the responses for the Twenty-Eighth Omnibus Objection.  Unless

16 Your Honor has any other questions, we request that Your Honor

17 enter the order.

18          THE COURT:  Anyone wish to be heard?

19          ALL:  (No verbal response).

20          THE COURT:  All right, I'll sign the order.

21          MR. GROW:  Okay, Your Honor, then moving on to item

22 27 on the Amended Agenda, which is the Debtor's Twenty-Ninth

23 Omnibus Substantive Objection to Claims.  In light of responses

24 received, the Debtors have revised the order to show the

25 adjournment of the objection with respect to the Proofs of

1    Claim filed by Credit Suisse First Boston Mortgage Capital,

2    Sharaine Hughes, Indiana Department of Revenue, and James

3    Rucker.  And then, to address just a couple of other responses,

4    I'm referring to Exhibit S to the Amended Agenda that shows

5    responses to the Twenty-Ninth Omnibus Objection.  Item #1 was a

6    response filed by the State of Missouri Department of Revenue.

7              THE COURT:  Okay.

8              MR. GROW:  The Debtors had objected to the claim of

9    the State of Missouri Department of Revenue, stating that they

10   owed no further liability, consistent with the returns that

11   they had filed, tax returns, with State of Missouri Department

12   of Revenue.  This Claimant filed a response stating that there

13   are still some minimal amounts owed, $34.04 priority, $55.05

14   administrative.  Debtors are not contesting this.  We've

15   revised the order accordingly to include these amounts.

16       Item #2 is another response from Washington Mutual.

17   Debtors sought to expunge three of their claims on the basis

18   that there's no liability.  They filed several claims,

19   identical, against all of the Debtors.  Washington Mutual and

20   the Debtors agree that there's no liability from, at least,

21   American Home Mortgage Ventures, LLC, Homegate Settlement

22   Services, and Great Oak Abstract Corp.  So Washington Mutual

23   has consented to the relief, but requested a provision in the

24   order stating that the Debtors will not object to their other

25   claims on the basis that they should have been alleged against

1   American Home Mortgage Ventures, Homegate Settlement Services,

2   or Great Oak Abstract Corp.

3        One last note on this -- on the responses received.  The

4   agenda reflects an adjournment for Deutsche Bank.  This was

5   listed on the agenda in error.  The Debtors are requesting that

6   the relief requested for Deutsche Bank be approved, and

7   Deutsche Bank did not file a response or any comment with

8   respect to this.  Unless Your Honor --

9             THE COURT:  Response to what, the claim objection?

10            MR. GROW:  Deutsche Bank did not file a response to

11  the claim objection.  The Debtors listed it on the agenda, by

12  mistake, as adjourned.

13            THE COURT:  Right.

14            MR. GROW:  We reached out to their -- to the phone

15  number listed on their claim.  All I got was an answering

16  machine, left 'em a message, did not hear back from 'em.

17            THE COURT:  When did you leave a message?

18            MR. GROW:  What's today, Wednesday?  I think --

19            THE COURT:  Tuesday, today's Tuesday.

20            MR. GROW:  Tuesday.  I think it was Friday.

21            THE COURT:  When?

22            MR. GROW:  Friday -- I don't remember, probably in

23  the afternoon.

24            THE COURT:  We're going to have to kick it, because

25  yesterday was a bank holiday and I don't know if they got the

 1    message and --

 2              MR. GROW:  Okay.

 3              THE COURT:  -- I don't want to be in a situation

 4    where they were duped, however unlikely that is, by the agenda.

 5              MR. GROW:  Okay, sure, I understand.

 6              THE COURT:  So we can just carry that to the next

 7    Omnibus.

 8              MR. GROW:  Okay, we could just cross them off of the

 9    exhibit, and if Your Honor wants to hand it back to me.

10              THE COURT:  Where are they?

11              MR. GROW:  They are on -- let me see, I think it's

12    maybe Exhibit A.

13              THE COURT:  Yes, Deutsche Bank National Trust?

14              MR. GROW:  That's right, 9225.

15              THE COURT:  Yes.  And if you get positive response

16    that they don't have a response to the Claim Objection, you can

17    submit something under Certification of Counsel.

