# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al., | Case No. 07-11047 (CSS) |
| Debtors. | Jointly Administered |
|  | Docket Ref. No. 8101 |
|  | Hearing Date: November 13, 2009 at 2:00 p.m. |
|  | Objection Deadline: November 6, 2009 at 4:00 p.m. |

## DEBTORS' (I) LIMITED OBJECTION TO MOTION OF PARK NATIONAL BANK FOR LIFTING THE AUTOMATIC STAY, OBJECTING TO DEBTOR'S USE OF CASH COLLATERAL, AND REQUESTING ADEQUATE PROTECTION AND (II) REQUEST FOR ALLOWANCE AND PAYMENT OF SECTION 506(c) CLAIM

The debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors"), by and through their undersigned counsel, hereby submit this (i) limited objection (the "Objection") to the *Motion of Park National Bank for Lifting the Automatic Stay, Objecting to Debtor's Use of Cash Collateral, and Requesting Adequate Protection* [D.I. 8101] (the "Motion to Lift Stay") and (ii) request (the "Request" and together with the Objection, "the Response") for allowance and payment of a claim pursuant to section 506(c) of title 11 of the United States Code (the "Bankruptcy Code") in the amount of $274,920.36 (the "Section 506(c) Claim"). In support of this Response, the Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

1. Although the Motion to Lift Stay on its face appears to be a typical and straightforward stay relief motion, it presents different and significant issues than those normally encountered in such motions. The primary significant issue that makes the Motion to Lift Stay atypical is the potential adverse effect of granting the Motion to Lift Stay prior to a determination of the Debtors' Request for allowance and payment of the Section 506(c) Claim. Put differently,

granting the Motion to Lift Stay prior to adjudicating the Section 506(c) Claim may deprive the Debtors' estates of valuable rights.

2. These valuable rights inure to the Debtors by virtue of the fact that they have spent approximately $611,000 to preserve the value of the collateral that is the subject of the Motion to Lift Stay, including $274,920.36 on account of *ad valorem* property taxes alone. Although section 506(c) of the Bankruptcy Code affords the Debtors the right to seek reimbursement of the entire $611,000 amount, the Debtors are only requesting the recovery the *ad valorem* property tax payments in the amount $274,920.36.

3. The Debtors' rights to recover the *ad valorem* property taxes in the amount of $274,920.36 is clearly and unequivocally afforded by the plain language of section 506(c) of the Bankruptcy Code. This clear and equivocal right is the result of the amendment to section 506(c) in 2005. Specifically, in 2005, Congress amended section 506(c) of the Bankruptcy Code, to provide "for the payment of all *ad valorem* property taxes" with respect to real property serving as collateral. 11 U.S.C. § 506(c). Accordingly, the Debtors are entitled to recover $274,920.36 from Park National as reasonable and necessary expenses for the benefit of their estates under section 506(c) of the Bankruptcy Code.

## GENERAL BACKGROUND

4. On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors have continued in possession of their properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5. An official committee of unsecured creditors (the "Committee") was appointed on August 14, 2007, and an official committee of borrowers (the "Borrowers Committee") was appointed on October 21, 2008. No trustee or examiner has been appointed.

6. The Debtors filed an Amended Chapter 11 Plan of Liquidation (as amended, supplemented and/or modified, the "Plan") with the Court on November 25, 2008. The Court entered an order confirming the Plan on February 23, 2009 [D.I. 7042].

**RELEVANT BACKGROUND**

7. In connection with the Debtors' efforts to maximize the value of their assets, the Debtors retained CB Richard Ellis, Inc. ("CBRE") as their real estate broker to market the real property located at 950 North Elmhurst Road/150 West Rand Road, Mount Prospect, Illinois (the "Property"). CBRE's retention by the Debtors was approved by entry of an Order dated March 11, 2008 [D.I. 3223] and the term of the engagement agreement was subsequently extended by Order appearing at Docket No. 6659.

