**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

------------------------------------------------------------- x

In re:

AMERICAN HOME MORTGAGE
HOLDINGS, INC., a Delaware corporation, et al.,

    Debtors.

------------------------------------------------------------- x

Chapter 11

Case No. 07-11047 (CSS)

Jointly Administered

**Hearing Date:  December 14, 2009 at 11:30 a.m..**
**Objection Deadline:  December 7, 2009 at 4:00 p.m.**

**MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 365 AND 554**
**AUTHORIZING (I) THE ABANDONMENT OF CERTAIN REAL PROPERTY AND (II)**
**THE REJECTION OF AGREEMENTS RELATED THERETO**

    The debtors and debtors in possession in the above-captioned cases (collectively,

the "Debtors"), by and through their counsel, hereby submit this motion (the "Motion") for entry

of the proposed order (the "Proposed Order"), pursuant to sections 105, 365, and 554 of title 11

of the United States Code (the "Bankruptcy Code"), (i) authorizing the Debtors to abandon

certain real property located at 950 North Elmhurst Road/150 West Rand Road, Mount Prospect,

Illinois (the "Property"), and (ii) authorizing and approving the rejection of certain unexpired

nonresidential real property leases identified on Exhibit A to the Proposed Order (collectively,

the "Rejected Agreements").  In support of the Motion, the Debtors respectfully represent and

state as follows:

## JURISDICTION

    1.    The Court has jurisdiction to consider this Motion pursuant to 28 U.S.C.

§§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these

cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The

statutory predicates for the relief requested herein are sections 105, 365 and 554 of the

Bankruptcy Code, as complimented by Rule 6007 of the Federal Rules of Bankruptcy Procedure.

## GENERAL BACKGROUND

2.      On August 6, 2007 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in possession of their properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      An official committee of unsecured creditors (the "<u>Committee</u>") was appointed on August 14, 2007, and an official committee of borrowers (the "<u>Borrowers Committee</u>") was appointed on October 21, 2008.  No trustee or examiner has been appointed.

4.      The Debtors filed an Amended Chapter 11 Plan of Liquidation (as amended, supplemented and/or modified, the "<u>Plan</u>") with the Court on November 25, 2008. The Court entered an order confirming the Plan on February 23, 2009 [D.I. 7042].

## RELEVANT BACKGROUND

5.      In connection with the Debtors' efforts to maximize the value of their assets, the Debtors retained CB Richard Ellis, Inc. ("<u>CBRE</u>") as their real estate broker to market the Property.  CBRE's retention by the Debtors was approved by entry of an Order dated March 11, 2008 [D.I. 3223] and the term of the engagement agreement was subsequently extended by Order appearing at Docket No. 6659.

6.      Following approval of its retention, CBRE extensively marketed the Property.  CBRE completed blast email marketing campaigns beginning on or about May 1, 2008 to an exclusive mailing list compiled by CBRE's Private Client Group to solicit interest in the Property.  In addition to the blast email campaigns, CBRE erected a sign on the Property, made numerous telephone calls, cooperated with other brokers and gave tours of the Property. CBRE also distributed an offering memorandum as part of its blast email campaigns.

7.    In late July, 2008, the Debtors entered into a letter of intent with an interested party for the sale of the Property and for the assignment of the accompanying leases. However, despite the Debtors' best efforts to finalize a purchase agreement with that party, the Debtors reached an impasse over certain terms and conditions of the agreement. As a result, the Debtors determined not to proceed with the proposed transaction.

8.    The Debtors, again with the assistance of CBRE, continued marketing the Property and the leases in an effort to maximize the value of the Property. The Debtors received an offer from The Equitable Funds LLC ("Equitable Funds") for the Property and for the assignment of the leases. After receiving that offer, the Debtors and Equitable Funds engaged in active negotiations concerning the terms and conditions of the sale. On April 13, 2009, the Debtors sent a letter of direction to North Star Trust Company, as successor-trustee to Park National Bank and Trust Company of Chicago, as legal owner of the Property ("Park National"), to execute a purchase agreement. On April 17, 2009, AHM Corp., Park National and Equitable Funds executed a purchase agreement. Shortly thereafter, on April 30, 2009, the Debtors filed a motion for authority to sell the Property (the "Sale Motion").

9.    Unfortunately, the second sale attempt also was unsuccessful. Equitable Funds, after further diligence, advised the Debtors that it would not proceed with the sale under the terms of the purchase agreement that was the subject of the Sale Motion. Instead, Equitable Funds offered to purchase the Property at a significantly reduced amount. So significantly reduced that it was approximately equal to the outstanding amount of the mortgage on the Property held by Park National Bank ("Park National"). The Debtors attempted to further negotiate the terms of the sale with the Equitable Funds and instituted a further marketing campaign, but neither effort produced an offer for the Property that exceeded the amount owed to

Park National on the mortgage. Accordingly, the Debtors withdrew the Sale Motion on August 6, 2009 [D.I. 7903].

