# Exhibit A

# COPY

1

1    IN THE UNITED STATES BANKRUPTCY COURT

2    FOR THE DISTRICT OF DELAWARE
     --------------------------------------- X
3    IN RE:  AMERICAN HOME MORTGAGE
     HOLDINGS, INC., a Delaware
4    Corporation, et al.,

5                        Debtors,

6    Chapter 11

7    Case No. 07-11-47 (CSS)
     --------------------------------------- X
8

9
                           1802 North 7th Street
10                         Phoenix, Arizona

11
                           November 20, 2009
12                         9:23 a.m.

13

14         THE DEPOSITION OF MONA DOBBEN was taken

15    at the offices of Coash & Coash, before Deborah Cleary,

16    RPR, CR, a Certified Reporter in the State of Arizona.

17

18

19

20

21

22

23         ELLEN GRAUER COURT REPORTING CO. LLC
            126 East 56th Street, Fifth Floor
24            New York, New York 10022
                  212-750-6434
25                Ref:  91818A

2

1   A P P E A R A N C E S:

2

3   Representing Debtor American Home Mortgage:

4           YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

5           By:  Curtis J. Crowther, Esq.

6           1000 West Street

7           The Brandywine Building, 17th Floor

8           Wilmington, Delaware 19801

9           (302) 571-6755

10          E-mail:  Ccrowther@ycst.com

11

12

13  Representing the Witness:

14          DOUGLAS JAMES PETTIBONE

15          Attorney at Law

16          17848 Sky Park Circle

17          Suite C

18          Irvine, California 92614

19          (714) 730-9091

20          E-mail:  Pettibonelaw@hotmail.com

21

22

23              * * * * * * *

24

25

3

1    --------------------- I N D E X ---------------------

2    WITNESS                    EXAMINATION BY              PAGE

3    MONA DOBBEN                MR. CROWTHER                  5

4

5

6    ------------------- E X H I B I T S -------------------

7    DOBBEN            DESCRIPTION                      FOR I.D.

8    Exhibit 1         Proof of Claim                         6

9    Exhibit 2         Proof of Claim                         8

10   Exhibit 3         Proof of Claim                         8

11   Exhibit 4         Loan Application                      29

12   Exhibit 5         Limited Power of Attorney             29

13   Exhibit 6         Certification                         36

14   Exhibit 7         Compliance Agreement                  37

15   Exhibit 8         California Insurance Disclosure        37

16   Exhibit 9         Loan Disclosure Statement             38

17   Exhibit 10        Private Mortgage Insurance

18                     Disclosure                            38

19   Exhibit 11        Per Diem Interest Disclosure          38

20   Exhibit 12        Occupancy Agreement                   39

21   Exhibit 13        Affiliated Business Arrangement

22                     Disclosure                            40

23   Exhibit 14        Equal Credit/Fair Lending Notice      40

24   Exhibit 15        Request for Tax Return                40

25   Exhibit 16        Request for Taxpayer ID               41

4

1  -------------- E X H I B I T S (Cont'd) ---------------

| | DOBBEN | DESCRIPTION | FOR I.D. |
|---|---|---|---|
| 3 | Exhibit 17 | Deed of Trust | 41 |
| 4 | Exhibit 18 | Signature/Name Affidavit | 42 |
| 5 | Exhibit 19 | Adjustable Rate Note | 45 |
| 6 | Exhibit 20 | Occupancy Certification | 46 |
| 7 | Exhibit 21 | Illinois Driver's License | 47 |
| 8 | Exhibit 22 | RESPA Servicing Disclosure | 48 |
| 9 | Exhibit 23 | Adjustable Rate Rider | 49 |
| 10 | Exhibit 24 | Credit Score Disclosure | 49 |
| 11 | Exhibit 25 | Banking Statement | 51 |
| 12 | Exhibit 26 | Settlement Statement | 52 |
| 13 | Exhibit 27 | Monthly Payment Information Letter | 53 |
| 14 | Exhibit 28 | Account Designation | 54 |
| 15 | Exhibit 29 | Truth in Lending Disclosure | 54 |
| 16 | Exhibit 30 | Invoice of Management Fees | 74 |
| 17 | Exhibit 31 | Amended Escrow Instructions | 76 |
| 18 | Exhibit 32 | Letter, 10/1/07 | 76 |
| 19 | Exhibit 33 | Notice of Trustee's Sale | 81 |
| 20 | Exhibit 34 | Collection History Profile | 88 |

21

22

23

24

25

5

1   M O N A   D O B B E N,

2       a witness herein, having been first duly sworn

3       by the Certified Reporter to speak the truth and

4       nothing but the truth, was examined and testified

5       as follows:

6

7   EXAMINATION BY

8   MR. CROWTHER:

9       Q.   Good morning, Ms. Dobben.  As you know when you

10  walked in, my name is Curtis Crowther.  I represent the

11  American Home Mortgage debtors in this bankruptcy case in

12  connection with the objections to your claims in this

13  case.

14       If any time you need a break, please just ask for

15  one.  There's only one time you will not be allowed to

16  take a break and that is if there's a question pending to

17  you.  If there is no question pending, you may have a

18  break at any time.

19       Do you understand that?

20       A.   Yes.

21       Q.   If at any time you don't understand a question I

22  ask, and sometimes I don't ask very good ones, you just

23  let me know that you don't understand it and we'll try to

24  figure out what was confusing or, you know, problematic

25  about that question.

6

1                         DOBBEN

2          Do you understand that?

3     A.   Yes.

4     Q.   Have you ever had your deposition taken before?

5     A.   Yes.

6     Q.   How many times, ma'am?

7     A.   Once.

8     Q.   How long ago was that?

9     A.   1974.

10    Q.   Do you still remember that deposition?

11    A.   You bet I do.

12    Q.   What was it about?

13    A.   Child custody.

14    Q.   Oh, that's sort of a major event is why you would

15   remember it?

16    A.   That's correct.

17    Q.   Do you recall filing three proofs of claim in the

18   American Home Mortgage bankruptcy cases?

19    A.   Honestly, no.

20         MR. CROWTHER:   We'll have this marked as Dobben

21   1.

22         (Deposition Exhibit Number 1 was marked

23          for identification, and a discussion was

24          held off the record.)

25    Q.   (By Mr. Crowther) And you've been handed what's

7

1                         DOBBEN

2    been marked as Exhibit 1.  Do you recognize this document?

3         A.    Well, I've seen a lot of documents, but I can't

4    recall at the moment seeing this one.

5         Q.    Is that your signature --

6         A.    Yes, sir.

7         Q.    -- at the bottom?

8         A.    That is my signature.

9         Q.    Is that your handwriting in the other parts of

10   the document?

11        A.    No, sir.

12        Q.    Do you know whose handwriting that is?

13        A.    Yes.

14        Q.    And whose is that?

15        A.    Alex, my daughter.

16        Q.    Do you think that your daughter Alex prepared

17   this and you signed it?

18        A.    I'm sure she did, yes.

19        Q.    Do you see where it has a number 5, Secured

20   Claim?  We're doing the bottom left.

21        A.    Oh, okay.

22        Q.    Do you see that?

23        A.    Uh-huh.

24        Q.    It says secured by real estate?

25        A.    (Witness nods head.)

8

                              DOBBEN

1

2     Q.   Do you know what real estate that you believe

3  your claim is secured by?

4     A.   Yes.

5     Q.   What real estate do you believe your claim is

6  secured by?

7     A.   The 37th Street property.

8     Q.   The one in Palmdale, California?

9     A.   Yes.

10         (Deposition Exhibit Number 2 was marked

11          for identification.)

12    Q.   You have now been handed what's been marked as

13  Exhibit 2.  Is that your signature at the bottom of the

14  first page of this document as well?

15    A.   Yes.

16    Q.   And do you believe this was also prepared by your

17  daughter Alex?

18    A.   Yes.  She has been my power of attorney.

19         (Deposition Exhibit Number 3 was marked

20          for identification.)

21    Q.   Do you recognize what's been marked as Exhibit 3,

22  Ms. Dobben?

23    A.   Yes.

24    Q.   You've seen this before?

25    A.   I've seen two others just like it, yes.

9

1                          DOBBEN

2       Q.   Is that your signature at the bottom of Exhibit

3   3?

4       A.   Yes, sir.

5       Q.   Do you believe this was also prepared by your

6   daughter Alex?

7       A.   Yes, sir.

8       Q.   Do you see where it says number 1, Basis for

9   Claim?

10      A.   Yes.

11      Q.   And it has checked the box, Other.  Do you see

12  that?

13      A.   Yes.

14      Q.   It says "illegal loan"?

15      A.   Correct.

16      Q.   Can you tell me what was illegal about the loan?

17      A.   There were forgeries.  There was an illegal

18  foreclosure.

19      Q.   Other than forgeries, was there anything illegal

20  about the loan?

21      A.   I don't know.

22      Q.   Why do you believe the foreclosure was illegal?

23      A.    For the simple reason that we tried to notify

24  everybody that we could find to notify and nobody

25  responded to us.  We were told a foreclosure was going

DOBBEN

1
2  through and then, no, it wasn't going through and they

3  went ahead and foreclosed anyway.

4      Q.    The property that was foreclosed, are we talking

5  about the Palmdale, California, street property -- I mean,

6  the Palmdale, California, 37th Street property?

7      A.    As far as I know, yes, that's what this is about.

8      Q.    Did you own the property on 37th Street?

9      A.    That's a good question.  I honestly don't know

10 whether I did or didn't.

11     Q.    What do you mean you don't know if you did or did

12 not own it?

13     A.    I signed some papers.  I was never given keys to

14 the property.

15     Q.    Do you recall signing papers relating to the 37th

16 Street property?

17     A.    That's what I thought they were.

18     Q.    Do you know what kind of papers you signed

19 relating to the 37th Street property?

20     A.    I guess escrow papers.

21     Q.    To buy real estate, is that what you mean by

22 escrow papers?

23     A.    They came from a title company.  Purchase

24 contract, no.

25     Q.    Well, I was asking what kind of papers that you

1                          DOBBEN

2    recall signing relating to the 37th Street property, and

3    you told me escrow papers.  What did you think escrow

4    papers did with respect to the 37th Street property?

5         A.   I thought I was purchasing a property.

6         Q.   Did you know how much the purchase price was

7    supposed to be for that property?

8         A.   No, sir.

9         Q.   Was there a reason that you would sign any papers

10   relating to an escrow on the 37th Street property?

11        A.   Just for investment property.

12        Q.   What do you mean by "investment property"?

13        A.   Income property.

14        Q.   And how were you to get income from this

15   investment property?

16        A.   There were renters in the home.

17        Q.   How did you know there were renters in the 37th

18   Street property?

19        A.   Only by what I was told.

20        Q.   And who told you that?

21        A.   Pat Downey.

22        Q.   Did he tell you that before you signed any escrow

23   papers?

