UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


| | | |
|---|---|---|
| IN RE: | . | Case No. 07-11047 (CSS) |
| | . | |
| AMERICAN HOME MORTGAGE, | . | |
| HOLDINGS, INC., a | . | 824 North Market Street |
| Delaware Corporation, | . | Wilmington, DE 19801 |
| et al., | . | |
| | . | |
| Debtors. | . | December 9, 2009 |
| . . . . . . . . . . . . . . | | 10:09 a.m. |


TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:          Young, Conaway, Stargatt & Taylor
                             LLP
                          By:  CURTIS J. CROWTHER, ESQ.
                               MICHAEL S. NEIBERG, ESQ.
                          The Brandywine Building
                          1000 West Street, 17th Floor
                          P.O. Box 391
                          Wilmington, DE  19899

                          American Home Mortgage
                          By:  EILEEN WANEKA


For the Creditors         Hahn & Hessen LLP
Committee:                By:  EDWARD SCHNITTER, ESQ.
                          488 Madison Avenue
                          14th and 15th Floor
                          New York, NY  10022


Audio Operator:           Leslie Murin


Proceedings recorded by electronic sound recording, transcript
                produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES  (CONT'D):

For Mona Dobben:            The Law Office of Douglas Pettibone
                           By:  DOUGLAS PETTIBONE, ESQ.
                           17848 Sky Park Circle
                           Suite C
                           Irvine, CA  92614

For the Dobben             The Law Office of Vivian Houghton
Plaintiffs:                By:  VIVIAN HOUGHTON, ESQ.
                           800 West Street, 2nd Floor
                           Wilmington, DE  19801

# I N D E X

|  | PAGE |
|---|---|
| **WITNESSES FOR THE DOBBEN PLAINTIFFS** | |
| PAULA RUSH | |
| Direct Examination by Mr. Pettibone | 11 |
| Cross Examination by Mr. Crowther | 46 |
| Redirect Examination by Mr. Pettibone | 52 |
| | |
| ALEX RYAN YAMAMURA | |
| Direct Examination by Mr. Pettibone | 59 |
| Cross Examination by Mr. Crowther | 70 |
| Redirect Examination by Mr. Pettibone | 88 |
| | |
| MONA DOBBEN | |
| Direct Examination by Mr. Pettibone | 95 |
| Cross Examination by Mr. Crowther | 116 |

| **EXHIBITS** | | **I.D.** | **EVD.** |
|---|---|---|---|
| P-1 | Purchase Contract | 38 | 130 |
| P-2 | Uniform Residential Loan App. | 39 | 130 |
| P-4 | Appraisal | 44 | 130 |
| P-6 | Verification Bureau Document | 45 | 130 |
| P-17 | HUD-1 | 28 | 130 |
| P-18 | Portion of Lender Loan File | 24 | 130 |
| P-19 | Document | 27 | 130 |
| P-22 | Clear to Close Authorization | 28 | 130 |
| P-22B | Document | 29 | 130 |
| P-22C | Document | 31 | 130 |
| P-25A | Servicing Records | 33 | 130 |
| P-26 | Foreclosure Notice | 36 | 130 |
| P-26 | Notice of Trustee Sale | 21 | 130 |
| P-28 | Release | 14 | 130 |
| P-29D | Letter | 16 | 130 |
| P-31A | Cover for Priority Mail | 17 | 130 |
| P-33 | 12/19/07 Letter | 17 | 130 |
| P-34 | Letter | 18 | 130 |
| P-34C | 4/30/08 Letter | 19 | 125 |
| P-36 | Power of Attorney | 20 | 130 |
| P-37 | Mortgage Trust Information | 23 | |
| P-56 | Document of Mr. Downey's license revoked | | 128 |
| P-58 | Screen shot | | 128 |
| P-61 | Registration of note with MEARS | | 129 |
| P-67 | Document | | 129 |
| P-68 | Document | | 130 |
| P-71 | Document | 57 | 130 |

**J&J COURT TRANSCRIBERS, INC.**

4

## I N D E X (CONT'D)

| **EXHIBITS** | **I.D.** | **EVD.** |
|---|---|---|
| P-72      Document | | 126 |
| D-1 thru | | |
| 41        Documents | | 131 |

**CLOSING ARGUMENTS**

| | | |
|---|---|---|
| By Mr. Pettibone | | 131 |
| By Mr. Crowther | | 149 |

**DECISION**

| | | |
|---|---|---|
| By the Court | | 159 |

**J&J COURT TRANSCRIBERS, INC.**

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Good morning.

3          UNIDENTIFIED ATTORNEYS:  Good morning, Your Honor.

4          THE COURT:  We are here on the evidentiary hearing in

5    connection with the debtor's claim objection to the claims of

6    Ms. Dobben, or Mrs. Dobben.  Did I pronounce that right?  Is it

7    Dobben or --

8          UNIDENTIFIED ATTORNEY:  Dobben.

9          THE COURT:  Dobben.  Mrs. Dobben.  As the debtor has

10   the burden of proof to rebut the prima facie validity of the

11   claim, I think it would be appropriate to start with Mr.

12   Crowther's case, unless you've agreed otherwise, and then turn

13   to Mrs. Dobben.  But if you wish to proceed otherwise I'm happy

14   to hear that.  You're making a face, Mr. Pettibone, so --

15         MR. PETTIBONE:  Yes.  We had prepared it for us to

16   meet the burden of proof.  If I could have a moment to talk to

17   my client?

18         THE COURT:  Well, Mr. Crowther, if you don't object?

19         MR. CROWTHER:  I certainly wouldn't object, Your

20   Honor --

21         THE COURT:  All right.

22         MR. CROWTHER:  -- but I would ask that witnesses be

23   asked to leave the courtroom so they're not here while other

24   witnesses testify.

25         THE COURT:  All right.  Mr. Pettibone, do you -- how

1  would you like to proceed?  You're going to go first?  I

2  believe you have -- intend to call Mrs. Dobben.  I have your

3  list here -- Ms. Yamamura, and Ms. Rush?  Is that correct?

4           MR. PETTIBONE:  Yes, it is.

5           THE COURT:  All right.  How would you like to

6  proceed?  I'll hear an opening, if you wish.  I mean, however

7  you wish to go.

8           MR. PETTIBONE:  Yes.  Well, I'd like to address just

9  a couple housekeeping issues, for lack of a better word,

10 present an opening statement, and then go ahead and call my

11 first witness.

12          THE COURT:  All right.  That's fine.  And then when

13 you call the witness we'll ask your other potential witnesses

14 to leave the courtroom to make sure that we don't have any

15 issues.  But you can address that to the Court at the

16 appropriate time.

17          MR. PETTIBONE:  Okay.

18          THE COURT:  All right.  So, let's proceed.

19          MR. PETTIBONE:  Okay.  Your Honor --

20          THE COURT:  If you would, take the podium?

21          MR. PETTIBONE:  Yes, sir.  Thank you.  Your Honor,

22 just a couple matters.  One, on Monday I gave the debtors an

23 amended exhibit list, and the documents that you have are in

24 accordance with that amended exhibit list.  The one exhibit

25 list that was for the claimant in the pretrial memorandum is

1 not the one that we would be using today.  I have given the

2 debtors not only the exhibits but the amended exhibit list as

3 well.

4          THE COURT:  Is there any objection, Mr. Crowther?

5          MR. CROWTHER:  There's no objections to a different

6 list.  There is objection to the actual exhibits.

7          THE COURT:  Understood.  Okay.  That's fine.

8          MR. PETTIBONE:  And the other issue, Your Honor, is

9 the denial of -- or the Court's ruling on our request for

10 production of further documents.  I believe this Court came out

11 with an order on Monday.  I haven't seen it, but it was -- I

12 know what it said, and that is that our request for further

13 production of documents was not to be the subject of a chambers

14 conference, and as far as I believe is that we still have an

15 issue pending on that.

16          We, pursuant to the Court's order, served 20

17 additional requests for production of documents upon the

18 debtors.  They responded and objected, and then I sent a meet

19 and confer letter to them to try to resolve what I thought was

20 a good faith discovery dispute over documents that were

21 relevant and necessary to the case that I have.  I didn't

22 receive a, you know, response to that meet and confer letter in

23 good faith, and having not received that, based upon the strict

24 time frames, I submitted to the Court a request for

25 intervention on that.  And I believe that issue is still

1  pending at this time.  I need those documents, and I'm prepared

2  to ask the Court for a ruling compelling them to produce those

3  documents, and if necessary, a brief continuance of the hearing

4  to review those.

5          THE COURT:  All right.  Mr. Crowther?  I believe I

6  ordered -- I received a correspondence, and I believe I entered

7  an order --

8          MR. CROWTHER:  You did.

9          THE COURT:  -- denying the request for a hearing, and

10  ordering there would be no further discovery in the matter.

11          MR. CROWTHER:  That is correct, Your Honor, and we

12  assumed the issue was concluded by that order.

13          THE COURT:  It is.  I reviewed the papers.  At some

14  point we have to be able to start and go forward with a

15  hearing, and what I'd like to do is proceed with the hearing on

16  the facts and documents we have, and after the evidence is

17  submitted, based on where we are in that evidence and any holes

18  you think you might need to fill, I would hear requests that

19  would go strictly to what you think the holes in your case may

20  have been as presented based on the debtors not producing

21  certain documents.  And I think that's the best way to take it.

22          MR. PETTIBONE:  Yes, sir.  Was there -- I don't know,

23  was there a correspondence?  I didn't -- was there a

24  correspondence from the debtors to me?

25          THE COURT:  Somebody sent me a list of the discovery,

1 asking for a chambers conference -- I got two -- two requests

2 last week.

3        MR. CROWTHER:  Right.  First you received Mr.

4 Pettibone's request, probably by Federal Express or overnight

5 mail.  We then filed a response, which we also filed with the

6 Court and e-mailed in PDF form to Mr. Pettibone.  In fact, I

7 think -- remember, we were having some issues with your e-mail.

8 I believe Mr. Schnitter had to forward it to you separately

9 because my e-mails to Mr. Pettibone repeatedly got bounced back

10 and rejected by his Hotmail account.  So, Mr. Pettibone would

11 be sent an e-mail from me, then I would ask Mr. Schnitter to

12 forward it again, and which I would then be C.C.'d on the e-

13 mail problem.  So, he got it twice, plus we actually filed it

14 with the Court so it's on the docket, so his local counsel

15 would have seen it.

16        MR. PETTIBONE:  I don't have a problem with that,

17 Your Honor.  I just -- it was new to me, and, yeah, there was

18 that issue with the Hotmail account.  I am going to be

19 addressing certain issues, then, during the course of the

20 testimony, Your Honor, especially with regards to, like, chain

21 of title.  And as you know, or as you will see, Your Honor,

22 that's a crucial part of our case in proving the wrongful

23 foreclosure.  So, I understand your order, and as we get there

24 I'll take your lead on that and make appropriate comments at

25 the --

1        THE COURT:  Well, you can certainly have the -- put

2   in testimony on it, and we'll see how that goes, whether that's

3   sufficient.

4        MR. PETTIBONE:  Yes, sir.  The only other issue, Your

5   Honor, is my -- one of my witnesses, Paula Rush, is a crucial

6   assistant in this.  As the Court knew, I requested a

7   continuance of it.  I had difficulty preparing on the short

8   notice.  I'm prepared to go forward, obviously, with what I

9   have, but I need her to help me, and she is a witness.

10        THE COURT:  Well, can we start with her?

11        MR. PETTIBONE:  Sure.

12        THE COURT:  I mean, that will solve it, right?

13        MR. PETTIBONE:  Okay.

14        THE COURT:  As long as you don't -- and if she has to

15  go -- if there is a need to bring her as a rebuttal witness, I

16  think we'll figure that out at that time.  I don't think the

17  spoilation or advance notice will be an issue.

18        MR. PETTIBONE:  Thank you, Your Honor.

19        THE COURT:  Do you have an opening, or do you just

20  want to get to it?

21        MR. PETTIBONE:  We can just get to it.

22        THE COURT:  All right.  I'd ask Mrs. Dobben and Ms.

23  Yamamura to find a comfortable place.

24        MR. PETTIBONE:  Your Honor, is Ms. Dobben a party?

25  Because she's a party isn't she entitled to be present?

1            THE COURT:  Yes.

2            MR. CROWTHER:  There's no objection, Your Honor.

3            THE COURT:  All right.  How about Mrs. Yamamura?

4            MR. CROWTHER:  There is an objection to Ms. Yamamura.

5            THE COURT:  There is?  All right.  If they have a way

6  to contact you, feel free to wander the streets of Wilmington

7  on a wet, miserable day.  Mrs. Rush, take the stand.  Remain

8  standing.

9                 PAULA RUSH, WITNESS, SWORN

10            THE CLERK:  Please state and spell your name for the

11  record.

12            MS. RUSH:  My name is Paula Rush, P-a-u-l-a, R-u-s-h.

13            THE CLERK:  Thank you.

14            MS. RUSH:  Do I need my book?

15            MR. PETTIBONE:  Yes.  Your Honor, may I approach the

16  witness and hand her the exhibit notebook?

17            THE COURT:  Yes, you may.

18            MR. PETTIBONE:  Thank you, Your Honor.

19            THE COURT:  Mr. Crowther, you may remain seated for

20  objections.

21            MR. CROWTHER:  Thank you, Your Honor.

22            THE COURT:  That way we can make sure we get it on

23  the mike.

24                     DIRECT EXAMINATION

25  BY MR. PETTIBONE:


                 **J&J COURT TRANSCRIBERS, INC.**

1 Q    Ms. Rush, would you state your name and spell your last

2 name for the record?

3 A    Paula Rush, R-u-s-h.

4 Q    And --

5         THE COURT:  Ms. Rush, would you mind moving the --

6 it's all -- there you go.  Thank you very much.

7 Q    At some point in time were you retained by Ms. Mona

8 Dobben?

9 A    Mona Dobben and Alex Yamamura found my website, which I

10 had uploaded research on, and they had contacted me.  They

11 thought that there were some issues with the loan transaction,

12 and they wanted me to look at the file.

13         MR. CROWTHER:  Objection, Your Honor.  Non-responsive

14 and hearsay within the response.

15         THE COURT:  Overruled.  You may continue.

16 A    They subsequently sent me the loan file and I did the

17 initial review of the papers that they actually had in their

18 possession on this particular transaction at that time.

19 Q    Okay.  What did Ms. Dobben -- do you know what time that

20 was, what date?

21 A    That was in either late August or early September of '07.

22 Q    Okay.  And do you have a background in auditing files?

23 A    At that time I was a beginner as far as looking at files,

24 and experience.  I had done a lot of personal research into

25 this subject matter, but the file that they sent me had a lot

1 of missing documents that are typical in a mortgage

2 transaction, as well as problems with dates that weren't

3 consistent, so I immediately thought this does not look like a

4 good file.

5          MR. CROWTHER:  Objection, Your Honor.  Move to

6 strike.  Competence and foundation.  And I would note for Your

7 Honor that the discovery order in this case prohibits expert

8 testimony.

9          THE COURT:  I don't think it's in the nature of

10 expert testimony.  I think it's in the nature of opinion of a

11 fact witness, so, overruled.

12 Q    Okay.  Who first contacted you?  Was is Ms. Dobben or Ms.

13 Alex Yamamura?

14 A    I'm not sure on the exact day that I was contacted.

15 Frequently Mona was at Alex's house and they would be there

16 together, so I don't remember that day, whether it was the two

17 of them together or if it was just Alex on the phone.

18 Q    Okay.  And Alex Yamamura is Ms. Dobben's daughter?

19 A    Correct.

20 Q    Okay.  What did you understand your role to be after you

21 were contacted?

22 A    They really just asked me to look at the file.

23          THE COURT:  All right.  Rather than saying what they

24 said to you, I'd like you to tell the Court what you know about

25 what your understanding of what you were supposed to do --

1            THE WITNESS:  Okay.

2            THE COURT:  -- to try to avoid questions or answers

3  where you say Mrs. Dobben told you this, or Mrs. Yamamura --

4            THE WITNESS:  Okay.

5            THE COURT:  -- told you this, because that is

6  hearsay.

7            THE WITNESS:  Okay.

8            THE COURT:  So, what was your understanding of what

9  they wanted you to do?

10           THE WITNESS:  My understanding was that they were

11 asking me to look at the file and see if I could help them in

12 any way to try to figure out what was going on.

13 Q    Okay.  And what, if anything, did you do next?

14 A    We basically tried to get -- or, I tried to get

15 information, running the names of the parties to the

16 transaction, you know, seeing if we could obtain any extra

17 documents from lenders, those kinds of things, to try to put

18 the pieces together of what was really going on.

19 Q    Okay.  I'm going to show you a document I'd like to mark

20 for Identification as Claimants' 28.

21           MR. PETTIBONE:  Your Honor, would we prefer that we

22 introduce the documents after foundation is laid or at the

23 conclusion of the testimony?

24           THE COURT:  Let's do it at the conclusion of the

25 testimony.  You're certainly -- we'll deal with objections as

1  they go along, but we'll deal with admissibility at the

2  conclusion of the testimony.

3         MR. PETTIBONE:  Yes, sir.

4  Q   Can you identify this document?

5  A   Yes.  This is a document that we sent to American Home to

6  get a release in order for me to be able to speak on behalf of

7  Mona to American Home on September 25th of '07.

8  Q   Okay.  And is that Mona Dobben's signature at the bottom?

9  A   Yes.

10 Q   And who is it faxed to, Exhibit 28?

11 A   I had called in and spoke to Mr. Cruz, and that was the

12 fax number that he told me to fax the release to, so it was

13 faxed to that number.

14 Q   Okay.  And what, if anything, happened after you sent this

15 release in?

16 A   They refused to speak with me.  At one point Santana Cruz

17 -- this was Henry Cruz, Santana Cruz did take my call, and said

18 that she would look into it and call me back, and she never

19 did.  She actually called me, like, three months later and said

20 she had been transferred to another area, and she couldn't help

21 me anymore.  So, no one ever responded to my inquiries or my

22 phone calls.

23 Q   I'm going to ask you to look at Exhibit 29 marked for

24 Identification.  It purports to be a November 13th, 2007

25 letter.  Do you recognize this document?

1  A     Yes, I do.

2  Q     Okay.  Can you identify it?

3  A     Yes.  It was a subsequent follow up, again, in my phone

4  calls, not being taken.  At one point someone said that they

5  had not gotten the previous release, and can I send it again,

6  so we tried, again, to send a release in on November 13th,

7  2007.

8  Q     Okay.  I'd like to have you look at Exhibit 29D, which is

9  just four pages back in the same exhibit.  It purports to be a

10 November 13th, 2007 letter.  Do you see that?

11 A     Yes.

12 Q     Can you identify that for the Court?

13 A     That was a letter that was sent by certified mail to

14 American Home as a qualified written request to try to get them

15 to respond in writing.

16 Q     Was there ever a response?

17 A     No.

18 Q     Does this letter contain a request for the owner of the

19 note?

20 A     Yes.

21 Q     Okay.

22 A     Under TILA 1641(f)(2), and also under UCC Codes we asked

23 for the holder in due course.

24 Q     Okay.  Did Ms. Dobben or yourself ever get an answer to

25 that?

Rush - Direct                    17

1  A     No, we did not.

2  Q     Okay.  I would like for you to turn to Claimant's Exhibit

3  31 -- 31A, which purports to be a cover for priority overnight

4  mail.  Do you see that document?

5  A     Yes.

6  Q     Can you identify that document?

7  A     That was just the receipt for the loan file which was sent

8  to Mona Dobben on 10/30 in response to a petition that was

9  filed into this Court, which was Docket 1490, asking for her

10 loan file.

11 Q     Okay.  Up until the time that the docket was filed, the

12 petition, had anybody produced the loan file or the holder of

13 the note, any chain of title?

14 A     No.

15 Q     I'd like you to take a look at Claimant's Exhibit 33,

16 please.  And do you recognize that document, which purports to

17 be a December 19th, 2007 letter?

18 A     Yes.

19 Q     Okay.  Can you identify that letter?

20 A     This letter was sent to me by Young, Conaway, Stargatt &

21 Taylor on December 19th, '07, and this letter was them

22 notifying me that they would not take any of my phone calls.

23 They reference a phone call I made to David Freeman, who was

24 the Executive Vice President of AHM Servicing, and they

25 basically said that they will not take any calls from me, and

**J&J COURT TRANSCRIBERS, INC.**

1 they tell me that Mona should call Scott Ellerby at American

2 Home Mortgage, and they sent this identical letter to her.

3 It's C.C.'d, as you can see, to John Callas (phonetic), David

4 Freeman, Mona Dobben.

5 Q    Did you ever discuss with Mona Dobben the contents of this

6 letter?

7 A    Yes.

8 Q    Okay.  And what did you tell her?

9 A    We decided that, okay, we need to call Scott Ellerby, and

10 we were attempting to make calls to Scott Ellerby.  We even

11 conferenced called with, you know, her on the line, and they

12 just repeatedly refused to take the calls.

13 Q    Okay.  I'd like you to refer to Exhibit 34, please.  That

14 purports to be a March 6th, 2008 letter from Chapman and

15 Cutler.  Do you recognize this document?

16 A    Yes.

17           MR. CROWTHER:  Objection, Your Honor.  Hearsay.

18           THE COURT:  Which -- I'm sorry.  Which document?

19           THE WITNESS:  The letter is to me.

20           THE COURT:  I'm sorry.  Which document?

21           MR. CROWTHER:  Exhibit 34 is a letter from Chapman

22 and Cutler on behalf of, I believe, Wells Fargo Bank.

23           THE WITNESS:  To me.

24           THE COURT:  I understand, Ms. Rush.  Well,

25 identifying the document is not hearsay, and we'll see what the

1  questions are.  So, it was to Ms. Rush so she can identify the

2  document.  Letter to you dated March 6th, 2008.

3  Q    Okay.  What, if anything, did you understand your role to

4  be around March 2008?

5  A    I was attempting to contact any parties that I knew of

6  that had anything to do with this loan to enlist their help,

7  and I knew that Wells Fargo was the master servicer by that

8  time because I had figured out where the loan was, so I went to

9  Chapman Cutler, who -- they took over monitoring the trust when

10 American Home Mortgage went into bankruptcy.

11 Q    Okay.  And did you make that contact with them?

12 A    I did.

13 Q    And what did you say to them?

14 A    I asked them for their intervention into the issues

15 surrounding the non-response to inquiries from American Home.

16 Q    I'd like you to look at Exhibit 34C, and I'll just

17 identify it for the record as an April 30th, 2008 letter from

18 Chapman and Cutler.  Do you recognize that document?

19 A    Yes.

20 Q    Okay.  And what, if anything, had happened in terms of

21 your role, what you were doing, between March and April of '08?

22 A    I was continuing -- basically did not take no answer for

23 an answer, and continuing to send e-mails, and letters, and

24 make phone calls, trying to enlist someone's help.  And this

25 letter came to me care of me.  They recognized me as a

1  representative for Mona Dobben, and they specifically reference

2  that they're writing me explaining their role as master

3  servicer.

4          MR. CROWTHER:  Objection, Your Honor.  The witness is

5  now testifying overtly from the contents of a document, and

6  she's also testifying to state of mind of the author of the

7  letter, who is not in this courtroom, and we say that that

8  state of mind is hearsay.

9          THE COURT:  Give me just a moment.

10                         (Pause)

11          THE COURT:  I'm going to allow the testimony under

12  Rule 807, under the residual exception.  Objection overruled.

13  Q    Okay.  I'd like you to -- do you know what a master

14  servicer is?

