# EXHIBIT A

B 10 (Official Form 10) (12/07)

| UNITED STATES BANKRUPTCY COURT | PROOF OF CLAIM |
|---|---|

Name of Debtor: American Home Mortgage Investment Corp.

Case Number: 07-11048

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

Name of Creditor (the person or other entity to whom the debtor owes money or property): ORIX Capital Markets, LLC ("ORIX")

☐ Check this box to indicate that this claim amends a previously filed

Name and address where notices should be sent:
ORIX
1717 Main Street, Suite 900
Dallas, TX 75201 Attn: Greg May
Telephone number: (214) 237-2000

Filed: USBC - District of Delaware
American Home Mortgage Holdings, Inc., Et Al.
07-11047 (CSS)        0000009211

Name and address where payment should be sent (if different from above):



Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. Amount of Claim as of Date Case Filed:   $ 74,362,091

If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.

If all or part of your claim is entitled to priority, complete item 5.

☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. **(see Exhibit 1 attached)**

2. Basis for Claim:   Repurchase Agreement (See Exhibit 2 attached)
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____

   3a. Debtor may have scheduled account as: _____
   (See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information. *(See Exhibit 3 attached for detailed explanation)*

Nature of property or right of setoff: ☐ Real Estate   ☐ Motor Vehicle   ☒ Other
Describe:

Value of Property:$___*___   Annual Interest Rate___*___%

Amount of arrearage and other charges as of time case filed included in secured claim,

if any: $ ___*___   Basis for perfection: ___*___

Amount of Secured Claim: $ ___*___   Amount Unsecured: $ 20,000,000 (Sec.562)

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).

☐ Up to $2,425* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(___).

Amount entitled to priority:

$_____

6. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim.

7. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. (See definition of "redacted" on reverse side.)

DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

If the documents are not available, please explain:

*Amounts are subject to adjustment on 4/1/10 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.*

Date:
1-10-08

Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number, if different from the notice address above. Attach copy of power of attorney, if any.

John Dinan, Director

FILED / FOR COURT USE ONLY

RECEIVED

JAN 11 2008

EPIQ BANKRUPTCY SOLUTIONS, LLC

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

Exhibit 1

## American Home Mortgage Investment Corporation
Repo Obligation Tracking

| | |
|---|---|
| Facility Amount | 140,000,000 |
| Obligation Amount Prior to Default | 73,009,000 |
| Last Repo Rollover Date | 7/26/2007 |
| Default Notice Date | 7/31/2007 |

| | Aug, 2007 |
|---|---|
| Outstanding Repo Obligation Amount | 73,009,000 |
| Under-Utilization Amount | 66,991,000 |
| Availability Fee | 5,117 |
| Exit Fee | 800,000 |
| Monthly Remittance Date | 8/6/2007 |
| 1Mo LIBOR Rate | 5.32000% |
| Repo Interest Rate | 9.07% |
| Default Interest Rate | 12.82% |
| Expense Calculations: | |
| Repo Interest Due on Default Date | 91,971 |
| Default Interest Due on Remittance Date | 155,996 |
| Total Repo Interest Due | 247,967 |
| Outstanding Obligation plus Interest | 73,256,967 |
| Monthly Legal Expense | 300,007 |
| Total Unpaid Legal Expenses | 300,007 |
| Total Outstanding Repo Obligation | 74,362,091 |

Exhibit 2
(ORIX Proof of Claim)

Basis for Claim:        ORIX, as a "repo participant" (as defined in 11U.S.C. § 101(46)), entered into that certain Master Repurchase Agreement and Annex I to Master Repurchase Agreement on June 28, 2007 (the "Repurchase Agreement") with Debtor as: (a) transferee-seller of certain mortgage-related securities to ORIX, as transferee-purchaser of these securities (the "Purchased Securities" ,as defined in the Repurchase Agreement), and (b) as guarantor of the obligations of Debtor and AHM SPV III, LLC to ORIX under said "Repurchase Agreement" (as defined in 11U.S.C § 101 (47)). Pursuant to the express contractual rights granted to ORIX in the Repurchase Agreement, ORIX exercised its rights to cause a liquidation, termination and/or acceleration of the Repurchase Agreement by delivery of a notice of default to Debtor on or about August 2, 2007, and in accordance with 11U.S.C.§559and 561. Consequently, the Purchased Securities (and the Income thereon) are held by ORIX, as owner, and do not constitute property of the Debtor's estate. As of the date of liquidation, termination and /or acceleration of the Repurchase Agreement, the market prices received, (or which could be obtained) from the Purchased Securities did not exceed the sum of the stated repurchase prices of the Purchased Securities, including all interest and other contractual charges and expense obligations under the Repurchase Agreement.

Exhibit 3
(ORIX Proof of Claim)

<u>Secured Claim:</u>     Under Schedule D of the Debtor's Schedule of Assets and
Liabilities, the Debtor has listed ORIX as a "creditor holding a
secured claim" under a master repurchase agreement in the amount
of $73,009,000, designated as both contingent and disputed.  ORIX
objects to and disputes the Debtor's characterization of the
transaction, giving rise to the obligations in the Repurchase
Agreement, as a "security arrangement" (See Exhibit 2 hereto).
Notwithstanding the foregoing, however, to the extent the
Bankruptcy Court determines that the Purchased Securities (and
related Income) or any portion thereof, under the Repurchase
Agreement are property in which the Debtor's estate possesses an
interest, then ORIX asserts, in the alternative, that ORIX holds a
perfected, protective first priority lien and security interest in such
assets in an amount which does not exceed the total repurchase
obligations of the Debtor under the Repurchase Agreement.

 THE BOND MARKET
TRADE ASSOCIATION

# MASTER
# REPURCHASE AGREEMENT
### SEPTEMBER 1996 VERSION

Dated as of June 28, 2007

**Among:**

American Home Mortgage Investment Corp. (a "Seller"),
AHM SPV III, LLC (also a "Seller")

and

ORIX Capital Markets, LLC ("Buyer")

## 1.    Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2.    Definitions

(a)    "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b)    "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c)    "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d)  "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e)  "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f)  "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g)  "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h)  "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i)  "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j)  "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) as of such date (unless contrary to market practice for such Securities);

(k)  "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360-day-per-year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l)  "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m)  "Prime Rate", the prime rate of U.S. commercial banks as published in *The Wall Street Journal* (or, if more than one such rate is published, the average of such rates);

(n)  "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o)  "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p)  "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefor in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q)  "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r)  "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s)  "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

-2-

(t)    "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

## 3.    Initiation; Confirmation; Termination

(a)    An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b)    Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and Seller with respect to the Transaction to which the Confirmation relates, unless with respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c)    In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market practice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termination in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof) against the transfer of the Repurchase Price to an account of Buyer.

## 4.    Margin Maintenance

(a)    If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggregate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b)    If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c)    If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subparagraph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party

receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or a Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or a Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5.    Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6.    Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7.    Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8.    Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the

-4-

Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they will be subject to liens granted by Seller to its clearing bank and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy the clearing lien or to obtain substitute securities.

---

9.    **Substitution**

(a)    Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b)    In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; *provided, however,* that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.

10.    **Representations**

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by-law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

11.    **Events of Default**

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to comply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or

-5-

Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a)  The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled).  The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b)  In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefor on the Repurchase Date determined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c)  In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d)  If the nondefaulting party exercises or is deemed to have exercised the option referred to in sub-paragraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

  (i)  as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefor on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

  (ii)  as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefaulting party as required hereunder or (B) in its sole discretion elect, in lieu of purchasing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefor in its sole discretion and (3) all prices, bids and offers shall be

-6-

determined together with accrued Income (except to the extent contrary to market practice with respect to the relevant Securities).

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in subparagraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the nondefaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the defaulting party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights otherwise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the performance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereunder may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

## 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

NY\1292860.2                                                                                          07-02-2007 12:24

15. **Non-assignability; Termination**

   (a)   The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

   (b)   Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

16. **Governing Law**

This Agreement shall be governed by the laws of the State of New York.

17. **No Waivers, Etc.**

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure herefrom shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pursuant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

18. **Use of Employee Plan Assets**

   (a)   If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

   (b)   Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

   (c)   By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

19. **Intent**

   (a)   The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

   (b)   It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

-8-

(c)  The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract", as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplicable).

(d)  It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDICIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20.  Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a)  in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b)  in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c)  in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

[SIGNATURES FOLLOW]

SELLERS

**AMERICAN HOME MORTGAGE
INVESTMENT CORP.**

By: _____
     Name: _____
     Title: _____

**AHM SPV III, LLC**

By: _____
     Name: _____
     Title: _____

BUYER

**ORIX CAPITAL MARKETS, LLC**

By: _____
Name: _____
              Vivian Gu
Title: _____
           President and CEO
         ORIX Capital Markets, LLC

SELLERS

**AMERICAN HOME MORTGAGE**
**INVESTMENT CORP.**

By: _____

Name: _____
             Alan B. Horn

Title: _____
         Executive Vice President
         General Counsel & Secretary

**AHM SPV III, LLC**

By: _____

Name: Alan B. Horn

Title: Secretary

BUYER

**ORIX CAPITAL MARKETS, LLC**

By: _____

Name: _____

Title: _____

Annex I To


MASTER REPURCHASE AGREEMENT

Supplemental Terms And Conditions

between

American Home Mortgage Investment Corp.,
as a Seller

and

AHM SPV III, LLC,
as a Seller

and

ORIX Capital Markets, LLC
as Buyer


Dated as of June 28, 2007

## TABLE OF CONTENTS

1.   OTHER APPLICABLE ANNEXES..................................................................2
2.   ADDITIONAL AND SUBSTITUTE DEFINITIONS ........................................2
3.   INITIATION; CONFIRMATION; TERMINATION; FEES ................................11
4.   MARGIN MAINTENANCE ..........................................................................16
5.   INCOME PAYMENTS AND PRINCIPAL PAYMENTS....................................17
6.   SECURITY INTEREST ................................................................................19
7.   PAYMENT, TRANSFER AND CUSTODY .....................................................20
8.   SALE, TRANSFER, HYPOTHECATION OR PLEDGE OF PURCHASED
     SECURITIES .............................................................................................23
9.   SUBSTITUTION ........................................................................................24
10.  REPRESENTATIONS ..................................................................................24
11.  NEGATIVE COVENANTS OF SELLER..........................................................28
12.  AFFIRMATIVE COVENANTS OF SELLER....................................................29
13.  EVENTS OF DEFAULT; TERMINATION EVENTS; REMEDIES .......................31
14.  DUE DILIGENCE .......................................................................................35
15.  NOTICES AND OTHER COMMUNICATIONS .............................................36
16.  NON-ASSIGNABILITY ...............................................................................37
17.  CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL ..............................37
18.  NO RELIANCE ..........................................................................................38
19.  INDEMNITY .............................................................................................38
20.  MISCELLANEOUS .....................................................................................39

## EXHIBITS AND SCHEDULES

SCHEDULE I-A     Buyer's Margin Percentages and Applicable Spreads
EXHIBIT I         Form of Confirmation
EXHIBIT II        Authorized Representatives of Seller
EXHIBIT III       Monthly Reporting Package
EXHIBIT IV        Form of Custodial Delivery
EXHIBIT V         Form of Power of Attorney
EXHIBIT VI        Advance Procedure
EXHIBIT VII       Form of Re-Direction Letter
EXHIBIT VIII      Marketable Securities Definition
EXHIBIT IX        Representations for Purchased Securities
EXHIBIT X         Designated Securities

**ANNEX I TO**
**MASTER REPURCHASE AGREEMENT**

Supplemental Terms and Conditions

This Annex I forms a part of the Master Repurchase Agreement dated as of June 28, 2007, between American Home Mortgage Investment Corp., as seller, AHM SPV III, LLC, as seller, and ORIX Capital Markets, LLC, as buyer (the "Agreement"). Capitalized terms used in this Annex I without definition shall have the respective meanings assigned to such terms in the Agreement. This Annex I is intended to supplement the Agreement and shall, wherever possible, be interpreted so as to be consistent with the Agreement; however, in the event of any conflict or inconsistency between the provisions of this Annex I, on the one hand, and the provisions of the Agreement, on the other, the provisions of this Annex I shall govern and control. All references in the Agreement to "the Agreement" shall be deemed to mean and refer to the Agreement, as supplemented and modified by this Annex I or as otherwise modified after the date hereof.

1.    **OTHER APPLICABLE ANNEXES**

In addition to this Annex I, the following Annexes and any Schedules thereto shall form a part of the Agreement and shall be applicable thereunder:

Annex II – Names and Addresses for Communications Between Parties.

2.    **ADDITIONAL AND SUBSTITUTE DEFINITIONS**

2.1    Additional Terms. In addition to the terms defined in the Agreement, the following terms shall have the respective meanings set forth below:

"Accelerated Repurchase Date" has the meaning specified in Section 13.2.1 of this Annex I.

"Additional Securities" means residential or commercial mortgage-backed securities (other than Designated Securities) that either (a) represent residual interests, (b) have a rating of "CCC" (or its equivalent) or higher from any Rating Agency or (c) are unrated securities which, in each case, are acceptable to Buyer in the exercise of its good faith business judgment.

"Affiliate" means, when used with respect to any specified Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such Person. Control means ownership of 20% or greater voting securities shall be presumed to constitute control.

"Agreement" has the meaning specified in the introductory paragraph of this Annex I.

"Alternative Rate" has the meaning specified in Section 3.7 of this Annex I.

"Alternative Rate Transaction" means, with respect to any Pricing Rate Period, any Transaction with respect to which the Pricing Rate for such Pricing Rate Period is determined with reference to the Alternative Rate.

"AHM LLC" means AHM LLC III, LLC, or its permitted successors in interest.

"AHMIC" means American Home Mortgage Investment Corp., or its permitted successors in interest.

