# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ---------------------------------------------------------------- x | |
| In re: | Chapter 11 |
| | |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al., [1] | Case No. 07-11047 (CSS) |
| | Jointly Administered |
| Debtors. | **Response Deadline: March 30, 2010 at 4 p.m. (ET)** |
| | **Hearing Date: April 6, 2010 at 10:30 a.m. (ET)** |
| ---------------------------------------------------------------- x | |

## DEBTORS' SUBSTANTIVE OBJECTION TO SWAP AGREEMENT CLAIM OF ROYAL BANK OF SCOTLAND PLC (CLAIM NO. 8963)

The above-captioned debtors and debtors in possession (the "Debtors") hereby

object (the "Objection") to claim number 8963 filed by Royal Bank of Scotland PLC ("RBS"),

through its agent Greenwich Capital Markets, Inc. ("Greenwich Capital"), (the "Swap Claim",

which is attached hereto as Schedule 1 to the Declaration of Simon Sakamoto in Support of the

Substantive Objection to Swap Agreement Claim of Royal Bank of Scotland PLC (Claim No.

8963) (the "Sakamoto Declaration"), attached hereto as Exhibit B) and request the entry of an

order (substantially in the form attached hereto as Exhibit A) classifying and allowing the Swap

Claim in its entirety as general unsecured claim and limiting RBS's collection on the Swap

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc., a Maryland corporation (f/k/a American Home Mortgage Servicing, Inc.) (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

Claim to its *pro rata* share as a general unsecured creditor.[2]  In support of this Objection, the

Debtors respectfully represent as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper in

this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief sought

herein is section 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rules

3003 and 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## GENERAL BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), the Debtors each filed a

voluntary petition with this Court for relief under chapter 11 of the Bankruptcy Code.  Each

Debtor is continuing to operate its business and manage its properties as a debtor in possession

pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      The Debtors' cases have been consolidated for procedural purposes only

and are being jointly administered pursuant to an order of this Court.

4.      On August 14, 2007, the United States Trustee for the District of Delaware

appointed an Official Committee of Unsecured Creditors (the "Creditors Committee").  On

October 21, 2008, the United States Trustee for the District of Delaware appointed an Official

Committee of Borrowers (the "Borrowers Committee").  No trustee or examiner has been

appointed.

---

[2]    While the Swap Claim is filed as a general unsecured claim, the attachment to the Swap Claim reserves the right to assert that the Debtors are holding collateral of RBS securing the Swap Claim or that RBS owns collateral held by the Debtors.  The instant objection is necessary because RBS has suggested that the Debtors are required to reserve the full amount of the swap claim under the terms of the Plan.

5.      On February 23, 2009, the Court entered an order [Docket No. 7042]

confirming the Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18,

2009 [Docket No. 7029] (the "Plan"). The Plan is not yet effective.

## RELEVANT BACKGROUND

**A.    The Swap Agreement**

6.      American Home Mortgage Investment Corp. ("AHM"), a debtor and

debtor in possession in the above-captioned bankruptcy cases, and RBS, by its agent Greenwich

Capital, are parties (each a "Party" and collectively, the "Parties") to that certain ISDA Master

Agreement dated as of November 12, 2004 (the "Master Agreement"), including that certain

Schedule to the ISDA Master Agreement (the "Schedule") and that certain ISDA Credit Support

Annex (the "CSA") (collectively, the "Swap Agreement", attached hereto as Schedule 2 to the

Sakamoto Declaration). The Master Agreement and the CSA entered into by the parties are

substantially in the form of the documents created and promulgated by the International Swaps

and Derivatives Association, Inc. ("ISDA"). Any changes to the baseline ISDA documents

negotiated between the parties were incorporated into the Swap Agreement through the Schedule

and section 13 of the CSA.[3]

7.      The Swap Agreement provides that, among other things, the Parties may

enter into a number of interest rate swap transactions (each a "Transaction", collectively the

