**Schedule 4**


**The Independent Amounts Paper**

  

# Independent Amounts

October 2009

  

Independent Amounts
October 2009

# Independent Amounts

## Abstract

Collateralization has become a key method of mitigating counterparty credit risk in the derivative markets, both bilateral, privately-negotiated derivatives and exchange-traded, standardized derivatives.  In several situations it is common for one party to provide collateral to its counterparty or a clearing house in an amount that exceeds the credit exposure between the two parties at a given point in time.  This may occur intentionally; for example, in many (but not all) situations the delivery of Initial Margin or Independent Amount will lead to over-collateralization.  It may also occur unintentionally; for example, during the time interval between the exposure between the parties reducing and the relevant amount of excess collateral being recalled.  Regardless of underlying cause, any situation in which one party has delivered collateral in excess of the credit exposure borne by the other party may represent additional risk in the event that the other party becomes insolvent.  This is, of course, the corollary of the scenario more often considered in collateralization, when the collateral delivered is less than the exposure.  But in either case, over-collateralization or under-collateralization, one party is at risk.

This paper is part one of a two-part examination of the risks associated with under-collateralization or over-collateralization associated with Independent Amounts ("IA") under ISDA Credit Support Annexes ("CSAs"), and the potential alternatives that may be developed by the derivatives market to protect participants.

Although the focus of this paper is the use of IA under CSAs, it will be obvious to readers that many of the same issues and potential alternative methods apply equally to Initial Margin posted under different forms of collateral agreement, including under the rulebooks of organized derivative exchanges, and also the unintentional under or over-collateralization that occurs between exposure reduction due to market fluctuation and the resulting collateral recall.

This paper is being produced jointly by ISDA, MFA and SIFMA.  It is one of the deliverables described in the derivative industry letter to the Federal Reserve Bank of New York and other banking supervisors dated June 2, 2009.  The first part of this paper (dealing with the use and risks of IA) will be published on October 12, 2009 and the second part (dealing with potential future market practice) will be published later in 2009 for a public comment period.

  

Independent Amounts
October 2009

# Contents

## Part I        The Use and Risks of Independent Amounts

1. Key Mechanics of the ISDA Credit Support Annex
2. Taxonomy
3. Purpose of Independent Amount
4. Risk to Parties Posting Independent Amounts
5. Third Party and Tri-Party Arrangements for Independent Amounts
6. Cash as Independent Amount
7. Independent Amounts Under Title Transfer Collateral Agreements
8. Appendix

## Part II        Alternate Approaches for Independent Amounts

*To Be Published Later in 2009*

### Copyright Notice

© 2009  International Swaps and Derivatives Association, Inc.;
Managed Funds Association; and
Securities Industry and Financial Markets Association

### Use Rights

A non-transferable, cancellable license is hereby granted for use of this material provided that the source is cited and the publishing entities are acknowledged.  An appropriate citation would be: "Independent Amounts" (ISDA / MFA / SIFMA, 2009)

### Capitalized Terms

Except as the context requires otherwise, terms in this paper which are capitalized and have either the meaning defined in the standard ISDA Master Agreement and ISDA Credit Support Annex or are specific taxonomy adopted for this paper and are defined in section 1.

  

Part I

# The Use and Risks of Independent Amounts

In Part I of this paper we address the use and the risks of Independent Amounts (IA) from an educational perspective. These sections describe the key terms used in this field, why we have the concept of IA in the market, how the market operates in practice, the risks of IA, and the alternative ways of holding IA. Part I of this paper is intended to be factual and not expressive of any particular viewpoint regarding the use of IA.

Part II of this paper will make recommendations for alternative approaches that may be incorporated into market practice in the use and risk management of IA.

## 1. Key Mechanics of the ISDA Credit Support Annex

This paper deals with a complex area of collateralization, where several terms have both technically-specific meaning and are also used broadly in a more colloquial fashion by industry practitioners. In this section we describe the key elements of the ISDA Credit Support Annex[1] as it relates to the computation of collateral requirements.

### 1.1 Credit Support Amount

The ISDA Credit Support Annex (CSA) defines[2] the overall amount of collateral that must be delivered between the parties, known as the Credit Support Amount, as:

> (i) the Secured Party's Exposure [...] plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold
>
> (Source : 1994 ISDA Credit Support Annex - New York Law version[3] )

The Secured Party is the party that is holding collateral; the Pledgor is the party that has delivered collateral[4].

### 1.2 Exposure

The term Exposure is defined in a technical manner that in common market usage essentially means the netted mid-market mark-to-market (MTM) value of the transactions in the portfolio between the parties[5]. This term is the core of the Credit Support Amount calculation, and tends to drive the overall collateral requirement between the parties, except in situations where portfolios are small (and therefore often have small MTM) in relation to any applicable Independent Amounts or Thresholds. The commercial reason for basing the collateral requirement around the Exposure is that this represents an approximation of the amount of credit default loss that would occur between the parties if one were to default. Note that, in common with all derivatives, OTC or exchange-traded, this can only ever be an estimate because the MTM of positions varies through time. It should also be noted that Exposure is calculated at mid-market levels so as not to penalize one party or the other (i.e., by calculating Exposure on one party's side of the market). Upon default close-out, valuations will often reflect the replacement cost of transactions calculated at the terminating party's bid or offer side of the market, and will often

 

**ISDA.**      **⬥SIFMA**     **Independent Amounts**
October 2009

take into account the creditworthiness of the terminating party. The amount of collateral held to secure Exposure may be more or less than the termination payment determined upon a close-out.

## 1.3 Independent Amount

The term Independent Amount is defined in the elections and variables section of the CSA[6], or in the confirmation for individual transactions.  It can be any amount that the parties agree, but typically is expressed as a fixed currency amount, a percentage of the notional principal amount, or a computation of value-at-risk.  Independent Amount can be defined at the level of the portfolio of transactions between two parties, or can be defined uniquely for each individual transaction;  it can be zero of course.  As can be seen from the definition of Credit Support Amount set out earlier, the Independent Amount will increase the overall amount of collateral that a party is required to deliver  -  it makes the Credit Support Amount from that party's perspective larger.  The underlying commercial reason behind Independent Amounts is the desire to create a "cushion" of additional collateral to protect against certain risks  -  we shall discuss these in more detail later in this paper.

## 1.4 Threshold[7]

The term Threshold is defined in the elections and variables section of the document, or (rarely) in the confirmation for individual transactions.  It can be zero, but otherwise will typically be defined as either a fixed currency amount or a variable currency amount that changes in response to changes in the credit rating of the party concerned.  In context of the expression for Credit Support Amount, any non-zero Threshold will decrease the overall amount of collateral that a party is required to deliver  -  it makes the Credit Support Amount from that party's perspective smaller.  The underlying commercial reason behind Thresholds is that often parties will be willing to take a certain amount of credit risk to each other unsecured (equal to the Threshold), before then requiring collateral to cover any additional risk.

## 1.5 Interaction Between The Elements of Credit Support Amount

When considering the operation of the CSA in practice, three points are critical to remember:

- As can be readily seen, Independent Amounts and Thresholds tend to work in opposition to one another in relation to any specific party under an agreement, which is why a particular CSA will typically employ one or the other in relation to each party.[8]

- In respect of Independent Amounts, it is also obvious that if both parties are subject to an Independent Amount they will tend to cancel each other out, which is why a particular CSA will typically require Independent Amount from neither party or one party, but rarely both parties.

- Exposure and Independent Amounts are simply two of several terms netted together in the expression that yields the overall Credit Support Amount.  This has an important practical consequence that although some market practitioners may sometimes think of two separate pools of collateral (one covering the Exposure and one covering the Independent Amount), under the ISDA CSA there is technically just a single pool of collateral, and the elements that make up that pool are generally not held separately. The issue addressed in this paper is whether Independent Amounts should be maintained separately so that they will be better protected from risk of loss upon a default by the party entitled to the Independent Amounts. [9]

 

## 2. Taxonomy

In this highly technical area of collateralization some terms sound similar but are different, and others appear different but carry equivalent meanings. In this section we lay out a consistent taxonomy that will be adopted in this paper and also relate these terms to others in market usage.

### 2.1 Taxonomy Employed in This Paper

For clarity we will adopt a consistent taxonomy in this paper:

> **Independent Amount** or IA will have the definition given in the Credit Support Annex and as the context requires will also refer to that element of the overall Credit Support Amount that is related to the IA.

> **Variation Margin** or VM will refer to the element of the overall Credit Support Amount that is related to the Exposure as defined in the Credit Support Annex.

> **Dealer** will refer to the party that is receiving IA from the other party.

> **End User** will refer to the party that is delivering IA to the other party.

It is important to point out that any type of counterparty could be subject to an IA requirement, including banks in some circumstances. The adoption of the Dealer and End User taxonomy set out above reflects the fact that historically the posting of IA has generally been associated with end users transacting OTC derivatives with dealers. However, this is not necessarily so in all cases and this paper should be read with this potential diversity in mind.

### 2.2 Other Similar Terms Used In The Market

Initial Margin is a term often used interchangeably with Independent Amount, but it is not actually a term used in industry-standard OTC derivative documentation at all; it comes from exchange rulebooks that set out the collateral required to be pledged by exchange members to the exchange clearing house.

Initial margin is typically an additional amount of collateral that must be posted to the clearing house in excess of the variation margin which reflects the market value of the exchange-traded contracts . Thus in generalized terms the initial margin on an exchange can be seen as equivalent to the IA term that goes into the computation of Credit Support Amount under an ISDA CSA.

Exchange variation margin is likewise analogous to the collateral that covers the Exposure term used in the CSA computation of Credit Support Amount. The CSA does not actually give us a convenient term by which to refer to this collateral; common market vocabulary has adopted the term Variation Margin from the exchange-traded derivative world to refer to this concept.

Various other terms (such as Original Margin and Lock-Up Margin) have developed in certain parts of the market to refer to concepts that are broadly similar to IA, although with some variations. To avoid confusion in this paper we will not use these terms further.

 
## 3. Purpose of Independent Amount

Unless otherwise established by contract, official rules, or statute, there is no obligation on any party that any OTC derivative transaction be collateralized. If the parties elect to collateralize, there is no requirement that IA be posted.  These are credit risk management decisions subject to negotiation between the parties.

The use of Independent Amounts originated in the earliest days of the collateralized OTC derivative market, which date back to the late 1980s.  IA has typically been a one-way obligation for an End User (typically a hedge fund) to post additional collateral to a Dealer, primarily as a cushion to guard against the residual credit risk that may exist even under a collateralized trading agreement.  Such residual credit risk may arise in four principal ways:

- When mark-to-market fluctuations occur there is a delay before the new collateral amount can be computed, called and settled
- When a counterparty defaults, no more collateral movements will occur but credit exposure may continue to increase until the non-defaulting party closes out the relevant risk positions
- Collateral agreements typically contain structural features designed to ensure that effort and cost are not wasted in moving *de minimus* amounts of collateral between the parties[10]
- Collateral transfers under the CSA are based on mid-market values of the underlying derivative contracts, whereas a party's loss upon default of the other party may be realized at either the bid or offer side of the market[11].  Thus, some disparity between collateral and exposure is always to be expected, and this may be significant where spreads for a product are particularly wide[12]

It is noted that both parties are subject to these residual credit risks, however, only the Dealer is protected against these risks by IAs, whereas the End User remains subject to these risks on an unsecured basis (in addition to the risk of non recovery of IAs).  This market practice developed based on the role Dealers play in derivatives trades and their relative credit standing.

The decision to require posting of IA is based on a number of factors, including, but not limited to:

- The credit quality of the End User[13] and the nature of their relationship with the Dealer
- The type of account or vehicle that is entering into the derivative transactions (e.g. whether or not leverage is being used, the percentage of liquid assets held in relation to swap notional value, etc.)
- The type of underlying exposure being taken - the riskier the exposure, the greater the Independent Amount requirement will be
- The volatility of a particular transaction or the derivatives portfolio.

## 4. Risks to Parties Posting Independent Amounts

While a Dealer receiving IA will benefit from the resulting buffer of additional collateral the End User may assume added risk of loss in the event the Dealer becomes insolvent.

