IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x  Chapter 11
In re:                                                        :
                                                              :  Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                        :
HOLDINGS, INC., a Delaware corporation, <u>et al.</u>,        :  Jointly Administered
                                                              :
     Debtors.                                                 :  **Docket Ref. Nos. 8226, 8423, & 8480**
                                                              :
                                                              :  **Hearing Date: To be determined**
------------------------------------------------------------- x  **Objection Deadline: March 30, 2010 at 4:00 p.m.**

### DEBTORS' AMENDED MOTION FOR RECOVERY OF COSTS AND EXPENSES PURSUANT TO 11 U.S.C. § 506(c) FROM MOUNT PROSPECT, ILLINOIS PROPERTY

The debtors and debtors in possession in the above-captioned cases (collectively, the "<u>Debtors</u>"), by and through their undersigned counsel, hereby submit this amended motion (the "<u>Amended Motion</u>") for recovery of costs and expenses pursuant to section 506(c) of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") from certain real property (the "<u>Property</u>") located at 950 North Elmhurst Road/150 West Rand Road, Mount Prospect, Illinois (the "<u>Section 506(c) Claim</u>"), which Amended Motion amends the Debtors' *(I) Limited Objection to Motion of Park National Bank for Lifting the Automatic Stay, Objecting to Debtor's Use of Cash Collateral, and Requesting Adequate Protection and (II) Request for Allowance and Payment of Section 506(c) Claim*, dated October 28, 2009 [D.I. 8226] (the "<u>Motion</u>").[1]  In support of this Amended Motion, the Debtors respectfully represent as follows:

### GENERAL BACKGROUND

1.  On August 6, 2007 (the "<u>Petition Date</u>"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors have

---

[1] Capitalized terms not defined herein shall have the meanings ascribed in the Motion.

continued in possession of their properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. An official committee of unsecured creditors (the "Committee") was appointed on August 14, 2007, and an official committee of borrowers (the "Borrowers Committee") was appointed on October 21, 2008. No trustee or examiner has been appointed.

3. The Debtors filed an Amended Chapter 11 Plan of Liquidation (as amended, supplemented and/or modified, the "Plan") with the Court on November 25, 2008. The Court entered an order confirming the Plan on February 23, 2009 [D.I. 7042]. The Plan is not yet effective.

## RELEVANT BACKGROUND

4. On August 9, 2005, the Debtors made a note (the "Note") in the principal amount of $1,007,000 payable to the order of Park National Bank and Trust of Chicago, the predecessor to North Star Trust Company, as successor-trustee to Park National Bank and Trust Company of Chicago, and legal owner of the Property ("Park National"). *See* Ex. B.

5. The 2005 Note is secured by a mortgage (the "Mortgage") made by the Debtors to Park National dated August 9, 2005, which created a mortgage lien on the Property. *See* Ex. C.

6. The Debtors retained CB Richard Ellis, Inc. ("CBRE") as their real estate broker to market the Property. CBRE's retention by the Debtors was approved by entry of an Order dated March 11, 2008 [D.I. 3223]. The term of the engagement was subsequently extended by Order appearing at Docket No. 6659. With the assistance of the Debtors, CBRE developed and executed an extensive campaign to market and sell the Property.

7.  Park National and the Debtors entered into two loan modification agreements (the "First Loan Modification Agreement" and "Second Loan Modification Agreement" and collectively referred to hereinafter as the "Loan Modification Agreements"), each of which, among other things, extended the maturity date under the Note permitting the Debtors to continue to market the Property.  *See* Ex. D; Ex. E.  Executed on July 28, 2009, the First Loan Modification Agreement extended the maturity date to February 9, 2009.  The Second Loan Modification Agreement was executed on February 3, 2009 and extended the maturity date to August 9, 2009.  The Second Loan Modification Agreement also provided that Park National could apply, on an expedited basis, to lift the automatic stay should an event of default occur.

8.  Despite a full marketing effort, the closest the Debtors came to selling the Property was an offer they received from The Equitable Funds LLC ("Equitable Funds") for the Property and for the assignment of the leases.  After receiving that offer, the Debtors and Equitable Funds engaged in active negotiations concerning the terms and conditions of the sale.  On April 13, 2009, the Debtors sent a letter of direction to Park National to execute a purchase agreement.  On April 17, 2009, AHM Corp., Park National and Equitable Funds executed a purchase agreement (the "Purchase Agreement").  Shortly thereafter, on April 30, 2009, the Debtors filed a motion for authority to sell the Property (the "Sale Motion").

