## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------- x
In re:                                                          :   Chapter 11
                                                                :
                                                                :   Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                           :
a Delaware corporation, et al.,¹                                :   Jointly Administered
                                                                :
                                                                :
                Debtors.                                        :   Objection Deadline (proposed): March 31, 2010, at 4:00 p.m. (ET)
                                                                :   Hearing Date (proposed): April 6, 2010 at 10:30 a.m. (ET)
                                                                :
-------------------------------------------------------------- x
```

### DEBTORS' MOTION PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 9019(a) FOR AN ORDER AUTHORIZING AND APPROVING RELEASE AND SETTLEMENT AGREEMENT WITH AMERICAN HOME MORTGAGE SERVICING, INC. (F/K/A AH MORTGAGE ACQUISITION CO., INC.)

AHM Holdings, a Delaware corporation, and certain of its affiliates, debtors and

debtors in possession in the above-captioned cases (collectively, "AHM" or the "Debtors"), by

this motion (the "Motion"), seek entry of an order pursuant to Rule 9019(a) of the Federal Rules

of Bankruptcy Procedure ("Bankruptcy Rules") and sections 105(a) and 363(b) of Title 11 of the

United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") authorizing and approving

that certain Release and Settlement Agreement (the "Settlement Agreement," attached as Exhibit

1 to the proposed form of order attached hereto) by and among debtors AHM Investment, AHM

Corp., AHM SV (collectively, the "Sellers") and AHM Acceptance (together with the Sellers,

the "AHM Parties"), and American Home Mortgage Servicing, Inc. (f/k/a AH Mortgage

Acquisition Co., Inc.) ("AHMSI" or the "Purchaser" and, together with the AHM Parties, the

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

"Parties").  In support of the Motion, the Debtors respectfully represent as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## GENERAL BACKGROUND

2.      On August 6, 2007 (the "Petition Date"), each of the Debtors commenced in this Court voluntary cases under chapter 11 of title 11 of the Bankruptcy Code.

3.      The Debtors' chapter 11 cases are being jointly administered pursuant to Rule 1005(b) of the Federal Rules of Bankruptcy Procedure.

4.      On August 14, 2007, the United States Trustee for the District of Delaware (the "Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").  No trustee or examiner has been appointed.

5.      By order dated February 23, 2009 [D.I. 7042] (as amended by D.I. 7555, the "Plan Confirmation Order"), the Court confirmed the Amended Chapter 11 Plan of Liquidation of the Debtors Dated February 18, 2009 (the "Plan").  The Plan is not yet effective.  Among the conditions to effectiveness of the Plan is the establishment of reserves (the "Plan Reserves") for (i) operating expenses of the post-confirmation trust and (ii) disputed priority and administrative claims.

## RELEVANT BACKGROUND

### I.      The Servicing Business

6.      Prior to bankruptcy, the Debtors were in the business primarily of originating, selling, and servicing residential mortgage loans.  Loans were typically originated by

AHM Corp. or AHM Acceptance and sold to wholesale loan purchasers or securitization trusts (including both "AHM"-sponsored securitizations and third-party-sponsored securitizations). AHM SV serviced the loans, either on an interim basis (for "servicing-released" loan sales) or a permanent basis (for "servicing-retained" loan sales).

7.    As servicer, AHM SV was required to collect payments from borrowers, maintain escrows for taxes and insurance ("T&I"), make certain servicing advances,[2] and make monthly remittances of principal and interest ("P&I") (net of servicing fees and reimbursable servicing advances) to the owners of the loans from custodial trust accounts established for their benefit (the "Investor Custodial Accounts"). Payments from borrowers were received into a central clearing account (the "Payment Clearing Account") and then routed into the appropriate Investor Custodial Accounts, T&I escrow accounts, and corporate accounts by a proprietary software system (the "Loan Servicing and Accounting Management System," a.k.a. "LSAMS") utilized by AHM SV.

## II.    The Servicing Sale

8.    On the Petition Date, the Debtors filed an emergency motion [D.I. 11] (the "Sale Motion") to authorize the sale of the assets used in their mortgage loan servicing business (the "Business"), including the assumption and assignment of certain executory contracts.

9.    On September 25, 2007, the Debtors filed an executed Asset Purchase Agreement [D.I. 931] (as subsequently amended, the "APA") by and among the Sellers and the Purchaser. To provide for the prompt payment of sale consideration to the Debtors while at the

---

2 A "servicing advance" is a cost which is fronted by the servicer and recoverable from future principal and interest payments by the borrower (or foreclosure proceeds, in the case of delinquent borrowers), generally relating to the enforcement of the mortgagee's rights under a mortgage loan (e.g., amounts paid to collection/foreclosure professionals) or the preservation of the mortgagee's collateral (e.g., T&I payments on behalf of delinquent borrowers).

066585.1001

same time providing the Purchaser time to obtain necessary licensure to operate the Servicing

Business, the APA contemplated a two-step closing: first, an "economic" close, at which the

Purchaser would tender the Purchase Price (as defined in the APA) and after which the Debtors

would continue to operate the Business in the ordinary course for the benefit and risk of the

Purchaser, using working capital to be provided by the Purchaser (the "Initial Closing"); and

second, a "legal" close, at which legal title to the Purchased Assets (as defined in the APA)

would vest in the Purchaser and which would be the effective date of assumption and assignment

of any executory contracts and unexpired leases (the "Final Closing").

   10. In light of the two-step closing, the APA required the Sellers and the

Purchaser to reconcile the net cash flow of the Servicing Business during the period between the

Initial Closing and the Final Closing (the "Interim Period") as contemplated by Exhibit G to the

APA (as amended from time to time, "APA Exhibit G").  Following the APA Exhibit G

reconciliation, the Sellers or the Purchaser, as applicable, would be required to make a

Reconciliation Payment to the other with respect to the net sources and uses of cash for the

Interim Period so as to put the Sellers and the Purchaser in the same economic position as if the

"legal" and "economic" closes had occurred simultaneously.

   11. The Court held a five-day evidentiary hearing (the "Sale Hearing") on

October 15-19, 2007, to consider approval of the Sale Motion and the APA.  On October 30,

2007, the Court entered an order [D.I. 1711] (the "Sale Approval Order") approving the Sale

Motion and the APA.  Among other things, the Sale Approval Order provided that a reserve of

$10 million (the "Cure Escrow") would be established for the purpose of (i) curing any default

with respect to any act or omission that occurred prior to the Initial Closing under any of the

Assumed Contracts and (ii) compensating any party for actual pecuniary loss, if any, to such

                  

party resulting from a default arising from any act or omission that occurred prior to the Initial Closing under any of the Assumed Contracts (all claims for such cure or compensation, collectively, the "Seller Cure Claims").

