limitations, negative amortization, and interest
rate carryover.

12 C.F.R. § 226.19(b)(2).

Plaintiff alleges and the disclosures show that her
application and good faith estimate showed an interest rate of
1% for 480 months. Compl. ¶ 23. According to Plaintiff's
allegations and the attachments to Defendant's Motion, the only
disclosure Plaintiff received prior to closing showing an
interest rate other than 1% was the TILDS, which showed an APR
of 6.320%. Id. ¶¶ 32, 35, 36. Even the TILDS, however, appears
to show monthly payments based on the 1% interest rate. Id. ¶
58. None of these documents reveals that the 1% rate is a
discounted rate. Plaintiff does not state clearly in her
Complaint whether she received the adjustable rate mortgage
disclosure statement prior to closing, but assuming that she
did, the adjustable rate mortgage disclosure statement allegedly
given to Plaintiff discusses both discount and premium rates
saying that any and all could potentially apply to her mortgage.

The Disclosure states

> If your Initial Interest Rate is an amount that
> is lower than the Fully Indexed Rate, this is called a
> "Discounted Rate". If your Initial Interest Rate is a
> Discounted Rate, because your initial monthly payment
> will be determined using the Initial Interest Rate and
> your first adjusted payment will be determined using
> an adjustable rate that is based on the index plus
> Margin, your first adjusted payment may increase even
> if the index decreases or remains the same. If your
> initial interest rate is an amount that is higher than

the Fully Indexed rate, this is called a "Premium
Rate".  If your Initial Interest Rate is a Premium
Rate, because your initial monthly payment will be
determined using the Initial Interest Rate and your
first adjusted payment will be determined using an
adjustable rate that is based on the Index plus
Margin, your first adjusted payment may decrease even
if the index remains the same or increases.  The
adjustable rate that is used to determine your first
adjusted payment may be higher or lower than the
Subsequent Rate.  Ask us for the amount of our current
discounts and premiums.  (As described in the section
below entitled "Increase in Principal Balance
(Negative Amortization)".

Nowhere does the Disclosure specify that the 1% interest

rate appearing on the various other disclosures is a discounted

rate.  Thus, Plaintiff has alleged sufficient facts to plausibly

state a claim under § 226.19(b)(2)(v) requiring that the lender

disclose clearly and conspicuously the fact that the interest

rate will be discounted.  Accord Velazquez v. GMAC Mortgage

Corp., 605 F. Supp. 2d 1049, 1067 (C.D. Cal. 2008) (holding that

the language used in the disclosures regarding the initial

interest rate, which is ambiguous as to whether it is a

discounted rate or not, may be sufficient for Plaintiff to make

out a claim that the disclosures were not clear and conspicuous

under § 226.19(b)(2)(v)); Plascencia v. Lending First Mortgage,

No. C 07-4485 CW, 2008 WL 1902698, at *5 (N.D. Cal. April 28,

2008) (holding that "Plaintiffs may be able to show that they

were not alerted in clear and conspicuous terms that the one-

percent interest rate was a discounted rate" based on language
in the mortgage note).

In addition, Plaintiff alleges and the adjustable rate
mortgage loan disclosure statement attached by Defendants
supports her contention that the loan program disclosure
provided to Plaintiff was not specific to Plaintiff's loan, as
required by § 226.19(b)(2), but rather discusses several
different MTA power arms without specifying which applied to
her.  Comp. ¶ 94, 95, Opp. ¶ 27(2).  In addition, as already
discussed, the disclosure discusses both discounted rates and
premium rates and situations where neither is part of the
mortgage.  Thus, Plaintiff has also alleged sufficient facts to
state a claim under § 226.19(b)(2) requiring that the lender
provide a loan program disclosure for each variable-rate program
in which the consumer expresses an interest.

Finally, Plaintiff alleges, and the adjustable rate
mortgage disclosure supports, that the variable rate disclosures
and explanations of negative amortization framed negative
amortization as a mere possibility by using language such as
"sometimes" and "may" instead of "always" and "will" despite the
certainty that Plaintiff would experience negative amortization
if she paid according to the payment schedule.  Opp. ¶ 28(4).

The Staff Commentary explains that

> [i]n transactions where paying the periodic payments
> will not fully amortize the outstanding balance at the
> end of the loan term and where the final payment will
> equal the periodic payment plus the remaining unpaid
> balance, the creditor must disclose this fact.  For
> example, the disclosure might read, 'Your periodic
> payments <u>will</u> not fully amortize your loan and you
> <u>will</u> be required to make a single payment of the
> periodic payment plus the remaining unpaid balance at
> the end of the loan term."

Staff Commentary, cmt. 19(b)(2)(iii)-1 (emphasis added).

