UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


IN RE:                      .   Case No. 07-11047(CSS)
                            .
                            .
AMERICAN HOME MORTGAGE      .
HOLDINGS, INC., et al.,     .   824 North Market Street
                            .   Wilmington, DE 19801
                            .
          Debtors.          .   April 6, 2010
. . . . . . . . . . . . .   .   10:38 a.m.


TRANSCRIPT OF HEARING
BEFORE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtors:            Young Conaway Stargatt & Taylor, LLP
                            By:  PATRICK A. JACKSON, ESQ.
                                 MICHAEL S. NEIBURG, ESQ.
                            The Brandywine Building
                            1000 West Street, 17th Floor
                            Wilmington, DE  19801


For the Official           Hahn & Hessen LLP
Committee of Unsecured     By:  MARK S. INDELICATO, ESQ.
Creditors:                 488 Madison Avenue
                           14th and 15th Floor
                           New York, NY  10022


                           Blank Rome, LLP
                           By:  TORI GUILFOYLE, ESQ.
                           Chase Manhattan Centre
                           1201 Market Street, Suite 800
                           Wilmington, DE 19801

Audio Operator:            Leslie Murin


Proceedings recorded by electronic sound recording, transcript
produced by transcription service

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Cont'd.):

For Bank of America:        Kaye Scholer LLP
                           By:  ANA M. ALFONSO, ESQ.
                                AARON RUBINSTEIN, ESQ.
                           425 Park Avenue
                           New York, NY  10022

                           Potter, Anderson & Corroon, LLP
                           By: LAURIE SELBER SILVERSTEIN, ESQ.
                           Hercules Plaza
                           1313 North Market Street
                           Wilmington, DE 19801

For Broadhollow &          Diamond McCarthy
Melville:                  By:  ALLAN B. DIAMOND, ESQ.
                           Two Houston Center
                           909 Fannin Street, Suite 1500
                           Houston, Texas 77010

                           Diamond McCarthy
                           By:  CHRISTOPHER A. PROVOST, ESQ.
                           620 Eighth Avenue, 39th Floor
                           New York, New York 10018

                           Rosenthal, Monhait, Gross &
                            Goddess, PA.
                           By:  NORMAN M. MONHAIT, ESQ.
                           919 Market Street, Suite 1401
                           Wilmington, DE 19801

TELEPHONIC APPEARANCES:

Pro Se:                    PAULA RUSH

Pro Se:                    ELISABETH JACKSON

For the Official           Hahn & Hessen LLP
Committee of Unsecured     By:  EDWARD SCHNITZER, ESQ.
Creditors:                 488 Madison Avenue
                           14th and 15th Floor
                           New York, NY  10022

For American Home          American Home Mortgage
Mortgage:          By:  EILEEN WANERKA

J&J COURT TRANSCRIBERS, INC.

1          THE CLERK:  All rise.

2          THE COURT:  Please be seated.  Good morning.

3          MR. NEIBURG:  Good morning, Your Honor.  Michael

4  Neiburg from Young, Conaway, Stargatt & Taylor on behalf of the

5  debtors.  Your Honor, Items Number 1 through 21 have been

6  adjourned, and with the Court's permission, Your Honor, we'd

7  like to skip to Item Number 25, as there's a number of counsel

8  from out of town, then we'll jump back to 22, if that would be

9  all right?

10          THE COURT:  That's fine.

11          MR. MONHAIT:  Good morning, Your Honor.  May it

12  please the Court.  I'm Norman Monhait.  I'm here on behalf of

13  Broadhollow Funding and Melville Funding in the matter that's

14  Item Number 25 on the agenda this morning.  Your Honor may

15  recall that I and my co-counsel, Allan Diamond, who is here

16  with me from Diamond McCarthy, and Christopher Provost were

17  before the Court on February 14th in connection -- February

18  18th, I'm sorry, in connection with the sale approval hearing

19  in which Your Honor approved the purchase by the clients we had

20  previously represented, who had moved to intervene in this

21  matter, to purchase the interest in Broadhollow and Melville.

22          We're here for a status conference this morning, and

23  with that having been said, I'd like to cede the podium to Mr.

24  Diamond.

25          THE COURT:  Very good.

**J&J COURT TRANSCRIBERS, INC.**

1            MR. MONHAIT:   Thank you.

2            THE COURT:   Good morning, Mr. Diamond.

3            MR. DIAMOND:   Good morning, Your Honor.  Status

4  conference.  We wanted to just get before the Court to advise

5  what the parties have been doing, where we are, and kind of

6  where this case is heading.

7            THE COURT:   Very good.

8            MR. DIAMOND:   We -- to my left is Aaron Rubinstein on

9  behalf -- at Kaye Scholer on behalf of Bank of America is here

10 as well.  We met yesterday to try to figure out exactly what we

11 wanted to do with respect to a pretrial scheduling conference.

12 I think where we are right now, Your Honor, is we have been

13 working to try to reach a stipulated agreement, subject, of

14 course, to the Court's approval with respect to a pretrial

15 scheduling order in the case.  We're not quite there yet, but I

16 think going to get there.

17            One of the issues that we have right now is we agreed

18 to extend Bank of America's answer date in this case, which the

19 Court approved recently, to April 26th, and the issue that has

20 arisen is -- and I -- I'll let Mr. Rubinstein address -- is

21 whether -- what Bank of America plans on filing on April 26th.

22 Obviously, there has been some pre-answer motions that date

23 back now a couple of years that this Court has ruled on, and so

24 we were discussing whether we're going to actually see an

25 answer.

1          THE COURT:  You had me like panicking until the
2  second part of that sentence.
3          MR. DIAMOND:  Well, so --
4          THE COURT:  Quite possible that I'd forgotten it, so
5  I'm glad to know I've ruled on those issues.
6          MR. DIAMOND:  Yes, you did.  And it's actually been a
7  significant passage of time since that -- since those rulings.
8  So where we are now is we're just waiting for Bank of America
9  to answer.  We understand that they are planning on doing so.
10 They may file some counterclaims as well, but I'll let Mr.
11 Rubinstein address what he is intending to do, and I think
12 subject to what he is going to say, our position on behalf the
13 plaintiffs, Broadhollow and Melville, is that the case should
14 get moving forward with respect to the commencement of
15 discovery essentially immediately after the April 26th answer
16 date, and we would propose there would be the Rule 26 exchange.
17         I think we've agreed on a date for that and then
18 discovery to commence, but the issue that we have right now is
19 when should it all commence.  Our position is that it should
20 commence forthright.  I'm going to let Mr. Rubinstein address
21 what they plan on filing, and then, hopefully, we can chat with
22 the Court briefly about this.
23         THE COURT:  Very good.  Mr. Rubinstein, good morning.
24         MR. RUBINSTEIN:  Good morning, Your Honor.  Thank
25 you.  Mr. Diamond is correct in everything that he described.

1  Let me tell you what we're thinking of doing, a couple of

2  things.  The significant majority of the amount at stake here

3  really is subject to a particular phrase in the agreement at

4  issue, the swap contract at issue, and we believe, after

5  analyzing the documents, that that is something that can be

6  determined by the Court as a matter of law on the face of the

7  document based on the unambiguous language of the agreement.

8          If the Court decides that motion, certainly decides

9  it in our favor, it reduces any potential damages to a very

10  small amount compared to what's currently alleged in the

11  complaint, and I can't believe that both sides' commercial

12  entities would let the case go forward under all the

13  circumstances.  And, quite frankly, even if the motion is

14  denied, I think that would educate our side.  And so what --

15          THE COURT:  You said most of the issues.  Would that

16  be dispositive of the entire case?

17          MR. RUBINSTEIN:  Not the entire case.  It would be a

18  motion for partial summary judgment because of that.  There

19  were two bases for the non-payment of a certain amount.  The

20  total amount at issue was approximately $24 million.  The -- of

21  that, $15 million is the result of the fact that the portfolio

22  contained ineligible loans, and it's our view, based on the --

23  what we believe is the unambiguous contract language, that the

24  swaps don't cover ineligible loans.  They only cover eligible

25  loans.  The remaining $9 million relates to another issue with

**J&J COURT TRANSCRIBERS, INC.**

1  respect to how the auction was conducted.  I don't think that's

2  an issue that is susceptible to a summary judgment motion,

3  but --

4          THE COURT:  Was there a dispute about whether the

5  loans were eligible or not?

6          MR. RUBINSTEIN:  No.  Well, we haven't -- we've never

7  addressed that with them.  I do not believe that there will be

8  a dispute with respect to whether or not the ones that we

9  determined were ineligible are indeed ineligible.  In fact,

10  there were two baskets of ineligible loans.  One basket that

11  was of a very substantial amount that were clearly and

12  objectively ineligible based on the information provided to us.

13  Another basket that was more subjective in the determination,

14  the bank decided to pay on those what we thought were

15  ineligible loans but would be subject to a subjective

16  evaluation.  So the only loans that they didn't pay on were

17  those that we think are indisputably ineligible.

18          So by making that motion, which we would do promptly,

19  I think it's a straightforward.  It's based on the one -- you

20  know, the contract language at issue.  I think it really puts

21  this case in a posture of potentially eliminating it.  That's

22  what we would propose to do, and we would ask -- and we would

23  do it promptly, and we would ask that the Court address that

24  motion first before the parties go off and running on

25  discovery.

1         The only additional issue I'd want to raise with that

2 is Mr. Diamond is correct.  They were gracious enough to give

3 us a three-week extension to answer the current complaint,

4 which is now due on April 26th.  I was informed yesterday by

5 Mr. Diamond that as new counsel in the case taking over old

6 counsel, they are going to -- they are planning to amend --

7 file an amended complaint, and, therefore, I believe that I

8 shouldn't have to answer the existing complaint if we now know

9 there's going to be some sort of amended complaint and then

10 have to answer that again.  They should file their amended

11 complaint.  I should answer that and make my motion for summary

12 judgment in response to that.  Once that's decided, if the case

13 isn't eliminated, we would go forward with discovery, but I

14 don't think it's in anybody's interest to spend a lot of money

15 and energy and effort in discovery under these circumstances.

