**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re:<br><br>AMERICAN HOME<br>MORTGAGE HOLDINGS, INC., et al.,<br><br>Debtors. | Chapter 11<br>Case No. 07-11047 (CSS)<br>(Jointly Administered) |
| BROADHOLLOW FUNDING, LLC and<br>MELVILLE FUNDING, LLC,<br><br>Plaintiffs-Counterclaim Defendants,<br><br>v.<br><br>BANK OF AMERICA, N.A.,<br><br>Defendant-Counterclaim Plaintiff. | Adversary Proceeding<br>Case No. 07-51738 (CSS) |

**ANSWER AND COUNTERCLAIMS OF BANK OF AMERICA, N.A.**

Defendant and counterclaim plaintiff Bank of America N.A. ("BofA"), by its attorneys Potter Anderson & Corroon LLP and Kaye Scholer LLP, for its answer and counterclaims, alleges as follows:

1. State that the allegations set forth in paragraph 1 constitute a legal conclusion to which no response is required and to the extent a response is required deny those allegations, except admit on information and belief the allegations set forth in the third sentence and admit that BofA entered into certain swap agreements with SPEs formed by the American Home Parties named Broadhollow and Melville and refer to those documents for their content.

2. Deny the allegations set forth in the fourth sentence of paragraph 2 and admit on information and belief the remaining allegations set forth in paragraph 2.

3. State that the allegations set forth in paragraph 3 constitute a legal conclusion to which no response is required and to the extent a response is required deny those allegations, except admit to the existence of the MLPSAs and the Swap Agreements and refer to those documents for their content, admit that a termination event under the MLPSAs occurred, and admit that an auction of certain mortgage loans took place as a result and that the proceeds of the sale were below par value.

4. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph 4 and on that basis deny the allegations, except deny that AHMSI is a plaintiff in this action and refer to the Court's decision and order dated June 27, 2008; admit the allegations set forth in the second sentence of paragraph 4.

5. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph 5 and on that basis deny the allegations; admit the allegations set forth in the second sentence of paragraph 5; deny the allegations set forth in the third sentence of paragraph 5.

6. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the first sentence of paragraph 6 and on that basis deny the allegations; admit the allegations set forth in the second sentence of paragraph 6; deny the allegations set forth in the third sentence of paragraph 6.

7. Admit the allegations set forth in paragraph 7.

8. State that the allegations set forth in the first and second sentence of paragraph 8 are legal conclusions to which no response is required and to the extent a response is

required deny the allegations. Deny the third sentence of paragraph 8 and state that BofA consents to entry of final orders or judgment by the bankruptcy judge.

9. State that the allegations set forth in paragraph 8 are legal conclusions to which no response is required and to the extent a response is required deny the allegations.

10. State that the allegations set forth in paragraph 9 are legal conclusions to which no response is required and to the extent a response is required deny the allegations.

11. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 10 and on that basis deny the allegations, except admit upon information and belief the allegations set forth in the first sentence and admit to the existence of a master loan purchase and service agreement among the American Home Parties and Broadhollow or Melville, as well as the existence of swap agreements among Broadhollow and Melville and the Broadhollow-Melville Swap Counterparties, and refer to those documents for their contents.

12. Admit upon information and belief the allegations set forth in the second sentence and deny the remaining allegations, except admit to the existence of a master loan purchase and service agreement among the American Home Parties and Broadhollow or Melville and refer to those documents for their contents.

13. Admit upon information and belief the allegations set forth in paragraph 12, except admit that Broadhollow and Melville entered into certain swap agreements with one or more of the Broadhollow-Melville Swap Counterparties and refer to those documents for their contents.

14. Deny the allegations set forth in paragraph 13, except admit that Broadhollow and Melville entered into certain swap agreements with one or more of the Broadhollow-Melville Swap Counterparties and refer to those documents for their contents.

15. Deny the allegations set forth in paragraph 14, except admit that Broadhollow and Melville entered into certain swap and back swap agreements with one or more of the Broadhollow-Melville Swap Counterparties and refer to those documents for their contents.

16. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15 and on that basis deny the allegations.

17. Admit the allegations set forth in paragraph 16.

18. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the second sentence of paragraph 17 and on that basis deny the allegations, and deny the remaining allegations except admit to the existence of a Base Indenture dated as of May 27, 2004 among Melville and Deutsche Bank Trust Company Americas and refer to that document, and its supplements, for their contents.

19. Deny the allegations set forth in paragraph 18, except admit that Broadhollow issued certain senior and subordinated notes and refer to those documents for their contents.

20. Deny the allegations set forth in paragraph 19 except admit to the existence of a Base Indenture dated as of May 27, 2004 among Broadhollow and Deutsche Bank Trust Company Americas and refer to that document, and its supplements, for their contents.

21. Deny the allegations set forth in paragraph 20 of the Amended Complaint, except admit to the existence of the Swap Agreements and refer to those documents for their

contents; deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in the last sentence of paragraph 20, including footnote 1, and on that basis deny the allegations.

22. Deny the allegations set forth in paragraph 21, except admit to the existence of the MLPSAs and refer to those documents for their contents.

23. Deny the allegations set forth in paragraph 22, except admit the existence of the MLPSAs and refer to those documents for their contents.

24. Deny the allegations set forth in paragraph 23, except admit the existence of the MLPSAs and refer to those documents for their contents.

25. Deny the allegations set forth in paragraph 24, except admit the existence of the MLPSAs and refer to those documents for their contents.

26. Deny the allegations set forth in paragraph 25, except admit the existence of the MLPSAs and refer to those documents for their contents.

