**IN THE UNITED STATES BANKRUPTCY COURT**
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------------ x
In re:                                                             :   Chapter 11
                                                                   :
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                             :   Case No. 07-11047 (CSS)
a Delaware corporation, et al., [1]                                :
                                                                   :   Jointly Administered
     Debtors.                                                      :
                                                                   :   Re:  Dkt. Nos. 8683, 8689, 8756, 8770 &
                                                                   :   8771
------------------------------------------------------------------ x

### REPLY OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO OBJECTIONS BY PAULA RUSH AND DAVID AND ELISABETH JACKSON TO CERTAIN SETTLEMENTS

The Official Committee of Unsecured Creditors (the "*Committee*,") of American Home Mortgage Holdings, Inc. ("*AHM Holdings*"), and certain of its direct and indirect affiliates and subsidiaries (collectively, "*AHM*" or the "*Debtors*"), hereby files this reply (the "*Reply*") in support of the Debtors' Motions Pursuant to Bankruptcy Rule 9019(a) for Orders Authorizing and Approving Stipulations with Deutsche Bank National Trust Company ("*DBNTC")*, Wells Fargo Bank, N.A. ("*Wells Fargo*"), and American Home Mortgage Servicing, Inc. f/k/a AH Mortgage Acquisition Co., Inc. ("*AHMSI*") [D.I. 8683, D.I. 8756 and D.I. 8689, respectively], and in opposition to the objections of (i) Paula Rush ("*Rush*"), as set forth in her *Adversary Proceeding for Equitable Subordination of Defendants Claim and Complaint for Declaratory Judgment and Other Relief* [D.I. 8771; Adv. Proc. No. 10-50917] (the "*Rush Complaint*") (ii) Dr.

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

David and Elisabeth Jackson (the "*Jacksons*"), as set forth in their *Adversary Proceeding To Subordinate Claims and for Declaratory Relief* [D.I. 8770; Adv. Proc. No. 10-50915] (the "*Jackson Complaint*" and together with the Rush Complaint, the "*Complaints*"). In support of the Reply, the Committee respectfully states as follows:

## PRELIMINARY STATEMENT

1. The settlement stipulations with DBNTC, Wells Fargo and AHMSI satisfy all of the requirements under Bankruptcy Rule 9019, and therefore should be approved.

2. Rather than setting forth a sufficient legal or factual argument to justify denying these settlements under Bankruptcy Rule 9019, the Complaints are unwarranted attacks on the Debtors, the Committee, and numerous other parties, and provide no grounds upon which the proposed settlements with DBNTC, Wells Fargo, and AHMSI should be denied.

## BACKGROUND FACTS

3. On August 6, 2007 (the "*Petition Date*"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. *The Amended Chapter 11 Plan Of Liquidation Of The Debtors* Dated As Of February 18, 2009 [Docket No. 7042] (the "*Plan*") was confirmed by the Confirmation Order. The Plan has not yet gone effective.

4. On August 6, 2007 (the "*Petition Date*") the Debtors filed an emergency motion [D.I. 11] (the "*Sale Motion*") to authorize the sale of the assets used in their mortgage loan servicing business (the "*Servicing Business*"), including the assumption and assignment of certain executory contracts.

5.  On October 30, 2007, the Court entered an order [D.I. 1711] (the "*Sale Order*") approving the Sale Motion and authorizing the sale of the Servicing Business and the assumption and assignment of certain executory contracts (the "*Assumed Contracts*") pursuant to a certain Asset Purchase Agreement by and among certain Debtors, as sellers, and AHMSI, as the purchaser.

6.  The Assumed Contracts included certain contracts (i) to which DBNTC, in its capacity as Trust Administrator and/or Indenture Trustee is a party or (ii) under which DBNTC is otherwise entitled to enforce the Debtors' obligations (the "*Assumed DBNTC Agreements*").

7.  The Assumed Contracts also included certain contracts (i) to which Wells Fargo, in its capacity as Master Servicer, Securities Administrator, and/or Indenture Trustee is a party or (ii) under which Wells Fargo is otherwise entitled to enforce the Debtors' obligations (the "*Assumed Wells Fargo Agreements*").

8.  Pursuant to the Sale Order, a reserve of $10 million (the "*Cure Escrow*") was established on or about November 16, 2007 (the "*Initial Closing Date*") for the payment of the certain cure amounts and certain related costs.

