## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------- x

In re:

AMERICAN HOME MORTGAGE HOLDINGS, INC.,
a Delaware corporation, <u>et al.</u>,[1]

           Debtors.

---------------------------------------------------------------- x

Chapter 11

Case No. 07-11047 (CSS)

Jointly Administered

Ref. Docket Nos. 8683, 8689, 8732, 8733, 8756

## DEBTORS' REPLY TO BORROWER-CLAIMANTS' OBJECTIONS TO SETTLEMENTS WITH (I) AMERICAN HOME MORTGAGE SERVICING, INC. (F/K/A AH MORTGAGE ACQUISITION CO., INC.); (II) DEUTSCHE BANK NATIONAL TRUST COMPANY; AND (III) WELLS FARGO BANK, N.A.

AHM Holdings, a Delaware corporation, and certain of its affiliates, debtors and

debtors in possession in the above-captioned cases (collectively, "<u>AHM</u>" or the "<u>Debtors</u>"),

hereby reply (the "<u>Reply</u>") to the objections of Paula Rush and Dr. David and Elisabeth Jackson

(collectively, the "<u>Borrower Objections</u>") to the Debtors' motions (collectively, the "<u>Settlement</u>

<u>Motions</u>") to approve settlements with:

    (i)    American Home Mortgage Servicing, Inc. (f/k/a AH Mortgage Acquisition Co., Inc.) ("<u>AHMSI</u>" or the "<u>Purchaser</u>") [D.I. 8689] (the "<u>AHMSI Motion</u>" and "<u>AHMSI Settlement</u>," as the context requires);

    (ii)    Deutsche Bank National Trust Company ("<u>DBNTC</u>") [D.I. 8683] (the "<u>DBNTC Motion</u>" and "<u>DBNTC Settlement</u>," as the context requires); and/or

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("<u>AHM Investment</u>"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("<u>AHM Acceptance</u>"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("<u>AHM SV</u>"), a Maryland corporation (7267); American Home Mortgage Corp. ("<u>AHM Corp.</u>"), a New York corporation (1558); American Home Mortgage Ventures LLC ("<u>AHM Ventures</u>"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("<u>Homegate</u>"), a New York corporation (7491); and Great Oak Abstract Corp. ("<u>Great Oak</u>"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

(iii)    Wells Fargo Bank, N.A. ("Wells Fargo") [D.I. 8756] (the "Wells Fargo Motion" and "Wells Fargo Settlement," as the context requires).[2]

## PRELIMINARY STATEMENT[3]

Before the Court is a timely motion, which is ripe for adjudication, to settle a disputed $17 million administrative claim asserted by AHMSI, the purchaser of the Debtors' mortgage loan servicing business, following the final closing of the sale in April 2008.  Also before the Court are timely motions, which are also ripe for adjudication, to settle disputes with DBNTC and Wells Fargo, counterparties to contracts assumed and assigned to AHMSI, over the cure amounts properly payable from a $10 million Cure Escrow in which the Debtors' estates have no residual economic interest (the escrow being subject to unassailable, first-priority liens of the Administrative Agent, which is significantly undersecured).  The AHMSI Settlement is a watershed moment in these chapter 11 cases, as it caps off more than two years of costly litigation and laborious negotiations between the parties, and facilitates the effectiveness of the Debtors' chapter 11 plan by obviating a dispute reserve of $17 million (or more) on account of this clam.  The AHMSI Settlement also reconciles a number of mutual claims between AHMSI and the Debtors in excess of $10 million, resulting in a return of over $8 million to the Debtors' estates.  The DBNTC and Wells Fargo settlements are likewise important, not only because administration of these entities' demands against the Cure Escrow is affirmatively mandated by

---

[2] Ms. Rush's and the Jacksons' objections to the DBNTC Motion are docketed in the main bankruptcy case at items 8732 and 8733, respectively.  Thereafter, Ms. Rush commenced an adversary proceeding (No. 10-50917 (CSS)) against, among others, DBNTC, "Wells Fargo," and "WLR Recovery Fund IIII, L.P."  The Jacksons commenced an adversary proceeding (No. 10-50915 (CSS)) against, among others, DBNTC, Wells Fargo, Wilbur Ross, "WLR Recovery Fund IIII, L.P.," "AH Mortgage Acquisitions," and "AHMSI".  The Debtors do not believe the adversary complaints constitute procedurally valid objections to the Settlement Motions.  In particular, with respect to the AHMSI Motion, the complaints are untimely and should not be considered without a showing by Ms. Rush and/or the Jacksons that their failure to file a timely objection was the result of excusable neglect.  See Fed. R. Bankr. P. 9006(b)(1).  Nevertheless, for purposes of this Reply, the term "Borrower Objections" encompasses the complaints insofar as they constitute objections to the Settlement Motions.

[3] Capitalized terms in this Preliminary Statement have the meanings ascribed to them elsewhere in this Reply.

the Sale Approval Order and the global settlement between the Debtors, the Creditors' Committee, and the Administrative Agent [D.I. 5308], but also because these settlements eliminate any potential administrative liability to DBNTC and Wells Fargo arising prior to the execution of the settlements.

Not presently before the Court are two adversary complaints commenced by Paula Rush and her clients Dr. David and Elisabeth Jackson,[4] against various non-debtor parties Ms. Rush previously attempted – and was twice denied – to bring into her individual litigation in the Maryland District Court. The complaints seek equitable subordination of these non-debtors' claims on the basis of an alleged conspiracy to hide the true identity of the holder of Ms. Rush's and the Jacksons' mortgage notes, though when one sifts through the conclusory allegations to the scant concrete allegations it appears the conspiracy is to be implied from the various parties' alleged failure (i) to respond to inquiries to which it is not clear they were under any legal obligation to respond, and (ii) to engage Ms. Rush and the Jacksons in discussions to rework their loans, which it is not clear they were required to do.

Though it is not at all clear from their pleadings, Ms. Rush and the Jacksons appear to be requesting that the Court deny the Settlement Motions because, if in the future Ms. Rush and the Jacksons end up having allowed claims against the Debtors and if they then prevail in their adversary proceedings in establishing fraud or egregious conduct on the part of the non-debtor defendants that would justify equitable subordination of their claims, then there may be some right or remedy that would possibly be affected by approval of the Settlement Motions today. Simply put, there are too many "ifs" in that sentence. There is simply no reason to hold

---

[4] The Jacksons, like other borrower-litigants in these chapter 11 cases, have paid Ms. Rush thousands of dollars in consulting fees relating to their alleged claims against the Debtors, and it is apparent (to the Debtors) from the material similarities between Ms. Rush's and the Jacksons' pleadings that they derive, at least in part, from common authorship.

up the Settlement Motions, the approval of which would benefit all creditors by advancing these chapter 11 cases toward having an effective plan, based on the speculative remedies of individual creditors. The Debtors will meet their burden at the hearing of establishing the Settlement Motions should be approved, and nothing in the Subordination Complaints changes that. Accordingly, the Borrower Objections should be overruled.

**PROCEDURAL HISTORY REGARDING MS. RUSH**

*The AHM Loan and Related Prepetition Litigation*

In or about April 2006, Ms. Rush refinanced her existing home mortgage through AHM Corp. d/b/a American Brokers Conduit. Ms. Rush's loan was a "pay option ARM," a type of adjustable-rate mortgage which generally permits the borrower to choose between fully-amortizing or interest-only monthly payments (including payments of only partial interest, resulting in negative amortization), subject to an overall cap on negative amortization after which point the loan "recasts" into fully-amortizing payments. The loan is secured by a deed of trust on Ms. Rush's home in Churchville, Maryland, and is presently owned by a non-debtor, third-party securitization trust. Prior to the sale of the Debtors' servicing business, Ms. Rush's loan was serviced by AHM SV.

On information and belief, in December 2006, foreclosure proceedings with respect to Ms. Rush's mortgage were commenced in Maryland state court by Mortgage Electronic Registration Systems, Inc. ("MERS"), as nominee for AHM Corp. and its successors and assigns. On January 9, 2007, Ms. Rush, *pro se*, filed a petition for relief under chapter 13 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Maryland. On her Schedules of Assets & Liabilities, Ms. Rush listed a claim of $596,426 secured by a lien in her home; the claim was not identified as unliquidated, contingent or disputed. Ms. Rush also

acknowledged approximately $13,000 in prepetition arrearages on the mortgage. Ms. Rush filed

a chapter 13 plan which proposed payments over three years to general unsecured creditors and

the cure of prepetition mortgage arrearages over five years. AHM SV objected to this plan

because it failed to acknowledge AHM SV as the holder of a secured claim. The chapter 13

trustee objected to the plan on feasibility grounds because Ms. Rush had testified at the meeting

of creditors that she had no regular income. On March 13, 2007, the Maryland Bankruptcy

Court denied confirmation of Ms. Rush's chapter 13 plan but granted her leave to amend.

