Exhibit 1

# IN THE UNITED STATES DISTRICT
## FOR THE DISTRICT OF MARYLAND
### GREENBELT

APR - 3 2007

AT GREEN LET
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND

PAULA RUSH,
2651 Peery Drive
Churchville, MD 21208

   Plaintiff pro se

Vs.

American Home Mortgage, Inc.
538 Broadhollow Road
Melville, NY 11747

American Home Mortgage Servicing Inc.
4600 Regent Drive, Suit 200
Irving, Texas 75063

American Brokers Conduit
The Loan Corporation
4890 W. Kennedy Blvd. #260
Tampa FL 33609

American Brokers Conduit
5160 Parkstone Drive Suite 190A
Chantilly, VA 20151

Trust Appraisers
1138 Gaither Road
Rockville Md. 20850

Servicelink
4000 Industrial Boulevard
Aliquippa, PA 15001

   Defendants

CASE NO.: WMN 07 CV0 854

**COMPLAINT** FOR:
 INJUNCTIVE AND OTHER
EQUITABLE RELIEF, LOAN
RECISSION, ORDER TO DISMISS
FORECLOSURE COMPLAINT,
MONETARY DAMAGES,
PENALTIES AND ATTORNEYS
FEES AND COSTS

**JURY TRIAL DEMANDED**

**Case No.**

**Pro se**

-1-

## INTRODUCTION

This action brought by Plaintiff, Paula Rush (hereinafter"Ms. Rush") is seeking relief from the predatory lending practices of the Defendant, American Home Mortgage Servicing et al, (hereinafter "AHM") and American Brokers Conduit et al ( hereinafter "ABC") for numerous violations of Maryland State and Federal laws in relation to a mortgage loan refinance Ms. Rush obtained through AHM. Including but limited to, violations of RICO, Maryland Finder's Fee Act, The Maryland Consumer Protection Act, TILA, RESPA, and ECOA, DBPA, and related civil claims in connection with a Pay Option Arm (herinafter "POA") loan product advertised and sold through ABC a division of AHM.

The problems that Plaintiff has experienced mirror many practices already forbidden as a result enforcement actions taken against many lenders. The claims also highlight and help to bring attention to the growing concern of the practices lenders use to create loans and then "sell off" the liabilities to unsuspecting investors who invest in mortgage securities. The issues include, but are not limited to: a fraudulent inflated appraisal, misrepresented interest rate and loan terms,
bait- and- switch on every term in the loan, an exorbitant broker kickback in the form of a YSP, document switching, equity stripping, negative amortization, prepayment penalties, conflicting and misleading statements both orally and written, improvident lending, targeting a single unmarried woman, steering into a refinance promising non-existent benefits. All issues presented are covered by state consumer laws and federal statutory laws. No effort has been made by American Home Mortgage Servicing to address plaintiff's concerns after plaintiff making them aware of said problems.

CLASS ACTION COMPLAINT

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action and venue is proper under MD. CTS & JUD. PRO. §6-102 and §6-103.  Because Plaintiff is domiciled in Maryland and inasmuch as AHM is a foreign business, which upon information and belief carries on regular business in the State of Maryland and derives substantial revenue from real estate, mortgage and other services regarding property in Maryland.

2.    Venue is proper in this Court under MD. CTS. & JUD. PRO. . §6-201 because the Defendant conducts regular business in various counties in Maryland and the actions giving rise to the suit concern real property located and damages caused in Maryland.

3.    Plaintiff and Defendants are citizens of different states and the amount in controversy of this action exceeds one million dollars ($1,000,000.00), exclusive of interest and costs. Venue is proper in this court under 28 USC 1391(b)(2).

## COMPLAINT

4.    Plaintiff, Paula Rush, brings this action on her own behalf against American Home Mortgage Servicing et al and American Brokers Conduit, a division of American Home Mortgage Serving, and for her complaint allege upon information and belief and based on her investigation to date, as follows:

## THE PARTIES

5.    Plaintiff, Paula Rush is a resident and citizen of Maryland and owns her home at 2651 Peery Drive Churchville MD. 21028.  Plaintiff is the borrower of a MTA Pay Option Arm in a transaction which  occurred on April 3, 2006, for a total loan amount of 586,500 inclusive

-3-

of loan origination and settlement charges.

6.    Defendant, American Mortgage Servicing is incorporated under the laws of the State of New York, having its principal place of business at 538 Broadhollow Rd Melville, NY 11747, and originates mortgages to consumers throughout the United States directly and through affiliates, brokers and divisions of American Home Mortgage.

7.    Defendant American Brokers Conduit is a division of American Home Mortgage and under this arrangement marketed, advertised, and sold the MTA Pay Option Arms in Maryland, and also marketed, advertised, and sold the loans throughout the United States.

### FACTUAL ALLEGATIONS

8.    Plaintiff realleges all of the foregoing paragraphs.

9.    AHM operates as a mortgage lender. Through various nationwide brokers and agents it direct markets mortgages. It advertises, solicits, markets, and brokers mortgage loans.

10.    ABC a division of AHM Company's agents complete loan applications on behalf of borrowers and those applications are submitted to the lender.

11.    In the month of Feb 2006, AHM direct mail marketed, advertised, and promoted the MTA Pay Option Arm via a direct mail flyer to Ms. Rush citing a pre qualified acceptance of a 1% interest rate due to Ms. Rush good credit standing and equity in her home.

### COUNT ONE- VIOLATIONS OF
### THE TRUTH IN LENDING ACT PRIOR TO CLOSING

12.    Plaintiff realleges all of the foregoing paragraphs.

13.    Plaintiff seeks a remedy under the Truth in Lending Act ("TILA"). 15 U.S.C.

1601 et seq., to obtain rescission, injunctive relief, redress, restitution, disgorgement, money damages, attorneys' fees and other equitable relief against Defendants for engaging in Unfair or deceptive acts or practices in violation of TILA, 15 U.S.C. 1601 et seq., and its Implementing Regulation Z, 12 C.F.R. Part 226.

14.     Through various forms of media including, but not limited to; print ads, brochures, the Internet, direct mailers and promotional documents, ABC marketed, advertised and warranted that the MTA Power Option Arm (herinafter "POA") loan was fit for the ordinary purpose for which it was presented as a financial tool to build wealth and eliminate debt via a 1% interest rate.

15.     AHM through ABC, marketed, advertised, and sold the POA to Ms. Rush via a direct mail flyer and subsequent phone conversations. In conjunction with the sale, ABC and AHM marketed, advertised and warranted that this loan was a financial tool to build wealth, eliminate debt, and would save large sums of money for the plaintiff via terms of a 1% interest rate, $56,000 cash out, and no prepayment penalty.

16.     Despite AHM representations, the loan program conceals material fact omissions, and material fact misrepresentations, the effect of which is that the actual wealth building is only for the lender at the borrower's expense.

17.     The POA loan advertisements fail to point out the effect of negative amortisation, the volatile nature of real estate appreciation, or the true interest rate/payment rate and subsequent negative amortisation on the proported savings. This renders them unable to perform the ordinary purposes for which they are sold.

18.     Defendant sells loans with a teaser rate stated in their Truth in Lending Disclosure

-5-

Statements that misled the plaintiff into thinking she was buying a loan product with loan interest

rate that was lower than the rate actually being charged on her mortgage account.

19.     AHM knew or should have known that the refinancing of her current loan with

and interest rate of 5.25% with the POA loan program promised non-existent benefits of saving

money to plaintiff. The POA loan programs do not perform in accordance with the

advertisements, marketing materials and written promises disseminated by ABC and AHM nor

with the reasonable expectations of ordinary consumers.

20.     In addition, Defendant processed the loan application for a 1% interest rate loan

which they do not offer. The Defendant knew or should have known that proper disclosures

according to Regulation Z were not being given to the plaintiff at the time the mortgage

application was submitted or within 3 days of application.

21.     The Plaintiff signed an application for a mortgage with an interest rate of 1% for

480 months. The application misrepresents the product being sold. The Defendant knew or

should have known that the product being sold to the Plaintiff was different from what was

applied for and what was represented to her in various documents, including the preliminary

TILDS.

