# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID E. JACKSON and ELISABETH JUDITH JACKSON, his wife,<br><br>        Plaintiffs, | ) CASE NO. 09-cv-6045-RMB(RLE)<br>)<br>)<br>)<br>) |

| | |
|---|---|
| AMERICAN BROKERS CONDUIT, a division Of AMERICAN HOME MORTGAGE, INC., CARTERET MORTGAGE CORPORATION; DEUTSCHE BANK TRUST COMPANY AMERICA; WELLS FARGO BANK, N.A.; and AMERICAN HOME MORTGAGE INVESTMENT TRUST 2006-2,<br><br>        Defendants. | ) **AMENDED COMPLAINT FOR FRAUD, BREACH OF FIDUCIARY DUTY, VIOLATIONS OF VIRGINIA CONSUMER PROTECTION ACT, VIOLATIONS OF FEDERAL HOME LENDING STATUTES, CONSPIRACY TO DEFRAUD, AIDING AND ABETTING FRAUD , RECISSION, OTHER RELIEF, AND DEMAND FOR JURY TRIAL** |

Plaintiffs sue Defendants for damages and other relief, and state:

**A.** Parties and Jurisdiction

1.  Plaintiffs DAVID JACKSON and ELISABETH JUDITH JACKSON are of majority age and are residents of the State of Virginia residing in their home located at 12787 Lavender Keep Cr., Fairfax, Virginia 22033 (hereafter the "Property"), and are "consumers" within the meaning of the Virginia Consumer Protection Act,

2.  Nominal Defendant AMERICAN BROKERS CONDUIT, a division of AMERICAN HOME MORTGAGE, INC. ("ABC") was, at all material times hereto, a foreign corporation which was doing business in the Commonwealth of Virginia including the origination of mortgage loans which constituted the collection of consumer debts, and is thus subject to

1

the provisions of the Virginia Consumer Protection Act, Code sec. 59.1-196 *et seq.*, and 13-303(4), and is also a "creditor" as defined by the Federal Truth In Lending Act (15 U.S.C. sec. 1602(f)). Although Defendant ABC maintained an office located at 5160 Parkstone Drive, Suite 190A in Chantilly, Virginia in connection with the transaction the subject of this action, said office was subordinate to ABC's main office located at 538 Broadhollow Road, Melville, New York 11747. Defendant ABC's corporate principal is currently the debtor in a Bankruptcy proceeding styled In Re: American Home Mortgage Holdings, Inc., Case No. 07-11047 in the United States Bankruptcy Court for the District of Delaware.

3.   Nominal Defendant CARTERET MORTGAGE CORPORATION ("CMC") is and was at all times material hereto a for-profit corporation organized under the laws of the Commonwealth of Virginia engaged in the business of a mortgage broker in connection with the transaction the subject of this action, and was also an agent of the remaining named Defendants in this action purposes of effecting the fraud and conspiracy the subject hereof. At all times material hereto, Defendant CMC was a "creditor" as defined by the Federal Truth In Lending Act (15 U.S.C. sec. 1602(f)) with its office for the transaction of regular business for purposes of the transaction being located at 6211 Centreville Road, Suite 800, Centreville, Virginia. Plaintiffs are informed and believe and thereon allege that CMC has filed for bankruptcy protection and therefore all references to CMC will be as a Nominal Defendant.

4. Defendant DEUTSCHE BANK TRUST COMPANY AMERICA ("DBTCA") is and was at all times material hereto the Indenture Trustee for Defendant AMERICAN HOME MORTGAGE INVESTMENT TRUST 2006-2 ("AHMIT 2006-2" as so identified herein *infra*), and was responsible, together with Defendant ABC, Defendant WELLS FARGO BANK, N.A. ("WF" as so identified herein *infra*), and Defendant AHMIT 2006-2, for the creation of the misleading and fraudulent mortgage loan the subject of this action. Defendant DBTCA's principal place of business is located at 60 Wall Street, New York, New York 10005.

5. Defendant WELLS FARGO BANK, N.A. ("WF") is and was at all times material hereto the Securities Administrator for Defendant AHMIT 2006-2 and was responsible, together with Defendant ABC, Defendant DBTCA, and Defendant AHMIT 2006-2, for the creation of the misleading and fraudulent mortgage loan the subject of this action. Defendant WF's principal place of business is located at 101 Park Avenue, New York, New York 10178.

6. Defendant AHMIT 2006-2 is and was at all times material hereto a Delaware Statutory Trust, with a principal place of business at 520 Broadhollow Road, Mellville, New York 11747, and a bankruptcy-remote separate legal entity which was the Issuing Entity for mortgage-backed notes series 2006-2 and was, together with Defendants ABC, DBTCA, and WF, responsible for the creation of the misleading and fraudulent mortgage loan the subject of this action.

7. Jurisdiction of the subject matter in this Court is proper pursuant to 28 U.S.C. sec. 1331, as Plaintiffs have sought relief under multiple Federal Statutes.

8. Jurisdiction of the Federal claims is proper in this Court pursuant to 15 U.S.C. sec. 1601 et. seq. and 15 U.S.C. sec. 1640(e).

9. Jurisdiction over the state-law claims is proper under the doctrine of Supplemental or Pendent Jurisdiction pursuant to 28 U.S.C. sec. 1367(a).

10. Venue of this action is proper within this Court pursuant to 28 U.S.C. sec. 1391 as all named Defendants (except for possibly the nominal Defendants in bankruptcy) are subject to suit within this Court, and thus all Defendants are properly sued in this Court.

Material Facts Common to All Counts

11. Between approximately 2001 and 2007, numerous Wall Street financial institutions, including Defendants DBTCA and WF and their affiliates, engaged in the creation and generation, through one or more agents or entities, of mortgage loans which were initiated for the primary purpose of serving as collateral for one or more forms of mortgage-backed securities.

12. These loans were either sold after closing, or pre-sold before closing, to a mortgage aggregator which would then resell the bundled mortgage loans to a special investment vehicle ("SIV") for the purpose of the bundled mortgage loans serving as collateral for series of Collateral Debt Obligations ("CDOs"), Collateralized Mortgage Obligations ("CMOs"), or other form of mortgage-backed security ("MBS").

