FILED ___ ENTERED
LOGGED ___ RECEIVED

# IN THE UNITED STATES DISTRICT
## FOR THE DISTRICT OF MARYLAND
### GREENBELT

APR - 3 2007

AT GREENBELT
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
MGMT DEPUTY BOX

PAULA RUSH,
2651 Peery Drive
Churchville, MD 21208

CASE NO.: WMN 07 CV 0854

Plaintiff pro se

Vs.

American Home Mortgage, Inc.
538 Broadhollow Road
Melville, NY 11747

American Home Mortgage Servicing Inc.
4600 Regent Drive, Suit 200
Irving, Texas 75063

American Brokers Conduit
The Loan Corporation
4890 W. Kennedy Blvd. #260
Tampa FL 33609

American Brokers Conduit
5160 Parkstone Drive Suite 190A
Chantilly, VA 20151

Trust Appraisers
1138 Gaither Road
Rockville Md. 20850

Servicelink
4000 Industrial Boulevard
Aliquippa, PA 15001

Defendants

**COMPLAINT** FOR:
 INJUNCTIVE AND OTHER
EQUITABLE RELIEF, LOAN
RECISSION, ORDER TO DISMISS
FORECLOSURE COMPLAINT,
MONETARY DAMAGES,
PENALTIES AND ATTORNEYS
FEES AND COSTS

**JURY TRIAL DEMANDED**

**Case No.**

**Pro se**

-1-

## INTRODUCTION

This action brought by Plaintiff, Paula Rush (hereinafter"Ms. Rush") is seeking relief from the

predatory lending practices of the Defendant, American Home Mortgage Servicing et al,

(hereinafter "AHM") and American Brokers Conduit et al ( hereinafter "ABC") for numerous

violations of Maryland State and Federal laws in relation to a mortgage loan refinance Ms.

Rush obtained through AHM. Including but limited to, violations of RICO, Maryland Finder's

Fee Act, The Maryland Consumer Protection Act,  TILA, RESPA, and ECOA, DBPA, and

related civil  claims in connection with a  Pay Option Arm (herinafter "POA") loan product

advertised and sold  through  ABC a division of AHM.

The problems that Plaintiff has experienced mirror many practices already forbidden as a result

enforcement actions taken against many lenders. The claims also highlight and help to bring

attention to the  growing concern of the practices lenders use to create loans and then "sell off"

the liabilities to unsuspecting investors who invest in mortgage securities.  The issues include,

but are not limited to: a fraudulent inflated appraisal,  misrepresented interest rate and loan

terms,

bait- and- switch on every term in the loan, an exorbitant broker kickback in the form of a YSP,

document switching, equity stripping, negative amortization, prepayment penalties,  conflicting

and misleading  statements both orally and written, improvident lending, targeting a single

unmarried woman, steering into a refinance promising non-existent benefits. All issues presented

are covered by state consumer laws and federal statutory laws.  No effort has been made by

American Home Mortgage Servicing to address plaintiff's concerns after plaintiff making them

aware of said problems.

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this action and venue is proper under MD. CTS &

JUD. PRO. §6-102 and §6-103.  Because Plaintiff is domiciled in Maryland and inasmuch as

AHM is a foreign business, which upon information and belief carries on regular business in the

State of Maryland and derives substantial revenue from real estate, mortgage and other services

regarding property in Maryland.

2.      Venue is proper in this Court under MD. CTS. & JUD. PRO. . §6-201 because the

Defendant conducts regular business in various counties in Maryland and the actions giving rise

to the suit concern real property located and damages caused in Maryland.

3.      Plaintiff and Defendants are citizens of different states and the amount in

controversy of this action exceeds one million dollars ($1,000,000.00), exclusive of interest and

costs. Venue is proper in this court under 28 USC 1391(b)(2).

**COMPLAINT**

4.      Plaintiff, Paula Rush, brings this action on her own behalf against American

Home Mortgage Servicing et al and American Brokers Conduit, a division of American Home

Mortgage Serving, and for her complaint allege upon information and belief and based on her

investigation to date, as follows:

**THE PARTIES**

5.      Plaintiff, Paula Rush is a resident and citizen of Maryland and owns her home at

2651 Peery Drive Churchville MD. 21028.  Plaintiff is the borrower of a MTA Pay Option Arm

in a transaction which  occurred on April 3, 2006,  for a total loan amount of 586,500 inclusive

-3-

of loan origination and settlement charges.

6.      Defendant, American Mortgage Servicing is incorporated under the laws of the State of New York, having its principal place of business at 538 Broadhollow Rd  Melville, NY 11747,  and originates mortgages to consumers throughout the United States directly and through affiliates, brokers and divisions of American Home Mortgage.

7.      Defendant American Brokers Conduit is a division of American Home Mortgage and under this arrangement marketed, advertised, and sold the MTA Pay Option Arms in Maryland, and also marketed, advertised, and sold the loans throughout the United States.

## FACTUAL ALLEGATIONS

8.      Plaintiff realleges all of the foregoing paragraphs.

9.      AHM operates as a mortgage lender. Through various nationwide brokers and agents it direct markets mortgages. It advertises, solicits, markets, and brokers mortgage loans.

10.      ABC a division of AHM Company's agents complete loan applications on behalf of borrowers and those applications are submitted to the lender.

11.      In the month of Feb 2006, AHM direct mail marketed, advertised, and promoted the MTA Pay Option Arm via a direct mail flyer to Ms. Rush citing a pre qualified acceptance of a 1% interest rate due to Ms. Rush good credit standing and equity in her home.

## COUNT ONE- VIOLATIONS OF
## THE TRUTH IN LENDING ACT PRIOR TO CLOSING

12.      Plaintiff realleges all of the foregoing paragraphs.

13.      Plaintiff seeks a remedy under the Truth in Lending Act ("TILA"), 15 U.S.C.

1601 et seq., to obtain rescission, injunctive relief, redress, restitution, disgorgement, money

damages, attorneys' fees and other equitable relief against Defendants for engaging in

Unfair or deceptive acts or practices in violation of TILA, 15 U.S.C. 1601 et seq., and its

Implementing Regulation Z, 12 C.F.R. Part 226.

14.     Through various forms of media including, but not limited to; print ads,

brochures, the Internet, direct mailers and promotional documents, ABC marketed, advertised

and warranted that the MTA Power Option Arm (herinafter "POA") loan was fit for the ordinary

purpose for which it was presented as a financial tool to build wealth and eliminate debt via a 1%

interest rate.

15.     AHM through ABC, marketed, advertised, and sold the POA to Ms. Rush via a

direct mail flyer and subsequent phone conversations. In conjunction with the sale, ABC and

AHM marketed, advertised and warranted that this loan was a financial tool to build wealth,

eliminate debt, and would save large sums of money for the plaintiff via terms of a 1% interest

rate, $56,000 cash out, and no prepayment penalty.

16.     Despite AHM representations, the loan program conceals material fact omissions,

and material fact misrepresentations, the effect of which is that the actual wealth building is only

for the lender at the borrower's expense.

17.     The POA loan advertisements fail to point out the effect of negative amortisation,

the volatile nature of real estate appreciation, or the true interest rate/payment rate and

subsequent negative amortisation on the proported savings. This renders them unable to perform

the ordinary purposes for which they are sold.

18.     Defendant sells loans with a teaser rate stated in their Truth in Lending Disclosure

**CLASS ACTION COMPLAINT**

Statements that misled the plaintiff into thinking she was buying a loan product with loan interest rate that was lower than the rate actually being charged on her mortgage account.

19.   AHM knew or should have known that the refinancing of her current loan with and interest rate of 5.25% with the POA loan program promised non-existent benefits of saving money to plaintiff. The POA loan programs do not perform in accordance with the advertisements, marketing materials and written promises disseminated by ABC and AHM nor with the reasonable expectations of ordinary consumers.

20.   In addition, Defendant processed the loan application for a 1% interest rate loan which they do not offer. The Defendant knew or should have known that proper disclosures according to Regulation Z were not being given to the plaintiff at the time the mortgage application was submitted or within 3 days of application.

21.   The Plaintiff signed an application for a mortgage with an interest rate of 1% for 480 months. The application misrepresents the product being sold. The Defendant knew or should have known that the product being sold to the Plaintiff was different from what was applied for and what was represented to her in various documents, including the preliminary TILDS.

22.   After completing loan applications for consumers, AHM failed to provide documents required within 3 days of receiving an application. The loan application started in early February, appraisal was done on Feb. 22, 2006 and preliminary "Federal Truth-in- Lending Disclosure Statements" and "Good Faith Estimate" were done on March 13, 2006. All loan terms were changed between March 13, 2006 and closing which occurred on April 3, 2006.

23.   The provided documents entitled preliminary "Federal Truth-in-Lending

-6-

Disclosure Statements" and "Good Faith Estimate" did nothing to clarify but instead continued to misrepresent the terms of the loans being offered, the POA loan programs contained a crucial misrepresentation of material facts. The 1% interest rate for 480 months listed using this exact term on the Loan Application and Good Faith estimate, was actually only offered for 23 days of the loan and the actual interest rate was between 7% and 8%.

24.     The loan was expressed as "Conventional" when even on AHM investment statements they differentiate between a Conventional loan, Other Adjustable Rate, and Pay Option Arm. This is taken directly from the AHM website on April 1, 2007.

Total Portfolio

Pay-option ARMS $ 4,352.7 23.5% 709 1.0% 12.8% 30.4% 55.8%

Other Adjust-able Rate 7,051.0 38.0% 721 1.0% 6.2% 25.8% 67.0%

Conven- tional Con- forming Fixed Rate 1,599.4 8.6% 716 3.4% 7.2% 27.8% 61.6%

Alternate A First Lien 3,366.0 18.2% 684 2.3% 31.2% 32.1% 34.4%

Jumbo Fixed Rate 652.3 3.5% 727 0.3% 3.6% 27.6% 68.5%

Home equity/ Second Liens 1,090.2 5.9% 713 0.4% 9.1% 32.1% 58.4%

Govern- ment Fixed Rate 173.3 0.9% 637 41.2% 26.8% 14.5% 17.5%

Con- struction 196.7 1.1% 725 2.1% 5.8% 21.2% 70.9%

Non-Prime 62.4 0.3% 682 8.5% 29.8% 27.4% 34.3% -

Total Loans $18,544.0 100.0% 710 1.7% 12.7% 28.5% 57.1%

25.     AHM failed to state a type of loan in the TILDS blank provided by Regulation Z. The lack of disclosure and the use of "Conventional" creates more confusion to what the actual loan program is. AHM is in full control over what they put in the form. With the conflicting

representations on both the preliminary TILDS and the final TILDS, AHM violated the requirements that the TILDS be "clear and conspicuous" and not misleading pursuant to Regulation Z.

26.     In addition AHM uses many terms to identify this loan, including Conventional, Power Arm, Pay Option Arm, 1 Mo. MTA Power ARM.

27.     The effect of which is meant to confuse an ordinary consumer.

28.     The loan program didn't save the plaintiff any money, but in fact cost her much more then the existing loan with a interest rate of 5.25% locked in for five years which plaintiff was mislead into refinancing. Her previous loan payment was $2611 and her new loan payment was $2055 for a difference of $556 and then the negative amortised interest of $2,300 was added to her principal balance. In fact this loan was immediately costing her $1,744 per month more. In addition the closing costs, this loan cost her over $30,000 equity in her house in the first year.

29.     On the preliminary "Good Faith Estimate" that AHM provided to Plaintiff, AHM has checked the box, "will not" have to pay a prepayment penalty. Then changed this at closing.

30.     On the preliminary documents entitled "Federal Truth-in-Lending Disclosure Statement," and "Good Faith Estimate," the documents differ substantially on every item from the final documents when there was no change in the loan program being sold, or no change in the affiliated companies providing settlement services.

31.     Defendant used deceptive language on its "Good Faith Estimate" and "Truth in Lending Disclosure Statements" that violates the TILA requirements that  language be both "clear and conspicuous" and that such  language not be misleading.

32.     As an example, on the "Good Faith Estimate" at the top of the page it says Type

-8-

of Loan : Conventional; Rate 1%; Term 480 months. No other rate is mentioned. No where on the document do the words ARM, Pay Option Arm, Negative Amortisation, Index plus Margin, or any clarifications appear.

**33.** On the "Truth In Lending Disclosure Statement" for the Plaintiff's loan, Defendant again used the word "Conventional to describe the loan. No where on this document do the words ARM, Pay Option Arm, Negative Amortisation, Index plus Margin, or any clarifications appear. They used "Conventional" on this document and omitted the reference they made to interest rate previous in this space next to conventional. The only reference made to interest rate on this document was APR of "6.320e" which does not reflect the final interest rate in any way.

**34.** AHM could have easily spelled out that the loan was and MTA Pay Option ARM or even just ARM, and the real rate of interest, on the loan application, on the TILDS, or on the GFE.

**35.** The above use of language and conflicting statements was intentional to mislead the Plaintiff as to the true nature of her loan. The only references closer to the actual interest rate on plaintiffs loan documents can be found in places which ask for a APR, a terminology even AHM on their own web site state is not understood by most consumers. This is downloaded from AHM website on April 1, 2007. They state the following; " There is a lot of talk in the industry about annual percentage rate (APR). In fact, APR is a required disclosure on many advertisements. While most people have a vague understanding of APR, few fully understand the concept; yet many make decisions based on it. This is one of those subjects where a little information can be counterproductive. Many people make decisions–bad decisions–using a tool

they don't really understand." And also, "You should also be aware that not all lenders follow the rules of calculating APR under the Truth in Lending Act. For example, the application fee may or may not be included in the APR calculation, depending on how the lender conducts business. Yet the actual fees that are included in the APR do not have to be separately disclosed. One lender may offer an incredibly low rate and show a very low APR because the loan has been packaged to avoid including substantial fees in the APR calculation. Ask to see a breakdown of fees charged."

"For adjustable rate mortgages (ARMs), the APR is based on the "accrual rate" of the loan, which assumes the loan rate will make adjustments based on the current index and margin for the loan and other adjustment restrictions. Of course, economic conditions are likely to change, so the actual APR will probably be different. Many software programs used by lending institutions rely on the person generating the quote to enter the current ARM index and margin. Be careful that your ARM quote doesn't use an inaccurately low index. In fact, you should ask the lender what index and margin was used for the quote. Borrowers can use APR for a quick analysis of a loan proposal. For example, if a lender quotes a rate well below the market rate, but the APR is substantially higher, the borrower can assume the loan requires payment of high fees. As mentioned previously, however, some fees may not be included in the APR, so this "quick check" isn't foolproof."

36.     Considering this statement, AHM by their own admission understands that most borrowers don't understand the APR or how it is calculated. They also admit that lenders can change the outcome of the APR based on how they "package" a loan. AHM uses the 1% teaser rate to change the outcome of the APR rate presented in the "Truth and Lending Disclosure

**CLASS ACTION COMPLAINT**

Statement" thereby rendering it a false misrepresentation of true disclosure. Also, their admission

of a "vague understanding" by consumers in conjunction with all of their other conflicting

statements in loan documents prove a pattern of intentionally trying to deceive through methods

they are very familiar with.

37.    In truth, AHM is presenting terms and interest rates it has no intention of offering.

The mortgage note issued to Plaintiff was for a mortgage that charged 1% interest for only 23

days. After that time, the rate of interest immediately went to a eight times higher rate and has

been adjusting to a much higher interest rate each month thereafter. This has caused the loan of

the Plaintiff to negatively amortize and is causing her to pay a higher interest rate than

represented in the majority of the documents.

38.    Defendant also provided this document to plaintiff, "AFFLIATES Third Party

Disclosure, which says, "You will be required to use the following providers which we have

repeatedly used or required borrowers to use within the last twelve months." Your appraisal

service may be provided by Homegate Settlement services, Inc. a wholly owed subsidiary of

American Home Mortgage Corp. Because of this relationship, this referral may provide

American Brokers Conduit financial or other benefit.

39.    The statement "You will be required," took away Plaintiffs choice of settlement

and title company services allowed by law in violation of 12 U.S. C. § 2607(d)(2) stating a

lender can not require the use of title company directly or indirectly.

## COUNT TWO – SERVICING MORTGAGE LOANS WITHOUT MANDATORY TRUTH IN LENDING DISCLOSURES SUBSEQUENT TO CLOSING

40.    Plaintiffs reallege all of the foregoing paragraphs.

41.     The actual mortgage note issued to Plaintiff was for a mortgage that charged 1% interest for only 23 days. After that time, the rate of interest immediately went to a rate eight times higher rate and has been adjusting to a much higher interest rate each month thereafter calculated on an index plus margin.

42.     This has caused the loan of the Plaintiff to negatively amortise based on a higher interest rate than represented in the majority of the documents.

43.     The Truth in Lending Act requires mandatory disclosures to adjustable rate mortgage customers subsequent to closing. Among the requirements of Regulation Z, is a duty of the servicing lender to notify variable rate customers 25 days prior to making any change in the interest rate on a variable rate loan.

44.     According to Federal Regulations, the following disclosures must be given:

§ 226.20 Subsequent disclosure requirements. An adjustment to the interest rate with or without a corresponding adjustment to the payment in a variable-rate transaction subject to §226.19(b) is an event requiring new disclosures to the consumer. At least once each year during

which an interest rate adjustment is implemented without an accompanying payment change, and at least 25, but no more than 120, calendar days before payment at a new level is due, the following disclosures, as applicable, must be delivered or placed in the mail:

(1) The current and **prior interest rates.**
(2) The index values upon which the current and prior interest rates are based.
(3) The extent to which the creditor has foregone any increase in the interest rate.
(4) The contractual effects of the adjustment, including **the payment due after the adjustment is made,** and a statement of the loan balance.
(5) **The payment, if different from that referred to in paragraph (c)(4) of this section, that would be required to fully amortize the loan at the new interest rate over the remainder of the loan term.**
*[Codified to 12 C.F.R. § 226.20]*

-12-

*[Section 226.20 amended at 52 Fed. Reg. 48671, December 24, 1987, effective
December 28, 1987, but compliance optional until October 1, 1988]*

**45.** The Defendant sold Plaintiff a loan wherein the Defendant apparently was

charging 1% note interest for the first 23 days of April 2006. In the month of May 2006,

Defendant began charging a note interest rate of over 7% without providing advance notice

consistent with the foregoing Regulation Z requirements. Even though the rate continued to rise

each and every month the disclosure of rate increases came after they had been implemented

with no new payment schedule needed to fully amortize the loan, therfore the Defendant did not

provide advanced notice consistent with the foregoing Regulation Z requirements, or identify the

payment which would be required to fully amortise the loan.

**46.** Defendant failed to make disclosures thereby collecting interest illegally on

plaintiffs loan.

**COUNT THREE – FALSE ADVERTISING**

**47.** Plaintiff realleges all of the foregoing paragraphs.

**48.** Plaintiff seeks a remedy for deceptive advertising and bait and switch sales of

mortgages which violate the the following: TILA, 12 CFR 226.16 (a) ( Regualation Z)

**49.** On the preliminary "Good Faith Estimate" that AHM has provided to consumers,

AHM has checked the box that is, "will not" have to pay a prepayment penalty. On the closing

documents that was changed to "may," which effectively meant, "will" have to pay a prepayment

penalty. Plaintiff does have a prepayment penalty on her loan.

**50.** AHM through ABC, marketed, advertised, and sold the MTA Power Option Arm

(herinafter "POA")  to Ms. Rush via a direct mail flyer and subsequent phone conversations. In

**CLASS ACTION COMPLAINT**

conjunction with the sale, ABC and AHM marketed, advertised and warranted that this loan was a financial tool to build wealth, eliminate debt, and would save large sums of money for the plaintiff via terms of a 1% interest rate, $56,000 cash out, and no prepayment penalty.

