UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE


| | | |
|---|---|---|
| IN RE: | . | Case No. 07-11047(CSS) |
| | . | |
| | . | |
| AMERICAN HOME MORTGAGE | . | |
| HOLDINGS, INC., | . | 824 North Market Street |
| | . | Wilmington, Delaware 19801 |
| | . | |
| Debtor. | . | May 11, 2010 |
| . . . . . . . . . . . . .. | . | 9:24 a.m. |


TRANSCRIPT OF MOTION HEARING
BEFORE HONORABLE CHRISTOPHER SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

| | |
|---|---|
| For the Debtor: | Young Conaway Stargatt & Taylor LLP |
| | By:  SEAN BEACH, ESQ. |
| | PATRICK JACKSON, ESQ. |
| | The Brandywine Building |
| | 1000 West Street, 17th Floor |
| | Wilmington, DE  19899 |
| | |
| | Zolfo, Cooper |
| | By:  SCOTT MARTINEZ, ESQ. |
| | (Appearing telephonically) |
| | |
| For the Creditors' | Hahn & Hessen, LLP |
| Committee: | By:  MARK INDELICATO, ESQ. |
| | EDWARD L. SCHNITZER, ESQ. |
| | 488 Madison Avenue |
| | New York, NY  10022 |
| | |
| | |
| Audio Operator: | Leslie Murin |


Proceedings recorded by electronic sound recording, transcript
produced by transcription service
_____

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609) 586-2311    Fax No. (609) 587-3599**

APPEARANCES (Contd'):

| | |
|---|---|
| For the Creditors' Committee: | BDO Consultants<br>By:  MICHELLE MICHAELIS, ESQ.<br>(Appearing telephonically) |
| | Blank Rome, LLP<br>By:  VICTORIA A. GUILFOYLE, ESQ.<br>1201 Market Street<br>Wilmington, DE 19801 |
| For Bank of America: | Potter Anderson & Corroon, LLP<br>By:  R. STEPHEN McNEILL, ESQ.<br>Hercules Plaza<br>1313 North Market St.<br>Wilmington, DE  19801 |
| | Kaye Scholer, LLP<br>By:  ANA M. ALFONSO, ESQ.<br>425 Park Avenue<br>New York, NY  10022 |
| For American Home Mortgage Servicing: | Greenberg Traurig, LLP<br>By:  VICTORIA W. COUNIHAN, ESQ.<br>The Nemours Building<br>1007 North Orange Street<br>Suite 1200<br>Wilmington, DE  19801 |
| | Jones Day<br>By:  DANIEL P. WINIKKA, ESQ.<br>272 North Harwood Street<br>Dallas, TX 75201 |
| For Wells Fargo: | Chapman and Cutler<br>By:  FRANKLIN H. TOP, III, ESQ.<br>111 West Monroe Street<br>Chicago IL 60603 |
| | Drinker, Biddle & Reath<br>By:  TODD C. SCHILTZ, ESQ.<br>1100 N. Market Street<br>Wilmington, DE 19801 |
| For DBNTC: | Nixon Peabody<br>By:  DENNIS J. DREBSKY, ESQ.<br>437 Madison Avenue<br>New York, NY 10022 |

1            THE COURT:  Please be seated.  Good morning.

2            MR. BEACH:  Good morning, Your Honor.  May it please

3  the Court, Sean Beach from Young, Conaway, Stargatt & Taylor on

4  behalf of the debtors.

5            Your Honor, the items on the agenda today are three

6  settlement motions that the debtors filed under Bankruptcy Code

7  Sections 105 and 363 in Bankruptcy Rule 9019.  Your Honor,

8  these settlements are with American Home Mortgage Servicing,

9  Inc., formerly known as AH Acquisition, the purchaser of the

10 debtor's servicing business, Deutsche Bank National Trust

11 Company and Wells Fargo Bank.

12           As Your Honor will recall the DB motion was continued

13 from the April 6th hearing for the purpose of permitting Ms.

14 Rush and the Jacksons to file motions seeking to subordinate

15 DB's claims to their own -- the balance of the Rush and Jackson

16 objections to the DB settlement was overruled.  Ms. Rush and

17 the Jacksons filed subordination complaints against multiple

18 non-debtor parties as a result of direction from the Court at

19 that hearing.  Your Honor gave seven days for them to file

20 subordination motions.  Instead, they filed complaints against

21 multiple parties, including all the parties to -- or the

22 counter parties to the settlements that are up for hearing

23 today.

24           As Your Honor will recall there was a status

25 conference thereafter to help give the parties some guidance in

1 terms of how those complaints would be dealt with for today's

2 hearing, and it was determined that those complaints would be

3 viewed as objections to each of the settlements.  Those

4 objections are all still pending.  We appreciate Your Honor

5 giving us the May 11th hearing.  We adjourned these from the

6 May 4th hearing in an attempt to settle -- to try to come to a

7 global settlement by and among all of the parties.

8         Unfortunately, we have not been able to come to

9 settlement agreements with the parties, and so the objections

10 by Ms. Rush and the Jacksons with respect to their allegations

11 that the settlements should not be approved because of their

12 ability, their alleged ability, to subordinate the claims of

13 DB, Wells and HMSI to their own unliquidated and contingent

14 claims.  In addition, Your Honor, there is one objection by

15 Bank of America to the settlement with American Home Mortgage

16 Servicing, Inc.  It's a limited objection.

17         Your Honor, I'd like to propose that for the purposes

18 of today to move most efficiently I think it makes sense since

19 the same objections are lodged to all three settlements, except

20 for the B of A objection, that we proceed with very brief, or

21 no openings, get to the evidence, and present evidence with

22 respect to all three motions at the same time and then move to

23 closings with respect to those settlement agreements.

24         THE COURT:  That's fine.

25         MR. BEACH:  Your Honor, the debtors, the Committee,

1  American Home Mortgage Servicing, Deutsche Bank and Wells Fargo

2  each filed replies to the Rush and Jackson objections.  All

3  parties are present in the courtroom today.  In addition, Your

4  Honor, I'd like to point out that David Souders from the Weiner

5  Brodsky firm who is defending American Home Servicing -- I'm

6  sorry, American Home Mortgage in connection with Ms. Rush's

7  Maryland District Court actions is present on the phone in case

8  Your Honor has any questions about the status of that action or

9  where the claim stands in connection with Ms. Rush's action in

10 the District Court of Maryland.

11         At the suggestion of the Court, Your Honor, the

12 debtors filed, in support of the evidentiary basis for the

13 settlements, the declaration of Kevin Nystrom who is the Chief

14 Restructuring Officer of the debtors and managing director of

15 Zolfo Cooper.  Your Honor, Mr. Nystrom is in the courtroom

16 today and is present in case any parties wish to cross examine

17 him, although I would point out, Your Honor, that none of the

18 objections go to the merits of the -- or the reasonableness of

19 the settlements, and are narrowly tailored to the subordination

20 issue.

21         In particular, Your Honor, we just received a reply

22 from Ms. Rush that indicates that in her summary of the

23 objections to the settlements that the parties argue that we

24 object to the settlements, and that that is just not the case.

25 We do not object to the settlements per se, we object to the

1  fact that the settlements are offered to some, while others are

2  ignored.

3         Your Honor, I would point out that with respect to

4  the DB settlement that was overruled at the last hearing.  In

5  addition, Ms. Rush also argues that any settlements are funds

6  from the estate and are not available to go to other creditors,

7  and it is possible that the estate may be administratively

8  insolvent.  Your Honor, Mr. Nystrom's declaration addresses

9  that point.  So, with that, Your Honor, I would -- I think what

10 the debtors would like to do is dispense with opening arguments

11 and move right to the evidence.  In terms of evidence in

12 support of each settlement, as I've indicated, Your Honor,

13 we've got the declaration of Mr. Nystrom and we'd like to seek

14 to have that declaration admitted.

15         THE COURT:  Do you have a blackberry that's near a

16 microphone or on top of the table?  Would you please put that

17 underneath?  The wireless communication gives us feedback.

18         MR. BEACH:  It might have been mine, Your Honor.

19         THE COURT:  That's fine.  All right, the Court will

20 admit the declaration of Kevin Nystrom into evidence in support

21 of the debtor's motions.  That's Docket 8835.  And I have read

22 the declaration.  Is there any other -- and any party -- I want

23 to finish the debtor's case in chief and then I'll open him up

24 to cross examination if they wish.  Is there any other evidence

25 that the debtor wishes?

1          MR. BEACH:  The only other evidence, Your Honor, is

2  we've asked Your Honor to take judicial notice of the servicing

3  sale order at Docket Number 1711 and the Bank of America

4  Settlement Order at Docket Number 5308.

5          THE COURT:  All right, I take judicial notice of

6  those documents.

