UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x  Chapter 11
In re:                                                          :
                                                                :  Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                                          :
HOLDINGS, INC., a Delaware corporation, et al.,                 :  Jointly Administered
                                                                :
                              Debtors.                          :  Obj. Deadline: June 14, 2010 at 4:00 p.m. (ET)
                                                                :  Hearing Date: June 21, 2010 at 11:00 a.m. (ET)
                                                                :
---------------------------------------------------------------x

**MOTION OF THE DEBTORS FOR ORDER PURSUANT TO SECTIONS 105(a) AND 363(b) OF THE BANKRUPTCY CODE AUTHORIZING AHM HOLDINGS TO EXERCISE ITS CONTROLLING INTEREST IN NON-DEBTOR AMERICAN HOME BANK, F.S.B. TO APPROVE A LIQUIDATION**

American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation, and certain of its direct and indirect affiliates and subsidiaries, the debtors and debtors-in-possession in the above cases (collectively, "AHM" or the "Debtors"),[1] hereby submit this motion (the "Motion"), pursuant to §§ 105(a) and 363(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and 8 Del. C. §303(a) for entry of an order authorizing AHM Holdings to exercise its controlling interest in American Home Bank (the "Bank"), a non-debtor federal thrift bank, to authorize a liquidation of the Bank pursuant to 12 U.S.C. § 181. In support of the Motion, the Debtors respectfully represent as follows:

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc., a Delaware corporation (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914) ("AHM Investment"); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

## JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief requested herein are §§ 105(a) and 363(b) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014 and 8 Del. C. §303(a).

## GENERAL BACKGROUND

2. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

4. On August 14, 2007, the United States Trustee for the District of Delaware (the "US Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee"). On October 21, 2008, the US Trustee appointed an Official Committee of Borrowers (the "Borrowers Committee"). No trustee or examiner has been appointed.

5. The Amended Chapter 11 Plan Of Liquidation Of The Debtors Dated As Of February 18, 2009 (the "Plan") was confirmed under section 1129 of the Bankruptcy Code on February 23, 2009 [D.I. 7042]. The Plan provides for the creation of a liquidating trust (the "Plan Trust") in which the property of the Debtors' bankruptcy estates—including AHM Holdings' stock in the Bank—will vest. The Plan authorizes the trustee of the Plan Trust (the "Plan Trustee") to liquidate assets of the Plan Trust without prior bankruptcy court approval (subject to the consent of

the Plan Oversight Committee for transactions greater than $1,000,000). The Plan has not yet gone effective.

## RELEVANT BACKGROUND AND MARKETING

6. The Bank was established in October 2006 when AHM Holdings purchased Flower Bank FSB, a one branch, Federal Deposit Insurance Corporation ("FDIC") and the Office of Thrift Supervision ("OTS") regulated federal savings bank founded in 1987. The Bank is a one branch bank headquartered in Chicago, Illinois and is wholly owned by AHM Holdings. AHM Holdings is wholly owned by AHM Investment. The current management team developed a strategic business plan, which utilizes a direct-to-consumer banking model that blends web-based self-service (account opening, online banking) with live agent support. This combination provides a high-touch customer experience when requested, while leveraging the cost efficiencies of direct marketing account acquisition and servicing. The Bank holds mortgages, consumer loans, securities and cash deposits. As of March 31, 2010, the Bank had approximately $57,423,578 in total assets at book value, with an estimated liquidation value between $50-53.5 million. As of the same date, the total estimated liabilities of the Bank were $15,172,465, which includes $13.917,304 in total deposits.

7. Since the Petition Date, the Debtors, through their investment banker Milestone Advisors, LLC ("Milestone"), in close consultation with the Committee and its advisors, have been marketing the Bank for sale, and have received interest from third parties wishing to acquire the bank. Interested purchasers have proposed both an acquisition of the Bank's net assets and the purchase of the outstanding shares in the Bank. Regulators have expressed a strong preference for a stock sale to both potential purchasers and the Debtors. The marketing efforts and

ultimate liquidation determination have entailed several phases of marketing and negotiations as reflected in the following summary:

Phase I: Initial Marketing and Negotiations

 (a) Milestone began marketing the Bank in October 2007.

 (b) During the initial marketing period, Milestone contacted 148 different parties, of which 121 were financial buyers and 27 were strategic buyers.

 (c) Confidentiality agreements were sent to 48 of the contacted parties.

