## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | ) | |
| | ) | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., *et al.*,[1] | ) | |
| | ) | Case No. 07-11047 (CSS) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| ——————————————————— | ) | |
| | ) | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF AMERICAN HOME MORTGAGE HOLDINGS, INC., *et al.*, | ) | Adv. Pro. No. _____ |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **COMPLAINT** |
| - against - | ) | |
| | ) | |
| DELOITTE & TOUCHE LLP, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

Plaintiff, the Official Committee of Unsecured Creditors ("Plaintiff" or "Committee") of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), by and through its co-counsel, Hahn & Hessen LLP and Blank Rome LLP, as for its complaint against defendant Deloitte & Touche LLP ("Deloitte"), states as follows:

### NATURE OF PROCEEDING

1.    This adversary proceeding is brought as the result of Deloitte's failure to audit with professional care and in accordance with professional standards the consolidated balance sheets (and related consolidated statements of income, stockholders' equity and cash flow) of

---

[1]    The Debtors in these cases are: American Home Mortgage Holdings, Inc.; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.); American Home Mortgage Corp.; American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc.; and Great Oak Abstract Corp.

American Home Mortgage Investment Corporation ("AHM") and the other Debtors for the year ended December 31, 2006 (the "2006 Financial Statements").

2.     The Debtors experienced tremendous growth in their loan origination business between 2002 and 2006, with loan originations totaling $12.2 billion in 2002, and increasing to a staggering $58.9 billion in 2006.   Between 2005 and 2006 alone, loan originations increased $13.6 billion.   The nature of the loans originated also changed significantly during this period. While in 2003, the loans originated by the Debtors consisted of 19% ARMs (a loan type with more risk) (discussed below) and 58.5% conventional fixed mortgage rate loans, by 2006, the loan composition was almost the exact opposite -- 49.7% ARMs and 23.8% conventional fixed mortgage rate loans.   Consequently, the Debtors' business in 2006 was starkly different than that of prior years.

3.     The Debtors first engaged Deloitte, one of the world's largest and most sophisticated accounting firms, to provide them with, among other things, auditing services starting around 2000.   Deloitte continued to provide auditing and accounting services to the Debtors until the bankruptcy filing in 2007.   Consequently, Deloitte was well aware of the Debtors' explosive growth and changing loan products, having lived through it during the years it audited the Debtors.

4.     Nevertheless, while its clients' business was dramatically different, as were the macroeconomic and industry conditions (particularly in 2006), Deloitte failed to alter or adjust its audit approach or testing procedures, and the result was disastrous.   For example, as a consequence of Deloitte's failure to adequately plan, design and implement its audit of the 2006 Financial Statements, the financial statements contained material misstatements totaling in excess of $177 million.

703159/013-1860523.12

5.      These misstatements notwithstanding, Deloitte issued its "unqualified opinion" (a) that the 2006 Financial Statements were prepared in conformity with generally accepted accounting principles ("GAAP") and presented fairly the financial position of the Debtors at December 31, 2006, and (b) on the effectiveness of the Debtors' internal controls over financial reporting. Deloitte also reported and certified to the Debtors that it conducted the audit of the 2006 Financial Statements in conformity with generally accepted auditing standards ("GAAS") and the standards of the Public Company Accounting Oversight Board ("PCAOB").  This could not have been further from reality.

6.      Unfortunately, the Debtors -- in reliance upon Deloitte's "unqualified opinion" as to the 2006 Financial Statements --  proceeded to, among other things, determine, declare and pay bonuses and dividends substantially in excess of what should have been paid.  If it had conducted the audit in a manner consistent with GAAS and the PCAOB standards, Deloitte (given its industry expertise and client familiarity) should have concluded that the 2006 Financial Statements were not prepared in accordance with GAAP, and obviously not free from material misstatements.  This adversary proceeding is brought to recover damages of at least $75 million resulting from Deloitte's negligence.

### THE PARTIES

**A.      Plaintiff**

7.      Each of the Debtors, including AHM, a Maryland corporation, commenced voluntary cases under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware on August 6, 2007 (the "Petition Date").

8.      The Debtors' chapter 11 cases are being jointly administered and, since the Petition Date, the Debtors have continued in the operation and management of their businesses

and properties as debtors-in-possession. No trustee or examiner has been appointed in the Debtors' chapter 11 cases.

9.    On August 14, 2007, the United States Trustee for the District of Delaware appointed the Committee, consisting of seven of the Debtors' largest unsecured creditors.

10.    On August 15, 2008, the Debtors filed a "Chapter 11 Plan of Liquidation of the Debtors" (as thereafter amended, the "Amended Plan").

11.    On February 23, 2009, the Bankruptcy Court entered its "Findings of Fact, Conclusions of Law and Order Confirming the Amended Chapter 11 Plan of Liquidation of the Debtors dated February 18, 2009" (the "Confirmation Order").

12.    The Amended Plan has not yet become effective.

13.    Upon becoming effective, the Amended Plan contemplates the creation of a Liquidating Trust (the "Liquidating Trust") and the appointment of a Liquidating Trustee (the "Liquidating Trustee") for the purpose of liquidating the Debtors' remaining assets, including any potential claims or causes of action that the Debtors have, for the benefit of the Debtors' creditors.

14.    Steven D. Sass has been selected to serve as the Liquidating Trustee upon the Amended Plan becoming effective, and that selection has been approved in the Confirmation Order.

15.    Upon the Amended Plan becoming effective, the Liquidating Trust and the Liquidating Trustee will succeed to the Debtors' rights and claims as plaintiffs in this adversary proceeding against Deloitte.

16.    By Stipulation dated June 7, 2010 (the "Stipulation") and in the interests of efficient pursuit and transition, the Debtors agreed to permit Plaintiff to pursue and prosecute this

-4-

adversary proceeding against Deloitte, as it is Plaintiff who holds the pecuniary interest in the outcome of this proceeding.

17.     On June 9, 2010, the Bankruptcy Court approved the Stipulation and entered an order granting authority and standing to Plaintiff to pursue the Debtors' claims against Deloitte in this adversary proceeding.

