IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| AMERICAN HOME MORTGAGE HOLDINGS, | . | Case No.07-11047(CSS) |
| INC., a Delaware corporation, | . | (Jointly Administered) |
| *et al.,* | . | |
| | . | June 30, 2010 (9:06 a.m.) |
| Debtors. | . | (Wilmington) |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

| | | |
|---|---|---|
| AMERICAN HOME MORTGAGE CORP., | . | |
| AMERICAN HOME MORTGAGE | . | |
| INVESTMENT CORP. and THE | . | |
| OFFICIAL COMMITTEE OF UN- | . | |
| SECURED CREDITORS OF AMERICAN | . | |
| HOME MORTGAGE HOLDINGS, INC., | . | |
| *et al.,* | . | |
| Plaintiffs, | . | |
| v. | . | Adversary Proceeding |
| | . | Case No. 09-51702(CSS) |
| JPMORGAN CHASE BANK, N.A., | . | |
| | . | |
| Defendant. | . | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Debtors: | Sean M. Beach, Esq. |
| | Young, Conaway, Stargatt & Taylor |
| | |
| For JPMorgan Chase: | Emil Kleinhaus, Esq. |
| | Wachtell, Lipton |
| | Dan Rath, Esq. |
| | Matt McGuire, Esq. |
| | James Greer, Esq. |
| | Landis, Rath & Cobb |
| | |
| For the Committee: | Michael Morris, Esq. |
| | Jeanne E. Irving, Esq. |
| | Hennigan, Bennett & Darman |
| | Rick Miller, Esq. |
| | Ferry, Joseph & Pearce |

<u>Audio Operator</u>:      Leslie Murin
<u>Transcriber</u>:        Elaine M. Ryan
                       (302) 683-0221

                Proceedings recorded by electronic sound recording;
                 transcript produced by transcription service.

```
1              THE CLERK: All rise.

2              THE COURT: Please be seated.  Good morning.

3              ALL: Good morning, Your Honor.

4              THE COURT: Mr. Kleinhaus.

5              MR. KLEINHAUS: Good morning, Your Honor.

6              THE COURT: You're the movant - Oh, I'm sorry,

7    you're not the movant.

8              MR. KLEINHAUS: It's the Committee's motion, so -

9              THE COURT: Yeah - Hey, it's 9:09.

10             MR. MORRIS: Thank you, Your Honor.

11             THE COURT: I'll get better as we go along, I

12   promise.

13             MR. MORRIS: Hopefully, I'll do the same.  I'm

14   Michael Morris.  We're with Hennigan, Bennett & Darman.  We

15   are the special conflicts counsel for the Committee.  With me

16   is Jeanne Irving, my colleague, also from Hennigan, Bennett &

17   Darman, and Rick Miller, our local counsel from Ferry,

18   Joseph.  We will primarily address the motion.  Mr. Beach is

19   here for the debtors who may also have remarks with respect

20   to the motion.

21             THE COURT: Could you move the microphones a little

22   closer, please.

23             MR. MORRIS: Sure.

24             THE COURT: Thank you.  There you go.  Thank you

25   very much.
```

1        MR. MORRIS: Is that better?

2        THE COURT: Yes.

3        MR. MORRIS: Your Honor, the complaint in this case

4    was filed jointly by the debtors and the Committee to obtain

5    declaratory relief, recover certain avoidable transfers, and

6    other related relief from JPMorgan Chase.  The basic facts

7    underlying the complaint are fairly simple.  Prior to the

8    filing of the case, the debtor and Chase entered into a

9    credit agreement secured by pooled mortgages.  In the normal

10   course of business, the debtors, as the managers and

11   servicers of the mortgages that were then the lien

12   collateral, would foreclose on defaulted mortgages.  As a

13   part of the process of foreclosing on the defaulted mortgages

14   and as a consequence of those foreclosures, the debtors would

15   acquire real property.  Having acquired the real property,

16   there was never any mortgage executed in favor of JPMorgan

17   with respect to that real property, and this action is filed

18   really to determine the legal consequence of both foreclosure

19   and the acquisition of the real property and the failure of

20   JPMorgan to file any real property secured devises with

21   respect to that real property.

22       THE COURT: And just so I'm clear, those activities,

23   the foreclosures, the conversion to the REO property, that

24   was both pre-petition and post-petition conduct.

25       MR. MORRIS: Correct.

1          THE COURT: And what was the breach?

2          MR. MORRIS: What was the breach of the underlying

3     mortgages or -

4          THE COURT: No, no, what was your breach?  They

5     allege you breached the contract, and you acknowledge, I

6     believe, that if there was a breach it was a pre-petition

7     breach.

8          MR. MORRIS: JPMorgan alleges that there was a

9     breach of § 7.4 of the credit agreement, which provides that

10    after foreclosure if the debtors acquire real property, they

11    will deliver executed mortgages.  Whether or not that

12    constitutes a breach is the issue that they've raised in the

13    second counterclaim.  Our position - and I'll elaborate on

14    that further, is that whether or not there was a breach of

15    that provision, even if proven, that breach would yield only

16    a pre-petition unsecured claim.

17         THE COURT: So even if is there's post-petition

18    conduct which if - and again, for purposes of a motion to

19    dismiss, post-petition conduct in violation of a pre-petition

20    agreement which gives rise to potential damages by the non-

21    breaching party, your position is, nonetheless, that's a pre-

22    petition claim.

23         MR. MORRIS: Correct.

24         THE COURT: And the contract had not been rejected

25    or otherwise terminated.

1        MR. MORRIS: Nor had it been assumed nor is it

2   really an executory contract, this is a credit agreement.

3        THE COURT: Alright, and you rely on <u>Transworld</u>

4   <u>Airlines</u>.

5        MR. MORRIS: We do, and several other cases to the

6   same effect.

7        THE COURT: Doesn't that give an incentive for

8   debtors to basically commit wrongdoing post-petition knowing

9   that they'll get 100-cent dollars as a result of their

10  wrongdoing and only have to pay out 5-cent dollars, and the

11  Bankruptcy Code says - Well, we looked to state law and we

12  also tried to preserve the rights of debtors and creditors as

13  they would exist under state law, unless there's a bankruptcy

14  reason, otherwise.  There's something about bankruptcy that

15  alters the debtors' rights, and what is it here that should

16  give, in effect, the debtors special treatment to breach

17  contracts and yet not have to pay damages?

18       MR. MORRIS: Well, Your Honor, there's a couple of

19  concepts embedded in that.  First, it is probably true that

20  the debtor breached covenants in pre-petition agreements for

21  virtually every financing that it has.  In addition to the

22  fundamental breach of failing to pay, I would venture a guess

23  that the debtor breached covenants with respect to margin

24  payments, with respect to maintenance of net worth, with

25  respect to reporting, with respect - There's all kinds of

1    breaches of pre-petition credit agreements that occur by

2    debtors post-petition.  With respect to -

3         THE COURT: Alright, so your position - Okay, but

4    those breaches are - Alright, so you're going to draw the

5    distinction, clearly a pre-petition breach of the contract is

6    a pre-petition claim.

7         MR. MORRIS: It's a pre-petition claim, and it -

8         THE COURT: And then the question would be, is there

9    a distinction between the continuation of a pre-petition

10   breach, i.e., not curing the pre-petition breach as opposed

11   to breaching again and repeatedly according to the

12   allegations on a post-petition basis?

13        MR. MORRIS: I guess that's - I understand that

14   point, but that's not really the distinction I would draw.

15        THE COURT: Okay.

16        MR. MORRIS: For example, in this case, the debtor,

17   again, probably breached lots of provisions of the pre-

18   petition credit agreement.  With respect to the collateral

19   and the maintenance of the collateral, bankruptcy imposes a

20   whole other set of rules.  It says, for example, that the

21   debtor may continue to use, sell, or lease property in which

22   someone has a security interest in the ordinary course of

23   business without notice or a hearing.  Now, the other party

24   has a right to ask for adequate protection to condition that

25   use of property on any basis.  They could have, for example,

1    sought adequate protection to prohibit foreclosures, adequate

2    protection to allow the filing of the mortgages, adequate

3    protection to relieve them of the requirement to file

4    mortgages with respect to the property.  So, the Bankruptcy

5    Code, even though there are a number of agreements, I mean, a

6    myriad of agreements that the debtor had pre-petition that

7    the debtor continues to breach post-petition.  The normal

8    operation of his business does provide protection for a

9    secured creditor, as in this case, with respect to the

10   management of its collateral, but it places that burden on

11   the secured creditor to seek that relief, otherwise, the

12   debtor continues to operate in the normal course of business,

13   and the normal course of business in this case -

14            THE COURT: Was the breach.

15            MR. MORRIS: Well, actually is was, and that sort of

16   raises the issue of whether or was a breach, but the normal

17   course of business throughout this relationship was the

18   debtor foreclosed on defaulted mortgages, obtained real

19   property, and never in the two years prior to the bankruptcy

20   case did they debtors ever give a mortgage on that real

21   estate.  They never refused to do so either because JPMorgan

22   never demanded that they do so.

