## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------X   Chapter 11
In re                                                       :
                                                            :   Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE HOLDING, INC.,                        :   Jointly Administered
a Delaware corporation, et al.,                             :
                                                            :
                                                Debtors.    :   Hearing Date:  8/16/10 @ 10:00 a.m.
                                                            :   Objections Due: 8/09/10 @ 4:00 p.m.
                                                            :
------------------------------------------------------------X
```

## OFFICIAL BORROWERS COMMITTEE'S AND CERTAIN INDIVIDUAL BORROWERS' MOTION TO ALLOW BORROWERS TO PURSUE DISCOVERY IN FURTHERANCE OF CLAIMS AND DEFENSES AGAINST NON-DEBTOR THIRD PARTIES AND, IF NECESSARY, FOR RELIEF FROM THE AUTOMATIC STAY, AND REQUEST FOR INSPECTION OF DEBTORS' DOCUMENTS AND EXAMINATIONS CONCERNING DEBTORS' RECORDS PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 2004

The Official Committee of Borrowers (the "Borrowers Committee")[1] and certain

individual borrower[2] movants[3] (together with the Borrowers Committee, the "Movants")

respectfully request an Order authorizing them to obtain documents and information possessed

by the Debtors that may support borrower claims and defenses against non-Debtor third parties.

Although obtaining this information from the Debtors through third-party discovery would not

implicate the automatic stay under section 362(a) of the Bankruptcy Code, out of caution,

Movants also request that the Court enter an order granting relief from the automatic stay, to the

extent such an Order is necessary.[4]

---

[1] Pursuant to an order of this Court entered on October 10, 2008, the United States Trustee appointed the Borrowers Committee on October 21, 2010.

[2] Capitalized terms not otherwise defined herein have the meanings ascribed in the Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009 (the "Plan").

[3] The individual Borrower movants are: (1) Penny Montague; (2) Gracie Graves; (3) Marjorie Crawford; (4) Annie Gordon; (5) Linda and Johnny Culpepper; and (6) Florence Dandridge.

[4] Movants have conferred with the Debtors' counsel and confirmed that the Debtors will oppose the Motion.

To ensure that this information is provided to and used by borrowers efficiently, thereby minimizing costs to the estate, Movants specifically request that the Court enter an Order authorizing them to: (1) conduct an examination of one or more knowledgeable representatives of the Debtors for the purposes of identifying the location, content and format of documents that may be relevant to borrower claims and defenses against non-Debtor third parties; (2) inspect the Debtors' documents for the purpose of identifying documents that may be relevant to their claims and defenses against non-Debtor third parties, and copy or obtain copies of such documents; and (3) conduct an examination of one or more custodians of the Debtors' records for the purpose authenticating such documents. In addition, the individual borrower Movants request authorization to cross-notice their discovery requests to the Debtors in their individual cases so that they can use documents and information obtained from the Debtors to support their claims and defenses against non-Debtor third parties.[5] The Court should also require the Debtors to maintain any documents produced by the Debtors in response to the coordinated discovery here requested and require that, upon Plan confirmation, such documents be transferred to the Borrower Information Ombudsperson so that they can be made available to other borrowers in litigation with third parties.

---

[5] The Borrowers' Committee has authority to file this motion. Under the Court's November 4, 2008 Supplemental Order Concerning Order Appointing Official Committee of Borrowers Pursuant to Section 1102(a)(2) of the Bankruptcy Code, the Borrowers Committee was authorized to pursue global stay relief on behalf of all borrowers in connection with foreclosure actions. In this motion, the Borrowers Committee and individual borrower Movants request relief from the automatic stay (if such relief is necessary) for the purpose of obtaining documents and information that may be relevant to borrowers' defenses to foreclosure actions. Accordingly, this motion is within the Borrowers Committee's authorized scope of work. To the extent that the relief sought in this motion exceeds the scope of work approved by this Court, the Borrowers Committee respectfully requests leave to file this motion.

## I.    PRELIMINARY STATEMENT

Thousands of individual Borrowers across the United States have claims or potential claims based on mortgage loans originated by corporate affiliates of American Home Mortgage Holdings, Inc. (collectively, "American Home" or the "Debtors").  These Borrowers allege that American Home, aided in some cases by third parties, routinely engaged in deceptive and fraudulent lending practices, systematically originated and serviced mortgages in violation of federal and state consumer protection laws, and intentionally collected millions of dollars in illegal fees and interest.

American Home has sold to third parties nearly all of the mortgage loans that it originated.  Many current holders of the loans originated by American Home have initiated foreclosure proceedings against borrowers.  Many borrowers have asserted defenses to foreclosure proceedings commenced by the current holders of their loans as well as third parties based upon American Home's illegal loan origination practices and the failure of American Home, and its successors, to properly assign mortgages to third parties.

Many borrowers have also asserted claims against non-Debtor third parties, including current holders of American Home loans as well as third parties involved in the loan origination and servicing processes, such as mortgage brokers, warehouse lenders and securitizers.  In these cases, borrowers are seeking, among other things:  (1) rescission of their loans; (2) recoupment of amounts paid by borrowers under fraudulent or illegal circumstances; (3) modification of their loan terms; (4) the voiding of their notes; and (5) other damages.

The Debtors possess documents and information that borrowers may need to support the assertion of defenses to foreclosure and to pursue claims against non-Debtor third parties.  For example, American Home possesses documents regarding its evaluation, retention, supervision,

and compensation of mortgage brokers who are defendants in borrowers' lawsuits. In addition, the Debtors possess documents that may demonstrate that mortgage loans originated by AHM have not been properly assigned to third parties; improper assignment of a mortgage can completely defeat a foreclosure action. Furthermore, the Debtors possess loan files that include documents that may demonstrate that American Home violated the Truth in Lending Act ("TILA"), Real Estate Settlement Procedures Act ("RESPA") and Home Ownership and Equity Protection Act ("HOEPA"), as well as state consumer protection statutes and common law fraud in originating certain loans. Borrowers may need such documents to successfully assert rescission claims under TILA against the current holders of their loans.

