# EXHIBIT C

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re ) | Chapter 11 |
| ) | |
| AMERICAN HOME MORTGAGE ) | Case No. 07-11047 (CSS) |
| HOLDING, INC., a Delaware corporation, ) | Jointly Administered |
| et al., ) | |
| ) | |
| Debtors. ) | |
| _____) | |

## DECLARATION OF MEGHAN FAUX

I, Meghan Faux, declare:

1. I am over 18 years old, have personal knowledge of the facts set forth herein, and am otherwise competent to execute this declaration.

2. I submit this declaration in support of the Official Borrowers Committee's And Certain Individual Borrowers' Motion To Allow Borrowers To Pursue Discovery In Furtherance Of Claims And Defenses Against Non-Debtor Third Parties And, If Necessary, For Relief From The Automatic Stay, And Request For Inspection Of Debtors' Documents And Examinations Concerning Debtors' Records Pursuant To Federal Rule Of Bankruptcy Procedure 2004.

3. I am an attorney admitted to practice in New York and the Director of the Foreclosure Prevention Project at South Brooklyn Legal Services ("SBLS"). In the more than ten years since it was founded, South Brooklyn Legal Services' Foreclosure Prevention Project has provided advice, referrals, loan remediation assistance, and legal representation to more than 3,000 homeowners at risk of foreclosure.

4. South Brooklyn represents Marjorie Crawford, a homeowner who received a predatory "Payment Option ARM" loan from the Debtors. At the time the Debtors extended the

loan to her, Ms. Crawford was a 76-year-old woman living on a fixed monthly income of $300 per month in social security and $200 in food stamps.

5.    In 2007, a broker from Direct Capital Corporation telephoned Ms. Crawford at her home and actively solicited her to refinance by informing her she could receive $100,000 and lower monthly payments. The broker assured Ms. Crawford that her new mortgage payments would be less than what she was paying at the time, around $1,000, and that she would receive a fixed-rate. Instead, she was given a negatively amortizing payment-option adjustable rate mortgage from American Brokers Conduit, a subsidiary of American Home Mortgage. Even though Ms. Crawford gave the broker documentation of her income, the income figures on her loan application were inflated. The loan Ms. Crawford received had a 1.25% initial rate that later increased to the Treasury Rate plus 2.85%. Unbeknownst to Ms. Crawford, her monthly mortgage payments did not cover the interest accruing on her loan. Her loan included a three-year prepayment penalty.

6.    In August 2009, SBLS began appearing at foreclosure settlement conferences in Kings County, New York Supreme Court on behalf of Ms. Crawford. In June 2010, SBLS moved to file a late answer on behalf of Ms. Crawford, raising multiple defenses and counterclaims, including lack of standing, as well as violations of the Truth in Lending Act, Home Ownership and Equity Protection Act, the New York State Deceptive Practices Act and usury law. In the motion, Ms. Crawford asserts, *inter alia*, that: (1) ABC failed to provide her with two copies of a notice of right to cancel the loan; (2) ABC originated a loan containing negative amortization terms and a prepayment penalty; (3) the disclosures made by ABC at the closing for the subject loan contained inaccurate and contradictory information regarding the finance charges; (4) the total points and fees payable by Ms. Crawford exceeded eight percent of

2

the total loan amount; (5) ABC, through its agent Direct Capital Corporation, falsified Ms. Crawford's loan application; (6) ABC omitted substantial fees from Ms. Crawford's HUD-1 Settlement Statement; and (7) the three-year prepayment penalty in Ms. Crawford's loan was usurious.

7.  SBLS has represented low-income homeowners in foreclosure proceedings and in affirmative litigation against mortgage lenders for over ten years. Based on my experience representing homeowners in foreclosure proceedings and in litigation with mortgage lenders, I have personal knowledge regarding the requirements a mortgage holder must satisfy in order to foreclose on a home, the defenses homeowners may assert to foreclosure, the nature of claims borrowers may assert against lenders, and the documents and information that may be relevant in foreclosure proceedings and litigation between borrowers and lenders.

8.  To support claims against servicers and holders of mortgage loans based upon fraudulent and illegal origination and servicing practices, and to support defenses to foreclosure, borrowers may need the following information and documents:

- Communications regarding the origination and documentation of mortgage loans;

- Documents describing a lender's underwriting practices and procedures;

- Documents concerning incentives offered and paid to brokers;

- Marketing materials provided by lenders to brokers and homeowners;

- Documents regarding a lender's mortgage assignment practices and procedures, including documents concerning lenders' relationship with and authority provided to MERS;

- Documents identifying Debtor's personnel during the time that mortgages were securitized, including documents demonstrating what personnel had authority to assign mortgages to subsequent holders;

- Lenders' document retention practices and document retention efforts;

- Underwriting documents and loan files for individual borrowers, which may include, among other things, copies of a Borrowers' HUD-1 forms, Truth-In-Lending Act Disclosure Statements, notes, deeds, loan applications, good-faith estimates, income statements, and credit reports; and

- Internal communications regarding the approval and documentation of individual borrowers' loans.

