# EXHIBIT E

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re | ) | Chapter 11 |
| | ) | |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-12047(CSS) |
| HOLDING, INC., a Delaware corporation, et al., | ) | Jointly Administered |
| | ) | |
| Debtors. | ) | |
| | ) | |

## DECLARATION OF MARGARET BECKER

I, Margaret Becker, declare:

1.      I am over 18 years old, have personal knowledge of the facts set forth herein, and am otherwise competent to execute this declaration.

2      I submit this declaration in support of the Official Borrowers Committee's and Certain Individual Borrowers' Motion To Allow Borrowers to Pursue Discovery In Furtherance Of Claims And Defenses Against Non-Debtor Third Parties And, If Necessary, For Relief From the Automatic Stay, And Request For Inspection of Debtors' Documents And Examinations Concerning Debtors' Records Pursuant To Federal Rule of Bankruptcy Procedure 2004 (the "Motion")

3.      I am an attorney admitted to practice in New York. Since 2006 I have worked as Director of the Homeowner Defense Project at Staten Island Legal Services.  The Homeowner Defense Project of Staten Island Legal Services provides legal services low- and middle-income homeowners in Staten Island who are in or at risk of foreclosure.  Many of our clients are in foreclosure proceedings and in litigation against mortgage lenders.  Many are not yet in foreclosure and attempting to negotiate modifications of their mortgages to make them

affordable. These latter clients have potential claims against the holders of their mortgages but have not yet raised them, preferring instead to negotiate a solution without litigation.

4.      I represent Florence Dandridge, a homeowner who received a predatory 'Payment Option ARM' loan from Debtors. At the time Debtors extended the loan to her, Ms. Dandridge was a 65-year-old retired woman living on a fixed income of $2,013 per month from pension and social security. She had a credit score of 728 when a broker telephoned her at home and offered to refinance her mortgage to a lower interest rate. Ms. Dandridge was told the loan would be a fixed-rate mortgage. Instead, she was given a negatively amortizing payment-option adjustable rate mortgage from American Brokers Conduit, a subsidiary of American Home Mortgage. Even though Ms. Dandridge gave the broker documentation of her income, the income figures on her loan application were inflated to over twice her real income. The loan disclosures made it appear that she would have monthly principal and interest payments of $837, and that the interest rate was 1.9%. In fact the 1.9% interest rate lasted for only two weeks, and the $837 monthly payment would not cover even the interest accruing on the loan. After two weeks the interest rate reset to 7.514% for one month, then to the Treasury Rate plus 2.85%. Once the growing principal reached 110% of the original principal, Ms. Dandridge would have to make monthly payments at the fully amortized rate, which would far exceed Ms. Dandridge's total monthly income. The loan also included a three-year prepayment penalty. Ms. Dandridge was never told that her loan would negatively amortize or that the monthly mortgage payments of $837 would not even cover the accruing interest.

5.      Ms. Dandridge is not currently in foreclosure. Should the current holder of her mortgage bring a foreclosure action against her, Ms. Dandridge would be able to raise her claims relating to origination of the mortgage defensively against the holder to reduce the amount owed and to challenge the validity of the debt. Her claims include violations of the Truth in Lending

2

Act, the Real Estate Settlement Procedures Act, New York's Deceptive Practices Act, and New York's usury law (General Obligations Law § 5-501 (3)(b)), and fraud. These claims would allow her to reduce her debt and, under the usury claim, have the loan declared void and unenforceable.

6.     Ms. Dandridge may also have a defense based on the foreclosing entity's standing to foreclose, if the mortgage and note were not properly assigned to the alleged current holder. Faulty and missing assignments are very common among loans originated during the period in which Debtors engaged in mortgage lending, and Debtors have admitted that they have lost the original notes in some cases. See Loan Sale and Interim Servicing Agreement dated April 9, 2010, Exhibit A, attached as Exhibit A to the Court's April 29, 2009 Order Pursuant to Sections 105 and 363 of the Bankruptcy Code: (1) Authorizing the Sale of Mortgage Loans and REO Properties Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (II) Authorizing and Approving Sale Agreement Thereto; and (III) Granting Related Relief. If the original note is missing, there is good reason to question the legal sufficiency of any assignments of that note.

