**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re | Chapter 11 |
| American Home Mortgage Holdings, Inc., *et al.*, | Case No. 07-11047 (CSS) (Jointly Administered) |
| Debtors. | **Objections Due: tbd** **Hearing Date: tbd** |

**CORRECTED MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION BY U.S. BANK, N.A. (F/K/A PARK NATIONAL BANK) FOR**
**SUMMARY JUDGMENT**

Womble Carlyle Sandridge & Rice, PLLC
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone # (302) 252-4324

And

Aronauer, Re & Yudell, LLP
444 Madison Avenue, 17th Floor
New York, New York 10022
Telephone # (212) 755-6000

*Attorneys for U.S. Bank, N.A. as*
*successor in interest to Park National Bank*

U.S. Bank National Association, as successor in interest to Park National Bank ("Park National"), by its attorneys, Womble Carlyle Sandridge & Rice, PLLC and Aronauer, Re & Yudell, LLP, submitted this Memorandum of Law in support of its motion for entry of an Order awarding Park National summary judgment in this contested matter denying, in full, Debtors' motion and amended motion for recovery of costs and expenses pursuant to Section 506(c) of Title 11 of the United States Code (the "Bankruptcy Code"). In support of this motion (the "Motion"), Park National respectfully states as follows:

## Preliminary Statement

As the Court may recall, Park National was the owner and holder of the first mortgage lien (the "Mortgage") on property owned by Debtors located in Mount Prospect, IL (the "Mortgaged Property"). By motion dated October 28, 2009 (the "506(c) Motion"), Debtors first sought recovery of certain expenses from the Mortgaged Property under § 506(c) of the Bankruptcy Code. In their 506(c) Motion, Debtors limited the amounts sought to real estate taxes paid post-petition and asserted that Debtors were entitled to recovery of those taxes paid as a matter of law.

Following Park National's opposition to the 506(c) Motion (the "Opposition to 506(c) Motion"), at a hearing on January 12, 2010, the Court rejected Debtors' assertion that the real estate taxes sought could be recovered simply because they were paid by Debtors. Rather, this Court held that to recover the taxes paid, Debtors must prove the usual elements under § 506(c), namely that the expenses were reasonable, necessary, and were intended to benefit and directly benefitted the secured creditor (Park National).

In response, Debtors filed an amended motion, dated March 9, 2010 (the "Amended 506(c) Motion") in which they asserted claims for additional and different expenses.

Park National objected to the Amended 506(c) Motion by its Opposition, dated March 30, 2010 (the "Opposition to Amended 506(c) Motion").

Following discovery, the arguments raised by Park National in its Opposition to 506(c) Motion and Opposition to Amended 506(c) Motion (the "Oppositions") remain to be decided by the Court.[1]  Further, there are no material issues of fact in dispute which would prevent the Court from determining, as a matter of law, that Debtors' 506(c) Motion and Amended 506(c) Motion should be denied.

As set forth more fully in the Oppositions, and as set forth more fully below, Debtors have the burden of establishing that, among other things, the payments they seek to recover were made with the intent to benefit Park National and that the payments actually benefitted Park National.  Even after months of discovery from the parties and third-parties, Debtors remain unable to prove these required elements of their claim.

Specifically, as discussed in the Oppositions and below, Debtors are obligated to prove that the Mortgaged Property was worth less than the debt due Park National at the commencement of this Bankruptcy Case in order to prevail on their claims.  Despite this obligation, the undisputed facts and Debtors' own admissions establish that the Mortgaged Property was worth more than $1.5 million on the Petition Date while the amount due Park National on the Mortgage was no more than $930,536.

Accordingly, as a matter of law, Debtors were not seeking to benefit Park National by paying the expenses of the Mortgaged Property.  Instead, Debtors were operating the

---

[1]    The Court is respectfully referred to the Oppositions for the arguments made therein.  Park National respectfully requests that all legal issues raised in those papers be determined by the Court prior to trial.

Mortgaged Property for their own benefit hoping to preserve their equity in the Mortgaged Property and make a huge profit upon the sale of the Mortgaged Property.

