*Exhibit "A"*

```
 1  FOR THE UNITED STATES BANKRUPTCY COURT
    FOR THE DISTRICT OF DELAWARE
 2  Chapter 11 Case No. 07-11047 (CSS)
    -----------------------------------x
 3  AMERICAN HOME MORTGAGE HOLDINGS,
    INC., a Delaware corporation,
 4  et al.,
                        Debtor.
 5  -----------------------------------x

 6                        August 12 2010
                          10:12 a.m.
 7

 8                     CONFIDENTIAL

 9

10          Deposition of SCOTT ROBERT MARTINEZ,

11       held at the offices of Zolfo Cooper, 1114

12       Avenue of the Americas, New York, New York,

13       pursuant to Notice, before Maureen

14       McCormick, a Notary Public of the State of

15       New York.

16

17

18

19

20            REGENCY REPORTING, INC.

21       Certified Court Reporters & Videographers

22      425 Eagle Rock Avenue      575 Madison Avenue

23      Roseland, NJ 07068         New York, NY 10022

24        www.regencyreporting.net      1-866-268-7866

25
```

2

CONFIDENTIAL

```
 1   A P P E A R A N C E S:

 2

 3   ARONAUER, RE & YUDELL, LLP

 4   Attorneys for U.S. Bank

 5   444 Madison Avenue, 17th Floor

 6   New York, New York 10022

 7   BY:    KENNETH S. YUDELL, ESQ.

 8   212-755-6000

 9   kyudell@aryllp.com

10

11   YOUNG CONAWAY STARGATT & TAYLOR, LLP

12   Attorneys for American Home Mortgage

13   Holdings, Inc.

14   P. O. Box 391

15   The Brandywine Building

16   1000 West Street, 17th Floor

17   Wilmington, Delaware 19801

18   BY:    SHARON M. ZIEG, ESQ.

19   302-571-6600

20   szieg@ycst.com

21

22

23

24

25
```

CONFIDENTIAL

1        Scott Robert Martinez - August 12 2010
2   it was produced to me, and if you turn to the very
3   first page, it says, "Exhibit A engagement
4   agreement."

5            Do you know what this was an Exhibit A
6   to?

7        A.    I don't.

8            MS. ZIEG:  Would you like me to tell

9        you?

10           MR. YUDELL:  Just curious.

11           MS. ZIEG:  It's the motion to retain

12       CBRE, which is a public document.

13           MR. YUDELL:  I just didn't know if it

14       was part of some different binder or

15       something else.

16           MS. ZIEG:  No.

17       Q.    On this listing agreement on the very
18   first page, if you look at the end of the first
19   paragraph, it says, "Property will be marketed at
20   $2,450,000."  Do you see that?

21       A.    Yes.

22       Q.    Do you know who made the decision to
23   market the property for $2,450,000?

24           MS. ZIEG:  Objection, scope.

25       A.    I don't know.

46

CONFIDENTIAL

1          Scott Robert Martinez - August 12 2010
2   intent again?  Is it a --
3          Q.    In any way, shape or form.  They say I
4   want to buy the property for X dollars, they put
5   it in an e-mail, I'd like to buy for X dollars,
6   they sent a letter, putting it in a formal letter
7   of intent, put in a formal contract.
8                In any way, shape or form, who was the
9   next person that put a price on purchasing the
10  property?
11         A.    I don't know who the next specific
12  person to put in a price for the building was, but
13  there were subsequent offers.
14         Q.    Why don't you give me a list of who
15  made offers?
16         A.    John Manglardi, the Equitable Funds,
17  and RN Realty.
18         Q.    When did RN Realty make an offer with
19  a price in it?
20         A.    I believe it was sometime in early
21  2008.
22         Q.    And how much did RN Realty offer to
23  purchase the property for?
24         A.    For 1.8 million.
25         Q.    And did the debtor accept RN Realty's

54

CONFIDENTIAL

```
 1        Scott Robert Martinez - August 12 2010
 2   contained in the letter of intent which has been
 3   identified as PNB 3 -- when did those negotiations
 4   stop?
 5        A.    I believe those fell apart at the end
 6   of 2008.
 7        Q.    So the debtor negotiated with RN
 8   Realty for a significant length of time?
 9        A.    Yes.
10        Q.    From sometime before August of 2008
11   through sometime near the end 2008?
12        A.    Yes.
13             MR. YUDELL:  Let's mark this as PNB 4.
14             (PNB Exhibit 4, E-Mail, 11/13/08,
15        marked for identification.)
16             MR. YUDELL:  Just for the record, PNB
17        4 contains a document production number AHM
18        Mount Prospect 002904, and appears to be an
19        e-mail from Leigh Rabman, dated November 13,
20        2008, to Ted Buenger with CCs to several
21        people, including apparently Robert Semple
22        at Kroll, now Zolfo Cooper, and Matthew
23        Lunn, who is an attorney at Young Conaway,
24        who are the attorneys for American Home
25        Mortgage.
```

CONFIDENTIAL

```
1          Scott Robert Martinez - August 12 2010
2          Q.     Was PNB 5 ever delivered to the
3    debtors?
4          A.     I don't know.
5          Q.     Do you know whether debtors responded
6    to PNB 5?
7          A.     I don't know if they did.
8          Q.     Looking down at Paragraph 2, purchase
9    price, the typed portion says $1,500,000, and
10   that's crossed off and initialled with a change to
11   $1.6 million.  Do you see that?
12         A.     Yes.
13         Q.     Do you know when those changes took
14   place?
15         A.     No.
16         Q.     Do you know why those changes took
17   place?
18                MS. ZIEG:  Objection, form.
19         A.     Specifically, no.
20         Q.     Did the debtors make a counteroffer to
21   the original $1.5 million offer?
22         A.     I'm not sure if there was a specific
23   counter to this.
24         Q.     Did the debtors negotiate with
25   Chicagoland or Mr. Manglardi regarding PNB 5?
```

72

CONFIDENTIAL

```
 1          Scott Robert Martinez - August 12 2010
 2      trying to come up with it.
 3                MS. ZIEG:  Okay.
 4      Q.    Do you have any knowledge of the
 5  August 20, 2007, letter of intent?
 6      A.    I don't, no.
 7      Q.    Or the October 12, 2007, e-mail that's
 8  referenced?
 9      A.    No.
10      Q.    Since you don't have any knowledge, I
11  won't ask any more questions about it.  We will
12  move on.
13                MS. ZIEG:  Can we take a break?
14                (Recess taken.)
15      Q.    Other than for Chicagoland and RN
16  Realty, I believe you mentioned the Equitable
17  Funds as somebody that made an offer to purchase
18  the property, correct?
19      A.    Yes.
20      Q.    Do you know when Equitable Funds first
21  approached the debtors about purchasing the
22  property?
23      A.    I believe it was in mid 2008.
24      Q.    And between the end of negotiations --
25                MS. ZIEG:  Can we assume, by the way,
```

74

CONFIDENTIAL

```
1           Scott Robert Martinez - August 12 2010
2           Q.     A letter of intent?
3           A.     Yeah.
4           Q.     Is this the first letter of intent
5    from Equitable Funds?
6           A.     I don't know if it's the first letter
7    of intent.  I know there was another offer made
8    prior to this.
9           Q.     What was the amount of the prior
10   offer?
11          A.     I believe it was 1.7 million.
12          Q.     And between the time of that prior
13   offer and November 20, 2008, the date of PNB 8,
14   why did the offer go down?
15          A.     I don't know.
16                 MS. ZIEG:  Objection, form.
17          A.     I don't know the reason for that.
18          Q.     Was there a formal letter of intent
19   with respect to the $1.7 million offer?
20          A.     I'm not sure.
21          Q.     How was the $1.7 million offer
22   conveyed to debtors?
23          A.     I don't remember.
24          Q.     After debtors received the $1.7
25   million offer, did they respond to it?
```

93

CONFIDENTIAL

```
 1          Scott Robert Martinez - August 12 2010
 2     A.     Can you repeat it?
 3            (Question read.)
 4     A.     At that point, I don't believe so.
 5     Q.     From August of 2007 until July of
 6  2009, who was in control of the property?
 7            MS. ZIEG:  Objection, form.
 8     A.     When you say in control --
 9     Q.     Who owned the property?
10     A.     American Home Mortgage had a mortgage
11  with -- I believe with PNB.
12     Q.     I didn't ask what liens were on the
13  property.  I asked who owned it.
14     A.     American Home.
15     Q.     And who was running the day-to-day
16  operations of the property?
17            MS. ZIEG:  Objection, form.
18     A.     American Home Mortgage.
19     Q.     Who was collecting the rents from the
20  property?
21            MS. ZIEG:  Objection, form.
22     A.     Can you be more specific in terms of
23  who?
24     Q.     Who did the tenants pay their rents
25  to?
```

CONFIDENTIAL

1        Scott Robert Martinez - August 12 2010

2        A.      American Home Mortgage.

3        Q.      Who paid the expenses of the property?

4        A.      American Home Mortgage.

5        Q.      Did any tenants send rent payments to

6   Park National Bank?

7                MS. ZIEG:  Objection, form.

8        A.      I don't know.  I don't think so.

9        Q.      Between August of 2007 and July 10,

10  2009, was Park National Bank consulted concerning

11  payment of the expenses of the property?

12       A.      Not that I'm aware of.  I didn't think

13  there was a reason for it to be.

14       Q.      Why didn't you think there was a

15  reason for it?

