*Exhibit "C"*

JOSHUA SILVERGLADE

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

IN RE:                                )
AMERICAN HOME MORTGAGE HOLDINGS,)  Case No.
INC., a Delaware corporation,   )  07-11047 (CSS)
et al.,                         )
          Debtors,              )

HIGHLY CONFIDENTIAL

DEPOSITION OF JOSHUA SILVERGLADE

Chicago, Illinois

August 19, 2010

REPORTED BY:   Tina Alfaro, RPR, CRR, RMR, CLR

2

JOSHUA SILVERGLADE

August 19, 2010

10:00 a.m.

The deposition of JOSHUA SILVERGLADE, held at the offices of Greenberg Traurig, 77 West Wacker Drive, Chicago, Illinois, pursuant to agreement before Tina M. Alfaro, a Registered Professional Reporter of the State of Illinois.

```
 1                    JOSHUA SILVERGLADE
 2   A P P E A R A N C E S:
 3      YOUNG CONAWAY STARGATT & TAYLOR, LLP
 4      BY: ANDREW LUNDGREN, ESQ.
 5          P.O. Box 391
 6          The Brandywine Building
 7          1000 West Street, 17th Floor
 8          Wilmington, Delaware 19801
 9          (302) 571-6743
10              On behalf of the Debtors;
11
12      ARONAUER RE & YUDELL, LLP
13      BY: KENNETH YUDELL, ESQ.
14          444 Madison Avenue
15          New York, New York 10022
16          (212) 755-6000
17              On behalf of Park National Bank.
18
19
20
21
22
23
24
25
```

```
                    JOSHUA SILVERGLADE
      MR. YUDELL:  Objection, form.
BY THE WITNESS:
      A.   It does.
      Q.   And for how much?
      MR. YUDELL:  Objection, form.
BY THE WITNESS:
      A.   $1,315,000.
      Q.   And what is the date of the letter?
      A.   November 20, 2008.
      Q.   And do you recall the previous letter that
we looked at from June 2008?
      A.   I do.
      Q.   And is the offer in this Debtor's 5 less
than that June letter?
      A.   The proposed purchase price?
      Q.   Yes.
      A.   Is less in the November 20, 2008 letter
than it is in the June 11, 2008 letter.
      Q.   Thank you.
           And the June 2008 letter is Debtor's 2?
      A.   It is.
      Q.   Can you tell me why the offer had gone
down?
      MR. YUDELL:  Objection, form.
```

JOSHUA SILVERGLADE

BY MR. LUNDGREN:

    Q. Or what was the reason for the decrease in the offer?

    MR. YUDELL: Same objection.

BY THE WITNESS:

    A. I think that decrease in price reflected mostly macro economic changes in that time period.

    Q. And when you say "macro economic," can you elaborate a little bit?

    A. The economic meltdown of 2008. Between June 2008 and November 2008 the real estate market took a significant downturn, including lease rates, occupancy, and otherwise.

    Q. And is that -- is it fair to say that your reference to the collapse of the economy in the e-mail that we just looked at, is that referring to the same macro economic condition?

    A. It is.

    MR. YUDELL: Objection, form.

BY MR. LUNDGREN:

    Q. Earlier we talked about some of the limited due diligence that you initially did on the property. By November 20th, the date of this letter, had you done more due diligence on the

```
                    JOSHUA SILVERGLADE
     A.   I do.
     Q.   And can you tell me what it is?
     A.   It is a letter from Melissa Seiler of
Greenberg Traurig to Zolfo Cooper, Young Conaway,
BDO Consulting, and Hahn & Hessen.
     Q.   Did you authorize Ms. Seiler to send this
letter?
     A.   We did.
     Q.   And does this letter have any attachments?
     A.   It appears to have the Internal Due
Diligence Review Draft 5/11/09 attached.
     Q.   And does this letter contain an offer for
the purchase -- an offering price for the purchase
of the property?
     A.   It does.
     Q.   And what is that figure?
     A.   It proposes to -- a purchase at the price
of $865,000.
     Q.   Do you know why that went up from 750?
     MR. YUDELL:  Objection, form.
BY THE WITNESS:
     A.   Why it went up from 750?  I'm not sure what
you mean.
     Q.   Do you know why between May 14, 2009 in
```

 GreenbergTraurig

Melissa E. Seller
Tel. 312.456.5209
Fax 312.899.0404
sellerm@gtlaw.com

May 19, 2009

**VIA FACSIMILE & FEDERAL EXPRESS**

Zolfo Cooper
1166 Avenue of the Americas, 24th Floor
New York, NY 10036
Attn: Scott Martinez
Facsimile No. 212-948-4226

