## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, *et al.*, | Case No. 07-11047 (CSS) |
| Debtors. | Jointly Administered |
| | **Ref. Docket Nos. 9229, 9230** |

## DEBTORS' ANSWERING BRIEF IN OPPOSITION TO MOTION BY
## U.S. BANK, N.A. (F/K/A PARK NATIONAL BANK) FOR SUMMARY JUDGMENT

Dated: Wilmington, Delaware
      September 30, 2010

Sean M. Beach (No. 4070)
Matthew B. Lunn (No. 4119)
Sharon M. Zieg (No. 4196)
Andrew A. Lundgren (No. 4429)
Justin Rucki (No. 5304)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

*Counsel to Debtors and Debtors in Possession*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................ ii

NATURE AND STAGE OF THE PROCEEDINGS ........................................ 1

SUMMARY OF THE ARGUMENT ...................................................... 1

RELEVANT BACKGROUND .......................................................... 3

ARGUMENT ..................................................................... 10

    I.    STANDARD OF REVIEW ............................................... 10

    II.   SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE THERE ARE NUMEROUS GENUINE ISSUES OF MATERIAL FACT IN DISPUTE ...................................................... 11

    A.   The Debtors' Evidence Establishes that the Expenses Paid Were Reasonable, Necessary, and Benefitted Park National as an Undersecured Creditor ........................................... 12

    B.   The Debtors' Evidence Establishes that Park National was Undersecured On the Dates the Debtors Paid the Expenses to be Surcharged ...................................................... 16

    C.   The Debtors' Evidence Establishes that Park National is Not Entitled to a Credit for Rents Collected ......................... 17

    D.   The Debtors' Evidences Establishes the Sufficiency of the Claim for Insurance Proceeds .......................................... 18

    III.  SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE PARK NATIONAL HAS FAILED TO DEMONSTRATE THAT IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW .......................... 20

    A.   The Petition Date is the Incorrect Date on Which to Value the Property ....................................................... 20

    B.   The Evidence Instead Supports the Proposition that the Property Should be Valued as of the Date of Disposition ................... 24

CONCLUSION .................................................................... 25

# TABLE OF AUTHORITIES

**Page**

## Cases

*In re Dawes*,
    2008 Bankr. LEXIS 3915 (Bankr. D. Kan. Oct. 29, 2008)............................ 15

*D&M Land Co., LLC v. BB&T Co.*,
    431 B.R. 133 (E.D.N.C. 2010)................................................................... 24

*In re AFCO Enterprises, Inc.*,
    35 B.R. 512 (Bankr. D. Utah 1983) .......................................................... 15

*In re Am. Home Mortg. Holdings, Inc.*,
    411 B.R. 181 (Bankr. D. Del. 2009) .......................................................... 13

*In re Bellman Farms, Inc.*,
    86 B.R. 1016 (Bankr. S.D. 1988)............................................................... 15

*In re Compton Impressions*
    217 F.3d 1256 (9th Cir. 2000) .................................................................. 23

*In re Consolidated Cotton Gin Co.*,
    347 B.R. 572 (Bankr. N.D. Tex. 2006)....................................................... 15

*In re Glen Eden Hospital, Inc.*,
    202 B.R. 589 Bankr. LEXIS 2130 (Bankr. E.D. Mich. Aug. 15, 1995)........ 24

*In re Hen House Interstate, Inc.*,
    177 F.3d 719 (8th Cir. 1999) .................................................................... 13

*In re Lovesac Corp.*,
    422 B.R. 478 (Bankr. D. Del. 2010) .......................................................... 10

*In re Mall One Assocs., L.P.*,
    185 B.R. 981 (E.D. Pa. 1995)............................................................... 17, 18

*In re Orfa Corp.*,
    170 B.R. 257 (E.D. Pa. 1994) ................................................................... 13

*In re U.S. Wireless Corp.*,
    386 B.R. 556 (Bankr. D. Del. 2008) .......................................................... 10

*U.S. v. Parmele*,
    171 B.R. 895 (N.D. Okla. 1994)................................................................ 15

*United States v. Boatmen's First Nat'l Bank,*
    5 F.3d 1157 (8th Cir. 1993) ........................................................................ 13

*United States v. Certain Real & Personal Property Belonging to Hayes,*
    943 F.2d 1292 (11th Cir. 1991) .................................................................. 18

**Statutes**

11 U.S.C. § 506 ............................................................................................ 15, 20

**Rules**

FED. R. CIV. P. 56 ............................................................................................ 10

**Other Authorities**

10A CHARLES WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE §
    2728 (3D 1998 & 2010 Suppl.) ................................................................. 10

11 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 56.13 (3d. 2010) ......... 10

3 ALAN N. RESNICK ET AL., COLLIER BANKRUPTCY PRACTICE GUIDE §
    52.14[3], (2010) ..................................................................................... 15, 21

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 356 (1977) ............................... 21

## NATURE AND STAGE OF THE PROCEEDINGS

1.    On August 6, 2007 (the "Petition Date"), the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of the title 11 of the United States Code (the "Bankruptcy Code"). The Debtors have continued in possession of their properties and have continued to operate their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    An official committee of unsecured creditors (the "Committee") was appointed on August 14, 2007. An official committee of borrowers (the "Borrowers Committee") was appointed on October 21, 2008, and disbanded on August 16, 2010. No trustee or examiner has been appointed.

3.    The Debtors filed an Amended Chapter 11 Plan of Liquidation (as amended, supplemented and/or modified, the "Plan") with the Court on November 25, 2008. The Court entered an order confirming the Plan on February 23, 2009 [Docket No. 7042]. The Plan has not yet gone effective.

4.    On September 16, 2010, Park National Bank and Trust of Chicago, the predecessor to North Star Trust Company, as successor-trustee to Park National Bank and Trust Company of Chicago, and legal owner of the Property ("Park National") filed its *Motion by U.S. Bank, N.A. (Park National Bank) for Summary Judgment* [Docket No. 9230] (the "Motion").

5.    The Debtors, by and through their undersigned counsel, hereby submit this answering brief in opposition to the Motion.

## SUMMARY OF THE ARGUMENT[1]

6.    Simply put, Park National has not and cannot establish or demonstrate that no genuine factual issues exist such that it is entitled to judgment as a matter of law. By its Motion,

---

[1]    Capitalized terms in the Summary of the Argument shall have the meanings ascribed to them *infra*.

