## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, *et al.*, | Case No. 07-11047 (CSS) |
| Debtors. | Jointly Administered |

## AFFIDAVIT OF ANDREW A. LUNDGREN

Andrew A. Lundgren, being duly sworn, deposes and says:

1.     I am an attorney at the law firm of Young Conaway Stargatt & Taylor, LLP, attorneys for the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"). I submit this Affidavit to introduce certain exhibits in connection with and in support of the *Debtors' Answering Brief in Opposition to Motion by U.S. Bank, N.A. (f/k/a Park National Bank) for Summary Judgment* (the "Answering Brief").

2.     Annexed hereto as Exhibit A are true and complete copies of the August 9, 2005, note (the "Note") in the principal amount of $1,007,000 payable to the order of Park National Bank and Trust of Chicago, the predecessor to North Star Trust Company, as successor-trustee to Park National Bank and Trust Company of Chicago, and legal owner of the Property ("Park National").

3.     Annexed hereto as Exhibit B are true and complete copies of the mortgage made by the Debtors to Park National dated August 9, 2005, which created a mortgage lien on the real property located at 950 North Elmhurst Road/150 West Rand Road, Mount Prospect, Illinois.

4.      Annexed hereto as Exhibit C are true and complete copies of the Debtors' schedules of assets and liabilities (the "Schedules"), which were previously filed with the Court on October 5, 2007.

5.      Annexed hereto as Exhibit D are true and complete copies of a first loan modification agreement that was executed on July 28, 2009.

6.      Annexed hereto as Exhibit E are true and complete copies of a second loan modification agreement that was executed on February 3, 2009.

7.      Annexed hereto as Exhibit F are true and complete copies of excerpts from the deposition of Joshua Silverglade, taken August 19, 2010.

8.      Annexed hereto as Exhibit G are true and complete copies of excerpts from the deposition of Scott Martinez, taken August 12, 2010.

9.      Annexed hereto as Exhibit H is a true and complete copy of an email from J. Grasi to M. Lunn, dated August 8, 2007, and Bates stamped AHM_Mt_Prospect_3509.

10.     Annexed hereto as Exhibit I is a true and complete copy of a letter from J. Manglardi to T. Buenger, dated July 17, 2008, and Bates stamped CBRE139-141.

11.     Annexed hereto as Exhibit J is a true and complete copy of a letter from RN Realty to T. Buenger, dated August 28, 2008, and Bates stamped AHM_Mt_Prospect_1648-1653.

12.     Annexed hereto as Exhibit K is a true and complete copy of an email from T. Buenger to J. Berger, dated August 5, 2009, and Bates stamped Equitable385-387.[1]

13.     Annexed hereto as Exhibit L is a true and complete copy of an email from J. Aronauer to M. Lunn, dated July 30, 2009, and sent at 5:35 a.m.

---

[1]     Documents produced by Equitable Funds are Bates stamped with numerals only. For convenience, the prefix "Equitable" is added here and throughout this affidavit when referring to Equitable Funds' documents.

14.     Annexed hereto as Exhibit M is a true and complete copy of an email from J. Aronauer to M. Lunn, dated July 30, 2009, and Bates stamped AHM_Mt_Prospect2265.

15.     Annexed hereto as Exhibit N is a true and complete copy of Park National Bank's Risk Rate & Accrual Status Change Request, dated August 26, 2009, and Bates stamped PN80.

16.     Annexed hereto as Exhibit O are true and complete copies of excerpts from the deposition of Frederick Body, taken September 1, 2010.

17.     Annexed hereto as Exhibit P is a true and complete copy of Park National Bank's Transfer to REO Form, dated July 21, 2010, and Bates stamped PN624-25.

18.     Annexed hereto as Exhibit Q is a true and complete copy of The Equitable Funds' Internal Due Diligence Memo, dated May 11, 2009, and Bates stamped AHM_Mt_Prospect 3174-3178.

19.     Annexed hereto as Exhibit R is a true and complete copy of a letter from M. Seiler to Zolfo Cooper, dated May 19, 2009, and Bates stamped AHM_Mt_Prospect3172-3173.

20.     Annexed hereto as Exhibit S are true and complete copies of excerpts from the deposition of Ted Buenger, taken September 2, 2010.

21.     Annexed hereto as Exhibit T is a true and complete copy of The Equitable Funds' Letter of Intent, dated November 20, 2008, and Bates stamped Equitable112-113.

22.     Annexed hereto as Exhibit U are true and complete copies of excerpts from the hearing held before this Court on January 12, 2010, regarding this contested matter.

23.     Annexed hereto as Exhibit V is a true and complete copy of Park National Deposition Exhibit 14, Exhibit G: Insurance Invoice.

24.     Annexed hereto as Exhibit W is a true and complete copy of certain emails from

J. Aronauer to K. Enos, dated June 20, 2008 and October 25, 2007, and Bates stamped

AHM_Mt_Prospect_2295-2296.

25.     Annexed hereto as Exhibit X is a true and complete copy of an email from J.

Berger to T. Buenger, dated August 4, 2009, and Bates stamped Equitable77.

Sworn to before me this
30th day of September, 2010

_____
NOTARY PUBLIC

DEBBIE ELLEN LASKIN
NOTARY PUBLIC
STATE OF DELAWARE
My commission expires Dec. 21, 2012

_____
ANDREW A. LUNDGREN

# EXHIBIT A

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,007,000.00 | 08-09-2005 | 05-09-2008 | 100562? | 92 | | GP | |

References in the shaded area are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** American Home Mortgage Corp. (TIN: 13-3461558)
538 Broadhollow Rd.
Melville, NY  11747

**Lender:** Park National Bank and Trust of Chicago
2958 North Milwaukee Avenue
Chicago, IL  60618
(773) 384-3400

**Principal Amount: $1,007,000.00**                                        Date of Note: August 9, 2005

**PROMISE TO PAY.** American Home Mortgage Corp. ("Borrower") promises to pay to Park National Bank and Trust of Chicago ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million Seven Thousand & 00/100 Dollars ($1,007,000.00), together with interest on the unpaid principal balance from August 9, 2005, until paid in full.

**PAYMENT.** Borrower will pay this loan in accordance with the following payment schedule:  36 monthly consecutive principal and interest payments of $9,202.49 each, beginning September 1, 2005, with interest calculated on the unpaid principal balances at an interest rate of 7.180% per annum; and one principal and interest payment of $882,567.92 on August 9, 2008, with interest calculated on the unpaid principal balances at an interest rate of 7.180% per annum.  This estimated final payment is based on the assumption that all payments will be made exactly as scheduled; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any unpaid collection costs; and then to any late charges.  The annual interest rate for this Note is computed on a 365/360 basis; that is, by applying the ratio of the annual interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**TAX AND INSURANCE RESERVES.** Borrower agrees to establish a reserve account to be retained from the loans proceeds in such amount deemed to be sufficient by Lender and shall pay monthly into that reserve account an amount equivalent to 1/12 of the annual real estate taxes and insurance premiums, as estimated by Lender, so as to provide sufficient funds for the payment of each year's taxes and insurance premiums one month prior to the date the taxes and insurance premiums become delinquent.  Borrower shall further pay a monthly pro-rata share of all assessments and other charges which may accrue against the Property.  If the amount so estimated and paid shall prove to be insufficient to pay such taxes, insurance premiums, assessments and other charges, Borrower shall pay the difference on demand of Lender.  All such payments shall be carried in an interest-free reserve account with Lender, provided that if this Note is executed in connection with the granting of a mortgage on a single-family owner-occupied residential property, Borrower, in lieu of establishing such reserve account, may pledge an interest-bearing savings account with Lender to secure the payment of estimated taxes, insurance premiums, assessments, and other charges.  Lender shall have the right to draw upon the reserve (or pledge) account to pay such items, and Lender shall not be required to determine the validity or accuracy of any item before paying it.  Nothing in the Note shall be construed as requiring Lender to advance other monies for such purposes, and Lender shall not incur any liability for anything it may do or omit to do with respect to the reserve account.  Subject to any limitations set by applicable law, if the amount so estimated and paid shall prove to be insufficient to pay such taxes, insurance premiums, assessments and other charges, Borrower shall pay the difference as required by Lender.  All amounts in the reserve account are hereby pledged to further secure the Indebtedness, and Lender is hereby authorized to withdraw and apply such amounts on the Indebtedness upon the occurrence of an Event of Default as described below.

**PREPAYMENT PENALTY.** Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.  Upon prepayment of this Note, Lender is entitled to the following prepayment penalty:  If the Prepayment occurs during the 1st year of the Term, a Prepayment Charge equal to 3% of the Prepayment will be due; if the Prepayment occurs during the 2nd year of the Term, a Prepayment Charge equal to 2% of the Prepayment will be due; if the Prepayment occurs during the 3rd year of the Term, a Prepayment Charge equal to 1% of the Prepayment will be due. Notwithstanding anything to the contrary set forth herein, if the Prepayment is made any time within 30 days of the Maturity Date, no Prepayment Charge will be due.  Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule.  Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Park National Bank and Trust, 2958 North Milwaukee Avenue Chicago, IL  60618.

**LATE CHARGE.** If a payment is 11 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, Lender, at its option, may, if permitted under applicable law, increase the interest rate on this Note to 18.000% per annum.  The interest rate will not exceed the maximum rate permitted by applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading, in any material respect at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help,

**PROMISSORY NOTE**
(Continued)

Loan No: 1005629                                                                                          Page 2

repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

Events Affecting Guarantor.  Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.  In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

Change In Ownership.  Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

Adverse Change.   A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

Insecurity.  Lender in good faith believes itself insecure.

Cure Provisions.  If any default, other than a default in payment is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after receiving written notice from Lender demanding cure of such default:  (1)  cures the default within fifteen (15) days; or  (2)  if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

LENDER'S RIGHTS.  Upon default, Lender may declare the entire unpaid principal balance on this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

ATTORNEYS' FEES; EXPENSES.  Lender may hire or pay someone else to help collect this Note if Borrower does not pay.  Borrower will pay Lender that amount.  This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.  If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

JURY WAIVER.  Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

GOVERNING LAW.  This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions.  This Note has been accepted by Lender in the State of Illinois.

CHOICE OF VENUE.  If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of Cook County, State of Illinois.

RIGHT OF SETOFF..  To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account).  This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future.  However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law.  Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts.

COLLATERAL.  Borrower acknowledges this Note is secured by Land Trust Mortgage and Assignment of Rents dated 08-09-2005 from North Star Trust Company, Successor Trustee to Park National Bank and Trust of Chicago, not personally but solely as Trustee u/t/a/ dated 12-20-1993 and known as Trust No. 10129 to Lender on real property commonly known as 950 N. Elmhurst Road, Mt. Prospect, Cook County, Illinois; all terms and conditions of which are hereby incorporated and made a part of this Note.

SUCCESSOR INTERESTS.  The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

GENERAL PROVISIONS.  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor.  Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

ILLINOIS INSURANCE NOTICE.  Unless Borrower provides Lender with evidence of the insurance coverage required by Borrower's agreement with Lender, Lender may purchase insurance at Borrower's expense to protect Lender's interests in the collateral.  This insurance may, but need not, protect Borrower's interests.  The coverage that Lender purchases may not pay any claim that Borrower makes or any claim that is made against Borrower in connection with the collateral.  Borrower may later cancel any insurance purchased by Lender, but only after providing Lender with evidence that Borrower has obtained insurance as required by their agreement.  If Lender purchases insurance for the collateral, Borrower will be responsible for the costs of that insurance, including interest and any other charges Lender may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance.  The costs of the insurance may be added to Borrower's total outstanding balance or obligation.  The costs of the insurance may be more than the cost of insurance Borrower may be able to obtain on Borrower's own.

**PROMISSORY NOTE**
(Continued)

Loan No: 1005629                                                                    Page 3

---

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE.  BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

AMERICAN HOME MORTGAGE CORP.

By:
Authorized Signer for American Home Mortgage Corp.

---

LASER PRO Lending, Ver. 5.33.09.003  Copr. Harland Financial Solutions, Inc. 1997, 2003  All Rights Reserved.  - IL  e:\LASERPRO\CFI\LPL\D20.FC  TR-1245  PR-20

## EXHIBIT B

900005.0004

**FREEDOM TITLE CORP.**

RECORDATION REQUESTED BY:
 Park National Bank and Trust
 of Chicago
 2958 North Milwaukee
 Avenue
 Chicago, IL 60618

WHEN RECORDED MAIL TO:
 Park National Bank and Trust
 of Chicago
 2958 North Milwaukee
 Avenue
 Chicago, IL 60618

SEND TAX NOTICES TO:
 Park National Bank and Trust
 of Chicago
 2958 North Milwaukee
 Avenue
 Chicago, IL 60618



Doc#: 0522449057 Fee: $52.00
Eugene "Gene" Moore RHSP Fee:$10.00
Cook County Recorder of Deeds
Date: 08/12/2005 03:08 PM Pg: 1 of 15

FOR RECORDER'S USE ONLY

6707605 1073

This Mortgage prepared by:
 Dorothy Gorski, Administrative Asst., Comml. Lending
 Park National Bank and Trust of Chicago
 2958 North Milwaukee Avenue
 Chicago, IL 60618

## MORTGAGE

**MAXIMUM LIEN.** At no time shall the principal amount of Indebtedness secured by the Mortgage, not including sums advanced to protect the security of the Mortgage, exceed $2,014,000.00.

THIS MORTGAGE dated August 9, 2005, is made and executed between North Star Trust Company, not personally but solely as Successor Trustee to Park National Bank and Trust of Chicago, under Trust Agreement dated 12-20-1993 and known as Trust No. 10129 (referred to below as "Grantor") and Park National Bank and Trust of Chicago, whose address is 2958 North Milwaukee Avenue, Chicago, IL 60618 (referred to below as "Lender").

**GRANT OF MORTGAGE.** For valuable consideration, Grantor not personally but as Trustee under the provisions of a deed or deeds in trust duly recorded and delivered to Grantor pursuant to a Trust Agreement dated December 20, 1993 and known as North Star Trust Company, not personally but solely as Successor Trustee to Park National Bank and Trust of Chicago, u/t/a dated 12-20-1993 and known as Trust No. 10129, mortgages and conveys to Lender all of Grantor's right, title, and interest in and to the following described real property, together with all existing or subsequently erected or affixed buildings, improvements and fixtures; all easements, rights of way, and appurtenances; all water, water rights, watercourses and ditch rights (including stock in utilities with ditch or irrigation rights); and all other rights, royalties, and profits relating to the real property, including without limitation all minerals, oil, gas, geothermal and similar matters, (the "Real Property") located in Cook County, State of Illinois:

 Legal Description attached hereto and made a part hereof as Exhibit "A".

The Real Property or its address is commonly known as 950 N. Elmhurst Road, Mt. Prospect, IL 60056. The Real Property tax identification number is 03-27-307-024.

PARCEL 1
LOT 1 IN RAND – ELMHURST SUBDIVISION BEING A SUBDIVISION OF PART OF THE EAST 1/2 OF THE
SOUTHWEST 1/4 OF SECTION 27, TOWNSHIP 42 NORTH, RANGE 11 EAST OF THE THIRD PRINCIPAL
MERIDIAN, IN THE VILLAGE OF MT. PROSPECT, ACCORDING TO THE PLAT THEREOF RECORDED
December 18, 1968 AS DOCUMENT 20707569 IN COOK COUNTY, ILLINOIS

PARCEL 2:
EASEMENT FOR DRIVEWAY PURPOSES, INGRESS AND EGRESS AND UNDERGROUND UTILITIES FOR
THE BENEFIT OF PARCEL 1 AFORESAID, AS CREATED BY DEED FROM F. C. BREHM, AS TRUSTEE
UNDER TRUST AGREEMENT DATED October 1, 1958 AS KNOWN AS TRUST NO. 580 TO THE
FIRESTONE TIRE AND RUBBER COMPANY RECORDED January 18, 1965 AS DOCUMENT NO. 19358929,
OVER:

THE SOUTHWEST 10 FEET AS MEASURED PERPENDICULAR TO THE SOUTHWEST LINE (EXCEPT THE
SOUTHEAST 45 FEET THEREOF) THE NORTHWEST 25 FEET OF THE SOUTHEAST 45 FEET AS
MEASURED PERPENDICULAR TO THE SOUTHEAST LINE, AND THE WEST 25 FEET OF THE EAST 45
FEET LYING WEST OF THE WEST LINE OF ELMHURST ROAD (EXCEPT THE AFOREDESCRIBED
SOUTHEAST 45 FEET THEREOF) OF THE FOLLOWING DESCRIBED TRACT OF LAND:

THAT PART OF THE EAST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 27, TOWNSHIP 42 NORTH, RANGE
11 EAST OF THE THIRD PRINCIPAL MERIDIAN, DESCRIBED AS FOLLOWS:

COMMENCING AT THE INTERSECTION OF THE CENTER LINE OF RAND ROAD WITH THE EAST LINE OF
SAID EAST 1/2 OF THE SOUTHWEST 1/4 OF SECTION 27, SAID POINT OF INTERSECTION BEING 198.97
FEET NORTH OF THE SOUTH LINE OF SAID SECTION 27; THENCE NORTHWESTERLY ALONG THE
SAID CENTER LINE OF RAND ROAD, 439.93 FEET; THENCE NORTHEASTERLY ON A STRAIGHT LINE
THAT IF EXTENDED WOULD INTERSECT THE EAST LINE OF THE EAST 1/2 OF THE SOUTHWEST 1/4 OF
SAID SECTION 27 AT A DISTANCE OF 439.93 FEET NORTH OF THE INTERSECTION OF THE SAID EAST
LINE WITH THE CENTER LINE OF RAND ROAD, FOR A DISTANCE OF 170.23 FEET TO THE POINT OF
BEGINNING;

THENCE NORTHWESTERLY AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE, A DISTANCE OF
189.03 FEET, THENCE NORTHEASTERLY AT RIGHT ANGLES TO THE LAST DESCRIBED COURSE, A
DISTANCE OF 249.60 FEET TO THE POINT ON THE AFORESAID EAST LINE OF THE EAST 1/2 OF THE
SOUTHWEST 1/4 OF SECTION 27; THENCE SOUTHWARD ALONG THE SAID EAST LINE A DISTANCE OF
205.00 FEET TO THE POINT BEING 439.93 FEET NORTH OF THE INTERSECTION OF THE SAID EAST
LINE OF THE CENTER LINE OF RAND ROAD; THENCE SOUTHWESTERLY, A DISTANCE OF 170.27 FEET
TO THE POINT OF BEGINNING (EXCEPTING THEREFROM THAT PART THEREOF HERETOFORE
DEDICATED FOR PUBLIC HIGHWAYS) IN COOK COUNTY, ILLINOIS

Loan No: 1005629

Grantor presently assigns to Lender all of Grantor's right, title, and interest in and to all present and future leases of the Property and all Rents from the Property. In addition, Grantor grants to Lender a Uniform Commercial Code security interest in the Personal Property and Rents.

