**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | |
| HOLDINGS, INC., a Delaware corporation, | ) | Case No. 07-11047 (CSS) |
| <u>et al.</u>[1] | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |
| | ) | **Ref. Docket No. 9213** |
| ----------------------------------------------------------- | ) | |

**DEBTORS' OBJECTION TO ADMINISTRATIVE EXPENSE**
**CLAIMS NUMBERED 10802, 10803, 10804, 10805, 10806, 10807,**
<u>**10808 AND 10809 FILED BY DEBORAH MILLS**</u>

The above-captioned debtors and debtors-in-possession ("<u>AHM</u>" or the

"<u>Debtors</u>") submit this objection (the "<u>Objection</u>") to administrative expense claims numbered

10803, 10804, 10805, and 10807 (the "<u>Mills Claims</u>")[2] filed by Ms. Deborah E. Mills ("<u>Ms.</u>

<u>Mills</u>") and request entry of an order disallowing and expunging the Mills Claims in full.[3]  In

support of this Objection, the Debtors respectfully represent as follows:

<u>**PRELIMINARY STATEMENT**</u>[4]

1.    The Mills Claims have no support in fact or law.  By the Mills Claims,

Ms. Mills alleges that (i) the Debtors fraudulently induced Ms. Mills to borrow $1,162,000 under

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("<u>AHM Holdings</u>"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("<u>AHM Investment</u>"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("<u>AHM Acceptance</u>"), a Maryland corporation (1979); AHM SV, Inc., f/k/a American Home Mortgage Servicing, Inc. ("<u>AHM SV</u>"), a Maryland corporation (7267); American Home Mortgage Corp. ("<u>AHM Corp.</u>"), a New York corporation (1558); American Home Mortgage Ventures LLC ("<u>AHM Ventures</u>"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("<u>Homegate</u>"), a New York corporation (7491); and Great Oak Abstract Corp. ("<u>Great Oak</u>"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

[2]    Ms. Mills, through her counsel, represented that she is withdrawing claims numbered 10802, 10806, 10808, and 10809.  To the extent that such claims are not withdrawn, the Debtors object to such claims on the bases set forth herein.

[3]    In the alternative, the Debtors seek entry of an order reducing and/or reclassifying the Mills Claim as set forth below.

[4]    Capitalized terms not defined in the Preliminary Statement shall have the meanings ascribed to such terms *infra*.

the Mills Loans as a result of statements allegedly made by Ms. Mills's own broker (Tanya Lettau, employed with JP Morgan Chase), and (ii) the Debtors wrongfully foreclosed on the Mills Loans based on unidentified "technical deficiencies" under California law. For the reasons described in detail below, including judicial estoppel, waiver, standing and failure to plead essential elements, Ms. Mills should be precluded from bringing the Mills Claims. Should the Mills Claims survive these gating issues, Ms. Mills cannot meet her substantive burdens and, given that the loan origination, alleged fraudulent statements and non-judicial foreclosure all occurred more than a year prior to the Petition Date, there is absolutely no basis to support the asserted administrative expense priority of the Mills Claims.

2.      First, Ms. Mills fails to establish fraud in the inducement. Ms. Mills alleges that her broker said that the Debtors agreed to provide Ms. Mills additional financing against the Property before December 2005. This claim is supported only by her own self-serving statements and is directly contradicted by the testimony of Ms. Mills's own broker, Ms. Lettau. Even if this Court determines that the broker's representation was made, Ms. Mills fails to meet her burden because she cannot show that: (i) the Debtors had knowledge of Ms. Lettau's statement; (ii) Ms. Mills changed her position in reliance on the alleged statement; (iii) any such reliance would be justifiable given, among other things, her knowledge that the Loan Applications provided false and inaccurate financial information; and/or (iv) any damages resulted from reliance on the misstatement (particularly in light of the fact that she defaulted on the Loans after one payment and several months before December 2005 when the funds were allegedly to be made available).

3.      Second, with respect to Ms. Mills's allegations of wrongful foreclosure, Ms. Mills fails to provide any particular fact with respect to her assertion of "technical deficiencies" required under California law. Moreover, the purported expert, Mr. Austin, that signed the declaration attached to the Mills Claims and was to support her vague allegations of

"technical deficiencies" under California law, is apparently no longer testifying as an expert on her behalf and his declaration is no longer being used to support the Mills Claims. Notably, Ms. Mills had the opportunity to raise concerns with respect to the non-judicial foreclosure at all times during the foreclosure process, in the Mills Bankruptcy (wherein she was represented by counsel), and at her Eviction Hearing. Ms. Mills never contested the foreclosure. To date, Ms. Mills has not stated a proper claim or identified a specific deficiency in the non-judicial foreclosure process and should be precluded from doing so after the conclusion of discovery.

4.     Finally, the equities fall heavily in favor of the Debtors. For instance:

- Ms. Mills never offered or attempted to reinstate the Mills Loans. In fact, Ms. Mills never had sufficient funding to reinstate the Mills Loans. (Mills Dep. 560:21-25.)

- AHM offered Ms. Mills a payment plan that would enable Ms. Mills to cure the defaulted payments, but the payment plan was refused by Ms. Mills. See Letter to Judge Sontchi Dated September 22, 2008 (attached to claims 10764 and 10765).

- Ms. Mills openly admitted to lying on her tax returns ("Yes, I lied on my taxes, call the IRS.") (Mills Dep. 605:8-12.)

- Ms. Mills lied in her Loan Applications. For instance:

  o The Loan Application identified only 2 assets. The first was a certificate of deposit in the amount of $500,000 with Singapore Bank. The $500,000 CD was identified on the Loan Application as the source of her down payment and a "liquid asset" to demonstrate her financial wherewithal. To the extent the $500,000 CD even existed, Ms. Mills testified that she never had access to the $500,000 CD and that the funds were not hers (Mills Dep. 296-297.) The second asset was a mobile home that she sold 2 months prior to filling out the Loan Application. While the Loan Application lists the Property as sold, it does not indicate that the net proceeds of the property were substantially less than the asset value listed on the Loan Application and it is unclear what happened to the cash proceeds. (Mills Dep. 312-313.)

  o Ms. Mills did not disclose (as required) that she was a party to pending Kuehn Litigation for fraud on her Loan Applications because she decided that the litigation did not have merit. (Mills Dep. 326-327.)

- o  Ms. Mills attested in her Loan Application that no money was borrowed for the down payment and never disclosed that she borrowed $164,000 from Mr. Kuhn (a recently widowed 81 year old man) (Mills Dep. 548:11-15.), who later sued her for fraud.

  o  Ms. Mills listed a gross monthly income of more than $28,000, which is contradicted by her bankruptcy schedules and statements filed under penalty of perjury.[5]

- •  Ms. Mills materially misrepresented facts in her individual bankruptcy case.  For instance:

  o  She intentionally used tax returns she knew to be inaccurate as the basis for her Schedules and SOFA  (Mills Dep. 521-523.)

  o  Ms. Mills intentionally omitted the Kuhn Loan on her Schedules. (Mills Dep. 548:22-24.) and when later sued for fraud by Mr. Kuhn in an adversary proceeding in the Mills Bankruptcy, settled the matter for $7,500.  Ms. Mills testified that the Kuhn Settlement, which was approved by the California Bankruptcy Court in connection with the settlement of an adversary for nondischargeability of a debt in her chapter 7 bankruptcy, was merely an "on-record" agreement for the attorneys, but Ms. Mills had an "off-the-record" settlement with Mr. Kuhn and that she would pay back the Kuhn Loan in full. (Mills Dep. 551-552.)

- •  Ms. Mills purposefully violated the California court's order at the Eviction Hearing by failing to vacate the Property, stating that "[she] wasn't going [without] a fight."[6] (Mills Dep. 586:4-17.)

5.      For the foregoing reasons, and as set forth more fully below, the Mills

Claims must be denied in their entirety.

## **JURISDICTION**

6.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), in that it is a matter

concerning the administration of the Debtors' estates.  Venue is proper in this Court pursuant to

---

[5]      On several occasions during discovery, the Debtors requested copies of Ms. Mills tax returns.  She refused to provide them stating that she no longer had copies.  When the Debtors provided her with guidance on how she could quickly obtain copies at no cost, Ms. Mills (through counsel) responded by stating that the tax returns were not relevant.  While this assertion is baseless, the Debtors determined that burdening the Court with a motion to compel was unnecessary given the material discrepancies between the income identified on her Loan Application, her testimony and her bankruptcy schedules.  Moreover, she had already testified to lying on her tax returns.

[6]      The transcript records Ms. Mills response as "I wasn't going out with a fight."  Counsel for the Debtors represents that the transcript erroneously transposed the words "out with."

28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections

502(b) and 503 of the Bankruptcy Code and Bankruptcy Rules 3003 and 3007.

## BACKGROUND

### A.    Mills Purchase of the Property

       7.      On or about May 19, 2005, Ms. Mills and Hilliard Development, LLC

entered into an agreement (as amended by counteroffer, the "Purchase Agreement") to purchase

that certain property located at 1880 Burnt Rock Way, Templeton, California (the "Property")

for a purchase price of $1,375,000 (the "Purchase Price").  A copy of the Purchase Agreement,

(as amended by the counteroffer, the "Counteroffer"), is attached hereto as Exhibit A.

       8.      Pursuant to the Purchase Agreement, Ms. Mills intended to seek financing

for $1,100,000[7] of the Purchase Price (Purchase Agr. ¶ 2(C); Counteroffer ¶ 1(B) and (C)(1)).

Accordingly, Ms. Mills was responsible for the remaining $275,000 of the Purchase Price

(excluding closing costs) (Purchase Agr. ¶¶ 2(A) and (E); Counteroffer ¶ 1(B) and (C)(1)).

Pursuant to the Purchase Agreement, the loan contingency expired on or about June 9, 2005.

(Purchase Agr. ¶ I).

### B.    Financing the Purchase of the Property

*1.    Mills's Initial Attempts to Obtain Financing*

       9.      In connection with the purchase of the Property, Ms. Mills initially sought

financing from Mr. Roland Jones ("Mr. Jones"), who was securing such financing through

Bridgeport Mortgage ("Bridgeport").  (See Mills Decl. ¶8.)  Pursuant to Ms. Mills, Bridgeport

had agreed to finance the purchase of the Property through two loan transactions (the

"Bridgeport Loans").

---

[7]     Pursuant to paragraph 1(B) of the Counteroffer, down payment and loan amounts are adjusted in the same proportion as in the original Purchase Agreement.  The Purchase Agreement provided 80% financing ($1,040,000 of the $1,300,000 offer).  Accordingly, the final financed amount equals $1,100,000 (i.e., 80% of $1,375,000).

10.    The Bridgeport Loans were in the approximate amount of $1,040,000 at a fixed rate of 7% amortized over 30 years.  Given the amounts of the Bridgeport Loans and other gifts, Ms. Mills would have been responsible for paying approximately $260,000, inclusive of down payment and closing costs.  (Mills Dep. 297.)[8]

11.    According to Ms. Mills, she was scheduled to close on the Property on or about July 1, 2005.  Id.  Ms. Mills further asserts that the week prior to the scheduled closing, Mr. Jones ceased contact with her.  (Mills Decl. ¶ 8.)  Despite regaining contact, Ms. Mills chose to end the broker relationship. (Mills Dep. 100:8-24, 136:4-14.)

2.    *Ms. Mills Contacts Tawnya Lettau*

12.    On or about June 29, 2005, Ms. Mills contacted Ms. Tawnya Lettau ("Ms. Lettau"), a mortgage broker with JP Morgan Chase d/b/a Chase Manhattan Mortgage Corp ("Chase"), to seek financing to purchase the Property.  (Mills Decl. ¶8.)  Ms. Mills selected Ms. Lettau as her new broker based on a recommendation from a local real estate appraiser.  (Mills Dep. 104-105.)

13.    On or about July 7, 2005, Ms. Lettau conducted a telephone interview with Ms. Mills to complete a loan application.  Given the amount of funds requested, the financing required a first loan and a "piggyback" (i.e, second loan); accordingly, Ms. Lettau completed two Uniform Residential Loan Applications based on the information provided by Ms. Mills.  (Lettau Dep. 39:21-25-40:1-3.)

3.    *The Loan Application and Underwriting Process*

14.    On or about July 7, 2005, Ms. Lettau transmitted certain information from the Uniform Residential Loan Applications to the Debtors through the Debtors' then-existing website for brokered loans and sent the hard copy loan applications, with supporting

---

[8]    Ms. Mills later testified that she did not recall the exact terms of the Bridgeport Loans and that she may have only been required to make a down payment of $68,750. (Mills Dep. 592:18-25-593:1-11.)

documentation (collectively and including the supporting documentation described below, the "Loan Applications").  Copies of the Loan Applications are attached hereto as Exhibits B1- B3.

15.    In the Loan Applications, Ms. Mills asserted that she had (i) gross monthly income of $28,552; (ii) approximately $690,000 in assets, including a certificate of deposit in the amount of $500,000, (the "$500,000 CD"); (iii) $51,253 in liabilities; and (iv) a total net worth of $638,747.  As verification of Ms. Mills's ability to make a down payment and afford subsequent mortgage costs, Ms. Mills provided (i) an account statement for the $500,000 CD, evidencing an amount of $500,000 in the name of Ms. Mills; (ii) a gift letter (the "Gift Letter") in the amount of $68,750 from Ms. Mills's fiancé, Mr. Anthony Esquivel ("Mr. Esquivel"); (iii) Seller's Final Settlement Statement ("Ventura Settlement Statement"), evidencing that Ms. Mills had obtained net proceeds of $58,905 for the sale of her previous home, located at 11100 Telegraph Road, Space 50, Ventura, California (the "Ventura Property"); and (iv) two tax preparer attestations (one by Mr. Michael J. Owen and one by Ms. Michele Grecco, the "Tax Attestations" and collectively with the $500,000 CD, the Gift Letter, and Ventura Settlement Statement, the "Loan Application Supporting Documentation").

