IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al.,<br><br>Debtors. | Chapter 11<br><br>Civil Action No. 07-11047 (CSS)<br><br>Jointly Administered |

**CLAIMANT DEBORAH E. MILLS RESPONSE TO
DEBTORS' OBJECTIONS TO ADMINISTRATIVE EXPENSE CLAIMS
NUMBERED 10802, 10803, 10804, 10805, 10806, 10807, 10808 AND 10809**

Deborah E. Mills ("Mills"), by and through her undersigned counsel, hereby submits this response to Debtors' Objections to Administrative Claim Numbers 10802, 10803, 10804, 10805, 10806, 10807, 10808 and 10809 filed on November 3, 2010 (D.I. 9405).[1]

**I.    PRELIMINARY STATEMENT**

As detailed in her Motion for Partial Summary Judgment [D.I. 9411], Debtors' foreclosure on Mills' home (known as 1880 Burnt Rock Way, Templeton, California, and referred to herein as the "Property") was void as a matter of law. As a result, the post-

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

petition sale of the Property was an act in furtherance of the fraud committed by Debtors in originating the Mills loans and, later, improperly foreclosing on her home. Therefore, the $813,750 sale price of the Property provided a benefit to the estate at the expense of Mills.

## II.    FACTUAL BACKGROUND

Mills filed the instant administrative claims against Debtors as a result of the damages that she suffered from the fraud committed by Debtors in originating her mortgage and, later, improperly foreclosing on her home. Mills lost the $212,500 down payment she made on her home (as well as over $48,544.44 in closing and escrow costs) and all of the capital she had available for her business (which failed due to lost working capital). Mills' credit was ruined and she suffered extreme emotional distress as a result of the foreclosure. Mills ultimately ended up declaring personal bankruptcy and has, to this day, not come close to recovering from the injuries inflicted upon her by Debtors.

Mills was a victim of a scheme orchestrated by Debtors to extract high down payments from potential mortgage customers in order to make the underlying mortgages more attractive for securitization. In Mills' case, Debtors initially offered her an attractive and affordable mortgage. (Exh. 1 at 111:23-112:7) However, after Mills had signed the initial paperwork, Debtors repeatedly conducted "hard" pulls of her credit report which dropped her credit score below an important threshold. (*Id.,* Exh. 2)

Once Debtors had succeeded in lowering Mills' credit score, Debtors informed her that she would need an additional $75,000 in cash to close her loan because of her credit score. (Exh. 1 at 47:16-48:12). In addition, because her score was now below an important threshold, Debtors told Mills that no one else would fund her loan – but

Debtors stated that they would make an "exception" for her. (*Id.* at 49:2-49:5.) When Mills informed Debtors (through their broker-agent) that coming up with an additional $75,000 would deplete all of her working capital and put her ability to pay back the mortgage in jeopardy, Debtors assured her that the additional funds she put down would be almost immediately available to her again in the form of a home equity loan. Specifically, Debtors represented to Mills that she would be able to access a $50,000 home equity line of credit just two month after her closing. (Exh. 3 at 85:11-85:18).

Debtor's never intended to give Mills access to that line of credit. After Mills took out her mortgage on Debtor's new "exception" terms, Debtor's promptly sold her loans into a securitization trust and reneged on their offer to give her access to any of the equity she had in the home. Mills was unable to make the second payment on her mortgage because all of her assets were used for the down payment and she had no funds remaining to get her business up and running.

Within four months of closing on her mortgage, Mills was in foreclosure. The foreclosure process is the other area where Debtors systematically broke the law in an effort to hide their losses from equity investors and repossess Mills' home as quickly as possible so they could liquidate it for profit.

### III.    RESPONSE TO OBJECTIONS

Debtors' objections to the Mills Claims [D.I. 9405] consist primarily of *ad hominem* attacks based on irrelevant and inadmissible material. The sum and substance of most of these personal attacks against Mills should be excluded from trial pursuant to Federal Rule of Evidence 608. To the extent there were any inaccuracies in Mills' loan application, they were not material. Debtors and their broker agent each conducted a

diligence process that verified all information that was material to the loan. Importantly, no action has been commenced by Debtors against Mills based on the information contained in her loan application. Thus, the Court is without jurisdiction (and, indeed, there has been no discovery on the issue) to determine whether any *material* errors were made in the Mills loan applications that were *actually relied upon* by Debtors to their detriment. Debtors should be precluded from trying the merits of their unasserted claims against Mills as part of this proceeding. With regard to the other objections raised by Debtors, they too are without merit and are disposed of below.

