# EXHIBIT 1

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

--------------------------------- X

IN RE:

AMERICAN HOME MORTGAGE,            Case No.

HOLDINGS, INC., a Delaware         07-11047 (CSS)

corporation, et al.,

        Debtors.

----------------------------------X

DEPOSITION OF TAWNYA LETTAU

Wednesday, October 20, 2010

San Luis Obispo, California

Reported in stenotype by:

Elizabeth A. Doukas, RPR, CSR #9872

46

1  that she was going to liquidate this CD in any way to fund
2  the down payment on the home?
3      A. I do not know.
4      Q. If you turn to the next page of this
5  application, which is 3 of 4, with Bates numbers 2022, in
6  the middle of that form there is a section 9, and then
7  Ms. Mills' signature is there; do you see that?
8      A. I do.
9      Q. Were you present when Ms. Mills signed this
10 document?
11     A. No, not to my knowledge, I was not.
12     Q. Does the fact that the date is 7/15/2005
13 indicated anything to you?
14     A. No.
15     Q. Do you know if she signed this application on
16 that date?
17     A. I'm sure she did.
18     Q. Okay. Do you explain to potential borrowers
19 that signing a Loan Application indicates that the
20 information they've provided on that Loan Application is
21 accurate?
22     A. Yes.
23     Q. Do you inform potential borrowers that, to the
24 extent anything changes with their financial situation,
25 that they need to supplement this application?

47

1      A. Yes.
2      Q. Previously you testified that it was always
3  contemplated that Ms. Mills' loan would be a piggyback
4  loan, meaning she would have a first mortgage and a second
5  mortgage?
6      A. Correct.
7      Q. At the time this Loan Application was filled
8  in, was a second Loan Application also filled in at the
9  same time?
10     A. Yes.
11     Q. And do you recall whether the second -- the
12 original second Loan Application was for $275,000?
13     A. I recall it initially for 200.
14     Q. It was initially for 200. Do you know why it
15 was initially for 200?
16     A. There was a -- yes, there was a FICO
17 discrepancy which did not meet the guideline and,
18 therefore, the loan was countered by the lender.
19     Q. And did you know, prior to filling out the
20 Loan Application, that Ms. Mills was going -- I'm sorry,
21 did you know, prior to filling out this second Loan
22 Application form, that Ms. Mills was going to need an
23 exception or did not meet the FICO score requirements?
24     A. It was a manual underwrite.
25     Q. I'm sorry, what is a "manual underwrite"?

48

1      A. It's basically to the discretion of the
2  lender.
3      Q. Okay. And at what point in time did you find
4  out that Ms. Mills did not meet the product requirements
5  for FICO score?
6      A. I don't recall the exact date, I can estimate
7  a week or two after this was dated.
8      Q. Okay. And did -- so was the original Loan
9  Application for the second mortgage for $275,000 or for
10 $200,000?
11     A. I don't recall, based off of what I'm reading
12 here.
13     Q. Okay. That's fine.
14        MS. ZIEG: This is going to be Lettau 7.
15           (Deposition Exhibit No. 7 was
16           marked for identification.)
17        MS. ZIEG: Q. Ms. Lettau, have you ever
18 seen this document before?
19     A. Yes.
20     Q. And can you explain to me what this document
21 is?
22     A. I need to read it here.
23     Q. Oh, that's fine. Take your time?
24        (Witness reviews document.)
25        THE WITNESS: It's an Exception Request for

49

1  her FICO score.
2         MS. ZIEG: Q. And what is an Exception
3  Request?
4      A. The program required a 660 and Ms. Mills had a
5  659.
6      Q. The loan program?
7      A. Yes.
8      Q. And did you receive a copy of this Exception
9  Request?
10     A. Yes, I did.
11     Q. And in what format did you receive a copy of
12 this Exception Request?
13     A. I don't remember.
14     Q. Would it be by e-mail?
15     A. Yes, it would.
16     Q. Okay. And what's the source of this Exception
17 Request? Was it ABC or was it you who filled out the
18 request?
19     A. It was ABC.
20     Q. Did you have any conversations with anyone at
21 ABC about this Exception Request?
22     A. I remember the assigned processor to the file
23 told me that they were going to make this request.
24     Q. And when she told you they were going to make
25 this request, what was your response?

