# EXHIBIT 4

Prospectus supplement dated October 28, 2005 (to prospectus dated October 28, 2005)

# $794,472,100

(Approximate)

 American Home Mortgage

# American Home Mortgage Assets Trust 2005-1

Issuer

### American Home Mortgage Servicing, Inc.

### Servicer

### American Home Mortgage Assets LLC

Depositor

### American Home Mortgage Assets Trust 2005-1, Mortgage-Backed Pass-Through Certificates, Series 2005-1

*You should consider carefully the risk factors beginning on page S-14 in this prospectus supplement.*

**The Trust**

The trust will consist primarily of a pool of adjustable-rate mortgage loans, divided into four loan groups. The trust will issue twenty-two classes of certificates, seventeen of which are offered under this prospectus supplement.

**Credit Enhancement**

The certificates will have credit enhancement in the form of:

- subordination provided to the group I certificates and group II certificates by the Class C-B Certificates, and provided to the Class C-B Certificates by each class of Class C-B Certificates with a lower payment priority;

- excess interest and overcollateralization for loan group III-A and loan group III-B;

- subordination provided to the group III senior certificates by the Class 3-M Certificates, and provided to the Class 3-M Certificates by each class of Class 3-M Certificates with a lower payment priority; and

- limited cross-collateralization as described in this prospectus supplement.

The group I certificates and group II certificates will not be cross-collateralized with the group III certificates.

In addition, a corridor contract will be included in the trust for the benefit of the group III certificates which may cover some basis risk shortfalls and realized losses on some classes of certificates.

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy of this prospectus supplement or accompanying prospectus. Any representation to the contrary is a criminal offense.**

**The Attorney General of the state of New York has not passed on or endorsed the merits of this offering. Any representation to the contrary is unlawful.**

Credit Suisse First Boston LLC will offer the offered certificates to the public from time to time in negotiated transactions, at varying prices to be determined at the time of sale. The proceeds to the depositor from the offering will be approximately 100.16% of the aggregate certificate principal balance of these certificates, plus interest from the cut-off date on the Class 1-A-1, Class 2-A-1, Class 2-A-2-1, Class 2-A-2-2, Class C-B-1, Class C-B-2 and Class C-B-3 Certificates. The expenses of the depositor are estimated to be $705,000. See "Method of Distribution" in this prospectus supplement.

# Credit Suisse First Boston

**Underwriter**

AHM_MILLS016016

| Adjustment Date | One-Year LIBOR Loan Index | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
| January 1 | 5.06% | 6.75% | 5.17% | 2.49% | 1.45% | 1.48% | 3.10% |
| February 1 | 5.40 | 6.76 | 4.88 | 2.43 | 1.38 | 1.37 | 3.27 |
| March 1 | 5.25 | 6.94 | 4.67 | 3.00 | 1.28 | 1.34 | 3.57 |
| April 1 | 5.23 | 7.10 | 4.44 | 2.63 | 1.36 | 1.81 | 3.81 |
| May 1 | 5.56 | 7.50 | 4.24 | 2.59 | 1.21 | 2.08 | 3.69 |
| June 1 | 5.84 | 7.18 | 4.18 | 2.28 | 1.19 | 2.11 | 3.76 |
| July 1 | 5.89 | 7.08 | 3.82 | 2.09 | 1.16 | 2.39 | 3.90 |
| August 1 | 6.06 | 6.97 | 3.56 | 1.90 | 1.44 | 2.35 | 4.22 |
| September 1 | 6.04 | 6.80 | 2.64 | 1.73 | 1.45 | 2.26 | 4.13 |
| October 1 | 6.25 | 6.73 | 2.27 | 1.64 | 1.24 | 2.49 | |
| November 1 | 6.27 | 6.56 | 2.39 | 1.73 | 1.48 | 2.54 | |
| December 1 | 6.50 | 6.00 | 2.44 | 1.45 | 1.60 | 2.96 | |

## Mortgage Loan Characteristics

*Loan Group I, Loan Group II, Loan Group III-A and Loan Group III-B*

The mortgage loans in Loan Group I, Loan Group II, Loan Group III-A and Loan Group III-B had an aggregate principal balance as of the Cut-off Date of approximately $797,994,863 after application of scheduled payments due on or before the Cut-off Date, whether or not received. In the aggregate, all of the mortgage loans are secured by first liens on the related mortgaged property.

As of the Cut-off Date, the mortgage loans had mortgage rates ranging from approximately 3.000% per annum to approximately 8.375% per annum and the weighted-average mortgage rate was approximately 5.474% per annum. The weighted average remaining term to stated maturity of the mortgage loans was approximately 359 months as of the Cut-off Date. None of the mortgage loans will have a first Due Date prior to February 1, 2005, or after November 1, 2005, or will have a remaining term to maturity of less than 351 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any mortgage loan is October 1, 2035.

None of the mortgage loans will be a buydown mortgage loan.

None of the mortgage loans originated in Georgia will be subject to the Georgia Fair Lending Act.

None of the mortgage loans will be subject to the Home Ownership and Equity Protection Act of 1994 or any comparable state or local law.

*Loan Group I*

The mortgage loans in Loan Group I had an aggregate principal balance as of the Cut-off Date of approximately $233,577,680, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the mortgage loans in Loan Group I are secured by first liens on the related mortgaged property.

