# EXHIBIT 2

```
                                                              1
                 UNITED STATES BANKRUPTCY COURT

                     DISTRICT OF DELAWARE


--------------------------------- X
IN RE:
AMERICAN HOME MORTGAGE,              Case No.
HOLDINGS, INC., a Delaware           07-11047 (CSS)
corporation, et al.,
           Debtors.
----------------------------------X



                 DEPOSITION OF TAWNYA LETTAU
                 Wednesday, October 20, 2010
                 San Luis Obispo, California




Reported in stenotype by:
Elizabeth A. Doukas, RPR, CSR #9872
```

82

1  how many other loans have you worked on since 2005?
2       MR. YOO: Objection, vague and ambiguous as to
3  "worked on." If you can respond, go ahead.
4       THE WITNESS: I average, as an originator, two
5  to 300 loans per year.
6       MR. STAMOULIS: Q. So, if we were to say
7  that -- well, let me back up.
8       So in the six years since this loan was
9  originated, it's possible that you could have brokered
10 as -- I'm sorry, worked on as many as 1800 other loans; is
11 that right?
12      MS. ZIEG: Objection.
13      MR. YOO: Objection, assumes facts not in
14 evidence and lacks foundation.
15      If you understand what he's asking you, go
16 ahead and respond. I don't think numbers work.
17      THE WITNESS: I don't know.
18      MR. STAMOULIS: Q. Well, you say you do
19 about two to three -- you work on about two to 300 loans
20 per year; is that right?
21      A. Yes, it is.
22      Q. Okay. And it's been about 600 -- I'm sorry,
23 six years --
24      A. Uh-huh.
25      Q. -- since Ms. Mills' loan was originated; is

83

1  that right?
2       A. Yes.
3       Q. So if you do 300 loans per year, in the six
4  years since Ms. Mills' loan was originated it's possible
5  that you could have worked on 1800 other loans in that time
6  period; is that right?
7       A. Yes.
8       Q. Now, for those two to 300 loans that you do
9  per year, what are your typical duties with regard to those
10 loans?
11      A. Interview the client. Discuss their purchase
12 or refinance. Loan programs.
13      Do you want more detail?
14      Q. Well, let me ask specifically. What is your
15 role with regard to assisting clients in filling out their
16 loan applications?
17      A. I tend to do it over the phone to accommodate
18 their schedule and ask them every specific question on the
19 Loan Application itself.
20      Q. Now, as you're filling out the Loan
21 Application over the phone, do you know whether the client
22 has a copy of the Loan Application in front of them while
23 they're speaking with you?
24      A. Most cases not.
25      Q. And so would the client typically have an

84

1  understanding of what columns you're putting in what
2  information on the actual physical Loan Application?
3       A. They should, it's very specific.
4       Q. Is it fair to say that most clients don't
5  actually see the final and completed Loan Application until
6  they come into your office to sign it?
7       MS. ZIEG: Objection, calls for speculation.
8       MR. YOO: Objection, lacks foundation. If you
9  can -- go ahead and respond, if you can do it.
10      THE WITNESS: My general practice is I either
11 e-mail or fax the Loan Application for their review. We
12 always have to obtain a signature, so it's always mailed to
13 them.
14      MR. STAMOULIS: Q. Do you remember what you
15 did with regard to Ms. Mills' loan concerning the review of
16 her Loan Application?
17      A. No.
18      MS. ZIEG: Objection, form.
19      MR. YOO: Vague and ambiguous. Counsel, why
20 don't you clarify, if you can.
21      MR. STAMOULIS: Q. I am -- let me rephrase.
22      Ms. Lettau -- and by the way, have you spelled
23 your name for the record?
24      A. No, I have not.
25      Q. Can you -- your name appears spelled

85

1  differently several ways on a number of the documents that
2  have been produced in this matter, and I was wondering if
3  you could please, for the record, spell your first and last
4  name?
5       A. Sure. It's Tawnya, that's T-a-w-n-y-a, last
6  name is Lettau, L-e-t-t-a-u.
7       Q. Thank you, Ms. Lettau. With regard to
8  Ms. Mills' loan, do you recall whether you sent her a copy
9  of her Loan Application to review prior to her coming into
10 your office to sign it?
11      A. I don't recall.
12      Q. Do you know if anyone sent Ms. Mills a copy of
13 her Loan Application to review prior to her coming into
14 your office to sign it?
15      MS. ZIEG: Objection, calls for speculation
16 and calls -- inaccurately states the testimony.
17      MR. YOO: If you know.
18      MR. STAMOULIS: Q. I'm asking you whether
19 you know --
20      A. I do not, I --
21      Q. -- anyone sent the Loan Application to
22 Ms. Mills for her review prior to signing?
23      A. I do not.
24      Q. Do you know how long Ms. Mills was in your
25 office when she came in to sign the Loan Application?

