# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | |
| HOLDINGS, INC., a Delaware corporation, | ) | Case No. 07-11047 (CSS) |
| et al.[1] | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| ------------------------------------------------------------ | ) | |

**EXPERT REPORT OF PHILLIP ADLESON IN SUPPORT OF DEBTORS'
OBJECTION TO ADMINISTRATIVE EXPENSE  CLAIMS NUMBERED 10802, 10803,
10804, 10805, 10806, 10807, 10808 AND 10809 FILED BY DEBORAH MILLS**

---

[1] The debtors in these cases (collectively, the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHMA"), a Maryland corporation (1979); AHM SV, Inc., f/k/a American Home Mortgage Servicing, Inc. ("AHMS"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

1. **INTRODUCTION**

    A. **Expert Report.**

I am Phillip M. Adleson, Esq., a licensed California Attorney since 1976, whose practice has emphasized real estate, mortgage lending and foreclosure law for over 30 years. I have been retained by counsel for the Debtors in the above-captioned matter to act as a consultant and expert witness.

2. **Qualifications And Publications**

A partial list of my material qualifications and publications is set forth on my current resume which is attached hereto as Exhibit A and incorporated herein by reference.

3. **Materials Reviewed.**

I have reviewed or considered the following materials in arriving at my opinions:

1. Administrative Expense Claims of claimant Deborah E. Mills ("Mills") with supporting declarations of Mills and Austin along with numerous other claims submitted by Mills with various attachments.

2. Lender's loan files on first and second loans including, but not limited to:[2] the Note and addendums; Deed of Trust and addendums and riders; lender escrow instructions; Title Insurance Policy; HUD-1; Truth-in-Lending Disclosure Statement; other loan disclosures; gift letter; closing statement for property sold as a condition of loan; loan applications and supporting documents; credit reports; purchase agreement and related documents; loan broker agreement; lender-broker agreement; appraisals; foreclosure documents; trustee's sale guaranty ("TSG"); endorsements; and servicing agreement.

3. Foreclosure File on the second deed of trust (skimming items in the foreclosure of the first deed of trust) including the substitution of trustee, notice of default, notice of sale, TSG, trustee's deed, endorsements, various letters and communications and instructions to the trustee.

---

[2] While I have scanned many documents in the lender's file it is impossible to have focused on any particular area in the lender's loan file as the claim, as I understand it, is relatively vague. Further emphasis and review would have been done if specific claims were articulated relating to the loan or loan file.

2

4. Conversations with various of Debtors' attorneys regarding depositions and various facts; and

5. Applicable laws, regulations and secondary sources where necessary to refresh my recollection of various issues.

## 4. STATEMENT OF FACTS

The Debtors include American Home Mortgage Servicing, Inc. ("AHMS") and a number of related entities. Mills filed various claims including amended administrative expense claims (collectively, the "Claim") in the Debtors' bankruptcy cases. Various of the Debtors were the lender on the first and second loans secured by deeds of trust.

In mid-May of 2005, Mills entered into a purchase agreement and counter offer (collectively, "Purchase Agreement")[3] to purchase a residential property commonly known as 1880 Burnt Rock Way, Templeton, CA 93465 (the "Property"). The purchase price of the Property was $1,375,000.00 with a $5,000 deposit; a $255,000 down payment and no secondary financing. It appears undisputed that the purchase was to be for an owner occupied personal residence.[4] The escrow was to close within 45 days (meaning 45 days from the acceptance which was 45 days from May 19, 2005 (July 5, 2005 at the outside))[5]. The parties executed a liquidated damages clause which limited the seller's recourse should the buyer default to Mills's $5,000.00 deposit. If there were further deposits, they would only be at risk upon the buyer's default if: (1) the total of all such payments did not exceed 3% of the sales price and (2) if a separate liquidated damages provision satisfying the requirements of Cal. Civil Code § 1677 was separately signed or initialed by each party to the contract for each such subsequent payment.[6] I saw no such additional addendum liquidated damages clause and assume, if one existed, it was not given to the lender.[7] Such an additional addendum would be required before the buyer's additional deposits are at risk should the buyer default.

