IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | Case No. 07-11047 (CSS) |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al., | : | Jointly Administered |
| | : | Docket Ref. Nos. 8812 & 8847 |
| Debtors. | : | Objection Deadline: TBD |
| | x | Hearing Date: TBD |

**CLAIMANT DEBORAH E. MILLS' OPPOSITION TO DEBTORS EMERGENCY MOTION *IN LIMINE* TO EXCLUDE UNDISCLOSED EVIDENCE**

Deborah E. Mills ("Mills"), by and through her undersigned counsel, hereby submits this Opposition to the Emergency Motion *In Limine* to Exclude Undisclosed Evidence brought by debtors and debtors-in-possession in the above-captioned case ("Debtors"[1]) that seeks to preclude Mills from introducing certain evidence and damages theories at trial.

Claimant Mills retained counsel for the first time in this matter on July 20, 2010. Shortly thereafter, Mills agreed, at Debtors' insistence,[2] to a highly expedited schedule for the adjudication of Mills' claims. Indeed the Scheduling Order (D.I. 9213) provided for only four weeks of fact discovery. Mills' agreed to this highly expedited schedule with the understanding

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings") (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); American Home Mortgage Servicing, Inc. ("AHM Servicing"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent Blvd., Suite 200, Irving, Texas 75063.

[2] On July 20, 2010, the Court ordered Debtors to reserve for the full amount of the Mills claim. Because Debtors are in the process of going final with their bankruptcy plan, Debtors made clear to Mills that this matter needed to be resolved immediately.

that there would be some flexibility between the parties in an effort to get the matter to trial as quickly as possible while accommodating new counsel that was taking on a complex and long-pending claim with substantial prior history.

While Debtors complain about the alleged prejudice caused from purportedly learning about "new" evidence just two weeks before trial (a claim that is fully refuted below), Debtors have been in possession of the evidence for weeks and they themselves are to blame for insisting on a schedule that brought the matter to trial less than three months from the start of fact discovery. Considering that both sides willingly agreed to conduct a good portion of fact discovery after the October 14, 2010 deadline, Debtors' present position of strict adherence to the Scheduling Order is hypocritical.

## I. BACKGROUND

On November 19, 2007, Mills, *pro se*, filed proof of claim no. 2743 against AHM Holdings in the amount of $1,170,000, claiming, *inter alia*, damages based on the loss of her down payment on a residential property, mortgage hypothecation, and fraud – all of which resulted from her allegation that Debtors fraudulently originated her mortgage and, later, improperly foreclosed on her home.

On March 31, 2010, Mills, *pro se*, filed proof of claim no. 10743, which amended proof of claim no. 2743, in the amount of $1,382,500, claiming, *inter alia*, damages based on mortgage hypothecation, incompetence, illegal foreclosure, loss of right to adequate protection of claim, unauthorized post petition asset transfers, and malfeasance – all of which resulted from allegations that Debtors fraudulently originated her mortgage and then improperly foreclosed on her home. Mills alleges 11 U.S.C. §§ 261, 549, 363 support her claim and establish the Debtors committed fraud. (Claim No. 10743 at ¶¶ 6, 9 (emphasis removed).) She raises 11 U.S.C. §§

361, 362, 363, and 364, (*id.* at ¶ 11 (emphasis removed), contends that her claim to her home was under a standing objection during the disposition of the property until the objection was withdrawn by Debtors' counsel without stating a reason, and asserts "I feel this is a post petition error or even crime on the estate . . . ." (*Id.* at ¶¶ 16-18 (emphasis removed).) Mills also alleged that that "[t]he damages continue, I have never recovered the lost savings. The mental and emotional grievance caused is painful; I cannot even talk about it." (*Id.* at ¶ 20.)

On April 27, 2010, Mills, *pro se*, filed a Motion for Order to (I) Amend Proof of Claim and (II) Motion for Order of Allowed Administrative Expense Claim Priority Against the Estate Pursuant to Section 503(b) of The Bankruptcy Code In Immediately Available Funds and (III) Order of Right To Protection of Certain Property Interest Under Section 361 or (IV) Avoidance Action Against Debtors Pursuant to Section 549. (D.I. 8812.) Mills asserts in the motion:

> The damages continue. I have never recovered the lost savings. The mental and emotional grievance caused is painful; I cannot even talk about it. I wish I could express the anger and frustration as this living hell continues on so long as this claim exists. And I say to this Honorable Court, these cases have gone on far too long and without resolution continue the damages.

