# EXHIBIT 2

426

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE


--------------------------------- X

IN RE:

AMERICAN HOME MORTGAGE,            Case No.

HOLDINGS, INC., a Delaware         07-11047 (CSS)

corporation, et al.,

            Debtors.

----------------------------------X




CONTINUED DEPOSITION OF DEBORAH MILLS

Volume II

Tuesday, October 19, 2010

San Luis Obispo, California




Reported in stenotype by:

Elizabeth A. Doukas, RPR, CSR #9872

451

1    A.  To our plan.
2    Q.  Whose plan?
3    A.  Anthony and myself.
4    Q.  And what plan was that?
5    A.  The plan was -- as I mentioned at my last
6  deposition, when they came back to me to make an -- when
7  they came back with the exception that my credit score
8  had gone down one point, we had to seriously think about
9  that $75,000, and I got assurance from Tawnya that I
10  could pull that money out.
11       And when I talked to Anthony, when he was
12  driving up back from Ventura, he even called her and
13  discussed it with her.  And he told her we had to think
14  about this over the weekend, this was a big decision, and
15  that Monday we went into her office and, you know, said
16  this is going to be tough for us to pull up, you know,
17  he's going to have to come up with the money somewhere,
18  but we had to have that assurance that we could pull that
19  money out.
20    Q.  So the plan was the $50,000?
21    A.  Well, that was part of it, but then there
22  are also, as I mentioned here, like with the Union Street
23  project and what our decision-making factors were, it's
24  like, you know, it was out of our hands.
25    Q.  Ms. Mills, at the time of the default on the

452

1  mortgage loan -- strike that.
2       At the time you took out the mortgage loan did
3  you have any steady income?
4    A.  Yeah, I still had income coming in.
5    Q.  And where was that income coming from?
6    A.  I was finishing up landscape projects down in
7  Ventura.  I was consulting with Malibu Mountain Club.  I
8  still had some big clients that were down in Ventura.
9    Q.  And did Mr. Esquivel have a steady income at
10  that point?
11    A.  Yes, he did.
12    Q.  When did you no longer have a steady income?
13    A.  Well, we put everything we could into the house.
14    Q.  Ms. Mills, I'm not talking about what assets you
15  put into the house, I'm talking about when did you no
16  longer have a steady income?
17    A.  Once we moved into the house and we were going
18  to pull that money out, and that's also very critical for
19  me in my business, when it's winter and when it's raining
20  that's the slowest time for me.  Things pick up in
21  spring.
22    Q.  You were relying -- Ms. Mills, you were relying
23  on --
24    A.  Pulling that $50,000 out.
25    Q.  For your income?

453

1    A.  To re-establish our business, to be able to pay
2  the mortgage, to get through that rainy season before
3  spring, before my business picks back up.
4    Q.  And, Ms. Mills, let's turn to page 3 of the
5  first full paragraph, could you take a look at that
6  paragraph, please.
7       (Witness reviews document.)
8    THE WITNESS:  Yes.
9    MR. BEACH:  Q.  Do you see where you're
10  referring to Mr. Layne Norcera?
11    A.  Yes.
12    Q.  Is that the same Mr. Norcera you were referring
13  to earlier?
14    A.  Yes.
15    Q.  Who you testified had spoken with American Home?
16    A.  Correct.
17    Q.  And if you look at the second sentence it reads,
18  "He assured me that he his company could assist the
19  situation and he strung me along for two months about a
20  bridge loan, as I'm sure he did with you."
21       And then the last -- the next sentence, "He even
22  went to the extent of opening up title insurance on the
23  property and drawing up the contract.  Then nothing.
24  Absolutely nothing"; can you explain to me what that
25  means?

454

1    A.  Exactly what it said.  At that point and what I
2  know now is a big difference.  When I wrote that
3  paragraph I still wasn't quite sure if -- you know, what
4  happened with American Home Mortgage, I didn't know who
5  to trust.
6       You have to understand that the day that I
7  talked to Layne Norcera and he said what he said, I tried
8  to take my own life, Mr. Beach.
9    Q.  Ms. Mills, doesn't this statement that we just
10  read about Mr. Norcera seem contrary to what you
11  testified to earlier about Mr. Norcera?
12    A.  I don't think it's contradictory, no.
13    Q.  How come?
14    A.  Well, when someone calls you up and says, "I
15  don't know, something's not right, you're on your own,"
16  when I thought it was a done deal, I didn't know what
17  went wrong.
18    Q.  Is it accurate to say that you were blaming
19  Mr. Norcera at this point for stringing you along for two
20  months?
21    A.  I was trying to work with American Home
22  Mortgage.
23    Q.  So you weren't -- so were you or were you not
24  blaming Mr. Norcera for stringing you along for two
25  months?

