# EXHIBIT 5

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

(CONFIDENTIAL PORTIONS)

-----------------------------------------x

IN RE:

AMERICAN HOME MORTGAGE                    Case No.

HOLDINGS, INC., a Delaware                07-11047 (CSS)

corporation, et al.,

                Debtors.

-----------------------------------------x

           DEPOSITION OF:   DEBORAH E. MILLS

              Tuesday, October 5, 2010

                Wilmington, Delaware

Reported in stenotype by:
Rich Germosen, CCR, CRCR, RPR, CRR, CLR

|  | 70 |
|---|---|
| 1 | DEBORAH E. MILLS |
| 2 | to complete the purchase of the property? |
| 3 | A. Yes. |
| 4 | Q. Was all of that cash for the down |
| 5 | payment from your personal funds? |
| 6 | A. No. |
| 7 | Q. Where was it from? |
| 8 | A. Partially from Anthony Esquivel |
| 9 | and also Ernie Kuhn. |
| 10 | Q. And that was the gift, the amount |
| 11 | from Anthony Esquivel is the gift that he had -- |
| 12 | well, tell -- what is the amount that Anthony |
| 13 | Esquivel gave you in connection with the down |
| 14 | payment? |
| 15 | A. I think it was around thirty |
| 16 | thousand. |
| 17 | Q. Thirty thousand? |
| 18 | A. Around thirty thousand when it |
| 19 | was -- no -- I don't remember exactly, but I |
| 20 | think at the time because our funds were also |
| 21 | together if you were to divide it maybe it was |
| 22 | thirty thousand. It could have been more. I -- |
| 23 | Q. Okay. |
| 24 |   And was that a loan from |
| 25 | Mr. Esquivel? |

|  | 71 |
|---|---|
| 1 | DEBORAH E. MILLS |
| 2 | A. No. |
| 3 | Q. Would you characterize it as a |
| 4 | gift from Mr. Esquivel? |
| 5 | A. Yes, yes. |
| 6 | Q. Did he ever ask you to repay that |
| 7 | money to him? |
| 8 | A. No. |
| 9 | Q. Have you ever repaid the money to |
| 10 | him? |
| 11 | A. No. |
| 12 | Q. What was the amount, what was the |
| 13 | amount -- you stated earlier that is it Earnest |
| 14 | Kuhn provided some of the funds for down payment, |
| 15 | is that correct? |
| 16 | A. Yes. |
| 17 | Q. How much did Mr. Kuhn provide? |
| 18 | A. A hundred and sixty-two thousand |
| 19 | five hundred. |
| 20 | Q. And was all that money used for |
| 21 | the down payment? |
| 22 | A. Correct. |
| 23 | Q. Was any of the cash from the down |
| 24 | payment from your personal funds? |
| 25 | A. Yes. |

|  | 72 |
|---|---|
| 1 | DEBORAH E. MILLS |
| 2 | Q. Approximately how much? |
| 3 | A. With all the closing costs and |
| 4 | everything I don't remember. As I said, Anthony |
| 5 | and my money was combined, so I'd say half of it, |
| 6 | maybe -- I, I don't recollect. I mean our money |
| 7 | was put together. |
| 8 | Q. Would it be accurate to say that |
| 9 | with the hundred and sixty-four thousand from |
| 10 | Kuhn -- |
| 11 | A. Hundred and sixty-two thousand -- |
| 12 | Q. I'm sorry. |
| 13 | A. -- five thousand. |
| 14 | Q. Hundred and sixty-two thousand |
| 15 | five hundred, you've got that one memorized. |
| 16 | A. Oh, yes. |
| 17 | Q. Plus the approximately thirty |
| 18 | thousand from Mr. Esquivel is approximately a |
| 19 | hundred and ninety-two thousand five hundred, is |
| 20 | that correct? |
| 21 | A. Correct, yeah. Around there. I |
| 22 | don't remember completely, but it's around there, |
| 23 | yes. |
| 24 | Q. So would it be accurate to say |
| 25 | that you paid approximately twenty thousand of |

