## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE | ) |
| HOLDINGS, INC., a Delaware corporation, | ) Case No. 07-11047 (CSS) |
| et al.[1] | ) |
| | ) Jointly Administered |
| Debtors. | ) |
| | ) **Ref. Docket No. 9213** |
| ------------------------------------------------------- | ) |

### DEBTORS' REPLY TO CLAIMANT DEBORAH E. MILLS'S RESPONSE TO DEBTORS' OBJECTION TO ADMINISTRATIVE EXPENSE CLAIMS NUMBERED 10802, 10803, 10804, 10805, 10806, 10807, 10808 AND 10809 FILED BY DEBORAH MILLS

The above-captioned debtors and debtors-in-possession ("AHM" or the "Debtors") submit this reply (the "Reply")[2] to the response [D.I. 9441] (the "Response") filed by Ms. Deborah E. Mills ("Ms. Mills") to the Debtors' objection to administrative expense claims numbered 10803, 10804, 10805, and 10807 [D.I. 9405] (the "Objection").[3] In support of this Reply, the Debtors respectfully represent as follows:

### PRELIMINARY STATEMENT

1.     The Debtors believe it telling that Ms. Mills's Response is rife with (i) conclusory allegations without any citations to documents or the factual record, and (ii) claims and allegations never raised by any of Ms. Mills's prior claims, pleadings, discovery responses or deposition testimony.

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc., f/k/a American Home Mortgage Servicing, Inc. ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

[2]     Ms. Mills, through her counsel, represented that she is withdrawing claims numbered 10802, 10806, 10808, and 10809. To the extent that such claims are not withdrawn, this Reply shall apply to such claims on the bases set forth herein.

[3]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Objection.

2.     The facts are straightforward.[4]  Ms. Mills, in her determination to purchase a $1,375,000 luxury property, provided false and/or misleading information on the Loan Applications provided to the Debtors, including:  (i) a $500,000 CD (used to demonstrate her financial wherewithal and identified as a source for her down payment), which she now testifies was never her asset, that she never had access to the funds and she has no idea what became of the proceeds from the $500,000 CD; (ii) a home with a market value of $190,000, with no disclosure of the underlying mortgage obligation of approximately $130,000, that was sold two months *prior to* her filling out the Loan Application which realized net proceeds of only $58,905.05; (iii) gross monthly income of over $28,000, which is contradicted by her own testimony and the Schedules and SOFAs she filed in her own bankruptcy;[5]  (iv) a representation that she was not party to any lawsuit despite the fact that she was being sued for fraud in connection with obtaining funds to buy her prior home;[6]  and (v) a representation, which was never corrected, that she did not take out a loan for her down payment, despite the fact that she admittedly borrowed $164,000 loan from a recently-widowed 81-year-old gentlemen who later sued her for fraud.  The Debtors – as acknowledged by Ms. Mills in her Loan Applications and the Borrower's Certification – relied upon the false information in granting her an underwriting exception and ultimately providing the $1,162,500 million in financing for the purchase of the Property.

3.     In the Mills Bankruptcy, Ms. Mills, who was represented by bankruptcy counsel, made affirmative statements of fact and admissions regarding her gross income and assets (among other things), listed the Mills Loans as undisputed debts, filed a notice of intent to

---

[4]     A full description of the facts is set forth in the Debtors' Objection.  Please note paragraph 139 of the Objection provides a typographical error.  The Trustee's Deed Upon Sale was recorded on August 22, 2006 (not June 22, 2006).

[5]     Ms. Mills continues to refuse to provide the Debtors with a copy of her tax returns.

[6]     The same lawsuit also moved for declaratory relief that she did not own the prior home (i.e. the home identified on her loan application as being worth $190,000), but Ms. Mills testified that she sold that home without notice to the party suing her.

reaffirm the Mills Loans, never objected to the stay relief motions and failed to identify any claims against the Debtors.  In particular, and both prior to and after pleading the Fifth Amendment, she admits that her lies included at least not reporting cash from her business income and over-reporting business entertainment expenses.  While Ms. Mills would like to give short shrift to her own lies, falsifications and wrongdoings, such repeated conduct raise serious issues with respect to her credibility as a witness, her inability to prove the necessary elements of the Mills Claims, and evidences her unclean hands and the real proximate cause of her nearly immediate defaults with respect to the Mills Loans.

### REPLY

I.    **MS. MILLS FAILS TO ADDRESS OR OTHERWISE CORRECT THE FATAL PROCEDURAL DEFICIENCIES WITH RESPECT TO THE MILLS CLAIMS**

4.    The Debtors raised procedural objections and threshold issues regarding Ms. Mills's pursuit of the Mills Claims in the Objection, including that (i) Ms. Mills waived or abandoned the Mills Claims as a result of her failure to list or assert the Mills Claims in her bankruptcy case; (ii) Ms. Mills lacks standing to pursue the Mills Claims because her chapter 7 trustee remains the only party with standing to prosecute the Mills Claims; and (iii) Ms. Mills cannot maintain *any* cause of action for irregularity or deficiency in the foreclosure process because Ms. Mills never made the required tender under California law.  (Obj. ¶¶ 111-117.)  Ms. Mills fails to even address these fatal deficiencies in her Response.

5.    With respect to the Debtors' objection based on the doctrine of judicial estoppel, Ms. Mills's argument that the fraud in the origination claims against the Debtors were not ripe at the time of the Mills Bankruptcy is not only directly contradicted by her own testimony and otherwise legally deficient, but simply defies logic.  First, Ms. Mills affirmatively

3

testified that she knew she had a claim against the Debtors at the time she filed her Schedules

and SOFA:[7]

> Q.    So it is your testimony that when you filed this schedule
>        [Bankruptcy Schedule B], you didn't believe you had any
>        claims against American Home?
>
> A.    No, I knew I had a claim against American Home
>        Mortgage.
>
> ***
>
> Q.    Should you have listed the claim that you're pursuing
>        against American Home in section 21?
>
> A.    Yes.

(Mills Dep. 500:2-6, 500:23-25)  Even assuming that Ms. Mills did not know of her claims

against the Debtors at the time she commenced the Mills Bankruptcy, she certainly knew of such

claims prior to the close of the Mills Bankruptcy.  E.g., Mills Dep. 563-64 (testifying that she

believed she had the right to stay in the property after the August 10, 2006 foreclosure because

the Debtors "stole [her] money, $212,000.")  Ms. Mills's affirmative assertion that she was a

"creditor" of the Debtors' estates occurred as of the Debtors' Petition Date – August 6, 2007 –

*two months prior* to the close of her own bankruptcy.  See Mills Email dated August 6, 2007,

attached to the Objection as Exhibit X; Mills Bankr. D.I. 55 (Order closing the Mills Bankruptcy

on October 9, 2007).  Moreover, the Original Claim was filed against the Debtors on November

19, 2007 – *over a year before the sale of the Property*, the time in which Ms. Mills now argues

is the time in which her claims allegedly "crystalized."[8]  (Resp. at 8.)  Despite such knowledge,

Ms. Mills never amended her Schedules or SOFAs to reflect any claims against the Debtors.

---

[7]    The Debtors have filed a motion in limine to exclude evidence regarding Ms. Mills's emotional damages claims. [D.I. 9443] To the extent that such evidence is not excluded, it should be noted that Ms. Mills's alleged suicide attempt occurred around December 2005-January 2006, six months prior to the filing of the Mills Bankruptcy. (Esquivel Dep. 160:17-25, Mills Dep. 454:6-8)

[8]    The assertion that the alleged claims were not ripe does not provide Ms. Mills with an excuse to avoid disclosing the Mills Claims in her bankruptcy. Item 21 of Schedule B clearly requires a debtor to disclose "*contingent* and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights

4

6.     Ms. Mills's knowledge of the existence of her claim, combined with her complete failure to disclose it, is legally sufficient to make a finding of bad faith for purposes of invoking the doctrine of judicial estoppel. See Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp., 337 F.3d 314, 325 (3d Cir. 2003) ("[I]f pleadings show (1) the fact of non-disclosure of an asset combined with (2) a debtor's obvious knowledge of the existence of the asset, a court need not take testimony in order to make a finding of bad faith.").

7.     The argument that Ms. Mills did not realize that she had claims against the Debtors because she believed the Debtors would work with her to reinstate her mortgage is simply unjustifiable. Ms. Mills commenced the Mills Bankruptcy *for the sole purpose* of stopping the Debtors' actions to foreclose. (Mills Dep. 473:17-19; 559:7-11.) Moreover, Ms. Mills testified that, at the time the Debtors' filed the Stay Relief Motions, Ms. Mills understood the intent for filing the Stay Relief Motions was so that the Debtors could 'deprive' Ms. Mills of her rights in the Property. (Mills Dep. 539:16-24; see also Mills Dep. 540:4-12; 542:22-25; 543:21-25.) The Court entered the Stay Relief Orders on July 25, 2006, and the trustee's sale occurred on August 10, 2006 – nearly a full year before Ms. Mills received a discharge of her debts in the Mills Bankruptcy. Had the Debtors not been the successful bidder at the trustee's sale, Ms. Mills would have had no opportunity to regain title to the Property. Following the failure to vacate – and six months before Ms. Mills received a discharge of her debts in the Mills Bankruptcy – the Debtors commenced eviction proceedings, wherein Ms. Mills was advised she would have to vacate the Property on or before January 2, 2007. (Mills Dep. 584:3-7; Esquivel Dep. 85: 21-23.) The actual eviction occurred on March 1, 2007 – still four months prior to Ms. Mills's discharge of debts in her bankruptcy. Although the Debtors would have accepted a

---

to setoff claims." See also 11 U.S.C. § 101 (defining "claim" as "[a] right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, *contingent, matured, unmatured*, disputed, undisputed, legal, equitable, secured, or unsecured."). Ms. Mills testified that her bankruptcy attorney went over her Schedules and SOFA with her and she reviewed the documents for accuracy prior to signing her verifications. (Mills Dep. 487:5-25, 506:9-19.)

5

reinstatement prior to the trustee's sale on August 10, 2006 – and may have accepted an actual, bona fide offer from Ms. Mills to purchase the Property for an amount equal to the full debt of the Mills Loans – the evidence clearly shows that the Debtors were exercising their rights to obtain title of, and sell, the Property for the benefit of the owners of the Mills Loans well before the close of the Mills Bankruptcy.

II.    **MS. MILLS'S NEW ASSERTION REGARDING A FRAUD SCHEME IN THE ORIGINATION OF THE MILLS LOANS IS BELIED BY THE EVIDENCE**

8.    In her Response, for the first time, Ms. Mills now apparently argues that she was the subject of a "scheme" orchestrated by the Debtors to extract high down payments in order to make underlying mortgages more attractive for securitization, and that, in furtherance of this alleged scheme, repeatedly conducted "hard" pulls of Ms. Mills's credit report to drop her credit score below the product guidelines.

9.    However, the credit report run by Ms. Mills's broker, Ms. Lettau, on July 7, 2005 (i.e, prior to the Debtors' involvement with Ms. Mills's Loan Applications whatsoever) shows not only that Ms. Mills's credit score was already 659, but also that the number of inquiries on Ms. Mills's credit was already a negative factor with respect to the credit score. See Credit Report dated 7/7/05 (the "Chase Credit Report"), attached hereto as Exhibit A. Indeed, the Chase Credit Report shows *twenty-four (24)* credit inquiries over the 90-day period preceding July 7, 2005.

10.    Moreover, as could have been addressed at Ms. Lettau's deposition had these fraud allegations been disclosed within Ms. Mills's discovery responses, the Debtors' standard practice is to request a credit report for all applicants during the underwriting process, regardless of whether a credit report was pulled by a borrower's broker. Ms. Mills's credit report was pulled once by the Debtors (Equifax Order Number 70SPX9, attached hereto as Exhibit B, the "AHM Credit Report") for usage for both Loan Applications, and the applicable credit score

6

was 659 – the same score identified on the prior Chase Credit Report.  The subsequent credit score disclosure notice, which was issued the same day, correctly identified Ms. Mills's credit score as 659.

11.    Finally, Ms. Mills's factual support with respect the alleged motive of the Debtors (i.e., creating attractive loan-to-value ratios) is completely misleading and meritless. Ms. Mills attaches a prospectus for the American Home Mortgage Assets Trust 2005-1 ("AHMAT 2005-1"), which was the securitization trust that, until the Debtors were forced to repurchase the First Loan in August 2007, was the owner/investor of Ms. Mills's First Loan. The terms of the First Loan – which constituted 80% of the Purchase Price – never changed as a result of the underwriting exception.  Notably, the "touted" loan-to-value ratios are (i) not cumulative loan-to-value ratios and were not effected by the additional required down payment, (ii) necessary disclosures for investors (Martinez Dep. 58:4-8), and (iii) not representations made by the Debtors.  The Second Loan (the terms of which were actually impacted by the exception) was not securitized into the American Home Mortgage Investment Trust 2005-SD1 (the "2005-SD1 Trust") until December 28, 2005 – two months *after* Ms. Mills defaulted on the Mills Loans.  The prospectus for the 2005-SD1 Trust (the "SD1 Prospectus"), which details the private placement available only to Qualified Institutional Buyers (as defined under Rule 144A of the Securities Act of 1933), bespeaks caution with respect to the delinquency history, document deficiency, usage of "Alt-A" underwriting guidelines, and other negative attributes of the mortgage loans being securitized (SD1 Prospectus S-14-35) – as well as the fact that all of the group II loans[9] are second liens with a "weighted average combined loan-to-value ratio at origination of such group II loans [of] approximately 95.33%" (SD1 Prospectus S-21).  Copies of

---

[9]    The 2005-SD1 Trust is comprised of two loan groups.  "Group I" consists of first lien loans and "Group II" consist of second lien loans.  Ms. Mills's Second Loan, is accordingly, party of the Group II Loans.

066585.1001

cited pages of the SD1 Prospectus are attached hereto as Exhibit C, and the entire document will be presented to the Court at trial.

**III.    THE PLAIN LANGUAGE OF THE STAY RELIEF ORDERS PROVIDE RELIEF FOR THE FORECLOSING PARTIES AND ARE NOT SUBJECT TO COLLATERAL ATTACK**

12.    In their Objection, the Debtors outlined the statutory requirements for a non-judicial foreclosure process under California and set forth the documentation which clearly supports the Debtors' compliance with these requirements.  Given Ms. Mills' failure to provide any factual basis in discovery, and to respond to this portion of the Debtors' Objection, as well as her decision not to provide any expert testimony regarding any claimed technical deficiencies in the foreclosure, Ms. Mills has waived her claim of technical deficiencies under California Law.

13.    Ms. Mills, for the first time in her motion for partial summary judgment [D.I. 9411] (the "Summary Judgment Motion") and her brief in support of the Summary Judgment Motion [D.I. 9412] (the "Summary Judgment Brief") argues that the ultimate party that conducted the non-judicial foreclosure of the subject property did not have relief from the automatic stay in Ms. Mills' personal bankruptcy case in California and, as a result, the foreclosure was void *ab initio*.  The plain language of the Stay Relief Orders contradict the argument advanced by Ms. Mills.

14.    The Stay Relief Motions sought the right to pursue foreclosure remedies on both the first and second mortgages in Ms. Mills's chapter 7 bankruptcy case.  Each motion is substantively the same with the exception of the Instrument Number (mortgage recording information) and the amount due for the separate notes/mortgages.  Each motion is completed on forms required by the United States Bankruptcy Court for the Central District of California.  The Stay Relief Motions were filed and noticed on June 30, 2006 with notice that any objection would have to be filed at least 14 days before the hearing scheduled for July 25, 2006.

8

15.    Both Stay Relief Motions were presented to the California Bankruptcy Court without objection.  Thereafter, on July 25, 2006, the Honorable Robin Riblet, United States Bankruptcy Court for the Central District of California entered two nearly identical Orders Granting Motion for Relief from Automatic Stay (the "Stay Relief Orders").  The Stay Relief Orders are form orders used in this district.  The substantive provisions of the Stay Relief Orders provide as follows:

(1)    The Motion was uncontested

(2)    The Motion affects real property known as:  1880 Burnt Rock Way, Templeton, CA  93465

(3)    The Motion is granted pursuant to 11 U.S.C. § 362(d)(1)

(4)    The automatic stay is terminated "as to Movant, **its successors, transferees and assigns ("Movant")** (emphasis added)

(5)    Movant (as defined in the Stay Relief Order to include the Movant under the Motion as well as its successors, transferees and assigns) "may enforce its remedies to foreclose upon and obtain possession of the Property in accordance with applicable non-bankruptcy law...."

See Stay Relief Orders.

16.    Accordingly, the Stay Relief Orders clearly, on their face, give relief from stay to *any and all successors, transferees and assigns* of American Home Mortgage Acceptance, Inc.  Ms. Mills concedes in the Summary Judgment Brief that the party that effectuated the foreclosure was a successor, transferee or assign of American Home Mortgage Acceptance, Inc. (Br. at n.2), and thus, was authorized pursuant to the Stay Relief Orders to foreclose upon and obtain possession of the Property.

17.    Additionally, as will be more fully set forth in the Debtors' brief in opposition to the Summary Judgment Motion, the Stay Relief Orders are final orders which are

9

not subject to collateral attack.[10]  See F.D.I.C. v. Shearson-American Exp., Inc., 996 F.2d 493,

498 (1st Cir. 1993) (even if an order modifying or terminating the automatic stay was erroneous,

such an order is entitled to respect and is not subject to collateral attack); In re Pardee, 218 B.R.

916, 924 (9th Cir. BAP 1998), aff'd, 193 F. 3d 1083 (9th Cir. 1999) (a final order such as a stay

relief order, cannot be collaterally attacked in a later proceeding even if the order was entered in

error).  As is the case here, when a "creditor has invoked remedies and settled its property rights

in good faith reliance upon the termination of the automatic stay in [bankruptcy court], [a court]

should not and may not invoke its broad equitable powers to void the results of the creditor's

action—even if doing so would enable the debtor to make full use of statutory remedies

previously unavailable…."  In re Spaude, 112 B .R. 304, 307 (Bankr. D. Minn. 1990).

18.    The allegations that AHM Acceptance was listed on the Stay Relief for the

purpose of "hiding potential losses from investors [of the 2005-SD1 Trust]" misses the mark.  As

an initial matter, Ms. Mills provides no support for such statements and the only testimony

potentially relevant to this topic directly contradicts Ms. Mills's baseless allegations.  (Larkin

Dep. 24:11-23; 82-84, 86-87 (representing that, to her knowledge, AHM SV would issue regular

reports to investors regarding the statuses of the loans, including whether such loans were

delinquent) and Martinez Dep. 48-50 (testifying, as the Debtors' 30(b)(6) witness, that he had no

knowledge that AHM SV was not in compliance with the terms of the prospectus (which is not a

contractual document in which AHM SV is a party)).[11]  Moreover, as noted above, the SD1

---

[10]    Even if Ms. Mills could collaterally attack the Stay Relief Orders, as will be discussed more fully in the Debtors' opposition to the Summary Judgment Motion, Ms. Mills's argument against AHM Acceptance's standing is equally unavailing.  See, e.g., Andrada Financing, LLC v. Humara Group, Inc., 2010 Bankr. LEXIS 1796 (D. Ariz. 2010) (holding that seeking a stay relief violation one year after entry of the relevant stay relief order was "unconscionably late" despite allegations that the defendants suppressed material facts from the court.)

[11]    To the extent that Ms. Mills's attempts to argue that the Debtors' failure to produce such documents is indicative of the lack of such reports, it is notable that (i) Ms. Mills's discovery requests do not actually cover or request any such documents, (ii) Debtors' counsel advised Ms. Mills's counsel that servicing documents are maintained by AHMSI and are not in the possession, custody or control of the Debtors, and (iii) Ms. Mills failed to issue a subpoena directed to AHMSI for such documentation or to subpoena an employee from AHMSI who would have personal knowledge of the investment reporting.

