IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                         :     Chapter 11
                              :

AMERICAN HOME MORTGAGE   :     Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, <u>et al.</u>,  :

                              :     Jointly Administered

           Debtors.         :

------------------------------------------------------------ x   Docket Ref. Nos. 8812 & 8847

## JOINT PRETRIAL ORDER REGARDING CLAIM OBJECTION HEARING

The debtors and debtors-in-possession in the above-captioned cases (collectively,

the "<u>Debtors</u>" ) and Deborah Mills ("<u>Mills</u>") submit the following as their Joint Pretrial

Order in advance of the hearing on Debtors' Objections to Claim Nos. 10802-10809.

**(A)**     **Basis of Jurisdiction**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).  Venue is proper

in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the

relief sought herein are Cal. Civ. Code §§ 3294(a) and 3333; §§ 362(h), 502(b) and 503

of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 3003 and 3007

of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

**(B)**     **Statement of Uncontested Facts**[1]

1.     On or about May 19, 2005, Ms. Mills and Hilliard Development, LLC

entered into an agreement (as amended by counteroffer, the "<u>Purchase Agreement</u>") to

purchase that certain property located at 1880 Burnt Rock Way, Templeton, California

(the "<u>Property</u>") for a total purchase price of $1,375,000 (the "<u>Purchase Price</u>").  A copy

---

[1]   Exhibits referred to in the Stipulation of Undisputed Facts are attached hereto and
incorporated herein by reference.

1

of the Purchase Agreement, (as amended by the counteroffer, the "Counteroffer"), is attached hereto as Exhibit A.

2.    In connection with the purchase of the Property, Ms. Mills initially sought financing through Mr. Roland Jones ("Mr. Jones"), who was seeking to secure financing for the Property (the "Bridgeport Loans") from Bridgeport Mortgage ("Bridgeport"). (See Mills Decl. ¶8.)

3.    On or about June 29, 2005, Ms. Mills contacted Ms. Tawnya Lettau ("Ms. Lettau"), a senior mortgage broker employed by JP Morgan Chase d/b/a Chase Manhattan Mortgage Corp ("Chase"), to seek financing to purchase the Property.

4.    Ms. Mills selected Ms. Lettau as her new broker based on a recommendation from a local real estate appraiser.

5.    Ms. Mills executed a broker agreement between Chase and Ms. Mills.. A copy of the form of the broker agreement is attached hereto as Exhibit B.

6.    On or about July 7, 2005, Ms. Lettau conducted a phone interview with Ms. Mills to prepare uniform residential loan applications on behalf of Ms. Mills.

7.    On or about July 10, 2005, Ms. Lettau transmitted information to American Brokers Conduit (a tradename of debtor, American Home Mortgage Corp.)("ABC").

8.    On July 10, 2005, ABC received two uniform residential loan applications, one of which requested $962,500 and the second of which requested a "piggyback" loan in the amount of $275,000, (the "Initial Loan Applications").

2

9.      Based on the Initial Loan Applications, Ms. Lettau provided Ms. Mills, for informational purposes only, with a good faith estimate that Ms. Mills would need approximately $152, 819.97 to complete settlement on the Property.

10.     On or about July 14, 2005, a regional underwriting managers reviewed the Initial Loan Applications and Loan Application Supporting Documentation and approved an "underwriting exception," a copy of the Exception Request is attached hereto as Exhibit C.

11.     The underwriting exception was conditioned upon, among other things, the second loan being no more than $200,000 and the interest rate increasing by 1.25%.

12.     As a result of the underwriting exception and the conditions imposed by the underwriting manager in connection therewith, the Initial Loan Applications were approved for (i) a first lien loan with an initial principal balance of $962,500 (the "First Loan"), and (ii) a second lien loan for an initial principal balance of $200,000 (the "Second Loan" and together with the First Loan, the "Mills Loans").

