# EXHIBIT A

1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

(CONFIDENTIAL PORTIONS)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

IN RE:

AMERICAN HOME MORTGAGE                     Case No.

HOLDINGS, INC., a Delaware                 07-11047 (CSS)

corporation, et al.,

                    Debtors.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


DEPOSITION OF:  DEBORAH E. MILLS

Tuesday, October 5, 2010

Wilmington, Delaware


Reported in stenotype by:

Rich Germosen, CCR, CRCR, RPR, CRR, CLR

1                    DEBORAH E. MILLS

2    out in two months.

3              Q.      Who at American Home made those

4    promises?

5              A.      That came from Tawnya Lattau, the

6    broker I was working with.

7              Q.      Is your understanding that Tawnya

8    Lattau was an employee of American Home?

9              A.      No, she was not an employee.  She

10   was a broker.

11             Q.      Then why do you say the debtors

12   meaning AHM induced me?

13             A.      Because she was representing

14   American Home Mortgage.  She was doing the loan

15   through American Home Mortgage.  It was clear

16   that she worked for Chase, but she was getting

17   the loan done with American Home Mortgage.

18             Q.      So it was clear to you that she

19   did work for Chase?

20             A.      Yeah.

21             Q.      At all times during your

22   relationship with --

23             A.      Yeah, that she was doing the loan

24   to American Home Mortgage, yes.

25             Q.      I understand.

1                    DEBORAH E. MILLS
2     had no motivation to -- this is my understanding
3     now after going through all this.  This is my --
4     they had no motivation to service the loan.  They
5     already had my deposit.  They already had a chunk
6     of cash.  That's a lot of money.  I don't care
7     who you are.  That was a lot of money on that
8     property.
9
10    BY MR. BEACH:
11          Q.     So it's your testimony that --
12                 Strike that.
13                 Let's move on to Paragraph 8.
14                 You state that, and this is in the
15    first sentence:  I had been working with
16    Mr. Roland Jones who was securing a loan with
17    Bridgeport Mortgage.
18          A.     Yeah.
19          Q.     Who is Roland Jones?
20          A.     He was a mortgage broker.
21          Q.     And when did you begin working
22    with him?
23          A.     It was the beginning part of May.
24          Q.     What year?
25          A.     2005.

DEBORAH E. MILLS

1  directly to close on that loan?

2       A.     Yes.  When I had talked to Sarah

3  previously and I had also talked with Mr. Jones,

4  but that week I couldn't get a hold of either of

5  them and we were supposed to close escrow and I

6  was like, oh, my God, what are we going to do?

7  We're supposed to close escrow and then that's

8  when I sought out and found Tawnya and I said can

9  you do this in four or five days?  I'm supposed

10  to close escrow.

11       Q.     Did you ask Tawnya to contact

12  Bridgeport Mortgage?

13       A.     No.

14       Q.     Why not?

15       A.     I -- the thought never occurred to

16  me.

17       Q.     Did you show Tawnya the

18  pre-approval commitment that you had from

19  Bridgeport Mortgage?

20       A.     I believe I did.  I mean I got her

21  the same information that I got to Roland, you

22  know.  You know, it was pretty much the same

23  process of going through an application.

24            I just felt I needed someone else

```
 1                    DEBORAH E. MILLS
 2   strike that.
 3                    In Section 9 you state that on or
 4   about June 29th, 2005 I contacted Tawnya Lattau a
 5   broker who sold loans for debtors.
 6                    Who is Tawnya Lattau?
 7        A.     I thought we already established
 8   that.  She's a broker who works for Chase, but
 9   also wrote loans for American Home Mortgage.
10        Q.     What's your understanding of what
11   a broker does?
12        A.     A broker can write loans for many
13   different lenders.  They're like a freelance,
14   freelance broker pretty much.  I don't know how
15   else to put it.
16        Q.     And how did you come to know
17   Ms. Lattau?
18        A.     I came to know her from one of the
19   appraisers.
20        Q.     One of the appraisers of the
21   property?
22        A.     Yes.
23        Q.     Gave you her name?
24        A.     Yes.
25        Q.     When did he or she give you
```

                    DEBORAH E. MILLS

1
2    Ms. Lattau's name?

3           A.      When he had done the appraisal I

4    was present on the property and we just got to

5    talking, you know, and he had mentioned Tawnya to

6    me that oh, you know, just through conversation

7    that, you know, she's a gal that writes loans.

8    She's a great gal.  She lives locally, et cetera,

9    et cetera, and so when I started having my

10   concerns with Mr. Jones I called up him and said,

11   okay, what's, who is that gal that you told me

12   about?  I would like to call her and that's how I

13   got her number.

14          Q.      Do you recall the date of the

15   appraisal where you, where you got her name?

16          A.      She was first mentioned to me,

17   well, it had to be in early May I would say when

18   the appraisals were done or late April.  I don't

19   know the exact time, but it was -- I know I had

20   to get two appraisals for the property and he was

21   one of the appraisers.

22          Q.      Okay.  So that's when you got her

23   name.

24                  When did you first contact

25   Ms. Lattau?

DEBORAH E. MILLS

1

2          A.      It was about on the 29th of June.

3          Q.      June.

4                  Did you -- was there ever a time

5   where you went to her office?

6          A.      Yes, both Anthony and I went to

7   her office after the, after she had come back to

8   us or me that we needed an additional

9   seventy-five thousand because my credit score was

10  off one point.  When she had told me that, I had

11  called Anthony.  He was coming up from Ventura at

12  the time and he also called her to discuss this

13  and then that Monday we went into her office and

14  talked to her about the change in terms.

15         Q.      That Monday, do you recall the

16  date?

17         A.      No, I don't, but I know that he

18  was coming up on a Friday and he, he called her

19  and said, well, Tawnya, we need to think about

20  this over the weekend.

21         Q.      Okay.

22                 When you went to the office did it

23  have an American Home sign anywhere outside?

24         A.      No, it did not.

25         Q.      Was there any brochures or signs

DEBORAH E. MILLS

1
2 inside her office that said American Home?

3          A.      I don't remember.  I really didn't

4 look for anything like that.

5          Q.      You don't recall seeing any?

6          A.      No.

7          Q.      What was the subject of your

8 initial discussion with Ms. Lattau?

9          A.      That we were concerned that this

10 was -- when you're talking about when we were in

11 her office, correct?

12          Q.      No, your initial discussion.  I

13 think you said you called her by telephone on

14 June 29th, is that correct?

15          A.      Yes, yes.

16          Q.      What was the --

17          A.      It was about then.

18          Q.      What was the subject of those

19 discussions?

20          A.      I told her I was referred by Chris

21 from the appraiser's office and that if anyone

22 could get a loan done it would be you and that

23 was the beginning and then we went through where

24 she checked my credit score and the application

25 process.

DEBORAH E. MILLS

1

2          Q.        Is this a mortgage broker

3  agreement with J.P. Morgan Chase?

4          A.        No.  It is for American Home

5  Mortgage.

6          Q.        I'll read the first paragraphs.

7  The mortgage broker agreement is entered into on

8  this date below by and between J.P. Morgan Chase

9  and the persons identified as the borrowers

10  below.

11          A.        Okay.  I stand corrected.

12          Q.        And have you -- you said you've

13  seen this before.

14                    Have you read this agreement

15  before?

16          A.        Back in 2005.

17          Q.        And had you signed this agreement?

18  Did you sign this agreement?

19          A.        Yes, I did.

20          Q.        Do you know approximately when you

21  signed this agreement?

22          A.        Probably on the 7th of, July 7th.

23          Q.        Okay.

24          A.        The same time that she signed it.

25          Q.        If you look on the top right part

DEBORAH E. MILLS

1
2   of the agreement it says the type of loan
3   requested brokered out are.
4                    Do you have an understanding of
5   what that means?
6           A.        Brokered out meaning that it was
7   going to be through another company aside from
8   Chase and that ARM is an adjustable rate
9   mortgage.
10          Q.        And does this appear to be a
11  mortgage brokerage agreement with respect to the
12  first lien loan?
13          A.        Correct.
14          Q.        On the left side about a third of
15  the way down do you see where it says mortgage
16  broker fee paid by borrower?
17          A.        Are you talking about processing
18  fee?
19          Q.        No.  It's right under application
20  fee on the left side about a third of the way
21  down.
22          A.        Oh, yeah, one percent of the
23  amount of the loan is, that's her commission.
24          Q.        Okay.
25                    And what is your understanding of

DEBORAH E. MILLS

1

2    come to an agreement --

3         Q.      Would it be accurate to say --

4         A.      We come to an agreement and, you

5    know, with their terms and with my terms and we

6    come to an agreement and then the loan is

7    executed.

8         Q.      Okay.

9                 Would it also be accurate to say

10   based on that provision I just read to you that

11   it's stating that Chase Manhattan Bank would not

12   be the lender with respect to your loan?

13        A.      That was my understanding, that

14   Chase was not my --

15        Q.      Okay.

16                And Section 2, the second sentence

17   it states:  Chase is not acting as a mortgage

18   lender or as an agent of the lender in this

19   transaction.

20                What is your understanding of that

21   statement?

22                MR. STAMOULIS:  Objection to form.

23                It speaks for itself.

24                THE WITNESS:  Yeah.  I --

25                MS. ZIEG:  Form.

1             DEBORAH E. MILLS

2

3    BY MR. BEACH:

4          Q.     You can answer the question.

5          A.     I, I don't know how to answer

6    that.  I mean she was my go between between

7    American Home Mortgage and myself, but, you know,

8    to isolate that sentence I, you know, I don't

9    know how to respond to that.

10         Q.     All right.

11                We'll take it in pieces then.

12                Chase is not acting as a mortgage

13   lender in this transaction.  What is your

14   understanding of that?

15         A.     That they're not acting as a

16   mortgage lender.

17         Q.     So then they wouldn't be giving

18   you a loan in connection with the property?

19         A.     Yeah, Chase would not be.

20         Q.     And we'll take the second piece of

21   that then.  Chase is not acting as a, as the

22   agent of the lender in this transaction.

23                What is your understanding of

24   that?

25         A.     Chase is not acting as the agent,

1                    DEBORAH E. MILLS
2    yeah.  The organization that she worked for was
3    not the acting agent.  So, in other words, that
4    Chase had nothing to do with this loan.  She was
5    brokering it out independently.  This to me is a
6    disclaimer saying that Chase is not going to back
7    anything that American Home Mortgage or any other
8    lender would provide.
9             Q.       So wouldn't back what American
10   Home Mortgage is providing.
11                     The portion of the sentence that
12   says as the -- it starts out with Chase is not
13   and then it -- and then after or it says as the
14   agent -- Chase is not acting as the agent of the
15   lender in this transaction.
16                     So when you say that they're
17   not -- I believe you said that they're not
18   working on behalf of American Home, but put it in
19   your own words.
20                     What is your understanding of --
21            A.       My understanding is --
22                     MR. STAMOULIS:  Wait.  Objection.
23                     Vague as to they're.
24                     MR. BEACH:  Can you read back the
25   question?

DEBORAH E. MILLS

1
2  set forth American Home Mortgage's policies and
3  procedures, but they're -- it's just a
4  disclaimer.  I don't know how else to put it.
5       Q.       Explain the disclaimer.
6       A.       A disclaimer saying that, okay,
7  Chase has their policies and procedures.
8  American Home Mortgage has their policies and
9  procedures.  What Chase is saying is that they
10  don't endorse what American Home Mortgage
11  presents.
12               Does that --
13       Q.       To your understanding was Chase
14  working as the agent of American Home Mortgage?
15       A.       No, this was brokered out
16  independently.
17       Q.       And was Ms. Lattau acting as a
18  broker on your behalf with respect to the
19  transaction?
20       A.       As a broker on my behalf, yes, but
21  also she had worked with American Home Mortgage.
22  She was the broker.  I don't know how else to put
23  it.  That's what a broker does.
24       Q.       Okay.
25               Section 4 it says specific Chase

                        DEBORAH E. MILLS

1

2    services.  It lists a host of services in this

3    paragraph.  Did Ms. Lattau provide these services

4    to you?

5                    I'll give you a moment to read it

6    if you'd like.

7            A.      Uh-huh.  Yes, she provided those

8    services.

9            Q.      All of those services?

10           A.      Yes.

11           Q.      To you?

12           A.      Yes.

13           Q.      What is your understanding of the

14   meaning of lender and, I'm sorry, I'm going to go

15   back to Paragraph 1, there is a defined term

16   lender.  What is your understanding of the

17   meaning of lender in that, in that paragraph and

18   then used throughout the document?

19                   MR. STAMOULIS:  I would just like

20   to put an objection on the record to the whole

21   line of questioning dealing with asking a lay

22   witness for her legal interpretation of terms in a

23   document.

24           Q.      You can answer the question.

25           A.      Okay.  I'm reading it again.

1          DEBORAH E. MILLS

2          Okay, now can you repeat the

3   question again?

4          Q.      What's your understanding of the

5   term lender?  It starts out in Paragraph 1 then

6   it's used throughout the document.

7          A.      Okay.  The lender, the lender that

8   she brought to the table who was American Home

9   Mortgage.

10         Q.      Okay.

11         So under this agreement it could

12  mean American Home, right?

13         A.      Yeah.

14         Q.      And it could mean other lenders

15  that she brings to the table in your words?

16         A.      Correct, but it came down to

17  American Home Mortgage.

18         Q.      Okay.

19         Is this document, does this

20  document mention American Home Mortgage at all?

21         A.      No, it doesn't.

22         Q.      In your discussion that you had

23  with Ms. Lattau on June 29th, 2005 did she state

24  that the lender would be American Home?

25         A.      At that point, no.

DEBORAH E. MILLS

1

2       Q.      So at no time during that
3  conversation did she mention American Home?
4       A.      Not to my recollection in the
5  first telephone conversation, no.
6       Q.      All right.
7              In Section 5 on Page 2 do you see
8  the second sentence it says:  Chase does not
9  guarantee that you will be approved for any
10 particular loan product or if you are approved
11 that you will receive the amount that you
12 requested or any specific terms or conditions.
13 What do you believe that means?
14      A.      Exactly what it says.  I mean they
15 don't -- there was no guarantees.  We'll go
16 through the process and we'll see if you qualify
17 and move forward.
18      Q.      All right.
19             Section 6 the first sentence
20 states that you agree to cooperate and to provide
21 complete and accurate information for your loan
22 application and the loan.
23             Did you provide complete and
24 accurate information for your loan application
25 and the loan?

