## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| *In re:* | ) | Chapter 11 |
| | ) | |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., *et al.*,[1] | ) | |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | |

### APPLICATION OF COUNTRYWIDE
### FOR ALLOWANCE OF ADMINISTRATIVE EXPENSES

Countrywide Bank, FSB, formerly Countrywide Bank, N.A. ("CWB"), and Countrywide

Home Loans, Inc. ("CHL" and collectively with CWB, "Countrywide"), by and through their

undersigned counsel, hereby file this application for allowance of an administrative expense (the

"Application"), and in support of this Application, Countrywide respectfully states as follows:

### JURISDICTION

1.      On August 6, 2007 (the "Petition Date"), the Debtors each filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code in this Court.

2.      The Court has jurisdiction over the subject matter of this Motion pursuant to 28

U.S.C. §§ 157(b) and 1334(b).  This is a core proceeding arising under Chapter 11 of the United

States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") that the Court has

authority to hear and determine within the meaning of 28 U.S.C. §157(b).  The statutory

predicate for the relief sought herein is Bankruptcy Code §§ 503(b) and 507(a)(2).

3.      On February 23, 2009, this Court entered its Order (D.I. 7042) confirming the

Amended Chapter 11 Plan of Liquidation of the Debtors dated February 18, 2009 (D.I. 7029)

---

[1] The debtors in these cases, which are collectively referred to as the "Debtors" in this Application, are:  American Home Mortgage Holdings, Inc.,; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.); American Home Mortgage Corp.; American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc.; and Great Oak Abstract Corp.

(the "Plan"). In Article 14(A)(14) of the Plan, this Court retained jurisdiction "over requests for allowance and/or payment of Claims entitled to priority under § 507(a)(2) of the Bankruptcy Code and any objections thereto."

4.      On November 30, 2010, the Debtors filed a Notice of (I) Occurrence of the Effective Date of the Plan; (II) Deadlines to File Administrative Claims, Professional Claims, Rejection Damages Claims, and Subordination Statements, and to Submit Invoices for Indenture Trustee Expenses; and (III) Appointment of Borrower Information Ombudsperson (D.I. 9519) (the "Notice of Effective Date").

**FACTUAL BACKGROUND**

5.      The Debtors' primary business entailed the origination, servicing, and sale of mortgage loans as well as investment in mortgage loans and mortgage-backed securities resulting from the securitization of residential mortgage loans. *See generally Caylon New York Branch v. American Home Mortgage, Inc. (In re American Home Mortgage, Inc.)*, 379 B.R. 503, 509 (Bankr. D. Del. 2008); *reconsideration denied* 383 B.R. 585 (Bankr. D. Del. 2008) [hereinafter *American Home I*]. As part of the financing and securitization aspects of its business, the Debtors developed an inventory of individual mortgage loans that the Debtors would often securitize or sell to third parties like Countrywide, who in turn often securitized these loans or sold them to government-sponsored entities like Fannie Mae or Freddie Mac. Sometimes these loans would be sold with the servicing rights retained by one of the Debtors and other times the servicing rights would be sold to the purchaser of the loan. As such, the mortgage loan purchase agreements were usually either "servicing retained" or "servicing released". *See id.* at 510 (generally describing the structure of the contracts entered into by the Debtors with respect to the sale of mortgages and their associated servicing rights); *see also DB*

*Structured Prods. Inc. v. American Home Mortgage Holdings, Inc. (In re American Home Mortgage Holdings, Inc.)*, 402 B.R. 87, 90 (Bankr. D. Del. 2009) (same) [hereinafter *American Home II*].

6.        In order to facilitate the sale or securitization of its mortgage loans, the Debtors entered into contracts with Triad Insurance Guaranty Corp. ("Triad"). Pursuant to the terms of these contracts, Triad agreed to issue mortgage insurance certificates providing insurance coverage for mortgages originated by the Debtors ("Master Insurance Contracts"). [2] Consistent with the Master Insurance Contracts, Triad issued mortgage insurance certificates insuring a large number of mortgage loans originated by the Debtors.

