# EXHIBIT 2

1          SUPERIOR COURT OF THE STATE OF CALIFORNIA

2              FOR THE COUNTY OF SAN BERNARDINO          **ORIGINAL**

3

4    ROBB EVANS,                        )
                                        )
5                Plaintiff,             )
                                        ) CASE NO.
6        vs.                            ) SCVSS 129645
                                        )
7                                       )
                                        )
     AMERICAN HOME MORTGAGE             )
8    CORPORATION, a New York            )
     Corporation; ASH ZAVERY, an       )
9    individual; SHAWN TIZABI, an       )
     individual; IAN CARNOCHAN, an      )
10   individual; JOHN F. CASY, an       )
     individual; DOES 1-100,            )
11   Inclusive,                         )
                                        ) VOLUME II
12               Defendants.            )(232 - 486)
                                        )
13   ---------------------------------)

14

15   DEPOSITION OF:

16            ROBB EVANS

17            MONDAY, DECEMBER 4, 2006

18            11:00 A.M.

19

20

21

22

23   Reported by:

24     ISABEL H. PEREZ

25     CSR NO. 12631

1       Deposition of ROBB EVANS, the Plaintiff, on

2   behalf of the Defendants, on Monday, December 4,

3   2006, 11:00 a.m., at 725 S. Figueroa Street,

4   Suite 2500, Los Angeles, California 90025, before

5   Isabel H. Perez, CSR No. 12631, pursuant to Notice.

6

7   APPEARANCES OF COUNSEL:

8

9   FOR PLAINTIFF:

10          DANZ & GERBER

11          BY:  PIP N. SMITS, ESQ.

12          13418 Ventura Boulevard

13          Sherman Oaks, California  91423

14          (818) 783-7300

15

16   FOR DEFENDANTS:

17          JACKSON LEWIS LLP

18          BY:  SCOTT C. LACUNZA, ESQ.

19          725 S. Figueroa Street

20          Suite 2500

21          Los Angeles, California  90017

22          (949) 885-1360

23

24

25

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1              LOS ANGELES, CALIFORNIA

2           MONDAY, DECEMBER 4, 2006

3                 11:00 A.M.

4

5                 ROBB EVANS,

6           having been first duly

7           resworn, was further examined

8           and testified as follows:

9

10              FURTHER EXAMINATION

11   BY MR. LACUNZA:

12       Q.   Good morning, Mr. Evans.

13       A.   Good morning.

14       Q.   As you know, we are here today to

15   complete the deposition that we started last

16   Thursday, and I just want to quickly confirm

17   that, as we talked about on Thursday, you

18   understand the importance of the oath you just

19   took; correct?

20       A.   Yes, sir.

21       Q.   And you understand it's the same oath

22   you would take in a court of law and has the same

23   force and effect?

24       A.   Yes.

25       Q.   Thank you.  Now, at the end of the

238

1    deposition on Thursday, we had just started to

2    talk about your alleged compensation for your

3    alleged employment at American Home Mortgage; do

4    you remember that?

5         A.   Yes.

6         Q.   Now, before we continue with that, I

7    want to show a couple of documents to introduce

8    them as exhibits and to get your opinion on them;

9    okay?

10              Let's introduce this as Exhibit 1.

11              (Defendants' Exhibit 1 was marked

12              for identification by the court

13              reporter and is attached hereto.)

14   BY MR. LACUNZA:

15        Q.   Mr. Evans, Exhibit 1 is a document that

16   is stamped by your attorney RE0013 to RE0025; and

17   on the first page it says, "American Home

18   Mortgage," and if you could take a minute to take

19   a look at this document and let me know when

20   you're finished.

21        A.   Is this the whole thing?

22        Q.   Just a copy what was produced by your

23   attorney to us.

24        A.   It seems to be light, unless I missed a

25   page.

239

1        Q.    Okay.  But as far as -- let me ask you

2   this:  Have you ever seen this before?

3        A.    Yes.

4        Q.    What is this?

5        A.    It's an American Home Mortgage New Employee

6   Pamphlet.

7        Q.    Understood.  Now, is this something you

8   received from American Home Mortgage?

9        A.    Yes.

10       Q.    And who did you receive this from?

11       A.    Ash Zavery.

12       Q.    And when did you receive this document?

13       A.    At the conclusion I had to sign a pay

14   agreement and some other documents, and then this was

15   part that got separated from those documents, and

16   this was my copy.

17       Q.    Now, do you recall at the last session

18   of your deposition we talked about a phone call

19   you had with Shawn initially?

20       A.    Yes.

21       Q.    And do you recall the next day you met

22   with Ash and Shawn at a chicken restaurant?

23       A.    Chick Flicks.

24       Q.    Exactly.  Then a few days later you went

25   to the facility to have what you refer to as an

240

1    initial meeting with Team Vision; correct?

2        A.    Yes.

3        Q.    Now, where in that time frame does

4    receiving this fit in?

5        A.    I believe I received this when I went back

6    for the meeting with Emilio and Joan and all those

7    folks, because it wasn't prepared when we had a

8    meeting at the chicken place.  It wasn't prepared.

9        Q.    So just to confirm:  You did not receive

10    this when you met with them at Chick Flicks;

11    correct?

12        A.    No.

13        Q.    And you did not receive this exhibit,

14    Exhibit 1, when you went to the Corona branch

15    immediately after lunch at Chick Flicks, correct,

16    when they did the walk-around?

