IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:

AMERICAN HOME MORTGAGE
HOLDINGS, INC., a Delaware corporation,
et. al.,

Debtors,

Chapter 11

Case No: 07-11047 (CSS)

Jointly Administered

---

Gil Quentin Alvarez

Plaintiff,

v.

American Home Mortgage Corp.,

Defendants.

Adv. Proc. No. 11-_____ (CSS)

## MOTION OF GIL QUENTIN ALVAREZ FOR ALLOWANCE OF ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. 503

Gil Quentin Alvarez, hereby requests the entry of an order, pursuant to 11 U.S.C section 503, allowing Gil Quentin Alvarez an administrative expense claim in the amount of $ 49,893.23 plus fees, costs and pre and post petition interest and damages. In support of its motion, Gil Q. Alvarez states as follow:

### JURISDICTION

1. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). Each Debtor is continuing to operate its business and manage its properties as a debtor

1

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2. This Court has jurisdiction over this motion pursuant to 28 U.S.C. section 157 and 1334(b). This matter is a core proceeding pursuant to 28 U.S.C. section 157 (b)(2)(A) and (B). Venue is proper in this District pursuant to 28 U.S.C. section 1408 and 1409.

## BACKGROUND

3. Movant, Gil Quentin Alvarez, and his wife signed a contract for the sale and purchase of a home in Apopka, Florida on February 5, 2005. Debtor/Defendant [in a related adversary proceeding] AHM assured Movant that they would obtain a 5.25% fixed rate and "lock it in".

4. On the day of closing Movant was ambushed with a higher interest rate of 5.75% rather than the one that Debtor had originally represented, i.e. 5.25%. Movant was forced to close on the home with a 5.75% interest rate because the seller was purchasing a home in Tampa, Florida that very day. Had Movant not elected to purchase the home, he would have been subject to legal action from the seller.

5. In April 2005, Movant consulted with an attorney, Bonita E. Zelman, who agreed to assist Movant at a reduced rate on a claim only basis in his dispute with AHM.

6. On April 7, 2005, Movant wrote a "Qualified Written Request" for relief pursuant to Section 6 of the Real Estate Settlement and Procedures Act (RESPA 12 U.S.C. 2605).

7. Shortly thereafter Debtor AHM knowing full well the misconduct associated with the mortgage, sold the mortgage to the Defendant [in a related adversarial proceeding], Wells Fargo Home Mortgage. The transfer became effective May 1, 2005.

8. On April 11, 2005 attorney Bonita Zelman contacted Defendant [in a related adversarial proceeding], Michael Strauss and informed him regarding the unlawful misconduct which had

occurred to the Movant.

9. On April 13, 2005 attorney Zelman also sent a "Qualified Written Request" to Defendant Wells Fargo requesting inter alia, that they not go through with the transfer of the mortgage.

10. Instead of conducting an investigation into the misconduct committed as they are required by RESPA, or make the appropriate corrections to the account, Defendant's AHM, Michael Strauss and Wells Fargo, embarked upon a pattern of deceit and fraud by fabricating different accounts and scenarios all in order to deprive the Movant of his rights under the TILA and RESPA, and, failed to provide Movant with the information he requested in order to hinder his access to justice and to wrongfully appropriate excess interest to which they were not entitled to.

11. Defendant AHM, among many fabricated scenarios, also intentionally lied to Defendant Wells Fargo that Movant's father-in-law had used a $600.00 credit offered by Defendant to Plaintiff to settle this matter.

12. Defendant Wells Fargo after initially indicating that they would investigate the matter, then refused to do so in order to reap the benefits and wrongfully appropriate excess interest to which they were not entitled to and to hinder Movant from asserting his rights under the law.

13. Since Defendant AHM and Defendant Strauss showed no inclination to act appropriately, professionally or to comply with the law, Movant was forced to file complaints with the U.S. Department of Housing and Urban Development and the State of Florida Office of Financial Regulation.

14. In response to inquiries sent by the U.S. Department of Housing and Urban Development and the Florida Office of Financial Regulation, Defendant AHM and Defendant Strauss who was

Chairman, President and CEO of Debtor and responsible for "strategic directions as well as overseeing day-to-day operations", continued in their pernicious pattern of deceit and fraud by continuing to fabricate intentional falsehoods and lies in regards to their commercial interaction with the Movant.

