# EXHIBIT C

# Repurchase Claim

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE<br>American Home Mortgage Claims Processing Center<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **PROOF OF CLAIM** |
|---|---|

| In Re:<br>American Home Mortgage Holdings, Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 07-11047 (CSS)<br>Jointly Administered | |
|---|---|---|
| Name of Debtor Against Which Claim is Held<br>**American Home Mortgage Investment Corp** | Case No. of Debtor<br>**07-11048** | |

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)

BARCLAYS CAPITAL INC.
Attn: Mark Manski - Head, Credit Restructuring Advisory Group-Americas
200 Park Ave.
New York, NY 10166

with a copy to:
Kirkpatrick & Lockhart Preston Gates Ellis LLP
Attn: Richard S. Miller
599 Lexington Ave.
New York, NY  10022
Telephone number:  (212) 536-3900
Email Address:  richard.miller@klgates.com

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

Filed: USBC - District of Delaware
American Home Mortgage Holdings, Inc., Et Al.
07-11047 (CSS)          0000008980

Account or other number by which creditor identifies debtor:

Check here if this claim:
☐ replaces    ☐ amends a previously filed claim, dated:_____

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other ___Repurchase agreement - See attachment___ (explain)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Last Four Digits of your SS#:  ___  ___  ___  ___
Unpaid compensation for services performed
from _____ to _____
(date)          (date)

**2. Date debt was incurred:**
February 8, 2006 through August 3, 2007

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ ___At least $45,064,682___ + _____ + _____ = ___At least $45,064,682___
(unsecured claim)      (secured)      (unsecured priority)      (Total)

If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☐ Other _____
Value of Collateral: $ _____
Amount of arrearage and other charges at time case filed included in secured claim, if any:  $ _____

**6. Unsecured Nonpriority Claim:** $ ___At least $45,064,682___
☑ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $ _____
Specify the priority of the claim:
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
☐ Wages, salaries, or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

THIS SPACE IS FOR COURT USE ONLY

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
**DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10** Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

FILED / RECEIVED

JAN 1 1 2008

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date<br>1/09/08 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any).<br>Head, Credit Restructuring Advisory Group – Americas | |
|---|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| AMERICAN HOME MORTGAGE | ) | Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware | ) |  |
| corporation, et al., | ) | Jointly Administered |
|  | ) |  |
| Debtors. | ) | **Doc. Ref. No. 1708** |

## ATTACHMENT TO PROOF OF CLAIM OF
## BARCLAYS CAPITAL INC.

**American Home Mortgage Investment Corp. – Case No. 07-11048**

    1.      Barclays Capital Inc. ("Barclays") is a party to that certain Master Repurchase Agreement, dated as of February 8, 2006, between Barclays and American Home Mortgage Investment Corp. (the "Debtor") and certain related Confirmations, copies of which are attached hereto as Exhibit "A", and other related transactional documents, as the same have been amended, supplemented and modified from time to time (collectively, the "Repurchase Agreement").[1] Pursuant to the Repurchase Agreement, the Debtor and Barclays entered into certain repurchase transactions whereby the Debtor transferred to Barclays various securities and other assets (referred to as "Purchased Securities" in the Repurchase Agreement) against the transfer of funds by Barclays with a simultaneous agreement by Barclays to transfer to the Debtor such Purchased Securities at a date certain or on demand against the transfer of funds by the Debtor.

    2.      Barclays is filing this claim (this "Proof of Claim") pursuant to the "Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates for

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Repurchase Agreement.

Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof," entered by the

Court on October 30, 2007 (the "Bar Date Order"), in order to set forth its aggregate claims

against the Debtor arising under or in connection with the Repurchase Agreement.

       3.     Pursuant to Paragraph 11(iii) of the Repurchase Agreement, an Event of

Default occurred on the Debtor's failure to comply with Paragraph 4 of the Repurchase

Agreement.  Pursuant to its letter dated August 3, 2007 (the "Termination Date"), a copy of

which is attached hereto as Exhibit "B", Barclays gave notice to the Debtor of (i) Barclays'

declaration of an Event of Default, (ii) the occurrence of the Repurchase Date for each

Transaction under the Repurchase Agreement as of August 3, 2007, and (iii) the immediate

termination of the Repurchase Agreement.

       4.     The Claimants' damages consist of the following:

     (i)     an amount of no less than $45,043,020, equal to: (A) the difference

between (I) the total Repurchase Price due under the Repurchase

Agreement as of the Termination Date and (II) the market value of the

Purchased Securities and certain other securities available as credit

support (collectively with the Purchased Securities, the "Securities"),

determined as set forth in Paragraph 5 below; and subject to (B) certain

additional costs due under the Repurchase Agreement and credits for the

benefit of the Debtor, as set forth in Exhibit "C" attached hereto;

     (ii)     an amount of $21,662, equal to legal expenses incurred by Barclays in

connection with or as a result of the Event of Default, as set forth in

Paragraph 11(g) of the Repurchase Agreement; and

     (iii)     Contingent claims for all indemnities of Barclays set forth in the

Repurchase Agreement, including without limitation the Debtor's liability

for all losses, damages, costs and expenses directly arising or resulting from the Event of Default, as set forth in Paragraph 11(g) of the Repurchase Agreement.

5.      Barclays has measured its damages under Paragraph 4(i) above in accordance with Paragraph 11(d)(i)(B) of the Repurchase Agreement, by giving the Debtor credit for all Securities in an amount equal to the value thereof determined as of the Termination Date or otherwise under the Repurchase Agreement by Barclays, based on the liquidity of the Securities and on yield, credit rating information, factor adjustments, performance characteristics and delinquencies, identity and quality of the servicer(s), and other attributes of such Securities.

6.      The documents on which this Proof of Claim is based include (without limitation) the documents annexed hereto. Barclays will provide copies of additional supporting documentation upon the reasonable written request delivered to counsel for Barclays made by any party in interest in these cases (subject to protection of any confidential information and trade secrets in such documentation). In addition, Barclays believes that the Debtor has copies of such documents related to the Repurchase Agreement.

7.      The claims set forth in this Proof of Claim are secured to the extent of any collateral granted to Barclays in respect thereof or Barclays' right of setoff under applicable law, and are otherwise asserted as unsecured claims. This Proof of Claim is without prejudice to the right of Barclays to claim such amounts as administrative expenses of this case pursuant to Section 503(b) of the Bankruptcy Code.

8.      Barclays reserves the right to assert by way of setoff, counterclaim and/or recoupment, all obligations and liabilities of the Debtor set forth in this Proof of Claim against any liability that may be asserted against Barclays.

9.       Barclays further reserves all rights to assert all claims, including, but not limited to, indemnification and contribution against the Debtor, with respect to any actions brought against it in connection with the Repurchase Agreement and related documents and the transactions contemplated therein, the Debtor and its estate or the Debtor's affiliates and their estates, whether the actions currently are pending or are filed at a future date. To the extent that the Debtor or any other party takes any action that would give rise to a right of counterclaim or other rights or claims Barclays may have against the Debtor, Barclays reserves all of its rights.

10.       No judgment has been rendered on the claims set forth in this Proof of Claim.

11.       Barclays further reserves the right to (i) amend, clarify, modify, update or supplement this Proof of Claim at any time and in any respect, including without limitation to assert additional claims and requests for payment or additional grounds for its claims, and/or to specify the amount of any contingent, unmatured and/or unliquidated claims as they become non-contingent, matured and/or liquidated; (ii) file additional proofs of claim at any time and in any respect; (iii) file separate proofs of claim on its own behalf and/or on behalf of other Barclays entities to the extent permitted by the Bar Date Order or applicable law, required by law or otherwise ordered by the Bankruptcy Court; and/or (iv) file a request for payment of administrative or priority expenses in accordance with 11 U.S.C. §§ 503(b) and 507(a). By virtue of the filing of this Proof of Claim, Barclays does not waive, and hereby expressly reserves, its right to pursue claims and requests for payment, including but not limited to, the claims and requests for payment described herein against the Debtor based upon alternative legal theories. To the extent additional discovery provides the basis for further claims against the Debtor in connection with Barclays' entry into and performance under the Repurchase Agreement with the Debtor, Barclays hereby reserves all such rights to assert such claims against

the Debtor, under federal and state law. Barclays also reserves any equitable claims against the Debtor arising from the Repurchase Agreement and the transactions contemplated therein.

12.    Barclays also files this Proof of Claim on behalf of any creditor or class of creditors whose claims are subordinate to the claims of Barclays (collectively, the "Subordinated Claims") and Barclays hereby asserts additional claims against the Debtor in the amount of any such Subordinated Claims. Barclays hereby asserts its right to enforce, and claim all benefits accorded by, any and all subordination provisions which exist in respect of the Subordinated Claims. Barclays also reserves the right to amend or supplement this Proof of Claim as may be necessary or appropriate to preserve the benefits of such Subordinated Claims or to further protect the rights and remedies of Barclays with respect to any such Subordinated Claims.

13.    This Proof of Claim is filed to protect Barclays from potential forfeiture of its claims. The filing of this Proof of Claim shall not constitute: (a) a waiver or release of the rights of Barclays (whether under the Repurchase Agreement or applicable law) against the Debtor or any other person or against any property in which Barclays has an interest or lien, (b) a consent by Barclays to the jurisdiction of this Court with respect to the subject matter of the claims set forth in this Proof of Claim, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in these cases against or otherwise involving Barclays, (c) a waiver of the right of Barclays to trial by jury in any proceedings so triable in these cases or any controversy or proceedings related to these cases, (d) an election of remedies, or (e) a waiver or limitation of any procedural or substantive rights or any procedural or substantive defenses to any claim that may be asserted against Barclays by the Debtor or by any trustee of its estate, by any official committee appointed in this Chapter 11 case, or any other party. In addition, Barclays reserves the right to withdraw this Proof of Claim with respect to its claims for any reason whatsoever.

14.    This Proof of Claim is in addition to and does not supersede any other proofs of claim filed by Barclays against the Debtor.  Additionally, this Proof of Claim shall not prejudice the rights of any Barclays entity or affiliate to file any other requests for payment or proofs of claim, including claims for the same or additional amounts as claimed herein.

15.    All notices concerning this Proof of Claim shall be sent to:

BARCLAYS CAPITAL INC.
Attn: Mark Manski
      Head, Credit Restructuring Advisory Group-Americas
200 Park Ave.
New York, NY  10166

with a copy to:

KIRKPATRICK & LOCKHART PRESTON GATES
ELLIS LLP
Attn:  Richard S. Miller
599 Lexington Ave.
New York, NY 10022

**Barclays Capital Inc.**
**Proof of Claim –Repurchase Agreement**

**Case No. 07-11048**
**American Home Mortgage Investment Corp.**

**EXHIBIT "A"**



# Master Repurchase Agreement

September 1996 Version

Dated as of:    February 8, 2006

Between:    Barclays Capital Inc.

And:    American Home Mortgage Investment Corp.

## 1. Applicability

From time to time the parties hereto may enter into transactions in which one party ("Seller") agrees to transfer to the other ("Buyer") securities or other assets ("Securities") against the transfer of funds by Buyer, with a simultaneous agreement by Buyer to transfer to Seller such Securities at a date certain or on demand, against the transfer of funds by Seller. Each such transaction shall be referred to herein as a "Transaction" and, unless otherwise agreed in writing, shall be governed by this Agreement, including any supplemental terms or conditions contained in Annex I hereto and in any other annexes identified herein or therein as applicable hereunder.

## 2. Definitions

(a) "Act of Insolvency", with respect to any party, (i) the commencement by such party as debtor of any case or proceeding under any bankruptcy, insolvency, reorganization, liquidation, moratorium, dissolution, delinquency or similar law, or such party seeking the appointment or election of a receiver, conservator, trustee, custodian or similar official for such party or any substantial part of its property, or the convening of any meeting of creditors for purposes of commencing any such case or proceeding or seeking such an appointment or election, (ii) the commencement of any such case or proceeding against such party, or another seeking such an appointment or election, or the filing against a party of an application for a protective decree under the provisions of the Securities Investor Protection Act of 1970, which (A) is consented to or not timely contested by such party, (B) results in the entry of an order for relief, such an appointment or election, the issuance of such a protective decree or the entry of an order having a similar effect, or (C) is not dismissed within 15 days, (iii) the making by such party of a general assignment for the benefit of creditors, or (iv) the admission in writing by such party of such party's inability to pay such party's debts as they become due;

(b) "Additional Purchased Securities", Securities provided by Seller to Buyer pursuant to Paragraph 4(a) hereof;

(c) "Buyer's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(d) "Buyer's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Seller's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction;

(e) "Confirmation", the meaning specified in Paragraph 3(b) hereof;

(f) "Income", with respect to any Security at any time, any principal thereof and all interest, dividends or other distributions thereon;

(g) "Margin Deficit", the meaning specified in Paragraph 4(a) hereof;

(h) "Margin Excess", the meaning specified in Paragraph 4(b) hereof;

(i) "Margin Notice Deadline", the time agreed to by the parties in the relevant Confirmation, Annex I hereto or otherwise as the deadline for giving notice requiring same-day satisfaction of margin maintenance obligations as provided in Paragraph 4 hereof (or, in the absence of any such agreement, the deadline for such purposes established in accordance with market practice);

(j) "Market Value", with respect to any Securities as of any date, the price for such Securities on such date obtained from a generally recognized source agreed to by the parties or the most recent closing bid quotation from such a source, plus accrued Income to the extent not included therein (other than any Income credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof ) as of such date (unless contrary to market practice for such Securities);

