# EXHIBIT D

# Master Agreement, Credit Support Annex and Confirmations

(Multicurrency—Cross Border)



## ISDA®

International Swap and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of March 13, 2006

**BARCLAYS BANK PLC**        and   **AMERICAN HOME MORTGAGE**
                                   **INVESTMENT CORP.**
.............................................................        ...........................................................
("Party A")                        ("Party B")

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)     *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)     *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)     *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)     *General Conditions.*

        (i)   Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

        (ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

        (iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap and Derivatives Association, Inc.

(b)    *Change of Account.* Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)    *Netting.* If on any date amounts would otherwise be payable:—

    (i)    in the same currency; and

    (ii)    in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation upon the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction. The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)    *Deduction or Withholding for Tax.*

    (i)    *Gross-Up.* All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:—

        (1)    promptly notify the other party ("Y") of such requirement;

        (2)    pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)    promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)    if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:—

            (A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

            (B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

ISDA® 1992

(ii) **Liability.** If—

    (1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

    (2)    X does not so deduct or withhold; and

    (3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    **Default Interest; Other Amounts.** Prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

## 3.    Representations

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), a t all times until the termination of this Agreement) that:—

(a)    **Basic Representations.**

    (i)    **Status.** It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

    (ii)    **Powers.** It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

    (iii)    **No Violation or Conflict.** Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

    (iv)    **Consents.** All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

    (v)    **Obligations Binding.** Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b)  *Absence of Certain Events.* No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c)  *Absence of Litigation.* There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d)  *Accuracy of Specified Information.* All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e)  *Payer Tax Representation.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f)  *Payee Tax Representations.* Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

4.    **Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:—

(a)  *Furnish Specified Information.* It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:—

   (i)    any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

   (ii)   any other documents specified in the Schedule or any Confirmation; and

   (iii)  upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)  *Maintain Authorisations.* It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)  *Comply with Laws.* It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)  *Tax Agreement.* It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)  *Payment of Stamp Tax.* Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated,

organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement is located ("Stamp Tax Juris diction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5.    Events of Default and Termination Events**

(a)    *Events of Default.* The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:—

(i)    *Failure to Pay or Deliver.* Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)    *Breach of Agreement.* Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event or any agreement or obligation under Section 4(a)(i), 4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    *Credit Support Default.*

(1)    Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)    the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)    the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    *Misrepresentation.* A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    *Default under Specified Transaction.* The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    *Cross Default.* If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however

described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii) **Bankruptcy.** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:—

(1) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii) **Merger Without Assumption.** The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:—

(1) the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2) the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

*(b)* **Termination Events.** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event

Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:—

    (i)    *Illegality.* Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):—

        (1)    to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

        (2)    to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

    (ii)    *Tax Event.* Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(i)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

    (iii)    *Tax Event Upon Merger.* The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially all its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

    (iv)    *Credit Event Upon Merger.* If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

    (v)    *Additional Termination Event.* If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c)    *Event of Default and Illegality.* If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

ISDA® 1992

## 6.    Early Termination

(a)    *Right to Terminate Following Event of Default.* If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1),(3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)    *Right to Terminate Following Termination Event.*

(i)    *Notice.* If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

(ii)    *Transfer to Avoid Termination Event.* If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or Affiliates so that such Termination Event ceases to exist.

If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

(iii)    *Two Affected Parties.* If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

(iv)    *Right to Terminate.* If:—

(1)    a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

(2)    an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then

ISDA® 1992

continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)     *Effect of Designation.*

    (i)     If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

    (ii)     Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)     *Calculations.*

    (i)     *Statement.* On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

    (ii)     *Payment Date.* An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)     *Payments on Early Termination.* If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

    (i)     *Events of Default.* If the Early Termination Date results from an Event of Default:—

        (1)     *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

        (2)     *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

        (3)     *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the

Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4)  *Second Method and Loss*. If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(ii)  *Termination Events*. If the Early Termination Date results from a Termination Event—

(1)  *One Affected Party*. If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2)  *Two Affected Parties*. If there are two Affected Parties—

(A) i   f Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)   if Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number, X will pay the absolute value of that amount to Y.

(iii)  *Adjustment for Bankruptcy*. In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)  *Pre-Estimate*. The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement neither party will be entitled to recover any additional damages as a consequence of such losses.

**ISDA® 1992**

7.    **Transfer**

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that: —

(a)    a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b)    a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

8.    **Contractual Currency**

(a)    *Payment in the Contractual Currency.* Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b)    *Judgments.* To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c)    *Separate Indemnities.* To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d)    *Evidence of Loss.* For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

## 9.    Miscellaneous

(a)    *Entire Agreement.* This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b)    *Amendments.* No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c)    *Survival of Obligations.* Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d)    *Remedies Cumulative.* Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e)    *Counterparts and Confirmations.*

(i)    This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)    The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f)    *No Waiver of Rights.* A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g)    *Headings.* The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10.    Offices; Multibranch Parties

(a)    If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)    Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)    If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11.    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document

ISDA® 1992

to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

**12.    Notices**

(a)    *Effectiveness.* Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:—

    (i)    if in writing and delivered in person or by courier, on the date it is delivered;

    (ii)    if sent by telex, on the date the recipient's answerback is received;

    (iii)    if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

    (iv)    if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

    (v)    if sent by electronic messaging system, on the date that electronic message is received,

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)    *Change of Addresses.* Either party may by notice to the other change the address, telex or facsimile number or electronic messaging system details at which notices or other communications are to be given to it.

**13.    Governing Law and Jurisdiction**

(a)    *Governing Law.* This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)    *Jurisdiction.* With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:—

    (i)    submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

    (ii)    waives any objection which it may have at any time to the laying of venue of any Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or reenactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)    *Service of Process.* Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receive, for it and on its behalf, service of process in any Proceedings. If for any

reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     *Waiver of Immunities.* Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14.    Definitions**

As used in this Agreement:—

*"Additional Termination Event"* has the meaning specified in Section 5(b).

*"Affected Party"* has the meaning specified in Section 5(b).

*"Affected Transactions"* means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

*"Affiliate"* means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

*"Applicable Rate"* means:—

(a)     in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)     in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)     in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)     in all other cases, the Termination Rate.

*"Burdened Party"* has the meaning specified in Section 5(b).

*"Change in Tax Law"* means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

*"consent"* includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

*"Credit Event Upon Merger"* has the meaning specified in Section 5(b).

*"Credit Support Document"* means any agreement or instrument that is specified as such in this Agreement.

*"Credit Support Provider"* has the meaning specified in the Schedule.

*"Default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

*"Defaulting Party"* has the meaning specified in Section 6(a).

*"Early Termination Date"* means the date determined in accordance with Section 6(a) or 6(b)(iv).

*"Event of Default"* has the meaning specified in Section 5(a)and, if applicable, in the Schedule.

*"Illegality"* has the meaning specified in Section 5(b).

*"Indemnifiable Tax"* means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

*"law"* includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and *"lawful"* and *"unlawful"* will be construed accordingly.

*"Local Business Day"* means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified, as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

*"Loss"* means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or reestablishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

*"Market Quotation"* means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have

been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group of Terminated Transactions cannot be determined.

*"Non-default Rate"* means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

*"Non-defaulting Party"* has the meaning specified in Section 6(a).

*"Office"* means a branch or office of a party, which may be such party's head or home office.

*"Potential Event of Default"* means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

*"Reference Market-makers"* means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

*"Relevant Jurisdiction"* means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purposes of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

*"Scheduled Payment Date"* means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

*"Set-off"* means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject (whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

*"Settlement Amount"* means, with respect to a party and any Early Termination Date, the sum of:—

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

*"Specified Entity"* has the meaning specified in the Schedule.

"*Specified Indebtedness*" means, subject to the Schedule, any obligation (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"*Specified Transaction*" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"*Stamp Tax*" means any stamp, registration, documentation or similar tax.

"*Tax*" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by any government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"*Tax Event*" has the meaning specified in Section 5(b).

"*Tax Event Upon Merger*" has the meaning specified in Section 5(b).

"*Terminated Transactions*" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"*Termination Currency*" has the meaning specified in the Schedule.

"*Termination Currency Equivalent*" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be), is determined as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

"*Termination Event*" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon Merger or an Additional Termination Event.

"*Termination Rate*" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"*Unpaid Amounts*" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**BARCLAYS BANK PLC**

By:
Name:        **Justin Wray**
Title:        **Director**

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**

By:
Name:
Title::        Thomas M. McDonagh
                Chief Investment Officer
                American Home Mortgage Investment Corp

_____Date_____

ISDA® 1992

(Multicurrency – Cross-Border)

**SCHEDULE**

to the

**1992 ISDA Master Agreement**

dated as of March 13, 2006

between

| | | |
|---|---|---|
| **BARCLAYS BANK PLC** | and | **AMERICAN HOME MORTGAGE INVESTMENT CORP.** |
| ("Party A") | | ("Party B") |
| *established as a Public Limited Company under the laws of England and Wales* | | *established as a Corporation under the laws of the state of Maryland* |

**Part 1.  Termination Provisions.**

(a)  *"Specified Entity"* means in relation to Party A for the purpose of:–

|  |  |
|---|---|
| Section 5(a)(v), | None |
| Section 5(a)(vi), | None |
| Section 5(a)(vii), | None |
| Section 5(b)(iv), | None |

and in relation to Party B for the purpose of:–

|  |  |
|---|---|
| Section 5(a)(v), | None |
| Section 5(a)(vi), | None |
| Section 5(a)(vii), | None |
| Section 5(b)(iv), | None |

(b)  *"Specified Transaction"* means instead of the definition in Section 14 of this Agreement, (i) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (A) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (B) which

19

is a type of transaction that is similar to any transaction referred to in clause (A) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (ii) any combination of these transactions and (iii) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

(c)　The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and to Party B. The following shall apply with respect to Section 5(a)(vi):

　　(i)　*"Specified Indebtedness"* shall have the meaning specified in Section 14, except that indebtedness or obligations in respect of deposits received in the ordinary course of the banking business of such party shall not constitute Specified Indebtedness.

　　(ii)　*"Threshold Amount"* means, in relation to a party, an amount equal to 3% of such party's shareholders' equity on a consolidated basis (determined in accordance with generally accepted accounting principles in such party's jurisdiction of incorporation or organization) as at the end of such party's most recently completed fiscal year.

(d)　The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and to Party B.

(e)　The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)　*Payments on Early Termination.* For the purpose of Section 6(e) of this Agreement:

　　(i)　Market Quotation will apply, provided that in respect of FX Transactions and Currency Options (as defined in Part 6 of this Schedule) Loss shall apply.

　　(ii)　The Second Method will apply to all Transactions.

(g)　*"Termination Currency"* means United States Dollars.

(h)　*Additional Termination Event* will not apply.


**Part 2.  Tax Representations.**

(a)　*Party A and Party B Payer Tax Representations.* For the purpose of Section 3(e), each of Party A and Party B makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement. In making this representation, it may rely on: (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement; (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)　*Party A Payee Tax Representations.* For the purpose of Section 3(f), Party A makes the following representation(s):

(i)     with respect to payments made to Party A which are not effectively connected to the United States:

It is a non-U.S. branch of a foreign person for United States federal income tax purposes.

(ii)    with respect to payments made to Party A which are effectively connected to the United States:

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the United States.

(c)    *Party B Payee Tax Representations.*  For the purpose of Section 3(f), Party B makes the following representations:

It is a corporation organized under the laws of the state of Maryland for United States federal income tax purposes.