18              MR. GROW:  Okay.

19              THE COURT:  All right, anything else?  Anyone wish to

20    be heard?

21              ALL:  (No verbal response).

22              THE COURT:  I'll sign the order.

23              MR. GROW:  Okay, thank you, Your Honor.  For the last

24    item on the agenda, I'm gonna hand the podium over to my

25    colleague, Sean Beach.

1          THE COURT:  All right, Mr. Beach.  Oh, Mr. Kunz, yes,

2     sir.

3          MR. KUNZ:  Your Honor, I apologize, may I please be

4     excused?

5          THE COURT:  Oh, of course, yes.

6          MR. KUNZ:  Thank you, Your Honor.

7          MR. BEACH:  Good morning, Your Honor.  May it please

8     the Court, Sean Beach on behalf of the Debtors.  Your Honor,

9     the last item on the agenda is the Application for an Increase

10    of the Fee Cap by the Borrowers' Committee, so I'll cede the

11    podium to them.

12         THE COURT:  All right, Mr. Macauley.

13         MR. MACAULEY:  Good morning, Your Honor.

14         THE COURT:  Good morning.

15         MR. MACAULEY:  Excuse me.  Thomas Macauley on behalf

16    of the Borrowers' Committee.  Your Honor, we're here on the

17    application of the Borrowers' Committee to increase the fee

18    cap.  It was an application that we filed on very short notice

19    back on January 20th.  I think it makes sense for me to --

20    notwithstanding the familiarity that Your Honor has with the

21    parties from last week, but just to sort of give us a little

22    bit of a chronology as to how we got here.

23       On October 8th was the hearing on the Motion to Appoint

24    the Borrowers' Committee, where the Court directed the

25    appointment of the Committee.  That order was entered two days

1   later on October 10th, directing the U.S. Trustee to appoint

2   the Borrowers' Committee.  On the evening of October 21st, the

3   U.S. Trustee appointed the Borrowers' Committee, and on the

4   following morning, the Court entered a supplemental order prior

5   to the first meeting of the Committee, and retention of

6   counsel.  The order was without prejudice to the rights of the

7   Borrowers' Committee to revisit the order, and the order set a

8   $250,000 cap on fees and expenses of legal professionals.  It

9   also prohibited the retention of any other professionals.

10       Now, also at that hearing, the Court set a Disclosure

11   Statement Hearing of November 25th, which came and the Court

12   approved the Disclosure Statement at that time, and set a

13   Confirmation Hearing of January 28th, which was a little --

14   actually, a little further afield than we had expected, but we

15   didn't complain at that time.

16       Fast forward, the application that we filed was on January

17   20th, by the Borrowers' Committee, to the -- to allow the

18   retention of a testifying expert, Ms. Saunders, and to increase

19   the cap on -- for fees and expenses to 400,000.  On January

20   22nd, the Court held a teleconference and allowed the retention

21   of Ms. Saunders under a $20,000 cap, and deferred the balance

22   of the application until after the Confirmation Hearing.  Now,

23   the plan was that the Debtors were gonna take three depositions

24   of the Borrower Committee witnesses prior to the hearing on the

25   28th.  On Monday the 28th, the Debtors adjourned the

1    Confirmation Hearing until February 9th.  In the next two weeks

2    there were five depositions, three of Borrower Committee

3    witnesses and two of Mr. Pasternak and Ms. Michaelis who were

4    witnesses that the Court heard at confirmation, which had not

5    previously been disclosed to the Borrowers' Committee.  And

6    then, on February 9th, the Confirmation Hearing went for three

7    days on the Borrowers' Committee objection, and at the end the

8    Court overruled the objection based on the specific record and

9    circumstances of these cases.

10        Now, at the teleconference back on the 22nd, the Court had

11   asked for some sense of the fees that the Borrowers' Committee

12   Counsel had incurred to date.  We are in the process of filing

13   some fee applications today, but I want to give Your Honor a

14   sense of where were are.  Specifically, we estimate

15   approximately 340,000 in expenses -- in fees and expenses

16   through the end of January.  That would be approximately

17   215,000 by the Gilbert Oshinsky Firm and 125,000 by my firm.