8. Following approval of its retention, CBRE extensively marketed the Property. CBRE completed blast email marketing campaigns beginning on or about May 1, 2008 to an exclusive mailing list compiled by CBRE's Private Client Group to solicit interest in the Property. In addition to the blast email campaigns, CBRE erected a sign on the Property, made numerous telephone calls, cooperated with other brokers and gave tours of the Property. CBRE also distributed an offering memorandum as part of its blast email campaigns.

9. In late July, 2008, the Debtors entered into a letter of intent with an interested party for the sale of the Property and for the assignment of the accompanying leases. However, despite the Debtors' best efforts to finalize a purchase agreement with that party, the

Debtors reached an impasse over certain terms and conditions of the agreement. As a result, the Debtors determined not to proceed with the proposed transaction.

10. The Debtors, again with the assistance of CBRE, continued marketing the Property and the leases in an effort to maximize the value of the Property. The Debtors received an offer from The Equitable Funds LLC ("Equitable Funds") for the Property and for the assignment of the leases. After receiving that offer, the Debtors and Equitable Funds engaged in active negotiations concerning the terms and conditions of the sale. On April 13, 2009, the Debtors sent a letter of direction to North Star Trust Company, as successor-trustee to Park National Bank and Trust Company of Chicago, as legal owner of the Property ("Park National"), to execute a purchase agreement. On April 17, 2009, AHM Corp., Park National and Equitable Funds executed a purchase agreement. Shortly thereafter, on April 30, 2009, the Debtors filed a motion for authority to sell the Property (the "Sale Motion").

11. Unfortunately, the second sale attempt also was unsuccessful. Equitable Funds, after further diligence, advised the Debtors that it would not proceed with the sale under the terms of the purchase agreement that was the subject of the Sale Motion. Instead, Equitable Funds offered to purchase the Property at a significantly reduced amount. So significantly reduced that it was lower than the outstanding amount of the mortgage on the Property held by Park National. The Debtors attempted to further negotiate the terms of the sale with the Equitable Funds and instituted a further marketing campaign, but neither effort produced an offer for the Property that exceeded the amount owed to Park National on the mortgage. Accordingly, the Debtors withdrew the Sale Motion on August 6, 2009 [D.I. 7903].

## RESPONSE

12. By this Response, the Debtors request entry of an order (i) denying the Motion to Lift Stay for such period of time as is necessary to allow for the determination of the Debtors' Section 506(c) Claim;[1] and (ii) granting the allowance and payment of the Section 506(c) Claim in the amount of $274,920.36.

### I. Objection – Park National Has Not Met Its Burden To Obtain Relief From the Automatic Stay

13. The purpose of the automatic stay provided under section 362 of the Bankruptcy Code is three-fold: "to prevent certain creditors from gaining a preference for their claims against the debtor; to forestall the depletion of the debtor's assets due to legal costs in defending proceedings against it; and, in general, to avoid interference with the orderly liquidation or rehabilitation of the debtor." *Borman v. Raymark Ind., Inc.*, 946 F.2d 1031, 1036 (3d Cir. 1991) (quoting *St. Croix Condominium Owners v. St. Croix Hotel*, 682 F.2d 446, 448 (3d Cir. 1982)).

14. Section 362(d)(1) of the Bankruptcy Code permits the Court to grant relief from the automatic stay "for cause." 11 U.S.C. § 362. "To establish cause, the party seeking relief from the stay must show that 'the balance of hardships from not obtaining relief tips significantly in [its] favor.'" *In re American Classic Voyages, Co.*, 298 B.R. 222, 225 (D. Del. 2003) (quoting *In re FRG*, 115 B.R. 72, 74 (E.D. Pa. 1990) (emphasis added, editing in *American Classic Voyages*)). "The term 'cause' as used in section 362(d) has no obvious definition and is determined on a case-by-case basis." *In re Integrated Health Services, Inc.*, 2000 Bankr. LEXIS 1319, *4-5 (Bankr. D. Del. 2000) (Walrath, J.); *In re Lincoln*, 264 B.R 370,

---

[1] The Debtors would not object to the entry of an order granting the Motion to Lift Stay if such order expressly provided that the relief granted to Park National would not prejudice, waive, modify or nullify the Debtors' rights under section 506(c) of the Bankruptcy Code to request and obtain the reimbursement of the *ad valorem* property taxes.