10.     Following these unsuccessful sale attempts, the Debtors have continued to operate the Property and lease portions of it to several tenants. The rents collected by the Debtors from the Property are less than the amounts reasonably necessary to maintain and preserve the Property, however. During the previous six months (from May to October 27, 2009), for instance, total rent collections from the Property aggregated to $83,500. During this same period, however, the Debtors incurred $108,031.08 in expenses relating to preservation of the Property. A summary of the expenses incurred and paid by the Debtors during the chapter 11 cases related to the Property is attached hereto as Exhibit A to this Motion.

11.     As the above figures illustrate, maintaining ownership of the Property is resulting in a net loss each month, thus reducing the value of the Debtors' estates. Furthermore, the expenses associated with the Property continue to accrue. For example, the Debtors were recently required to install a new heating/cooling unit for the Property at a cost of approximately $17,000.

12.     On September 28, 2009, Park National filed its Motion of Park National Bank for Lifting the Automatic Stay, Objecting to Debtor's Use of Cash Collateral, and Requesting Adequate Protection [D.I. 8101]. The Debtors filed limited objection to that motion on October 28, 2009 [D.I. 8226] in order to ensure that certain rights they enjoy under section 506(c) of the Bankruptcy Code were not prejudiced. The Debtors and Park National have agreed to the modification of the automatic stay to allow Park National to foreclose on the Property, while preserving the Debtors' claim against Park National under section 506(c) of the Bankruptcy Code.

**RELIEF REQUESTED**

13.     By this Motion, the Debtors request entry of an order, pursuant to sections

105, 365, and 554 of the Bankruptcy Code, authorizing the Debtors to abandon the Property and

reject the Rejected Agreements, effective as of December 31, 2009.[1]

**BASIS FOR RELIEF**

A.     **Abandonment of the Property**

14.     Section 554 of the Bankruptcy Code provides that "[a]fter notice and a

hearing, the trustee may abandon any property of the estate that is burdensome to the estate or

that is of inconsequential value and benefit to the estate." Additionally, section 105(a) of the

Bankruptcy Code provides, in pertinent part, that "[t]he court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of this title." The purpose

of section 105(a) of the Bankruptcy Code is "to assure the bankruptcy courts power to take

whatever action is appropriate or necessary in aid of the exercise of their jurisdiction." 2 Collier

on Bankruptcy, ¶ 105.01 at 105-6 (15th ed. rev. 1999).

15.     Courts should apply the business judgment standard in reviewing a

debtor's decision to abandon property. See In re Slack, 290 B.R. 282, 284 (Bankr. D.N.J. 2003)

("The trustee's power to abandon property is discretionary. . . . The court only needs to find the

trustee made: 1) a business judgment; 2) in good faith; 3) upon some reasonable basis; and 4)

within the trustee's scope of authority.") (internal citations omitted). A debtor need only make a

business judgment that the property to be abandoned is *either* "burdensome to the estate" *or* "of

inconsequential value and benefit to the estate." Reich v. Burke (In re Reich), 54 B.R. 995, 1004

---

[1]  The Debtors reserve their rights to argue that any claim for damages arising from the rejection
of the Rejected Agreements is limited to the remedies available under any applicable termination
provision of such Rejected Agreement.

(Bankr. E.D. Mich. 1985) ("[I]f a trustee feels an asset is of inconsequential value and benefit to the estate *or* that it is 'burdensome to the estate,' he may abandon it." (emphasis in original)).

16.     Simply put, given the Debtors' failed sale efforts with respect to the Property, the Debtors consenting to Park National's request relief from stay, and the current facts and circumstances of these cases, the abandonment of the Property is warranted under sections 105 and 554(a) of the Bankruptcy Code. The Property has become burdensome to the Debtors. Maintaining ownership of the Property is resulting in a net decrease in the value of the Debtors' estates each month because the costs of maintaining the Property accrue in excess of rent, and the expenses associated with the Property continue to accrue.

17.     The Debtors attempted over the course of the past couple of years to sell the Property. However, those efforts were unsuccessful. The Debtors have consented to relief from the automatic stay, provided that it did not waive or otherwise jeopardize the Debtors' requested section 506(c) claim against Park National, and understand that Park National is in the process of appointing a receiver. As a result, the Property is also of inconsequential value to the Debtors' estates.

18.     Accordingly, based on the foregoing, the Debtors' decision to abandon the Property, which is burdensome and of inconsequential value, should be approved and the Debtors should be authorized to take such actions as are necessary to facilitate and effectuate the abandonment of the Property.