24        A.   Absolutely.

25        Q.   How far before you signed the escrow papers that

1                           DOBBEN
2    you're aware of did he tell you about the renters?
3         A.   When the transaction first began.
4         Q.   And when was that?
5         A.   I honestly don't remember.
6         Q.   Was it a week before you signed the papers?
7         A.   Oh, more than that.
8         Q.   A month before?
9         A.   Possibly.  I don't -- I don't really remember.
10        Q.   Possibly more than a month?
11        A.   Could have been.  This is two and a half years
12   ago.
13        Q.   I understand.  Was it in -- this happened in
14   2007; correct?
15        A.   Correct.
16        Q.   Was it around, say, New Years of 2007 when the
17   idea of 37th Street property came up?
18        A.   No.  It was probably, I would have to say, maybe
19   in March.
20        Q.   So that would be March of 2007; correct?
21        A.   Correct.
22        Q.   What did Mr. Downey tell you about the renters
23   and the 37th Street property as an investment property?
24        A.   That they were good renters.
25        Q.   Did he give any details as to what that meant

1                              DOBBEN
2      that they were good renters?
3          A.    No.   That a mother and a daughter had owned the
4      properties.   They had good renters in there.
5          Q.    Did he tell you how much the good renters were
6      paying in rent?
7          A.    No, not that I remember.
8          Q.    Did you ever figure out before you signed the
9      escrow papers what the anticipated income would have been
10     from the investment property at 37th Street?
11         A.    Yes.   At the time there was enough so that any
12     kind of loan payments could be made and then nothing would
13     come out of my pocket.
14         Q.    Who did that calculation?
15         A.    I have to assume that it was Pat because he was
16     the one I was dealing with.
17         Q.    Did you look at the numbers to see whether or not
18     they were correct?
19         A.    I didn't look at anything until the esc -- not
20     the escrow officer, but the notary came to the house and
21     said, Now sign these and -- thank you.
22         Q.    Do you know if you were -- before you signed the
23     escrow papers, did you know if there was going to be any
24     profit to you?
25         A.    Yes, I was told there would be profit or I would

                          DOBBEN
1
2   -- never would have signed the papers.
3       Q.    And how much did you think the profit was going
4   to be before you signed the papers?
5       A.    I don't remember.  I don't know.
6       Q.    Was it more than $500 a month?
7       A.    Yeah, I think it was probably.
8       Q.    When you were thinking about this, what he was
9   telling you about the profit, had you ever invested in
10  real estate before?
11      A.    Yes, sir.
12      Q.    How long had you invested in real estate for?
13      A.    I had owned a property in Michigan that I had
14  held for probably 12 years.
15      Q.    Was that an investment property?
16      A.    Yes, sir.
17      Q.    Did you rent that out to people?
18      A.    Yes, sir.
19      Q.    Did you have a manager or a management agent?
20      A.    Yes, sir.
21      Q.    Did you live in that property first?
22      A.    For a while?
23      Q.    Yes.
24      A.    Yes, sir, I did.
25      Q.    Did you then buy another property and rent that

15

DOBBEN

1
2    one out?

3        A.   I had moved away from Michigan, yes.

4        Q.   How long had you used the property in Michigan as

5    a rental or investment property?

6        A.   Probably over 10 years.

7        Q.   Do you still own that property?

8        A.   No, sir.

9        Q.   Did you sell that property?

10       A.   Yes, sir.

11       Q.   When did you sell it?  What year, I should say.

12       A.   '74, '75.

13       Q.   When you sold it, were you making a profit on the

14   rental income?

15       A.   Yes.

16       Q.   Had you made a profit the entire time you rented

17   the property out?

18       A.   Yes.

19       Q.   How did you choose the management agent that was

20   dealing with that property in Michigan?

21       A.   I have -- I don't remember.  That's a long time

22   ago.

23       Q.   Did you interview people?

24       A.   I don't remember.

25       Q.   Was it a real estate agent?

1                          DOBBEN

2      A.   I don't know.

3      Q.   How did you meet Pat Downey?

4      A.   Through my daughter, Alex Ryan.

5      Q.   Do you know what Ms. Ryan's relationship was with

6   Mr. Downey?

7      A.   I think they had been friends.

8      Q.   Do you know how long they had been friends?

9      A.   No, sir.

10     Q.   Do you know if they worked together?

11     A.   She had a movie production.  And as far as I

12   know, he was one of the actors.

13     Q.   Did your daughter introduce you to Mr. Downey?

14     A.   Yes, she did.

15     Q.   And how did she describe him when she introduced

16   him?

17     A.   "Mom, I'd like to have you meet Pat Downey."

18     Q.   And who did she tell you Pat Downey was?

19     A.   She didn't tell me who Pat Downey was.  We were

20   at a premier.  I was just meeting different people as went

21   around the group.

22     Q.   Did she introduce him as her friend?

23     A.   No.

24     Q.   Did she introduce him as an actor on the film?

25     A.   No.

17

1                              DOBBEN

2          Q.   Did she introduce him as someone she was in

3     business with?

4          A.   No.

5          Q.   She said, "This is Pat Downey"?

6          A.   Uh-huh, and his wife, Norma Downey.

7          Q.   At what point does the subject of investing in

8     real estate come up between you and Mr. Downey?

9          A.   Probably two or three months later.

10         Q.   And how does that come about?

11         A.   I was asked if I'd like to invest in some real

12    estate.  It was good income.

13         Q.   Who asked you if you would like to invest in some

14    real estate?

15         A.   Pat.

16         Q.   And how did he ask you, meaning, by phone, in

17    person?

18         A.   He called me.

19         Q.   How did he get your telephone number?

20         A.   I'm sure through my daughter.

21         Q.   Did your daughter know that he was going to be

22    calling you about investing in real estate?

23         A.   I think she probably did.

24         Q.   Had you expressed an interest in investing in

25    real estate again before he called you?

18

1                          DOBBEN

2      A.   I don't think I'd thought about it.  Opportunity

3  hadn't arisen.

4      Q.   Were you open to the possibility of the

5  opportunity arising?

6      A.   Yes.

7      Q.   Why?

8      A.   If it wasn't going to cost me any money.

9      Q.   Everybody likes to make money; right?

10     A.   True.

11     Q.   Seems like such a --

12     A.   I live on social security.

13     Q.   -- simple concept?

14     A.   Yes, sir.

15          (A discussion was held off the record

16           between counsel and witness.)

17     Q.   (By Mr. Crowther) Did Mr. Downey have a specific

18  property in mind when he first contacted you about

19  investing in real estate?

20     A.   I believe he had more than a few properties, yes.

21     Q.   Did he tell you he had a few properties in mind?

22     A.   Yes.

23     Q.   Were those few properties the ones that

24  ultimately ended up in the complaint that we're talking

25  about today?

1                        DOBBEN

2      A.    If -- yes.

3      Q.    The ones that you said you were put into, those,

4  those properties?

5      A.    Correct.

6      Q.    Okay.

7      A.    There may be others that I don't even know about.

8      Q.    Did you trust Mr. Downey when he called you about

9  investing in real estate?

10     A.    Why not?

11     Q.    Well, I asked you if you did.

12     A.    Yes.

13     Q.    And why did you trust him?

14     A.    Well, I guess because when I met him, he seemed

15  like a nice gentleman.

16     Q.    Did you know if he had any experience in

17  investment properties?

18     A.    No.

19     Q.    Did you know if he had engaged in these types of

20  transactions prior to his call to you?

21     A.    No.

22     Q.    Between the time you met him for the first time

23  at that premier --

24     A.    Uh-huh.

25     Q.    -- and the time you received the phone call from

1                        DOBBEN

2    him about investing in real estate properties, had you

3    talked to him in the middle?

4         A.   No.

5         Q.   Had your daughter indicated she was talking to

6    him between those times?

7         A.   I'm sure she did.

8         Q.   Did she tell you that she had been talking to him

9    about investments in real estate?

10        A.   I don't know.

11        Q.   So you meet him at the movie premier, and then

12   months later he calls you about investing in real estate;

13   is that correct?

14        A.   Yes.

15        Q.   When did you decide that you were interested in

16   doing what he was suggesting?

17        A.   Probably a few weeks after he'd called me.

18        Q.   What did you do during those few weeks in order

19   to come to the conclusion that you'd want to invest in

20   real estate?

21        A.   I figured that it could help my daughter's

22   production and it certainly could help me.

23        Q.   How could it help your daughter's production?

24        A.   Because I would be able to give her some of the

25   profits that I had received.

```
                              DOBBEN
 1
 2      Q.    You were going to share?

 3      A.    Correct.

 4      Q.    Did she know you were going to share?

 5      A.    Yes.

 6      Q.    And how did that come up between you and your

 7   daughter?

 8      A.    I told her that I would be more than happy to

 9   share with her.

10      Q.    Did she know that Mr. Downey had contacted you --

11   I should say, when did she find out that Mr. Downey had

12   contacted you about investing?

13      A.    I don't know.

14      Q.    How soon after the call did you approach her

15   about sharing profits?

16      A.    Probably as soon as I decided to do it.

17      Q.    So within a few weeks?

18      A.    I would think so.

19      Q.    What did you hope to gain from investing in the

20   real estate?

21      A.    Income.

22      Q.    Did you do any investigation as to the properties

23   Mr. Downey had suggested?

24           MR. PETTIBONE:  And at the beginning of the time,

25   right?
```

22

1                          DOBBEN

2          MR. CROWTHER:  Yes.

3          MR. PETTIBONE:  During this period.  Okay.

4      A.   I was here in Arizona.  That's in California.

5   No.

6      Q.   (By Mr. Crowther) All of the properties were in

7   California that he was suggesting?

8      A.   As far as I know, yes.

9      Q.   Did you do any investigation of the towns where

10  those properties were?

11     A.   No.

12     Q.   Did you do any investigation of the neighborhoods

13  where those properties were?

14     A.   No.

15     Q.   What did Mr. Downey tell you would be required of

16  you in order to do the investments in the real estate?

17     A.   My name, my social security number, a copy of my

18  income tax and any investments that I have.

19     Q.   Investments like stocks and bonds?

20     A.   Uh-huh.

21     Q.   Did you ask him why those things would be

22  necessary?

23     A.   No.

24     Q.   Did you give him those things?

25     A.   Yes.

23

1                          DOBBEN

2      Q.   Why?

3      A.   Because he told me that's how we could proceed.

4      Q.   Did you have an understanding at all as to how

5  the process would work?

6      A.   I don't -- I don't understand.

7      Q.   Sure.  Who would decide what properties you were

8  going to buy?

9      A.   Oh, Pat was the one.  He was going to make the

10  investments for me.

11      Q.   You left it up to him?

12      A.   Yes.

13      Q.   Why?

14      A.   He was the one who approached me.

15      Q.   Did you give him your information regarding your

16  financial situation?

17      A.   Yes.

18      Q.   Did you ask him why or how he was going to use

19  that?

20      A.   No.

21      Q.   Did you give him copies of your tax returns?

22      A.   Yes.

23      Q.   Did you ask him why he needed those?

24      A.   No.  I trusted him.  I figured that's what he

25  needed.

24

DOBBEN

1

2    Q.    Between the time you met Mr. Downey at the

3    premier and the time you were giving him this information,

4    how many times did you actually talk to him?

5    A.    I don't remember.

6    Q.    More than the two times you've identified so far?

7    A.    It's two and a half years ago.  It's longer than

8    that.  I honestly don't remember.