15  A    Yes, I do.

16  Q    Okay.  And what is that?

17  A    A master servicer is to oversee the servicing of the sub-

18  servicer, and they have the role actually of making the

19  decision if a loan is to be modified or foreclosed upon, and

20  the servicer must communicate to them what's going on at the

21  time when a loan is in default.

22  Q    Okay.  I'd like you to refer to Exhibit 36, if you would?

23  It purports to be a limited power of attorney?

24  A    Yes.

25  Q    Do you recognize --

Rush - Direct                                        21

1            THE COURT:  I'm sorry.  Which exhibit?

2            MR. PETTIBONE:  Excuse me, Your Honor.  Exhibit 36.

3            THE COURT:  All right.  Okay.

4  Q    Do you recognize Exhibit 36?

5  A    Yes.

6  Q    Okay.  What was the purpose of this document?

7  A    The power of attorney was a last ditch effort to try to

8  get someone to -- at American Home to recognize my permission

9  to speak on behalf of Mona Dobben and to try to stop -- at that

10 time this was done for April 14th of '08, which was right after

11 we found out at the last minute that a foreclosure was pending.

12 Q    Now, let's talk about that just briefly.  How did you find

13 out there was a foreclosure pending with regards to -- can I

14 refer to it as the 37th Street property?  Or --

15 A    Yes.

16 Q    Okay.  How did you first find out about that?

17 A    I had advised Mona that she should file a mail forward

18 from that address because we couldn't find out, you know, what

19 was going on.  And a mail forward came from that address to her

20 address in Sun City, and that was the first time we saw the

21 foreclosure notice.

22 Q    Let's just take a moment, as long as we're on that

23 subject.  Okay.  I'd like you to look at Exhibit 26, please.

24 And I'll identify it as a Notice of Trustee Sale.  Do you

25 recognize this document?

**J&J COURT TRANSCRIBERS, INC.**

Rush - Direct                                        22

1  A    Yes.

2  Q    Is this the document that you were just referring to?

3  A    Yes.

4  Q    And whose handwritten notation is that in the top right-

5  hand corner?

6  A    That's either Mona's or Alex's.  I don't know.  One of

7  them wrote that on there.

8  Q    And was this the first notice that you were aware of that

9  there was a foreclosure pending on the 37th Street property?

10 A    Yes.

11 Q    I'd like you to go back, then, to Exhibit 37.

12          THE COURT:  I'm sorry.  When did -- if I could back

13 up, when did you first contact Wells Fargo as the master

14 servicer?

15          THE WITNESS:  That was around that first letter that

16 we were just -- I can't remember which exhibit that was.

17          THE COURT:  The response was March 6th, so it was on

18 or about then?

19          THE WITNESS:  Yes.

20          THE COURT:  Okay.

21          UNIDENTIFIED SPEAKER:  I'm sorry.  I missed --

22          THE WITNESS:  It was the March --

23          THE COURT:  They just didn't hear it, so --

24          THE WITNESS:  Yes.  It was the March 6th time frame,

25 right before that.

1  Q    Exhibit 37, what is this document?

2  A    This is information that I downloaded from the Securities

3  and Exchange web site about this particular mortgage trust.

4  Q    Okay.  And what did you find?

5           THE COURT:  I'm sorry.  What exhibit are we on again?

6           MR. PETTIBONE:  I'm sorry, Judge.  37.

7           THE COURT:  I'm trying to keep up.  Okay.

8  A    I went on the SEC filings after I figured out which trust

9  her loan was in, and I wanted to, you know, find out who the

10 parties were that were possible contact points in reference to

11 this loan, so this is the information that I downloaded as far

12 as the parties to this securitized trust.

13 Q    Okay.  Did you ever get -- or, you testified that you did

14 get the lender loan file, correct?

15 A    Right.  In --

16 Q    And that was after petitioning the Court?

17 A    That was October 30th of 2007.

18 Q    And after -- it was sent to Mona Dobben?

19 A    Yes, at her Sun City address.

20 Q    All right.  And after Mona Dobben received the loan file,

21 did she send it to you for review?

22 A    Yes.

23 Q    Okay.  And did you review it?

24 A    Yes.

25 Q    Okay.  I'd like you to refer to Exhibit 17 if you would?

**J&J COURT TRANSCRIBERS, INC.**

1 Do you recognize this document?

2 A    Yes.

3 Q    And what is it?

4 A    This is the document, the HUD-1 that Mona had when she

5 sent me the first profile.  This was a document that she had in

6 the very beginning.

7 Q    And I'd now like you to look at Exhibit 18.

8 A    Yes.

9 Q    Do you recognize Exhibit 18?

10 A    Yes.

11 Q    Okay.  Did you compare Exhibit 17 -- where did you get

12 Exhibit 18?

13 A    Exhibit 18 was part of the lender loan file that was sent

14 out on October 30th, 2007.

15 Q    Did you compare the information between Exhibits 17 and

16 18?

17 A    I did.

18 Q    Okay.  And did you notice any discrepancies?

19 A    The discrepancy is that -- it's not a discrepancy, but

20 it's -- things were added to this one that weren't on her

21 document.

22 Q    When you say they were added to this one, you're talking

23 about they were added to Number 18?

24 A    Right.  It was the seller's side of the transaction, which

25 in California the purchaser does not see the seller's side of

1  the transaction, so it's not that they did anything wrong in

2  not putting that on there, but that's where all of the entries

3  at the additional settlement charges that were added that were

4  not there on her copies.  She didn't see that there was a

5  $44,000 purported note payable to Alex Ryan Yamamura

6  Landscaping.

7  Q    And can you show where that is?  Is that on 18B?

8  A    Yes.  That's Line 1305.

9  Q    And it says note payable to Alex Ryan Yamamura

10 Landscaping?

11 A    Yes.

12 Q    And did you give any significance to that?

13 A    Yes, because I had already had conversations with them and

14 there was no --

15            THE COURT:  With whom?  I'm sorry.  You said them.

16            THE WITNESS:  With Mona Dobben and Alex.

17            THE COURT:  Okay.

18            THE WITNESS:  And there was no knowledge of --

19            MR. CROWTHER:  Objection.  Calls for hearsay.

20            THE COURT:  Overruled, again, under the residual

21 exception.  Go ahead.  There was no knowledge --

22            THE WITNESS:  There was no knowledge that any such

23 transaction of that nature took place in reference to this

24 loan.

25 Q    Okay.  And any conversation that you had with Mona Dobben,

1 a claimant, a party to the case, did you ask her if that

2 company existed?

3 A    Yes.

4 Q    Okay.  And to your knowledge, or hers, did that company

5 exist?

6 A    No.

7          MR. CROWTHER:  Objection.  Calls for hearsay.

8          THE COURT:  Given the -- I'm going to overrule it and

9 just sort of prospectively, given the circumstances of this

10 case, I really don't, and Ms. Rush's position as attorney-in-

11 fact at least at some times in this case, I really don't view

12 communications that Ms. Rush received from Ms. Yamamura or Mrs.

13 Dobben to constitute hearsay.  I'm going to continue to

14 overrule your objection.  You can have a standing objection

15 based on hearsay, but I'm going to overrule them on the basis

16 of the residual exception.

17          MR. PETTIBONE:  Thank you, Your Honor.

18          THE COURT:  At least the communications between --

19 the statements of Mrs. Dobben and Ms. Yamamura.

20 Q    Was there anything else added to this Document 18 that you

21 noticed that wasn't in 17?

22 A    It was primarily the seller's side of the transaction, and

23 I think that was the only thing that was different on here.

24 The -- you know, there was a natural hazard disclosure report

25 and two wire fees to tighten escrow, but, you know, again,

1 those were charged to the seller, not to her, so, you know, I'm

2 not sure that there's anything wrong with them adding something

3 like that.  I'm not sure.

4             THE COURT:  And the landscaping charges is charged to

5 the seller?

6             THE WITNESS:  It is charged on the seller's side of

7 the transaction.

8             THE COURT:  All right.

9 Q    In Exhibit 18A, do you see up in the top box the

10 settlement date of April 19th, 2007?

11 A    Yes.

12 Q    Okay.  When you were reviewing the file did you find any

13 significance with regards to that date?

14 A    I did.

15 Q    And what was that?

16 A    That the documents that were produced had a date -- well,

17 they had a lot of different dates on them, but the settlement

18 papers purported to be signed on April 17th of 2007, so I

19 wondered how they could have a HUD-1 that was produced on the

20 19th for a settlement that took place on the 17th.

21 Q    I'd like you to refer to Exhibit 19, please.  Can you

22 identify this document?

23 A    Yes.

24 Q    And where did this document come from?

25 A    This came from the lender loan file that was delivered on

1  October 30th of '07.

2  Q    Did you review this document when you received it from Ms.

3  Dobben?

4  A    Yes.

5  Q    Okay.  Did you identify any issues with regards to this

6  document?

7  A    Yes.  This one had a date on it of 4/10/07, and was

8  purported to be the final Truth in Lending, and the filing

9  reporting fee was listed at two fifty when the HUD-1 said 87.

10  And it was dated 4/17/09.

11          THE COURT:  I'm sorry.  It was --

12          THE WITNESS:  It was dated --

13          THE COURT:  It's dated 4/10, but the signature of Ms.

14  Dobben is 4/17?

15          THE WITNESS:  Correct.

16          THE COURT:  All right.  And it indicates the final?

17  All right.  Thank you.

18          MR. PETTIBONE:  Okay.  Thank you.

19  Q    I'd like you to look at Exhibit 22, please.  Do you

20  recognize this document?

21  A    Yes.

22  Q    And can you identify it?

23  A    This is a document, again, that came with the Lender Loan

24  File on 10/30/07, and it is -- it looks like the Clear to Close

25  Authorization from the underwriter, Randy Dostelick (phonetic),

1  and it's signed by him on 3/29/07, and it has a statement that

2  was written on it by -- it was on this document when we

3  received it.  It looks like his handwriting.  I don't know.

4  Pat, signing today.

5            MR. CROWTHER:  Objection, Your Honor.  Move to

6  strike.  Competence.

7            THE COURT:  Hearsay and competence.  Sustained.

8            MR. PETTIBONE:  Thank you.

9            THE COURT:  As to whose note it is.

10           MR. PETTIBONE:  Okay.

11 Q    This note, Pat signing today, was on the document when you

12 received it?

13 A    Yes.

14 Q    And the underlying person that worked with Mona Dobben was

15 Pat Downey?

16 A    Correct.

17 Q    Is there anything else that you saw on this document of

18 significance when you received it from Mona Dobben other than

19 what you've already identified?

20 A    On Number 2 it says borrower's credit from sellers not to

21 exceed three percent.  And, you know, they listed it as a note

22 payable.  I don't know -- I honestly don't know what that

23 purpose was for that.

24 Q    Let's take a look at 22B.  Did this document come from the

25 lender loan file?

1  A    Yes.

2  Q    Can you identify what debtor entities are recipient of the

3  fees?

4  A    American Home Mortgage Acceptance was the administrative

5  origination fee.  American Home Mortgage Acceptance was the

6  prepaid interest.  American Home Mortgage Acceptance was the

7  wire fee.  American Brokers' Conduit was a tax service fee.

8  And American Broker's Conduit was a flood hazard fee.

9           THE COURT:  I'm sorry.  I think I have the wrong

10 exhibit.  Which exhibit?

11          MR. PETTIBONE:  22B, sir.

12          THE COURT:  Oh.  Okay.  I was in 23.  So, just give

13 me a moment.

14 Q    Could you identify where that is on 22B?

15 A    It's right at the top left corner.

16 Q    So --

17          THE COURT:  B as in boy?

18          MR. PETTIBONE:  Yes, sir.

19          THE COURT:  Okay.  I've got it.  Thank you.  Sorry.

20 Q    And so, the fee section headnote on the left as what you

21 were just identifying?

22 A    Correct.

23 Q    And then the recipients, identified as vendor on the

24 right, was what you just identified?

25 A    Yes.

1  Q     And then you described the various entities in the record,

2  correct?

3  A     Yes.

4  Q     Is there a broker fee on this document?

5  A     Yes.  They put a broker premium.  It says by lender,

6  6,307.88.

7  Q     Where do you -- and can you identify where that is?

8  A     That's in the -- sort of to the middle bottom, on the left

9  hand side of the document.

10 Q     Okay.  Let's go to 22C, please.  Do you see this document?

11 A     Yes.

12 Q     Can you identify it for the record?

13 A     This is the same document, but there's differences in this

14 document.

15 Q     What are the differences?

16 A     This document has a wire date of 4/5/07, whereas 22B, it's

17 blank where there's a wire date.  And this one the broker

18 premium is different.  It's 5,807.25.  And other than that I

19 think the fees were the same to the same parties.  There is a

20 difference between the prepaid interest.  This document has

21 three forty-three forty eight, nineteen days.  So, that would

22 have been a closing that was going to take place at a different

23 time of the month.  This first one has a daily prepaid interest

24 of two thirty five oh two, that's 22B, and that says thirteen

25 days of interest.  So, these were from two different

Rush - Direct                                    32

1  transactions, different dated transactions.

2  Q    Is that the significance of that prepaid interest being

3  different on these two documents?

4  A    Correct.

5  Q    Is there anything else different --

6         THE COURT:  I'm sorry.  Is -- I'm having a little

7  trouble reading it -- well, looking -- I understand the total

8  prepaid interest is different.  Is the daily rate different?

9         THE WITNESS:  Yes.  It's right under it.  It says

10 daily breakdown.  It's really small.  19 days on 22C, and 13

11 days on 22B.

12        THE COURT:  Right.  But it's eighteen oh eight a day

13 on both documents as I read it.  Is that correct?

14        THE WITNESS:  What are you saying?

15        THE COURT:  It says -- the number of days are

16 different, but the daily rate is the same, eighteen oh eight?

17        THE WITNESS:  Correct.

18        THE COURT:  Okay.

19 Q    Where did the 22B come from?

20 A    22B came from the lender loan file.

21 Q    Okay.  And which document was the one Mona Dobben had

22 given to you when she first sent you her file?

23 A    It's 22C.

24        THE COURT:  All right.  So, Ms. Dobben gave you 22C

25 and 22B came from the loan file?

**J&J COURT TRANSCRIBERS, INC.**

1              THE WITNESS:  Correct.

2   Q    Did you identify everything that was different that you

3   noticed the difference between these documents?

4   A    I think so.

5   Q    Can you look at Exhibit 25, please?  25A?

6   A    Yes.

7   Q    Can you identify this document?

8   A    Yes.

9   Q    What is it?

10  A    These were the servicing records which were sent with the

11  loan file October 30th of '07.

12  Q    And do you know whose handwriting that it that said

13  refused all calls?

14  A    Yes.  That's my handwriting.

15  Q    Okay.  And why did you write that on Exhibit 25A?

16  A    I have a habit, a bad habit of just writing whatever I am

17  thinking at the time on documents, which you will see

18  throughout this -- these documents.  I was just frustrated, and

19  that day I wrote this on this.

20  Q    So, when the document came to you it didn't have refused

21  all calls on it?

22  A    No.

23  Q    Okay.  And what do you understand Exhibit 25A to show?

24  A    Well, they obviously were calling her after we had asked

25  them not to.  We had asked, obviously, before previous to this

1   time to call me on her behalf, and they were obviously

2   generating calls out of the servicing unit to her phone number.

3   Q     These are the collection calls?

4   A     Correct.

5   Q     On the loan?

6   A     Collections.  Right.

7           MR. CROWTHER:  Objection.  There's nothing about

8   collections on the -- about what the purpose of the calls were.

9           THE COURT:  I don't know what the -- well, I don't --

10  agreed on the purpose.  The document indicates it's a

11  collection history profile.  But the purpose of the calls,

12  again, is hearsay because we don't know.  So, sustained to that

13  extent.

14  Q     Do you know if Mona Dobben was receiving collection calls?

15  A     Yes.

16  Q     Okay.  And were those collection calls -- how do you know

17  that?

18  A     She was upset and we eventually got her a caller I.D. so

19  that she could -- she was getting bombarded with calls from

20  multiple lenders.

21          MR. CROWTHER:  Objection, Your Honor.  Relevance.

22  This is -- this -- they just introduced is an exhibit that

23  identifies that she didn't answer any of the, quote, collection

24  calls.  Now she's testifying about other lenders making Ms.

25  Dobben upset because she received calls from them.  What the

Rush - Direct                                      35

1  relevance is to this case is beyond me.  In addition, it seems

2  contrary to the very evidence that he just introduced that,

3  quote, refused all calls.

4          THE COURT:  I'll strike the evidence about receiving

5  calls from other lenders on relevance grounds, but I'll allow

6  the evidence that Ms. Dobben was upset about getting calls, and

7  obviously that she eventually got a caller I.D.  I'll accept

8  that evidence.

9          MR. PETTIBONE:  Thank you.

10  Q    Do you know if any of the collection calls were from the

11  -- American Home Mortgage loan to Mona Dobben?

12  A    Yes.

13  Q    Okay.  And how do you know that?

14  A    She told me the -- she would tell me the phone numbers

15  that the calls were coming from.

16  Q    Now, did Mona Dobben sign a release for you to speak with

17  American Home?

18  A    Yes.

19  Q    Okay.  Did we cover that?

20  A    Yes.  That was nine -- the first release was 9/25/07.

21  Q    And did she send that, or did you?

22  A    She did.

23  Q    Okay.  And have we introduced that document yet?

24  A    Yes.

25  Q    Okay.  Sorry.  Did you ever call American Home and attempt

1   -- how many times did you call American Home Mortgage and

2   attempt to get them to contact you with regards to the

3   foreclosure?

4   A    Many.  I couldn't put a number on it.  It would be dozens.

5   Q    Okay.  I would like you to take a look at -- let's go back

6   to 26 again, which is the foreclosure notice that we had

7   previously identified, what, if anything, happened with regards

8   to you and Mona Dobben after you received this Notice of

9   Trustee Sale?

10  A    Well --

11           THE COURT:  Lay a -- if you lay a foundation on --

12  since it's dated October could you lay a foundation on where it

13  came from?

14           MR. PETTIBONE:  Okay.

15  Q    Where did this document come from?

16  A    This document was mail forwarded from the 37th Street

17  property to her Sun City address, and she received it on

18  4/11/08.

19           THE COURT:  Thank you.

20  Q    Okay.  Did you make any -- did you call anybody as a

21  result of this?

22  A    Yes.  We tried to call TD Service, who was the foreclosure

23  agent, and we did speak to Kimberly Coonrat (phonetic) at TD

24  Service.

25  Q    Okay.  And what did --

Rush - Direct                                    37

1  A    She told me that --

2           MR. CROWTHER:  Objection.  Hearsay.

3           THE COURT:  Sustained.  Wait a minute.  Let me back

4  up a minute on that ruling.  When did the preliminary close on

5  the servicing sale happen?

6           MR. CROWTHER:  November of '07.  The final close was

7  actually before April 11th of '08.

8           THE COURT:  Well, before the receipt of this letter

9  in April?

10          MR. CROWTHER:  Yes.  The actual final close took

11 place before 10/08, so she received it on 4/11, the final close

12 had already occurred.

13          THE COURT:  Well, I think it's a little unclear as to

14 whether TD Services could be considered an authorized agent of

15 the debtor entities at this time, so under the statement

16 against interest exception I'll allow, at least preliminarily,

17 pending further decision, or, sorry, perhaps to strike, and

18 I'll overrule the hearsay objection for now.  So, you may

19 answer the question.  What did she tell you?

20          THE WITNESS:  Kimberly Coonrat informed us that she

21 would call the debtor -- or, I don't know if it was the debtor

22 at that time.  We're confused about that.  She would call

23 American Home Mortgage Servicing and ask them if they had

24 another address for Mona Dobben.  And it was, again, we were

25 calling every day to ask if there was any response and at the

1  -- you know, when the response came a few days later, she said

2  that she had been informed that they said they had no other

3  address for Mona Dobben and they were going forward with the

4  foreclosure.

5  Q    And they had the 37th Street address?  Is that what they

6  were telling you?

7  A    Correct.

8  Q    What is a securitized trust?

9  A    A securitized trust is they pull a large group of loans

10  and they package them into a security where they then sell

11  interest out of the trust to investors.  And in some cases the

12  originator will hold some securities, residual interests in the

13  trust.

14  Q    Do you know whether or not Ms. Dobben's loan, the subject

15  loan, was part of the securitized trust?

16  A    I did find her loan.  I located it.  It's listed in the

17  securitized trust documents.  They do not list it by her loan

18  number.  I frequently find in the trust that they list them one

19  through 5,000, and you have to search by the loan level data

20  points, and I found her loan, it was Number 1381 in this

21  particular trust.

22  Q    I'd like you to refer to Exhibit 1, please.  Can you

23  identify this document?

24  A    Yes.  This was the -- this came from the lender loan file,

25  and this was the purchase contract for this 37th Street

Rush - Direct                                          39

1  property.

2  Q    Did you ever have any conversations with Ms. Dobben

3  whether or not this was her signature on 1B?

4  A    Yes.

5  Q    And what did she say?

6  A    She said it was not.

7  Q    I'd like you to refer to Exhibit 2, please.  Oh, let me

8  back up.  What's the date on this document?

9  A    There are some dates on this document that appear to have

10  been changed.  If you look at the February, and then the 27th,

11  28, in the very beginning of the document, it appears somebody

12  whited some date out and made a change, and put that date in.

13  Q    I'd like you to refer to Exhibit 2, please.  Could you

14  identify this document?

15  A    This is the uniform residential loan application.

16  Q    And did this come from the lender loan file?

17  A    Yes.

18  Q    Did you ever have any conversations with Ms. Dobben as to

19  whether or not that was her signature?

20  A    Yes.

21  Q    And was it?

22  A    She told me it was not.

23  Q    Okay.  Did you review this document?

24  A    Yes.

25  Q    Do you see in the lower left hand half of the document

1  where it says home phone number?

2  A    Yes.

3  Q    Do you know if that is, in fact, Ms. Dobben's home phone

4  number?

5  A    Yes.  Her home phone number was on these documents.

6  Q    Do you know whether or not Ms. Dobben ever received a call

7  from anybody from American Home, or the underwriters with

8  regards to this loan?

9  A    Not --

10          MR. CROWTHER:  Objection.  Competence, Your Honor.

11  She wasn't retained until long after the closing.

12          THE WITNESS:  Mona can answer that question.

13          THE COURT:  Yes.  Sustained.

14  Q    Did you ever have a conversation with Ms. Dobben as to

15  what her income was?

16  A    Yes.

17  Q    Okay.  I'd like you to refer to, if you would, the second

18  page of Exhibit 2, where it says base income, $8,300.  Do you

19  see that?

20  A    Yes.

21  Q    Does Ms. Dobben have an income of $8,300?

22  A    No, she does not.

23  Q    Do you see up in the top left hand corner of Exhibit 2

24  where it says retired?

25  A    Yes.

1  Q    Wasn't -- to your knowledge was Ms. Dobben retired?

2  A    Yes.

3          THE COURT:  Where's the income on the document?

4          MR. PETTIBONE:  I'm sorry, Your Honor.  It's the

5  second page.

6          THE COURT:  Ah.

7          MR. PETTIBONE:  It has a Bate stamp -- it's American

8  Home Mortgage Bate stamp 002.

9          THE COURT:  Exhibit 2?

10         MR. PETTIBONE:  Yes, sir.

11         THE COURT:  I only have one page.  2D?  Is that what

12 I'm supposed to be -- oh, yes.  2D?

13         MR. PETTIBONE:  I want to make sure I -- I'm at

14 Exhibit 2, Your Honor, and in the bottom it has American Home

15 Mortgage Bate stamped 001, the next page is 002, and 003.  You

16 don't have that?