"Applicable Spread" means, with respect to a Transaction involving Purchased Securities in any Rating Category,

> (i)      so long as no Event of Default shall have occurred and be continuing, the incremental per annum rate (expressed as a number of "basis points", each basis point being equivalent to 1/100 of 1%) specified in Schedule I-A attached to this Annex I as being the "Applicable Spread" for Purchased Securities in such Rating Category, and

> (ii)     after the occurrence and during the continuance of an Event of Default, the applicable incremental per annum rate described in clause (i) of this definition, plus 375 basis points (3.75%).

"Availability Fee" has the meaning specified in Section 3.5 of this Annex I.

"Business Day" means a day other than (i) a Saturday or Sunday, or (ii) a day in which the New York Stock Exchange or banks in the State of New York are authorized or obligated by law or executive order to be closed.

"Buyer" means ORIX Capital Markets, LLC, or any successor.

"Cash Equivalents" means (a) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit and eurodollar time deposits with maturities of 90 days or less from the date of acquisition and overnight bank deposits of Buyer or of any commercial bank having capital and surplus in excess of $500,000,000, (c) repurchase obligations of Buyer or of any commercial bank satisfying the requirements of clause (b) of this definition, having a term of not more than seven days with respect to securities issued or fully guaranteed or insured by the United States Government, (d) commercial paper of a domestic issuer rated at least A-1 or the equivalent thereof by S&P or P-1 or the equivalent thereof by Moody's and in either case maturing within 90 days after the day of acquisition, (e) securities with maturities of 90 days or less from the date of acquisition issued or fully guaranteed by any state, commonwealth or territory of the United States, by any political subdivision or taxing authority of any such state, commonwealth or territory or by any foreign government, the securities of which state, commonwealth, territory, political subdivision, taxing authority or foreign government (as the case may be) are rated at least A by S&P or A by Moody's, (f) securities with maturities of 90 days or less from the date of acquisition backed by standby letters of credit issued by Buyer or any commercial bank satisfying the requirements of clause (b) of this definition or (g) shares of

3

money market mutual or similar funds that invest exclusively in assets satisfying the requirements of clauses (a) through (f) of this definition.

"Cash Management Account" means a segregated interest bearing account, established by Buyer in the name of Buyer at Mellon Bank, N.A. or another a financial institution reasonably acceptable to Seller.

"Change of Control" means any of the following have occurred:

    A. with respect to AHM SPV, any transaction or event as a result of which AHMIC ceases to own, directly or indirectly 100% of the equity interests of AHM SPV;

    B. with respect to AHMIC,

        (i) the sale, transfer, or other disposition of all or substantially all of AHMIC's assets (excluding any such action taken in connection with any securitization transaction); or

        (ii) the consummation of a merger or consolidation of AHMIC with or into another entity or any other corporate reorganization (in one transaction or in a series of transactions), if more than 50% of the combined voting power of the continuing or surviving entity's stock outstanding immediately after such merger, consolidation or such other reorganization is owned by persons who were not stockholders of AHMIC immediately prior to such merger, consolidation or other reorganization; or

        (iii) a change in the majority of the board of directors of AHMIC during any twelve-month period; or

        (iv) any "going private" transaction as a consequence of which more than 50% of the common equity shares of AHMIC are delisted from a public stock exchange.

"Code" means the United States Internal Revenue code of 1986, as amended from time to time.

"Control Agreement" an agreement among the Sellers, Buyer and Custodian, in form acceptable to Buyer and the Sellers.

"Collection Period" means the period beginning on but excluding the last Cut-off Date in the month preceding the month in which such Remittance Date occurs and continuing to and including the Cut-off Date immediately preceding such Remittance Date.

"Custodial Delivery" means the form executed by the Sellers in order to deliver the Purchased Securities Schedule and the Purchased Securities File to Buyer or its designee pursuant to Section 7, a form of which is attached hereto as Exhibit IV.

"Cut-off Date" means the end of business on the Business Day preceding each Remittance Date.

"Default" means any event that, with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"Designated Securities" means the Securities listed on Exhibit X hereto.

"Diligence Materials" shall mean the Preliminary Due Diligence Package together with the Supplemental Due Diligence List.

"Early Repurchase Date" has the meaning specified in Section 3.4 of this Annex I.

"Eligible Securities" shall mean (a) Designated Securities or (b) Additional Securities, which, in each case, conform to the representations and warranties set forth on Exhibit IX.

"Equity Proceeds" shall mean any proceeds received from any sale or issuance of any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent equity ownership interests in a Person that is not a corporation, including, without limitation, any and all member or other equivalent interests in any limited liability company, and any and all warrants or options to purchase any of the foregoing

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated thereunder.  Section references to ERISA are to ERISA, as in effect at the date of this Agreement and, as of the relevant date, any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" means any corporation or trade or business that is a member of any group of organizations (i) described in Section 414(b) or (c) of the Code of which Seller is a member and (ii) solely for purposes of potential liability under Section 302(c)(11) of ERISA and Section 412(c)(11) of the Code and the lien created under Section 302(f) of ERISA and Section 412(n) of the Code, described in Section 414(m) or (o) of the Code of which Seller is a member.

"Exit Fee" shall mean the fee payable by the Sellers pursuant to Section 3.5 of this Annex I in the event Seller terminates the facility prior to the Termination Date or Buyer terminates the facility on account of an Event of Default.  The Exit Fee shall equal (i) in the event that the facility is terminated on or before the first anniversary of the date hereof, $800,000, (ii)  in the event that the facility is terminated after the first anniversary of the date hereof but on or before the date 21 months after the date hereof, $400,000, and (iii) in the event that the facility is terminated thereafter, $0.

"Facility Amount" shall mean $140,000,000.

"Filings" has the meaning specified in Section 6 of this Annex I.

"GAAP" shall mean United States generally accepted accounting principles consistently applied as in effect from time to time.

"Governmental Authority" shall mean any national or federal government, any state, regional, local or other political subdivision thereof with jurisdiction and any Person with jurisdiction

exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Indemnified Amounts" and "Indemnified Parties" has the meaning specified in Section 19 of this Annex I.

"Intangible Assets Value" shall mean the excess of the cost over book value of assets acquired, patents, trademarks, trade names, copyrights, franchises and other intangible assets (excluding in any event the value of any residual securities).

"LIBOR" shall mean the rate per annum calculated as set forth below:

On each Pricing Rate Determination Date, LIBOR for the next Pricing Rate Period will be the rate for deposits in United States dollars for a one-month period that appears on Reuters LIBOR 01 Screen or its successor as of 11:00 a.m., London time, on such date; or

On any Pricing Rate Determination Date on which no such rate appears on Reuters LIBOR 01 Screen as described above, LIBOR for the next Pricing Rate Period will be determined on the basis of the arithmetic mean of the rates at which deposits in United States dollars are offered by the Reference Banks at approximately 11:00 a.m., London time, on such date to prime banks in the London interbank market for a one-month period.

All percentages resulting from any calculations or determinations referred to in this definition will be rounded upwards, if necessary, to the nearest multiple of 1/100th of 1% and all U.S. dollar amounts used in or resulting from such calculations will be rounded to the nearest cent (with one-half cent or more being rounding upwards).

"LIBO Rate" shall mean, with respect to any Pricing Rate Period pertaining to a Transaction, a rate per annum determined for such Pricing Rate Period in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{LIBOR}}{1 - \text{Reserve Requirement}}$$

"Marketable Securities" has the meaning set forth in Exhibit VIII.

"Moody's" shall mean Moody's Investor Service, Inc.

"Multiemployer Plan" shall mean a multiemployer plan defined as such in Section 3(37) of ERISA to which contributions have been, or were required to have been, made by Seller or any ERISA Affiliate and which is covered by Title IV of ERISA.

"Net Income" shall mean with respect to AHMIC for any period, the consolidated net income (or loss) of AHMIC and its consolidated subsidiaries for such period as determined on a consolidated basis in accordance with GAAP.

"New Collateral" shall mean an Eligible Security that the Sellers propose to be included as Collateral.

6

"Original Purchase Percentage" shall mean, with respect to any Transaction as of any day, the percentage shown on Exhibit 1-A.

"Person" shall mean an individual, corporation, limited liability company, business trust, partnership, joint tenant or tenant-in-common, trust, unincorporated organization, or other entity, or a federal, state or local government or any agency or political subdivision thereof.

"Plan" means an employee benefit or other plan established or maintained by Seller or any ERISA Affiliate during the five year period ended prior to the date of this Agreement or to which Seller or any ERISA Affiliate makes, is obligated to make or has, within the five year period ended prior to the date of this Agreement, been required to make contributions and that is covered by Title IV of ERISA or Section 302 of ERISA or Section 412 of the Code, other than a Multiemployer Plan.

"Preliminary Due Diligence Package" shall mean with respect to any New Collateral, a summary memorandum outlining the proposed transaction, together with the following due diligence information relating to the New Collateral to be provided by the Sellers to Buyer pursuant to this Agreement with respect to each Eligible Security:

        (a)     loan data disk;

        (b)     Securitization Documents;

        (c)     remittance report for the three most recent periods, to the extent in the Sellers' possession;

        (d)     quarterly remittance reports, to the extent in the Sellers' possession;

"Pricing Rate Determination Date" shall mean (a) in the case of the first Pricing Rate Period with respect to any Transaction, the second Business Day preceding the first day of such Pricing Rate Period and (b) with respect to any subsequent Pricing Rate Period, the Business Day immediately preceding the first day of the Pricing Rate Period commencing on and including the first Remittance Date in a calendar month.

"Pricing Rate Period" shall mean, (a) in the case of the first Pricing Rate Period with respect to any Transaction, the period commencing on and including the Purchase Date for such Transaction and ending on and excluding the Remittance Date of the next succeeding calendar month, and (b) in the case of any subsequent Pricing Rate Period, the period commencing on and including such Remittance Date and ending on and excluding the following Remittance Date; provided, however, that in no event shall any Pricing Rate Period end subsequent to the Repurchase Date.

"Principal Payment" shall mean, with respect to any Purchased Securities, any payment or prepayment of principal received by the Buyer in respect thereof.

"Rating Agency" shall mean any of Fitch Inc., DBRS, Moody's and Standard & Poor's.

7

"Rating Category" shall mean any of the rating categories listed in Schedule I-A attached to this Annex I. Whenever Purchased Securities are rated by more than one Rating Agency and a split rating applies to such Purchased Securities (i.e., one Rating Agency rates such Purchased Securities at a lower rating level than the other of such Rating Agencies), then for all purposes of this Agreement where a rating is to be selected (including, without limitation, in the determination of any percentages pursuant to Schedule I-A of this Annex I), the lower of the ratings shall apply.

"Reference Banks" shall mean banks each of which shall (i) be a leading bank engaged in transactions in Eurodollar deposits in the international Eurocurrency market and (ii) have an established place of business in London. Initially, the Reference Banks shall be JP Morgan Chase Bank, Barclays Bank, Plc and Deutsche Bank AG. If any such Reference Bank should be unwilling or unable to act as such or if Buyer shall terminate the appointment of any such Reference Bank or if any of the Reference Banks should be removed from the Reuters Monitor Money Rates Service or in any other way fail to meet the qualifications of a Reference Bank, Buyer in the exercise of its good faith business judgment may designate alternative banks meeting the criteria specified in clauses (i) and (ii) above.

"Related Securities" shall mean residential or commercial mortgage backed securities (other than the Purchased Securities) issued as part of the same transaction as the transaction in which the Purchased Securities are issued and either having a lower rating than such Purchased Securities or having no rating.

"Relevant System" shall mean (a) The Depository Trust Company in New York, New York, or (b) such other clearing organization or book-entry system as is agreed upon by the Buyer and the Sellers.

"Remittance Date" shall mean the Business Day in each month that is one Business Day after the latest of the payment dates of the Purchased Securities then subject to Transactions.

"Requirement of Law" shall mean any law, treaty, rule, regulation, code, directive, policy, order or requirement or determination of an arbitrator or a court or other Governmental Authority whether now or hereafter enacted or in effect.

"Reserve Requirement" shall mean, with respect to any Pricing Rate Period, the aggregate (without duplication) of the rates (expressed as a decimal fraction) of reserve requirements in effect during such Pricing Rate Period (including, without limitation, basic, supplemental, marginal and emergency reserves under any regulations of the Board of Governors of the Federal Reserve System or other governmental authority having jurisdiction with respect thereto) dealing with reserve requirements prescribed for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of such Board of Governors) maintained by Buyer.

"Reset Date" shall mean, with respect to any Transaction, the day prior to the first day of the Pricing Rate Period commencing on and including the Remittance Date in a calendar month with respect to such Transaction.

"Securitization Document" shall mean, with respect to any Eligible Securities, any pooling and servicing agreement or other agreement governing the issuance and administration of such

8

Eligible Securities and any offering document used in the distribution and sale of such Eligible Securities (including, without limitation, the preliminary and final private placement memorandum, prospectus and/or offering memorandum).

"Seller" shall mean each of American Home Mortgage Investment Corp., a Maryland corporation and AHM SPV III, LLC a Delaware limited liability company.

"Sovereign Repurchase Event" shall mean as a result of sovereign action or inaction (directly or indirectly), Buyer becomes unable to perform any absolute or contingent obligation to make a payment or transfer or to receive a payment or transfer in respect of any Transaction hereunder or to comply with any other material provision of the Agreement relating to such Transaction.

"Standard & Poor's" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"Structuring Fee" has the meaning assigned to such term in Section 3.6 of this Annex I.

"Supplemental Due Diligence List" shall mean, with respect to any New Collateral, information or deliveries concerning the New Collateral that Buyer shall reasonably request in addition to the Preliminary Due Diligence Package.