"Transactions"). Since the Debtors held certain assets, such as mortgages on real property,

whose values were determined by fixed interest rates, AHM's primary reason for entering into

the Swap Agreement was to hedge against general interest rate fluctuations in the market. Under

the Swap Agreement, the Parties could enter into a number of separate Transactions that were

---

[3]      As there is no difference between the relevant portions of the form ISDA Master Agreement and Credit Support
Annex and the Master Agreement and CSA entered into by the Parties to the Swap Agreement, those form
documents promulgated by the ISDA will also be referred to herein as the Master Agreement and the CSA.

covered by the terms of that agreement. The value of the Transactions under the Swap Agreement fluctuated daily, and at any given time one Party was "in the money" based upon the relevant interest rate indicators for that day. The final value of any given Transaction, however, would be determined upon the date of termination of that Transaction, whether that date occurred by expiration of the contractual term or by Early Termination following notice of an Event of Default[4]. The Party that was in the money at the time of the termination of that Transaction would be owed that amount under the terms of the Swap Agreement.

        8.     In order to hedge against the credit default risk of the opposing Party, the Party that was in the money at a given time (the "Secured Party") could, subject to certain terms and conditions and often on a daily basis, request the delivery of collateral, usually cash or securities, (the "Swap Collateral") to secure the potential payment obligations of the Party (the "Pledgor") that was "out of the money" at that time under the Swap Agreement.

        9.     On April 30, 2007, cash was sent to AHM as Swap Collateral under the terms of the Swap Agreement, in the amount of $1,168,000 (the amount of cash Swap Collateral outstanding at any give time, the "Cash Collateral"). The amount of the Cash Collateral fluctuated, often daily, with RBS wiring additional Cash Collateral to the Debtors' general operating account with Citibank (the "Citi Prime Brokerage Account") and the Debtors wiring cash from that account to RBS based on the daily valuation of the Transactions under the Swap Agreement. On July 26, 2007, the final outstanding balance of Cash Collateral was $4,780,378.

        10.    The Citi Prime Brokerage Account was the primary account of AHM and was used for practically all operational and financial obligations of AHM. With hundreds of wires of funds in and out of the Citi Prime Brokerage Account on a daily basis, the Debtors had

---

[4]   Capitalized terms not defined herein shall have the meanings ascribed to them in the Swap Agreement.

                                        

no ability to track specific cash in the account. In the ordinary course of business, the Debtors generally kept the net cash balance of the Citi Prime Brokerage Account negative or close to zero, as any cash in that account would be used to pay off debt or invested, generally on a daily basis, in a variety of instruments that would bear a higher interest rate than the cash in the Citi Prime Brokerage Account. The Debtors transferred cash from the Citi Prime Brokerage Account to parties in satisfaction of their financial and operational obligations. On July 26, 2007, the final outstanding balance of Cash Collateral that was transferred to AHM was $4,780,378.

11.    During the month of July 2007, a large number of draws from the Citi Prime Brokerage Account, resulting mostly from margin calls received from various repurchase and swap agreements, caused the net worth of the Debtor's Citi Prime Brokerage Account to become negative by July 28, 2007. As a result, the Debtors' ability to transfer funds from the Citi Prime Brokerage Account ceased and the Debtors were left with a negative balance on that account.

**B.    Default Under the Swap Agreement and Early Termination**

12.    RBS sent a certain Notice of Default and Early Termination Date letter (the "Termination Letter") on August 3, 2007. This letter effectively terminated the five outstanding Transactions under the Swap Agreement as of that date.

13.    On August 6, 2007, the Debtors filed for relief under chapter 11 of the Bankruptcy Code.

14.    On August 14, 2007, RBS sent a certain Follow Up Notice in Respect of Closeout Amounts Due to RBS Pursuant to the ISDA Agreement between RBS and AHMIC (the "Follow Up Notice"). In the Follow Up Notice, RBS netted the five Transactions under the terms of Swap Agreement as of August 3, 2007. The netted amount was $422,750 in favor of RBS (the "Termination Value"). The Follow Up Notice made the claim that RBS was the owner

of the Cash Collateral. The amount of this Cash Collateral was allegedly $4,780,378, of which

$31,108 was accrued interest under the terms of the CSA.