In a Dealer insolvency, if an End User delivered IA directly to such Dealer and such IA was rehypothecated or commingled with such Dealer assets, and such Dealer is overcollateralized by virtue of such IA, then the End User will have a general unsecured claim for the recovery of such IA and would be entitled to a pro rata distribution along with all other general unsecured creditors.

 

This type of claim ranks behind other creditor claims of higher priority, and thus in many insolvencies general unsecured creditors get paid less than 100% of their claim amount[14].

As recent events demonstrate, this is not merely a hypothetical risk. In the case of Lehman Brothers, many investors may be exposed to significant losses[15] in part because they had effectively over-collateralized Lehman through the provision of IA[16]. These IAs were generally delivered directly to Lehman, with the right of rehypothecation[17]. This meant that the IAs were permitted to be freely used by Lehman, and were not segregated or afforded any client asset protections. Therefore, following Lehman's bankruptcy filing, claims for the return of cash and securities posted to meet IA requirements were treated as general unsecured claims on the debtor's estate. These are given the same priority as claims of other general creditors, meaning in this particular case that counterparties will likely only recover a small percentage of the value of any IA posted.

However, as further discussed throughout this paper, steps may be taken to mitigate or eliminate losses of IA in a Dealer insolvency. While collateral agreements are most commonly setup with direct holding of the collateral with the right of rehypothecation and/or commingling of assets, leading to the characterization of these amounts as general unsecured claims, this need not be the case. It should be noted that there is a selection of various forms of collateral documentation with different degrees of risk and complexity - for example, tri-party custodial arrangements or the ISDA Credit Support Deed for UK Dealers—which would afford certain "client money" protections[18].

The Lehman experience has led to an increased awareness of the risks associated with posting IA. It has translated into a strong desire on the part of certain End Users to ensure that IA posted to a Dealer is held in a manner that ensures it is remote from the bankruptcy of the Dealer counterparty and immediately recoverable (i.e. "portable") upon the occurrence of such an event.

In this context there is industry-wide focus on considering alternate approaches to handling Independent Amounts that:

- In the event of default by the End User, permit the Dealer to perform close out calculations and if a net amount is owing to the Dealer, to reliably and rapidly seize and liquidate collateral (including IA) under the CSA[19].
- In the event of default by the Dealer, permit the End-User to regain control of the IA once close out of the underlying portfolio has occurred and any liability to the estate of Dealer has been discharged, while still being operationally feasible, cost-effective, and sufficiently protected within the laws of the relevant jurisdictions for both parties, notwithstanding the previous points above.

## 5. Third Party and Tri-Party Arrangements for Independent Amounts

*The following discussion applies IA in the form of securities collateral pledged under a security interest form of collateral agreement. Please see Section 6 for a discussion of cash pledged as IA under a security interest form of collateral agreement. Section 7 addresses cash and securities delivered as IA under a title transfer form of collateral agreement.*

There are essentially three ways in which a party may hold IA posted to it:

- Direct holding, in which the IA is delivered by the End User to the Dealer, and the Dealer holds the IA themselves or through an affiliate entity.

  
- ▪ Third Party custody, in which an unaffiliated bank, broker-dealer or other party[20] operates under agreement with one of the two counterparties and simply provides typical custody and safekeeping services.

- ▪ Tri-Party custody, in which an unaffiliated bank or other party providing tri-party custodial services operates under a three-way contract between it and the two derivative counterparties. Among other duties, the tri-party agent releases collateral to each of the counterparties subject to pre-defined conditions.

The terms "Third Party" and "Tri-Party" therefore connote significantly different custodial arrangements that may be used in connection with a collateral agreement.

Third Party and Tri-Party agreements will always require additional documentation between one or both parties and the custodial entity, and will likely entail amendment to the CSA documents between the parties.

## 5.1 Direct Holding of IA

Where IA is delivered directly from the End User to the Dealer with rehypothecation rights and there are no formalized arrangements for the collateral to be segregated in some manner, it becomes impossible to distinguish between the IA and the other assets of the Dealer. In the event of the insolvency of the Dealer, the IA will likely be afforded no special protection and will form a part of the estate of the debtor. Claims for recovery will likely be treated as general unsecured creditor claims.

Where the Dealer takes IA that was delivered directly to it and passes it over to an affiliate to hold, much will depend on the status of the affiliate and the legal arrangement governing the holding of collateral by that affiliate. If the affiliate is a *bona fide* custodial bank and is a separate bankruptcy-remote legal entity to the affiliated derivative counterparty entity[21], then it may be possible, with the proper documentation and regulatory regime, to consider this situation as a third party custody arrangement as discussed below. Generally, however, with direct holding of IA in the name of a secured party (whether held directly or with an affiliate), it will be difficult to robustly establish any degree of bankruptcy remoteness.

### Figure 1. Direct Holding of IA Illustrated



  

**ISDA.**

## 5.2 Third Party Custody Holding of IA

Where a Dealer receives IA from an End User, places it with a third party custodian and does not rehypothecate the collateral it will be relatively easy to distinguish between the IA and the other assets of the Dealer.

In this situation there is no privity of contract between the End User and the third party custodian, but nevertheless strong traceability of assets is afforded. This is particularly so if the Dealer is obligated by its contract with the End User to hold the IA in this third party, segregated manner, and the End User is in possession of identifying details such as the custodian name and address, the relevant account number, etc. The End User may have no control or contractual rights over the account containing the IA, but in the event of the insolvency of the Dealer, the End User can explicitly and uniquely identify the IA it had posted.

In fact, under the customer asset protection rules in several jurisdictions, holding of IA that follow the pattern set out above may enjoy certain statutory protections. For example, under the UK FSA's CASS 3 and CASS 6 rules[22], in certain cases securities collateral delivered to a counterparty that is not rehypothecated and is held segregated with a solvent custodian will enjoy the full range of customer asset protections. Certain other protections under FDIA and SIPA[23] may apply in the United States, with parallel rules in other countries.

The foregoing assumes that the secured party holds collateral with a third party custodian, subject to a bilateral contract between the two, and furthermore that the collateral is not rehypothecated. Where a third party is used but collateral is rehypothecated, it may be more difficult to establish strong traceability of assets; customer asset protection rules will not apply. This case is therefore similar to direct holding of collateral for these purposes.

**Figure 2. 3rd Party Custody Holding of IA Illustrated**



  

**Independent Amounts**
October 2009

## 5.3 Tri-Party Collateral Agent Holding of IA[24]

In a tri-party holding arrangement of IA there is a three-way agreement between the custody bank (sometimes also called the collateral agent) and the two derivative counterparties. The End User delivers IA to the collateral agent for the benefit of the Dealer.

The End User and the Dealer are both in direct privity of contract with the collateral agent, and therefore each can enforce its rights by giving notice to the collateral agent following the default of the other. While direct privity exists between the three parties, it is important to note that the tri-party custodian is not the Dealer's "Custodian" for purposes of Paragraph 6 of the New York CSA.

In this, as in all other holding models for collateral, the secured party must ensure that it obtains and continues to have a perfected security interest in the collateral. The method of perfection of a security interest differs by jurisdiction and collateral type, but in many cases it is predicated on some notion of the secured party having "control" over the assets[25]. In the tri-party holding model this is slightly more complicated than in other models, because of the existence of the third party and the three-way contract. The collateral agent provides certain undertakings to the Dealer, most particularly that they will follow the instructions of the Dealer at all times, except when the Dealer is in default under the relevant agreements. Generally, tri-party agreements also provide for a party to issue a "Notice of Exclusive Control" under certain circumstances; this is helpful in that it formally eliminates any rights of the defaulting party to attempt to instruct movement of the collateral. These measures are intended to establish the necessary degree of control to achieve a perfected security interest. Whether such a perfected position is accomplished is typically a question of local law and may depend upon the respective rights of all parties under the tri-party agreement.

### Figure 3. Tri-Party Collateral Agent Holding of IA Illustrated



 

ISDA.

SIFMA

## 6. Cash as Independent Amount

*This section considers cash pledged under a security interest form of collateral agreement.*

Cash has the inherent property of fungibility. Therefore, cash delivered to a counterparty or to a custodian will be difficult to effectively segregate on the balance sheet of the entity concerned - it will effectively be an unsecured claim on the party holding it.

This issue may be possible to avoid in circumstances where cash is held with a third party custodian in a defined segregated account and not invested or re-used in any way; the pledgor would likely not earn a return on cash sequestered in this way. If the third party offers an investment of segregated cash collateral, it may have only limited and low-yielding investment options.

To avoid this investment return issue, sometimes cash is delivered as collateral with an accompanying or standing instruction to invest that cash in a defined range of instruments. These typically include mutual fund investment units and short term liquid paper, although any investment could be instructed in this way in theory. In these circumstances, it is not always clear what asset the secured party actually has a security interest in. For example, if cash was delivered as IA for the benefit of the Dealer to the custodian who had instructions to purchase money market funds with the cash, does the Dealer have a security interest in the cash or the money market fund units? Overnight cash sweep products also present similar challenges, since at the close of business on a day D and the opening of business on day D+1 a party may clearly be holding cash collateral, but in the intervening overnight hours the cash may have been swept to an offshore jurisdiction and invested in securities or other assets to earn a return.

In general, it may be preferable to use cash collateral only where the receiving party has unfettered rights of use, and therefore can both generate an appropriate investment return on the cash and avoid ambiguity as to what the collateral actually is; by contrast, where collateral will be segregated it should be delivered in the form of a debt or equity security, or instrument such as a money market fund unit, that is well-characterized and has a defined return to the pledging party.

In either case, careful drafting of documentation is needed to ensure that the secured party has a security interest in the collateral at all stages and in all forms of holding, whether it is in the form of cash or some investment holding purchased or financed with the cash.

## 7. Independent Amounts Under Title Transfer Collateral Agreements

*This section considers both cash and securities delivered under a title transfer form of collateral agreement.*

IA can be a feature of both the New York Law Credit Support Annex (security interest form of collateralization) and the English Law Credit Support Annex (title transfer form of collateralization). The legal mechanisms underpinning these otherwise essentially similar documents are very different. The idea of segregating IA into non-rehypothecable accounts is really applicable only to the security interest forms of documentation[26].

Under the English Law CSA, the Transferor becomes an unsecured creditor once it delivers (by outright transfer of title) excess collateral. Regardless of what the Transferee does with those assets (subject to not behaving in a way that risks re-characterization of the delivery), the risk to the Transferor does not change. The assets belong to the Transferee at the point of delivery. When the Transferee uses those assets, it is using its own assets and not rehypothecating. By

 
contrast, under the NY CSA when the Pledgor delivers assets, the Pledgor retains a title in those assets which may be effectively extinguished when/if the assets are commingled or rehypothecated.

Under a title transfer collateral agreement, a transfer of assets inherently creates an unsecured claim for the return of those assets, subject to common law set off rights in respect of other amounts owing between the parties. This is the basis for around half of the collateralized OTC derivative market, in addition to the repo markets.

In fact, if one were to segregate IA (or any collateral) under a title transfer collateral agreement, it would create a high degree of recharacterization risk. Under a title transfer agreement, the recipient of collateral becomes the legal holder of title to the asset concerned - the recipient owns the assets outright. If they were to segregate those assets and treat them in a manner different to that in which they generally treat their own assets, then it invites recharacterization of the agreement as not being a title transfer at all, but in fact being a security interest form of collateral arrangement, but one for which the necessary steps to perfect a security interest might not have taken place.

Therefore, as distinct from the three patterns of holding collateral under a security interest agreement discussed in Section 5, under a title transfer agreement there really is only one method of holding collateral, which is for the secured party to hold it directly.

There has been some significant amendment of the legislation relating to the perfection of security interest arrangements within the European market pursuant to the terms of the Financial Collateral Directive. This may go some way towards allaying this concern about recharacterization risk. However, the Directive has not been implemented in a consistent way across the different jurisdictions within the European Economic Area so it is unlikely that a generic solution will be feasible.

It should be noted that the title-transfer based English Law Credit Support Annex has a parallel security interest based companion document, the English Law Credit Support Deed. In addition, the ISDA 2001 Margin Provisions document contains both title transfer and security interest mechanisms for taking collateral. It may be feasible to create a situation where the VM element of the overall collateral pool is subject to title transfer (freely useable) and the IA element is subject to security interest (segregated) by using either the English Law CSA and CSD in conjunction, or by using the Margin Provisions.