9.  After further due diligence pursuant to the terms of the Purchase Agreement – which was executed by Park National – Equitable Funds advised the Debtors that it would only proceed with the sale at a reduced purchase price.  So significantly reduced that, after deducting certain fees and expenses (without even taking into consideration the Section 506(c) Claim) the purchase price was less than the outstanding amount of the Mortgage on the Property held by Park National.  The Debtors attempted to further negotiate the terms of the sale with the

Equitable Funds and instituted a further marketing campaign, but neither effort produced an offer for the Property that exceeded the amount owed to Park National on the Mortgage. Accordingly, the Debtors withdrew the Sale Motion on August 6, 2009 [D.I. 7903].

10. The Debtors failed to make the monthly Mortgage payment due under the Note on August 1, 2009. Non-payment of a scheduled payment was an event of default under the Note.

11. On September 28, 2009, Park National filed its *Motion of Park National Bank for Lifting the Automatic Stay, Objecting to Debtor's Use of Cash Collateral, and Requesting Adequate Protection* [D.I. 8101], seeking, *inter alia*, to obtain relief from stay to foreclose the Mortgage on the Property (the "Stay Relief Motion"). In response, the Debtors filed the Motion on October 28, 2009. The Motion responded to the Stay Relief Motion and asserted a claim against Park National pursuant to section 506(c) of the Bankruptcy Code. On November 20, 2009, Park National filed the Opposition of Park National Bank to the Motion [D.I. 8325] (the "Objection"). On January 7, 2010, the Debtors filed a reply to the Objection (the "Reply") [D.I. 8480].

12. Park National and the Debtors entered into an agreed order, entered on December 17, 2009, whereby the Debtors agreed to consent to stay relief and to abandon the Property and Park National expressly agreed, among other things, that: (i) "Nothing in this Agreed Order shall prejudice, modify, waive, limit, or otherwise affect in any way any claim or claims that the Debtors may have against Park National or the Property pursuant to section 506(c) of the Bankruptcy Code, including the Section 506(c) Claim" (*see* Agreed Order, Para. 4), and (ii) "No acts of dominion Park National takes over the Property as a result of the limited modification of the automatic stay, including, but not limited to taking possession of and/or

transferring the Property, shall prejudice, modify, waive, limit, or otherwise affect in any way any claim or claims that the Debtors may have against Park National or the Property pursuant to section 506(c) of the Bankruptcy Code, including the Section 506(c) Claim" (*see* Agreed Order, Para. 5) [D.I. 8423] (the "Agreed Order").

13. Pursuant to the Agreed Order, the Debtors filed their *Motion for an Order Pursuant to 11 U.S.C. §§ 105, 365 and 554 Authorizing (I) the Abandonment of Certain Real Property and (II) the Rejection of Agreements Related Thereto* [D.I. 8340] on November 25, 2009 (the "Motion to Abandon"). The Court entered an Order granting the Motion to Abandon on December 14, 2009 [D.I. 8413], thereby authorizing the Debtors to abandon the Property on December 31, 2009.

14. Park National and the Debtors agreed that the parties would first proceed with legal arguments relating to the ad valorem property tax portion of the Section 506(c) Claim, which oral argument was held on January 12, 2010. The parties further agreed – as stated on the record at the January 12, 2010 hearing – that an evidentiary hearing would be held with respect to the Section 506(c) Claim. The Court did not find, as a matter of law, that the expenses were, *inter alia*, actual and necessary costs for the preservation of the Property as the 2005 amendments did not establish a *per se* rule. The Court then directed the parties to confer regarding a discovery schedule and date to hear evidentiary arguments on the Section 506(c) Claim.

15. In filing this Amended Motion, the Debtors seek reimbursement of (i) $274,920.36 on account of the aforementioned ad valorem property tax claims, (ii) $257,194.48 on account of the repair and maintenance expenses identified on Exhibit F, and (iii) $20,000 on

account of the insurance expenses incurred by the Debtors with respect to the Property.  *See* Ex. G.

## RELIEF REQUESTED

16. By this Amended Motion, the Debtors seek to recover the costs and expenses of preserving and/or disposing of the Property pursuant to section 506(c) of title 11 of the United States Code, which Section 506(c) Claim is comprised of ad valorem property tax payments, repair and maintenance expenses, and insurance expenses.