12.     The Initial Closing under the APA occurred on November 16, 2007, at which time, among other things, (i) the Purchase Price (as defined in the APA) was paid to Bank of America, N.A., as Administrative Agent (the "Administrative Agent") for itself and certain other prepetition secured lenders having liens in substantially all the assets of the Servicing Business; and (ii) the Cure Escrow was established and funded as required by the Sale Approval Order.

13.     The Final Closing occurred on April 11, 2008, at which time, among other things, the Purchaser entered into certain interim servicing agreements and subservicing agreements with AHM Corp., AHM SV, and/or AHM Acceptance with respect to loans for which the Purchaser did not acquire the servicing rights pursuant to the APA (such loans, collectively, the "Excluded Portfolio").

## II.     The AHMSI Motion and Debtors' Preliminary Objection

14.     On May 23, 2008, the Purchaser filed a motion for allowance of an administrative expense claim for alleged breaches of the APA [D.I. 4233] (as amended, the "AHMSI Motion").  In the AHMSI Motion, the Purchaser alleged that, during the period between the Initial Closing and the Final Closing when the Sellers were operating the Servicing Business for the Purchaser's risk and benefit, the Sellers used funds from accounts established for the benefit of the Purchaser to remedy shortfalls in unidentified investors' custodial accounts that had resulted from pre-Initial Closing acts or omissions of the Sellers.  The Purchaser asserted this violated the APA because account shortfalls relating to pre-Initial Closing acts or

omissions were "Retained Liabilities" of the Sellers which were not authorized to be paid out of

the Purchaser's accounts. On August 18, 2008, the Purchaser amended the AHMSI Motion [D.I.

5495]. In its amended request, the Purchaser, (i) reasserted its claims for reimbursement of

amounts allegedly paid by the Sellers from the Purchaser's accounts to remedy alleged pre-Initial

Closing shortfalls in certain unidentified investors' custodial accounts (such claims, the

"Misappropriation Claims"), (ii) asserted claims for breach of the APA resulting from alleged

cash shortfalls in Investor Custodial Accounts or T&I escrow accounts (such claims, collectively,

the "Uncured Shortfall Claims"), and asserted other claims discussed below.

      15.    The allegations underlying the Uncured Shortfall Claims, which totaled

approximately $5.13 million, were as follows:

    a.   Liquidation Proceeds ($2,040,718). In LSAMS, the application of settlement
proceeds to a loan triggers final payment to the investor on account of such
loan. LSAMS only permits a loan to be liquidated once. However, the
Federal Housing Authority ("FHA") and Veterans Affairs ("VA") require
several stages to complete liquidation of a loan and to receive insurance
proceeds. Accordingly for accounting purposes, the Debtors used a special
general ledger account to hold unapplied settlement proceeds of FHA- and
VA-insured loans that were in foreclosure pending final settlement, at which
point the proceeds would be run through the LSAMS system and pushed
down into the applicable Investor Custodial Accounts. The Purchaser asserts
that initial and supplemental settlement proceeds of 19 loans (ranging from
$20k to $173k) were swept from the servicing business's operating accounts
into the 434 Account prior to the Initial Closing, and were not applied to the
loans (or were applied inadequately) through LSAMS, leaving an anticipated
shortfall of approximately $2 million in the Investors' Custodial Accounts as
of the Initial Closing.

    b.   Paid-in-Full Loans Sold to Third Parties ($1,598,654). This claim relates to
certain loans where it is alleged that (i) AHM Corp. originated the loan and
sold it as part of a securitization, (ii) prior to the close of the securitization, the
loan paid off, (iii) AHM Corp. received both the sale proceeds from the
securitization investor and the loan payoff proceeds from the borrower, and
never funded the Investor Custodial Account, and (iv) the Investor Custodial
Account then paid the investor the paid-in-full loan amount, resulting in a pre-
Initial Closing shortfall in the Investor Custodial Account.

066585.1001

    c.  <u>Expenses Denied by Wells Fargo ($749,406)</u>.  When a loan was closed at a loss AHM SV would include the total unpaid principal balance in the wire remittance to the investor as an addition, and then include the loss on the loan as a subtraction.  These additions and subtractions would then net to the realized loan payoff.  The Purchaser asserts that, prior to the Initial Closing, AHM SV incurred $749,056 in expenses in connection with the foreclosure of seven loans that Wells Fargo Bank, N.A., as master servicer, did not agree could be passed along to the investors pursuant to the applicable servicing agreements.  Accordingly, Wells Fargo required AHM SV to remit to the investors an amount equal to the full liquidation proceeds, without reduction for the disputed foreclosure expenses.  The Purchaser asserts that, because AHM SV had already deducted these expenses from the liquidation proceeds prior to depositing them in the Investor Custodial Accounts, when AHM SV remitted from those accounts an amount equal to the gross liquidation proceeds, a shortfall resulted in the accounts.

    d.  <u>Repurchases ($738,384)</u>.  Loan sale agreements typically contained seller representations requiring repurchase of loans that suffered "early payment defaults" or "EPDs."  The Purchaser asserts that, prior to the Initial Closing, AHM SV satisfied AHM Corp.'s repurchase obligation with respect to three EPD loans by transferring funds to the investors from their own Investor Custodial Accounts, resulting in a shortfall of $738,384 as of the Initial Closing.

    16.    The allegations underlying the Misappropriation Claims, which totaled approximately $3.47 million, were as follows:

    a.  <u>Overpayment of Advances ($1,496,586)</u>.  The Purchaser asserts that (i) on June 29, 2007, AHM Corp. made a corporate advance of $5,082,009 from the 434 Account into an Investor Custody Account; (ii) on 6 subsequent days, the LSAMS system automatically paid back the 434 Account $1,496,586; (iii) three days after the advance, AHM SV manually transferred $5,082,009 from the Investor Custody Account to the 434 Account, thus making an overpayment of all of the automatic payments from LSAMS; and (iv) during the Interim Period, AHM SV cleared the deficiency in the Investor Custody Account using the Purchaser's funds.

    b.  <u>Paid-in-Full Loans (Compensating Interest) ($1,213,341)</u>.  If a loan pays off on, e.g., the 15th of the month, the borrower typically pays interest through that day of the month, but no more.  Loan purchasers could be either "Actual/Actual" investors or "Schedule/Schedule" investors.  Actual/Actual investors are entitled to receive the actual interest paid by the borrower through payoff, whereas Schedule/Schedule investors are entitled to receive a full month of interest in the final month of a loan, regardless of what day the loan paid off.  This extra interest (i.e., the full-month interest less the partial-month interest paid by the borrower) is referred to as "compensating interest".