Similarly, the Staff Commentary to § 226.19(b)(2)(vii) says

> A creditor must disclose, where applicable, the
> possibility of negative amortization.  For example,
> the disclosure might state, "If any of your payments
> is not sufficient to cover the interest due, the
> difference will be added to your loan amount.... If
> the consumer is given the option to cap monthly
> payments that may result in negative amortization, the
> creditor must fully disclose the rules relating to the
> option, including the effects of exercising the option
> (such as negative amortization <u>will</u> occur and the
> principal balance <u>will</u> increase).

Staff Commentary, cmt. 19(b)(2)(vii)-2 (emphasis added).

The Adjustable Rate Mortgage Loan Disclosure Statement

allegedly provided to Plaintiff explains in the description of

the monthly payment calculation that Plaintiff may pay off the

loan in full sooner than expected or may have a balance

remaining at the end.

> Since the interest rate changes more frequently than
> the payment change, <u>the loan may be paid in full
> sooner than expected</u> if the interest rate decreases
> substantially, or an extra amount may have to be paid
> at the end if the interest rate rises substantially
> during the last few years of the loan term.

The adjustable rate disclosure then goes on to explain negative amortization.

> The principal balance on your loan can increase even though you are making the required monthly payments. This is called "Negative Amortization". This can happen as described in this section. If the Initial Interest Rate, which is used to establish the initial monthly payment, is lower than the Subsequent Interest Rate, which applies commencing on the first day of the month immediately following the month in which your loan closes, the initial monthly payment will be insufficient to pay the interest that is accruing during the Subsequent Interest Rate period. Additionally, following the end of the Subsequent Interest Rate period, your Interest rate will become an adjustable rate that may change monthly. Subject to the 125.000% Principal Balance Limitation, your monthly payment will change on the due date of your twelfth monthly payment, and every twelve months thereafter. Thus, even if your monthly payment adjusts to an amount that will pay the interest that is accruing at the time, once the interest rate changes the adjusted monthly payment may be insufficient to pay the interest that accrues. Further, except for each fifth scheduled payment change, and subject to the 125.000% Principal Balance Limitation, the monthly payment may not be increased by more than 7-1/2% from the previous payment amount. This cap may keep the monthly payment below the amount that is necessary to fully pay the interest that is accruing.

> If your monthly payment is not sufficient to pay monthly interest, you may take advantage of the negative amortization feature by letting the interest defer and become part of the principal balance to be paid by future monthly payments, or you may also choose to limit any negative amortization by increasing the amount of your monthly payment or by paying any deferred interest in a lump sum at any time. Ask us about the payment options available for these loan programs.

Plaintiff's adjustable rate rider, attached to Defendants'
Motion to Dismiss and judicially noticed by this Court explained
that Plaintiff would pay interest at a yearly rate of 1% until
April 3, 2006 (23 days after the closing of her loan) and that
her initial monthly payment would be based on that rate.
Commencing May 1, 2006, however, she would pay interest at a
yearly rate of 7.438%.  Furthermore, the interest rate that
Plaintiff would be required to pay may face further changes on
the 1st day of June, 2006 and on that day every month
thereafter.  Each date that her interest rate could change is
called a "Change Date."  On each Change Date, the interest rate
would be calculated by adding Three and 550 thousands percentage
points (the "Margin") to the Current Index.  According to the
Adjustable Rate Rider, the interest rate is capped at 9.950%.

If this manner of adjusting the interest rate is not
confusing enough, every year starting on June 1, 2007, and on
the same date each twelfth month thereafter (the "Payment Change
Date"), Defendants would determine the amount of the monthly
payment that would be sufficient to repay the projected
Principal balance Plaintiff was expected to owe as of the
Payment Change Date in full on the maturity date at the interest
rate that will become effective one month prior to the Payment
Change Date in substantially equal payments.  The result of this
calculation is the new amount of Plaintiff's monthly payment and

Plaintiff was to pay that new payment until the next Payment
Change Date.

The Payment Changes, however, are subject to two
limitations.  First, the amount of the new monthly payment is
limited to 7 ½% more or less than the current payment.  Second,
after a not so clear explanation of negative amortization, the
Adjustable Rate Rider explains that the unpaid Principal of the
mortgage can never exceed 125% of the principal amount borrowed.
If the unpaid Principal will exceed that amount, the new monthly
payment could exceed the 7 ½% annual payment increase
limitation.  Finally, on the fifth anniversary of the due date
of the first monthly payment, and that same day every five years
thereafter, the monthly payment will be adjusted without regard
to the 7 ½%  payment cap.