16         THE COURT:  Okay.

17         MR. RUBINSTEIN:  And that I think we can continue, by

18 the way, to go forward and negotiate a proposed scheduling

19 order that would have the various time periods and intervals

20 for the different stages of a case.  The only question would be

21 when it would start.  Would it start after a decision on the

22 summary judgment motion or would it start after we file an

23 answer to either the amended complaint when it's filed or to

24 the existing complaint?

25         MR. DIAMOND:  Your Honor, if I may, Allan Diamond.

**J&J COURT TRANSCRIBERS, INC.**

1          THE COURT:  Yes, sir.

2          MR. DIAMOND:  It seems to me that the posture of this

3 is a little of putting the cart before the horse.  I mean this

4 case is almost three years old.  We're sitting now in a posture

5 where counsel wants to file essentially a motion for summary

6 judgment -- partial summary judgment on the very day or the

7 next day after they file an answer.  It doesn't make any sense,

8 because by their own admission, what they're saying to the

9 Court is, okay, there's two basis issues here.  One they think

10 is capable, potentially a resolution by summary judgment,

11 which, by the way, I don't know whether it is or it isn't.  It

12 may be that if we see a motion for partial summary judgment, we

13 may feel that there's no genuine issues of material disputed

14 fact, but we think that the ruling should be against Bank of

15 America, or we might look at it and say there are issues of

16 disputed fact.  Don't know until I see it.

17          But the fact of the matter is that there's going to

18 be at a minimum, regardless of resolution of a partial summary

19 judgment, a significant remainder of this case that has to go

20 forward.  So to put a halt --

21          THE COURT:  Well --

22          MR. DIAMOND:  -- after three years to all of the

23 discovery --

24          THE COURT:  Let me ask you this.

25          MR. DIAMOND:  Yes.

1          THE COURT:  Do you anticipate the discovery would be
2   easily bifurcated between the two issues, at least as Mr.
3   Rubinstein has laid them out, or are they sufficiently
4   intertwined that there may be -- may be inefficient or
5   difficult to allow discovery, for instance, to go forward with
6   the one claim and maybe hold off the other claim until I get
7   the summary judgment motion, and I can figure out whether it
8   makes sense to go forward or not.

9          MR. DIAMOND:  Quite candidly, Your Honor, I think
10  it's the latter, because even if this issue that is the one
11  that is the subject of the motion for partial summary judgment,
12  based upon various documentation, the parties are going to need
13  to do some significant exchange of documents and some document
14  production requests to make sure that we have all of the
15  appropriate documentation that might go to that issue.  So, to
16  me, there are going to be somewhat intertwined at least from a
17  document standpoint and possibly from a discovery in deposition
18  standpoint.

19          And so, you know, as the Court knows, I mean there's
20  -- we're interested in the most expeditious resolution of this
21  as possible, but by the same token, in order to get that, to
22  say let's just put a halt to the entire case, no discovery,
23  let's wait and see and take a motion for partial summary
24  judgment for any discovery whatsoever, because counsel believes
25  that maybe that issue doesn't involve disputed  material facts

1  doesn't make any sense.  The discovery can go forward, and at

2  the same time, if they want to file a motion for partial

3  summary judgment that early in the case and feel like it can be

4  done based upon whatever documentation that's exchanged, we're

5  fine with that.  We're fine with an aggressive schedule of

6  having that resolved, but discovery at least should proceed

7  forward, because we know there's going to be the rest of the

8  case that's going to involve discovery.

9            THE COURT:  All right.

10           MR. DIAMOND:  The last point, Your Honor, with

11  respect to the amendment of pleadings, I did mention to Mr.

12  Rubinstein yesterday that we were contemplating possibility of

13  filing an amended complaint, which I called a cleanup

14  complaint.  I don't think we're anticipating any substantive

15  changes at all, and we're looking at it, of course, since we're

16  new counsel to the case.  Given the passage of time, that

17  complaint was originally filed almost three years ago.  There

18  might have been some events over the course of the last three

19  years that ought to be an amended complaint from a factual

20  standpoint, so that when we start the discovery and people are

21  taking depositions, everybody understands exactly what the

22  relative positions of the parties are in the pleadings.

23           So bottom line is I was suggesting we will file what

24  I'll call a -- you know, a cleanup complaint, but I really

25  don't think -- I'm not interested in causing any delay or

1  necessary inconvenience or additional cost, but they really

2  should file their answer after all this time.  We'll file the

3  cleanup complaint as soon as we can, and if they need to file

4  an amended answer at some point down the road to things that we

5  put in the amended cleanup complaint, they can do that.  But

6  forcing us to go ahead and filing an amended complaint now

7  before they file an answer after we've stretched out the answer

8  date as it is, I just respectfully think we shouldn't do that.

9          THE COURT:  Well, if you file an amended complaint

10  after they answer, you're going to need leave of the Court.

11          MR. DIAMOND:  Correct.

12          THE COURT:  If you file it now, you don't.

13          MR. DIAMOND:  True.

14          THE COURT:  And are you in a position to file it now

15  or --

16          MR. DIAMOND:  I think we can.  You know, if we had

17  to, of course, we would.  We would like the opportunity

18  candidly to have Bank of America, after all of these years,

19  file their pleadings, their answer and the counterclaim, and

20  then we can kind of look and see, based upon the issues that

21  get joined in those pleadings, as to what additional facts have

22  transpired over the last few years that need to be amended.  I

23  do recognize that we'd have to seek leave of Court, but I think

24  these are going to be non-issues.

25          THE COURT:  Mr. Rubinstein, is it your intent to file

1  the partial summary judgment motion in effect immediately after

2  any answer?

3      MR. RUBINSTEIN:  Very shortly after any answer, yes,

4  Your Honor.  Of course, one man's cleanup on a complaint could

5  be --

6      THE COURT:  I understand.

7      MR. RUBINSTEIN:  -- another person's substance, and I

8  think it is the cart before the horse in this instance of

9  saying answer and then we'll file an amended complaint.

10     THE COURT:  All right.  Here --

11     MR. RUBINSTEIN:  I think --

12     THE COURT:  That's -- here's what I'd like to do.

13 Your answer will be due 14 days after the filing of an amended

14 complaint, and when I say answer, I mean response to the

15 amended complaint.  You may want to file some sort of motion to

16 dismiss judgment on the pleadings.  I don't know.  I would then

17 give you seven days to file the motion for summary judgment.

18 If you don't do it by then, discovery will commence.

19     If you do file it, I'd like the parties to agree on a

20 briefing schedule.  After the schedule is -- after that

21 briefing schedule is completed, I'd like another status

22 conference, and we can do it by phone, and I'll let you know

23 whether I think discovery should go forward or not.  Once I see

24 the documents, I think I'll be in a position to actually make

25 the decision.  Obviously, if you do file the motion with the

1  seven days, discovery would not commence until that status

2  conference at the earliest.   Okay?

3           After we decide that -- well, depending on what I

4  decide, either you don't file the motion or I decide that

5  discovery should go forward, at that time the parties can work

6  out a scheduling order, and we can think about trial and things

7  like that and work back from it.

8           MR. DIAMOND:   Your Honor, if I may ask the Court to

9  possibly tweak one thing with that.   Since I don't know what

10 the motion for partial summary judgment precisely is and what

11 it's going to be based upon, and if it's based upon some short

12 subset of documents, and either they're unambiguous or they're

13 not, but I think what would be helpful is at least if there was

14 discovery document exchange prior to summary judgment -- I mean

15 I just don't think summary judgment is appropriate before we

16 even see what the universe of documents is that's in their

17 possession.   They may have selectively chosen X, Y, or Z to

18 present to the Court, present to us, that may be fair.   It may

19 be unfair.   I won't know until I know what the universe of

20 documents are.

21          MR. RUBINSTEIN:   Your Honor, that's something

22 precisely that they can raise after they see our motion at the

23 status conference.   I -- we're only going to be relying on the

24 document on which the complaint was asserted, which is the

25 transaction document here.   It's going to be the unambiguous

1  language contained in the document.

2          THE COURT:  Does Mr. Diamond have your version of

3  that document?

4          MR. RUBINSTEIN:  He has plaintiff's version of the

5  document.  I --

6          THE COURT:  Well, I want you to give him your

7  version --

8          MR. RUBINSTEIN:  Sure.  Okay.

9          THE COURT:  -- of what you're in effect -- what

10 you're relying on.

11         MR. RUBINSTEIN:  Will do, Your Honor.

12         THE COURT:  And I think that'll sufficient.  And if

13 there are -- if it looks like there are disputes, it cuts

14 against the movant.

15         MR. RUBINSTEIN:  Right.  Thank you.

16         THE COURT:  All right.  I don't think a formal order

17 is required, unless you really want one.  If you really want

18 one, submit it under certification, otherwise --

19         MR. RUBINSTEIN:  We're fine, Your Honor.

20         THE COURT:  Okay.  And when you send over the notice

21 of completion of briefing, if you could note in there in the

22 notice that the Court indicated it wanted a status conference

23 after that just be -- so I don't forget, which is quite

24 possible.  And if you don't file the motion and you work out a

25 discovery schedule, just -- you can submit it under

1  certification of counsel, but don't set a pretrial conference

2  or a -- don't set a date for a pretrial or a trial without

3  checking with chambers.  All right?