27. Deny the allegations set forth in paragraph 26, except admit the existence of the MLPSAs and refer to those documents for their contents.

28. Deny the allegations set forth in paragraph 27, except admit the existence of the MLPSAs and refer to those documents for their contents.

29. Deny the allegations set forth in paragraph 28, except admit the existence of the BofA Swap Agreements and the existence of the MLPSAs and refer to those documents for their contents.

30. Deny the allegations set forth in paragraph 29, except admit the existence of the BofA Swap Agreements and refer to those documents for their contents.

31. Deny the allegations set forth in paragraph 30, except admit the existence of the BofA Swap Agreements and refer to those documents for their contents.

32. Deny the allegations set forth in paragraph 31, except admit the existence of the BofA Swap Agreements and refer to those documents for their contents.

33. Admit the allegations set forth in paragraph 32.

34. Deny the allegations set forth in paragraph 33, except admit the existence of the MLPSAs and refer to those documents for their contents.

35. Deny the allegations set forth in paragraph 34.

36. Deny the allegations set forth in paragraph 35, except admit that on October 1, 2007 and October 3, 2007, an American Home Party corresponded with BofA regarding Partial Termination Payments that BofA allegedly owed Broadhollow and Melville under the BofA Swap Agreements and refer to that correspondence and those agreements for their contents.

37. Deny the allegations set forth in paragraph 36, except admit that BofA sent a letter on October 4, 2007 in response to the correspondence it had received regarding Partial Termination Payments allegedly due and refer to that document for its content.

38. Deny the allegations set forth in paragraph 37, except admit that BofA sent a letter to counsel for Broadhollow and Melville on October 9, 2007 and refer to that document for its content.

39. Deny the allegations set forth in paragraph 38, except admit to the existence of the margin properly posted and applied by BofA pursuant to the Back Swap Agreements and refer to those documents for their content.

40. Deny the allegations set forth in paragraph 39, except admit to the existence of correspondence made to BofA on October 19, 2007 and refer to those documents for their content.

41. Deny the allegations set forth in paragraph 40, except admit to the existence of the BofA Swap Agreements and the MLPSAs, and refer to those documents for their content.

42. State that the allegations set forth in paragraph 41 constitute a legal conclusion to which no response is required and to the extent a response is required deny those allegations.

43. Deny the allegations set forth in paragraph 42, except admit to the existence of a Banc of America Securities, LLC, Private Placement Memorandum and refer to that document for its content.

44. Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 43 and on that basis deny the allegations.

IN ANSWER TO COUNT I

45. In answering the allegations set forth in paragraph 44, restate and incorporate the replies and answers to paragraphs 1 through 43 as if fully set forth herein.

46. Admit the allegations set forth in paragraph 45.

47. Deny the allegations set forth in paragraph 46.

48. Deny the allegations set forth in paragraph 47.

49. Deny the allegations set forth in paragraph 48.

50. State that the allegations set forth in paragraph 49 constitute a legal conclusion to which no response is required and to the extent a response is required deny those allegations.

51. State that the allegations set forth in paragraph 50 constitute a legal conclusion to which no response is required and to the extent a response is required deny those allegations.

**DEFENDANT'S AFFIRMATIVE DEFENSES**

52. BofA repeats and realleges the responses and defenses set forth in its Answer to the Amended Complaint as if they were fully set forth in each of the following affirmative defenses:

**First Affirmative Defense**

53. The Amended Complaint fails to state a claim against BofA upon which relief can be granted.

**Second Affirmative Defense**

54. Plaintiffs' claims are barred under the doctrines of *in pari delicto* and equitable estoppel.

**Third Affirmative Defense**

55. Plaintiffs are guilty of unclean hands.

**Fourth Affirmative Defense**

56. Plaintiffs have suffered no injury or damages.

**Fifth Affirmative Defense**

57. Any injury or damages allegedly suffered by Plaintiffs were caused by Plaintiffs' own culpable conduct, and, accordingly, Plaintiffs are barred from any recovery against BofA or, alternatively, any recovery which might otherwise be had by Plaintiffs should be reduced and diminished to the extent that Plaintiffs' culpable conduct caused or contributed to any damages or injury that Plaintiffs may have sustained.

**Sixth Affirmative Defense**

58. Any injury or damages to Plaintiffs were caused by acts and/or omissions of others for whose acts or omissions BofA is not responsible.

**Seventh Affirmative Defense**

59. Plaintiffs failed to mitigate, minimize or avoid their damages, if any.

**Eighth Affirmative Defense**

60. Plaintiffs' claim is barred by their own fraudulent conduct and misrepresentations, as set forth in detail in BofA's Counterclaims, *infra.*

**Ninth Affirmative Defense**

61. Plaintiffs' claim is barred by their own fraudulent inducement to contract, as set forth in detail in BofA's Counterclaims, *infra.*

**Tenth Affirmative Defense**

62. Plaintiffs materially breached their obligations under the agreements and transactions Plaintiffs are suing under, as set forth in detail in BofA's Counterclaims, *infra*, and therefore Plaintiffs may not now sue to recover based on those agreements and transactions.

**Eleventh Affirmative Defense**

63. Plaintiffs materially breached the implied covenant of good faith and fair dealing inherent in the contractual agreements and transactions they are suing under, as set forth in detail in BofA's Counterclaims, *infra*, and therefore may not now sue to recover based on those agreements and transactions.