**Claims Asserted by Rush**

9.  On April 3, 2007, Rush filed a complaint (the "*Original Complaint*"), against certain Debtor entities in the United States District Court for the District of Maryland, Civil Action WMN-07-CV-0854 (the "*Original Case*"), alleging various claims relating to Rush's refinancing of her residential mortgage loan. The Original Complaint included allegations of violations of the Truth-in Lending Act ("*TILA*"), violations of certain disclosure requirements, fraud, and unjust enrichment. The Original Case was stayed on August 8, 2007 due to the Debtors' bankruptcy. Following the stay against the Debtors, the Original Case was dismissed without prejudice and administratively closed.

3

10. On June 11, 2008, Rush filed with this Court an E*mergency Motion for an Order of Relief from the Automatic Stay* (the "*Lift Stay Motion*")[D.I. 4637], requesting that the Court lift the automatic stay so as to allow Rush to continue to pursue her claims against the Debtors and other associated parties of interest, including equitable remedies, in the Maryland District Court. On July 17, 2008, this Court granted Rush relief from the automatic stay [D.I 5173] (the "*Lift Stay Order*") to permit her to continue seeking relief against the Debtor pending in the Maryland District Court.

11. Rush filed a proof of claim, listed on the claims register of the Debtor as Claim No. 8743, for her rescission claims in the amount of $1,790,000. Claim No. 8743 incorrectly asserts that Rush is partially secured by her own residence in the amount of $700,000. On March 9, 2009, Rush was granted leave by the Court to file additional claims against additional Debtor entities, subsequent to which Rush filed similar proofs of claim, listed on the claims register as Claim Nos. 10687,10688, and 10689.

12. On April 3, 2009, Rush moved before the Maryland District Court to reopen the Original Case and add new party defendants. On August 19, 2009, the Maryland District Court granted Rush's motion to reopen the administratively closed case against the Debtors, but denied her relief seeking to add new parties, which included DBNTC.[2]

13. On December 3, 2009, Judge William N. Nickerson, Senior United States District Judge for the Maryland District Court, issued a memorandum opinion (the "*December Opinion*") granting in part and denying in part the Debtors' motion to dismiss the Original Case. Judge

---

[2] In conjunction with his order granting the reopening of the Original Case, Judge Nickerson issued a memorandum opinion (the "*August Opinion*"). In the August Opinion, Judge Nickerson highlights Rush's failure to comply with the local rules, which prevents the Court from seriously analyzing the merits of her claims against the new defendants. Judge Nickerson then denied Rush's motion with respect to adding further allegations against other parties, including DBNTC, as such allegations stemmed from transactions or occurrences that took place before the filing of the Original Complaint, and were not permitted to be added by supplemental pleading.

Nickerson dismissed multiple counts alleged by Rush, including counts related to certain disclosures, certain TILA violations, RICO violations, negligence and breach of fiduciary duty, and breach of contract. Rush's claims for rescission and possibly intended Real Estate Settlement Procedures Act ("*RESPA*") claims were dismissed without prejudice. Rush was granted leave to amend those counts. The Maryland District Court specifically instructed Rush to properly plead certain claims under RESPA and certain other claims for rescission under TILA.

14. On January 5, 2010, Rush ignored Judge Nickerson's limited grant of leave to amend, and in addition to amending her RESPA and TILA rescission claims, moved before the Maryland District Court to add numerous new Defendants, including, among others, DBNTC, WL Ross and Co., LLC, Goldman Sachs, and Wells Fargo Bank (collectively, the "*Additional Defendants*"), and moved to seek additional injunctive relief.

15. On April 6, 2010, Judge Nickerson issued another memorandum Opinion (the "*April Opinion*"), granting in part and denying in part Rush's motion. In the April Opinion, after explaining that the majority of the proposed claims alleged by Rush focus on accusations that certain of the AHM defendants and the Additional Defendants hid the identity of the owner of Rush's mortgage note from her (*See* April Op. 3), Judge Nickerson denied her request to add the Additional Defendants because she failed to make clear how she has any actual claim against any of these proposed Additional Defendants.