On April 3, 2007, Ms. Rush, again *pro se*, filed a lengthy complaint against

AHM[5] in the United States District Court for the District of Maryland, asserting twelve counts

for relief relating to her mortgage with AHM and seeking rescission of the loan and monetary

damages. Thereafter, Ms. Rush filed an amended plan in her chapter 13 case, which proposed

payments to general unsecured creditors over two years but did not propose to cure prepetition

arrearages, providing instead that the mortgage would be treated in accordance with the lawsuit.

On April 13, 2007, MERS filed a motion for relief from the automatic stay in Ms.

Rush's chapter 13 case to permit continuation of the foreclosure proceedings upon the mortgage.

Also that day, Ms. Rush, through counsel, filed a motion to dismiss her chapter 13 case "without

prejudice." On April 19, 2007, the Maryland Bankruptcy Court entered an order dismissing the

chapter 13 case with prejudice in accordance with section 109(g)(2) of the Bankruptcy Code,

which prohibited Ms. Rush from filing another bankruptcy petition within 180 days.[6]

---

[5] Specifically, Ms. Rush named American Home Mortgage, Inc., American Home Mortgage Servicing, Inc. (now known as AHM SV), and American Brokers Conduit ("ABC") as defendants. ABC and American Home Mortgage, Inc. were D/B/A of AHM Corp. Accordingly, AHM has treated the action as against AHM Corp. and AHM SV.

[6] Section 109(g) is one of the provisions added by the 2005 amendments to the Bankruptcy Code to address the problem of serial bankruptcy filings. It provides, in pertinent part, that no individual may be a "debtor" under the Bankruptcy Code if he or she has been a debtor "at any time in the preceding 180 days if . . . the debtor requested and obtained the voluntary dismissal of the case following the filing of a request for relief from the automatic stay". 11 U.S.C. § 109(g)(2).

On July 31, 2007, AHM moved to dismiss Ms. Rush's complaint for failure to state a claim upon which relief could be granted.  AHM filed for chapter 11 protection on August 6, 2007 (the "Petition Date"), resulting in a stay of the litigation.  On October 25, 2007, the Maryland District Court dismissed Ms. Rush's action as to the non-AHM defendants for want of subject-matter jurisdiction, and administratively closed the case because there were no remaining defendants against which the litigation could proceed.

### *Chapter 11 Litigation*

#### The Servicing Sale and 2004 Motion

On the Petition Date, the Debtors filed an emergency motion [D.I. 11] (the "Sale Motion") to authorize the sale of the assets used in their mortgage loan servicing business (the "Servicing Business"), including the Debtors' mortgage loan servicing rights under contracts with DBNTC and/or Wells Fargo, among others.  On September 25, 2007, the Debtors filed an executed Asset Purchase Agreement [D.I. 931] (as subsequently amended, the "APA") by and among certain of the Debtors and AH Mortgage Acquisition Co., Inc., as Purchaser.

On or about October 4, 2007, Ms. Rush, *pro se*, filed a 42-page motion [D.I. 1656] (the "Omnibus Motion") seeking (i) the examination of, and production of documents by, the Debtors pursuant to Bankruptcy Rule 2004 (the "Rule 2004 Request"); (ii) the appointment of a trustee or examiner pursuant to section 1104 of the Bankruptcy Code; (iii) the appointment of a consumer privacy ombudsman pursuant to section 363 of the Bankruptcy Code; and (iv) certain injunctive relief relating to the proposed sale of the Servicing Business.

The Court held a five-day evidentiary hearing (the "Sale Hearing") on October 15-19, 2007, to consider approval of the Sale Motion and the APA.  Although Ms. Rush did not file an objection to the Sale Motion, strictly speaking, she appeared at the Sale Hearing (i) "*pro*

*se* on behalf of borrowers"[7] to question one of the Debtors' witnesses about loan modifications and the procedure for responding to "Qualified Written Requests" pursuant to the Real Estate Settlement Procedures Act ("RESPA") (see generally 10/16/07 Hr'g Tr. at 213:25-227:16); and (ii) during oral argument, to express her concern that the transition of servicing would make it harder for borrowers to "break through to the owners of the[ir] note[s]." (See generally 10/19/07 Hr'g Tr. at 158:4-160:12.)  On October 23, 2007, the Court issued a bench ruling approving the Sale Motion and overruling all objections thereto.  Thereafter, on October 30, 2007, the Court entered an order [D.I. 1711] (the "Sale Approval Order") granting the Sale Motion and approving the APA.

The Court held an evidentiary hearing on Ms. Rush's Omnibus Motion on October 31, 2007.  Prior to this hearing, the Debtors provided Ms. Rush with AHM's origination and servicing files for her loan, as the same were maintained in the ordinary course of AHM's business.  Following evidence and argument at this hearing, the Court noted that Ms. Rush "ha[d] been given a great deal of information that she may not otherwise have been entitled to if the [D]ebtors had simply refused to cooperate in connection with the [Rule] 2004 [Request]." (10/31/07 Hr'g Tr. at 56:24-57:2.)  To the extent Ms. Rush's Rule 2004 Request sought "additional information such as . . . who the master servicer [of her loan] is or . . . what the policies of third parties are, who the actual owner of the loan is," the Court found the Rule 2004 Request was moot, stating:

> I'm *not at all convinced* that she's entitled to that.  Her issues are with the servicer.  The servicer is the debtor.  Lawyers have certified to the Court that the loan is no longer owned by a debtor entity.  I think that's sufficient under Rule 2004 and ends the inquiry.

---

[7] Ms. Rush stated she represented other AHM borrowers in addition to herself, but acknowledged she was not an attorney.  Accordingly, the Court did not permit Ms. Rush to represent anyone other than herself.  (10/16/07 Hr'g Tr. at 214:15-25.)

(10/31/07 Hr'g Tr. at 57:12-19 (emphasis added).)[8]

The Court similarly denied the remainder of the relief requested in the Omnibus

Motion, noting with respect to Ms. Rush's request for appointment of a chapter 11 trustee that

> a lot of the policy arguments I'm hearing in connection with Ms. Rush's motion, frankly, I don't find to either be accurate or if they are accurate, they're incomplete, and even if they're accurate and somewhat incomplete, I'm not sure they're analogous or applicable to the situation we have here.

(Id. at 67:2-7.)  While the Court took very seriously Ms. Rush's allegations that the Debtors had

violated the law, including TILA and RESPA, the Court stated:

> I haven't heard enough testimony or even representations that those issues are broad enough or pervasive enough to rise to a level that at this point would require[] the appointment of a trustee, and I draw a distinction between how they originated loans and serviced loans and what . . . effect that may have on the consumers and what duties they have as debtor in possession in managing their business on behalf of all their creditors, which the consumers who may have claims against the [D]ebtors are only one piece of that puzzle.

(Id. at 68:18-69:1.)  Similarly, with respect to the request for appointment of an examiner, the

Court stated it "didn't see any real factual allegations contained in the [Omnibus M]otion when it

came to these issues" and "felt that the movants basically parroted the language of the statute and

sort of said, Because I just said what the statute says, a trustee or an examiner should be

appointed, and obviously, you need to do more than that."  (Id. at 75:3-8.)  Finally, with respect

to Ms. Rush's request for injunctive relief, the Court instructed: "You can't get an injunction by

filing a motion. . . .  You have to file an adversary proceeding under Rule 7001, and you need to

---

[8]  The Court reiterated this point in response to argument by Laura Beall, another AHM borrower, who had requested the Court require the Debtors to affirm to her in writing that Wells Fargo, as master servicer, had the power to agree to any loan modifications: "I'm not going to require the [D]ebtors to make a statement to that effect. . . .  [T]here's only so much that you're entitled to in a . . . residential real estate transaction.  You're a party to a contract.  It is heavily regulated.  You're entitled to what you're entitled to.  I'm not going to expand those rights, and I think it would be harmful to the thousands if not tens of thousands of creditors . . . to continue to distract this debtor by requiring it to do anything other than it's required to do under the law.  I'm not going to expand under the Bankruptcy Code their responsibilities to provide you with additional information.  I think it would be harmful to the greater good of the bankruptcy case."  (10/31/07 Hr'g Tr. at 59:23-60:10.)

meet the criteria to get an injunction and you have to support it by evidence, and without that, I'll deny that." (Id. 78:10-14.)

### The Non-Performing Loan Sale

On December 22, 2007, the Debtors filed a motion [D.I. 2490] seeking approval of the sale of certain non-performing loans and bidding procedures relating thereto. Ms. Rush, *pro se*, filed a 24-page objection [D.I. 2816] to this motion on or about January 30, 2008, in which she renewed her "demand to know the true owner or master servicer of her loan" and her "assertion of non-compliance" with respect to the same. (D.I. 2816 at 1.) In her objection, Ms. Rush expressed concern that loans containing "underwriting or compliance issues" would be sold "to a former financing partner to avoid liabilities on such loans". (Id.) She went on to accuse the Debtors' witnesses and professionals of making false and misleading statements, acting in bad faith, committing fraud, and engaging in insider trading, among other things. She also reiterated legal positions previously asserted, and rejected by the Court, in the Omnibus Motion.