22.     After completing loan applications for consumers, AHM failed to provide

documents required within 3 days of receiving an application. The loan application started in

early February, appraisal was done on Feb. 22, 2006 and preliminary "Federal Truth-in- Lending

Disclosure Statements" and "Good Faith Estimate" were done on March 13, 2006. All loan terms

were changed between March 13, 2006 and closing which occurred on April 3, 2006.

23.     The provided documents entitled preliminary "Federal Truth-in-Lending

CLASS ACTION COMPLAINT

Disclosure Statements" and "Good Faith Estimate" did nothing to clarify but instead continued to misrepresent the terms of the loans being offered, the POA loan programs contained a crucial misrepresentation of material facts. The 1% interest rate for 480 months listed using this exact term on the Loan Application and Good Faith estimate, was actually only offered for 23 days of the loan and the actual interest rate was between 7% and 8%.

24.    The loan was expressed as "Conventional" when even on AHM investment statements they differentiate between a Conventional loan, Other Adjustable Rate, and Pay Option Arm. This is taken directly from the AHM website on April 1, 2007.

Total Portfolio

Pay-option ARMS $ 4,352.7 23.5% 709 1.0% 12.8% 30.4% 55.8%

Other Adjust-able Rate 7,051.0 38.0% 721 1.0% 6.2% 25.8% 67.0%

Conven- tional Con- forming Fixed Rate 1,599.4 8.6% 716 3.4% 7.2% 27.8% 61.6%

Alternate A First Lien 3,366.0 18.2% 684 2.3% 31.2% 32.1% 34.4%

Jumbo Fixed Rate 652.3 3.5% 727 0.3% 3.6% 27.6% 68.5%

Home equity/ Second Liens 1,090.2 5.9% 713 0.4% 9.1% 32.1% 58.4%

Govern- ment Fixed Rate 173.3 0.9% 637 41.2% 26.8% 14.5% 17.5%

Con- struction 196.7 1.1% 725 2.1% 5.8% 21.2% 70.9%

Non-Prime 62.4 0.3% 682 8.5% 29.8% 27.4% 34.3% -

Total Loans $18,544.0 100.0% 710 1.7% 12.7% 28.5% 57.1%

25.    AHM failed to state a type of loan in the TILDS blank provided by Regulation Z. The lack of disclosure and the use of "Conventional" creates more confusion to what the actual loan program is. AHM is in full control over what they put in the form. With the conflicting

representations on both the preliminary TILDS and the final TILDS. AHM violated the requirements that the TILDS be "clear and conspicuous" and not misleading pursuant to Regulation Z.

26.    In addition AHM uses many terms to identify this loan, including Conventional, Power Arm, Pay Option Arm, 1 Mo. MTA Power ARM.

27.    The effect of which is meant to confuse an ordinary consumer.

28.    The loan program didn't save the plaintiff any money, but in fact cost her much more then the existing loan with a interest rate of 5.25% locked in for five years which plaintiff was mislead into refinancing. Her previous loan payment was $2611 and her new loan payment was $2055 for a difference of $556 and then the negative amortised interest of $2,300 was added to her principal balance. In fact this loan was immediately costing her $1,744 per month more. In addition the closing costs, this loan cost her over $30,000 equity in her house in the first year.

29.    On the preliminary "Good Faith Estimate" that AHM provided to Plaintiff, AHM has checked the box. "will not" have to pay a prepayment penalty. Then changed this at closing.

30.    On the preliminary documents entitled "Federal Truth-in-Lending Disclosure Statement," and "Good Faith Estimate," the documents differ substantially on every item from the final documents when there was no change in the loan program being sold, or no change in the affiliated companies providing settlement services.

31.    Defendant used deceptive language on its "Good Faith Estimate" and "Truth in Lending Disclosure Statements" that violates the TILA requirements that language be both "clear and conspicuous" and that such language not be misleading.

32.    As an example, on the "Good Faith Estimate" at the top of the page it says Type

-8-

of Loan : Conventional; Rate 1%; Term 480 months. No other rate is mentioned. No where on the document do the words ARM, Pay Option Arm, Negative Amortisation, Index plus Margin, or any clarifications appear.

**33.** On the "Truth In Lending Disclosure Statement" for the Plaintiff's loan, Defendant again used the word "Conventional to describe the loan. No where on this document do the words ARM, Pay Option Arm, Negative Amortisation, Index plus Margin, or any clarifications appear. They used "Conventional" on this document and omitted the reference they made to interest rate previous in this space next to conventional. The only reference made to interest rate on this document was APR of "6.320e" which does not reflect the final interest rate in any way.

**34.** AHM could have easily spelled out that the loan was and MTA Pay Option ARM or even just ARM, and the real rate of interest, on the loan application, on the TILDS, or on the GFE.

**35.** The above use of language and conflicting statements was intentional to mislead the Plaintiff as to the true nature of her loan. The only references closer to the actual interest rate on plaintiffs loan documents can be found in places which ask for a APR, a terminology even AHM on their own web site state is not understood by most consumers. This is downloaded from AHM website on April 1, 2007. They state the following; " There is a lot of talk in the industry about annual percentage rate (APR). In fact, APR is a required disclosure on many advertisements. While most people have a vague understanding of APR, few fully understand the concept; yet many make decisions based on it. This is one of those subjects where a little information can be counterproductive. Many people make decisions–bad decisions–using a tool

they don't really understand." And also, "You should also be aware that not all lenders follow the rules of calculating APR under the Truth in Lending Act. For example, the application fee may or may not be included in the APR calculation, depending on how the lender conducts business. Yet the actual fees that are included in the APR do not have to be separately disclosed. One lender may offer an incredibly low rate and show a very low APR because the loan has been packaged to avoid including substantial fees in the APR calculation. Ask to see a breakdown of fees charged."

"For adjustable rate mortgages (ARMs), the APR is based on the "accrual rate" of the loan, which assumes the loan rate will make adjustments based on the current index and margin for the loan and other adjustment restrictions. Of course, economic conditions are likely to change, so the actual APR will probably be different. Many software programs used by lending institutions rely on the person generating the quote to enter the current ARM index and margin. Be careful that your ARM quote doesn't use an inaccurately low index. In fact, you should ask the lender what index and margin was used for the quote. Borrowers can use APR for a quick analysis of a loan proposal. For example, if a lender quotes a rate well below the market rate, but the APR is substantially higher, the borrower can assume the loan requires payment of high fees. As mentioned previously, however, some fees may not be included in the APR, so this "quick check" isn't foolproof."

36.    Considering this statement, AHM by their own admission understands that most borrowers don't understand the APR or how it is calculated. They also admit that lenders can change the outcome of the APR based on how they "package" a loan. AHM uses the 1% teaser rate to change the outcome of the APR rate presented in the "Truth and Lending Disclosure

Statement" thereby rendering it a false misrepresentation of true disclosure. Also, their admission of a "vague understanding" by consumers in conjunction with all of their other conflicting statements in loan documents prove a pattern of intentionally trying to deceive through methods they are very familiar with.

37.    In truth, AHM is presenting terms and interest rates it has no intention of offering. The mortgage note issued to Plaintiff was for a mortgage that charged 1% interest for only 23 days. After that time, the rate of interest immediately went to a eight times higher rate and has been adjusting to a much higher interest rate each month thereafter. This has caused the loan of the Plaintiff to negatively amortize and is causing her to pay a higher interest rate than represented in the majority of the documents.

38.    Defendant also provided this document to plaintiff, "AFFLIATES Third Party Disclosure, which says, "You will be required to use the following providers which we have repeatedly used or required borrowers to use within the last twelve months." Your appraisal service may be provided by Homegate Settlement services, Inc. a wholly owed subsidiary of American Home Mortgage Corp. Because of this relationship, this referral may provide American Brokers Conduit financial or other benefit.

39.    The statement "You will be required," took away Plaintiffs choice of settlement and title company services allowed by law in violation of 12 U.S. C. § 2607(d)(2) stating a lender can not require the use of title company directly or indirectly.