13. Due to the multiple layers of resale and in order to provide the ever-increasing income stream needed to obtain a "AAA" rating for the MBS from a rating institution, and in order to fund the payments to be made to the investors of the MBS and provide funds for payment of insurances and other expenses incident to the creation of the MBS while simultaneously purporting to make these mortgage loans attractive to borrowers, the financial institutions required mortgage loans which contained provisions advantageous to the MBS (such as variable rate promissory notes, "Option ARM" riders, and prepayment penalties), and terms, conditions, language, and forms of loan documents which were paper-intensive, complicated, and were not readily understandable, or were confusing, or were misleading to the average borrower.

14. Further, the financial institutions placed "quotas" on loan originators which, in some instances, required that 50 or more loans be originated per day, and as such, the financial institutions knew that the average borrower, when confronted with a large volume of loan documents, would not have the proper time or opportunity to review what they were signing.

15. In furtherance of this scheme, the brokers would tout that a borrower could obtain a refinance or a home equity line of credit ("HELOC") for a low "teaser" rate (such as 1%), but intentionally failed to disclose that this rate was only for a very short-term (in this case, such rate being in effect for only one week).

16. The originating "lender", together with the broker, would also only qualify the borrower for the loan at the initial "teaser" rate based on the borrower's income and expense information, knowing that the borrower did not qualify for the payments during the life of the loan, particularly at the point when the variable rate would cause the monthly payment to double or triple in amount, as the originating lender and broker knew that the loan was either already or destined for resale.

17. If a borrower, when presented with a Truth-In-Lending Disclosure which showed a significant increase in the monthly payment at a given point in time, questioned the appropriateness of the loan, the broker would advise the borrower "not to worry about it", as the borrower could simply "come back in a year or two and refinance at the lower rate" while knowing that the loan had already been or was about to be sold and that refinancing the loan would be problematic at best.

18. Additionally in furtherance of this scheme, borrowers were not provided with a copy of the "final" loan documents either at or following closing and, in the instant case, certain closing documents were fraudulently manufactured post-closing with forged signatures on the Final Truth-In-Lending disclosure which forged document contained an interest rate different that that presented at closing and different from that set forth on the promissory Note.

19. Some time prior to June 30, 2006, Defendants AHMIT 2006-2, WF, and DBTCA entered into an agreement to form an MBS known as American

Home Mortgage Investment Trust 2006-2 Mortgage-Backed Notes Series 2006-2, with said MBS to be collateralized by mortgage loans originated by, among others, Defendant ABC through and with Defendant CMC.

20. The structure of this MBS required that the mortgage loans serving as collateral be in the form of adjustable rate mortgages with Option ARM riders, negative amortization, and prepayment penalties in order to provide the enhanced income stream necessary to obtain the AAA rating, fund the multiple resale of the loans, and provide the ever-increasing income stream for payment of costs incident to the MBS including dividends to be paid to the investors thereof.

21. The subject mortgage loans, with complicated variable interest rate structures, voluminous documents, small print, and confusing terminology (which Defendant ABC's corporate principal has admitted, in its own publications, is "confusing to borrowers") were to be marketed to the consuming public, including the Plaintiffs herein, as "low interest rate" loans without the legally required material disclosures as to the true cost of the loans and in a form which Defendants DBTCA, WF, AHMIT 2006-2, ABC, and CMC knew would not be readily understood by borrowers.

22. Defendant ABC, through and with Defendant CMC, actively advertised and promoted these mortgage loans throughout the year 2006. Defendants DBTCA, WF, AHMIT 2006-2 encouraged ABC's and CMC's conduct with respect to these types of loans and marketing of the loans.

DBTCA, WF, and AHMIT 2006-2 ratified and accepted the benefits of ABC's and CMC's conduct.

23. As a matter of regular business practice, American Home Mortgage through ABC "pushed" millions of these high interest loans on unsuspecting borrowers such as Plaintiffs. Misleading advertisements and training manuals were sent out by American Home Mortgage and ABC to brokers such as CMC in this action. MTA Pay Option Arms were "pitched" to consumers who otherwise would have qualified for a good fixed rate loan and that were in a better loan before being refinanced. As will be set forth more fully herein this is what occurred with the Plaintiffs involving their loan transaction.

24. Plaintiffs are informed and believe and thereon allege there were several financial benefits to DBTCA, WF, AHMIT 2006-2 imbedded in these high interest loans. In order to hide the financial benefits to DBTCA, WF, AHMIT 2006 and the damaging effects of those benefits on borrowers, disclosures were confusing and misleading. This conduct as well as the conduct of training employees of American Home Mortgage and ABC employees to play down the negative amortization and even given them selling skills "language" to counteract any objections was all conduct and actions which was accepted, ratified and approved by DBTCA, WF, AHMIT 2006-2.

25. Benefits from loans, such as the Plaintiffs' loan herein, which were induced by fraud and misrepresentations, as well as loans obtained in

violation of TILA and RESPA were readily accepted by DBTCA, WF, AHMIT 2006-2 as was the loan which is the subject of this action.

26. Some time prior to March 24, 2006, Plaintiffs made application for a refinance of the Property through Defendant CMC for a "1%" loan.

27. Defendant CMC affirmatively represented to Plaintiffs that they qualified for a loan with Defendant ABC which had a "1% interest rate".

28. Initial disclosures also misled Plaintiffs into believing that the loan would not be subject to a prepayment penalty.

29. The disclosures failed to point out that negative amortization would occur.

30. The Adjustable Rate Rider and the Prepayment Rider were not presented in the "Good Faith Package."

31. Based on this affirmative representation, Plaintiffs agreed to enter into a mortgage loan with Defendant ABC through Defendant CMC.

32. The initial Good Faith Estimate ("GFE") signed by the Plaintiffs on March 13, 2006 affirmatively represented that the loan was a "conventional loan" with an interest rate of 1%.

33. On March 24, 2006, Plaintiffs proceeded to closing on the mortgage loan.

34. At the closing and for the first time, Defendants CMC and ABC, through the closing documents, affirmatively represented to Plaintiffs that although the loan had an initial rate of 1% interest, that the loan was in fact an "adjustable rate" loan.