51.    Under 25. Under TILA, 15 U.S.C. 1601 et seq. and its implementing Regulation Z, 12 C.F.R. Part 226, persons who advertise "closed-end credit," as defined in 12 C.F.R. section 226.2(a)(10), must comply with the applicable provisions of TILA and Regulation Z, including but not limited to, Sections 226.4, 226.22, and 226.24 of Regulation Z, 12 C.F.R. Section 226 et seq. "Credit means the right to defer payment of debt or to incur debt and defer its payment." 12 C.F.R. section 226.2(a)(14). "Closed-end credit means consumer credit other than open-end credit," and "open-end credit" is defined as "consumer credit extended by a creditor under a plan in which: (i) The creditor reasonably contemplates repeated transactions; (ii) The creditor may impose a finance charge from time to time on an outstanding unpaid balance; and (iii) The amount of credit that may be extended to the consumer during the term of the plan (up to any limit set by the creditor) is generally made available to the extent that any outstanding balance is repaid." 12 C.F.R. sections 226.2(a)(10) & (20). The regulation on advertising says the following:

§ 226.24 Advertising.

(a) Actually available terms. If an advertisement for credit states specific credit terms, it shall state only those terms that actually are or will be arranged or offered by the creditor.
(b) Advertisement of rate of finance charge. If an advertisement states a rate of finance charge, it shall state the rate as an "annual percentage rate," using that term. If the annual percentage rate may be increased after consummation, the advertisement shall state that fact. The advertisement shall not state any other rate, except that a simple annual rate or periodic rate that is applied to an unpaid balance may be stated in conjunction with, but not more conspicuously than, the annual percentage rate.
(c) Advertisement of terms that require additional disclosures. (1) If any of the following terms is set forth in an advertisement, the advertisement shall meet the requirements of

-14-

paragraph (c)(2) of this section:

(i) The amount or percentage of any downpayment.

(ii) The number of payments or period of repayment.

(iii) The amount of any payment.

(iv) The amount of any finance charge.

(2) An advertisement stating any of the terms in paragraph (c)(1) of this section shall state the following terms, (An example of one or more typical extensions of credit with a statement of all the terms applicable to each may be used.) as applicable:

(i) The amount or percentage of the downpayment.

(ii) The terms of repayment.

(iii) The "annual percentage rate," using that term, and, if the rate may be increased after consummation, that fact.

(d) Catalogs and multiple-page advertisements; electronic advertisements. (1) If a catalog or other multiple-page advertisement, or an advertisement using electronic communication gives information in a table or schedule in sufficient detail to permit determination of the disclosures required by paragraph (c)(2) of this section, it shall be considered a single advertisement if:

(i) The table or schedule is clearly and conspicuously set forth; and

(ii) Any statement of terms of the credit terms in paragraph (c)(1) of this section appearing anywhere else in the catalog or advertisement clearly refers to the page or location where the table or schedule begins.

(2) A catalog or other multiple-page advertisement or an advertisement using electronic communication complies with paragraph (c)(2) of this section if the table or schedule of terms includes all appropriate disclosures for a representative scale of amounts up to the level of the more commonly sold higher-priced property or services offered.

[Codified to 12 C.F.R. § 226.24]

[Section 226.24 amended at 66 Fed. Reg. 17338, March 30, 2001, effective March 30, 2001]

52.     The Defendant violated the TILA rules on advertising as published in Regulation

Z. Defendants have advertised closed-end credit to consumers by disseminating false

advertisements for mortgage loans, including but not limited to advertisements, marketing

brochures and other mortgage documentation for loans at a lower rate than are actually being

charged, stating teaser rates such as "1%" and other misleading implications.

53.     AHM practices a pattern of presenting this "teaser rate" as the prominent

feature/rate on advertising materials, web sites, and broker training materials. The following is

an example of advertising materials disseminated by AHM; A posting which was found on

March 31, 2007 on Craigslist in many different states by an employee of AHM. Second example

is taken directly from AHM website on April 1, 2007. Clearly the "pitch" authorized to draw

people in is a bold reference to an interest rate of 1.25%. A small disclaimer is used at the

bottom of these ads. Craigslist Posting:

# Don't pay higher than 1.25% interest rate on your mortgage!

Reply to: serv-302513771@craigslist.org
Date: 2007-03-29, 12:12PM EDT

Licensed in all 50 states and the District of Columbia, we have over 2,000 different loan products to meet the needs of all our customers!

Our popular **Pay Option ARM** allows you defer a portion of your interest. Use it for your rental home, vacation home, or primary residence. The base rate starts at just 1.25%!

Other products include:
• 100% Owner-Occupied Financing with a 660 FICO
• 100% Investor Financing with 700 FICO
• 97% Financing with 580 FICO (full doc only)
• Payment option ARMs have a start rate of 1.25%*
• Home Equity Loans
• Less than perfect credit
• Lot Loans
• Government Loans (FHA/VA)
• 40 Year Loans (Fixed, ARMs, Neg Am)
• JUMBO Loans
• Loans for LLC's
• Limited or no documentation
• Interest only
• Commercial loans (brokered)
• Construction Loans

Call today! Seth Harris
American Home Mortgage (NYSE: AHM)
503-231-6009 Office
888-248-6633 Toll Free
971-563-7398 Cell

**CLASS ACTION COMPLAINT**

*The payment rate of 1.25% applies for the first five years; interest accrues at 6.75% during that same period for this program. Accrual rates may vary by program. APR is 7.38%. Rates are as of 03/23/07 and subject to change without notice. APR subject to increase after consummation.

Call Seth Harris for current rates and programs. This product may not be available in all 50 states.
**All loans are subject to credit approval.

**AHM Web Site April 1, 2007**
Power 5 MTA

Power 5 MTA Gives You Security & SUPER LOW Payments!

If you're like most homebuyers, you want a mortgage that gives you purchasing power and peace of mind. Our new Power 5 MTA delivers both — and much more!

Here are the valuable benefits:
- Fixed payment based on **1.25%** of your original loan amount for the first five years.*
- A fixed interest rate that doesn't change for the first five years.
- A choice of four monthly payment options for better budgeting and cash flow management.

A fixed payment of **1.25%** of your original loan amount for the first five years keeps your payments unbelievably low and expands your purchasing power across many more neighborhoods!

At the same time, a fixed interest rate for the first five years provides lasting safety and security. With a fixed rate, there's no monthly guessing game. You know exactly where you stand all the time!

Click Here Now to get more information on how this AMAZING loan can help you achieve your homeownership goals!

* The payment rate of **1.25% applies for the first five years**; interest accrues at 7.25% during that same period for this program. Accrual rates may vary by program. APR is 7.38%. Rates are as of 4/26/2006 and subject to change without notice. APR subject to increase after consummation. Call your loan officer for current rates and

-17-

programs. This product may not be available in all 50 states.

54.     In addition, Defendant is processing applications for a 1% interest rate loan which they do not offer. The Defendant knew or should have known that proper disclosures according to Regulation Z were not being given to the plaintiff at the time the mortgage application was submitted. As an example, the Plaintiff signed an application for a mortgage with an interest rate of 1% for 480 months. The application misrepresents the product being sold. The Defendant knew or should have known that the product being sold to the Plaintiff was different from what was applied for and what was represented to her in various advertisement documents.

55.     AHM knew or should have known that the refinancing of plaintiffs current loan with the POA loan program promised non-existent benefits to plaintiff. The POA loan programs do not perform in accordance with the advertisements, marketing materials and written promises disseminated by ABC and AHM nor with the reasonable expectations of ordinary consumers.

56.     At the time of initial direct mail offer and loan application, and then again in the subsequent Good Faith Estimate, the POA loan programs contained a crucial misrepresentation of material fact, the 1% interest rate listed using this exact term on the loan application and Good Faith estimate, was blantantly false advertising. The rate of 1% was only offered for 23 days of the loan and the actual interest rate was closer to 8%.

57.     Notwithstanding its advertisements, AHM has never offered an interest rate of 1% "conventional" loans. Instead, a loan that AHM has falsely advertised as a 1% and "conventional" loan is in fact an adjustable rate mortgage (Negative Amortisation ARM) for which the interest rate varies each month and the minimum payment is the only aspect the rate relates to. The rate adjusts each and every month that the loan is in existence.

**CLASS ACTION COMPLAINT**

58.     This loan features four payment options, however only the lowest payment is used on the TILDS thereby leaving the plaintiff to assume this is the payment she should be making thereby encouraging the negative amortization aspect of this loan. No other payment option is presented on the TILDS or amortisation schedule provided to show this aspect of the loan.

59.     The effect of which is that the loan program didn't save the plaintiff any money, but in fact cost her much more then the existing loan with a interest rate of 5.25% locked in for five years which plaintiff was mislead into refinancing.

60.     The minimum payment amount for the first year of this loan has been the amount that would be due if the consumer truly had a 1% loan. The actual interest rate charged is in fact considerably higher and varies monthly causing negative amortization. The minimum payment does rise each year at rate which is not explained well anywhere in the loan document of how this increase is calculated. The minimum payment option "will" result in negative amortisation under any circumstances, however they chose to use the word, "may" even though they know each month any unpaid interest is added to the principal of the loan, so that the principal balance increases rather than decreases for periods during the course of the loan.

61.     This loan is not a 1% or "conventional" loan as those terms are understood by consumers. AHM has made mail advertisements, brochures and other documents and information disseminated to consumers and helped mortgage brokers create such advertisements on its behalf. Many of the company's advertisements, brochures and other documents disseminated to customers indicate "boldly" a low teaser rate, without disclosing that the teaser rate is only available for the first month of a 40-year loan and would increase after the first month, and then use very small disclaimers to state that interest would accrue at an APR rate

CLASS ACTION COMPLAINT

substantially higher than the teaser payment rate.

62.    ABC has also completed applications on behalf of consumers and obtained consumers' signatures only at closing on applications for loans that AHM has not offered or that were not available to the consumers, including but not limited to a 1%. AHM requires that applications be signed at the closing so AHM is ultimately responsible for the content of the applications and the related marketing programs. As an example, the Plaintiff in this action signed an application for a 40 year conventional mortgage with an interest rate of 1%. The application was filled out by a broker working on behalf of the Defendant in April 2006. The application was signed at the request of the Defendant at the mortgage closing in April 2006. At no time did AHM disclose to the Plaintiffs that no such loan program was being offered.

63.    The effect of which is that the loan program didn't save the plaintiff any money, but in fact cost her much more then the existing loan with a interest rate of 5.25% locked in for five years which plaintiff was mislead into refinancing.

64.    The result of which led to devastating loss of financial security, pending foreclosure, substantial loss of equity in home, and continued duress due to an expensive illegal prepayment penalty locking plaintiff into said loan.

65.    The mortgage when issued differs substantially from the program advertised and disclosed in AHM documentation and advertising. In credit advertisements, Defendants have violated the requirements of TILA and Regulation Z by:

A. advertising credit terms other than those terms that actually are or will be arranged or offered by the creditor, in violation of Section 226.24(a) of Regulation Z, 12 C.F.R. 5 226.24(a);
B. stating a rate of finance charge without clearly and conspicuously

disclosing the annual percentage rate, and, if the annual percentage rate
may be increased after consummation, that fact, and advertising a payment
rate without clearly and conspicuously making other required disclosures,
in violation of Sections 144(c) and 107 of TILA, 15 U.S.C.sections
1664(c) & 1606, Sections 226.24(b) and 226.22 of Regulation Z, 12
C.F.R. sections 226.24(b) & 226.22, and Section 226.24(b)-4 of the
Federal Reserve Board's Official Staff Commentary to Regulation Z, 12
C.F.R, Section 226.24(b)-4, Supp. 1; and stating the period of repayment
and/or the amount of a payment, but
C. failing to disclose clearly and conspicuously one or both of the following
items: (1) the terms of repayment and (2) the annual percentage rate, using
that term, and, if the rate may be increased after consummation, that fact,
in violation of Section 144(d) of TILA, 15 U.S.C. section l664(d), and
Section 226.24(c) of Regulation Z, 12 C.F.R. section 226.24(c).

**66.** Therefore, Defendant's representations, as alleged above, were, and are, false or

misleading. Defendants' practices constitute deceptive acts or practices.

**67.** To facilitate this loan a reference is made to a 1% rate throughout all the loan

documents to confuse and mislead.

A)The initial mailer;

B)the loan application;

C)the good faith estimate;

D)adjustable rate rider;

F)and adjustable rate note.

**68.** In the course of advertising and offering a loan to Plaintiff, Defendants have

represented, expressly or by implication, that the monthly payment of a specified amount or at a

specified rate is the cost of obtaining a loan through AHM. Defendants have failed to disclose or

to disclose adequately that;

(1) monthly payment of the specified amount or at the specified rate will result in negative
amortization and cause an increase in the total debt during the course of the loan, and

_____

**CLASS ACTION COMPLAINT**

(2)  the monthly payment amount will increase. This additional information would have been material to consumers in deciding whether to apply for and obtain a loan through AHM. The failure to disclose, or disclose adequately, this information in light of the representations made was and is a deceptive practice.

69.    In the course and conduct of advertising and offering credit, Defendants have represented both orally and written, and on their web site, expressly or by implication, that cash savings or annual savings of refinancing and/or consolidating existing debts into a mortgage loan obtained through AHM.

70.    In truth and in fact, the cash savings have not accurately illustrated the potential annual savings or lack thereof in regards to the refinancing and/or consolidating plaintiffs first mortgage with a rate of 5.25% and home equity loan into a mortgage loan obtained through AHM.

71.    Defendants' representations, as alleged in this complaint, were false and misleading.

72.    The only references closer to the actual interest rate on Plaintiffs loan documents can be found in places which ask for a APR or a reference to how rate is calculated like index plus margin. A terminology even AHM on their own website say is a term not understood by most consumers.

73.    On the Adjustable Rate Rider they use the term "at a yearly rate of 1%" then reference second the 7.438% rate.  Clearly 1% is used much more frequently then any other rate throughout loan documents and always used previous to any other rate.

## COUNT FOUR – FRAUD AND DECEPTIVE ACTS

74.    To facilitate this loan and create a LTV ratio which worked a material fact

misrepresentation was made both verbally and on documents provided to plaintiff using a grossly inflated appraisal by counting non-existent finished square footage in plaintiffs home. The appraisal which was done on Plaintiff property on Feb. 22, 2006 ordered by ABC was withheld from the plaintiff even as she requested it. The broker stated a verbal value of $870,000 and put this value on the loan application. At no other time did plaintiff see any other value placed on her property. Upon receiving the appraisal after demanding it for bankruptcy court, plaintiff noticed irregularities. First, the amount of the appraisal was not $870,000 but $790,000. Then upon further inspection The basement in plaintiffs home was counted as finished as well as an inflated square footage on the main living levels. The appraiser added over $146,000 in value to the appraisal using non-existent finished SF. He also ignored lower comparable properties which were available at that time and instead used the highest comparable he could find even if they were further away and did not reflect the values of the neighbourhood this property was in.

75.     Loan would not have been possible using actual finished SF as this would have resulted in a much lower LTV ratio. LTV ratio is one of the selling tools AHM mortgage is describing their portfolio to investors, an incentive for them to inflate appraisals.

76.     ABC chose appraiser and controlled transaction completely by withholding appraisal from plaintiff even though she was forced to pay for it directly to the appraiser. Appraiser refused on previous occasion to give Plaintiff appraisal citing he works for the lender. Finally Plaintiff demanded the appraisal cited the bankruptcy court demanded it, and finally received the appraisal in Jan of 2007 via email from the appraiser 11 months after loan transaction.

77.     Fraud occurred when ABC made a false statement of material fact that was

known to be or believed to be false when made that was intended to induce the plaintiff to act and led to subsequent action by the plaintiff in reliance on the validity of the representation and resulted in damage to the Plaintiff. This statement of appraised value was represented both verbally, and on the loan application.

78.     Fraud occurred in making this misrepresentation, Plaintiff, to her detriment relied on this fact as a major factor in taking out the loan.

79.     Fraud occurred in making a promise of a 1% interest rate, $56,000 cash out to pay credit debt, and no prepayment penalty, with no intent to perform that promise when Plaintiff reasonably relied on that representation to her detriment.

80.     The Plaintiff acted in reliance upon these statements and the plaintiff thereby suffered injury.

81.     AHM has engaged in unfair or deceptive trade acts or practices in violation of Maryland Code §4-88-107, §4-88-108, including, but not limited to: the aforementioned conduct is and was deceptive, false, fraudulent, and constitutes unconscionable, unfair and deceptive commercial practices in that AHM has, by the use of false or deceptive statements and/or knowing intentional material omissions, misrepresented and/or concealed the true nature of the MTA Pay Option Arm loan programs.

82.     As a direct and proximate result of these unfair, deceptive and unconscionable commercial practices, Plaintiff has been damaged as alleged herein, and are entitled to recover actual damages and any other damages permitted by the applicable consumer protection statute, in an amount to be proven at trial as well as attorneys' fees and costs.

83.     Under the Consumer Fraud and Deceptive Business Practices Act unfair practices

are: Deception, fraud, false pretense, false promise, misrepresentation, concealment, or suppression, or omission of a material fact. Throughout this complaint each of these practices can be found.

**84.**    Under The Maryland Consumer Protection Act " Md. Code Ann., Comm. Law §§ 13-101, *et seq.* a wide variety of deceptive trade practices are expressly prohibited including, "deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same." *Id.* § 13-301(9).

**85.**    Defendant paid the broker a YSP of $19794 an exorbitant fee, or "unearned gravy" for delivering such harsh mortgage terms as an above par rate and a prepayment penalty in violation of The Real Estate Settlement Procedures Act, 12 U.S.C. §2601 et seq., 24 C.F.R. Part 3500 et seq., 1974. (RESPA).

**86.**    Defendant also provided a document to plaintiff, which stated, "we will require you to use these affiliated companies, which we have used in the past." Thereby taking away the choice of settlement and title company services allowed by law under RESPA.

**87.**    The  remedy is full loan recession releasing the security interest in the property and giving rise to an Order to Dismiss the Complaint for Foreclosure of Mortgage

**88.**    To facilitate this loan a material fact misrepresentation was made of promised false benefits. AHM disseminates benefits of savings and appreciation of real estate as reasoning for the financial benefit of the Pay Option Arm. Nowhere in their advertising do they account for, include, or explain the aspect of negative amortisation.

**89.**    Savings "does not" occur due to negative amortisation, and based on a higher

**CLASS ACTION COMPLAINT**

interest rate. Rate of appreciation is a subjective/market driven variable that cannot and should not be promised as a benefit.

90.    Negative amortisation is the only "guarantee" in these loans if you pay the payment amount listed on TILDS, and it is the only facet of the loan not accounted for in any presentation of this loan. Negative amortisation is banned in Md. Commercial Law Code §12-127, 12-311, 12-409.1 and 12-1029

91.    AHM  uses "Bait and Switch" to totally change the initial loan terms offered to borrower and presented in loan application and Good Faith documents. Between the date of March 13, 2006 and April 3, 2006 every meaningful aspect of loan offered was changed in violation of ECOA .

92.    All of these issues reduce this contract to nothing more then a fraudulent sham aimed at inducing the plaintiff to enter into a loan for the sole benefit of unjust enrichment of the defendant

93.    No actual index or margin rate was presented in any preliminary documents. The only references to indexes and margins is a generic one that a rate will be calculated using an index and margin. No actual numbers are revealed on what these indexes or margins will be until closing.

94.    In the generic disclosures which are seven pages referencing 1, 3, 3, 6, and 12, Month MTA Power ARMs, there is no exact reference stating which program the loan offered actually is.

95.    If seven pages of programs wasn't enough to confuse the ordinary consumer, the references to indexes and margins, and calculators they offer are all based on a 15 or 30 year

loan, and plaintiff was given a 40 year loan rendering them useless.

96.     To facilitate the fradulent transactions, AHM/ABC uses different documents in the Good Faith presentation and then change the final documents. Two of the noted changes are addding an extra disclaimor using a different document in the mountain of documents at closing and changing the sheet which reads "you will be required" to use our affiliate companies to "you can choose."

97.     As a result of the fraudulent misrepresentation, Plaintiff has suffered damages, in that she was sold a loan program that she would not otherwise have purchased had she known of the truthful terms and non-existent benefits of the loan. AHM effectively trapped Plantiff into this loan by the use of a prepayment penalty. Plaintiff is in bankruptcy and facing foreclosure, is emotionally destroyed, and her good credit is ruined. Damages are severe.