7          MR. BEACH:  And, Your Honor, that concludes the

8  evidence from the debtors in support of the settlements.

9          THE COURT:  All right.  Does any party wish to cross

10 examine Mr. Nystrom?

11                    (No audible response)

12         THE COURT:  All right, I hear none.  Let me hear an

13 articulation of Ms. Rush's ongoing objection from Ms. Rush and

14 then I'll hear response, if any.

15         All right.  Ms. Rush, good morning.

16         MS. RUSH:  Your Honor, I have a book that I put

17 together for you.  Do you want me to hand that to you?

18         THE COURT:  Yes, please.

19         MS. RUSH:  Okay.  Good morning.

20         I apologize that this was not in, previously, but we

21 got replies up until even yesterday, one came from Wells Fargo.

22 So, this was kind of, you know, rushed to put this together.

23 But, we have prepared a response and it is the first document

24 in that book which kind of goes over the points.  Mr. Beach is

25 picking out, you know, one or two lines of what I said, but

1 I'll try to give you the synopsis or overview of what I feel

2 the situation is.  What he said is only a small part of it.

3       The overall theme of the responses that we got was

4 predominantly, you know, we don't have any rights, we don't

5 even deserve to bring this equitable subordination motion.  You

6 know, the banks feel that as borrowers we are just

7 inconsequential damages that are just irrelevant and we

8 shouldn't even be here.  The last time I checked we have as

9 much right to come into this court and try to assert our issues

10 as they do.  Unfortunately, they sort of take priority.  You

11 know, they claim there's huge claims and, you know, so if they

12 settle for 500 million instead of 1.2 billion then it's a good

13 day for all and everybody agrees because it's banks on one side

14 and banks on the other.

15       They claim that the parties that were asking for the

16 subordination are not insiders of the debtor.  These parties

17 had warehouse funding lines, they funded, they securitized,

18 they sit on the committees, some of them are large shareholders

19 in the debtors.  Wells Fargo is master servicer and securities

20 administrator on a majority of their trust.  Deutsche Bank

21 indenture trustee, document custodian on the majority of their

22 trust.  So, I mean, you know, the insider definition in

23 bankruptcy code I think does bring these parties in under that

24 and heightened scrutiny should be applied.  And that's my

25 opinion, and I'm not a lawyer, so you'll have to decide whether

1  that applies in this case or not.

2         In the motions that were brought there was -- they

3  went beyond objecting to the settlement and went into the

4  merits of the litigation, the merits of my claims and they kind

5  of gloss over what the judge did uphold in <u>Greenbelt</u> on a

6  motion to dismiss.  And that includes three counts of TILA, two

7  counts of RESPA, fraud, unjust enrichment and Maryland Consumer

8  Protection Act.  They seem to think that's no big deal.  Most

9  cases go to trial with one or two causes of action, I have

10  several.

11         The judge also in his opinion -- they picked out

12  certain parts of it and forgot other parts -- he did not say

13  that I don't have claims against these parties.  They try to

14  assert that it's already been decided and litigated and he said

15  I couldn't add them.  What he said, which I articulate in my

16  pleading, is his specific commentary is that he felt that

17  because it's state law fraud claims and recission claims which

18  would be the only claims I could bring against them would be

19  better suited to be decided by a state court and not in his

20  court.

21         Also, that goes to my point.  Because they hid who

22  they were from me for a long period of time I was not able to

23  bring them in.  This suit was filed in the one year which is

24  the affirmative statute of limitations time frame against

25  American Home.  But, of course, I didn't find out until much

1  later who all of these parties even were, and then it took even

2  longer to figure it all out.  So, you know, part of the

3  prejudice that I suffered in having them in my suit was because

4  of them hiding themselves, which again I feel they used the

5  debtor entity, American Home Mortgage, to do.

6          They also talk about my character and try to

7  discredit me as if I was someone who claimed bankruptcy, and

8  I'm this and I'm that, and we didn't get a committee in the

9  accredited case.  So, I don't know what the hell that has to do

10 with anything, but that's what they decided to do.

11          I have not talked about my personal situation leading

12 up to this, but I did give you a little background in here.  I

13 took care of my father for nine years after he had a stroke.

14 He died a very bad death in 2006.  At that point in time I

15 needed to make a good financial decision, and I was going to

16 sell my house.  I got a one percent flyer in the mail that said

17 this loan is a great loan, it's one percent interest rate.  I

18 bit.  I made a huge mistake.  It was financial suicide.

19          At first, I was just going to walk out of my house,

20 then I did what a lot of people do, I went to bankruptcy to try

21 to figure out what I was going to do.  Then I was advised to

22 drop out of bankruptcy.  They said it was dismissed with

23 prejudice, it was not.  It was dismissed without prejudice and

24 it was on the advice of counsel.  I filed the affirmation

25 action, and I decided to fight back.  And I'm glad that I did

1 today.  Three years later I'm still fighting, nothing's

2 resolved almost four years now.  But, the way that they paint

3 the picture and what the picture actually is, none of these

4 people in this courtroom know.  They don't know anything about

5 me, personally.  They don't know how I came to be in this loan,

6 yet they like to sling mud and I don't appreciate it, at all.

7          The parties that are, again, that we're seeking

8 subordination of, it is no secret anymore what these parties

9 have done.  This Carl Levin investigation in the senate just

10 released 900 pages of documents on Goldman Sachs, over 600

11 pages of documents on WaMu.  And it was very clear what his

12 findings were, was that these were the parties that funded and

13 financed the folly that has taken down our financial systems.

14 He flat out completely, straightforwardly said that -- what

15 these people were doing and that they knew what they were

16 doing.

17          As a matter of fact there's a Goldman Sachs e-mail

18 from the very time frame, March of '06, when I was taking my

19 loan where they're saying game over, we know this is imploding.

20 Yet, they're still putting people in these loans that they know

21 are going to go under.  So, it's no secret anymore.  Three

22 years ago it was a big secret.  But, it's no secret anymore

23 what these people did to people.  And these loans, it's no

24 secret that the majority of these loans are going under because

25 they were ill-conceived to begin with.  No one should have ever

1  been sold these loans.  They are not good loans, they were

2  misrepresented.  My judge makes that very clear.  The language

3  of the note is not in keeping with TILA, according to my judge.

4  Many courts have already decided that fact.

5        So, they're talking about the merits which I don't

6  think that that has anything to do with this because again,

7  that's not decided, it is still in litigation.  But, I think

8  that there is -- I have strong evidence of what's already been

9  upheld that there is merits to the claims.

10        The other issue is, these parties, like Deutsche

11  Bank, said they were not a warehouse lender, that the member of

12  the committee which is Deutsche Bank National Trust Company was

13  the entity that acted as the indenture trustee.  A lot of the

14  other business that they conducted was under subsidiary

15  companies; Deutsche Bank AG, Deutsche Bank Securities, Deutsche

16  Bank Structured Products.  Basically, all Deutsche Bank, but

17  they want to, you know, segment it out and say well we weren't

18  a warehouse lender.  We didn't make margin calls.

19        I have a document which is in your book that

20  basically is a forward swap contract, an ISDA contract and

21  letters from them stating specifically that they were making

22  margin calls on the debtor.  I have a memo that Deutsche Bank

23  sent out to all its servicers August 30th, 2007 where it says

24  that if you bring a foreclosure action it must be in the name

25  of the trustee as the representative for, and then the trust

1  name.   None of my foreclosure actions were brought like that.

2  They were brought in MERS and American Home Servicing, and

3  American Home Mortgage Corp., never in the name of the actual

4  true party in interest.

5          Wells Fargo says as master servicer they have no

6  obligation, whatsoever, to borrowers, it's only to the

7  investors.  I have the trust documents in here which basically

8  lay out the specifics of what their requirements are.  They

9  said they have no loss mitigation loan modification, they don't

10 get involved in that, at all.  There was testimony in this

11 courtroom on October 31st where Dickman on the stand, Mr.

12 Dickman testified that they're the ones that have to give the

13 approval for loan modification and foreclosure.  Yet Wells

14 Fargo, in their pleading, is claiming that they have nothing to

15 do with any of that.

16         So, it's amazing to me that these parties continue to

17 just assert whatever they want to assert, whether it's even

18 true or not, to get what they want.  The money itself -- and

19 again I didn't have a good understanding of this before, I do

20 now -- I understand that the debtor-in-possession was just a

21 financing arrangement, that the debtors are American Home, the

22 debtors-in-possession.  That Ross simply provided funding when

23 it wasn't just him, it was other lenders which are never

24 disclosed.  I don't know who the lenders are that gave them the

25 money so that they could stay in control of the bankruptcy and

1 do this as it has been done.