 (d) 37 parties were provided with the confidential information memorandum ("CIM").

 (e) Of the interested parties, three had conversations with the Bank's management, including two who visited the Bank at its headquarters in Chicago.

 (f) In February 2008, Milestone began the process of negotiating a stalking horse bid with a potential purchaser. Milestone presented a summary of the potential transaction to the Committee on March 5, 2008. The negotiations broke down and did not result in a firm stalking horse bid.

Phase II: Remarketing and Negotiations

 (a) Milestone began the re-marketing of the Bank in March 2008.

 (b) During the remarketing period, Milestone reached out to 33 different parties, of which 20 were financial/strategic buyers and 13 were institutions applying for a thrift charter.

 (c) Confidentiality agreements were sent to 19 of the contacted parties.

 (d) 16 parties were provided with the CIM as well as an updated financial package.

 (e) Of the interested parties, five visited the Bank at its headquarters in Chicago to meet with management and four performed due diligence on the Bank.

 (f) Milestone received five initial bids, of which three were invited to a final bidding round.

(g) In July 2008, Milestone began the process of negotiating a stalking horse bid with another potential purchaser. On August 7, 2008, the negotiations broke down and did not result in a firm stalking horse bid.

Phase III: Negotiations with Another Potential Stalking Horse

(a) Milestone contacted eight parties after the negotiations failed to result in a firm bid with the last potential purchaser.

(b) On September 30, 2008, AHM Holdings, the Bank, and another potential purchaser entered into a 45-day exclusivity period to enter into a definitive agreement.

(c) The potential purchaser had completed due diligence and was in the process of negotiating a stock purchase agreement when negotiations broke down in November 2008.

Phase IV: Negotiations and Agreement with The Bancorp

(a) Milestone contacted another fifteen parties.

(b) On March 12, 2009, AHM Holdings, the Bank, and The Bancorp, Inc. ("Bancorp") entered into a 10-day exclusivity period to enter into a definitive agreement.

(c) Thereafter, Bancorp completed its due diligence and on April 1, 2009 executed a stock purchase agreement (the "Bancorp SPA"). That same day, the Debtors filed a motion to establish sale procedures, with stalking-horse protections for Bancorp, and to authorize a sale of AHM Holdings' stock in accordance with the Bancorp SPA [D.I. 7220].

(d) The Court approved the proposed sale procedures by order dated April 21, 2009 [D.I. 7306]. By order dated May 15, 2009 [D.I. 7398], the Court approved the sale of AHM Holdings' stock in the Bank pursuant to the Bancorp SPA.

(e) Under Section 8.1(b)(i) of the Bancorp SPA, the Bancorp SPA could be terminated by either Bancorp or AHM Holdings if the OTS had not approved the sale of the Bank to Bancorp by a certain date (the "Termination Date"). In April 2010, Holdings terminated the Bancorp SPA due to Bancorp's lack of communication with AHM Holdings regarding its continued interest in the transaction and the status of its regulatory approval.

5

Phase V: Exploring Additional Indications of Interest for the Bank

    (f)    In and after March 2010, certain parties expressed an interest in acquiring all of the common stock of the Bank.

    (g)    After communications and initial diligence, those parties decided not to pursue any purchase and sale transactions with the Bank.

8. The boards of directors of the Bank and AHM Investment have carefully considered the financial position of the Bank, including the continued monthly operating losses at the Bank that would continue through the pursuit of acquisition alternatives, and believe that the Bank has sufficient liquidity to engage in a voluntary liquidation and would return more money to its sole shareholder, AHM Holdings, through a dissolution than through any other alternative available to Bank at this point. The Committee has been involved throughout the process of determining the best course of action to maximize the value of the Bank assets for the benefit of the Debtors' estates and creditors.

9. AHM Investment, AHM Holdings, the Bank, the Committee and their financial advisors will continue to review opportunities to sell the Bank, subject to requisite approval. However, the parties do not intend to divert from or delay the implementation of the plan of liquidation unless an acceptable buyer is found, further operating losses are supported by the new purchaser and, upon consultation with regulatory authorities, the parties believe regulatory approval can be obtained within a reasonable timeframe. As such, the Debtors and the Bank's board of directors believe the most appropriate course of action may be to pursue a liquidation of the Bank, subject to the review of and approval by the OTS, and then to distribute any equity of the Bank to AHM Holdings.