**B.     Defendant**

18.     Deloitte is a limited liability partnership formed under the laws of Delaware and maintains its principal place of business in New York, New York, where it is engaged in the business of providing quarterly reviews, annual audits and other financial services.

19.     Prior to the Petition Date, Deloitte was the Debtors' independent auditor and, in that capacity, performed annual audits and quarterly reviews of the Debtors' financial statements (including the 2006 Financial Statements) and annual audits of the effectiveness of their internal controls over financial reporting.  Deloitte also performed other accounting services for the Debtors including, among other things, tax preparation and other consulting services. Deloitte received substantial fees from the Debtors, approximating or exceeding $13 million during the period from 2002 to 2006, for the various services it rendered to the Debtors.

**JURISDICTION AND VENUE**

20.     This adversary proceeding is a civil proceeding arising under the Bankruptcy Code or arising in or related to a case under the Bankruptcy Code within the meaning of 28 U.S.C. § 1334.

21.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334 because this proceeding is related to an underlying bankruptcy case pending in this Court.

703159/013-1860523.12

22.     Venue is proper in the District of Delaware under 28 U.S.C. § 1409 in that this proceeding arises in and relates to a bankruptcy case pending in this district.

23.     This is a core proceeding under 28 U.S.C. § 157(b)(2)(O). If, however, the Court determines that this proceeding is non-core, Plaintiff consents to entry of a final order by this Court pursuant to 28 U.S.C. § 157(c)(2).

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### I.     Overview Of The Debtors' Business

24.     AHM was formed in 1988, and together with the other Debtors, was engaged in the mortgage banking business.  AHM became a public company in 1999 and reorganized in 2003 to qualify as a real estate investment trust for federal tax purposes.

25.     Prior to the Petition Date, the Debtors' business was comprised of three segments: (a) originating residential mortgage loans (and either securitizing those loans or selling them for a profit to investors or intermediaries); (b) holding a leveraged portfolio of mortgage loans held for investment or mortgage-backed securities in order to earn net interest income; and (c) residential mortgage loan servicing. The first two segments of the Debtors' business are relevant to this proceeding, and their relevant facets are hereinafter discussed.

### A.     The Debtors' Mortgage Loan Origination Business

26.     The Debtors originated various types of mortgage loans for the purpose of either (a) selling them for profit to investors (either through securitized transactions or whole loan sales), or (b) holding them for investments and earning income thereon in the form of borrower interest payments.  The Debtors funded mortgage loans that they originated through their own capital and several warehouse credit facilities.  As for the mortgages originated through warehouse credit facilities, in exchange for the warehouse lenders' funding, the Debtors sold the funded mortgage loans to said lenders subject to repurchase obligations triggered by, among

-6-

other things, an early payment default, or the Debtors' breach of a material representation or warranty made in connection with the sale.

27.    The Debtors originated a variety of mortgage loan products, including conventional fixed mortgage rate loans, Alternate "A" mortgage loans, and adjustable rate mortgage loans ("ARMs").  Conventional fixed rate mortgage loans are mortgage loans that conform to the underwriting standards established by Fannie Mae or Freddie Mac, are limited to high-quality borrowers with good credit history, and require adequate down payments or mortgage insurance.

28.    Alternate "A" mortgage loans are those made to borrowers whose credit is generally within the typical Fannie Mae or Freddie Mac guidelines, but because they have certain loan characteristics making them non-conforming to these guidelines, Alternate "A" mortgage loans are considered more riskier than conventional conforming fixed rate mortgages.

29.    ARMs are mortgage loans that have variable fluctuating interest rates and are considered riskier than conventional conforming fixed rate mortgage loans.

30.    Since their founding, the Debtors' loan origination business experienced tremendous growth. As reported in its Form 10-K for the period ending December 31, 2006 (the "2006 Form 10-K") (incorporated herein by reference) filed with the United States Securities and Exchange Commission, the Debtors' loan originations totaled $58.9 billion in 2006, compared with $45.3 billion in 2005, $23.1 billion in 2004, $21.7 billion in 2003, and $12.2 billion in 2002.

31.    The dramatic growth in the Debtors' mortgage origination business was primarily attributable to their increasing originations of ARMs, including a subtype, namely pay option ARMs.  Pay option ARMs are a form of adjustable rate mortgages which offer the borrower the

"option" of how to make payments: a specified minimum payment, an interest-only payment, a 15-year fully amortizing payment, and a 30-year fully amortizing payment. This type of ARM often results in a negatively amortized loan at a given point in time due to the borrower's ability to make payments less than the interest amount which causes the unpaid principal balance of the loan to increase.

32.    In 2003, the mortgage loans the Debtors originated were comprised of 19% ARMs and 58.5% conventional conforming fixed mortgage rate loans. The following year, the percentage of ARMs increased to 36.7%, while conventional conforming fixed rate mortgage loans decreased to 31%. The percentage of ARMs originated by the Debtors continued to increase, reaching 42.1% in 2005 and 49.7% in 2006, compared with the declining percentage of conventional conforming fixed rate loans, which decreased to 27.1% in 2005 and 23.8% in 2006.

33.    In addition, the Debtors originated home equity or second mortgage loans that are generally secured by second liens on the related property. The Debtors' loan originations for these types of loans grew from $1.03 billion in 2004 to $3.61 billion in 2006. These types of loans present an additional layer of risk as they are behind first lien lenders under a liquidation scenario. Since these loans are subject to higher losses, during times of declining home values and liquidation recoveries as experienced beginning in the second half of 2006, recoveries on second lien loans are negatively impacted to a significant extent.

**B.    Loans Held For Sale ("LHFS")**

34.    The Debtors sold many of the mortgage loans they originated in the secondary mortgage market to investors through whole loan sales or securitized transactions, and in 2006, such sales totaled $56 billion.