23            THE COURT: Well, now, you're -

24            MR. MORRIS: And that's the manner in which the

25   parties operated.

1          THE COURT: Now you're getting into issues that

2    would probably be not sufficient to - allegations on your

3    side that would not be sufficient to defeat a motion to

4    dismiss and would probably give the other side a right to

5    discovery, if you're starting to talk about course of conduct

6    in the last two years and what was the ordinary course of

7    business and what wasn't, they can get discovery on that.

8          MR. MORRIS: They can, but the point that I was

9    trying to get to with respect to that is looking at the pre-

10   petition claims and looking at this contract, JPMorgan has

11   already filed proofs of claim, they so allege both in the

12   pleading and in their response to the motion.  Presumably, in

13   those proofs of claim, they've asked for the full amount due

14   under their debt.  The most that JPMorgan will ever receive

15   on account of this pre-petition claim is the amount that it's

16   owed, regardless of what breaches may have occurred pre-

17   petition or post-petition.  Their maximum claim is going to

18   be whatever it is, which is, it's going to be the amount that

19   they're owed under the debt less the application of any

20   collateral.

21         THE COURT: Well, clearly, I mean, the question is

22   not - Well, our law is that if it makes sense to breach a

23   contract from an economic perspective, go ahead and breach,

24   but you're liable for damages.

25         MR. MORRIS: Right.

1          THE COURT: Expectation damages and we all covered

2     that in what - day one of contracts, first year in law

3     school, but the question is, bankruptcy puts a spin on that.

4          MR. MORRIS: Uh-huh.

5          THE COURT: And it puts the spin on that of the fact

6     that there's a distinction between general and secured

7     claims, secured claim and administrative expense claim.

8          MR. MORRIS: Yes.

9          THE COURT: And what I'm struggling with is - or

10    what I will struggle with throughout today, is this concept

11    that a continued repeated post-petition breaches of a pre-

12    petition contract are such that clearly they give rise to

13    damages.

14         MR. MORRIS: Uh-huh.

15         THE COURT: They're occurring on a post-petition

16    basis.

17         MR. MORRIS: Uh-huh.

18         THE COURT: Even though the contract had initially

19    been breached pre-petition and yet there's no entitlement to

20    administrative expense claims.  Clearly, there's a benefit to

21    the debtors' estate to convert the property to make it REO

22    property and then ultimately sell the REO property.  So, it's

23    not a question of whether there's a benefit to the estate in

24    breaching, so I - Don't your damages have to be post-petition

25    administrative expense damages at least potentially because

1    otherwise you're creating a perverse incentive to allow the

2    debtor to breach post-petition and not really pay the freight

3    of expectation damages?

4              MR. MORRIS: Well, Your Honor, I don't think that's

5    the case for a couple of reasons, but first, if you examine,

6    for example, in the <u>TWA</u> case where the Court held that post-

7    petition breach of a pre-petition contract could yield only a

8    pre-petition claim.  The contract in that case as an

9    indemnity agreement where the debtors were to indemnify for

10   what was alleged to be continuing conduct and post-petition

11   conduct with respect to that indemnity agreement, and the

12   Court found that because it was a pre-petition contract, it

13   simply represented a pre-petition claim, and that's been a

14   fairly consistent holding throughout the series of cases that

15   we articulated.  Now, because the - and then you also have to

16   look at, in the context of this case, it doesn't increase the

17   unsecured claim of - I mean, it doesn't increase the damages

18   that JPMorgan would incur.  Their damages are simply the

19   amount that's due on the debt.

20             THE COURT: I agree.

21             MR. MORRIS: So, that there's no increase in damages

22   by reason of this conduct, and, what the Bankruptcy Code does

23   specifically with respect to collateral is impose the burden

24   to protect collateral or to obtain adequate protection for

25   the debtors' ordinary course use of that collateral on the

1    secured creditor.   So the secured creditor is not -

2          THE COURT: They alleged that you wrongfully,

3    basically hid your actions against them and did not give them

4    a fair opportunity to protect their rights.   Now, and again,

5    it's a motion to dismiss.   I don't know if that would hold up

6    or not, but if I take that allegation, at least - and I don't

7    know if it meets the Trombly (phonetical) standard but if I

8    take that allegation at least at face value for purposes of

9    the discussion you and I are having, again, it raises this

10   issue that you have hoodwinked them into not seeking adequate

11   protection.

12         MR. MORRIS: There's a couple of things about that

13   that are both contained in their allegations that negate that

14   implication.   First, the very credit agreement that we're

15   talking about, as I think they even referred to as a scratch

16   and dent facility as to which they knew there were

17   foreclosures, they happened pre-petition, they happened post-

18   petition, they knew they were going on, the debtors clearly

19   stated on the record in the motion that they referred to that

20   in the ordinary course of business it forecloses on defaulted

21   mortgages.   This was within the first month of the case, and

22   this yielded an order with respect to the sale of REO

23   properties that they have themselves cited in connection with

24   this motion to dismiss, and it's on the record in these

25   proceedings.   JPMorgan was well aware that foreclosures were

1    occurring with respect to defaulted mortgages in the ordinary

2    course of business and as a continuing basis.  They also knew

3    that they were not getting real property mortgages on these

4    REO properties.  I mean, this is not something that someone

5    led them to believe they were getting real property

6    mortgages, they knew full well they weren't.  So, they knew

7    the foreclosures were occurring in the normal course of

8    business.  They knew that they weren't getting mortgages with

9    respect to those, and they knew that they needed to get

10   mortgages to have a security interest in that real property

11   as evidenced by their own documents.  So, all of those

12   elements were well known and are within the context of this

13   motion to dismiss as being well known by JPMorgan.  So, as a

14   consequence, the allegation that somehow the debtors were

15   hiding this process, just doesn't hold up even under the

16   context of a motion to dismiss because they have both in

17   their counterclaims and in their answer and in this motion

18   acknowledged each of those elements.  And so, the only thing

19   that's at issue with respect to that is not whether the

20   debtors were foreclosing or whether JPMorgan knew or should

21   have known that they were foreclosing or rather, what's the

22   legal effect of that.  In their objection with respect to

23   what the debtors were doing, it seems not to be that the

24   debtors were foreclosing on real property.  They knew that.

25   In fact they were receiving proceeds of it before the debtor

1   realized and corrected its error in distributing proceeds of

2   REO properties to them.  So, they knew that the foreclosures

3   were occurring.  They knew that REO was being acquired.  They

4   knew that REO was being sold throughout this process.  So,

5   the only complaint about this whole process is that the

6   debtors and the Committee have raised the legal issue of what

7   the legal effect of that process was.  There was nothing else

8   that was occurring that the debtors were doing with respect

9   to this property that was unknown to JPMorgan.  It may be

10  that they didn't know that property X, Y, Z located at a

11  particular address was the actual subject of foreclosure, but

12  they certainly knew that foreclosures were occurring in the

13  normal course of business, particularly in this market, and

14  they knew that REO was being acquired.  It's on the record in

15  this proceeding.  They have cite it.  So the only element

16  that they didn't - and they knew that they didn't have

17  mortgages on that REO.  So there's no element of anything

18  that the debtors did that was unknown to JPMorgan except

19  perhaps in this specific, SUA specific property, but they

20  certainly knew that this process was occurring, continuing,

21  and a part of the normal operation of managing these

22  mortgages.  So in that context, to say that the burden is on

23  them to do what the Bankruptcy Code says a secured creditor

24  should do if it has concern with respect to the use of its

25  property in the normal course of business, is to do that

1   which they did not do, which is to seek adequate protection

2   for their interest in some respect and the manner in which

3   they could have done so, there's a list of things they could

4   have done were they truly concerned on that, but the debtor

5   is authorized to continue to operate in the normal course of

6   business.  It is authorized to use, sell, or lease property

7   in the normal course of business even if there's a security

8   interest in that property and it is the burden of the secured

9   creditor to condition or otherwise seek adequate protection

10  with respect to that use.

11          THE COURT: Well, of course, there are limitations

12  on that.  You have to acknowledge that.  You're not allowed

13  to use their property to set up a meth lab.