The automatic stay does not shield the Debtors from discovery requests related to claims and defenses borrowers have asserted or will assert against non-Debtor third parties. Accordingly, the Court should enter an order authorizing the Borrowers Committee and individual borrower Movants to serve discovery requests on the Debtors related to their claims and defenses against non-Debtor third parties.

Even if the automatic stay did protect the Debtors from the discovery requested by borrowers in this motion, sufficient "cause" would exist for the Court to lift the automatic stay and allow the Borrowers Committee and individual borrower Movants to seek third-party discovery from the Debtors. The purposes underlying the automatic stay would not be furthered by protecting the Debtors from the limited discovery sought by the Borrowers Committee and individual borrower Movants. Lifting the stay to allow Borrowers to seek limited discovery from the Debtors would not materially erode the estate's assets or interfere with the orderly liquidation of American Home.

Furthermore, the benefit to borrowers in having access to documents and information that may support their claims and defenses against non-Debtor third parties outweighs the expense that the estate would incur in responding to the borrowers' discovery requests. Accordingly, the Court should lift the automatic stay (if it applies in this context) for the limited purpose of allowing the Borrowers Committee and individual borrower Movants to serve discovery requests on the Debtors in furtherance of their claims and defenses against non-Debtor third parties.

To minimize the expense to the estate, and to themselves, of this discovery, the Borrowers Committee and individual borrower Movants will work cooperatively with the Debtors to ascertain the location and content of potentially relevant documents and information; authenticate documents; and coordinate the use of Debtors' documents and information in borrowers' litigation. To facilitate an efficient production and use of the Debtors' documents and information, the Court should enter an Order authorizing Movants to: (1) conduct an examination of one or more knowledgeable representatives of the Debtors for the purposes of identifying the location, content, and format of documents that may be relevant to borrower claims and defenses against non-Debtor third parties; (2) inspect the Debtors' documents for the purpose of identifying documents that may be relevant to borrowers' claims and defenses against non-Debtor third parties, and to copy or obtain copies of such documents; and (3) conduct an examination of one or more custodians of the Debtors' records for the purpose authenticating such documents. In addition, the individual Movants request authorization to cross-notice their discovery requests to the Debtors in their individual cases so that they can use documents and information obtained from the Debtors to support their claims and defenses against non-Debtor third parties. The proposed examinations and inspections are specifically intended to promote the efficient review, production, and use of the Debtors' information.

## II.    BACKGROUND

### A.    <u>American Home's Lending Practices</u>

American Home originated hundreds of thousands of loans.  By 2006, it was the tenth largest mortgage lender in the United States.[6]  Many American Home loans had features that made them particularly likely to result in defaults and to generate foreclosure proceedings.

American Home sold a variety of adjustable rate mortgages ("ARMs") with low initial rates or minimum payment requirements that typically rose much higher after a few months (or even a few days), at which point many borrowers were shocked to discover that they could no longer keep up with their monthly payments.

### 1.    Payment Option ARMs

American Home's most notorious products were so-called "Payment Option" ARMs ("POAs").  A POA is a mortgage loan for which the interest rate on the note is periodically adjusted based on a variety of indices and that initially offers the borrower several monthly payment options, such as:  (1) a specified minimum payment; (2) an interest-only payment; or (3) a traditional 15, 30, or 40 year fully amortizing payment.[7]

POAs are extremely risky because they can result in negative amortization, meaning that the principal amount owed by borrowers will increase rather than decrease over time, even if the borrower is never late on a single payment.  These loans contain teaser rates as low as 1% or 2% that last as little as two weeks before resetting to a higher rate, typically 7% or 8%.  The minimum payment a borrower is allowed to make under a POA is based on the teaser rate, and borrowers are qualified based on their ability to make this minimum payment.  While the

---

[6] Disclosure Statement Pursuant to Section 1125 of the Bankruptcy Code With Respect to the Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of November 25, 2008 (the "Disclosure Statement") at 19.
[7] *See* Federal Reserve Board, *FRB: Interest-Only Mortgage Payments and Option Payment ARMs,*
http://www.federalreserve.gov/pubs/mortgage_interestonly/.

monthly interest due on the loan jumps dramatically after a few weeks, the minimum payments remain the same. Typically, once the amount owed reaches 110% of the initial principal, the payment options disappear and the borrowers must make the fully amortizing payments, which are much higher.

Many POAs carry prepayment penalties. Although these penalties are typically disclosed to borrowers during the loan origination process, the pernicious nature of these penalties is not apparent in many instances. Many borrowers do not know that their interest rates jump dramatically on these loans in a short period; hence they do not contemplate the need to refinance during the prepayment penalty period. Typically, in the experience of members of the Borrowers Committee, because the disclosures on these loans were obscure and complex, homeowners did not become aware that these loans negatively amortized until they began to notice their principal increasing with each monthly bill. To the extent borrowers were duped into taking these loans, the prepayment penalty prevented them from escaping. Prepayment penalties can essentially trap borrowers in loans by making refinancing prohibitively expensive.