9. Borrowers need access to these documents to support their claims and defenses against non-Debtor third parties, particularly third parties seeking to foreclose on their homes. Specifically, borrowers may need these documents to prove, among other things, that lenders or third parties;

- Failed to take into account future rate adjustments and negative amortization in determining borrowers' ability to repay;

- Misrepresented borrowers' income in determining borrowers' ability to repay;

- Failed to provide required documentation to borrowers;

- Misrepresented the terms of loans to borrowers;

- Knew that borrowers were likely to default on loans;

- Intentionally disregarded internal underwriting or fraud prevention policies;

- Failed to properly assign notes and mortgages to successors; and

- Deliberately entered into relationships with mortgage brokers who were poorly trained, poorly supervised, and provided with financial incentives to place loans with borrowers who were likely to default.

10. In my experience, the documents sought in the Motion are critical to bringing about a negotiated settlement or to prevailing at trial. Documents that show a lender's marketing and underwriting policies may demonstrate motivation and intent to deceive, an important element in claims challenging the enforceability of a mortgage and note (*e.g.* that a borrower was fraudulently induced into obtaining a mortgage). In claims against third-party brokers, the

4

originating lender's marketing, underwriting and securitization policies and procedures can help demonstrate the broker's motivation and/or that a broker's misrepresentations were willful.

11. Documents concerning the lender's policies, and its relationships with brokers and other lenders (including correspondent lenders or warehouse lenders), are essential to rebut subsequent holders' attempts to claim "holder in due course" status, avoid assignee liability, or to support borrowers' claims that the current holder is liable for illegalities in the loan origination based on the existence of a joint venture between the originator and the holder. In many cases, subsequent loan holders were intimately involved in the origination of loans and were not innocent purchasers.

12. Loans made in contravention of stated policies can show that due diligence by the holder would have made clear that the loan carried legal liability. Documents that provide information about the nature of a lender's practices and its incentives can help rebut attempts by current holders to portray a borrowers as the parties solely responsible for predatory loans.

13. Documents that discuss Debtors' policies and practices as a loan servicer may be critical to homeowners challenging the amount of a debt based on servicing abuses. To the extent that Debtors serviced loans owned by non-Debtor holders, the holder could be liable for servicing abuses based on an agency relationship.

14. Documents regarding loan transfers and assignments are essential in challenging a current holder's standing to foreclose on a mortgage. With alarming frequency, alleged mortgage holders are bringing foreclosure actions on mortgage loans that they do not own.

15. Assignment defects in these cases run the gamut. In some cases, assignment documents are generated immediately before (or in some cases after) foreclosure is commenced and are signed by parties that lack authority.

16. Many foreclosure cases involve assignments to and from the Mortgage Electronic Registration System (MERS). MERS is a corporation that administers an electronic registry which tracks ownership interests in mortgages for its members, who are mortgage originators and investors. Ms. Crawford's mortgage indicates that MERS is the "mortgagee of record" for purposes of recording. MERS' authority to perfect assignments has been questioned by numerous courts. *See, e.g., Citibank, N.A. as Trustee v. Picon*, No. 13902/08 (N.Y. Sup. Ct., Queens County, Nov. 6, 2008) (questioning whether originator Countrywide's limited agency agreement with MERS gave MERS authority to transfer a mortgage and note to Citibank); *Deutsche Bank Nat'l Trust Co. v. Leigh*, No. 103682/08 (N.Y. Sup. Ct., Nassau County, Mar. 31, 2009).

17. In other cases mortgages have been assigned without the note, the chain of assignments is incomplete, or assignments were made to trusts long after the trust's formation, rendering the assignments void as *ultra vires*. There is growing concern among foreclosure defense attorneys that assignments are being fabricated after alleged transfers occurred, in an attempt to correct prior legal deficiencies. Documents in Debtors' possession that reveal its practices and policies regarding mortgage assignments, particularly assignments to trusts, may be important evidence for homeowners to show either that the assignments in their cases followed the required practice and the practice itself was legally insufficient, or that the assignment in their cases deviated from the proscribed practice, which could bolster borrower claims that the assignment documents were fabricated.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 8, 2010 in Brooklyn, New York.

7

By: /s/ *Meghan Faux*
     Meghan Faux