7.     I have represented low and middle-income homeowners in foreclosure proceedings and in affirmative litigation against mortgage lenders for over four years.

8.     Based on my experience representing homeowners in foreclosure proceedings and in litigation with mortgage lenders, I have personal knowledge regarding the requirements a mortgage holder must satisfy in order to foreclose on a home, the defenses homeowners may assert to foreclosure, the nature of claims borrowers may assert against lenders, and the documents and information that may be relevant in foreclosure proceedings and litigation between borrowers and lenders.

9.     To support claims against servicers and holders of mortgage loans based upon

3

fraudulent and illegal origination and servicing practices, and to support defenses to foreclosure, borrowers may need the following information and documents:

- Communications regarding the origination and documentation of mortgage loans; Documents describing a lender's underwriting practices and procedures; Documents concerning incentives offered and paid to brokers;

- Marketing materials provided by lenders to brokers and homeowners;

- Documents regarding a lender's mortgage assignment practices and procedures, including documents concerning lenders' relationship with and authority provided to MERS;

- Documents identifying Debtor's personnel during the time that mortgages were securitized, including documents demonstrating what personnel *had authority to* assign mortgages to subsequent holders.

- Lenders' document retention practices and document retention efforts;

- Underwriting documents and loan files for individual borrowers, which may include, among other things, copies of a Borrowers' HUD-1 forms, Truth-In-Lending Act Disclosure Statements, notes, deeds, loan applications, good-faith estimates, income statements, and credit reports; and

- Internal communications regarding the approval and documentation of individual borrowers' loans.

10.    Borrowers need access to these documents to support their claims and defenses against non-Debtor third parties, particularly third parties seeking to foreclose on their homes. Specifically, borrowers may need these documents to prove, among other things, that lenders or third parties;

- Failed to take into account future rate adjustments and negative amortization in determining borrowers' ability to repay;

- Misrepresented borrowers' income in determining borrowers' ability to repay;

-  Failed to provide required documentation to borrowers;

- Misrepresented the terms of loans to borrowers;

- Knew that borrowers were likely to default on loans;

- Intentionally disregarded internal underwriting or *fraud* prevention policies;

- Induced brokers to put borrowers in higher-rate mortgages than the borrowers qualified for;

- Failed to properly assign notes and mortgages to successors; and

- Deliberately entered into relationships with mortgage brokers who were poorly trained, poorly supervised, and provided with financial incentives to place loans with borrowers who were likely to default.

11.    In my experience, the documents sought in the Motion can be critical to bringing about a negotiated settlement or to winning litigation at trial. Documents that show a lender's marketing and underwriting policies help demonstrate motivation and intent to deceive, an important element in claims challenging the enforceability of a mortgage and note (e.g. that a borrower was fraudulently induced into a mortgage). In claims against third-party brokers or others involved in a predatory loan transaction, the originating lender's marketing, underwriting and securitization policies and procedures can help demonstrate the broker's motivation and that a broker's misrepresentations were willful.

12.    Documents concerning the lender's policies, and its relationships with brokers and other lenders (as correspondent lenders or warehouse lenders), are essential to rebut subsequent holders' attempts to claim 'holder in due course' status or avoid assignee liability, or to support borrowers' claims that the holder is liable for illegalities in the loan origination based on the existence of a joint venture between the originator and the holder In many cases, subsequent loan holders were intimately involved in the origination, of the loans and were not innocent purchasers.

13.    Loans made in contravention of stated policies can *show that* rudimentary due diligence by the holder would have made clear that the loan carried legal liability. Documents that paint a picture of the nature of a lender's practices, and its perverse

incentives, can help rebut attempts by holders portray the borrower as the party responsible for the predatory loan (either for being too ignorant or for knowingly participating in the transaction), or to rebut holder attempts to shift blame entirely to the broker for the deceptive or fraudulent activity.