The undisputed facts establish that Debtors listed the Mortgaged Property for sale at $2,425,000 and that Debtors received numerous offers to purchase the Mortgaged Property for in excess of $1.5 million.  Those offers included an offer made by the prior owner of the Mortgaged Property on August 8, 2007, the day after this Bankruptcy Case was filed, to purchase the Mortgaged Property for $1.5 million.[2]

Rather than accept the initial $1.5 million offer which would have paid Park National in full, Debtors spent time trying to decide what to do.  Several months later, Debtors hired a broker to market and solicit higher offers for the Mortgaged Property.  Debtors received a broker's opinion of value from their chosen listing broker valuing the Mortgaged Property at as much as $2,450,000.  Debtors then listed the Mortgaged Property for sale at $2,450,000.  After receiving several offers to purchase the Mortgaged Property, Debtors countered all of the offers at $2.1 million, enticing several of the prospective purchasers to increase their offers.

None of this was done to benefit Park National.  Park National would have been paid in full and made whole by Debtors' acceptance of the very first offer received by Debtors the day after the Petition was filed.  Instead, Debtors took their time, sought to make a huge windfall and gambled that they could sell the Mortgaged Property for even more money.

Unfortunately, Debtors' gamble failed.  The credit markets crashed in the summer and fall of 2008.  Real estate values plummeted, and the offers to purchase the Mortgaged Property for the extraordinary amounts Debtors were demanding dried up.  Thus, Debtors'

---

[2]     This offer is consistent with the $1,548,161 value of the Mortgaged Property admitted by Debtors in their Petition.

4

actions were harmful to Park National, not beneficial.  Having rolled the dice and lost, Debtors seek to hold Park National responsible for the costs of their gamble.  That is not the purpose of § 506(c) of the Bankruptcy Code.

Even if the Court were to determine that another date should be used to value the Mortgaged Property, such as the date of the expenditures for which reimbursement is sought, Debtors motions must still be denied.[3]  This is because Debtors have failed to produce sufficient evidence of the value of the Mortgaged Property on any such dates and have thus failed to carry their burden of proof.  Further, the only evidence of value establishes that Park National was oversecured at all relevant times.

---

[3]    As explained below, Park National submits that such a holding by this Court would be in error and that the proper valuation date for Debtors' claim under § 506(c) of the Bankruptcy Code is the date the Petition was filed.

While Debtors will no doubt point to their failed negotiations as evidence that the Mortgaged Property was worth less than the amount due Park National, that evidence, even if undisputed, is insufficient as a matter of law to carry Debtors' burden of proof. Moreover, even if sufficient to carry its burden, the resulting reduced offer in May 2009 to purchase the Mortgaged Property for $865,000 establishes that Park National was still oversecured and leaves Debtors without any proof of the Mortgaged Property's value prior to May 2009.[4] As such, all claims for expenses incurred by Debtors prior to May 2009 must be denied as a matter of law.

In the event the Court declines to grant Park National summary judgment on Debtors' claims as a matter of law, the Court should still determine that the Debtors' claim is grossly overstated. The Court should grant partial summary judgment to Park National and find that Park National is entitled to a credit for all income collected by Debtors from the Mortgaged Property during any such period in which Debtors are permitted to seek reimbursement of expenses. While Debtors claim expenses of $552,114.84, this claim ignores the income Debtors received from the Mortgaged Property of $371,290.81. Thus, the Court should determine that Park National is entitled to a credit for all such income, and Debtors' claim should be limited to no more than $180,824.03.

Debtors' claims should be further reduced with respect to the claimed $20,000 for insurance since that claim is admittedly based on nothing but pure speculation.

## Facts[5]

---

[4]    Park National disputes that this is a proper valuation of the Mortgaged Property as of May 2009. Park National further asserts that, at trial, the evidence will show that the value of the Mortgaged Property on that date was higher than the amount of that offer.

[5]    All capitalized terms not otherwise defined herein shall have the meanings

6

On August 7, 2007, this Bankruptcy Case was commenced.

On August 8, 2007, Debtors received an offer to purchase the Mortgaged Property from John Manglardi, a prior owner of the Mortgaged Property, in the amount of $1,500,000. Debtors' Tr., at Exhibit 6; CBRE Tr., at 41.

On October 5, 2007, Debtors filed their schedules of assets and liabilities (the "Schedules"). In the Schedules, Debtors listed the market value of the Mortgaged Property as $1,548,161. Exhibit B: Schedules.

Debtors Schedules list the amount due Park National as $930,536. Id.

On February 27, 2008, Debtors signed a listing agreement with CB Richard Ellis ("CBRE") pursuant to which Debtors agreed to list the Mortgaged Property for sale at the price of $2,450,000. Debtors' Tr., at Exhibit 1.