16       A.      American Home wasn't in default.

17       Q.      Between the date of the petition and

18  July of 2009, did the debtor consider paying off

19  the mortgage?

20                MS. ZIEG:  Objection to form.

21       A.      Can you be more specific with pay off

22  the mortgage?

23       Q.      Paying the balance due of the

24  mortgage.

25                MS. ZIEG:  At any point in time during

101

CONFIDENTIAL

```
 1          Scott Robert Martinez - August 12 2010
 2          Q.     Were there plantings at the property?
 3          A.     I'm not sure if there were or not.
 4          Q.     The next one is Omni-1 Electronics.
 5   What was that vendor?
 6          A.     I don't recall exactly what they did,
 7   but I believe it was -- I'm not even going to
 8   guess.  I'm not sure.
 9          Q.     You don't know the purpose of those
10   expenditures?
11          A.     I do.  If you have a copy of the
12   invoice, I can look at it and tell you, but I
13   can't remember off the top of my head.
14          Q.     Village of Mount Prospect I will skip.
15   Zartler Heating & Air-Conditioning, what were
16   their responsibilities at the property?
17          A.     Looks like that was a repair for HVAC.
18          Q.     The next vendor Scott Karzmar
19   Commercial HVAC?
20          A.     Uh-huh.
21          Q.     How is that different?  What work did
22   that vendor do that's different from what Zartler
23   did?
24          A.     Without looking at the invoice, I'm
25   not sure.
```

104

CONFIDENTIAL

```
 1           Scott Robert Martinez - August 12 2010
 2      A.      Without looking at the 506 (c) claim,
 3  again, I don't know what was and wasn't included
 4  in the language there.
 5              MR. YUDELL:  Off the record.
 6              (Discussion off the record.)
 7              MR. YUDELL:  We will mark this as PNB
 8          14, and I'll state for the record that it is
 9          incomplete because of the copying issue.
10              We are missing I think the last two
11          pages.
12              (PNB Exhibit 14, Exhibit G, Insurance
13          Invoice, marked for identification.)
14              (Recess taken.)
15              MR. YUDELL:  For the record, we have
16          just replaced what has been marked as PNB 14
17          with a new PNB 14 that is a complete copy of
18          Exhibit G to the debtor's amended 506 (c)
19          motion.
20      Q.      If we turn to this exhibit, the first
21  page references insurance for the Mount Prospect
22  property, correct?
23      A.      Yes.
24      Q.      So the insurance referenced on this
25  invoice is solely for the Mount Prospect property,
```

CONFIDENTIAL

1        Scott Robert Martinez - August 12 2010
2   correct?
3        A.    Correct.
4        Q.    If you turn the page to the second
5   invoice, this invoice references Melville, New
6   York.
7        A.    Yes.
8        Q.    What's the relation of this payment
9   for the Mount Prospect property?
10        A.    It's the same policy number.
11        Q.    Is that the only relation?
12        A.    That's the relationship, yeah.  It may
13   happen to be the two buildings that American Home
14   Mortgage owned.
15        Q.    Is any of the $6,333 paid on this
16   second invoice benefiting the Mount Prospect
17   property?
18        A.    Can you say that again?  Anything on
19   the second page?
20        Q.    The second page, yes.
21        A.    Is any of that benefiting --
22        Q.    The Mount Prospect property.
23        A.    It's under the same policy number, so
24   I believe it was just split out to share the
25   different amounts associated with each of the

CONFIDENTIAL

1        Scott Robert Martinez - August 12 2010
2    properties.
3        Q.    So this amount would be for the
4    insurance that's covering the -- this amount being
5    on the second page, the second invoice, would be
6    for the insurance covering the Melville property?
7        A.    The way the invoice reads, yes.
8        Q.    And is that -- what reality is not
9    just what the invoice reads.  That's why I'm
10   asking what the invoice means.
11           MS. ZIEG:  I think there's a footnote
12       on this, in the -- I know there's a footnote
13       on this in the amended motion.
14           MR. YUDELL:  I understand what the
15       footnote is --
16           MS. ZIEG:  I want to make sure you
17       weren't --
18           MR. YUDELL:  I'm trying to understand
19       what exactly these invoices are and how
20       they're chargeable to the Mount Prospect
21       property.
22           MS. ZIEG:  I think what the footnote
23       says, they didn't charge all of it to the
24       Mount Prospect property.
25           MR. YUDELL:  What I'm ultimately

CONFIDENTIAL

```
1          Scott Robert Martinez - August 12 2010
2          trying to get to is how the debtor
3          calculated its estimate of $20,000, but --
4          A.    Back up.  Can you define the 20,000?
5    What 20,000?
6          Q.    In the debtor's amended motion,
7    they're seeking, the debtors are seeking, you're
8    seeking -- a surcharge of $20,000 for insurance.
9               Are you aware of that?
10              MS. ZIEG:  Objection, form.
11         A.    If you can provide we with a copy of
12   it, I can answer it I think more clearly.
13              MS. ZIEG:  Just give him the page or
14         you want him to read the whole motion?
15              MR. YUDELL:  No, just the page.
16         A.    Okay.  I think the explanation is
17   pretty much self-explanatory, I think.
18         Q.    Can you explain to me how this second
19   invoice is chargeable to the Mount Prospect
20   property?
21         A.    Which second invoice are we talking
22   about, the 6,300?
23         Q.    Yes.
24         A.    It's not.
25              MS. ZIEG:  Objection.  Objection,
```

108

CONFIDENTIAL

```
1          Scott Robert Martinez - August 12 2010
2      form.
3          Q.    Can you explain -- let's turn to the
4      third invoice.
5          A.    It's not.
6          Q.    Not chargeable to Mount Prospect?  Or
7      the fourth invoice, is that chargeable to Mount
8      Prospect?
9          A.    No.  I think the 20,000 is derived
10     from three years of 7,500.
11         Q.    From August of 2007 until the property
12     was abandoned in December of 2009, did insurance
13     rates remain flat?
14         A.    I don't know.
15               MS. ZIEG:  Objection.
16               By the way, this policy goes through
17         August of 2010, just so you know.
18               MR. YUDELL:  I understand.
19               MS. ZIEG:  And the record is clear.
20         Q.    Is this policy still in effect with
21     respect to the Mount Prospect property?
22         A.    No, it's expired.
23         Q.    Was the policy with respect to the
24     Mount Prospect property terminated prior to its
25     stated August 4, 2010, expiration date?
```

CONFIDENTIAL

| | |
|---|---|
| 1 | Scott Robert Martinez - August 12 2010 |
| 2 | A.    No. |
| 3 | Q.    Why not? |
| 4 | A.    Debtors never terminated it. |
| 5 | Q.    Would the debtors have received a |
| 6 | partial refund had they terminated it earlier? |
| 7 | A.    Potentially, yes. |
| 8 | Q.    How is the debtor's $20,000 claim for |
| 9 | insurance calculated? |
| 10 | A.    It looks like it's the 7500 that's |
| 11 | quoted on the Invoice No. 1 * 61178 for three |
| 12 | years, so 7500 times 3. |
| 13 | Q.    What were the actual insurance charges |
| 14 | with respect to the Mount Prospect property from |
| 15 | the petition date through August 3, 2009? |
| 16 | A.    I don't know specifically, because it |
| 17 | was -- again, it was bundled in one package. |
| 18 | Q.    Does the debtor have any records which |
| 19 | would set forth the actual amount of insurance |
| 20 | charges paid for the Mount Prospect property from |
| 21 | August -- from filing the petition through August |
| 22 | 3, 2009? |
| 23 | MS. ZIEG:   Objection, form. |
| 24 | A.    You're looking for an itemized invoice |
| 25 | or document that shows a breakout of what was |

110

CONFIDENTIAL

1          Scott Robert Martinez - August 12 2010
2   charged for Mount Prospect?
3          Q.    Yes.
4          A.    Not to my knowledge one exists.
5              MR. YUDELL:  Let's mark this as PNB
6          15.
7              (PNB Exhibit 15, Exhibit A, marked for
8          identification.)
9              MR. YUDELL:  For the record, PNB 15 is
10         Exhibit A to the debtor's opposition to Park
11         National's motion to lift stay and debtor's
12         cross motion for a 506 (c) claim.
13             MS. ZIEG:  I reserve my rights.
14             MR. YUDELL:  Just give you the
15         representation so you know where it came
16         from.
17         Q.    We have been through expenses, so I
18   want you to focus simply on the rent line.
19             Far to the left it's titled "Rental
20   Income."  Below that it says "rent."
21             Is that intending to represent the
22   rent that was collected on the Mount Prospect
23   property for each of those months?
24         A.    Yes, that's the rent that was
25   collected each of those months.

115

CONFIDENTIAL

1          Scott Robert Martinez - August 12 2010

2    provided, too?

3                    MS. ZIEG:   Yes.

4          Q.      In November 2009, did the debtors

5    collect the $12,000 in rents?

6          A.      Without looking at it, I don't

7    remember.

8          Q.      And in December 2009, did the debtors

9    collect $12,000 in rent?

10         A.      Same.

11         Q.      Did the debtors receive any utility

12   refunds once it abandoned the property?

13         A.      They might have.

14                    MR. YUDELL:   Let's mark as 16.

15                    (PNB Exhibit 16, Letter, 1/4/10,

16         marked for identification.)

17         Q.      PNB 16 is a document containing

18   production Nos. AHM Mount Prospect 000909 through

19   912, dated January 4, 2010, from ComEd and

20   directed to American Home Mortgage in Melville.