John C. Kuffel, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Facsimile No. 302-576-3478

David Berliner
BDO Consulting
135 West 50th Street
New York, NY 10020
Facsimile No. 212-515-2599

Mark S. Indelicato, Esquire
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 20022
Facsimile No. 212-478-7400

Re: Purchase and Sale Agreement dated as of April 17, 2009 (the "<u>Agreement</u>") by and between North Star Trust Company, an Illinois corporation, as successor-trustee to Park National Bank and Trust Company of Chicago, under Trust Agreement dated December 20, 1993 (known as Trust Number 10129) ("<u>Legal Owner</u>"), and American Home Mortgage Corp., a New York Corporation ("<u>Beneficiary</u>"; Legal Owner and Beneficiary are hereinafter collectively referred to as "<u>Sellers</u>"), and The Equitable Funds LLC, a Delaware limited liability company, or its permitted assignee ("<u>Purchaser</u>") for the purchase and sale of the real property commonly known as 950 North Elmhurst Road and 150 West Rand Road, having a tax parcel number of 03-27-307-024 (the "<u>Property</u>").

**EXHIBIT** Debtors 15 8·19·10 TM

ALBANY
AMSTERDAM
ATLANTA
AUSTIN
BERLIN*
BOSTON
BRUSSELS*
CHICAGO
DALLAS
DELAWARE
DENVER
FORT LAUDERDALE
HOUSTON
LAS VEGAS
LONDON*
LOS ANGELES
MIAMI
MILAN*
NEW JERSEY
NEW YORK
ORANGE COUNTY
ORLANDO
PALM BEACH COUNTY
PHILADELPHIA
PHOENIX
ROME*
SACRAMENTO
SHANGHAI
SILICON VALLEY
TALLAHASSEE
TAMPA
TOKYO*
TYSONS CORNER
WASHINGTON, D.C.
ZURICH
*STRATEGIC ALLIANCE

CHI 58,261,492v2
GREENBERG TRAURIG, LLP ▪ ATTORNEYS AT LAW ▪ WWW.GTLAW.COM
77 West Wacker Drive ▪ Suite 3100 ▪ Chicago, IL 60601 ▪ Tel 312.456.8400 ▪ Fax 312.456.8435

Zolfo Cooper
May 19, 2009
Page 2

Gentlemen:

As you know, this office represents the Purchaser in connection with the above-referenced Agreement. Any initially capitalized term used, but not otherwise defined, in this letter shall have the meaning ascribed to such term in the Agreement.

In conducting its due diligence of the Property, Purchaser has uncovered several significant issues concerning the Property and its value. With my client's authorization, I am enclosing Purchaser's internal memo of May 11, 2009 briefly summarizing some of such matters (the "Memo"). In addition to the matters set forth in the Memo, on May 12, 2009, Purchaser learned additional information regarding the Property's rent stream that was materially different from that which had previously been represented to Purchaser in marketing and diligence materials. Specifically, (i) Greg Hahaj Personal Training Center, Inc.'s rent has been reduced from $7,700/month to $7,000/month, (ii) The Darkside Tanning Studio, Ltd.'s rent has been reduced from $2,205/month to $2,000/month, and (iii) despite the foregoing rent reduction, The Darkside Tanning Studio, Ltd. has not paid rent since February of 2008 (i.e., it has not paid rent for the last 15 months). On May 14, 2009, Purchaser received a cash flow statement for the Property reflecting a negative net operating income (for the most recently concluded twelve-month period) close to four times greater than that which had previously been represented to Purchaser in marketing and diligence materials.

Needless to say, the value of the Property is materially affected by the matters described in the Memo and outlined above. Therefore, on behalf of Purchaser, and in accordance with Section 6(b) of the Agreement, we hereby notify Beneficiary that Purchaser elects to terminate the Agreement. Please be advised that pursuant to Section 6(b) of the Agreement and the Escrow Instructions, Purchaser intends to promptly request that the Escrow Agent refund the Initial Deposit to Purchaser.

Adjusting the valuation to take into account the matters set forth above and in the Memo, Purchaser is willing to reinstate the Agreement at a Purchase Price of Eight Hundred and Sixty Five Thousand Dollars ($865,000.00) and otherwise on the same terms and conditions contained therein. In connection with reinstatement of the Agreement, Purchaser is prepared to waive its due diligence contingency and proceed to Closing.

Please contact me if you have any questions or would like to discuss.