Park National seeks to have the Court suspend disbelief by ignoring the record in these proceedings and grant summary judgment on a one-sided vision of the evidence. First, Park National would have the Court ignore the fact that every claim it has made concerning the value of the Property is disputed by the Debtors, and disputed with competent evidence. Indeed, the only actual disposition value reflected in the record is the fully informed offer of a buyer that had completed its due diligence on the Property and the foreclosure sale of the Property – the latter being evidence that, despite Park National's recalcitrance during discovery, the Debtors have uncovered.

      7.     In fact, Park National's purported evidence of value – the Debtors' schedules, the Debtors' marketing efforts, and contingent letters of intent later withdrawn by potential buyers – ignores not only the value of the Property, but the condition of the Property itself. As is clear from the Debtors' evidence, the Property suffers from a variety of infirmities that significantly impact the value of the Property, including potential environmental contamination, title defects, and easement issues. Park National would have the Court simply disregard the now known condition of the Property and adopt valuations based on outdated and inaccurate information, speculation and estimation. To do so would be akin to valuing a parcel of real property with an active, but previously unknown, volcano beneath the surface; once the volcano explodes, there is no basis in reality to revert to an earlier valuation of the Property. The damage done, the Property can only be worth what a market participant is willing to pay for it. This is exactly what the Debtors' evidence demonstrates and what the Debtors intend to prove at trial.

      8.     Second, Park National would have the Court ignore section 506 of the Bankruptcy Code in determining, as a matter of law, the date to establish the value of the Property. Section 506 of the Bankruptcy Code does not direct the Court to value the Property as of the Petition

Date, as Park National contends.  Instead, the statute – and the legislative history – unequivocally

states that it is the "purpose" of the valuation and the "proposed use or disposition" of the

Property that drives the valuation analysis.  Using these criteria, the Petition Date cannot be the

date on which to value the Property because the Property was not "disposed" until the Debtors

abandoned it, or, alternatively, when the Property was sold at foreclosure.

9.    Numerous factual disputes exist on the central questions to be resolved at trial,

including, but not limited to, valuation of the Property and the corresponding assessment of

whether Park National is over- or undersecured in relation to the Property.   Furthermore, Park

National's assertion that it is entitled to judgment as a matter of law concerning valuation as of

the Petition Date misreads the structure and purpose of section 506, and therefore is misplaced.

For these reasons, and for the reasons stated below, the Court should reject Park National's

attempt to short-circuit the trial process and deny summary judgment in its entirety.

## RELEVANT BACKGROUND

10.    On August 9, 2005, American Home Mortgage Corp. ("AHM Corp."), one of the

Debtors, made a note (the "Note") in the principal amount of $1,007,000 payable to the order of

Park National.  (*See* Note at 1, attached as Exhibit A to the Affidavit of Andrew A. Lundgren.[2])

11.    The Note is secured by a mortgage (the "Mortgage") made by the Debtors to Park

National dated August 9, 2005, which created a mortgage lien on the real property located at 950

North Elmhurst Road/150 West Rand Road, Mount Prospect, Illinois (the "Property").

(Mortgage, Exhibit B.)

12.    On October 5, 2007, the Debtors each filed their schedules of assets and liabilities

(the "Schedules").  AHM Corp. listed the Property with a value of $1,548,161 in the Schedules.

(*See* American Home Mortgage Corp. Schedules, Schedule A [Docket No. 1350], Exhibit C (in

---

[2]    All references to exhibits, unless otherwise noted, are to the Affidavit of Andrew A. Lundgren.

relevant part only).)  The Schedules expressly stated that "[t]he Debtor reserves the right to

dispute, or to assert offset or defenses to, any claim reflected on the Schedules and/or Statements

as to amount, liability or classification.  The Debtor also reserves all rights with respect to the

values, amounts and characterizations of the assets and liabilities listed in its Schedules and

Statements." (*Id.* at Global Notes to Schedules of Assets and Liabilities and Statement of

Financial Affairs of American Home Mortgage Corp. ("Global Notes to Schedules").)

    13.    The Debtors retained CB Richard Ellis, Inc. ("CBRE") as their real estate broker

to market the Property.  CBRE's retention by the Debtors was approved by entry of an Order

dated March 11, 2008 [Docket No. 3223].  The term of the engagement was subsequently

extended by Order of the Court [Docket No. 6659].  With the assistance of the Debtors, CBRE

developed and executed an extensive campaign to market and sell the Property.

    14.    While CBRE and the Debtors actively marketed and negotiated offers for the sale

of the Property, Park National and the Debtors entered into two loan modification agreements

(the "First Loan Modification Agreement" and "Second Loan Modification Agreement,"

Exhibits D and E, respectively, and collectively referred to hereinafter as the "Loan Modification

Agreements"), each of which, among other things, extended the maturity date under the Note.

Executed on July 28, 2009, the First Loan Modification Agreement extended the maturity date to

February 9, 2009.  The Second Loan Modification Agreement was executed on February 3, 2009

and extended the maturity date to August 9, 2009.  The Second Loan Modification Agreement

also provided that Park National could apply, on an expedited basis, to lift the automatic stay

should an event of default occur.  Throughout this period, AHM Corp. continued to meet its

obligations under the Note.

15.     Despite a full marketing effort, the closest the Debtors came to selling the

Property was an offer they received from The Equitable Funds, LLC ("Equitable Funds") for the

Property and for the assignment of the leases.  After receiving that offer, the Debtors and

Equitable Funds engaged in extensive negotiations concerning the terms and conditions of the

sale.  On April 13, 2009, the Debtors sent a letter of direction to Park National to execute a

purchase agreement.  On April 17, 2009, AHM Corp., Park National and Equitable Funds

executed a purchase agreement (the "Purchase Agreement").  Shortly thereafter, on April 30,

2009, the Debtors filed a motion for authority to sell the Property, subject to a due diligence

period, for $1,315,000 [Docket No. 7335] (the "Sale Motion").

16.     After due diligence was conducted by the Equitable Funds pursuant to the terms

of the Purchase Agreement, Equitable Funds advised the Debtors that it would only proceed with

the sale at a reduced purchase price ██████████████████████████████████████████

████████████ (Silverglade Deposition ("Depo.") at 82:10-13, Exhibit F.)  This reduced

figure was based on, among other things, potential environmental and easement problems that

were unknown until the due diligence process, and reflected Equitable Funds' valuation of the

Property.  (Id. at 79:9 – 82:14.)

17.     The adjusted purchase price, $865,000, was so significantly reduced that, after

deducting certain fees and expenses related to closing (without even taking into consideration the

Section 506(c) Claim) the purchase price was less than the outstanding amount of the Mortgage

on the Property held by Park National.  The Debtors attempted to further negotiate the terms of

the sale with Equitable Funds and instituted a further marketing campaign, but neither effort

produced an offer for the Property that exceeded the amount owed to Park National on the

Mortgage.  Accordingly, the Debtors withdrew the Sale Motion on August 6, 2009 [Docket No. 7903].