THIS MORTGAGE, INCLUDING THE ASSIGNMENT OF RENTS AND THE SECURITY INTEREST IN THE RENTS AND PERSONAL PROPERTY, IS GIVEN TO SECURE (A) PAYMENT OF THE INDEBTEDNESS AND (B) PERFORMANCE OF ANY AND ALL OBLIGATIONS UNDER THIS MORTGAGE. THIS MORTGAGE IS GIVEN AND ACCEPTED ON THE FOLLOWING TERMS:

**GRANTOR'S WAIVERS.** Grantor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other law which may prevent Lender from bringing any action against Grantor, including a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES.** Grantor warrants that: (a) this Mortgage is executed at Borrower's request and not at the request of Lender; (b) Grantor has the full power, right, and authority to enter into this Mortgage and to hypothecate the Property; (c) the provisions of this Mortgage do not conflict with, or result in a default under any agreement or other instrument binding upon Grantor and do not result in a violation of any law, regulation, court decree or order applicable to Grantor; (d) Grantor has established adequate means of obtaining from Borrower on a continuing basis information about Borrower's financial condition; and (e) Lender has made no representation to Grantor about Borrower (including without limitation the creditworthiness of Borrower).

**PAYMENT AND PERFORMANCE.** Except as otherwise provided in this Mortgage, Borrower shall pay to Lender all Indebtedness secured by this Mortgage as it becomes due, and Borrower and Grantor shall strictly perform all Borrower's and Grantor's obligations under this Mortgage.

**POSSESSION AND MAINTENANCE OF THE PROPERTY.** Borrower and Grantor agree that Borrower's and Grantor's possession and use of the Property shall be governed by the following provisions:

**Possession and Use.** Until the occurrence of an Event of Default, Grantor may (1) remain in possession and control of the Property; (2) use, operate or manage the Property; and (3) collect the Rents from the Property.

**Duty to Maintain.** Grantor shall maintain the Property in tenantable condition and promptly perform all repairs, replacements, and maintenance necessary to preserve its value.

**Compliance With Environmental Laws.** Grantor represents and warrants to Lender that: (1) During the period of Grantor's ownership of the Property, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from the Property; (2) Grantor has no knowledge of, or reason to believe that there has been, except as previously disclosed to and acknowledged by Lender in writing, (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Property by any prior owners or occupants of the Property, or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters; and (3) Except as previously disclosed to and acknowledged by Lender in writing, (a) neither Grantor nor any tenant, contractor, agent or other authorized user of the Property shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from the Property; and (b) any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations and ordinances, including without limitation all Environmental Laws. Grantor authorizes Lender and its agents to enter upon the Property to make such inspections and tests, at Grantor's expense, as Lender may deem appropriate to determine compliance of the Property with this section of the Mortgage. Any inspections or tests made by Lender shall be for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Grantor or to any other person. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Property for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any such laws; and (2) agrees to indemnify and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Mortgage or as a

consequence of any use, generation, manufacture, storage, disposal, release or threatened release occurring prior to Grantor's ownership or interest in the Property, whether or not the same was or should have been known to Grantor. The provisions of this section of the Mortgage, including the obligation to indemnify, shall survive the payment of the Indebtedness and the satisfaction and reconveyance of the lien of this Mortgage and shall not be affected by Lender's acquisition of any interest in the Property, whether by foreclosure or otherwise.

**Nuisance, Waste.** Grantor shall not cause, conduct or permit any nuisance nor commit, permit, or suffer any stripping of or waste on or to the Property or any portion of the Property. Without limiting the generality of the foregoing, Grantor will not remove, or grant to any other party the right to remove, any timber, minerals (including oil and gas), coal, clay, scoria, soil, gravel or rock products without Lender's prior written consent.

**Removal of Improvements.** Grantor shall not demolish or remove any Improvements from the Real Property without Lender's prior written consent. As a condition to the removal of any Improvements, Lender may require Grantor to make arrangements satisfactory to Lender to replace such Improvements with Improvements of at least equal value.

**Lender's Right to Enter.** Lender and Lender's agents and representatives may enter upon the Real Property at all reasonable times to attend to Lender's interests and to inspect the Real Property for purposes of Grantor's compliance with the terms and conditions of this Mortgage.

**Compliance with Governmental Requirements.** Grantor shall promptly comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the use or occupancy of the Property, including without limitation, the Americans With Disabilities Act. Grantor may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Grantor has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Property are not jeopardized. Lender may require Grantor to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Duty to Protect.** Grantor agrees neither to abandon or leave unattended the Property. Grantor shall do all other acts, in addition to those acts set forth above in this section, which from the character and use of the Property are reasonably necessary to protect and preserve the Property.

**DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by federal law or by Illinois law.

**TAXES AND LIENS.** The following provisions relating to the taxes and liens on the Property are part of this Mortgage:

**Payment.** Grantor shall pay when due (and in all events prior to delinquency) all taxes, payroll taxes, special taxes, assessments, water charges and sewer service charges levied against or on account of the Property, and shall pay when due all claims for work done on or for services rendered or material furnished to the Property. Grantor shall maintain the Property free of any liens having priority over or equal to the interest of Lender under this Mortgage, except for those liens specifically agreed to in writing by Lender, and except for the lien of taxes and assessments not due as further specified in the Right to Contest paragraph.

**Right to Contest.** Grantor may withhold payment of any tax, assessment, or claim in connection with a good faith dispute over the obligation to pay, so long as Lender's interest in the Property is not jeopardized. If a lien arises or is filed as a result of nonpayment, Grantor shall within fifteen (15) days after the lien arises or, if a lien is filed, within fifteen (15) days after Grantor has notice of the filing, secure the discharge of the lien, or if requested by Lender, deposit with Lender cash or a sufficient corporate surety bond or other security

Loan No: 1005629                                                                                    Page 4

satisfactory to Lender in an amount sufficient to discharge the lien plus any costs and attorneys' fees, or other charges that could accrue as a result of a foreclosure or sale under the lien.  In any contest, Grantor shall defend itself and Lender and shall satisfy any adverse judgment before enforcement against the Property. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings.

**Evidence of Payment.**  Grantor shall upon demand furnish to Lender satisfactory evidence of payment of the taxes or assessments and shall authorize the appropriate governmental official to deliver to Lender at any time a written statement of the taxes and assessments against the Property.

**Notice of Construction.**  Grantor shall notify Lender at least fifteen (15) days before any work is commenced, any services are furnished, or any materials are supplied to the Property, if any mechanic's lien, materialmen's lien, or other lien could be asserted on account of the work, services, or materials.  Grantor will upon request of Lender furnish to Lender advance assurances satisfactory to Lender that Grantor can and will pay the cost of such improvements.

**PROPERTY DAMAGE INSURANCE.**  The following provisions relating to insuring the Property are a part of this Mortgage:

**Maintenance of Insurance.**  Grantor shall procure and maintain policies of fire insurance with standard extended coverage endorsements on a replacement basis for the full insurable value covering all Improvements on the Real Property in an amount sufficient to avoid application of any coinsurance clause, and with a standard mortgagee clause in favor of Lender.  Grantor shall also procure and maintain comprehensive general liability insurance in such coverage amounts as Lender may request with Lender being named as additional insureds in such liability insurance policies.  Additionally, Grantor shall maintain such other insurance, including but not limited to hazard, business interruption and boiler insurance as Lender may require.  Policies shall be written by such insurance companies and in such form as may be reasonably acceptable to Lender.  Grantor shall deliver to Lender certificates of coverage from each insurer containing a stipulation that coverage will not be cancelled or diminished without a minimum of ten (10) days' prior written notice to Lender and not containing any disclaimer of the insurer's liability for failure to give such notice.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person.  Should the Real Property be located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, Grantor agrees to obtain and maintain Federal Flood Insurance, if available, within 45 days after notice is given by Lender that the Property is located in a special flood hazard area, for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender, and to maintain such insurance for the term of the loan.

**Application of Proceeds.**  Grantor shall promptly notify Lender of any loss or damage to the Property if the estimated cost of repair or replacement exceeds $1,000.00.  Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty.  Whether or not Lender's security is impaired, Lender may, at Lender's election, receive and retain the proceeds of any insurance and apply the proceeds to the reduction of the Indebtedness, payment of any lien affecting the Property, or the restoration and repair of the Property.  If Lender elects to apply the proceeds to restoration and repair, Grantor shall repair or replace the damaged or destroyed Improvements in a manner satisfactory to Lender.  Lender shall, upon satisfactory proof of such expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration if Grantor is not in default under this Mortgage.  Any proceeds which have not been disbursed within 180 days after their receipt and which Lender has not committed to the repair or restoration of the Property shall be used first to pay any amount owing to Lender under this Mortgage, then to pay accrued interest, and the remainder, if any, shall be applied to the principal balance of the Indebtedness.  If Lender holds any proceeds after payment in full of the Indebtedness, such proceeds shall be paid to Grantor as Grantor's interests may appear.

**Grantor's Report on Insurance.**  Upon request of Lender, however not more than once a year, Grantor shall furnish to Lender a report on each existing policy of insurance showing:  (1)  the name of the insurer;  (2)  the risks insured;  (3)  the amount of the policy;  (4)  the property insured, the then current replacement value of such property, and the manner of determining that value; and  (5)  the expiration date of the policy.  Grantor

Loan No: 1005629                                                                                                          Page 5

shall, upon request of Lender, have an independent appraiser satisfactory to Lender determine the cash value replacement cost of the Property.

**TAX AND INSURANCE RESERVES.** Grantor agrees to establish a reserve account to be retained from the loans proceeds in such amount deemed to be sufficient by Lender and shall pay monthly into that reserve account an amount equivalent to 1/12 of the annual real estate taxes and insurance premiums, as estimated by Lender, so as to provide sufficient funds for the payment of each year's taxes and insurance premiums one month prior to the date the taxes and insurance premiums become delinquent. Grantor shall further pay a monthly pro-rata share of all assessments and other charges which may accrue against the Property. If the amount so estimated and paid shall prove to be insufficient to pay such taxes, insurance premiums, assessments and other charges, Grantor shall pay the difference on demand of Lender. All such payments shall be carried in an interest-free reserve account with Lender, provided that if this Mortgage is executed in connection with the granting of a mortgage on a single-family owner-occupied residential property, Grantor, in lieu of establishing such reserve account, may pledge an interest-bearing savings account with Lender to secure the payment of estimated taxes, insurance premiums, assessments, and other charges. Lender shall have the right to draw upon the reserve (or pledge) account to pay such items, and Lender shall not be required to determine the validity or accuracy of any item before paying it. Nothing in the Mortgage shall be construed as requiring Lender to advance other monies for such purposes, and Lender shall not incur any liability for anything it may do or omit to do with respect to the reserve account. Subject to any limitations set by applicable law, if the amount so estimated and paid shall prove to be insufficient to pay such taxes, insurance premiums, assessments and other charges, Grantor shall pay the difference as required by Lender. All amounts in the reserve account are hereby pledged to further secure the Indebtedness, and Lender is hereby authorized to withdraw and apply such amounts on the Indebtedness upon the occurrence of an Event of Default as described below.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Property or if Grantor fails to comply with any provision of this Mortgage or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Mortgage or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Property and paying all costs for insuring, maintaining and preserving the Property. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Mortgage also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**WARRANTY; DEFENSE OF TITLE.** The following provisions relating to ownership of the Property are a part of this Mortgage:

Title. Grantor warrants that: (a) Grantor holds good and marketable title of record to the Property in fee simple, free and clear of all liens and encumbrances other than those set forth in the Real Property description or in any title insurance policy, title report, or final title opinion issued in favor of, and accepted by, Lender in connection with this Mortgage, and (b) Grantor has the full right, power, and authority to execute and deliver this Mortgage to Lender.

Defense of Title. Subject to the exception in the paragraph above, Grantor warrants and will forever defend the title to the Property against the lawful claims of all persons. In the event any action or proceeding is commenced that questions Grantor's title or the interest of Lender under this Mortgage, Grantor shall defend the action at Grantor's expense. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of Lender's own choice, and Grantor will deliver, or cause to be delivered, to Lender such instruments as Lender may request from time to time to permit such participation.

**Compliance With Laws.** Grantor warrants that the Property and Grantor's use of the Property complies with all existing applicable laws, ordinances, and regulations of governmental authorities.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Mortgage shall survive the execution and delivery of this Mortgage, shall be continuing in nature, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full.

**CONDEMNATION.** The following provisions relating to condemnation proceedings are a part of this Mortgage:

**Proceedings.** If any proceeding in condemnation is filed, Grantor shall promptly notify Lender in writing, and Grantor shall promptly take such steps as may be necessary to defend the action and obtain the award. Grantor may be the nominal party in such proceeding, but Lender shall be entitled to participate in the proceeding and to be represented in the proceeding by counsel of its own choice, and Grantor will deliver or cause to be delivered to Lender such instruments and documentation as may be requested by Lender from time to time to permit such participation.

**Application of Net Proceeds.** If all or any part of the Property is condemned by eminent domain proceedings or by any proceeding or purchase in lieu of condemnation, Lender may at its election require that all or any portion of the net proceeds of the award be applied to the Indebtedness or the repair or restoration of the Property. The net proceeds of the award shall mean the award after payment of all reasonable costs, expenses, and attorneys' fees incurred by Lender in connection with the condemnation.

**IMPOSITION OF TAXES, FEES AND CHARGES BY GOVERNMENTAL AUTHORITIES.** The following provisions relating to governmental taxes, fees and charges are a part of this Mortgage:

**Current Taxes, Fees and Charges.** Upon request by Lender, Grantor shall execute such documents in addition to this Mortgage and take whatever other action is requested by Lender to perfect and continue Lender's lien on the Real Property. Grantor shall reimburse Lender for all taxes, as described below, together with all expenses incurred in recording, perfecting or continuing this Mortgage, including without limitation all taxes, fees, documentary stamps, and other charges for recording or registering this Mortgage.

**Taxes.** The following shall constitute taxes to which this section applies: (1) a specific tax upon this type of Mortgage or upon all or any part of the Indebtedness secured by this Mortgage; (2) a specific tax on Borrower which Borrower is authorized or required to deduct from payments on the Indebtedness secured by this type of Mortgage; (3) a tax on this type of Mortgage chargeable against the Lender or the holder of the Note; and (4) a specific tax on all or any portion of the Indebtedness or on payments of principal and interest made by Borrower.

**Subsequent Taxes.** If any tax to which this section applies is enacted subsequent to the date of this Mortgage, this event shall have the same effect as an Event of Default, and Lender may exercise any or all of its available remedies for an Event of Default as provided below unless Grantor either (1) pays the tax before it becomes delinquent, or (2) contests the tax as provided above in the Taxes and Liens section and deposits with Lender cash or a sufficient corporate surety bond or other security satisfactory to Lender.

**SECURITY AGREEMENT; FINANCING STATEMENTS.** The following provisions relating to this Mortgage as a security agreement are a part of this Mortgage:

**Security Agreement.** This instrument shall constitute a Security Agreement to the extent any of the Property constitutes fixtures, and Lender shall have all of the rights of a secured party under the Uniform Commercial Code as amended from time to time.

**Security Interest.** Upon request by Lender, Grantor shall take whatever action is requested by Lender to perfect and continue Lender's security interest in the Rents and Personal Property. In addition to recording this Mortgage in the real property records, Lender may, at any time and without further authorization from Grantor, file executed counterparts, copies or reproductions of this Mortgage as a financing statement. Grantor shall reimburse Lender for all expenses incurred in perfecting or continuing this security interest. Upon default, Grantor shall not remove, sever or detach the Personal Property from the Property. Upon default, Grantor shall assemble any Personal Property not affixed to the Property in a manner and at a place reasonably convenient

to Grantor and Lender and make it available to Lender within three (3) days after receipt of written demand from Lender to the extent permitted by applicable law.

**Addresses.** The mailing addresses of Grantor (debtor) and Lender (secured party) from which information concerning the security interest granted by this Mortgage may be obtained (each as required by the Uniform Commercial Code) are as stated on the first page of this Mortgage.

**FURTHER ASSURANCES; ATTORNEY-IN-FACT.** The following provisions relating to further assurances and attorney-in-fact are a part of this Mortgage:

**Further Assurances.** At any time, and from time to time, upon request of Lender, Grantor will make, execute and deliver, or will cause to be made, executed or delivered, to Lender or to Lender's designee, and when requested by Lender, cause to be filed, recorded, refiled, or rerecorded, as the case may be, at such times and in such offices and places as Lender may deem appropriate, any and all such mortgages, deeds of trust, security deeds, security agreements, financing statements, continuation statements, instruments of further assurance, certificates, and other documents as may, in the sole opinion of Lender, be necessary or desirable in order to effectuate, complete, perfect, continue, or preserve (1) Borrower's and Grantor's obligations under the Note, this Mortgage, and the Related Documents, and (2) the liens and security interests created by this Mortgage as first and prior liens on the Property, whether now owned or hereafter acquired by Grantor. Unless prohibited by law or Lender agrees to the contrary in writing, Grantor shall reimburse Lender for all costs and expenses incurred in connection with the matters referred to in this paragraph.

**Attorney-in-Fact.** If Grantor fails to do any of the things referred to in the preceding paragraph, Lender may do so for and in the name of Grantor and at Grantor's expense. For such purposes, Grantor hereby irrevocably appoints Lender as Grantor's attorney-in-fact for the purpose of making, executing, delivering, filing, recording, and doing all other things as may be necessary or desirable, in Lender's sole opinion, to accomplish the matters referred to in the preceding paragraph.

**FULL PERFORMANCE.** If Borrower pays all the Indebtedness when due, and otherwise performs all the obligations imposed upon Grantor under this Mortgage, Lender shall execute and deliver to Grantor a suitable satisfaction of this Mortgage and suitable statements of termination of any financing statement on file evidencing Lender's security interest in the Rents and the Personal Property. Grantor will pay, if permitted by applicable law, any reasonable termination fee as determined by Lender from time to time.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Borrower, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of any claim made by Lender with any claimant (including without limitation Borrower), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Mortgage and this Mortgage shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Mortgage or of any note or other instrument or agreement evidencing the Indebtedness and the Property will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Mortgage.

**EVENTS OF DEFAULT.** Each of the following, at Lender's option, shall constitute an Event of Default under this Mortgage:

**Payment Default.** Borrower fails to make any payment when due under the Indebtedness.

**Default on Other Payments.** Failure of Grantor within the time required by this Mortgage to make any payment for taxes or insurance, or any other payment necessary to prevent filing of or to effect discharge of any lien.

**Other Defaults.** Borrower or Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Mortgage or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower or Grantor.