16.    Additionally, Ms. Mills declared that (i) she was not a party to a lawsuit and (ii) no part of the down payment was borrowed.  See Loan App. § VIII(h).

17.    By signing the Loan Applications, Ms. Mills acknowledged that (i) the information was true and correct as of the date set forth (i.e., 7/15/05); (ii) any intentional or negligent misrepresentation of the information contained in the Loan Applications may result in civil liability and/or criminal penalties, including but not limited to, fine or imprisonment or both; and (iii) Ms. Mills was obligated to amend and/or supplement the information provided in the Loan Application if any material fact in the Loan Applications should change prior to the closing of the loan.  See Loan App. § IX.

18.    Following receipt of the Loan Applications on July 10, 2005, the Debtors performed a manual underwriting of Ms. Mills's financing request.  In connection with the Debtors' underwriting, the Debtors, among other things, (i) obtained a credit report of Ms. Mills; (ii) performed a verification of mortgage and/or rent accounts; (iii) obtained a verbal verification of employment from Ms. Mills's accountant, Mr. Michael J. Owens ("Mr. Owens"); and (iv) reviewed two appraisals from independent appraisers, each estimating the fair market value of the Property to be $1,375,000.  Because Ms. Mills's requested loan product was "stated income," the Debtors did not verify her income, but rather relied upon the information submitted by Ms. Mills in her Loan Applications.

19.    Following receipt of Ms. Mills's credit report, the Debtors' internal underwriters determined that Ms. Mills did not meet the qualifications for the requested financing.  Specifically, Ms. Mills's credit score was one (1) point below the required credit score for the requested financing product.  See Approve REIT Product Exception Request, attached hereto as Exhibit C (the "Exception Request").

20.    On or about July 14, 2005, one of the Debtors' regional underwriting managers reviewed the Loan Applications and approved an "underwriting exception" based on, among other things, Ms. Mills's "strong savings, [and] significant reserves after coe[9] of 27+ mos." See Exception Request.  Such reserves were verified by receipt of the account statement for the $500,000 CD.  Id.  The underwriting exception was conditioned upon, among other things, the second loan being reduced in amount to $200,000.  Id.  Additionally, the Debtors increased the interest rate of the first loan by 1.25%.

21.    As a result of the underwriting exception and the conditions therewith, the Debtors approved the Loan Applications for (i) a first lien loan for an unpaid principle balance of $962,500 (the "First Loan"), and (ii) a second lien loan for an unpaid principal balance of

---

[9]    Upon information and belief, "coe" stands for "close of escrow."

$200,000 (the "Second Loan" and together with the First Loan, the "Mills Loans").  Given the

Purchase Price of $1,375,000, if the loan terms were accepted, Ms. Mills was required to fund

approximately $212,500 as a down payment, plus closing costs.

22.     Between July 14, 2005 and July 15, 2005, the underwriting exception and

the increased rate were addressed with Ms. Mills's broker, Ms. Lettau.  Ms. Lettau advised the

Debtors that Ms. Mills accepted the financing and would "pay down points" in lieu of paying an

increased interest rate.  See HUD-1 Statement, line 801.

23.     On July 15, 2005, the Debtors prepared the promissory notes and related

documents in anticipation of closing the Mills Loans.

    *4.*     *Closing of the Loans*

24.     The closing of the Mills Loans (the "Closing") and the purchase of the

Property was to occur on or about July 19, 2005.  Chicago Title Company acted as a the

settlement agent (the "Settlement Agent") with respect to the Closing.

25.     Between July 15, 2005 and July 19, 2005, in anticipation of the Closing,

Ms. Mills executed certain required documents, including, but not limited to, "final" Loan

Applications, promissory notes, addendums and riders for the Mills Loans, Deeds of Trust for

the Mills Loans, final Truth-in-Lending statements, RESPA Servicing Disclosure, Buyer's

Escrow Information Sheet, Escrow Waiver Letter, Compliance Agreement and Borrower's

Certification & Authorization (the "Borrowers Certifications," and collectively and inclusive of

all required documents for each loan, the "Closing Documents").  (Mills Dep. 363-380:8.)

26.     The executed Closing Documents were held in escrow by the Settlement

Agent until the all Closing conditions were met and the Mills Loans were funded.

27.     Pursuant to the Borrower's Certifications, attached hereto as Group

Exhibit D, Ms. Mills made the following certification:

> In applying for the loan, [Ms. Mills] completed a loan application
> containing various information on the purpose of the loan, the

9

amount and source of the down payment, employment and income information, and assets and liabilities. [Ms. Mills] certif[ies] that all of the information is true and complete. [Ms. Mills] made no misrepresentations in the loan application or other documents, nor did [she] omit any pertinent information."

Borrower's Cert., ¶ 1. Ms. Mills also certified:

[She] fully understand[s] that it is a Federal crime punishable by fine or imprisonment, or both, to knowingly make any false statements when applying for this mortgage, as applicable under the provisions of Title 18, United States Code, Section 1014.

Borrower's Cert. ¶ 3.

28.    On July 19, 2005, the Debtors wired the funds (the "Funds") for the Mills Loans to the Settlement Agent in anticipation of the Closing.

29.    Upon the request of Ms. Mills, the Closing was extended to a date no later than August 8, 2005. (Mills Dep. 221:5-7.) For consideration of the extension, Ms. Mills paid an additional $55,000 nonrefundable deposit to the seller, Hilliard Development, LLC, with an agreement to pay $350.00 per day from July 6, 2005 to the close of escrow. See Amendment to Escrow Instructions attached to Claim 2743.

30.    On July 27, 2005, the Settlement Agent returned the Funds because the Closing had not yet occurred. Thereafter, the Settlement Agent requested the Funds to be re-disbursed, and the Debtors re-funded the Mills Loans on August 8, 2005 (the "Closing Date").

31.    At Closing, Chase (Ms. Lettau's employer) received $12,031.25, paid by Ms. Mills as an origination fee. See HUD-1, Line 813. No fees were paid to Ms. Lettau or Chase by the Debtors.

32.    As of the Closing Date, Ms. Mills became the fee simple owner of the Property, and the Debtors held a first and second lien (evidenced by the recorded deeds of trust the "Deeds of Trust") against the Property. [10]

---

[10]    The First Loan, in the original principal amount of $962,500.00, is evidenced by an Adjustable Rate Note dated July 15, 2005 (signed by Ms. Mills on July 19, 2005) and secured by a Deed of Trust dated July 15, 2005 which was recorded in San Luis Obispo County, California on August 9, 2005. The First Loan required interest

33.     At no time prior to the Closing Date did Ms. Mills modify, supplement or otherwise amend her Loan Applications.

## C.     Failure to Make Mortgage Payments

34.     Ms. Mills was required to make monthly mortgage payments in the aggregate amount of approximately $6,492.30 on the first of each month.  See Mills Loans ¶ 3. Because Ms. Mills executed the Escrow Waiver Letter, the monthly mortgage payments did not include amounts for taxes or insurance.

35.     Ms. Mills first mortgage payments were due on September 1, 2005.  The Debtors did not receive payment until September 13, 2005 (the "First Payment").

36.     On October 1, 2005, Ms. Mills failed to make a mortgage payment for either of the Mills Loans.  ***No further amounts were ever received from Ms. Mills or any of her purported agents on behalf of the Mills Loans.***

37.     On or about October 7, 2005, Ms. Mills telephoned the Debtors' servicing entity, AHM SV, to inquire about a refinancing.  At that time, Ms. Mills had not paid her monthly mortgage obligation and was delinquent under the Mills Loans.  Ms. Mills was advised that, given the status of the Mills Loans, she could not seek additional funds. (Mills Dep. 78:2-24.)  Ms. Mills was advised to try again at a later date (Esquivel Dep. 52-53) (testifying that Ms. Mills was advised to "basically try back later"), but Ms. Mills did not inquire at what time she should attempt to refinance (Mills Dep. 78:10-24; 151-152), nor do the Debtors' records indicate that Ms. Mills ever contacted them again regarding refinancing.

---

only payments for the first two years at 5.625% with monthly interest only payments in the amount of $4,511.72 commencing on September 1, 2005 and continuing until August 1, 2007.  Thereafter, the interest rate could adjust every 6 months based upon the 6-month Libor Index and a 3.5% margin.  The payment would be adjusted based on the changed interest rate to an amount to pay the interest and amortize the principal balance over the remainder of the loan.  The Second Loan, in the original principal amount of $200,000 is evidenced by a Balloon Note dated July 15, 2005 and secured by a deed of trust dated July 15, 2005 and recorded on August 9, 2005.  The Second Loan had an interest rate of 11.5% with payments in the amount of $1,980.58 commencing on September 1, 2005.  The Second Loan was amortized over 30 years but matured (with a balloon payment) on August 1, 2020 (i.e., a "30 due in 15" loan).

38.    On October 24, 2005, Ms. Mills advised the Debtors that she was waiting on payment from clients and that payment would be received by the Debtors for amounts covering both the October and November obligations by the end of the week.

39.    On November 3, 2005, the Debtors received a check from Ms. Mills, dated November 7, 2005, in the amount of $9,014.04 (the "November 7th Check").  On or about November 23, 2005, the November 7th Check bounced.

40.    During the period from October 2005 through December 2005, the Debtors attempted, on several occasions, to contact Ms. Mills to resolve the delinquencies.

41.    On December 22, 2005, the Debtors sent Ms. Mills two letters (one for each of the Mills Loans, the "Breach Letters," copies of which are attached hereto as Group Exhibit E) advising Ms. Mills that she had breached the Mills Loans due to nonpayment.  The Breach Letters provided acceptable methods of payment and provided direct contact information for one of the Debtors' loss mitigation specialists, Ms. Amanda Ellsworth ("Ms. Ellsworth").

42.    On the same day, the Debtors contacted Ms. Mills, and she advised the Debtors that a check to her from Thailand had been lost and funds would not be available until the middle of the next week.

43.    On or about January 4, 2006, Ms. Mills advised the Debtors that she was seeking to bring the Mills Loans current through alternative financing.  Ms. Mills authorized the Debtors to speak with her new broker, Mr. Layne Mark Nocera ("Mr. Nocera").

44.    On January 10, 2006, the Debtors spoke with Mr. Nocera, who indicated that he intended to assist Ms. Mills, but could not provide a timeframe.  Thereafter, on January 19, 2006, Mr. Nocera informed the Debtors that he was setting up an escrow account to bring the Mills Loans current.  Despite follow-up calls, no payments were made on the Mills Loans.

**D.    Commencement of Non-Judicial Foreclosure Process[11] and Continuing Requests for Postponement**

45.    On January 24, 2006, the Debtors referred the Mills Loans to Cal-Western Reconveyance Corp ("Cal-Western"), a non-judicial foreclosure specialist, to commence non-judicial foreclosure proceedings against the Property.  The non-judicial foreclosure proceedings were initially "dual-tracked," i.e., the foreclosure processes for both Mills Loans were occurring simultaneously.

46.    On January 27, 2006, Cal-Western recorded a Notice of Default for each of the Mills Loans (collectively, the "Notices of Default") with the San Luis Obispo County Clerk/Recorder's Office.

47.    On January 26, 2006, AHM SV (f/k/a American Home Mortgage Servicing, Inc.), as servicer for the present beneficiary,[12] executed a Substitution of Trustee with respect to the First Loan Deed of Trust (the "First Loan Substitution of Trustee") appointing Cal-Western as the new trustee under the First Loan Deed of Trust.  The First Loan Substitution of Trustee was recorded on March 1, 2006.

48.    On the same day, the Mortgage Electronic Registration Systems ("MERS"), as original nominal beneficiary, executed a Substitution of Trustee with respect to the Second Loan Deed of Trust (the "Second Loan Substitution of Trustee") appointing Cal-Western as the new trustee under the Second Loan Deed of Trust.  The Second Loan Substitution of Trustee was recorded on March 1, 2006.

49.    On May 8, 2006, Cal-Western, as newly-appointed trustee for each Deed of Trust, executed a Notice of Trustee's Sale with respect to the Deeds of Trust for each of the Mills Loans (collectively, the "Notices of Trustee's Sale"), which initially scheduled the trustee's

---

[11]    The details of the non-judicial foreclosure requirements and process are provided in section IV.B. below. The information provided herein is a summary of facts for general timeline purposes.

[12]    The First Loan was initially sold to an affiliate of Credit Suisse First Boston, who later included the First Loan in the AHMAT 2005-1 securitization trust.  In July 2007, the Debtors repurchased the First Loan pursuant to the governing loan sale documents.  With respect to each change in ownership, AHM SV remained as servicer.

sales (i.e., foreclosure sales) of the Property on June 7, 2006 (the "Initial Trustee's Sale Date").

The Notices of Trustee's Sale were recorded on May 15, 2006.

      50.    On May 20, 2006, Ms. Mills contacted the Debtors, inquiring how to

postpone the foreclosure.  Thereafter, one of the Debtors' loss mitigation specialists, Ms. Carol

Oates ("Ms. Oates"), contacted Ms. Mills and advised Ms. Mills that she needed to reinstate the

loans (i.e., pay the outstanding balances on the Mills loans, plus attorney fees and costs) or, at

minimum, Ms. Mills would need to pay half of the delinquency and qualify for a payment plan.

Ms. Mills advised Ms. Oates that she would directly contact Ms. Ellsworth, her loss mitigation

specialist.

      51.    Within the week of Ms. Mills's inquiry, on May 24, 2006, the Debtors

discussed loss mitigation options with Ms. Mills and sent her a package of information (the

"Loss Mitigation Package") to complete and return to the Debtors, allowing the Debtors to

determine her eligibility for various options.