### a.  There Is Strong Evidence Proving Debtors' Fraudulent Intent

Mills approached Debtors to secure a loan after a prior lender mishandled her file and personal financial information. At the time Mills applied for her loan with Debtors, the Property was already in escrow and she was paying $350 per day to hold on to the Property while she sought new financing. Thus, Debtors knew that time was of the essence for Mills and that she could be taken advantage of as a result.

The initial financing terms offered by Debtors called for Mills to pay a $137,500 down payment towards the costs of her home (in addition to the over $48,544.44 in closing costs and escrow fees). Mills accepted these terms and her application was submitted for final processing.[2] As part of "processing" the Mills loan application,

---

[2] As part of the loan application process, Mills provided her broker, Ms. Lettau (Debtors' agent), with copies of her bank statements and tax returns. Mills made a full and fair disclosure of all of her assets and income to Debtors and made all of her information subject to verification by Debtors. Ms. Lettau testified that she sent all of Mills' information to Debtors and assumed Debtors did their job of verifying that information. (Exh. 1 at 88:9-88:14; 91:11-91:17). Ms. Lettau also testified that she filled out the loan application based on the documentary information provided by Mills and that Mills may not have even seen the loan application until the day she signed it (after her loan had been approved). (Exh. 1 at 83:13-87:7). Therefore, to the extent there were any errors on the loan application, those errors were made by Ms. Lettau.

Debtors pulled Mills' credit score.  Mills credit score was 660 at the time of the loan application and was thus on the cut-off point for receiving loan terms offered to good credit borrowers.  Realizing that her credit was on the cut-off point, Debtors performed successive hard pulls of her credit score until her score dropped to 659, one point below the cut-off.[3]

As a result of Debtors fraudulent and improper conduct, Debtors informed Mills that, because her credit score was below the important 660 cut-off, she needed to supply an additional $75,000 in cash towards her down payment in order to qualify for the "exception" terms that Debtors offered to borrowers with sub-par credit.  As will be detailed at trial, this was part of an ongoing scheme orchestrated by Debtors to extract high down payments from borrowers in order to achieve high loan to value ratios that made Debtors' loans particularly attractive on the securitization market.[4]

When Mills informed Debtors that she could not afford an additional $75,000 down payment because that would deplete all of her cash reserves and cripple her ability to re-start her business in the new location she was moving to, Debtors assured her that that the additional down payment was a mere formality and that she would be able to regain access to her down payment through a home equity loan almost immediately after she closed on the loan.  Specifically, Debtors represented (through Ms. Lettau[5]) that Mills

---

[3] Indeed, the final Mills credit score report shows that a negative factor weighing against her score was the "[n]umber of recent inquiries."  (Exh. 2 at AHM_MILLS 002639).

[4] Debtors own offering prospectuses repeatedly tout the high loan to value ratios of their loans to prospective investors.  (See, e.g., Exh. 4 (excerpt of prospectus marked as Exhibit 5 in the Deposition of Scott Martinez).

[5] The Mills loans closed in August 2005.  In the intervening six years, Ms. Lettau handled over 1,800 other loans in her role as a mortgage broker.  (Exh. 1 at 83:3-83:7)  Not surprisingly, when asked about Debtors promises, Ms. Lettau stated she could not recall whether she or anyone else in her office had any conversations with Ms. Mills regarding the offer to give Ms. Mills access to an equity line of credit in October 2005.  (Exh. 1 at

would be able to take out a $50,000 home equity loan in October 2005, just two months after her closing date.  (Exh. 3 at 85:11-85:18).  Debtors also represented to Mills that, because of her "low" credit score, no other banks would fund a loan for her and that she would likely lose her $60,000 partial down payment and escrow funds if she walked away from the new loan terms offered by Debtors.

Reasonably and justifiably relying on Debtors representations that (a) her credit score was below the 660 cut-off at the time of her loan application and thus no other financial institution would be willing to fund her loan; and (2) she would be able to access the equity in her home by October 2005, Mills entered into the loans on the "exception" terms that were offered by Debtors.  Mills would not have entered into the loans if these representations were not made by Debtors.