|  | 82 |  | 84 |
|---|---|---|---|
| 1 | how many other loans have you worked on since 2005? | 1 | understanding of what columns you're putting in what |
| 2 | MR. YOO: Objection, vague and ambiguous as to | 2 | information on the actual physical Loan Application? |
| 3 | "worked on." If you can respond, go ahead. | 3 | A. They should, it's very specific. |
| 4 | THE WITNESS: I average, as an originator, two | 4 | Q. Is it fair to say that most clients don't |
| 5 | to 300 loans per year. | 5 | actually see the final and completed Loan Application until |
| 6 | MR. STAMOULIS: Q. So, if we were to say | 6 | they come into your office to sign it? |
| 7 | that -- well, let me back up. | 7 | MS. ZIEG: Objection, calls for speculation. |
| 8 | So in the six years since this loan was | 8 | MR. YOO: Objection, lacks foundation. If you |
| 9 | originated, it's possible that you could have brokered | 9 | can -- go ahead and respond, if you can do it. |
| 10 | as -- I'm sorry, worked on as many as 1800 other loans; is | 10 | THE WITNESS: My general practice is I either |
| 11 | that right? | 11 | e-mail or fax the Loan Application for their review. We |
| 12 | MS. ZIEG: Objection. | 12 | always have to obtain a signature, so it's always mailed to |
| 13 | MR. YOO: Objection, assumes facts not in | 13 | them. |
| 14 | evidence and lacks foundation. | 14 | MR. STAMOULIS: Q. Do you remember what you |
| 15 | If you understand what he's asking you, go | 15 | did with regard to Ms. Mills' loan concerning the review of |
| 16 | ahead and respond. I don't think numbers work. | 16 | her Loan Application? |
| 17 | THE WITNESS: I don't know. | 17 | A. No. |
| 18 | MR. STAMOULIS: Q. Well, you say you do | 18 | MS. ZIEG: Objection, form. |
| 19 | about two to three -- you work on about two to 300 loans | 19 | MR. YOO: Vague and ambiguous. Counsel, why |
| 20 | per year; is that right? | 20 | don't you clarify, if you can. |
| 21 | A. Yes, it is. | 21 | MR. STAMOULIS: Q. I am -- let me rephrase. |
| 22 | Q. Okay. And it's been about 600 -- I'm sorry, | 22 | Ms. Lettau -- and by the way, have you spelled |
| 23 | six years -- | 23 | your name for the record? |
| 24 | A. Uh-huh. | 24 | A. No, I have not. |
| 25 | Q. -- since Ms. Mills' loan was originated; is | 25 | Q. Can you -- your name appears spelled |