The average principal balance of the mortgage loans in Loan Group I at origination was approximately $475,974. No mortgage loans in Loan Group I had a principal balance at origination of greater than approximately $3,500,000 or less than approximately $40,000. The average principal balance of the mortgage loans in Loan Group I as of the Cut-off Date was approximately $473,788. No mortgage loans in Loan Group I had a principal balance as of the Cut-off Date of greater than approximately $3,500,000 or less than approximately $40,000.

S-26

AHM_MILLS016041

As of the Cut-off Date, the mortgage loans in Loan Group I had mortgage rates ranging from approximately 3.000% per annum to approximately 4.875% per annum and the weighted average mortgage rate was approximately 4.424% per annum. The weighted average remaining term to stated maturity of the mortgage loans in Loan Group I was approximately 359 months as of the Cut-off Date. None of the mortgage loans in Loan Group I had a first Due Date prior to September 1, 2005, or after November 1, 2005, or had a remaining term to maturity of less than 358 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any mortgage loans in Loan Group I is October 1, 2035.

None of the mortgage loans in Loan Group I will provide for prepayment charges.

The weighted average of the loan-to-value ratios at origination of the mortgage loans in Loan Group I was approximately 70.60%. No loan-to-value ratio at origination of any mortgage loan in Loan Group I was greater than approximately 95.00% or less than approximately 6.55%.

*Loan Group II*

The mortgage loans in Loan Group II had an aggregate principal balance as of the Cut-off Date of approximately $101,814,564, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the mortgage loans in Loan Group II are secured by first liens on the related mortgaged property.

The average principal balance of the mortgage loans in Loan Group II at origination was approximately $350,740. No mortgage loans in Loan Group II had a principal balance at origination of greater than approximately $2,000,000 or less than approximately $56,000. The average principal balance of the mortgage loans in Loan Group II as of the Cut-off Date was approximately $349,878. No mortgage loans in Loan Group II had a principal balance as of the Cut-off Date of greater than approximately $2,000,000 or less than approximately $55,934.

As of the Cut-off Date, the mortgage loans in Loan Group II had mortgage rates ranging from approximately 3.625% per annum to approximately 5.500% per annum and the weighted average mortgage rate was approximately 5.145% per annum. The weighted average remaining term to stated maturity of the mortgage loans in Loan Group II was approximately 359 months as of the Cut-off Date. None of the mortgage loans in Loan Group II had a first Due Date prior to September 1, 2005, or after November 1, 2005, or had a remaining term to maturity of less than 358 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any mortgage loans in Loan Group II is October 1, 2035.

Approximately 0.62% of the mortgage loans in Loan Group II will provide for prepayment charges.

The weighted average of the loan-to-value ratios at origination of the mortgage loans in Loan Group II was approximately 75.68%. No loan-to-value ratio at origination of any mortgage loan in Loan Group II was greater than approximately 90.00% or less than approximately 17.50%.

*Loan Group III*

The mortgage loans in Loan Group III had an aggregate principal balance as of the Cut-off Date of approximately $462,602,618, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the mortgage loans in Loan Group III are secured by first liens on the related mortgaged property.

The average principal balance of the mortgage loans in Loan Group III at origination was approximately $334,773. No mortgage loans in Loan Group III had a principal balance at origination of greater than approximately $2,747,500 or less than approximately $30,200. The average principal balance of the mortgage loans in Loan Group III as of the Cut-off Date was approximately $334,734. No

AHM_MILLS016042

mortgage loans in Loan Group III had a principal balance as of the Cut-off Date of greater than approximately $2,747,500 or less than approximately $30,179.

As of the Cut-off Date, the mortgage loans in Loan Group III had mortgage rates ranging from approximately 4.125% per annum to approximately 8.375% per annum and the weighted average mortgage rate was approximately 6.076% per annum. The weighted average remaining term to stated maturity of the mortgage loans in Loan Group III was approximately 359 months as of the Cut-off Date. None of the mortgage loans in Loan Group III had a first Due Date prior to February 1, 2005, or after November 1, 2005, or had a remaining term to maturity of less than 351 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any mortgage loans in Loan Group III is October 1, 2035.

Approximately 6.48% of the mortgage loans in Loan Group III will provide for prepayment charges.

The weighted average of the loan-to-value ratios at origination of the mortgage loans in Loan Group III was approximately 73.49%. No loan-to-value ratio at origination of any mortgage loan in Loan Group III was greater than approximately 95.00% or less than approximately 8.87%.

*Loan Group III-A*

The mortgage loans in Loan Group III-A had an aggregate principal balance as of the Cut-off Date of approximately $326,458,125, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the mortgage loans in Loan Group III-A are secured by first liens on the related mortgaged property.

The average principal balance of the mortgage loans in Loan Group III-A at origination was approximately $435,329. No mortgage loans in Loan Group III-A had a principal balance at origination of greater than approximately $2,747,500 or less than approximately $30,200. The average principal balance of the mortgage loans in Loan Group III-A as of the Cut-off Date was approximately $30,179. No mortgage loans in Loan Group III-A had a principal balance as of the Cut-off Date of greater than approximately $2,747,500 or less than approximately $30,179.