22 (Pages 82 to 85)

## Page 86

1  MS. ZIEG: Objection, misstates the testimony.
2  MR. YOO: Lacks foundation, assumes facts not
3  in evidence.
4  Do you know whether she came into your office
5  to sign the Loan Application?
6  THE WITNESS: I do not.
7  MR. STAMOULIS: Okay.
8  Q. Do you know where the Loan Application was
9  signed?
10  A. I do not remember.
11  Q. Would you have known at the time where the
12  Loan Application was signed?
13  A. No.
14  MS. ZIEG: Objection, calls for speculation.
15  MR. YOO: If you know.
16  THE WITNESS: I do not know.
17  MR. STAMOULIS: Q. Do you recall ever
18  sitting down with Ms. Mills and going over her loan -- her
19  completed Loan Application with her prior to her signing
20  it?
21  A. No, I do not.
22  Q. You do not recall or you know that that did
23  not happen?
24  A. I do not recall.
25  Q. So it's possible that you could have sat down

## Page 87

1  with her to review the Loan Application but you just don't
2  remember?
3  A. That is correct, yes.
4  Q. Do you know or do you recall whether anyone
5  sat down with Ms. Lettau to review her Loan Application
6  prior to her signing it?
7  A. No, I do not recall.
8  Q. When -- now, when you have the completed Loan
9  Application, with whatever supporting documents that you
10  collect, what do you do with those materials?
11  MR. YOO: Counsel, generally there are two
12  categories of loans here, brokered loans and her loans that
13  she -- she dealt with directly with Chase.
14  Are you just asking generally as to all loans?
15  Because her -- you know, her procedure and practice may
16  differ depending upon what type of loan you're talking
17  about.
18  MR. STAMOULIS: Well, I was speaking
19  generally. And if the witness wants to draw a distinction,
20  if her practices are different, please feel free to tell
21  me.
22  Q. But I'm just generally asking, what happens
23  when you collect up a completed Loan Application and
24  whatever bank statements or other documents you might have?
25  A. For a brokered loan we use the trans box and

## Page 88

1  we overnight it directly to the institution, and I would
2  always keep a shadow file in my office.
3  Q. Now, does the institution typically have roles
4  as to what kind of documentation it requires?
5  A. The institution and loan program.
6  Q. And if you did not send enough information,
7  would the loan still be processed and approved?
8  A. No.
9  Q. So for Ms. Mills' loan, is it fair to say that
10  the only way the loan could have been processed and
11  approved was if you had provided American Home Mortgage
12  with every single piece of information they required to
13  process and approve this loan?
14  A. Yes.
15  Q. Now, do you personally verify the accuracy of
16  any of the material that is put on the Loan Application?
17  MR. YOO: Objection, vague and ambiguous as to
18  what specific loan program.
19  Ms. Lettau, if you could respond to the
20  question as phrased, go ahead. If not, then ask for a
21  clarification.
22  THE WITNESS: Clarification, please.
23  MR. YOO: Again, we talked about stated income
24  loans and there may be loans that are not stated income
25  loans which may have different requirements.

## Page 89

1  MR. STAMOULIS: Well, I'm asking more along
2  the lines of her general job responsibilities, and I'm
3  asking whether one of those responsibilities is to do
4  fact-checking on whether or not information contained in an
5  application is accurate.
6  MR. YOO: Same objections as her
7  responsibilities and obligations may differ based upon what
8  specific loan product it is.
9  If you can respond as currently phrased, go
10  ahead. If you cannot, ask for clarification.
11  THE WITNESS: I'm going to ask for more
12  clarification.
13  MR. STAMOULIS: Okay.
14  Q. Well, then, let's focus on brokered loans.
15  So when you have a brokered loan and you get a
16  complete application and you get the supporting materials
17  that are required by that institution, do you do anything
18  to verify the information contained in those materials?
19  MR. YOO: Same objections. As previously
20  testified by Ms. Lettau, depending on what type of loan
21  product, if they're stated income with asset verification,
22  she already testified as to what she does.
23  I don't believe there was any questions
24  relating to just nonstated income or just regular loans.
25  She may have different obligations as to different loan