The Purchase Agreement provided a loan contingency on the first loan of 21 days from May 19, 2005 (i.e., June 9, 2005 at the outside). Although the ultimate lender required Mills to obtain additional proceeds from the sale of an existing property she

---

[3] These documents were prepared on standard forms made available by the California Association of Realtors ("C.A.R.") which were, and still are, widely use by licensed real estate agents in California.

[4] See, the Purchase Agreement, ¶ 3 and the loan applications for the first and second loans ultimately secured by the Property.

[5] This calculation is the best case for the buyer and excludes the day of acceptance of the counteroffer and extends the close of escrow because in any case the 45th day was on a weekend or holiday when escrows and the county recorder's office are not open.

[6] Cal. Civ. Code § 1678.

[7] While this may be a question for the trier of fact, my assumption is based upon the fact that no such increased deposit – liquidated damages form was in the loan files for the first and second loans that were ultimately made to Mills and secured by the Property. Even if such an agreement existed, it is unlikely to impact my opinions expressed herein.

owned, there was no contingency in the Purchase Agreement for the sale of any existing property owned by Mills. Ultimately, the seller and Mills agreed to extend the escrow to August 8, 2005 although there is no express reference to extending the loan contingency.[8]

It appears that prior to any evidence of contact with any Debtor or with JP Morgan Chase Bank d/b/a Chase Manhattan Mortgage ("Chase"), Mills sought to arrange financing for the Purchase Agreement through a Bridgeport Mortgage ("Bridgeport"). While there is no material information in the lenders' files regarding Bridgeport, I understand that Mills contends that although Bridgeport ultimately agreed to the desired financing, Mills refused to go through with the financing due to what she believed was a lack of communication by the agent for Bridgeport.[9]

On or about June 7, 2005, Mills contacted Tawnya Lettau ("Lettau"), who worked for Chase in San Luis Obispo to arrange the necessary financing to purchase the Property. On July 7, 2005, two days before the loan contingency was to expire under the Purchase Agreement, Mills appears to have entered into a Mortgage Broker Agreement with Chase to retain it to act as a mortgage broker to assist her in obtaining a purchase money loan from a lender (not necessarily AHMA or ABC). Mills appears to have agreed to pay a 1% fee to Chase for the services provided to her.[10] Even if this was an oral agreement, the performance by the parties shows executed performance of such an agreement, including the payment of a brokers commission by borrower to Chase.

From the Claim and other evidence, it is contended that Mills discussed with the Lettau that Mills's goal was to obtain 100% financing. This is not consistent with the Purchase Agreement.[11] The loan file contains a Closing Cost Worksheet—Purchase, dated July 14, 2005 which appears to be prepared by Lettau showing a first loan of $962,500.00, a second loan of $275,000 and a down payment of $152,819.97. This informational statement expressly stated it was not a good faith estimate and that one would be provided later. Nothing on the worksheet referenced any particular lender.

---

[8] There may be documents that I do not have relating to extensions of the Purchase Agreement, close of escrow or extension of the loan contingency. The existence of such agreements and the impact of any such additional agreements are for the finder of fact to determine. However, assuming further contractual extensions, those facts would not materially impact my opinion.

[9] This assumption is based upon a summary of the Mills' deposition provided by Debtors' counsel and is assumed to be true. However, should the trier of fact come to a different finding as to the reason this financing failed or was not used, it is not likely to have a material impact on my testimony.

[10] The broker agreement in the file is not signed by Mills creating a question of fact as to whether she read and agreed to the broker agreement. I assume Mills executed the broker agreement. However, if she did not, the agency relationship with Chase would be determine by the agreement of the parties (i.e., what it was that Mills asked Chase to do for her).

[11] This point may not be relevant if there was an addendum or amendment to the purchase agreement relating to the change in financing. In the absence of such addendum or amendment, such alternate financing could be acceptable if it could be concluded (i.e., same as cash) by the close of escrow.