(*Id.* at p. 4.) As part of the requested relief, Mills sought "[A]n ORDER pursuant to Section 361, 362, 363, and 364 providing 'adequate protection' of funds received by the estate of disposed property in the amount of $634,954.46 for the benefit of claimant Deborah Mills claim 10764." (*Id.* at p. 5.)

Debtors filed their opposition to Mills' Motion on May 11, 2010. (D.I. 8846; D.I. 8847.) On August 13, 2010, Mills, through the undersigned counsel, filed Administrative Expense Proofs of Claims against each of the Debtors. These Claims, Nos. 10802-10809, superseded and replaced all other claims made by Mills against the Debtors, but incorporated by reference each of Mills' allegations and statements of fact set forth in her previous claims. (Claim nos. 10802-

10809, Mills Affidavit at ¶ 3.) In each of claim nos. 10802-10809, Mills filed an affidavit declaring, among other items:

> 6. My loan transaction with Debtors was initiated, supported and maintained by predatory lending practices.
>
> 7. For example, the loan origination was fraudulently induced. Debtors induced me to rely on false promises of a future refinancing, equity line or some other means of accessing the equity, in exchange for closing the new terms of the transaction now. By of intentionally causing me, the borrower to be unable to fulfill the requirements of the loan, Debtors triggered the default."
>
> * * * * *
>
> 9. On or about June 29, 2005, I contacted Tanya Lattau, a broker who sold loans for Debtors.
>
> 10. I started the process with Ms. Lattau and she assured me we could get this done in a 4 to 5 days. I got her my basic information to start the process and after that information was supplied, we discussed 100$ financing as the goal of the loan.
>
> 11. Within 5 days, Ms. Lattau came back to me and stated that we could do the loan, but we would need a down payment of around $68,000 and closing costs around $20,000.
>
> 12. We didn't hear back from her for several days but felt comfortable that she had a handle on things. We were getting ready to close escrow and she came back to us and stated that there was a problem. My credit score was a few points off but upon review they would make an exception under the conditions that the down payment be increased to $212,500.
>
> 13. I was a bit shocked in my phone conversation with her. At this point, she stated that we could pull at least $50,000 out within two months of closing the loan, on or about December 2005.
>
> 14. We moved forward on the loan on the basis that we could pull money out within two months of closing the loan.
>
> 15. In October 2005, I contacted AHM directly to start the process of refinancing the second loan. It was my understanding that we did have a two month pre-payment penalty so we did not want to have it completed until December 2005 – but they were aware that this was understood when we originated the loan. After several discussions with AHM I found out they would not do the refinance they had promised.

* * * * *

17. Through the discovery process, I anticipate producing and obtaining evidence that will establish the following facts:

**Facts Concerning the Loan Origination**

. . .

- Debtors loan file contains nothing regarding qualifications for the second mortgage or how or why it was included.
- Fraudulent inducement as stated above.

. . . .

**Facts Concerning the Foreclosure Process**

. . .

- Violations of numerous California statutory requirement

. . . .

18. As a result of the above irregularities that will be established b y a preponderance of the evidence, I was fraudulently induced to enter into a loan for the Home by Debtors.

19. As a result of the above irregularities that will be established b y a preponderance of the evidence, the purported foreclosure on the Home by Debtors was technically defective and thus my rights to the home were no extinguished prior to the filing of the Debtors bankruptcy petition.

A hearing on whether to allow Mills' Administrative Expense Claims is scheduled for November 22, 2010.

## II. ARGUMENT

Debtors have been in possession of the evidence and theories that they purport are "Undisclosed Evidence" since well before Mills filed her motion for partial summary judgment and her response to Debtors' objections. Nevertheless, Debtors argue that permitting Mills to pursue damages based on her emotional distress, whether those emotional distress damages are compensatory or punitive,[3] or a theory of liability predicated on mortgage origination fraud would prejudice them because they believe they need additional discovery and a delay of trial to

[3] Debtors do not contest that Mills should be permitted to seek punitive damages that are not grounded in her emotional distress claims (e.g., punitive damages pursuant to 11 U.S.C. § 362(h)). Statutory damages, which may include punitive damages, were identified in her interrogatory responses since the start of this litigation. (*See* D.I. 9443 at ¶ 17.)

complete that discovery.[4] Debtors' failure to pursue discovery on topics and theories that they were aware of during discovery should not be rewarded by preventing Mills' from presenting them at trial.