DiscoveryWorks Global     888.557.8650     dw-global.com

455

1    A.  Well, I wasn't sure if he -- yes, in this letter
2  to Amanda I was stating as such.
3        I was trying to work with American Home
4  Mortgage.  What am I supposed to do, say, you know what,
5  you guys are unresponsive, you haven't worked with me in
6  the past?  I mean, if I took an ugly tone to American
7  Home Mortgage, how was anything going to come out of it?
8    Q.  Ms. Mills, this statement that you made about
9  Mr. Norcera, do you think it's a truthful statement?
10   A.  Knowing what I know now?  No.  Because American
11 Home Mortgage couldn't do anything, they no longer owned
12 the loans.  This is just more proof of how they -- they
13 couldn't do anything.  And they never went to where the
14 trusts were or the master servicers to those trusts.
15 They led me to believe that they owned the property -- or
16 the loans, and they didn't.
17   Q.  All right, Ms. Mills, let's go to the last page.
18 The first full sentence on the last page states that "a
19 breakthrough has been made and there is light at the end
20 of the tunnel," would you please explain that statement?
21   A.  Because I was lining up work and there was money
22 coming in.  There was -- you know, finally, things were
23 seeming like they were starting to fall into place.
24   Q.  Did they fall into place?
25   A.  No, they did not.

456

1    Q.  And what do you mean when you say, "things did
2  not fall into place," financially?
3    A.  Financially they didn't.  When this letter was
4  written I was also working with Bernadine Beaureguard,
5  who was going to get moneys to help cure the default.
6        Now, when this letter was written on the 29th,
7  you know, yes, light at the end of the tunnel means in
8  the future, it didn't mean at that moment, you -- can you
9  comprehend that?
10   Q.  Would you repeat that, please?
11   A.  I said light at the end of the tunnel, that is
12 in the future, correct?
13   Q.  Ms. Mills, you're not asking me questions, I'm
14 asking you questions today, so please just respond to the
15 questions I'm asking you.
16   A.  In most people's minds, when you say, "light at
17 the end of the tunnel," that means there's things in the
18 future that are coming up.
19   Q.  Okay.  Ms. Mills, did you think this letter was
20 going to assist you in stopping the foreclosure process?
21   A.  I was hoping that it would open up a way where
22 they would work with me, that somebody in that company
23 had to be receptive.
24   Q.  Ms. Mills, you testified earlier that if you had
25 gotten that $50,000, you'd get through the rainy season

457

1  in the winter; is that correct?
2    A.  Correct.
3    Q.  And the $50,000 you're referring to is the
4  equity or refinancing that you anticipated getting from
5  the property; is that correct?
6    A.  Correct.
7    Q.  Were there any other debts that you had to pay
8  at the time?
9    A.  No.
10   Q.  There were no outstanding debts?
11   A.  I had a truck payment and I had some revolving
12 credit cards.
13   Q.  Did you speak with Ms. Ellsworth after you sent
14 the letter?
15   A.  Bernadine Beaureguard spoke to her.
16   Q.  And what's your understanding of those
17 discussions?
18   A.  Same thing, they -- you know, Bernadine had to
19 get assurance that they were still not going to foreclose
20 on the property if they went ahead with funding, and she
21 could not get that assurance.
22   Q.  When was it that you realized your home was
23 scheduled for a foreclosure option?
24   A.  I can't remember.
25   Q.  Approximately?

458

1    A.  Beginning part of 2006.
2    Q.  Do you recall how you learned about the option?
3    A.  Well, you just showed me those two letters.  So,
4  I knew it was coming.
5    Q.  Did you receive any other notices regarding the
6  foreclosure sale?
7    A.  I probably did.  It was --
8    Q.  Did you see any notices posted to the house?
9    A.  There was a notice that was posted on the
10 window, yes.
11   Q.  Did you speak with any representatives from
12 American Home regarding the foreclosure sale?
13   A.  I was in constant contact with them.
14   Q.  Do you recall what the original date of the
15 foreclosure sale was?
16   A.  I don't remember.  I believe it was the 9th of
17 July.
18       MR. BEACH:  All right, Ms. Mills, I'm going to
19 ask that the document at tab number 6 be identified as
20 document number 67, please.
21       (Deposition Exhibit No. 67 was
22        marked for identification.)
23       MR. BEACH:  Tab number 6 I'd like marked as
24 Exhibit No. 67, please.
25       THE REPORTER:  Tab 6 was marked as Exhibit 67.