|  | 73 |
|---|---|
| 1 | DEBORAH E. MILLS |
| 2 | your own funds for the down payment? |
| 3 | A. Oh, easily, yeah. |
| 4 | Q. Do you think it would be more or |
| 5 | less than that? |
| 6 | A. Well, there was closing costs and |
| 7 | all that. I -- |
| 8 | Q. Okay. |
| 9 | A. I don't remember the total out the |
| 10 | door sticker price. |
| 11 | Q. So the cash that you paid from |
| 12 | your personal funds was the additional amount of |
| 13 | the down payment plus the cash for the closing |
| 14 | costs? |
| 15 | A. Correct. |
| 16 | Q. Would you please turn to Page 2, |
| 17 | Section 6. |
| 18 | A. (Reviews.) |
| 19 | Q. You state that my loan transaction |
| 20 | with the debtors was initiated, supported and |
| 21 | maintained by predatory lending practices. |
| 22 |   What is your understanding of the |
| 23 | meaning of quotes predatory lending practices? |
| 24 | A. What is my understanding? |
| 25 | Q. Yes. |

74

DEBORAH E. MILLS
 A. Say anything, do anything, get the money, get the loan done.
 Q. Could you expand on that a little bit? Who would be saying anything, doing anything?
 A. Well, making promises and not making good on them.
 Q. And who would be making the promises? You said generally making promises. I'm trying to establish if you're talking about yourself, a broker, a lender, who is making those promises?
 A. Who is making those promises? My understanding with predatory lending practices is getting as much money down as possible and making promises that money can be pulled out and then not letting that happen.
 Q. So --
 A. Making an exception like with my loan, coming back and having one point off on my credit score and having to come up with an additional seventy-five thousand dollars to make an exception, that to me is predatory lending practices.

75

DEBORAH E. MILLS
 Q. You said at the beginning of that description that part of the predatory lending is getting as big of a down payment as possible?
 A. Yeah.
 Q. Is that the lender that one, that you're referring to that would be seeking --
 A. The lender, yeah.
 Q. Referring back to Section 6 again, that same statement, what do you mean when you say that the loan transaction was initiated by predatory lending practices?
 A. Initiated. Because at the last moment they came back to me because my credit score was one point off and they made an exception with an additional seventy-five thousand dollars that I would be granted the loan.
 Q. Okay.
  And then also on that same statement what do you mean when you say that the loan transaction was, quote, unquote, supported by predatory lending practices?
 A. It was supported because I was promised that I could pull money out of the

76

DEBORAH E. MILLS
property and they would not, American Home Mortgage would not allow me to do that because it wasn't seasoned, and I was promised that that I could do that and that's the reason why I took that loan. Everything was put into that and then when I went to pull the money out, it's not seasoned. I wasn't allowed to. So, yeah, it was supported and then when I was in default there was no communication. American Home Mortgage would not communicate with me, would not give me assurance. They would not let me make it right.
 Q. They never communicated with you when you were in default?
 A. I communicated with a couple of people, but it was kind of like a shell game. Well, I'm not exactly the right person. You'll have to talk to this person. No, no, no, you know, so I'd call that person. I had a calling tree, like ten people I would call. They wouldn't pick up the phone. The only way I could get them to pick up the phone is if I did star 69 so they didn't know that I was calling.
 Q. And did you testify earlier that some of those people that you contacted at

77

DEBORAH E. MILLS
American Home indicated to you that you would not be able to refinance because the loan was not seasoned?
 A. Correct.
 Q. Okay.
  And back to that same statement in Section 6, what do you mean when you say that the loan transaction was maintained by predatory lending practices?
 A. They would not work with me. They had no motivation to work with me.
 Q. What do you mean when you say they had no motivation to work with you?
 A. I was trying to cure the default.
 Q. And --
 A. And they would not work with me.
 Q. What were you doing to try to cure the default?
 A. Give them money. I even left messages. I want to give you money. Please call me.
 Q. Is your testimony that you had enough money to cure all the defaults at the time you called American Home?