066585.1001

Prospectus clearly provides that "substantially all of the mortgage loan pools being securitized have delinquency history, document deficiency or other negative attributes" (SD1 Prospectus at S-14) and that "[t]he servicer will take such actions as it deems to be in the best interest of the trust with respect to defaulted mortgage loans and foreclose upon or otherwise comparably convert the ownership of properties securing defaulted mortgages loans as to which no satisfactory collection arrangements can be made" (SD1 Prospectus at S-64).

19.     Finally, Ms. Mills's allegation with respect to MERS is a red herring. MERS, as nominal beneficiary, did not conduct the foreclosure – rather it substituted the trustee under the Deed of Trust from Chicago Title Company to Cal-Western. Cal-Western, as the substituted trustee under the Second Loan Deed of Trust, was the party who completed the non-judicial foreclosure, following the referral of the Mills Loans to Cal-Western by AHM SV, the servicer and agent of the 2005-SD1 Trust (i.e., the "true" beneficiary of the Second Loan Deed of Trust) which referral informed the trustee that the Mills Loans were in default. See Letter from AHM SV to Cal-Western dated January 25, 2006 and enclosing documents including a Statement of Debt Due (faxed to Cal-Western on January 26, 2006), attached hereto as Exhibit D. Regardless, such claims have been rejected by various courts, see e.g., In re Mortgage Electronic Registration Systems (MERS) Litigation, 2010 U.S. Dist. LEXIS 106345 (D. Ariz. Sept. 30, 2010), and Ms. Mills fails to provide any evidence that she was injured by these acts – or that she made the tender required by law to even bring a claim of wrongful foreclosure under California law.

## IV.     MS. MILLS'S REMAINING ARGUMENTS ARE UNSUPPORTABLE

### A.     Ms. Mills's Fraudulent Loan Applications Provide Evidentiary Support That Ms. Mills' Has Unclean Hands and Evidence the True Reasons For Her Defaults

20.     Based on the *direct* inconsistencies and falsities in Ms. Mills's Loan Applications, her tax returns, her bankruptcy Schedules and her SOFAs, as well as her own

11

testimony, it is without question that Ms. Mills has provided false and/or misleading information

in violation of one or more federal laws. See, e.g., 18 U.S.C. § 1014 (federal crime to make false

statements in loan applications); 18 U.S.C. §§ 152 and 3571 (federal penalties for making false

statements or concealing property); and 26 U.S.C. § 7206 (federal crime to make false returns,

statement or other document). While Ms. Mills would like to exclude such evidence, it is

clearly, and directly, relevant to Ms. Mills's credibility, her inability to prove essential elements

of the Mills Claims, as well as supporting the Debtors' affirmative defenses[12] to the Mills

Claims.

        21.     With respect to Ms. Mills's false Loan Applications, Ms. Mills attempts to

circumvent the issue by arguing that Debtors have not introduced evidence that Ms. Mills's

fraudulent statements were (a) intentional, (b) material, (c) not already known to Debtors as a

result of their pre-loan asset/income verification process; (d) relied upon by Debtors to the

exclusion of information uncovered in Debtors' own pre-loan verification process; or (e) the

cause of any action taken by Debtors in funding the Mills Loans. (Response at 12.) These

allegations are simply untrue in light of the factual support set forth in the Debtors' Objection,

including, among other things, (1) Ms. Mills's testimony that she reviewed and executed the

Loan Applications which misrepresented, *inter alia*, the $500,000 CD as her asset; (2) failed to

inform the Debtors that she took out an additional loan to cover the down payment as she was

required to report; (3) Ms. Mills's loan was "stated income" and, as a result, the Debtors relied

upon Ms. Mills's declaration that her gross income was approximately $28,000/month, an

amount which is grossly inflated given Ms. Mills's income identified on her SOFAs in her

personal bankruptcy case filed shortly thereafter; (4) Ms. Mills affirmatively provided the

verification of the $500,000 CD (i.e., the bank account statement which identified the $500,000

---

[12]     By their Objection, the Debtors also raised equitable estoppel and waiver arguments that appear to go
uncontested by Ms. Mills.

                                        

CD in her name) for purposes of the Debtors' underwriting; (5) Ms. Mills executed the Loan

Applications and a Borrower's Certification in which she acknowledged the Debtors' reliance on

the information she provided in connection with underwriting and funding the Mills Loans; and

(6) the Exception Request clearly shows that the basis for the exception given to Ms. Mills – and

ultimately funding of the loans - was Ms. Mills's "strong savings, [and] significant reserves after

[close of escrow] of 27+ months" – verified through receipt of the bank statement for the

$500,000 CD that Ms. Mills submitted in conjunction with her Loan Applications.

22.    Moreover, Ms. Mills's excuse that Ms. Lettau initially filled out the Loan

Applications of no moment. Not only did Ms. Mills fully ratify the information provided to the

Debtors from Ms. Lettau when she executed the "final" Loan Applications and Borrower's

Certifications on July 15, 2005 (as well as provide the very bank statement that indicates that she

owned the $500,000 CD knowing that it was in her name for no apparent reason and that she had

no right to that money), the affirmative statements in the uniform residential loan applications

should be imputed to Ms. Mills because, at all times during the loan application process, Ms.

Lettau was Ms. Mills's selected broker and thus, her agent.

23.    Under California law, an agent is one who represents another, called the

principal, in dealing with third persons. Cal. Civ. Code § 2295 (2009). An agency relationship

is created when a principal in some manner indicates that an agent should act on his behalf and

the agent must agree to act under his control. Van't Rood v. County of Santa Clara, 113 Cal.

App. 4th 549, 571 (Cal. Ct. App. 2003). Customarily, as is the case here, a mortgage broker is

retained by a borrower to act as a *borrower's* agent in negotiating an acceptable loan. See, e.g.,

House v. Cal State Mortg. Co., 2009 U.S. Dist. LEXIS 58529, at *64 (E.D. Cal. July 9, 2009)

(citations omitted).

24.    An intent to create an agency relationship and control of the agent by the

principal are essential. "The primary test for the creation of an agency is the intention of the

principal to employ the agent to act on behalf of the principal in dealing with third persons as the principal's representative, and the agent's intention to accept the employment." 2 HARRY D. MILLER, CALIFORNIA REAL ESTATE § 3:5, at 25 (2000 & 2009-2010 Supp.). Similarly, "[a]n agency is proved by evidence that the person for whom the work was performed had the right to control the activities of the alleged agent." Van't Rood, 113 Cal. App. 4th at 572. Control means the right to control the "means and manner in which the result is achieved." Wickham v. Southland Corp., 168 Cal. App. 3d 49, 59 (Cal. Ct. App. 1985).

25.    First, Ms. Mills and Ms. Lettau displayed an intent to create an agency relationship. Specifically, Ms. Mills testified that Ms. Lettau acted as her mortgage broker. (Mills Dep. 117:17-22 ("Q. And was Ms. L[e]ttau acting as a broker on your behalf with respect to the transaction? A. As a broker on my behalf, yes, but also she had worked with American Home Mortgage. She was the broker."). Similarly, Ms. Mills controlled Ms. Lettau's actions. Ms. Mills unequivocally testified that she and Ms. Lettau worked together to find a lender with the most favorable loan terms. (Mills Dep. at 123:03-05 ("She said she was going to go out and see what she could get.").) Based on the evidence, Ms. Lettau acted as Ms. Mills's agent as a matter of law, and the information provided to the Debtors by Ms. Lettau should be imputed to Ms. Mills as that information was transmitted to the Debtors in the course of that agency.

B.    *The Debtors Did Not Have Mortgage Insurance on the Mills Loans*

26.    Ms. Mills erroneously asserts that the Debtors obtained, and benefited from, mortgage insurance with respect to the Mills Loans, and provides no basis for such a claim. The only citation Ms. Mills asserts is a single paragraph of the prospectus for the AHMAT 2005-1 securitization. (Response at 12.) First, the plain language of the paragraph cited by Ms. Mills provides that the mortgage loan insurance was not required (but rather referred only to *any* mortgage insurance policies that existed) and that amounts covered were

14

only to a *percentage of the value of a mortgage loan* (not a percentage of the value of the

Property) – to the extent that such default mortgage loans were covered.  Second, Ms. Mills

provides no evidence that her particular loans were insured and/or that the purported "loss" was

covered.[13]  Third, to the extent that the AHMAT 2005-1 and its investors recovered any

insurance proceeds, they are not the Debtors.  Fourth, the Debtors repurchased the First Loan and

provided testimony that the Debtors did not make any claims against any mortgage pool

insurance policies (Martinez Dep. 70-71).  Fifth, the proceeds of the sale of the Property were

$634,954.46, which were received by the Debtors from AHMSI on January 27, 2009, more than

$500,000 less than the original amount loaned to Ms. Mills and well below the payoff amount of

the loans.

## V.    PUNITIVE DAMAGES ARE NOT AFFORDED ADMINISTRATIVE EXPENSE PRIORITY

27.    Ms. Mills is seeking punitive damages pursuant to Cal. Civ. Code § 3294.

Notably, an award of punitive damages requires that Ms. Mills prove "by clear and convincing

evidence that the defendant has been guilty of oppression, fraud, or malice."  Cal. Civ. Code §

3294.  The Debtors believe that punitive damages are unavailable in this circumstance because

the evidence does not even support a claim for fraud in the inducement under a standard of

"preponderance of the evidence."  To the extent that this Court were to determine that Ms. Mills

is entitled to an award of punitive damages, such damages are not entitled to administrative

expense priority.  See Commonwealth of Pennsylvania Dept. of Env. Res. V. Tri-State Clinical

Laboratories, Inc., 178 F.3d 685 (3d Cir. 1999).

---

[13]    During the deposition of Mr. Martinez on October 4, 2010, Debtors' counsel specifically informed Ms. Mills that she could subpoena the trusts to determine whether or not any claims were made against any insurance policies.  To the Debtors' knowledge, Ms. Mills never attempted to subpoena such information.  (Martinez Dep. 76:2-25; see also 75:6-23)

YCST01:10377641.3                                                                    066585.1001

## RESERVATION OF RIGHTS

28.    The Debtors reserve their rights to supplement their Objection and this

Reply, and to assert any defenses necessary to contest any additional evidence, claims or theories

of liability set forth by the Undisclosed Evidence.

Dated: Wilmington, Delaware
　　　　November 17, 2010

　　　　　　　　　　　　　　YOUNG CONAWAY STARGATT & TAYLOR, LLP


　　　　　　　　　　　　　　*/s/ Margaret Whiteman Greecher*
　　　　　　　　　　　　　　Sean M. Beach (No. 4070)
　　　　　　　　　　　　　　Sharon M. Zieg (No. 4196)
　　　　　　　　　　　　　　Erin D. Edwards (No. 4392)
　　　　　　　　　　　　　　Margaret Whiteman Greecher (No. 4652)
　　　　　　　　　　　　　　The Brandywine Building
　　　　　　　　　　　　　　1000 West Street, 17th Floor
　　　　　　　　　　　　　　Wilmington, Delaware 19801
　　　　　　　　　　　　　　Telephone: (302) 571-6600
　　　　　　　　　　　　　　Facsimile: (302) 571-1253

　　　　　　　　　　　　　　Counsel for Debtors and Debtors in Possession

YCST01:10377641.3                                                                066585.1001

## **EXHIBIT A**

Chase Credit Report

(AHM_MILLS006210-AHM_MILLS006214)

**SUBMITTED UNDER SEAL**

## EXHIBIT B

AHM Credit Report

(AHM_MILLS006191-AHM_MILLS006198)

**SUBMITTED UNDER SEAL**

YCST01:10377641.3

066585.1001

## EXHIBIT C

Relevant citations to the SD1 Prospectus

YCST01:10377641.3                                                                066585.1001

Offering circular supplement dated December 28, 2005 (to offering circular dated December 28, 2005)

**$103,566,000**
(Approximate)

## American Home Mortgage Investment Trust 2005-SD1
Issuer

### American Home Mortgage Servicing, Inc.
Servicer

### American Home Mortgage Securities LLC
Depositor

#### American Home Mortgage Investment Trust 2005-SD1,
#### Mortgage-Backed Notes, Series 2005-SD1

---

**You should consider carefully the risk factors beginning on page S-14 in this offering circular supplement.**

---

This numbered copy is for the exclusive use of the person named below, and should be returned to American Home Mortgage Securities LLC (the "Depositor") or UBS Securities LLC (the "Initial Purchaser") immediately upon request.

Name                                                    Copy No. (Shown in Red)

If the above number does not appear in red, there is a presumption that this offering circular supplement has been improperly reproduced and circulated, in which case the Depositor and the Initial Purchaser disclaim any responsibility for its contents and use. No person has been authorized to give any information or to make any representations other than those contained in this offering circular supplement and the accompanying offering circular and, if given or made, such information or representations must not be relied upon. The delivery of this offering circular supplement at any time does not imply that the information herein is correct as of any time subsequent to its date.

**This offering circular supplement may not be forwarded, transmitted, copied or otherwise reproduced by any recipient hereof in any manner whatsoever.**

**The Trust**

The trust will consist primarily of a pool of fixed-rate and adjustable-rate mortgage loans, divided into two loan groups. The trust will issue twelve classes of notes, two of which are offered under this offering circular supplement.

**Credit Enhancement**

- The Class I-A1 Notes will have credit enhancement in the form subordination provided by other classes of notes as described in this offering circular supplement.

- The Class II-A1 Notes will have credit enhancement in the form of (i) excess interest and overcollateralization and (ii) subordination provided by other classes of notes as described in this offering circular supplement.

In addition, two swap agreements will be included in the trust which will primarily cover basis risk shortfalls on the related offered notes.

**The offered notes have not been registered under the Securities Act of 1933, as amended (the "Securities Act"). The offered notes, including interest, are not guaranteed by the United States and do not constitute debts or obligations of the United States or any agency or instrumentality of the United States. The offered notes described herein may only be offered to "qualified institutional buyers" as defined under Rule 144A under the Securities Act. See "Description of the Notes— Transfer and Exchange of the Offered notes" and "Private Placement" herein.**

UBS Securities LLC will offer the Class I-A1 Notes and Class II-A1 Notes, at varying prices to be determined at the time of sale. The proceeds to the depositor from the offering will be approximately 100.00% of the aggregate note principal balance of these notes, plus interest from the cut-off date on the Class I-A1 Notes and Class II-A1 Notes. The expenses of the depositor are estimated to be $375,000. *See "Private Placement" in this offering circular supplement.*

## UBS Investment Bank

AHM_MILLS017806

**Important notice about information presented in this offering circular supplement
and the accompanying offering circular**

**You should rely only on the information contained in this document. We have not authorized
anyone to provide you with different information.**

**We provide information to you about the notes in two separate documents that progressively
provide more detail:**

- the accompanying offering circular, which provides general information, some of which
  may not apply to this series of notes; and

- this offering circular supplement, which describes the specific terms of this series of
  notes.

**If the description of your notes in this offering circular supplement differs from the related
description in the offering circular, you should rely on the information in this offering circular
supplement.**

The depositor's principal executive offices are located at 538 Broadhollow Road, Melville, New
York 11747 and its phone number is (877) 281-5500.

AHM_MILLS017807

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATIONS OTHER THAN THOSE CONTAINED IN THIS OFFERING CIRCULAR SUPPLEMENT AND THE ACCOMPANYING OFFERING CIRCULAR AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATIONS MUST NOT BE RELIED UPON. THIS OFFERING CIRCULAR SUPPLEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THE SECURITIES OFFERED HEREBY. THIS OFFERING CIRCULAR SUPPLEMENT SHALL NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY, NOR SHALL THERE BE ANY SALE OF THE OFFERED NOTES, IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER, SOLICITATION OR SALE WOULD BE UNLAWFUL PRIOR TO REGISTRATION OR QUALIFICATION UNDER THE SECURITIES LAWS OF SUCH STATE OR OTHER JURISDICTION. THE DELIVERY OF THIS OFFERING CIRCULAR SUPPLEMENT AT ANY TIME DOES NOT IMPLY THAT INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO THE DATE OF THIS OFFERING CIRCULAR.

THE OFFERED NOTES DESCRIBED HEREIN MAY ONLY BE OFFERED TO "QUALIFIED INSTITUTIONAL BUYERS" AS DEFINED UNDER RULE 144A UNDER THE SECURITIES ACT. THE TRANSFER OF THE OFFERED NOTES IS SUBJECT TO CERTAIN CONDITIONS AS DESCRIBED HEREIN. SEE "DESCRIPTION OF THE NOTES—TRANSFER AND EXCHANGE OF OFFERED NOTES" AND "PRIVATE PLACEMENT" HEREIN.

The Offered Notes are subject to additional restrictions on transfer to certain plans subject to ERISA or Section 4975 of the Code or other persons investing "plan assets" of any such plan. *See "Description of the Notes—Transfer and Exchange of the Offered Notes" and "ERISA Considerations" herein.*

THIS OFFERING CIRCULAR SUPPLEMENT IS FURNISHED ON A CONFIDENTIAL BASIS SOLELY FOR THE PURPOSE OF EVALUATING THE INVESTMENT OFFERED HEREBY. THE INFORMATION CONTAINED HEREIN MAY NOT BE REPRODUCED OR USED IN WHOLE OR IN PART FOR ANY OTHER PURPOSE. THE INFORMATION CONTAINED HEREIN IS CONFIDENTIAL.

AN INVESTOR OR POTENTIAL INVESTOR IN THE NOTES (AND EACH EMPLOYEE, REPRESENTATIVE, OR OTHER AGENT OF SUCH PERSON OR ENTITY) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION, THE TAX TREATMENT AND TAX STRUCTURE OF THE TRANSACTION (AS DEFINED IN UNITED STATES TREASURY REGULATION SECTION 1.6011-4) AND ALL RELATED MATERIALS OF ANY KIND, INCLUDING OPINIONS OR OTHER TAX ANALYSES, THAT ARE PROVIDED TO SUCH PERSON OR ENTITY. HOWEVER, SUCH PERSON OR ENTITY MAY NOT DISCLOSE ANY OTHER INFORMATION RELATING TO THIS TRANSACTION UNLESS SUCH INFORMATION IS RELATED TO SUCH TAX TREATMENT AND TAX STRUCTURE.

IT IS EXPECTED THAT INVESTORS INTERESTED IN PARTICIPATING IN THIS PRIVATE PLACEMENT WILL CONDUCT AN INDEPENDENT INVESTIGATION OF THE RISKS POSED BY AN INVESTMENT IN THE OFFERED NOTES. OFFICERS OF THE DEPOSITOR WILL BE AVAILABLE TO ANSWER QUESTIONS CONCERNING THE TRUST AND WILL, UPON REQUEST, MAKE AVAILABLE SUCH OTHER INFORMATION AS INVESTORS MAY REASONABLY REQUEST. THE OFFERING CIRCULAR ALSO CONTAINS CERTAIN INFORMATION CONCERNING THE OFFERED NOTES, THE MORTGAGE LOANS AND THE OBLIGATIONS OF THE DEPOSITOR, THE MASTER SERVICER AND OTHERS WITH RESPECT THERETO.