13.     Given the Purchase Price of $1,375,000, if the loan terms were accepted, Ms. Mills was required to fund approximately $212,500 towards the purchase plus closing costs.

14.     On or about July 15, 2005, Ms. Mills reviewed and executed the uniform residential loan applications, copies of which are attached hereto as Exhibit D, (collectively with the Loan Application Supporting Documentation, the "Loan Applications").

15.     Between July 15, 2005 and July 19, 2005, in anticipation of the close of escrow, Ms. Mills executed certain required documents, including, but not limited to,

3

promissory notes, addendums and riders for the Mills Loans, Deeds of Trust for the Mills

Loans, final Truth-in-Lending statements, RESPA Servicing Disclosure, Buyer's Escrow

Information Sheet, Escrow Waiver Letter, Compliance Agreement and Borrower's

Certification & Authorization (the "Borrowers Certifications," and collectively and

inclusive of all required documents for each loan, the "Closing Documents").

16.    One of the Closing Documents was Form 4506 provided authorization for

the release of Mills' tax transcripts to the lenders for the loans. AHM_MILLS 003448.

17.    The executed Closing Documents were held in escrow by the Settlement

Agent until all Closing conditions were met and the Mills Loans were ultimately funded.

18.    The closing of escrow was postponed at the request of Ms. Mills to a date

no later than August 8, 2005.

19.    For consideration of the extension, Ms. Mills paid an additional $55,000

nonrefundable deposit to the seller, Hilliard Development, LLC, on or about July 25,

2005, with an agreement to pay $350.00 per day from July 6, 2005 to the close of escrow.

20.    On August 3, 2005, Ms. Mills executed a promissory note in the amount

$164,201, a copy of which attached hereto as Exhibit E.

21.    The from Mr. Ernest Kuhn was used to close on escrow on the Property.

22.    Ms. Mills paid Chase (Ms. Lettau's employer) an origination fee.

23.    On August 8, 2005, the close of escrow on the Property occurred (the

"Closing").

24.    As of the Closing, Ms. Mills became the fee simple owner of the Property,

and Ms. Mills executed a first and a second Deed of Trust representing the lien positions

of the Mills Loans against the Property.

4

25.    The First Loan was for $962,500.00 and was assigned loan number 0000928512.

26.    The Second Loan was for $200,000 and was assigned loan number 0000930980.

27.    Ms. Mills was required to make monthly mortgage payments on the Mills Loans in the aggregate amount of approximately $6,492.30 on the first day of each month.

28.    Ms. Mills executed the Escrow Waiver Letter, a copy of which is attached hereto as Exhibit F.

29.    Ms. Mills's monthly mortgage payments did not include amounts for taxes or hazard/property insurance.

30.    AHM SV (f/k/a American Home Mortgage Servicing, Inc.), as servicer of the Mills Loans, received a $6,492.30 payment on September 13, 2005 for the Mills Loans.

31.    AHM SV, as servicer of the Mills Loans, did not receive any subsequent payment from Ms. Mills or any of her agents on account of the Mills Loans.  Ms. Mills attempted to make a payment of $9,014.04 in November of 2005.  The payment was reversed for insufficient funds on November 23, 2005.

32.    On or about October 7, 2005, Ms. Mills telephoned AHM SV to inquire about a refinancing.

33.    On December 22, 2005, AHM SV sent Ms. Mills two letters (one for each of the Mills Loans, the "Breach Letters," copies of which are attached hereto as Group Exhibit G.

5

34.    On January 26, 2006, AHM SV executed a Substitution of Trustee with respect to the First Loan (the "First Loan Substitution of Trustee") appointing Cal-Western as the substitute trustee under the First Loan.

35.    On January 26, 2006, MERS, as nominal beneficiary, executed a Substitution of Trustee with respect to the 980 loan (the "Second Loan Substitution of Trustee") appointing Cal-Western as the substitute trustee under the Second Loan Deed of Trust,.