1                    DEBORAH E. MILLS

2          A.      Yes, I did.

3          Q.      And do you believe that Chase or

4    Ms. Lattau, the broker, relied on that

5    information?

6          A.      Yes, I -- yeah.

7          Q.      In finding a loan for the

8    property?

9          A.      Yes.

10         Q.      See Section 8.  It says you agree

11   to pay as a mortgage broker fee in the amount

12   stated above upon the funding of the loan that is

13   obtained through our efforts.

14              Is that a mortgage -- is that the

15   mortgage broker fee referred to --

16         A.      Yeah, on the front of the page

17   which is one percent of the amount of loan

18   funded.

19         Q.      Okay.

20              That's all for that document.  You

21   can give that back to the court reporter please.

22              I'm going to turn back to the

23   proof of claim form that's been marked as Exhibit

24   Number 1.

25              Did Ms. Lattau help you prepare

DEBORAH E. MILLS

1
2  the loan application?

3       A.    I don't understand what you mean

4  by that.  She asked questions and I filled out

5  the application and she requested items and I

6  supplied those items.  So if you constitute that

7  as helping me fill out the loan application then,

8  yes, she did.

9       Q.    Okay.

10            Did she discuss different loan

11  options with you?

12       A.    In our first initial conversation,

13  yes, what she was going to try to secure for me.

14       Q.    And what was that?

15       A.    I don't remember.  They're in my

16  notes.  If I can reflect back I can point out

17  conversations I've had with Tawnya.

18       Q.    When you say your notes, those are

19  the notes that are on the notepads?

20       A.    Yeah.

21       Q.    Do you recall what type of loan

22  you requested?

23       A.    At first it was a hundred percent

24  financing.  That's what our goal was.

25       Q.    Did you discuss with Ms. Lattau

DEBORAH E. MILLS

1

2 contacting more than one lender?

3          A.     I -- we didn't discuss it.  She

4 said she was going to go out and see what she

5 could get.  So I'm assuming, and that's all I can

6 do is assume is that she contacted several

7 lenders.

8          Q.     But you don't know how many she

9 contacted?

10          A.     I have no idea.

11          Q.     Did Ms. Lattau find a loan for

12 you?

13          A.     Yes, she did.

14          Q.     What were the terms of that loan?

15          A.     Well, the terms of the loan had

16 changed.  Originally it was going to be about

17 eighty-eight thousand and then, as I mentioned

18 before, after I signed the docs on the 15th I am

19 assuming that American Home Mortgage ran my

20 credit again and I was one point off and there

21 was an exception made and came back that I had to

22 come up with another seventy-five thousand

23 dollars.

24          Q.     In Section 10 of the declaration,

25 that's your declaration that we were referring to

426

UNITED STATES BANKRUPTCY COURT

DISTRICT OF DELAWARE

---------------------------------- X

IN RE:

AMERICAN HOME MORTGAGE,                Case No.

HOLDINGS, INC., a Delaware             07-11047 (CSS)

corporation, et al.,

          Debtors.

----------------------------------X

CONTINUED DEPOSITION OF DEBORAH MILLS

Volume II

Tuesday, October 19, 2010

San Luis Obispo, California

Reported in stenotype by:

Elizabeth A. Doukas, RPR, CSR #9872

612

1    Mortgage.

2        Q.    I believe your testimony at the last deposition

3    was that you didn't discuss any particular lenders until

4    the loan was ultimately approved?

5        A.    Yeah, but she threw -- she had thrown a couple

6    of mortgage companies' names at me, because she was

7    saying that she was going to have to broker this loan,

8    that it couldn't go through Chase.

9            So, in conversation, I mean, yeah, until it was

10   all fine and said and done, it was an American Home

11   Mortgage.

12       Q.    So at this time she discussed other mortgage

13   companies in addition to American Home?

14       A.    Yes.

15       Q.    At the time this note was made?

16       A.    Yes.

17       Q.    What other companies were those?

18       A.    I don't remember now.

19       Q.    All right, let's move to document number 669.

20   Did you make this note?

21       A.    Yes, I did.

22       Q.    When did you make it?

23       A.    It was about the same time when I was discussing

24   different options that we might be able to pursue and

25   get, and this was with Tawnya.

**EXHIBIT B**

 

26405236

## MORTGAGE BROKER AGREEMENT

This Mortgage Broker Agreement (the "Agreement") is entered into on the date below (the "Agreement Date") by and between JPMorgan Chase Bank, N.A.                    ("Chase," "we," "us" or "our") and the persons identified as the borrower(s) below (the "Borrower," "you" or "your").

Borrower(s): Deborah E Mills              Date: 07/07/2005

Type of loan requested: BROKERED OUT ARM

Telephone (Day): _____    Amount of Loan Requested: $962,500
Telephone (Evening): 805-302-7470    Property address: 1880 Burnt Rock Way
Fax: _____              Templeton, CA  93465

Application Fee:                  $0.00 _____ (N/A if required by law or if property appraisal and/or credit report fee is shown below).

Mortgage Broker Fee Paid by Borrower:  _1.00_ % of the amount of the loan that is funded. The fee is estimated to be $ _9625.00_ .

Yield Spread Premium (fee to Chase    _____ % of the amount of the loan that is
paid by mortgage lender):            funded. The fee is estimated to be $ _____ .

Third Party Fees
   Property appraisal fee:            $350
   Credit report fee:                $_____ for each Borrower
   Courier, express mail, etc. fee:   $_____ for each delivery of documents
   _processing fee_        :         $ _250—_
                                     $_____

The parties agree as follows:

1. **Brokerage Services Generally.** You requested us to provide brokerage services to assist you in obtaining a loan as described above to be secured by a mortgage on the above residential property (the "Loan"). The Loan you are applying for will be from another mortgage lender (the "Lender") upon the terms and conditions you request or the Lender requires.

2. **Our Role.** We will act as independent contractor and not as your agent or fiduciary in providing services to you. Our services also benefit Lenders with which we have various independent contractor agreements. Chase is not acting as a mortgage lender or as the agent of the Lender in this transaction. Chase will not make you a mortgage loan or issue a commitment to you for a mortgage loan. Our services are consultative and you will rely on your judgement in choosing your Loan.

3. **Mortgage Lender.** We will submit your Loan application to one or more Lenders with which Chase works. We limit the number of these Lenders for efficiency in rendering brokerage services. While we seek to assist you in meeting your financial needs, we do not distribute the products of all lenders or investors in the market and cannot guaranty the lowest price or best terms available in the market.


DEPOSITION EXHIBIT
MillsD2
10/5/10

 

4. **Specific Chase Services.** We will perform one or more of the following services: help you prepare a Loan application; counsel you regarding the mortgage loan process; educate you regarding different types of loan products, features and options, including how the closing costs, interest rates, payments and terms can vary under each product; collect financial information; initiate/order verifications of employment, verifications of deposit, mortgage and other loan verifications, legal documents, appraisals, inspections or engineering reports; provide you with certain disclosures; explain loan eligibility requirements and, if reasonably feasible, help you clear credit problems; and maintain regular contact with you, the Lender, the closing agent, etc. to apprise them of the status of the application and Loan and to gather needed information. Chase may also provide related services, such as assisting you in prequalifying for a Loan and/or in obtaining from the Lender a "lock-in" of the interest rate and points for your Loan.

5. **Loan Approval and Terms.** We will use commercially reasonable efforts to assist you in obtaining a Loan. Chase does not guarantee that you will be approved for any particular loan product or, if you are approved, that you will receive the amount that you requested or any specific terms or conditions. The Lender is responsible for processing your Loan application, determining the Loan amount, and making any Loan commitment, giving applicable disclosures, agreeing to lock-in a rate, and funding the Loan. Any Loan will likely contain a variety of terms, conditions and requirements not set forth in this Agreement. If a Lender is not willing to provide you with an acceptable Loan, we will work with you to help you decide whether a Loan for a different amount or with different terms and conditions will nevertheless meet your needs.

6. **Your Duties.** You agree to cooperate and to provide complete and accurate information for your Loan application and Loan. We will help match you with an appropriate Loan solely on the basis of this information. You agree to notify us if you apply elsewhere for another Loan and, once we submit an application for you to a Lender, you agree not to apply directly to that Lender.

7. **Application Fee.** You agree to pay us an application fee in the amount stated above for our efforts in preparing and processing your Loan application. Whether or not you get a Loan, the Application Fee is non-refundable unless required by law.

8. **Mortgage Broker Fee.** You agree to pay us a mortgage broker fee in the amount stated above upon the funding of a Loan that is obtained through our efforts. You can pay the fee directly to us or have the closing agent collect it from the Loan proceeds and pay it to us. If the fee is added to your Loan amount, your Loan payments will increase in amount. The fee will be disclosed to you by the Lender. We may also be paid by the Lender based on (i) the value of the Loan or related servicing rights in the market place or (ii) other services, goods or facilities performed or provided by us to the Lender.

9. **Yield Spread Premium.** In order to fully compensate us for our services, upon funding of a Loan, the Lender will pay us a Yield Spread Premium in the amount stated above and will disclose to you the exact amount. This fee will cause the interest rate on your Loan to be higher than the rate that would otherwise apply and will increase your loan payments.

10. **Relationship Between the Mortgage Broker Fee and Yield Spread Premium.** The Mortgage Broker Fee, Yield Spread Premium, and your Loan's interest rate and payments are interrelated and may be negotiable. You may have flexibility to have our total compensation apportioned in a way that is most advantageous to you. *This is something that you should do before you sign this Agreement.* If you wish to avoid paying up front points and fees, you may pay a higher interest rate to the Lender, in which case the Lender will pay us a higher Yield Spread Premium. If you wish to pay a lower interest rate, you will pay higher up front points and fees.



**11. Third Party Fees.** You will be required to pay Chase the fees set forth above for services that will be performed by third parties in connection with the processing and funding of your Loan application. The fees for such third-party services are incurred once the services are ordered. These fees are non-refundable unless actual costs are lower than the amount collected.

**12. Termination of Agreement.** This Agreement shall terminate either: (i) following the funding of a Loan you obtain through our efforts or (ii) sixty (60) days from the Agreement Date if an acceptable Loan commitment cannot be obtained for you. Any rights of a party that have accrued prior to termination of this Agreement will survive termination.

**13. Notices.** All notices and communications under this Agreement must be in writing and personally delivered or mailed, postage prepaid, and addressed to the other party at the address set forth below.

**14. Authorization and Acknowledgement.** By signing below, you: (i) authorize Chase to order credit reports on you and release your loan application, credit reports and other data and information to any Lender; (ii) authorize any Lender or its affiliates to release to Chase any information relating to your Loan application or Loan; (iii) acknowledge with respect to the Loan that you and Chase have entered into this Agreement before Chase has performed any brokerage services and that this is the only agreement with Chase for brokerage services; and (iv) acknowledge that you have read and understand this Agreement and received a duplicate signed copy of it.

BORROWER(S)

By: _Tawnya Lettau_

Tawnya Lettau

Title: Senior Loan Officer

Date: 7/7/05

Telephone: 805-593-1177

Fax: 805-547-1105

Address: 1101 Marsh Street

San Luis Obispo, CA  9340

_____
Borrower
Deborah E Mills

_____
Borrower

Date: _____

Address: 1880 Burnt Rock Way

Templeton, CA  93465

Mortgage Broker Agreement
C-6024  (1/05)  (replaces 8/03)  page 3 of 3

**<u>EXHIBIT C</u>**

**CHASE**

Chase Manhattan Mortgage Corporation
343 Thornall Street
Edison, NJ 08837
Tel 732-205-0762
Fax 732-205-8446

Christine Loudon
Vice President
Investor Relations

December 30, 2004


RECEIVED
JAN 3 2005

Vivian K. Sin - Senior Counsel
American Home Mortgage
d/b/a American Brokers Conduit
538 Broadhollow Road
Melville, NY 11747

Dear Vivian

Please be advised that effective January 1, 2005, Chase Manhattan Mortgage Corporation ("CMMC") is merging into Chase Home Finance LLC ("CHF LLC") and CHF LLC will be the surviving entity. The mortgage originations assets and business of CHF LLC, including but not limited to its broker out agreements, are being transferred to its parent, JPMorgan Chase Bank, National Association ("JPMC"). From and after January 1, 2005, the mortgage origination business formerly conducted by CMMC will be conducted by JPMC, and all rights and obligations of CMMC under its contract with your company will be assigned to and assumed by JPMC.

This letter will also serve as notice that the corporate office has been relocated to 194 **Wood Avenue South, Iselin, New Jersey 08830.**

If you have any questions, please call Chris Loudon at 732-452-8728. The new fax number is 732-452-8048.

Sincerely,

Christine Loudon
Vice President



**American Home Mortgage**
538 Broadhollow Road
Melville, New York 11747

Vivian K. Sin
*Senior Counsel*
Phone: (516) 949-3935
Fax:    (866) 291-6374
vsin@americanhm.com

CONFIDENTIAL and PRIVILIGED

March 30, 2005

Christine Loudon
Chase Home Finance
194 Wood Avenue South
Iselin, NJ 08830
Tel: (732) 452-8728
Fax:(732) 452-8048

RE: Broker Agreement between American Brokers Conduit and JPMorgan
Chase Bank, N.A

Dear Ms. Loudon:

Per your request, please find original signed copies. Please fax Exhibit A and provide copy of licensing or letter of exemption, also please confirm that Chase will not be brokering in Montana, South Carolina and West Virginia, and reason. Should you require additional information, please do not hesitate to contact me.

Very truly yours,

Vivian K. Sin

cc: Jackie McCormack
    Chase Home Finance

## BROKER AGREEMENT

This Broker Agreement, hereinafter referred to as the "Agreement", is made between American Home Mortgage Corp. doing business as American Brokers Conduit whose address is 17744 Sky Park Circle, Suite 150 – Irvine, CA 92614, hereinafter referred to as "Lender", and JPMorgan Chase Bank, N.A., hereinafter referred to as "Broker", whose address is 194 Wood Avenue South, Iselin, New Jersey 08830.