7.        Prior to the commencement of the Debtors' cases, certain of the Debtors and Countrywide entered into various loan purchase and servicing agreements and other related agreements.[3] Under the Countrywide Contracts, Countrywide sometimes bought only mortgages from the Debtors and other times it bought both the mortgage and the right to service the mortgage. When Countrywide bought only the mortgages, the relevant Countrywide Contract frequently provided that a Debtor would service the loan sold. This Court has previously held in similar situations that (i) the mortgage purchase portion of the contract is severable from the servicing portion of the contract and (ii) that the mortgage loan purchase

---

[2]      The Master Insurance Contracts are identified in Adversary Proceeding *Triad v. American Home Mortgage, et al,* Adv. Pro. No. 09- 52193 (CSS), Complaint [D.I. 1].

[3]      Countrywide has attached Appendix 1 to this Application, which lists all of the known contracts between Countrywide and the various Debtors (the "Countrywide Contracts"). To the extent that there are other contracts between Countrywide and any of the Debtors, Countrywide reserves the right to include them in the definition of Countrywide Contracts and to include administrative expenses arising under any additional contracts as part of the administrative expense applied for in this Application. Also, due to their voluminous nature the Countrywide Contracts, the Countrywide Contracts are not attached to this Application as Exhibits; they can be requested from undersigned counsel are available as attachments to the Countrywide proofs of claim on the claim agent's website. *See* Claim Nos. 10476, 10480, 10481, 10447.

portion of these types of agreements are "Repurchase Agreements" under Bankruptcy Code §§ 101(47), 741(7), and 555. *See American Home I*, 379 B.R. at 512-20. The Debtors have also stipulated that the mortgage purchase portion of these types of agreements is not an executory contract. *See, e.g., American Home II*, 402 B.R. at 93. The Court has not made any prior determinations with respect to any Countrywide Contract.

8.      Each of the Countrywide Contracts contains a provision requiring the Debtors to repurchase the mortgage loans sold to Countrywide upon the occurrence of various conditions.[4]

9.      On the Petition Date, the Debtors filed an emergency motion to sell its servicing business. *See id.* at 92; D.I. 11. As part of this proposed sale process, the Debtors listed certain contracts it intended possibly to assume and assign to a proposed buyer, which list included two of the Countrywide Contracts (the "Countrywide Contracts Subject to the Sale Motion"). *See* D.I. 403 at Ex. A (listing the 2006 and 2007 Agreements as subject to possible assumption and assignment). Countrywide objected to the sale or the assumption and assignment of these contracts for a variety of reasons. *See generally* D.I. 614, 924, and 1056. As a result of these objections and other negotiations, the Debtors removed both of the Countrywide Contracts Subject to the Sale Motion from the list of contracts to be sold or assumed and assigned to the proposed buyer. *See* D. I. 1711, Ex. A-2, Section 11.2 of First Amendment to the APA. The servicing rights associated with the 2007 Agreement were then sold to Countrywide in satisfaction of Countrywide's objections to the sale. D.I. 2462.

10.     Separate from Countrywide's purchase of the servicing rights, Countrywide also bought approximately $460 million worth of loans from the Debtors in an ordinary course of

---

[4]     *See* Section 7 of the 1995 Agreement; Section 3.3 of the 2003 Agreement; Section 3.3 of the 2006 Agreement; Section 3.3 of the 2007 HELOC Agreement; and Section 3.3 of the 2007 Agreement, each as defined on Appendix 1.

business transaction (the "Post-Petition Loan Purchases").[5]  This transaction was not Court
approved but the Debtors satisfied themselves that it was conducted in the ordinary course of
their business and that it was the type of post-petition transaction that did not need separate
Court approval.

11.     The Debtors did not seek to assume and assign or sell any of the Countrywide
Contracts during the course of their bankruptcy cases.  The Plan that was submitted and
confirmed by this Court merely provided that any executory contract that had not been
previously assumed, assumed and assigned, or rejected, and was not subject to a motion for such
relief, was deemed rejected as of the effective date of the Plan.  *See* Plan at §11.A.  The Plan
neither listed which contracts were subject to this provision of the Plan nor did the Debtors
identify which executory contracts were subject to this Plan provision, but it clearly only applied
to contracts that remained executory.