17        A.    Correct.

18        Q.    So the best recollection you received

19    this document is when you went back a few days

20    later as part of what you refer to as a Team

21    Vision meeting; correct?

22        A.    Yes.

23        Q.    Thank you.  Did you receive, to the best

24    of your recollection, any other document that you

25    refer to as an American Home Mortgage Handbook?

241

1    A.    I am not quite sure how to answer that, so

2  I'll just say this one is light.  The one I got talks

3  about the benefits and stuff that they offer, and

4  it's about half a dozen more pages.  So I don't know

5  if that's another document if that's how you would

6  refer to it, but this one seems light.

7    Q.    Do you have a copy of that other

8  document you're referring to that seems heavier?

9    A.    Yes.

10    Q.    And where is that?

11    A.    At my home office.

12    MR. LACUNZA:  And I guess, Counsel, I

13  request if he has any additional documents that

14  are responsive to the document request would you

15  produce?

16    MS. SMITS:  Absolutely.  Sure.

17  BY MR. LACUNZA:

18    Q.    I just ask, Mr. Evans, if you have any

19  documents at home regarding what we're talking

20  about to please work with your attorney to get

21  copies of those to her.

22    A.    Certainly.

23    Q.    Thank you.  So before we move on, do you

24  recall who specifically gave you Exhibit 1?

25    A.    Ash Zavery.

MERRILL  LEGAL  SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1       Q.    But not Shawn Tizabi; correct?

2       A.    No.

3             MR. LACUNZA:  Let's mark this as

4    Exhibit 2.

5             (Defendants' Exhibit 2 was marked

6             for identification by the court

7             reporter and is attached hereto.)

8    BY MR. LACUNZA:

9       Q.    Mr. Evans, Exhibit 2 is a three-page

10   document stamped by your attorney RE0032 to

11   RE0034 that was produced by your attorney in this

12   case.  It is entitled "American Home Mortgage

13   Continuation of Coverage Rights Under COBRA."

14            If you could take a minute to look at

15   that document, please.

16      A.    Yes.

17      Q.    Thank you.  Have you seen this document

18   before?

19      A.    Yes.

20      Q.    And what is this document?

21      A.    It's a continuation of coverage of your

22   COBRA rights, your extended insurance coverage.

23      Q.    And when did you receive this document?

24      A.    Same time I received my employee handbook or

25   the Welcome Employee Guide.

243

1       Q.    Exhibit 1?

2       A.    Exhibit 1.

3       Q.    And the other documents you referred to

4    before?

5       A.    Yes.

6       Q.    Now, who gave you this document,

7    Exhibit 2?

8       A.    Ash Zavery.

9       Q.    When did he give you Exhibit 2?

10      A.    At the same time he gave me Exhibit 1.  They

11   were attached.

12      Q.    And so, to the best of your

13   recollection, at the meeting that you went back

14   to the Corona branch to meet with the Team

15   Vision; correct?

16      A.    Yes.

17      Q.    And that was a meeting with Emilio

18   Nunez; correct?

19      A.    Yes.

20           MR. LACUNZA:  This next document we'll

21   mark as Exhibit 3.  It is a document stamped

22   RE0026 to RE0031, and it appears to be a memo

23   from American Home Mortgage to American Home

24   Mortgage New Hires, from Human Resources.

25           (Defendants' Exhibit 3 was marked

244

1              for identification by the court

2              reporter and is attached hereto.)

3    BY MR. LACUNZA:

4        Q.   And if you could take a look at that

5    document for a minute and tell me when you're

6    finished.

7        A.   Yes.

8        Q.   And have you seen this document before?

9        A.   Yes.

10       Q.   And when have you seen this document?

11       A.   This document was attached to Exhibit 1 and

12   Exhibit 2.

13       Q.   Was this part of the employment package

14   that you referred to at the first session of your

15   deposition?

16       A.   Yes.

17       Q.   So when we talk about the employment

18   package that you believe you received, we're

19   referring to Exhibit 1 and Exhibit 2 and

20   Exhibit 3 as well.

21       A.   Yes.

22       Q.   And who provided this document to you?

23       A.   Ash Zavery.

24       Q.   And when did Mr. Zavery provide this

25   document to you?

245

1      A.   At the same time as I received Exhibit 1 and

2    Exhibit 2.

3      Q.   Now, Mr. Evans, in relation to the

4    meeting that you went to at the Corona facility

5    that we talked about at the last session of your

6    deposition, how long was that meeting about?

7      A.   Maybe 30 minutes.

8      Q.   And did you leave the facility after the

9    meeting, or did you stay around after the

10   meeting?

11     A.   I stayed.

12     Q.   So when in relation to that time frame

13   you just referenced did you receive the documents

14   that we're talking about.  Was it at the

15   beginning of the meeting, during the meeting, or

16   after the meeting?

17     A.   After.

18     Q.   And was anybody else present when you

19   received these documents besides yourself and

20   Mr. Zavery?

21     A.   Shawn Tizabi was there, and I believe Joan

22   was there.

23     Q.   At the specific time that you --

24     A.   Yes.

25     Q.   -- actually received the documents?

246

1        A.   Yeah.  I'm going to too fast.  Sorry.

2        Q.   That's okay.

3        A.   Yes.

4        Q.   Thank you.  So after the meeting

5   concluded, you were still in the same area with

6   those individuals and Ash Zavery provided you

7   with these documents; correct?

8        A.   Yes.

9        Q.   Do you know if Mr. Zavery provided any

10   of these documents to anyone else?