15.    On November 21, 2005, the Director of RESPA and Interstate Land Sales at the U.S. Department of Housing and Urban Development directed Defendant AHM and Defendant Strauss to reach a resolution with the Movant and his attorney within 15 days. Defendant AHM and Defendant Strauss wrongfully refused to do so. See exhibit A.

16.    On October 17, 2006 the Office of Financial Regulation in the State of Florida took administrative action against Defendant AHM. In a Stipulation and Consent Agreement the State of Florida fined the Defendant five thousand dollars ($5,000.00) for their misconduct against the Movant. This document is signed by Mr. Alan B. Horn, the General Counsel of Defendant AHM and who reported directly to Defendant Strauss.

17.    Among the factual findings by the Florida Office of Financial Regulation were the following: **a) The loan originator acting for the Respondent (i.e. Defendant AHM) promised Mr. Alvarez (Movant) a 5.25% interest rate, and at closing, the rate had increased to 5.75%. Mr. Alvarez alleges that he had to accept a mortgage loan at 5.75% interest or face legal action. b) over the thirty-year life of the mortgage, Mr. Alvarez (Movant) will incur financial loss (emphasis added).** See exhibit B.

18.    As this Honorable Court is aware, this Stipulation and Consent Agreement entered into by the State of Florida Office of Financial Regulation and Defendant AHM effectively estops the Defendant's AHM, Wells Fargo or Defendant Strauss of creating or generating any further

implausible or factually challenged scenarios regarding the misconduct they committed against Movant or that the money they are receiving or have received are lawfully obtained.

19. On December 4, 2006 attorney Zelman requested that Defendant Strauss and Defendant AHM set up a meeting with Defendant Wells Fargo so as to settle this matter. As has been the custom and practice, Defendants Strauss, AHM and Wells Fargo refused to settle this matter.

20. After receiving no response to repeated requests for a resolution to this matter, attorney Zelman contacted Defendant Strauss and Defendant AHM to request a settlement. Defendant AHM informed attorney Zelman that they had D&O policies and to indicate Movant's losses in the form of a letter so that they could submit a claim to their D&O policies. Movant's attorney mailed said letter on April 6, 2007. See exhibit C.

21. On April 13, 2007 Defendant AHM, after initially indicating their willingness to settle and upon information and belief in knowing that they would file for bankruptcy protection and the need to preserve D&O policies for the benefit of Defendant's Strauss and AHM for the misconduct later alleged by the SEC and other entities, wrongfully refused settle with the Movant. See exhibit D.

## MISCONDUCT COMMITTED POST PETITION FILING

22. On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code"). Each Debtor is continuing to operate its business and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the bankruptcy Code.

23. Despite the fact that Defendant AHM and Defendant Strauss were personally aware of Movant's claim, they wrongfully and without just cause chose not to notice him or list him as a

potential creditor.

24. On September 15, 2008, Movant appeared before this Honorable Court and was directed by the Court to work together with Debtor's counsel, i.e. Mr. Nathan Grow, Esq., so that a proposed Form of Order in connection with Movant's motion be prepared.

25. While Movant was initially worried in working with Debtor's counsel and found the direction of the Court to do so disconcerting, he later appreciated the wisdom of the Court in that it allowed both parties to communicate with each other and find common ground on resolving the issues.

26. From September 15, 2008 until October 6, 2008 Movant communicated and negotiated with Mr. Grow by way of telephone and e-mail. During these negotiations, Movant pointed out to Mr. Grow the findings by the State of Florida Office of Financial Regulation who had fined the debtors in regards to Movant's case and the November 21, 2005 letter to Mr. Strauss from the Director of RESPA and Interstate Land Sales at the U.S. Department of Housing and Urban Development that directed Mr. Strauss and AHM to reach a resolution with the Movant and his then attorney which they then wrongfully refused to do.

27. Movant, during these negotiations, refused to agree to any "reservation of rights" without knowing what specific rights were to be reserved. Movant wanted complete finality with regards to his claim and informed this to Mr. Grow.