(k) "Price Differential", with respect to any Transaction as of any date, the aggregate amount obtained by daily application of the Pricing Rate for such Transaction to the Purchase Price for such Transaction on a 360 day per year basis for the actual number of days during the period commencing on (and including) the Purchase Date for such Transaction and ending on (but excluding) the date of determination (reduced by any amount of such Price Differential previously paid by Seller to Buyer with respect to such Transaction);

(l) "Pricing Rate", the per annum percentage rate for determination of the Price Differential;

(m) "Prime Rate", the prime rate of U.S. commercial banks as published in The Wall Street Journal (or, if more than one such rate is published, the average of such rates);

(n) "Purchase Date", the date on which Purchased Securities are to be transferred by Seller to Buyer;

(o) "Purchase Price", (i) on the Purchase Date, the price at which Purchased Securities are transferred by Seller to Buyer, and (ii) thereafter, except where Buyer and Seller agree otherwise, such price increased by the amount of any cash transferred by Buyer to Seller pursuant to Paragraph 4(b) hereof and decreased by the amount of any cash transferred by Seller to Buyer pursuant to Paragraph 4(a) hereof or applied to reduce Seller's obligations under clause (ii) of Paragraph 5 hereof;

(p) "Purchased Securities", the Securities transferred by Seller to Buyer in a Transaction hereunder, and any Securities substituted therefore in accordance with Paragraph 9 hereof. The term "Purchased Securities" with respect to any Transaction at any time also shall include Additional Purchased Securities delivered pursuant to Paragraph 4(a) hereof and shall exclude Securities returned pursuant to Paragraph 4(b) hereof;

(q) "Repurchase Date", the date on which Seller is to repurchase the Purchased Securities from Buyer, including any date determined by application of the provisions of Paragraph 3(c) or 11 hereof;

(r) "Repurchase Price", the price at which Purchased Securities are to be transferred from Buyer to Seller upon termination of a Transaction, which will be determined in each case (including Transactions terminable upon demand) as the sum of the Purchase Price and the Price Differential as of the date of such determination;

(s) "Seller's Margin Amount", with respect to any Transaction as of any date, the amount obtained by application of the Seller's Margin Percentage to the Repurchase Price for such Transaction as of such date;

(t) "Seller's Margin Percentage", with respect to any Transaction as of any date, a percentage (which may be equal to the Buyer's Margin Percentage) agreed to by Buyer and Seller or, in the absence of any such agreement, the percentage obtained by dividing the Market Value of the Purchased Securities on the Purchase Date by the Purchase Price on the Purchase Date for such Transaction.

### 3. Initiation; Confirmation; Termination

(a) An agreement to enter into a Transaction may be made orally or in writing at the initiation of either Buyer or Seller. On the Purchase Date for the Transaction, the Purchased Securities shall be transferred to Buyer or its agent against the transfer of the Purchase Price to an account of Seller.

(b) Upon agreeing to enter into a Transaction hereunder, Buyer or Seller (or both), as shall be agreed, shall promptly deliver to the other party a written confirmation of each Transaction (a "Confirmation"). The Confirmation shall describe the Purchased Securities (including CUSIP number, if any), identify Buyer and Seller and set forth (i) the Purchase Date, (ii) the Purchase Price, (iii) the Repurchase Date, unless the Transaction is to be terminable on demand, (iv) the Pricing Rate or Repurchase Price applicable to the Transaction, and (v) any additional terms or conditions of the Transaction not inconsistent with this Agreement. The Confirmation, together with this Agreement, shall constitute conclusive evidence of the terms agreed between Buyer and

Seller with respect to the Transaction to which the Confirmation relates, unless with

respect to the Confirmation specific objection is made promptly after receipt thereof. In the event of any conflict between the terms of such Confirmation and this Agreement, this Agreement shall prevail.

(c) In the case of Transactions terminable upon demand, such demand shall be made by Buyer or Seller, no later than such time as is customary in accordance with market prac-tice, by telephone or otherwise on or prior to the business day on which such termination will be effective. On the date specified in such demand, or on the date fixed for termina-tion. in the case of Transactions having a fixed term, termination of the Transaction will be effected by transfer to Seller or its agent of the Purchased Securities and any Income in respect thereof received by Buyer (and not previously credited or transferred to, or applied to the obligations of, Seller pursuant to Paragraph 5 hereof ) against the transfer of the Repurchase Price to an account of Buyer.

## 4. Margin Maintenance

(a) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Buyer is less than the aggre-gate Buyer's Margin Amount for all such Transactions (a "Margin Deficit"), then Buyer may by notice to Seller require Seller in such Transactions, at Seller's option, to transfer to Buyer cash or additional Securities reasonably acceptable to Buyer ("Additional Purchased Securities"), so that the cash and aggregate Market Value of the Purchased Securities, including any such Additional Purchased Securities, will thereupon equal or exceed such aggregate Buyer's Margin Amount (decreased by the amount of any Margin Deficit as of such date arising from any Transactions in which such Buyer is acting as Seller).

(b) If at any time the aggregate Market Value of all Purchased Securities subject to all Transactions in which a particular party hereto is acting as Seller exceeds the aggregate Seller's Margin Amount for all such Transactions at such time (a "Margin Excess"), then Seller may by notice to Buyer require Buyer in such Transactions, at Buyer's option, to transfer cash or Purchased Securities to Seller, so that the aggregate Market Value of the Purchased Securities, after deduction of any such cash or any Purchased Securities so transferred, will thereupon not exceed such aggregate Seller's Margin Amount (increased by the amount of any Margin Excess as of such date arising from any Transactions in which such Seller is acting as Buyer).

(c) If any notice is given by Buyer or Seller under subparagraph (a) or (b) of this Paragraph at or before the Margin Notice Deadline on any business day, the party receiving such notice shall transfer cash or Additional Purchased Securities as provided in such subpara-graph no later than the close of business in the relevant market on such day. If any such notice is given after the Margin Notice Deadline, the party receiving such notice shall transfer such cash or Securities no later than the close of business in the relevant market on the next business day following such notice.

(d) Any cash transferred pursuant to this Paragraph shall be attributed to such Transactions

as shall be agreed upon by Buyer and Seller.

(e) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer or Seller (or both) under subparagraphs (a) and (b) of this Paragraph may be exercised only where a Margin Deficit or Margin Excess, as the case may be, exceeds a specified dollar amount or a specified percentage of the Repurchase Prices for such Transactions (which amount or percentage shall be agreed to by Buyer and Seller prior to entering into any such Transactions).

(f) Seller and Buyer may agree, with respect to any or all Transactions hereunder, that the respective rights of Buyer and Seller under subparagraphs (a) and (b) of this Paragraph to require the elimination of a Margin Deficit or a Margin Excess, as the case may be, may be exercised whenever such a Margin Deficit or Margin Excess exists with respect to any single Transaction hereunder (calculated without regard to any other Transaction outstanding under this Agreement).

## 5. Income Payments

Seller shall be entitled to receive an amount equal to all Income paid or distributed on or in respect of the Securities that is not otherwise received by Seller, to the full extent it would be so entitled if the Securities had not been sold to Buyer. Buyer shall, as the parties may agree with respect to any Transaction (or, in the absence of any such agreement, as Buyer shall reasonably determine in its discretion), on the date such Income is paid or distributed either (i) transfer to or credit to the account of Seller such Income with respect to any Purchased Securities subject to such Transaction or (ii) with respect to Income paid in cash, apply the Income payment or payments to reduce the amount, if any, to be transferred to Buyer by Seller upon termination of such Transaction. Buyer shall not be obligated to take any action pursuant to the preceding sentence (A) to the extent that such action would result in the creation of a Margin Deficit, unless prior thereto or simultaneously therewith Seller transfers to Buyer cash or Additional Purchased Securities sufficient to eliminate such Margin Deficit, or (B) if an Event of Default with respect to Seller has occurred and is then continuing at the time such Income is paid or distributed.

## 6. Security Interest

Although the parties intend that all Transactions hereunder be sales and purchases and not loans, in the event any such Transactions are deemed to be loans, Seller shall be deemed to have pledged to Buyer as security for the performance by Seller of its obligations under each such Transaction, and shall be deemed to have granted to Buyer a security interest in, all of the Purchased Securities with respect to all Transactions hereunder and all Income thereon and other proceeds thereof.

## 7. Payment and Transfer

Unless otherwise mutually agreed, all transfers of funds hereunder shall be in immediately available funds. All Securities transferred by one party hereto to the other party (i) shall be in suitable form for transfer or shall be accompanied by duly executed instruments of transfer or assignment in blank and such other documentation as the party receiving possession may reasonably request, (ii) shall be transferred on the book-entry system of a Federal Reserve Bank, or (iii) shall be transferred by any other method mutually acceptable to Seller and Buyer.

## 8. Segregation of Purchased Securities

To the extent required by applicable law, all Purchased Securities in the possession of Seller shall be segregated from other securities in its possession and shall be identified as subject to this Agreement. Segregation may be accomplished by appropriate identification on the books and records of the holder, including a financial or securities intermediary or a clearing corporation. All of Seller's interest in the Purchased Securities shall pass to Buyer on the Purchase Date and, unless otherwise agreed by Buyer and Seller, nothing in this Agreement shall preclude Buyer from engaging in repurchase transactions with the Purchased Securities or otherwise selling, transferring, pledging or hypothecating the Purchased Securities, but no such transaction shall relieve Buyer of its obligations to transfer Purchased Securities to Seller pursuant to Paragraph 3, 4 or 11 hereof, or of Buyer's obligation to credit or pay Income to, or apply Income to the obligations of, Seller pursuant to Paragraph 5 hereof.

---

**Required Disclosure for Transactions in Which the Seller Retains Custody of the Purchased Securities**

Seller is not permitted to substitute other securities for those subject to this Agreement and therefore must keep Buyer's securities segregated at all times, unless in this Agreement Buyer grants Seller the right to substitute other securities. If Buyer grants the right to substitute, this means that Buyer's securities will likely be commingled with Seller's own securities during the trading day. Buyer is advised that, during any trading day that Buyer's securities are commingled with Seller's securities, they [will]* [may]** be subject to liens granted by Seller to [its clearing bank]* [third parties]** and may be used by Seller for deliveries on other securities transactions. Whenever the securities are commingled, Seller's ability to resegregate substitute securities for Buyer will be subject to Seller's ability to satisfy [the clearing]* [any]** lien or to obtain substitute securities.

\* Language to be used under 17 C.F.R. ß403.4(e) if Seller is a government securities broker or dealer other than a financial institution.

\*\* Language to be used under 17 C.F.R. ß403.5(d) if Seller is a financial institution.

---

## 9. Substitution

(a) Seller may, subject to agreement with and acceptance by Buyer, substitute other Securities for any Purchased Securities. Such substitution shall be made by transfer to Buyer of such other Securities and transfer to Seller of such Purchased Securities. After substitution, the substituted Securities shall be deemed to be Purchased Securities.

(b) In Transactions in which Seller retains custody of Purchased Securities, the parties expressly agree that Buyer shall be deemed, for purposes of subparagraph (a) of this Paragraph, to have agreed to and accepted in this Agreement substitution by Seller of other Securities for Purchased Securities; provided, however, that such other Securities shall have a Market Value at least equal to the Market Value of the Purchased Securities

for which they are substituted.

## 10. Representations

Each of Buyer and Seller represents and warrants to the other that (i) it is duly authorized to execute and deliver this Agreement, to enter into Transactions contemplated hereunder and to perform its obligations hereunder and has taken all necessary action to authorize such execution, delivery and performance, (ii) it will engage in such Transactions as principal (or, if agreed in writing, in the form of an annex hereto or otherwise, in advance of any Transaction by the other party hereto, as agent for a disclosed principal), (iii) the person signing this Agreement on its behalf is duly authorized to do so on its behalf (or on behalf of any such disclosed principal), (iv) it has obtained all authorizations of any governmental body required in connection with this Agreement and the Transactions hereunder and such authorizations are in full force and effect and (v) the execution, delivery and performance of this Agreement and the Transactions hereunder will not violate any law, ordinance, charter, by- law or rule applicable to it or any agreement by which it is bound or by which any of its assets are affected. On the Purchase Date for any Transaction Buyer and Seller shall each be deemed to repeat all the foregoing representations made by it.

## 11. Events of Default

In the event that (i) Seller fails to transfer or Buyer fails to purchase Purchased Securities upon the applicable Purchase Date, (ii) Seller fails to repurchase or Buyer fails to transfer Purchased Securities upon the applicable Repurchase Date, (iii) Seller or Buyer fails to com-ply with Paragraph 4 hereof, (iv) Buyer fails, after one business day's notice, to comply with Paragraph 5 hereof, (v) an Act of Insolvency occurs with respect to Seller or Buyer, (vi) any representation made by Seller or Buyer shall have been incorrect or untrue in any material respect when made or repeated or deemed to have been made or repeated, or (vii) Seller or Buyer shall admit to the other its inability to, or its intention not to, perform any of its obligations hereunder (each an "Event of Default"):

(a) The nondefaulting party may, at its option (which option shall be deemed to have been exercised immediately upon the occurrence of an Act of Insolvency), declare an Event of Default to have occurred hereunder and, upon the exercise or deemed exercise of such option, the Repurchase Date for each Transaction hereunder shall, if it has not already occurred, be deemed immediately to occur (except that, in the event that the Purchase Date for any Transaction has not yet occurred as of the date of such exercise or deemed exercise, such Transaction shall be deemed immediately canceled). The nondefaulting party shall (except upon the occurrence of an Act of Insolvency) give notice to the defaulting party of the exercise of such option as promptly as practicable.