**Part 3.  Agreement to Deliver Documents.**

For the purpose of Section 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents as applicable:-

(a)    Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Any form or document accurately completed and in a manner reasonably satisfactory to the other party that may be required or reasonably requested in order to allow the other party to make a payment under a Transaction without any deduction or withholding for or on account of any Tax or with deduction or withholding at a reduced rate, promptly upon reasonable demand by the other party, including, without limitation, an executed United States Internal Revenue Service Form W-9 or Form W-8BEN and/or W-8ECI (or any successor thereto). | Upon execution of this Agreement, and thereafter promptly upon reasonable demand by the other Party. |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|

21

| Party A and Party B | Evidence, reasonably satisfactory to the other party, as to the incumbency and true signatures of the signatories of such party for this Agreement and each Confirmation. | Upon execution of this Agreement and, if necessary, each Confirmation. | Yes |
| --- | --- | --- | --- |
| Party B | A certified copy of the Resolution of Party B's Board of Directors/Governing Body authorising the execution and delivery of this Agreement and each Confirmation and performance of its obligations hereunder. | At, prior to or as soon as practicable after the execution of this Agreement. | Yes |
| Party A and Party B | The Credit Support Document referred to in Part 4(f) and evidence, reasonably satisfactory to the other Party, as to the incumbency and true signatures of the signatories to such Credit Support Document. | Upon execution of this Agreement, any relevant Credit Support Document and any relevant Confirmation, or as soon as practicable thereafter. | Yes |
| Party B | Copy of Party B's most recent, publicly available quarterly report containing unaudited financial statements. | Where such financial statement is not reasonably publicly available on "EDGAR" or Party B's internet home page, promptly upon reasonable request and in any event no later than 30 days after the end of the relevant fiscal quarterly period. | Yes. |
| Party A and Party B | Copy of the annual report of such party, containing annual audited consolidated financial statements, for its most recently ended fiscal year prepared in accordance with generally accepted accounting principles in the country in which such party is organized and certified by independent certified public accountants or chartered accountants. | Where such financial statement is not reasonably publicly available on "EDGAR" or such party's internet home page, promptly upon reasonable request and in any event no later than 60 days after the end of each fiscal year of such party. | Yes |

**Part 4.  Miscellaneous.**

(a)    *Addresses for Notices.*  For the purpose of Section 12(a) of this Agreement:

22

*Address for Notices or Communications to Party A:-*
Notices should be sent to the address of the relevant branch set out in the relevant Confirmation (as may be amended from time to time), provided that in the case of notices or communications relating to Section 5, 6, 7, 11 or 13 to, such notices should be sent to:

| | |
|---|---|
| Address: | Barclays Capital |
| | 200 Park Avenue |
| | New York, New York 10166 |
| Attention: | General Counsel |
| Facsimile No.: | (212) 412-7519 |
| Telephone No.: | (212) 412-4000 |

*Address for Notices or Communications to Party B:-*
Notices should be sent to the address of the relevant branch set out in the relevant Confirmation (as may be amended from time to time), provided that in the case of notices or communications relating to Section 5, 6, 7, 11 or 13, such notices should be sent to:

| | |
|---|---|
| Address: | American Home Mortgage Investment Corp. |
| | 538 Broadhollow Road |
| | Melville, NY 11747 |
| Attention: | Alan B. Horn, General Counsel |
| Facsimile No.: | (800) 209-7276 |
| Telephone No.: | (516) 396-7703 |

(b)    *Process Agent.* For the purpose of Section 13(c) of this Agreement:-

Party A appoints as its Process Agent: not applicable.

Party B appoints as its Process Agent: not applicable.

(c)    *Offices.* The provisions of Section 10(a) will apply to this Agreement.

(d)    *Multibranch Party.* For the purpose of Section 10(c) of this Agreement.

Party A is a Multibranch Party and may act through its London, Hong Kong, New York, Tokyo, Mumbai, Seoul, Sydney and Singapore offices.

Party B is not a Multibranch Party.

(e)    *Calculation Agent.* The Calculation Agent will be Party A, unless otherwise specified in a Confirmation relating to the applicable Transaction.

(f)    *Credit Support Document.* Details of any Credit Support Document: the Credit Support Annex to this Schedule between Party A and Party B which supplements, forms part of, and is subject to this Agreement.

(g)    *Credit Support Provider.*

Credit Support Provider means in relation to Party A: none.

Credit Support Provider means in relation to Party B: none.

(h)    *Governing Law.* **THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE).**

(i)    *Netting of Payments.* Section 2(c)(ii) will not apply to any amounts payable with respect to Transactions from the date of this Agreement.

(j)    *"Affiliate"* will have the meaning specified in Section 14 of this Agreement.

**Part 5. Other Provisions.**

(a)   *Confirmations.* For each Transaction Party A and Party B agree to enter into under this Agreement, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction. Party B shall execute and return the Confirmation promptly. Any correction of an error shall be made promptly upon receipt of the telex or the facsimile transmission.

(b)   *Right of Set-off.* Section 6 of the Agreement is amended by the inclusion of the following new subsection 6(f):

"*Right of Set-off.* In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default with respect to a party or an Illegality, Credit Event Upon Merger or Additional Termination Event where such party is the only Affected Party (in each case, "Party X"), the other party ("Party Y") will have the right (but not the obligation) without prior notice to Party X or any other person to set-off any obligation of Party X owing to Party Y or any of Party Y's Affiliates, branches or offices (whether or not arising under this Agreement, whether or not matured, whether or not contingent, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Party Y or any of Party Y's Affiliates, branches or offices owing to Party X (whether or not arising under this Agreement, whether or not matured, whether or not contingent, and regardless of the currency, place of payment or booking office of the obligation).

In order to enable Party Y to exercise its rights of set-off, (i) Party Y may in good faith convert any obligation to another currency at a market rate reasonably determined by Party Y and set-off in respect of that converted amount and/or (ii) if an obligation is unascertained, Party Y may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this paragraph will be deemed to constitute or create a charge or other security interest.

This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

(c)   *Consent to Recording.* Each party (i) consents to the monitoring or recording, at any time and from time to time, by the other party of any and all communications between officers or employees of the parties, (ii) waives any further notice of such monitoring or recording, and (iii) agrees to notify (and, if required by law, obtain the consent of) its officers and employees with respect to such monitoring or recording. Any such recording may be submitted in evidence to any court or in any Proceeding for the purpose of establishing any matters pertinent to this Agreement or any Transaction.

(d)   *Modified Representation.* For purposes of Section 3(d) of this Agreement, the following shall be added immediately prior to the period at the end thereof:

"; *provided, however*, that in the case of financial statements delivered by either party, the only representation being made by either party is that such financial statements give a fair view of the state of affairs of the relevant entity to which they relate as at the date of such financial statements."

(e)   *Relationship Between the Parties.* Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)   *Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations

related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii) *Assessment and Understanding*. It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

(iii) *Status of Parties*. The other party is not acting as a fiduciary or an advisor for it in respect of that Transaction.

(iv) *No Agency*. It is entering into this Agreement and each Transaction as principal and not as agent of any person.

(f) *Existing Agreements*. Effective as of the date hereof, this Agreement shall supersede any existing agreement or agreements between the parties relating to any Specified Transaction (as defined below) entered into through any of the Offices of the parties listed in Part 4(d) of this Schedule, other than any agreement or agreements relating to, and solely applicable to, a Transaction or Transactions specifically and individually identified within such agreement or agreements, by reference to the terms of the Transaction or Transactions. All confirmations relating to such Specified Transactions shall be Confirmations under this Agreement and such Specified Transactions shall be Transactions under this Agreement. For the purpose of this provision only, the definition of Specified Transaction shall be as defined in Section 14 of the Master Agreement amended by the deletion of the words ", subject to the Schedule," from the first line and "this Agreement or" from the final line.

If, on the date hereof, any sum remains payable under that superseded agreement as a result of any Transaction, this Agreement shall apply in relation thereto with any necessary consequential amendments.

(g) *Additional Events of Default*. None.

(h) *Waiver of Right to Trial by Jury*. **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION.**

(i) *Additional Representations*. For purposes of Section 3 of this Agreement, the following shall be added immediately following paragraph (f) thereof:

"(g) It is an "eligible contract participant" within the meaning of the Commodity Exchange Act, as amended.

**Part 6.    Additional Terms for FX Transactions and Currency Option Transactions.**

(a) *Incorporation of 1998 ISDA FX and Currency Option Definitions*. The definitions and provisions contained in the 1998 ISDA FX and Currency Option Definitions (as amended and supplemented by the 1998 ISDA Euro Definitions, together the "1998 FX Definitions") as published by the International Swaps and Derivatives Association, Inc. and Emerging Markets Traders Association, are incorporated into any Confirmation, with respect to FX Transactions or Currency Options, which supplements and forms part of this Agreement, and all capitalized terms used in a Confirmation shall have the meaning set forth in the 1998 FX Definitions, unless otherwise defined in a Confirmation.

(b) *Confirmations*. Any FX Transaction or Currency Option into which the parties may before the date of this Agreement have entered, or may in the future enter, where the relevant Confirmation on its face does not expressly exclude the application of this Agreement, shall (to the extent not otherwise provided for in this Agreement) be subject to, governed by and construed in accordance with this Agreement (in substitution for

any existing terms, if any, whether express or implied). Each such FX Transaction and Currency Option shall be a Transaction, and the documents and other confirming evidence (including electronic messages on an electronic messaging service) exchanged between the parties confirming such FX Transaction or Currency Option shall each be a Confirmation (even where not so specified therein), for the purposes of this Agreement.

**BARCLAYS BANK PLC**

By: _Justin Wray_____
   Name:     **Justin Wray**
   Title:      **Director**
   Date:

**AMERICAN HOME MORTGAGE
INVESTMENT CORP.**

By: _Thomas McDonagh_____
   Name:
   Title:    Thomas M. McDonagh
   Date:    Chief Invest. of
          American home m'tg Investment Cr T

(Bilateral Form)                    (ISDA Agreements subject to New York Law Only)



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

### ISDA MASTER AGREEMENT

..................................................

dated as of March 13, 2006

between

**BARCLAYS BANK PLC**                  and      **AMERICAN HOME MORTGAGE
                                                INVESTMENT CORP.**

.................................................      .................................................

("Party A")                                      ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

### Paragraph 1. Interpretation

(a)      *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Schedule, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)      *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

### Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994 International Swaps and Derivatives Association, Inc.

**Paragraph 3. Credit Support Obligations**

(a)     *Delivery Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Secured Party on or promptly following a Valuation Date, if the Delivery Amount for that Valuation Date equals or exceeds the Pledgor's Minimum Transfer Amount, then the Pledgor will Transfer to the Secured Party Eligible Credit Support having a Value as of the date of Transfer at least equal to the applicable Delivery Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Delivery Amount"* applicable to the Pledgor for any Valuation Date will equal the amount by which:

    (i)     the Credit Support Amount

exceeds

    (ii)    the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party.


(b)     *Return Amount.* Subject to Paragraphs 4 and 5, upon a demand made by the Pledgor on or promptly following a Valuation Date, if the Return Amount for that Valuation Date equals or exceeds the Secured Party's Minimum Transfer Amount, then the Secured Party will Transfer to the Pledgor Posted Credit Support specified by the Pledgor in that demand having a Value as of the date of Transfer as close as practicable to the applicable Return Amount (rounded pursuant to Paragraph 13). Unless otherwise specified in Paragraph 13, the *"Return Amount"* applicable to the Secured Party for any Valuation Date will equal the amount by which:

    (i)     the Value as of that Valuation Date of all Posted Credit Support held by the Secured Party

exceeds

    (ii)    the Credit Support Amount.

*"Credit Support Amount"* means, unless otherwise specified in Paragraph 13, for any Valuation Date (i) the Secured Party's Exposure for that Valuation Date plus (ii) the aggregate of all Independent Amounts applicable to the Pledgor, if any, minus (iii) all Independent Amounts applicable to the Secured Party, if any, minus (iv) the Pledgor's Threshold; *provided, however,* that the Credit Support Amount will be deemed to be zero whenever the calculation of Credit Support Amount yields a number less than zero.

**Paragraph 4. Conditions Precedent, Transfer Timing, Calculations and Substitutions**

(a)     *Conditions Precedent.* Each Transfer obligation of the Pledgor under Paragraphs 3 and 5 and of the Secured Party under Paragraphs 3, 4(d)(ii), 5 and 6(d) is subject to the conditions precedent that:

    (i)     no Event of Default, Potential Event of Default or Specified Condition has occurred and is continuing with respect to the other party; and

    (ii)    no Early Termination Date for which any unsatisfied payment obligations exist has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the other party.

(b)     *Transfer Timing.* Subject to Paragraphs 4(a) and 5 and unless otherwise specified, if a demand for the Transfer of Eligible Credit Support or Posted Credit Support is made by the Notification Time, then the relevant Transfer will be made not later than the close of business on the next Local Business Day; if a demand is made after the Notification Time, then the relevant Transfer will be made not later than the close of business on the second Local Business Day thereafter.

(c)     *Calculations.* All calculations of Value and Exposure for purposes of Paragraphs 3 and 6(d) will be made by the Valuation Agent as of the Valuation Time. The Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) of its calculations not later than the Notification Time on the Local Business Day following the applicable Valuation Date (or in the case of Paragraph 6(d), following the date of calculation).