18   In February it's a little more vague, because we don't really

19   have the time, but we're estimating about 150,000 for the

20   Gilbert Oshinsky Firm, and somewhere between 50 and 75,000 for

21   my firm.  So, in total, we're looking at about 340,000 through

22   the end of January, and about 200 to 225,000 for February.

23   That would cover, effectively, fees through entry of the

24   Confirmation Order.  And, I guess, that would be fee

25   application preparation, but I would think that would be

1   somewhat minimal.  That also -- that doesn't include whatever

2   fees that Ms. Saunders incurred, but she was under a $20,000

3   cap, and I'm not aware that there was any problem with that

4   cap.

5        Now, the reason -- my sense is that the reason the Court

6   was asking about fee applications back on the teleconference on

7   the 22nd was that the Court really wasn't sure what the

8   Borrowers' Committee was doing, and wanted to get a sense from

9   at least some document as to what we were doing.  I think,

10  having had the Confirmation Hearing last week, and having seen

11  the changes that were made to the plan, I think the Court can

12  get a sense for what, you know, what the Borrowers' Committee

13  has been doing.  As far as the -- now, the Debtors filed an

14  objection, it was a joint objection by the Debtors and the

15  Creditor's Committee, to our application.  They specifically

16  talked about our efforts to obtain the SEC production, which,

17  as Your Honor may recall, was the subject of an application by

18  the Borrowers' Committee the week before confirmation, to

19  obtain those documents.  There's something -- it's -- the way I

20  read their objection, it gives you the sense that we

21  unilaterally contacted the Debtor's Regulatory Counsel.  I

22  don't know if that was really meant to be put in there, but we

23  did that at their request.  They asked us to contact Allen and

24  Overy and make arrangements.  Allen and Overy then diverted us

25  back to Young Conaway.  Then we had an issue, and that's when

1   we sought the Court's intervention.  The Court ended up denying

2   our application based on the representation by Allen and Overy

3   and by Debtor's Counsel that they had supplied my firm with a

4   large quantity of documents on the Friday before confirmation.

5   Now, Your Honor may recall that the record at confirmation

6   included two documents from the SEC production, and those two

7   documents allowed the Court to make -- to infer on the notice

8   issue that the claims of Borrowers with pay option ARMS were,

9   in fact, readily ascertainable by the Debtors.  And,

10  specifically, those documents showed that 87% of the pay option

11  ARMS were negatively amortizing, which was substantially higher

12  than the national average, and that American Home had devised a

13  new pay option ARMS product, sort of a gentler, kinder version

14  that would allow, for instance, only payments in the five-year

15  period subsequent to loan recast.  Now, the Court declined to

16  make that inference in overruling the Borrowers' Committee

17  objection.  But those documents did come from the SEC

18  production.  The Borrowers' Committee's objectives and the

19  objections that we made at the confirmation, I think, were

20  plainly tolerable and were made in good faith in the interest

21  of the Borrowers with claims in our fiduciary capacity that the

22  Committee has.  As I said, we don't anticipate any further fees

23  or expenses after entry of the Confirmation Order, aside from

24  fee application preparation.  And we request that the Court

25  remove the cap that was set forth on the November 4th order.

1  And, obviously, any fees of the Borrowers' Committee's
2  professionals are subject to further review by the parties and
3  by the Court under the Section 330 standard.
4          THE COURT:  Is the work of the Borrowers' Committee,
5  at this point, done?  I mean, are you -- I guess the short --
6  are you appealing the Confirmation Order, or --
7          MR. MACAULEY:  Your Honor, the -- two questions, I
8  guess.  One, we have -- we want to sit down with Mr. Beach
9  after the hearing, hopefully, and sort of iron out any issues
10  with respect to the Confirmation Order and the plan.  Second,
11  with respect to an appeal, we haven't had a chance to convene a
12  meeting of our Committee.  We have a meeting set up for
13  tomorrow, and, you know, we're gonna sort of tell the Committee
14  what's going on and then, you know, and then at that point --
15          THE COURT:  I understand.
16          MR. MACAULEY:  -- they can decide.
17          THE COURT:  You have spoken to your client.
18          MR. MACAULEY:  Right.
19          THE COURT:  All right, anything further?
20          MR. MACAULEY:  Nothing further, Your Honor.
21          THE COURT:  Mr. Beach, any comment?
22          MR. BEACH:  Good afternoon, Your Honor.  For the
23  record, Sean Beach from Young Conaway.  Your Honor, I think
24  we're in a very similar situation that we were a couple weeks
25  ago, and that it's premature to consider this increase in the