372 (Bankr. E.D. Pa. 2001)("Each request for relief for "cause" under [section] 362(d)(1) must be considered on its own facts.").

15. The appropriate standard to determine cause is a three-part balancing test: (1) whether allowing litigation that is subjected to the stay, if any, to continue in another forum will result in any great prejudice to the debtor; (2) whether maintaining the stay will cause any hardship to the non-bankrupt party and whether this hardship is greater than the resulting prejudice to the debtor; and (3) whether the non-bankrupt party has a probability of prevailing on the merits of any litigation that is resumed as a result of the lifting of the stay. *See In re Rexene Products, Co.*, 141 B.R. 574, 576 (Bankr. D. Del. 1992). The most important factor to consider when addressing whether to lift the automatic stay is the effect on the administration of the Debtors' chapter 11 cases. *See In re Curtis*, 40 B.R. 795, 806 (Bankr. D. Utah 1984); *In re Towner Petroleum Co.*, 48 B.R. 182, 191 (Bankr. W.D. Okla. 1985) ("Even slight interference with administration may be sufficient..."); *see also In re Penn-Dixie Industries, Inc.*, 6 B.R. 832, 836 (Bankr. S.D.N.Y. 1980) ("Interference by creditors in the administration of the estate, no matter how small, through the continuance of a preliminary skirmish in a suit outside the Bankruptcy Court is prohibited.").

16. Although Park National would likely be entitled to foreclose on the Property if the automatic stay were lifted, lifting the automatic stay at this time would cause a hardship on the Debtors that is greater than the hardship imposed on Park National by maintaining the stay. Park National has not alleged facts evidencing that the Property will continue to deteriorate in value following the filing of the Motion to Lift Stay. Instead, Park National has simply alleged that the Property has significantly decreased in value between August 2007 and July 3, 2009. *See* Motion to Lift Stay, ¶¶ 13-14. Moreover, Park National has

not alleged a reason for this depreciation apart from a terse reference to the "downward trend in the values of commercial real estate" during this period. *Id.* at ¶ 14. Thus, Park National has not alleged what, if any, significant detriment it will suffer if the Motion to Lift Stay is held in abeyance pending final judgment on the Section 506(c) Claim.

17.  Lifting the stay, by contrast, may dispossess the Debtors of significant rights afforded to them under section 506(c) of the Bankruptcy Code and runs the risk of having a negative effect on the administration of the Debtors' chapter 11 cases.[2] If the Motion to Lift Stay is granted, and if the Court subsequently determines that the Section 506(c) Claim is somehow extinguished upon foreclosure or similar action by Park National, then the Debtors' estates would suffer the loss of a valuable asset.

18.  The Motion to Lift Stay is also flawed to the extent that it advances the notion that diminution in the value of the Property between the Petition Date and the date of the Motion to Lift Stay, if established, would demonstrate Park National's lack of adequate protection and, thus, "cause" for relief from the stay. It is well-established that "adequate protection may only be awarded from the date movants seek relief" under section 362(d)(1) and/or section 363(e). *In re Continental Airlines*, 146 B.R. 536, 539-40 (Bankr. D. Del. 1992) (citing *In re Best Prods. Co.*, 138 B.R. 155 (Bankr. S.D.N.Y. 1992)); *see In re Wilson*, 70 B.R. 46, 48 (Bankr. N.D. Ill. 1987). Accordingly, for adequate protection purposes, a secured creditor's lien in collateral is appropriately valued as of the date of the adequate protection request (as opposed to the bankruptcy filing date), and the creditor is only entitled to receive adequate protection of its lien against subsequent decline in value (as opposed to all post-petition decline in value). *Id.* The benefits of this bright-line rule are twofold: "First, the rule does not