**B.     Rejection of the Rejected Agreements**

19.     Section 365(a) of the Bankruptcy Code provides that a debtor, "subject to the court's approval, may assume or reject any executory contract or an unexpired lease." 11 U.S.C. § 365(a); see also University Med. Ctr. v. Sullivan (In re University Med. Ctr.), 973 F.2d

1065, 1075 (3d Cir. 1992). The Court may approve a debtor's rejection of an executory contract

or unexpired lease if such rejection is made in the exercise of such debtor's sound business

judgment, and if such rejection benefits its estate. See, e.g., Sharon Steel Corp. v. National Fuel

Gas Distrib. Corp., 872 F.2d 36, 39 (3d Cir. 1989); NLRB v. Bildisco & Bildisco (In re

Bildisco), 682 F.2d 72, 79 (3d Cir. 1982), aff'd, 465 U.S. 513 (1984); In re Patterson, 119 B.R.

59 (E.D. Pa. 1990). See also, In re Federated Dep't. Stores, Inc., 131 B.R. 808, 811 (S.D. Ohio

1991) ("Courts traditionally have applied the business judgment standard in determining whether

to authorize the rejection of executory contracts and unexpired leases."); Westbury Real Estate

Ventures, Inc. v. Bradlees, Inc. (In re Bradlees, Inc.), 194 B.R. 555, 558 n.1 (Bankr. S.D.N.Y.

1996) ("[U]nder the business judgment test . . . [a court should approve a debtor's proposed

rejection] if the debtor can demonstrate that rejection will benefit the estate."). It is enough if a

debtor determines in its business judgment that a benefit will be realized. Sharon Steel Corp.,

872 F.2d at 39 (citing Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co. (In re Wheeling-

Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987)). The business judgment

standard requires that the Court approve the debtor's business decision unless that judgment is

the product of bad faith, whim or caprice. Lubrizol Enter., Inc. v. Richmond Metal Finishers,

756 F.2d 1043, 1047 (4th Cir. 1985), cert. denied, 475 U.S. 1057 (1986).

          20.    As an integral component of the Debtors' efforts to maximize value for

their estates and creditors by, among other things, eliminating unnecessary administrative

burdens, the Debtors have determined, in the exercise of their business judgment, that it is in the

best interest of their estates and creditors to abandon their interest in the Property. Because the

Debtors lease their interests in the Property to others under the Rejected Agreements, the

Rejected Agreements will hold no material economic value to the Debtors or their estates upon

Park National foreclosing on the Property as a result of the consensual agreement for stay relief and the abandonment of the Property.

21.     Accordingly, the Debtors submit that the rejection of the Rejected Agreements is within their sound business judgment and is in the best interest of the Debtors, their estates, creditors and other parties-in-interest.

22.     In accordance with the *Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof* [D.I. 1708], the Debtors respectfully request that any claim allegedly arising from the rejection of the Rejected Agreements (a "Rejection Claim") must be filed on or before the date that is thirty (30) days from the entry of the Proposed Order (the "Rejection Bar Date").  Any holder of a Rejection Claim who fails to timely file a proof of such claim on or before the Rejection Bar Date shall not be treated as a creditor for purposes of voting upon, or receiving distributions under, any chapter 11 plan or plans in these chapter 11 cases in respect of that claim.

## NOTICE

23.     Notice of this Motion will be provided to: (i) the Office of the United States Trustee; (ii) counsel to the Committee; (iii) counsel to the Borrowers Committee; (iv) counsel to Park National; (v) the parties to the Rejected Agreements; and (vi) all parties entitled to notice under Bankr. Del. L.R. 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form annexed hereto as Exhibit B, authorizing the Debtors to abandon the Property and reject the Rejected Agreements pursuant to sections 105, 365, and 554 of the Bankruptcy Code.

Dated: November 25 2009         YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware

Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Justin H. Rucki (No. 5304)
The Brandywine Building
1000 West Street - 17th Floor
P.O. Box 391
Wilmington, Delaware  19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel to Debtors and Debtors in Possession

# EXHIBIT A

**List of Expenses**

Mt. Prospect Building Monthly Cash Flow
Activity from August 2007 through October 27, 2009