9    Q.    Was there any particular reason why you trusted

10   Mr. Downey with all this information?

11   A.    Because I thought he was an honest person.

12   Q.    Because he was nice?

13   A.    Yes.

14   Q.    Was there any other reason besides that he was

15   nice that you trusted him?

16   A.    He was doing business with other people that I

17   knew.

18   Q.    With whom?

19   A.    The Markowicz.

20   Q.    Who were they?

21   A.    They are two dentists out of the California area,

22   Richard and Yolanda Markowicz.  He was doing business with

23   Bill Proxman.  They've also been caught in this mortgage

24   loan fraud.

25   Q.    When you say they were doing business with Mr.

25

                           DOBBEN

1

2      Downey, are you saying that they were also investing in

3      real estate?

4          A.   Correct.

5          Q.   Did you know the Markowiczes before you were

6      approached by Mr. Downey?

7          A.   No.

8          Q.   Did Mr. Downey suggest you contact them --

9          A.   No.

10         Q.   -- about him?

11         A.   No.

12         Q.   How did you know the Markowiczes had invested in

13     real estate with Mr. Downey before you did?

14         A.   I'm not sure that I knew that they had before I

15     did.  I just knew these were a group of friends of Alex's.

16         Q.   The Markowiczes were friends of Alex's?

17         A.   Yes.  They were investors in her production.

18         Q.   The same with Proxman?

19         A.   I don't know that Bill is.

20         Q.   You listed those people because I asked you what

21     reasons you had to trust Mr. Downey.  Are you telling me

22     that you did not know that these individuals had invested

23     at the time you did?

24         A.   That's correct.

25         Q.   Other than that you had met Mr. Downey at the

1                           DOBBEN

2    premier and thought he was a nice man, what other reasons

3    did you have to trust Mr. Downey with your personal

4    financial information?

5         A.   Only that my daughter knew him.

6         Q.   Before you decided to give Mr. Downey your

7    personal financial information, did you ask your daughter

8    about Mr. Downey?

9         A.   I don't know what I would ask her other than that

10   I knew that they were friends.

11        Q.   Did you ask her about whether he has a good

12   business relationship with people?

13        A.   No.  I guess I just assumed.

14        Q.   Because your daughter was friends with him and

15   she wouldn't associate with people who weren't; correct?

16        A.   Yes.

17        Q.   Did you ask your daughter about Mr. Downey's real

18   estate experience?

19        A.   No.

20        Q.   Did you ask anyone about Mr. Downey's real estate

21   experience?

22        A.   No.

23        Q.   Did you know generally how expensive the

24   properties were going to be that you were going to invest

25   in?

1                         DOBBEN

2       A.   No.

3       Q.   Did you think that they were going to be

4   $100,000?

5       A.   California properties?  No.

6       Q.   Did you have an idea in your head as to how much

7   properties would probably cost?

8       A.   I don't honestly know.

9       Q.   Did you think you were going to be buying million

10  dollar pieces of property?

11      A.   No.

12      Q.   Did you think you were going to be buying

13  $200,000 pieces of property?

14      A.   I don't know.

15      Q.   How did you think that the properties you were

16  going to purchase were going to be purchased?

17      A.   I don't know.

18      Q.   How do you normally purchase real estate?

19      A.   How do I purchase real estate?

20      Q.   Yes.

21      A.   I don't.

22      Q.   Have you ever purchased a house before?

23      A.   Yes.

24      Q.   How did you do that?

25      A.   Cash.

28

1                          DOBBEN

2        Q.   Did you ever get a mortgage?

3        A.   Yes.

4        Q.   How often have you had a mortgage, other than

5   investment properties?

6        A.   Twice.

7        Q.   Did you ever have a mortgage for an investment

8   property other than the ones that we're talking about

9   today?

10       A.   No.

11       Q.   Did you have hundreds of thousands of dollars to

12   buy a house?

13       A.   No.

14       Q.   Did you have hundreds of thousands of dollars to

15   buy investment real estate?

16       A.   No.

17       Q.   Did you think that you were going to be paying

18   cash for the purchase of investment real estate with Mr.

19   Downey?

20       A.   No.

21       Q.   Did you think that you were going to be getting

22   loans for that investment real estate?

23       A.   Yes.

24       Q.   Did you think that those loans would be secured

25   by mortgages on that investment real estate?

                              DOBBEN

1

2      A.   The loan payments were being paid from the rental

3   on the income properties.

4      Q.   Right.  The idea was that Mr. Downey said that

5   the income would pay for the mortgages; right?

6      A.   Correct.

7      Q.   Okay.  Did you ever ask for a rental history of

8   any of the properties?

9      A.   No.

10      Q.   Did you ever ask for rent receipts from the prior

11   tenants?

12      A.   No.

13      Q.   Did you ever ask for an account statement of

14   rents collected?

15      A.   No.

16      Q.   Because you trusted Mr. Downey?

17      A.   Correct.

18           MR. CROWTHER:   Number 4.

19           (Deposition Exhibit Number 4 was marked

20            for identification.)

21      Q.   (By Mr. Crowther) Is that your signature on the

22   first page?

23      A.   No.  No, it's not my initials either.  No, no,

24   no, no, no.  No, no, no, no, no, no.

25           (Deposition Exhibit Number 5 was marked

30

1                         DOBBEN

2            for identification.)

3       Q.   Turning to page 3 of the document that's been

4   marked as Exhibit 5, is that your signature on page 3?

5       A.   Yes.

6       Q.   At the end of that document, Ms. Dobben, do you

7   see where it says State of Arizona, County of Maricopa?

8       A.   Yes.

9       Q.   Do you know what that whole part of this document

10  is?

11      A.   Sorry?

12      Q.   Do you know what this part of the document is?

13      A.   Somebody's notarizing a signature.

14      Q.   What do you think notarizing a signature means?

15      A.   Witnessing somebody signing something.

16      Q.   So this person by the name of John Davis signed

17  saying that they witnessed you sign this document; right?

18      A.   I would say, yeah.

19      Q.   And it says they're a notary public in the State

20  of Arizona, Maricopa County; right?

21      A.   Uh-huh.

22      Q.   Do you think that has any meaning?

23      A.   How do you -- what do you mean?

24      Q.   Do you think that's kind of important that it's

25  got a notarized signature on it?

31

DOBBEN

1

2    A.   Yes.

3    Q.   Why is that important?

4    A.   Because it says that he saw me sign my name to

5    something.

6    Q.   Do you think it's safe to assume that you in fact

7    signed it because there's a notary clause there?

8    A.   Well, his signature's on here, and here's this.

9    I didn't sign anything here.  So how do I know that the

10   rest of this is what I signed just because these papers

11   are put together?

12        MR. PETTIBONE:  I think that you've been handed a

13   document.  Maybe you should take a look at the document.

14   Take your time for a second.  And I think it's --

15        MR. CROWTHER:  Counsel?

16        MR. PETTIBONE:  Yeah.

17        MR. CROWTHER:  I think you ought to let her go.

18        MR. PETTIBONE:  Well, I think you're asking her

19   points about a document without --

20        MR. CROWTHER:  I'm asking her about her

21   signature.

22        MR. PETTIBONE:  Well, she hasn't reviewed the

23   document.

24        MR. CROWTHER:  That's fine.

25        MR. PETTIBONE:  You're taking a piece of a

1                              DOBBEN

2    document, and then you're arguing with her sort of telling

3    her --

4              MR. CROWTHER:  I'm simply asking her about the

5    notary clause, Counsel, so...

6              MR. PETTIBONE:  Yeah, the notary.

7         Q.   (By Mr. Crowther) So the next question, Ms.

8    Dobbens --

9              MR. PETTIBONE:  Why can't she read the document?

10             MR. CROWTHER:  She can read anything she wants.

11             MR. PETTIBONE:  Okay.  Please read the document.

12             THE WITNESS:  Okay.

13             MR. PETTIBONE:  At least read it and then see if

14   you can under -- know what it is.

15        A.   Okay.  I know what it is.

16             MR. PETTIBONE:  Okay.  Thanks.

17        Q.   (By Mr. Crowther) So do you think the notary

18   clause at the end has any importance?

19             MR. PETTIBONE:  Been asked and answered.

20        A.   Yes.

21        Q.   (By Mr. Crowther) I'm sorry?

22        A.   Yes.

23        Q.   And why?

24             MR. PETTIBONE:  Asked and answered.

25        Q.   (By Mr. Crowther) Why is it important?

1                           DOBBEN
2           MR. PETTIBONE:  Asked and answered.  You can
3     answer it.
4           A.   Okay.  I did give Paula Rush power of attorney.
5           Q.   (By Mr. Crowther) Is it important that someone by
6     the name of John Davis who's a notary public for the State
7     of Arizona, Maricopa County signed this document saying
8     that you appeared before him and signed it?  Is that
9     important?
10          MR. PETTIBONE:  That's a little vague.  It's
11    ambiguous.
12          If you understand it, you can answer.
13          A.   Yeah, I guess so.
14          Q.   (By Mr. Crowther) My question is, Why?  Why is
15    that important?
16          MR. PETTIBONE:  That's been asked and answered.
17          Q.   (By Mr. Crowther) You can answer.
18          A.   I gave Paula Rush power of attorney.
19          Q.   Did you want someone else to rely upon this power
20    of attorney because it was in fact signed by a notary?
21          A.   I don't understand what you're asking.
22          Q.   Sure.  Did you send this to people?
23          A.   Yes.
24          Q.   Why?
25          A.   So Paula Rush could help me.

34

DOBBEN

1

2      Q.   What if they all said:  "I'm sorry, Ms. Dobben.

3   We don't know this is really you."

4           MR. PETTIBONE:  Calls for --

5      Q.   (By Mr. Crowther) Would that be a problem?

6           MR. PETTIBONE:  Calls for speculation.  Assumes

7   facts not in evidence.

8           If you understand the question, you can answer

9   it.

10      Q.   (By Mr. Crowther) Would it be a problem if they

11   simply said, "We don't know this is you"?

12           MR. PETTIBONE:  Same objections.

13      A.   I don't know you.

14      Q.   (By Mr. Crowther) Can you answer my question, Ms.

15   Dobben?  Would it be a problem if the people you sent this

16   to could not rely upon the fact that it was in fact your

17   signature?

18           MR. PETTIBONE:  Same objections.

19      A.   I don't know how to answer your question.

20      Q.   (By Mr. Crowther) How do we know this is actually

21   your signature before you were sitting here telling me

22   it's your signature?

23           MR. PETTIBONE:  That's argumentative.  You can

24   answer it.

25      A.   I guess you don't, do you?

DOBBEN

1

2  Q.   (By Mr. Crowther) And that would be okay if we

3  just completely ignored it then?

4        MR. PETTIBONE:  Calls for speculation and very

5  argumentative at that point.

6  Q.   (By Mr. Crowther) Would it be?  Would that be

7  okay with you if we just ignored it?

8        MR. PETTIBONE:  It's --

9        THE COURT REPORTER:  We didn't?  Excuse me if we

10  didn't?

11       MR. CROWTHER:  If we just ignored it.

12       MR. PETTIBONE:  It's argumentative.  It's

13  speculative.  Assumes facts not in evidence.  There's no

14  foundation for the question.