17         THE COURT:  No.

18         MR. PETTIBONE:  Okay.

19         THE WITNESS:  Do you want to give him --

20         THE COURT:  Not as that exhibit.  It's the -- I have

21 two pages, one appears to be a fax dated 4/4/07, and at least

22 the fax line at the top, and the other appears to be one page,

23 it looks like the first page of a uniform residential loan

24 application.

25         THE WITNESS:  Do you want to give him my document?

1          MR. PETTIBONE:  May I show these to counsel and

2 submit these to Your Honor?

3          THE COURT:  Sure.  You can show them to counsel.

4 We'll figure out whether I can -- I can get them after he has

5 had a chance to look at them.

6                    (Pause)

7          MR. PETTIBONE:  Okay.  There is a stipulation that

8 this is what is in Exhibit 2 binder, and somehow it didn't make

9 it to the Court.  May I approach, Your Honor?

10         THE COURT:  Yes.  I'm going to replace this with what

11 I've just received, and put it in as Exhibit 2 in my binder,

12 pursuant to the stipulation.  All right.  We're on Page 2?  Is

13 that right?  Or three?

14         MR. PETTIBONE:  Two, Your Honor.

15         THE COURT:  All right.  And -- income?  9,037?

16         MR. PETTIBONE:  Yes, sir.

17         THE COURT:  Okay.  Got it.

18         MR. PETTIBONE:  And then, at the top, retired.

19         THE COURT:  Right.  Okay.

20 Q    Now, in Exhibit 2 is a document, the next document, which

21 has a Bate stamp, 005.  It's another uniform residential loan

22 application?

23         MR. PETTIBONE:  Do you have that one, Your Honor?

24         THE COURT:  Yes.

25         MR. PETTIBONE:  Okay.

                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. PETTIBONE:  And since the witness gave you our

2  other copy, may I approach the witness and show her?

3          THE COURT:  Yes.

4          MR. PETTIBONE:  Thank you.

5  Q    Okay.  I'm showing you a document marked as -- it's

6  Exhibit 2, but it's beginning 0005.  Do you see that?

7  A    Yes.

8  Q    Okay.  Can you identify that document?

9  A    This is another uniform residential loan application.

10 Q    And when did you receive this document?

11 A    This also came from the lender loan file.

12 Q    And did you have a conversation with Ms. Dobben as to

13 whether or not that was her signature?

14 A    Yes.

15 Q    Okay.  And is it her signature?

16 A    No.  She said it was not.

17 Q    Okay.  In this document it says that Ms. Dobben had a

18 face-to-face -- let me back up a little bit.  On the

19 residential loan application Bate stamped 00005, and then the

20 next page, 06, do you see Bate stamp 06?

21 A    Yes.

22 Q    Okay.  Do you see any income listed in the residential

23 loan application?

24 A    No.  On this application it's blank.

25 Q    Do you Greg Clark?

**J&J COURT TRANSCRIBERS, INC.**

1  A    No, I do not.

2  Q    In this document does it state that Mona Dobben had a

3  face-to-face meeting with Greg Clark?

4  A    Yes.

5  Q    And did you have a conversation with Ms. Dobben about

6  that?

7  A    Yes.

8  Q    Did she ever have a face-to-face meeting with--

9  A    She said she did not.

10  Q    Okay.  And then, the prior document, Loan Application 001

11  through 004, there was an indication that Ms. Dobben had a

12  face-to-face meeting with Brianne Offerman (phonetic)?

13  A    Yes.

14  Q    Did you have a conversation with Ms. Dobben about that?

15  A    Yes.

16  Q    Did she ever have a face-to-face meeting?

17  A    She said she did not.

18  Q    Okay.  I'd like you to refer to Exhibit 4, please.  Can

19  you identify what this document is?

20  A    This was the appraisal for 37th Street property.

21  Q    And this came in the lender loan file?

22  A    This came in the lender loan file.

23  Q    And we only have the -- basically the face sheet and the

24  second sheet in our exhibits, correct?

25  A    Correct.

1  Q    And the date on the appraisal?

2  A    Is 3/6 of 2007.

3  Q    Okay.  I'd like you to refer to Exhibit 6 if you would?

4  I'll identify it as a Verification Bureau.  Do you see this

5  document?

6  A    Yes.

7  Q    Did you have a conversation -- what is this document?

8  A    This is a verification -- supposed verification for fraud

9  prevention and it was acting as an agent on behalf of American

10  Brokers' Conduit, it says.  And it's supposed to be her signing

11  -- verifying that that is who she is, and this is her

12  information, authorization for Social Security to release

13  social security number verification to American Brokers'

14  Conduit.

15          MR. PETTIBONE:  Your Honor, in the interest of time,

16  the next documents were going to be the same types of

17  questions.  They're basically Exhibits 7 through 16, and I was

18  just going to have the same testimony, which I can do through

19  Ms. Dobben, just to identify that those are not her signatures

20  on those documents.

21          THE COURT:  All right.  Well, it certainly would be

22  preferable to have Ms. Dobben --

23          MR. PETTIBONE:  Yes.

24          THE COURT:  -- make those statements.

25          MR. PETTIBONE:  Okay.  I have nothing further, Your

1  Honor.

2            THE COURT:  All right.  Cross?  And again, Mr.

3  Pettibone, if you'll move that mike -- it doesn't move much,

4  but if you move the mike a little closer, you can remain seated

5  during objections.

6            MR. PETTIBONE:  Yes, sir.

7                      CROSS EXAMINATION

8  BY MR. CROWTHER:

9  Q    When did you first realize that Ms. Dobben's loan was

10 securitized into a trust?

11 A    After I received, or she received the loan file and sent

12 it to me that the lender sent out on 10/30/07, I spent hundreds

13 of hours trying to figure out, because I couldn't get the

14 answer.  So, I ended up cross referencing a I.N.V. number that

15 was on her servicing records with bank account records that

16 American Home had submitted into this case, and by that process

17 figured out where it was, and then I had to go on the SEC

18 filings to actually find it, locate it, confirm that it was

19 there.

20 Q    So, you knew at that point that American Home Mortgage

21 accepted saying it was not the owner of the loan any longer,

22 correct?

23 A    No, that's not true.

24 Q    You knew it was in a trust, correct?

25 A    I have reviewed several different chains of supposed title

                  **J&J COURT TRANSCRIBERS, INC.**

1  of where the loan went.  There's one that's in the servicing

2  records, there's a different one that the trust presents, and

3  there's a different one on the foreclosure notice, so there's

4  no -- just because something is supposed to be in a certain

5  place doesn't mean that it's there or that it was assigned

6  properly to that particular place.

7  Q    So, you didn't verify whether or not, in fact, it was in

8  the 2007-5 trust?  Do I understand you correctly?

9  A    I verified it in the way that I found it listed on the SEC

10  filing, but we have never been able to get documents that prove

11  any chain of assignments that it actually went, and even the

12  foreclosure notice does not have that particular chain of

13  assignment on it.  It doesn't say Deutsche Bank foreclosing for

14  the certificate holders of AHMA 2007-5 trust, which under Reg.

15  A-B violation is typically how a foreclosure is done if a loan

16  is in a trust.

17  Q    Are you familiar with California law on foreclosures?

18  A    A little bit.

19  Q    Can you tell me what the procedure is for foreclosure in

20  California?

21  A    They foreclosed under MEARS (phonetic), and it appears

22  from the documents that we have, which aren't complete, that

23  the loan went --

24  Q    No.  I asked you what the procedure is, not what the

25  documents show.  What is the procedure for foreclosure in

**J&J COURT TRANSCRIBERS, INC.**

1 California?

2 A    The procedure?  I don't understand what you're saying.

3 Q    I asked you if you were familiar with the procedure for

4 foreclosure in California.  You told me you were.  I asked you

5 to describe for us the procedure for foreclosure in California.

6 A    The procedure for foreclosure in California is non-

7 judicial, as I understand it, and you're -- you know, you're

8 able to substitute a trustee, and initiate a foreclosure on a

9 note.  And there's a time line, and there's certain required

10 steps that they have to take for proper notice on foreclosures

11 if it's a non-judicial trustee sale.  They have strict notice

12 requirements on those kinds of sales.

13 Q    So, there was a trustee sale here; is that correct?

14 A    From what I can tell.

15 Q    Who was the trustee at the time of the sale?

16 A    TD Service was assigned the right of substitution trustee.

17 Q    Were any of the debtors a trustee in the sale?

18 A    It was assigned from -- I need the document.  What number

19 exhibit is that?

20         THE COURT:  If you don't know, you don't know.

21 A    26.

22         THE COURT:  So, don't answer because you don't know.

23         THE WITNESS:  Well, I just -- I know what the

24 document says.  That's all I can tell you, the document of

25 substitution of trustee says that Robert Hardman, as vice

1 president for American Home Mortgage Servicing, Inc., signed

2 for them to initiate the substitution of trustee to TD Service.

3 Q    So, at the time of the trustee sale TD Service Company was

4 the trustee?

5 A    Yes.

6 Q    At the time you sent your November 13th, '07 letter, you

7 already had the lender file, correct?

8 A    Correct.

9 Q    And from that lender file you had already ascertained that

10 the loan was part of a securitized trust, correct?

11 A    No, that's not correct.  It took me months to figure it

12 out.

13 Q    The information that you needed to figure that out started

14 with that loan file, didn't it?

15 A    That's correct.

16 Q    And that was your starting point to get to the answer of

17 where that loan was securitized, correct?

18 A    Correct.

19 Q    Did Ms. Dobben tell you that she signed mortgage documents

20 on April 17th of '07?

21 A    She did not tell me she signed anything on the 17th.  She

22 told me that that would have been impossible because she was

23 not available on the 17th.

24 Q    Did Ms. Dobben tell you that she hand wrote April 17th,

25 '07 on mortgage documents?

1  A    She didn't -- we did not discuss that.  Again, I saw it in
2  your deposition.  I don't think that she remembers exactly what
3  day it was, but she has -- you're going to have to ask her,
4  because she has since looked at her calendar and looked up the
5  dates.
6  Q    You're aware that she testified that the handwritten date
7  on the mortgage documents is her own handwriting, aren't you?
8  A    I only know what I saw in the depositions.  I really think
9  you need to ask her the questions about the dates.
10 Q    Do you know how settlements in California are performed?
11 A    They can be performed different ways.
12 Q    Do you know what an escrow is in California?
13 A    Yes.
14 Q    What is an escrow in California?
15 A    When somebody purchases a house it goes into escrow, and
16 then it closes at a later date.
17 Q    Do you know if there is one date where a settlement
18 occurs?  Or can it occur over a period of time?
19 A    I'm sure it can occur over a period of time.
20 Q    So, someone can sign mortgage documents on one day, but
21 the settlement can actually happen on a different day, correct?
22 A    I don't know that to be the case.  I cannot testify to
23 that.
24 Q    Do you have any reason that that would not be the case?
25 A    I really would not want to give an opinion about what goes

1  on in California.

2  Q    So, you're not familiar with how escrows work in

3  California, then?

4  A    I'm familiar.  I'm not familiar -- I'm not a settlement

5  agent.  I do not do settlements, so no, I'm not going to give

6  an opinion on that.  No.

7  Q    Did you contact Wells Fargo as a master servicer under the

8  trust itself?

9  A    Under the trust?

10 Q    Yes.

11 A    No.  When I first contacted them it was as a general

12 master servicer, just because I knew that they were master

13 servicer.  They had testified in this Court that they were a

14 master servicer on quite a few of American Home's trusts.

15 Q    So, you knew that Wells Fargo was a master servicer of

16 securitized mortgage trusts?

17 A    Correct.

18 Q    And you just took the gamble that they were, in fact, the

19 master servicer under the 2007-5 trust?

20 A    I did.

21 Q    Did you choose to contact them because you thought they

22 might be the servicer, the master servicer, under the trust

23 that Ms. Dobben's mortgage was in?

24 A    Yes.

25        MR. CROWTHER:  No further questions.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Redirect?

2          MR. PETTIBONE:  Just briefly, Your Honor.

3                    REDIRECT EXAMINATION

4   BY MR. PETTIBONE:

5   Q    With regards to the questions that were asked regarding

6   your verification of the chain of assignment --

7   A    Yes.

8   Q    -- do you recall that question?  Now, if you look at

9   Exhibit 26, do you have that in front of you?

10  A    Yes.

11  Q    Okay.  It shows that the trustee was Gateway originally?

12  A    Yes.

13         THE COURT:  Where are you looking?

14         MR. PETTIBONE:  Oh, I'm sorry, Your Honor.  I'm on

15  Exhibit 26.

16  Q    And where does it show that Gateway was the trustee?

17  A    Gateway -- and the substitution of trustee, which is 26C,

18  it says Gateway Title was the original trustee in the deed of

19  trust.

20  Q    Okay.  Then, from there, where does the chain of title go

21  according to this document?

22  A    According to this document it was a MEARS, acting as

23  nominee for American Home Mortgage Servicings.

24  Q    And then from there where does it go, the chain of title?

25         THE COURT:  We're going backwards, right?  We're

1  moving backwards?

2          MR. PETTIBONE:  Yes.

3          THE COURT:  So, TD, and then Gateway, and then MEARS

4  as agent for servicing.  Right?

5          MR. PETTIBONE:  I think it's --

6  Q    Is it Gateway to MEARS, to TD?  Is that --

7  A    Yes.  It was Gateway, and then to MEARS --

8          THE COURT:  Oh.

9  A    And then American Home Mortgage Servicing, Robert Harman,

10  vice president, signed, I guess, as the vice president, or

11  officer that can, you know, sign for MEARS foreclosures to TD

12  Service.

13  Q    Now, when you received the loan file, did you receive the

14  servicing records?

15  A    Yes.

16  Q    Can you identify those servicing records that you

17  received?  Maybe you can look at the exhibit list?  I think it

18  might be 24.

19  A    Yes.

20  Q    Now, what do the servicing records show the chain of

21  assignment to be?

22  A    It showed, on 6/1/07, that the loan was funded on a

23  warehouse line, which 011, and again, I cross referenced that

24  with the bank accounts.  And then it says it immediately went

25  to 421, which on the bank account said was Countrywide Bank.

1  And then --

2           THE COURT:  Where are you?  I'm sorry.

3           THE WITNESS:  It's 24.

4           MR. PETTIBONE:  24A?

5           THE COURT:  24A.

6           THE WITNESS:  Do you see 011 and 421?

7           THE COURT:  No.  All right.  4/6/07 the loan happens.

8  All right.  And then there's a couple other charges, and then

9  4/30/07.  Is that the transfer?  011?

10          THE WITNESS:  011 is a warehouse line for American

11 Home Mortgage on their warehouse accounts.  And the 4/21, which

12 is -- do you see where it says old investor pool, new investor

13 pool?

14          THE COURT:  Yes.

15          THE WITNESS:  421 is Countrywide Bank.

16          THE COURT:  Okay.

17          THE WITNESS:  And then the next page, it goes from,

18 on 7/1/07, from 421 to 356, and again, 421 is Countrywide.  356

19 was cross referenced to be the bank account for the AHMA 2007-5

20 trust.

21          THE COURT:  All right.  So -- well, I don't -- kudos

22 to you -- first of all, kudos to you for figuring this out.

23          THE WITNESS:  It took hundreds of hours, literally.

24          THE COURT:  All right.  So, this indicates that the

25 loan -- it looks -- well, I don't know when the loan was

1 funded, but on April 30th it goes from old investor pool, which

2 you say is a warehouse line for the debtor, or one of the

3 debtors, to a new investor pool, which was Countrywide?

4          THE WITNESS:  Correct.

5          THE COURT:  And then Countrywide sends it to --

6          THE WITNESS:  AHMA --

7          THE COURT:  -- to the trust?

8          THE WITNESS:  Right.

9          THE COURT:  Right.  Okay.  And this is the actual

10 ownership of the loan?

11          THE WITNESS:  Right.

12          THE COURT:  All right.

13          THE WITNESS:  And the next page has the 356 and 421

14 account --

15          THE COURT:  Right.

16          THE WITNESS:  -- from one of the filings.  And I

17 don't have the page that has the warehouse lines.  They were

18 the first ones.  And 11 was one of the warehouse lines which

19 I'm assuming at this point was acceptance, but we don't know.

20 BY MR. PETTIBONE:

21 Q    Okay.  So, the servicing records, does it show that the

22 loan originated with the conduit?

23 A    It -- the loan records in total show that acceptance and

24 American Brokers' Conduit had a hand in the origination of the

25 loan.

1  Q    From there it goes to the warehouse line, correct?

2  A    Right.

3  Q    So, it goes from Conduit to accept -- in the servicing

4  records it's Conduit acceptance to the warehouse line, to

5  Countrywide, to the American Home Mortgage trust savings C.D.?

6  A    Right.

7  Q    Okay.  And then the foreclosure documents show that it

8  went from Gateway, to MEARS, to trustee service, TD?

9  A    Right.  And then there's another wrinkle which was

10  produced in the debtor's document, which was -- I think it's

11  either 62 or 65.  Hold on.

12        MR. CROWTHER:  Your Honor, at this point I'm going to

13  object.  We're going way beyond the scope of cross examination,

14  and we're getting way, way, way far afield.

15        MR. PETTIBONE:  He asked the --

16        THE COURT:  He asked about -- go ahead.

17        MR. PETTIBONE:  He asked if she verified the chain of

18  title.

19        THE COURT:  Overruled.  So, we're looking at Document

20  60?  Is that right?

21        MR. PETTIBONE:  No, I think the document that she's

22  looking for now is -- was produced -- I have a copy of it here

23  -- by American Home Mortgage, Bate stamped 00229.

24        MR. CROWTHER:  What exhibit?

25        THE COURT:  It's not in the exhibit binder?

**J&J COURT TRANSCRIBERS, INC.**

Rush - Redirect                    57

1          MR. PETTIBONE:  No, sir.

2          THE COURT:  All right.

3          MR. PETTIBONE:  So, I would offer it -- it's not in

4  their exhibit notebook.  It was produced during discovery.  I'm

5  not sure of the procedure, but I would ask that it be -- I

6  could show it to Ms. --

7          THE COURT:  Yes.  Go ahead.

8          MR. CROWTHER:  Can I see it?

9          MR. PETTIBONE:  Yes.

10                    (Counsel confer)

11          MR. PETTIBONE:  Your Honor, may I make it -- identify

12  it for Identification as Claimant's 71?

13          THE COURT:  Yes.

14          MR. PETTIBONE:  Thank you.

15  Q    I'm going to show you a document that purports to be a

16  printout from American Home Mortgage --

17  A    That's the one I'm looking for.

18  Q    -- Bate stamped 00229, and this is the only copy we have

19  right now.

20  A    Yes.

21  Q    Okay?  Is that the document you were looking for?

22  A    Yes.

23  Q    Okay.  And what does the document show?

24  A    This document says that the loan was assigned and sold to

25  Countrywide Bank on 3/20/07.

1           MR. PETTIBONE:  May I show that -- submit that to the
2   Court?
3           THE COURT:  Let me look at it.
4                         (Pause)
5           THE COURT:  All right.  You can take it back.
6           MR. PETTIBONE:  All right.  I have no further
7   questions, Your Honor.
8           MR. CROWTHER:  No more questions for the witness,
9   Your Honor.
10          THE COURT:  All right.  Thank you, Ms. Rush.  You may
11  step down.  Who will be your next witness?
12          MR. PETTIBONE:  My next witness, then, will be Alex
13  Yamamura.
14          THE COURT:  All right.  We'll take a recess, short
15  recess, while you find Ms. Yamamura and prepare.
16          MR. PETTIBONE:  Thank you, Your Honor.
17                         (Recess)
18          MR. PETTIBONE:  Judge, I'd like to call Alex
19  Yamamura.
20          THE COURT:  All right.  Take the stand and remain
21  standing.  I know it's cold in here, but --
22                         (Laughter)
23          UNIDENTIFIED SPEAKER:  It's freezing.
24          THE COURT:  It's the way I like it.
25          COURT OFFICER:  Raise your right hand.

**J&J COURT TRANSCRIBERS, INC.**

1          ALEX YAMAMURA, PLAINTIFF'S WITNESS, SWORN

2          COURT OFFICER:  Please state and spell your name for

3   the record.

4          MS. YAMAMURA:  Alex Yamamura.  A-l-e-x, Y-a-m-a-m-u-

5   r-a.

6          COURT OFFICER:  Thank you.

7                    DIRECT EXAMINATION

8   BY MR. PETTIBONE:

9   Q    Good morning.  Your relationship with Mona Dobben is

10  you're her daughter?

11  A    Correct.

12  Q    Okay.

13         THE COURT:  I'm sorry, ma'am.  Sit any way you want,

14  but if you move the mike just a little -- just twist it over to

15  your side, or move a little closer.  There you go.  Thank you.

16  Perfect.

17  Q    Did you introduce your mother to Pat Downey?

18  A    Yes.

19  Q    Okay.  And who is Pat Downey?

20  A    He's a business acquaintance of mine.

21  Q    Okay.  And how long had you known him before you

22  introduced him to your mother?

23  A    I have known him between seven and ten years, but there

24  was a period of time when I had no contact with Pat at all.  I

25  had reconnected with him less than 12 months before I believe I

                    **J&J COURT TRANSCRIBERS, INC.**

1  introduced my mom to him.

2  Q    When you say business acquaintance, maybe -- can you just

3  say what that -- what is that?

4  A    Sure.  Pat was interested in my projects through

5  production.

6  Q    And that's what you do, right?  You -- can you describe

7  what you do --

8  A    Sure.

9  Q    -- regarding the films and the production, I mean.

10 A    Sure.

11 Q    I create projects for motion picture development, ultra

12 low budget.  You know, I work with the writers.  I have a

13 production attorney that works with me.

14 Q    And why did you introduce Pat Downey to your mother?

15 A    Oh.  I had had a premiere on my first ultra low budget

16 project.  The premiere was at Mann's Chinese Theater.  Anyone

17 who is a Screen Actor's Guild member, which Pat Downey is, is

18 entitled to show up at any of my sets.  They're permitted to

19 eat.  I have no control over what a Screen Actor's Guild member

20 would do.  Pat happened to be a the premiere.  Most of the

21 people that I work with don't know anything, or very little

22 about me personally, and everyone was real curious.  I had

23 invited my mom.

24 Q    Okay.  So, your mom was invited.  And why did you

25 introduce Pat Downey to her, though?

1  A     He just happened to be there.  People were coming up in

2  groups, trying to find out who the pretty lady was standing

3  beside me.

4  Q     Okay.  Did the idea of real estate investing come up at

5  any time?

6  A     No.

7  Q     Okay.  When did that first come up?

8  A     Oh, that was months and months after the premiere.

9  Q     Okay.  And how did that come up?

10  A     Pat Downey had called me on the phone.  He said that he

11  had a deal that he had been putting together, and it was

12  blowing up.  He told me that he was looking for new people to

13  hold his transaction together and asked if I knew of anybody

14  who might be interested in investing.

15  Q     Okay.  Is that -- are we talking real estate?

16  A     Real estate.  Yes.

17  Q     Okay.  And what did you say to him?

18  A     I said it was possible.  I mean, I didn't know.  And I

19  gave him a -- ran through a list of potential people.

20  Q     Okay.  And in those potential people was your mother?

21  A     Yes.

22  Q     Okay.  Do you know what your -- at that time -- do we have

23  a time frame of when that was in relation to the purchase of

24  the 37th Street -- or, alleged purchase?

25  A     Is your question from the time that he had called and said

1  he was looking for investors for real estate?