"Tangible Net Worth" shall mean, as of a particular date, (i) all amounts that would be included under stockholder's equity on a balance sheet of AHMIC and its consolidated subsidiaries at such date, determined in accordance with GAAP, less (ii) the sum of (A) amounts owing to AHMIC and its consolidated subsidiaries from Affiliates and (B) Intangible Assets Value of AHMIC and its consolidated subsidiaries.

"Target Price" shall mean, with respect to any Purchased Securities as of any date, the amount (expressed in dollars) obtained by multiplying (i) the Market Value of such Purchased Securities as of such date by (ii) the Original Purchase Percentage for the Purchased Securities.

"Termination Date" shall mean June 26, 2009.

"Termination Event" has the meaning specified in Section 13.3 of this Annex I.

"Termination Event Put Price" shall mean the price at which the Purchased Securities are to be transferred from Buyer to the Sellers upon termination of the Transactions upon the occurrence of a Termination Event which price shall be equal to the sum of (a) the Purchase Price of such Purchased Securities multiplied by 1.005 and (b) the Price Differential with respect to such Purchased Securities as of the date of such determination, minus (c) all Income and cash actually received by Buyer in respect of such Transaction pursuant to Sections 4.1, 5.2, 5.3, 5.4 and 5.5 of this Annex I.

"Transaction Conditions Precedent" has the meaning specified in Section 3.2 of this Annex I.

"Transaction Documents" shall mean, collectively, the Agreement, this Annex I, any other applicable Annexes to the Agreement, the Control Agreement and all Confirmations executed pursuant to the Agreement and this Annex I in connection with specific Transactions.

9

"Trustee" shall mean, with respect to any Eligible Securities, the trustee under the Securitization Document applicable to such Eligible Securities.

"UCC" has the meaning specified in Section 6 of this Annex I.

"Unfunded Margin Amount" shall mean unfunded eligible collateral under a committed warehouse facility whereby funds may be drawn within one Business Day of request thereof and pursuant to which no event or circumstance shall have occurred thereunder that would, by terms of the applicable agreement, prohibit the Sellers from borrowing or drawing money thereunder.

2.2    Substitute Terms.  The following capitalized terms shall have the respective meanings set forth below, in lieu of the meanings for such terms set forth in the Agreement:

"Buyer's Margin Percentage" shall mean, with respect to the Purchased Securities, as of any date, the "Buyer's Margin Percentage" specified for the applicable Rating Category in Schedule I-A attached to this Annex I.

"Confirmation" has the meaning specified in Section 3.2 of this Annex I.

"Event of Default" has the meaning specified in Section 13 of this Annex I.

"Margin Notice Deadline" shall mean 10:00 a.m. (New York City time).

"Market Value" shall mean, with respect to any Purchased Securities as of any relevant date, the market value for such Purchased Securities on such date, as determined by Buyer in the exercise of its reasonable good faith business judgment.  The Market Value of all Purchased Securities shall be determined by Buyer, in the exercise of its good faith business judgment, on each Business Day during the term of the Agreement.

"Pricing Rate" shall mean, for any Pricing Rate Period, with respect to a Transaction involving Purchased, an annual rate equal to the LIBO Rate for the Pricing Rate Period commencing on and including the first Remittance Date in a calendar month plus the relevant Applicable Spread for such Transaction, subject to adjustment and/or conversion as provided in Sections 3.7 and 3.8.

"Purchase Price" shall mean, with respect to any Purchased Securities, (i) initially the price at which such Purchased Securities are transferred by the Sellers to Buyer on the applicable Purchase Date and (ii) thereafter, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Section 4.2 hereof.  The Purchase Price as of any Purchase Date for any Purchased Securities shall be an amount (expressed in dollars) equal to the product obtained by multiplying (i) the Market Value of such Purchased Securities by (ii) the Original Purchase Percentage for such Purchased Security.

"Purchased Securities" shall mean, (i) with respect to any Transaction, the Eligible Securities sold by the Sellers to Buyer in such Transaction until such Eligible Securities are repurchased pursuant to this Agreement, and (ii) with respect to the Transactions in general, all Eligible Securities sold by the Sellers to Buyer and any additional collateral delivered by the Sellers to

Buyer pursuant to Section 4.1 of this Annex I until such Eligible Securities are repurchased pursuant to this Agreement.

"Replacement Collateral" has the meaning specified in Section 13.4.2 of this Annex I.

"Repurchase Date" shall mean the Business Day immediately preceding the second anniversary of the date of the Agreement.

"Repurchase Price" shall mean, with respect to any Purchased Securities as of any date, the price at which such Purchased Securities are to be transferred from Buyer to the Sellers upon termination of the related Transaction in whole or in part; such price will be determined in each case as the sum of the Purchase Price of such Purchased Securities and the Price Differential with respect to such Purchased Securities as of the date of such determination, minus all Income and cash actually received by Buyer in respect of such Transaction pursuant to Sections 4.1, 5.2, 5.3, 5.4 and 5.5 of this Annex I.


3.      **INITIATION; CONFIRMATION; TERMINATION; FEES**

The provisions of Paragraph 3 of the Agreement are hereby modified and superseded in their respective entireties by the following provisions of this Section 3:

3.1     Initiation.  Subject to the terms and conditions set forth in the Agreement (including, without limitation, the "Transaction Conditions Precedent" specified in Section 3.2 of this Annex I) Buyer shall from time to time enter into Transactions with the Sellers on any Business Day from and including the date of the Agreement to but excluding the Termination Date and pursuant to any such Transaction, the Sellers shall be entitled to sell, repurchase and re-sell any assets in accordance with this Agreement.  An agreement to enter into a Transaction shall be made in writing at the initiation of the Sellers as provided below; provided, however, that the aggregate Repurchase Price (excluding the Price Differential with respect to the Purchased Securities as of the date of determination) for all Transactions shall not exceed the Facility Amount.  The Sellers shall give Buyer written notice of each proposed Transaction and Buyer shall inform the Sellers of its determination if any assets proposed to be sold to Buyer by the Sellers are Eligible Securities solely in accordance with Exhibit VI attached hereto.  Buyer shall have the right to review all Securities proposed to be sold to Buyer in any Transaction and to conduct its own due diligence investigation of such Securities as Buyer reasonably determines to determine if they are Eligible Securities.  Buyer shall be entitled to make a determination, in the exercise of its good faith business judgment, that it shall not purchase any or all of the Additional Securities proposed to be sold to Buyer by the Seller.  On the Purchase Date for the Transaction, which shall be not less than three Business Days following the issuance of the Confirmation (hereinafter defined), the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of the Sellers.

3.2     Confirmation; Conditions Precedent.

        3.2.1   Upon agreeing to enter into a Transaction hereunder, provided each of the Transaction Conditions Precedent (as hereinafter defined) shall have been satisfied (or waived by Buyer), Buyer shall promptly (and in any event within two Business Days) deliver to the Sellers

a written confirmation in the form of Exhibit I attached hereto of each Transaction (a "Confirmation"). Unless otherwise agreed by the parties, Buyer shall deliver a separate Confirmation with respect to each Purchased Security that is the subject of a Transaction. Such Confirmation shall describe the Purchased Securities (including CUSIP number, if any), shall identify Buyer and the Sellers, and shall set forth:

      A.    the Purchase Date,

      B.    the Purchase Price for such Purchased Securities,

      C.    the Repurchase Date,

      D.    the acquisition cost (if the Purchased Security is acquired from a third party); and

      E.    and any additional terms or conditions mutually agreed upon by the Buyer and the Seller.

3.2.2  The "Transaction Conditions Precedent" shall be deemed to have been satisfied with respect to any proposed Transaction if:

      A.    no Default or Event of Default under the Agreement shall have occurred and be continuing as of the Purchase Date for such proposed Transaction;

      B.    the representations and warranties made by the Sellers in any of the Transaction Documents shall be true and correct in all material respects as of the Purchase Date for such Transaction;

      C.    Buyer shall have determined, in accordance with the applicable provisions of Section 3.1 of this Annex I, that the assets proposed to be sold to Buyer by the Sellers in such Transaction are Eligible Securities;

      D.    with respect to any proposed Transaction for Securities in the event the Sellers or an Affiliate of the Sellers owns the Related Securities, the Sellers shall have (x) caused ownership of the Related Securities to be transferred to the Sellers simultaneous with or prior to the purchase of the Purchased Securities by Buyer and (y) delivered to Buyer a power of attorney and any other documentation reasonably required by Buyer sufficient to permit Buyer upon the occurrence and during the continuance of an Event of Default to register the transfer of the Related Securities from the Sellers to Buyer or its designee;

      E.    Sellers shall have paid to Buyer all Availability Fees then owing;

      F.    Buyer shall have received an opinion or opinions of outside counsel to the Sellers with respect to enforceability and perfection, in form and substance acceptable to Buyer;

12

G.    Buyer shall have determined that, with respect to any Purchased Securities that are the subject of a proposed Transaction and are rated "B+"(or the equivalent) or lower or are not rated, such Purchased Securities, together with any Purchased Securities issued by the same trust, entitle the holder thereof to control the selection of the special servicer for the mortgage loans underlying such Purchased Securities at any time the underlying Purchased Securities are not performing, to the extent permitted by the terms of the underlying securities; and

H.    with respect to any proposed Transaction for Purchased Securities in a "real estate mortgage investment conduit" (or REMIC), in the event the Sellers or an Affiliate of the Sellers owns the Related Securities (it being understood that for purposes of this provision, Related Securities shall include (a) the securities issued in such "real estate mortgage investment conduit" (or REMIC)  transaction that have no rating and (b) if such unrated securities do not entitle the holder thereof to control the selection of the special servicer for the mortgage loans underlying such Purchased Securities (i.e. serve as the controlling class), the securities that have a rating and entitle the holder thereof to control the selection of the special servicer for the mortgage loans underlying such Purchased Securities (i.e., to serve as the controlling class)), the Sellers shall have either:

i.    (a) caused ownership of the Related Securities to be transferred to the Sellers simultaneous with or prior to the purchase of the Purchased Securities by Buyer and (b) delivered to Buyer a power of attorney and any other documentation reasonably required by Buyer sufficient to permit Buyer upon the occurrence and during the continuance of an Event of Default to register the transfer of the Related Securities from the Sellers to Buyer or its designee, or

ii.    delivered to Buyer an agreement satisfactory to Buyer irrevocably conveying and transferring to Buyer the right to control the selection of the special servicer for the related mortgage loans if an Event of Default occurs under the Agreement.

3.3    Effect of Confirmation. Each Confirmation, together with the Agreement, including this Annex I, shall be conclusive evidence of the terms of the Transaction(s) covered thereby absent manifest error unless objected to in writing by the Sellers no later than three Business Days after the date such Confirmation is received by the Sellers.  An objection sent by the Sellers with respect to any Confirmation must state specifically that the writing is an objection, must specify the provision(s) of such Confirmation being objected to by the Sellers, must set forth such provision(s) in the manner that Seller believes such provisions should be stated, and must be received by Buyer no more than two Business Days after such Confirmation is received by the Sellers..

3.4    Early Repurchase; Exit Fee.

3.4.1    No Transaction shall be terminable on demand by Buyer other than upon the occurrence and during the continuance of an Event of Default by the Sellers or if a Sovereign Repurchase Event occurs.  In the event a Sovereign Repurchase Event occurs, then Sellers shall

NY\1297055.4

have no obligation to pay any Exit Fee or Availability Fees for the period following such Sovereign Repurchase Event.

3.4.2    The Sellers may terminate a Transaction in whole or in part and repurchase all or a portion of Purchased Securities subject to a Transaction on any Business Day prior to the Repurchase Date (an "Early Repurchase Date") by providing notice to Buyer in writing of its intent to terminate such Transaction and repurchase such Purchased Securities no later than three Business Days prior to such Early Repurchase Date. Such notice shall set forth the Early Repurchase Date and shall identify with particularity the Purchased Securities to be repurchased on such Early Repurchase Date. On the Repurchase Date, termination of the applicable Transactions will be effected by transfer to the Sellers or their respective agents of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, the Sellers pursuant to Section 5 of this Annex I) against the simultaneous transfer of the Repurchase Price to an account of Buyer.

3.5    Exit Fee.    The Sellers may terminate all Transactions and terminate this facility upon three Business Days' notice (as set forth in Section 3.4.1 above); provided, that on such Early Repurchase Date, in addition to repaying the Repurchase Price to the Buyer, the Sellers shall pay the Exit Fee, if any, and any other amounts payable under this Agreement (including, without limitation, Sections 3.8 and 3.9 of this Annex I).

3.6    Structuring and Availability Fee.    Concurrently with its execution and delivery of the Agreement, the Sellers shall pay Buyer a structuring fee (the "Structuring Fee") in an amount equal to $1,750,000 (such amount representing one and one-quarter percent (1.25%) of the Facility Amount). On the Remittance Date of each calendar month, in the event that the aggregate Purchase Price of all Transactions outstanding on such Remittance Date is less than $100,000,000, the Sellers shall pay Buyer an availability fee (the "Availability Fee") in an amount equal to one twelfth (1/12), multiplied by one-quarter of one percent (0.25%), multiplied by the amount (if any) by which the aggregate Purchase Price of all Transactions outstanding on such Remittance Date is less than $140,000,000. Notwithstanding the foregoing, the Sellers shall not be required to pay any Availability Fee with respect to the first Pricing Rate Period in the event that the aggregate Purchase Price of all Transactions outstanding exceeds $100,000,000 throughout the period commencing on the date two weeks after the date hereof and ending on the first Remittance Date.