**C.    The Swap Claim**

       15.     On January 11, 2008, RBS filed the Swap Claim against AHM

Investment. RBS's exact position is unclear from the face of the Swap Claim and its

attachments. RBS checked boxes indicating both a "secured claim" and "unsecured non-priority

claim." In the secured claim portion, RBS wrote "setoff" but did not include an amount. In the

unsecured non-priority claim section, RBS made an unsecured claim for $5,203,128, the total of

the Termination Amount and the Cash Collateral. In an attachment to the Swap Claim, RBS

reserves its alleged right to assert that the Cash Collateral must be returned in full.

## RELIEF REQUESTED

       16.     By this Objection, the Debtors seek entry of an order, pursuant to section

502(b) of the Bankruptcy Code and Bankruptcy Rules 3003 and 3007, classifying RBS's Swap

Claim as an allowed general unsecured claim for $5,203,128 and limiting RBS's recovery to the

amount commensurate with the *pro rata* distribution it is allowed as a holder of a general

unsecured claim in this Case. As set forth below, the Swap Claim is entitled only to general

unsecured status with no further rights of recovery.

## OBJECTION

### RBS Holds A General Unsecured, Non-Priority Claim Against AHM For The Outstanding Cash Collateral Amount.

17.    AHM, by a plain reading of the Swap Agreement, had an unfettered right

to use or dispose of the Cash Collateral as it saw fit.  This right is the standard, default provision

included by ISDA in paragraph 6(c) of the CSA.  In Paragraph 6(c), the CSA states, in relevant

part, that "[u]nless otherwise specified in Paragraph 13…, then the Secured Party [i.e. AHM]

will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right

to:

> (i)    sell, pledge, rehypothecate, assign, invest, use, commingle
> or otherwise dispose of, or otherwise use in its business any Posted
> Collateral it holds, free from any claim or right of any nature
> whatsoever of the Pledgor, including any equity or right of
> redemption by the Pledgor; and
>
> (ii)    register any Posted Collateral in the name of the Secured
> Party, its Custodian or a nominee for either.

CSA at 4, ¶ 6(c)(i).  While the Parties had the opportunity to negotiate and change the terms and

effect of this provision through modifications to paragraph 13 of the CSA or in the Schedule, no

such change was made.  Paragraph 13 states that "[t]he provisions of Paragraph 6(c) will apply to

both parties."  CSA at 14, ¶ 13.  The only requirement of a Secured Party under the Swap

Agreement is that they were to treat the Swap Collateral as it would any of their other assets.  *See*

CSA at 4, ¶6(a).  Effectively, there would be no legal distinction between the Swap Collateral

and any of the Secured Party's other assets.

18.    Upon receipt of the Cash Collateral by AHM (i.e., the Secured Party), that

asset was "free from an claim or right of any nature whatsoever of the Pledgor[, RBS,] including

any equity or right of redemption."  CSA at 4, ¶ 6(c)(i).  As such, the Secured Party has the right

to immediately dispose of all of its assets, including any Swap Collateral, without any claim or

7

interference from the Pledgor. The Swap Collateral is effectively the property of the Secured Party since it has the right to dispose of that collateral the moment it receives it. Since the CSA does not create any security interest on the part of the Pledgor, if the Swap Agreement were to terminate the moment after all the assets were alienated, and the Secured Party was over-collateralized, the Pledgor would have no recourse but an unsecured claim for the dollar value of the debt in the amount of the over-collateralization. The Cash Collateral, along with all of Debtors' other cash assets that came into the Citi Prime Brokerage Account, did not sit there, but was used, commingled and rehypothecated daily in any number of transactions.