## 8. Appendix

Expanding upon the references made in Section 5.2 and footnote 20, below we reproduce in relevant parts the Client Asset rules from the UK FSA Handbook. For the complete reference material, please see FSA Handbook, Client Assets (CASS) section, found at http://fsahandbook.info/FSA/html/handbook/CASS. Text below in bold is quoted from the FSA Handbook; other text is provided to assist the reader with context.

CASS 3 ("Collateral") establishes that collateral received with no rehypothecation rights falls under the custody or client money rules:

- **CASS 3.1.3 - This chapter does not apply to a firm that has only a bare security interest (without rights to hypothecate) in the client's asset. In such circumstances, the firm must comply with the custody rules or client money rules as appropriate.**

CASS 3.1.5 – 3.1.7 provide further guidance on this section.

 

**ISDA.**

Independent Amounts<br>October 2009

In addition, collateral with rehypothecation rights that are not exercised is also covered:

- **CASS 3.2.3 – If the firm has the right to use the client's assets under a "right to use arrangement" but has not yet exercised its right to treat the asset as its own, the client money rules or the custody rules will continue to apply as appropriate until such time as the firm excercises its right [...]**

CASS 6 ("Custody Rules") sets out the requirements for assets considered to be under the custody rules.  It excludes title transfer collateral assets from its scope:

- **CASS 6.1.6 - The custody rules do not apply where a client transfers full ownership of a safe custody asset to a firm for the purpose of securing or otherwise covering present or future, actual, contingent or prospective obligations.**

CASS 6 then goes on to explicitly require a firm holding client assets to preserve the client's ownership rights, including upon insolvency of the firm:

- **CASS 6.2.1 - A firm must, when holding safe custody assets belonging to clients, make adequate arrangements so as to safeguard clients' ownership rights, especially in the event of the firm's insolvency, and to prevent the use of safe custody assets belonging to a client on the firm's own account except with the client's express consent.**

It further articulates how this protection may be accomplished, including the non-mandatory use of a third party service, and the requirement to establish segregation between the assets of the firm and the client (and indeed the third party, if one is used):

- **CASS 6.3.1**
  **(1) A firm may deposit safe custody assets held by it on behalf of its clients into an account or accounts opened with a third party, but only if it exercises all due skill, care and diligence in the selection, appointment and periodic review of the third party and of the arrangements for the holding and safekeeping of those safe custody assets.**
  **(1A) A firm which arranges the registration of a safe custody investment through a third party must exercise all due skill, care and diligence in the selection and appointment of the third party.**
  **(2) A firm must take the necessary steps to ensure that any client's safe custody assets deposited with a third party, in accordance with this rule are identifiable separately from the applicable assets belonging to the firm and from the applicable assets belonging to that third party, by means of differently titled accounts on the books of the third party or other equivalent measures that achieve the same level of protection.**

Readers are advised that this is only a brief survey of the relevant provisions of the FSA's Client Asset (CASS) rules.  Review of the complete CASS text is recommended, and firms may wish to take advice from qualified legal practitioners.

TO BE CONTINUED IN PART II

# Alternate Approaches for Independent Amounts

DUE FOR PUBLICATION LATER IN 2009

**ISDA.**  

Independent Amounts
October 2009

## NOTES

[1]    Independent Amounts can be used under any of the ISDA Credit Support Annexes. For illustration purposes, in this document we will mainly refer to the 1994 version according to New York law, except as otherwise stated.

[2]    It should be noted that this definition of Credit Support Amount is the standard one provided in the boilerplate CSA language. Counterparties occasionally modify the language bilaterally, including one type of modification that causes the Pledgor to deliver no less than the sum of all Independent Amounts; this differs from the standard formulation above by removing the so-called "netting" effect whereby an increasingly negative exposure for the Secured Party (i.e. the Secured Party is out-of-the-money on the underlying derivative contracts) reduces and then eventually eliminates the need for the Pledgor to deliver Independent Amounts. The alternative formulation is set out in Appendix C to the User's Guide to the 1994 ISDA Credit Support Annex. It is used on some occasions where a Dealer requires to hold IA amounts even where the net mark-to-market of the portfolio is negative, which under the standard boilerplate CSA terms would reduce, eventually to zero, the IA posted by the End User. Under the CSA standard netting approach, the End User's entitlement to require a Dealer to post collateral to cover Exposure when the Dealer is out-of-the-money is reduced by the End User's IA - so the End User ends up holding an insufficient amount of collateral to cover Exposure by an amount equal to the End User's IA.

[3]    The equivalent definition under the 1995 ISDA Credit Support Annex English Law version is: "(i) the Transferee's Exposure plus (ii) all Independent Amounts applicable to the Transferor, if any, minus (iii) all Independent Amounts applicable to the Transferee, if any, minus (iv) the Transferor's Threshold".

[4]    For these purposes we ignore certain esoteric scenarios where both parties may be Secured Party and Pledgor at the same time, and also scenarios where no collateral has yet moved under the agreement. Note also that under the English Law version of the CSA the term "Secured Party" is replaced by "Transferee", and "Pledgor" becomes "Transferor".

[5]    Technically the definition of <u>Exposure</u> refers to the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number)... as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; ... using estimates at mid-market of the amounts that would be paid for Replacement Transactions. Where termination of the portfolio occurs and neither party is the affected party, that means that the values ascribed to trades being terminated are those measured at the mid-point of the market, in other words half-way between the bid and the offer values that would be used if one of the parties were the affected party (i.e. in default). Interestingly, the definition of <u>Exposure</u> also includes any due but unpaid amounts between the parties - these would be part of the termination calculation, of course. This would include both payments ordinarily in transit between the parties, and also failed payments past due and currently unsettled. General market practice is currently not to include unpaid amounts in collateral calculations, although this topic has been raised within industry forums and market practice may be amended in the future.

[6]    Paragraph 13 in the NY law CSA; or Paragraph 11 in the English law CSA.

[7]    For completeness, it should be noted that the CSA contains another term in the collateral computation, known as the Minimum Transfer Amount or MTA. The parties may agree any level of MTA, which sets a lower limit on the amount of collateral that will be transferred between the parties at any point in time. The purpose is to allow the parties to prevent the movements of small amounts of collateral that are of *de minimus* credit risk protection benefit but of high operational risk and nuisance value. Generally MTAs are small compared to thresholds, and they can be zero where the parties' intent is to move every dollar of collateral every day. The CSA also contains a Rounding term, which is of even smaller effect typically, and used to round collateral movements to the nearest sensible size of unit (often the nearest $1,000 or $10,000). Neither MTA nor Rounding are further considered in this paper.

[8]    The provision for IAs can be found in confirmations or the Credit Support Annex to the ISDA Master Agreement.

[9]    As discussed below, the portion of collateral representing Exposure is often not subject to the same risk of loss upon a default by the party holding such collateral (assuming Exposure has been determined accurately and market prices do not move significantly against the defaulting party following default).

[10]    These terms include <u>Minimum Transfer Amount</u> and <u>Rounding</u> amount in the CSA documents.

[11]    It is important to note that the determination of the Settlement Amount upon the declaration of any Early Termination Date under the ISDA Master Agreement may also require that mid-market valuations be used, for example upon the occurrence of a Termination Event where both parties are "Affected Parties".

**ISDA.**   SIFMA

12   It is noted that both parties are subject to these risks, regardless of the type of party or whether or not IA is posted.

13   If the End User is significantly more creditworthy than the Dealer, the Independent Amount may be paid by the Dealer to the End User, although this is rare.  Independent Amounts are rarely if ever used between Dealers.

14   Notwithstanding challenges as to validity or common law or contractual set off with amounts due elsewhere between the insolvent party and the counterparty

15   Strictly speaking the Lehman case remains on-going so it is not definitively known what losses, if any, will have been suffered by counterparties.  However, at the time of writing unsecured general creditor claims against the Lehman estate were trading at under 20 cents on the dollar, implying significant losses will be realized when the final distribution to creditors eventually occurs.

16   It is possible that the IA posted to a Dealer that becomes insolvent may not all be excess collateral.  For example, there may be unreconciled or unconfirmed deals between the parties or there may be operational issues on any given day that mean the VM called is inaccurate.

17   Rehypothecation rights are included in the standard ISDA CSA documents according to New York law in Paragraph 6(c), and are either given effect or disapplied according to the election of the parties made in Paragraph 13(g)(ii). Under the English law version of the documents, there is no such grant of rehypothecation rights because the document is fundamentally based on the transfer of title occurring when collateral is delivered.  Unlike rehypothecation rights under Paragraph 6(c) of the New York law document, the title transfer underpinning the English law CSA cannot be disapplied.  This presents particular issues with IAs delivered under an English law CSA, which are dealt with in Section 6 of this paper.

18   The ISDA Credit Support Deed (an English law security interest form of collateral document) contemplates that collateral shall not be rehypothecated and that it will be held in a segregated account.  Under the UK FSA rules on Client Assets (CASS 6), where the secured party does not have the right to rehypothecate collateral subject to a security interest, the secured party is obliged to hold the assets as if they are client assets, and thus the collateral is subject to a wide range of protections not applicable to collateral delivered under a title transfer agreement or a security interest with rehypothecation rights agreement.

19   The close out sequence under the ISDA Master Agreement is that (a) the agreement is terminated, (b) the termination payment is calculated according to the procedures set forth in the Master Agreement, (c) any termination payment and other amounts (i.e. unpaid amounts) are netted against posted collateral (noting that the entire pool of collateral is available for this purpose – IA and VM are not separately distinguished for this purpose), and then (d) after netting and any applicable common law set off rights have been exercised a determination is made whether any amount is owed or owing and by which party.  However, it should be noted that where the Secured Party is the Defaulting/ Affected Party, the Defaulting/ Affected Party is required to immediately return collateral to the non-defaulting Party. See Para 8(b) of the New York Law CSA.

20   Custodians and tri-party collateral agents are generally banks, either commercial banks or the underlying bank entities that operate central securities depositories.  There may, however, be other non-bank entities that now or in the future operate such services.  It should be noted that additional protection may exist when utilizing bank provided solutions, e.g. FDIC insurance (subject to the limits on such protection).  Further due diligence is required to provide assurances that affiliated regulated custodians provide the same protection to End Users as unaffiliated regulated custodians.

21   This could be established via a legal opinion from an independent law firm supporting non-consolidation of the trading counterparty entity and the affiliated custodian, for example based on the fact pattern that the custodian is a regulated entity subject to a separate insolvency regime.

22   The FSA Handbook sections 3 and 6 (Client Asset or CASS) includes several provisions that can provide protection for firms posting IA.  See Appendix 1 for more information.

23   The Securities Investor Protection Act (SIPA) is codified in Title 15 of the United States Code at Sections 78aaa - 111. The SIPA created the SIPC, a nonprofit, private membership corporation to which most registered brokers and dealers are required to belong. 15 U.S.C. § 78ccc. The SIPC fund, which constitutes an insurance program, is authorized under 15 U.S.C. § 78ddd(a), and assessments against members are authorized by 15 U.S.C. §§ 78ddd(c) and (d). The fund is designed to protect the customers of brokers or dealers subject to the SIPA from loss in case of financial failure of the member. The fund is supported by assessments upon its members. If the fund should become inadequate, the SIPA authorizes borrowing against the U.S. Treasury. An analogy could be made to the role of the Federal Deposit Insurance Corporation in the banking industry.  The insurance coverage provided in this manner is strictly limited in size and does not apply to all dealers (e.g. foreign dealers).

ISDA.  

Independent Amounts
October 2009

24    Tri-party collateral agent holding of OTC derivative collateral and the well-established Tri-party repo market have some similarities but a comparative analysis of the two markets is beyond the scope of this paper. One crucial difference is the legal nature of the collateral arrangement under-pinning the repo market, which is title transfer. There is also no equivalent IA term in the repo market, instead the parties agree to "haircuts" on the purchase prices, which take into account volatility in the underlying securities being sold in the repurchase transactions. Because of these conceptual differences in the repo market, it is difficult to draw comparisons to the OTC derivative market.