## BASIS FOR RELIEF

17. Section 506(c) of the Bankruptcy Code provides, in its entirety, that:

> The trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

11 U.S.C. § 506(c).[2]

18. The phrase "including the payment of all ad valorem property taxes with respect to the property" was added to section 506(c) by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA").  Prior to the enactment of BAPCPA, the courts generally applied a test similar to that set forth by the U.S. Court of Appeals for the Third Circuit in *Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp.*, 884 F.2d 80, 84 (3d Cir. 1989).  In *Equibank*, the Third Circuit held that ad valorem "[t]axes not secured by liens may also be payable by the secured creditor under section 506."  *Id.*  For this to be the case, the Third Circuit held that section 506(c) required "a two-step inquiry" addressing (1) "whether the taxes are

---

[2] Pursuant to section 1107(a) of the Bankruptcy Code, the Debtors are granted the powers of a trustee and thus may receive a reimbursement under section 506(c) on the same terms as a trustee.

reasonable, necessary costs and expenses of preserving or disposing of the property" and (2) "whether they benefit the secured creditors." *Id.*

19. Generally speaking, applicable Third Circuit caselaw requires the same showing to recover miscellaneous expenses pursuant to section 506(c) as is required for the recovery of ad valorem property tax payments. "Our decisions have clarified that to recover expenses under § 506(c), a claimant must demonstrate that (1) the expenditures are reasonable and necessary to the preservation or disposal of the property and (2) the expenditures provide a direct benefit to the secured creditors." *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Industries, Inc.)*, 57 F.3d 321, 325-26 (3d Cir. 1995) (collecting cases).

### I.    Ad Valorem Property Taxes

20. Both elements of the *Equibank* test are satisfied in this case. Pursuant to the Mortgage, Park National required the Debtors to make real estate tax escrow payments to Park National each month in the amount of 1/12 of the yearly ad valorem property taxes to be assessed against the Property, as estimated by Park National. Ex. 2, at 5. Additionally, any difference between the estimated and actual yearly tax assessment on the Property was payable by the Debtors to Park National on demand. *Id.* Through this escrow provision, the Debtors have paid ad valorem property taxes due and owing on the Property in the amount of $274,920.36 since the Petition Date.

21. Payments for ad valorem taxes related to the Property are "reasonable, necessary costs and expenses of preserving or disposing of the property." The Supreme Court has noted that expenses are "reasonable" with respect to section 506(c) when they are incurred in the ordinary course at a reasonable price. *See Hartford Underwriters Ins. Co. v. Magna Bank, N.A. (In re Hen House Interstate, Inc.)*, 177 F.3d 719, 721 (8th Cir. 1999), (en banc), *aff'd*, 530

U.S. 1 (2000).  A survey of the applicable caselaw shows that the reasonableness of ad valorem property tax payments is generally not a disputed issue, and this case should be no different.  Because the ad valorem real property taxes were incurred in the ordinary course using standard tax rates, the ad valorem property tax expenses were reasonable.

22. The expenses were also necessary to preserve the value of the Property.  Under governing Illinois law, failure to pay the ad valorem taxes would result in a tax lien on the Property that would constitute "a prior and first lien on the [P]roperty, superior to all other liens and encumbrances, from and including the first day of January in the year in which the taxes are levied until the taxes are paid or until the [P]roperty is sold" pursuant to a tax sale under the statute.  35 ILL. Comp. Stat. 200/21-75.  Pursuant to section 362(b)(18) of the Bankruptcy Code – which was added to the Bankruptcy Code in 1994, five years after the *Equibank* decision – this lien would have attached to the Property because statutory liens for ad valorem property taxes are expressly exempted from the provisions of the automatic stay.[3]  Paying the ad valorem property taxes due and owing on the Property was necessary to avoid, among other things, a default under the Mortgage, the imposition of this first priority lien above the priority of the

---

[3] Section 362(b)(18) states that "the creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition" is exempted from the provisions of the automatic stay.  *See* 11 U.S.C. § 362(b)(18).  The legislative history to the amendment that created section 362(b)(18) states as follows:

> Local governments rely on real property taxes to constitute one of their principal sources of revenue. These taxes are, in turn, typically secured by statutory liens. Both the property owner and any mortgage holder recognize that their interest in real property is subject to the local governments right to collect such property taxes. However, several circuit courts have held the automatic stay prevents local governments from attaching a statutory lien to property taxes accruing subsequent to a bankruptcy filing. These decisions create a windfall for secured lenders, who would otherwise be subordinated to such tax liens, and significantly impair the revenue collecting capability of local governments. This section overrules these cases and allow local governments to utilize their statutory property tax liens in order to secure the payment of property taxes.