DB02:9357244.4    066585.1001

Since compensating interest was not a regularly scheduled payment that would be received from a borrower, it had to be funded into the Investor Custody Account (typically, from the 434 Account) in order to make the required monthly remittance to the Schedule/Schedule investor. The Purchaser asserts that, prior to the Initial Closing, the Sellers did not fund the Investor Custodial Accounts of Schedule/Schedule investors for compensating interest of $1,213,341 owed on over 1,500 paid-in-full loans. During the Interim Period, it is alleged that AHM SV used the Purchaser's funds to fund the Investor Custodial Accounts for this compensating interest.

c.  <u>Funding of HELOC Custodial Accounts ($597,677).</u> This claim relates to the reimbursement of draws on home equity lines of credit ("<u>HELOCs</u>") funded by AHM Corp. prior to the Initial Closing. The typical flow of funds under a HELOC was as follows: (i) the borrower would request a draw on the HELOC, and AHM Corp. would advance the draw from the 434 Account; (ii) the amount of HELOC draws would be deducted from the next remittance to the investor, at which time the funds were available to reimburse the 434 Account for the draw advances; and (iii) the 434 Account would be reimbursed from Investor Custodial Accounts via manual accounting entries. HELOC servicing agreements were "Excluded Assets" under the APA and were not sold to the Purchaser; and all liabilities relating to Excluded Assets were "Retained Liabilities" of the Sellers. The Purchaser alleges that, prior to the Initial Closing, AHM SV transferred amounts in excess of the underlying HELOC draws from Investor Custodial Accounts into the 434 Account, resulting in a $597,677 shortfall in the HELOC Investor Custodial Accounts. The Purchaser further alleges that, during the Interim Period, AHM SV replenished the shortfall in the HELOC Investor Custodial Accounts using the Purchaser's funds.

d.  <u>Paid-in-Full Loans Sold to Third Parties ($164,303).</u> The Purchaser asserts that during the Interim Period AHM SV advanced $164,303 of the Purchaser's funds to make up Investor Custodial Account shortfalls relating to paid-in-full loans sold to third parties (discussed above).

17.  Other claims asserted in the AHMSI Motion, totaling approximately $8.6 million), along with the factual allegations underlying them, are as follows:

a.  <u>Prepayment Penalties ($7,504,426 before adjustments[3]).</u> Some loans impose penalties for payment prior to maturity. Investor Custodial Accounts pay pre-payment penalties to investors on a one-month lag. The Purchaser contends prepayment penalties collected from borrowers were

---

3 The Third Amendment to the APA, which was executed prior to filing of the AHMSI Motion, contained a partial purchase price adjustment to account for issues arising from prepayment penalties and LPMI (discussed below). Purchaser contends a further adjustment of $4.6 million in the aggregate for prepayment penalties and LPMI is needed.

placed into a separate corporate account maintained by AHM Corp. (the "434 Account") and not subsequently transferred to Investor Custodial Accounts. Since the Investor Custodial Accounts are purported to have made all the investor payments, including prepayment penalties, the Purchaser contends the Investor Custodial Accounts are owed the prepayment penalties received into the 434 Account.

b.   LPMI ($6,476,423 before adjustments). In most instances, amounts for lender-paid mortgage insurance ("LPMI") premiums were "stripped" by LSAMS from payments by borrowers and sent to the 434 Account, which later funded the payment of the insurance policy premiums as they became due. The Purchaser asserts that, during the Interim Period, the Servicing Business paid LPMI premiums which should have been remitted from the 434 Account.

c.   Payment Clearing Account Deficiency ($2,423,759). The Purchaser asserts a non-cash entry into LSAMS (a NLBATCH, or new loan batch) was erroneously coded as a cash entry, and when cash receipts subsequently came in from the loans, LSAMS was unable to push them down into the appropriate Investor Custodial Accounts, and the cash receipts ended up suspended in the Payment Clearing Account, in what was referred to as the "pending" category. Pending items were typically cleared manually. According to the Purchaser, as pending items built up in the Payment Clearing Account bank reconciliation, AHM SV's bank reconciliation person did not clear the items, but simply added an outstanding credit to the account to make it appear balanced. Later, it is asserted, someone saw the credit and booked it manually to the 434 Account as "excess cash" sitting in the clearing account. The Purchaser funded the Payment Clearing Account with $45 million on the Initial Closing, and when the account was later closed the Purchaser discovered the approximately $2.4 million discrepancy, for which it seeks reimbursement.

d.   FNMA Guaranty Fees ($834,648). For loans guaranteed by the Federal National Mortgage Association ("FNMA"), LSAMS would "strip" a prorated portion of FNMA guaranty fees off of incoming borrower payments and transfer it to the 434 Account until the guaranty fees fell due, at which point the fees would be remitted to FNMA from the 434 Account. Similar to the LPMI claim, the Purchaser asserts the Sellers collected $834,648 from borrowers pre-Initial Closing on account of FNMA guaranty fees, which fees became due and payable during the Interim Period and were allegedly paid using the Purchaser's funds.

e.   Signature Bank Agreement ($757,426). This claim is for a refund of the purchase price attributable to a loan servicing agreement with Signature Bank for a portfolio of approximately 94 loans. The Purchaser asserts this agreement should not have been included among the contracts sold to the

9

Purchaser because the Sellers did not have any "servicing rights" under this agreement, as that term is ordinarily understood in the industry. Specifically, the Purchaser contends that the Signature Bank agreement permits Signature Bank (i) to terminate the servicer without cause at any time prior to the initial term of the agreement, and (ii) to sell the servicing rights at any time. According to the Purchaser, an agreement with these characteristics could not have been intended by the parties to command the purchase price assigned to it in the Servicing APA, and a refund is therefore appropriate.

    f.     <u>Document Delivery Costs ($31,200).</u> This claim is for the estimated costs of transporting certain hard-copy loan files from Melville, New York to the Purchaser's place of business in Irving, Texas. The Purchaser asserts the APA requires the Sellers to physically deliver the loan files to the Purchaser in Texas, at their own expense, and that the Sellers' refusal to do so constitutes a breach of the APA.