The statements in the adjustable rate mortgage disclosure
indicate that negative amortization is a mere possibility.  Yet
it is inconceivable to this Court under any possible Index value
how Plaintiff's mortgage loan, assuming her allegations are
true, could not have resulted in negative amortization if she
was paying the monthly payment as outlined in the Adjustable
Rate Rider.  Again, assuming the allegations are true,
Defendants must have known of this certainty at the time that
they provided her with the disclosure.  Thus, Plaintiff may be
able to demonstrate that these hypothetical references to

negative amortization do not clearly and conspicuously disclose
"the effects of exercising the [payment cap]" such that
"negative amortization will occur and the principal balance will
increase." This Court's decision is in accord with courts that
have ruled on almost identical language. See Velazquez, 605 F.
Supp. 2d at 1066 (holding that "while the disclosures perhaps
accurately stated how negative amortization would occur,
Plaintiffs may be able to show that these references did not
clearly and conspicuously disclose that, by exercising the
payment cap, negative amortization would definitely occur during
the first few years."); Mincey v. World Savings Bank, FSB, 614
F. Supp. 2d 610, 638 (D.S.C. 2008) (granting "Plaintiffs' Motion
for Judgment on the Pleadings with respect to the claim that
[Defendant] violated the TILA by disclosing negative
amortization was a possibility when in fact it was a
certainty"); Plascencia, 2008 WL 1902698, at *5-6 (holding that
"Plaintiffs may be able to show that the Note's reference to
negative amortization as a hypothetical event does not clearly
and conspicuously disclose 'the effects of exercising the
[payment cap] option' -i.e., that 'negative amortization will
occur and the principal loan balance will increase.'");
Mandrigues v. World Savings, Inc., No. C 07-04497 JF, 2008 WL
1701948, at * 2 (N.D. Cal. April 9, 2008) (holding that where
Plaintiffs allege that the promissory notes issued in connection

with the subject loans state that negative amortization is a
mere possibility, where in fact such occurrence was guaranteed,
the plaintiff adequately pleaded a claim under 12 C.F.R. §§
226.17 and 12 C.F.R. § 226.19).  Therefore, the court will deny
Defendant's motion as to Plaintiff's claim relating to
violations of the variable rate disclosure requirements of 12
C.F.R. § 226.19(b)(2).

The Court notes that Defendants raised the language in the
Adjustable Rate Rider attached to the Note to argue that the §
226.19(b)(2) disclosures were made.  The Court questions whether
the Adjustable Rate Rider can be considered a disclosure for the
purposes of § 226.19(b)(2) given that the disclosures are to be
made at the time Plaintiff applied for the loan and the Rider is
a part of the Note signed at closing.  Regardless, even if the
Court were to consider the Rider, the Court's conclusion would
be the same as to the discounted rate (the Rider does not
specify that the 1% rate is a discounted rate) and as to the
negative amortization (the language in the Rider similarly
expresses negative amortization as a possibility and not as an
occurrence certain to occur).  The only difference would be that
the Rider is specific as to Plaintiff's loan and would not
violate § 226.19(b)(2) as to that claim.  As this is a motion to
dismiss, however, and it is unknown when Plaintiff received the

rider, the Court will not dismiss that claim on the basis of the adjustable rate rider.

## 3.   Count II: TILA's Post-Closing Disclosures

Plaintiff's second count alleges that Defendants violated TILA's post closing disclosure requirements regarding interest rates and payments relating to variable-rate adjustments under 12 C.F.R. § 226.20(c).  Section 226.20(c) applies to variable rate transactions subject to § 226.19 in which adjustments to the interest rate may occur with or without a corresponding adjustment to the payment.  With such transactions the creditor must provide new disclosures to the debtor under two circumstances: 1) if there is an adjustment to the interest rate without an accompanying payment change the disclosure must be made once per year; 2) if there is a payment due at a new level, the disclosure must be made at least 25, but no more than 120 calendar days before payment at the new level is due.  12 C.F.R. § 226.20(c).  The disclosure must contain the following information:

> (1) The current and prior interest rates.
>
> (2) The index values upon which the current and prior interest rates are based.
>
> (3) The extent to which the creditor has foregone any increase in interest rate.

(4) The contractual effects of the adjustment, including the payment due after the adjustment is made, and a statement of the loan balance.

(5) The payment, if different from that referred to in paragraph (c)(4) of this section, that would be required to fully amortize the loan at the new interest rate over the remainder of the loan term.

Id.

Plaintiff alleges that the mortgage note showed a 1% interest rate in April 2006, but that the rate increased to over 7% in May 2006 and that it continued to rise monthly thereafter. Compl. at ¶ 45.  Plaintiff alleges that Defendants did not provide her with advance notice of the changes, but only after the fact.  Id.  Moreover, Plaintiff alleges that the notices of the rate changes did not contain a new payment schedule that would allow Plaintiff to fully amortize the loan.  Id.

Plaintiff has alleged sufficient facts to state a claim under § 226.20(c)(5) because she alleges that the notice of interest rate changes Defendants sent did not state the payment amount that would be required to fully amortize the loan at the new interest rate over the remainder of the loan term. Plaintiff does not state a claim under § 226.20(c), however, as regards the timing of the notice since other than the situation where the rate change results in a payment change, which Plaintiff does not allege happened here, § 226.20(c) requires only that the notice of rate change be made once per year and it

does not require that it be made in advance of the change.

Thus, Plaintiff's claim for violation of § 226.20(c)(5),

Defendant's alleged failure to state the payment amount needed

to fully amortize the loan in the rate change notice, will not

be dismissed.  Plaintiff's § 226.20(c) claim will be dismissed,

however, in so far as it alleges that the notice was not timely

made.