4          MR. DIAMOND:  Okay.  Thank you, Your Honor.

5          MR. RUBINSTEIN:  Thank you, Your Honor.

6          THE COURT:  You're welcome.  Thank you.

7          MR. NEIBURG:  Thank you, Your Honor.  Michael Neiburg

8  for the debtors.

9          THE COURT:  Yes.  Excuse me.

10                          (Pause)

11         THE COURT:  Go ahead.

12         MR. NEIBURG:  Your Honor, next is Item Number 22, the

13  debtors' -- the second omnibus claims objection.  I believe we

14  did file a certificate of no objection, but I don't believe

15  Your Honor had time to address that.

16         THE COURT:  I signed that about an hour ago.

17         MR. NEIBURG:  Oh, thank you, Your Honor.  Next is

18  Item Number --

19         THE COURT:  I believe.

20         MR. NEIBURG:  Next is Item Number 23, which is the

21  debtors' --

22         THE COURT:  I'm sorry.  Just to interrupt again, if

23  you don't see it on the docket, you know, by tomorrow, let us

24  know and correct me.

25         MR. NEIBURG:  No problem, Your Honor.  Thank you.

1  Next is Item 23, which is the debtors' 53rd omnibus claims

2  objection.  We did receive one in response, Your Honor, and --

3  from the City of Portland, Oregon, and we have adjourned the

4  objection as to that claim -- all of their claims that we'd

5  like to move forward with our objection.

6          THE COURT:  Oh, okay.  I misread that.  Just give me

7  a moment.

8                          (Pause)

9          THE COURT:  I don't have that memo with me, so let's

10  skip to the next matter, although I understand it may take some

11  time, and we'll take that at the end, because I -- I need to

12  review it.  I misunderstood the -- I didn't read the status

13  line carefully enough, so I thought the whole matter was

14  continued.

15          MR. NEIBURG:  So --

16          THE COURT:  Okay.

17          MR. NEIBURG:  No problem, Your Honor.  So you wanted

18  to review the 53rd again?

19          THE COURT:  Yes, I have a memo I need to look at.

20          MR. NEIBURG:  Okay.  I guess at this time I'd like to

21  cede the podium to Patrick Jackson for Number -- Item 24.

22          MR. JACKSON:  Good morning, Your Honor.  Patrick

23  Jackson from Young Conaway for the debtors.  This item is a

24  9019 motion to approve a settlement stipulation between the

25  debtors and Deutsche Bank National Trust Company relating to

1  its asserted cure claims in connection with the servicing sale.

2  And there's actually -- I think it's got kind of a lengthy

3  history.  If the Court wouldn't mind, I can walk you back

4  through.

5          THE COURT:  That's fine.

6          MR. JACKSON:  Deutsche Bank is the securitization

7  trustee of about -- of more than 40 trusts that purchased loans

8  from AHM.  They're also the custodian of certain records

9  pursuant to custody agreements with AHM and other non-debtor

10  parties.  Earlier in the case they filed a -- pretty much a

11  blanket proof of claim asserting all types of claims that they

12  might have by category.  They have a seat on the Creditors'

13  Committee.  They are one of the substantial unsecured creditor

14  of the estate, and the types of claims that they asserted in

15  their proofs of claim, I think the most substantial piece to

16  them would be early payment default and breach of warranty

17  repurchase claims, which was a pretty big category of claims

18  that the debtors dealt with in their Chapter 11 plan, as the

19  Court may recall.

20          They've also had asserted kind of placeholder proof

21  of claim for various indemnification rights that they may have

22  under the particular contract as well as custody fees.  Their

23  proof of claim also included, you know, a standard reservation

24  of rights to amend with respect to claims that weren't apparent

25  to them at the time.

1          Very early in the bankruptcy case the debtors filed

2    an emergency motion to sell substantially all of the assets of

3    their loan servicing business.  These assets included primarily

4    the debtors' rights under various servicing agreements with

5    whole loan purchasers and with securitization trusts such as

6    DB's trusts.  The assets of the servicing business were

7    encumbered -- fully encumbered by liens in favor of Bank of

8    America as Administrative Agent for itself and certain pre-

9    petition secured lenders.  So the servicing sale proposed a

10   cash sale to an entity owned by Wilbur Ross, a distressed

11   investor -- distressed debt investor, and it contemplated the

12   assumption and assignment of or the transfer, as it were, of

13   executory and non-executory contracts to the purchaser.

14         Deutsche Bank was a counter party to several of the

15   contracts that were proposed to be sold.  It also had a right

16   to enforce the debtors' obligations under certain of the

17   contracts proposed to be sold.  They, along with several other

18   parties, objected to the proposed sale.  They had discovery.

19         There were basically two types of contracts at issue

20   with DB.  There were mortgaged -- residential mortgage loan

21   servicing agreements, which constituted the bulk of the assets

22   that were sold to the purchaser, and then there were home

23   equity line of credit or HELOC servicing agreements.  As it

24   turned out, the HELOC servicing agreements presented a very

25   legally complex issue to the servicing sale and caused a lot of

1  consternation.  There were actually several objections by

2  counter parties to HELOC servicing agreements, and during the

3  trial on the servicing sale the debtors and the purchaser opted

4  to defer the HELOCs and not include the HELOCs as part of the

5  sale.

6          So in addition to this resolution of the HELOC based

7  objections, there was a resolution of DB's objection to the

8  sale as well as the objection of several other securitization

9  trustees, and this sale was embodied in the sale order by the

10 creation of a $10 million cure escrow, which was a reserve set

11 aside from the purchase price to satisfy cure claims.  And then

12 there was a procedure set up whereby the counter parties to the

13 assumed contracts would be able to obtain some additional

14 diligence and investigate whether they had cure claims, and

15 they were given a supplemental deadline by which they could

16 assert cure claims.

17         The servicing sale order provides that the cure

18 escrow, since it's a reserve of -- set aside from purchase

19 price, B of A's lien attaches to the cure escrow, and B of A is

20 ultimately entitled to any residuum that's left over from the

21 cure escrow after the cure claims are paid.

22         The Court may also recall that subsequent to the

23 servicing sale there was a global settlement agreement between

24 the debtors, the Creditors' Committee, and Bank of America

25 resolving at the time all open issues or -- with few

1 exceptions, all open issues between the parties.  As a result

2 of this B of A settlement stipulation, B of A took over the

3 responsibility for resolving most of the cure claims against

4 the cure escrow being that they're the primary party in

5 interest -- economic party in interest.

6         There were a handful of cure claims that the debtor

7 retained responsibility for resolving.  As I understand it, it

8 was due to potential conflicts that counsel for B of A may have

9 had or that B of A itself may have had with respect to

10 entities, for example, that were within its lender group.  So

11 Deutsche Bank was one of the parties that the debtors retained

12 responsibility for resolving.  Deutsche Bank did assert timely

13 cure claims pursuant to the servicing order -- servicing sale

14 order.  Their cure claims consisted primarily of about $500,000

15 worth of attorney's fee indemnification, about 50,000 of

16 indemnification for internal costs and default administration

17 fees, and then there was a $227,000 piece that relates to an

18 invoice that DB had been presented by counsel to -- by one of

19 the HELOC insurers for reimbursement for its counsel.  So DB

20 was seeking that the debtor reimburse it for that, which

21 presumably, it was going to be out of pocket to the HELOC

22 insurer.

23         The debtors objected to DB's cure claims.  After an

24 informal production from DB of its billing records with respect

25 to the attorney's fees, the debtors objected, and the

1 fundamental basis of the objection was that DB had not

2 articulated a contractual basis in its -- in the assumed

3 servicing agreements for it to be indemnified for these

4 particular costs.  Our review of at least a sampling of the

5 agreements had led us to believe that the indemnification

6 rights were triggered by a default.

7           If there had been a default under an agreement, then

8 there would be an obligation to indemnify, but our position was

9 that the Court had found that there weren't any defaults under

10 any of the servicing agreements as part of the servicing sale

11 trial, and, therefore, it's kind of a bootstrapping cure claim

12 if you're going to allege the right to indemnity without

13 alleging the underlying default.

14           We also objected on the basis that expenses related

15 to HELOC loans where the HELOC servicing agreements weren't

16 assigned to the purchaser would not be appropriate as cure

17 claims.  The -- subsequent to the filing of that objection, and

18 there were similar objections lodged against cure claims of

19 other securitization trustees, DB and the debtors in

20 consultation with B of A had discussed possible settlement for

21 some months actually and have exchanged settlement proposals,

22 and, ultimately, the stipulation that's before the Court today

23 is similar to ones that have been entered with respect to Bank

24 of New York and Citi Bank.  And essentially what it does is it

25 allows about 48 percent of the asserted cure amount, $335,000,

1  as a cure claim that will be paid from the cure escrow, and

2  then the balance of the asserted cure claim is allowed as a

3  general unsecured claim against the applicable debtor.

4        The HELOC portion of the claim, this reimbursement of

5  the HELOC insurer's counsel, is allowed to AHM acceptance,

6  which is the entity that originated the HELOC loans, and then

7  balance of the claim, which is just general indemnification for

8  attorney's fees, is allowed against AHM SV, Incorporated, which

9  is the servicing entity.  Upon receipt -- under the

10 stipulation, upon receipt of the allowed cure claim

11 distribution from the cure escrow, DB releases any claims that

12 it might have -- that it has or that it might have, whether

13 known or unknown, against the debtors, other than the claims

14 that are specifically allowed by the stipulation and other than

15 the claims that are specifically asserted in their proof of

16 claim.

17        Now, what this does, from the debtors' perspective,

18 is it puts some boundaries around what it is that we're going

19 to be resolving in the future with DB when we do get around to

20 reconciling their filed proofs of claim.  This settlement does

21 not liquidate the amount of DB's filed proofs of claim other

22 than the partial piece that it allows, which I just recited.