**Twelth Affirmative Defense**

64. Plaintiffs' damages, if any, were solely the result of their own negligence and conduct, and that of their agents, and Plaintiffs assumed the risk of loss on the contractual agreements and transactions they are suing under.

**Thirteenth Affirmative Defense**

65. BofA was entitled to, and did, reasonably and in good faith rely upon the acts and representations of Plaintiffs and their agents with respect to the transactions that are the subject of the claim asserted against BofA.

* * *

66. BofA hereby gives notice that it intends to rely upon such other and further defenses as may become available or apparent during pre-trial proceedings in this case and hereby reserves all rights to assert such defenses.

## COUNTERCLAIMS

Counterclaim Plaintiff BofA ("BofA" or "Counterclaimant"), upon knowledge as to its own acts and upon information and belief as to the actions of Plaintiffs and others, by its attorneys Potter Anderson & Corroon LLP and Kaye Scholer LLP, alleges as follows:

### The Parties

1. Counterclaimant is a national banking association chartered under the laws of the United States of America with its headquarters and principal place of business in Charlotte, North Carolina.

2. Counterclaim Defendant Broadhollow is a special purpose Delaware limited liability company having its principal place of business in Melville, New York.

3. Counterclaim Defendant Melville is a special purpose Delaware limited liability company having its principal place of business in Melville, New York.

### Jurisdiction

4. This Court ruled in a Decision and Order dated June 27, 2008 that it has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This adversary proceeding is a non-core proceeding. BofA consents to entry of final orders or judgment by the bankruptcy judge.

5. This Court has personal jurisdiction over Counterclaim Defendants Broadhollow and Melville.

### Factual Background

Introduction

6. Upon information and belief, Broadhollow and Melville are special purpose entities ("SPEs") formed by American Home Mortgage Corp. ("AHMC"). During all

relevant times, AHMC was the sole member and manager of Broadhollow, and American Home Mortgage Acceptance, Inc. ("AHMA") was the sole member and manager of Melville (collectively the "American Home Parties").

7. Upon information and belief, AHMC formed Broadhollow and Melville to facilitate the financing of certain residential mortgage loans originated by it, via (a) two Mortgage Loan Purchasing and Servicing Agreements, each dated May 27, 2004 ("MLPSAs"), whereby Broadhollow and Melville would purchase loans from, respectively, AHMC and AHMA, and (b) swap agreements among Broadhollow and Melville and certain Broadhollow-Melville Swap Counterparties, including BofA, ("Swap Counterparties") designed to hedge certain interest rate risks, non-credit market value risk and prepayment risk associated with Broadhollow and Melville owning those mortgage loans eligible to be purchased and properly purchased under the MLPSAs ("Swap Agreements") (collectively the "Program" or the "Program Documents").[1]

8. The MLPSAs directed that the mortgage loans owned by Broadhollow and Melville be sold upon the occurrence of certain termination events, which would trigger the payment of "Partial Termination Payments" between the Swap Counterparties and Broadhollow and Melville under the Swap Agreements. Specifically, if the mortgage loans were sold for over par value, Broadhollow and Melville would owe Partial Termination Payments to the Swap Counterparties amounting to that overage; conversely, if the mortgage loans were sold for under par value, the Swap Counterparties would owe Partial Termination Payments to Broadhollow and Melville amounting to the portion of the loss that was attributable to market value loss.

---

[1] The MLPSAs are annexed to the Amended Complaint as exhibits A and B; the Swap Agreements are annexed to the Amended Complaint as exhibits C and D.

9. Because BofA understood that it would be liable for Partial Termination Payments to Broadhollow and Melville under the Swap Agreements for certain shortfalls Broadhollow and Melville suffered from the sale of the mortgage loans triggered by a termination event under the MLPSAs, BofA's agreement to participate as a Swap Counterparty was contingent on the MLPSAs' unambiguous requirement that all mortgage loans purchased by Broadhollow and Melville from the American Home Parties be "eligible loans" that met specific eligibility criteria, and that BofA have the right to enforce that eligibility requirement as a third-party beneficiary to the MLPSAs.

10. At the time of the execution of the MLPSAs and the Swap Agreements, the American Home Parties, who were the Managers of Broadhollow and Melville and acted on their behalf, represented to BofA that all of the mortgage loans sold and purchased into the Program would be eligible loans that met the eligibility requirements under the Program Documents. Broadhollow and Melville, and the American Home Parties as Managers of Broadhollow and Melville, failed to disclose to BofA at that time that they intended to sell and purchase mortgage loans for the Program that did not meet the eligibility requirements of the Program Documents, or that they had no intention of honoring the Swap Counterparties' rights under those documents that only eligible loans be included in the Program.

11. Broadhollow and Melville subsequently did purchase mortgage loans from the American Home Parties that failed to meet the Program Documents' eligibility requirements, and did so knowingly. Broadhollow and Melville never informed BofA of these purchases, which were explicitly prohibited under the Program Documents. Broadhollow and Melville also did not sell the ineligible loans back to the American Home Parties, as the Program Documents required of them should any such ineligible loans somehow enter the Program.

12. BofA was not responsible under the Program Documents to ensure that the portfolio consisted of only eligible loans. That obligation resided with Broadhollow and Melville. At no time prior to the Termination Event did BofA know, or have any opportunity or basis to know, that the portfolio contained ineligible loans.