**Claims Asserted by the Jacksons**

16. On January 23, 2009, the Jacksons filed Claim No. 10713, and subsequently on May 22, 2009, filed Claim Nos. 1714, 10715, 10716, and 10717.

17. The Jacksons were given leave by the Court solely to file a motion to seek equitable subordination of the DBNTC Claims (as defined below) to their claims. However, like

5

Rush, the Jacksons ignored the Court's instructions and order, and instead filed a complaint seeking not only equitable subordination of the DBNTC Claims (as defined below), but also equitable subordination against numerous third parties, and additional remedies that include, *inter alia,* declaratory relief, disgorgement of funds, and a $700,000 administrative priority claim.

**Settlement of Claims with DBNTC, Wells Fargo, and AHMSI**

18. In accordance with the Sale Order, DBNTC timely filed (i) the *Initial Omnibus Cure Claim of Deutsche Bank National Trust Co. as Trust Administrator and/or Indenture Trustee against Cure Escrow* [D.I. 2223] (as supplemented by D.I. 2225, the "*DBNTC Initial Cure Claim*") and (ii) the *Proof of Transfer Cost Claim of Deutsche Bank National Trust Co., in Various Capacities* [D.I. 3973] (the "*DBNTC Transfer Cost Claim*" and together with the DBNTC Initial Cure Claim, the "*DBNTC Cure Claim*," which asserted aggregate claims of $774,719 as the seller's cure amount.

19. DBNTC timely filed Claim No. 9189 against AHM Acceptance, which set forth DBNTC's claims in various capacities, against certain of the Debtors (the "*DBNTC Integrated Proof of Claim*" and together with the DBNTC Cure Claim, the "DBNTC Claims"), as well as additional claims against certain Debtors related to the transition of servicing.

20. On or about March 25, 2009, the Debtors filed an objection to the DBNTC Cure Claim and the Wells Fargo Cure Claim (as defined below). Subsequently, the parties engaged in negotiations to settle such matters.

21. On March 15, 2010, the Debtors entered into a stipulation with DBNTC (the "*DBNTC Settlement Stipulation*"), resolving certain cure claims asserted in connection with the assumption and assignment of certain loan servicing agreements to AHMSI. The DBNTC Settlement Stipulation allowed DBNTC, among other things, a cure claim in the amount of

6

$355,536, general unsecured claims in the amounts of $227,740 and $191,443 against certain Debtor entities arising out of the DBNTC Integrated Proof of Claim, as well as a broad release by DBNTC of other claims and causes of actions against the Debtors or the Cure Escrow.

22. Wells Fargo timely filed (i) the *Initial Omnibus Cure Claim of Wells Fargo Bank, NA., as Master Servicer, Securities Administrator, Trust Administrator and/or Indenture Trustee against Cure Escrow* [D.I. 2229] (the "*Wells Fargo Initial Cure Claim*") and (ii) the *Objection of Wells Fargo Bank, N.A. to the Notice of Interim Cure Period Schedule* [D.I. 2585], and (iii) the *Transfer Claim of Wells Fargo Bank, N.A. as Master Servicer, Securities Administrator, Trust Administrator and/or Indenture Trustee* [D.I. 3974] (the "*Wells Fargo Transfer Cost Claim*" and together with the Wells Fargo Initial Cure Claim, the "*Wells Fargo Cure Claim*"), which asserted aggregate claims of $774,719 as the seller's cure amount.

23. Wells Fargo, as Trustee, timely filed Claim Nos. 9233, 9234, 9235, and 9236 against certain of the Debtors (the "*Wells Fargo Proofs of Claim*"), for certain repurchase obligations and indemnification of certain legal fees and expenses.

24. On March 31, 2010, the Debtors entered into a stipulation with Wells Fargo (the "*Wells Fargo Settlement Stipulation*"), resolving certain cure claims asserted in connection with the assumption and assignment of certain loan servicing agreements to AHMSI. The Wells Fargo Settlement Stipulation allowed Wells Fargo, among other things, a cure claim in the amount of $298,145, general unsecured claims in the amounts of $162,602, $555,801, and $162,602 against certain Debtor entities, as well as a broad release by Wells Fargo of other claims and causes of actions against the Debtors or the Cure Escrow.