At the February 1, 2008, hearing to consider approval of the bid procedures for the non-performing loan sale, the Debtors' witness testified that Ms. Rush's loan was not included in the proposed sale. (2/1/08 Hr'g Tr. at 24:23-24.) The Debtors had advised Ms. Rush the same prior to the hearing, and indicated their belief that her objection was moot. Nevertheless, Ms. Rush pressed her objection (id. at 46:6-49:17), which was overruled by the Court (id. at 56:9-20).

### The Proof of Claim

On January 11, 2008, Ms. Rush filed a proof of claim against AHM Corp. asserting an unsecured, non-priority claim in the amount of $1,090,000 and a secured claim in the amount of $700,000 on account of her prepetition litigation.

**The Stay Relief Motion**

Following dismissal of the Maryland District Court action as to non-AHM

defendant ServiceLink, on or about November 27, 2007, Ms. Rush, *pro se*, filed a new complaint

against ServiceLink in the Circuit Court for Hartford County, Maryland which included federal

causes of action.  ServiceLink filed a Notice of Removal to the United States District Court for

the District of Maryland, Case No. 08-604 (WMN), followed by a motion to dismiss the federal

causes of action for failure to state a claim on which relief could be granted.  On March 31, 2008,

Ms. Rush filed a motion to consolidate the Maryland District Court actions against AHM and

ServiceLink.  ServiceLink objected to the proposed consolidation because, among other reasons,

the administrative closure of the case against AHM, and the automatic stay in AHM's

bankruptcy case, would only delay the litigation further.

On June 11, 2008, Ms. Rush filed a 38-page, "emergency" motion (with more

than 150 pages of exhibits) to lift the automatic stay [D.I. 4637] with respect to the Maryland

action so as to facilitate consolidation of the AHM and ServiceLink actions.  In her motion, Ms.

Rush accused the Debtors of, *inter alia*, (i) abusing the bankruptcy process "to create an unfair

disadvantage to borrowers," (ii) protecting the identity of the third-party purchaser of her loan,

(iii) fraud, and (iv) unspecified criminal activity.  Ms. Rush acknowledged in her motion that she

had discovered the identity of the owner of her mortgage loan, the Goldman Sachs Trust GSR

2006 OA-1, of which DBNTC was trustee and Wells Fargo the master servicer.  (D.I. 4637 at

¶¶ 16-17.)

Shortly after Ms. Rush filed her stay relief motion, on June 16, 2008, the

Maryland District Court dismissed the federal causes of action against ServiceLink, denied Ms.

Rush's motion to consolidate, and remanded the remainder of the ServiceLink action to

Maryland state court.

The Debtors did not oppose lifting the stay solely to permit continuation of the

Maryland action against AHM, but filed a reservation of rights with respect to Ms. Rush's

factual allegations, which the Debtors disputed [D.I. 4977]. On July 17, 2008, this Court entered

a consensual order lifting the automatic stay [D.I. 5173].

On or about August 11, 2008, it appears that Ms. Rush sent a letter to the GSR

Mortgage Loan Trust 2006-OA1, AHMSI, DBNTC, and Wells Fargo, threatening them with

litigation.[9] In her letter, Ms. Rush stated:

> On July 17, 2008, I received Relief From Stay to proceed with my case in Federal
> Court. Before I proceed I'm attempting one last time to communicate to parties
> with an interest in this loan. Up until this point you have allowed [AHM and its
> counsel] to represent your interest as you have hidden in the background. They
> did not negotiate in good faith and have failed miserably in ways that will cost all
> parties to this action. Damages have continued to escalate for all parties to this
> loan including you.
>
> I have found my loan in SEC filings for GSR 2006-OA1 Trust, so it is pointless to
> continue to try and hide behind [AHM]. . . .
>
> I fully realize why all the parties to this loan are hiding behind American Home.
> No one wants to be held accountable, however it is too late as I have already
> discovered this information so wouldn't it make more sense to just come forward.
> As ongoing concerns you can no longer hide behind the bankrupt [AHM].

Notwithstanding obtaining relief from the stay, and despite her threats in this letter dated August

11, 2008, Ms. Rush did not take any action to reopen the Maryland District Court case against

AHM or to pursue AHMSI, DBNTC or Wells Fargo until April 3, 2009, as discussed further

below.

---

[9] The letter was attached as an exhibit to Ms. Rush's motion to amend her proofs of claim [D.I. 7002], discussed
further below.

### The Borrowers' Committee Motion and Disclosure Statement Objection

On August 15, 2008, the Debtors filed the *Chapter 11 Plan of Liquidation of the Debtors Dated as of August 15, 2008* [D.I. 5450] (as subsequently amended from time to time, the "Plan") and accompanying disclosure statement [D.I. 5451] (as subsequently amended from time to time, the "Disclosure Statement"). On September 8, 2009, Ms. Rush filed an objection to the Disclosure Statement [D.I. 5858], again asserting fraud and unspecified criminal activity on the part of AHM.

On September 9, 2008, Ms. Rush and certain other AHM borrowers, through counsel, filed a motion [D.I. 5675] for appointment of an official committee of borrowers pursuant to section 1102(a)(2) of the Bankruptcy Code. Over the objections of the Debtors and the Creditors' Committee, the Court granted this motion and ordered [D.I. 6220] the U.S. Trustee to appoint an official committee of borrowers (the "Borrowers' Committee"). Ms. Rush was (and, upon information and belief, remains) chairperson of the Borrowers' Committee.

The Debtors' Disclosure Statement, as amended on November 25, 2008 [D.I. 6627], was approved on a consensual basis on December 1, 2008, as a result of amendments made at the request of certain parties in interest, including the Borrowers' Committee [D.I. 6644].

### The Borrowers' Committee Plan Objection

On January 22, 2009, following a breakdown of negotiations concerning the Debtors' Plan as amended on November 25, 2008, the Borrowers' Committee filed an objection to confirmation of the Plan [D.I. 6883, later supplemented by D.I. 6964], after which point the Debtors and the Borrowers' Committee conducted expedited discovery.

The Plan was overwhelmingly accepted by the Debtors' unsecured creditor classes, *including* the borrower classes in the three estates most likely to have borrower claims (i.e., AHM Corp., AHM Acceptance, and AHM SV), and was voluntarily amended by the Debtors prior to the confirmation hearing to include provisions responsive to borrower concerns, including, without limitation:

- Prospective relief from the Plan's injunctive and stay provisions to permit borrowers to assert counterclaims and defenses in foreclosure actions brought by or on behalf of the Plan Trust, or to commence or continue actions against the Debtors nominally for the purpose of obtaining relief from non-debtor parties.

- Express preservation of borrowers' rights (i) to assert defenses to payment of amounts due on loans owned by the Debtors; (ii) to assert nonmonetary remedies (including rescission under TILA) against the Plan Trust; (iii) to set off or recoup borrower claims against amounts owing on loans owned by the Plan Trust; and (iv) to assert rights against non-debtor third parties (including, but not limited to, the current owners of their loans).

- Employment of a "Borrower Information Ombudsperson" by the Plan Trust to respond to requests by borrowers for information concerning the identities of (i) the initial purchasers of the loans from the Debtors and (ii) the servicer to whom the Debtors initially transferred servicing of the loans.

- Requiring the Plan Trustee to confer (or cause the loan servicer to confer) with borrowers within thirty (30) days regarding written requests for loan modification or, in the event they do not have the power to modify the loan, forwarding the modification request to the appropriate party (if known).

- Requiring the Plan Trustee to use reasonable efforts to contact borrower-claimants to obtain information regarding their asserted claims and to make a reasonable offer of settlement prior to objecting to such claim.

The Court held a three-day evidentiary hearing to consider confirmation of the Plan on January 9-11, 2009. At or prior to this hearing, more than twenty formal and informal objections to the Plan were consensually resolved, leaving only the Borrowers' Committee's objection. At the conclusion of the hearing, the Court overruled the Borrowers' Committee's objection *in toto*. (2/11/09 Hr'g Tr. at 153:21-22.) Specific objections raised by the Borrowers' Committee and rejected by the Court (either explicitly or implicitly) include:

- Notice of the claims bar date was inadequate.

- The Plan provided more favorable treatment to financial institution claimants than to borrower claimants.

- Due to mortgage insurance on pools of loans, financial institution claimants asserting EPD/Breach Claims against the Debtors with respect to certain loans may receive double recoveries.

- The Plan's global resolution of inter-company claims prejudiced borrowers by saddling AHM Corp., the primary origination entity, with administrative expenses while not crediting AHM Corp. for the value of avoidance action recoveries.

- The Plan Trustee will be hopelessly conflicted because the Plan Oversight Committee will consist of large financial institutions who will block attempts by the Plan Trustee to investigate or pursue causes of action based upon their alleged misconduct.

The Court entered an order confirming the Plan (as amended February 18, 2009) on February 23, 2009 [D.I. 7042] (as subsequently amended, the "Plan Confirmation Order").