## COUNT TWO – SERVICING MORTGAGE LOANS WITHOUT MANDATORY TRUTH IN LENDING DISCLOSURES SUBSEQUENT TO CLOSING

40.    Plaintiffs reallege all of the foregoing paragraphs.

41.    The actual mortgage note issued to Plaintiff was for a mortgage that charged 1% interest for only 23 days. After that time, the rate of interest immediately went to a rate eight times higher rate and has been adjusting to a much higher interest rate each month thereafter calculated on an index plus margin.

42.    This has caused the loan of the Plaintiff to negatively amortise based on a higher interest rate than represented in the majority of the documents.

43.    The Truth in Lending Act requires mandatory disclosures to adjustable rate mortgage customers subsequent to closing. Among the requirements of Regulation Z, is a duty of the servicing lender to notify variable rate customers 25 days prior to making any change in the interest rate on a variable rate loan.

44.    According to Federal Regulations, the following disclosures must be given:

§ 226.20 Subsequent disclosure requirements. An adjustment to the interest rate with or without a corresponding adjustment to the payment in a variable-rate transaction subject to §226.19(b) is an event requiring new disclosures to the consumer. At least once each year during

which an interest rate adjustment is implemented without an accompanying payment change, and at least 25, but no more than 120, calendar days before payment at a new level is due, the following disclosures, as applicable, must be delivered or placed in the mail:

(1) The current and **prior interest rates.**
(2) The index values upon which the current and prior interest rates are based.
(3) The extent to which the creditor has foregone any increase in the interest rate.
(4) The contractual effects of the adjustment, including **the payment due after the adjustment is made,** and a statement of the loan balance.
(5) **The payment, if different from that referred to in paragraph (c)(4) of this section, that would be required to fully amortize the loan at the new interest rate over the remainder of the loan term.**
*[Codified to 12 C.F.R. § 226.20]*

-12-

*[Section 226.20 amended at 52 Fed. Reg. 48671, December 24, 1987, effective December 28, 1987, but compliance optional until October 1, 1988]*

45.    The Defendant sold Plaintiff a loan wherein the Defendant apparently was charging 1% note interest for the first 23 days of April 2006. In the month of May 2006, Defendant began charging a note interest rate of over 7% without providing advance notice consistent with the foregoing Regulation Z requirements. Even though the rate continued to rise each and every month the disclosure of rate increases came after they had been implemented with no new payment schedule needed to fully amortize the loan, therfore the Defendant did not provide advanced notice consistent with the foregoing Regulation Z requirements, or identify the payment which would be required to fully amortise the loan.

46.    Defendant failed to make disclosures thereby collecting interest illegally on plaintiffs loan.

## COUNT THREE -- FALSE ADVERTISING

47.    Plaintiff realleges all of the foregoing paragraphs.

48.    Plaintiff seeks a remedy for deceptive advertising and bait and switch sales of mortgages which violate the the following: TILA, 12 CFR 226.16 (a) ( Regualation Z)

49.    On the preliminary "Good Faith Estimate" that AHM has provided to consumers, AHM has checked the box that is, "will not" have to pay a prepayment penalty. On the closing documents that was changed to "may," which effectively meant, "will" have to pay a prepayment penalty. Plaintiff does have a prepayment penalty on her loan.

50.    AHM through ABC, marketed, advertised, and sold the MTA Power Option Arm (herinafter "POA") to Ms. Rush via a direct mail flyer and subsequent phone conversations. In

-13-

conjunction with the sale, ABC and AHM marketed, advertised and warranted that this loan was a financial tool to build wealth, eliminate debt, and would save large sums of money for the plaintiff via terms of a 1% interest rate, $56,000 cash out, and no prepayment penalty.

51.    Under 25. Under TILA, 15 U.S.C. 1601 et seq. and its implementing Regulation Z, 12 C.F.R. Part 226, persons who advertise "closed-end credit," as defined in 12 C.F.R. section 226.2(a)(10), must comply with the applicable provisions of TILA and Regulation Z, including but not limited to, Sections 226.4, 226.22, and 226.24 of Regulation Z, 12 C.F.R. Section 226 et seq. "Credit means the right to defer payment of debt or to incur debt and defer its payment." 12 C.F.R. section 226.2(a)(14). "Closed-end credit means consumer credit other than open-end credit," and "open-end credit" is defined as "consumer credit extended by a creditor under a plan in which: (i) The creditor reasonably contemplates repeated transactions; (ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid." 12 C.F.R. sections 226.2(a)(10) & (20). The regulation on advertising says the following: § 226.24 Advertising.

(a) Actually available terms. If an advertisement for credit states specific credit terms, it shall state only those terms that actually are or will be arranged or offered by the creditor.
(b) Advertisement of rate of finance charge. If an advertisement states a rate of finance charge, it shall state the rate as an "annual percentage rate," using that term. If the annual percentage rate may be increased after consummation, the advertisement shall state that fact. The advertisement shall not state any other rate, except that a simple annual rate or periodic rate that is applied to an unpaid balance may be stated in conjunction with, but not more conspicuously than, the annual percentage rate.
(c) Advertisement of terms that require additional disclosures. (1) If any of the following terms is set forth in an advertisement, the advertisement shall meet the requirements of

paragraph (c)(2) of this section:

(i) The amount or percentage of any downpayment.

(ii) The number of payments or period of repayment.

(iii) The amount of any payment.

(iv) The amount of any finance charge.

(2) An advertisement stating any of the terms in paragraph (c)(1) of this section shall state the following terms, (An example of one or more typical extensions of credit with a statement of all the terms applicable to each may be used.) as applicable:

(i) The amount or percentage of the downpayment.

(ii) The terms of repayment.

(iii) The "annual percentage rate," using that term, and, if the rate may be increased after consummation, that fact.

(d) Catalogs and multiple-page advertisements; electronic advertisements. (1) If a catalog or other multiple-page advertisement, or an advertisement using electronic communication gives information in a table or schedule in sufficient detail to permit determination of the disclosures required by paragraph (c)(2) of this section, it shall be considered a single advertisement if:

(i) The table or schedule is clearly and conspicuously set forth; and

(ii) Any statement of terms of the credit terms in paragraph (c)(1) of this section appearing anywhere else in the catalog or advertisement clearly refers to the page or location where the table or schedule begins.

(2) A catalog or other multiple-page advertisement or an advertisement using electronic communication complies with paragraph (c)(2) of this section if the table or schedule of terms includes all appropriate disclosures for a representative scale of amounts up to the level of the more commonly sold higher-priced property or services offered.

[Codified to 12 C.F.R. § 226.24]

[Section 226.24 amended at 66 Fed. Reg. 17338, March 30, 2001, effective March 30, 2001]

     **52.**     The Defendant violated the TILA rules on advertising as published in Regulation Z. Defendants have advertised closed-end credit to consumers by disseminating false advertisements for mortgage loans, including but not limited to advertisements, marketing brochures and other mortgage documentation for loans at a lower rate than are actually being charged, stating teaser rates such as "1%" and other misleading implications.

     **53.**     AHM practices a pattern of presenting this "teaser rate" as the prominent feature/rate on advertising materials, web sites, and broker training materials. The following is

-15-

an example of advertising materials disseminated by AHM; A posting which was found on

March 31, 2007 on Craigslist in many different states by an employee of AHM. Second example

is taken directly from AHM website on April 1, 2007. Clearly the "pitch" authorized to draw

people in is a bold reference to an interest rate of 1.25%. A small disclaimer is used at the

bottom of these ads. Craigslist Posting:

# Don't pay higher than 1.25% interest rate on your mortgage!

Reply to: serv-302513771@craigslist.org
Date: 2007-03-29, 12:12PM EDT

Licensed in all 50 states and the District of Columbia, we have over 2,000 different loan products
to meet the needs of all our customers!

Our popular **Pay Option ARM** allows you defer a portion of your interest. Use it for your rental
home, vacation home, or primary residence. The base rate starts at just 1.25%!