35. The closing documents were inconsistent as to the interest rate, were confusing, and were materially misleading, as:

(a) the Deed of Trust set forth that the interest rate on the Note was 1% but that it was "subject to change in accordance with the Adjustable Rate Rider";

(b) the Promissory Note set forth that the rate was 1% for one week after which it increased to 7.438% but that the rate thereafter was "in accordance with Section 4 of this Note";

(c) Section 4 of the Note sets forth that a new interest rate will be calculated by adding 3.550 percentage points to a "Current Index" which is a 12-month average, "determined as set forth below", of the annual yields on actively traded United States Treasury Securities "adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" and

(d) The "annual percentage rate" on the Final TIL was 7.460%.

36. The Good Faith Estimate showed a 1% interest rate and that in no other place on the preliminary disclosures does it show anything close to the actual interest rate which would be charged. Plaintiffs assert that all documents contradict each other and are misleading.

37. Defendants ABC and CMC failed to explain the interest calculation to the Plaintiffs; failed to explain the effect of the Option ARM; failed to provide a history of the Index; and failed to disclose to the Plaintiffs that the loan was a "negative amortization" loan.

38. Plaintiffs claim the use of the 1% interest rate on several of the pre-closing disclosures was misleading and therefore not clear and conspicuous as required by 12 C.F.R. §§226.17, 226.18. Moreover, there was failure to indicate that the 1% rate was a discounted rate and the variable rate disclosures, particularly as to the certainty of negative

amortization did not meet the clear and conspicuous requirement of 12 C.F.R. §§ 226.17 and 226.19.

39. Plaintiffs also alleges that they did not receive the required pre-closing disclosures in the time frame mandated by TILA under 12 C.F.R. § 226.19(a)(1) & (a)(2).

40. Plaintiffs did not receive notice of changes in interest rate following the consummation of the mortgage under 12 C.F.R. § 226.20(c).

41. Plaintiffs further are informed and believe and thereon allege that they did not receive two copies of the notice of right to rescind at closing.

42. Plaintiffs allege that the TILDS did not include clearly and conspicuously any of the required disclosures under § 226.18. Section 226.18 requires that if the APR may increase after consummation of the transaction, the TILDS must show that the transaction contains a variable-rate feature accompanied by a statement that variable-rate disclosures have been provided earlier.

43. Plaintiffs did not receive the TILDS, and other disclosures within three days of loan application, which is a violation of 12 C.F.R. § 226.19(a)(1)(i)

44. Plaintiffs further allege that the final § 226.18 disclosures were different from the preliminary disclosures, most importantly by having a different APR and showing that Plaintiff's may have to pay a prepayment penalty

45. Plaintiffs allege that they did not see any changes to the Disclosure until closing and that they were not given time to read them nor did the settlement agent leave any copies. This late provision of the disclosures

does not comply with § 226.19(a)(2)(ii) requiring receipt of the corrected disclosures three business days prior to consummation nor does it comply with the § 226.17(a)(1) requirement that they receive the disclosures in a form that the borrower could keep.

46. Plaintiffs were charged for lender paid mortgage insurance ("LPMI"). This insurance is required to be disclosed under The Homeowner Protection Act of 1998. This type of insurance is required to be disclosed to a borrower under the Homeowner Protection Act of 1998 because the borrower pays the premiums in an increased interest rate, and this type of insurance can never be cancelled by the borrower unlike traditional mortgage insurance. This insurance was not disclosed to the Plaintiffs.

47. In the months after closing, Plaintiffs noticed that despite making regular and timely payments that the amount of loan principal did not decrease, and in fact increased, the result being that the loan was a "negative amortization" loan.

48. Beginning on or about November 16, 2006, Plaintiffs made repeated inquiry of Defendant CMC as to why the amount of principal was not decreasing with payments, the unexplained change in the interest rate, and a request to refinance the loan. Plaintiffs made repeated inquiries to Defendant CMC including making such inquiries on or about July 30, 2007 and November 26, 2007.

49. Defendant CMC failed to properly respond to any of Plaintiff's inquiries; failed to provide any explanations as requested by Plaintiffs; failed to

provide any documentation; and simply told Plaintiffs that the mortgage loan was "a good loan" and "not to worry about it", thus intentionally concealing the truth as to the Plaintiffs' mortgage loan from the Plaintiffs.

50. Plaintiffs thus initiated their own research as to the mortgage loan and Defendant ASC, and discovered in or about September of 2007 that a yield spread premium ("YSP") of over $26,000.00 had been paid to Defendant CMC with Defendant CMC having never disclosed this to Plaintiffs.

51. Some time in 2007, Defendant ABC's corporate principal sought bankruptcy protection which bankruptcy proceeding remains active as of the date of the filing of this Complaint.

52. In continued effort to ascertain the truth as to their mortgage loan, Plaintiffs contacted Defendant CMC on or about November 21, 2007 and requested Defendant CMC to forward a copy of the GFE as Plaintiffs did not have a copy in their loan closing file, and also inquired as to the non-disclosed YSP.

53. Plaintiffs continued to contact Defendant CMC with regard to the fact that the monthly statements from Defendants' servicing entity did not show any reduction in principal despite timely payments and the non-disclosed YSP. Defendant CMC failed to undertake any action in response to Plaintiffs' concerns; failed to explain the true cost of the loan to Plaintiffs; and thus continued to engage in intentional concealment of the facts as to the true cost of the mortgage loan.

54. In further continuation of their inquiry as to the truth about their mortgage loan, Plaintiffs sent a Qualified Written Request ("QWR") to the servicing division of Defendant ABC on May 10, 2008 detailing numerous issues with the mortgage loan and requesting information and documentation.

55. Defendant ABC's servicing agent, through its counsel, failed to properly and fully respond to the QWR, providing only evasive statements and taking a position that Plaintiffs' inquiry "did not relate to the servicing of the loan" and thus no response to specific requests for information and documentation was being provided.

56. Defendant ABC's corporate principal thereafter sought permission from the Bankruptcy Court to destroy loan files, including that of the Plaintiffs.

57. Plaintiffs vigorously opposed the request for destruction of loan files, and the presiding Judge in the Bankruptcy specifically ordered Defendant ABC's corporate principal to provide Plaintiffs with a complete copy of the loan file.