98.     ABC baited plaintiff into this transaction promising 1% interest rate and then proceeded to immediately in less then one month increase the rate to 7.43 and increase it every month thereafter. Maryland commercial code states," The interest rate may not be adjusted more frequently than once in a 6 month period. The amount of increase in any 6 month period may not be more than the equivalent of 1 percentage point above the rate in effect prior to the rate change. §12-118(ii).

99.     American Home Mortgage is well aware of how these loans are marketed as they lend directly and promote the same benefits on their own web site. To date, however, American Home Mortgage has failed to institute any programs to restructure or replace their practices even as many other lenders, including but not limited to; Ameriquest, New Century, Wells Fargo, Countrywide and most recently Chevy Chase Bank have been given harsh penalties, lost court

cases and been forced by state and federal regulators to reform said practices. Many courts,

federal agencies, and lawmakers have expressed their findings on many of the issues raised in

this complaint. AHM willfully continues to practice predatory practices ignoring all the of

overwhelming condemnation of practices contained in this complaint.

PREPARED STATEMENT of the FTC on EFFORTS TO COMBAT UNFAIR AND
DECEPTIVE SUBPRIME LENDING
Before the SENATE SPECIAL COMMITTEE OF AGING
Wash DC
Feb. 24, 2004

"Empirical evidence suggests that subprime loans are different from prime loans in terms of the
variety, complexity and level of risks they pose. Several cases have resulted in large monetary
judgements, including Ameriquest, HFC, Citigroup, The Associates, Fairbanks Capital.

September 2002 – Landmark case. The FTC charged Citigroup Inc's subsidiaries, Associates
First Capital Corp., and Associates Corp of North America("The Associates") engaged in
systematic and widespread deception and other illegal lending practices. " they lured customers
into high-cost loans through false and misleading statements and half-truths about loan costs, and
violated numerous federal laws, including the TILA, the FCRA, and the FDCPA.

First Alliance Mortgage Co. - THE FTC and others, including six states, private plaintiffs, and
the AARP, reached a major settlement with mortgage lender First Alliance Mortgage Co. in
March 2002. The complaint alleged that the defendants loan officers in their sales presentations
made blatantly deceptive claims about monetary and other loan terms.

July 2002 – The FTC, HUD, State of Illnois, jointly settled a case against a regional sub-prime
lender, Mercantile Mortgage Company Inc., charging violations of the FTC Act, TILA, HOEPA,
and the RESPA. The FTC alleged that the company's employees, and one mortgage broker who
was acting as an agent in soliciting and closing loans on it's behalf, misrepresented key loan
terms to borrowers.

FAIRBANKS CAPITAL CORP.Nov. 2003- The FTC along with HUD, announced a settlement
with Fairbanks Capital Corp. and its parent company of violations of 15 U.S.C. 45(a), 15
U.S.C. 1639 HOEPA. TILA 15 USC 1601 et seq, ECOA 15 USC 1691 et seq, FCRA 15 USC
1681 et seq, FDCPA USC 1692 et seq. Citing harsh mortgage terms, pre payment penalties, and
broker kickbacks, to name a few.

Other Banking Litigation Developments

This year, after the Eleventh Circuit in Culpepper v. Inland Mtge ruled that yield spread premiums were prohibited referral fees under RESPA, plaintiffs instituted a RICO class action based on that practice.

In Cannon v. Nationwide Acceptance Corporation, a Federal Judge in the Northern District of Illinois allowed a RICO class action to be maintained on the basic premise that the lenders' solicitation of new business induced existing borrowers to refinance existing loans rather than going the cheaper route of just borrowing more funds.

Chevy Chase Bank – The most recent opinion supports the argument that lenders are using a misrpresentation of these loan products to sell them to unsuspecting consumers.

Sanfrancisco Gate

Last month, a survey of the national appraisal industry conducted by October Research Corp. reported that 90 percent of appraisers feel pressure to inflate the value of homes to meet expectations -- be it a purchase price or an estimated value for a refinance.

Of course, this isn't the first time evidence of appraiser pressure has been aired. Just four years ago, during the boom, a similar study found that a full 55 percent of appraisers had had lenders, brokers or owners attempt to inflate their values.

In 2005, Jonathan Miller, appraiser and bubble blogger, launched Soapbox to "vent" about the "pressure myself, my firm and my profession was under to make the number 'or else.'"
"It seemed that no one really cared about ethics or the risk placed on [the] banking system," he wrote recently. "Appraisers were fast becoming the enablers to fraud and a whole lot of 'gray areas' that I wanted no part of."

"Internet-based mortgage companies call all the time," says Curt Thor of Real Estate Appraisals Association of Northern California and a Marin appraiser with North Bay Real Estate Appraisals for over 20 years. "They're fishing for appraisers. They tell me what the number is and ask me if I can match it."

John Philipp, an appraiser based in Sonoma County, says that he's experienced similar "dialing for appraisals" when mortgage brokers routinely call and ask him to complete a "comp check" before offering the appraisal assignment. "[T]hey want me to research the subject property and based on county information do research thru the MLS and give them a value before seeing the property. Sometimes they tell me what value they need to make their loan go through, which is illegal. The appraiser is not supposed to be made aware of the owner's estimate of value, or the value that is needed to make the loan, so as not to be influenced or have a predetermined number prior to the inspection," he writes in an e-mail about refinance appraisals. "[B]asically, the broker wants an appraisal without having to pay for it."
Philipp knows from experience that these brokers are not a source of future business. "Once I advise these

callers that I don't perform this service and that it is illegal to even ask, I don't hear from them again."

" He says that the pressure on appraisers has been growing since the 1990s, when banks began to eliminate their in-house appraisal offices and outsource the business of managing appraisals to appraisal management companies. Suddenly, mortgage brokers – who may have the biggest stake in the deal going through – were in the business of hiring appraisers directly.

CURRAN ANNOUNCES AMERIQUEST WILL PAY $325 MILLION AND REFORM ITS
LENDING PRACTICES TO RESOLVE STATES' INVESTIGATIONS
**Ssweeping reforms of practices that states alleged amounted to predatory lending.** "This is a huge settlement, but we believe Ameriquest did a lot of damage to consumers," said Attorney General Curran. "With this agreement in place Ameriquest's practices will change."

The company agreed to a battery of new standards to prevent what the states alleged were unfair and deceptive practices. Curran's office believes that Ameriquest employees deceived consumers as part of high-pressure tactics to sell mortgage refinances and that these high-pressure sales tactics were used to reach desired sales levels and high monthly individual sales quotas. These tactics were induced by a lopsided commission structure.

Under the agreement, Ameriquest is required to: Provide the same interest rates and discount points for similarly-situated consumers. Not pay sales personnel incentives to include prepayment penalties or any other fees or charges in the mortgages. Provide full disclosure regarding interest rates, discount points, prepayment penalties, and other loan or refinancing terms.
Overhaul its appraisal practices by removing branch offices and sales personnel from the appraiser selection process, instituting an automated system to select appraisers from panels created in each state, limiting the company's ability to get second opinions on appraisals, and prohibiting Ameriquest employees from influencing appraisals. Not encourage prospective borrowers to falsify income sources or income levels. Provide accurate, good faith estimates. Limit prepayment penalty periods on variable rate mortgages. Not engage in refinancing solicitations during the first 24 months of a loan, unless the borrower is considering refinancing. Use independent loan closers.

Elizabeth Kelderhouse, a Community Affairs Officer with the **FDIC.**
Examples of predatory practices include schemes where the lender promises one type of loan or interest rate but switches to another one that's more costly to the borrower, and "equity stripping," in which the lender deliberately makes a loan that is beyond the borrower's ability to repay in hopes of foreclosing on the loan and taking possession of the house. Predatory lenders primarily target consumers they believe are vulnerable.

CLASS ACTION COMPLAINT

## COUNT FIVE- RICO

100.   RICO violation occurred  when the Defendant participated directly or indirectly in a pattern of racketeering activity to acquire an interest in the real property located at 2651 Peery Drive Churchville Md. 21028.

101.   ABC and AHM  acts and the predicate acts caused the Plaintiff's injuries. The line was crossed when the lender acting in the normal course of its business, crossed the line between the normal course of business and illegal activities by the lender's participation in development and marketing activities. The lender is liable for aiding and abetting the predicate acts of the RICO violation because there was an illegal act. The lender was aware of its role in the unlawful act. The lender knowingly rendered substantial assistance in the act.

102.   AHM is liable for a civil RICO violation even because AHM resulted in  profit to the lender, and because Plaintiff suffered an economic injury.

103.   There is  clear evidence of a scheme by ABC and AHM to defraud Plaintiff and many other unwitting parties including investors and   the lender's conduct has a "criminal dimension and degree."

104.   AHM disseminated information to Plaintiff and other consumers via their web site and through other marketing materials, to induce Plaintiff to act on a refinance of her mortgage loan with no benefit to her.

105.   AHM disseminates misleading information to investors via their web site and in SEC filings to promote their revenue.

106.   AHM uses a pattern and practice of affliated companies and divisions to control

the entire transaction.

107.   AHM paid ABC, and uses a pattern and practice of an incentive, or kickback in the form of a YSP or "unearned gravy" of over $19,794 paid on Plaintiffs loan for delivering a higher than par rate and other harsh loan terms and inflated fees, They paid this incentive for targeting, steering and negligently representing terms and benefits of the MTA Pay Option Arm to induce Plaintiff into taking this loan, and for delivering a loan they can sell for a higher value to investors. The amount paid was not based on any legitmate services provided, but rather a kickback based on the less favorable loan terms and interest rate delivered. This violates Maryland Finder's Fee Act, MD. CODE ANN. Com. Law §12-801 et seq. And Federal statute Prohibition against unearned fees and fee splitting: 12 USC 2607 (b) 24 CFR 3500.14, RICO, and RESPA.

108.   This payment was made between employer (lender AHM) to employee (broker ABC). Broker rules state that a mortgage broker may not be a director, officer, or employee of any lender where he places a loan. Md Commerical Code §12-803 A mortgage broker may not charge a finder's fee in any transaction of the mortgage broker is the lender or an owner, part owner, partner, director, officer, or employee of the lender. Commercial Code §12-804(e)

109.   ABC included documents which state " you must use our affliate companies," and has utilized a number of divisions and affliate companies to facilitate the entire transaction in violation of RESPA. This is a clear pattern and practice of using affiliates and divisions to control the outcome of the loans it ultimately controls.

110.   AHM uses the information such as LTV ratios to qualify the value of the assets it holds. Therefore AHM benefits from over appraising the value of its real estate holdings to

CLASS ACTION COMPLAINT

inflate or give the effect of inflating the overall value of its companies stock

111.    Although ABC pulled all three of Plaintiffs credit scores they chose to use only one in her loan information. AHM uses such information as and credit scores to qualify the stability of the borrowers of the assets it holds, Therefore AHM benefits from using only the highest credit scores even when they pull all three credit scores to inflate or give the effect of inflating the overall value of its companies stock

112.    Despite the overwhelming publicity, consumer and state and federal actions against lenders for these same practices, American Brokers Conduit, American Home Mortgage, continue to actively conceal the existence and nature of these loan practices from consumers. In fact, Amercian Home Mortgage has recently published a statement to investors about the loan products is sells which is full of contrived statements of fact trying to reassure investors as it's stock tumbles.

113.    American Home Mortgage Servicing has offered no alternatives for relief and instead only wants to foreclosure and steal property it acquired fradulently even as Plaintiff alerted counsel for the Defendant in the foreclosure proceedings of her issues. In addition, she has contact counsel for plaintiff by mail in their foreclosure suit stating her issues, and spoke directly with AHM representative Diamond Ramos at AHM again expressing her issues.

114.    AHM knew or should have known that the POA loan poses a real and unreasonable damage to consumers' due to loss of equity, stripped through refinancing costs and misrepresented interest rates.

115.    Plaintiff has not received the value for which she bargained for when she refinanced. There is a great difference in value between the loan advertised and the actual loan

product sold.

116.    As a result, the plaintiff has suffered irreparable damages to her credit, her security, her home equity, and her well being.

## COUNT SIX -NEGLIGENCE

117.    Plaintiff realleges all of the foregoing paragraphs.

118.    Plaintiff relied to her detriment on an appraisal ordered, supplied, and suppressed by the lender. The lender owed her a duty of care in preparing the appraisal when the lender can foresee that the Plaintiff would rely upon the erroneous appraisal. The lender became directly involved in the transaction and made assurances of the value of the property, through its affliated ABC.

119.    The loan products were defectively designed and pose an unreasonable risk of financial damage to consumers.

120.    The Loan products were fraudulently misrepresented and pose an unreasonable risk of financial damage to consumers.

121.    At the time AHM was selling these loan products, it was aware, or reasonably should have been aware, of the foreseeable risks of financial damage and loss of equity  to consumers' associated with the use of these loan products. They still continue to negligently sell these loan products even as the current real estate markets conditions make them increasingly damaging to consumers.

122.    AHM failed to disclose the known risks associated with the MTA Pay Option Arms, and by allowing the sale and use of these loan products when it knew they would not

-34-

perform as intended.

123.    American Home Mortgage had a duty to disclose to the consuming public the foreseeable risks associated with the use of these loan products. American Home Mortgage further had a duty not to market these defective loan products in such a way as to deceive consumers into taking them.

124.    AHM breached its duties to the Plaintiff by failing to disclose the known risks and true costs associated with these loan programs, and by allowing the sale and use of these loan programs when it knew they would not perform as presented.

125.    As a result of the foregoing, the Plaintiff has suffered damages that were directly and proximately caused by the defective loan program and misrepresentation of interest rate. Plaintiff is entitled to damages in an amount to be determined at trial.

## COUNT SEVEN- BREACH OF EXPRESS WARRANTY

126.    Plaintiff realleges all of the foregoing paragraphs.

127.    The advertisements, models and samples, and other similar uniform representations disseminated by American Brokers Conduit regarding the MTA Pay Option Arm were, and are, affirmations of fact and/or promises with regard to the performance and quality of those programs. These advertisements, models and samples, and other similar representations, formed, in whole or in part, the basis of the bargain as between American Brokers Conduit and the plaintiff, and constituted express warranties that the loans would conform thereto. As described above, plaintiff's loan did not conform to these warranties, representations, models and samples.

128.    American Brokers Conduit guaranteed expressed benefits to Plaintiff, which AHM breached and failed to honor.

129.    Plaintiff had no meaningful choice in determining the terms, the terms of the loan product unreasonably favored American Brokers Conduit over the plaintiff; a gross disparity in bargaining power existed as between ABC and plaintiff; and ABC knew the loan programs were of no benefit to the plaintiff and would result in loss of equity in plaintiffs home.

130.    By virtue of its knowledge of the misleading and false advertising and its knowledge of the real consequence of this loan product, as many federal actions have been taken for the same factual allegations, AHM has also received notice of the plaintiffs issued by virtue of a letter to attorneys representing AHM in foreclosure proceeding against plaintiff.

131.    ABC breached these representations and implied warranties. ABC made and/or allowed these misrepresentations to be made with the intent of inducing Plaintiff to enter into loan agreeements. If Plaintiff had known the true facts, she would not have entered into such agreements.

132.    As a result of the foregoing, the Plaintiff has suffered damages that were directly and proximately caused by the misrepresented loan programs. Plaintiff is entitled to damages in an amount to be determined at trial.

### COUNT EIGHT –BREACH OF FUDCIARY DUTY

133.    Plaintiff realleges all of the foregoing paragraphs.

134.    Appraiser is recognized as a "Financial institution under the law." In this capacity he had a fudiciary duty to act in a manner consistent with good faith and fair dealing and not to promote the interest of AHM to the detriment of the Plaintiff.

CLASS ACTION COMPLAINT

135.   A special relationship was invoked when the plaintiff was guided by the judgment
and advice of ABC and AHM and was justified in believing that the other party would act in her
best interest. AHM and ABC acquired influence over the Plaintiff through use of credit profiling,
misrepresentations, and material ommissions, and has abused that influence. ABC knew or had
reason to know that the Plaintiff was placing her trust and confidence in the lender and was
relying on the lender to counsel and inform.

136.   AHM settlement agent, Servicelink, has committed misconduct such as
negligence. In Maryland, the legislature has strongly suggested that a contractual relationship
exists between a borrower and a settlement agent. Unless good cause can be shown, a lender may
not prohibit a borrower from engaging a licensed settlement agent selected by that borrower. Md.
Code Ann., Comm. Law II § 12-120(a, c)

137.   A settlement agent is considered an agent of the borrower, and a fiduciary
relationship to the borrower does exist. The settlement agent must act in good faith and make full
disclosure to the borrower of all facts material to the borrower's decision to accept or reject the
proposed transaction, and must act with care, skill, and diligence for the benefit of the borrower.

138.   Title documents are confusing to most consumers and, indeed, to many business
people. The settlement agent did not take care to adequately explain the instruments of
conveyance and the loan documents. The settlement agent did not explain the HUD-1 Settlement
Statement, the mortgage, deed of trust, TILA Statement, or, the all-important right of rescission.
In fact, he barely spoke to the Plaintiff, just saying sign here, sign there.

139.   Settlement agents are escrow agents and having collected fees from the buyer at
settlement, the settlement agent, acting as an escrow agent, has a fiduciary duty to pay the

CLASS ACTION COMPLAINT

vendor-related fees incurred in preparation for the settlement. Thus, the settlement agent was required to pay off Plaintiffs first mortgage to Countrywide Home Loans and Home equity line of credit to Citimortgage. The loan was settled on April 3, 2006, and funded on April 7, 2006 as the required 3 day period passed. However both of Plaintiffs previous loans were not paid until April 10, 2206 thereby costing her duplicate interest on two loans and benefiting the escrow company with use of these funds.

140.    The settlement agent did not secure release in the home equity lien of credit and to this date it is still recorded against Plaintiffs property. The settlement agent is obliged to secure the release of the existing mortgage and obtain the release of other subordinate liens as agreed upon by the parties.

### COUNT NINE- UNJUST ENRICHMENT/RESTITUTION

141.    Plaintiff realleges all of the foregoing paragraphs.

142.    Defendant is a "lender" as that term is defined in Maryland Code

143.    Plaintiff is a "borrower" as that term is defined in Maryland Code.

144.    Defendant marketed, advertised and/or promoted the loan program as a financial tool to build wealth and eliminate debt, fit for the ordinary purpose for which they were to be used as set forth more fully above.

145.    Defendant accepted payments from Plaintiff for the settlement and subsequent mortgage payments for the loan it originated.

146.    Plaintiff did not receive a loan product that was fit for the ordinary purpose for which it was to be used.

147.    American Home Mortgage breached these representations and implied

representations. American Home Mortgage made and/or allowed these misrepresentations to be made with the intent of inducing Plaintiff to enter into a loan agreeement.

**148.**   It would be inequitable for Defendant to retain this money and security interest in this property, in light of its misrepresentations and omissions, because Plaintiff did not, in fact, receive products that were in keeping with the promised benefits, and fit for the ordinary purpose for which they were to be used.

**149.**   If Plaintiff had known the true facts, she would not have entered into loan.

**150.**   As a result of the foregoing, plaintiff has suffered damages that were directly and proximately caused by the misrepresented loan product. Plaintiff is entitled to damages in an amount to be determined at trial.

**151.**   The problems that Plaintiff has had with her loan read like a poster for Predatory lending including, but are not limited to: a fradulent inflated appraisal, misrepresented interest rate and loan terms, bait and switch on every term in the loan, an exhorbitant YSP, document switching, equity stripping, negative amortization, prepayment penalty,  conflicting statements both orally and written, targeting a single unmarried woman, steering into a refinance promising non-existent benefits.

## COUNT TEN - BREACH OF CONTRACT

**152.**   While the relationship between debtor and creditor alone does not lend itself to a general imposition of the duty of good faith and fair dealing, courts nonetheless recognize that a duty of good faith and fair dealing may arise: a) by agreement; (b) when an imbalance of bargaining power exists at least; when the defendant is responsible for the imbalance.