2        The other thing that I've learned, which I didn't

3 understand before, which is Bank of America's claim for 1.2

4 billion in pre -- was for a group of prepetition secured

5 lenders, again, which are not disclosed or described who they

6 are.  So they were the beneficiaries of the 500 million of

7 which this ten million has been carved out to go for the cure

8 claims.  The cure claims, and the breach claims and the, you

9 know, missing money in accounts or whatever else, no one wants

10 to know where any of the missing money went, they just want to

11 make a claim, and that's the Wilbur Ross claim.  He's claiming

12 there was misappropriation of funds that went into unknown

13 investor accounts.  But, nobody wants to know where that money

14 went, just come to the bankruptcy court and tell American Home

15 to give it to us.

16        The cure claims and breach claims are based partially

17 on -- especially the breach claims -- things like what happened

18 with my loan.  You know, the document exception reports that

19 Deutsche Bank is saying are no big deal, well, they are a big

20 deal.  They're getting foreclosures tossed out all over the

21 country for not having the proper paperwork.  No one has ever

22 presented the proper paperwork in any of my foreclosure

23 actions.  Two foreclosure attorneys have dismissed my

24 foreclosure action and walked away from it.  Bierman Geesing

25 just dismissed, again.

1          So, you know, honestly this is one book, I could give

2   you five books of information.  We don't have time to go

3   through all this today, so I'm trying to give you the

4   highlights of what my position is.  My position is that these

5   are the parties who worked together to not only make these

6   loans in the first place, but have also worked together, as a

7   group, during this bankruptcy to make sure that I didn't find

8   out who owned my loan, to try to do foreclosures several times

9   to take my home while they knew I had this action pending since

10  April of '06, and to, you know, conceal what their roles are in

11  these various parts of the bankruptcy, whether it's -- you

12  know, Deutsche Bank has claimed that they did not participate

13  in any discussions that had to do with loans that they had an

14  interest in.  Well, they have an interest in almost all the

15  loans in this bankruptcy and frankly they didn't do an

16  affidavit.

17         They find -- you know, I can't ask the person who's

18  on the committee, unless they're here today, to swear that they

19  did not participate in any of the discussions that had to do

20  with borrowers or borrower claims, or whether to put Mr.

21  Dickman on the stand on October 31st which, again, it's still a

22  sore spot with me.

23         After that hearing I received a case from Peg Brickly

24  which was a Philadelphia bankruptcy case, Mayer v. Countrywide,

25  and that judge, Judge Raslavich made it very clear that they

1  had an obligation to answer under TILA 1641(f)(2) and they

2  didn't, and he was very angry.  And he basically spelled it out

3  in that case, in that pleading, and I feel like that day in

4  this court they lied to this Court.  And I feel like a bad

5  decision was made that day based on that, and not one person

6  has ever taken any responsibility for that.  And they're still

7  using that decision, and they did in their pleadings, that you

8  had already decided that they had no obligation to give me that

9  information.

10       After I got that case I sent it to the trustee, he

11  talked to American Home, and John Palace wrote a letter to

12  Laura Beal telling her where her loan is and explaining that

13  they do have to comply with that statute.  I never got a

14  letter, by the way.  I found all of my information, on my own,

15  hours and hours and months and months of time that I've put

16  into this.  And, you know, unfortunately for them I'm a single

17  mother, they backed me into the corner and you don't want to do

18  that, because I have come out swinging.  And I'm going to

19  continue until this is over.  If they don't want to end it,

20  that's fine, I'll just keep going.

21       But, I think I have overwhelming evidence of what

22  these people have done.  I think in the public domain there's

23  overwhelming evidence of what these people have done.  And,

24  frankly, if fraud is upheld in my case I don't think that I can

25  be thrown into the unsecured creditor pile anyway because fraud

1  is not supposed to be protected in a bankruptcy.  So, that's

2  another issue that I, you know, intend to argue.

3         So, unless you have any questions for me that's, I

4  think, a summary of -- you know, I sent letters directly, I

5  have the certified return receipt to the trust parties, Goldman

6  Sachs, Deutsche Bank, Wells, Fargo, the new servicing American

7  Home Mortgage Servicing Unit.  I have asked over and over again

8  for these people to come forward to, you know, deal with my

9  issues, anything and I get nothing, no response, ever, from any

10  of them.

11         So, I have no choice but to come into this venue,

12  unfortunately, and try to protect what, you know, little I may

13  be able to get out of this.

14         The other thing that's really bothering me is, I

15  talked to Mr. Beach and I asked him if there was any insurances

16  that would cover my claims and he said that he didn't know of

17  any insurances.  Then I sent him the document that was filed in

18  this court where they had all their insurances and their bonds

19  which they asked the debtor estate to pay for.  And then he

20  said, well, they're not going to cover because you're asserting

21  fraud.  And I said, okay, well, then if it's fraud it can't be

22  protected by the bankruptcy court either.  So, I mean, I don't

23  know what the status of that is.

24         I don't know if American Home reported to their

25  insurer that I had a lawsuit that I filed at the time.  I am

1  understanding they are claims made policies, which means the

2  claim is in the year with which you claim it.  I don't think

3  there was a lot of lawsuits against them in 2006.  So, you

4  know, again, I have no choice but to try to, you know,

5  hopefully exercise my rights of asking for equitable

6  subordination.  And, you know, irregardless of what everyone is

7  testifying in this court I am not convinced that this debtor

8  will not go administratively insolvent.

9       I'm glad that they're all testifying and I hope that

10 that's not what happens, for everybody's sake, not just mine,

11 that there is some distribution to creditors, but I'm not

12 convinced that there will be.  And I think that the parties

13 that are, you know, are being settled out, again, it's the

14 majority of parties that are being settled out are the big bank

15 claims.  And I do feel, and again, it's never been looked into,

16 discussed, but in the Sacamoto (phonetic) transcripts in this

17 case, he says that he believed that the lenders were simply

18 making margin calls to pad their position knowing that American

19 Home was going into bankruptcy.

20      And we have to remember these are the parties that

21 drove them into bankruptcy.  They simultaneously made hundreds

22 of millions of dollars worth of margin calls while they pulled

23 their credit lines.  So, basically it all imploded very

24 quickly.  The disclosure was $20 billion, left the estate in

25 the 90 days leading up to the bankruptcy, 16 billion from corp.

1 No one has ever talked about what that money was for.  I'm

2 assuming the majority of that was seizing assets that were

3 leveraged and margin calls.  But, again, no disclosure was made

4 of who got any of that money.

5          So, I do think that these banks have gotten an

6 enormous amount of money already.  I think the 500 million is

7 and, you know, a big chunk more and I just think, you know,

8 when's enough?  When is enough enough?  And when does the

9 little guy get a little tiny recovery out of this pie?

10          So, do you have any questions for me?

11          THE COURT:  No I don't.  Thank you.

12          MS. RUSH:  Thank you.

13          THE COURT:  Thank you, Ms. Rush.  Does any other

14 objector wish to be heard?

15                    (No audible response)

16          THE COURT:  Bank of America.  Ms. Jackson, you can

17 come up.

18          MS. JACKSON:  Good morning, Your Honor.

19          Ms Rush has certainly enumerated the issues related

20 to all the banks.  And in the interest of time what I would

21 like to do is just add a little bit of my history.

22          THE COURT:  Sure.

23          MS. JACKSON:  I feel that I am a borrower caught

24 between a rock and a hard place.  Was told about the loan, the

25 opportunity for the pay option arm from a friend, in quotes,

1  who actually wrote a book about how to process and do these

2  loans.  Every three years you would get a refinance.  And that

3  it was a great opportunity to reduce your monthly payments and

4  be able to do other things with it.

5          We entered into this loan in good faith.  He was what

6  I would call a trusted advisor.  And all of us, regardless of

7  our education, have trusted advisors that we seek out.  My

8  husband, as a veterinarian, you know, people come to him for

9  advice on their pets that they wouldn't try to do like a spay

10  or whatever on their own dog.  And we relied on this person and

11  all the parties to do what was reasonable and responsible for

12  us as a borrower.

13          And I'll never forget the first bill we got --

14  statement we got, there was no reflection of the deferred

15  principle -- the deferred interest that then became principle.

16  But, the second one just absolutely -- I was glad I was sitting

17  down because I think it was in the neighborhood of like $2500

18  that had been added to our principle as deferred interest.  The

19  horrible thing about it is that we could have qualified for a

20  regular 30-year conventional, and we were relying, as I said,

21  on the trusted advisors to be able to do the right thing.

22          Subsequently, I found out -- I happened to go to a

23  financial seminar, discovered what YSP was, yield spread

24  premium, found out that they, through American Brokers Conduit

25  and all the other parties, American Home paid Carteret almost

1  $27,000.  And when I asked -- Tom his name was -- what that was

2  because it was appearing as a just kind of an irrelevant number

3  on the HUD he said, oh, don't worry about that.  That's just

4  what the lender pays me.  Found out that there was a very high

5  interest rate.  There was a prepayment penalty.