10. The Bank's board of directors has approved the Voluntary Plan of Dissolution, dated May 6, 2010 (the "Plan of Dissolution"). Specifically, the Plan of Dissolution

discusses the intent by the Bank to file an application for approval by the OTS of an early dividend distribution of $15 million to be made to AHM Holdings and further provides:

(a) Cash and cash equivalents will be used to satisfy deposits and other liabilities to the extent that such deposits are not placed with another depository institution.

(b) Loans that are owned by the Bank will either be sold or transferred to AHM Holdings via dividend to be sold by AHM Holdings.

(c) The Bank has another $1.7 million in assets that will be liquidated.

(d) Upon satisfaction of the Bank's liabilities and liquidation or distribution by dividend of all the Bank's remaining assets, the Bank will terminate any remaining employees and surrender its charter to OTS for cancellation.

## RELIEF REQUESTED

11. By this Motion, the Debtors seek entry of an order substantially in the form attached hereto as Exhibit A authorizing AHM Holdings, without further notice or hearing from this Court or further corporate action, to vote its stock in the Bank in favor of a liquidation of the Bank as has been proposed by the board of directors of the Bank.

## AUTHORITY FOR REQUESTED RELIEF

12. Assets of the non-debtor Bank are not property of the Debtors' bankruptcy estates; AHM Holdings' stock in the Bank, however, is property of AHM Holdings' bankruptcy estate. See 11 U.S.C. § 541(a); United States W. Fin. Servs. v. Berlin (In re Berlin), 151 B.R. 719, 723 (Bankr. W.D. Pa. 1993) ("The general rule is that although the interest of a debtor in a partnership is estate property, any property owned by the partnership itself is not estate property." (citing E.A. Martin Machinery Co. v. Williams, 875 F.2d 668, 670 (8th Cir. 1989)). Property of the bankruptcy estate may be used, sold, or leased by the debtor in possession ("DIP"). 11 U.S.C. §§ 363 and 1107.

13. Where operation of the debtor's business is authorized, the DIP may use property of the estate in the ordinary course of business without notice or a hearing, unless otherwise ordered by the Court. 11 U.S.C. § 363(c)(1). The DIP may use property of the estate outside the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1). The Debtors assume *arguendo*, for purposes of this Motion, that AHM Holdings' voting its stock in favor of a liquidation would constitute a "use" of AHM Holding' Bank stock outside the ordinary course of business.

14. Section 363 of the Bankruptcy Code does not set forth a standard for determining when it is appropriate for a court to authorize a DIP's use of property outside the ordinary course of business. However, courts in this Circuit and others have required that the decision to *sell* assets outside the ordinary course of business be based upon the sound business judgment of the debtors. See In re Abbotts Dairies of Pennsylvania, Inc., 788 F.2d 143 (3d Cir. 1986); see also Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996); Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1071 (2d Cir. 1983); Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp., (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153 (D. Del. 1999); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D.D.C. 1991).

15. Additionally, section 105(a) of the Bankruptcy Code provides a bankruptcy court with broad powers in the administration of a case under the Bankruptcy Code. Section 105(a) provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). Provided that a bankruptcy court does not employ its equitable powers to achieve a result not contemplated by the Bankruptcy Code, the exercise of its section 105(a) power is proper. In re Fesco Plastics

Corp., 996 F.2d 152, 154 (7th Cir. 1993); Pincus v. Graduate Loan Ctr. (In re Pincus), 280 B.R. 303, 312 (Bankr. S.D.N.Y. 2002). Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets. See, e.g., Chinichian v. Campolongo (In re Chinichian), 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); In re Cooper Props. Liquidating Trust, Inc., 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

16.    Assuming a "sound business judgment" test would govern AHM Holdings' voting its stock in the Bank in favor of a liquidation, the Debtors respectfully submit that authorization of a liquidation recommended by the board of directors of the Bank would be an exercise of sound business judgment and should be approved.

17.    The "sound business judgment" test ordinarily requires a debtor to establish four elements in order to justify a sale of property outside the ordinary course of business, namely, (a) that a "sound business purpose" justifies the sale, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtors have obtained a fair and reasonable price, and (d) good faith. Abbotts Dairies, 788 F.2d 143; Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989). A debtor's showing of a sound business purpose need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons." In re Baldwin United Corp., 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984). Whether or not there are sufficient business reasons to justify a transaction

depends upon the facts and circumstances of each case. <u>Lionel</u>, 722 F.2d at 1071; <u>Montgomery Ward</u>, 242 B.R. at 155 (approving funding of employee incentive and severance program; business purpose requirement fulfilled because stabilizing turnover rate and increasing morale were necessary to successful reorganization).