35.    The mortgage loans that the Debtors held for sale (including the mortgage loans that the Debtors sold, but repurchased and then held again pending resale) were identified on

-8-

their balance sheet as "mortgage loans held for sale" or LHFS. As of December 31, 2006, the Debtors reported LHFS totaling $1.5 billion in the 2006 Financial Statements.

36.    Financial Accounting Standards Board ("FASB") 65 requires (as the 2006 Form 10-K acknowledges) that mortgage loans held for sale be reported at the lower of cost or fair value ("LOCOM"), determined as of the balance sheet date.  As discussed more fully below, the LOCOM adjustment reported as of December 31, 2006 in the 2006 Financial Statements was not computed in accordance with FASB 65 (*i.e.*, GAAP).  Prior to 2006, the LOCOM valuation adjustment was not reported in the Debtors' public annual financial statements because the amount was not then material.

37.    In addition to having to record the LHFS using LOCOM, a "Repurchase Reserve" (hereinafter defined) for loans already sold had to be established.  In this regard, the Debtors' sale of a loan in the LHFS portfolio to investors was conditioned upon the Debtors' obligation to repurchase the loan or substitute the loan if, among other things, the loan experienced an early payment default, or the Debtors, in connection with the sale, materially breached a representation or warranty concerning the loan's characteristics and/or origination.  Given this potential repurchase obligation, GAAP (*e.g.*, Statement of Financial Accounting Standards ("SFAS") No. 140) required the establishment of a liability or reserve for potential future losses from repurchase obligations (the "Repurchase Reserve") for probable future losses and expenses that might be incurred on those loans subject to a repurchase obligation. As of December 31, 2006, a Repurchase Reserve of $6.9 million was recorded, down from $12.9 million as of June 30, 2006.

38.    Similar to the LOCOM valuation reserve, the Repurchase Reserve was disclosed in the 2006 Financial Statements.  As more fully discussed below, the 2006 Financial Statements substantially understated the Repurchase Reserve as of December 31, 2006, since it only

reflected a reserve against Debtors' repurchase obligations with respect to repurchase requests that the Debtors actually received (a small subset), rather than a reserve against the Debtors' total potential repurchase obligation regardless of whether a repurchase request was received (the full population of loans sold with recourse).

### C.    Loans Held For Investment ("LHFI")

39.    The Debtors retained certain mortgage loans on their balance sheet through securitizations structured as financings, which were identified on the Debtors' balance sheet as "mortgage loans held for investment" or LHFI. The Debtors recognized income from LHFI in the form of borrower interest payments.

40.    GAAP (*e.g.*, SFAS No. 5) required that an allowance for loan losses ("ALL") be recorded to reflect probable and reasonably estimable losses on the mortgage loans in the LHFI portfolio. Consistent with that requirement, the 2006 Form 10-K reported that the Debtors' policy for determining the appropriate ALL consisted of periodically evaluating the adequacy of the ALL based on the Debtors' past loan loss experience, known and inherent risks in the loan portfolio, adverse circumstances possibly affecting the borrowers' ability to repay, the estimated value of the underlying real estate collateral, and the then current market conditions within the geographic areas in which the real estate was situated. The ALL was to be increased by a provision to loan losses charged to income and reduced by charge-offs, net of recoveries.

41.    According to the 2006 Financial Statements, as of December 31, 2006, the principal balance of the Debtors' LHFI totaled $6.3 billion (up from $3.5 billion at December 31, 2005 and $0 as of December 31, 2004), a large portion of which consisted of ARMs and other risky loans, and the related ALL was $14,191,000.

42.    The ALL was computed in the 2006 Financial Statements in the same manner as the LOCOM valuation reserve for LHFI. Contrary to GAAP and the GAAP-consistent

methodology disclosed in the 2006 Form 10-K for computing the ALL, the ALL actually reported in the 2006 Financial Statements was computed simply by taking a 10% reserve on non-performing loans aged greater than 90 days, and a 25% reserve on non-performing loans aged greater than 180 days.  This formulaic computation of the ALL was not adjusted to account for the significant changes in the types of loans being originated (*e.g.*, increasing originations of pay-option ARMs or second lien loans) or the changing macroeconomic conditions. As more fully discussed below, due to the improper use of the formulaic computation, the ALL reserve was substantially understated at December 31, 2006.

#### D.     <u>Transactions With Intermediaries</u>

43.     Although in the normal course of their business the Debtors marketed and sold mortgage loans to third-party investors, the Debtors also sold mortgage loans (a "gestated loan") to an intermediary or "gestation facility" prior to the ultimate investor.  A gestated loan is a loan that is considered sold when there is a firm commitment from an investor to purchase a pool of loans having certain characteristics. A gestated loan transaction typically worked as follows: once the Debtors received a trade commitment from an interested investor to purchase mortgage loans, the Debtors would not generally close the transaction for another 30 to 60 days (or longer) to allow for (a) due diligence to be conducted by the investor on the proposed loan pool, (b) servicing arrangements and agreements to be negotiated and finalized, and (c) the purchase funding to occur. During this gestation period, a variety of events could occur, for example, loans not conforming to the characteristics of the loan pool that the interested investor agreed to purchase might be removed from the pool; the purchase price could be adjusted; the unpaid principal balance of the pool could change; or the parties could simply terminate the transaction. Consequently, the gain recognized at the time the Debtors placed the loan in a gestation facility could vary significantly from the gain, if any, ultimately realized.

44.     For accounting purposes, the 2006 Financial Statements reflect a total gain on "sales" relating to gestated loans of approximately $131.2 million (up significantly from $30.7 million in 2005), and a net gestation gain of approximately $107.4 million for the month of December 2006 alone. The gains, however, relate to loan trades that had not yet settled or closed (*i.e.*, still subject to the previously described contingencies) prior to the end of 2006. Therefore, as discussed further below, the $107.4 million in gains should not have been reported in December 2006.