14          MR. MORRIS: No.

15          THE COURT: And, you know, increase your returns -

16          MR. MORRIS: No, obviously, and one can't destroy

17  property and we're not - and that didn't occur here.  It's

18  not alleged to have occurred here.  The only thing that is

19  alleged to have occurred here is that debtors foreclosed on

20  defaulted mortgages, and what the Court would determine in

21  the context of this proceeding is, What is the legal effect

22  of that activity?  So, you don't have to reach the concept

23  that the debtor could, you know, destroy property, operate a

24  meth lab, do something like that in order to decide this

25  case.  This was normal, ordinary, lawful use of property.

1          THE COURT: Well, and my only pont, obviously, an

2    absurd example, but my only point being that you seem to be

3    saying, you seem to be asserting in effect a blanket rule

4    that the debtor can in the post-petition time period breach a

5    pre-petition contract, and all it gives rise to is a pre-

6    petition breach, and that seems to have a blanket rule there,

7    seems somewhat aggressive to me, and then the question

8    becomes certainly - then the question becomes in the context

9    of a motion to dismiss, is application of a blanket rule

10    appropriate, and then the background would be, Alright, well,

11    if it's not a blanket rule, what are the parameters of the

12    rule?

13          MR. MORRIS: I think - and that's fine.  And I think

14    to decide this case on this motion to dismiss, one doesn't

15    need to decide the extremes other than there's certainly

16    adequate law and rules that would protect a party from

17    extreme examples, but for example, if the debtors should

18    breach a provision as in the <u>TWA</u> case with respect to an

19    indemnity that existed pre-petition and breach it post-

20    petition, the Court has held and granted a motion to dismiss

21    on the finding that such a breach would only constitute a

22    pre-petition claim.  Similarly in this case, there may well

23    have been other breaches of other provisions of this claim.

24    It doesn't increase the amount that they're owed, but it

25    would still constitute nothing other than a pre-petition

1    claim, and the purpose of that is, with respect to, for

2    example, in an executory contract, which this isn't because

3    it's a credit agreement, but an executory contract post-

4    petition breaches occur regularly, and if the debtor rejects

5    that contract, even though those breaches may have occurred

6    post-petition, absent some particular use and benefit -

7             THE COURT: Well, the Code helps -

8             MR. MORRIS:  - that it's a pre-petition claim.

9             THE COURT: The Code helps you out there because it

10   says that a rejection has the effect of being a breach as of

11   the petition date.

12            MR. MORRIS: It does, but these cases also following

13   the same logic hold that a breach of a contract which happens

14   not to be a pre-petition claim -

15            THE COURT: If you reject a claim - Say you have a

16   lease of real property and obviously you have your 365(d)(3)

17   obligations that you fail to meet and then you reject the

18   executory contract, it's deemed to be a pre-petition breach -

19            MR. MORRIS: Right.

20            THE COURT:  -nonetheless, the violation of the

21   365(d)(3) obligations would give rise to an administrative

22   expense claim.

23            MR. MORRIS: Right, and that's because the

24   Bankruptcy Code imposes that administrative expense claim.

25   No such claim is imposed in this case, at least absent the

1   granting of an adequate protection.

2          THE COURT: Well, to be unfair to you, the Third

3   Circuit ruled yesterday that 365(3) doesn't supplement or

4   supplant 503(b)(1).  So, take me out of my 365(d)(3) example

5   and just say, Alright, forget about (d)(3) let's make it,

6   say, a personal property lease that's rejected on day 59 -

7          MR. MORRIS: Uh-huh.

8          THE COURT:  - and you don't pay the rent under the

9   lease - excuse me, the lease payments under the personal

10  property lease and you reject it, there would be an argument

11  there'd be a 503(b)(1) claim there.

12         MR. MORRIS: Sure, but that 503(b)(1) claim is based

13  upon the post-petition use of that property.

14         THE COURT: Uh-huh.

15         MR. MORRIS: And in this case, the debtor - the only

16  actions that the debtors are alleged to have taken, which is

17  the foreclosure of the defaulted mortgages, were actions that

18  it was authorized to take both by the contract, which clearly

19  contemplates that the debtor is going to continue to enforce

20  mortgages and foreclose on defaulted mortgages, and by the

21  Bankruptcy Code which specifically authorizes it to use,

22  sell, or lease property in the normal course of business, and

23  you add to that gloss the fact that the debtors' intention to

24  continue to foreclose on defaulted mortgages was made very

25  clear at the beginning of this case has been referred to by

1    JPMorgan.  There are no actions that were taken by the

2    debtors of which JPMorgan was unaware during the course of

3    this case and for which it could not have obtained the

4    appropriate protection under the 363 provisions of the

5    Bankruptcy Code.  So you don't have to reach the conclusion,

6    in fact it would be an inappropriate conclusion to reach,

7    that the secured creditor was in this case without remedy

8    with respect to these foreclosures.  They knew every element

9    that was continuing.  They had ample means to protect

10   themselves.

11            THE COURT: But would the recording of a mortgage by

12   the lender post-petition be a stay violation?

13            MR. MORRIS: Whether it would have been a stay

14   violation - I mean, I'll think about that for a moment, I

15   would think that whether it would be or not is something that

16   would have been easily remedied with respect to an order by

17   this Court.

18            THE COURT: In this concept, your argument is that

19   they were on notice that you were breaching the contract and

20   that they had a right or they had an obligation to seek

21   adequate protection or relief from the automatic stay or

22   ignore either of those and simply do the mortgage filings -

23            MR. MORRIS: Yeah.

24            THE COURT: - and they did not do so.

25            MR. MORRIS: They chose to do nothing.  And they -

1           THE COURT: Now, isn't that argument something that

2    is open to discovery because it hinges on what they knew and

3    when they knew it?

4           MR. MORRIS: But what I'm arguing is, and -

5           THE COURT: We may be getting very far afield of

6    your argument, so I apologize.

7           MR. MORRIS: No, that's quite alright.  The point is

8    that we have within the context of both their allegations in

9    their answering counterclaim and in their response to the

10   motion to dismiss an acknowledgment that they are aware of

11   every element of this already, because they are clearly aware

12   that they didn't get mortgages.  They're clearly aware that

13   defaulted mortgages are being foreclosed in the normal course

14   of business.  They are aware that as a part of foreclosing on

15   mortgages in the normal course of business, the debtors

16   acquired real property.  In this case, all of this is on the

17   record in the context of both this answer and counterclaims

18   and in the context of this motion to dismiss, each of those

19   elements are present.  So, it doesn't require any discovery

20   to determine that those elements have all been satisfied and

21   all exist in this case, and in that context, there is no

22   basis for an allegation that somehow JPMorgan was unaware

23   that foreclosures were taking place and unaware that REO was

24   being acquired.

25           THE COURT: Okay.

1          MR. MORRIS: And they knew on top of all of this

2    that they had no mortgage on the REO that was being acquired

3    by reason of the foreclosures.  So they knew and within the

4    context of this motion to dismiss are chargeable with

5    knowledge of all of the elements that would lead them to

6    believe that they either could acquiesce in this activity,

7    which is what they chose to do, or to seek some sort of

8    relief as they were permitted to do by § 363 of the

9    Bankruptcy Code, and as a consequence, the rules that are

10   annunciated in the law in the various cases that we've cited

11   that this kind of pre-petition breach occurring in the normal

12   course of business of a - post-petition breach of a pre-

13   petition contract can yield nothing other than a pre-petition

14   claim, and as such, an adversary proceeding forcing the

15   debtors to defend whether or not there was in fact a breach

16   of that provision is inappropriate.  They should be left to

17   their claims process, and the interesting thing about that is

18   that why does that make the difference, you might ask, since

19   the issue of what their pre-petition claim is, is going to

20   have to be decided in some fashion, but if you think about

21   the claims process, the only thing that will really be at

22   issue in the claims process is the amount that they're owed

23   under the credit agreement less the proper application of any

24   collateral that they have received.  There is not going to be

25   litigation in the claims process on whether the debtors

1   breached this or any other covenant contained in the credit

2   agreement because the debtors didn't pay and the maximum

3   amount of the damages are not increased by reason of the fact

4   that not only did they not pay but they breached their

5   reporting requirements and they breached the maintenance

6   requirements with respect to collateral ratios, and that they

7   breached other covenants that may be contained within the

8   credit agreement.  So, to allow the claim to proceed on what

9   can only yield a pre-petition claim is an enormous waste

10  because it forces the debtors to defend a cause of action

11  that otherwise will never require defense, discovery, or

12  prosecution, and it's for this reason that the Courts have

13  with some high level of consistency found that where a claim

14  can only yield a pre-petition claim it is not appropriate to

15  prosecute an adversary proceeding in the bankruptcy case.