In the third quarter of 2006 alone, American Home originated $5.4 billion in POAs, making it the seventh largest originator of POAs in the United States. Disclosure Statement at 19. American Home has sold most of the loans it originated to third parties. *Id.* at 22. According to estimates published in the Wall Street Journal in March 2010, although "the default process has already hit something resembling a peak" for POAs, "more than three in four option ARMS are under water according to Fitch Ratings, and one-third have a combined loan-to-value ratio of over 150%."[8]

---

[8] Nick Timiraos, *Mortgage Increases Blunted*, Wall St. J., Mar. 29, 2010.

2.      Short Reset Loans and "Teaser Rates"

Many American Home loans contained other features that also resulted in claims by Borrowers. For example, many American Home mortgages were "short reset" mortgages. Under many definitions, a mortgage is regarded as a "short reset" mortgage if the interest rate on the note is adjusted (based on specified indices) within two years of the date on which the mortgage is originated.

And similarly, many American Home mortgages employed "teaser rates." A "teaser rate" mortgage is one in which the borrower starts with an adjustable introductory interest rate that increases by at least 3 percentage points within the first year following its origination. In many cases, American Home mortgages included teaser rates that lasted for only a few days.

3.      American Home's Loan Sales and Securitizations

American Home sold nearly all of the loans that it originated to securities dealers, large national banks, Fannie Mae, Freddie Mac, thrifts and smaller banks, real estate investment trusts and other institutional loan buyers.[9] Other loans were sold and assigned into securitization trusts, out of which all of the ownership interests were sold to investors.[10]

The Debtors typically sold the loans they originated shortly after a borrower finalized the purchase of a home. As a result, by the time most borrowers began to experience negative amortization, or a higher interest rate under the products described above, American Home was no longer the holder of the loans. When borrowers defaulted under their American Home mortgages, in most cases, the entities that initiated foreclosure actions were not the Debtors, but rather subsequent purchasers of loans originated by the Debtors.

---

[9] *See* Disclosure Statement at 21-22.
[10] *Id.*

**B.**      <u>Claims and Defenses Based Upon American Home's Products and Practices</u>

Many borrowers have asserted (or will assert in the future) causes of action under federal, state, and common law based on the products and practices described above (and others).  The legal basis of these claims includes:

- Truth in Lending Act

- Home Ownership and Equity Protection Act

- Real Estate Settlement Procedures Act

- Common law fraud and conspiracy to commit fraud (including appraisal fraud)

- State deceptive and unfair practices, predatory lending, or usury laws

In addition, borrowers with American Home loans have asserted that the current loan holder lacks standing to foreclose based on a defective assignment from a former loan holder.

These legal theories may apply to a variety of participants in the mortgage process.  For example, under TILA, if a lender fails to make a material disclosure in originating a loan or violates HOEPA by originating a high cost unaffordable loan, a borrower may assert a claim seeking rescission of the loan against the current holder, regardless of whether the current holder was involved in the origination of the loan.  15 U.S.C. § 1641(2010).  Borrowers who no longer have rescission claims based on the statute of limitations can still raise TILA claims defensively in the nature of recoupment in a foreclosure.  *Id.* § 1640.  Accordingly, it is not uncommon for a borrower to name three different entities – the mortgage originator, the mortgage servicer, and the current mortgage holder – as defendants in a lawsuit.   Borrowers have also named other third parties in lawsuits related to American Home loans, including warehouse lenders, mortgage securitizers, and agents of American Home (including mortgage brokers).

The following individual Movants have asserted claims or may assert claims against non-Debtor third parties based on loans originated by American Home.

1.    Penny Montague

Penny Montague is a 61-year-old widow who owns a small home in Beaverton, Oregon, where she and her autistic son live on a fixed income of Social Security survivor and disability benefits.  She alleges that, in June 2007, she was convinced to refinance her existing mortgage into a negatively-amortizing American Home loan.  According to Ms. Montague, a broker fraudulently induced her to refinance her mortgage, failing to disclose that her new American Home POA could negatively amortize if Ms. Montague paid nothing more than the minimum payment option.

Ms. Montague contends that the material disclosures Mss. Montague was entitled to receive at closing under TILA were not clearly and conspicuously provided.  Mss. Montague has filed a lawsuit in the United States District Court for the District of Oregon seeking, among other things:  (1) the rescission of her loan pursuant to TILA; and (2) damages based on her broker's fraud.  Ms. Montague has asserted her rescission claim against all current and former holders of her loan, which has been securitized and is now held by a trust called Structured Asset Mortgage Investments II Inc. Structured Asset Mortgage Investments II Trust 2007-AR4, Mortgage Pass-Through Certificate, Series 2007-AR-4.

2.    Gracie Graves

Gracie Graves has lived in her home in Washington, DC since 1972.  Now in her 70s, Ms. Graves lives on a modest pension and Social Security income.  Ms. Graves, and her late husband Herman, received a solicitation by mail offering to lower the monthly payments on their house.  Concerned about their rising debt and ability to manage a recent adjustable rate

mortgage, they called the number on the advertisement. The next day, a broker came to their home and had them fill out an application. Ms. Graves alleges that the broker told her that their new monthly payment would be $706, over $150 per month less than what they were paying. However, when they received their first monthly statement, the Graves learned that the full amortizing payment on the loan was $1800, roughly double their previous mortgage payment. Like many other American Home borrowers, the Graves had received a payment option ARM with a one month 1% teaser rate and a prepayment penalty. Ms. Graves claims that she and her husband telephoned their broker but were told that the brokerage had gone out of business. The broker received a yield spread premium of $10,320 for the Graves' mortgage.

The Graves filed a lawsuit in the United States District Court for the District of Columbia against several parties, including their broker, alleging violations of the District of Columbia's consumer protection laws and TILA, and seeking, among other things, actual and punitive damages and the rescission of their loan.