14.    Documents that discuss Debtors' policies and practices as a loan servicer may be critical to homeowners challenging the amount of a debt based on servicing abuses. To the extent that Debtors serviced loans owned by non-Debtor holders, that holder would be liable for any servicing abuses committed by its servicer, due to its agency relationship.

16.    Documents regarding loan transfers and assignments are essential in challenging a holder's standing to foreclose on a mortgage. With alarming frequency, alleged mortgage holders are bringing foreclosure actions on mortgage loans that they do not own. *See, e.g., In re Foreclosure Cases*, 521 F. Supp. 2d 650 (S.D. Ohio *2007); In re Foreclosure Actions*, 2007 WL 4034554 (N.D. Ohio Nov. 14, 2007); In re Foreclosure Cases, 2007 WL 3232430 (N.D. Ohio Oct. 31, 2007) (dismissing over 60 foreclosure actions on standing grounds).

17.    Assignment defects in these cases run the gamut. In some cases, assignment documents are generated immediately before (or in some cases after) foreclosure is commenced and are signed by parties that lack authority. *See e.g. U.S. Bank Nat'l Assoc. v. Merino*, 836 N.Y.S.2d 853 (N.Y. Sup. Ct. 2007) (in which the same individual executed two assignments at the same time on behalf of two different assignors); *Wells Fargo Bank, N.A. v. Farmer*, 859 N.Y.S.2d 900 (Table), 2008 WL 307454 (N.Y. Sup. Ct. Feb. 4, 2008) (in which the same individual executed power of attorney for the assignor and assignee in the same transaction).

18.    Many foreclosure cases involve assignments to and from the Mortgage Electronic Registration System (MERS).    MERS is a corporation that administers an electronic registry which tracks ownership interests in mortgages for its members, who are mortgage originators and investors. Florence Dandridge's mortgage indicates that MERS is the 'mortgagee of *record'* for purposes of recording.  Upon information and belief, Deutsche Bank National Trust Company claims to be the holder of this mortgage as trustee. It is quite likely in Ms. Dandridge's case, therefore, that MERS was an assignee and assignor in the chain of assignments of Ms. Dandridge's mortgage and note. (See also, Declaration of Peter Bibler, concerning a MERS assignment in another loan originated by Debtors.) MERS' authority to make assignments has been questioned by numerous courts.  *See, e.g., Citibank, N.A. as Trustee v. Picon*, No. 13902/08 (N.Y. Sup. Ct., Queens County, Nov. 6, 2005) (questioning whether originator Countrywide's limited agency agreement with MERS gave MERS authority to transfer the mortgage and note to Citibank); *Deutsche Bank Nat'l Trust Co. v. Leigh*, No. 103682/08 (N.Y. Sup. Ct., Nassau County, Mar. 31, 2009).  Documents that reveal the nature and scope of Debtors' relationship with MERS may prove critical to Ms. Dandridge should she need to defend herself against foreclosure by Deutsche Bank or another entity claiming to be the holder of her mortgage.

19.    In other cases mortgages have been assigned without the note, the chain of assignments is incomplete, or assignments were made to trusts long after the trust's formation, rendering the assignments void as *ultra vires*. There is growing concern among foreclosure defense attorneys that assignments are being fabricated after the alleged transfers occurred, in an attempt to correct prior legal deficiencies. Documents in Debtors' possession that reveal its practices and policies regarding mortgage assignments, particularly assignments to trusts, may be important evidence for homeowners to show either that the assignments in their cases

followed the required practice and the practice itself was legally insufficient, or that the assignment in their cases deviated from the practice, which could bolster borrower claims that the assignment documents were fabricated after the fact.

20.     Despite the plaintiff bearing the burden of proving standing in any case, in foreclosure cases-the overwhelming majority of which proceed as default judgments-courts have perhaps become accustom to granting judgments for plaintiffs without a careful examination of the sufficiency of plaintiff's standing allegations. It is frequently incumbent on homeowner-defendants to demonstrate a holder-plaintiff's lack of standing. *Washington Mutual Bank, F.A. v. Green*, 806 N.E.2d 604 (Ohio Ct. App. 2004).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 25, 2010 in Staten Island, New York.

By: _____

Margaret Becker

8