By July 2008, Debtors had received several offers to purchase the Mortgaged Property, including offers from RN Realty at $1,855,000, The Equitable Funds at $1,700,000 and First Chicagoland Properties at $1,600,000. Debtors' Tr., at 46, 66, 74 and Exhibits 3 and 5.

Debtors wasted approximately four months (from August 2008 through November 2008) negotiating a contract of sale with RN Realty after accepting their offer to purchase the Mortgaged Property for $1,855,000. Debtors' Tr., at 54. During this time period, there was substantial disruption in the credit and financial markets which substantially reduced real estate values, including the value of the Mortgaged Property. Silverglade Tr., at 40-41.

After negotiations broke off with RN Realty, Debtors turned to another potential purchaser for the Mortgaged Property, The Equitable Funds. However, by November 2008,

ascribed to them in the accompanying Affidavit of Kenneth S. Yudell, sworn to September 15, 2010.

Equitable Funds was only willing to offer $1,315,000 to purchase the Mortgaged Property.

Debtors' Tr., at Exhibits 8 and 9.  In July 2008, The Equitable Funds had offered $1,700,000 for

the Mortgaged Property.  Debtors' Tr., at 74.  The sole reason for the reduction in the offer was

the change in the economy.  Silverglade Tr., at 40-41.

On or about April 17, 2009, Debtors entered into a Purchase and Sale Agreement

with The Equitable Funds for the sale of the Mortgaged Premises in the amount of $1,315,000.

While Equitable Funds later terminated this Agreement, on May 19, 2009, Equitable Funds

informed Debtors that they were still willing to purchase the Mortgaged Property for $865,000,

without doing any further due diligence.  Silverglade Tr., at 81 and Exhibit 15.

On August 9, 2009, Debtors failed to pay all amounts due Park National upon the

maturity of the loan.  Body Aff., ¶ 7.

Pursuant to an Agreed Order, dated December 17, 2009, Park National was

granted stay relief in order to pursue its remedies against the Mortgaged Property due to Debtors'

non-payment of amounts due.  On December 31, 2010, Debtors abandoned the Mortgaged

Property.

From the Petition Date through the date of abandonment, Debtors were in

possession and control of the Mortgaged Property.  Debtors' Tr., at 93-94.  Park National had

nothing to do with managing the Mortgaged Property prior to abandonment, and Park National

was not consulted concerning the payment of the expenses of the Mortgaged Property.  Debtors'

Tr., at 94.

On September 22, 2009, the amount due Park National was $852,546.45.  Body

Aff., ¶ 9.

As such, the Mortgaged Property was worth significantly more than the amount due Park National on the Petition Date.  Further, the Mortgaged Property was worth more than the amount due Park National at all times from the Petition Date through December 31, 2009.

Debtors have not submitted an expert report on value and have not identified any expert to testify as to the value of the Mortgaged Property.

**<u>Argument</u>**

**Point I.**

**Park National is Entitled to Summary
Judgment On All Claims Since It Was
<u>Oversecured on the Date the Petition Was Filed</u>**

In making a claim under § 506(c), a claimant is required to demonstrate that the expenses sought to be recovered "are reasonable and necessary to the preservation or disposal of the property and . . . the expenditures provide a *direct* benefit to the secured creditors."  <u>In re Visual Industries, Inc.</u>, 57 F.3d 321, 325 (3d Cir. 1995), *quoting*, <u>In re C.S. Associates</u>, 29 F.3d 903, 906 (3d Cir. 1994) (emphasis in original) (citations omitted).  Further, it is the claimant's burden to prove each of these elements by a preponderance of the evidence.  <u>In re Midlantic Bank, N.A.</u>, 1996 WL 135339, at *3 (E.D. Pa. 1996), *citing*, <u>C.S. Associates</u>, 29 F.3d at 906.

A claimant is required to make a detailed showing as to the value of the expenditures sought to be surcharged against the property.  <u>C.S. Associates</u>, 29 F.3d at 908.  The mere accrual of taxes against the property is insufficient to prove a direct benefit to the secured creditor.  <u>Id.</u>

In addition, "to warrant [§] 506(c) recovery ... [the claimant] must show that ... funds were expended primarily for the benefit of the creditor and that the creditor directly benefitted from the expenditure."    In re Flagstaff Foodservice Corp., 762 F.2d 10, 12 (2d Cir.1985) (quoted with approval by the Third Circuit in C.S. Associates, 29, F.3d at 906).  The mere fact that there is an incidental benefit to a secured creditor is insufficient under § 506(c). Id.