21                    What is ComEd?

22         A.      They are the electrical company that

23   provides electricity to the Mount Prospect

24   building.

25         Q.      On the second page it appears that

CONFIDENTIAL

1        Scott Robert Martinez - August 12 2010
2    there was a -- what is showing as excess credit of
3    $7,690.81.
4            Did the debtor receive a check for
5    that amount from ComEd?
6        A.    I'd have to look at the records of
7    American Home, but I believe so.
8            MS. ZIEG:  Can I interrupt for one
9        moment?
10           We had two properties in Mount
11       Prospect.  This particular document, the one
12       you are looking to with Bates numbers 910 at
13       the bottom, this relates to a different
14       Mount Prospect property, 150 West Rand Road.
15           It's the next page, Bates No. 911 --
16       I'm sorry, Bates No. 912 -- that relates to
17       the Mount Prospect property that is the
18       subject of our dispute, which is 950 North
19       Elmhurst Road.  I just wanted to point that
20       out.
21           MR. YUDELL:  Two properties?
22           MS. ZIEG:  Two properties, one we
23       lease and one we owned, and the one we owned
24       is the one that's the subject of this
25       dispute, which is the one located at 950

117

CONFIDENTIAL

1          Scott Robert Martinez - August 12 2010
2      North Elmhurst.
3                MR. YUDELL:  I only ask the question
4      because I've seen this property listed with
5      two addresses.  Is it also on Rand?
6                MS. ZIEG:  No.  At least that's my
7      understanding, there's two properties,
8      correct?
9                THE WITNESS:  There are two different
10     -- there are two addresses related to the
11     Mount Prospect building, one being the main
12     building at 950 North Elmhurst, and I
13     believe the second one is located at 150
14     West Rand Road.
15     Q.     Are both of those addresses subject to
16  Park National's mortgage?
17     A.     I believe so.
18                MS. ZIEG:  There's an additional Mount
19     Prospect property that we rented, correct?
20                THE WITNESS:  I don't think so, not
21     that I saw.  I never saw a rent check go out
22     or a lease.
23     Q.     So to the best of your knowledge, all
24  of this which is PNB 16 relates to the Mount
25  Prospect property which is subject to Park

CONFIDENTIAL

```
 1        Scott Robert Martinez - August 12 2010
 2   National Bank's mortgage?
 3        A.    Sorry, say that again.
 4        Q.    So both of the invoices that are
 5   connected as part of PNB 16 are properties which
 6   are subject to Park National's mortgage, correct?
 7        A.    Yes, I believe so.
 8             MS. ZIEG:   Objection, form.
 9        Q.    What happened with the $7,690.81
10   received by American Home Mortgage as a refund?
11        A.    I'm not sure if it was received, but
12   if it was received, it would have been deposited
13   in their general operating account.
14        Q.    Were there any other utility refunds
15   that were received by American Home Mortgage?
16        A.    Yes, I believe there's one in here
17   that's a Footnote B in April 2009.
18             MS. ZIEG:   He's turned back to PNB 15.
19        A.    Footnote B on PNB 15 says the debtors
20   received a return of $2,000 deposit from Nicor
21   Gas.
22        Q.    And was that $2,000 included in the
23   rent column in PNB 15?
24        A.    No, I believe it's in the utilities
25   where the Footnote B is, first line under
```

## EXHIBIT A

### Engagement Agreement



DB02:6557722.4

066585.1001

CONFIDENTIAL

AHM_Mt_Prospect_000322



**CB RICHARD ELLIS**

**EXCLUSIVE SALES LISTING AGREEMENT**
CB RICHARD ELLIS, INC.
BROKERAGE AND MANAGEMENT
LICENSED REAL ESTATE BROKER

1. In consideration of the listing for sale the real property hereinafter described (the "Property") by CB Richard Ellis, Inc. ("Broker") and Broker's agreement to use its best efforts to effect a sale of same, the undersigned ("Owner") hereby grants to Broker the exclusive right to sell the Property for a period commencing February 22, 2008, and ending midnight November 30, 2008, (the "Term") which Term may be terminated by either party with or without cause upon thirty (30) day written notice. Property will be marketed at $2,450,000.00.

   This Property is situated in the City of Mount Prospect, County of Cook, State of Illinois, is located at 950 Elmhurst Road, Elmhurst Illinois and is further described as 950 Elmhurst Road, Elmhurst, Illinois.

   References herein to the Property shall be understood to include portions of the Property.

2. Owner agrees to pay Broker a sales commission in accordance with Broker's Schedule of Sale Commissions (the "Schedule"), a copy of which is executed by Owner, attached hereto and hereby made a part hereof. This commission shall be earned for services rendered, if, during the Term: (a) the Property is sold to a purchaser procured by Broker, Owner, or anyone else or (b) Owner contributes or conveys the Property to a partnership, joint venture, or other business entity. Outside brokers or co-brokers will be paid by their principals; provided, however, notwithstanding anything contained in this Agreement to the contrary, under no circumstances shall the Owner its Trustee or the Bankruptcy Court have any liability to Broker or any third party claiming through Broker for any commission, finder's or referral fee or other compensation in excess of the Commission and Broker covenants and agrees to indemnify and hold harmless Owner from and against any and all such claims, suits, judgments, obligations, costs, losses, expenses and liabilities (including reasonable attorney's fees) arising therefrom to the extent of commissions paid hereunder. Any and all fees and commissions due hereunder are subject to the approval of the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") and shall be paid in accordance with sections 328, 330 and 331 of the Bankruptcy Code, such Federal Rules of Bankruptcy Procedure as may be applicable from time to time, and rules or procedures fixed by the Bankruptcy Court. Notwithstanding anything contained herein, or any law, custom or practice to the contrary, Owner's obligation to pay Broker or any cooperating broker, co-broker or outside broker or third party, the Commission as provided in this Agreement is subject to and contingent upon the consummation of a settlement (as evidenced by the execution and delivery of a deed to the Property by Owner or a transfer or other instrument divesting Owner of its ownership interests and rights in and to the Property) on the Property in accordance with the terms as evidenced by a fully executed Agreement of Sale by all necessary parties and the remittance of the closing proceeds from such sale in accordance with a closing statement approved and signed by the Owner and the Bankruptcy Court (the "Closing").

3. Owner further agrees that Owner shall pay Broker a commission in accordance with the Schedule, if, within ninety (90) calendar days after the expiration or termination of the Term the Property is sold to, or Owner enters into a contract of sale of the Property with, or negotiations continue, resume or commence and thereafter continue leading to a sale of the Property to any person or entity (including his/her/its successors, assigns or affiliates) with whom Broker has negotiated (either directly or through another broker or agent) or to whom the Property has been submitted prior to the expiration or termination of the Term (the "Prospects"). Broker is authorized to continue negotiations with the Prospects. Broker agrees to submit a written list of such Prospects to Owner not later than ten (10) calendar days following the expiration or termination of the Term, together with written records of Broker that documents that such Prospect: (a) had been contacted by Broker in regard to the Property either (i) in person, or (ii) by telephone, and had received written information from Broker about the Property, or (b) had initiated contact with Broker in regard to the Property either (i) in person, or (ii) by telephone, and had received written information from Broker about the Property; provided, however, that if a written offer has been submitted it shall not be necessary to include the offeror's name on the list.

4. As used in this Agreement the term "sale" shall include an exchange of the Property, and also the granting of an option to purchase the Property. Owner agrees that in the event such an option is granted, Owner shall pay Broker a sales commission in accordance with the Schedule on the price paid for the option and for any extensions thereof. This commission shall be paid upon receipt by Owner of any such payment(s). In the event such an option is exercised, whether during the Term or thereafter,

DB02:6448992.4                                                                066585.1081

Owner shall also pay Broker a sales commission on the gross sales price of the Property, in accordance with the Schedule. Notwithstanding the foregoing, to the extent that all or part of the price paid for the option or any extension thereof is applied to the sales price of the Property, then any commission previously paid by Owner to Broker on account of such option payment(s) shall be credited against the commission payable to Broker on account of the exercise of the option.

5. Commissions shall be payable hereunder when earned or at the earlier of closing of escrow, recordation of the deed, or taking of possession by the purchaser or tenant.

6. Unless otherwise provided herein, the terms of sale shall be, at the option of the purchaser, either cash or cash to any existing loan. Any offer may contain normal and customary contingencies such as those relating to the condition of the Property, title report, and timing of closing.

7. Owner agrees to cooperate with Broker in bringing about a sale of the Property and to refer immediately to Broker all inquiries of anyone interested in the Property. All negotiations are to be through Broker. Broker is authorized to accept a deposit from any prospective purchaser and to handle it in accordance with the instructions of the parties unless contrary to applicable law. Broker is exclusively authorized to advertise the Property and, exclusively, to place a sign(s) on the Property if, in Broker's opinion, such would facilitate the sale of the Property. Owner and its counsel will be responsible for determining the legal sufficiency of any purchase and sale agreement and other documents relating to any transaction contemplated by this Agreement.

8. In the event the Property is removed from the market due to the opening of an escrow or acceptance of an offer to purchase the Property during the Term, or any extension thereof, and the sale is not consummated for any reason then, in that event, the Term shall be extended for a period of time equal to the number of days that the escrow had been opened and/or the Property had been removed from the market, whichever is longer, provided that, in no event shall such extension(s) exceed ninety (90) calendar days in the aggregate.