Sincerely,

Melissa E. Seiler, Esq.
for GREENBERG TRAURIG

Enclosure

cc: Jonathan Berger
Josh Silverglade
Sean W. Bezark, Esq.

CHI 58,261,492v2

GREENBERG TRAURIG, LLP • ATTORNEYS AT LAW • WWW.GTLAW.COM

CONFIDENTIAL

AHM_Mt_Prospect_003173
AHM_Mt_Prospect_003173

INTERNAL DUE DILIGENCE REVIEW – Draft 5/11/09

| | |
|---|---|
| To: | Advisory Board |
| From: | Jonathan Berger and Josh Silverglade |
| Property: | 950 North Elmhurst Road & 150 West Rand Road, Mount Prospect, Illinois (Property) |
| Seller: | American Home Mortgage (AHM), as debtor-in-possession |
| Due Diligence Period: | 30 days. Expires Wednesday May 20, 2009 |
| Anticipated Closing Date: | June 30th, 2009 |
| Source of Funds: | Cash on hand |

As we continue to examine and study the Property, we have uncovered several significant issues concerning the Property and its value. The following is a brief summary of these matters:

**Environmental Matters**

After we signed the contract, we received a copy of the December 29, 2008 Carlson Environmental Phase I Report prepared for American Home Mortgage Corporation. Carlson identified the following material concerns:

1. The adjoining property to the south (Firestone) had a Leaking Underground Storage Tank (LUST) that was removed in 1997. The LUST was located just a few feet south of the Property.

2. The Property is suspected of having asbestos containing materials (ACMs) in various surfaces and materials and/or polychlorinated biphenyls (PCBs) in the elevator hydraulic fluid.

3. The Property was owned by Sinclair Refining Company, giving rise to the concern that the property was used as a gas filling station; and

Carlson recommended that state environmental records be reviewed and, if those documents did not conclusively resolve matters 1 and 3 (above), Carlson recommended subsurface sampling on the Property. With regard to matter 2, sampling could be conducted of the materials suspected to contain ACMs and PCBs.

We engaged Pioneer Environmental to review the Carlson report and prepare a new Phase I report. As part of its work, Pioneer conducted a thorough review of records at the local and state levels, including those at the Illinois Environmental Protection Agency (IEPA).

With regard to the LUST issue on the adjacent property, Pioneer obtained from the IEPA a copy of the UST Removal Report prepared for Bridgestone/Firestone in 1998. This report contained sampling results that indicate that the soils adjacent to the LUST were impacted. In fact, the area in between the LUST and the Property were contaminated indicating that the Property is likely impacted as well. Based on these sampling results, the IEPA denied a request to close the matter and required (at least) that additional sampling be conducted to define the extent (vertical and lateral) of the impacted area. No additional work appears to have been done.

With regard to the concern raised by Carlson that the Property was owned by Sinclair and therefore might have been used as a gas filling station, Pioneer uncovered documents that suggest that the Property was not used as a filling station and therefore not a concern.

### Title/Survey Issues

After we signed the contract, we received a copy of the August 25, 2008 survey of the Property prepared for AHM as well as a copy of the title commitment from Chicago Title. There are many material encumbrances on title, including many easements for various purposes. Many of the encumbrances are not reflected on the existing survey. As a result, we do not know what part(s) of the Property are burdened by these encumbrances. We have ordered a new, more complete survey and we expect it May 21st (to be paid for 50% by us and 50% by AHM). Despite any additional clarity that the new survey may provide, there will remain many material encumbrances on the Property, including:

1. There is a large easement on the east side of the Property that severely limits the use or redevelopment of the east side of the Property. The easement is for ingress and egress for properties to the south of the Property (including traffic to and from Firestone, McDonalds and Jiffy Lube). This easement makes the east side of the Property look like an access road for the neighbors. It also prohibits building on the most valuable part of this land site – part of the land that would otherwise be buildable according to the city code. This easement is directly over an area currently striped and used for parking, further reducing the number of parking spaces at this already under-parked property.

2. There is an easement for utilities that runs directly through the middle of the building. This is very unusual and may limit the ability to improve and/or lease the inside of the building in this area.

2

CONFIDENTIAL

AHM_Mt_Prospect_003175
AHM_Mt_Prospect_003175

3. There are unreadable documents (including the plat map) recorded on title. Chicago Title says that there are no readable versions available.