18.    Prior to receiving Equitable Funds' offer, the Debtors received other offers to purchase the Property.  These included offers to purchase the Property from John Manglardi for $1,500,000, RN Realty for $1,855,000; and First Chicagoland Properties at $1,600,000. (Martinez Depo. 46:03-21, Exhibit G; Email from J. Grasi to M. Lunn, August 8, 2007, AHM_Mt_Prospect_3509, Exhibit H.)  Unlike the $865,000 offer from the Equitable Funds, however, none of these offers were firm – each was conditional in one or more respects on further due diligence and it appears none were made with knowledge of the issues that caused the Equitable Funds to reduce its offer for the Property.  (Martinez Depo. at 50:3 – 52:22; Letter from J. Manglardi to T. Buenger, July 17, 2008, CBRE139-141, ¶ 4, Exhibit I; Letter from RN Realty to T. Buenger, August 28, 2008, AHM_Mt_Prospect_1648-1653, at 2, Exhibit J.)  In fact, RN Realty eventually renewed its offer in 2009 for less than $950,000 (Martinez Depo. at 53:10-24) and another entity came forward with a $700,000 offer.  (*Id.* 82-83.)

19.    Unable to sell the Property, CBRE conducted an auction for the Property in July 2009.  The Property again failed to sell.  (Email from T. Buenger to J. Berger, August 5, 2009, Equitable385-387, Exhibit K.[3])  Following the auction, the Debtors and Park National engaged in negotiations over how to dispose of the Property.  (Email from J. Aronauer to M. Lunn, July 30, 2009, 5:35 a.m., Exhibit L)  Park National also requested that the Debtors conduct a second sale process.  (Email from J. Aronauer to M. Lunn, July 30, 2009, 3:40 p.m., AHM_Mt_Prospect 2265, Exhibit M.)

---

[3]    Documents produced by Equitable Funds are Bates stamped with numerals only.  For convenience, the prefix "Equitable" is added here and throughout the brief when referring to Equitable Funds' documents.

20.    Under the Second Loan Modification Agreement, the extended maturity date came due in August 2009.  As of August 1, 2009, the Debtors communicated to Park National that they would be unable to pay the balance of the Note.  (Park National Bank, Risk Rate & Accrual Status Change Request, August 26, 2009, PN80, Exhibit N.)  Non-payment of a scheduled payment was an event of default under the Note. (Note at 1.)

21.    On September 28, 2009, Park National initiated this contested matter in the above-captioned cases by filing its *Motion of Park National Bank for Lifting the Automatic Stay, Objecting to Debtor's Use of Cash Collateral, and Requesting Adequate Protection* [Docket No. 8101] (the "Stay Relief Motion"), which sought, among other things, to obtain relief from the automatic stay to foreclose on the Property.

22.    In response and opposition, the Debtors filed *Debtors' (I) Limited Objection to Motion of Park National Bank for Lifting the Automatic Stay, Objecting to Debtor's Use of Cash Collateral, and Requesting Adequate Protection and (II) Request for Allowance and Payment of Section 506(c) Claim, dated October 28, 2009* [Docket No. 8226] (the "Section 506(c) Motion"). The Section 506(c) Motion responded to the Stay Relief Motion and asserted a claim against Park National pursuant to section 506(c) of the Bankruptcy Code.

23.    On November 25, 2009, the Debtors filed a motion seeking authorization to abandon the Property [Docket No. 8340].  The Debtors and Park National thereafter entered into an agreed order [Docket No. 8423] (the "Agreed Order"), entered on December 17, 2009, whereby the Debtors agreed to consent to stay relief and to abandon the Property.  In turn, Park National *expressly agreed*, among other things, that nothing in the Agreed Order would affect any claim that the Debtors may have against Park National or the Property pursuant to section 506(c) of the Bankruptcy Code (the "Section 506(c) Claim").  By allowing Park National to

obtain stay relief and permitting the Debtors to preserve the Section 506(c) Claim, despite

abandoning the Property, the Agreed Order resolved the Stay Relief Motion.  The Court

thereafter entered an Order that abandoned the Property effective as of December 31, 2009

[Docket No. 8413].

24.     On November 20, 2009, Park National filed its *Opposition of Park National Bank*

*to the Motion* [Docket No. 8325] (the "Objection").  On January 7, 2010, the Debtors filed a

reply to the Objection [Docket No. 8480].

25.     By agreement of the parties, on January 12, 2010, the Court held a hearing (the

"Hearing") relating only to the issue of whether section 506(c), as amended, as a matter of law,

entitles the Debtors to reimbursement for amounts expended on account of ad valorem taxes.  At

the Hearing, the Court deferred ruling and directed the parties to confer regarding a discovery

schedule and date to conduct an evidentiary hearing related to the Debtors' claims against Park

National under section 506(c).[4]

26.     Following the Hearing, the parties engaged in discovery.  In August and

September 2010, the Debtors deposed the 30(b)(6) designees of Park National, Equitable Funds,

and CBRE; Park National deposed the 30(b)(6) designee of the Debtors.  Additionally, the

Debtors submitted, under certification of counsel, a proposed scheduling order (the "Scheduling

Order") to the Court.  The Court entered the Scheduling Order on July 22, 2010 [Docket No.

9041].  The Scheduling Order set forth numerous discovery deadlines and provided for a two-

---

[4]     After the hearing, on March 9, 2010, the Debtors filed their *Amended Motion for Recovery of Costs and Expenses Pursuant to 11 U.S.C. § 506(c) from Mount Prospect, Illinois* Property [Docket No. 8665] (the "Amended Motion"), which amended and supplemented the Section 506(c) Motion.  On March 30, 2010, Park National filed its brief in opposition to the Amended Motion [Docket No. 8724].  In order to avoid the unnecessary proliferation of motion papers, and given that the Amended Motion is already fully briefed, the facts and legal arguments recited in the Amended Motion are incorporated herein by reference.

day evidentiary hearing on the Section 506(c) Claim to commence on September 29, 2010, at

9:30 a.m. (the "Trial Date").  (Scheduling Order, ¶ 18.)