Loan No: 1005629

**Default in Favor of Third Parties.** Should Borrower or any Grantor default under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's ability to repay the Indebtedness or Borrower's or Grantor's ability to perform their respective obligations under this Mortgage or any related document.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or Grantor or on Borrower's or Grantor's behalf under this Mortgage or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Mortgage or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Borrower's or Grantor's existence as a going business, the insolvency of Borrower or Grantor, the appointment of a receiver for any part of Borrower's or Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower or Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or Grantor or by any governmental agency against any property securing the Indebtedness. This includes a garnishment of any of Borrower's or Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower or Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower or Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Breach of Other Agreement.** Any breach by Borrower or Grantor under the terms of any other agreement between Borrower or Grantor and Lender that is not remedied within any grace period provided therein, including without limitation any agreement concerning any indebtedness or other obligation of Borrower or Grantor to Lender, whether existing now or later.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness. In the event of a death, Lender, at its option, may, but shall not be required to, permit the Guarantor's estate to assume unconditionally the obligations arising under the guaranty in a manner satisfactory to Lender, and, in doing so, cure any Event of Default.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default in payment is curable and if Grantor has not been given a notice of a breach of the same provision of this Mortgage within the preceding twelve (12) months, it may be cured if Grantor, after receiving written notice from Lender demanding cure of such default: (1) cures the default within fifteen (15) days; or (2) if the cure requires more than fifteen (15) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** Upon the occurrence of an Event of Default and at any time thereafter, Lender, at Lender's option, may exercise any one or more of the following rights and remedies, in addition to any other rights or remedies provided by law:

Loan No: 1005629

**Accelerate Indebtedness.** Lender shall have the right at its option without notice to Grantor to declare the entire Indebtedness immediately due and payable, including any prepayment penalty which Grantor would be required to pay.

**UCC Remedies.** With respect to all or any part of the Personal Property, Lender shall have all the rights and remedies of a secured party under the Uniform Commercial Code.

**Collect Rents.** Lender shall have the right, without notice to Borrower or Grantor, to take possession of the Property and collect the Rents, including amounts past due and unpaid, and apply the net proceeds, over and above Lender's costs, against the Indebtedness. In furtherance of this right, Lender may require any tenant or other user of the Property to make payments of rent or use fees directly to Lender. If the Rents are collected by Lender, then Grantor irrevocably designates Lender as Grantor's attorney-in-fact to endorse instruments received in payment thereof in the name of Grantor and to negotiate the same and collect the proceeds. Payments by tenants or other users to Lender in response to Lender's demand shall satisfy the obligations for which the payments are made, whether or not any proper grounds for the demand existed. Lender may exercise its rights under this subparagraph either in person, by agent, or through a receiver.

**Mortgagee in Possession.** Lender shall have the right to be placed as mortgagee in possession or to have a receiver appointed to take possession of all or any part of the Property, with the power to protect and preserve the Property, to operate the Property preceding foreclosure or sale, and to collect the Rents from the Property and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The mortgagee in possession or receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Property exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing Grantor's interest in all or any part of the Property.

**Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining in the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this section.

**Other Remedies.** Lender shall have all other rights and remedies provided in this Mortgage or the Note or available at law or in equity.

**Sale of the Property.** To the extent permitted by applicable law, Borrower and Grantor hereby waive any and all right to have the Property marshalled. In exercising its rights and remedies, Lender shall be free to sell all or any part of the Property together or separately, in one sale or by separate sales. Lender shall be entitled to bid at any public sale on all or any portion of the Property.

**Notice of Sale.** Lender shall give Grantor reasonable notice of the time and place of any public sale of the Personal Property or of the time after which any private sale or other intended disposition of the Personal Property is to be made. Reasonable notice shall mean notice given at least ten (10) days before the time of the sale or disposition. Any sale of the Personal Property may be made in conjunction with any sale of the Real Property.

**Election of Remedies.** Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Mortgage, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies. Nothing under this Mortgage or otherwise shall be construed so as to limit or restrict the rights and remedies available to Lender following an Event of Default, or in any way to limit or restrict the rights and ability of Lender to proceed directly against Grantor and/or Borrower and/or against any other co-maker, guarantor, surety or endorser and/or to proceed against any other collateral directly or indirectly securing the Indebtedness.

**Attorneys' Fees; Expenses.** If Lender institutes any suit or action to enforce any of the terms of this Mortgage, Lender shall be entitled to recover such sum as the court may adjudge reasonable as attorneys' fees at trial and upon any appeal. Whether or not any court action is involved, and to the extent not prohibited by law, all

MORTGAGE
(Continued)

reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights shall become a part of the Indebtedness payable on demand and shall bear interest at the Note rate from the date of the expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services, the cost of searching records, obtaining title reports (including foreclosure reports), surveyors' reports, and appraisal fees and title insurance, to the extent permitted by applicable law. Grantor also will pay any court costs, in addition to all other sums provided by law.

**NOTICES.** Any notice required to be given under this Mortgage, including without limitation any notice of default and any notice of sale shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Mortgage. All copies of notices of foreclosure from the holder of any lien which has priority over this Mortgage shall be sent to Lender's address, as shown near the beginning of this Mortgage. Any party may change its address for notices under this Mortgage by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Mortgage:

**Amendments.** This Mortgage, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Mortgage. No alteration of or amendment to this Mortgage shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Annual Reports.** If the Property is used for purposes other than Grantor's residence, Grantor shall furnish to Lender, upon request, a certified statement of net operating income received from the Property during Grantor's previous fiscal year in such form and detail as Lender shall require. "Net operating income" shall mean all cash receipts from the Property less all cash expenditures made in connection with the operation of the Property.

**Caption Headings.** Caption headings in this Mortgage are for convenience purposes only and are not to be used to interpret or define the provisions of this Mortgage.

**Governing Law.** This Mortgage will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Illinois without regard to its conflicts of law provisions. This Mortgage has been accepted by Lender in the State of Illinois.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of Cook County, State of Illinois.

**Joint and Several Liability.** All obligations of Borrower and Grantor under this Mortgage shall be joint and several, and all references to Grantor shall mean each and every Grantor, and all references to Borrower shall mean each and every Borrower. This means that each Borrower and Grantor signing below is responsible for all obligations in this Mortgage.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Mortgage unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Mortgage shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Mortgage. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Mortgage, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent

MORTGAGE
(Continued)

instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Severability.** If a court of competent jurisdiction finds any provision of this Mortgage to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Mortgage. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Mortgage shall not affect the legality, validity or enforceability of any other provision of this Mortgage.

**Merger.** There shall be no merger of the interest or estate created by this Mortgage with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Mortgage on transfer of Grantor's interest, this Mortgage shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Property becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Mortgage and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Mortgage or liability under the Indebtedness.

**Time is of the Essence.** Time is of the essence in the performance of this Mortgage.

**Waive Jury.** All parties to this Mortgage hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**Waiver of Homestead Exemption.** Grantor hereby releases and waives all rights and benefits of the homestead exemption laws of the State of Illinois as to all Indebtedness secured by this Mortgage.

**Waiver of Right of Redemption.** NOTWITHSTANDING ANY OF THE PROVISIONS TO THE CONTRARY CONTAINED IN THIS MORTGAGE, GRANTOR HEREBY WAIVES, TO THE EXTENT PERMITTED UNDER 735 ILCS 5/15-1601(b) OR ANY SIMILAR LAW EXISTING AFTER THE DATE OF THIS MORTGAGE, ANY AND ALL RIGHTS OF REDEMPTION ON GRANTOR'S BEHALF AND ON BEHALF OF ANY OTHER PERSONS PERMITTED TO REDEEM THE PROPERTY.

**Grantor's Liability.** This Mortgage is executed by Grantor, not personally but as Trustee as provided above in the exercise of the power and the authority conferred upon and vested in it as such Trustee (and Grantor thereby warrants that it possesses full power and authority to execute this instrument). It is expressly understood and agreed that with the exception of the foregoing warranty, notwithstanding anything to the contrary contained herein, that each and all of the warranties, indemnities, representations, covenants, undertakings, and agreements made in this Mortgage on the part of Grantor, while in form purporting to be the warranties, indemnities, representations, covenants, undertakings, and agreements of Grantor, are nevertheless each and every one of them made and intended not as personal warranties, indemnities, representations, covenants, undertakings, and agreements by Grantor or for the purpose or with the intention of binding Grantor personally, and nothing in this Mortgage or in the Note shall be construed as creating any liability on the part of Grantor personally to pay the Note or any interest that may accrue thereon, or any other Indebtedness under this Mortgage, or to perform any covenant, undertaking, or agreement, either express or implied, contained in this Mortgage, all such liability, if any, being expressly waived by Lender and by every person now or hereafter claiming any right or security under this Mortgage, and that so far as Grantor and its successors personally are concerned, the legal holder or holders of the Note and the owner or owners of any Indebtedness shall look solely to the Property for the payment of the Note and Indebtedness, by the enforcement of the lien created by this Mortgage in the manner provided in the Note and herein or by action to enforce the personal liability of any Guarantor or obligor, other than Grantor, on the Note.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Mortgage. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful

Loan No: 1005629

money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Mortgage shall have the meanings attributed to such terms in the Uniform Commercial Code.

**Borrower.** The word "Borrower" means any and all persons and entities signing the Note.

**Default.** The word "Default" means the Default set forth in this Mortgage in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Mortgage in the events of default section of this Mortgage.

**Grantor.** The word "Grantor" means North Star Trust Company, not personally but as Trustee under that certain Trust Agreement dated December 20, 1993 and known as trust number 10129. The Grantor is the mortgagor under this Mortgage.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Improvements.** The word "Improvements" means all existing and future improvements, buildings, structures, mobile homes affixed on the Real Property, facilities, additions, replacements and other construction on the Real Property.

**Indebtedness.** The word "Indebtedness" means all principal, interest, and other amounts, costs and expenses payable under the Note or Related Documents, together with all renewals of, extensions of, modifications of, consolidations of and substitutions for the Note or Related Documents and any amounts expended or advanced by Lender to discharge Grantor's obligations or expenses incurred by Lender to enforce Grantor's obligations under this Mortgage, together with interest on such amounts as provided in this Mortgage.

**Lender.** The word "Lender" means Park National Bank and Trust of Chicago, its successors and assigns.

**Mortgage.** The word "Mortgage" means this Mortgage between Grantor and Lender.

**Note.** The word "Note" means the promissory note dated August 9, 2005, in the original principal amount of $1,007,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the promissory note or agreement. The interest rate on the Note is 7.180%. Payments on the Note are to be made in accordance with the following payment schedule: 36 monthly consecutive principal and interest payments of $9,202.49 each, beginning September 1, 2005, with interest calculated on the unpaid principal balances at an interest rate of 7.180% per annum; and one principal and interest payment of $882,567.92 on August 9, 2008, with interest calculated on the unpaid principal balances at an interest rate of 7.180% per annum. This estimated final payment is based on the assumption

## MORTGAGE
### (Continued)

that all payments will be made exactly as scheduled; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Mortgage.

**Personal Property.** The words "Personal Property" mean all equipment, fixtures, and other articles of personal property now or hereafter owned by Grantor, and now or hereafter attached or affixed to the Real Property; together with all accessions, parts, and additions to, all replacements of, and all substitutions for, any of such property; and together with all proceeds (including without limitation all insurance proceeds and refunds of premiums) from any sale or other disposition of the Property.

**Property.** The word "Property" means collectively the Real Property and the Personal Property.

**Real Property.** The words "Real Property" mean the real property, interests and rights, as further described in this Mortgage.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**Rents.** The word "Rents" means all present and future rents, revenues, income, issues, royalties, profits, and other benefits derived from the Property.

**Trustee.** The word "Trustee" means North Star Trust Company, whose address is 500 West Madison Street, Chicago , IL 60661, and any substitute or successor trustees.

GRANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS MORTGAGE, AND GRANTOR AGREES TO ITS TERMS.

GRANTOR:

NORTH STAR TRUST COMPANY, NOT PERSONALLY BUT SOLELY AS SUCCESSOR TRUSTEE TO PARK NATIONAL BANK AND TRUST OF CHICAGO, U/T/A DATED 12-20-1993 AND KNOWN AS TRUST NO. 10129

By: _____

Authorized Signer for North Star Trust Company, not personally but solely as Successor Trustee to Park National Bank and Trust of Chicago, u/t/a dated 12-20-1993 and known as Trust No. 10129

Loan No: 1005629

**MORTGAGE**
**(Continued)**

Page 14

## TRUST ACKNOWLEDGMENT

STATE OF _ILLINOIS_ )
 ) SS
COUNTY OF _LAKE_ )

On this _9TH_ day of _August_ _2005_ before me, the undersigned Notary
Public, personally appeared ~~Silvia Medina , Trust Officer~~
~~of    North Star Trust Company~~
, and known to me to be (an) authorized trustee(s) or agent(s) of the trust that executed the Mortgage and
acknowledged the Mortgage to be the free and voluntary act and deed of the trust, by authority set forth in the trust
documents or, by authority of statute, for the uses and purposes therein mentioned, and on oath stated that he or
she/they is/are authorized to execute this Mortgage and in fact executed the Mortgage on behalf of the trust.

By _Sharon K. Crowley_     Residing at _____

Notary Public in and for the State of _Illinois_

My commission expires _____

"OFFICIAL SEAL"
Sharon K. Crowley
Notary Public, State of Illinois
My Commission Expires Sept. 17, 2008

LASER PRO Lending, Ver 5.27.00.005  Copr. Harland Financial Solutions, Inc. 1997, 2005.  All Rights Reserved.  - IL  c:\LASERPRO\CFI\LPL\G03.FC  TR-1345  PR-29

# EXHIBIT C

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

In re  AMERICAN HOME MORTGAGE CORP.

            Debtor

Case No.  **07-11051**

Chapter  **11**

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages in each.  Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided.  Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts from Schedules D, E, and F to determine the total amount of the debtor's liabilities.

| NAME OF SCHEDULE | ATTACHED (YES/NO) | NO. OF SHEETS | AMOUNTS SCHEDULED | | |
| --- | --- | --- | --- | --- | --- |
| | | | ASSETS | LIABILITIES | OTHER |
| A - Real Property | Yes | 32 | $38,454,462.15 | | |
| B - Personal Property | Yes | 242 | $3,611,368,415.58 | | |
| C - Property Claimed As Exempt | No | | | | N/A |
| D - Creditors Holding Secured Claims | Yes | 4 | | $2,982,107,598.00 | |
| E - Creditors Holding Unsecured Priority Claims | Yes | 503 | | $8,329,388.80 | |
| F - Creditors Holding Unsecured Nonpriority Claims | Yes | 858 | | $1,643,140,936.01 | |
| G - Executory Contracts and Unexpired Leases | Yes | 590 | | | |
| H - Codebtors | Yes | 7 | | | |
| I - Current Income of Individual Debtor(s) | No | | | | N/A |
| J - Current Expenditures of Individual Debtor(s) | No | | | | N/A |
| Total Number of Sheets of ALL Schedules | | 2,236 | | | |
| Total Assets | | | $3,649,822,877.73 | | |
| Total Liabilities | | | | $4,633,577,922.81 | |

## GLOBAL NOTES TO SCHEDULES OF ASSETS AND LIABILITIES AND STATEMENT OF FINANCIAL AFFAIRS OF AMERICAN HOME MORTGAGE CORP.

American Home Mortgage Corp., (the "Debtor") submits its Schedules of Assets and Liabilities (the "Schedules") and Statement of Financial Affairs (the "Statements") pursuant to 11 U.S.C. § 521 and Federal Rule of Bankruptcy Procedure 1007. The Schedules and Statements prepared by the Debtor are unaudited and were prepared with data as near as possible to August 6, 2007 (the "Petition Date"). While the Debtor's management has exercised reasonable best efforts to ensure that the Schedules and Statements are accurate and complete based on information that was available at the time of preparation, inadvertent errors or omissions may exist. Accordingly, the Debtor reserves the right to amend the Schedules and Statements from time to time as may be necessary or appropriate and expects it will do so as information becomes available. These global notes (the "Global Notes") are incorporated by reference in, and comprise an integral part of, the Schedules and Statements, and should be referred to and reviewed in connection with any review of the Schedules and Statements.

The Debtor reserves the right to dispute, or to assert offset or defenses to, any claim reflected on the Schedules and/or Statements as to amount, liability or classification. The Debtor also reserves all rights with respect to the values, amounts and characterizations of the assets and liabilities listed in its Schedules and Statements.

Any failure to designate a claim listed on the Debtor's Schedules as "disputed," "contingent" or "unliquidated" does not constitute an admission by the Debtor that such amount is not "disputed," "contingent" or "unliquidated". The Debtor reserves the right to dispute, or to assert setoff rights, counterclaims or defenses to, any claim reflected on its Schedules as to amount, liability or classification, or to otherwise subsequently designate any claim as "disputed," "contingent" or "unliquidated". Additionally, the dollar amounts of claims listed may be exclusive of contingent and additional unliquidated amounts. Further, the claims of individual creditors for, among other things, merchandise, goods, services, or taxes are listed as the amounts entered on the Debtor's books and records and may not reflect credits or allowances due from such creditors to the Debtor. The Debtor reserves all of its rights with respect to any such credits and allowances.

As it would be expensive and unduly burdensome to obtain current market valuations of the Debtor's property interests, unless otherwise noted, the carrying value on the Debtor's books (net book value), rather than the current market values, of the Debtor's interests in property and of the Debtor's liabilities, is reflected on the Debtor's Schedules and Statements.

The Debtor has not set forth all causes of action against all third parties as assets in its Schedules and Statements. The Debtor reserves all of its rights with respect to any causes of action it may have and neither these Global Notes nor the Schedules and Statements shall be deemed a waiver of any such causes of action.

The Schedules and Statements have been signed by the Debtor's Executive Vice President and Chief Financial Officer, Stephen A. Hozie. In reviewing and signing the Schedules and Statements, Mr. Hozie has necessarily relied upon the efforts, statements and representations of other Debtor personnel and professionals. Mr. Hozie has not (and could not have) personally verified the accuracy of each such statement and representation, including statements and representations concerning amounts owed to creditors and their addresses.

In addition to the foregoing, the following conventions were adopted by the Debtor in the preparation of the Schedules and Statements:

### Schedules of Assets and Liabilities

#### Schedule A Notes

- Real Estate Owned ("REO") properties are valued at Net Realizable Value (appraisal less estimated cost to sell).

- All REO properties are subject to a Bank of America lien for servicing advances.

#### Schedule B Notes

- Unless otherwise noted, Schedule B lists the net book value for each of the Debtor's assets as of July 31, 2007, as reflected on the Debtor's books and records.

- Schedule B2 does not include custodial and escrow accounts maintained by the Debtor in the ordinary course of its business.

- Schedule B2 – Due to the timing of certain automatic transfers, some accounts have been listed with a negative balance. For those accounts, there are corresponding accounts listed in Schedule B2 from which funds would be withdrawn and therefore the total for Schedule B2 is correct.

- Schedule B35 – Mortgage Backed Securities are listed at face value.

- Schedule B35 – Loans are listed at unpaid principal balance.

#### Schedule D Notes

- Except as otherwise agreed in accordance with a stipulation or agreed order or any other order entered by the Bankruptcy Court, the Debtor reserves its rights to dispute or challenge the validity, perfection or immunity from avoidance of any

lien purported to be granted or perfected in any specific asset to a secured creditor listed on Schedule D.

- Holders of secured claims by virtue of holding setoff rights against the Debtor or leasing equipment to the Debtor are not included on Schedule D. Lessors, utility companies and other parties which may hold security deposits have also not been listed on Schedule D.