      52.    On or about May 29, 2006, as part of the Loss Mitigation Package, Ms.

Mills sent Ms. Ellsworth a "hardship letter," (the "Hardship Letter") wherein Ms. Mills identified

the circumstances affecting Ms. Mills's ability to make monthly payments on the Mills Loans,

including, among other things, that (i) following the purchase of the Property, her moving

company (a) destroyed her personal property, (b) stole all of her electronic equipment, and (c)

emptied her bank account;[13] (ii) Ms. Mills's work portfolio was lost as a result of her electronics

being stolen; (iii) Ms. Mills's planned employment was put on hold indefinitely; (iv) a rainy

winter season precluded Ms. Mills from completing other employment opportunities; (v) a

bridge loan by Mr. Layne Nocera fell through; and (vi) Ms. Mills's mother was diagnosed with

Meniere's disease.  Nowhere in the letter does Ms. Mills identify any promise to, or failure of,

---

[13]    Ms. Mills testified that the American Eagle Moving Company illegally withdrew $5,000 from her bank account through a series of unauthorized withdrawals. (Mills Dep. 148:20-25-149:1-6.)

the Debtors to refinance either or both of the Mills Loans.  A copy of the Hardship Letter is attached hereto as Exhibit F.

53.    Other than sending the Hardship Letter, Ms. Mills failed to complete the Loss Mitigation Package.  Specifically, Ms. Mills never submitted the required tax information or proof of income.[14]

54.    Despite Ms. Mills's failure to complete a Loss Mitigation Package, the Debtors still offered to assist her in creating a payment plan to cure the default status of the Mills Loans.  Ms. Mills admits that the Debtors informed her that she could pay an additional $3,000 per month over her regular monthly payments to cure the default.  See Letter to Judge Sontchi dated September 22, 2008 (attached to claims numbered 10764 and 10765).

55.    On June 5, 2006, Ms. Mills contacted Cal-Western and obtained reinstatement quotes and wiring instructions.  As of June 5, 2006, the amount required to reinstate the Mills Loans, including attorney fees and costs, was $67,141.00.

56.    On the same day, Ms. Mills contacted Ms. Oates and requested a postponement of the Initial Trustee's Sale Date.  Ms. Mills faxed a letter to Ms. Oates attaching a contingent loan commitment for "$48,000 TBD" from Market Place Properties LOC/B&B Investments (the "June 5, 2006 Fax" attached hereto as Exhibit G).[15]  Given that the reinstatement amount was $67,141.00, the contingent loan commitment was insufficient to reinstate the Mills Loans.

57.    On June 6, 2006, Ms. Oates and Ms. Mills further discussed postponement of the Initial Trustee's Sale Date.  On the same day, Ms. Mills faxed a letter (the "June 6, 2006 Fax" attached hereto as Exhibit H) to Ms. Oates attaching a letter from First Fidelity Investments

---

[14]    On May 30, 2006, the Debtors contacted Ms. Mills regarding the missing information.  Ms. Mills advised she would have the information by June 1, 2006; however, the Debtors never received such documentation.

[15]    Upon information and belief, Market Place Properties is an investment company affiliated with Ms. Bernadine Beaureguard.

confirming that Mr. Esquivel was partially liquidating a $125,000 certificate of deposit to reinstate the Mills Loans fully.

58.    Following receipt of the June 6, 2006 Fax, the Debtors postponed the Initial Trustee's Sale Date for ten (10) business days.[16]  The rescheduled date for the trustee's sale was June 19, 2006 (the "Second Trustee's Sale Date").

59.    On June 15, 2006, two (2) business days before the Second Trustee's Sale Date, Ms. Mills advised the Debtors that the anticipated funds were misapplied by First Fidelity Investments.  Ms. Mills confirmed her statement by a facsimile (the "June 15, 2006 Fax" attached hereto as Exhibit I), which attached a letter from First Fidelity Investments advising Mr. Esquivel of the accounting error.

60.    Following receipt of the June 15, 2006 Fax, the Debtors postponed the Second Trustee's Sale Date to June 26, 2006 (the "Third Trustee's Sale Date").  On June 16, 2006, the Debtors advised Ms. Mills that no further postponements would be provided.

61.    On June 22, 2006, two (2) business days before the Third Trustee's Sale Date, Ms. Mills directly contacted the Debtors' foreclosure professional, Cal-Western, to request a one-week postponement of the Third Trustee's Sale Date.  See Facsimile dated June 22, 2006, attached hereto as Exhibit J (the "June 22, 2006 Fax").

62.    The Debtors denied the request for further postponement.

**E.    Ms. Mills's Intervening Chapter 7 Bankruptcy**

63.    On June 26, 2006 (i.e., the Third Trustee Sale Date), Ms. Mills filed Chapter 7 bankruptcy (Case No. 06-10337, the "Mills Bankruptcy") in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court"), thereby automatically staying the trustee's sale.  Accordingly, the Debtors postponed the Third

---

[16]    As described more fully below, the postponements of the trustee's sales are accomplished by oral postponement at the sale site.

Trustee's Sale Date to August 10, 2006 (the "Fourth Trustee's Sale Date") to allow sufficient time to obtain stay relief.

64.    Simultaneously with the filing of the petition for relief under chapter 7 the Bankruptcy Code, Ms. Mills filed Schedules D, E, and F [Mills Bankr. D.I. 1, attached hereto as Exhibit K]. On July 11, 2006, Ms. Mills filed the remainder of her Schedules (collectively with Schedule D, E, and F, and as amended, the "Schedules")[17] and her Statement of Financial Affairs (the "SOFA") [Mills Bankr. D.I. 10, attached hereto as Exhibit L]. A comparison of Ms. Mills's Loan Applications and the Schedules and SOFA reveal multiple inconsistencies regarding Ms. Mills's assets, including, but not limited to, the following:

a.    In contrast to the statements in her Loan Applications providing that her gross monthly income was approximately $28,000, Ms. Mills identified her gross income for the entire 2004 fiscal year as $56,054.00 and for fiscal year 2005 as $115,810.00. Contrast Loan App. § V with Mills Bankr. SOFA 1; see also (Mills Dep. 269) (testifying that her gross income for the year prior to the Loan Applications was approximately $330,000) and (Mills Dep. 270) (testifying that Ms. Mills's gross income for 2004 was approximately $290,000).

b.    Despite Ms. Mills's statement that she was not a party to a lawsuit in her Loan Applications, Ms. Mills identified *Kuehn v. Mills* filed in the Superior Court of Ventura County (Civil Action No. 232847, the "Kuehn Litigation") as a lawsuit to which she was a party within the one year immediately preceding the filing of the Mills Bankruptcy. See Mills Bankr. SOFA 4. A review of the Kuehn Litigation reveals that, on March 30, 2005, Mr. Peter Kuehn ("Mr. Kuehn") commenced an

---

[17]    On several occasions during the pendency of her bankruptcy, including following the foreclosure sale dated August 10, 2006 (described below), Ms. Mills amended and withdrew her Schedules. See Mills Bankr. D.I. 17, 31, 32, 34, 35, 36, 37, 38, 39, and 40. Such amendments generally relate to Schedules J and I, as well as her various income statements. At no point during the pendency of the Mills Bankruptcy, did Ms. Mills amend Schedules A, B, or D or the Mills SOFA.

action against Ms. Mills for declaratory relief providing that Ms. Mills did not solely own the Ventura Property based upon, among other things, fraud in connection with obtaining the down payment of the Ventura Property and conversion of assets in connection with their business, Kuehn Mills Productions. Before disposition of the Kuehn Litigation and without notice to Mr. Kuehn, Ms. Mills sold the Ventura Property and used the settlement funds to pay for the Closing on the Property.  (Mills Dep. 263-264) (confirming these were the allegations brought by Mr. Kuehn).  Thereafter, Mr. Kuehn dismissed the Kuehn Litigation on February 14, 2006.

c.  Despite listing the $500,000 CD as a $500,000 asset in her Loan Applications, in the Mills Bankruptcy, Ms. Mills did not identify the $500,000 CD in her current assets, her list of closed financial accounts held in the name of the Ms. Mills within the one year immediately preceding the Mills Bankruptcy, or otherwise in her Schedules and SOFA.  Contrast Loan App. § VI with Mills Bankr. Schedule B and Mills Bankr. SOFA 11.

d.  Ms. Mills did not identify Michael Owens, Ms. Mills's alleged accountant who verified Ms. Mills's employment in connection with her Loan Applications, as a bookkeeper or accountant who kept, supervised, audited, prepared a financial statement, or otherwise had possession of any of Ms. Mills's books or records. Contrast Tax Attestations with Mills Bankr. SOFA 19.

e.  Despite Ms. Mills's assertions on her Loan Applications that no part of her down payment was borrowed (and the failure to evidence the debt to Mr. Kuhn on her Schedules),[18] on September 12, 2006, Mr. Ernest Kuhn ("Mr. Kuhn") filed a

---

[18]    Despite recording a grant deed identifying Mr. Ernest Kuhn as a joint tenant in February of 2006 (four months prior to the Mills Bankruptcy), Ms. Mills listed the Property as solely owned, with a secured amount of $1,161,433.49.  This amount is equal to the sum of the two secured claims for the Mills Loans identified on

18

complaint (the "Kuhn Complaint") in the Mills Bankruptcy (Adversary Case No.

06-01087, the "Kuhn Adversary") for nondischargeability of debt for fraud in

connection with amounts loaned to Ms. Mills for the down payment on the

Property.  The Kuhn Adversary revealed that Ms. Mills borrowed approximately

$164,200 (the "Kuhn Loan") of the $212,500 down payment on the Property from

Mr. Kuhn.  Compare Loan Applications with Mills's Interrogatory Answer 9; see

also Mills Dep. 70:4-9 (admitting that monies from the Kuhn Loan were used for

the down payment on the Property).  Ms. Mills and Mr. Esquivel pledged the

assets of Mr. Esquivel's company, Elea Management Group, as collateral for the

Kuhn Loan.  See Kuhn Loan Promissory Note, attached hereto as Exhibit M.[19]

Settlement of the Kuhn Adversary consisted of total payment of $7,500 to Mr.

Kuhn and mutual releases; however, Ms. Mills testified that the Kuhn Settlement

(attached hereto, with related order, as Group Exhibit N) was merely an "on

record" settlement (Mills Dep. 551:22-25-552.)

f.    Ms. Mills did not identify Bridgeport Mortgage, Mr. Nocera, Ms. Beauregard,

Market Place Properties or any other party besides the Debtors, who had been

provided a financial statement within two years immediately preceding the Mills

Bankruptcy.  See Mills Bankr. SOFA 19d.

65.    With respect to the Debtors and the Property, Ms. Mills listed the Mills

Loans as noncontingent, liquidated, and undisputed liabilities.  See Mills Bankr. Schedule D.

Additionally, Ms. Mills indicated her intent to reaffirm the Mills Loans pursuant to 11 U.S.C. §

524(c).  See Chapter 7 Individual Debtor's Statement of Intention [Mills Bankr. D.I. 10].  Ms.

---

Schedule D and, thus, presumably does not include any potential secured claim of Mr. Kuhn.  Moreover, Ms. Mills testified that she did not include Mr. Kuhn on her schedules because she did not want to list the Kuhn Loan. (Mills Dep. 548:22-24.)

[19]    Ms. Mills admitted that the Promissory Note attached to the Kuhn Complaint (a true and correct copy of which is attached hereto) is a true and correct copy of the promissory note signed by Ms. Mills with respect to the Kuhn Loan.  See Kuhn Adv. D.I. 4.

Mills did **not** schedule any litigation or potential claim against the Debtors, Ms. Lettau or Cal-Western for fraud, or otherwise, in connection with the Mills Loans.[20]  See Mills Bankr. Schedule B(21).

66.    On June 30, 2006, the Debtors filed their motions for relief from the automatic stay (the "Stay Relief Motions") to continue foreclosure on the Mills Loans.  [Mills Bankr. D.I. 7 & 8].  Ms. Mills did not contest the Stay Relief Motions and, accordingly, on July 25, 2006, the California Bankruptcy Court entered orders granting the relief requested by the Stay Relief Motions.  [Mills Bankr. D.I. 12 & 13, attached hereto as Group Exhibit O].

67.    Ms. Mills received a discharge of her debts on July 19, 2007 [Mills Bankr. D.I. 52], and the Mills Bankruptcy closed on October 9, 2007 [Mills Bankr. D.I. 55] (following the conclusion of the Kuhn Adversary).[21]

## F.    Uncontested Continuation of the Foreclosure Process and Auction

68.    Given the grant of stay relief on July 25, 2006, the Debtors were not required to further postpone the Fourth Trustee's Sale Date of August 10, 2006.

69.    On August 9, 2006 (one day before the Fourth Trustee's Sale Date), Ms. Mills's attorney, Mr. Vaughn Taus ("Mr. Taus"), contacted the Debtors seeking further postponement of the trustee's sale.  In his e-mail communication to the Debtors (the "Taus E-mail" attached hereto as Exhibit P), Mr. Taus proposed immediate payment of one (1) month's mortgage payment with respect to each of the Mills Loans, followed by an open-ended installment plan which addressed only three to four additional month's payments.  The Taus E-mail did not provide any evidence of financial ability to pay the total outstanding obligations, which at this time equaled approximately $74,500.  The Debtors rejected the offer.

---

[20]    Ms. Mills identified only one contingent or unliquidated claim – a claim against her moving company for $20,000.

[21]    The Kuhn Adversary closed on October 5, 2007 [Kuhn Adv. D.I. 22].

70.    On August 10, 2006, the trustee's sale for the Second Loan Deed of Trust occurred.  AHM SV, as servicer for the Second Loan[22], credit bid the full amount of the debt owed under the Second Deed of Trust ($229,251.71), subject to the First Loan Deed of Trust.  AHM SV was declared the successful bidder.