Had Mills known that Debtors were the ones who caused her credit score to drop below the 660 threshold, she could have forced Debtors to petition the reporting agencies to correct her score so that she could seek other funding sources.  Had Mills known that Debtors would not follow through on their promise to let her access the equity in her home by October 2005, she would not have agreed to the terms of the "exception" loans. Instead, Mills entered into loans with Debtors that wiped out her entire cash reserves and Debtors then left her in the cold when she attempted to access the equity in her home. Thus, Mills justifiably relied on Debtors' misrepresentation in deciding to enter into the loans to her detriment, creating liability for the Debtors under California law.  *See Engalla v. Permanente Medical Group, Inc.*, 938 P.2d 903, 919 (Cal. 1997) ("'It is not ... necessary that [a plaintiff's] reliance upon the truth of the fraudulent misrepresentation be

---

112:20-113:6).  Nevertheless, Debtors admit that Mills contacted them in October 2005 seeking access to just such an equity line of credit.  (Exh. 5 at 40:7-40:13).  This fact is strong circumstantial evidence that Debtors did make the offer Mills relied upon.

the sole or even the predominant or decisive factor in influencing his conduct. . . . It is enough that the representation has played a substantial part, and so has been a substantial factor, in influencing his decision.'"). Further, "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Id*. Here, there can be no question that Debtors misrepresentations of Mills' credit score and the loan finance terms were material.

Because of her reliance on Debtors conduct, Mills is entitled to recover under California law for the all of the resulting damages she suffered. *Id*. As a direct result of Debtors conduct, Mills defaulted on her loans; lost her home to foreclosure; was forcibly evicted from the Property; saw her business fail; suffered severe emotional distress which led to a suicide attempt; and lost all of her equity in the home (her $212,500 down payment and $48,544.44 in closing costs) when her home was liquidated by Debtors post-petition.

### b. Mills Claims Against Debtors Crystallized Post-Petition

Debtors argue that Mills should be precluded from making any claims based on Debtors' fraud in this action because she did not list any potential claims against Debtors as assets on her bankruptcy schedules that were completed in 2006. Because Mills did not know that she had any claims against Debtors at the time of her bankruptcy, Debtors argument fails as a matter of law. *See Kelsey v. Waste Management*, 76 Cal. App. 4th 590, 598 (Cal. App. 1st Dist. 1999) (refusing to apply judicial estoppels where defendant failed to prove that the failure to list a claim was an intentional act).

At the time Mills completed her bankruptcy schedules, none of her claims against Debtors were ripe. While she was aware that Debtors had reneged on their promise to

give her access to a home equity line of credit, she was still under the impression that Debtors would work with her to reinstate her mortgage and, thus, did not believe she had any cause of action against Debtors.   In 2006, Mills had no knowledge of Debtors' conduct regarding her credit score or the impropriety of Debtors' foreclosure.

Mills continued to make offers to either have her loans reinstated, or redeem/repurchase the Property up until the post-petition sale of the Property.  Until the 2009 liquidation of the Property, Debtors could have rectified Mills' situation.  Even at the post-petition sale, Debtors could have avoided much of their liability by liquidating the Property for a higher price (which would have resulted in Mills receiving any funds that were in excess of the amounts of the original loans).  Thus, it was the post-petition sale of the Property by the Debtors that crystallized Mills' claims against the Debtors. Therefore, listing potential claims against the Debtors on bankruptcy schedules in 2006 would have been far too speculative.

Judicial estoppel "is an extraordinary remedy that should be applied with caution."  *Kelsey v. Waste Management*, 76 Cal. App. 4th 590, 598 (Cal. App. 1st Dist. 1999)  Judicial estoppel may only be invoked when a number of factual predicates are met.  Judicial estoppel applies most appropriately when: "(1) the same party has taken two positions; (2) the positions were taken in judicial or quasi-judicial administrative proceedings; (3)  the party was successful in asserting the first position (i.e., the tribunal adopted the position or accepted it as true); (4) the two positions are totally inconsistent; and (5) the first position was ***not taken as a result of ignorance, fraud, or mistake***."  *MW Erectors, Inc. v. Neiderhauser Ornamental & Metal Works Co., Inc.*, 36 Cal.4th 412 , 422 (2005)(emphasis added).

The mere fact that there has been a nondisclosure in bankruptcy proceedings is not enough to impose judicial estoppel.  *See Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1049 (8th Cir. 2006).   There must also be a showing of ***intentional*** contradictory positions before judicial estoppel will apply.  *See Browning Manufacturing v. Mims*, 179 F.3d 197, 206 (5th Cir. 1999) (holding that judicial estoppel prohibits parties "from deliberately changing positions according to the exigencies of the moment" and is "generally applied where 'intentional self-contradiction is being used an a means of obtaining unfair advantage'"; *Havird Oil Co., Inc. v. Marathon Oil Co., Inc.*, 149 F.3d 283, 292 (4th Cir. 1998) (finding intentional action necessary); *American National Bank v. Federal Deposit Ins. Corp.*, 710 F.2d 1528, 1536 (11th Cir. 1983) (finding that judicial estoppel applies "to the calculated assertion of divergent sworn positions"; *Kelsey*, 76 Cal.App.4th 597, 599 (holding that summary judgment was improper where defendant failed to show intentional omission of claim).