|  | 83 |  | 85 |
|---|---|---|---|
| 1 | that right? | 1 | differently several ways on a number of the documents that |
| 2 | A. Yes. | 2 | have been produced in this matter, and I was wondering if |
| 3 | Q. So if you do 300 loans per year, in the six | 3 | you could please, for the record, spell your first and last |
| 4 | years since Ms. Mills' loan was originated it's possible | 4 | name? |
| 5 | that you could have worked on 1800 other loans in that time | 5 | A. Sure. It's Tawnya, that's T-a-w-n-y-a, last |
| 6 | period; is that right? | 6 | name is Lettau, L-e-t-t-a-u. |
| 7 | A. Yes. | 7 | Q. Thank you, Ms. Lettau. With regard to |
| 8 | Q. Now, for those two to 300 loans that you do | 8 | Ms. Mills' loan, do you recall whether you sent her a copy |
| 9 | per year, what are your typical duties with regard to those | 9 | of her Loan Application to review prior to her coming into |
| 10 | loans? | 10 | your office to sign it? |
| 11 | A. Interview the client. Discuss their purchase | 11 | A. I don't recall. |
| 12 | or refinance. Loan programs. | 12 | Q. Do you know if anyone sent Ms. Mills a copy of |
| 13 | Do you want more detail? | 13 | her Loan Application to review prior to her coming into |
| 14 | Q. Well, let me ask specifically. What is your | 14 | your office to sign it? |
| 15 | role with regard to assisting clients in filling out their | 15 | MS. ZIEG: Objection, calls for speculation |
| 16 | loan applications? | 16 | and calls -- inaccurately states the testimony. |
| 17 | A. I tend to do it over the phone to accommodate | 17 | MR. YOO: If you know. |
| 18 | their schedule and ask them every specific question on the | 18 | MR. STAMOULIS: Q. I'm asking you whether |
| 19 | Loan Application itself. | 19 | you know -- |
| 20 | Q. Now, as you're filling out the Loan | 20 | A. I do not, I -- |
| 21 | Application over the phone, do you know whether the client | 21 | Q. -- anyone sent the Loan Application to |
| 22 | has a copy of the Loan Application in front of them while | 22 | Ms. Mills for her review prior to signing? |
| 23 | they're speaking with you? | 23 | A. I do not. |
| 24 | A. Most cases not. | 24 | Q. Do you know how long Ms. Mills was in your |
| 25 | Q. And so would the client typically have an | 25 | office when she came in to sign the Loan Application? |

Page 86

1  MS. ZIEG: Objection, misstates the testimony.
2  MR. YOO: Lacks foundation, assumes facts not
3  in evidence.
4      Do you know whether she came into your office
5  to sign the Loan Application?
6      THE WITNESS: I do not.
7      MR. STAMOULIS: Okay.
8  Q.  Do you know where the Loan Application was
9  signed?
10 A.  I do not remember.
11 Q.  Would you have known at the time where the
12 Loan Application was signed?
13 A.  No.
14     MS. ZIEG: Objection, calls for speculation.
15     MR. YOO: If you know.
16     THE WITNESS: I do not know.
17     MR. STAMOULIS:  Q.  Do you recall ever
18 sitting down with Ms. Mills and going over her loan -- her
19 completed Loan Application with her prior to her signing
20 it?
21 A.  No, I do not.
22 Q.  You do not recall or you know that that did
23 not happen?
24 A.  I do not recall.
25 Q.  So it's possible that you could have sat down

Page 87

1  with her to review the Loan Application but you just don't
2  remember?
3  A.  That is correct, yes.
4  Q.  Do you know or do you recall whether anyone
5  sat down with Ms. Lettau to review her Loan Application
6  prior to her signing it?
7  A.  No, I do not recall.
8  Q.  When -- now, when you have the completed Loan
9  Application, with whatever supporting documents that you
10 collect, what do you do with those materials?
11     MR. YOO: Counsel, generally there are two
12 categories of loans here, brokered loans and her loans that
13 she -- she dealt with directly with Chase.
14     Are you just asking generally as to all loans?
15 Because her -- you know, her procedure and practice may
16 differ depending upon what type of loan you're talking
17 about.
18     MR. STAMOULIS: Well, I was speaking
19 generally.  And if the witness wants to draw a distinction,
20 if her practices are different, please feel free to tell
21 me.
22 Q.  But I'm just generally asking, what happens
23 when you collect up a completed Loan Application and
24 whatever bank statements or other documents you might have?
25 A.  For a brokered loan we use the trans box and