As of the Cut-off Date, the mortgage loans in Loan Group III-A had mortgage rates ranging from approximately 4.125% per annum to approximately 8.375% per annum and the weighted average mortgage rate was approximately 6.072% per annum. The weighted average remaining term to stated maturity of the mortgage loans in Loan Group III-A was approximately 359 months as of the Cut-off Date. None of the mortgage loans in Loan Group III-A had a first Due Date prior to February 1, 2005, or after November 1, 2005, or had a remaining term to maturity of less than 351 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any mortgage loans in Loan Group III-A is October 1, 2035.

Approximately 5.35% of the mortgage loans in Loan Group III-A will provide for prepayment charges.

The weighted average of the loan-to-value ratios at origination of the mortgage loans in Loan Group III-A was approximately 73.34%. No loan-to-value ratio at origination of any mortgage loan in Loan Group III-A was greater than approximately 95.00% or less than approximately 26.00%.

*Loan Group III-B*

The mortgage loans in Loan Group III-B had an aggregate principal balance as of the Cut-off Date of approximately $136,144,493, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the mortgage loans in Loan Group III-B are secured by first liens on the related mortgaged property.

S-28

AHM_MILLS016043

The average principal balance of the mortgage loans in Loan Group III-B at origination was approximately $215,443. No mortgage loans in Loan Group III-B had a principal balance at origination of greater than approximately $612,500 or less than approximately $31,360. The average principal balance of the mortgage loans in Loan Group III-B as of the Cut-off Date was approximately $215,419. No mortgage loans in Loan Group III-B had a principal balance as of the Cut-off Date of greater than approximately $612,500 or less than approximately $31,360.

As of the Cut-off Date, the mortgage loans in Loan Group III-B had mortgage rates ranging from approximately 4.375% per annum to approximately 7.875% per annum and the weighted average mortgage rate was approximately 6.087% per annum. The weighted average remaining term to stated maturity of the mortgage loans in Loan Group III-B was approximately 359 months as of the Cut-off Date. None of the mortgage loans in Loan Group III-B had a first Due Date prior to August 1, 2005, or after November 1, 2005, or had a remaining term to maturity of less than 357 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any mortgage loans in Loan Group III-B is October 1, 2035.

Approximately 9.17% of the mortgage loans in Loan Group III-B will provide for prepayment charges.

The weighted average of the loan-to-value ratios at origination of the mortgage loans in Loan Group III-B was approximately 73.86%. No loan-to-value ratio at origination of any mortgage loan in Loan Group III-B was greater than approximately 95.00% or less than approximately 8.87%.

**Prepayment Charges**

Approximately 0.62%, 5.35% and 9.17% of the mortgage loans in Loan Group II, Loan Group III-A and Loan Group III-B, respectively, provide for payment by the mortgagor of a prepayment charge in limited circumstances on prepayments. Generally, these mortgage loans provide for payment of a prepayment charge on partial or full prepayments made within twelve months to five years or some other period as provided in the related mortgage note from the date of origination of the mortgage loan. The amount of the prepayment charge is as provided in the related mortgage note, and the prepayment charge will generally apply if, in any twelve-month period during the first year, five years or other period as provided in the related mortgage note from the date of origination of the mortgage loan, the mortgagor prepays an aggregate amount exceeding 20% of the original principal balance of the mortgage loan or another amount permitted by applicable law. The amount of the prepayment charge will, for the majority of the mortgage loans, be equal to 6 months' advance interest calculated on the basis of the mortgage rate in effect at the time of the prepayment on the amount prepaid in excess of 20% of the original principal balance of the mortgage loan, but it may be a lesser or greater amount as provided in the related mortgage notes. The holders of the Class P Certificates will be entitled to all prepayment charges received on the mortgage loans, and these amounts will not be available for distribution on the other classes of certificates. The Servicer may waive the collection of any otherwise applicable prepayment charge or reduce the amount thereof actually collected, but only if done so in compliance with the prepayment charge waiver standards set forth in the applicable agreement. There can be no assurance that the prepayment charges will have any effect on the prepayment performance of the mortgage loans.

All of the mortgage loans with prepayment charges have prepayment charges which are "hard" throughout the period for which a prepayment charge applies, meaning that the borrower has to cover the prepayment charge regardless of the reason for prepayment. None of the mortgage loans have prepayment charges which are "soft" throughout the period(s) for which a prepayment charge applies.

AHM_MILLS016044

**Mortgage Rates of the Mortgage Loans as of the Cut-Off Date (%) for the Group I Loans**

| Mortgage Rates of the Mortgage Loans as of the Cut-Off Date (%) | Number of Mortgage Loans | Aggregate Stated Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 2.751 - 3.000 | 1 | $ 154,933.00 | 0.07% |
| 3.251 - 3.500 | 12 | 3,666,301.60 | 1.57 |
| 3.501 - 3.750 | 14 | 5,501,525.67 | 2.36 |
| 3.751 - 4.000 | 54 | 25,453,327.92 | 10.90 |
| 4.001 - 4.250 | 90 | 50,276,113.56 | 21.52 |
| 4.251 - 4.500 | 121 | 57,335,342.65 | 24.55 |
| 4.501 - 4.750 | 146 | 65,773,602.86 | 28.16 |
| 4.751 - 5.000 | 55 | 25,416,533.20 | 10.88 |
| TOTAL | 493 | $ 233,577,680.46 | 100.00% |

| | |
|---|---|
| Minimum Mortgage Rates: | 3.000% |
| Maximum Mortgage Rates: | 4.875% |
| Weighted Average Mortgage Rates: | 4.424% |