## Page 90

```
 1  products, whether it's brokered or nonbrokered.
 2         If you can respond as currently phrased, go
 3  ahead and respond.
 4         THE WITNESS:  I cannot.
 5         MR. STAMOULIS:  Q.  Well, then, let's focus
 6  in again on stated income loans.
 7         Can you just briefly refresh my recollection
 8  as to what -- what you do to verify verified stated income
 9  loans?
10         MR. YOO:  Go ahead.
11         THE WITNESS:  It was a stated income verified
12  assets, so I accumulated the assets in the form of a bank
13  statement.
14         MR. STAMOULIS:  Q.  Did you call the bank --
15     A.  No, I'm not required to.
16     Q.  -- that the statement came from?
17     A.  No, and I'm not required to do so.
18     Q.  Did you make any inquiries to the bank as to
19  whether or not the asset was liquid?
20     A.  I do not recall.
21     Q.  Now, do you know whether the institution that
22  is granting the loan has its own verification process?
23         MS. ZIEG:  Object --
24         MR. YOO:  Objection, calls for speculation.
25  If you know.
```

## Page 91

```
 1         THE WITNESS:  I do not know.
 2         MR. STAMOULIS:  Okay.
 3     Q.  So you do not know whether the institution
 4  that's granting the loan calls banks and verifies whether
 5  assets are liquid or illiquid?
 6     A.  I do not know.
 7     Q.  Okay.  But it is the institution that
 8  ultimately decides to approve or reject a Loan Application;
 9  is that right?
10     A.  That's right.
11     Q.  So when you receive an approval, is it fair to
12  say that you assume that the institution did whatever due
13  diligence it needed to do?
14         MS. ZIEG:  Objection, form.
15         MR. YOO:  Only if you know.
16         THE WITNESS:  The word assume.  Yes, that is
17  my understanding.
18         MR. STAMOULIS:  Q.  Now, has -- have you
19  ever had the occasion where one of your institutions that
20  granted a loan later went back and commenced an action
21  against a borrower for misstatements on a Loan Application?
22     A.  I do not know.
23     Q.  Have you ever been asked to provide any
24  information in any case brought by a lender against a
25  borrower with regard to statements made on a Loan
```

## Page 92

```
 1  Application?
 2     A.  No, I have not.
 3     Q.  Have you ever been deposed before?
 4     A.  No, I have not.
 5     Q.  Are you aware of whether or not American Home
 6  Mortgage ever brought a claim against Ms. Mills for any of
 7  the statements contained in her Loan Application?
 8     A.  No, I am not.
 9     Q.  Have you ever had a financial institution
10  reject a Loan Application based on -- I'm sorry, let me
11  just rephrase.
12         Have you ever had a financial institution
13  reject one of the loan applications that you've submitted?
14     A.  I don't remember.
15     Q.  So in the 1800 loans that you've done in the
16  last six years, you don't know whether any of those
17  applications have ever been rejected?
18     A.  Stam, I literally would only do three brokered
19  loans per year, at a very small window.
20         MR. YOO:  I think we have an misunderstanding
21  here, maybe you need to clarify as to the loan applications
22  being rejected, whether it applies to all the loans that
23  she -- she -- you know, she dealt with, whether they were
24  brokered or straight through Chase.
25         It appears that she just assumed that you were
```

## Page 93

```
 1  talking about brokered loans.
 2         MR. STAMOULIS:  Okay.
 3     Q.  Well, let's just go back to that answer.
 4         So, you don't remember the details of the
 5  other broker loans that you've done over the last six years
 6  as to whether or not they were approved or rejected?
 7     A.  That's correct.
 8     Q.  Do you even remember the names of the
 9  borrowers of those loans that you did over the last six
10  years that were brokered loans?
11     A.  Not off the top of my head, no.
12         MR. YOO:  And also, I would instruct her not
13  to disclose any of those names based upon the privacy
14  rights of those borrowers.
15         So, to the extent that he asked you to
16  identify their names, I'm going to instruct you not to
17  answer.
18         MR. STAMOULIS:  I'm not asking to ask that.
19         MR. YOO:  And I don't think it's proper.
20         MR. STAMOULIS:  Q.  Do you remember, sitting
21  here today, the names of the -- of each of the financial
22  institutions that were involved in those brokered loans
23  that you did over the last six years?
24     A.  Yes.
25         MR. YOO:  Objection, asked and answered.  Go
```