Mills in her Claim admitted that her "credit score was a few points off but upon review they [the Lender] would make an exception under the conditions that the down payment be increased." This statement appears consistent with the loan file which indicates based upon the underwriting requirement for the first loan, Mills's credit score of 659 was one point short of the 660 credit score needed for the first loan available from AHMA. Ultimately, AHMA, as the potential first lender, waived this requirement and was willing to make a $962,500 purchase money loan secured by a first deed of trust, allowing $200,000 loan secured by a second deed of trust leaving $212,500 as a down payment.

AHMA issued a Notice of Loan Approval ("Loan Approval") on the first loan dated July 14, 2005 and which was to expire on August 8, 2005. The Loan Approval contained a number of conditions including the close of a property owned by Mills producing net proceeds of $58,600. In addition Mills represented that she was receiving a gift from her fiancé in the amount of $68,750 that would be used towards the down payment. Mills gave gift letters to the first and second lenders representing that she was receiving a gift in the amount of $68,500 from her fiancé, Roger Anthony Esquivel and, among other things, the letter stated that the funds were "a bona fide gift, and there is no obligation, expressed or implied, to repay [the gift] at any time."[12] The July 15, 2005, Mills's gift letter for the second loan (which was ultimately foreclosed upon) was signed by both Mills and her fiancé.

With respect to the first loan, Mills signed a receipt dated July 19, 2005 for a Truth-in-Lending Disclosure Statement which was dated July 15, 2005. This disclosure described the material terms of the proposed first loan.[13]

At the close of escrow, AHMA made a first loan to Mills in the original principal amount of $962,500.00 evidenced by a standard form Adjustable Rate Note ("Note") dated July 15, 2005 and secured by a standard form Deed of Trust dated July 15, 2005 which was recorded in San Luis Obispo County, California on August 9, 2005 ("Deed of Trust").[14] The Note required interest only payments for the first two years at 5.625% with monthly interest only payments in the amount of $4,511.72 commencing on September 1, 2005 and continuing until August 1, 2007 after which the interest rate could adjust every 6 months based upon the 6-month Libor Index and a 3.5% margin. The payment would be adjusted based on the changed interest rate to an amount to pay the interest and amortize the principal balance over the remainder of the loan. The material loan documents were signed by Mills on July 19, 2005.

---

[12] The copy of the gift letter in the file for the first loan appears to be unsigned. However, an identical letter in the loan file for the second deed of trust was signed.

[13] Extensive time was not spent reviewing this document as the statute of limitations has run on any claim for damages under Federal Truth-in-Lending, but I am prepared to testify regarding the document.

[14] In California the recording date is generally viewed as the "closing date".

Consistent with the loan disclosures Lender received, a $9,883.83 loan origination fee on the first loan, and Chase, as broker and consistent with its broker's agreement, received a broker's fee of $12,031.25 plus some minor incidental charges.

Using Chase as her broker, Mills obtained a concurrent (piggyback) loan secured by a second deed of trust. The American Brokers Conduit ("ABC") executed lender's escrow loan instructions for the first loan on July 19, 2005, permitting $200,000 in secondary financing and the balance to be paid by Mills.

On July 14, 2005, ABC issued a Notice of Loan Approval on a second loan naming ABC as the lender and with an expiration date of September 12, 2005. The loan commitment was for a loan in the principal amount of $200,000 with an interest rate of 11.5%.

The second loan to Mills in the original principal amount of $200,000 was made by ABC. The second loan was evidenced by a Balloon Note dated July 15, 2005 and secured by a deed of trust dated July 15, 2005 and recorded on August 9, 2005. The second loan had an interest rate of 11.5% with payments in the amount of $1,980.58 commencing on September 1, 2005. The loan was amortized over 30 years but matured (with a balloon payment) on August 1, 2020 (i.e., a "30 due in 15" loan). The loan documents appear to have been executed by Mills on July 15, 2005 but the lender's closing instructions were issued on July 19, 2005, concurrent with the lender's loan instructions on the first loan.