**a. Mills' Emotional Distress Claim Is Not New And Discovery Is Complete**

The Debtors already are in possession of all the evidence relating to Mills' emotional distress damages claim. Mills' emotional distress damages are based on one event, her December 27, 2005 suicide attempt that was caused by Debtors' actions. Counsel for Mills were not aware of this event until it was disclosed by Claimant's fiancé, Anthony Esquivel, during his deposition on October 11, 2010:

> Q. So do you recall what time frame that was?
>
> A. That was between October, November, December, that time frame in 2005. Then came Lane Nocera. After that, that was devastating. That's when we knew things were not looking good. Then Lane and then when he dropped out of the thing, that's when Deborah kind of lost it.
>
> Q. What do you mean she lost it?
>
> A. She had an emotional breakdown. She tried to commit suicide.

(Exh. 1 at 160:16-160:25). After this fact was revealed, Debtors sought more discovery on the issue. Specifically, Debtors' counsel asked about the treatment Mills received for her suicide attempt:

> Q. Did she seek treatment then?
>
> A. Well, there was an ambulance that was there, the police, and she was taken to the hospital. She was evaluated and she was released to me after she was stitched up.

(Exh. 1 at 161:1-161:5.)

---

[4] Debtors insisted on a shortened discovery schedule and they knew Mills' assertions and theories of the case with sufficient time to pursue discovery before fact discovery closed.

Later, at the subsequent deposition of Mills on October 19, 2010 – well after the October 5, 2010 date Debtors claim they had been "baited" into not inquiring as to Mills' emotional distress damages during the first day of Mills' deposition –the topic of Mills' suicide attempt was raised again:

> Q. And if you look at the second sentence it reads, "He assured me that he his company could assist the situation and he strung me along for two months about a bridge loan, as I'm sure he did with you." And then the last -- the next sentence, "He even went to the extent of opening up title insurance on the property and drawing up the contract. Then nothing. Absolutely nothing"; can you explain to me what that means?
>
> A. Exactly what it said. At that point and what I know now is a big difference. When I wrote that paragraph I still wasn't quite sure if -- you know, what happened with American Home Mortgage, I didn't know who to trust. You have to understand that the day that I talked to Layne Norcera and he said what he said, I tried to take my own life, Mr. Beach.

(Exh. 2 at 453:17-454:8.) Debtors' counsel then proceeded to ask follow-up questions directed at determining whether someone other than Debtors could have been the cause of Mills' emotional distress and related suicide attempt:

> Q. Is it accurate to say that you were blaming Mr. Norcera at this point for stringing you along for two months?
>
> A. I was trying to work with American Home Mortgage.
>
> Q. So you weren't -- so were you or were you not blaming Mr. Norcera for stringing you along for two months?
>
> A. Well, I wasn't sure if he -- yes, in this letter to Amanda I was stating as such. I was trying to work with American Home Mortgage. What am I supposed to do, say, you know what, you guys are unresponsive, you haven't worked with me in the past? I mean, if I took an ugly tone to American Home Mortgage, how was anything going to come out of it?

(Exh. 2 at 454:18-455:7.) Importantly, Mills' counsel did not object once to any of the above questions relating to Mills' suicide attempt – not even to the form of the question. For the Debtors to not inform the Court of this line of questioning while asserting that they were

blindsided is disingenuous at best. Mills also subsequently produced her medical records documenting her trip to the emergency room to have the knife wounds on her wrists treated. Mills also offered to make herself available for additional deposition testimony on the limited topics of her emotional distress and punitive damages claims. (Exh. 3 at p. 2.) Thus, Debtors were in no way precluded from seeking discovery regarding the basis for Mills' emotional distress damages claim and, indeed, already are in possession of all discovery relevant to this issue.