9 (Pages 455 to 458)

595

1    Q.  What were the results of that offer?
2    A.  Just received a telephone call, no, they won't
3 accept it.
4    Q.  Who received the telephone call?
5    A.  We -- I received a telephone call from Terry
6 Miles saying they won't accept it.
7    Q.  Why did Ms. Miles call you?
8    A.  Well, she called Curtis and she called me,
9 because she knows that this offer was being made on
10 behalf of me.
11    Q.  And how come the offer was rejected?
12    A.  They gave no explanation.  This is still when we
13 were trying to figure out what the market price was, they
14 would not disclose what the value of the property was or
15 what they would accept.  It was like throwing darts.
16    Q.  Was Mr. Brown going to offer cash for the
17 property?
18    A.  I believe -- I believe it was part cash and he
19 had his own financing.  I believe he had, like, 250,000,
20 cash.
21    Q.  And where was he getting financing from?
22    A.  I'm not sure.  You know, I didn't fill out his
23 loan application, I don't know who his lender was.  But I
24 know that it got done and it got over to Terry Miles.
25    Q.  All right, let's turn to number 633.  Are you

596

1 there, Ms. Mills?
2    A.  Oh, yes, I am, I'm sorry.
3    Q.  Are these your notes?
4    A.  Yes, they are.
5    Q.  Who is Em -- there's a note on the bottom that
6 says Emerald Home Loans, what is that?
7    A.  Yeah, that was one time -- I think it was
8 like -- it's in that timeframe when we were trying to get
9 total refinancing.  I was dealing with American Home loan
10 and also Mason Financial.  And with Mason we got the
11 appraisal done.  And this is prior to December of 2005.
12 And they were ready to fund but they pulled my credit and
13 at that point it was down to 490, it dropped like a rock.
14    Q.  When was this note made?
15    A.  Well, there's kind of a conglomerate, typical
16 Deborah, grabbing papers and writing at several different
17 times.  But it was around, I would say in the timeframe
18 of 2005, like around October, after I had talked to
19 American Home Mortgage and found out that they weren't
20 going to let us pull any money out, that there wasn't
21 enough seasoning, is their term that they used.
22    Q.  How do you know that's when this was made?
23    A.  Because that's about the time that I was dealing
24 with them.  When I realized, oh, I better try to -- you
25 know, our first thing was, well, let's just try to

597

1 refinance the whole thing and get rid of American Home
2 Mortgage.  That was our first intent, you know, once I
3 found out I couldn't pull out the 50,000, so -- but by
4 then, my credit score had went down to 490.
5    Q.  How does this note give you the timeframe that
6 you just testified about?
7    A.  Because that's about the timeframe that I was
8 working with Emerald Home Loan.
9    And then Ken's number there, that's actually
10 when I met Ken Embisado, who later on was working with
11 Larry Norwood.  You know, I was developing some
12 relationships out there with people, and that's when I
13 first started communicating.  And, you know, he worked
14 with Larry Norwood in his office with his other agent,
15 Eva.
16    Q.  How did this note support your claims again
17 American Home Mortgage?
18    A.  It supports it in the fact that there was a
19 promise made that I was going to be able to pull out some
20 money.  And then when I called them up they, you know,
21 gave me the line about seasoning and didn't even offer me
22 an application.  And it just illustrates their conduct in
23 how they operated through just not working with the
24 borrower.
25    Q.  How does this note support that fact?

598

1    A.  Well, it supports it that immediately after
2 moving into the property, I'm here trying to find another
3 lender to get rid of American Home Mortgage.
4    Q.  Immediately after you moved into the property
5 you sought a new lender to get rid of American Home
6 Mortgage; is that what your testimony is?
7    A.  What I'm saying is we moved in in August and it
8 was a thought, because -- not to get rid of -- the second
9 was, what, 11 and a half percent, that was just
10 outrageous.  And so it's like, if we could go and
11 refinance the second, you know, that was our first
12 attempt.
13    But then after, you know, talking to them in
14 October, that's when I began to say, gosh, there's -- I
15 wish we could just find another lender and just be done
16 with American Home Mortgage.
17    Q.  If you -- why didn't you just go with another
18 lender to begin with?
19    A.  We had come so far and we had that guarantee.  I
20 felt comfortable, you know, everything was expedited
21 quickly.  The only thing that did make me feel
22 uncomfortable is when, you know, Tawnya called us up and
23 said, "Okay, your credit score went down one point, but
24 they're willing to make an exception if you come up with
25 an additional 75,000."