THE APPROPRIATE CHARACTERIZATION OF THE OFFERED NOTES UNDER VARIOUS LEGAL INVESTMENT RESTRICTIONS, AND THUS THE ABILITY OF INVESTORS

AHM_MILLS017808

SUBJECT TO THESE RESTRICTIONS TO PURCHASE SUCH NOTES, ARE SUBJECT TO SIGNIFICANT INTERPRETIVE UNCERTAINTIES. ACCORDINGLY, INVESTORS WHOSE INVESTMENT AUTHORITY IS SUBJECT TO LEGAL RESTRICTIONS SHOULD CONSULT THEIR OWN LEGAL ADVISORS TO DETERMINE WHETHER AND TO WHAT EXTENT THE OFFERED NOTES CONSTITUTE LEGAL INVESTMENTS FOR THEM. THE CLASS M-5, CLASS M-6 AND CLASS B NOTES WILL NOT BE "MORTGAGE RELATED SECURITIES" FOR PURPOSES OF THE SECONDARY MORTGAGE MARKET ENHANCEMENT ACT.

THERE WILL BE NO LIQUID MARKET FOR THE OFFERED NOTES.

NOTICE TO NEW HAMPSHIRE RESIDENTS:

NEITHER THE FACT THAT A REGISTRATION STATEMENT OR AN APPLICATION FOR A LICENSE HAS BEEN FILED WITH THE STATE OF NEW HAMPSHIRE UNDER CHAPTER 421-B OF THE NEW HAMPSHIRE REVISED STATUTES NOR THE FACT THAT A SECURITY IS EFFECTIVELY REGISTERED OR A PERSON IS LICENSED IN THE STATE OF NEW HAMPSHIRE CONSTITUTES A FINDING BY THE SECRETARY OF STATE OF THE STATE OF NEW HAMPSHIRE THAT ANY DOCUMENT FILED UNDER CHAPTER 421-B IS TRUE, COMPLETE AND NOT MISLEADING. NEITHER ANY SUCH FACT NOR THE FACT THAT AN EXEMPTION OR EXCEPTION IS AVAILABLE FOR A SECURITY OR A TRANSACTION MEANS THAT THE SECRETARY OF STATE OF THE STATE OF NEW HAMPSHIRE HAS PASSED IN ANY WAY UPON THE MERITS OR QUALIFICATIONS OF, OR RECOMMENDED OR GIVEN APPROVAL TO, ANY PERSON, SECURITY, OR TRANSACTION. IT IS UNLAWFUL TO MAKE, OR CAUSE TO BE MADE, TO ANY PROSPECTIVE PURCHASER, CUSTOMER, OR CLIENT ANY REPRESENTATION INCONSISTENT WITH THE PROVISIONS OF THIS PARAGRAPH.

THIS OFFERING CIRCULAR SUPPLEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN THE OFFERED NOTES NOR AN OFFER OF SUCH NOTES TO ANY PERSON IN ANY STATE OR OTHER JURISDICTION IN WHICH SUCH OFFER WOULD BE UNLAWFUL.

**IRS CIRCULAR 230 NOTICE**

**TO ENSURE COMPLIANCE WITH INTERNAL REVENUE SERVICE CIRCULAR 230, TAXPAYERS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS OFFERING CIRCULAR SUPPLEMENT IS NOT INTENDED OR WRITTEN BY US TO BE RELIED UPON, AND CANNOT BE RELIED UPON BY TAXPAYERS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON TAXPAYERS UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) TAXPAYERS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

Capitalized terms used herein and not otherwise defined herein have the meanings assigned in the offering circular.

AHM MILLS017809

**TABLE OF CONTENTS**

**OFFERING CIRCULAR SUPPLEMENT**

| Caption | Page |
|---|---|
| SUMMARY OF OFFERING CIRCULAR SUPPLEMENT | 7 |
| RISK FACTORS | 14 |
| THE MORTGAGE POOL | 25 |
| General | 25 |
| Performing Loans, Sub-Performing Loans and Re-Performing Loans | 25 |
| Arrearages | 26 |
| Negative Amortization Loans | 27 |
| Adjustable Rate Loans | 27 |
| Indices on Certain of the Mortgage Loans | 27 |
| Mortgage Loan Characteristics | 28 |
| THE MASTER SERVICER AND THE SERVICER | 29 |
| Master Servicer | 29 |
| Servicer | 30 |
| MORTGAGE LOAN ORIGINATION | 33 |
| ADDITIONAL INFORMATION | 35 |
| DESCRIPTION OF THE NOTES | 36 |
| General | 36 |
| Transfer and Exchange of the Offered Notes | 37 |
| Book-Entry Notes | 38 |
| Allocation of Group I Available Funds | 40 |
| Interest Payments on the Group II Notes | 41 |
| Principal Payments on the Group II Notes | 42 |
| Overcollateralization Provisions on the Group II Notes | 43 |
| Calculation of LIBOR for the LIBOR Notes | 44 |
| The Swap Agreements | 44 |
| Allocation of Losses on the Mortgage Loans | 47 |
| YIELD ON THE NOTES | 48 |
| General | 48 |

| Caption | Page |
|---|---|
| Prepayment Considerations | 49 |
| Allocation of Principal Payments | 50 |
| Interest Shortfalls and Realized Losses | 51 |
| Note Interest Rates | 52 |
| Purchase Price | 52 |
| Final Scheduled Payment Date | 52 |
| Optional Termination | 53 |
| Weighted Average Life | 53 |
| THE ISSUER | 62 |
| THE OWNER TRUSTEE | 62 |
| THE INDENTURE TRUSTEE | 62 |
| THE SECURITIES ADMINISTRATOR | 63 |
| THE MASTER SERVICING AGREEMENT AND SERVICING AGREEMENT | 63 |
| Servicing and Other Compensation And Payment of Expenses | 63 |
| Realization Upon Defaulted Mortgage Loans | 64 |
| The Protected Accounts | 64 |
| Optional Repurchase of Defaulted Mortgage Loans | 64 |
| Pledge and Assignment of Servicer's Rights | 64 |
| THE INDENTURE | 65 |
| General | 65 |
| Rights Upon Event of Default | 65 |
| Limitation on Suits | 66 |
| Resignation and Removal of Indenture Trustee | 66 |
| Optional Termination | 66 |
| ASSIGNMENT OF LOANS | 66 |
| General | 66 |
| FEDERAL INCOME TAX CONSEQUENCES | 67 |
| Tax Classification of the Trust and of the Notes | 67 |

AHM MILLS017810

| Caption | Page |
|---|---|
| Tax Consequences to Holders of the Offered Notes | 68 |
| PRIVATE PLACEMENT | 68 |
| SECONDARY MARKET | 68 |
| LEGAL OPINIONS | 69 |
| RATINGS | 69 |
| LEGAL INVESTMENT | 69 |
| ERISA CONSIDERATIONS | 70 |
| GLOSSARY | 72 |
| Exhibit A | EX-1 |
| ANNEX I | AX-1 |
| Schedule A | A-1 |

AHM MILLS017811

## SUMMARY OF OFFERING CIRCULAR SUPPLEMENT

The following summary is a very broad overview of the notes and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the notes, read carefully this entire offering circular supplement and the entire accompanying offering circular. A glossary is included at the end of this offering circular supplement. Capitalized terms used but not defined in the glossary at the end of this offering circular supplement have the meanings assigned to them in the glossary at the end of the accompanying offering circular.

Issuer or Trust.................................... American Home Mortgage Investment Trust 2005-SD1.

Title of Series .................................... Mortgage-Backed Notes, Series 2005-SD1.

Cut-off Date....................................... December 1, 2005.

Closing Date...................................... On or about December 28, 2005.

Depositor .......................................... American Home Mortgage Securities LLC.

Seller................................................. American Home Mortgage Acceptance, Inc., an affiliate of the depositor and the servicer.

Master Servicer ................................. Wells Fargo Bank, National Association.

Servicer............................................. American Home Mortgage Servicing, Inc.

Indenture Trustee.............................. Deutsche Bank National Trust Company.

Owner Trustee ................................... Wilmington Trust Company.

Securities Administrator................... Wells Fargo Bank, National Association.

Swap Counterparty ............................ Bear Stearns Financial Products, Inc.

Payment Dates................................... Payments on the notes will be made on the 25th day of each month, or, if such day is not a business day, on the next succeeding business day, beginning in January 2006.

Notes................................................. The classes of notes and their note interest rates and initial note principal balances are set forth in the table below.

AHM_MILLS017812

**Offered Notes**

| Class | Note Interest Rate | Initial Note Principal Balance | Initial Rating (Fitch/Moody's) | Designation |
|---|---|---|---|---|
| I-A1 | Adjustable Rate | $ 34,663,000 | AAA/Aaa | Senior/Adjustable Rate |
| II-A1 | Adjustable Rate | $ 68,903,000 | AAA/Aaa | Senior/Adjustable Rate |
| Total Offered Notes: | | $ 103,566,000 | | |

**Non-Offered Notes**

| Class | Note Interest Rate | Initial Note Principal Balance | Initial Rating (Fitch/Moody's) | Designation |
|---|---|---|---|---|
| I-M1 | 5.00% | $ 2,558,000 | AA/Aa2 | Subordinate/Fixed Rate |
| I-M2 | 0.00% | $ 1,141,000 | A/A2 | Subordinate/Principal Only |
| I-M3 | 0.00% | $ 951,000 | BBB/Baa2 | Subordinate/Principal Only |
| I-M4 | 0.00% | $ 1,268,000 | BB/NR | Subordinate/Principal Only |
| I-M5 | 0.00% | $ 1,691,959 | NR/NR | Subordinate/Principal Only |
| II-M1 | 6.187% | $ 7,211,000 | AA/Aa2 | Subordinate/Fixed Rate |
| II-M2 | 6.685% | $ 6,125,000 | A/A2 | Subordinate/Fixed Rate |
| II-M3 | 8.000% | $ 5,532,000 | BBB/Baa2 | Subordinate/Fixed Rate |
| II-M4 | 8.000% | $ 5,729,000 | BB/NR | Subordinate/Fixed Rate |
| II-M5 | 0.00% | $ 5,285,982 | B/NR | Subordinate/Principal Only |
| Total Non-Offered Notes: | | $ 37,492,942 | | |

AHM_MILLS017813

**Other Information:**

**Class I-A1 Notes and Class II-A1 Notes:**

The note interest rates on these classes of notes will be equal to the least of:

- One-month LIBOR plus the related note margin set forth below, and
- the related available funds rate described in this offering circular supplement.

| | Note Margin | |
|---|---|---|
| Class | (1) | (2) |
| I-A1 ..................................................... | 0.450% | 0.900% |
| II-A1 .................................................... | 0.500% | 1.000% |

---

(1)    Prior to the step-up date as described in this offering circular supplement.
(2)    On and after the step-up date as described in this offering circular supplement.

AHM_MILLS017814

## The Trust

The Depositor will establish American Home Mortgage Investment Trust 2005-SD1, a Delaware statutory trust, pursuant to a trust agreement among the Depositor, the Owner Trustee, and the Securities Administrator. Pursuant to the trust agreement, the Depositor will deposit the mortgage loans into the trust on the closing date. On the closing date, pursuant to an indenture between the Trust, the Indenture Trustee and the Securities Administrator, the Trust will issue the notes.

Payments of interest and principal on the notes will be made only from payments received from the related assets of the trust as described in this offering circular supplement.

The trust will also include two swap agreements, which will cover basis risk shortfalls on the related offered notes as described below under "Swap Agreements."

The beneficial ownership interest in the trust will be represented by the trust certificates, which are not offered by this offering circular supplement. The trust will also issue the Class I-M1, Class I-M2, Class I-M3, Class I-M4, Class I-M5, Class II-M1, Class II-M2, Class II-M3, Class II-M4 and Class II-M5 Notes, which are not offered hereby.

*See "Description of the Notes" in this offering circular supplement.*

## The Mortgage Loans

The trust will initially contain approximately 1,876 fixed-rate and adjustable-rate mortgage loans secured by first or second liens on one- to four-family residential real properties, divided into two loan groups. The mortgage loans have an aggregate principal balance of approximately $141,058,942 as of the Cut-off Date.

The interest rate on each adjustable-rate mortgage loan will be adjusted, in some cases after an initial fixed-rate period, monthly, semi-annually or annually to equal the related index plus a fixed percentage set forth in or computed in accordance with the related mortgage note subject to rounding and to certain other limitations, including a maximum lifetime mortgage rate, as more fully described under *"The Mortgage Pool" in this offering circular*

supplement and Schedule A, which is attached to and is part of this offering circular supplement. The related index is as described under "The Mortgage Pool—Indices on the Mortgage Loans" in this offering circular supplement.

The mortgage loans in the two loan groups will have characteristics as follows:

## The Group I Loans

The group I mortgage loans will consist of fixed-rate and adjustable-rate mortgage loans, some of which are hybrid mortgage loans with an initial fixed-rate period of one, two, three or five years.

The following table summarizes the approximate characteristics of all of the group I mortgage loans as of the Cut-off Date:

| | |
|---|---|
| Number of mortgage loans: | 237 |
| Aggregate stated principal balance: | $42,272,960 |
| Range of scheduled principal balances: | $24,353 to $1,500,000 |
| Average scheduled principal balance: | $178,367 |
| Range of mortgage rates: | 3.500% to 10.200% |
| Weighted average mortgage rate: | 5.924% |
| Range of remaining terms to stated maturity (months): | 102 to 358 |
| Weighted average remaining terms to stated maturity (months): | 334 |
| Weighted average loan-to-value ratio at origination: | 77.55% |
| Weighted average gross margin: | 3.051% |
| Weighted average maximum lifetime mortgage rate (per annum): | 5.413% |
| Weighted average months to first interest adjustment date (months): | 7 |
| Loan Index Type: | |
| 1 Year LIBOR | 5.588% |
| 6 Month LIBOR | 8.852% |
| 1 Year CMT | 13.367% |

## The Group II Loans

The group II mortgage loans will consist of fixed rate loans, all of which are second lien mortgage loans.

The following table summarizes the approximate characteristics of all of the group II mortgage loans as of the Cut-off Date:

AHM_MILLS017815

| | |
|---|---|
| Number of mortgage loans: | 1,639 |
| Aggregate stated principal balance: | $98,785,982 |
| Range of scheduled principal balances: | $3,004 to $498,197 |
| Average scheduled principal balance: | $60,272 |
| Range of mortgage rates: | 6.250% to 17.000% |
| Weighted average mortgage rate: | 10.449% |
| Range of remaining terms to stated maturity (months): | 109 to 239 |
| Weighted average remaining terms to stated maturity (months): | 176 |
| Weighted average loan-to-value ratio at origination: | 95.33% |

## Priority of Payments on the Group I Notes

In general, on any payment date, funds available with respect to the mortgage loans in loan group I after the payment of certain fees and expenses, will be distributed as follows, in each case to the extent of remaining related available funds:

first, to pay accrued note interest on the Class I-A1 Notes, plus any related unpaid interest shortfalls;

second, to pay the group I senior optimal principal amount for the Class I-A1 Notes;

third, to pay any applicable basis risk carryforward amount to the Class I-A1 Notes;

fourth, to pay and applicable allocated realized loss amounts to the Class I-A1 Notes;

fifth, to pay accrued note interest on the Class I-M1 Notes;

sixth, to pay sequentially to the Class I-M1, Class I-M2, Class I-M3, Class I-M4 and Class I-M5 Notes, in each case up to an amount equal to such class's allocable share of principal for such distribution date;

seventh, to pay any applicable net WAC carryforward amount to the Class I-M1 Notes; and

eighth, any remainder to the holders of the trust certificates as provided in the indenture and the trust agreement.

*See "Description of the Notes" in this offering circular supplement for additional information.*

## Priority of Payments on the Group II Notes

*Interest Distributions*

In general, on any payment date, funds available with respect to the mortgage loans in loan group II after the payment of certain fees and expenses, will be distributed as follows, in each case to the extent of remaining related available funds:

first, to pay accrued note interest on the related Class II-A1 Notes, plus any related unpaid interest shortfalls;

second, to pay accrued note interest on the Class II-M1 Notes;

third, to pay accrued note interest on the Class II-M2 Notes;

fourth, to pay accrued note interest on the Class II-M3 Notes; and

fifth, to pay accrued note interest on the Class II-M4 Notes.

*Principal Distributions*

Amounts available after paying interest on the Class II-A1 Notes and Class II-M Notes will be used to pay principal on such notes as described in this offering circular supplement.

*Net Monthly Excess Cashflow Distributions*

Amounts available after paying interest and principal, as applicable, to the Class II-A1 Notes and Class II-M Notes, as described in this offering circular supplement will be net monthly excess cashflow and will be used for various purposes, including paying principal on the Class II-A1 Notes and Class II-M Notes to maintain the target amount of overcollateralization and covering some interest shortfalls, basis risk shortfalls and allocated realized loss amounts on such notes.

*See "Description of the Notes" in this offering circular supplement for additional information.*

## Credit Enhancement

The credit enhancement provided for the benefit of the holders of the Class I-A Notes consists of the subordination provided by the Class I-M Notes.

The credit enhancement provided for the benefit of the holders of the Class II-A Notes consists of net monthly excess cashflow, overcollateralization and the subordination provided by the Class II-M Notes.

Among the classes of Class M Notes, each related class of Class M Notes with a higher numerical class designation will provide

AHM_MILLS017816

subordination to each such class of Class M Notes with a lower numerical class designation.

*See "Description of the Notes" in this offering circular supplement for additional information.*

### Advances

The servicer will be obligated to make cash advances with respect to delinquent payments of scheduled interest and principal on the mortgage loans, in general, to the extent that the servicer reasonably believes that such cash advances can be repaid from future payments on the mortgage loans. If the servicer fails to make any required advances, the master servicer, as successor servicer, may be obligated to do so, as described in this offering circular supplement. These cash advances are only intended to maintain a regular flow of scheduled interest and principal payments on the notes and are not intended to guarantee or insure against losses.

### Swap Agreements

The trust will include two swap agreements. On the closing date, either the seller will assign to the depositor, and the depositor will assign to the trust primarily for the benefit of the Class I-A1 Notes and Class II-A1 Notes its rights under the related swap agreements, or the depositor will cause the owner trustee to enter into the swap agreements on behalf of the trust with the swap counterparty. Payments under the swap agreements will be made pursuant to the formulas described in this offering circular supplement. Amounts paid under the related swap agreements will be available primarily to cover basis risk shortfalls on the Class I-A1 Notes and Class II-A1 Notes as described in this offering circular supplement.

*See "Description of the Notes — The Swap Agreements" in this offering circular supplement.*

### Optional Termination

At its option, the holder of the trust certificates, or, if there is no single holder, the majority holder of the trust certificates may, at its option, (a) purchase all of the group I loans and redeem the group I notes after any payment date on which the aggregate stated principal balance of the group I loans as of the end of the related due period is less than 20% of the cut-off date balance of the group I loans and (b) purchase all of the group II loans and redeem the group II

notes after any payment date on which the aggregate stated principal balance of the group II loans as of the end of the related due period is less than 20% of the cut-off date balance of the group II loans.

*See "The Indenture— Optional Termination" in this offering circular supplement.*

### Federal Income Tax Consequences

For federal income tax purposes the offered notes will be characterized as debt to the extent they are issued to parties unrelated to the owner of the trust certificates. Each noteholder that is unrelated to the owner of the trust certificates, by its acceptance of an offered note, will agree to treat the notes as debt.

The trust will be classified as a taxable mortgage pool. The trust will not, however, be subject to federal income tax as a corporation as long as the trust certificates and the Class I-M1, Class I-M2, Class I-M3, Class I-M4, Class I-M5, Class II-M4 and Class II-M5 Notes are owned exclusively by a "real estate investment trust" or by a "qualified REIT subsidiary." American Home Mortgage Investment Corp. represents that it qualifies as a "real estate investment trust" and that it will own the trust certificates and the Class I-M1, Class I-M2, Class I-M3, Class I-M4, Class I-M5, Class II-M4 and Class II-M5 Notes indirectly through a "qualified REIT subsidiary." Moreover, the trust agreement sets forth restrictions on the transferability of the trust certificates and the Class I-M1, Class I-M2, Class I-M3, Class I-M4, Class I-M5, Class II-M4 and Class II-M5 Notes to ensure that they will only be held by a "real estate investment trust" or a "qualified REIT subsidiary."