36.    On January 27, 2006, Cal-Western recorded a Notice of Default for each of the Mills Loans (collectively, the "Notices of Default") with the San Luis Obispo County Clerk/Recorder's Office.

37.    On May 8, 2006, Cal-Western, as substitute  trustee for each of the respective Deeds of Trust, executed a Notice of Trustee's Sale with respect to the Deeds of Trust (collectively, the "Notices of Trustee's Sale"), which initially scheduled the trustee's sales (i.e., foreclosure sales) of the Property on June 7, 2006 (the "Initial Trustee's Sale Date") at 11:30 a.m.

38.    Notice of Trustee's Sale was recorded on May 15, 2006 and was mailed by first class and certified on May 18, 2006 (i.e., twenty (20) days prior to the sale date). See Recorded Notice of Trustee's Sale and Affidavit of Mailing Notice of Trustee's Sale, attached hereto as Exhibits H & I.

39.    The initial trustee's sale was scheduled to be conducted on June 7, 2006 (the "Initial Trustee's Sale Date").

6

40.    The Notice of Trustee's Sale was posted once on the Property and once in a public place, a copy of the Certificate of Posting Property and Public Place is attached hereto as Exhibit J.

41.    The Notice of Trustee's Sale was published for three consecutive calendar weeks beginning May 18, 2006 in *The Cambrian*, and a copy of the Affidavit of Publication is attached hereto as Exhibit K.

42.    On May 24, 2006, AHM SV discussed loss mitigation options with Ms. Mills and sent her a package of information (the "Loss Mitigation Package") to complete and return to AHM SV, allowing AHM SV to determine her eligibility for various options.

43.    On or about May 29, 2006, Ms. Mills sent Ms. Ellsworth a "hardship letter," (the "Hardship Letter"), a copy of which is attached hereto as Exhibit L.

44.    AHM SV offered Ms. Mills an installment plan to reinstate the default that would have required Ms. Mills to pay an additional $3,000 per month above her regular monthly payments to cure the default.

45.    Ms. Mills rejected this offer.

46.    On June 5, 2006, Ms. Mills faxed a letter to AHM SV requesting a postponement of the trustee's sale and attaching a contingent loan commitment (the "Contingent Loan Commitment") from Market Place Properties LOC/B&B Investments (the "June 5, 2006 Fax" attached hereto as Exhibit M).

47.    Market Place Properties is an investment company affiliated with Ms. Bernadine Beaureguard

7

48.    On June 5, 2006, the amount required to reinstate the Mills Loans was $67,141.00.

49.    The amount of the Contingent Loan Commitment was insufficient to reinstate the Mills Loans.

50.    On June 6, 2006, Ms. Mills faxed a letter and attachment requesting additional time (the "June 6, 2006 Fax") to Ms. Oates, copies of which are attached hereto as Exhibit N.

51.    On June 6, 2006, following receipt of the June 6, Fax, AHM SV postponed the Initial Trustee's Sale Date for ten (10) business days.  The rescheduled date for the trustee's sale was June 19, 2006 (the "Second Trustee's Sale Date").

52.    On June 15, 2006, Ms. Mills faxed a letter and attachment requesting additional time to AHM SV, copies of which are attached hereto as Exhibit O (the "June 15, 2006 Fax").

53.    On June 15, 2006, following receipt of the June 15, 2006 Fax, AHM SV postponed the Second Trustee's Sale Date to June 26, 2006 (the "Third Trustee's Sale Date").

54.    On June 22, 2006, Ms. Mills faxed a letter requesting a further extension of time to Cal-Western, a copy of which is attached hereto as Exhibit P (the "June 22, 2006 Fax").

55.    On June 26, 2006 (i.e., the Third Trustee Sale Date), Ms. Mills filed a chapter 7 bankruptcy (Case No. 06-10337, the "Mills Bankruptcy") in the United States Bankruptcy Court for the Central District of California (the "California Bankruptcy Court").