## RECITALS

WHEREAS, Lender and Broker are engaged in loan origination in all states (see NJ addendum) with the exception of Montana, South Carolina and West Virginia.

WHEREAS, Lender desires the Broker to assist in such loan originations and to render its service on the terms and conditions provided in this Agreement; and,

WHEREAS, Broker wishes to assign residential mortgage loan application packages to Lender which meet Lender requirements.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

1.    **TERM**

This Agreement may be terminated by either party for any reason upon fifteen (15) days prior written notice and may be terminated immediately for any material breach of any covenant, obligation, or duty contained herein or for any material violation of any law, ordinance, statute, rule, regulation governing the conduct of either party hereto.

Termination shall not affect the obligations of the parties with respect to any loan registered by Broker with Lender in a manner customary to Lender before such termination.

2.    **SERVICES**

A.    Broker, who represents and warrants that it is knowledgeable in all aspects of residential real estate lending in the state(s) where Broker is located, is hereby contracted by Lender for the purpose of soliciting and processing applications for real estate secured loans in the aforementioned state(s).  It is hereby agreed that the Lender will accept only those loan applications that, in its opinion, meet its current loan program parameters (as provided by Lender to Broker) and that result from purchase and refinance transactions.  Although the program parameters are subject to change from time to time, the changes will not adversely effect loans that have already been locked with Lender.

B.    All loan applications submitted by Broker shall contain all information and original documentation then required by Lender, including but not limited to the following:  The loan applications, credit reports, appraisals, verifications of deposit, verifications of employment and verifications of mortgages. Broker will provide the following disclosures as applicable:  HUD Guide to Settlement Costs, Consumer Handbook on Adjustable Rate Mortgages and Good Faith Estimate of Settlement Costs.  ARM Program Disclosures and state disclosures required at the time Broker receives the application will be provided by Broker if supplied by Lender.

C.    The responsibilities of the Lender will include providing initial and final TIL, loan underwriting, preliminary approval, notice of final approval or declination, preparation of loan closing documents and settlement instructions in Lender's name, closing, and funding of approved loan transactions. Lender shall have no recourse against Broker for damages relating to any loan approved and closed by Lender based on any defect in any closing, closing document, settlement instructions or disclosures prepared by Lender.  Lender further agrees that the review of all title policies, property surveys and hazard and flood insurance policies are the responsibility of Lender.  It is hereby understood that Broker shall make no credit commitments on behalf of Lender and that Lender shall have the sole and absolute discretion to determine whether a loan will be granted and under what conditions.

D.    There may, during the term of this Agreement, be instances where an application will be submitted from the applicant directly to the Lender after the Broker has performed some or all of the processing functions related to the application.  In these instances, Broker will consider its fee earned if, within 180 days of registration of a loan with Lender, Applicant closes with Lender.  There shall not be more than ten (10) such instances over the term of this Agreement.

3.    TERMS AND CONDITIONS

Submission to the Lender by the Broker of the Loan Package is subject to the following terms and conditions:

A. Eligible properties are identified in the description of the mortgage programs that has been previously provided by Lender to Broker.

B. The minimum and maximum loan amounts acceptable will be shown in Lender's most recently published Underwriting Guidelines, which have been provided to Broker. By signing this Agreement, Broker acknowledges receipt of said guidelines.

4.    REPRESENTATIONS AND WARRANTIES

As to each Loan Package submitted by Broker to Lender, Broker hereby represents and warrants to Lender, and Lender represents and warrants to Broker, as indicated, the following:

A.    LEGAL STATUS. Each party represents that it is duly licensed or is otherwise exempt from licensing, to perform its obligations hereunder, under and according to the laws of the state in which each loan is originated, and will, during the term hereof, maintain such licenses. The parties also represent that they are corporations in good standing, duly organized and validly existing.

B.    AUTHORITY.    The execution and delivery of the Agreement by each party and the performance by each party of the obligations to be performed by it hereunder have been duly authorized by all necessary corporate action.

C.    LEGALITY. The execution and delivery of the Agreement by the parties and the performance by the parties of the obligations to be performed by each hereunder do not violate, in any material respect, any current applicable provision of any law, rule, regulation, order, writ judgment injunction, decree, determination or award presently in effect having applicability to each party or of the articles of incorporation, or by-laws of each party. The parties will continue to comply in all material respects with the above legal requirements in addition to all applicable federal and state laws and regulations including, but not limited to, Equal Credit Opportunity Act, Real Estate Settlement Procedures Act, Truth-in-Lending Act and Fair Credit Reporting Act.

D.    BINDING OBLIGATIONS.    This Agreement, when duly executed and delivered by both parties, constitutes a legal, valid and binding obligation of each party enforceable against the other according to its terms.

E.    NO SUITS. There were no actions, suits, or proceedings pending or, to the knowledge of Broker, threatened against or affecting Broker or the properties of Broker before any court or governmental department, commission, board, bureau, agency or instrumentality, or domestic or foreign, which if determined adversely to Broker, would have a material adverse effect on the financial condition of Broker.

F.    AUTHORIZATION.    Broker is authorized to submit loan applications to Lender by each and every borrower on whose behalf a loan application is presented to Lender.

G.    DOCUMENTS SUBMITTED BY BROKER. Each document furnished to the Lender by Broker is complete and accurate as to information within Broker's knowledge and as reported by the applicant; to Broker's knowledge contains no misleading information; to Broker's knowledge has been prepared and executed and copies delivered as required by law; and to Broker's knowledge all signatures and initials therein are authorized and genuine.

H.    NO ADVERSE INFORMATION.    Broker has no adverse information concerning Borrower which it has not communicated to Lender.

I.    FAIR LENDING.    Lender represents and warrants that it has received, reviewed, and understood the JPMorgage Chase Bank, NA Fair Lending Statement, attached as Exhibit A. Further, Lender represents and warrants that it is cognizant and remains cognizant of its fair lending obligations under the Fair Housing Act, the Equal Opportunity Act, and all other federal, state, and local laws and regulations.

J.    PREDATORY LENDING. Lender acknowledges that Broker has a policy of not originating or brokering high-cost loans as defined by any applicable federal, state or local law and/or regulations ("High-Cost Loans") and that Broker is submitting the Loan Package to Lender base in part on Lenders representations that it does not originate or close High Cost

Page 2

Loans. Lender warrants that Lender will not take any action or make any changes, adjustments or additions to the Loan Package that would make the Loan a High-Cost Loan and will not originate or close the loans as a High-Cost Loan. Lender shall indemnify and hold Broker harmless from and against any loss, damage, liability, cost and expense, including reasonable attorney's fees arising out of any violation of the above warranty.

5.    **INDEMNITY, REMEDIES AND REPURCHASE**

Broker shall indemnify and hold Lender harmless from and against any loss, damage, liability, cost and expense, including reasonable attorneys fees arising out of any breach of a representation, warranty, covenant or agreement of Broker contained in the Agreement, or any negligence or fraud on the part of Broker in originating or processing any Loan approved and closed by Lender pursuant to this Agreement. Lender shall indemnify and hold Broker harmless from and against any and all claims, loss, damage, liability, costs and expenses including reasonable attorneys fees, arising out of any breach of Lender's representations, warranties, covenants or agreements contained in this Agreement or any negligence or fraud on the part of the Lender in underwriting, closing, funding or servicing any loan approved and closed by Lender pursuant to this Agreement.

Each party shall give immediate notice to the other party of any suit or action instituted arising out of the representations or activities under this Agreement.

Broker will only be required to repurchase any Loan upon evidence of fraud committed by Broker or its employees in the origination or processing of such Loan or upon a material breach of any of Broker's representations, warranties, covenants or agreements contained in the Agreement provided the effect of such fraud, gross negligence, or material breach is to materially and adversely affect the market value or salability in the secondary market of such Loan and Broker is unable to cure any defect or breach within sixty (60) days of notification from Lender. If at the end of such sixty (60) day period Broker has been unable to cure the defect or breach in question. Broker will repurchase the loan within thirty (30) days at a price equal to the outstanding principal amount of the loan plus any accrued but unpaid interest as of the date of purchase by Lender and any and all reasonable costs incurred by Lender in connection with the repurchase transaction.

6.    **FACILITIES.**

Except as otherwise provided herein, Lender will have no responsibility or obligation to provide Broker with any personnel, material, facilities, or equipment required for Broker to perform under this Agreement.

7.    **FEES.**

Payment of the Broker's fee from borrower is solely the responsibility of the borrower pursuant to Broker's agreement with the borrower. However, Lender agrees to assist in the collection of the Broker's fee from borrower at closing to the extent that such fees are reflected in the brokers demand statement to Lender.

Broker acknowledges that the Broker's fee to be collected is reasonable and customary under relevant state law and as expressed in the Mortgage Broker Fee Agreement between the Broker and Borrower.

In all cases where Lender has agreed to pay a fee to Broker pursuant to the terms of this Agreement, Lender will not be obligated to pay any such fee if a loan does not close or, in the case of rescindable transaction, the loan closes but is subsequently rescinded by the borrower.

8.    **NO FINDER'S FEE**

Each party represents and warrants that there are no claims for brokerage fees or finder's fees in connection with the transactions contemplated by this Agreement resulting from any action taken by either party for which the other will be responsible. Each party agrees to exonerate, indemnify and hold harmless the other in respect to any and all losses sustained by the other as a result of liability to any broker or finder on the basis of any arrangement or agreement made by or on behalf of such party not provided for herein.

9.    **NO AGENCY OR EMPLOYMENT RELATIONSHIP**

Broker shall not be considered, under the provisions of this Agreement or otherwise, as having employee status, and shall not be entitled to any reimbursement from Lender for any expense incurred by Broker under this Agreement. Broker shall have no authority to bind, obligate or commit Lender by any promise or representation unless specifically authorized by

Lender in writing in a particular transaction. Broker shall not represent to any party that it in anyway represents lender or is authorized to act on behalf of Lender. This Agreement shall not be construed as a partnership or joint venture, nor is it the intent of the parties hereto to create an agency relationship. Broker is an independent contractor in all respects. Neither party hereto shall be liable for any obligation incurred by the other except as provided herein.

10.    **RESTRICTIONS**

Broker may distribute written materials to prospective borrowers using Lender's name only where required by law and shall not otherwise use the name of the Lender in any advertising or promotional piece unless authorized to do so by Lender in writing.

Any advertising document which Broker wishes to use in connection with the loans subject to this Agreement, whether or not such documents contain Lender's name, shall be submitted to Lender for written approval prior to its use, which approval shall not be withheld unreasonably.

It is understood that Broker will conform to the current residential real estate lending policies of Lender and will convey only those rates to potential loan customers which are published or provided by Lender for such purpose.

Should this Agreement be terminated for any reason whatsoever, each party agrees not to divulge to anyone any proprietary information of the other party or any specific loan transaction information regarding any past borrower or applicant unless required by law to do so.

11.    **SEVERABILITY**

Should any of the provisions described above be deemed invalid or unenforceable for any reason whatsoever, such shall not render invalid any of the remaining provisions as they remain severable apart from the terms of this Agreement.

12.    **ASSIGNMENT.**

Neither this Agreement nor any duties or obligations hereunder shall be assignable by Broker without the prior written consent of Lender. In the event of an assignment by Broker to which Lender has consented, the assignee or his legal representative shall agree in writing with Lender to personally assume, perform and be bound by the covenants contained herein. A change in the corporate character or principals of either party to this Agreement shall not constitute an assignment under this section. Assignment by Broker to any of its affiliates shall not constitute an assignment under this section.

13.    **ATTORNEY'S FEES**

If any action at law or in equity is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, in addition to any other relief to which it may be entitled.

14.    **NOTICES**

All notices shall be in writing and sent by Certified U.S. mail to the following addresses:

Lender:

> American Brokers Conduit
> 17744 Sky Park Circle
> Suite 150
> Irvine, CA 92614

> Attn:
> Title:

Broker:
(Corp.)

> JPMorgan Chase Bank, N.A.
> 194 Wood Avenue South
> Iselin, NJ 08830

> Attn:    Christine Loudon
> Title:    Vice President

> (Local)

> Attn:
> Title:

### 15.  GOVERNING LAW

The validity of this Agreement and any of its terms or provision, as well as the rights and duties of the parties hereunder shall be governed by the laws of the State of New Jersey.

### 16.  NON-EXCLUSIVITY

This Agreement shall be non-exclusive as to both Lender and Broker, and each party may make or originate loans with or without the assistance of the other and may use the services of other brokers or lenders.

### 17.  ENTIRE AGREEMENT

This Agreement supersedes any and all other Agreements, either oral or in writing between the parties hereto with respect to the subject matter hereto, and no other Agreement, statement or promise relating to the subject matter of this Agreement which is not contained herein shall be valid or binding.

In witness whereof, the parties have signed and executed this Agreement as of this ⟨30⟩ day of _March_, 2005.

Lender: American Home Mortgage Corp.
Tax I.D. No: 13-3461554

By: ⟨signature⟩, Pres. Wholesale & STC                Date: 3/30/05

Broker: Chase Manhattan Mortgage Corporation
Tax I.D. No: _____ 13 4994650 _____

By: ⟨signature⟩                Date: 3/9/05
Christine Loudon, Vice President

### NEW JERSEY ADDENDUM TO BROKER AGREEMENT

This is an Addendum to the Broker Agreement, hereinafter referred to as the "Agreement", made between American Brokers Conduit whose address is 17744 Sky Park Circle, Suite 150 – Irvine, CA 92614, hereinafter referred to as "Lender", and JPMorgan Chase Bank, N.A., hereinafter referred to as "Broker", whose address is 194, Wood Avenue South, Iselin, New Jersey 08830 dated ___ ___ ___ ___.

1. The last sentence in Paragraph 4C of the Agreement shall be deleted and the following inserted in its stead:

   The parties will continue to comply in all material respects with the above legal requirements in addition to all applicable federal, state and local laws and regulations including, but not limited to, Equal Credit Opportunity Act, Real Estate Settlement Procedures Act, Truth-in-Lending Act, Fair Credit Reporting Act, HOEPA, and New Jersey Home Ownership Security Act.