12.     After entry of the order confirming the Plan, Triad filed an adversary proceeding
against AHM in which it named AHM as the putative class representative of a defendant class
consisting of parties, similarly situated to Countrywide, which purchased mortgage loans from
AHM that were insured by Triad ("Triad Action").  Countrywide has intervened in the Triad
Action to protect its interests and rights, however, Countrywide has yet to file a further
substantive or dispositive pleading in the Triad Action as the time to respond to the complaint
has been extended multiple times.

13.     In the Triad Action, Triad seeks, among other relief, "global rescission" of

---

[5]     This transaction occurred in accordance with a Commitment Letter for "AOT" and
"Direct Trade" Programs, dated April 23, 2007.  This transaction closed on or about August 24,
2007.  As part of this purchase, Countrywide paid the Debtors secured lenders who then released
the mortgage loans from their collateral pools so they could be delivered to Countrywide free
and clear of their liens.

Master Insurance Contracts -- and necessarily each of the several individual mortgage loan insurance policy certificates that were issued under the Master Insurance Contracts.  Complaint at ¶46 and 66 to 77.  Many of these insurance policies issued are on account of loans now owned by Countrywide or serviced by Countrywide for others.

14.    In certain instances, entities to whom Countrywide has sold or securitized mortgage loans, like Fannie Mae, have sought to require Countrywide to repurchase those mortgage loans as a result of issues raised by Triad in response to mortgage insurance claims submitted by Countrywide or based on Triad's purported rescission of mortgage insurance coverage based on alleged issues asserted by Triad in the Triad Action regarding the underwriting of the mortgage loans generally.  Under many of the Countrywide Contracts, Triad's actions in denying claims and rescinding coverage, in turn, trigger a requirement by the Debtors to repurchase these loans back from Countrywide (the "Debtors' Repurchase Obligations").

15.    As of December 22, 2010, Countrywide has made at least 86 claims against Triad for loans that it bought from the Debtors and sold to a third party but that Countrywide has bought back from that third party and now owns once again (the "repurchase/makewhole claims").  The total unpaid principal balance on account of these repurchase/makewhole claims is $14,040,886.  Inclusive of these 86 claims, Countrywide has a total of 130 repurchase/makewhole mortgage loan claims with a unpaid principal balance of $28,374,807.  Triad has to date denied coverage for 245 mortgage loan insurance claims on account of mortgage loans with an unpaid principal balance of $48,447,011 and has rescinded coverage for 284 mortgage loans with an unpaid principal balance of $55,150,164.[6]  Countrywide

---

[6]    Countrywide applies for the amount of its full losses as its administrative claim;

understands that Triad has either escrowed or returned the premium payments made by the

insureds on account of the insurance certificates issued under the Master Insurance Contracts

(the "Premiums"), and Triad has offered or intends to escrow the amounts Triad is obligated to

pay Countrywide and others on account of valid insurance claims submitted by Countrywide

pending the outcome of its "global rescission" claim (the "Insurance Amounts"). Complaint at

¶¶46 and 76. The figures in this paragraph are as of the December 22, 2010 and are subject to

adjustment based on future events. Additionally, it is foreseeable that Countrywide, or other

owners of loans that Countrywide or one of its affiliates service, will assert additional claims

against the insurance policies in the future which will give rise to additional

makewhole/repurchase claims against the Debtors. Should Triad succeed in the Triad Action,

Countrywide will be seeking to recover losses as an administrative expense priority with respect

to approximately 4,000 mortgage loans.

     16.    While Countrywide does not believe the Triad Action has any merit and intends

to move to dismiss the Triad Action, in order to preserve its rights to claim the Premiums and

Insurance Amounts belonging to Countrywide, Countrywide asserts its currently contingent

administrative expenses as a result of the Triad Action and asserts as administrative expenses

those amounts set forth above that have arisen due to Triad's current or future denial of claims

or rescission even if Triad is unsuccessful on the Triad Action.