11        A.   I would only be assuming.

12        Q.   So you don't know one way or the other?

13        A.   He was the senior loan officer, and our

14   manager, I mean, Shawn, answered to him, I answered

15   to him, Joan answered to him, and any other reps, I

16   don't know how many reps they had.

17        Q.   But, for example, you didn't see if

18   Mr. Zavery handed the same documents to Joan?

19        A.   No.

20        Q.   As far as you know, she was already

21   hired by American Home Mortgage at that time;

22   correct?

23        A.   Correct.

24             MR. LACUNZA:  Let's mark this document

25   as Exhibit 4.

247

1              (Defendants' Exhibit 4 was marked

2              for identification by the court

3              reporter and is attached hereto.)

4    BY MR. LACUNZA:

5        Q.   Mr. Evans, Exhibit 4 is a one-page

6    document entitled the "American Home Mortgage New

7    Employee Completion Checklist."  And this

8    document is not stamped by your attorney.  This

9    document has not been produced by your attorney.

10   I'm showing you this from our side.

11             And if you could take a minute to take a

12   look at this, please.

13       A.   Yes.

14       Q.   Have you ever seen a document such as

15   this before?

16       A.   A checklist?

17       Q.   Well, I'm asking -- strike that.

18             Did you ever receive, as part of the

19   documents you testified you received from

20   Mr. Zavery, a document such as this?

21       A.   I don't recall seeing this one.

22       Q.   So, to the best your recollection, you

23   did not receive this document; correct?

24       A.   Correct.

25       Q.   Thank you.

                                                    248

1          MS. SMITS:  If I may state on the record

2     what you told me off the record last week:  The

3     reason that you hadn't produced this previously

4     is because our document requests to you stated,

5     quote, unquote, during the employment of

6     plaintiff, and since you place semantics on that,

7     you haven't produced anything; correct?

8          MR. LACUNZA:  That's correct.  As far as

9     I remember, all the document requests are

10    specifically tied to documents related to

11    Mr. Evans employment, and it's our position, of

12    course, that Mr. Evans was not employed with the

13    company.

14         MS. SMITS:  Thank you.

15         MR. LACUNZA:  Let's mark this document

16    as Exhibit 5.

17              (Defendants' Exhibit 5 was marked

18              for identification by the court

19              reporter and is attached hereto.)

20    BY MR. LACUNZA:

21         Q.   Mr. Evans, Exhibit 5 is a one-page

22    document entitled, "Employee Handbook

23    Acknowledgment Form," and if you could take a

24    minute to take a look at that, please.

25         A.   Yes.

                                                    249

1      Q.    Now, have you ever seen this type of

2   document before?

3      A.    Yes.

4      Q.    And where did you see this type of

5   document before?

6      A.    This was part of my employment package.

7      Q.    So, to your testimony you did receive a

8   copy of this type of document at the same time

9   you received the other documents we referred to?

10     A.    Did you say did I receive a copy of this?

11     Q.    Well, I'm just trying to distinguish.

12   You obviously didn't receive this one.

13     A.    No.   I signed it and returned it to my

14   manager, because it requires his signature as well.

15     Q.    No.   Understood.   I just want to make

16   sure you understand when I'm showing you

17   documents sometimes there's documents you've

18   actually signed that are the exact copies of

19   something you received versus just something I'm

20   showing you as a sample.   So this document I do

21   not see your signature on; correct?

22     A.    Correct.

23     Q.    I don't think you actually received this

24   exact document.

25     A.    No.

250

1     Q.   So when I say "a copy," I'm just

2   referring to the fact that it may not be the

3   exact document referring to, but I want to know

4   that it's the same document in your mind.

5     A.   Okay.

6     Q.   So you did receive something like this

7   at the time you received your alleged employment

8   package; correct?

9     A.   Yes.

10     Q.   So who provided you with this type of

11   document?

12     A.   Ash Zavery.

13     Q.   At the same time you received the other

14   documents?

15     A.   Yes.

16     Q.   And what did you do with this document

17   when you received it?

18     A.   I was requested to sign it, date it, and

19   return it, and that's what I did.

20     Q.   And who requested for to you sign it,

21   date it, and return it?

22     A.   Ash.

23     Q.   Did anybody else discuss this particular

24   document with you?

25     A.   Not to my knowledge, no.

251

1     Q.   So other than Ash Zavery, you did not

2   discuss Exhibit 5 with any Human Resources

3   person; correct?

4     A.   No.

5     Q.   No that's correct?

6     A.   I did not discuss this document other than

7   with Ash Zavery.

8     Q.   Thank you.  Now, you testified that you

9   signed a document similar to Exhibit 5; correct?

10     A.   Yes.

11     Q.   Do you have a copy of that anywhere with

12   you?

13     A.   No.

14     Q.   And so you're sure you do not have a

15   copy of that at home; correct?

16     A.   As sure as I can be.

17     Q.   Thank you.  And when you signed

18   Exhibit 5, who did you give that to?

19     A.   I returned it to Ash Zavery.

20     Q.   And in relation to the time frame we

21   talked about before, when did you return it to

22   him?  So, for example, did you take it home,

23   sign, it and bring it back the next day?

24     A.   No.  Within minutes.

25     Q.   The same time we referred to with

252

1    respect to the meeting; correct?

2        A.    Yes.

3        Q.    Thank you.

4            MR. LACUNZA:  Let's mark this document

5    as Exhibit 6.

6            (Defendants' Exhibit 6 was marked

7            for identification by the court

8            reporter and is attached hereto.)