**DEBTOR AHM ENGAGES IN BAD FAITH BY PREVARICATING TO AN OFFICER OF THE COURT AND MOVANT REGARDING THEIR D&O POLICIES**

28. During these negotiations, Movant requested that Mr. Grow reach out to Debtors to inquire if they would use their insurance which would cover the misconduct committed by Debtors and

their officers/agents. Despite the fact that Debtors had initially indicated to Movant's then attorney that they had insurance in the form of Directors and Officers liability insurance policies to cover Movant's situation, and in fact had asked her to submit a written claim so that they may submit it to their D&O policy, (see exhibit C), they then wrongfully and without just cause prevaricate to Mr. Grow, an officer of the court, and by extension to the Movant and the Court, on or about October 3, 2008 that they did not have such insurance.

29. As this Court is aware, after prevaricating to Mr. Grow that they did not have insurance to cover their unlawful actions against the Movant, Debtors requested that this Court allow Debtors to use their D&O policies to fund Settlements and Stipulation and Agreements against AHM and Michael Strauss (See Docket No. 7934, dated 8/11/09).

30. Irrespective of the fact that Movant knew that Debtors had prevaricated to Mr. Grow, Movant was very clear with Mr. Grow that he did not want Debtors to maintain rights in perpetuity which they would later attempt to use in any adversary proceeding against him and wanted to settle this matter. Indeed on three occasions Movant indicated to Mr. Grow that he would reach out to Your Honor because he was not satisfied with the adverse language being drafted in the proposed Form of Order and because he wanted a Form of Order that would bring finality to his claim.

31. After extensive back and forth negotiations, it was agreed that Debtors and Movant would resolve his claim in good faith. On October 10, 2008 the Order was signed by Your Honor which ordered, inter alia, that Debtors and Movant will work in good faith to resolve his claim. See Docket No. 6189 and 6219.

**DESPITE THE FACT THAT DEBTORS AGREED TO RESOLVE THE CLAIM IN**

## GOOD FAITH, AND IN FACT WERE ORDERED TO DO SO BY THIS COURT, DEBTORS ENGAGE IN BAD FAITH BY REFUSING TO NEGOTIATE OR RESOLVE THE CLAIM WITH MOVANT.

32. Despite the fact that Movant wanted to resolve his claim absent an adversarial proceeding, Debtors continued their pattern of disdain toward Movant and his claim by refusing to abide by their agreement and refusing to comply with the Order issued by this Court to resolve the claim.

33. On December 20, 2010 Movant submitted a Subordination Statement to this Court which outlined all of the issues mentioned in this Motion.

34. Prior to March 9, 2011 the date set by this Court for a hearing on the Subordination Statements, counsel to the Trustee reached out to Movant not to settle this matter but to convince him to drop his Subordination Statement. In response, Debtors, contrary to their written agreement and the Order of this Court, indicated that any subordination rights should be "...properly brought as an adversary proceeding under Part VII of the Federal Rules of Bankruptcy Procedure." See Docket No. 9748 dated 2/1/2011.

35. On March 9, 2011 Movant appeared before Your Honor and objected to his funds being transferred by the trustee that were the subject of a Court Order. Movant pointed out that his case was different from the other claims in that he had factual findings against the Debtors by the State of Florida Office of Financial Regulation, and that he had an agreement to settle this matter in good faith outside an adversary proceeding.

36. In response, Debtors futilely attempted to state that they complied with the Court's Order by ridiculously calling Movant at home prior to the hearing in order to persuade him to drop his subordination statement. It was at this juncture that Your Honor directed Debtors to go out into the hallway and reach an agreement with the Movant.

## DEFENDANTS "ONE AND ONLY" COURT DIRECTED "GOOD FAITH NEGOTIATION" WAS A THREE MINUTE TAKE IT OR LEAVE IT OFFER OF ABOUT ONE PERCENT OF PLAINTIFFS CLAIM

37. Debtors made what was a take it or leave it offer in that Movant accept about one percent of his claim. When Movant suggested other relief, Debtors disingenuously indicated that they could not offer anything more and that any further relief would have to come from Your Honor. Movant is aware that Debtors have in other cases after good faith negotiations, settled claims for more than one percent of their claims. Debtors unwillingness to negotiate in good faith and inflexibility left Movant with no alternative but to file a complaint/adversary proceeding as Debtors all but urged him to do, and a Motion for sanctions. It was apparent from Plaintiffs brief "good faith negotiation" that Debtors, after almost two and a half years, had absolutely no clue as to Plaintiffs claim therefore rendering any "settlement offer" devoid of any analysis of the facts or conclusions of law. It is indeed deplorable that Debtors would treat a Pro-se Movant and his wife in such a demeaning, uncaring and despicable manner as they did on March 9, 2011.