(b) In all Transactions in which the defaulting party is acting as Seller, if the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, (i) the defaulting party's obligations in such Transactions to repurchase all Purchased Securities, at the Repurchase Price therefore on the Repurchase Date deter-mined in accordance with subparagraph (a) of this Paragraph, shall thereupon become immediately due and payable, (ii) all Income paid after such exercise or deemed exercise shall be retained by the nondefaulting party and applied to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder, and (iii) the defaulting party shall immediately deliver to the nondefaulting party any

Purchased Securities subject to such Transactions then in the defaulting party's possession or control.

(c) In all Transactions in which the defaulting party is acting as Buyer, upon tender by the nondefaulting party of payment of the aggregate Repurchase Prices for all such Transactions, all right, title and interest in and entitlement to all Purchased Securities subject to such Transactions shall be deemed transferred to the nondefaulting party, and the defaulting party shall deliver all such Purchased Securities to the nondefaulting party.

(d) If the nondefaulting party exercises or is deemed to have exercised the option referred to in subparagraph (a) of this Paragraph, the nondefaulting party, without prior notice to the defaulting party, may:

(i) as to Transactions in which the defaulting party is acting as Seller, (A) immediately sell, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfactory, any or all Purchased Securities subject to such Transactions and apply the proceeds thereof to the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder or (B) in its sole discretion elect, in lieu of selling all or a portion of such Purchased Securities, to give the defaulting party credit for such Purchased Securities in an amount equal to the price therefore on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source, against the aggregate unpaid Repurchase Prices and any other amounts owing by the defaulting party hereunder; and

(ii) as to Transactions in which the defaulting party is acting as Buyer, (A) immediately purchase, in a recognized market (or otherwise in a commercially reasonable manner) at such price or prices as the nondefaulting party may reasonably deem satisfac- tory, securities ("Replacement Securities") of the same class and amount as any Purchased Securities that are not delivered by the defaulting party to the nondefault- ing party as required hereunder or (B) in its sole discretion elect, in lieu of purchas- ing Replacement Securities, to be deemed to have purchased Replacement Securities at the price therefor on such date, obtained from a generally recognized source or the most recent closing offer quotation from such a source.

Unless otherwise provided in Annex I, the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments traded in a recognized market, (2) in the absence of a generally recognized source for prices or bid or offer quo- tations for any Security, the nondefaulting party may establish the source therefore in its sole discretion and (3) all prices, bids and offers shall be determined together with accrued Income (except to the extent contrary to market practice with respect to the rel- evant Securities)..

(e) As to Transactions in which the defaulting party is acting as Buyer, the defaulting party shall be liable to the nondefaulting party for any excess of the price paid (or deemed paid) by the nondefaulting party for Replacement Securities over the Repurchase Price for the Purchased Securities replaced thereby and for any amounts payable by the defaulting party under Paragraph 5 hereof or otherwise hereunder.

(f) For purposes of this Paragraph 11, the Repurchase Price for each Transaction hereunder in respect of which the defaulting party is acting as Buyer shall not increase above the

amount of such Repurchase Price for such Transaction determined as of the date of the exercise or deemed exercise by the nondefaulting party of the option referred to in sub-paragraph (a) of this Paragraph.

(g) The defaulting party shall be liable to the nondefaulting party for (i) the amount of all reasonable legal or other expenses incurred by the nondefaulting party in connection with or as a result of an Event of Default, (ii) damages in an amount equal to the cost (including all fees, expenses and commissions) of entering into replacement transactions and entering into or terminating hedge transactions in connection with or as a result of an Event of Default, and (iii) any other loss, damage, cost or expense directly arising or resulting from the occurrence of an Event of Default in respect of a Transaction.

(h) To the extent permitted by applicable law, the defaulting party shall be liable to the non-defaulting party for interest on any amounts owing by the defaulting party hereunder, from the date the defaulting party becomes liable for such amounts hereunder until such amounts are (i) paid in full by the defaulting party or (ii) satisfied in full by the exercise of the nondefaulting party's rights hereunder. Interest on any sum payable by the default-ing party to the nondefaulting party under this Paragraph 11(h) shall be at a rate equal to the greater of the Pricing Rate for the relevant Transaction or the Prime Rate.

(i) The nondefaulting party shall have, in addition to its rights hereunder, any rights other-wise available to it under any other agreement or applicable law.

## 12. Single Agreement

Buyer and Seller acknowledge that, and have entered hereinto and will enter into each Transaction hereunder in consideration of and in reliance upon the fact that, all Transactions hereunder constitute a single business and contractual relationship and have been made in consideration of each other. Accordingly, each of Buyer and Seller agrees (i) to perform all of its obligations in respect of each Transaction hereunder, and that a default in the perfor-mance of any such obligations shall constitute a default by it in respect of all Transactions hereunder, (ii) that each of them shall be entitled to set off claims and apply property held by them in respect of any Transaction against obligations owing to them in respect of any other Transactions hereunder and (iii) that payments, deliveries and other transfers made by either of them in respect of any Transaction shall be deemed to have been made in consideration of payments, deliveries and other transfers in respect of any other Transactions hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.

## 13. Notices and Other Communications

Any and all notices, statements, demands or other communications hereunder may be given by a party to the other by mail, facsimile, telegraph, messenger or otherwise to the address specified in Annex II hereto, or so sent to such party at any other place specified in a notice of change of address hereafter received by the other. All notices, demands and requests hereun-der may be made orally, to be confirmed promptly in writing, or by other communication as specified in the preceding sentence.

### 14. Entire Agreement; Severability

This Agreement shall supersede any existing agreements between the parties containing gen-eral terms and conditions for repurchase transactions. Each provision and agreement herein shall be treated as separate and independent from any other provision or agreement herein and shall be enforceable notwithstanding the unenforceability of any such other provision or agreement.

### 15. Non-assignability; Termination

(a) The rights and obligations of the parties under this Agreement and under any Transaction shall not be assigned by either party without the prior written consent of the other party, and any such assignment without the prior written consent of the other party shall be null and void. Subject to the foregoing, this Agreement and any Transactions shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns. This Agreement may be terminated by either party upon giving written notice to the other, except that this Agreement shall, notwithstanding such notice, remain applicable to any Transactions then outstanding.

(b) Subparagraph (a) of this Paragraph 15 shall not preclude a party from assigning, charging or otherwise dealing with all or any part of its interest in any sum payable to it under Paragraph 11 hereof.

### 16. Governing Law

This Agreement shall be governed by the laws of the State of New York without giving effect to the conflict of law principles thereof.

### 17. No Waivers, Etc.

No express or implied waiver of any Event of Default by either party shall constitute a waiver of any other Event of Default and no exercise of any remedy hereunder by any party shall constitute a waiver of its right to exercise any other remedy hereunder. No modification or waiver of any provision of this Agreement and no consent by any party to a departure here-from shall be effective unless and until such shall be in writing and duly executed by both of the parties hereto. Without limitation on any of the foregoing, the failure to give a notice pur-suant to Paragraph 4(a) or 4(b) hereof will not constitute a waiver of any right to do so at a later date.

### 18. Use of Employee Plan Assets

(a) If assets of an employee benefit plan subject to any provision of the Employee Retirement Income Security Act of 1974 ("ERISA") are intended to be used by either party hereto (the "Plan Party") in a Transaction, the Plan Party shall so notify the other party prior to the Transaction. The Plan Party shall represent in writing to the other party that the

Transaction does not constitute a prohibited transaction under ERISA or is otherwise exempt therefrom, and the other party may proceed in reliance thereon but shall not be required so to proceed.

(b) Subject to the last sentence of subparagraph (a) of this Paragraph, any such Transaction shall proceed only if Seller furnishes or has furnished to Buyer its most recent available audited statement of its financial condition and its most recent subsequent unaudited statement of its financial condition.

(c) By entering into a Transaction pursuant to this Paragraph, Seller shall be deemed (i) to represent to Buyer that since the date of Seller's latest such financial statements, there has been no material adverse change in Seller's financial condition which Seller has not disclosed to Buyer, and (ii) to agree to provide Buyer with future audited and unaudited statements of its financial condition as they are issued, so long as it is a Seller in any outstanding Transaction involving a Plan Party.

## 19. Intent

(a) The parties recognize that each Transaction is a "repurchase agreement" as that term is defined in Section 101 of Title 11 of the United States Code, as amended (except insofar as the type of Securities subject to such Transaction or the term of such Transaction would render such definition inapplicable), and a "securities contract" as that term is defined in Section 741 of Title 11 of the United States Code, as amended (except insofar as the type of assets subject to such Transaction would render such definition inapplica-ble).

(b) It is understood that either party's right to liquidate Securities delivered to it in connection with Transactions hereunder or to exercise any other remedies pursuant to Paragraph 11 hereof is a contractual right to liquidate such Transaction as described in Sections 555 and 559 of Title 11 of the United States Code, as amended.

(c) The parties agree and acknowledge that if a party hereto is an "insured depository institution," as such term is defined in the Federal Deposit Insurance Act, as amended ("FDIA"), then each Transaction hereunder is a "qualified financial contract," as that term is defined in FDIA and any rules, orders or policy statements thereunder (except insofar as the type of assets subject to such Transaction would render such definition inapplica-ble).

(d) It is understood that this Agreement constitutes a "netting contract" as defined in and subject to Title IV of the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA") and each payment entitlement and payment obligation under any Transaction hereunder shall constitute a "covered contractual payment entitlement" or "covered contractual payment obligation", respectively, as defined in and subject to FDI-CIA (except insofar as one or both of the parties is not a "financial institution" as that term is defined in FDICIA).

## 20. Disclosure Relating to Certain Federal Protections

The parties acknowledge that they have been advised that:

(a) in the case of Transactions in which one of the parties is a broker or dealer registered with the Securities and Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 ("1934 Act"), the Securities Investor Protection Corporation has

taken the position that the provisions of the Securities Investor Protection Act of 1970 ("SIPA") do not protect the other party with respect to any Transaction hereunder;

(b) in the case of Transactions in which one of the parties is a government securities broker or a government securities dealer registered with the SEC under Section 15C of the 1934 Act, SIPA will not provide protection to the other party with respect to any Transaction hereunder; and

(c) in the case of Transactions in which one of the parties is a financial institution, funds held by the financial institution pursuant to a Transaction hereunder are not a deposit and therefore are not insured by the Federal Deposit Insurance Corporation or the National Credit Union Share Insurance Fund, as applicable.

Barclays Capital Inc.

By: _____

Title: _____Timothy Keenan_____
            Managing Director

Date: _____2/16/05_____

American Home Mortgage Investment Corp.

By: _____

Title: _____Thomas McDonagh_____

Date: ____EVP and CIO____

## Annex I

## Supplemental Terms and Conditions

This Annex I forms a part of the Master Repurchase Agreement dated as of <u>February 8, 2006</u> (the "<u>Agreement</u>") between <u>Barclays Capital Inc.</u> and <u>American Home Mortgage Investment Corp.</u> Capitalized terms used but not defined in this Annex I shall have the meanings ascribed to them in the Agreement.

1. <u>Other Applicable Annexes</u>.  In addition to this Annex I and Annex II, no other Annexes shall form a part of this Agreement and shall be applicable.

2. <u>Inconsistency</u>.  In the event of any inconsistency between the terms of the Agreement and this Annex, this Annex shall govern.

3. <u>Purchase Price Maintenance</u>.  The parties agree that in any Transaction hereunder whose term extends over an Income payment date for the Securities subject to such Transaction, Buyer shall on the date such Income is paid transfer to or credit to the account of Seller an amount equal to such Income payment or payments pursuant to Paragraph 5(i) and shall not apply the Income payment or payments to reduce the amount to be transferred to Buyer or Seller upon termination of the Transaction pursuant to Paragraph 5(ii) of the Agreement.

Notwithstanding the definition of Purchase Price in Paragraph 2 of the Agreement and the provisions of Paragraph 4 of the Agreement, the parties agree (i) that the Purchase Price will not be increased or decreased by the amount of any cash transferred by one party to the other pursuant to Paragraph 4 of the Agreement and (ii) that transfer of such cash shall be treated as if it constituted a transfer of Securities (with a Market Value equal to the U.S. dollar amount of such cash) pursuant to Paragraph 4(a) or (b), as the case may be (including for purposes of the definition of "Additional Purchased Securities")

4. <u>Submission to Jurisdiction</u>.  Each party irrevocably and unconditionally (i) submits to the non-exclusive jurisdiction of any United States Federal or New York State court sitting in Manhattan, and any appellate court from any such court, solely for the purpose of any suit, action or proceeding brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement and (ii) waives, to the fullest extent it may effectively do so, any defense of an inconvenient forum to the maintenance of such action or proceeding in any such court and any right of jurisdiction on account of its place of residence or domicile.

5. <u>Waiver of Immunity</u>.  To the extent that either party has or hereafter may acquire any immunity (sovereign or otherwise) from any legal action, suit or proceeding, from jurisdiction of any court or from setoff or any legal process (whether service or notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) with respect to itself or any of its property, such party hereby irrevocably waives and agrees not to plead or claim such immunity in respect of any action brought to enforce its obligations under the Agreement or relating in any way to the Agreement or any Transaction under the Agreement.

IN WITNESS WHEREOF, the parties have caused this Annex I to be executed by their respective officers, thereunto duly authorized, as of the date first above written.

BARCLAYS CAPITAL INC.