2

(d)    *Substitutions.*

(i)  Unless otherwise specified in Paragraph 13, upon notice to the Secured Party specifying the items of Posted Credit Support to be exchanged, the Pledgor may, on any Local Business Day, Transfer to the Secured Party substitute Eligible Credit Support (the "Substitute Credit Support"); and

(ii)  subject to Paragraph 4(a), the Secured Party will Transfer to the Pledgor the items of Posted Credit Support specified by the Pledgor in its notice not later than the Local Business Day following the date on which the Secured Party receives the Substitute Credit Support, unless otherwise specified in Paragraph 13 (the "Substitution Date"); *provided* that the Secured Party will only be obligated to Transfer Posted Credit Support with a Value as of the date of Transfer of that Posted Credit Support equal to the Value as of that date of the Substitute Credit Support.

**Paragraph 5. Dispute Resolution**

If a party (a "Disputing Party") disputes (I) the Valuation Agent's calculation of a Delivery Amount or a Return Amount or (II) the Value of any Transfer of Eligible Credit Support or Posted Credit Support, then (1) the Disputing Party will notify the other party and the Valuation Agent (if the Valuation Agent is not the other party) not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (2) subject to Paragraph 4(a), the appropriate party will Transfer the undisputed amount to the other party not later than the close of business on the Local Business Day following (X) the date that the demand is made under Paragraph 3 in the case of (I) above or (Y) the date of Transfer in the case of (II) above, (3) the parties will consult with each other in an attempt to resolve the dispute and (4) if they fail to resolve the dispute by the Resolution Time, then:

(i)  In the case of a dispute involving a Delivery Amount or Return Amount, unless otherwise specified in Paragraph 13, the Valuation Agent will recalculate the Exposure and the Value as of the Recalculation Date by:

(A) utilizing any calculations of Exposure for the Transactions (or Swap Transactions) that the parties have agreed are not in dispute;

(B) calculating the Exposure for the Transactions (or Swap Transactions) in dispute by seeking four actual quotations at mid-market from Reference Market-makers for purposes of calculating Market Quotation, and taking the arithmetic average of those obtained; *provided* that if four quotations are not available for a particular Transaction (or Swap Transaction), then fewer than four quotations may be used for that Transaction (or Swap Transaction); and if no quotations are available for a particular Transaction (or Swap Transaction), then the Valuation Agent's original calculations will be used for that Transaction (or Swap Transaction); and

(C) utilizing the procedures specified in Paragraph 13 for calculating the Value, if disputed, of Posted Credit Support.

(ii)  In the case of a dispute involving the Value of any Transfer of Eligible Credit Support or Posted Credit Support, the Valuation Agent will recalculate the Value as of the date of Transfer pursuant to Paragraph 13.

Following a recalculation pursuant to this Paragraph, the Valuation Agent will notify each party (or the other party, if the Valuation Agent is a party) not later than the Notification Time on the Local Business Day following the Resolution Time. The appropriate party will, upon demand following that notice by the Valuation Agent or a resolution pursuant to (3) above and subject to Paragraphs 4(a) and 4(b), make the appropriate Transfer.

**Paragraph 6. Holding and Using Posted Collateral**

(a)      *Care of Posted Collateral.* Without limiting the Secured Party's rights under Paragraph 6(c), the Secured Party will exercise reasonable care to assure the safe custody of all Posted Collateral to the extent required by applicable law, and in any event the Secured Party will be deemed to have exercised reasonable care if it exercises at least the same degree of care as it would exercise with respect to its own property. Except as specified in the preceding sentence, the Secured Party will have no duty with respect to Posted Collateral, including, without limitation, any duty to collect any Distributions, or enforce or preserve any rights pertaining thereto.

(b)      **Eligibility to Hold Posted Collateral; Custodians.**

(i)  *General.* Subject to the satisfaction of any conditions specified in Paragraph 13 for holding Posted Collateral, the Secured Party will be entitled to hold Posted Collateral or to appoint an agent (a "Custodian") to hold Posted Collateral for the Secured Party. Upon notice by the Secured Party to the Pledgor of the appointment of a Custodian, the Pledgor's obligations to make any Transfer will be discharged by making the Transfer to that Custodian. The holding of Posted Collateral by a Custodian will be deemed to be the holding of that Posted Collateral by the Secured Party for which the Custodian is acting.

(ii) *Failure to Satisfy Conditions.* If the Secured Party or its Custodian fails to satisfy any conditions for holding Posted Collateral, then upon a demand made by the Pledgor, the Secured Party will, not later than five Local Business Days after the demand, Transfer or cause its Custodian to Transfer all Posted Collateral held by it to a Custodian that satisfies those conditions or to the Secured Party if it satisfies those conditions.

(iii) *Liability.* The Secured Party will be liable for the acts or omissions of its Custodian to the same extent that the Secured Party would be liable hereunder for its own acts or omissions.

(c)      *Use of Posted Collateral.* Unless otherwise specified in Paragraph 13 and without limiting the rights and obligations of the parties under Paragraphs 3, 4(d)(ii), 5, 6(d) and 8, if the Secured Party is not a Defaulting Party or an Affected Party with respect to a Specified Condition and no Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then the Secured Party will, notwithstanding Section 9-207 of the New York Uniform Commercial Code, have the right to:

(i)  sell, pledge, rehypothecate, assign, invest, use, commingle or otherwise dispose of, or otherwise use in its business any Posted Collateral it holds, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor; and

(ii) register any Posted Collateral in the name of the Secured Party, its Custodian or a nominee for either.

For purposes of the obligation to Transfer Eligible Credit Support or Posted Credit Support pursuant to Paragraphs 3 and 5 and any rights or remedies authorized under this Agreement, the Secured Party will be deemed to continue to hold all Posted Collateral and to receive Distributions made thereon, regardless of whether the Secured Party has exercised any rights with respect to any Posted Collateral pursuant to (i) or (ii) above.

(d)      *Distributions and Interest Amount.*

(i)  *Distributions.* Subject to Paragraph 4(a), if the Secured Party receives or is deemed to receive Distributions on a Local Business Day, it will Transfer to the Pledgor not later than the following Local Business Day any Distributions it receives or is deemed to receive to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose).

(ii)  *Interest Amount.* Unless otherwise specified in Paragraph 13 and subject to Paragraph 4(a), in lieu of any interest, dividends or other amounts paid or deemed to have been paid with respect to Posted Collateral in the form of Cash (all of which may be retained by the Secured Party), the Secured Party will Transfer to the Pledgor at the times specified in Paragraph 13 the Interest Amount to the extent that a Delivery Amount would not be created or increased by that Transfer, as calculated by the Valuation Agent (and the date of calculation will be deemed to be a Valuation Date for this purpose). The Interest Amount or portion thereof not Transferred pursuant to this Paragraph will constitute Posted Collateral in the form of Cash and will be subject to the security interest granted under Paragraph 2.

## Paragraph 7. Events of Default

For purposes of Section 5(a)(iii)(1) of this Agreement, an Event of Default will exist with respect to a party if:

(i)  that party fails (or fails to cause its Custodian) to make, when due, any Transfer of Eligible Collateral, Posted Collateral or the Interest Amount, as applicable, required to be made by it and that failure continues for two Local Business Days after notice of that failure is given to that party;

(ii)  that party fails to comply with any restriction or prohibition specified in this Annex with respect to any of the rights specified in Paragraph 6(c) and that failure continues for five Local Business Days after notice of that failure is given to that party; or

(iii)  that party fails to comply with or perform any agreement or obligation other than those specified in Paragraphs 7(i) and 7(ii) and that failure continues for 30 days after notice of that failure is given to that party.

## Paragraph 8. Certain Rights and Remedies

(a)  *Secured Party's Rights and Remedies.* If at any time (1) an Event of Default or Specified Condition with respect to the Pledgor has occurred and is continuing or (2) an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Pledgor, then, unless the Pledgor has paid in full all of its Obligations that are then due, the Secured Party may exercise one or more of the following rights and remedies:

(i)  all rights and remedies available to a secured party under applicable law with respect to Posted Collateral held by the Secured Party;

(ii)  any other rights and remedies available to the Secured Party under the terms of Other Posted Support, if any;

(iii)  the right to Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

(iv)  the right to liquidate any Posted Collateral held by the Secured Party through one or more public or private sales or other dispositions with such notice, if any, as may be required under applicable law, free from any claim or right of any nature whatsoever of the Pledgor, including any equity or right of redemption by the Pledgor (with the Secured Party having the right to purchase any or all of the Posted Collateral to be sold) and to apply the proceeds (or the Cash equivalent thereof) from the liquidation of the Posted Collateral to any amounts payable by the Pledgor with respect to any Obligations in that order as the Secured Party may elect.

Each party acknowledges and agrees that Posted Collateral in the form of securities may decline speedily in value and is of a type customarily sold on a recognized market, and, accordingly, the Pledgor is not entitled to prior notice of any sale of that Posted Collateral by the Secured Party, except any notice that is required under applicable law and cannot be waived.

(b)    *Pledgor's Rights and Remedies.* If at any time an Early Termination Date has occurred or been designated as the result of an Event of Default or Specified Condition with respect to the Secured Party, then (except in the case of an Early Termination Date relating to less than all Transactions (or Swap Transactions) where the Secured Party has paid in full all of its obligations that are then due under Section 6(e) of this Agreement):

    (i)  the Pledgor may exercise all rights and remedies available to a pledgor under applicable law with respect to Posted Collateral held by the Secured Party;

    (ii)  the Pledgor may exercise any other rights and remedies available to the Pledgor under the terms of Other Posted Support, if any;

    (iii) the Secured Party will be obligated immediately to Transfer all Posted Collateral and the Interest Amount to the Pledgor; and

    (iv) to the extent that Posted Collateral or the Interest Amount is not so Transferred pursuant to (iii) above, the Pledgor may:

        (A) Set-off any amounts payable by the Pledgor with respect to any Obligations against any Posted Collateral or the Cash equivalent of any Posted Collateral held by the Secured Party (or any obligation of the Secured Party to Transfer that Posted Collateral); and

        (B) to the extent that the Pledgor does not Set-off under (iv)(A) above, withhold payment of any remaining amounts payable by the Pledgor with respect to any Obligations, up to the Value of any remaining Posted Collateral held by the Secured Party, until that Posted Collateral is Transferred to the Pledgor.

(c)    *Deficiencies and Excess Proceeds.* The Secured Party will Transfer to the Pledgor any proceeds and Posted Credit Support remaining after liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b) after satisfaction in full of all amounts payable by the Pledgor with respect to any Obligations; the Pledgor in all events will remain liable for any amounts remaining unpaid after any liquidation, Set-off and/or application under Paragraphs 8(a) and 8(b).

(d)    *Final Returns.* When no amounts are or thereafter may become payable by the Pledgor with respect to any Obligations (except for any potential liability under Section 2(d) of this Agreement), the Secured Party will Transfer to the Pledgor all Posted Credit Support and the Interest Amount, if any.

**Paragraph 9. Representations**

Each party represents to the other party (which representations will be deemed to be repeated as of each date on which it, as the Pledgor, Transfers Eligible Collateral) that:

    (i)  it has the power to grant a security interest in and lien on any Eligible Collateral it Transfers as the Pledgor and has taken all necessary actions to authorize the granting of that security interest and lien;

    (ii)  it is the sole owner of or otherwise has the right to Transfer all Eligible Collateral it Transfers to the Secured Party hereunder, free and clear of any security interest, lien, encumbrance or other restrictions other than the security interest and lien granted under Paragraph 2;

    (iii) upon the Transfer of any Eligible Collateral to the Secured Party under the terms of this Annex, the Secured Party will have a valid and perfected first priority security interest therein (assuming that any central clearing corporation or any third-party financial intermediary or other entity not within the control of the Pledgor involved in the Transfer of that Eligible Collateral gives the notices and takes the action required of it under applicable law for perfection of that interest); and

    (iv) the performance by it of its obligations under this Annex will not result in the creation of any security interest, lien or other encumbrance on any Posted Collateral other than the security interest and lien granted under Paragraph 2.

**Paragraph 10. Expenses**

(a)      *General.* Except as otherwise provided in Paragraphs 10(b) and 10(c), each party will pay its own costs and expenses in connection with performing its obligations under this Annex and neither party will be liable for any costs and expenses incurred by the other party in connection herewith.