1    cap for the Borrowers' Committee.  Yes, we've had the
2    Confirmation Hearing; we've got some sense of the work that the
3    Borrowers' Committee has done over the last couple weeks, but
4    we still haven't seen a fee application.  They're telling us
5    now, for the first time, that it appears that they've blown the
6    $250,000 cap by more than double, in fact, quite a bit more
7    than double.  And we don't know why.  We don't know, exactly,
8    what they've done over that period of time, other than
9    preparation for the trial.  And, Your Honor, I think some of
10   the issues that they raise during trial, before trial, some of
11   the discovery that they had done may not be relevant to the
12   scope of their retention.  But again, it's difficult for us to
13   be able to assess that at this point.  And every dollar -- we
14   didn't get a clear answer as to whether these guys are done or
15   not.  I think that might go a long way in terms of determining
16   what might be an appropriate amount of money that the
17   Borrowers' Committee can be paid for fees and expenses.  But we
18   don't know if this is over.  It started out with a $250,000
19   cap, then they asked for a $400,000 increase.  Now it appears
20   as though they're asking for $585,000, but they're saying it
21   may not be done.  They're talking about negotiations on the
22   order and the plan.  I want to make it clear that we don't
23   believe that it's appropriate to negotiate the order and the
24   plan.  We're gonna work out some clarification issues, but I
25   don't expect our discussions, after this hearing, to be

1    negotiations.  I think those have been resolved by Your Honor's
2    ruling at the hearing.  So I don't anticipate that that will be
3    an extensive expense.

4         But, Your Honor, I feel like I'm arguing in a vacuum.  And
5    other than to note that every dollar that's spent by the
6    Borrowers' Committee is $3 out of every Creditor's pocket,
7    including the Borrower Creditors that have filed claims in
8    these cases.  So I do believe that we need to, first of all,
9    figure out when their work is done.  Hopefully that is very
10   soon.  Then we need to be able to see fee applications and be
11   able to ascertain whether it was appropriate what they spent
12   their money on, and within the scope of their retention.  And
13   then we can make a determination as to whether the $250,000 cap
14   is appropriate.

15             THE COURT:  Okay.

16             MR. BEACH:  Your Honor, I believe Mr. Indelicato is -
17   - wasn't able to make it down today, but I think he is on the
18   phone, so he may have comments as well.

19             THE COURT:  All right.

20             MR. INDELICATO:  I am, Your Honor.  Thank you, Mark
21   Indelicato from Hahn & Hessen on behalf of the Committee.  Your
22   Honor, I echo many of the comments made by Mr. Beach, and I
23   think as -- well, at least the parties, if not the Court, made
24   reference the last time we had this discussion.  It's very
25   difficult to view and determine the validity of an increase in

1   the cap without there having been any final fee applications,

2   or any fee applications in that matter.  What we would suggest,

3   Your Honor, is that this either be carried, or denied without

4   prejudice at -- to the time they file a final fee application,

5   when we could all really evaluate what was done and the

6   necessity for it, and then the Court can make an appropriate

7   ruling, and we could impose -- interpose an appropriate

8   objection based on the actual facts, and not our supposition.

9   After we see the documents, Your Honor, and after we see the

10  time records, we may be able to resolve this very quickly with

11  Mr. Macauley.  But asking us, in a vacuum, to agree to an

12  increase in the cap, when we have no idea what was done, how

13  the money was spent, what the issues were that were researched

14  or reviewed, the documents reviewed, so I think, Your Honor,

15  the appropriate way to respond, at least from the Creditors'

16  perspective, is until we actually have an opportunity to review

17  it, I think this is premature, since they're not gonna be paid

18  anything until a final fee app, or at least until they file a

19  fee app, that I think we should have an opportunity, before

20  we're forced to make arguments before the Court, to actually

21  see what was done and how the money was spent.  And for those

22  reasons, Your Honor, we would ask that this motion be denied.