---

[2] The Debtors believe that the Section 506(c) Claim would survive following the termination of the automatic stay. However, because it appears that no court in this District has addressed the question of whether a debtor's 506(c) rights survive the surrender of the collateral, the Debtors object to the Motion to Lift Stay.

reward the creditor for inaction . . . . Second, th[e] rule puts the debtor on notice at the time the creditor's motion is filed that at a future point in time the collateral will have to be relinquished or payments will have to be made." *In re Wilson*, 70 B.R. at 48.

19.     Yet another defect with the Motion to Lift Stay is that diminution in value of collateral is only sufficient to establish cause for relief from stay where the movant is undersecured. *See In re Morysville Body Works, Inc.*, 86 B.R. 51, 57 (Bankr. E.D. Pa. 1988) (no prima facie cause where creditor failed to establish insufficiency of equity cushion); *In re Jug End in Berkshires, Inc.*, 46 B.R. 892, 900 (Bankr. D. Mass. 1985) (burden shifts to debtor where creditor establishes "prima facie case under § 362(d)(1) of an inadequate equity cushion"); *In re Kane*, 27 B.R. 902, 905 (Bankr. M.D. Pa. 1983) (prima facie cause requires showing the equity cushion is inadequate). Although Park National may be undersecured, it purports to have an equity cushion of approximately 31% in the Motion to Lift Stay. *See* Motion to Lift Stay, ¶ 26. Thus, to the extent Park National is oversecured, the Motion to Lift Stay should be denied absent some other showing why cause exists to lift the stay.

20.     Park National's objection to the Debtors' alleged use of cash collateral and its accompanying request for adequate protection also misses the mark. The Debtors have been using the rent proceeds Park National claims as cash collateral to preserve the value of the Property. During the previous six months (from May to October 27, 2009), for instance, total rent collections from the Property aggregated to $83,500. During this same period, however, the Debtors incurred $108,031.08 in expenses relating to preservation of the Property. A summary of the expenses incurred and paid by the Debtors during the chapter 11 cases related to the Property, including the ad valorem tax payments, is attached hereto as <u>Exhibit A</u>.

21. As the above figures illustrate, the rents collected by the Debtors from the Property are less than the amounts reasonably necessary to maintain and preserve the Property. Furthermore, these expenses continue to accrue. For example, the Debtors were recently required to install a new heating/cooling unit for the Property at a cost of approximately $17,000.

22. Accordingly, there has been no dissipation of Park National's interest in the rents that was not for Park National's benefit. Nevertheless, the Debtors are willing to provide Park National with an accounting of all rents collected from the Property and all funds expended by the Debtors to preserve and maintain the Property until the Section 506(c) Claim is fully adjudicated.

## II. The Debtors Are Entitled to the Section 506(c) Claim

23. Park National seeks to avoid the potential imposition on the Debtors' section 506(c) rights discussed above by denying the Debtors' entitlement to reimbursement under section 506(c) of the Bankruptcy Code in the Motion to Lift Stay. Both the plain language of section 506(c) and applicable Third Circuit case law, however, clearly provide that the Debtors are entitled to allowance and payment of the Section 506(c) Claim against Park National.

24. The Debtors have expended over $611,000 on expenses associated with preserving the Property since the Petition Date. Included in this figure is $274,920.36 the Debtors paid for the benefit of Park National on account of the *ad valorem* property taxes (the "Property Taxes") assessed against the Property, which is the basis of the Section 506(c) Claim.