| | Aug 07 | Sept 07 | Oct 07 | Nov 07 | Dec 07 | Jan 08 | Feb 08 | Mar 08 | April 08 | May 08 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Rental Income** | | | | | | | | | | |
| Rent | $ 7,500.00 | $ 7,500.00 | $ 17,500.00 | $ 14,000.00 | $ - | $ 16,500.00 | $ 11,500.00 | $ 24,500.00 | $ 10,500.00 | $ 28,500.00 |
| **Occupancy Expense (a)** | | | | | | | | | | |
| Utilities (b) | 1,055.39 | - | 6,317.59 | 609.44 | - | - | 7,210.05 | 9,074.16 | 1,017.19 | 4,978.55 |
| Office Maintenance | 8,507.95 | 976.30 | 16,031.21 | 645.00 | 4,631.22 | - | 14,660.38 | 5,540.83 | 10,282.35 | 12,347.51 |
| Office Expense | 7,858.75 | 2,094.07 | 9,071.35 | 2,273.72 | - | 331.45 | 1,057.12 | - | 575.00 | 3,500.00 |
| Real Estate Tax Expense | 11,346.53 | 22,693.05 | - | 22,893.06 | - | 11,346.53 | 11,757.51 | 11,257.51 | 11,257.51 | 11,257.51 |
| Total Occupancy Expense | 28,178.62 | 26,363.38 | 32,865.15 | 26,721.22 | 4,631.22 | 11,677.98 | 34,184.96 | 26,273.50 | 23,133.05 | 32,078.57 |
| Net Cash Flow Before P&I Payments | $ (21,578.62) | $ (18,853.28) | $ (15,365.15) | $ (12,721.22) | $ (4,631.22) | $ 4,822.02 | $ (22,684.56) | $ (1,773.50) | $ (12,638.05) | $ (3,578.57) |

| | June 08 | July 08 | Aug 08 | Sept 08 | Oct 08 | Nov 08 | Dec 08 | Jan 09 | Feb 09 | Mar 09 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Rental Income** | | | | | | | | | | |
| Rent | $ 7,000.00 | $ 12,000.00 | $ 12,000.00 | $ 5,000.00 | $ 12,000.00 | $ 12,000.00 | $ 10,000.00 | $ 11,000.00 | $ 9,000.00 | $ 8,000.00 |
| **Occupancy Expense (a)** | | | | | | | | | | |
| Utilities (b) | 10,772.97 | 3,350.12 | 5,544.67 | 3,635.23 | 3,716.67 | 2,916.83 | 3,631.31 | 3,346.22 | 3,655.97 | 2,704.63 |
| Office Maintenance | 8,603.58 | 4,227.58 | 7,445.41 | 8,953.47 | 10,726.38 | 4,512.35 | 7,359.19 | 11,036.47 | 4,535.94 | 10,357.57 |
| Office Expense | - | 580.11 | - | - | - | - | 659.57 | - | - | - |
| Real Estate Tax Expense | 11,257.51 | 11,252.51 | 10,030.51 | 11,252.51 | 10,409.51 | 10,830.51 | 10,830.51 | 10,930.51 | 10,830.51 | 10,830.51 |
| Total Occupancy Expense | 30,629.06 | 19,410.32 | 23,020.59 | 23,841.21 | 24,051.45 | 18,259.49 | 22,740.58 | 25,313.20 | 19,422.22 | 23,893.36 |
| Net Cash Flow Before P&I Payments | $ (23,629.06) | $ (7,410.32) | $ (11,020.59) | $ (18,841.21) | $ (12,051.45) | $ (6,259.49) | $ (12,740.58) | $ (14,313.20) | $ (10,422.22) | $ (14,893.36) |

| | April 09 | May 09 | June 09 | July 09 | Aug 09 | Sept 09 | Oct 09 (c) | Aug 07 - Oct 09 (c) Total |
|---|---|---|---|---|---|---|---|---|
| **Rental Income** | | | | | | | | |
| Rent | $ 16,500.00 | $ 16,500.00 | $ 19,000.00 | $ 5,000.00 | $ 18,000.00 | $ 12,000.00 | $ 12,000.00 | $ 335,000.00 |
| **Occupancy Expense (a)** | | | | | | | | |
| Utilities (b) | 616.04 | 2,244.47 | 2,741.87 | 3,511.17 | 3,420.65 | 3,578.44 | - | 90,905.47 |
| Office Maintenance | 10,514.52 | 4,877.51 | 7,024.19 | 8,742.31 | 10,674.76 | 4,220.94 | 17,330.04 | 218,415.07 |
| Office Expense | - | 24.30 | - | - | - | - | - | 28,490.40 |
| Real Estate Tax Expense | 13,170.51 | 13,170.51 | 13,170.51 | 13,170.51 | - | - | - | 274,920.36 |
| Total Occupancy Expense | 24,301.07 | 20,316.74 | 23,006.57 | 25,423.94 | 14,095.41 | 7,909.38 | 17,330.04 | 611,731.25 |
| Net Cash Flow Before P&I Payments | $ (7,801.07) | $ (3,816.74) | $ (4,006.57) | $ (20,423.94) | $ 4,954.59 | $ 4,091.62 | $ (5,330.04) | $ (276,731.25) |

**Notes:**
(a) Occupancy expenses do not include mortgage principal and interest payments or insurance payments
(b) April 2009 utilities include a return of a $3,000 deposit from Nicor Gas
(c) October activity up through October 27, 2009