15       MR. CROWTHER:  Counsel, there are no speaking

16  objections in this deposition.

17       MR. PETTIBONE:  It's not a speaking objection.

18       MR. CROWTHER:  It is a speaking objection.

19       MR. PETTIBONE:  Argumentative?

20       MR. CROWTHER:  Yes.

21       MR. PETTIBONE:  Foundation?

22       MR. CROWTHER:  Your objection's noted, Counsel.

23       MR. PETTIBONE:  Can I say something for the --

24       MR. CROWTHER:  No, Counsel, you're not.

25       MR. PETTIBONE:  You've interrupted me three

36

1                           DOBBEN

2    times.

3              MR. CROWTHER:   That's because you're improperly

4    objecting to questions, Counsel.

5              MR. PETTIBONE:   I'm not improperly objecting.

6              MR. CROWTHER:   The objection is "objection."

7    That's it.

8              MR. PETTIBONE:   That's all I'm doing.

9              MR. CROWTHER:   All your objections are preserved

10   for trial.

11             MR. PETTIBONE:   I'm going to lay the objections I

12   need to lay in the deposition.   It's not that big a deal.

13       Q.   (By Mr. Crowther)   Ms.  Dobben --

14             MR. PETTIBONE:   It's not that big of a deal.

15       Q.   (By Mr. Crowther) -- what do you think a notary

16   is for?

17             MR. PETTIBONE:   She's asked and answered that

18   question.

19       Q.   (By Mr. Crowther) You can answer.

20             MR. PETTIBONE:   You can answer.

21       A.   Verify your signature.

22       Q.   (By Mr. Crowther) For who?

23       A.   I guess for anybody who wants to see it.

24             (Deposition Exhibit Number 6 was marked

25               for identification.)

1                            DOBBEN

2        Q.    (By Mr. Crowther) You've been handed what's been

3    marked as Exhibit 6.   Is that your signature at the

4    bottom, Ms. Dobben?

5        A.    Yes.

6        Q.    Is that your correct social security number?

7        A.    Yes.

8        Q.    Is that your handwriting where the date is?

9        A.    Yes.

10              (Deposition Exhibit Number 7 was marked

11               for identification.)

12        Q.    You've been handed what's been marked as Exhibit

13    7.   Is that your signature on this document?

14        A.    Yes.

15        Q.    Is that your handwriting where it has the date?

16        A.    Yes.

17        Q.    Do you see this document has a notary signature

18    to it?

19        A.    Yes.

20              (Deposition Exhibit Number 8 was marked

21               for identification.)

22        Q.    You've been handed what's been marked as Exhibit

23    8.   Is that your signature on the document?

24        A.    Yes.

25        Q.    Is that your handwritten date?

38

1                              DOBBEN

2       A.    Yes.

3             (Deposition Exhibit Number 9 was marked

4             for identification.)

5       Q.    You've been handed what's been marked as Exhibit

6    9.  I'll ask you to turn to the back and ask if that's

7    your signature on the last page.

8       A.    Yes.

9       Q.    Is that your handwritten date?

10      A.    Yes.

11            (Deposition Exhibit Number 10 was marked

12            for identification.)

13      Q.    You've been handed what's been marked as Exhibit

14   10.  I'll ask if that's your signature on the bottom of

15   that document.

16      A.    Uh-huh.

17      Q.    Is that your handwritten date as well?

18      A.    Yes.

19            (Deposition Exhibit Number 11 was marked

20            for identification.)

21      Q.    You've been handed what's been marked as Exhibit

22   11.  Is that your signature at the bottom of this

23   document?

24      A.    Yes.

25      Q.    Is that your handwritten date?

39

1                               DOBBEN

2          A.    Yes.

3                (Deposition Exhibit Number 12 was marked

4                 for identification.)

5          Q.    You've been handed what's been marked as Exhibit

6     12.  Is that your signature at the bottom of the document?

7          A.    Yes.

8          Q.    Is that also your handwritten date?

9          A.    Yes.

10         Q.    Do you see what the title of this document is?

11         A.    Occupancy Agreement.

12               THE COURT REPORTER:   Say that again.

13               THE WITNESS:   Occupancy Agreement.

14         Q.    (By Mr. Crowther) Do you see where it says number

15    1?

16         A.    Uh-huh.

17         Q.    "Borrower intends to occupy the property as

18    borrower's primary residence."  Did you intend to occupy

19    the property known as 38645 37th Street East, Palmdale,

20    California, as your primary residence?

21         A.    No, sir.  These were rental properties.

22         Q.    Was there any time that you ever thought that you

23    were going to reside or move to the 37th Street East

24    property?

25         A.    No.

40

1                             DOBBEN

2          (A discussion was held off the record,

3           and Deposition Exhibit Number 13 was marked

4           for identification.)

5      Q.   Ms. Dobben, you've been handed what's been marked

6   as Exhibit 13.  I'll ask if that's your signature at the

7   bottom of this document.

8      A.   Yes.

9          (Deposition Exhibit Number 14 was marked

10          for identification.)

11     Q.   You've been handed what's been marked as Exhibit

12  14.  Is that your signature at the top part of this

13  document?

14     A.   Yes.

15     Q.   Is that your handwritten date?

16     A.   Yes.

17          (Deposition Exhibit Number 15 was marked

18          for identification.)

19     Q.   You've been handed what's been marked as Exhibit

20  15.

21     A.   Uh-huh.

22     Q.   Is that your signature at the bottom of this

23  document?

24     A.   Yes.

25     Q.   Is that your initials also next to the date

1                        DOBBEN

2    there?

3        A.    Yes.

4        Q.    Are you the one who crossed out the 10 and wrote

5    17?

6        A.    Yes.

7              (Deposition Exhibit Number 16 was marked

8               for identification.)

9        Q.    You've been handed what's been marked as Exhibit

10    16.   Is that your signature in the middle of the document,

11    ma'am?

12        A.    Yes.

13        Q.    Is that your handwritten date?

14        A.    Yes.

15        Q.    Is that your correct taxpayer identification or

16    social security number written right above there?

17        A.    Yes.

18              (Deposition Exhibit Number 17 was marked

19               for identification.)

20        Q.    I'm going to ask you to turn to the next to the

21    last page, which is page 14 of 15.   And I'll ask if that's

22    your signature on that page.

23        A.    Yes.

24        Q.    Can you turn to the next page, please.

25        A.    (Complies with request.)

42

1                          DOBBEN

2      Q.   Do you know what that is?

3      A.   No.

4      Q.   Does that appear to you to be a notary clause?

5      A.   No, doesn't have a notary on there.

6           THE COURT REPORTER:  Say that again.

7           THE WITNESS:  He said, Turn to the next page.  I

8  turned to the next page.  I don't see the notary.

9           MR. PETTIBONE:  Last page.

10     Q.   (By Mr. Crowther) Last page.  I'm sorry.  I

11 apologize.

12     A.   Yes.

13     Q.   Does that say that this notary signed that you

14 signed this document in front of them?

15     A.   Yes.

16          (Deposition Exhibit Number 18 was marked

17           for identification.)

18     Q.   You've been handed what's been marked as Exhibit

19 18.  Is that your signature on this document?

20     A.   Yes.

21     Q.   Is that also a notary clause at the bottom signed

22 by a notary saying you signed it in front of them?

23     A.   Yes.

24     Q.   Did you sign this in front of this notary,

25 Deborah Huffert?

43

1                          DOBBEN

2      A.   Yes.

3      Q.   Did Ms. Huffert come to your house?

4      A.   Yes.

5      Q.   Did she introduce herself as Deborah Huffert?

6  How do you know she's the one who was there?

7      A.   Good question.

8      Q.   How do you know?

9      A.   I had to trust.

10     Q.   Who was there?

11     A.   Me.

12     Q.   Anyone else?

13     A.   No.  I live alone.

14     Q.   It was just Ms. Huffert or someone who says she

15  was Ms. Huffert?

16     A.   Correct.

17     Q.   Was there a stack of documents put in front of

18  you?

19     A.   Yes.

20     Q.   Did you look at the documents?

21     A.   Yes.

22     Q.   Did you read them or just sort of glance through

23  them?

24     A.   It's a large stack of documents.

25     Q.   Sometimes multiple copies of everything; right?

44

DOBBEN

1

2      A.    I don't know.

3      Q.    Did you know that you were purchasing a piece of

4   real estate at that point in time?

5      A.    I thought that's what I was doing.

6      Q.    For investment purposes?

7      A.    Correct.

8      Q.    Did you know that there was going to be a

9   mortgage associated with the purchase of that real estate?

10     A.    I assumed there would be.

11     Q.    Because you weren't paying cash?

12     A.    Correct.

13     Q.    Did you know who the mortgage lender was at that

14   point in time?

15     A.    No, sir.  I thought I was dealing with fair and

16   honest people.

17     Q.    Let me ask you to take a look at document number

18   17.  See at the top where it says American Home Mortgage

19   Acceptance, Inc.?

20     A.    Yes.

21     Q.    Did you see that when you were signing the

22   document?

23     A.    I'm not sure that I did.

24     Q.    You see at the bottom where it says under (C)

25   "Lender" is American Home Mortgage Acceptance, Inc.?

45

1                          DOBBEN

2          Do you see that?

3      A.    Okay.  Yes.

4      Q.    Did you see that that was the lender on this Deed

5  of Trust that you signed?

6      A.    This is how papers do.  Put your initial here.

7  Put your initial here.  Put your initial here.  Put your

8  initial here.  Did I read these?  No.  Put your initial

9  here.  Put your initial here.  Put your initial here.

10     Q.    So you put your initial on all the pages?

11     A.    Yes, sir.

12     Q.    Did you care who the lender was at that time?

13     A.    No.

14     Q.    As long as you were able to buy the property?

15     A.    (No oral response.)

16     Q.    Because you wanted to make the income; right?

17     A.    Yes.  Wanted to make an investment.  I didn't

18  care whether it was Wells Fargo or who it was.

19          (Deposition Exhibit Number 19 was marked

20            for identification.)

21     Q.    You've been handed what's been marked as Exhibit

22  19.  Going to page 6 of 6, which is the page before the

23  last one in what you've been handed, is that your

24  signature on page 6 of 6?

25     A.    Yes.

46

1                           DOBBEN
2        Q.   Do you know what a note is when you're talking
3    about a mortgage?
4        A.   No.  The amount you owe, I guess.
5        Q.   That's pretty much it, the amount you owe.
6        A.   Okay.
7        Q.   Did you understand that you owed something to
8    whoever was loaning you the money under this note?
9        A.   I don't know.
10       Q.   You didn't know if you owed it or not?
11       A.   Yes.
12       Q.   You knew you owed it?
13       A.   Yes.
14            (Deposition Exhibit Number 20 was marked
15             for identification.)
16       Q.   You've been handed what's been marked as Exhibit
17   20.  Is that your signature?
18       A.   Yes.
19       Q.   Is that your handwritten date?
20       A.   Yes.
21       Q.   Do you see what line is checked?
22       A.   Pardon me?
23       Q.   Do you see what line is checked?
24       A.   Uh-huh.
25       Q.   Is that your checkmark?