2  Q    Do we know when that date was?

3  A    I don't know the exact date.

4  Q    Can you estimate it?

5  A    It was -- I apologize.  I'm trying to think back.  The

6  premiere took place in 2006, and --

7  Q    That's fine.  So, some time between 2006 you gave your

8  mom's name to Pat Downey, along with other names?

9  A    Correct.

10  Q    Okay.  And do you know, at that time that he contacted

11  you, what your mother's financial situation was?

12  A    No.

13  Q    You knew that she was retired?

14  A    Yes.

15  Q    Did you know how much money that she had in retirement, or

16  savings?

17  A    No.  I had no idea.

18  Q    Okay.  Did you ask your mom -- did you tell your mom that

19  you had told Pat Downey that you had given -- let me say that

20  -- did your mom know that you had told Pat Downey -- given Pat

21  Downey her name?

22  A    Yes.

23  Q    Okay.  And did you tell your mom that she should be

24  investing in real estate?

25  A    No.

1  Q    Did you know at the time that you introduced Pat Downey to
2  your mom that he didn't have a broker's license?
3  A    No, I did not.
4  Q    Let me move forward.  When did you first find that out?
5  A    That was on my own transaction, that's identity theft
6  mortgage fraud.  It was probably not until -- it's a little
7  confusing because things unfold, and they were very complex.
8  They still are.  I still don't know a lot.  But it was through
9  my own fraud investigator with my lender, that it was
10  discovered.  That was approximately May of 2007 that I
11  discovered that he did not have a broker's license.
12  Q    That it had been revoked?
13  A    Yes.
14  Q    And that he had been convicted as a felon?
15  A    Yes.  That is what I believe he was indicating, that Pat's
16  license had been taken under frauds and swindles.
17  Q    Okay.  Did you know -- when did you first know that Pat
18  Downey had contacted your mom?
19  A    I actually don't know.  I mean, later to learn that, yes,
20  they had been communication, but I don't now exactly when they
21  actually conversed on the phone.
22  Q    Okay.  When did you first learn that your mom had made an
23  investment through Pat Downey?  Was it after the loan -- after
24  the investment had already been made?
25  A    Yes.

1 Q    And what were the circumstances under which you learned

2 your mother had invested with Pat Downey?

3 A    Well, I was probably a little more acutely aware of some

4 things, because I had my own problem that I had just

5 discovered, and as it was starting to unfold.  Mom had called

6 and said there was something funny going on.

7 Q    Can you explain that more of what she told you?

8 A    That there were not mortgage payment coupons.  That she

9 had left a couple of messages for Pat.  By that point in time I

10 had already contacted another mortgage broker that I had known

11 for years that had indicated to me that I had fraud in my

12 transactions likely, and I had already made contact with my

13 production attorney looking for a referral to an attorney to

14 help me.  So by the time mom was saying that there was

15 something wrong, that things weren't making sense, she didn't

16 have mortgage payments, the concern was starting to kind of

17 mimic some of the things that were in my own transaction.

18 Q    And was your transaction with Pat Downey?

19 A    Yes.

20 Q    So what, if anything, did you do after this -- you can

21 strike that.  How did you end up contacting Ms. Rush?

22 A    When mom sent me her loan packages, and there were a

23 number of them, some that looked like they were successful

24 transactions, some that looked like maybe something wasn't

25 complete on them, I started contacting the FBI, the DA's

1  Office.  I'd gone in to do research on what do you do if there

2  is fraud, since it had been indicated by the other mortgage

3  broker that I knew.  I started following lists on what it was

4  indicating what I should do on the Internet.  So it was the

5  FBI, the police department, the DA, the Attorney General.  And

6  by the time that my production attorney had made contact back

7  with me with a referral to an attorney for us to talk with, I

8  already had mom's packages.

9         I continued to follow with the Internet and had

10 looked up my own lender, and I found a connection to Paula in

11 regard to EMC Mortgage, and I sent her an e-mail note

12 immediately and I got a response immediately.

13 Q    Okay.  And prior to -- do you know when that was,

14 approximately September '07, June?

15 A    October into September, general, yes, time frame.  A lot

16 was going on.

17 Q    Prior to contacting Ms. Rush, had you ever made or

18 attempted to make any contact with any of the debtor entities,

19 trustees, title companies, anything like that?

20 A    No.

21 Q    So you and your mother retained basically Ms. Rush to

22 assist you with this?

23 A    Yes.

24 Q    And the other matter, your mother was involved in other

25 properties through Pat Downey, correct?

1 A     Correct.

2 Q     Four total, correct?  Nine potential.

3        MR. CROWTHER:  Objection, Your Honor, leading the

4 witness and relevance.

5        THE COURT:  I've been waiting for that objection.

6 Don't lead the witness.

7        MR. PETTIBONE:  Sorry, Your Honor.

8        THE COURT:  And what's the relevance of Mr. Downey's

9 other deals?

10        MR. PETTIBONE:  Just background.  I'll withdraw and

11 move on, Your Honor.  Thank you.

12        THE COURT:  All right, very good.

13 Q     What if anything then did you and Ms. Rush do with regards

14 to discovering what had happened -- let me say this, contacting

15 American Home Mortgage?

16 A     When I found Paula I had done up several sets of binders

17 with the documents that I had and that my mom had.  Had sent

18 those off to Paula so she could take a look at what I was

19 looking at.  Paula indicated the first thing that I should do,

20 if I hadn't already done it is put fraud alerts on our credit

21 reports.  And then Paula and I started digging.  There were a

22 lot of names that were similar in mom's transactions and my

23 transaction, and we started doing research, background on those

24 different individuals.  Paula followed along.

25        I had already made the initial contact with the FBI

1  and the DA.  By the time they were making contact back, Paula

2  actually talked with them with me on the phone at times,

3  sometimes also by herself.  She also made direct contact with

4  all the lenders.

5  Q    Okay.  Did you ever contact any of the debtor entities in

6  this case yourself?

7  A    Yes.

8  Q    Okay.  Let's talk about -- how many times?

9  A    I don't know how many times.  It was numerous.  Or

10 attempted to anyway.

11 Q    Have you talked to more than ten, more than 20?

12 A    Just on the American Home transaction?

13 Q    Yes.

14 A    I think probably, collectively it was indeed more than

15 ten, either in writing with the various things that we did or

16 verbally calling.

17 Q    Can you describe in sum or substance those efforts?

18 A    First thing was TILA and RESPA letters that went out.

19 There have been attempts, repeated attempts to contact Scott

20 Ellerby with American Home as instructed, in a letter that was

21 sent to my mom.  Also, numerous attempts with TD Services.

22 Kimberly Coonrat sticks out most vividly in my mind.  There was

23 another individual that we talked with also when the

24 foreclosure was already going down.  And she would indicate

25 that she was in communication as were her supervisors in

1 communication with American Home.

2 Q    You indicated that you never got a hold of Scott Ellerby?

3 A    Correct.  Left numerous messages.  Actually went so far as

4 have my mom drive over to my house so I could make a three-way

5 call with mom and Paula on the line.  Left numerous messages,

6 he never returned our calls?

7 Q    Were you aware of your mother's credit score?

8 A    Not directly.  You know, I realized my mom has always been

9 a, you know, a real good individual.  She always paid her bills

10 on time.

11 Q    So you're not aware?

12 A    She's frugal.  But no, I mean, actual knowledge of what

13 her credit score was the time?  Absolutely not.  Of course with

14 all this, there's been a lot that I learned, unfortunately.

15 Q    Let me show you a document here I'll mark, it's already

16 been marked as 18.  It will be Page 18(b).

17        UNIDENTIFIED SPEAKER:  She has the book?

18        MR. PETTIBONE:  I have it there.

19 Q    Do you see it, 18(b)?

20 A    I have 18(b).

21 Q    Can you go down to Line Number 305 on the left?  Do you

22 see that?

23 A    Yes, I do.

24 Q    Note payable to Alex Ryan Yamamura Landscaping?

25 A    I see that.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Okay.  Is there such a company Alex Ryan Yamamura

2  landscaping?

3  A    Not to the best of my knowledge.

4  Q    Do you know what that's referring to?

5  A    No, I don't.  I've only seen it, this would be my third

6  time.  This was not on my mother's paperwork.  The first time I

7  saw it was on the HUD1 that we got from American Home in

8  October and then I saw it at the depositions.

9  Q    Okay.  Did you receive $44,000 or in that number range?

10 A    No, I did not.

11 Q    Well, do you have a note for 44,000?

12 A    No, I do not.

13 Q    Did you ever receive any benefit from this transaction

14 with regards to your mother and the 37th Street property?

15 A    No, unless you consider, you know, financial hardship on

16 my part, trying to help her unwind, and a lot of aggravation.

17 Q    Did you witness any aggravation in your mother during this

18 process?

19 A    Aggravation and fear, yes.

20 Q    And when did that start, at the time that she came to you

21 -- when did that start?

22 A    During the time that Pat was orchestrating her

23 transactions I had little to no contact with her.  But by the

24 time she was telling me that she had problems and she was going

25 to send me the loan packages that she did have, she was pretty

Yamamura - Cross/Crowther                        70

1 agitated.  Angry, scared.

2 Q    Did you assist your mother, you know, financially with

3 regards to hiring Ms. Rush or my office or did that money come

4 from your mother?

5 A    No, I paid for the majority of it.

6 Q    Do you know how much you've paid to Ms. Rush to help you

7 and your mother with regards to this transaction?

8 A    No, I don't have a total figure and it's not nearly what

9 she should have been paid for the help she's given me.

10 Q    Can you estimate it?

11 A    It could even be around $60,000.  I really don't know off

12 the top of my head.

13 Q    But just to Ms. Rush.  You don't know the amount that you

14 paid?

15 A    I don't.

16          MR. PETTIBONE:  I don't have any further questions.

17          THE COURT:  Cross?

18                    CROSS EXAMINATION

19 BY MR. CROWTHER:

20 Q    Ms. Yamamura, prior to you introducing your mom to Mr.

21 Downey, she didn't know Mr. Downey, correct?

22 A    That's correct.

23 Q    Did you know that your mom thought that Mr. Downey was

24 your friend?

25 A    I don't know if she thought that he was my friend.

1  Everyone that was there that I was introducing to her --

2  Q    Did you know that she trusted him?

3           THE COURT:  Let her finish, Mr. Crowther.

4  A    -- you know, she wouldn't have any knowledge as to, you

5  know, how tight a relationship was with anybody that I

6  introduced her to that day.

7  Q    Did you know that she trusted him because she thought he

8  was your friend?

9  A    I don't really know what her thought pattern was on that.

10 Q    Did you ever have a real estate transaction with Mr.

11 Downey?

12 A    Yes, I did.

13 Q    In fact, that occurred in February of '07, correct?

14 A    Correct.

15 Q    And you told us before that he had bought a property in

16 your name without you knowing it.

17 A    Correct.

18 Q    Do I understand that correctly?

19 A    Yes.

20 Q    I think you referred to as he stole your identity.

21 A    Identity theft and mortgage fraud.

22 Q    Because he bought a property in your name and obtained

23 mortgages in your name.  Is that what happened?

24 A     That is a portion of it, yes.

25 Q    And you claim that you didn't know about the property

1  being purchased until he called you and told you he had bought

2  a property, correct?

3  A    Correct, it was my understanding that the production was

4  buying a property.

5  Q    That your company was buying a property?

6  A    Correct.

7  Q    And that's property at 650 Sinoloa in Simi Valley?

8  A    Correct.

9  Q    And that's California as well?

10 A    Yes it is.

11 Q    At the time you were living in California, correct?

12 A    Correct.

13 Q    Did you sign mortgage documents incident to a transaction

14 for that property?

15 A    Could you be specific for me as to which documents, the

16 mortgage documents?

17 Q    Sure.  Did you sign a deed of trust?

18         THE COURT:  I'm sorry?

19 Q    Did you sign a deed of trust?

20 A    I don't recall.

21 Q    Did you sign disclosures relating to that loan?

22 A    I am not sure what the title was on any of the documents.

23 Q    You were aware there was a mortgage for property that was

24 being purchased at 650 Sinoloa?

25 A    Correct.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    So he did not buy a property that you didn't know about?

2  A    I was taken into the mortgage company to sign escrow

3  papers.  I did not sign a purchase contract nor did I ask him

4  to find me a house or the production.

5  Q    So you signed mortgage documents for property you don't

6  want?

7  A    My belief at the time was that if Pat Downey was able to

8  find a way to get me or the production to qualify, that it had

9  to have been legitimate transaction.  What I was later to learn

10 is that he had opened a bank account using my name, my social

11 without my knowledge, which forced me to qualify, which is

12 where the problem is.

13 Q    So you shouldn't have been given a loan that you

14 ultimately signed, do I understand you correctly?

15 A    I did not qualify in a legal fashion for that mortgage.

16 Q    Did you stay at the property?

17 A    I did for a period of time.

18 Q    So you lived there?

19 A    Yes, I did.  While I made the payments.

20 Q    How much were the payments?

21 A    Almost 12,000 a month.

22       THE COURT:  I'm sorry, 12,000?

23       THE WITNESS:  Correct.

24 Q    In fact,  the mortgages you took out on that property

25 were in excess of a million dollars, weren't they?

1  A    That Pat put me into, that is correct.

2  Q    And the purchase price of this property was in excess of

3  $1.3 million, wasn't it?

4  A    That is correct.

5         THE COURT:  I'm sorry, is this a residential property

6  or a business property?

7         THE WITNESS:  It is a residential property.

8  Q    Now, when you found out, as you described it, that you had

9  purchased this property, did you immediately suspect that there

10 was some fraud involved?

11        MR. PETTIBONE:  I object, is there relevance at this

12 point, Your Honor?

13        THE COURT:  Where are you headed with this, Mr.

14 Crowther?

15        MR. CROWTHER:  It goes to a time line, Your Honor.

16        THE COURT:  All right.  Overruled.

17 Q    Did you suspect there was fraud when you immediately found

18 out that you had purchased a property in excess of $1.3

19 million?

20 A    No, because my belief was that the production had

21 purchased the property.

22 Q    Was your belief that the production had taken out the

23 mortgages?

24 A    Yes, actually.

25        MR. CROWTHER:  Your Honor, may I take a moment to

Yamamura - Cross/Crowther                    75

1  mark some documents?

2          THE COURT:  Mm-mm.

3          MR. CROWTHER:  Request permission to approach the

4  witness, Your Honor.

5          THE COURT:  Okay.

6  Q    Ms. Yamamura, I hand you what's been marked for

7  identification as Debtor's Exhibit 35, is that your signature

8  on that document?

9  A    It appears to be a copy of, yes.

10 Q    Who's it identify the borrower as?

11 A    Where would that be on the form?  Or is that the

12 applicant?

13 Q    Right at the top where it says borrower

14 A    Borrower, Alex Ryan Yamamura.

15 Q    How much was this loan?

16 A    Where is that on the document?

17 Q    How about under amount financed.

18 A    $1,054,060.68.

19         THE COURT:  Mr. Crowther, may I have a copy?

20         MR. CROWTHER:  Sure, Your Honor.

21         THE COURT:  Thank you.  Whose address is that, 30101

22 Agoura Court?

23         THE WITNESS:  I don't know.

24         THE COURT:  It's not yours?

25         THE WITNESS:  No.

1    MR. CROWTHER:  That will become clear in a moment,
2 Your Honor.
3          THE COURT:  I'm sorry?
4          MR. CROWTHER: That will become clear in a moment.
5          THE COURT:  All right, thank you.
6 Q    I've handed you what has been marked as Debtor's Exhibit
7 36 for identification.  I ask you to turn to the second page
8 and ask if that's your signature on the bottom of that
9 document?
10 A    Yes, that is a copy of my signature.
11 Q    And this document's closing instructions from Commitment
12 Lending, the lender for your transaction, correct?
13 A    That was, upon discovery, the table funder, it was later
14 sold to EMC mortgage.
15 Q    Loan amount, $1,086,700, correct?
16 A    Correct.
17 Q    Looking at the bottom of the document, do you see where it
18 says vesting in the title?
19 A    I'm sorry, where it says what now?
20 A    Vesting to read.
21 Q    On Page 1 of that?
22 A    That's correct.
23 Q    And it says, I'm sorry, what?
24 A    Vesting.  Where is says vesting to read under Number 2?
25 Vesting to be Alex Ryan Yamamura, a married woman as her sole

1 and separate property.  Do you see that?  First page, Ms.

2 Yamamura.

3 Q    Well, I'm not finding it on here.

4          THE COURT:  If you don't, you don't.  Mr. Crowther,

5 you may approach --

6          MR. CROWTHER:  Certainly.

7          THE COURT:  -- and point to the witness where you're

8 looking.  And I'll take a copy too.  May I have a copy as well

9 please?  Thank you.

10 A    Yes, I see that now.

11 Q    It also shows you as the borrower at the top of the page,

12 Borrower, Alex Ryan Yamamura, does it not?

13 A    Yes, it does.

14          MR. CROWTHER:  Permission to approach the witness

15 again, Your Honor.

16          THE COURT:  Yes.

17          MR. CROWTHER:  May I approach, Your Honor?

18          THE COURT:  Yes, please.  Thank you.

19 Q    Ms. Yamamura, you've been handed what's been marked as

20 Debtor's Exhibit 37 for identification.  Is that your signature

21 on the second page of this document, Ms.  Yamamura?

22 A    Yes, it is a copy of my signature.

23 Q    And this is the specific closing instructions for the

24 second mortgage that you obtained on the 650 Sinoloa Road

25 property, correct?

1  A    Well, there were actually three sets of documents that I

2  was asked to sign and I believe that this appears to be one of

3  the three sets.

4  Q    And it's for the second mortgage you got on 650 Sinoloa

5  Road, correct?

6  A    Correct.

7  Q    And the amount of this one was $350,000, correct?

8  A    Correct.

9  Q    And the  borrower was Alex Ryan Yamamura, correct?

10 A    Yes, according to these documents.  But while these

11 documents were being presented to me, Pat was actually called

12 in at the final set of documents that I was presented to sign

13 and it was brought to his attention that there was a problem.

14         THE COURT:  Which was what?

15         THE WITNESS:  It was my understanding that the

16 production was purchasing this property when I was told that I

17 had purchased a property, but also I don't know whether it was

18 this set or one of the other two sets of papers that I was

19 asked to sign.  It was showing that there were prepayment

20 penalties that I was told would not be in existence.

21         THE COURT:  Okay, were you -- I just don't know under

22 California law, were you represented by an attorney?

23         THE WITNESS:  No, I was not.

24         THE COURT:  Do you know whether it's required or not

25 required?

**J&J COURT TRANSCRIBERS, INC.**

1        THE WITNESS:  I don't know.

2        THE COURT:  Okay.

3        MR. CROWTHER:  Permission to approach the witness and

4  Your Honor.

5        THE COURT:  Yes.  Thank you.

6  Q    I've handed you what's been marked as Debtor's Exhibit 38.

7  Is that your signature on this document as well?

8  A    That is a copy of my signature.

9  Q    Do you see where it says, buyers vesting, Alex Ryan

10 Yamamura, a married woman, it is her sole and separate

11 property.

12 A    Yes, I do.

13 Q    Do you see where it says new loan, buyer will pay new loan

14 in the amount of $1,086,700?

15 A    Yes, I do.

16 Q    Do you see where it says in the next paragraph, new loan,

17 buyer will obtain a new loan in the amount of $350,000?

18 A    Yes, I do.

19 Q    So you knew you were buying property as Alex Ryan

20 Yamamura, a married woman, as your sole and separate property.

21 You signed this, didn't you?

22        THE COURT:  Compound question.  Ask one question at a

23 time, Mr. Crowther.

24        MR. CROWTHER:  Certainly.

25 Q    You knew you were buying property at 650 Sinoloa Road,

1  Simi Valley, California, correct?

2  A    I believed that the production was.

3  Q    You signed this document which is a single page, correct?

4  A    Pat Downey had gone to my now former husband and had a

5  grant deed signed without my knowledge.  It was my belief there

6  was no way that I could purchase a piece of real estate.

7            THE COURT:  Did you sign the document?

8            THE WITNESS:  I did sign this document.

9            THE COURT:  Thank you.

10           MR. CROWTHER:  Permission to approach the witness and

11 Your Honor again.

12 Q    I pass you what's been marked as Debtor's Exhibit 39.

13 I'll ask you to turn to Page 13 of 14.  Is that your signature

14 on the signature page of this deed of trust?

15 A    That is a copy of my signature.

16 Q    Ask you to turn to Page 3 of 3 on the adjustable rate

17 rider that's attached behind it.  Is that your signature on

18 that page?

19 A    That is a copy of my signature.

20           MR. PETTIBONE:  Your Honor, I'm going to object.  May

21 I be heard?

22           THE COURT:  Yes.

23           MR. PETTIBONE:  Your Honor, I'm going to object as to

24 relevance again and also opening up a whole transaction that

25 can be very time consuming for me to now rehabilitate her.  And

1  I thought we were going to do a time line and I can maybe

2  stipulate to these dates or something.

3          THE COURT:  Mr. Crowther?

4          MR. CROWTHER:  Your Honor, it goes to a couple things

5  right now.  It goes to this witness' credibility first of all.

6  Their, you know, purported fraud scheme and then we'll get into

7  the time line shortly.  The dates of these transactions of all

8  these documents is February of '07.  As Your Honor knows, the

9  mortgage with Ms. Dobben did not close until April of '07.  Ms.

10 Yamamura has testified that she was frauded prior, two months

11 prior to Ms. Dobbin closing any transactions with AHM.  We

12 don't believe there's any such fraud.  So we believe this is

13 all counter to their entire theory of some purported fraud

14 theory.

15         THE COURT:  All right, I'll allow it.

16 Q    Do you see that all those signature blocks there is Alex

17 Ryan Yamamura, Ms. Yamamura?

18 A    I'm sorry, what was the question?

19 Q    Do you see that all the signature blocks are Alex Ryan

20 Yamamura?

21         THE COURT:  All the signature blocks on what?

22         MR. CROWTHER:  On what she just authenticated.

23         THE COURT:  All right.

24 A    That that's a copy of my signature?

25 Q    Right.

**J&J COURT TRANSCRIBERS, INC.**

1  A     Yes.

2  Q     And right below your signature is the party at being

3  signing is Alex Ryan Yamamura.

4  A     I see that.

5  Q     This is the deed of trust that you signed for $1,086,700

6  relating to 50 Sinoloa Road?

7  A     This is one of three sets of documents that I was

8  presented with to sign.

9          THE COURT:  Who prepared these documents, to your

10  knowledge?  Was it Mr. Downey or was it the Commitment Lending?

11          THE WITNESS:  I don't know.  Pat had brought one set

12  and interrupted a production meeting.  He sent someone else

13  from his office to bring another set.  And then I was actually

14  driven to a title settlement company in Simi Valley to sign a

15  third set.  And I'm not sure which set we're looking at right

16  now.

17          THE COURT:  But they all -- Mr. Downey drove you?

18          THE WITNESS:  Yes.  And he was present and I asked

19  him to come on in when they were having me sign the third of

20  the three.

21          MR. CROWTHER:  Permission to approach the witness and

22  Your Honor.

23          THE COURT:  Yes.

24  Q     You've been handed what's been marked as Debtor's

25  Exhibit 40.  I'd ask you to turn to Page 7 of 7.  Is that your

Yamamura - Cross/Crowther                    83

1  signature at the bottom, promissory at the top?

2  A    Yes, that appears to be a copy of my signature.

3  Q    And on Page 2 of 2 following the balloon rider there,

4  that's your signature as well, Ms. Yamamura?