3.7    Alternative Rate.    If prior to the first day of any Pricing Rate Period with respect to any Transaction, (i) Buyer shall have determined (which determination shall be conclusive and binding upon the Sellers) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the LIBO Rate for such Pricing Rate Period, or (ii) the LIBO Rate determined or to be determined for such Pricing Rate Period will not adequately and fairly reflect the cost to Buyer (as determined and certified by Buyer) of making or maintaining Transactions during such Pricing Rate Period, Buyer shall give telecopy or telephonic notice thereof to the Sellers as soon as practicable thereafter. If such notice is given, the Pricing Rate with respect to such Transaction for such Pricing Rate Period, and for any subsequent Pricing Rate Periods until such notice has been withdrawn by Buyer, shall be a per annum rate (the "Alternative Rate") determined based on an index approximating the behavior of LIBOR as reasonably determined by Buyer (which may be the Prime Rate); provided, that in the

14

event that the Buyer shall have determined that the Transactions shall be converted to Alternative Rate Transactions, the Sellers shall have the right to terminate all Transactions and terminate this facility without payment of an Exit Fee.

3.8    Changes of Law. Notwithstanding any other provision herein, if the adoption of or any change in any Requirement of Law or in the interpretation or application thereof shall make it unlawful for Buyer to effect Transactions as contemplated by the Transaction Documents, (a) the commitment of Buyer hereunder to enter into new Transactions and to continue Transactions as such shall forthwith be canceled, and (b) the Transactions then outstanding shall be converted automatically to Alternative Rate Transactions on the last day of the then current Pricing Rate Period or within such earlier period as may be required by law. If any such conversion of a Transaction occurs on a day that is not the last day of the then current Pricing Rate Period with respect to such Transaction, the Sellers shall pay to Buyer such amounts, if any, as may be required pursuant to Section 3.9 of this Annex I. Upon any such cancellation of the Buyer's commitment, the Sellers shall have no obligation to pay any Exit Fee or Availability Fees for the period following such cancellation.

3.9    Cost Indemnification. Upon demand by Buyer, the Sellers shall indemnify Buyer and hold Buyer harmless from any net loss or expense (not to include any lost profit or opportunity) (including, without limitation, reasonable attorneys' fees actually incurred and disbursements) that Buyer may sustain or incur as a consequence of (i) default by the Sellers in terminating any Transaction after the Sellers have given a notice in accordance with Section 3.4 of a termination of a Transaction, (ii) payment of the Repurchase Price on any day other than a Remittance Date (including, without limitation, any such loss or expense in the nature of a breakage cost attributable thereto arising from the reemployment of funds obtained by Buyer to maintain Transactions hereunder or from fees payable to terminate the deposits from which such funds were obtained) or (iii) default by the Sellers in selling Eligible Securities after the Sellers have notified Buyer of a proposed Transaction and Buyer has agreed to purchase such Eligible Securities in accordance with the provisions of this Agreement. As a condition to the Sellers' liability under this paragraph, Buyer shall promptly deliver to the Sellers a certificate as to such costs, losses, damages and expenses, setting forth the calculations therefor and including any available supporting documentation, which certificate shall be conclusive and binding on the Sellers in the absence of manifest error.

3.10    Increased Cost. If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof by any Governmental Authority or compliance by Buyer with any directive from any central bank or other Governmental Authority having jurisdiction over Buyer made subsequent to the date hereof shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of Buyer that is not otherwise included in the determination of the LIBO Rate hereunder;

and the result of any of the foregoing is to increase the cost to Buyer by an amount that Buyer deems to be material, of entering into, continuing or maintaining Transactions or to reduce any amount receivable under the Transaction Documents in respect thereof; then, in any such case, the Sellers shall promptly pay Buyer, upon its demand, any additional amounts necessary to

compensate Buyer for such increased cost or reduced amount receivable. If Buyer becomes entitled to claim any additional amounts pursuant to this Section 3.9, it shall promptly notify the Sellers of the event by reason of which it has become so entitled. As a condition to the Sellers' liability under this paragraph, Buyer shall promptly deliver to the Sellers a certificate as to the calculation of any additional amounts payable pursuant to this subsection and including any available supporting documentation, which certificate shall be conclusive and binding upon the Sellers in the absence of manifest error. This covenant shall survive the termination of the Agreement and this Annex I and the repurchase by the Sellers of any or all of the Purchased Securities.

3.11    Regulatory Costs. If Buyer shall have reasonably determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by Buyer or any corporation controlling Buyer with any directive regarding capital adequacy from any Governmental Authority made subsequent to the date hereof does or shall have the effect of reducing the rate of return on Buyer's or such corporation's capital as a consequence of its obligations hereunder to a level below that which Buyer or such corporation could have achieved but for such adoption, change or compliance by an amount that is deemed by Buyer to be material, then from time to time, after submission by Buyer to the Sellers of a written request therefore, the Sellers shall pay to Buyer such additional amount or amounts as will compensate Buyer for such reduction. As a condition to the Sellers' liability under this paragraph, Buyer shall promptly deliver to the Sellers a certificate as to the calculation of any additional amounts payable pursuant to this subsection and including any available supporting documentation, which certificate shall be conclusive and binding upon the Sellers in the absence of manifest error. This covenant shall survive the termination of the Agreement and this Annex I and the repurchase by the Sellers of any or all of the Purchased Securities.

4.    **MARGIN MAINTENANCE**

4.1    Paragraphs 4(a) and 4(b) of the Agreement are hereby modified in their entirety to read as follows:

(a) If at any time, the aggregate Market Value of any of the Purchased Securities shall be less than Buyer's Margin Amount for such Purchased Securities (such deficiency, a "Margin Deficit"), then Buyer may by notice to the Sellers require the Sellers to transfer to Buyer (A) cash, Cash Equivalents, Eligible Securities (in the case of Eligible Securities other than Designated Securities, subject to Buyer's approval and valuation, in Buyer's discretion), Marketable Securities, a letter of credit acceptable to Buyer in its sole and absolute discretion or other collateral acceptable to Buyer in its sole and absolute discretion, in an amount not less than the Margin Deficit, so that the sum obtained by adding the Market Value of such Purchased Securities plus other collateral shall equal or exceed the aggregate of Buyer's Margin Amount for all Transactions, as of the same date. The Sellers' failure to cure any Margin Deficit as required by the preceding sentence shall constitute an Event of Default under the Transaction Documents and shall entitle

16

Buyer to exercise its remedies under Section 13 of Annex I (including, without limitation, the liquidation remedy provided for in Section 13.2.4 of Annex I).

(b) If any time the aggregate Market Value of any Purchased Security in any Rating Category multiplied by the Original Purchase Percentage for such Rating Category, as such Original Purchase Percentage may be adjusted in accordance with this Agreement, shall be greater than the aggregate Repurchase Price for the Transaction relating to such Purchased Security (a "Margin Excess") then the Sellers may by notice to Buyer require Buyer to transfer to the Sellers cash in an amount (expressed in dollars) up to the Margin Excess; provided, that any such transfer of cash (1) shall not be in an amount less than $1,000,000, and (2) shall be evidenced by amended and restated Confirmations.

4.2    If any notice is given by Buyer under Paragraph 4(a) of the Agreement at or before the Margin Notice Deadline on any Business Day, the Sellers shall transfer Marketable Securities, cash, a letter of credit or other acceptable collateral as provided in Paragraph 4(a) no later than the close of business in the relevant market on the same Business Day. If any such notice is given after the Margin Notice Deadline, the Sellers shall transfer such Marketable Securities, Eligible Securities, Cash Equivalents, cash, additional collateral or letter of credit no later than the close of business in the relevant market on the next Business Day following such notice. If any notice is given by the Sellers under Paragraph 4(b) of the Agreement prior to the close of business on any Business Day, then Buyer shall transfer cash no later than the close of business in the relevant market on the second following Business Day. Notice required pursuant to Paragraph 4(a) or 4(b) of the Agreement may be given by any means of telecopier or telegraphic transmission and shall be delivered in accordance with the terms of the Agreement. The failure of Buyer or the Sellers, on any one or more occasions, to exercise its rights under Paragraph 4(a) or 4(b) of the Agreement shall not change or alter the terms and conditions to which the Agreement is subject or limit the right of Buyer or the Sellers to do so at a later date. Buyer and the Sellers agree that any failure or delay by either party to exercise its rights under Paragraph 4(a) or 4(b) of the Agreement shall not limit such party's rights under the Agreement or otherwise existing by law or in any way create additional rights for such party.

4.3    Paragraph 4(d) of the Agreement is hereby modified in its entirety to read as follows:

(d) Any cash transferred to Buyer or the Sellers pursuant to Paragraph 4(a) or 4(b) of the Agreement with respect to any Purchased Securities shall be attributed to the relevant Transaction.

4.4    Paragraphs 4(e) and 4(f) of the Agreement is hereby deleted in its entirety.


5.    **INCOME PAYMENTS AND PRINCIPAL PAYMENTS**

The provisions of Paragraph 5 of the Agreement are hereby modified and superseded in their respective entireties by the following provisions of this Section 5:

5.1    Cash Management Account. The Cash Management Account shall be established by the Sellers concurrently with the execution and delivery of the Agreement and this Annex I by the

Sellers and Buyer.  Buyer shall have sole dominion and control over the Cash Management Account.  The Sellers shall cause all Income in respect of the Purchased Securities to be deposited directly into the Cash Management Account.  Such Income shall be applied or distributed by Buyer in accordance with the applicable provisions of <u>Sections 5.2</u> through <u>5.5</u> and <u>14.1.3</u> of this Annex I.

5.2    <u>Direction of Payments</u>.  The Sellers shall deliver to each Trustee under a Purchased Security an irrevocable direction letter in the form attached as <u>Exhibit VII</u> to this Agreement instructing the Trustee to pay all Income under the related Purchased Security to the Cash Management Account, and shall provide to Buyer proof of such delivery.  If a Trustee forwards any Income with respect to a Purchased Security to the Sellers rather than directly to the Cash Management Account, the Sellers shall (i) deliver an additional irrevocable direction letter to the applicable Trustee and make other commercially reasonable efforts to cause such Trustee to forward such amounts directly to the Cash Management Account and (ii) within one Business Day deposit in the Cash Management Account any such amounts.

5.3    <u>Application of Income Payments</u>.  So long as no Event of Default with respect to any Purchased Security shall have occurred and be continuing, all Income received by Buyer in respect of the Purchased Securities (other than Principal Payments) during each Collection Period shall be applied by Buyer on the related Remittance Date as follows:

        5.3.1    first, to remit to Buyer an amount equal to the Price Differential that has accrued and is outstanding as of such Remittance Date;

        5.3.2    second, to remit to Buyer any Availability Fee and any other fees or costs then due and owning; and

        5.3.3    third, to remit to the Sellers the remainder, if any.

5.4    <u>Application of Principal Payments</u>.  So long as no Event of Default with respect to any Purchased Security shall have occurred and be continuing, any Principal Payment received by Buyer in respect of any of the Purchased Securities during each Collection Period shall be applied by Buyer on the Remittance Date in the following order of priority:

        5.4.1    first, to make a payment to Buyer on account of the Repurchase Price of the Purchased Securities in respect of which such Principal Payment has been received, until the Repurchase Price for such Purchased Securities has been reduced to the Target Price for such Purchased Securities as of the date of such payment (as determined by Buyer after giving effect to such Principal Payment);

        5.4.2    second, to make a payment to Buyer on account of the Repurchase Price of any other Purchased Securities as to which the Repurchase Price exceeds the Target Price (for this purpose, making such payment in the order of those Purchased Securities with the largest to smallest excess of the Repurchase Price over the Target Price), until the aggregate Repurchase Price for all of such Purchased Securities has been reduced to the aggregate Target Price for all of the Purchased Securities, as of the date of such payment (as determined by Buyer after giving effect to such Principal Payment);

06-29-2007 09:50

5.4.3    third, to remit to Buyer any Availability Fee and any other fees or costs then due and owing; and

5.4.4    fourth, remit to the Sellers the remainder of such Principal Payment.

5.5    Payments During Default. If an Event of Default shall have occurred and be continuing, all Income received by the Buyer in respect of the Purchased Securities shall be applied by Buyer on the Business Day next following the Business Day on which such funds are deposited in the Cash Management Account as follows:

5.5.1    first, to remit to Buyer an amount equal to the Price Differential that has accrued and is outstanding in respect of all of the Purchased Securities as of such Business Day;

5.5.2    second, to remit to Buyer any Availability Fee and any other fees or costs then due and owing;

5.5.3    third, to make a payment to Buyer pro rata on account of the Repurchase Price of the Purchased Securities until the Repurchase Price for all of the Purchased Securities in all Rating Categories has been reduced to zero; and

5.5.4    fourth, to remit to Sellers the remainder.

6.    **SECURITY INTEREST**

Paragraph 6 of the Agreement is hereby modified in its entirety to read as follows:

The Buyer and the Sellers intend that all Transactions hereunder be sales and purchases to Buyer of the Purchased Securities and not loans from Buyer to the Sellers secured by the Purchased Securities for nontax purposes. However, in the event any such Transaction is deemed to be a loan, each Seller hereby pledges all of its right, title, and interest in, to and under and grants a first priority lien on, and security interest in, all of the following property, whether now owned or hereafter acquired, now existing or hereafter created and wherever located (collectively, the "Collateral") to Buyer to secure the payment and performance of all other amounts or obligations owing to Buyer pursuant to this Agreement and the related documents described herein:

(a)    the Purchased Securities purchased pursuant to this Agreement and all "securities accounts" created in connection therewith (as defined in Section 8-501(a) of the UCC) to which any or all of such Purchased Securities are credited;

(b)    the Cash Management Account created in connection with this Agreement and all monies from time to time on deposit in such Cash Management Account;

(c)    all "general intangibles", "accounts" and "chattel paper" as defined in the UCC relating to or constituting any and all of the foregoing; and

19

(d)    all replacements, substitutions or distributions on or proceeds, payments, Income and profits of, and records (but excluding any financial models or other proprietary information) and files relating to any and all of any of the foregoing.