19.     The receipt of Cash Collateral by AHM and its right to freely rehypothecate, use, and commingle those assets, and the fact that it did so, created an unsecured debt obligation on the part of AHM for the amount of the collateral in excess of the amount they were in the money upon termination of the Swap Agreement. When the Swap Agreement was terminated, AHM was over-collateralized by the entire amount of the Cash Collateral they held. AHM had a matured debt obligation to pay that amount to RBS and RBS had an unsecured claim against AHM. Several guidelines and publications by the ISDA - the organization that drafted and promulgated the Master Agreement and the CSA - confirm the Debtors' position that the free use and rehypothecation rights granted by the CSA give RBS a general unsecured claim against AHM.

20.     In the *2005 ISDA Collateral Guidelines* (the "2005 Guidelines", attached hereto as Schedule 3 to the Sakamoto Declaration), the ISDA sought "to provide a comprehensive review of current collateralization practice that will be useful to collateral practitioners in the market and also informative for financial industry regulators and legislative bodies. . . ." 2005 Guidelines at 1, §1.1. The ISDA recommends that the 2005 Guidelines are to

8

be read in close conjunction with the ISDA's credit support documents, including the CSA. *See* 2005 Guidelines at 5-6; § 1.4.

      21.    The 2005 Guidelines discuss a situation with facts remarkably similar to those before the Court and state that a Pledgor, under these circumstances, will be an unsecured creditor of the Secured Party. The 2005 Guidelines state in relevant part:

> In bilateral collateral agreements, delivery of collateral to a
> counterparty will increase credit exposure if rehypothecation rights
> over the collateral are granted and there is any degree of over-
> collateralization. This credit exposure can arise due to market
> movements. . . which may cause a position to increase in value,
> and therefore lead to a temporary over-collateralization. Consider
> Party A which has delivered collateral to party B valued at US$100
> to cover an exposure of US$100. . . . If the mark-to-market value
> of the exposure position reduces to US$90, then A will have over-
> collateralized by US$10 until such time as the excess is recalled.
> *If, in the meantime, B were to default then party A would be an*
> *unsecured creditor for the excess of US$10 of collateral.*

2005 Guidelines at 15, §2.3, Over-Collateralization (emphasis added). These are the exact facts before the Court.

      22.    ISDA also published *Independent Amounts* in October 2009 (the "Independent Amounts Paper", attached hereto as Schedule 4 to the Sakamoto Declaration). Independent amounts, also known as initial margin, are simply another example of collateral that can be given in addition to Swap Collateral under the CSA. *See* 2005 Guidelines at 15, §2.3, Initial Margin. Over-collateralization due to the posting of independent amounts presents "essentially the same issue" as over-collateralization arising from the transfer of Swap Collateral. *See* 2005 Guidelines at 15, §2.3, Over-Collateralization. The Independent Amounts Paper presents a similar picture to the 2005 Guidelines and states that:

> [i]n a[n]. . . insolvency, if [Party A] delivered IA directly to such
> [Party B] and such IA was rehypothecated or commingled with
> such [Party B] assets, and such [Party B] is overcollateralized by

    

> virtue of such IA, then [Party A] will have a general unsecured
> claim for recovery of such IA and would be entitled to a pro rata
> distribution along with all other general unsecured creditors."

The Independent Amounts Paper at 6, § 4. More specifically, the Independent Amounts Paper

states that "[c]ash has the inherent property of fungibility. Therefore, cash delivered to a

counterparty. . . will be difficult to segregate on the balance sheet of the entity concerned – it will

effectively be an unsecured claim on the party holding it." The Independent Amounts Paper at

11, §6.

      23.    The Independent Amounts Paper confirms that our present scenario, the

transfer of collateral with free use and rehypothecation rights, is the baseline under the CSA, but

also states that this does not need to be the case. *See* The Independent Amounts Paper at 7, §4.