25    Under the Uniform Commercial Code (articles 8 and 9) adopted by most states in the USA and applicable to most types of counterparty, the essential step of perfecting a security interest is to take control over the collateral. In other jurisdictions there may additionally be filings or registrations that must be made to accomplish a perfected security interest. This is a highly complex area of law and readers are advised to take appropriate legal advice from qualified counsel.

26    Primarily this would be the Credit Support Annex under New York Law. It also includes the Credit Support Deed under English law, although this document is very rarely used in practice.

**Schedule 5**

**The Parsec Motion**

DRINKER BIDDLE & REATH LLP
140 Broadway, 39th Floor
New York, New York 10005-1116
Stephanie Wickouski
Telephone:    (212) 248-3170

—and—

DRINKER BIDDLE & REATH LLP
1500 K. St., NW - Suite 1100
Washington, DC 20005-1209
Kristin K. Going
Telephone: (202) 230-5177

Attorneys for Parsec Trading Corp.

**Hearing Date: January 15, 2009 at 10:00 a.m. (EST)**
**Objection Deadline: January 12, 2009 at 4:00 p.m. (EST)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                            :
In re:                                                      :
                                                            :    Chapter 11
LEHMAN BROTHERS HOLDINGS,                                    :    Case No. 08-13555-JMP
                                                            :
            Debtor.                                         :
                                                            :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF HEARING ON MOTION OF PARSEC TRADING CORPORATION FOR (A) DETERMINATION THAT THE AUTOMATIC STAY DOES NOT PREVENT RECOVERY OF PLEDGED COLLATERAL; OR (B) IN THE ALTERNATIVE, RELIEF FROM THE AUTOMATIC STAY TO RECOVER PLEDGED COLLATERAL PURSUANT TO SWAP COLLATERAL AGREEMENT**

**PLEASE TAKE NOTICE,** that by motion (the "Motion") dated December 10, 2008 of

Parsec Trading Corporation ("Parsec") filed contemporaneously herewith, by and through its

undersigned counsel, a hearing (the "Hearing") will be held before the Honorable James M.

Peck, United States Bankruptcy Judge, in Room 601, at the United States Bankruptcy Court for

the Southern District of New York (the "Bankruptcy Court"), Alexander Hamilton Custom

House, One Bowling Green, New York, New York 10004-1408, on January 15, 2009 at 10:00

a.m. (EST), or as soon thereafter as counsel can be heard, seeking entry of an order (a) determining that the automatic stay does not prevent the termination of the Swap Collateral Agreement by and among Parsec, Lehman Brothers Special Financing, Inc. and The Chase Manhattan Bank, or (b) in the alternative, granting Parsec relief from the automatic stay to recover its pledged collateral under to the Swap Collateral Agreement.

 **PLEASE TAKE FURTHER NOTICE**, that objections, if any, to the Motion, must (a) be made in writing; (b) comply with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules and Administrative Orders for the United States Bankruptcy Court for the Southern District of New York, and the Court's September 22, 2008 Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures (the "Case Management Order"); (c) be filed with the Bankruptcy Court in accordance with General Order M-242 (as amended) (which can be found at www.nysb.uscourts.gov) (i) electronically by registered users of the Bankruptcy Court's case filing system, or (ii) on a 3.5 inch disk, preferably in Portable Document Format (PDF), Word, WordPerfect, or any other Windows-based word processing format, by all other parties in interest; (d) be submitted in hard copy form to the Chambers of the Honorable James M. Peck, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Custom House, One Bowling Green, New York, New York 10004; and (e) and served in accordance with General Order M-242 and the Case Management Order upon the following parties: (i) counsel for Parsec, Drinker Biddle & Reath LLP, 140 Broadway, 39th Floor, New York, New York 10005-1116, Attention: Stephanie Wickouski, and Drinker Biddle & Reath LLP, 1500 K Street, N.W., Suite 1100, Washington, D.C. 20005, Attention: Kristin Going, (ii) counsel for the Debtors, Weil Gotshal & Manges LLP, 767 Fifth

Avenue, New York, New York 10153, Attention: Harvey R. Miller, Richard P. Krasnow, Lori R. Fife, Shai Waisman, and Jacqueline Marcus, (iii) counsel for the Official Committee of Unsecured Creditors, Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New York, New York 10005, Attention: Dennis F. Dunne, Dennis O'Donnell and Evan Fleck, (iv) counsel for the Debtors' Postpetition Lenders, Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, New York, New York 10006, Attention: Lindsee P. Granfield and Lisa Schweitzer, and Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004, Attention: Robinson B. Lacy and Hydee R. Feldstein, and (v) the Office of the United States Trustee for the Southern District of New York, 33 Whitehall Street, 21st Floor, New York, New York 10004, Attention: Tracy Hope Davis, Andy Velez-Rivera, Paul Schwartzberg, Brian Masumoto, and Linda Riffkin **so as to be actually received, in all cases, no later than January 12, 2009 at 4:00 p.m. (EST)**. Only those objections or responses which have been timely filed and served may be considered by the Court at the Hearing;

**PLEASE TAKE FURTHER NOTICE** that the Court may grant the relief requested in the Motion without a hearing if no objections to the Motion are timely filed and served; and

**PLEASE TAKE FURTHER NOTICE**, that the Hearing to consider the Motion may be adjourned thereafter from time to time without further notice to parties in interest other than the announcement of the adjourned date at the Hearing or any other hearing thereafter.

Dated:  New York, New York
        December 10, 2008

**DRINKER BIDDLE & REATH LLP**


By: /s/ Stephanie Wickouski
    Stephanie Wickouski
    140 Broadway, 39th Floor
    New York, New York 10005-1116

3

(212) 248-3140

—and—

Kristin K. Going
1500 K. St., NW - Suite 1100
Washington, DC 20005-1209
(202) 230-5177

*Counsel to Parsec Trading Corporation*

NY01/ 7116104.1

DRINKER BIDDLE & REATH LLP
140 Broadway, 39th Floor
New York, New York 10005-1116
Stephanie Wickouski
Telephone:    (212) 248-3170

—and—

DRINKER BIDDLE & REATH LLP
1500 K. St., NW - Suite 1100
Washington, DC 20005-1209
Kristin K. Going
Telephone: (202) 230-5177

Attorneys for Parsec Trading Corp.

**Hearing Date: January 15, 2009 at 10:00 a.m. (EST)**
**Objection Deadline: January 12, 2009 at 4:00 p.m. (EST)**

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                           :
In re:                     :
                           :  Chapter 11
LEHMAN BROTHERS HOLDINGS,  :  Case No. 08-13555-JMP
                           :
        Debtor.           :
                           :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MOTION OF PARSEC TRADING CORPORATION FOR (A) DETERMINATION
THAT THE AUTOMATIC STAY DOES NOT PREVENT RECOVERY OF PLEDGED
COLLATERAL; OR (B) IN THE ALTERNATIVE, RELIEF FROM THE AUTOMATIC
STAY TO RECOVER PLEDGED COLLATERAL PURSUANT TO SWAP
COLLATERAL AGREEMENT**

Parsec Trading Corp. ("Parsec") by and through its undersigned counsel, respectfully

submits this motion (the "Motion") for an order, pursuant to sections 555 and 362 of title 11 of

the United States Code (the "Bankruptcy Code") determining that the automatic stay does not

prevent termination of the Collateral Agreement (as defined below) or in the alternative, for

relief from the automatic stay to allow Parsec to recover its collateral under the Collateral

Agreement.  In support of the relief sought, Parsec respectfully states as follows:

### Jurisdiction and Venue

1.     The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334 and 157.  This

Motion is a core proceeding under 28 U.S.C. § 157(b)(2).  Venue is proper in this district

pursuant to 28 U.S.C. § 1409(a).

### Factual Background

2.     Parsec and Lehman Brothers Special Financing, Inc. ("Special Financing") entered into

an ISDA Master Agreement dated April 21, 1997 (the "Swap Agreement"), pursuant to which

Parsec agreed to pledge certain collateral to Special Financing to secure Parsec's obligations

under the Swap Agreement.

3.     Parsec and Special Financing also entered into a Swap Collateral Agreement (the

"Collateral Agreement") with The Chase Manhattan Bank ("Chase") dated as of August 25,

1999, attached hereto as Exhibit A, whereby Chase holds Parsec's pledged collateral (the

"Collateral").

NY01/ 7115586.2                                2

4.    Special Financing's bankruptcy filing constituted an event of default under the Swap

Agreement, and pursuant to section 6(a) of the Swap Agreement, Parsec terminated the Swap

Agreement by notice dated September 15, 2008, attached hereto as Exhibit B.  Parsec also

provided Special Financing with a statement of calculations following early termination, dated

September 25, 2008, and attached hereto as Exhibit C.  On September 26, 2008, Parsec provided

Chase written notice of termination and requested return of the Collateral, which is also attached

hereto as Exhibit D.

5.    Parsec believes that the automatic stay provisions on section 362 of the Bankruptcy Code

do not apply in this instance because the Swap Agreement and Collateral Agreement are

"securities contracts" and that Parsec is a "financial institution" as those terms are defined in the

Bankruptcy Code.  Therefore Parsec may terminate the Collateral Agreement and Chase may

return Parsec's collateral without the need to obtain relief from the automatic stay from the Court

pursuant to section 555 of the Bankruptcy Code.  However, because Chase has refused to turn

over the Collateral absent a Bankruptcy Court order, Parsec seeks a determination from the Court

that the automatic stay provisions of the Bankruptcy Code do not apply, and that Parsec can

terminate the Collateral Agreement and receive the return of the Collateral from Chase.

6.    In the event the Court determines that the automatic stay does apply, Parsec seeks, in the

alternative, relief from the automatic stay pursuant to section 362(d)(1) of the Bankruptcy Code

so that it can terminate the Collateral Agreement.  As set forth below, the Swap Agreement is

"out of the money" for Special Financing and thus there is no monetary value to Special

Financing's bankruptcy estate.  However, the prejudice to Parsec is substantial as Chase is

currently holding in excess of $13,000,000.00 of Parsec's collateral.   Chase will not release

these funds absent this Court's order.  Therefore, cause exists to grant relief from the automatic stay.

**Relief Requested**

7.      Parsec respectfully requests entry of the attached proposed order determining that the automatic stay of section 362 of the Bankruptcy Code does not apply, and therefore Parsec may terminate the Collateral Agreement without prior permission from the Court.  In the event the Court determines that the automatic stay provisions of the Bankruptcy Code do apply, Parsec respectfully requests, in the alternative, relief from the automatic stay so as to permit Parsec to take all actions necessary to terminate the Collateral Agreement.  Parsec further seeks an order compelling Chase to turnover the Collateral as required under the provisions of the Swap Agreement and Collateral Agreement.

**Basis for Relief Requested**

**A.      Parsec is Entitled to Terminate the Collateral Agreement Pursuant to the Safe Harbor Provisions of the Bankruptcy Code**

8.      Section 555 of the Bankruptcy Code provides in relevant part:

> The exercise of a contractual right of a ...financial institution...to cause the liquidation, termination, or acceleration of a securities contract, as defined in section 741 of this title, because of the condition of the kind specified in section 365(e)(1) of this title shall not be stayed, avoided, or otherwise limited by operation of any provision of this title...

11 U.S.C. § 555.

9.      Parsec meets the definition of "financial institution" in section 101(22) of the Bankruptcy Code, as the definition includes the customer of a bank, when the bank is acting as agent and/or custodian for the customer, as Special Finance and Chase were acting as agent and/or custodian for Parsec.  The Swap Agreement and Collateral Agreement are "securities contracts" pursuant

to section 741(7) of the Bankruptcy Code as they are contracts for the purchase, sale or loan of a security, or contracts that are similar to an agreement for the purchase, sale or loan or a security.

10.    Therefore, Parsec requests this Court determine that terminating the Collateral Agreement is within the safe harbor provisions of the Bankruptcy Code and that Parsec is entitled to terminate the Collateral Agreement without further order of the Bankruptcy Court.

**B.    Even if the Automatic Stay Does Apply, Cause Exists to Lift the Automatic Stay**

11.    In the event the Court determines the automatic stay applies, Parsec requests the Court lift the automatic stay to allow it to recover the Collateral from Chase.