H.R. Rep. No. 103-835 (1994).

Mortgage, an increase in the first priority ad valorem tax claim by the accrual of fees and penalties for late or non-payment, and the costs and expenses associated with a potential foreclosure by the taxing authority. Such a lien would have decreased the value of the Property by decreasing the amount that a purchaser would pay for the Property. Therefore, paying the taxes due and owing avoided the imposition of a tax lien and preserved the value of the Property.

23. The addition of section 362(b)(18) to the Bankruptcy Code in 1994 is significant to the circumstances present herein because of its impact on prior section 506(c) caselaw. Prior to the adoption of section 362(b)(18), some cases held that the payment of ad valorem property taxes accruing post-petition were not necessary to preserve the value of the real property, because the applicable taxing authorities were stayed from pursuing their remedies by the automatic stay. *See, e.g.*, *In re Bellman Farms, Inc.*, 86 B.R. 1016, 1021 (Bankr. D.S.D. 1988). These cases reasoned that the automatic stay prevented the creation and perfection of tax liens against the property *Id.* Following the enactment of section 362(b)(18), however, this reasoning no longer holds true. Consequently, the basis for several prior section 506(c) decisions involving ad valorem property taxes, including some authority cited by Park National in support of the Objection, is statutorily mooted.

24. There is also ample evidence to prove these expenses satisfy the direct benefit test. Non-payment of the taxes would have resulted in a properly perfected first priority lien superior to the lien of Park National being placed on the Property. Park National cannot credibly contend that they were oversecured. The Debtors' extensive marketing and sales efforts resulted in an offer to purchase the Property that was insufficient to satisfy the amount due on the Mortgage. As this Court has noted previously in this very case, value is best viewed as "what one could buy or sell the asset for in the marketplace." *In re Am. Home Mortg. Holdings, Inc.*,

2009 Bankr. LEXIS 2527, at *24 (Bankr. D. Del. Sept. 8, 2009). The marketing process here demonstrates that Park National was undersecured at the time the Debtors surrendered the Property. Consequently, every dollar the Debtors paid toward the ad valorem property taxes due and owing on the Property benefited Park National. Were these taxes not paid, a lien would have been imposed on the Property for these amounts, thus reducing Park National's secured claim even further – especially after any applicable taxes and late fees were added to the amounts due. Ensuring this did not happen provided a direct benefit to Park National.

25. Accordingly, the Debtors request that the Section 506(c) Claim include $274,920.36 for amounts paid toward the ad valorem real estate taxes assessed against the Property.

## II. Maintenance and Repair Costs

26. As noted by the Third Circuit in *Visual Industries*:

> *Collier on Bankruptcy* contains a detailed list of the types of costs and expenses that would generally be found to relate to the preservation or disposition of the subject property and benefit the holder of the security interest. This list includes … maintenance and repair costs …. All of these expenditures share a common characteristic: they are expenses directly related to disposing of or preserving the creditor's collateral.

*Visual Industries*, 57 F.3d at 325 (citing 3 Collier on Bankruptcy ¶ 506.06.56-57 (Lawrence P. King, et al. eds., 15th ed. 1994)).

27. The maintenance and repair costs detailed in Exhibit F fall within this general rule. These expenses were "reasonable" because they were incurred in the ordinary course at a reasonable price, as set forth in great detail on Exhibit F. *See Hartford Underwriters Ins. Co.,* 177 F.3d at 721.

28. The expenses set forth on Exhibit F were also necessary to preserve the value of the Property. For example, the Debtors were recently required to install a new heating/cooling unit for the Property at a cost of approximately $17,000. Had this expense not been incurred, the value of the Property would have deteriorated because a subsequent purchaser would have had to incur this expense. Similarly, the other repair and maintenance expenses incurred by the Debtors with respect to the Property, including everything from elevator repair expense to regularly scheduled maintenance, were necessary to keep the Property in good repair, thereby preserving and possibly even increasing its value.