    18.     On September 10, 2008, the Debtors filed a preliminary objection to the AHMSI Motion [D.I. 5798] (the "<u>Objection</u>"), which was joined by the Committee [D.I. 5811]. In the Objection, with respect to the Uncured Shortfall Claims of approximately $5.1 million, the Debtors reserved the right to seek discovery on the Purchaser's factual allegations, but asserted that:

    a.    the existence of shortfalls in Investor Custodial Accounts or T&I escrows as of the Initial Closing would not constitute a breach of the APA, because the APA contemplated an "as is, where is" transaction and the Sellers made no representations or warranties as to the sufficiency of the funding of any accounts;

    b.    pursuant to the Sale Approval Order, any claim against the Sellers arising under an Assumed Contract with respect to pre-Initial Closing acts or omissions of the Sellers (including, but not limited to, any claim of an investor resulting from a shortfall in its custodial account or a borrower's T&I escrow) had been satisfied in full by the establishment of the Cure Escrow;

    c.    by operation of the injunctive provisions in the Sale Approval Order, any such claim could only be asserted against the Cure Escrow, and could not be asserted against the Debtors or against the Purchaser;

    d.    the Purchaser did not have standing to assert claims against the Cure Escrow; and

                                                     

     e.   the Uncured Shortfall Claims were duplicative of claims already asserted against the Cure Escrow or, to the extent not asserted, time-barred and unenforceable under the Sale Approval Order.

19.     In the Objection, the Debtors also raised absolute legal defenses to payment of the claims relating to (i) the alleged Payment Clearing Account deficiency, (ii) the FNMA guaranty fees, (iii) the Signature Bank agreement, and (iv) the document delivery costs.

20.     With respect to the remainder of the claims asserted in the AHMSI Motion—in particular, the LPMI/prepayment penalty claim and the Misappropriation Claims, which are admittedly fact-intensive—the Debtors reserved their rights to seek discovery and supplement the Objection at a later time. Also, with respect to the Misappropriation Claims, the Debtors reserved their rights, *inter alia*, (i) to bring avoidance actions under section 549 of the Bankruptcy Code to recover any amounts transferred to or for the benefit of investors during the Interim Period, to the extent such transfers violated the APA (and, by extension, the Sale Approval Order) and (ii) to pursue any available causes of action against officers and employees of the Debtors (most of whom were then employed by the Purchaser) based upon their actions or inactions during the Interim Period.

21.     Finally, in the Objection, the Debtors asserted a right to set off against any allowed administrative claim approximately $2.6 million owed to AHM Corp. for certain corporate overhead and insurance costs it paid on behalf of the Servicing Business during the Interim Period.

## III.    Discovery and Settlement Discussions

22.     Shortly after the filing of the AHMSI Motion, a representative of the Debtors met with representatives of the Purchaser at its headquarters in Irving, Texas, to discuss the factual underpinnings for the various claims in the AHMSI Motion. Following this meeting, the Purchaser retained Alvarez & Marsal ("A&M") to evaluate the Servicing Business's books

11

and records with respect to, and to quantify and document, the various claims asserted in the

AHMSI Motion.

      23.     Following its investigation of the Servicing Business's books and records,

A&M provided the Debtors certain documents in support of the various claims asserted in the

AHMSI Motion (together with additional documents provided by A&M or the Purchaser from

time to time in support of the AHMSI Motion, the "Supporting Documents"), consisting

primarily of the following:

      a.   Compare files – comparisons between the expected investor general ledger ("G/L") balance and the actual investor G/L balance.

      b.   Bank reconciliations of Investor Custodial Accounts – reconciliations between the actual bank balance, the actual investor G/L balance, and the expected investor G/L balance.

      c.   G/L "suspense" accounts – G/L transaction items that have not been resolved.

      d.   Payment Clearing Account "pending" file – transaction items from the clearing account that require resolution..

      24.     On October 2, 2008, the Court approved the Debtors' retention of Traxi

LLC ("Traxi") as special litigation financial advisors in connection with the AHMSI Motion

[D.I. 6177]. Traxi professionals conferred with A&M professionals and/or employees of the

Purchaser on several occasions to discuss the Supporting Documents and the underlying bank

account reconciliation reports and account activity during the time periods relevant to the

AHMSI Motion. Traxi's review of the Supporting Documents has concluded that, while the

Purchaser's supporting evidence is largely *consistent* with the transactions alleged to have

occurred, in many instances the Purchaser's support is not *conclusive* that the transactions

alleged to have occurred did in fact occur (or, if they did, that there were not offsetting

transactions in favor of the Sellers that would need to be taken into account in determining the

amount, if any, owed to the Purchaser). Thus, to fully vet the factual allegations in the AHMSI

          

Motion, the Debtors would likely need to reconstruct the loan-level activity in each of the relevant accounts using historical accounting data and bank reconciliations. This process would be complicated significantly by the fact that, following the Final Closing, the Purchaser transitioned from the LSAMS system to a new proprietary loan servicing system (the "Option One System"). Thus, to obtain crucial data from the LSAMS system, Traxi would have to either obtain licensure and expertise in using LSAMS or formulate queries from the LSAMS system and have the Purchaser's employees run reports based on those queries.

25.    The Debtors and AHMSI have exchanged certain written discovery requests and responses, which are subject in all respects to the limitations agreed upon and to be agreed upon (the "Discovery Limitations") pursuant to a certain letter agreement dated December 10, 2008, regarding the scope of discovery. Notwithstanding the Discovery Limitations and the parties' other good faith efforts to narrow the scope of discovery and otherwise minimize litigation costs and expenses, the parties have expended, and expect that they will continue to expend, significant financial and human resources in connection with the litigation concerning the AHMSI Motion.[4] Accordingly, the parties agreed it would be mutually beneficial to halt wide-scale document discovery and focus on discussing settlement.

26.    In the course of settlement discussions regarding the AHMSI Motion, the parties concluded it would be desirable to work toward a global resolution of other open items (including, e.g., the APA Exhibit G reconciliation). The parties conferred for several months, and have reached an agreement, embodied in the Settlement Agreement, in settlement of (i) the AHMSI Motion; (ii) the APA Exhibit G reconciliation; (iii) certain payment obligations under or

---

[4] For instance, the parties conferred in good faith regarding search terms for electronic document production, but the search terms currently under consideration by the parties would result in "hits" in between 366,000 and 617,000 documents.

relating to certain Subservicing Agreements; and (iv) certain other disputes and potential

disputes. The Debtors believe the Settlement Agreement represents a fair and reasonable

compromise in light of the costs, uncertainties, risks, and delays attendant to litigation of the

open issues between the parties.

## THE SETTLEMENT AGREEMENT

27.    The principal terms of the Settlement Agreement are set forth below:[5]

a.    <u>Effectiveness.</u> Except as otherwise expressly provided therein, the Settlement Agreement shall become effective immediately when the Settlement Approval Order becomes a final, non-appealable order (such time, the "<u>Effective Time</u>"). If the Effective Time does not occur by April 30, 2010, either AHMSI or the Sellers shall have the option to terminate the Settlement Agreement by written notice to the other Party and upon such termination the Settlement Agreement will be of no force or effect, *ab initio*, without any further action by any of the Parties.