4.   Count III: TILA's Advertising Disclosures

       Plaintiff alleges that she received from AHMC a direct mail

flyer advertising that she had been pre-approved for a 1%

mortgage loan.  Compl. ¶¶ 11, 15, 50.  She claims that the

advertisement indicated that the loan would save her money, act

as a financial tool to build wealth and eliminate debt – none of

which has happened.  Id. ¶ 15, ¶ 50.  Plaintiff contends that

the terms outlined in the advertisement violated the advertising

disclosure requirements of 15 U.S.C. § 1664 and the

corresponding regulation at 12 C.F.R. § 226.24.  In particular,

she alleges that the advertisement that she received did not

reflect clearly and conspicuously the true interest rate, terms

of payment and subsequent negative amortization.  Id. ¶ 17, 65.

Moreover, she claims that the 1% interest rate loan advertised

is not actually a product that Defendants offer.  Id. ¶ 20, 54,

57, 65.

Section 1664 of Title 15 and 12 C.F.R. § 226.24, however,

do not provide for a statutory private remedy.  Section 1640 of

Title 15 provides a private remedy for violations of Parts B, D,

and E of Subchapter I of the Consumer Credit Protection Act.

Section 1664 is under Part C of Subchapter I, however, and is

not included in the private remedy provided under § 1640.

Section 1664 does not itself contain any civil liability

provision nor is a civil liability provision contained elsewhere

in Part C.  Rather, the legislative history indicates that

"authority to enforce compliance with the credit advertising

requirements is relegated to administrative agencies as provided

in . . . 15 U.S.C. § 1607." Jordan v. Montgomery Ward & Co.,

442 F.2d 78, 81 (8th Cir. 1971).  Thus, this Court does not have

original subject matter jurisdiction over Plaintiff's

advertising claim under 15 U.S.C. § 1664.  Accord Smeyres v.

General Motors Corp., 820 F.2d 782, 783-84 (6th Cir. 1987);

Jordan, 442 F.2d at 81-82; Fidelity Mortgage Corp. v. Seattle

Times Co., 304 F. Supp. 2d 1270, 1273-74 (W.D. Wash. 2004).

Plaintiff's Count III will be dismissed.

## D.    Count IV: Fraud and Deceptive Acts

Within Count IV, Plaintiff raises two separate causes of

action: common-law fraud and a violation of the Maryland

Consumer Protection Act.  The Court finds that Plaintiff has

alleged sufficient facts to support these claims and Defendants'
motion will be denied as to Count IV.

1.    Fraud

Plaintiff alleges that Defendant AHMC committed fraud 1) by
arranging for a fraudulent appraisal that inflated the value of
her property and 2) by promising her a loan with a 1% interest
rate, $56,000 cash out, and no prepayment penalty with no intent
to perform that promise.   Defendants argue that Plaintiff has
failed to plead her claim with the particularity required by
Federal Rule of Civil Procedure 9(b).   They also argue that even
if this claim is stated with the required specificity, it is
precluded because Plaintiff's reliance on the alleged
misrepresentations was not reasonable and that Plaintiff's
alleged facts do not support a claim of fraud and that her own
claims contradict each other.   Alternatively, Defendants argue
that, even if Plaintiff has stated sufficient facts, fraud
cannot be based on future promises.

To survive a motion to dismiss on a fraud claim under
Maryland law, Plaintiff must allege the following elements: 1)
that a representation made by a party was false; 2) that the
defendant knew the representation was false or made the
misrepresentation with such reckless indifference to truth as to
impute knowledge and an intent to defraud; 3) that the

misrepresentation was made for the purpose of deceiving the
plaintiff; 4) that the plaintiff reasonably relied upon the
misrepresentation; and 5) that the plaintiff suffered damage
directly resulting from the misrepresentation.    Suburban
Properties Mgt., Inc. v. Johnson, 204 A.2d 326, 329 (Md. 1964).
Fraud claims are subject to Federal Rule of Civil Procedure
9(b), requiring that claimants plead fraud with particularity.
The particularities with which fraud claims must be pleaded
include "the time, place, and contents of false representations,
as well as the identity of the person making the
misrepresentation and what he obtained thereby."    Harrison v.
Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir.
1999) (quoting 5 Charles Alan Wright and Arthur R. Miller,
Federal Practice and Procedure: Civil § 1297, at 590 (2d ed.
1990).

Rule 9(b) allows, however, "conclusory allegations of
defendant's knowledge as to the true facts and of defendant's
intent to deceive."    Id.    The intent of Rule 9(b) is to ensure

> "that the defendant has sufficient information to
> formulate a defense by putting it on notice of the
> conduct complained of[,] . . . to protect defendants
> from frivolous suits[,] . . . to eliminate fraud
> actions in which all the facts are learned after
> discovery[,] . . . [and] to protect defendants from
> harm to their goodwill and reputation."