23 So it's a benefit for us, because it -- from our perspective,

24 it caps off any potential administrative claim that DB may or

25 may -- may have otherwise asserted.  Under our settlement they

1  can't, because it would've -- this would have been a claim that

2  arose prior to the date of the settlement, and it paves the way

3  for us to reconcile the rest of their claims, which we are in

4  the process of doing pursuant to the Chapter 11 plan and the

5  protocol regarding the early payment default and breach claims.

6          Now, the 9019 motion itself is -- sets this forth not

7  -- I apologize if -- I've made some of this background detail,

8  which I think is helpful to understand where we are today and

9  where the objections put us.

10         With respect to the objections, there were objections

11 filed by Paula Rush, who I believe is in the courtroom, as well

12 as Dr. and Mrs. Jackson, who I believe are on the phone line,

13 and I believe I understand the nature of the objection.  I

14 believe they are legal as opposed to factual, so I would

15 propose that we go forward today with argument as opposed to

16 evidence, but -- and while I do think I understand what the

17 nature of the objection is, I, you know, certainly would cede

18 the podium to the objecting parties to articulate it with the

19 ability to respond.

20         THE COURT:  All right.  Well, let's -- let me hear

21 from -- well, first of all, let me hear from Ms. Rush and the

22 Jackson family, and then I'll hear a response from whoever

23 wishes to be heard, and we can decide at that time whether

24 evidence is required.  Let me hear from Ms. Rush.  Good

25 morning.

**J&J COURT TRANSCRIBERS, INC.**

1          MS. RUSH:  Good morning.  I did file an objection.  I

2   have noticed that the settlement with Deutsche Bank -- and

3   there's one pending with Mr. Ross.  Deutsche Bank is a party to

4   my loan as indenture trustee.  Deutsche Bank does sit on the

5   Unsecured Creditors' Committee.  In my case in Federal Court in

6   Greenbelt, American Home has objected to adding the true

7   parties in interest to my lawsuit, so they are indemnifying

8   them, representing them in that venue.  Deutsche Bank and

9   Goldman Sachs, who was a shareholder in American Home,

10  obviously did substantial business with this debtor and I feel

11  do have some responsibility and liability for the kinds of

12  loans that people were put in.  I also directly noticed

13  Deutsche Bank and Goldman Sachs and the trust parties after I

14  found out who they who.

15          In addition to that, on Docket 5356 -- it's Exhibit

16  1B, Page 50 -- Deutsche Bank filed an exception report, and on

17  that report it says that there are 6,021 missing Mear's

18  assignments on my trust which only had 7,000 loans in it.  So

19  there's a good chance that they do not have the proper

20  assignment that my loan never made it out of American Home

21  Mortgage Company to begin with.  No one has ever produced a

22  note, an assignment.  In the process of my case I originally

23  went into bankruptcy when I first started, because I didn't

24  know what else to do.  It said American Home Mortgage Servicing

25  had a secured claim.  The first foreclosure action that was

1  filed said Mear's was nominee for American Home Mortgage

2  Corporation.  That was April 26th, '07.

3      It was not until the latest foreclosure action and

4  even the second round -- the first round they still did not

5  name Deutsche Bank or Goldman Sachs.  It was the second time,

6  so we're in '09 where they finally came forward and said they

7  are the secured party, only because I had all the evidence to

8  prove otherwise from what had been done before.

9      So I am still not in this point in my lawsuit into

10 discovery, because it got obviously delayed with the bankruptcy

11 and all of that.  But my judge has just held up several causes

12 of action on a motion to dismiss, including fraud, and I feel

13 that Deutsche Bank may be very involved in what happened to me,

14 with not giving me who owned my note, with being in collusion

15 with American Home, with sitting on this Committee and making

16 sure I didn't find out where my loan was, and I personally feel

17 like the debtors are not resolving claims of borrowers,

18 including mine.

19     I've been in litigation since April of '07.  I've had

20 no offers, no -- even dialogue at settlements or negotiations.

21 My life has been on hold for almost four years because of this

22 loan.  So I'm here today to say that I do not think that it's

23 appropriate that they are settling with a party like Deutsche

24 Bank, and that if I were to have a claim, if it was to end up

25 in unsecured, there's a possibility the bank sale did not go

1  through.  It was pulled three days before there was a decision

2  due by the OTS.

3          There's been a lot of talk that if the bank sale does

4  not go through, that this debtor may end up in insolvency.  I

5  would've argued equitable subordination of Deutsche Bank's

6  claims to my claim, you know, and I feel like there's going to

7  be a lot of settlements that are going to happen before there's

8  even an opportunity, and that the debtor is going to go

9  insolvent, and people with borrower claims are stuck in the

10 unsecured pile are going to get nothing.  So that's why I'm

11 here, and that's why I'm objecting today to Deutsche Bank's

12 settlement that they're proposing.

13         THE COURT:  Okay.  Thank you.  Dr. Jackson or Mrs.

14 Jackson, do you wish to be heard?

15         MS. JACKSON:  Yes.  Hi, Judge Sontchi.  This is Judy

16 Jackson.

17         THE COURT:  You may proceed.

18         MS. JACKSON:  Can you hear me okay?

19         THE COURT:  Yes, we hear you fine.  Go ahead.

20         MS. JACKSON:  Kind of piggybacking on what Paula Rush

21 just said, we are completely frustrated by the fact that

22 American Home has not responded other fronts, whether it be

23 pursuing our proof or the lawsuit that we currently have

24 pending in the Southern District of Manhattan filed out of

25 necessity, because we couldn't get any response from them.  So

**J&J COURT TRANSCRIBERS, INC.**

1  I, too, am concerned that the money will be gone before

2  unsecured creditors like us will have an opportunity to have

3  our proof of claims -- I guess the word is proved and be able

4  to get any money.

5           And on the other side, for us with our lawsuit,

6  that's not moving forward either, and American Home and all the

7  entities involved seem to be dragging their feet, stonewalling

8  us at any opportunity, and I am, as a borrower, feeling like

9  I'm completely out in the cold.  I feel that we're not moving

10 forward in any regard on either side, so I, too, want to be

11 very, very careful that I appeal to the Court to -- I'm

12 concerned that all the money's going to be gone before the

13 unsecured creditors have an opportunity to have their proofs of

14 claim reviewed.

15          THE COURT:  Okay.  Thank you.  Response.  Mr.

16 Jackson.

17          MR. JACKSON:  Your Honor, Mr. Jackson.  Patrick

18 Jackson from Young Conaway for the record.  I think what I

19 discern from the objections is they are legal in nature, and I

20 guess the two concerns are why haven't you settled with me, on

21 the one hand, does approving this settlement jeopardize

22 collections not other unsecured creditors who are not party to

23 this settlement.

24          THE COURT:  Well, and I think I would -- well, I

25 think it would -- if I could articulate what I think it is, I

1  would say that wrapped up in effect that you've said is, is it

2  equitable or fair for the debtor and Deutsche Bank to reach a

3  settlement when there is a possibility of (a) administrative

4  insolvency, or (b) there are claims that are not being

5  negotiated or resolved.  The second issue to me is, although

6  not quite articulated this way, are the -- is the ability to

7  seek equitable subordination of Deutsche Bank's claim to Ms.

8  Rush's claim or the Jackson's claim being eliminated by this

9  settlement and, more specifically, the releases?  And if so, is

10  that appropriate in the context of a settlement?  It's a bit of

11  throw in at the end of the objection, but, frankly, to me it's

12  the harder issue.

13        MR. JACKSON:  Okay, and I think, Your Honor, I can --

14  I want to take them in the order -- on the subject of

15  administrative insolvency, it's true that the bank sale has not

16  -- was not consummated.  It was withdrawn prior to OTS

17  approval, and the debtors are pursuing other avenues to

18  liquidating AH Bank, which is the most substantial unliquidated

19  asset of the debtors' estates right now.  In the -- I think --

20        THE COURT:  The contract was assumed and assigned.

21        MR. JACKSON:  Right, and --

22        THE COURT:  And there were -- the debtor acknowledges

23  there were at least some defaults under the contract that

24  you're settling.

25        MR. JACKSON:  We don't --

1          THE COURT:  You've agreed --

2          MR. JACKSON:  Right.

3          THE COURT:  -- to settle --

4          MR. JACKSON:  We've agreed to settle them.

5          THE COURT:  -- because of the risk that there were

6   defaults in the --

7          MR. JACKSON:  Right.

8          THE COURT:  -- amount of the assertion and the excess

9   -- the amount of money at play, the reduction in the claim, the

10  cost of litigating the claim, et cetera.

11         MR. JACKSON:  Correct, and --

12         THE COURT:  Classic very low threshold settlement

13  standard.

14         MR. JACKSON:  That's correct.  There's a twist here

15  in that if we're to focus on the money that's leaving the

16  estate, if you will, as a result of this settlement with DB,

17  the only money that's going out is money that's currently

18  sitting in a cure escrow, which is fully subject to Bank of

19  America's perfected pre-petition lien.  I don't know offhand

20  that it's possible under 510© to subordinate a cure claim,

21  because a cure claim is a bit of a misnomer.  There's an

22  affirmative obligation to cure defaults in connection with a

23  assumption and assignment, so I don't know that it would be

24  legally possible to subordinate this --

25         THE COURT:  Well, if the -- and I don't either.  If

1  the default is non-payment of a pre-petition amount due that's

2  unsecured, even if the claim is subordinated to one other

3  claim, it wouldn't be subordinated to other claims, and Ms.