13. BofA only discovered the existence and extent of ineligible loans in the portfolio after a Termination Event took place that resulted in a Court-approved process to sell the loans at auction. The Program Documents did not permit a Termination Event Auction to include ineligible loans. When BofA raised its concerns about these ineligible loans, and provided proof of their ineligibility, Broadhollow and Melville, and the American Home Parties as their managers, ignored BofA's repeated requests for additional information to fully ascertain the extent of improper loans in the portfolio, and refused to separate them out from the eligible loans to be sold in the auction to prevent an artificial depression in the sales price achieved for the eligible loans sold in the auction.

14. BofA has no obligations under the Swap Agreements to make any Partial Termination Payments to Broadhollow or Melville for the portion of any loss attributable to market value loss, under any circumstances, with respect to any loans that are ineligible for the Program under the criteria set forth in the Program Documents.

15. To the extent the Court finds, to the contrary, that BofA is liable under the Swap Agreements to pay the Partial Termination Payments demanded by Broadhollow and Melville for losses to them resulting from the ineligible loans sold at auction, BofA has been damaged by the same amount, due to Broadhollow's and Melville's breach of the MLPSAs in allowing ineligible loans into the Program (and failing to sell them back to the American Home Parties).

16. BofA has also been damaged by Broadhollow's and Melville's failure to conduct a proper auction of the loan portfolio upon the Termination Event, as set forth in the Program Documents, evidenced by their refusal to separate out the ineligible loans improperly in the portfolio from the eligible loans authorized under the MLPSAs for sale. The poor value of the ineligible loans sold at auction drove down the sales price that would have been realized had Broadhollow and Melville conducted a proper auction that sold off only eligible loans. BofA has been damaged by the amount that the proceeds from the auction as conducted for eligible loans were less than they would have been had Broadhollow and Melville conducted the auction properly.

The MLPSAs

17. Each MLPSA unequivocally states: "**Each Mortgage Loan must be an Eligible Loan.**" (MLPSA Sec. 2.4) (emphasis added).

18. BofA is a third-party beneficiary to the MLPSA. (*See*, Section 12.15 "Third Party Beneficiary. The Swap Counterparty [BofA] is a third-party beneficiary to this Purchase Agreement and is entitled to the rights and benefits hereunder and may enforce the provisions hereof as if it were a party hereto.").

19. Further, the Swap Agreements require BofA to make Partial Termination Payments only in connection with "Mortgage Loans," as that term is defined in the MLPSAs. (*See* Exhibit A to Swap Agreements, "Confirmation," defining "Partial Termination Payments" as applying to "Mortgage Loans," and stating that "[u]nless otherwise defined in this Confirmation or in the Definitions [and the term "Mortgage Loans" is not], capitalized terms used herein have the meanings ascribed to such terms in the Mortgage Loan Purchase and Servicing Agreement . . .").

20. The MLPSA defines "Mortgage Loan" as "any mortgage loan purchased by the Purchaser pursuant to any Transfer Supplement and subsequently not repurchased by the Seller or the Servicer or sold, securitized or otherwise transferred by the Purchaser pursuant to the terms hereof. " (MLPSA at 10).

21. The MLPSA explicitly spells out that, via these Transfer Supplements, the American Home Parties may only sell Mortgage Loans, and Broadhollow and Melville may only purchase Mortgage Loans, that are Eligible Loans:

> Sale of Mortgage Loans. (a) From time to time, pursuant to any Transfer Supplement, the Seller may sell, transfer, assign, set over and convey to the Purchaser and the Purchaser shall purchase, without recourse, but subject to the terms hereof, all right, title and interest of the Seller in and to each Mortgage Loan identified on the Transfer Supplement, originated or purchased by the Seller; *provided, however* . . . that **each Mortgage Loan transferred on each Closing Date must be an Eligible Loan.**

MLPSA sec. 2.1 (italics in original; bolded emphasis added).

22. Section 2.1 of the MLPSA goes on to state that "[t]he subject Portfolio [defined as "A Mortgage Loan or pool of Mortgage Loans sold to Purchaser on a Closing Date pursuant to the terms hereof and the applicable Transfer Supplement"] and related servicing rights shall be sold by the Seller to the Purchaser as described in Section 2.4 hereof." Section 2.4, as stated above, unequivocally states that: "**Each Mortgage Loan must be an Eligible Loan.**" (MLPSA Sec. 2.4) (emphasis added).

23. The very execution of the MLPSA is premised on the materiality of this eligibility requirement, as reflected in the MLPSA's introductory "Whereas" clauses:

> WHEREAS, the Purchaser has agreed to purchase from the Seller and the Seller has agreed to sell to the Purchaser from time to time mortgage loans **constituting Eligible Loans** until the termination of this Purchase Agreement in accordance with Section 11.1 hereof.

> WHEREAS, the Purchaser, the Seller and the Servicer **wish to prescribe the manner of purchase of Eligible Loans**.

(MLPSA at 1) (emphasis added).

24. Indeed, the termination provision of Section 11.1, consistent with the above, states that: "This Purchase Agreement shall terminate upon the final payment, other liquidation (or any advance with respect thereto) or sale or Securitization of each Mortgage Loan sold hereunder, and the Seller's delivery of a written notice to the Purchaser that **its commitment to purchase Eligible Loans** hereunder has been terminated." (MLPSA Sec. 11.1) (emphasis added).

25. The MLPSA's Eligibility Criteria requires, among other things, that "each Mortgage Loan must be either a Conforming Loan or a Non-Conforming Loan." (MLPSA at 5). The MLPSA defines a Conforming Loan as "An Eligible Loan which conforms to the Guidelines of the Agencies as such guidelines have been modified by FHLMC, FNMA, FHLB, and GNMA with respect to Eligible Loans originated or purchased by the Seller." The MLPSA defines a Non-Conforming Loan as "An Eligible Loan which substantially conforms to the Guidelines except (i) the principal amount thereof may excced the principal amount of loans which conform to the Guidelines or (ii) for other specified exceptions to the Guidelines that are consistent with the Seller's Non-Conforming Loan underwriting standards." (MLPSA at 4, 11).