25. On May 23, 2008, AHMSI filed a motion for allowance of an administrative expense claim for alleged breaches of the Asset Purchase Agreement (the "*APA*") related to the

7

sale of the Servicing Business, alleging, *inter alia*, claims for reimbursement of amounts allegedly paid by sellers to remedy certain shortfalls in certain custodial accounts; claims for breach of the APA, and certain additional claims.

26. On or about March 16, 2010, the Debtors entered into a stipulation with AHMSI (the "*AHMSI Settlement Stipulation*" and together with the Wells Fargo Settlement Stipulation and the DBNTC Settlement Stipulation, the "*Settlement Stipulations*"), resolving the substantial majority of outstanding claims related to the sale of the Servicing Business. The AHMSI Settlement Stipulation allowed AHMSI, among other things, an administrative expense claim against the Debtors' estates in the amount of $6,000,000, payment of certain other claims from applicable custodial accounts, and a carve out for certain shortfall claims to be asserted against the Cure Escrow, as well as certain releases by AHMSI of other claims and causes of actions against the Debtors.

27. In March and April 2010, the Debtors filed Motions pursuant to section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 for orders authorizing and approving the Settlement Stipulations (the "*DBNTC Settlement Motion*" (D.I. 8683; March 15, 2010), the "*AHMSI Settlement Motion*" (D.I. 8689; March 16, 2010), and the "*Wells Fargo Settlement Motion*" (D.I. 8756; April 8, 2010), (collectively, the "*Settlement Motions*").

28. On April 1, 2010, Rush filed an objection to the DBNTC Settlement Motion [D.I. 8732], alleging, *inter alia,* that DBNTC, as indenture trustee, actively colluded with the Debtors and other parties to obfuscate the true owner of Rush's loan, and abused insider positions in this bankruptcy case to deny Rush the relief she sought against the Debtors and other parties in certain actions pending in Maryland (as described further herein). The Jacksons filed a similar objection on the same day [D.I. 8733].

29. On April 6, 2010, this Court held a hearing with respect to the Settlement Motion between the Debtors and DBNTC. During the hearing, this Court gave Rush and the Jacksons seven days to file a motion to equitably subordinate the claims of DBNTC.

30. On April 13, 2010, despite this Court's clear instructions, Rush and the Jacksons initiated adversary proceedings by filing the Complaints seeking equitable subordination not only as to DBNTC, but also as to include Goldman Sachs, GSR 2006-OA1 Trust, Wells Fargo, WLR Recovery Fund IIII, L.P., and Michael Strauss and also seeking additional remedies that include, *inter alia,* declaratory relief, disgorgement of funds, and granting of administrative priority claims.

31. On April 27, 2010, the Court held a status conference with respect to the Settlement Motions and the Complaints. At that conference, the Court held that it would consider the Complaints as objections to the Settlement Motions and all parties could file replies on or before April 30, 2010. That deadline was extended by agreement of the parties to May 6, 2010.

## ARGUMENT

### I. The Settlement Stipulations Should be Approved Pursuant to Bankruptcy Rule 9019

32. As the Debtors exercised sound business judgment in entering into the Settlement Stipulations, and such settlements are in the best interests of the creditors and the Debtors' estates, they should be approved.

#### A. Standard Under Bankruptcy Rule 9019

33. Section 105 of the Bankruptcy Code provides in pertinent part that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a). Bankruptcy Rule 9019 provides that

9

"[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

34. "[C]ompromises are favored in bankruptcy" in order to minimize litigation and expedite the administration of a bankruptcy estate. In re Martin, 91 F.3d 389, 393 (3d Cir. 1996); *see also* In re Coram Healthcare, Inc., 315 B.R. 321, 329 (Bankr. D. Del. 2004). The Supreme Court has recognized that "in administering a reorganization proceeding in an economical and practical manner, it will often be wise to arrange the settlement of claims in which there are substantial and reasonable doubts." In re Protective Comm. For Indep. Stockholders of TMT Ferry, Inc. v. Anderson, 390 U.S. 414 (1986).