**The Motion to Amend Proof of Claim**

Prior to entry of the Plan Confirmation Order, on February 9, 2009, Ms. Rush filed a motion [D.I. 7002] to amend her proof of claim filed against AHM Corp. so as to permit her to assert late claims against each of the other Debtors. As basis for permitting late-filed claims, Ms. Rush asserted the Plan had "changed the rules" by deconsolidating the Debtors' estates[10] and leaving her with a claim against the AHM Corp. estate, which had a lower anticipated payout than the AHM Holdings estate. In her motion, Ms. Rush again accused the Debtors of fraud, unspecified criminal activity, and conspiracy to obfuscate the true identity of the owner and master servicer of Ms. Rush's loan. She also reiterated many of the same arguments made by the Borrowers' Committee (and overruled by the Court) in connection with its objection to the Plan (regarding, e.g., the EPD/Breach Claims Protocol and the bar date

---

[10] The Debtors' estates were never consolidated. However, the Debtors' cases are being jointly administered.

notice).  Finally, and importantly for present purposes, Ms. Rush suggested that DBNTC's and

Wells Fargo's claims against the Debtors' estates should be subordinated to her claim:

> Considering my loan may be in a Goldman Sachs TRUST GSR 2006-OA1 (still unknown/unconfirmed) and Deutsche Bank and Wells Fargo have both submitted claim[s] under the Debtors[' EPD/Breach Claims Protocol under the Plan], on GSR 2006-OA1, *why shouldn't my recovery come before the[ir] recovery*?  They are the holders of the note, they received the fruits of the fraud.  They also would be the beneficiary of the TRIAD mortgage insurance policy, which I paid for vicariously in the interest rate charged on my loan.

(D.I. 7002 at ¶ 14 (emphasis added).)

The Debtors conferred with Ms. Rush in good faith in connection with her motion

and ultimately agreed to permit her to file additional proofs of claim against AHM Holdings,

AHM SV, and Homegate, subject to the rights of the Debtors or any other party in interest to

object to the allowance or priority of such claims on any and all bases other than timeliness.  On

March 9, 2009, the Court entered a consent order [D.I. 7086] embodying this agreement.

### The Borrowers' Committee's Motion to Release Funds

Five months after confirmation of the Plan, on July 20, 2009, the Borrowers

Committee, through new proposed counsel W. Jeff Barnes, filed a motion [D.I. 7619] (the

"Funds-Release Motion") to "re-allocate" the $50,000 earmarked under the Plan for payment of

the Borrower Information Ombudsperson to the Borrowers' Committee to conduct unspecified

post-confirmation "investigatory work" on behalf of borrowers.  The Borrowers' Committee

sought expedited consideration of the Funds-Release Motion [D.I. 7620] to coincide with a

hearing in the *Accredited Home Lenders* case before Judge Walrath wherein Mr. Barnes and Ms.

Rush were appearing in their bid (ultimately, unsuccessful) to form a borrowers' committee.  The

Debtors objected to the shortened notice [D.I. 7620], which was denied by the Court [D.I. 7626].

The Funds-Release Motion was withdrawn following discussions between the

Debtors' counsel and the proposed new local counsel for the Borrowers' Committee.

### Post-Confirmation Activity in the Maryland Action

On April 3, 2009, Ms. Rush, *pro se*, filed a 51-page motion to reopen the

Maryland District Court action and to add AHM Holdings, Homegate, Goldman Sachs Mortgage

Securities Corp., Goldman Sachs Mortgage Company, Deutsche Bank, Wells Fargo, the GSR

2086-OA1 Trust, Citibank, and MERS as new party defendants. In her motion, Ms. Rush

accused AHM's counsel (including the undersigned firm) of aiding AHM in its "deceit and

obfuscation." AHM opposed the motion to the extent it sought relief beyond reopening the case

to permit prosecution against the original AHM defendants. The Maryland District Court agreed

and, for the reasons set forth in its memorandum opinion dated August 19, 2009, granted Ms.

Rush's motion as to the reopening of the case but denied it as to the addition of new party

defendants.

In November 2009, the successor trustee of the deed of trust secured by Ms.

Rush's home commenced foreclosure proceedings in Maryland state court.

Following the completion of briefing on AHM's motion to dismiss (originally

filed July 31, 2007), the Maryland District Court entered an order partially dismissing with

prejudice portions of Counts I and II (TILA disclosures), Count III (TILA advertising

provisions), Count V (RICO), Counts VI, VIII, and XI (negligence and breach of fiduciary duty),

Count VII (breach of express warranties), Count X (breach of contract), and Count XII (duress

and economic duress) of Ms. Rush's complaint for the reasons set forth in the memorandum

opinion dated December 3, 2009. The Maryland District Court also dismissed, without prejudice

and with leave to amend within 30 days, Ms. Rush's claims for (i) rescission for violations of

TILA, and (ii) violations of RESPA, to the extent raised by Ms. Rush. Applying a liberal

pleading standard appropriate to *pro se* pleadings, the Court concluded the following claims

survived dismissal under Fed. R. Civ. P. 12(b)(6):[11]

> Count I: Whether the pre-closing disclosures required by 12 C.F.R. § 226.18 were timely
> made pursuant to 12 C.F.R. § 226.19 and "in a form that the consumer may keep before
> consummation of the transaction" as required by 12 C.F.R. § 226.17.

> Count II: Whether the post-closing disclosures required by 12 C.F.R. § 226.20(c)(5) were
> made.

> Count IV: Common-law fraud and violation of the Maryland Consumer Fraud and
> Deceptive Business Practices Act, Md Ann. Code, Com. Law § 13-101 *et seq.*, based on
> allegations that AHM (i) arranged for a fraudulent appraisal that inflated the value of Ms.
> Rush's property and (ii) promised Ms. Rush a loan with a 1% interest rate, $56,000 cash
> out, and no prepayment penalty with no intent to perform that promise.

> Count IX: Unjust enrichment/restitution based on Ms. Rush's allegation that the
> mortgage contract was obtained via fraudulent means.

  In lieu of filing an amended complaint to properly plead her TILA rescission and

RESPA claims, on or about January 5, 2010, Ms. Rush filed a renewed motion seeking to add

new party defendants, including, but not limited to, DBNTC, Wells Fargo, "Wilbur Ross and Co.

LLC (AHMSI & Trustee as Debtor in Possession American Home)," and the GSR Mortgage

Loan Trust 2006-OA1.  She also sought entry of a temporary restraining order ("TRO")

enjoining the foreclosure proceedings in Maryland state court pending adjudication of the

Maryland District Court action.

  As set forth in its memorandum opinion dated February 4, 2010, the Maryland

District Court denied the TRO request as moot because the foreclosure sale scheduled for

January 8, 2010, had been cancelled and there was no other foreclosure sale date scheduled for

the property.  The Maryland District Court ruled further that it would not have stayed the

---

[11] Ms. Rush characterizes denial of Rule 12(b)(6) dismissal as the Maryland District Court's "upholding" her
claims.  The Debtors disagree with this characterization, since the Rule 12(b)(6) analysis requires a court to accept at
face value the factual allegations in the complaint, without making any determination as to their accuracy.

foreclosure proceedings in favor of the federal litigation because the only claims remaining in the federal litigation that would possibly be affected by the foreclosure action are the common-law fraud claim and her claim for violation of Maryland consumer protection law, both of which were state-law claims which the Maryland state court was better positioned to decide.

By memorandum opinion dated April 10, 2010, the Maryland District Court denied Ms. Rush's motion to add new party defendants, but granted it in part to the extent it sought to amend the prior complaint to state a RESPA claim against AHM for requiring Ms. Rush to use AHM's affiliated settlement provider and for paying a yield spread premium of $19,792 to her mortgage broker.  Regarding the new defendants, the Maryland District Court noted:

> For the most part, Plaintiff's factual allegations against each of the parties, other than the AHM Defendants, is that they refused to answer her letters and phone calls, failed to reach out to try to resolve the issues, and conspired to prevent her from discovering the true owner of her loan.  Plaintiff does not allege, however, why they should have responded to her requests.  Moreover, Plaintiff does not even attempt to state any claims against two of the proposed defendants, WL Ross and Co. LLC, and The Loan Corporation.  Thus, while the Court has sympathy for Plaintiff in attempting to understand the great complexities of securitized loans, she has failed to make clear how she has any actual claim against any of these proposed additional defendants and Plaintiff's motion to amend her Complaint to add these defendants will be denied.

Regarding Ms. Rush's newly pleaded claim that AHM and the proposed new party defendants had "unclean hands" by virtue of their failure to disclose ownership of her loan as required by TILA § 1641(f)(2) after numerous requests, the Maryland District Court ruled that the damages remedy in TILA § 1640(a) was Ms. Rush's sole remedy, and the court was not at liberty to provide additional, non-statutory remedies.

Following the Maryland District Court's ruling, on April 20, 2010, AHM filed its answer to Ms. Rush's complaint.  On April 29, 2010, the Maryland District Court entered a

Scheduling Order establishing July 28, 2010, as the discovery cutoff and August 30, 2010, as the deadline for filing case-dispositive motions.

## PROCEDURAL HISTORY REGARDING THE JACKSONS

The Jacksons obtained a "Pay Option ARM" loan through ABC on or about March 24, 2006. The loan was securitized as part of the AHMIT 2006-2 trust, and the Debtors' servicing rights to the loan were sold to AHMSI in connection with the sale of the Debtors' servicing business.