Other products include:
• 100% Owner-Occupied Financing with a 660 FICO
• 100% Investor Financing with 700 FICO
• 97% Financing with 580 FICO (full doc only)
• Payment option ARMs have a start rate of 1.25%*
• Home Equity Loans
• Less than perfect credit
• Lot Loans
• Government Loans (FHA/VA)
• 40 Year Loans (Fixed, ARMs, Neg Am)
• JUMBO Loans
• Loans for LLC's
• Limited or no documentation
• Interest only
• Commercial loans (brokered)
• Construction Loans

Call today!  Seth Harris
American Home Mortgage (NYSE: AHM)
503-231-6009 Office
888-248-6633 Toll Free
971-563-7398 Cell

\*The payment rate of 1.25% applies for the first five years; interest accrues at 6.75%
during that same period for this program. Accrual rates may vary by program. APR is 7.38%.
Rates are as of 03/23/07 and subject to change without notice. APR subject to increase after consummation.

Call Seth Harris for current rates and programs. This product may not be available in all 50
states.
\*\*All loans are subject to credit approval.

**AHM Web Site April 1, 2007**
Power 5 MTA

Power 5 MTA Gives You Security & SUPER LOW Payments!

If you're like most homebuyers, you want a mortgage that gives you
purchasing power and peace of mind. Our new Power 5 MTA delivers
both — and much more!

Here are the valuable benefits:
- Fixed payment based on **1.25%** of your original loan amount for the
  first five years.\*
- A fixed interest rate that doesn't change for the first five years.
- A choice of four monthly payment options for better budgeting and
  cash flow management.

A fixed payment of **1.25%** of your original loan amount for the first
five years keeps your payments unbelievably low and expands your
purchasing power across many more neighborhoods!

At the same time, a fixed interest rate for the first five years provides
lasting safety and security. With a fixed rate, there's no monthly
guessing game. You know exactly where you stand all the time!

Click Here Now to get more information on how this AMAZING loan
can help you achieve your homeownership goals!

\* The payment rate of **1.25% applies for the first five years**; interest accrues at
7.25% during that same period for this program. Accrual rates may vary by program.
APR is 7.38%. Rates are as of 4/26/2006 and subject to change without notice. APR
subject to increase after consummation. Call your loan officer for current rates and

-17-

programs. This product may not be available in all 50 states.

54.    In addition, Defendant is processing applications for a 1% interest rate loan which

they do not offer.  The Defendant knew or should have known that  proper disclosures according

to Regulation Z were not being given to the plaintiff at the time the mortgage application was

submitted. As an example, the Plaintiff signed an application for a mortgage with an interest rate

of  1% for 480 months. The application misrepresents the product being sold. The Defendant

knew or should have known that the product being sold to the Plaintiff was different from what

was applied for and what was represented to her in various advertisement documents.

55.    AHM knew or should have known that the refinancing of plaintiff's current loan

with the POA loan program promised non-existent benefits to plaintiff. The POA loan programs

do not perform in accordance with the advertisements, marketing materials and written promises

disseminated by ABC and AHM nor with the reasonable expectations of ordinary consumers.

56.    At the time of initial direct mail offer and loan application, and then again in the

subsequent Good Faith Estimate, the POA loan programs contained a crucial misrepresentation

of material fact, the 1% interest rate listed using this exact term on the loan application and Good

Faith estimate, was blantantly false advertising. The rate of 1% was only offered for 23 days of

the loan and the actual interest rate was closer to 8%.

57.    Notwithstanding its advertisements, AHM has never offered an interest rate of 1%

"conventional" loans. Instead, a loan that AHM has falsely advertised as a 1% and

"conventional" loan is in fact an adjustable rate mortgage (Negative Amortisation ARM) for

which the interest rate varies each month and the minimum payment is the only aspect the rate

relates to. The rate adjusts each and every month that the loan is in existence.

-18-

**58.**     This loan features four payment options, however only the lowest payment is used on the TILDS thereby leaving the plaintiff to assume this is the payment she should be making thereby encouraging the negative amortization aspect of this loan. No other payment option is presented on the TILDS or amortisation schedule provided to show this aspect of the loan.

**59.**     The effect of which is that the loan program didn't save the plaintiff any money, but in fact cost her much more then the existing loan with a interest rate of 5.25% locked in for five years which plaintiff was mislead into refinancing.

**60.**     The minimum payment amount for the first year of this loan has been the amount that would be due if the consumer truly had a 1% loan. The actual interest rate charged is in fact considerably higher and varies monthly causing negative amortization. The minimum payment does rise each year at rate which is not explained well anywhere in the loan document of how this increase is calculated. The minimum payment option "will" result in negative amortisation under any circumstances, however they chose to use the word, "may" even though they know each month any unpaid interest is added to the principal of the loan, so that the principal balance increases rather than decreases for periods during the course of the loan.

**61.**     This loan is not a 1% or "conventional" loan as those terms are understood by consumers. AHM has made mail advertisements, brochures and other documents and information disseminated to consumers and helped mortgage brokers create such advertisements on its behalf. Many of the company's advertisements, brochures and other documents disseminated to customers indicate "boldly" a low teaser rate, without disclosing that the teaser rate is only available for the first month of a 40-year loan and would increase after the first month, and then use very small disclaimers to state that interest would accrue at an APR rate

substantially higher than the teaser payment rate.

62.    ABC has also completed applications on behalf of consumers and obtained consumers' signatures only at closing on applications for loans that AHM has not offered or that were not available to the consumers, including but not limited to a 1%. AHM requires that applications be signed at the closing so AHM is ultimately responsible for the content of the applications and the related marketing programs. As an example, the Plaintiff in this action signed an application for a 40 year conventional mortgage with an interest rate of 1%. The application was filled out by a broker working on behalf of the Defendant in April 2006. The application was signed at the request of the Defendant at the mortgage closing in April 2006. At no time did AHM disclose to the Plaintiffs that no such loan program was being offered.

63.    The effect of which is that the loan program didn't save the plaintiff any money, but in fact cost her much more then the existing loan with a interest rate of 5.25% locked in for five years which plaintiff was mislead into refinancing.

64.    The result of which led to devastating loss of financial security, pending foreclosure, substantial loss of equity in home, and continued duress due to an expensive illegal prepayment penalty locking plaintiff into said loan.

65.    The mortgage when issued differs substantially from the program advertised and disclosed in AHM documentation and advertising. In credit advertisements, Defendants have violated the requirements of TILA and Regulation Z by:

A. advertising credit terms other than those terms that actually are or will be arranged or offered by the creditor, in violation of Section 226.24(a) of Regulation Z, 12 C.F.R. 5 226.24(a);
B. stating a rate of finance charge without clearly and conspicuously

disclosing the annual percentage rate, and, if the annual percentage rate
may be increased after consummation, that fact, and advertising a payment
rate without clearly and conspicuously making other required disclosures,
in violation of Sections 144(c) and 107 of TILA, 15 U.S.C.sections
1664(c) & 1606, Sections 226.24(b) and 226.22 of Regulation Z, 12
C.F.R. sections 226.24(b) & 226.22, and Section 226.24(b)-4 of the
Federal Reserve Board's Official Staff Commentary to Regulation Z, 12
C.F.R. Section 226.24(b)-4, Supp. 1; and stating the period of repayment
and/or the amount of a payment, but
C. failing to disclose clearly and conspicuously one or both of the following
items: (1) the terms of repayment and (2) the annual percentage rate, using
that term, and, if the rate may be increased after consummation, that fact,
in violation of Section 144(d) of TILA, 15 U.S.C. section 1664(d), and
Section 226.24(c) of Regulation Z, 12 C.F.R. section 226.24(c).

66.    Therefore, Defendant's representations, as alleged above, were, and are, false or

misleading. Defendants' practices constitute deceptive acts or practices.

67.    To facilitate this loan a reference is made to a 1% rate throughout all the loan

documents to confuse and mislead.

A)The initial mailer;

B)the loan application;

C)the good faith estimate;

D)adjustable rate rider;

F)and adjustable rate note.