58. Upon same being provided to Plaintiffs in the fall of 2008 pursuant to a Court Order of the Bankruptcy Court, it was discovered for the first time that a "Final TIL" had been fraudulently manufactured with forged signatures of the Plaintiffs, with such forged Final TIL containing an interest rate which was greater than that on the Final TIL which Plaintiffs signed at the March 24, 2006 closing.

59. To date, none of the Defendants named herein has ever provided Plaintiffs with the repeatedly requested information as to the true cost of

14

their mortgage loan or any explanation of why the YSP was not disclosed, thus resulting in an intentional concealment of the truth as to the mortgage loan despite Plaintiffs' repeated and diligent efforts to seek such truth.

## C. Claims for Relief

### COUNT I: VIOLATIONS OF FEDERAL TRUTH IN LENDING ACT
[against Defendants ABC, CMC,DBTCA, WF, AHMIT 2006]

60. Plaintiffs reaffirm and reallege paragraphs 1 through 59 hereinabove as if set forth more fully hereinbelow.

61. This is an action brought for violations of the Federal Truth in Lending Act, 15 U.S.C. sec. 1601 *et seq.*, particularly sec. 1635 and 1638(a).

62. The loan was initiated with ABC and CMC. However, the loan has been assigned, transferred, sold, sercuritized or otherwise conveyed. Plaintiffs are informed and believe and thereon allege that those in control or possession of Plaintiffs' note have as a condition to their ownership, interest, control or possession, a note based upon a loan that it is violation of the Federal Truth and Lending Act ("TILA"). Therefore Plaintiffs assert against the true holders of the note and those who have an interest in the note or are in control or possession of the note that they have accepted an assignment, interest, ownership or possession of a note which violates TILA. Plaintiff therefore asserts its claims for TILA violations against all Defendants named herein who claim an interest in the note upon which the TILA violations are based and who are accepting benefits as a result of the violations.  Plaintiffs properly asked for disclosure of the true owner

of the note under 15 U.S.C. § 1641(f)(2) and various Defendants herein obfuscated that information. Therefore it is unclear who currently owns the mortgage note at issue by Defendants, and each of their own actions of concealment and cover up.

63. TILA requires lenders to disclose certain information about the terms of a loan to prospective borrowers, 15 U.S.C. sec. 1635, 1638; 12 CFR sec. 226.17, and the lender may not disclose information so as to obscure the relationship of the terms to each other. 12 CFR sec. 226.17(a)(1).

64. Disclosure of a variable rate feature required pursuant to 12 CFR sec. 226.18(f) must be clear and not misleading.

65. As set forth above, Defendants ABC and CMC, in violation of 12 CFR sec. 225.23(2), failed to provide Plaintiffs with certain material disclosures in connection with the mortgage loan the subject of this action either by a total failure to do so, or by materially misrepresenting or concealing the truth, or by providing disclosures which conflicted with other disclosures, doing so as to disclosures relating to the annual percentage rate; disclosures as to the finance charge; disclosures as to the amount financed; disclosures as to the total payments; disclosures as to the payment schedule; and disclosures and limitations regarding certain high cost mortgage loans.

66. Defendants ABC and CMC also did not disclose the consequences of negative amortization as required by 12 CFR sec. 226.19(b)(2)(v).

67. The conduct of Defendants ABC and CMC thus provides the basis for Plaintiffs to assert this cause of action pursuant to 15 U.S.C. sec. 1602(u); Federal Reserve Board Regulation Z codified as 12 CFR sec. 226.23, and Regulation Z, sec. 226.17(b) as the loan transaction the subject of this action was a refinance.

68. Plaintiffs allege that the required disclosures under § 226.19 were not clear and conspicuous as required by § 226.17 and that they were not timely made. Plaintiff's also assert the disclosure were not made timely as required by § 226.19(a)(1) & (a)(2). All disclosures required by Subpart C of Regulation Z, which includes 12 C.F.R. §§ 226.18 and 226.19, must be made clearly and conspicuously, in writing, in a form that the consumer may keep. 12 C.F.R. § 226.17(a)(1). The required timing of the disclosures in variable rate mortgage transactions are outlined by 12 C.F.R. §§ 226.19(a) & (b), 226.20(c), but in all cases must be given prior to consummation of the transaction. 12 C.F.R. § 226.17(b). This never occurred in Plaintiffs' loan.

69. Plaintiff's assert violations of § 226.18 in that the application and the Good Faith Estimate showed a 1% interest rate and that in no other place on the preliminary disclosures does it show anything close to the actual interest rate which would be charged. Plaintiffs assert that all documents contradict each other and are misleading.

70. Plaintiffs allege that the TILDS did not include clearly and conspicuously any of the required disclosures under § 226.18. Section 226.18 requires

that if the APR may increase after consummation of the transaction, the TILDS must show that the transaction contains a variable-rate feature accompanied by a statement that variable-rate disclosures have been provided earlier.

71. Plaintiffs allege that the TILDS did not include clearly and conspicuously any of the required disclosures under § 226.18. Section 226.18 requires that if the APR may increase after consummation of the transaction, the TILDS must show that the transaction contains a variable-rate feature accompanied by a statement that variable-rate disclosures have been provided earlier. This did not occur in Plaintiffs' loan transaction.

72. Plaintiff's further allege that the final § 226.18 disclosures were different from the preliminary disclosures, most importantly by having a different APR and showing that Plaintiff's may have to pay a prepayment penalty.

73. Plaintiff's allege that they did not even see the changed disclosures, however, until closing and that they were not given time to read them nor did the settlement agent leave any copies. This late provision of the disclosures does not comply with § 226.19(a)(2)(ii) requiring receipt of the corrected disclosures three business days prior to consummation nor does it comply with the § 226.17(a)(1) requirement that she receive the disclosures in a form that the borrower could keep.

74. Plaintiffs allege that the disclosures show that the application and good faith estimate showed an interest rate of 1% for 480 months. The only disclosure Plaintiff's received prior to closing showing an interest rate other than 1% was the TILDS. Even the TILDS, however, shows monthly payments based on the 1% interest rate.   None of these documents reveals that the 1% rate is a discounted rate.