**153.**   The Defendant, and its affiliates, have a "hidden agenda" as to the borrowers,

making false promises, and actively discouraging alternative financing through prepayment penalties, and otherwise acting dishonestly to maximize its revenues. AHM methods of controlling the loan process through use of its appraisers, affiliates, divisions, and other business partners, has demonstrated its unique, unequal bargaining position. AHM has also used its specialized knowledge against borrowers to succesfully misrepresent loan products which reap huge profits for AHM benefit only.

## COUNT ELEVEN - BREACH OF FUDICIARY DUTY

**154.**   Appraiser is recognized as a "Financial institution under the law." In this capacity he had a fudiciary duty to act in a manner consistent with good faith and fair dealing and not to promote the interest of AHM to the detriment of the Plaintiff.

**155.**   A special relationship was invoked when the plaintiff was guided by the judgment and advice of ABC and AHM and was justified in believing that the other party would act in her best interest. AHM and ABC acquired influence over the Plaintiff through use of credit profiling, misrepresentations, and material ommissions, and has abused that influence. ABC knew or had reason to know that the Plaintiff was placing her trust and confidence in the lender and was relying on the lender to counsel and inform.

## COUNT TWELVE DURESS AND ECONOMIC DURESS

**156.**   Through the threat of an illegal prepayment penalty AHM used this to create a situation which substantially limits the Plaintiffs free agency ability to get out of the contract. Thereby causing the Plaintiff to stay in an arrangement that she otherwise would not and was not legally bound to do. The restraint was imminent. Plaintiff had no present means of protection other then court action.

## ESTOPPEL FROM PLEADING AND TOLLING OF
## APPLICABLE STATUTES OF LIMITATIONS

157.    Defendant is estopped from relying on any statutes of limitation by virtue of its

acts of fraudulent concealment. Upon information and belief, Defendant knew of the

misrepresented material facts of interest rate, and of a falsely inflated appraisal, and has known

of the misrepresented facts in the loan for some time, and has concealed it from Plaintiff and/or

failed to alert the borrowers of the full disclosures and ramifications of these misrepresentations.

158.    Given Defendant's failure to disclose information about the misrepresented

nature of the loan program – information over which it had exclusive control -- and because

Plaintiff and consumers could not reasonably have known that the loan programs were thereby

misrepresented, Defendant is estopped from relying on any statutes of limitations that might

otherwise be applicable to the claims asserted herein.

## PRAYER FOR RELIEF ON ALL COUNTS

159.    WHEREFORE, Plaintiff, on behalf of herself, prays for judgment as

requested against American Home Mortgage and further prays for remedies under the Truth in

Lending Act ("TILA"), 15 U.S.C. 1601 et seq., to obtain redress, restitution, disgorgement,

monetary damages, attorneys' fees and other equitable relief against Defendants for engaging in

unfair or deceptive acts or practices in violation of TILA, 15 U.S.C. 5 1601 et seq., and its

implementing Regulation Z, 12 C.F.R. Part 226. Plaintiff has suffered substantial injury as a

result of Defendants ' unlawful acts or practices, as set forth in each of the Counts above. Absent

injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust

enrichment, and harm the public interest. Plaintiff is seeking:

CLASS ACTION COMPLAINT

(a)        Restitution and/or disgorgement of amounts paid by Plaintiff for the settlement and mortgage payments, together with interest from the date of payment;

(b)        loan recission;

(c)        injunctive relief;

(d)        actual damages;

(e)        punitive damages;

(f)        statutorily provided damages;

(g)        statutory prejudgment interest;

(h)        reasonable attorneys' fees and the costs of this action;

(i)        legal and equitable relief under the causes of action stated herein;

(j)        and for such other relief at this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff demands a trial by jury of 12 on all issues so triable.

Plaintiff reserves the right to ammend complaint as further investigation and discovery may reveal additional causes of action.

Filed:
Paula Rush
Pro se - Pending Attorney Representation
2651 Peery Drive  Churchville Md. 21028

443-676-3509
paularush@comcast.net

CLASS ACTION COMPLAINT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND


PAULA RUSH                          :
                                    :
v.                                  :    Civil No. WMN-07-854
                                    :
AMERICAN HOME MORTGAGE, INC,        :
<u>et al.</u>                       :


### <u>MEMORANDUM</u>

Before the Court is the motion of Defendant, Trust Appraisers (TA), to dismiss the Complaint, Paper No. 12, and Plaintiff, <u>pro</u> <u>se</u>, Paula Rush's Motion for Leave to File an Amended Supplemental Complaint.  Paper No. 13.  Both motions are fully briefed and are ripe for the Court's review.  Also pending before the Court is Defendant Servicelink's motion to dismiss.  Paper No. 30.  This motion is unopposed.[1]  Upon a review of the pleadings and applicable case law, the Court determines that no hearing is necessary (Local Rule 105.6) and that the motion to amend will be denied and the case will be dismissed without prejudice as to Servicelink and TA.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

This case arises out of the purchase of a home equity loan.

───────────────

[1]The remaining Defendants, American Home Mortgage, Inc. (AHM), American Home Mortgage Servicing, Inc. (AHM Servicing), and American Brokers Conduit (ABC)(collectively American Home) also moved to dismiss the complaint.  Paper No. 20.  Thereafter, American filed a "Suggestion of Bankruptcy" stating that, on August 6, 2007, each had filed voluntary petitions for bankruptcy in the United States District Court for the District of Delaware, Wilmington Division.  Paper No. 23.  Accordingly, this action is automatically stayed as to those entities pursuant to 11 U.S.C. § 362(a).

Plaintiff owns a home located at 2651 Peery Drive, Churchville,
Maryland 21028 (the Property).  In February of 2006, Plaintiff
applied for a Pay Option (PO) Adjustable Rate Mortgage (ARM)
offered by AHM, marketed by ABC, and serviced by AHM Servicing.
Plaintiff alleges that ABC represented to her that refinancing
her home through the PO ARM would "build wealth, eliminate debt,
and would save large sums of money for [her] via terms of a 1%
interest rate, $56,000 cash out, and no prepayment penalty."
Compl. ¶ 15.

On February 22, 2006, in conjunction with Plaintiff's loan
application, TA completed an appraisal of the Property and
submitted it to the lender.[2]  On April 3, 2006, Plaintiff closed
on the loan.  Defendant Servicelink acted as the settlement agent
at the closing.

One year later, April 3, 2007, Plaintiff brought the instant
action, alleging, inter alia, that the Defendants - the loan
originator, the loan servicer, the lender, the appraiser, and the
settlement agent - violated federal and state law by
misrepresenting the terms of the loan, fraudulently overstating
the value of Plaintiff's home, and thereby inducing her to enter
into a loan she could not afford and which has caused her
financial harm.  Her Complaint asserts twelve counts: "Violations
of the Truth in Lending Act Prior to Closing" (Count I);

---

[2]It is not clear from Plaintiff's Complaint whether the
lender was AHM or an entity referred to as "The Loan
Corporation."

2

"Servicing Mortgage Loans Without Mandatory Truth in Lending Disclosures Subsequent to Closing" (Count II); "False Advertising" (Count III); "Fraud and Deceptive Acts" (Count IV); "RICO" (Count V); "Negligence" (Count VI); "Breach of Express Warranty" (Count VII); "Breach of F[i]duciary Duty" (Counts VIII & XI); "Unjust Enrichment/Restitution" (Count IX); "Breach of Contract" (Count X); and "Duress and Economic Duress" (Count XII).

On June 21, 2007, Defendant TA moved to dismiss the complaint for failure to state a claim or, in the alternative, requested a more definite statement as to the allegations against it given that Plaintiff never referenced TA by name in the body of her Complaint.

On July 3, 2007, Plaintiff moved for leave to amend her complaint. Although Plaintiff's proposed "Amended Supplemental Complaint" is not in compliance with Local Rule 103.6.[3], and will be denied for that reason, the Court will consider the allegations raised therein against Defendant TA as it considers

---

[3]Local Rule 103.6 provides, in pertinent part, that a party seeking to amend a pleading shall attach both a clean copy of the proposed amended pleading and a copy of the amended pleading wherein "stricken material has been lined through or enclosed in brackets and new material has been underlined or set forth in bold-faced type."
    Plaintiff's "Amended Supplemental Complaint" does not incorporate the allegations in her original complaint at all. Rather, the amended pleading sets forth new allegations against Defendant TA only. The pleading is not a "Supplemental Pleading" within the meaning of Rule 15(d) of the Federal Rules of Civil Procedure, however, because the allegations against TA do not post-date the filing of the original complaint.

if amendment, properly presented, would be futile.  In her

proposed amended complaint, Plaintiff asserts eight counts solely

against TA: 1) "Fraudulent Inducement," 2) "Fraudulent

Concealment," 3) "Fraudulent Misrepresentation," 4) "Maryland

Real Estate Contract Law," 5) "The Maryland Consumer Protection

Act," 6) "Unfair Trade Practices and Consumer Protection Law," 7)

"Breach of Contract," and 8) "Breach of Fiduciary Duty."

As noted above, on August 8, 2007, the American Home

Defendants filed a "Suggestion of Bankruptcy."  Paper No. 23.

On August 31, 2007, Defendant Servicelink moved to dismiss

the Complaint for lack of subject matter jurisdiction and/or for

failure to state a claim.  Plaintiff did not respond to

Servicelink's motion.  Servicelink contends that this Court lacks

diversity jurisdiction over the action because Plaintiff and

Defendant TA both are citizens of Maryland.  Servicelink further

argues that the Court lacks federal question jurisdiction because

Plaintiff asserts only a state law claim (breach of fiduciary

duty) against Servicelink and that exercise of supplemental

jurisdiction pursuant to 28 U.S.C. § 1367 is not appropriate

because the claim against Servicelink is not part of the same

case or controversy as the federal law claims against the

American Home Defendants.  Even if this Court were to conclude

that supplemental jurisdiction exists, however, Servicelink urges

the Court to decline to exercise such jurisdiction given that all

of the federal law claims are stayed by virtue of the bankruptcy

proceedings.

4

## II. STANDARD OF LAW

The district courts have diversity jurisdiction over civil actions where the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the parties.  28 U.S.C. § 1332(a).  Additionally, the district courts have federal question jurisdiction over all civil actions "arising under federal law."  28 U.S.C. § 1331.  A case arises under federal law where federal law creates the cause of action or where "the vindication of a right under state law necessarily turn[s] on some construction of federal law[.]"  Franchise Tax Bd. v. Constr. Laborers Vacation Trust, 463 U.S. 1, 9 (1983).  Where federal question jurisdiction exists, the district courts also have "supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy[.]"  28 U.S.C. § 1367(a).  Even where supplemental jurisdiction exists under § 1367(a), district courts have discretion to "decline to exercise supplemental jurisdiction" in four instances:

> (1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claims over which the district court has original jurisdiction, (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c).

## III. DISCUSSION

### A. Diversity Jurisdiction

Plaintiff alleges diversity jurisdiction over this action in

5

both her original complaint and her proposed amended complaint.
Compl. ¶ 3; Am. Compl. ¶ 1.  Plaintiff is a citizen of Maryland.
Compl. ¶ 5; Am. Compl. ¶ 4.  In her amended complaint, Plaintiff
alleges that Defendant TA is a "business licensed under the laws
of the State of Maryland with a principal place of business []
located in Gaithersburg Maryland."  Am. Compl. ¶ 5; <u>See also</u>
Servicelink's Mot. to Dismiss, Ex. A (certificate from the
Maryland Department of Assessments and Taxation indicating that
TA is a Maryland corporation).[4]  Based on these facts, complete
diversity of citizenship does not exist and the Court lacks
diversity jurisdiction over this action.

**B. Federal Question Jurisdiction**

As discussed above, Plaintiff raises claims arising under
both federal and state law in her complaint.  It is clear that
this Court has original jurisdiction over those claims arising
under federal law.  Before considering whether supplemental
jurisdiction exists as to the state law claims, however, the
Court must first determine whether Plaintiff asserts any federal
claims against either TA or Servicelink.

Reading Plaintiff's complaint and amended complaint broadly,
she asserts causes of action under the following federal laws: 1)
TILA and its implementing Regulation Z, 2) the Real Estate
Settlement Practices Act (RESPA), 3) the Equal Credit Opportunity
Act (ECOA), and 4) the Racketeer Influenced and Corrupt

---

[4]Plaintiff does not make jurisdictional allegations related
to TA or Servicelink in her original complaint.

Organizations Act (RICO).  See Compl. ¶¶ 12-73, 91, 100-116.
Plaintiff alleges that the American Home Defendants violated each
of these federal statutes, but she alleges no such violation by
TA or Servicelink.  Rather, Plaintiff asserts claims against TA
for common law fraud and fraudulent inducement, breach of
contract, and breach of fiduciary duty as well as claims under
the Maryland Consumer Protection Act.  Am. Compl. ¶¶ 28-79.[5]  The
only allegations concerning Servicelink appear in Count VIII of
the original complaint for breach of fiduciary duty and state
that, as settlement agent, Servicelink "committed misconduct such
as negligence" by failing to "take care to adequately explain the
instruments of conveyance and the loan documents," including,
"the HUD-1 Settlement Statement, the mortgage, deed of trust,
TILA Statement, or, the all-important right of rescission."

---

[5]Within Plaintiff's fraudulent inducement count in her
amended complaint, she alleges that TA violated the Federal Trade
Commission Act (FTC Act).  The FTC Act creates no private cause
of action, however, and may be enforced only by the FTC.  E.g.,
Williams v. Nat'l Sch. of Health Tech., Inc., 836 F.Supp. 273,
283 (E.D. Pa. 1993).
    Similarly, within Plaintiff's breach of fiduciary duty count
in her amended complaint, she alleges violations of the Bank
Holding Company Act (BHCA) and the Uniform Standards of
Professional Appraisal Practices (USPAP).  BHCA also does not
create a private cause of action.  See generally, Baggett v.
First Nat'l Bank of Gainesville, 117 F.3d 1342 (11th Cir. 1997).
USPAP is promulgated by the Appraisal Foundation, "a quasi-
government agency created by Congress to regulate appraisers in
the United States."  McKesson Corp. v. Islamic Republic of Iran,
116 F. Supp. 2d. 13, 23 (D.D.C. 2000).  While compliance with
USPAP standards may be relevant to a negligence cause of action,
there is no private cause of action for non-compliance with
USPAP, nor does it appear that federal law requires compliance
unless the "appraisal is being performed for a federal agency."
Id.

Compl. ¶¶ 136-138.  Plaintiff also alleges that Servicelink "was

required to pay off Plaintiff's first mortgage" within 3 days of

settlement, but did not timely do so causing "duplicate interest

on two loans" and that Servicelink "did not secure release in the

home equity lien of credit[.]"  Compl. ¶¶ 139-140.  Accordingly,

the Court concludes that Plaintiff pleads no cause of action

arising under federal law against Defendants Servicelink and TA.[6]

       As discussed, <u>supra</u>, this Court has supplemental

_____

       [6]Plaintiff does not include a separate prayer for relief
within each count of her complaint, rather she includes one
prayer for relief at the conclusion.  In her prayer for relief,
Plaintiff
       prays for judgment as requested against American Home
       Mortgage and further prays for remedies under [TILA] .
       . . to obtain redress, restitution, disgorgement,
       monetary damages, attorneys' fees and other equitable
       relief against <u>Defendants</u> for engaging in unfair or
       deceptive acts or practices in violation of TILA . . .
       and its implementing Regulation Z . . . .  Plaintiff
       has suffered substantial injury as a result of
       <u>Defendants</u>' unlawful acts or practices as set forth in
       each of the Counts above.
Compl. ¶ 159 (emphasis added).
       To the extent that Plaintiff's prayer for relief could be
read to bring all of the Defendants, including Servicelink and
TA, within the TILA cause of action, the Court notes that such a
claim is not cognizable against an appraiser or settlement agent.
<u>See</u> 15 U.S.C. § 1601 <u>et seq.</u> (Applying disclosure requirements to
"creditors" and defining the term to mean those who "regularly
extend consumer credit" and to whom the borrower's debt initially
is payable); <u>See also, e.g.</u>, <u>Morilus v. Countrywide Home Loans,
Inc.</u>, No. 07-900, 2007 WL 1810676 at *2-3 (E.D. Pa. June 20,
2007) (dismissing a TILA cause of action against an appraiser
because the statute "is directed solely at parties extending
consumer credit").
       Furthermore, the Court concludes that neither TA or
Servicelink is brought within the federal claims by virtue of the
boilerplate language that "Plaintiff realleges all of the
foregoing paragraphs" (which appears in some, but not all, of the
federal counts) because no allegations concerning TA or
Servicelink (or even any mention of these Defendants) precedes
the assertion of the federal causes of action.

jurisdiction over related state law claims that are "part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  Despite Defendant Servicelink's contention to the contrary, the state law claims clearly fall within the scope of this Court's supplemental jurisdiction under 28 U.S.C. § 1367(a) in that all of Plaintiff's allegations arise out of the same home equity loan transaction.  See White v. County of Newberry, 985 F. 2d 168, 172 (4th Cir. 1993) (noting that "claims need only revolve around a central fact pattern" to support the exercise of supplemental jurisdiction).

Servicelink argues, however, that this Court should decline to exercise supplemental jurisdiction under the circumstances where all of the federal claims have been stayed due to the pending bankruptcy petition filed by the American Home Defendants.  As discussed above, this Court may decline to exercise supplemental jurisdiction where it has original jurisdiction over related claims if one of the four factors identified in 28 U.S.C. § 1367(c) exists.  In the instant case, the first three factors are inapplicable in that Plaintiff's claims do not "raise[] a novel or complex issue of State law," Plaintiff's state law claims do not "substantially predominate[] over the claims over which the district court has original jurisdiction," and the Court has not "dismissed all claims over which it has original jurisdiction."  See 28 U.S.C. § 1367(c).

Accordingly, the Court turns to the fourth factor, which

9

provides that the Court may decline supplemental jurisdiction under "exceptional circumstances" where "there are other compelling reasons for declining jurisdiction."  28 U.S.C. § 1367(c)(4).  Given that all claims over which this Court has original jurisdiction are indefinitely stayed by the pending bankruptcy proceedings, it is quite possible that only the state law claims would be tried were the Court to exercise supplemental jurisdiction.  In that sense, it is analogous to a case where the federal claims have been dismissed.  See Carnegie-Mellon Univ. V. Cohill, 484 U.S 343, 350 n.7 (1988) (noting that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine - judicial economy, convenience, fairness, and comity - will point toward declining to exercise jurisdiction over the remaining state-law claims").  Exercise of supplemental jurisdiction under these circumstances would not further the goals of comity and judicial economy.  See United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966) (discussing the doctrine of pendant jurisdiction later codified in 28 U.S.C. § 1367 and noting that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties"); See also Shanaghan v. Cahill, 58 F.3d 106, 110 (4th Cir. 1995) (discussing factors to be considered in exercising discretion to decline supplemental jurisdiction).

The Court thus concludes that "exceptional circumstances" exist to decline to exercise supplemental jurisdiction over the

10

state law claims pending against TA and Servicelink and that

dismissal of the complaint as to those defendants is proper.  <u>See</u>

<u>Laborers Pension Fund v. Yordanoff Constr. Co.</u>, No. 94-2310, 1994

WL 323300 at *2 (N.D. Ill. June 27, 1994)(declining to exercise

supplemental jurisdiction over a mechanics lien state law claim

where the federal claims were stayed due to bankruptcy

proceedings).  The dismissal will be without prejudice and, by

operation of 28 U.S.C. § 1367, all applicable limitations periods

were tolled during the pendency of the claim in federal court and

for an additional thirty days after dismissal (or longer as

provided by state law).  <u>See</u> 28 U.S.C. § 1367(d).  Having

resolved to dismiss Plaintiff's claims against Servicelink and TA

for lack of jurisdiction, TA's motion to dismiss for failure to

state a claim will be denied as moot.