6        So, because our loan is based on a one-year -- an

7  average of one year interest rates, it took us -- when interest

8  rates started to drop it would take us 11 months moving forward

9  before we would see a reflection of that.  So, it was killing

10 us, and it's a horrible loan.  We have tried to work through a

11 process to fix it.  We hired an attorney a year and a half ago

12 to talk to, at the time it was Wells Fargo, and they said we

13 couldn't afford it.

14       So, we then were using another attorney in October

15 and we tried again and we were told, oh, we could well afford

16 this loan.  So, you know, it's like make up your mind, which

17 here again we're the borrower caught between a rock and a hard

18 place.

19       And last week, as you know, Mr. Beach tried to

20 negotiate and we've never heard anything.  I mean, we never

21 heard anything formal discussion.  But, we made honest efforts

22 and spent a huge amount of money to try to get someone's

23 attention to be able to fix this very -- our lawsuit is stating

24 that it is a predatory fraudulent loan.  And, in fact, one of

25 the pieces of paper related to our loan is a truth and lending

1  on which the amount of the recordation fees, the interest rate,

2  the finance charge and the APR were all changed after closing,

3  and our names were signed, and they are not our names.  So, we

4  feel we've got a very, very, very valid case currently in New

5  York, Southern District in Manhattan.

6          And what we're trying to do is to say, as I started,

7  we feel like we're the borrower caught between a rock and a

8  hard place.  We can't seem to get reconciliation anywhere.  And

9  in fact in the early discussions Mr. Beach indicated that the

10  parties thought that we were going to want to do a deed in lieu

11  of foreclosure.  And I'm like I want my house, you know.  We

12  had bought this home intending to live in it for many, many

13  years.  And at this point it's declined in value, we can't

14  refinance it.  We've spent upwards of $50,000 trying to get

15  someone's attention to try to fix the loan so we could stay in

16  the house, because by next March I don't have any idea what our

17  payment is going to be.

18          So, the reason that we're here is because we did not

19  get a relief from stay, so the only way that we can get claims

20  is through this court.  And we will continue our lawsuit

21  against American Home and the entities that are in the

22  bankruptcy are named as nominal defendants in our lawsuit, but

23  Deutsche Bank, Wells Fargo, et cetera are named as defendants.

24  And we will continue to pursue in both arenas, as appropriate,

25  because we have not been able to -- I mean, $50,000 in legal

1  fees, that's a lot of money and nothing is happening.

2            THE COURT:  Okay.  Thank you, ma'am.

3            MS. JACKSON:  Thank you.

4            THE COURT:  Ms. Alfonso.

5            MS. ALFONSO:  Good morning, Your Honor.  For the

6  record Anna Alfonso from Kay Schuler for Bank of America as

7  administrative agent for the prepetition lenders.

8            Your Honor, we did not object to the Deutsche Bank

9  settlement or the Wells Fargo settlement.  We support those.  I

10 stand because we objected to one very limited aspect of the

11 proposed settlement with the Wilbur Ross entity, HM Servicing.

12 And that was the attempt to preserve for the Ross entity the

13 ability to make claims against the cure escrow that was

14 established pursuant to the sale order back in 2007.

15           My argument is simple and it's in our papers.

16 Essentially, there was a bar date in 2007.  HM Servicing had no

17 right and has never asserted a claim against the cure escrow.

18 We felt we had to speak now because even though the language is

19 styled as simply a reservation of rights, the implication of

20 that reservation of rights is that somehow at some point in the

21 future HM Servicing could assert a claim against those funds.

22 And as of right now the debtor is in breach of its obligations

23 under the cure escrow agreement to send funds that are not

24 otherwise on reserve for disputed claimants back to the agent

25 for distribution to the lenders.

1          So, I'm confident that the debtor wants to and agrees

2 that it is time to comply with those obligations.  We've been

3 talking.  What we don't want is to have a situation where those

4 funds are tied up forever so that in the event the Wilbur Ross

5 entity wants to make a claim, it can look to those proceeds.

6 It has no right to do so, so we would respectfully request that

7 the reservation of rights language be stricken from the

8 settlement.

9          THE COURT:  So, you want me to require them to

10 release that?

11          MS. ALFONSO:  Require Wilbur Ross to release that?

12          THE COURT:  Yes.

13          MS. ALFONSO:  They have nothing to release.  I think

14 that it's more appropriate for the settlement agreement to be

15 silent on that issue.

16          THE COURT:  Well, it's a general release, or it's a

17 very broad release.  So, without the reservation they would, in

18 effect, be releasing those claims.

19          MS. ALFONSO:  Your Honor, I take your point, and I

20 know that I can't rewrite the agreement that was stricken.  I

21 feel that I had to raise the point with Your Honor, because at

22 some point in the future if we can't have an agreement with the

23 debtor to have the debtor follow the contractual obligations

24 that it has under the cure escrow agreement and comply with the

25 sale order that we're going to be back here, Your Honor.  And I

1  didn't want to let this hearing come and go without making the

2  Court aware that the reservation of rights being requested by

3  the Wilbur Ross entity is simply a red herring.

4            THE COURT:  All right, give me a minute.

5                      (Pause)

6            THE COURT:  So, your argument is that HSMI has never

7  asserted a claim against secure escrow --

8            MS. ALFONSO:  Right.

9            THE COURT:  -- and has missed the bar date.  So, that

10 any reservation of rights would be inappropriate because of the

11 implication, first of all that they have a claim, and second,

12 it's just one more impediment to the debtors fulfilling their

13 obligations to pay out on the cure escrow.  But, if -- of

14 course, if they have no claim there's nothing to reserve.  But,

15 nonetheless, it would complicate another obligation of the

16 debtor which is involving processing the cure escrow.  Like

17 throwing something into the mix that has no merit, but will

18 slow down process.  And as a result I shouldn't approve that

19 because it's unfair or prejudicial to claimants against the

20 cure escrow, and is a pointless exercise since there is no

21 claim to begin with.

22            MS. ALFONSO:  Yes, Your Honor.  I wish I had said it

23 as well as you just did.

24            THE COURT:  I was just trying to get my head around

25 it.  All right.  Thank you.

1          MS. ALFONSO:  Thank you, Your Honor.

2          THE COURT:  And that's an extant objection.

3          MS. ALFONSO:  Yes.

4          THE COURT:  It's still live, right?  Yes?  You're

5   nodding.  Okay.

6          Before I hear a response I want -- we're going to

7   take a recess.  I have not had an opportunity to read Ms.

8   Rush's written submission that is in the notebook in front of

9   me, her reply -- maybe I'm -- yes, dated yesterday.  So, no, I

10  haven't had an opportunity to review this.  So, I want to look

11  at that so I have some context before I hear -- excuse me, I

12  have both allergies and a cold, so I'm not sounding so good.

13  I want an opportunity to read this before I hear responses

14  from, I assume, the debtor, the committee and perhaps the other

15  settlement parties.  So, we're going to take -- it's 34 pages

16  and I want to read it carefully, so we'll take a 15, 20 minute

17  recess while I look at that document.

18                          (Recess)

19          COURT CLERK:  All rise.

20          THE COURT:  Please be seated.  All right, I'll hear a

21  reply.

22          MR. BEACH:  For the record, Your Honor, Sean Beach

23  from Young Conaway on behalf of the debtors.

24          Your Honor, first as to the Bank of America limited

25  objection.  Your Honor, I can understand why Bank of America is

1 concerned about having the reservation of rights in the

2 settlement agreement, but that was a heavily negotiated

3 settlement agreement with American Home Mortgage Servicing.

4 That was a provision that was negotiated into the agreement and

5 it is truly and simply a reservation of rights.  They may or

6 may not file a claim.  If a claim is filed, all rights are

7 reserved for Bank of America and for any other party.

8         And to Ms. Alfonso's other point of the debtor's

9 obligations in terms of releasing money from the cure escrow,

10 those obligations are set forth in other agreements, and this

11 reservation of rights doesn't affect those obligations.  The

12 debtor still have those obligations and recognize that we still

13 have those obligations and we'll comply with those obligations,

14 as required, or we'll seek relief from the Court to the extent

15 we need --

16         THE COURT:  Well, is it the debtor's position that

17 HSMI has any claim against secure escrow, or that they have no

18 claim against the secure escrow?

19         MR. BEACH:  Is it the debtor's position as to what

20 HSMI is claiming?

21         THE COURT:  What's the debtor's position on whether

22 HSMI has a claim against secure escrow?

23         MR. BEACH:  Well, Your Honor, certainly the bar date

24 has passed.  So whether or not they can assert a claim they

25 would have to get past that hurdle, I would think.  In terms of

1 whether they have a claim that is assertable against the cure

2 escrow, it probably only could be assertable standing in the

3 shoes of certain other parties, and I don't know if --

4         THE COURT:  Well, and if they do assert a claim you

5 have to reserve against it.