18. The Debtors submit that more than ample business justification exists for AHM Holdings to approve a liquidation of the Bank. AHM Holdings' investment in the bank is one of (if not *the*) largest unliquidated assets of the Debtors' bankruptcy estates, the liquidation of which will facilitate the effectiveness, and eventual consummation, of the Plan—the ultimate goal of these chapter 11 cases.

19. To the extent the "notice" requirement of the <u>Abbotts Dairies</u> test applies to a use of property such as the voting of AHM Holdings' stock, the Debtors submit that all interested parties have been on notice for quite some time of the Debtors' intention to sell the stock in the Bank (which was previously approved by order of this Court after full notice to all parties in interest). Moreover, through disclosure and solicitation of the Plan, which was ultimately accepted by the overwhelming majority of creditors and confirmed by order of this Court, the Debtors made all parties in interest aware of their intention to liquidate all their remaining assets on limited notice to parties in interest (i.e., by action of the Plan Trustee in consultation with the Plan Oversight Committee). Accordingly, the Debtors respectfully submit that, under the circumstances, this Motion constitutes sufficient notice for purposes of the second prong of the <u>Abbotts Dairies</u> standard, to the extent applicable.

20. Given the extensive marketing of the Bank by Milestone over a period of more than two years, the Debtors believe that the Bank's board is in a good position to determine a reasonable value for the Bank's assets. Given the board's independent fiduciary duties to the Bank

and to AHM Holdings, its sole shareholder, the Debtors submit that all parties in interest can be assured that the consideration received for the Bank's assets will be fair and reasonable, and that AHM Holdings' approval of such a liquidation will satisfy the third prong of the Abbotts Dairies standard, to the extent applicable.

21. Finally, AHM Holdings' voting of its stock in favor of a liquidation of the Bank's assets will satisfy the "good faith" prong of the Abbotts Dairies standard, to the extent applicable. Any such liquidation would be the culmination of more than two years of active marketing by Milestone, which resulted in a previous sale transaction approved by this Court to have been in good faith. So too will a potential liquidation of the Bank proceed with the utmost good faith. Most of the Bank's assets are now cash and AHM Holdings will monitor the liquidation of the remaining few Bank assets to ensure good faith and fair dealing. No known potential bidder of any of the remaining Bank assets is an insider of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code, and all negotiations have been and will continue to be conducted on an arms length, good-faith basis.

22. For the reasons set forth above, the Debtors respectfully submit that AHM Holdings' voting its stock in favor of a liquidation of the Bank, where such liquidation is approved and recommended by the Bank's board of directors, would constitute an exercise of sound business judgment and would be in the best interests of the Debtors' estates and creditors.

23. The Debtors further submit that waiver of the 10-day stay of Bankruptcy Rule 6004(h), to the extent applicable, is appropriate. Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 10 days after entry of the order, unless the court orders otherwise." The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. See

Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten (10) day stay period, Collier on Bankruptcy suggests that the ten (10) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy 15th Ed. Rev., ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, Collier's provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id. The Debtors hereby request that the Court waive the ten-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

24.  Notice of this Motion has been provided to: (a) all entities known to have expressed a bona fide interest in acquiring the Bank's assets; (b) counsel to the Bank of America, N.A., as administrative agent; (c) counsel to the Committee; (d) the Office of the United States Trustee for the District of Delaware; (e) the Office of Thrift Supervision; (f) the Federal Deposit Insurance Corporation; (g) the Internal Revenue Service; (h) the U.S. Securities and Exchange Commission; and (i) all parties that have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request entry of an order granting this Motion and awarding such other and further relief as the Court deems just and proper.

Dated: May 28, 2010            YOUNG CONAWAY STARGATT & TAYLOR, LLP
       Wilmington, Delaware
                               /s/ Sean M. Beach
                               James L. Patton, Jr. (No. 2202)
                               Pauline K. Morgan (No. 3650)
                               Sean M. Beach (No. 4070)
                               Patrick A. Jackson (No. 4976)
                               The Brandywine Building
                               1000 West Street, 17th Floor
                               Wilmington, Delaware 19801
                               (302) 571-6600

                               Counsel for the Debtors and Debtors-in-Possession