## II.     Deloitte's 2006 Audit

45.     The Debtors engaged Deloitte to audit the 2006 Financial Statements pursuant to an engagement agreement, dated July 10, 2006 (the "Engagement Agreement"), wherein Deloitte agreed to, among other things, perform the audit in accordance with GAAS and PCAOB standards, express an opinion on the fairness of the 2006 Financial Statements under GAAP, and express an opinion on management's assessment of the effectiveness of the Debtors' internal controls over their financial reporting (collectively the "2006 Audit").

46.     In connection with the 2006 Audit, Deloitte personnel were present at the Debtors' headquarters and had access to the Debtors' financial records (including the 2006 Financial Statements), and to their management and employees concerning the Debtors' financial reporting and accounting policies and practices.

47.     After completing the 2006 Audit (for which Deloitte received approximately $2.3 million), Deloitte issued its March 1, 2007 audit report to the Debtors (the "2006 Audit Report"), and expressed its "unqualified opinion" therein as follows:

> We have audited the accompanying consolidated balance sheets of American Home Mortgage Investment Corp. and subsidiaries (the "Company") as of December 31, 2006 and 2005, and the related consolidated statements of income, stockholders' equity and cash flows for each of the three years in the period ended December 31,

-12-

2006. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of American Home Mortgage Investment Corp. and subsidiaries at December 31, 2006 and 2005, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2006, in conformity with accounting principles generally accepted in the United States of America.

We have also audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the effectiveness of the Company's internal control over financial reporting as of December 31, 2006, based on the criteria established in *Internal Control - Integrated Framework* issued by the Committee of Sponsoring Organization of the Treadway Commission and our report dated March 1, 2007 expressed an unqualified opinion on management's assessment of the effectiveness of the Company's internal control over financial reporting and an unqualified opinion on the effectiveness of the Company's internal control over financial reporting.

## III.    The GAAP Violations

48.    The 2006 Financial Statements contained various misstatements, including, without limitation, misstatements relating to: (a) the calculation of the Repurchase Reserve; (b) the valuation of the LHFS portfolio; (c) the timing of recordation of gains involving gestated loans; and (d) the computation of the ALL for the LHFI portfolio, discussed hereinafter.

A.    <u>**The Repurchase Reserve Was Substantially Understated**</u>

49.    GAAP (*e.g.*, SFAS No. 140) required that a Repurchase Reserve be established to reserve for losses that might be incurred in connection with the loans that have been sold but which the Debtors might ultimately have to repurchase from investors. In determining the amount of the Repurchase Reserve, all obligations assumed and all representations and warranties bearing on the Debtors' repurchase obligations needed to be analyzed. After considering these factors, a reserve (liability) reflecting the fair value at the date of transfer of all loans sold with potential repurchase obligations was supposed to be established.

50.    As reflected in the 2006 Financial Statements, the Repurchase Reserve was recorded at $6,937,056, but appears to have been calculated solely on the number of actual repurchase requests that the Debtors received, without considering all of the loans sold for which the Debtors had repurchase liability exposure, albeit no repurchase request had yet been made.

51.    In addition, although the actual number of repurchase requests rose substantially from June to December 2006, the recorded Repurchase Reserve decreased from $12.9 million as of June 30, 2006 to $6.9 million as of December 31, 2006.  As such, the actual Repurchase Reserve reflected in the 2006 Financial Statements as a percentage of the outstanding repurchase requests, significantly decreased from 7.84% at June 30, 2006 to only 1.88% at December 31, 2006, as follows (in $000s):

|  | **6/30/06** | **9/30/06** | **12/31/06** |
|---|---|---|---|
| Repurchase Reserve Recorded | $12,973 | $ 6,956 | $ 6,937 |
| Outstanding Repurchase Requests | 165,525 | 180,608 | 368,131 |
| Reserve as % of Repurchase Requests | 7.84% | 3.85% | 1.88% |

52.    Furthermore (as reflected in the following chart), the number of repurchase requests received by the Debtors increased dramatically during 2006, both in amount and as a percentage of loans sold:

| Period | Demand Requests | Loans Sold | Percent |
|--------|-----------------|------------|---------|
| 2006-Q1 | $8,921,387 | $13,533,589,000 | 0.1% |
| 2006-Q2 | 134,974,063 | 13,828,120,000 | 1.0% |
| 2006-Q3 | 194,118,457 | 14,331,910,000 | 1.4% |
| 2006-Q4 | 343,520,315 | 14,280,609,000 | 2.4% |
| 2007-Q1 | 461,181,014 | 13,330,737,000 | 3.5% |

53.     Further compounding the deficiency of the Repurchase Reserve as of December 31, 2006, was the fact that a significant portion, approximately 25%, of the repurchase requests being received by the Debtors related to second lien loans, which are riskier and subject to greater loss severity rates, thereby resulting in a far greater inability to recover or mitigate losses on such loans, and consequently resulting in a direct loss.

54.     Loss severity is the rate of loss incurred on the liquidation or sale of a defaulted mortgage loan.  Loss severity is defined as the difference between the outstanding principal on the mortgage loan less the realized loss divided by the outstanding unpaid principal on the mortgage loan.

55.     The Debtors experienced significantly higher loss severity rates beginning in the third quarter of 2006.  Furthermore, the loss severity rates dramatically increased in the 1st quarter of 2007 to over 28%.  The increase in loss severity rates was due to a noticeable deterioration in the performance of the Debtors' second lien loans as shown in the chart below (in $000s):

| | Q1 2006 | | Q2 2006 | | Q3 2006 | | Q4 2006 | | Q1 2007 | |
|---|---|---|---|---|---|---|---|---|---|---|
| | UPB | Loss | UPB | Loss | UPB | Loss | UPB | Loss | UPB | Loss |
| 1st Lien | $19,011 | 8.00% | $23,334 | 8.64% | $27,041 | 13.02% | $36,362 | 7.28% | $40,541 | 8.83% |
| 2nd Lien | $1,469 | 36.95% | $1,270 | 43.69% | $2,291 | 63.84% | $5,761 | 45.26% | $13,421 | 88.60% |
| Total | $20,480 | 10.08% | $24,604 | 10.45% | $29,331 | 16.99% | $42,123 | 12.48% | $53,962 | 28.44% |

56.     Exacerbating the inadequacy of the Repurchase Reserve recorded as of December 31, 2006, neither the Debtors nor Deloitte adjusted the recorded reserve to account for

the 15% increase in repurchase requests received shortly after the 2006 year-end (and prior to the 2006 Audit opinion issue date), which increase was material in evaluating the Debtors' potential repurchase liability and should have resulted in a significant increase in the Repurchase Reserve recorded as of December 31, 2006.