16  And the cases that we've cited clearly stand for that

17  proposition.  In fact, even the cases that JPMorgan cites in

18  response, the Sherron case and the Diamond case don't really

19  stand for the opposite proposition nor does the Uni-Marts

20  case.  The Uni-Marts case, they cite for the proposition that

21  as long as the action's filed in the home court, it's not a

22  violation of the automatic stay, but what the Court said in

23  the Uni-Marts case was, the filing of that action perhaps on

24  a violation of the automatic stay but is nothing other than

25  the equivalent of the filing of a proof of claim.  The Court

1    in Uni-Marts also went ahead to dismiss the action that was

2    in front of it, and so, the ruling on the automatic stay was

3    really quite secondary and unnecessary to their decision.

4              THE COURT: So you're allowed to sue a party and

5    then say it's a violation of the automatic stay for them to

6    assert a counterclaim?

7              MR. MORRIS: If that counterclaim can yield nothing

8    other than a pre-petition claim.  If that counterclaim is not

9    just on a pre-petition claim, it's a different circumstance,

10   and in fact, if you look at the Uni-Marts case, the action

11   there also sought a determination of whether a D&O policy was

12   property of the estate.  So, it was not exclusively an action

13   on a pre-petition claim, but regardless of whether - the main

14   point is not necessarily a technical issue of whether filing

15   in the home court is a violation of the automatic stay that

16   might subject someone to an action purely for the violation

17   of the automatic stay, because that's not really what's at

18   stake in this case, but the automatic stay is designed to

19   funnel pre-petition claims through the claims process and to

20   allow the prosecution of what is only a pre-petition claim in

21   the context of an adversary proceeding does violate that

22   principle, and that's, again, I go back to the TWA case where

23   the Court specifically found that because the post-petition

24   violation of the indemnity agreement could only yield a pre-

25   petition claim, it was appropriate to dismiss that cause of

1    action for failure to state a claim, and that is the basis

2    upon which we would seek to dismiss that cause of action

3    contained in the counterclaims.  Unless you have other

4    questions with respect to that count, I will move -

5            THE COURT: No, I'm fine.

6            MR. MORRIS:  - crisply along.  The next cause of

7    action, which was Count 3 of the counterclaims alleges a

8    conversion.  This is related to what we've just discussed

9    with respect to the pre-petition claim in the sense that

10   JPMorgan has not alleged any action that will constitute a

11   conversion of their collateral.  The only actions taken by

12   the debtor with respect to the collateral was the foreclosure

13   on defaulted mortgages.  In order for there to be a

14   conversion, such an action would have to be an unauthorized

15   dominion over property or misapplication of funds or

16   something to that effect, and that is consistent with the

17   cases that even JPMorgan has cited with respect to

18   conversion.  In this case, the only obligation is that the

19   debtors foreclosed on defaulted mortgages.  They were

20   authorized to foreclose on defaulted mortgages, both by the

21   contract and by the Bankruptcy Code, and as a consequence,

22   the only action of which they can complain that the debtors

23   took is the foreclosure on defaulted mortgages, which they

24   were authorized to do, and perhaps a breach of contract.  A

25   breach of contract cannot form the basis for a conversion

1  claim, and as a consequence, their conversion claim fails to

2  state a claim for relief.  It's not a case where property was

3  misapplied.  All the property here is accounted for.  It's

4  reserved in accordance with stipulations and stipulated

5  orders that have been entered by this Court.  The

6  foreclosures were done in accordance with the authorization

7  contained both within the general rubric of the credit

8  agreement and the debtors' ability to operate the property in

9  the normal course and § 363 of the Bankruptcy Code.  There

10  simply was no action taken by the debtors with respect to

11  this collateral that could constitute wrongful conduct

12  sufficient to give rise to a conversion claim.  Your Honor,

13  with respect to the remaining claims for relief that we've

14  sought to dismiss, my colleague, Ms. Irving, will address

15  those, if that's acceptable to the Court.

16          THE COURT: Okay.  Thank you.

17          MR. MORRIS: Thank you.

18          MS. IRVING: Good morning, Your Honor.  I'm going to

19  be addressing Counts 4, 5, and 6 and riding the coattails of

20  Mr. Morris somewhat with respect to Count 4, that's for

21  unjust enrichment.  Similar to the conversion claim, an

22  unjust enrichment claim can't stand where there's a contract

23  that covers the same subject matter.  An unjust enrichment

24  claim is a claim that speaks in quasi-contract, and as such

25  can't exist where it's based, basically, on the same breach

1  of contract that the Count 2 breach of contract is based on.

2       THE COURT: Uh-huh.

3       MS. IRVING: JPMorgan's response to that is that

4  here there is a different wrong that has caused them harm

5  separate and apart from the breach of contract but it in fact

6  they both conclusorily allege that that separate wrong is the

7  debtors' improper exercise of control over JPMorgan's

8  collateral.  However, Your Honor, as Mr. Morris has just

9  explained, the only allegations in the counterclaims of any

10  action by the debtors that did JPMorgan harm was that the

11  debtors foreclosed on mortgages in the normal course of

12  business and as expressly authorized in the contract.

13  Consequently, the only harm that JPMorgan could say came to

14  them was from the debtors not providing mortgages that

15  JPMorgan could record once that collateral had become REO.

16  So, we're back to a simple breach of contract.  As a result,

17  JPMorgan has failed to state a claim on an unjust enrichment

18  count.  Another argument JPMorgan raises is that they could

19  state a count for unjust enrichment in the alternative to a

20  breach of contract claim in a circumstance where there is a

21  dispute about either the existence of the contract or its

22  applicability to the subject matter at hand.  They tried to

23  buttress that argument by saying that the debtors have never

24  assumed the credit agreement.  The fact that the debtors

25  haven't assumed that contract doesn't mean that it doesn't

1    exist and it doesn't mean that it doesn't apply to the

2    situation here and the issues raised by JPMorgan's

3    counterclaims.  The fact that the contract doesn't exist may

4    mean that the breach of it post-petition does not give rise

5    to an administrative expense, but once again, that does not

6    negate the fact that the contract does exist and does apply

7    to the issues raised here and consequently does not give rise

8    to an unjust enrichment claim.  In the 5th cause of action,

9    JPMorgan attempts to allege a constructive trust claim.  A

10   constructive trust is a remedy and not a cause of action and

11   that has been clearly the holding of the cases that we cite,

12   and I think there are close to a dozen of them that directly

13   address that issue.  JPMorgan cites a couple of cases that

14   casually give reference to a constructive trust as a cause of

15   action but don't actually raise the question of whether a

16   constructive trust is a remedy as opposed to a cause of

17   action in all the cases that have been cited by either party

18   that does raise that issue clearly hold that a constructive

19   trust is a remedy.  Moreover, JPMorgan has not alleged the

20   essential elements that would even give rise to the remedy of

21   a constructive trust.  For a constructive trust to exist,

22   there has to have been a fiduciary relationship between

23   JPMorgan and the debtors, and that clearly is not alleged

24   here at all.  The complaint doesn't mention the word

25   "fiduciary" or "confidential relationship", the counterclaim

1    does not mention that, and the credit agreement, which is

2    attached as an exhibit to JPMorgan's counterclaim clearly

3    states that the relationship between JPMorgan and the debtors

4    was one of debtor/creditor and no other.  The 6th cause of

5    action is for an accounting, and again there, an accounting

6    is a remedy and not a cause of action.  Again, all the cases

7    that are cited by either party that specifically address the

8    question of whether an accounting is a cause of action as

9    opposed to a remedy uniformly hold that an accounting is a

10   remedy and not a cause of action.  Additionally, there are -

11   in order to give rise to even the remedy of an accounting, a

12   party would have to allege that they did not have an adequate

13   remedy at law.  They clearly do have an adequate remedy of

14   law here and that there was an entrustment of money to the

15   defendant.  Neither of those is alleged in this circumstance.