3.    Marjorie Crawford

Ms. Marjorie Crawford is a 76-year-old woman who lives in Brooklyn, New York on a fixed monthly income of $300 per month in social security and $200 in food stamps. In 2007, a broker from Direct Capital Corporation telephoned Ms. Crawford at her home and solicited her to refinance by informing her she could receive lower monthly payments. According to Ms. Crawford, the broker assured her that the new mortgage payments would be less than what she was paying at the time and that she would receive a fixed-rate.

Instead, Ms. Crawford was given a negatively amortizing payment-option adjustable rate mortgage from American Brokers Conduit, a subsidiary of American Home. The loan Ms.

Crawford received had a 1.25% initial rate that lasted for twenty five days. After twenty- five days, the interest rate reset to 8.879% for one month, then to the Treasury Rate plus 2.85%.

Ms. Crawford is now in foreclosure proceedings in the Supreme Court for Kings County, New York. Ms. Crawford has asserted the following defenses to foreclosure: (1) American Home failed to provide her with certain documents; (2) American Home extended a loan containing negative amortization terms and a prepayment penalty; (3) the disclosures made by American Home at her closing contained inaccurate and contradictory information regarding finance charges; (4) the total points and fees payable by Ms. Crawford exceeded eight percent of the total loan amount; (5) American Home, through its agent Direct Capital Corporation, falsified Ms. Crawford's loan application; (6) American Home omitted substantial fees from Ms. Crawford's HUD-1 Settlement Statement; and (7) the three-year prepayment penalty in Ms. Crawford's loan is usurious.

4.    Annie Gordon

In December 2006, Ms. Annie Gordon refinanced her home in Chicago, Illinois and obtained two loans through American Brokers Conduit, an American Home subsidiary, for $225,600 and $28,200. Her first loan had an interest rate of 7.75% which adjusted up to 12.75%. Her second loan had a fixed interest rate of 12.50% and included a balloon payment of approximately $24,000 payable after fifteen years. The refinance closing occurred outside Ms. Gordon's workplace in the car of the closing agent for American Brokers Conduit. Ms. Gordon was provided incomplete loan documents; for her first loan, she did not receive a TILA Disclosure Statement or a Notice of Right to Cancel.

In March 2008, Ms. Gordon fell behind on her mortgage. In December 2008, the current holder of her loan filed a foreclosure action in Cook County, Illinois. Ms. Gordon raised

affirmative defenses and a counterclaim, asserting that the plaintiff lacks standing because it purports to be the holder of the subject note and mortgage by an defective assignment processed through Mortgage Electronic Registration Systems, Inc. ("MERS").  In addition, Ms. Gordon is seeking the rescission of her loan based on American Brokers Conduit's alleged TILA violations.

5.      Linda and Johnny Culpepper

The Culpeppers owned a home in Chicago, Illinois.  They allege that they were the victims of a mortgage rescue scam whereby a third party fraudulently induced them to transfer title to their home to a straw purchaser, who in turn demanded payments under mortgages originated by American Home totaling $425,000.

6.      Florence Dandridge

Ms. Dandridge lives in Staten Island, New York.  At the time she obtained her American Home loan, Ms. Dandridge was a 65-year old retiree living on a fixed income from a pension and social security.  A broker contacted Ms. Dandridge and offered to refinance her mortgage at a lower interest rate.  She was told that she would be given a fixed rate mortgage.

Instead, Ms. Dandridge was given a negatively-amortizing POA from American Brokers Conduit, a subsidiary of American Home.  According to Ms. Dandridge, the loan disclosures made it appear as though she would have an interest rate of 1.9% under her refinanced loan.  The 1.9% rate lasted only two weeks, re-setting to 7.514% for one month, then to the Treasury Rate plus 2.85%.  Once the growing principal under her loan reached 110% of the original principal, Ms. Dandridge would have to make monthly payments at the fully amortized rate, which would far exceed her monthly income.  Ms. Dandridge alleges that she was never told that her loan would negatively amortize or that her monthly mortgage payments would not even cover the accruing interest under her loan.

C.    **The Plan's Provisions Preserving Borrower Claims and Defenses**

On February 23, 2009, the Court entered an order confirming the Plan, which has not yet gone effective.  The Plan included provisions that: (1) preserved Borrower claims and defenses available under mortgages transferred to third parties pursuant to the Plan or after the Effective Date (Plan § 17.B); and (2) preserved Borrowers' claims, defenses, or remedies under mortgage loans originated or serviced by any Debtor as against any non-Debtor party (Plan § 17.D).

The Plan also provided for the employment of a disinterested person as an ombudsperson to respond to borrowers' information requests (Plan § 17.H).  Under the Plan, following a request from a borrower, the Plan Trustee is required to work with the ombudsperson to provide the borrower with the identity of the current holder and servicer of the loan (many borrowers do not know the identity of the current holder or servicer of their loans) and a copy of his or her loan file.  To date, the Debtors have rebuffed requests by Borrowers' Committee and Movants to provide the information sought in this Motion.

D.    **Debtors Possess Documents Relevant to Borrower Claims**

On October 21, 2009, American Home sought authority from the Court to destroy approximately 3,700 boxes of materials that it asserted the Debtors "no longer needed for the Debtors' business operations or the remaining chapter 11 process."  Debtor's Motion to Authorize the Abandonment and Destruction of Certain Documents and Records at 8 (D.I. 8081).  These documents included, among other things:  (1) documents related to the Debtors' review and approval of broker applications; (2) the desk contents of American Home employees involved in the origination and servicing of mortgage loans; (3) various hard copy reports from departments at American Home generated through the Debtors' information systems; and (4) documents maintained by a title abstract business affiliated with the Debtor.  *Id.* at 5-6.