Further, § 506(c) does not authorize charging encumbered assets with any expenses where the secured claim is fully secured by the collateral.  This prohibition is because the secured creditor receives no benefit from those costs and would have realized full satisfaction of its claim without the intervention of the trustee.  See, e.g., In re Compton Impressions, Ltd., 217 F.3d 1256, 1261 (9th Cir. 2000) (denying 506(c) surcharge where oversecured creditor "could have fully recovered the unpaid balance of their loan if they had initially foreclosed");  D&M Land Co., LLC v. Branch Banking & Trust Co., 413 B.R. 133, 138 (E.D.N.C. 2010)  ("sale... where creditor is oversecured will rarely benefit creditor because the creditor could have foreclosed upon and sold the collateral to satisfy the debt"); In re Glen Eden Hospital, Inc., 202 B.R. 589, 590 (Bankr. E.D. Mich. 1995) (rejecting claim for § 506(c) surcharge where secured creditor fully secured at time the petition was filed and would have been paid in full if collateral had been liquidated when the petition was filed);  In Re Codesco, Inc., 18 B.R. 225, 228-229 (Bankr. S.D.N.Y. 1982), modified on other grounds, In Re Croton River Club, Inc., 162 B.R. 656, 663 (Bankr. S.D.N.Y. 1993).

As is shown more fully below, Debtors have failed to carry their burden of proof under § 506(c).  Debtors' expenditures were for their own benefit, not the benefit of Park National.  As such, Debtors' claims should be denied in their entirety.

**Debtors' Motion Fails Because Debtors'**
**Admissions Establish that Park National was Oversecured**

In their Amended Motion, Debtors assert that Park National "was undersecured at the time the Debtors surrendered the [Mortgaged] Property."  Amended Motion, at p. 10. Debtors' allegation, while incorrect, is irrelevant as a matter of law.

Courts throughout the country have consistently held that when a secured creditor is oversecured on the date the petition is filed, the secured creditor's collateral cannot be surcharged under § 506(c) for expenses of preserving the property.  See, e.g., Compton Impressions, 217 F.3d at 1261; D&M Land, 413 B.R at 138; Glen Eden, 202 B.R. at 590.

The reasoning of most of these courts is quite simple.  Since it was oversecured, the secured creditor could have been paid in full by the liquidation of the collateral at the time the petition was filed.  Id.  Thus, any expenditures made by the debtor did not provide a direct benefit (or any benefit) to the secured creditor.  Id.

The reasoning of these courts holds true in this case.  Regardless whether Debtors paid or did not pay the taxes or the other expenses, Park National would still have been fully secured.  Accordingly, Debtors' payment of the taxes or other expenses provided no benefit to Park National (certainly not a direct benefit).  Rather, Debtors' payments merely preserved Debtors' equity in the property and provided Debtors, not Park National, with the benefit.  Just like in Mall at One Assoc., "every action which the Debtor took in this case short of allowing [the mortgagee] to foreclose as soon as possible provided a clear detriment, rather than any direct benefit, to [the mortgagee]."  In re Mall at One Assoc., L.P., 185 B.R. 981, 989 (Bankr. E.D. Pa. 1995).

11

By the Debtors own admissions, the Mortgaged Property was worth $1,548,161 on the Petition Date.  Debtors' Schedule A.  Debtors also admit that on the same date, Park National was owed only $930,536.  Id.[6]  As such,  Park National was oversecured on the Petition Date by at least $617,625, and Debtors' claim for a § 506(c) surcharge fails as a matter of law.

**Debtors' Motion Fails Since**
**Debtors Were in Possession of Property**
**And Were Legally Obligated to Pay the Taxes**

Debtors concede that they were in possession and control of the Mortgaged Property during the time of all expenditures sought to be recovered in the Motion and Amended Motion.  Debtors' Tr., at 93-94.  At all relevant times, Debtors rented the Mortgaged Property to tenants, collected the rents from the tenants, marketed and tried to sell the Mortgaged Property, and otherwise enjoyed the benefits of ownership of the Mortgaged Property.  Id.  Debtors did not consult with Park National concerning the payment of the expenses of the Mortgaged Property.  Id.  Under these circumstances, Debtors are not permitted a surcharge under § 506(c) for their payment of real property taxes and other expenses of the Mortgaged Property.  In re Consolidated Cotton Gin Co., Inc., 347 B.R. 572, 580 (Bankr. N.D. Tex. 2006).