9. Owner agrees to disclose to Broker and to prospective tenants or purchasers any and all information which Owner has regarding present and future zoning and environmental matters affecting the Property and regarding the condition of the Property, including, but not limited to structural, mechanical and soils conditions, the presence and location of asbestos, PCB transformers, other toxic, hazardous or contaminated substances, and underground storage tanks in, on, or about the Property. Broker is authorized to disclose any such information to prospective purchasers or tenants.

10. Owner represents that it is the owner of the Property and that, except as may be set forth in an addendum attached hereto, no person or entity who has an ownership interest in the Property is a foreign person as defined in the Foreign Investment in Real Property Tax Act (commonly known as "FIRPTA").

11. If earnest money or similar deposits made by a prospective purchaser or tenant are forfeited, in addition to any other rights of Broker pursuant to this Agreement, Broker shall be entitled to one-half (1/2) thereof, but not to exceed the total amount of the anticipated commission.

12. To the extent permitted by applicable law, Broker is authorized to deduct its commissions from any deposits, payments or other funds, including proceeds of sale or rental payments, paid by a purchaser or tenant in connection with a transaction contemplated by this Agreement, and Owner hereby irrevocably assigns said funds and proceeds to Broker to the extent necessary to pay said commissions. Broker is authorized to provide a copy of this Agreement to any escrow or closing agent working on such transaction, and such escrow or closing agent, or tenant, is hereby instructed by Owner to pay Broker's commissions from any such funds or proceeds available. Owner shall remain liable for the entire amount of said commissions regardless of whether Broker exercises its rights under this paragraph.

13. Owner and Broker designate the individual(s) identified below as the legal agent(s) of Owner, to the exclusion of all other licensees of Broker (individually or collectively referred to as "Designated Agent(s)"). Owner acknowledges that Broker is a national brokerage firm and that in some cases it may represent prospective purchasers or tenants. Owner desires that the Property be presented to such persons or entities, and consents to any dual representation created in the event that such purchaser or tenant is also represented by Designated Agent(s). Designated Agent(s) shall not disclose the confidential information of one principal to the other.

Designated Agent(s): Robert D. Graham, Thomas A. Rusthoven and Ted H. Buenger.

DB02:6448992.4                                          2                                          066585.1001

CONFIDENTIAL

AHM Mt Prospect 000324

14. In the event that the Property becomes the subject of foreclosure proceedings prior to the expiration of this Agreement, then this Agreement shall be deemed suspended until such time as the Owner may reacquire the Property within the Term. If this Agreement is suspended pursuant to this paragraph, Broker shall be free to enter into a listing agreement with any receiver, the party initiating the foreclosure, the party purchasing the Property at a foreclosure sale, or any other person having an interest in the Property.

15. In the event of any dispute between Owner and Broker relating to this Agreement, the Property or Owner or Broker's performance hereunder, Owner and Broker agree that (to the extent possible) the Bankruptcy Court, shall have exclusive jurisdiction to hear and resolve any such dispute. With respect to any dispute over which the Bankruptcy Court has no jurisdiction, Owner and Broker agree that such dispute shall be resolved by means of binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrator(s) may be entered in any court of competent jurisdiction. Depositions may be taken and other discovery obtained during such arbitration proceedings to the same extent as authorized in civil judicial proceedings in the State of Illinois. The arbitrator(s) shall be limited to awarding compensatory damages and shall have no authority to award punitive, exemplary or similar type damages. The prevailing party in the arbitration proceeding shall be entitled to recover its expenses, including the costs of the arbitration proceeding, and reasonable attorneys' fees from the non-prevailing party.

16. This Agreement, and all of the obligations of Broker arising hereunder, are subject to the approval of the Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), and are contingent upon the Bankruptcy Court's entry and issuance of an Order , pursuant to the Bankruptcy Code authorizing the retention and employment of CB Richard Ellis, Inc., as Real Estate Broker in accordance with the terms of this Agreement.

17. Each signatory to this Agreement represents and warrants that (s)he has full authority to sign this Agreement on behalf of the party for whom (s)he signs and that this Agreement binds such party.

18. This Agreement constitutes the entire agreement between Owner and Broker and supersedes all prior discussions, negotiations and agreements, whether oral or written. Owner and Broker each represent and warrant to the other that in entering into this Agreement, they are not relying upon any discussions, representations, understandings or agreements, other than the matters specifically stated herein. No amendment, alteration, cancellation or withdrawal of this Agreement or its terms, including the amount of commission or the time of payment of commission, shall be valid or binding unless made in writing and signed by both Owner and Broker. This Agreement shall be binding upon, and shall benefit, the heirs, successors, and assignees of the parties. In the event any clause, provision, paragraph or term of this Agreement shall be deemed to be unenforceable or void based on any controlling state or federal law, the remaining provisions hereof, and each part, shall remain unaffected and shall continue in full force and effect.

19. The parties hereto agree to, comply with all applicable federal, state and local laws, regulations, codes, ordinances and administrative orders having jurisdiction over the assets, property or the subject matter of this Agreement, including, but not limited to, the 1964 Civil Rights Act and all amendments thereto, the Foreign Investment In Real Property Tax Act, the Comprehensive Environmental Response Compensation and Liability Act, and The Americans With Disabilities Act. Owner and Broker agree that the Property will be offered in compliance with all applicable anti-discrimination laws. Broker acknowledges and agrees that it is illegal to refuse to display or sell to any person because of such person's membership in any class protected by Article 3 of the Illinois Human Rights Act.

20. Except to the extent set forth herein, the obligations of Broker may not be delegated and, Broker may not assign, transfer, pledge, encumber, hypothecate or otherwise dispose of this Agreement, or any of its rights hereunder, and any attempted delegation or disposition shall be null and void and without effect.

21. Any provision(s) of this Agreement which shall be invalid or void shall in no way affect, impair or invalidate any other provisions hereof, and the remaining provisions hereof shall remain in full force and effect.

22. Broker shall accept delivery of and present all offers and counteroffers to buy or sell the Owner's property.

23. Broker shall assist the Owner in developing, communicating, negotiating and presenting offers, counteroffers, and notices that relate to the offers and counteroffers until a purchase agreement is signed and all contingencies are satisfied or waived.

CONFIDENTIAL                                                                     AHM Mt Prospect 000325

24. Broker shall answer the Owners' questions relating to offers, counteroffers, notices, and contingencies.

The undersigned Owner hereby acknowledges receipt of a copy of this Agreement.

Accepted:

CB Richard Ellis, Inc.
Licensed Real Estate Broker

By: _Jffrey SBarutt_

Title: Managing Director

Address: 20 N. Martingale, # 100
Schaumburg, IL 60173

Telephone: 847-706-4940

Date: 2·22·08

American Home Mortgage Corporation

A(n) _____
                (Owner)

By: _____

Title: ~~Director, Corporate Real Estate~~  EVP ost

Address: 538 Broadhollow Road
Melville, NY 11747

Telephone: ~~631.622.3172~~ 636-296-7203 ost

Date:

CONSULT YOUR ADVISORS — This document has legal consequences. No representation or recommendation is made by Broker as to the legal or tax consequences of this Agreement or the transaction(s) which it contemplates. These are questions for your attorney and financial advisors.

CONFIDENTIAL                                                    AHM Mt Prospect 000326



**SCHEDULE OF SALE COMMISSIONS**
CB RICHARD ELLIS, INC.   (CHICAGO AREA OFFICE)
BROKERAGE AND MANAGEMENT
LICENSED REAL ESTATE BROKER

FOR PROPERTY AT 950 N. Elmhurst Road, Mount Prospect, Illinois.

As to sales of improved real property, Broker's commission shall be 2.5% of the first $1,600,000.00 of the gross sales price plus 12% of the gross sales price in excess thereof. Gross sales price shall include any and all consideration received or receivable, in whatever form, including but not limited to assumption or release of existing liabilities. The Property is deemed to be improved. The commission shall be paid when earned or at the close of escrow through escrow, or if there is no escrow, then upon recordation of the deed; provided, however, that if the transaction involves an installment contract, then payment shall be made upon execution of such contract. In the event Owner contributes or conveys the Property or any interest therein to a joint venture, partnership, or other business entity, the commission shall be calculated on the fair market value of the Property, less the value of the interest in the Property retained by or transferred to Owner, as the case may be, and shall be paid at the time of the contribution or transfer. If Owner is a partnership, corporation, or other business entity, and an interest in the partnership, corporation or other business entity is transferred, whether by merger, outright purchase or otherwise, in lieu of a sale of the Property, and applicable law does not prohibit the payment of a commission in connection with such sale or transfer, the commission shall be calculated on the fair market value of the Property, rather than the gross sales price, multiplied by the percentage of interest so transferred, and shall be paid at the time of the transfer.

The provisions hereof are subject to the terms and provisions of any Exclusive Sales Listing Agreement, Exclusive Leasing Listing Agreement, Exclusive Subleasing Listing Agreement, Exclusive Representation Agreement or other agreement to which this Schedule may be attached and which is executed by the parties hereto.

In the event Owner fails to make payments within the time limits set forth herein, then from the date due until paid, the delinquent amount shall bear interest at the maximum rate permitted in the state in which the office of Broker executing this Schedule is located. If Broker is required to institute legal action against Owner relating to this Schedule or any agreement to which it is attached, Broker shall be entitled to reasonable attorneys' fees and costs.