### Lease Rates and Parking Limitations

As part of our review of the Property, we met with many leasing agents, including two from CBRE. After inspecting the Property and several days of consideration, both CBRE agents declined our request to act as our agent in the event we acquire the Property. They provided the following information:

1. Since the time CBRE published the marketing materials on behalf of AHM, vacancy rates have climbed to all time highs, absorption rates have plummeted and rental rates continue to fall.

2. The market rent for the first floor office space is $5.00 per square foot and the market rent for the retail space on Rand Road is $12.00 to $14.00.

3. The Property does not have enough parking to support the entire building. Due to the insufficient parking, some of the first floor space and all of the lower level space will likely not be rentable (due to municipal parking requirements that must be met in order to receive occupancy permits).

4. Even looking past the parking limitations, there is almost no demand for lower level windowless office space (despite the significant improvements made by AHM).

5. The Property has an unusually high loss factor for a multi-tenant building.

### Current Tenants

1. Farmers Insurance occupies approximately 1,200 SF and not the 480 square feet indicated by the rent roll provided by AHM. As a result, the actual rent is $10.00 per square foot and not the $25.00 per square foot indicated in the rent roll.

2. During an inspection of the Property, we were told that Darkside Tanning Studio has not paid rent in over 6 months. We have requested from AHM and continue to wait for a cash flow statement and estoppel letters from the existing tenants. Darkside Tanning represents annual income of $25,830 plus tenant contributions towards utilities, taxes, etc.

### Real Estate Taxes

It appears that the real estate taxes have not been timely contested. As a result the taxes are currently based on a fully occupied building. The cost to appeal the taxes will need to be borne by the new owner. Further, the new owner will have to pay higher taxes for an undetermined period of time after closing.

### Parking Lot Issues

3

CONFIDENTIAL

AHM_Mt_Prospect_003176
AHM_Mt_Prospect_003176

1. As discussed above, the number of parking spaces (87 spaces) is insufficient to allow the re-use of the entire building. Depending on the ultimate tenant need and municipal standard, we expect that a portion of the first floor space and the entire lower level will not be rentable due to the parking limitations. (AHM reportedly leased approximately 100 parking spaces across the street in the mall parking lot.)

2. An easement, on the east side of the property, is directly over an area currently striped and used for parking, further reducing the number of parking spaces at the Property.

3. The parking lot is actively used by visitors to the adjacent McDonalds, Jiffy Lube and Firestone properties. The neighboring properties do not contribute towards the repair and maintenance of the parking lot.

4. The general condition of the parking lot is poor and is rapidly deteriorating. There is significant deferred maintenance that poses a hazard and a liability.

5. Deferred maintenance is $25,000. Capital Budget is $90,000.00 for 2" overlay throughout.

### Building Repair Costs

The building requires maintenance and repairs in order to keep it in a condition acceptable to tenants. Required work will need to include:

1. Roof: According to AHM, the roof was last replaced in 1994 making it 15 years old. The general condition of the roof is fair with several areas in very poor condition. This type of roof has an expected life span of 10-15 years. Tenant interviews along with the property inspections revealed several roof leaks. The budgeted cost to repair/replace the roof is $125,000.

2. Parapet Wall: Due to significant deferred maintenance, the parapet wall is no longer structurally sound and represents an immediate danger of falling masonry. The budgeted cost to repair the parapet wall is $45,000.

3. HVAC: According to our HVAC equipment inventory, there are a total of 7 HVAC units at the Property, with two of the units dating back to 1994. According to Noel Squitieri of GT Mechanical, these types of units have a life expectancy of 15 years (with timely maintenance and repairs). Many of the units are nearing the end of their useful life. Tenants all complained about uneven heating and cooling throughout their space and the building. Not all of the tenant spaces have HVAC controls within their space. HVAC Budget is $90,000.

4

4. <u>EIFS</u>: The overall condition of the EIFS is good except it was not finished properly where the EIFS meets up with the parapet wall. As a result, the EIFS is showing signs of deterioration and water infiltration. There is approximately $5,000 of maintenance and repairs needed.

5. <u>Life Safety & ADA Compliance</u>: As the building is divided for multiple users, significant and costly issues surrounding accessibility and life safety will need to be addressed. In addition, ADA compliant bathroom(s) are needed as well as over-sized, marked handicapped parking spaces.

**Sources of Information:**
- Pioneer Engineering & Environmental Services, Inc.
  - Draft Phase I Report
  - Property Condition Assessment
- Summit Design & Build ,LLC
  - Building Maintenance & Repairs
- GT Mechanical
  - HVAC
- Greenberg Traurig

CONFIDENTIAL

AHM_Mt_Prospect_003178
AHM_Mt_Prospect_003178