27.     As set forth in the subsequent *Debtors' Motion to Compel* (the "Motion to

Compel") [Docket No. 9090], however, Park National's non-expert discovery was incomplete in

numerous material respects, despite repeated requests from the Debtors that Park National

remedy such deficiencies.   Following a hearing on the Motion to Compel, the Court entered an

order granting the Motion to Compel on August 18, 2010 (the "Motion to Compel Order")

[Docket No. 953].  The Motion to Compel Order directed Park National to immediately provide

the Debtors with all outstanding documents the Debtors had requested.  The Court also drew the

adverse inference that Park National "sought to disguise a low value" of the Property when it

failed to provide the Debtors with discovery related to the period following abandonment of the

Property.  Additionally, the Motion to Compel Order awarded the Debtors the costs of

prosecuting the Motion to Compel, including reasonable attorneys' fees.

28.     On September 8, 2010, as a result of Park National's unwillingness to produce

expert-related discovery, the Debtors filed *Debtors' Motion to Exclude Expert Testimony and*

*Report of Steven S. Albert* (the "Motion to Exclude") [Docket No. 9203].  The Motion to Exclude

sought to exclude certain alleged expert testimony proffered by Park National on account of Park

National's ongoing failure to abide by the expert-discovery requirements of Federal Rule of Civil

Procedure 26.  After the Motion to Exclude was filed but before it was decided, the Court

granted the Debtors' request to reschedule the Trial Date during a telephonic status conference

on September 16, 2010.  At the omnibus hearing held on September 23, 2010, the Court entered

an order excluding Park National's expert evidence pursuant to Rules 26 and 37 of the Federal

Rules of Civil Procedure (the "Motion to Exclude Order") [Docket No. 9258].

29.     On September 16, 2010, Park National filed the Motion and an accompanying

memorandum of law [Docket Nos. 9229 & 9230]. This is the Debtors' answering brief in

opposition to the Motion.

## ARGUMENT

I.      STANDARD OF REVIEW

30.     Federal Rule of Civil Procedure 56(c), made applicable to these proceedings by

Bankruptcy Rule 7056, provides that summary judgment can only be rendered "if the pleadings,

the discovery and disclosure materials on file, and any affidavits show that there is no genuine

issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(c). "To prove that no genuine factual issues exist, the movant must present a

factual scenario without any 'unexplained gaps.' " 11 JAMES W. MOORE, MOORE'S FEDERAL

PRACTICE 3D § 56.13[1], at 56-165 to 56-166 (2010). Furthermore, as this Court has recently

stated:

> At the summary judgment stage, the court does not weigh the evidence and
> determine the truth of the matter; rather, the court determines whether there is a
> genuine issue for trial. A material fact is one which could alter the outcome of the
> case. It is genuine when it is 'triable,' that is, when reasonable minds could
> disagree on the result.

*In re Lovesac Corp.*, 422 B.R. 478, 482 (Bankr. D. Del. 2010) (citations and internal quotation

marks omitted) (denying motion for summary judgment).

31.     "Importantly, all reasonable inferences must be drawn in favor of the nonmoving

party and any doubt must be read in favor of the nonmovant." *In re U.S. Wireless Corp.*, 386

B.R. 556, 560 (Bankr. D. Del. 2008) (internal citations omitted). Thus, "once [the Court]

determines that a triable issue exists the inquiry is at an end and summary judgment must be

denied." 10A CHARLES WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 2728,

at 524 (1998 & 2010 Suppl.).

32.     Under these principles, Park National has not met its burden to demonstrate that

no genuine factual issues exist or that it is entitled to judgment as a matter of law.  Specifically,

in the Motion, Park National recites several "points" that it claims warrant short-circuiting the

trial process:

> *Point I.*  The expenses the Debtors incurred do not provide a benefit to Park
> National because they are unreasonable and unnecessary to preserve and dispose
> of the Property, Park National is oversecured, and the Debtors were already
> obligated to pay taxes on the Property.  (Motion at 9-14.)
>
> *Point II.*  Park National was oversecured through at least May 19, 2009, and all
> expenses the Debtors incurred through that date are therefore unreasonable,
> unnecessary, and of no benefit to Park National.  (Motion at 14-18.)
>
> *Point III.*  Certain rental income received by the Debtors constitutes the cash
> collateral of Park National, and thus should be credited against any expense
> surcharge to avoid a "double recovery."  (Motion at 18-19.)
>
> *Point IV.*  The Debtors' entitlement to reimbursement for $20,000 in payments
> made to insure the Property is based on "speculation."  (Motion at 19-20.)

Based on the record, however, none of these conclusory statements are supported by the

evidence.  In fact, the evidence specifically contradicts each of the foregoing points.  In addition,

Park National's assertion that the Court should value the Property as of the Petition Date is

incorrect as a matter of law.  Accordingly, summary judgment should be denied.

II.     SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE THERE ARE NUMEROUS
        GENUINE ISSUES OF MATERIAL FACT IN DISPUTE

33.     Park National ignores that nearly every material fact at issue is in dispute.  All the

facts the Debtors elicited in discovery – evidence of valuation, over- and undersecured status,

expenses, insurance, among others – are conveniently overlooked or only mentioned in passing.

As demonstrated below, the Debtors' evidence illustrates the numerous competing disputes that

cannot be decided on summary judgment and can only be resolved at trial.

A.    *The Debtors' Evidence Establishes that the Expenses Paid Were Reasonable, Necessary, and Benefitted Park National as an Undersecured Creditor*

34.    First, contrary to Park National's assertion in Point I, the numerous expenses incurred by the Debtors were reasonable and necessary to preserve and dispose of the Property and, as a result, directly benefitted Park National. Mr. Body testified at his deposition that the expenses the Debtors paid were necessary and reasonable. For example, on the subject of insurance, Mr. Body admitted that insurance "protects the bank's collateral." (Body Depo. at 43:8, Exhibit O.) Mr. Body further noted that for some properties insurance "may be the only source of payment, and we need to insure [property] in case there was any damage to the property or anything that would diminish the value of that property." (*Id.* at 41:12-16.)

35.    Mr. Body also testified that when Park National decides whether to commence a foreclosure on a property, the bank includes in its estimated costs of sale certain "carrying costs." (Body Depo. at 40:10.) These carrying costs "could be anything," including utilities, real estate taxes, and insurance, according to Mr. Body. (*Id.* at 40:12-18.) Additionally, "[t]here may be some general maintenance of the property. There may be some minor repairs of the property." (*Id.* at 45:2-4.) When a receiver is appointed for a property, moreover, Park National reimburses the property's receiver for expenses of this type. (*Id.* at 45:5 – 48:5.) Thus, according to Park National's own witness, the expenses the Debtors paid were reasonable and necessary to preserving the Property.