- Although the Debtor has scheduled the claims of various creditors as secured claims, the debtor reserves all rights to dispute or challenge the secured nature of any such creditor's claim or the characterization of the structure of any such transaction, or any document or instrument, related to such creditor's claim.

- In certain instances, the Debtor may be a co-obligor, co-mortgagor or guarantor with respect to scheduled claims of its affiliates, and no claim schedule on Schedule D is intended to acknowledge claims of creditors that are otherwise satisfied or discharged by other entities.

- The descriptions provided are intended only to be a summary. Reference to the applicable credit agreements and related documents is necessary for a complete description of the collateral and the nature, extent and priority of any liens. Nothing herein shall be deemed a modification or interpretation of the terms of such agreements.

Schedule E Notes

- The Bankruptcy Court has approved the payment of certain unsecured claims against the Debtor including, without limitation, certain claims of employees for wages, salaries, and benefits. While the Debtor has made every effort to reflect such payments in Schedule E, some payments may not have been accounted for.

- The listing of any claim on this Schedule E does not constitute an admission by the Debtor that such claim is entitled to priority treatment under 11 U.S.C. § 507. The Debtor reserves the right to take the position that any claim listed on Schedule E is not entitled to priority.

- Due to confidentiality concerns, the Debtor has suppressed the addresses of the employee claimants listed in this Schedule.

Schedule F Notes

- The Bankruptcy Court has approved the payment of certain unsecured claims against the Debtor including, without limitation, certain claims of critical vendors. While the Debtor has made every effort to reflect such payments in Schedule F,

DB02:6281673.1                                                                 066585.1001

some payments made after the Petition Date pursuant to the first day order may not be accounted for in Schedule F.

- The Debtor expressly incorporates by reference into Schedules F all parties to pending and potential litigation listed in 4(a) of the Debtor's Statements as contingent, unliquidated and disputed claims, to the extent not already listed on Schedule F.

- While the Debtor has made an effort to identify the entity owing the accounts payable obligation to each creditor, the Debtor and its affiliated debtors utilized a consolidated cash management and accounts payable systems which were administered by Debtor. As such, most of the creditors will appear on the Schedules of Debtor notwithstanding the fact that certain of those obligations may be obligations of one or more of Debtor's affiliated debtors.

- Due to confidentiality concerns, the Debtor has suppressed the addresses of the employee claimants listed in this Schedule.


Schedule G Notes

- While reasonable best efforts have been made to ensure the accuracy of Schedule G, inadvertent errors or omissions may have occurred. To the extent the Debtor becomes aware of additional executory contracts and unexpired leases, it will supplement this Schedule.

- The Debtor hereby reserves all rights to dispute the validity, status or enforceability of any contracts, agreements or leases set forth in Schedule G and to amend or supplement such Schedule as necessary. Additionally, the placing of a contract or lease onto this Schedule shall not be deemed an admission that such contract is an executory contract or unexpired lease, or that it is necessarily a binding, valid and enforceable contract. Any and all of the Debtor's rights, claims and causes of action with respect to the contracts and agreements listed on this Schedule are hereby reserved and preserved.

- Omission of a contract or agreement from this Schedule does not constitute an admission that such omitted contract or agreement is not an executory contract or unexpired lease. The Debtor's rights under the Bankruptcy Code with respect to any such omitted contracts or agreements are not impaired by the omission. This Schedule may be amended at any time to add any omitted contract or agreement.

- The contracts, agreements and leases listed on Schedule G may have expired or may have been rejected, terminated, assigned, modified, amended and/or supplemented from time to time by various amendments, change orders, restatements, waivers, estoppel certificates, letters and other documents, instruments, and agreements which may not be listed therein. Certain of the real

4

property leases listed on Schedule G may contain renewal options, guarantees of payment, options to purchase, rights of first refusal, rights to lease additional space and other miscellaneous rights.  Such rights, powers, duties and obligations are not set forth on Schedule G.  Certain of the agreements listed on Schedule G may be in the nature of conditional sales agreements or secured financings, and the inclusion of such on Schedule G is not an admission that the agreement is an executory contract, financing agreement or otherwise.

## Statement of Financial Affairs

### Statement of Financial Affairs Question 3b

The Debtor has scheduled known payments to creditors aggregating more than $5,475 that were made during the 90 days prior to the Petition Date other than ordinary course wages/expense reimbursements of employees.  Additionally, payments made to the Debtor's professionals are listed in response to Statement of Financial Affairs Question 9.

Certain payments made to creditors were made via corporate credit card. Those payments to creditors will not be reflected in the Debtor's response to Question 3b.

The obligations of certain of its affiliated debtors were paid by and through the Debtor, notwithstanding the fact that certain of those obligations may be obligations of one or more of the affiliated debtors.  Accordingly, certain of the payments set forth in response to Question 3b may have been made to creditors of affiliated debtors.

Disbursements made from custodial and escrow accounts have not been listed.  While most of the funds disbursed from these accounts were disbursed in the ordinary course of the Debtors' loan servicing business and would not constitute payments or transfers to or for the benefit of creditors, a relatively minor amount of disbursements may relate to payments or transfers made by the Debtors to or for the benefit of creditors.  Without expending a substantial amount of time and effort from its limited resources, the Debtors are unable to segregate the small number of disbursements made to or for the benefit of creditors from the vast number of payments made on behalf of others.

Refer to Schedule F for creditors' addresses not listed on Exhibit 3b.

### Statement of Financial Affairs Question 3c

Schedule 3c of each Debtor includes payments to insiders in the form of checks, wire transfers and other similar disbursements made from bank accounts historically used for payroll and other employee-related disbursements.  This schedule does not include payments made directly to credit card issuers for employee business expenses incurred by insiders.

5

Statement of Financial Affairs Question 4

The Debtor has made every effort to include on Exhibit 4 a complete list of all suits and proceedings to which the Debtor and its affiliated debtors were a party within the one year immediately preceding the Petition Date.  To the extend the Debtor has omitted any suits or proceedings, it will amend its Statements.

Statement of Financial Affairs Question 5

While various lenders purported to exercise certain remedies under their respective agreements, the Debtor reserves all of its rights with respect to whether the remedies exercised by such lenders were proper or were properly exercised.

Statement of Financial Affairs Question 9

The obligations of the Debtor and its affiliated debtors are paid by and through American Home Mortgage Investment Corp. (Case No. 07-11048).  Accordingly, the payments related to debt counseling or bankruptcy appear for affiliated debtors appear in the response to Statement of Financial Affairs Question 9 of American Home Mortgage Investment Corp.

Statement of Financial Affairs Question 14

The Debtor maintains and services loan portfolios owned by various institutions.  At any given time, in the ordinary course of business, the Debtor received and maintained documents and received and disbursed funds related to the loans that it serviced.  In conjunction with its loan servicing, the debtor controlled and continues to maintain custodial bank accounts, which are detailed on the attached Exhibit 14.  The Debtor reserves the right to dispute or challenge the ownership interest of assets held in the custodial bank accounts.

In addition, in the ordinary course of its business, the Debtor leases equipment from certain third-party lessors for use in the daily operation of its business.  Any such leases are set forth in Schedule G.  The property subject to any of such leases is not reflected in either Schedule A or Schedule B as either owned property or assets of the Debtor.  Neither is the property subject to any such leases reflected in the Debtor's Statement of Financial Affairs as property or assets of third-parties within the control of the Debtor.  Nothing in the Schedules is or shall be construed as an admission or determination as to the legal status of any lease (including whether any lease is a true lease or a financing arrangement), and the Debtor reserves all rights with respect to any of such issues.

Statement of Financial Affairs Question 17

From time to time, the Debtor has, in the ordinary course of business, foreclosed on real estate property subject to minor problems which were subsequently resolved.

Statement of Financial Affairs Question 19

In addition to the parties included in the Debtor's response to Statement of Financial Affairs Question 19, the Debtor provided financial statements in the ordinary course of business to various parties including regulatory agencies, financial institutions and investment banks. In addition, financial statements have been provided to other parties as requested. While every effort has been made to provide a complete and accurate list, inadvertent errors or omissions may exist.

*** END OF GLOBAL NOTES ***

In re  **AMERICAN HOME MORTGAGE CORP.**                     Case No.  **07-11051**

　　　　　　　　　　Debtor                                              (if known)

## SCHEDULE A - REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a co-tenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit.  If the debtor is married, state whether husband, wife, or both own the property by placing an "H", "W", "J", or "C" in the column labeled "Husband, Wife, Joint, or Community."  If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

Do not include interests in executory contracts and unexpired leases on this schedule.  List them in Schedule G-Executory Contracts and Unexpired Leases.

If any entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim.  See Schedule D.  If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C - Property Claimed as Exempt.

| DESCRIPTION AND LOCATION OF PROPERTY | NATURE OF DEBTOR'S INTEREST IN PROPERTY | HUSBAND, WIFE, JOINT, OR COMMUNITY | CURRENT MARKET VALUE OF DEBTOR'S INTEREST IN PROPERTY, WITHOUT DEDUCTING ANY SECURED CLAIM OR EXEMPTION | AMOUNT OF SECURED CLAIM |
|---|---|---|---|---|
| MT. PROSPECT OFFICE BUILDING 950 NORTH ELMHURST ROAD MT. PROSPECT, ILLINOIS  60056<br><br>OFFICE BUILDING CONSISTING OF APPROXIMATELY 36,000 SQUARE FEET AND WHICH SERVED AS THE HEADQUARTERS FOR THE COMPANY'S EASTERN RETAIL SALES DIVISION | Ownership | | $1,548,161.00 | $930,536.00 |
| REO ID - AR1380 AD1 LOAN # - 1001364486 1380 AIRPORT ROAD UNIT D1 HOT SPRINGS NATIONAL, AR  71913 | Repossessed Property | | $360,000.00 | Subject to Warehouse line. |

Sheet no. 1 of 32 sheets attached to
Schedule of Real Property

| | |
|---|---|
| Subtotal (Total of this page) | $1,908,161.00 |
| Total (Use only on the last page of the completed Schedule A) | |

(Report total also on Summary of Schedules)

**EXHIBIT D**

With respect to the mortgage on 950 Elmhurst Road, Mount Prospect, Illinois, and the related loan documents (the "Loan Documents") this is to confirm the following:

1.    The due date of the mortgage is extended through February 9, 2009 (the "Extended Due Date") subject to the principal balance and amounts coming due, pursuant to the Loan Documents, prior to the Extended Due Date.

2.    Monthly payments will continue to be made (with the same 7.18% interest rate) as were previously made under the Loan Documents.

3.    Whenever the mortgage loan comes due or prepaid, but no later than the Extended Due Date, there will be due to Park National, in addition to the amounts due under the Loan Documents, the following:  (a) Park National's legal fees through July 25, 2008 in the amount of $8,113.80, and (b) an extension fee of $8,806.40.

4.    If Bankruptcy Court approval is required, American Home Mortgage Corp. will apply and proceed in good faith to obtain such approval.

5.    Except as modified herein, the Loan Documents remain in full force and effect.  No change or modification shall be effective unless in writing and signed by the party to be changed with such change or modification.

Dated: July 28, 2008

AMERICAN HOME MORTGAGE CORP.

PARK NATIONAL BANK AND TRUST OF CHICAGO

By: _____
    Name: _____

    Position: _____

By: _____
    Name: _____
    Frederick D. Body
    Position: Senior Vice President

With respect to the mortgage on 950 Elmhurst Road, Mount Prospect, Illinois, and the related loan documents (the "Loan Documents") this is to confirm the following:

1.    The due date of the mortgage is extended through February 9, 2009 (the "Extended Due Date") subject to the principal balance and amounts coming due, pursuant to the Loan Documents, prior to the Extended Due Date.

2.    Monthly payments will continue to be made (with the same 7.18% interest rate) as were previously made under the Loan Documents.

3.    Whenever the mortgage loan comes due or prepaid, but no later than the Extended Due Date, there will be due to Park National, in addition to the amounts due under the Loan Documents, the following:  (a) Park National's legal fees through July 25, 2008 in the amount of $8,113.80, and (b) an extension fee of $8,806.40.

4.    If Bankruptcy Court approval is required, American Home Mortgage Corp. will apply and proceed in good faith to obtain such approval.

5.    Except as modified herein, the Loan Documents remain in full force and effect.  No change or modification shall be effective unless in writing and signed by the party to be changed with such change or modification.

Dated: August ___, 2008

AMERICAN HOME MORTGAGE CORP.

By: _____
    Name: Bret W Fernandes
    Position: Director of Restructuring

PARK NATIONAL BANK AND TRUST OF CHICAGO

By: _____
    Name: _____
        Frederick D. Body
    Position:  Senior Vice President

**Exhibit E**

Second Loan Modification Agreement

# **EXHIBIT E**

## SECOND LOAN MODIFICATION AGREEMENT

With respect to that certain Promissory Note (the "Note") dated August 9, 2005, in the original principal amount of $1,007,000 (the "Loan"), by American Home Mortgage Corp. ("Borrower), as maker, in favor of Park National Bank and Trust Company of Chicago ("Lender"), as payee, which Note is secured by that certain Mortgage (the "Mortgage") dated August 9, 2005, and recorded in Cook County, Illinois on August 12, 2005, as document number 0522449057, on the property known as 950 Elmhurst Road, Mount Prospect, Illinois (the Note, Mortgage and all other documents executed and/or delivered in connection with the Loan, all as amended by that certain loan modification agreement (the "First Modification") dated July 28, 2008, by and between Borrower and Lender, are herein referred to collectively as the "Loan Documents"), this is to confirm (the "Confirmation") the following:

1.    The due date of the Loan and the maturity date of the Note is extended through August 9, 2009 (the "Extended Due Date") subject to the principal balance and amounts coming due, pursuant to the Loan Documents, prior to the Extended Due Date.

2.    Monthly payments will continue to be made (with the same 7.18% interest rate) as were previously made under the Loan Documents.

3.    Whenever the Loan comes due or is prepaid, but no later than the Extended Due Date, there will be due to Park National, in addition to the amounts due under the Loan Documents, the following: (a) Park National's legal fees through January 31, 2009 in the aggregate amount of $15,000.00 (the "Legal Fees") and (b) an extension fee in the aggregate amount of $17,612.80 (the "Extension Fee"). Notwithstanding anything contained herein or in any one or more of the Loan Documents, including, but not limited to the, First Modification, to the contrary, Lender acknowledges and agrees that the aforementioned Legal Fees and Extension

066585.1001

Fee include in the totals thereof, and are not in addition to, the legal fees and extension fee provided for in Paragraph 3 of the First Modification. Lender acknowledges and agrees that Lender shall not be entitled to receive, and Borrower shall not be obligated to pay, or liable for, any legal fees or extension fees in excess of the above-listed $15,000.00 Legal Fees and $17,612.80 Extension Fee.

   4. If Bankruptcy Court approval is required for the validity of the Confirmation, American Home Mortgage Corp. will apply and proceed in good faith to obtain such approval.

   5. If there is an Event of Default under the Loan Documents, Park National may then apply to the Bankruptcy Court, on an expedited basis, to lift the bankruptcy stay and to vacate any injunction that is part of a confirmed bankruptcy plan. Notwithstanding the foregoing, the substantive rights of American Home Mortgage Corporation and other parties in interest to contest any such request on any and all bases is preserved.

   6. Except as modified herein, the Loan Documents remain in full force and effect. No change or modification shall be effective unless in writing and signed by the party to be changed with such change or modification. This Agreement may be executed in one or more counterparts by facsimile signatures and/or original signatures. The signatures of the parties who sign different counterparts of this Agreement or any of the instruments executed to effectuate the purposes of this Agreement shall have the same effect as if those parties had signed the same counterparts of this Agreement or of any such instrument.

End of Text – One Execution Page Follows

Dated: February 3, 2009

AMERICAN HOME MORTGAGE CORP.

PARK NATIONAL BANK AND TRUST
OF CHICAGO

By: _Bret W Hunt_
   Name: _Bret W Fernandes_
   Position: _Director of Restructuring_

By: _____
   Name: _____
         Frederick D. Body
   Position: _Senior Vice President_

Dated: February 3, 2009

AMERICAN HOME MORTGAGE CORP.

PARK NATIONAL BANK AND TRUST
OF CHICAGO

By: _____

Name: _____

Position: _____

By: _____

Name: _____
Frederick D. Body

Position: _Senior Vice President_

# EXHIBIT F

Redacted[1]

---

[1]    The Debtors intend to file a motion to seal the unredacted version of the *Debtors' Answering Brief in Opposition to Motion by U.S. Bank, N.A. (f/k/a Park National Bank) for Summary Judgment* and accompanying *Affidavit of Andrew A. Lundgren.*

# EXHIBIT G

1  FOR THE UNITED STATES BANKRUPTCY COURT
   FOR THE DISTRICT OF DELAWARE
2  Chapter 11 Case No. 07-11047 (CSS)
   ----------------------------------x
3  AMERICAN HOME MORTGAGE HOLDINGS,
   INC., a Delaware corporation,
4  et al.,
                        Debtor.
5  ----------------------------------x
6                      August 12 2010
                       10:12 a.m.
7
8                  CONFIDENTIAL
9
10          Deposition of SCOTT ROBERT MARTINEZ,
11      held at the offices of Zolfo Cooper, 1114
12      Avenue of the Americas, New York, New York,
13      pursuant to Notice, before Maureen
14      McCormick, a Notary Public of the State of
15      New York.
16
17
18
19
20             REGENCY REPORTING, INC.
21      Certified Court Reporters & Videographers
22      425 Eagle Rock Avenue      575 Madison Avenue
23      Roseland, NJ 07068         New York, NY 10022
24       www.regencyreporting.net    1-866-268-7866
25

CONFIDENTIAL

1        Scott Robert Martinez – August 12 2010
2   into a contract?
3        A.    I believe that these were still
4   subject to due diligence.  This is just their
5   initial offer, and there were sale agreements that
6   were being passed around back and forth between
7   the parties.
8        Q.    To your knowledge, did RN Realty ever
9   do their due diligence?
10        A.    I don't know.
11        MS. ZIEG:  You mean complete it?
12        Q.    You mentioned this letter of intent
13   was subject to due diligence.
14        A.    Uh-huh.
15        Q.    Was the contract that was being
16   negotiated subject to due diligence by RN Realty?
17        MS. ZIEG:  By contract, do you mean
18        APA?
19        MR. YUDELL:  Whatever you may want to
20        title it.
21        MS. ZIEG:  I just want to make sure he
22        understands, because when you say contract,
23        he might not understand.
24        A.    You're asking was the sale agreement
25   subject to the completion of due diligence?

CONFIDENTIAL

1          Scott Robert Martinez – August 12 2010

2          Q.     Right, the sale agreement that was

3  being negotiated?

4          A.     Yes, yes.

5          Q.     It was that agreement that was being

6  negotiated was still going to be subject to RN

7  doing additional due diligence, correct?

8          A.     Correct.

9          Q.     And despite the fact that the

10 agreement would still have provided RN Realty with

11 additional time to do due diligence, no asset

12 purchase agreement was ever entered into with RN

13 Realty, correct?

14         A.     Could you rephrase that question?

15         Q.     What you have in front of you as PNB 3

16 is a letter of intent that as you mentioned was

17 subject to RN Realty doing due diligence, correct?