71.    On the same day, Cal-Western, as trustee under the Second Deed of Trust empowered with the power of sale, executed the Trustee's Deed Upon Sale (the "<u>Trustee's Deed Upon Sale</u>"), conveying title of the Property to AHM SV.

72.    Following the transfer of ownership of the Property to the AHM SV, the Debtors determined that it was in the best interests of the owners/investors of the Mills Loans to cancel the trustee's sale for the First Loan Deed of Trust.[23]  Accordingly, Cal-Western executed a Notice of Rescission of the Notice of Default and Election to Sell Under Deed of Trust (the "<u>First Loan Notice of Rescission</u>"), which was recorded on August 17, 2006.

73.    On August 22, 2006, the Trustee's Deed Upon Sale was recorded.

## G.    Eviction of Ms. Mills and Mr. Esquivel and Subsequent Marketing the Property as "REO"

74.    Despite the foreclosure, Ms. Mills and Mr. Esquivel continued to occupy the Property unlawfully.  Following numerous attempts to have Ms. Mills and Mr. Esquivel vacate the Property consensually, the Debtors were forced to hire counsel and commence eviction proceedings.  Shortly before the Eviction Date (defined below) and thereafter, Ms. Mills and Mr. Esquivel began making multiple unacceptable offers to repurchase the Property and inundating the Debtors with calls and correspondence to various employees of the Debtors in an effort to demand acceptance of these offers.

---

[22]    At this time, the Second Loan was owned by the AHMIT 2005-SD1.

[23]    Had the Debtors completed the foreclosure sale with respect to the First Loan, all rights with respect to the Second Loan would have been extinguished.

1. *The Eviction Process*

75.    Following a hearing regarding the eviction on November 30, 2006 (the "Eviction Hearing"), the court ordered that Ms. Mills and Mr. Esquivel vacate the Property on or before January 2, 2007.  Both Ms. Mills and Mr. Esquivel attended the Eviction Hearing. (Mills Dep. 584:3-7; Esquivel Dep. 85: 21-23.)

76.    In direct violation of the court's order, Ms. Mills and Mr. Esquivel continued to occupy the Property beyond January 2, 2007.  (Mills Dep. 586:4-17) (stating that she did not vacate in accordance with the court's order).  Nearly two months after the deadline set by the court, the Debtors received a date (March 1, 2007) by which the sheriff could effectuate the eviction.

77.    On February 23, 2007, Ms. Mills and Mr. Esquivel were provided five business days' notice (the "Eviction Notice") of the March 1, 2007 eviction (the "Eviction Date". However, despite attendance at the Eviction Hearing and receipt of the subsequent Eviction Notice, Ms. Mills and Mr. Esquivel made no efforts to remove their personal belongings or vacate the Property prior to the Eviction Date.  As a result, when Ms. Mills and Mr. Esquivel vacated the Property on the Eviction Date, they left a majority of their personal belongings in the Property.

78.    Following the eviction, the Debtors contacted Ms. Mills and Mr. Esquivel regarding picking-up of their personal belongings.  On March 15, 2007, Ms. Mills and Mr. Esquivel agreed to remove all personal property from the Property by April 1, 2007.  See Personal Property Agreement & Release, attached hereto as Exhibit Q.

79.    On March 31, 2007, Ms. Mills and Mr. Esquivel advised the Debtors that they would not remove all of their personal belongings from the Property by April 1, 2007. Instead, Ms. Mills and Mr. Esquivel unilaterally changed the dates in the Personal Property Agreement & Release to April 20, 2007.  See Esquivel Letter dated March 31, 2007, attached

hereto as Exhibit R.   Given the continued refusal to remove all of their personal belongings from

the Property, the Debtors once again had to retain counsel.  On May 17, 2007, Mr. Robert

Jackson, sent a notice advising Mr. Esquivel that any personal property not picked up by June 4,

2007, would be disposed pursuant to Cal. Civ. Code § 1988.  See Notice of Right to Reclaim

Abandoned Personal Property, attached hereto as Exhibit S.

   80. Given their refusal to vacate the property and to retrieve their remaining

personal belongings, the Debtors were unable to market the Property fully until June 4, 2007.

   *2.  Multiple Contacts with the Debtors*

   81. In connection with the marketing and sale of any REO Property, the

Debtors entered into certain standard Listing Agreements and REO Marketing Agreements with

local real estate agents (here, Ms. Terry Miles ("Ms. Miles")).  Copies of the Listing Agreement

and REO Marketing Agreement with respect to the Property are attached hereto as Group Exhibit

T.

   82. As set forth in the REO Marketing Agreement, all offers were to be

written and sent to the REO manager, along with a pre-qualification of the purchaser.  Only after

receipt of a pre-qualified offer would the Debtors determine to accept, reject or counter the

written offer.  REO Marketing Agr. ¶ g.  As set forth in the Listing Agreement dated March 31,

2007, the Debtors initially listed the price of the Property as $1,443,000.  (Larkin Dep. 54:7-15;

59:2-9.)

   83. Prior to the listing, on or about March 7, 2007, Ms. Mills and Mr. Esquivel

sent an e-mail correspondence to the Debtors' Chief Executive Officer, Michael Strauss (the

"Strauss Letter" attached hereto as Exhibit U).  In the Strauss Letter, Ms. Mills and Mr. Esquivel

requested an exception to the Debtors' requirement that potential purchasers evidence an ability

to close by "pre-qualifying" for a loan.  The Strauss Letter did not, however, indicate any

purchase price or agreement to pay the outstanding obligations under the Mills Loans.  Also

notably absent from the Strauss Letter is any allegation of fraud the Debtors had committed or any contention of improper foreclosure of the Property.

84.    Immediately following receipt of the Strauss Letter and in direct response thereto, Mr. David Friedman ("Mr. Friedman"), Executive Vice President of AHM SV, met with Ms. Jane Larkin ("Ms. Larkin"), Vice President of the REO and Valuations Department of AHM SV, and Mr. Robert Hardman ("Mr. Hardman"), Vice President of Bankruptcy and Foreclosures of AHM SV.  Additionally, the Strauss Letter was sent to the Debtors' legal department for review.

85.    At the direction of Mr. Friedman, Ms. Larkin and Mr. Hardman reviewed the Debtors' files on the Mills Loans and the Property, created a chronology of events with respect to the Mills Loans, and determined that Ms. Mills had been afforded ample opportunity to reinstate the Mills Loans prior to foreclosure and to purchase the Property following the foreclosure.  (Larkin Dep. 48-50.)  See also Chronology attached hereto as Exhibit V.

86.    Additionally, within 48 hours of sending the Strauss Letter, Ms. Miles, the Debtors' real estate agent, contacted Ms. Mills and Mr. Esquivel regarding submission of a valid or conforming offer to purchase the Property.  (Esquivel Dep. 107:16-20.)  Thereafter, on multiple occasions, Ms. Mills and Mr. Esquivel were again advised by both Ms. Miles and Ms. Larkin on the pre-requisites for the Debtors to consider an offer to purchase the Property. (Esquivel Dep. 95-96) (testifying that Ms. Miles advised them of the procedure for making offers, and Ms. Larkin contacted them regarding offers on the Property); (Esquivel Dep. 103-104) (testifying that they were advised they needed to prequalify with the Debtors to submit an acceptable offer); (Esquivel Dep. 128:5-8) (testifying that Ms. Mills was in contact with Ms. Larkin and "several other people").

87.    Despite the Debtors' and their representatives' specific instructions for submitting an offer to purchase the Property, Ms. Mills and Mr. Esquivel never presented the Debtors with a single, compliant offer.

88.    In fact, contrary to Ms. Mills's and Mr. Esquivel's repeated representations that the offers submitted by acquaintances on their behalf were fully funded, each offer, to the extent an offer was submitted, was contingent on financing.

    a.    Curtis & Vanessa Brown (the "Browns").  The Debtors have no record of ever receiving an executed offer from the Browns.  The only documentation provided by Ms. Mills are documents prepared by the Debtors' real estate agent for execution.  Regardless, testimony by Mr. Esquivel provides that any offer by the Browns would not have exceeded $800,000.  (Esquivel Dep. 123-124.)

    b.    Larry Norwood ("Mr. Norwood").  On or about March 15, 2007, Mr. Norwood submitted a written offer for the Property in the amount of $750,000.  Following the rejection of this initial offer, on or about April 4, 2007, the Debtors received a second offer from Mr. Norwood of $1,025,000.  Given that the Debtors' valuation for the Property at that time was approximately $1.3 million, the Debtors rejected Mr. Norwood's offer.[24] (Larkin Dep. 56:6-14.)

89.    Thereafter, Ms. Mills and Mr. Esquivel continued to systematically reduce the price of their offers.  (See Esquivel Dep. 123-125.)  As of August 3, 2007, Ms. Mills and Mr. Esquivel had reduced their invalid offers to $500,000.[25]  See Esquivel E-mail dated August 3, 2007, attached hereto as Exhibit W.

---

[24]    At the time of Mr. Norwood's offer, the Debtors also received an offer for $1,100,000 from parties unrelated to Ms. Mills.  Given the Debtors' valuation for the Property at $1.3 million, this offer was also rejected.

[25]    Mr. Esquivel also testified that George, last name unknown, offered to purchase the Property for $300,000.  At the time of the offer, Mr. Esquivel estimated the fair market value of the Property to be $800,000 (Esquivel Dep. 127:8-9; 129:9-12).

90.    Following the Debtors' bankruptcy filing on August 6, 2007, Ms. Mills and Mr. Esquivel demanded the return of the Property in exchange for $250,000 cash.  See Esquivel Email dated August 6, 2007, attached hereto as Exhibit X.  On August 14, 2007, Mr. Esquivel contacted Mr. Strauss directly with an offer to purchase the Property for $300,000.  See Esquivel Email dated August 14, 2007, attached hereto as Exhibit Y.

91.    Following the $300,000 offer made by Ms. Mills and Mr. Esquivel on August 14, 2007, the Debtors advised Ms. Mills and Mr. Esquivel that they would no longer entertain any offers or other correspondence from them, but for the previously discussed offer of payment in full of the balance of the Mills Loans, plus all expenses incurred in connection with the foreclosure and subsequent eviction proceedings.  (Esquivel Dep. 106:7-22) (testifying that the Debtors advised Ms. Mills and Mr. Esquivel that they could purchase the Property for approximately $1.4 million); (Esquivel Dep. 149:7-15) (testifying that the Debtors continued to advise Ms. Mills and Mr. Esquivel that they would accept $1.4 million); (Esquivel Dep. 132-133) (testifying that they were in contact with at minimum, Ms. Larkin, Ms. Miles, Ms. Reandra Tillis and Mr. Friedman and that the Debtors indicated that they "wanted to entertain" a $1.1 million offer, but that Mr. Esquivel offered $300,000); (Esquivel Dep. 130:17-21) (testifying that the Debtors advised Mr. Esquivel that offers of $300,000 for the Property were too low).

92.    Ms. Mills and Mr. Esquivel never made any offer to Purchase the Property for the full pay-off amount which was conveyed to them as approximately $1.4 million.  (Larkin Dep. 69:6-20.)  Despite understanding what the Debtors considered an acceptable offer, Ms. Mills and Mr. Esquivel continued contacting multiple Debtors' employees, executives and professionals offering $300,000 to purchase the Property.  See Email from Ms. Mills to Mr. Alan Horn, Mr. Friedman, and Ms. Larkin dated August 21, 2007, attached hereto as Exhibit Z (stating that Ms. Mills was merely "getting closer" to a figure that the Debtors would accept); (Mills Dep. 626-627) (testifying that Mr. Esquivel talked to Mr. Strauss who advised Mr.

Esquivel to contact Jane Larkin); (Mills Dep. 627:16-20); (Esquivel Dep. 11-24) (testifying that

Mr. Strauss picked up his phone and spoke with Mr. Esquivel regarding the Property); (Esquivel

124-125) (testifying that they continued to make declining offers); (Esquivel Dep. 136-137)

(testifying that Ms. Mills and Mr. Esquivel continued to call multiple employees of the Debtors

at various times and despite stating that no one would talk to them further testifying that the

Debtors' employees would pick up).  Because Ms. Mills never provided a valid offer higher than

$300,000 during the pendency of the Debtors' Bankruptcy Cases, all such offers were rejected.[26]

93.    At the same time, the Debtors were negotiating an offer with a third party,

Anthony Hall ("Mr. Hall") for a purchase price of $1,250,000.  (Larkin Dep. 67-68.)  On or

about August 14, 2007, the Debtors accepted the offer from Mr. Hall for $1,250,000 with a

financing contingency.  Accordingly, while the Debtors were proceeding with the sale of the

Property to Mr. Hall (the "Hall Sale"), the Debtors were also entertaining offers in the event that

the Hall Sale did not close.  The Hall Sale did not close due to Mr. Hall's exercise of the loan

contingency.

## H.    The Debtors' Bankruptcy

94.    On August 6, 2007 (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition commencing the above captioned cases under chapter 11 of the

Bankruptcy Code (the "Bankruptcy Cases").  Each Debtor is continuing to operate its business

and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the

Bankruptcy Code.  The Bankruptcy Cases have been consolidated for procedural purposes only

and are being jointly administered pursuant to an order of this Court.

95.    At the time of filing, the Debtors owned the First Loan and listed it as an

asset on their Schedules of Assets and Liabilities.   The First Loan was listed with an estimated

value of $1.17 million. [D.I. 1350].

---

[26]    Furthermore, Ms. Mills and Mr. Esquivel never provided supporting evidence to the Debtors that they had
$300,000 cash.

96.    On August 24, 2007, this Court entered an order permitting the Debtors to sell real estate owned ("REO") property in the ordinary course of the Debtors' business. [D.I. 358].