Mills was unaware of many of the facts that form the basis of her claims at the time of her own bankruptcy in 2006.  For instance, because the Mills loans were recorded as being owned by MERS as a nominee, it was impossible for Mills to know who actually owned her loans at the time of her bankruptcy.  Indeed, the entire purpose behind the creation of MERS was to allow banks to transfer mortgage notes without disclosing such transfers, thus permitting greater securitization of mortgage notes for profit.[6]   The complete opacity created by the MERS system effectively prevented Mills from knowing, until discovery in the instant proceeding, that (1) the stay in her bankruptcy was violated; (2) the foreclosure of the Property was void, and (3)  she could have recovered damages

---

[6] MERS has been sued by several states because of this conduct.  The states claim that MERS violates their state recording laws by permitting banks to transfer interests in notes without having to record or even disclose such transfers.  See Exh. 6.

pursuant to to 11 U.S.C. § 362(h) as a result.  Thus, no judicial estoppel should attach as a result of the disclosures, or lack thereof, Mills made in her bankruptcy schedules in 2006.

### c.  Debtors Foreclosure Violated a Stay And Caused Damages

In Claimant's Motion for Partial Summary Judgment [D.I. 9411], Mills sets forth how Debtors' foreclosure of the Property is void because it violated the automatic stay of the Mills bankruptcy.  As detailed in *In re Maisel*, 378 B.R. 19 (Bankr. D. Mass., 2007) this violation was not trivial:

> Today, more and more homeowners turn to the bankruptcy system for protection when facing financial hardship or impending foreclosure.  It is this Court's responsibility to ensure that these debtors receive the full protection of the Bankruptcy Code, including the benefit of an automatic stay, for as long as they are entitled to it.  Unfortunately, concomitant with the increase in foreclosures is an increase in lenders who, in their rush to foreclose, haphazardly fail to comply with even the most basic legal requirements of the bankruptcy system.  It is the lenders' responsibility to comply, and this Court's responsibility to ensure compliance, with both the substantive and procedural requirements of the Bankruptcy Code.  *See In re Foreclosure Cases*, 2007 W.L. 3232430 (N.D. Ohio 2007).  As this Court made clear in its decision in *In re Schwartz*, 366 B.R. 265 (Bankr. D. Mass. 2007), it takes its role in this regard very seriously and will require proof of each element required to obtain relief from stay.  The most basic element required to obtain relief from stay is that a movant have standing to bring and prosecute such a motion.

*Id*. at 21-22.  Because the entities that foreclosed on the Property never applied for relief from the stay, their prosecution of the foreclosure constituted a willful violation of the Mills bankruptcy stay.

In contemplation of violations of a stay, 11 U.S.C. § 362(h) provides that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances,

may recover punitive damages."  A violation is willful if the defendant knew of the stay and the defendant's acts were intentional.  *See In re Atlantic Bus. and Comm. Corp.*, 901 F.2d 325, 329 (3d Cir. 1990).

The Court of Appeals for the Second Circuit in *Crysen/Montenay Energy Co. v. Esselen Assoc., Inc.* (*In re Crysen/Montenay Energy Co.*), 902 F.2d 1098 (2d Cir. 1990), set forth the standard for awarding damages pursuant to Code § 362(h).  According to the Second Circuit, "[a]ny deliberate act taken in violation of a stay, which the violator knows to be in existence, justifies an award of actual damages." *Id.* at 1105.  Furthermore, "[a]n additional finding of maliciousness or bad faith on the part of the offending creditor warrants the further imposition of punitive damages pursuant to 11 U.S.C. § 362(h)."

Here, Debtors acts were in bad faith.  They knew that the Mills loans were owned by two investment trusts at the time Mills filed for bankruptcy.  Specifically, the 512 loan was owned by American Home Mortgage Asset Trust 2001-1 from October 2005 until July 2007.  The 980 loan was owned by American Home Investment Trust 2005-SD1 from December 2005 until 2009.  For all relevant times, MERS was the beneficiary and nominee for both loans.  Nevertheless, Debtor AHM Acceptance, a party with no colorable claim to the Property or either loan, moved for relief from the stay in July 2006.