Page 88

1  we overnight it directly to the institution, and I would
2  always keep a shadow file in my office.
3  Q.  Now, does the institution typically have roles
4  as to what kind of documentation it requires?
5  A.  The institution and loan program.
6  Q.  And if you did not send enough information,
7  would the loan still be processed and approved?
8  A.  No.
9  Q.  So for Ms. Mills' loan, is it fair to say that
10 the only way the loan could have been processed and
11 approved was if you had provided American Home Mortgage
12 with every single piece of information they required to
13 process and approve this loan?
14 A.  Yes.
15 Q.  Now, do you personally verify the accuracy of
16 any of the material that is put on the Loan Application?
17     MR. YOO: Objection, vague and ambiguous as to
18 what specific loan program.
19     Ms. Lettau, if you could respond to the
20 question as phrased, go ahead.  If not, then ask for a
21 clarification.
22     THE WITNESS: Clarification, please.
23     MR. YOO: Again, we talked about stated income
24 loans and there may be loans that are not stated income
25 loans which may have different requirements.

Page 89

1      MR. STAMOULIS: Well, I'm asking more along
2  the lines of her general job responsibilities, and I'm
3  asking whether one of those responsibilities is to do
4  fact-checking on whether or not information contained in an
5  application is accurate.
6      MR. YOO: Same objections as her
7  responsibilities and obligations may differ based upon what
8  specific loan product it is.
9      If you can respond as currently phrased, go
10 ahead.  If you cannot, ask for clarification.
11     THE WITNESS: I'm going to ask for more
12 clarification.
13     MR. STAMOULIS: Okay.
14 Q.  Well, then, let's focus on brokered loans.
15     So when you have a brokered loan and you get a
16 complete application and you get the supporting materials
17 that are required by that institution, do you do anything
18 to verify the information contained in those materials?
19     MR. YOO: Same objections.  As previously
20 testified by Ms. Lettau, depending on what type of loan
21 product, if they're stated income with asset verification,
22 she already testified as to what she does.
23     I don't believe there was any questions
24 relating to just nonstated income or just regular loans.
25 She may have different obligations as to different loan

## Page 90

products, whether it's brokered or nonbrokered.
    If you can respond as currently phrased, go ahead and respond.
    THE WITNESS: I cannot.
    MR. STAMOULIS: Q. Well, then, let's focus in again on stated income loans.
    Can you just briefly refresh my recollection as to what -- what you do to verify verified stated income loans?
    MR. YOO: Go ahead.
    THE WITNESS: It was a stated income verified assets, so I accumulated the assets in the form of a bank statement.
    MR. STAMOULIS: Q. Did you call the bank --
    A. No, I'm not required to.
    Q. -- that the statement came from?
    A. No, and I'm not required to do so.
    Q. Did you make any inquiries to the bank as to whether or not the asset was liquid?
    A. I do not recall.
    Q. Now, do you know whether the institution that is granting the loan has its own verification process?
    MS. ZIEG: Object --
    MR. YOO: Objection, calls for speculation. If you know.

## Page 91

    THE WITNESS: I do not know.
    MR. STAMOULIS: Okay.
    Q. So you do not know whether the institution that's granting the loan calls banks and verifies whether assets are liquid or illiquid?
    A. I do not know.
    Q. Okay. But it is the institution that ultimately decides to approve or reject a Loan Application; is that right?
    A. That's right.
    Q. So when you receive an approval, is it fair to say that you assume that the institution did whatever due diligence it needed to do?
    MS. ZIEG: Objection, form.
    MR. YOO: Only if you know.
    THE WITNESS: The word assume. Yes, that is my understanding.
    MR. STAMOULIS: Q. Now, has -- have you ever had the occasion where one of your institutions that granted a loan later went back and commenced an action against a borrower for misstatements on a Loan Application?
    A. I do not know.
    Q. Have you ever been asked to provide any information in any case brought by a lender against a borrower with regard to statements made on a Loan