**Original Loan-to-Value Ratios\* of the Mortgage Loans for the Group I Loans**

| Original Loan-to-Value Ratios* of the Mortgage Loans (%) | Number of Mortgage Loans | Aggregate Stated Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0 - 50.00 | 32 | $ 17,182,357.88 | 7.36% |
| 50.01 - 55.00 | 13 | 7,548,802.99 | 3.23 |
| 55.01 - 60.00 | 23 | 20,174,991.93 | 8.64 |
| 60.01 - 65.00 | 24 | 11,808,187.12 | 5.06 |
| 65.01 - 70.00 | 61 | 33,571,045.31 | 14.37 |
| 70.01 - 75.00 | 87 | 43,863,267.97 | 18.78 |
| 75.01 - 80.00 | 240 | 95,814,151.18 | 41.02 |
| 80.01 - 85.00 | 1 | 432,600.00 | 0.19 |
| 85.01 - 90.00 | 6 | 1,633,083.09 | 0.70 |
| 90.01 - 95.00 | 6 | 1,549,192.99 | 0.66 |
| TOTAL | 493 | $ 233,577,680.46 | 100.00% |

Weighted Average Original Loan-to-Value Ratios: 70.60%

\* Original Loan-to-Value Ratios are calculated by taking the original principal balance and dividing the lesser of the original appraised value and sales price of the property.

A-3

AHM_MILLS016129

**Mortgage Rates of the Mortgage Loans as of the Cut-Off Date (%) for the Group II Loans**

| Mortgage Rates of the Mortgage Loans as of the Cut-Off Date (%) | Number of Mortgage Loans | Aggregate Stated Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 3.501 - 3.750 | 1 | $      544,000.00 | 0.53% |
| 3.751 - 4.000 | 5 | 2,773,364.10 | 2.72 |
| 4.001 - 4.250 | 2 | 540,000.00 | 0.53 |
| 4.251 - 4.500 | 9 | 4,196,034.99 | 4.12 |
| 4.501 - 4.750 | 14 | 3,719,354.33 | 3.65 |
| 4.751 - 5.000 | 57 | 21,002,275.30 | 20.63 |
| 5.001 - 5.250 | 73 | 27,327,728.76 | 26.84 |
| 5.251 - 5.500 | 130 | 41,711,806.52 | 40.97 |
| TOTAL | 291 | $  101,814,564.00 | 100.00% |

| | |
|---|---|
| Minimum Mortgage Rates: | 3.625% |
| Maximum Mortgage Rates: | 5.500% |
| Weighted Average Mortgage Rates: | 5.145% |

**Original Loan-to-Value Ratios\* of the Mortgage Loans for the Group II Loans**

| Original Loan-to-Value Ratios* of the Mortgage Loans | Number of Mortgage Loans | Aggregate Stated Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0 - 50.00 | 7 | $      2,774,435.09 | 2.72% |
| 50.01 - 55.00 | 2 | 618,800.00 | 0.61 |
| 55.01 - 60.00 | 4 | 1,636,236.64 | 1.61 |
| 60.01 - 65.00 | 10 | 6,179,674.63 | 6.07 |
| 65.01 - 70.00 | 20 | 10,142,155.49 | 9.96 |
| 70.01 - 75.00 | 13 | 4,451,074.09 | 4.37 |
| 75.01 - 80.00 | 229 | 75,060,245.15 | 73.72 |
| 80.01 - 85.00 | 1 | 355,000.00 | 0.35 |
| 85.01 - 90.00 | 5 | 596,942.91 | 0.59 |
| TOTAL | 291 | $  101,814,564.00 | 100.00% |

Weighted Average Original Loan-to-Value Ratios:      75.68%

\* Original Loan-to-Value Ratios are calculated by taking the Original Principal Balance and dividing the lesser of the original appraised value and sales price of the property.

A-11

AHM_MILLS016137

## Original Loan-to-Value Ratios* of the Mortgage Loans For the Group III-A

| Original Loan-to-Value Ratios* of the Mortgage Loans | Number of Mortgage Loans | Aggregate Stated Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0 - 50.00 | 8 | $ 2,914,800.01 | 0.89% |
| 50.01 - 55.00 | 4 | 2,663,921.88 | 0.82 |
| 55.01 - 60.00 | 12 | 10,089,275.63 | 3.09 |
| 60.01 - 65.00 | 18 | 11,519,749.21 | 3.53 |
| 65.01 - 70.00 | 297 | 133,565,922.04 | 40.91 |
| 70.01 - 75.00 | 83 | 48,408,371.01 | 14.83 |
| 75.01 - 80.00 | 294 | 110,917,394.27 | 33.98 |
| 80.01 - 85.00 | 4 | 580,435.15 | 0.18 |
| 85.01 - 90.00 | 18 | 3,491,504.59 | 1.07 |
| 90.01 - 95.00 | 12 | 2,306,750.88 | 0.71 |
| TOTAL | 750 | $ 326,458,124.67 | 100.00% |

Weighted Average Original Loan-to-Value Ratios:     73.34%

* Original Loan-to-Value Ratios are calculated by taking the original principal balance and dividing the lesser of the original appraised value and sales price of the property.