With respect to the second loan, Mills signed a receipt dated July 19, 2005 for a Truth-in-Lending Disclosure Statement which was dated July 15, 2005. This disclosure described the material terms of the proposed first loan.[15]

On the second loan, consistent with the loan disclosures the second lender received $1,030.56 as a loan origination fee and Chase, as broker and consistent with its broker's agreement with borrower, received a broker's fee of $2,000.

Both the first and second deeds of trust were put in the name of MERS[16], as beneficiary, as nominee for the actual lenders.

On July 15 and 19th, 2005, Mills signed separate loan applications (Form 1003) for the first and second loans respectively. Each loan application represented, among other things, that Mills had monthly income of $28,552.00; that she had as an asset a $500,000 CD (proof provided to lender); that she was not involved in any lawsuits and that she was not borrowing any part of the down payment. It appears all of these material facts were false. Such representations likely constitute loan fraud. On both loans, Mills signed a "Borrower's Certification & Authorization" which stated, among

---

[15] Extensive time was not spent reviewing this document as the statute of limitations has run on any claim for damages under Federal Truth-in-Lending, but I am prepared to testify concerning the document.

[16] MERS = the Mortgage Electronic Registration System, Inc.

other things: "In applying for the loan, I/we completed a loan application containing various information on the purpose of the loan, the amount and source of the down payment, employment and income information, and assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/we omit any pertinent information." Both the 1003 loan applications and the Borrower's Certification expressly point out that it may be a crime to knowingly make a misrepresentation on a loan application.

Mills defaulted on both the first and second loans by failing to pay her installments commencing on October 1, 2005 and continuing each month thereafter. It appears that before any foreclosure action was commenced the loan servicer communicated with Mills pointing out her defaults on both loans. Ultimately, non-judicial foreclosures were commenced on both the first and second deed of trust.

A notice of default and election to sell (a "Notice of Default") on the second deed of trust was recorded on January 27, 2006 in San Luis Obispo County, California, referencing Mills's failure to make her installment payment due commencing on October 1, 2005. Copies were mailed to the parties and addresses indicated in a TSG and as required by California law.[17] The TSG is a title product used by trustees or foreclosure agents in California to provide the necessary information for a trustee to mail foreclosure notices to the persons and addresses required by law and to determine the proper newspapers of general circulations required for publication of notice of sale. Notices of default in California, as here, may be processed by trustee, mortgagee, or beneficiary, or any of their authorized agents.[18]

On January 26, 2006, MERS executed a notarized substitution of trustee appointing Cal-Western Reconveyance Corporation ("Cal-Western") acting as substitute trustee. Cal-Western is an independent foreclosure agent or trustee providing reconveyance and foreclosure services for many lenders in California. The substitution of trustee appears to have been recorded on March 1, 2006 and served by mail on February 27, 2006 on those parties entitled to notice. The substitution of trustee appears to be consistent with trustee practices in California as regulated by Cal. Civil Code § 2934a.

A notice of trustee's sale on the second deed of trust was recorded on May 15, 2006 scheduling a trustee's sale for June 7, 2006. The notice of sale was mailed to those entitled to notice on May 18, 2006; published in an appropriate newspaper of general circulation on May 18 and 25, 2006 and on June 1, 2006; posted on the Property on May 16, 2006 and posted in a public place (the San Luis Obispo Court Superior Courthouse) on May 19, 2006.

Reinstatement figures on both the first and second loans were provided by Cal-Western to Mills by mail on May 25, 2006 and by facsimile on May 30, 2006. There is

---

[17] See Cal. Civ. Code §§ 2924, 2924b and 2924c(c).
[18] Cal. Civ. Code §§ 2924(a)(1) and 2924b(b).

7

no evidence in the file of a lawful tender of reinstatement (cure) and pre-sale redemption as permitted under California law.[19]

On June 26, 2006, the day of the postponed foreclosure sale, through counsel, Mills filed a Chapter 7 bankruptcy in the Central District of California.  Mills never asserted any of her current claims in her bankruptcy nor did she list such claims as an asset.  She listed the debt as undisputed.