Further, because Mills' emotional distress damages stem from a single incident and do not relate to a debilitating mental condition that requires continued treatment, courts characterize her type of emotional distress claim with the unfortunate term "garden variety." Garden variety emotional distress is defined as "ordinary and commonplace emotional distress . . . . In contrast, emotional distress that is not garden-variety may be complex, such as resulting in a specific psychiatric disorder, or may be unusual, such as to disable one from working." *Ruhlmann v. Ulster Co. Dep't of Soc. Servs.*, 194 F.R.D. 445, 2000 U.S. Dist. LEXIS 9390, at *13, n.6 (N.D.N.Y. July 6, 2000). A plaintiff does not place her mental condition in issue, warranting a Rule 35(a) independent medical examination ("IME") by claiming "garden variety claims of emotional distress." *Id.* at *18. Merely making a claim for physical or emotional distress – as opposed to a claim of a "psychiatric disorder requiring psychiatric or psychological counseling" – does not warrant a Rule 35(a) examination. *See Cody v. Marriott Corp.*, 103 F.R.D. 421, 1984 U.S. Dist. LEXIS 22016, at *4, *6 (D. Mass. Nov 14, 1984); *EEOC v. Vail Corp.*, 2008 U.S. Dist. LEXIS 86046, *16 (D. Colo. Oct. 1, 2008) ("Emotional distress limited to mental anguish, humiliation, inconvenience, pain and suffering, and loss of enjoyment of life does not place [Plaintiff's] mental condition in controversy and does not provide good cause for requiring an

IME.” ). Ultimately, "[t]he granting or denying of a motion for a [mental] examination rests in the sound discretion of the [motions] court." *Coca-Cola Bottling Co. of Puerto Rico v. Negron Torres*, 255 F.2d 149, 153 (1st Cir. 1958).

Because Mills did not seek any further treatment for her suicide attempt and does not intend to introduce any expert evidence relating to her emotional distress, the Court should decline Debtors' request to subject Mills to intensive physiological evaluations as a pre-requisite to making an emotional distress damages claim. Debtors' request is no more than an abusive discovery tactic meant to intimidate Mills into declining to pursue a legitimate damages theory. For at least these reasons, all of Debtors' claims of prejudice and unfair surprise are without merit and should be rejected by the Court.

**b. Mills Basis For Her Fraud Claim Is Not New**

Surprisingly, Debtors also allege unfair surprise regarding the fraud in the origination claims raised by Mills. Specifically, Debtors claim the allegation that Debtors engaged in tactics to extract high down payments from prospective customers in an effort to enhance the securitization value of their loans was raised for the first time in Mills' Response to Debtors' Objections. (D.I. 9443 at ¶ 19.) That representation could not be further from the truth. At the October 4, 2010 deposition of Debtors' corporate designee, Scott Martinez, Mills set forth her theory regarding Debtors scheme to defraud mortgage customers:

> Q. Did American Home Mortgage encourage its brokers to try to get people to put more money down so that the ultimate products they were selling had very low loan-to-value ratios?
>
> A: American Home Mortgage had a lot of products that it offered.

(Exh. 4 at 60:16-60:24).

> Q. Did you ever run across a memorandum or directives to sales staff to try to push to get more money out of consumers for down payments to achieve favorable loan-to-value ratios?
>
> MS. ZIEG: Objection, form.
>
> THE WITNESS: I don't recall seeing any memos.
>
> Q. Were there any internal corporate policies at AHM that put emphasis on the low loan-to-value mortgages that were attractive for securitization?
>
> MS. ZIEG: Objection, form. What do you mean by low?
>
> Q. On a scale of 1 to 100, 100 is high and anything below that is low.
>
> MS. ZIEG: Do you mean percent?
>
> MR. STAMOULIS: Yes.
>
> MS. ZIEG: Loan-to-value?
>
> MR. STAMOULIS: Yes.
>
> MS. ZIEG: Objection, form.
>
> Q. So, were you aware of any corporate policy at AHM that encouraged selling the kinds of loans that would be attractive for securitization?
>
> A. I don't recall seeing anything.

(Exh. 4 at 61:7-62:10).

In addition to setting forth Mills' scheme theory during the deposition of Debtors' corporate designee, Mills herself testified regarding how she believed Debtors defrauded her when asked to elaborate and explain her interrogatory responses and theories of the case:

> Q. You state that my loan transaction with the debtors was initiated, supported and maintained by predatory lending practices. What is your understanding of the meaning of quotes predatory lending practices?
>
> A. What is my understanding?
>
> Q. Yes.

A. Say anything, do anything, get the money, get the loan done.

(Exh. 5 at 73:19-74:3).