44 (Pages 595 to 598)

599

1      And as I said before, Anthony and I had to
2  really have a heart to heart about, okay, how we're going
3  to do this, is this going to work.
4      We had that guarantee.  I mean, like I said, we
5  went and saw Tawnya and we were assured that, you know,
6  we would be able to pull out that money, so we thought we
7  were going to be okay.
8      MR. BEACH:  All right, I'd like to ask the court
9  reporter to get the document that was identified in the
10  first deposition as number 19, entitled Counter Offer.
11      THE REPORTER:  Okay, one moment.
12      THE WITNESS:  Yes.
13      MR. BEACH:  Q.  Ms. Mills, you previously
14  testified about this document; do you recall this
15  document?
16      A.  Yes, I recall this document.
17      Q.  And what is this document?
18      A.  It was an agreement that I came up with with the
19  builder of the house that they wouldn't come down on
20  price but they were willing to provide $25,000 in
21  concrete work for the landscape.
22      Q.  All right, if you look on page 2 of this
23  document, it's entitled California Residential Purchase
24  Agreement and Joint Escrow Instructions; do you see that?
25      A.  Yes, I do.

600

1      Q.  Was this the original offer that you made to the
2  builder?
3      A.  That was the original offer, correct.
4      Q.  Okay.  And you say that there is a first loan in
5  the amount of $1,040,000 referenced there; do you see
6  that in C?
7      A.  Okay.  Yeah.
8      Q.  What is that referring to?
9      A.  I don't know.
10      Q.  Ms. Mills, this is your purchase contract, is it
11  not?
12      A.  Yes, it is.  This is connected to the other doc
13  I have in my other hand, correct?
14      Q.  I don't know what you have in your other hand.
15      A.  Okay, I have doc -- what you just pulled out of
16  the -- I mean, this is -- okay, this -- 2716, 2717, these
17  go hand in hand, I'm assuming, correct?
18      Q.  Ms. Mills, 2716, look at the top of that
19  document?
20      A.  Okay, 2716.  Yes.
21      Q.  It says Counter Offer, correct?
22      A.  Correct.
23      Q.  And then it has a purchase price of 1,375,000,
24  correct?
25      A.  Correct.

601

1      Q.  And it references the 25,000 in upgrades that
2  you indicated were your agreement with the sales -- the
3  ultimate agreement to purchase the property; is that
4  correct?
5      A.  Correct.
6      Q.  And if you turn to 2717; do you see that
7  document?
8      A.  Yes, I see that document.
9      Q.  Ms. Mills, you previously testified that your
10  initials are on each page of this document and that you
11  signed this document; do you recall that testimony?
12      A.  I recall that testimony.
13      Q.  Can you tell me what you believe this document
14  to be?
15      A.  It says Purchase Agreement and Joint Escrow
16  Instructions.  I went in --
17      Q.  Would it be accurate to say that this is your
18  Purchase Agreement offer that you made to the builder?
19      A.  This looks like I -- I can't remember, I
20  guess -- I don't know.
21      Q.  What do you believe this to be, Ms. Mills?
22      A.  All I can attest to is that it was around the
23  time that I was working with Bridgeport, I don't know if
24  this is balance of purchase price.
25      Purchase price total, 1.3, I don't know why the

602

1  first loan amount -- this never came about with
2  Bridgeport, the final was 88,000.
3      Q.  Is this the offer -- is this the offer you made
4  to purchase the property?
5      A.  For 1.3.  Purchase price total, 1.3.
6      Q.  And do you see in section C it says, First loan
7  in the amount of 1,040,000?
8      A.  Yeah, I don't know why that's in there, this
9  paper didn't get -- didn't go through, because this was
10  not --
11      Q.  I don't understand -- what do you mean, this
12  paper didn't go through?
13      A.  Well, I went and signed doc's for Bridgeport and
14  all that, and maybe this is what their original one was.
15  But when he we got down to the bottom line, when I did my
16  final signing, it was 88,000.  Was my down payment, it
17  was 5 percent.
18      I don't know why this would say there was a loan
19  for 1.4, the property was 1.3.
20      Q.  Ms. Mills, do you see section E, it says,
21  "Balance of purchase price, not including costs of
22  obtaining loans and other closing costs in the amount
23  of"?
24      A.  I don't know where this document came from,
25  okay.  I see my initials on it, but this was at the time

DiscoveryWorks Global      888.557.8650      dw-global.com