*See "Risk Factors — The Trust May Be Taxable if the Seller Fails to Qualify As A REIT" in this offering circular supplement and "Federal Income Tax Consequences" in this offering circular supplement and in the accompanying offering circular for additional information concerning the application of federal income tax laws to the notes.*

### Ratings

It is a condition to the issuance of the notes that they receive at least the following ratings from Fitch Ratings, Inc., which is referred to herein as Fitch, and Moody's Investors

AHM_MILLS017817

Service, Inc., which is referred to herein as Moody's:

| Notes | Fitch | Moody's |
|---|---|---|
| Class I-A1 | AAA | Aaa |
| Class II-A1 | AAA | Aaa |
| Class I-M1 | AA | Aa2 |
| Class I-M2 | A | A2 |
| Class I-M3 | BBB | Baa2 |
| Class I-M4 | BB | NR |
| Class I-M5 | NR | NR |
| Class II-M1 | AA | Aa2 |
| Class II-M2 | A | A2 |
| Class II-M3 | BBB | Baa2 |
| Class II-M4 | BB | NR |
| Class II-M5 | B | NR |

The ratings on the notes address the likelihood that holders of the notes will receive all distributions on the mortgage loans to which they are entitled, other than some interest shortfalls. However, the ratings do not address the possibility that noteholders might suffer a lower than anticipated yield.

A security rating is not a recommendation to buy, sell or hold a security and is subject to change or withdrawal at any time by the assigning rating agency. The ratings also do not address the rate of principal prepayments on the mortgage loans.

In particular, the rate of prepayments, if different than originally anticipated, could adversely affect the yield realized by holders of the notes.

*See "Yield on the Notes" and "Ratings" in this offering circular supplement and "Yield Considerations" in the offering circular.*

**Legal Investment**

When issued, the offered notes will not constitute "mortgage related securities" for purposes of SMMEA.

*See "Legal Investment" in this offering circular supplement and "Legal Investment Matters" in the offering circular.*

**ERISA Considerations**

The offered notes may be eligible for purchase by persons investing assets of employee benefit plans or individual retirement accounts,

subject to important considerations. Plans should consult with their legal advisors before investing in the notes.

*See "ERISA Considerations" in this offering circular supplement and in the accompanying offering circular.*

AHM_MILLS017818

## RISK FACTORS

The offered notes are not suitable investments for all investors. In particular, you should not purchase the offered notes unless you understand the prepayment, credit, liquidity and market risks associated with the offered notes.

The offered notes are complex securities. You should possess, either alone or together with an investment advisor, the expertise necessary to evaluate the information contained in this offering circular supplement and the accompanying offering circular in the context of your financial situation and tolerance for risk.

You should carefully consider, among other things, the following factors in connection with the purchase of the notes:

**The Offered Notes May Only Be Purchased by "Qualified Institutional Buyers".**

The Offered Notes will not be registered under the Securities Act or the securities laws of any other jurisdiction. The Offered Notes are being offered in a private placement to "qualified institutional buyers" as defined under Rule 144A. As described in this offering circular supplement under "Description of the Notes—Transfer and Exchange of the Offered Notes," no sale, pledge or other transfer of any Offered Notes may be made by any person unless such transfer is in compliance with the terms and provisions of the Indenture and only in a transaction that does not require registration under the Securities Act or the securities laws of any state.

We cannot assure you that a secondary market for the Offered Notes will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your notes readily or at prices that will enable you to realize your desired yield. The market values of the Offered Notes are likely to fluctuate. Fluctuations may be significant and could result in significant losses to you.

**Many of the Mortgage Loans Have Attributes That May Increase Risk of Loss on the Mortgage Loans.**

Substantially all of the mortgage loans have a delinquency history, document deficiency or other negative attributes. For example, the mortgage pool includes mortgage loans which may have one or more of the following characteristics:

- mortgage loans which may currently be delinquent up to 89 days or for longer periods;
- mortgage loans for which the related mortgaged property is in disrepair;
- mortgage loans with histories of delinquency;
- mortgage loans where the related borrower is currently in bankruptcy;
- mortgage loans which may not comply with the applicable guidelines of the seller;
- mortgage loans with arrearages which resulted from prior delinquencies;
- mortgage loans with low credit scores and/or high current loan-to-value ratios or combined loan-to-value-ratios;
- mortgage loans for which the original appraisal was not supported, resulting in a faulty initial loan-to-value ratio or combined-loan-to-value ratio;
- seasoned mortgage loans; or
- mortgage loans with missing loan documentation, including mortgage notes, assignments and other documents.

AHM_MILLS017819

For mortgage loans with missing or defective loan documentation, the seller will not be required to repurchase such mortgage loans from the trust unless the omission or defect materially interferes with the servicer's ability to foreclose on the related mortgaged property.

As a result of these characteristics, the mortgage loans may have increased delinquencies and losses as compared to other mortgage pools and other series of mortgage-backed notes issued by American Home Mortgage Securities LLC or its affiliates.

See *"The Mortgage Pool" in this offering memorandum for additional information reflecting the various delinquency and document deficiency characteristics of the mortgage loans.*

**The Notes Will Have Limited Liquidity, So You May Be Unable to Sell Your Securities or May Be Forced to Sell Them at a Discount from Their Fair Market Value.**

The initial purchaser intends to make a secondary market in the offered notes, however, it is not obligated to do so. There can be no assurance that a secondary market for the notes will develop or, if one does develop, that it will provide holders of the notes with liquidity of investment or that it will continue for the life of the notes. There are only a limited number of securitizations which include mortgage loans originated or purchased by the seller. This is the first securitization of the seller which includes mortgage loans with the attributes described in this offering circular supplement. As a result, the secondary market for the notes may be very limited. In addition, any resale prices that may be available for any note in any market that may develop may be at a discount from the initial offering price or the fair market value thereof. The notes will not be listed on any securities exchange.

**The Trust May Be Taxable if the Seller Fails to Qualify as a REIT.**

It is anticipated that the trust will be characterized as one or more taxable mortgage pools, or TMPs, for federal income tax purposes. In general, a TMP is treated as a separate corporation not includible with any other corporation in a consolidated income tax return, and is subject to corporate income taxation. However, it is anticipated that, for federal income tax purposes, the trust will be treated as being entirely owned by the seller or an affiliate which is a "real estate investment trust," or REIT, or by a "qualified REIT subsidiary" and, consequently, the trust will be treated as a "qualified REIT subsidiary" of the seller. So long as the trust continues to be treated as being entirely owned by the seller for such purposes and so long as the seller continues to qualify as a REIT, classification of the trust as a TMP will not cause it to be subject to corporate income tax. Rather, the consequence of the classification of the trust as a TMP is that the shareholders of the seller will be required to treat a portion of the dividends they receive from the seller as though they were "excess inclusions" with respect to a residual interest in a "real estate mortgage investment conduit," or REMIC, within the meaning of Section 860D of the Code.

In the event that the trust is not treated as being wholly owned by a REIT for federal income tax purposes, it would become subject to federal income taxation as a corporation and would not be permitted to be included in a consolidated income tax return of another corporate entity. No transfer of the trust certificates, Class I-M1, Class I-M2, Class I-M3, Class I-M4, Class I-M5, Class II-M4 and Class II-M5 Notes will be permitted to an entity that is not a REIT or treated as a REIT for federal income tax purposes.

In the event that federal income taxes are imposed on the trust, the cash flow available to make payments on the offered notes would be reduced. In addition, the need for cash to pay such taxes could result in a liquidation of the trust, with a consequential redemption of the notes at a time earlier than anticipated.

AHM_MILLS017820

**The Mortgage Loans Concentrated in a Specific Region May Present a Greater Risk of Loss with Respect to Such Mortgage Loans.**

As of the cut-off date, approximately 6.29% and 18.63% of the group I mortgage loans and group II mortgage loans, respectively, and approximately 14.93% of the mortgage loans in the aggregate, are secured by properties in the State of California. Investors should note that some geographic regions of the United States from time to time will experience weaker regional economic conditions and housing markets, and, consequently, will experience higher rates of loss and delinquency than will be experienced on mortgage loans generally. For example, a region's economic condition and housing market may be directly, or indirectly, adversely affected by natural disasters or civil disturbances such as earthquakes, hurricanes, floods, eruptions or riots. The economic impact of any of these types of events may also be felt in areas beyond the region immediately affected by the disaster or disturbance. The mortgage loans securing the notes may be concentrated in these regions, and any concentration may present risk considerations in addition to those generally present for similar mortgage-backed securities without this concentration. Any risks associated with mortgage loan concentration may affect the yield to maturity of the notes to the extent losses caused by these risks which are not covered by credit enhancement are allocated to the notes.

**Certain of the Mortgage Loans Have Arrearages and May be Subject to Repayment or Bankruptcy Plans.**

Approximately 1.54% and 1.08% of the group I mortgage loans and group II mortgage loans, respectively, and approximately 1.22% of the mortgage loans in the aggregate, are currently subject to repayment or bankruptcy plans, under which prior delinquent monthly payments and advances must be paid during a period, generally ranging from zero to five years, after the plan is entered into. As a result, these loans will have larger monthly payments until the obligations under the plans are paid in full. In addition, approximately 21.10% and 15.74% of the group I mortgage loans and group II mortgage loans, respectively, and approximately 16.42% of the mortgage loans in the aggregate, have arrearages and are not subject to plans.

Arrearages represent past due monthly payments and advances in respect of mortgage loans that were unpaid on or prior to the cut-off date. The total amount of arrearages on the group I mortgage loans is $140,790 representing 0.33% of the principal balance of the group I mortgage loans as of the cut-off date of which approximately 23% are only missing their scheduled payment for December 1, 2005. The total amount of arrearages on the group II mortgage loans is $318,900 representing 0.32% of the principal balance of the group II mortgage loans as of the cut-off date of which approximately 37% are only missing their scheduled payment for December 1, 2005. Although the rights to receive these arrearages are not included in the trust, the borrower must make a larger monthly payment to avoid default. In addition, if a borrower defaults a foreclosure action may be commenced immediately.

All of these loans, due to their prior delinquency history, may have a greater risk of delinquency and loss than newly-originated loans of comparable size and geographical concentration without any delinquency history.

Arrearages will be reimbursed to the servicer on a first priority basis. Arrearages may be substantial and may represent several monthly payments that have been missed. As a result, losses on these mortgage loans may be higher than would otherwise be the case. See "the Mortgage Pool— Arrearages" in this offering circular supplement.

**The Delinquencies on the Mortgage Loans are High, Which May Increase the Risk of Loss on the Mortgage Loans.**

Some of the mortgage loans included in the trust are either currently delinquent or have been delinquent in the past. As of the cut-off date, approximately 2.15% and 2.03% of the group I mortgage loans and group II mortgage loans, respectively, and approximately 2.06% of the mortgage loans in the

AHM_MILLS017821

aggregate, are 30 to 59 days delinquent in payment of principal and interest under the terms of the related mortgage note and may be subject to a repayment or bankruptcy plan.  As of the cut-off date, approximately 0.52% and 0.86% of the group I mortgage loans and group II mortgage loans, respectively, and approximately 0.76% of the mortgage loans in the aggregate, are 60 to 89 days delinquent in payment of principal and interest under the terms of the related mortgage note and may be subject to a repayment or bankruptcy plan. As of the cut-off date, approximately 0.35% and 0.25% of the group I mortgage loans and group II mortgage loans, respectively, and approximately 0.28% of the mortgage loans in the aggregate, are 90 to 119 days delinquent in payment of principal and interest under the terms of the related mortgage note and may be subject to a repayment or bankruptcy plan. As of the cut-off date, approximately 1.95% and 0.63% of the group I mortgage loans and group II mortgage loans, respectively, and approximately 1.03% of the mortgage loans in the aggregate, are 120 or more days delinquent in payment of principal and interest under the terms of the related mortgage note and may be subject to a repayment or bankruptcy plan. Mortgage loans with a history of delinquencies are more likely to experience delinquencies in the future, even if these mortgage loans are current as of the cut-off date. *See "The Mortgage Pool—Mortgage Loan Characteristics" in this offering circular supplement.*

**Hurricane Katrina May Adversely Affect the Mortgage Loans.**

Hurricane Katrina struck Louisiana, Mississippi, Alabama, Florida and surrounding areas on August 29, 2005, primarily affecting the states of Louisiana, Mississippi and Alabama. However, none of the mortgage loans included in the trust are in areas which were initially designated as disaster areas by FEMA. However, mortgagors in areas affected by the hurricane may also be affected by any decline in the economic environment. Approximately 2.50% and 2.19% of the group I mortgage loans and group II mortgage loans, respectively, and approximately 2.28% of the mortgage loans in the aggregate, in the trust are located in the states of Louisiana, Mississippi and Alabama.

**The Value of the Mortgage Loans May Be Affected By, Among Other Things, a Decline in Real Estate Values, Which May Result in Losses or Shortfalls Being Incurred on the Notes.**

No assurance can be given that values of the mortgaged properties have remained or will remain at their levels on the dates of origination of the related mortgage loans.  If the residential real estate market should experience an overall decline in property values so that the outstanding balances of the mortgage loans, and any other financing on the mortgaged properties, in the mortgage pool become equal to or greater than the value of the mortgaged properties, the actual rates of delinquencies, foreclosures and losses could be higher than those now generally experienced in the mortgage lending industry. In some areas of the United States, real estate values have risen at a greater rate in recent years than in the past. In particular, mortgage loans with high principal balances or high combined loan-to-value ratios may be adversely affected by any decline in real estate values. Real estate values in any area of the country may be affected by several factors, including population trends, mortgage interest rates, and the economic well-being of that area.  Any decrease in the value of the mortgage properties related to the mortgage loans may result in the allocation of losses which are not covered by credit enhancement to the notes.

**Interest Generated by the Mortgage Loans May Be Insufficient to Create or Maintain Overcollateralization.**

The amount of interest generated by the mortgage loans (net of fees and expenses) in loan group II is expected to be higher than the amount of interest required to be paid to the related notes.  Any such excess interest will be used to create or maintain the target or level of overcollateralization by covering current or previous realized losses on the group II mortgage loans. We cannot assure you, however, that enough excess interest will be available to create or maintain the required level of overcollateralization. The factors described below will affect the amount of excess interest that the mortgage loans will generate:

AHM_MILLS017822

- Every time a mortgage loan is prepaid in full, excess interest may be reduced because the mortgage loan will no longer be outstanding and generating interest or, in the case of a partial prepayment, will be generating less interest.

- Every time a mortgage loan is liquidated, excess interest may be reduced because such mortgage loans will no longer be outstanding and generating interest.

- If the rates of delinquencies, defaults or losses on the mortgage loans turn out to be higher than expected, excess interest will be reduced by the amount necessary to compensate for any shortfalls in cash available on such date to make required payments on the notes.

- If prepayments, defaults and liquidations occur more rapidly on the mortgage loans with relatively higher interest rates than on the mortgage loans with relatively lower interest rates, the amount of excess interest generated by the mortgage loans will be less than would otherwise be the case.

**The Rate and Timing of Principal Distributions on the Notes Will Be Affected by Prepayment Speeds.**

Mortgagors may prepay their mortgage loans in whole or in part at any time. We cannot predict the rate at which borrowers will repay their loans. A prepayment of a mortgage loan generally will result in a prepayment on the related notes:

- If you purchase your notes at a discount and principal is repaid slower than you anticipate, then your yield may be lower than you anticipate.

- If you purchase your notes at a premium and principal is repaid faster than you anticipate, then your yield may be lower than you anticipate.

- The rate of prepayments on the mortgage loans will be sensitive to prevailing interest rates. Generally, if interest rates decline, mortgage loan prepayments may increase due to the availability of other mortgage loans at lower interest rates. Conversely, if prevailing interest rates rise, the prepayments on mortgage loans may decrease.

- Refinancing programs, which may involve targeted soliciting of all or some of the mortgagors to refinance their mortgage loans, may increase the rate of prepayments on the mortgage loans. Any such refinancing programs will be directed at all of the Servicer's customers and will not be exclusively directed at the mortgagors related to the mortgage loans in the mortgage pool.

- The seller will be required to purchase mortgage loans from the trust in the event certain breaches of representations and warranties occur and have not been cured. In addition, the seller has the option to purchase mortgage loans that become 90 days or more delinquent. These purchases will have the same effect on the holders of the notes as a prepayment in full of any such purchased mortgage loans.

- With respect to the group II notes, the overcollateralization provisions are intended to result in an accelerated rate of principal payments to holders of the classes of notes whenever overcollateralization is at a level below the required level. An earlier return of principal to the holders of the notes as a result of the overcollateralization provisions will influence the yield on the notes in a manner similar to the manner in which principal prepayments on the mortgage loans will influence the yield on the notes.

*See "Yield on the Notes" in this offering circular supplement, including the tables entitled "Percent of Initial Note Principal Balance Outstanding at the Following CPR Percentages."*

AHM_MILLS017823

**Some Additional Risks Are Associated with the Notes.**

The weighted average life of, and the yields to maturity on, the notes will be sensitive to the rate and timing of mortgagor defaults and the severity of ensuing losses on the mortgage loans. If the actual rate and severity of losses on the mortgage loans are higher than those assumed by an investor in these related notes, the actual yield to maturity of these notes may be lower than assumed. The timing of losses on the mortgage loans will also affect an investor's actual yields to maturity, even if the rate of defaults and severity of losses over the life of the mortgage pool are consistent with an investor's expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the group II mortgage loans, to the extent they exceed the amount of the overcollateralization following payments of principal on the related payment date, will reduce the note principal balance of the related Class M Notes. The indenture does not permit the allocation of realized losses to the Class II-A1 Notes. Investors in the Class II-A1 Notes should note that although realized losses will not be allocated to the Class II-A1 Notes, under certain loss scenarios there will not be enough principal and interest on the mortgage loans to pay the Class II-A1 Notes all interest and principal amounts to which they are then entitled.

The yields to maturity on the notes will be extremely sensitive to losses due to defaults on the mortgage loans (and the timing thereof), to the extent such losses are not covered by excess interest or overcollateralization (in the case of the group II notes), or a class of notes subordinate thereto. Furthermore, as described in this offering circular supplement, the timing of receipt of principal and interest by the notes may be adversely affected by losses even if such class of notes does not ultimately bear such loss.

Also, investors in the notes should be aware that after the related step-down date, if no related trigger event is in effect, the most subordinate class of the Class II-M Notes may receive more than such class' pro rata share of principal for that payment date. As a result, the note principal balance of the most subordinate class or classes of such Class M Notes may be reduced to zero prior to the more senior class or classes of such notes.

**Statutory and Judicial Limitations on Foreclosure Procedures May Delay Recovery in Respect of the Mortgaged Property and, in Some Instances, Limit the Amount that May Be Recovered by the Foreclosing Lender, Resulting in Losses on the Mortgage Loans That Might be Allocated to the Notes.**

Foreclosure procedures may vary from state to state. Two primary methods of foreclosing a mortgage instrument are judicial foreclosure, involving court proceedings, and non-judicial foreclosure pursuant to a power of sale granted in the mortgage instrument. A foreclosure action is subject to most of the delays and expenses of other lawsuits if defenses are raised or counterclaims are asserted. Delays may also result from difficulties in locating necessary defendants. Non-judicial foreclosures may be subject to delays resulting from state laws mandating the recording of notice of default and notice of sale and, in some states, notice to any party having an interest of record in the real property, including junior lienholders. Some states have adopted "anti-deficiency" statutes that limit the ability of a lender to collect the full amount owed on a mortgage loan if the property sells at foreclosure for less than the full amount owed. In addition, United States courts have traditionally imposed general equitable principles to limit the remedies available to lenders in foreclosure actions that are perceived by the court as harsh or unfair. The effect of these statutes and judicial principles may be to delay and/or reduce distributions in respect of the notes. See "Legal Aspects of Mortgage Loans—Foreclosure on Mortgages and Some Contracts" in the accompanying offering circular.