56.    Mr. Vaughn Taus represented Ms. Mills as her bankruptcy counsel in the Mills Bankruptcy.

57.    On June 30, 2006, motions for relief from the automatic stay (the "Stay Relief Motions") were filed in the Mills Bankruptcy to continue the foreclosure process related to the Property.

58.    On July 25, 2006, the California Bankruptcy Court entered orders granting relief from the automatic stay, copies of which are attached hereto as Exhibit Q.

59.    On September 12, 2006, Mr. Ernest Kuhn ("Mr. Kuhn") filed a complaint (the "Kuhn Complaint") in the Mills Bankruptcy (Adversary Case No. 06-01087, the "Kuhn Adversary") for nondischargeability of debt for fraud in connection with a loan to Ms. Mills in the amount of $164,201 in connection with her purchase of the Property.

60.    On October 13, 2006, Ms. Mills filed her answer to the Kuhn Complaint.

61.    Ms. Mills admitted in her answer that Mr. Kuhn loaned her $164,201 in connection with the purchase of the Property.

62.    On August 21, 2007, Ms. Mills executed the Stipulation for Judgment of Nondischargeability of Debt and Mutual General Release; Order Thereon (the "Kuhn Settlement"), a copy of which is attached hereto as Exhibit R.

63.    Ms. Mills received a discharge of her debts on July 19, 2007 [Mills Bankr. D.I. 52].

64.    The Kuhn Stipulation was filed with the California Bankruptcy Court on August 27, 2007.

65.    On September 4, 2007, the California Bankruptcy Court entered an order approving the Kuhn Settlement.

9

66.    The Kuhn Adversary was terminated on October 5, 2007 [Kuhn Adv. D.I. 22].

67.    The Mills Bankruptcy case was administratively closed on October 9, 2007 [Mills Bankr. D.I. 55].

68.    On August 9, 2006, Mr. Taus, sent an e-mail communication to AHM SV (the "Taus E-mail" attached hereto as Exhibit S).

69.    AHM SV, as servicer for the Second Loan[2], credit bid $229,251.71, subject to the First Loan Deed of Trust.

70.    Ms. Mills and Mr. Esquivel continued to occupy the Property after August 10, 2006.

71.    On November 30, 2006, Ms. Mills and Mr. Esquivel attended a judicial hearing (the "Eviction Hearing") regarding their potential eviction from the Property.

72.    Neither Ms. Mills nor Mr. Esquivel vacated the Property on or before January 2, 2007.

73.    On February 23, 2007, Ms. Mills and Mr. Esquivel received notice of eviction scheduled for March 1, 2007.

74.    On March 15, 2007, Ms. Mills and Mr. Esquivel executed a Personal Property Agreement & Release, attached hereto as Exhibit T.

75.    On March 31, 2007, Ms. Mills and Mr. Esquivel informed AHM SV that they would not remove all of their personal belongings by April 1, 2007, a copy of the relevant letter is attached hereto as Exhibit U.

---

[2]    At this time, the Second Loan was owned by AHMIT 2005-SD1.

76.    On May 17, 2007, Mr. Robert Jackson, sent a notice advising Mr. Esquivel that any personal property not picked up by June 4, 2007 would be disposed of in accordance with Cal. Civ. Code § 1988, a copy of the which is attached hereto as Exhibit V.

77.    Ms. Mills and/or Mr. Esquivel did not remove all of their personal belongings from the Property before June 4, 2007.

78.    AHM SV entered into a Listing Agreement and REO Marketing Agreement with local real estate agent, Ms. Terry Miles ("Ms. Miles") on March 27, 2007 and March 31, 2007 (respectively), copies of the which are attached hereto as Group Exhibit W

79.    On or about March 7, 2007, Ms. Mills and Mr. Esquivel sent e-mail correspondence to the Debtors' then-Chief Executive Officer, Michael Strauss (the "Strauss Letter" attached hereto as Exhibit X).