2. The following shall be added to the end of the last subparagraph of Paragraph 5 of the Agreement:

   Broker will not repurchase any Loan that has been determined to be in violation of Federal, State or local predatory lending laws and/or regulations.

3. The following shall be added to the end Paragraph 5 of the Agreement:

   Each party shall indemnify and hold the other harmless from and against any loss, damage, liability, cost and expense, including reasonable attorney's fees arising out of any violation of applicable Federal, State or local predatory lending laws and/or regulations.

In witness whereof, the parties have signed and executed this Agreement as of this 30th day of March , 2005.

Lender: American Home Mortgage Corp.
Tax I.D. No: 13 - 3461558

By: _____ Pres Wholesaler DTC         Date: 3/30/05

Broker: JPMorgan Chase Bank, N.A.
Tax I.D. No: ___ 13 4994650

By: _____         Date: 3/09/05
Christine Loudon, Vice President



**CHASE**

Chase Home Finance
194 Wood Avenue South
Iselin, NJ 08830
Tel 732-452-8728
Fax 732-452-8048

Christine Loudon

RECEIVED
MAR 1 1 2005

March 9, 2005

Vivian Sin
American Brokers Conduit
538 Broadhollow Road
Melville, NY 11747

RE:    Broker Agreement between American Brokers Conduit
        and  JPMorgan Chase Bank, N.A.

Dear Vivian:

Enclosed is a new revised broker agreement for American Brokers Conduit's consideration.  Due to Chase's name and legal structure change, along with the new address we thought a new agreement in the name of JPMorgan Chase is warranted.  All terms and conditions of the preceding agreement remain the same with a few exceptions.

- We have expanded the states to include all states in which American Brokers Conduit is licensed to do business, with the exception of Montana, South Carolina and West Virginia.
- We have added two additional clauses to section 4.  One clause addresses Fair Lending  (with an Exhibit A attached) and the second Predatory Lending.  We have under scored the changes in these sections to indicate change.
- Due to specific brokering laws with regard to predatory lending in the State of NJ we have added a New Jersey Addendum to the Agreement to meet state specific requirements.

We are enclosing a copy of the existing agreement for ease of reference.  If American Brokers Conduit is in agreement with the terms set forth in the new revised agreement please return one fully executed agreement to my attention for Chase's records.  If you want to discuss any changes further please do not hesitate to call me at 732-452-8728.

Thank you for your assistance in this matter.  We look forward to the expansion of our existing agreement and a continued long and prosperous relationship.

Sincerely,

Christine Loudon

JPMorgan Chase Bank, NA • 194 Wood Avenue South Iselin, NJ

15318 - Showing in Branch

15928 - has no agreement in it.

## BROKER AGREEMENT

This Broker Agreement, hereinafter referred to as the "Agreement", is made between American Home Mortgage Corp. doing business as American Brokers Conduit whose address is 17744 Sky Park Circle, Suite 150 - Irvine, CA 92614, hereinafter referred to as "Lender", and JPMorgan Chase Bank, N.A., hereinafter referred to as "Broker", whose address is 194 Wood Avenue South, Iselin, New Jersey 08830.

## RECITALS

WHEREAS, Lender and Broker are engaged in loan origination in all states (see NJ addendum) with the exception of Montana, South Carolina and West Virginia.

WHEREAS, Lender desires the Broker to assist in such loan originations and to render its service on the terms and conditions provided in this Agreement; and,

WHEREAS, Broker wishes to assign residential mortgage loan application packages to Lender which meet Lender requirements.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

1.    **TERM**

This Agreement may be terminated by either party for any reason upon fifteen (15) days prior written notice and may be terminated immediately for any material breach of any covenant, obligation, or duty contained herein or for any material violation of any law, ordinance, statute, rule, regulation governing the conduct of either party hereto.

Termination shall not affect the obligations of the parties with respect to any loan registered by Broker with Lender in a manner customary to Lender before such termination.

2.    **SERVICES**

A.    Broker, who represents and warrants that it is knowledgeable in all aspects of residential real estate lending in the state(s) where Broker is located, is hereby contracted by Lender for the purpose of soliciting and processing applications for real estate secured loans in the aforementioned state(s). It is hereby agreed that the Lender will accept only those loan applications that, in its opinion, meet its current loan program parameters (as provided by Lender to Broker) and that result from purchase and refinance transactions. Although the program parameters are subject to change from time to time, the changes will not adversely effect loans that have already been locked with Lender.

B.    All loan applications submitted by Broker shall contain all information and original documentation then required by Lender, including but not limited to the following: The loan applications, credit reports, appraisals, verifications of deposit, verifications of employment and verifications of mortgages. Broker will provide the following disclosures as applicable: HUD Guide to Settlement Costs, Consumer Handbook on Adjustable Rate Mortgages and Good Faith Estimate of Settlement Costs. ARM Program Disclosures and state disclosures required at the time Broker receives the application will be provided by Broker if supplied by Lender.

C.    The responsibilities of the Lender will include providing initial and final TIL, loan underwriting, preliminary approval, notice of final approval or declination, preparation of loan closing documents and settlement instructions in Lender's name, closing, and funding of approved loan transactions. Lender shall have no recourse against Broker for damages relating to any loan approved and closed by Lender based on any defect in any closing, closing document, settlement instructions or disclosures prepared by Lender. Lender further agrees that the review of all title policies, property surveys and hazard and flood insurance policies are the responsibility of Lender. It is hereby understood that Broker shall make no credit commitments on behalf of Lender and that Lender shall have the sole and absolute discretion to determine whether a loan will be granted and under what conditions.

D.    There may, during the term of this Agreement, be instances where an application will be submitted from the applicant directly to the Lender after the Broker has performed some or all of the processing functions related to the application. In these instances, Broker will consider its fee earned if, within 180 days of registration of a loan with Lender, Applicant closes with Lender. There shall not be more than ten (10) such instances over the term of this Agreement.

3.    **TERMS AND CONDITIONS**

Submission to the Lender by the Broker of the Loan Package is subject to the following terms and conditions:

A. Eligible properties are identified in the description of the mortgage programs that has been previously provided by Lender to Broker.

B. The minimum and maximum loan amounts acceptable will be shown in Lender's most recently published Underwriting Guidelines, which have been provided to Broker. By signing this Agreement, Broker acknowledges receipt of said guidelines.

4.    **REPRESENTATIONS AND WARRANTIES**

As to each Loan Package submitted by Broker to Lender, Broker hereby represents and warrants to Lender, and Lender represents and warrants to Broker, as indicated, the following:

A.    **LEGAL STATUS.** Each party represents that it is duly licensed or is otherwise exempt from licensing, to perform its obligations hereunder, under and according to the laws of the state in which each loan is originated, and will, during the term hereof, maintain such licenses. The parties also represent that they are corporations in good standing, duly organized and validly existing.

B.    **AUTHORITY.**   The execution and delivery of the Agreement by each party and the performance by each party of the obligations to be performed by it hereunder have been duly authorized by all necessary corporate action.

C.    **LEGALITY.** The execution and delivery of the Agreement by the parties and the performance by the parties of the obligations to be performed by each hereunder do not violate, in any material respect, any current applicable provision of any law, rule, regulation, order, writ judgment injunction, decree, determination or award presently in effect having applicability to each party or of the articles of incorporation, or by-laws of each party. The parties will continue to comply in all material respects with the above legal requirements in addition to all applicable federal and state laws and regulations including, but not limited to, Equal Credit Opportunity Act, Real Estate Settlement Procedures Act, Truth-in-Lending Act and Fair Credit Reporting Act.

D.    **BINDING OBLIGATIONS.**   This Agreement, when duly executed and delivered by both parties, constitutes a legal, valid and binding obligation of each party enforceable against the other according to its terms.

E.    **NO SUITS.** There were no actions, suits, or proceedings pending or, to the knowledge of Broker, threatened against or affecting Broker or the properties of Broker before any court or governmental department, commission, board, bureau, agency or instrumentality, or domestic or foreign, which if determined adversely to Broker, would have a material adverse effect on the financial condition of Broker.

F.    **AUTHORIZATION.**  Broker is authorized to submit loan applications to Lender by each and every borrower on whose behalf a loan application is presented to Lender.

G.    **DOCUMENTS SUBMITTED BY BROKER.**  Each document furnished to the Lender by Broker is complete and accurate as to information within Broker's knowledge and as reported by the applicant; to Broker's knowledge contains no misleading information; to Broker's knowledge has been prepared and executed and copies delivered as required by law; and to Broker's knowledge all signatures and initials therein are authorized and genuine.

H.    **NO ADVERSE INFORMATION.**   Broker has no adverse information concerning Borrower which it has not communicated to Lender.

I.    **FAIR LENDING.**   Lender represents and warrants that it has received, reviewed, and understood the JPMorgage Chase Bank, NA Fair Lending Statement, attached as Exhibit A. Further, Lender represents and warrants that it is cognizant and remains cognizant of its fair lending obligations under the Fair Housing Act, the Equal Opportunity Act, and all other federal, state, and local laws and regulations.

J.    **PREDATORY LENDING.**  Lender acknowledges that Broker has a policy of not originating or brokering high-cost loans as defined by any applicable federal, state or local law and/or regulations ("High-Cost Loans") and that Broker is submitting the Loan Package to Lender base in part on Lenders representations that it does not originate or close High Cost

Loans. Lender warrants that Lender will not take any action or make any changes, adjustments or additions to the Loan Package that would make the Loan a High-Cost Loan and will not originate or close the loans as a High-Cost Loan. Lender shall indemnify and hold Broker harmless from and against any loss, damage, liability, cost and expense, including reasonable attorney's fees arising out of any violation of the above warranty.

## 5.    INDEMNITY, REMEDIES AND REPURCHASE

Broker shall indemnify and hold Lender harmless from and against any loss, damage, liability, cost and expense, including reasonable attorneys fees arising out of any breach of a representation, warranty, covenant or agreement of Broker contained in the Agreement, or any negligence or fraud on the part of Broker in originating or processing any Loan approved and closed by Lender pursuant to this Agreement.  Lender shall indemnify and hold Broker harmless from and against any and all claims, loss, damage, liability, costs and expenses including reasonable attorneys fees, arising out of any breach of Lender's representations, warranties, covenants or agreements contained in this Agreement or any negligence or fraud on the part of the Lender in underwriting, closing, funding or servicing any loan approved and closed by Lender pursuant to this Agreement.

Each party shall give immediate notice to the other party of any suit or action instituted arising out of the representations or activities under this Agreement.

Broker will only be required to repurchase any Loan upon evidence of fraud committed by Broker or its employees in the origination or processing of such Loan or upon a material breach of any of Broker's representations, warranties, covenants or agreements contained in the Agreement provided the effect of such fraud, gross negligence, or material breach is to materially and adversely affect the market value or salability in the secondary market of such Loan and Broker is unable to cure any defect or breach within sixty (60) days of notification from Lender. If at the end of such sixty (60) day period Broker has been unable to cure the defect or breach in question.  Broker will repurchase the loan within thirty (30) days at a price equal to the outstanding principal amount of the loan plus any accrued but unpaid interest as of the date of purchase by Lender and any and all reasonable costs incurred by Lender in connection with the repurchase transaction.

## 6.    FACILITIES.

Except as otherwise provided herein, Lender will have no responsibility or obligation to provide Broker with any personnel, material, facilities, or equipment required for Broker to perform under this Agreement.

## 7.    FEES.

Payment of the Broker's fee from borrower is solely the responsibility of the borrower pursuant to Broker's agreement with the borrower.  However, Lender agrees to assist in the collection of the Broker's fee from borrower at closing to the extent that such fees are reflected in the brokers demand statement to Lender.

Broker acknowledges that the Broker's fee to be collected is reasonable and customary under relevant state law and as expressed in the Mortgage Broker Fee Agreement between the Broker and Borrower.

In all cases where Lender has agreed to pay a fee to Broker pursuant to the terms of this Agreement, Lender will not be obligated to pay any such fee if a loan does not close or, in the case of rescindable transaction, the loan closes but is subsequently rescinded by the borrower.

## 8.    NO FINDER'S FEE

Each party represents and warrants that there are no claims for brokerage fees or finder's fees in connection with the transactions contemplated by this Agreement resulting from any action taken by either party for which the other will be responsible.  Each party agrees to exonerate, indemnify and hold harmless the other in respect to any and all losses sustained by the other as a result of liability to any broker or finder on the basis of any arrangement or agreement made by or on behalf of such party not provided for herein.

## 9.    NO AGENCY OR EMPLOYMENT RELATIONSHIP

Broker shall not be considered, under the provisions of this Agreement or otherwise, as having employee status, and shall not be entitled to any reimbursement from Lender for any expense incurred by Broker under this Agreement.  Broker shall have no authority to bind, obligate or commit Lender by any promise or representation unless specifically authorized by

Lender in writing in a particular transaction. Broker shall not represent to any party that it in anyway represents lender or is authorized to act on behalf of Lender. This Agreement shall not be construed as a partnership or joint venture, nor is it the intent of the parties hereto to create an agency relationship. Broker is an independent contractor in all respects. Neither party hereto shall be liable for any obligation incurred by the other except as provided herein.

10.    **RESTRICTIONS**

Broker may distribute written materials to prospective borrowers using Lender's name only where required by law and shall not otherwise use the name of the Lender in any advertising or promotional piece unless authorized to do so by Lender in writing.

Any advertising document which Broker wishes to use in connection with the loans subject to this Agreement, whether or not such documents contain Lender's name, shall be submitted to Lender for written approval prior to its use, which approval shall not be withheld unreasonably.

It is understood that Broker will conform to the current residential real estate lending policies of Lender and will convey only those rates to potential loan customers which are published or provided by Lender for such purpose.

Should this Agreement be terminated for any reason whatsoever, each party agrees not to divulge to anyone any proprietary information of the other party or any specific loan transaction information regarding any past borrower or applicant unless required by law to do so.

11.    **SEVERABILITY**

Should any of the provisions described above be deemed invalid or unenforceable for any reason whatsoever, such shall not render invalid any of the remaining provisions as they remain severable apart from the terms of this Agreement.