## ADMINISTRATIVE EXPENSES ASSERTED

     17.    Countrywide hereby applies for allowance and payment of administrative

expenses in the amount to be determined by the Court on account of:

---

however, Triad has only insured a portion of these losses and to the extent Countrywide's
Application for administrative expense priority is denied for the full amount of the unpaid
principal balances, its entitled to receive the Insurance Amounts as a lesser included
administrative expense asserted in this Application. The total Insurance Amount can be
quantified if and when necessary.

- Any unpaid obligations on account of, or breaches of the documents governing, the Post-Petition Loan Purchases, including, but not limited to, repurchase obligations that may arise on account of the Post-Petition Loan Purchases.

- Repurchase obligations and other losses that arose after the Petition Date under the Countrywide Contracts.

- All Premiums that Triad has returned or may return in the future to the Debtors that are allocable to any mortgage loan owned or serviced by Countrywide.

- All Insurance Amounts associated with a mortgage loan owned by Countrywide.

- Any repurchase obligations that the Debtors will owe Countrywide on account of Triad's rescission or denial of any claims, including, but not limited to those that will arise if Triad is judicially permitted to rescind the Master Insurance Contracts and relevant mortgage loan policies.

18.     Each of the foregoing amounts is contingent and ongoing in that the Debtors' Repurchase Obligations, any repurchase obligations arising under, or liability for any breaches of, the documents governing the Post-Petition Loan Purchases, and any administrative expenses that might arise on account of the Triad Action are contingent on the outcome of future events. Countrywide applies for allowance and payment of administrative expenses for all damages to which it is entitled under any and all of the Countrywide Contracts, documents governing the Post-Petition Loan Purchases, Court orders, the Triad Action, applicable law, or otherwise, including, but not limited to, damages, attorneys' fees, costs and expenses in an unliquidated amount to be determined at an appropriate time resulting from post-petition breaches of the

Countrywide Contracts or the documents governing the Post-Petition Loan Purchases and Triad's rescission of the Master Insurance Contracts and each of the several individual mortgage loan insurance certificates issued under those Master Insurance Contracts.

19.     Countrywide also asserts as administrative expenses any associated indemnification or reimbursement rights on account of any such Repurchase Obligations under the Countrywide Contracts or the documents governing the Post-Petition Loan Purchases.

20.     Countrywide has previously filed proofs of claim for Repurchase Obligations that arose under the Countrywide Contracts prior to the Petition Date and the administrative expenses applied for in this Application are in addition to those prepetition claims because, for among other reasons, these administrative expenses arise under non-executory contracts after the Petition Date.  If the Court finds that the loan purchase portion of the Countrywide Contracts are executory contracts and that any portion of the administrative expenses applied for here are not entitled to administrative priority, then Countrywide alternatively asserts those damages as rejection damages.[7]

## LEGAL BASIS FOR CLAIMS

### I.     Allowance and Payment of Administrative Expense

21.     Section 507(a)(2) of the Bankruptcy Code provides that all "administrative expenses allowed under section 503(b)" are entitled to the second highest priority of payment, after certain domestic support obligations.  11 U.S.C. § 507(a)(2).  In turn, Section 503(b) includes in its definition of administrative expenses "the actual, necessary costs and expenses of

---

[7]     In accordance with the Notice of Effective Date, Countrywide has submitted proofs of claim to which it has attached this Application.  These new proofs of claims supplement Countrywide's previously filed proofs of claim by adding the claims, losses, and damages asserted in this Application should they ultimately not be allowed and paid as administrative expenses.

preserving the estate[,]" 11 U.S.C. § 503(b)(1)(A), and "substantial contributions" and associated expenses.  11 U.S.C. § 503(b)(3) and (4).

22.    While the Bankruptcy Code does not define what costs and expenses should be treated as "actual" or "necessary" for the preservation of the bankruptcy estate, courts in this Circuit have generally followed a two pronged test, which requires that an applicant show that the claim arises out of a transaction with the debtor-in-possession and benefits the estate. *Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re: O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir. 1999) ("[A] debt qualifies as an [administrative expense under 503(b)(1)(A)] only if (1) it arose from a transaction with the bankruptcy estate and (2) directly and substantially benefitted the estate.").