9    BY MR. LACUNZA:

10       Q.    Mr. Evans, Exhibit 6 is a document

11   entitled, "American Home Mortgage Holdings

12   Employee Handbook."  The front page is dated

13   January 2003; and I don't have an exact page

14   count, unfortunately, because it's neither

15   numbered nor Bates stamped.  But if you could

16   take a look at that for a minute and let me know

17   when you're done.

18       A.    Looks like an employee handbook.

19       Q.    Now, Mr. Evans, to the best of your

20   recollection, did you receive something like this

21   with respect to your employment package that

22   you're referring to?

23       A.    Something like this, I would be referring to

24   Exhibit 1 with more pages attached to it, not this

25   exact one.

253

1      Q.   Okay.  So as far as you recall you did

2   not receive this exact handbook in the form of

3   Exhibit 6; is that correct?

4      A.   Correct.

5      Q.   Now, if you could turn to about -- I

6   think it's the ninth page from the back, and let

7   me know when you have that.

8      A.   The part where it says, "authorities

9   responsibilities?"

10     Q.   I think the ninth page from the back.

11  Isn't the Employee Handbook Acknowledgment form?

12     A.   Employee Handbook Acknowledgment Form, yes.

13     Q.   I just want to confirm that page appears

14  to be the same as Exhibit 5; correct?

15     A.   Yes.

16     Q.   In your mind, do you recall signing a

17  document as Exhibit 5 or something similar to

18  Exhibit 5?

19          MS. SMITS:  Don't guess.  If you know,

20  you can answer.

21          THE WITNESS:  I signed a document like

22  this, but for all I know a word could have been

23  changed.

24  BY MR. LACUNZA:

25     Q.   No.  Sure.  I just want to make sure.

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1    You mentioned that you think you did not receive

2    Exhibit 6, correct, the handbook?

3        A.    Not all this.

4        Q.    Exactly.  And that Exhibit 5 appears to

5    be part of Exhibit 6, so I just wanted to know if

6    you maybe see that if it refreshes your

7    recollection as to whether or not you signed a

8    document that looks like Exhibit 5 or not or

9    whether it could have been a different document.

10          MS. SMITS:  Counsel, I'd like to object

11   on the conclusion that you placed that it's part

12   of the packet.  Seems that there's nothing

13   attached, like you said, that there's no page

14   number, and at least our copies are attached with

15   a clip.

16          So as far as authenticity we don't know

17   who put this together or whether this is the

18   correct order, but if Mr. Evans understands the

19   question, you can certainly answer.

20          THE WITNESS:  I did sign a document like

21   this, yes.

22   BY MR. LACUNZA:

23       Q.    That was the question.

24          Well just to confirm, you do recall

25   signing a document in the form of Exhibit 5;

255

1    correct.

2        A.    Yes.

3        Q.    But you recall receiving it in relation

4    to a document in the form of Exhibit 1; correct?

5        A.    Yes.

6        Q.    Thank you.  Now, Mr. Evans, as I

7    mentioned at the start of today's session, I want

8    to pick up where we left off at the last session

9    where we started to talk about your compensation.

10   Do you recall that testimony?

11       A.    Yes.

12       Q.    Now, you testified that when you were

13   allegedly hired by American Home Mortgage that

14   you were paid on a commission basis; correct?

15       A.    Yes.

16       Q.    And for purposes of starting today, can

17   you tell me what that commission base is that you

18   were paid on?

19       A.    50 percent of the gross markup.

20       Q.    And then you mentioned at the last

21   session that there was something in writing, from

22   either Ash Zavery or Shawn Tizabi, that

23   referenced that commission policy?

24       A.    Yes.

25             MR. LACUNZA:  Let's go ahead and

256

1    introduce this now as Exhibit 7 so we have that

2    for our discussion.

3              (Defendants' Exhibit 7 was marked

4              for identification by the court

5              reporter and is attached hereto.)

6    BY MR. LACUNZA:

7         Q.   Exhibit 7, Mr. Evans, is the actual

8    civil complaint that was filed in your lawsuit by

9    your attorney.  Can you take a minute to look at

10   this, please.

11        A.   Sure.

12             MS. SMITS:  Off the record.

13             (Brief pause in the proceeding.)

14             THE WITNESS:  Okay.

15   BY MR. LACUNZA:

16        Q.   Now, Mr. Evans, I know you're not an

17   attorney.  Regarding this document, I just want

18   you, if possible, to turn to the back, please, of

19   Exhibit 7.

20        A.   Very back?

21        Q.   Yes, which should be the last page.

22        A.   The Yahoo e-mail.

23        Q.   Yes.  And that appears to be Exhibit 1

24   to the Complaint; correct?

25        A.   "As per your conversation with Mr. Tizabi, I

257

1    confirm that you will get 50 percent commission and I

2    hope you will give me at least $1 million every

3    month."

4        Q.    Now, that's what it says on that page;

5    correct?

6        A.    Yes.

7        Q.    And --

8            MS. SMITS:  I'm sorry, Counsel.  It

9    says, "$1 million sales every month."

10            MR. LACUNZA:  Yes.

11    BY MR. LACUNZA:

12        Q.    And I just want to confirm:  This

13    document is attached to your Complaint as

14    Exhibit 1; correct?

15        A.    Yes.

16        Q.    Now, when you mentioned earlier that

17    there was an e-mail between Ash Zavery to

18    yourself setting forth the commission plan, just

19    in terms of going forward, this is the document

20    you're referring to; correct?