38. The bankruptcy system relies on the candor and accuracy of information presented by all parties, creditors, debtors and lawyers alike.

39. The court system is dependent on all parties engaged in litigation abiding by the orders of the court. The failure to comply with orders not only impairs the efficient functioning of the court and adjudication of claims, but breeds disrespect for the dictates of the bankruptcy Code and a culture in which cases can linger for years without resolution. If the integrity of court orders and the integrity of our judicial system are to be maintained, a litigant cannot ignore court orders with impunity.

40. AHM in the course of their business, profession and employment, supplied false

information to the Movant which Movant justifiably relied upon. AHM failed to exercise reasonable care and competence in obtaining, verifying and communicating said information regarding the existence of D&O policies to the Movant.

41.   AHM has acted in bad faith in ignoring court orders and presenting Movant with false and misleading information regarding the existence of D&O policies. Their conduct needlessly protracted the litigation in this case and caused Movant further harm, expenses and needless litigation contrary to their October 2008 agreement and this Court's October 10, 2008 Order.

**MOVANT IS ENTITLED TO AN ADMINISTRATIVE EXPENSE PURSUANT TO 11 U.S.C. SECTION 503 (b)(1)(A).**

42.   Movant is entitled to the allowance of an administrative claim pursuant to section 503 (b) (1) (A) of the Bankruptcy Code. Section 503 (b) (1) (A) provides that after notice and a hearing, there shall be allowed administrative expenses, including (1)(A) "the actual, necessary costs and expenses of preserving the estate..." To establish an administrative claim under this section, there must be (1) a post-petition transaction between the claimant and the estate and (2) a benefit to the estate. Calpine Corp. V. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999).

**TRANSACTING BUSINESS WITH THE DEBTOR-IN-POSSESSION**

43.   Under the Web "Bing Dictionary", transactions are defined, inter alia, as "act of negotiating" the act of negotiating something or carrying out a business deal and "interaction" which is defined as "a communication or activity between two or more people that influences and affects all of them." See exhibit E.

44.   Here, there can be no disagreement that from September 15, 2008 up and until October 6,

2008, Movant and the Debtors were transacting and negotiating with each other on finding common ground on resolving the issues between them. As indicated on numerous occasions, Movant during these negotiations was ready to cut off negotiations and to re-appear before Your Honor because he was not satisfied with the adverse language being drafted in the proposed Form of Order and because he wanted a Form of Order that would bring finality to his claim. After extensive back and forth negotiations, it was agreed that Debtor AHM and Movant would resolve his claim in good faith. On October 10, 2008 the Order was signed by Your Honor. See Docket No.: 6189 and 6219.

## BENEFIT TO THE ESTATE

45. The deal, agreement, negotiation we [Movant and Debtor] reached would allow Debtors to focus their energies, resources and time on resolving pending issues before them. Thus there can also be no disagreement that the Debtors-in-possession substantially benefitted in the operation of their business by placing the Movant's claim to the side as opposed to him asking for leave to file suit in the Eastern District of New York or having to answer for their misconduct in not noticing Movant when they knew full well he was owed monies which unlawfully flowed into the estate.

46. Also, by prevaricating to the Movant that they did not have D&O policies to cover their misconduct against the Movant, the Movant provided an actual benefit to the estate so that they were able to use the D&O policies to settle their and the other "settling defendants" intentional misconduct. By prevaricating to the Movant, they wrongfully enriched themselves by the amount of his claim.

## TORT CLAIM

11

47. Movant argues, alternatively, that he is entitled to an administrative claim because his claim was caused by a post-petition tort of the debtor. Courts have considered a tort committed post-petition by a debtor-in-possession in the operation of its business to be the only instance "where there is no discernable benefit to the debtor estate," however, fundamental fairness requires that a claimant receive an administrative priority claim. In re Women First Healthcare, Inc., 322 B.R. 115, 123 (Bankr. D. Del 2005); see also Reading Co. V. Brown, 391 U.S. 471, 477 (1986) (concluding that party damaged by fire caused by trustee's negligence was entitled to administrative priority claim because of "one important, and here decisive, statutory objective: fairness to all persons having claims.").