By: _____

Title: __Timothy Keenan__
        __Managing Director__

Date: __2/16/05__

AMERICAN HOME MORTGAGE
INVESTMENT CORP.

By: _____

Title: _Thomas McDonagh_

Date: _EVP and CFO_

<u>**ANNEX II**</u>
Names and Addresses for Communications Between Parties

<u>**Barclays Capital Inc.**</u>
<u>For all legal notices under this Agreement:</u>

Barclays Capital Services LLC
Documentation Services Unit
200 Cedars Knolls Road
Whippany, NJ 07981
Immediate Attention: Bob Richardson
Telephone: (973) 576-3850
Fax: (973) 576-3385

<u>with a copy</u> to:
Barclays Capital Inc.
Legal Department
200 Park Avenue
New York, NY 10166
Immediate Attention: Jonathan Hughes, General Counsel
Telephone: (212) 412-3544
Fax: (212) 412-7519

<u>For operational questions or problems:</u>
Mr. William Arnold
Barclays Capital Services LLC
200 Cedars Knolls Road
Whippany, NJ 07981
Telephone: (973) 576-3202
Fax: (973) 576-6924

<u>**American Home Mortgage Investment Corp.**</u>
<u>For all legal notices under this Agreement:</u>
American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, New York 11747
Attention:      Alan B. Horn, General Counsel
Telephone:      516-396-7703
Facsimile:      800-209-7276

<u>For operational questions or problems:</u>
American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, New York 11747
Attention:      Thomas M. McDonagh, Chief Investment Officer
Telephone:      516-622-8960
Facsimile:      516-949-3942


**BARCLAYS CAPITAL**

## Liability Side Structured Repo Trade Confirm

**Confirmation Terms and Conditions**

The purpose of this document, a '**Confirmation**' for the purpose of the Agreement, is to set forth the terms and conditions of the series of repurchase transactions entered into between us on the Contract Date referred to below.

This Confirmation supplements and forms part of, and is subject to, the Master Repurchase Agreement as entered into between us as of February 8, 2006 as the same may be amended from time to time (the '**Agreement**'). All provisions contained in the Agreement govern this Confirmation except as expressly modified below. Words and phrases defined in the Agreement and used in this Confirmation shall have the same meaning herein as in the Agreement. In the event of any inconsistency between the terms of the Agreement and this Confirmation, this Confirmation shall govern.

**IN THE EVENT OF A DECLARATION OF AN EVENT OF DEFAULT, IN ADDITION TO OTHER AMOUNTS OWNING BY EITHER PARTY UNDER THE AGREEMENT, COUNTERPARTY MAY OWE BARCLAYS CAPITAL INC. ("BCI") AN AMOUNT EQUAL TO THE "TERMINATION VALUE" (AS DEFINED BELOW). THE TERMINATION VALUE WILL REFLECT CHANGES IN THE MARKET VALUE OF THE PARTIES' RESPECTIVE POSITIONS IN THE TRANSACTION AND MAY BE VOLATILE. IF AT THE REQUEST OF COUNTERPARTY, BCI AGREES TO A VOLUNTARY EARLY TERMINATION, THE EARLY TERMINATION PRICE AT WHICH BCI WOULD BE WILLING TO TERMINATE THE TRANSACTION WILL REFLECT THE TERMINATION VALUE AT THAT TIME AS DETERMINED BY BCI AS IF BCI WAS THE NON-DEFAULTING PARTY. COUNTERPARTY COULD EXPERIENCE SIGNIFICANT LOSSES AS A RESULT OF THE TERMINATION VALUE.**

| | |
|---|---|
| Contract Date: | June 19, 2006 |
| Purchased Securities: | Private Label (AAA) Hybrid ARMs |
| CUSIP, ISN or other identifying number(s) of Purchase Securities | CUSIPs : <br> 05946XJ79 (Original Face Value - $127,371,000) <br> 94983TAE0 (Original Face Value - $35,566,615) |
| Buyer: | Barclays Capital Inc. or BCI |
| Seller: | American Home Mortgage Investment Corporation |
| Purchase Date: | The Purchase Date for the Initial Transaction shall be June 20, 2006 and the Purchase Date for each Subsequent Transaction shall be the Repurchase Date for the immediately preceding Transaction. |
| Purchase Price: | USD 145,000,000 |
| Contractual Currency: | USD (United States Dollars) |
| Repurchase Date: | The Repurchase Date for the Initial Transaction shall be July 20, 2006 and the Repurchase Date for each Subsequent Transaction shall be the 20th |

| | |
|---|---|
| | day of the next succeeding month following the Purchase Date for such Subsequent Transaction, *provided* that the Final Repurchase Date will be last Repurchase Date. If any of dates specified above is not a Business Day, the corresponding Repurchase Date shall occur on the first following day that is a Business Day unless that day falls in the next calendar month, in which case the Repurchase Date will be the first preceding date that is a Business Day. As used herein, "**Business Day**" shall mean a date on which commercial banks are open for business in New York, New York. |
| Pricing Rate: | 1m USD Libor + 5bps <br><br> 1m USD Libor Source: Telerate Page 3750 – BBA. <br><br> Initial 1m USD Libor setting: 5.27938% <br><br> Libor for any day shall be the rate published on Telerate Page 3750 – BBA as of 11:00 a.m., London time, provided that, if such publication is no longer available, then the rate as published in such successor publication as the Calculation Agent may determine in good faith. <br><br> Libor shall be determined two London business days prior to the start of the Pricing Rate Payment Period, <u>provided that,</u> on any day where Libor is not available, the preceding Libor setting will apply. <br><br> For the purposes of this Confirmation, the term "**Pricing Rate Payment Period**" for each Transaction shall mean the period of time beginning with (and including) the Purchase Date for such Transaction and ending with (but excluding) the Repurchase Date for such Transaction, <u>provided that,</u> in the event of an early termination, the Pricing Rate Payment Period shall be determined on the date of the early termination. |
| Pricing Rate Day Count Basis: | Actual/360 |
| Buyer's Margin Percentage: | 103% |
| Initial Transaction: | The repurchase transaction evidenced hereby commencing on the initial Purchase Date and having as its Repurchase Date the first Repurchase Date specified below is referred to herein as the '**Initial Transaction**'. |
| Subsequent Transactions: | Upon the repurchase of the Purchased Securities by Seller on each Repurchase Date other than the Final Repurchase Date, Buyer and Seller shall automatically be deemed to have entered into a new repurchase transaction with regard to the same face amount of equivalent Purchased Securities (each, a '**Subsequent Transaction**') on terms (other than the Purchase Date and Repurchase Date) identical to the Initial Transaction. The Initial Transaction and the Subsequent Transactions are referred to, collectively, as the '**Transactions.**' The settlement obligations of Buyer and Seller in respect of a Transaction that terminates on a Repurchase Date and the Subsequent Transaction that commences on such Repurchase Date will be set-off against each other such that the only amounts that will be transferred between the parties will be the payment by Seller to Buyer of the amount by which the Repurchase Price of the |

2

| | |
|---|---|
| | terminating Transaction exceeds the Purchase Price of the Subsequent Transaction. |
| Final Repurchase Date: | December 20, 2007, subject to adjustment in accordance with the Business Day convention set out under "Repurchase Date". |
| Buyer's Bank Account[s] Details: | |
| Sellers Bank Account[s] Details: | |
| Termination Value: | "**Termination Value**" shall mean the amount, determined by the Calculation Agent in good faith, necessary to compensate the non-defaulting party fairly for losses and costs (or gains, in which case expressed as a negative number) in connection with any early termination of the Transaction prior to the Final Repurchase Date as a result of the occurrence of an Event of Default, including, without limitation and without duplication, (a) the amount that the non-defaulting party would be willing to pay, or require to receive from, a third party dealer ("**Dealer**") of recognized standing in the markets in which transactions similar to the Transaction are traded, in consideration of the Dealer entering into an agreement with the non-defaulting party that would have the effect of preserving for the non-defaulting party the economic equivalent of the non-defaulting party's rights and obligations under the Transaction for the period commencing on the date of such early termination and ending on the Final Repurchase Date and (b) any out-of-pocket hedging or unwind costs incurred by the non-defaulting party relating to such early termination, but excluding any amounts payable by either party to the other under the provisions of Paragraph 11 of the Agreement (regardless of whether or not amounts calculated to be owing under such Paragraph are actually paid in accordance therewith). If the non-defaulting party would be willing to pay an amount to the Dealer, the Termination Value will be a Positive Termination Value (which will have the effect of increasing the amount otherwise payable by the defaulting party, or reducing the amount otherwise payable by the non-defaulting party, under the Agreement in connection with the occurrence of the Event of Default). If the non-defaulting party would require the Dealer to pay an amount to it, the Termination Value will be a Negative Termination Value (which will have the effect of reducing the amount otherwise payable by the defaulting party, or increasing the amount otherwise payable by the non-defaulting party, under the Agreement in connection with the occurrence of the Event of Default). |
| Payments Upon Event of Default: | If an Event of Default is declared (or a party's option to declare an Event of Default is deemed exercised) under the Agreement, then in addition to any other amounts owing by either party to the other in connection with such declaration (or deemed declaration) in respect of the Transactions pursuant to the provisions of Paragraph 11 of the Agreement, the defaulting party shall owe the non-defaulting party an amount equal to Positive Termination Value (or the non-defaulting party shall owe the |

3

| | |
|---|---|
| | defaulting party an amount equal to the Negative Termination Value) as of the date of such declaration (or deemed declaration). The Termination Value calculated in connection with an Event of Default will be payable on the day that notice of the amount payable is effective. Such amount will be paid together with (to the extent permitted under applicable law) interest thereon from (and including) the date of occurrence of the Event of Default to (but excluding) the date such amount is paid at the rate specified in Paragraph II(h) of the Agreement. Payments payable by each party to the other in connection with an Event of Default may be applied against each other and netted. |
| Buyer's Margin Amount: | For purposes of calculating margin maintenance requirements under the Agreement, Buyer's Margin Amount with respect to the Transaction hereunder as of any date shall be equal to the sum of the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date. |
| Calculation Agent: | For purposes of determining the Termination Value in connection with the occurrence of an Event of Default, the Calculation Agent will be the non-defaulting party. For purposes of determining the Pricing Rate, the Calculation Agent will be BCI. |
| Call, Redemption or other Payment of Principal of Purchased Securities: | The parties acknowledge and agree that the application by Buyer (pursuant to clause (ii) of the second sentence of Paragraph 5 of the Agreement) of all or any portion of Income constituting a Principal Payment (as defined below) to reduce the Repurchase Price payable by Seller to Buyer upon termination of a Transaction does not (a) entitle Seller to any payment of interest or income on such Principal Payment for the period from date of payment of the Principal Payment to termination of the Transaction or (b) result in a reduction in the Purchase Price for purposes of calculating the Repurchase Price for such Transaction. If Buyer elects to apply a Principal Payment pursuant to clause (ii) of the second sentence of Paragraph 5 of the Agreement (rather than transfer to or credit such Principal Payment to the account of Seller pursuant to clause (i) of such sentence), then, in lieu of such application, Seller may at any time substitute other Securities for such Principal Payment in accordance with the terms and conditions of Paragraph 9 of the Agreement as amended and supplemented by this Confirmation (as if each reference therein to Purchased Securities were a reference to the Principal Payment). |
| | As used herein, "**Principal Payment**" shall mean any Income constituting a payment of principal of Purchased Securities (whether pursuant to call, full or partial redemption, prepayment, scheduled amortization or otherwise). |

| Substitutions; Eligible Securities for Substitution: | At Buyer's sole and absolute discretion, Seller may substitute Purchased Securities pursuant to Paragraph 9(a) of the Agreement (including the substitutions contemplated under the "Call, Redemption or other Payment of Principal of Purchased Securities" section above), _provided that_, the new Securities supplied by Seller (1) are of an equal or better quality than the substituted Purchased Securities; (2) have similar characteristics to the substituted Purchased Securities; and (3) have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.<br><br>Purchased Securities may be substituted no more than twice per month. Notwithstanding the immediately preceding sentence, if Seller has already substituted twice during a given month, Seller may request additional substitutions with such requests to be accepted or denied at the Buyer's sole and absolute discretion.<br><br>Any Securities substituted for the Purchase Securities or Principal Payments shall be deemed to be Purchased Securities hereunder. |
| Representations: | Each party represents to the other party on the Contract Date that:<br><br>(i) **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether this Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deem necessary. It is not relying on the other party for legal, accounting or tax advice and has consulted its own expert legal, tax and accounting advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.<br><br>(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.<br><br>(iii) **Status of Parties.** The other party is not acting as a fiduciary for, or an adviser to, it in respect of this Transaction. |

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transactions by responding within three (3) Business Days by promptly signing in the space provided below and both (i) faxing the signed copy to Incoming Transactions Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Fax +(44) 20-7773-6810/6857, Tel +(44) 20-7773-6901/6904/6965, and (ii) mailing the signed copy to Barclays Capital Inc., c/o Barclays Bank PLC, 5 The North Colonnade, Canary Wharf, London E14 4BB Attention of Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations. Your failure to respond within such period shall not affect the validity or enforceability of the Transactions as against you. This facsimile shall be the only documentation in respect of the Transactions and accordingly no hard copy versions of this Confirmation for these Transactions shall be provided unless the Counterparty requests.

Yours faithfully,

BARCLAYS CAPITAL INC.