(b)      *Posted Credit Support.* The Pledgor will promptly pay when due all taxes, assessments or charges of any nature that are imposed with respect to Posted Credit Support held by the Secured Party upon becoming aware of the same, regardless of whether any portion of that Posted Credit Support is subsequently disposed of under Paragraph 6(c), except for those taxes, assessments and charges that result from the exercise of the Secured Party's rights under Paragraph 6(c).

(c)      *Liquidation/Application of Posted Credit Support.* All reasonable costs and expenses incurred by or on behalf of the Secured Party or the Pledgor in connection with the liquidation and/or application of any Posted Credit Support under Paragraph 8 will be payable, on demand and pursuant to the Expenses Section of this Agreement, by the Defaulting Party or, if there is no Defaulting Party, equally by the parties.

**Paragraph 11. Miscellaneous**

(a)      *Default Interest.* A Secured Party that fails to make, when due, any Transfer of Posted Collateral or the Interest Amount will be obligated to pay the Pledgor (to the extent permitted under applicable law) an amount equal to interest at the Default Rate multiplied by the Value of the items of property that were required to be Transferred, from (and including) the date that Posted Collateral or Interest Amount was required to be Transferred to (but excluding) the date of Transfer of that Posted Collateral or Interest Amount. This interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(b)      *Further Assurances.* Promptly following a demand made by a party, the other party will execute, deliver, file and record any financing statement, specific assignment or other document and take any other action that may be necessary or desirable and reasonably requested by that party to create, preserve, perfect or validate any security interest or lien granted under Paragraph 2, to enable that party to exercise or enforce its rights under this Annex with respect to Posted Credit Support or an Interest Amount or to effect or document a release of a security interest on Posted Collateral or an Interest Amount.

(c)      *Further Protection.* The Pledgor will promptly give notice to the Secured Party of, and defend against, any suit, action, proceeding or lien that involves Posted Credit Support Transferred by the Pledgor or that could adversely affect the security interest and lien granted by it under Paragraph 2, unless that suit, action, proceeding or lien re sults from the exercise of the Secured Party's rights under Paragraph 6(c).

(d)      *Good Faith and Commercially Reasonable Manner.* Performance of all obligations under this Annex, including, but not limited to, all calculations, valuations and determinations made by either party, will be made in good faith and in a commercially reasonable manner.

(e)      *Demands and Notices.* All demands and notices made by a party under this Annex will be made as specified in the Notices Section of this Agreement, except as otherwise provided in Paragraph 13.

(f)      *Specifications of Certain Matters.* Anything referred to in this Annex as being specified in Paragraph 13 also may be specified in one or more Confirmations or other documents and this Annex will be construed accordingly.

**Paragraph 12. Definitions**

As used in this Annex:-

*"Cash"* means the lawful currency of the United States of America.

*"Credit Support Amount"* has the meaning specified in Paragraph 3.

*"Custodian"* has the meaning specified in Paragraphs 6(b)(i) and 13.

*"Delivery Amount"* has the meaning specified in Paragraph 3(a).

*"Disputing Party"* has the meaning specified in Paragraph 5.

*"Distributions"* means with respect to Posted Collateral other than Cash, all principal, interest and other payments and distributions of cash or other property with respect thereto, regardless of whether the Secured Party has disposed of that Posted Collateral under Paragraph 6(c). Distributions will not include any item of property acquired by the Secured Party upon any disposition or liquidation of Posted Collateral or, with respect to any Posted Collateral in the form of Cash, any distributions on that collateral, unless otherwise specified herein.

*"Eligible Collateral"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Eligible Credit Support"* means Eligible Collateral and Other Eligible Support.

*"Exposure"* means for any Valuation Date or other date for which Exposure is calculated and subject to Paragraph 5 in the case of a dispute, the amount, if any, that would be payable to a party that is the Secured Party by the other party (expressed as a positive number) or by a party that is the Secured Party to the other party (expressed as a negative number) pursuant to Section 6(e)(ii)(2)(A) of this Agreement as if all Transactions (or Swap Transactions) were being terminated as of the relevant Valuation Time; *provided* that Market Quotation will be determined by the Valuation Agent using its estimates at mid-market of the amounts that would be paid for Replacement Transactions (as that term is defined in the definition of "Market Quotation").

*"Independent Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Interest Amount"* means, with respect to an Interest Period, the aggregate sum of the amounts of interest calculated for each day in that Interest Period on the principal amount of Posted Collateral in the form of Cash held by the Secured Party on that day, determined by the Secured Party for each such day as follows:

　　　　(x)　the amount of that Cash on that day; multiplied by

　　　　(y)　the Interest Rate in effect for that day; divided by

　　　　(z)　360.

*"Interest Period"* means the period from (and including) the last Local Business Day on which an Interest Amount was Transferred (or, if no Interest Amount has yet been Transferred, the Local Business Day on which Posted Collateral in the form of Cash was Transferred to or received by the Secured Party) to (but excluding) the Local Business Day on which the current Interest Amount is to be Transferred.

*"Interest Rate"* means the rate specified in Paragraph 13.

*"Local Business Day"*, unless otherwise specified in Paragraph 13, has the meaning specified in the Definitions Section of this Agreement, except that references to a payment in clause (b) thereof will be deemed to include a Transfer under this Annex.

*"Minimum Transfer Amount"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Notification Time"* has the meaning specified in Paragraph 13.

*"Obligations"* means, with respect to a party, all present and future obligations of that party under this Agreement and any additional obligations specified for that party in Paragraph 13.

*"Other Eligible Support"* means, with respect to a party, the items, if any, specified as such for that party in Paragraph 13.

*"Other Posted Support"* means all Other Eligible Support Transferred to the Secured Party that remains in effect for the benefit of that Secured Party.

*"Pledgor"* means either party, when that party (i) receives a demand for or is required to Transfer Eligible Credit Support under Paragraph 3(a) or (ii) has Transferred Eligible Credit Support under Paragraph 3(a).

*"Posted Collateral"* means all Eligible Collateral, other property, Distributions, and all proceeds thereof that have been Transferred to or received by the Secured Party under this Annex and not Transferred to the Pledgor pursuant to Paragraph 3(b), 4(d)(ii) or 6(d)(i) or released by the Secured Party under Paragraph 8. Any Interest Amount or portion thereof not Transferred pursuant to Paragraph 6(d)(ii) will constitute Posted Collateral in the form of Cash.

*"Posted Credit Support"* means Posted Collateral and Other Posted Support.

*"Recalculation Date"* means the Valuation Date that gives rise to the dispute under Paragraph 5; *provided, however,* that if a subsequent Valuation Date occurs under Paragraph 3 prior to the resolution of the dispute, then the "Recalculation Date" means the most recent Valuation Date under Paragraph 3.

*"Resolution Time"* has the meaning specified in Paragraph 13.

*"Return Amount"* has the meaning specified in Paragraph 3(b).

*"Secured Party"* means either party, when that party (i) makes a demand for or is entitled to receive Eligible Credit Support under Paragraph 3(a) or (ii) holds or is deemed to hold Posted Credit Support.

*"Specified Condition"* means, with respect to a party, any event specified as such for that party in Paragraph 13.

*"Substitute Credit Support"* has the meaning specified in Paragraph 4(d)(i).

*"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

*"Threshold"* means, with respect to a party, the amount specified as such for that party in Paragraph 13; if no amount is specified, zero.

*"Transfer"* means, with respect to any Eligible Credit Support, Posted Credit Support or Interest Amount, and in accordance with the instructions of the Secured Party, Pledgor or Custodian, as applicable:

(i) in the case of Cash, payment or delivery by wire transfer into one or more bank accounts specified by the recipient;

(ii) in the case of certificated securities that cannot be paid or delivered by book-entry, payment or delivery in appropriate physical form to the recipient or its account accompanied by any duly executed instruments of transfer, assignments in blank, transfer tax stamps and any other documents necessary to constitute a legally valid transfer to the recipient;

(iii) in the case of securities that can be paid or delivered by book-entry, the giving of written instructions to the relevant depository institution or other entity specified by the recipient, together with a written copy thereof to the recipient, sufficient if complied with to result in a legally effective transfer of the relevant interest to the recipient; and

(iv) in the case of Other Eligible Support or Other Posted Support, as specified in Paragraph 13.

9

*"Valuation Agent"* has the meaning specified in Paragraph 13.

*"Valuation Date"* means each date specified in or otherwise determined pursuant to Paragraph 13.

*"Valuation Percentage"* means, for any item of Eligible Collateral, the percentage specified in Paragraph 13.

*"Valuation Time"* has the meaning specified in Paragraph 13.

*"Value"* means for any Valuation Date or other date for which Value is calculated and subject to Paragraph 5 in the case of a dispute, with respect to:

    (i)   Eligible Collateral or Posted Collateral that is:

        (A) Cash, the amount thereof; and

        (B) a security, the bid price obtained by the Valuation Agent multiplied by the applicable Valuation Percentage, if any;

    (ii)   Posted Collateral that consists of items that are not specified as Eligible Collateral, zero; and

    (iii)  Other Eligible Support and Other Posted Support, as specified in Paragraph 13.

**Party A: BARCLAYS BANK PLC**
**Party B: AMERICAN HOME MORTGAGE INVESTMENT CORP.**

**Paragraph 13.  Elections and Variables**

(a)   *Security Interest for "Obligations".*  The term *"Obligations"* as used in this Annex includes the following additional obligations:

With respect to Party A:  None.

With respect to Party B:  None.

(b)   *Credit Support Obligations.*

  (i)   *Delivery Amount, Return Amount and Credit Support Amount.*

    (A)   *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

    (B)   *"Return Amount"* has the meaning specified in Paragraph 3(b).

    (C)   *"Credit Support Amount"* has the meaning specified in Paragraph 3.

  (ii)   *Eligible Collateral.*  The following items will qualify as *"Eligible Collateral"* for the party specified:

|     |     | Party A | Party B | Valuation Percentage |
|-----|-----|---------|---------|----------------------|
| (A) | Cash | X | X | 100% |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department ("Treasury Securities") having a remaining term to maturity of not more than 1 year | X | X | 100% |
| (C) | Treasury Securities having a remaining term to maturity of more than 1 year but not more than 2 years | X | X | 99.25% |
| (D) | Treasury Securities having a remaining term to maturity of more than 2 years but not more than 5 years | X | X | 98.5% |
| (E) | Treasury Securities having a remaining term to maturity of more than 5 years but not more than 10 years | X | X | 97.25% |
| (F) | Treasury Securities having a remaining term to maturity of more than ten years | X | X | 97% |
| (G) | Private Label Mortgage-Backed Securities (as defined below) with a Credit Rating of AA- / Aa3  or higher | X | X | 95% |

11

| (H) | Private Label Mortgage-Backed Securities (as defined below) with a Credit Rating of A / A2 or A- / A3 | X | X | 90% |
| (I) | Private Label Mortgage-Backed Securities (as defined below) with a Credit Rating of BBB / Baa2 or BBB- / Baa3 | X | X | 85% |
| (J) | Private Label Mortgage-Backed Securities (as defined below) with a Credit Rating of BB / Ba | X | X | 80% |

"*Private-Label Mortgage-Backed Security*" means fixed-rate and adjustable-rate mortgage-backed securities rated by at least one (1) of Moody's, S&P or Fitch (for the avoidance of doubt, if credit rating agencies differ, the lower rating will apply), identified with a CUSIP Number in Bloomberg and with cash flows available through Bloomberg or Intex (except as set forth below), backed by a mortgage pool consisting of prime, conventional, fixed-rate or adjustable-rate (as applicable), first-lien mortgage loans with terms to maturity of not more that 40 years from the date of origination; provided that, so long as the Secured Party has made such demand by the Notification Time, the Pledgor shall provide the Secured Party with the CUSIP for each such security to be delivered (not to exceed ten (10) CUSIPs with respect to the Transfer of Eligible Credit Support and the Posted Credit Support at any one time) prior to 5:00 p.m. New York time on the date such demand is made by the Secured Party (the "Demand Date"), and if the Secured Party makes such demand after the Notification Time on the Demand Date, the Pledgor shall provide the Secured Party with such CUSIPs by no later than 5:00 p.m. New York time on the date following the Demand Date, and provided, further, that with respect to any mortgage-backed security that has been issued in connection with a mortgage loan securitization transaction by or on behalf of Party B (or any subsidiary or affiliate of Party B) (a "Party B Securitization Transaction") where Party A (or any affiliate of Party A) acted as a lead or co-manager of such Party B Securitization Transaction, Party A and Party B acknowledge and agree that such mortgage-backed security shall constitute a "Private-Label Mortgage-Backed Security," and shall qualify as Eligible Collateral hereunder, regardless of whether such mortgage-backed security can be identified with a CUSIP Number in Bloomberg or has cash flows available through Bloomberg or Intex.