23          THE COURT:  All right, Mr. Macauley?

24          MR. MACAULEY:  Thank you, Your Honor, Thomas Macauley

25  for the Borrowers' Committee.  With respect to the premature

1   argument, Your Honor, what Mr. Beach is saying is that they

2   want to have a chance to look at our fee applications and

3   decide whether they're appropriate, whether we worked outside

4   the scope of the order that was set forth by Your Honor, what,

5   in fact, we did during our specific time.  Your Honor, it seems

6   to me, that's a fee application process.  That's what the

7   Court's gonna do, that's what the parties are gonna do at the

8   Final Fee Application Hearing.  If Your Honor -- I mean, by

9   removing the cap, there's no -- I mean, they -- it's without

10  prejudice to any argument that they may -- that the Committee

11  or the Debtors may argue that -- to say that --

12          THE COURT:  Well --

13          MR. MACAULEY:  -- hey, they spent -- they spent too

14  much for the value that was given.  I mean, that's an -- that's

15  an argument that's made at a Fee Application Hearing.

16          THE COURT:  So your point is, why should they oppose

17  this, because it's without prejudice to their rights.  And my

18  response to that is, why are you asking for this, because it's

19  without prejudice to your rights.  Why do I need to lift the

20  cap?  I mean, you're going to file your fee apps.  Why can't I

21  just look at it when I actually have the facts in front of me?

22  I mean, I appreciate your representations as to what occurred,

23  don't get me wrong.  But my concern here is, you know -- well,

24  let's -- let me back up a minute.

25          Every professional that's hired has a fee cap.  They have

1   327A.  It's in everybody's -- or 330, excuse me.  They have 330

2   and 331 that act as a fee cap, reasonable, actual and

3   necessary, et cetera.  The Court enters a more specific fee cap

4   occasionally, and like I did in this case, and I've been

5   involved in other cases where it's been done, because you're

6   putting expenses on the estate, but for a very specific

7   purpose.  And the concern is that you can craft the order as to

8   the scope of services as narrowly as you like, but that you

9   also need, you know, the stick of a cap to hopefully discipline

10  clients and counsel as to what will or won't be compensable.

11  But even under that, even if your fee -- even if your fee

12  applications were $249,000.99, you'd still have to worry about

13  330, and that's always going to be the case.

14      The fee cap, you know, the idea is to limit the scope of

15  services and focus the scope of services on the issues that the

16  Court felt were needing further exploration and litigation, or

17  -- well, not litigation, but adversarial representation issues

18  that had arisen.  But the bullet is already out of the gun on

19  the vast majority of what you're going to do, if not

20  everything.  And, as professionals, you took client direction

21  and did the best you could on behalf of your clients, and as

22  officers of the Court, I'm sure, knowing both of you, that you

23  did your best to stay within the confines of your charge and

24  your limitations, consistent, however, with the fact that

25  clients are clients, and clients get to tell lawyers what to

1   do.

2       I'm reluctant to mess with the status quo, because the

3   status quo is what it is, and I say that saying, simply, unless

4   you think it's some sort of cloud on your representation that -

5   - what I'd like to do is get the fee applications, look at the

6   fee applications, listen to the other side, and say okay, the

7   fee applications are allowed in X amount, and that's the cap.

8   In other words, the cap goes away.  I'm a little concerned that

9   if I raise the cap today, that we could have a series of issues

10  continuing to be raised by the Borrowers' Committee that go

11  beyond the scope of their charge, continuing to increase the

12  fees and expenses to the estate, not just yours, but the

13  Committee's, the Debtor's, that have to respond to what the

14  Borrower Committee is doing.  Now, I think that, frankly, I

15  think that in consulting your client about what to do going

16  forward in connection with the Confirmation Order, that a

17  relevant inquiry for you, as part of giving that advice and

18  taking direction, is the cap that I put in place.  So I think

19  it still serves a purpose, and I'm inclined to leave it in

20  place, but without prejudice for you to come in at a Fee

21  Application Hearing and tell me look, I did all this stuff I

22  did, it was all reasonable, and it was all focused on the task

23  you set.  Look, I pulled 250, you know, not magic.  I mean, you

24  know, I pulled $250,000 out of the air, and maybe I was wrong.