25. The Debtors, by the express and clear provisions of section 506(c), are entitled to reimbursement from Park National for the amount of the Property Taxes. Prior to the enactment of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

("BAPCPA"), there was a split of authority regarding whether a debtor or trustee was entitled to recover property taxes paid on account of real property securing an allowed claim under section 506(c) of the Bankruptcy Code. During this time, the U.S. Court of Appeals for the Third Circuit held in *Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp.*, 884 F.2d 80, 84 (3d Cir. 1989), that such "[t]axes not secured by liens may also be payable by the secured creditor under section 506." *Id.* For this to be the case, the Third Circuit held that section 506(c) required "a two-step inquiry" addressing (1) "whether the taxes are reasonable, necessary costs and expenses of preserving or disposing of the property" and (2) "whether they benefit the secured creditors." *Id.*

26.     BAPCPA amended section 506(c) by adding "including the payment of *all* ad valorem property taxes with respect to the property" to the end of section 506(c) (emphasis added). Section 506(c) now provides, in its entirety:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of *all* ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c) (emphasis added).[3]

27.     Consequently, section 506(c) expressly entitles a debtor or trustee to reimbursement of "all" *ad valorem* property taxes paid with respect to property securing an allowed, secured claim for the benefit of its holder, such as Park National. Through this amendment, Congress effectively adopted those pre-2005 cases holding that the payment of such taxes are actual necessary expenses of preserving a secured creditor's collateral. Moreover, the inclusion of the word "all" dispenses with the need for a case-by-case examination of whether *ad*

---

[3] Pursuant to section 1107(a) of the Bankruptcy Code, the Debtors are granted the powers of a trustee and thus may receive a reimbursement under section 506(c) on the same terms as a trustee.

*valorem* property tax payments were reasonable and necessary for the preservation of the collateral. Reading the new language of section 506(c) to say that Congress only intended to clarify that such taxes could be recovered in some instances would be to read the word "all" out of the statute.[4]

28. Rather than acknowledge this significant change in the law, Park National continues to cite pre-2005 cases for the proposition that "the payment of real estate taxes provides only potentially incidental and not direct benefit as required by 506(c)." *See* Motion to Lift Stay, n. 7 (citing *United Jersey Bank v. Miller (In re C.S. Associates)*, 29 F.3d 903, 906-07 (3d Cir. 1994) and *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Industries, Inc.)*, 57 F.3d 321, 326 (3d Cir. 1995).

29. Aside from these cases no longer being applicable, Park National misstates their holdings. *C.S. Associates* does not stand for the proposition that real property

---

[4] To the extent that the two-step inquiry set forth by the Third Circuit in *Equibank* continues to be necessary despite the plain language of section 506(c), the Debtors are entitled to the Section 506(c) Claim because the taxes paid by the Debtors were reasonable, necessary costs and expenses of preserving of the Property and served to benefit Park National. Indeed, the importance of these tax payments to Park National is readily apparent from the fact that Park National required real estate tax escrow payments. In forcing the Debtors to make these property tax payments, Park National clearly viewed payment of the Property Taxes as an important act of preserving its collateral that it did not wish to leave to Debtors' business judgment. Requiring the Debtors to make the property tax payments should foreclose any argument that the Property Taxes were not paid for the benefit of Park National.

Moreover, the mere fact that Park National claims to be oversecured in the Property and may obtain full satisfaction of its claim upon a sale regardless of whether the Debtors paid the Property Taxes does not mean it derived no benefit from the payment of the Property Taxes by the Debtors. At the time Property Taxes such as those in this case are paid, no party can calculate with absolute certainty whether a secured creditor will continue to be oversecured in the future. Therefore, payment of such taxes provides a creditor with a security interest in real property a form of prospective value, at a minimum: the payments essentially insure against any potential diminution in the value of the property securing the creditor's claim.