47

DOBBEN

1

2      A.   I don't know.

3      Q.   Is it somebody else's checkmark?

4      A.   I don't know.

5      Q.   The box that's checked reads, Principal

6  Residence:  The property will be occupied by me/us as our

7  primary residence.

8           That's not true; right?

9      A.   I never intended to occupy that property.

10     Q.   In fact, there's a box that says, Investment

11  Property:  This property will not be occupied by me/us and

12  will be considered strictly an investor unit.  Do you see

13  that under C?

14     A.   I see that.

15     Q.   Do you have any understanding as to why the box

16  that's checked has any importance at all?

17          MR. PETTIBONE:  It calls for a legal conclusion.

18  You can answer it as you understand it.

19     A.   I guess, yeah, if I'm going to live in the house,

20  I'm going to live in a house.  Okay?

21          (Deposition Exhibit Number 21 was marked

22           for identification.)

23     Q.   (By Mr. Crowther) You've been handed what's been

24  marked as Exhibit 21.  I hope you recognize that document.

25     A.   (Witness nods head.)

48

1                              DOBBEN

2        Q.    What is it?

3        A.    It was my driver's license from Illinois.

4        Q.    In 2007, did you live in Illinois?

5        A.    No.

6        Q.    How long had you not lived in Illinois in 2007?

7        A.    I came here in -- returned here in October.

8        Q.    Of 2000 --

9        A.    6.

10       Q.    And have you lived in Arizona since October of

11   2006?

12       A.    That's when I returned to Arizona.

13       Q.    My question was, Have you lived in Arizona since

14   October of 2006?

15       A.    Yes.

16       Q.    Do you have an Arizona driver's license now?

17       A.    Yes.

18       Q.    Did you have an Arizona driver's license in April

19   of 2007?

20       A.    No.  This one didn't expire until January.

21            MR. CROWTHER:  I wasn't suggesting your license

22   was expired.

23            (A discussion was held off the record,

24             and Deposition Exhibit Number 22 was marked

25             for identification.)

49

1                            DOBBEN

2        Q.   (By Mr. Crowther) You've been handed what's been

3    marked as Exhibit 22.  Is that your signature at the

4    bottom?

5        A.   Yes.

6        Q.   Is that your handwritten date?

7        A.   Yes.

8             (Deposition Exhibit Number 23 was marked

9              for identification.)

10       Q.   You've now been handed what's been marked as

11   Exhibit 23.  Turning to the last page, Ms. Dobben, is that

12   your signature?

13       A.   Yes.

14            (Deposition Exhibit Number 24 was marked

15             for identification.)

16       Q.   You've been handed what's been marked as Exhibit

17   24.  I'll ask you to turn to the second page of this and

18   ask if that's your signature at the bottom.

19       A.   Yes.

20       Q.   Is that your handwritten date?

21       A.   Yes.

22       Q.   Is Exhibit 6 a forgery, Ms. Dobben?

23       A.   I don't think so.

24       Q.   Is Exhibit 7 a forgery, Ms. Dobben?

25       A.   I just answered these.  No.

50

1                          DOBBEN

2        Q.   Is Exhibit 8 a forgery, Ms. Dobben?

3        A.   No.

4        Q.   Is Exhibit 9 a forgery, Ms. Dobben?

5        A.   No.

6        Q.   Is Exhibit 10 a forgery, Ms. Dobben?

7        A.   No.

8        Q.   Is Exhibit 11 a forgery, Ms. Dobben?

9        A.   No.

10       Q.   Is Exhibit 12 a forgery, Ms. Dobben?

11       A.   No.

12       Q.   Is Exhibit 13 a forgery, Ms. Dobben?

13       A.   No.

14       Q.   Is Exhibit 14 a forgery?

15       A.   No.

16       Q.   Is Exhibit 15 a forgery, Ms. Dobben?

17       A.   No.

18       Q.   Is Exhibit 16 a forgery?

19       A.   No.

20       Q.   Is Exhibit 17 a forgery, Ms. Dobben?

21       A.   No.

22       Q.   Is Exhibit 18 a forgery?

23       A.   No.

24       Q.   Is Exhibit 19 a forgery?

25       A.   No.

1                    DOBBEN

2      Q.   Is Exhibit 20 a forgery?

3      A.   No.

4      Q.   Exhibit 21's not a forgery; right?

5      A.   No, sir.

6      Q.   Exhibit 22, is that a forgery?

7      A.   No.

8      Q.   Exhibit 23, is that a forgery?

9      A.   No.

10     Q.   Exhibit 24, is that a forgery?

11     A.   No.

12          (Deposition Exhibit Number 25 was marked

13           for identification.)

14     Q.   Do you recognize what Exhibit 25 is, Ms. Dobben?

15     A.   It's American Funds.

16     Q.   What's that?

17     A.   That's where I have my money.

18     Q.   Did you give this to somebody?

19     A.   I have to say, yes, I did, if you have xeroxed

20  copies of it.

21     Q.   Who do you think you gave it to?

22     A.   Pat Downey.

23     Q.   Is this the bank account information you

24  indicated that you had given to him when he asked you for

25  it?

52

DOBBEN

1

2      A.   Correct.

3      Q.   Did you ever see a rental or lease agreement for

4  the 37th Street property?

5      A.   No.  I've already answered that once.

6      Q.   You've never seen one?

7      A.   No.

8      Q.   Did you -- do you know how much the rent was

9  supposed to be when you purchased the property?

10     A.   No.

11          (Deposition Exhibit Number 26 was marked

12           for identification.)

13     Q.   You've been handed what's marked as Exhibit 26.

14  Have you seen that document before?

15     A.   I'm not sure.  I don't remember.

16     Q.   Do you know what it is?

17     A.   It says it's a Settlement Statement.

18     Q.   Do you know what a settlement statement is used

19  for?

20     A.   No.  I guess to settle something.

21     Q.   Did you make any payments to American Home

22  Mortgage?

23     A.   Yes, sir.

24     Q.   Was that relating to the 37th Street property?

25     A.   Yes.

1                          DOBBEN

2      Q.   Did you have any other loans other than with 37th

3  Street property with American Home?

4      A.   Not that I'm aware of.

5      Q.   Was there a monthly payment that you needed to

6  make?

7      A.   Yes.

8      Q.   Who told you how much the monthly payment was?

9      A.   I don't remember whether I started receiving

10 telephone calls or I had already contacted Pat to ask him

11 where the coupon payments were.

12     Q.   How long after April of 2007 did you ask about

13 coupons?

14     A.   Probably within 30 days because my understanding

15 is within 30 days, you have to start making payments.

16     Q.   Did you have an idea as to how much your payment

17 was supposed to be?

18     A.   Not at that moment, no.

19     Q.   Did it matter to you how much your payment was

20 supposed to be?

21     A.   No, if there was enough rental income coming in

22 from the properties, no.

23          (Deposition Exhibit Number 27 was marked

24             for identification.)

25     Q.   Been handed what's been marked as Exhibit 27.

54

DOBBEN

1
2       Have you ever seen this document before?

3           A.    I don't know.   2 of '06.   My God, I can't

4       remember.

5               MR. PETTIBONE:   If you say something, your

6       thought process, she may be recording it down.

7               THE WITNESS:   Oh, okay.   All I said was 2 of '06,

8       down here.   I don't remember.   Okay.

9               MR. PETTIBONE:   That's the question.   Have you

10      ever seen the document?

11          A.    I'm not sure that I have.

12              (A recess ensued from 10:35 a.m. until

13               10:50 a.m.)

14              MR. CROWTHER:   We'll go back on the record.

15              (Deposition Exhibit Number 28 was marked

16               for identification.)

17          Q.    (By Mr. Crowther) You've been handed what's been

18      marked as Exhibit 28.   Is that also your signature on that

19      document?

20          A.    Yes.

21          Q.    Is that your handwritten date?

22          A.    Yes.

23          Q.    I assume this wasn't a forgery then?

24          A.    No.

25              (Deposition Exhibit Number 29 was marked

                              DOBBEN
1
2              for identification.)
3        Q.    You've been handed what's been marked as Exhibit
4   29.  Is that your signature on the bottom of that first
5   page of that document?
6        A.    Yes.
7        Q.    Is that also your handwritten date?
8        A.    Yes.
9        Q.    I assume this isn't a forgery either then?
10       A.    No.
11       Q.    When I say 37th Street property, you understand
12  I'm talking about the property in Palmdale, California,
13  that was the American Home Mortgage loan; right?
14       A.    Yes.
15       Q.    I just want to make sure we're clear.  I'd rather
16  just say 37th Street property to make it easier.
17       A.    Fine.
18       Q.    And if I say American Home, I mean any of the
19  American Home debtors.  Okay?  So we'll just make it --
20  doesn't matter which one.  Okay?
21       A.    Okay.
22       Q.    All right.  Why do you think American Home knew
23  about the things Mr. Downey had told you?
24            MR. PETTIBONE:  A little vague as to time.  Go
25  ahead and answer it as you know.

56

DOBBEN

1

2    A.    What Mr. Downey told me is what Mr. Downey told

3    me.  I do not know what Mr. Downey told American Homes.

4    Q.    (By Mr. Crowther) Do you know if he told American

5    Home anything?

6    A.    No.

7    Q.    Do you know if he told American Home that you

8    were purchasing the 37th Street property as investment

9    property?

10    A.    I have no idea.

11    Q.    Before you bought it, did you tell American Home

12    that you were buying the 37th Street property as

13    investment property?

14    A.    I don't even know who American Homes is.

15    Q.    Who was supposed to be the initial property

16    management person at the 37th Street property?

17    A.    Ilham Theodory.

18         MR. PETTIBONE:  Do want to spell it for her, if

19    you can.

20         THE WITNESS:  Oh, gosh, I don't know how you

21    spell it.

22         THE COURT REPORTER:  Just say it one more time.

23         THE WITNESS:  Ilhelm.

24         MR. CROWTHER:  It's I-l-h-a-m, and I believe it's

25    -- is it Theodory?

1                          DOBBEN

2              THE WITNESS:  Theodory.

3              MR. CROWTHER:  T-h-e-o-d-o-r-y.

4              THE WITNESS:  Okay.

5              MR. CROWTHER:  See, I got one.

6              THE COURT REPORTER:  You get a gold star.

7              THE WITNESS:  You can have it.

8              (A discussion was held off the record.)

9         Q.   (By Mr. Crowther) We just identified Mr.

10   Theodory.  Is that the gentleman that you thought was the

11   original property management person?

12        A.   It's Mrs.

13        Q.   Oh, oh, it's a Mrs.  See, I don't know.

14             (A discussion was held off the record.)

15        Q.   (By Mr. Crowther) Mrs. Theodory was the property

16   manager?

17        A.   Yes.

18        Q.   Had you ever met Mrs. Theodory?

19        A.   No.

20        Q.   Who introduced you to the concept of Mrs.

21   Theodory existing and was going to manage the property?

22        A.   Pat Downey.

23        Q.   What did Mr. Downey tell you about Mrs. Theodory?

24        A.   She was the property manager.

25        Q.   Of just the 37th Street property or other

1                          DOBBEN

2   properties?