5  A    Yes, that appears to be a copy of my signature.  I'm not

6  sure that I ever saw this notary, however.  I don't recall

7  every meeting anyone by the name of Janice Willoby.

8  Q    Did you sign the document in a room all by yourself?

9  A    No, but the gal that I signed in front of, her name was

10  not Janice.

11  Q    Was your husband involved or ex-husband involved in this

12  real estate deal?

13  A    I was later to learn that Pat Downey had had him sign two

14  separate grant deeds on two separate properties without my

15  knowledge.  If that indicates that he was involved, perhaps he

16  was.

17  Q    Your husband's name -- was he your husband then or your

18  ex-husband?

19  A    He is now my ex-husband.

20  Q    In February of '07 was he your husband?

21  A    Yes, he was.

22  Q    You're aware that California is a community property

23  state, right?

24         THE COURT:  Relevance.  Move on on this one.  We

25  don't want to get into Ms. Yamamura's personal life and

**J&J COURT TRANSCRIBERS, INC.**

1 marriage.  She's entitled, I think, to the same privacy as Mr.

2 Woods.

3 Q    Your ex-husband had to disclaim any interest in this real

4 estate, didn't he?

5           THE COURT:  At what time?  Why are you going into

6 this, Mr. Crowther?  Let's move past this.

7 Q    After February of '07, did you tell your mom that Mr.

8 Downey had frauded you?

9 A    It was after February, yes.

10 Q    How long after, Ms. Yamamura?

11 A    I don't believe that I actually was fully aware of what I

12 was looking at in my own transactions until probably April into

13 May.

14 Q    You knew that your mom was going to be contacted by Mr.

15 Downey to buy real estate, right?

16 A    To see if she was interested, correct, if she were able to

17 qualify, yes.

18 Q    Because you're the one who gave him her name and number,

19 right?

20 A    Correct.  As I did several other people.

21 Q    And you gave her name and number so that she could be

22 contacted to buy investment real estate, correct?

23 A    Well, not if she didn't qualify.

24 Q    Of if she didn't want it.

25 A    Or if she didn't want it.

Yamamura - Cross/Crowther                    85

1  Q    You didn't tell her between February 15th of '07 and April
2  17th of '07, don't do business with Mr. Downey, did you?
3  A    No.
4  Q    You must have thought your mom was competent to make a
5  decision as to whether or not she wanted to buy investment real
6  estate, didn't you?
7  A    Yes, assuming that the appropriate laws were in effect to
8  protect people from fraud.
9  Q    You must have thought your mom could afford to buy
10 investment real estate or otherwise you wouldn't have given her
11 name, right?
12 A    No, I had no knowledge of her financial information.
13 Q    You just give Mr. Downey your mom's name without wondering
14 whether or not this was good for her?
15        MR. PETTIBONE:  Argumentative.
16        THE COURT:  Sustained.
17 Q    Did you ask your mom whether she was interested in
18 purchasing investment real estate?
19 A    Not those specific words, no.
20 Q    What specific words did you ask your mom about purchasing
21 investment real estate?
22 A    I don't think I actually asked her a question.  I told her
23 that Pat had a deal that was dropping and that I had suggested
24 that perhaps he wanted to talk with several people I knew.
25 Q    Your mom included?

**J&J COURT TRANSCRIBERS, INC.**

1  A    Correct.

2  Q    There was no reason you didn't think your mom should buy

3  investment real estate, did you?

4  A    Well, if it wasn't a legitimate transaction --

5         THE COURT:  I'm sorry.

6  Q    Was there a reason why you didn't think your mom should

7  buy investment real estate?

8  A    That wasn't my call.

9  Q    It was your mom's call?

10  A    Yes.

11  Q    And your mom, in your view, was able to make that call?

12  A    I'm sorry, would you please rephrase the question?

13  Q    Sure.  In your view, your mom was able to make that call.

14  A    As to whether or not --

15  Q    Whether or not --

16  A    -- she was interested in purchasing real estate?

17  Q    Correct.

18  A    Yes.

19  Q    You had no doubt that she was able to make that decision?

20         MR. PETTIBONE:  Asked and answered, Your Honor.

21         THE COURT:  Sustained.

22  Q    How long did you make the mortgage payments on the Sinoloa

23  property?

24  A    Several months.

25  Q    More than three?

1        MR. PETTIBONE:  Same objection, Your Honor.  We were

2   going to be moving on.

3        THE COURT:  I think again it goes to credibility.  So

4   overruled.

5   Q    More than three?

6   A    Yes.

7   Q    More than six?

8   A    I don't recall.  I did until we had an agreement we were

9   doing the deed in lieu of foreclosure.  My loans were deemed

10  void.

11  Q    Were you in default at the time you in default at the time

12  you did a deed in lieu of foreclosure?

13  A    No, I was not.

14  Q    So you continued making payments up until that time?

15  A    When we had the agreement that we would do the deed in

16  lieu.

17        MR. CROWTHER:  Permission to approach the witness and

18  Your Honor.

19        THE COURT:  Thank you.

20  Q    I hand you what's been marked as Debtor's Exhibit 41.  Is

21  the deed in lieu of foreclosure that you just referred to?

22  A    This appears to be a copy, yes.

23  Q    You signed this on November 14th of 2007?  I'm sorry, I'm

24  incorrect.  What date did you sign this document?

25  A    I don't see a date by my signature.

                    **J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  If you know.  If you don't know, you

2  don't know.

3  Q    Did you appear before a notary by the name of Sharon

4  Hensky on December 11th of '07 and sign this in front of her as

5  it indicates at the bottom?

6  A    Yes, I did.

7  Q    Would that be the date you signed it?

8  A    Yes.

9          MR. CROWTHER:  No further questions.

10          MR. PETTIBONE:  Thank you, Your Honor.

11          THE COURT:  Redirect?

12          MR. PETTIBONE:  Yes, sir.

13          THE COURT:  Are you ready now or would you like a

14  break?

15          MR. PETTIBONE:  We can take a break.

16          THE COURT:  Let's take a very short recess and then

17  we'll do redirect.  You cannot discuss the substance of your

18  testimony during the break.

19                    (Recess)

20          THE COURT:  Please be seated.  Redirect?

21          MR. PETTIBONE:  Thank you, Your Honor.

22          THE COURT:  Yes.  Ms. Yamamura, please take the

23  stand.

24          MR. PETTIBONE:  Your Honor, my pro hac vice counsel,

25  Vivian Houghton, needs to make an appearance at a creditors'

1  meeting, and I would ask an oral motion if she could be excused

2  temporarily for that?

3           THE COURT:  Of course, yes.

4           MS. HOUGHTON:  Thank you, Your Honor.

5           MR. PETTIBONE:  May I proceed, Your Honor?

6           THE COURT:  Yes.

7                    REDIRECT EXAMINATION

8  BY MR. PETTIBONE:

9  Q    Ms. Yamamura, when you discovered that your transaction in

10 Simi Valley was potentially a fraud being committed upon you,

11 what did you do?

12 A    I contacted the FBI, the FTC, the police department, the

13 DA's Office and the Attorney General.

14 Q    And when did you do that?

15 A    It was after May of 2007.  I don't know the exact month.

16 Q    And why did you not do it before that time?

17 A    Things are very confusing with Pat Downey, and I was not

18 putting two and two together.

19 Q    When was it that you had, you believe, enough knowledge

20 that a fraud had been committed upon you to start making

21 complaints against Patrick Downey.

22 Q    May into June I was confident enough that I was actually

23 putting it in writing and pleading for some assistance.  I

24 wasn't getting any answers out of Pat Downey or his broker and

25 it just was looking more and more suspicious.

1          THE COURT:  I'm sorry, I'm  confused.  Mr. Downey was

2   not the broker on your deal?

3          THE WITNESS:  He was, but he had a designated broker

4   for the real estate, historical real estate and finance.

5          THE COURT:  All right.  So he used them.

6          THE WITNESS:  A designated broker by the name of

7   Gregory Clark.

8   Q    I'm going to show you a document that's been identified as

9   Exhibit 58 in the Plaintiff's notebook there.  And just for the

10  record and clarification, 58 contains a number of documents.

11  The one I'm going to use, if I can have the Court's permission

12  is the complaint that she filed with the FTC.

13         THE COURT:  Okay.

14  Q    And that would be Page 2 of Exhibit 58.

15         MR. CROWTHER:  Your Honor, for the record, Exhibit 58

16  appears to be only partial parts of documents.  It's a

17  hodgepodge of parts of a number of documents and the text

18  actual is missing.   We would object to any use of these

19  exhibits because we're really prejudiced by the fact that the

20  actual complaint part, supposedly what is alleged, is not

21  there.  It's omitted.

22         THE COURT:  I assume you're using this for the date

23  it was done.

24         MR. PETTIBONE:  Yes, sir.

25         THE COURT:  And where is that reflected?

1          MR. PETTIBONE:  I don't -- see it on the bottom

2   right-hand corner of the document as a print date.  Date August

3   29th, 2007.

4          THE COURT:  This is a screen shot.  Is this the

5   screen shot you saved or --

6          THE WITNESS:  I printed it.

7          THE COURT:  At the time you filled it out?

8          THE WITNESS:  I believe so, yes.

9          THE COURT:  It's the complete screen.  This is all

10  there was to fill out, right?

11         THE WITNESS:  Right.

12         THE COURT:  All right.  I'll allow examination on

13  this document.

14         MR. PETTIBONE:  Okay.

15  Q    Is this document the document that you filled out with the

16  Federal Trade Commission?

17  A    Yes, it is.

18  Q    And you filled out other documents as well, FBI, DA and

19  Attorney General?

20  A    The FBI was a phone call.  The DA's Office, I actually

21  sent them a large binder.  By that point I already believed my

22  mother had a problem, and her documents were also included.

23  Q    Now when you entered into this grant deed in lieu of

24  foreclosure, it's Debtor's Exhibit 41, do you see it before you

25  there?

1 A    Yes.

2 Q    Can you tell us the circumstances under which you entered

3 into this document?

4           THE COURT:  Debtor's or yours?

5           MR. PETTIBONE:  That's debtor's, Your Honor.

6           THE COURT:  Oh, that's one of the ones you handed up.

7 Hang on, give me a minute.

8           MR. PETTIBONE:  Yes, Your Honor.

9           THE COURT:  Okay.  I have it.  What was the question?

10 I'm sorry.

11 Q    What were the circumstances under which you entered into

12 this agreement?

13 A    I had already asked Paula for help on my behalf as well as

14 my mom, and she'd been in contact with the lender, EMC

15 Mortgage.  I had already filed the numerous complaints and it

16 was agreed by EMC Mortgage and then again later, the FTC, that

17 my loans were void.

18           MR. CROWTHER:  Objection, Your Honor.  Calls for a

19 state of mind of someone else.  Why they agreed to what they

20 agreed was --

21           THE COURT:  Why who agreed to it?

22           MR. CROWTHER:  EMC or what the FTC did is not in the

23 record and why they did that is not in the record.

24           THE COURT:  Sustained.  You can tell me what they

25 did, but not why.

1  Q     Describe what they did.

2          THE COURT:  Or what you did.

3  Q     What you did.

4  A     All right.  Now I'm confused.  Why we did the deed in lieu

5  of foreclosure?

6          THE COURT:  Why you did the deed, yes, and the

7  background to it.

8  A     Because EMC had agreed that the loans needed to be moved

9  out of my name, and the only way to do it was by the deed in

10 lieu of foreclosure, that the loans were void, so this is what

11 we did.

12 Q     And did you make a determination that there had been a

13 fraud in your loan?

14 A     Yes, I believe so, yes.

15 Q     And how did you come to that determination?

16 A     Well, when they agreed that the loans were void and they

17 shouldn't be in my name in the first place, that I've been a

18 victim of mortgage fraud and identity theft, yes.

19 Q     And you had Ms. Rush also engaged in this negotiation with

20 you on the EMC?

21 A     That's correct.  She dealt directly with the top fraud

22 investigator, John Gray and Chris Ferrara.

23 Q     And who prepared these documents, the EMC grant deed in

24 lieu of foreclosure, do you know?

25 A     I believe it was the attorneys for EMC.

1          MR. PETTIBONE:  Nothing further, Your Honor.

2          THE COURT:  All right, you may step down.

3          MR. CROWTHER:  Your Honor, we just ask that the

4  Exhibits 35 to 41 be moved into evidence at this point.

5          THE COURT:  Well, any objection?

6          MR. PETTIBONE:  Was it his exhibits, Your Honor?

7          THE COURT:  Yes, the ones he handed up loose.

8          MR. PETTIBONE:  You know, I wanted to move mine in

9  too.  I don't know --

10          THE COURT:  Let's wait until testimony is over and

11  then we'll deal with the exhibits.  But I understand your

12  desire.

13          MR. PETTIBONE: I'd like to call Ms. Dobben.

14          THE COURT:  Yes.

15          MR. PETTIBONE:  May I proceed now?

16          THE COURT:  Yes you may.  I would like, I know people

17  may get hungry.  I would like to push through if we can,

18  because I cannot go past 3:30, so I'd like to maybe push

19  through the witnesses and then maybe we'll take a break before

20  argument.  All right?

21          MR. PETTIBONE:  And then have argument, Your Honor?

22          THE COURT:  Yes, I think that's how we'll do it.  But

23  let's see where we are on the timing.  Ms. Dobben, will you

24  please take the stand?

25              MONA DOBBEN, PLAINTIFF'S WITNESS, SWORN


                    **J&J COURT TRANSCRIBERS, INC.**

1    THE CLERK:  Please state your full name for the

2  record.

3    THE WITNESS:  Mona Dobben, M-o-n-a, Do-b-b-e-n.

4    THE CLERK:  Thank you.

5    DIRECT EXAMINATION

6  BY MR. PETTIBONE:

7  Q    Okay, Ms. Dobben, how are you doing?

8  A    Okay.

9  Q    Okay, good.  I'd like to talk to you about why we're here

10  and some of the issues, and I'm going to ask you to refer to

11  some documents now, we're going to go through them and I'm

12  going to ask you some questions about it.  You have the

13  notebook in front of you there?

14  A    Yes, I do.

15  Q    I'd like you to refer to Exhibit 1.  Do you see that

16  document?

17  A    Yes, I do.

18  Q    Okay.  On the second page of that document, it purports to

19  be your signature up in the top left-hand corner, is that your

20  signature?

21  A    No, sir.

22  Q    Okay.  Now when did you first meet Patrick Downey?

23  A    I met Patrick Downey at the premiere of Alex Ryan, my

24  daughter.

25  Q    You've heard the testimony of Alex Yamamura that she gave

**J&J COURT TRANSCRIBERS, INC.**

1  him your number.  Did he ever contact you after that?

2  A    Yes, he did.

3  Q    And do you know when that was?

4  A    Honestly, no I don't.  I would have to say it was probably

5  after February, end of January, first of February.

6  Q    Did he call you by phone?

7  A    Yes, he did.

8  Q    Can you tell us what the sum or substance of that

9  conversation was?

10  A    Yes, he told me that he had a mother and daughter that had

11  had some properties and were willing to -- they wanted to move

12  on and do something else and would I be interested in investing

13  in some rental properties.

14  Q    And did you ultimately agree to invest in some properties

15  with him?

16  A    I told him that I really needed to think about it, which I

17  did, and I told him that yes, I would like to try and invest.

18  Q    And what was your purpose of investing?

19  A    To make a little more income for myself.

20  Q    What was the idea?  How were you going to make the income

21  with regards to this?

22  A    He told me that these had been -- had long term tenants in

23  them, good, secure tenants.  That there was a good income off

24  these properties.

25  Q    Did you ever met him face to face?

1 A    Only at the premiere.

2 Q    Did you ever sign any documents that you were aware of

3 with regards to this property, the 37th Street property?

4 A    The only papers that I signed that I'm aware of are what

5 would be called escrow papers.

6 Q    Okay.  Had you ever previously owned any investment

7 property or rental property?

8 A    Yes, I have.

9 Q    Okay, and when was that?

10 A    In 1960.

11 Q    Was there a loan on that property?

12 A    No.

13 Q    For how long did you own that rental property?

14 A    Approximately ten years.

15 Q    And was it a -- it was rented out?

16 A    At first I lived in it.  It was a wedding present from my

17 grandparents to me.  I lived in the property for a while.  When

18 I moved out, I rented the bottom part of it, yes.

19 Q    Did you give Pat Downey your financial information?

20 A    Yes, I did.

21 Q    And what did you give him?

22 A    I gave him a copy of my American Funds, I gave him a copy,

23 I believe he asked for my last year's income tax.

24 Q    When you say American Funds, is that your retirement

25 account or savings account?

1  A    Yes, it would be considered a savings account, yes.

2  Q    Did you receive any income off of that?

3  A    Yes, there's a little monthly income, yes.

4  Q    And what other income did you have other than American

5  Funds, let's say in early 2007?

6  A    Social Security.

7  Q    And how much was that?

8  A    Now it's up to $777 a month.

9  Q    Okay.  What was it then?  Lower than that I take it?

10 A    Yes.

11 Q    And what was the income off the American Funds account at

12 that point?

13 A    At that time I would usually draw about $1,000 a month.

14 Q    All right.  I'd like you to take a look at Exhibit 2 if

15 you would, which is a uniform residential loan application.

16 A    There's nothing in two.

17        UNIDENTIFIED SPEAKER:  Oh, we gave that to --

18        THE COURT:  You gave that to me.

19        MR. PETTIBONE:  May I use it, Your Honor.

20        THE COURT:  You can use it.  Stand up there and ask

21 her, that's fine.

22 Q    First of all, is this your signature?

23 A    No, sir.

24 Q    Do you see in the lower left-hand corner, the phone

25 number?

1  A    Yes.

2  Q    Is that your phone number though?

3  A    Yes, it is.

4  Q    And this doesn't contain any of your initials?

5  A    No, that's not my initials.

6  Q    Okay.

7  A    I mean, they're my initials, but I didn't write them.

8  Q    Do you see on, I'm going to call it Bates Stamp 00002

9  there's a reference in the left-hand corner about a quarter of

10  the way down to your making income of $8300 a month, do you see

11  that?

12  A    Yes, I do.

13  Q    And is that a true statement?  Were you making $8300 a

14  month?

15  A    No, no.

16  Q    Okay.  You're retired, right?

17  A    Yes.

18  Q    Okay.  Now when you say that you signed escrow papers, was

19  that at your home?

20  A    Yes.

21  Q    And who came to you with the escrow papers?

22  A    Somebody had called and said a notary was coming out.  I

23  don't remember whether Pat had called me ahead of time and said

24  they were sending somebody out or whether just somebody called

25  and said they were coming out to have me sign some papers.

1  Q    And did you keep a copy of what you signed?

2  A    That's a hard question to ask.  I was given a stack of

3  papers that was just left at my house.

4  Q    Okay.  You don't know what they were?  You felt they were

5  escrow papers?

6  A    Yes.  I thought they would be.

7  Q    Now, on this document it makes a reference in the

8  left-hand corner to a face to face interview that you had with

9  a Brianne Offerman.  Did you ever a face to fact interview with

10  her?

11  A    No, I don't know Brianne.

12  Q    Okay.  I'm going to show you another document.  It's the

13  same type of form.  It's Bates Stamped 00005 through 08, and

14  it's not your signature on these documents either?

15  A    No, that's not my signature.

16        THE COURT:  Don't lead the witness, please.

17        MR. CROWTHER:  Your Honor, just for the record, I

18  offer to stipulate that this series of documents is not signed

19  by Ms. Dobben in order to push this through quicker.

20        THE COURT:  Okay.

21        MR. CROWTHER:  So I don't know whether --

22        THE COURT:  Which series of documents?

23        MR. CROWTHER:  There's a whole series of documents

24  that I believe are here for that purpose and all Mr. Pettibone

25  has to do is identify them and I will stipulate that it's not

1  her signature.

2          THE COURT:  All right.

3          MR. PETTIBONE:  We can do that.  Some of the

4  documents I will be asking some questions on.

5          THE COURT:  Of course.

6          MR. PETTIBONE:  Okay?  So 1, 2, 3 -- excuse me, not 3

7  -- 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16.

8  Those are the ones that are before me at this time.

9          THE COURT:  Okay.

10          MR. PETTIBONE:  And none of those are her signature.

11          THE COURT:  Mr. Crowther?

12          MR. CROWTHER:  The debtors will stipulate that that

13  is not Ms. Dobben's signature on those documents.  However, we

14  don't seek their admissibility because of other notes and

15  writing on those documents.  Disregarding that writing in those

16  notes.

17          THE COURT:  I understand.  You stipulate to that's

18  not her signature on those documents.

19          MR. CROWTHER:  Correct.

20

21          THE COURT:  All right.

22  BY MR. PETTIBONE:

23  Q    Ms. Dobben, were you ever aware -- let me strike that --

24  did you ever meet a Greg Clark face to face either?

25  A    No, I don't know Greg Clark.  I know the name, but I don't

Dobben - Direct/Pettibone                                102

1  know Greg Clark.

2  Q    Is the only person that you saw face to face on this

3  transaction was the woman that came out and had you sign the

4  papers?

5  A    Yes.

6  Q    Were you ever aware that an appraisal had been conducted

7  on the 37th Street property?

8  A    No.

9  Q    I'm going to show you a document that is the Debtor's

10 Exhibit 18, so you have to go to the other notebook now.

11 A    It's the other one?

12        THE COURT:  I'm sorry, Debtor's 18?

13        MR. PETTIBONE:  Yes, sir.

14 Q    It purports to be an adjustable rate note.  Ms. Dobben,

15 have you ever seen that document before?

16 A    It's interesting that you should ask that, because I've

17 seen so many papers now, I guess maybe yes I have.  I think I

18 saw this when I had my deposition taken.

19 Q    Okay.  If you look to the last page there, or second to

20 page, is that your signature?

21 A    Yes, it is.

22 Q    on the note of the date -- the date of the note states

23 April 10th, 2007, do you know if you signed this on April 10th,

24 2007?

25 A    No, I don't know whether I signed it on the tenth.

**J&J COURT TRANSCRIBERS, INC.**

1  Q    Do you know when it was that you signed those escrow

2  papers?

3  A    When my deposition was taken, I was thinking the papers

4  had said 4/11, okay.  Since then I've been told, no, those

5  papers said 4/17.

6         THE COURT:  When you say -- what do you mean you've

7  been told?  You looked at the documents and you thought it was

8  4/11?

9         THE WITNESS:  No.  When I had my deposition taken, I

10 said yes, they were my signature.  There was a date on there.

11 And after I went home I couldn't remember whether the date --

12 what the date said.  Now they're saying that maybe it was 4/11

13 or maybe it was 4/17.  I looked at my calendar and I was in San

14 Antonio, Texas with a girlfriend and I didn't get home until

15 the 16th and she was still there with me on the 17th, so now

16 I'm questioning my own mind --

17        THE COURT:  All right.

18        THE WITNESS:  what date were those papers really

19 signed.

20        THE COURT:  So you were in San Antonio on the 11th?

21        THE WITNESS:  Yes.

22 Q    And you didn't return until the 17th?

23 A    That's right.

24        THE COURT:  Sixteenth.

25 Q    Sixteenth.

Dobben - Direct/Pettibone                    104

1  A    Sixteenth, yes.

2  Q    And as far as you know you didn't -- of course you didn't

3  sign any -- did you sign any documents during that time period?