Buyer's security interest in the Collateral shall terminate only upon termination of the Sellers' obligations under this Agreement and the documents delivered in connection herewith and therewith. For purposes of the grant of the security interest pursuant to Paragraph 6 of the Agreement, the Agreement shall be deemed to constitute a security agreement under the New York Uniform Commercial Code (the "UCC"). Buyer shall have all of the rights and may exercise all of the remedies of a secured creditor under the UCC and the other laws of the State of New York. In furtherance of the foregoing, (a) the Sellers, at their sole cost and expense, shall cause to be filed in such locations as may be necessary to perfect and maintain perfection and priority of the security interest granted hereby, UCC-1 financing statements and continuation statements (collectively, the "Filings"), and shall forward copies of such Filings to Buyer upon completion thereof, and (b) the Seller shall from time to time take such further actions as may be reasonably requested by Buyer to maintain and continue the perfection and priority of the security interest granted hereby (including marking its records and files to evidence the interests granted to Buyer hereunder).

## 7.    PAYMENT, TRANSFER AND CUSTODY

The provisions of Paragraph 7 of the Agreement are hereby modified and superseded in their respective entireties by the following provisions of this Section 7:

7.1    Transfer.  On the Purchase Date for each Transaction, ownership of the related Purchased Securities shall be transferred to Buyer or its designee against the simultaneous transfer of the Purchase Price to an account of the Sellers specified in the Confirmation relating to such Transaction.

7.2    Ownership.  On or prior to the applicable Purchase Date, the Sellers shall deliver the related Purchased Securities re-registered in the name of Buyer or other designee of Buyer (or, subject to the approval of Buyer, endorsed in blank pursuant to documentation sufficient to permit the re-registration of the Purchased Securities by Buyer in the name of Buyer or other designee of Buyer) and Buyer or its other designee shall have all rights of conversions, exchange, subscription and any other rights, privileges and options pertaining to such Purchased Securities as the owner thereof, and in connection therewith, the right to deposit and deliver any and all of such Purchased Securities with any committee, depositary transfer, agent, register or other designated agency upon such terms and conditions as Buyer may determine. The Purchased Securities shall be held by Buyer or its designee, as exclusive bailee and agent for Buyer, either directly or through the facilities of a Relevant System, as "securities intermediary" (as defined in Section 8-102(a)(14) of the UCC and 31 C.F.R. Section 357.2) and credited to the "securities account" (as defined in Section 8-501(a) of the UCC) of Buyer. Buyer, as "entitlement holder" (as defined in Section 8-102(a)(7) of the UCC) with respect to such Purchased Securities, shall be entitled to receive all cash dividends and distributions paid in respect thereof. Any such dividends or distributions with respect to such Purchased Securities received by Seller shall be promptly remitted to the Cash Management Account.

06-29-2007 09:50

7.3    Delivery of Securities.  With respect to the Purchased Securities that shall be delivered or held in uncertificated form and the ownership of which is registered on books maintained by the issuer thereof or its transfer agent, the Sellers shall deliver documentation sufficient to permit the re-registration of the Purchased Securities by Buyer in the name of Buyer or its designee and at the request of Buyer, shall take such other and further steps, and shall execute and deliver such documents or instruments necessary in the reasonable opinion of Buyer, to effect a legally valid transfer to Buyer hereunder.  With respect to such Purchased Securities that shall be delivered or held in definitive, certificated form, the Sellers shall deliver to Buyer or its designee the original of the relevant certificate, registered in the name of Buyer or its designee (or, subject to the approval of Buyer, endorsed in blank pursuant to documentation sufficient to permit the re-registration of the Purchase Securities by Buyer in the name of Buyer or other designee of Buyer. Unless otherwise instructed by Buyer, any delivery of a security or other item of investment property in definitive, certificated form shall be made to the Buyer or its designee.  With respect to such Purchased Securities that shall be delivered through a Relevant System in book entry form and credited to or otherwise held in a securities account, the Sellers shall take such actions necessary to provide instruction to the relevant financial institution or other entity, which instruction shall be sufficient if complied with to register the transfer of such Purchased Securities from the Sellers to Buyer or its designee.  In connection with any account to which such Purchased Securities are credited or otherwise held, the Sellers shall execute and deliver such other and further documents or instruments necessary, in the reasonable opinion of Buyer, to affect a legally valid transfer to Buyer hereunder.  Any account to which such Purchased Securities are credited or otherwise held shall be designated in accordance with Buyer's custodial agreement or such variation thereon as Buyer may direct.  Any delivery of such Portfolio Security in accordance with this paragraph, or any other method acceptable to Buyer, shall be sufficient to cause Buyer to be the "entitlement holder" (as defined in Section 8-102(a)(7) of the UCC) with respect to such Purchased Securities and, if the Transaction is recharacterized as a secured financing, to have a perfected first priority security interest therein. No Purchased Securities, whether certificated or uncertificated, shall remain in the name, or possession, of the Sellers or any of its agents or in any securities account in the name of the Sellers or any of its agents.

7.4    Purchase Date Deliveries.  As a condition to Buyer's purchase of any Securities, the Sellers shall deliver to Buyer on or prior to the Purchase Date with respect to such Securities:

7.4.1    copies of the executed Securitization Documents governing such Securities, and the offering documents related to such Securities, each certified by the related Seller as a true, correct and complete copy of the original document delivered to such Seller;

7.4.2    an instruction letter from the related Seller to the Trustee under such Securitization Documents, instructing the Trustee to remit all sums required to be remitted to the holder of such Securities under such Securitization Document to the Cash Management Account or as otherwise directed in a written notice signed by the related Seller;

7.4.3    copies of all distribution statements, if any, delivered to the Sellers pursuant to such Securitization Documents during the three-month period immediately preceding such Purchase Date; and

7.4.4    any other documents or instruments necessary in the reasonable opinion of Buyer to consummate the sale of such Securities to Buyer or, if such Transaction is recharacterized as a secured financing, to create and perfect in favor of Buyer a valid perfected first priority security interest in such Securities.

7.5    Custodial Delivery; Purchased Securities File.  On or before one Business Day prior to each Purchase Date with respect to each Purchased Security, the related Seller shall deliver or cause to be delivered to Buyer or its designee the Custodial Delivery in the form attached hereto as Exhibit IV.  In connection with each sale, transfer, conveyance and assignment of a Purchased Securities, on or before one Business Day prior to each Purchase Date with respect to such Purchased Securities, the related Seller shall deliver or cause to be delivered and released to the Buyer or its designee the following original documents (collectively, the "Purchased Securities File") pertaining to each of the Purchased Securities identified in the Custodial Delivery delivered therewith:

> A.    the original Security, if certificated, along with an executed stock or bond power;

> B.    The assignment of Purchased Securities sufficient to transfer to Buyer all of Seller's rights, title and interest in and to the Purchased Securities;

> C.    All other documents and instruments evidencing, guaranteeing, insuring or otherwise constituting or modifying or otherwise affecting such Purchased Securities, or otherwise executed or delivered in connection with, or otherwise relating to, such Purchased Securities;

With respect to all of the Purchased Securities delivered by Seller to Buyer or its designee, the related Seller shall execute an omnibus power of attorney substantially in the form of Exhibit V attached hereto irrevocably appointing Buyer its attorney-in-fact with full power upon the occurrence and during the continuance of an Event of Default to (i) complete and record the re-registration of the Purchased Securities and (ii) take such other steps as may be necessary or desirable to enforce Buyer's rights with respect to such Purchased Securities.  Buyer shall deposit the Purchased Securities Files representing the Purchased Securities, or direct that the Purchased Securities Files be deposited directly, with the Buyer or its designee.  The Purchased Securities Files shall be maintained in accordance with Buyer's custodial agreement.  Any Purchased Securities Files not delivered to Buyer or its designee are and shall be held in trust by the Sellers or their designee for the benefit of Buyer as the owner thereof.  The books and records (including, without limitation, any computer records or tapes) of the Sellers or their respective designees shall be marked appropriately to reflect clearly the sale of the related Purchased Securities to Buyer.

7.6    Operational Issues.  Unless an Event of Default on the part of the Sellers shall have occurred and be continuing, Buyer shall exercise all voting and corporate rights with respect to the Purchased Securities in accordance with the related Seller's written instructions, provided, however, that Buyer shall not be required to follow the related Seller's instructions concerning any vote or corporate right if doing so would, in Buyer's good faith reasonable business judgment, impair the Purchased Securities or be inconsistent with or result in any violation of

22

any provision of the Transaction Documents.  Upon the occurrence and during the continuation of an Event of Default on the part of the Sellers, Buyer shall be entitled to exercise all voting and corporate rights with respect to the Purchased Securities without regard to any Seller's instructions.

7.7      Custody.  With respect to the Securities Files delivered to the Buyer, the Buyer shall, or shall cause its designee to, segregate and maintain continuous custody of the Securities Files in secure and fire-resistant facilities in accordance with customary standards for such custody. Upon the payment of the Repurchase Price for each Transaction, the Buyer shall, or shall cause its designee to, release to the Seller or its designee the related Securities Files with respect to the designated Securities.

## 8.      SALE, TRANSFER, HYPOTHECATION OR PLEDGE OF PURCHASED SECURITIES

The provisions of Paragraph 8 of the Agreement are hereby modified and superseded in their respective entireties by the following provisions of this Section 8:

8.1      Title to all Purchased Securities shall pass to Buyer on the applicable Purchase Date, and Buyer shall have free and unrestricted use of all Purchased Securities.  Subject to Section 8.2, nothing in the Agreement or any other Transaction Document shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging, repledging, hypothecating, or rehypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations under Section 16 or Buyer's obligations to transfer the Purchased Securities to Seller pursuant to Sections 3 or 13 of this Annex I or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, the Sellers pursuant to Section 5 hereof.

8.2      Notwithstanding anything to the contrary provided herein or in any related Transaction Document, absent a default by the Sellers, the Buyer may not cause the Purchased Securities to be sold or otherwise divest the Sellers of ownership of the Purchased Securities for U.S. federal income tax purposes, it being understood that a pledge of the Purchased Securities by the Buyer that does not permit the transferee to transfer the Purchased Securities, or a repurchase agreement with respect to the Purchased Securities that is treated as a financing for U.S. federal income tax purposes, shall not cause the Purchased Securities to be sold or otherwise divest the Seller of ownership of the Purchased Securities for U.S. federal income tax purposes.

8.3      Notwithstanding anything to the contrary provided herein or in any related Transaction Document, the Buyer and the Sellers agree to treat each Transaction as a loan by the Buyer to the Sellers that is secured by the Purchased Securities for U.S. federal income tax purposes unless otherwise required by law.

8.4      All Purchased Securities in the possession of Buyer shall be segregated from other securities in its possession and shall be identified as subject to this Agreement.  Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation.

9.    **SUBSTITUTION**

Paragraph 9 of the Agreement ("Substitution") is hereby deleted in its entirety and replaced by the following:

> In the case of any Transaction for which the Repurchase Date is other than the Business Day immediately following the Purchase Date and with respect to which Seller does not have any existing right to substitute substantially the same Eligible Securities for the Purchased Securities, the Sellers shall have the right, subject to the proviso to this sentence, upon notice to Buyer, which notice shall be given at or prior to 10:00 a.m. (New York time) on such Business Day, to substitute substantially the same Eligible Securities for any Purchased Securities, respectively, provided, however, that Buyer may elect, in the exercise of its good faith business judgment, by the close of business on the Business Day notice is received, or by the close of the next Business Day if notice is given after 10:00 a.m. (New York time) on such day, not to accept a substitution of Additional Securities. In the event such substitution is accepted by Buyer, such substitution shall be made by the related Seller's transfer to Buyer of such other Eligible Securities and Buyer's transfer to the Sellers of such Purchased Securities, and after substitution, the substituted Eligible Securities shall be deemed to be Purchased Securities, respectively. In the event Buyer elects not to accept such substitution, Buyer shall offer the Sellers the right to terminate the Transaction.

10.    **REPRESENTATIONS**

10.1    In addition to the representations and warranties appearing in Paragraph 10 of the Agreement, each Seller represents and warrants to Buyer that as of the Purchase Date for the purchase of any Purchased Securities by Buyer from the Sellers and any Transaction thereunder and at all times while any Transaction thereunder is in full force and effect:

10.1.1    Organization. Each Seller is duly organized, validly existing and in good standing under the laws and regulations of the state of Seller's organization and is duly licensed, qualified, and in good standing in every state where such licensing or qualification is necessary for the transaction of Seller's business. Seller has the power to own and hold the assets it purports to own and hold, and to carry on its business as now being conducted and proposed to be conducted, and has the power to execute, deliver, and perform its obligations under the Agreement and the other Transaction Documents.

10.1.2    Due Execution; Enforceability. The Transaction Documents have been duly executed and delivered by each Seller, for good and valuable consideration. The Transaction Documents constitute the legal, valid and binding obligations of each Seller, enforceable against Seller in accordance with their respective terms subject to bankruptcy, insolvency, and other limitations on creditors' rights generally and to equitable principles.

10.1.3    Non-Contravention. Neither the execution and delivery of the Transaction Documents, nor consummation by the Sellers of the transactions contemplated by the Transaction Documents (or any of them), nor compliance by the Sellers with the terms, conditions and provisions of the Transaction Documents (or any of them) will conflict with or

NY\1297055.4

result in a breach of any of the terms, conditions or provisions of (i) the organizational documents of each Seller, (ii) any material contractual obligation to which each Seller is now a party or the rights under which have been assigned to a Seller or the obligations under which have been assumed by a Seller or to which the assets of a Seller are subject or constitute a default thereunder, or result thereunder in the creation or imposition of any lien upon any of the assets of a Seller, other than pursuant to the Transaction Documents, (iii) any judgment or order, writ, injunction, decree or demand of any court applicable to such Seller, or (iv) any applicable Requirement of Law. Each Seller has all necessary licenses, permits and other consents from Governmental Authorities necessary to acquire, own and sell the Purchased Securities and for the performance of its obligations under the Transaction Documents.