The Independent Amounts Paper goes on to describe how the above outcome can be prevented

by altering the provisions of the CSA or requiring a custody agreement and segregation for any

Swap Collateral transferred. *See Id.* These options were not, however, used by the Parties and

the creation of a debt obligation and the resulting general unsecured claim status of RBS, as

described in the 2005 Guidelines and the Independent Amounts Paper, is applicable.

      24.    The Independent Amounts Paper also discusses how the free use and

rehypothecation situation has arisen in the recent Lehman Brothers bankruptcy:

> As recent events demonstrate, this is not merely a hypothetical
> risk. In the case of Lehman Brothers, many investors may be
> exposed to significant losses in part because they had effectively
> over-collateralized Lehman. . . . [Collateral was] generally
> delivered directly to Lehman, with the right of rehypothecation.
> This meant that the [collateral was] permitted to be freely used by
> Lehman, and w[as] not segregated or afforded any client asset
> protections. Therefore, following Lehman's bankruptcy filing,
> claims for the return of cash. . . posted to meet [collateral]
> requirements were treated as general unsecured claims on the
> debtor's estate. These are given the same priority as claims of
> other general creditors. . . .

The Independent Amounts Paper at 7, §4.

25.     This situation described by ISDA in the Independent Amounts Paper has appeared on the docket of Case No. 08-13555-JPM in the United States Bankruptcy Court for the Southern District of New York (the ("Lehman Bankruptcy").  While there are no written opinions of the court in the Lehman Bankruptcy docket concerning this specific issue, there is a motion and subsequent claim on the docket that mirrors the scenario presented by ISDA and is similar to the facts before the Court.

26.     In the Lehman Bankruptcy, Parsec Trading Corporation ("Parsec") filed a certain Motion of Parsec Trading Corporation for (A) Determination that the Automatic Stay Does not Prevent Recovery of Pledged Collateral; or (B) in the Alternative, Relief from the Automatic Stay to Recover Pledged Collateral Pursuant to Swap Collateral Agreement, dated December 10, 2008 [Docket No. 2152] (the "Parsec Motion", attached hereto, along with the Custody Agreement, as Schedule 5 to the Sakamoto Declaration).  Parsec and Lehman Brothers Special Financing, Inc. ("Lehman") entered into a swap agreement, which was composed of the Master Agreement, the CSA, and an additional collateral agreement (the "Custody Agreement"). See Parsec Motion at 2, §§ 2,3; see also Parsec Settlement at 2, §§ B,C (as defined below).  The Parsec Motion was settled by that certain Stipulation and Order Among the Debtors, the Committee and Parsec Trading Corporation Resolving Motion of Parsec Trading Corporation dated March 11, 2009 [Docket No. 3049] (the "Parsec Settlement", attached hereto as Schedule 6 to the Sakamoto Declaration).  Following the entry of the Parsec Settlement, Parsec filed a proof of claim numbered 31765 (the "Parsec Claim", attached hereto as Schedule 7 to the Sakamoto Declaration) (collectively with the Parsec Motion and the Parsec Settlement, the "Parsec Documents").

DB02:9303611.4                                                                067920.1001

27.    Parsec transferred certain treasury securities to Lehman as an independent amount under the swap agreement entered into between Parsec and Lehman.  These securities were not subject to the provisions of the CSA, but – unlike here - to a negotiated custody agreement.  *See* Parsec Settlement at 2, § B.  During the pendency of their swap agreement with Lehman, Parsec also transferred significant amounts of cash as Swap Collateral under the CSA.  *See Id.* at C.  As here, the cash collateral provided by Parsec to Lehman was not subject to a custody agreement.