12.    Pursuant to section 362(d)(1) of the Bankruptcy Code, the Court, after notice and a hearing, may terminate the automatic stay for cause.  While cause is not defined in the Bankruptcy Code, the Second Circuit has identified several factors in determining whether cause exists, including the impact of the stay and the balance of the harms.  *In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2d Cir. 1990).  The Second Circuit also concluded that the issue of whether to terminate the automatic stay is within the sound discretion of the Bankruptcy Court. *Id.*

13.    Parsec has cause to terminate the stay, to the extent it applies, to allow it to terminate the Collateral Agreement and recoup the Collateral from Chase.  There is no benefit to Special Finance as it is already holding an amount in excess of the termination value.  Special Finance is currently holding $49,487,274.05 plus interest from Parsec.  Based upon the termination notice of calculations that Parsec sent to Special Finance, the value of the portfolio was $46,737,917.55. Therefore, Special Finance is not owed any additional amounts, but instead owes $2,797,842.30, plus interest and expenses to Parsec.  However, in addition to the above, Chase is holding

$ 13,000,000.00 in treasury notes, which constitutes Excess Collateral (as that term is defined in the Collateral Agreement). The intent and purpose of the Excess Collateral was to protect Special Finance in the event that Parsec defaulted under the Swap Agreement or did not have sufficient funds to pay Special Finance at the termination of the Swap Agreement. Clearly that is not what happened in this instance, and the Collateral must be returned to Parsec.

C.      **Once the Collateral Agreement Is Terminated, Chase Must Return the Collateral**

14.     Pursuant to Paragraph 12 of the Collateral Agreement, Chase was obligated to turn over the Collateral to Parsec upon receipt of a certificate from Parsec stating that an Early Termination Date (as defined in the Swap Agreement) has occurred. However, despite receiving such a certificate on September 26, 2008, Chase has refused to turn over the Collateral absent an Order from this Bankruptcy Court determining that the automatic stay is either not in effect or has been terminated, and directing Chase to turn over the Collateral to Parsec. Pursuant to the terms of the Swap Agreement and Collateral Agreement, Chase has no valid basis for withholding the Collateral from Parsec. Therefore, Chase must turn over the Collateral to Parsec.

<u>Notice</u>

15.     Notice of this Motion has been provided pursuant to this Court's Order [Dkt. 285] entered on September 22, 2008 governing case management and administrative procedures for the Debtors' cases to: (i) counsel for the Debtors, (ii) the Office of the United States Trustee for the Southern District of New York, (iii) counsel to the Official Committee of Unsecured Creditors, (iv) counsel to the postpetition lenders, (v) counsel for Chase Manhattan Bank, and (vi) all other parties requesting notice under Bankruptcy Rule 2002. In light of the nature of the relief requested herein, Parsec submits that no other or further notice need be given.

**No Prior Request**

16.    No prior request for the relief sought herein has been made to this or any other Court.


Dated:  December 10, 2008


By: /s/ Stephanie Wickouski
       Stephanie Wickouski
       DRINKER BIDDLE & REATH LLP
       140 Broadway, 39th Floor
       New York, New York 10005-1116
       Telephone:    (212) 248-3170
       Facsimile:     (212) 348-3141

       —and—

       Kristin K. Going
       DRINKER BIDDLE & REATH LLP
       1500 K. St., NW - Suite 1100
       Washington, DC 20005-1209
       Telephone: (202) 230-5177
       Facsimile: (202) 842-8465

       Attorneys for Parsec Trading Corp.

## SWAP COLLATERAL AGREEMENT

SWAP COLLATERAL AGREEMENT, dated as of August 25, 1999 (the "Agreement"), among Lehman Brothers Special Financing Inc. (the "Secured Party"), Parsec Trading Corp. (the "Pledgor"), and The Chase Manhattan Bank, as custodian hereunder (the "Custodian").

### W I T N E S S E T H

WHEREAS, Secured Party and Pledgor have entered into an ISDA Master Agreement dated as of April 21, 1997 (the "Swap Agreement"), pursuant to which Pledgor has agreed to pledge Eligible Collateral (as defined below) to Secured Party to secure Pledgor's obligations to Secured Party pursuant to the Swap Agreement; and

WHEREAS, Secured Party and Pledgor have requested Custodian to hold that portion of the Eligible Collateral at least equal to the Independent Amount (as defined below) and to perform certain other functions as more fully described herein; and

WHEREAS, Custodian has agreed to act on behalf of Secured Party and Pledgor as custodian of the Eligible Collateral delivered to Custodian by Pledgor for the benefit of Secured Party;

NOW THEREFORE, in consideration of the mutual promises set forth hereafter, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

Whenever used in this Agreement, unless the context otherwise requires, the following words shall have the meanings set forth below:

1.      "Account" shall mean a custodial account for the deposit of securities and any related accounts for the deposit of cash established and maintained pursuant to this Agreement in which Eligible Collateral shall be deposited by or on behalf of Pledgor and pledged to Secured Party.

2.      "Authorized Person" shall be any officer of Secured Party or Pledgor, as more fully set forth on Schedule II attached hereto, as the case may be, and any other person whether or not any such person is an officer or employee of Secured Party or Pledgor, duly authorized by Secured Party or Pledgor to give Oral and/or Written Instructions on behalf of Secured Party or Pledgor, as the case may be, such person to be designated in a Certificate which contains a specimen signature of such person.

3.      "Book-Entry System" shall mean the book-entry system for securities maintained at The Federal Reserve Bank of New York ("FRBNY").

232575:v02

EXHIBIT

Exhibit

A

4.     "Business Day" shall mean any day on which Custodian is open for business and on which the Book-Entry System and/or Clearing Corporation are open for business.

5.     "Cash" shall mean immediately available funds in any of the following currencies: U.S. Dollar, Japanese Yen, Canadian Dollar, Deutsche Mark, British Pound Sterling, Italian Lira and French Franc.

6.     "Certificate" shall mean any notice, instruction, schedule or other instrument in writing, authorized or required by this Agreement to be given to Custodian, which is actually received by Custodian and signed by an Authorized Person.

7.     "Clearing Corporation" shall include The Depository Trust Company, Participants Trust Company and any other clearing corporation within the meaning of Section 8-102(3) of the Uniform Commercial Code of the State of New York, as amended, or otherwise authorized to act as a securities depository or clearing agency.

8.     "Collateral Value" shall mean the amount obtained by dividing the Market Value of Eligible Collateral by the applicable Valuation Percentage.

9.     "Eligible Collateral" shall mean cash, and the types of securities designated as Eligible Collateral on Schedule I attached hereto.

10.     "Independent Amount" shall mean the Independent Amount, as defined in the Swap Agreement, as reported to Custodian pursuant to Article IV, Paragraph 1 hereof.

11.     "Market Value of Eligible Collateral" shall mean, with respect to each type of security constituting Eligible Collateral, the sum of (i) the market value of each such security in the Account based on the most recently available closing bid price for each such security as made available to Custodian by a recognized pricing service selected by Custodian; provided however, that if such service does not report a closing bid price for a particular security, the market value shall be as determined by Custodian in its sole discretion based on information furnished to Custodian by one or more brokers or dealers in such security, and (ii) accrued interest on each such security (to the extent not reflected in such market value). In the case of Cash, the face amount thereof shall be deemed the Market Value; provided, however, that with respect to any Cash denominated in a currency other than U.S. Dollars, the face amount shall be converted to the spot exchange rate U.S. Dollar equivalent as Chase shall determine in a commercially reasonable manner at the time of such conversion.

12.     "Oral Instructions" shall mean verbal instructions actually received by Custodian from an Authorized Person or from a person reasonably believed by Custodian to be an Authorized Person.

13.     "Proceeds" shall mean any principal or interest payments or other distributions made in connection with Eligible Collateral.

14.    "Valuation Percentage" shall mean the percentage indicated on Schedule I with respect to specific types of Eligible Collateral, as Schedule I may be amended from time to time.

15.    "Written Instructions" shall mean written communications actually received by Custodian from an Authorized Person or from a person reasonably believed by Custodian to be an Authorized Person by letter, telex, telecopy, facsimile, or other on-line system, or any other method whereby Custodian is able to verify with a reasonable degree of certainty the identity of the sender of such communications.

All references to time in this Agreement shall mean the time in effect on that day in New York, New York.

## ARTICLE II
## APPOINTMENT OF CUSTODIAN; THE ACCOUNT

1.    Pledgor and Secured Party hereby appoint Custodian as custodian of all Eligible Collateral at any time delivered to Custodian, in accordance with the appropriate cash or security delivery instructions as set forth in Schedule III attached hereto, by or on behalf of Pledgor during the term of this Agreement. Custodian hereby accepts appointment as such custodian and agrees to establish and maintain the Account and appropriate records identifying the Eligible Collateral as pledged by Pledgor to Secured Party. Pledgor, Secured Party and Custodian agree that the Eligible Collateral will be held for Secured Party in the Account by Custodian as agent of Secured Party and the parties further agree that Custodian will take such action with respect to any Eligible Collateral as Secured Party may instruct and that in no event shall any consent of Pledgor be required in order for Custodian to act in accordance with Secured Party's instructions to it; provided that, Custodian shall be held harmless in connection with any action or inaction implementing Secured Party's instructions. Secured Party hereby covenants, for the benefit of Pledgor, that Secured Party will not instruct Custodian to deliver or cause to be transferred any Eligible Collateral to any person other than Pledgor unless and until an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor or Pledgor has defaulted on its Obligations pursuant to the Swap Agreement. The foregoing covenant is for the benefit of Pledgor only and shall in no way be deemed to constitute a limitation on Secured Party's right at any time to instruct Custodian or on Custodian's ability to rely on such instructions. If Custodian receives Written Instructions from Secured Party prior to 11:00 a.m. on a Business Day directing Custodian to transfer any Eligible Collateral, Custodian shall so transfer such Eligible Collateral prior to the close of business on that Business Day and Custodian's duties hereunder with respect to such Eligible Collateral shall terminate, and Custodian shall be held harmless therefor.

2.    Pledgor and Secured Party agree that Eligible Collateral to be delivered to Custodian for deposit in the Account may be in the form of credits to the account of Custodian either at the Book-Entry System or a Clearing Corporation or by delivery to Custodian of physical certificates in bearer form or readily negotiable so as to constitute good delivery under securities industry practices. Pledgor and Secured Party hereby authorize Custodian on a continuous and on-going basis, to deposit in the Book-Entry System and/or the appropriate Clearing Corporation all Eligible Collateral eligible for deposit therein and to utilize the Book-

232575:v02

Entry System, Clearing Corporation and the receipt and delivery of physical certificates or any combination thereof in connection with its performance hereunder. Pledgor and Secured Party also authorize Custodian to hold Eligible Collateral in registered form in its name or the name of its nominee or nominees. Where Eligible Collateral eligible for deposit in the Book-Entry System or Clearing Corporation is transferred to the Account, Custodian shall identify such Eligible Collateral on its books and records as belonging to Pledgor, and pledged to Secured Party and shall send Secured Party a confirmation in accordance with Article IV, Paragraph 13.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

1.      Secured Party, Pledgor and Custodian each represents and warrants that:

(i)     It is duly organized and existing under the laws of the jurisdiction of its organization with full power and authority to execute and deliver this Agreement and to perform all of the duties and obligations to be performed by it hereunder;

(ii)    This Agreement is legally and validly entered into, does not, and will not, violate any ordinance, charter, by-law, rule or statute applicable to it, and is enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency or similar laws, or by equitable principles relating to or limiting creditors' rights generally; and

(iii)   The person executing this Agreement on its behalf has been duly and properly authorized to do so.

2.      Pledgor further represents and warrants that it  owns the Eligible Collateral transferred into the Account from time to time free and clear of all liens, claims, security interests and encumbrances (except those granted herein), and Pledgor hereby grants to Secured Party a pledge and first priority security interest in all of Pledgor's right, title, and interest in and to the Eligible Collateral, as security for Pledgor's obligations to Secured Party pursuant to the Swap Agreement.