29. These expenses preserved the going concern value of the Property and the preservation of this going concern value constitutes a benefit to Park National. Had the Debtors not expended these amounts, the residual value of the Property would have decreased. By virtue of its Mortgage on the Property and the value of the Property, Park National was the party who benefited from an increase or decrease in the residual value of the Property. Accordingly, the Debtors request that the Section 506(c) Claim include $257,194.48 for maintenance and repair costs.

### III. Insurance Costs

30. Between the Petition Date and the date the Debtors moved to surrender the Property to Park National, the Debtors expended in excess of $20,000 on account of insurance for the Property.[4]

---

[4] Between August 2007 and August 2009, the insurance on the Property was provided by a policy that covered numerous properties. Although the Debtors did incur additional costs for including the Property in this policy, the Debtors did not receive a line item bill detailing exactly how much additional cost they incurred on account of the Property. In August 2009, however, the Debtors insurance arrangement with respect to the Property changed. At this time, the Debtors received an invoice for $7,453.00 for insurance on the Property for the period from August 4, 2009 to August 4, 2010. *See* Ex. B. This invoice serves at the baseline for the Debtors' $20,000 insurance estimate.

31. The Debtors submit that courts generally recognize insurance for collateral securing a creditor's claim as a reasonable, necessary expense recoverable under section 506(c). *See, e.g.*, *United States v. Ralph Owens Trucking Co. (In re Ralph Owens Trucking Co.)*, No. 03-40428, 2010 Bankr. LEXIS 194, at *6 (Bankr. N.D. Tex. Jan. 27, 2010) ("Typically, a trustee invoking section 506(c) does so to obtain reimbursement for insurance, maintenance, or security costs, or the costs of sale of the creditor's collateral. Those sorts of expenses clearly involve preservation or disposition of the collateral."). Moreover, the cost of insurance has been reimbursed pursuant to section 506(c) upon a minimal showing in other cases. *See, e.g.*, *In re James E. O'Connell Co.*, 893 F.2d 1072, 1074 (9th Cir. 1990).

32. Given the value of the Property, $20,000 in insurance expense is more than reasonable for over two years of coverage. This amount also was consistent with the Debtors' pre-petition insurance expense for the Property. Therefore, the Debtors submit that the insurance expense is "reasonable" within the meaning of section 506(c).

33. The insurance expense also was necessary to preserve the value of the Property. Had the Property not been insured and suffered damage, the value of Park National's collateral would have been reduced – possibly to nothing. Recognizing this, Park National required the Debtors to pay for insurance on the Property in the Mortgage.

34. Finally, Park National directly benefited from the insurance. Pursuant to the Mortgage, Park National was entitled to receive and retain the proceeds of any insurance payment, whether or not their security interest in the Property was impaired. Ex. C, at 4. Moreover, the insurance ensured that Park National would receive the value of its collateral if a fire or other disaster destroyed the collateral. This provided a benefit to Park National regardless of whether it was oversecured or undersecured.

35. Consequently, the Debtors submit that the $20,000 paid for insurance on the Property was reasonable and necessary for the preservation of the value of the Property, and provided a direct benefit to Park National. The Debtors thus request that the Section 506(c) Claim include $20,000 for insurance costs.

## RESERVATION OF RIGHTS

36. The Debtors expressly reserve the right to amend, modify or supplement this Amended Motion following the completion of discovery relating to the matters discussed herein.

## NOTICE

37. Notice of this Response has been provided to: (i) the Office of the United States Trustee; (ii) counsel to the Committee; and (iii) counsel to Park National. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court enter an order, substantially in the form annexed hereto as Exhibit A, that grants the allowance and directs the payment of the Section 506(c) Claim to the Debtors in the amount of $552,114.84.

Dated: Wilmington, Delaware
      March 9, 2010              YOUNG CONAWAY STARGATT & TAYLOR, LLP

                                          */s/ Justin H. Rucki*
                                          Sean M. Beach (No. 4070)
                                          Sharon M. Zieg (No. 4196)
                                          Matthew B. Lunn (No. 4119)
                                          Justin H. Rucki (No. 5304)
                                          The Brandywine Building
                                          1000 West Street, 17th Floor
                                          Wilmington, Delaware 19801
                                          Telephone: (302) 571-6600
                                          Facsimile: (302) 571-1253

                                          Counsel for Debtors and Debtors in Possession