b.    <u>Settlement of AHMSI Motion</u>. At the Effective Time, without any further action by any Party or the Bankruptcy Court, AHMSI shall be allowed an administrative expense priority claim against Sellers' estates pursuant to Section 503(b) of the Bankruptcy Code in the amount of $6,000,000 (the "<u>AHMSI Motion Claim</u>").[6] Sellers shall pay the AHMSI Motion Claim to AHMSI in immediately available funds on the day on which the Effective Time occurs. As soon as practicable after the Effective Time, AHMSI shall withdraw the AHMSI Motion, with prejudice to all claims asserted therein <u>other</u> <u>than</u> Account Shortfall Claims.

c.    <u>Payment of Other Claims and Expenses</u> (discussed further below).

(i)    The Parties acknowledge and agree that the amounts set forth as servicing fees, LPMI advances, corporate and escrow advances, and HELOC advances identified in <u>Part 1</u> of <u>Exhibit D</u> to the Settlement Agreement (collectively, the "<u>AHMSI Owed Amounts</u>") are due and payable to AHMSI pursuant to the terms of the APA or the Subservicing Agreements.

(ii)    The Parties acknowledge and agree that the amounts set forth as subservicing fees, overhead and insurance costs paid during the Interim Period, net corporate and escrow advances (collectively, the "<u>Sellers Owed Amounts</u>") and principal and interest for unencumbered loans (the "<u>P&I Owed Amounts</u>"),

---

[5] The terms of the Settlement Agreement set forth herein are a summary only, and all terms not defined herein shall be given the meanings ascribed to them in the Settlement Agreement. To the extent of any inconsistency between this summary and the Settlement Agreement, the terms of the Settlement Agreement shall govern.

[6] Subsumed within the AHMSI Motion Claim is also a settlement of the APA Exhibit G Reconciliation, which constitutes an amount payable by the Sellers pursuant to the APA.

each identified in Part 2 of Exhibit D to the Settlement Motion are due and payable to the AHM Parties pursuant to the terms of the APA or the Subservicing Agreements. On the day on which the Effective Time occurs, (A) AHMSI shall pay to the applicable AHM Party from the applicable custodial account, in immediately available funds, the P&I Owed Amounts and (B) AHMSI shall pay to Sellers in immediately available funds an amount equal to the excess of the Sellers Owed Amounts over the AHMSI Owed Amounts.

(iii)    The Parties acknowledge that AHMSI Owed Amounts and Sellers Owed Amounts are (A) not payable with respect to any claims asserted in the AHMSI Motion, as a part of the Asserted Claim Amount, or as a part of the AHMSI Motion Claim; and (B) in addition to, and separate from, the amounts payable pursuant to the settlement of the AHMSI Motion Claim.

d.    Mutual Release. Effective as of the Effective Time:

(i)    AHMSI, individually and on behalf of each of its subsidiaries and affiliates, present and former officers, directors, parents, general partners, management companies, shareholders, partners, associates, predecessors, members, successors, legal representatives, attorneys, assigns, agents and employees (each an "AHMSI Releasing Party" and collectively the "AHMSI Releasing Parties"), irrevocably and unconditionally, without limitation, releases, acquits and forever discharges each Seller, and each of their respective subsidiaries and affiliates, present and former officers, directors, parents, general partners, management companies, shareholders, partners, associates, predecessors, members, successors (including, without limitation, the Plan Trust and the Plan Trustee (as defined in the Plan Confirmation Order)), legal representatives, attorneys, assigns, agents and employees (each an "AHM Released Party" and collectively the "AHM Released Parties") from any and all judgments, executions, actionable matters, causes of action, claims, counterclaims, demands, rights (including rights of offset and set-off), suits, debts and sums of money, obligations, duties, liabilities, injuries, damages, losses, compensation, costs, expenses (including, without limitation, attorneys' fees), of every name, kind or nature whatsoever whether claimed to be against person, entity or property, in law or in equity, whether such claims are presently known or unknown, direct or indirect, fixed or contingent, which any AHMSI Releasing Party has ever had, or now has, or which any AHMSI Releasing Party may claim to have against any AHM Released Party, arising from or relating to the APA, the Sale Approval Order, or any agreement or transaction contemplated by the APA or the Sale Approval Order, other than those claims specifically identified on Exhibit C to the Settlement Agreement (provided that AHMSI's sole recourse with respect to any Account Shortfall Claims shall be the Cure Escrow as provided in paragraph 7 of the Settlement Agreement); and

(ii)    Sellers individually and on behalf of each of their respective subsidiaries and affiliates, present and former officers, directors, parents, general partners, management companies, shareholders, partners, associates, predecessors,

members, successors (including, without limitation, the Plan Trust and the Plan Trustee (as defined in the Plan Confirmation Order)), legal representatives, attorneys, assigns, agents and employees (each an "AHM Releasing Party" and collectively, the "AHM Releasing Parties"), irrevocably and unconditionally, without limitation, hereby release, acquit and forever discharge AHMSI and each of its subsidiaries and affiliates and each of their respective present and former officers, directors, parents, general partners, management companies, shareholders, partners, associates, predecessors, members, successors, legal representatives, attorneys, assigns, agents and employees (each an "AHMSI Released Party" and collectively, the "AHMSI Released Parties") from any and all judgments, executions, actionable matters, causes of action, claims, counterclaims, demands, rights (including rights of offset and set-off), suits, debts and sums of money, obligations, duties, liabilities, injuries, damages, losses, compensation, costs, and expenses (including, without limitation, attorneys' fees) of every name, kind or nature whatsoever whether claimed to be against person, entity or property, in law or in equity, whether such claims are presently known or unknown, direct or indirect, fixed or contingent, which any AHM Releasing Party or any of their respective estates has ever had, or now has, or which any AHM Releasing Party or any of their respective estates may claim to have against any AHMSI Released Party, arising from or relating to the APA, the Sale Approval Order, or any agreement or transaction contemplated by the APA or the Sale Approval Order, other than those claims specifically identified on Exhibit C to the Settlement Agreement (discussed further below).