41

Id. (quoting United States ex rel. Stinson, Lyons, Gerlin &
Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc., 755
F. Supp. 1055, 1056-57 (S.D. Ga. 1990)).  Thus, the Fourth
Circuit has held that "[a] court should hesitate to dismiss a
complaint under Rule 9(b) if the court is satisfied (1) that the
defendant has been made aware of the particular circumstances
for which she will have to prepare a defense at trial, and (2)
that plaintiff has substantial prediscovery evidence of those
facts."  Id.

Here, Plaintiff has alleged that AHMC through ABC
misrepresented to her through advertisements and phone
conversations that she was purchasing a mortgage with a 1%
interest rate with a $56,000 cash out, and no prepayment
penalty.  Compl. ¶¶ 50, 79.  Plaintiff also alleges that
Defendants stated an inflated appraised value.  Id. ¶ 74.  She
alleged that these misrepresentations occurred prior to the
closing of the loan and that she closed on the loan in reliance
on those statements.  Id. ¶¶ 77-79.  She has also alleged that
the Defendants knew that the misrepresentations were false and
that they caused her injury.  Id.  Thus, Plaintiff has pled
fraud with sufficient particularity to meet the requirements of
Rule 9(b).

Defendant alleges that her reliance was not reasonable, however, because she received disclosures showing an APR between 7% and 8% and that her note explicitly set forth the terms of her loan, accompanied by an all-capital disclaimer about the possibility of negative amortization. As explained under the Truth-in-Lending discussion, however, while the TILDS and good faith estimates may have complied with § 226.18, the disclosures when taken together could be misleading as to the interest rate since several of the documents stated that the interest rate was 1%. Only the TILDS showed anything different. Moreover, the terms changed between the time Plaintiff was given the preliminary disclosures and when she closed on her loan and she alleges that she was not given time to read the closing documents or a copy at the time of closing. Thus, the Court is not prepared to say at this time that her reliance on the alleged statements was unreasonable.

Defendants also argue that Plaintiff's Complaint demonstrates that she knew that the 1% rate was not the rate of her loan because she refers to it as a teaser rate. The Complaint, however, indicates that Plaintiff only discovered that the 1% rate was a "teaser rate" after closing and her use of that term in her Complaint is meant only to emphasize the alleged misrepresentation.

Defendants also argue that Plaintiff cannot prove that Defendants made any alleged misrepresentation because they did not perform the appraisal.   Defendants are incorrect, however, because Plaintiff's allegation is that Defendants knew that the appraisal was incorrect and yet represented to Plaintiff that it was correct and in reliance on that statement, Plaintiff closed on the loan.   Compl. ¶ 77.

Finally, Defendants contend that Plaintiff's fraud claim is barred because promissory statements as to future events cannot be the basis of fraud.   Defendants fail to note, however, that fraud claims may be based on allegations that the promisor did not intend to keep its promise at the time that it made the promise.   Sass v. Andrew, 832 A.2d 247, 264 (Md. Ct. Spec. App. 2003).   Here Plaintiff alleges that, at the time Defendants promised her a loan of 1%, it had no intention of keeping its promise.   Compl. ¶ 79.

Thus, the Court believes that dismissal is not warranted at this stage, particularly where, as here, Defendants have "been made aware of the particular circumstances for which [they] will have to prepare a defense at trial."

2.    Maryland Consumer Fraud and Deceptive Business Practices
      Act

Under Count IV, Plaintiff also claims that Defendants

violated the Maryland Consumer Fraud and Deceptive Business

Practices Act, Md Ann. Code, Com. Law § 13-101 et seq.[4]  In

particular, Plaintiff alleges that Defendants violated § 13-

301(9) of the Act, which prohibits

> "Deception, fraud, false pretense, false premise,
> misrepresentation, or knowing concealment,
> suppression, or omission of any material fact with the
> intent that a consumer rely on the same in connection
> with:
>
> (i) The promotion or sale of any consumer goods,
> consumer realty, or consumer service;
>
> (ii) A contract or other agreement for the evaluation,
> perfection, marketing, brokering or promotion of an
> invention; or
>
> (iii) The subsequent performance of a merchant with
> respect to an agreement of sale, lease, or rental[.]"

Defendant argues in a footnote that Rule 9(b)'s

particularity requirements also apply to such claims and that

Plaintiff has not pled this claim with sufficient particularity.

As already discussed, however, Plaintiff has pled her fraud

---

[4] Plaintiff's Complaint also references Arkansas' Deceptive Trade
Practices Act, Ark Code Ann. §§ 4-88-107 & 108, and Illinois'
Consumer Fraud and Deceptive Business Practices Act, 815 Ill.
Comp. Stat. 505.  It is unclear why Plaintiff includes these
statutes in her Complaint as she provides no explanation as to
how they would apply in this case.  To the extent that Plaintiff
means to raise these as additional claims, they will be
dismissed for a failure to allege sufficient facts to state a
claim.

allegations with sufficient particularity to survive a motion to dismiss and her allegations apply equally here.  Thus, Defendants' motion to dismiss as to the Plaintiff's claim that Defendants violated the Maryland Consumer Fraud and Deceptive Business Practices Act will also be denied.