4  Rush's standing to seek equitable subordination is limited to

5  those specific cases, a specific claim she has against Deutsche

6  Bank and not general creditor claims.

7           MR. JACKSON:  Okay.

8           THE COURT:  Judge Shannon ruled on that recently.

9           MR. JACKSON:  I guess --

10          THE COURT:  It's a bit of a quandary.  I -- and I

11  guess the fundamental question is -- and I expect the answer is

12  yes -- this is a final complete settlement of the cure claim,

13  and the money they get is the money they get, and there is

14  mutual releases, and the money will stay there, and --

15          MR. JACKSON:  There are not mutual releases.  It's

16  actually a unilateral release by DB, for what that's worth.

17  It's -- the debtor hadn't asserted any claims against DB in

18  connection with this, so it really is unilateral.  DB in

19  exchange for --

20          THE COURT:  But you're allowing the claim.

21          MR. JACKSON:  We're allowing the cure claim and then

22  we're allowing an unsecured claim, but there's no provision in

23  this settlement that provides for a distribution on the

24  unsecured portion of DB's claim.

25          THE COURT:  All right.  Okay.

                    **J&J COURT TRANSCRIBERS, INC.**

1          MR. JACKSON:  And conceptually, it --

2          THE COURT:  But you're waiving the right to otherwise

3 in the future contest the claim that you're allowing today.

4          MR. JACKSON:  The specific cure claim in the stip.

5 That's right.

6          THE COURT:  Right, so --

7          MR. JACKSON:  But this is a very --

8          THE COURT:  -- to be -- I guess to be more precise,

9 they're not mutual releases, but it's going to be the end of

10 the inquiry about the cure claim, and the cure claim will get

11 paid right away, and the unsecured claim will await

12 distribution.

13          MR. JACKSON:  And the unsecured piece will await

14 distribution as well as the rest of DB's filed proofs of claim,

15 which haven't been reconciled yet and are going to --

16          THE COURT:  So Ms. Rush could -- is unaffected in her

17 ability to seek to equitably subordinate the unsecured claim --

18          MR. JACKSON:  That's correct.

19          THE COURT:  -- even though it's allowed.

20          MR. JACKSON:  And to the --

21          THE COURT:  And -- but the -- but not the

22 administrative expense claim.

23          MR. JACKSON:  The cure claim, you mean?

24          THE COURT:  Yes.

25          MR. JACKSON:  The -- well, I guess that would depend

1 if it's possible to order -- if the Court could order as a

2 remedy for equitable subordination discouragement of amounts

3 previously received, and I don't know that, and certainly, DB's

4 not here to -- you know, to argue that point nor is it before

5 the Court.  But it -- DB's cure claims have been out there

6 since the spring of '08.

7        THE COURT:  Well --

8        MR. JACKSON:  So the payment now is more by way of

9 wrapping up the cure escrow, which B of A is the economic party

10 in interest, and conceivably, if Ms. Rush had an equitable

11 subordination claim, she certainly is free to bring it with

12 respect to the remainder of DB's claims, and it's actually -- I

13 know that procedurally the remedy of subordination would

14 subordinate DB's distribution to Ms. Rush's claim, so I would

15 suspect -- I don't have the figures  on me now, but I suspect

16 that DB's distribution on what it's allowed -- early payment

17 default and breach of warranty claims for 45 securitization

18 trusts pursuant to the plan would -- may be sufficient that Ms.

19 Rush is not prejudiced by allowing this amount to go out as a

20 cure -- as a cure claim from the cure escrow.

21       And, you know, I think nothing in the stip or the

22 order approving it certainly affects any right of Ms. Rush to

23 do whatever she has a right to do.  It's purely an agreement

24 between the debtor and DB in the context of the cure escrow,

25 which was a structure that was set up under the servicing sale

1 order.

2          B of A has an economic interest in the outcome of

3 this.  The Creditors' Committee has a right under the servicing

4 sale order to also object to any cure claims, so they were

5 parties that were consulted in this process, but there's

6 nothing in this order that prevents Ms. Rush from pursuing

7 whatever relief she needs to pursue against DB here or in

8 Maryland.  And I just wanted to point out that with respect to

9 the Maryland litigation, Ms. Rush has stay relief to pursue

10 that.  In December there was a -- the decision that was

11 attached to Ms. Rush's objection dismissed the majority of her

12 claims, dismissed others without prejudice with leave to amend,

13 and did not dismiss others.  And as far as I under -- as I

14 know, she has not yet amended her complaint with respect to

15 those that were -- where she was granted leave, and the debtors

16 are currently represented by an ordinary course professional

17 who is pursuing that litigation.  So I don't personally know

18 what's going on in that litigation other than that there's no

19 impediment from this Court in light of the stay relief.

20          And with respect to the Jacksons, I understand they

21 had filed a motion for stay relief, which was denied, however,

22 the debtors' Chapter 11 plan contains an article that was

23 negotiated in part with the Official Committee of Borrowers and

24 -- which contains certain types of prospective stay relief for

25 actions taken that are necessary to prevent a foreclosure on

1  the home.  For example, the only thing that really the stay

2  applies to is the liquidation of a borrower claim.  To the

3  extent there's any equitable remedy that needs to be taken by a

4  borrower, that is by and large permitted under the plan.

5           And so it's -- I think it's really the rights that

6  we're talking about here with respect to the borrowers would be

7  their rights to liquidate their claim against the estate, which

8  Ms. Rush is currently doing in Maryland Federal Court and which

9  the Jacksons, absent stay relief, will be doing through the

10  proof of claim process.  But the other rights against third

11  parties that are being asserted, debtors can take no position

12  on that --

13           THE COURT:  Okay.

14           MR. JACKSON:  -- other than that we certainly don't

15  intend to stand in the way of it, but it just may be that the

16  ultimate target, for example, of a recision action is going to

17  have to be the entity that currently owns the loan.  So I don't

18  know that the debtors are capable of providing the relief

19  that's ultimately sought in terms of the ability to stay to say

20  in the home.

21           THE COURT:  Well, but there's an argument by Ms. Rush

22  that you -- that the assignment was not effective, and that the

23  debtor may still own the loan.

24           MR. JACKSON:  Right, and I suppose to the extent the

25  loan were property of the estate, which is not our

1  understanding, I suppose there --

2          THE COURT:  All right.

3          MR. JACKSON:  -- could be something done there.

4          THE COURT:  All right.  Anyone else in response to

5  the objection wish to be heard?  Mr. Indelicato.

6          MR. INDELICATO:  Your Honor, Mark Indelicato from

7  Hahn & Hessen on behalf of the Committee.  Your Honor, I'll be

8  brief.  To echo what Mr. Jackson said, the Committee has been

9  involved in the context of these negotiations, and we believe

10 this settlement is appropriate in light of the circumstances.

11         I guess to address one of the Court's concerns, is it

12 equitable to settle with DB in the light of the fact that

13 certain other claims have not been addressed or resolved yet,

14 Your Honor, I think the way Mr. Jackson characterized the $10

15 million escrow, while factually correct, is a bit of a

16 misnomer.  As I recall, and counsel for B of A is here to

17 correct me, the $10 million is really B of A's asset.  It was

18 carved out in negotiation with respect to the sale in order to

19 provide a fund under which these cure claims could be resolved

20 after the closing, so that we can go forward with the closing.

21 I don't believe there's any circumstances under which if, in

22 fact, the cure escrows are not allowed, that this money will

23 come back to the estate.  So while technically is isn't an

24 escrow --

25         THE COURT:  Yes, but it won't go -- it arguably

**J&J COURT TRANSCRIBERS, INC.**

1  wouldn't go to Deutsche Bank.

2          MR. INDELICATO:  But it would go to B of A, so

3  that --

4          THE COURT:  But Ms. Rush's position is, at least in

5  the context of what she's seeking today, deals with

6  subordination of Deutsche Bank, and if the answer is the

7  unsecured claims are subordinated to other claims that are

8  unsecured, would that affect one way or the other the cure

9  claim?

10          MR. INDELICATO:  It -- I don't believe so, Your

11  Honor.

12          THE COURT:  In other words, she wants to -- well, she

13  doesn't --

14          MR. INDELICATO:  I --

15          THE COURT:  She believes, I think I would articulate

16  it, that it's not a reasonable exercise of the debtors'

17  business judgment that should be approved to settle with

18  Deutsche Bank, because they acted improperly.

19          MR. INDELICATO:  I believe that is --

20          THE COURT:  -- and --

21          MR. INDELICATO:  -- part of her argument, Your Honor.

22          THE COURT:  Right.

23          MR. INDELICATO:  I think unfortunately --

24          THE COURT:  And, as a result, subordination, while it

25  may not bring money back into the estate, would arguably take

1    it from Deutsche Bank, in effect punishing Deutsche Bank --

2              MR. INDELICATO:  Your Honor --

3              THE COURT:  -- and leaving them with an unsecured

4    claim that it was subordinated to Ms. Rush's claim.  And then

5    if all of that happens, then the question becomes, well, would

6    that have any effect on the cure claims.  So let's assume, for

7    instance, Ms. Rush and Deutsche Bank have a subordination

8    agreement pre-petition that's enforceable, and that

9    subordination agreement subordinates Deutsche Bank's claim to

10   Ms. Rush's claim, and the debtor -- a debtor seeks to assume

11   and assign a contract that's the basis for the subordinated

12   cure claim or subordinated claim, and as a result, they have to

13   cure the default, and one of the defaults is always failure to

14   pay in connection with a claim.  So there's an affirmative

15   obligation to cure claims in order to assume and assign claims

16   and -- or assume and assign contracts, and the assumption and

17   assignment has been previously approved.  All that gets you to

18   the question of -- and this is leading for you -- does it

19   matter.  Now, you say no, I assume.