26. The MLPSA's Eligibility Criteria also states that each Mortgage Loan must satisfy myriad "Eligibility Representations" set forth in Section 3.2 therein. (MLPSA at 5). Those Eligibility Representations include, but are not limited to, the following: (i) each mortgage loan is an Eligible Loan; (ii) each mortgage is a valid first lien on the mortgage property, subject only to matters which residential mortgages are commonly subject to and which do not

materially interfere with the benefits of the security intended to be provided by the related mortgages; (iii) the Seller is the sole owner of record and holder of each Mortgage Loan sold by it to the Issuer; (iv) each Mortgage Loan is not and has not been secured by any collateral except the lien of the corresponding mortgage; (v) each Mortgage Loan was underwritten in material compliance with the applicable Guidelines or was at the time of origination a qualifying Non-Conforming Loan and underwritten in accordance with customary underwriting standards for Non-Conforming Loans sold to third-party investors; (vi) no Mortgage Loan has a payment thirty (30) days or more past its contractual due date; (vii) no existing defaults at the time of purchase; (viii) compliance with mortgage insurance requirements; (ix) compliance with government insurance requirements and certifications; (x) compliance with mortgage application requirements, and (xi) the deliverance of custodial documents.

27. In the Private Placement Memorandum dated May 22, 2007 ("PPM"), the MLPSAs are described consistently with the above, explaining that: "Pursuant to the Mortgage Loan Purchase Agreement, the Issuer will purchase from the Seller from time to time Mortgage Loans designated by the Seller **which comply with Eligibility Criteria** . . ." (PPM at 10) (emphasis added). See also, PPM at 12 ("In connection with the Issuer's purchase of Mortgage Loans on any day, the Mortgage Loans acquired on such day must satisfy the following eligibility criteria. . .").

28. The PPM also reflects the parties' understanding that BofA had no obligation at any time to ensure that the portfolio consisted exclusively of eligible loans; but, instead, that the risk associated with a residential mortgage loan not being an "Eligible Loan" is a risk of the Issuer (defined as Broadhollow and Melville) and not the Swap Counterparties: "The

ability of the Issuer to realize the value of its Mortgage Loans through sales and securitizations thereof is largely dependent upon the Mortgage Loans being Eligible Loans." (PPM at 13).

29. Further, in the event for any reason the purchaser purchases ineligible loans under the MLPSA, the MLPSA requires the American Home Parties to repurchase all of those ineligible loans from Broadhollow and Melville. (*See*, MLPSA Sec. 3.3). As articulated in the PPM:

> The Seller makes representations and warranties that each Mortgage Loan sold to the Issuer under the Mortgage Loan Purchase Agreement is an Eligible Loan. In the event any Mortgage Loan is determined to be an Ineligible Loan, the Seller is required to repurchase such Ineligible Loan from the Issuer. In the event the Seller fails for any reason to repurchase such Ineligible Loan from the Issuer, or fails to pay the Issuer the full Repurchase Price therefor, the Issuer may suffer delays in its ability to sell or securitize such Ineligible Loan or may suffer a decrease in the amount of proceeds received upon sales and securitizations thereof.

PPM at 13.

Termination Event, Subsequent Auction and Resulting Dispute

30. On August 6, 2007, the American Home Parties filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. A Termination Event occurred with respect to the MLPSAs prior to the bankruptcy filing. On August 22, 2007, the Bankruptcy Court approved auction procedures to be implemented by AHM Servicing on behalf of, and acting for, Broadhollow and Melville for the sale of the residential mortgage loans then owned by Broadhollow and Melville. Under Section 11.2 of the MLPSA, such a "Termination Event Auction" covers only "non-Delinquent Loans and non-Defaulted Loans" -- *i.e.* eligible loans.

31. The articulated purpose of this auction, as set forth in the Motion For Bankruptcy Court Approval, the Order Authorizing the Auction and Sale Procedures, and the Auction Procedures Agreement, was to seek "maximum value for the Assets."

32. Broadhollow and Melville had repeated discussions with the Swap Counterparties regarding the framework for the upcoming auction and sale, wherein Broadhollow and Melville advised the Swap Counterparties that there were very few, if any, ineligible loans in the portfolio, and that there was no need to segregate them out to prevent any artificial depression in the price achieved for the non-delinquent and non-defaulted loans or artificial depression in bidder turnout for the auction.

33. In the course of preparing for the upcoming auction and sale, BofA and the other Swap Counterparties received preliminary due diligence information from MDMC Mortgage Services, Inc., AHM Servicing and the Collateral Agent with respect to the residential mortgage loans. This information with respect to the residential mortgage loans owned by Broadhollow and Melville had never previously been made available to BofA or, upon information and belief, to any other Swap Counterparty.

34. Upon review of the due diligence, BofA discovered, despite Broadhollow's and Melville's repeated representations to the contrary, that a substantial portion of the mortgage loans in the portfolio scheduled to be sold at auction were in the portfolio improperly because they failed to meet the loan eligibility requirements set forth in the MLPSA, and therefore should not be auctioned off with the proper, eligible loans. BofA calculated that these ineligible loans amounted to at least $400 million out of approximately $1 billion in outstanding principal balance of the loans to be auctioned off.