35. Pursuant to Bankruptcy Rule 9019, "the authority to approve a compromise settlement is within the sound discretion of the bankruptcy court." In re Key3Media Group, Inc., 336 B.R. 87, 92 (Bankr. D. Del. 2005); *see also* In re Louise's, Inc., 211 B.R. 798, 801 (D. Del. 1997). When exercising such discretion, the bankruptcy court must determine whether the compromise is "fair, reasonable, and in the best interests [sic] of the estate." In re Key3Media Group, 336 B.R. at 92; see also In re RFE Industries, Inc., 283 F.3d 159, 165 (3d Cir. 2002); In re Louise's, Inc., 211 B.R. at 801. In making that determination, the bankruptcy court need not find that the proposed settlement is the best possible compromise. In re Key3Media Group, 336 B.R. at 93-94. Rather, the settlement should be approved as long as it "falls within the reasonable range of litigation possibilities." Coram, 315 B.R. at 330; see also Cosoff v. Rodman (In re W.T. Grant Co.), 699 F.2d 599, 608 (2d Cir.), *cert. denied*, 464 U.S. 822 (1983) (same). The bankruptcy court is also not required to consider the information necessary to resolve the factual dispute, nor is it necessary for the bankruptcy court to "conclusively determine claims subject to a compromise." In re Key3Media Group, 336 B.R. at 92.

10

36. Courts consider the following four factors to determine whether a settlement is in the best interests of the estate: (1) the probability of success in litigation; (2) the complexity of litigation involved, and the expense, inconvenience and delay necessarily attendant to litigation; (3) the difficulties, if any, to be encountered in the matter of collection; and (4) the paramount interest of the creditors and a proper deference to their reasonable opinions. See, e.g., TMT Trailer Ferry, 390 U.S. 414, 424 (1968); Myers v. Martin (In re Martin), 91 F.3d 389, 393 (3d Cir. 1996). Nothing asserted by Rush or the Jacksons alters the applicability of the Martin Factors, which weigh in favor of approving the Settlement Stipulations.

### B. The Parties Meet the Standard Under Rule 9019

37. The resolutions embodied in the Settlement Stipulations are reasonable and in the best interest of the Debtors, their estates, their creditors and other parties in interest. The Settlement Stipulations are the products of significant and lengthy discussions and negotiations between the Debtors and the respective parties, and settlement falls well with the range of reasonable litigation possibilities. The Committee was involved in their negotiations and believes they are beneficial to the Debtors' estates and their creditors.[3] The Settlement Stipulations provide fair and practical resolution of numerous disputed issues, including certain Cure Claims issues and other objections, and avoid the need to commence costly and time-consuming litigation to determine the validity of such claims and the extent of certain liabilities.

38. Applying the first Martin factor, absent the Settlement Stipulations, the disputes between the Debtors and the relevant parties would have to be litigated before the Court with no assurances of a favorable outcome for the Debtors' estates. The resolution of these disputes under the terms of the respective Settlement Stipulations are favorable outcomes because they

---

[3] During the course of the negotiations, DBNTC abstained from any Committee discussions involving the DBNTC Settlement Stipulation.

eliminate potentially protracted litigation over the validity and extent of DBNTC's, Wells Fargo's, and AHMSI's claims which would continue to drain valuable estate resources. Moreover, while the Debtors dispute the extent of liability to certain cure claims and other claims, the Committee agrees that the uncertainty and inherent risk in litigating these matters as well as the unavoidable distraction of the Debtors' management attendant thereto mitigate in favor of a prompt and consensual resolution of such outstanding matters.

39.     Applying the second Martin factor, the Settlement Stipulations satisfy the four-factor test largely for the reasons set forth above with respect to the probability of success in litigation. Litigation over the validity and amounts allowed with respect to DBNTC's, Wells Fargo's, and AHMSI's various claims, and resolving certain objections thereto, would involve complex legal and financial issues, and a potentially lengthy proceeding, which would be costly for the Debtors' estates and inconvenient to all parties involved. Additionally, such litigation could distract the Debtors and their professionals from other more important matters in the wind-down of the Debtors' estates.

40.     The Debtors assert, and the Committee agrees, that collection of any judgment is not an issue in these instances. Therefore, the third Martin factor is neutral.

41.     The fourth Martin factor also weighs in favor of approval of the Settlement Stipulations, as entry into the Settlement Stipulations serves the paramount interest of creditors. The Settlement Stipulations' resolution of claims represent a savings for the creditors by obviating litigation, thereby saving the expenses attendant to such litigation. In addition, the amounts to be received by DBNTC, Wells Fargo, and AHMSI under the terms of their respective Settlement Stipulations represent a mere fraction of the amounts that such parties claim that they

are owed by the Debtors. Therefore, the fourth factor of the <u>Martin</u> test is satisfied, and all factors weigh in favor of the Court granting the Settlement Motions.