On or about June 17, 2008, two months after the final closing of the sale of the servicing business to AHMSI, the Jacksons filed their first pleading in these bankruptcy cases, requesting copies of their loan file through their *Objection to Motion for Destruction o/Documents Pursuant to 11 U.S.C §§ 105, 363 and 554 and Complaint for Protection of Original Documents* [D.I. 4720]. In their motion, the Jacksons indicated they understood their loan was owned by the AHMIT 2006-2 securitization trust, of which DBNTC was trustee and Wells Fargo was master servicer. In response to the Jacksons' motion, the Debtors provided the Jacksons their loan file.

On January 19, 2009, more than a year after the bar date for filing unsecured claims, the Jacksons filed a proof of claim (#10647) against an unspecified debtor asserting an unsecured nonpriority claim of $1,872,000 and a secured claim of $600,000 relating to "Pay Option ARM Loan Fraud". On or about February 2, 2009, the Jacksons sent a letter to the Court, which was docketed as item 6917, attaching a motion for an order deeming their proof of claim timely filed or, alternatively, permitting late filing. The motion raised a number of the factual allegations and legal arguments (usually, verbatim) from Ms. Rush's various pleadings. In the

motion, the Jacksons indicated their legal counsel was negotiating with AHM to rescind the

Jacksons' loan[12] but that if AHM did not settle, the Jacksons would commence litigation.

Despite knowledge of the Debtors' bankruptcy filing, and in violation of the

automatic stay, on or about March 24, 2009, the Jacksons, through counsel, filed a complaint (the

"Jackson Complaint") against AHM,[13] DBNTC, and Wells Fargo, among others, in the United

States District Court for the Eastern District of New York, Case No. cv-09-1225 (the "New York

Action").  The Jackson Complaint sought from AHM, among other things, (i) statutory damages

for violations of 15 U.S.C. § 1638(a); (ii) return of any money or property paid by the Plaintiffs;

(iii) an amount of money equal to twice the finance charge in connection with the transactions;

(iv) actual damages, including attorneys' fees; (v) damages in an amount equal to three times the

amount of the undisclosed yield spread premium; (vi) damages against violations of Virginia

Consumer Practices Act; (vii) punitive damages; and (viii) damages for unjust enrichment.

On April 13, 2009, the Jacksons, through counsel, filed an emergency motion for

relief from the automatic stay [D.I. 7307] to permit commencement of the New York Action.

The Debtors conferred with the Jacksons' counsel regarding the late-filed claim and the request

for stay relief and, as a result of such discussions, consented to entry of an order authorizing the

late filing of the Jacksons' claim, as well as additional claims the Jacksons intended to file

against other Debtors, subject to a full reservation of rights as to the allowed amount of such

claims.  [See D.I. 7345 (certification of counsel submitting consent order).]  Subsequently, on

May 22, 2009, the Jacksons filed proofs of claim against AHM Corp., AHM SV, AHM

Acceptance, AHM Investment, and AHM Holdings (#10713-10717, respectively), asserting

---

[12]  Of course, as the Debtors neither owned nor serviced the loan, the Debtors lacked the authority to consent to
rescission.

[13]  The named AHM defendant is "American Brokers Conduit, a division of American Home Mortgage, Inc.," which
the Debtors understand to refer to AHM Corp.

unspecified priority claims in the amount of $2,425 and non-priority unsecured and secured

claims in unliquidated amounts.

The Debtors also consented to limited stay relief to permit the New York Action

to proceed against AHM (i) solely to the extent necessary to halt a foreclosure related to the

Jacksons' loan and/or (ii) nominally to permit the Jacksons to exercise rights against non-debtor

third parties, which the Debtors believed was consistent with the operative provisions of the

Plan.[14] Despite these accommodations, the Jacksons rejected the Debtors' proposal and pressed

for stay relief to permit their claims to be adjudicated in the New York Action. The Debtors,

joined by the Creditors' Committee, objected [D.I. 7319 & 7321, respectively], and the stay

relief motion was addressed at the omnibus hearing on May 15, 2009. After hearing argument

by the Jacksons' counsel, as well as by Ms. Rush, the Court denied the motion, subject fully to

any prospective stay relief to which the Jacksons were entitled under the Plan. (See Hr'g Tr. at

58:11-59:25; [D.I. 7434].)

## OBJECTIONS TO THE PROPOSED SETTLEMENTS

On March 31, 2010, the Ms. Rush and the Jacksons filed objections to the

DBNTC Motion [D.I. 8732 & 8733, respectively]. The objections suggested the Debtors were

settling with DBNTC on favorable terms owing to DBNTC's status as a Creditors' Committee

member, and accused the Debtors of unreasonably refusing to settle borrower claims. The

---

[14] The Plan and Confirmation Order provide borrowers with prospective modification of the automatic stay to permit

> (i) the borrower(s) under any mortgage loan against whom a foreclosure action is commenced by or on behalf of the Plan Trust or any Debtor, ... (b) in the case of a nonjudicial foreclosure, solely to commence and prosecute an action against the Plan Trust, Debtor and/or loan servicer as necessary to halt and for the purpose of halting the foreclosure;

> (ii) borrower(s) under any mortgage loan originated or serviced by one or more Debtors to commence ... an action or cross-claim against such Debtor(s) nominally for the purpose of obtaining relief against a non-Debtor party.

(Plan, Art. 17(E)(i) and (ii) (as modified by the Plan Confirmation Order, ¶ 51 (i) and (ii)).)

objections also asserted that Ms. Rush and the Jacksons should be afforded an opportunity to investigate DBNTC and pursue equitable subordination of its claims, and that approval of the settlement would render equitable subordination impossible.

The DBNTC Motion and objections thereto were heard at the April 6, 2010, omnibus hearing.  Following argument by Ms. Rush and Mrs. Jackson, as well as counsel for the Debtors, the Creditors' Committee, and Bank of America, N.A (the "Administrative Agent"), the Court ruled that the DBNTC Motion and objections thereto would be continued to the May 4, 2010, hearing "solely with regard to the equitable subordination claim" but that the objections would be overruled in all other respects.  (4/6/10 Hr'g Tr. 57:2-7.)  The Court ruled further that Ms. Rush and the Jacksons would have seven days to file "a motion to equitably subordinate [DBNTC's] claim," which would also be heard on May 4 (Id. at 57:8-10 (Rush) and 58:5-6 (Jacksons).)

On or about April 13, 2010, Ms. Rush, *pro se*, filed her *Adversary Proceeding for Equitable Subordination of Defendants Claims and Complaint for Declaratory Judgement* [sic] *and Other Relief* (the "Rush Complaint") against DBNTC, "Goldman Sachs," GSR 2006-OA1 Trust, "Wells Fargo," "WLR Recovery Fund IIII [*sic*], L.P.," and Michael Strauss.  The Rush Complaint was docketed by the Court as adversary proceeding number 10-50917 (CSS) (the "Rush Adversary").  Also on April 13, the Jacksons, *pro se*, filed their *Adversary Proceeding to Subordinate Claims and for Declaratory Relief* (the "Jackson Complaint" and, together with the Rush Complaint, the "Subordination Complaints"), against DBNTC, "AHMIT 2006-2 Trust a Statutory Trust," American Home Mortgage Securities, LLC, Michael Strauss, Wells Fargo Bank N.A., Wilbur Ross, "WLR Recovery Fund IIII [*sic*], L.P.," "AH Mortgage Acquisitions," and "AHMSI."  The Jackson Complaint was docketed by the Court as adversary proceeding

number 10-50915 (CSS) (the "Jackson Adversary" and, together with the Rush Adversary, the "Subordination Proceedings").  The Subordination Complaints seek a wide array of relief, including, *inter alia*, subordination of defendants' claims and disgorgement of payments received by the defendants on account of the Rush and Jackson loans.  In addition, though the Subordination Complaints do not name the Debtors as defendants, they suggest entitlement to administrative priority claims in the amount of $650,000 and $700,000 for Ms. Rush and the Jacksons, respectively, on a "post-petition aiding and abetting fraud" theory.[15]

On April 27, 2010, at the request of several parties, the Court held a status conference concerning the Subordination Complaints.  At this conference, the Court ruled that, for purposes of the hearing to consider the Proposed Settlements, the Subordination Complaints would be treated as objections to the Proposed Settlements and the defendants thereto were free to reply to them, *qua* objections, without prejudice to any rights or remedies to which they may be entitled in the adversary process.

As of the date hereof, neither Ms. Rush nor the Jacksons have otherwise objected to the AHMSI Motion or the Wells Fargo Motion.

---

[15] The Debtors assume Ms. Rush and the Jacksons lifted this theory from the Court's transcript ruling at the trial on the Mona Dobben claim.  The December 9, 2009, order awarding Ms. Dobben an administrative claim [D.I. 8424] was vacated by consent order on March 3, 2010 [D.I. 8667], in connection with a settlement of the Debtors' appeal therefrom.  Even assuming the ruling could be in any way precedential following vacation of the order, the Debtors do not believe it is portable to other contexts because, as the Court itself noted, "every case is unique on its facts and th[e Dobben case] is, although unique is unique, this is really unique."  (2/18/10 Hr'g Tr. at 23:2:2-3.)