68.    In the course of advertising and offering a loan to Plaintiff, Defendants have

represented, expressly or by implication, that the monthly payment of a specified amount or at a

specified rate is the cost of obtaining a loan through AHM. Defendants have failed to disclose or

to disclose adequately that;

(1) monthly payment of the specified amount or at the specified rate will result in negative
     amortization and cause an increase in the total debt during the course of the loan, and

(2) the monthly payment amount will increase. This additional information would have been material to consumers in deciding whether to apply for and obtain a loan through AHM. The failure to disclose, or disclose adequately, this information in light of the representations made was and is a deceptive practice.

69.    In the course and conduct of advertising and offering credit, Defendants have represented both orally and written, and on their web site, expressly or by implication, that cash savings or annual savings of refinancing and/or consolidating existing debts into a mortgage loan obtained through AHM.

70.    In truth and in fact, the cash savings have not accurately illustrated the potential annual savings or lack thereof in regards to the refinancing and/or consolidating plaintiffs first mortgage with a rate of 5.25% and home equity loan into a mortgage loan obtained through AHM.

71.    Defendants' representations, as alleged in this complaint, were false and misleading.

72.    The only references closer to the actual interest rate on Plaintiffs loan documents can be found in places which ask for a APR or a reference to how rate is calculated like index plus margin. A terminology even AHM on their own website say is a term not understood by most consumers.

73.    On the Adjustable Rate Rider they use the term "at a yearly rate of 1%" then reference second the 7.438% rate. Clearly 1% is used much more frequently then any other rate throughout loan documents and always used previous to any other rate.

## COUNT FOUR – FRAUD AND DECEPTIVE ACTS

74.    To facilitate this loan and create a LTV ratio which worked a material fact

-22-

misrepresentation was made both verbally and on documents provided to plaintiff using a grossly inflated appraisal by counting non-existent finished square footage in plaintiffs home. The appraisal which was done on Plaintiff property on Feb. 22, 2006 ordered by ABC was withheld from the plaintiff even as she requested it. The broker stated a verbal value of $870,000 and put this value on the loan application. At no other time did plaintiff see any other value placed on her property. Upon receiving the appraisal after demanding it for bankruptcy court, plaintiff noticed irregularities. First, the amount of the appraisal was not $870,000 but $790,000. Then upon further inspection The basement in plaintiffs home was counted as finished as well as an inflated square footage on the main living levels. The appraiser added over $146,000 in value to the appraisal using non-existent finished SF. He also ignored lower comparable properties which were available at that time and instead used the highest comparable he could find even if they were further away and did not reflect the values of the neighbourhood this property was in.

75.     Loan would not have been possible using actual finished SF as this would have resulted in a much lower LTV ratio. LTV ratio is one of the selling tools AHM mortgage is describing their portfolio to investors, an incentive for them to inflate appraisals.

76.     ABC chose appraiser and controlled transaction completely by withholding appraisal from plaintiff even though she was forced to pay for it directly to the appraiser. Appraiser refused on previous occasion to give Plaintiff appraisal citing he works for the lender. Finally Plaintiff demanded the appraisal cited the bankruptcy court demanded it, and finally received the appraisal in Jan of 2007 via email from the appraiser 11 months after loan transaction.

77.     Fraud occurred when ABC made a false statement of material fact that was

known to be or believed to be false when made that was intended to induce the plaintiff to act and led to subsequent action by the plaintiff in reliance on the validity of the representation and resulted in damage to the Plaintiff. This statement of appraised value was represented both verbally, and on the loan application.

78.    Fraud occurred in making this misrepresentation, Plaintiff, to her detriment relied on this fact as a major factor in taking out the loan.

79.    Fraud occurred in making a promise of a 1% interest rate, $56,000 cash out to pay credit debt, and no prepayment penalty, with no intent to perform that promise when Plaintiff reasonably relied on that representation to her detriment.

80.    The Plaintiff acted in reliance upon these statements and the plaintiff thereby suffered injury.

81.    AHM has engaged in unfair or deceptive trade acts or practices in violation of Maryland Code §4-88-107, §4-88-108, including, but not limited to: the aforementioned conduct is and was deceptive, false, fraudulent, and constitutes unconscionable, unfair and deceptive commercial practices in that AHM has, by the use of false or deceptive statements and/or knowing intentional material omissions, misrepresented and/or concealed the true nature of the MTA Pay Option Arm loan programs.

82.    As a direct and proximate result of these unfair, deceptive and unconscionable commercial practices, Plaintiff has been damaged as alleged herein, and are entitled to recover actual damages and any other damages permitted by the applicable consumer protection statute, in an amount to be proven at trial as well as attorneys' fees and costs.

83.    Under the Consumer Fraud and Deceptive Business Practices Act unfair practices

CLASS ACTION COMPLAINT

are: Deception, fraud, false pretence, false promise, misrepresentation, concealment, or suppression, or omission of a material fact. Throughout this complaint each of these practices can be found.

    **84.**    Under The Maryland Consumer Protection Act " Md. Code Ann., Comm. Law §§ 13-101, *et seq.* a wide variety of deceptive trade practices are expressly prohibited including, "deception, fraud, false pretence, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same." *Id.* § 13-301(9).

    **85.**    Defendant paid the broker a YSP of $19794 an exorbitant fee, or "unearned gravy" for delivering such harsh mortgage terms as an above par rate and a prepayment penalty in violation of The Real Estate Settlement Procedures Act, 12 U.S.C. §2601 et seq., 24 C.F.R. Part 3500 et seq., 1974. (RESPA).

    **86.**    Defendant also provided a document to plaintiff, which stated, "we will require you to use these affiliated companies, which we have used in the past." Thereby taking away the choice of settlement and title company services allowed by law under RESPA.

    **87.**    The remedy is full loan recession releasing the security interest in the property and giving rise to an Order to Dismiss the Complaint for Foreclosure of Mortgage

    **88.**    To facilitate this loan a material fact misrepresentation was made of promised false benefits. AHM disseminates benefits of savings and appreciation of real estate as reasoning for the financial benefit of the Pay Option Arm. Nowhere in their advertising do they account for, include, or explain the aspect of negative amortisation.

    **89.**    Savings "does not" occur due to negative amortisation, and based on a higher

**CLASS ACTION COMPLAINT**

interest rate. Rate of appreciation is a subjective/market driven variable that cannot and should not be promised as a benefit.

90.    Negative amortisation is the only "guarantee" in these loans if you pay the payment amount listed on TILDS, and it is the only facet of the loan not accounted for in any presentation of this loan. Negative amortisation is banned in Md. Commercial Law Code §12-127, 12-311, 12-409.1 and 12-1029

91.    AHM uses "Bait and Switch" to totally change the initial loan terms offered to borrower and presented in loan application and Good Faith documents. Between the date of March 13, 2006 and April 3, 2006 every meaningful aspect of loan offered was changed in violation of ECOA .

92.    All of these issues reduce this contract to nothing more then a fraudulent sham aimed at inducing the plaintiff to enter into a loan for the sole benefit of unjust enrichment of the defendant

93.    No actual index or margin rate was presented in any preliminary documents. The only references to indexes and margins is a generic one that a rate will be calculated using an index and margin. No actual numbers are revealed on what these indexes or margins will be until closing.

94.    In the generic disclosures which are seven pages referencing 1, 3, 3, 6, and 12, Month MTA Power ARMs, there is no exact reference stating which program the loan offered actually is.

95.    If seven pages of programs wasn't enough to confuse the ordinary consumer, the references to indexes and margins, and calculators they offer are all based on a 15 or 30 year

CLASS ACTION COMPLAINT

loan, and plaintiff was given a 40 year loan rendering them useless.

96.    To facilitate the fradulent transactions, AHM/ABC uses different documents in the Good Faith presentation and then change the final documents. Two of the noted changes are adding an extra disclaimor using a different document in the mountain of documents at closing and changing the sheet which reads "you will be required" to use our affiliate companies to "you can choose."

97.    As a result of the fraudulent misrepresentation, Plaintiff has suffered damages, in that she was sold a loan program that she would not otherwise have purchased had she known of the truthful terms and non-existent benefits of the loan. AHM effectively trapped Plantiff into this loan by the use of a prepayment penalty.  Plaintiff is in bankruptcy and facing foreclosure, is emotionally destroyed, and her good credit is ruined. Damages are severe.