75. Nowhere does the Disclosure specify that the 1% interest rate appearing on the various other disclosures is a discounted rate. Plaintiff's assert a claim under § 226.19(b)(2)(v) requiring that the lender disclose clearly and conspicuously the fact that the interest rate will be discounted

76. The loan program disclosures provided to Plaintiff's were not specific to this loan, as required by § 226.19(b)(2), but rather discusses several different MTA power arms without specifying which applied to her.   In addition, the disclosure discusses both discounted rates and premium rates and situations where neither is part of the mortgage. Thus, Plaintiffs allege a claim under § 226.19(b)(2) requiring that the lender provide a loan program disclosure for each variable-rate program in which the consumer expresses an interest.

77. Plaintiffs assert that Defendants violated § 226.20(c)(5), for failure to state the payment amount needed to fully amortize the loan in the rate change notice.

78. Plaintiffs allege that Defendants violated TILA's post closing disclosure requirements regarding interest rates and payments relating to variable-rate adjustments under 12 C.F.R. § 226.20(c)

79. Plaintiffs allege that the mortgage note showed a 1% interest rate at closing, but that the rate increased to over 7.5% at the end of that month and they continued to rise monthly thereafter. Defendants did not provide the Plaintiffs with advance notice of the changes, but only after the fact. The notices of the rate changes did not contain a new payment schedule that would allow Plaintiffs to fully amortize the loan. Under § 226.20(c)(5) Plaintiffs allege that the notice of interest rate changes Defendants sent did not state the payment amount that would be required to fully amortize the loan at the new interest rate over the remainder of the loan term, but simply continue to ask for a 1% interest payment.

80. Defendants' failure to provide the required material disclosures provides Plaintiffs with the right to rescind the transaction pursuant to 12 CFR sec. 226.23, and Plaintiffs, through this public Complaint which is intended to be construed, for purposes of this claim, as a formal Notice of Rescission, hereby elect to rescind the transaction.

81. Plaintiffs also seek statutory damages for all TILA violations set forth herein.

82. This action is brought timely in view of the Defendants' actions which have induced and tricked Plaintiffs into permitting any earlier filing

deadline to pass, and in view of Plaintiffs' demonstrated due diligence in seeking to ascertain the truth in order to protect their legal rights.

83. As a direct consequence of and in connection with Plaintiffs' legal and lawful exercise of their right of rescission, the true "lender" and its agents, are required, within twenty (20) days of this Notice of Rescission, to:

(a) desist from making any claims for finance charges in the transaction;

(b) return all monies paid by Plaintiffs in connection with the transaction to the Plaintiffs;

(c) satisfy all security interests, including mortgages, which were acquired in the transaction.

84. Upon the true "lender's" full performance of its obligations Plaintiffs shall tender any sums to which the true lender is legally entitled.

85. As Plaintiffs have satisfied the requirements for a TILA rescission action pursuant to 15 U.S.C. sec. 1635, Plaintiffs are entitled to an award of attorneys' fees pursuant to 15 U.S.C. sec. 1640(3).

86. Based on Defendants' TILA violations, each of said Defendants is liable to the Plaintiffs for the following, which Plaintiffs demand as relief:

(a) rescission of the mortgage loan transactions;

(b) termination of the mortgage and security interest in the property the subject of the mortgage loan documents created in the transaction;

(c) return of any money or property paid by the Plaintiffs including all payments made in connection with the transactions;

(d) an amount of money equal to twice the finance charge in connection with the transactions;

(e) relinquishment of the right to retain any proceeds; and

(f) actual damages in an amount to be determined at trial, including attorneys' fees.

## COUNT II: VIOLATIONS OF REAL ESTATE SETTLEMENT PROCEDURES ACT
[Against Defendants ABC, CMC DBTCA, WF, AHMIT 2006]

87. Plaintiffs reaffirm and reallege paragraphs 1 through 86 herein as if specifically set forth more fully herein below.

88. As mortgage lenders, Defendants ABC and CMC are subject to the provisions of the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. sec. 2601 et seq. The loan was initiated with ABC and CMC. However, the loan has been assigned, transferred, sold, sercuritized or otherwise conveyed. Plaintiffs are informed and believe and thereon allege that those in control or possession of Plaintiffs' note have as a condition to their ownership, interest, control or possession, a note based upon a loan that it is violation of RESPA. Therefore Plaintiffs assert against the true holders of the note and those who have an interest in the note or are in control or possession of the note that they have accepted an assignment, interest, ownership or possession of a note which violates RESPA. Plaintiff therefore asserts its claims for RESPA violations against all Defendants named herein and all who have benefitted from the violations. Plaintiffs properly asked for disclosure of the true owner of the note under 15 U.S.C. § 1641(f)(2) and various parties to this loan trust

22

obfuscated that information. Therefore it is unclear who currently owns the mortgage note at issue.

89. 12 U.S.C. sec. 2607 expressly prohibits the acceptance of any improper fees or kickbacks or payments for services not performed.

90. In violation of 12 U.S.C. sec. 2607, Defendants ABC and CMC caused Defendant CMC to be paid an illegal kickback, in the form of the undisclosed YSP, for services not performed, and surreptitiously charged Plaintiffs in excess of $26,000.00 for this illegal kickback which was never disclosed to or approved by Plaintiffs.

91. Pursuant to 12 U.S.C. sec. 2607(d), Plaintiffs are permitted to bring this action against Defendants jointly and severally for their violations of the prohibitions and limitations of sec. 2607 and for damages in an amount equal to three (3) times the amount of the undisclosed YSP.

92. Plaintiffs also demand, if found to be the prevailing party, that they be awarded their court costs and reasonable attorneys' fees pursuant to 12 U.S.C. sec. 2607(d)(5).

## COUNT III: VIOLATIONS OF VIRGINIA CONSUMER PRACTICES ACT
[against Defendants ABC and CMC]

93. Plaintiffs reaffirm and reallege paragraphs 1 through 92 above as if set forth more fully hereinbelow.

94. Defendants ABC and CMC are subject to the Virginia Consumer Protection Act (the "Act"), *Virginia Code* sec. 59.1-196 *et seq.*

95. Defendants ABC and CMC are "suppliers", and Plaintiffs are "consumers" within the meaning of the Act, and the loan the subject of this action was a "consumer transaction" within the intent of the Act.