**IV. CONCLUSION**

For the reasons stated above, Plaintiff's action is

dismissed without prejudice against Defendants Servicelink and

TA.  A separate order will issue.


_____/s/_____
William M. Nickerson
Senior United States District Judge



Dated: October 25, 2007


11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

```
PAULA RUSH                        :
                                  :
v.                                :    Civil No. WMN-07-854
                                  :
AMERICAN HOME MORTGAGE, INC.,     :
et al.                            :
```

## MEMORANDUM

Pending before the Court are two motions, both filed by Plaintiff, pro se, Paula Rush: (1) a Motion to Reopen Administratively Closed Case and Add New Party Defendants, Paper No. 36; and (2) a Motion for Extension of Time to File an Amended Complaint and Response to American Home Mortgage Motion to Dismiss. Paper No. 40. Both motions are ripe for the Court's decision.[1] The Court finds no hearing is necessary, Local Rule 105.6, and that Plaintiff's motions will be denied.

This case arises out of the purchase of a home equity loan. On April 3, 2006, Plaintiff entered into an Adjustable Rate Mortgage (ARM) whereby Plaintiff borrowed $586,500 from Defendant American Home Mortgage, Corp. in return for a security interest in Plaintiff's residence. Compl. ¶ 5. On April 3, 2007, Plaintiff filed suit in this Court against American Home Mortgage, Corp., American Home Mortgage Servicing, Inc., and

---

[1] Plaintiff has not replied to the oppositions to either of her motions, and the time permitted under the Local Rule for doing so has expired. Local Rule 105.2.a.

American Brokers Conduit American Home (collectively, "American Home")[2] and two additional defendants, Servicelink and Trust Appraisers ("TA"), alleging that the origination and servicing of her ARM violated state and federal laws.

On July 31, 2007, American Home filed a motion to dismiss. Plaintiff filed her Opposition to this motion on August 17, 2007.  Before American Home had an opportunity to file a Reply memorandum, this matter was stayed because of the filing of American Home's August 8, 2007, Suggestion of Bankruptcy.  The motion to dismiss remains outstanding.

While this matter was stayed against American Home, this Court granted the motions to dismiss filed by Servicelink and TA on October 25, 2007, leaving American Home as the only remaining defendants.  In the same Order, the Court administratively closed the case because the remaining defendants were in bankruptcy.

On June 16, 2008, Plaintiff filed an unopposed motion in the United States Bankruptcy Court for the District of Delaware against Debtor American Home Mortgage Corp., et al. seeking relief from the stay and permission to continue her Complaint in this Court.  Case No. 07-11047.  On July 17, 2008, the Honorable

---

[2] The Complaint incorrectly identifies American Home Mortgage, Corp. as American Home Mortgage, Inc.  In addition, according to Defendants, American Brokers Conduit is not a separate entity but a dba of American Home Mortgage, Corp.

Christopher Sontchi of the United State Bankruptcy Court for the District of Delaware granted the motion. Judge Sontchi's Order stated that "the automatic stay imposed by Section 362 of the Bankruptcy Code is lifted in order to permit Movant to continue her lawsuit pending in the United States District Court for the District of Maryland . . . ." Opp'n to Mot. to Reopen, Ex. A (Order Granting Emergency Motion for Relief From Automatic Stay).

Plaintiff now seeks to amend her Complaint by adding new defendants,[3] as well as new allegations. In its October 25, 2007, memorandum dismissing Defendants Servicelink and TA, this Court also denied Plaintiff's previous motion for leave to amend her Complaint as it was not in compliance with Local Rule 103.6. Local Rule 103.6 provides, in pertinent part, that a party seeking to amend a pleading shall attach both a clean copy of the proposed amended pleading and a copy of the amended pleading wherein "stricken material has been lined through or enclosed in brackets and new material has been underlined or set forth in bold-faced type." Furthermore, "before filing a motion requesting leave to file an amended pleading, counsel shall

---

[3] Plaintiff names five entities as the presumptive new defendants in her motion: Deutsche Bank National Trust Company; Goldman Sachs Mortgage Company; Wells Fargo Bank, National Association; Mortgage Electronic Registration Systems Inc.; and Citigroup, Inc. Mot. to Reopen 12-14, ¶¶ 29-33.

3

attempt to obtain the consent of other counsel.  Counsel shall state whether the consent of other counsel has been obtained." Local Rule 103.6(d).

As with her previous motion, Plaintiff has failed to comply with this Rule.  Plaintiff has not attached her amended complaint to her Motion, nor has she attached the also-required amended version.  Moreover, Plaintiff has not attempted to obtain the consent of Defendants' counsel.  Not only does Plaintiff's failure to comply with the technical requirements of the Local Rules require this Court to deny her motion, but it is these very failures that prevent the Court from seriously analyzing whether there is any merit to her claims against the new defendants.

Even if this Court liberally construes Plaintiff's motion to reopen and add new defendants as a request to file a supplement to her pending Complaint pursuant to Rule 15(d), Plaintiff has failed to state a basis for such a pleading. Rule 15(d) of the Federal Rules of Civil Procedure allows a party to serve a supplemental pleading setting out "any transaction, occurrence, or event that happened <u>after the date of the pleading to be supplemented</u>." (emphasis added). Supplemental pleadings require the permission of the Court, and must be made by motion, reasonable notice, and under just terms.

4

Id.  A plaintiff may add new defendants via a supplemental
pleading, but only if the supplemental pleading relies "in good
part on transactions, occurrences, and events which had happened
since the action had begun."  Griffin v. County School Bd. of
Prince Edward County, 377 U.S. 218, 226 (1964).

Plaintiff's motion, however, does not appear to add any
allegations of a transaction, occurrence or event that took
place subsequent to the filing of her Complaint.  For example,
the crux of Plaintiff's motion is her allegation that
"Defendants,[4] acting in concert, formed an enterprise . . . that
was organized for the illegal and fraudulent purposes of
inducing Plaintiff to take a loan, and to induce a secondary
market participant, believed to be Goldman Sachs, to purchase a
loan for inflated and misrepresented amounts . . . that left
[Goldman Sachs] under secured."  Mot. to Reopen at 46, ¶ 103.
"Goldman Sachs, Wells Fargo, and Deutsche Bank, as assignees are
liable as the [Truth in Lending Act] violations were apparent on
the face of the [loan] documents."  Id. at 44, ¶ 99.  These
allegations obviously concern the origination of Plaintiff's
ARM, an event that Plaintiff alleges happened on April 3, 2006,
Compl. ¶ 5, one year before her Complaint was filed on April 3,

---

[4] Plaintiff fails to note the entity or entities to which this
term refers.  See footnote three for a list of the newly named
defendants.

5

2007.  Thus, these allegations to do not permit the addition of
defendants through a supplemental pleading and Plaintiff's
motion to reopen will be denied as to her request to amend her
Complaint.  The Court, however, will reopen the case and allow
American Home to file a Reply memorandum to their motion to
dismiss.

Despite already having filed a motion to reopen the case
and add new defendants, Plaintiff also filed a second request
for "leave to file an amended complaint under Rule 15(a) and (d)
of the Federal Rules of Civil Procedure . . . ."  Pl.'s Mot. for
Ext. at 1.  For the reasons discussed above regarding her motion
to reopen and add new defendants, the Court will also deny this
new request to file an amended complaint.

In Plaintiff's second motion, she also requests an
extension of time to file an opposition to American Home's
motion to dismiss, stating that she "has never responded to
[American Home's] Motion to Dismiss due to the bankruptcy
filing, because Plaintiff anticipated that a resolution could be
reached in that venue."  Id., ¶ 8.  This, however, is an
inaccurate statement as Plaintiff filed her "Motion in
Opposition to Defendant American Home Mortgage Motion to
Dismiss" on August 17, 2007.  Paper No. 27.  In the accompanying
Memorandum, Plaintiff argued against the motion to dismiss for

6

thirty-two pages and attached a Proposed Order and twelve

separate exhibits.  Because Plaintiff has already responded to

the Motion to Dismiss, her motion for an extension of time will

be denied.

For the foregoing reasons, Plaintiff's motions will be

denied.  A separate order will issue.

                           _____/s/_____
                           William M. Nickerson
                           United States District Judge

Dated: August 19, 2009

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

PAULA RUSH                          *
                                    *
          v.                        *        Civil Action WMN-07-CV-0854
                                    *
AMERICAN HOME MORTGAGE, INC.        *
et al.                              *

      *    *    *    *    *    *    *    *    *    *    *    *

### MEMORANDUM

Before the Court is Defendants American Home Mortgage Corp., D/B/A American Brokers Conduit, and AHM SV, Inc.'s (together "AHM Defendants") Motion to Dismiss.[1]  Paper No. 20. This case was filed on April 3, 2007, against Defendants American Home Mortgage, Inc., American Home Mortgage Servicing Inc., American Brokers Conduit, Trust Appraisers, and Servicelink alleging various claims relating to Plaintiff's Mortgage Refinance to a "MTA Pay Option ARM."  The AHM Defendants filed the motion to dismiss at issue here on July 31, 2007.  Paper No. 20.  Plaintiff filed her Opposition on August 17, 2007.  Paper No. 27.  Subsequently, the case was stayed as to the AHM Defendants on August 8, 2007, due to their filing bankruptcy under Chapter 11.  Paper No. 23.

---

[1] Plaintiff incorrectly identified American Brokers Conduit as a separate Defendant.  In fact, American Brokers Conduit is the D/B/A of American Home Mortgage and thus, the same Defendant. In addition, the name of Defendant American Home Servicing, Inc. has changed to AHM SV, Inc. since the filing of this Complaint and AHM SV, Inc. has thus replaced American Home Servicing, Inc. as the correct Defendant.

1

Following the stay against the AHM Defendants, the case was
dismissed without prejudice as to Defendants Trust Appraisers
and Servicelink due to a lack of subject matter jurisdiction
over those Defendants.  Paper Nos. 32 & 33.  Within the same
dismissal order, the Court administratively closed this action
as there were no remaining Defendants against whom the case
could proceed.[2]  Paper No. 33.

On August 19, 2009, the Court granted Plaintiff's motion to
reopen the administratively closed case against the AHM
Defendants, but denied her motions to amend her Complaint and

---

[2] Plaintiff requested in her Motion to Dismiss that the Court
enter default judgment against The Loan Corporation.  It is
unclear, however, whether the Loan Corporation was properly
named as a Defendant, and, if so, whether they were properly
served.  The Loan Corporation never entered an appearance nor
filed a responsive pleading to Plaintiff's Complaint, although
its representative allegedly told Plaintiff that they had not
been properly served or named in the Complaint.  Plaintiff
served the Summons and Complaint on "American Brokers Conduit;
The Loan Corporation" at The Loan Corporation's address.  Thus,
The Loan Corporation, which is not owned or affiliated with
American Brokers Conduit, allegedly stated that Plaintiff had
not served The Loan Corporation, but had improperly served
American Brokers Conduit at The Loan Corporation's address.  In
Plaintiff's Opposition to AHM Defendants' Motion to Dismiss,
Plaintiff asked the court for default judgment against The Loan
Corporation and stated that they brokered the loan through some
affiliation with American Brokers Conduit.  Subsequent to
Plaintiff's filing, this case was administratively closed and
the issue was never addressed.  When Plaintiff filed her motion
to reopen the case, she alleged that The Loan Corporation had
gone out of business and the Court reopened the case only as to
the AHM Defendants.  Thus, as The Loan Corporation is no longer
a Defendant and Plaintiff has not moved for its addition,
Plaintiff's request for default judgment will be denied without
prejudice.

add new parties.   Paper No. 43.   Subsequently, the AHM

Defendants filed their Reply to Plaintiff's Opposition and this

motion is now ripe.   As Plaintiff's various motions to amend her

Complaint have all been denied, this Motion is based only upon

claims and allegations contained in Plaintiff's original

Complaint and her Opposition to the Motion and not on any

allegations contained in any of her proposed amended complaints.

Upon review of the pleadings and the applicable case law,

the Court determines that no hearing is necessary (Local Rule

105.6) and that the Motion to Dismiss will be granted in part

and denied in part as set forth below.

## I.   BACKGROUND

On April 3, 2006, Plaintiff Paula Rush refinanced her

existing home loan and entered into a MTA Pay Option ARM loan

agreement with American Home Mortgage Corp. ("AHMC") d/b/a

American Brokers Conduit ("ABC").   Compl. ¶ 5.   Plaintiff's MTA

Pay Option ARM loan ("the loan") has a variable rate feature

with payment caps.   Plaintiff alleges that she was told that she

was receiving a loan with a 1% interest rate for 480 months.

Compl. ¶ 21.   Instead, however, the loan possessed a low, fixed

payment for a certain period of time, but not a low, fixed

interest rate.   Id. ¶ 66.   Plaintiff claims that she received

the low interest rate for only one month after which Defendants

increased the interest rate that they charged, albeit not her monthly payment. Id. ¶ 37.

Plaintiff alleges that her belief regarding the interest rate stemmed first from the misleading advertisements sent out by Defendants. She alleges that she received a direct mail flyer for a MTA Pay Option Arm that stated that she was pre-qualified for a 1% interest rate due to her good credit standing and equity in her home. Id. ¶ 11.

Plaintiff also alleges that her belief that she was purchasing a mortgage with a 1% interest rate stemmed from confusing loan disclosures that changed from when she first submitted her application to when she closed on the loan. Moreover, she alleges that she did not timely receive the disclosures within the mandates of the Truth-in-Lending Act. She claims that the disclosures relating to interest rate, the APR, and the use of the term conventional to describe the type of loan that she had were misleading and led her to believe she was applying for a mortgage with a 1% interest rate. Plaintiff also claims that the initial disclosures misled her into believing that her loan would not be subject to a prepayment penalty. Finally, Plaintiff claims that the disclosures failed to point out that negative amortization would occur.

Based upon these allegations, Plaintiff raises twelve counts: 1) Violations of the Truth-in-Lending Act (TILA) Prior

4

to Closing; 2) Servicing Mortgage Loans Without Mandatory TILA

Disclosures Subsequent to Closing; 3) False Advertising; 4)

Fraud and Deceptive Acts; 5) Racketeer Influenced and Corrupt

Organizations Act (RICO); 6)Negligence; 7) Breach of Express

Warranty; 8) Breach of Fiduciary Duty; 9) Unjust

Enrichment/Restitution; 10) Breach of Contract; 11) Breach of

Fiduciary Duty; and 12) Duress and Economic Duress.

## II.  LEGAL STANDARD

     To survive a Rule 12(b)(6) motion to dismiss, "a complaint

must contain sufficient factual matter, . . . , to 'state a

claim to relief that is plausible on its face.'" Ashcroft v.

Iqbal, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atlantic Corp.

v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial

plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." Iqbal, 129 S.

Ct. at 1949 (citing Twombly, 550 U.S. at 556).  "Detailed

factual allegations" are not required, but allegations must be

more than "labels and conclusions," or "a formulaic recitation

of the elements of a cause of action[.]" Iqbal, 129 S. Ct. at

1949 (quoting Twombly, 550 U.S. at 555). "[O]nce a claim has

been stated adequately," however, "it may be supported by

showing any set of facts consistent with the allegations in the

complaint." Twombly, 550 U.S. at 563.  In considering such a

5

motion, the court is required to accept as true all well-pled
allegations in the complaint, and to construe the facts and
reasonable inferences from those facts in the light most
favorable to the plaintiff.  <u>Ibarra v. United States</u>, 120 F.3d
472, 474 (4th Cir. 1997) (citing <u>Little v. Federal Bureau of
Investigation</u>, 1F.3d 255, 256 (4th Cir. 1993).

## III. DISCUSSION

### A.   Judicial Notice and Consideration of Documents and Facts Raised Outside the Complaint

On a motion to dismiss pursuant to Federal Rule of Civil
Procedure 12(b)(6), a district court generally may not consider
any material beyond the pleadings.  <u>See</u> <u>Phillips v. LCI Int'l
Inc.</u>, 190 F.3d 609, 618 (4th Cir. 1999).  Documents attached to
the complaint are part of the complaint and are properly
considered on a motion to dismiss.  Fed. R. Civ. P. 10(c) ("A
copy of a written instrument that is an exhibit to a pleading is
part of the pleading for all purposes.").  <u>See</u> <u>Robinson v. Ladd
Furniture, Inc.</u>, No. 92-228995, 995 F.2d 1064 (Table), 1993 WL
211309, at *3 (4th Cir. June 14, 1993).  Plaintiff has attached
the following documents to her Complaint that will be considered
on this motion to dismiss: Plaintiff's application signed and
dated on April 3, 2006; Preliminary and Final Truth In Lending
Disclosure Statements ("TILDS") dated March 13, 2006, and April
3, 2006, respectively; a Preliminary Good Faith Estimate dated

March 13, 2006; Addendum D showing Correspondent/Broker Fees; an unsigned and undated Settlement Statement; and an Appraisal.

In addition to documents attached to the Complaint, the Court may consider material attached to the motion to dismiss that "was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." Phillips v. LCI Int'l Inc., 190 F.3d at 618 (internal citations omitted). Defendants attached to their motion to dismiss and request judicial notice of 1) a copy of Plaintiff's application dated by the interviewer on March 30, 2006, and by Plaintiff on April 3, 2006; 2) a Truth-in-Lending Disclosure Statement ("TILDS") with a date prepared of February 17, 2006, and allegedly signed by Plaintiff on March 5, 2006; 3) a final TILDS allegedly signed by Plaintiff on April 3, 2006; 4) an Adjustable Rate Rider allegedly signed by Plaintiff on April 3, 2006; 5) a Prepayment Rider allegedly signed by Plaintiff on April 3, 2006; 6) an Adjustable Rate Mortgage Loan Disclosure Statement allegedly signed by Plaintiff on April 3, 2006; 7) a POWER ARM Option Adjustable Rate Mortgage flyer; 8) a Good Faith Estimate dated February 17, 2006, and allegedly signed by Plaintiff on March 6, 2006; and 8) an Affiliated Business Arrangement Disclosure allegedly signed by Plaintiff with a date prepared of March 14, 2006.

Plaintiff disputes the following documents submitted by
Defendants: the application, the preliminary TILDS, the POWER
ARM Option Adjustable Rate Mortgage flyer, the Preliminary Good
Faith Estimate, and the Affiliated Business Arrangement
Disclosure.  Plaintiff has attached what she argues to be the
correct documents as to each of these and references them in her
Complaint and in her Opposition to the Motion to Dismiss.  The
determination of which documents are correct is more
appropriately left to the fact finder at trial.  Thus, for
purposes of this Motion to Dismiss, because the Court is
mandated to accept all well-plead facts as true and may consider
documents properly attached to the complaint, of these contested
documents, the Court will refer to the Plaintiff's versions of
the documents and not to the Defendants' in determining whether
dismissal is appropriate.

The final TILDS attached to Defendants' Motion is identical
to that attached to Plaintiff's Complaint.  It is thus
considered insofar as Plaintiff's attachment is considered.

Plaintiff does not contest the Adjustable Rate Rider or the
Prepayment Rider attached to Defendant's Motion as inaccurate,
but says that they weren't presented in the "Good Faith
Package."  Plaintiff does not explain, however, what the Good
Faith Package is.  Plaintiff also does not dispute the
Adjustable Rate Mortgage Loan Disclosure Statement.  Because

Plaintiff does not dispute these disclosures and she references them in her Complaint, they will be considered in this Motion to Dismiss.