6         MR. BEACH:  If they do assert a claim, yes.  But,

7 again, Your Honor, that's just a reservation of rights and it

8 doesn't mean that they will or won't file a claim.  But, that

9 is part and parcel to the settlement agreement that we have

10 with American Home Mortgage Servicing, and we don't believe it

11 affects any parties' rights, not the debtor's rights in terms

12 of what our --

13         THE COURT:  I mean, anyone could assert a --

14         MR. BEACH:  That's right.

15         THE COURT:  -- a file with it.  Anyone can assert a

16 late filed claim against secure escrow and litigate whether

17 there's excusable neglect in place.  I'm just sitting here

18 wondering how HMSI could justify filing a claim late and get it

19 past the Court, but nothing really leaps to mind given their

20 intimate involvement in this case.

21         MR. BEACH:  And, frankly, I think that was probably

22 Bank of America's point that they wanted to make to Your Honor

23 today.

24         THE COURT:  Right.  Let's cut it off.  Let's get

25 done.  Let's stop reserving rights and, you know, settle for

1  God sakes and move on to something else and give me my money.

2  Sounds likes Mrs. Rush's objection, not without merit.  You

3  know, I want to get paid.

4         MR. BEACH:  Understandable.

5         THE COURT:  But, you're going to sit here and tell me

6  it's part of a bigger agreement.  It was heavily negotiated and

7  it was the price of a settlement and we're looking at it

8  globally.  It's the best deal for the debtor, notwithstanding

9  the fact that it may cause some pain in the future.

10        MR. BEACH:  Exactly, Your Honor.

11        THE COURT:  All right, I got it.

12        MR. BEACH:  Your Honor, as to the objections to all

13 three settlements from Ms. Rush and the Jacksons the debtors

14 are sympathetic towards the extent of time that these cases

15 have taken to administer, and the fact that we haven't gotten

16 to all claims yet.  But, Your Honor is well-aware --

17        THE COURT:  Well, I think Ms. Rush might kind of roll

18 her eyes at your expression of sympathy.  I'm not saying I do,

19 but, you know, it has been a long time.  And I think her

20 argument is look, all the big boys are taking care of each

21 other.  It's a group of -- what did Hugh Ray say at one time?

22 "It's a bunch of rats in a bag of flour saying they ain't

23 dusty."  They're all kind of, all right I'll take care of you,

24 you take care of me and we'll deal with these big claims and

25 get that all done.  And meanwhile people who have -- may or may

1  not have claims at a lower amount but as a percentage of their

2  livelihood it may have greater effect.  But, in any event,

3  they're continued to be pushed back and nobody taking care of

4  eventually allegedly.  And, you know, all of that may make

5  perfect sense.

6       Clearly, it's -- clearly the debtor is more heavily

7  impacted by claims in the hundreds of millions of dollars or

8  even billions than it is by claims of hundreds of thousands or

9  even a million dollars or more.  And, you know, you work top to

10 bottom.  You can -- anybody that's done this business for

11 awhile knows that you continue to narrow issues, you continue

12 to narrow issues, and that's how you run an estate.

13      MR. BEACH:  Exactly, Your Honor.  And the only thing

14 I would add is a point that Your Honor made at the Deutsche

15 Bank hearing which is that until the most recently filed

16 complaints that seem to suggest an administrative claim, Ms.

17 Rush and the Jacksons had asserted unsecured and secured

18 claims.  The unsecured claims cannot be paid until we get to an

19 effective date, beyond an effective date and in a position to

20 make distributions.

21      THE COURT:  Right.  So, even if the claim -- well,

22 but if the claim had settled you could arguably, as part of the

23 settlement, pay something.  If you haven't allowed unsecured

24 claim, you can't.

25      MR. BEACH:  Right.  And, Your Honor --

1          THE COURT:  And there's no right to any payment on

2    any unsecured claim, allowed or otherwise, until at the

3    earliest post-effective date, correct?

4          MR. BEACH:  That's right, Your Honor.  And as Your

5    Honor is alluding to, the debtor's focus has certainly been on

6    getting this plan to go effective.  And the settlement

7    agreement with American Home Mortgage Servicing, in particular,

8    gets the estate $21 million closer to that goal because it

9    takes away an otherwise required reserve for the 17 plus

10   million dollar administrative claim and it also provides some

11   additional funds into the estate once all the payments are made

12   after the settlement's approved.  So, it does bring the estate

13   much closer to that goal.

14         The Deutsche Bank and Wells Fargo settlements while

15   they don't have as big of an economic impact they are part of

16   requirements under both agreements with those parties and

17   previous orders of the Courts for the debtors to resolve those.

18   And as Your Honor has seen in the declaration of Mr. Nystrom,

19   the settlements meet the 9019 standards for approval.  The

20   debtors believe that the Rush and Jackson objections to the

21   settlements really don't go to the merits of having met the

22   9019 standards.  And, certainly, the declaration of Mr. Nystrom

23   certainly provides that it's the debtor's business judgment

24   that all three settlements are important for the estate that

25   having --

1          THE COURT:  Well, I understand his comment, but is

2     the response, well, of course, Judge, again, they're all taking

3     care of each other.  And I guess it goes to a question of the

4     verity allegations or facts that would imply, in effect, an

5     insider type of transaction where, yes, you know, you make the

6     case for the 9019 settlement standards being met because

7     there's a conspiracy among the parties to hide fraud or what

8     have you and, you know, who has independently looked at this.

9     And I can't, sitting up here, because all I can look at is the

10    evidence that's presented.  And, again, we're spinning

11    hypotheticals.  There's no evidence of that one way or the

12    other.  And who's in charge of the debtor at this point?

13         MR. BEACH:  Who's in charge of the debtor?

14         THE COURT:  Right.

15         MR. BEACH:  Well, Mr. Nystrom is the Chief

16    Restructuring Officer and, you know, the declarant.  And as

17    Your Honor indicated --

18         THE COURT:  And there's no indication that he's -- I

19    mean, there's no allegation that he's an insider.

20         MR. BEACH:  Absolutely not, Your Honor.  And in

21    addition to that, Your Honor, I might add that if you ask Mr.

22    Winikka or the other counter parties there have been some very

23    heated negotiations in connection with these settlements.  And

24    the negotiations with those parties have been no less difficult

25    than negotiations we've had with the borrowers, as well, in

1  connection with trying to settle with those claims.

2          THE COURT:  Okay.

3          MR. BEACH:  Your Honor, I'll open up the podium in

4  case Your Honor has any additional questions.  The two main

5  arguments the debtors had were, we meet the 9019 standards and

6  there's no evidence to rebut that we haven't.  And in addition

7  to that, that we don't believe the creditors, the borrowers are

8  prejudiced by the approval of --

9          THE COURT:  I think we got into this last time a

10  little bit.  But, there are two types of equitable

11  subordination claims, if you will.  There are claims on behalf

12  of creditors, as a whole.  And Judge Shannon has ruled those

13  types of claims cannot be asserted by individuals.  It doesn't

14  give, you know, rise to that, and I think arguably those are

15  being released.  But, there's also Ms. Rush's individual

16  equitable subordination claim.  So, if she has a private

17  equitable subordination claim on behalf of herself you can't

18  release that claim on her behalf.  So, for example, she would

19  have to show though, however, that these entities took action

20  specific to her that would give rise to a claim to justify

21  equitably subordinating their claim to her claim.  That's not

22  being released.

23          MR. BEACH:  That is not being released under these

24  settlement agreements.  Now, as to whether some of that might

25  be moot, I think that's another question.  But, you're right,

1  Your Honor, those are not being released.

2         THE COURT:  Well, she has again extant claims being

3  asserted in another court, as well, against non-debtor

4  defendants, as well, as in this court on behalf -- as filed

5  proofs of claim.  And I think the debtor is still a defendant

6  in the suit in <u>Greenbelt</u>.

7         MR. BEACH:  Yes, Your Honor.

8         THE COURT:  So that's being asserted out there, as

9  well.

10         MR. BEACH:  The only defendants.

11         THE COURT:  So, those claims survived.  They are what

12  they are.  To the extent, however, in those claims she would be

13  asserting, either derivatively or more generally, claims on

14  behalf of the debtor's estate or claims on behalf of all

15  creditors against these entities they would be released.