57.     Additionally, the disclosure in Note 18 of the 2006 Financial Statements states that "Generally, the Company is not exposed to significant credit risk on its loans sold to investors", which is a direct contradiction with the actual events occurring in late 2006 (*i.e.*, a dramatic increase in repurchase requests).

58.     Despite the rapid increase in the number of repurchase requests being received, including a significant number of second lien loans, the Repurchase Reserve was not increased (and, in fact, was decreased) and, as previously noted, did not reflect the entire population of any loans sold for which the Debtors had repurchase liability exposure, but had not yet received a repurchase request.

59.     Consequently, for the various reasons noted above, the Repurchase Reserve as reported in the 2006 Financial Statements was substantially understated in an amount in excess of $30 million.

## B.     The LHFS Portfolio Was Substantially Overvalued

60.     GAAP (*e.g.*, SFAS No. 65) required LHFS, including loans the Debtors repurchased and held pending resale, be reported at the lower of cost or market (or LOCOM), which meant that the cost and the market value of each loan or loan pool in the LHFS portfolio had to be determined and compared, and each loan or loan pool then valued at the lower figure.

61.     The LOCOM methodology (which was specified in the 2006 Form 10-K) was not actually applied in valuing the LHFS portfolio in the 2006 Financial Statements. Instead, the LHFS were valued by formulaically calculating 10% of the unpaid principal balance for loans

aged greater than 90 days, and 25% of the unpaid principal balance for loans aged greater than 180 days.

62.    Because the appropriate LOCOM methodology was not applied, the LHFS were substantially overstated by at least $20 million.

C.    **The Gains Concerning The Gestation Transactions Were Substantially Overstated**

63.    GAAP (*e.g.*, SFAS No. 140) permits the recordation of a gain on the sale of a loan if the transaction constitutes a "sale" under GAAP. For a transaction to constitute a "sale," SFAS No. 140 requires the transferor to surrender control over transferred assets for consideration, other than beneficial interests, noting that control is surrendered if, and only if, all of the following conditions are met: (i) a loan is isolated from the transferor and placed beyond the reach of the transferor and its creditors, (ii) the transferee has the unconditional right to pledge or exchange the loan, and (iii) the transferor relinquishes effective control over the transferred assets.

64.    The 2006 Financial Statements identify the Debtors' transactions with the gestation facilities (and before closing) as "sales" and reflect gains on such "sales."  However, the gestation transactions with gestation facilities as reflected in the 2006 Financial Statements did not constitute "sales" as of December 31, 2006, because, among other reasons, the Debtors still had the obligation to repurchase the loans if the transaction did not close or the potential investor determined that certain loans did not conform to the type of the loans it had agreed to purchase. Consequently, the gains recorded in the 2006 Financial Statements in connection with the gestation transactions violated GAAP since they should not have been reported as sales until 2007 when the sales criteria were met.

703159/013-1860523.12

65.     Even if these gestation transactions were deemed true sales under the SFAS No. 140 criteria in 2006, GAAP required that a reserve be established reflective of the portion of the recognized gain that might ultimately be unrecognizable due to, for example, price fluctuations or terminated transactions.

66.     The 2006 Financial Statements reflect a net gain of $107.4 million for sales of gestated loans for the month of December 2006, and a total net gain of $131.2 million for the year ended December 31, 2006. The 2006 Financial Statements overstated the gains in an amount at least equal to the amount of the gain on the gestated loan sales occurring in December 2006 ($107.4 million) given that these transactions did not constitute 2006 sales, and, thus, the gains should have been reported (at the earliest) in 2007.

>    **D.**     **The ALL For The LHFI Portfolio Was Substantially Understated**

67.     GAAP required that an ALL be calculated for the mortgage loans the Debtors' held for investment (LHFI).

68.     GAAP (*e.g.*, SFAS Nos. 5 and 114) required that a reserve be recorded to reflect an estimated loss when, based upon the available information, "it is probable that an asset has been *impaired* or a liability had been incurred at the date of the financial statements" and "the amount of loss can be reasonably estimated." SFAS No. 5 (emphasis added). A loan is considered impaired when "based on current information and events, it is probable that a creditor will be unable to collect all amounts due according to the contractual terms of the loan agreement[,]" which includes both the principal and interest payments according to the schedules in the loan agreement (SFAS No. 114).

69.     The 2006 Form 10-K articulates the Debtors' policy (consistent with GAAP) for calculating ALL, specifically that the calculation be based upon factors impacting the estimated losses to be incurred in the future, such as the Debtors' "past loan loss experience, known and

-18-

inherent risks in the loan portfolio, adverse circumstances which may affect the borrowers' ability to repay, the estimated value of the underlying real estate collateral and current market conditions within the geographic areas surrounding the underlying real estate."

70.     These factors reported in the 2006 Form 10-K (which were particularly important given the LHFS portfolio's increasing riskiness) were not actually considered. Rather, the ALL for the LHFI portfolio was calculated by applying a simple mathematical formula, *i.e.*, computing 10% of the unpaid principal balance for loans aged greater than 90 days, and 25% of the unpaid principal balance for loans aged greater than 180 days, resulting in an ALL reported in the 2006 Financial Statements totaling $14,191,000.

71.     If the ALL for the LHFI portfolio had been calculated in a manner consistent with GAAP (and the Debtors' stated policy), the amount of the ALL reported in the 2006 Financial Statements should have been at least $20 million higher.