16   Thank you, Your Honor.

17            THE COURT: Mr. Beach.

18            MR. BEACH: Good morning, Your Honor.  May it please

19   the Court, Sean Beach from Young, Conaway, Stargatt & Taylor

20   on behalf of the debtors.  Your Honor, I rise to support,

21   obviously, the motion to dismiss that the debtors are jointly

22   a party to.  I won't repeat all the argument of Mr. Morris or

23   Ms. Irving, but I do want to raise a couple of points, and

24   first of all, this adversary proceeding is an action about

25   the perfection rights of a very sophisticated secured

1   creditor.  This pool, this warehouse line wasn't a repurchase
2   agreement like many of the other lines Your Honor has seen in
3   this case.  It was more similar to the Bank of America
4   warehouse line and what's at issue is a perfected security
5   interest.  This, unlike the Bank of America pool was a
6   scratch and dent pool.  The ones that went into this pool had
7   issues.  They had document issues, they had other issues, and
8   quite often would roll into a foreclosure and an REO process.
9   This was the case well prior to the petition date, prior to
10  the preference period, during the preference period, and
11  post-petition as well.  During that time, since the inception
12  of this credit agreement in 2006, JPMorgan was aware of how
13  the debtors were handling this collateral both in servicing
14  and its ownership interest in this collateral, and throughout
15  that period of time, there were not mortgages given on this
16  property and for good reason.  There's quite a bit of a
17  burden in terms of putting mortgages on all of these
18  properties.  So, the parties were aware.  JPMorgan as a
19  sophisticated creditor was aware that its perfected security
20  interests, once it changed from mortgage perfected under the
21  UCC to a piece of real property that there were perfection
22  issues.  It was aware of that, again, since prior to the
23  preference period and then post-petition.  Now, unlike other
24  creditors in this case, like Bank of America, Bank of America
25  had the same issue for the preference period, and as Your

1    Honor may recall, a significant settlement payment was made

2    in connection with that preference period perfection issue in

3    the global settlement between the Committee and the debtors

4    with Bank of America.  Now, post-petition, Bank of America

5    had a cash collateral order and protected their perfected

6    security interest on day one of the bankruptcy case, which is

7    why they didn't have the same issue post-petition as JPMorgan

8    does with respect to this perfected security interest.  I

9    raise these points, Your Honor, because earlier Your Honor

10    indicated that you were struggling with the concept of a

11    continued breach post-petition.  I would submit to Your Honor

12    that it is very clear and JPMorgan hasn't made any different

13    contention that they were aware of how this collateral is

14    being handled since well before the petition date, and that

15    same conduct was the way this collateral was handled post-

16    petition as well.  So, Your Honor, unless Your Honor has any

17    questions for me, I'll rest at this point.

18            THE COURT: Okay, thank you.  Mr. Kleinhaus?

19            MR. KLEINHAUS: Good morning, Your Honor.  Emil

20    Kleinhaus, Wachtell, Lipton, Rosen, and Katz, here on behalf

21    of JPMorgan Chase Bank.  I'm here with Dan Rath and Matt

22    McGuire of the Landis, Rath firm who are Delaware counsel for

23    JPMorgan and Alex Lease of Wachtell, Lipton.  When this case

24    was filed in 2007, JPMorgan had valid perfected security

25    interest on certain property, mortgage loans.  What Your

1   Honor just heard from the Committee and the debtors is that

2   in their view, based on conduct that occurred under the

3   auspices of this Court post-petition, while the debtors were

4   debtors in possession, the debtors have succeeded in

5   effectively taking away JPMorgan's property rights.  Before I

6   respond to the various -

7        THE COURT: Well, no, I think their argument is,

8   okay, yeah, we breached, and you have a claim.  It's just an

9   unsecured claim.

10        MR. KLEINHAUS: Let me respond to that in a few

11   ways, Your Honor.

12        THE COURT: Alright.

13        MR. KLEINHAUS: First of all, with respect to the

14   argument, yeah, we breached.  It's an unsecured claim.  I

15   think Your Honor was absolutely right in pointing out that

16   the debtor here is essentially saying, We breached.  You get

17   however many cents on the dollar, bankruptcy dollars on

18   account of your claim even though you had a perfected

19   security interest as of the filing.  Now, the TWA case

20   certainly in that context held that as a general rule there

21   is only a pre-petition unsecured claim for breach of an

22   indemnity agreement.  Now this case is different in several

23   fundamental ways, and first of all, JPMorgan here has alleged

24   claims, and I'll get to them a bit later, for conversion

25   which is a tort and I don't think anybody would dispute that

1    under <u>Redding vs. Brown</u> and case law from this District,

2    damages for a tort claim would clearly be entitled to

3    administrative priority.  Beyond that, with respect to the

4    breach of contract, the debtors are essentially asking for a

5    judgment as a matter of law that JPMorgan could not be

6    entitled to an administrative expense claim.  They concede

7    that the contract was breached, and then they say Your Honor

8    should preemptively now rule that the damages resulting from

9    that breach are entitled only to pre-petition status, and

10   with respect, that argument has several problems.  For one

11   thing, the debtors here did benefit from their breach on a

12   post-petition basis.  They benefitted dollar for dollar from

13   the windfall that they received as a result of what JPMorgan

14   views as a taking of its collateral.  Beyond that, Your

15   Honor, JPMorgan in its counterclaims has alleged causes of

16   action for constructive trust and equitable lien.  Now,

17   whether those are causes of action or remedies, and I'll get

18   to that later, what is clear is that JPMorgan has alleged

19   that those remedies or causes of action should be granted and

20   in doing so, has alleged that a remedy is appropriate here

21   other than damages.  So, aside from the damages that would

22   result from the continued post-petition breach of the

23   agreement potentially being entitled to administrative

24   priority status, JPMorgan has also alleged that on these

25   facts it is entitled to a remedy other than damages on

1   account of the debtors' post-petition conduct, and one of the

2   remedies that they've said it's entitled to is an equitable

3   lien, which under New York law attaches in a circumstance

4   where the contract makes clear that the parties intended a

5   secured creditor to continued to have secured rights in

6   particular property, and this contract makes that clear in

7   every possible way.  It states that JPMorgan has a security

8   interest in the loans that are extended to homeowners and it

9   states that JPMorgan has a security interest in the proceeds

10  and accessions of those loans, and it requires the debtors

11  immediately to give JPMorgan what it needs to take a security

12  interest in the ultimate proceeds after foreclosure.  So,

13  Your Honor, for numerous reasons, the argument that this is

14  just a breach of contract doesn't work here.  There were

15  post-petition benefits, and there are remedies available here

16  to JPMorgan beyond damages and JPMorgan has asserted claims

17  for conversion and other post-petition conduct that, putting

18  aside any breach of contract, would entitled it to an

19  administrative claim.  Before talking about conversion a bit

20  more and the other causes of action, I just want to step back

21  for a minute and talk about the argument that I heard to the

22  effect that this Court should essentially enter judgment as a

23  matter of law in favor of the plaintiffs on what I understand

24  to be an estoppel argument, namely that JPMorgan knew all

25  along that its collateral rights were being violated and sat

1    back and did nothing.  JPMorgan here -

2          THE COURT: I really don't think you need to spend

3    any time on that.

4          MR. KLEINHAUS: Okay.

5          THE COURT: I mean, that's a factual issue.

6          MR. KLEINHAUS: I couldn't agree more.

7          THE COURT: I'm certainly not on this record going

8    to support a motion to dismiss.

9          MR. KLEINHAUS: Okay, I couldn't agree more, and for

10    context in talking about the other claims, I would just note

11    that, as I think Mr. Morris acknowledged, the debtors

12    remitted to JPMorgan for 15 months during these cases the

13    proceeds of its collateral from REO sales.

14          THE COURT: And before they changed their mind.

15          MR. KLEINHAUS: Yes.  So, there's substantial

16    factual issues as Your Honor noted as to whether or not some

17    estoppel argument is available to the plaintiffs here.

18          THE COURT: I mean, maybe you lose no matter what,

19    but I don't see - and I mean, you may lose no matter what on

20    the motion to dismiss based on the pre-petition argument/as

21    opposed to administrative or secured claim, and if not, maybe

22    you lose on the merits of the estoppel argument, but I just

23    don't see how you can address it in a motion to dismiss.  I'm

24    just reserving my rights.

25          MR. KLEINHAUS: Let me turn, Your Honor, to some of

1    the individual claims, and I'd like to start with the

2    conversion claim because from JPMorgan's standpoint, what the

3    debtors have done here is in effect converted its collateral.

4    The debtors have, by virtue of their own unilateral action

5    they say succeeded in depriving JPMorgan of property rights

6    that they had at the outset of this bankruptcy case.  New

7    York law has two requirements for conversion.  One is legal

8    ownership or an immediate superior right of possession to a

9    specific identifiable thing, and two, is the exercise of

10   unauthorized dominion over the thing in question.  The

11   debtors here were indisputably in default on the loans since

12   these cases began, and under New York law, the UCC, and under

13   the credit agreement it's well established that in a default

14   situation for purposes of a conversion claim, a secured

15   creditor has an immediate superior right of possession to its

16   collateral, vis-a-vis the debtor and third parties.  That

17   brings us to the second prong, which is unauthorized use.