The Borrowers Committee opposed the Debtors' motion, arguing that: (1) borrowers may need some of these documents to support their claims and defenses against non-Debtor third parties; (2) the Debtors were obligated to preserve such documents to the extent they could be relevant to borrower claims and defenses; and (3) during Plan negotiations, the Debtors agreed to include provisions in the Plan that would preserve borrower claims and defenses against non-Debtor third parties and ensure Borrowers' access to documents relevant to such claims and defenses. Opposition to Debtors' Motion for an Order Authorizing the Abandonment and Destruction of Certain Documents and Records (D.I. 8153). The Debtors' ultimately withdrew their motion.

The documents that American Home sought authority to destroy comprise only a fraction of the materials in the Debtors' possession that may be relevant to borrowers' litigation. Upon information and belief, the Debtors also possess, among other things:

- Documents describing American Home's relationships and business dealings with brokers;

- Communications regarding the origination and documentation of mortgage loans;

- Documents describing American Home's underwriting practices and procedures;

- Documents describing American Home's role in correspondent lending or its relationship with warehouse lenders;

- Marketing materials provided to homeowners and/or brokers;

- Documents regarding American Home's mortgage assignment practices and procedures, including documents concerning American Home's relationship with and authority provided to MERS; and

- American Home's document retention practices and document retention efforts.

American Home also possesses documents specifically relating to individual borrowers. While American Home has stated in the past that it preserved most of these documents in electronic form and then transferred such documents to other parties, Movants would, at a minimum, seek to question a representative of American Home about the nature and location(s) of these documents, including:

- Underwriting documents and loan files for individual borrowers, which may include, among other things, copies of borrowers' HUD-1 forms, Truth-In-Lending Act Disclosure Statements, notes, deeds, loan applications, good-faith estimates, income statements, and credit reports; and

- Internal communications regarding the approval and documentation of individual borrowers' loans.

Borrowers need access to the documents described above to support their claims and defenses against non-Debtor third parties, particularly third parties seeking to foreclose on their homes.[11] Under TILA, a borrower can seek rescission of his or her loan as a defense to a foreclosure proceeding if he or she is able to demonstrate that there was a material omission or inaccurate disclosure in the disclosure statement provided to a Borrower during the loan origination process or that a required HOEPA disclosure was not made. 12 C.F.R. Part 226.15. Even if a borrower's TILA rescission claim is not viable due to expiration of the statute of limitations, many other claims related to origination may be raised by homeowners as defenses to foreclosure.

In addition, borrowers may need documents possessed by the Debtors to prove, among other things, that the Debtors or third parties:

---

[11] Hope Del Carlo, Peter Bibler, Meghan Faux, Tamara F. Kishnir Groman, Rawle, Rawle Andrews Jr. and Margaret Becker are attorneys with various legal aid organizations that provide assistance to borrowers with predatory lending claims and/or who are parties to foreclosure actions. Each of these individuals has submitted a declaration, attached as Exhibits A-F hereto, in which they describe the nature of their clients' claims and defenses and the information needed to support such claims and defenses.

- Failed to take into account future rate adjustments and negative amortization in determining borrowers' ability to repay;

- Intentionally placed borrowers in unaffordable refinance loans for the purpose of stripping homeowners' equity;

- Misrepresented Borrowers' income in determining borrowers' ability to repay;

- Failed to provide required documentation to borrowers;

- Misrepresented the terms of loans to borrowers;

- Knew that borrowers were likely to default on loans;

- Intentionally disregarded internal underwriting or fraud prevention policies; and

- Failed to properly assign notes and mortgages to successors.

These documents may also show that American Home deliberately entered into relationships with mortgage brokers who were poorly trained, poorly supervised, and provided with financial incentives to place American Home loans with borrowers who were likely to default.

## III.    ARGUMENT

Borrowers are entitled to documents and information in the Debtors' possession that may be relevant to their claims and defenses against non-Debtor third parties. The Plan expressly preserves these claims and defenses and includes mechanisms that allow borrowers to obtain documents and information possessed by the Debtors that may be relevant to their claims and defenses against non-Debtor third parties. But because the Plan is not yet effective, the most important of these mechanisms is not in place. A Borrower Information Ombudsperson has not yet been appointed (and, in any event, a Borrowers Information Ombudsperson would not necessarily be in position to provide borrowers with all documents needed to support their claims and defenses). As a result, many borrowers do not have many types of documents and information in the Debtors' possession that may be relevant to claims and defenses against non-

Debtor third parties. There are a variety of American Home business practices that so far have gone almost completely unexplored, even though they are highly relevant to individual borrowers' cases. And some borrowers do not even know the identity of the current holder and servicer of their loans and have been unable to obtain their own loan documents. To date, the Debtors have rebuffed requests by Movants to provide the information sought in this Motion.

Although the automatic stay forbids the commencement of discovery "against the debtor," the discovery requested herein is not for the purpose of furthering claims against the Debtors, but instead is sought as support for claims and defenses involving non-Debtor third parties. Numerous bankruptcy courts have recognized this distinction and held that the automatic stay does not protect a debtor from discovery requests related to litigation involving a non-debtor third party. Accordingly, the Court should enter an order clarifying that borrowers are authorized to seek the discovery from the Debtors requested herein.

If, however, the automatic stay did shield the Debtors from the discovery sought by the Movants, the Court should lift the automatic stay for the limited purpose of allowing borrowers to seek documents and information from the Debtors that may support claims and defenses against non-Debtor third parties. Lifting the stay for this limited purpose will not undermine the purposes of the stay. Movants are not seeking to use the discovery to pursue recoveries from the estate. Rather, Movants seek discovery to support claims and defenses against non-Debtor third parties (although the discovery may be relevant to claims against Debtors as well as non-Debtors). Moreover, the Debtors are no longer in the mortgage origination and servicing businesses, and a lifting of the automatic stay will not interfere with the progress of the Debtors' liquidation.