---

[6]    These admissions by Debtors are judicial admissions which are unrebuttable.  See In re Boherer, 266 B.R. 200, 201 (Bankr. N.D. Cal. 2001) ("Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions."); Sovereign Bank v. BJ's Wholesale Club, Inc., 533 F.3d 162, 181 (3d Cir. 2008) (binding nature of judicial admissions).

In Consolidated Cotton, the debtor, like the Debtors here, had paid ad valorem property taxes and sought a surcharge under § 506(c).  Relying on C.S. Associates, the Court denied the debtor's motion holding that "[p]aying the ad valorem taxes incurred while in possession of the property against which the taxes are assessed does not satisfy the direct benefit test articulated by the courts."  Consolidated Cotton, 347 B.R. at 580.  The Consolidated Cotton Court went on to state:

> Consolidated Cotton owned the property and was using it in its operations and was therefore legally obligated to pay the ad valorem taxes.  Authorizing a surcharge for the ad valorem taxes would be more of a windfall than a reimbursement to Consolidated Cotton.

Id.  While Consolidated Cotton was decided under the prior version of § 506(c), the court stated that the amendment would not alter its decision.  Specifically, the court stated: "The addition of paid ad valorem taxes as an expense potentially subject to reimbursement by an amendment of section 506(c) and [sic] does not alter the Court's conclusion on this issue."  Id.[7]

Other courts which have addressed the issue agree with the reasoning in Consolidated Cotton and deny a surcharge under § 506(c) for real property taxes when the debtor is in possession of the property.  See, e.g., U.S. v. Parmele, 171 B.R. 895, 901 (N.D. Okla. 1994) (mere post-petition payment of real estate taxes insufficient to establish surcharge under § 506(c)); and In re Bellman Farms, Inc., 86 B.R. 1016, 1021 (Bankr. S.D. 1988) (same).

---

[7]    This Court agreed with the decision in Consolidated Cotton that the recent amendment to § 506(c) did not change the analysis of whether a debtor could recover paid expenses from a secured creditor.  While this Court did not issue a written decision, the Court held that Debtors were obligated to prove its claim for reimbursement of real estate taxes under the usual standards applicable to § 506(c) claims.

Debtors reference to a mortgage provision which required the escrow and payment of real estate taxes does not change this result.  As other courts in this Circuit have recognized, "those payments were made in compliance with contractual obligations, not as benefits bestowed upon [the mortgagee] by the Debtor." Mall at One Assoc., 185 B.R. at 990.

**Point II**

**Even if the Court Adopts a Different
Valuation Date, Park National
Is Still Entitled to Summary Judgment**

As set forth above, the proper valuation date for determining Debtors' 506(c) claim is the Petition date.  If the Court elects to use a different valuation date for determining whether Park National was oversecured (and Park National asserts that the Court should not), the only possible alternative is to determine Park National's status on the date the claimed expenditure is made.

Debtors' obligation is to prove that each expenditure made was reasonable, necessary, and directly benefitted Park National.  Visual Indus., 57 F.3d at 325.  As noted, courts have consistently held that where a secured creditor is oversecured, there is no benefit to the secured creditor by expenditures to preserve or maintain the collateral because the secured creditor can be made whole by the liquidation of the collateral.  See ¶¶ 34 and 37, above.  Thus, the only possible alternative analysis would require the Court to determine the status of Park National on the date each expenditure was made.

Despite this obligation, Debtors have not disclosed any expert, have not produced any expert report, and their time to do so has passed.  As such, Debtors can only be relying on various facts to attempt to establish the value of the Mortgaged Property on any given date.[8]

_____

[8]    While Debtors have referred, in their motion *in limine*, to a possible rebuttal of

14

Park National's appraisals, this does not permit Debtors to disclose their own appraisal in the guise of a rebuttal.  See Fuller v. Volvo GM Heavy Truck Corp., 1995 WL 489542; at *2 (August 10, 1995 N.D. Ill).