Owner hereby acknowledges receipt of a copy of this Schedule and agrees that it shall be binding upon its heirs, successors and assignees. In the event Owner sells or otherwise disposes of its interest in the Property, Owner shall remain liable for payment of the commissions provided for in this Schedule and any agreement of which it is a part, unless the purchaser or transferee assumes all of such obligations in writing in such form as is acceptable to Broker.

APPROVED this _____ day of _____, 20____

CB Richard Ellis, Inc.
Licensed Real Estate Broker

By: _Jffny S Barnett_

Title: Managing Director

Date: 2-27-08

American Home Mortgage Corp.
Owner

By: _[signature]_

Title: EVP

Date: 2/27/08

DB02:6541273.2

066585.1001

CONFIDENTIAL

AHM Mt Prospect 000327

# CBRE
### CB RICHARD ELLIS

**Rob Graham**
**First Vice President**

CB Richard Ellis, Inc.
20 N. Martingale, Suite 100
Schaumburg, IL 60173

T  847 706 4034
F  847 706 4959

VIA EMAIL:  thomas.trepanier@americanhm.com

www.cbre.com

Mr. Thomas Trepanier        *Bob Sempke* ✓
Director, Corporate Real Estate
American Home Mortgage
538 Broadhollow Road
Melville, NY 11747

OPINION OF VALUE – 950 N. ELMHURST ROAD
MOUNT PROSPECT, ILLINOIS

The subject property in Mount Prospect is a single-story (with finished lower level) approximately 35,000 sq. ft. masonry/brick building likely constructed in the 1960's with more recent renovations/additions.  The building has two primary entrances and exposure on both Elmhurst and Rand Roads.  The exterior of the building, while dated architecturally, appears to be in good condition.  The existing parking ratio is well below average and expanding the building and/or parking does not appear feasible. It is our understanding that in the past off-site parking was accommodated at Randhurst Mall (across Elmhurst Road).  Located in Cook County, the property is partially occupied by both retail and office tenants.

950 N. Elmhurst is located in the Northwest market but has limited exposure to traditional office markets.  This factor can be traced to limited immediate highway accessibility, the high level of mixed-use facilities and mature residential in the immediate area.

If the building were vacant today, CBRE would recommend an asking gross rental rate of $12.00-$14.00 per square foot gross ($9.00 - $10.00 for lower level space), assuming fully assessed combined real estate taxes and operating expenses of $5.50-$6.00 per square foot.  These economics assume that the primary use remains office and in a condition commensurate with modern office space.  On a sale basis, CBRE would recommend an asking price of $65.00 - $70.00 per square foot with an anticipated effective price in the $55.00 - $60.00 range.  The primary target market would be local office users for all or a portion of the property that will pay a premium over a purely speculative investor.





Primary competition would be expected from other single-story facilities and/or older office properties in the vicinity. The surrounding office markets have improved modestly over the past few years. The vacancy rate in suburban Chicago is 14.9% (17.6% including subleases) while the Northwest market is 16.1% (19.5% including subleases). The high vacancy rates are primarily attributed to slow demand as supply has remained stable. The impetus for a significant change in the state of the subject property's market is not anticipated in the short term. On a positive note, there are limited land sites available in the vicinity and construction material costs continue to escalate.

The following represents recent office building sale transactions:

| Building/Address | Size | Price/S.F. | Comments |
|---|---|---|---|
| 555 Business Center Drive Mt. Prospect | 32,573 SF | $2,060,000 ($63.24 SF) | Office/warehouse. Sold to user. |
| 601 E. Kensington Road Mt. Prospect | 80,000 SF | $1,500,000 ($18.75 SF) | Office/R & D. Property sold for land value. Existing structures demolished. |
| 1001 Feehanville Drive Mt. Prospect | 14,200 SF | $940,000 ($66.20 SF) | Flex (80% office) building sold for corporate H.Q. |
| 852 Feehanville Drive Mt. Prospect | 63,200 SF | $4,992,800 ($79.00 SF) | Vacant building purchased by neighbor. |
| 701 E. Prospect Avenue Mt. Prospect | 16,215 SF | $900,000 ($55.50 SF) | Vacant building built in 1960. |
| 350 W. Kensington Road Mt. Prospect | 13,392 SF | $1,835,000 ($94.63 SF) | Class B office building. |
| 800 E. Northwest Highway Mt. Prospect | 23,000 SF | $1,509,000 ($59.40 SF) | Class B office building built in 1980. |

Tom, please contact me with any questions, comments or if you need additional information.

Sincerely,
CB Richard Ellis

*Robert D. [signature]*

Robert D. Graham
First Vice President



**R N R E A L T Y**



August 28, 2008

<u>**Via: Email Delivery**</u>
American Home Mortgage Corp.
Debtor Case #07-11047 (CSS)
C/O Ted Buenger
CB Richard Ellis, as Agent
700 Commerce Drive Suite 550
Oak Brook, IL 60523

**Re:**  **Proposal for Purchase of 950 N Elmhurst Road/150 W Rand Road, Mount Prospect, IL ("Property").**

Dear Ted:

The following lays out the principal terms under which RN Realty Ventures, Inc. would proceed to negotiate to purchase the aforementioned Property.

| | |
|---|---|
| **Property:** | An approximately 67,383 SF site (land). |
| **Purchaser:** | RN Realty Ventures, Inc. |
| **Seller:** | Owner of Record |
| **Purchase Price:** | $1,855,000 plus/minus prorations |
| **Closing Date:** | Within 45 days after of the expiration of the Feasibility Period. |
| **Earnest Money:** | $50,000 payable upon execution of the Contract. Said earnest money is to be deposited into a modified joint order escrow with interest to be earned thereon for the benefit of Purchaser. |
| **Prorations:** | Customary prorations, if any. Real estate taxes shall be prorated at 110% of the last ascertainable tax bill or current proposed assessment, if higher. |

R N R E A L T Y
V E N T U R E S , I N C .          ❖  225 W. Illinois, Suite 350          ❖  Tel  312.527.8200          ❖  www.rnrealty.com
                                   Chicago, IL 60610                         Fax  312.222.0356

CONFIDENTIAL                                                                  AHM Mt Prospect 001648

**Due Diligence:**    For a period of 45 days immediately following the last of full execution and delivery of a purchase contract ("Contract"), Purchaser's receipt of the Due Diligence Materials as herein defined, and Bankruptcy Court Approval, as set forth hereinafter (the "Feasibility Period"), Purchaser shall have an opportunity to examine the books and records of the Property, make inquiry concerning the Property with Seller and other applicable parties; investigate the physical condition of the Property and the feasibility of the Purchaser's intended acquisition of the Property. Purchaser shall have the right, in its sole discretion, to terminate the Contract at any time prior to the expiration of the Feasibility Period, and upon such termination, the earnest money shall be immediately returned to Purchaser. Due Diligence Materials shall include the following items which Seller shall deliver to Purchaser: current title commitment, ALTA survey as described below, and to the extent in effect, all leases, lease amendments, signed letters of intent to lease, option agreements, easement agreements and other binding agreements affecting the Property (including management and service contracts), studies, reports (including any soil or environmental reports) including the Phase I described below relating to the Property as well as notices pertaining to the Property from governing bodies or parties with interests in the Property. Seller shall also make available to Purchaser any other information pertaining to the Property which Purchaser may reasonably request.

**Encumbrances:**    Purchaser shall agree to accept title to the Property subject only to the following: (a) general real estate taxes which are not yet due and payable; (b) such other covenants, conditions, restrictions and easements of record which are acceptable to Purchaser and (c) the Property being vacant and free of any and all tenancies or user licenses except for those leases identified in **Schedule A** hereof, which shall be confirmed by the respective tenants in estoppel letters to be received prior to closing.

**Survey:**    Within thirty (30) days of a fully executed Contract, Seller shall provide Purchaser with a current ALTA survey of the Property (not older than 90 days).

**Environmental:**    Within thirty (30) days of a fully executed Contract, Seller shall provide Purchaser with a current Phase 1 environmental report on the subject Property. An acceptable environmental report should disclose that there is no presence of "hazardous materials" in, on or about the Property which would require remediation. Should the report indicate the presence or potential of any "hazardous materials", Seller, at its cost, shall cause a Phase 2 investigation to be performed, in a manner satisfactory to Purchaser, so as to identify the nature and extent of the required remediation; whereupon the Feasibility Period shall be extended

AHM Mt Prospect 001649

so as to afford the Purchaser a reasonable period of time (but not less than 30 days) after completion of the Phase 2 report to evaluate the condition and the impact on its intent to purchase the Property. The Feasibility Period shall be extended to provide for such events.

**Transfer Taxes/ Closing Costs:**

Purchaser shall pay customary transfer taxes, if any, and Seller shall pay its respective City, State, County and other local transfer taxes. All escrow costs shall be borne equally. Seller shall provide at its cost satisfactory title insurance in the amount of the purchase price with extended coverage, a 3.1 zoning endorsement along with other customary coverages.

**Operation Pending Contract & Closing:**

Seller shall operate the Property in accordance with customary and prudent real estate practices and otherwise in the ordinary course of business; provided, however, Seller will not enter into any new leases or modify or terminate any existing leases without the prior written consent of Purchaser, which consent may be withheld in Purchaser's sole discretion; provided further, if the proposed lease or modification of an existing lease permits the lessor to terminate the lease on no more than 60 days notice, Purchaser's consent shall not be unreasonably withheld. Additionally, Seller shall not seek or apply to modify or vary the current zoning of the Property without Purchaser's prior written consent. Nor will Seller enter into any service contracts, which are not terminable at closing should Purchaser elect to terminate such contracts.