36.    The expenses the Debtors paid also directly benefitted Park National because Park National was, contrary to Park National's assertions, undersecured. At his deposition, Mr. Silverglade testified that Equitable Funds ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ (Silverglade Depo. 82:10-13.) Equitable Funds arrived at this figure only after performing its due diligence and discovering the significant potential environmental, easement, and title

concerns surrounding the Property. (*Id.* at 75:06-07; *id.* at 82:06-11.) RN Realty, another

potential buyer, similarly backed out of a deal to purchase the Property when it recognized these

same issues. (Martinez Depo. 53:24-54:06.) An auction in July 2009 similarly brought no

bidders. (Martinez Depo. 122:10-16.) The 2010 foreclosure, auction, and sale, moreover,

resulted in the receipt of only a single (credit) bid of $978,790.80, which bid was from Park

National. (Park National Bank, Transfer to REO Form, July 21, 2010, PN624-25, Exhibit P (the

"Transfer to REO Form").) These pieces of evidence, illustrating what a buyer would actually

pay for the Property, are all indicators of value – and Park National's status as an undersecured

creditor. *See, e.g., In re Am. Home Mortg. Holdings, Inc.*, 411 B.R. 181, 192 (Bankr. D. Del.

2009) ("Every valuation methodology has as its goal the determination of value, which, by

definition, means *the sale price of the asset*.") (emphasis added).[5]

     37.    Putting aside the fact that the Motion only mentions this evidence in passing, if at

all, Park National's asserted evidence of value – the Debtors' Schedules, the Debtors' marketing,

and the initial bids of potential buyers – all fail to account for these indicia of market value. The

Debtors' Schedules, for example, do not somehow elevate an estimate of value to unrebuttable

judicial admission for purposes of section 506(c). As is clear from the Schedules, any statement

about value by the Debtors is subject to revision as new information becomes available. (*See*

Global Notes to Schedules.) The Debtors, moreover, filed the Schedules in 2007, nearly two

years before the true conditions of the Property – and hence true market value – became known.

---

[5]    Benefit may also be demonstrated by consent. By encouraging the Debtors to market the Property for years
after the Petition Date, Park National is hard-pressed to argue, in hindsight, that the Debtors' preservation of the
Property as a going concern conferred no benefit on Park National. *See, e.g., In re Orfa Corp.*, 170 B.R. 257, 273
(E.D. Pa. 1994) ("It would be an odd result indeed if the Bank were able to avoid liability for services related to the
preservation or disposal of its collateral to which it specifically gave its consent on the ground that such services
were not reasonable and necessary."); *United States v. Boatmen's First Nat'l Bank*, 5 F.3d 1157, 1160 (8th Cir.
1993) ("We . . . hold that when a secured creditor agrees to the preservation of the debtor business as a going
concern and that preservation requires the payment of payroll taxes, any unpaid post-petition taxes may be charged
to the secured collateral, together with any interest and penalties, pursuant to section 506(c) of the Bankruptcy
Code."), *overruled on other grounds, In re Hen House Interstate, Inc.*, 177 F.3d 719 (8th Cir. 1999).

(*See, e.g.*, The Equitable Funds, Internal Due Diligence Memo, May 11, 2009,

AHM_Mt_Prospect3174-3178, Exhibit Q; Letter from M. Seiler to Zolfo Cooper, May 19, 2009,

AHM_Mt_Prospect3172-3173, Exhibit R ("Needless to say, the value of the Property is

materially affected by the matters described in the Memo . . . .").) The price at which the

Debtors marketed the Property and the initial bids reflected in buyers' letter of intent are equally

unpersuasive indicators of value. As Mr. Buenger testified, CBRE believed the actual value

"was at a lower price" when it listed the Property for sale, not $2.4 million. (Buenger Depo. at

24:19-22, Exhibit S.) This makes logical sense; a seller would not list a deflated offering price.

Equitable Funds and RN Realty's letters of intent are similarly only inchoate expressions of

value; the offering prices were subject to the buyer thoroughly evaluating the true condition of

the Property. (*See* The Equitable Funds, Letter of Intent, November 20, 2008, Equitable112-113,

Exhibit T ("If Purchaser, in its sole opinion, is not satisfied with the results of its due diligence,

Purchase may terminate . . . ."); Silverglade Depo. 148:03-11 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

38.    Finally, Park National's assertion that the Debtors cannot recover a surcharge for

ad valorem property taxes because they were in possession of the Property and obligated to pay

the taxes under the Mortgage ignores the factual disputes set forth above. The Debtors' evidence

of the Property's value and Park National's undersecured status, along with the adverse inference

the Court has drawn that Park National withheld discovery materials in order to disguise a low

value of the Property, all demonstrate the viability of the Debtors' ability to recover ad valorem

taxes it paid to preserve the Property.[6]

---

[6]    Park National's assertions concerning possession are nonsensical. Said differently, a debtor would not
likely spend limited estate resources and funds to preserve and maintain property in which it had no possession or

39.     As asserted in the Debtors' Amended 506(c) Motion, nothing in the statute or the case law indicates otherwise. *See* Amended 506(c) Motion at 7-10 (discussing case law allowing recovery of ad valorem taxes); *see also* 11 U.S.C. § 506(c) (affirmatively stating that "the payment of all ad valorem property taxes with respect to the property" may be recovered); *In re AFCO Enterprises, Inc.*, 35 B.R. 512 (Bankr. D. Utah 1983) (all expenses associated with running a resort were recoverable under Section 506(c) because paying such expenses preserved going concern value of the resort, which benefited the secured creditor); 3 ALAN N. RESNICK ET AL., COLLIER BANKRUPTCY PRACTICE GUIDE § 52.14[3], at 52-36 (2010) ("Reasonable and necessary costs and expenses of preserving or disposing of collateral will almost surely include . . . (4) as added by the 2005 Amendments, property taxes.").[7]

40.     Ultimately, the parties' conflicting estimates of value underlay all other inquiries into reasonableness, necessity, and benefit.  Given these disparities in the evidence, summary judgment is inappropriate. *See, e.g.*, *Caldwell v. Olshan Found. Repair Co.*, 2007 U.S. Dist. LEXIS 24590, at *9 (E.D. Ky. Apr. 2, 2007) (holding that "opposing estimates regarding the diminution in fair market value create a question of fact for the jury and are not appropriate for summary judgment.").

---

control.  If possession of property were the benchmark for disqualifying surcharges under section 506(c), it would render section 506(c) meaningless.