18         A.     Yes.

19         Q.     And you said the asset purchase

20 agreement that was being negotiated with RN Realty

21 would have provided RN Realty with additional time

22 to conduct their due diligence, correct?

23         A.     I believe so, yes.

24         Q.     So my question -- what I'm trying to

25 get at is why wasn't -- what was the impasse

CONFIDENTIAL

1      Scott Robert Martinez – August 12 2010
2  between the debtors and RN Realty in getting to a
3  signed agreement, an asset purchase agreement?
4          MS. ZIEG:  Objection, form.
5      A.    Can you be more specific in what --
6      Q.    I'm trying to find out.  I can't be
7  more specific, because I'm trying to ask why --
8  what was the debtor asking for or what was RN
9  Realty asking you for that the other party wasn't
10  willing to give?
11      A.    RN Realty wanted an extension to the
12  due diligence period.
13      Q.    RN Realty wanted a longer due
14  diligence period than the debtors was willing to
15  give?
16      A.    Yes.
17          MS. ZIEG:  Are you asking for
18      everything that --
19          MR. YUDELL:  I'm asking for the
20      primary reason.
21      Q.    That was the primary reason?
22      A.    Yeah, I believe so, yes.
23      Q.    At some point, did negotiations stop
24  with RN Realty?
25          MS. ZIEG:  Objection to form.

CONFIDENTIAL

1              Scott Robert Martinez - August 12 2010
2        A.      You mean more specific in terms of
3   which --
4        Q.      Any discussions with RN Realty about
5   the purchase of the property?
6              MS. ZIEG:   About this purchase?
7        Q.      Was there more than one purchase
8   proposed by RN Realty?
9        A.      Yes.
10        Q.      What other purchase or purchases were
11   proposed by RN Realty?
12        A.      During which time frame?
13        Q.      During any time frame --
14              MS. ZIEG:   Objection, vague.
15        Q.      -- from and after August of 2007.
16        A.      There is the initial 1.8, and there
17   was a second offer of 1.855, and in 2009 I believe
18   they also came back with another offer.
19        Q.      And what is the amount of the other
20   offer that --
21        A.      I can't recall.
22        Q.      -- RN Realty made in 2009?
23        A.      I can't recall the number.  I know it
24   was under -- I know it was under 950,000.
25        Q.      When did negotiations of the offer

CONFIDENTIAL

1        Scott Robert Martinez - August 12 2010
2    contained in the letter of intent which has been
3    identified as PNB 3 -- when did those negotiations
4    stop?
5        A.      I believe those fell apart at the end
6    of 2008.
7        Q.      So the debtor negotiated with RN
8    Realty for a significant length of time?
9        A.      Yes.
10        Q.      From sometime before August of 2008
11    through sometime near the end 2008?
12        A.      Yes.
13            MR. YUDELL:   Let's mark this as PNB 4.
14            (PNB Exhibit 4, E-Mail, 11/13/08,
15        marked for identification.)
16            MR. YUDELL:   Just for the record, PNB
17        4 contains a document production number AHM
18        Mount Prospect 002904, and appears to be an
19        e-mail from Leigh Rabman, dated November 13,
20        2008, to Ted Buenger with CCs to several
21        people, including apparently Robert Semple
22        at Kroll, now Zolfo Cooper, and Matthew
23        Lunn, who is an attorney at Young Conaway,
24        who are the attorneys for American Home
25        Mortgage.

CONFIDENTIAL

1        Scott Robert Martinez - August 12 2010

2   what not, you had John Manglardi separately.   I

3   don't know if --

4           MS. ZIEG:   Let's just make it that

5       this deposition transcript is confidential,

6       and I don't have any issues with you showing

7       it to your client, but just can't get out to

8       third parties yet, but there are people that

9       signed NDAs and may have some issues about

10      disclosure of their names to outside

11      parties, but subject to that -- and we have

12      local rules that require that's the case,

13      but I just wanted to put that on the record.

14      Go ahead.

15          MR. YUDELL:   That's fine.

16      Q.    Do you need that question reread to

17  you?

18      A.    No.   Post petition it would be

19  assuming John Manglardi, when his first offer was

20  made, wasn't on behalf of First Chicagoland, and I

21  believe in July of 2009 the Moats came forward

22  with an offer.

23      Q.    How did the Moats make their offer?

24      A.    I believe it was in the form of an

25  e-mail.

CONFIDENTIAL

```
 1        Scott Robert Martinez — August 12 2010
 2             MS. ZIEG:  Objection.
 3    Q.    What was the amount of that offer?
 4             MS. ZIEG:  Objection, form.
 5    A.    I believe it was 700,000.
 6    Q.    Did the debtors accept this offer?
 7    A.    No.
 8    Q.    Did the debtors reject the offer?
 9    A.    We didn't accept it.
10             MS. ZIEG:  Objection, form.
11    Q.    Did debtors counteroffer?
12             MS. ZIEG:  Objection, form.
13    A.    I don't believe so, no.
14    Q.    Did the debtors respond to the offer
15 in any way?
16             MS. ZIEG:  Objection, form.
17    A.    I believe they were told that it was
18 too low.
19    Q.    And who told them, them being the
20 Moats?
21    A.    I'm not sure, but I believe it was
22 CBRE.
23    Q.    Did anybody at debtors direct CBRE to
24 take that action?
25             MS. ZIEG:  Objection, form.
```

CONFIDENTIAL

1        Scott Robert Martinez - August 12 2010

2        form.

3        Q.    Can you explain -- let's turn to the

4   third invoice.

5        A.    It's not.

6        Q.    Not chargeable to Mount Prospect?  Or

7   the fourth invoice, is that chargeable to Mount

8   Prospect?

9        A.    No.  I think the 20,000 is derived

10  from three years of 7,500.

11       Q.    From August of 2007 until the property

12  was abandoned in December of 2009, did insurance

13  rates remain flat?

14       A.    I don't know.

15            MS. ZIEG:  Objection.

16            By the way, this policy goes through

17       August of 2010, just so you know.

18            MR. YUDELL:  I understand.

19            MS. ZIEG:  And the record is clear.

20       Q.    Is this policy still in effect with

21  respect to the Mount Prospect property?

22       A.    No, it's expired.

23       Q.    Was the policy with respect to the

24  Mount Prospect property terminated prior to its

25  stated August 4, 2010, expiration date?

CONFIDENTIAL

```
1          Scott Robert Martinez - August 12 2010
2      A.    No.
3      Q.    Why not?
4      A.    Debtors never terminated it.
5      Q.    Would the debtors have received a
6  partial refund had they terminated it earlier?
7      A.    Potentially, yes.
8      Q.    How is the debtor's $20,000 claim for
9  insurance calculated?
10     A.    It looks like it's the 7500 that's
11 quoted on the Invoice No. 1 * 61178 for three
12 years, so 7500 times 3.
13     Q.    What were the actual insurance charges
14 with respect to the Mount Prospect property from
15 the petition date through August 3, 2009?
16     A.    I don't know specifically, because it
17 was -- again, it was bundled in one package.
18     Q.    Does the debtor have any records which
19 would set forth the actual amount of insurance
20 charges paid for the Mount Prospect property from
21 August -- from filing the petition through August
22 3, 2009?
23         MS. ZIEG:  Objection, form.
24     A.    You're looking for an itemized invoice
25 or document that shows a breakout of what was
```

CONFIDENTIAL

1        Scott Robert Martinez - August 12 2010

2        privilege and attorney/client communications

3        privilege, and we will not be providing them

4        on the basis of privilege.

5    RL         MR. YUDELL:   I disagree with that, but

6        we will let the court decide.

7        Q.     Other than counsel, did you speak to

8    anybody in preparing for today's deposition?

9        A.     No.

10        Q.     When did American Home Mortgage decide

11   to stop marketing the property?

12               MS. ZIEG:   Objection, form.

13        A.     I believe CB Richard Ellis's

14   engagement expired in August of 2009, and the

15   auction that we set in July of 2009 was

16   unsuccessful.

17        Q.     Was continuing with CB Richard Ellis

18   considered by debtors?

19        A.     At that point?  No.

20        Q.     Again, this is in July August 2009

21   time frame.  Did debtors consider engaging a

22   different company to market the property?

23        A.     No.

24        Q.     Other than Hilco, did debtors at any

25   time post petition consider engaging a different

# **EXHIBIT H**

900005.0004



Redacted

**From:** Grasl, Jeffrey [mailto:jgrasl@mcdonaldhopkins.com]
**Sent:** Wednesday, August 08, 2007 11:31 AM
**To:** Lunn, Matthew
**Cc:** Gross, Stephen; rnl@lorenzinilaw.com
**Subject:** AHM: Interest in purchase of certain assets

Mr. Lunn,

My name is Jeff Grasl and am one of the attorneys representing Mr. John Manglardi.  I would like to discuss with you a proposal from my client for the purchase of the 950 N. Elmhurst Road, Mount Prospect, Illinois property, plus all furniture fixtures and equipment on the premises, including the assignment of all leases (this would also include the purchase of phone and fax numbers, etc...).  My client is willing to make a cash bid of $1.5 million, or in the alternative, to assume the mortgage on the property.  Please give me a call to discuss.  Thank you.


Jeffrey S. Grasl, Esq.
McDonald Hopkins PLC | 39533 Woodward Ave.
Suite 318 | Bloomfield Hills, MI  48304
direct 248.220.1336 | fax 248.646.5075 | jgrasl@mcdonaldhopkins.com | www.mcdonaldhopkins.com

THE INFORMATION CONTAINED IN THIS TRANSMISSION IS ATTORNEY PRIVILEGED AND/OR CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE.  IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY NOTIFY ME BY TELEPHONE AND PERMANENTLY DELETE THE ORIGINAL AND ANY COPY OF THIS E-MAIL AND DESTROY ANY PRINTOUT THEREOF.



EXHIBIT

**EXHIBIT I**



# Finest Chicagoland Properties, LLC
950 N. Elmhurst Road
Mount Prospect, IL 60056

July 17, 2008

CB Richard Ellis
700 Commerce Drive
Suite 550
Oak Brook, IL 60523

Attn: Mr. Ted Buenger, Jr.

Re: Acquisition of 950 N. Elmhurst Road, Mount Prospect, Illinois

Dear Ted:

I am pleased to submit this letter of intent ("Letter") outlining the basic terms and condition under which Finest Chicagoland Properties, LLC, an Illinois limited liability company, its successors its successors and assigns ("Purchaser") would be prepared to purchase certain real estate owned by American Home Mortgage Holdings, Inc. ("Seller"). This letter is intended to establish a course of action, and not to bind either party at this time.

The following constitutes the basic terms and conditions:

1.  **Property Purchase:** Purchaser proposes to purchase the real property commonly known as 950 N. Elmhurst Road, Mount Prospect, Illinois (the "Land") together with all rights, privileges, easements and appurtenances to the Land owned by Seller, if any, including, without limitation, all easements, rights-of-way, and other appurtenances used in connection with the beneficial use or enjoyment of the Land (being referred to herein collectively as the "Appurtenances") and all improvements, buildings, fixtures, furniture, and equipment thereon (the "Improvements"). The Land, Appurtenances, and Improvements described above shall collectively be referred to as the "Real Estate," and all of furniture, equipment, machinery, office supplies, and all other personal property owned or leased by Seller located at the Real Estate (the "Personal Property") (the Real Estate and Personal Property shall be collectively referred to as the "Acquired Assets").

2.  **Purchase Price:** The purchase price Purchaser will pay for the Acquired Assets is One Million Five Hundred Thousand Dollars and 00/100 ($1,500,000.00). An

{1126910:3}

of their respective legal counsel, brokers, accountants, and other professional advisors.

This letter of intent shall be governed and construed in accordance with the laws of the State of Illinois.

If the foregoing is acceptable to Seller, please so indicate by signing this Letter where indicated and returning one copy to me. Your signature indicates that you are duly authorized to execute this Letter on behalf of the Seller.

Sincerely,

John Manglardi, Managing Member

Accepted and Agreed:

By: _____
Name: _____
Date: _____

[1263910:3]

earnest money deposit of Fifty Thousand Dollars ($50,000.00) within 3 days after the acceptance.

3. **Financing**: Purchaser has the capacity and support to close the transaction.

4. **Conditions to Obligations**: The completion of the transaction between the Purchaser and Seller will be subject to fulfillment, among other things, of the following:

   a. Buyer's satisfaction, in its sole discretion, with the results of its due diligence investigation.
   b. Negotiation, execution and delivery of definitive agreements and documents setting forth the definitive terms of the transaction, in form and substance mutually satisfactory to the parties and containing representations, warranties, covenants, undertakings, indemnification and other terms and conditions customary for a transaction of this nature (the "Definitive Documentation").
   c. Approval of the Definitive Documentation and the transactions contemplated thereby by the Buyer.
   d. Approval from the Bankruptcy Court of the Definitive Documentation and the transactions contemplated thereby.

5. **Process and Timetable**:

   a. Promptly after execution of this Letter by Seller, Seller will promptly give Purchaser, its lender, if any, and their professional advisors access to the information, facilities and personnel requested by them in order to perform their due diligence. Purchaser and Seller have as their mutual objective completion of all due diligence within 20 days.
   b. As promptly as practical after commencement of due diligence, Purchaser will cause its counsel to prepare drafts of the Definitive Documentation. Purchaser and Seller have as their mutual objective to negotiate, execute and deliver the Definitive Documentation within 30 days.
   c. Purchaser and Seller have as their mutual object to have a closing within 60 days from the date of this Letter is accepted and agreed to by the Seller.
   d. Each of the parties will bear their own cost and expenses in connection with the transaction.

6. **Nature of Letter**: The purpose of this letter of intent is to establish the parameters under which the parties may proceed towards consideration and consummation of specified transactions. By signing this letter of intent, the parties hereto are **not** bound to consummate any transactions for the purpose and sale of the Acquired Assets, or any similar transfer.

7. **Costs and Expenses**: Each party will bare its own costs and expenses in connection with the proposed transactions. including without limitation, the costs

{1263910:3}

# EXHIBIT J





**R N R E A L T Y**

August 28, 2008

<u>**Via: Email Delivery**</u>
American Home Mortgage Corp.
Debtor Case #07-11047 (CSS)
C/O Ted Buenger
CB Richard Ellis, as Agent
700 Commerce Drive Suite 550
Oak Brook, IL 60523

**Re:**  **Proposal for Purchase of 950 N Elmhurst Road/150 W Rand Road, Mount Prospect, IL ("Property").**

Dear Ted:

The following lays out the principal terms under which RN Realty Ventures, Inc. would proceed to negotiate to purchase the aforementioned Property.

| | |
|---|---|
| **Property:** | An approximately 67,383 SF site (land). |
| **Purchaser:** | RN Realty Ventures, Inc. |
| **Seller:** | Owner of Record |
| **Purchase Price:** | $1,855,000 plus/minus prorations |
| **Closing Date:** | Within 45 days after the expiration of the Feasibility Period. |
| **Earnest Money:** | $50,000 payable upon execution of the Contract. Said earnest money is to be deposited into a modified joint order escrow with interest to be earned thereon for the benefit of Purchaser. |
| **Prorations:** | Customary prorations, if any. Real estate taxes shall be prorated at 110% of the last ascertainable tax bill or current proposed assessment, if higher. |

R N R E A L T Y          ◆   225 W. Illinois, Suite 350      ◆   Tel  312.527.6200     ◆  www.rnrealty.com
V E N T U R E S , I N C .          Chicago, IL 60610                Fax  312.222.0356

**Due Diligence:** For a period of 45 days immediately following the last of full execution and delivery of a purchase contract ("Contract"), Purchaser's receipt of the Due Diligence Materials as herein defined, and Bankruptcy Court Approval, as set forth hereinafter (the "Feasibility Period"), Purchaser shall have an opportunity to examine the books and records of the Property, make inquiry concerning the Property with Seller and other applicable parties; investigate the physical condition of the Property and the feasibility of the Purchaser's intended acquisition of the Property. Purchaser shall have the right, in its sole discretion, to terminate the Contract at any time prior to the expiration of the Feasibility Period, and upon such termination, the earnest money shall be immediately returned to Purchaser. Due Diligence Materials shall include the following items which Seller shall deliver to Purchaser: current title commitment, ALTA survey as described below, and to the extent in effect, all leases, lease amendments, signed letters of intent to lease, option agreements, easement agreements and other binding agreements affecting the Property (including management and service contracts), studies, reports (including any soil or environmental reports) including the Phase I described below relating to the Property as well as notices pertaining to the Property from governing bodies or parties with interests in the Property. Seller shall also make available to Purchaser any other information pertaining to the Property which Purchaser may reasonably request.

**Encumbrances:** Purchaser shall agree to accept title to the Property subject only to the following: (a) general real estate taxes which are not yet due and payable; (b) such other covenants, conditions, restrictions and easements of record which are acceptable to Purchaser and (c) the Property being vacant and free of any and all tenancies or user licenses except for those leases identified in **Schedule A** hereof, which shall be confirmed by the respective tenants in estoppel letters to be received prior to closing.

**Survey:** Within thirty (30) days of a fully executed Contract, Seller shall provide Purchaser with a current ALTA survey of the Property (not older than 90 days).

**Environmental:** Within thirty (30) days of a fully executed Contract, Seller shall provide Purchaser with a current Phase 1 environmental report on the subject Property. An acceptable environmental report should disclose that there is no presence of "hazardous materials" in, on or about the Property which would require remediation. Should the report indicate the presence or potential of any "hazardous materials", Seller, at its cost, shall cause a Phase 2 investigation to be performed, in a manner satisfactory to Purchaser, so as to identify the nature and extent of the required remediation; whereupon the Feasibility Period shall be extended

so as to afford the Purchaser a reasonable period of time (but not less than 30 days) after completion of the Phase 2 report to evaluate the condition and the impact on its intent to purchase the Property. The Feasibility Period shall be extended to provide for such events.

**Transfer Taxes/ Closing Costs:**

Purchaser shall pay customary transfer taxes, if any, and Seller shall pay its respective City, State, County and other local transfer taxes. All escrow costs shall be borne equally. Seller shall provide at its cost satisfactory title insurance in the amount of the purchase price with extended coverage, a 3.1 zoning endorsement along with other customary coverages.

**Operation Pending Contract & Closing:**

Seller shall operate the Property in accordance with customary and prudent real estate practices and otherwise in the ordinary course of business; provided, however, Seller will not enter into any new leases or modify or terminate any existing leases without the prior written consent of Purchaser, which consent may be withheld in Purchaser's sole discretion; provided further, if the proposed lease or modification of an existing lease permits the lessor to terminate the lease on no more than 60 days notice, Purchaser's consent shall not be unreasonably withheld. Additionally, Seller shall not seek or apply to modify or vary the current zoning of the Property without Purchaser's prior written consent. Nor will Seller enter into any service contracts, which are not terminable at closing should Purchaser elect to terminate such contracts.