97.    On October 30, 2007, this Court entered an order (the "Servicing Sale Order") approving the Debtors' sale (the "Sale") of the mortgage servicing business to AH Mortgage Acquisition Co. (n/k/a American Home Mortgage Servicing, Inc.) ("AHMSI") [D.I. 1711].  Following the final closing of the Sale on April 11, 2008, the Property was serviced by AHMSI for the benefit of the owners of the Mills Loans.

98.    The Amended Chapter 11 Plan of Liquidation of the Debtors dated as of February 18, 2009 (the "Plan") was confirmed under section 1129 of the Bankruptcy Code on February 23, 2009 [D.I. 7042].  The Plan provides for the creation of a liquidating trust (the "Plan Trust") in which the property of the Debtors' bankruptcy estates will vest.  The Plan has not yet gone effective.

I.    **The Ultimate Sale of the Property**

99.    Despite the Debtors' continuous marketing efforts, the Property was ultimately sold (by AHMSI) on January 13, 2009 for a purchase price of $813,750.00.

100.    To transfer the Property free and clear of encumbrances to the purchaser, the First Loan security interest (evidenced by the First Loan Deed of Trust) had to be released from the Property.  As a result, on January 8, 2009, AHM SV executed a Substitution of Trustee and Full Reconveyance.  The Substitution of Trustee and Full Reconveyance was recorded on January 14, 2009.

101.    The Debtors received $634,954.46 from the sale of the Property on account of the First Loan, resulting in a loss of $327,545.54 in unpaid principle balance[27] with respect to the First Loan and a total loss of $200,000 in unpaid principle balance with respect to

---

[27]    To be clear, Ms. Mills single payment in September 2005 was interest only; accordingly, Ms. Mills **never** made a principle payment.

the Second Loan (owned by the AHMIT 2005-SD1 Trust).  These losses do not include the

accrued interest that Ms. Mills never paid with respect to the Mills Loans.

**J.      The Current Claims**

102.    On November 19, 2007, Ms. Mills filed claim numbered 2743 (the

"Original Claim").  By the Original Claim, Ms. Mills asserted she was entitled to (i) a secured

claim in the amount of $212,500.00 and (ii) an unsecured non-priority claim in the amount of

$1,170,000.00 against American Home Mortgage Holdings, Inc.  Ms. Mills admitted the debt

was incurred as of August 9, 2005.

103.    On March 31, 2010, Ms. Mills filed two amended claims, in which Ms.

Mills asserted entitlement to two identical claims for (i) secured claims in the amount of

$634,954.46 and (ii) unsecured non-priority claims in the amount of $747,545.54 against all

Debtors (the "Amended Claims").

104.    On or about April 27, 2010, Ms. Mills, *pro se*, filed her *Motion for Order*

*to (I) Amend Proof of Claim and (II) Motion for Order of Allowed Administrative Expense Claim*

*Priority Against the Estate Pursuant to Section 503(b) of the Bankruptcy Code in Immediately*

*Available Fund and (III) Order of Right to Protection of Certain Property Interests Under*

*Section 361 or (IV) Avoidance Action Against Debtors Pursuant to Section 549* [D.I. 8812] (the

"Administrative Expense Motion").  Both the Debtors and the Official Committee of Unsecured

Creditors (the "Committee") objected to the Administrative Expense Motion [D.I. 8847 & 8846,

respectively], asserting, among other things, that Ms. Mills did not have the legal authority to the

right of protection of property interests under section 361 of the Bankruptcy Code and Ms. Mills

lacked standing to institute an avoidance action under section 549 of the Bankruptcy Code.

105.    Ms. Mills subsequently retained counsel for the purposes of litigating the

Administrative Expense Motion seeking an administrative expense claim in the amount of

$1,382,500 against each of the Debtors.  The parties entered into a Scheduling Order [D.I. 9149

and amended at 9213], in which Ms. Mills agreed to file administrative proofs of claim setting

forth any and all causes of action to be asserted against the Debtors.  The administrative proofs

of claim superseded all previously filed claims.  <u>See</u> Claim Nos. 10802-10809.

106.    Despite the intent that the newly filed claims would provide the Debtors

with a clear understanding of the claims being asserted against them, Ms. Mills filed the Mills

Claims, which incorporated by reference all of Ms. Mills's previous claims and motions.  In

addition, the Mills Claims merely attached two vague declarations in support of the Mills

Claims.  First, Ms. Mills attached a declaration of purported expert Mr. Christopher Austin (the

"<u>Austin Declaration</u>") stating only that there were "numerous violations by the Debtors of a

multitude of State and Federal lending regulations" and that the Debtors apparently "failed to

comply with California Civil Code § 2923.5 and 2924 in perfecting their foreclosure."  Not only

is the Austin Declaration devoid of any specific origination statute or factual support for any of

his allegations, Ms. Mills's attorneys have now advised that they do not intend to rely upon the

Austin Declaration or use him as a witness.  Second, Ms. Mills attached her own declaration

which (i) alleges that Ms. Lettau fraudulently induced Ms. Mills into obtaining the Mills Loans,

(ii) provides bullet point facts that vaguely and/or tangentially concern the loan origination and

foreclosure process, and (iii) makes the statement that, as a result of these supposed

irregularities, the Debtors' foreclosure was "technically defective."

107.    Despite numerous attempts to clarify the causes of action asserted in the

Mills Claims, the Debtors remain unable to do so.  The Debtors have been advised that Ms. Mills

is asserting (i) fraud in the origination based solely on Ms. Lettau's alleged statement that the

Debtors would provide Ms. Mills with $50,000 in equity financing, and (ii) wrongful foreclosure

as a result of the "technical defects" in the foreclosure process; however, it remains unclear what

particular concerns are being raised with respect to either issue.[28]  Despite the unclear nature of

---

[28]    The written discovery process provided little insight.  For example, in response to the Debtors'

Ms. Mills's allegations of wrongdoing on the part of the Debtors, the Debtors address in detail

below the allegations believed to be asserted by Ms. Mills and the lack of a legal basis for each.

## OBJECTION

I.      THE MILLS CLAIMS SHOULD BE DISALLOWED IN THEIR ENTIRETY

108.    To comply with the requirements for filing a claim, "a claimant must

allege facts sufficient to support a legal basis for the claim.  If the assertions in the filed claim

meet this standard of sufficiency, the claim is *prima facie* valid pursuant to Rule 3001(f) of the

Federal Rules of Bankruptcy Procedure."  In re Planet Hollywood Int'l, 247 B.R. 391, 395

(Bankr. D. Del. 2001).  The initial burden, however, is on the claimant to allege facts sufficient

to support its claim, and, if the averments in such claim fail to meet the standard of sufficiency, it

is not '*prima facie*' valid.  See In re Allegheny Int'l, Inc., 954 F.2d 167, 173 (3d Cir. 1992).  If

an objection to a proof of claim is made, as it is here, the ultimate burden of proof still remains

upon the creditor.  See In re Fidelity Mortgage Holding Co., 837 F.2d 696, 698 (5th Cir. 1988).

109.    As set forth above, beyond her self-serving declaration, Ms. Mills[29] has

failed to include any documentation to substantiate her claim.  Based on her incomprehensive

pleadings, the Debtors believe the crux of  Ms. Mills's claims to be that she was fraudulently

induced into the Mills Loans and that the Debtors illegally foreclosed on the Property.  As set

forth below, this information, on its face, fails to demonstrate any liability of the Debtors, let

alone Ms. Mills's claim that she is entitled to an administrative expense claim in the amount of

$1,382,500 from the Debtors.

---

interrogatory requesting the identification of damages, Ms. Mills objected on the basis (i) of attorney-client privilege, work product and other privileges, (ii) equal accessibility, and (iii) prematurity in that it calls for expert testimony.  Upon request by the Debtors, Ms. Mills supplemented her response, stating only that she intended to seek damages pursuant to Cal. Civ. Code § 3294 (general California statute for punitive damages), and Cal. Civ. Code § 3333 (general California statute stating that the measure of damages for breach of an obligation arising from contract is compensatory damages).  Moreover, Ms. Mills is no longer providing expert testimony.

[29]      Ms. Mills's attorneys have now advised that they do not intend to rely upon the Austin Declaration.

110.    The Debtors respectfully request that the Court disallow the Mills Claims. First, Mills should not be permitted to pursue the Mills Claims because of (i) the doctrine of judicial estoppel, (ii) Ms. Mills's waiver and/or abandonment of the Mills Claims, (iii) Ms. Mills's lack of standing to pursue the Mills Claims, and (iv) Ms. Mills's failure to ever allege tender of indebtedness pursuant to the 'tender rule' under California law.  Second, Ms. Mills has failed to allege facts sufficient to establish she was fraudulently induced into the Mills Loans. Third, Ms. Mills has additionally failed to allege a deficiency in the Debtors' foreclosure of the Property.  Fourth, the equitable factors all weigh in favor of the Debtors. Finally, even if Ms. Mills has alleged facts sufficient to support her claims, she is not entitled to an administrative priority claim against the Debtors' estates.

## II.    Ms. Mills Should Be Not Be Permitted to Pursue the Mills Claims

### A.    The Doctrine of Judicial Estoppel Should Be Applied to Prohibit the Mills Claims From Being Pursued

111.    "[A]bsent any good explanation, a party should not be allowed to gain an advantage by litigation in one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."  Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 319 (3d Cir. 2003).  Courts have applied the doctrine of judicial estoppel when: (i) a party's assertion is irreconcilably inconsistent with a position it asserted in a prior proceeding, (ii) the party changed its position in bad faith, and (iii) no lesser sanction would adequately remedy the damage done by the party's misconduct.  Krystal, 337 F.3d at 319 (internal citations omitted).

112.    Here, as in Krystal, Ms. Mills should be judicially estopped from asserting claims against the Debtors because, among other things, Ms. Mills knowingly failed to identify any of the Mills Claims as assets in the Mills Bankruptcy and, as a result, obtained a discharge of debts.  In Krystal, the Court of Appeals for the Third Circuit (the "Third Circuit") affirmed the lower courts' decisions to dismiss a breach of contract action subsequently brought by a debtor

who failed to disclose the action as an asset in its pending bankruptcy. 337 F.3d at 316. Because

the bankruptcy was pending, Krystal could have amended its schedules to correct the defect;

however, the Third Circuit rejected this avenue stating that "[t]he bankruptcy rules were clearly

not intended to encourage this kind of inadequate and misleading disclosure by creating an

escape hatch debtors can duck into to avoid sanctions for omitting claims once their lack of

candor is discovered." Krystal, 337 F.3d at 321; see also Burnes v. Pemco Aeroplex, Inc., 291

F.3d 1282, 1288 (11th Cir. 2002) (allowing a debtor to amend filings only after an omission has

been detected "suggests that a debtor should consider disclosing potential assets only if… caught

concealing them."). The Third Circuit determined that dismissal of the action was "necessary to

prevent [the debtor] from profiting from its omission" and was "also 'required to preserve the

integrity of the earlier proceedings.'" Krystal, 337 F.3d at 325 (citing Oneida Motor Freight, Inc.

v. United Jersey Bank, 848 F.2d 414, 428 (3d Cir. (1988)).

    113. Given Ms. Mills's assertions that she knew of the fraud in October 2005

when the Debtors allegedly failed to provide her with refinancing, Ms. Mills was clearly aware

of the fraud as of the filing of the Mills Bankruptcy.[30] (Mills Dep. 500:2-6, 500:23-25)

(testifying that she knew of the claims against the Debtors at the time of filing her Schedules, and

admitted that such claims should have been scheduled in line 21 of Schedule B); see Krystal, 337

F.3d at 322 (each of the events had already occurred when the debtor made the applicable filings

under the Bankruptcy Code). Despite such knowledge, Ms. Mills (i) identified the obligations

under the Mills Loans as noncontingent, liquidated and undisputed debts, (ii) failed to identify

any potential causes of actions or claims against any of the Debtors, Ms. Lettau or Chase, and

(iii) failed to contest the Debtors' Stay Relief Motions. See Krystal, 337 F.3d 324 (contrasting

facts in Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 363 (3d Cir. 1996),

---

[30]  "[I]f pleadings show (1) the fact of non-disclosure of an asset combined with (2) a debtor's obvious knowledge of the existence of the asset, a court need not take testimony in order to make a finding of bad faith." Krystal, 337 F.3d at 325.

where borrower had omitted assets, but also omitted counterbalancing liabilities). Not only did this failure affect the creditors generally, but Mr. Kuhn settled the Kuhn Adversary for $7,500 (which was not paid), resulting in a debt forgiveness of $157,000 with respect to Ms. Mills's down payment on the Property. [31]  Compare Krystal, 337 F.3d at 324 (debtor had every reason to minimize its assets so that creditors would conclude they had no choice but to significantly compromise their claims and approve borrower's reorganization) with (Mills Dep. 487-488, 506-507) (testifying that she believed the court, chapter 7 trustee and creditors relied on the accuracy of her Schedules and SOFA).  Moreover, despite Ms. Mills's actual knowledge of her claims against the Debtors as well as knowledge that she could amend her Schedules, Ms. Mills never amended her Schedules to reflect the Mills Claims in her bankruptcy. (Mills Dep. 537-538.) Notably, Ms. Mills executed the Kuhn Settlement on August 21, 2007, approximately two weeks after she had advised Mr. Strauss that she believed she was a creditor in the Debtors' bankruptcy. Ms. Mills subsequently executed her Original Claim on October 31, 2007 (just two weeks after the Mills Bankruptcy closed), wherein she identified $212,500 (the amount of her down payment without any reduction for the Mr. Kuhn's debt forgiveness) of her $1,372,500.00 claim, as secured.