The reason why the trusts were not included in the application for relief from the stay is because Debtors did not want to inform the trusts about the default on the Mills loan.  Doing so would have triggered numerous obligations under the servicing agreements for those trusts and also would have required informing investors about the default.  Debtors took great pains to hide potential losses from investors.  As a result,

Debtors choice to go forward with the foreclosure on the Property, when they knew full well that neither MERS nor the investment trusts were authorized to go forward in light of the Mills bankruptcy stay, constitutes a bad faith violation of the Mills bankruptcy stay.

### d.  Equitable Factors Weigh In Favor Of Mills Recovery

Debtors claim that equitable factors in this matter favor the Debtors.  That, however, is simply untrue.  First, Debtors have not introduced any evidence showing that any errors in the Mills loan application were (1) intentional; (2) material; (3) not already known to Debtors as a result of their pre-loan asset/income verification process; (4) relied upon by Debtors to the exclusion of the information uncovered in Debtors' own pre-loan verification process; or (5) the cause of any action taken by Debtors in funding the Mills loan.  Debtors' arguments regarding the statements on the Mills loan application are a red-herring and are completely irrelevant to any issue in this case.

Second, Debtors' have already recovered the full value of the Mills loans from claims made against the mortgage pool insurance policies that were procured in connection with securitizing the loans.  As the prospectuses for the investment trusts that own the loans make clear, Debtors and the trusts would procure mortgage pool insurance to cover themselves and their investors from any losses associated with defaults on mortgages that were securitized.  (*See, e.g.*, Exh.4 at AHM_MILLS016219)  When deposed about the mortgage pool insurance policies, Debtors' corporate designee testified that the Debtors and the investment trusts complied with the promises made in the prospectuses.  (Exh. 5 at 49:15-50:1).  As a result, the Court may draw the conclusion that Debtors have already recovered in excess of $1.1 million from claims made against

the mortgage pool insurance policies that covered the loans to Mills.  As a result, permitting Debtors to retain any portion of the over $800,000 generated from the post-petition liquidation of the property would be inequitable.

### e.  Mills Is Entitled To Administrative Expense Status

The pre-petition torts committed by Debtors were all part of a scheme that culminated with the 2009 post-petition liquidation of the Property.  At trial, Mills will show the interconnectedness of the mortgage origination fraud, the refusal to permit Mills to cure any deficiencies pre- and post-foreclosure and the impropriety of the foreclosure. All of these acts were taken by Debtors in an effort to maximize the value of the Mills loan on the securitization market by, first, improperly extracting a higher down payment from her based on fraudulent misrepresentations and then, second, by concealing the default of her loans from the investors in the trusts in order to improperly inflate the value of the securitization instruments those loans were rolled into.  Indeed, Mills will show at trial that Debtors violated numerous provisions of their master servicing agreements for these loans (violations that ensured Mills would never be able to avoid foreclosure) in an effort to conceal loan defaults from investors.  Debtors even violated the Mills bankruptcy stay as part of their concealment efforts.

Because the foreclosure was void *ab initio* as a result of violating the Mills bankruptcy stay, Debtors' post-petition liquidation of the property caused Mills significant damages under § 362(h) and improperly benefitted the estate in the amount of $813,750.  For at least this reason, Mills claims should be accorded administrative expense status.

## IV.    CONCLUSION

For the foregoing reasons, the Court should over-rule the objections of Debtors and allow the administrative expense claims raised by Mills.


Dated:   November 10, 2010                   _/s/ *Stamatios Stamoulis*_____
                                             Stamatios Stamoulis  #4606
                                             stamoulis@swdelaw.com
                                             Stamoulis & Weinblatt LLC
                                             Two Fox Point Centre
                                             6 Denny Road, Suite 307
                                             Wilmington, DE 19809
                                             (302) 999-1540

                                             *Attorneys for Deborah E. Mills*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al., | Civil Action No. 07-11047 (CSS) |
| | Jointly Administered |
| Debtors. | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 10, 2010, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing(s) to all registered counsel.  In addition, the following counsel also were served by email:

HAHN & HESSEN LLP
Mark S. Indelicato, Esq.
488 Madison Avenue
New York, NY 10022

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Sean Beach, Esq.
The Brandywine Bldg.
1000 West Street, 17th Floor
PO Box 391
Wilmington, DE 19899-0391

/s/ *Stamatios Stamoulis*
Stamatios Stamoulis