## Page 92

Application?
    A. No, I have not.
    Q. Have you ever been deposed before?
    A. No, I have not.
    Q. Are you aware of whether or not American Home Mortgage ever brought a claim against Ms. Mills for any of the statements contained in her Loan Application?
    A. No, I am not.
    Q. Have you ever had a financial institution reject a Loan Application based on -- I'm sorry, let me just rephrase.
    Have you ever had a financial institution reject one of the loan applications that you've submitted?
    A. I don't remember.
    Q. So in the 1800 loans that you've done in the last six years, you don't know whether any of those applications have ever been rejected?
    A. Stam, I literally would only do three brokered loans per year, at a very small window.
    MR. YOO: I think we have an misunderstanding here, maybe you need to clarify as to the loan applications being rejected, whether it applies to all the loans that she -- she -- you know, she dealt with, whether they were brokered or straight through Chase.
    It appears that she just assumed that you were

## Page 93

talking about brokered loans.
    MR. STAMOULIS: Okay.
    Q. Well, let's just go back to that answer.
    So, you don't remember the details of the other broker loans that you've done over the last six years as to whether or not they were approved or rejected?
    A. That's correct.
    Q. Do you even remember the names of the borrowers of those loans that you did over the last six years that were brokered loans?
    A. Not off the top of my head, no.
    MR. YOO: And also, I would instruct her not to disclose any of those names based upon the privacy rights of those borrowers.
    So, to the extent that he asked you to identify their names, I'm going to instruct you not to answer.
    MR. STAMOULIS: I'm not asking to ask that.
    MR. YOO: And I don't think it's proper.
    MR. STAMOULIS: Q. Do you remember, sitting here today, the names of the -- of each of the financial institutions that were involved in those brokered loans that you did over the last six years?
    A. Yes.
    MR. YOO: Objection, asked and answered. Go

|  | 106 |  | 108 |
|---|---|---|---|
| 1 | MR. STAMOULIS: Q. Do you know whether -- | 1 | Q. You personally? |
| 2 | when you submit an application to American Home Mortgage, | 2 | MS. ZIEG: Objection. |
| 3 | whether they also pull the credit score of the applicant | 3 | MR. YOO: Objection, calls for improper |
| 4 | that you're submitting the application for? | 4 | opinion testimony. I don't think the question is proper, |
| 5 | A. I do not know. | 5 | but go ahead and respond, if you can. |
| 6 | Q. Okay. Do you know it with regard to Chase? | 6 | THE WITNESS: I do not see a reason to pull |
| 7 | MR. YOO: I instruct you not to answer. I | 7 | two credits for a first and a second mortgage concurrent |
| 8 | don't see any relevance how -- what Chase does as to the | 8 | with the same loan. |
| 9 | bankruptcy of American Home Mortgage, as well as Ms. Mills' | 9 | MR. STAMOULIS: Great. |
| 10 | claim. | 10 | Q. Have you ever had the situation, in any of the |
| 11 | MR. STAMOULIS: Q. Do you know it with | 11 | loans that you've worked on, where, after the initial terms |
| 12 | regard to the other institutions that you have brokered | 12 | of the loan were set, that an exception was found and that |
| 13 | loans for that are not Chase? | 13 | the terms had to change? |
| 14 | A. I do not. | 14 | A. Yes. |
| 15 | Q. And do you know whether a credit score is | 15 | MS. ZIEG: Objection -- |
| 16 | pulled multiple times, once for the main loan and then once | 16 | THE WITNESS: Yes. |
| 17 | again for the piggyback loan, by a lending institution? | 17 | MS. ZIEG: -- vague. |
| 18 | MS. ZIEG: Objection, calls for speculation, | 18 | MR. YOO: Go ahead and respond. |
| 19 | lacks foundation. | 19 | THE WITNESS: Yes. |
| 20 | MR. YOO: Same objection. I would only ask | 20 | MR. STAMOULIS: Okay. |
| 21 | her -- allow her to answer if she has such knowledge from | 21 | Q. So other than Ms. Mills, how often has that |
| 22 | American Home Mortgage. | 22 | happened in the last six years? |
| 23 | THE WITNESS: And I do not. | 23 | A. I can't answer -- I do not know. |
| 24 | MR. STAMOULIS: Q. When you pull an | 24 | Q. Could you estimate as to maybe, you know, five |
| 25 | applicant's credit score for a loan that's going to involve | 25 | times, ten times, 100 times? |