A-21

AHM_MILLS016147

## Mortgage Rates of the Mortgage Loans as of the Cut-Off Date (%) for the Group III-B Loans

| Mortgage Rates of the Mortgage Loans as of the Cut-Off date(%) | Number of Mortgage Loans | Aggregate Stated Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 4.251  -  4.500 | 3 | $     824,803.00 | 0.61% |
| 4.501  -  4.750 | 5 | 944,640.00 | 0.69 |
| 4.751  -  5.000 | 23 | 5,011,486.45 | 3.68 |
| 5.001  -  5.250 | 33 | 8,820,263.84 | 6.48 |
| 5.251  -  5.500 | 51 | 11,754,681.78 | 8.63 |
| 5.501  -  5.750 | 99 | 22,206,622.07 | 16.31 |
| 5.751  -  6.000 | 117 | 25,343,900.75 | 18.62 |
| 6.001  -  6.250 | 83 | 19,000,215.72 | 13.96 |
| 6.251  -  6.500 | 59 | 11,944,520.94 | 8.77 |
| 6.501  -  6.750 | 48 | 10,958,369.54 | 8.05 |
| 6.751  -  7.000 | 37 | 7,051,365.67 | 5.18 |
| 7.001  -  7.250 | 13 | 2,729,394.06 | 2.00 |
| 7.251  -  7.500 | 18 | 2,520,714.60 | 1.85 |
| 7.501  -  7.750 | 42 | 6,998,315.01 | 5.14 |
| 7.751  -  8.000 | 1 | 35,200.00 | 0.03 |
| **TOTAL** | **632** | **$  136,144,493.43** | **100.00%** |

| | |
|---|---|
| Minimum Mortgage Rates: | 4.375% |
| Maximum Mortgage Rates: | 7.875% |
| Weighted Average Mortgage Rates: | 6.087% |

## Original Loan-to-Value Ratios* of the Mortgage Loans for the Group III-B Loans

| Original Loan-to-Value Ratios* of the Mortgage Loans (%) | Number of Mortgage Loans | Aggregate Stated Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0  -  50.00 | 10 | $     1,464,528.65 | 1.08% |
| 50.01  -  55.00 | 2 | 290,000.00 | 0.21 |
| 55.01  -  60.00 | 5 | 899,895.34 | 0.66 |
| 60.01  -  65.00 | 12 | 2,907,775.00 | 2.14 |
| 65.01  -  70.00 | 300 | 68,108,680.50 | 50.03 |
| 70.01  -  75.00 | 32 | 7,378,059.00 | 5.42 |
| 75.01  -  80.00 | 244 | 50,360,372.12 | 36.99 |
| 80.01  -  85.00 | 8 | 1,462,013.58 | 1.07 |
| 85.01  -  90.00 | 9 | 1,442,378.89 | 1.06 |
| 90.01  -  95.00 | 10 | 1,830,790.35 | 1.34 |
| **TOTAL** | **632** | **$  136,144,493.43** | **100.00%** |

Weighted Average Original Loan-to-Value Ratios:        73.86%

* Original Loan-to-Value Ratios are calculated by taking the original principal balance and dividing the lesser of the original appraised value and sales price of the property.

A-30

AHM_MILLS016156

### Original Loan-to-Value Ratios* of the Mortgage Loans for the Group III Loans

| Original Loan-to-Value Ratios* of the Mortgage Loans | Number of Mortgage Loans | Aggregate Stated Principal Balance Outstanding as of Cut-Off Date | % of Mortgage Loans |
|---|---|---|---|
| 0 - 50.00 | 18 | $ 4,379,328.66 | 0.95% |
| 50.01 - 55.00 | 6 | 2,953,921.88 | 0.64 |
| 55.01 - 60.00 | 17 | 10,989,170.97 | 2.38 |
| 60.01 - 65.00 | 30 | 14,427,524.21 | 3.12 |
| 65.01 - 70.00 | 597 | 201,674,602.54 | 43.60 |
| 70.01 - 75.00 | 115 | 55,786,430.01 | 12.06 |
| 75.01 - 80.00 | 538 | 161,277,766.39 | 34.86 |
| 80.01 - 85.00 | 12 | 2,042,448.73 | 0.44 |
| 85.01 - 90.00 | 27 | 4,933,883.48 | 1.07 |
| 90.01 - 95.00 | 22 | 4,137,541.23 | 0.89 |
| TOTAL | 1,382 | $ 462,602,618.10 | 100.00% |

Weighted Average Original Loan-to-Value Ratios:    73.49%

A-40

AHM_MILLS016166

**Mortgage Pool Insurance Policies**

Any mortgage pool insurance policy obtained by the company for a trust fund will be issued by the insurer named in the applicable prospectus supplement. Each mortgage pool insurance policy will cover Defaulted Mortgage Losses in an amount equal to a percentage specified in the applicable prospectus supplement of the aggregate principal balance of the mortgage loans on the cut-off date, or will cover a portion of Defaulted Mortgage Losses on any mortgage up to a specified percentage of the Value of that mortgage loan. As set forth under "Maintenance of Credit Enhancement," the master servicer will use reasonable efforts to maintain, or cause the servicers to maintain, any mortgage pool insurance policy and to present claims thereunder to the insurer on behalf of itself, the related trustee and the related securityholders. The mortgage pool insurance policies, however, are not blanket policies against loss, since claims thereunder may only be made respecting particular defaulted mortgage loans and only upon satisfaction of the terms of the related policy. Any exceptions to coverage will be described in the related prospectus supplement. Unless specified in the related prospectus supplement, the mortgage pool insurance policies may not cover losses due to a failure to pay or denial of a claim under a Primary Insurance Policy, irrespective of the reason therefor.