A standard form "Order Granting Relief from the Automatic Stay" was signed by the court, filed and entered on July 25, 2006.

Prior to the actual trustee's sale, the trustee's sale on the second deed of trust was postponed as follows:

- From the original sale date of June 7, 2006 to June 19, 2006 at the beneficiary's request apparently in response to Mills' request to allow her time to get funds to reinstate.

- From June 19, 2006 until June 26, 2006 at the beneficiary's request.

- From June 26, 2006 to August 10, 2006 due to Mills bankruptcy.

The proper procedures and declarations of postponement appear to have been followed.

Prior to the trustee's sale, Mills inquired whether a postponement could be obtained for $25,000 to allow her time to raise funds.  Cal-Western provided Mills with reinstatement figures for the first and second deeds of trust as both would be required to reinstate the second deed of trust.  It is possible that at the time of the request, the statutory right of reinstatement had lapsed although Cal-Western sent Mills reinstatement figures and we assume Debtors would have accepted reinstatement if tendered.[20]  It also appears from communications with Mills's attorney that she did not have the ability to tender the proper amount to effect a tender of reinstatement.

The trustee's sale was conducted on August 10, 2006, selling the Property, subject to the first deed of trust, to AMHS.[21] for $229,251.71.

### 5. Mills Claims

Reviewing various of the claims submitted to the court it is impossible to determine what specific claims are being alleged by Mills against various Debtors.  I will

---

[19] Cal. Civ. Code §§ 2903, 2905 and 2924c.

[20] Under California law, reinstatement terminates as a matter of right 5 business days prior to the trustee's sale. Cal. Civ. Code 2924c.

[21] Through conversations with Debtors' counsel, I understand and assume that around April 2008, this  "American Home Mortgage Servicing, Inc."  was a third party (non-Debtor) company that acquired the servicing rights, including the rights to the Property, which was a Real Estate Owned ("REO") property at the time, and it subsequently sold the Property to a third party purchaser.

try to address some of the areas about which she expresses concern. If the claims are more specifically articulated, I would be prepared to give testimony on the areas set forth herein as well as on numerous other areas arising from the subject loans, loan files and foreclosure files.

### A. Pre-Origination Fraud

There is nothing in the materials reviewed that would evidence any pre-origination fraud on the part of any Debtor. To the extent that Chase made representations to Mills, any conclusions would have to be based upon verbal testimony of Mills, Lettau and others and would be something to be determined by the trier of fact.

Typically, in 2005, lenders in California obtained loan packages from a number of brokers generally pursuant to a lender-broker agreement which established a limited independent contractor relationship. The brokers generally would operate under one of three licenses, unless exempt. As here, the lender-broker agreements circa 2005 were generally non-exclusive and the broker's authority was limited to soliciting borrowers for, and presenting completed loan applications for, loans and properties specifically designated as available from a lender in writing pursuant to various loan programs or underwriting guidelines which were either provided to the broker or which were regularly published for the broker's review. Since most such lender-broker agreements, as here, were non-exclusive, a broker could, and generally did, solicit borrowers and package loans for a number of different lenders with different loan programs and underwriting standards. For example, a borrower might need a short term loan secured by a junior deed of trust which may fall outside of the underwriting guidelines and loan programs offered by lenders such as those involved in this case. In such cases, they may send the loan package to "private money lenders" or their agents for consideration. The underwriting standards for such private money loans were generally far more liberal and flexible but subject to different California laws placing limitations on what could be underwritten (e.g., limited loan-to-value ratios).

Because the brokers were not exclusive independent contractors, as here, the brokers were invariably not authorized to make loan commitments on behalf of a Lender and the decision to accept a written loan application was solely in the absolute discretion of the Lender to determine whether a loan commitment will be made and what conditions. In addition, under the lender-broker agreement brokers have no authority to bind, obligate or commit Lender to do so by any promise or representation unless specifically authorized by the lender in writing in a particular transaction. Brokers are not authorized to represent to the public that they represent the lender or that they are authorized to act on behalf of the lender.