Further, both Mills and Esquivel detailed in their deposition testimony exactly how Debtors' intentional efforts to lower Mills' credit score fit into Debtors' scheme to extract high down payments from potential borrowers, and thus make Debtors' loans more attractive on the securitization market:

> Q. And what was your understanding for the change in the down payment amount?
>
> A. My understanding was that at the time that they were going to fund that they pulled her credit score ***again*** and that it had been notched down and that they required $75,000 more.

(Exh. 1 at 31:4-31:9 (emphasis added).)

> Q. Referring back to Section 6 again, that same statement, what do you mean when you say that the loan transaction was initiated by predatory lending practices?
>
> A. Initiated. Because at the last moment they came back to me because my credit score was one point off and they made an exception with an additional seventy-five thousand dollars that I would be granted the loan.

(Exh. 5 at 75:9 – 75:18).

Finally, Mills and Esquivel explained how they relied on Debtors' representation that, because Mills had a poor credit score, they had to accept the loan on the exception terms if they wanted the house because no one else would lend to her:

> Q And did you and Deborah discuss her conversation with Tawnya?
>
> A She informed me that -- Tawnya said that the credit score needed to be brought back up, that it was going to take six months and during that time we could work to get the credit score back so we could do it through Chase. That was my concern, that she wanted to do it through Chase.

(Exh. 1 at 54:24-55:6.)

Q. If you -- why didn't you just go with another lender to begin with?

A. We had come so far and we had that guarantee. I felt comfortable, you know, everything was expedited quickly. The only thing that did make me feel uncomfortable is when, you know, Tawnya called us up and said, "Okay, your credit score went down one point, but they're willing to make an exception if you come up with an additional 75,000." And as I said before, Anthony and I had to really have a heart to heart about, okay, how we're going to do this, is this going to work. We had that guarantee. I mean, like I said, we went and saw Tawnya and we were assured that, you know, we would be able to pull out that money, so we thought we were going to be okay.

(Exh. 2 at 598:17-599:7).

Thus, deposition testimony already on-record fully sets forth Mills' allegation that Debtors lured her into placing a higher down payment to get her loan by (1) intentionally lowering her credit score; (2) offering her exception terms that overlooked her now "poor" credit score for an additional $75,000 down payment; (3) informing her that no other lender would offer her such exception terms because her credit score was too low; and (4) promising her that she would be able to access a $50,000 portion of her down payment almost immediately in the form of a home equity loan (a promise they never honored). Even if Debtors were not on notice of the full contours of Mills' fraud theory after the depositions of Mills and Esquivel, the deposition of Ms. Tawnya Lettau (Debtors broker-agent) left no doubt:

Q. When you pull an applicant's credit score for a loan that's going to involve a main loan and a piggyback loan, do you pull it once or do you pull it twice?

A. I pull it once.

(Exh. 6 at 106:24-107:3)

Q. My question is, can you think of any logical reason why you would want to pull an applicant's credit score twice in a row if you're dealing with a main loan and a piggyback loan?

A. No.

(Exh. 6 at 107:19-107:23.) Based on the foregoing testimony, it is unfathomable to imagine how the Debtors can claim that they were unaware of Mills' fraud theory until the filing of the response to Debtors' objection.

**c. If Debtors Were To Be Prejudiced – Which They Are Not – Debtors Created Their Own Prejudice**

Mills filed her motion for partial summary judgment on November 4, 2010 which seeks a ruling that Debtors foreclosure on her property was defective but does not seek a ruling on damages. In her Opening Brief, the "Statement of Facts" contains the following sentence: "Mills lost the $212,500 down payment she made on her home and over $48,500 in closing and escrow costs, in addition to suffering severe emotional distress and other consequential damages." Almost a week later on November 10, 2010, the same day Mills' response to Debtors' objection to her claims was due, Debtors demanded that Mills amend her brief by deleting the sentence and

> ceas[ing] any further allegations of emotional distress, punitive or consequential damages in any other written pleadings or in Court. Please confirm your agreement to the foregoing by tomorrow, November 11, 2010, If we do not hear from you by tomorrow, the Debtors intend to seek relief related to the assertions set forth above and costs related thereto.

(Exh. 7 at p. 2.)