**Credit Enhancement Is Limited, and the Potential Inadequacy of the Credit Enhancement to Cover Losses on the Trust Assets May Result in Losses or Shortfalls Being Allocated to the Class I-A1 Notes and Class II-A1 Notes.**

AHM_MILLS017824

The credit enhancement features described in the summary of this offering circular supplement are intended to enhance the likelihood that holders of the Class I-A1 Notes and Class II-A1 Notes, and to a more limited extent, the holders of the Class I-M Notes and Class II-M Notes, will receive regular payments of interest (with respect to the Class I-M1 Notes and Class II-M Notes) and principal. However, we cannot assure you that the applicable credit enhancement will adequately cover any shortfalls in cash available to pay your notes as a result of delinquencies or defaults on the mortgage loans. On the closing date, there will be no initial overcollateralization.

If delinquencies or defaults occur on the mortgage loans, neither the servicer nor any other entity will advance scheduled monthly payments of interest and principal on delinquent or defaulted mortgage loans if, in the good faith judgment of the servicer, these advances would not be ultimately recovered from the proceeds of the mortgage loan.

The ratings of the notes by the rating agencies may be lowered following the initial issuance thereof as a result of losses on the mortgage loans in excess of the levels contemplated by the rating agencies at the time of their initial rating analysis. None of the depositor, the seller, the master servicer, the servicer, the indenture trustee, the owner trustee, the securities administrator or any of their respective affiliates will have any obligation to replace or supplement any credit enhancement, or to take any other action to maintain the ratings on the notes. See "Description of Credit Enhancement—Reduction or Substitution of Credit Enhancement" in the accompanying offering circular.

**The Difference Between the Interest Rates on the Notes and the Related Mortgage Loans May Result in Shortfalls with Respect to these Notes.**

The note interest rate with respect to the Class I-A1 Notes and Class II-A1 Notes adjusts each month and is based upon the value of an index of one-month LIBOR plus the related margin and the related available funds rate. However, the mortgage rate for the adjustable-rate mortgage loans is based upon the related index, in each case plus the related gross margin, and adjusts monthly, semi-annually or annually. The indices on the mortgage loans and the One-Month LIBOR Index may respond differently to economic and market factors, and there is not necessarily any correlation between them. Moreover, the related mortgage loans are subject to maximum mortgage rates and minimum mortgage rates. Thus, it is possible, for example, that one-month LIBOR may rise during periods in which the mortgage loan indices are stable or falling or that, even if each of the mortgage loan indices rise during the same period, one-month LIBOR may rise much more rapidly than the other loan indices. To the extent that the note interest rate on these notes is limited to the related available funds rate, basis risk shortfalls may occur. See "Description of the Notes — Interest Payments" in this offering circular supplement.

Net monthly excess cashflow may be used, subject to the priorities described in this offering circular supplement, to cover basis risk shortfalls or net WAC shortfalls on the group II notes. However, there can be no assurance that available net monthly excess cashflow will be sufficient to cover these shortfalls, particularly because in a situation where the note interest rate on a class of notes is limited to the related available funds rate, there may be little or no net monthly excess cashflow.

The swap agreements will be assigned to, or entered into by, the owner trustee on behalf of the trust and the net amounts payable from the related swap agreement will provide some protection against any basis risk shortfalls on the Class I-A1 Notes and Class II-A1 Notes. However, amounts payable under the swap agreements are based on the parameters described in this offering circular supplement, and, to the extent the actual performance of the related mortgage loans differs from the expectations on which these parameters were based, the swap agreements may provide insufficient funds to cover these shortfalls. In addition, payments from the swap agreements are subject to a ceiling, which may limit the amount of payments from the swap agreements to cover these shortfalls.

To the extent that amounts payable under the swap agreements are insufficient to cover basis risk shortfalls on the Class I-A1 Notes and Class II-A1 Notes, net monthly excess cashflow may be used,

AHM_MILLS017825

subject to the priorities described in this offering circular supplement. However, there can be no assurance that available net monthly excess cashflow will be sufficient to cover these shortfalls, particularly because in a situation where the note interest rate on the Class I-A1 Notes and Class II-A1 Notes is limited to the related available funds rate, there will be little or no net monthly excess cashflow.

**Some of the Mortgage Loans Were Underwritten to "Alt-A" Underwriting Standards, Which May Result in Losses or Shortfalls to Be Incurred on the Related Notes.**

Approximately 19.26% of the mortgage loans in loan group I were underwritten generally in accordance with "Alt-A" underwriting standards. An "Alt-A" loan means a loan which is ineligible for purchase by Fannie Mae or Freddie Mac due to either credit characteristics of the related mortgagor or documentation standards in connection with the underwriting of the related mortgage loan that do not meet the Fannie Mae or Freddie Mac underwriting guidelines for "A" credit mortgagors. These credit characteristics include mortgagors whose creditworthiness and repayment ability do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines and mortgagors who may have a record of credit write-offs, outstanding judgments, prior bankruptcies and other credit items that do not satisfy such Fannie Mae or Freddie Mac underwriting guidelines. An "Alt-A" loan may or may not have a conforming principal balance at origination, and may satisfy the Fannie Mae or Freddie Mac underwriting guidelines for "A-" credit mortgagors.

These documentation standards may include mortgagors who provide limited or no documentation in connection with the underwriting of the related mortgage loan. Accordingly, these loans are likely to experience rates of delinquency, foreclosure and loss that are higher, and may be substantially higher, than loans originated in accordance with the Fannie Mae or Freddie Mac underwriting guidelines for "A" credit mortgagors. In addition, the originators' underwriting standards do not prohibit a mortgagor from obtaining secondary financing at the time of origination of the originators' first lien mortgage loan, or at any time thereafter, which secondary financing would reduce the equity the mortgagor would otherwise have in the related mortgaged property as indicated in the originators' loan-to-value ratio determination. Any resulting losses, to the extent not covered by credit enhancement, will affect the yield to maturity of the notes. *For a description of the underwriting standards under which the mortgage loans were originated, see "Mortgage Loan Origination—Underwriting Guidelines" in this offering circular supplement.*

**The Mortgage Pool Includes Several Instances of Multiple Mortgage Loans Made to the Same Borrower.**

The mortgage pool includes several instances of multiple mortgage loans made to the same borrower. All of these mortgage loans are indicated with a loan purpose of "investment" or "investor" in the tables in this offering circular supplement. While these mortgage loans are not cross-defaulted, any default with respect to one of these mortgage loans may indicate an inability or unwillingness to pay on the part of the related borrower. In addition, many of these mortgage loans are located in mortgaged properties in adjacent or nearby locations. The greatest number of mortgage loans made to a single borrower is 6, with an aggregate stated principal balance as of the cut-off date of $159,728. However, the original principal balances of these mortgage loans are generally smaller than the other mortgage loans included in the trust.

**Some of the Mortgage Loans are Secured by Second Liens, Which May Result in Increased Losses with Respect to These Mortgage Loans**

All of the group II loans are secured by second liens, rather than first liens. The weighted average combined loan-to-value ratio at origination of such group II loans is approximately 95.33%. The related first lien will not be a group II loan. In the case of second liens, there is a possibility that adequate funds will not be received in connection with a foreclosure of the related senior liens to satisfy fully both the

AHM_MILLS017826

senior liens and the mortgage loan secured by a junior lien. In that case, the trust, as holder of the junior mortgage, could incur a loss.

**Some of the Mortgage Loans Have an Initial Interest Only Period, Which May Result in Increased Delinquencies and Losses.**

As of the cut-off date, approximately 2.38% and 5.68% of the group I mortgage loans have an initial interest only period of five years and ten years, respectively. During the applicable interest only period, the payment made by the related mortgagor will be less than it would be if the mortgage loan amortized. In addition, the mortgage loan balance will not be reduced by any principal portion of scheduled payments during this period. As a result, no principal payments will be made to the notes from these mortgage loans during their interest only period except in the case of a prepayment.

After the initial interest only period, the scheduled monthly payment on these mortgage loans will increase, which may result in increased delinquencies by the related mortgagors, particularly if interest rates have increased and the mortgagor is unable to refinance. In addition, losses may be greater on these mortgage loans as a result of the mortgage loan not amortizing during the early years of these mortgage loans. Although the amount of principal included in each scheduled monthly payment for a traditional mortgage loan is relatively small during the first few years after the origination of a mortgage loan, in the aggregate the amount can be significant. Any resulting delinquencies and losses, to the extent not covered by credit enhancement, will be allocated to the related notes as described in this offering circular supplement.

Mortgage loans with an initial interest only period are relatively new in the mortgage marketplace. The performance of these mortgage loans may be significantly different than mortgage loans that begin to amortize with their first monthly payment. In particular, there may be a higher expectation by these mortgagors of refinancing their mortgage loans with a new mortgage loan, in particular one with an initial interest only period, which may result in higher or lower prepayment speeds than would otherwise be the case. In addition, the failure to build equity in the property by the related mortgagor may affect the delinquency, loss and prepayment of these mortgage loans.

**The Ratings on the Notes are Not a Recommendation to Buy, Sell or Hold the Notes and are Subject to Withdrawal at any Time, Which May Affect the Liquidity or the Market Value of the Notes.**

It is a condition to the issuance of the notes that each class of notes be rated no lower than the ratings described in this offering circular supplement. A security rating is not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time. No person is obligated to maintain the rating on any note, and, accordingly, there can be no assurance that the rating assigned to any note on the date on which the notes are initially issued will not be lowered or withdrawn by either rating agency at any time thereafter. In the event any rating is revised or withdrawn, the liquidity or the market value of the related notes may be adversely affected. *See "Ratings" in this offering circular supplement and in the offering circular.*

**The Mortgage Loans May Have Limited Recourse to the Related Borrower, Which May Result in Losses with Respect to These Mortgage Loans.**

The mortgage loans included in the trust may be nonrecourse loans or loans for which recourse may be restricted or unenforceable. As to those loans, recourse in the event of mortgagor default will be limited to the specific real property and other assets, if any, that were pledged to secure the mortgage loan. However, even with respect to those loans that provide for recourse against the mortgagor and its assets generally, there can be no assurance that enforcement of the recourse provisions will be practicable, or that the other assets of the mortgagor will be sufficient to permit a recovery in respect of a defaulted mortgage loan significantly in excess of the liquidation value of the related mortgaged property. Any risks associated with mortgage loans with no or limited recourse may adversely affect the yield to maturity of

AHM_MILLS017827

the notes to the extent losses caused by these risks which are not covered by credit enhancement are allocated to the related notes.

**The Mortgage Loans May Have Environmental Risks, Which May Result in Increased Losses with Respect to These Mortgage Loans.**

To the extent any related mortgaged property is contaminated with or affected by hazardous wastes or hazardous substances, these mortgage loans may incur losses. *See "Servicing of Mortgage Loans—Realization Upon or Sale of Defaulted Mortgage Loans" and "Legal Aspects of Mortgage Loans—Environmental Legislation" in the accompanying offering circular.* To the extent these environmental risks result in losses on the mortgage loans, the yield to maturity of the related notes, to the extent not covered by credit enhancement, may be affected.

**Violation of Various Federal, State and Local Laws May Result in Losses on the Mortgage Loans.**

Applicable state and local laws generally regulate interest rates and other charges, require specific disclosure, and require licensing of the originator. In addition, other state and local laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the mortgage loans.

The mortgage loans are also subject to federal laws, including:

(a)    the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require specific disclosures to the borrowers regarding the terms of the mortgage loans;

(b)    the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit; and

(c)    the Fair Credit Reporting Act, which regulates the use and reporting of information related to the borrower's credit experience.

Depending on the provisions of the applicable law and the specific facts and circumstances involved, violations of these federal or state laws, policies and principles may limit the ability of the trust to collect all or part of the principal of or interest on the mortgage loans, may entitle the borrower to a refund of amounts previously paid and, in addition, could subject the trust to damages and administrative enforcement. *See "Legal Aspects of Mortgage Loans" in the accompanying offering circular.*

On the closing date, the seller will represent, among other things, that each mortgage loan, at the time it was made and as of the applicable transfer date, complied in all material respects with all applicable laws and regulations, including, without limitation, usury, equal credit opportunity, disclosure and recording laws and all predatory lending laws, and each loan has been serviced in all material respects in accordance with applicable state and federal laws, including, without limitation, usury, equal credit opportunity, disclosure and recording laws. In the event of a breach of this representation, the seller will be obligated to cure the breach or repurchase or replace the affected mortgage loan in the manner described in the offering circular.

**The Return on the Notes Could be Reduced by Shortfalls Due to the Application of the Servicemembers Civil Relief Act and Similar State Laws.**

The Servicemembers Civil Relief Act, or the Relief Act, and similar state laws provide relief to mortgagors who enter active military service and to mortgagors in reserve status who are called to active military service after the origination of their mortgage loans. The military operations by the United States in Iraq and Afghanistan have caused an increase in the number of citizens in active military duty, including those citizens previously in reserve status. Under the Relief Act the interest rate applicable to a mortgage loan for which the related mortgagor is called to active military service will be reduced from the

AHM_MILLS017828

percentage stated in the related mortgage note to 6.00%. This interest rate reduction and any reduction provided under similar state laws will result in an interest shortfall because neither the master servicer nor the servicer will be able to collect the amount of interest which otherwise would be payable with respect to such mortgage loan if the Relief Act or similar state law was not applicable thereto. This shortfall will not be paid by the mortgagor on future due dates or advanced by the master servicer or the servicer and, therefore, will reduce the available funds for the noteholders on subsequent payment dates. We do not know how many mortgage loans in the mortgage pool have been or may be affected by the application of the Relief Act or similar state law. In addition, the Relief Act imposes limitations that would impair the ability of the servicer to foreclose on an affected single family loan during the mortgagor's period of active duty status, and, under some circumstances, during an additional three month period thereafter. Thus, in the event that the Relief Act or similar legislation or regulations applies to any mortgage loan which goes into default, there may be delays in payment and losses on the notes in connection therewith. Any other interest shortfalls, deferrals or forgiveness of payments on the mortgage loans resulting from similar legislation or regulations may result in delays in payments or losses to the holders of the notes.

AHM MILLS017829

percentage stated in the related mortgage note to 6.00%. This interest rate reduction and any reduction provided under similar state laws will result in an interest shortfall because neither the master servicer nor the servicer will be able to collect the amount of interest which otherwise would be payable with respect to such mortgage loan if the Relief Act or similar state law was not applicable thereto. This shortfall will not be paid by the mortgagor on future due dates or advanced by the master servicer or the servicer and, therefore, will reduce the available funds for the noteholders on subsequent payment dates. We do not know how many mortgage loans in the mortgage pool have been or may be affected by the application of the Relief Act or similar state law. In addition, the Relief Act imposes limitations that would impair the ability of the servicer to foreclose on an affected single family loan during the mortgagor's period of active duty status, and, under some circumstances, during an additional three month period thereafter. Thus, in the event that the Relief Act or similar legislation or regulations applies to any mortgage loan which goes into default, there may be delays in payment and losses on the notes in connection therewith. Any other interest shortfalls, deferrals or forgiveness of payments on the mortgage loans resulting from similar legislation or regulations may result in delays in payments or losses to the holders of the notes.

AHM_MILLS017829

## THE MORTGAGE POOL

**General**

References to percentages of the mortgage loans unless otherwise noted are calculated based on the aggregate unpaid principal balance of the mortgage loans as of the Cut-off Date.

All of the mortgage loans will be acquired by the Depositor on the date of issuance of the Notes from American Home Mortgage Acceptance, Inc., an affiliate of the Depositor and the servicer, pursuant to the Mortgage Loan Purchase Agreement. *See "Mortgage Loan Origination" in this offering circular supplement.*

The mortgage pool will consist of approximately 1,876 first lien and second lien, fixed-rate and adjustable-rate mortgages secured primarily by one- to four-family residences and interests in shares issued by a cooperative apartment corporation and the related proprietary lease, which are referred to in this offering circular supplement as the mortgage loans. *See "Legal Aspects of Mortgage Loans— Cooperative Mortgage Loans" in the offering circular.* The mortgage loans have an initial aggregate unpaid principal balance as of the Cut-off Date of approximately $141,058,942 after application of scheduled payments due on or before the Cut-off Date whether or not received and subject to a permitted variance of plus or minus 10%. The mortgage loans have original terms to maturity of not greater than 30 years. The depositor will convey the mortgage loans to the trust on the Closing Date pursuant to the Trust Agreement.

As to mortgage loans which have been modified, references in this offering circular supplement to the date of origination shall be deemed to be the date of the most recent modification. All percentages of the mortgage loans described in this offering circular supplement are approximate percentages determined as of the cut-off date after deducting payments due during the month of December 2005, unless otherwise indicated.

The mortgage pool, referred to herein as the Mortgage Pool, has been divided into two loan groups, designated as Loan Group I and Loan Group II as more fully described below and in Schedule A to this offering circular supplement. The mortgage loans in Loan Group I are referred to herein as the Group I Loans and the mortgage loans in Loan Group II are referred to herein as the Group II Loans. Each group of mortgage loans is referred to herein as a Loan Group.

The mortgage loans are being serviced by the Servicer as described below under "The Servicer." The mortgage loans were originated generally in accordance with the guidelines described in "Mortgage Loan Origination" in this offering circular supplement.

All of the mortgage loans have scheduled monthly payments due on the Due Date. Each mortgage loan will contain a customary "due-on-sale" clause or will be assumable as provided in the related mortgage note.

Substantially all of the mortgage loans with loan-to-value ratios in excess of 80.00% have primary mortgage insurance up to the required agency limits.

None of the mortgage loans will be a buydown mortgage loan. None of the mortgage loans originated in Georgia will be subject to the Georgia Fair Lending Act. None of the mortgage loans will be subject to the Home Ownership and Equity Protection Act of 1994 or any comparable state or local law.

**Performing Loans, Sub-Performing Loans and Re-Performing Loans**

All of the mortgage loans are categorized as either Performing Loans, Sub-Performing Loans or Re-Performing Loans, each as defined below. All references to periods of delinquency are based on the

AHM_MILLS017830

methodology described under "The Master Servicer And The Servicer" in this offering circular supplement, as of the cut-off date.

Performing Loans are mortgage loans that are less than 30 days delinquent as of the cut off date under the terms of the related mortgage note (as modified, if applicable). As of the cut off date, approximately 95.03% and 96.23% of the Group I Loans and of the Group II Loans, respectively, are Performing Loans. None of the Group I Loans which are Performing Loans are Repayment Plan Loans or Bankruptcy Plan Loans. Approximately 0.53% of the Group II Loans which are Sub-Performing Loans are Repayment Plan Loans or Bankruptcy Plan Loans.

Sub-Performing Loans are mortgage loans that are 30 to 89 days delinquent as of the cut off date under the terms of the related mortgage note (as modified, if applicable). As of the cut off date, approximately 2.82% of the mortgage loans are Sub-Performing Loans. These loans may or may not be Repayment Plan Loans or Bankruptcy Plan Loans. None of the Group I Loans which are Sub-Performing Loans are Repayment Plan Loans or Bankruptcy Plan Loans. Approximately 0.02% of the Group II Loans which are Sub-Performing Loans are Repayment Plan Loans or Bankruptcy Plan Loans.