80.    Ms. Mills and Mr. Esquivel retained Mr. Ken Coffey as their real estate agent.

81.    AHM SV rejected all offers made by Ms. Mills and/or her purported agents to purchase the Property.

82.    On August 6, 2007, each of the Debtors filed with this Court a voluntary petition commencing the above captioned cases under chapter 11 of the Bankruptcy Code.

83.    On or about August 14, 2007, AHM SV accepted the offer from Mr. Hall for $1,250,000 with a financing contingency to purchase the Property.    Mr. Hall ultimately did not close on the sale of the Property.

11

84.     On October 30, 2007, this Court entered an order (the "Servicing Sale Order") approving the Debtors' sale (the "Sale") of the mortgage servicing business to AH Mortgage Acquisition Co. (n/k/a American Home Mortgage Servicing, Inc.) ("AHMSI") [D.I. 1711].

85.     Following the final closing of the Sale on April 11, 2008, the Property was serviced by AHMSI for the benefit of the owners of the Mills Loans.

86.     On January 8, 2009, AHMSI executed a Substitution of Trustee and Full Reconveyance.   The Substitution of Trustee and Full Reconveyance was recorded on January 14, 2009

87.     On or about January 13, 2009, AHMSI conveyed the Property to an unrelated, third party for the purchase price of $813,750.

88.     AHM Acceptance received $634,954.46 from the sale of the Property on account of the 512 Loan, resulting in a loss of $327,545.54 in unpaid principle balance with respect to the 512 Loan, exclusive of accrued interest that Ms. Mills never paid with respect to the Mills Loans.

89.     On November 19, 2007, Ms. Mills filed claim numbered 2743 (the "Original Claim").

90.     On March 31, 2010, Ms. Mills filed two amended claims, claims numbered 10764 and 10765 (the "Amended Claims").

91.     On April 27, 2010, Mills filed a Motion for Order to (I) Amend Proof of Claim and (II) Motion for Order of Allowed Administrative Expense Claim Priority Against the Estate Pursuant to Section 503(b) of The Bankruptcy Code In Immediately Available Funds and (III) Order of Right To Protection of Certain Property Interest

12

Under Section 361 or (IV) Avoidance Action Against Debtors Pursuant to Section 549. (D.I. 8812.) Debtors filed their opposition on to Mills' Motion on May 11, 2010. (D.I. 8846; D.I. 8847.)

92.    On August 13, 2010, Mills filed Administrative Expense Proofs of Claims against each of the Debtors, claims numbered 10802-10809 (the "Mills Claims"). The Mills Claims superseded and replaced all other claims made by Mills against the Debtors.

93.    Ms. Mills withdraws claims numbered claims numbered 10802, 10806, 10808, and 10809.

(A)    **Statement of Facts That Are in Dispute**

1.    **Mills Statement of Facts in Dispute**

a.    Whether Debtors committed fraud in originating Mills' mortgage and later, improperly foreclosing on the Property.

b.    Whether Debtors represented to Mills that she would be able to access a $50,000 home equity line of credit just two months after her closing.

c.    Whether Debtors' violation of the automatic stay in Mills' bankruptcy proceeding was willful.

d.    Whether Mills' claims are entitled to administrative expense status.

e.    The amount of Mills' damages as set forth in Mills' proofs of claims.

2.    **Debtors' Statement of Facts in Dispute**[3]

a.    Whether Ms. Mills committed fraud in obtaining the Mills Loans.