12.    **ASSIGNMENT.**

Neither this Agreement nor any duties or obligations hereunder shall be assignable by Broker without the prior written consent of Lender. In the event of an assignment by Broker to which Lender has consented, the assignee or his legal representative shall agree in writing with Lender to personally assume, perform and be bound by the covenants contained herein. A change in the corporate character or principals of either party to this Agreement shall not constitute an assignment under this section. Assignment by Broker to any of its affiliates shall not constitute an assignment under this section.

13.    **ATTORNEY'S FEES**

If any action at law or in equity is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, in addition to any other relief to which it may be entitled.

14.    **NOTICES**

All notices shall be in writing and sent by Certified U.S. mail to the following addresses:

Lender:

    American Brokers Conduit
    17744 Sky Park Circle
    Suite 150
    Irvine, CA 92614

    Attn:
    Title:

Broker:
(Corp.)

    JPMorgan Chase Bank, N.A.
    194 Wood Avenue South
    Iselin, NJ 08830

    Attn:  Christine Loudon
    Title:  Vice President

    (Local)

    Attn:
    Title:

15.    **GOVERNING LAW**

The validity of this Agreement and any of its terms or provision, as well as the rights and duties of the parties hereunder shall be governed by the laws of the State of New Jersey.

16.    **NON-EXCLUSIVITY**

This Agreement shall be non-exclusive as to both Lender and Broker, and each party may make or originate loans with or without the assistance of the other and may use the services of other brokers or lenders.

17.    **ENTIRE AGREEMENT**

This Agreement supersedes any and all other Agreements, either oral or in writing between the parties hereto with respect to the subject matter hereto, and no other Agreement, statement or promise relating to the subject matter of this Agreement which is not contained herein shall be valid or binding.

In witness whereof, the parties have signed and executed this Agreement as of this 30 day of March , 2005.

Lender:    American Home Mortgage Corp.
Tax I.D. No:    13-3461558

By:    _____, Mr. Wholesale ADTC          Date: 3/30/05

Broker: Chase Manhattan Mortgage Corporation
Tax I.D. No:    13 4994650

By:    Christine Loudon          Date: 3/9/05
       Christine Loudon, Vice President

## NEW JERSEY ADDENDUM TO BROKER AGREEMENT

This is an Addendum to the Broker Agreement, hereinafter referred to as the "Agreement", made between American Brokers Conduit whose address is 17744 Sky Park Circle, Suite 150 – Irvine, CA 92614, hereinafter referred to as "Lender", and JPMorgan Chase Bank, N.A., hereinafter referred to as "Broker", whose address is 194, Wood Avenue South, Iselin, New Jersey 08830 dated _____.

1. The last sentence in Paragraph 4C of the Agreement shall be deleted and the following inserted in its stead:

> The parties will continue to comply in all material respects with the above legal requirements in addition to all applicable federal, state and local laws and regulations including, but not limited to, Equal Credit Opportunity Act, Real Estate Settlement Procedures Act, Truth-in-Lending Act, Fair Credit Reporting Act, HOEPA, and New Jersey Home Ownership Security Act.

2. The following shall be added to the end of the last subparagraph of Paragraph 5 of the Agreement:

> Broker will not repurchase any Loan that has been determined to be in violation of Federal, State or local predatory lending laws and/or regulations.

3. The following shall be added to the end Paragraph 5 of the Agreement:

> Each party shall indemnify and hold the other harmless from and against any loss, damage, liability, cost and expense, including reasonable attorney's fees arising out of any violation of applicable Federal, State or local predatory lending laws and/or regulations.

In witness whereof, the parties have signed and executed this Agreement as of this 30th day of March _____, 2005.

Lender: American Home Mortgage Corp.
Tax I.D. No: 13 - 3461558

By: _D. ___ Ross Wholesale VCC___    Date: 3/30/05

Broker: JPMorgan Chase Bank, N.A.
Tax I.D. No: 13 4994650

By: _Christine Loudon___    Date: 3/09/05
Christine Loudon, Vice President

## BROKER AGREEMENT

This Broker Agreement, hereinafter referred to as the "Agreement", is made between American Brokers Conduit whose address is 17744 Sky Park Circle, Suite 150 - Irvine, CA 92614, hereinafter referred to as "Lender", and Chase Manhattan Mortgage Corporation, hereinafter referred to as "Broker", whose address is 343 Thornall Street, Edison, New Jersey 08837.

## RECITALS

WHEREAS, Lender and Broker are engaged in loan origination in the state(s) of AZ, CA, HI, ID, NM, NV, OR, UT and WA

WHEREAS, Lender desires the Broker to assist in such loan originations and to render its service on the terms and conditions provided in this Agreement; and,

WHEREAS, Broker wishes to assign residential mortgage loan application packages to Lender which meet Lender requirements.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

1.   **TERM**

This Agreement may be terminated by either party for any reason upon fifteen (15) days prior written notice and may be terminated immediately for any material breach of any covenant, obligation, or duty contained herein or for any material violation of any law, ordinance, statute, rule, regulation governing the conduct of either party hereto.

Termination shall not affect the obligations of the parties with respect to any loan registered by Broker with Lender in a manner customary to Lender before such termination.

2.   **SERVICES**

A.   Broker, who represents and warrants that it is knowledgeable in all aspects of residential real estate lending in the state(s) where Broker is located, is hereby contracted by Lender for the purpose of soliciting and processing applications for real estate secured loans in the aforementioned state(s). It is hereby agreed that the Lender will accept only those loan applications that, in its opinion, meet its current loan program parameters (as provided by Lender to Broker) and that result from purchase and refinance transactions.

B.   All loan applications submitted by Broker shall contain all information and original documentation then required by Lender, including but not limited to the following:  The loan applications, credit reports, appraisals, verifications of deposit, verifications of employment and verifications of mortgages. Broker will provide the following disclosures as applicable:  HUD Guide to Settlement Costs, Consumer Handbook on Adjustable Rate Mortgages and Good Faith Estimate of Settlement Costs. ARM Program Disclosures and state disclosures required at the time Broker receives the application will be provided by Broker if supplied by Lender.

C.   The responsibilities of the Lender will include providing initial and final TIL, loan underwriting, preliminary approval, notice of final approval or declination, preparation of loan closing documents and settlement instructions in Lender's name, closing, and funding of approved loan transactions. Lender shall have no recourse against Broker for damages relating to any loan approved and closed by Lender based on any defect in any closing closing document

3.    **TERMS AND CONDITIONS**

Submission to the Lender by the Broker of the Loan Package is subject to the following terms and conditions:

A. Eligible properties are identified in the description of the mortgage programs that has been previously provided by Lender to Broker.

B. The minimum and maximum loan amounts acceptable will be shown in Lender's most recently published Underwriting Guidelines, which have been provided to Broker. By signing this Agreement, Broker acknowledges receipt of said guidelines.

4.    **REPRESENTATIONS AND WARRANTIES**

As to each Loan Package submitted by Broker to Lender, Broker hereby represents and warrants to Lender, and Lender represents and warrants to Broker, as indicated, the following:

A.    **LEGAL STATUS.** Each party represents that it is duly licensed or is otherwise exempt from licensing, to perform its obligations hereunder, under and according to the laws of the state in which each loan is originated, and will, during the term hereof, maintain such licenses. The parties also represent that they are corporations in good standing, duly organized and validly existing.

B.    **AUTHORITY.**   The execution and delivery of the Agreement by each party and the performance by each party of the obligations to be performed by it hereunder have been duly authorized by all necessary corporate action.

C.    **LEGALITY.**  The execution and delivery of the Agreement by the parties and the performance by the parties of the obligations to be performed by each hereunder do not violate, in any material respect, any current applicable provision of any law, rule, regulation, order, writ judgment injunction, decree, determination or award presently in effect having applicability to each party or of the articles of incorporation, or by-laws of each party. The parties will continue to comply in all material respects with the above legal requirements in addition to all applicable federal and state laws and regulations including, but not limited to, Equal Credit Opportunity Act, Real Estate Settlement Procedures Act, Truth-in-Lending Act and Fair Credit Reporting Act.

D.    **BINDING OBLIGATIONS.**   This Agreement, when duly executed and delivered by both parties, constitutes a legal, valid and binding obligation of each party enforceable against the other according to its terms.

E.    **NO SUITS.**  There were no actions, suits, or proceedings pending or, to the knowledge of Broker, threatened against or affecting Broker or the properties of Broker before any court or governmental department, commission, board, bureau, agency or instrumentality, or domestic or foreign, which if determined adversely to Broker, would have a material adverse effect on the financial condition of Broker.

F.    **AUTHORIZATION.**   Broker is authorized to submit loan applications to Lender by each and every borrower on whose behalf a loan application is presented to Lender.

G.    **DOCUMENTS SUBMITTED BY BROKER.** Each document furnished to the Lender by Broker is complete and accurate as to information within Broker's knowledge and as reported by the applicant; to Broker's knowledge contains no misleading information; to Broker's knowledge has been prepared and executed and copies delivered as required by law;

from and against any and all claims, loss, damage, liability, costs and expenses including reasonable attorneys fees, arising out of any breach of Lender's representations, warranties, covenants or agreements contained in this Agreement or any negligence or fraud on the part of the Lender in underwriting, closing, funding or servicing any loan approved and closed by Lender pursuant to this Agreement.

Each party shall give immediate notice to the other party of any suit or action instituted arising out of the representations or activities under this Agreement.

Broker will only be required to repurchase any Loan upon evidence of fraud committed by Broker or its employees in the origination or processing of such Loan or upon a material breach of any of Broker's representations, warranties, covenants or agreements contained in the Agreement provided the effect of such fraud, gross negligence, or material breach is to materially and adversely affect the market value or salability in the secondary market of such Loan and Broker is unable to cure any defect or breach within sixty (60) days of notification from Lender. If at the end of such sixty (60) day period Broker has been unable to cure the defect or breach in question. Broker will repurchase the loan within thirty (30) days at a price equal to the outstanding principal amount of the loan plus any accrued but unpaid interest as of the date of purchase by Lender and any and all reasonable costs incurred by Lender in connection with the repurchase transaction.

6.    **FACILITIES.**

Except as otherwise provided herein, Lender will have no responsibility or obligation to provide Broker with any personnel, material, facilities, or equipment required for Broker to perform under this Agreement.

7.    **FEES.**

Payment of the Broker's fee from borrower is solely the responsibility of the borrower pursuant to Broker's agreement with the borrower. However, Lender agrees to assist in the collection of the Broker's fee from borrower at closing to the extent that such fees are reflected in the brokers demand statement to Lender.

Broker acknowledges that the Broker's fee to be collected is reasonable and customary under relevant state law and as expressed in the Mortgage Broker Fee Agreement between the Broker and Borrower.

In all cases where Lender has agreed to pay a fee to Broker pursuant to the terms of this Agreement, Lender will not be obligated to pay any such fee if a loan does not close or, in the case of rescindable transaction, the loan closes but is subsequently rescinded by the borrower.

8.    **NO FINDER'S FEE**

Each party represents and warrants that there are no claims for brokerage fees or finder's fees in connection with the transactions contemplated by this Agreement resulting from any action taken by either party for which the other will be responsible. Each party agrees to exonerate, indemnify and hold harmless the other in respect to any and all losses sustained by the other as a result of liability to any broker or finder on the basis of any arrangement or agreement made by or on behalf of such party not provided for herein.

9.    **NO AGENCY OR EMPLOYMENT RELATIONSHIP**

Broker shall not be considered, under the provisions of this Agreement or otherwise, as

10.   **RESTRICTIONS**

Broker may distribute written materials to prospective borrowers using Lender's name only where required by law and shall not otherwise use the name of the Lender in any advertising or promotional piece unless authorized to do so by Lender in writing.

Any advertising document which Broker wishes to use in connection with the loans subject to this Agreement, whether or not such documents contain Lender's name, shall be submitted to Lender for written approval prior to its use, which approval shall not be withheld unreasonably.

It is understood that Broker will conform to the current residential real estate lending policies of Lender and will convey only those rates to potential loan customers which are published or provided by Lender for such purpose.

Should this Agreement be terminated for any reason whatsoever, each party agrees not to divulge to anyone any proprietary information of the other party or any specific loan transaction information regarding any past borrower or applicant unless required by law to do so.

11.   **SEVERABILITY**

Should any of the provisions described above be deemed invalid or unenforceable for any reason whatsoever, such shall not render invalid any of the remaining provisions as they remain severable apart from the terms of this Agreement.

12.   **ASSIGNMENT.**

Neither this Agreement nor any duties or obligations hereunder shall be assignable by Broker without the prior written consent of Lender. In the event of an assignment by Broker to which Lender has consented, the assignee or his legal representative shall agree in writing with Lender to personally assume, perform and be bound by the covenants contained herein. A change in the corporate character or principals of either party to this Agreement shall not constitute an assignment under this section. Assignment by Broker to any of its affiliates shall not constitute an assignment under this section.

13.   **ATTORNEY'S FEES**

If any action at law or in equity is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, in addition to any other relief to which it may be entitled.

14.   **NOTICES**

All notices shall be in writing and sent by Certified U.S. mail to the following addresses:

Lender:

American Brokers Conduit
17744 Sky Park Circle
Suite 150
Irvine, CA 92614

Attn:
Title:

15.    **GOVERNING LAW**

The validity of this Agreement and any of its terms or provision, as well as the rights and duties of the parties hereunder shall be governed by the laws of the State of New Jersey.

16.    **NON-EXCLUSIVITY**

This Agreement shall be non-exclusive as to both Lender and Broker, and each party may make or originate loans with or without the assistance of the other and may use the services of other brokers or lenders.

17.    **ENTIRE AGREEMENT**

This Agreement supersedes any and all other Agreements, either oral or in writing between the parties hereto with respect to the subject matter hereto, and no other Agreement, statement or promise relating to the subject matter of this Agreement which is not contained herein shall be valid or binding.

In witness whereof, the parties have signed and executed this Agreement as of this_____day of _____, 2004.