23.    Post-petition obligations under a prepetition contract can give rise to an administrative expense where the debtor in possession elects to continue to receive benefits under the contract post-petition. *In re Harnischfeger Industries, Inc.*, 293 B.R. 650, 659 (Bankr. D. Del. 2003) (*citing NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984)); *accord, Goody's Family Clothing, Inc. v. Mountaineer Property Co. II, LLC (In re Goody's Family Clothing, Inc.)*, 401 B.R. 656, 671 n.14 (D. Del. 2009), *aff'd*, 610 F.3d 812 (3d Cir. 2010) (holding that "the relevant factor is not when the agreement was formed, but when the services necessary for the preservation of the estate were rendered" and stating that "[t]o be eligible for administrative expense priority, a post-petition transaction need not involve the exchange of money or formation of a contract.  Indeed, a claimant's performance of a pre-petition contract, and a debtor's acceptance of that performance, can establish a post-petition transaction.") (internal citations omitted); *see also Zagata Fabricators, Inc. v. Superior Air Prods.*, 893 F.2d 624, 627 (3d Cir. 1990) (when a debtor occupies and uses a premises, the landlord may seek rent as an

administrative claim because a physical space enables the financial entity to survive); *In re Garden Ridge Corp.*, 321 B.R. 669, 676 (Bankr. D. Del. 2005) (same); *In re DVI, Inc.*, 308 B.R. 703, 708 (Bankr. D. Del. 2004) ("If a lessee continues to use premises post-rejection, then a benefit has been conferred upon the estate which constitutes an administrative expense under section 503(b)." The presumption is that the lease rate is the fair market value."); *In re ZB Co., Inc.*, 302 B.R. 316, 319 (Bankr. D. Del. 2003) (contract rate is presumed to be fair market value); *In re HQ Global Holdings, Inc.*, 282 B.R. 169, 173 (Bankr. D. Del. 2002) (landlords have administrative claims for premises that debtors occupy and use post petition).

24.      When a debtor benefits from a pre-petition contract, the amount of the resulting benefit to the estate will be measured in accordance with the actual usage and the contracted-for consideration. Thus, in the absence of evidence to the contrary, the court will look to the contractual provisions in an agreement in establishing value to the estate and the amount of an administrative claim. *In re DVI, Inc.*, 308 B.R. at 708 (presumption for fair market value is the contracted-for lease rate); *In re Beverage Canners Int'l Corp.*, 255 B.R. 89, 92 (Bankr. S.D. Fla. 2000) (contractual rate for trademarks is presumed fair when there is no contrary evidence); *Broadcast Corp. of Georgia v. Broadfoot (In re Subscription Television of Greater Atlanta)*, 789 F.3d 1530 (11th Cir. 1986) (allowing an administrative claim to the provider of a broadcast signal for the period in which the debtor used the signal in its operations after the commencement of the case); *accord, Goody's Family Clothing*, 401 B.R. at 673 (allowing pro-rated Section 503(b)(1)(A) claim for post-petition "stub rent" based on lease rate). *See also* 4 COLLIER ON BANKRUPTCY ¶503.06[3][c] (Alan N. Resnick & Henry J. Sommer eds, 16th ed.) (discussing the doctrine under the Supreme Court decision *Reading Co. v. Brown*, 391 U.S. 471 (1968) and *In re Charlesbank Laundry, Inc.*, 755 F.2d 200 (1st Cir. 1985) and their progeny in

which "actual and necessary costs" should "include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible" and how this doctrine applies not only to post-petition tort claims where fairness dictates that a tort claim based on negligence should be paid ahead of pre-reorganization claims, then it logically follows that an act that violates the law and damages other should also be entitled to administrative expense priority).