21        A.    As far as the e-mail or as far as the actual

22    contract that I signed?

23        Q.    Well, you tell me what exist out there

24    that sets forth the fact that you'll get

25    50 percent commission.

258

1      A.   It's a commission structure, working

2   agreement that was signed and dated by myself and

3   Ash, and this e-mail was just in response to me

4   telling Ash, "my patience has expired.  I want my

5   money.  I want to be paid.

6      Q.   Now, the date of this e-mail is Friday,

7   May 13, 2005; correct?

8      A.   Yes.

9      Q.   And just so I'm clear:  In addition to

10  this, you believe there's a separate document

11  somewhere that you signed that states you'll get

12  50 percent commission based on the gross markup;

13  correct?

14     A.   Yes.

15     Q.   Do you have a copy of that document

16  anywhere?

17     A.   No.

18     Q.   And what did you do with that document

19  that you're referring to?

20     A.    I signed it along with the documents that

21  were attached to Exhibit 1 and returned it to

22  Mr. Zavery for his signature.

23     Q.   And do you know if anything what

24  happened to that document after you gave it back

25  to Mr. Zavery?

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

```
 1    progression.

 2           Now, other than the two documents you

 3    referred to, the e-mail attachment to Exhibit 7

 4    and the alleged written document that you signed

 5    that you just referred to, are there any other

 6    documents that in your mind demonstrate or

 7    evidence whatever commission pay plan you had

 8    with your alleged employment with American Home

 9    Mortgage?

10       A.   No.

11           MS. SMITS:  Can you read that back.

12           (The previous question was read back

13           by the court reporter as follows:

14               "QUESTION:  Are there any other

15           documents that in your mind

16           demonstrate or evidence whatever

17           commission pay plan you had with your

18           alleged employment with American Home

19           Mortgage?")

20           MS. SMITS:  Thank you.

21    BY MR. LACUNZA:

22       Q.   So, just to confirm, there are no other

23    documents that you're aware of that set, forth

24    your specific commission plan; correct?

25       A.   Not that I'm aware of.
```

263

1    Q.    Did you actually see Mr. Zavery or

2    anyone sign the document that you're referring

3    to, not the e-mail but the other document?

4    A.    No.  I signed my part of the employment

5    package, the documents that were required for me to

6    sign and date, and I left them for his signature.

7    Q.    Did you ever have any discussions with

8    John Cady regarding your commission plan at

9    American Home Mortgage?

10   A.    I don't recall a discussion like that with

11   John.

12   Q.    Do you recall having any discussions

13   with Ian Carnochan regarding your alleged

14   commission plan and American Home Mortgage?

15   A.    No.

16   Q.    Do you recall having any discussions

17   with Emilio Nunez regarding your alleged

18   commission plan at American Home Mortgage?

19   A.    I discussed payment with Emilio, but not the

20   specific outline of my work agreement contract

21   whatever.  That was handled with Ash.

22   Q.    Understood.  So you never discussed what

23   percentage you would be getting with Emilio?

24   A.    No.

25   Q.    So other than Ash Zavery -- strike that.

264

1        ...d you ever discuss the specific

2    percentage portion with Shawn Tizabi?

3        A.    Yes.

4        Q.    And was that at the lunch meeting at the

5    chicken place?

6        A.    I believe it was on the phone first and then

7    at the chicken place, because I wouldn't go in blind

8    and not knowing what I would be paid.

9        Q.    Thank you.  So other than Ash Zavery or

10   Shawn Tizabi, did you discuss with anyone else at

11   American Home Mortgage what you're commission

12   plan would be if you were hired by the company?

13       A.    No.

14       Q.    Thank you.  Now, other than what we had

15   discussed, other than your commission, which is

16   50 percent of the gross markup, did you have any

17   other verbal communications with anybody

18   regarding the commission plan?

19       A.    That would be inappropriate, so, no.

20       Q.    Thank you.

21            MS. SMITS:  Can I have a cup of coffee?

22            MR. LACUNZA:  Absolutely.

23            (Brief pause in the proceeding.)

24   BY MR. LACUNZA:

25       Q.    So when we talked about your commission,

1     your alleged commission plan with American Home

2     Mortgage, we're only referring to the discussions

3     you had with Ash Zavery and Shawn Tizabi and the

4     written documents we referred to; correct?

5          A.   Yes.

6          Q.   Thank you.  And I think you mentioned

7     last session:  Other than the commission

8     structure we're talking about, there were no

9     other elements to your pay structure; correct?

10         A.   No.

11         Q.   And do you know -- did you or were to

12    you receive any type of draw against the

13    commission?

14         A.   I never requested a draw.

15         Q.   Was that ever discussed with either

16    Shawn or Ash?

17         A.   No.

18         Q.   Now, Mr. Evans, do you know if you were

19    ever actually listed or contained in the

20    company's payroll system?

21         A.   Do I know for a fact?

22         Q.   Yes.

23         A.   No.  Do I believe that?  Yes.

24         Q.   And why do you believe that.

25         A.   Shawn said I received a check from New York,

266

1    but it was a zero check.  I was obviously not happy

2    to see that my check was a big fat zero, so I am not

3    sure what words were exchanged; but I wasn't happy.

4        Q.    Now, let's talk about that briefly.

5    When did that occur, this discussion you're

6    referring to?

7        A.    That was -- well, I can't give you an exact

8    date.