48. In the present case, Movant asserts that the Debtor committed negligent misrepresentation, fraud and deceit, breach of contract and breach of implied covenant of good faith and fair dealing as the torts necessary for his Reading claim. The Third Circuit has recognized, in dicta, that Reading continues to apply under the Bankruptcy Code. See Pennsylvania Dept. Of Envtl. Res. V. Tri-State Clinical Lab., 178 F.3d 685, 690-02 (3d. Cir. 1999). See also, In re Met-L-Wood Corp., 115 B.R. 133, 135-36 (N.D. Ill. 1990) (authorizing administrative expense for party defending frivolous lawsuit by trustee "on grounds of fundamental fairness").

49. Courts have applied Reading even where there is "no discernable benefit to the debtor estate" if "fundamental fairness" requires that the claimant's right take precedence over others. See In re Hemingway Transp., Inc., 993 F.2d 915, 929 n.17 (1st Cir. 1993) (holding that CERCLA claim of purchaser of property from debtor was entitled to administrative claim priority); In re Charlesbank Laundry, Inc., 755 F.2d 200, 202 (1st Cir. 1985) (finding that fees awarded against debtor for violating zoning regulations was entitled to administrative priority

under section 503(b)).

50. Fundamental fairness requires that Movant's claim take precedence over others. The debtors have wrongfully enriched themselves with funds they are aware were obtained both fraudulently and negligently [see exhibit B]. Fundamental fairness dictates that these funds be returned to Movant and his family by way of this administrative expense in order to prevent unjust enrichment, conversion and violation of the Uniform Fraudulent Transfer Act (UFTA). Here just as in In re Charlesbank Laundry, Inc., fees [here interest] wrongfully awarded to the debtor for violating the law [here by way of negligence], (see exhibit B), should be entitled to administrative priority under section 503 (b).

## TORT OF NEGLIGENT MISREPRESENTATION

51. Movant asserts that he is entitled to an administrative expense under Reading because the Debtor negligently misrepresented to him (and thus to the Court) that it did not have D&O policies to cover the misconduct it committed against Movant. Under Delaware Law, the tort of negligent misrepresentation is established when: (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information. Restatement (Second) of Torts section 552 (1977). See also, Brug v. Enstar Group, Inc., 755 F.Supp 1247, 1258-59 (D. Del. 1991); Carello v. PricewaterhouseCoopers LLP, 2002 WL 1454111 (Del. Super. July 3, 2002; aff'd June 19, 2006).

52. Here, the Debtor clearly failed to exercise reasonable care and/or competence in obtaining, verifying or communicating the information provided to the Movant. First, Movant clearly informed debtor's attorney during their negotiations that debtor had previously indicated to

Movant that they had D&O policies and in fact had requested that Movant submit a claim in the form of a letter so that debtor could file such a claim with their D&O policies, see exhibit C. There has NEVER been a rejection form from ANY insurance carrier denying Movant's claim. It is clear that Debtor, acting in conformity with their custom and practice of prevaricating and fabricating responses to the Movant, simply negligently misrepresented and supplied false information regarding the existence of the D&O policies, for the guidance of the Movant, with a promise to settle his case, so as to prevent him from asserting his rights under the law.

53. The supplying of such negligent misrepresented information regarding the existence of the D&O policies without exercising reasonable care or competence in verifying the information is of great harm since false representations such as this, there is less opportunity for the parties and the Court to ensure that a miscarriage of justice does not occur based on those false representations. The negligent misrepresentation committed by the debtors has wrongfully given them an unfair and dishonest advantage in keeping monies that they were not entitled to and to use said policies to fund settlements of other lawsuits against Debtors and its former Chairman Michael Strauss.

## FRAUD AND DECEIT

54. By prevaricating to the Movant that they did not have D&O policies to cover the misconduct committed by the Debtors and Michael Strauss, despite the fact that they had previously indicated that they did and requested Movant to submit a claim so that it could be forwarded to said D&O policies, [see exhibit C], without actually bothering to submit, investigate or review the claim, debtor perpetrated said false and fraudulent response in order to wrongfully gain an unfair and dishonest advantage so as to keep monies that they knew they were

not entitled to because of the findings by the State of Florida Office of Financial Regulation [see exhibit B] and to use said policies to fund other lawsuit settlements against debtors and Michael Strauss. As a result of debtors deliberate fraudulent and deceitful acts, Movant has suffered and will continue to suffer actual harm and monetary damages.