_____
Name:
Authorized Signatory
Date:

AMERICAN HOME MORTGAGE INVESTMENT CORPORATION

_____
Name:
Title:
Date:

 **BARCLAYS CAPITAL**

5 The North Colonnade
Canary Wharf
London E14 4BB
United Kingdom

Tel +44 (0)20 7623 2323

| | |
|---|---|
| **To:** | American Home Mortgage Investment Corporation ("the Counterparty") |
| **Attn.:** | IRINA SHKLYAR |
| **Fax No:** | (00)1-631-9493942 |
| **From:** | Barclays Capital Inc. or BCI ("Barclays") |
| **Date:** | March 12, 2007 |
| **Reference:** | HBT366 \ 1 |

### Structured Repo Trade Confirmation

The purpose of this document, a **'Confirmation'** for the purpose of the Agreement, is to set forth the terms and conditions of the series of repurchase transactions entered into between us on the Contract Date referred to below.

This Confirmation supplements and forms part of, and is subject to, the Master Repurchase Agreement as entered into between us as of February 8, 2006 as the same may be amended from time to time (the **'Agreement'**).  All provisions contained in the Agreement govern this Confirmation except as expressly modified below.  Words and phrases defined in the Agreement and used in this Confirmation shall have the same meaning herein as in the Agreement.  In the event of any inconsistency between the terms of the Agreement and this Confirmation, this Confirmation shall govern.

**IN THE EVENT OF A DECLARATION OF AN EVENT OF DEFAULT, IN ADDITION TO OTHER AMOUNTS OWNING BY EITHER PARTY UNDER THE AGREEMENT, COUNTERPARTY MAY OWE BARCLAYS CAPITAL INC. ("BCI") AN AMOUNT EQUAL TO THE "TERMINATION VALUE" (AS DEFINED BELOW).  THE TERMINATION VALUE WILL REFLECT CHANGES IN THE MARKET VALUE OF THE PARTIES' RESPECTIVE POSITIONS IN THE TRANSACTION AND MAY BE VOLATILE.  IF AT THE REQUEST OF COUNTERPARTY, BCI AGREES TO A VOLUNTARY EARLY TERMINATION, THE EARLY TERMINATION PRICE AT WHICH BCI WOULD BE WILLING TO TERMINATE THE TRANSACTION WILL REFLECT THE TERMINATION VALUE AT THAT TIME AS DETERMINED BY BCI AS IF BCI WAS THE NON-DEFAULTING PARTY.  COUNTERPARTY COULD EXPERIENCE SIGNIFICANT LOSSES AS A RESULT OF THE TERMINATION VALUE.**

| Contract Date: | June 19, 2006 |
|---|---|
| Purchased Securities: | Private Label (AAA) Hybrid ARMs |
| CUSIP, ISN or other identifying number(s) of Purchase Securities | CUSIPs : |
| | 05946XJ79 (Original Face Value - $127,371,000) |
| | 94983TAE0 (Original Face Value - $35,566,615) |

Barclays Capital - the investment banking division of Barclays Bank PLC. Registered in England 1026167.
Registered office 54 Lombard Street, London EC3P 3AH. Authorised and regulated by the Financial Services Authority and a member of the London Stock Exchange.
Please note that with effect from 31 May 2005 our Registered Office will move to 1 Churchill Place, London E14 5HP.

| Buyer: | Barclays |
|---|---|
| Seller: | Counterparty |
| Purchase Date: | The Purchase Date for the Initial Transaction shall be June 20, 2006 and the Purchase Date for each Subsequent Transaction shall be the Repurchase Date for the immediately preceding Transaction. |
| Purchase Price: | USD 145,000,000 |
| Contractual Currency: | USD (United States Dollars) |
| Repurchase Date: | The Repurchase Date for the Initial Transaction shall be July 20, 2006 and the Repurchase Date for each Subsequent Transaction shall be the 20th day of the next succeeding month following the Purchase Date for such Subsequent Transaction, *provided* that the Final Repurchase Date will be last Repurchase Date. If any of dates specified above is not a Business Day, the corresponding Repurchase Date shall occur on the first following day that is a Business Day unless that day falls in the next calendar month, in which case the Repurchase Date will be the first preceding date that is a Business Day. As used herein, "**Business Day**" shall mean a date on which commercial banks are open for business in New York, New York. |
| Pricing Rate: | 1m USD Libor + 5bps<br><br>1m USD Libor Source: Telerate Page 3750 – BBA.<br><br>Initial 1m USD Libor setting: 5.27938%<br><br>Libor for any day shall be the rate published on Telerate Page 3750 – BBA as of 11:00 a.m., London time, provided that, if such publication is no longer available, then the rate as published in such successor publication as the Calculation Agent may determine in good faith.<br><br>Libor shall be determined two London business days prior to the start of the Pricing Rate Payment Period, <u>provided that,</u> on any day where Libor is not available, the preceding Libor setting will apply.<br><br>For the purposes of this Confirmation, the term "**Pricing Rate Payment Period**" for each Transaction shall mean the period of time beginning with (and including) the Purchase Date for such Transaction and ending with (but excluding) the Repurchase Date for such Transaction, <u>provided that,</u> in the event of an early termination, the Pricing Rate Payment Period shall be determined on the date of the early termination. |
| Pricing Rate Day Count Basis: | Actual/360 |
| Buyer's Margin Percentage: | 103% |
| Initial Transaction: | The repurchase transaction evidenced hereby commencing on the initial Purchase Date and having as its Repurchase Date the first Repurchase Date specified below is referred to herein as the '**Initial Transaction**'. |
| Subsequent Transactions: | Upon the repurchase of the Purchased Securities by Seller on each Repurchase Date other than the Final Repurchase Date, Buyer and Seller shall automatically be deemed to have entered into a new repurchase transaction with regard to the same face amount of equivalent Purchased Securities (each, a '**Subsequent Transaction**') on terms (other than the Purchase Date and Repurchase Date) identical to the Initial Transaction. The Initial Transaction and the Subsequent Transactions are referred to, collectively, as the '**Transactions.**' The settlement obligations of Buyer and Seller in respect of a Transaction that terminates on a Repurchase Date and the |

| | |
|---|---|
| | Subsequent Transaction that commences on such Repurchase Date will be set-off against each other such that the only amounts that will be transferred between the parties will be the payment by Seller to Buyer of the amount by which the Repurchase Price of the terminating Transaction exceeds the Purchase Price of the Subsequent Transaction. |
| Final Repurchase Date: | December 20, 2007, subject to adjustment in accordance with the Business Day convention set out under "Repurchase Date". |
| Buyer's Bank Account[s] Details: | To be Advised |
| Sellers Bank Account[s] Details: | Please Advise |
| Termination Value: | "**Termination Value**" shall mean the amount, determined by the Calculation Agent in good faith, necessary to compensate the non-defaulting party fairly for losses and costs (or gains, in which case expressed as a negative number) in connection with any early termination of the Transaction prior to the Final Repurchase Date as a result of the occurrence of an Event of Default, including, without limitation and without duplication, (a) the amount that the non-defaulting party would be willing to pay, or require to receive from, a third party dealer ("**Dealer**") of recognized standing in the markets in which transactions similar to the Transaction are traded, in consideration of the Dealer entering into an agreement with the non-defaulting party that would have the effect of preserving for the non-defaulting party the economic equivalent of the non-defaulting party's rights and obligations under the Transaction for the period commencing on the date of such early termination and ending on the Final Repurchase Date and (b) any out-of-pocket hedging or unwind costs incurred by the non-defaulting party relating to such early termination, but excluding any amounts payable by either party to the other under the provisions of Paragraph 11 of the Agreement (regardless of whether or not amounts calculated to be owing under such Paragraph are actually paid in accordance therewith). If the non-defaulting party would be willing to pay an amount to the Dealer, the Termination Value will be a Positive Termination Value (which will have the effect of increasing the amount otherwise payable by the defaulting party, or reducing the amount otherwise payable by the non-defaulting party, under the Agreement in connection with the occurrence of the Event of Default). If the non-defaulting party would require the Dealer to pay an amount to it, the Termination Value will be a Negative Termination Value (which will have the effect of reducing the amount otherwise payable by the defaulting party, or increasing the amount otherwise payable by the non-defaulting party, under the Agreement in connection with the occurrence of the Event of Default). |
| Payments Upon Event of Default: | If an Event of Default is declared (or a party's option to declare an Event of Default is deemed exercised) under the Agreement, then in addition to any other amounts owing by either party to the other in connection with such declaration (or deemed declaration) in respect of the Transactions pursuant to the provisions of Paragraph 11 of the Agreement, the defaulting party shall owe the non-defaulting party an amount equal to Positive Termination Value (or the non-defaulting party shall owe the defaulting party an amount equal to the Negative Termination Value) as of the date of such declaration (or deemed declaration). The Termination Value calculated in connection with an Event of Default will be payable on the day that notice of the amount payable is effective. Such amount will be paid together with (to the extent permitted under applicable law) interest thereon from (and |

|  |  |
|---|---|
|  | including) the date of occurrence of the Event of Default to (but excluding) the date such amount is paid at the rate specified in Paragraph 11(h) of the Agreement. Payments payable by each party to the other in connection with an Event of Default may be applied against each other and netted. |
| Buyer's Margin Amount: | For purposes of calculating margin maintenance requirements under the Agreement, Buyer's Margin Amount with respect to the Transaction hereunder as of any date shall be equal to the sum of the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price for such Transaction as of such date. |
| Calculation Agent: | For purposes of determining the Termination Value in connection with the occurrence of an Event of Default, the Calculation Agent will be the non-defaulting party. For purposes of determining the Pricing Rate, the Calculation Agent will be BCI. |
| Call, Redemption or other Payment of Principal of Purchased Securities: | The parties acknowledge and agree that the application by Buyer (pursuant to clause (ii) of the second sentence of Paragraph 5 of the Agreement) of all or any portion of Income constituting a Principal Payment (as defined below) to reduce the Repurchase Price payable by Seller to Buyer upon termination of a Transaction does not (a) entitle Seller to any payment of interest or income on such Principal Payment for the period from date of payment of the Principal Payment to termination of the Transaction or (b) result in a reduction in the Purchase Price for purposes of calculating the Repurchase Price for such Transaction.<br><br>If Buyer elects to apply a Principal Payment pursuant to clause (ii) of the second sentence of Paragraph 5 of the Agreement (rather than transfer to or credit such Principal Payment to the account of Seller pursuant to clause (i) of such sentence), then, in lieu of such application, Seller may at any time substitute other Securities for such Principal Payment in accordance with the terms and conditions of Paragraph 9 of the Agreement as amended and supplemented by this Confirmation (as if each reference therein to Purchased Securities were a reference to the Principal Payment).<br><br>As used herein, **"Principal Payment"** shall mean any Income constituting a payment of principal of Purchased Securities (whether pursuant to call, full or partial redemption, prepayment, scheduled amortization or otherwise). |
| Substitutions; Eligible Securities for Substitution: | At Buyer's sole and absolute discretion, Seller may substitute Purchased Securities pursuant to Paragraph 9(a) of the Agreement (including the substitutions contemplated under the "Call, Redemption or other Payment of Principal of Purchased Securities" section above), *provided that*, the new Securities supplied by Seller (1) are of an equal or better quality than the substituted Purchased Securities; (2) have similar characteristics to the substituted Purchased Securities; and (3) have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.<br><br>Purchased Securities may be substituted no more than twice per month. Notwithstanding the immediately preceding sentence, if Seller has already substituted twice during a given month, Seller may request additional substitutions with such requests to be accepted or denied at the Buyer's sole and absolute discretion.<br><br>Any Securities substituted for the Purchase Securities or Principal Payments shall be deemed to be Purchased Securities hereunder. |

| Representations: | Each party represents to the other party on the Contract Date that: |
|---|---|
| | (i) **Non-Reliance**. It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether this Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deem necessary. It is not relying on the other party for legal, accounting or tax advice and has consulted its own expert legal, tax and accounting advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction. |
| | (ii) **Assessment and Understanding**. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction. |
| | (iii) **Status of Parties**. The other party is not acting as a fiduciary for, or an adviser to, it in respect of this Transaction. |

The time of dealing will be confirmed by Barclays upon written request. Barclays is regulated by the Financial Services Authority. Barclays is acting for its own account in respect of this Transaction.

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within three (3) Business Days by promptly signing in the space provided below and both (i) faxing the signed copy to Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Fax +(44) 20-7773-6810/6045. Tel +(44) 20-7773-6901/6904/6965, and (ii) mailing the signed copy to Barclays Bank PLC, 5 The North Colonnade, Canary Wharf, London E14 4BB, Attention of Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations. Your failure to respond within such period shall not affect the validity or enforceability of the Transaction as against you. Barclays Bank PLC, New York Branch acted as agent in the Transaction. This facsimile shall be the only documentation in respect of this Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests.

For and on behalf of
Barclays Capital Inc. or BCI

Sarah Fairman

Date:

For and on behalf of
American Home Mortgage Investment
Corporation

NAME:
Authorised Signatory
Date:

Jan 3, 2008

HBT3661v4Mar1207

For and on behalf of
Barclays Capital Inc. or BCI

For and on behalf of
American Home Mortgage Investment
Corporation

Umiar Padhiar

Date: _____

NAME:
Authorised Signatory
Date:

*Barclays Bank PLC and its affiliates, including Barclays Capital Inc., may share with each other information, including non-public credit information, concerning its clients and prospective clients. If you do not want such information to be shared, you must write to the Director of Compliance, Barclays Bank PLC, 222 Broadway, New York, N.Y. 10038.*

```
<UniqueID:HBT3661v4Mar1207.doc><AtTime:+1><ToName:IRINA
SHKLYAR><ToCompany:AMERICAN HOME MORTGAGE INVESTMENT><ToContactNum:9-
(00)1-631-6223266><ToFaxNum:9-(00)1-631-
9493942><BillInfo1:Confirms><BillInfo2:C37><FromName:Global Transaction
Documentation><FromPhone:44(20) 77736461><FromFaxNum:44(20) 77736810>
```

Barclays Capital - the Investment banking division of Barclays Bank PLC. Registered in England 1026167.
Registered office 54 Lombard Street, London EC3P 3AH. Authorised and regulated by the Financial Services Authority and a member of the London Stock Exchange.
Please note that with effect from 31 May 2005 our Registered Office will move to 1 Churchill Place, London E14 5HP.