(iii) *Other Eligible Support.* The following items will qualify as "*Other Eligible Support*" for Party A and Party B:  None.

(iv) *Thresholds.*

    (A) *"Independent Amount"* means with respect to a party, except as otherwise provided in a Confirmation: Zero.

    (B) *"Threshold"* means with respect to Party A: zero.
    *"Threshold"* means with respect to Party B: zero.

    (C) *"Minimum Transfer Amount"* means with respect to Party A or Party B: USD 250,000, but provided that if (i) an Event of Default or a Potential Event of Default has occurred with respect to a party, the Minimum Transfer Amount for such party shall be zero; and (ii) where the Credit Support Amount with respect to both parties on a Valuation Date is zero and there are no outstanding Transactions, the Minimum Transfer Amount with respect to both parties on such day shall be zero.

    (D) *Rounding.* The Delivery Amount and the Return Amount will be rounded up and down, in each case, to the nearest integral multiple of USD 10,000, respectively.

(c) *Valuation and Timing.*

    (i) *"Valuation Agent"* means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable, unless otherwise specified here: These rules will apply. In addition, the Valuation Agent will be the Secured Party for purposes of calculating Value in connection with substitutions pursuant to Paragraph 4(d).

    (ii) *"Valuation Date"* means each day that is a Local Business Day for both Party A and Party B.

    (iii) *"Valuation Time"* means the close of business on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable, *provided* that the calculations of Value and Exposure will, as far as practicable, be made as of approximately the same time on the same date.

    (iv) *"Notification Time"* means 11:00 p.m., New York time, on a Local Business Day.

(d) *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination Event(s) will be a *"Specified Condition"* for the party specified (that party being the Affected Party) so long as all Transactions are Affected Transactions:

| | Party A | Party B |
|---|---|---|
| Illegality | X | X |
| Tax Event | X | X |
| Tax Even Upon Merger | X | X |
| Credit Event Upon Merger | X | X |
| Additional Termination Events | X | X |

13

(e)  *Substitution.*

    (i)  *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

    (ii)  *Consent.* If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d): Applicable. Neither party shall unreasonably withhold its consent to any substitution request by the other party.

(f)  *Dispute Resolution.*

    (i)  *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which notice of the dispute is given under Paragraph 5.

    (ii)  *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Eligible Credit Support or Posted Credit Support as of the relevant Valuation Date or date of Transfer will be calculated as follows:

        (A)  With respect to Cash, the amount thereof; and

        (B)  with respect to Treasury Securities, the product of (i) the sum of (1) either (x) the mean of the bid and asked prices for Treasury Securities that appear in Bloomberg Financial Markets and Commodities News produced by The Bloomberg, L.P., a Delaware limited partnership ("Bloomberg") for such day (or, if such day is not a Local Business Day, for the preceding Local Business Day) or (y) if the bid and asked prices for Treasury Securities does not so appear, the mean of the final bid prices quoted on such date by any two principal market makers for such Treasury Securities chosen by the Valuation Agent, or (z) if the bid and asked prices for Treasury Securities does not so appear and if quotations are not available from two principal market makers for such date (to determine whether quotations are not available, the Valuation Agent shall seek quotations from at least three principal market markers), the mean of such final bid prices as of the day next preceding such date on which such quotations were available, plus (2) the accreted interest on such Treasury Securities (except to the extent included in the applicable price referred to in (1) of this clause (B) as of such date), multiplied by (ii) the Valuation Percentage applicable to such Treasury Securities; and, with respect to Private-Label Mortgage-Backed Securities, Value shall be calculated (i) based on quotations contained on an acceptable electronic information service or (ii) by Party A or an affiliate of Party A that is a market-maker in such Private-Label Mortgage-Backed Security.

        The definition of "Value" in this Annex is modified to include in clause (i)(B) thereof after the words "bid price" the parenthetical "(or at the option of the Valuation Agent the mean of the bid price and asked price)".

    (iii)  *Alternative.* The provisions of Paragraph 5 will apply.

(g)  *Holding and Using Posted Collateral.*

(i) *Eligibility to Hold Posted Collateral; Custodians.* Each party (and its Custodian, if any) will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

    (A) Posted Collateral may be held only in the following jurisdictions: New York.

    (B) Party B's Custodian: Party B's Custodian shall (A) be a trust company or a commercial bank with trust powers organized under the laws of the United States or any state thereof and subject to supervision or examination by a federal or state authority and (B) have a Credit Rating of A2 or higher by Moody's or A or higher by Standard & Poor's, respectively.

(ii) *Use of Posted Collateral.* The provisions of Paragraph 6(c) will apply to the parties.

(h) *Distributions and Interest Amount.*

(i) *Interest Rate.* The "Interest Rate" will be the effective Federal Funds rate in U.S. Dollars as reported in Federal Reserve Publication H. 15 or such other rate as the parties may agree from time to time.

(ii) *Transfer of Interest Amount.* The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

(iii) *Alternative to Interest Amount.* The provisions of Paragraph 6(d)(ii) will apply. except as modified here: If Transfer of an Interest Amount (or any portion thereof) to a Pledgor on any day would result in, or increase, a Delivery Amount (treating that day as a Valuation Date, as provided in Paragraph 6(d)(ii)) but the Pledgor would nonetheless have no obligation to make a Transfer pursuant to Paragraph 3(a) on that day if it were a Valuation Date (because the Delivery Amount is lower than the Pledgor's Minimum Transfer Amount or otherwise), the Secured Party will be required to Transfer that Interest Amount (or portion thereof) to the Pledgor, notwithstanding anything to the contrary in Paragraph 6(d)(ii).] [Barclays comment: Checking with my Collateral Management Dept.

(i) *Additional Representation(s):* None.

(j) *Other Eligible Support and Other Posted Support.*

(i) *"Value"* with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(ii) *"Transfer"* with respect to Other Eligible Support and Other Posted Support means: Not applicable.

(k)   *Demands and Notices.*

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here: N/A.

(l)   *Addresses for Transfers.*

Party A:

| For cash: | For Treasury Securities: |
|---|---|
| Barclays Bank PLC, NY | Bank of NYC/BBPLCLDN |
| Aba #026-002-574 | Aba #021-000-018 |
| F/O: Barclays Swaps & Options Group NY | |
| A/C #: 050019228 | |
| Ref: Collateral | |

Party B: To be specified in writing by Party B.

(m)   *Other Provisions.*

(i)   *Transfer of Undisputed Amount.*  Paragraph 5 is hereby amended by adding the following after the phrase "of (II) above" in the eighth line thereof:
"(*provided* that such Transfer need not be made prior to the time that such Transfer need otherwise be made pursuant to the demand made under Paragraph 3)".

(ii)   *Certain Distributions Received.*  If a Secured Party receives or is deemed to receive Distributions on a day that is not a Local Business Day, or after its close of business on a Local Business Day, it will Transfer the Distributions to the Pledgor on the second following Local Business Day, subject to Paragraph 4(a), but only to the extent contemplated in Paragraph 6(d)(i) in connection with Distributions received or deemed received on a Local Business Day.

(iii)   *Set-off.*  For purposes of Paragraphs 2 and 8(a)(iii) of this Annex, the reference to any amount payable under Section 6 of this Agreement in the definition of "Set-off" in this Agreement shall be deemed a reference to any amount payable with respect to any Obligation, as described in Paragraph 8(a)(iii) of this Annex.

(iv)   *Taxes.*  Paragraph 10(b) is hereby amended by adding the following at the end of the text thereof:

; *provided, however,* that notwithstanding this Paragraph 10(b), Section 2(d) of the Agreement shall apply to any Indemnifiable Tax imposed on a payment or deemed payment by the Secured Party to the Pledgor described in Paragraph 6(d) hereof

(v)   *Severability.*  In the event any one or more of the provisions contained in this Annex shall be held illegal, invalid or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in the Agreement shall not in any way be affected or impaired thereby.

(vi) *Additional Definitions.* Paragraph 12 is hereby amended by adding the following:

"*Credit Rating*" means, with respect to a security on any date of determination, the rating then assigned to by Standard & Poor's, Moody's or Fitch.

"*Fitch*" means Fitch Ratings Ltd. or any successor in business thereto.

"*Moody's*" means Moody's Investor Services, Inc. or its successor.

"*Standard & Poor's*" means the Standard & Poor's Ratings Group (a division of McGraw-Hill, Inc.) or its successor.

**BARCLAYS BANK PLC**

By: _____
Name:    Justin Wray
Title:    Director

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**

By: _____
Name:
Title:  Thomas M. McDonagh
        Chief Investment Officer
        American Home Mortgage Investment Corp
        _____ Date_____

17

Barclays Capital
5 The North Colonnade
Canary Wharf
London E14 4BB

Tel +44 (0)20 7623 2323

# BARCLAYS

**To:**        American Home Mortgage Investment Corp.  ("Party B" or "Counterparty")

**Attn:**      Simon Sakamoto

**Fax No:**   (516) 714-2403

**From:**     BARCLAYS BANK PLC (LONDON HEAD OFFICE) ("Party A" or "Barclays")

**Date:**      March 29, 2006

**Reference:**   1141029B

## Balance Guaranteed Cap Confirmation

The purpose of this facsimile (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between us as to the terms of the Transaction. This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement referred to below.

The definitions and provisions contained in the 2000 ISDA Definitions (the "2000 Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. In the event of any inconsistency between the 2000 Definitions and this Confirmation, this Confirmation will govern for the purposes of the Transaction. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for the purposes of the 2000 Definitions. Capitalized terms used in this Confirmation and not defined in this Confirmation or the 2000 Definitions shall have the respective meanings assigned in the Agreement. All terms used herein and not otherwise defined in the Master Agreement referred to above, shall have the meanings given to them in the Indenture, dated as of March 29, 2006 (the "Indenture"), among American Home Mortgage Investment Trust 2006-1, as Issuing Entity, Wells Fargo Bank, N.A., Securities Administrator and Deutsche Bank National Trust Company as Indenture Trustee.

Each party hereto agrees to make payment to the other party hereto in accordance with the provisions of this Confirmation and of the Agreement.

This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between you and us as to the terms of the Swap Transaction to which this Confirmation relates.

This Confirmation is subject to the terms and conditions of the ISDA Master Agreement dated as of March 13, 2006, between each of Party A and Party B and shall form a part of and be subject to that ISDA Master Agreement (the "ISDA Master Agreement").

Each party represents to the other party that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary): -

(a)     **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction: it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction.

(b)     **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(c)     **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

2

The terms of the particular Transaction to which this Confirmation relates are as follows:

## 1. General Terms:

**Notional Amount:** As at any date, the aggregate of the Note Principal Balances of the Class I-1A-1, Class I-A-2, Class I-A-3, Class I-M-1, Class I-M-2 and Class I-M-3 Notes (each an "Applicable Note" and, collectively, the "Applicable Notes") as set forth under the column heading "Beginning Note Balance" in the monthly statement to noteholders issued pursuant to the Indenture (the "Monthly Statement to Noteholders") for the Payment Date following such date.

**Trade Date:** March 29, 2006

**Effective Date:** March 29, 2006

**Termination Date:** The earlier of (a) the date on which the Note Principal Balance of each and every of the Applicable Notes has been reduced to zero, and (b) the Final Scheduled Payment Date, subject to adjustment in accordance with the Following Business Day Convention.

## 2. Floating Amount:

**Floating Amount Payer:** Counterparty

**Floating Amount:** For each Calculation Period, an amount equal to the aggregate of the Uncapped Floater Amounts as defined in each of the Reference Transactions.

**Floating Amount Payer Payment Dates:** One Business Day prior to the 25th calendar day of each month from and including April 25, 2006, to (and including) the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

## 3. Basis Risk Shortfall Carryforward Amounts

**Basis Risk Shortfall Carryforward Amount Payer:** Barclays

**Basis Risk Shortfall Carryforward** For each Calculation Period, an amount equal to the aggregate of the Basis Risk Shortfall Carryforward Amount actually received in respect of each of the Reference Transactions.