25  Maybe it was way too low.  Maybe it was too high, I don't know.

1    Let's see what you did.  You presented a very professional --

2    actually all sides, an extremely professional, well-managed,

3    three-day evidentiary hearing.  And I think it's fair to say

4    that you asserted some -- I don't know if -- I don't want to

5    get into it, whether it was colorful or not, but the claims

6    were presented in a very professional manner.  Ultimately, you

7    lost, but if that's the -- if that's the measuring stick by

8    which we hold the allowance of fees, obviously, the world would

9    be a very different place.  So you've -- I've kept you from

10   interrupting me like five times, and now I'm going to let you

11   talk.  Tell me why I'm wrong.

12           MR. MACAULEY:  Your Honor, I understand your

13   thinking, but I think, if you look down the road at a fee -- at

14   a Final Fee Application Hearing, I think having the cap in

15   place makes for a more adversarial result, and I think the

16   reason is this:  I think that if you have a cap in place, there

17   is very likely no way that you're not going to have a contested

18   Final Fee Application Hearing.  Whereas, if the issue is simply

19   the amount that we spent and, you know, obviously all the

20   different 330 issues, including the scope, which, you know,

21   we're not seeking to expand the scope of what we did under the

22   terms of the order, I think it provides a playing field that is

23   much more likely to resolve in a potential resolution and a Fee

24   Application -- a Final Fee Application Hearing where the

25   parties are at least in line, and the Court is in a position

1   of, rather than deciding between the parties' positions, but
2   rather than seeing whether this makes sense.  Now, I'm making
3   no promises, but I'm just -- I'm thinking, you know, I think --
4   because -- I don't see how there's a resolution and -- I mean,
5   I -- I mean, we've seen how the Debtors and the Committees have
6   reacted to the Borrowers' Committee.  They opposed our motion
7   to appoint the Borrowers' Committee.  They opposed -- they
8   wanted to put $150,000 cap, if you recall, on our fees.  The
9   Judge made it -- you know, you made it 250.  So they're going
10  to push this issue.  I mean, there's no ifs, ands or buts about
11  it.  And so long as that cap's in place, you're gonna have a
12  contested hearing, you're gonna have more expenses expended by
13  all the parties in the case, and I don't think that's the best
14  interest of the estate.  I think if you simply look at the fee
15  applications on their face, you have the scope of the order
16  that's in -- you know, that's set forth, you have all the
17  review requirements under 330, I think that's the best way -- I
18  mean, I think we're, you know, the professionals are all
19  reasonable people.  I think that's the best way to get to the
20  result that's most efficient for the estate.
21              THE COURT:  All right.  Well, I respectfully
22  disagree, Mr. Macauley, and I'm going to deny your relief
23  without prejudice, and I will hear it again at the hearing on
24  the Final Fee Application.
25              MR. MACAULEY:  Okay.

1          THE COURT:  And, you know, if you talk me into it

2    then, you talk me into it then.  I'm not saying one way or the

3    other.  I feel very strongly, I simply don't have the facts in

4    front of me to make an informed decision to change my previous

5    decision, and I'm -- and I don't think the Committee and the

6    Debtor have that information as of now.  And I don't agree with

7    you that they're going to oppose you simply because they have

8    the hammer of the -- the other hammer, you know, one more tool

9    in their arsenal, or weapon in their arsenal -- I'm mixing my

10   metaphors -- to fight you with.  That's not been my impression

11   of this Committee and their professionals and this Debtor and

12   their professionals, but I've been wrong before.  So we'll

13   await circumstances.  I'm going to deny the application without

14   prejudice.  And no need to resubmit it.  I'll just -- I'll hear

15   it in the context of the Final Fee Application process, okay?

16          MR. MACAULEY:  Very well, thank you, Your Honor.

17          THE COURT:  You're welcome.

18          MR. BEACH:  Your Honor, if I may, the agenda's

19   concluded, but I did have one housekeeping matter.  As Your

20   Honor heard, we are still working on the Confirmation Order;

21   hope to submit that shortly to Your Honor.  But we do want to

22   make, or put a finding in the order, and I just wanted to see

23   if I could get a clarification on one point.  My notes indicate

24   that, with respect to the notice issue, Your Honor used

25   reasonably foreseeable in terms of a portion of the ruling, and

1  my understanding of that was you were saying that even if we

2  used a reasonably foreseeable standard instead of the 3rd

3  Circuit's standard in Chemetron, which is reasonably

4  ascertainable to the Debtors, that these Creditors still --

5  these Borrowers still wouldn't be known Creditors.  So I wanted

6  to put that finding in the order, but I did want to just raise

7  the issue with Your Honor.