This all assumes, of course, that Park National is oversecured in the Property. Under the facts of this case and applicable law, however, this assumption does not appear to hold true. Despite the extensive marketing and sales efforts discussed above, the last offer received by the Debtors for the Property was less than the balance due to Park National on the note secured by the Property. As this Court has noted previously in this very case, value is best viewed as "what one could buy or sell the asset for in the marketplace." *In re Am. Home Mortg. Holdings, Inc.*, 2009 Bankr. LEXIS 2527, at *24 (Bankr. D. Del. Sept. 8, 2009). Thus, it appears that, at the current time, Park National is undersecured. This is compounded by the fact that, under Illinois law, a tax lien on the Property would constitute a prior and first lien on the Property, superior to all other liens and encumbrances, from and including the first day of January in the year in which the taxes are levied until the taxes are paid or until the Property is sold. 35 ILL. Comp. Stat. 200/21-75.

taxes cannot be surcharged by a debtor pursuant to section 506(c). It instead simply held that a city was not entitled to direct payment of property taxes by a secured creditor where the claimed benefit to the secured creditor was municipal services that preserved the secured property in the course of preserving all property within the jurisdiction (*i.e.*, fire and police services). *C.S. Associates*, 29 F.3d at 908. Likewise, the Third Circuit Panel in *Visual Industries* framed the issue before them as the following: "Does 11 U.S.C. § 506(c) authorize payment to trade creditors who furnish raw materials to a Chapter 11 debtor thereby maintaining the debtor's operation, where the materials supplied did not directly benefit the secured creditor's property?" *Visual Industries*, 57 F.3d at 323. In short, neither case involved the reimbursement of property taxes paid by a debtor.[5]

30. Finally, the Property Taxes are not the only expenses Debtors are entitled to recover under section 506(c) of the Bankruptcy Code. As stated above, numerous other expenses were necessary for preserving the value of, and continuing operations at, the Property. In addition to the $274,920.36 expended by the Debtors for payment of the Property Taxes on the Property, including approximately $246,000 for office maintenance, and approximately $91,000 for utility expenses paid through October 27, 2009.

31. In summation, Park National bears the burden of demonstrating that cause exists to modify the automatic stay and has not asserted or otherwise presented any facts showing that the burden they would suffer from maintaining the automatic stay as to the Property is greater than the hardship the Debtors will suffer if their 506(c) rights are later found to be dispossessed when Park National asserts its rights over the Property.

---

[5] Park National also appears to contend that the Debtors are not entitled to section 506(c) reimbursement because "they did not sell the Property so as to pay off the Mortgage." Motion to Lift Stay, n. 7. This argument overlooks the plain language of section 506(c), which provides a debtor may recover the cost of "preserving, or disposing of" collateral. *See* 11 U.S.C. § 506(c) (emphasis added). The Property need not be sold in order for the Debtors to be reimbursed expenses obtained in the course of preserving it.

## NOTICE

32. Notice of this Response has been provided to: (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the Borrowers Committee; (iv) counsel to Park National; and (v) all parties entitled to notice under Bankr. Del. L.R. 2002-1(b). In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court (i) deny the Motion to Lift Stay pending determination of the Debtors' Section 506(c) Claim; and (ii) enter an order, substantially in the form annexed hereto as Exhibit B, that grants the allowance and directs the payment of the Section 506(c) Claim to the Debtors in the amount of $274,920.36.

Dated: Wilmington, Delaware
       October 28, 2009

                        YOUNG CONAWAY STARGATT & TAYLOR, LLP

                        */s/ Justin H. Rucki*
                        Sean M. Beach (No. 4070)
                        Sharon M. Zieg (No. 4196)
                        Matthew B. Lunn (No. 4119)
                        Justin H. Rucki (No. 5304)
                        The Brandywine Building
                        1000 West Street, 17th Floor
                        Wilmington, Delaware 19801
                        Telephone: (302) 571-6600
                        Facsimile: (302) 571-1253

                        Counsel for Debtors and Debtors in Possession