3       A.   Oh, of other properties.

4       Q.   Properties that you were going to buy as well or

5   properties that --

6       A.   Possibly.

7       Q.   Do you know if Mrs. Theodory was a property

8   manager for properties that you weren't going to buy?

9       A.   I have to assume that she is.  She's a property

10  manager.  She has a real estate company and works with Pat

11  Downey and American Homes.

12      Q.   What do you mean she works with American Homes?

13      A.   With Pat Downey, as far as I know, American

14  Homes.

15      Q.   How does Pat Downey work with American Homes?

16      A.   He finds investors and takes them to American

17  Homes to get mortgages.

18      Q.   He's a mortgage broker?

19      A.   Yeah.  As far as I know, yes.

20      Q.   Did Mr. Downey arrange other transactions for you

21  as well?

22      A.   Yes, he was in the process of it, yes.

23      Q.   Do you know if there were other mortgage

24  companies that you borrowed money from in connection with

25  those transactions?

59

1                          DOBBEN

2        A.   I know that he was dealing with other mortgage

3   companies, yes.

4        Q.   Did Mr. Downey work for those mortgage companies

5   as well?

6        A.   As far as I know, he did.

7        Q.   When you say he worked for them, what do you

8   mean?

9        A.   He finds the investors and then goes and finds

10  the mortgage company that's working with.

11       Q.   Working with who?

12       A.   The mortgage companies and the investors.

13       Q.   Meaning you as the investor?

14       A.   Yeah, like he's a middle man.

15       Q.   He brokers deals?

16       A.   Okay.

17       Q.   Does that sound about right?

18       A.   I guess so, yes.

19       Q.   Do you know if there was a particular reason why

20  you didn't use the same lender for each transaction that

21  you purchased property?

22       A.   Have no idea, no idea.

23       Q.   Do you think maybe he was shopping around for the

24  deals?

25       A.   Could be.

60

DOBBEN

1

2    Q.   Do you think he was looking for better deals

3    between different lenders?

4    A.   Could be.

5    Q.   Did you expect him to do that?

6    A.   I don't think I gave it a thought.

7    Q.   Other than that the income on the property was

8    higher than the mortgage payment, did you care?

9    A.   No, as long as it was all a clean transaction.

10   Q.   What do you mean by a clean transaction?

11   A.   That everything would go smoothly.

12   Q.   When you bought the 37th Street property, did it

13   not go smoothly?

14   A.   I don't know how to answer that.

15   Q.   Was there a reason you don't think it went

16   smoothly?

17   A.   The way it's turned out.

18   Q.   After the fact?

19   A.   Yes.

20   Q.   The actual transaction part where you bought the

21   property, did that go smoothly?

22   A.   I would say, Yes.

23   Q.   Basically if the mortgage payment you had to pay

24   on the 37th Street property was $2,000 and the income that

25   you were receiving was $2,500, everything would be fine?

DOBBEN

1

2    A.   Yes.

3    Q.   The problem is that the income you were receiving

4 wasn't even as much as the mortgage payment; correct?

5    A.   That's correct, yes.

6    Q.   Whose fault is that, do you think?

7    A.   I don't know.

8    Q.   Do you blame Mr. Downey?

9    A.   I blame Mr. Downey, and I also blame the people

10 that put the package together.

11    Q.   Why?

12    A.   Because we have truth in lending.  We have

13 underwriters that are supposed to look at these things,

14 and it's something I never should have been in.

15    Q.   Because why?

16    A.   Because I don't have the money to support this.

17    Q.   When you bought the --

18    A.   This is what I consider a scam.

19    Q.   When you bought the 37th Street property, isn't

20 it true you had approximately $160,000 in the bank?

21    A.   Yes.

22    Q.   Do you think if you wanted to buy a piece of

23 property, you wouldn't be approved for a mortgage?

24    A.   It would depend on the price of the property.

25    Q.   Sure.  Let's start with a mortgage for $400,000.

62

DOBBEN

1
2    A.   No.

3    Q.   Do you think you would not be approved for that?

4    A.   Correct.

5    Q.   Why not?

6    A.   Because at 70 years old, that's all the income I

7 have. I wouldn't have been approved. Shouldn't have been

8 approved.

9    Q.   By all the income you have, you mean your social

10 security income?

11   A.   Yeah.

12   Q.   In 2007, what was your social security income?

13   A.   Oh, gosh, probably $721.

14   Q.   Did you have any other income other than social

15 security income?

16   A.   No, sir.

17   Q.   Did you have any earnings on your investments?

18   A.   Just interest.

19   Q.   In 2007, did you have any investment properties?

20   A.   No.

21   Q.   Were you anticipating having earnings from the

22 properties you purchased?

23   A.   Yes, hopefully.

24   Q.   The 37th Street property, do you know how much it

25 was worth at a market value basis when you purchased it?

63

1                              DOBBEN

2       A.   No.

3       Q.   Did you ask anybody?

4       A.   No.

5       Q.   Did you care?

6       A.   I don't think so.

7       Q.   As long as the income was more than the mortgage

8    payment?

9       A.   Correct.  As long as it could sustain itself.

10       Q.   And Mr. Downey told you it could?

11       A.   Yes.

12       Q.   Did Mrs. Theodory tell you it could?

13       A.   I honestly don't remember whether she did or not.

14       Q.   Have you ever met Mrs. Theodory in person?

15       A.   Yes.

16       Q.   When?

17       A.   My gosh, Alex and I drove up to see the

18    properties and met Ilham at her office.  And she called.

19    We had told her we were coming and made appointment, made

20    an appointment to see the house.

21       Q.   When was this?

22       A.   Probably in June.

23       Q.   Of '07?

24       A.   Yes.

25       Q.   And are we talking about the 37th Street

64

1                         DOBBEN

2    property?

3        A.   Yes.

4        Q.   So did you actually see the 37th Street property

5    in June of 2007?

6        A.   Yes.

7        Q.   What did you think?

8        A.   I was stunned.

9        Q.   What were you stunned about?

10       A.   First of all, the size of the property, that it

11   did not look like a property that was being lived in.

12       Q.   What do you mean?

13       A.   It looked like people had just started to move in

14   or were camping.

15       Q.   Camping inside or outside?

16       A.   Inside.

17       Q.   Did you ask Ms. Theodory for an explanation as to

18   what was going on?

19       A.   I don't remember whether I did or not.  By this

20   time, I was so in shock as to what -- yeah.

21       Q.   Did you buy any additional investment properties

22   after visiting the 37th Street property?

23       A.   No.

24       Q.   What did you do with respect to Mr. Downey?

25       A.   I think we tried to have a conversation with him,

1                          DOBBEN

2    and then red flags went up and we started notifying people

3    that, you know, we notified the FBI.  We notified American

4    Homes.  Alex went on the internet, and there was a list of

5    who you could notify if you felt that there was fraud.

6    And so we scrambled and put binders together and sent them

7    out to everybody that was on that list.

8         Q.   And when did all of this happen?

9         A.   In June, as soon as we realized that this was not

10   what we had thought it was going to be.

11        Q.   And why -- what was different about it that you

12   thought it wasn't what you thought it was going to be?

13        A.   Well, because if you're told something is one way

14   and then when you go and see and it's completely

15   different.

16        Q.   And the person who told you that was Mr. Downey?

17        A.   Correct.

18        Q.   Did anyone else other than Mr. Downey tell you

19   anything about the income on the investment property being

20   greater than the mortgage payment?

21        A.   Mr. Downey was the one that I was dealing with.

22        Q.   Do you know with respect to the 37th Street

23   property whether it was listed for sale prior to you

24   supposedly buying it?

25        A.   I have no idea.  I have no idea.

66

1                          DOBBEN

2       Q.   Do you know what the sale price or listing price

3    was for that property?

4       A.   I don't know that it was ever listed.

5       Q.   Do you know if the property was ever appraised by

6    anyone?

7       A.   I believe the property was appraised.

8       Q.   Do you know for how much it was appraised?

9       A.   No.

10      Q.   Do you know how many times it was appraised

11   relating to your transaction?

12      A.   No.

13      Q.   Does it matter to you if it was appraised or not?

14      A.   I think it should have been.

15      Q.   Why?

16      A.   I think there should have been a home inspection.

17      Q.   Did you ever ask for a home inspection?

18      A.   Yes.

19      Q.   Who did you ask for it?

20      A.   Through Pat Downey.

21      Q.   And what did Mr. Downey say in response to your

22   request to have a home inspection?

23      A.   Had all been taken care of.

24      Q.   What do you mean by it's all been taken care of?

25      A.   That it was done.  It's been taken care of.

67

DOBBEN

1

2      Q.   Did he tell you what the results of that home

3  inspection were?

4      A.   I don't remember.

5      Q.   Did you ask if there were any problems with the

6  property that you should be aware of?

7      A.   No.

8      Q.   Did you ever ask if there were any property

9  defects that needed to be corrected?

10      A.   No.

11      Q.   Did you ever ask if you could see a copy of an

12  inspection report?

13      A.   I don't know.

14      Q.   Is it fair to say that when you actually bought

15  the property that because Mr. Downey had told you it was

16  inspected, you simply assumed it was inspected and was

17  fine?

18      A.   I don't know that when I bought the property that

19  Mr. Downey had told me there was an inspection.

20      Q.   Okay.  When did you ask him about an inspection?

21      A.   I believe after I had seen the house.  You have

22  to understand.  I thought there was a full-time reliable

23  tenant in the house.

24      Q.   Were you told the name of the tenant that was

25  supposed to have been in the house when you bought it?

68

DOBBEN

1

2      A.   No.

3      Q.   And the person who told you or gave you the

4   impression that there was a full-time tenant was Mr.

5   Downey?

6      A.   Correct.

7      Q.   Did anyone else tell you or give you that

8   impression other than Mr. Downey?

9      A.   I had no contact with anyone other than Mr.

10  Downey.

11     Q.   Do the names Brian and Kalisha Jefferson ring any

12  bells with you?

13     A.   Yes.

14          THE COURT REPORTER:  The name what?

15          MR. CROWTHER:  Brian and Kalisha Jefferson,

16  K-a-l-i-s-h-a.

17     A.   Yes.  They were the tenants in the property.

18     Q.   (By Mr. Crowther) When were they supposed to have

19  been tenants in the property?

20     A.   As far as I knew, for a long time.

21     Q.   But you weren't told their names before you

22  bought the property?

23     A.   Correct.

24     Q.   But you believe they were the same tenants who

25  were there before and after you bought the property?

69

                          DOBBEN

1

2      A.   Correct.

3      Q.   Do you know if in fact they were there before and

4    after you bought the property?

5      A.   I know that after, yes.  Before, no.

6      Q.   Do you know how much rent Brian and Kalisha

7    Jefferson were supposed to have been paying for 37th

8    Street property?

9      A.   At the moment, I can't give you a figure, no.

10     Q.   Do you know if they paid it every month, whatever

11   that number was?

12     A.   When I supposedly owned the property?

13     Q.   Yes.

14     A.   No, they never did.

15     Q.   They never paid rent?

16     A.   No.  They would pay portions of rent, but never

17   the amount to cover the mortgage.

18     Q.   Well, do you know -- when you say portion of the

19   rent, are you saying that they didn't pay enough to cover

20   the mortgage or they didn't pay --

21     A.   Correct.

22     Q.   -- or they didn't pay what they thought they were

23   supposed to pay?