4  A    No.  No, we were at the River Walk having a vacation.

5           THE COURT:  It's a nice place.

6  Q    Okay, I'd like you to refer to Exhibit 18 if you would.

7           THE COURT:  I thought that's where we were?

8           THE WITNESS:  Yes, we just did 18.

9           MS. HOUGHTON:  Ours?

10          MR. PETTIBONE:  Excuse me, ours.  The Plaintiff's 18,

11  Your Honor.

12  Q    Do you have that document in front of you?

13  A    I'm sorry, which one?

14  Q    Eighteen.

15  A    Yes.

16  Q    I think it's in this notebook here.  Will that help you?

17  A    Okay.

18  Q    Do you recognize this document at all?

19  A    I believe I was shown this document in the deposition.

20  Q    Okay.  Before that time, do you know if you had ever

21  received this document?

22  A    I think I did, yes.  I think that was in those papers.

23  Q    Did you know what was going on with regards to buying this

24  property at 37th Street?

25  A    No, sir, I did not.

Dobben - Direct/Pettibone                    105

1          MR. CROWTHER:  Objection, Your Honor.

2          THE COURT:  Vague.  Yes, sustained.  I don't even

3   know what that means.

4   Q    What did you understand was going on with the 37th Street

5   property?

6   A    I understood that there was a military man and his family

7   that lived in the property that had lived there for a long

8   time, very good tenants.

9   Q    Okay.  When did you first discover that there -- or raise

10  a concern of yours that there was something going on not right

11  with this 37th Street property?

12  A    With the 37th property, I think probably the day that Alex

13  and I went up to take a look at the properties.

14  Q    At some point prior to that, just as a time line, you

15  already had noticed that something else was going on with the

16  other properties?

17  A    Yes.

18  Q    Okay.

19  A    Yes.

20  Q    All right.  And so you went out to see the property?

21  A    Yes.

22  Q    Do you remember when that was?

23  A    I think it was around the first part of July of '07.

24  Q    Okay.  And why did you do that?

25  A    Because I just felt that there was something going on

J&J COURT TRANSCRIBERS, INC.

1  because of all this paperwork that just didn't seem right, and

2  we had had problems trying to communicate with Pat Downey as to

3  where my loan files were and what was going on in the loan

4  files.  So we drove up there and took a look at the properties

5  and met with Ilhim Fedoric (phonetic).

6  Q    And who was she?

7  A    She was supposedly the woman who was going to manage these

8  properties.

9  Q    And didn't you describe the property, what you saw?

10 A    The thing that probably shocked me the most is that it

11 looked like somebody was just moving in, that it wasn't a house

12 that was being lived in.  I only met the man who was -- his

13 wife's name was Kaleesha, I've talked to her on the phone --

14 Brian.  Met a man who I was introduced that this was Brian.

15 Q    What, if anything, did you do after you came back and

16 looked at the property with regards to this specific

17 transaction, anything?

18 A    I think that by that time we were so aware that this was

19 not working out the way that it was supposed to have been

20 worked out, and I'm not sure that -- we had sent papers to the

21 FBI and all that you know, that the papers that went out to

22 different people to alert them that there were some problems

23 with these loans.

24 Q    Did you ever make any contact directly to any of the

25 debtors yourself after you -- let's say after you visited the

1  property?

2  A    I didn't without either having my daughter on the phone or

3  Paula.

4  Q    Okay.  And you retained, gave authorization for Paula Rush

5  to act on your behalf?

6  A    Yes, I did, yes.

7  Q    Okay.  And do you know how many times you were on the

8  phone that you attempted to contact the debtors?

9  A    I know that I was on the phone at least three times when

10  we tried to call and did not get any answer.  I had gone over

11  to Alex's house one time and Paula and Alex and I were on the

12  phone and the other time I was at home.

13  Q    And what was the communication or the response?

14  A    We were told to call a man by the name, Scott Ellerby I

15  think his name is, and we could not get through to him.

16  Q    Were you aware that Paula Rush was making attempts to

17  contact?

18  A    Yes.

19  Q    And you're aware that your daughter was as well?

20  A    Yes.

21  Q    And those were all on your behalf?

22  A    Yes.

23  Q    At some point in time, did you receive a foreclosure

24  notice on the 37th Street property?

25  A    I think that I finally received a foreclosure notice on

**J&J COURT TRANSCRIBERS, INC.**

1 the property with a stamp of a forwarding address to me, yes.

2 Q    And prior to that time, had you submitted a forwarding

3 address?

4 A    Yes, we did, yes.  I only have one address.

5 Q    And that's what?

6 A    9209 North 107th Drive, Sun City, Arizona.  And that's

7 home.

8 Q    Okay.  That's where you want to be right now, right?

9 A    Yes.

10 Q    Okay.  What, if anything, did you do after you received a

11 foreclosure notice?

12 A    I'm sure I quickly got on the phone to Alex and to Paula.

13 Q    Did you -- are you aware of any attempts that were made to

14 stop the foreclosure?

15 A    Yes.  Yes, because they had made some calls to some of the

16 people that the foreclosures were coming -- that it was coming

17 from on my behalf, yes.

18 Q    Okay.

19 A    I mean, this is so far over my head that, yes, I

20 desperately needed help.

21 Q    How old are you, may I ask?  Take the liberty, because

22 it's an issue in the case.

23 A    How young are you?  Seventy.

24 Q    And did you have a mortgage payment on your house in Sun

25 City?

1  A    Yes, I do.

2  Q    And at that time did you in '07?

3  A    Yes.

4  Q    And what was the mortgage payment?

5  A    $317 I think.

6  Q    Were you aware that there was any insurance placed on the

7  property, property insurance?

8  A    Excuse me.  Yes, I was.

9  Q    We're going to go through the next documents a little

10 quickly.  If you'd just go to 29.  Is that your signature?

11 A    Yes, it is.

12 Q    Okay.  That's the real one.  And then this was, you gave

13 -- let me strike that.  So if you could look at -- excuse me,

14 Your Honor -- okay, will you look at 28 please?  And that's

15 your signature?

16 A    Yes.

17 Q    You authorized this letter to be sent and faxed to

18 American Home Mortgage?

19 A    Yes, I did.

20 Q    And the same with Exhibit 29, this was done at your

21 authorization?

22 A    Yes, it is.

23 Q    And will you look at Exhibit 26 please?  Do you see that

24 document, the notice of trustee sale?

25 A    Mm-mm.

**J&J COURT TRANSCRIBERS, INC.**

Dobben - Direct/Pettibone                    110

1  Q    Is this the notice that you had received in the mail that

2  was forwarded?

3  A    Yes.

4  Q    Do you know whose handwriting that is up in the right-hand

5  corner?

6  A    Yes, I do.

7  Q    Whose is that?

8  A    That's mine.

9  Q    I'd like you to go to Exhibit 20 please, and it purports

10 to be a temporary mortgage payment coupon, with a lot of

11 writing on it --

12            THE COURT:  Which bank?

13            MR. PETTIBONE:  I'm sorry, Your Honor, Exhibit 20.

14            THE COURT:  Go ahead.

15            MR. PETTIBONE:  Okay.

16 Q    Do you recognize this document?

17 A    Yes, I do.

18 Q    What is this document?

19 A    This is a document that Pat Downey said to me, because I

20 said to him, if I have to make a mortgage payment on these I

21 have to have a mortgage payment card.  So he said, well,

22 they're in your documents.  So I looked through the papers that

23 I had and there was nothing that I could see that said anything

24 about how you made a mortgage payment or who you made the

25 mortgage payment to.  So I sent my documents over to Pat Downey

1  and then he sent these back to me, sent the documents back to

2  me and in there he had put a xerox copy of what you see here

3  and told me to just change the dates on there and each month

4  just cut the little coupon out and make my payments that way.

5  Q    Okay.  When you signed those papers, those escrow papers,

6  and after that, did you put money into the escrow?

7  A    No.

8  Q    You didn't pay the Titan escrow?

9  A    I paid that prior to signing escrow papers.

10 Q    Do you remember that amount?

11 A    Five-hundred dollars.

12 Q    Do you remember paying Alliance Impounds any money in that

13 transaction?

14 A    No.

15 Q    I'd like to refresh your recollection with a document.

16 I'll show you the document.  Do you recall as this being in the

17 preparation of the payments that you made into escrow?

18 A    Yes.

19 Q    Okay.

20 A    Okay.

21 Q    And does this refresh your recollection that you made a

22 $500 payment?

23 A    Yes.

24 Q    Titan Escrow?

25 A    Yes.

1  Q    And a $500 payment to Alliance?

2  A    Right.

3  Q    Five-hundred payment to Fidelity Impounds?

4  A    Correct.

5  Q    And then there was a deposit in the Titan escrow of

6  52,000.

7  A    I didn't make that.

8  Q    Okay.  Do you know where that money came from?

9  A    I have no idea.

10  Q    All right.  But these were your monies that you paid?

11  A    That was my money.

12  Q    Then you did make some mortgage payments on this property,

13  correct?

14  A    Yes, I did.

15  Q    And would you be able to testify to what the mortgage

16  payment is without looking at this?

17  A    Yes.  I can tell you what they were.

18  Q    All right.

19  A    Well, maybe not to the penny.  Sixteen-hundred, I think

20  58.

21  Q    Okay.  Let me show you this to refresh your recollection.

22  A    Okay.

23  Q    Sixteen hundred and 50 dollars?

24  A    Okay.

25  Q    Okay.  And how long did you make those payments for?

Dobben - Direct/Pettibone                              113

1  A    I made those payments for four months.

2  Q    Now --

3           THE COURT:  Sixteen fifty a month for four months?

4           MR. PETTIBONE:  Yes, sir.

5           THE COURT:  All right.  When?  Time frame?

6           MR. PETTIBONE:  Thank you.  It's June 4th, July 5th,

7  August 1st and September 1st.

8  Q    So you made those payments, correct?

9  A    Yes.

10 Q    Now as a result of hiring Ms. Rush, you paid her some

11 money too, correct?

12 A    That's correct.

13 Q    Do you remember how much you paid her?

14 A    I think I paid Paula maybe $18,000.

15 Q    And do you know how much you paid me or your daughter paid

16 me?

17 A    No.  No, I don't know how much she's paid you.

18 Q    What was the status of your credit prior to this

19 transaction?

20 A    I have always had an over 800 credit score.

21 A    And what was it -- do you know what it is now?

22           MR. CROWTHER:  Objection, Your Honor.  When I deposed

23 the witness, she was unable to answer this question and we

24 would object to any --

25           THE COURT:  Well, you can impeach on cross.  You

**J&J COURT TRANSCRIBERS, INC.**

1  know.  I'm sorry, ma'am, would you move the microphone just a

2  little down and maybe a little closer there?

3              THE WITNESS:  Sure.

4              THE COURT:  Thank you.  So do you know what your

5  credit score is today?

6              THE WITNESS:  I think my credit score today is about

7  670 maybe.

8              THE COURT:  Okay.

9  Q    Do you know if whether or not there are credit reporting,

10 a foreclosure on your credit even as of this date?

11 A    As far as I know, yes there are.

12 Q    And have you ever had a home equity line of credit?

13 A    Yes, I did.

14 Q    Okay.  What's the status of that?

15 A    It's been closed.

16 Q    Do you know why?

17 A    Because of the foreclosures.

18             MR. CROWTHER:  Objection, Your Honor.  Competence.

19 Calls for the state of mind of the lender.

20             THE COURT:  Did you receive any communication from

21 the lender indicating the reason that the line has been closed?

22             THE WITNESS:  Yes.  I received a letter from the Bank

23 of America telling me that because of the credit problems that,

24 yes.

25             THE COURT:  I'll overrule the objection, allow the

1  testimony.

2          MR. CROWTHER:  Your Honor, for the record, that was

3  not produced in discovery and we had asked for that as part of

4  our discovery request.

5          THE COURT:  All right.

6  Q    Other than your credit line being lost, taken, have you

7  ever tried to purchase anything on credit since the

8  foreclosure, since you were notified of the foreclosure?

9  A    No, I have not.

10 Q    And why not?

11 A    Because I have such a poor credit score now, I just didn't

12 feel anybody would loan me any money.

13 Q    Do you -- is there anything that you would have done that

14 you didn't do because of your credit score?

15 A    If I had still had the immaculate credit score that I had

16 prior to this, yes I would have done a little remodeling to my

17 house.  I probably would have bought a new car.  I guarantee it

18 would be my last car.  I mean, I'm driving a car that's a '95.

19 Q    The Rodeo?

20 A    My Rodeo, yes, sir.

21 Q    Anything else?

22 A    I might have taken some trips.

23 Q    I know this litigation has been very stressful to you.

24 A    Yes.

25 Q    Okay.  And I want you to put that, the stress of the

1  litigation, if you can, aside, and also want to try to, if you

2  can, put the stress of other things in your life aside and I

3  want to ask you, do you feel that you've suffered any emotional

4  distress as a result of having this -- not being able to get

5  this foreclosure stopped or off your record?

6  A    Yes, yes.

7  Q    What is that?

8  A    It's made me extremely nervous.  I have tremendous fear

9  and I don't trust --

10  Q    I bet that's --

11  A    -- I don't want people to know I've been involved in such

12  an unpleasant thing.

13          MR. PETTIBONE:  I have no further question.

14          THE COURT:  Let's take a moment before cross.

15                  (Recess)

16          THE COURT:  Please be seated.  Mr. Crowther, any

17  questions?

18          MR. CROWTHER:  Yes, Your Honor.

19                  CROSS EXAMINATION

20  BY MR. CROWTHER:

21  Q    Ms. Dobben, between the time of February of '07 and April

22  of '07 when you purchased the 37th Street property, did you

23  talk to your daughter about real estate?

24  A    I'm not sure whether I did or not.  I do know that during

25  that time she was in production, and so it was very difficult

Dobben - Cross/Crowther                          117

1  to be talking with her.

2  Q    Before you bought the property on 37th Street in April of

3  '07 did you talk to your daughter about the fact that she had

4  purchased the property in Simi Valley, California?

5  A    I knew she had purchased the property in Simi Valley.

6  Yes.

7  Q    Were you aware that she had purchased that property with

8  Mr. Downey being involved in the transaction?

9  A    Yes.  I knew Pat Downey had helped her on that

10  transaction.  Yes.

11  Q    Did she tell you that you shouldn't proceed with any

12  business dealings with Mr. Downey during those conversations?

13  A    Would you restate that?

14  Q    Sure.  Did your daughter tell you that you should not

15  proceed with any transactions with Mr. Downey during any of

16  those conversations?

17  A    Which conversations?

18  Q    About her Simi Valley property.

19  A    No.

20  Q    Before you purchased the property on 37th Street did your

21  daughter ever tell you that you should not proceed with any

22  transactions with Mr. Downey?

23  A    No.

24  Q    I'm going to ask you to turn to Exhibit 24 in the debtors'

25  exhibits.  That's the bank account statement that we were

1 discussing earlier.

2 A    I'm sorry, what was the number again?

3 Q    24.

4 A    Yes.

5 Q    Why did you give that to Mr. Downey?

6 A    Because Mr. Downey asked me to.

7 Q    Was that because you were using him to try to get a

8 mortgage for investment real estate?

9 A    Yes.

10 Q    Did you know that Mr. Downey was trying to find investment

11 real estate properties for you to buy?

12 A    No.  Mr. Downey told me that he had some.  He was not

13 looking for any.

14 Q    And one of those properties was the 37th Street property?

15 A    He didn't tell me any addresses whatsoever.  I didn't know

16 what the addresses were.

17 Q    Did you ask?

18 A    No.

19 Q    Did you know that in order to buy these investment real

20 estate properties that Mr. Downey had in mind that you would

21 need to get some type of financing to do that?

22 A    Mr. Downey had told me that these properties were going to

23 be no money down.

24 Q    Meaning that you wouldn't have to come out of pocket for

25 money?

1  A    Correct.

2  Q    And did you have to come out of pocket when you bought the

3  37th Street property?

4  A    The $500.  Yes, sir.

5  Q    And you got that back at closing, didn't you?

6  A    Yes, sir, I did.

7  Q    So you bought the 37th Street property for no money down.

8  A    That's correct.

9  Q    That's okay, right?  That's what you thought was going to

10 happen?

11 A    Yes, sir.

12 Q    Did someone tell you to stop paying the mortgage payment

13 on the 37th Street property?

14 A    I don't know whether anyone told me to or not, but when

15 you run out of money then you have to stop making payments.  I

16 made the payments as long as I had the money that I could

17 afford to make those payments.  I was told that the people that

18 were renting those properties that there would be enough income

19 in those that I would be able to make the mortgage payments.

20 Q    And who told you that?

21 A    Pat Downey did.

22 Q    He told you basically that the rental income would be

23 enough to make the mortgage payment.

24 A    Correct.  Also Ilhim Fedoric.

25 Q    The property manager.

1  A    That's correct.

2  Q    For how long did you have enough rental income to pay the

3  mortgage payment?

4  A    Four months.  And that was not rental income.  That was

5  money that I had set aside and I paid those payments.

6          THE COURT:  Did you ever receive any rental income?

7          THE WITNESS:  There was a little rental income that

8  did come in.  Yes, sir.

9          THE COURT:  Monthly or in a --

10          THE WITNESS:  Spasmodically we'll put it that way.

11          THE COURT:  Inconsistently.

12          THE WITNESS:  Very much so.  Yes.

13          THE COURT:  And that would come from your property

14  agent?

15          THE WITNESS:  Yes.

16          THE COURT:  All right.

17  Q    When did you stop making the monthly mortgage payment for

18  the 37th Street property?

19  A    After four months.

20  Q    Basically at the end of the summer of 2007?

21  A    Correct.  I made July -- June, July, August, and I believe

22  September.  Four months.  Yes, sir.

23          MR. CROWTHER:  No further questions, Your Honor.

24          THE COURT:  Thank you.  Redirect?

25          MR. PETTIBONE:  No, Your Honor.

1          THE COURT:  You may step down, ma'am.  Thank you.

2  Any further evidence from Ms. Dobben's side?

3          MR. PETTIBONE:  The only thing I have, Your Honor, is

4  a document that I wanted to get into evidence which was a R

5  Exhibit 70 -- 69 and 70 which were documents produced during

6  discovery by the debtors.  And I wanted to get those into

7  evidence, but argue them.  I don't have a witness to lay a

8  foundation on those.

9          THE COURT:  All right.  So I'll hold that in abeyance

10 until -- Mr. Crowther, are you going to have a witness?

11         MR. CROWTHER:  Not if I can move Ms. Dobben's

12 deposition transcript and interrogatory responses into

13 evidence.

14         THE COURT:  Any objection?

15         MR. PETTIBONE:  Yes.

16         THE COURT:  Call a witness.  I mean, or argue why you

17 should be allowed to put them in --

18         MR. CROWTHER:  Well, her deposition transcript is

19 admission of a party.  I'm entitled as a matter of rule under

20 Rule 34 to use that as her testimony and to the entire exhibit

21 -- the entire transcript into evidence.  That's one of the

22 specific uses for a deposition of a party.

23         THE COURT:  Sorry, I'm looking for my FRE.

24         MR. CROWTHER:  Federal Rule of Civil Procedure 34

25 itself provides that --

1          THE COURT:  Yes.  I just had to find the right book.

2   Not Rule 34.  36?

3          MR. CROWTHER:  30 and 34, Your Honor.

4          THE COURT:  30 and 34.  Can you direct me to the

5   specific reference in 30?

6          MR. CROWTHER:  Actually I said the wrong rule, Your

7   Honor.  It's Rule 32 which is federal bankruptcy Rule 7032

8   using depositions under Rule 32A.

9          THE COURT:  All right.

10          MR. CROWTHER:  At a hearing or trial all or part of a

11   deposition may be used against a party.  The party was present

12   or represented at the taking of the deposition and knows of it

13   and if used that would be admissible under Federal Rules of

14   Evidence if the defendant were present in testifying.  Ms.

15   Dobben was of course represented by counsel.

16          THE COURT:  All right.  I disagree.  32(a) says that,

17   "At a hearing or trial all or part of the deposition may be

18   used against a party, A) the party was present or represented

19   at the taking of the deposition or had reasonable notice."

20   That's obviously satisfied.  "It is used to the extent it would

21   be admissible under FRE if the deponent were -- if to the

22   extent it would be admissible if the deponent were present and

23   testifying, and the uses allowed under 32(a)(2)."  Go through

24   (a)(2) impeachment just putting it in generally is not

25   impeachment.  She's not a 30(b)(6) witness.  She's not

1 unavailable.  There she is.

2             MR. CROWTHER:  Then I will call Ms. Dobben an adverse

3 witness, Your Honor.

4             THE COURT:  Very good.

5             MR. CROWTHER:  Request permission to ask leading

6 questions of Ms. Dobben.

7             THE COURT:  Yes.  Granted.

8             MR. CROWTHER:  We did move also her interrogatory

9 responses in under Rule 33.  We would ask that those be

10 admitted into evidence.

11            THE COURT:  Objection?

12            MR. PETTIBONE:  Yes.  Objection.  Same objection,

13 Your Honor.

14            THE COURT:  Are they admissions?

15            MR. CROWTHER:  Yes, they are Your Honor.  As is the

16 testimony in the deposition.  But without, you know, I have no

17 problem going through the entire transcript one by one now with

18 Ms. Dobben.  I thought I'd expedite process because most of

19 it's with respect to her signature on documents.  But if Your

20 Honor wants me to go through each one I will have no problem

21 doing so although we may be here a little while.  I was hoping

22 to be able to have the documents since they were all

23 authenticated with her signature at the deposition to make that

24 pretty easily.  But again, I have no problem doing it again.

25            THE COURT:  Objection sustained.  You can use them

1 for impeachment purposes.  But you're going to have to go

2 through them.

3        MR. PETTIBONE:  Well, if the only purpose is to

4 authenticate documents to her -- that she signed at her

5 deposition I have no problem with the admissibility of certain

6 documents.

7        MR. CROWTHER:  If we're going to do it that way, Your

8 Honor, with no deposition in I'm going to take the liberty of

9 asking her all the questions that I have for purposes of her

10 being examined now.

11       MR. PETTIBONE:  I mean, using that would do it.  It

12 just seems like kind of a --

13       THE COURT:  Well, you've got a choice.  He can either

14 do it here and he's certainly entitled to, or we can do it

15 through the deposition with your consent, and --

16       MR. PETTIBONE:  The idea as I understand it the offer

17 of proof is to lay the foundation for the admissibility of the

18 documents that were used at the deposition?

19       MR. CROWTHER:  That's part of it.

20       THE COURT:  Well, I don't know -- what -- I assume

21 the deposition went broader than that.

22       MR. CROWTHER:  Just a little bit.  Not too much.

23 Again, Your Honor, this is to me a colossal waste of time.

24 We've had Ms. Dobben's deposition, it was relatively short, two

25 and half hours.  They want to object to the deposition itself

1  being used I have no problem doing it all over again.  And

2  that's what they propose to do, I think.

3          THE COURT:  Well, what I'd like you to do is -- I'm

4  sorry if we keep taking recesses, but let's take a few minutes

5  to allow you two to talk to each other and see if you can flush

6  this out a little better and figure out how to do it in a way

7  that makes some practical sense, but still preserves the

8  parties' right.  All right?

9          MR. PETTIBONE:  Yes, sir.

10          THE COURT:  So, Ms. Dobben, you can stay there if you

11  like, you can go where you wish.  But we're going to take a

12  recess.

13                      (Recess)

14          MR. CROWTHER:  I'm not sure if Your Honor ultimately

15  ruled on Exhibit 34 which was the Wells Fargo letter.  I don't

16  know what the purpose is for that letter for admissibility

17  purposes.

18          MR. PETTIBONE:  The relevance was one of an attempt

19  by Ms. Rush to establish contact regarding a foreclosure

20  proceeding.