10.1.4 <u>Litigation; Requirements of Law</u>. There is no action, suit, proceeding, investigation, or arbitration pending or, to the best knowledge of each Seller, threatened against such Seller or any of its assets, that may result in any material adverse change in the business, operations, financial condition, properties, or assets of such Seller that may have an adverse effect on the validity of the Transaction Documents or the Purchased Securities or any action taken or to be taken in connection with the obligations of Seller under any of the Transaction Documents. Each Seller is in compliance in all material respects with all Requirements of Law. No Seller is in default in any material respect with respect to any judgment, order, writ, injunction, decree, rule or regulation of any arbitrator or Governmental Authority.

10.1.5 <u>No Broker</u>. Except as disclosed to Buyer, no Seller has dealt with any broker, investment banker, agent, or other Person (other than Buyer or an Affiliate of Buyer) who may ·be entitled to any commission or compensation in connection with the sale of Purchased :Securities pursuant to any of the Transaction Documents. Each Seller shall pay the fee of any broker, investment banker, agent or other person with whom it has dealt.

10.1.6 <u>Good Title to Purchased Securities</u>. Immediately prior to the purchase of any Purchased Securities by Buyer from the related Seller, such Purchased Securities were free and clear of any lien, encumbrance or impediment to transfer (including any "adverse claim" as defined in Section 8-102(a)(1) of the UCC), and such Seller is the record and beneficial owner of and has good and marketable title to and the right to sell and transfer such Purchased Securities to Buyer and, upon transfer of such Purchased Securities to Buyer, Buyer shall be the owner of such Purchased Securities free of any adverse claim. In the event the related Transaction is recharacterized as a secured financing of the Purchased Securities, the provisions of the Agreement are effective to create in favor of Buyer a valid security interest in all rights, title and interest of such Seller in, to and under the Collateral and Buyer shall have a valid, perfected first priority security interest in the Purchased Securities (and without limitation on the foregoing, Buyer, as entitlement holder, shall have a "security entitlement" to the Purchased Securities).

10.1.7 <u>No Default</u>. No Default or Event of Default exists under or with respect to the Transaction Documents or any other outstanding credit facility, repurchase facility or warehouse line of credit in a manner that would constitute an Event of Default under <u>Section 13.1.9</u> hereof.

10.1.8 <u>Representations in Securitization Documents</u>. All of the Purchased Securities have been validly issued and are fully paid and non-assessable and not subject to preemptive rights and have been offered, issued and sold in compliance with all Requirements of Law. To

the extent that an Affiliate of any Seller is a party thereto, the Securitization Documents are genuine, in full force and effect and ( with respect to each Securitization Document other than the offering documents) the legal, valid and binding obligation of such Affiliate enforceable in accordance with their terms. The Securitization Documents have not been altered or modified in any material respect, except as disclosed to Buyer in writing. No Seller has waived the performance of any action or any default, breach or violation resulting from action or inaction under a Securitization Document and has not been made aware of any such waiver. Except as disclosed to Buyer in writing, there is no default, breach, violation or event of acceleration existing under a Securitization Document and no event has occurred that, with the passage of time or giving of notice or both and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration thereunder. Each Purchased Security is freely assignable and the related Securitization Document permits the related Seller to sell, assign or pledge such Purchased Security. With respect to each Transaction, each Seller shall further make the representations set forth on Exhibit IX hereto.

10.1.9 <u>Adequate Capitalization; No Fraudulent Transfer</u>. Each Seller has, as of such Purchase Date, adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations. Seller is generally able to pay, and as of the date hereof is paying, its debts as they come due. No Seller has become, or is presently, financially insolvent nor will any Seller be made insolvent by virtue of such Seller's execution of or performance under any of the Transaction Documents within the meaning of the bankruptcy laws or the insolvency laws of any jurisdiction. No Seller has entered into any Transaction Document or any Transaction pursuant thereto in contemplation of insolvency or with intent to hinder, delay or defraud any creditor.

10.1.10 <u>Consents</u>. No consent, approval or other action of, or filing by any Seller with, any Governmental Authority or any other Person is required to authorize, or is otherwise required in connection with, the execution, delivery and performance of any of the Transaction Documents (other than consents, approvals and filings that have been obtained or made, as applicable).

10.1.11 <u>Organizational Documents</u>. Each Seller has delivered to Buyer certified copies of its organizational documents, together with all amendments.

10.1.12 <u>No Encumbrances</u>. There are (i) no outstanding rights, options, warrants or agreements on the part of the Sellers for a purchase, sale or issuance, in connection with which Seller shall repurchase the Purchased Securities, except for sales in connection with which Seller shall repurchase the relevant Purchased Security from Buyer pursuant to the terms of hereof, (ii) no agreements on the part of the Sellers to issue, sell or distribute the Purchased Securities, and (iii) no obligations on the part of the Sellers (contingent or otherwise) to purchase, redeem or otherwise acquire any securities or any interest therein or to pay any dividend or make any distribution in respect of the Purchased Securities.

10.1.13 <u>Federal Regulations</u>. No Seller is (A) an "investment company," or a company "controlled by an investment company," within the meaning of the Investment Company Act of 1940, as amended, or (B) a "holding company," or a "subsidiary company of a holding company," or an "affiliate" of either a "holding company" or a "subsidiary company of a holding

company," as such terms are defined in the Public Utility Holding Company Act of 1935, as amended.

10.1.14  Taxes. Each Seller has filed or caused to be filed all material tax returns that to the knowledge of such Seller would be delinquent if they had not been filed on or before the date hereof and has paid all material taxes shown to be due and payable on or before the date hereof on such returns or on any assessments made against it or any of its property and all other material taxes, fees or other charges imposed on it and any of its assets by any Governmental Authority except for any such taxes as are being appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided; no material tax liens have been filed against any of such Seller's assets and, to such Seller's knowledge, no claims are being asserted with respect to any such taxes, fees or other charges.

10.1.15  ERISA. The Sellers do not have any Plans or any ERISA Affiliates and makes no contributions to any Plans or any Multiemployer Plans.

10.1.16  Judgments/Bankruptcy. There are no judgments against Sellers collectively for the payment of money in an amount greater than or $5,000,000 individually or in the aggregate which have remained undischarged or unpaid for a period of 30 days, during which period execution of such judgment is not effectively stayed and no Act of Insolvency has ever occurred with respect to Seller.

10.1.17  Full and Accurate Disclosure. No information contained in the Transaction Documents, or in any written statement furnished by or on behalf of the Sellers pursuant to the terms of the Transaction Documents, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading in light of the circumstances under which they were made.

10.1.18  Financial Information. All financial data concerning the Sellers and the Purchased Securities that has been delivered by or on behalf of the Sellers to Buyer is true, complete and correct in all material respects and has been prepared in accordance with GAAP. Since the delivery of such data, except as otherwise disclosed in writing to Buyer, there has been no change in the financial position of Seller or the Purchased Securities, or in the results of operations of Seller, which change is reasonably likely to have in a material adverse effect on Seller.

10.1.19  Chief Executive Office. On the date of the Agreement, each Seller's chief executive office and principal place of business is located at 538 Broadhollow Rd., Melville, New York. The location where each Seller keeps its books and records, including all computer tapes and records relating to the Collateral is its chief executive office.

10.1.20  Safe Harbors. Sellers acknowledge that:

A.     This agreement is a "master netting agreement" under the U.S. Bankruptcy Code (the "Bankruptcy Code"), and a "netting contract" as defined in the netting provisions of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA");

27

B.    This Agreement and each Transaction is of a type set forth in Section 561(a)(1)-(5) of the Bankruptcy Code;

C.    Buyer is a "master netting agreement participant," a "financial institution," a "financial participant," a "forward contract merchant" and a "swap participant" as defined in the Bankruptcy Code, and a "financial institution" as defined in the netting provisions of FDICIA;

D.    The remedies provided herein are the remedies referred to in Section 561(a), Section 362(b)(6), (7), (17) and (27), and Section 362(o) of the Bankruptcy Code, and in Section 11(e)(8)(A) and (C) of the Federal Deposit Insurance Act;

E.    All transfers of cash, securities or other property under or in connection with this Agreement or any Transaction are "margin payments," "settlement payments" and "transfers" under Sections 546(e), (f), (g) or (j), and under Section 548(d)(2) of the Bankruptcy Code; and

F.    Each obligation under or in connection with this Agreement or any Transaction is an obligation to make a "margin payment," "settlement payment" and "payment" within the meaning of Sections 362, 560 and 561 of the Bankruptcy Code.

10.2    On the Purchase Date for any Transaction, the Sellers shall be deemed to have made all of the representations set forth in Section 10.1 of this Annex I as of such Purchase Date.

11.    **NEGATIVE COVENANTS OF SELLER**

On and as of the date hereof and each Purchase Date and until the Agreement and this Annex I are no longer in force with respect to any Transaction, no Seller shall, without the prior written consent of Buyer:

11.1    Title.  Take any action that would directly or indirectly impair or adversely affect Buyer's title (subject to the provisions of Sections 8.2 and 8.3) to the Purchased Securities;

11.2    Transfers.  While any Purchased Security is subject to a Transaction hereunder, transfer, assign, convey, grant, bargain, sell, set over, deliver or otherwise dispose of, or pledge or hypothecate, directly or indirectly, any interest in the Purchased Securities (or any of them) to any Person other than Buyer, or engage in repurchase transactions or similar transactions with respect to the Purchased Securities (or any of them) with any Person other than Buyer;

11.3    Encumbrance.  Create, incur or permit to exist any lien, encumbrance or security interest in or on the Purchased Securities, except as described in Paragraph 6 of the Agreement; or create, incur or permit to exist any lien, encumbrance or security interest in or on any of the other Collateral subject to the security interest granted by Seller pursuant to Paragraph 6 of the Agreement;

28

11.4    Fundamental Changes.  Modify any of the organizational documents of the Sellers which change is reasonably likely to have a material adverse effect on such Seller or fail to maintain its corporate or limited liability company existence;

11.5    Securitization Changes.  Consent or assent to any amendment or supplement to, or termination of, any Securitization Document, or other material agreement or instrument relating to the Purchased Securities other than in accordance with Section 7.6;

11.6    Securitization Actions After Default.  At any time after an Event of Default on the part of Seller has occurred and is continuing, vote or take any action to permit any rights afforded to a holder of the Purchased Securities under the related Securitization Documents; or

11.7    Actions after Default. After the occurrence and during the continuation of a Default or Event of Default that is continuing, the Sellers shall not make any payment on account of, or set apart assets for, a sinking or other analogous fund for the purchase, redemption, defeasance, retirement or other acquisition of any equity interest of the Sellers, whether now or hereafter outstanding, or make any other distribution or dividend in respect of any of the foregoing or to any shareholder or equity owner of the Sellers, either directly or indirectly, whether in cash or property or in obligations of the Sellers or any of the Sellers' consolidated Subsidiaries. Notwithstanding the foregoing, upon the occurrence of a Default or Event of Default, the Sellers may make such distributions or dividends (and only such distributions or dividends) in cash or property that are reasonably necessary for AHMIC to maintain its status as a REIT under the Code and not to be subject to corporate level tax based on income or to excise tax under Section 4981 of the Code.

12.    **AFFIRMATIVE COVENANTS OF SELLER**

12.1    Notice of Adverse Changes.  Each Seller shall promptly notify Buyer of any material adverse change in its business operations and/or financial condition, provided, however, that nothing in this Section 12 shall relieve such Seller of its obligations under the Agreement.  Each Seller shall promptly notify Buyer of (a) any acceleration of indebtedness in excess of $10,000,000; (b) any event or circumstance that could cause a material adverse change in the business, operations, corporate structure or financial condition, creditworthiness or prospects of Seller, (c) the entering of any judgment (whether or not appealable) against such Seller in excess of $3,000,000 and unpaid or uncured for 60 days, and (d) as any material adverse development with respect to litigation or the filing of material new litigation against Seller or any Affiliate

12.2    Representations.  Each Seller shall provide Buyer with copies of such documents as Buyer may reasonably request evidencing the truthfulness of the representations set forth in Section 10.

12.3    Defense of Collateral.  Each Seller shall (1) defend the right, title and interest of Buyer in and to the Collateral against, and take such other action as is necessary to remove, the Liens, security interests, claims and demands of all Persons (other than security interests by or through Buyer) and (2) at Buyer's reasonable request, take all action necessary to ensure that Buyer will have a first priority security interest in the Purchased Securities subject to any of the Transactions in the event such Transactions are recharacterized as secured financings.

29

12.4    Compliance with Transaction Documents.  The Sellers shall observe, perform and satisfy all the terms, provisions, covenants and conditions required to be observed, performed or satisfied by it, and shall pay when due all costs, fees and expenses required to be paid by it, under the Transaction Documents.  Each Seller shall pay and discharge all material taxes, levies, liens and other charges on its assets and on the Collateral that, in each case, in any manner would create any lien or charge upon the Collateral, except for any such taxes as are being appropriately contested in good faith by appropriate proceedings diligently conducted and with respect to which adequate reserves have been provided in accordance with GAAP.

12.5    Financial Covenants.

   12.5.1  Maintenance of Tangible Net Worth.  AHMIC shall maintain a Tangible Net Worth at all times of not less than the sum of (i) $914,000,000 plus (ii) an amount equal to 75% of any Equity Proceeds.

   12.5.2  Maintenance of Liquidity.  AHMIC shall maintain at all times, (a) cash, (b) Cash Equivalents, (c) unencumbered and unpledged Marketable Securities (valued in accordance with Exhibit VIII) and (d) Unfunded Margin Amount, in an aggregate amount of not less than $75,000,000.