28.    Parsec terminated their swap agreement with Lehman.  Lehman was in the money, but over-collateralized by almost $3 million in cash under the Master Agreement and by the $12 million in treasury securities under the Custody Agreement.  *See* Parsec Claim, § attachment.  The Parsec Motion was an attempt to reclaim the treasury securities under the Custody Agreement, but, importantly, that motion and the Parsec Settlement did not make any claim that the excess cash Swap Collateral was the property of Parsec or was subject to immediate return in full.  Tellingly, following the filing of the Parsec Settlement, Parsec filed the Parsec Claim wherein the value of the treasury securities not covered by the settlement was listed as a secured claim and the entire amount of the excess cash Swap Collateral was listed as a general, unsecured claim.  *Id.*

29.    The transaction between Parsec and Lehman is properly treated by those parties in accordance with ISDA's interpretation of the CSA set forth in the 2005 Guidelines and the Independent Amount Paper.  Parsec, the Pledgor in that case, treated the treasury securities, that were subject to the Custody Agreement and not to the free use and rehypothecation rights of the CSA, as their property or a secured claim and they treated the cash, that was subject to the

12

baseline free use rights of the CSA, as a debt obligation and Parsec is entitled only to a general

unsecured claim. *See* Parsec Motion at 5-6, § 14; *see also* Parsec Claim, attachment.

## RESERVATION OF RIGHTS

30.    This Objection is not an omnibus objection and is, therefore, not subject to

the restrictions contain in Rule 3007-1 of the Local Rules for the United Stated Bankruptcy

Court District of Delaware. Accordingly, the Debtors expressly reserve any and all rights,

including without limitation: (i) the right to amend, modify, or supplement this Objection and/or

object in the future to any aspect of Swap Claim; (ii) the right to bring any causes of action under

applicable sections of the Bankruptcy Code or other applicable law; (iii) the right to object to any

and all other claims filed by RBS or Greenwich Capital, or their parents, subsidiaries or

affiliates, in the above-captioned bankruptcy cases or otherwise[5]; and (iv) the right to present

additional evidence to the Court at the hearing. In addition, while the Debtors do not fully agree

with the amount asserted by RBS in the Swap Claim, if the instant Objection is sustained the

Debtors are willing to allow the Swap Claim in the asserted amount. However, the Debtors

reserve the right to challenge the amount of the claim and to raise any and all other claims and

defenses at a later time, without limiting any of the rights reserved in this section.

## CONCLUSION

31.    The Swap Claim must be classified as a general unsecured claim against

AHM Investment. This result is clear when considering the Debtors ability to freely use and

rehypothecate the Cash Collateral under the terms of the Swap Agreement and the fact that the

Debtors did in freely use the Cash Collateral in the normal course of business prior to the

Termination Date and Petition Date. Further evidencing this position is the fact that RBS could

---

[5] Including, but not limited to, Proofs of Claim No. 8951, 8952, 8954, 8956, 8958, 8959, 8960, 8961, 8962, and 8963 in the above-captioned bankruptcy cases.

DB02:9303611.4                                                                                     067920.1001

have negotiated to alter this right of the Debtors to freely rehypothecate and chose not to do so, the interpretive guidelines of the ISDA and the instructive resolution of similar issues in the Lehman bankruptcy case.

   WHEREFORE, based on the foregoing, the Debtors respectfully request entry of an order, substantially in the form attached hereto as Exhibit A, sustaining this Objection in all respects, classifying the Swap Claim as general, unsecured, limiting RBS's recovery on the Swap Claim to its *pro rata* share as a general, unsecured creditor and granting such other and further relief as the Court deems just and proper.

Dated: March 5, 2010
   Wilmington, Delaware

        **YOUNG CONAWAY STARGATT & TAYLOR, LLP**

        _____
        Sean M. Beach (No. 4070)
        Michael S. Neiburg (No. 5275)
        The Brandywine Building
        1000 West Street, 17th Floor
        Wilmington, Delaware  19801
        Telephone: (302) 571-6600
        Facsimile: (302) 571-1253

        Counsel to the Debtors and Debtors in Possession

DB02:9303611.4                       067920.1001