3.      Custodian further represents and warrants that:

(i)     It is a New York banking corporation with its principal office at 270 Park Avenue, New York, New York 10017;

(ii)    It will maintain the Account as a custody account and shall administer the Account in the same manner it administers similar accounts established for the same purpose; and

(iii)   It is a "Member Bank" of FRBNY (within the meaning of 31 C.F.R. 306.115(g)) and maintains a book-entry securities account with FRBNY and each Clearing Corporation in which it holds Eligible Collateral hereunder.

## ARTICLE IV
## CUSTODY OF CASH AND SECURITIES

1.     At Secured Party's option or at Pledgor's request, Secured Party shall provide Written Instructions by 11:00 a.m. to Custodian and Pledgor indicating the Independent Amount. Until new Written Instructions indicating a new Independent Amount are received by Custodian, Custodian shall conclusively presume that the Independent Amount has remained unchanged. On each Business Day Custodian shall calculate the Collateral Value and shall, upon request of Pledgor or Secured Party, notify Pledgor or Secured Party, as the case may be, of the Collateral Value.  If on any Business Day the Collateral Value of Eligible Collateral is less than the Independent Amount, Custodian agrees to provide notice thereof and of the amount of such shortfall (a "Shortfall Notice") as promptly as practicable (and in any event shall endeavor to provide the Shortfall Notice within one (1) Business Day) to Pledgor and Secured Party. Pledgor agrees to deliver or cause to be delivered, as provided below, to Custodian for deposit in the Account additional Eligible Collateral ("Additional Collateral") in an amount such that the Collateral Value of Eligible Collateral in the Account, including such Additional Collateral, equals or exceeds the Independent Amount. Pledgor agrees that if a Shortfall Notice is received prior to 12:00 noon on a Business Day, such delivery shall be made on the second succeeding Business Day.  In the event that at any time Pledgor does not deliver Additional Collateral as required hereby, Custodian shall, as promptly as practicable, notify Secured Party of such failure.

2.     Custodian shall determine that all Additional Collateral to be transferred to the Account constitutes Eligible Collateral.  Any Additional Collateral which does not constitute Eligible Collateral shall not be transferred to the Account.

3.     If, subject to Article IV, Paragraph 12 after the close of trading on any Business Day, the Collateral Value of Eligible Collateral in the Account is greater than the Independent Amount, Custodian is authorized to transfer from the Account Eligible Collateral in an amount equal to such excess in accordance with Oral or Written Instructions from Pledgor.   The Custodian is hereby authorized by Pledgor to use the cash and security delivery instructions set forth on Schedule IV attached hereto when transferring excess Eligible Collateral to it.

4.     In the event any other payment instructions are given in writing, by telephone or by telecopier, Custodian is authorized to seek confirmation of such instructions by telephone call-back to any person designated on Schedule II attached hereto with respect to an instruction purportedly given by the Pledgor and to any person designated on Schedule II attached hereto with respect to an instruction purportedly given by the Secured Party, and Custodian may rely upon the confirmation of anyone purporting to be a person so designated.   The persons and telephone numbers for call-backs may be changed only in writing, purporting to be issued in the name of Pledgor or Secured Party, as the case may be, actually received and acknowledged by Custodian. Pledgor and Secured Party each acknowledges that such security procedure is commercially reasonable.  It is understood, however, that Custodian shall not be required to verify payment instructions pursuant to the above described security procedure when the amounts to be transferred are below dollar thresholds from time to time established by Custodian, when payment information (other than dollar amount and date of payment) have been pre-established with Custodian, when Pledgor is the beneficiary of a Pledgor initiated funds

transfer or the Secured Party is the beneficiary of a Secured Party initiated funds transfer or when the circumstances otherwise warrant as determined by Custodian in its reasonable discretion.

5.      It is understood and agreed that Custodian and the beneficiary's bank in any funds transfer may solely rely upon any account number or similar identifying number provided by Pledgor to identify (i) the beneficiary, (ii) the beneficiary's bank, or (iii) an intermediary bank. Custodian may debit Pledgor's account in connection with any payment orders issued by Custodian using any such identifying numbers, even where their use may result in a person other than the beneficiary being paid, or the transfer of funds to a bank other than the beneficiary's bank or an intermediary bank designated by Pledgor.

6.      In receiving and processing payment instructions by Pledgor or Secured Party and in issuing payment orders in furtherance thereof, Custodian, to the maximum extent permitted by law, shall not be liable for: events or circumstances beyond reasonable control of Custodian or (ii) indirect, special or consequential damages, even if Custodian is advised as to the possibility thereof.

7.      Custodian may provide Pledgor and Secured Party, from time to time, with additional or changed procedures or instructions in connection with the matters described herein, upon written notice to Pledgor and Secured Party.

8.      As long as Custodian has not received a Certificate pursuant to Article IV, Paragraph 11 or 12, Secured Party hereby grants Pledgor authority to substitute other Eligible Collateral for any Eligible Collateral which is held in the Account in accordance with the terms of this provision.   Pledgor may exercise the right of substitution by giving Custodian Oral Instructions or Written Instructions to transfer certain Eligible Collateral out of the Account upon the delivery into the Account of substitute Eligible Collateral ('Substitute Collateral") in an amount such that the Collateral Value in the Account, including such Substitute Collateral, equals or exceeds the Independent Amount.   Custodian shall determine that all Substitute Collateral transferred to the Account constitutes Eligible Collateral.   Any Substitute Collateral which does not constitute Eligible Collateral shall not be transferred to the Account and shall not be included in Custodian's calculation of Collateral Value.

9.      If a dispute arises between Pledgor and Secured Party with respect to the Collateral Value of Eligible Collateral, Pledgor and Secured Party agree that such dispute shall be resolved in accordance with the following provisions:

(i)      Pledgor and Secured Party shall notify Custodian of the dispute with respect to the Collateral Value of Eligible Collateral ("Dispute Notice");

(ii)      Pledgor and Secured Party shall then jointly notify Custodian of a recalculated value with respect to the Collateral Value of Eligible Collateral ("Recalculated Value") which shall supplant the disputed Collateral Value of Eligible Collateral.

(iii)      Custodian may, upon receipt, fully rely, without any inquiry, on the Recalculated Value;

(iv)    Notwithstanding anything to the contrary herein, no Eligible Collateral shall be transferred to or from the Account until any dispute is resolved and Custodian has received joint notice from Pledgor and Secured Party that the dispute has been resolved; and

(v)    Notwithstanding anything to the contrary herein, Custodian shall be held harmless from and against any Losses incurred in connection with Custodian's implementation of the provisions herein with respect to any Notice of Dispute or any Recalculated Value.

10.    Custodian shall not subject any Eligible Collateral in the Account to any security interest, lien or right of setoff in favor of Custodian or any third party claiming through Custodian, and Custodian shall not pledge, encumber, hypothecate, transfer, dispose of, or otherwise grant any third party an interest in, any Eligible Collateral.

11.    Until such time that Custodian shall receive a Certificate from Secured Party certifying that Pledgor has defaulted in its obligations to Secured Party pursuant to the Swap Agreement, Custodian shall credit all Proceeds received by Custodian to the cash account identified by Pledgor in Schedule IV attached hereto,.

12.    In the event that Custodian receives a Certificate from Secured Party certifying that (i) Pledgor has defaulted in its obligations to Secured Party pursuant to the Swap Agreement or (ii) an Early Termination Date (as defined in the Swap Agreement) has been designated under and pursuant to the Swap Agreement, Custodian shall be authorized, without further inquiry, to act upon Written Instructions from Secured Party with respect to the disposition of all or any part of the Eligible Collateral. If at any time after Custodian has received such Certificate, Custodian receives Written Instructions from Secured Party prior to 11:00 a.m. on a Business Day directing Custodian to transfer any Eligible Collateral, Custodian shall so transfer such Eligible Collateral prior to the close of business of that Business Day and Custodian's duties hereunder with respect to such Eligible Collateral shall terminate. Unless instructed differently, the Custodian is hereby authorized by the Secured Party to use the cash and security delivery instructions set forth on Schedule V attached hereto when transferring excess Eligible Collateral to it.

13.    Custodian will provide Pledgor and Secured Party with a confirmation statement on each Business Day on which a transfer or substitution occurs and each month with a statement identifying all Eligible Collateral in the Account and showing all transactions in the Account for the past month. Secured Party and Pledgor shall promptly review all such statements and shall promptly advise Custodian of any error, omission or inaccuracy in each statements. Custodian shall undertake to correct any errors, failures or omissions that are reported to Custodian by Secured Party or Pledgor. Any such corrections shall be reflected on subsequent statements.

14.    Pledgor acknowledges and agrees that any noncompliance by Secured Party with any obligations to Pledgor hereunder or under the Swap Agreement shall not be deemed a violation of such obligations to the extent such non-compliance is attributable solely to the action or inaction of Custodian, the Book-Entry System, any Clearing Corporation or their successors or nominees. Notwithstanding the foregoing, it is expressly understood and agreed that Custodian's liability (if any) shall be determined in accordance with Article V, Paragraph 1 (a)

## ARTICLE V
## CONCERNING CUSTODIAN

1.     (a)  Custodian shall use reasonable care in performing its obligations under this Agreement.  Custodian shall not be liable for any costs, expenses, damages, liabilities or claims, including reasonable fees of counsel (collectively, "Losses"), resulting from its action or inaction in connection with this Agreement, including Losses which are incurred by reason of any action or inaction by the Book-Entry System, any Clearing Corporation, or their successors or nominees, except for those Losses arising out of Custodian's gross negligence, bad faith or willful misconduct.  In no event shall Custodian be liable to Pledgor, Secured Party or any third party for special, indirect or consequential damages, or lost profits or loss of business, arising under or in connection with this Agreement.  Custodian may, with respect to questions of law, apply for and obtain the advice and opinion of counsel and shall be fully protected with respect to anything done or omitted by it in good faith in conformity with such reasonable advice or opinion.  The limitations of liability with respect to Custodian shall survive the termination of this Agreement.

(b)  Pledgor agrees to indemnify and defend Custodian and hold it harmless from and against any and all Losses (including claims by Pledgor or Secured Party) which are sustained by Custodian as a result of Custodian's action or inaction in connection with this Agreement except to the extent that any Losses arise out of Custodian's gross negligence, bad faith or willful misconduct.

(c)  Secured Party agrees to indemnify and defend Custodian and hold it harmless from and against any and all Losses which are sustained by Custodian by reason of or as a result of (i) any negligence, bad faith or willful misconduct by Secured Party in any way relating to, or arising from, this Agreement or transactions hereunder and (ii) any action taken or omitted by Custodian pursuant to Secured Party's Oral or Written Instructions.  Notwithstanding the foregoing, Secured Party shall not indemnify Custodian to the extent those Losses arise out of Custodian's gross negligence, bad faith or willful misconduct.

(d)  It is expressly understood and agreed that Custodian's right to indemnification hereunder shall be enforceable against Pledgor and Secured Party directly, without any obligation to first proceed against any third party for whom they may act, and irrespective of any rights or recourse that Secured Party or Pledgor may have against any such third party.  This indemnity shall be a continuing obligation of Pledgor and Secured Party, their respective successors and assigns, notwithstanding the termination of this Agreement.

2.     Without limiting the generality of the foregoing, Custodian shall be under no obligation to inquire into, and shall not be liable for:

(i)     The validity of the issue of any securities purchased or sold by or for Pledgor or Secured Party;

(ii)    The due authority of any Authorized Person to act on behalf of Pledgor or Secured Party with respect to Eligible Collateral held in the Account; or

(iii)    The due authority of Pledgor or Secured Party to purchase, sell or hold any particular security hereunder.

3.    Custodian shall not be under any duty or obligation to take action to effect collection of any amount due on the Eligible Collateral in the Account whether or not the Eligible Collateral upon which such amount is payable is in default, or if payment is refused after due demand or presentation, unless and until (i) it shall be directed to take such action by Written Instructions and (ii) it shall be assured to its satisfaction of reimbursement of its reasonable costs and expenses in connection with any such action.