e.    Release of Claims against AHMSI Employees.  Effective as of the Effective Time, Sellers, individually and on behalf of each of the other AHM Releasing Parties, shall release, acquit and forever discharge each and every present and former employee of AHMSI listed on Exhibit E to the Settlement Agreement (the "Released Employees") from any and all claims, whether such claims are presently known or unknown, direct or indirect, fixed or contingent, which any of the AHM Releasing Parties or any of their respective estates has ever had, or now has, or which any of the AHM Releasing Parties or any of their respective estates may claim to have against them, arising from or related to their employment by any of Sellers or their respective affiliates; provided that, this release will only be effective for the applicable employee for so long as that employee does not bring a claim against the estate of any AHM Releasing Parties, excluding claims that are (i) allowed as an administrative expense under § 503(b)(1)(A)(i) of the Bankruptcy Code or (ii) entitled to priority under § 507(a)(4) or (a)(5) of the Bankruptcy Code (claims under subparagraph (i) and (ii), "Employee Permitted Claims") and, in the event the applicable employee brings any claim other than an Employee Permitted Claim against any AHM Releasing Parties, the release granted to the applicable employee shall be of no force or effect, void ab initio, without any further action by any of the Parties.

f.    Claims not Released; Limitations on Account Shortfall Claims (discussed further below). The Settlement Agreement shall have no effect on, and AHMSI and the Sellers are not settling, discharging or waiving, any claims set forth in Exhibit C to the Settlement Agreement; provided that AHMSI's sole recourse on account of any Account Shortfall Claim shall be against the Cure Escrow, to the extent (and only to the extent) permitted

16

by the Sale Approval Order. Sellers shall not, and each Seller shall cause their respective affiliates not to, object to the allowance or payment of any Account Shortfall Claim asserted by AHMSI against the Cure Escrow; provided, however, that nothing in the Settlement Agreement or the Settlement Approval Order is intended, nor shall it be construed:

> (i)    to affect the rights, if any, of any party in interest (including, but not limited to, the Administrative Agent) other than Sellers and their respective affiliates to object to any Account Shortfall Claim asserted against the Cure Escrow on any basis whatsoever;

> (ii)    as an acknowledgement, admission, or finding (i) as to the validity, amount or timeliness of any Account Shortfall Claim or (ii) that any Account Shortfall Claim constitutes a Seller Cure Claim that is properly assertable against the Cure Escrow in accordance with the Sale Approval Order, it being understood by AHMSI and the Sellers that the Settlement Agreement shall not create or give rise to any Seller Cure Claim, or substantive or procedural right or remedy, that did not previously exist under a prior agreement or order of the Bankruptcy Court, or otherwise under applicable Law;

> (iii)    to require Sellers to cooperate with or assist AHMSI in the pursuit of any Account Shortfall Claim against the Cure Escrow, except to the extent provided in paragraph 13 of the Settlement Agreement (regarding production of documents); or

> (iv)    to prohibit Sellers, solely to the extent required by the *Order Approving and Authorizing Stipulation of Settlement Among (i) the Debtors, (ii) Bank of America, N.A., as Administrative Agent, and (iii) the Official Committee of Unsecured Creditors and Granting Related Relief* [D.I. 5308] (the "BofA Settlement Stipulation"), from (A) litigating or otherwise resolving the claim against the Cure Escrow of any party identified on Exhibit B to the BofA Settlement Stipulation, or (B) at the Administrative Agent's request, providing reasonable cooperation to the Administrative Agent in connection with litigation of any claim against the Cure Escrow.

g.    Representations and Warranties. The Settlement Agreement contains customary representations and warranties between the Parties regarding corporate existence/authority, intention to be bound, and the like. In addition:

> (i)    Purchaser represents and warrants that it has not received any single invoice or group of related invoices that are unpaid as of the date of execution of the Settlement Agreement and that exceed $25,000 in one instance or more than $100,000 in the aggregate that, in each instance, relate to the operation of the Business during the Interim Period, other than invoices for ordinary course professionals (e.g., attorneys); and

(ii)    Sellers represent and warrant that, as of the date of execution of the Settlement Agreement, an aggregate amount of $2,648,316 claims have been adjudicated as payable or have been agreed to be paid from the Cure Escrow; and an aggregate amount of $3,268,596 of disputed claims remain alleged to be outstanding against the Cure Escrow.

h.    <u>Cooperation Regarding Loan/REO Sales by Sellers.</u>  From and after the Effective Time, AHMSI shall cooperate reasonably and in good faith with Sellers to facilitate Sellers' sale of any Mortgage Loans or REO Property owned or held for the benefit of any Seller or any affiliate of Seller and being serviced by AHMSI pursuant to one of the Subservicing Agreements.

i.    <u>Cooperation Regarding Third-Party Litigation.</u>  From and after the Effective Time, the Parties shall cooperate reasonably and in good faith to make non- privileged information and documentation relating to the Business prior to the Final Closing in their possession available (i) to each other in litigation with third parties, and (ii) to the Committee in any litigation brought by the Committee on behalf of the Debtors' bankruptcy estates, so long as making such information or documentation available does not violate applicable Law (including privacy Laws), provided that the requesting party pays (or, with respect to requests by the Committee, the Debtors pay) all reasonable costs (including both third party out-of-pocket costs and internal time) of the requested party associated with making the information and documentation available.  For purposes of calculating the cost of internal time in the event AHMSI is the requested party, (A) all persons with titles of assistant vice president and below (including those individuals with no titles, but excluding in all cases in-house attorneys) will be charged at the rate of $75.00 per hour and (B) all persons with titles higher than assistant vice president and all in-house attorneys, regardless of title, will be charged at the rate of $125 per hour.

j.    <u>Governing Law and Waiver of Jury Trial.</u>  The Settlement Agreement shall be construed and enforced in accordance with the (i) the internal laws of the State of New York without giving effect to the rules governing the conflict of laws and (ii) to the extent applicable, the Bankruptcy Code.  The Parties irrevocably waive the right to trial by jury in any action relating to the Settlement Agreement.

k.    <u>Venue and Retention of Jurisdiction.</u>  The Bankruptcy Court shall have exclusive jurisdiction to enforce the terms of the Settlement Agreement and to decide any claims or disputes which may arise or result from, or be connected with, the Settlement Agreement, any breach or default thereunder, or the transactions contemplated thereby, provided that if the Sellers' bankruptcy cases have closed, the Parties agree to submit to the exclusive jurisdiction of the federal or state courts, as applicable, of New York sitting in New York County.

l.    <u>AHM Acceptance as Party to Certain Provisions.</u>  AHM Acceptance, which is a party to two of the Subservicing Agreements, is a party to the Settlement Agreement as to certain provisions solely to effectuate a settlement of claims arising under those Subservicing Agreements.