**E.    Count V: Racketeer Influenced and Corrupt Organizations Act**

Plaintiff's fifth claim against Defendants is for a violation of the Racketeer Influenced and Corrupt Organizations Act (RICO).[5]  Essentially, Plaintiff appears to allege that the lender, Defendant AHMC, conducted a pattern of racketeering activity by 1) disseminating information to Plaintiff and other consumers via their website and through other marketing materials; and 2) disseminating misleading information to investors via their web site and in SEC filings to promote their

---

[5] It is unclear if Plaintiff's references within Count V to various Maryland and Federal statutes unrelated to her RICO claim are meant to be additional claims or if they are simply intended as factual allegations.  Plaintiff cites to and claims violations by Defendants of Maryland Finder's Fee Act, Md. Code Ann., Com. Law § 12-801 et seq., Federal prohibitions against unearned fees and fee splitting under 12 U.S.C. 2607(b) and 24 C.F.R. § 3500.14; Maryland prohibitions against mortgage brokers being a director, officer, or employee of any lender where he places a loan, Md. Code Ann., Com. Law § 12-803; and prohibitions against a mortgage broker charging a finder's fee in any transaction of the mortgage if the broker is the lender or an owner, part owner, partner, director, officer, or employee of the lender, Md. Code Ann., Com. Law § 12-804(e).  Other than the reference to RESPA as discussed in Note 3 above, to the extent that these allegations are intended to be additional claims, these claims will be dismissed for a failure to allege sufficient facts to state a claim.

revenue. Compl. ¶¶ 104, 105. It then paid an incentive to Defendant ABC, whom Plaintiff terms an "employee" of AHMC, for its efforts in securing Plaintiff's purchase of the more profitable loan by various techniques such as obtaining an inflated appraisal, and by selectively choosing which of Plaintiff's credit scores would be most useful. Id. ¶¶ 107, 108, 111. In addition, Plaintiff alleges that Defendant ABC also secured additional revenue for AHMC by requiring Plaintiff to use ABC and AHMC affiliated companies, such as their affiliated settlement company. Id. ¶ 109.

RICO defines four types of prohibited conduct, but Plaintiff does not state which of the four types Defendants are alleged to have violated. The four types of conduct prohibited under RICO are

[a]   the use of income derived from a "pattern of racketeering activity" to acquire an interest in or establish an enterprise engaged in or affecting interstate commerce;

[b]   the acquisition or maintenance of any interest in an enterprise "through" a pattern of racketeering activity;

[c]   conducting or participating in the conduct of an enterprise through a pattern of racketeering activity; and

[d] conspiring to violate any of these provisions.

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 482 (1985)
(citing 18 U.S.C. § 1962). Plaintiff appears to be alleging a
violation of 18 U.S.C. § 1962(c) which states "it shall be
unlawful for any person employed by or associated with any
enterprise engaged in, or the activities of which affect,
interstate or foreign commerce, to conduct or participate,
directly or indirectly, in the conduct of such enterprise's
affairs through a pattern of racketeering activity or collection
of an unlawful debt." The facts alleged by Plaintiff fail to
state a RICO claim, however, and will be dismissed.

A violation of § 1962(c) requires the establishment of four
elements: (1) conduct (2) of an enterprise (3) through a pattern
(4) of racketeering activity. *Sedima*, 473 U.S. at 496.
Defendant argues that Plaintiff does not state a RICO claim
because she has not alleged a RICO "enterprise." "A RICO
'enterprise' is an ongoing formal or informal organization whose
associates function as a continuing unit." *Toucheque v. Price
Brothers Co.*, 5 F. Supp. 2d 341, 346 (D. Md. 1998) (citing
*Palmetto State Med. Ctr. v. Operation Lifeline*, 117 F.3d 142,
148 (4th Cir. 1997)). Under § 1962(c), the RICO "enterprise"
cannot be the same as the 'person' alleged to have violated the
statute. In other words, the defendant cannot be the same as

the "enterprise." Id. at 347 (citing Operation Lifeline, 117 F.3d at 148). "This distinction requirement stems from the purpose of § 1962(c), which is designed solely to reach criminal activity by employees while protecting the innocent corporate enterprise from criminal infiltration." Id.