20             MR. INDELICATO:  Yes, I do, Your Honor, and first let

21   me start with I think -- unfortunately, I think the papers were

22   not as clear as they could be, and I believe Ms. Rush in her

23   arguments assumed, based on the pleadings, that these were

24   assets of the debtors' estate that were being paid.  That if,

25   in fact, she were able to have this objection denied, there

1 would be more funds available to the estate, and if, in fact,

2 the --

3 　　　　　THE COURT:  Well, what happens to the money that's

4 saved on the cure claim?

5 　　　　　MR. INDELICATO:  It goes to B of A, Your Honor.

6 　　　　　THE COURT:  There are no other cure claims that could

7 be asserted against the escrow?

8 　　　　　MR. INDELICATO:  Well, ultimately to the extent there

9 is anything left in the $10 million after all cure claims are

10 resolved --

11 　　　　　THE COURT:  Right.

12 　　　　　MR. INDELICATO:  -- the balance of those funds will

13 go to B of A.   Your Honor, when -- I think -- as the Court

14 articulated the position of Ms. Rush, I think, Your Honor, it's

15 more akin to -- and I think --

16 　　　　　THE COURT:  Let me back up.

17 　　　　　MR. INDELICATO:  Yes.

18 　　　　　THE COURT:  I'm sorry to keep interrupting.

19 　　　　　MR. INDELICATO:  Sure.

20 　　　　　THE COURT:  The amount of Bank of America's claim

21 against the debtor is resolved --

22 　　　　　MR. INDELICATO:  The amount is --

23 　　　　　THE COURT:  -- and will not be affected by whatever

24 money the received back from the escrow.

25 　　　　　MR. INDELICATO:  I believe, Your Honor, if, in fact -

1  - their claim will be adjusted based on what they get out of

2  the escrow.

3          THE COURT:  So it would be reduced.

4          MR. INDELICATO:  It -- right.  To the extent they

5  get --

6          THE COURT:  So --

7          MR. INDELICATO:  -- the full 10 million, it will be

8  reduced --

9          THE COURT:  And that's a secured claim.

10         MR. INDELICATO:  Excuse me?

11         THE COURT:  And that's a secured claim.

12         MR. INDELICATO:  That will be a -- I'm not sure, Your

13 Honor, because we have settled with B of A.  There is a portion

14 of it unsecured but --

15         MR. ALFONSO:  Hi, it's Ana Alfonso from Kaye Scholer

16 for Bank of America as Administrative Agent.  Yes, Your Honor,

17 we were unfortunately severely under secured, and that $10

18 million escrow is our cash collateral, and it does apply toward

19 the reduction of our claim on a dollar-for-dollar basis.

20 Whatever we have left will be a deficiency claim against the

21 estate, and we are still hundreds of millions of dollars under

22 water right now as we try to work out the portfolio that we

23 took back, which was also our collateral.

24         MR. INDELICATO:  Does that address the Court's

25 concern on that issue?

1         THE COURT:  Is Ms. Rush's ability to subordinate the
2  unsecured claim or seek to -- well, if successful on a claim of
3  equitable subordination, would Ms. Rush be able to subordinate
4  the -- or would the Court be able to subordinate the unsecured
5  claim of Bank of America -- excuse me -- of Deutsche Bank to
6  Ms. Rush's claim or does this --

7         MS. ALFONSO:  I don't think that would be impacted by
8  this settlement, Your Honor.

9         THE COURT:  Well, there's an allowed amount being set
10  up but -- of the unsecured claim, but it doesn't affect -- and
11  she's not giving any kind of release.  It doesn't affect her
12  ability to seek equitable subordination of the unsecured claim.

13         MR. INDELICATO:  Your Honor, this just --

14         MS. ALFONSO:  Correct.

15         MR. INDELICATO:  -- is a very small portion of what
16  is ultimately DB's unsecured claim.  There's nothing in here
17  that would preclude any third parties who have rights against
18  DB from asserting whatever rights they have in this court or in
19  another court, and that's the point I was getting to, Your
20  Honor.  What Ms. Rush is seeking is really sort of a
21  prejudgment provision that would provide a remedy if she's
22  ultimately successful, and I don't think that's appropriate in
23  an objection to the settlement.  This is a settlement of a cure
24  claim that needs to be resolved, so we could move forward with
25  the case.

1           The settlement in and of itself outside of the claims

2    of third parties has been determined to be reasonable by all of

3    the parties in interest subject to the Court's final blessing,

4    and I think that's what we need to focus on today.  There's

5    nothing in here that would release any rights third parties

6    have against DB to assert whatever rights they have in this

7    Court or in another court.  So we believe that based on that,

8    this settlement is appropriate and should be approved by the

9    Court.

10          THE COURT:  Okay.  Thank you.

11          MR. INDELICATO:  Thank you, Your Honor.

12          MS. ALFONSO:  Your Honor, may I just be heard for a

13   few points?

14          THE COURT:  Of course.

15          MS. ALFONSO:  Again, Ana Alfonso for Bank of America

16   as Administrative Agent.  I do respect and sympathize with the

17   objecting parties' frustration over how long it is taking to

18   get to a resolution of their claims, but not approving this

19   settlement won't get them any closer to that resolution,

20   because this is one more headache that the debtors have had to

21   deal with.  We have been clamoring to get this cure escrow

22   resolved for three years, and we haven't gotten a penny yet.

23   One of the reasons why we haven't gotten it resolved is because

24   of this Deutsche Bank claim.

25          We have -- we are comfortable with the settlement,

1  and we'd like to see it get resolved, so that we can all move

2  one step forward toward resolution of the remaining issues in

3  this case.  Again, I don't think the motion was that clear, so

4  in fairness to the objecting parties, the money that was --

5  that is being paid as a direct result of this settlement is

6  coming out of the lender group's cash collateral.  If we wind

7  up in a situation where the estate becomes administratively

8  insolvent, that won't change because of what happens with the

9  cure escrow.  There is no scenario at this point in which the

10 estate would ever get a penny of that cure escrow.  This is --

11 if we were over secured, then there might be a possibility for

12 that to happen, but that will never happen, Your Honor.  So

13 we're really dealing with Bank of America and its syndicate as

14 the real parties in interest here potentially being punished

15 because --

16         THE COURT:  Well, let me -- the result if I don't

17 approve this settlement -- and this is just a hypothetical.

18 But if I don't approve this settlement and, I don't know, the

19 end result of everything is that $4 million goes back to Bank

20 of America, that reduces Bank of America's unsecured claim by 4

21 million --

22         MS. ALFONSO:  Correct.

23         THE COURT:  -- and has a microscopic incremental

24 improvement of the claims of unsecured creditors.  Now that's a

25 general right, and I think there's an argument -- a good

1  argument under the law that Ms. Rush can't seek subordination

2  -- well, it's not really a subordination issue.  Is it a

3  business judgment issue?  I don't even know how to articulate

4  it, so never mind.

5          MS. ALFONSO:  Well, let me just add one point to

6  your --

7          THE COURT:  Yes.

8          MS. ALFONSO:  -- your thought, Your Honor, is that if

9  we don't settle this claim today, the settlement is not

10  approved, then this claim will be litigated, will take up a lot

11  of time and attention and expense that could otherwise be used

12  to work on other matters that have not been as susceptible to

13  resolution.  The amount that's getting paid here I'm sure would

14  be spent effectively on trying to litigate over this -- these

15  issues, and, frankly, that's one of the reasons why we think

16  the settlement --

17          THE COURT:  Spent by whom?

18          MS. ALFONSO:  -- is reasonable.

19          THE COURT:  The debtor --

20          MS. ALFONSO:  Well, the debtor --

21          THE COURT:  It could increase the debtors'

22  administrative expense claim, I take it?

23          MS. ALFONSO:  I'm sorry?

24          THE COURT:  It would increase the debtors'

25  administrative expense claim for professional fees.

1          MS. ALFONSO:  Well, candidly, I think that we have to

2   reimburse them under our settlement, so they would -- right now

3   the reason that the debtor is coming before the Court is,  in

4   part, because they're getting a release from Deutsche Bank,

5   which is valuable consideration for the estate, but also

6   because they're obligated to resolve these claims against the

7   cure escrow pursuant to Bank of America's settlement with the

8   debtors and the Committee.

9          THE COURT:  Does the indemnification of the debtors

10  come out of the cure escrow?

11         MS. ALFONSO:  Well, the bank has to pay it whether it

12  comes out of the cure escrow or whether we come out of pocket

13  it.  Presumably, it will come out of the escrow once we get a

14  bill for all of these services.

15         THE COURT:  When you say presumably, what does the

16  settlement say?

17         MS. ALFONSO:  I don't have the settlement at the

18  podium with me, but it comes out of proceeds of the collateral,

19  and that's one portion of collateral.  It could come out of the

20  escrow or it could come out of other collateral.

21         THE COURT:  So the escrow's not -- is not exclusively

22  for the payment of cure claims.

23         MS. ALFONSO:  It is.  The cure escrow, by its terms,

24  which was set up years before our settlement agreement with the

25  debtor, is exclusively for the payment of cure claims -- seller

**J&J COURT TRANSCRIBERS, INC.**

1  cure claims.

2          THE COURT:  Well, then how does -- how does the --

3  how does your indemnification payments to the debtor reduce the

4  cure escrow?

5          MS. ALFONSO:  Our settlement was more general than it

6  allowed us.  Money is fungible, and we have collateral that

7  comes in the form of --

8          THE COURT:  Well, no it's not if it's escrowed.

9          MS. ALFONSO:  Well --

10          THE COURT:  It's not fungible at all.

11          MS. ALFONSO:  Once it gets released to us.  There's

12  nothing in the cure escrow that allows us to redirect the funds

13  to the debtor, but once we receive it, we can use that

14  collateral --

15          THE COURT:  Here's what I'm getting at.

16          MS. ALFONSO:   -- or our other collateral.

17          THE COURT:  Here's what I'm getting at.  You say that

18  it's going to save the debtor money.  It's not.  It's actually

19  going to help the debtor, because you say that the

20  administrative expense claims, other than cure escrows -- cure

21  claims can't go against the cure escrow, and you have a right

22  -- you have an obligation to indemnify the debtor.  So --

23          MS. ALFONSO:  For professional costs associated with

24  litigating.