35. These loans were ineligible for the portfolio based on their failure to meet clear, objective eligibility requirements in the MLPSA, including, but not limited to, with respect to lien position, existing defaults at the time of purchase, failure to comply with mortgage insurance requirements, failure to comply with government insurance requirements and certifications, failure to deliver custodial documents and failure to satisfy mortgage application requirements. Many of these mortgage loans failed to meet multiple eligibility requirements. As a result of their ineligibility, these loans were of poor quality that had substantially less value on the open market compared to the eligible loans. BofA also realized that the due diligence that was provided to it was woefully inadequate to assess the full extent of the ineligibility issues. These loans should have never been in the Program. Nor did Broadhollow and Melville sell them back to the American Home Parties as required by the MLPSAs.

36. On September 19, 2007, BofA contacted representatives of Broadhollow and Melville informing them of these facts and attaching a preliminary list of certain of the loans that BofA had obtained through the due diligence process which failed to meet the MLPSA's loan eligibility requirements. BofA also informed Broadhollow and Melville that BofA needed additional information to further assess the extent of this issue. BofA also informed Broadhollow and Melville that the substantial number of ineligible loans improperly in the portfolio should not be sold at auction along with the eligible loans for which the auction was intended. BofA informed Broadhollow and Melville that selling the ineligible and eligible loans together at auction would decrease the value of the eligible loans being sold and deter bidders at auction, and therefore Broadhollow and Melville needed to segregate out those ineligible loans for sale separately from those to be properly sold at auction in accordance with the Program Documents.

37. Indeed, upon information and belief, the American Home Parties, the managers of Broadhollow and Melville, have recognized over the course of liquidating other assets the devastating effect that inferior assets can have on the overall sale of a portfolio of assets, and in such instances have separated out those inferior assets to be sold separately so as to prevent such degradation in value of the remaining, stronger assets.

38. BofA followed up its correspondence with Broadhollow and Melville on September 24, 2007, two days before the auction for the Broadhollow and Melville assets, wherein BofA reiterated its concern over the more than $400 million outstanding in the portfolio's principal balance that comprised ineligible mortgage loans and BofA told Broadhollow and Melville that the auction required segregation of those loans to minimize the deleterious effect inclusion of ineligible loans would have on the sale of the proper, eligible assets in the portfolio.

39. Despite BofA's repeated urgings for Broadhollow and Melville to bucket separately the ineligible loans for auction so as not to depress artificially the purchase price to be received for the eligible loans to be sold, Broadhollow and Melville refused to do so. The auction took place on September 26, 2007, without such segregation, and as predicted, the auction resulted in artificially low prices for the eligible assets sold.

40. Because the mortgage loans were sold at less than par value, Broadhollow and Melville sent BofA two requests for Partial Termination Payments dated October 1, 2007 and two requests for Partial Termination Payments dated October 3, 2007. These requests demanded that BofA make payment (according to its proportionate share vis a vis the other Swap Counterparties) for the full amount of the shortfall in sale proceeds from the auction -- totaling $37.95 million. Broadhollow and Melville made this demand despite knowing that a substantial

portion of the loans sold did not meet eligibility requirements under the MLPSAs, and despite knowing that by selling these improper, ineligible loans at auction amidst the eligible loans properly on the block in accordance with the Program Documents, the total sale proceeds from the auction had been artificially depressed to a correspondingly significant degree, and thus the Partial Termination Payments that they were seeking from BofA were artificially high and beyond what the Program Documents required.

41. When only eligible loans are considered and the adverse impact of including ineligible loans in the auction is eliminated, the amount of Partial Termination Payments BofA was contractually obligated to make under the Swap Agreements was not the $37.95 million amount that Broadhollow and Melville had demanded, but $13,791,184.

42. On October 10, 2007, BofA made payment to Broadhollow and Melville of $13,791,184 in full satisfaction of its payment obligations under the Swap Agreements.

**COUNT I**
**(Breach of MLPSAs)**

43. BofA repeats and realleges each and every allegation set forth above as if fully set forth herein.

44. Broadhollow and Melville are parties to the MLPSAs.

45. BofA is a third-party beneficiary of the MLPSAs and is "entitled to the rights and benefits [thereunder] and may enforce the provisions [thereof] as if it were a party [thereto]." MLPSA Sec. 12.15.

46. Under the express, unambiguous terms of the MLPSAs, Broadhollow and Melville were required to purchase only Eligible Loans from the American Home Parties.

47. Broadhollow and Melville breached their contractual covenants, representations and obligations under the MLPSAs by purchasing loans from the American

Home Parties that failed to meet the objective eligibility requirements for the portfolio as set forth in the MLPSAs.

48. Under the express, unambiguous terms of the MLPSAs, Broadhollow and Melville were required to sell ineligible loans they had purchased back to the American Home Parties.

49. Broadhollow and Melville breached their contractual covenants, representations and obligations under the MLPSAs by failing to sell any ineligible loans back to the American Home Parties.

50. Broadhollow and Melville also breached their contractual covenants, representations and obligations under the MLPSAs by virtue of their failure to conduct a proper auction of the loan portfolio upon the Termination Event, in contravention of Section 11.2 of the MLPSAs. Section 11.2 authorized Broadhollow and Melville to sell only eligible loans at auction, which they breached through their refusal to separate out from the auction the ineligible loans improperly in the portfolio. Instead, the poor value of the ineligible loans sold at auction drove down the sales price that would have been realized had Broadhollow and Melville conducted a proper auction that sold off only eligible loans. BofA has been damaged by the amount that the proceeds from the auction as conducted were less than they would have been had Broadhollow and Melville conducted the auction properly.