**C. Rush and the Jacksons Assert no Reasons to Deny the Settlement Motions**

42. While Rush and the Jacksons make allegations that the Settlement Stipulations are inherently inequitable simply because the Debtors have chosen to avoid litigation and settle with DBNTC, Wells Fargo and AHMSI, while litigation continues against Rush and the Jacksons, nothing asserted by them give any reason why this Court should not approve the Settlement Stipulations based on their satisfaction of the <u>Martin</u> factors.

**II. Rush and the Jacksons Fail to Allege or Establish Any Justification for the Extraordinary Remedy of Equitable Subordination.**

**A. The Rush and Jackson Complaints' Requests for Equitable Subordination are Premature.**

43. Rush and the Jacksons' attempt to utilize the extraordinary remedy of equitable subordination as a basis to prevent approval of the Settlement Stipulations is flawed. Section 510(c) of the Bankruptcy Code only permits subordination of "all or part of an allowed claim to all or part of another *allowed* claim or all or part of another *allowed* interest." At this time, Rush and the Jacksons do not have allowed claims, and as such, utilizing equitable subordination to essentially object to a claim is premature. <u>Cf.</u> <u>In re Mid-American Waste Sys., Inc.</u>, 274 B.R. 111, 125-26 (Bankr. D.Del. 2001) (claim objection denied as premature where debtor was seeking to equitably subordinate a claim that was not yet allowed). In fact, to hold otherwise would essentially grant Rush and the Jacksons a preliminary injunction and/or attachment without alleging, let alone meeting, the requirements of Bankruptcy Rule 7065.

44. In the case at hand, the parties dispute the relevant and operating facts underlying the claims asserted by Rush and the Jacksons. As discussed *supra*, Rush's allegations of misconduct against numerous parties are being litigated in the Maryland District Court, and have

13

not been allowed or liquidated by this court or any other. Thus, since neither Rush nor the Jacksons possess allowed claims, and the relevant facts are disputed by the parties, their attempted use of equitable subordination is premature and should not be a basis to deny the Settlement Motions.

**B. The Assertions by Rush and the Jacksons do not meet the Required Criteria for Equitable Subordination**

45. The Court's power to equitably subordinate one's claim to that of another is an equitable doctrine, and must be applied in such a way that it is not punitive. See Matter of Missionary Baptist Foundation of America, 818 F.2d 1135, 1143 (5th Cir. 1987). As explained in Missionary Baptist, the general categories of conduct considered sufficient to warrant equitable subordination have been broadly recognized as (1) fraud, illegality, breach of fiduciary duty; (2) undercapitalization; and (3) claimant's use of the debtor as a mere instrumentality or alter ego. Id.

46. Most courts have required a showing that three elements must be satisfied before the exercise of the court's power of equitable subordination is appropriate: (i) the claimant must have engaged in some type of inequitable conduct; (ii) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (iii) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. Citicorp Venture Capital, Ltd. v. Comm. Of Creditors Holding Unsecured Claims, 160 F.3d 982 (3d. Cir. 1998) (citing U.S. v. Noland, 517 U.S. 535 (1996), which described existing case law as consistent with the three part test identified in In re Mobile Steel Co., 563 F.2d 692, 700 (5th Cir. 1977)).

47. In the case before this Court, Rush and the Jacksons make allegations that various entities partook in inequitable behavior and misconduct simply because they have not settled

14

with them, and did not give in to their demands. The accusations alone with no supporting factual basis do not meet the first requirement under the Mobile Steel standard of any inequitable conduct. Second, Rush's and the Jacksons' accusations do not provide any factual allegations or reasons as to why DBNTC's or any other defendant's conduct, simply by not giving into their demands, caused their injury or injury to any other creditors. Third, Rush and the Jacksons assert that equitable subordination is warranted based on their assertions that the Defendants are insiders subject to a higher level of scrutiny, yet make no showing how DBNTC or the additional parties (with the exception of Strauss) are insiders.