**ARGUMENT**[16]

I.    **The Proposed Settlements Meet the Standard for Approval under Bankruptcy Rule 9019; the Borrower Objections do not Meaningfully Argue Otherwise**

The proposed settlements meet the standard for approval under Bankruptcy Rule 9019 for the reasons set forth in the respective Settlement Motions, which are incorporated herein by reference.

The Borrower Objections do not address the substantive legal standard for approval of the proposed settlements, save perhaps for Ms. Rush's general (and unsupported) assertion that it is "unfair and unjust" for AHMSI, DBNTC, and/or Wells Fargo to receive additional funds from the Debtors when, in Ms. Rush's mind, they were already "enriched" by prepetition margin calls (Rush Compl. ¶ 74) and the Debtors were applying a "different standard" to settlement of borrower claims (id. ¶ 5).  In point of fact, AHMSI received nothing prepetition because it did not yet exist (having been formed post-petition for the purposes of acquiring the Debtors' servicing business), and neither DBNTC nor Wells Fargo made any margin calls.  Additionally, the generalized "fairness" objection regarding the Debtors' settling with AHMSI, DBNTC, and Wells Fargo while at the same time litigating Ms. Rush's claim was *expressly overruled* by the Court at the April 6, 2010, hearing:

> In connection with the argument of fairness, if you will, of the debtor moving forward and trying to resolve claims . . . such as the Deutsche Bank claim and not moving forward and filing an objection or dealing with claims such as Ms. Rush and the Jacksons, *I don't find that as an impediment to the extent it's even true.*  I don't think it rises to a level of purposefulness or nefariousness . . . to in any way stand in any way as an impediment to settlement. . . .  So I'm going to do two

---

[16]  The Debtors expect a number of the arguments herein will also be raised (and perhaps are better raised) by other parties in interest against whom the Subordination Complaints seek relief.  The purpose of the Debtors' arguments in this pleading is not to "protect" the non-debtor parties, but rather to protect the settlements the Debtors have worked so hard to achieve for the benefit of their estates and creditors.  To be clear, the Debtors have no interest in participating in the Subordination Proceedings.  But to the extent this litigation threatens overall progress of these chapter 11 cases, the Debtors have little choice but to weigh in.

things.  First of all, I'm going to overrule the objection[s] in part in connection
with the fairness argument.  I'm going to continue the objection[s] in connection
with the equitable subordination argument to the next hearing. . . .  I'm going to
continue the settlement hearing to May 4th solely with regard to the equitable
subordination claim.

(4/6/10 Hr'g Tr. at 55:12-20; 56:25; 57:1-7 (emphasis added).)[17]

The only other portions of the Subordination Complaints which are arguably

responsive to the Settlement Motions are as follows:

- conclusory assertions that AHMSI, DBNTC and Wells Fargo are "insiders" of the
  Debtors to which a "heightened scrutiny standard" applies (Rush Compl. at 14; Jackson
  Compl. at 11);

- questions about the sufficiency of AHMSI's administrative expense request (see Rush
  Complaint ¶ 60 ("Plaintiff is troubled by the assertion that unidentified investors were the
  beneficiary of amounts that were misappropriated that [AHMSI] now makes claim for
  those missing funds [sic] . . . . [AHMSI does] not seek to identify where the funds went
  . . . ."); Jackson Compl. ¶ 51 ("Shouldn't it be a requirement that . . . [AHMSI] define
  where those funds went before making a claim to retrieve them from the estate?"); and

- Ms. Rush's assertion that the Settlement Motions "are not clear on exactly which claims
  are being settled and what particular loan or trust the settlements apply to" (Rush Compl.
  ¶ 75).

The latter two points are addressed by the Rule 9019 standard, which requires only that the Court

canvass the issues and conclude that the proposed settlement falls above the lowest point of

reasonableness.  As the Debtors will establish at the May 11, 2010, hearing, AHMSI provided

the Debtors documents and data from which the Debtors were able to evaluate the merits of

AHMSI's various claims and weigh the risks and benefits of pursuing a litigated outcome versus

a settlement.  Requiring the Debtors and/or AHMSI to make a complete record of every claim

asserted by AHMSI would largely defeat the purpose of the settlement.  With respect to the

---

[17] This argument has actually been overruled twice before: first, at the conclusion of the three-day confirmation
hearing (the Borrowers' Committee having objected to the EPD/Breach Claims Protocol in the Plan because, among
other reasons, borrowers were not being afforded a similar claims allowance protocol); then again, at the April 6
hearing.

claims settled, the Debtors respectfully submit that the Settlement Motions and agreements incorporated therein are sufficiently clear to permit the Court to evaluate them under the liberal Rule 9019 standard.  To the extent the Court has questions, the Debtors will address them at the hearing.

As to the "heightened scrutiny" argument, as a threshold matter, the Subordination Complaints fail to explain how AHMSI, DBNTC or Wells Fargo constitute "insiders" for purposes of the Bankruptcy Code.  Ms. Rush and the Jacksons do not identify any statutory "insider" category under § 101(31) of the Bankruptcy Code into which AHMSI, DBNTC or Wells Fargo might fall.  And while the Third Circuit has recognized that creditors might constitute "non-statutory insiders" under appropriate circumstances, such circumstances are not present in this case.  To be non-statutory insiders, AHMSI, DBNTC and Wells Fargo would need, at a minimum, a sufficiently close relationship to the Debtors "to suggest that any transactions were not conducted at arm's length."  Shubert v. Lucent Techs. Inc. (In re Winstar Communs., Inc.), 554 F.3d 382, 396-397 (3d Cir. 2009).  For example, in Winstar, the Third Circuit found that a creditor's ability to coerce the debtor into entering transactions that were not in the debtor's interests was sufficient to establish the creditor's status as a non-statutory "insider."  Id. at 397.  In the Subordination Complaints, apart from misguided allegations regarding "margin calls" which were never in fact made by AHMSI, DBNTC or Wells Fargo, Ms. Rush and the Jacksons do not allege that AHMSI, DBNTC or Wells Fargo were in any position to coerce the Debtors into entering into transactions that were not in the Debtors' best interests.  Furthermore, with respect to AHMSI, paragraph F of the Sale Approval Order specifically finds that AHMSI and the Debtors contracted in good faith and at arm's length,

which should end the inquiry as to AHMSI's "insider" status vis-à-vis the settlement of sale-related claims.

Even in the unlikely event the Court were to treat AHMSI, DBNTC and Wells Fargo as "insiders" of the Debtors and apply "heightened scrutiny" to the Settlement Motions, the Debtors will establish at the May 11 hearing that the proposed settlements are entirely fair to the Debtors. Accordingly, nothing raised in the Subordination Complaints precludes approval of the Settlement Motions under the Rule 9019 standard. The Borrower Objections thus boil down entirely to the speculative, eleventh-hour requests for equitable subordination against defendants who have not yet been served, based on conclusory (and largely incomprehensible) allegations that have not yet been tested for legal sufficiency. The Borrower Objections should be overruled in their entirety.

## II.   Approval of the Proposed Settlements Will not Prejudice the Borrowers' Alleged Subordination Rights

### A.   Administrative Claims Will be Paid in Full

As is evident from the Subordination Complaints, Ms. Rush and the Jacksons believe they are entitled to administrative priority claims in the amount of $1.35 million in the aggregate. At the May 11, 2010, hearing to consider the Settlement Motions, the Debtors will establish they have sufficient assets to for the Plan to go effective,[18] even in the unlikely event Ms. Rush's and the Jacksons' purported administrative claims were reserved in the aggregate amount of $1.35 million. Accordingly, equitable subordination of the $6 million administrative

---

[18] Ms. Rush cites the Debtors' termination of the most recent contract to sell AHM Holdings' stock in American Home Bank, f.s.b. (the "Bank") as evidence of the Debtors' looming administrative insolvency and conversion to chapter 7. (See Rush Compl. ¶¶ 113-14.) This is unfounded. The fact that the Debtors terminated a sale of the stock in the Bank and are exploring other options (such as an asset sale or a liquidation plan) does not mean the Bank asset has disappeared from the Debtors' estates.

claim to be allowed to AHMSI pursuant to the AHMSI settlement would be a purely academic exercise, and delay of the AHMSI Settlement would be inappropriate based upon a mere speculative possibility of engaging in this exercise in the future if (and only if) Ms. Rush and the Jacksons are successful establishing <u>both</u> their underlying claims against the Debtors <u>and</u> egregious conduct on the part of AHMSI that would justify equitable subordination.

### B.    The Sale Approval Order Precludes Subordination of AHMSI's Claims

Paragraphs 49-50 of the Sale Approval Order, in a section entitled "Superpriority Status for Claims Under the APA Against Sellers," provide, in pertinent part, as follows:

> As protection to the Purchaser following the payment of the Purchase Price at the Initial Closing, any Reconciliation Payment payable to Purchaser pursuant to Section 6.2(b) or 6.2(e) of the APA *shall have the status of an allowed superpriority administrative expense claim against the Sellers with priority over all administrative expense claims and unsecured claims against the Sellers,* including any adequate protection-related claims and any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, to the extent permitted by applicable law . . . .