98.    ABC baited plaintiff into this transaction promising 1% interest rate and then proceeded to immediately in less then one month increase the rate to 7.43 and increase it every month thereafter. Maryland commercial code states," The interest rate may not be adjusted more frequently than once in a 6 month period.  The amount of increase in any 6 month period may not be more than the equivalent of 1 percentage point above the rate in effect prior to the rate change. §12-118(ii).

99.    American Home Mortgage is well aware of how these loans are marketed as they lend directly and promote the same benefits on their own web site.  To date, however, American Home Mortgage has failed to institute any programs to restructure or replace their practices even as many other lenders, including but not limited to; Ameriquest, New Century, Wells Fargo, Countrywide and most recently Chevy Chase Bank have been given harsh penalties, lost court

cases and been forced by state and federal regulators to reform said practices. Many courts,

federal agencies, and lawmakers have expressed their findings on many of the issues raised in

this complaint. AHM willfully continues to practice predatory practices ignoring all the of

overwhelming condemnation of practices contained in this complaint.

PREPARED STATEMENT of the FTC on EFFORTS TO COMBAT UNFAIR AND
DECEPTIVE SUBPRIME LENDING
Before the SENATE SPECIAL COMMITTEE OF AGING
Wash DC
Feb. 24, 2004

"Empirical evidence suggests that subprime loans are different from prime loans in terms of the
variety, complexity and level of risks they pose. Several cases have resulted in large monetary
judgements, including Ameriquest, HFC, Citigroup, The Associates, Fairbanks Capital.

September 2002 – Landmark case. The FTC charged Citigroup Inc's subsidiaries, Associates
First Capital Corp., and Associates Corp of North America("The Associates") engaged in
systematic and widespread deception and other illegal lending practices. " they lured customers
into high-cost loans through false and misleading statements and half-truths about loan costs, and
violated numerous federal laws, including the TILA, the FCRA, and the FDCPA.

First Alliance Mortgage Co. - THE FTC and others, including six states, private plaintiffs, and
the AARP, reached a major settlement with mortgage lender First Alliance Mortgage Co. in
March 2002. The complaint alleged that the defendants loan officers in their sales presentations
made blatantly deceptive claims about monetary and other loan terms.

July 2002 – The FTC, HUD, State of Illnois, jointly settled a case against a regional sub-prime
lender, Mercantile Mortgage Company Inc., charging violations of the FTC Act, TILA, HOEPA,
and the RESPA. The FTC alleged that the company's employees, and one mortgage broker who
was acting as an agent in soliciting and closing loans on it's behalf, misrepresented key loan
terms to borrowers.


FAIRBANKS CAPITAL CORP.Nov. 2003- The FTC along with HUD, announced a settlement
with Fairbanks Capital Corp. and its parent company of violations of 15 U.S.C. 45(a), 15
U.S.C. 1639 HOEPA. TILA 15 USC 1601 et seq, ECOA 15 USC 1691 et seq, FCRA 15 USC
1681 et seq, FDCPA USC 1692 et seq. Citing harsh mortgage terms, pre payment penalties, and
broker kickbacks, to name a few.

Other Banking Litigation Developments

This year, after the Eleventh Circuit in Culpepper v. Inland Mtge ruled that yield spread premiums were prohibited referral fees under RESPA, plaintiffs instituted a RICO class action based on that practice.

In Cannon v. Nationwide Acceptance Corporation, a Federal Judge in the Northern District of Illinois allowed a RICO class action to be maintained on the basic premise that the lenders' solicitation of new business induced existing borrowers to refinance existing loans rather than going the cheaper route of just borrowing more funds.

Chevy Chase Bank – The most recent opinion supports the argument that lenders are using a misrpresentation of these loan products to sell them to unsuspecting consumers.

Sanfrancisco Gate

Last month, a survey of the national appraisal industry conducted by October Research Corp. reported that 90 percent of appraisers feel pressure to inflate the value of homes to meet expectations -- be it a purchase price or an estimated value for a refinance.

Of course, this isn't the first time evidence of appraiser pressure has been aired. Just four years ago, during the boom, a similar study found that a full 55 percent of appraisers had had lenders, brokers or owners attempt to inflate their values.

In 2005, Jonathan Miller, appraiser and bubble blogger, launched Soapbox to "vent" about the "pressure myself, my firm and my profession was under to make the number 'or else.'"
"It seemed that no one really cared about ethics or the risk placed on [the] banking system," he wrote recently. "Appraisers were fast becoming the enablers to fraud and a whole lot of 'gray areas' that I wanted no part of."

"Internet-based mortgage companies call all the time," says Curt Thor of Real Estate Appraisals Association of Northern California and a Marin appraiser with North Bay Real Estate Appraisals for over 20 years. "They're fishing for appraisers. They tell me what the number is and ask me if I can match it."

John Philipp, an appraiser based in Sonoma County, says that he's experienced similar "dialing for appraisals" when mortgage brokers routinely call and ask him to complete a "comp check" before offering the appraisal assignment. "[T]hey want me to research the subject property and based on county information do research thru the MLS and give them a value before seeing the property. Sometimes they tell me what value they need to make their loan go through, which is illegal. The appraiser is not supposed to be made aware of the owner's estimate of value, or the value that is needed to make the loan, so as not to be influenced or have a predetermined number prior to the inspection," he writes in an e-mail about refinance appraisals. "[B]asically, the broker wants an appraisal without having to pay for it."
Philipp knows from experience that these brokers are not a source of future business. "Once I advise these

CLASS ACTION COMPLAINT

callers that I don't perform this service and that it is illegal to even ask. I don't hear from them again."

" He says that the pressure on appraisers has been growing since the 1990s, when banks began to eliminate their in-house appraisal offices and outsource the business of managing appraisals to appraisal management companies. Suddenly, mortgage brokers – who may have the biggest stake in the deal going through – were in the business of hiring appraisers directly.

CURRAN ANNOUNCES AMERIQUEST WILL PAY $325 MILLION AND REFORM ITS LENDING PRACTICES TO RESOLVE STATES' INVESTIGATIONS
**Ssweeping reforms of practices that states alleged amounted to predatory lending.** "This is a huge settlement, but we believe Ameriquest did a lot of damage to consumers," said Attorney General Curran. "With this agreement in place Ameriquest's practices will change."

The company agreed to a battery of new standards to prevent what the states alleged were unfair and deceptive practices. Curran's office believes that Ameriquest employees deceived consumers as part of high-pressure tactics to sell mortgage refinances and that these high-pressure sales tactics were used to reach desired sales levels and high monthly individual sales quotas. These tactics were induced by a lopsided commission structure.

Under the agreement, Ameriquest is required to: Provide the same interest rates and discount points for similarly-situated consumers. Not pay sales personnel incentives to include prepayment penalties or any other fees or charges in the mortgages. Provide full disclosure regarding interest rates, discount points, prepayment penalties, and other loan or refinancing terms.
Overhaul its appraisal practices by removing branch offices and sales personnel from the appraiser selection process, instituting an automated system to select appraisers from panels created in each state, limiting the company's ability to get second opinions on appraisals, and prohibiting Ameriquest employees from influencing appraisals. Not encourage prospective borrowers to falsify income sources or income levels. Provide accurate, good faith estimates. Limit prepayment penalty periods on variable rate mortgages. Not engage in refinancing solicitations during the first 24 months of a loan, unless the borrower is considering refinancing. Use independent loan closers.

Elizabeth Kelderhouse, a Community Affairs Officer with the **FDIC.**
Examples of predatory practices include schemes where the lender promises one type of loan or interest rate but switches to another one that's more costly to the borrower, and "equity stripping," in which the lender deliberately makes a loan that is beyond the borrower's ability to repay in hopes of foreclosing on the loan and taking possession of the house. Predatory lenders primarily target consumers they believe are vulnerable.

-30-

## COUNT FIVE- RICO

**100.**   RICO violation occurred when the Defendant participated directly or indirectly in a pattern of racketeering activity to acquire an interest in the real property located at 2651 Peery Drive Churchville Md. 21028.