96. *Virginia Code* sec. 59.1-200 A.14. declares using any deception, fraud, false pretenses, or misrepresentation in connection with a consumer transaction as unlawful

97. In violation of the Act, Defendants ABC and CMC have committed unfair and/or deceptive acts and practices, including fraudulent concealment, in connection with the consumer transaction the subject of this action, including but not limited to:

   (a) making false and misleading oral and written statements and other representations which had the capacity, tendency, or effect of deceiving or misleading the Plaintiffs;

   (b) failing to state a material fact if the failure deceives or tends to deceive; and

   (c) engaging in deception, fraud, false pretense, false premise, misrepresentation, and knowing concealment and omission of material facts with the intent that the Plaintiffs rely thereon.

98. As a direct and proximate result of the Defendants ABC's and CMC's violations of the Act, Plaintiffs have suffered damages.

99. Plaintiffs are permitted to bring this action for damages for the Defendants ABC's and CMC's violations of the Act and are entitled to recover damages sustained.

100.    Plaintiffs also seek seek attorneys' fees against Defendants ABC and CMC as permitted by law.

101.    This action has been brought timely, under the totality of the circumstances, pursuant to *Virginia Code* sec. 8.01-243 and 8.01-249(1.) and decisional law thereunder.

## COUNT IV: FRAUDULENT MISREPRESENTATION
[against Defendants ABC and CMC]

102.    Plaintiffs reaffirm and reallege paragraphs 1 through 101 hereinabove as if set forth more fully hereinbelow.

103.    Defendants ABC and CMC knowingly, intentionally, and fraudulently concealed material information from Plaintiffs which is required by Federal Statutes and Regulations to be disclosed to the Plaintiffs as set forth above.

104.    Said Defendants also materially misrepresented material information to the Plaintiffs with full knowledge by said Defendants that their affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made.

105.    Under the circumstances, the material omissions and material misrepresentations of said Defendants were malicious.

106.    Plaintiffs, not being mortgage lenders, mortgage brokers, or mortgage lenders, reasonably relied upon the representations of said Defendants (or the lack of disclosures by said Defendants) in agreeing to execute the mortgage loan documents.

107.     Had Plaintiffs known of the falsity of said Defendants' representations, Plaintiffs would not have entered into the transactions the subject of this action.

108.     As a direct and proximate cause of said Defendants' material omissions and material misrepresentations, Plaintiffs have suffered damages.

109.     Under the totality of the circumstances, Defendants' actions were willful, wanton, intentional, and engaged in with a callous and reckless disregard for the rights of the Plaintiffs, justifying an award of not only actual compensatory but also exemplary punitive damages to serve as a deterrent not only as to future conduct of Defendants ABC and CMC, but also to other persons or entities with similar inclinations.

110.     This action has been brought timely under the totality of the circumstances pursuant to *Virginia Code* sec. 8.01-243 and 8.01-249(1.) and decisional law thereunder.

## COUNT V: BREACH OF FIDUCIARY DUTY
[against Defendant CMC]

111.     Plaintiffs reaffirm and reallege paragraphs 1 through 110 hereinabove as if set forth more fully hereinbelow.

112.     Defendant CMC, being the mortgage broker for Plaintiffs, was in a fiduciary relationship with Plaintiffs and owed certain duties to Plaintiffs arising out of this fiduciary relationship.

113.     These duties included:

(a) providing mortgage loan services and a loan program to Plaintiffs which was best suited to the Plaintiffs given their income and expenses;

(b) fully and fairly disclosing the total cost of the loan and the true nature of the loan;

(c) fully disclosing all charges associated with the transaction;

(d) charging Plaintiffs only for services provided;

(e) fully responding to Plaintiffs' inquiries and concerns relating to payments made, reduction of principal, and document requests;

(f) not engaging in actions for the benefit of Defendant CMC to the detriment and damage of the Plaintiffs; and

(g) not engaging in conduct which may place Plaintiffs in jeopardy of the exercise of their legal rights.

114.    Defendant CMC repeatedly breached its fiduciary duties to the Plaintiffs by its actions and inactions as set forth above.

115.    Defendant CMC accomplished its breach of its fiduciary duties to the Plaintiffs through a pattern of fraudulent concealment, misrepresentation, and material omission, resulting in the Plaintiffs' entry into a mortgage loan transaction which was contrary to the Plaintiffs' best interests.

116.    As a direct and proximate result of said Defendant CMC's breaches of its fiduciary duties, Plaintiffs have suffered damages.

117.    Under the totality of the circumstances, Defendant CMC's actions were willful, wanton, intentional, and with a callous and reckless disregard for the rights of the Plaintiffs justifying an award of not only actual compensatory but also exemplary punitive damages to serve as a

deterrent not only as to future conduct of Defendant CMC, but also to other persons or entities with similar inclinations.

118.    This action has been brought timely under the totality of the circumstances pursuant to *Virginia Code* sec. 8.01-243 and 8.01-249(1.) and decisional law thereunder.

## COUNT VI: UNJUST ENRICHMENT
[against Defendants ABC and CMC DBTCA, WF, and AHMIT 2006-2 ]
UNJUST ENRICHMENT
(Against all Defendants)

119.    Plaintiffs reallege and reaffirm paragraphs 1 through 118 hereinabove as if set forth more fully hereinbelow.

120.    Defendants ABC and CMC had an implied contract with the Plaintiffs to ensure that Plaintiffs understood all fees which would be paid to said Defendants and their agents and assigns to obtain credit on Plaintiffs' behalf, and to not charge any fees which were not fully disclosed in advance to Plaintiffs or fees for services which were not provided. This implied contract was assigned, transferred or conveyed to DBTCA, WF, and AHMIT 2006-2. DBTCA, WF, and AHMIT 2006-2 accepted the benefits of the implied contract and ratified the conduct and actions of ABC and CMC.

121.    Defendants ABC and CMC had full knowledge, at all times material, that they intended to charge Plaintiffs a YSP without disclosing same to Plaintiffs, with said Defendants having actual knowledge that said

YSP was an illegal kickback and was not in consideration for any services rendered.

122.    Defendants ABC, CMC, DBTCA, WF, and AHMIT 2006-2 cannot, in good conscience and equity, retain the benefits from their actions of charging Plaintiffs an illegal and undisclosed YSP.

123.    Defendants, ABC, CMC, DBTCA, WF, and AHMIT 2006-have been unjustly enriched at the expense of the Plaintiffs, and maintenance of the enrichment would be contrary to the rules and principles of equity.