In addition, Plaintiff alleges additional facts in her Opposition to Defendants' motion and appears to be making additional claims; although the additional claims are not explicit.  Because of the Court's obligation to liberally construe a pro se Complaint, the Court will consider the existing facts to the extent that the additional facts support her existing claims.  See Donahue v. United States Dep't of Justice, 751 F. Supp. 45, 49 (S.D.N.Y. 1990) abrogated on other grounds by Sosa v. Alvarez-Machain, 542 U.S. 692 (2004) (holding that due to "[t]he court's duty to adopt a generous attitude when evaluating a pro se complaint" that it would consider the allegations in the plaintiff's opposition to the motion to dismiss where they are consistent with the allegations in the complaint).  See also Smith v. Blackledge, 451 F.2d 1201, 1202-03 (4th Cir. 1971) (holding that a document denominated by the plaintiff as one to "further particularize" the complaint, which included new claims, but construed by the District Judge as an opposition to the defendants' motion to dismiss should have been considered an amendment to the complaint); Riner v. Edwards, Civ. No. 7:07-cv-00455, 2008 WL 4388788, at * 6 (W.D. W. Va. Sept. 26, 2008)(holding that the court would construe the

plaintiff's opposition to the motion to dismiss to the extent

that it raised new claims because of the "less stringent"

pleading standards to be accorded pro se plaintiffs); Motto v.

Correctional Medical Services, Civ. No. 5:06-cv-00163, 2007 WL

2897854, at *3 (S.D. W. Va. Sept. 27, 2007) (upholding the

magistrate judge's decision to consider the plaintiff's response

brief as a pleading because "the court is charged with liberally

construing a pleading filed by a pro se litigant to allow for

the development of a potentially meritorious claim").  The Court

will not, however, recognize any additional claims at this time

as it is not clear from Plaintiff's Opposition whether she is

pleading additional claims or simply additional facts. [3]

---

[3] On several occasions within the Complaint and her Opposition,
Plaintiff seems to allege that Defendants violated the Equal
Credit Opportunity Act (ECOA) and the Real Estate Settlement
Procedures Act (RESPA).  Because she has not alleged these
claims as separate counts, it is unclear if she intended these
references to be factual allegations or additional claims.

Regardless, it does not appear that Plaintiff could allege any
facts that would state a violation of ECOA.  Thus, to the extent
that Plaintiff was attempting to claim Defendants violated ECOA
that claim will be dismissed for failure to state a claim.

Whether Plaintiff could successfully allege a RESPA claim,
however, particularly as to her allegations that Defendants
required her to use Defendants' affiliated settlement providers
is less clear.  Thus, to the extent that Plaintiff was
attempting to claim Defendants violated RESPA, the claim will be
dismissed at this time but with leave to amend within 30 days.

## B.    Federal Rule of Procedure 8(a) and (e)

Defendants' first argument is that Plaintiff's Complaint should be dismissed for a failure to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief" under Federal Rule of Civil Procedure 8(a) and because the averments of the Complaint are not "simple, concise, and direct" as directed by Rule 8(e)(1).  "What is a 'short and plain' statement depends upon the nature of the case."  Barnes v. A. Sind & Assoc., 32 F.R.D. 39, 40 (D. Md. 1963) (citing 2 Moore's Federal Practice, 2d ed., ¶8.13, p. 1653).  When determining whether a complaint fails to comply with Rule 8(a), "courts have looked to various factors, including the length and complexity of the complaint, whether the complaint was clear enough to enable the defendant to know how to defend himself, and whether the plaintiff was represented by counsel.  North Carolina v. McGuirt, 114 Fed. App'x. 555, 558 (4th Cir. 2004) (internal citations omitted).  As is the case here, pro se complainants are held to less stringent standards than formal pleadings drafted by lawyers.  Haines v. Kerner, 404 U.S. 519, 520 (1972).  "Pleadings should not be scrutinized with such technical nicety that a meritorious claim should be defeated, and even if the claim is insufficient in substance, it may be amended to achieve justice." Gordon v. Leeke, 574 F.2d 1147, 1151 (4th Cir. 1978) (citing Rice v. Olson, 324 U.S. 786,

791-92 (1945) and Holiday v. Johnston, 313 U.S. 342, 350 (1941)).  "A complaint, especially a pro se complaint, should not be dismissed summarily unless 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  Id. (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).  Moreover, "a reasonable latitude should be allowed to a pleader in the statement of his claim or defense. . . .  In practice, what matters is not alone whether the phrase is immaterial, but whether its presence, if it be immaterial, is calculated to be harmful."  Barnes, 32 F.R.D. at 40 (citing Sinkbeil v. Suhr, 7 F.R.D. 92 (D.C. Neb. 1946)).

Here, Plaintiff's Complaint can hardly be called artful and even qualifies as disorganized, but it does state sufficient facts to establish some valid claims.  The relevant facts and claims are easily distinguishable such that Defendants can suitably respond to them and defend themselves – in fact, the Defendants have done so in their reply memorandum.  While there may be some extraneous or duplicative facts, they are not calculated to be "harmful."  As such, under the liberal pleading standards granted to a pro se Plaintiff, Plaintiff's Complaint is sufficient and will not be summarily dismissed on Rule 8 grounds.

**C.   Truth In Lending Act Claims (Counts I-III)**

Plaintiff raises three counts related to the Truth-in-Lending Act (TILA).  Count I alleges violations of two TILA disclosure regulations that took place prior to and at closing. Plaintiff claims that Defendants' use of the term Conventional and the 1% interest rate on several of the pre-closing disclosures as well as the disclosed APR was misleading and therefore not clear and conspicuous as required by 12 C.F.R. §§ 226.17, 226.18.  Moreover, Defendants failure to indicate that the 1% rate was a discounted rate and the variable rate disclosures, particularly as to the certainty of negative amortization did not meet the clear and conspicuous requirement of 12 C.F.R. §§ 226.17 and 226.19.  Plaintiff also alleges that she did not receive the required pre-closing disclosures in the time frame mandated by TILA under 12 C.F.R. § 226.19(a)(1) & (a)(2). Plaintiff's second count is for violating TILA provisions as to notice of changes in interest rate following the consummation of the mortgage under 12 C.F.R. § 226.20(c). In Count III Plaintiff claims that Defendants violated the advertising disclosure provisions of 15 U.S.C. § 1664.

TILA is a consumer protection statute enacted by Congress "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."

15 U.S.C. § 1601(a).  Pursuant to its congressionally-delegated

authority, the Federal Reserve Board implemented TILA through

its issuance of Regulation Z, 12 C.F.R. § 226 et seq., and its

interpretations and Official Staff Commentary, 12 C.F.R. Pt.

226, Supp. I ("Staff Commentary").  Courts have noted that TILA

is a remedial statute that is liberally construed in the favor

of consumers.  White v. Arlen Realty & Development Corp., 540

F.2d 645, 649 (4th Cir. 1975) ("The language of [TILA] should be

construed liberally in light of its broadly remedial purpose.").

In order to ensure that the consumer is protected as Congress

envisioned, the provisions of the Act and its implementing

regulations must be strictly enforced.  Mars v. Spartanburg

Chrysler Plymouth, Inc., 713 F.2d 65, 67 (4th Cir. 1983)

superseded by statute and regulation on other grounds.

Moreover, "'a misleading disclosure is as much a violation of

TILA as a failure to disclose at all.'"  Nkengfack v.

Homecomings Financial, LLC, No. RDB 08-2746, 2009 WL 1663533, at

*2 (D. Md. June 15, 2009) (quoting Barnes v. Fleet Nat. Bank,

N.A., 370 F.3d 164, 174 (1st Cir. 2004) quoting Smith v.

Chapman, 614 F.2d 968, 977 (5th Cir. 1980)).

1.   Statute of Limitations

     Defendants' first argument relating to the alleged TILA

violations is that Plaintiff's TILA claims are time barred by a

one year statute of limitations.  15 U.S.C. § 1640(e) provides

that "[a]ny action under this section may be brought in any

United States district court, or in any other court of competent

jurisdiction, within one year from the date of the occurrence of

the violation."  Where the violations alleged relate to failures

of the lender to provide required pre-loan consummation

disclosures, the "occurrence of the violation" is generally

considered to be the date the loan agreement is entered into.

See, e.g., Davis v. Edgemere Finance Co., 523 F. Supp. 1121,

1123 (D. Md. 1981) ("[Section 1640(e)'s] one-year limitation

period begins to run from the date the loan agreement is entered

into.").  Here, Plaintiff allegedly closed on her loan on April

3, 2006.  Plaintiff filed her Complaint on April 3, 2007.  The

Fourth Circuit computes the statue of limitations periods in

statutes using Federal Rule of Civil Procedure 6(a) which

"exclude[s] the day of the act, event, or default that begins

the period."  Hernandez v. Caldwell, 225 F.3d 435, 439 (4th Cir.

2000).  Thus, the statute of limitations here began to run on

April 4, 2006, and expired on April 3, 2007.  Plaintiff thus

filed her Complaint within the period of the statute of

limitations and her TILA claims for damages will not be

dismissed on this basis.

Plaintiff also requests rescission under TILA.  15 U.S.C. §
1635(a) provides that

> in the case of any consumer credit transaction . . .
> in which a security interest, . . ., is or will be
> retained or acquired in any property which is used as
> the principal dwelling of the person to whom credit is
> extended, the obligor shall have the right to rescind
> the transaction until midnight of the third business
> day following the consummation of the transaction or
> the delivery of the information and rescission forms
> required under this section together with a statement
> containing the material disclosures required by this
> subchapter, whichever is later, by notifying the
> creditor, in accordance with regulations of the board,
> of his intention to do so.  The creditor shall clearly
> and conspicuously disclose, in accordance with
> regulations of the Board, to any obligor in a
> transaction subject to this section the rights of the
> obligor under this section.  The creditor shall also
> provide, in accordance with regulations of the Board,
> appropriate forms for the obligor to exercise his
> right to rescind any transaction subject to this
> section.

15 U.S.C. § 1635(f) provides that where the material disclosures

and/or the required rescission notice are not delivered to the

consumer, the right of rescission expires three years after the

date of consummation of the transaction with certain exceptions

that do not apply here.

According to the Staff Commentary, "the period within which

the consumer may exercise the right to rescind runs for 3

business days from the last of 3 events:

- consummation of the transaction;
- delivery of all material disclosures; and

16

- delivery to the consumer of the required rescission notice."

Staff Commentary, cmt. 23(a)(3)-1.  Where any one of the three events does not occur, however, the consumer has three years from the consummation of the loan to rescind.

To effect delivery, "it is not sufficient for the creditor merely to show the consumer the document containing the disclosures before the consumer signs and becomes obligated. The consumer must be free to take possession of and review the document in its entirety before signing."  Staff Commentary, cmt. 17(b)-3.  The Staff Commentary to 12 C.F.R § 226.17 provides an example that would satisfy the disclosure requirement: "A creditor gives a consumer a multiple-copy form containing a credit agreement and TILA disclosures.  The consumer reviews and signs the form and returns it to the creditor, who separates the copies and gives one copy to the consumer to keep."  Id.

Section 226.23 of Regulation Z provides that the term 'material disclosures' means the required disclosures of the annual percentage rate, the finance charge, the amount financed, the total of payments, the payment schedule, and the disclosures and limitations referred to in §§ 226.32(c) and (d) and 226.35(b)(2).  12 C.F.R. § 226.23 n.48.  In addition, the Commentary to Regulation Z further elucidates the meaning of

material disclosures by stating that a "failure to provide
information regarding the annual percentage rate also includes
failure to inform the consumer of the existence of a variable
rate feature." Staff Commentary, cmt 23(a)(3)-2. "Failure to
give the other required disclosures does not prevent the running
of the rescission period, although that failure may result in
civil liability or administrative sanctions." Id.

Plaintiff does not state sufficient allegations in her
Complaint to maintain a rescission claim and it will be
dismissed without prejudice and with leave to amend within
thirty days. First, it is unclear from Plaintiff's Complaint
who currently owns the mortgage note at issue and whether the
Defendants are the correct parties on whom to exercise a right
to rescission. Second, Plaintiff states in her Opposition to
the Motion to Dismiss that she did not receive a copy of the
final TILDS at closing, but that she "received a set of
documents back in the mail sometime after closing." Thus, it is
unclear when Plaintiff actually received the material
disclosures. Finally, Plaintiff states in her Opposition that
she was asked to sign a release at closing saying that she would
not be rescinding the loan, but does not state whether she ever
received two copies of the notice of her right to rescind.
Without knowing if or when Plaintiff received the material

disclosures and the two copies of the notice of right to

rescind, it is impossible to determine if Plaintiff's request

for rescission was made within three days of the deliverance of

the disclosures.

## 2.   Count I: TILA's Pre-Closing Disclosures

Plaintiff's allegations for violations of TILA under Count

I involve allegations that the required disclosures under §§

226.18 and 226.19 were not clear and conspicuous as required by

§ 226.17 and that they were not timely made.  As explained

below, this Court finds that Plaintiff has not stated facts to

establish that the disclosures made under § 226.18 were not

clear and conspicuous as required by § 226.17 and that claim

will be dismissed.  Plaintiff has, however, stated sufficient

facts to survive the motion to dismiss as to whether the

disclosures required by § 226.19 were made clearly and

conspicuously.  In addition, Plaintiff has stated sufficient

facts to survive Defendant's Motion to Dismiss as to the

timeliness of the disclosures made by Defendants as required by

§ 226.19(a)(1) & (a)(2).

All disclosures required by Subpart C of Regulation Z,

which includes 12 C.F.R. §§ 226.18 and 226.19, must be made

clearly and conspicuously, in writing, in a form that the

consumer may keep.  12 C.F.R. § 226.17(a)(1).  The required

timing of the disclosures in variable rate mortgage transactions
are outlined by 12 C.F.R. §§ 226.19(a) & (b), 226.20(c), but in
all cases must be given prior to consummation of the
transaction.  12 C.F.R. § 226.17(b)

### a.    12 C.F.R. § 226.18 Disclosures

Section 226.18 of Title 12 requires the following
disclosures on mortgages pertinent to Plaintiff's Complaint:

1.    Itemization of the amount financed, which may be
satisfied by the Good Faith Estimate of settlement
costs as provided by the Real Estate Settlement
Procedures Act (12 USC 2601 et seq.);

2.    The annual percentage rate ("APR");

3.    If the APR may increase after consummation of the
transaction, the disclosure must show that the
transaction contains a variable-rate feature and there
must be a statement that variable-rate disclosures
have been provided earlier;

4.    A statement as to whether a prepayment penalty will be
imposed.

Plaintiff makes several allegations relating to violations
of § 226.18.  Plaintiff claims that the application and the Good
Faith Estimate showed a 1% interest rate and that the only place
on the preliminary disclosures that showed anything close to the

actual interest rate accruing on Plaintiff's loan was the APR on

the TILDS, which she alleges, even Defendants acknowledge is a

term confusing to consumers.  Compl. ¶¶ 32, 35, 36.  Moreover,

she alleges that both the Good Faith Estimate and the TILDS were

misleading as they showed the type of loan as "conventional"

without using the terms ARM, pay option arm, negative

amortization, index plus margin or any clarification of the term

"conventional."  Id. ¶ 24, 25, 33.  Moreover, Plaintiff contends

that the only use of the word conventional in their descriptions

of mortgage loan products on their website is attached to a

conforming fixed loan, which further contributes to the lack of

clarity as to what loan product she was purchasing.  Id. ¶ 24.

    While Plaintiff's allegations may in fact have contributed

to Plaintiff being misled about her loan, none of them result in

violations of § 226.18.  Under § 226.18, the Good Faith Estimate

serves the purpose of itemizing the amount financed, including

the amount of any proceeds distributed to the consumer, the

amount credited to the consumer's account with the creditor, any

amounts paid to third persons by the creditor on behalf of the

consumer, and the prepaid finance charge.  Plaintiff makes no

allegations that Defendants did not clearly and conspicuously

make these disclosures on the Good Faith Estimate, however.

Similarly, Defendants here used the model TILDS form provided in Appendix H-2 to Regulation Z.  While Plaintiff may find the use of the term APR misleading, Defendants were required to include the APR by law and she has not alleged that the APR shown on her final TILDS was not accurate.  Nor has Plaintiff alleged that the TILDS did not include clearly and conspicuously any of the required disclosures under § 226.18.

Plaintiff's argument that the use of the term "conventional" to describe her loan type on the application, Good Faith Estimate, and TILDS was misleading because there were no further clarifications as to the adjustable rate nature of her loan is unavailing as to the Section 226.18 disclosures. Section 226.18 requires that if the APR may increase after consummation of the transaction, the TILDS must show that the transaction contains a variable-rate feature accompanied by a statement that variable-rate disclosures have been provided earlier.  Both the preliminary and final TILDS attached to Plaintiff's Complaint included these required statements. Moreover, Defendants argue and Black's law dictionary supports that the term "Conventional" when referring to a mortgage is a term of art indicating that the loan is not federally insured and is not a reference to the amortization of the loan.  BLACK'S LAW DICTIONARY 300 (8th ed. 2004), "mortgage."  Plaintiff's

application also made this distinction clear as it shows the possible loan types as conventional, VA, FHA, USDA/Rural Housing Service, and Other, while under amortization type it shows that it is an ARM of the type (AH) 1 Mo. MTA thus indicating that the loan can be both conventional and an adjustable rate. Plaintiff's alleging that Defendants' website shows a loan called "conventional conforming fixed rate" is irrelevant to her argument as she pulled that from their website on April 1, 2007, almost a year after she closed on her loan and she never alleges that a similar term influenced her understanding at the time that she was considering whether to purchase the loan.  Thus, Plaintiff's claim that the § 226.18 disclosures were not clear and conspicuous as required under § 226.17 will be dismissed.

Nonetheless, even though the allegations are not sufficient to state that the § 226.18 disclosures were not clear and conspicuous, Plaintiff may be able to establish that Defendants' disclosures were not timely under 12 C.F.R. § 226.19(a)(1) and (a)(2) and not "in a form that the consumer may keep before consummation of the transaction" as required by § 226.17(a)(1). In mortgage transactions subject to the Real Estate Settlement Procedures Act (12 U.S.C. § 2601 et seq.) the disclosures under 12 C.F.R. § 226.18 (which was allegedly made here in the form of the TILDS and the Good Faith Estimate) must "be delivered or

mailed to the consumer no later than the third business day
after the creditor receives the consumer's written application"
and no "later than the seventh business day before consummation
of the transaction."   12 C.F.R. § 226.19(a)(1)(i) &
§226.19(a)(2)(i).  If the disclosed APR becomes inaccurate, as
defined by § 226.22, "the creditor shall provide corrected
disclosures with all changed terms.  The consumer must receive
the corrected disclosures no later than three business days
before consummation."  12 C.F.R. § 226.19(a)(2)(ii).  According
to the staff commentary "[i]t is not sufficient for the creditor
merely to show the consumer the document containing the
disclosures before the consumer signs and becomes obligated.
The consumer must be free to take possession of and review the
document in its entirety before signing."  Staff Commentary, cmt
17(b)-3.

Defendants have not argued that the mortgage transaction
here was not subject to the Real Estate Settlement Procedures
Act, thus, the preliminary TILDS and Good Faith Estimate was to
be delivered or mailed to Plaintiff within three days of when
she applied for her loan.  Plaintiff alleges that she did not
receive the TILDS, however, for almost three weeks after she
submitted her application, Compl. ¶ 22, which may be sufficient
to allege a violation of 12 C.F.R. § 226.19(a)(1)(i).  Moreover,

Plaintiff alleges that the final § 226.18 disclosures were
different from the preliminary disclosures, most importantly by
having a different APR and showing that Plaintiff may have to
pay a prepayment penalty.  Compl. ¶ 30; Preliminary and Final
TILDS.  Plaintiff alleges that she did not even see the changed
disclosures, however, until closing and that she was not given
time to read them nor did the settlement agent leave copies with
her.  Opp. ¶¶ 16, 18, 25, 26.  This late provision of the
disclosures alleged by Plaintiff does not appear to comply with
§ 226.19(a)(2)(ii) requiring receipt of the corrected
disclosures three business days prior to consummation nor does
it comply with the § 226.17(a)(1) requirement that she receive
the disclosures in a form that she could keep.  Thus,
Plaintiff's claim as to the timeliness and manner of delivery of
the § 226.18 disclosures will not be dismissed.