16         MR. BEACH:  Yes, Your Honor.

17         THE COURT:  All right.  Let me hear from anyone else.

18  Mr. Indelicato.

19         MR. INDELICATO:  Good morning, Your Honor, Mark

20  Indelicato on behalf of the Committee.  Your Honor, I'm going

21  to be very brief because a lot of the issues we were going to

22  address have already been addressed either by the Court or by

23  Mr. Beach.  We agree with the Nystrom affidavit.  We believe

24  the 9019 standards were met.  Since the committee has been

25  actively involved in this case I just want to sort of address a

1  little -- a few of the questions the Court raised.  Who is

2  watching the debtor?  Who is in charge of the debtor?

3         We have developed a very good working relationship

4  with Mr. Nystrom and Mr. Beach.  Most of the significant issues

5  that get done in this case get done with the cooperation input

6  and negotiation with the committee.

7         For example, Your Honor, the settlement with Wilbur

8  Ross and AHM Servicing was done over a two-year period.  I

9  would say about four or five months ago the debtor came to us

10 with what they believed was a final deal.  It left certain

11 unresolved issues that were going to be resolved later.  Given

12 the structure of the settlement, the releases and all of the

13 various issues that were going on the committee insisted that

14 all issues be resolved before we would consent to the

15 settlement.  And therefore the parties went back to the drawing

16 board and we have the settlement that we have today.

17        In other words, we have a settlement that finally

18 resolves all of the issues with AHM so that we could hopefully

19 work our way to the effective date instead of having a

20 settlement on some of the issues and having to litigate some of

21 the other issues.  So, it was the committee's input and

22 insistence that this all get resolved that emanates into the

23 settlement that we have today.

24        Your Honor, not only has AHM had their financial

25 advisors, and the debtors had Traxi, but we have also had BDO

1 working with them through all of the financial machinations of

2 the settlement.

3          THE COURT:  Now, Deutsche Bank is a member of your

4 committee.

5          MR. INDELICATO:  They are, Your Honor.

6          THE COURT:  So, I assume they had no involvement

7 whatsoever in connection with any negotiations between the

8 debtor, the committee and Deutsche Bank?

9          MR. INDELICATO:  That's correct, Your Honor.  They

10 were not involved.  In fact, the committee only was

11 tangentially involved in order to keep the cost down of the

12 administration of this estate.  With respect to the cure

13 claims, Your Honor, the debtor would negotiate them and then

14 pass them by the committee.  We would pass them by our

15 financial advisors to make sure they made economic sense and

16 then we would pass them by the committee.

17          THE COURT:  All right.

18          MR. INDELICATO:  So, we have been involved, Your

19 Honor, with the debtor, and the goal over the last year has

20 been very simple, get to an effective date.  We need to get to

21 an effective date to reduce the administrative burden on this

22 estate and hopefully preserve whatever money there is for

23 unsecured creditors.  Our goal is still to make a distribution

24 to unsecured creditors.  Obviously, as we've indicated in the

25 affidavit and in our pleadings, this settlement is crucial to

1  that.

2        If you work the numbers there are, you know, tens of

3  millions of dollars swing in how the estate can go effective

4  once this settlement is approved.  And we really believe, based

5  on going through the numbers with BDO in the analysis of this

6  settlement, the HM settlement, is in the best interest of the

7  estate.  We also, having reviewed the settlements with Wells

8  and with BD believe those are in the best interest of the

9  estate, as well.

10        Your Honor, our pleadings went on to address somewhat

11  what we believe to be the merits of Ms. Rush's claim.  But,

12  that may be appropriate for another day when and if this Court

13  has the hearing on her equitable subordination motions.  And

14  we're happy to rest on our pleadings, unless the Court has any

15  specific questions.

16        THE COURT:  I do not.  Thank you.

17        MR. INDELICATO:  Thank you, Your Honor.

18        THE COURT:  Anyone else?

19        MR. WINIKKA:  Good morning, Your Honor, Dan Winikka,

20  Jones Day on behalf of American Home Mortgage Servicing, Inc.,

21  the purchasers of the servicing business.

22        Just very briefly, Your Honor.  I think counsel for

23  B of A have acknowledged can't strike just a part of the

24  settlement.  The carve out for these account shortfall claims

25  and the reservations of rights on those claims potentially

1 against the cure escrow was heavily negotiated and is part of

2 this settlement.

3         THE COURT:  Well, can you articulate for me what the

4 basis of that claim would be and why it could be allowed,

5 notwithstanding the fact that it would be late filed?

6         MR. WINIKKA:  Sure, Your Honor.  These are claims for

7 shortfalls that were discovered in the custodial accounts.

8 These are claims that were asserted as part of our

9 administrative claim motion back in 2008, I would say shortly

10 after they were discovered.

11         It would certainly be our position that all parties

12 were on notice that we had these potential claims for

13 shortfalls in these accounts, to the extent they were either

14 claims against the debtors, as an administrative claim for

15 breach of the asset purchase agreement, or alternatively if

16 they're limited to a cure escrow and they're not barred from

17 going against the cure escrow claims against cure escrow.

18 So, from our position those have been pending since 2008 and

19 they were asserted shortly after they were discovered.

20         THE COURT:  Well, I understand the administrative

21 side, but perhaps I'm troubled, and maybe it's only because

22 it's a misuse of a term, but how is a party that's not a party

23 to the actual contract or lease assumed and assigned entitled

24 to cure?

25         MR. WINIKKA:  Well, Your Honor, I think the issue is

1 | whether or not, as servicer, we would have standing on behalf
2 | of the trust for which we service those mortgages to bring
3 | those claims.  And that may be an issue, you know, it may be
4 | that the trust would have to come in and actually assert those
5 | claims as Your Honor is suggesting.  We felt as a servicer it
6 | was our duty to raise those claims.  We also thought, in our
7 | view, it was a breach of the APA.  Now, you know, as part of
8 | the settlement that's being released, that aspect of it.  But,
9 | at this point from my client's perspective those claims have
10 | been -- or all parties have been on notice that those claims
11 | exist.

12 | Whether we have standing to pursue them I suppose is
13 | an issue for another day.  Or whether the trust could at this
14 | point come in and assert cure claims relying upon the fact that
15 | the servicer had put all parties on notice back in 2008 that
16 | these issues existed shortly after they were discovered.  But,
17 | all of those issues, Your Honor, there's not an issue for today
18 | about release of the escrow.  That's an issue for another day.

19 | THE COURT:  There's no deadline, however, for you to
20 | bring that claim.

21 | MR. WINIKKA:  Well, I think B of A's position would
22 | be the deadline passed long ago before they were even asserted,
23 | but --

24 | THE COURT:  But, there's no --

25 | MR. WINIKKA:  This settlement doesn't set a specific

1  deadline by --

2         THE COURT:  Leaves everybody where they were.

3         MR. WINIKKA:  Correct, Your Honor.

4         THE COURT:  All right.  Okay.

5         MR. WINIKKA:  Thank you.

6         THE COURT:  Well, what about this -- okay that's --

7  never mind.  Thank you.

8         MR. WINIKKA:  Thank you, Your Honor.

9         MR. TOP:  Good morning, Your Honor, Frank Top on

10  behalf of Wells Fargo as master servicer in this matter.  And

11  I'm going to be very, very brief, as well, because I think the

12  debtors did a very good job of presenting the settlement.  And

13  again I think we're focusing on the fact that this is a

14  settlement of certain claims and not any adjudication of the

15  adversary proceedings that have been filed against various

16  parties in connection with this matter.

17         I did want to stress for the record, however, that

18  again, we're very sympathetic to the Jacksons and Paula Rush

19  and their particular plight.  There's many other people out

20  there.  But, you also have to keep in mind that as master

21  servicer for trusts it's not as if Wells Fargo is getting the

22  benefit of any of this money.  All these claims have been

23  asserted on behalf of trusts and any payments that --

24         THE COURT:  But, you get paid for servicing the

25  loans.  And included in your obligation as servicer is to take

1  actions to preserve the corpus of the trust.

2          MR. TOP:  Well, and that's a very important point you

3  raise there, as well, because our role is to preserve the

4  corpus of the trust.  And you take a look -- and this again,

5  this prejudges the adversary proceedings and things like that,

6  so I'm just mentioning it now for this, as I suppose, a

7  preamble.  But, even in all the papers that Ms. Rush has filed

8  in connection with this particular matter she underlines the

9  point that all our duties, but at the very end of everything

10  she underlines it's for the benefit of investors and indenture

11  trustees, and not for the benefit of individual borrowers.  Our

12  role is to oversee the servicing on behalf of other people, not

13  for individual borrowers.  And it's no wonder --

14          THE COURT:  Yes, but there are obligations as a

15  master servicer that would, under law as opposed to contract,

16  would require you to do certain things.  You have to be

17  licensed to be servicer.

18          MR. TOP:  To be a servicer, and probably to be --

19          THE COURT:  But, presumably to people licensed you

20  have to obey the law.