## IV.    Deloitte's Failure To Perform The 2006 Audit In Accordance With Professional Standards And Its Contractual Obligations (incorporating all previous allegations)

72.     As the Debtors' auditor, Deloitte owed the Debtors a duty to plan, conduct and report the results of its 2006 Audit with due professional care and in accordance with professional standards, including GAAS and the PCAOB.

73.     Among other things, Deloitte was required to:

a.      adequately plan the audit, including its nature, timing and scope;

b.      obtain a sufficient understanding of the Debtors and their environment (including their internal controls) to assess the risk of material misstatement of the 2006 Financial Statements;

c.      obtain sufficient and appropriate audit evidence to afford a reasonable basis for its opinion regarding the 2006 Financial Statements under audit; and

703159/013-1860523.12

d.      state whether the 2006 Financial Statements were prepared in accordance with GAAP.

74.     Deloitte breached its duty of professional care and contractual obligations to the Debtors and otherwise failed to perform the 2006 Audit and reviews in accordance with GAAS and other professional standards (including those of the PCAOB) by, among other things:

a.      not planning and preparing the 2006 Audit appropriately in light of the risks of the engagement;

b.      not ensuring that the Debtors complied with GAAP regarding the Debtors' methodology for calculating the ALL for the LHFI portfolio, the Repurchase Reserve, gains involving gestated loans, and LOCOM for the LHFS portfolio;

c.      not exhibiting the appropriate amount of professional skepticism in reviewing the methodology employed by the Debtors to calculate the ALL for the LHFI portfolio, the Repurchase Reserve, gains involving gestated loans, and LOCOM for the LHFS portfolio;

d.      not obtaining sufficient competent evidence through inspection, observation, inquiries and testing to afford a reasonable basis for its unqualified opinion regarding the 2006 Financial Statements; and

e.      not uncovering material weaknesses and significant internal control deficiencies relating to the calculation of the ALL for the LHFI portfolio, the Repurchase Reserve for LHFS, gains involving gestated loans, and LOCOM for the LHFS portfolio.

## A.    <u>Deloitte's Audit Deficiencies Concerning The Repurchase Reserve</u>

75.     Deloitte's audit of the Repurchase Reserve violated GAAS and the PCAOB standards, as well as its contractual obligations, given Deloitte's failure to perform proper testing on the Debtors' calculation of the Repurchase Reserve as required by GAAS General Standard No. 3.

76.     Deloitte tested the reasonableness of the Repurchase Reserve by examining only *actual* repurchase requests received by the Debtors and failed to consider *potential* repurchase requests.  If Deloitte had followed professional standards, it would have required that all

-20-

obligations, representations and warranties on sold loans be examined and that the loans subject to a repurchase obligation be identified, and then that information would have been the starting point for ascertaining the reasonableness of the Repurchase Reserve. If Deloitte had followed the applicable professional standards, it would have determined that the Repurchase Reserve reflected in the 2006 Financial Statements was calculated based on only a small subset of loans having a potential repurchase obligation, and was, thus, significantly understated as of December 31, 2006.

77.    Deloitte also failed to perform additional testing on the adequacy of the Repurchase Reserve after the Debtors experienced a 15% increase in repurchase requests shortly after the 2006 year-end, including estimating how much of the increase was applicable to loans sold prior to year-end and then re-evaluating the Repurchase Reserve computation.

78.    Furthermore, Deloitte did not obtain sufficient and competent audit evidence to afford a reasonable basis for its opinion that the methodology and calculation of the Repurchase Reserve was adequate and conformed to the requirements of GAAP, as required by GAAS Standard of Fieldwork No. 3 and Standard of Reporting No. 1.  In fact, even under this faulty methodology the $6.9 million Repurchase Reserve was understated by at least $4 million.

79.    If Deloitte performed the 2006 Audit in accordance with standards of due professional care and its contractual obligations, it would have determined that the Repurchase Reserve as reflected in the 2006 Financial Statements violated GAAP and was misstated in an amount in excess of $30 million.

### B.    Deloitte's Audit Deficiencies Concerning The Valuation Of The LHFS Portfolio

80.    Deloitte's audit of the LHFS failed to comply with GAAS and the PCAOB standards, as well as its contractual duties, as it failed to perform proper testing on the

-21-

methodology used to value the portfolio to ensure that such methodology complied with GAAP and that the LHFS were appropriately valued as required by GAAS General Standard No. 3.

81.    The methodology used in the 2006 Financial Statements, however, did require that the value of each individual or specific loan in the LHFS portfolio be considered.  In fact, if Deloitte had taken into consideration all of the relevant factors that determined the LOCOM valuation of the LFHS (including the riskiness of the LHFS portfolio, the Debtors' rapid growth from 2005 to 2006, and the significant change in the mortgage loans products originated by the Debtors), Deloitte would have determined that the methodology used in the 2006 Financial Statements resulted in significant overstatement of the LHFS portfolio.

82.    Moreover, if Deloitte had conducted proper testing, it would have determined that a proper LOCOM valuation methodology was not used, as required by GAAP (SFAS No. 65), this failure also constitutes a breach of Deloitte's duties under Standard of Reporting No. 1.

83.    Deloitte's audit of the LHFS also violated GAAS Fieldwork Standard No. 3 in that it failed to obtain sufficient and competent audit evidence to afford a reasonable basis for its opinion that the methodology used to value the LHFS portfolio was proper.  For example, Deloitte failed to perform more detailed testing on the loans comprising the LHFS portfolio to ensure that all of the relevant factors were taken into account, including the loans' high risk nature, that the $130 million of loans in LHFS were already repurchased by the Debtors, and the nearly 10% delinquency rate at December 31, 2006.

### C.    Deloitte's Audit Deficiencies Concerning The Recordation Of Gains On Gestation Transactions

84.    Deloitte's audit of the transactions involving gestated loans, including the related recordation of gains, failed to comply with the standards of due professional care, GAAS General Standard No. 3, the PCAOB standards, as well as its contractual obligations, as it failed

to perform proper testing on the accounting treatment and valuation with respect to the gains reported in the 2006 Financial Statements in connection with such transactions.