18   The contract here authorized the debtors to use JPMorgan's

19   collateral, namely the loans, in a very particular way or it

20   contemplated them using it in a very particular way.  The

21   debtors would use the loans at a foreclosure sale and if the

22   debtors bid in those loans rather than a third party coming

23   in at a foreclosure sale and buying the property, if the

24   debtor bid in those loans, which is what they did here, they

25   took JPMorgan's collateral and they exchanged it for

1    something else.  If the debtors did that, the contract

2    contemplated that they would at the same time give notice to

3    JPMorgan and they would also give JPMorgan necessary

4    documentation to take a perfected security interest in the

5    underlying collateral.  The debtors did not act within their

6    authority here, and the case law in New York which we cite in

7    our brief is clear that when a debtor or a party acts outside

8    the bounds of its contractual authority the result of which

9    is that it takes a party's property, that is a cause of

10   action for conversion.  Now, I'll come to unjust enrichment

11   in a little while, but it's important to point out that

12   conversion is not a quasi-contractual cause of action.

13   Conversion is a tort, and the New York cases establish that a

14   conversion claim, while it can't be based on a mere breach of

15   contract, so JPMorgan couldn't sue the debtors for conversion

16   for not repaying the loan, it certainly can be based on the

17   same conduct that's related to a breach of contract if a

18   separate duty has been breached, and here, that's precisely

19   what happened.  There's a preexisting duty before the

20   contract even comes into place for the debtors to respect

21   JPMorgan's collateral rights.  Instead, what the debtors did

22   is they traded in JPMorgan's collateral behind JPMorgan's

23   back and they're now claiming to have taken the proceeds, the

24   underlying REO, free and clear of JPMorgan's lien.  Before we

25   even get to the contract rights which the parties negotiated

1    in recognition of those background common law rights that

2    JPMorgan has, there is a duty on the part of these debtors to

3    respect JPMorgan's collateral rights and in numerous cases

4    which we cite in our brief, including the <u>Bank of India</u> case,

5    the <u>TMNB Funding</u> case, and the <u>Five Star Bank</u> case, courts

6    have sustained conversion claims where precisely that right

7    was violated, the right of a secured creditor not to have a

8    debtor or another party interfere with its collateral.

9    There's another case that we cite in our brief that I think

10   directly addresses and refutes this notion that the

11   conversion claim here is somehow duplicative of the breach of

12   contract claim even though conversion is not a quasi-

13   contractual cause of action, and that's the <u>Hamlet at Willow</u>

14   <u>Creek</u> case.  In that case there was a developer of land which

15   I think the parties wanted to make into a golf club that

16   entered into a contract with an excavator, and the contract

17   said the excavator can excavate X land up to a certain amount

18   but nothing beyond that.  The excavator went ahead with his

19   excavation and excavated more land than the excavator was

20   allowed to excavate.  The developer brings a breach of

21   contract claim and a conversion claim, and the excavator

22   makes the exact same argument the debtors and the Committee

23   are making here.  This is just a breach of contract claim.

24   The Appellate Division in New York disagrees with the

25   excavator.  The Appellate Division says, There's a breach of

1    contract claim, vis-a-vis, the breach of the provision

2    stating you can only excavate X, but to the extent you acted

3    outside of those provisions, you acted beyond your authority,

4    that's conversion and that's precisely what's happened here.

5    The debtors had authority to use JPMorgan's collateral in

6    very specific narrow ways that protected JPMorgan's rights,

7    and what they did instead, like this excavator in the Hamlet

8    at Willow Creek case is they ignored that which they were

9    allowed to do.  They went beyond it and have now claimed that

10   they're taking JPMorgan's collateral irrespective of

11   JPMorgan's property rights under New York law.  That, Your

12   Honor, is conversion in addition to breach of contract, and

13   for that reason the conversion claim should not be dismissed.

14   I talked already some about the breach of contract claim and

15   explained why from JPMorgan's perspective any dismissal of

16   that claim is premature and ultimately JPMorgan believes not

17   only will the breach of contract be proven, in fact I think

18   it's already admitted, but JPMorgan - either on the basis of

19   the post-petition benefit to the estate or on the basis of a

20   remedy other than damages, JPMorgan would be entitled to an

21   administrative claim.  I'm not going to say much about the

22   automatic stay argument.  I would only say, first of all,

23   that the Uni-Marts decision that Judge Walrath issued just

24   last year is precisely on point in terms of bringing an

25   action in the debtors' home court, and beyond that, the

1   debtors and the Committee have not cited a single case

2   holding that a counterclaim brought in a suit brought by the

3   debtors post-petition is a violation of the automatic stay.

4   We've cited many cases to the contrary.  I think the law is

5   uniform on this.  The one case they cite on this issue is

6   telling in that it deals with a pre-petition counterclaim in

7   another court.  So, I just don't think there's any basis to

8   say there's been a stay violation, and beyond those

9   arguments, there's also the fact that as to all of JPMorgan's

10  claims, in JPMorgan's view, the claims give rise to a

11  administrative expense claim, and the Bankruptcy Rules, Rule

12  7013 are quite clear that you have to state a counterclaim

13  with respect to post-petition conduct.  So, JPMorgan would

14  have been entitled to state counterclaims with respect to any

15  conduct, but it was required to state counterclaims with

16  respect to this post-petition conduct.  So, there's really no

17  argument that there's been a stay violation here.  JPMorgan

18  has brought causes of action for a constructive trust and an

19  equitable lien.  In the opening brief that was filed in the

20  motion to dismiss there was really two arguments.  One is

21  that these are not causes of action, they're just remedies,

22  and the other is that 544(a)(3) of the Bankruptcy Code would

23  permit avoidance of any constructive trust or equitable lien.

24  In their reply brief and today there's been a somewhat

25  broader argument that JPMorgan hasn't even stated a valid

1   claim to begin with on these grounds.  So, I'm just going to

2   back up a little bit and talk about why JPMorgan has stated a

3   valid claim and then turn to those specific arguments.  Let

4   me start with equitable lien because JPMorgan specifically

5   alleges in its counterclaims an entitlement to an equitable

6   lien, and as far as I can tell, the debtors have basically

7   ignored that argument and is focused only on constructive

8   trust.  The concept of an equitable lien really fits this

9   case well.  As explained in the Bank of India case, that we

10  do cite in our briefs from the Appellate Division in New

11  York, "When it is clear from a contract that the purpose and

12  intent of the parties was to give a lien upon specific

13  property, equity will give to the transaction the result that

14  it was intended to produce and treats as done that which the

15  parties intended to be done."  The parties here clearly

16  intended by virtue of numerous contractual provisions for

17  JPMorgan to maintain its property rights after foreclosure on

18  REO property.  Equity should treat that foreclosure as having

19  been done as it was intended to be done.  With respect to a

20  constructive trust, I'll go back here to Judge Cardozo from

21  one of the foundational New York constructive trust cases,

22  Beatty vs. Guggenheim, 122 Northeast 378, where he said that,

23  "A constructive trust will be imposed when property has been

24  acquired in such circumstances that the holder of legal title

25  may not in good conscience retain their beneficial interest.

1    A court of equity in decreeing a constructive trust is bound

2    by no unyielding formula.  The equity of the transaction must

3    shape the measure of relief."  In Simmons vs. Simmons, a 1978

4    Court of Appeals case, 45 N.Y.2d 233, the Court of Appeals

5    elaborated and said, "The doctrine's applicability is limited

6    only by the inventiveness of men who find new ways to enrich

7    themselves unjustly by grasping what should not belong to

8    them."  This case is pretty inventive, what the Committee

9    came up with after 15 months of JPMorgan getting the proceeds

10   of its collateral, and it's precisely that sort of

11   inventiveness that the doctrines of constructive trust and

12   equitable lien are intended to remedy, and based on those

13   doctrines, New York courts have specifically rejected the

14   argument that was made today about some fiduciary

15   relationship is required for a constructive trust.  As

16   explained in one of the cases cited in our brief, A

17   constructive trust may be imposed under New York Law, quote,

18   "whenever necessary to satisfy the demands of justice, even

19   in", quote, "the complete absence of any fiduciary

20   relationship between a debtor and a creditor."  That's the

21   Pfohl Brothers Landfill case.  This again, Your Honor, is a

22   cause of action that cannot be dismissed on the pleadings.

23   The attempted legal argument that a fiduciary relationship is

24   needed is not supported by New York law and it doesn't apply

25   at all to the concept of an equitable lien which is a

1   contract based cause of action, which is what we have here.