As discussed further below, Movants will work cooperatively with the Debtors and will undertake reasonable efforts to facilitate the efficient production and use of documents and information possessed by the Debtors.

A.    **The Automatic Stay Does Not Shield the Debtors From Discovery Related to Claims and Defenses Against Non-Debtor Third Parties.**

Section 362(a) of the Bankruptcy Code stays the "commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1) (2010). Section 362(a) applies only to actions against a debtor. The Borrowers Committee and individual borrower Movants acknowledge that claims against the Debtor are stayed. Movants seek the discovery described herein because they have a current need for information that will help them in ongoing litigation with third parties that will determine whether they can remain in their homes.

Courts have consistently held that the automatic stay does not preclude third party discovery against a debtor related to claims and defenses involving non-debtor third parties. *See In re Richard B. Vance & Co.*, 289 B.R. 692, 697 (Bankr. C.D. Ill. 2003) (holding "it is now generally accepted that discovery pertaining to claims against the bankrupt's codefendants is not stayed, even if the discovery requires a response from the debtor, and even if the information discovered could later be used against the debtor"); *In re Miller*, 262 B.R. 499, 505 (9th Cir. BAP 2001) (holding "information is information" and the mere fact that such information related to a third party claim is sought from a debtor does not itself result in a violation of the automatic stay); *In re Mahurkar Double Lumen Hemodialysis Catheter Patent Litig.*, 140 B.R. 969, 978

(Bankr. N.D. Ill. 1992) (debtor's employees were not protected by the automatic stay from

discovery requests relating to claims against non-debtor defendants); *In re Hillsborough*

*Holdings Corp.*, 130 B.R. 603, 605 (Bankr. M.D. Fl. 1991) (holding "it is clear that a literal

reading of § 362(a) leaves no doubt that the automatic stay would not prevent [co-defendant]

from conducting the proposed discovery to be used for its defense in the suit").

> **B.      If the Automatic Stay Does Apply to the Discovery Sought, the Court Should Lift the Automatic Stay and Allow the Borrowers Committee and Individual Borrower Movants To Seek Third Party Discovery from the Debtors.**

>> 1.      Standard For Lifting the Automatic Stay

Under Section 362(d)(1) of the Bankruptcy Code, "on request of a party in interest and

after notice and a hearing, the court shall grant relief from the stay provided under subsection (a)

of this section by terminating, annulling, modifying or conditioning such stay - (1) for cause ..."

Although the Bankruptcy Code does not provide a definition of "cause" and there is no rigid test

for determining whether sufficient cause exists to modify an automatic stay, courts in this district

have considered the policies underlying the automatic stay and the competing interests of the

debtor and the movant in deciding whether cause exists to justify lifting the automatic stay.  *In re*

*Continental Airlines, Inc.*, 152 B.R. 420, 424 (D. Del. 1993).

The underlying purpose of the automatic stay is to "prevent certain creditors from gaining

preference for their claims against the debtor, forestall the depletion of the debtor's assets due to

legal costs in defending proceedings against it, and, in general, to avoid interference with the

orderly liquidation or rehabilitation of the debtor." *Borman v. Raymark Indus., Inc.*, 946 F.2d

1031, 1036 (3d Cir. 1991).

In considering the competing interests of a debtor and a movant seeking relief from an

automatic stay, this Court has considered whether the hardship to the non-bankrupt party by

maintenance of the stay considerably outweighs the hardship to the debtor. *In re W.R. Grace & Co.*, Nos. 01-01139(JFK), 2007 WL 1129170, at *2 (Bankr. D. Del. Apr. 13, 2007).[12]

As discussed further below, lifting the automatic stay (if necessary at all in this instance) to allow borrowers to pursue third party discovery against the Debtors:  (1) will not undermine the purposes of the automatic stay; and (2) is warranted by the competing interests of the Debtors and the borrowers, which favor the borrowers.  Thus, sufficient "cause" exists to warrant lifting the automatic stay for the limited purpose requested herein.

2.    Lifting the Stay to Allow Limited Borrower Discovery Against the Debtors is Consistent With the Purposes of Section 362(a) of the Bankruptcy Code

The purposes underlying section 362(a) of the Bankruptcy Code do not warrant enforcing the automatic stay against borrowers seeking discovery from the Debtors in furtherance of their claims and defenses against non-Debtor third parties.  Lifting the automatic stay to allow limited third-party discovery against the Debtors will not:  (1) result in a material depletion or unfair distribution of the assets of the estate; or (2) interfere with the administration of this case.   The borrowers' claims against non-Debtor third parties, if they ultimately succeed, will not be paid from assets of the estate.  Thus, providing documents and information to borrowers to pursue claims and defenses against non-Debtor third parties will not result in:  (1) a depletion of the estate's assets (other than the modest costs associated with producing documents and information sought by borrowers); or (2) borrowers obtaining a greater recovery from the estate than that obtained by other unsecured creditors.

---

[12] In weighing the interests of the bankrupt party and parties seeking stay relief, courts in this district have also considered:  (1) whether prejudice to either the bankrupt estate or the debtor will result from continuation of the suit; and (2) the probability of the creditor prevailing on the merits. *In re W.R. Grace & Co.*, Nos. 01-01139(JFK), 2007 WL 1129170, at *2 (Bankr. D. Del. Apr. 13, 2007).  However, these factors are inapplicable here since the Movants do not seek discovery to support claims and defenses against the Debtors.