From the Petition date until sometime in February 2008, there is no evidence of value other than Debtors' admission in its Schedules that the Mortgaged Property was worth $1,548,161 and Manglardi's $1,500,000 offer to purchase the Mortgaged Property on August 8, 2007. Debtors' Tr., at 46 and 72; Exhibit B: Schedules.

In or about February 2008, Debtors received a broker's opinion of value of the Mortgaged Property from CBRE. CBRE Tr., at 22; and Exhibit 173. CBRE's opinion was that the asking price for the Mortgaged Property should be between $2,275,000 and $2,450,000 ($65-$70 per square foot times 35,000 s.f.) with an expected sale price between $1,925,000 and $2,100,000 ($55-$60 per square foot times 35,000 s.f.). CBRE Tr., at Exhibit 173. Needless to say, this opinion of value by Debtors' agent establishes that Park National was still oversecured by a significant amount.

The next indication of value disclosed during discovery was the Debtors' listing price for the Mortgaged Property. Debtors' Tr., at 31 and Exhibit 1. Since this listing price was $2,450,000, it is undisputed that Park National remained oversecured.

The next indications of value are the offers to purchase the Mortgaged Property received by Debtors in June and July 2008. All of these offers were substantially higher than the amount due to Park National. Among others, Debtors received offers to purchase the Mortgaged Property for $1,600,000, $1,700,000 and $1,855,000. Debtors' Tr., at 46, 66, 74 and Exhibits 3 and 5. Based upon these offers, it is undisputed that Park National was still substantially oversecured.

There are no additional indications of value until November 2008. That is because Debtors were negotiating a purchase and sale agreement with one potential purchaser, RN Realty (who offered $1,855,000), apparently to the exclusion of all others. CBRE Tr., at

16

169.  When these negotiations terminated, Debtors returned to the next highest offer, The

Equitable Funds who had previously offered $1,700,000 for the Mortgaged Property.

However, The Equitable Funds was no longer willing to purchase the Mortgaged

Property for $1,700,000.  Instead, they lowered their offer to $1,315,000.  Debtors' Tr., Exhibit

8.  The sole reason for the reduction was the substantial decline in the economy which occurred

since their last offer.  Silverglade Tr. at 41.  Even so, Park National remained substantially

oversecured.

Again Debtors took an extended period negotiating a contract of sale.  Ultimately,

a Purchase and Sale Agreement was entered into with The Equitable Funds on April 17, 2009 in

the amount of $1,315,000.  Silverglade Tr. at 5.  This establishes that Park National remained

oversecured.

The Equitable Funds terminated the Purchase and Sale Agreement on May 19,

2009, allegedly due to issues discovered by them during their due diligence review of the

Mortgaged Property.  Silverglade Tr., Exhibit 15.  Debtors will no doubt argue that the actions of

The Equitable Funds establish that the other offers were not true indications of value.  That is

hardly true, especially in light of the $400,000 reduction in the offer to purchase by The

Equitable Funds solely because of the change in the economy.  But even with the alleged issues

with the Mortgaged Property, The Equitable Funds was still willing to purchase the Mortgaged

Property on May 17, 2009 for $865,000 (without any further due diligence).[9]  Id.

---

[9]      Even if the Court were to adopt such an argument from the Debtors that the July
2008 offers were not true indications of value because the parties had not yet completed due
diligence, these offers still establish that Park National was oversecured.  While The Equitable
Funds reduced their offer by $435,000 after completing due diligence, reducing the other offers
by the same amount still leaves the Mortgaged Property worth as much as $1,450,000 based upon
the offer of RN Realty ($1,885,000 - $435,000).

Even if we were to accept $865,000 as an appropriate value of the Mortgaged Property on May 19, 2009, this amount still exceeded the amount then due to Park National.[10] See Body Tr., Exhibit 106 (amount due as of May 13, 2009 was $845,503.47.)

As a result of the foregoing, at a minimum, the Court should grant Park National partial summary judgment as to all expenses incurred by Debtors through at least May 19, 2009. The only evidence available establishes that Park National was oversecured through at least this date.

**Point III**

**Park National is Entitled to A Credit
For All Income from the Mortgaged Property**

In both its 506(c) Motion and Amended 506(c) Motion, Debtors fail to provide any credit in their calculations for the income Debtors received from the Mortgaged Property. In its own schedule attached as an exhibit to its 506(c) Motion, Debtors attach a spreadsheet showing that they collected $335,000 in "Rental Income" from the Mortgaged Property from the Petition date through October 27, 2009. Debtors' Tr., at 110 and Exhibit 15.