**Continuing Access:**

Commencing on the full execution of the Contract and continuing through and including the Closing Date, Purchaser and its agents and employees shall have access to the Property from time to time upon reasonable prior notice. Purchaser shall indemnify, defend, and hold Seller harmless from and against any and all loss, damage, liability and expense which Seller may incur solely as a result of any negligent act performed by Purchaser, or any of Purchaser's agents or employees; on or about the Property pursuant to this paragraph.

**Bankruptcy Covenants:**

Purchaser acknowledges that Seller has filed for protection under Chapter 11 of the Bankruptcy Code. Consequently, Purchaser is unwilling to proceed without approval ("Approval") of the Contract by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Seller agrees that within five (5) days after full execution of the Contract, it shall file a Motion with the Bankruptcy Court seeking approval of the Contract (as same may be later modified in the reasonable discretion of the Seller) pursuant to 11 U.S.C. § 363, and diligently pursue approval of the Motion. If Seller shall not obtain Bankruptcy Court Approval within 45 days after the date of the Contract,

CONFIDENTIAL

Purchaser may terminate the Contract. Additionally, Purchaser believes that sale of the Property might be subject to further bidding by other prospective purchasers at the discretion of Seller's Creditor's Committee. Therefore, the terms of the Contract will also contain the following provisions:

    i.)    <u>Bid Protection</u> – Bids must exceed the Purchase Price by 10%.

    ii.)    <u>Break-Up Fee</u> - Purchaser shall be paid a "break up fee" equal to $50,000 in the event another offer is accepted by Seller, such amount payable to Purchaser no later than closing of such sale.

    iii.)    <u>Right to Credit Bid</u> In the event further offers are solicited or a bid process is conducted, Purchaser shall have the right to make competing offers or tender bids and in such event, Purchaser shall have the right to "credit bid" its "break up fee" against such offer or bid.

**Exclusivity:** So long as discussions and negotiations between Seller and Purchaser concerning the terms and conditions of the Contract are continuing, Seller and its representatives (whom Seller agrees to instruct accordingly) agree not to discuss, transmit information, engage in negotiations, or enter into any agreements or understandings with any third party for a possible sale or lease of the Property or any portion thereof.

**Non – Binding Effect:** The terms and conditions set forth in this letter of interest represent a statement of the parties mutual understanding with respect to the transaction contemplated hereby, and other than Seller's agreement in the Exclusivity paragraph, binding and enforceable obligations with respect to the purchase and sale of the Property will only result upon the full execution of the Contract (which Contract shall be subject to Bankruptcy Court Approval, as set forth above). However, by this letter, the parties agree to be legally bound to negotiate in good faith to resolve matters which are not addressed or finalized in this letter, and to enter into the Contract incorporating such resolved matters and the terms and conditions described in this letter within twenty (20) days after Seller's acceptance of this letter. In the event the parties are unable to resolve such matters and execute the Contract within such twenty (20) day period, despite their good faith efforts to do so, neither party shall be obligated to consummate the transaction described in this letter and this letter shall be deemed null and void.

If the terms and conditions set forth in this letter are acceptable to Seller, please indicate such acceptance by having a copy hereof executed by an authorized party on behalf of Seller and returning such counterpart to me within three (3) days of the date of this letter.    If we have not received a fully signed counterpart of this letter within three (3) business days after the date of this letter, then this offer to purchase the Property on the terms and conditions outlined herein shall be deemed revoked and shall be of no further force or effect.    Immediately upon our receipt of an executed copy of this letter Seller will commence the preparation of the Contract in a form consistent with the terms contained herein.

We hope we can conclude this transaction on the terms outlined herein and should you have any questions regarding the above or the purchaser entity please don't hesitate to call me at 312-527-6200.

Very truly yours,
RN Realty Ventures, Inc.

Noah O'Neill
Acquisitions Associate

Agreed and accepted this _____ day of _____, 2008

**Seller:**

_____

by: _____, its _____

CC: Leigh Rabman, President

AHM Mt Prospect 001652

**Schedule A – Existing Leases**

| Business Name | Square Feet | Lease Expiration | Renewal Options | Comments |
|---|---|---|---|---|
| Farmers Insurance Agency | 480 | Expired 10/31/05 | 0 | Lease is assumed as month to month |
| TMP Investments | 2,100 | 8/31/08 | 0 | If tenant doesn't vacate it is assumed the lease runs month to month |
| Personal Training Center, Inc. | 6,700 | 12/31/08 | 1 – (1) yr | Renewal is concurrent with the Tanning Studio |
| The Darkside Tanning Studio, Ltd. | 1,600 | 12/31/08 | 1 – (1) yr | Renewal is concurrent with the Training Center |

CHICAGO\2506065.2
ID\SSH

CONFIDENTIAL

AHM Mt Prospect 001653



Redacted

**From:** Grasl, Jeffrey [mailto:jgrasl@mcdonaldhopkins.com]
**Sent:** Wednesday, August 08, 2007 11:31 AM
**To:** Lunn, Matthew
**Cc:** Gross, Stephen; rnl@lorenzinilaw.com
**Subject:** AHM: Interest in purchase of certain assets

Mr. Lunn,

My name is Jeff Grasl and am one of the attorneys representing Mr. John Manglardi. I would like to discuss with you a proposal from my client for the purchase of the 950 N. Elmhurst Road, Mount Prospect, Illinois property, plus all furniture fixtures and equipment on the premises, including the assignment of all leases (this would also include the purchase of phone and fax numbers, etc...). My client is willing to make a cash bid of $1.5 million, or in the alternative, to assume the mortgage on the property. Please give me a call to discuss. Thank you.


Jeffrey S. Grasl, Esq.
McDonald Hopkins PLC | 39533 Woodward Ave.
Suite 318 | Bloomfield Hills, MI  48304
direct 248.220.1336 | fax 248.646.5075 | jgrasl@mcdonaldhopkins.com | www.mcdonaldhopkins.com

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS ATTORNEY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION INTENDED FOR THE
USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY
NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED
THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY ME BY TELEPHONE AND PERMANENTLY DELETE THE ORIGINAL AND ANY COPY
OF THIS E-MAIL AND DESTROY ANY PRINTOUT THEREOF.



EXHIBIT



## THE  E Q U I T A B L E  F U N D S  LLC

November 20, 2008

Ted Buenger
Vice President
CBRE
700 Commerce Drive
Suite 500
Oak Brook, IL 60523

### Re: 950 N Elmhurst Road / 150 W Rand Road, Mt. Prospect, IL

Dear Ted:

We are pleased to submit this Letter of Intent to purchase 950 N. Elmhurst Road / 150 W.
Rand Road in Mt. Prospect, Illinois (the "Property") from American Home Mortgage Corp. (the
"Seller"). The following outlines the terms under which we would enter into an agreement to
purchase the Property:

| | |
|---|---|
| Property: | Approximately 34,695 square foot building on 1.55 acres of land located at 950 N. Elmhurst Road / 150 W. Rand Road, Mt. Prospect, IL |
| Purchaser: | The Equitable Funds LLC, or its nominee |
| Seller: | American Home Mortgage Corp. |
| Purchase Price: | $1,315,000 |
| Financing Contingency: | None |
| Seller Representations: | None. Purchaser will acquire the property As-Is without Seller Representations or Warranties. |
| Due Diligence: | Once the contract receives approval from the United States Bankruptcy Court and the Seller provides to Purchaser the Information Documents, Purchaser shall have a period of 30 business days ("Due Diligence Period") to conduct its due diligence of the Property. If Purchaser, in its sole opinion, is not satisfied with the results of its due diligence, Purchaser may terminate the Contract by notifying Seller in writing prior to the expiration of the Due Diligence Period, at which time the Earnest Money and any interest earned thereon shall be returned to Purchaser. |

CONFIDENTIAL

| | |
|---|---|
| Contract: | Purchaser will provide Seller with a purchase contract ("Contract") within five (5) business days of the execution of this Letter of Intent. |
| Information Documents: | Upon the execution of the Contract, Seller shall furnish Purchaser with copies of all documents that are in the Seller's possession or control and that relate to the Property including, but not limited to, building plans and specifications, plat of survey (including legal description), title policy, contracts, leases, licenses, and agreements affecting any portion of the Property (including management, maintenance, service, supply) that will survive the closing, any and all soil tests or environmental reports pertaining to the Property or neighboring properties, structural reports regarding any element of the building, any notices received from any governmental entity, authority or agency and the Real Estate Tax Bills (the "Information Documents") |
| Earnest Money: | Purchaser shall deposit $30,000 ("Earnest Money") into an escrow account at Chicago Title Insurance Company. Upon expiration of the Due Diligence Period the Earnest Money becomes non-refundable. At Closing the Earnest Money Deposit (and any interest earned thereon) shall be applied to the Purchase Price. |
| Closing Date: | Closing shall occur thirty (30) days after the expiration of the Due Diligence Period. |

Please let me know if the terms of this Letter of Intent are acceptable. If so, please sign a copy of this letter and return it to me. This offer shall expire, unless otherwise accepted by the Seller on December 5th 2008.

Also, we invite you to contact Douglas Boersma at JP Morgan Chase regarding our financial ability to close this transaction. He can be reached at (312) 661-5145. Thank you for you consideration.