[7]     The cases that Park National cites are inopposite. *In re Consolidated Cotton Gin Co.*, 347 B.R. 572, 580 (Bankr. N.D. Tex. 2006), was not decided under the current iteration of Section 506(c) (which explicitly allows the recovery of ad valorem taxes) and therefore its statements about taxes are, at best, dicta. *U.S. v. Parmele*, 171 B.R. 895, 901 (N.D. Okla. 1994) and *In re Bellman Farms, Inc.*, 86 B.R. 1016, 1021 (Bankr. S.D. 1988) are equally unavailing. Each, in addition to being decided before the 2005 Amendments, simply recite that the recovery of a surcharge for ad valorem taxes is not automatic. Whether the Debtors are entitled, under the new version of Section 506(c) and Third Circuit precedent, to recover and to what extent, are precisely questions answerable only at a trial. *Cf. In re Dawes*, 2008 Bankr. LEXIS 3915, at *19 (Bankr. D. Kan. Oct. 29, 2008) ("[I]n cases posing complex issues of fact and unsettled questions of law, sound judicial administration dictates that the court withhold judgment until the whole factual structure stands upon a solid foundation of a plenary trial where the proof can be developed, questions answered, issues clearly focused and facts definitively found.") (citation omitted).

B.      *The Debtors' Evidence Establishes that Park National was Undersecured On the Dates the Debtors Paid the Expenses to be Surcharged*

41.     In Point II, Park National alternatively asserts that the Court should enter summary judgment in its favor based on the claim that it was allegedly oversecured on each date the Debtors paid a surcharged expense. This argument cannot succeed for the same reason Park National's claims about reasonableness, necessity, and benefit fail; Park National was undersecured at each point in time the Debtors paid such expenses.

42.     As demonstrated above, the Property cannot be valued by reference to Schedules, buyers' letters of intent, or the outset of the marketing process. Each of these simply reflects an estimate of value, and is unsupported by either actual due diligence or evidence of a sale or other exchange. Yet, Park National relies on listing prices, the Debtors' Schedules, initial offers subject to multiple contingencies, and other "indicators" of value that, in Park National's mind, definitively establish the value of the Property. (*See* Motion at 16.) As noted above, the Debtors' evidence belies that assertion, and establishes the value of the Property at no more than $865,000.

43.     In an effort to escape this evidence, Park National lastly claims that, even if the Court were to adopt a value of $865,000, Park National would still be oversecured through May 19, 2009, the date of Equitable Funds' revised offer, and thus entitled to summary judgment for all expenses up to that date. (Motion at 18, citing Body Depo. Ex. 106 (amount due under Note as of May 13, 2009 was $845,503.47).) This argument, even if true, entirely overlooks the fact that such an oversecurity – less than $20,000 – would only reduce, rather than eliminate, any surcharge. (*In re American Home Mortgage Holdings, Inc.*, Transcript of Proceedings, January 12, 2010 ("Hearing Tr.") at 35:16-22, Exhibit U.) At bottom, this inquiry is fact-intensive, and

can only be resolved following the presentation of evidence and witnesses at trial. As a result, Point II offers no rationale for granting summary judgment.

C.     *The Debtors' Evidence Establishes that Park National is Not Entitled to a Credit for Rents Collected*

44.     Park National next asserts in Point III that it is entitled to a credit for all rents collected by the Debtors from the Property because, without recognizing this credit, "the Debtors would obtain a double recovery since they would obtain reimbursement for expenses paid with Park National's own cash collateral." (Motion at 19.) This assertion is false and illogical.

45.     First, if Park National were permitted to secure a credit for all rent payments received by the Debtors from the Property, the double recovery would run to Park National, not the Debtors. Because the Debtors made the monthly payments to Park National under the Mortgage and Note, any credits for rents received would be in addition to those mortgage payments. Park National cites no principle by which a secured creditor is entitled to both rent received *and* separate payments of principal and interest on the underlying note.

46.     Second, even if the Court were to credit Park National with a portion of the rent payments, such credit could only be recognized, by the terms of the Mortgage, following an event of default. (*See* Mortgage at 9.) As Park National itself has recognized, this event occurred on August 1, 2009. (Stay Relief Motion at 4, ¶ 9.) This would, at best, entitle Park National to a credit for rents received for the five months leading up to the Debtors' abandonment of the Property in December 2009. All of these facts are ignored in the Motion.

47.     Third, Park National's principal case does not stand for the proposition that the failure to credit a secured lender for rents received constitutes a "double recovery" for the debtor. (*See* Motion at 19, citing *In re Mall One Assocs., L.P.*, 185 B.R. 981 (E.D. Pa. 1995).) In *Mall One*, unlike here, the debtor and certain creditors entered into "cash collateral stipulations," one

of which provided for the payment of certain expenses from the debtor's rents.  In the Motion,

Park National literally omits this fact in its block quotation, which is reproduced below with the

excised material in italics:

> As the cash collateral Stipulations manifest, the expenses in issue were expressly
> permitted to be paid from the cash collateral of the Creditors in the Debtor's
> rents.  In essence, the Creditors advanced their own collateral to the Debtor one
> time to allow the Debtor to remain in business.  The Creditors cannot be called on
> to make these same advances from their security interests in the rents a second
> time.  There is no evidence that the Creditors gave their written consent to any
> modifications to the Stipulations, as was required by the Stipulations with respect
> to any use of their cash collateral not expressly authorized thereby.  The expenses
> requested were therefore already paid out of the Creditors' cash collateral in rents
> . . . .

*Id.* at 990.  Because there is no such agreement among the parties here that would create the type

of double recovery discussed in *Mall One*, Park National's reliance on the case is misplaced.

48.      The extent to which Park National's security interest extends to the rents the

Debtors collected, when they could be considered cash collateral under the Mortgage, and, if so,

any resulting offset, are all dependent on underlying issues of fact.  These issues, in turn, are

most appropriately resolved at trial.  *See United States v. Certain Real & Personal Property*

*Belonging to Hayes*, 943 F.2d 1292, 1297 (11th Cir. 1991) (noting that trial courts may "deny

summary judgment in a case where there is reason to believe that the better course would be to

proceed to a full trial.") (citations omitted).

D.      *The Debtors' Evidences Establishes the Sufficiency of the Claim for Insurance*
        *Proceeds*

49.      Finally, in Point IV, Park National contends that the Debtors' claim for

reimbursement of certain premiums paid to keep the Property insured is based on "speculation"

and is derived from "charges for insurance on other properties."  (Motion at 19-20.)  Park

National is wrong.  As demonstrated by the invoices in the record and the testimony of Mr.

Martinez, the Debtors' claim for reimbursement of insurance premiums is established.