**Continuing Access:**

Commencing on the full execution of the Contract and continuing through and including the Closing Date, Purchaser and its agents and employees shall have access to the Property from time to time upon reasonable prior notice. Purchaser shall indemnify, defend, and hold Seller harmless from and against any and all loss, damage, liability and expense which Seller may incur solely as a result of any negligent act performed by Purchaser, or any of Purchaser's agents or employees; on or about the Property pursuant to this paragraph.

**Bankruptcy Covenants:**

Purchaser acknowledges that Seller has filed for protection under Chapter 11 of the Bankruptcy Code. Consequently, Purchaser is unwilling to proceed without approval ("Approval") of the Contract by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). Seller agrees that within five (5) days after full execution of the Contract, it shall file a Motion with the Bankruptcy Court seeking approval of the Contract (as same may be later modified in the reasonable discretion of the Seller) pursuant to 11 U.S.C. § 363, and diligently pursue approval of the Motion. If Seller shall not obtain Bankruptcy Court Approval within 45 days after the date of the Contract,

Purchaser may terminate the Contract. Additionally, Purchaser believes that sale of the Property might be subject to further bidding by other prospective purchasers at the discretion of Seller's Creditor's Committee. Therefore, the terms of the Contract will also contain the following provisions:

    i.)    <u>Bid Protection</u> – Bids must exceed the Purchase Price by 10%.

    ii.)    <u>Break-Up Fee</u> - Purchaser shall be paid a "break up fee" equal to $50,000 in the event another offer is accepted by Seller, such amount payable to Purchaser no later than closing of such sale.

    iii.)    <u>Right to Credit Bid</u> In the event further offers are solicited or a bid process is conducted, Purchaser shall have the right to make competing offers or tender bids and in such event, Purchaser shall have the right to "credit bid" its "break up fee" against such offer or bid.

**Exclusivity:**    So long as discussions and negotiations between Seller and Purchaser concerning the terms and conditions of the Contract are continuing, Seller and its representatives (whom Seller agrees to instruct accordingly) agree not to discuss, transmit information, engage in negotiations, or enter into any agreements or understandings with any third party for a possible sale or lease of the Property or any portion thereof.

**Non - Binding Effect:**    The terms and conditions set forth in this letter of interest represent a statement of the parties mutual understanding with respect to the transaction contemplated hereby, and other than Seller's agreement in the Exclusivity paragraph, binding and enforceable obligations with respect to the purchase and sale of the Property will only result upon the full execution of the Contract (which Contract shall be subject to Bankruptcy Court Approval, as set forth above). However, by this letter, the parties agree to be legally bound to negotiate in good faith to resolve matters which are not addressed or finalized in this letter, and to enter into the Contract incorporating such resolved matters and the terms and conditions described in this letter within twenty (20) days after Seller's acceptance of this letter. In the event the parties are unable to resolve such matters and execute the Contract within such twenty (20) day period, despite their good faith efforts to do so, neither party shall be obligated to consummate the transaction described in this letter and this letter shall be deemed null and void.

If the terms and conditions set forth in this letter are acceptable to Seller, please indicate such acceptance by having a copy hereof executed by an authorized party on behalf of Seller and returning such counterpart to me within three (3) days of the date of this letter.   If we have not received a fully signed counterpart of this letter within three (3) business days after the date of this letter, then this offer to purchase the Property on the terms and conditions outlined herein shall be deemed revoked and shall be of no further force or effect.   Immediately upon our receipt of an executed copy of this letter Seller will commence the preparation of the Contract in a form consistent with the terms contained herein.

We hope we can conclude this transaction on the terms outlined herein and should you have any questions regarding the above or the purchaser entity please don't hesitate to call me at 312-527-6200.

Very truly yours,
RN Realty Ventures, Inc.

Noah O'Neill
Acquisitions Associate

Agreed and accepted this _____ day of _____, 2008

**Seller:**

_____

by: _____, its _____

CC: Leigh Rabman, President

AHM Mt Prospect 001652

**Schedule A – Existing Leases**

| Business Name | Square Feet | Lease Expiration | Renewal Options | Comments |
|---|---|---|---|---|
| Farmers Insurance Agency | 480 | Expired 10/31/05 | 0 | Lease is assumed as month to month |
| TMP Investments | 2,100 | 8/31/08 | 0 | If tenant doesn't vacate it is assumed the lease runs month to month |
| Personal Training Center, Inc. | 6,700 | 12/31/08 | 1 – (1) yr | Renewal is concurrent with the Tanning Studio |
| The Darkside Tanning Studio, Ltd. | 1,600 | 12/31/08 | 1 – (1) yr | Renewal is concurrent with the Training Center |

CHICAGO\2506065.2
ID\SSH

AHM Mt Prospect 001653

## EXHIBIT K

Redacted[1]

---

[1]    The Debtors intend to file a motion to seal the unredacted version of the *Debtors' Answering Brief in Opposition to Motion by U.S. Bank, N.A. (f/k/a Park National Bank) for Summary Judgment* and accompanying *Affidavit of Andrew A. Lundgren.*

# EXHIBIT L

| | |
|---|---|
| **From:** | Joseph Aronauer <jaronauer@aryllp.com> |
| **Sent:** | Thursday, July 30, 2009 5:35 AM |
| **To:** | Lunn, Matthew <mlunn@ycst.com> |
| **Cc:** | Busenkell, Mike <MBusenkell@wcsr.com> |
| **Subject:** | RE: AHM - Mt. Prospect |

Would you stipulate to lift the stay with reserving all your rights
under 506(c) ?

---

Joseph Aronauer
ARONAUER, RE & YUDELL, LLP
444 Madison Avenue, 17th Floor
New York, NY 10022
Tel: (212) 755-6000
Fax: (212) 755-6006
Website: www.aryllp.com
-----Original Message-----
From: Lunn, Matthew [mailto:mlunn@ycst.com]
Sent: Wednesday, July 29, 2009 10:39 PM
To: Joseph Aronauer
Cc: Busenkell, Mike
Subject: RE: AHM - Mt. Prospect
The Debtors have a different view and may determine to proceed with
asserting a claim under 506(c). Please also be advised that the Debtors
do not intend to make the final payment due in the beginning of August
under the note.
-----Original Message-----
From: Joseph Aronauer [mailto:jaronauer@aryllp.com]
Sent: Tuesday, July 28, 2009 6:50 PM
To: Lunn, Matthew
Cc: Busenkell, Mike
Subject: FW: AHM - Mt. Prospect
I cannot read the print out; the type is too small. But I don't
see how Park National is liable under 506(c) of the Code for either (1)
the Debtor making mortgage payments that included real estate taxes , or
(2) for monies Debtor expended in an unsuccessful attempt to sell the
mortgaged property. I have reviewed Third Circuit law in this area and
I don't think Debtor has a valid claim.
Please let me know the status of what the Debtor plans to do
with the mortgaged property and if there is a court date. Thanks

---

Joseph Aronauer
ARONAUER, RE & YUDELL, LLP
444 Madison Avenue, 17th Floor
New York, NY 10022
Tel: (212) 755-6000
Fax: (212) 755-6006
Website: www.aryllp.com

-----Original Message-----
From: Lunn, Matthew [mailto:mlunn@ycst.com]
Sent: Friday, July 17, 2009 10:24 PM
To: Joseph Aronauer
Subject: AHM - Mt. Prospect
Joe:
Attached are the amounts the Debtors have spent during the chapter 11
cases to simply preserve the Mt. Prospect property. A determination has
not been made as to the amount of costs associated with the attempted
disposition of the Mt. Prospect property. After you have had an
opportunity to review the attached, please give me a call to discuss.
Thanks,
Matt
<<Mt Prospect.pdf>>
This email and any attached files are confidential and intended solely
for the intended recipient(s). If you are not the named recipient you
should not read, distribute, copy or alter this email. Any views or
opinions expressed in this email are those of the author and do not
represent those of the company. Warning: Although precautions have been
taken to make sure no viruses are present in this email, the company
cannot accept responsibility for any loss or damage that arise from the
use of this email or attachments.
This email and any attached files are confidential and intended solely for the intended
recipient(s). If you are not the named recipient you should not read, distribute, copy or alter
this email. Any views or opinions expressed in this email are those of the author and do not
represent those of the company. Warning: Although precautions have been taken to make
sure no viruses are present in this email, the company cannot accept responsibility for any
loss or damage that arise from the use of this email or attachments.

**EXHIBIT M**

900005.0004

| | |
|---|---|
| **From:** | Joseph Aronauer <jaronauer@aryllp.com> |
| **Sent:** | Thursday, July 30, 2009 3:40 PM |
| **To:** | Lunn, Matthew <mlunn@ycst.com> |
| **Cc:** | Busenkell, Mike <MBusenkell@wcsr.com> |
| **Subject:** | American Home Mortgage; Property at Mount Prospect, Illinois |

And in lieu of a lift stay, what about a 363 sale ?

Joseph Aronauer
ARONAUER, RE & YUDELL, LLP
444 Madison Avenue, 17th Floor
New York, NY 10022
Tel: (212) 755-6000
Fax: (212) 755-6006
Website: www.aryllp.com

Notice: This message, and any attached file, is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply e-mail and delete all copies of the original message. Thank you.

Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Aronauer, Re & Yudell, LLP for any loss or damage arising in any way from its use.

This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of the company. Warning: Although precautions have been taken to make sure no viruses are present in this email, the company cannot accept responsibility for any loss or damage that arise from the use of this email or attachments.

CONFIDENTIAL

**EXHIBIT N**

**PARK NATIONAL BANK**

**RISK RATE & ACCRUAL STATUS
CHANGE REQUEST**

| | |
|---|---|
| REQUEST DATE: | August 26, 2009 |
| LAST CHANGE DATE: | 09/15/08 |
| BORROWER: | American Home Mortgage Corporation |
| ACCOUNT-NOTE NUMBER: | #1005629/1 |
| LOAN OFFICER: | FDB/176 |
| CURRENT COMMITMENT: | $0 |
| NOTE BALANCE | $832,756.93 |
| PARTICIPATED % / BANK: | N/A |

| RISK RATING | | ACCRUAL STATUS | |
|---|---|---|---|
| CURRENT RISK RATE: | 5T | CURRENT ACCRUAL STATUS | A |
| PROPOSED RISK RATE: | 7 | PROPOSED ACCRUAL STATUS | N |

**REASONS FOR PROPOSED CHANGE(S):**
Chapter 11 filed August 2007.  Borrower continued making monthly payments until August 2009 when its attorney informed our counsel that no further payments will be made.  In fact, a suit has been filed by the borrower for $62,674.51 which is being claimed as preferential payments.

**BACKGROUND INFORMATION**
The original debt was originated in 1994 by Park National Bank.  American Home Mortgage Corporation assumed it in July 2005.

**FINANCIAL INFORMATION**
Financial information has not been provided.

**COLLATERAL DESCRIPTION**
1st mortgage on a 35,683 S/F retail/office building located at 950 N. Elmhurst Road/150 W. Rand Road, Mt. Prospect, IL.  The property was appraised in 1999 for $1,850,000 [$51.85/SF] which creates a 45% LTV.  A current appraisal is in process which will value the property as of today and as of the August 2007 bankruptcy date.

**OTHER INFORMATION**
The property is reportedly burdened by numerous easements recorded against it and has a reported LUST site next door.

**PAYMENT HISTORY**
The next payment due date is 08/01/09.

| RECOMMENDING OFFICER | CREDIT ADMINISTRATION APPROVAL |
|---|---|
| | |
| LOAN OFFICER | SENIOR LENDER |

PN000080

# EXHIBIT O

1

FREDERICK BODY

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE


IN RE:                              )

AMERICAN HOME MORTGAGE HOLDINGS,) Case No.

INC., a Delaware corporation,    ) 07-11047 (CSS)

et al.,                             )

            Debtors,              )




DEPOSITION OF FREDERICK BODY

Chicago, Illinois

September 1, 2010




REPORTED BY:  Tina Alfaro, RPR, CRR, RMR, CLR

FREDERICK BODY

1

2     MR. YUDELL:  Objection, form.

3  BY THE WITNESS:

4     A.  The easiest way to answer is if we have a

5  value, we do reduce that value by a small margin.

6     Q.  What is the reduction -- what's included in

7  that small margin that you reduce the value by?

8     MR. YUDELL:  Objection, form.

9  BY THE WITNESS:

10     A.  Carrying costs of the property, commission

11  if we have to sell it.

12     Q.  And what is included in carrying costs?

13  What do you mean by carrying costs?

14     A.  That could be anything.  It could be

15  utilities, it could be real estate taxes, it could

16  be insurance, which at times are mitigated by the

17  fact that there's rental income coming into us

18  also.

19     Q.  Okay.  And why does the bank need to think

20  about things like insurance on the property?

21     MR. YUDELL:  Objection to form.

22     MS. ZEIG:  I want to rephrase that because that

23  was a horribly phrased question.

24  BY MS. ZEIG:

25     Q.  Why would the bank need to pay for

FREDERICK BODY

1

2   insurance on the property once it has initiated

3   foreclosure proceedings?

4       MR. YUDELL:  Objection, form.

5   BY THE WITNESS:

6       A.  We would only acquire insurance if the

7   borrower did not have insurance on it.

8       Q.  Why would you want to have a piece of

9   property insured?

10      MR. YUDELL:  Objection, form.

11  BY THE WITNESS:

12      A.  That's our collateral.  It may be the only

13  source of repayment, and we need to insure it in

14  case there was any damage to the property or

15  anything that would diminish the value of that

16  property.

17      Q.  And does keeping insurance on the property

18  preserve the value of the property?

19      MR. YUDELL:  Objection, form.

20  BY THE WITNESS:

21      A.  No.

22      Q.  How does it not preserve the value of the

23  property?

24      A.  The value of the property is really based

25  on what the economic -- you know, the real estate

1            FREDERICK BODY

2  market is.  As we know, values today are not what

3  necessarily they were, you know, three years ago.

4       Q.  And would a better way to describe that be

5  that having insurance on the property protects the

6  bank in case something was to happen to that

7  collateral?

8       MR. YUDELL:  Objection, form.

9  BY THE WITNESS:

10      A.  Well, again, at what point in time are you

11  speaking of?

12      Q.  Once you've commenced foreclosure

13  proceedings you were saying that you make sure

14  there's insurance on the property.  If there isn't

15  insurance on the property you say the bank will

16  purchase insurance for the property.

17      A.  Right.

18      Q.  And the purpose, you said -- correct me if

19  I'm wrong or misstate what you said.  You said the

20  purpose of having insurance on the property is, I

21  think you said, to protect -- you might not have

22  said to protect -- was that in case something

23  happens to the property, that's the only way the

24  bank is going to get the money back?

25      A.  If it's foreclosed, that's correct.

FREDERICK BODY

Q.  If it's foreclosed.  So my question was, is
the purpose for purchasing insurance on a property,
to the extent insurance needs to be purchased, is it
to protect the bank's collateral?

MR. YUDELL:  Objection to form.

BY THE WITNESS:

A.  Well, it protects the bank's collateral.
It protects the borrower's equity, if there is any
equity in the property, because we're speaking of
prior to foreclosure.  It protects the tenants if
there's tenants in the property.  So it protects
more than just the bank.

Q.  How does it protect the tenants?

A.  If there's damage to the property where
they have their office, their store, what have you,
there's insurance funds available to build out and
rebuild so they can continue on with their business.

Q.  And you had said that sometimes the bank
can minimize its carrying costs by the rents it
collects?

A.  Correct.

Q.  So to the extent that you're collecting
rents on a property that foreclosure proceedings
have been initiated on, do you first use those rents

1                    FREDERICK BODY

2   to help reduce the carrying costs on that

3   property?

4        MR. YUDELL:  Objection to form.

5   BY THE WITNESS:

6        A.  The rents collected are used to pay the

7   expenses of the property.

8        Q.  Does it benefit the bank when there's

9   tenants in properties for which foreclosure

10  proceedings have been initiated?

11       MR. YUDELL:  Objection to form.

12  BY THE WITNESS:

13       A.  Not only does it benefit the bank, it

14  benefits the borrower because the more tenants you

15  have the more income that's generated by that

16  property.  In commercial real estate that means it's

17  worth more.

18       Q.  Okay.

19       A.  So there is a benefit to both.

20       Q.  There's a benefit to both.  Okay.

21           And what other types of costs are included

22  within carrying costs?

23       MR. YUDELL:  Objection to form.

24  BY THE WITNESS:

25       A.  I mentioned utilities, insurance, and

1                    FREDERICK BODY

2    taxes.  There may be some general maintenance of the

3    property.  There may be minor repairs of the

4    property.  Again, it varies.

5         Q.  And does the bank expend funds -- during

6    the initiation of the foreclosure proceedings until

7    foreclosure, does the bank expend funds on those

8    types of expenses that you just mentioned, minor

9    repairs, maintenance?

10        MR. YUDELL:  Objection to form.

11   BY THE WITNESS:

12        A.  Generally when we're in that situation

13   there's a receiver on the property.  The receiver

14   expends those funds, and the receiver may bill us

15   for reimbursement.

16        Q.  And does the bank typically pay for -- does

17   the bank typically reimburse the receiver?

18        MR. YUDELL:  Objection, form.

19   BY THE WITNESS:

20        A.  Yes.

21        Q.  On what basis does the bank decide whether

22   it's going to reimburse the receiver?

23        A.  I'm not sure if I understand the question.

24        Q.  Do you review -- do you personally, that's

25   you individually, do you review the receiver's

FREDERICK BODY

1
2  reports seeking reimbursement?

3       A.  On the properties -- on the loans that have

4  properties under receivership that are in my

5  portfolio, the reimbursement bill would come to me,

6  yes, and I would look at it.

7       Q.  And what would you do when you look at it?

8       MR. YUDELL:  Objection to form.

9  BY THE WITNESS:

10      A.  See what the expenses were for, how much

11  there were, and if it was repairs, I would probably

12  go out to the property and make sure the repairs are

13  done.

14      Q.  Okay.  So it's very hands-on when you're in

15  the workout group?

16      A.  Yes.

17      Q.  And is there any procedure by which you can

18  object to the reasonableness of some of those

19  expenses?

20      MR. YUDELL:  Objection to form.  Just for

21  purposes, are we talking only Illinois?  Because the

22  law may be different in different places.

23      MS. ZEIG:  I'm just talking about Mr. Body

24  generally.  I'm talking about him personally because

25  he was saying he goes out to the property.  So I

FREDERICK BODY

2  believe he only does properties in Illinois.

3      THE WITNESS:  No.  I have properties over the

4  entire United States.

5      MS. ZEIG:  Thank you.  I appreciate that.

6      MR. YUDELL:  I didn't want to get into

7  different laws in different states.

8  BY MS. ZEIG:

9      Q.  I'm only talking about properties in

10  Illinois, and we can generally say that as to this

11  entire deposition unless I say otherwise.

12          So with respect to properties that are in

13  the midst of foreclosure proceedings and for which a

14  receiver has been appointed, you stated that you

15  review the reports prepared by that receiver seeking

16  reimbursement and that sometimes you actually go out

17  to the property and make sure repairs have been done

18  and you generally review the report to make sure

19  that the expenses the receiver is seeking

20  reimbursement for are reasonable; is that correct?