### B.    Ms. Mills Waived or Abandoned the Mills Claims

114.    If Ms. Mills is not judicially estopped from raising the Mills Claims, she should be deemed to have waived or abandoned the claims by her failure to identify them on her Schedules and/or SOFA and/or her failure to contest the Debtors' Stay Relief Motions.  Altman v. McCollum, 236 P.2d 914, 922 (Cal. App. Dep't Super. Ct. 1951) (Under California law, "waiver is a voluntary relinquishment, expressly or impliedly, of a known right and depends upon the intention of one party only.").  Here, Ms. Mills knew of all facts relevant to the Mills

---

[31]    Ms Mills testified that, despite the Kuhn Settlement, Ms. Mills had an "off-the-record" settlement with Mr. Kuhn and that she would pay back the Kuhn Loan in full.  Upon information and belief, Mr. Kuhn died on March 30, 2010.

Claims as of the Mills Bankruptcy, yet she neither asserted the claims in her Schedules and

SOFA nor raised an objection with respect to the Debtors' Stay Relief Motions.  Accordingly,

Ms. Mills has voluntarily waived the Mills Claims by not raising them, pursuant to her duty to do

so, in her bankruptcy.   .  See 28 Am. Jur. 2d *Estoppel and Waiver* § 160, at 845-46 (1966)

("Mere silence . . . is no waiver *unless there is an obligation to speak*.") (emphasis added).

> **C.      Even if the Mills Claims Can Be Pursued, Ms. Mills Lacks Standing To
>            Pursue Them.**

        115.    It is well-settled that pre-petition causes of action are property of a

Chapter 7 bankrupt estate, and only the trustee in bankruptcy has standing to pursue it. Parker v.

Wendy's Int'l, Inc., 365 F.3d 1268 (11th Cir. 2004) ("[A] trustee, as the representative of the

bankruptcy estate, is the proper party in interest, and is the only party with standing to prosecute

causes of action belonging to the estate.").  Although a claim may be subsequently pursued by

the debtor if the chapter 7 trustee abandons the claim, "[f]ailure to list an interest on a bankruptcy

schedule leaves that interest in the bankruptcy estate." Id.  Because the Mills Claims were not

disclosed on her Schedules and SOFA, they remain assets of the now-closed Mills Bankruptcy

and cannot be brought by Ms. Mills.  See, e.g., Robert v. Household Fin. Corp. II, 432 B.R. 464

(D. Mass. 2010) (because undisclosed assets were never abandoned by operation of § 554, they

remain property of the chapter 7 bankruptcy estate and the former chapter 7 trustee remains "the

only party with standing to prosecute those claims.") (internal citations omitted).

> **D.      Because Ms. Mills Admits that Neither She or Any of Her Purported
>            Representatives Allege Tender or Even Offered to Tender the Indebtedness,
>            Ms. Mills Cannot Maintain *Any* Cause of Action for Irregularity or
>            Deficiency in the Foreclosure Process**

        116.    "Under California law, the 'tender rule' requires that, as a precondition to

challenging a foreclosure sale or any cause of action implicitly integrated to the sale, the

borrower must make a valid and viable tender of payment of the secured debt." Small v.

Mortgage Elec. Registrations Sys., Inc., No. 2:09-cv-0458, 2010 U.S. Dist. LEXIS 97135, *37-

39 (E.D. Cal. Sept. 16, 2010) (citing <u>Montoya v. Countrywide Bank</u>, No. C 09-00641 JW, 2009

U.S. Dist. LEXIS 53920 (N.D. Cal. June 25, 2009)); <u>Abdallah v. United Sav. Bank</u>, 43 Cal. App.

4th 1101, 1109 (Cal. App. 1st Dist. 1996).  The application of the "tender rule" prevents "a court

from uselessly setting aside a foreclosure sale on a technical ground when the party making the

challenge has not established his ability to purchase the property."  <u>Small</u>, 2010 U.S. Dist.

LEXIS 97135, at *37 (citing <u>Williams v. Countrywide Home Loans</u>, No. C 99-0242 SC, 1999

U.S. Dist. LEXIS 14550 (N.D. Cal. Sept. 15, 1999)).  The plaintiff must demonstrate both a

willingness to pay and the ability to pay.  <u>Id.</u> (citing <u>In re Worcester</u>, 811 F.2d 1224, 1231 (9th

Cir. 1987)).

117.    Here, Ms. Mills not only fails to allege tender of indebtedness, but both

she and Mr. Esquivel affirmatively testified that they never offered the amount of the secured

indebtedness and did not have the funds available to do so.  (Mills Dep. 181-183; 273-275)

(testifying that the one point in which Ms. Mills alleges she had amounts to reinstate the loan

prior to the foreclosure, the amounts were not sufficient to cure the default); (Mills Dep. 175:4-

13) (testifying that following the foreclosure, Ms. Mills never made offers to reinstate the loan);

(Mills Dep. 198-199) (testifying that following the foreclosure, all offers made did not include a

full repayment of debt owed); (Esquivel Dep. 150-151) (testifying that the highest offer made on

the Property was $1.1 million and that there "was nothing to be done with the [Mills Loans]");

(Esquivel Dep. 149-151) (testifying that prior to the foreclosure, no offers to pay the full amount

of the indebtedness were provided, and that no offers to pay amounts on the Second Mills Loan

were ever offered).  As a result of such unwillingness and inability to pay the debt, Ms. Mills is

precluded from continuing any challenge to the foreclosure.

**III.      MS. MILLS CANNOT MEET HER BURDEN TO ESTABLISH FRAUDULENT INDUCEMENT**

118.    Ms. Mills's claim for fraud in the origination is based solely[32] upon Ms.

Mills's unsubstantiated allegation that, prior to the Closing of the Mills Loans, Ms. Lettau

verbally advised Ms. Mills that the Debtors would provide Ms. Mills access to least $50,000 in

additional financing on or before December 2005. (Mills Dep. 83-87.)  Ms. Mills asserts that she

relied upon Ms. Lettau's statement – the making of which Ms. Lettau adamantly denied under

oath at her trial deposition - to change her position into entering into the Mills Loans, ultimately

resulting in the loss of the Property.

119.    In California, the required elements of fraud are "a) misrepresentation; b)

knowledge of falsity; c) intent to defraud, i.e., to induce reliance; d) justifiable reliance; and e)

resulting damage." Pontiflet-More v. GMAC Mortgage, No. 2:09-cv-01685, 2010 U.S. Dist.

LEXIS 11043, at *22, Case. No. 09-cv-016585 (E.D. Cal. Jan. 19, 2010) (citing In re Estate of

Young, 160 Cal. App. 4th 62, 79 (Cal. Ct. App. 2008)) (citation omitted).  As set forth in detail,

Ms. Mills has not and cannot establish the required elements for a claim of fraud against the

Debtors.

**A.      There is No Credible Evidence that the Debtors Made Any Misrepresentation to Ms. Mills**

120.    As noted above, Ms. Mills's claim for fraudulent inducement is based on

a single claim that Ms. Lettau allegedly told Ms. Mills that the Debtors would provide additional

funding for Ms. Mills in the short months following the Closing of the Mills Loans.  Ironically,

although Ms. Lettau testified that most of her communication with Ms. Mills was conducted by

e-mails, Ms. Mills has refused to even attempt to obtain access to the email account she used

---

[32]      Ms. Mills vaguely raises issues regarding different dates of the documents, however, in her deposition, Ms. Mills testified that each document was signed by her, and that the signing of the documents occurred prior to the funding of the loan.  Moreover, counsel to Ms. Mills have advised the Debtors that the Declaration of Mr. Christopher Austin, attached to the Mills Claims, will not be utilized by her at trial.  As will be discussed at trial by the Debtors' expert, Mr. Adleson, because California is an "escrow state" (i.e., closing documents are signed and held in escrow until funding), differing dates on documents are commonplace.  Notably, Ms. Mills does not argue that any document fails to reflect the material terms of the Mills Loans as she understood them prior to or at execution of the documents.

during the relevant time period.  Ms. Mills provides no documentation to support her allegation and her testimony is contradicted not only by her own fiancé, Mr. Esquivel, but by Ms. Lettau as well. Contrast (Mills Dep. 106:4-20) (alleging that her fiancé contacted Ms. Lettau directly regarding the assurance that Ms. Mills could obtain additional funding from the equity of the home) with (Esquivel Dep. 51:7-18) (stating that Mr. Esquivel never directly discussed with Ms. Lettau the refinancing and was not present during any statements affirming the representation that Ms. Mills could refinance through the Debtors); (Lettau Dep. 56:16-19) (stating she never had any conversations with Ms. Mills regarding accessing the equity in the property).

121.    Moreover, Ms. Mills's own testimony provides numerous contradictory stories regarding the ability to obtain additional financing. (See Mills Decl.¶¶ 12-13) (stating that Ms. Lettau told Ms. Mills that she could pull out equity during the call advising Ms. Mills of the underwriting exception); (Mills Dep. 88-89) (testifying that the assurances to take out equity came on July 15th (i.e., after the underwriting exception); (Mills Dep. 609-610) (testifying that the chance to refinance in December was discussed in one of the first conversations with Ms. Lettau); (Mills Dep. 620-621) (testifying that prior to the underwriting exception, she had discussed accessing equity within a short time frame after the Closing of the Mills Loans).

## B.    Knowledge of Falsity/Intent to Defraud

122.    Even assuming *arguendo* that Ms. Lettau made the statement that Ms. Mills could pull equity from the Property by December 2005, Ms. Mills fails to allege any facts supporting the requirement that the Debtors had knowledge of the statement being made or its falsity.  See Pontiflet-Moore, 2010 U.S. Dist. LEXIS 11043, at *23 (Plaintiff's claim for fraud against the lender is factually deficient where it rests on "promises" that were made by her mortgage broker.)  "Without any showing by Plaintiff that [the lender] ever communicated with the broker or had knowledge that the Plaintiff's information was 'misrepresented,' Plaintiff's Fraud claim fails."  Id. at *22.

123.    Moreover, had the statement been made with the Debtors' knowledge, Ms. Mills can offer no evidence that the statement was false at the time it was made.  See Kett v. Graeser, 241 Cal. App. 2d 571, 573 (Cal. Ct. App. 1966) (stating that if defendants had made the promise, intending at the time to perform it, there is no case, "for the contemporary lack of intent to perform is an essential element of [promissory fraud to induce buyers to purchase home]"); Magpali v. Farmers Group, Inc., 48 Cal. App. 4th 460, 481 (Cal. Ct. App. 1996) ("Something more than nonperformance is required to prove the defendant's intent not to perform his promise….[I]f plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury.") (internal citations omitted). Here, Ms. Mills's attempt to obtain the additional financing from the Debtors was a single phone call in October of 2005 -- made after she had already defaulted on the Mills Loans and two months prior to the time in which she expected the allegedly promised funds to be made available (Mills Dep. 546-547).  In this call, the Debtors advised Ms. Mills that the Mills Loans were not "seasoned" (i.e, the Mills Loans had not been in existence long enough to provide additional financing) and to try back later (Esquivel Dep. 52-53), yet she never inquired whether the Mills Loans would be seasoned prior to December 2005 (Mills Dep. 78:10-24, 151-152); and, as of December 2005, Ms. Mills was working with a different lender (Mills Dep. 154:12-16).

**C.    Justifiable Reliance**

124.    "Reliance exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or transaction."  Engalla v. Permanente Med. Group, Inc., 938 P.2d 903, 919 (Cal. 1997); see also Romero v. Countrywide Bank, N.A., No. C 07-

4491, 2010 U.S. Dist. LEXIS 89935 (N.D. Cal. July 27, 2010) (misrepresention must be a "substantial" factor in influencing the decision).

125.    Despite her bald assertion to the contrary, Ms. Mills did not change her position in reliance of the alleged misrepresentation.  Ms. Mills never contemplated walking away from the purchase of the Property or declining the Mills Loans.  As evidenced by the Purchase Agreement, Ms. Mills had a loan contingency of only $1,100,000 of the Purchase Agreement, which expired prior to initial contact with Ms. Lettau or the Debtors.  As a result, Ms. Mills was responsible for the *full* Purchase Price of the Property.  Even if the loan contingency was effective, Ms. Mills expected to be responsible for at least $275,000 (i.e, $62,500 more than the down payment paid by Ms. Mills at Closing).  Moreover, Ms. Mills placed the utilities in her name as early as July 8, 2005 in anticipation of closing on the Bridgeport Loan (Mills Dep. 591:20-23).  Without having the full financing yet available for the Closing, on July 25, 2005, Ms. Mills paid an additional $60,000 non-refundable deposit for the purchase of the Property (Mills Dep. 223:4-15, 222-224).  Ms. Mills declined seeking a further extension to review alternative financing simply because she wanted to move in to "her dream home." (Mills Dep. 223-224.)

126.    Assuming *arguendo* that Ms. Mills changed her position, her reliance on the statement was unjustifiable.  First, there were *no* material terms of the additional financing.  Indeed, any alleged discussion regarding the additional financing never "got down to the nitty-gritty," and Ms. Mills was never provided information regarding (i) the type of loan (i.e, refinancing or home equity line); (ii) an interest rate, or (iii) a maturity date of the loan.  (Mills Dep. 86-87); see, e.g., Keen v. American Home Mortgage Servicing, Inc., 664 F. Supp. 2d 1086, 1099-1100 (E.D. Cal. 2009) (the mere understanding that a loan or mortgage would be restructured is insufficient to state a claim for breach of contract.).  Moreover, a reasonable person would not have relied on a bare assertion that a bank would provide additional funding

40

without obtaining any specificity or written assurances from the bank-- especially in light of all

the required documentation with respect to the Loan Applications and Closing of the Mills Loans

and the failure any of those documents to mention any additional financing.