|  | 107 |  | 109 |
|---|---|---|---|
| 1 | a main loan and a piggyback loan, do you pull it once or do | 1 | A. I can't -- |
| 2 | you pull it twice? | 2 | MS. ZIEG: Objection. |
| 3 | A. I pull it once. | 3 | THE WITNESS: I could not. |
| 4 | Q. Can you think of any reason why you would pull | 4 | MS. ZIEG: Form. |
| 5 | a credit -- you would pull an applicant's credit score | 5 | MR. STAMOULIS: Q. Without naming any |
| 6 | twice in a row when you're dealing with a main loan and | 6 | names, sitting here today can you think of any specific |
| 7 | then a piggyback loan? | 7 | instance in which the terms of a particular loan changed |
| 8 | MS. ZIEG: Objection, vague. Objection, calls | 8 | after the original Loan Application was put in? |
| 9 | for speculation and lacks foundation. | 9 | MR. YOO: Asked and answered. |
| 10 | When you say, "you," are you asking Ms. Lettau | 10 | THE WITNESS: Yes. |
| 11 | if, when she pulls -- | 11 | MR. STAMOULIS: Q. Do you know whether |
| 12 | MR. STAMOULIS: Yeah, absolutely. | 12 | there was ever an instance where an additional down payment |
| 13 | MS. ZIEG: Okay. | 13 | was required because the terms had changed? |
| 14 | MR. YOO: Same objection -- join in the | 14 | A. Yes. |
| 15 | objections. Go ahead and respond if you can. | 15 | Q. Can you recall, sitting here today, any |
| 16 | THE WITNESS: I -- no, I would just pull one | 16 | instance where you went back and as part of dealing with |
| 17 | credit report. | 17 | the change in terms you inquired as to whether a |
| 18 | MR. STAMOULIS: Okay. | 18 | post-closing line of credit could be established to access |
| 19 | Q. My question is, can you think of any logical | 19 | part of the down payment? |
| 20 | reason why you would want to pull an applicant's credit | 20 | A. No. |
| 21 | score twice in a row if you're dealing with a main loan and | 21 | Q. You don't recall or you know that that has |
| 22 | a piggyback loan? | 22 | never happened? |
| 23 | A. No. | 23 | A. I know that that has never happened. |
| 24 | MS. ZIEG: Her personally? | 24 | Q. So, in all of the loans that you've worked on |
| 25 | MR. STAMOULIS: Yes. | 25 | in the last six years, you have never dealt with a |