**Letter of Credit**

If any component of credit enhancement as to the offered securities of a series is to be provided by a letter of credit, a bank will deliver to the related trustee an irrevocable letter of credit. The letter of credit may provide direct coverage with respect to the mortgage loans. The bank that delivered the letter of credit, as well as the amount available under the letter of credit with respect to each component of credit enhancement, will be specified in the applicable prospectus supplement. If so specified in the related prospectus supplement, the letter of credit may permit draws only in the event of certain types of losses and shortfalls. The letter of credit may also provide for the payment of required advances which the master servicer or any servicer fails to make. The amount available under the letter of credit will, in all cases, be reduced to the extent of any unreimbursed payments thereunder and may otherwise be reduced as described in the related prospectus supplement. The letter of credit will expire on the expiration date set forth in the related prospectus supplement, unless earlier terminated or extended in accordance with its terms.

**Special Hazard Insurance Policies**

Any special hazard insurance policy covering Special Hazard Losses obtained by the company for a trust fund will be issued by the insurer named in the applicable prospectus supplement. Each special hazard insurance policy will, subject to limitations described below, protect holders of the related series of securities from Special Hazard Losses. See "Description of Primary Mortgage Insurance, Hazard Insurance; Claims Thereunder." However, a special hazard insurance policy will not cover losses occasioned by war, civil insurrection, some governmental actions, errors in design, faulty workmanship or materials (except under some circumstances), nuclear reaction, chemical contamination, waste by the mortgagor and other risks. Aggregate claims under a special hazard insurance policy will be limited to the amount set forth in the related prospectus supplement and will be subject to reduction as described in the related prospectus supplement.

Subject to the foregoing limitations, a special hazard insurance policy will provide that, where there has been damage to property securing a foreclosed mortgage loan (title to which has been acquired by the insured) and to the extent the damage is not covered by the hazard insurance policy or flood insurance policy, if any, maintained by the mortgagor or the master servicer, special servicer or the servicer, the insurer will pay the lesser of (1) the cost of repair or replacement of the property or (2) upon transfer of the property to the insurer, the unpaid principal balance of the mortgage loan at the time of acquisition of the property by foreclosure or deed in lieu of foreclosure, plus accrued interest at the

43

AHM_MILLS016219

any other derivative product agreement and any counterparties will be described in the accompanying prospectus supplement.

Yield supplement agreements may be entered into to supplement the interest rate or other rates on one or more classes of the securities of any series.

There can be no assurance that the trustee will be able to enter into or offset swaps or enter into yield supplement agreements or other derivative product agreements at any specific time or at prices or on other terms that are advantageous. In addition, although the terms of the swaps and yield supplement agreements may provide for termination under various circumstances, there can be no assurance that the trustee will be able to terminate a swap or yield supplement agreement when it would be economically advantageous to the trust fund to do so.

## Purchase Obligations

Some types of trust assets and some classes of securities of any series, as specified in the related prospectus supplement, may be subject to a purchase obligation that would become applicable on one or more specified dates, or upon the occurrence of one or more specified events, or on demand made by or on behalf of the applicable securityholders. A purchase obligation may be in the form of a conditional or unconditional purchase commitment, liquidity facility, remarketing agreement, maturity guaranty, put option or demand feature. The terms and conditions of each purchase obligation, including the purchase price, timing and payment procedure, will be described in the accompanying prospectus supplement. A purchase obligation relating to trust assets may apply to those trust assets or to the related securities. Each purchase obligation may be a secured or unsecured obligation of the provider thereof, which may include a bank or other financial institution or an insurance company. Each purchase obligation will be evidenced by an instrument delivered to the trustee for the benefit of the applicable securityholders of the related series. As specified in the accompanying prospectus supplement, each purchase obligation relating to trust assets will be payable solely to the trustee for the benefit of the securityholders of the related series. Other purchase obligations may be payable to the trustee or directly to the holders of the securities to which that obligation relate.

### DESCRIPTION OF PRIMARY MORTGAGE INSURANCE, HAZARD INSURANCE; CLAIMS THEREUNDER

## General

The mortgaged property with respect to each mortgage loan will be required to be covered by a hazard insurance policy and, if required as described below, a Primary Insurance Policy. The following is only a brief description of these insurance policies and does not purport to summarize or describe all of the provisions of these policies. The insurance is subject to underwriting and approval of individual mortgage loans by the respective insurers.