In addition, generally when a broker initially meets with a potential borrower, he/she does not know to which lender the broker will submit the loan to as the broker will have to decide which lenders provide loan programs that will suit the borrower's needs. Casual comments by a broker that she will assist in arranging future financing, generally beyond the scope of the brokers authorization by any particular lender.

9

Lenders, as here, will generally only consider completed loan applications under the particular lender's programs and published underwriting standards.

Even if Lettau or another representative of Chase made a representation about obtaining a future loan, Lettau appears to have been retained to procure specific loans for the borrower. Lenders specifically did not authorize Chase to act as its agent for the purpose of making loan commitments. This is evidenced by the file, the lender-broker agreement and by the express written loan commitments directly from the actual lenders relating to the loans that were made. There is no evidence in the loan files that the requested loans were conditioned upon some future financing. In fact, no such assertion appears to have been made by Mills in her bankruptcy in 2006 or during the foreclosure process. In addition, I see dozens of cases like this and claims of such prior oral agreements are often made but are rarely successful in California where there is no written document evidencing the intent to make a loan.

I understand that Mills may claim that Lettau spoke with someone at the Debtors' office who may have represented to Lettau that future financing would, or could, be made available. I further understand that Lettau disputes Mills's version. Again, the factual issue is one for the finder of fact. This variation of the facts really would not change my opinion. In the absence of any evidence in the file, it is questionable whether Chase or Debtors made such a representation. However, even if Lettau or Debtors' representatives did make such a representation, borrower reliance on such a representation would be questionable in light of the Debtors' policies and procedures. That is just as with the two loans made to Mills, Debtors used written conditional loan commitments to document the loans they were willing to make. Thereafter, borrower was given a series of documents and disclosures relating to the proposed loan. There is absolutely nothing in any materials I reviewed showing anyone involved in the original first and second loan discussed or considered a third loan in the future.

### B. Origination

While each lender has its own procedures, the loan origination files for the first and second loans appear to meet the customs and practice for similar lenders doing business in California at the time these loans were made.

Appropriate loan disclosures were made in light of the type of loans being made. Neither the first nor second deed of trust were covered by California's High Cost Mortgage Statute (e.g., predatory lending law) as they existed in 2005.[22] The terms of the loans do not appear to meet the thresholds to make either loan involved in this case be viewed as a high cost mortgage loan (predatory mortgage) at the time the loans were made.

Mills apparently questions the fact that some documents were not dated or signed at the same time. Under the escrow/title company practice used in California (as

---

[22] Cal. Financial Code § 4970 et seq.

10

opposed to attorney closings) at all relevant times, it is not uncommon or unlawful for documents to be signed at different times, although all necessary documents must be signed and placed in escrow prior to the close of escrow. In addition, regardless of the dates on the documents, all escrow conditions (from the borrower and lender) must be complied with prior to closing.

Mills raises an issue regarding hazard insurance or homeowners insurance policies that she could not verify with the lender. Unless there is more, this claim lacks merit as well. That is, the loan documents show that both loans in this matter did not require an initial escrow (impound) account for insurance and that buyer was to obtain her own insurance and to submit proof of required coverage to the lenders. As such, lenders had no part in obtaining this insurance coverage or in collecting and/or paying premiums on such insurance. As a condition of the loans, Mills would have had to acquire insurance, provide proof of coverage, through escrow, that she had obtained insurance acceptable to the lender (i.e., consistent with the lender's loan instructions or policy).

### C. Foreclosure Process

As noted above in my discussion of the foreclosure process, it appears from the file that the procedures required for a non-judicial foreclosure were followed in the foreclosure of the second deed of trust which ultimately went to sale.

Mills raises in her Claim that the trustee or lender did not comply with Cal. Civil Code § 2923.5. I have written compliance programs for trustees, lenders and loan servicers regarding that Code section. In addition, I personally prepared the pre-legislative counsel reviewed draft of clean-up legislation enacted by the California Legislature in 2009 as SB 306. Mills' claim regarding noncompliance with Civil Code §§ 2923.5 (and related code sections) is meritless. While it is true that no one complied with this section, the reason is simple. Civil Code §§ 2923.5 (and related code sections) were enacted by the California legislature as urgency legislation in 2008 and was known as **SB 1137. Section 2923.5 only applies to notices of default or notices of sale recorded on or after Saturday, September 6, 2008**.[23] The non-judicial foreclosures in this case were completed well before Section 2923.5 was enacted.