In response to Debtors' letter, Mills replied on November 11, 2010. (Exh. 3.) Mills explained:

> The brief sets forth the undisputed facts in Ms. Mills' case, including the sentence "Mills lost the $212,500 down payment she made on her home and over $48,500 in closing and escrow costs, in addition to suffering severe emotional distress and other consequential damages." The motion does not seek an award of damages and there is no justifiable reason to remove the quoted sentence.
>
> As you may recall, Debtors sought a very short time period to bring this case to trial because the Court is requiring Debtors to hold funds in reserve for Ms. Mills' claim. We agreed to the aggressive schedule proposed by Debtors with the understanding that there would be some flexibility as a result of the compressed time periods. Indeed, even though discovery was supposed to end

> weeks ago pursuant to the Scheduling Order, both sides have agreed to conduct depositions beyond the close of discovery and document production is still ongoing (evidenced by Debtors production of over 500 pages of material to Claimant just yesterday). As a result, we have not had the typical time needed to evaluate the case and amend Mills' pleadings and discovery responses accordingly.
>
> Ms. Mills' first day of deposition testimony occurred at the beginning of discovery and, as you quoted in your letter, Ms. Mills testified on October 5, 2010 that it was her understanding on that day that she was not seeking any emotional damages or punitive damages. (Mills Tr. dated Oct. 5, 2010 65:12-15 (Q. Ms. Mills, is that your understanding, that you're not seeking any emotional damages or punitive damages. A. ***Not at this juncture.***) That testimony does not preclude Ms. Mills from seeking emotional damages or punitive damages at a later juncture. Indeed, the later juncture has arrived and Ms. Mills will be supplementing her interrogatory responses this week.
>
> Debtors already are in possession of the facts that support Ms. Mills' seeking emotional and punitive damages. For example, the following exchange took place during Anthony Esquivel's deposition: . . . .
>
> Further, the liquidation of Ms. Mills' home willfully violated the automatic stay in her bankruptcy proceeding. 11 U.S.C. § 362(h) states that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorney's fees, and, in appropriate circumstances, may recover punitive damages." This is a statutory basis for seeking punitive damages and is consistent with my statement at her deposition.
>
> Accordingly, because Debtors already are in possession of all of the facts that support a claim for emotional distress and punitive damages, Debtors will not be prejudiced by Ms. Mills' seeking these damages at trial. Nevertheless, to the extent Debtors require any additional information on this specific issue, we agree to make Ms. Mills available for deposition prior to trial on the limited topics of her emotional distress and punitive damages claims (though we believe there is absolutely no need for such a deposition).

(*Id.*)

Instead of contacting Mills and seeking a meet and confer, Debtors filed their motion *in limine* seeking much more than having Mills remove one sentence from her opening brief for partial summary judgment. This is not the meet and confer contemplated by Del. Bank. L.R. 7026-1(c). Had Debtors met and conferred with Mills, Mills could have pointed to all of the evidence that Debtors already had in their possession, and Debtors and Mills may have been able to reach a compromise without

wasting judicial resources. Instead, Debtors filed their motion, did not inform the Court of evidence they already had in their possession, including testimony obtained through depositions, and seek fees from Mills or Mills' counsel. The Court should deny Debtors motion and, if fees should be awarded to any party regarding this motion, the award of fees should go to Mills.

## III. CONCLUSION

For the foregoing reasons, the Court should deny the Emergency Motion *In Limine* filed by Debtors and permit trial to go forward as scheduled on November 22, 2010 with no additional discovery beforehand.

Dated: November 15, 2010

/s/ *Stamatios Stamoulis*

Stamatios Stamoulis #4606
stamoulis@swdelaw.com
Richard C. Weinblatt #5080
weinblatt@swdelaw.com
Stamoulis & Weinblatt LLC
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, DE 19809
(302) 999-1540

*Attorneys for Deborah E. Mills*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| In re: AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, et al., Debtors. | Chapter 11<br>Civil Action No. 07-11047 (CSS)<br>Jointly Administered |
|---|---|

**CERTIFICATE OF SERVICE**

I hereby certify that on November 15, 2010, I electronically filed the above document(s) with the Clerk of Court using CM/ECF which will send electronic notification of such filing(s) to all registered counsel. In addition, the following counsel also were served by email:

HAHN & HESSEN LLP
Mark S. Indelicato, Esq.
488 Madison Avenue
New York, NY 10022

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Sean Beach, Esq.
The Brandywine Bldg.
1000 West Street, 17th Floor
PO Box 391
Wilmington, DE 19899-0391

/s/ *Stamatios Stamoulis*
Stamatios Stamoulis #4606