Re-Performing Loans are mortgage loans that are greater than 89 days delinquent as of the cut off date under the terms of the related mortgage note (as modified, if applicable). As of the cut-off date, approximately 2.30% and 0.88% of the Group I Loans and of the Group II Loans, respectively, are Re-Performing Loans. These loans may or may not be Repayment Plan Loans or Bankruptcy Plan Loans. Approximately 1.54% of the Group I Loans which are Re-Performing Loans are Repayment Plan Loans or Bankruptcy Plan Loans. Approximately 0.53% of the Group II Loans which are Re-Performing Loans are Repayment Plan Loans or Bankruptcy Plan Loans.

**Arrearages**

The total amount of arrearages on the Group I Loans is $140,790 representing 0.33% of the principal balance of such Loan Group as of the cut-off date of which approximately 23% are only missing their scheduled payment for December 1, 2005. The total amount of arrearages on the Group II Loans is $318,900 representing 0.32% of the principal balance of such Loan Group as of the cut-off date of which approximately 37% are only missing their scheduled payment for December 1, 2005. Arrearages on the mortgage loans generally consist of delinquent payments owing under the mortgage loan. The amount of any arrearages for a Repayment Plan Loan or Bankruptcy Plan Loan will be stated in the related repayment plan or bankruptcy plan. The amount of any arrearages for a Cash Flow Loan generally consists of the amount of delinquent payments. The right to receive all arrearages shall not be included as part of the trust and, accordingly, payments with respect to these arrearages will not be payable to the noteholders. All of the Re-Performing Loans and Sub-Performing Loans have arrearages. Some of the Performing Loans also have arrearages.

The borrowers under the Bankruptcy Plan Loans will make their scheduled monthly payments and an arrearage payment which will be allocated as provided in the related bankruptcy plan. The borrowers under the Repayment Plan Loans or Cash Flow Loans will make a single payment, which will be applied first to the arrearage and second to their scheduled monthly payment.

The servicer may immediately commence foreclosure if sufficient payments are not received with respect to a Bankruptcy Plan Loan and if the bankruptcy plan permits foreclosure at that time. The servicer may immediately commence foreclosure on a Repayment Plan Loan if the monthly payment is insufficient to cover an amount equal to the scheduled monthly payment and the arrearage in accordance with the repayment plan. The servicer may immediately commence foreclosure on a Cash Flow Loan if the monthly payment made by the borrower is less than the amount of the scheduled monthly payment. However, so long as payments made by the borrower are sufficient to pay such amounts as described above, the servicer, pursuant to the servicing agreement, will not be allowed to foreclose on these mortgage loans. In addition, with respect to a Cash Flow Loan or Repayment Plan Loan, if the borrower

AHM_MILLS017831

makes a monthly payment and that payment is applied to an arrearage, the amount of the scheduled monthly payment is required to be advanced by the master servicer, subject to recoverability.

The servicer will be entitled to reimburse itself in connection with any liquidation of these mortgage loans on a first priority basis in respect of the arrearage or in respect to any advance made by the servicer as a result of the allocation of a monthly payment being paid first to cover an arrearage. Mortgage loans with arrearages may have higher effective loan-to-value ratios for such mortgage loans. In addition, the servicer will be entitled to reimburse itself from other amounts in the trust to the extent the related proceeds are insufficient to repay the advance. To the extent arrearages remain unpaid at the maturity date of the related mortgage loan, they will become due and payable at that time, resulting in a balloon payment.

**Negative Amortization Loans**

Approximately 0.86% of the Group I Loans have a negative amortization feature, under which accrued interest may be deferred and added to the principal balance of the loan. Negative amortization results from the fact that while the interest rate on a negative amortization loan adjusts monthly, the amount of the monthly payment adjusts only on an annual basis. In addition, the monthly payment may not fully amortize the principal balance of the loan on an annual adjustment date if a payment cap applies.

For each negative amortization loan, the total amount of deferred interest that may be added is limited by a provision to the effect that the principal amount of the loan may not exceed a percentage, or negative amortization cap, times the principal amount of the loan at origination. For these loans, if the monthly payment as otherwise calculated would cause the negative amortization cap to be exceeded, the monthly payment will be increased to a fully amortizing level for a stated period. The negative amortization cap is 125% for the Group I Loans which provide for negative amortization.

**Adjustable Rate Loans**

Approximately 27.81% of the Group I Loans are adjustable-rate mortgage loans. The interest rate borne by each of these mortgage loans will be adjusted, following in some cases an initial fixed-rate period, as follows:

- monthly based on the One-Month LIBOR Loan Index;
- semi-annually based on the Six-Month LIBOR Loan Index; or
- annually based on the One-Year LIBOR Loan Index or One-Year CMT Index,

each referred to in this offering circular supplement as an Index. The rate on each of these mortgage loans will be computed in accordance with the related mortgage note, plus (or minus) the related gross margin, generally subject to rounding and to certain other limitations, including generally a maximum lifetime mortgage rate and in certain cases a minimum lifetime mortgage rate and in certain cases a maximum upward or downward adjustment on each interest adjustment date.

**Indices on Certain of the Mortgage Loans**

*One-Month LIBOR.* Approximately 0.86% of the Group I Loans will adjust monthly based on the One-Month LIBOR Loan Index. The One-Month LIBOR Loan Index will be a per annum rate equal to the average of interbank offered rates for one-month U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal and as are most recently available as of the time specified in the related mortgage note.

*Six-Month LIBOR.* Approximately 8.85% of the Group I Loans will adjust semi-annually based on the Six-Month LIBOR Loan Index. The Six-Month LIBOR Loan Index will be a per annum rate equal to the average of interbank offered rates for six-month U.S. dollar-denominated deposits in the London

AHM_MILLS017832

market based on quotations of major banks as published in The Wall Street Journal and as are most recently available as of the time specified in the related mortgage note.

*One-Year LIBOR.* Approximately 5.59% of the Group I Loans will adjust annually based on One-Year LIBOR. The One-Year LIBOR Loan Index will be a per annum rate equal to the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market based on quotations of major banks as published in The Wall Street Journal and are most recently available as of the time specified in the related mortgage note.

*One-Year CMT.* Approximately 13.37% of the Group I Loans will adjust annually based on One-Year CMT. The One-Year CMT Index will be a per annum rate equal to the weekly or monthly average yields on U.S. Treasury securities adjusted to a constant maturity of one year as made available by the Federal Reserve in Federal Reserve Statistical Release H.15.

## Mortgage Loan Characteristics

*Loan Group I*

The Group I Loans will have an aggregate principal balance as of the Cut-off Date of approximately $42,272,960, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the Group I Loans are secured by first liens on the related mortgaged property.

The average principal balance of the Group I Loans at origination will be approximately $181,356. No Group I Loan had a principal balance at origination of greater than approximately $1,500,000, or less than approximately $25,000. The average principal balance of the Group I Loans as of the Cut-off Date will be approximately $178,367. No Group I Loan will have a principal balance as of the Cut-off Date of greater than approximately $1,500,000 or less than approximately $24,353.

As of the Cut-off Date, the Group I Loans will have mortgage rates ranging from approximately 3.500% per annum to approximately 10.200% per annum and the weighted average mortgage rate will be approximately 5.924% per annum. The weighted average remaining term to stated maturity of the Group I Loans will be approximately 334 months as of the Cut-off Date. None of the Group I Loans will have a first Due Date prior to August 1, 2000, or after September 1, 2005, or will have a remaining term to maturity of less than 102 months or greater than 358 months as of the Cut-off Date. The latest maturity date of any Group I Loans is August 1, 2035.

Approximately 4.91% of the Group I Loans will provide for prepayment charges.

The weighted average of the loan-to-value ratios at origination of the Group I Loans will be approximately 77.55%. No loan-to-value ratio at origination of any Group I Loan was greater than approximately 107.48% or less than approximately 18.55%.

For additional information regarding the Group I Loans, see Schedule A to this offering circular supplement.

*Loan Group II*

The Group II Loans will have an aggregate principal balance as of the Cut-off Date of approximately $98,785,982, after application of scheduled payments due on or before the Cut-off Date, whether or not received. All of the Group II Loans are secured by second liens on the related mortgaged property.

The average principal balance of the Group II Loans at origination will be approximately $60,623. No Group II Loan had a principal balance at origination of greater than approximately $500,000 or less than approximately $7,350. The average principal balance of the Group II Loans as of the Cut-off

AHM_MILLS017833

Date will be approximately $60,272. No Group II Loan will have a principal balance as of the Cut-off Date of greater than approximately $498,197 or less than approximately $3,004.

As of the Cut-off Date, the Group II Loans will have mortgage rates ranging from approximately 6.250% per annum to approximately 17.000% per annum and the weighted-average mortgage rate will be approximately 10.449% per annum. The weighted average remaining term to stated maturity of the Group II Loans will be approximately 176 months as of the Cut-off Date. None of the Group II Loans will have a first Due Date prior to October 1, 2003, or after November 1, 2005, or will have a remaining term to maturity of less than 109 months or greater than 239 months as of the Cut-off Date. The latest maturity date of any Group II Loan is October 1, 2025.

Approximately 0.26% of the Group II Loans will provide for prepayment charges.

The loan-to-value ratio of a mortgage loan secured by a second lien is equal to the ratio, expressed as a percentage, of the principal amount of the loan at origination plus the related senior lien balance, to the lesser of the appraised value of the related mortgaged property at the time of origination and the sales price. The weighted average of the loan-to-value ratios at origination of the Group II Loans was approximately 95.33%. No loan-to-value ratio at origination of any Group II Loan was greater than approximately 108.87% or less than approximately 22.60%.

For additional information regarding the Group II Loans, see Schedule A to this offering circular supplement.

## THE MASTER SERVICER AND THE SERVICER

**Master Servicer**

Wells Fargo Bank, National Association, referred to in this offering circular supplement as the Master Servicer, will act as the Master Servicer of the mortgage loans pursuant to the Master Servicing Agreement, dated as of the Closing Date, among the Master Servicer, Securities Administrator, Indenture Trustee and Issuer. The Master Servicer is a national banking association, with its master servicing offices located in Columbia, Maryland. The Master Servicer is engaged in the business of master servicing single family residential mortgage loans secured by properties located in all 50 states and the District of Columbia.

The Master Servicer will, in accordance with the terms set forth in the Master Servicing Agreement, supervise the servicing of the mortgage loans by the Servicer under the Servicing Agreement. However, the Master Servicer will not supervise the servicing of any simple interest mortgage loans or arrearages by the Servicer. The Master Servicer will not ultimately be responsible for the performance of the servicing activities by the Servicer, except as otherwise described herein and the Master Servicing Agreement. If the Servicer fails to fulfill its obligations under the Servicing Agreement, then the Master Servicer is obligated to terminate the Servicer and either appoint a successor servicer, as provided in the Master Servicing Agreement or assume the obligations of the Servicer under the Servicing Agreement. In accordance with the terms and conditions of the Servicing Agreement, the Servicer may not waive, modify or vary any term of any mortgage loan or consent to the postponement of any such term, or in any manner grant indulgence to any mortgagor unless the Servicer has obtained the prior written consent of the Master Servicer.

In addition, the Servicer shall be required to provide to the Master Servicer a liquidation report upon the foreclosure sale of any mortgaged property or the acquisition of a mortgaged property pursuant to a deed-in-lieu of foreclosure. If the Servicer has determined that there is a realized loss with respect to a mortgaged property, the Master Servicer shall review and approve all realized loss calculations contained in such liquidation report.

AHM_MILLS017834

As compensation for its services under the Master Servicing Agreement, the Master Servicer shall be entitled to the Master Servicing Fee and all investment income or other earnings on the funds on deposit in the Payment Account. The Master Servicer will also be entitled to reimbursement from the Trust Estate for certain expenses and other amounts prior to the payment of any amounts to the Noteholders or certificateholders.

**Servicer**

American Home Mortgage Servicing, Inc., referred to in this offering circular supplement as the Servicer, will act as the Servicer of the mortgage loans pursuant to the Servicing Agreement, dated as of the Closing Date, among the Seller, Servicer, Master Servicer, Issuer and Indenture Trustee. The Servicer is a Maryland corporation. The Servicer is engaged in the business of servicing single family residential mortgage loans secured by properties located in all 50 states and the District of Columbia. The Servicer is an affiliate of the Seller and the Depositor. The Servicer may use subservicers with respect to all or a portion of the mortgage loans.

The Servicer may be terminated with respect to Loan Group I upon the occurrence of a Group I Servicing Trigger Event or with respect to Loan Group II upon the occurrence of a Group II Servicing Trigger Event.

*Delinquency and Foreclosure Experience.*

The following tables set forth the delinquency and foreclosure experience of adjustable-rate and fixed-rate mortgage loans funded by American Home and serviced by the Servicer as of the dates indicated. The tables only set forth information for mortgage loans serviced for American Home by the Servicer. The table does not include information for mortgage loans which were originated by American Home but are serviced by servicers other than the Servicer. In addition, they do not include other mortgage loans serviced by the Servicer which were originated by other originators. As a result, there can be no assurance, and no representation is made, that the delinquency and foreclosure experience with respect to the mortgage loans will be similar to that reflected in the tables below, nor is any representation made as to the rate at which losses may be experienced on liquidation of defaulted mortgage loans. The actual loss and delinquency experience on the mortgage loans will depend, among other things, upon the value of the real estate securing such mortgage loans and the ability of borrowers to make required payments. In particular, the mortgage loans in this securitization have attributes which may result in a significantly worse delinquency and loss experience than other mortgage loans originated by the seller.

The information set forth in the following paragraphs with respect to the Servicer has been provided by the Servicer.

AHM MILLS017835

## Delinquency and Foreclosure Experience in American Home's
## Adjustable Rate Mortgage Loan Portfolio

|  | As of September 30, 2004 | | | As of November 30, 2003 | | |
|---|---|---|---|---|---|---|
|  | No. of Loans | Principal Balance | % by Principal Balance | No. of Loans | Principal Balance | % by Principal Balance |
| Count/Balance.................. | 39,291 | $ 8,232,798,967 |  | 15,680 | $2,722,534,254 |  |
| 30-59 Days ................... | 446 | $   81,680,044 | 0.99% | 272 | $   34,929,151 | 1.28% |
| 60-89 Days ................... | 79 | $   14,653,738 | 0.18% | 45 | $    5,943,734 | 0.22% |
| 90 Days or more ........... | 73 | $   11,298,668 | 0.14% | 39 | $    3,743,110 | 0.14% |
| Delinquent/Bankruptcies.. | 120 | $   11,806,973 | 0.14% | 115 | $    9,965,649 | 0.36% |
| Total Delinquencies ......... | 718 | $  119,439,423 | 1.45% | 471 | $   54,581,644 | 2.00% |
| Foreclosures Pending ....... | 94 | $   12,677,963 | 0.15% | 88 | $    8,914,390 | 0.33% |
| Total Default ................... | 812 | $  132,117,386 | 1.60% | 559 | $   63,496,034 | 2.33% |

|  | As of December 31, 2004 | | | As of September 30, 2005 | | |
|---|---|---|---|---|---|---|
|  | No. of Loans | Principal Balance | % by Principal Balance | No. of Loans | Principal Balance | % by Principal Balance |
| Count/Balance.................. | 47,738 | $10,680,668,217 |  | 53,137 | $14,441,826,194 |  |
| 30-59 Days ................... | 535 | $  109,713,803 | 1.02% | 164 | $   45,080,200 | 0.31% |
| 60-89 Days ................... | 94 | $   18,117,688 | 0.16% | 29 | $    7,169,498 | 0.05% |
| 90 Days or more ........... | 38 | $    5,813,868 | 0.05% | 26 | $    7,736,791 | 0.05% |
| Delinquent/Bankruptcies.. | 78 | $    7,072,773 | 0.06% | 35 | $    5,557,163 | 0.04% |
| Total Delinquencies ......... | 745 | $  140,072,131 | 1.31% | 254 | $   65,543,652 | 0.45% |
| Foreclosures Pending ....... | 106 | $   20,815,426 | 0.19% | 159 | $   47,707,032 | 0.33% |
| Total Default ................... | 851 | $  161,533,557 | 1.51% | 413 | $  113,250,684 | 0.78% |

AHM_MILLS017836

### Delinquency and Foreclosure Experience in American Home's
### Fixed Rate Mortgage Loan Portfolio

| | As of December 31, 2004 | | | As of September 30, 2005 | | |
|---|---|---|---|---|---|---|
| | No. of Loans | Principal Balance | % by Principal Balance | No. of Loans | Principal Balance | % by Principal Balance |
| Count/Balance.............. | 52,683 | $ 6,009,988,813 | | 13,708 | $2,390,781,601 | |
| 30-59 Days .................. | 1,250 | $ 218,903,320 | 1.97% | 53 | $ 12,948,950 | 0.54% |
| 60-89 Days .................. | 262 | $ 24,919,320 | 0.41% | 17 | $ 4,581,457 | 0.19% |
| 90 Days or more ........... | 232 | $ 19,411,083 | 0.32% | 9 | $ 1,105,766 | 0.05% |
| Delinquent/Bankruptcies.. | 430 | $ 39,372,889 | 0.65% | 7 | $ 7,078,213 | 0.05% |
| Total Delinquencies ......... | 2,154 | $ 249,863,302 | 3.37% | 86 | $ 19,714,385 | 0.82% |
| Foreclosures Pending ....... | 314 | $ 31,155,164 | 0.51% | 32 | $ 4,878,153 | 0.20% |
| Total Default................... | 2,468 | $ 233,762,251 | 3.88% | 49 | $ 7,165,210 | 0.35% |

### Delinquency and Foreclosure Experience in American Home's
### Mortgage Loan Portfolio

| | As of December 31, 2004 | | | As of September 2005 | | |
|---|---|---|---|---|---|---|
| | No. of Loans | Principal Balance | % by Principal Balance | No. of Loans | Principal Balance | % by Principal Balance |
| Count/Balance.............. | 105,011 | $16,955,933,011 | | 75,369 | $17,317,560,260 | |
| 30-59 Days .................. | 1,882 | $ 233,710,634 | 1.37% | 348 | $ 65,158,426 | 0.38% |
| 60-89 Days .................. | 401 | $ 45,068,378 | 0.26% | 56 | $ 12,263,098 | 0.07% |
| 90 Days or more ........... | 275 | $ 25,941,223 | 0.15% | 49 | $ 9,271,243 | 0.05% |
| Delinquent/Bankruptcies.. | 508 | $ 46,445,663 | 0.27% | 44 | $ 6,709,628 | 0.04% |
| Total Delinquencies ......... | 3,066 | $ 351,165,898 | 2.87% | 497 | $ 93,402,395 | 0.54% |
| Foreclosures Pending ....... | 420 | $ 51,970,590 | 0.30% | 197 | $ 52,953,937 | 0.31% |
| Total Default................... | 3,486 | $ 403,136,488 | 2.37% | 694 | $ 146,356,332 | 0.85% |

While the above foreclosure and delinquency experience is typical of American Home's recent experience with respect to its fixed-rate and adjustable-rate mortgage loan portfolios master serviced by Servicer, there can be no assurance that experience on the mortgage loans will be similar. Accordingly, the information should not be considered to reflect the credit quality of the mortgage loans, or as a basis for assessing the likelihood, amount or severity of losses on the mortgage loans. The mortgage loans may be more recently originated than, and are likely to have other characteristics which distinguish them from, the loans in the tables above.