---

[3]    The facts in dispute listed herein are general in nature, and are not the entire

13

b.      Whether Ms. Mills misrepresented her gross income on the Loan Applications.

c.      Whether Ms. Mills misrepresented her assets on the Loan Applications.

d.      Whether Ms. Mills provided misleading documentation to verify the assets identified on the Loan Applications.

e.      Whether Ms. Mills misrepresented her liabilities on the Loan Applications.

f.      Whether Ms. Mills misrepresented the source of her down payment on the Loan Applications by failing to disclose that she borrowed approximately $164,000 for the down payment on the Property.

g.      Whether Ms. Mills intentionally failed to disclose the pending lawsuit filed against her related to the Ventura Property on the Loan Applications.

h.      Whether Ms. Mills's credit score was 659 prior to the Debtors' receipt of the Loan Applications.

i.      Whether the Debtors "pulled" Ms. Mills credit report once.

j.      Whether any of the Debtors relied upon the facts set forth by Ms. Mills in her Loan Applications in approving the underwriting exception and ultimately funding the Mills Loans.

k.      Whether any of the Debtors relied upon the supporting documentation provided by Ms. Mills in approving the underwriting exception and ultimately funding the Mills Loans.

14

l.      Whether any of the Debtors obtained Ms. Mills's tax returns prior to the Closing of the Mills Loans.

m.      Whether the Mills Loans made the required payments due on October 1, 2005.

n.      Whether Ms. Mills knew of her claims against the Debtors when she filed and/or at any time during the pendency of her personal bankruptcy.

o.      Whether Ms. Mills knew of the facts surrounding the claims against the Debtors when she filed and/or at any time during the pendency of her personal bankruptcy.

p.      Whether Ms. Mills failed to disclose known claims against the Debtors when she filed and/or at any time during the pendency of her personal bankruptcy.

q.      Whether Ms. Mills intentionally failed to disclose known claims against the Debtors when she filed and/or at any time during the pendency of her personal bankruptcy.

r.      Whether AHM SV provided notice to the owners of the Mills Loans regarding the status of the Mills Loans.

s.      Whether the Debtors violated the automatic stay imposed by Ms. Mills's personal bankruptcy.

t.      Did Ms. Mills offer the amount to reinstate (i.e, the amounts in arrearage) the Mills Loans.

u.      Did Ms. Mills tender the amount to reinstate (i.e, the amounts in arrearage) the Mills Loans.

15

v.    Did Ms. Mills offer the amount to redeem (i.e. the amount of the full indebtedness) the Mills Loans.

w.    Did Ms. Mills tender amount to redeem (i.e. the amount of the full indebtedness) the Mills Loans.

x.    Did Ms. Mills comply with the requirements to submit an acceptable offer for the Property.

y.    Did Ms. Mills and/or her purported agents make an acceptable offer for the Property.

z.    During the pendency of Debtors' bankruptcy, did Ms. Mills and/or her purported agents offer more than the sum of $350,000 for the Property.

aa.    Whether Ms. Mills advised any of the Debtors of her alleged claims prior to August 2007.

bb.    Whether Ms. Mills advised any of the Debtors of improper or wrongful foreclosure prior to August 2007.

**(B)    Damages or Other Relief**

1.    **Mills' Claims for Damages or Other Relief**

Mills seeks entry of an order granting the relief requested in Administrative Expense Claims Numbered 10803, 10804, 10805, and 10807 filed by Deborah Mills and allowing Mills's damage claims in an amount to be determined by the Court.  Mills intends to seek damages at least pursuant to Cal. Civ. Code, § 3294 (a) and Cal. Civ. Code § 3333, and 11 U.S.C. §362(h), among other bases for relief.  Mills seeks $1,350,000 in actual damages for the fraud committed by Debtors, for Debtors' improper

foreclosure and for Debtors' improper liquidation of the Property. All of Mills damages should be accorded administrative expense status.

###### 2. Debtors' Claims for Damages or Other Relief

Debtors seek entry of an order, pursuant to §§ 502(b) and 503 of the Bankruptcy Code and Bankruptcy Rules 3003 and 3007, disallowing and expunging the Mills Claims in full.