Lender:
Tax I.D. No: _____

By: _____          Date:_____


Broker: Chase Manhattan Mortgage Corporation
Tax I.D. No: _____22 1092200_____

By: _____          Date: _6/10/04_
          Christine Loudon, Vice President

## BROKER AGREEMENT

This Broker Agreement, hereinafter referred to as the "Agreement", is made between American Brokers Conduit whose address is 17744 Sky Park Circle, Suite 150 - Irvine, CA 92614, hereinafter referred to as "Lender", and Chase Manhattan Mortgage Corporation, hereinafter referred to as "Broker", whose address is 343 Thornall Street, Edison, New Jersey 08837.

## RECITALS

WHEREAS, Lender and Broker are engaged in loan origination in the state(s) of AZ, CA, HI, ID, NM, NV, OR, UT and WA

WHEREAS, Lender desires the Broker to assist in such loan originations and to render its service on the terms and conditions provided in this Agreement; and,

WHEREAS, Broker wishes to assign residential mortgage loan application packages to Lender which meet Lender requirements.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the parties agree as follows:

1. **TERM**

This Agreement may be terminated by either party for any reason upon fifteen (15) days prior written notice and may be terminated immediately for any material breach of any covenant, obligation, or duty contained herein or for any material violation of any law, ordinance, statute, rule, regulation governing the conduct of either party hereto.

Termination shall not affect the obligations of the parties with respect to any loan registered by Broker with Lender in a manner customary to Lender before such termination.

2. **SERVICES**

A. Broker, who represents and warrants that it is knowledgeable in all aspects of residential real estate lending in the state(s) where Broker is located, is hereby contracted by Lender for the purpose of soliciting and processing applications for real estate secured loans in the aforementioned state(s). It is hereby agreed that the Lender will accept only those loan applications that, in its opinion, meet its current loan program parameters (as provided by Lender to Broker) and that result from purchase and refinance transactions.

B. All loan applications submitted by Broker shall contain all information and original documentation then required by Lender, including but not limited to the following: The loan applications, credit reports, appraisals, verifications of deposit, verifications of employment and verifications of mortgages. Broker will provide the following disclosures as applicable: HUD Guide to Settlement Costs, Consumer Handbook on Adjustable Rate Mortgages and Good Faith Estimate of Settlement Costs. ARM Program Disclosures and state disclosures required at the time Broker receives the application will be provided by Broker if supplied by Lender.

C. The responsibilities of the Lender will include providing initial and final TIL, loan underwriting, preliminary approval, notice of final approval or declination, preparation of loan closing documents and settlement instructions in Lender's name, closing, and funding of approved loan transactions. Lender shall have no recourse against Broker for damages relating to any loan approved and closed by Lender based on any defect in any closing, closing document

3.    **TERMS AND CONDITIONS**

Submission to the Lender by the Broker of the Loan Package is subject to the following terms and conditions:

A. Eligible properties are identified in the description of the mortgage programs that has been previously provided by Lender to Broker.

B. The minimum and maximum loan amounts acceptable will be shown in Lender's most recently published Underwriting Guidelines, which have been provided to Broker. By signing this Agreement, Broker acknowledges receipt of said guidelines.

4.    **REPRESENTATIONS AND WARRANTIES**

As to each Loan Package submitted by Broker to Lender, Broker hereby represents and warrants to Lender, and Lender represents and warrants to Broker, as indicated, the following:

A.    **LEGAL STATUS.** Each party represents that it is duly licensed or is otherwise exempt from licensing, to perform its obligations hereunder, under and according to the laws of the state in which each loan is originated, and will, during the term hereof, maintain such licenses. The parties also represent that they are corporations in good standing, duly organized and validly existing.

B.    **AUTHORITY.**  The execution and delivery of the Agreement by each party and the performance by each party of the obligations to be performed by it hereunder have been duly authorized by all necessary corporate action.

C.    **LEGALITY.**  The execution and delivery of the Agreement by the parties and the performance by the parties of the obligations to be performed by each hereunder do not violate, in any material respect, any current applicable provision of any law, rule, regulation, order, writ judgment injunction, decree, determination or award presently in effect having applicability to each party or of the articles of incorporation, or by-laws of each party. The parties will continue to comply in all material respects with the above legal requirements in addition to all applicable federal and state laws and regulations including, but not limited to, Equal Credit Opportunity Act, Real Estate Settlement Procedures Act, Truth-in-Lending Act and Fair Credit Reporting Act.

D.    **BINDING OBLIGATIONS.**  This Agreement, when duly executed and delivered by both parties, constitutes a legal, valid and binding obligation of each party enforceable against the other according to its terms.

E.    **NO SUITS.**  There were no actions, suits, or proceedings pending or, to the knowledge of Broker, threatened against or affecting Broker or the properties of Broker before any court or governmental department, commission, board, bureau, agency or instrumentality, or domestic or foreign, which if determined adversely to Broker, would have a material adverse effect on the financial condition of Broker.

F.    **AUTHORIZATION.**  Broker is authorized to submit loan applications to Lender by each and every borrower on whose behalf a loan application is presented to Lender.

G.    **DOCUMENTS SUBMITTED BY BROKER.**  Each document furnished to the Lender by Broker is complete and accurate as to information within Broker's knowledge and as reported by the applicant; to Broker's knowledge contains no misleading information; to Broker's knowledge has been prepared and executed and copies delivered as required by law;

from and against any and all claims, loss, damage, liability, costs and expenses including reasonable attorneys fees, arising out of any breach of Lender's representations, warranties, covenants or agreements contained in this Agreement or any negligence or fraud on the part of the Lender in underwriting, closing, funding or servicing any loan approved and closed by Lender pursuant to this Agreement.

Each party shall give immediate notice to the other party of any suit or action instituted arising out of the representations or activities under this Agreement.

Broker will only be required to repurchase any Loan upon evidence of fraud committed by Broker or its employees in the origination or processing of such Loan or upon a material breach of any of Broker's representations, warranties, covenants or agreements contained in the Agreement provided the effect of such fraud, gross negligence, or material breach is to materially and adversely affect the market value or salability in the secondary market of such Loan and Broker is unable to cure any defect or breach within sixty (60) days of notification from Lender. If at the end of such sixty (60) day period Broker has been unable to cure the defect or breach in question. Broker will repurchase the loan within thirty (30) days at a price equal to the outstanding principal amount of the loan plus any accrued but unpaid interest as of the date of purchase by Lender and any and all reasonable costs incurred by Lender in connection with the repurchase transaction.

6.    **FACILITIES.**

Except as otherwise provided herein, Lender will have no responsibility or obligation to provide Broker with any personnel, material, facilities, or equipment required for Broker to perform under this Agreement.

7.    **FEES.**

Payment of the Broker's fee from borrower is solely the responsibility of the borrower pursuant to Broker's agreement with the borrower. However, Lender agrees to assist in the collection of the Broker's fee from borrower at closing to the extent that such fees are reflected in the brokers demand statement to Lender.

Broker acknowledges that the Broker's fee to be collected is reasonable and customary under relevant state law and as expressed in the Mortgage Broker Fee Agreement between the Broker and Borrower.

In all cases where Lender has agreed to pay a fee to Broker pursuant to the terms of this Agreement, Lender will not be obligated to pay any such fee if a loan does not close or, in the case of rescindable transaction, the loan closes but is subsequently rescinded by the borrower.

8.    **NO FINDER'S FEE**

Each party represents and warrants that there are no claims for brokerage fees or finder's fees in connection with the transactions contemplated by this Agreement resulting from any action taken by either party for which the other will be responsible. Each party agrees to exonerate, indemnify and hold harmless the other in respect to any and all losses sustained by the other as a result of liability to any broker or finder on the basis of any arrangement or agreement made by or on behalf of such party not provided for herein.

9.    **NO AGENCY OR EMPLOYMENT RELATIONSHIP**

Broker shall not be considered, under the provisions of this Agreement or otherwise, as

10. **RESTRICTIONS**

Broker may distribute written materials to prospective borrowers using Lender's name only where required by law and shall not otherwise use the name of the Lender in any advertising or promotional piece unless authorized to do so by Lender in writing.

Any advertising document which Broker wishes to use in connection with the loans subject to this Agreement, whether or not such documents contain Lender's name, shall be submitted to Lender for written approval prior to its use, which approval shall not be withheld unreasonably.

It is understood that Broker will conform to the current residential real estate lending policies of Lender and will convey only those rates to potential loan customers which are published or provided by Lender for such purpose.

Should this Agreement be terminated for any reason whatsoever, each party agrees not to divulge to anyone any proprietary information of the other party or any specific loan transaction information regarding any past borrower or applicant unless required by law to do so.

11. **SEVERABILITY**

Should any of the provisions described above be deemed invalid or unenforceable for any reason whatsoever, such shall not render invalid any of the remaining provisions as they remain severable apart from the terms of this Agreement.

12. **ASSIGNMENT.**

Neither this Agreement nor any duties or obligations hereunder shall be assignable by Broker without the prior written consent of Lender. In the event of an assignment by Broker to which Lender has consented, the assignee or his legal representative shall agree in writing with Lender to personally assume, perform and be bound by the covenants contained herein. A change in the corporate character or principals of either party to this Agreement shall not constitute an assignment under this section. Assignment by Broker to any of its affiliates shall not constitute an assignment under this section.

13. **ATTORNEY'S FEES**

If any action at law or in equity is brought to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, in addition to any other relief to which it may be entitled.

14. **NOTICES**

All notices shall be in writing and sent by Certified U.S. mail to the following addresses:

Lender:

American Brokers Conduit
17744 Sky Park Circle
Suite 150
Irvine, CA 92614

Attn:
Title:

15.    **GOVERNING LAW**

The validity of this Agreement and any of its terms or provision, as well as the rights and duties of the parties hereunder shall be governed by the laws of the State of New Jersey.

16.    **NON-EXCLUSIVITY**

This Agreement shall be non-exclusive as to both Lender and Broker, and each party may make or originate loans with or without the assistance of the other and may use the services of other brokers or lenders.

17.    **ENTIRE AGREEMENT**

This Agreement supersedes any and all other Agreements, either oral or in writing between the parties hereto with respect to the subject matter hereto, and no other Agreement, statement or promise relating to the subject matter of this Agreement which is not contained herein shall be valid or binding.

In witness whereof, the parties have signed and executed this Agreement as of this_____day of _____, 2004.


Lender:
Tax I.D. No:    _____

By:    _____        Date:_____


Broker: Chase Manhattan Mortgage Corporation
Tax I.D. No:    ___22 1092200_____

By:    _____        Date: 6/10/04
        Christine Loudon, Vice President

## EXHIBIT D

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | |
| HOLDINGS, INC., a Delaware corporation, | ) | Case No. 07-11047 (CSS) |
| et al.[1] | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |
| ----------------------------------------------------------- | ) | |

## EXPERT REPORT OF PHILLIP ADLESON IN SUPPORT OF DEBTORS' OBJECTION TO ADMINISTRATIVE EXPENSE  CLAIMS NUMBERED 10802, 10803, 10804, 10805, 10806, 10807, 10808 AND 10809 FILED BY DEBORAH MILLS

---

[1] The debtors in these cases (collectively, the "Debtors"), along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHMA"), a Maryland corporation (1979); AHM SV, Inc., f/k/a American Home Mortgage Servicing, Inc. ("AHMS"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

## 1. INTRODUCTION

### A. Expert Report.

I am Phillip M. Adleson, Esq., a licensed California Attorney since 1976, whose practice has emphasized real estate, mortgage lending and foreclosure law for over 30 years. I have been retained by counsel for the Debtors in the above-captioned matter to act as a consultant and expert witness.

### 2. Qualifications And Publications

A partial list of my material qualifications and publications is set forth on my current resume which is attached hereto as Exhibit A and incorporated herein by reference.

### 3. Materials Reviewed.

I have reviewed or considered the following materials in arriving at my opinions:

1. Administrative Expense Claims of claimant Deborah E. Mills ("Mills") with supporting declarations of Mills and Austin along with numerous other claims submitted by Mills with various attachments.

2. Lender's loan files on first and second loans including, but not limited to:[2] the Note and addendums; Deed of Trust and addendums and riders; lender escrow instructions; Title Insurance Policy; HUD-1; Truth-in-Lending Disclosure Statement; other loan disclosures; gift letter; closing statement for property sold as a condition of loan; loan applications and supporting documents; credit reports; purchase agreement and related documents; loan broker agreement; lender-broker agreement; appraisals; foreclosure documents; trustee's sale guaranty ("TSG"); endorsements; and servicing agreement.

3. Foreclosure File on the second deed of trust (skimming items in the foreclosure of the first deed of trust) including the substitution of trustee, notice of default, notice of sale, TSG, trustee's deed, endorsements, various letters and communications and instructions to the trustee.

---

[2] While I have scanned many documents in the lender's file it is impossible to have focused on any particular area in the lender's loan file as the claim, as I understand it, is relatively vague. Further emphasis and review would have been done if specific claims were articulated relating to the loan or loan file.

2

4. Conversations with various of Debtors' attorneys regarding depositions and various facts; and

5. Applicable laws, regulations and secondary sources where necessary to refresh my recollection of various issues.

## 4. STATEMENT OF FACTS

The Debtors include American Home Mortgage Servicing, Inc. ("AHMS") and a number of related entities. Mills filed various claims including amended administrative expense claims (collectively, the "Claim") in the Debtors' bankruptcy cases. Various of the Debtors were the lender on the first and second loans secured by deeds of trust.

In mid-May of 2005, Mills entered into a purchase agreement and counter offer (collectively, "Purchase Agreement")[3] to purchase a residential property commonly known as 1880 Burnt Rock Way, Templeton, CA 93465 (the "Property"). The purchase price of the Property was $1,375,000.00 with a $5,000 deposit; a $255,000 down payment and no secondary financing. It appears undisputed that the purchase was to be for an owner occupied personal residence.[4] The escrow was to close within 45 days (meaning 45 days from the acceptance which was 45 days from May 19, 2005 (July 5, 2005 at the outside))[5]. The parties executed a liquidated damages clause which limited the seller's recourse should the buyer default to Mills's $5,000.00 deposit. If there were further deposits, they would only be at risk upon the buyer's default if: (1) the total of all such payments did not exceed 3% of the sales price and (2) if a separate liquidated damages provision satisfying the requirements of Cal. Civil Code § 1677 was separately signed or initialed by each party to the contract for each such subsequent payment.[6] I saw no such additional addendum liquidated damages clause and assume, if one existed, it was not given to the lender.[7] Such an additional addendum would be required before the buyer's additional deposits are at risk should the buyer default.