## II. Countrywide's Post-Petition Transactions with the Estates entitle it to Allowance and Payment of Administrative Expense

25.    The Post-Petition Loan Purchase transaction arises out of a transaction with the estates and since it was a post petition transaction, any breach of that agreement or any claims arising under the documents governing the Post-Petition Loan Purchase Transaction are entitled to an administrative priority. *See id.* at ¶503.06[6][a] (Alan N. Resnick & Henry J. Sommer eds, 16th ed.)("If the trustee enters into a contract or lease after entry of the order for relief and subsequently breaches the contract or lease, the other party will have a claim for damages. The amount of these damages will be determined under the contract or lease and the full amount of the damages arising form the trustee's breach will constitute administrative expenses.")

26.    In a similar vein, all Repurchase Obligations and any associated indemnification or reimbursement claims associated with those Repurchase Obligations that arose under the Countrywide Contracts after the Petition Date constitute a post-petition transaction under a non-executory contract (as noted above, the Debtors have previously stipulated that the loan purchase agreements are non-executory).  As such, these obligations are likewise entitled to administrative expense priority and upon payment, Countrywide will transfer the repurchased mortgage loans to the Debtors who can hold or liquidate them to the benefit of all creditors of these estates.

### III.   Any Future Rescission Remedy in the Triad Action will entitle Countrywide to Allowance and Payment of Administrative Expense

27.      The remaining administrative expenses Countrywide applies for will depend upon the outcome of the Triad Action. First, if the Premiums or the Insurance Amounts are returned to the Debtors rather than Countrywide when Countrywide is entitled to them, that payment will benefit the estate in the amount of the Premiums and Insurance Amounts either returned or paid. Countrywide should at that time be granted an administrative expense equal to the amount of such Premiums or Insurance Amounts paid to the Debtors rather than to Countrywide. Second, if any court grants Triad a global rescission remedy (or if Triad continues to deny claims and rescind policies notwithstanding the outcome of the Triad Action) every loan that was previously insured by Triad will no longer be insured and such condition will result in a breach of various agreements, which may include, but not be limited to, the Countrywide Contracts and the documents governing the Post-Petition Loan Purchases. These breaches could subject the Debtors to repurchase demands for thousands of loans that it is not currently obligated to repurchase. As such, these repurchase demands will arise post-petition and will entitle Countrywide to put mortgages back to the Debtors in exchange for cash payments and further entitle Countrywide to all rights and remedies under the relevant contracts, including, but not limited to, associated indemnity and reimbursement obligations. All of these claims should be granted administrative priority upon the rescission of the Master Insurance Contracts and related insurance certificates.

### RESERVATION OF RIGHTS

28.      Countrywide reserves its right to amend or revise this Application or to assert additional administrative expenses that arise as a result of its relationship with any of the Debtors or the outcome of the Triad Action. Countrywide further reserves its rights to submit

additional evidence or briefing in support of this Application at the time of or in advance of any

hearing on this Application.  Additionally, Countrywide reserves its right to seek discovery from

the Debtors or other relevant third parties to obtain evidence and to submit additional briefing

with respect to any objections or related pleadings filed with respect to this Application.

**[Remainder of Page Intentionally Left Blank]**

## CONCLUSION

29.     Countrywide respectfully requests that the Court enter an order (a) granting this Motion and allowing Countrywide's administrative expense in an amount to be determined by the Court; (b) ordering that payment of such administrative expense be made in accordance with the Plan; and (c) granting such other and further relief as may be just and proper.

## NOTICE

30.     In accordance with the Notice of the Effective Date, Notice of this Application has been provided to: (1) counsel to the Debtors; (2) counsel for the Plan Trustee, and (3) the Office of the United States Trustee.  Additionally all parties registered to receive service of pleadings in these cases with the Courts ECF system should receive electronic service of this Application.

Dated: January 5, 2011
     Wilmington, DE

EDWARDS ANGELL PALMER & DODGE LLP

/s/ R. Craig Martin
Stuart M. Brown (DE Bar No. 4050)
Denise Kraft (DE Bar No. 2778)
R. Craig Martin (DE Bar No. 5032)
919 North Market Street, Suite 1500
Wilmington, DE  19801
(302) 777-7770

- and -

David Weiss
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
(415) 543-8700

Counsel to Countrywide Bank, FSB, formerly Countrywide Bank, N.A. (n/k/a Bank of America, N.A.), and Countrywide Home Loans, Inc.