9        Q.    No.  Just approximate.

10       A.    Long after the Carpenter and Belcher loans

11   were finalized.  So it should be like maybe a couple

12   of three weeks after the loans were completely, you

13   know, (inaudible) got their money, and then it

14   trickles down.  So after those loans were finalized.

15       Q.    We will get into the specifics of check

16   processing and so forth in a little bit.

17            Is there any reason, other than that

18   what you just referred to, that would make you

19   think you were in the payroll system?

20       A.    Any other reason to believe I was in the

21   payroll system?

22       Q.    Yes.  For example, other document that

23   indicates that you were in the payroll system?

24   Did you ever fill out anything that says, "please

25   enter the following system information for our

267

1   payroll system," anything like that?

2       A.   Other than the documents that were included

3   in the original Employee Handbook, no.

4       Q.   Thank you.  Now, did you ever actually

5   receive a payroll check from American Home

6   Mortgage?

7       A.   No.

8       Q.   The check you referred a minute ago, you

9   said that Shawn told you there was a check for

10  zero dollars; correct?

11      A.   Correct.

12      Q.   Did you ever actually see it?

13      A.   No.

14      Q.   So Shawn Tizabi never handed you a check

15  made out to you for zero dollars; correct?

16      A.   Correct.

17      Q.   To this day, as you sit here, have you

18  ever seen that check made out to you for zero

19  dollars?

20      A.   No.

21      Q.   When he told you that a check had been

22  made for zero dollars in your name, did this

23  occur in person or on the telephone?

24      A.   It occurred on the telephone.

25      Q.   And what, specifically, did Mr. Tizabi

268

1    say to you.

2        A.   "Robb, I have a check here for you.  You're

3    not going to be happy.  It's a zero check."

4            And, of course, I was angry that it was a

5    zero check.

6        Q.   Do you recall, to the best of your

7    recollection, Mr. Evans, I know it's been two

8    years.  Best to your recollection, what did you

9    say to that statement to Mr. Tizabi?

10       A.   "What the hell is that all about?  Zero

11   check?  It must have cost more money to send it to me

12   if it's a zero check.  What's that all about?"

13           And he said, "Don't feel bad."

14           I can't remember the guy's name -- "Gustavo,

15   Fernando, Francisco -- he had one too, don't feel too

16   bad, he's got one, too."

17           "Why would I care?  I'm sorry for him, but

18   where's my money?"

19       Q.   Did he explain anything to you other

20   than what you said that he said, "don't feel

21   bad"?  Did he give any reason why it was a zero

22   dollars check?

23       A.   He was checking into it.

24       Q.   Had you, up to that point, heard

25   anything like from on any of your prior

269

1    employers?

2         A.    I've seen larger companies do that before,

3    where they send a check next to nothing or a zero

4    check to zero out their account or whatever.  But

5    nine times out of ten the account agent or

6    salesperson would be expecting that.

7         Q.    Do you recall at the last session we

8    talked about your prior three employers in the

9    mortgage industry; correct?

10        A.    Yes.

11        Q.    And that was Bancorp and Star National

12   Home Lenders; correct?

13        A.    Yes.

14        Q.    Now, have you in your experience ever

15   heard anything like this occurring before, where

16   someone in your position would be issued a zero

17   dollars check?

18        A.    No.

19        Q.    So was it shocking to you?

20        A.    Yes.

21        Q.    Now, we'll get into the specifics of

22   what commissions you believe are owed in a little

23   bit.  But right now, as you sit here today,

24   before we move into that, what were you expecting

25   the check, (sic) did you have any idea or you

270

1    just expected something?

2         A.   No.   I expected somewhere around 10,700,

3    somewhere in that area.   I'm just rounding it off.

4         Q.   Sure.

5         A.   Less any taxes or any other deductions I

6    claimed.   That's what I was expecting.   So obviously

7    ten seven and zero could get you a little hot.

8         Q.   Sure.   Now, you recall at last session

9    of your deposition to establish a framework we

10   established a timetable for your employment, your

11   alleged employment, at American Home Mortgage; do

12   you recall that?

13        A.   Yes.

14        Q.   And you testified that was approximately

15   from March 2005 until some point in June 2005;

16   correct?

17        A.   Correct.

18        Q.   Can you, as you sit here today, give me

19   any authenticity this discussion occurred on the

20   telephone when you called Mr. Tizabi about the

21   check.   And then he told you about the zero

22   dollars check, where in that time frame does that

23   fit, approximately?

24        A.   I can't answer without guessing.   I have to

25   go check my documents and stuff and see the timeline

                                                            271

1      A.    Almost daily.

2      Q.    We'll go through those in a little bit,

3   then.  I just want to make sure.

4            And the same thing with Ash.  You still

5   had further discussions with him?

6      A.    Yes.

7      Q.    Did most of those discussions take place

8   in person or on the phone or e-mail?

9      A.    A combination.

10     Q.    So round me out the conversation piece.

11           As you sit here today, have you ever

12   actually been paid by American Home Mortgage for

13   anything?

14     A.    No.

15     Q.    So as you sit here today, you've never

16   received any type of compensation for your

17   alleged employment from American Home Mortgage;

18   correct?

19     A.    Correct.

20     Q.    And have you ever reported to the IRS

21   any income received from American Home Mortgage?

22     A.    No.

23     Q.    Now, Mr. Evans, I want to talk briefly

24   about your job performance during your alleged

25   employment with American Home Mortgage.