## BREACH OF CONTRACT

55. A breach of contract is a legal cause of action in which a binding agreement or bargained for exchange is not honored by one or more of the parties to the contract by non-performance. Debtor clearly by failing to resolve Movant's claim in good faith as agreed on October 6, 2008 and later memorialized in an Order by this Honorable Court dated October 10, 2008, displayed conduct that fell short of what a reasonable person would do to protect Movant from the foreseeable risk of harm.

56. Despite debtor's take it or leave it offer of about one percent given to him after almost two and a half years coupled with their negligent misrepresentation regarding their D&O policies, the Court's Order of October 10, 2008 still remains in effect. As has been the custom and norm of the debtor AHM, no further communication or offer to settle or request for information has been received or directed at Movant. The proper way to have complied with the law and the Order of this Court was for the debtor to inform Movant that they will be in touch to resolve the issues and if they could not, request judicial intervention. Here, after Movant informed debtor that he was not inclined to accept their low offer because of the misconduct displayed by the debtors post petition, debtors simply ignored him and any suggestions he had to negotiate in good faith. The last thing Movant did on March 9, 2011, after debtors one and only offer, was to respectfully request that Mr. Beach at least agree to separate any funds that may belong to the Movant to

which, Mr. Beach brushed off Movant and simply said no without offering any suggestions to resolve the claim or agree to stay in touch toward resolving the claim, AS HE IS REQUIRED TO DO UNDER THE COURT'S ORDER dated October 10, 2008. EMPHASIS ADDED. As a result of debtors breach of contract, Movant has suffered and will continue to suffer actual harm in the loss of his rights and monetary damages.

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

57. The implied covenant of good faith and fair dealing is a general assumption of the law of contracts that people will act in good faith and deal fairly without breaking their word, using shifty means to avoid obligations, or denying what the other party obviously understood. Here, debtors by failing to resolve Movant's claim in good faith as agreed to on October 6, 2008 and later memorialized in an Order by this Honorable Court, Debtor AHM displayed conduct that fell short of what a reasonable person would do to protect Movant from the foreseeable risk of harm.

58. The debtors also used shifty means to avoid obligations by prevaricating to the Movant that they did not have D&O policies to cover their misconduct despite the fact that they had requested that he submit a claim as far back as 2007 so that they could submit it to their D&O policy. See exhibit C. The debtors by failing to corroborate, substantiate, investigate, review the information provided breached its obligation under the implied covenant of good faith and fair dealing. As a result of their conduct, debtor AHM displayed conduct that fell short of what a reasonable person would do to protect Movant from the foreseeable risk of harm. As a result of the debtors breach of the implied covenant of good faith and fair dealing, Movant has suffered and will continue to suffer actual harm in the loss of his rights and actual monetary damages.

### APPLICATION OF THE LAW TO THE FACTS

59. Fundamental fairness requires that Movant's claim take precedence over others. The debtors have wrongfully enriched themselves with funds they are aware were obtained both fraudulently and negligently [see exhibit B]. Fundamental fairness dictates that these funds be returned to Movant and his family. Here just as in In re Charlesbank Laundry, Inc., fees [here interest] wrongfully awarded to the debtor for violating the law [here by way of negligence, etc.], (see exhibit B), should be entitled to administrative priority under section 503 (b).

60. Movant respectfully requests that his claim of $47,618.50 be considered an administrative expense based upon the benefit received by debtors in Movant agreeing to negotiate in good faith thereby allowing debtors the benefit to concentrate on other matters pending before this Honorable Court. Debtors breach, negligent misrepresentation and bad faith has caused Movant actual harm in the loss of rights which cannot be cured with monetary compensation and actual damages in court fees, expenses, traveling to court, lodging, gas etc.. Movant has traveled to this court a total of four (4) times because of Debtors continued violation of this Court's Order and the other misconduct noted above. Movant respectfully requests additional administrative expenses for the above with pre and post petition interest, damages and any other relief this Court deems just and proper.

Dated: March 31, 2011
       Apopka, FL 32712

Respectfully submitted,

Gil Quentin Alvarez
Movant, Pro-se

542 Mount Argyll Court
Apopka, FL 32712
407-731-5670