 **BARCLAYS CAPITAL**

5 The North Colonnade
Canary Wharf
London E14 4BB
United Kingdom

Tel +44 (0)20 7623 2323

| | |
|---|---|
| **To:** | AMERICAN HOME MORTGAGE INVESTMENT CORPORATION ("the Counterparty") |
| **Attn.:** | FRANK BLUE |
| **Fax No:** | (00)1-631-9493942 |
| **From:** | BARCLAYS CAPITAL INC ("Barclays") |
| **Date:** | August 11, 2006 |
| **Reference:** | HQT380 |

### Structured Repo Trade Confirmation

The purpose of this document, a 'Confirmation' for the purpose of the Agreement, is to set forth the terms and conditions of the series of repurchase transactions entered into between us on the Contract Date referred to below.

This Confirmation supplements and forms part of, and is subject to, the Master Repurchase Agreement as entered into between us as of February 8, 2006 as the same may be amended from time to time (the 'Agreement'). All provisions contained in the Agreement govern this Confirmation except as expressly modified below. Words and phrases defined in the Agreement and used in this Confirmation shall have the same meaning herein as in the Agreement. In the event of any inconsistency between the terms of the Agreement and this Confirmation, this Confirmation shall govern.

IN THE EVENT OF A DECLARATION OF AN EVENT OF DEFAULT, IN ADDITION TO OTHER AMOUNTS OWNING BY EITHER PARTY UNDER THE AGREEMENT, COUNTERPARTY MAY OWE BARCLAYS CAPITAL INC. ("BCI") AN AMOUNT EQUAL TO THE "TERMINATION VALUE" (AS DEFINED BELOW). THE TERMINATION VALUE WILL REFLECT CHANGES IN THE MARKET VALUE OF THE PARTIES' RESPECTIVE POSITIONS IN THE TRANSACTION AND MAY BE VOLATILE. IF AT THE REQUEST OF COUNTERPARTY, BCI AGREES TO A VOLUNTARY EARLY TERMINATION, THE EARLY TERMINATION PRICE AT WHICH BCI WOULD BE WILLING TO TERMINATE THE TRANSACTION WILL REFLECT THE TERMINATION VALUE AT THAT TIME AS DETERMINED BY BCI AS IF BCI WAS THE NON-DEFAULTING PARTY. COUNTERPARTY COULD EXPERIENCE SIGNIFICANT LOSSES AS A RESULT OF THE TERMINATION VALUE.

Barclays Capital – the investment banking division of Barclays Bank PLC. Registered in England 1026167.
Registered office 54 Lombard Street, London EC3P 3AH. Authorised and regulated by the Financial Services Authority and a member of the London Stock Exchange.
Please note that with effect from 31 May 2005 our Registered Office will move to 1 Churchill Place, London E14 5HP.

| Contract Date: | August 2, 2006 |
|---|---|
| Purchased Securities: | AAA Private Label Hybrid ARMs |
| CUSIP, ISN or other identifying number(s) of Purchase Securities | <table><tr><td>CUSIP</td><td>Original Face Value</td></tr><tr><td>32051GQ81</td><td>USD79,340,546</td></tr><tr><td>761118LP1</td><td>USD72,208,335</td></tr><tr><td>058927AF1</td><td>USD200,000,000</td></tr><tr><td>45661HAE7</td><td>USD45,033,012</td></tr></table> |
| Buyer: | Barclays |
| Seller: | Counterparty |
| Purchase Date: | The Purchase Date for the Initial Transaction (as defined below) shall be August 3, 2006 and the Purchase Date for each Subsequent Transaction (as defined below) shall be the Repurchase Date for the immediately preceding Transaction. |
| Purchase Price: | USD350,000,000 |
| Contractual Currency: | USD (United States Dollars) |
| Repurchase Date: | The Repurchase Date for the Initial Transaction shall be September 3, 2006 and the Repurchase Date for each Subsequent Transaction shall be the 3rd day of the next succeeding month following the Purchase Date for such Subsequent Transaction, *provided* that the Final Repurchase Date will be last Repurchase Date. If any of dates specified above is not a Business Day, the corresponding Repurchase Date shall occur on the first following day that is a Business Day unless that day falls in the next calendar month, in which case the Repurchase Date will be the first preceding date that is a Business Day. As used herein, **"Business Day"** shall mean a date on which commercial banks are open for business in New York, New York. |
| Pricing Rate: | 1-month USD Libor + 5 basis points p.a.<br><br>1-month USD Libor for the Initial Transaction shall be set at 5.39563%.<br><br>Libor for any day shall be the rate published on Telerate Page 3750 – BBA as of 11:00 a.m., London time, provided that, if such publication is no longer available, then the rate as published in such successor publication as the Calculation Agent may determine in good faith.<br><br>Libor shall be determined two London business days prior to the start of the Pricing Rate Payment Period, *provided that*, on any day where Libor is not available, the preceding Libor setting will apply.<br><br>For the purposes of this Confirmation, the term **"Pricing Rate Payment Period"** for each Transaction shall mean the period of time beginning with (and including) the Purchase Date for such Transaction and ending with (but excluding) the Repurchase Date for such Transaction, *provided that*, in the event of an early termination, the Pricing Rate Payment Period shall be determined on the date of the early termination. |
| Pricing Rate Day Count Basis: | Actual/360 |
| Buyer's Margin Percentage: | 103% |
| Initial Transaction: | The repurchase transaction evidenced hereby commencing on the initial Purchase Date and having as its Repurchase Date the first |

| | |
|---|---|
| | Repurchase Date specified below is referred to herein as the '**Initial Transaction**'. |
| Subsequent Transactions: | Upon the repurchase of the Purchased Securities by Seller on each Repurchase Date other than the Final Repurchase Date, Buyer and Seller shall automatically be deemed to have entered into a new repurchase transaction with regard to the same face amount of equivalent Purchased Securities (each, a '**Subsequent Transaction**') on terms (other than the Purchase Date and Repurchase Date) identical to the Initial Transaction.  The Initial Transaction and the Subsequent Transactions are referred to, collectively, as the '**Transactions.**' The settlement obligations of Buyer and Seller in respect of a Transaction that terminates on a Repurchase Date and the Subsequent Transaction that commences on such Repurchase Date will be set-off against each other such that the only amounts that will be transferred between the parties will be the payment by Seller to Buyer of the amount by which the Repurchase Price of the terminating Transaction exceeds the Purchase Price of the Subsequent Transaction. |
| Final Repurchase Date: | February 3, 2008, subject to adjustment in accordance with the Business Day convention set out under "Repurchase Date". |
| Buyer's Bank Account[s] Details: | To be advised |
| Sellers Bank Account[s] Details: | Please advise |
| Termination Value: | "**Termination Value**" shall mean the amount, determined by the Calculation Agent in good faith, necessary to compensate the non-defaulting party fairly for losses and costs (or gains, in which case expressed as a negative number) in connection with any early termination of the Transaction prior to the Final Repurchase Date as a result of the occurrence of an Event of Default, including, without limitation and without duplication, (a) the amount that the non-defaulting party would be willing to pay, or require to receive from, a third party dealer ("**Dealer**") of recognized standing in the markets in which transactions similar to the Transaction are traded, in consideration of the Dealer entering into an agreement with the non-defaulting party that would have the effect of preserving for the non-defaulting party the economic equivalent of the non-defaulting party's rights and obligations under the Transaction for the period commencing on the date of such early termination and ending on the Final Repurchase Date and (b) any out-of-pocket hedging or unwind costs incurred by the non-defaulting party relating to such early termination, but excluding any amounts payable by either party to the other under the provisions of Paragraph 11 of the Agreement (regardless of whether or not amounts calculated to be owing under such Paragraph are actually paid in accordance therewith).  If the non-defaulting party would be willing to pay an amount to the Dealer, the Termination Value will be a Positive Termination Value (which will have the effect of increasing the amount otherwise payable by the defaulting party, or reducing the amount otherwise payable by the non-defaulting party, under the Agreement in connection with the occurrence of the Event of Default).  If the non-defaulting party would require the Dealer to pay an amount to it, the Termination Value will be a Negative Termination Value (which will have the effect of reducing the amount otherwise payable by the defaulting party, or increasing the amount otherwise payable by the non-defaulting party, under the Agreement in connection with the occurrence of the Event of Default). |
| Payments Upon Event of Default: | If an Event of Default is declared (or a party's option to declare an |

| | |
|---|---|
| | Event of Default is deemed exercised) under the Agreement, then in addition to any other amounts owing by either party to the other in connection with such declaration (or deemed declaration) in respect of the Transactions pursuant to the provisions of Paragraph 11 of the Agreement, the defaulting party shall owe the non-defaulting party an amount equal to Positive Termination Value (or the non-defaulting party shall owe the defaulting party an amount equal to the Negative Termination Value) as of the date of such declaration (or deemed declaration). The Termination Value calculated in connection with an Event of Default will be payable on the day that notice of the amount payable is effective. Such amount will be paid together with (to the extent permitted under applicable law) interest thereon from (and including) the date of occurrence of the Event of Default to (but excluding) the date such amount is paid at the rate specified in Paragraph 11(h) of the Agreement. Payments payable by each party to the other in connection with an Event of Default may be applied against each other and netted. |
| Buyer's Margin Amount: | For purposes of calculating margin maintenance requirements under the Agreement, Buyer's Margin Amount with respect to the Transaction hereunder as of any date shall be equal to the amount obtained by application of the Buyer's Margin Percentage to the Repurchase Price as of such date. |
| Calculation Agent: | For purposes of determining the Termination Value in connection with the occurrence of an Event of Default, the Calculation Agent will be the non-defaulting party. For purposes of determining the Pricing Rate, the Calculation Agent will be BCI. |
| Call, Redemption or other Payment of Principal of Purchased Securities: | The parties acknowledge and agree that the application by Buyer (pursuant to clause (ii) of the second sentence of Paragraph 5 of the Agreement) of all or any portion of Income constituting a Principal Payment (as defined below) to reduce the Repurchase Price payable by Seller to Buyer upon termination of a Transaction does not (a) entitle Seller to any payment of interest or income on such Principal Payment for the period from date of payment of the Principal Payment to termination of the Transaction or (b) result in a reduction in the Purchase Price for purposes of calculating the Repurchase Price for such Transaction.<br><br>If Buyer elects to apply a Principal Payment pursuant to clause (ii) of the second sentence of Paragraph 5 of the Agreement (rather than transfer to or credit such Principal Payment to the account of Seller pursuant to clause (i) of such sentence), then, in lieu of such application, Seller may at any time substitute other Securities for such Principal Payment in accordance with the terms and conditions of Paragraph 9 of the Agreement as amended and supplemented by this Confirmation (as if each reference therein to Purchased Securities were a reference to the Principal Payment).<br><br>As used herein, "**Principal Payment**" shall mean any Income constituting a payment of principal of Purchased Securities (whether pursuant to call, full or partial redemption, prepayment, scheduled amortization or otherwise). |

| Substitutions; Eligible Securities for Substitution: | At Buyer's sole and absolute discretion, Seller may substitute Purchased Securities pursuant to Paragraph 9(a) of the Agreement (including the substitutions contemplated under the "Call, Redemption or other Payment of Principal of Purchased Securities" section above), _provided that_, the new Securities supplied by Seller (1) are of an equal or better quality than the substituted Purchased Securities; (2) have similar characteristics to the substituted Purchased Securities; and (3) have a Market Value at least equal to the Market Value of the Purchased Securities for which they are substituted.<br><br>Purchased Securities may be substituted no more than twice per month. Notwithstanding the immediately preceding sentence, if Seller has already substituted twice during a given month, Seller may request additional substitutions with such requests to be accepted or denied at the Buyer's sole and absolute discretion.<br><br>Any Securities substituted for the Purchase Securities or Principal Payments shall be deemed to be Purchased Securities hereunder. |
| --- | --- |
| Representations: | Each party represents to the other party on the Contract Date that:<br><br>(i) **Non-Reliance**. It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether this Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deem necessary. It is not relying on the other party for legal, accounting or tax advice and has consulted its own expert legal, tax and accounting advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.<br><br>(ii) **Assessment and Understanding**. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of this Transaction.<br><br>(iii) **Status of Parties**. The other party is not acting as a fiduciary for, or an adviser to, it in respect of this Transaction. |

6 of 7

| C. | OFFICES |
|---|---|
| Barclays: | Address for Notices:<br>222 BROADWAY - 9TH FLOOR<br>NEW YORK, NY 10038<br>Tel:    1(212) 4121440<br>Fax:    1(212) 4122677 |
| Counterparty: | Address for Notices:<br>520 BROADHOLLOW ROAD<br>MELVILLE NY 11747-3604<br>Tel:    1(631) 6223266<br>Fax:    1(631) 9493942 |

The time of dealing will be confirmed by Barclays upon written request. Barclays is regulated by the Financial Services Authority. Barclays is acting for its own account in respect of this Transaction.