3

| | |
|---|---|
| Amount: | |
| Basis Risk Shortfall Carryforward Amount Payer Payment Dates: | The 25th calendar day of each month from and including April 25, 2006, to (and including) the Termination Date, subject to adjustment in accordance with the Following Business Day Convention. |

## 4. Other Provisions

| | |
|---|---|
| Business Days: | New York. |
| Calculation Agent: | Barclays. For the purpose of making any determination or calculation hereunder, the Calculation Agent may rely on any information, report, notice or certificate delivered to it by the Indenture Trustee, or as otherwise provided under the Indenture, and the Calculation Agent shall not be liable for any error, incompleteness or omission regarding such information. |
| Netting of Payments: | Section 2(c)(ii) shall apply to payments made with respect to this Transaction. |
| Condition Precedent to Effectiveness of this Transaction: | **The parties hereto acknowledge and agree that this Confirmation and this Transaction shall not be effective and not shall not give rise to any obligation of payment, performance or otherwise by Barclays or Counterparty unless and until such time as Barclays and the Reference Entity execute all necessary documentation related to the Reference Transactions (including, without limitation, the Confirmations for all of the Reference Transactions).** |
| Additional Termination Event: | Any of the Reference Transactions entered into on or about the date of this Agreement between Party A and the Reference Entity is terminated, and the Reference Entity is the Defaulting Party or the Affected Party as applicable. For the purposes of this Additional Termination Event, Counterparty shall be the sole Affected Party. |
| | Where: |
| | "Reference Entity" means American Home Mortgage Investment Trust, 2006-1; and |
| | "Reference Transaction" means the Transaction between Barclays and each Reference Entity with a trade reference number of 1141010B, 1141017B, 1141020B, 1141021B, 1141024B, 1141026B (collectively, the "Reference Transactions"). |
| 5. Collateral Provisions: | I. Eligible Collateral Criteria |
| | Notwithstanding anything to the contrary in the Credit Support Annex, the posting by the Counterparty of Posted Credit Support in relation to this Transaction shall be limited in the following manner (in each case with Barclays as the Valuation Agent and the rating described below consisting of the long-term rating assigned by S&P or Fitch (or the equivalent rating given by Moody's) to the applicable Eligible Collateral: |
| | Private-Label Mortgage-Backed Securities (which means fixed-rate and adjustable-rate |

mortgage-backed securities rated by at least one (1) of Moody's, S&P or Fitch and for the avoidance of doubt, if credit rating agencies differ, the lower rating will apply) shall be Eligible Collateral and Posted Collateral shall at all times satisfy the following criteria:

    i.    rated "AA" and above must be greater than or equal to 46.15% of the Posted Collateral; and

    ii.    rated "A" and above must be greater than or equal to 73.92% of the Posted Collateral; and

    iii.    rated "BBB" and above must be greater than or equal to 92.30% of the Posted Collateral and

    iv.    rated "BB" and above must be greater than or equal to 100% of the Posted Collateral.

## II. Required Collateral

As applicable to the Counterparty, the Credit Support Amount required to be posted by the Counterparty as Pledgor to Barclays as the Secured Party under the Credit Support Annex as of any relevant date shall be equal to the components of Credit Support Amount as set forth under Sections 5(II)(A), (B) and (C) below.

**(A) Counterparty's Independent Amount:** For purposes of this Transaction, the Independent Amount under the Credit Support Annex shall be applicable solely to the Counterparty as of any relevant date and shall be an amount equal to the product of:

(i) 1.00% multiplied by

(ii) the aggregate Note Principal Balances of the Applicable Notes (the "Aggregate Note Principal Balance") as set forth under the column heading "Beginning Note Balance" in the Monthly Statement to Noteholders applicable to the then-current Calculation Period.

**(B) Reference Cap Mark-to-Market:** As of each Valuation Date (which shall be every Business Day during the term of this Transaction), a hypothetical transaction in the form described below (the "Reference Cap") shall be used by the Valuation Agent to determine the Barclays' Exposure under the Credit Support Annex. A new Reference Cap shall be applicable to each Calculation Period and shall be based on a (i) new Reference Cap Amortization Schedule and (ii) a new Strike Rate as set forth below:

| 1. Reference Cap Notional Amortization Schedule: | A new Reference Cap Amortization Schedule (each with distinct Notional Amounts and Calculation Periods with respect to such Reference Cap) shall be determined for each Calculation Period as follows: <br><br>(a) For each new Reference Cap Amortization Schedule, the Notional Amount with respect to the initial month (the "Initial Notional Amount") shall be an amount equal to the aggregate of the Note Principal Balances of the Applicable Notes applicable to the then-current Calculation Period. |
| --- | --- |

(b) For the Calculation Periods beginning as of the Effective Date and ending on 25-Dec-06, each sequential Reference Cap Notional Amount (each a "Subsequent Notional Amount") shall be determined based on the projected future amortization schedule of the Applicable Notes as determined by the Calculation Agent using publicly available cash-flow models (such as Intex or Bloomberg) using the CPR vector as set forth immediately below:

| Reference Cap Calculation Period | | CPR |
|---|---|---|
| Start Date | End Date | |
| 25-Apr-06 | 25-May-06 | .20 |
| 25-May-06 | 25-Jun-06 | .20 |
| 25-Jun-06 | 25-Jul-06 | .20 |
| 25-Jul-06 | 25-Aug-06 | .2167 |
| 25-Aug-06 | 25-Sep-06 | .2333 |
| 25-Sep-06 and thereafter | 25-Oct-06 and thereafter | .25 |

(c) Beginning with the Calculation Period commencing on 25-Dec-06 and thereafter, each Subsequent Notional Amount of such Reference Cap transaction shall be determined based on the projected future amortization schedule of the Applicable Notes as determined by the Calculation Agent using publicly available cash-flow models (such as Intex or Bloomberg) using the CPR as set forth immediately below:

$$CPR = Min (25\%, X-5\%);$$

Where:

$X$ = 6-month Average CPR (expressed as a percentage) as reported pursuant to the Indenture.

Notwithstanding the foregoing, whenever a Reference Cap Notional Amount equals an amount that is less than 10 percent of the Initial Reference Cap Notional Amount for a Calculation Period, then the Reference Cap Notional Amount shall be deemed to be zero for such Reference Cap Calculation Period and for each remaining Reference Cap Calculation Period.

| | |
|---|---|
| Reference Cap Termination Date: | For each Calculation Period, the Reference Cap Termination Date shall be the Payment Date in March 2046. |
| Reference Cap Buyer: | Barclays |
| Reference Cap Calculation Period: | For each Calculation Period, the Reference Cap Calculation Period shall be from and including the 25th of each month, to but excluding the 25th of the next month; provided that the initial Calculation Period shall commence on the Effective Date and the final |

| | Calculation Period shall end on the Reference Cap Termination Date. |
|---|---|
| Reference Cap Payment Dates: | One Business Day prior to the 25th of each month during the term of the Transaction |
| 2. Strike Rate: | The Strike Rate for each Calculation Period shall be equal to the difference of:<br><br>(a) the weighted average Lifetime Rate Cap of the Group I Loans minus<br><br>(b) Expenses expressed as a percentage.<br><br>"Expenses" shall include each of the following: (i) the Servicing Fee Rate for the Group I Loans; (ii) any LPMI Insurer Fee Rate for the Group I Loans, (iii) the Weighted Average Note Margin and (iv) aggregate of the Uncapped Floater Fee Rate (which is 0.0242% for each Reference Transaction) payable to Barclays under the Reference Transactions.<br><br>Where:<br><br>Weighted Average Note Margin shall be a number equal to the quotient of:<br><br>(A+B+C+D+E+F) divided by the aggregate of the Note Principal Balance of the Applicable Notes for the Calculation Period.<br><br>Where:<br><br>(A) = 0.14%    *    Class I-1A-1 Note Principal Balance for the Calculation Period<br><br>(B) = 0.19%    *    Class I-A-2 Note Principal Balance for the Calculation Period<br><br>(C) = 0.30%    *    Class I-A-3 Note Principal Balance for the Calculation Period<br><br>(D) = 0.38%    *    Class I-M-1 Note Principal Balance for the Calculation Period<br><br>(E) = 0.42%    *    Class I-M-2 Note Principal Balance for the Calculation Period<br><br>(F) = 0.68%    *    Class I-M-3 Note Principal Balance for the Calculation Period |

7

| Floating Rate Option: | USD-LIBOR-BBA |
|---|---|
| Designated Maturity: | One month |
| Floating Rate Day Count Fraction: | Actual/360 |

(C) Exposure under CSA related to Negative Amortization:

In addition to Barclays' Exposure under the Credit Support Annex related to the Reference Cap Mark-to-Market as set forth in Section 5(II)(B) hereof, an additional component of Barclays' Exposure may be applicable in certain circumstances to collateralize exposure related to Negative Amortization with respect to the Reference Transactions and shall be determined as follows:

Barclays' Exposure related to Negative Amortization with respect to the Reference Transactions shall be:

1.  Zero, provided that (a) Excess Spread is greater than 0.74% or (b) the 6-month Average CPR (expressed as a percentage and as reported pursuant to the Indenture) is greater than 11% or (c) the then-current Calculation Period is a Calculation Period ending on or before September 25, 2006; or

2.  If none of (a), (b), or (c) under clause 1 above apply, then an additional component of Barclays' Exposure will be applicable and shall be determined in accordance with the following formula:

$$P \times \max(0, Z)$$

For purposes of 1 above:

"Excess Spread" is an amount equal to:

(a) the difference of the weighted average of the Group I Loan Rates <u>minus</u>

(b) the sum of (i) the weighted average of the Note Interest Rate on the Applicable Notes and (ii) the Expenses expressed as a percentage of the pool balance for the Group I Loans set forth in Section 5(II)(B)(2)(b) above <u>excluding</u> clause (iii) of such definition, the Weighted Average Note Spread.

For purposes of 2 above:

$P$ = the Notional Amount of this Transaction, and

$Z$ = the product of: 0.25% * (12% - Y) * 100, and

$Y$ = the 6-month Average CPR (expressed as a percentage and as reported pursuant to the Indenture)

**6.Accounts Details:**

Payments to Party A:

Correspondent: BARCLAYS BANK PLC NEW YORK
FFED: 026002574
Beneficiary: BARCLAYS SWAPS
Beneficiary Account: 050-01922-8

Payments to Party B:

To be provided by Party B in writing.

**7. Notices:**

Party A:

Address for other Notices:
BGS OPERATIONS
5 THE NORTH COLONNADE
CANARY WHARF
LONDON E14 4PU
Tel:    44(20) 77736603
Fax:    44(20) 77736810
BGSOperations@barcap.com.

Party B:

Pursuant to the ISDA Master Agreement.

9

The time of dealing will be confirmed by Barclays upon written request. Barclays is regulated by the Financial Services Authority. Barclays is acting for its own account in respect of this Transaction.

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within three (3) Business Days by promptly signing in the space provided below and both (i) faxing the signed copy to Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Fax +(44) 20-7773-6810/6857, Tel +(44) 20-7773-6901/6904/6965, and (ii) mailing the signed copy to Barclays Bank PLC, 5 The North Colonnade, Canary Wharf, London E14 4BB, Attention of Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operation. Your failure to respond within such period shall not affect the validity or enforceability of the Transaction against you. This facsimile shall be the only documentation in respect of the Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests.

| For and on behalf of<br>**Barclays Bank PLC** | For and on behalf of<br>**American Home Mortgage Investment Corp.** |
|---|---|
| Name:<br>Title:       **Adam Carysforth**<br>Date:          Authorised Signatory | Name:<br>Title:<br>Date: |

Barclays Bank PLC and its Affiliates, including Barclays Capital Inc., may share with each other information, including non-public credit information, concerning its clients and prospective clients. If you do not want such information to be shared, you must write to the Director of Compliance, Barclays Bank PLC, 200 Park Avenue, New York, NY 10166.

*Confirmation Signature Page for: 1141029B*

10

Barclays Capital
5 The North Colonnade
Canary Wharf
London E14 4BB

Tel +44 (0)20 7623 2323

# BARCLAYS

| | |
|---|---|
| **To:** | American Home Mortgage Investment Corp.  ("Party B" or "Counterparty") |
| **Attn:** | [ ] |
| **Fax No:** | [ ] |
| **From:** | BARCLAYS BANK PLC (LONDON HEAD OFFICE) ("Party A" or "Barclays") |
| **Date:** | March 29, 2006 |
| **Reference:** | 1135578B / 1135614B |

## Rate Cap Corridor Transaction

The purpose of this facsimile (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between us as to the terms of the Transaction. This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement referred to below.