8           THE COURT:  That's not what I meant.  I meant

9  reasonably -- I meant the Chemetron test.

10          MR. BEACH:  Okay.

11          THE COURT:  I may have -- I probably confused whether

12  reasonably ascertainable and reasonably foreseeable were the

13  appropriate -- I think they're synonyms.  I mean, I find no --

14  see a difference between ascertainable and foreseeable.

15  Something that's foreseeable is ascertainable.

16          MR. BEACH:  Understood, Your Honor.  There is

17  nuances, in fact, in the Chemetron case.  They do talk about

18  reasonably foreseeable as potentially being a more open-ended

19  test and a difficult test for Borrowers to -- or for Debtors to

20  be able to comply with, and so they rejected that should have

21  known or reasonably foreseeable standard in that case.  So I

22  only wanted to just get the clarification from Your Honor in

23  terms of being able to put the finding in the order.  I --

24          THE COURT:  So what's -- I'll tell you what.  Put it

25  -- give me two, when you send it over.

 1                MR. BEACH:  Okay, and --

 2                THE COURT:  Just give me one with it and one without

 3    it, and talk -- you can talk about it in the certification.

 4                MR. BEACH:  Okay, would you like --

 5                THE COURT:  Because I don't -- that was how many days

 6    ago?  That was -- I don't --

 7                MR. BEACH:  It was --

 8                THE COURT:  Wednesday last week?

 9                MR. BEACH:  Yeah, almost a week ago.  Would you like

10    me to just attach a copy of that Chemetron case as well, as

11    a --

12                THE COURT:  I have it here somewhere.

13                MR. BEACH:  Okay.

14                THE COURT:  But, yes, that'd be helpful to not make

15    me look for it again.

16                MR. BEACH:  Okay, thank you, Your Honor.

17                THE COURT:  What I was thinking of, at one point we

18    were talking about timing.  I did say that I think the timing

19    didn't matter, because I thought you got the same result if you

20    looked as of the petition date or as of the bar date order or

21    as of the bar date or as of the Confirmation Hearing, as to

22    whether those claims were reasonably ascertainable

23    {slash}/foreseeable, that that didn't matter, that I found and

24    believe that there's no different result in determining whether

25    the claims are reasonably foreseeable or ascertainable,

1  depending on timing, and in any of those timeframes, I found

2  that they were not.  I don't remember confusing ascertainable

3  from -- with foreseeable, but it's certainly quite possible.  I

4  meant to apply the Chemetron --

5            MR. BEACH:  Okay.

6            THE COURT:  -- test.

7            MR. BEACH:  Yeah, it could be that my notes were -- I

8  was taking notes --

9            THE COURT:  Well, you kept saying that -- they kept

10 saying reasonably foreseeable, and you kept saying reasonably

11 ascertainable, I know that.

12           MR. BEACH:  Yeah, and I think at the end of the day,

13 they ultimately agreed that the standard is reasonably

14 ascertainable, but my argument was that they were still arguing

15 a foreseeable standard at the end of the day.

16           THE COURT:  I understand.

17           MR. BEACH:  But anyway, Your Honor, we will submit --

18 for the most part, we're not gonna put all the findings in the

19 Confirmation Order.  I did just want to put that standard in

20 there and make sure I got the clarification from the Court.

21 Otherwise we'll -- you know, we'll just say that the findings

22 are as set forth on the record, at the hearing.

23           THE COURT:  Okay.

24           MR. BEACH:  Thank you, Your Honor.

25           THE COURT:  You're welcome.  Anything further?

32

1                    ALL:   (No verbal response).

2                    THE COURT:  All right, hearing adjourned.

3           (Court adjourned)

4

5                         CERTIFICATION
6    I certify that the foregoing is a correct transcript from the
7    electronic sound recording of the proceedings in the above-
8    entitled matter.
9

10   *Lewis Parham*                          10/22/09

11   _____       _____
12   Signature of Transcriber                Date