24     A.   They didn't pay enough to pay the mortgage.

25     Q.   If there were no repair bills, would that have

DOBBEN

1
2   changed the equation, the math equation?

3      A.   I don't know.

4      Q.   Do you know if their base rent was more or less

5   than the amount of the mortgage payment?

6      A.   Repeat that.

7      Q.   Sure.  Do you know if their base rent was more or

8   less than the amount of your mortgage payment for the 37th

9   Street property?

10      A.   I didn't know then, no.

11      Q.   Do you know now?

12      A.   It's been two and a half years.  No, I have --

13   no.

14      Q.   Did you know if there was a management fee that

15   was supposed to have been paid to Mrs. Theodory for

16   managing?

17      A.   Not at the time.

18      Q.   When did you find out that there was a management

19   fee?

20      A.   When I met with Ilham.

21      Q.   In June of 2007?

22      A.   Correct.

23      Q.   Did you get any rent payments, say, in May of

24   2007?

25      A.   I don't remember.  I don't remember.

1                          DOBBEN

2       Q.   Did you ever actually get a check from somebody

3    for rent?

4       A.   Yes.

5       Q.   When did you start getting checks from somebody

6    for rent?

7       A.   I don't remember.  I don't remember.

8       Q.   When the rent first started being paid, where did

9    the checks come from?

10      A.   I believe the checks were given to Ilham, and

11   Ilham deposited them into a checking account that I had

12   opened.

13      Q.   Was that checking account in your name?

14      A.   Yes.

15      Q.   And where was that checking account, at what

16   bank?

17      A.   Bank of America.

18      Q.   So you opened up a bank account at Bank of

19   America for purposes of the rent checks?

20      A.   Correct.

21      Q.   Do you know if the rent checks were payable to

22   you or to something else or someone else?

23      A.   Don't honestly remember.

24      Q.   Did you go visit other properties that you had

25   purchased through Mr. Downey as investment properties at

72

1                          DOBBEN

2     the same time?

3         A.    Yes.

4         Q.    Were they all sort of similar in condition?

5         A.    Similar in condition.  One was over lived in, and

6     one was completely vacant.

7         Q.    Any of the properties that he had put you in, I

8     think that's the phrase we're using in your claim, were

9     any of them what he said they were?

10        A.    No.

11        Q.    Did you find that out in June of 2007?

12        A.    Yes.

13        Q.    What did you think of Mr. Downey at that point in

14    time?

15        A.    I don't think you want it to go on record, sir.

16        Q.    I do.  What did you think of Mr. Downey at that

17    point in time?

18        A.    At that point in time?  Do I dare say it?

19              MR. PETTIBONE:  Yeah, go ahead.

20        A.    I'd have taken him out in the desert, stripped

21    him down bare and poured honey on him and let the ants eat

22    him up.

23        Q.    (By Mr. Crowther) Why?

24        A.    Because he -- because of what he had done to me.

25        Q.    Because he lied to you?

73

1                          DOBBEN

2      A.   Certainly, he lied to me.

3      Q.   Because he tricked you?

4      A.   Whatever you want to say, yes.

5      Q.   Because he stole your money?

6      A.   No.  He didn't steal my money.

7      Q.   He didn't?

8      A.   No.

9           MR. PETTIBONE:  You want to take a break?

10          THE WITNESS:  No.

11          MR. CROWTHER:  Do you want to take a few minutes,

12   Doug?

13          MR. PETTIBONE:  Just a couple minutes.

14          MR. CROWTHER:  Yeah, let's take a couple minutes.

15          (A recess ensued from 11:16 a.m. until

16           11:24 a.m.)

17      Q.   (By Mr. Crowther) Did you ever terminate the

18   services of Mrs. Theodory as manager of your property at

19   37th Street?

20      A.   You betcha.

21      Q.   Why?

22      A.   Because she's in cahoots with Pat Downey.

23      Q.   And why do you think that?

24      A.   I don't know for a fact.  That's a feeling.  Why

25   would he have sent me to her if that wasn't another one of

                         DOBBEN

1
2    his, whatever you want to call it, cohorts, bed fellows.

3    It's a ring.  It's a ring.

4        Q.    It's a ring?

5        A.    Sure.

6        Q.    Who's in the ring?

7        A.    Pat, people he works with, Ilham.

8        Q.    Anyone else?

9        A.    I'm sure.

10       Q.    Well, I'm asking you.

11       A.    His broker, Greg Clark.

12       Q.    Anyone else?

13       A.    Not that I -- the appraisers.  Who are the

14   appraisers?  I don't know.

15       Q.    How do you know if they're part of the ring if

16   you don't know who they are?

17       A.    That's just a feeling I have.  It has to be a den

18   of thieves.  Excuse me.

19       Q.    It must be because otherwise it wouldn't happen?

20       A.    Pretty much so.

21       Q.    When did you terminate the management services of

22   Mrs. Theodory?

23       A.    Probably in July.  Shortly after I'd seen the

24   properties.  Maybe August.

25            (Deposition Exhibit Number 30 was marked

75

                              DOBBEN
1
2                  for identification.)
3        Q.    You've been handed what's been marked as Exhibit
4   30.  Have you seen this before?
5        A.    I may have.
6        Q.    Do you remember paying a $500 upfront fee to
7   Preferred Real Estate for management fees?
8        A.    I remember giving Ilham a check for $500.  I
9   don't know who I made it payable to.
10       Q.    Do you know if Ilham is associated with Preferred
11  Real Estate?
12       A.    I think that's who she is.
13       Q.    Has a monthly management fee of $100.  Do you see
14  that?
15       A.    Uh-huh.
16       Q.    Did you understand that was supposed to be the
17  management fee for the 37th Street property?
18       A.    No, not at the time, no.
19       Q.    I'm not sure if I asked.  Did you pay this
20  invoice?
21       A.    I remember paying $500, yes.
22       Q.    Did you pay anything else other than the $500?
23       A.    I don't think so.  I think I came back to
24  Arizona, and I was supposed to send her more money for
25  managing the properties, and I wouldn't do it.  I just

1                            DOBBEN
2      stopped.
3           Q.   You refused to do anymore?
4           A.   Absolutely.
5                (Deposition Exhibit Number 31 was marked
6                 for identification.)
7           Q.   Is that your signature on Exhibit 31, Ms. Dobben?
8           A.   Yes.
9           Q.   This isn't a forgery; right?
10          A.   No.
11               (Deposition Exhibit Number 32 was marked
12                for identification.)
13          Q.   You've been handed what's been marked as Exhibit
14     32.  Do you recognize that document?
15          A.   Uh-huh.
16          Q.   Have you seen that document before today?
17          A.   Yes, sir.
18          Q.   And what is it?
19          A.   It's a letter that Ilham receive -- she had
20     received a letter from my daughter saying that, you know,
21     Hey, let's stop all this stuff.
22          Q.   What's the date of this?
23          A.   October 1st.
24          Q.   Of 2007?
25          A.   Uh-huh.

1                          DOBBEN

2        Q.    It says, "I received a call today from your

3    daughter Alex and your friend Paula Rush terminating my

4    management of your properties."  Did she in fact receive a

5    call from your daughter Alex and Paula Rush terminating

6    the management of your properties?

7        A.    As far as I know, yes.

8        Q.    Do you believe it was on October 1st of 2007?

9        A.    Thereabouts, yeah.

10       Q.    It says in the second paragraph, "As per our

11   conversation, you told me to deduct the fees for the

12   repairs and deposit the rest in the bank account."  Do you

13   see that?

14       A.    Yes.

15       Q.    Did you tell Ms. Theodory that?

16       A.    There was a -- there were some charges made.

17   There was a water heater that had to go into one property,

18   which I was not aware of until after the fact.  And

19   somebody had complained about a garage door needed repair.

20       Q.    Did you tell her to deduct fees for repairs and

21   deposit the balance of it into the bank account?

22       A.    I think I probably said something like if the

23   things that need to be done, they need to be taken care of

24   to satisfy tenants who are living in the properties.

25       Q.    It says in the bank account.  Is that the one at

78

DOBBEN

1
2    Bank of America?

3        A.    Yes, that would be into my checking account, yes.

4        Q.    Did you have one bank account for all the

5    investment properties you had?

6        A.    Yes.

7        Q.    Okay.

8        A.    Yes.

9        Q.    So she managed multiple properties, and all the

10   rents checks would go into the one bank account?

11       A.    Correct.

12       Q.    Okay.  The last line says, "You will find copies

13   of receipts, management agreements, lease agreements,

14   copies of deposit slips."

15             Do you see that?

16       A.    Yes.

17       Q.    Were those things included with this letter sent

18   to you?

19       A.    I honestly don't know.  I know she had sent me a

20   management agreement which I told her I was not going to

21   sign and she had also sent deposit receipts that were

22   extremely hard to understand because you couldn't tell

23   where what was going and who it was coming from.

24       Q.    Do you monitor your credit report?

25       A.    Yes, sir, I do.

79

DOBBEN

1

2  Q.   How long have you been monitoring your credit

3  report?

4  A.   Probably four or five years.

5  Q.   How often do you monitor your credit report?

6  A.   Every time it comes.

7  Q.   What do you mean "every time it comes"?

8  A.   I have, through my Discover card, a fraud alert.

9  So every quarter I receive credit reports so I know who

10  dings my credit, any inquiries, always a red flag for

11  that.

12  Q.   Now or they were for years?

13  A.   No.  I've been doing this now probably for four

14  years.

15  Q.   Have you been denied credit in the last three

16  years?

17  A.   No.

18  Q.   Have you applied for credit and been refused

19  credit in the last three years?

20  A.   No, sir.

21  Q.   Have you ever been denied credit in your entire

22  life?

23  A.   No, sir.  I had a 8.6 credit average.

24  Q.   Now?

25  A.   No.

80

                                DOBBEN

1

2        Q.    What is it now?

3        A.    647.

4        Q.    Was there some credit you wanted to go apply for

5    but didn't?

6        A.    No.  No, I wouldn't even try at this point.

7        Q.    Back in April of 2007, do you think you were

8    creditworthy?

9        A.    I know I was.

10       Q.    Why do you know you were?

11       A.    Because just prior to that, I had opened a Home

12   Depot credit card and was told that, Hey, excellent

13   credit, no problem.

14       Q.    Do you know what a trustee's sale is?

15       A.    I believe it's when attorneys go in and there's

16   bidding on property.  I'm not sure.

17       Q.    Do you know if a trustee's sale is basically a

18   foreclosure?

19       A.    If you say so, okay.

20       Q.    Well, I'm asking you.  Do you know if they're the

21   same?

22       A.    No, I do not know if they're the same thing.

23       Q.    Do you know how the property at 37th Street was

24   sold?