21          MR. CROWTHER:  If that's his purpose, Your Honor,

22  there's no objection to that.

23          THE COURT:  34 is admitted for that purpose.

24          MR. CROWTHER:  Document Number 37 we object on the

25  basis that it's hearsay, there's no authentication of the

1  document, and it in fact is a cut and paste of publicly filed

2  documents purported by Ms. Rush.  But yet the whole documents

3  aren't being admitted into evidence.

4          MR. PETTIBONE:  Well, we do have the whole documents.

5  We did send it in discovery.  I'd ask that the Court recognize

6  it.

7          THE COURT:  I'll admit the document in its entirety.

8          MR. CROWTHER:  What's here is 37 is not the actual

9  document at all.

10         THE COURT:  I understand.  So let's mark -- we'll

11 mark that as 71.

12         MR. PETTIBONE:  72 I think.

13         THE COURT:  72?

14         MR. PETTIBONE:  Yes, sir.

15         THE COURT:  Okay.  So 36 is excluded, 72 will be

16 admitted.

17         MS RUSH:  We did actually make a SEC filing.  It was

18 54.  It was supposed to be 54 and 55.

19         THE COURT:  And those are just summary pages with

20 filing dates.  There's no way there's an SEC filing in my

21 experience that's not more than 100 pages.

22         MS. RUSH:  Yeah, that's it right there.

23         THE COURT:  Is that 71?

24         MR. PETTIBONE:  No, 72.

25         THE COURT:  72.  All right, 72 is admitted.

1          MR. CROWTHER:  Your Honor, I think Your Honor said 36

2    I think you meant 37 was excluded.

3          THE COURT:  I apologize.  37 is excluded.  Thank you.

4    Can you hand me up a copy of 72, please.

5          MR. CROWTHER:  May I continue, Your Honor?

6          THE COURT:  Oh, yes.

7          MR. CROWTHER:  Okay.  I'm sorry.  I didn't know if

8    Your Honor was ready or not.  Exhibit Number 54.  This was not

9    produced during discovery even though the request was

10   specifically for what evidence documents they wished -- were

11   going to proffer in their case in chief.  That would be the

12   only basis of the objection other than we believe it may be

13   only part of a filing.

14         MR. PETTIBONE:  Withdrawn, Your Honor.

15         THE COURT:  All right.  55 and 56?  Is that correct?

16   All right, they're withdrawn.

17         MR. CROWTHER:  54 and 55 actually, Your Honor.

18         THE COURT:  Okay.  My numbers are off today.  I

19   apologize.  54, 55 are excluded.

20         MR. CROWTHER:  56 we object on the basis of relevancy

21   and hearsay and also it was not produced in the course of

22   discovery.

23         THE COURT:  I don't even know what it is.  This

24   indicates his license was revoked?

25         MR. PETTIBONE:  Yes.

1          MR. CROWTHER:  Mr. Downey's license, not Mr. Blair

2    Clark's license.

3          THE COURT:  All right.  Objection overruled.  I'll

4    admit it into evidence.

5          MR. CROWTHER:  We object to Exhibit Number 57 on the

6    basis of relevance and the fact it was not produced in the

7    course of discovery.  It also appears only to be part of a

8    document.

9          THE COURT:  Response.

10          MR. PETTIBONE:  Withdrawn, Your Honor.

11          THE COURT:  All right, 57's withdrawn.

12          MR. CROWTHER:  58, same basis for objection,

13    relevance, was not produced in the course of discovery, and it

14    appears to be only part of a document.

15          MR. PETTIBONE:  Your Honor, this is the one that we

16    asked Alex Yamamura about it.  It is a -- the full document, 58

17    is not complete, but there are three pages which is the FDC

18    consumer complaint form that are complete.  This was the

19    website -- I forget what you called it, the term of art that

20    you used, but that she printed it right off the website.

21          THE COURT:  I guess that's screen shot.

22          MR. PETTIBONE:  Screen shot.

23          THE COURT:  Objection is overruled.  I'll admit 58

24    into evidence.

25          MR. CROWTHER:  Exhibit Number 59 we object on the

1  basis of relevance.  It was not produced during the course of

2  discovery even though it was required to be, and that it's

3  hearsay.

4        MR. PETTIBONE:  Withdrawn.

5        THE COURT:  Okay.

6        MR. CROWTHER:  Same objections for Exhibit Number 60.

7        MR. PETTIBONE:  Withdrawn.

8        MR. CROWTHER:  61 we object to on the basis that it

9  has not been authenticated.  It is hearsay, and it was not

10 produced in the course of discovery.

11       THE COURT:  What is it?

12       MS. RUSH:  It's the registration and MEARS.

13       THE COURT:  It's the registration of the note with

14 MEARS.

15       MS. RUSH:  It's what you get -- you can go online on

16 MEARS and pull down the registration --

17       THE COURT:  All right.  Overruled.  I'll admit it.

18       MR. CROWTHER:  We object to Exhibit Number 67 on the

19 basis of hearsay, relevance, and authenticity.  The date of

20 that is 4/16/09 which was subsequent to the transfer of service

21 in its entirety.

22       THE COURT:  Overruled.

23       MR. CROWTHER:  We object to Number 68 on the basis

24 that it's an unsigned document, it's hearsay, it was not

25 produced in the course of discovery, relevance and

1  authenticity.

2            THE COURT:  Any response?

3            MR. PETTIBONE:  I see that it's not signed, but I

4  would ask that, you know, it be admitted.

5            THE COURT:  Can you make a proffer from where it came

6  from?

7            MR. PETTIBONE:  Ms. Rush obtained this.

8            MS. RUSH:  Yes, it was --

9            THE COURT:  From Public Records?

10            MS. RUSH:  Yes.

11            THE COURT:  All right.  Overruled.  It's admitted.

12            MR. CROWTHER:  That concludes the exhibits, Your

13  Honor.

14            THE COURT:  Okay.  I assume you want to move -- all

15  right, so 1 through 72 are admitted subject to the exclusions

16  which were of 21, 27, 37, 54, 55, 57, 59, and 60.  Exhibit 4 is

17  admitted only to indicate the date of the document.  And 34 is

18  admitted only as an indication of attempts in effect to verify

19  that Ms. Rush was making attempts at that time to get

20  information.  Mr. Crowther, I assume you want to move them all

21  in?

22            MR. CROWTHER:  That's correct, Your Honor.  1 through

23  34 as well as 35 through 41, I believe it is.

24            THE COURT:  Any objection?  This is document 71,

25  correct?

1          MR. PETTIBONE:  That's 71.  Yes, sir.  No objection,
2  Your Honor.

3          THE COURT:  Okay.  Debtors' Exhibits 1 through 41?

4          MR. CROWTHER:  41.

5          THE COURT:  Are admitted without objection.  Any more
6  evidence from any party?  All right.  That'll close the
7  evidentiary record in this matter.  I'd like to hear argument
8  if you have any.

9          MR. PETTIBONE:  I do, Your Honor.  Any chance I could
10  take the liberty since we are a little bit ahead of schedule,
11  just five minutes to organize my notes?

12          THE COURT:  Yes.  We can certainly take -- well,
13  again, I have until 3:30 and we're not going to have an hour of
14  argument.  So let's take a break until 2:25.

15          MR. PETTIBONE:  Thank you.

16          THE COURT:  All right.  And then we'll start
17  argument.  Is that all right?

18                    (Recess)

19          COURT DEPUTY:  All rise.

20          THE COURT:  Please be seated.  Mr. Pettibone.

21          MR. PETTIBONE:  Thank you.  Your Honor, on behalf of
22  my clients, Ms. Rush, and myself I want to take the opportunity
23  just briefly to thank you, you know, for a fair hearing.  And
24  no matter what, win, lose, draw, otherwise, we're thankful for
25  that.  And I think we can all agree to that.  It should be

1 without even mentioning it, but we're just, I don't know,

2 there's some thankfulness about the way the proceeding was

3 conducted and that in the United States we have an opportunity

4 to be able to present something like this in this kind of a

5 fashion.  So just -- and to your staff, too.

6        Your Honor, the record shows that there was a broker

7 fraud.  I think we can all agree to that.  This man came in and

8 destroyed Mona Dobben's life, her daughter's life for that

9 matter and others.  We look at -- there's no testimonies

10 different than the fact that her name was forged which is a

11 horrible situation, horrible occurrences.

12        THE COURT:  Not in all instances, but yes.

13        MR. PETTIBONE:  Yes.  And I'll leave that to the

14 Court.  Exhibits basically 1 through 16 were forged names of

15 hers on there.  And so we have this broker fraud going on.  The

16 question is then, you know, how much did the debtors know about

17 it?  And if you look at the inception of this our argument is

18 how is it possible that a loan like this could have got

19 through.  Obviously Mona Dobben didn't know what was going on

20 other than the fact that she was going to do an investment in

21 some property, it was supposed to be a rental, and the rental

22 was to cover the mortgage.  She got taken.

23        But there's liability, there's responsibility when

24 you take a look at the manner in which the loan was approved.

25 And then you look back and you see the one document that we

admitted into evidence with regards to the cease and desist in
California.  Here's a company heading into bankruptcy.  Here's
a company that at the time of our country, you know, going into
a recession is gathering up all the money, all the opportunity
they can to the disadvantage of Mona Dobben and others.

They're packaging up these loans, they're overwriting
the entries so that they can get these loans approved, there's
broker incentives to get the loans approved, there's
commissions that are going on.  And the idea is to package up
this loan, get it sold and into a securitization or a trust for
the benefit of other people and other entities, and that's why
they didn't respond to her.

Let me go back though.  You have a loan that the 68
year old woman, a $400,000 loan with a $40,000 note on it,
allegedly, an adjustable rate loan -- note.  And this type of
loan should have never made it.  There should have been some
protections.  It's not as if the broker on the other end was
doing a legitimate transaction for her that she was protected
there.  This loan should have never made it through.  So
where's the testimony there?  There is none offered by the
debtors.  No witnesses.  Nothing to the contrary that this loan
should not or was or should have been approved.  That this loan
was legitimate, and everything was -- there was no red flags or
anything from the debtor on that in the evidence.

There are red flags with regards to her signature.

1  Signature obviously didn't match her driver's license.  There

2  is testimony that they had a good signature on her.  And you

3  can tell by comparison that it doesn't match.  There were other

4  red flags that should have been noticed.  And that is in

5  Exhibit 69 and 70 which is the due diligence that the debtors

6  are to conduct with regards to their broker.  69 is the broker

7  agreement and 70 is the due diligence.  We know from looking at

8  69 that the processor on the loan was Pat Downey.  A minimal

9  check on that as we introduced into evidence just pulled up on

10 the Internet would show that he had his licence revoked, and a

11 further check would have shown that he was a convicted felon.

12        Exhibit 70 shows that Stacy Eagle, the 80 percent

13 owner of Historic Real Estate, they did a background check on

14 her, this is the debtors' documents, she's late on real estate

15 payments and she had previously filed a bankruptcy.

16        THE COURT:  And her connection is what?

17        MR. PETTIBONE:  She is the -- if you look at the

18 Exhibit 70 she's the 80 percent owner and CEO of Historic Real

19 Estate which is the broker entity.  There's enough red flag --

20        THE COURT:  I'm having a little trouble.  My 70 is

21 this.  Is that the right 70?

22        MR. PETTIBONE:  Yes, sir.

23        THE COURT:  Okay.  Where do I see that?

24        MR. PETTIBONE:  Well, her being the 80 percent owner

25 of Historic Real Estate --

1            THE COURT:  Is there any dispute as to that fact?

2    Any dispute as to that fact, that she's the 80 -- that this

3    person is the 80 percent owner?

4            MR. CROWTHER:  Our documents -- we don't have that --

5    that document's not here, Your Honor.

6            THE COURT:  That was a new document.  It's hard for

7    me because it's barely legible.

8            MR. PETTIBONE:  70 is the background check that they

9    had done on her which shows the bankruptcy and the late

10   payments on her own real estate.  The broker application which

11   is Bates Stamped 465, Exhibit 70, Bates Stamped 465.

12           THE COURT:  Oh, I see it.

13           MR. PETTIBONE:  Shows that she is the 80 percent

14   owner.  So she's got problems.  So the argument again is that

15   these are red flags that are alerting or should have alerted

16   the debtor entities that this loan shouldn't have gone through.

17   After the loan goes through liability is established based upon

18   the attempts by Mona Dobben, Alex Yamamura and Paula Rush to

19   contact American Home Mortgage and seek their assistance, their

20   help with regards to this foreclosure notice that they received

21   in April of '07.

22           So they contact them telling them that there's a

23   fraud, that a broker's committed fraud.  And the undisputed

24   testimony from our witnesses is that there was no response to

25   any of those communications.  There is -- the only letter that

1  we have is from the debtors' law firm to Paula Rush saying that

2  they're not going to talk to her.  Now there is a document that

3  shows the calls that are being made to Mona Dobben.  That's the

4  left-hand of the company collecting -- making collection calls

5  to her which is a further of her emotional distress damages.

6         And the right-hand when we're asking or these people

7  are asking for help with this foreclosure nobody's responding

8  at all.  Why?  I think that's the motivation.  So first there's

9  liability because they're not responding, and there's oral

10  communications, there's written communications, there's RESPA

11  letters, there's TILA letters.  Your Honor, is there an

12  argument that this is not her primary residence and there RESPA

13  and TILA don't apply?  I know they're going to say that, but at

14  a minimum the Federal Trade Commission Section 5 applies.  And

15  that's good faith, fair dealing with the assistance of a

16  borrower.  So they can't escape getting being a RESPA and TILA

17  letters by saying it's not her primary residence when there's

18  duties that go beyond that.  People are trying to contact you

19  and tell you that there's a foreclosure going on that a fraud

20  has been committed.

21         Also, the notices of the foreclosure are wrong.

22  There's wrongful foreclosure on the notices.  They're sending

23  the notices to 37th Street property when she lives in Sun City,

24  Arizona.  And that's the other argument with regards to the

25  TILA and RESPA violations is that they're saying RESPA and TILA

1 don't apply, we say they do, but the loan application says that

2 the 37th Street properties are primary residence, they had

3 approved that, and then they're sending the foreclosure notices

4 to her in California at this 37th Street property.  So they

5 can't have it both ways.  We got them across the board on that

6 with regards to their liability for not responding to any of

7 the communications made by these people, Paula Rush, Alex

8 Yamamura, Mona Dobben.

9         And then I got to the point is why did they not

10 respond?  So what's the motivation to responding?  I touched

11 briefly on in argument that they're lining it up for a

12 bankruptcy, they're already discovered in California to be

13 insolvent at the time that they're doing this with the loan,

14 approving the loan.  What could be the reason that they're not

15 responding to her request?  It could only be this claim that

16 they're making against the insurance policy Magic.  They're

17 collecting on the insurance on a default with the foreclosure,

18 but they can't collect upon it if there's fraud.

19         MR. CROWTHER:  Objection, Your Honor, assumes facts

20 not in evidence.  Move to strike.

21         MR. PETTIBONE:  It's argument.

22         THE COURT:  All right, it's argument.  It is what it

23 is for what it's worth.

24         MR. PETTIBONE:  And that's the argument.  I'm arguing

25 motivating, Your Honor.  The reason that they're not responding

1   is because they're collecting insurance on this and there is in

2   the court we know that there's claims being filed against Magic

3   and that it's noted that the reason that they would not have --

4   if there was a fraud they wouldn't have collected that.

5           MR. CROWTHER:  Same objection, Your Honor.  Move to

6   strike.

7           THE COURT:  Overruled.  I'll take it for what it's

8   worth.

9           MR. PETTIBONE:  So now you this nightmare chain of

10  assignment issue.  A wrongful foreclosure being committed.  The

11  foreclosure documents show that the trustee, Exhibit 26, is

12  Gateway.  Then it goes to MEARS, then the substitute trustee is

13  TD Service.  But if you look at their servicing records,

14  Exhibit 24, it starts with Conduit and acceptance, goes to the

15  warehouse line, that was that one with Paula Rush that we were

16  going through that it was amazing that somebody could interpret

17  it, then the Countrywide, and then to the American Home

18  Mortgage, I believe it was the CD Savings.

19          So we have conflicting evidence of the chain of

20  assignment.  And that's the key to part of the wrongful

21  foreclosure is the who was the owner of the note?  If they

22  can't -- and there's no evidence from the debtors that they had

23  the right to come in and foreclose the original holder of the

24  note.

25          THE COURT:  Well, the debtor didn't foreclose on the

1  note, did they?

2          MR. PETTIBONE:  Thank you.  And the debtor originated

3  the foreclosure proceeding.  The debtor originated the

4  foreclosure proceeding, and then transferred that or sold that

5  interest to the Wilbur Ross Entity.

6          THE COURT:  Well, the foreclosure proceeding was

7  instituted when?

8          MR. PETTIBONE:  Well, it was foreclosed in April,

9  '08.

10          THE COURT:  Yes, but when did it start?

11          MR. PETTIBONE:  It started in -- she received notice

12  in April of '07.

13          MS. RUSH:  It started in December of '07.

14          THE COURT:  It started in December.  Well, that's

15  after the closing.  The closing was in November.

16          MR. PETTIBONE:  The closing --

17          THE COURT:  Of the sale to the buyer of the servicing

18  business.  That's the servicing business.  That's not

19  necessarily the owner.  The owner is not the servicer.  So the

20  chain of title, as I understand it, from Conduit acceptance to

21  HM -- AHM acceptance, to Countrywide, to the trust.  And then

22  we've got a black box, I guess, until Gateway gets it.  And

23  then Gateway gives it to MEARS who does, I believe in the MEARS

24  documents indicates it is acting for AHM Servicing.  And of

25  course at this point I assume that that's the buyer at that

1  point.  And then it goes to TD.  So the hole here is between

2  the trust and Gateway.

3          And my question on this is how does that affect the

4  debtor, because the trust is not a debtor.  And Gateway, MEARS,

5  and TD are not debtors.  The debtors didn't receive the

6  property in connection with the foreclosure.  It went to, I

7  assume, the holder of the note at that time.  I don't know who

8  that is.  I assume it's the trust.  My point isn't that there

9  is not a break in the title.  But my point is at the time

10 there's a break in the title or appears to be based on the

11 evidence that I have it's a nondebtor entity at that point.

12 Now what happened in that black box I don't know, but I don't

13 have any evidence as to who asked for it.  But I have no

14 evidence as to who did what before it got to Gateway.

15         MR. PETTIBONE:  Then I'll just close out that part of

16 the argument, Your Honor, to show -- to say that, you know, it

17 goes to their not responding, you know, early on prior --

18         THE COURT:  Well, I -- correct.  I mean, I think

19 that's a somewhat separate theory which is that the foreclosure

20 was not properly noticed, the law was not complied with, and

21 that that may have been caused in part or in whole by the fact

22 that as alleged AHM did not communicate the proper -- the

23 debtor did not communicate the proper information to the

24 subsequent servicer so that notices that were dated November

25 and December were not received until April.  I think that's one

1  of your arguments.  And that information request -- that change

2  of information request occurred prior to November 10th at least

3  some of them.  I don't know why I said November 10th, but

4  sometime in November.  I think it was late November, actually,

5  if I remember correctly.

6          MS. RUSH:  September was the start.

7          THE COURT:  No, I understand, but I'm talking about

8  the sale to -- of the servicing business.  The economic close

9  which is the time when I entered the order.  It was late

10 November.

11         MR. CROWTHER:  I think it was November 13th if I

12 remember correctly.

13         THE COURT:  All right.  It was a bit of a blur.  But

14 anyway, we know there's at least one or two communications

15 prior to that time requesting changes in who to contact and the

16 contact information.

17         MR. PETTIBONE:  Thank you.  And I'll move on then on

18 that one, Your Honor.  The claim is against, you know, various

19 debtor entities who originally had -- and we're going back to

20 origination had touched the loan in any manner whatsoever.

21 American Brokers Conduit was the HUD-1.  American Home Mortgage

22 acceptance was on the HUD-1.  American Home Mortgage Holdings

23 was on the MEARS.  American Home Mortgage Servicing, American

24 Home Mortgage Investment were debtors that had their

25 fingerprints on the loan.  And that's what our claim is

1 against.  If you look at the affiliated we know from the CD

2 savings account that American Home Bank had access or had a

3 relationship with that CD and savings account.

4        Your Honor, there are a couple of things I want to

5 talk about just briefly before I go to damages is the issue

6 that came up with Alex Yamamura, and, you know, with regards to

7 her loan and her attack on credibility again attempting by the

8 debtors to deflect the responsibility away from themselves.

9 There is a fraud that occurred on Mona Dobben.  And the issue

10 that we're raising is what is it that American Home Mortgage

11 did or did not do with regards to that loan?  What their

12 responsibility is, their underwriters, their company after

13 receiving at least those notices that the Court addressed.

14        So we feel that that's pretty irrelevant and

15 immaterial to the case and the liability.  She was not

16 represented by an attorney and that they're both victims of

17 fraud.  And then you talk about when she became aware of it.

18 You know, when she was actually becoming aware of it making the

19 claims to the FBI, FTC, BA and attorney general.

20        The other issue I wanted to address is the deposition

21 testimony that's coming in.  I'm sure there's going to be some

22 argument that Mona Dobben's deposition testimony is different

23 than her testimony in the courtroom.  Not by much, but if there

24 was, she's 70 years old, we certainly have been rushing to

25 prepare for the hearing here today, and there may be some other

1  issues, just natural human nature issues that would have

2  refreshed her recollection on certain things.  I think most of

3  it is about her credit that, you know, she said in the

4  deposition I believe that she wasn't damaged by her credit.

5  And so we cleaned that up.  I'm not sure what other issues

6  there are, but I would just argue that.  That there some,

7  you know, basically human nature issues involved in maybe not

8  recollecting things entirely at the time.

9          So what of our damages?  Well, we're asking for a

10  secured claim based upon a wrongful conversion of the property.

11  It was her property, it was taken and that claim is against all

12  debtor entities.

13          THE COURT:  Secured claim and what?  What's the

14  collateral?

15          MR. PETTIBONE:  Her property.  Any equitable interest

16  she had in it at the time.

17          THE COURT:  So at the time in April, '09 when the

18  property was, you allege, improperly taken from her through the

19  trustee sale that that in effect was a wrongful dissipation of

20  a secure -- of collateral -- conversion of collateral really,

21  and that she gets a secured claim at that time that in effect

22  stays in place.  But it would only do so, wouldn't it to the

23  extent of the value of the property?  I mean, that's what the

24  law says.  And the value of the property appears to have been

25  about the loan value or -- I don't have any evidence because of

1 the way the appraisal was put in, but tracing through the

2 documents and the no money down, etcetera, etcetera I think

3 it's a fair -- and we value that as of the petition date.  We

4 don't value it a year later when the markets in real estate in

5 California plummeted.

6          But I'm struggling with the secured aspect of it, and

7 I wonder if it's not more properly assuming it's valid as an

8 administrative expense claim as a post-petition crime by the

9 debtor in converting property or being involved as an

10 accessory, if you will, in converting property that they had no

11 right to convert.

12          MR. PETTIBONE:  That's my next argument.

13          THE COURT:  That's your next argument.  All right.

14          MR. PETTIBONE:  You know, I'll be moving on.  That is

15 the argument.  And also that the administration priority claim

16 is based upon the fact that --

17          THE COURT:  I assume, and I don't put words in your

18 mouth, but I assume that your theory here, because I go through

19 the unsecured priority list and I really don't see anything

20 other than perhaps an administrative expense claim.  And that

21 would in effect be for a post-petition breach of contract or

22 some sort of tort if you will, etcetera.  And that would be

23 your claim as an administrative expense claim.  So then we get

24 into, I think, again assuming there's liability there -- oh,

25 and I'm sorry, and the basis of that would be that there was

1  some post-petition actions by the debtor or perhaps more

2  precisely the servicing entity which in effect was wrongful

3  participation in the entire process.  And it happened post-

4  petition.