   12.5.3  Profitability.  AHMIC shall not permit, for any two consecutive fiscal quarters, Net Income for such period, before income taxes for such period and distributions made during such period, to be less than $1.00.

12.6    Change of Location.  Each Seller shall advise Buyer in writing of the opening of any new chief executive office or the closing of any such office and of any change in Seller's name or the places where the books and records pertaining to the Purchased Securities are held not less than 15 Business Days prior to taking any such action.

12.7    Financial Reporting/Compliance Reporting.  Within 15 days after each month end, the Sellers shall deliver to Buyer a compliance certificate certifying compliance with all covenants contained herein, including (with specificity) all financial covenants, and a monthly reporting package containing all information set forth on Exhibit III attached hereto.  Sellers shall also provide to Buyer the following financial information:

   12.7.1  Within 15 days after the last day of each fiscal quarter, a schedule identifying the parties, facility commitment amount, and maturity date, as well as the total amount outstanding and total undrawn availability in the aggregate with respect to all indebtedness, including master repurchase facilities of the Sellers and their Affiliates;

   12.7.2  Within 45 days after the last day of each of the first three fiscal quarters in any fiscal year, the Sellers's consolidated statements of income and statements of changes in cash flow for such quarter and balance sheets as of the end of such quarter, in each case presented fairly in accordance with GAAP and certified as being true and correct by an officer's certificate; and

   12.7.3  Within 90 days after the last day of its fiscal year, the Sellers's audited consolidated statements of income and statements of changes in cash flow for such year and

NY\1297055.4                                           06-29-2007 09:50

balance sheets as of the end of such year, in each case presented fairly in accordance with GAAP, and accompanied, in all cases, by an unqualified report of a nationally recognized independent certified public accounting firm consented to by Buyer.

12.8    Compliance with Law.  The Sellers shall at all times comply in all material respects with all laws, ordinances, rules and regulations of any federal, state, municipal or other public authority having jurisdiction over the Sellers or any of its assets and the Sellers shall do or cause to be done all things reasonably necessary to preserve and maintain in full force and effect its legal existence, and all licenses material to its business.  the Sellers shall at all times keep proper books of records and accounts in which full, true and correct entries shall be made of its transactions in accordance with GAAP and set aside on its books from its earnings for each fiscal year all such proper reserves in accordance with GAAP.

13.    **EVENTS OF DEFAULT; TERMINATION EVENTS; REMEDIES**

13.1    Defaults.  After the occurrence and during the continuance of an Event of Default on the part of the Sellers (or either of them), each Seller hereby appoints Buyer as attorney-in-fact of such Seller for the purpose of carrying out the provisions of this Agreement and taking any action and executing or endorsing any instruments that Buyer may deem necessary or advisable to accomplish the purposes hereof, which appointment as attorney-in-fact is irrevocable and coupled with an interest.  Furthermore, Paragraph 11 of the Agreement is amended by the deletion of clauses (i) and (vi) in the first paragraph, and by the addition of the following at the end of the first paragraph before the phrase, "(each an 'Event of Default')":

13.1.1  either (A) the Transaction Documents shall for any reason not cause, or shall cease to cause, Buyer to be the owner free of any adverse claim of any of the Purchased Securities, or (B) if a Transaction is recharacterized as a secured financing, the Transaction Documents with respect to any Transaction shall for any reason cease to create a valid first priority security interest in favor of Buyer in any of the Purchased Securities;

13.1.2  failure of Buyer to receive on any Remittance Date the accreted value of the Price Differential (less any amount of such Price Differential previously paid by the Sellers to Buyer) (including, without limitation, in the event the Income paid or distributed on or in respect of the Purchased Securities is insufficient to make such payment and the Sellers do not make such payment or cause such payment to be made) (except that such failure shall not be an Event of Default by the Sellers if sufficient Income, other than Principal Payments, is on deposit in the Cash Management Account) which failure is not remedied within three Business Days;

13.1.3  failure of any Seller to make any other payment owing to Buyer that has become due, whether by acceleration or otherwise under the terms of this Agreement, which failure is not remedied within the applicable period (in the case of a failure pursuant to Paragraph 4 or Section 13.1) or five Business Days (in the case of any other such failure);

13.1.4  any governmental, regulatory, or self-regulatory authority shall have taken any action to remove, limit, restrict, suspend or terminate the rights, privileges, or operations of a Seller, which suspension has a material adverse effect on the financial condition or business operations of the Seller taken as a whole which is not remedied within 30 calendar days;

13.1.5  Buyer shall have determined, in the exercise of its good faith business judgment, (A) that there has been a material adverse change in the business, operations, corporate structure or financial condition of the Sellers; or (B) that a material adverse change in the financial or legal condition of the Sellers is likely to occur due to the pendency of a material legal action against the Sellers taken as a whole;

13.1.6  An Act of Insolvency shall have occurred with respect to any Seller;

13.1.7  any representation made by any Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated (other than the representations and warranties set forth in Sections 10.1.8 or 10.1.17 (in the case of 10.1.17, with respect to the affected Purchased Securities only) made by the Sellers, which shall not be considered an Event of Default if incorrect or untrue in any material respect, provided Seller terminates the related Transaction in whole or in part, as applicable, and repurchases the related Purchased Securities on an Early Repurchase Date no later than three Business Days after receiving notice of such incorrect or untrue representation (unless the Sellers shall have made any such representation with knowledge that it was materially incorrect or untrue at the time made) which is not remedied within 15 calendar days, provided such 15-day period shall apply only if the value or security of such Purchased Securities is not impaired or prejudiced on account of such falsity or inaccuracy;

13.1.8  a final judgment by any competent court in the United States of America for the payment of money in an amount greater than or $5,000,000 shall have been rendered against the Sellers (in the aggregate) and remained undischarged or unpaid for a period of 30 days, during which period execution of such judgment is not effectively stayed;

13.1.9  Any Seller or any of their respective Affiliates shall have defaulted or failed to perform under any note, indenture, loan agreement, repurchase agreement, guaranty, swap agreement or any other contract, agreement or transaction to which it is a party, which default (A) involves the failure to pay a matured obligation, or (B) permits the acceleration of the maturity of obligations by any other party to or beneficiary of such note, indenture, loan agreement, guaranty, swap agreement or other contract agreement or transaction, or such Seller shall breach any covenant or condition, shall fail to perform, admits its inability to perform or state its intention not to perform its obligations under any Transaction or in respect of any repurchase agreement, reverse repurchase agreement, warehouse lending facility, securities contract, derivative transaction, servicing agreement or lease with any party if the default could materially adversely affect the financial condition of such Seller, in each case, relating to relating to any indebtedness in excess of $5,000,000, provided, however, that any such default, failure to perform or breach shall not constitute an Event of Default if the Sellers cures such default, failure to perform or breach, as the case may be, within the grace period, if any, provided under the applicable agreement;

13.1.10  Any Seller enters into any financial or service agreement or engages in any other transaction of a financial nature with an Affiliate of such Seller, other than upon arm's length terms available to unaffiliated third parties generally.

32

13.1.11   Any of the Sellers or Buyer shall breach or fail to perform any of the terms, covenants, obligations or conditions of this Agreement, other than as specifically otherwise referred to in this definition of "Event of Default", and such breach or failure to perform is not remedied within ten calendar days after notice thereof to the Sellers or Buyer from the applicable party or its successors or assigns; provided, that if such breach or failure to perform is a default other than a default that can be cured by the payment of a sum of money and is susceptible of cure but cannot reasonably be cured within such ten calendar days period, such fifteen calendar days period shall be extended to a period of 20 calendar days in total.

13.2   Acceleration and Payment.  Paragraph 11(a)-(i) of the Agreement is hereby deleted and replaced with the following and with this Section 13.2 below:

If an Event of Default shall occur and be continuing with respect to any Seller, the following rights and remedies shall be available to Buyer:

13.2.1   At the option of Buyer, exercised by written notice to the Sellers (which option shall be deemed to have been exercised, even if no notice is given, immediately upon the occurrence of an Act of Insolvency), the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (the date on which such option is exercised or deemed to have been exercised, the "Accelerated Repurchase Date").

13.2.2   If Buyer exercises or is deemed to have exercised the option referred to in Section 13.2.1 of this Annex I:

A.     the Sellers' obligations hereunder to repurchase all Purchased Securities shall become immediately due and payable on and as of the Accelerated Repurchase Date;

B.     to the extent permitted by applicable law, the Repurchase Price with respect to each Transaction (determined as of the Accelerated Repurchase Date) shall be increased by the aggregate amount obtained by daily application of, on a 360 day per year basis for the actual number of days during the period from and including the Accelerated Repurchase Date to but excluding the date of payment of the Repurchase Price (as so increased), (x) the Pricing Rate for such Transaction multiplied by (y) the Repurchase Price for such Transaction (decreased by (I) any amounts actually remitted to Buyer from time to time pursuant to Section 5 of this Annex I and applied to such Repurchase Price, and (II) any amounts applied to the Repurchase Price pursuant to Section 13.2.3 of this Annex I);

C.     In addition to any rights and remedies of Buyer provided by this Agreement and by law, Buyer shall have the right, without prior notice to the Sellers, any such notice being expressly waived by the Sellers to the extent permitted by applicable law, upon any amount becoming due and payable by the Sellers hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at

33

any time held or owing by Buyer or any Affiliate thereof to or for the credit or the account of the Sellers. Buyer agrees promptly to notify the Sellers after any such set-off and application made by Buyer; provided that the failure to give such notice shall not affect the validity of such set-off and application.

13.2.3  After five Business Days' notice to the Sellers (which notice need not be given if an Act of Insolvency shall have occurred with respect to the Sellers, and which may be the notice given under Section 13.2.1 above), Buyer may (A) immediately sell, at a public or private sale in a commercially reasonable manner and at such price or prices as Buyer may reasonably deem satisfactory any or all of the Purchased Securities or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the Sellers credit for such Purchased Securities in an amount equal to the Market Value of such Purchased Securities against the aggregate unpaid Repurchase Price for such Purchased Securities and any other amounts owing by the Sellers under the Transaction Documents. The proceeds of any disposition of Purchased Securities effected pursuant to this Section shall be applied, (u) *first*, to the reasonable costs and expenses incurred by Buyer in connection with the Sellers' default; (v) *second*, to any costs of cover, (w) *third* to the Availability Fee; (x) *fourth*, to the Repurchase Price; (y) *fifth,* to the Exit Fee, if any; and (z) *sixth*, to any other outstanding obligation of the Sellers to Buyer or its Affiliates.

13.2.4  The parties recognize that it may not be possible to purchase or sell all of the Purchased Securities on a particular Business Day, or in a transaction with the same purchaser, or in the same manner because the market for such Purchased Securities may not be liquid. In view of the nature of the Purchased Securities, the parties agree that liquidation of a Transaction .or the Purchased Securities does not require a public purchase or sale and that a good faith private purchase or sale shall be deemed to have been made in a commercially reasonable manner. Accordingly, Buyer may elect, in its sole discretion, the time and manner of liquidating any Purchased Securities, and nothing contained herein shall (A) obligate Buyer to liquidate any Purchased Securities on the occurrence and during the continuance of an Event of Default or to liquidate all of the Purchased Securities in the same manner or on the same Business Day or (B) constitute a waiver of any right or remedy of Buyer.

13.2.5  The Sellers shall be liable to Buyer for (A) the amount of all reasonable expenses, including reasonable legal fees and expenses, actually incurred by Buyer in connection with or as a consequence of an Event of Default with respect to the Sellers, (B) all costs incurred in connection with covering transactions, and (c) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default with respect to the Sellers.

13.2.6  Buyer shall have, in addition to its rights and remedies under the Transaction Documents, all of the rights and remedies provided by applicable federal, state, foreign, and local laws (including, without limitation, if the Transactions are recharacterized as secured financings, the rights and remedies of a secured party under the UCC of the State of New York, to the extent that the UCC is applicable, and the right to offset any mutual debt and claim), in equity, and under any other agreement between Buyer and the Sellers. Without limiting the generality of the foregoing, Buyer shall be entitled to set off the proceeds of the liquidation of the Purchased Securities against all of the Sellers; obligations to Buyer, whether or not such obligations are then due, without prejudice to Buyer's right to recover any deficiency.

34

13.2.7 Buyer may exercise any or all of the remedies available to Buyer immediately upon the occurrence of an Event of Default and at any time during the continuance thereof. All rights and remedies arising under the Transaction Documents, as amended from time to time, are cumulative and not exclusive of any other rights or remedies that Buyer may have.

13.2.8 Buyer may enforce its rights and remedies hereunder without prior judicial process or hearing, and each Seller hereby expressly waives any defenses such Seller might otherwise have to require Buyer to enforce its rights by judicial process. Each Seller also waives any defense Seller might otherwise have arising from the use of nonjudicial process, disposition of any or all of the Purchased Securities, or from any other election of remedies. Each Seller recognizes that nonjudicial remedies are consistent with the usages of the trade, are responsive to commercial necessity and are the result of a bargain at arm's length.

13.3    Change of Control Termination Event.  If a Change of Control of a Seller occurs (a "Termination Event"), the Buyer shall have the right, in its sole discretion, to immediately terminate the Buyer's obligation to enter into any additional Transactions and cause the Sellers to repurchase any Purchased Securities subject to a Transaction hereunder at the Termination Event Put Price within 90 calendar days following receipt of a request therefor from Buyer following the occurrence of a Termination Event.  No Exit Fee shall be payable upon the Sellers repurchase of the Purchased Securities pursuant to a Termination Event.

13.4    Seller's Rights.  If an Event of Default occurs and is continuing with respect to Buyer, the following rights and remedies shall be available to the Sellers:

13.4.1 Upon tender by the Sellers of payment of the aggregate Repurchase Price for all Purchased Securities, Buyer's right, title and interest in such Purchased Securities shall be deemed transferred to the Sellers, and Buyer shall deliver such Purchased Securities to the Sellers.