4.    Custodian shall not be responsible for, or considered to be Custodian of, any Eligible Collateral or money (whether or not represented by any check, draft, or other instrument for the payment of money) received by it for deposit in the Account until Custodian actually receives and collects such Eligible Collateral or funds directly or by the final crediting of Custodian's account on the books of the Book-Entry System or the appropriate Clearing Corporation. Custodian will be entitled to reverse any credits made on Secured Party's behalf where such credits have been previously made and Eligible Collateral or monies are not finally collected.

5.    Custodian shall be entitled to receive and Pledgor agrees to pay to Custodian such compensation as may be agreed upon from time to time between Custodian and Pledgor and Custodian's out-of-pocket expenses.

6.    Custodian shall be entitled to rely upon any Certificates, Written or Oral Instructions actually received by Custodian and reasonably believed by Custodian to be duly authorized and delivered. Pledgor and Secured Party each agrees to forward to Custodian Written Instructions confirming Oral Instructions in such manner so that such Written Instructions are received by Custodian by the close of business of the same day that such Oral Instructions are given to Custodian. Pledgor and Secured Party each agrees that the fact that such confirming Written Instructions are not received or that contrary instructions are received by Custodian shall in no way affect the validity or enforceability of the transactions previously authorized and effected by Custodian.

7.    It is understood that Custodian is authorized to supply any information regarding the Account which is required by any law or governmental regulation now or hereafter in effect

8.    Custodian shall not be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused, directly or indirectly, by circumstances beyond its reasonable control, including without limitation, acts of God, earthquakes, fires, floods, wars, civil or military disturbances, sabotage, epidemics, riots, interruptions, loss or malfunctions of utilities, transportation, computer (hardware or software) or communications service; labor disputes; acts of civil or military authority; governmental, judicial

or regulatory actions; provided however, that Custodian shall use its best efforts to resume performance as soon as possible.

9.     Custodian is authorized to utilize any generally recognized pricing information service (including brokers and dealers of securities) in order to perform its valuation responsibilities hereunder, and Secured Party and Pledgor agree to hold Custodian harmless from and against any Losses incurred as a result of errors or omissions of any such pricing information service, broker or dealer.

10.    Custodian shall have no duties or responsibilities whatsoever except such duties and responsibilities as are specifically set forth in this Agreement, and no covenant or obligation shall be implied against Custodian in connection with this Agreement.

## ARTICLE VI
## TERMINATION

Any of the parties hereto may terminate this Agreement by giving to the other parties a notice in writing specifying the date of such termination, which shall be not less than ninety (90) days after the date of giving of such notice. Pledgor may terminate this Agreement at any time that no Eligible Collateral is in the Account by giving notice in writing to Custodian and Secured Party specifying the date of such termination. Such notice shall not affect or terminate Secured Party's security interest in the Eligible Collateral. Upon termination hereof, Pledgor shall pay to Custodian such compensation as may be due to Custodian as of the date of such termination, and Custodian shall follow such reasonable Written Instructions of Pledgor and Secured Party concerning the transfer of custody of Eligible Collateral, records and other items. In the event of discrepancy between Written Instructions of Pledgor and Secured Party, Custodian shall act pursuant to Secured Party's Written Instructions. Upon the date set forth in a termination notice this Agreement shall terminate, and, except as otherwise provided herein, all obligations of the parties to each other hereunder shall cease.

## ARTICLE VII
## MISCELLANEOUS

1.     Pledgor and Secured Party each agrees to furnish to Custodian a new Certificate in the event that any presently Authorized Person ceases to be an Authorized Person or in the event that any other Authorized Persons are appointed and authorized. Until such new Certificate is received, Custodian shall be fully protected in acting upon Oral Instructions or signatures of the present Authorized Persons, as set forth on Schedule II attached hereto.

2.     Any notice or other instrument in writing, authorized or required by this Agreement to be given to Custodian shall be sufficiently given if addressed to Custodian and received by it at its offices at 450 West 33rd Street, 10th Floor, New York, New York 10001, Attention:  Pledged Asset Control Services or at such other place as Custodian may from time to time designate in writing.

232575:v02

3.     Any notice or other instrument in writing, authorized or required by this Agreement to be given to Pledgor shall be sufficiently given if addressed to Pledgor and received by it at its offices at Mees Pierson Fund Services, Montague Sterling Centre, East Bay Street, Nassau, Bahamas with a copy to: The Watermark Group, 100 Thanet Circle, Suite 201, Princeton, NJ 08549 or at such other place as Pledgor may from time to time designate in writing.

4.     Any notice or other instrument in writing, authorized or required by this Agreement to be given to Secured Party shall be sufficiently given if addressed to Secured Party and received by it at its offices at 200 Vesey Street, 7th Floor, New York, New York 10285, Attention: Derivatives Margin or at such other place as Secured Party may from time to time designate in writing.

5.     Upon reasonable request, Secured Party and Pledgor shall have access to Custodian's books and records maintained in connection with this Agreement during Custodian's normal business hours. Upon reasonable request, copies of any such books and records shall be provided to Secured Party or Pledgor at its expense.

6.     In case any provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations shall not in any way be affected or impaired thereby, and if any provision is inapplicable to any person or circumstances, it shall nevertheless remain applicable to all other persons and circumstances.

7.     This Agreement represents the entire agreement among the parties hereto with respect to transactions subject to this Agreement and may not be amended or modified in any manner except by a written agreement executed by all of the parties hereto.

8.     This Agreement shall extend to and shall be binding upon the parties hereto, and their respective successors and assigns; provided, however, that this Agreement shall not be assignable by any party without the written consent of the other parties.

9.     This Agreement shall be construed in accordance with the laws of the State of New York without regard to conflict of laws principles thereof. The parties hereby consent to the jurisdiction of a state of federal court situated in New York City, New York in connection with any dispute arising hereunder. Each party hereto hereby waives trial by jury in any proceeding involving, directly or indirectly, any matter in any way arising out of, related to, or connected with, this Agreement. To the extent that in any jurisdiction any party may now or hereafter be entitled to claim, for itself or its assets, immunity from suit, execution, attachment (before or after judgment) or other legal process, each party hereto irrevocably agrees not to claim, and it hereby waives, such immunity.

10.     The headings and captions in this Agreement are for reference only and shall not affect the construction or interpretation of any of its provisions.

232575;v02

11.    This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but such counterparts shall, together, constitute only one instrument.

12.    In the event of any inconsistency between the terms and conditions of the Swap Agreement and this Agreement with respect to the rights, duties or obligations of Custodian, the terms and conditions of this Agreement shall govern.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective officers, thereunto duly authorized, on the day and year first above written.

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By: _____
Title:

**Sherri Venokur**
**Vice President**

**PARSEC TRADING CORP.**

By: _____
Title: Dawn E. Davies
       Director

**THE CHASE MANHATTAN BANK**

By: _____
Title:
       VP

## Schedule 6

**The Parsec Settlement**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
                                   :

In re                            :      **Chapter 11 Case No.**
                                   :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*   :      **08-13555 (JMP)**
                                   :

                  **Debtors.**       :      **(Jointly Administered)**
                                   :

                                   :
-------------------------------------------------------------x

### STIPULATION AND ORDER
### AMONG THE DEBTORS, THE COMMITTEE AND PARSEC TRADING CORPORATION RESOLVING MOTION OF PARSEC TRADING CORPORATION

        This stipulation (the "Stipulation") is entered into among (i) Lehman Brothers

Holdings Inc. ("LBHI") and its affiliated debtors in the above-referenced chapter 11 cases, as

debtors (collectively, the "Debtors"), including Lehman Brothers Special Financing Inc.

("LBSF"), (ii) the Official Committee of Unsecured Creditors appointed in the above referenced

chapter 11 cases (the "Committee") and (iii) Parsec Trading Corporation ("Parsec"), by and

through their undersigned counsel.

### RECITALS

        A.       Commencing on September 15, 2008 and periodically thereafter, LBHI and

certain of its subsidiaries, including LBSF, commenced with this Court voluntary cases under

chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States

Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The

Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being

jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure.

The Debtors are authorized to operate their businesses and manage their properties as debtors in

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.    On December 10, 2008, Parsec filed a Motion (the "Motion") [Docket No. 2152] seeking (i) a determination from this Court that the automatic stay provisions of the Bankruptcy Code do not apply to that certain Swap Collateral Agreement (the "Collateral Agreement") with The Chase Manhattan Bank ("Chase"), dated as of August 25, 1999, pursuant to which Chase holds $13,000,000 in treasury notes (the "Treasuries Collateral") pledged by Parsec to LBSF; or, in the alternative, (ii) entry of an order granting relief from the automatic stay so that Parsec may terminate the Collateral Agreement.

C.    In addition to the Treasuries Collateral, approximately $49,487,274.05 in cash representing variation margin was posted by Parsec directly with LBSF (the "Cash Collateral"), to secure Parsec's obligations to LBSF under an ISDA Master Agreement, dated April 21, 1997 (the "Swap Agreement").

D.    Parsec terminated the Swap Agreement by notice dated September 15, 2008.

E.    The Motion was initially set for hearing on January 14, 2009 at 10:00 a.m. Parsec adjourned a hearing on the Motion and entered into negotiations with LBSF in an effort to consensually resolve the Motion.

F.    LBSF, the Committee and Parsec are continuing to negotiate in an attempt to resolve the outstanding valuation and legal issues related to the remaining Treasuries Collateral.

NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED by and between the Debtors and Parsec (the "Parties"), that:

1.    The automatic stay extant pursuant to section 362 of the Bankruptcy Code is hereby modified solely to allow (i) Parsec to send written instructions to Chase concerning the transfer of custody of Treasuries Collateral in the face amount of $9,000,000 (the "Settlement Collateral"), and Chase to follow the written instructions of Parsec and LBSF concerning the

transfer of custody of the Settlement Collateral; and (ii) Chase to follow the written instructions of Parsec and LBSF concerning the transfer of custody of additional Treasuries Collateral other than the Settlement Collateral in the event the Parties reach an agreement regarding the additional Treasuries Collateral, in accordance with the terms and conditions of the Collateral Agreement.

2.      Nothing contained herein shall be deemed to be a release or waiver of any Party's claims or causes of action against any other Party, including without limitation the right of Parsec to seek relief from the automatic stay to instruct Chase to release the remaining Treasuries Collateral or to assert one or more claims in LBSF's and/or LBHI's pending bankruptcy cases or the right of LBSF, LBHI and the Committee to contest any such motion or claims or to assert affirmative claims against Parsec.

3.      The Motion is hereby withdrawn without prejudice.

4.      This Stipulation contains the entire agreement between the Parties and supercedes all prior agreements and undertakings between Parties relating thereto.

5.      The Parties represent and warrant to each other that the signatories to this Stipulation have full power and authority to enter into this Stipulation.

6.      This Stipulation may not be changed, modified, or amended except in a writing signed by the Parties and/or their attorneys.

7.      The Parties agree that any dispute regarding this Stipulation shall be subject to the exclusive jurisdiction and venue of the Bankruptcy Court.

8.    This Stipulation may be executed in any number of counterparts and shall constitute one agreement, binding upon the Parties hereto as if the Parties signed the same document; all facsimile signatures shall be treated as originals for all purposes.

Dated: New York, New York
          March 6th, 2008

By: /s/ Lori R. Fife
      Lori R. Fife

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors

By: /s/ Wilbur F. Foster, Jr.
      Wilbur F. Foster, Jr.
      Evan R. Fleck

MILBANK, TWEED, HADLEY & McCLOY LLP
1 Chase Manhattan Plaza
New York, New York 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

By: /s/ Kristin K. Going
      Kristin K. Going

DRINKER BIDDLE & REATH LLP
1500 K. St., NW – Suite 1100
Washington, DC 20005-1209
Telephone: (202) 230-5177
Facsimile: (202) 230-5377

Attorneys for Parsec Trading Corp.

**SO ORDERED** this 11th day of March 2009

/s/ James M. Peck
HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE

## Schedule 7


**The Parsec Claim**

## PROOF OF CLAIM

**United States Bankruptcy Court/Southern District of New York**
Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

| In Re: Lehman Brothers Holdings, Inc., et al. Debtors. | Chapter 11 Case No. 08-13555 (JMP) (Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held **Lehman Brothers Special Financing Inc.** | Case No. of Debtor **08-13888 (JMP)** |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Filed: USBC - Southern District of New York
Lehman Brothers Holdings Inc., Et Al.
08-13555 (JMP)        0000031765

☐ Check this box amends a previous.