28.    <u>Exhibit C</u> to the Settlement Agreement identifies certain categories of claims that are *not* subject to the agreement's general release provisions, namely:

    a.   claims arising after the date the Settlement Agreement is executed;

    b.   claims arising under the Settlement Agreement itself;

    c.   claims arising under Subservicing Agreements *other than* those reflected as AHMSI Owed Amounts and Sellers Owed Amounts on <u>Exhibit D</u> to the Settlement Agreement (discussed below);

    d.   Account Shortfall Claims, to the extent asserted solely against the Cure Escrow, and subject to all reservations/limitations set forth in paragraph 7 of the Settlement Agreement (described in paragraph 27(f) above);

    e.   claims of the Debtors arising under the APA for reimbursement, indemnification, or contribution from AHMSI with respect to administrative expense claims asserted, or that may be asserted, against the Debtors arising from or relating to the claims of professionals retained and employed by the Debtors' bankruptcy estates for compensation for services rendered, and/or reimbursement of expenses incurred in connection with or for the benefit of the Business;

    f.   any present or future claim of AHMSI or the Debtors relating to (i) the ownership of any claim or cause of action of any nature relating to the operation of the Business that is assertable against the U.S. Department of Housing and Urban Development, any affiliate thereof, or any other government unit, including without limitation, the Internal Revenue Service) (such claims and causes of action, collectively, "<u>Government Claims</u>") or (ii) the proper allocation, as between the Debtors and AHMSI, of proceeds of any Government Claims; and

    g.   Any and all claims of AHMSI or the Sellers for breach of (or rights of AHMSI or the Sellers to compel specific performance of) certain continuing obligations under the APA and/or Sale Approval Order.

29.    <u>Exhibit D</u> to the Settlement Agreement reflects amounts acknowledged by the Parties to be due and owing to one another, which are unrelated to the AHMSI Motion Claims and fall within the following categories:

DB02:9357244.4                 066585.1001

### *Amounts Owed from Sellers to AHMSI*

a. <u>Servicing fees ($1,570,830.44).</u> Servicing fees with respect to loans in the Excluded Portfolio which were serviced or subserviced by AHMSI post-Final Closing (through September 2009).

b. <u>HELOC advances ($151,555.49).</u> Reimbursement for HELOC advances made post-Initial Closing (through September 30, 2009), under unencumbered HELOCs in the Excluded Portfolio which were owned by the Debtors.

c. <u>LPMI advances ($473,516.25).</u> Reimbursement for LPMI advances made post-Final Closing (through September 2009) on unencumbered loans in the Excluded Portfolio which were owned by the Debtors.

### *Amounts Owed from AHMSI to Sellers*

d. <u>Subservicing Fees owed to the Sellers ($628,577).</u> Servicing fees payable to AHM SV and collected by the Servicing Business during the Interim Period (specifically, January – March 2008) on loans in the Excluded Portfolio, less the contractual subservicing fee payable to the Servicing Business pursuant to the APA.

e. <u>Overhead and Insurance Cost Paid by Sellers ($2,592,600).</u> Amounts owed to AHM Corp. for certain corporate overhead and insurance costs it paid on behalf of the Servicing Business during the Interim Period, on account of which the Debtors asserted a setoff right in their Objection to the AHMSI Motion.

f. <u>Net corporate and escrow advances ($1,200,000).</u> Following the Initial Closing, the Purchaser provided the Debtors daily reports of servicing advances made by the Servicing Business on the Excluded Portfolio. On a weekly basis, the Debtors funded the net advances (i.e., amounts advanced by the Purchaser less any amounts recouped by the Servicing Business from loan proceeds that week) in arrears using their own funds. Over time, the Servicing Business (pre-Final Closing) or AHMSI (post-Final Closing, through September 2009) recouped some of these advances, but never remitted them to the Debtors. This $1.2 million figure represents a good-faith compromise between the parties as to the amount of advances funded by the Debtors and later recovered by the Servicing Business/AHMSI, following exchanges of accounting and banking data and several months of discussions.

g. <u>P&I for Unencumbered Loans ($4,279,364.45).</u> This represents P&I collected by the Servicing Business from July 2007 through the Final Closing, or by AHMSI post-Final Closing (in most instances, through September 2009), on unencumbered loans in the Excluded Portfolio which were owned by the Debtors.

The net result of the AHMSI Owed Amounts, on the one hand, and the Sellers Owed Amount and P&I Owed Amount, is a $6,504,639.27 payable to the Debtors' estates.

## RELIEF REQUESTED AND BASIS THEREFOR

30.     By this Motion, the Debtors are seeking this Court's authorization and approval of the Settlement Agreement pursuant to section 105(a) and 363(b) of the Bankruptcy Code and Bankruptcy Rule 9019(a).

31.     Rule 9019(a) provides that "on motion by the trustee and after a hearing, the Court may approve a compromise or settlement." The settlement of time-consuming and burdensome litigation, especially in the bankruptcy context, is encouraged. In re Penn Central Transp. Co., 596 F.2d 1002 (3d Cir. 1979). The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Comm. for Indep. Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414 (1986).

32.     Approval of a proposed settlement is within the "sound discretion" of the Bankruptcy Court. In re Neshaminy Office Building Associates, 62 B.R. 798, 803 (Bankr. E.D. Pa. 1986). The court must determine whether the proposed settlement is in the "best interests of the estate." See In re Energy Cooperative, Inc., 886 F.2d 921, 927 (7th Cir. 1989). In determining the fairness and equity of a compromise in bankruptcy, the United States Court of Appeals for the Third Circuit has stated that it is important that the bankruptcy court "apprise[] itself of all facts necessary to form an intelligent and objective opinion of the probabilities of ultimate success should the claims be litigated, and estimated the complexity, expense and likely duration of such litigation, and other factors relevant to a full and fair assessment of the [claims]." In re Penn Central Transportation Co., 596 F.2d 1127, 1153 (3d Cir. 1979); see also

21

In re Marvel Entertainment Group, Inc., 222 B.R. 243 (D. Del. 1998) (quoting, In re Louise's Inc., 211 B.R. 798, 801 (D. Del. 1997) (describing "the ultimate inquiry to be whether 'the compromise is fair, reasonable, and in the interest of the estate.'").

33.     In particular, the Third Circuit Court of Appeals has enumerated four factors that should be considered in determining whether a settlement should be approved, namely: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Meyers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996); accord Will v. Northwestern Univ. (In re Nutraquest, Inc.), 434 F.3d 639, 644 (3d Cir. 2006).

34.     In deciding whether to approve a settlement, the bankruptcy court should not substitute its judgment for that of the debtor. Neshaminy, 62 B.R. at 803. Nor should it decide the numerous questions of law or fact raised by litigation. Rather, it should canvass the issues to see whether the settlement falls below the lowest point in the range of reasonableness. See In re W.T. Grant and Co., 699 F.2d 599, 608 (2d Cir. 1983), cert. denied, 464 U.S. 22 (1983); see also In re World Health Alternatives, Inc., 344 B.R. at 296 (stating that "the court does not have to be convinced that the settlement is the best possible compromise. Rather, the court must conclude that the settlement is within the reasonable range of litigation possibilities.") (internal citations and quotations omitted).