Defendants argue, and this Court agrees, that Plaintiff's Complaint does not identify the "enterprise." On the one hand, it appears that Plaintiff alleges that the "lender" is the enterprise and Defendants AHMC and ABC are the "persons" associated with the enterprise that are conducting the racketeering. Compl. ¶¶ 101-103. Later in her Complaint, however, Plaintiff refers to AHMC as the lender and the "employer" and to ABC as the "employee" with ABC generating profit for AHMC via illicit means, but with AHMC also conducting alleged predicate activity. Id. ¶ 108. Under this scenario, it would appear that Plaintiff is alleging that AHMC is the enterprise and ABC is the RICO "person." Yet ABC is a d/b/a of AHMC and not a separate person. In any scenario, however, Plaintiff has not alleged an "enterprise" separate from Defendants. Thus, because Plaintiff has not adequately alleged a RICO enterprise, nor does it appear that she could allege a RICO enterprise separate from Defendants AHMC and ABC, she has

not sufficiently stated a RICO claim to survive a motion to dismiss.

**F.   Count VI, VIII, and XI:   Negligence and Breach of Fiduciary Duty**

Plaintiff alleges one count of negligence and two counts of breach of fiduciary duty.  As a preliminary matter, Maryland courts do not recognize a separate action for breach of fiduciary duty, but rather, the claim is to be found in another tort or contract claim.  Vinogradova v. Suntrust Bank, Inc., 875 A.2d 222, 231 (Md. Ct. Spec. App. 2005).  Both of Plaintiff's claims for breach of fiduciary duty are identical and thus will be treated as one claim.  Plaintiff alleges that Defendants AHMC and ABC had a special relationship to Plaintiff because she was guided by their judgment and advice and that she believed that they would act in her best interest.[6]  Compl. ¶¶ 135, 155.  As Plaintiff's claim relates to their duty toward Plaintiff, they will be considered in conjunction with her negligence claim.

Under Maryland law, in order to state a cause of action for negligence, Plaintiff must demonstrate a duty owed to her by Defendants.  Parker v. Columbia Bank, 604 A.2d 521, 531-32 (Md. Ct. Spec. App. 1992) (citing Jacques v. First Nat'l Bank, 515 A.2d 756, 758 (Md. 1986)).  Here Plaintiff alleges three duties

---

[6] Plaintiff also alleges fiduciary relationships by the appraiser and the title company, both of whom have been dismissed as parties.  Thus, claims as to those parties have been dismissed.

owed to Plaintiff by Defendants AHMC and ABC: 1) A duty of care in preparing the appraisal upon which the Defendants could foresee that the Plaintiff would rely; 2) a duty to disclose to "the consuming public" the foreseeable risks associated with the use of the loan product at issue here and to not market the loan product in such a way as to deceive consumers into taking them; and 3) the fiduciary duty discussed above requiring Defendants to act in her best interest.

Defendants correctly argue that it is a longstanding principle of Maryland law that the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between a debtor and a creditor and it is not fiduciary in nature. Yousef v. Trustbank Sav., F.S.B., 568 A.2d 1134, 1138 (Md. Ct. Spec. App. 1990). Exceptions may arise, however, where there are special circumstances. Parker, 604 A.2d at 532-33. Some cases state that "special circumstances 'may' exist where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and relying on the bank to counsel and inform him." Id. at 533 (internal citations omitted). The Parker court analyzed the cases in which courts had indicated that a special "counseling" duty may arise and found that "even in those cases, courts generally refused to hold the bank liable to its customer." Id.

Those courts reasoned "that a borrower cannot 'abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held to be liable as a fiduciary." Id. (internal citations omitted) (emphasis in original).

Here, Plaintiff has not alleged any facts demonstrating that the Defendants consciously assumed any special duties toward Plaintiff beyond those of a normal lender/borrower relationship.  Thus, her negligence and fiduciary duty claims will be dismissed for failure to state a claim.

## G.   Count VII: Breach of Express Warranties

Plaintiff alleges in Count VII that ABC made express warranties on which she relied when purchasing her loan. Plaintiff alleges that ABC breached these express warranties and that she suffered damages as a proximate result of the breach. As a preliminary matter, Defendants argue that Plaintiff fails to state a claim because she does not state what specifically are the express warranties made by ABC, but simply avers generally that Defendant ABC made express warranties via advertisements, models and samples, and other similar uniform representations without specifying which statements constituted the express warranties.  In a breach of express warranty action,

"a plaintiff must set forth the terms and conditions of the warranty." <u>Pulte Home Corp. v. Parex, Inc.</u>, 923 A.2d 971, 996 (Md. Ct. Spec. App. 2007).  Here Plaintiff has not met this standard.

Regardless, even if Plaintiff had pleaded the claim with more specificity, Plaintiff's claim must fail because in Maryland, express warranties are governed statutorily by § 2-313 of the Commercial Law Article of the Maryland Code, which provides as follows:

> § 2-313.  Express warranties by affirmation, promise, description, sample
>
> (1)  Express warranties by the seller are created as follows:
>
> > (a)  Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> >
> > (b)  Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> >
> > (c)  Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

A "good" is defined under Md. Code Ann., Com. Law § 2-105 (1) as "all things (including specially manufactured goods) which are movable at the time of identification to the contract

for sale other than the money in which the price is to be paid,
investment securities (Title 8) and things in action." Here,
Plaintiff is not buying a movable thing, but is contracting to
borrow money that is to be repaid with interest. Thus,
Plaintiff's mortgage does not qualify as a "good" under § 2-313
so Plaintiff cannot state a claim for breach of express
warranty. The claim will, therefore, be dismissed.