25          MR. INDELICATO:  Your Honor --

1          THE COURT:  So if I allow the litigation to go --

2    hang on.  So if I allow the litigation to go forward, and it

3    costs the debtor $2 million to fight it, and, ultimately, I

4    determine a ruling that in effect eliminates the cure claim of

5    Deutsche Bank, all that is done, and it has had zero effect on

6    the debtors' estate, because the cure claims are either

7    available or not available.  The cure escrow's either available

8    or not available to pay cure claims, and the debtor is going to

9    get paid to prosecute that by your client, and that amount that

10   the debtor gets paid won't reduce the cure escrow.

11          MS. ALFONSO:  But it won't be --

12          THE COURT:  So it doesn't cost -- it ultimately

13   doesn't cost the estate a dime to litigate this.

14          MS. ALFONSO:  Well, my unsecured claim stays that

15   much larger.

16          MR. INDELICATO:  That was the point, Your Honor.  She

17   was trying to get to the issue you were raising.  That if, in

18   fact, the cure -- if you ultimately granted Ms. Rush's

19   objection and denied the settlement, that the cost of

20   litigating --

21          THE COURT:  I'm going to interrupt you.  Could

22   everybody sit down and relax.  Okay?  Back off the podium.  Ms.

23   Rush, have a seat.  Mr. Jackson, have a seat.  I'll hear

24   everybody, but it's becoming a crowd up there.

25          MR. INDELICATO:  Yes, the way the settlement works

1    with B of A is ultimately they're responsible to pay all of the

2    costs, and the Court is correct, it's not limited by the cure

3    escrow.  It's not to come out of the escrow.  It's a current

4    obligation of B of A to pay the expenses as incurred by the

5    debtor.  But to the extent those expenses are incurred and

6    paid, they would increase the debtor -- the B of A's unsecured

7    claim, so we would -- she was trying to respond to the Court's

8    concern that if, in fact, the objection was sustained and the

9    settlement was denied, then, in fact, whatever dollars are

10   saved by a reduction in their unsecured claim would be more

11   than overtaken by the increase in the unsecured claim as a

12   result of the additional costs associated with this litigation.

13            THE COURT:  But if the result is -- if the result is

14   to eliminate the Deutsche Bank claim as a result of the

15   litigation and make any clarification on what the issue there

16   is or not, and the reduction in the Deutsche Bank claim is

17   greater than the indemnification claim, the end result is in

18   connection with the funds available for the -- in connection

19   with the total amount of claims against the estate for

20   unsecured claims, it gets reduced.

21            MR. INDELICATO:  Your Honor, there is a breakpoint,

22   and that breakpoint is that number is --

23            THE COURT:  And we're about seven ifs into the issue.

24            MR. INDELICATO:  That's correct, Your Honor.

25            THE COURT:  Okay.  Anything further from Bank of

1  America?

2         MS. ALFONSO:  All I wanted to add, Your Honor, is my

3  point was really that this is one more distraction for the

4  debtors' counsel to deal with.  They have a million complex

5  issues to deal with and getting rid of one more on a reasonable

6  basis --

7         THE COURT:  Well --

8         MS. ALFONSO:  -- I think is --

9         THE COURT:  And that goes --

10        MS. ALFONSO:  -- ultimately inures to the benefit of

11 the -- those parties who are waiting in line to get their

12 matters resolved.

13        THE COURT:  Well, that goes to Ms. Rush's equitable

14 fairness argument, whether the -- whether it's greater harm to

15 hold Bank of America and Deutsche Bank up, so the debtor can

16 concentrate on individuals or whether it's okay to settle with

17 a member of the Unsecured Creditors' Committee and perhaps some

18 benefit to large shareholder first, and then the implicit

19 assumption is because of their influence, as opposed to dealing

20 with individuals and although claim amounts obviously are

21 vastly different, as a matter of percentage of assets of the

22 claimant, clearly, Ms. Rush's claim, whatever is ultimately

23 allowed, I think all candor will have a greater impact on her

24 finances than Bank of America's finances, I hope.

25        MS. ALFONSO:  I think so, Your Honor, and again I do

1  sympathize with the frustration, but we are now here with a

2  settlement.  If it is approved today, then it goes away.  If it

3  is not approved today, then we are, you know, potentially

4  taking up further in addition --

5            THE COURT:  Well, not approved today or not approved?

6            MS. ALFONSO:  Well, not approved -- I was hoping it

7  would be approved today.  Obviously, it may not be, but --

8            THE COURT:  And my point is it --

9            MS. ALFONSO:  If we have to deal with --

10           THE COURT:  -- it had a 30-day deadline on it.  My

11  memory is that it provided that in the event that it wasn't

12  approved within 30 days of execution, it was void ab initio.

13           MS. ALFONSO:  Probably so, something like that, Your

14  Honor.

15           THE COURT:  Deutsche Bank is not here.

16           MS. ALFONSO:  That's correct, Your Honor.

17           THE COURT:  And why isn't Deutsche Bank here?

18           MS. ALFONSO:  I don't know the answer to that, Your

19  Honor.

20           THE COURT:  All right.  Anything further before I

21  hear Ms. Rush's reply?  Mr. Jackson.

22           MR. JACKSON:  Thanks, Your Honor.  Patrick Jackson

23  from Young Conaway.  I just -- you know, I rose earlier,

24  because I think when we got several ifs down the road, it was

25  -- I have copies of the relevant documents.  I wasn't, you

1  know, certainly not going to want to page through the -- every

2  one of these documents.  But our understanding of the B of A

3  agreement is B of A's obligated to reimburse for the costs of

4  litigating cure claims, for example.  Out of the proceeds of

5  collateral it's non-recourse obligation.  So to the extent

6  their collateral stops throwing off proceeds, it -- we are at

7  risk.

8          There's also the issue of -- which I believe is an

9  open issue, and I don't want to give Ms. Alfonso any ideas, but

10 the underlying question of what constitutes, you know, fees

11 that are related to the cure escrow, as Mr. Indelicato pointed

12 out, the debtors are receiving some benefit under this

13 settlement insofar as we are able to rein in any potential

14 unknown other claims that Deutsche Bank may assert, and that

15 would include administration claims, which, being that there's

16 no administrative bar date in the case right now, is always a

17 possibility.

18         So to what extent is the debtors', you know, pursuit

19 of the settlement to get a release for itself of admin

20 liability fairly attributable to resolving the cure claim?  I

21 imagine that's a discussion we're going to have with Ms.

22 Alfonso when it comes time to, you know, submit our bills.  So

23 I don't know that it's as cut and dry as Young Conaway sends

24 the invoices to B of A, who happily pays it.  I hope it works

25 that way, but I don't know that it will.

**J&J COURT TRANSCRIBERS, INC.**

1        And the other -- as far as Deutsche Bank not being
2   here today, I don't know that I can characterize why that is,
3   except that the debtors are the movants, and, you know, DB
4   happens to be the counter party.  But I don't know that they
5   considered their presence necessary today, but I can't speak
6   for them, so --

7        THE COURT:  Okay.  Ms. Rush, I'll give you the final
8   word.

9        MS. RUSH:  That would be nice.  I find it interesting
10  that their arguments are always, you know, they want to avoid
11  litigation.  They want to resolve things.  You know, it's going
12  to take so much time away from this and that,  yet when it's a
13  borrower, you know, I'm in litigation.  They're perfectly happy
14  to fight my litigation for the next seven years and tie up my
15  life.  They do not want a resolution.  You know, that's
16  acceptable.

17       Our claims, borrowers, I understand they are maybe
18  minuscule compared to hundreds of millions of dollars that
19  American Home owes the  banks, but we're stuck in an even -- I
20  wish it was just cash that I was out.  I'm stuck.  I'm in a
21  position where I can't move forward with my life.  This has
22  occupied my life for almost four years, and they don't put any
23  weight on that at all.  We have been treated from the very
24  beginning as if we're non-issues.  We're obnoxious little gnats
25  that they just need to swat away.  I don't think it's right.  I

1  don't think it's fair.

2        I do think that Deutsche Bank has used their position

3  on the Unsecured creditors' Committee inappropriately.  I have

4  not had a chance to bring any of that to this Court, but I

5  think the Court knows that there have been incidents in the

6  past where we came to this Court where we asked to know who was

7  the owner of our note.  The Unsecured Creditors' Committee

8  joined the debtor in deciding that we were not entitled to that

9  information.

10        Deutsche Bank has asked for in Docket 5275 for

11  indemnification for litigation.  They named me by name.

12  They've known about my lawsuit.  You know, the debtor is still

13  using their legal counsel to protect Deutsche Bank and Goldman

14  Sachs, because they have objected in my federal case to adding

15  them to my lawsuit.

16        So when it comes to borrowers, the argument is one

17  way.  When it comes to settling with people they want to settle

18  with, the things they want to resolve, it's another way, and I

19  do think that it's not fair, and it's not equitable.  And

20  that's my final word.  Thank you.

21        THE COURT:  Thank you.  Ms. Jackson, do you have any

22  comment?

23        MS. JACKSON:  Yes, Your Honor.  Just to reiterate, I

24  believe that it seems to be a pattern of everyone dealing with

25  the whole situation whether you're in a lawsuit or trying to

1  establish proof of claim.  That everyone involved -- and this

2  is my personal feeling.  Everyone involved seems to be doing

3  their best to be dragging their feet.