51. The Swap Agreements do not require BofA to pay Partial Termination Payments to Broadhollow and Melville for any monetary loss resulting from the sale of mortgage loans that were ineligible for the portfolio. However, if the Court determines that BofA did obligate itself in the Swap Agreements to make such Payments, then BofA has been damaged by the exact amount of those Payments as a result of Broadhollow's and Melville's breaches of their

contractual obligations. But for those breaches, the loan portfolio would not have contained any ineligible loans at the time of the auction; accordingly, the auction of the portfolio would not have included ineligible loans. Therefore their sale for below par value would not have triggered the Partial Termination Payments that Broadhollow and Melville are suing for.

**COUNT II**
**(Breach of Implied Covenant of Good Faith and Fair Dealing)**

52. BofA repeats and realleges each and every allegation set forth above as if fully set forth herein.

53. New York law implies a covenant of good faith and fair dealing in all contracts. This covenant precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement. The duty is violated when one party acts to deprive the other of the right to receive the benefits under the agreement.

54. Broadhollow and Melville breached their obligations of good faith and fair dealing under the MLPSAs and the Swap Agreements by purchasing ineligible loans into the Program even though they were precluded from doing so under those agreements, even though they represented in those agreements that they would not do so, and even though they knew that such loans were worth less than eligible loans and presented a greater risk of causing loss to BofA under the swaps should it be determined that the swaps covered ineligible loans.

55. The Swap Agreements do not require BofA to pay Partial Termination Payments to Broadhollow and Melville for any monetary loss resulting from the sale of mortgage loans that were ineligible for the portfolio. However, if the Court determines that BofA did obligate itself in the Swap Agreements to make such Payments, then BofA has been damaged by the exact amount of those Payments as a result of Broadhollow's and Melville's breaches of their

implied covenants of good faith and fair dealing under the parties' MLPSAs and the Swap Agreements.

56. Further, Broadhollow and Melville knew that the loan portfolio it sold at auction pursuant to a Termination Event under the MLPSAs included a significant number of loans that were ineligible for the Program, and thus improperly up for auction under its guidelines. Despite this knowledge, Broadhollow and Melville purposefully grouped these ineligible loans for sale at auction with the eligible loans properly in the portfolio, knowing that the former's poor quality, marketability and re-sale value would significantly depress the cumulative proceeds that Broadhollow and Melville would recover at auction, thus allowing them to artificially increase the Partial Termination Payments they could assert were owed to them by BofA under the Swap Agreements. In doing so, Broadhollow and Melville acted to deprive BofA of its right to receive the benefit it secured as a third party beneficiary to the MLPSAs to obligate itself under the Program Documents exclusively to the sale (by auction or otherwise) of high quality eligible loans, thereby minimizing its potential liability for Partial Termination Payments under the Swap Agreements. By doing so, Broadhollow and Melville further breached their obligations of good faith and fair dealing.

57. But for those breaches, the auction would not have contained any ineligible loans, and the resulting proceeds from that auction for eligible loans would have been higher, thereby reducing the Partial Termination Payments that Broadhollow and Melville are suing for to the exact amount that BofA agreed to, and did, pay them.

**COUNT III**
**(Fraud and Fraudulent Inducement to Contract)**

58. BofA repeats and realleges each and every allegation set forth above as if fully set forth herein.

59. Broadhollow and Melville made material misstatements to BofA and/or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading.

60. Broadhollow and Melville represented to BofA in the Program Documents generally and in the MLPSAs specifically, that, among other things, they would only purchase eligible loans from the American Home Parties for inclusion in the portfolio; that these eligible loans would meet certain clear and objective mortgage requirements; and that if Broadhollow and/or Melville somehow did purchase loans for the Program that failed to meet the MLPSA's eligibility criteria, that they would sell those loans back to the American Home Parties.

61. Broadhollow and Melville knew, or should have known, that these statements and representations were not truthful or complete when made. Broadhollow and Melville entered into the MLPSAs with the intention to purchase ineligible loans, or with reckless disregard for whether or not the loans they would purchase from the American Home Parties were eligible under the agreements' criteria. Broadhollow and Melville further intended to keep ineligible loans in the portfolio and had no intention of selling any such loans back to the American Home Parties as required by the MLPSAs and as they had represented in the MLPSAs they would do.

62. Thereafter, Broadhollow and Melville proceeded to purchase into the loan portfolio ineligible loans that failed to meet the MLPSA's eligibility requirements by objective, verifiable standards, including, but not limited to, with respect to lien position, existing defaults at the time of purchase, failure to comply with mortgage insurance requirements, failure to comply with government insurance requirements and certifications, failure to deliver custodial documents and failure to satisfy mortgage application requirements. Further, Broadhollow and

Melville failed to sell those ineligible mortgages back to the American Home Parties so as to protect the integrity of the quality of the loan portfolio as contracted for and expected by the parties, including BofA.

63. BofA relied upon these material misstatements, misrepresentations, and omissions to its detriment. But for the material misrepresentations of Broadhollow and Melville, BofA would not have participated in the Program. Broadhollow and Melville made these material misstatements and misrepresentations to induce BofA to participate in the Program, and BofA relied on these material misstatements and representations when agreeing to participate.