48. In examining grounds for equitable subordination, a claim arising from the dealings between a debtor and an insider are to be rigorously scrutinized by the courts. See Shubert v. Lucent Techs. Inc. (In re Winstar), 554 F.3d 382, 412 (3d. Cir. 2009). On the other hand, if the claimant is not an insider, then evidence of more egregious conduct such as fraud, spoliation or overreaching is necessary. Id. (citing In re Fabricators, Inc., 926 F.2d. 1458 (5th. Cir. 1991)).

49. Rush and the Jacksons' arguments that DBNTC and other defendants[4] are insiders is unfounded. In the case before this Court, Rush and the Jacksons provide no factual basis to assert that, with the exception of Strauss, any of the additional parties are insiders or have any manner of control over the Debtors, nor do any of the additional parties meet the definition of an "insider" under 11 U.S.C. 101(31). As such, any of the claims that Rush or the Jacksons seek to equitably subordinate need not be subject to rigorous scrutiny by this Court.

50. Moreover, none of the allegations asserted in the Rush and Jackson Complaints, even if assumed to be true for arguments sake, rise to the level of egregious conduct such that

---

[4] With the exception of Michael Strauss, a former officer of the Debtors, none of the other additional parties named by Rush meet the definition of an insider under 11. U.S.C. 101(31).

would be required to equitably subordinate the claims of a non-insider. In <u>Winstar</u>, the Court found material evidence of unfair conduct, which included evidence that Lucent, which had several outstanding credit agreements, had used threats of non-payment under certain contracts to force the debtor to purchase unneeded equipment and caused substantial harm to the debtor and its creditors. 554 F.3d at 412-13. In the case at hand, none of Rush's or the Jacksons' accusations arise to the level of egregious conduct that would similarly warrant equitable subordination.

51. As such, Rush and the Jacksons fail to allege, let alone prove, any grounds for equitable subordination. In the matter before the Court, Rush and the Jacksons' accusations are an unveiled attempt to punish DBNTC and the additional parties for what they perceive as inequitable conduct against them. Rush and the Jacksons do not provide any factual basis for actual fraud, illegality or the existence, let alone breach, of fiduciary duties. Other than allegations unsupported by any facts, Rush and the Jacksons do not prove that any of the parties' conduct fell into any categories of conduct considered sufficient to warrant equitable subordination. <u>Missionary Baptist</u>, 818 F.2d at 1143.

### III. Rush's Claims Should be Rejected as they Have Already Been Rejected By the Court in her Chosen Forum.

52. At Rush's request, this Court granted relief in the form of the Lift Stay Order to allow her to continue her lawsuit against the Debtors before the Maryland District Court rather than partake in the claims process before this Court. The Lift Stay Order served to provide for efficient administration of the Debtors' cases by allowing Rush to continue to seek relief in her preferred forum in Maryland. Rush now appears to seek to reverse course and litigate her claims before this Court solely because she is unsatisfied with Judge Nickerson's decisions in Maryland.

16

128189.01600/40188152v.1

53. In granting relief from the automatic stay, courts often determine that the non-bankruptcy forum is the more appropriate forum in which parties may litigate their issues. In <u>Baldino v. Wilson (In re Wilson)</u>, 116 F.3d 87 (3d. Cir. 1997), the Court reversed and remanded a decision of the District Court affirming the Bankruptcy Court's denial of relief from the automatic stay to a *pro se* party, explaining "[i]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere." <u>In re Wilson</u>, 116 F.3d at 91 (quoting S. Rep. No. 95-989, 95th Cong.2d Sess. 50 (1978)). Similarly, where proceedings have been pending in a non-bankruptcy forum for a substantial period and there are multiple parties involved, judicial economy may support lifting the automatic stay to permit litigation in the non-bankruptcy forum to continue. See <u>In re Chan</u>, 355 B.R. 494, 500 (Bankr. E.D.Pa. 2006).

54. In the Lift Stay Motion, Rush expressed her desire and sought such relief to proceed in the non-bankruptcy forum. Rush argued that cause existed under Bankruptcy Code section 362(d)(1) to grant relief from the stay, and "request[ed] that the court lift the automatic stay in order for Movant to pursue claims that sound in fraud against American Home Mortgage and associated parties of interest." (Lift Stay Mot. ¶ 3). Moreover, Rush referred to the potential additional of other parties, and specifically stated that "the finger pointing will be for Judge Nickerson to decide who in fact is responsible for all the conducts alleged in Movants action." (Lift Stay Mot. ¶ 33).