> Without limiting, modifying, or reducing the foregoing, the payment of the superpriority claim, if any, described in the foregoing paragraph shall be in cash at the time and manner as provided in the APA, without further order of the Court.  The obligation to pay any such amount in full in cash when due shall not be discharged, modified, enjoined, or otherwise affected by any plan of reorganization or liquidation for any Seller, or the conversion of any Seller's case to a case under chapter 7 of the Bankruptcy Code.

(Sale App. Ord. ¶¶ 49-50.)

Paragraph 54 of the Sale Approval Order provides:

> Nothing contained in . . . any other order in these cases (including any order entered after any conversion of any case to one under chapter 7 of the Bankruptcy Code) (a "Subsequent Order") shall alter, conflict with or derogate from the provisions of the APA or this Order.  Notwithstanding any language in any Plan or Subsequent Order, no such Plan or Subsequent Order will be construed to alter, conflict with, or derogate from the provisions of the APA or this Order.

(<u>Id.</u> ¶ 54.)

Subordination of AHMSI's claim against the Debtors arising under the APA would conflict with the super-priority status afforded such obligations under the Sale Approval Order and would otherwise conflict with or derogate from the provisions of the APA or the Sale Approval Order, which contemplate the Debtors' performance under the post-petition contract in the ordinary course without further authorization of the Court. The fact that the Debtors have disputed the scope of the asserted obligations under the APA and have reached a compromise with AHMSI regarding this dispute does not change the fact that, in the absence of any dispute, the Debtors would have been authorized to pay AHMSI in real time, without prior Court approval, nor does it change the fact that AHMSI's claims, such as they may be, are entitled to protection under the Sale Approval Order. Accordingly, the AHMSI Settlement will have no effect on the Subordination Proceedings. See In re Insilco Techs., Inc., 480 F.3d 212, 219-220 (3d Cir. 2007) (finding equitable subordination claim against lenders was precluded by prior settlement and consent order releasing all causes of action related to lenders' claims).

**C.     Distributions from the Cure Escrow do not Implicate Borrowers' Subordination Rights**

      **1.     Section 510(c) Does Not Apply to Rights Under Section 365(b)(1) of the Bankruptcy Code**

The claims at issue in the DBNTC and Wells Fargo Settlements relate primarily to the cure of defaults (and compensation for pecuniary losses resulting from such defaults) under executory mortgage loan servicing contracts[19] that were assumed and assigned to AHMSI effective April 11, 2008. Section 365 of the Bankruptcy Code requires such cure/compensation as a prerequisite of the assumption and assignment of an executory contract, where there has

---

[19] The servicing agreements to which DBNTC and Wells Fargo are party were stipulated by the Debtors to be executory contracts within the meaning of section 365 of the Bankruptcy Code.

been a default under such contract.  11 U.S.C. § 365(b)(1)(A)-(B) (requiring cure/compensation

as condition of assumption) & (f)(2)(A) (requiring assumption as condition to assignment).  As

the Third Circuit has explained, the purpose of these provisions is to protect the "benefit of the

bargain" for the non-debtor party to the contract:

> Once an assumption order is entered, the [nondebtor party] must perform in
> accordance with the terms of the assumed agreements.  However, as a matter of
> fairness, before requiring the [nondebtor] to perform, courts require the debtor in
> possession to "give[] the other contracting party the full benefit of [its] bargain."
> H.R. Rep. No. 95-595, at 348 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6304-
> 05; see also Matter of Superior Toy & Mfg. Co., Inc., 78 F.3d 1169, 1174 (7th
> Cir. 1996).  In other words, the debtor must cure all defaults, assure future
> performance, and make the other contracting party whole *before it may be
> permitted to assume* the agreement.

Kimmelman v. Port Auth. of N.Y. & N.J. (In re Kiwi Int'l Air Lines, Inc.), 344 F.3d 311, 318

(3d Cir. 2003) (emphasis added).  While the bankruptcy court has some measure of "equitable

discretion" to modify executory contracts to facilitate assumption and assignment thereof, the

Third Circuit has repeatedly held that "the modification of a contracting party's rights is not to be

taken lightly" and any modification must be consistent with "the policy requiring that the non-

debtor receive the full benefit of his or her bargain."  In re Fleming Cos., 499 F.3d 300, 305 (3d

Cir. Del. 2007) (quoting In re Joshua Slocum Ltd., 922 F.2d 1081, 1091 (3d Cir. 1990)).

Section 510(c) provides, in pertinent part, that the Court, after notice and a

hearing, may, "[u]nder principles of equitable subordination, subordinate *for purposes of

distribution* all or part of *an allowed claim* to all or part of another allowed claim . . . ."  11

U.S.C. § 510(c)(1) (emphasis added).  While a right to payment pursuant to § 365(b)(1) is

certainly a "right to payment" constituting a "claim" under the § 101(5) of the Bankruptcy

Code,[20] given the reference to "distribution" and "allowance" in § 510(c), the Debtors submit

---

[20] The Court noted this at the April 6 hearing in response to Debtors' counsel's observation that the term "cure

that § 510(c)(1) subordination extends only to claims that are subject to the Bankruptcy Code's

distribution scheme and provisions regarding allowance, which excludes the "cure claims" of

DBNTC and Wells Fargo.

The Bankruptcy Code's distribution scheme is set forth in § 726, which provides

in pertinent part that "[e]xcept as provided in section 510 of this title, property of the estate shall

be distributed" first, in accordance with § 507 priorities; second, in payment of "allowed"

unsecured claims proof of which is timely filed (or tardily filed by a creditor having no notice or

actual knowledge of the case in time for timely filing); third, in payment of "allowed" unsecured

claims, proof of which is tardily filed; fourth, in payment of any "allowed claim, whether secured

or unsecured, for any fine, penalty, or forfeiture, or for multiple, exemplary, or punitive

damages" arising prepetition; fifth, in payment of post-petition interest; and sixth, to the debtor.

11 U.S.C. § 726(a) (emphasis added).  Nowhere in the § 726 distribution scheme is the

cure/compensation language of § 365(b)(1) mirrored.  Nor does the "except as provided in

section 510 of this title" language from § 726 have an analogue in § 365(b)(1).

The allowance of claims is governed by § 502 (for general unsecured and non-

administrative priority claims), § 503 (for administrative claims), and § 506 (for secured claims),

none of which deals with cure/compensation payable to non-debtor parties to executory

contracts.  Similarly, § 365(b)(1) is devoid of any reference to "allowance" of claims.  Rather,

the obligation to cure/compensate is stated *as a limitation on the assumption power itself*, namely

that the debtor "may not assume" the contract unless "at the time of assumption" there is

cure/compensation, or adequate assurance of prompt cure/compensation.  11 U.S.C.

---

claim" is somewhat of a misnomer given that cure/compensation is an affirmative requirement of assumption and
assignment of an executory contract.

§ 365(b)(1)(A)-(B).  Thus, while bankruptcy practitioners (and courts) frequently use the "cure claim" and allowance/disallowance terminology as shorthand when dealing with cure/compensation under § 365(b)(1)—just as one might refer to a request for payment of an administrative expense as an "administrative proof of claim," though it is not—the Debtors submit that the concepts of cure/compensation under § 365(b)(1) and equitable subordination under § 510(c)(1) are incompatible as a matter of statutory construction.  Accordingly, while any general unsecured claims allowed pursuant to the DBNTC and Wells Fargo Settlements are obviously subject to equitable subordination under § 510(c)(1) (as discussed below), the portions of those settlements providing for distributions from the Cure Escrow are not, and therefore do not interfere with Ms. Rush's or the Jacksons' rights in the Subordination Proceedings.

At the April 6 hearing, in response to Debtors' counsel's argument that § 365 cure rights were not subject to subordination under § 510(c)(1), the Court posited a hypothetical subordination agreement between Ms. Rush and DBNTC whereby DBNTC agreed to subordinate its claims to Ms. Rush's claims.  The Court then noted that such agreement would likely be enforceable by operation of § 510(a) of the Bankruptcy Code, which provides that subordination agreements are enforceable in bankruptcy to the same extent as they are enforceable under applicable non-bankruptcy law.  However, irrespective whether the hypothetical subordination *by agreement of the parties* would be enforced under § 510(a) and freedom-of-contract principles, the question here is whether equitable subordination is permissible *under § 510(c)(1)*.  Thus, the contract interpretation question in the 510(a) subordination agreement hypothetical could only be analogous, if at all, to interpreting subordination under § 510(c)(1) if the subordination agreement itself parroted the language of § 510(c)(1).  Even then, the applicable non-bankruptcy law used to interpret the contract and the

actual language of the subordination agreement could, and likely will, materially differ from any § 510(c)(1) analysis.  Additionally, controlling precedent under § 510(c)(1) requires that "equitable subordination of [a] claim must not be inconsistent with the provisions of the Bankruptcy Code." Shubert v. Lucent Techs. Inc (In re Winstar Communs., Inc.), 554 F.3d 382, 411 (3d Cir. 2009) (internal quotations omitted).  The Debtors submit that Congress circumscribed the permissible boundaries of equitable subordination by making the distribution scheme of § 726 (and by extension, the priority scheme of § 507) expressly subject to § 510.  See 11 U.S.C. § 726(a).  Here, application of equitable subordination would run contrary to the language and policies of § 365 safeguarding the "benefit of the bargain" under contracts assumed and assigned by the Debtors, and would thus be inconsistent with the Bankruptcy Code so as to preclude application of § 510(c)(1).