**101.**   ABC and AHM acts and the predicate acts caused the Plaintiff's injuries. The line was crossed when the lender acting in the normal course of its business, crossed the line between the normal course of business and illegal activities by the lender's participation in development and marketing activities. The lender is liable for aiding and abetting the predicate acts of the RICO violation because there was an illegal act. The lender was aware of its role in the unlawful act. The lender knowingly rendered substantial assistance in the act.

**102.**   AHM is liable for a civil RICO violation even because AHM resulted in profit to the lender, and because Plaintiff suffered an economic injury.

**103.**   There is clear evidence of a scheme by ABC and AHM to defraud Plaintiff and many other unwitting parties including investors and the lender's conduct has a "criminal dimension and degree."

**104.**   AHM disseminated information to Plaintiff and other consumers via their web site and through other marketing materials, to induce Plaintiff to act on a refinance of her mortgage loan with no benefit to her.

**105.**   AHM disseminates misleading information to investors via their web site and in SEC filings to promote their revenue.

**106.**   AHM uses a pattern and practice of affiliated companies and divisions to control

-31-

the entire transaction.

107.    AHM paid ABC, and uses a pattern and practice of an incentive, or kickback in the form of a  YSP or "unearned gravy" of over $19,794 paid on Plaintiffs loan for delivering a higher than par rate and other harsh loan terms and inflated fees. They paid this incentive for targeting, steering and negligently representing terms and benefits of the MTA Pay Option Arm to induce Plaintiff into taking this loan,  and for delivering a loan they can sell for a higher value to investors. The amount paid was not based on any legitimate services provided, but rather a kickback based on the less favorable loan terms and interest rate delivered. This violates Maryland Finder's Fee Act, MD. CODE ANN. Com. Law §12-801 et seq. And Federal statute Prohibition against unearned fees and fee splitting: 12 USC 2607 (b) 24 CFR 3500.14,  RICO, and RESPA.

108.    This payment was made between employer (lender AHM) to employee (broker ABC).  Broker rules state that a mortgage broker may not be a director, officer, or employee of any lender where he places a loan.  Md Commerical Code §12-803 A mortgage broker may not charge a finder's fee in any transaction of the mortgage broker is the lender or an owner, part owner, partner, director, officer, or employee of the lender. Commercial Code §12-804(e)

109.    ABC included documents which state " you must use our affiliate companies," and has utilized a number of divisions and affliate companies to facilitate the entire transaction in violation of RESPA.  This is a clear pattern and practice of using affiliates and divisions to control the outcome of the loans it ultimately controls.

110.    AHM uses the information such as LTV ratios to qualify the value of the assets it holds. Therefore AHM benefits from over appraising the value of its real estate holdings to

inflate or give the effect of inflating the overall value of its companies stock

111.    Although ABC pulled all three of Plaintiffs credit scores they chose to use only one in her loan information. AHM uses such information as and credit scores to qualify the stability of the borrowers of the assets it holds, Therefore AHM benefits from using only the highest credit scores even when they pull all three credit scores to inflate or give the effect of inflating the overall value of its companies stock

112.    Despite the overwhelming publicity, consumer and state and federal actions against lenders for these same practices, American Brokers Conduit, American Home Mortgage, continue to actively conceal the existence and nature of these loan practices from consumers. In fact, Amercian Home Mortgage has recently published a statement to investors about the loan products is sells which is full of contrived statements of fact trying to reassure investors as it's stock tumbles.

113.    American Home Mortgage Servicing has offered no alternatives for relief and instead only wants to foreclosure and steal property it acquired fradulently even as Plaintiff alerted counsel for the Defendant in the foreclosure proceedings of her issues. In addition, she has contact counsel for plaintiff by mail in their foreclosure suit stating her issues, and spoke directly with AHM representative Diamond Ramos at AHM again expressing her issues.

114.    AHM knew or should have known that the POA loan poses a real and unreasonable damage to consumers' due to loss of equity, stripped through refinancing costs and misrepresented interest rates.

115.    Plaintiff has not received the value for which she bargained for when she refinanced. There is a great difference in value between the loan advertised and the actual loan

product sold.

116.    As a result, the plaintiff has suffered irreparable damages to her credit, her security, her home equity, and her well being.

## COUNT SIX - NEGLIGENCE

117.    Plaintiff realleges all of the foregoing paragraphs.

118.    Plaintiff relied to her detriment on an appraisal ordered, supplied, and suppressed by the lender. The lender owed her a duty of care in preparing the appraisal when the lender can foresee that the Plaintiff would rely upon the erroneous appraisal. The lender became directly involved in the transaction and made assurances of the value of the property, through its affliated ABC.

119.    The loan products were defectively designed and pose an unreasonable risk of financial damage to consumers.

120.    The Loan products were fraudulently misrepresented and pose an unreasonable risk of financial damage to consumers.

121.    At the time AHM was selling these loan products, it was aware, or reasonably should have been aware, of the foreseeable risks of financial damage and loss of equity to consumers' associated with the use of these loan products. They still continue to negligently sell these loan products even as the current real estate markets conditions make them increasingly damaging to consumers.

122.    AHM failed to disclose the known risks associated with the MTA Pay Option Arms, and by allowing the sale and use of these loan products when it knew they would not

-34-

perform as intended.

123.    American Home Mortgage had a duty to disclose to the consuming public the foreseeable risks associated with the use of these loan products. American Home Mortgage further had a duty not to market these defective loan products in such a way as to deceive consumers into taking them.

124.    AHM breached its duties to the Plaintiff by failing to disclose the known risks and true costs associated with these loan programs, and by allowing the sale and use of these loan programs when it knew they would not perform as presented.

125.    As a result of the foregoing, the Plaintiff has suffered damages that were directly and proximately caused by the defective loan program and misrepresentation of interest rate. Plaintiff is entitled to damages in an amount to be determined at trial.


## COUNT SEVEN- BREACH OF EXPRESS WARRANTY

126.    Plaintiff realleges all of the foregoing paragraphs.

127.    The advertisements, models and samples, and other similar uniform representations disseminated by American Brokers Conduit regarding the MTA Pay Option Arm were, and are, affirmations of fact and/or promises with regard to the performance and quality of those programs. These advertisements, models and samples, and other similar representations, formed, in whole or in part, the basis of the bargain as between American Brokers Conduit and the plaintiff, and constituted express warranties that the loans would conform thereto. As described above, plaintiff's loan did not conform to these warranties, representations, models and samples.

-35-

128.    American Brokers Conduit guaranteed expressed benefits to Plaintiff, which AHM breached and failed to honor.

129.    Plaintiff had no meaningful choice in determining the terms, the terms of the loan product unreasonably favored American Brokers Conduit over the plaintiff; a gross disparity in bargaining power existed as between ABC and plaintiff; and ABC knew the loan programs were of no benefit to the plaintiff and would result in loss of equity in plaintiffs home.

130.    By virtue of its knowledge of the misleading and false advertising and its knowledge of the real consequence of this loan product, as many federal actions have been taken for the same factual allegations, AHM has also received notice of the plaintiffs issued by virtue of a letter to attorneys representing AHM in foreclosure proceeding against plaintiff.

131.    ABC breached these representations and implied warranties. ABC made and/or allowed these misrepresentations to be made with the intent of inducing Plaintiff to enter into loan agreeements.  If Plaintiff had known the true facts, she would not have entered into such agreements.

132.    As a result of the foregoing, the Plaintiff has suffered damages that were directly and proximately caused by the misrepresented loan programs. Plaintiff is entitled to damages in an amount to be determined at trial.

## COUNT EIGHT –BREACH OF FUDCIARY DUTY

133.    Plaintiff realleges all of the foregoing paragraphs.

134.    Appraiser is recognized as a "Financial institution under the law." In this capacity he had a fudiciary duty to act in a manner consistent with good faith and fair dealing and not to promote the interest of AHM to the detriment of the Plaintiff.