124.    Plaintiffs thus demand restitution from Defendants ABC, CMC, DBTCA, WF, and AHMIT 2006 in the form of actual damages, exemplary damages, and any attorneys' fees which may be awardable by law.

125.    This action has been brought timely under the totality of the circumstances pursuant to *Virginia Code* sec. 8.01-243 and 8.01-249(1.) and decisional law thereunder.

### COUNT VII: CIVIL CONSPIRACY TO DEFRAUD
[against Defendants ABC, CMC, DBTCA, WF, and AHMIT 2006-2]

126.    Plaintiffs reaffirm and reallege paragraphs 1 through 125 hereinabove as if set forth more fully hereinbelow.

127.    As set forth above, all Defendants agreed, between and among themselves to engage in a scheme to defraud by marketing and causing borrowers to enter into mortgage loans which were fundamentally unfair and misleading to average borrowers and were intentionally disguised as being attractive to borrowers, with the primary purpose of said mortgage

loans being for resale to investment banking concerns to provide collateral for MBS at the expense of and to the detriment to borrowers.

128.    At all times material hereto, Defendants intended to saddle borrowers with undisclosed fees, undisclosed YSPs, undisclosed negative amortization, varying monthly payment amounts which could not be reasonably calculated by the borrowers, and a payment scenario which was detrimental to borrowers so that Defendants could reap profits at the expense of the unknowing borrowers who were duped into entering into the subject mortgage loans with false representations, material nondisclosures and, in the instant case, forged closing documents as well.

129.    Defendants thus engaged in a series of overt acts which were intentionally designed to both accomplish an unlawful purpose (causing innocent borrowers to enter into what were fraudulent mortgage loans) and further an otherwise lawful purpose (originating mortgage loans) through unlawful means (*e.g.* fraud, material nondisclosure, intentional misrepresentation, fraudulent concealment, and forgery).

130.    Plaintiffs were within the intended class of victims of Defendants, as Plaintiffs' mortgage loan was intended to be and in fact became a part of the American Home Mortgage Investment Trust 2006-2 as collateral for Mortgage-Backed Notes Series 2006-2, which Trust closed on or about June 30, 2006.

131.    The primary purpose of the Defendants' causing the Plaintiffs to enter into the mortgage loan the subject of this action was to provide

collateral security for the MBS known as American Home Mortgage Investment Trust 2006-2 Mortgage-Backed Notes Series 2006-2, with this primary intent of the Defendants being intentionally accomplished through fraud, material nondisclosure, misrepresentation, fraudulent concealment, and forgery.

132.    The Defendants structured the entire mortgage loan transaction, from initial form and structure of the mortgage loan to closing and securitization, through a design and plan which required an Indenture Trustee, a Securities Administrator, an Issuer and Trust, a lender, and a broker.

133.    As set forth above, Defendants DBTCA, WF, and AHMIT 2006-2 engaged in overt acts in furtherance of the conspiracy and to set the conspiracy in motion, and Defendants ABC and CMC engaged in acts in furtherance of the conspiracy to accomplish its ends which actions in pursuance of the conspiracy have directly and proximately resulted in damages to the Plaintiffs.

134.    The actions of the various Defendants were interrelated and could not have been accomplished without participation of all Defendants pursuant to the scheme orchestrated by the Defendants, as:

(a) Defendant ABC was the "lender" but was not a broker, trust, Indenture Trustee, Issuer, or Securities Administrator;

(b) Defendant CMC was the broker but was not a lender, trust, Indenture Trustee, Issuer, or Securities Administrator;

(c) Defendant DBTCA was the Indenture Trustee but was not the lender, broker, trust, Issuer, or Securities Administrator;

(d) Defendant WF was the Securities Administrator but was not the lender, broker, trust, Issuer, or Indenture Trustee; and

(e) Defendant AHMIT 2006-2 was the issuer of the Trust which was collateralized in part with the Plaintiffs' mortgage loan but which was not the lender, broker, Indenture Trustee, or Securities Administrator.

135.    As a direct and proximate result of the actions and a course of conduct of all Defendants which were planned, designed, and orchestrated to further several illegal acts and to accomplish a legal act by unlawful means through the commission of several overt acts in furtherance of the conspiracy to defraud the Plaintiffs, Plaintiffs have suffered damages and have thus satisfied the requirements for pleading a cause of action for civil conspiracy under applicable Virginia decisional law.

136.    The actions of all Defendants were committed intentionally, willfully, wantonly, and with reckless disregard for the rights of the Plaintiffs.

137.    Plaintiffs thus demand an award of actual, compensatory, and punitive damages.

## COUNT VIII: AIDING AND ABETTING

[Against Defendants DBTCA, WF, and AHMIT 2006-2]

138.    Plaintiffs reaffirm and reallege paragraphs 1-137 hereinabove as if set forth more fully hereinbelow.

139.    The deliberate and successful efforts of to ABC and CMC and their agents, employees and/or representatives, as hereinabove alleged, constituted a scheme to defraud Plaintiffs. Plaintiffs are informed and believe, and based thereon allege, that defendants DBTCA, WF, and AHMIT 2006-2 had actual knowledge of the fraud and aided and abetted in the fraud and/or otherwise further ratified the conduct of ABC and CMC which included but was not limited to:

a. Accepting and possessing an interest in a note based upon a loan with forged signatures on the loan documents (loan fraud).

b. Accepting and possessing an interest in a note with altered information on the loan documents done so without Plaintiffs' knowledge or consent.

c. Accepting and possessing an interest in a loan which contained inconsistent information and documentation in the loan file to support the funding of the loan.

d. Accepting and possessing an interest in a loan which contained loan terms that were inconsistent with the needs of Plaintiffs and were not appropriate for Plaintiffs and for which Plaintiffs never agreed because a fraud had been committed upon them.

e. Accepting and possessing an interest in a loan, knowing that the loan documents had been altered.

f. Ignoring numerous complaints from Plaintiffs regarding their loan and failing to provide Plaintiffs with their loan documents, despite demands for the same. Once information, if any, was provided, the information provided was designed not to help Plaintiffs but instead to further confuse and deter them.