### b.   12 C.F.R. § 226.19(b)(2) Disclosures

Although Plaintiff's Complaint does not state sufficient
facts to make a claim that the disclosures violated § 226.18,
Plaintiff's allegations, if true, may be sufficient to establish
various violations of the variable rate disclosure requirements
under § 226.19(b).  Plaintiff alleges that she did not receive,
as required by § 226.19(b), a variable rate disclosure
particular to her loan, that the disclosures did not indicate

that she was receiving a discounted rate, and did not explain that making the 1% interest rate payments would certainly result in negative amortization of her loan.

Section 226.19(b) provides that "[i]f the annual percentage rate may increase after consummation in a transaction secured by the consumer's principal dwelling with a term greater than one year," the lender is required to make certain disclosures at the time an application form is provided or before the consumer pays a non-refundable fee.  Among these disclosures must be "a loan program disclosure for each variable-rate program in which the consumer expresses an interest."  12 C.F.R. § 226.19(b)(2).  In particular, the loan program disclosure must include

(i)     the fact that the interest rate, payment, or term of the loan can change;
(ii)    the index or formula used in making adjustments, and a source of information about the index or formula;
(iii)   an explanation of how the interest rate and payment will be determined, including an explanation of how the index is adjusted, such as by the addition of a margin;
(iv)    a statement that the consumer should ask about the current margin value and current interest rate;
(v)     the fact that the interest rate will be discounted and a statement that the consumer should ask about the amount of the interest rate discount;
(vi)    the frequency of the interest rate and payment changes;
(vii)   any rules relating to changes in the index, interest rate, payment amount, and outstanding loan balance including, for example, an explanation of interest rate or payment

limitations, negative amortization, and interest
rate carryover.

12 C.F.R. § 226.19(b)(2).

Plaintiff alleges and the disclosures show that her
application and good faith estimate showed an interest rate of
1% for 480 months.  Compl. ¶ 23.  According to Plaintiff's
allegations and the attachments to Defendant's Motion, the only
disclosure Plaintiff received prior to closing showing an
interest rate other than 1% was the TILDS, which showed an APR
of 6.320%.  Id. ¶¶ 32, 35, 36.  Even the TILDS, however, appears
to show monthly payments based on the 1% interest rate.  Id. ¶
58.  None of these documents reveals that the 1% rate is a
discounted rate.  Plaintiff does not state clearly in her
Complaint whether she received the adjustable rate mortgage
disclosure statement prior to closing, but assuming that she
did, the adjustable rate mortgage disclosure statement allegedly
given to Plaintiff discusses both discount and premium rates
saying that any and all could potentially apply to her mortgage.

The Disclosure states

If your Initial Interest Rate is an amount that
is lower than the Fully Indexed Rate, this is called a
"Discounted Rate".  If your Initial Interest Rate is a
Discounted Rate, because your initial monthly payment
will be determined using the Initial Interest Rate and
your first adjusted payment will be determined using
an adjustable rate that is based on the index plus
Margin, your first adjusted payment may increase even
if the index decreases or remains the same.  If your
initial interest rate is an amount that is higher than

the Fully Indexed rate, this is called a "Premium
Rate". If your Initial Interest Rate is a Premium
Rate, because your initial monthly payment will be
determined using the Initial Interest Rate and your
first adjusted payment will be determined using an
adjustable rate that is based on the Index plus
Margin, your first adjusted payment may decrease even
if the index remains the same or increases. The
adjustable rate that is used to determine your first
adjusted payment may be higher or lower than the
Subsequent Rate. Ask us for the amount of our current
discounts and premiums. (As described in the section
below entitled "Increase in Principal Balance
(Negative Amortization)".

Nowhere does the Disclosure specify that the 1% interest

rate appearing on the various other disclosures is a discounted

rate. Thus, Plaintiff has alleged sufficient facts to plausibly

state a claim under § 226.19(b)(2)(v) requiring that the lender

disclose clearly and conspicuously the fact that the interest

rate will be discounted. Accord Velazquez v. GMAC Mortgage

Corp., 605 F. Supp. 2d 1049, 1067 (C.D. Cal. 2008) (holding that

the language used in the disclosures regarding the initial

interest rate, which is ambiguous as to whether it is a

discounted rate or not, may be sufficient for Plaintiff to make

out a claim that the disclosures were not clear and conspicuous

under § 226.19(b)(2)(v)); Plascencia v. Lending First Mortgage,

No. C 07-4485 CW, 2008 WL 1902698, at *5 (N.D. Cal. April 28,

2008) (holding that "Plaintiffs may be able to show that they

were not alerted in clear and conspicuous terms that the one-

percent interest rate was a discounted rate" based on language in the mortgage note).

In addition, Plaintiff alleges and the adjustable rate mortgage loan disclosure statement attached by Defendants supports her contention that the loan program disclosure provided to Plaintiff was not specific to Plaintiff's loan, as required by § 226.19(b)(2), but rather discusses several different MTA power arms without specifying which applied to her.  Comp. ¶ 94, 95, Opp. ¶ 27(2).  In addition, as already discussed, the disclosure discusses both discounted rates and premium rates and situations where neither is part of the mortgage.  Thus, Plaintiff has also alleged sufficient facts to state a claim under § 226.19(b)(2) requiring that the lender provide a loan program disclosure for each variable-rate program in which the consumer expresses an interest.

Finally, Plaintiff alleges, and the adjustable rate mortgage disclosure supports, that the variable rate disclosures and explanations of negative amortization framed negative amortization as a mere possibility by using language such as "sometimes" and "may" instead of "always" and "will" despite the certainty that Plaintiff would experience negative amortization if she paid according to the payment schedule.  Opp. ¶ 28(4).

The Staff Commentary explains that

> [i]n transactions where paying the periodic payments
> will not fully amortize the outstanding balance at the
> end of the loan term and where the final payment will
> equal the periodic payment plus the remaining unpaid
> balance, the creditor must disclose this fact.  For
> example, the disclosure might read, 'Your periodic
> payments <u>will</u> not fully amortize your loan and you
> <u>will</u> be required to make a single payment of the
> periodic payment plus the remaining unpaid balance at
> the end of the loan term."

Staff Commentary, cmt. 19(b)(2)(iii)-1 (emphasis added).

Similarly, the Staff Commentary to § 226.19(b)(2)(vii) says

> A creditor must disclose, where applicable, the
> possibility of negative amortization.  For example,
> the disclosure might state, "If any of your payments
> is not sufficient to cover the interest due, the
> difference will be added to your loan amount.... If
> the consumer is given the option to cap monthly
> payments that may result in negative amortization, the
> creditor must fully disclose the rules relating to the
> option, including the effects of exercising the option
> (such as negative amortization <u>will</u> occur and the
> principal balance <u>will</u> increase).

Staff Commentary, cmt. 19(b)(2)(vii)-2 (emphasis added).

The Adjustable Rate Mortgage Loan Disclosure Statement
allegedly provided to Plaintiff explains in the description of
the monthly payment calculation that Plaintiff may pay off the
loan in full sooner than expected or may have a balance
remaining at the end.

> Since the interest rate changes more frequently than
> the payment change, <u>the loan may be paid in full
> sooner than expected</u> if the interest rate decreases
> substantially, or an extra amount may have to be paid
> at the end if the interest rate rises substantially
> during the last few years of the loan term.

The adjustable rate disclosure then goes on to explain negative amortization.

> The principal balance on your loan can increase even though you are making the required monthly payments. This is called "Negative Amortization". This can happen as described in this section. If the Initial Interest Rate, which is used to establish the initial monthly payment, is lower than the Subsequent Interest Rate, which applies commencing on the first day of the month immediately following the month in which your loan closes, the initial monthly payment will be insufficient to pay the interest that is accruing during the Subsequent Interest Rate period. Additionally, following the end of the Subsequent Interest Rate period, your Interest rate will become an adjustable rate that may change monthly. Subject to the 125.000% Principal Balance Limitation, your monthly payment will change on the due date of your twelfth monthly payment, and every twelve months thereafter. Thus, even if your monthly payment adjusts to an amount that will pay the interest that is accruing at the time, once the interest rate changes the adjusted monthly payment may be insufficient to pay the interest that accrues. Further, except for each fifth scheduled payment change, and subject to the 125.000% Principal Balance Limitation, the monthly payment may not be increased by more than 7-1/2% from the previous payment amount. This cap may keep the monthly payment below the amount that is necessary to fully pay the interest that is accruing.

> If your monthly payment is not sufficient to pay monthly interest, you may take advantage of the negative amortization feature by letting the interest defer and become part of the principal balance to be paid by future monthly payments, or you may also choose to limit any negative amortization by increasing the amount of your monthly payment or by paying any deferred interest in a lump sum at any time. Ask us about the payment options available for these loan programs.

Plaintiff's adjustable rate rider, attached to Defendants'
Motion to Dismiss and judicially noticed by this Court explained
that Plaintiff would pay interest at a yearly rate of 1% until
April 3, 2006 (23 days after the closing of her loan) and that
her initial monthly payment would be based on that rate.
Commencing May 1, 2006, however, she would pay interest at a
yearly rate of 7.438%.  Furthermore, the interest rate that
Plaintiff would be required to pay may face further changes on
the 1st day of June, 2006 and on that day every month
thereafter.  Each date that her interest rate could change is
called a "Change Date."  On each Change Date, the interest rate
would be calculated by adding Three and 550 thousands percentage
points (the "Margin") to the Current Index.  According to the
Adjustable Rate Rider, the interest rate is capped at 9.950%.

If this manner of adjusting the interest rate is not
confusing enough, every year starting on June 1, 2007, and on
the same date each twelfth month thereafter (the "Payment Change
Date"), Defendants would determine the amount of the monthly
payment that would be sufficient to repay the projected
Principal balance Plaintiff was expected to owe as of the
Payment Change Date in full on the maturity date at the interest
rate that will become effective one month prior to the Payment
Change Date in substantially equal payments.  The result of this
calculation is the new amount of Plaintiff's monthly payment and

Plaintiff was to pay that new payment until the next Payment
Change Date.

The Payment Changes, however, are subject to two
limitations.  First, the amount of the new monthly payment is
limited to 7 ½% more or less than the current payment.  Second,
after a not so clear explanation of negative amortization, the
Adjustable Rate Rider explains that the unpaid Principal of the
mortgage can never exceed 125% of the principal amount borrowed.
If the unpaid Principal will exceed that amount, the new monthly
payment could exceed the 7 ½% annual payment increase
limitation.  Finally, on the fifth anniversary of the due date
of the first monthly payment, and that same day every five years
thereafter, the monthly payment will be adjusted without regard
to the 7 ½%  payment cap.

The statements in the adjustable rate mortgage disclosure
indicate that negative amortization is a mere possibility.  Yet
it is inconceivable to this Court under any possible Index value
how Plaintiff's mortgage loan, assuming her allegations are
true, could not have resulted in negative amortization if she
was paying the monthly payment as outlined in the Adjustable
Rate Rider.  Again, assuming the allegations are true,
Defendants must have known of this certainty at the time that
they provided her with the disclosure.  Thus, Plaintiff may be
able to demonstrate that these hypothetical references to

negative amortization do not clearly and conspicuously disclose

"the effects of exercising the [payment cap]" such that

"negative amortization <u>will</u> occur and the principal balance <u>will</u>

increase."  This Court's decision is in accord with courts that

have ruled on almost identical language.  <u>See</u> <u>Velazquez</u>, 605 F.

Supp. 2d at 1066 (holding that "while the disclosures perhaps

accurately stated how negative amortization would occur,

Plaintiffs may be able to show that these references did not

clearly and conspicuously disclose that, by exercising the

payment cap, negative amortization would definitely occur during

the first few years."); <u>Mincey v. World Savings Bank, FSB</u>, 614

F. Supp. 2d 610, 638 (D.S.C. 2008) (granting "Plaintiffs' Motion

for Judgment on the Pleadings with respect to the claim that

[Defendant] violated the TILA by disclosing negative

amortization was a possibility when in fact it was a

certainty"); <u>Plascencia</u>, 2008 WL 1902698, at *5-6 (holding that

"Plaintiffs may be able to show that the Note's reference to

negative amortization as a hypothetical event does not clearly

and conspicuously disclose 'the effects of exercising the

[payment cap] option' –i.e., that 'negative amortization <u>will</u>

occur and the principal loan balance <u>will</u> increase.'");

<u>Mandrigues v. World Savings, Inc.</u>, No. C 07-04497 JF, 2008 WL

1701948, at * 2 (N.D. Cal. April 9, 2008) (holding that where

Plaintiffs allege that the promissory notes issued in connection

with the subject loans state that negative amortization is a
mere possibility, where in fact such occurrence was guaranteed,
the plaintiff adequately pleaded a claim under 12 C.F.R. §§
226.17 and 12 C.F.R. § 226.19).  Therefore, the court will deny
Defendant's motion as to Plaintiff's claim relating to
violations of the variable rate disclosure requirements of 12
C.F.R. § 226.19(b)(2).

The Court notes that Defendants raised the language in the
Adjustable Rate Rider attached to the Note to argue that the §
226.19(b)(2) disclosures were made.  The Court questions whether
the Adjustable Rate Rider can be considered a disclosure for the
purposes of § 226.19(b)(2) given that the disclosures are to be
made at the time Plaintiff applied for the loan and the Rider is
a part of the Note signed at closing.  Regardless, even if the
Court were to consider the Rider, the Court's conclusion would
be the same as to the discounted rate (the Rider does not
specify that the 1% rate is a discounted rate) and as to the
negative amortization (the language in the Rider similarly
expresses negative amortization as a possibility and not as an
occurrence certain to occur).  The only difference would be that
the Rider is specific as to Plaintiff's loan and would not
violate § 226.19(b)(2) as to that claim.  As this is a motion to
dismiss, however, and it is unknown when Plaintiff received the

rider, the Court will not dismiss that claim on the basis of the adjustable rate rider.

3.   Count II: TILA's Post-Closing Disclosures

Plaintiff's second count alleges that Defendants violated TILA's post closing disclosure requirements regarding interest rates and payments relating to variable-rate adjustments under 12 C.F.R. § 226.20(c).  Section 226.20(c) applies to variable rate transactions subject to § 226.19 in which adjustments to the interest rate may occur with or without a corresponding adjustment to the payment.  With such transactions the creditor must provide new disclosures to the debtor under two circumstances: 1) if there is an adjustment to the interest rate without an accompanying payment change the disclosure must be made once per year; 2) if there is a payment due at a new level, the disclosure must be made at least 25, but no more than 120 calendar days before payment at the new level is due.  12 C.F.R. § 226.20(c).  The disclosure must contain the following information:

(1) The current and prior interest rates.

(2) The index values upon which the current and prior interest rates are based.

(3) The extent to which the creditor has foregone any increase in interest rate.

(4) The contractual effects of the adjustment, including the payment due after the adjustment is made, and a statement of the loan balance.

(5) The payment, if different from that referred to in paragraph (c)(4) of this section, that would be required to fully amortize the loan at the new interest rate over the remainder of the loan term.

Id.

Plaintiff alleges that the mortgage note showed a 1% interest rate in April 2006, but that the rate increased to over 7% in May 2006 and that it continued to rise monthly thereafter. Compl. at ¶ 45. Plaintiff alleges that Defendants did not provide her with advance notice of the changes, but only after the fact. Id. Moreover, Plaintiff alleges that the notices of the rate changes did not contain a new payment schedule that would allow Plaintiff to fully amortize the loan. Id.

Plaintiff has alleged sufficient facts to state a claim under § 226.20(c)(5) because she alleges that the notice of interest rate changes Defendants sent did not state the payment amount that would be required to fully amortize the loan at the new interest rate over the remainder of the loan term. Plaintiff does not state a claim under § 226.20(c), however, as regards the timing of the notice since other than the situation where the rate change results in a payment change, which Plaintiff does not allege happened here, § 226.20(c) requires only that the notice of rate change be made once per year and it

does not require that it be made in advance of the change.

Thus, Plaintiff's claim for violation of § 226.20(c)(5),

Defendant's alleged failure to state the payment amount needed

to fully amortize the loan in the rate change notice, will not

be dismissed.  Plaintiff's § 226.20(c) claim will be dismissed,

however, in so far as it alleges that the notice was not timely

made.

4.   Count III: TILA's Advertising Disclosures

Plaintiff alleges that she received from AHMC a direct mail

flyer advertising that she had been pre-approved for a 1%

mortgage loan.  Compl. ¶¶ 11, 15, 50.  She claims that the

advertisement indicated that the loan would save her money, act

as a financial tool to build wealth and eliminate debt – none of

which has happened.  Id. ¶ 15, ¶ 50.  Plaintiff contends that

the terms outlined in the advertisement violated the advertising

disclosure requirements of 15 U.S.C. § 1664 and the

corresponding regulation at 12 C.F.R. § 226.24.  In particular,

she alleges that the advertisement that she received did not

reflect clearly and conspicuously the true interest rate, terms

of payment and subsequent negative amortization.  Id. ¶ 17, 65.

Moreover, she claims that the 1% interest rate loan advertised

is not actually a product that Defendants offer.  Id. ¶ 20, 54,

57, 65.

Section 1664 of Title 15 and 12 C.F.R. § 226.24, however,
do not provide for a statutory private remedy.  Section 1640 of
Title 15 provides a private remedy for violations of Parts B, D,
and E of Subchapter I of the Consumer Credit Protection Act.
Section 1664 is under Part C of Subchapter I, however, and is
not included in the private remedy provided under § 1640.
Section 1664 does not itself contain any civil liability
provision nor is a civil liability provision contained elsewhere
in Part C.  Rather, the legislative history indicates that
"authority to enforce compliance with the credit advertising
requirements is relegated to administrative agencies as provided
in . . . 15 U.S.C. § 1607." Jordan v. Montgomery Ward & Co.,
442 F.2d 78, 81 (8th Cir. 1971).  Thus, this Court does not have
original subject matter jurisdiction over Plaintiff's
advertising claim under 15 U.S.C. § 1664.  Accord Smeyres v.
General Motors Corp., 820 F.2d 782, 783-84 (6th Cir. 1987);
Jordan, 442 F.2d at 81-82; Fidelity Mortgage Corp. v. Seattle
Times Co., 304 F. Supp. 2d 1270, 1273-74 (W.D. Wash. 2004).
Plaintiff's Count III will be dismissed.

**D.   Count IV: Fraud and Deceptive Acts**

Within Count IV, Plaintiff raises two separate causes of
action: common-law fraud and a violation of the Maryland
Consumer Protection Act.  The Court finds that Plaintiff has

39

alleged sufficient facts to support these claims and Defendants'
motion will be denied as to Count IV.

## 1.   Fraud

Plaintiff alleges that Defendant AHMC committed fraud 1) by
arranging for a fraudulent appraisal that inflated the value of
her property and 2) by promising her a loan with a 1% interest
rate, $56,000 cash out, and no prepayment penalty with no intent
to perform that promise.  Defendants argue that Plaintiff has
failed to plead her claim with the particularity required by
Federal Rule of Civil Procedure 9(b).  They also argue that even
if this claim is stated with the required specificity, it is
precluded because Plaintiff's reliance on the alleged
misrepresentations was not reasonable and that Plaintiff's
alleged facts do not support a claim of fraud and that her own
claims contradict each other.  Alternatively, Defendants argue
that, even if Plaintiff has stated sufficient facts, fraud
cannot be based on future promises.

To survive a motion to dismiss on a fraud claim under
Maryland law, Plaintiff must allege the following elements: 1)
that a representation made by a party was false; 2) that the
defendant knew the representation was false or made the
misrepresentation with such reckless indifference to truth as to
impute knowledge and an intent to defraud; 3) that the

40

misrepresentation was made for the purpose of deceiving the
plaintiff; 4) that the plaintiff reasonably relied upon the
misrepresentation; and 5) that the plaintiff suffered damage
directly resulting from the misrepresentation.  Suburban
Properties Mgt., Inc. v. Johnson, 204 A.2d 326, 329 (Md. 1964).
Fraud claims are subject to Federal Rule of Civil Procedure
9(b), requiring that claimants plead fraud with particularity.
The particularities with which fraud claims must be pleaded
include "the time, place, and contents of false representations,
as well as the identity of the person making the
misrepresentation and what he obtained thereby."  Harrison v.
Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir.
1999) (quoting 5 Charles Alan Wright and Arthur R. Miller,
Federal Practice and Procedure: Civil § 1297, at 590 (2d ed.
1990).