21          MR. TOP:  Okay.  But, you take a look at even the

22  things she cites in TILA and RESPA, and there's very specific

23  definitions as to who a servicer is in those particular

24  statutes.  And the servicer is defined as a person that's

25  actually collecting the money and interacting with the

1 borrower, and that's not what the master servicer does, at all.

2 But, in any event that has nothing to do with this particular

3 settlement.  That's going to be heard on another day in the

4 adversary proceedings.

5        And I -- of course, the other thing I just want to

6 add is, we've -- you know, while I received a copy of the

7 adversary proceeding I don't think it's ever been appropriately

8 served and I don't know whether we're expecting guidance from

9 you, Your Honor, as to how -- knowing our call we were going o

10 contemplate what we were supposed to do with those particular

11 adversary proceedings and how you wanted those to proceed, as

12 well.

13        THE COURT:  Okay.  Now, what was the debtor -- could

14 you be more specific about what Wells Fargo's relationship with

15 the debtor was prepetition?

16        MR. TOP:  Well, I can only speak on behalf of the

17 corporate trust side of things.  I don't know all the areas --

18 relationships that Wells Fargo may have had with AHM.  But, as

19 it relates to the corporate trust department we were indenture

20 trustee on only, I think, four or five of the related

21 securitization trust.  None of them are at issue in this

22 particular matter.  And then we're just a service provider to

23 the trusts.  We're not really a direct contract with AHM or

24 anything like that.  So, again, our obligation under the master

25 servicing agreement is to oversee the servicing.  And we were

43

1  also securities administrator which meant taking the money --

2  taking a look at the waterfall and sending it off to the

3  various investors and the like.

4          THE COURT:  All right.  And you're not a party -- you

5  weren't a party to repurchase agreements or anything like that.

6          MR. TOP:  I'm not aware that they were.  I'm not

7  aware that they were.  But, I can't say that for sure either,

8  Your Honor, because again, I represent the corporate trust side

9  of things.  That would have been a totally different side of

10 the bank.  But, we're not, again, we were not on the creditor's

11 committee or anything like that either.  We're just --

12         THE COURT:  Would you agree with the proposition that

13 any individual claim Ms. Rush or the Jacksons have against your

14 client for personal equitable subordination is not being

15 released?

16         MR. TOP:  I would agree with that.  I would say

17 claim, if any, though, and that's the way I would put it.

18         THE COURT:  Well, of course.

19         MR. TOP:  But, I'm acknowledging the fact that she

20 has filed her adversary complaint and we will respond

21 accordingly to it.

22         THE COURT:  Well, the question was a little more

23 specific which was that --

24         MR. TOP:  Well, sure.  We're not --

25         THE COURT:  -- it's not being released.  Without

44

1  admitting liability you understand it's not being released.

2          MR. TOP:  Without admitting liability I understand

3  that, as well, Your Honor.  It's not being released.

4          THE COURT:  Thank you.  Deutsche Bank.

5          MR. DREBSKY:  Good morning, Your Honor, Dennis

6  Drebsky from Nixon Peabody on behalf of Georgia Bank.

7          I'll try to be at least as brief as my compatriots.

8  First, I think there's a basic misconception in the pleadings

9  that, you know, one, Deutsche Bank isn't like another Deutsche

10 Bank, we're separate entities.  In fact, we can't lend money,

11 Deutsche Bank National Trust Company under its charter and

12 under the OCC.  As this Court probably remembers the very

13 outset of these proceedings during the sale hearing we

14 supported it with a reservation and another Deutsche entity

15 vigorously opposed it.  We have no control over those either.

16 What we do is not lend money, we're not a warehouse lender or

17 whatever, and I think that's in the pleadings.

18          I'd like to say something about -- we were members

19 and are members of the creditor's committee.  And I can echo

20 the representation that was made by committee counsel that we

21 had no part of any negotiations relating to so-called insider

22 transactions, Mrs. Rush or whatever, that we totally were not

23 involved with that, whatsoever.  And I sat on the committee as

24 counsel to Deutsche Bank National Trust Company at all of the

25 meetings, whether telephonic or in person.  So, I can make that

1 representation with knowledge of the facts.

2          One thing that, again, and I think this has been
3 echoed is, none of the money that would be coming by reason of
4 this settlement goes to Deutsche Bank National Trust Company.
5 They all go to the underlying holders.  And the underlying
6 holders are not big banks, necessarily.  They're pension funds,
7 they're individuals.  This is not some big boys game.

8          As this Court remembers, I'm sure, at the very outset
9 the cure reserve was set because we could not -- at that time,
10 (1) we didn't want to hold up the sale of the banks that were
11 involved, and (2) we had to sort out exactly how much of claims
12 would be involved, and that took a long time.

13          And am I real satisfied with the amount that we're
14 getting under the settlement?  Frankly, no.  We've gone back
15 and forth for it looks like two years -- it seems like an
16 eternity -- exchanging documents, exchanging discovery request.
17 And this has been the product of it.  Maybe there's, frankly,
18 here some creditor fatigue in agreeing to this settlement.
19 But, we believe under the circumstances it's fair.  And that
20 was what the cure claim was set, you know, at the very outset.

21          As to jumping to a question as to personal
22 subordination claims that Mrs. Rush, the Jacksons or anyone
23 else has, we don't believe they're being released in anyway by
24 this Court approving the settlement.  And we'll deal with that
25 in the appropriate proceeding.

1       THE COURT:  All right.  Thank you.

2       MR. DREBSKY:  Thank you.

3       THE COURT:  Okay.  Well, I see two issues here.

4  Well, let me back up a minute.  Generally speaking, clearly the

5  evidence before the Court today from a business perspective

6  meets the criteria of Section 9019 on all three settlements.

7  Indeed, I would argue that it's a really watershed moment in

8  the continuing development of these cases to get these types of

9  large claims dealt with so the debtor can move forward.  It's a

10  practical reality of the practice of law in this type of forum

11  that the bigger check gets paid first or dealt with first and

12  then you move to the littler ones as you go down the waterfall.

13  Billion dollar claims can affect whether the case is going to

14  go forward or not, whether it's administratively solvent or

15  not.  Million dollar claims in a case of this size are not as

16  significant.

17       So, Ms. Rush and Ms. Jackson really assert a couple

18  of issues in this case in connection with the settlement.  One,

19  it's simply inequitable and unfair for the debtors and the

20  committee to continue to negotiate with the corporate entities

21  with the larger claims while ignoring the active claims -- the

22  active claimants and the claims of those claimants, such as the

23  Jacksons and Ms. Rush.  Certainly equity -- inequitable

24  considerations are part and parcel of anything this Court

25  decides.  And the debtor -- excuse me -- the Court is not going

47

to approve relief of a debtor that comes into the court with
dirty hands or unclean hands and is acting inequitably.   I
don't see that as the case.   Certainly not the case, at least,
in connection with the settlements before the Court.

        I think the evidence is clear that this has been an
ongoing difficult, lengthy process dealing with large claims
and not any type of willy nilly, well, I like you better, or
I'm going to deal with you first in an inequitable way.   There
are real, factual and legal reasons for dealing with these
claims and making them a priority.

        One of the other issues that the objectors raise is
the fact that, I think, that they want to make it clear that
any claim they have against any entity is not being affected by
the release here, and that is absolutely the case.   If Ms. Rush
or the Jacksons have a claim for equitable subordination that
they can bring on their own behalf against non-debtor parties,
it is preserved, it is not being in any way released.   Claims,
more broad claims, claims on behalf of all creditors, claims on
behalf of the debtor obviously are subject to the releases
contained in the documents.

        Mrs. Rush's claim against the debtors is not affected
in that she still has a proof of claim, a proof of claim that
hasn't been objected to, and as well as lawsuits pending
against the debtors -- there are lawsuits pending against the
debtors, individually.   Those are preserved.   That's a

1  dichotomy.  Again, I beg your pardon.  That's in the context of

2  her individual claim.

3        There's a sort of broader point, if you will, and I'm

4  not sure it's -- well, I don't think it's really relevant,

5  frankly, based on this record to the specific issues in front

6  of the Court which is this global --

7                    (Pause)

8        THE COURT:  -- a broader issue which is -- really

9  goes to the macro economic issues that led to, among other

10 things, this bankruptcy and the freezing of the credit markets,

11 et cetera which is, my God, what were people doing, what were

12 they thinking, and who was conspiring with whom?  Obviously,

13 these are ongoing political issues, as well as economic.

14       The senate has been looking into the Goldman Sachs

15 matter and Ms. Rush referenced Senator Levin's comments in

16 connection with that.  That's well beyond the jurisdiction, or

17 can this Court in connection with complex macro economic and

18 government action or inaction that led to clearly an economic,

19 global economic, crises and a collapse of at least short term

20 the credit markets and a collapse in the mortgage market and

21 real estate market.