85.    Among other things, Deloitte did not evaluate whether such transactions constitute "sales" under GAAP, and thus, whether the recordation of related gains and the amounts thereof were appropriate. Nor did Deloitte verify the accuracy of the amount of gains recorded by confirming that the price agreed upon at the time of the interested investor's agreement to purchase the loans was the actual price at which the gestated loan pool sale closed, or address the appropriateness of the timing of the recognition of the gain in 2006 versus 2007.

86.    As for the transactions generally, Deloitte also failed to obtain sufficient and competent audit evidence to afford a reasonable basis for its opinion that these transactions constituted sales as required by GAAS Fieldwork Standard No. 3. Among the audit evidence that Deloitte failed to obtain was information explaining the reasons why certain loans were not sold shortly after receiving a commitment to purchase, and the price at which the loans were ultimately being sold. This information was required for Deloitte to properly test whether the sales and gains were accurately reported in 2006 and conformed to GAAP.  In addition, Deloitte also failed to perform any procedures to verify whether the Debtors collected the full amount of the receivables related to the gestated loans.

87.    If Deloitte had conducted proper testing, it would have determined that the recordation of gains on gestated loan transactions violated GAAP; Deloitte thus also violated GAAS Standard of Reporting No. 1.

**D.    Deloitte's Audit Deficiencies Concerning The ALL For LHFI**

88.    Deloitte's audit of the accounting for ALL for the LHFI portfolio failed to comply with GAAS and the PCAOB standards, as well as its contractual obligations, as it failed to perform proper testing on whether the methodology used for calculating the ALL conformed to

-23-

GAAP and the Debtors' own stated policies, as required of Deloitte by GAAS General Standard No. 3.

89.    Instead of testing the information provided by the Debtors that listed the loans comprising the LHFI portfolio and the amount of the ALL calculated by the Debtors, Deloitte used the benchmarking analysis conducted by Deloitte's Capital Markets Group, which used three portfolios classified as "prime loans," to benchmark the ALL. Deloitte's use of the Capital Markets Group's benchmarking analysis to test the ALL for LHFI was improper because the three prime portfolios used for the analysis did not fairly represent the loans in the LHFI portfolio, which was largely comprised of high risk loans, including pay option ARMs.

90.    In addition, Deloitte failed to address the deteriorating macroeconomic environment, consider the substantially increasing default rates on the Debtors' loan portfolio and evaluate factors that impacted the calculation of the ALL, including the high percentage of riskier mortgage loans comprising the LHFI portfolio. As of December 31, 2005, borrower delinquencies for the Debtors' loans in the LHFI were 0.41%, which significantly increased (over 380%) to 1.56% as of December 31, 2006.  The dollar amount of delinquent loans increased from $14.2 million at December 31, 2005, to $97.9 million at December 31, 2006, and $78.0 million of this increase related specifically to loans pending foreclosure.

91.    Deloitte even recognized the potential risks associated with the LHFI pool and the ALL, and therefore, stated that it would design its audit of the ALL to account for these risks. Despite such recognition and its newly-designed audit plan, in the actual performance of its audit testing Deloitte ultimately did not consider these important factors in its audit work.

703159/013-1860523.12

92.     If Deloitte had properly tested the ALL, it would have discovered that the methodology used to calculate the ALL violated GAAP (and the Debtors' own stated policy), thus, Deloitte also violated GAAS Standard of Reporting No. 1.

93.     Finally, Deloitte failed to obtain sufficient and competent audit evidence to afford a reasonable basis for its audit opinion as required by Standards of Fieldwork No 3. Given, among other things, the high risk nature of the Debtors' LHFI portfolio and market conditions showing substantial increases in delinquencies and mortgage losses, Deloitte should have performed additional testing of the ALL calculation and challenged the inclusion of only 3 prime portfolios in the analysis conducted by Deloitte's Capital Markets Group.

### E.     Deloitte's Audit Deficiencies Concerning The Debtors' Internal Controls

94.     GAAS and the Engagement Agreement required Deloitte to conduct a proper examination of the Debtors' internal controls (including accounting, financial and managerial controls), to understand the internal controls (including the risk that material misstatements exist in the financial statements), and to determine whether reliance on those controls is justified. If Deloitte determined that such internal controls were unreliable, it was required to expand the nature and scope of the audit procedures.

95.     The 2006 Audit of the Debtors' internal controls over financial reporting was not conducted by Deloitte in accordance with the professional standards, including those of the PCAOB.

96.     GAAS Standard of Fieldwork No. 2 requires that an auditor have a sufficient understanding of the company's internal controls to properly plan the audit, assess risks and determine the nature, timing, and extent of audit testing to be performed. According to Auditing Standards (AU Section §110.03), while it is management's responsibility to implement

-25-

accounting policies and establish and maintain internal controls, it is the auditor's responsibility to express an opinion on management's assessment of the effectiveness of the company's internal control over financial reporting.

97.    During the course of the 2006 Audit, Deloitte became aware or should have become aware of instances where the Debtors accounting for the Repurchase Reserve, LOCOM valuation of LHFS, reporting of gains on transactions involving gestated loans and calculation of the ALL for LHFI contained material errors or irregularities.

98.    For example, Deloitte failed to ensure that the Debtors' written policies were consistent with the actual practices for recording the LOCOM reserve and the valuation of the mortgage loans in the LHFI and LHFS portfolios.  Deloitte failed to ensure that the calculation of the Repurchase Reserve or the inputs used to evaluate the sufficiency of the Repurchase Reserve were proper, and failed to design its audit procedures to accurately compute the Repurchase Reserve.

99.    Deloitte violated Standard of Fieldwork No. 2 by failing to:

   a.    obtain information and understand the Debtors' internal controls sufficient to plan the 2006 Audit and determine the proper nature and scope of the testing;

   b.    detect material weaknesses and deficiencies in the Debtors' internal controls relating to their calculation of the Repurchase Reserve and LOCOM valuation of LHFS, including checking whether the methodologies employed by the Debtors were consistent with their stated policies, which they were not;

   c.    detect material weaknesses and deficiencies in the Debtors' internal controls relating to Debtors' reporting gains on sales involving gestated loans, including the accuracy of the Debtors' calculation of the gains; and

   d.    detect material weaknesses and deficiencies in the Debtors' internal controls relating to their calculation of the ALL for LHFI, including checking whether the Debtors' actual practices complied with their stated policies.