2   As to the notion that these are not standalone claims, a

3   couple of responses.  One is, the only cases from the courts

4   of New York State that are cited by either side in this case

5   are a number of very recent New York cases that state quite

6   clearly, they describe constructive trust as a cause of

7   action, and those cases are by no means exhaustive.  There

8   are many, many cases going back in the courts of New York,

9   including from the New York Court of Appeals, describing

10  constructive trust as a cause of action.  Committee counsel

11  has said today that the Committee has cited many cases to the

12  contrary.  I think if you look at most of the cases cited in

13  their brief, they're just cases that describe constructive

14  trust as a remedy, but there's no disagreement on that point.

15  Constructive trust can certainly be a remedy, but the issue

16  is, can it also be a standalone cause of action, and while I

17  acknowledge that the law on this issue is not as crystal

18  clear as one would like, the best guidance available, which

19  are the decisions of the Court of New York, uniformly treat

20  constructive trust as a standalone cause of action, and

21  there's no reason why this Court shouldn't and why it

22  shouldn't be a standalone cause of action, but beyond that,

23  it's really not essential for the Court to make that

24  determination now because JPMorgan has pleaded valid causes

25  of action for breach of contract, for conversion, and

1    otherwise.  So, whether it's a cause of action or a remedy,

2    at the pleading stage there's no basis or reason to take it

3    off the table.  JPMorgan has pleaded the facts that are

4    necessary to establish that a constructive trust or an

5    equitable lien should lie, and whether it's in aid of other

6    causes of action or as a standalone cause of action as the

7    New York cases seem to suggest, the allegations are there and

8    there's no reason to dismiss those claims.

9              THE COURT: Okay.

10             MR. KLEINHAUS:  Last point, Your Honor, close to

11   the last point, I'll try to move more quickly, unjust

12   enrichment.  Unjust enrichment unlike conversion is a quasi-

13   contractual cause of action.  The reason JPMorgan thinks an

14   unjust enrichment claim lies here in addition to the contract

15   claim is for one of the reasons why a conversion claim lies

16   which is that the rights here that JPMorgan is seeking to

17   remedy do not arise exclusively out of the contract.  There

18   are separate common law rights that are being vindicated

19   here, and the taking of JPMorgan's property is a harm that

20   JPMorgan believes is separate and apart from the harm arising

21   from the specific notice provisions of the contract.  And

22   finally, Your Honor, with respect to accounting, same

23   analysis as constructive trust in the sense that the New York

24   courts that have spoken to the issue have treated accounting

25   as a standalone cause of action and again the best guidance

1    available are those decisions and for that reason the

2    accounting cause of action also should not be dismissed.  So,

3    to sum up, Your Honor, JPMorgan is here and has brought

4    counterclaims because if the debtors' view of the facts and

5    the consequences of the facts is sustained, JPMorgan has

6    suffered a loss of property rights and concededly has been

7    the victim of a breach of contract which depending on what

8    the remedy ultimately is in this case may well give rise to

9    an administrative claim, and JPMorgan respectfully requests

10   that the Court deny the motion to dismiss for those reasons.

11           THE COURT: Alright, thank you.  Reply?

12           MR. MORRIS: Thank you, Your Honor.  Just to address

13   a point and clarify the record, the debtors do not concede

14   that there's a breach of this provision.  In order to

15   determine a breach of this provision there might be a number

16   of other issues that would have to be addressed with respect

17   to the pre-petition contract of the parties, the acquiescence

18   of JPMorgan in the contract, materiality to it at various

19   times and during the course of the contract, but for purposes

20   of this hearing only, because it is a motion to dismiss, the

21   debtors address the matter as even if they were to prevail,

22   it would yield only a pre-petition claim, but we do not, and

23   I want the record to be very clear that we do not concede

24   that there was any breach -

25           THE COURT: Understood.

1          MR. MORRIS:  - or at least that the conduct

2     constituted a breach of that provision.  With respect to the

3     conversion claim and the question of authorized use of the

4     property, counsel states that the debtors were not acting

5     within their authorized use of the property because that

6     authorized use had some special ramifications that they could

7     only do it if they also protected JPMorgan's collateral.  The

8     actual contract doesn't actually say that, but what that does

9     ignore is that in virtually every case the same argument

10    could be made as to any use of collateral.  For example,

11    counsel says that after a default which occurred on the

12    filing of this case for a number of reasons including the

13    failure to pay, the authority to operate and to foreclose on

14    mortgages and do the normal operation of business ceased, and

15    therefore, the conversion claim lies, but what that ignores

16    is that in every case under the Bankruptcy Code, upon the

17    filing of a bankruptcy case, which may be a breach of every

18    single pre-petition credit agreement that any debtor's likely

19    to have, I would venture to say that most every credit

20    agreement will provide that after default, the debtor can no

21    longer use the property, but the Bankruptcy Code overrides

22    that and says under 363 that notwithstanding this, a debtor

23    in possession can operate a normal course of business and can

24    use, sell, or lease collateral of a secured creditor without

25    notice or a hearing following the filing of a Chapter 11

1   case, and therefore, in terms of authorized use of this

2   property by means of foreclosure, that's all the debtors were

3   doing and irrespective of whether there was something special

4   which, frankly I can't find in the credit agreement, that

5   limits the debtors' ability to foreclose on defaulted

6   mortgages, the Bankruptcy Code authorizations in 363

7   supplement and supercede that which give the debtor the

8   authority to operate in the normal course of business, and in

9   this case, not only is it implied and they didn't have to

10  sort of divine this, the debtor said in a publicly filed

11  pleading of which they themselves have cited that in the

12  normal course of business, they're foreclosing their

13  properties and acquiring REO property.  That was well within

14  their authorized use of that property and cannot give rise to

15  a conversion claim.  If it could, then a conversion claim

16  would lie for every secured creditor for the debtors' post-

17  petition use of property after the filing of a Chapter 11

18  case.  It goes way too far, and a conversion claim simply

19  cannot be based upon that normal course use of property in

20  accordance with the Bankruptcy Code with a public record such

21  as this.  So they still have not alleged a sufficient -

22          THE COURT: Well, that all begs the question of

23  whether it was in the ordinary course of business in the

24  first place, and again, it's not necessarily - it's not just

25  - the allegations are not just that you foreclosed on

1   property.  There are other allegations that are involved that

2   may take it outside the ordinary course of business.

3           MR. MORRIS: The only other allegations that I could

4   find in the complaint on this were that the debtors deprived

5   them of their collateral, which is an allegation of the

6   conclusory legal effect of the action.  In other words,

7   there's no allegation in the counterclaims that the debtors

8   were not authorized to foreclose on property.

9           THE COURT: But if the debtor acted in violation of

10  a contract post-petition in the ordinary course of business

11  or not, how does that not possibly give rise to a conversion

12  motion?

13          MR. MORRIS: Because to be a conversion claim there

14  has to be a superior right of possession which they did not

15  have because the Bankruptcy Code interposes the requirements

16  in order for a secured creditor to obtain the right to

17  possession, something they did not seek.  So, if you were to

18  say that there's a conversion case in every circumstance

19  where a debtor uses collateral post-petition -

20          THE COURT: But they did not seek it based on your

21  activities.

22          MR. MORRIS: They did not -

23          THE COURT: They did not seek it because they

24  believed that there was no need to seek it because - How do

25  you get around the fact that, you know, 15 months passed by

1   before you figured out that you might have a cause of action

2   here?

3         MR. MORRIS: Well, I think the cause of action was

4   raised, the first instance that I was aware was we raised it

5   in connection with a loan sale and this was -

6         THE COURT: Fairly early in the case.

7         MR. MORRIS: Fairly early in the case, within the

8   first four months of the case, I think, and they certainly

9   were aware of this argument from that time.  I believe, and

10  my memory's getting lousy as I get old, but I believe that

11  was in February or March of 2008, case having been filed on

12  August of 2007, and this issue was raised at that point.  So

13  they certainly, as of that date, were very aware of this

14  argument.  You know the payment of the proceeds in the normal

15  course of business to JPMorgan thereafter, you know, I can't

16  explain, but nonetheless, every fact, and you have to

17  separate the facts that occurred from what the legal

18  consequence of those facts are, but every fact that relates

19  to the foreclosure and REO properties was well known to

20  JPMorgan and the other parties.  The fact that the debtors

21  were foreclosing in the normal course of business, the fact

22  that as a result of those foreclosures there were REO

23  properties, and the fact that those REO properties were being

24  sold, those facts were known.  What perhaps wasn't known was

25  what the legal effect of those facts were, but that is a

1    separate question and that does not give rise to a

2    conversion.  In order to have a conversion, they're going to

3    have to - you know, someone would have to allege some form of

4    wrongful conduct, of interference and inappropriate dominion

5    or misapplication of funds per property.  There's none of

6    that here.  Each of the facts, in terms of what was happening

7    with the collateral was known.