Nor will borrower discovery interfere with the liquidation of American Home. The Plan has been confirmed and the parties are awaiting the satisfaction of certain contingencies for the Plan to become effective. The limited discovery sought in this Motion will not impact the effectiveness of the Plan or any other aspect of the Debtors' bankruptcy cases.

3.    The Interests of the Borrowers Warrant Lifting the Stay

The competing interests of the borrowers and the Debtors further demonstrate "cause" to warrant lifting the automatic stay and allowing limited third-party discovery against the Debtors. Essentially, Movants are merely asking the Debtors to honor their ongoing duties to comply with the law – in this case the law governing the obligations of a business to respond to requests seeking discovery of documents and information relevant to third-party litigation. The hardship that will be suffered by borrowers if they do not obtain documents and information that may support their claims and defenses against non-Debtor third parties is substantial. As discussed further below, compared to the modest expense that the estate will incur in responding to borrowers' discovery requests, these hardships favor lifting the automatic stay to allow borrowers to seek discovery from the Debtors in furtherance of their claims and defenses against non-Debtor third parties.

The costs that the Debtors will incur in responding to borrowers' third party discovery requests will be small. Borrower discovery will be coordinated through the Borrowers' Committee to maximize efficiency and minimize cost. In fact, producing the documents and information requested by the borrowers in a coordinated and streamlined fashion may actually save the estate time and costs it would otherwise have to incur in responding to borrowers' information requests in the ordinary course. The Debtors and the estate will lose nothing if the automatic stay is lifted for the limited circumstance described herein, other than the modest costs of producing documents and information in their possession.

However, if the stay is not lifted to allow the discovery sought in this Motion, borrowers will lack access to documents and information that may be necessary to support their claims and defenses against non-Debtor third parties. The Debtors are likely the only available source for certain documents, such as underwriting guidelines, communications and payments to brokers, and mortgage assignment protocols, that are critical to certain borrower claims and defenses.

**C.    The Borrowers Committee and Individual Borrowers Will Coordinate Discovery To Minimize the Expense to the Debtors and the Estate.**

1.    Proposed Process

The process proposed by the Movants would result in an efficient transfer of information from the Debtors to borrowers, including borrowers who are not yet involved in litigation relating to loans originated by American Home, but may be involved in such litigation in the future. All parties have an interest in promoting such efficiencies. As noted above, Movants seek an Order authorizing them to: (1) conduct an examination of one or more knowledgeable representatives of the Debtors for the purposes of identifying the location, content, and format of documents that may be relevant to borrower claims and defenses against non-Debtor third parties; (2) inspect the Debtors' documents for the purpose of identifying documents that may be relevant to their claims and defenses against non-Debtor third parties, and copy or obtain copies of such documents; and (3) conduct an examination of one or more custodians of the Debtors' records for the purpose authenticating such documents. In addition, the individual borrower Movants request authorization to cross-notice their discovery requests to the Debtors in their individual cases so that they can use documents and information obtained from the Debtors to support their claims and defenses against non-Debtor third parties.

These steps will enable the Movants to identify and obtain potentially relevant documents quickly (and in a manner that will enable them to make use of such materials in their individual

cases), while minimizing the disruption to the Debtors that uncoordinated discovery requests otherwise might cause.  Movants anticipate that, once the Debtors' documents have been reviewed and searched, additional reviews and searches will not be necessary, as the documents deemed to be most relevant will be held by the Debtors (and, later, the Borrower Information Ombudsperson) and easily produced.

    2.    The Borrowers Committee's and the Individual Borrower Movants' Request To Inspect the Debtors' Documents and Examine a Records Custodian is Authorized By Federal Rule of Bankruptcy Procedure 2004

Federal Rule of Bankruptcy Procedure 2004 states that "on the motion of any party in interest, the court may order the examination of any entity."  The scope of a Rule 2004 examination is "unfettered and broad."  *In re Bennett Funding Group, Inc.*, 203 B.R. 24, 28 (Bankr. N.D.N.Y. 1996).  The examination may relate to the acts, conduct, property, liabilities and the financial condition of the debtor and "any other matter relevant to the case."  Fed. R. Bankr. P. 2004(b).  Rule 2004 specifically authorizes an entity to compel the attendance of a witness for examination or the production of documents.  Fed. R. Bankr. P. 2004(c).

Movants want to identify, locate and authenticate documents relating to the acts, conduct and property of the Debtors that are likely to be relevant to borrowers' litigation against third parties.  Inspecting the Debtors' documents and conducting examinations of the Debtors' records custodian for these purposes is within the permissible scope of a Rule 2004 examination.

Allowing the Borrowers Committee and individual borrower Movants to identify, locate and authenticate documents through the processes described above will be less expensive than forcing the Debtors to respond to hundreds of similar requests from borrowers for such information without any coordination.  Thus, the Court should authorize the relief requested by Borrowers herein pursuant to Federal Rule of Bankruptcy Procedure 2004.

## IV.    CONCLUSION

Because borrowers continue to need access to a variety of American Home documents that may be relevant to their claims and defenses against non-Debtor third parties, the Motion should be granted.

Dated: July 28, 2010

ZUCKERMAN SPAEDER LLP

Thomas G. Macauley (ID No. 3411)
919 Market Street, Suite 990
Wilmington, DE 19801
Telephone:  (302) 427-0400
Facsimile:  (302) 427-8242

- and -

GILBERT LLP
Stephen A. Weisbrod
W. Hunter Winstead
1100 New York Avenue, NW, Suite 700
Washington, DC 20005
Telephone:  (202) 772-1962
Facsimile:  (202) 772-3962

Attorneys for the Official Committee of
Borrowers

AARP MARYLAND
Rawle Andrews Jr.