Debtor also received additional income from the Mortgaged Property after October 27, 2010. Debtor received $28,600 in rent from October 28, 2009 through December 31, 2009. Exhibit G. In addition, Debtors received a utility deposit refund of $7,690.81. Debtors' Tr., at 115-118 and Exhibit 16. Accordingly, Park National should receive a credit in the amount of $371,290.81 ($335,000 + $28,600 + $7,690.81) against any expense claims awarded to Debtors.

---

[10]    In the event there will be a trial of this matter, Park National intends to dispute that this $865,000 offer was a true indication of the value of the Mortgaged Property. Park National believes the value of the Mortgaged Property continued to be significantly higher than the amount of this offer.

18

As the Court is aware, in light of Park National's secured position, the rents constitute Park National's cash collateral.  In the absence of such a credit, the Debtors would obtain a double recovery since they would obtain reimbursement for expenses paid with Park National's own cash collateral.  As the Court in <u>Mall at One Assoc.</u>, stated in denying a § 506(c) claim for reimbursement:

> In essence, the Creditors advanced their own collateral to the Debtor one time to allow the Debtor to remain in business.  The Creditors cannot be called on to make these same advances from their security interests in the rents a second time. . . .The expenses requested were therefore already paid out of the Creditors' cash collateral in rents.

<u>Mall at One Assoc.</u>, 189 B.R. at 990.

## Point IV

### Park National is Entitled to Summary Judgment
### On Debtors' Claim Regarding Payment of Insurance

Debtors make a claim in their Amended 506(c) Motion for reimbursement of certain insurance premiums allegedly paid with respect to the Mortgaged Property.  In their Amended 506(c) Motion, Debtors seek reimbursement of $20,000 for insurance.  However, Debtors' testimony establishes that this claim is based upon speculation and cannot be supported.  As such, Park National is entitled to summary judgment on this portion of Debtors' claim.

As evidence of their claim for reimbursement of insurance, Debtors produced certain invoices for insurance.  Debtors' Tr., Exhibit 14.  At his deposition, Debtors' 30(b)(6) witness testified that the amounts set forth in the invoices do not establish the amount Debtors are claiming in the Amended Motion.  Debtors' Tr., at 104-109.  Debtor further testified that

19

there was no invoice breaking out the amounts chargeable only to the Mortgaged Property. Debtors' Tr. at 109-110.

      With respect to the periods from August 2007 through August 2009, Debtors' testimony is that they have no invoices establishing the amount Debtors paid to insure the Mortgaged Property.  Id.  This is because the Mortgaged Property was insured under a blanket policy with Debtors' Melville, NY property.  As such, Debtors' merely "derived" the amount of their claim from these other invoices.  Debtors' Tr. at 108.  Debtors' speculation as to the appropriate insurance amount based upon charges for insurance on other properties is insufficient to carry its burden of proof.

      Accordingly, Debtors' claim for reimbursement related to payments for property insurance prior to August 2009 should be denied as a matter of law.

## Conclusion

      Based upon all of the foregoing, including Debtors' own admissions, Park National is entitled to summary judgment on all claims because Park National was oversecured on the date Debtors' Petition was filed.  To the extent the Court denies Park National summary judgment as to all claims and instead looks to valuation dates on the dates payments for expenses were made by Debtors, then Park National should be granted summary judgment as to all claims for payments made through at least May 2009 since the undisputed evidence establishes that Park National was oversecured through at least that date.  Further, Park National should be given a credit for all income collected by the Debtors during any time period Debtors are awarded reimbursement, and Debtors claims for reimbursement related to payment of insurance should also be limited to payments made after August 2009.

20

Dated: September 16, 2010          **Womble Carlyle Sandridge & Rice, PLLC**

By:__/s/ Michael Busenkell_____
        Michael Busenkell (Del. Bar No. 3933)
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone: (302) 252-4324
Facsimile: (302) 661-7724
E-mail: mbusenkell@wcsr.com

And

Aronauer, Re & Yudell, LLP
Kenneth S. Yudell, admitted Pro Hac Vice
444 Madison Avenue, 17th Floor
New York, New York 10022
Telephone # (212) 755-6000

*Attorneys for U.S. Bank, N.A. as successor in interest
to Park National Bank*

21