Very truly yours,

Jonathan Berger

**Accepted by:**

Its:

Date:

**From:** Jonathan Berger [berger@tefllc.com]
**Sent:** Wednesday, December 03, 2008 3:46 PM
**To:** Buenger, Ted @ Oak Brook
**Subject:** Re: Response to Letter of Intent to Purchase 950 N Elmhust Rd/150 W Rand Rd., Mount Prospect, IL dated November 20, 2008 (LOI)

Ted,

Below you will find our comments to the Seller's response. We do not agree to the text in blue and we would like to add the text in red. If these terms are acceptable, we can prepare a contract this week. Let us know.

Thank you,

Jonathan



On 12/3/08 10:50 AM, "Buenger, Ted @ Oak Brook" <Ted.Buenger@cbre.com> wrote:

Jonathan

Here is Seller's response to your LOI:

Price:                    $1,500,000   $1,310,000

Due Diligence:         30 day due diligence period begins upon execution of Contract and delivery of Information Documents. Seller will seek approval from the United States Bankruptcy Court upon completion of due diligence. If contract is not approved for a reason other than the receipt of a competing offer, Seller will pay Buyer's costs incurred during due diligence, not to exceed $50,000. Seller will provide a current Phase I Environmental Report, current survey and title policy. Upon completion and waiver of the Due Diligence Period by the Buyer, the Seller/Debtor shall use its best efforts to promptly obtain the Bankruptcy Court approval of the Contract and shall file a Motion with the Bankruptcy Court no later then three business days after the completion and waiver of the Due Diligence Period.

Earnest Money:        $50,000 earnest money at contract execution and an additional $50,000 earnest money at completion of due diligence

Competitive Bids:      If Seller receives competitive bids after completion of due diligence and before court approval, Seller can terminate Purchaser's Contract and accept another bid subject to the following:

1)    The bid must exceed the purchase price by 10%
2)    Purchaser will receive a "Break Up Fee" of $50,000 in the event the Contract is not approved by the United States Bankruptcy Court. The Break Up fee shall be paid prior to the disbursement of any of the sale proceeds to any of the Creditors (including the Secured        Creditors).
3)    Purchaser shall have the right to "credit bid" its Break Up Fee against such other offers.

This letter/proposal is intended solely as a preliminary expression of general intentions and is to be used for discussion purposes only. The parties intend that neither shall have any contractual obligations to the other with respect to the matters referred herein unless and until a definitive agreement has been fully executed and delivered by the parties. The parties agree that this letter/proposal is not intended to create any agreement or obligation by either party to negotiate a definitive lease/purchase and sale agreement and imposes no duty whatsoever on either party to continue negotiations, including without limitation any obligation to negotiate in good faith or in any way other than at arm's length. Prior to delivery of a definitive executed agreement, and without any liability to the other party, either party may (1) propose different terms from those summarized herein, (2) enter into negotiations with other parties and/or (3) unilaterally terminate all negotiations with the other party hereto.

Ted Buenger CCIM | Vice President

Investment Properties
CB Richard Ellis | Capital Markets
700 Commerce Drive, Suite 550 | Oak Brook, IL 60523
T 630 573 7091 | F 630 573 7018 | C 847 804 6915
ted.buenger@cbre.com <mailto:firstname.lastname@cbre.com> | www.cbre.com
<blocked::http://www.cbre.com>

This email may contain information that is confidential or attorney-client privileged and may constitute inside information. The contents of this email are
intended only for the recipient(s) listed above. If you are not the intended recipient, you are directed not to read, disclose, distribute or otherwise use this
transmission. If you have received this email in error, please notify the sender immediately and delete the transmission. Delivery of this message is not
intended to waive any applicable privileges.

**<u>Exhibit G</u>**

Insurance Invoice





**InterCity Agency, Inc.**
**INSURANCE**

Business built
through trust.

And a commitment
to keeping it.

REMIT TO: 42-40 BELL BOULEVARD, SUITE 103 • BAYSIDE, NEW YORK 11361 • PHONE 718-279-7700 • FAX 718-631-0067

STREGER DIVISION: 277 NORTH AVENUE • NEW ROCHELLE, NEW YORK 10801 • PHONE 914-632-6869 • FAX 914-632-3718

## ──── INVOICE ────

American Home Mortgage Investment Corp.
538 Broadhollow Road
Attn: Paul Moran
Melville, NY  11747

| | |
|---|---|
| Invoice Date | 08/03/09 |
| Invoice No. | 86634 |
| Bill-To Code | AMEHO |
| Client Code | AMEHO |
| Inv Order No. | 1*61178 |

Named Insured: American Home Mortgage Investment Corp.

Amount Remitted: $

*Please return this portion with your payment.*

Make checks payable to: Intercity Agency, Inc.

| Effective Date | Policy Period | Description | Invoice Amount |
|---|---|---|---|
| 08/04/09 | 08/04/09 to 08/04/10 | Chubb Group<br>Policy No. 35800229<br>*Renewal - Commercial Package | 7,453.00 |
| | | Mt. Prospect, IL<br>$3,250,000 Building Special<br>500,000 Rents<br>1,000,000/2,000,000 GL | |
| | | Invoice Number: 86634        Amount Due: | 7,453.00 |

OK TO *[handwritten signature]*
*[handwritten]* 8/4/09

*[handwritten]* 51100
*[handwritten]* 9530/C
*[handwritten]* # 61444

Premiums Due and Payable on Effective Date

NAT    Page: 1              ORIGINAL INVOICE



**InterCity Agency, Inc.**

**INSURANCE**

Business built through trust.

And a commitment to keeping it.

REMIT TO: 42-40 BELL BOULEVARD, SUITE 103 • BAYSIDE, NEW YORK 11361 • PHONE 718 279-7700 • FAX 718 631-0067

STREGER DIVISION: 277 NORTH AVENUE • NEW ROCHELLE, NEW YORK 10801 • PHONE 914 632-6869 • FAX 914 632-3718

## ─── INVOICE ───

American Home Mortgage Investment Corp.
538 Broadhollow Road
Attn: Paul Moran
Melville, NY  11747

| | |
|---|---|
| Invoice Date | 08/03/09 |
| Invoice No. | 86635 |
| Bill-To Code | AMEHO |
| Client Code | AMEHO |
| Inv Order No. | 1*61182 |

Named Insured: American Home Mortgage Investment Corp.

Amount Remitted: $

Make checks payable to: Intercity Agency, Inc.

| Effective Date | Policy Period | Coverage Description | Billed Amount |
|---|---|---|---|
| 08/04/09 | 08/04/09 to 08/04/10 | Chubb Group Policy No. 35800229 *Renewal - Commercial Package | 6,333.00 |
| | | Melville, NY $1,000,000 BPP/EDP $1,000,000/2,000,000 GL $1,000,000 EBL | |
| | | Invoice Number: 86635          Amount Due: | 6,333.00 |

Premiums Due and Payable on Effective Date

NAT    Page: 1              ORIGINAL INVOICE



**InterCity Agency, Inc.**

INSURANCE

Business built through trust

And a commitment to keeping it.

REMIT TO: 42-40 BELL BOULEVARD, SUITE 103 • BAYSIDE, NEW YORK 11361 • PHONE 718 279-7700 • FAX 718 631-0067

STREGER DIVISION: 277 NORTH AVENUE • NEW ROCHELLE, NEW YORK 10801 • PHONE 914 632-6869 • FAX 914 632-3718

## ── INVOICE ──

| | |
|---|---|
| American Home Mortgage Investment Corp. | Invoice Date    08/03/09 |
| 538 Broadhollow Road | Invoice No.     86638 |
| Attn: Paul Moran | Bill-To Code    AMEHO |
| Melville, NY  11747 | Client Code     AMEHO |
| | Inv Order No.   1*61188 |

Named Insured: American Home Mortgage Investment Corp.

Amount Remitted: $

Please return this portion with your payment.

### Make checks payable to: Intercity Agency, Inc.

| 08/04/09 | 08/04/09 to 08/04/10 | Chubb Group Policy No. TBD *Rewrite - Umbrella Liability | 6,925.00 |
|---|---|---|---|
| | | $5,000,000 | |
| | | Invoice Number: 86638        Amount Due: | 6,925.00 |

NAT    Page: 1              ORIGINAL INVOICE



**InterCity Agency, Inc.**

**INSURANCE**

Business built through trust.

And a commitment to keeping it.

REMIT TO: 42-40 BELL BOULEVARD, SUITE 103 • BAYSIDE, NEW YORK 11361 • PHONE 718-279-7700 • FAX 718-631-0067

STREGER DIVISION; 277 NORTH AVENUE • NEW ROCHELLE, NEW YORK 10801 • PHONE 914-632-6869 • FAX 914-632-3718

## —— INVOICE ——

American Home Mortgage Investment Corp.
538 Broadhollow Road
Attn: Paul Moran
Melville, NY  11747

Named Insured: American Home Mortgage Investment Corp.

| | |
|---|---|
| Invoice Date | 08/03/09 |
| Invoice No. | 86639 |
| Bill-To Code | AMEHO |
| Client Code | AMEHO |
| Inv Order No. | 1*61183 |
| Amount Remitted: $ | |

Please note on the portion with your payment

Make checks payable to: Intercity Agency, Inc.

| Effective Date | Policy Period | Description | Line of Amount |
|---|---|---|---|
| 08/04/09 | 08/04/09 to 08/04/10 | Federal Insurance Company Policy No. 73523338 *Renewal - Commercial Automobile | 800.00 |
| | | Hired and Non-Owned liability | |
| | | Invoice Number: 86639        Amount Due: | 800.00 |

*Moran signature*
8/4/09

Payments Due and Payable on Effective Date

NAT    Page: 1              ORIGINAL INVOICE

**EXHIBIT A**





0010

P.O. BOX 87522
CHICAGO, IL 60680

Account Number:   4141309064
January 04, 2010

2884 1 M8 0.382  2884/002884/002884 008 01 CX9WE0     01052010
AMERICAN HOME MORTGAGE
538 BROADHOLLOW RD
MELVILLE, NY 11747-2352

Dear Customer:

    This deposit receipt has been issued to replace previously issued deposit receipts. Since it is important that your name and address be correct, please be sure to bring any errors or changes to our attention. If you have any questions, please call us at 1-800-Edison-1 (1-800-334-7661).