50.    Concerning the invoices, Park National cannot credibly argue that the amount of

insurance paid on the Property is unknown simply because the Debtors' insured more than one

property on their policy.  (*See* Park National Deposition Exhibit 14, Exhibit G: Insurance

Invoice, Exhibit V (the "Insurance Invoices")  As shown in the Amended Motion, the Debtors

paid *in excess of* $20,000 in insurance premiums during the period August 2007-August 2010.

(Amended Motion at 11, n.4.)  Rather than seek to recoup the entirety of the insurance paid, the

Debtors are simply seeking to recover a reasonable and supportable portion of the expenses

incurred to make certain that the Property remained insured.

51.    Mr. Martinez's deposition testimony indicates nothing to the contrary.  Mr.

Martinez stated that, because the Property was insured alongside other properties under one

policy for 2007-2008 and 2008-2009, he could not itemize the insurance costs associated with

the Property for those years without looking to the 2009-2010 invoice that *was* itemized.

(Martinez Depo. at 109:08-12; Insurance Invoices at 1.)  Thus, to arrive at a reasonable figure,

Mr. Martinez calculated the insurance expenses for the two previous policy years by reference to

the 2009-2010 itemization of $7,453.  (Martinez Depo. 108:09-10; Insurance Invoices at 1)

Making such a calculation is not "speculation," nor is it based on "charges for insurance on other

properties."  Because the record adequately shows that the Debtors incurred costs associated with

insuring the Property, Park National is not entitled to summary judgment on the Debtors' request

for reimbursement of insurance expenses.

III.   SUMMARY JUDGMENT IS INAPPROPRIATE BECAUSE PARK NATIONAL HAS
       FAILED TO DEMONSTRATE THAT IT IS ENTITLED TO JUDGMENT AS A
       MATTER OF LAW

A.    *The Petition Date is the Incorrect Date on Which to Value the Property*

52.    In addition to ignoring the factual disputes among the parties concerning the core

questions of value and undersecured status, Park National erroneously asserts that it is entitled to

a judgment as a matter of law that the Property should be valued, for purposes of section 506(c),

on the Petition Date.  Such an assertion, which ignores both the structure and function of section

506 as a whole and the factual circumstances of these proceedings, is incorrect.  In fact, the

evidence demonstrates that the Property should instead be valued on the date of disposition –

either the December 31, 2009, abandonment or the May 24, 2010, foreclosure sale.  Accordingly,

Park National cannot show that it is entitled to summary judgment.

53.    Section 506(c) of the Bankruptcy Code directs that "[t]he trustee may recover

from property securing an allowed secured claim the reasonable, necessary costs and expenses of

preserving, or disposing of, such property to the extent of any benefit to the holder of such claim,

including the payment of all ad valorem property taxes with respect to the property."  11 U.S.C.

§ 506(c).  Section 506(a), in turn, explains that the value of a "creditor's interest in the estate's

interest"[8] in the property "shall be determined in light of the purpose of the valuation and of the

proposed disposition or use of such property, and in conjunction with any hearing on such

disposition or use . . . ."  *Id.* § 506(a)(1).  According to the legislative history, Congress did not

intend there to be a single point at which a section 506 valuation is made.  Rather, "[c]ourts will

have to determine value on a case-by-case basis, taking into account the facts of each case and

---

[8]    The extent of Park National's interest in the Debtors' interest in the Property is co-extensive by virtue of
the Mortgage held by Park National.  Therefore, any valuation of the Property will necessarily be a valuation of Park
National's secured claim.

the competing interests in the case." H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 356 (1977).

This variability is embodied in the case law that has developed since the statute's enactment.

*See, e.g.,* 3 COLLIER BANKRUPTCY PRACTICE GUIDE at § 52.08, at 52-25 ("[W]ere there an

overall theme from the body of cases, it would be that courts have broad discretion in choosing

valuation dates – and they have used it.").[9]

      54.     Pursuant to this framework, the proper date of valuation cannot be the Petition

Date because selecting such a date contravenes both the "purpose" of the valuation and the

"proposed disposition or use" of the Property. First, the purpose of the valuation in these

proceedings is to determine, for use in calculating a section 506(c) surcharge, whether Park

National is over- or undersecured in relation to the Property. (Hearing Tr. 35:16-22.) As

explained in Section II, none of the evidence that Park National relies on – Schedules, letters of

intent, and marketing materials – indicate value on a fully informed basis. Instead, the only

reliable indicia of value are what a market participant with complete information was willing to

pay for the Property or the proceeds from an actual disposition of the Property (here, a

foreclosure). (Silverglade Depo. 82:10-13 ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓) Both of these "dispositions" of the Property occurred well after the Petition Date.

---

[9]     Indeed, the statutory directive is demonstrated by the divergent approaches courts may take to establish value based on the particular proceedings at issue. As one commentator has noted:

> [T]he amount of a single item of property may be valued in different ways depending on the context of the valuation. At the outset of a case, the secured claim might be fixed at one amount in connection with a request for adequate protection or relief from stay. Later on, it might be fixed at another amount in connection with a determination of whether the creditor is adequately protected if a senior or equal lien is granted to a postpetition lender pursuant to section 364(d). Later still, the claim might be fixed at yet another amount in connection with a proposed disposition of the collateral, and at still another amount for purposes of a plan.

4 COLLIER ON BANKRUPTCY § 506.03[7][g], at 506-85. The case law agrees. *See, e.g., In re Scott*, 248 B.R. 786 (Bankr. N.D. Ill. 2000) (fixing valuation date as of effective date of plan); *In re Schreiber*, 163 B.R. 327 (Bankr. N.D. Ill. 1994) (holding that conclusively fixing the value of collateral as of the petition date would disregard the language of section 506(a)); *In re Kain*, 86 B.R. 506 (Bankr. W.D. Mich. 1988) (fixing valuation date as of date that adequate protection sought by secured creditor); *In re Parker*, 148 B.R. 604 (Bankr. D. Idaho 1992) (fixing valuation on date in close proximity to confirmation date).

Accordingly, in order to ascertain the market or actual value of the Property – the purpose of the valuation – the Court must look beyond the Petition Date.

55.    Second, the "proposed disposition or use" of the Property is two-fold: (1) following the Petition Date, the Debtors actively marketed the Property and, when the environmental and other problems, which were unknown as of the Petition Date, surfaced that impacted the Property's actual value, the Debtors eventually disposed of the Property by abandoning it; and (2) once abandoned, Park National itself disposed of the Property through a foreclosure sale.  All of these actions – marketing, abandonment, and foreclosure sale – indicate that the proposed disposition or use was to sell or otherwise dispose of the Property in order to satisfy the Mortgage and Note.  None of them have a connection to the Petition Date that would warrant or justify valuing the Property as of that point in time.