21      A.  Yes.

22      Q.  And what happens -- or what do you do if

23  you don't believe the expenses are reasonable?

24      MR. YUDELL:  Objection, form.

25  BY THE WITNESS:

FREDERICK BODY

1

2    A.  Although I don't believe it's ever

3  happened, what I would do would be to pick up the

4  phone, call the receiver, and ask him, you know,

5  what the situation is.

6    Q.  Are you generally familiar with the

7  receivers that are appointed for your properties,

8  for properties that you personally are managing?

9    A.  Yes.

10    Q.  And so are you familiar with Mr. Jenson?

11    A.  Janson, yes.

12    Q.  And how many properties is he the receiver

13  for that are your responsibility?

14    A.  Three currently if we consider American

15  Home.

16    Q.  Okay.

17         And of the 200 that you were managing from

18  August 2007 until today, how many properties has

19  Mr. Jenson --

20    A.  Janson.

21    Q.  Janson.  If I was looking at the spelling.

22         (continuing) -- been the receiver for?

23    A.  Loans that were under my purview?

24    Q.  Yes, sir.

25    A.  At least a dozen.

1             FREDERICK BODY

2        Q.   And how do you know Mr. Beunger?

3        A.   He assisted Park National Bank on something

4   completely different eight or nine years ago.

5        Q.   And is that your only familiarity with

6   Mr. Beunger?

7        A.   Yes.

8        Q.   And did you ever speak to Mr. Beunger about

9   this property?

10       A.   I believe I did, yes.

11       Q.   And when were those conversations?

12       A.   To the best of my recollection, it was

13   around the time the renewal -- this loan was renewed

14   twice, if I remember.  It would have been around the

15   time of renewal I would have just called him and

16   asked what's happening and that would -- his

17   response I would try, you know, to put in our loan

18   presentation, maybe it's still being listed or

19   whatever, you know, if there were offers made or

20   what have you.  I would just put that in the loan

21   presentation for our committee's use.

22       Q.   So did you do that twice since there were

23   two --

24       A.   I believe I did.  I can't recall exactly,

25   but I believe I did it both times.

FREDERICK BODY

1

2      A.   That could be.

3      Q.   With respect to the first loan

4   modification, did that occur in August of 2008?

5      A.   I believe it did, yes.

6      Q.   Or the end of July 2008?

7      A.   Effective, yes.

8      Q.   And when did Park National Bank consider

9   reaching out to the Debtors to discuss that

10  extension?

11      MR. YUDELL:   Objection to form.

12  BY THE WITNESS:

13      A.   Park National did not discuss anything with

14  the Debtors at any time.   I believe Mr. Aronauer

15  might have --

16      Q.   He's your representative.   So...

17      A.   He had some conversations with whomever at

18  American Home.

19      Q.   Or counsel for American Home?

20      A.   That's why I'm saying whomever.   Right.

21      Q.   So Mr. Aronauer on your behalf, on Park

22  National's behalf, had discussions with the Debtor

23  regarding extension of maturity date?

24      A.   I believe so.

25      Q.   Is that your understanding?

                          FREDERICK BODY

1
2        A.   Yes.

3        Q.   Okay.  Did you direct Mr. Aronauer to have

4   those discussions?

5        MR. YUDELL:  Objection to form.

6   BY THE WITNESS:

7        A.   Probably.

8        Q.   Would he have gone and done it on his

9   own?

10       A.   No.

11       Q.   Is there any basis for why Park National

12   Bank considered extending the maturity date on the

13   loan?

14       A.   Yes.

15       Q.   And what is that basis?

16       A.   Payments had been made each and every

17   month, and it was our understanding -- or my

18   understanding, you know, that American Home was

19   trying to dispose of the property.  If they didn't

20   extend -- if the maturity date was not extended,

21   then I'd have a delinquent loan, which is something

22   nobody wants.

23       Q.   Right.

24       A.   In effect, it would give American Home more

25   time to sell the property.

1              FREDERICK BODY

2            AFTERNOON SESSION

3                                    (1:30 p.m.)

4              FREDERICK BODY,

5    the witness at the time of recess, having been

6    previously duly sworn, was further examined and

7    testified as follows:

8                  EXAMINATION

9                  (Resumed)

10   BY MS. ZEIG:

11        Q.  So we're back on the record, and you

12   remember that you were placed under oath this

13   morning?

14        A.  Yes.

15        Q.  And you know what it means to be under

16   oath?

17        A.  Yes.

18        Q.  What options did PNB consider to maximize

19   their recovery on the note?

20        MR. YUDELL:  Objection to form.  What time

21   period?

22        MS. ZEIG:  During his entire time period,

23   August 2007 to date.

24   BY THE WITNESS:

25        A.  Well, our main hope would have been that

FREDERICK BODY

1

2  American Home sells the property and pays us off in

3  full.

4      Q.  So that was your main hope.  What other

5  options did Park National consider as possibilities

6  for maximizing value or the recovery on the note?

7      MR. YUDELL:  Objection to form.

8  BY THE WITNESS:

9      A.  Well, either selling the note or, if we had

10  to, foreclose and sell the property.

11      Q.  So selling the note was a possibility in

12  Park National's -- Park National did consider

13  selling the note -- did Park National consider

14  selling the note?

15      A.  Yes.

16      Q.  And between the petition date and December

17  2008, did anyone -- did Park National reach out to

18  anyone about selling the note?

19      A.  No.

20      Q.  Did anyone reach out to Park National about

21  purchasing the note?

22      A.  Yes.

23      Q.  And who was that?

24      A.  Well, as you mentioned before, Berger.  I

25  forget his company's name.

FREDERICK BODY

1

2  the decision, but the decision to extend was made

3  basically, to the best of my recollections, for two

4  reasons.  Number one, American Home was still making

5  the payments as they had promised to make, and,

6  number two, so give them time to sell the property

7  and pay us off and they could walk away with some

8  money.

9       Q.  Did you have any concerns around the time

10  of the second loan modification that American Home

11  would not continue to make payments on the note?

12       A.  Again, I have never spoken with anyone from

13  American Home, but since they had continued to make

14  payments for how many years, I didn't necessarily

15  have any suspicion that they would stop.

16       Q.  And did you have any concerns they might

17  not sell the property for the amount of note?

18       MR. YUDELL:  Objection to form.

19  BY THE WITNESS:

20       A.  No concerns at all.

21       Q.  Is there any reason that PNB would seek

22  relief from the automatic stay other than because

23  they were concerned about the value of the property

24  or whether the Debtors would continue to make

25  payments on the note?

FREDERICK BODY

1

2     MR. YUDELL:  Objection to form.

3  BY THE WITNESS:

4     A.  You're talking January, February --

5     Q.  January 2010.

6     MR. YUDELL:  2009.

7  BY MS. ZEIG:

8     Q.  2009.  I apologize.  2009.

9     A.  I answered the first part before.  We had

10 no concerns about them paying because they always

11 paid in the past.  The second part about the real

12 estate, we had no concerns that they would not be

13 able to sell the real estate in an amount sufficient

14 to pay us off.

15    Q.  Okay.  In terms of January and February of

16 2009, would there be any reason at that time for the

17 bank to seek relief from the automatic stay?

18    MR. YUDELL:  Objection to form.

19 BY THE WITNESS:

20    A.  In this particular case?

21    Q.  Yes.  With respect to this particular loan.

22    A.  I don't believe there would be any.

23                (Debtor's Exhibit No. 97 was

24                 marked as requested.)

25 BY MS. ZEIG:

FREDERICK BODY

1

2    A.   I've never heard that expression.

3    Q.   Are you familiar with the concept of

4    secured creditor exemption?

5    A.   No.

6    Q.   Do you know what Park National Bank is

7    currently doing with the property?

8    A.   Do you mean U.S. Bank?

9    Q.   U.S. Bank as the successor in interest to

10   Park National Bank.

11   A.   It's in the ORE department, and, again, I'm

12   assuming that they're going to -- they're trying to

13   market the property and sell it for the highest

14   possible price.

15   Q.   Did you ask anyone in the REO department

16   what the current disposition of the property is?

17   A.   No.

18   Q.   So I'm going to assume that you do not

19   know -- do you know who's currently marketing the

20   property?

21   MR. YUDELL:   Objection to form.   If anybody.

22   BY MS. ZEIG:

23   Q.   If anybody.

24   A.   Well, Dan Lawlor is, call him, my

25   counterpart, if that's the right term.   He's

**EXHIBIT P**

# Transfer To REO Form

PARK NATIONAL BANK                                         Community Bank Of Vermont

| | |
|---|---|
| Date: | 07/21/10 |
| OREO Name: | American Home Mortgage |
| Previous Bank Ownership: | Park National Bank |
| Corporation to hold REO: | SA Challenger Inc |
| Became OREO via: | Foreclosure |
| Date of Sheriff's Sale | 05/25/10 |
| Bid Amount | $978,790.80 |
| Sale Confirmation Date | 07/01/10 |
| Date Deeded | tbd |

(Original Deed to be forwarded to REO Group w/in 30 days)

OREO Officer: Dan Lawlor
☑ SAG - EAST OAK PARK
☐ SAG - EAST REO  FFG
Lead Bank: Park National Bank
Lead Officer: Frederick D. body
Phone: 708-445-3216
Email: frederick.body@usbank.com

| Loan Information | Loan 1 | Loan 2 | Loan 3 | Loan 4 | Total |
|---|---|---|---|---|---|
| Loan Name on Metavante: | American Home Mortgage | | | | |
| Originating Bank Cost Center | 43878 | | | | |
| Account-Note# (use new USB CBOL Acct # | 25-0031014575-18 | | | | |
| Commitment #: | n/a | | | | $832,756.93 |
| Note Balance | $632,756.93 | | | | $0.00 |
| Less: Non-Accrual Interest Credits | | | | | $0.00 |
| Less: Prior Charge-Offs: | | | | | $0.00 |
| = Ledger Balance | $832,756.93 | $0.00 | $0.00 | $0.00 | $832,756.93 |
| Less: Parts Sold: | | | | | $0.00 |
| Less: Unearned Discounts & Fees: | | | | | $0.00 |
| Plus: Unaccreted Premiums & Costs: | | | | | $0.00 |
| Net Loan (G/L Balance) | | $0.00 | $0.00 | $0.00 | ($92,823.35) |
| Escrow Balance (Neg Bal put as "-") | $ | (92,823.35) | | | $925,580.28 |
| Loan Balance at Transfer | $925,580.28 | | | | |

(exact amount dollars and cents - no rounding)

*Negative/Positive Escrows will increase or decrease loan balance at transfer.

**Borrower Information**                  (not required if PNB is not the lead lender or is not the servicer of the loan)

Borrower: American Home Mortgage Corporation                  Borrower TIN/SSN: 13-3461558
Borrower Mailing Address: 538 Broadhollow Road, Melville, NY 11747-3876

**Property Information**

| Property Type: | Property A | Property B | Property C | Property D | List multiple properties only if they will be carried as one OREO asset. |
|---|---|---|---|---|---|
| Project Name (if applicable): | Mixed Use | | | | |
| Street Address: | 950 N. Elmhurst Road | | | | Use separate forms to set up multiple OREO assets. |
| City/State/Zip: | Mt. Prospect, IL 60056 | | | | |
| Description: | 34,505 S/F retail/office building built in 1970 on 1.54 acres. | | | | |

| Valuation/Charge-Off/Impairment | Property A | Property B | Property C | Property D | TOTAL |
|---|---|---|---|---|---|
| Appraisal Firm: | Arglanas & Associates | | | | |
| Date: | 05/13/10 | | | | |
| Market Value: | $940,000.00 | $0.00 | $0.00 | $0.00 | $940,000.00 |
| Margining % | 7.50% | | | | 7.50% |
| Less: Costs to Sell | ($70,500.00) | $0.00 | $0.00 | $0.00 | ($70,500.00) |
| Projected Proceeds | $869,500.00 | $0.00 | $0.00 | $0.00 | $869,500.00 |
| | What should be done about the Impairment? | | | Net Loan Exposure | $925,580.28 |
| | Charge Off Now | | | Estimated Impairment | ($56,080.28) |

New Appraisal Ordered    No        Expected Due Date

(not required if PNB is not primary manager of the asset)

**Real Estate Taxes**

| Property | PIN Number(s): | County | Annual Tax | Next Tax Due Date | Unpaid Taxes & Penalties |
|---|---|---|---|---|---|
| 950 N. Elmhurst Rd, Mt. Prospect | 03-27-307-024-0000 | Cook | $141,822.86 | 10/01/10 | $0.00 |
| | | | $0.00 | | $0.00 |
| | | | $0.00 | | $0.00 |
| | | | $0.00 | | $0.00 |

List additional PINs/amounts on a separate sheet. Provide copies of bills if available. Unpaid taxes will be confirmed and paid unless otherwise instructed.

If Taxes Past Due    Taxes Must Be Current At REO Transfer        Amount to be Paid    $0.00

Comments / Other Instructions

**Insurance (if participated to a third party or over $2.6MM Book Balance)**                    (not required if not participated or book balance is below $2.6MM)

Current Carrier: Force Placed                                                                Current Premium: _____
Informed of REO Status: TBD                                                                          Paid: _____
Is property in flood zone: No                    (Circle one)                         Expiration Date: _____

**Comments / Other instructions**
_____

**Other Payments**
☐ Other Payments / Amounts Due (see attached)
Attach bills / information regarding other amounts past due or that will be due on a regular basis (e.g. Association Fees, Water, Sewer, Utilities, etc.)
_____

**Attorney**
Is there an attorney working on this case?
Firm Name: Mike Goldstein                              Guarantor (yes/no): American Home Mortgage Investment Corp
Contact Name: _____                          Deficiency (yes - amount/no):        No
Contact Address: 17 N. State Street, Suite 980, Chicago, IL 60613          Next Action:        N/A
Phone & Email: 312-348-0045; mjg@mjglaw.com                        Next Action Date: _____

**Property Management**                                                    (not required if PNB is not primary manager of the asset)
Is there a management company, receiver, or other third-party managing the daily operations of the subject property? _____
Firm Name: Chicago Real Estate Resources                            Insurance Carrier: _____
Contact Name: Eric Janssen                                        Policy #: _____
Contact Address: 932 Grace Street, Chicago, IL 60613              Expiration Date: _____
Phone & Email: 773-327-9300; eric@crer.com

| Officer Checklist | Loan Servicing Checklist | Accounting Checklist |
|---|---|---|
| ☑ Form completed / signed | ☐ Transfer from Metavante to OREO Completed | G/L Account (Asset): _____ |
| ☐ Downstream Participants Informed of OREO status | ☐ Tax Monitoring Set Up on First American | G/L Account (Expense): _____ |
| ☑ REO memo completed and attached. | ☐ Flood Ins. Monitoring Set Up on First Am. | Cost Center: _____ |
| ☐ Keys included (if not, who has possession) | ☐ Taxes Paid | |

**Comments / Other Instructions/Other pertinent issues (other mortgages, zoning or physical condition issues,etc.)**
_____

**Approvals:**

| Officer/Team Leader | Dave Heyson | Jackie Barlow | Richard Mikos | Accounting | Loan Servicing |
|---|---|---|---|---|---|
| | | | *to be signed off via SAG submission | | |

## EXHIBIT Q

Redacted[1]

---

[1]  The Debtors intend to file a motion to seal the unredacted version of the *Debtors' Answering Brief in Opposition to Motion by U.S. Bank, N.A. (f/k/a Park National Bank) for Summary Judgment* and accompanying *Affidavit of Andrew A. Lundgren.*

# **EXHIBIT R**



**GT** GreenbergTraurig

Melissa E. Seller
Tel. 312.456.5209
Fax 312.899.0404
sellerm@gtlaw.com

May 19, 2009

**VIA FACSIMILE & FEDERAL EXPRESS**

Zolfo Cooper
1166 Avenue of the Americas, 24th Floor
New York, NY 10036
Attn: Scott Martinez
Facsimile No. 212-948-4226

John C. Kuffel, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
Facsimile No. 302-576-3478

David Berliner
BDO Consulting
135 West 50th Street
New York, NY 10020
Facsimile No. 212-515-2599

Mark S. Indelicato, Esquire
Hahn & Hessen LLP
488 Madison Avenue
New York, NY 20022
Facsimile No. 212-478-7400

Re:    Purchase and Sale Agreement dated as of April 17, 2009 (the "<u>Agreement</u>") by and
       between North Star Trust Company, an Illinois corporation, as successor-trustee to
       Park National Bank and Trust Company of Chicago, under Trust Agreement dated
       December 20, 1993 (known as Trust Number 10129) ("<u>Legal Owner</u>"), and American
       Home Mortgage Corp., a New York Corporation ("<u>Beneficiary</u>"; Legal Owner and
       Beneficiary are hereinafter collectively referred to as "<u>Sellers</u>"), and The Equitable
       Funds LLC, a Delaware limited liability company, or its permitted assignee
       ("<u>Purchaser</u>") for the purchase and sale of the real property commonly known as 950
       North Elmhurst Road and 150 West Rand Road, having a tax parcel number of 03-27-
       307-024 (the "<u>Property</u>").

ALBANY

AMSTERDAM

ATLANTA

AUSTIN

BERLIN*

BOSTON

BRUSSELS*

CHICAGO

DALLAS

DELAWARE

DENVER

FORT LAUDERDALE

HOUSTON

LAS VEGAS

LONDON*

LOS ANGELES

MIAMI

MILAN*

NEW JERSEY

NEW YORK

ORANGE COUNTY

ORLANDO

PALM BEACH COUNTY

PHILADELPHIA

PHOENIX

ROME*

SACRAMENTO

SHANGHAI

SILICON VALLEY

TALLAHASSEE

TAMPA

TOKYO*

TYSONS CORNER

WASHINGTON, D.C.

ZURICH

*STRATEGIC ALLIANCE

EXHIBIT
Debtors 15
8·19·10 TM

CHI 58,261,492v2
GREENBERG TRAURIG, LLP ▪ ATTORNEYS AT LAW ▪ WWW.GTLAW.COM
77 West Wacker Drive ▪ Suite 3100 ▪ Chicago, IL 60601 ▪ Tel 312.456.8400 ▪ Fax 312.456.8435

CONFIDENTIAL

Zolfo Cooper
May 19, 2009
Page 2

---

Gentlemen:

As you know, this office represents the Purchaser in connection with the above-referenced Agreement. Any initially capitalized term used, but not otherwise defined, in this letter shall have the meaning ascribed to such term in the Agreement.

In conducting its due diligence of the Property, Purchaser has uncovered several significant issues concerning the Property and its value. With my client's authorization, I am enclosing Purchaser's internal memo of May 11, 2009 briefly summarizing some of such matters (the "Memo"). In addition to the matters set forth in the Memo, on May 12, 2009, Purchaser learned additional information regarding the Property's rent stream that was materially different from that which had previously been represented to Purchaser in marketing and diligence materials. Specifically, (i) Greg Hahaj Personal Training Center, Inc.'s rent has been reduced from $7,700/month to $7,000/month, (ii) The Darkside Tanning Studio, Ltd.'s rent has been reduced from $2,205/month to $2,000/month, and (iii) despite the foregoing rent reduction, The Darkside Tanning Studio, Ltd. has not paid rent since February of 2008 (i.e., it has not paid rent for the last 15 months). On May 14, 2009, Purchaser received a cash flow statement for the Property reflecting a negative net operating income (for the most recently concluded twelve-month period) close to four times greater than that which had previously been represented to Purchaser in marketing and diligence materials.