127.    Second, Ms. Mills's reliance on the statement was not justified given the

fraudulent information provided by Ms. Mills to Ms. Lettau and the Debtors in connection with

obtaining approval for the Mills Loans.  In support of her Loan Applications, Ms. Mills

identified the $500,000 CD as one of her assets.  In addition, as proof of the $500,000 CD, Ms.

Mills provided Ms. Lettau with an account statement identifying Ms. Mills as the owner of a

$500,000 CD deposited with Singbanc and maturing on December 2005 (Mills Dep. 298:14-21);

however, Ms. Mills knew that she could not access the funds (Mills Dep. 290-292) (testifying

that Mr. Esquivel set up the $500,000 CD in early 2005 so that Ms. Mills "would have an asset,"

but that the $500,000 CD wasn't to be liquidated).  Additionally, Ms. Mills never advised Ms.

Lettau or the Debtors that she was a party to a lawsuit (involving fraud in the procurement of the

home she had recently sold and whose proceeds she listed as a source for her down payment of

the Property) or that she obtained a loan of $164,201 from Mr. Kuhn as the primary source of

funds for the down payment and closing costs.  (Mills Dep. 548:5-15); see also Loan App.

(stating no amounts of her down payment for the Mills Loans were borrowed).  Given that Ms.

Mills knew that that the information provided by her would be relied upon by Ms. Lettau and

ultimately the lender(s) financing her purchase of the Property (Mills Dep. 120-121), Ms. Mills

should have known that any statements made by Ms. Lettau or the Debtors regarding refinancing

would have been based on inaccurate information and, in turn, Ms. Mills should have known

such statements were unreliable.

### D.    Damages For Ms. Mills Cannot Establish A Claim For Damages Related To Her Allegation Of Fraudulent Inducement

128.    A predicate for recovery of damages on a fraud claim is establishing that

the damages were, in fact, caused by the detrimental reliance on a fraudulent misstatement.

Kruse v. Bank of America, 202 Cal. App. 3d 38, 60-65 (Cal. Ct. App. 1988) ("No liability attaches if the damages sustained were otherwise inevitable or due to unrelated causes. . . The absence of the necessary element of causation, we conclude is fatal to the [] claim."); see also Cal. Civ. Code § 3333 (requiring that any compensatory damages be "proximately caused" by the breach of an obligation not arising from contract.).  Here, Ms. Mills admits that she defaulted on the Mills Loans prior to the time that the allegedly promised funds would have been made available.  (Mills Dep. 139-141.)  Ms. Mills further testified that her default was the result of "other things [that] took place that shouldn't have taken place" (Mills Dep. 141:5-12) including (i) movers that cleaned out Ms. Mills's bank account and stole property from her (Mills Dep. 141:14-17) including Ms. Mills's computer, which contained written articles that Mills sold for a fee and her landscaping portfolio that Ms. Mills used to market her business (Mills Dep. 144:5-14); (ii) Ms. Mills's inability to maintain her business because of her relocation (Mills Dep. 145-146); and (iii) that the declining economy led to a lack of demand for her landscaping services (Mills Dep. 145-146); see also Hardship Letter (providing, in addition to the foregoing, that (i) Ms. Mills's planned employment was unexpectedly put on hold indefinitely; (ii) a rainy winter season precluded Ms. Mills from completing other employment opportunities; and (iii) Ms. Mills's mother was diagnosed with Meniere's disease.)

129.    Ms. Mills also appears to be asserting punitive damages pursuant to Cal. Civ. Code § 3294.  Notably, an award of punitive damages requires that Ms. Mills prove "by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code § 3294.  The Debtors believe that punitive damages are unavailable in this circumstance because the evidence does not even support a claim for fraud in the inducement under a standard of "preponderance of the evidence."

**IV.    THE DEBTORS' FORECLOSURE ON THE PROPERTY
WAS PROPER AND COMPLIED WITH APPLICABLE LAW.**

130.    Pursuant to the Mills Claims, Ms. Mills asserts the following issues concerning the foreclosure process utilized by the Debtors with respect to the Property: (i) violations of numerous California statutory requirements; (ii) no publication of notices of foreclosure; (iii) denial of right to reinstatement within the 5-day period before the trustee's sale; (iv) obfuscation and delay by Debtors to reinstate home in anticipation of their planned bankruptcy filing; and (v) incommunicativeness by failing to honor an oral agreement to be given time to make good on loan and numerous offers made to redeem that went unresponded. (Mills Decl. ¶ 17).  Not only has Ms. Mills failed to meet the prerequisites for bringing such claims (discussed above), her identified concerns are either contradicted by the evidence or meritless.

### A.    Deeds of Trust and Non-Judicial Foreclosures Generally

131.    A loan to purchase real property generally involves two documents – a promissory note and a security instrument.  The purpose of the security instrument is to secure payment of the promissory note by allowing the lender to reach some asset of the debtor if the promissory note is not paid.  <u>Alliance Mortgage Co. v. Rothwell</u>, 900 P.2d 601, 606 (Cal. 1995).  In California, the majority of residential home loans are secured by a deed of trust rather than a traditional mortgage.  <u>Id</u>.  "In either case, the creditor is said to have a lien on the property given as security, which is also referred to as collateral."  <u>Id</u>.

132.    Practically speaking, there is little difference between a mortgage and a deed of trust in that they perform the same basic function and a deed of trust is "substantially only a mortgage with power of sale." <u>Macleod v. Moran</u>, 94 P. 604, 605 (Cal. 1908). Whereas the parties to a mortgage are the debtor/mortgagor and the creditor/mortgagee, in a deed of trust, there are three parties: the debtor/trustor, the creditor/beneficiary, and a neutral third party called a trustee.  <u>See</u> <u>Alliance Mortgage Co.</u>, 900 P.2d at 606.  The deed of trust describes the property,

states that it secures an obligation, affirms the beneficial interest of the beneficiary, is signed by the trustor, sets forth that it is conveyed to the trustee by the trustor, and empowers the trustee to (1) sell the property if the trustor defaults or (2) reconvey title to the trustor if the trustor satisfies all obligations under the promissory note, or to a purchaser of the property upon a foreclosure. See Weber v. McCleverty, 86 P. 706, 708 (Cal. 1906)

133.    However, in legal effect, a deed and a mortgage are distinct.  Whereas a mortgage creates only a lien on the property and does not transfer the title, within a deed of trust legal title to the property is transferred from the trustor to the trustee although only for the limited purpose of conveying title when required in the execution of the trust.  Weber, 86 P. at 708.  However, the deed of trust carries none of the incidents of ownership of the property, other than the power to sell the property upon the trustor's default.  See Macleod, 94 P. at 605.

134.    Foreclosure under the deed of trust divests the trustor of any right, title or interest in the property.  Moeller v. Chun-Yen Lien, 25 Cal. App. 4th 822, 831 (Cal. Ct. App. 1994).  Pursuant to an elaborate and interrelated set of foreclosure and antideficiency statutes, the only form of action for the recovery of any debt secured by a deed of trust or mortgage is foreclosure, which may be either judicial or non-judicial.  Alliance Mortgage Co., 900 P.2d at 606 (internal citations omitted).  Judicial foreclosures allow creditors to seek deficiency judgments against borrowers; however, the borrower is provided with a statutory right of redemption.  Id.  In contrast, non-judicial foreclosures, which involve the trustee's exercise of the power of sale pursuant to a deed of trust, provide creditors with a more efficient foreclosure process and no statutory right of redemption;  however, the creditor cannot seek a deficiency judgment against the borrower.

**B.    The Debtors Complied with the Applicable California Non-Judicial Foreclosure Laws**

135.    "If the trustee's deed recites that all statutory notice requirements and procedures required by law for the conduct of the foreclosure have been satisfied, a rebuttable

presumption arises that the sale has been conducted regularly and properly." Spencer v. DHI Mortgage Co., Ltd., 642 F. Supp. 2d 1153, 1166 (E.D. Cal. 2009) (citing Nguyen v. Calhoun, 105 Cal. App. 4th 428 (Cal. Ct. App. 2003)).  Ms. Mills's vague and conclusory assertion that the Debtors engaged in "violations of numerous California statutory requirement" with respect to her foreclosure is insufficient to rebut such a presumption.  Regardless, as discussed briefly below[33] and as will be discussed more fully at trial, if necessary, the Debtors fully complied with the statutory requirements of non-judicial foreclosure, including the publication notice requirements, in effect at the time of the foreclosure.[34]

   136. California courts have held that "[t]he comprehensive statutory framework established to govern non-judicial foreclosure sales is intended to be exhaustive . . . [i]t includes a myriad of rules relating to notice and right to cure." Spencer, 642 F. Supp. 2d at 1166 (internal citation omitted).  Pursuant to this statutory framework, the non-judicial foreclosure process commences by the recording a notice of default and mailing the notice to the required parties within 10 business days of the recording. Spencer, 642 F. Supp. 2d at 1166; Cal. Civ. Code § 2924(a)(1) and § 2924(b).  Here, Cal-Western[35] recorded the Notice of Default with respect to the Second Deed of Trust on January 27, 2006 and mailed the same on January 30, 2006 by first class and certified mail. See Recorded Notice of Default, attached hereto as Exhibit AA and

---

[33] Because the Debtors did not conclude the foreclosure process with respect to the First Loan Deed of Trust, the Debtors only address the Second Loan Deed of Trust.

[34] The Austin Declaration, which Ms. Mills's counsel has advised will not be a document relied upon by Ms. Mills, identified California Civil Code §§ 2923.5 and § 2924 in perfecting their foreclosure.  Section 2923.5 is inapplicable to the non-judicial foreclosure that took place on the Property because it applies only to notices of default or notices of sale recorded on or after September 6, 2008.  As will be discussed herein, section 2924 provides the exhaustive statutory requirements for non-judicial foreclosure, still leaving the Debtors without a coherent understanding of the allegations being made against them.

[35] "[A] trustee, mortagee or beneficiary or any of their authorized agents may conduct the foreclosure process." Spencer, 642 F. Supp. 2d at 1166 (citing Cal. Civ. Code § 2924(a)(1)).  Additionally a "person authorized to record the notice of default or the notice of sale includes an agent for the mortgagee or beneficiary, an agent of the named trustee, any person designated in an executed substitution of trustee, or an agent of that substituted trustee." Spencer, 642 F. Supp. 2d at 1166 (citing Cal. Civ. Code 2924(b)(4).  After the filing of the Notice of Default, on February MERS (as nominal beneficiary) executed and recorded the Second Loan Substitution of Trustee (with requisite affidavit of mailing), naming Cal-Western as the substituted trustee. See Exhibit DD; Cal. Civ. Code § 2934a(c).

Affidavit of Mailing Notice of Default (10-Day), attached hereto as Exhibit BB.  Cal-Western

also caused the Notice of Default to be mailed by first class and certified mail on February 27,

2006, as further required by section 2924(c)(2) of the California Civil Code. See Affidavit of

Mailing of Notice of Default (30-Day), attached hereto as Exhibit CC.

137.    Three months after the recordation of the Notice of Default (i.e., any time

after April 27, 2006), a trustee's sale can be scheduled and noticed.  Here, the Initial Trustee's

Sale Date was June 7, 2006.  Notice of Initial Trustee's Sale Date recorded on May 15, 2006 and

was mailed by first class and certified mail to the requisite parties on May 18, 2006 (i.e., twenty

(20) days prior to the sale date). See Recorded Notice of Trustee's Sale and Affidavit of Mailing

Notice of Trustee's Sale, attached hereto as Exhibits EE & FF respectively; Cal. Civ. Code §§

2924f(b)(1); 2924b.  Additionally, the Notice of Trustee's Sale was posted once on the Property

and once in a public place (See Certificate of Posting Property and Public Place, attached hereto

as Exhibit GG; Cal. Civ. Code § 2924f; see also (Mills Dep. 458:8-10) (admitting seeing posting

on the house)) and published for three consecutive calendar weeks beginning May 18, 2006 in

*The Cambrian* (See Affidavit of Publication, attached hereto as Exhibit HH; Cal. Civ. Code §

2924f(b)(1)).

138.    As noted previously, the Debtors unsuccessfully attempted to work with

Ms. Mills and allow her time to obtain the funds to reinstate the loans by agreeing to postpone

the trustee's sales on multiple occasions (in addition to having to postpone the Third Trustee's

Sale Date in connection with the filing of the Mills Bankruptcy).  These postponements did not

require the beneficiary, trustee or its agents to start the foreclosure process over again – all that is

needed is a public declaration at the time and place last appointed for the sale, so long as the sale

is not postponed for over a year. See Cal. Civ. Code §2924g; Certificate of Postponements

attached hereto as Group Exhibit II.  Here, the first postponement occurred on June 7, 2006 (i.e,

Initial Trustee's Sale Date) and the trustee's sale occurred on August 10, 2006 – well under the one-year timeframe for recommencing the foreclosure process.

139.    Following entry of the orders on July 25, 2007, granting relief from the stay by the California Bankruptcy Court in the Mills Bankruptcy, the Debtors moved forward with the trustee's sale for the Second Loan Deed of Trust[36] on the Fourth Trustee's Sale Date (i.e., August 10, 2006). See Cal. Civ. Code § 2924g(d) - (e). At the trustee's sale, AHM SV, as servicer and agent for the AHMIT 2005-SD1, credit bid on the Property (see Cal. Civ. Code § 2924h(b)), and was deemed the highest and best bidder by the auctioneer (see Cal. Civ. Code § 2924a). The Trustee's Deed Upon Sale was recorded on June 22, 2006 and, accordingly, was deemed perfected as of August 10, 2006. See Cal. Civ. Code §2924h(c); Recorded Trustee's Deed Upon Sale attached hereto as Exhibit JJ. At that time, Ms. Mills was divested of any rights in the Property. Moeller, 25 Cal. App. 4th at 831.