|   | 110 |   | 112 |
|---|---|---|---|
| 1 | situation where an applicant borrower has inquired about | 1 | A.  Yes. |
| 2 | accessing their down payment after the closing as a result | 2 | Q.  You do recall? |
| 3 | of a change in loan terms? | 3 | A.  I do recall. |
| 4 | MR. YOO:  Objection, vague and ambiguous. | 4 | Q.  Okay.  And what is your recollection of that |
| 5 | THE WITNESS:  I have to be -- there are | 5 | conversation? |
| 6 | seasoning requirements, you have to depend on appreciation, | 6 | A.  The lender came back with a counter and the |
| 7 | loan programs and terms change, so I would never advise | 7 | counter required a larger down payment. |
| 8 | something like that. | 8 | Q.  So do you recall whether you had this via |
| 9 | MR. STAMOULIS:  Okay. | 9 | phone with her or via e-mail? |
| 10 | Q.  But sitting here today, do you -- can you | 10 | A.  I don't recall exactly.  Like I said, it |
| 11 | state under oath that that situation has never come up in | 11 | warranted a phone call, so I would assume I would have made |
| 12 | the last six years? | 12 | a phone call. |
| 13 | MS. ZIEG:  Objection, vague. | 13 | Q.  And would it have been you that would have |
| 14 | MR. YOO:  Join. | 14 | made the phone call? |
| 15 | THE WITNESS:  I do not recall, no. | 15 | A.  Yes. |
| 16 | MR. STAMOULIS:  Q.  And sitting here today, | 16 | Q.  Do you recall whether your assistant or anyone |
| 17 | can you -- do you recall advising Ms. Mills about seasoning | 17 | else in your office called Ms. Mills about the change to |
| 18 | requirements? | 18 | the terms of her loan? |
| 19 | MR. YOO:  Objection, vague and ambiguous, | 19 | A.  I do not. |
| 20 | unintelligible.  Go ahead and respond if you understand | 20 | Q.  Do you recall whether Ms. Mills asked about |
| 21 | what he's asking you. | 21 | getting access to her, what would now be a $212,000 down |
| 22 | THE WITNESS:  No, I do not.  I do not | 22 | payment, after she closed on her loan? |
| 23 | remember. | 23 | A.  I do not. |
| 24 | MR. STAMOULIS:  Okay. | 24 | Q.  Do you recall whether anyone in your office |
| 25 | Q.  You do know what seasoning requirements are, | 25 | discussed with Ms. Mills about getting access to that |

|   | 111 |   | 113 |
|---|---|---|---|
| 1 | right? | 1 | $212,000 down payment after the closing of her loan? |
| 2 | A.  Yes, I do. | 2 | A.  I do not. |
| 3 | Q.  Okay.  And you don't remember whether you ever | 3 | Q.  Do you recall whether you had any |
| 4 | explained seasoning requirements to Ms. Mills? | 4 | conversations with American Brokers Conduit about possibly |
| 5 | A.  I was never asked about pulling money out, so, | 5 | getting an exception to the seasoning requirements? |
| 6 | therefore, we did not have that conversation. | 6 | A.  I do not. |
| 7 | Q.  So you are stating as a fact that you are | 7 | Q.  Do you recall whether anyone in your office |
| 8 | absolutely certain that you did not have a discussion with | 8 | ever had any conversations with American Brokers Conduit |
| 9 | Ms. Mills about seasoning requirements? | 9 | about getting an exception to the seasoning requirements to |
| 10 | A.  Correct. | 10 | access the $212,000 loan? |
| 11 | Q.  Do you recall how you notified Ms. Mills that | 11 | A.  I do not. |
| 12 | the terms of her loan had changed based on American Brokers | 12 | Q.  Now, you mentioned that your contact at |
| 13 | Conduit's review of her application? | 13 | American Brokers Conduit was Mr. Cordova; is that right? |
| 14 | A.  I do not recall specifically, but it would | 14 | A.  Yes. |
| 15 | warrant a phone call, with my character. | 15 | Q.  Is his name Rick Cordova? |
| 16 | Q.  But you don't recall whether you called her? | 16 | A.  Yes, it is. |
| 17 | A.  I don't recall if it was in the form of an | 17 | Q.  Do you know, is that Richard, or do you know |
| 18 | e-mail or a phone call, but my assumption would be a phone | 18 | what his first full name is? |
| 19 | call. | 19 | A.  I do not. |
| 20 | Q.  Okay.  Did you have your e-mails from that | 20 | Q.  Okay.  And what was Mr. Cordova's position |
| 21 | time period? | 21 | with American Home Mortgage -- or American Brokers Conduit? |
| 22 | A.  I do not. | 22 | A.  He was the representative.  Basically their |
| 23 | Q.  And do you specifically recall any | 23 | job is to go around to other mortgage institutions and to |
| 24 | conversation with Ms. Mills wherein you informed her that | 24 | promote their company for business. |
| 25 | the terms of her loan had changed? | 25 | Q.  Do you recall what if any conversations you |