## Primary Mortgage Insurance Policies

In a securitization of single family loans, single family loans included in the related mortgage pool having a Loan-to-Value Ratio at origination of over 80% (or other percentage as described in the related prospectus supplement) may be required by the company to be covered by a Primary Insurance Policy. The Primary Insurance Policy will insure against default on a mortgage loan as to at least the principal amount thereof exceeding 75% of the Value of the related mortgaged property (or other percentage as described in the related prospectus supplement) at origination of the mortgage loan, unless and until the principal balance of the mortgage loan is reduced to a level that would produce a Loan-to-Value Ratio equal to or less than at least 80% (or other percentage as described in the prospectus

48

supplement). This type of mortgage loan will not be considered to be an exception to the foregoing standard if no Primary Insurance Policy was obtained at origination but the mortgage loan has amortized to below the above Loan-to-Value Ratio percentage as of the applicable cut-off date. Mortgage loans which are subject to negative amortization will only be covered by a Primary Insurance Policy if the coverage was so required upon their origination, notwithstanding that subsequent negative amortization may cause the mortgage loan's Loan-to-Value Ratio, based on the then-current balance, to subsequently exceed the limits which would have required the coverage upon their origination. Multifamily, commercial and mixed-use loans will not be covered by a Primary Insurance Policy, regardless of the related Loan-to-Value Ratio.

While the terms and conditions of the Primary Insurance Policies issued by a primary insurer will differ from those in Primary Insurance Policies issued by other primary insurers, each Primary Insurance Policy will in general cover the Primary Insurance Covered Loss. The primary insurer generally will be required to pay:

- the insured percentage of the Primary Insurance Covered Loss;

- the entire amount of the Primary Insurance Covered Loss, after receipt by the primary insurer of good and merchantable title to, and possession of, the mortgaged property; or

- at the option of the primary insurer, the sum of the delinquent monthly payments plus any advances made by the insured, both to the date of the claim payment and, thereafter, monthly payments in the amount that would have become due under the mortgage loan if it had not been discharged plus any advances made by the insured until the earlier of (1) the date the mortgage loan would have been discharged in full if the default had not occurred or (2) an approved sale.

As conditions precedent to the filing or payment of a claim under a Primary Insurance Policy, in the event of default by the mortgagor, the insured will typically be required, among other things, to:

- advance or discharge (1) hazard insurance premiums and (2) as necessary and approved in advance by the primary insurer, real estate taxes, protection and preservation expenses and foreclosure and related costs;

- in the event of any physical loss or damage to the mortgaged property, have the mortgaged property restored to at least its condition at the effective date of the Primary Insurance Policy (ordinary wear and tear excepted); and

- tender to the primary insurer good and merchantable title to, and possession of, the mortgaged property.

For any single family loan for which the coverage is required under the standard described above, the master servicer will maintain, or will cause each servicer to maintain, in full force and effect and to the extent coverage is available a Primary Insurance Policy with regard to each single family loan, provided that the Primary Insurance Policy was in place as of the cut-off date and the company had knowledge of the Primary Insurance Policy. The master servicer or the Seller will not cancel or refuse to renew a Primary Insurance Policy in effect at the time of the initial issuance of a series of securities that is required to be kept in force under the applicable pooling and servicing agreement or indenture unless the replacement Primary Insurance Policy for the canceled or non-renewed policy is maintained with an insurer whose claims-paying ability is acceptable to the Rating Agency or Agencies that rated the series of securities for mortgage pass-through certificates having a rating equal to or better than the highest then-current rating of any class of the series of securities. For further information regarding the extent of

49

coverage under any mortgage pool insurance policy or primary Insurance Policy, see "Description of Credit Enhancement—Mortgage Pool insurance Policies."

**Hazard Insurance Policies**

The terms of the mortgage loans require each mortgagor to maintain a hazard insurance policy for their mortgage loan. Additionally, the pooling and servicing agreement or servicing agreement will require the master servicer to cause to be maintained for each mortgage loan a hazard insurance policy providing for no less than the coverage of the standard form of fire insurance policy with extended coverage customary in the state in which the property is located. The coverage generally will be in an amount equal to the lesser of the principal balance owing on the mortgage loan and 100% of the insurable value of the improvements securing the mortgage loan; provided, that in any case, such amount shall be sufficient to prevent the mortgagor and/or mortgagee from becoming a co-insurer. The ability of the master servicer to ensure that hazard insurance proceeds are appropriately applied may be dependent on it, or the servicer of the mortgage loan, being named as an additional insured under any hazard insurance policy and under any flood insurance policy referred to below, or upon the extent to which information in this regard is furnished to the master servicer by mortgagors or servicers.

As set forth above, all amounts collected by the master servicer or a servicer under any hazard policy (except for amounts to be applied to the restoration or repair of the mortgaged property or released to the mortgagor in accordance with teamster servicer's normal servicing procedures) will be deposited in the related Distribution Account. The pooling and servicing agreement or servicing agreement will provide that the master servicer may satisfy its obligation to cause hazard policies to be maintained by maintaining, or causing a servicer to maintain, a blanket policy insuring against losses on the mortgage loans. If the blanket policy contains a deductible clause, the master servicer will deposit, or will cause the applicable servicer to deposit, in the related Distribution Account all sums which would have been deposited therein but for the clause.