Similarly, I am informed that the claimant may assert that the failure of the trustee to possess the actual original note and deed of trust is somehow a defect in a California non-judicial foreclosure. Even if such a factual assertion were found to be true, my opinion is that trustees and beneficiaries in California generally do not obtain the original note and deed of trust. Over 99% of the foreclosures in California are conducted through non-judicial foreclosure. The California Supreme Court and Courts of Appeal have limited most trustee and beneficiary duties in a non-judicial foreclosure to those set forth in the deed of trust as regulated by a comprehensive legislative scheme which

---

[23] Monday, September 8, 2008, is the first recording day after the notice provisions of sections 2 and 5 of SB 1137 become effective.

preempt common law and other inconsistent provisions of law.[24] The comprehensive legislative system (in 2005) was found in Cal. Civil Code §§ 2924 et seq. While the original note is required for a judicial foreclosure in California, neither the original note nor deed of trust is legally required for a non-judicial foreclosure (although the issue has been widely circulated on the internet and at foreclosure defense boot camps).[25] The primary rationale of the courts in California is that the comprehensive legislative system for non-judicial foreclosure does not require any party to have, possess or present the original note as a condition of commencing or concluding a non-judicial foreclosure.

Mills's Claim also suggests that there was no publication of notices of foreclosure. From a review of the file, it appears that proper publication of notice of sale was arranged and accomplished. This opinion is based upon, among other things, the customary documents I would expect to see in a California trustee's foreclosure file (e.g., TSG, certificates of publication; transmittals to a posting and publishing company and similar documents).

If Mills is claiming that republication would be required as a condition of making postponements that claim would lack merit. The procedure to postpone (part of the comprehensive legislative scheme discussed above) is set forth in Cal. Civil Code § 2924g. All that is required after the original notice of sale has been given is that the trustee give a notice of each postponement and the reason therefor through a public declaration at the time and place last appointed for sale. The public declaration of postponement must set forth the new date, time, and place of sale and the place of sale shall be the same place as originally fixed by the trustee for the sale. No other notice of postponement need be given.[26]

### 6. Tender and Damages.

Mills makes a monetary claim for various amounts with a total (depending on which claim is reviewed) of approximately $1,382,500. While California does recognize both a contract (deed of trust) and tort action for wrongful foreclosure, it has a long history and case law regarding the necessity of tender to successfully set aside a trustee's sale or to even recovery damages.

---

[24] *I.E. Associates v. Safeco Title Ins. Co.* (I.E. Associates) (1985) 39 Cal.3d 281; *Banc of America Leasing & Capital LLC v. 3 Arch Trustee Services* (2009) 180 Cal.App.4th 1080; and *Heritage Oaks Partners v. First American Title Insurance* (2007) 155 Cal.App.4th 339; *Nguyen v. Calhoun*, (2003) 105 Cal.App.4th 428, 440-441;

[25] *Sicairos v. Ndex West, LLC et al.* (S.D. Cal., Feb. 13, 2009) 2009 WL 385855 ; *Spencer v. DHI Mortgage Company, Ltd.*, (Dist. Court. N.D. Cal. 2009) 642 F.2d 1153; *Gallegos v. Recon Trust Company* 2009 W.L. 215406 (S.D. Cal. 2009); *Ritchie v. Cmty. Lending Corp.* (2009 C.D. Cal.) 2009 U.S. Dist. Ct. LEXIS 73216. *Kuoha v. Equifirst Corp*, (2009 S.D. Cal.) 2009 LEXIS 94699 (and numerous cases cited therein).