AHM MILLS017837

## MORTGAGE LOAN ORIGINATION

American Home Mortgage Investment Corp. and, together with its direct or indirect wholly-owned subsidiaries, collectively referred to herein as American Home, is in the business of investing in mortgage-backed securities resulting from the securitization of residential mortgage loans that its subsidiaries originate and service. As of September 30, 2005, American Home's mortgage-backed securities holdings business held a leveraged portfolio of mortgage-backed securities in the amount of approximately $9.2 billion in order to generate net interest income. American Home's loan origination business offers a broad array of mortgage products and primarily makes loans to borrowers with good credit profiles. American Home originated approximately $23.1 billion in aggregate principal amount of loans in 2004. American Home conducts lending through retail and wholesale loan production offices as well as its direct-to-consumer channel supported by American Home's call center. American Home operates more than 530 retail and wholesale loan production offices located in 45 states and makes loans throughout all 50 states and the District of Columbia. American Home's servicing business services the loans American Home retains for investment as well as certain loans for third parties. As of September 30, 2005, American Home serviced approximately 146,855 loans with an aggregate principal amount of approximately $27.5 billion.

The common stock of American Home Mortgage Investment Corp. is publicly traded on the New York Stock Exchange under the ticker symbol "AHM". The principal executive offices of American Home are located at 538 Broadhollow Road, Melville, New York 11747. The information set forth in the following paragraphs with respect to American Home has been provided by American Home.

*Underwriting Guidelines*

The following information generally describes American Home's underwriting guidelines with respect to mortgage loans originated pursuant to its "conforming" or "prime" underwriting standards and its Alt-A underwriting guidelines. Approximately 49.70% and 98.12% of the Group I and Group II mortgage loans, respectively, were generally written in accordance with American Home's "prime" underwriting guidelines. Approximately 19.26% of the Group I Loans were generally written in accordance with American Home's Alt-A underwriting guidelines. However, many of these mortgage loans were originated outside of these guidelines. Approximately 20.34% of the Group I Loans were generally written in accordance with the Federal Housing Administration's underwriting guidelines.

The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the Department of Veterans Affairs (VA), the US Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac. FHA and VA loans are generally approved by these same automated underwriting systems.

American Home's non-conforming underwriting guidelines are similar to those of the government sponsored enterprises Fannie Mae and Freddie Mac but these loans are "non-conforming" in that they may not conform to the maximum loan amounts and in some cases to the underwriting guidelines of Fannie Mae and Freddie Mac. These non-conforming loans do not conform to and are not insurable by the Federal Housing Administration nor can they be guaranteed by the Department of Veterans Affairs.

American Home's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. Because each loan is different, American Home expects

AHM_MILLS017838

and encourages underwriters to use professional judgment based on their experience in making a lending decision.

American Home underwrites a borrower's creditworthiness based solely on information that American Home believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

The non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac in that the borrower provides the same information on the loan application along with documentation to verify the accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. For these Alt-A products the borrower may not be required to verify employment income, assets required to close or both. For some other Alt-A products the borrower is not required to provide any information regarding employment income, assets required to close or both.   Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

American Home obtains a credit report that summarizes each borrower's credit history. The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report. A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit. Applicants who have higher credit scores will, as a group, have fewer defaults than those who have lower credit scores. The minimum credit score allowed by American Home non-conforming loan guidelines for these loans is 620 and the average is typically over 700. For American Home Alt-A products, the minimum credit score is generally 580. If the borrowers do not have a credit score they must have an alternative credit history showing at least three trade lines with no payments over 60 days past due in the last 12 months.

In addition to reviewing the borrower's credit history and credit score, American Home underwriters closely review the borrower's housing payment history. In general, for non-conforming loans the borrower should not have made any mortgage payments over thirty days after the due date for the most recent twelve months. In general, for Alt-A loans the borrower may have no more than one payment that was made over thirty days after the due date for the most recent twelve months.

In order to determine if a borrower qualifies for a non-conforming loan, the loans have been either approved by Fannie Mae's Desktop Underwriter or Freddie Mac's Loan Prospector automated underwriting systems or they have been manually underwritten by American Home underwriters. American Home's Alt-A loan products have been approved manually by contract underwriters provided by certain mortgage insurance companies. American Home Solutions products must receive an approval from the Assetwise automated underwriting system. For manually underwritten loans, the underwriter must ensure that the borrower's income will support the total housing expense on an ongoing basis. Underwriters may give consideration to borrowers who have demonstrated an ability to carry a similar or greater housing expense for an extended period. In addition to the monthly housing expense the underwriter must evaluate the borrower's ability to manage all recurring payments on all debts, including the monthly housing expense. When evaluating the ratio of all monthly debt payments to the borrower's monthly income (debt-to-income ratio), the underwriter should be aware of the degree and frequency of credit usage and its impact on the borrower's ability to repay the loan. For example, borrowers who lower

AHM MILLS017839

their total obligations should receive favorable consideration and borrowers with a history of heavy usage and a pattern of slow or late payments should receive less flexibility.

Every American Home mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. The appraisers perform on site inspections of the property and report on the neighborhood and property condition in factual and specific terms. Each appraisal contains an opinion of value that represents the appraiser's professional conclusion based on market data of sales of comparable properties, a logical analysis with adjustments for differences between the comparable sales and the subject property and the appraiser's judgment. In addition, each appraisal is reviewed for accuracy and consistency by an American Home underwriter or a mortgage insurance company contract underwriter.

The appraiser's value conclusion is used to calculate the ratio (loan-to-value) of the loan amount to the value of the property. For loans made to purchase a property this ratio is based on the lower of the sales price of the property and the appraised value. American Home sets various maximum loan-to-value ratios based on the loan amount, property type, loan purpose and occupancy of the subject property securing the loan. In general, American Home requires lower loan-to-value ratios for those loans that are perceived to have a higher risk, such as high loan amounts, loans in which additional cash is being taken out on a refinance transaction or loans on second homes. A lower loan-to-value ratio requires a borrower to have more equity in the property which is a significant additional incentive to the borrower to avoid default on the loan. In addition, for all conventional loans in which the loan-to-value ratio exceeds 80%, American Home requires that the loan be insured by a private mortgage insurance company that is approved by Fannie Mae and Freddie Mac. Loans with higher loan-to-value ratios require higher coverage levels. For example, non-conforming loans with loan-to-value ratios of 85%, 90% and 95% require mortgage insurance coverage of 12%, 25% and 30%, respectively. Alt-A loans with full or alternative documentation and loan-to-value ratios of 85%, 90%, 95% and 97% require mortgage insurance coverage of 12-20%, 25%, 30% and 35%, respectively. Alt-A loans with loan-to-value ratios up to 100% require 35% coverage.

American Home realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to American Home's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

## ADDITIONAL INFORMATION

The description of the mortgage pool and the mortgaged properties in this offering circular supplement, including Schedule A hereto, is based upon the mortgage pool as constituted at the close of business on the Cut-off Date, as adjusted for the stated principal payments due on or before this date. Prior to the issuance of the Notes, mortgage loans may be removed from the mortgage pool as a result of incomplete documentation or otherwise if the Depositor deems this removal necessary or desirable, and may be prepaid at any time. A limited number of other mortgage loans may be included in the mortgage pool prior to the issuance of the Notes unless including these mortgage loans would materially alter the characteristics of the mortgage pool as described in this offering circular supplement. The Depositor believes that the information set forth in this offering circular supplement will be representative of the characteristics of the mortgage pool as it will be constituted at the time the Notes are issued, although the range of mortgage rates and maturities and other characteristics of the mortgage loans may vary. In no event, however, will more than 10% (by principal balance at the Cut-off Date) of the mortgage loans deviate from the characteristics of the mortgage loans set forth in this offering circular supplement.

AHM_MILLS017840

## **EXHIBIT D**

Referral Letter to Cal-Western

YCST01:10377641.3                                                                                        066585.1001

01/26/06 10:52:21

January 25, 2006

1086027-01

Cal-Western Reconveyance Corp
525 East Main Street
El Cajon, Ca  92022-9004

AHM Loan Number:    1000930980              Deborah E Mills

Mail Address:        1880 Burnt Rock Way       Property Address:       same
                     Templeton, CA  93465

Dear Counselor:

Please commence foreclosure immediately on the above referenced mortgage loan complying with the
terms of the mortgage loan documents, and investor/insurer guidelines. Enclosed you will find a
Foreclosure Referral Sheet outlining the specifics of the case which is being referred to you.  We would
like you to order a title search immediately to ensure that all interested parties (lien holders) are notified in
advance of the foreclosure sale.  Please send copies of relevant documents including proof of publication,
to my attention and to the investor, if applicable.  Please inform me of any delays.

All requests for reinstatement or payoff / assumption figures will be referred to your office.  All checks
accepted on behalf of A American Home Mortgage Servicing in the form of certified funds.  Your office will
accept neither partial payments nor repayment plans unless they are pre-authorized in writing by AMH.

Upon completion of the foreclosure, please submit your bill for fees & costs.  Your bill must provide a
complete cost breakdown.  All correspondence should reference our account number.  Should you have
any questions, please feel free to contact me at the number below.

Please do not fax any attorney bills to our office.  We will only honor original bills submitted
though the mail, to prevent duplicate payments.

IN THE COURSE OF PROCESSING THIS FORECLOSURE ACTION, AND UPON COMPLETION OF THE TITLE
SEARCH IF YOU DISCOVER THAT "AMERICAN HOME MORTGAGE" ORIGINATED A SECOND MORTGAGE
ON THE SUBJECT PROPERTY BUT HAS SINCE SOLD THAT MORTGAGE TO ANOTHER ENTITY, PLEASE
CONTACT YOUR FORECLOSURE REPRESENTATIVE AT AMERICAN HOME MORTGAGE TO DETERMINE
HOW THIS LOAN SHOULD BE HANDLED.

Sincerely,

Janet Gibson

Janet Gibson
Foreclosure Administrator
(214) 260-6838
(214) 260-6826

Enclosures

cc: Foreclosure files

AHM_MILLS019372

01/26/06 10:52:22

January 25, 2006

Deborah E Mills
1880 Burnt Rock Way
Templeton, CA 93465

| AHM Loan Number: | 1000930980 | Deborah E Mills | |
| --- | --- | --- | --- |
| Mail Address: | 1880 Burnt Rock Way<br>Templeton, CA 93465 | Property Address: | same |

Dear Mortgagor(s):

Today we have forwarded your account to our foreclosure attorney. Therefore, legal fees and costs that accrue will be included in the amount due should you desire to reinstate your account.

When our attorney has the foreclosure docketed in court, your account will be reported in a foreclosure status with the credit bureau.

**Any questions concerning this foreclosure action should be directed to our foreclosure attorney, Cal-Western Reconveyance Corp 619-590-9200.**

Sincerely,

*Janet Gibson*

Janet Gibson
Foreclosure Administrator
(214) 260-6838
(214) 260-6826

cc: Foreclosure files

AHM_MILLS019373

01/26/06 10:52:23

\* Case No.

## STATEMENT OF DEBT DUE UNDER DEED OF TRUST As of 01/25/2006

**\*\*\*\*AMENDED\*\*\*\***

Account No.      1000930980
Borrower/s:      Deborah Mills

Prop:      1880 Burnt Rock Way
           Templeton, CA 93465

| | |
|---|---:|
| Original Amount of Deed of Trust | 200,000.00 |
| Payments to Principal | |
| Principal Accrued | 63.91 |
| **BALANCE UNPAID PRINCIPAL** | 199,936.09 |
| **PLUS** | |
| Escrow advances by American Home Mortgage Servicing | 0.00 |
| Corporate advances by American Home Mortgage Servicing | 0.00 |
| Interest due on the sum of 199,936.09 from 9/1/2005 to 01/25/2006 | 9,260.05 |
| Accrued late charges | 0.00 |
| Accrued fees | 0.00 |
| **LESS** | |
| Escrow account balance | -0.00 |
| Funds on hand | -0.00 |
| **TOTAL DEBT** | 209,196.14 |

Daily Interest after 01/25/2006 will be 62.99.

American Home Mortgage Servicing F/K/A
PaineWebber Mortgage Finance, Inc.

By: _____
      Robert Hardman, Vice President

STATE OF TEXAS, COUNTY OF DALLAS, to wit:

I HEREBY CERTIFY, that on 01/25/2006 before me, a Notary Public of the State of Texas, personally appeared Robert Hardman, Vice President of American Home Mortgage Servicing F/K/A PaineWebber Mortgage Finance, Inc., and agent of the holder of the trust in the above-entitled cause, and made oath that the foregoing is a true statement of the debt due under the Deed of Trust filed in the said cause remaining due and unpaid to the holder of the trust.

AS WITNESS my hand and notarial seal.

My commission expires: _____
      Notary Public

ANGELICA M. CASTRO
Notary Public, State of Texas
My Commission Expires
April 19, 2009

AHM MILLS019374

01/26/06 10:52:24



**AMERICAN. HOME MORTGAGE SERVICING**

01/25/2006

Deborah Mills
1880 Burnt Rock Way
Templeton, CA 93465

## FORECLOSURE REFERRAL SHEET ACCOUNT # 1000930980

| | |
|---|---|
| SPECIAL INSTRUCTIONS/COMMENTS _____ | MERS REGISTRATION  <u>YES</u> <u>NO</u> |
| FIRST LEGAL FILING DATE REQUIRED BY: _____ | ____  ____ |

Borrower/s: Deborah Mills
Social Security #: ▓▓▓▓▓▓▓▓
Prop: 1880 Burnt Rock Way
      Templeton, CA 93465

Lender/Note Holder: AMERICAN HOME MTG SERV, INC.

Insurer (FHA/PMI/VA): _____ *CU* _____

FHA/VA/PMI ID # _____

| | |
|---|---|
| Balance Unpaid Principal: | $ 199,936.09 |
| Monthly P & I: | $ 1,980.58 |
| Interest Rate: | 11.50 |
| Monthly Late Charge: | $ 99.03 |

### REINSTATEMENT MUST HAVE PRIOR APPROVAL FROM THIS OFFICE

Due Date: 10/1/2005 Reinstatement Figures Through *1,25,06*

| | |
|---|---|
| No of payments delinquent: | 4 |
| Total Delinquent: | $ 7,922.32 |
| Late Charges: | $ 0.00 |
| NSF Charges: | $ 0.00 |
| Fees: | $ 0.00 |
| Corporate Advance: | $ 0.00 |
| Funds in Partial Pymt/Forebearance | $ 0.00 |
| **Sub Total:** | **$ 7,922.32** |

Liquidation Appraisal:     $

Total To Reinstate:     $ *7922.32*

Enclosed Documents for Referral:

| | | |
|---|---|---|
| (Original/Copy) Deed of Trust/Mortgage ____ | Collection Letters ✓ |
| (Original/Copy) Note ____ | Statement of Debt ____ |
| (Original/Copy) Title Policy(copy) ✓ | Other ____ |



4600 Regent Blvd, Suite #200, Irving, TX 75063-24432 www.americanhm.com
Licensed Mortgage Banker or Authorized Lender in the Fifty States and The District of Columbia * NYSE Listing Symbol - AHM

AHM_MILLS019375

01/26/06 10:52:25

Foreclosure Administrator: _____
Phone Number: 214-260-_____  Date: 01/25/2006

4600 Regent Blvd, Suite #200, Irving, TX 75063-24432 www.americanhm.com
Licensed Mortgage Banker or Authorized Lender in the Fifty States and The District of Columbia * NYSE Listing Symbol · AHM

AHM MILLS019376

01/26/06 10:52:27



'AMERICAN' HOME MORTGAGE' SERVICING

01/25/2006

Re: AHM No. 1000930980
                Mills

Dear Counsel:

<u>X</u> Enclosed please find:

    <u>X</u> an amended statement of debt;

    ___ an executed military affidavit;

    ___ an executed substitute of trustees;

    ___ the assignments you requested.

___ Please forward a condo bill.

___ Please provide the following information:

    ___ docket date;

    ___ sale date, if established; proposed ad.

    ___ eviction date, if established.

___ Please have the deed recorded.

___ Please re-open the foreclosure.

<u>X</u>

<u>X</u>

Thank you for your assistance in this matter.  Please
call if you have any questions regarding this matter.

Sincerely,

*Janet Gibson*
*314-260-6838*

4600 Regent Blvd, Suite #200, Irving, TX 75063-24432 www.americanhm.com
Licensed Mortgage Banker or Authorized Lender in the Fifty States and The District of Columbia * NYSE Listing Symbol -
AHM

AHM MILLS019377

01/26/06 10:52:28



# American Home Mortgage Servicing

4600 Regent Blvd, Suite 200
Irving, Texas 75063
1-877-304-8300

December 22, 2005

Deborah Mills
1880 Burnt Rock Way
Templeton, CA 93465

Re:    American Home Mortgage Loan # 1000930980
Property  1880 Burnt Rock Way, Templeton, CA 93465

Dear Deborah Mills:

This letter is written to you to advise you that you are currently in def
for non-payment of the monthly mortgage payments for the months o
2005.

In order to cure this default, please forward to us the sum of $5941.7
payments, late charges and fees now due by certified check, cashiers
delay in reinstating your mortgage account will result in additional a

**NOTE**

As payments are due on the first day of each month and late charges
delinquency, the above total delinquency amount must be paid incre
payment, if not received prior to January 15, 2006 for the total of $7

The total amount due indicated above should be mailed to America
4600 Regent Blvd, Ste 200, Irving, Texas 75063. For your conve
enclosed. Please enclose the appropriate coupons with these funds.

In the event this default is not cured as herein stated, we may, at our option,
say declare that all of the sums secured by your Deed of Trust shall be immediately due and payable with
out father demand and invoke the power of sale and any other remedies permitted by applicable law. In the
event we do Accelerate, then we shall entitled to collect all reasonable cost and expenses incurred in
pursuing the remedies available to us including, but not limited to, reasonable Attorney fees.

A copy of this letter is being sent to you by regular first-class mail and certified. We await the courtesy of
your reply.

Sincerely,

Amanda Ellsworth
1-877-304-8300 X 6822
Loss Mitigation Specialist

---

Licensed Mortgage Banker or Authorized Lender in the Fifty States and The District of Columbia • NYSE Listing Symbol - AHM

AHM_MILLS019378

01/26/06 10:52:29

RECORDING REQUESTED BY:
CHICAGO TITLE

3440089

Recording Requested By:
American Brokers Conduit

Return To:
American Brokers Conduit
520 Broadhollow Road
Melville, NY 11747

Prepared By:



JULIE RODEWALD
San Luis Obispo County – Clerk/Recorder
Recorded at the request of
Chicago Title Company

DOC#: 2005065865

| | | |
|---|---|---|
| DOC#: 2005065865 | Titles: 3 | Pages: 10 |
| | Fees | 48.00 |
| | Taxes | 0.00 |
| | Others | 0.00 |
| | PAID | $48.00 |

DG.
8/09/2005
8:00 AM

# DEED OF TRUST AND REQUEST FOR NOTICE OF DEFAULT

MIN 100024200009309804

THIS DEED OF TRUST is made this    15th    day of   July, 2005    , among the Trustor,
Deborah E. Mills, a Single Woman

whose address is  179 Niblick Road PMB 143, Paso Robles, CA  93446          (herein "Borrower"),
Chicago Title Company

(herein "Trustee"), and the Beneficiary,
Mortgage Electronic Registration Systems, Inc. ("MERS"), (solely as nominee for Lender, as hereinafter defined, and Lender's
successors and assigns). MERS is organized and existing under the laws of Delaware, and has an address and telephone number
of P.O. Box 2026, Flint, MI 48501-2026; tel. (888) 679-MERS.
American Brokers Conduit

("Lender") is organized and
existing under the laws of   State of New York                , and has an address of
538 Broadhollow Road, Melville, NY  11747
      BORROWER, in consideration of the indebtedness herein recited and the trust herein created, irrevocably grants and conveys
to Trustee, in trust, with power of sale, the following described property located in the County of  San Luis Obispo
                                         , State of California:
Parcel 95 of Parcel Map COAL 99-0229, in the County of San Luis Obispo, State of
California, according to map recorded April 19, 2002 in Book 56, Page 39 of Parcel
Maps, and Certification of Correction recorded February 10, 2004 as Instrument No.
2004-010437 of Official Records, in the Office of the County Recorder of said
County.

which has the address of
[Street]
1880 Burnt Rock Way
Templeton                     [City] , California  93465      [ZIP Code] (herein "Property Address");

DOC #:328641          APPL #:0000930980

CALIFORNIA - SECOND MORTGAGE - 1/80 - FNMA/FHLMC UNIFORM INSTRUMENT  WITH MERS

-76N(CA)  (0304)      UM51 '0304    Form 3805
Page 1 of 7                    Amended 9/99
      VMP MORTGAGE FORMS - (800)521-7291    Initials:

AHM_MILLS019379

01/26/06 10:52:30

TOGETHER with all the improvements now or hereafter erected on the property, and all easements, rights, appurtenances and rents (subject however to the rights and authorities given herein to Lender to collect and apply such rents), all of which shall be deemed to be and remain a part of the property covered by this Deed of Trust; and all of the foregoing, together with said property (or the leasehold estate if this Deed of Trust is on a leasehold) are hereinafter referred to as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Deed of Trust; but, if necessary to comply with law or custom, MERS, (as nominee for Lender and Lender's successors and assigns), has the right; to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing or canceling this Deed of Trust.