#### (C) Legal Issues Presented

##### 1. Mills' Statement of Legal Issues Presented

a. Whether Debtors committed fraud in originating Mills' mortgage and later, improperly foreclosing on the Property.

b. Whether Debtors' violated of the automatic stay in Mills' bankruptcy proceeding.

c. Whether Debtors' violation of the automatic stay in Mills' bankruptcy proceeding was willful.

d. Whether MERS execution of a Substitution of Trustee instrument naming Cal Western was effective under California law.

e. Whether Mills' claims are entitled to administrative expense status.

f. The amount of Mills' damages as set forth in Mills' proofs of claims, excluding the portion of Mills' damage claims related to costs and expenses, including attorneys' fees, which are not before the Court at this time.

##### 2. Debtors' Statement of Legal Issues Presented

a. Whether Ms. Mills has standing to bring the Mills Claims.

b.    Whether Ms. Mills should be judicially estopped from bringing the Mills Claims.

c.    Whether Ms. Mills waived and/or abandoned the Mills Claims.

d.    Whether Ms. Mills is barred by the doctrines of res judicata and/or collateral estoppel from bringing the Mills Claims since she failed to include them on her schedules in her personal bankruptcy.

e.    Whether Ms. Mills's failure to tender of reinstatement (cure) on the Mills Loans precludes Ms. Mills from pursuing any cause of action for wrongful or improper foreclosure under California law.

f.    Whether Ms. Mills's failure to tender the full indebtedness (redeem) on the Mills Loans precludes Ms. Mills from pursuing any cause of action for wrongful or improper foreclosure.

g.    Whether Ms. Mills has met her burden to establish that the Debtors' denied her the right to reinstate the Mills Loans.

h.    Whether Ms. Mills has met her burden to establish that the Debtors' denied her the right to redeem the Mills Loans.

i.    Whether the Stay Relief Order granted relief from the automatic stay to the entity that effected the foreclosed on the Second Loan.

j.    Whether Ms. Mills can collaterally attack the Stay Relief Order entered by the United States Bankruptcy Court for the Central District of California in the Mills Bankruptcy.

YCST01:10394057.10          066585.1001

k.    Whether Ms. Mills can seek to collaterally attack the Stay Relief Order entered by the United States Bankruptcy Court for the Central District of California in the Mills Bankruptcy in this Court.

l.    Whether Ms. Mills met her burden of proof that there was fraud in the origination of the Mills Loans.

m.    Whether Ms. Mills met her burden of proof that the Debtors fraudulently induced Mills to enter in the Mills Loans.

n.    Whether Ms. Mills met her burden of proof for wrongful or improper foreclosure.

o.    Whether Ms. Mills should be denied any award of damages, or a reduction in the award of damages, based on equitable estoppel.

p.    Whether Ms. Mills should be denied any award of damages, or a reduction in any award of damages, based on laches.

q.    Whether Ms. Mills should be denied any award of damages, or a reduction in the award of damages, based upon Ms. Mills's unclean hands.

r.    Whether any award of damages should be reduced by damages sustained by the Debtors as a result of Ms. Mills's fraud in the origination of her loans.

s.    Whether any award of damages should be reduced by the damages sustained by the Debtors as a result of the ultimate sale of the Property being insufficient to pay off her indebtedness.

t.    Whether Ms. Mills met her burden of proof that any award of damages should be afforded administrative expense priority.

u.      Whether Ms. Mills met her burden of proof to establish a legally cognizable claim against any of the Debtors.

v.      Whether Ms. Mills should be precluded from recovering on any claim against Debtors due to her fraud and misrepresentations in connection with obtaining the Mills Loans.

**(D)      Witnesses**

1.      Ms. Mills and the Debtors each reserve the right to (a) withdraw any of the witnesses identified below from testifying as part of their case-in-chief, (b) present their witnesses in the order they deem appropriate, (c) rely upon the testimony of any witnesses called by the other party at the hearing, and (d) call any witnesses necessary for rebuttal purposes, whether or not previously identified. Therefore, Ms. Mills and the Debtors each reserve the right to call additional witnesses on rebuttal and/or the other parties' witnesses.