The Purchase Agreement provided a loan contingency on the first loan of 21 days from May 19, 2005 (i.e., June 9, 2005 at the outside). Although the ultimate lender required Mills to obtain additional proceeds from the sale of an existing property she

---

[3] These documents were prepared on standard forms made available by the California Association of Realtors ("C.A.R.") which were, and still are, widely use by licensed real estate agents in California.

[4] See, the Purchase Agreement, ¶ 3 and the loan applications for the first and second loans ultimately secured by the Property.

[5] This calculation is the best case for the buyer and excludes the day of acceptance of the counteroffer and extends the close of escrow because in any case the 45th day was on a weekend or holiday when escrows and the county recorder's office are not open.

[6] Cal. Civ. Code § 1678.

[7] While this may be a question for the trier of fact, my assumption is based upon the fact that no such increased deposit – liquidated damages form was in the loan files for the first and second loans that were ultimately made to Mills and secured by the Property. Even if such an agreement existed, it is unlikely to impact my opinions expressed herein.

3

owned, there was no contingency in the Purchase Agreement for the sale of any existing property owned by Mills. Ultimately, the seller and Mills agreed to extend the escrow to August 8, 2005 although there is no express reference to extending the loan contingency.[8]

It appears that prior to any evidence of contact with any Debtor or with JP Morgan Chase Bank d/b/a Chase Manhattan Mortgage ("Chase"), Mills sought to arrange financing for the Purchase Agreement through a Bridgeport Mortgage ("Bridgeport"). While there is no material information in the lenders' files regarding Bridgeport, I understand that Mills contends that although Bridgeport ultimately agreed to the desired financing, Mills refused to go through with the financing due to what she believed was a lack of communication by the agent for Bridgeport.[9]

On or about June 7, 2005, Mills contacted Tawnya Lettau ("Lettau"), who worked for Chase in San Luis Obispo to arrange the necessary financing to purchase the Property. On July 7, 2005, two days before the loan contingency was to expire under the Purchase Agreement, Mills appears to have entered into a Mortgage Broker Agreement with Chase to retain it to act as a mortgage broker to assist her in obtaining a purchase money loan from a lender (not necessarily AHMA or ABC). Mills appears to have agreed to pay a 1% fee to Chase for the services provided to her.[10] Even if this was an oral agreement, the performance by the parties shows executed performance of such an agreement, including the payment of a brokers commission by borrower to Chase.

From the Claim and other evidence, it is contended that Mills discussed with the Lettau that Mills's goal was to obtain 100% financing. This is not consistent with the Purchase Agreement.[11] The loan file contains a Closing Cost Worksheet—Purchase, dated July 14, 2005 which appears to be prepared by Lettau showing a first loan of $962,500.00, a second loan of $275,000 and a down payment of $152,819.97. This informational statement expressly stated it was not a good faith estimate and that one would be provided later. Nothing on the worksheet referenced any particular lender.

---

[8] There may be documents that I do not have relating to extensions of the Purchase Agreement, close of escrow or extension of the loan contingency. The existence of such agreements and the impact of any such additional agreements are for the finder of fact to determine. However, assuming further contractual extensions, those facts would not materially impact my opinion.

[9] This assumption is based upon a summary of the Mills' deposition provided by Debtors' counsel and is assumed to be true. However, should the trier of fact come to a different finding as to the reason this financing failed or was not used, it is not likely to have a material impact on my testimony.

[10] The broker agreement in the file is not signed by Mills creating a question of fact as to whether she read and agreed to the broker agreement. I assume Mills executed the broker agreement. However, if she did not, the agency relationship with Chase would be determine by the agreement of the parties (i.e., what it was that Mills asked Chase to do for her).

[11] This point may not be relevant if there was an addendum or amendment to the purchase agreement relating to the change in financing. In the absence of such addendum or amendment, such alternate financing could be acceptable if it could be concluded (i.e., same as cash) by the close of escrow.

4

Mills in her Claim admitted that her "credit score was a few points off but upon review they [the Lender] would make an exception under the conditions that the down payment be increased." This statement appears consistent with the loan file which indicates based upon the underwriting requirement for the first loan, Mills's credit score of 659 was one point short of the 660 credit score needed for the first loan available from AHMA. Ultimately, AHMA, as the potential first lender, waived this requirement and was willing to make a $962,500 purchase money loan secured by a first deed of trust, allowing $200,000 loan secured by a second deed of trust leaving $212,500 as a down payment.

AHMA issued a Notice of Loan Approval ("Loan Approval") on the first loan dated July 14, 2005 and which was to expire on August 8, 2005. The Loan Approval contained a number of conditions including the close of a property owned by Mills producing net proceeds of $58,600. In addition Mills represented that she was receiving a gift from her fiancé in the amount of $68,750 that would be used towards the down payment. Mills gave gift letters to the first and second lenders representing that she was receiving a gift in the amount of $68,500 from her fiancé, Roger Anthony Esquivel and, among other things, the letter stated that the funds were "a bona fide gift, and there is no obligation, expressed or implied, to repay [the gift] at any time."[12] The July 15, 2005, Mills's gift letter for the second loan (which was ultimately foreclosed upon) was signed by both Mills and her fiancé.

With respect to the first loan, Mills signed a receipt dated July 19, 2005 for a Truth-in-Lending Disclosure Statement which was dated July 15, 2005. This disclosure described the material terms of the proposed first loan.[13]

At the close of escrow, AHMA made a first loan to Mills in the original principal amount of $962,500.00 evidenced by a standard form Adjustable Rate Note ("Note") dated July 15, 2005 and secured by a standard form Deed of Trust dated July 15, 2005 which was recorded in San Luis Obispo County, California on August 9, 2005 ("Deed of Trust").[14] The Note required interest only payments for the first two years at 5.625% with monthly interest only payments in the amount of $4,511.72 commencing on September 1, 2005 and continuing until August 1, 2007 after which the interest rate could adjust every 6 months based upon the 6-month Libor Index and a 3.5% margin. The payment would be adjusted based on the changed interest rate to an amount to pay the interest and amortize the principal balance over the remainder of the loan. The material loan documents were signed by Mills on July 19, 2005.

---

[12] The copy of the gift letter in the file for the first loan appears to be unsigned. However, an identical letter in the loan file for the second deed of trust was signed.

[13] Extensive time was not spent reviewing this document as the statute of limitations has run on any claim for damages under Federal Truth-in-Lending, but I am prepared to testify regarding the document.

[14] In California the recording date is generally viewed as the "closing date".

5

Consistent with the loan disclosures Lender received, a $9,883.83 loan origination fee on the first loan, and Chase, as broker and consistent with its broker's agreement, received a broker's fee of $12,031.25 plus some minor incidental charges.

Using Chase as her broker, Mills obtained a concurrent (piggyback) loan secured by a second deed of trust. The American Brokers Conduit ("ABC") executed lender's escrow loan instructions for the first loan on July 19, 2005, permitting $200,000 in secondary financing and the balance to be paid by Mills.

On July 14, 2005, ABC issued a Notice of Loan Approval on a second loan naming ABC as the lender and with an expiration date of September 12, 2005. The loan commitment was for a loan in the principal amount of $200,000 with an interest rate of 11.5%.

The second loan to Mills in the original principal amount of $200,000 was made by ABC. The second loan was evidenced by a Balloon Note dated July 15, 2005 and secured by a deed of trust dated July 15, 2005 and recorded on August 9, 2005. The second loan had an interest rate of 11.5% with payments in the amount of $1,980.58 commencing on September 1, 2005. The loan was amortized over 30 years but matured (with a balloon payment) on August 1, 2020 (i.e., a "30 due in 15" loan). The loan documents appear to have been executed by Mills on July 15, 2005 but the lender's closing instructions were issued on July 19, 2005, concurrent with the lender's loan instructions on the first loan.

With respect to the second loan, Mills signed a receipt dated July 19, 2005 for a Truth-in-Lending Disclosure Statement which was dated July 15, 2005. This disclosure described the material terms of the proposed first loan.[15]

On the second loan, consistent with the loan disclosures the second lender received $1,030.56 as a loan origination fee and Chase, as broker and consistent with its broker's agreement with borrower, received a broker's fee of $2,000.

Both the first and second deeds of trust were put in the name of MERS[16], as beneficiary, as nominee for the actual lenders.

On July 15 and 19th, 2005, Mills signed separate loan applications (Form 1003) for the first and second loans respectively. Each loan application represented, among other things, that Mills had monthly income of $28,552.00; that she had as an asset a $500,000 CD (proof provided to lender); that she was not involved in any lawsuits and that she was not borrowing any part of the down payment. It appears all of these material facts were false. Such representations likely constitute loan fraud. On both loans, Mills signed a "Borrower's Certification & Authorization" which stated, among

---

[15] Extensive time was not spent reviewing this document as the statute of limitations has run on any claim for damages under Federal Truth-in-Lending, but I am prepared to testify concerning the document.

[16] MERS = the Mortgage Electronic Registration System, Inc.

6

other things: "In applying for the loan, I/we completed a loan application containing various information on the purpose of the loan, the amount and source of the down payment, employment and income information, and assets and liabilities. I/We certify that all of the information is true and complete. I/We made no misrepresentations in the loan application or other documents, nor did I/we omit any pertinent information." Both the 1003 loan applications and the Borrower's Certification expressly point out that it may be a crime to knowingly make a misrepresentation on a loan application.

Mills defaulted on both the first and second loans by failing to pay her installments commencing on October 1, 2005 and continuing each month thereafter. It appears that before any foreclosure action was commenced the loan servicer communicated with Mills pointing out her defaults on both loans. Ultimately, non-judicial foreclosures were commenced on both the first and second deed of trust.

A notice of default and election to sell (a "Notice of Default") on the second deed of trust was recorded on January 27, 2006 in San Luis Obispo County, California, referencing Mills's failure to make her installment payment due commencing on October 1, 2005. Copies were mailed to the parties and addresses indicated in a TSG and as required by California law.[17] The TSG is a title product used by trustees or foreclosure agents in California to provide the necessary information for a trustee to mail foreclosure notices to the persons and addresses required by law and to determine the proper newspapers of general circulations required for publication of notice of sale. Notices of default in California, as here, may be processed by trustee, mortgagee, or beneficiary, or any of their authorized agents.[18]

On January 26, 2006, MERS executed a notarized substitution of trustee appointing Cal-Western Reconveyance Corporation ("Cal-Western") acting as substitute trustee. Cal-Western is an independent foreclosure agent or trustee providing reconveyance and foreclosure services for many lenders in California. The substitution of trustee appears to have been recorded on March 1, 2006 and served by mail on February 27, 2006 on those parties entitled to notice. The substitution of trustee appears to be consistent with trustee practices in California as regulated by Cal. Civil Code § 2934a.

A notice of trustee's sale on the second deed of trust was recorded on May 15, 2006 scheduling a trustee's sale for June 7, 2006. The notice of sale was mailed to those entitled to notice on May 18, 2006; published in an appropriate newspaper of general circulation on May 18 and 25, 2006 and on June 1, 2006; posted on the Property on May 16, 2006 and posted in a public place (the San Luis Obispo Court Superior Courthouse) on May 19, 2006.

Reinstatement figures on both the first and second loans were provided by Cal-Western to Mills by mail on May 25, 2006 and by facsimile on May 30, 2006. There is

---

[17] See Cal. Civ. Code §§ 2924, 2924b and 2924c(c).

[18] Cal. Civ. Code §§ 2924(a)(1) and 2924b(b).

7

no evidence in the file of a lawful tender of reinstatement (cure) and pre-sale redemption as permitted under California law.[19]

On June 26, 2006, the day of the postponed foreclosure sale, through counsel, Mills filed a Chapter 7 bankruptcy in the Central District of California. Mills never asserted any of her current claims in her bankruptcy nor did she list such claims as an asset. She listed the debt as undisputed.

A standard form "Order Granting Relief from the Automatic Stay" was signed by the court, filed and entered on July 25, 2006.

Prior to the actual trustee's sale, the trustee's sale on the second deed of trust was postponed as follows:

- From the original sale date of June 7, 2006 to June 19, 2006 at the beneficiary's request apparently in response to Mills' request to allow her time to get funds to reinstate.

- From June 19, 2006 until June 26, 2006 at the beneficiary's request.

- From June 26, 2006 to August 10, 2006 due to Mills bankruptcy.

The proper procedures and declarations of postponement appear to have been followed.

Prior to the trustee's sale, Mills inquired whether a postponement could be obtained for $25,000 to allow her time to raise funds. Cal-Western provided Mills with reinstatement figures for the first and second deeds of trust as both would be required to reinstate the second deed of trust. It is possible that at the time of the request, the statutory right of reinstatement had lapsed although Cal-Western sent Mills reinstatement figures and we assume Debtors would have accepted reinstatement if tendered.[20] It also appears from communications with Mills's attorney that she did not have the ability to tender the proper amount to effect a tender of reinstatement.

The trustee's sale was conducted on August 10, 2006, selling the Property, subject to the first deed of trust, to AMHS.[21] for $229,251.71.

### 5. Mills Claims

Reviewing various of the claims submitted to the court it is impossible to determine what specific claims are being alleged by Mills against various Debtors. I will

---

[19] Cal. Civ. Code §§ 2903, 2905 and 2924c.

[20] Under California law, reinstatement terminates as a matter of right 5 business days prior to the trustee's sale. Cal. Civ. Code 2924c.

[21] Through conversations with Debtors' counsel, I understand and assume that around April 2008, this "American Home Mortgage Servicing, Inc." was a third party (non-Debtor) company that acquired the servicing rights, including the rights to the Property, which was a Real Estate Owned ("REO") property at the time, and it subsequently sold the Property to a third party purchaser.

try to address some of the areas about which she expresses concern. If the claims are more specifically articulated, I would be prepared to give testimony on the areas set forth herein as well as on numerous other areas arising from the subject loans, loan files and foreclosure files.