279

1     Q.   And what were those issues?

2     A.   That's when I received a call saying that
3     their offices have been broken into at least sometime
4     in June, and the only thing that was taken or messed
5     with were my files, which I found odd, and so I asked
6     for the file police report number and the detective
7     or whoever was involved, and I assumed at that time,
8     since that much time had elapsed, that just seemed
9     hokie, that now they're trying to scare me, okay?

10         So I called the detective and had a brief
11    chat with him and, you know, "Did you break into this
12    office in Corona."

13         "No, I didn't.

14         "Okay.  That's all I have for you."  So --

15    Q.   All right.  Walk me through that.  Who
16    first called you about the alleged break-in?

17    A.   Shawn called me.  I'd already packed up and
18    moved on, as far as that goes.  So he called me at my
19    job and told me that, you know, "Over the weekend the
20    office was broken into.  Seems the only thing that
21    was messed with was your file."

22    Q.   Let's stop right there for a minute.  So
23    you've already started work somewhere else?

24    A.   Yes.

25    Q.   And what company was that?

281

1      A.   Charter.

2      Q.   Was that where you worked immediately

3  after your alleged employment with American Home

4  Mortgage?

5      A.   Yes.

6      Q.   Do you still work with them today?

7      A.   I broker loans with them, but I don't hang

8  my hat there exclusively.

9      Q.   And what's the title?  Is it just

10  Charter, or was there a full title?

11      A.   Charter Funding.

12      Q.   And when did you, approximately, start

13  working for Charter Funding?

14      A.   June.

15      Q.   About June 2005?

16      A.   Yes.

17      Q.   Thank you.

18           So Shawn Tizabi calls you up while your

19  working for Charter Funding and tells you that

20  American Home Mortgage, Corona branch, had been

21  broken into?

22      A.   Yes.

23      Q.   What else did he tell you during that

24  phone call?

25      A.   That the only thing that seems to be messed

1    with was my files.

2        Q.    Did he say or implied that you had

3    broken into the office?

4        A.    I think that's where he was going.

5        Q.    That's how you interpret it?

6        A.    That's now.

7        Q.    And you asked him for the police report

8    information?

9        A.    Yes.

10        Q.    Is there anything else he said to you at

11    that time?

12        A.    That detective or the officer wanted to

13    speak with me.

14        Q.    Did he say or did you say whether or not

15    that had anything to do with whether you would

16    receive your commissions or not?

17        A.    I did.

18        Q.    And what did you say?

19        A.    "One has nothing to do with the other.    If

20    my files were messed with?  So what you got copies,

21    you can go through escrow and get copies.  The loans

22    have been funded.  Where is my money?"

23        Q.    And what did he say?

24        A.    They were working on it.

25        Q.    Did he specifically say or imply that

283

1   because of the break in you wouldn't be getting

2   your commission?

3        A.   No.   That I was just -- I don't know; some

4   sort of scare tactic or something.  I don't

5   understand the mentality behind that.

6        Q.   So you just kind of assumed that since

7   you were waiting for your commission he then

8   calls you up and says, "it got broken into," and

9   in your mind, after dealing with them already,

10  "wait a minute.  This doesn't make sense"?

11       A.   Maybe this would make Robb disappear.

12       Q.   Understood.  I was just curious whether

13  he specifically said to you, "Hey, Robb, sorry.

14  We can't ever get your commission.  Our office

15  got burglarized.  Your stuff is gone, good-bye."

16            So he never said that; correct?

17       A.   Never said that.

18       Q.   Now, anything else that you can recall

19  that you two talked about at that time?

20       A.   That was pretty much it.  I hunted down the

21  detective it and spoke with him.

22       Q.   How did you hunt down the detective?

23       A.   I asked for the case number and which police

24  department was out of and the officer's name from

25  Shawn.  He gave that all to me.

284

1      Q.   Do you recall what police department

2   handled it?

3      A.   Corona.

4      Q.   And then what did you do?

5      A.   I called the officer, the phone number that

6   they gave me.

7      Q.   And what happened next?

8      A.   The officer asked me a couple of questions,

9   and I answered, and he said that would be all.

10      Q.   And do you recall, as you sit here, what

11   questions he asked you?

12      A.   "Did you break into the Corona office"?

13      Q.   What did you say?

14      A.   "No, I did not."

15      Q.   That's all over the telephone; correct?

16      A.   Yes.

17      Q.   And anything else that you two

18   discussed?

19      A.   No.

20      Q.   Did he give any indication of what the

21   status of the investigation was?

22      A.   I didn't ask.

23      Q.   Do you recall whether it was a male or

24   female detective?

25      A.   Male.

285

1      Q.   Do you recall the person's name?

2      A.   If I'm correct, I think it's D. Alvarez, but

3   I got copies, and you probably got copies of my notes

4   on that.

5      Q.   Anything else you can tell me about your

6   discussion with Officer Alvarez?

7      A.   No.

8      Q.   As far as you know or as you sit here

9   today, what happened to that investigation?

10      MS. SMITS:  Calls for speculation; but

11   if you know you can answer.

12      THE WITNESS:  I don't know.

13   BY MR. LACUNZA:

14      Q.   Have you ever talked to anybody else

15   after that point about this investigation?

16      A.   No.

17      Q.   Now, Mr. Evans, as we talked earlier,

18   you believe that you were employed by American

19   Home Mortgage from approximately March 2005 to

20   June 2005; correct?

21      A.   Yes.

22      Q.   Now, how did your employment, your

23   alleged employment with American Home Mortgage,

24   end?