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within three (3) Business Days by promptly signing in the space provided below and both (i) faxing the signed copy to Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Fax No. (212) 412-2677, and (ii) mailing the signed copy to Barclays Bank PLC, 222 Broadway, New York, New York 10038, Attention of Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations. Your failure to respond within such period shall not affect the validity or enforceability of the Transaction as against you, Barclays Bank PLC, New York Branch acted as agent in the Transaction. This facsimile shall be the only documentation in respect of this Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests.

For and on behalf of
BARCLAYS CAPITAL INC

*A. Carysforth*

Adam Carysforth

For and on behalf of
AMERICAN HOME MORTGAGE
INVESTMENT CORPORATION

Date: January 3, 2008

Date:

Jan 3, 2008

HQT3801v4Sep2806

For and on behalf of
BARCLAYS CAPITAL INC

For and on behalf of
AMERICAN HOME MORTGAGE
INVESTMENT CORPORATION

Date: January 3, 2008

Date:

Bruce Frederick

*Barclays Bank PLC and its affiliates, including Barclays Capital Inc., may share with each other information, including non-public credit information, concerning its clients and prospective clients. If you do not want such information to be shared, you must write to the Director of Compliance, Barclays Bank PLC, 222 Broadway, New York, N.Y. 10038.*

```
<UniqueID:HQT3801v1Aug1106.doc><AtTime:+1><ToName:FRANK
BLUE><ToCompany:AMERICAN HOME MORTGAGE INVESTMENT><ToContactNum:9-(00)1-
631-6223266><ToFaxNum:9-(00)1-631-
9493942><BillInfo1:Confirms><BillInfo2:C37><FromName:Global Transaction
Documentation><FromPhone:44(20) 77736461><FromFaxNum:44(20) 77736810>
```

Barclays Capital - the Investment banking division of Barclays Bank PLC. Registered in England 1026167.
Registered office 54 Lombard Street, London EC3P 3AH. Authorised and regulated by the Financial Services Authority and a member of the London Stock Exchange.
Please note that with effect from 31 May 2005 our Registered Office will move to 1 Churchill Place, London E14 5HP.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO          08/29/07 0003577
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

PLEDGE IN-CLOSE
0802070016555

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br>  WE RETURNED TO YOU AS COLLATERAL | 08/29/07  10434 | 08/03/07 |
| | N/O 08/03/07 | |
| | CUSTOMER SETTLEMENT INSTRUCTIONS | |
|   ACCOUNT#:    END DATE:08/03/07 | NO EXTERNAL DELIVERIES<br>SEE OPS MGMT | |
|   40040411463 | | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 4,422,333.00<br><br>CURRENT FACE AMT:<br>4,422,333.00<br>FACTOR: 1.00000000 | AMERICAN HOME MORTGAGE INVESTM<br><br>DUE 11/25/2025 FLTR 144A<br>SERIES 2005-SD1 CLASS 2M2<br><br>DTD:120105 MTD:112525 CPR:  6.685<br><br>IS:US02660THU07 CUSIP #: 02660THU0 | |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|
| | | | |

BARCLAYS SETTLEMENT INSTR:

  DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:          PRD. CODE(S):     TDR. CODE(S):    NEXT CPN. DT.:09/01/07

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO          08/29/07 0003568
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

PLEDGE IN-CLOSE
0802070016511

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br>WE RETURNED TO YOU AS COLLATERAL<br><br>ACCOUNT#:          END DATE:08/03/07<br><br>40040411463 | 08/29/07   10418 | 08/03/07 |

CUSTOMER SETTLEMENT INSTRUCTIONS

NO EXTERNAL DELIVERIES
SEE OPS MGMT

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 5,729,000.00<br><br>CURRENT FACE AMT:<br>5,729,000.00<br>FACTOR: 1.00000000 | AMERICAN HOME MORTGAGE INVESTM<br><br>DUE 11/25/2025 8% 144A<br>SERIES 2005-SD1 CLASS 2M4<br><br>DTD:120105 MTD:112525 CPR:  8<br><br>IS:US02660THW62 CUSIP #: 02660THW6 | |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|
| | | | |

BARCLAYS SETTLEMENT INSTR:

  DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:          PRD. CODE(S):     TDR. CODE(S):     NEXT CPN. DT.:09/01/07

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY  10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO            08/29/07  0003532
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

RV-CLOSE
0730070014337

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br>WE SOLD TO YOU ON CLOSING REV REPO | 08/29/07   10334 | 08/03/07 |
| ACCOUNT#:          END DATE:08/03/07 | CUSTOMER SETTLEMENT INSTRUCTIONS | |
| 40040411463      CURR. RATE: 5.40000<br>APPLIED TO PRINCIPAL | NO EXTERNAL DELIVERIES<br>SEE OPS MGMT | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 23,033,000.00<br><br>CURRENT FACE AMT:<br>23,033,000.00<br>FACTOR: 1.00000000 | AMERICAN HOME MTGE INVT TRUST<br><br>SERIES 2006-1 CLASS 1M4<br><br>DTD:032906 MTD:032546 CPR:  6.52<br><br>IS:US02660TJN46 CUSIP #: 02660TJN4 | 90.077402 |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|
| 20,747,528.00 | 28,009.16 | USD | 20,775,537.16 |

BARCLAYS SETTLEMENT INSTR:

  DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:          PRD. CODE(S):      TDR. CODE(S):      NEXT CPN. DT.:08/25/07

| FROM | TO | RATE | PERIOD INT |
|---|---|---|---|
| 07/25/07 | 08/03/07 | 5.4 | 28009.16 |

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

08/29/07  0003533

# BARCLAYS

RV-CLOSE
0730070014380

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL: | 08/29/07   10341 | 08/03/07 |
| WE SOLD TO YOU ON CLOSING REV REPO | | |
| ACCOUNT#:           END DATE:08/03/07 | CUSTOMER SETTLEMENT INSTRUCTIONS | |
| 40040411463      CURR. RATE: 5.52000 | NO EXTERNAL DELIVERIES | |
| APPLIED TO PRINCIPAL | SEE OPS MGMT | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 9,384,000.00 | AMERICAN HOME MTGE INVT TRUST | 82.9302217 |
| | SERIES 2006-1 CLASS 1M5 | |
| CURRENT FACE AMT: | DTD:032906 MTD:032546 CPR:  7.57 | |
| 9,384,000.00 | | |
| FACTOR: 1.00000000 | IS:US02660TJP93 CUSIP #: 02660TJP9 | |

| 7,782,172.00 | 10,739.40 | USD | 7,792,911.40 |
|---|---|---|---|
| PRINCIPAL | INTEREST | COMM/FEES/MISC. | NET AMOUNT |

BARCLAYS SETTLEMENT INSTR:

DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:              PRD. CODE(S):        TDR. CODE(S):        NEXT CPN. DT.:08/25/07

| FROM | TO | RATE | PERIOD INT |
|---|---|---|---|
| 07/25/07 | 08/03/07 | 5.52 | 10739.40 |

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO          08/29/07 0003526
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

RV-CLOSE
0730070014326

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br>　WE SOLD TO YOU ON CLOSING REV REPO | 08/29/07　10327 | 08/03/07 |
| | CUSTOMER SETTLEMENT INSTRUCTIONS | |
| 　ACCOUNT#:　　　　　END DATE:08/03/07 | NO EXTERNAL DELIVERIES<br>SEE OPS MGMT | |
| 　40040411463　　CURR. RATE: 5.52000<br>　　　　　　APPLIED TO PRINCIPAL | | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 1,840,643.00<br><br>CURRENT FACE AMT:<br>　1,840,643.00<br>FACTOR: 1.00000000 | AMERICAN HOME MTGE INVT TRUST<br><br>SERIES 2006-1 CLASS 1M6<br><br>DTD:032906 MTD:032546 CPR:  8.22<br><br>IS:US02660TJQ76 CUSIP #: 02660TJQ7 | 76.7744207 |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|
| 1,413,143.00 | 1,950.14 | USD | 1,415,093.14 |

BARCLAYS SETTLEMENT INSTR:

　DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:　　　　　PRD. CODE(S):　　TDR. CODE(S):　　NEXT CPN. DT.:08/27/07

| FROM | TO | RATE | PERIOD INT |
|---|---|---|---|
| 07/25/07 | 08/03/07 | 5.52 | 1950.14 |

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO          08/29/07 0003576
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

PLEDGE IN-CLOSE
0807070003537

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL: | 08/29/07  10432 | 08/03/07 |
| WE RETURNED TO YOU AS COLLATERAL | | |
| | CUSTOMER SETTLEMENT INSTRUCTIONS | |
| ACCOUNT#:                END DATE:08/03/07 | NO EXTERNAL DELIVERIES | |
| 40040411463 | SEE OPS MGMT | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 2,424,357.00<br><br>CURRENT FACE AMT:<br>2,424,357.00<br>FACTOR: 1.00000000 | AMERICAN HOME MTGE INVT TRUST<br><br>SERIES 2006-1 CLASS 1M6<br><br>DTD:032906 MTD:032546 CPR:  8.22<br><br>IS:US02660TJQ76 CUSIP #: 02660TJQ7 | |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|
| | | | |

BARCLAYS SETTLEMENT INSTR:
  DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:            PRD. CODE(S):        TDR. CODE(S):        NEXT CPN. DT.:08/27/07

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO          08/29/07 0003477
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

RV-CLOSE
0807070003722

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br>    WE SOLD TO YOU ON CLOSING REV REPO | 08/29/07   10233<br>A/O 07/23/07 | 08/03/07 |
| ACCOUNT#:          END DATE:08/03/07 | CUSTOMER SETTLEMENT INSTRUCTIONS | |
| 40040411463     CURR. RATE: 5.4<br>          APPLIED TO PRINCIPAL | NO EXTERNAL DELIVERIES<br>SEE OPS MGMT | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 4,812,000.00<br><br>CURRENT FACE AMT:<br>    4,812,000.00<br>FACTOR: 1.00000000 | AMERICAN HOME MORTGAGE INV TRU<br><br>  FLT DUE 01252037 144A<br><br><br>  DTD:031307 MTD:012537 CPR:  5.67<br><br>  IS:US026931AG01 CUSIP #: 026931AG0 | 80.3812344 |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|
| 3,867,945.00 | 6,382.11 | USD | 3,874,327.11 |

BARCLAYS SETTLEMENT INSTR:
  DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:          PRD. CODE(S):      TDR. CODE(S):      NEXT CPN. DT.:08/27/07

  FROM      TO      RATE     PERIOD INT
07/23/07  08/03/07   5.4     6382.11

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO                08/29/07  0003478
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

RV-CLOSE
0724070008666

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br>　WE SOLD TO YOU ON CLOSING REV REPO | 08/29/07   10234<br>N/C 07/23/07 | 08/03/07 |
| 　　ACCOUNT#:　　　　END DATE:08/03/07 | CUSTOMER SETTLEMENT INSTRUCTIONS | |
| 　40040411463　　　CURR. RATE: 5.4<br>　　　　　APPLIED TO PRINCIPAL | NO EXTERNAL DELIVERIES<br>SEE OPS MGMT | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 3,164,000.00<br><br>CURRENT FACE AMT:<br>　　3,164,000.00<br>FACTOR: 1.00000000 | AMERICAN HOME MORTGAGE INV TRU<br>　FLT DUE 09/25/2026 144A<br><br>DTD:031307 MTD:092526 CPR:  5.81<br><br>IS:US026931AK13 CUSIP #: 026931AK1 | 75.2624842 |
| 2,381,305.00 | 3,929.15 | USD | 2,385,234.15 |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|

BARCLAYS SETTLEMENT INSTR:

　DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:　　　　　PRD. CODE(S):　　　TDR. CODE(S):　　　NEXT CPN. DT.:08/27/07

| FROM | TO | RATE | PERIOD INT |
|---|---|---|---|
| 07/23/07 | 08/03/07 | 5.4 | 3929.15 |

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY  10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO          08/29/07 0003479
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

RV-CLOSE
0724070008812

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br> WE SOLD TO YOU ON CLOSING REV REPO<br><br> ACCOUNT#:          END DATE:08/03/07<br><br> 40040411463      CURR. RATE: 5.42<br>              APPLIED TO PRINCIPAL | 08/29/07   10252<br>A/O 07/23/07 | 08/03/07 |
|  | CUSTOMER SETTLEMENT INSTRUCTIONS | |
|  | NO EXTERNAL DELIVERIES<br>SEE OPS MGMT | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 2,353,000.00<br><br>CURRENT FACE AMT:<br>  2,353,000.00<br>FACTOR: 1.00000000 | AMERICAN HOME MORTGAGE INV TRU<br><br> FLT DUE 09/25/2026 144A<br><br> DTD:031307 MTD:092526 CPR:  6.22<br><br> IS:US026931AL95 CUSIP #: 026931AL9 | 54.2140247 |
| 1,275,656.00 | 2,112.63 | USD | 1,277,768.63 |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|

BARCLAYS SETTLEMENT INSTR:
  DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:          PRD. CODE(S):      TDR. CODE(S):      NEXT CPN. DT.:08/27/07

  FROM     TO     RATE     PERIOD INT
07/23/07 08/03/07  5.42     2112.63

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO          08/29/07 0003499
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