1. The definitions and provisions contained in the 2000 ISDA Definitions (the "2000 Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. In the event of any inconsistency between the 2000 Definitions and this Confirmation, this Confirmation will govern for the purposes of the Transaction. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for the purposes of the 2000 Definitions. Capitalized terms used in this Confirmation and not defined in this Confirmation or the 2000 Definitions shall have the respective meanings assigned in the Agreement.

1

This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between you and us as to the terms of the Swap Transaction to which this Confirmation relates.

This Confirmation is subject to the terms and conditions of the ISDA Master Agreement dated as of March 13, 2006, between each of Party A and Party B and shall form a part of and be subject to that ISDA Master Agreement.

Each party represents to the other party that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary): -

(a)     **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction: it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction.

(b)     **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(c)     **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

The terms of the particular Transaction to which this Confirmation relates are as follows:

| 2. | TRADE DETAILS |
|---|---|
| Notional Amount: | With respect to any Calculation Period the amount set forth for such period in Schedule A attached hereto |
| Trade Date: | March 29, 2006 |
| Effective Date: | March 29, 2006 |
| Termination Date: | March 25, 2012; subject to adjustment in accordance with the Following Business Day Convention |
| Fixed Amounts: | |
|     Fixed Rate Payer: | Counterparty |
|     Fixed Rate Payer Payment Date(s): | March 29, 2006; subject to adjustment in accordance with the Following Business Day |

2

| | |
|---|---|
| | Convention |
| Fixed Amount: | USD360,000 |
| Floating Amounts: | To be determined in accordance with the following formula: Greater of (i) (Floating Rate Option – Strike Rate) * Notional Amount * Floating Rate Day Count Fraction; and (ii) zero. |
| Floating Rate Payer: | Barclays. |
| Strike Rate | 9.1671% |
| Cap Rate | 11.1671% |
| Floating Rate Payer Period End Date(s): | The 25th of each month in each year from (and including) April 25, 2006 to (and including) the Termination Date; subject to adjustment in accordance with the Following Business Day Convention |
| Floating Rate Payer Payment Date(s): | Early Payment shall be applicable. For each Calculation Period, the first Business Day prior to each Floating Rate Payer Period End Date. |
| Floating Rate Option. | USD-LIBOR-BBA; provided, however, that if the Floating Rate determined for such Floating Rate Option for any Calculation Period is greater than the Cap Rate then the Floating Rate Option for such Calculation Period shall be deemed to be the Cap Rate |
| Floating Rate Day Count Fraction: | Actual / 360 |
| Designated Maturity: | 1 Month. |
| Reset Dates: | The first day of Each Calculation Period. |
| Business Days: | New York. |
| Governing Law: | This Transaction and this Confirmation will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine except Section 5-1401 and Section 5-1402 of the New York General |

3

| | |
|---|---|
| | Obligation Law). |
| **3.**<br>Payments to Barclays: | **ACCOUNT DETAILS**<br>Correspondent: BARCLAYS BANK PLC<br>NEW YORK<br>FEED: 026002574<br>Beneficiary: BARCLAYS SWAPS<br>Beneficiary Account: 050-01922-8 |
| Payments to Counterparty: | [PLEASE ADVISE] |
| **4.**<br>Barclays: | **OFFICES**<br>Address for Notices:<br>5 The North Colonnade<br>Canary Wharf<br>E14 4BB<br>Tel: 44(20) 7773 6461<br>Fax: 44(20) 777 36810 |
| Counterparty: | Address for Notices:<br>[PLEASE ADVISE] |

4

The time of dealing will be confirmed by Barclays upon written request. Barclays is regulated by the Financial Services Authority. Barclays is acting for its own account in respect of this Transaction.

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within three (3) Business Days by promptly signing in the space provided below and both (i) faxing the signed copy to Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Fax +(44) 20-7773-6310/6857, Tel +(44) 20-7773-6901/6904/6965, and (ii) mailing the signed copy to Barclays Bank PLC, 5 The North Colonnade, Canary Wharf, London E14 4BB, Attention of Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Your failure to respond within such period shall not affect the validity or enforceability of the Transaction against you. This facsimile shall be the only documentation in respect of the Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests.

| For and on behalf of Barclays Bank PLC | | For and on behalf of American Home Mortgage Investment Corp. | |
|---|---|---|---|
| Name: Sally Green | | Name: Thomas M. McDonald | |
| Title: Authorised Signatory | | Title: Chief Investment Officer | |
| Date: | | Date: American Home Mortgage Investment Corp. 3·29 Date 2001 | |

Barclays Bank PLC and its Affiliates, including Barclays Capital Inc., may share with each other information, including non-public credit information, concerning its clients and prospective clients. If you do not want such information to be shared, you must write to the Director of Compliance: Barclays Bank PLC, 200 Park Avenue, New York, NY 10166.

Confirm signature page for [11XX5788 / 11X4614]

5

Schedule A to the Confirmation dated as of March 29, 2006
Re: Reference Number 11355787B / 1135614B

| PERIOD START DATE | PERIOD END DATE | NOTIONAL (in USD) |
|---|---|---|
| 29-Mar-06 | 25-Apr-06 | -0- |
| 25-Apr-06 | 25-May-06 | 1,221,820,616 |
| 25-May-06 | 25-Jun-06 | 1,195,809,598 |
| 25-Jun-06 | 25-Jul-06 | 1,168,433,014 |
| 25-Jul-06 | 25-Aug-06 | 1,141,600,693 |
| 25-Aug-06 | 25-Sep-06 | 1,115,355,345 |
| 25-Sep-06 | 25-Oct-06 | 1,089,680,139 |
| 25-Oct-06 | 25-Nov-06 | 1,064,562,504 |
| 25-Nov-06 | 25-Dec-06 | 1,039,989,552 |
| 25-Dec-06 | 25-Jan-07 | 1,015,910,524 |
| 25-Jan-07 | 25-Feb-07 | 992,182,846 |
| 25-Feb-07 | 25-Mar-07 | 968,970,328 |
| 25-Mar-07 | 25-Apr-07 | 946,265,259 |
| 25-Apr-07 | 25-May-07 | 924,056,386 |
| 25-May-07 | 25-Jun-07 | 902,332,708 |
| 25-Jun-07 | 25-Jul-07 | 881,083,473 |
| 25-Jul-07 | 25-Aug-07 | 860,298,169 |
| 25-Aug-07 | 25-Sep-07 | 839,966,520 |
| 25-Sep-07 | 25-Oct-07 | 820,078,481 |
| 25-Oct-07 | 25-Nov-07 | 800,624,232 |
| 25-Nov-07 | 25-Dec-07 | 781,593,694 |
| 25-Dec-07 | 25-Jan-08 | 762,942,602 |
| 25-Jan-08 | 25-Feb-08 | 744,543,946 |
| 25-Feb-08 | 25-Mar-08 | 726,544,707 |
| 25-Mar-08 | 25-Apr-08 | 708,941,244 |
| 25-Apr-08 | 25-May-08 | 691,724,737 |
| 25-May-08 | 25-Jun-08 | 674,886,563 |
| 25-Jun-08 | 25-Jul-08 | 658,418,294 |
| 25-Jul-08 | 25-Aug-08 | 642,311,691 |
| 25-Aug-08 | 25-Sep-08 | 626,558,703 |
| 25-Sep-08 | 25-Oct-08 | 611,151,459 |
| 25-Oct-08 | 25-Nov-08 | 596,082,264 |
| 25-Nov-08 | 25-Dec-08 | 581,343,213 |
| 25-Dec-08 | 25-Jan-09 | 566,898,965 |
| 25-Jan-09 | 25-Feb-09 | 552,647,470 |
| 25-Feb-09 | 25-Mar-09 | 538,673,739 |
| 25-Mar-09 | 25-Apr-09 | 524,888,706 |
| 25-Apr-09 | 25-May-09 | 511,411,587 |

| | | |
|---|---|---|
| 25-May-09 | 25-Jun-09 | 498,208,921 |
| 25-Jun-09 | 25-Jul-09 | 485,301,530 |
| 25-Jul-09 | 25-Aug-09 | 472,682,734 |
| 25-Aug-09 | 25-Sep-09 | 460,317,945 |
| 25-Sep-09 | 25-Oct-09 | 448,230,030 |
| 25-Oct-09 | 25-Nov-09 | 438,035,928 |
| 25-Nov-09 | 25-Dec-09 | 428,350,536 |
| 25-Dec-09 | 25-Jan-10 | 418,863,290 |
| 25-Jan-10 | 25-Feb-10 | 409,520,574 |
| 25-Feb-10 | 25-Mar-10 | 400,386,175 |
| 25-Mar-10 | 25-Apr-10 | 391,457,889 |
| 25-Apr-10 | 25-May-10 | 382,731,020 |
| 25-May-10 | 25-Jun-10 | 374,200,980 |
| 25-Jun-10 | 25-Jul-10 | 365,863,284 |
| 25-Jul-10 | 25-Aug-10 | 357,713,554 |
| 25-Aug-10 | 25-Sep-10 | 349,747,509 |
| 25-Sep-10 | 25-Oct-10 | 341,960,969 |
| 25-Oct-10 | 25-Nov-10 | 334,349,846 |
| 25-Nov-10 | 25-Dec-10 | 326,883,379 |
| 25-Dec-10 | 25-Jan-11 | 319,402,203 |
| 25-Jan-11 | 25-Feb-11 | 311,562,251 |
| 25-Feb-11 | 25-Mar-11 | 303,898,794 |
| 25-Mar-11 | 25-Apr-11 | 296,422,003 |
| 25-Apr-11 | 25-May-11 | 289,127,362 |
| 25-May-11 | 25-Jun-11 | 282,010,467 |
| 25-Jun-11 | 25-Jul-11 | 275,067,016 |
| 25-Jul-11 | 25-Aug-11 | 268,292,813 |
| 25-Aug-11 | 25-Sep-11 | 261,683,762 |
| 25-Sep-11 | 25-Oct-11 | 255,235,866 |
| 25-Oct-11 | 25-Nov-11 | 248,945,225 |
| 25-Nov-11 | 25-Dec-11 | 242,808,031 |
| 25-Dec-11 | 25-Jan-12 | 236,820,569 |
| 25-Jan-12 | 25-Feb-12 | 230,979,214 |
| 25-Feb-12 | 25-Mar-12 | 225,280,426 |

Barclays Capital
5 The North Colonnade
Canary Wharf
London E14 4BB

Tel +44 (0)20 7623 2323

# BARCLAYS

| | |
|---|---|
| **To:** | American Home Mortgage Investment Corp.  ("Party B" or "Counterparty") |
| **Attn:** | [ ] |
| **Fax No:** | [ ] |
| **From:** | BARCLAYS BANK PLC (LONDON HEAD OFFICE) ("Party A" or "Barclays") |
| **Date:** | March 29, 2006 |
| **Reference:** | 1135557B / 1135549B |

## Rate Cap Corridor Transaction

The purpose of this facsimile (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between us as to the terms of the Transaction. This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement referred to below.

1.    The definitions and provisions contained in the 2000 ISDA Definitions (the "2000 Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. In the event of any inconsistency between the 2000 Definitions and this Confirmation, this Confirmation will govern for the purposes of the Transaction. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for the purposes of the 2000 Definitions. Capitalized terms used in this Confirmation and not defined in this Confirmation or the 2000 Definitions shall have the respective meanings assigned in the Agreement.

1

This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between you and us as to the terms of the Swap Transaction to which this Confirmation relates.

This Confirmation is subject to the terms and conditions of the ISDA Master Agreement dated as of March 13, 2006, between each of Party A and Party B and shall form a part of and be subject to that ISDA Master Agreement.

Each party represents to the other party that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary): –

(a)     **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction: it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction.