25       A.    No.

81

1                              DOBBEN
2         Q.    Do you know if there was a foreclosure?
3         A.    I understand there was a foreclosure, yes.
4         Q.    How do you understand that there was a
5    foreclosure?
6         A.    There was a paper sent to the house that said
7    foreclosure.  Okay?
8         Q.    To what house?
9         A.    Sent to my residence in Sun City.
10        Q.    By whom?
11        A.    I don't remember.  I don't remember whether it
12   was a -- do you call them a foreclosure company or a group
13   of attorneys?  I don't know.  Yes.
14        Q.    When was that?
15        A.    But there was a foreclosure.
16        Q.    When was that?
17        A.    I can't give an exact date.
18               (Deposition Exhibit Number 33 was marked
19                for identification.)
20        Q.    You've been handed what's been marked as Exhibit
21   33.  Do you recognize this document?
22        A.    I have to say I believe I do, that T.D. Service
23   Company.
24        Q.    Is that your handwriting at the top where it says
25   "R-e-c" --

82

1                           DOBBEN
2        A.    Yes.
3        Q.    -- "4-11-08"?
4        A.    Yes, it is.  Yes, it is.
5        Q.    Does that mean you received this on April 11th,
6    2008?
7        A.    Yes.
8        Q.    Was this received at your Sun City address, or
9    was this received at the property address in California?
10       A.    No, this would have come to my home in Sun City.
11       Q.    Did you attend the trustee's sale that was
12   scheduled under this notice here?
13       A.    No, sir.
14       Q.    It says -- you see where it says the "said sale
15   will be held April 29th, 2008, at 11:00 a.m."?  Do you see
16   that at the bottom?
17       A.    Yes.
18       Q.    Were you aware there was going to be a sale based
19   upon this on April 29th, 2008 at 11:00 a.m.?
20       A.    Yes.  And I received it on 4/11?
21       Q.    That's what it says.  I'm not sure if you did or
22   not.
23       A.    Yeah.
24       Q.    But you were; right?
25       A.    Yeah.  Yes, sir, that the sale's on 4/10, and I

1                               DOBBEN
2     received it on 4/11.
3          Q.   Actually it says the sale's on April 29th of
4     2008?
5          A.   Oh, excuse me.
6          Q.   Doesn't it?  At the bottom of the page, first
7     page.
8          A.   Oh.
9          Q.   It says, "Said sale will be held on April 29th,
10    2008" --
11         A.   Oh, okay.
12         Q.   -- "at 11:00 a.m."?
13         A.   Yes, uh-huh.
14         Q.   You see that?
15         A.   Yes.
16         Q.   So you received it on April 11 --
17         A.   Uh-huh.
18         Q.   -- for a sale scheduled for April 29th; correct?
19         A.   Yes.
20         Q.   Was your daughter Alex involved at all in the
21    transaction where you purchased the 37th Street property?
22         A.   No.
23         Q.   Did she know about it at the time it was
24    happening?
25         A.   No, I don't think she did.  No.  I think when

84

DOBBEN

1
2    these properties were in the makings, she was in
3    production.
4        Q.   Meaning she was making a film?
5        A.   Correct.
6        Q.   Did she know that you had actually bought
7    property at 37th Street at all?
8        A.   I don't think so.
9        Q.   Did you ever -- when was the first time you
10   believe she found out that you had purchased property at
11   37th Street?
12       A.   Maybe shortly after.  I don't really know.
13       Q.   You mean like a week, a month?
14       A.   Let's say maybe like three weeks because she was
15   out on a shoot for a few weeks.  I had no contact with her
16   during that time.
17       Q.   When you're talking about the illegal
18   foreclosure, is that the trustee sale that you're
19   referring to, the one we just discussed?
20       A.   Uh-huh.
21       Q.   Was there another illegal foreclosure that you're
22   aware of?
23       A.   Not at the moment, no.
24       Q.   It's not a trick question.  I just simply asked.
25       A.   Okay.

85

                              DOBBEN

1

2       Q.   I'm just wondering.

3       A.   I mean, if they did something else, I don't know

4   it, unless you got a paper and say.

5       Q.   Has anyone sought to bring any legal action

6   against you to recover any additional amounts due under

7   the mortgage that was the subject of the trustee sale?  Do

8   you understand what I'm asking?

9       A.   No.  Start over.

10      Q.   Sure.  You understand the property is sold at a

11  trustee's sale; correct?

12      A.   I hope it was.

13      Q.   And that somebody bid something for it; correct?

14  That sometimes the bid isn't as much as the amount of the

15  debt.  Do you understand --

16      A.   Okay.

17      Q.   -- that could happen?

18      A.   Okay.  I understand that.

19      Q.   Has anyone sought to come after you personally

20  for any difference between the amount of the bid and the

21  amount of the debt?

22      A.   I don't think so.

23      Q.   No one's sued you?

24      A.   No, no.  No, no one's sued me.

25      Q.   Have you gotten any letters?

1                         DOBBEN

2       A.   No, no.

3       Q.   No one's said, Ms. Dobben, you owe us $200,000

4  because we didn't sell your house for too much money?

5       A.   No.

6       Q.   That would probably make you even angrier,

7  wouldn't it?

8       A.   Well, you ain't going to get blood out of a

9  stone, baby.  Sue away.

10       Q.   That would upset you though, wouldn't it?

11       A.   Well, sure.

12       Q.   And none of these mortgage lenders have sued you

13  for anything?

14       A.   Not that I'm aware of.

15       Q.   Has anyone sent you a collection notice after

16  they sold your property asking you for more money?

17       A.   I don't believe so.

18       Q.   Did you want to continue to own these investment

19  properties?

20            MR. PETTIBONE:  At what time?

21       Q.   (By Mr. Crowther) After they were sold?

22       A.   No, no, no.

23       Q.   Did you want to continue to own them after, say,

24  August of 2007?

25       A.   Not after I saw the problems it was causing,

DOBBEN

1

2    absolutely not, no.

3        Q.    So after June of 2000 when you -- 2007 when you

4    saw the problems with the properties, you didn't want them

5    anymore?

6        A.    Not under the circumstances that they were, no.

7    Did I continue to make the payments as long as I could?

8    Yes.

9        Q.    How long did you continue to make the payment on

10    the American Home mortgage?

11        A.    I don't -- I don't recall, honestly don't recall.

12        Q.    Did you pay it after June of 2007?

13        A.    I believe I did.

14        Q.    What happened that you weren't able to continue

15    to make the payments anymore?

16        A.    There wasn't enough money.  The well ran dry.

17        Q.    At that time, how many mortgage payments were you

18    making when the well ran dry?

19        A.    I think there were six.

20        Q.    Were you receiving calls from the mortgage

21    companies when you stopped sending payments?

22        A.    Yes, yes.

23        Q.    Did you talk to them when they called?

24        A.    Yes.  Some I did, yes.

25        Q.    Did you talk to American Home?

88

DOBBEN

1

2    A.   I don't remember whether I did or not.

3         (Deposition Exhibit Number 34 was marked

4          for identification.)

5    Q.   Have you seen this document before that's been

6    marked as Exhibit 34?

7    A.   I don't know what this is.

8    Q.   Do you know whose handwriting that is where it

9    says "refused all calls"?

10   A.   No, I don't know.  I don't know whose that is.

11   Q.   I'll represent to you that these are calls made

12   to you by American Home Mortgage Servicing, Inc. in

13   October of 2007.

14   A.   Okay.

15   Q.   Do you see what their responses are on each of

16   the calls?

17   A.   It says, "refused all calls."

18   Q.   Do you see on each entry where it says,

19   "10/23/07, time, 20:09, no answer."  And it goes down.  No

20   answer.  No answer.  No answer.  Do you see that?

21   A.   Uh-huh.

22   Q.   Were you not accepting calls from American Home

23   in October of 2007?

24   A.   Not intentionally.  I do have an answering

25   machine.

89

1                              DOBBEN

2      Q.   Were you refusing calls from American Home in --

3      A.   No.

4      Q.   -- October of 2007?

5      A.   No.

6      Q.   Why would someone say you were?

7           MR. PETTIBONE:  Calls for speculation.

8      Q.   (By Mr. Crowther) You're allowed to answer.

9           MR. PETTIBONE:  It's conjecture.  If you know.

10     Q.   (By Mr. Crowther) Why would someone say you

11  refused all calls?

12     A.   I have no idea, and I don't know who wrote that.

13     Q.   Were you refusing calls from American Home in

14  October of 2007?

15          MR. PETTIBONE:  It's been asked --

16     A.   No.

17          MR. PETTIBONE:  -- and answered.

18          THE COURT REPORTER:  Answer?

19          MR. CROWTHER:  I'm sorry?

20     A.   No, no.

21     Q.   (By Mr. Crowther) Would you have had a reason to

22  refuse calls from American Home in October of 2007?

23     A.   In October of '07?

24     Q.   Yes.

25     A.   No.

                              DOBBEN

1

2              MR. CROWTHER:  No further questions.

3              MR. PETTIBONE:  I have no questions.  Can we go

4    off the record and talk about the transcript?

5              (A discussion was held off the record.)

6              MR. PETTIBONE:  Yes.  A PDF format would be the

7    best for me or some sort of electronic transfer.

8              (A discussion was held off the record.)

9              MR. PETTIBONE:  My client will read the

10   deposition transcript, and she will sign it and make any

11   changes as are necessary.  I'll notify counsel within

12   three days of its receipt to us of any changes or

13   modifications in writing.

14             MR. CROWTHER:  And we will indeed reserve our

15   right to redepose her in the event she changes -- makes

16   any material changes to the deposition.

17             MR. PETTIBONE:  Fair enough.

18

19             (Deposition concluded at 11:54 a.m.)

20

21

22

23

24

25

91

1                       A C K N O W L E D G M E N T

2

3    STATE OF              )

4                          ) ss.:

5    COUNTY OF             )

6

7              I, MONA DOBBEN, hereby certify that I

8    have read the transcript of my testimony taken under

9    oath in my deposition; that the transcript is a true,

10   complete and correct record of my testimony, and that

11   the answers on the record as given by me are true

12   and correct.

13

14                    _____

15                          MONA DOBBEN

16

17   Signed and subscribed to before

18   me, this      day of           ,

19   20__.

20

21   _____

22   Notary Public, State of _____

23

24

25

92

```
1                   C E R T I F I C A T E

2      STATE OF ARIZONA        )
                               ) ss.
3      COUNTY OF MARICOPA      )

4              BE IT KNOWN that the foregoing deposition was

5      taken by me, Deborah Cleary, RPR, a Certified Reporter,

6      Certificate #50663, for the State of Arizona, and by

7      virtue thereof authorized to administer an oath; that the

8      witness before testifying was duly sworn by me to testify

9      to the whole truth; that the questions propounded by

10     counsel and the answers of the witness thereto were taken

11     down by me in shorthand and thereafter reduced to print by

12     computer-aided transcription under my direction; that

13     pursuant to request, notification was provided that the

14     deposition is available for review and signature; that the

15     foregoing pages are a full, true and accurate transcript

16     of all proceedings and testimony had and adduced upon the

17     taking of said deposition, all to the best of my skill and

18     ability.

19             I FURTHER CERTIFY that I am in no way related to nor

20     employed by any of the parties hereto, nor am I in any way

21     interested in the outcome hereof,

22             DATED at Phoenix, Arizona, this 22nd day of

23     November, 2009.

24                            Deborah Cleary, RPR/CR
                              Certified Reporter
25                            Certificate No. 50663
```

# Ex. 1-34

# Filed Under Seal