5          All right, so let's ask this, who's your claim

6  against, and what's the back up for the numbers.  By back up I

7  mean break out.

8          MR. PETTIBONE:  Well, at least the claim is -- we've

9  asked that it be against all debtor entities, but those that

10 touched the loan would be American Brokers Conduit, American

11 Home Mortgage Acceptance, American Home Mortgage Holdings,

12 American Home Mortgage Servicing, American Home Mortgage

13 Investment.

14         THE COURT:  Well, you've only filed claims against

15 American Home Mortgage Holdings, American Home Corp., and

16 American Mortgage Servicing, correct?

17         MR. PETTIBONE:  Well, they were filed, yes, before I

18 -- right.  That's what the claims are.

19         THE COURT:  And that's what the objection deals with.

20         MR. PETTIBONE:  Right.

21         THE COURT:  Okay.  And when did Holdings touch the

22 loan?

23         MS. RUSH:  On the MEARS it says Holdings.

24         THE COURT:  What document is the MEARS document?

25         MS. RUSH:  It's registered under Holdings.  61.

1                    THE COURT:  Okay.

2                    MR. PETTIBONE:  So the damages then, Your Honor, were

3   the testimony of Mona Dobben that she paid into the payments

4   through the escrow was $1500 and then she made four months of

5   -- which that would be $1500.  Then she made mortgage payments

6   of $1650.93 for four months which is $6603.72.  Then the

7   testimony was that they had paid Ms. Rush 18,000.  Then you

8   have, Your Honor, her credit and the fact that, you know, she

9   lost a $40,000 equity line on her home.  She couldn't purchase

10  things that she wanted to later on the credit and that the

11  foreclosure is still showing on her credit report even as this

12  date so there's continuing damages as well as the emotional

13  distress that she went through and she testified to.  It's a

14  difficult number to come up with with regards to the -- well,

15  we know the 40,000 at least has a basis as an actual damage

16  number.  But what do you --

17                   THE COURT:  Has there been any -- I'm sorry.  Has

18  there been any action by whoever alleges to own the note now

19  personally against Ms. Dobben to collect that?

20                   MR. PETTIBONE:  No, sir.

21                   THE COURT:  All right.

22                   MS. RUSH:  Well, she just got that statement from

23  American Home.

24                   MR. PETTIBONE:  That's a different one.

25                   MS. RUSH:  The statement that just came?  Did that

1  ask her for a payment?

2       MR. PETTIBONE:  Well, apparently there was a

3  statement that we didn't introduce into evidence, Your Honor.

4  It was very confusing.  We're not sure if they're trying to

5  collect now or not.  But up until the time of that statement

6  there was no deficiency or anything like that.

7       THE COURT:  All right.  So she borrowed the money as

8  you say as a result of fraud, paid some money under it, it went

9  to foreclosure at which time the house was taken.  Obviously

10 there would be a claim for any deficiency at that point by the

11 secured lender whoever it was.  And that has not been brought

12 as of yet.

13      MR. PETTIBONE:  Other than this reference.  Yes,

14 that's correct.

15      THE COURT:  All right.  So why would that give rise

16 to the 451 number in the claim for the real estate?

17      MR. PETTIBONE:  Well, I don't know if it -- you know,

18 what we're doing now is eliciting testimony and the numbers are

19 what they are today.

20      THE COURT:  Okay.

21      MR. PETTIBONE:  So it'd have to be amended.

22      THE COURT:  So we're really talking about the numbers

23 that get the claim up, would be the loss of credit and the

24 damages that arises from that -- not loss of credit.  Well, it

25 is loss of credit as a result.  Lost equity line and ability to

1  get credit for other things.  The emotional issues that resolve

2  -- are resolved with that or affiliated with that.  And also

3  the emotional distress generally in connection with going

4  through this entire process.  I assume Ms. Dobben has not

5  declared bankruptcy.

6            MR. PETTIBONE:  Correct.

7            THE COURT:  All right.

8            MR. PETTIBONE:  And then you have the 18,000 paid to

9  a third party, Ms. Rush, to --

10           THE COURT:  And what are your bills?

11           MR. PETTIBONE:  Mine are -- well, it was $4000

12 retainer.  And then that was not used up, but it certainly will

13 be for coming out here.  So I would anticipate at least another

14 two thousand.  My expenses were paid by Ms. Yamamura for the

15 flight and the hotel.  There was another attorney involved

16 before me receive money as well.

17           THE COURT:  Ms. Houghton, your fees?

18           MS. HOUGHTON:  Yes, Your Honor.  I haven't discussed

19 that.  It's minimal.  It's not going to be a lot of money, Your

20 Honor.

21           THE COURT:  Okay.

22           MS. HOUGHTON:  I just did the motion pro hac vice and

23 spent time.

24           THE COURT:  Okay.  Understood.

25           MS. HOUGHTON:  So it's not going to be much.

1          THE COURT:  All right.  Anything further?

2          MR. PETTIBONE:  No, Your Honor.  Thanks for letting

3  me be heard.

4          THE COURT:  Very good.

5          MR. PETTIBONE:  Okay.

6          THE COURT:  Mr. Crowther.

7          MR. CROWTHER:  Your Honor will recall way back when

8  Ms. Dobben's claim started out as a 600 page pro se complaint,

9  and we ended up here now with a hundred page complaint which is

10 supposed to be the basis of the claim.  It keeps morphing into

11 something different.  It's a moving target.  It never seems to

12 stop moving.  The theories just keep getting more and more

13 complicated, complex, but yet when you ask for the basis of

14 them you get nothing.  When you look at the interrogatory

15 responses there's nothing.

16         We asked Ms. Dobben at her deposition about whether

17 or not she intended to sign for a loan, she says yes.  She said

18 that right here.  She intended to buy investment property, she

19 intended to get a loan to buy that property.  She intended to

20 get it with no money down which she accomplished.  What is the

21 fraud?  What a fraud is that supposedly Mr. Downey who was not

22 the broker, the record reflects that Gregory Blair Clark is the

23 broker, that Mr. Downey told her that the rental income on the

24 property would be sufficient to pay the expenses and the

25 carrying costs such as the mortgage payments.  That's

1  supposedly the fraud.

2          THE COURT:  That and forging her signature.

3          MR. CROWTHER:  We don't know whether or not, and the

4  question was never asked.  She knew he was doing this for her.

5  She delegated to him to go get this stuff done.  That's what

6  she testified to.  She didn't understand how it was being done,

7  but she gave it to him.  She gave him the bank statement, she

8  gave him tax returns, she gave him all the information he

9  needed to facilitate a loan that she had the ability to say no

10  to.  But she didn't want to say no.  She wanted to make money

11  in real estate.  There's nothing wrong with that.  There's

12  nothing actionable about that.  There's no crime in that.

13  People do that.

14          Ms. Dobben wanted to do that.  She wanted to earn

15  money with investment real estate.  The unfortunate thing was

16  Mr. Downey the friend of her daughter, the person who was

17  introduced to her by her daughter was not the right person to

18  be doing this.  He clearly did not have a complete grasp of the

19  tenants and things of that sort.  But that's not the debtors'

20  problem.  The debtor didn't do that.  And Ms. Dobben paid the

21  mortgage payment.  She clearly knew she had a mortgage.  A

22  mortgage that she conceded.  She signed all the disclosures,

23  certifications, deed of trust.  She concedes she signed those.

24  She hand wrote her date April 17th, 2007, repeatedly.  There's

25  no fraud in the loan.  The problem is Ms. Dobben didn't make

1  the income from the property that she was told by Mr. Downey

2  and Mr. Downey alone that the properties would generate.

3        At her deposition she was asked if the income from

4  the property was $2500 and the mortgage payments were 2000

5  would we even be here.  The answer's no.  Because the problem

6  isn't the fact that there was a purchase of property.  The

7  problem isn't the fact that there's a mortgage.  The problem is

8  that Mr. Downey, again, Mr. Downey supposedly made promises to

9  her.  What we find out is Ms. Dobben didn't check anything.

10 She didn't go visit the property, didn't check the property,

11 didn't ask for inspections, didn't ask for appraisals, didn't

12 ask for anything.  She merely trusted Mr. Downey.  And she

13 trusted Mr. Downey because she thought Mr. Downey was a friend

14 of her daughter's.  Mr. Downey should be the target, not the

15 debtor.

16        Ms. Dobben has repeatedly over and over again said

17 she intended to buy the property, she intended to buy it for

18 investment purposes, she was going to rent it out, she never

19 intended to live it.  And that but for the fact it wasn't what

20 Mr. Downey said you have no problem.  So we go through the

21 various claims she's asserted in her litigation with that

22 backdrop knowing that each and every operative mortgage

23 document, and the operative mortgage documents are the ones

24 that were signed at closing by Ms. Dobben.  Nothing that leads

25 up to that, because the solution to the problem at closing if

1  Ms. Dobben did not want a mortgage would be not to sign the

2  documents.  But that would have been contrary to what her

3  purpose was.  And that was to buy investment property, to own

4  investment property, and to finance that purchase.

5        One of those purchases was for the mortgage from

6  American Home Mortgage Acceptance, Inc. without a doubt.  But

7  there's no allegation, and no evidence that the debtors knew

8  about any of that.  There's no evidence that the debtors knew

9  that anyone did anything other than Ms. Dobben signing the loan

10 documents which she does not dispute.

11       The theory here is that they shouldn't have given her

12 a loan.  Well, because she's old?  Well, no, you can't do that.

13 In fact, she signed the Equal Credit Opportunity Act which says

14 you cannot discriminate on the basis of age.  Well, they should

15 have called her.  Why?  They had her back statement.  Showed

16 she had $168,000 in cash.  She in fact made the mortgage

17 payment for four months.  But then she stopped.  But when you

18 stop making mortgage payments it creates a problem.  People

19 start calls.  People start wondering.

20       There's allegations of fraud everywhere here, but

21 what exactly is the fraud?  What is the proof of a fraud?  Mr.

22 Downey told me that I would make money in investment real

23 estate.  That's it.  There's been no other allegation of fraud

24 put on today, Your Honor, none.  Let's assume that Mr. Downey

25 did in fact tell her that.  How does that get us to the

1  debtors?  How do the debtors have fault in that statement from

2  Mr. Downey?  Because he worked for a broker?  That's not a

3  fraud connection.  To stop the fraud all Ms. Dobben had to do

4  on April 17th of 2007 is not sign the documents.  That's all.

5          But again, at that time she wanted to get the

6  mortgage.  She wanted the loan, she wanted to buy the house for

7  no money down and she got exactly, exactly what she asked for.

8  What she didn't know was that the property she never saw, the

9  property she never asked about, the property she never asked

10 for rental records for, the property she never bothered to ask

11 for an appraisal for or inspection for wasn't what Mr. Downey

12 had said.  Is that really justifiable reliance for even a fraud

13 plan?  I don't know.  But it certainly isn't one against the

14 debtors.

15         Again, the last person was Ms. Dobben.  She could

16 have stopped this.  It wasn't as if Mr. Downey got her a

17 mortgage, signed her documents for the mortgage and said

18 surprise, you have a mortgage.  That's not what happened.  That

19 is not how this transpired.  Not even their own evidence says

20 that.  What it says is that the initial process was started by

21 Mr. Downey a process Ms. Dobben knew about, that she delegated

22 to him.  He was going to find the properties because he had

23 properties in mind.  He was going to arrange for the financing.

24 What she cared about, no money down, and that it produced

25 income.  That's all she cared about.  And if I was buying

1 investment property I'd care about those things, too.  The

2 problem is that doesn't get you to liability for a fraud claim

3 against the debtors, any of the debtors.

4        Similarly, it doesn't get you to an aiding and

5 abetting a fraud.  There is no evidence that anyone at AHM knew

6 about these statements, none.  Not only do we have a failure or

7 any particularize fraud, but it doesn't even remotely go to any

8 of the debtors.

9        The next claim in the complaint is for a cancellation

10 of a written instrument.  Well, the evidence here is that the

11 written instrument is somewhere else.  There's no evidence it's

12 with the debtors.  Anyway there wouldn't be a monetary claim

13 against the debtors anyway.  That would be inequitable claim.

14 Same thing with recission.  There's no evidence the debtors

15 owned the note and haven't owned it for a long time.  In fact

16 it appears that since May of 2007 it's been in the trust.

17 TILA, RESPA, they don't apply to this transaction at all.  As a

18 matter of law they don't apply.

19        It's Ms. Dobben who signed saying that her address

20 would be the Palmdale, California address.  Multiple times she

21 did that.  It's no surprise that notices would be sent to that

22 address.  There's nothing in the record which suggests that Ms.

23 Dobben ever asked that notices for the Palmdale property go to

24 a different address other than the Palmdale property.

25        Your Honor, I think, talked about well, the letters.

**J&J COURT TRANSCRIBERS, INC.**

1  The letters do not ask that notices be sent to a different

2  address.  They don't.  Well, what did Ms. Dobben have at that

3  address?  She had a management agent.  Someone she paid.  She

4  clearly had Mr. Downey still involved by her own testimony.

5  She was sending him stuff after the fact.  Maybe he stopped

6  responding, but she clearly had him.  Again, that's not the

7  debtor or anyone associated with the debtor.

8         Her next claim is a RICO claim.  There's just not

9  predicate acts for a RICO Act whatsoever.  Wrongful

10 foreclosure.  Well, what the record shows here, Your Honor, is

11 that Ms. Dobben stopped making mortgage payments on a mortgage

12 she voluntarily signed for a loan she voluntarily took out for

13 a business purpose, investment real estate.  If you stop making

14 payments you may be foreclosed on by a lender who has a

15 security interest in your real property.  That lender wasn't

16 American Home, it was someone else.  But there's no such thing

17 as a wrongful foreclosure when you admittedly haven't made the

18 payments.  There's no other basis for that claim.

19        Ms. Dobben knew the trustee sale was taking place in

20 April of 2008.  She had notice of it at the address she

21 provided in her documents.  There's no evidence of any

22 substitution address for notices.  She puts in stuff about the

23 bankruptcy case, but that's different.  We have to give notice

24 to those parties who send us document requests.  That doesn't

25 go to the servicer.  The servicer can't just substitute an

1  address because they want to.  They could have sent notice to a

2  servicer to ask for a different address.  They did not.

3  There's no evidence of that happening.  All there is is there's

4  been fraud in this transaction.

5         Allegations of fraud, rampant fraud, fraud schemes.

6  Theft of identity.  Well, that's not really what happened.

7  There's been no theft of identity.  Ms. Dobben conceded she

8  signed all these documents.  She conceded all of this.  Where

9  is the identity theft?  Well, it was just things being thrown

10 out there.  Nothing about changing the notice address.  Not a

11 single piece of evidence.

12        Interestingly Ms. Dobben appears to be claiming that

13 she's deprived of her property she doesn't want in the first

14 place.  She stopped paying voluntarily.  But yet she wants to

15 keep the property that she didn't want to buy in the first

16 place apparently.  That to me is circular.  It makes no sense.

17 She hasn't been pursued for any deficiency.  So essentially her

18 claim is well, you reported a foreclosure.  Well, it happened.

19 There was a trustee sale April 29th of 2008.  That's what

20 happened.  There's nothing false about that's what happened.

21 How Ms. Dobben got to that point may be questionable as to what

22 Mr. Downey told her she was buying.  But the fact of the matter

23 is everything else was straight up right as she expected it.

24 She bought a property for investment purposes, no money down

25 with money she borrowed.  When you borrow money you pay it

1 back.  She decided not to.

2          THE COURT:  I need you to start to wrap up, Mr.

3 Crowther, based on my time frame.

4          MR. CROWTHER:  Certainly, Your Honor.  There is no

5 evidence that there was anything done by any of the debtors

6 that was wrongful.  If you look through the disclosures that

7 Ms. Dobben signed she identifies the Palmdale, California

8 address as the address for notices.  Ask if there's a different

9 mailing address it's right.  She signed the document and dated

10 it.  Did she understand it?  We don't know.  But everyone else

11 testified today that she was competent, she knew what she was

12 doing, there was no concerns about whether or not she could

13 invest in real estate.

14          The person you think know her the best, her daughter,

15 is the one who suggested her as a person to invest in real

16 estate.  Had no questions about her ability to make those

17 decisions, did not bother to follow up and see whether or not

18 it had gone anywhere.  But somehow it's the debtors' fault that

19 this happened.  There's no evidence, Your Honor, none.

20          Ultimately while Mr. Downey may have done something

21 wrong, and for purposes today I don't like the guy either, but

22 that doesn't mean the debtors are responsible.  And there is no

23 secured claim, there is no admin claim.  The actual foreclosure

24 itself took place after servicing was sold.  That means it

25 could have stopped at anytime up to that trustee sale date of

1 April 29th of 2008.  That's when the divestiture occurred of

2 any secured right or secured interest or any property right.

3 It was divested only on or after April 29th of 2008.

4         No matter what the process was before that there's

5 always a way to stop.  And once it stops there's no damage.  In

6 this case it could have stopped anytime when the debtors

7 weren't even involved at all.  The debtors weren't even the

8 servicer any longer.  I mean by name rather than legal.

9 Meaning the debtors weren't involved in servicing after April

10 of '08.  So while that was occurring the debtors were gone.  It

11 could have stopped.

12         THE COURT:  Okay.

13         MR. CROWTHER:  That party is --

14         THE COURT:  Sixty seconds.  I'm sorry, but I have a

15 hard deadline.

16         MR. CROWTHER:  The only thing the debtors didn't do

17 here was respond to repeated threats of litigation, lawsuits

18 and things of those sorts.  That's what those letters talk

19 about.  There's no obligation to do that at all.  And

20 ultimately it just opens up a proverbial can of worms which

21 brings us to today.  Well, Your Honor, it's time to close the

22 can.  This had to end, and we ask Your Honor expunge each and

23 everyone of the claims that's been submitted by Ms. Dobben.

24         THE COURT:  All right.  Mr. Pettibone, any reply?

25         MR. PETTIBONE:  I submit, Your Honor, and I'll submit

1 and then thank you again for your time.

2          THE COURT:  All right.  You're welcome.  Well, thank

3 you.  I've been thinking about this during our breaks, I've

4 read the documents prior to the hearing, and a couple findings

5 to get started.  I don't think there is any doubt whatsoever

6 that Mr. Downey defrauded Ms. Dobben.  And frankly it shocks

7 the conscience of the Court what went on here.  And I don't

8 think there's any question she was damaged by that fraud.  He

9 lied to her about what the property would generate, she relied

10 on that in connection with agreeing to go forward with the

11 transaction.  He forged her signature.  He never met with her

12 personally in connection with the matter.  He sent the

13 documents or caused the documents to be sent over that she did

14 sign, and she relied on him that they were proper.

15          I've bought a couple of houses, I've had several

16 mortgages.  I got to tell you I don't read all the documents at

17 closing, nobody does.  You rely on the agent that is arranging

18 the deal.  All right.  In Delaware it's a lawyer, you have to

19 have a lawyer.  And if he lies to you and defrauds you you sue

20 him because he defrauded you.

21          So the issue really to me is perhaps like President

22 Nixon what did the debtor know and when did they know it?  I

23 find that the debtor had a duty to monitor its brokers.

24 Clearly Mr. Downey who was an employee of the broker who

25 arranged the deal was an unlicensed broker and a convicted

1  felon, and completely and utterly inappropriate to participate

2  in the business he was participating in.  The broker itself was

3  controlled by a party with serious economic issues that the

4  debtor knew about based on its due diligence.

5          As Mr. Pettibone said there were a number of red

6  flags that were raised prior to this deal being closed that

7  gave rise or should have given rise to the debtor doing

8  something other than blindly accepting the document submitted

9  by a broker who they shouldn't have been dealing with in the

10  first place.  The debtor is liable as an accessory to Mr.

11  Downey's fraud against Ms. Dobben.

12          Now, that would give rise to a pre-petition unsecured

13  claim.  The question then becomes did they do something in

14  connection with that aiding and abetting of fraud post-petition

15  which would make the claim administrative?  As an aside there

16  is no secured claim here because the property -- there is no

17  property of the estate against which secured claim can be

18  broad, but there is perhaps an administrative claim for a

19  wrongful termination or conversion of the property.  But in any

20  event I don't need to get there, because I believe that the

21  debtor did do actions post-petition which exacerbated and

22  continued their aiding and abetting of the fraud against Ms.

23  Dobben that gave rise to the damages she incurred.

24          Frankly, I feel like the debtor gave Ms. Dobben the

25  run around.  She took repeated steps to get the documents to

1 the right place, to get the documents at all and I remember

2 several hearings with Ms. Rush on that issue, and to in effect

3 ignore presale of the servicing business, numerous requests to

4 acknowledge who should be receiving notices.  And that

5 ultimately led to damage to Ms. Dobben in that the foreclosure

6 was so eminent, for instance, she couldn't do what her daughter

7 did which is do a deed in lieu or some other activity which

8 would have preserved her credit rating.

9          The debtors' issues in connection with not

10 acknowledging notice continued after the sale because the new

11 servicer was relying on the documents that the old servicer had

12 in place.  Were there opportunities perhaps later to figure out

13 whether that's the proper thing to do or not, and maybe

14 everything could have stopped?  I don't know.  I really feel

15 and find that the debtors' argument is just too clever by half.

16 They want to separate out these different pieces and legal

17 entities, and assume that a person like Mrs. Dobben or even Ms.

18 Rush who is ever experienced obviously in this field can figure

19 it out.  I mean, it took her months to figure out who owned the

20 loan.  That's not the problem of the borrower.  That is the

21 problem of the lender.

22          Now, we have concrete damages of $32,103

23 approximately which includes the $1500 paid at the beginning,

24 the $6600 approximately paid on the mortgage, the 18,000 to Ms.

25 Rush, and 6000 to Mr. Pettibone.  And I'm just for purposes of

J&J COURT TRANSCRIBERS, INC.

1 doing this I'm going to assume approximately $1000 for Ms.

2 Houghton.  So that actually gets us to $33,000.  I am going to

3 award an administrative expense claim based on those facts in

4 the amount of $33,000 because I find that the conduct giving

5 rise to those damages continue post-petition.  That claim is

6 against American Home Mortgage Servicing, American Home Corp,

7 and American Home Mortgage Holdings jointly and severally.

8        Based on the loss of credit, the deterioration of the

9 credit score as a result of fraud, the emotional distress

10 clearly suffered by the -- by Ms. Dobben I'm going to award

11 those damages as treble damages.  And I'm just going to round

12 it off because that would be 99.  I'm going to award an

13 administrative expense claim of $100,000 to Ms. Dobben and

14 require the debtor pay it within 21 days.  And I request that

15 the debtor submit a form of order under certification of

16 counsel.  Any questions?

17        MR. PETTIBONE:  No, sir.

18        MS. RUSH:  Thank you.

19        THE COURT:  All right.  Hearing adjourned.

20                    *  *  *  *  *

21

22

163

# **C E R T I F I C A T I O N**

We, TAMMY DeRISI, RITA BERGEN and KIMBERLY UPSHUR, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.


/s/ Tammy DeRisi            DATE:  December 14, 2009
TAMMY DeRISI


/s/ Rita Bergen
RITA BERGEN


/s/ Kimberly Upshur
KIMBERLY UPSHUR
J&J COURT TRANSCRIBERS, INC.