13.4.2 If the Seller exercises the option referred to in Section 13.4.1 hereof and Buyer fails to deliver any Purchased Securities to the Sellers, after three Business Days' notice to Buyer, the Sellers may (A) purchase securities or loans, as applicable ("Replacement Collateral"), that are in as similar an amount and interest rate as is reasonably practicable and in the same Rating Category as such Purchased Securities or (B) in its sole discretion elect, in lieu of purchasing Replacement Collateral, to be deemed to have purchased Replacement Collateral at a price therefor equal to the Market Value of such Purchased Securities as of such date.

13.4.3 Buyer shall be liable to the Sellers for any excess of the price paid (or deemed paid) by the Sellers for Replacement Collateral therefor over the Repurchase Price for the Purchased Securities replaced thereby.  In addition, Buyer shall be liable to the Sellers for interest at the related Pricing Rate on such remaining liability with respect to each such purchase (or deemed purchase) of Replacement Collateral calculated on a 360-day year basis for the actual number of days during the period from and including the date of such purchase (or deemed purchase) until paid in full by Buyer.

14.    DUE DILIGENCE

Each Seller acknowledges that Buyer has the right to perform continuing due diligence reviews with respect to the Purchased Securities, for purposes of verifying compliance with the representations, warranties and specifications made hereunder, or otherwise, and Seller agrees that upon reasonable prior written notice to the Sellers, Buyer or its authorized representatives will be permitted during normal business hours to examine, inspect, and make copies and extracts of, servicing records and any and all documents, records, agreements, instruments or information relating to such Purchased Securities in the possession or under the control of the Sellers. Upon reasonable prior notice, the Sellers also shall make available to Buyer a knowledgeable financial or accounting officer for the purpose of answering questions respecting the Purchased Securities. Without limiting the generality of the foregoing, Seller acknowledges that Buyer may enter into Transactions with the Sellers based solely upon the information provided by the Sellers to Buyer and the representations, warranties and covenants contained herein, and that Buyer, at its option, has the right at any time to conduct a partial or complete due diligence review on some or all of the Purchased Securities. Each Seller further agrees that the Sellers shall reimburse Buyer for any and all out-of-pocket costs and expenses reasonably incurred by Buyer in connection with Buyer's activities pursuant to this Section 14 ("Due Diligence Costs"), provided that such Due Diligence Costs shall not exceed $25,000 per calendar year unless a Default or Event of Default shall have occurred, in which event Buyer shall have the right to perform due diligence, at the sole expense of the Sellers without regard to the dollar limitation set forth herein.

## 15.    NOTICES AND OTHER COMMUNICATIONS

The provisions of Paragraph 13 of the Agreement are hereby modified and superseded in their respective entireties by the following provisions of this Section 15:

All notices, consents, approvals and requests required or permitted hereunder shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) hand delivery, with proof of attempted delivery, (b) certified or registered United States mail, postage prepaid, (c) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (d) by telecopier (with answerback acknowledged) provided that such telecopied notice must also be delivered by one of the means set forth in (a), (b) or (c) above, to the address specified in Annex II hereto or at such other address and person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section. A copy of all notices, consents, approvals and requests directed to the Sellers (other than Confirmations) shall be delivered concurrently to the following: Alan Horn, American Home Mortgage Investment Corp, 538 Broadhollow Rd., Melville, NY 11747 Telefax: 800 209-7276. A notice shall be deemed to have been given: (a) in the case of hand delivery, at the time of delivery, (b) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day, (c) in the case of expedited prepaid delivery upon the first attempted delivery on a Business Day, or (d) in the case of telecopier, upon receipt of answerback confirmation, if delivered before 5:30 pm recipient local time on a Business Day, and otherwise on the next succeeding Business Day, provided that such telecopied notice was also delivered as required in this Section. A party receiving a notice that does not comply with the technical requirements for notice under this Section may elect to waive any deficiencies and treat the notice as having been properly given.

36

<u>16.</u>    **NON-ASSIGNABILITY**

The provisions of Paragraph 15 of the Agreement are hereby modified and superseded in their respective entireties by the following provisions of this <u>Section 16</u>.

<u>16.1</u>    The rights and obligations of the parties under the Transaction Documents and under any Transaction shall not be assigned by either party without the prior written consent of the other party; <u>provided, however</u>, that Buyer may assign its rights and obligations under the Transaction Documents and/or under any Transaction to any Affiliate whose long term unsecured debt rating is (either directly or indirectly through its being part of a holding company or other form of corporate organization) investment grade by a nationally recognized statistical rating organization, without the prior written consent of Seller.

<u>16.2</u>    Buyer shall be entitled to issue one or more participation interests with respect to any or all of the Transactions; <u>provided, however</u>, that (i) Buyer shall act as exclusive agent for all participants in any dealings with the Sellers in connection with such Transactions and (ii) the Sellers shall not be obligated to deal directly with any party other than Buyer in connection with such Transactions, or to pay or reimburse Buyer for any costs that would not have been incurred by Buyer had no participation interests in such Transactions been issued.

<u>16.3</u>    Subject to the foregoing, the Transaction Documents and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. Nothing in the Transaction Documents, express or implied, shall give to any Person, other than the parties to the Transaction Documents and their respective successors, any benefit or any legal or equitable right, power, remedy or claim under the Transaction Documents.

<u>17.</u>    **CONSENT TO JURISDICTION; WAIVER OF JURY TRIAL**

<u>17.1</u>    Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

<u>17.2</u>    To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from set off or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

<u>17.3</u>    The parties hereby irrevocably waive, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding and irrevocably consent to the service of any summons and complaint and any other process by the

mailing of copies of such process to them at their respective address specified herein.  The parties hereby agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Section shall affect the right of Buyer to serve legal process in any other manner permitted by law or affect the right of Buyer to bring any action or proceeding against Seller or its property in the courts of other jurisdictions.

17.4    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR ANY INSTRUMENT OR DOCUMENT DELIVERED HEREUNDER OR THEREUNDER.

18.    **NO RELIANCE**

Each of Buyer and the Seller hereby acknowledges, represents and warrants to the other that, in connection with the negotiation of, the entering into, and the performance under, the Transaction Documents and each Transaction thereunder:

18.1    It is not relying (for purposes of making any investment decision or otherwise) upon any advice, counsel or representations (whether written or oral) of the other party to the Transaction Documents, other than the representations expressly set forth in the Transaction Documents.

18.2    It has consulted with its own legal, regulatory, tax, business, investment, financial and accounting advisors to the extent that it has deemed necessary, and it has made its own investment, hedging and trading decisions (including decisions regarding the suitability of any Transaction) based upon its own judgment and upon any advice from such advisors as it has deemed necessary and not upon any view expressed by the other party.

18.3    It is a sophisticated and informed Person that has a full understanding of all the terms, conditions and risks (economic and otherwise) of the Transaction Documents and each Transaction thereunder and is capable of assuming and willing to assume (financially and otherwise) those risks;

18.4    It is not acting as a fiduciary or financial, investment or commodity trading advisor for the other party and has not given the other party (directly or indirectly through any other Person) any assurance, guaranty or representation whatsoever as to the merits (either legal, regulatory, tax, business, investment, financial accounting or otherwise) of the Transaction Documents or any Transaction thereunder.

19.    **INDEMNITY**

The Sellers hereby agree to indemnify Buyer, Buyer's designee and each of its officers, directors, employees, members, managing members, agents and shareholders (collectively, "Indemnified Parties") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, stamp, excise, sales or other similar taxes that may be

payable or determined to be payable with respect to any of the Collateral, fees, costs, expenses (including reasonable attorneys fees and disbursements actually incurred) or disbursements (all of the foregoing, collectively "Indemnified Amounts")) that may at any time (including, without limitation, such time as this Agreement shall no longer be in effect and the Transactions shall have been repaid in full) be imposed on or asserted against any Indemnified Party in any way whatsoever arising out of or in connection with, or relating to, this Agreement or any Transactions thereunder or any action taken or omitted to be taken by any Indemnified Party under or in connection with any of the foregoing, provided that Seller shall not be liable for Indemnified Amounts resulting (A) from the gross negligence or willful misconduct of any Indemnified Party or (B) attributable to Buyer's ownership of any Purchased Securities following enforcement of its rights under this Agreement with respect thereto (unless and to the extent such liability relates to an event, circumstance or condition that occurred prior to the enforcement of such rights). The Sellers also agree to reimburse Buyer as and when billed by Buyer for all Buyer's reasonable costs and expenses incurred in connection with Buyer's due diligence reviews with respect to the Purchased Securities (including, without limitation, those incurred pursuant to Section 20) and the enforcement or the preservation of Buyer's rights under this Agreement or any Transaction contemplated hereby, including without limitation the reasonable fees and disbursements of its counsel. The Sellers hereby acknowledge that the obligation of the Sellers hereunder are full recourse obligations of the Sellers.

## 20.    MISCELLANEOUS

20.1    Several Liability/Guaranty. The obligations of the Sellers hereunder are several and AHM LLC shall have no liability for any obligation of AHMIC hereunder. AHMIC hereby guarantees in full the timely payment and performance of each and every obligation of AHM LLC arising hereunder.

20.2    Time of the Essence. Time is of the essence under the Transaction Documents and all Transactions thereunder and all references to a time shall mean New York time in effect on the date of the action unless otherwise expressly stated in the Transaction Documents.

20.3    Cumulative Rights. All rights, remedies and powers of Buyer hereunder and in connection herewith are irrevocable and cumulative, and not alternative or exclusive, and shall be in addition to all other rights, remedies and powers of Buyer whether under law, equity or agreement. In addition to the rights and remedies granted to it in this Agreement, Buyer shall have all rights and remedies of a secured party under the UCC.

20.4    Counterparts. The Transaction Documents may be executed in counterparts, each of which so executed shall be deemed to be an original, but all of such counterparts shall together constitute but one and the same instrument.

20.5    Headings. The headings in the Transaction Documents are for convenience of reference only and shall not affect the interpretation or construction of the Transaction Documents.

20.6    Costs. Without limiting the rights and remedies of Buyer under the Transaction Documents, the Sellers shall pay Buyer's reasonable out-of-pocket costs and expenses, including reasonable fees actually incurred and expenses of accountants, attorneys and advisors, incurred

in connection with the preparation, negotiation, execution and consummation of, and any amendment, supplement or modification to, the Transaction Documents and the Transactions thereunder.  Seller agrees to pay Buyer on demand all costs and expenses (including reasonable expenses actually incurred for legal services of every kind) of any subsequent enforcement of any of the provisions hereof, or of the performance by Buyer of any obligations of Seller in respect of the Purchased Securities, or any actual or attempted sale, or any exchange, enforcement, collection, compromise or settlement in respect of any of the Collateral and for the custody, care or preservation of the Collateral (including insurance costs) and defending or asserting rights and claims of Buyer in respect thereof, by litigation or otherwise.  In addition, Seller agrees to promptly pay all reasonable costs and expenses (including reasonable expenses for legal services actually incurred) incurred in connection with the maintenance of the Cash Management Account and registering the Collateral in the name of Buyer or its nominee.  All such expenses shall be recourse obligations of Seller to Buyer under this Agreement.

20.7    Severability.  Each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or be invalid under such law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

20.8    Security Agreement.  The parties acknowledge and agree that although they intend to treat each Transaction as a sale of the Purchased Securities for non-tax purposes, in the event that such sale shall be recharacterized as a secured financing, this Annex I shall also serve as a security agreement with respect to Buyer's rights in the Collateral.  In order to secure and to provide for the prompt and unconditional repayment of the Repurchase Price and the performance of its obligations under the Agreement, Seller hereby pledges to Buyer and hereby grants to Buyer a first priority security interest in all of its rights in the Purchased Securities.  Seller hereby covenants to duly execute any Form UCC-1 financing statements as reasonably required by Buyer in order to perfect its security interest created hereby in such rights and obligations granted above, it being agreed that Seller shall pay any and all fees required to file such financing statements.

20.9    Integration.  This Agreement contains a final and complete integration of all prior expressions by the parties with respect to the subject matter hereof and thereof and shall constitute the entire agreement among the parties with respect to such subject matter, superseding all prior oral or written understandings.

20.10    Construction.  Should any provision of this Agreement require judicial interpretation, it is agreed that a court interpreting or construing the same shall not apply a presumption that the terms hereof shall be more strictly construed against any Person by reason of the rule of construction that a document is to be construed more strictly against the Person who itself or through its agent prepared the same, it being agreed that all parties have participated in the preparation of this Agreement.

20.11    Securities Contract.  The parties recognize that each Transaction is a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended.

40

IN WITNESS WHEREOF, the parties have executed this Annex I as of the 28 day of June, 2007.

BUYER:

ORIX CAPITAL MARKETS, LLC

By: _____

Name: _____
          Vivian Gu
Title: _____
        President and CEO.
      ORIX Capital Markets, LLC

SELLER:

AMERICAN HOME MORTGAGE
INVESTMENT CORP., a Maryland corporation

By: _____

Name: _____
Title: _____

SELLER:

AHM SPV III, LLC, a Delaware limited liability
company

By: _____

Name: _____
Title: _____

41

IN WITNESS WHEREOF, the parties have executed this Annex I as of the 28 day of June, 2007.

BUYER:

ORIX CAPITAL MARKETS, LLC

By: _____
    Name:_____
    Title:_____

SELLER:

AMERICAN HOME MORTGAGE
INVESTMENT CORP., a Maryland corporation

By: _____
    Name:_____Alan B. Horn_____
    Title:____Executive Vice President____
           General Counsel & Secretary

SELLER:

AHM SPV III, LLC, a Delaware limited liability
company

By: _____
    Name:___Alan B. Horn___
    Title:___Secretary___

41

06-28-2007  10:08