Court Claim Number: _____
*(If known)*

Filed on: _____

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)
Parsec Trading Corporation
Administration Office
Rosebank Centre
11 Bermuda Road
Pembroke HM 08, Bermuda
Telephone number: 441-299-3882

with a copy to:

Drinker Biddle & Reath LLP
1500 K Street, N.W. Suite 1100
Washington, D.C. 20005
Attention: Kristin Going
Telephone number: 202-230-5177    E-mail Address:
Kristin.Going@dbr.com

Name and address where payments should be sent (if different from above):

Telephone number:

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

1. Amount of Claim as of Date Case Filed: __$7,086,891.97 plus interest, fees and expenses__

If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete Item 4.

If all or part your claim is entitled to priority, complete Item 5.

If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. § (b)(9), complete Item 6.
☒ Check this box if all or part of your claim is based on a Derivative Contract.*
☐ Check this box if all or part of your claim is based on a Guarantee.*
* IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.
☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is based on a Derivative Contract or Guarantee.

2. Basis for Claim: ___see attached___
(See instruction #2 on reverse side.)

3. Last four digits of any number by which creditor identifies debtor: _____

3a. Debtor may have scheduled account as: _____
(See instruction #3a on reverse side.)

4. Secured Claim (See instruction #4 on reverse side)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff:    ☐ Real Estate    ☐ Motor Vehicle    ☒ Other
Describe: Treasury notes held by The Chase Manhattan Bank pursuant to that certain Swap Collateral Agreement dated as of August 25, 1999
Value of Property: $ _notional value of $4,000,000_    Annual Interest Rate ____%
_current value of $4,072,350.51 as of 9/18/09  plus_
_attorneys fees and costs_
Amount of arrearage and other charges as of time case filed included in secured claim, if any:

$ _____    Basis for perfection: _____

Amount of Secured Claim: $_ notional value of_    Amount Unsecured: $ _3,014,541.46 plus attorneys fees and expenses_
_$4,000,000 current value of $4,072,350.51 as of_
_9/18/09 plus attorneys fees and costs_

6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. § 503(b)(9): $ _____
(See instruction #6 on reverse side.)

7. Credits: The amount of all payments on this claim has been credited for the purpose of making this proof of claim

8. Documents: Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements or running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
DO NOT SEND ORIGINAL DOCUMENTS. ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.

5. Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.

Specify the priority of the claim.

☐ Domestic support obligation under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries, or commissions (up to $10,950) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan – 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units – 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

Amount entitled to priority:

$ _____

**FILED / RECEIVED**

SEP 22 2009

EPIQ BANKRUPTCY SOLUTIONS, LLC

If the documents are not available, please explain:

| Date: | Signature: The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. | |
|---|---|---|
| 9/21/2009 | PARSEC TRADING CORPORATION | |
| | By: Kristin Going    Its: Attorney (pursuant to the attached Special Power of Attorney) | |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both  18 U.S.C. §§ 152 and 3571.

## ATTACHMENT TO PROOF OF CLAIM OF
## PARSEC TRADING CORPORATION

Parsec Trading Corporation ("Parsec") and Lehman Brothers Special Financing, Inc. ("LBSF"), the Debtor herein, entered into an ISDA Master Agreement dated April 21, 1997 (the "Swap Agreement"), pursuant to which Parsec agreed to pledge certain collateral to LBSF to secure Parsec's obligations under the Swap Agreement. Parsec and LBSF also entered into a Swap Collateral Agreement (the "Collateral Agreement") with The Chase Manhattan Bank ("Chase"), dated as of August 25, 1999, whereby Chase agreed to hold Parsec's pledged collateral. Parsec and LBSF were also parties to a forward rate agreement (the "FRA"). As of the Petition Date, Chase was holding $13,000,000 in notional value of treasury notes (the "Treasuries Collateral") pledged by Parsec to LBSF. In addition, approximately $49,487,274.05 in cash (the "Cash Collateral") representing variation margin had been posted by Parsec directly with LBSF to secure Parsec's obligations to LBSF under the Swap Agreement.

Lehman Brothers Holdings, Inc. and LBSF's bankruptcy filings constituted events of default under the Swap Agreement, and pursuant to section 6(a) of the Swap Agreement, Parsec terminated the Swap Agreement by notice dated September 15, 2008. Parsec also provided LBSF with a statement of calculations following early termination, dated September 25, 2008. On September 26, 2008, Parsec provided Chase written notice of termination and requested return of the Treasuries Collateral. Based upon the termination notice of calculations that Parsec sent to LBSF, the value of the swap portfolio at the termination date was $46,737,917.55, which amount Parsec set-off against the Cash Collateral. LBSF still holds the remaining Cash Collateral and therefore as of September 25, 2008, $2,797,842.30, plus interest and expenses, is due, owing and/or returnable to Parsec as the remaining Cash Collateral after setoff.

Pursuant to a "Stipulation and Order Among the Debtors, the Committee and Parsec Trading Corporation Resolving Motion of Parsec Trading Corporation" (the "Stipulation"), entered March 11, 2009, the automatic stay in the Debtor's bankruptcy case was modified solely to allow (i) Parsec to send written instructions to Chase concerning the transfer of custody of Treasuries Collateral in the face amount of $9,000,000, and (ii) Chase to follow the written instructions of Parsec and LBSF concerning the transfer of custody of the $9,000,000 in Treasuries Collateral. The intent and purpose of the Treasuries Collateral was to protect LBSF in the event that Parsec defaulted under the Swap Agreement or did not have sufficient funds to pay LBSF at the termination of the Swap Agreement. Parsec did not default under the Swap Agreement and it had sufficient funds to pay LBSF at the termination of the Swap Agreement. Pursuant to the Stipulation, nothing therein is "deemed to be a release or waiver of any Party's claims or causes of action against any other Party, including without limitation the right of Parsec to seek relief from the automatic stay to instruct Chase to release the remaining Treasuries Collateral or to assert one or more claims in LBSF's and/or LBHI's pending bankruptcy cases . . . ." LBSF has refused to instruct Chase to release the remaining Treasuries Collateral, and therefore Parsec has a secured claim to the extent of the value of the remaining Treasuries Collateral.

Accordingly, this proof of claim by Parsec asserts (i) a secured claim for the remaining Treasuries Collateral held by Chase, consisting of United States of America 3.625% Debenture, CUSIP No. 912828HF0, maturing on October 31, 2009, and having a notional value as of 9/18/2009 of $4,000,000 with a market value of 4,072,350.51, and (ii) an unsecured claim, consisting of (a) $2,797,842.30, representing the Cash Collateral still held by LBSF, plus all accrued interest and expenses thereon, through September 25, 2008 (the "LBSF Petition Date"),

and (b) $216,699.16, representing the value of certain receivables as of the LBSF Petition Date pursuant to the FRA plus all accrued interest and expenses thereon. For the sake of clarity, Parsec's secured claim is not a fixed dollar amount; the secured claim is to the Treasuries Collateral itself.

DC01/ 2279093.1

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| LEHMAN BROTHERS SPECIAL FINANCING, INC., | : | Case No. 08-13888 (JMP) |
| Debtor. | : | |

### SPECIAL POWER OF ATTORNEY

To:    Kristin K. Going, Esq., Drinker Biddle & Reath LLP,

   1500 K Street, Suite 1100, Washington, D.C. 20005

   The undersigned claimant/creditor hereby authorizes you as attorney in fact for the undersigned and with full power of substitution to execute the prepetition proof of claim to be filed by Parsec Trading Corp. against the debtor (the "Debtor") in the above-captioned bankruptcy case, said proof of claim to be filed with the Debtor's claims agent on or before 5:00 p.m. Prevailing Eastern Time on September 22, 2009.

Dated: September 18th, 2009          Signed: Parsec Trading Corp.

By: JONATHAN CCLIPPER
as:    Director

Address:
RosebankCentre
11 Bermudiana Road
Pembroke HM 08 Bermuda

   [If executed on behalf of a corporation] Acknowledged before me on 18th SEPTEMBER 2009 by JONATHAN C. CLIPPER , who says that he [or she] is A DIRECTOR of the corporation named above and is authorized to execute this power of attorney in its behalf.

[Official character]



Signed at Hamilton, Bermuda
this  18th  day of SEPTEMBER, 2009
Anthony D. Whaley
Notary Public, Islands of Bermuda

NY01/ 7139602.2

## PARSEC TRADING CORP.

### Written Resolution of the Directors
### Pursuant to Article 73 of the Company's Articles of Association

We, the undersigned, being all of the Directors for the time being of **Parsec Trading Corp.** (the "Company"), a Company incorporated in the British Virgin Islands, pursuant to Article 73 of the Company's Articles of Association, do **HEREBY CONSENT** to the following action and adopt the following Resolutions set out below. This Written Consent may be executed in counterparts, and a copy shall be inserted into the Company's Minute Book. Any action taken herein shall be of the same force and effect as if the same had been passed by a Meeting of the Board of Directors duly called and constituted.

---

### Power of Attorney

*WHEREAS* the Company proposed to give Kristin K. Going, Esq. of Drinker Biddle & Reath LLP a Special Power of Attorney to represent it in the bankruptcy case between Lehman Brothers Special Financing, Inc. and the Company (the "Bankruptcy Case"), a copy of which is attached hereto and forms a part of this resolution:

It was now therefore *RESOLVED:*

    (i)        to approve the issue of a Special Power of Attorney authorising Kristin K. Going, Esq. of Drinker Biddle & Reath LLP to represent it in relation to the Bankruptcy Case;

    (ii)       to authorise any one Director to sign the Special Power of Attorney on behalf of the Company;

Jeffrey G. Conyers
Date: Sept 18 2009

Michael Schroter
Date: September 18, 2009

Jonathan C. Clipper
Date: 18th Sept 2009

DrinkerBiddle&Reath
L L P

Kristin K. Going
202-230-5177 Direct
202-842-8465 Fax
kristin.going@dbr.com

*Law Offices*

1500 K Street N. W.
Suite 1100
Washington, D.C.
20005-1209

(202) 842-8800
(202) 842-8465 fax
www.drinkerbiddle.com

CALIFORNIA
DELAWARE
ILLINOIS
NEW JERSEY
NEW YORK
PENNSYLVANIA
WASHINGTON D.C.
WISCONSIN

September 21, 2009

***Via Overnight Delivery***

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Processing Center
757 Third Avenue
Third Floor
New York, New York 10017

     **Re:**    **Lehman Brothers Special Financing Inc.,**
          **Case No. 09-13888-JMP (United States Bankr. Ct. S.D.N.Y.)**

Dear Clerk:

    Enclosed please find an original and two (2) copies of the proof of claim of Parsec Trading Corp., to be filed in the chapter 11 bankruptcy case of the above-referenced Debtor.

    Please file the original proof of claim and return a file-stamped copy to me in the enclosed self-addressed, stamped envelope.

    Thank you for your assistance in this matter.

               Sincerely,

               Kristin K. Going

Enclosures

*Established 1849*

FedEx
Express

**US Airbill**

fedex.com  1.800.GoFedEx  1.800.463.3339

TRK# 8588 7732 2470

EB OGSA

FedEx

TUE - 22 SEP  A1
PRIORITY OVERNIGHT

100 17
NY-US
EWR

**FedEx Retrieval Copy**

1 From

Date _____  Sender's FedEx Account Number 162270923

Company  Brinker Biddle & Reath LLP

Name  Daniel Northrop

Address  191 N. Wacker Drive, Suite 3700

City  Chicago   State  IL   ZIP  60606-1698

2 Your Internal Billing Reference  323188

3 To

Recipient's Name  Attn: Lehman Brothers

Company  Epic Bankruptcy Solutions, LLC
         Holding Claims Processing

Address  757 Third Avenue, 3rd Floor

City  New York   State  NY   ZIP  10017

Phone  312 569-1510

8588 7732 2470

SEP 22 2009

@ 2005 FedEx

Recipient's Phone

**Paperboard**

520

FedEx.com  1.800.GoFedEx  1.800.463.3339