35.     In the Debtors' judgment, the resolutions embodied in the Settlement Agreement are reasonable and in the best interest of the Debtors, their estates, their creditors and other parties in interest. The Settlement Agreement provides for a fair and practical resolution of numerous disputed issues which, if litigated to their conclusion, would consume vast amounts of

the Debtors' limited resources and, in all likelihood, would further delay the effectiveness of the

Plan. The Settlement Agreement was the product of significant and lengthy discussions and

negotiations between the Debtors, AHMSI, and the Committee over a period of almost two

years, and the settlement embodied therein falls well above the lowest point in the range of

reasonableness. In addition, as discussed below, each of the applicable <u>Martin</u> factors weighs in

favor of approving the Settlement Agreement.

### A.    The Probability of Success in Litigation

36.    Absent the Settlement Agreement, the AHMSI Motion would have to be

litigated before the Court with no assurances of a favorable outcome for the Debtors' estates.

The resolution of the Account Shortfall Claims under the terms of the Settlement Agreement is

appropriate and reasonable. By limiting the Purchaser's recourse with respect to Account

Shortfall Claims to the Cure Escrow, the Settlement Agreement directs such claims to the only

place they might appropriately be asserted, while preserving the rights of all parties in

connection with those claims if AHMSI ever asserts them against the Cure Escrow. With respect

to the remaining claims set forth in the AHMSI Motion, the Debtors believe that they have

strong legal defenses (particularly, for claims relating to document delivery costs, the FNMA

guaranty fees, the Signature Bank agreement, and the alleged Payment Clearing Account

Deficiency), but at the same time significant potential exposure (particularly, for

Misappropriation Claims and LPMI/prepayment penalty claims, to the extent the facts are as

alleged by the Purchaser). On balance, the Debtors believe that the $6 million settlement of the

more than $17 million in AHMSI Motion Claims is an extremely favorable result for the

Debtors' estates and falls *not only* above the lowest point in the range of reasonableness, *but also*

within the range of favorable litigation outcomes for the Debtors, without the attendant delay and

expense of litigation.  Accordingly, the first <u>Martin</u> factor weighs decisively in favor of approving the Settlement Agreement.

**B.      The Likely Difficulties in Collection**

37.      The Debtors do not believe that collection of any judgment that could be obtained against AHMSI is a significant issue animating the Settlement Agreement, thus rendering this factor neutral.  However, the Debtors do note that an ancillary benefit of the Settlement Agreement will be the payment of amounts acknowledged by the Purchaser to be due and owing to the Debtors and unrelated to the AHMSI Motion (as set forth in <u>Exhibit D</u> to the Settlement Agreement), which the Purchaser has not released to date.  The Debtors are optimistic that, in combination with the settlement of the AHMSI Motion Claims (which will decrease the amount of the necessary Plan Reserves), the Debtors' receipt of AHMSI Owed Amounts will facilitate funding of the Plan Reserves and the effectiveness of the Plan to the benefit of all creditors.

**C.      The Complexity of the Litigation Involved, and the Expense, Inconvenience and Delay Necessarily Attending It**

38.      The Debtors submit that the Settlement Agreement plainly satisfies the third factor in <u>Martin's</u> four-factor test.  While the Debtors believe that some of the issues raised in the AHMSI Motion could be disposed of as a matter of law, the bulk of the litigation would surround issues the Debtors acknowledge are both legally and factually complex.  Complicating matters for the Debtors in the litigation scenario are the facts that (i) the key personnel knowledgeable about the factual allegations set forth in the AHMSI Motion are currently employed by AHMSI or otherwise unavailable to the Debtors, (ii) most of the relevant documents are in the possession of AHMSI; and (iii) most of the relevant accounting information (which will be pivotal to the outcome of the litigation) resides on the dormant LSAMS system,

24

which will require forensic accountants and other experts to extract and process. In sum, the

Debtors believe that litigation of the AHMSI Motion would be a veritable "black hole" of

litigation expenses and would entail significant delay, particularly considering the significant

burdens on this Court's docket which would presumably make it difficult to schedule a

potentially lengthy trial at any time in the near future. Accordingly, the third <u>Martin</u> factor

weighs in favor of approving the Settlement Agreement.

### D.    The Paramount Interest of Creditors

39.    Entry into the Settlement Agreement serves the paramount interest of

creditors of the Debtors. Resolution of the AHMSI Motion Claims represents a savings for the

creditors by obviating litigation, thereby saving the expenses attendant to such litigation. As

noted above, the Settlement Agreement also frees up AHMSI Owed Amounts acknowledged to

be owed to the Debtors, but which otherwise might be delayed by an inability to resolve the

AHMSI Motion Claims. The combined effect of the reduction of potential administrative

exposure, on the one hand, and the increase of cash, on the other hand, will be to facilitate

effectiveness of the Plan for the benefit of all creditors. Accordingly, the fourth <u>Martin</u> factor

weighs in favor approving the Settlement Agreement.

### E.    Summary

40.    A review of the four factors set forth above clearly demonstrates that the

Settlement Agreement is in the best interest of the Debtors, the Debtors' estates and creditors.

The resolution and compromise of the disputes and issues between the Parties as embodied in the

Stipulation: (i) is fair and equitable; (ii) represents a settlement that rests well above the lowest

point in the reasonable range of potential litigation outcomes; (iii) obviates the expense, delay,

inconvenience and uncertainty that would attend any litigation of the Parties' issues; and

(iv) advances the paramount interests of creditors.  Therefore, the Stipulation satisfies Bankruptcy Rule 9019 and should be approved by the Court.

## NOTICE

41.     Notice of this Motion will be provided to (i) the United States Trustee for the District of Delaware; (ii) counsel to the Official Committee of Unsecured Creditors; (iii) counsel to Bank of America, N.A., as Administrative Agent; (iv) counsel to AHMSI; and (v) all parties entitled to notice under Del. Bankr. L.R. 2002-1(b).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order substantially in the form attached hereto approving the Settlement Agreement and granting the Debtors such other and further relief as is just and proper.

Dated:    Wilmington, Delaware          YOUNG CONAWAY STARGATT & TAYLOR, LLP
          March 16, 2010

          Sean M. Beach (No. 4070)
          Patrick A. Jackson (No. 4976)
          The Brandywine Building
          1000 West Street, 17th Floor
          Wilmington, Delaware 19801
          Telephone: (302) 571-6600
          Facsimile: (302) 571-1253

          Counsel for Debtors and Debtors in Possession

DB02:9357244.4                                                              066585.1001