**H.   Count IX: Unjust Enrichment/Restitution**

Plaintiff's ninth claim is for unjust enrichment. She
argues that as the mortgage contract was obtained via fraudulent
means, that Defendants have been unjustly enriched. As
Defendants argue, Maryland courts generally do not recognize a
cause of action for unjust enrichment where the relationship of
the parties is set out in a valid contract. County Com'rs of
Caroline County v. J. Roland Dashiell & Sons, Inc., 747 A.2d
600, 607 (Md. 2000). Courts recognize certain exceptions to
this rule, however, as in cases "when there is evidence of fraud
or bad faith, there has breach of contract or a mutual recission
of the contract, when rescission is warranted, or when the
express contract does not fully address a subject matter." Id.
at 608-09. Here, Plaintiff alleges fraud and breach of contract
sufficient to survive a motion to dismiss, thus the mortgage
note is not a bar to an unjust enrichment claim here.

To establish a claim for unjust enrichment in Maryland, the Plaintiff must allege three elements: 1) "a benefit conferred upon the defendant by the plaintiff;" 2) "an appreciation or knowledge by the defendant of the benefit;" and 3) "the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." <u>Id.</u> at 607 n.7.  Here Plaintiff has alleged all three elements and the claim will not be dismissed at this point in the litigation.

**H.   Count X:  Breach of Contract**

Plaintiff alleges in Count X a breach of the implied duty of good faith and fair dealing.  Defendants contend that Plaintiff's claim should be dismissed because it does not allege any breach of the express terms of the mortgage.  Maryland recognizes an implied duty of good faith and fair dealing in certain contracts, however.  <u>Parker</u>, 604 A.2d at 531.  "The duty simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract."  <u>Id.</u>

Plaintiff's allegations relating to the breach of the duty of good faith relate to events prior to closing on the mortgage. She has not alleged that Defendants have acted in such a way as to prevent Plaintiff from performing her obligations under the

mortgage note.  Thus, Plaintiff has failed to state a claim for breach of contract and Count X will be dismissed.

**J.    Count XII:        Duress and Economic Duress**

Plaintiff's final count is for Duress and Economic Duress. Defendants rightly argue that Maryland does not have a damages claim for duress.  Rather, the remedy is to make the contract voidable where a plaintiff can establish that the plaintiff's assent to the agreement was forced or involuntary.  <u>Blum v. Blum</u>, 477 A.2d 289, 294 (Md. Ct. Spec. App. 1984).  Plaintiff's allegations relate to the fact that her loan contains "an illegal prepayment penalty," which prevents her from leaving the contract.  Plaintiff does not allege that Defendants forced her into the mortgage agreement or that her consent was involuntary. Thus, Plaintiff does not state a claim for duress or economic duress and Count XII will be dismissed.

**IV.    CONCLUSION**

For the foregoing reasons, Defendants' motion will be granted in part and denied in part.  Plaintiff's claims for violation of the requirement that 12 C.F.R. § 226.18 disclosures be clear and conspicuous (partial Count I), for a violation of 12 C.F.R. § 226.20(c) as to timeliness of the post-closing disclosures (partial Count II), for violation of the Truth in Lending Act's Advertising provisions (Count III), for violation

of RICO (Count V), for negligence and breach of fiduciary duty
(Counts VI, VIII, and XI), for breach of contract (Count X), and
for duress and economic duress (Count XII) will be dismissed.[7]
Plaintiff's claims for rescission and her possibly intended
RESPA claim will also be dismissed, but without prejudice and
with leave to amend the Complaint within 30 days to properly
make those claims.[8]  Plaintiff will be permitted to proceed on
her claims for the timeliness of the § 226.18 Truth-in-Lending
disclosures and for violations of the 12 C.F.R. § 226.19(b)
variable rate disclosure requirements (partial Count I), for
violation of the disclosure requirements under 12 C.F.R. §
226.20(c)(5) (partial Count II), for fraud and deceptive acts
(Count IV), and for unjust enrichment (Count IX).  A separate
order will issue.

                              /s/
                        _____
                        William M. Nickerson
                        Senior United States District Judge
December 3, 2009

_____

[7] Any unenumerated claims, to the extent Plaintiff also intended
them as claims, other than RESPA, will also be dismissed.

[8] The Court notes, however, that by granting leave to amend on
the rescission and RESPA claims, it is not suggesting that
Plaintiff should amend her Complaint.  Rather the Court is
recognizing the liberal pleading standard accorded to pro se
plaintiffs and the desire to see no meritorious claim dismissed
on a technicality.  The Court suggests, however, that should
Plaintiff move to amend her Complaint that she should make every
attempt to be concise and, given the already voluminous
Complaint filed, it is unlikely that she would need more than an
additional five pages with which to properly allege these two
claims.