4          As an example, we filed a RESPA letter, a written

5  RESPA request on the 10th of May in '08 and never got a

6  response from anyone until they requested to have the documents

7  shredded.  And I appeared telephonically at that point and said

8  please don't allow that, and you didn't, and that was when you

9  said get the loan information to American Home, but they only

10 did that, because you asked them to.

11         We subsequently had to hire Paula to do work on the

12 whole mortgage -- the whole settlement situation, the -- I'm

13 sorry,  I just lost my train of thought -- the owner of the

14 note, and she was the one that came up with the information for

15 us.  But before that, there was no compliance on the part of

16 American Home at all.

17         So I don't understand why it -- things can't happen

18 concurrently in the first place, why they can't work with the

19 unsecured borrowers to get their proofs of claim heard, and it

20 just seems to permeate everything that's going on with the

21 whole situation.  As I said earlier, the fact that we're not

22 getting any movement on our lawsuit and we're not getting any

23 movement, we -- because we were denied relief from stay, we

24 have no choice but to prosecute the claim, and they have never

25 responded to the claim for us to be able to prosecute it.  So

1  it's -- we're out there in never never land related to that.

2          I'm just very frustrated by the attitude of all the

3  players.  Our indenture trustee is Deutsche Bank.  Wells

4  Fargo's involved.  Just the attitude of everybody is, as I just

5  heard Paula say, we're little gnats out there.  We don't

6  matter, and they'll squash at any opportunity.  So I wonder if

7  there's a way to ultimately ask you to see if they would

8  schedule something for us to be able to move forward with our

9  proof of claim and get some resolution on it.

10          THE COURT:  Okay.  Thank you.

11          MS. JACKSON:  Thank you.

12          THE COURT:  I'm prepared to rule.  In connection with

13  the argument of fairness, if you will, of the debtor moving

14  forward and trying to resolve claims -- cure claims such as the

15  Deutsche Bank claim and not moving forward and filing an

16  objection or dealing with claims such as Ms. Rush and the

17  Jacksons, I don't find that as an impediment to the extent it's

18  even true.  I don't think it rises to a level of purposefulness

19  or nefariousness, which is -- sorry -- nefarious purpose to in

20  any way stand in any way as an impediment to settlement.

21          This is a big estate.  There are large claims

22  involved.  I understand and appreciate the frustration of the

23  Jacksons and Ms. Rush, but even were I had to force the debtor

24  to deal with what -- to deal with the unsecured claims asserted

25  by the Jacksons and Ms. Rush, they wouldn't get paid until the

1  plan goes effective.  So the timing of that resolution, while

2  it would certainly probably help on a personal level by

3  providing peace of mind in connection with a final resolution,

4  will not provide any money on those claims.

5          So I don't think -- and I'm not going to force the

6  debtor to settle with anybody, and I'm not going to set a

7  deadline to file claim objections, at least not at this point

8  on the facts in front of me.

9          The more tricky question is whether a claim of

10 equitable subordination would be adversely affected by allowing

11 the cure claim and whether that would have a benefit if I were

12 to equitably subordinate the claim to Ms. Rush.  To reiterate,

13 Ms. Rush only has standing to seek equitable subordination of a

14 claim based on individual arguments not on arguments that

15 affect creditors in general.

16         It's a bit of a quandary, and I'm hampered by

17 Deutsche Bank's absence, because I can't ask them the question

18 what is their position.  Frankly, I'm flummoxed about why

19 they're not here.  I think Mr. Jackson did a brave job in

20 trying to defend them in that they're not the movant, but

21 they're the party who's claim is being settled, and we're

22 talking about millions of dollars.  It's not -- lawyers are

23 expensive, but it's not that expensive to bring someone down

24 from New York.

25         So I'm going to do two things.  First of all, I'm

1  going to overrule the objection in part in connection with the

2  fairness argument.  I'm going to continue the objection in

3  connection with the equitable subordination argument to the

4  next hearing, which is May something.  Let me get the date.  I

5  think it's May 4th, but let me -- yes, it's May 4th.  I'm going

6  to continue the settlement hearing to May 4th solely with

7  regard to the equitable subordination claim.

8          I'm going to give you, Ms. Rush, seven days to file a

9  motion to equitably subordinate that claim, the claim with

10 Deutsche Bank, and that will be heard as well on May 4th.

11 Obviously, parties in interest will have an opportunity to

12 respond to that motion.  In connection, I would like a reply to

13 -- by the debtor at least in connection with this issue as

14 being presented by Ms. Rush.  In the event that Ms. Rush does

15 not file a motion for equitable subordination prior -- by no

16 later than April -- well, let me get that -- I think I got the

17 wrong day.  It's seven days, so by no later than April 13, I

18 will sign the settlement order under certification of counsel.

19         All right, so just to reiterate, overruling the

20 objection as to fairness, continuing it in connection with

21 equitable subordination, giving Ms. Rush until April 13th to

22 file a motion to equitably subordinate Deutsche Bank's claim,

23 giving the debtor and any other party in interest an

24 opportunity to file a reply in connection with the claim

25 objection on those issues as well as, of course, to any claim

1   of equitable subordination.  All that will be heard on May 4th.

2   I expect Deutsche Bank to be here.  You can tell them that.

3           In the event the claim -- excuse me -- in the event

4   the motion for equitable subordination is not filed by April

5   13th, I will overrule the objection in its entirety.  This

6   applies to the Jacksons as well.  I will overrule the

7   objections in their entirety, and I'll sign an order under

8   certification of counsel approving the settlement, because I

9   think we have some narrow issues -- a very narrow issue we just

10  need to deal with, and I'm not comfortable playing it through

11  in my head and the effects that it may or not have in

12  connection with recoveries to deal with it today.

13          And I -- you know, I can't ask Deutsche Bank what

14  they think, and, ultimately, we're talking about a claim --

15  ultimately, we're talking about a cause of action against them

16  to subordinate their claim.  So that's the ruling.  I don't

17  think we need an order at this point.  I think it's pretty

18  clear.  Okay?

19          MR. INDELICATO:  Your Honor, just one point of

20  clarification.  If -- and I understand the Court's concern,

21  since DB is not here.  If DB were willing to agree that any

22  entry of the order would not affect Ms. Rush's right to seek an

23  equitable subordination of their claim at a subsequent date --

24          THE COURT:  Well, here's the problem.  I don't think

25  as written it affects her right to seek equitable subordination

1  of the unsecured claim.  The question is what follows from

2  that, and I just can't figure it out sitting here today.  Maybe

3  I'm too tired.  I need another cup of coffee.

4          MR. INDELICATO:  That's fine, Your Honor.

5          THE COURT:  Okay.  You look puzzled, Mr. Jackson.

6  Puzzled by what I said, puzzled by why I said it?

7          MR. JACKSON:  No, Your Honor, I'm trying to divine

8  DB's response in light of -- I guess building on what Mr.

9  Indelicato suggested, I think -- I would suspect that if Your

10  Honor's concern is merely what happens to the money once it

11  leaves the cure escrow, it's out the door in a sense, Ms. Rush

12  prevails on an equitable subordination, can she no longer have

13  a remedy with respect to that money that left?  Is it something

14  that could be fixed by DB saying, sure, you know, putting aside

15  whether it's ordinarily legally possible, we would agree to

16  discourage any amount paid under this stip if our claim is, in

17  fact, subordinated at a later date?

18          THE COURT:  Well, I don't think we need -- I -- let's

19  just have a hearing.

20          MR. JACKSON:  We don't need to negotiate --

21          THE COURT:  Let's --

22          MR. JACKSON:   -- for DB.

23          THE COURT:  No, don't negotiate, but let's have a

24  hearing.  And, look, if you negotiate with Ms. Rush and the

25  Jacksons, and they agree, and Deutsche Bank agrees and

1  everybody agrees, and you want to send me an order on consent,

2  I'm always open to that.  I don't know if you can reach that

3  kind of agreement.  I -- frankly, I doubt it, but --

4          MR. JACKSON:  We shall do our best.

5          THE COURT:  Of course.  Let's take a short -- well,

6  actually, just give me a moment, and we'll deal with the claim

7  objection.

8                        (Pause)

9          THE COURT:  Portland, Oregon's claim is continued?

10         MR. NEIBURG:  Correct, Your Honor.  I think we'll

11 have to reach out to the City of Portland.  I think we're going

12 to allow the claim and its amount, but it needs to be

13 reassigned to a different debtor, so we're going to work with

14 the City to have an order effecting that under cert of counsel

15 in the future.

16         THE COURT:  And these are the licensing fees.  I'll

17 approve the objection.

18         MR. NEIBURG:  Thank you, Your Honor.  May I approach?

19         THE COURT:  Yes.

20                        (Pause)

21         THE COURT:  Anything further for today?  Ms. Rush?

22         MS. RUSH:  Are we finished, since I need to --

23         THE COURT:  We are finished.

24         MS. RUSH:  Okay.  Thank you, Judge.

25         THE COURT:  Thank you.


**J&J COURT TRANSCRIBERS, INC.**

1          MR. NEIBURG:  Nothing further, Your Honor, from the

2    debtors.

3          THE COURT:  Very good.  Very good.  Hearing

4    adjourned.

5                         * * * * *

6                  **C E R T I F I C A T I O N**

7          I, PATRICIA C. REPKO, court approved transcriber,

8    certify that the foregoing is a correct transcript from the

9    official electronic sound recording of the proceedings in the

10   above-entitled matter, and to the best of my ability.

11

12   /s/ Patricia C. Repko            DATE:  April 12, 2010

13   PATRICIA C. REPKO

14   J&J COURT TRANSCRIBERS, INC.

15

16

17

18

19

20

21

22

23

24

25