64. If the Court determines that BofA obligated itself in the Swap Agreements to make Partial Termination Payments inclusive of the ineligible loans sold at auction, then BofA has been damaged by Broadhollow's and Melville's fraudulent conduct. BofA's damages equal the differential between the amount of the Partial Termination Payment that BofA would have owed to Broadhollow and Melville after the auctioning off of a portfolio of exclusively eligible loans, as they had fraudulently represented to BofA would be the case -- i.e. the Partial Termination Payment of $13,791,184 that BofA paid to Broadhollow and Melville -- and the Partial Termination Payment that Broadhollow and Melville actually demanded of it, the larger amount of which resulted solely from the fact that the portfolio of loans sold at action improperly included lower quality ineligible loans that lessened the value of the assets sold.

65. The conduct of Broadhollow and Melville was committed fraudulently and with malicious intent. Accordingly, BofA is entitled to an additional award of exemplary damages against Broadhollow and Melville in an amount to be determined by the Court.

**COUNT IV**
**(Negligent Misrepresentation)**

66. BofA repeats and realleges each and every allegation set forth above as if fully set forth herein.

67. Broadhollow and Melville, in the course of transactions in which they had pecuniary interests, supplied information and made representations to BofA regarding the eligibility of the loans that would be purchased and included, and that were purchased and included, in the portfolio, for BofA's benefit and guidance in entering into those transactions, which were material and false and, having a duty to disclose, failed to inform BofA of material facts relating to its transactions.

68. Broadhollow and Melville should have known, through the exercise of ordinary and reasonable care, that the information and representations provided to BofA regarding the eligibility of the loans that would be purchased and included, and that were purchased and included, in the portfolio were materially false, misleading or incomplete. Only Broadhollow and Melville (and the American Home Parties as their Managers) had access to, and knowledge of, the contents of each mortgage loan in the portfolio and accordingly whether or not each mortgage loan met the Program's eligibility requirements. As a result, Broadhollow and Melville had a special relationship of trust and/or confidence with BofA. Their representations and omissions regarding the eligibility of the loans in the portfolio were directly intended for BofA, and Broadhollow and Melville expected BofA to rely and act upon them in entering into the Program. Broadhollow and Melville had a duty to BofA to exercise reasonable and ordinary care in obtaining and communicating to BofA information concerning the extent to which any mortgage loans in the portfolio may not have met the Program's eligibility requirements. Broadhollow and Melville failed to exercise such reasonable care or competence.

69. BofA reasonably and justifiably relied to its detriment on the false information and representations of Broadhollow and Melville that the loan portfolio would contain and contained only loans that met the Program's eligibility criteria.

70. Broadhollow and Melville induced BofA to enter into the Program on the basis of the false information which Broadhollow and Melville negligently provided to BofA. If the Court determines that BofA obligated itself in the Swap Agreements to make Partial Termination Payments inclusive of the ineligible loans sold at auction, then BofA has been damaged by Broadhollow's and Melville's negligent misrepresentations. BofA's damages equal the differential between the amount of the Partial Termination Payment that BofA would have owed them after the auctioning off of a portfolio of exclusively eligible loans, as they had negligently misrepresented to BofA -- i.e. the Partial Termination Payment of $13,791,184 that BofA paid to Broadhollow and Melville -- and the Partial Termination Payment that Broadhollow and Melville actually demanded of it, the larger amount of which resulted solely from the fact that the portfolio of loans sold at action improperly included lower quality ineligible loans that lessened the value of the assets sold.

**PRAYER**

**WHEREFORE**, BofA requests the entry of an order in its favor granting:

a) judgment dismissing with prejudice and denying the relief sought with respect to all claims against BofA in the Amended Complaint;

b) alternatively, granting Counterclaimant damages on its claims at law;

c) awarding Counterclaimant its reasonable and necessary attorneys' fees and expenses, together with costs of court, and prejudgment and post-judgment interest at the maximum rate allowed by law;

d) on Count III of these Counterclaims, exemplary damages in an amount to be determined by the Court; and

e) such other and further relief as the Court may deem just and proper.

Dated: May 4, 2010
Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

By: [signature]
Laurie Selber Silverstein (DE Bar 2396)
R. Stephen McNeill (DE Bar 5210)
P. O. Box 951
1313 N. Market Street, 6th Floor
Wilmington, Delaware 19899
(302) 984-6000

- and -

KAYE SCHOLER LLP
Aaron Rubinstein
Margot B. Schonholtz
Kaye Scholer LLP
425 Park Avenue
New York, NY 10022

Counsel for Bank of America, N.A.

964879

**CERTIFICATE OF SERVICE**

I, Laurie Selber Silverstein, hereby certify that I am not less than 18 years of age and that on this 4th day of May, 2010, I caused a true and correct copy of the within **Answer and Counterclaims of Bank of America, N.A.** to be served on the following party in the manner indicated below:

**VIA HAND DELIVERY**
Norman M. Monhait, Esquire
Rosenthal, Monhait & Goddess, P.A.
919 Market Street, Suite 1401
Wilmington, DE 19801

**VIA REGULAR U.S. MAIL**
Christopher A. Provost, Esquire
Diamond McCarthy LLP
620 Eighth Avenue, 39th Floor
New York, NY 10018

**VIA REGULAR U.S. MAIL**
Allen B. Diamond, Esquire
Diamond McCarthy LLP
Two Houston Center
909 Fannin Street, 15th Floor
Houston, TX 77010

**VIA REGULAR U.S. MAIL**
J. Gregory Taylor, Esquire
Diamond McCarthy LLP
Renaissance Tower
1201 Elm Street, 34th Floor
Dallas, TX 75270

Under penalty of perjury, I declare that the forgoing is true and correct.

Laurie Selber Silverstein

Pac#964883