55. Based on that request, the Court entered the Lift Stay Order and Rush pursued her claims accordingly. However, in the April Opinion, Judge Nickerson held that Rush failed to state any actual claims against the Additional Defendants. Specifically, Judge Nickerson stated

that Rush does not allege why DBNTC or any of the other Additional Defendants should have responded to her requests, and fails to make clear how she has any actual claim against any of these proposed Additional Defendants, and subsequently denied her relief against such Additional Defendants.  (*See* April Op. 8.)

56.     By repeating allegations already heard and rejected by the Maryland District Court, Rush violates the terms and the purpose of the Lift Stay Order.  Rush chose her forum and should not be permitted to retrade solely because the case is not going her way in her chosen forum.  See GNK Enter. v. ConAgra (In re GNK Enter.), 197 B.R. 444, 450 (Bankr. S.D.N.Y. 1996).  In GNK, the debtor filed an adversary complaint alleging fraud and breach of contract and sought to expunge or equitably subordinate a creditor's proof of claim, despite the fact that such issues were previously asserted in two separate actions in the United States District Court for the Southern District of New York by predecessors in interest to the debtor.  Id. at 446.  The GNK Court then held that the operative facts on which the debtor based its claims for subordination or expungement were already determined against the debtor by other courts.  Id. at 450.  The GNK Court further held that the debtor failed to overcome certain deficiencies exposed by the Judge in one of the previous matters, and that the rules are no less appropriate before the current Court then as they were before the previous Judge.  Id.  The GNK Court ultimately held the debtor could not relitigate such claims in the form of a claim for affirmative relief or as an objection to a proof of claim, and denied the counts for expungement and equitable subordination.  Id.

57.     By filing the Rush Complaint, Rush is seeking to relitigate the same issues that were already ruled upon by Judge Nickerson.  As in GNK, the operative facts of Rush's claims were already determined against her by Judge Nickerson.  Moreover, Rush fails to overcome the

18

128189.01600/40188152v.1

deficiencies of her allegations exposed by Judge Nickerson in the April Opinion. <u>Id.</u>  By seeking equitable subordination, and similarly attempting to sneak additional claims and parties into her complaint, Rush is misusing this Court's resources and abusing the Lift Stay Order by improperly seeking to relitigate her claims, which are just as deficient before this Court as they were before Judge Nickerson.[5]

## **<u>RESERVATION OF RIGHTS</u>**

58.    The Committee reserves the right to amend, modify, or supplement this Reply, to file a reply to any further amendments or responses thereto, and to file additional objections to the relief sought in the Complaints based upon subsequent developments in this dispute.  The Committee further reserves its rights to assert against Rush and the Jacksons any and all claims for legal or equitable relief (including, without limitation, claims for money damages [or claims under Bankruptcy Rule 9011]) arising from or in any way connected with the Complaints.

## **<u>CONCLUSION</u>**

WHEREFORE, the Official Committee of Unsecured Creditors respectfully requests that the Court enter an Order approving the Settlement Stipulations and overruling the objections by Rush and the Jacksons.

*[Signature Page to Follow]*

---

[5]    Similar to her previously denied attempts to attain additional relief before Judge Nickerson in Maryland, Rush ignores the specific and limiting instructions of the Court.  Not only does Rush contravene the Court's directive by filing a Complaint, Rush names additional parties and seeks remedies in addition to equitable subordination.

Dated: Wilmington, Delaware  
May 6, 2010

BLANK ROME LLP

*/s/ Victoria Guilfoyle*  
Bonnie Glantz Fatell (No. 3809)  
David W. Carickhoff (No. 3715)  
Victoria A. Guilfoyle (No. 5183)  
1201 Market Street, Suite 800  
Wilmington, DE 19801  
Telephone: (302) 425-6400  
Facsimile: (302) 425-6464

-and-

HAHN & HESSEN LLP  
Mark S. Indelicato, Esq.  
Edward L. Schnitzer, Esq.  
Zahir A. Virani, Esq.  
488 Madison Avenue  
New York, NY 10022  
Telephone: (212) 478-7200  
Facsimile: (212) 478-7400

Co-Counsel for the Official Committee of Unsecured Creditors