> **2.    Even Assuming Section 510(c) Applies, the Subordination Request is Moot**

As noted above, the cure of prior defaults and compensation for pecuniary losses resulting therefrom is a prerequisite for assumption and assignment of an executory contract.  11 U.S.C. § 365(b)(1)(A)-(B).  Believing there had been no material, economically significant defaults under the DBNTC and Wells Fargo contracts to be assumed and assigned to AHMSI, the Debtors originally proposed cure amounts of $0 with respect to these contracts.  DBNTC and Wells Fargo objected to the proposed assumption and assignment in part because they had not had adequate time to verify the correctness of the Debtors' proposed cure.  The resolution of this objection, as embodied in the Servicing Sale Order, was to permit DBNTC and Wells Fargo (along with certain other parties) additional time to investigate and assert possible cure claims and to escrow $10 million of the purchase price (an amount determined to be sufficient to satisfy all cure/compensation obligations arising from the sale of the servicing business).

The sale to AHMSI closed in two stages: <u>first</u>, an "economic" close on November 16, 2007 (the "<u>Initial Closing</u>"), at which time AHMSI tendered the purchase price and the Cure Escrow was established, and after which the Debtors continued to operate the servicing business in the ordinary course for the benefit and risk of AHMSI, using working capital provided by AHMSI; <u>second</u>, a "legal" close on April 11, 2008 (the "<u>Final Closing</u>"), at which time legal title to the assets of the servicing business vested in AHMSI, and the assumption and assignment of executory contracts (including, but not limited to, the DBNTC and Wells Fargo agreements) became effective.  The cure of defaults was also a multi-stage process, and parties were afforded opportunities to assert claims for cure amounts (i) arising from defaults prior to the date of entry of the Sale Approval Order (the "<u>Initial Cure Amounts</u>"), (ii) arising from defaults between the entry of the Sale Approval Order and the Initial Closing (the "<u>Interim Cure Amounts</u>"), and (iii) arising from defaults between the Initial Closing and the Final Closing (the "<u>Purchaser Cure Amounts</u>").  The Sale Approval Order also permitted certain parties (including DBNTC and Wells Fargo) to assert "<u>Transfer Cost Claims</u>" with respect to out of pocket costs relating to the transition of servicing from the Debtors to AHMSI.  Initial Cure Amounts, Interim Cure Amounts, and Transfer Cost Claims, collectively, constitute "<u>Seller Cure Amounts</u>" which are payable solely from the Cure Escrow.  Purchaser Cure Amounts represent obligations of the Debtors which AHMSI is affirmatively obligated to reimburse, given that they arose, if at all, during the post-Initial Closing, pre-Final Closing period (the "<u>Interim Period</u>") during which AHMSI assumed all risks and benefits of operation of the servicing business.

The Sale Approval Order decreed that, by establishing the Cure Escrow, the Debtors had "cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Initial Closing under the Assumed Contracts" (Sale App. Ord.

¶ K) and had satisfied "all of the requirements of sections . . .365(b) and 365(f) of the

Bankruptcy Code . . . for the assumption and assignment . . . of each of the Assumed Contracts"

(id. ¶ O).  The Sale Approval Order went on to find that all defaults under any Assumed Contract

"*shall be deemed cured* or satisfied upon payment by the Sellers of the Sellers' Cure Amount"

(id. ¶ 40 (emphasis added)) and that placement of $10 million into the Cure Escrow constituted

"*full satisfaction of the Sellers' Cure Amount*" (id. at ¶ 32 (emphasis added)).  Accordingly,

paragraph 43 of the Sale Approval Order provided that, so long as the $10 million had been

placed into the Cure Escrow, the Assumed Contracts could be assumed and assigned to AHMSI

in accordance with the parties' agreement (i.e., at the Final Closing) "whether or not any funds in

the Cure Escrow shall have been paid to the Counterparties in respect of the Sellers' Cure

Amount . . . at or prior to, or in connection with, such assignment".  (Id. ¶ 43.)

      The Sale Approval Order provides for continuation of the security interest of the

Administrative Agent in the Cure Escrow.  (Id. ¶ 11.)  The Debtors, the Creditors' Committee,

and the Administrative Agent were afforded standing to object to any Sellers' Cure Amount, at

which point the Sellers' Cure Amount would be deemed disputed and may only be allowed

pursuant to further Order of the Court.  (Id. ¶ 35.)  The release of cash from the Cure Escrow is

governed by the terms of the Cure Escrow Agreement, which is incorporated into the Sale

Approval Order by reference (id. ¶ 37).  The Cure Escrow Agreement permits funds to be

disbursed only to the Counterparties or to the Administrative Agent, as applicable.  The Debtors

have no residual or reversionary interest in the funds in the Cure Escrow.

      Based on the foregoing, and because cure/compensation under § 365(b)(1) is a

*prerequisite* to assumption and assignment of an executory contract, the Debtors submit that any

"disbursement" on account of DBNTC's or Wells Fargo's cure claims that could arguably have

been subject to subordination under § 510(c)(1) occurred in November 2007 upon establishment of the Cure Escrow or, at the very latest, in April 2008 upon the effective date of assumption and assignment of the DBNTC and Wells Fargo contracts. Upon establishment of the Cure Escrow, the Debtors divested themselves of any interest in the escrowed funds and disposition of the funds was committed to the terms of the Cure Escrow Agreement, subject to adjudication of any disputes, if necessary, in this Court.

The establishment of an escrow to facilitate adjudication of cure disputes is commonplace in this district and greatly facilitates asset sales by disentangling approval of the sale as a whole from potentially time-consuming (and largely unrelated) cure litigation. The fact that the Cure Escrow Agreement, as is common, has this Court as its preferred venue to adjudicate any disputes should not be misconstrued as an open-ended commitment of the escrowed funds to the vagaries of the Subordination Proceedings, which were brought *almost two years* after § 365 required the Debtors to cure/compensate DBNTC and Wells Fargo or provide adequate assurance of "prompt" cure/compensation. Indeed, were the Cure Escrow to become swept up in the Subordination Proceedings in this case, it would call into question the continued viability of cure escrows to resolve cure objections to proposed asset sales in this jurisdiction.

### D. The Debtors Will Reserve Distributions on DBNTC's and Wells Fargo's Unsecured Claims Pending Resolution of the Subordination Actions

The Debtors openly acknowledge that, to the extent the DBNTC and Wells Fargo Settlements provide DBNTC and Wells Fargo with allowed unsecured claims, the settlements have some bearing on the Subordination Proceedings. While it is unclear from the Subordination Complaints whether Ms. Rush or the Jacksons object to the allowance of these claims, objecting to allowance would be self-defeating, insofar as equitable subordination only works if the target

of the subordination has an allowed claim.  Insilco Techs., 480 F.3d at 219 (noting that, "[w]ithout an underlying claim, equitable subordination is a non-starter").  Thus, the only rational basis for objecting to the DBNTC and Wells Fargo Settlements vis-à-vis the unsecured claim portion would be if the settlements required distributions on the unsecured claim to be made within a time certain.  They do not.  The settlements provide only for the allowance of the claims; distributions will be made as and when permitted by the Plan once it goes effective.

The distribution provisions of the Plan contain standard procedures regarding the establishment of reserves for and withholding of distributions to disputed claims.  For the record, in light of the pending Subordination Proceedings, the Debtors consider all unsecured claims of DBNTC and Wells Fargo to be "disputed" for purposes of the Plan and will recommend to the Plan Trustee that he withhold all distributions on the allowed unsecured claims of DBNTC and Wells Fargo in a disputed claims reserve until the Subordination Proceedings are resolved.  Accordingly, approval of the DBNTC and Wells Fargo Settlements will in no way prejudice Ms. Rush's or the Jacksons' prosecution of the Subordination Complaints.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court overrule the Borrower Objections and enter orders approving the Settlement Motions and granting the Debtors such other and further relief as is just and proper.

Dated:    Wilmington, Delaware       YOUNG CONAWAY STARGATT & TAYLOR, LLP
          May 6, 2010

                                      Sean M. Beach (No. 4070)
                                      Patrick A. Jackson (No. 4976)
                                      The Brandywine Building
                                      1000 West Street, 17th Floor
                                      Wilmington, Delaware 19801
                                      Telephone: (302) 571-6600
                                      Facsimile: (302) 571-1253

                                      Counsel for Debtors and Debtors in Possession