CLASS ACTION COMPLAINT

135.   A special relationship was invoked when the plaintiff was guided by the judgment and advice of ABC and AHM and was justified in believing that the other party would act in her best interest. AHM and ABC acquired influence over the Plaintiff through use of credit profiling, misrepresentations, and material ommissions, and has abused that influence. ABC knew or had reason to know that the Plaintiff was placing her trust and confidence in the lender and was relying on the lender to counsel and inform.

136.   AHM settlement agent, Servicelink, has committed misconduct such as negligence. In Maryland, the legislature has strongly suggested that a contractual relationship exists between a borrower and a settlement agent. Unless good cause can be shown, a lender may not prohibit a borrower from engaging a licensed settlement agent selected by that borrower. Md. Code Ann., Comm. Law II § 12-120(a, c)

137.   A settlement agent is considered an agent of the borrower, and a fiduciary relationship to the borrower does exist. The settlement agent must act in good faith and make full disclosure to the borrower of all facts material to the borrower's decision to accept or reject the proposed transaction, and must act with care, skill, and diligence for the benefit of the borrower.

138.   Title documents are confusing to most consumers and, indeed, to many business people. The settlement agent did not take care to adequately explain the instruments of conveyance and the loan documents. The settlement agent did not explain the HUD-1 Settlement Statement, the mortgage, deed of trust, TILA Statement, or, the all-important right of rescission. In fact, he barely spoke to the Plaintiff, just saying sign here, sign there.

139.   Settlement agents are escrow agents and having collected fees from the buyer at settlement, the settlement agent, acting as an escrow agent, has a fiduciary duty to pay the

**CLASS ACTION COMPLAINT**

vendor-related fees incurred in preparation for the settlement. Thus, the settlement agent was required to pay off Plaintiffs first mortgage to Countrywide Home Loans and Home equity line of credit to Citimortgage. The loan was settled on April 3, 2006, and funded on April 7, 2006 as the required 3 day period passed. However both of Plaintiffs previous loans were not paid until April 10, 2206 thereby costing her duplicate interest on two loans and benefiting the escrow company with use of these funds.

140.    The settlement agent did not secure release in the home equity lien of credit and to this date it is still recorded against Plaintiffs property. The settlement agent is obliged to secure the release of the existing mortgage and obtain the release of other subordinate liens as agreed upon by the parties.

## COUNT NINE- UNJUST ENRICHMENT/RESTITUTION

141.    Plaintiff realleges all of the foregoing paragraphs.

142.    Defendant is a "lender" as that term is defined in Maryland Code

143.    Plaintiff is a "borrower" as that term is defined in Maryland Code.

144.    Defendant marketed, advertised and/or promoted the loan program as a financial tool to build wealth and eliminate debt, fit for the ordinary purpose for which they were to be used as set forth more fully above.

145.    Defendant accepted payments from Plaintiff for the settlement and subsequent mortgage payments for the loan it originated.

146.    Plaintiff did not receive a loan product that was fit for the ordinary purpose for which it was to be used.

147.    American Home Mortgage breached these representations and implied

CLASS ACTION COMPLAINT

representations. American Home Mortgage made and/or allowed these misrepresentations to be made with the intent of inducing Plaintiff to enter into a loan agreement.

148.    It would be inequitable for Defendant to retain this money and security interest in this property, in light of its misrepresentations and omissions, because Plaintiff did not, in fact, receive products that were in keeping with the promised benefits, and fit for the ordinary purpose for which they were to be used.

149.    If Plaintiff had known the true facts, she would not have entered into loan.

150.    As a result of the foregoing, plaintiff has suffered damages that were directly and proximately caused by the misrepresented loan product. Plaintiff is entitled to damages in an amount to be determined at trial.

151.    The problems that Plaintiff has had with her loan read like a poster for Predatory lending including, but are not limited to: a fradulent inflated appraisal, misrepresented interest rate and loan terms, bait and switch on every term in the loan, an exhorbitant YSP, document switching, equity stripping, negative amortization, prepayment penalty,  conflicting statements both orally and written, targeting a single unmarried woman, steering into a refinance promising non-existent benefits.

## COUNT TEN - BREACH OF CONTRACT

152.    While the relationship between debtor and creditor alone does not lend itself to a general imposition of the duty of good faith and fair dealing, courts nonetheless recognize that a duty of good faith and fair dealing may arise: a) by agreement; (b) when an imbalance of bargaining power exists at least; when the defendant is responsible for the imbalance.

153.    The Defendant, and its affiliates, have a "hidden agenda" as to the borrowers,

making false promises, and actively discouraging alternative financing through prepayment penalties, and otherwise acting dishonestly to maximize its revenues. AHM methods of controlling the loan process through use of its appraisers, affiliates, divisions, and other business partners, has demonstrated its unique, unequal bargaining position. AHM has also used its specialized knowledge against borrowers to succesfully misrepresent loan products which reap huge profits for AHM benefit only.

## COUNT ELEVEN - BREACH OF FUDICIARY DUTY

**154.**    Appraiser is recognized as a "Financial institution under the law." In this capacity he had a fudiciary duty to act in a manner consistent with good faith and fair dealing and not to promote the interest of AHM to the detriment of the Plaintiff.

**155.**    A special relationship was invoked when the plaintiff was guided by the judgment and advice of ABC and AHM and was justified in believing that the other party would act in her best interest. AHM and ABC acquired influence over the Plaintiff through use of credit profiling, misrepresentations, and material ommissions, and has abused that influence. ABC knew or had reason to know that the Plaintiff was placing her trust and confidence in the lender and was relying on the lender to counsel and inform.

## COUNT TWELVE DURESS AND ECONOMIC DURESS

**156.**    Through the threat of an illegal prepayment penalty AHM used this to create a situation which substantially limits the Plaintiffs free agency ability to get out of the contract. Thereby causing the Plaintiff to stay in an arrangement that she otherwise would not and was not legally bound to do. The restraint was imminent. Plaintiff had no present means of protection other then court action.

## ESTOPPEL FROM PLEADING AND TOLLING OF
## APPLICABLE STATUTES OF LIMITATIONS

157.    Defendant is estopped from relying on any statutes of limitation by virtue of its acts of fraudulent concealment. Upon information and belief, Defendant knew of the misrepresented material facts of interest rate, and of a falsely inflated appraisal, and has known of the misrepresented facts in the loan for some time, and has concealed it from Plaintiff and/or failed to alert the borrowers of the full disclosures and ramifications of these misrepresentations.

158.    Given Defendant's failure to disclose information about the misrepresented nature of the loan program – information over which it had exclusive control -- and because Plaintiff and consumers could not reasonably have known that the loan programs were thereby misrepresented, Defendant is estopped from relying on any statutes of limitations that might otherwise be applicable to the claims asserted herein.

## PRAYER FOR RELIEF ON ALL COUNTS

159.    WHEREFORE, Plaintiff, on behalf of herself, prays for judgment as requested against American Home Mortgage and further prays for remedies under the Truth in Lending Act ("TILA"), 15 U.S.C. 1601 et seq., to obtain redress, restitution, disgorgement, monetary damages, attorneys' fees and other equitable relief against Defendants for engaging in unfair or deceptive acts or practices in violation of TILA, 15 U.S.C. 5 1601 et seq., and its implementing Regulation Z, 12 C.F.R. Part 226. Plaintiff has suffered substantial injury as a result of Defendants' unlawful acts or practices, as set forth in each of the Counts above. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest. Plaintiff is seeking:

-41-

(a)         Restitution and/or disgorgement of amounts paid by Plaintiff for the settlement and mortgage payments, together with interest from the date of payment;

(b)         loan recission;

(c)         injunctive relief;

(d)         actual damages;

(e)         punitive damages;

(f)         statutorily provided damages;

(g)         statutory prejudgment interest;

(h)         reasonable attorneys' fees and the costs of this action;

(i)         legal and equitable relief under the causes of action stated herein;

(j)         and for such other relief at this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of 12 on all issues so triable.

Plaintiff reserves the right to ammend complaint as further investigation and discovery may reveal additional causes of action.

Filed:
Paula Rush
Pro se - Pending Attorney Representation
2651 Peery Drive  Churchville Md. 21028

443-676-3509
paularush@comcast.net

CLASS ACTION COMPLAINT