g. Refusing to provide Plaintiffs with information about their loans, fees and charges, notwithstanding Plaintiffs' demand for the information and thereby actively participating in a concealment of information all to Plaintiffs' detriment while all the while accepting benefits of the fraudulent transaction.

h. Accepting and possessing an interest in a fraudulent loan.

i. Accepting and possessing an interest in a loan that was obtained in violation of TILA and RESPA.

j. Structuring the entire mortgage loan transaction, from initial form and structure of the mortgage loan to closing and securitization, through a design and plan which required an Indenture Trustee, a Securities Administrator, an Issuer and Trust, a lender, and a broker all who benefited at the detriment of Plaintiffs .

k. Engaging in conduct, the primary purpose of which was to cause Plaintiffs to enter into the mortgage loan so as to provide collateral security for the AHMIT 2006-2, with this primary intent of the Defendants

being intentionally accomplished through fraud, material nondisclosure, misrepresentation, fraudulent concealment, and forgery.

l. Plaintiffs believe other conduct will be uncovered during the course of discovery and Plaintiffs will seek leave to amend to allege any additional conduct once such conduct is ascertained.

140.    Absent this assistance and ratification of ABC and CMC's conduct, the scheme to defraud Plaintiffs and engage in the wrongful conduct as set forth in this complaint could not have been successful. DBTCA, WF, and AHMIT 2006-2 promoted and encouraged the illegal conduct of ABC and CMC as acceptable business practices and rewarded such conduct. As such DBTCA, WF, and AHMIT 2006-2 aided and abetted the fraud and wrongful conduct of ABC and CMC. DBTCA, WF, and AHMIT 2006-2 chose to ignore the obvious problems associated with Plaintiffs' loan or even help Plaintiffs. DBTCA, WF, and AHMIT 2006-2 did more than just look the other way and accept the benefits of ABC and CMC'S conduct. DBTCA, WF, and AHMIT 2006-2 chose to willingly participate and accept the benefits of the fraud and wrongful conduct of ABC and CMC in conscious disregard of Plaintiffs' rights all to Plaintiffs' damages in a sum according to proof at the time of trial. DBTCA, WF, and AHMIT 2006-2 continue to benefit from the conduct of ABC and CMC.

141.    As a direct and proximate result of the acts and conduct of DBTCA, WF, and AHMIT 2006-2, as alleged above, Plaintiffs have suffered

substantial damages, including punitive and/treble damages all in an amount to be ascertained at the time of trial of this matter.

## COUNT IX: CANCELLATION OF WRITTEN INSTRUMENTS BASED ON FORGERYAND TILA AND RESPA VIOLATIONS

[Against all Defendants]

142.    Plaintiffs reaffirm and reallege paragraphs 1-141 hereinabove as if set forth more fully hereinbelow.

143.    A Deed of Trust is at all times herein mentioned in existence which encumbers the Subject Property

**144.**    The documents which support the transaction, namely portions of the loan documents are forged as well as the existence of TILA and RESPA violations in the loan transaction.  Loan documents do not bear Plaintiffs' actual and true signature. Loan fraud has been committed upon Plaintiffs.  Plaintiffs intend service of the Summons and Amended Complaint in this action to serve as a notice of cancellation of Deeds of Trust. The deeds have caused and if left not cancelled will continue to cause Plaintiffs serious injury if left outstanding.

## RELIEF SOUGHT

WHEREFORE, having set forth the above-described legally sufficient causes of actions against the Defendants, Plaintiffs pray for the entry of Final Judgment against all Defendants jointly and severally canceling the Note and Mortgage and rescinding the

residential mortgage transaction the subject of this action; for damages in an amount not yet quantified but to be proven at trial and such other amounts to be proven at trial; an award of three times the amount of actual damages sustained; for costs and attorneys' fees; that the Court find that the transactions the subject of this action are illegal and are deemed void; and for any other and further relief which is just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand trial by jury of all matters so triable as a matter of right and pursuant to Rule 3:21 of the Virginia Rules of Court and the rules of this Court.

**Dated this 21st day of December, 2009.**

Respectfully submitted,

_David Aker_

| | |
|---|---|
| Douglas J. Pettibone | David Aker |
| (*counsel to seek admission pro hac vice*) | (EDNY Bar Code No. DA5506) |
| Law Office of Douglas J. Pettibone | David Aker, Attorney at Law |
| 17848 Sky Park Circle Suite C | 23 Southern Road |
| Irvine, CA. 92614 | Hartsdale, New York 10530-2128 |
| Tel. No. 714-730-9091 | Tel. No. 914 674-1094 |
| Fax No. 714-245-7324 | Fax No. 914 479-5404 |
| Pettibonelaw@hotmail.com | daveaker@optonline.net |
| | *Attorneys for Plaintiffs* |

<u>CERTIFICATE OF SERVICE</u>

THE UNDERSIGNED HEREBY CERTIFIES that a true and correct copy of the

foregoing:

AMENDED COMPLAINT FOR FRAUD, BREACH OF FIDUCIARY DUTY, VIOLATIONS OF VIRGINIA CONSUMER PROTECTION ACT, VIOLATIONS OF FEDERAL HOME LENDING STATUTES, CONSPIRACY TO DEFRAUD, AIDING AND ABETTING FRAUD, RECISSION, OTHER RELIEF, AND DEMAND FOR JURY TRIAL

was forwarded, on December 21, 2009, via e-mail and via the ECF system to David A. Kochman, Esq., dkochman@reedsmith.com, ReedSmith LLP, 599 Lexington Avenue, New York, NY 10022, and by e-mail to Diane A. Bettino, Esq., bettino@reedsmith.com, Reed Smith LLP, Princeton Forrestal Village, 136 Main Street, Princeton, New Jersey 08543, attorneys for defendants Deutsche Bank Trust Company America, Wells Fargo Bank, N.A., and American Home Mortgage Investment Trust 2006-2, and that such e-mail service was indicated as being accepted as proper service, by return e-mail from the aforementioned David A. Kochman, Esq.

David Aker, Esq.
Local Counsel for DAVID E. JACKSON and ELISABETH JUDITH JACKSON
23 Southern Road
Hartsdale, New York 10530
Tel: (914) 674-1094
Fax: (914) 479-5304
e-mail: daveaker@optonline.net

By: _____
David Aker, Esq.