     Rule 9(b) allows, however, "conclusory allegations of
defendant's knowledge as to the true facts and of defendant's
intent to deceive."  Id.  The intent of Rule 9(b) is to ensure

          "that the defendant has sufficient information to
     formulate a defense by putting it on notice of the
     conduct complained of[,] . . . to protect defendants
     from frivolous suits[,] . . . to eliminate fraud
     actions in which all the facts are learned after
     discovery[,] . . . [and] to protect defendants from
     harm to their goodwill and reputation."

Id. (quoting United States ex rel. Stinson, Lyons, Gerlin &
Bustamante, P.A. v. Blue Cross Blue Shield of Georgia, Inc., 755
F. Supp. 1055, 1056-57 (S.D. Ga. 1990)).  Thus, the Fourth
Circuit has held that "[a] court should hesitate to dismiss a
complaint under Rule 9(b) if the court is satisfied (1) that the
defendant has been made aware of the particular circumstances
for which she will have to prepare a defense at trial, and (2)
that plaintiff has substantial prediscovery evidence of those
facts."  Id.

Here, Plaintiff has alleged that AHMC through ABC
misrepresented to her through advertisements and phone
conversations that she was purchasing a mortgage with a 1%
interest rate with a $56,000 cash out, and no prepayment
penalty.  Compl. ¶¶ 50, 79.  Plaintiff also alleges that
Defendants stated an inflated appraised value.  Id. ¶ 74.  She
alleged that these misrepresentations occurred prior to the
closing of the loan and that she closed on the loan in reliance
on those statements.  Id. ¶¶ 77-79.  She has also alleged that
the Defendants knew that the misrepresentations were false and
that they caused her injury.  Id.  Thus, Plaintiff has pled
fraud with sufficient particularity to meet the requirements of
Rule 9(b).

Defendant alleges that her reliance was not reasonable, however, because she received disclosures showing an APR between 7% and 8% and that her note explicitly set forth the terms of her loan, accompanied by an all-capital disclaimer about the possibility of negative amortization.  As explained under the Truth-in-Lending discussion, however, while the TILDS and good faith estimates may have complied with § 226.18, the disclosures when taken together could be misleading as to the interest rate since several of the documents stated that the interest rate was 1%.  Only the TILDS showed anything different.  Moreover, the terms changed between the time Plaintiff was given the preliminary disclosures and when she closed on her loan and she alleges that she was not given time to read the closing documents or a copy at the time of closing.  Thus, the Court is not prepared to say at this time that her reliance on the alleged statements was unreasonable.

Defendants also argue that Plaintiff's Complaint demonstrates that she knew that the 1% rate was not the rate of her loan because she refers to it as a teaser rate.  The Complaint, however, indicates that Plaintiff only discovered that the 1% rate was a "teaser rate" after closing and her use of that term in her Complaint is meant only to emphasize the alleged misrepresentation.

Defendants also argue that Plaintiff cannot prove that Defendants made any alleged misrepresentation because they did not perform the appraisal. Defendants are incorrect, however, because Plaintiff's allegation is that Defendants knew that the appraisal was incorrect and yet represented to Plaintiff that it was correct and in reliance on that statement, Plaintiff closed on the loan. Compl. ¶ 77.

Finally, Defendants contend that Plaintiff's fraud claim is barred because promissory statements as to future events cannot be the basis of fraud. Defendants fail to note, however, that fraud claims may be based on allegations that the promisor did not intend to keep its promise at the time that it made the promise. Sass v. Andrew, 832 A.2d 247, 264 (Md. Ct. Spec. App. 2003). Here Plaintiff alleges that, at the time Defendants promised her a loan of 1%, it had no intention of keeping its promise. Compl. ¶ 79.

Thus, the Court believes that dismissal is not warranted at this stage, particularly where, as here, Defendants have "been made aware of the particular circumstances for which [they] will have to prepare a defense at trial."

2.    Maryland Consumer Fraud and Deceptive Business Practices
      Act

Under Count IV, Plaintiff also claims that Defendants

violated the Maryland Consumer Fraud and Deceptive Business

Practices Act, Md Ann. Code, Com. Law § 13-101 et seq.[4]  In

particular, Plaintiff alleges that Defendants violated § 13-

301(9) of the Act, which prohibits

        "Deception, fraud, false pretense, false premise,
        misrepresentation, or knowing concealment,
        suppression, or omission of any material fact with the
        intent that a consumer rely on the same in connection
        with:

        (i) The promotion or sale of any consumer goods,
        consumer realty, or consumer service;

        (ii) A contract or other agreement for the evaluation,
        perfection, marketing, brokering or promotion of an
        invention; or

        (iii) The subsequent performance of a merchant with
        respect to an agreement of sale, lease, or rental[.]"

Defendant argues in a footnote that Rule 9(b)'s

particularity requirements also apply to such claims and that

Plaintiff has not pled this claim with sufficient particularity.

As already discussed, however, Plaintiff has pled her fraud

---

[4] Plaintiff's Complaint also references Arkansas' Deceptive Trade
Practices Act, Ark Code Ann. §§ 4-88-107 & 108, and Illinois'
Consumer Fraud and Deceptive Business Practices Act, 815 Ill.
Comp. Stat. 505.  It is unclear why Plaintiff includes these
statutes in her Complaint as she provides no explanation as to
how they would apply in this case.  To the extent that Plaintiff
means to raise these as additional claims, they will be
dismissed for a failure to allege sufficient facts to state a
claim.

allegations with sufficient particularity to survive a motion to
dismiss and her allegations apply equally here.   Thus,
Defendants' motion to dismiss as to the Plaintiff's claim that
Defendants violated the Maryland Consumer Fraud and Deceptive
Business Practices Act will also be denied.

## E.   Count V: Racketeer Influenced and Corrupt Organizations Act

Plaintiff's fifth claim against Defendants is for a
violation of the Racketeer Influenced and Corrupt Organizations
Act (RICO).[5]   Essentially, Plaintiff appears to allege that the
lender, Defendant AHMC, conducted a pattern of racketeering
activity by 1) disseminating information to Plaintiff and other
consumers via their website and through other marketing
materials; and 2) disseminating misleading information to
investors via their web site and in SEC filings to promote their

---

[5] It is unclear if Plaintiff's references within Count V to
various Maryland and Federal statutes unrelated to her RICO
claim are meant to be additional claims or if they are simply
intended as factual allegations.   Plaintiff cites to and claims
violations by Defendants of Maryland Finder's Fee Act, Md. Code
Ann., Com. Law § 12-801 et seq., Federal prohibitions against
unearned fees and fee splitting under 12 U.S.C. 2607(b) and 24
C.F.R. § 3500.14; Maryland prohibitions against mortgage brokers
being a director, officer, or employee of any lender where he
places a loan, Md. Code Ann., Com. Law § 12-803; and
prohibitions against a mortgage broker charging a finder's fee
in any transaction of the mortgage if the broker is the lender
or an owner, part owner, partner, director, officer, or employee
of the lender, Md. Code Ann., Com. Law § 12-804(e).   Other than
the reference to RESPA as discussed in Note 3 above, to the
extent that these allegations are intended to be additional
claims, these claims will be dismissed for a failure to allege
sufficient facts to state a claim.

revenue.  Compl. ¶¶ 104, 105.  It then paid an incentive to

Defendant ABC, whom Plaintiff terms an "employee" of AHMC, for

its efforts in securing Plaintiff's purchase of the more

profitable loan by various techniques such as obtaining an

inflated appraisal, and by selectively choosing which of

Plaintiff's credit scores would be most useful.  Id. ¶¶ 107,

108, 111.  In addition, Plaintiff alleges that Defendant ABC

also secured additional revenue for AHMC by requiring Plaintiff

to use ABC and AHMC affiliated companies, such as their

affiliated settlement company.  Id. ¶ 109.

    RICO defines four types of prohibited conduct, but

Plaintiff does not state which of the four types Defendants are

alleged to have violated.  The four types of conduct prohibited

under RICO are

    [a]   the use of income derived from a "pattern of
          racketeering activity" to acquire an interest in
          or establish an enterprise engaged in or
          affecting interstate commerce;


    [b]   the acquisition or maintenance of any interest in
          an enterprise "through" a pattern of racketeering
          activity;


    [c]   conducting or participating in the conduct of an
          enterprise through a pattern of racketeering
          activity; and

[d]  conspiring to violate any of these provisions.

Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 482 (1985)

(citing 18 U.S.C. § 1962).  Plaintiff appears to be alleging a

violation of 18 U.S.C. § 1962(c) which states "it shall be

unlawful for any person employed by or associated with any

enterprise engaged in, or the activities of which affect,

interstate or foreign commerce, to conduct or participate,

directly or indirectly, in the conduct of such enterprise's

affairs through a pattern of racketeering activity or collection

of an unlawful debt."  The facts alleged by Plaintiff fail to

state a RICO claim, however, and will be dismissed.

A violation of § 1962(c) requires the establishment of four

elements: (1) conduct (2) of an enterprise (3) through a pattern

(4) of racketeering activity.  Sedima, 473 U.S. at 496.

Defendant argues that Plaintiff does not state a RICO claim

because she has not alleged a RICO "enterprise."  "A RICO

'enterprise' is an ongoing formal or informal organization whose

associates function as a continuing unit."  Toucheque v. Price

Brothers Co., 5 F. Supp. 2d 341, 346 (D. Md. 1998) (citing

Palmetto State Med. Ctr. v. Operation Lifeline, 117 F.3d 142,

148 (4th Cir. 1997)).  Under § 1962(c), the RICO "enterprise"

cannot be the same as the 'person' alleged to have violated the

statute.  In other words, the defendant cannot be the same as

48

the "enterprise." Id. at 347 (citing Operation Lifeline, 117
F.3d at 148). "This distinction requirement stems from the
purpose of § 1962(c), which is designed solely to reach criminal
activity by employees while protecting the innocent corporate
enterprise from criminal infiltration." Id.

Defendants argue, and this Court agrees, that Plaintiff's
Complaint does not identify the "enterprise." On the one hand,
it appears that Plaintiff alleges that the "lender" is the
enterprise and Defendants AHMC and ABC are the "persons"
associated with the enterprise that are conducting the
racketeering. Compl. ¶¶ 101-103. Later in her Complaint,
however, Plaintiff refers to AHMC as the lender and the
"employer" and to ABC as the "employee" with ABC generating
profit for AHMC via illicit means, but with AHMC also conducting
alleged predicate activity. Id. ¶ 108. Under this scenario, it
would appear that Plaintiff is alleging that AHMC is the
enterprise and ABC is the RICO "person." Yet ABC is a d/b/a of
AHMC and not a separate person. In any scenario, however,
Plaintiff has not alleged an "enterprise" separate from
Defendants. Thus, because Plaintiff has not adequately alleged
a RICO enterprise, nor does it appear that she could allege a
RICO enterprise separate from Defendants AHMC and ABC, she has

not sufficiently stated a RICO claim to survive a motion to dismiss.

## F.    Count VI, VIII, and XI:  Negligence and Breach of Fiduciary Duty

Plaintiff alleges one count of negligence and two counts of breach of fiduciary duty.  As a preliminary matter, Maryland courts do not recognize a separate action for breach of fiduciary duty, but rather, the claim is to be found in another tort or contract claim.  Vinogradova v. Suntrust Bank, Inc., 875 A.2d 222, 231 (Md. Ct. Spec. App. 2005).  Both of Plaintiff's claims for breach of fiduciary duty are identical and thus will be treated as one claim.  Plaintiff alleges that Defendants AHMC and ABC had a special relationship to Plaintiff because she was guided by their judgment and advice and that she believed that they would act in her best interest.[6]  Compl. ¶¶ 135, 155.  As Plaintiff's claim relates to their duty toward Plaintiff, they will be considered in conjunction with her negligence claim.

Under Maryland law, in order to state a cause of action for negligence, Plaintiff must demonstrate a duty owed to her by Defendants.  Parker v. Columbia Bank, 604 A.2d 521, 531-32 (Md. Ct. Spec. App. 1992) (citing Jacques v. First Nat'l Bank, 515 A.2d 756, 758 (Md. 1986)).  Here Plaintiff alleges three duties

---

[6] Plaintiff also alleges fiduciary relationships by the appraiser and the title company, both of whom have been dismissed as parties.  Thus, claims as to those parties have been dismissed.

owed to Plaintiff by Defendants AHMC and ABC: 1) A duty of care in preparing the appraisal upon which the Defendants could foresee that the Plaintiff would rely; 2) a duty to disclose to "the consuming public" the foreseeable risks associated with the use of the loan product at issue here and to not market the loan product in such a way as to deceive consumers into taking them; and 3) the fiduciary duty discussed above requiring Defendants to act in her best interest.

Defendants correctly argue that it is a longstanding principle of Maryland law that the relationship of a bank to its customer in a loan transaction is ordinarily a contractual relationship between a debtor and a creditor and it is not fiduciary in nature. Yousef v. Trustbank Sav., F.S.B., 568 A.2d 1134, 1138 (Md. Ct. Spec. App. 1990). Exceptions may arise, however, where there are special circumstances. Parker, 604 A.2d at 532-33. Some cases state that "special circumstances 'may' exist where the bank knows or has reason to know that the customer is placing his trust and confidence in the bank and relying on the bank to counsel and inform him." Id. at 533 (internal citations omitted). The Parker court analyzed the cases in which courts had indicated that a special "counseling" duty may arise and found that "even in those cases, courts generally refused to hold the bank liable to its customer." Id.

Those courts reasoned "that a borrower cannot 'abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held to be liable as a fiduciary." Id. (internal citations omitted) (emphasis in original).

Here, Plaintiff has not alleged any facts demonstrating that the Defendants consciously assumed any special duties toward Plaintiff beyond those of a normal lender/borrower relationship. Thus, her negligence and fiduciary duty claims will be dismissed for failure to state a claim.

## G.    Count VII: Breach of Express Warranties

Plaintiff alleges in Count VII that ABC made express warranties on which she relied when purchasing her loan. Plaintiff alleges that ABC breached these express warranties and that she suffered damages as a proximate result of the breach. As a preliminary matter, Defendants argue that Plaintiff fails to state a claim because she does not state what specifically are the express warranties made by ABC, but simply avers generally that Defendant ABC made express warranties via advertisements, models and samples, and other similar uniform representations without specifying which statements constituted the express warranties.  In a breach of express warranty action,

"a plaintiff must set forth the terms and conditions of the warranty." Pulte Home Corp. v. Parex, Inc., 923 A.2d 971, 996 (Md. Ct. Spec. App. 2007).  Here Plaintiff has not met this standard.

Regardless, even if Plaintiff had pleaded the claim with more specificity, Plaintiff's claim must fail because in Maryland, express warranties are governed statutorily by § 2-313 of the Commercial Law Article of the Maryland Code, which provides as follows:

§ 2-313.  Express warranties by affirmation, promise, description, sample

(1)  Express warranties by the seller are created as follows:

(a)  Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

(b)  Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.

(c)  Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

A "good" is defined under Md. Code Ann., Com. Law § 2-105 (1) as "all things (including specially manufactured goods) which are movable at the time of identification to the contract

for sale other than the money in which the price is to be paid,
investment securities (Title 8) and things in action." Here,
Plaintiff is not buying a movable thing, but is contracting to
borrow money that is to be repaid with interest. Thus,
Plaintiff's mortgage does not qualify as a "good" under § 2-313
so Plaintiff cannot state a claim for breach of express
warranty. The claim will, therefore, be dismissed.

## H.    Count IX: Unjust Enrichment/Restitution

Plaintiff's ninth claim is for unjust enrichment. She
argues that as the mortgage contract was obtained via fraudulent
means, that Defendants have been unjustly enriched. As
Defendants argue, Maryland courts generally do not recognize a
cause of action for unjust enrichment where the relationship of
the parties is set out in a valid contract. County Com'rs of
Caroline County v. J. Roland Dashiell & Sons, Inc., 747 A.2d
600, 607 (Md. 2000). Courts recognize certain exceptions to
this rule, however, as in cases "when there is evidence of fraud
or bad faith, there has breach of contract or a mutual recission
of the contract, when rescission is warranted, or when the
express contract does not fully address a subject matter." Id.
at 608-09. Here, Plaintiff alleges fraud and breach of contract
sufficient to survive a motion to dismiss, thus the mortgage
note is not a bar to an unjust enrichment claim here.

To establish a claim for unjust enrichment in Maryland, the Plaintiff must allege three elements: 1) "a benefit conferred upon the defendant by the plaintiff;" 2) "an appreciation or knowledge by the defendant of the benefit;" and 3) "the acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." Id. at 607 n.7.  Here Plaintiff has alleged all three elements and the claim will not be dismissed at this point in the litigation.

## H.    Count X:   Breach of Contract

Plaintiff alleges in Count X a breach of the implied duty of good faith and fair dealing.  Defendants contend that Plaintiff's claim should be dismissed because it does not allege any breach of the express terms of the mortgage.  Maryland recognizes an implied duty of good faith and fair dealing in certain contracts, however.  Parker, 604 A.2d at 531.  "The duty simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract."  Id.

Plaintiff's allegations relating to the breach of the duty of good faith relate to events prior to closing on the mortgage. She has not alleged that Defendants have acted in such a way as to prevent Plaintiff from performing her obligations under the

mortgage note.  Thus, Plaintiff has failed to state a claim for breach of contract and Count X will be dismissed.

## J.    Count XII:      Duress and Economic Duress

Plaintiff's final count is for Duress and Economic Duress. Defendants rightly argue that Maryland does not have a damages claim for duress.  Rather, the remedy is to make the contract voidable where a plaintiff can establish that the plaintiff's assent to the agreement was forced or involuntary.  <u>Blum v. Blum</u>, 477 A.2d 289, 294 (Md. Ct. Spec. App. 1984).  Plaintiff's allegations relate to the fact that her loan contains "an illegal prepayment penalty," which prevents her from leaving the contract.  Plaintiff does not allege that Defendants forced her into the mortgage agreement or that her consent was involuntary. Thus, Plaintiff does not state a claim for duress or economic duress and Count XII will be dismissed.

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motion will be granted in part and denied in part.  Plaintiff's claims for violation of the requirement that 12 C.F.R. § 226.18 disclosures be clear and conspicuous (partial Count I), for a violation of 12 C.F.R. § 226.20(c) as to timeliness of the post-closing disclosures (partial Count II), for violation of the Truth in Lending Act's Advertising provisions (Count III), for violation

of RICO (Count V), for negligence and breach of fiduciary duty

(Counts VI, VIII, and XI), for breach of contract (Count X), and

for duress and economic duress (Count XII) will be dismissed.[7]

Plaintiff's claims for rescission and her possibly intended

RESPA claim will also be dismissed, but without prejudice and

with leave to amend the Complaint within 30 days to properly

make those claims.[8]  Plaintiff will be permitted to proceed on

her claims for the timeliness of the § 226.18 Truth-in-Lending

disclosures and for violations of the 12 C.F.R. § 226.19(b)

variable rate disclosure requirements (partial Count I), for

violation of the disclosure requirements under 12 C.F.R. §

226.20(c)(5) (partial Count II), for fraud and deceptive acts

(Count IV), and for unjust enrichment (Count IX).  A separate

order will issue.

_____/s/_____
William M. Nickerson
Senior United States District Judge

December 3, 2009

---

[7] Any unenumerated claims, to the extent Plaintiff also intended
them as claims, other than RESPA, will also be dismissed.

[8] The Court notes, however, that by granting leave to amend on
the rescission and RESPA claims, it is not suggesting that
Plaintiff should amend her Complaint.  Rather the Court is
recognizing the liberal pleading standard accorded to pro se
plaintiffs and the desire to see no meritorious claim dismissed
on a technicality.  The Court suggests, however, that should
Plaintiff move to amend her Complaint that she should make every
attempt to be concise and, given the already voluminous
Complaint filed, it is unlikely that she would need more than an
additional five pages with which to properly allege these two
claims.