22       I have one little piece of this to worry about and

23 that's American Home Mortgage and a debtor's estate that's in

24 front of me.  While the Court will not countenance fraud, and

25 if I thought there was actual fraud going on here with this

1  case I would not hesitate to appoint a trustee.  If I felt that

2  the debtor was not independently exercising independent

3  judgment -- independently exercising independent judgment,

4  excuse me, over whether to settle cases like this or to run the

5  case I would appoint a trustee or an examiner.  I wouldn't

6  hesitate.  There's no evidence that that's gone on in this

7  case.

8          There have been individual actions that I felt were

9  not particularly helpful in certain specific instances with

10 specific creditors, and I think everybody knows what I'm

11 talking about, Ms. Dobbin.  But, that was a very one isolated

12 incident among maybe other isolated instances, but not a

13 general running of the case.  And I see no reason to infer,

14 certainly not to the level to hold up the settlement, that the

15 debtors are not independently exercising business judgment in

16 their fiduciary duties in negotiating settlements among large

17 creditors such as Deutsche Bank and Wells Fargo who may or may

18 not have had some nefarious piece in the collapse of the global

19 economy.  That's not for me today.  And again, on this record

20 there is nothing that would remotely suggest or inference that

21 that occurred.

22         So, I'm going to overrule.  In connection with the

23 settlements I'm going to overrule Ms. Rush and Ms. Jackson and

24 on behalf of her husband, as well, Dr. Jackson's objection to

25 the settlement, although I'm going to revisit the Jackson/Rush

1  issues in a moment.

2          The Bank of America settlement limited objection will

3  also be overruled.  It is part and parcel of a larger objection

4  -- or excuse me -- settlement, and the Court is not in a

5  position to carve up a settlement.  The parties have agreed to

6  a contract.  I'm not in the negotiations, thank goodness, and

7  I'm not at the table arguing over one provision or the other.

8  If it has an unacceptable provision I won't approve it, and the

9  parties can go back to the drawing board.

10          In this instance, this provision doesn't rise to that

11  level.  It is simply a reservation of rights in connection with

12  one piece of the ongoing relationship that was not part of this

13  settlement.  It sounds, from what I hear sitting up here today,

14  that there are very strong defenses to that claim, but I don't

15  know.  It's not in front of me and every claim rises or falls

16  on its facts.  And whether AM -- AHMSI could assert, either

17  individually or derivatively, some sort of cure claim against a

18  cure escrow is going to rise or fall on the facts of that claim

19  and legal argument.

20          To not include it in their reservation of rights

21  would, in effect, require those parties to release those claims

22  they don't feel they're in a position to do.  I don't believe

23  there's going to be any -- as I sit here today I don't have any

24  reason to believe that allowing those rights to be reserved

25  will have any ongoing delaying effect or financially strapping

1  effect on the debtor's estate or the cure escrow.

2        So, for all those reasons I will approve the

3  settlement agreements and sign the orders.  Back up a second.

4  I continue -- all that said, I think Ms. Rush and the Jacksons

5  have a point, maybe it's an equitable point, but a point

6  nonetheless, that given the press, the debtor's agenda in

7  business and limited resources, their claims continue to stand

8  out there and they may or may not be -- they may or may not

9  have merit.  They may or may not have merit to the full extent

10 sought.  There may be some claims that do have merit.  But, the

11 bottom line is, they're out there.  And the debtor, to a

12 certain extent, has the advantage of the automatic stay in

13 order to -- it's certainly still with the Jacksons and for some

14 time had it with Ms. Rush to stop that determination and in

15 both instances to focus through the bankruptcy court.

16        I'm not casting any aspersions on any party, but I

17 think, frankly, by their diligent participation in the process

18 they have earned the right to at least get -- the Court have an

19 opportunity or perhaps foster an opportunity to resolve these

20 issues.  And I note that Mr. Beach said there were some

21 discussions about a global settlement that were not fruitful.

22 I'm glad to hear the parties are talking.

23        I have arranged for Judge Shannon to attempt to

24 mediate Ms. Rush and the Jackson's claims against the debtor's

25 estate.  Judge Shannon will contact -- or I ask Mr. Beach if

1 you could contact his chambers tomorrow to -- or actually today

2 to arrange some sort of call to try to work out a process to do

3 that mediation.  I think a call -- I think he mentioned that a

4 call tomorrow would be fine.  And I think he's in a position to

5 hopefully mediate this next week.  I'm not arguing people

6 absolutely have to settle.  I mean, that's not what I'm about.

7 Judge Shannon is an honest broker and I think perhaps would be

8 very helpful in his frankness in moving the parties together.

9          I'm requiring, however, that the committee and the

10 debtor and Ms. Rush and Ms. Jackson participate in that

11 mediation at a mutually convenient time, in person, here in

12 Wilmington.  Anyone else may attend such as Bank of America,

13 such as Deutsche Bank.  I leave it to your part, you.  That may

14 make it more difficult, frankly, if you start pulling in claims

15 that may or may not exist against third parties.  Again, I

16 leave that to the parties and Judge Shannon.

17          But, I am sending the debtor, the committee, the

18 Jacksons, and Ms. Rush to mediation in front of Judge Shannon

19 in an attempt to mediate whatever claims they may or may not

20 have against the debtor's estate, and hopefully to reach a

21 global settlement of the issues that continue to exist between

22 those parties.

23          So, Mr. Beach if you would please contact Judge

24 Shannon's chambers and coordinate with Ms. Rush,and Ms. Jackson

25 and Mr. Indelicato to arrange those matters.  Okay.

1        MR. BEACH:  I will certainly do that, Your Honor.

2   Just for clarification, are we talking, I assume, about two

3   separate mediations, the Rush side, and the Jackson side?

4        THE COURT:  I'll let Judge Shannon work that out.

5        MR. BEACH:  I'll contact his chambers.

6        THE COURT:  Okay.  Do you have forms of order on the

7   settlements?  Please approach.

8        MR. BEACH:  May I approach?

9        THE COURT:  Yes.

10                      (Pause)

11        THE COURT:  Okay, I've signed the orders.  Is there

12  anything else for today?

13        MR. BEACH:  Your Honor, that exhausts the agenda.

14  The only thing I would point out or ask is, if we are

15  addressing how parties are to respond to the complaints at this

16  point, or are we holding that pending mediation?

17        THE COURT:  Well, hopefully, maybe the mediation can

18  take care of that, maybe it can't.  As I said they were -- I

19  deem them, for today's purposes, as objections.  However, the

20  reservation of rights exist or it was clear that individual

21  equitable subordination claims may still exist.  I don't know

22  whether they've -- in connection with the debtor it would be a

23  violation of the automatic stay to sue the debtor.  Is the

24  debtor a defendant?

25        MR. BEACH:  The debtor is not a named defendant on

54

1 the complaint although in some of the paragraphs it suggests

2 that they have an administrative claim.  So, frankly I --

3 sitting here I'm not even sure how the debtor needs to --

4 whether the debtor needs to respond, at all, to the complaints,

5 frankly, Your Honor.  We are not a named defendant.

6          THE COURT:  Well, when is our next hearing?  I can

7 find out.

8          All right.  I'll continue this matter -- I'll

9 continue those matters to the next hearing on, looks like --

10 why do we have two in one week?

11          MR. BEACH:  What are the dates, Your Honor?

12          THE COURT:  Three hearings at the end of June.  The

13 21st, 24th,and 30th.  I'm trying to figure out why.

14          MR. BEACH:  Could one of those be a trial on the

15 Orrick's claim?  I'd have to look into it.  I can call your

16 chambers and --

17          THE COURT:  Let me just -- let's see if we can figure

18 this out.

19                         (Pause)

20          MR. BEACH:  Your Honor, I have the omnibus as the

21 21st.

22          THE COURT:  All right.  We'll continue the status

23 conference in connection with the complaints to the 21st to see

24 what the developments, if any, are of mediation.  And to think

25 about the issue.  In the meantime, the time to both serve and

55

1  answer the complaints is continued.

2           MR. BEACH:  Thank you, Your Honor.

3           THE COURT:  You're welcome.  Anything else?

4                (No audible response)

5           THE COURT:  Hearing adjourned.

6                     * * * * *

7              **C E R T I F I C A T I O N**

8           I, KIMBERLY UPSHUR, court approved transcriber,

9  certify that the foregoing is a correct transcript from the

10 official electronic sound recording of the proceedings in the

11 above-entitled matter, and to the best of my ability.

12

13 /s/ Kimberly Upshur

14 KIMBERLY UPSHUR

15 J&J COURT TRANSCRIBERS, INC.          DATE:  May 17, 2010

16

17

18

19

20

21

22

23

24

25 (CR)