-26-

100.    If Deloitte had complied with GAAS and performed proper and sufficient testing on the Debtors' internal controls, it would have learned that the information contained in the 2006 Financial Statements, and the Debtors' procedures and policies relating to the accounting for the Repurchase Reserve and LOCOM valuation of LHFS, reporting of gains on transactions involving gestated loans and calculation of the ALL for LHFI contained material misstatements, and the 2006 Financial Statements were not fairly presented in accordance with GAAP.

## V.    **The Damages**

101.    The material misstatements in the 2006 Financial Statements rendered them unreliable.

102.    Deloitte, in performing the 2006 Audit, did not (1) detect or recommend that the Debtors correct the misstatements in the 2006 Financial Statements; (2) propose audit differences related to the calculation of the Repurchase Reserve, the LOCOM valuation of LHFS, and the ALL for LHFI, or the recordation of gains involving gestated loans; or (3) issue an adverse or qualified opinion in connection with the 2006 Audit.

103.    By reason of Deloitte's failure to conduct the 2006 Audit in accordance with professional standards, the Debtors proceeded without correcting the 2006 Financial Statements or with knowledge that those financial statements were materially misstated.  Thus, the Debtors operated as if they actually generated a reported net income of $263.5 million in 2006, when due to the various misstatements noted above, the actual net income was substantially less.

104.    The actual losses and damages that were proximately caused by Deloitte's failure to perform the 2006 Audit in accordance with the standards of the PCAOB and GAAS, as well as their obligations under the Engagement Letter, include, among others, the following:

> a.    excessive bonuses paid to the Debtors' employees based upon materially misstated financial performance for the year ended December 31, 2006, as reported in the 2006 Financial Statements;

703159/013-1860523.12

b.      excessive dividends which were calculated based upon the materially misstated financial performance for the year ended December 31, 2006; and

c.      fees paid by the Debtors to Deloitte.

### First Claim For Relief – Professional Negligence/Malpractice
### (incorporating all previous allegations)

105.    In performing the 2006 Audit, Deloitte owed a duty and obligation to the Debtors to perform that audit in a professional manner, with professional care, and in accordance with professional standards, including GAAS and those of the PCAOB.

106.    As described above, Deloitte failed to perform the 2006 Audit in a professional manner, with professional care and in accordance with professional standards, including GAAS and those of the PCAOB.

107.    As a direct and proximate result of Deloitte's negligence/malpractice, Plaintiff is entitled to damages of at least $75 million.

### Second Claim For Relief – Negligent Misrepresentation
### (incorporating all previous allegations)

108.    As described above, Deloitte made numerous representations to the Debtors, including that:

a.      the 2006 Financial Statements presented fairly, in all material respects, the Debtors' financial condition as of December 31, 2006, and in conformity with GAAP;

b.      the 2006 Audit was conducted in conformity with professional standards, including GAAS and those of the PCAOB;

c.      the Debtors maintained effective internal controls over financial reporting as of December 31, 2006;

d.      the Debtors in 2006 were properly accounting in accordance with GAAP for the Repurchase Reserve, valuation of the LHFS, gains involving gestated loans, and the ALL for LHFI; and

e.      the Debtors' accounting policies and practices in 2006 were in conformity with GAAP.

-28-

109.    Deloitte owed a duty to the Debtors in making those representations.

110.    The representations made by Deloitte were false and/or misleading when made, and Deloitte knew or reasonably should have known that such representations were false and/or misleading.

111.    Deloitte knew or reasonably should have known that the Debtors would rely on its representations.

112.    Debtors reasonably relied to their detriment on Deloitte's representations in among other things, awarding, declaring and paying bonuses and dividends.

113.    As a direct and proximate result of Deloitte's negligent misrepresentations, Plaintiff is entitled to damages of at least $75 million.

**Third Claim For Relief – Breach of Contract**<br>**(incorporating all previous allegations)**

114.    Pursuant to the terms of the Engagement Agreement between the Debtors and Deloitte, Deloitte agreed to provide audit and review services to the Debtors in accordance with GAAS and those of the PCAOB.

115.    Deloitte materially breached the terms of the Engagement Agreement with the Debtors by, among other things, failing to render audit services in accordance with GAAS and those of the PCAOB.

116.    As a direct and proximate result of Deloitte's material breach of the Engagement Agreement, Plaintiff is entitled to damages of at least $75 million.

**WHEREFORE**, Plaintiff, on behalf of the Debtors' estate, requests entry of a judgment against Deloitte:

      a.    on the First Claim For Relief, awarding an amount not less than $75 million, together with interest;

703159/013-1860523.12

b.  on the Second Claim For Relief, awarding an amount not less than $75 million, together with interest;

c.  on the Third Claim For Relief, awarding an amount not less than $75 million, together with interest;

d.  awarding Plaintiff the costs and expenses of this adversary proceeding, including reasonable attorneys' fees; and

e.  awarding Plaintiff such and further legal or equitable relief as the Court may deem just and proper.

Dated: June 11, 2010

**BLANK ROME LLP**

*/s/  David W. Carickhoff*
Bonnie Glantz Fatell (DE Bar No. 3809)
David W. Carickhoff (DE Bar No. 3715)
1201 Market Street, Suite 800
Wilmington, Delaware 19801
Telephone:    (302) 425-6404
Facsimile:    (302) 428-5101

**HAHN & HESSEN LLP**
John P. McCahey
Robert J. Malatak
Christina J. Kang
488 Madison Avenue
New York, NY  10022
Telephone:    (212) 478-7200
Facsimile:    (212) 478-7400

*Co-Counsel for Plaintiff*