8              THE COURT: Okay.

9              MR. MORRIS: And as a consequence, we don't think

10   that there could be any valid conversion claim because if you

11   allowed a conversion claim in this case, a conversion claim

12   could exist in any case where there's use of collateral after

13   a default, which the Bankruptcy Code specifically authorizes

14   be done, and it happens post-petition, and it happens

15   regularly, and it happens in any case where there is a

16   continued use of collateral following the filing of a Chapter

17   11 case.  The Uni-Marts case which counsel attempted to cite

18   to bolster its position, which it cites to bolster its

19   position, again, did find that filing in the home court was

20   not a violation of the automatic stay, but the court

21   specifically says, and I think the pin cite on that is page

22   129 - I could be wrong on that too, but basically the Court

23   says, It's simply the equivalent of the filing of a proof of

24   claim, and there are other cases that to a similar effect,

25   the court won't necessarily impose sanctions on someone for

1    filing in the home court.  We're not seeking that, but if it

2    is it relates to a pre-petition claim, it's just the

3    equivalent of filing a proof of claim putting the estate on

4    notice of the claim.  It doesn't change the fact that it's

5    still only a pre-petition claim and there's no reason to

6    prosecute that claim in the context of this case.  Unjust

7    enrichment, to address just briefly, you could make the same

8    unjust enrichment argument with respect to every lien

9    avoidance case that's ever been brought.  In nearly every

10   case where there's a lien avoidance there's a contract

11   between parties under which the secured creditor is supposed

12   to have a lien, and for whatever reason the lien is avoid,

13   the estate realizes a benefit from that avoidance, but, Your

14   Honor, that's simply the consequence of the activities of the

15   parties in obtaining and/or perfecting a lien, and that's

16   really what this case is about, and unjust enrichment, again,

17   to take their argument, extends it way beyond any context in

18   which it's appropriate in a bankruptcy case.  For there to be

19   unjust enrichment, there would have to be some wrongful

20   conduct, and in this case, the conduct by the debtors

21   throughout the case and the treatment of its collateral was

22   as authorized either by contract or by the Bankruptcy Code,

23   and as a consequence, it can't yield an unjust enrichment

24   claim or else you would have an unjust enrichment claim in

25   virtually every lien avoidance case.  Simply stated, the case

1    is about, and no matter how one might like to characterize it

2    as being some sort of conversion or other tort action, is

3    about what the legal effect of this operation and use of the

4    collateral was with the full knowledge of the parties.  Even

5    though they claim this was done behind their back, all of the

6    facts, putting aside the legal conclusion resulting from

7    those facts, but all of the facts were on the record and

8    known to the parties, and this is not a lender without

9    resources and that is not sophisticated.  They well knew what

10   is required to obtain a security interest in real property

11   and what to do to perfect that security interest and that's

12   what this case is about.

13            THE COURT:  Thank you.

14            MR. MORRIS:   Thank you.

15            MS. IRVING: Your Honor, just briefly, two points.

16   On the constructive trust claim, we cited several cases on

17   page 6 of our reply brief that hold that a constructive

18   trust, even as a remedy, requires a confidential fiduciary

19   relationship.  The Suisse cases from 2009, the S&Arrow

20   (phonetical) cases from 2004.  That doesn't exist here and

21   that claim should be dismissed.  Both the constructive trust

22   claim and the accounting claim also should be dismissed

23   because they are remedies and not causes of action.  Every

24   case that we've cited - that either party have cited that

25   actually grapples with that issue, concludes uniformly that

1  it's a remedy.  And, I think, that's it.  Thank you very -

2  And, Your Honor, also, this Court is entitled to follow the

3  Bankruptcy Court decisions on that point and the District

4  Court decisions that review those bankruptcy decisions, all

5  of which hold that constructive trust and accounting are

6  remedies.

7      THE COURT: Yes, thank you.  Okay.  I'm prepared to

8  rule.  I am going - Well, first of all, let's back up.  We're

9  on a motion to dismiss, and that's <u>Trombly</u> is the controlling

10  standard and the question is, have there been allegations

11  that if plausible, plausibly support relief, would give rise

12  to a cause of action and if so a motion to dismiss must be

13  denied.  I am going to deny the motion to dismiss - Excuse

14  me, yes, I'm sorry.  Let me get it right.  I'm going to deny

15  the motion to dismiss in connection with the breach of

16  contract and conversion claims.  I think I made it clear in

17  argument but just to say it again.  To the extent <u>TWA</u> creates

18  some sort of a rule that a post-petition breach of a pre-

19  petition contract creates only a general unsecured claim for

20  that breach, I disagree with that.  I don't think that's what

21  <u>TWA</u> says, but if one is to argue that's what it says, I don't

22  think that's correct.  I think it's going to turn on the

23  facts of the case and what the actions are, but to allow a

24  debtor to a pre-petition contract to continually breach that

25  contract post-petition prior to any rejection and know that

1    all that will arise is a general unsecured claim and usually,

2    of course, it would make sense in a case where general

3    unsecured claims are not going to receive 100-cent dollars, I

4    think would create a perverse incentive that would give the

5    debtor the right to take advantage in an undue way of the

6    fact that it's in bankruptcy and the distinction between the

7    treatment of general unsecured claims, secured claims, and

8    administrative expense claims.  It's going to turn on the

9    facts of the case.  I think that a pre-petition breach that

10   simply continues on a post-petition basis is a very different

11   animal from new or repeatedly new post-petition breaches.

12   We'll deal with that when we have to deal with that, but

13   certainly there's enough here to survive a motion to dismiss.

14    Similarly, I believe and find that the conversion count

15   should survive a motion to dismiss.  There may be - I think

16   there's sufficient allegations under the New York law that

17   may give rise to a conversion claim.  Certainly, it could be

18   plausible under the facts alleged.  The unjust enrichment

19   constructive trust and accounting provisions are claims are

20   more difficult for the counter claimant, the JPMorgan.  They

21   are, I believe, at heart equitable remedies for other

22   breaches, whether it be conversion or breach of contract.

23   They are in effect equitable remedies.  Unfortunately, the

24   law is somewhat confused on the issue, and I think judges,

25   frankly, aren't necessarily as attentive to the distinction

1    between a claim and a remedy as they should be.  I think here

2    especially the accounting and unjust enrichment claims really

3    are plainly or very close to plainly remedies.  A

4    constructive trust the law is undoubtedly much more confused

5    and amorphous, and courts, quote/unquote, "misuse" the claim

6    quite a bit, at least from my humble - well, not so humble,

7    but my humble opinion.  Nonetheless, I think that since the

8    motion to dismiss is going to be denied as to the meat of the

9    claims and allowing these claims to stand will have no real

10   substantive effect on the continuation of the case and

11   discovery, et cetera, I am going to allow those counterclaims

12   to stand, although I think, as I said, as independent claims

13   it's highly unlikely I would ultimately sustain them, but of

14   course, they are remedies that may be available based on a

15   validly sustained claim of conversion or breach of contract.

16   Frankly, JPMorgan has the money, it's sitting there either in

17   escrow or in their pocket.  So, I'm not quite sure why an

18   equitable remedy would be necessary in the first place.

19   We'll deal with that at trial.  That's a factual question, if

20   we get to trial, or summary judgment or however we dispose of

21   the merits.  So, I'm going to deny the motion to dismiss in

22   its entirety based on the reasons set forth on the record.  I

23   find that under _Trombly_ the counterclaims are sufficiently

24   supported by facts that if they are true, plausibly give rise

25   or may plausibly give rise to a cause of action, and of

1  course, I have to deem the factual allegations to be true in

2  the context of a motion to dismiss, and I'd ask movant to -

3  excuse me, I'd ask Mr. Kleinhaus, I'd ask your side to

4  circulate and submit an order under certification of counsel.

5  Anything further for today?

6          MR. MORRIS: No, Your Honor.

7          THE COURT: Alright, thank you very much.  Hearing

8  adjourned.

9          (Whereupon at 10:28 a.m., the hearing in this

10  matter was concluded for this date.)

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19  United States Courts, certify that the foregoing is a correct

20  transcript from the electronic sound recording of the

21  proceedings in the above-entitled matter.

22

23  /s/ Elaine M. Ryan                        July 1, 2010
    Elaine M. Ryan
    2801 Faulkland Road
    Wilmington, DE 19808
    (302) 683-0221