200 St. Paul Place, Suite 2510
Baltimore, Maryland 21202
Telephone: (410) 895-7601
Facsimile: (410) 837-0269

Attorneys for Gracie Graves


LEGAL ASSISTANCE FOUNDATION OF
METROPOLITAN CHICAGO
Peter Bibler
111 West Jackson Boulevard, 3rd Floor
Chicago, Illinois 60604
Telephone: (312) 341-1070
Facsimile: (312) 341-1041

Attorneys for Annie M. Gordon


LEGAL ASSISTANCE FOUNDATION OF
METROPOLITAN CHICAGO
Tamara F. Kushnir Groman
111 West Jackson Boulevard, 3rd Floor
Chicago, Illinois 60604
Telephone: (312) 341-1070
Facsimile: (312) 341-1041

Attorneys for Johnny and Linda Culpepper


OREGON LAW CENTER
Hope Del Carlo
921 SW Washington, Suite 516
Portland, Oregon 97205
Telephone: (503) 295-2760

Attorneys for Penny Montague

AARP MARYLAND
Rawle Andrews Jr.
200 St. Paul Place, Suite 2510
Baltimore, Maryland 21202
Telephone: (410) 895-7601
Facsimile: (410) 837-0269

Attorneys for Gracie Graves

LEGAL ASSISTANCE FOUNDATION OF
METROPOLITAN CHICAGO
Peter Bibler
111 West Jackson Boulevard, 3rd Floor
Chicago, Illinois 60604
Telephone: (312) 341-1070
Facsimile: (312) 341-1041

Attorneys for Annie M. Gordon

LEGAL ASSISTANCE FOUNDATION OF
METROPOLITAN CHICAGO
Tamara F. Kushnir Groman
111 West Jackson Boulevard, 3rd Floor
Chicago, Illinois 60604
Telephone: (312) 341-1070
Facsimile: (312) 341-1041

Attorneys for Johnny and Linda Culpepper

OREGON LAW CENTER
Hope Del Carlo
921 SW Washington, Suite 516
Portland, Oregon 97205
Telephone: (503) 295-2760

Attorneys for Penny Montague

AARP MARYLAND
Rawle Andrews Jr.
200 St. Paul Place, Suite 2510
Baltimore, Maryland 21202
Telephone: (410) 895-7601
Facsimile: (410) 837-0269

Attorneys for Gracie Graves


LEGAL ASSISTANCE FOUNDATION OF
METROPOLITAN CHICAGO
Peter Bibler
111 West Jackson Boulevard, 3rd Floor
Chicago, Illinois 60604
Telephone: (312) 341-1070
Facsimile: (312) 341-1041

Attorneys for Annie M. Gordon

LEGAL ASSISTANCE FOUNDATION OF
METROPOLITAN CHICAGO
Tamara F. Kushnir Groman
111 West Jackson Boulevard, 3rd Floor
Chicago, Illinois 60604
Telephone: (312) 341-1070
Facsimile: (312) 341-1041

Attorneys for Johnny and Linda Culpepper


OREGON LAW CENTER
Hope Del Carlo
921 SW Washington, Suite 516
Portland, Oregon 97205
Telephone: (503) 295-2760

Attorneys for Penny Montague

Peter Bibler
111 West Jackson Boulevard, 3rd Floor
Chicago, Illinois 60604
Telephone: (312) 341-1070
Facsimile: (312) 341-1041

Attorneys for Annie M. Gordon

LEGAL ASSISTANCE FOUNDATION OF
METROPOLITAN CHICAGO
Tamara F. Kushnir Groman
111 West Jackson Boulevard, 3rd Floor
Chicago, Illinois 60604
Telephone: (312) 341-1070
Facsimile: (312) 341-1041

Attorneys for Johnny and Linda Culpepper

OREGON LAW CENTER
Hope Del Carlo
921 SW Washington, Suite 516
Portland, Oregon 97205
Telephone: (503) 295-2760

Attorneys for Penny Montague

SOUTH BROOKLYN LEGAL SERVICES
Meghan Faux
105 Court Street, 3rd Floor
Brooklyn, New York 11201
Telephone: (718) 237-5500
Facsimile: (718) 855-0733

Attorneys for Marjorie Crawford

STATEN ISLAND LEGAL SERVICES
Margaret Becker
36 Richmond Terrace, Ste. 205

27

SOUTH BROOKLYN LEGAL SERVICES
Meghan Faux, Of Counsel
105 Court Street, 3rd Floor
Brooklyn, New York 11201
Telephone:  (718) 237-5500
Facsimile:  (718) 855-0733

Attorneys for Marjorie Crawford


STATEN ISLAND LEGAL SERVICES
Margaret Becker
36 Richmond Terrace, Ste. 205
Staten Island, New York 10301
Telephone:  (718) 233-6480
Facsimile:  (718) 448-2264

Attorneys for Florence Dandridge

27

SOUTH BROOKLYN LEGAL SERVICES
Meghan Faux
105 Court Street, 3rd Floor
Brooklyn, New York 11201
Telephone:  (718) 237-5500
Facsimile:  (718) 855-0733

Attorneys for Marjorie Crawford

w/ permission by (HW)

STATEN ISLAND LEGAL SERVICES
Margaret Becker
36 Richmond Terrace, Ste. 205
Staten Island, New York 10301
Telephone:  (718) 233-6480
Facsimile:  (718) 448-2264

Attorneys for Florence Dandridge

27