    This receipt for deposit to secure payment of your final electric service bill is void when deposit is applied on the final bill or refunded. The deposit is not transferable to another person and will be applied to your unpaid final bill or will be refunded when your credit is established to the utility's satisfaction. Any credit balance remaining after payment of bills incurred to date service is discontinued will be payable to you without notice or demand. Interest at a rate determined by the Illinois Commerce Commission will be credited to your account annually. When service is discontinued, interest will be calculated from the date the deposit was received (if less than one year) or last date interest was applied to the account.

                                                        ComEd

Commonwealth Edison                    Account Number:   4141309064
P.O. BOX 87522                         January 04, 2010
CHICAGO, IL 60680

$7,745.00                              AMERICAN HOME MORTGAGE
                                       150 W RAND RD
                                       MOUNT PROSPECT, IL 60056

The Sum of
*Seven Thousand Seven Hundred Forty-Five
*and 00/100 Dollars

Deposit # 434963738

# ELECTRIC SERVICE DEPOSIT RECEIPT
# SAVE THIS RECEIPT





CONFIDENTIAL                                           AHM Mt Prospect 000909

# ComEd.
An Exelon Company

www.comed.com

USEFUL TELEPHONE NUMBERS
Hearing/Speech Impaired: 1-800-572-5789 (TTY)

Customer Service:    1-877-4-ComEd-1 (1-877-426-6331)

Page 1 of 2
Name             AMERICAN HOME MORTGAGE
Service Location  150 W RAND RD MOUNT PROSPECT
Phone Number      847-577-2119
Account Number    4141309064

Issue Date        January 04, 2010             **Late payment charges will continue until bill is paid.**

| Meter Information | Read Meter Date | Meter Number | Load Type | Reading Type | Meter Reading Previous | Present | Diff | Mult x | Usage |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31 | 140489878 | General Service | Tot kWh | 9423 ACT | 9482 EST | 59 | 120 | 7080 |
| | 12/31 | 140489878 | General Service | kW | 26.42 ACT | 26.70 EST | 0.28 | 120 | 33.60 |

Commercial Demand – 0 to 100 kW          Service from  12/14/2009  to  12/31/2009  – 17 Days

| Current Period | | | | |
|---|---|---|---|---|
| Customer Charge | | | | $7.70 |
| Standard Metering Charge | | | | 3.82 |
| Distribution Facilities Charge | 33.60 kW X | 2.75562 | | 92.59 |
| Transmission Services Charge | 7,080 kWh X | 0.00596 | | 42.20 |
| Electricity Supply Charge | 7,080 kWh X | 0.06507 | | 460.70 |
| Purchased Electricity Adjustment | | | | 5.52 |
| Environmental Cost Recovery Adj | 7,080 kWh X | -0.00010 | | -0.71 |
| Energy Efficiency Programs | 7,080 kWh X | 0.00073 | | 5.17 |
| Franchise Cost | $101.11 X | 6.18700% | | 6.26 |
| State Tax | | | | 22.71 |
| Municipal Tax | | | | 18.55 |
| **Total current charges** | | | | **$664.51** |

| Other Charges | |
|---|---|
| Thank you for your payment of $1,463.08 | |
| Refund | $7,026.30 |
| Current late payment charge (s) - electric | $21.94 |
| Deposit | $-7,786.09 |
| Charges from previous bill | $73.34 |
| Excess credit | $-7,026.30 |
| **Total other charges** | **$-7,690.81** |

| **Total amount due** | **$0.00** |
|---|---|

* * * Final Bill * * * It's Free! Subscribe to ComEd's Energy Insights Online Web-based analysis service. See how, when and how much electricity your organization uses. For details and requirements visit www.ComEd.com/EIO today!

---

When paying in person, please bring the entire bill.

Return only this portion with your check made payable to ComEd. Please write your account number on your check.

# ComEd.
An Exelon Company

[ ] Check here to pledge a donation to Power Up fund and complete form on reverse side.

To pay by phone call 1-800-588-9477.
A convenience fee will apply.

41413 0906 40000 0000

22734 1 MB 0.382  0922/022734/000960 076 01 CX9405          289 01052010
AMERICAN HOME MORTGAGE
538 BROADHOLLOW RD
MELVILLE, NY  11747-2352

Account Number          Payment Receipt Stamp
4141309064

[ Payment Amount ]

Please pay this
amount by 01/19/2010          $0.00

ComEd
PO Box 6111
Carol Stream, IL 60197-6111

0000066451000007334

41413090646000000000190000000



CONFIDENTIAL

AHM Mt Prospect 000910

**ComEd**
An Exelon Company

www.comed.com

USEFUL TELEPHONE NUMBERS
Hearing/Speech Impaired: 1-800-572-5789 (TTY)

Customer Service:    1-877-4-ComEd-1 (1-877-426-6331)

Page 2 of 2
Your Usage
Profile

4141309064



13-Month Usage (Total kWh)
* Non-regular billing period

| Month Billed | Total Demand | Avg Daily kWh | Avg Daily Temp |
|---|---|---|---|
| Current Month | 0.0 | 416.5 | 27 |
| Last Month | 0.0 | 409.4 | 39 |
| Last Year | 0.0 | 534.9 | 23 |



DO NOT MAIL THIS PORTION WITH YOUR PAYMENT

22734 1 M8 0.382 GX9WDS  0227340202 2C0

CONFIDENTIAL

AHM Mt Prospect 000911

# ComEd.
An Exelon Company

www.comed.com

USEFUL TELEPHONE NUMBERS
Hearing/Speech Impaired: 1-800-572-5789 (TTY)

Customer Service:        1-877-4-ComEd-1 (1-877-426-6331)

Page 1 of 1
Name          AMERICAN HOME MORTGAGE
Service Location  950 N ELMHURST RD MOUNT PROSPECT
Phone Number   847-577-2119
Account Number  4057755007

Issue Date     January 04, 2010        **Late payment charges will continue until bill is paid.**

Meter Information

| Read Date | Meter Number | Load Type | Reading Type | Previous | Present | Diff | Mult x | Usage |
|---|---|---|---|---|---|---|---|---|
| 12/31 | 086122916 | General Service | Tot kWh | 23208 ACT | 23258 EST | 50 | 60 | 3000 |
| 12/31 | 086122916 | General Service | kW | 81.37 ACT | 81.74 EST | 0.37 | 60 | 22.20 |

Current Period

Commercial Demand - 0 to 100 kW          Service from 12/14/2009 to 12/31/2009 - 17 Days

| | | | |
|---|---|---|---|
| Customer Charge | | | $7.70 |
| Standard Metering Charge | | | 3.82 |
| Distribution Facilities Charge | 22.20 kW X | 2.75562 | 61.17 |
| Transmission Services Charge | 3,000 kWh X | 0.00596 | 17.88 |
| Electricity Supply Charge | 3,000 kWh X | 0.06507 | 195.21 |
| Purchased Electricity Adjustment | | | 2.34 |
| Environmental Cost Recovery Adj | 3,000 kWh X | -0.00010 | -0.30 |
| Energy Efficiency Programs | 3,000 kWh X | 0.00073 | 2.19 |
| Franchise Cost | $69.69 X | 6.18700% | 4.31 |
| State Tax | | | 9.69 |
| Municipal Tax | | | 8.63 |
| **Total current charges** | | | **$312.64** |

Other Charges

Thank you for your payment of $594.31

**Total amount due**                              **$312.64**

Your Usage Profile



13-Month Usage (Total kWh)

15000
9000
3000
J F M A M J J A S O N D J
* Non-regular billing period

| Month Billed | Total Demand | Avg Daily kWh | Avg Daily Temp |
|---|---|---|---|
| Current Month | 0.0 | 176.5 | 27 |
| Last Month | 0.0 | 172.9 | 39 |
| Last Year | 0.0 | 217.7 | 23 |

* * * Final Bill * * * It's Free! Subscribe to ComEd's Energy Insights Online Web-based analysis service. See how, when and how much electricity your organization uses. For details and requirements visit www.ComEd.com/EIO today!

---

When paying in person, please bring the entire bill.

Return only this portion with your check made payable to ComEd. Please write your account number on your check.

# ComEd.
An Exelon Company

[ ] Check here to pledge a donation to Power Up fund and complete form on reverse side.

To pay by phone call 1-800-588-9477.
A convenience fee will apply.

40577 5500 70000 0000

22733 1 MB 0.382  0929/022733/000962 076 01 GXXWDS          1789 01052010
AMERICAN HOME MORTGAGE
538 BROADHOLLOW RD
MELVILLE, NY 11747-2352

Account Number
**4057755007**

Payment Receipt Stamp

Payment Amount [         ]

ComEd
PO Box 6111
Carol Stream, IL 60197-6111

Please pay this amount by 01/19/2010              **$312.64**

00000312640000000000

40577550070000312640019031264b