56.    Indeed, Park National provides no rationale at all for selecting the Petition Date for purposes of valuation.  For example, Park National insists in the Motion that the Debtors "wasted four months" in 2008 negotiating a contract of sale with RN Realty and that they later "gambled that they could sell the Mortgaged Property for even more money" by marketing the Property through CBRE.  (Motion at 4, 6.)  Nothing could be further from the truth.  From soon after the Petition Date in August 2007 to the date of abandonment in December 2009, the Debtors engaged in an extensive marketing process with Park National's knowledge and consent.  (*See* Body Depo. 170:09-14 (stating that Park National had "no concerns" about the Debtors being able to sell the Property); *id.* at 126:12-21 (testifying that Mr. Body received status updates on the marketing of the Property from CBRE and relayed such information to Park National's loan committee).)  Put differently, instead of "gambling" with the real estate market, the Debtors pursued the sale route with Park National's blessing.  The evidence shows that Park National was

well-informed of the marketing and sale process and approved the extensions of the Note's maturity date. (Body Depo. 167:2-8 ("[T]he decision to extend was made basically, to the best of my recollections, for two reasons. Number one, American Home was still making the payments as they had promised to make, and, number two, [to] give them time to sell the property and pay us off and they could walk away with some money."); Emails from J. Aronauer to K. Enos, June 20, 2008 and October 25, 2007, AHM_Mt_Prospect_2295-2296, Exhibit W (stating that Park National would like to discuss "plans for the property" and reaching out to the Debtors concerning the first maturity date); *see also* First Loan Modification Agreement; Second Loan Modification Agreement.) In fact, the Debtors continued to service the debt until August 2009 and it was not until the end of September 2009 that Park National actually sought stay relief to foreclose, over two years after the Petition Date. Finally, even today, months after the foreclosure sale, Park National still has been unable to sell the Property. (Body Depo. 224:06-14.) For Park National to now say that the Debtors somehow stalled the process for their own purposes is disingenuous at best.[10]

57.    Park National's principal cases, moreover, do not stand for the proposition that the date of determining whether a creditor is over- or undersecured is the Petition Date. (*See* Motion at 11.) In the first case, *In re Compton Impressions*, the debtor was in default as of the petition date. 217 F.3d 1256, 1259 (9th Cir. 2000). The Ninth Circuit therefore used the petition date to value the underlying property at issue, noting that the secured creditors "could have sought relief from the automatic stay to begin foreclosure" as of that date. *Id.* Here, Park

---

[10]    Park National's assertions are especially egregious given the fact that, up until the date of abandonment, the Debtors worked with Park National to grant the stay relief it sought in exchange for preserving the Debtors' ability to recover a section 506(c) surcharge. (*See, e.g.*, Agreed Order; Body Depo. 139:18-140:03 (admitting that Park National's main strategy to maximize their recovery from 2007 to date has been to "hope" that the Debtors sold the Property).) While Park National did not expressly consent to allow a specific amount or type of claim in the stay relief negotiations, its efforts to accommodate the Debtors for such expenses they incurred while trying to sell the Property is flatly inconsistent with Park National's unreasonable position today. (*See, e.g.*, Body Depo. 128:21-129:10 (admitting that it was Park National that initiated discussions about extending the maturity date).)

National could not have done the same, as Park National extended the maturity date to August 2009, and the Debtors continued to make payments on the Note up to that time.

58.     *In re Glen Eden Hospital, Inc.*, 202 B.R. 589, 1995 Bankr. LEXIS 2130 (Bankr. E.D. Mich. Aug. 15, 1995), and *D&M Land Co., LLC v. BB&T Co.*, 431 B.R. 133 (E.D.N.C. 2010), the other two cases relied on by Park National, are equally inapposite.  In *Glen Eden*, the Michigan court looked to the petition date because the value of the collateral at issue, accounts receivable, was known as of that date.  1995 Bankr. LEXIS 2130 at *3.  Unlike here, where the collateral is real property that was disposed of years after the petition date, the *Glen Eden* court had no statutory need to look beyond the date of the bankruptcy filing to determine value.  In *D&M Land*, the North Carolina court affirmatively stated that the secured creditor was undersecured following an auction of real property that brought less than the amount of the underlying note.  431 B.R. at 135 ("BB&T eventually purchased the Realty at auction for $4.2 million.  Because D&M's sole asset was the Realty, this sale left BB&T under-secured.").  Although the court eventually denied the section 506(c) claim, it did so in large part because the secured creditor "could have satisfied its lien through an immediate foreclosure" as of the petition date.  *Id.* at 138.  As noted above, Park National had no such option here.

B.     *The Evidence Instead Supports the Proposition that the Property Should be Valued as of the Date of Disposition*

59.     The evidence in the record demonstrates that the date of valuation should be the date on which the Property was disposed, either through abandonment or the later foreclosure sale.  The only offer to purchase the Property that was not contingent on further due diligence was made with full knowledge of the potential problems at the site that was contemporaneous with the abandonment in December 2009 came from Equitable Funds.  (*See* Email from J. Berger to T. Buenger, August 4, 2009, Equitable77, Exhibit X ▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰▰)

████████████████  Moreover, the foreclosure sale in early 2010 itself brought a single

credit bid, from Park National, for approximately $978,000.  (*See* Transfer to REO Form.)

During these two periods of disposition, the value of the Property is definitively known.

60.    Determining value based on these time periods thus fulfills the requirements of

Section 506(a) that the Court look to both the purpose of the valuation and the proposed

disposition of the collateral.  Relying on the Petition Date, as Park National asserts, does not.

Accordingly, Park National is not entitled to judgment as a matter of law and summary judgment

should be denied.

## CONCLUSION

For the foregoing reasons, the Debtors respectfully request that the *Motion by U.S. Bank,*

*N.A. (F/K/A Park National Bank) for Summary Judgment* [Docket No. 9229] be denied in its

entirety.

Dated: Wilmington, Delaware  
      September 30, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Andrew A. Lundgren*

_____

Sean M. Beach (No. 4070)  
Matthew B. Lunn (No. 4119)  
Sharon M. Zieg (No. 4196)  
Andrew A. Lundgren (No. 4429)  
Justin Rucki (No. 5304)  
The Brandywine Building  
1000 West Street, 17th Floor  
P.O. Box 391  
Wilmington, Delaware 19899-0391  
Telephone:  (302) 571-6600  
Facsimile:  (302) 571-1253

*Counsel to Debtors and Debtors in Possession*