Needless to say, the value of the Property is materially affected by the matters described in the Memo and outlined above. Therefore, on behalf of Purchaser, and in accordance with Section 6(b) of the Agreement, we hereby notify Beneficiary that Purchaser elects to terminate the Agreement. Please be advised that pursuant to Section 6(b) of the Agreement and the Escrow Instructions, Purchaser intends to promptly request that the Escrow Agent refund the Initial Deposit to Purchaser.

Adjusting the valuation to take into account the matters set forth above and in the Memo, Purchaser is willing to reinstate the Agreement at a Purchase Price of Eight Hundred and Sixty Five Thousand Dollars ($865,000.00) and otherwise on the same terms and conditions contained therein. In connection with reinstatement of the Agreement, Purchaser is prepared to waive its due diligence contingency and proceed to Closing.

Please contact me if you have any questions or would like to discuss.

Sincerely,

Melissa E. Seiler, Esq.
for GREENBERG TRAURIG

Enclosure

cc:    Jonathan Berger
       Josh Silverglade
       Sean W. Bezark, Esq.

*CHI 58,261,492v2*

CONFIDENTIAL

**EXHIBIT S**

900005.0004

1

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

IN RE:

AMERICAN HOME MORTGAGE          )

HOLDINGS, INC., a              ) Case No.

Delaware corporation,          )

et al.                         ) 07-11047 (CSS)

                               )

        Debtors.               )


DEPOSITION of TED BUENGER
Thursday September 2, 2010
Oak Brook, Illinois


Reported By:
TRICIA J. LATHOURIS, CSR, RPR
JOB NO. 20372

1                       TED BUENGER

2    we listed it at two million four.

3           Q       And is it typical that you would list

4    a property for more than what you would estimate it

5    will ultimately sell for?

6           A       If we thought that the buyer was

7    motivated to sell.

8           Q       You can put that aside, sir.

9           MR. YUDELL:  Could we go off the record for

10   a second?

11          MS. ZIEG:  Sure.

12                  (Off the record.)

13          MS. ZIEG:  Back on the record.

14   BY MS. ZIEG:

15          Q       In May of 2008 did you have any

16   thoughts about what the reasonable market value of

17   this piece of property would be?

18          MR. YUDELL:  Objection to form.

19          A       You know, we -- this is strange

20   because the listing agreement says 2.4, but I'm

21   pretty sure the actual -- when we marketed, I

22   thought it was at a lower price, but --

23          MS. ENDOY:  Can you repeat the question?

24          MS. ZIEG:  Sure.

25   BY MS. ZIEG:

**EXHIBIT T**

November 20, 2008

Ted Buenger
Vice President
CBRE
700 Commerce Drive
Suite 500
Oak Brook, IL 60523

Re: 950 N Elmhurst Road / 150 W Rand Road, Mt. Prospect, IL

Dear Ted:

We are pleased to submit this Letter of Intent to purchase 950 N. Elmhurst Road / 150 W. Rand Road in Mt. Prospect, Illinois (the "Property") from American Home Mortgage Corp. (the "Seller"). The following outlines the terms under which we would enter into an agreement to purchase the Property:

| | |
|---|---|
| Property: | Approximately 34,695 square foot building on 1.55 acres of land located at 950 N. Elmhurst Road / 150 W. Rand Road, Mt. Prospect, IL |
| Purchaser: | The Equitable Funds LLC, or its nominee |
| Seller: | American Home Mortgage Corp. |
| Purchase Price: | $1,315,000 |
| Financing Contingency: | None |
| Seller Representations: | None. Purchaser will acquire the property As-Is without Seller Representations or Warranties. |
| Due Diligence: | Once the contract receives approval from the United States Bankruptcy Court and the Seller provides to Purchaser the Information Documents, Purchaser shall have a period of 30 business days ("Due Diligence Period") to conduct its due diligence of the Property. If Purchaser, in its sole opinion, is not satisfied with the results of its due diligence, Purchaser may terminate the Contract by notifying Seller in writing prior to the expiration of the Due Diligence Period, at which time the Earnest Money and any interest earned thereon shall be returned to Purchaser. |


EXHIBIT
Debtors 5
PENGAD 800-631-6989
8.19.10 TA

0112

| | |
|---|---|
| Contract: | Purchaser will provide Seller with a purchase contract ("Contract") within five (5) business days of the execution of this Letter of Intent. |
| Information Documents: | Upon the execution of the Contract, Seller shall furnish Purchaser with copies of all documents that are in the Seller's possession or control and that relate to the Property including, but not limited to, building plans and specifications, plat of survey (including legal description), title policy, contracts, leases, licenses, and agreements affecting any portion of the Property (including management, maintenance, service, supply) that will survive the closing, any and all soil tests or environmental reports pertaining to the Property or neighboring properties, structural reports regarding any element of the building, any notices received from any governmental entity, authority or agency and the Real Estate Tax Bills (the "Information Documents") |
| Earnest Money: | Purchaser shall deposit $30,000 ("Earnest Money") into an escrow account at Chicago Title Insurance Company. Upon expiration of the Due Diligence Period the Earnest Money becomes non-refundable. At Closing the Earnest Money Deposit (and any interest earned thereon) shall be applied to the Purchase Price. |
| Closing Date: | Closing shall occur thirty (30) days after the expiration of the Due Diligence Period. |

Please let me know if the terms of this Letter of Intent are acceptable. If so, please sign a copy of this letter and return it to me. This offer shall expire, unless otherwise accepted by the Seller on December 5th 2008.

Also, we invite you to contact Douglas Boersma at JP Morgan Chase regarding our financial ability to close this transaction. He can be reached at (312) 661-5145. Thank you for you consideration.

Very truly yours,


Jonathan Berger


Accepted by:

   Its:

   Date:

0113

**EXHIBIT U**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE: | ) Chapter 11 |
|  | ) |
| AMERICAN HOME MORTGAGE | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware | ) |
| Corporation, et al., | ) Courtroom 6 |
|  | ) 824 Market Street |
| _____Debtors._____ | ) Wilmington, Delaware |

January 12, 2010
9:14 a.m.


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE CHRISTOPHER S. SONTCHI
UNITED STATES BANKRUPTCY JUDGE

APPEARANCES:


For Debtors:                        Young Conaway Stargatt & Taylor
                                    BY:  MICHAEL S. NEIBURG, ESQ.
                                    BY:  SEAN M. BEACH, ESQ.
                                    The Brandywine Building
                                    1000 West Street
                                    17th Floor
                                    Wilmington, DE 19801
                                    (302) 571-6600




ECRO:                               LESLIE MURIN

Transcription Service:              DIAZ DATA SERVICES
                                    331 Schuylkill Street
                                    Harrisburg, Pennsylvania 17110
                                    (717) 233-6664


Proceedings recorded by electronic sound recording; transcript
produced by transcription service

APPEARANCES:
(Continued)


For AT&T:                          Archer & Greiner, P.C.
                                   BY:  JENNIFER L. STORY, ESQ.
                                   300 Delaware Avenue
                                   Suite 1370
                                   Wilmington, DE 19801
                                   (302) 777-4350



For The Official Committee        Hahn & Hessen LLP
Of Unsecured Creditors:           BY:  EDWARD L. SCHNITZER, ESQ.
                                   488 Madison Avenue
                                   New York, NY 10022
                                   (212) 478-7200

                                   Blank Rome LLP
                                   BY:  VICTORIA A. GUILFOYLE, ESQ.
                                   1201 Market Street
                                   Suite 800
                                   Wilmington, DE 19801
                                   (302) 425-6400


For ABN AMRO Bank:                Milbank Tweed Hadley & McCloy
                                   BY:  ROBERT J. MOORE, ESQ.
                                   BY:  FRED NEUFELD, ESQ.
                                   601 South Figueroa Street
                                   30th Floor
                                   Los Angeles, CA 90017-5735
                                   (213) 892-4000

For US Bank:                      Womble Carlyle Sandridge & Rice
                                   BY:  MICHAEL BUSENKELL, ESQ.
                                   222 Delaware Avenue
                                   Wilmington, DE 19801
                                   (302) 252-4320

For American Home Mortgage:       Eileen Wanerka

TELEPHONIC APPEARANCES:

For Eeco Electric:                Steven Breest

1   worth $200,000, and the State of Delaware comes in and assert

2   -- and puts a 50 million -- $50,000 claim ahead of me, all

3   right.  I'm still over-secured.  I can still foreclose, I can

4   still get paid my 100,000, provided that I pay the 50 to the

5   state, and then you get the 50 equity.  You're the one that's

6   hurt, not the mortgage holder.

7           MR. BEACH:  I under --

8           THE COURT:  And that -- and I'm not saying that

9   that's what happened, but I -- the only way I can make that

10  determination is based on evidence.

11          MR. BEACH:  I understand, Your Honor.  And, you

12  know, obviously we'll be arguing to Your Honor --

13          THE COURT:  The value of the property.

14          MR. BEACH:  -- somewhere -- value of the property

15  based on the --

16          THE COURT:  I agree with you that if the facts were

17  such that the property was worth 125 under the same analysis,

18  the effect is to reduce their collateral from 100 to 75, that's

19  a harm.  They're hurt.  And paying that 50 to avoid that lien

20  benefits them, however only to the extent of $25,000, not 50.

21  So one could argue that the 506(c) claim in that instance would

22  be limited to $25,000.

23          MR. BEACH:  I understand, Your Honor.

24          THE COURT:  All right.

25          MR. BEACH:  So, Your Honor, I think where that

**EXHIBIT V**

**Exhibit G**

Insurance Invoice





**InterCity Agency, Inc.**

**INSURANCE**

Business built
through trust.

And a commitment
to keeping it.

REMIT TO: 42-40 BELL BOULEVARD, SUITE 103 • BAYSIDE, NEW YORK 11361 • PHONE 718 279-7700 • FAX 718 631-0067

STEGER DIVISION: 277 NORTH AVENUE • NEW ROCHELLE, NEW YORK 10801 • PHONE 914 632-6869 • FAX 914 632-3718

## ——— INVOICE ———

American Home Mortgage Investment Corp.
538 Broadhollow Road
Attn: Paul Moran
Melville, NY  11747

| | |
|---|---|
| Invoice Date | 08/03/09 |
| Invoice No. | 86634 |
| Bill-To Code | AMEHO |
| Client Code | AMEHO |
| Inv Order No. | 1*61178 |

Named Insured: American Home Mortgage Investment Corp.

Amount Remitted: $

Please return this portion with your payment.

Make checks payable to: Intercity Agency, Inc.

| Effective Date | Policy Period | Description | Total Amount |
|---|---|---|---|
| 08/04/09 | 08/04/09 to 08/04/10 | Chubb Group Policy No. 35800229 *Renewal - Commercial Package | 7,453.00 |
| | | Mt. Prospect, IL $3,250,000 Building Special 500,000 Rents 1,000,000/2,000,000 GL | |
| | | Invoice Number: 86634   Amount Due: | 7,453.00 |

*(handwritten: OK to Pay, signature, 8/4/09)*

*(handwritten notes in lower right)*

Premium Due On Payable on Effective Date

NAT    Page: 1              ORIGINAL INVOICE



**InterCity Agency, Inc.**

**INSURANCE**

Business built through trust.

And a commitment to keeping it.

REMIT TO: 42-40 BELL BOULEVARD, SUITE 103 • BAYSIDE, NEW YORK 11361 • PHONE 718-279-7700 • FAX 718-631-0067

STREGER DIVISION: 277 NORTH AVENUE • NEW ROCHELLE, NEW YORK 10801 • PHONE 914-632-6869 • FAX 914-632-3718

## ——INVOICE——

American Home Mortgage Investment Corp.
538 Broadhollow Road
Attn: Paul Moran
Melville, NY  11747

Named Insured: American Home Mortgage Investment Corp.

| | |
|---|---|
| Invoice Date | 08/03/09 |
| Invoice No. | 86635 |
| Bill-To Code | AMEHO |
| Client Code | AMEHO |
| Inv Order No. | 1*61182 |
| Amount Remitted: $ | |

Please return this portion with your payment.

**Make checks payable to: Intercity Agency, Inc.**

| Effective Date | Policy Period | Coverage Description | Amount Due |
|---|---|---|---|
| 08/04/09 | 08/04/09 to 08/04/10 | Chubb Group Policy No. 35800229 *Renewal - Commercial Package<br><br>Melville, NY<br>$1,000,000 BPP/EDP<br>$1,000,000/2,000,000 GL<br>$1,000,000 EBL | 6,333.00 |
| | | Invoice Number: 86635        Amount Due: | 6,333.00 |

Billing Due and Payable on Effective Date

NAT   Page: 1          ORIGINAL INVOICE



**InterCity Agency, Inc.**

**INSURANCE**

Business built
through trust

And a commitment
to keeping it.

REMIT TO: 42-40 BELL BOULEVARD, SUITE 103 • BAYSIDE, NEW YORK 11361 • PHONE 718 279-7700 • FAX 718 631-0067

STREGER DIVISION: 277 NORTH AVENUE • NEW ROCHELLE, NEW YORK 10801 • PHONE 914 632-6869 • FAX 914 632-2718

## — INVOICE —

American Home Mortgage Investment Corp.
538 Broadhollow Road
Attn: Paul Moran
Melville, NY 11747

| | |
|---|---|
| Invoice Date | 08/03/09 |
| Invoice No. | 86638 |
| Bill-To Code | AMEHO |
| Client Code | AMEHO |
| Inv Order No. | 1*61188 |

Named Insured: American Home Mortgage Investment Corp.

Amount Remitted: $

Make checks payable to: Intercity Agency, Inc.

| Effective Date | | Description | Amount |
|---|---|---|---|
| 08/04/09 | 08/04/09 to 08/04/10 | Chubb Group Policy No. TBD *Rewrite - Umbrella Liability | 6,925.00 |
| | | $5,000,000 | |
| | | Invoice Number: 86638     Amount Due: | 6,925.00 |

Premiums Due and Payable on Effective Date

NAT     Page: 1          ORIGINAL INVOICE



**InterCity Agency, Inc.**

**INSURANCE**

Business built
through trust.

And a commitment
to keeping it.

REMIT TO: 42-40 BELL BOULEVARD, SUITE 103 • BAYSIDE, NEW YORK 11361 • PHONE 718-279-7700 • FAX 718-631-0067

STREGER DIVISION: 277 NORTH AVENUE • NEW ROCHELLE, NEW YORK 10801 • PHONE 914-632-6869 • FAX 914-632-5718

## ----- INVOICE -----

American Home Mortgage Investment Corp.
538 Broadhollow Road
Attn: Paul Moran
Melville, NY  11747

| | |
|---|---|
| Invoice Date | 08/03/09 |
| Invoice No. | 86639 |
| Bill-To Code | AMEHO |
| Client Code | AMEHO |
| Inv Order No. | 1*61183 |

Named Insured: American Home Mortgage Investment Corp.

Amount Remitted: $

Please return this portion with your payment.

Make checks payable to: Intercity Agency, Inc.

| Effective Date | Policy Period | Description | Amount |
|---|---|---|---|
| 08/04/09 | 08/04/09 to 08/04/10 | Federal Insurance Company Policy No. 73523338 *Renewal - Commercial Automobile | 800.00 |
| | | Hired and Non-Owned liability | |
| | | Invoice Number: 86639          Amount Due: | 800.00 |

Premium Due and Payable on Effective Date

NAT    Page: 1              ORIGINAL INVOICE

**EXHIBIT W**



**From:** Joseph Aronauer [mailto:jaronauer@aryllp.com]
**Sent:** Friday, June 20, 2008 12:06 PM
**To:** Enos, Kenneth
**Subject:** RE: 950 N. Elmhurst Road, Mt. Prospect, IL 60056

Ken: Please give me a call next week. The mortgage comes due on August 6, 2008. thanks

---

Joseph Aronauer
ARONAUER, RE & YUDELL, LLP
444 Madison Avenue, 17th Floor
New York, NY 10022
Tel: (212) 755-6000
Fax: (212) 755-6006
Website: www.aryllp.com

**From:** Enos, Kenneth [mailto:kenos@ycst.com]
**Sent:** Friday, October 26, 2007 10:34 AM
**To:** Joseph Aronauer
**Subject:** RE: 950 N. Elmhurst Road, Mt. Prospect, IL 60056

Joseph - I have spoken with the Company and they are in the process of obtaining a real estate broker to sell the property. At this point, the sale is being managed by Kroll Zolfo Cooper so there is really no one available at the Company who can speak with your client. However, to the extent you need any additional information beyond that which I have provided, please let me know and I will do my best to obtain it.

Regards,

Kenneth J. Enos
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
Phone: 302-571-5003
Facsimile: 302-576-3289
kenos@ycst.com

CONFIDENTIAL

This message may contain confidential attorney-client communications or other protected information. If you believe you are not an intended recipient (even if this message was sent to your e-mail address), you may not use, copy, or retransmit it. If you believe you received this message by mistake, please notify us by return e-mail, and then delete this message. Thank you for your cooperation.

**From:** Joseph Aronauer [mailto:jaronauer@aryllp.com]
**Sent:** Thursday, October 25, 2007 1:54 PM
**To:** Enos, Kenneth
**Subject:** 950 N. Elmhurst Road, Mt. Prospect, IL 60056

We represent Park National Bank which holds a mortgage on the above property. My client would like to speak to someone at American Home to get a sense of the tentative plans for the property.  Please let me know if that is acceptable.  My contact information is set forth below.

Joseph Aronauer
ARONAUER, RE & YUDELL, LLP
444 Madison Avenue, 17th Floor
New York, NY 10022
Tel: (212) 755-6000
Fax: (212) 755-6006
Website: www.aryllp.com

Notice: This message, and any attached file, is intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by reply e-mail and delete all copies of the original message. Thank you.

Although this email and any attachments are believed to be free of any virus or other defect that might affect any computer system into which it is received and opened, it is the responsibility of the recipient to ensure that it is virus free and no responsibility is accepted by Aronauer, Re & Yudell, LLP for any loss or damage arising in  any way from its use.

This email and any attached files are confidential and intended solely for the intended recipient(s). If you are not the named recipient you should not read, distribute, copy or alter this email. Any views or opinions expressed in this email are those of the author and do not represent those of the company. Warning: Although precautions have been taken to make sure no viruses are present in this email, the company cannot accept responsibility for any loss or damage that arise from the use of this email or attachments.

AHM_Mt_Prospect_002296

## EXHIBIT X

Redacted[1]

---

[1] The Debtors intend to file a motion to seal the unredacted version of the *Debtors' Answering Brief in Opposition to Motion by U.S. Bank, N.A. (f/k/a Park National Bank) for Summary Judgment* and accompanying *Affidavit of Andrew A. Lundgren.*