> **C.    Ms. Mills Allegations that the Debtors' Denied Her the Right to Reinstatement or Redemption Are Meritless**

140.    Ms. Mills admits that neither she nor any of her representatives ever offered or tendered funds to reinstate or redeem the Mills Loans.

141.    Under California Law, borrowers have a statutory right to reinstate only *before* five business days prior to the date of sale. Cal. Civ. Code § 2924c(e). Accordingly, Ms. Mills's first allegation with respect to reinstatement – denial of her right to reinstate *within* the 5-day period before the trustee's sale – fails. Moreover, reinstatement requires payment of all sums in default (including all reasonable costs and expenses incurred by the beneficiary in enforcing the terms of the deed of trust). Cal. Civ. Code § 2924c(a)(1). Even if the right to

---

[36]    Foreclosure by a junior lienholder, under the second deed of trust, can occur during the existence of a senior or first deed of trust and the trustee's deed that is executed following a valid sale under a second deed of trust "conveys all title which the trustor had, which title is subject only to the rights of those claiming under the first deed of trust." Davidow v. Corporation of America, 16 Cal. App. 2d 6, 12 (Cal. App. 1st Dist. 1936); see also Kolodge v. Boyd, 88 Cal. App. 4th 349, 356 (Cal. App. 1st Dist. 2001) (lienholder credit bidding under second deed of trust, like any other successful purchaser, take the property subject to the senior lien.").

reinstate was applicable within five (5) days before foreclosure, the Taus E-mail, sent on behalf of Ms. Mills by her attorney, clearly shows that Ms. Mills did not have funds to fully reinstate the loan within this period.  See Taus Email (requesting further postponement for consideration of only one month's mortgage payment).

142.    For the same reason, Ms. Mills's argument that the Debtors somehow obfuscated or delayed her right to reinstatement in anticipation of their planned bankruptcy filing in 2007 (i.e., two years *after* the trustee's sale) fails.

143.    Ms. Mills's final argument with respect to the foreclosure process – failure to honor oral agreement to be given time to make good[37] on loan and/or failure to respond to numerous offers made to redeem – is belied by both law and fact.  "Redemption" from a secured loan is made by a *full payment* of all sums due by the terms of the secured obligation, including all costs and fees and, in the non-judicial foreclosure process, is only available *prior* to the trustee's sale. Cal. Civ. Code § 2905 and 2903; Alliance Mortgage Co., 900 P.2d at 606. Because Ms. Mills did not have a right to redeem the Property, the Debtors were under no further obligation to communicate with Ms. Mills following the trustee's sale.  Regardless, the evidence clearly shows that (i) Ms. Mills and her agents had numerous calls and correspondence with the Debtors, including their agents and executives regarding the potential purchase of the Property; (ii) the Property was marketed for over two years, giving ample time for Ms. Mills to "make good on [the Mills] Loan[s];" (iii) neither Ms. Mills nor any of her agents ever offered to pay the full amount of the Mills Loans (let alone full payment with costs and fees) (Mills Dep. 560:1-8); and (iv) Ms. Mills never had sufficient funds to pay off all of the debt under the Mills Loans (Mills Dep. 560:21-25).

---

[37]    The Debtors deny an oral agreement to "make good" on the Mills Loans.

**V.      EQUITABLE FACTORS WEIGH IN FAVOR OF DENIAL OF THE MILLS CLAIMS**

144.    Assuming that the Debtors were somehow liable to Ms. Mills with respect to the Mills Loans, Ms. Mills should be denied an award of damages based on any one of a number of equitable principles, including (i) equitable estoppel, (ii) laches, and (iii) unclean hands.  Each theory will be discussed in turn.

**A.      Equitable Estoppel**

145.    "Equitable estoppel precludes a party from doing an act differently than the manner in which he induced another party to expect.  It arises when a party 'intentionally or through culpable negligence induces another to believe certain facts to exist' and the other party 'rightfully relies and acts on such belief' to its detriment. The essential elements of equitable estoppel are thus inducement and detrimental reliance."  <u>Kirleis v. Dickie, McCamey & Chilcote, P.C.</u>, 560 F.3d 156, 165 (3d Cir. 2009) (internal citations omitted).  Here, Ms. Mills admits that (i) she reviewed and executed the Loan Applications for the purposes of obtaining the Mills Loans (Mills Dep. 334:19-21) and (ii) the Loan Applications contain information that was not accurate prior to the closing of the Mills Loans.[38]  Indeed, Ms. Mills admits that, among other things, (i) her fiancé put the $500,000 CD in her name so she "would have an asset" (Mills Dep. 292:10-11), but the $500,000 CD was held within her fiance's company (Mills Dep. 296-297) and she had no rights to it (Mills Dep. 287:9-20), and (ii) she listed the $500,000 CD as her asset in the Loan Applications (<u>see</u> Loan App).  Ms. Mills failed to disclose she was a party to lawsuit, despite knowing of the pending Kuehn Litigation. (Mills Dep. 325-327.)  Additionally, Ms. Mills failed to supplement her Loan Applications, as required, to notify the Debtors that she had obtained the Kuhn Loan as the primary source of her down payment on the Property. (Mills Dep. 54:5-15.)  In addition, it is the Debtors belief that Ms. Mills overstated her gross income of the Loan Applications.

---

[38]      <u>See</u> 18 U.S.C. § 1014 (knowingly making false statement on loan application is a federal crime).

146.    As acknowledged by Ms. Mills in her Loan Applications and evidenced by, among other things, the Exception Request, the Debtors relied on the information in the Loan Applications (most significantly, the $500,000 CD) in approving the Exception Request and, in turn, Closing on the Mills Loans.  Ms. Mills's lack of liquid assets immediately following the Closing directly resulted in her failure to be able to pay the mortgage payments in the second month.  Ms. Mills's defaults cost the Debtors *no less than* $327,545.54 (the difference between the unpaid principle balance of the First Mills Loan and the amounts received by the Debtors following the liquidation of the Property in January 2009).[39]

### B.    Laches

147.    Laches is most commonly raised as an affirmative defense to a lawsuit and requires inexcusable delay in bringing suit and prejudice to the defendant as a result of the delay. See In re Diet Drugs (Phentermin/Fenfluramin/Dexflenfluramine) Prod. Liab. Litig., No. 09-2424, 2010 U.S. App. LEXIS 7749 (3d Cir. Apr. 14, 2010) (citing Univ. of Pittsburgh v. Champion Prods., 686 F.2d 1040, 1044 (3d Cir. 1982)).  Here, Ms. Mills admits that, prior to the Debtors' own bankruptcy filing in August 6, 2007, she *never* advised the Debtors or any of their agents that she believed that she had been fraudulently induced into the Mills Loans (Mills. Dep. 201-202).  To the extent that Ms. Mills argues that the Debtors should not have gone through with the foreclosure, Ms. Mills's failure to even raise the issue with the Debtors in inexcusable. (Esquivel Dep. 151:17-25-153:1-4.)  Given such failure, the Debtors were denied the opportunity to investigate the allegations prior to the conclusion of the foreclosure proceedings.  At best, the Debtors incurred needless servicing expenses relating to professional fees for both the foreclosure costs and eviction proceedings.

---

[39]    At minimum, such amounts should be set off against any liability of the Debtors.  Moreover, these amounts do not include the loss taken by the investors of the AHMIT 2005-SD1 as ultimate beneficiaries for the Second Mills Loans or the accrued and unpaid interest with respect to both of the Mills Loans.

### C.    Unclean Hands

148.    The equitable doctrine of unclean hands "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the [other party.]" Ellenburg v. Brockway, Inc., 763 F.2d 1091, 1097 (9th Cir. 1985)  (quoting Precision Inst. Mfg. Co. v. Automotive Maint. Mach. Co., 324 U.S. 806, 814 (1945)). "To establish unclean hands, a defendant must demonstrate (1) inequitable conduct by the plaintiff; (2) that the plaintiff's conduct directly relates to the claim which it has asserted against the defendant; and (3) plaintiff's conduct injured the defendant." Demarest v. Quick Loan Funding, Inc., No. CV09-01687, 2009 U.S. Dist. LEXIS 120251, *30 (C.D. Cal. Apr. 6, 2009) (citing Survivor Prod. LLC v. Fox Broad. Co., No. CV01-3234 LGB (SHX), 2001 U.S. Dist. LEXIS 25511, *3 (C.D. Cal. June 12, 2001)). "In applying the doctrine, '[w]hat is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants.'" Ellenburg, 763 F.2d at 1097 (quoting Republic Molding Corp. v. B.W. Photo Util., 319 F.2d 347, 349 (9th Cir.1963)).

149.    Had Ms. Mills provided true and accurate Loan Applications, Ms. Mills would have not have been approved for an underwriting exception and, accordingly, would not have obtained the Mills Loans from the Debtors.  By falsely representing her assets and liabilities with respect to her Loan Applications, Ms. Mills obtained the Mills Loans with unclean hands and should be precluded from making allegations of fraudulent statements in the origination and/or foreclosure deficiencies.  Awarding Ms. Mills any damages resulting from the Mills Loans would unfairly prejudice the Debtors and the creditors of their estates.

## VI.    MS. MILLS IS NOT ENTITLED TO ANY ADMINISTRATIVE PRIORITY CLAIM AGAINST THE DEBTORS' ESTATES

150.    Section 503 of the Bankruptcy Code affords administrative expense priority to claims representing "actual, necessary costs and expenses of preserving the estate."

11 U.S.C. § 503(b)(1)(A).  To be considered an actual, necessary cost and expense of preserving the estate, a claim "must arise from a transaction with the debtor-in-possession and the consideration supporting the claimant's right to payment must be beneficial to the debtor-in-possession in the operation of the business." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999) (internal citation omitted). Courts have considered a tort committed post-petition by a debtor-in-possession in the operation of its business to be the only instance "where there is no discernible benefit to the debtor estate," however, fundamental fairness requires that a claimant receive an administrative priority claim. In re Women First Healthcare, Inc., 332 B.R. 115, 123 (Bankr. D. Del. 2005) (internal citations omitted); see also Reading Co. v. Brown, 391 U.S. 471 (1968).

151.    In order to hold administrative expenses to a minimum and to maximize the value of the bankruptcy estate, section 503(b) is narrowly construed.  In re Bernard Techs., Inc., 342 B.R. 174, 177 (Bankr. D. Del. 2006) (Walrath, J.).  Accordingly, Ms. Mills under section 503(b)(1)(A) carries a "heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." Id. (quoting Calpine, 181 F.3d at 533); see In re Unidigital, Inc., 262 B.R. 283 ("Claimants who seek payment ahead of other unsecured claims bear the burden of establishing that their claim qualifies for priority status.").  Ms. Mills must prove her entitlement to an administrative expense claim against the Debtors by a preponderance of the evidence.  Bernard Techs., 342 B.R. at 177.

152.    Ms. Mills cannot meet this burden.  First, Ms. Mills cannot establish a "transaction with the Debtor-in-Possession."  The final act of the Debtors with respect to Ms. Mills and the Property (i.e., the eviction of Ms. Mills from the Property) occurred six months prior to the Debtors' bankruptcy filings.  More importantly, any potential obligation to Ms. Mills and her potential legal interest in the Property concluded in August 2006, more than a year

before the Debtors ever filed bankruptcy.   Ms. Mills cannot, nor has she attempted to, point to any post-petition transaction with the Debtor-in-Possession that would entitle her claim to administrative priority.

153.    Furthermore, Ms. Mills cannot establish a benefit to the Debtors' estates. Ms. Mills repeatedly asserts that the Debtors have "double benefited" from the Property, yet such allegations are simply untrue. (Mills' Admin. Mot. 2.)  The Debtors funded the Mills Loans in the aggregate amount of $1,162,500.00.  Ms. Mills made *one* interest-only payment with respect to the Mills Loans, and the Debtors incurred additional costs in connection with the foreclosure and eviction process.  When the Property ultimately sold in January of 2009, the Debtors received only $634,954.46.  The Debtors' estates have clearly not benefited from the sale of the Property and have, in fact, lost over $327,000 in connection with the unpaid principle balance of the First Loan alone.  Ms. Mills is unable to establish any transaction with the Debtor-in-Possession or a benefit to the Bankruptcy Estate, both of which are required to establish an allowed administrative claim.

154.    Ms. Mills fails claim of a support her claim pursuant to Reading that a tort committed post-petition by the Debtors entitles her to an administrative claim.  First, Ms. Mills must establish a connection between her claim and the Debtors' post-petition activities to make her Reading argument successful.  See In re Unidigital, Inc., 262 B.R. at 290 (holding the debtors had ceased operations at the premises of the alleged tort prior to the bankruptcy, therefore, the alleged tort was "not committed during the conduct of business which benefitted the estate and other creditors.").  Ms. Mills asserts in each of the Mills Claims that the claims were incurred during the origination of the Mills Loans and the foreclosure of her property, both of which occurred well before the Debtors' bankruptcy filing.  Additionally, the fraud claim asserted by Ms. Mills is entirely based on the Debtors' alleged activities in relation to the origination of the Mills Loans.  The Debtors ceased any origination of loans prior to their bankruptcy filing.  Thus,

Ms. Mills is unable to establish a connection between the Mills Claims and the Debtors' post-petition business activities.  Ms. Mills's bare assertions of a continuing fraud during the pendency of the bankruptcy are insufficient to support an administrative claim and any such claims must be denied.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that this Court enter an order disallowing and expunging the Mills Claims and/or granting other and further relief as may be appropriate under the circumstances.

Dated: Wilmington, Delaware
       November 3, 2010

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Margaret Whiteman Greecher*
Sean M. Beach (No. 4070)
Sharon M. Zieg (No. 4196)
Erin D. Edwards (No. 4392)
Margaret Whiteman Greecher (No. 4652)
Morgan L. Seward (No. 5388)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

Counsel for Debtors and Debtors in Possession