In general, the standard form of fire and extended coverage policy covers physical damage to or destruction of the improvements on the property by fire, lightning, explosion, smoke, windstorm, hail, riot, strike and civil commotion, subject to the conditions and exclusions specified in each policy. Although the policies relating to the mortgage loans will be underwritten by different insurers under different state laws in accordance with different applicable state forms and therefore will not contain identical terms and conditions, the basic terms thereof are dictated by respective state laws, and most of these policies typically do not cover any physical damage resulting from the following: war, revolution, governmental actions, floods and other water-related causes, earth movement (including earthquakes, landslides and mudflows), nuclear reactions, wet or dry rot, vermin, rodents, insects or domestic animals, theft and, depending on the case, vandalism. The foregoing list is merely indicative of the kinds of uninsured risks and is not intended to be all-inclusive. Where the improvements securing a mortgage loan are located in a federally designated flood area at the time of origination of the mortgage loan, the pooling and servicing agreement or servicing agreement requires the master servicer to cause to be maintained for this mortgage loan, flood insurance (to the extent available) in an amount equal in general to the lesser of the amount required to compensate for any loss or damage on a replacement cost basis or the maximum insurance available under the federal flood insurance program.

The hazard insurance policies covering the mortgaged properties typically contain a co-insurance clause which in effect requires the insured at all times to carry insurance of a specified percentage (generally 80% to 90%) of the full replacement value of the improvements on the property in order to recover the full amount of any partial loss. If the insured's coverage falls below this specified percentage, the clause generally provides that the insurer's liability in the event of partial loss does not exceed the greater of (1) the replacement cost of the improvements damaged or destroyed less physical depreciation

50

AHM_MILLS016226

including attorneys' fees, which may be recovered by a lender. Thereafter, subject to the right of the borrower in some states to remain in possession during the redemption period, the lender will assume the burdens of ownership, including obtaining hazard insurance, paying taxes and making the repairs at its own expense as are necessary to render the property suitable for sale. Generally, the lender will obtain the services of a real estate broker and pay the broker's commission in connection with the sale of the property. Depending upon market conditions, the ultimate proceeds of the sale of the property may not equal the lender's investment in the property and, in some states, the lender may be entitled to a deficiency judgment. Any loss may be reduced by the receipt of any mortgage insurance proceeds or other forms of credit enhancement for a series of certificates. See "Description of Credit Enhancement".

A junior mortgagee may not foreclose on the property securing a junior mortgage unless it forecloses subject to the senior mortgages. The junior mortgagee must either pay the entire amount due on the senior mortgages prior to or at the time of the foreclosure sale or undertake to pay on any senior mortgages on which the mortgagor is currently in default. Under either course of action, the junior mortgagee may add the amounts paid to the balance due on the junior loan, and may be subrogated to the rights of the senior mortgages. In addition, in the event that the foreclosure of a junior mortgage triggers the enforcement of a "due-on-sale" clause, the junior mortgagee may be required to pay the full amount of the senior mortgages to the senior mortgagees. Accordingly, with respect to those single family loans which are junior mortgage loans, if the lender purchases the property, the lender's title will be subject to all senior liens and claims and governmental liens. The proceeds received by the referee or trustee from the sale are applied first to the costs, fees and expenses of sale and then in satisfaction of the indebtedness secured by the mortgage or deed of trust under which the foreclosure sale was conducted. Any remaining proceeds are generally payable to the holders of junior mortgages or deeds of trust and other liens and claims in order of their priority, whether or not the borrower is in default. Any additional proceeds are generally payable to the mortgagor or trustor. The payment of the proceeds to the holders of junior mortgages may occur in the foreclosure action of the senior mortgagee or may require the institution of separate legal proceeds.

In foreclosure, courts have imposed general equitable principles. The equitable principles are generally designed to relieve the borrower from the legal effect of its defaults under the loan documents. Examples of judicial remedies that have been fashioned include judicial requirements that the lender undertake affirmative and expensive actions to determine the causes for the borrower's default and the likelihood that the borrower will be able to reinstate the loan. In some cases, courts have substituted their judgment for the lender's judgment and have required that lenders reinstate loans or recast payment schedules in order to accommodate borrowers who are suffering from temporary financial disability. In other cases, courts have limited the right of the lender to foreclose if the default under the mortgage instrument is not monetary, such as the borrower's failure to adequately maintain the property or the borrower's execution of a second mortgage or deed of trust affecting the property. Finally, some courts have been faced with the issue of whether or not federal or state constitutional provisions reflecting due process concerns for adequate notice require that borrowers under deeds of trust or mortgages receive notices in addition to the statutorily-prescribed minimums. For the most part, these cases have upheld the notice provisions as being reasonable or have found that the sale by a trustee under a deed of trust, or under a mortgage having a power of sale, does not involve sufficient state action to afford constitutional protection to the borrower.

**Foreclosure on Shares of Cooperatives**

The Cooperative shares owned by the tenant-stockholder, together with the rights of the tenant-stockholder under the proprietary lease or occupancy agreement, are pledged to the lender and are, in almost all cases, subject to restrictions on transfer as set forth in the Cooperative's certificate of incorporation and by-laws, as well as in the proprietary lease or occupancy agreement. The Cooperative may cancel the proprietary lease or occupancy agreement, even while pledged, for failure by the tenant-

71