[26] Cal. Civ. Code § 2924g(d); *U.S. Cold Storage v. Great Western Sav. & Loan* (1985) 165 Cal.App.3d 1214; *Cal. Livestock Prod. Credit v. Sutfin* (1985) 165 Cal. App. 3d 136.)

YCST01:10279152.2                                                                                           066585.1001

In cases such as the instant one where a party claims that they tried to, or wanted to, pay the lender money but the lender would not accept the funds, it is critical for all parties to understand the circumstances and what is the required nature or amount of tender. Either to set aside a trustee's sale (e.g., declaratory relief, wrongful foreclosure, cancellation, quiet title) **or even to recover damages**, plaintiffs must allege and prove that they *unconditionally tendered reinstatement, redemption or restitution* under the Deed of Trust.[27] This rule is based upon the equitable maxim that a court of equity will not order a useless act performed. A party attempting to set aside a foreclosure sale must allege tender of the foreclosing obligation as an essential element of any causes of action based upon irregularities in the sale procedure. To hold otherwise would permit plaintiffs to state a cause of action without the necessary element of damage to themselves. "The rationale behind the rule is that if the plaintiffs could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to plaintiffs."

Customarily lenders will accept any sufficient and lawfully adequate tender of reinstatement and redemption. Prior to the current economy downturn in the real estate market, some lenders would accept less than full tender but that was totally within their discretion. This case arises prior to various state and federal laws addressing loan modifications, therefore those laws do not need to be considered.

My opinion is that no lawful tender was made by Mills at any time either to reinstate or to redeem.

As to reinstatement prior to the trustee's sale of the second deed of trust, in late May 2006, Mills requested a reinstatement figure. Cal-Western (as noted above) mailed and faxed reinstatement figures to Mills to stop the foreclosure. Tender in late May 2006, would have required that Mills bring current her delinquent first mortgage and her delinquent second mortgage. While Mills apparently made offers of less than the amount owed, such is not a valid tender.

After her bankruptcy and just prior to the actual foreclosure in August 2006, Mills's counsel e-mailed the servicer and admitted his client did not have sufficient funds to make a full tender and he attempted to obtain a postponement for the payment of one-month's payment on each loan because his client expected to come into sufficient funds in the future. This is negotiation, not a tender.[28] Conditional loan commitments or promises of third parties to give money to a tendering party does not constitute being ready, willing and able to tender.[29]

---

[27] See, *Karlsen v. American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112, 117-118; *Abdallah v. United Sav. Bank* (1996) 43 Cal.App.4th 1101, 1109; *Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 577; *FPCI Re-Hab 01 v. E & G Investments* (1989) 207 Cal.App.3d 1018, 1021-1022 [damages]; Civil Code §§ 2903-2904 and § 2924c.

[28] *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428.

[29] *Am-Cal Inv. Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526.

13

Apparently there were a number of communications and discussion between Mills and the successful purchaser at the trustee's sale about reacquiring the Property. Generally to set aside a sale, the borrower would have to tender the full amount of the obligation. There is no evidence of this happening.

My opinion is there was never a valid tender by Mills at any time. In addition, from the materials reviewed, it is my opinion that neither the lender nor the trustee under the second deed of trust did anything to prevent Mills from exercising her right to reinstate or redeem.

In California on a non-judicial foreclosure there is no post-foreclosure sale redemption after a non-judicial foreclosure. Redemption is limited to the time period after the reinstatement period expires (i.e., 5 business days prior to the sale) and the time the trustee's sale is concluded. As such, any repurchase would be such to the normal rules of contract (i.e., an offer and acceptance). There is no obligation after a foreclosure for the successful purchaser to resell to the owner. The file shows nothing more than some discussions after the foreclosure sale and no accepted contract.

Unlike the situation before the trustee's sale, after the trustee's sale whether the lender may have ceased communicating with Mills regarding a potential repurchase is irrelevant. Neither the lender nor the purchaser at the trustee's sale have any obligation to communicate with, or to negotiate with, Mills.

Dated: October 15, 2010.                    ADLESON, HESS & KELLY, a P.C.

                                            By:_____
                                               Phillip M. Adleson