TO SECURE to Lender the repayment of the indebtedness evidenced by Borrower's note dated   July 15, 2005                  and extensions and renewals thereof (herein "Note"), in the principal sum of .
U.S. $  200,000.00          , with interest thereon, providing for monthly installments of principal and interest, with the balance of the indebtedness, if not sooner paid, due and payable on     August 1, 2020                    ; the payment of all other sums, with interest thereon, advanced in accordance herewith to protect the security of this Deed of Trust; and the performance of the covenants and agreements of Borrower herein contained.

Borrower covenants that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property, and that the Property is unencumbered except for encumbrances of record. Borrower covenants that Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to encumbrances of record.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. Payment of Principal and Interest. Borrower shall promptly pay when due the principal and interest indebtedness evidenced by the Note and late charges as provided in the Note.
2. Funds for Taxes and Insurance. Subject to applicable law or a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments of principal and interest are payable under the Note, until the Note is paid in full, a sum (herein "Funds") equal to one-twelfth of the yearly taxes and assessments (including condominium and planned unit development assessments, if any) which may attain priority over this Deed of Trust, and ground rents on the Property, if any, plus one-twelfth of yearly premium installments for hazard insurance, plus one-twelfth of yearly premium installments for mortgage insurance, if any, all as reasonably estimated initially and from time to time by Lender on the basis of assessments and bills and reasonable estimates thereof. Borrower shall not be obligated to make such payments of Funds to Lender to the extent that Borrower makes such payments to the holder of a prior mortgage or deed of trust if such holder is an institutional lender.
If Borrower pays Funds to Lender, the Funds shall be held in an institution the deposits or accounts of which are insured or guaranteed by a federal or state agency (including Lender if Lender is such an institution). Lender shall apply the Funds to pay said taxes, assessments, insurance premiums and ground rents. Lender may not charge for so holding and applying the Funds, analyzing said account or verifying and compiling said assessments and bills, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. Borrower and Lender may agree in writing at the time of execution of this Deed of Trust that interest on the Funds shall be paid to Borrower, and unless such agreement is made or applicable law requires such interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for the sums secured by this Deed of Trust.
If the amount of the Funds held by Lender, together with the future monthly installments of Funds payable prior to the due dates of taxes, assessments, insurance premiums and ground rents, shall exceed the amount required to pay said taxes, assessments, insurance premiums and ground rents as they fall due, such excess shall be, at Borrower's option, either promptly repaid to Borrower or credited to Borrower on monthly installments of Funds. If the amount of the Funds held by Lender shall not be sufficient to pay taxes, assessments, insurance premiums and ground rents as they fall due, Borrower shall pay to Lender any amount necessary to make up the deficiency in one or more payments as Lender may require.
Upon payment in full of all sums secured by this Deed of Trust, Lender shall promptly refund to Borrower any Funds held by Lender. If under paragraph 17 hereof the Property is sold or the Property is otherwise acquired by Lender, Lender shall apply, no later than immediately prior to the sale of the Property or its acquisition by Lender, any Funds held by Lender at the time of application as a credit against the sums secured by this Deed of Trust.
3. Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under the Note and paragraphs 1 and 2 hereof shall be applied by Lender first in payment of amounts payable to Lender by Borrower under paragraph 2 hereof, then to interest payable on the Note, and then to the principal of the Note.
4. Prior Mortgages and Deeds of Trust; Charges; Liens. Borrower shall perform all of Borrower's obligations under any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust, including Borrower's covenants to make payments when due. Borrower shall pay or cause to be paid all taxes, assessments and other charges, fines and impositions attributable to the Property which may attain a priority over this Deed of Trust, and leasehold payments or ground rents, if any.
5. Hazard Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.

DOC  #1328642                    APPL #:0000930980

VMP -76N(CA) (0201)                         Page 2 of 7                              Initials:                   Form 3805

AHM_MILLS019380

01/26/06 10:52:33

The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided, that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Deed of Trust.

6. **Preservation and Maintenance of Property; Leaseholds; Condominiums; Planned Unit Developments.** Borrower shall keep the Property in good repair and shall not commit waste or permit impairment or deterioration of the Property and shall comply with the provisions of any lease if this Deed of Trust is on a leasehold. If this Deed of Trust is on a unit in a condominium or a planned unit development, Borrower shall perform all of Borrower's obligations under the declaration or covenants creating or governing the condominium or planned unit development, the by-laws and regulations of the condominium or planned unit development, and constituent documents.

7. **Protection of Lender's Security.** If Borrower fails to perform the covenants and agreements contained in this Deed of Trust, or if any action or proceeding is commenced which materially affects Lender's interest in the Property, then Lender, at Lender's option, upon notice to Borrower, may make such appearances, disburse such sums, including reasonable attorneys' fees, and take such action as is necessary to protect Lender's interest. If Lender required mortgage insurance as a condition of making the loan secured by this Deed of Trust, Borrower shall pay the premiums required to maintain such insurance in effect until such time as the requirement for such insurance terminates in accordance with Borrower's and Lender's written agreement or applicable law.

Any amounts disbursed by Lender pursuant to this paragraph 7, with interest thereon, at the Note rate, shall become additional indebtedness of Borrower secured by this Deed of Trust. Unless Borrower and Lender agree to other terms of payment, such amounts shall be payable upon notice from Lender to Borrower requesting payment thereof. Nothing contained in this paragraph 7 shall require Lender to incur any expense or take any action hereunder.

8. **Inspection.** Lender may make or cause to be made reasonable entries upon and inspections of the Property, provided that Lender shall give Borrower notice prior to any such inspection specifying reasonable cause therefor related to Lender's interest in the Property.

9. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of the Property, or part thereof, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Deed of Trust.

10. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Deed of Trust granted by Lender to any successor in interest of Borrower shall not operate to release, in any manner, the liability of the original Borrower and Borrower's successors in interest. Lender shall not be required to commence proceedings against such successor or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Deed of Trust by reason of any demand made by the original Borrower and Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy hereunder, or otherwise afforded by applicable law, shall not be a waiver of or preclude the exercise of any such right or remedy.

11. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements herein contained shall bind, and the rights hereunder shall inure to, the respective successors and assigns of Lender and Borrower, subject to the provisions of paragraph 16 hereof. All covenants and agreements of Borrower shall be joint and several. Any Borrower who co-signs this Deed of Trust, but does not execute the Note, (a) is co-signing this Deed of Trust only to grant and convey that Borrower's interest in the Property to Trustee under the terms of this Deed of Trust, (b) is not personally liable on the Note or under this Deed of Trust, and (c) agrees that Lender and any other Borrower hereunder may agree to extend, modify, forbear, or make any other accommodations with regard to the terms of this Deed of Trust or the Note, without that Borrower's consent and without releasing that Borrower or modifying this Deed of Trust as to that Borrower's interest in the Property.

12. **Notice.** Except for any notice required under applicable law to be given in another manner, (a) any notice to Borrower provided for in this Deed of Trust shall be given by delivering it or by mailing such notice by certified mail addressed to Borrower at the Property Address or at such other address as Borrower may designate by notice to Lender as provided herein, and (b) any notice to Lender shall be given by certified mail to Lender's address stated herein or to such other address as Lender may designate by notice to Borrower as provided herein. Any notice provided for in this Deed of Trust shall be deemed to have been given to Borrower or Lender when given in the manner designated herein.

13. **Governing Law; Severability.** The state and local laws applicable to this Deed of Trust shall be the laws of the jurisdiction in which the Property is located. The foregoing sentence shall not limit the applicability of federal law to this Deed of Trust. In the event that any provision or clause of this Deed of Trust or the Note conflicts with applicable law, such conflict

DOC #:328643          APPL #:0000930980

*MFD*-76N(CA) (0200)          Page 3 of 7          Initials *dm*          Form 3805

AHM MILLS019381

01/26/06 10:52:34

shall not affect other provisions of this Deed of Trust or the Note which can be given effect without the conflicting provision, and to this end the provisions of this Deed of Trust and the Note are declared to be severable. As used herein, "costs," "expenses" and "attorneys' fees" include all sums to the extent not prohibited by applicable law or limited herein.

14. **Borrower's Copy.** Borrower shall be furnished a conformed copy of the Note and this Deed of Trust at the time of execution or after recordation hereof.

15. **Rehabilitation Loan Agreement.** Borrower shall fulfill all of Borrower's obligations under any home rehabilitation, improvement, repair, or other loan agreement which Borrower enters into with Lender. Lender, at Lender's option, may require Borrower to execute and deliver to Lender, in a form acceptable to Lender, an assignment of any rights, claims or defenses which Borrower may have against parties who supply labor, materials or services in connection with improvements made to the Property.

16. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Deed of Trust. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Deed of Trust.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Deed of Trust. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Deed of Trust without further notice or demand on Borrower.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

17. **Acceleration; Remedies.** Except as provided in paragraph 16 hereof, upon Borrower's breach of any covenant or agreement of Borrower in this Deed of Trust, including the covenants to pay when due any sums secured by this Deed of Trust, Lender, prior to acceleration shall give notice to Borrower as provided in paragraph 12 hereof specifying: (1) the breach; (2) the action required to cure such breach; (3) a date, not less than 10 days from the date the notice is mailed to Borrower, by which such breach must be cured; and (4) that failure to cure such breach on or before the date specified in the notice may result in acceleration of the sums secured by this Deed of Trust and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the breach is not cured on or before the date specified in the notice, Lender, at Lender's option may declare all of the sums secured by this Deed of Trust to be immediately due and payable without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all reasonable costs and expenses incurred in pursuing the remedies provided in this paragraph 17, including, but not limited to, reasonable attorneys' fees.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's selection to cause the Property to be sold and shall cause such notice to be recorded in each county in which the Property or some part thereof is located, Lender or Trustee shall mail copies of such notice in the manner prescribed by applicable law. Trustee shall give public notice of sale to the persons and in the manner prescribed by applicable law. After the lapse of such time as may be required by applicable law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in such order as Trustee may determine. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or Lender's designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property so sold without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all reasonable costs and expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees and costs of title evidence; (b) to all sums secured by this Deed of Trust; and (c) the excess, if any, to the person or persons legally entitled thereto.

18. **Borrower's Right to Reinstate.** Notwithstanding Lender's acceleration of the sums secured by this Deed of Trust due to Borrower's breach, Borrower shall have the right to have any proceedings begun by Lender to enforce this Deed of Trust discontinued at any time prior to five days before sale of the Property pursuant to the power of sale contained in this Deed of Trust or at any time prior to entry of a judgment enforcing this Deed of Trust if: (a) Borrower pays Lender all sums which would be then due under this Deed of Trust and the Note had no acceleration occurred; (b) Borrower cures all breaches of any other covenants or agreements of Borrower contained in this Deed of Trust; (c) Borrower pays all reasonable expenses incurred by Lender and Trustee in enforcing the covenants and agreements of Borrower contained in this Deed of Trust, and in enforcing Lender's and Trustee's remedies as provided in paragraph 17 hereof, including, but not limited to, reasonable attorneys' fees; and (d) Borrower takes such

DOC #:328644                APPL #:0000930980                                Initials: [signature]

[LOGO]-76N(CA) (0204)                      Page 6 of 7                              Form 3805

AHM_MILLS019382

01/26/06 10:52:35

action as Lender may reasonably require to assure that the lien of this Deed of Trust, Lender's interest in the Property and Borrower's obligation to pay the sums secured by this Deed of Trust shall continue unimpaired. Upon such payment and cure by Borrower, this Deed of Trust and the obligations secured hereby shall remain in full force and effect as if no acceleration had occurred.

19. **Assignment of Rents; Appointment of Receiver; Lender in Possession.** As additional security hereunder, Borrower hereby assigns to Lender the rents of the Property, provided that Borrower shall, prior to acceleration under paragraph 17 hereof or abandonment of the Property, have the right to collect and retain such rents as they become due and payable.

Upon acceleration under paragraph 17 hereof or abandonment of the Property, Lender, in person, by agent or by judicially appointed receiver shall be entitled to enter upon, take possession of and manage the Property and to collect the rents of the Property including those past due. All rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including, but not limited to, receiver's fees, premiums on receiver's bonds and reasonable attorneys' fees, and then to the sums secured by this Deed of Trust. Lender and the receiver shall be liable to account only for those rents actually received.

20. **Reconveyance.** Upon payment of all sums secured by this Deed of Trust, Lender shall request Trustee to reconvey the Property and shall surrender this Deed of Trust and all notes evidencing indebtedness secured by this Deed of Trust to Trustee. Trustee shall reconvey the Property without warranty and to the person or persons legally entitled thereto. Such person or persons shall pay all costs of recordation, if any.

21. **Substitute Trustee.** Lender, at Lender's option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county where the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this instrument is recorded and the name and address of the successor trustee. The successor trustee shall, without conveyance of the Property, succeed to all the title, powers and duties conferred upon the Trustee herein and by applicable law. The procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

22. **Request for Notices.** Borrower requests that copies of the notice of default and notice of sale be sent to Borrower's address which is the Property Address. Lender requests that copies of notices of foreclosure from the holder of any lien which has priority over this Deed of Trust be sent to Lender's address, as set forth on page one of this Deed of Trust, as provided by Section 2924(b) of the Civil Code of California.

23. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

REQUEST FOR NOTICE OF DEFAULT
AND FORECLOSURE UNDER SUPERIOR
MORTGAGES OR DEEDS OF TRUST

Borrower and Lender request the holder of any mortgage, deed of trust or other encumbrance with a lien which has priority over this Deed of Trust to give Notice to Lender, at Lender's address set forth on page one of this Deed of Trust, of any default under the superior encumbrance and of any sale or other foreclosure action.

In accordance with Section 2924b, Civil Code, request is hereby made that a copy of any notice of default and a copy of any notice of sale under the deed of trust (or mortgage) recorded *Concurrent* , in Book , Page , records of San Luis Obispo County, or filed for record with recorder's serial number , California, executed by Deborah E. Mills, a Single Woman

as trustor (or mortgagor) in which American Brokers Conduit

is named

as beneficiary (or mortgagee) and Chicago Title Company

as trustee

be mailed to American Brokers Conduit
at 538 Broadhollow Road, Melville, NY 11747

DOC #:328645                  APPL #:0000930980

-76N(CA) (0204)                                Page 5 of 7                                Form 3805

AHM_MILLS019383

01/26/06 10:52:36

NOTICE: A copy of any notice of default and of any notice of sale will be sent only to the address contained in this recorded request. If your address changes, a new request must be recorded.

State of California
County of _Sam Luis Obispo_
On _7-15-05_ , before me _Lori L. Filipponi_ , personally appeared
_Deborah E. Mills_ , personally known to me

(or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

_____

```
        LORI L. FILIPPONI
        COMM. #1481275
   NOTARY PUBLIC - CALIFORNIA
      SAN LUIS OBISPO COUNTY
   My Comm. Expires APR. 6, 2008
```

IN WITNESS WHEREOF, Borrower has executed this Deed of Trust.

_Deborah Mills_ (Seal)                    _____ (Seal)
Deborah E. Mills        -Borrower                                 -Borrower

_____ (Seal)           _____ (Seal)
                -Borrower                                        -Borrower

_____ (Seal)           _____ (Seal)
                -Borrower                                        -Borrower

_____ (Seal)           _____ (Seal)
                -Borrower                                        -Borrower

*[Sign Original Only]*

DOC #1328646                  APPL #:0000930980
-76N(CA) (0201)                   Page 6 of 7                     Form 3805

AHM_MILLS019384

01/26/06 10:52:37

State of California
County of San Luis Obispo
On    7-15-05    , before me    Lori L. Filipponi    , personally appeared

Deborah E. Mills

, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

LORI L. FILIPPONI
COMM. #1481275
NOTARY PUBLIC - CALIFORNIA
SAN LUIS OBISPO COUNTY
My Comm. Expires APR. 6, 2008

DOC #:328647
IMP-76N(CA) (0200)    APPL #:0000930980    Page 7 of 7    Initials    Form 3805

AHM_MILLS019385

01/26/06 10:52:41

# PLANNED UNIT DEVELOPMENT RIDER

THIS PLANNED UNIT DEVELOPMENT RIDER is made this        15th                day of
July, 2005                                , and is incorporated into and shall be
deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument")
of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
American Brokers Conduit

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:
1880 Burnt Rock Way, Templeton, CA  93465

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other
such parcels and certain common areas and facilities, as described in
        THE DECLARATION OF COVENANTS AND RESTICTIONS·

(the "Declaration"). The Property is a part of a planned unit development known as
SANTA YSABEL RANCH

[Name of Planned Unit Development]
(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent
entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the
uses, benefits and proceeds of Borrower's interest.

   PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument,
Borrower and Lender further covenant and agree as follows:
   A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the: (i) Declaration; (ii) articles of incorporation,
trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or
other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and
assessments imposed pursuant to the Constituent Documents.

DOC #:321911        APPL #:0000930980
MULTISTATE PUD RIDER - Single - Family/Second   Mortgage
        UM31 0003              Page 1 of 3
Initials:                                                       3/99
VMP-207R (0003)        VMP MORTGAGE FORMS - (800)521-7291

AHM_MILLS019386

01/26/06 10:52:41

**B. Hazard Insurance.** So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the provision in Uniform Covenant 2 for the monthly payment to Lender of the yearly, premium installments for hazard insurance on the Property; and (ii) Borrower's obligation under Uniform Covenant 5 to maintain hazard insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required hazard insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

**C. Public Liability Insurance.** Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

**D. Condemnation.** The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Uniform Covenant 9.

**E. Lender's Prior Consent.** Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

DOC #:321912          APPL #:0000930980

Initials: _JM_

-207R (0003)                          Page 2 of 3                          3/99

AHM_MILLS019387

01/26/06 10:52:42

F. **Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)
Deborah E. Mills          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

_____ (Seal)
                          -Borrower

DOC #:321913        APPL #:0000930980
(MIN)207R (0003)         Page 3 of 3                    3/99

**END OF DOCUMENT**

AHM_MILLS019388