A.      Mills intends to call the following witnesses at the hearing:

- Deborah Mills:  Ms. Mills may testify generally about, among other things, the facts and circumstances related to Mills' damage claims, the loans and related matters, including without limitation, the origination of the loans, and the foreclosure process.

- Anthony Esquivel:  Mr. Esquivel may testify generally about, among other things, the loans and related matters, including without limitation, the origination of the loans, and the foreclosure process.

- Scott Martinez:  Martinez will be called as an adverse witness and may testify generally about the facts and circumstances concerning Debtors' mortgage business and the foreclosure of the Mills Property.

B.    Debtors intend to call the following witnesses at the hearing:[4]

- Scott Martinez – review and analysis of Mills Claims.

- Simon Sakamoto - Mr. Sakamoto may testify generally about the secondary market for loan, loan sales and securitizations, and the facts and circumstances relating to the sales and/or securitizations of the Mills Loans.

- Eileen Wanerka - Ms. Wanerka may testify generally about, among other things, the Debtors' independent broker relations and monitoring and policies in connection therewith, the Debtors' underwriting procedures, loan origination, and the facts and circumstances surrounding the origination of the Mills Loans

- Philip Adelson - Mr. Adleson may testify to the standard and customary industry practices and processes for originating and foreclosing on loans in the state of California and to his audit of the loan files for the First Loan and Second Loan and of the foreclosure file for the Second Loan.

- Anthony Esquivel. – Mr. Esquivel may be called as an adverse witnesses and to testify about the facts and circumstances concerning the Mills Loans and foreclosure on the Property.

---

[4]    The Debtors also intend to rely on the depositions (as designated) of Ms. Mills, Mr. Esquivel, Ms. Lettau and Ms. Larkin.

21

**(E)     Exhibit List**

Mills and Debtors have agreed upon certain uncontested facts identified in the Stipulation of Facts. Mills and Debtors may use the Stipulation of Facts and any exhibits thereto as exhibits at the hearing.

Mills and Debtors reserve the right to object to any of the exhibits relied on by the other party on appropriate grounds. Mills and Debtors also reserve the right to use the other party's exhibits and/or to provide rebuttal exhibits, if necessary.

In addition to the Stipulation of Facts and any exhibits thereto the Mills may use the exhibits identified on the attached Exhibit 1 in her case in chief at the hearing.

In addition to the Stipulation of Facts and any exhibits thereto, Debtors may use the exhibits identified on the attached Exhibit 2 in their case in chief at the Hearing.

**(F)     Discovery Items to Be Offered Into Evidence**

Ms. Mills and the Debtors will designate those portions of deposition transcripts to be submitted as evidence in accordance with a mutually agreed upon schedule. The mutually agreed upon schedule will provide an opportunity to identify counter-designations and to object to any designations or counter-designations.

**(G)    Estimated Length of Trial**

Ms. Mills and the Debtors estimate the trial will take 3 days.


STAMOULIS & WEINBLATT LLC

*/s/ Stamatios Stamoulis*
Stamatios Stamoulis #4606
 stamoulis@swdelaw.com
Richard C. Weinblatt #5080
 weinblatt@swdelaw.com
Two Fox Point Centre
6 Denny Road, Suite 307
Wilmington, Delaware 19809
Telephone:  (302) 999-1540

*Attorneys for Deborah Mills*


YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ Margaret Whiteman Greecher*
Sean M. Beach # 4070
 sbeach@ycst.com
Sharon M. Zieg #4196
 szieg@ycst.com
Erin D. Edwards # 4392
 eedwards@ycst.com
Margaret Whiteman Greecher # 4652
 mgreecher@ycst.com
Morgan L. Seward # 5388
 mseward@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
Telephone:  (302) 571-6600

*Attorneys for Debtors and*
*Debtors-in-Possession*


SO ORDERED:

Dated:_____

_____
UNITED STATES BANKRUPTCY JUDGE