## A.  Pre-Origination Fraud

There is nothing in the materials reviewed that would evidence any pre-origination fraud on the part of any Debtor.    To the extent that Chase made representations to Mills, any conclusions would have to be based upon verbal testimony of Mills, Lettau and others and would be something to be determined by the trier of fact.

Typically, in 2005, lenders in California obtained loan packages from a number of brokers generally pursuant to a lender-broker agreement which established a limited independent contractor relationship.  The brokers generally would operate under one of three licenses, unless exempt.  As here, the lender-broker agreements circa 2005 were generally non-exclusive and the broker's authority was limited to soliciting borrowers for, and presenting completed loan applications for, loans and properties specifically designated as available from a lender in writing pursuant to various loan programs or underwriting guidelines which were either provided to the broker or which were regularly published for the broker's review.  Since most such lender-broker agreements, as here, were non-exclusive, a broker could, and generally did, solicit borrowers and package loans for a number of different lenders with different loan programs and underwriting standards.  For example, a borrower might need a short term loan secured by a junior deed of trust which may fall outside of the underwriting guidelines and loan programs offered by lenders such as those involved in this case.  In such cases, they may send the loan package to "private money lenders" or their agents for consideration.  The underwriting standards for such private money loans were generally far more liberal and flexible but subject to different California laws placing limitations on what could be underwritten (e.g., limited loan-to-value ratios).

Because the brokers were not exclusive independent contractors, as here, the brokers were invariably not authorized to make loan commitments on behalf of a Lender and the decision to accept a written loan application was solely in the absolute discretion of the Lender to determine whether a loan commitment will be made and what conditions.    In addition, under the lender-broker agreement brokers have no authority to bind, obligate or commit Lender to do so by any promise or representation unless specifically authorized by the lender in writing in a particular transaction.  Brokers are not authorized to represent to the public that they represent the lender or that they are authorized to act on behalf of the lender.

In addition, generally when a broker initially meets with a potential borrower, he/she does not know to which lender the broker will submit the loan to as the broker will have to decide which lenders provide loan programs that will suit the borrower's needs.  Casual comments by a broker that she will assist in arranging future financing, generally beyond the scope of the brokers authorization by any particular lender.

9

Lenders, as here, will generally only consider completed loan applications under the particular lender's programs and published underwriting standards.

Even if Lettau or another representative of Chase made a representation about obtaining a future loan, Lettau appears to have been retained to procure specific loans for the borrower. Lenders specifically did not authorize Chase to act as its agent for the purpose of making loan commitments. This is evidenced by the file, the lender-broker agreement and by the express written loan commitments directly from the actual lenders relating to the loans that were made. There is no evidence in the loan files that the requested loans were conditioned upon some future financing. In fact, no such assertion appears to have been made by Mills in her bankruptcy in 2006 or during the foreclosure process. In addition, I see dozens of cases like this and claims of such prior oral agreements are often made but are rarely successful in California where there is no written document evidencing the intent to make a loan.

I understand that Mills may claim that Lettau spoke with someone at the Debtors' office who may have represented to Lettau that future financing would, or could, be made available. I further understand that Lettau disputes Mills's version. Again, the factual issue is one for the finder of fact. This variation of the facts really would not change my opinion. In the absence of any evidence in the file, it is questionable whether Chase or Debtors made such a representation. However, even if Lettau or Debtors' representatives did make such a representation, borrower reliance on such a representation would be questionable in light of the Debtors' policies and procedures. That is just as with the two loans made to Mills, Debtors used written conditional loan commitments to document the loans they were willing to make. Thereafter, borrower was given a series of documents and disclosures relating to the proposed loan. There is absolutely nothing in any materials I reviewed showing anyone involved in the original first and second loan discussed or considered a third loan in the future.

## B.  Origination

While each lender has its own procedures, the loan origination files for the first and second loans appear to meet the customs and practice for similar lenders doing business in California at the time these loans were made.

Appropriate loan disclosures were made in light of the type of loans being made. Neither the first nor second deed of trust were covered by California's High Cost Mortgage Statute (e.g., predatory lending law) as they existed in 2005.[22] The terms of the loans do not appear to meet the thresholds to make either loan involved in this case be viewed as a high cost mortgage loan (predatory mortgage) at the time the loans were made.

Mills apparently questions the fact that some documents were not dated or signed at the same time. Under the escrow/title company practice used in California (as

---

[22] Cal. Financial Code § 4970 et seq.

10

opposed to attorney closings) at all relevant times, it is not uncommon or unlawful for documents to be signed at different times, although all necessary documents must be signed and placed in escrow prior to the close of escrow. In addition, regardless of the dates on the documents, all escrow conditions (from the borrower and lender) must be complied with prior to closing.

Mills raises an issue regarding hazard insurance or homeowners insurance policies that she could not verify with the lender. Unless there is more, this claim lacks merit as well. That is, the loan documents show that both loans in this matter did not require an initial escrow (impound) account for insurance and that buyer was to obtain her own insurance and to submit proof of required coverage to the lenders. As such, lenders had no part in obtaining this insurance coverage or in collecting and/or paying premiums on such insurance. As a condition of the loans, Mills would have had to acquire insurance, provide proof of coverage, through escrow, that she had obtained insurance acceptable to the lender (i.e., consistent with the lender's loan instructions or policy).

### C.  Foreclosure Process

As noted above in my discussion of the foreclosure process, it appears from the file that the procedures required for a non-judicial foreclosure were followed in the foreclosure of the second deed of trust which ultimately went to sale.

Mills raises in her Claim that the trustee or lender did not comply with Cal. Civil Code § 2923.5. I have written compliance programs for trustees, lenders and loan servicers regarding that Code section. In addition, I personally prepared the pre-legislative counsel reviewed draft of clean-up legislation enacted by the California Legislature in 2009 as SB 306. Mills' claim regarding noncompliance with Civil Code §§ 2923.5 (and related code sections) is meritless. While it is true that no one complied with this section, the reason is simple. Civil Code §§ 2923.5 (and related code sections) were enacted by the California legislature as urgency legislation in 2008 and was known as *SB 1137. Section 2923.5 only applies to notices of default or notices of sale recorded on or after Saturday, September 6, 2008.*[23] The non-judicial foreclosures in this case were completed well before Section 2923.5 was enacted.

Similarly, I am informed that the claimant may assert that the failure of the trustee to possess the actual original note and deed of trust is somehow a defect in a California non-judicial foreclosure. Even if such a factual assertion were found to be true, my opinion is that trustees and beneficiaries in California generally do not obtain the original note and deed of trust. Over 99% of the foreclosures in California are conducted through non-judicial foreclosure. The California Supreme Court and Courts of Appeal have limited most trustee and beneficiary duties in a non-judicial foreclosure to those set forth in the deed of trust as regulated by a comprehensive legislative scheme which

---

[23] Monday, September 8, 2008, is the first recording day after the notice provisions of sections 2 and 5 of SB 1137 become effective.

preempt common law and other inconsistent provisions of law.[24]  The comprehensive legislative system (in 2005) was found in Cal. Civil Code §§ 2924 et seq.  While the original note is required for a judicial foreclosure in California, neither the original note nor deed of trust is legally required for a non-judicial foreclosure (although the issue has been widely circulated on the internet and at foreclosure defense boot camps).[25]  The primary rationale of the courts in California is that the comprehensive legislative system for non-judicial foreclosure does not require any party to have, possess or present the original note as a condition of commencing or concluding a non-judicial foreclosure.

Mills's Claim also suggests that there was no publication of notices of foreclosure.  From a review of the file, it appears that proper publication of notice of sale was arranged and accomplished.  This opinion is based upon, among other things, the customary documents I would expect to see in a California trustee's foreclosure file (e.g., TSG, certificates of publication; transmittals to a posting and publishing company and similar documents).

If Mills is claiming that republication would be required as a condition of making postponements that claim would lack merit.  The procedure to postpone (part of the comprehensive legislative scheme discussed above) is set forth in Cal. Civil Code § 2924g.  All that is required after the original notice of sale has been given is that the trustee give a notice of each postponement and the reason therefor through a public declaration at the time and place last appointed for sale. The public declaration of postponement must set forth the new date, time, and place of sale and the place of sale shall be the same place as originally fixed by the trustee for the sale. No other notice of postponement need be given.[26]

### 6.  Tender and Damages.

Mills makes a monetary claim for various amounts with a total (depending on which claim is reviewed) of approximately $1,382,500.  While California does recognize both a contract (deed of trust) and tort action for wrongful foreclosure, it has a long history and case law regarding the necessity of tender to successfully set aside a trustee's sale or to even recovery damages.

---

[24] *I.E. Associates v. Safeco Title Ins. Co.* (I.E. Associates) (1985) 39 Cal.3d 281; *Banc of America Leasing & Capital LLC v. 3 Arch Trustee Services* (2009) 180 Cal.App.4th 1080; and *Heritage Oaks Partners v. First American Title Insurance* (2007) 155 Cal.App.4th 339; *Nguyen v. Calhoun*, (2003) 105 Cal.App.4th 428, 440-441;

[25] *Sicairos v. Ndex West, LLC et al.* (S.D. Cal., Feb. 13, 2009) 2009 WL 385855 ; *Spencer v. DHI Mortgage Company, Ltd.*, (Dist. Court. N.D. Cal. 2009) 642 F.2d 1153; *Gallegos v. Recon Trust Company* 2009 W.L. 215406 (S.D. Cal. 2009); *Ritchie v. Cmty. Lending Corp.* (2009 C.D. Cal.) 2009 U.S. Dist. Ct. LEXIS 73216. *Kuoha v. Equifirst Corp*, (2009 S.D. Cal.) 2009 LEXIS 94699 (and numerous cases cited therein).

[26] Cal. Civ. Code § 2924g(d); *U.S. Cold Storage v. Great Western Sav. & Loan* (1985) 165 Cal.App.3d 1214; *Cal. Livestock Prod. Credit v. Sutfin* (1985) 165 Cal. App. 3d 136.)

12

In cases such as the instant one where a party claims that they tried to, or wanted to, pay the lender money but the lender would not accept the funds, it is critical for all parties to understand the circumstances and what is the required nature or amount of tender. Either to set aside a trustee's sale (e.g., declaratory relief, wrongful foreclosure, cancellation, quiet title) *or even to recover damages*, plaintiffs must allege and prove that they *unconditionally tendered reinstatement, redemption or restitution* under the Deed of Trust.[27]  This rule is based upon the equitable maxim that a court of equity will not order a useless act performed.    A party attempting to set aside a foreclosure sale must allege tender of the foreclosing obligation as an essential element of any causes of action based upon irregularities in the sale procedure. To hold otherwise would permit plaintiffs to state a cause of action without the necessary element of damage to themselves.   "The rationale behind the rule is that if the plaintiffs could not have redeemed the property had the sale procedures been proper, any irregularities in the sale did not result in damages to plaintiffs."

Customarily lenders will accept any sufficient and lawfully adequate tender of reinstatement and redemption.  Prior to the current economy downturn in the real estate market, some lenders would accept less than full tender but that was totally within their discretion.   This case arises prior to various state and federal laws addressing loan modifications, therefore those laws do not need to be considered.

My opinion is that no lawful tender was made by Mills at any time either to reinstate or to redeem.

As to reinstatement prior to the trustee's sale of the second deed of trust, in late May 2006, Mills requested a reinstatement figure.  Cal-Western (as noted above) mailed and faxed reinstatement figures to Mills to stop the foreclosure.  Tender in late May 2006, would have required that Mills bring current her delinquent first mortgage and her delinquent second mortgage.  While Mills apparently made offers of less than the amount owed, such is not a valid tender.

After her bankruptcy and just prior to the actual foreclosure in August 2006, Mills's counsel e-mailed the servicer and admitted his client did not have sufficient funds to make a full tender and he attempted to obtain a postponement for the payment of one-month's payment on each loan because his client expected to come into sufficient funds in the future.  This is negotiation, not a tender.[28]   Conditional loan commitments or promises of third parties to give money to a tendering party does not constitute being ready, willing and able to tender.[29]

---

[27] See, *Karlsen v. American Sav. & Loan Assn.* (1971) 15 Cal.App.3d 112, 117-118; *Abdallah v. United Sav. Bank* (1996) 43 Cal.App.4th 1101, 1109; *Arnolds Management Corp. v. Eischen* (1984) 158 Cal.App.3d 575, 577; *FPCI Re-Hab 01 v. E & G Investments* (1989) 207 Cal.App.3d 1018, 1021-1022 [damages]; Civil Code §§ 2903-2904 and § 2924c.

[28] *Nguyen v. Calhoun* (2003) 105 Cal.App.4th 428.

[29] *Am-Cal Inv. Co. v. Sharlyn Estates, Inc.* (1967) 255 Cal.App.2d 526.

13

Apparently there were a number of communications and discussion between Mills and the successful purchaser at the trustee's sale about reacquiring the Property. Generally to set aside a sale, the borrower would have to tender the full amount of the obligation. There is no evidence of this happening.

My opinion is there was never a valid tender by Mills at any time. In addition, from the materials reviewed, it is my opinion that neither the lender nor the trustee under the second deed of trust did anything to prevent Mills from exercising her right to reinstate or redeem.

In California on a non-judicial foreclosure there is no post-foreclosure sale redemption after a non-judicial foreclosure. Redemption is limited to the time period after the reinstatement period expires (i.e., 5 business days prior to the sale) and the time the trustee's sale is concluded. As such, any repurchase would be such to the normal rules of contract (i.e., an offer and acceptance). There is no obligation after a foreclosure for the successful purchaser to resell to the owner. The file shows nothing more than some discussions after the foreclosure sale and no accepted contract.

Unlike the situation before the trustee's sale, after the trustee's sale whether the lender may have ceased communicating with Mills regarding a potential repurchase is irrelevant. Neither the lender nor the purchaser at the trustee's sale have any obligation to communicate with, or to negotiate with, Mills.

Dated: October 15, 2010.                    ADLESON, HESS & KELLY, a P.C.


                                            By:_____
                                                Phillip M. Adleson

14