25      A.   With weeks and weeks of waiting for my check

286

1    for wrongful termination against the defendants?

2       A.   Nothing further.

3       Q.   Other than what you've testified about

4    today and at the last session of your deposition,

5    are there any other facts that support your claim

6    for fraud against the defendants?

7       A.   No.

8       Q.   Other than what you've testified today

9    and at the last session of your deposition, are

10   there any other facts that support your claim for

11   reasonable value for services performed against

12   the defendants?

13      A.   No.

14      Q.   And finally, other than what you've

15   testified about today and at last session of your

16   deposition, are there any other facts that

17   support your claim for intentional infliction of

18   emotional distress against the defendants?

19      A.   Nothing additional.

20      Q.   Great.  Thank you.  I have no further

21   questions.

22           I guess we'll do the same stipulation we

23   did previously?

24           MS. SMITS:  Sure.

25           MR. LACUNZA:  And you can get ahold of

482

1       that; correct?

2                   No further questions.  So stipulated.

3                   MS. SMITS:  Thank you.  So stipulated.

4                   (Whereupon the stipulation from

5                   the deposition of Mr. Evans's Volume I

6                   was redacted as follows:

7                       "MR. LACUNZA:  My proposed

8                   stipulation  will be to relieve the

9                   court reporter of her obligations

10                  under the code:  To allow her to prepare

11                  the transcript; to forward the

12                  transcript to counsel for Mr. Evans for

13                  review by Mr. Evans under penalty of

14                  perjury; Mr. Evans's, counsel will

15                  notify me within 30 days.

16                      "MS. SMITS:  Fair enough.

17                      "MR. LACUNZA:  In writing of any

18                  changes to the transcripts, within 30

19                  days of receipt of the transcript; if I

20                  do not receive any notification of

21                  changes from Mr. Evans's counsel in that

22                  30-day period, it will be deemed that

23                  the original transcript has been signed

24                  without changes; and thereafter,

25                  Mr. Evans's counsel will maintain

MERRILL   LEGAL   SOLUTIONS
800-826-0277   818-593-2300   Fax 818-593-2301   www.merrillcorp.com

1           custody of the original; Mr. Evans's

2           counsel will make the transcript

3           available upon reasonable request for

4           any need in litigation; and finally, if

5           the original is lost or otherwise

6           unavailable, a certified copy can be

7           used as an original in the case.

8               "MS. SMITS:  So stipulated.

9               "MR. LACUNZA:  So stipulated.

10              "MS. SMITS:  I also request a copy

11          (The deposition was concluded

12          at 5:42 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

MERRILL    LEGAL    SOLUTIONS
800-826-0277    818-593-2300    Fax 818-593-2301    www.merrillcorp.com

1   STATE OF CALIFORNIA          )

2                                )   ss.

3   COUNTY OF LOS ANGELES        )

4

5           I, ROBB EVANS, II declare under

6   the penalties of perjury under the State of

7   California that the foregoing is true and

8    correct.

9           Executed this _____ day of

10   _____,

11   2006, at _____, California.

12

13

14

15                          _____

16                          ROBB EVANS, II

17

18

19

20

21

22

23

24

25

485

REPORTER'S CERTIFICATE

The undersigned Certified Shorthand Reporter licensed in the State of California does hereby certify:

That the foregoing deposition was taken before me at the time and place therein set forth, at which time the witness was duly sworn by me;

That the testimony of the witness and all objections made at the time of the examination were transcribed, said transcript being a true copy of my shorthand notes thereof.

That the dismantling of the original transcript will void the reporter's certificate.

I further declare that I have no interest in the outcome of the action.

In witness whereof, I have subscribed my name this ___11___ day of _December_ _____, 2006.


_Isabel Haro Perez_

Isabel Haro Perez

Certificate No. 12631

PROOF OF SERVICE/ CERTIFICATE OF SERVICE
**UNITED STATES BANKRTUPCY COURT**
**FOR THE DISTRICT OF DELAWARE**
Case No. 07-11047 (CSS); Chapter 11

I am employed in the City of San Bernardino, State of California. I am over the age of 18 years and not a party to the within action. My business address is 505 N. Arrowhead Avenue, Suite 104, San Bernardino, CA 92401. On the below date I served the following documents:

**CLAIMANT ROBB EVANS' OPPOSITION TO DEBTOR'S OBJECTION AND EXHIBITS.**

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael S. Neiburg, Esq.
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801

Attorneys for Debtors and Debtors in Possession

**JACKSON LEWIS, LLP**
Mr. Scott Lacunza, Esq.
5000 Birch Street, Suite 4800
Newport Beach, CA 92660

Attorney for Defendants AMERICAN HOME MORTGAGE CORPORATION, IAN CARNOCHAN, and JOHN F. CADY

Said documents were served in each of the following manners as indicated by an "(X)" before such mode of service:

( ) BY U.S. MAIL I caused each such envelope with postage thereon fully prepaid, to be placed in the United States mail at San Bernardino, on the date stated below. I am familiar with the practice of my employer for collection and processing of the correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States mail the same day as it is placed for collection.

**( X ) BY OVERNIGHT DELIVERY** I caused such envelope to be delivered to the Federal Express Office with delivery fees fully prepaid for overnight delivery to the offices as stated above.

(☐) BY PERSONAL SERVICE, by delivering a copy of the documents(s) listed above to the person(s) at the address(es) set forth above.

(☒) **STATE** I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 4, 2011, at Victorville, California.

_____
PIP N. SMITH