RV-CLOSE
0724070008953

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br>  WE SOLD TO YOU ON CLOSING REV REPO<br><br>   ACCOUNT#:          END DATE:08/03/07<br><br>   40040411463      CURR. RATE: 5.45<br>             APPLIED TO PRINCIPAL | 08/29/07   10267<br>~~~/~ ~~/~~/~~ | 08/03/07 |
| | CUSTOMER SETTLEMENT INSTRUCTIONS | |
| | NO EXTERNAL DELIVERIES<br>SEE OPS MGMT | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 1,009,000.00<br><br>CURRENT FACE AMT:<br>    1,009,000.00<br>FACTOR: 1.00000000 | AMERICAN HOME MGTE INVT TRUST<br>  FLT DUE 09252026 144A<br><br>  DTD:031307 MTD:092526 CPR:  6.67<br><br>  IS:US026931AM78 CUSIP #: 026931AM7 | 32.2499505 |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|
| 325,402.00 | 541.88 | USD | 325,943.88 |

BARCLAYS SETTLEMENT INSTR:
  DVP/RVP #7256                |
                              |
                              |

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:          PRD. CODE(S):      TDR. CODE(S):      NEXT CPN. DT.:08/27/07

   FROM      TO     RATE    PERIOD INT
07/23/07 08/03/07  5.45     541.88

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO            08/29/07 0003506
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

RV-CLOSE
0724070008980

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br>  WE SOLD TO YOU ON CLOSING REV REPO<br><br>  ACCOUNT#:            END DATE:08/03/07<br><br>  40040411463      CURR. RATE: 5.45<br>                APPLIED TO PRINCIPAL | 08/29/07    10269<br>A/O 07/23/07<br><br>**CUSTOMER SETTLEMENT INSTRUCTIONS**<br>NO EXTERNAL DELIVERIES<br>SEE OPS MGMT | 08/03/07 |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 554,000.00<br><br>CURRENT FACE AMT:<br>    554,000.00<br>FACTOR: 1.00000000 | AMERI HOME MORTG INVST TRUST<br>  FLT DUE 09252026 144A<br><br>  DTD:031307 MTD:092526 CPR:  7.04<br><br>  IS:US026931AN51 CUSIP #: 026931AN5 | 32.25 |

| 178,665.00 | 297.53 | USD | 178,962.53 |
|---|---|---|---|
| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |

**BARCLAYS SETTLEMENT INSTR:**
  DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:          PRD. CODE(S):      TDR. CODE(S):      NEXT CPN. DT.:08/27/07

|  FROM  |  TO  |  RATE  |  PERIOD INT  |
|---|---|---|---|
| 07/23/07 | 08/03/07 | 5.45 | 297.53 |

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO         08/29/07 0003498
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

RV-CLOSE
0724070008895

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL: | 08/29/07   10257 | 08/03/07 |
| WE SOLD TO YOU ON CLOSING REV REPO | A/O 07/23/07 | |
| | **CUSTOMER SETTLEMENT INSTRUCTIONS** | |
| ACCOUNT#:          END DATE:08/03/07 | NO EXTERNAL DELIVERIES | |
| | SEE OPS MGMT | |
| 40040411463    CURR. RATE: 5.42 | | |
| APPLIED TO PRINCIPAL | | |

| QUANTITY | SECURITY DESCRIPTION | PRICE |
|---|---|---|
| 12,059,000.00 | AMERICAN HOME MORTGAGE INV<br>07252046 144A | 46.2248777 |
| CURRENT FACE AMT: | | |
| 12,059,000.00 | DTD:020107 MTD:072546 CPR:  6.8 | |
| FACTOR: 1.00000000 | | |
| | IS:US026933AC52 CUSIP #: 026933AC5 | |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|
| 5,574,258.00 | 9,231.59 | USD | 5,583,489.59 |

**BARCLAYS SETTLEMENT INSTR:**

DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:          PRD. CODE(S):      TDR. CODE(S):      NEXT CPN. DT.:09/01/07

| FROM | TO | RATE | PERIOD INT |
|---|---|---|---|
| 07/23/07 | 08/03/07 | 5.42 | 9231.59 |

Barclays Capital Inc.

Barclays Capital Inc.
200 Park Avenue
New York, NY 10166
Tel +1 (973) 576 6923
Fax +1 (973) 576 3051
Telex 67090513 BAR ZW

AHMIC-AHM SHORT TERM REPO           08/29/07  0003507
520 BROADHOLLOW ROAD
MELVILLE NY 11747-3604

# BARCLAYS

RV-CLOSE
0724070008993

| TRADED OTC UNLESS OTHERWISE INDICATED | TRADE DATE | SETTLEMENT DATE |
|---|---|---|
| AS PRINCIPAL:<br>  WE SOLD TO YOU ON CLOSING REV REPO<br><br>   ACCOUNT#:          END DATE:08/03/07<br><br>  40040411463      CURR. RATE: 5.45<br>              APPLIED TO PRINCIPAL | 08/29/07   10290<br>A/O 07/23/07 | 08/03/07 |
| | **CUSTOMER SETTLEMENT INSTRUCTIONS** | |
| | NO EXTERNAL DELIVERIES<br>SEE OPS MGMT | |

| QUANTITY | SECURITY DESCRIPTION | | PRICE |
|---|---|---|---|
| 10,880,000.00<br><br>CURRENT FACE AMT:<br>   10,880,000.00<br>FACTOR: 1.00000000 | AMER HOME MRGT INVST TRUST<br>  DUE 07252046 144A<br><br>  DTD:020107 MTD:072546 CPR:  6.5<br><br>  IS:US026933AD36 CUSIP #: 026933AD3 | | 21 |

| PRINCIPAL | INTEREST | COMM/FEES/MISC | NET AMOUNT |
|---|---|---|---|
| 2,284,800.00 | 3,804.83 | USD | 2,288,604.83 |

**BARCLAYS SETTLEMENT INSTR:**

  DVP/RVP #7256

SPECIFICS: ALT. MIN. TAX.:N  TAX CODE(S):
OID PRC.:          PRD. CODE(S):      TDR. CODE(S):     NEXT CPN. DT.:09/01/07

   FROM     TO    RATE    PERIOD INT
  07/23/07 08/03/07  5.45   3804.83

Barclays Capital Inc.

**Barclays Capital Inc.**                                    **Case No. 07-11048**
**Proof of Claim –Repurchase Agreement**        **American Home Mortgage Investment Corp.**

**EXHIBIT "B"**

BARCLAYS CAPITAL INC.
200 Park Ave.
New York, NY 10166

August 3, 2007

VIA TELECOPIER,
HAND DELIVERY
AND ELECTRONIC MAIL

American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, NY 11747
Alan B. Horn, General Counsel
Fax: (800) 209-7276

        Re:     Declaration of Event of Default
                  Notice of Repurchase Date
                  Notice of Termination

Ladies and Gentlemen:

Reference is made to the Master Repurchase Agreement dated as of February 8, 2006, together with all annexes, confirmations and schedules thereto, and as the same have been amended, supplemented and otherwise modified as of the date first written above (collectively, the "**MRA**") between American Home Mortgage Investment Corp. ("**AHMIC**" or "**you**") and Barclays Capital Inc. ("**BCI**"). Capitalized terms used herein but not defined herein shall have the respective meaning assigned to such terms in the MRA.

You are hereby notified that as a result of a failure by AHMIC to comply with paragraph 4 of the MRA, an Event of Default has occurred and is continuing under paragraph 11(iii) of the MRA.

As a result of the foregoing, BCI hereby declares an Event of Default under paragraph 11(a) of the MRA. The Repurchase Date for each Transaction under the MRA is today's date.

You are further notified, pursuant to paragraph 15(a), that BCI terminates the MRA with immediate effect.

AHMIC is further notified that (i) BCI has other rights and remedies under applicable law and the MRA (including but not limited to those rights specified under Paragraphs 11(b), 11(d)(i), 11(g) and 11(h) of the MRA), (ii) all such rights and remedies are hereby reserved and no such rights have been waived, abandoned, discontinued or in any other manner precluded from exercise, and (iii) the failure to exercise any such right or remedy shall not constitute (or be deemed to constitute) any waiver, abandonment, discontinuation or other preclusion of the exercise thereof or of any other right or remedy of BCI.

This Notice shall be governed by and construed in accordance with the laws of the State of New York.

Very truly yours,

BARCLAYS CAPITAL INC.

By: _____

Name:  Timothy Keenan
Title:  Managing Director

Cc:      Alan Kaplan, Deputy General Counsel, Americas

2

## EXHIBIT "C"

### American Home Mortgage  |REPO vs Cash Proceeds

| Cusip | Bond Name | Repurchase price as at 3rd Aug | Face | Factor | Cash Price | Cash | Accrued | Market Value | Net |
|---|---|---|---|---|---|---|---|---|---|
| **Repos** | | | | | | | | | |
| 02660CAG5 | AHM 2007-2 13A2 | (45,918,477) | 49,979,851 | 0.94931 | 88.00 | 41,752,711 | 15,815 | 41,768,526 | (4,149,951) |
| 02660TGU1 | AHM 2005-4 3A3 | (17,178,031) | 20,029,235 | 0.53313 | 94.75 | 10,117,512 | 15,376 | 10,132,888 | (7,045,142) |
| 02660TJN4 | AHM 2006-1 1 M4 | (20,775,537) | 23,033,000 | 1.00000 | 61.00 | 14,050,130 | 37,544 | 14,087,674 | (6,687,863) |
| 02660TJP9 | AHM 2006-1 1 M5 | (7,792,911) | 9,384,000 | 1.00000 | 40.00 | 3,753,600 | 17,759 | 3,771,359 | (4,021,552) |
| 02660TJQ7 | AHM 2006-1 1 M6 | (1,415,093) | 4,265,000 | 1.00000 | 25.00 | 1,066,250 | 8,765 | 1,075,015 | (340,079) |
| 026931AE5 | AHM 2007-A 2A | (25,710,798) | 29,862,000 | 0.86228 | 14.00 | 3,604,919 | 36,500 | 3,641,418 | (22,069,380) |
| 026931AG0 | AHM 2007-A 1M1 | (3,874,327) | 4,812,000 | 1.00000 | 70.00 | 3,368,400 | 6,821 | 3,375,221 | (499,106) |
| 026931AK1 | AHM 2007-A 2M1 | (2,385,234) | 3,164,000 | 1.00000 | 5.00 | 158,200 | 4,596 | 162,796 | (2,222,438) |
| 026931AL9 | AHM 2007-A 2M2 | (1,277,769) | 2,353,000 | 1.00000 | 5.00 | 117,650 | 3,659 | 121,309 | (1,156,460) |
| 026931AM7 | AHM 2007-A 2M3 | (325,944) | 1,009,000 | 1.00000 | 5.00 | 50,450 | 1,683 | 52,133 | (273,811) |
| 026931AN5 | AHM 2007-A 2M4 | (178,963) | 554,000 | 1.00000 | 5.00 | 27,700 | 975 | 28,675 | (150,287) |
| 026933AC5 | AHM 2007-A 4M2 | (5,583,490) | 12,059,000 | 1.00000 | 5.00 | 602,950 | 4,556 | 607,506 | (4,975,984) |
| 026933AD3 | AHM 2007-A 4M3 | (2,288,605) | 10,880,000 | 1.00000 | 5.00 | 544,000 | 3,929 | 547,929 | (1,740,676) |
| 761116FN3 | RALI 2005-QA9 NB42 | (13,836,551) | 16,388,000 | 0.69847 | 97.00 | 11,103,127 | 3,491 | 11,106,619 | (2,729,932) |
| | | | | | | | | | (58,062,662) |
| **Collateral** | | | | | | | | | |
| 02660TAN3 | AHM 2004-1 3A | | 3,139,921 | 0.45987 | 94.00 | 1,357,325 | 263 | 1,357,588 | 1,357,588 |
| 02660TEB5 | AHM 2005-1 4A2 | | 263,021 | 0.39979 | 80.00 | 84,122 | 29 | 84,152 | 84,152 |
| 02660THU0 | AHM 2005-SD1 2M2 | | 4,422,333 | 1.00000 | 5.00 | 221,117 | 1,642 | 222,759 | 222,759 |
| 02660THW6 | AHM 2005-SD1 2M4 | | 5,729,000 | 1.00000 | 5.00 | 286,450 | 2,546 | 288,996 | 288,996 |
| 251510UG1 | DBALT 2005-AR2 4A2 | | 2,421,813 | 0.73182 | 96.00 | 1,701,440 | 550 | 1,701,990 | 1,701,990 |
| 45660LW47 | INDXFRN-0136 | | 3,248,974 | 0.74196 | 95.50 | 2,302,143 | 716 | 2,302,858 | 2,302,858 |
| 576433GN0 | MARM 2007-3 6 7A1 | | 6,274,354 | 0.03198 | 90.00 | 180,589 | 82 | 180,671 | 180,671 |
| 86359BBR1 | SASC 2003-37A 1A | | 20,000,000 | 0.11887 | 97.00 | 2,305,982 | 1,019 | 2,307,000 | 2,307,000 |
| 86359BEK3 | SASC 2003-40A 3A2 | | 2,572,760 | 0.24565 | 95.50 | 603,554 | 158 | 603,712 | 603,712 |
| | Cash Margin | | | | | 2,800,000 | 9,149 | 2,809,149 | 2,809,149 |
| | | | | | | | | | 11,858,876 |

Structured Repo - Repo Closeout     (41,287)

Fails/Cash Breaks     12,628

Closeout Deficit     (46,232,445)

P&I     1,189,425

Net Deficit Estimate     (45,043,020)