(b)     **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(c)     **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

The terms of the particular Transaction to which this Confirmation relates are as follows:

| 2. | **TRADE DETAILS** |
|---|---|
| Notional Amount: | With respect to any Calculation Period the amount set forth for such period in Schedule A attached hereto |
| Trade Date: | March 29, 2006 |
| Effective Date: | March 29, 2006 |
| Termination Date: | March 25, 2012; subject to adjustment in accordance with the Following Business Day Convention |
| Fixed Amounts: | |
| Fixed Rate Payer: | Counterparty |
| Fixed Rate Payer Payment Date(s): | March 29, 2006; subject to adjustment in accordance with the Following Business Day |

2

| | |
|---|---|
| | Convention |
| Fixed Amount: | USD60,000 |
| **Floating Amounts:** | To be determined in accordance with the following formula: Greater of (i) (Floating Rate Option – Strike Rate) * Notional Amount * Floating Rate Day Count Fraction; and (ii) zero. |
| Floating Rate Payer: | Barclays. |
| Strike Rate | 8.8645% |
| Cap Rate | 10.8645% |
| Floating Rate Payer Period End Date(s): | The 25th of each month in each year from (and including) April 25, 2006 to (and including) the Termination Date; subject to adjustment in accordance with the Following Business Day Convention |
| Floating Rate Payer Payment Date(s): | Early Payment shall be applicable. For each Calculation Period, the first Business Day prior to each Floating Rate Payer Period End Date. |
| Floating Rate Option. | USD-LIBOR-BBA; provided, however, that if the Floating Rate determined for such Floating Rate Option for any Calculation Period is greater than the Cap Rate then the Floating Rate Option for such Calculation Period shall be deemed to be the Cap Rate |
| Floating Rate Day Count Fraction: | Actual / 360 |
| Designated Maturity: | 1 Month. |
| Reset Dates: | The first day of Each Calculation Period. |
| **Business Days:** | New York. |
| **Governing Law:** | This Transaction and this Confirmation will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine except Section 5-1401 and Section 5-1402 of the New York General |

3

| | Obligation Law). |
|---|---|
| **3.**<br>Payments to Barclays: | **ACCOUNT DETAILS**<br>Correspondent: BARCLAYS BANK PLC<br>NEW YORK<br>FEED: 026002574<br>Beneficiary: BARCLAYS SWAPS<br>Beneficiary Account: 050-01922-8 |
| Payments to Counterparty: | [PLEASE ADVISE] |
| **4.**<br>Barclays: | **OFFICES**<br><u>Address for Notices:</u><br>5 The North Colonnade<br>Canary Wharf<br>E14 4 BB<br>Tel: 44(20) 7773 6461<br>Fax: 44(20) 777 36810 |
| Counterparty: | <u>Address for Notices:</u><br>[PLEASE ADVISE] |

4

The time of dealing will be confirmed by Barclays upon written request. Barclays is regulated by the Financial Services Authority. Barclays is acting for its own account in respect of this Transaction.

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within three (3) Business Days by promptly signing in the space provided below and both (i) faxing the signed copy to Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Fax +(44) 20-7773-6810/6857, Tel +(44) 20-7773-6901/6904/6965, and (ii) mailing the signed copy to Barclays Bank PLC, 5 The North Colonnade, Canary Wharf, London E14 4BB, Attention of Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operation, Your failure to respond within such period shall not affect the validity or enforceability of the Transaction against you. This facsimile shall be the only documentation in respect of the Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests.

| For and on behalf of Barclays Bank PLC | For and on behalf of American Home Mortgage Investment Corp. |
|---|---|
| | |
| Name: Sally Green | Name: Thomas M. McDonagh |
| Title: Authorised Signatory | Title: Chief Investment Officer |
| Date: | Date: American Home Mortgage Investment Corp. |
| | 3-29 Date 2008 |

Barclays Bank PLC and its Affiliates, including Barclays Capital Inc., may share with each other information, including non-public credit information, concerning its clients and prospective clients. If you do not want such information to be shared, you must write to the Director of Compliance, Barclays Bank PLC, 200 Park Avenue, New York, NY 10166.

*Confirm Signature Page for 1135587B / 1135549B*

5

Schedule A to the Confirmation dated as of March 29, 2006
Re: Reference Number 1135557B / 1135549B

| PERIOD START DATE | PERIOD END DATE | NOTIONAL (in USD) |
|---|---|---|
| 29-Mar-06 | 25-Apr-06 | -0- |
| 25-Apr-06 | 25-May-06 | 66,513,000 |
| 25-May-06 | 25-Jun-06 | 66,513,000 |
| 25-Jun-06 | 25-Jul-06 | 66,513,000 |
| 25-Jul-06 | 25-Aug-06 | 66,513,000 |
| 25-Aug-06 | 25-Sep-06 | 66,513,000 |
| 25-Sep-06 | 25-Oct-06 | 66,513,000 |
| 25-Oct-06 | 25-Nov-06 | 66,513,000 |
| 25-Nov-06 | 25-Dec-06 | 66,513,000 |
| 25-Dec-06 | 25-Jan-07 | 66,513,000 |
| 25-Jan-07 | 25-Feb-07 | 66,513,000 |
| 25-Feb-07 | 25-Mar-07 | 66,513,000 |
| 25-Mar-07 | 25-Apr-07 | 66,513,000 |
| 25-Apr-07 | 25-May-07 | 66,513,000 |
| 25-May-07 | 25-Jun-07 | 66,513,000 |
| 25-Jun-07 | 25-Jul-07 | 66,513,000 |
| 25-Jul-07 | 25-Aug-07 | 66,513,000 |
| 25-Aug-07 | 25-Sep-07 | 66,513,000 |
| 25-Sep-07 | 25-Oct-07 | 66,513,000 |
| 25-Oct-07 | 25-Nov-07 | 66,513,000 |
| 25-Nov-07 | 25-Dec-07 | 66,513,000 |
| 25-Dec-07 | 25-Jan-08 | 66,513,000 |
| 25-Jan-08 | 25-Feb-08 | 66,513,000 |
| 25-Feb-08 | 25-Mar-08 | 66,513,000 |
| 25-Mar-08 | 25-Apr-08 | 66,513,000 |
| 25-Apr-08 | 25-May-08 | 66,513,000 |
| 25-May-08 | 25-Jun-08 | 66,513,000 |
| 25-Jun-08 | 25-Jul-08 | 66,513,000 |
| 25-Jul-08 | 25-Aug-08 | 66,513,000 |
| 25-Aug-08 | 25-Sep-08 | 66,513,000 |
| 25-Sep-08 | 25-Oct-08 | 66,513,000 |
| 25-Oct-08 | 25-Nov-08 | 66,513,000 |
| 25-Nov-08 | 25-Dec-08 | 66,513,000 |
| 25-Dec-08 | 25-Jan-09 | 66,513,000 |
| 25-Jan-09 | 25-Feb-09 | 66,513,000 |
| 25-Feb-09 | 25-Mar-09 | 66,513,000 |
| 25-Mar-09 | 25-Apr-09 | 66,513,000 |
| 25-Apr-09 | 25-May-09 | 66,513,000 |

6

| | | |
|---|---|---|
| 25-May-09 | 25-Jun-09 | 66,513,000 |
| 25-Jun-09 | 25-Jul-09 | 66,513,000 |
| 25-Jul-09 | 25-Aug-09 | 66,513,000 |
| 25-Aug-09 | 25-Sep-09 | 66,513,000 |
| 25-Sep-09 | 25-Oct-09 | 66,513,000 |
| 25-Oct-09 | 25-Nov-09 | 65,257,582 |
| 25-Nov-09 | 25-Dec-09 | 63,814,675 |
| 25-Dec-09 | 25-Jan-10 | 62,401,287 |
| 25-Jan-10 | 25-Feb-10 | 61,009,430 |
| 25-Feb-10 | 25-Mar-10 | 59,648,609 |
| 25-Mar-10 | 25-Apr-10 | 58,318,493 |
| 25-Apr-10 | 25-May-10 | 57,018,384 |
| 25-May-10 | 25-Jun-10 | 55,747,599 |
| 25-Jun-10 | 25-Jul-10 | 54,505,468 |
| 25-Jul-10 | 25-Aug-10 | 53,291,340 |
| 25-Aug-10 | 25-Sep-10 | 52,104,577 |
| 25-Sep-10 | 25-Oct-10 | 50,944,556 |
| 25-Oct-10 | 25-Nov-10 | 49,810,669 |
| 25-Nov-10 | 25-Dec-10 | 48,698,332 |
| 25-Dec-10 | 25-Jan-11 | 47,583,803 |
| 25-Jan-11 | 25-Feb-11 | 46,415,825 |
| 25-Feb-11 | 25-Mar-11 | 45,274,141 |
| 25-Mar-11 | 25-Apr-11 | 44,160,266 |
| 25-Apr-11 | 25-May-11 | 43,073,527 |
| 25-May-11 | 25-Jun-11 | 42,013,269 |
| 25-Jun-11 | 25-Jul-11 | 40,978,849 |
| 25-Jul-11 | 25-Aug-11 | 39,969,644 |
| 25-Aug-11 | 25-Sep-11 | 38,985,043 |
| 25-Sep-11 | 25-Oct-11 | 38,024,451 |
| 25-Oct-11 | 25-Nov-11 | 37,087,285 |
| 25-Nov-11 | 25-Dec-11 | 36,172,980 |
| 25-Dec-11 | 25-Jan-12 | 35,280,982 |
| 25-Jan-12 | 25-Feb-12 | 34,410,750 |
| 25-Feb-12 | 25-Mar-12 | 33,561,758 |

7

**Barclays Bank PLC**                              **Case No. 07-11048**
<u>**Proof of Claim – Swap Agreement**</u>   <u>**American Home Mortgage Investment Corp.**</u>

<u>**EXHIBIT "B"**</u>

BARCLAYS BANK PLC
200 Park Ave.
New York, NY  10166

August 2, 2007

VIA TELECOPIER,
HAND DELIVERY
AND ELECTRONIC MAIL

American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, NY 11747
Alan B. Horn, General Counsel
Fax: (800) 209-7276

Re:    Notice of Early Termination
Notice of Set-off

Ladies and Gentlemen:

Reference is made to the 1992 ISDA Master Agreement (the "Master Agreement") dated as of March 13, 2006 between American Home Mortgage Investment Corp. ("Counterparty") and Barclays Bank PLC ("Barclays").  All capitalized terms not otherwise defined in this notice shall have the meanings assigned to them in the Master Agreement.

We hereby give notice that one or more Events of Default have occurred and are continuing under the Master Agreement, including without limitation (i) an Event of Default under Section 5(a)(vi) (*Cross Default*) of the Master Agreement as a result of the existence of one or more "Events of Default" under, and as defined in, the Second Amended and Restated Credit Agreement dated as of August 10, 2006 among the Counterparty, the other Borrowers party thereto, Bank of America, N.A., as the Administrative Agent and the other Lenders from time to time party thereto, and (ii) an Event of Default under Section 5(a)(vii) (*Bankruptcy*) of the Master Agreement as a result of Counterparty being unable to pay its debts.

Pursuant to Section 6(a) (*Right to Terminate Following Event of Default*) of the Master Agreement, Barclays hereby designates August 2, 2007, being a date not more than 20 days from the date of this letter, as the Early Termination Date in respect of all outstanding Transactions.

In addition, we hereby notify you that Barclays is exercising its right under Section 6(f) of the Master Agreement to set off any amounts payable by it to Counterparty under the Master Agreement against the Counterparty's unsatisfied obligations, including without limitation "Margin Deficit", existing under, and as defined

in, that Master Repurchase Agreement dated as of February 8, 2006 (together with all annexes, confirmations and schedules thereto, and as the same have been amended, supplemented and otherwise modified as of the date first written above, collectively, the "**MRA**") between Counterparty and our affiliate, Barclays Capital Inc. ("**BCI**").

On or as soon as reasonably practicable following the Early Termination Date, Barclays will provide you with a statement in accordance with Section 6(d)(i) (*Statement*) of the Master Agreement specifying the payments due in relation to the Early Termination Date.

In accordance with Section 12(a) (*Effectiveness*) of the Master Agreement, this notice is being sent by courier during normal business hours and will be deemed effective today.

This notice shall be governed by and construed in accordance with New York law.

Counterparty is further notified that (i) Barclays has certain rights and remedies under applicable law and the Master Agreement, (ii) all such rights and remedies are hereby reserved and no such rights have been waived, abandoned, discontinued or in any other manner precluded from exercise, and (iii) the failure to exercise any such right or remedy shall not constitute (or be deemed to constitute) any waiver, abandonment, discontinuation or other preclusion of the exercise thereof or of any other right or remedy of Barclays.

Very truly yours,

BARCLAYS BANK PLC

By: _____
Name:    Mark Manski
Title:    Director


Cc:    Alan Kaplan, Deputy General Counsel, Americas

2