# EXHIBIT F

# Swap Claim

066585.1001

| UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE<br>American Home Mortgage Claims Processing Center<br>FDR Station, P.O. Box 5076<br>New York, NY 10150-5076 | **PROOF OF CLAIM** |
|---|---|

| In Re:<br>American Home Mortgage Holdings, Inc., et al.,<br>Debtors. | Chapter 11<br>Case No. 07-11047 (CSS)<br>Jointly Administered |
|---|---|
| Name of Debtor Against Which Claim is Held<br>American Home Mortgage Investment Corp | Case No. of Debtor<br>07-11048 |

**NOTE:** This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

THIS SPACE IS FOR COURT USE ONLY

**Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)**

BARCLAYS BANK PLC
Attn: Mark Manski - Head, Credit Restructuring Advisory Group-Americas
200 Park Ave.
New York, NY 10166

with a copy to:
Kirkpatrick & Lockhart Preston Gates Ellis LLP
Attn: Richard S. Miller
599 Lexington Ave.
New York, NY 10022

Telephone number: (212) 536-3900
Email Address: richard.miller@klgates.com

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notice from the bankruptcy court in this case.

☐ Check box if the address shown differs from the address on the envelope sent to you by the court.

Filed: USBC - District of Delaware
American Home Mortgage Holdings, Inc., Et Al.
07-11047 (CSS)          0000008979

**Account or other number by which creditor identifies debtor:**

Check here if this claim:
☐ replaces   ☐ amends a previously filed claim, dated: _____

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other   Swap agreement - See attachment   (explain)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Last Four Digits of your SS#: ___ ___ — ___ ___ — ___ ___ ___ ___
Unpaid compensation for services performed
from _____ to _____
         (date)        (date)

**2. Date debt was incurred:**
March 13, 2006 through August 2, 2007

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ At least $10,830 + _____ + _____ = At least $10,830
  (unsecured nonpriority)   (secured)   (unsecured priority)   (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate   ☐ Motor Vehicle
☐ Other _____
Value of Collateral: $ _____
Amount of arrearage and other charges at time case filed included in secured claim, if any: $ _____

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $ _____
Specify the priority of the claim:
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

**6. Unsecured Nonpriority Claim:** $ At least $10,830
☑ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.

**DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10** Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

FILED / RECEIVED
JAN 11 2008
EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date<br>1/09/08 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any)<br>Head, Credit Restructuring Advisory Group - Americas |
|---|---|

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware | ) |
| corporation, et al., | ) Jointly Administered |
| | ) |
| Debtors. | ) **Doc. Ref. No. 1708** |

## ATTACHMENT TO PROOF OF CLAIM OF
## BARCLAYS BANK PLC

**American Home Mortgage Investment Corp. – Case No. 07-11048**

1.      Barclays Bank PLC ("Barclays") is a party to that certain ISDA Master Agreement (Multicurrency-Cross Border), dated as of March 13, 2006, between Barclays and American Home Mortgage Investment Corp. (the "Debtor"), that certain ISDA Credit Support Annex (Bilateral Form), dated as of March 13, 2006, between Barclays and the Debtor, and certain related Confirmations, copies of which are attached hereto as Exhibit "A", and other related transactional documents, as the same have been amended, supplemented and modified from time to time (collectively, the "Swap Agreement").[1] Pursuant to the Swap Agreement, the Debtor and Barclays entered into certain swap transactions whereby the Debtor and Barclays agreed to make certain payments or deliveries specified in the Confirmations.

2.      Barclays is filing this claim (this "Proof of Claim") pursuant to the "Order Pursuant to Bankruptcy Rule 3003(c)(3) and Local Rule 2002-1(e) Establishing Bar Dates for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof," entered by the

---

[1] Capitalized terms used but not defined herein shall have the meanings set forth in the Swap Agreement.

Court on October 30, 2007 (the "Bar Date Order"), in order to set forth its aggregate claims

against the Debtor arising under or in connection with the Swap Agreement.

      3.      Pursuant to Paragraph 5 of the Swap Agreement, one or more Events of

Default occurred as a result of a certain cross-default and the Debtor being unable to pay its

debts. Pursuant to its letter dated August 2, 2007, a copy of which is attached hereto as Exhibit

"B", Barclays gave notice to the Debtor of (i) the occurrence of one or more Events of Default,

(ii) Barclays' designation of August 2, 2007 as the Early Termination Date in respect of all

outstanding Transactions under the Swap Agreement, and (iii) Barclays' exercise of its right

under the Swap Agreement to set off any amounts payable by Barclays to the Debtor against the

Debtor's unsatisfied obligations under that certain Master Repurchase Agreement dated as of

February 8, 2006, between the Debtor and Barclays Capital Inc., an affiliate of Barclays

(together with all annexes, confirmations and schedules thereto, and as the same have been

amended, supplemented and otherwise modified from time to time).

      4.      The Claimants' damages consist of the following:

      (i)      an amount of $10,830, equal to legal expenses incurred by Barclays by

            reason of the enforcement and protection of its rights under the Swap

            Agreement or by reason of the early termination of the Transactions, as set

            forth in Paragraph 11 of the Swap Agreement; and

      (ii)      Contingent claims for all indemnities of Barclays set forth in the Swap

            Agreement, including without limitation the Debtor's liability for (i) all

            expenses incurred by Barclays by reason of the enforcement and

            protection of its rights under the Swap Agreement or by reason of the

            early termination of the Transactions, as set forth in Paragraph 11 of the

            Swap Agreement; and (ii) all Indemnifiable Taxes, Stamp Taxes and other

indemnified tax liabilities as set forth in Paragraphs 2(d) and 4(e) of the Swap Agreement.

5.    The documents on which this Proof of Claim is based include (without limitation) the documents annexed hereto, and the standard industry forms of (i) the ISDA Master Agreement (Multicurrency-Cross Border) (1992 version), published by the International Swap Dealers Association, Inc., and (ii) the ISDA Credit Support Annex (Bilateral Form) (1994 version), published by the International Swaps and Derivatives Association, Inc.  Barclays will provide copies of additional supporting documentation upon the reasonable written request delivered to counsel for Barclays made by any party in interest in these cases (subject to protection of any confidential information and trade secrets in such documentation).  In addition, Barclays believes that the Debtor has copies of such documents related to the Swap Agreement.

6.    The claims set forth in this Proof of Claim are secured to the extent of any collateral granted to Barclays in respect thereof or Barclays' right of setoff under applicable law, and are otherwise asserted as unsecured claims.  This Proof of Claim is without prejudice to the right of Barclays to claim such amounts as administrative expenses of this case pursuant to Section 503(b) of the Bankruptcy Code.

7.    Barclays reserves the right to assert by way of setoff, counterclaim and/or recoupment, all obligations and liabilities of the Debtor set forth in this Proof of Claim against any liability that may be asserted against Barclays.

8.    Barclays further reserves all rights to assert all claims, including, but not limited to, indemnification and contribution against the Debtor, with respect to any actions brought against it in connection with the Swap Agreement and related documents and the transactions contemplated therein, the Debtor and its estate or the Debtor's affiliates and their estates, whether the actions currently are pending or are filed at a future date.  To the extent that

the Debtor or any other party takes any action that would give rise to a right of counterclaim or other rights or claims Barclays may have against the Debtor, Barclays reserves all of its rights.

   9. No judgment has been rendered on the claims set forth in this Proof of Claim.

   10. Barclays further reserves the right to (i) amend, clarify, modify, update or supplement this Proof of Claim at any time and in any respect, including without limitation to assert additional claims and requests for payment or additional grounds for its claims, and/or to specify the amount of any contingent, unmatured and/or unliquidated claims as they become non-contingent, matured and/or liquidated; (ii) file additional proofs of claim at any time and in any respect; (iii) file separate proofs of claim on its own behalf and/or on behalf of other Barclays entities to the extent permitted by the Bar Date Order or applicable law, required by law or otherwise ordered by the Bankruptcy Court; and/or (iv) file a request for payment of administrative or priority expenses in accordance with 11 U.S.C. §§ 503(b) and 507(a).  By virtue of the filing of this Proof of Claim, Barclays does not waive, and hereby expressly reserves, its right to pursue claims and requests for payment, including but not limited to, the claims and requests for payment described herein against the Debtor based upon alternative legal theories.  To the extent additional discovery provides the basis for further claims against the Debtor in connection with Barclays' entry into and performance under the Swap Agreement with the Debtor, Barclays hereby reserves all such rights to assert such claims against the Debtor, under federal and state law.  Barclays also reserves any equitable claims against the Debtor arising from the Swap Agreement and the transactions contemplated therein.

   11. Barclays also files this Proof of Claim on behalf of any creditor or class of creditors whose claims are subordinate to the claims of Barclays (collectively, the "Subordinated Claims") and Barclays hereby asserts additional claims against the Debtor in the amount of any

such Subordinated Claims. Barclays hereby asserts its right to enforce, and claim all benefits

accorded by, any and all subordination provisions which exist in respect of the Subordinated

Claims. Barclays also reserves the right to amend or supplement this Proof of Claim as may be

necessary or appropriate to preserve the benefits of such Subordinated Claims or to further

protect the rights and remedies of Barclays with respect to any such Subordinated Claims.

      12.    This Proof of Claim is filed to protect Barclays from potential forfeiture of

its claims. The filing of this Proof of Claim shall not constitute: (a) a waiver or release of the

rights of Barclays (whether under the Swap Agreement or applicable law) against the Debtor or

any other person or against any property in which Barclays has an interest or lien, (b) a consent

by Barclays to the jurisdiction of this Court with respect to the subject matter of the claims set

forth in this Proof of Claim, any objection or other proceeding commenced with respect thereto

or any other proceeding commenced in these cases against or otherwise involving Barclays, (c) a

waiver of the right of Barclays to trial by jury in any proceedings so triable in these cases or any

controversy or proceedings related to these cases, (d) an election of remedies, or (e) a waiver or

limitation of any procedural or substantive rights or any procedural or substantive defenses to

any claim that may be asserted against Barclays by the Debtor or by any trustee of its estate, by

any official committee appointed in this Chapter 11 case, or any other party. In addition,

Barclays reserves the right to withdraw this Proof of Claim with respect to its claims for any

reason whatsoever.

      13.    This Proof of Claim is in addition to and does not supersede any other

proofs of claim filed by Barclays against the Debtor. Additionally, this Proof of Claim shall not

prejudice the rights of any Barclays entity or affiliate to file any other requests for payment or

proofs of claim, including claims for the same or additional amounts as claimed herein.

14.    All notices concerning this Proof of Claim shall be sent to:

BARCLAYS BANK PLC
Attn: Mark Manski
    Head, Credit Restructuring Advisory Group-Americas
200 Park Ave.
New York, NY  10166

with a copy to:

KIRKPATRICK & LOCKHART PRESTON GATES
ELLIS LLP
Attn:  Richard S. Miller
599 Lexington Ave.
New York, NY 10022

**Barclays Bank PLC**
**Proof of Claim – Swap Agreement**

Case No. 07-11048
**American Home Mortgage Investment Corp.**

**EXHIBIT "A"**

(Multicurrency—Cross Border)

# ISDA®

International Swap and Derivatives Association, Inc.

# MASTER AGREEMENT

dated as of  March 13, 2006

**BARCLAYS BANK PLC**                      and  **AMERICAN HOME MORTGA GE INVESTMENT CORP.**

...................................................              ...................................................
("Party A")                                                        ("Party B")

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchanged between the parties confirming those Transactions.

Accordingly, the parties agree as follows:—

1.      **Interpretation**

(a)      *Definitions.* The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      *Inconsistency.* In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      *Single Agreement.* All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

2.      **Obligations**

(a)      *General Conditions.*

(i)  Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)  Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii) Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

Copyright © 1992 by International Swap and Derivatives Association, Inc.

value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

**BARCLAYS BANK PLC**

By: _____
Name:
Title:    **Justin Wray**
          **Director**

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**

By: _____
Name:
Title::
        Thomas M. McDonagh
        Chief Investment Officer
        American Home Mortgage Investment Corp.
        _____Date_____

ISDA® 1992

(Multicurrency – Cross-Border)

**SCHEDULE**

to the

**1992 ISDA Master Agreement**

dated as of March 13, 2006

between

| | | |
|---|---|---|
| **BARCLAYS BANK PLC** | and | **AMERICAN HOME MORTGAGE INVESTMENT CORP.** |
| ("Party A") | | ("Party B") |
| *established as a Public Limited Company under the laws of England and Wales* | | *established as a Corporation under the laws of the state of Maryland* |

**Part 1. Termination Provisions.**

(a)  "*Specified Entity*" means in relation to Party A for the purpose of:–

| | |
|---|---|
| Section 5(a)(v), | None |
| Section 5(a)(vi), | None |
| Section 5(a)(vii), | None |
| Section 5(b)(iv), | None |

and in relation to Party B for the purpose of:–

| | |
|---|---|
| Section 5(a)(v), | None |
| Section 5(a)(vi), | None |
| Section 5(a)(vii), | None |
| Section 5(b)(iv), | None |

(b)  "*Specified Transaction*" means instead of the definition in Section 14 of this Agreement, (i) any transaction (including an agreement with respect to any such transaction) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is not a Transaction under this Agreement but (A) which is a rate swap transaction, swap option, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option, credit protection transaction, credit swap, credit default swap, credit default option, total return swap, credit spread transaction, repurchase transaction, reverse repurchase transaction, buy/sell-back transaction, securities lending transaction, weather index transaction or forward purchase or sale of a security, commodity or other financial instrument or interest (including any option with respect to any of these transactions) or (B) which

19

is a type of transaction that is similar to any transaction referred to in clause (A) above that is currently, or in the future becomes, recurrently entered into in the financial markets (including terms and conditions incorporated by reference in such agreement) and which is a forward, swap, future, option or other derivative on one or more rates, currencies, commodities, equity securities or other equity instruments, debt securities or other debt instruments, economic indices or measures of economic risk or value, or other benchmarks against which payments or deliveries are to be made, (ii) any combination of these transactions and (iii) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

(c)  The *"Cross Default"* provisions of Section 5(a)(vi) will apply to Party A and to Party B.  The following shall apply with respect to Section 5(a)(vi):

  (i)  *"Specified Indebtedness"* shall have the meaning specified in Section 14, except that indebtedness or obligations in respect of deposits received in the ordinary course of the banking business of such party shall not constitute Specified Indebtedness.

  (ii)  *"Threshold Amount"* means, in relation to a party, an amount equal to 3% of such party's shareholders' equity on a consolidated basis (determined in accordance with generally accepted accounting principles in such party's jurisdiction of incorporation or organization) as at the end of such party's most recently completed fiscal year.

  (d)  The *"Credit Event Upon Merger"* provisions of Section 5(b)(iv) will apply to Party A and to Party B.

(e)  The *"Automatic Early Termination"* provision of Section 6(a) will not apply to Party A and will not apply to Party B.

(f)  *Payments on Early Termination.*  For the purpose of Section 6(e) of this Agreement:

  (i)  Market Quotation will apply, provided that in respect of FX Transactions and Currency Options (as defined in Part 6 of this Schedule) Loss shall apply.

  (ii)  The Second Method will apply to all Transactions.

(g)  *"Termination Currency"* means United States Dollars.

(h)  *Additional Termination Event* will not apply.

**Part 2.  Tax Representations.**

(a)  *Party A and Party B Payer Tax Representations.*  For the purpose of Section 3(e), each of Party A and Party B makes the following representation:

It is not required by any applicable law, as modified by the practice of any relevant governmental revenue authority, of any Relevant Jurisdiction to make any deduction or withholding for or on account of any Tax from any payment (other than interest under Section 2(e), 6(d)(ii) or 6(e) of this Agreement) to be made by it to the other party under this Agreement.  In making this representation, it may rely on:  (i) the accuracy of any representation made by the other party pursuant to Section 3(f) of this Agreement; (ii) the satisfaction of the agreement of the other party contained in Section 4(a)(i) or 4(a)(iii) of this Agreement and the accuracy and effectiveness of any document provided by the other party pursuant to Section 4(a)(i) or 4(a)(iii) of this Agreement; and (iii) the satisfaction of the agreement of the other party contained in Section 4(d) of this Agreement, provided that it shall not be a breach of this representation where reliance is placed on clause (ii) and the other party does not deliver a form or document under Section 4(a)(iii) by reason of material prejudice to its legal or commercial position.

(b)  *Party A Payee Tax Representations.*  For the purpose of Section 3(f), Party A makes the following representation(s):

(i)     with respect to payments made to Party A which are not effectively connected to the United States:

It is a non-U.S. branch of a foreign person for United States federal income tax purposes.

(ii)    with respect to payments made to Party A which are effectively connected to the United States:

Each payment received or to be received by it in connection with this Agreement will be effectively connected with its conduct of a trade or business in the United States.

(c)    *Party B Payee Tax Representations.*    For the purpose of Section 3(f), Party B makes the following representations:

It is a corporation organized under the laws of the state of Maryland for United States federal income tax purposes.

**Part 3.  Agreement to Deliver Documents.**

For the purpose of Section 4(a)(i) and (ii) of this Agreement, each party agrees to deliver the following documents as applicable:-

(a)    Tax forms, documents or certificates to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered |
|---|---|---|
| Party A and Party B | Any form or document accurately completed and in a manner reasonably satisfactory to the other party that may be required or reasonably requested in order to allow the other party to make a payment under a Transaction without any deduction or withholding for or on account of any Tax or with deduction or withholding at a reduced rate, promptly upon reasonable demand by the other party, including, without limitation, an executed United States Internal Revenue Service Form W-9 or Form W-8BEN and/or W-8ECI (or any successor thereto). | Upon execution of this Agreement, and thereafter promptly upon reasonable demand by the other Party. |

(b)    Other documents to be delivered are:

| Party required to deliver document | Form/Document/ Certificate | Date by which to be delivered | Covered by Section 3(d) Representation |
|---|---|---|---|

| Party A and Party B | Evidence, reasonably satisfactory to the other party, as to the incumbency and true signatures of the signatories of such party for this Agreement and each Confirmation. | Upon execution of this Agreement and, if necessary, each Confirmation. | Yes |
|---|---|---|---|
| Party B | A certified copy of the Resolution of Party B's Board of Directors/Governing Body authorising the execution and delivery of this Agreement and each Confirmation and performance of its obligations hereunder. | At, prior to or as soon as practicable after the execution of this Agreement. | Yes |
| Party A and Party B | The Credit Support Document referred to in Part 4(f) and evidence, reasonably satisfactory to the other Party, as to the incumbency and true signatures of the signatories to such Credit Support Document. | Upon execution of this Agreement, any relevant Credit Support Document and any relevant Confirmation, or as soon as practicable thereafter. | Yes |
| Party B | Copy of Party B's most recent, publicly available quarterly report containing unaudited financial statements. | Where such financial statement is not reasonably publicly available on "EDGAR" or Party B's internet home page, promptly upon reasonable request and in any event no later than 30 days after the end of the relevant fiscal quarterly period. | Yes |
| Party A and Party B | Copy of the annual report of such party, containing annual audited consolidated financial statements, for its most recently ended fiscal year prepared in accordance with generally accepted accounting principles in the country in which such party is organized and certified by independent certified public accountants or chartered accountants. | Where such financial statement is not reasonably publicly available on "EDGAR" or such party's internet home page, promptly upon reasonable request and in any event no later than 60 days after the end of each fiscal year of such party. | Yes |

**Part 4. Miscellaneous.**

(a)     *Addresses for Notices.* For the purpose of Section 12(a) of this Agreement:

*Address for Notices or Communications to Party A:-*
Notices should be sent to the address of the relevant branch set out in the relevant Confirmation (as may be amended from time to time), provided that in the case of notices or communications relating to Section 5, 6, 7, 11 or 13 to, such notices should be sent to:

| | |
|---|---|
| Address: | Barclays Capital |
| | 200 Park Avenue |
| | New York, New York 10166 |
| Attention: | General Counsel |
| Facsimile No.: | (212) 412-7519 |
| Telephone No.: | (212) 412-4000 |

*Address for Notices or Communications to Party B:-*
Notices should be sent to the address of the relevant branch set out in the relevant Confirmation (as may be amended from time to time), provided that in the case of notices or communications relating to Section 5, 6, 7, 11 or 13, such notices should be sent to:

| | |
|---|---|
| Address: | American Home Mortgage Investment Corp. |
| | 538 Broadhollow Road |
| | Melville, NY 11747 |
| Attention: | Alan B. Horn, General Counsel |
| Facsimile No.: | (800) 209-7276 |
| Telephone No.: | (516) 396-7703 |

(b)    *Process Agent.* For the purpose of Section 13(c) of this Agreement:-

Party A appoints as its Process Agent: not applicable.

Party B appoints as its Process Agent: not applicable.

(c)    *Offices.* The provisions of Section 10(a) will apply to this Agreement.

(d)    *Multibranch Party.* For the purpose of Section 10(c) of this Agreement.

Party A is a Multibranch Party and may act through its London, Hong Kong, New York, Tokyo, Mumbai, Seoul, Sydney and Singapore offices.

Party B is not a Multibranch Party.

(e)    *Calculation Agent.* The Calculation Agent will be Party A, unless otherwise specified in a Confirmation relating to the applicable Transaction.

(f)    *Credit Support Document.* Details of any Credit Support Document: the Credit Support Annex to this Schedule between Party A and Party B which supplements, forms part of, and is subject to this Agreement.

(g)    *Credit Support Provider.*

Credit Support Provider means in relation to Party A: none.

Credit Support Provider means in relation to Party B: none.

(h)    *Governing Law.*    THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK (WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE).

(i)    *Netting of Payments.* Section 2(c)(ii) will not apply to any amounts payable with respect to Transactions from the date of this Agreement.

(j)    *"Affiliate"* will have the meaning specified in Section 14 of this Agreement.

23

**Part 5. Other Provisions.**

(a)  *Confirmations.* For each Transaction Party A and Party B agree to enter into under this Agreement, Party A shall promptly send to Party B a Confirmation setting forth the terms of such Transaction. Party B shall execute and return the Confirmation promptly. Any correction of an error shall be made promptly upon receipt of the telex or the facsimile transmission.

(b)  *Right of Set-off.* Section 6 of the Agreement is amended by the inclusion of the following new subsection 6(f):

"*Right of Set-off.* In addition to any rights of set-off a party may have as a matter of law or otherwise, upon the occurrence of an Event of Default with respect to a party or an Illegality, Credit Event Upon Merger or Additional Termination Event where such party is the only Affected Party (in each case, "Party X"), the other party ("Party Y") will have the right (but not the obligation) without prior notice to Party X or any other person to set-off any obligation of Party X owing to Party Y or any of Party Y's Affiliates, branches or offices (whether or not arising under this Agreement, whether or not matured, whether or not contingent, and regardless of the currency, place of payment or booking office of the obligation) against any obligation of Party Y or any of Party Y's Affiliates, branches or offices owing to Party X (whether or not arising under this Agreement, whether or not matured, whether or not contingent, and regardless of the currency, place of payment or booking office of the obligation).

In order to enable Party Y to exercise its rights of set-off, (i) Party Y may in good faith convert any obligation to another currency at a market rate reasonably determined by Party Y and set-off in respect of that converted amount and/or (ii) if an obligation is unascertained, Party Y may in good faith estimate that obligation and set-off in respect of the estimate, subject to the relevant party accounting to the other when the obligation is ascertained.

Nothing in this paragraph will be deemed to constitute or create a charge or other security interest.

This Section 6(f) shall be without prejudice and in addition to any right of set-off, combination of accounts, lien or other right to which any party is at any time otherwise entitled (whether by operation of law, contract or otherwise)."

(c)  *Consent to Recording.* Each party (i) consents to the monitoring or recording, at any time and from time to time, by the other party of any and all communications between officers or employees of the parties, (ii) waives any further notice of such monitoring or recording, and (iii) agrees to notify (and, if required by law, obtain the consent of) its officers and employees with respect to such monitoring or recording. Any such recording may be submitted in evidence to any court or in any Proceeding for the purpose of establishing any matters pertinent to this Agreement or any Transaction.

(d)  *Modified Representation.* For purposes of Section 3(d) of this Agreement, the following shall be added immediately prior to the period at the end thereof:

"; *provided, however,* that in the case of financial statements delivered by either party, the only representation being made by either party is that such financial statements give a fair view of the state of affairs of the relevant entity to which they relate as at the date of such financial statements."

(e)  *Relationship Between the Parties.* Each party will be deemed to represent to the other party on the date on which it enters into a Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction):

(i)  *Non-Reliance.* It is acting for its own account, and it has made its own independent decisions to enter into that Transaction and as to whether that Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisors as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into that Transaction; it being understood that information and explanations

related to the terms and conditions of a Transaction shall not be considered investment advice or a recommendation to enter into that Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction.

(ii)   *Assessment and Understanding.* It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of that Transaction. It is also capable of assuming, and assumes, the financial and other risks of that Transaction.

(iii)   *Status of Parties.* The other party is not acting as a fiduciary or an advisor for it in respect of that Transaction.

(iv)   *No Agency.* It is entering into this Agreement and each Transaction as principal and not as agent of any person.

(f)   *Existing Agreements.* Effective as of the date hereof, this Agreement shall supersede any existing agreement or agreements between the parties relating to any Specified Transaction (as defined below) entered into through any of the Offices of the parties listed in Part 4(d) of this Schedule, other than any agreement or agreements relating to, and solely applicable to, a Transaction or Transactions specifically and individually identified within such agreement or agreements, by reference to the terms of the Transaction or Transactions. All confirmations relating to such Specified Transactions shall be Confirmations under this Agreement and such Specified Transactions shall be Transactions under this Agreement. For the purpose of this provision only, the definition of Specified Transaction shall be as defined in Section 14 of the Master Agreement amended by the deletion of the words ", subject to the Schedule," from the first line and "this Agreement or" from the final line.

If, on the date hereof, any sum remains payable under that superseded agreement as a result of any Transaction, this Agreement shall apply in relation thereto with any necessary consequential amendments.

(g)   *Additional Events of Default.* None.

(h)   *Waiver of Right to Trial by Jury.* **EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO A TRIAL BY JURY WITH RESPECT TO ANY LEGAL PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTION.**

(i)   *Additional Representations.* For purposes of Section 3 of this Agreement, the following shall be added immediately following paragraph (f) thereof:

"(g) It is an "eligible contract participant" within the meaning of the Commodity Exchange Act, as amended.

**Part 6.   Additional Terms for FX Transactions and Currency Option Transactions.**

(a)   *Incorporation of 1998 ISDA FX and Currency Option Definitions.* The definitions and provisions contained in the 1998 ISDA FX and Currency Option Definitions (as amended and supplemented by the 1998 ISDA Euro Definitions, together the "1998 FX Definitions") as published by the International Swaps and Derivatives Association, Inc. and Emerging Markets Traders Association, are incorporated into any Confirmation, with respect to FX Transactions or Currency Options, which supplements and forms part of this Agreement, and all capitalized terms used in a Confirmation shall have the meaning set forth in the 1998 FX Definitions, unless otherwise defined in a Confirmation.

(b)   *Confirmations.* Any FX Transaction or Currency Option into which the parties may before the date of this Agreement have entered, or may in the future enter, where the relevant Confirmation on its face does not expressly exclude the application of this Agreement, shall (to the extent not otherwise provided for in this Agreement) be subject to, governed by and construed in accordance with this Agreement (in substitution for

any existing terms, if any, whether express or implied).  Each such FX Transaction and Currency Option shall be a Transaction, and the documents and other confirming evidence (including electronic messages on an electronic messaging service) exchanged between the parties confirming such FX Transaction or Currency Option shall each be a Confirmation (even where not so specified therein), for the purposes of this Agreement.

**BARCLAYS BANK PLC**

By:

Name:  **Justin Wray**

Title:  **Director**

Date:

**AMERICAN HOME MORTGAGE INVESTMENT CORP.**

By:

Name:

Title:  Thomas M. McDonagh
Chief Investment Officer

Date:  American Home Mortgage Investment Corp.

Date

26

(Bilateral Form)                                    (ISDA Agreements subject to New York Law Only)



International Swaps and Derivatives Association, Inc.

# CREDIT SUPPORT ANNEX

to the Schedule to the

### ISDA MASTER AGREEMENT

·············································

dated as of March 13, 2006

between

**BARCLAYS BANK PLC**                and      **AMERICAN HOME MORTGAGE INVESTMENT CORP.**

···········································          ···········································
("Party A")                                        ("Party B")

This Annex supplements, forms part of, and is subject to, the above-referenced Agreement, is part of its Schedule and is a Credit Support Document under this Agreement with respect to each party.

Accordingly, the parties agree as follows:—

### Paragraph 1. Interpretation

(a)     *Definitions and Inconsistency.* Capitalized terms not otherwise defined herein or elsewhere in this Agreement have the meanings specified pursuant to Paragraph 12, and all references in this Annex to Paragraphs are to Paragraphs of this Annex. In the event of any inconsistency between this Annex and the other provisions of this Annex, this Annex will prevail, and in the event of any inconsistency between Paragraph 13 and the other provisions of this Annex, Paragraph 13 will prevail.

(b)     *Secured Party and Pledgor.* All references in this Annex to the "Secured Party" will be to either party when acting in that capacity and all corresponding references to the "Pledgor" will be to the other party when acting in that capacity; *provided, however,* that if Other Posted Support is held by a party to this Annex, all references herein to that party as the Secured Party with respect to that Other Posted Support will be to that party as the beneficiary thereof and will not subject that support or that party as the beneficiary thereof to provisions of law generally relating to security interests and secured parties.

### Paragraph 2. Security Interest

Each party, as the Pledgor, hereby pledges to the other party, as the Secured Party, as security for its Obligations, and grants to the Secured Party a first priority continuing security interest in, lien on and right of Set-off against all Posted Collateral Transferred to or received by the Secured Party hereunder. Upon the Transfer by the Secured Party to the Pledgor of Posted Collateral, the security interest and lien granted hereunder on that Posted Collateral will be released immediately and, to the extent possible, without any further action by either party.

Copyright © 1994  International Swaps and Derivatives Association, Inc.

1

Party A:  BARCLAYS BANK PLC
Party B:  AMERICAN HOME MORTGAGE INVESTMENT CORP.

**Paragraph 13. Elections and Variables**

(a)  *Security Interest for "Obligations".*  The term *"Obligations"* as used in this Annex includes the following additional obligations:

With respect to Party A:  None.

With respect to Party B:  None.

(b)  *Credit Support Obligations.*

  (i)  *Delivery Amount, Return Amount and Credit Support Amount.*

   (A)  *"Delivery Amount"* has the meaning specified in Paragraph 3(a).

   (B)  *"Return Amount"* has the meaning specified in Paragraph 3(b).

   (C)  *"Credit Support Amount"* has the meaning specified in Paragraph 3.

  (ii)  *Eligible Collateral.*  The following items will qualify as *"Eligible Collateral"* for the party specified:

|     |     | Party A | Party B | Valuation Percentage |
|-----|-----|---------|---------|----------------------|
| (A) | Cash | X | X | 100% |
| (B) | negotiable debt obligations issued by the U.S. Treasury Department ("Treasury Securities") having a remaining term to maturity of not more than 1 year | X | X | 100% |
| (C) | Treasury Securities having a remaining term to maturity of more than 1 year but not more than 2 years | X | X | 99.25% |
| (D) | Treasury Securities having a remaining term to maturity of more than 2 years but not more than 5 years | X | X | 98.5% |
| (E) | Treasury Securities having a remaining term to maturity of more than 5 years but not more than 10 years | X | X | 97.25% |
| (F) | Treasury Securities having a remaining term to maturity of more than ten years | X | X | 97% |
| (G) | Private Label Mortgage-Backed Securities (as defined below) with a Credit Rating of AA- / Aa3  or higher | X | X | 95% |

11

| (H) | Private Label Mortgage-Backed Securities (as defined below) with a Credit Rating of A / A2 or A- / A3 | X | X | 90% |
|-----|-----|---|---|-----|
| (I) | Private Label Mortgage-Backed Securities (as defined below) with a Credit Rating of BBB / Baa2 or BBB- / Baa3 | X | X | 85% |
| (J) | Private Label Mortgage-Backed Securities (as defined below) with a Credit Rating of BB / Ba | X | X | 80% |

"*Private-Label Mortgage-Backed Security*" means fixed-rate and adjustable-rate mortgage-backed securities rated by at least one (1) of Moody's, S&P or Fitch (for the avoidance of doubt, if credit rating agencies differ, the lower rating will apply), identified with a CUSIP Number in Bloomberg and with cash flows available through Bloomberg or Intex(except as set forth below), backed by a mortgage pool consisting of prime, conventional, fixed-rate or adjustable-rate (as applicable), first-lien mortgage loans with terms to maturity of not more that 40 years from the date of origination; provided that, so long as the Secured Party has made such demand by the Notification Time, the Pledgor shall provide the Secured Party with the CUSIP for each such security to be delivered (not to exceed ten (10) CUSIPs with respect to the Transfer of Eligible Credit Support and the Posted Credit Support at any one time) prior to 5:00 p.m. New York time on the date such demand is made by the Secured Party (the "Demand Date"), and if the Secured Party makes such demand after the Notification Time on the Demand Date, the Pledgor shall provide the Secured Party with such CUSIPs by no later than 5:00 p.m. New York time on the date following the Demand Date, and provided, further, that with respect to any mortgage-backed security that has been issued in connection with a mortgage loan securitization transaction by or on behalf of Party B (or any subsidiary or affiliate of Party B) (a "Party B Securitization Transaction") where Party A (or any affiliate of Party A) acted as a lead or co-manager of such Party B Securitization Transaction, Party A and Party B acknowledge and agree that such mortgage-backed security shall constitute a "Private-Label Mortgage-Backed Security," and shall qualify as Eligible Collateral hereunder, regardless of whether such mortgage-backed security can be identified with a CUSIP Number in Bloomberg or has cash flows available through Bloomberg or Intex.

(iii) *Other Eligible Support.* The following items will qualify as "*Other Eligible Support*" for Party A and Party B: None.

(iv) *Thresholds.*

(A) *"Independent Amount"* means with respect to a party, except as otherwise provided in a Confirmation: Zero.

(B) *"Threshold"* means with respect to Party A: zero.
*"Threshold"* means with respect to Party B: zero.

(C) *"Minimum Transfer Amount"* means with respect to Party A or Party B: USD250,000, but provided that if (i) an Event of Default or a Potential Event of Default has occurred with respect to a party, the Minimum Transfer Amount for such party shall be zero; and (ii) where the Credit Support Amount with respect to both parties on a Valuation Date is zero and there are no outstanding Transactions, the Minimum Transfer Amount with respect to both parties on such day shall be zero.

(D) *Rounding.* The Delivery Amount and the Return Amount will be rounded up and down, in each case, to the nearest integral multiple of USD10,000, respectively.

(c) *Valuation and Timing.*

(i) *"Valuation Agent"* means, for purposes of Paragraphs 3 and 5, the party making the demand under Paragraph 3, and, for purposes of Paragraph 6(d), the Secured Party receiving or deemed to receive the Distributions or the Interest Amount, as applicable, unless otherwise specified here: These rules will apply. In addition, the Valuation Agent will be the Secured Party for purposes of calculating Value in connection with substitutions pursuant to Paragraph 4(d).

(ii) *"Valuation Date"* means each day that is a Local Business Day for both Party A and Party B.

(iii) *"Valuation Time"* means the close of business on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable, *provided* that the calculations of Value and Exposure will, as far as practicable, be made as of approximately the same time on the same date.

(iv) *"Notification Time"* means 11:00 p.m., New York time, on a Local Business Day.

(d) *Conditions Precedent and Secured Party's Rights and Remedies.* The following Termination Event(s) will be a *"Specified Condition"* for the party specified (that party being the Affected Party) so long as all Transactions are Affected Transactions:

| | Party A | Party B |
|---|---|---|
| Illegality | X | X |
| Tax Event | X | X |
| Tax Even Upon Merger | X | X |
| Credit Event Upon Merger | X | X |
| Additional Termination Events | X | X |

13

(e)   *Substitution.*

   (i)   *"Substitution Date"* has the meaning specified in Paragraph 4(d)(ii).

   (ii)  *Consent.* If specified here as applicable, then the Pledgor must obtain the Secured Party's consent for any substitution pursuant to Paragraph 4(d):  Applicable.  Neither party shall unreasonably withhold its consent to any substitution request by the other party.

(f)   *Dispute Resolution.*

   (i)   *"Resolution Time"* means 1:00 p.m., New York time, on the Local Business Day following the date on which notice of the dispute is given under Paragraph 5.

   (ii)  *Value.* For the purpose of Paragraphs 5(i)(C) and 5(ii), the Value of Eligible Credit Support or Posted Credit Support as of the relevant Valuation Date or date of Transfer will be calculated as follows:

     (A)  With respect to Cash, the amount thereof; and

     (B)  with respect to Treasury Securities, the product of (i) the sum of (1) either (x) the mean of the bid and asked prices for Treasury Securities that appear in Bloomberg Financial Markets and Commodities News produced by The Bloomberg, L.P., a Delaware limited partnership ("Bloomberg") for such day (or, if such day is not a Local Business Day, for the preceding Local Business Day) or (y) if the bid and asked prices for Treasury Securities does not so appear, the mean of the final bid prices quoted on such date by any two principal market makers for such Treasury Securities chosen by the Valuation Agent, or (z) if the bid and asked prices for Treasury Securities does not so appear and if quotations are not available from two principal market makers for such date (to determine whether quotations are not available, the Valuation Agent shall seek quotations from at least three principal market markers), the mean of such final bid prices as of the day next preceding such date on which such quotations were available, plus (2) the accreted interest on such Treasury Securities (except to the extent included in the applicable price referred to in (1) of this clause (B) as of such date), multiplied by (ii) the Valuation Percentage applicable to such Treasury Securities; and, with respect to Private-Label Mortgage-Backed Securities, Value shall be calculated (i) based on quotations contained on an acceptable electronic information service or (ii) by Party A or an affiliate of Party A that is a market-maker in such Private-Label Mortgage-Backed Security.

     The definition of "Value" in this Annex is modified to include in clause (i)(B) thereof after the words "bid price" the parenthetical "(or at the option of the Valuation Agent the mean of the bid price and asked price)".

   (iii) *Alternative.* The provisions of Paragraph 5 will apply.

(g)   *Holding and Using Posted Collateral.*

(i)    *Eligibility to Hold Posted Collateral; Custodians.* Each party (and its Custodian, if any) will be entitled to hold Posted Collateral pursuant to Paragraph 6(b); *provided* that the following conditions applicable to it are satisfied:

(A)  Posted Collateral may be held only in the following jurisdictions:  New York.

(B)  Party B's Custodian:  Party B's Custodian shall (A) be a trust company or a commercial bank with trust powers organized under the laws of the United States or any state thereof and subject to supervision or examination by a federal or state authority and (B) have a Credit Rating of A2 or higher by Moody's or A or higher by Standard & Poor's, respectively.

(ii)   *Use of Posted Collateral.*  The provisions of Paragraph 6(c) will apply to the parties.

(h)    **Distributions and Interest Amount.**

(i)    *Interest Rate.*  The "Interest Rate" will be the effective Federal Funds rate in U.S. Dollars as reported in Federal Reserve Publication H. 15 or such other rate as the parties may agree from time to time.

(ii)   *Transfer of Interest Amount.*  The Transfer of the Interest Amount will be made on the last Local Business Day of each calendar month and on any Local Business Day that Posted Collateral in the form of Cash is Transferred to the Pledgor pursuant to Paragraph 3(b).

(iii)  *Alternative to Interest Amount.*  The provisions of Paragraph 6(d)(ii) will apply, except as modified here: If Transfer of an Interest Amount (or any portion thereof) to a Pledgor on any day would result in, or increase, a Delivery Amount (treating that day as a Valuation Date, as provided in Paragraph 6(d)(ii)) but the Pledgor would nonetheless have no obligation to make a Transfer pursuant to Paragraph 3(a) on that day if it were a Valuation Date (because the Delivery Amount is lower than the Pledgor's Minimum Transfer Amount or otherwise), the Secured Party will be required to Transfer that Interest Amount (or portion thereof) to the Pledgor, notwithstanding anything to the contrary in Paragraph 6(d)(ii).] [Barclays comment: Checking with my Collateral Management Dept.

(i)    **Additional Representation(s):**  None.

(j)    **Other Eligible Support and Other Posted Support.**

(i)    *"Value"* with respect to Other Eligible Support and Other Posted Support means:  Not applicable.

(ii)   *"Transfer"* with respect to Other Eligible Support and Other Posted Support means:  Not applicable.

15

(k) **Demands and Notices.**

All demands, specifications and notices under this Annex will be made pursuant to the Notices Section of this Agreement, unless otherwise specified here: N/A.

(l) **Addresses for Transfers.**

Party A:

For cash:                                          For Treasury Securities:

Barclays Bank PLC, NY                              Bank of NYC/BBPLCLDN
Aba #026-002-574                                   Aba #021-000-018
F/O: Barclays Swaps & Options Group NY
A/C #: 050019228
Ref: Collateral

Party B: To be specified in writing by Party B.

(m) **Other Provisions.**

(i) **Transfer of Undisputed Amount.** Paragraph 5 is hereby amended by adding the following after the phrase "of (II) above" in the eighth line thereof:
"(*provided* that such Transfer need not be made prior to the time that such Transfer need otherwise be made pursuant to the demand made under Paragraph 3)".

(ii) **Certain Distributions Received.** If a Secured Party receives or is deemed to receive Distributions on a day that is not a Local Business Day, or after its close of business on a Local Business Day, it will Transfer the Distributions to the Pledgor on the second following Local Business Day, subject to Paragraph 4(a), but only to the extent contemplated in Paragraph 6(d)(i) in connection with Distributions received or deemed received on a Local Business Day.

(iii) **Set-off.** For purposes of Paragraphs 2 and 8(a)(iii) of this Annex, the reference to any amount payable under Section 6 of this Agreement in the definition of "Set-off" in this Agreement shall be deemed a reference to any amount payable with respect to any Obligation, as described in Paragraph 8(a)(iii) of this Annex.

(iv) **Taxes.** Paragraph 10(b) is hereby amended by adding the following at the end of the text thereof:

; *provided, however*, that notwithstanding this Paragraph 10(b), Section 2(d) of the Agreement shall apply to any Indemnifiable Tax imposed on a payment or deemed payment by the Secured Party to the Pledgor described in Paragraph 6(d) hereof

(v) **Severability.** In the event any one or more of the provisions contained in this Annex shall be held illegal, invalid or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained in the Agreement shall not in any way be affected or impaired thereby.

16

(vi)  *Additional Definitions.*  Paragraph 12 is hereby amended by adding the following:

"*Credit Rating*" means, with respect to a security on any date of determination, the rating then assigned to by Standard & Poor's, Moody's or Fitch.

"*Fitch*" means Fitch Ratings Ltd. or any successor in business thereto.

"*Moody's*" means Moody's Investor Services, Inc. or its successor.

"*Standard & Poor's*" means the Standard & Poor's Ratings Group (a division of McGraw-Hill, Inc.) or its successor.

BARCLAYS BANK PLC

By: _____
Name:     **Justin Wray**
Title:       **Director**

AMERICAN HOME MORTGAGE
INVESTMENT CORP.

By: _____
Name:  Thomas M. McDonagh
Title:    Chief Investment Officer
          American Home Mortgage Investment Corp
_____ Date____ __

17

Barclays Capital
5 The North Colonnade
Canary Wharf
London E14 4BB

Tel +44 (0)20 7623 2323

# BARCLAYS

| | |
|---|---|
| **To:** | American Home Mortgage Investment Corp.   ("Party B" or "Counterparty") |
| **Attn:** | Simon Sakamoto |
| **Fax No:** | (516) 714-2403 |
| **From:** | BARCLAYS BANK PLC (LONDON HEAD OFFICE) ("Party A" or "Barclays") |
| **Date:** | March 29, 2006 |
| **Reference:** | 1141029B |

### Balance Guaranteed Cap Confirmation

The purpose of this facsimile (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between us as to the terms of the Transaction. This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement referred to below.

The definitions and provisions contained in the 2000 ISDA Definitions (the "2000 Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. In the event of any inconsistency between the 2000 Definitions and this Confirmation, this Confirmation will govern for the purposes of the Transaction. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for the purposes of the 2000 Definitions. Capitalized terms used in this Confirmation and not defined in this Confirmation or the 2000 Definitions shall have the respective meanings assigned in the Agreement.  All terms used herein and not otherwise defined in the Master Agreement referred to above, shall have the meanings given to them in the Indenture, dated as of March 29, 2006 (the "Indenture"), among American Home Mortgage Investment Trust 2006-1, as Issuing Entity, Wells Fargo Bank, N.A., Securities Administrator and Deutsche Bank National Trust Company as Indenture Trustee.

1

Each party hereto agrees to make payment to the other party hereto in accordance with the provisions of this Confirmation and of the Agreement.

This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between you and us as to the terms of the Swap Transaction to which this Confirmation relates.

This Confirmation is subject to the terms and conditions of the ISDA Master Agreement dated as of March 13, 2006, between each of Party A and Party B and shall form a part of and be subject to that ISDA Master Agreement (the "ISDA Master Agreement").

Each party represents to the other party that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary): -

(a)     **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction: it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction.

(b)     **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(c)     **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

2

The terms of the particular Transaction to which this Confirmation relates are as follows:

### 1. General Terms:

Notional Amount: As at any date, the aggregate of the Note Principal Balances of the Class I-1A-1, Class I-A-2, Class I-A-3, Class I-M-1, Class I-M-2 and Class I-M-3 Notes (each an "Applicable Note" and, collectively, the "Applicable Notes") as set forth under the column heading "Beginning Note Balance" in the monthly statement to noteholders issued pursuant to the Indenture (the "Monthly Statement to Noteholders") for the Payment Date following such date.

Trade Date: March 29, 2006

Effective Date: March 29, 2006

Termination Date: The earlier of (a) the date on which the Note Principal Balance of each and every of the Applicable Notes has been reduced to zero, and (b) the Final Scheduled Payment Date, subject to adjustment in accordance with the Following Business Day Convention.

### 2. Floating Amount:

Floating Amount Payer: Counterparty

Floating Amount: For each Calculation Period, an amount equal to the aggregate of the Uncapped Floater Amounts as defined in each of the Reference Transactions.

Floating Amount Payer Payment Dates: One Business Day prior to the 25th calendar day of each month from and including April 25, 2006, to (and including) the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

### 3. Basis Risk Shortfall Carryforward Amounts

Basis Risk Shortfall Carryforward Amount Payer: Barclays

Basis Risk Shortfall Carryforward For each Calculation Period, an amount equal to the aggregate of the Basis Risk Shortfall Carryforward Amount actually received in respect of each of the Reference Transactions.

3

Amount:

Basis Risk
Shortfall
Carryforward
Amount Payer
Payment Dates:

The 25th calendar day of each month from and including April 25, 2006, to (and including) the Termination Date, subject to adjustment in accordance with the Following Business Day Convention.

## 4. Other Provisions

Business Days:

New York.

Calculation Agent:

Barclays. For the purpose of making any determination or calculation hereunder, the Calculation Agent may rely on any information, report, notice or certificate delivered to it by the Indenture Trustee, or as otherwise provided under the Indenture, and the Calculation Agent shall not be liable for any error, incompleteness or omission regarding such information.

Netting of
Payments:

Section 2(c)(ii) shall apply to payments made with respect to this Transaction.

**Condition
Precedent to
Effectiveness of
this Transaction:**

**The parties hereto acknowledge and agree that this Confirmation and this Transaction shall not be effective and not shall not give rise to any obligation of payment, performance or otherwise by Barclays or Counterparty unless and until such time as Barclays and the Reference Entity execute all necessary documentation related to the Reference Transactions (including, without limitation, the Confirmations for all of the Reference Transactions).**

Additional
Termination
Event:

Any of the Reference Transactions entered into on or about the date of this Agreement between Party A and the Reference Entity is terminated, and the Reference Entity is the Defaulting Party or the Affected Party as applicable. For the purposes of this Additional Termination Event, Counterparty shall be the sole Affected Party.

Where:

"Reference Entity" means American Home Mortgage Investment Trust, 2006-1; and

"Reference Transaction" means the Transaction between Barclays and each Reference Entity with a trade reference number of 1141010B, 1141017B, 1141020B, 1141021B, 1141024B, 1141026B (collectively, the "Reference Transactions").

## 5. Collateral Provisions:

### I. Eligible Collateral Criteria

Notwithstanding anything to the contrary in the Credit Support Annex, the posting by the Counterparty of Posted Credit Support in relation to this Transaction shall be limited in the following manner (in each case with Barclays as the Valuation Agent and the rating described below consisting of the long-term rating assigned by S&P or Fitch (or the equivalent rating given by Moody's) to the applicable Eligible Collateral:

Private-Label Mortgage-Backed Securities (which means fixed-rate and adjustable-rate

4

mortgage-backed securities rated by at least one (1) of Moody's, S&P or Fitch and for the avoidance of doubt, if credit rating agencies differ, the lower rating will apply) shall be Eligible Collateral and Posted Collateral shall at all times satisfy the following criteria:

    i.    rated "AA" and above must be greater than or equal to 46.15% of the Posted Collateral; and

    ii.    rated "A" and above must be greater than or equal to 73.92% of the Posted Collateral; and

    iii.    rated "BBB" and above must be greater than or equal to 92.30% of the Posted Collateral and

    iv.    rated "BB" and above must be greater than or equal to 100% of the Posted Collateral.

## II. Required Collateral

As applicable to the Counterparty, the Credit Support Amount required to be posted by the Counterparty as Pledgor to Barclays as the Secured Party under the Credit Support Annex as of any relevant date shall be equal to the components of Credit Support Amount as set forth under Sections 5(II)(A), (B) and (C) below.

**(A) Counterparty's Independent Amount:**

For purposes of this Transaction, the Independent Amount under the Credit Support Annex shall be applicable solely to the Counterparty as of any relevant date and shall be an amount equal to the product of:

(i) 1.00% multiplied by

(ii) the aggregate Note Principal Balances of the Applicable Notes (the "Aggregate Note Principal Balance") as set forth under the column heading "Beginning Note Balance" in the Monthly Statement to Noteholders applicable to the then-current Calculation Period.

**(B) Reference Cap Mark-to-Market:**

As of each Valuation Date (which shall be every Business Day during the term of this Transaction), a hypothetical transaction in the form described below (the "Reference Cap") shall be used by the Valuation Agent to determine the Barclays' Exposure under the Credit Support Annex. A new Reference Cap shall be applicable to each Calculation Period and shall be based on a (i) new Reference Cap Amortization Schedule and (ii) a new Strike Rate as set forth below:

| 1. Reference Cap Notional Amortization Schedule: | A new Reference Cap Amortization Schedule (each with distinct Notional Amounts and Calculation Periods with respect to such Reference Cap) shall be determined for each Calculation Period as follows:<br><br>(a) For each new Reference Cap Amortization Schedule, the Notional Amount with respect to the initial month (the "Initial Notional Amount") shall be an amount equal to the aggregate of the Note Principal Balances of the Applicable Notes applicable to the then-current Calculation Period. |
|---|---|

5

(b) For the Calculation Periods beginning as of the Effective Date and ending on 25-Dec-06, each sequential Reference Cap Notional Amount (each a "Subsequent Notional Amount") shall be determined based on the projected future amortization schedule of the Applicable Notes as determined by the Calculation Agent using publicly available cash-flow models (such as Intex or Bloomberg) using the CPR vector as set forth immediately below:

| Reference Cap Calculation Period | | CPR |
|---|---|---|
| Start Date | End Date | |
| 25-Apr-06 | 25-May-06 | .20 |
| 25-May-06 | 25-Jun-06 | .20 |
| 25-Jun-06 | 25-Jul-06 | .20 |
| 25-Jul-06 | 25-Aug-06 | .2167 |
| 25-Aug-06 | 25-Sep-06 | .2333 |
| 25-Sep-06 and thereafter | 25-Oct-06 and thereafter | .25 |

(c) Beginning with the Calculation Period commencing on 25-Dec-06 and thereafter, each Subsequent Notional Amount of such Reference Cap transaction shall be determined based on the projected future amortization schedule of the Applicable Notes as determined by the Calculation Agent using publicly available cash-flow models (such as Intex or Bloomberg) using the CPR as set forth immediately below:

CPR = Min (25%, X-5%);

Where:

X = 6-month Average CPR (expressed as a percentage) as reported pursuant to the Indenture.

Notwithstanding the foregoing, whenever a Reference Cap Notional Amount equals an amount that is less than 10 percent of the Initial Reference Cap Notional Amount for a Calculation Period, then the Reference Cap Notional Amount shall be deemed to be zero for such Reference Cap Calculation Period and for each remaining Reference Cap Calculation Period.

| | |
|---|---|
| Reference Cap Termination Date: | For each Calculation Period, the Reference Cap Termination Date shall be the Payment Date in March 2046. |
| Reference Cap Buyer: | Barclays |
| Reference Cap Calculation Period: | For each Calculation Period, the Reference Cap Calculation Period shall be from and including the 25th of each month, to but excluding the 25th of the next month; provided that the initial Calculation Period shall commence on the Effective Date and the final |

6

| | |
|---|---|
| | Calculation Period shall end on the Reference Cap Termination Date. |
| Reference Cap Payment Dates: | One Business Day prior to the 25th of each month during the term of the Transaction |
| 2. Strike Rate: | The Strike Rate for each Calculation Period shall be equal to the difference of:<br><br>(a) the weighted average Lifetime Rate Cap of the Group I Loans minus<br><br>(b) Expenses expressed as a percentage.<br><br>"Expenses" shall include each of the following: (i) the Servicing Fee Rate for the Group I Loans; (ii) any LPMI Insurer Fee Rate for the Group I Loans, (iii) the Weighted Average Note Margin and (iv) aggregate of the Uncapped Floater Fee Rate (which is 0.0242% for each Reference Transaction) payable to Barclays under the Reference Transactions.<br><br>Where:<br><br>Weighted Average Note Margin shall be a number equal to the quotient of:<br><br>(A+B+C+D+E+F) divided by the aggregate of the Note Principal Balance of the Applicable Notes for the Calculation Period.<br><br>Where:<br><br>(A) = 0.14% * Class I-1A-1 Note Principal Balance for the Calculation Period<br><br>(B) = 0.19% * Class I-A-2 Note Principal Balance for the Calculation Period<br><br>(C) = 0.30% * Class I-A-3 Note Principal Balance for the Calculation Period<br><br>(D) = 0.38% * Class I-M-1 Note Principal Balance for the Calculation Period<br><br>(E) = 0.42% * Class I-M-2 Note Principal Balance for the Calculation Period<br><br>(F) = 0.68% * Class I-M-3 Note Principal Balance for the Calculation Period |

7

| Floating Rate Option: | USD-LIBOR-BBA |
| Designated Maturity: | One month |
| Floating Rate Day Count Fraction: | Actual/360 |

**(C) Exposure under CSA related to Negative Amortization:**

In addition to Barclays' Exposure under the Credit Support Annex related to the Reference Cap Mark-to-Market as set forth in Section 5(II)(B) hereof, an additional component of Barclays' Exposure may be applicable in certain circumstances to collateralize exposure related to Negative Amortization with respect to the Reference Transactions and shall be determined as follows:

Barclays' Exposure related to Negative Amortization with respect to the Reference Transactions shall be:

1.   Zero, provided that (a) Excess Spread is greater than 0.74% or (b) the 6-month Average CPR (expressed as a percentage and as reported pursuant to the Indenture) is greater than 11% or (c) the then-current Calculation Period is a Calculation Period ending on or before September 25, 2006; or

2. If none of (a), (b), or (c) under clause 1 above apply, then an additional component of Barclays' Exposure will be applicable and shall be determined in accordance with the following formula:

$$P \times \max(0, Z)$$

For purposes of 1 above:

"Excess Spread" is an amount equal to:

(a) the difference of the weighted average of the Group I Loan Rates <u>minus</u>

(b) the sum of (i) the weighted average of the Note Interest Rate on the Applicable Notes and (ii) the Expenses expressed as a percentage of the pool balance for the Group I Loans set forth in Section 5(II)(B)(2)(b) above <u>excluding</u> clause (iii) of such definition, the Weighted Average Note Spread.

For purposes of 2 above:

$P$ = the Notional Amount of this Transaction, and

$Z$ = the product of:  0.25% * (12% - Y) * 100, and

8

Y = the 6-month Average CPR (expressed as a percentage and as reported pursuant to the Indenture)

**6. Accounts Details:**

Payments to Party A:
Correspondent: BARCLAYS BANK PLC NEW YORK
FFED: 026002574
Beneficiary: BARCLAYS SWAPS
Beneficiary Account: 050-01922-8

Payments to Party B:
To be provided by Party B in writing.

**7. Notices:**

Party A:
Address for other Notices:
BGS OPERATIONS
5 THE NORTH COLONNADE
CANARY WHARF
LONDON E14 4PU
Tel:    44(20) 77736603
Fax:    44(20) 77736810
BGSOperations@barcap.com,

Party B:
Pursuant to the ISDA Master Agreement.

9

The time of dealing will be confirmed by Barclays upon written request. Barclays is regulated by the Financial Services Authority. Barclays is acting for its own account in respect of this Transaction.

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within three (3) Business Days by promptly signing in the space provided below and both (i) faxing the signed copy to Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Fax +(44) 20-7773-6810/6857, Tel +(44) 20-7773-6901/6904/6965, and (ii) mailing the signed copy to Barclays Bank PLC, 5 The North Colonnade, Canary Wharf, London E14 4BB, Attention of Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operation. Your failure to respond within such period shall not affect the validity or enforceability of the Transaction against you. This facsimile shall be the only documentation in respect of the Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests.

| For and on behalf of<br>**Barclays Bank PLC** | For and on behalf of<br>**American Home Mortgage Investment Corp.** |
|---|---|
| Name:<br>Title:<br>Date:    **Adam Carysforth**<br>Authorised Signatory | Name:<br>Title:<br>Date: |

Barclays Bank PLC and its Affiliates, including Barclays Capital Inc., may share with each other information, including non-public credit information, concerning its clients and prospective clients. If you do not want such information to be shared, you must write to the Director of Compliance, Barclays Bank PLC, 200 Park Avenue, New York, NY 10166.

*Confirmation Signature Page for: 1141029B*

Barclays Capital
5 The North Colonnade
Canary Wharf
London E14 4BB

Tel +44 (0)20 7623 2323

# BARCLAYS

| | |
|---|---|
| **To:** | American Home Mortgage Investment Corp.  ("Party B" or "Counterparty") |
| **Attn:** | [ ] |
| **Fax No:** | [ ] |
| **From:** | BARCLAYS BANK PLC (LONDON HEAD OFFICE) ("Party A" or "Barclays") |
| **Date:** | March 29, 2006 |
| **Reference:** | 1135578B / 1135614B |

## Rate Cap Corridor Transaction

The purpose of this facsimile (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between us as to the terms of the Transaction. This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement referred to below.

1. The definitions and provisions contained in the 2000 ISDA Definitions (the "2000 Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. In the event of any inconsistency between the 2000 Definitions and this Confirmation, this Confirmation will govern for the purposes of the Transaction. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for the purposes of the 2000 Definitions. Capitalized terms used in this Confirmation and not defined in this Confirmation or the 2000 Definitions shall have the respective meanings assigned in the Agreement.

1

This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between you and us as to the terms of the Swap Transaction to which this Confirmation relates.

This Confirmation is subject to the terms and conditions of the ISDA Master Agreement dated as of March 13, 2006, between each of Party A and Party B and shall form a part of and be subject to that ISDA Master Agreement.

Each party represents to the other party that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary): -

(a)  **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction: it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction.

(b)  **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(c)  **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

The terms of the particular Transaction to which this Confirmation relates are as follows:

| 2. | TRADE DETAILS |
|---|---|
| Notional Amount: | With respect to any Calculation Period the amount set forth for such period in Schedule A attached hereto |
| Trade Date: | March 29, 2006 |
| Effective Date: | March 29, 2006 |
| Termination Date: | March 25, 2012; subject to adjustment in accordance with the Following Business Day Convention |
| Fixed Amounts: | |
| Fixed Rate Payer: | Counterparty |
| Fixed Rate Payer Payment Date(s): | March 29, 2006; subject to adjustment in accordance with the Following Business Day |

2

| | |
|---|---|
| | Convention |
| Fixed Amount: | USD360,000 |
| **Floating Amounts:** | To be determined in accordance with the following formula: Greater of (i) (Floating Rate Option – Strike Rate) * Notional Amount * Floating Rate Day Count Fraction; and (ii) zero. |
| Floating Rate Payer: | Barclays. |
| Strike Rate | 9.1671% |
| Cap Rate | 11.1671% |
| Floating Rate Payer Period End Date(s): | The 25th of each month in each year from (and including) April 25, 2006 to (and including) the Termination Date; subject to adjustment in accordance with the Following Business Day Convention |
| Floating Rate Payer Payment Date(s): | Early Payment shall be applicable. For each Calculation Period, the first Business Day prior to each Floating Rate Payer Period End Date. |
| Floating Rate Option. | USD-LIBOR-BBA; provided, however, that if the Floating Rate determined for such Floating Rate Option for any Calculation Period is greater than the Cap Rate then the Floating Rate Option for such Calculation Period shall be deemed to be the Cap Rate |
| Floating Rate Day Count Fraction: | Actual / 360 |
| Designated Maturity: | 1 Month. |
| Reset Dates: | The first day of Each Calculation Period. |
| **Business Days:** | New York. |
| **Governing Law:** | This Transaction and this Confirmation will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine except Section 5-1401 and Section 5-1402 of the New York General |

3

| | Obligation Law). |
|---|---|
| **3.** <br> Payments to Barclays: | **ACCOUNT DETAILS** <br> Correspondent: BARCLAYS BANK PLC NEW YORK <br> FEED: 026002574 <br> Beneficiary: BARCLAYS SWAPS <br> Beneficiary Account: 050-01922-8 |
| Payments to Counterparty: | [PLEASE ADVISE] |
| **4.** <br> Barclays: | **OFFICES** <br> Address for Notices: <br> 5 The North Colonnade <br> Canary Wharf <br> E14 4BB <br> Tel: 44(20) 7773 6461 <br> Fax: 44(20) 777 36810 |
| Counterparty: | Address for Notices: <br> [PLEASE ADVISE] |

4

The time of dealing will be confirmed by Barclays upon written reque.  Barclays is regulated by the Financial Services Authority.  Barclays is acting for its own account in respect of this Transaction

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within three (3) Business Days by promptly signing in the space provided below and both (i) faxing the signed copy to Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Fax +(44) 20-7773-6310/6857, Tel +(44) 20-7773-6901/6904/6965, and (ii) mailing the signed copy to Barclays Bank PLC 5 The North Colonnade, Canary Wharf, London E14 4BB, Attention of Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Globe Operation.  Your failure to respond within such period shall not affect the validity or enforceability of the Transaction against you.  This facsimile shall be the only documentation in respect of the Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests

| For and on behalf of<br>Barclays Bank PLC | | For and on behalf of<br>American Home Mortgage Investment Corp. |
|---|---|---|
| | | |
| Name: Sally Green<br>Title: Authorised Signatory<br>Date: | | Name: Thomas M. McDonagh<br>Title: Chief Investment Officer<br>American Home Mortgage Investment Corp.<br>Date: 3-29 Date 2001 |

Barclays Bank PLC and its Affiliates, including Barclays Capital Inc., may share with each other information, including non-public credit information, concerning its clients and prospective clients  If you do not want such information to be shared, you must write to the Director of Compliance: Barclays Bank PLC 200 Park Avenue, New York, NY 10166

Confirm signature page for [1355788 / 1556514]

9

Schedule A to the Confirmation dated as of March 29, 2006
Re: Reference Number 11355787B / 1135614B

| PERIOD START DATE | PERIOD END DATE | NOTIONAL (in USD) |
|---|---|---|
| 29-Mar-06 | 25-Apr-06 | -0- |
| 25-Apr-06 | 25-May-06 | 1,221,820,616 |
| 25-May-06 | 25-Jun-06 | 1,195,809,598 |
| 25-Jun-06 | 25-Jul-06 | 1,168,433,014 |
| 25-Jul-06 | 25-Aug-06 | 1,141,600,693 |
| 25-Aug-06 | 25-Sep-06 | 1,115,355,345 |
| 25-Sep-06 | 25-Oct-06 | 1,089,680,139 |
| 25-Oct-06 | 25-Nov-06 | 1,064,562,504 |
| 25-Nov-06 | 25-Dec-06 | 1,039,989,552 |
| 25-Dec-06 | 25-Jan-07 | 1,015,910,524 |
| 25-Jan-07 | 25-Feb-07 | 992,182,846 |
| 25-Feb-07 | 25-Mar-07 | 968,970,328 |
| 25-Mar-07 | 25-Apr-07 | 946,265,259 |
| 25-Apr-07 | 25-May-07 | 924,056,386 |
| 25-May-07 | 25-Jun-07 | 902,332,708 |
| 25-Jun-07 | 25-Jul-07 | 881,083,473 |
| 25-Jul-07 | 25-Aug-07 | 860,298,169 |
| 25-Aug-07 | 25-Sep-07 | 839,966,520 |
| 25-Sep-07 | 25-Oct-07 | 820,078,481 |
| 25-Oct-07 | 25-Nov-07 | 800,624,232 |
| 25-Nov-07 | 25-Dec-07 | 781,593,694 |
| 25-Dec-07 | 25-Jan-08 | 762,942,602 |
| 25-Jan-08 | 25-Feb-08 | 744,543,946 |
| 25-Feb-08 | 25-Mar-08 | 726,544,707 |
| 25-Mar-08 | 25-Apr-08 | 708,941,244 |
| 25-Apr-08 | 25-May-08 | 691,724,737 |
| 25-May-08 | 25-Jun-08 | 674,886,563 |
| 25-Jun-08 | 25-Jul-08 | 658,418,294 |
| 25-Jul-08 | 25-Aug-08 | 642,311,691 |
| 25-Aug-08 | 25-Sep-08 | 626,558,703 |
| 25-Sep-08 | 25-Oct-08 | 611,151,459 |
| 25-Oct-08 | 25-Nov-08 | 596,082,264 |
| 25-Nov-08 | 25-Dec-08 | 581,343,213 |
| 25-Dec-08 | 25-Jan-09 | 566,898,965 |
| 25-Jan-09 | 25-Feb-09 | 552,647,470 |
| 25-Feb-09 | 25-Mar-09 | 538,673,739 |
| 25-Mar-09 | 25-Apr-09 | 524,888,706 |
| 25-Apr-09 | 25-May-09 | 511,411,587 |

6

| | | |
|---|---|---|
| 25-May-09 | 25-Jun-09 | 498,208,921 |
| 25-Jun-09 | 25-Jul-09 | 485,301,530 |
| 25-Jul-09 | 25-Aug-09 | 472,682,734 |
| 25-Aug-09 | 25-Sep-09 | 460,317,945 |
| 25-Sep-09 | 25-Oct-09 | 448,230,030 |
| 25-Oct-09 | 25-Nov-09 | 438,035,928 |
| 25-Nov-09 | 25-Dec-09 | 428,350,536 |
| 25-Dec-09 | 25-Jan-10 | 418,863,290 |
| 25-Jan-10 | 25-Feb-10 | 409,520,574 |
| 25-Feb-10 | 25-Mar-10 | 400,386,175 |
| 25-Mar-10 | 25-Apr-10 | 391,457,889 |
| 25-Apr-10 | 25-May-10 | 382,731,020 |
| 25-May-10 | 25-Jun-10 | 374,200,980 |
| 25-Jun-10 | 25-Jul-10 | 365,863,284 |
| 25-Jul-10 | 25-Aug-10 | 357,713,554 |
| 25-Aug-10 | 25-Sep-10 | 349,747,509 |
| 25-Sep-10 | 25-Oct-10 | 341,960,969 |
| 25-Oct-10 | 25-Nov-10 | 334,349,846 |
| 25-Nov-10 | 25-Dec-10 | 326,883,379 |
| 25-Dec-10 | 25-Jan-11 | 319,402,203 |
| 25-Jan-11 | 25-Feb-11 | 311,562,251 |
| 25-Feb-11 | 25-Mar-11 | 303,898,794 |
| 25-Mar-11 | 25-Apr-11 | 296,422,003 |
| 25-Apr-11 | 25-May-11 | 289,127,362 |
| 25-May-11 | 25-Jun-11 | 282,010,467 |
| 25-Jun-11 | 25-Jul-11 | 275,067,016 |
| 25-Jul-11 | 25-Aug-11 | 268,292,813 |
| 25-Aug-11 | 25-Sep-11 | 261,683,762 |
| 25-Sep-11 | 25-Oct-11 | 255,235,866 |
| 25-Oct-11 | 25-Nov-11 | 248,945,225 |
| 25-Nov-11 | 25-Dec-11 | 242,808,031 |
| 25-Dec-11 | 25-Jan-12 | 236,820,569 |
| 25-Jan-12 | 25-Feb-12 | 230,979,214 |
| 25-Feb-12 | 25-Mar-12 | 225,280,426 |

Barclays Capital
5 The North Colonnade
Canary Wharf
London E14 4BB

Tel +44 (0)20 7623 2323

# BARCLAYS

**To:**     American Home Mortgage Investment Corp.   ("Party B" or "Counterparty")

**Attn:**     [ ]

**Fax No:**     [ ]

**From:**     BARCLAYS BANK PLC (LONDON HEAD OFFICE) ("Party A" or "Barclays")

**Date:**     March 29, 2006

**Reference:**     1135557B / 1135549B

## Rate Cap Corridor Transaction

The purpose of this facsimile (this "Confirmation") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "Transaction"). This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between us as to the terms of the Transaction. This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement referred to below.

1. The definitions and provisions contained in the 2000 ISDA Definitions (the "2000 Definitions"), as published by the International Swaps and Derivatives Association, Inc. ("ISDA") are incorporated into this Confirmation. In the event of any inconsistency between the 2000 Definitions and this Confirmation, this Confirmation will govern for the purposes of the Transaction. References herein to a "Transaction" shall be deemed to be references to a "Swap Transaction" for the purposes of the 2000 Definitions. Capitalized terms used in this Confirmation and not defined in this Confirmation or the 2000 Definitions shall have the respective meanings assigned in the Agreement.

1

This Confirmation supersedes any previous Confirmation or other communication with respect to the Transaction and evidences a complete and binding agreement between you and us as to the terms of the Swap Transaction to which this Confirmation relates.

This Confirmation is subject to the terms and conditions of the ISDA Master Agreement dated as of March 13, 2006, between each of Party A and Party B and shall form a part of and be subject to that ISDA Master Agreement.

Each party represents to the other party that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary): –

(a)    **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into the Transaction and as to whether the Transaction is appropriate or proper based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into the Transaction: it being understood that information and explanations related to the terms and conditions of the Transaction shall not be considered investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of the Transaction.

(b)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of the Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(c)    **Status of Parties.** The other party is not acting as a fiduciary for or an adviser to it in respect of the Transaction.

The terms of the particular Transaction to which this Confirmation relates are as follows:

| 2. | TRADE DETAILS |
|---|---|
| Notional Amount: | With respect to any Calculation Period the amount set forth for such period in Schedule A attached hereto |
| Trade Date: | March 29, 2006 |
| Effective Date: | March 29, 2006 |
| Termination Date: | March 25, 2012; subject to adjustment in accordance with the Following Business Day Convention |
| Fixed Amounts: | |
| Fixed Rate Payer: | Counterparty |
| Fixed Rate Payer Payment Date(s): | March 29, 2006; subject to adjustment in accordance with the Following Business Day |

2

| | |
|---|---|
| | Convention |
| Fixed Amount: | USD60,000 |
| **Floating Amounts:** | To be determined in accordance with the following formula:<br>Greater of (i) (Floating Rate Option – Strike Rate) * Notional Amount * Floating Rate Day Count Fraction; and (ii) zero. |
| Floating Rate Payer: | Barclays. |
| Strike Rate | 8.8645% |
| Cap Rate | 10.8645% |
| Floating Rate Payer Period End Date(s): | The 25th of each month in each year from (and including) April 25, 2006 to (and including) the Termination Date; subject to adjustment in accordance with the Following Business Day Convention |
| Floating Rate Payer Payment Date(s): | Early Payment shall be applicable. For each Calculation Period, the first Business Day prior to each Floating Rate Payer Period End Date. |
| Floating Rate Option. | USD-LIBOR-BBA; provided, however, that if the Floating Rate determined for such Floating Rate Option for any Calculation Period is greater than the Cap Rate then the Floating Rate Option for such Calculation Period shall be deemed to be the Cap Rate |
| Floating Rate Day Count Fraction: | Actual / 360 |
| Designated Maturity: | 1 Month. |
| Reset Dates: | The first day of Each Calculation Period. |
| **Business Days:** | New York. |
| Governing Law: | This Transaction and this Confirmation will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine except Section 5-1401 and Section 5-1402 of the New York General |

3

| | Obligation Law). |
|---|---|
| **3.** | **ACCOUNT DETAILS** |
| Payments to Barclays: | Correspondent: BARCLAYS BANK PLC NEW YORK<br>FEED: 026002574<br>Beneficiary: BARCLAYS SWAPS<br>Beneficiary Account: 050-01922-8 |
| Payments to Counterparty: | [PLEASE ADVISE] |
| **4.** | **OFFICES** |
| Barclays: | Address for Notices:<br>5 The North Colonnade<br>Canary Wharf<br>E14 4 BB<br>Tel: 44(20) 7773 6461<br>Fax: 44(20) 777 36810 |
| Counterparty: | Address for Notices:<br>[PLEASE ADVISE] |

4

The time of dealing will be confirmed by Barclays upon written request. Barclays is regulated by the Financial Services Authority. Barclays is acting for its own account in respect of this Transaction.

Please confirm that the foregoing correctly sets forth all the terms and conditions of our agreement with respect to the Transaction by responding within three (3) Business Days by promptly signing in the space provided below and both (i) faxing the signed copy to Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operations, Fax +(44) 20-7773-6810/6857, Tel +(44) 20-7773-6901/6904/6965, and (ii) mailing the signed copy to Barclays Bank PLC, 5 The North Colonnade, Canary Wharf, London E14 4BB, Attention of Incoming Transaction Documentation, Barclays Capital Global OTC Transaction Documentation & Management, Global Operation. Your failure to respond within such period shall not affect the validity or enforceability of the Transaction against you. This facsimile shall be the only documentation in respect of the Transaction and accordingly no hard copy versions of this Confirmation for this Transaction shall be provided unless the Counterparty requests.

| For and on behalf of Barclays Bank PLC | For and on behalf of American Home Mortgage Investment Corp. |
|---|---|
| *signature* | *signature* |
| Name: Baily Green <br> Title: Authorised Signatory <br> Date: | Name: Thomas M. McDonagh <br> Title: Chief Investment Officer <br> American Home Mortgage Investment Corp. <br> Date: 3-29-2006 |

Barclays Bank PLC and its Affiliates, including Barclays Capital Inc., may share with each other information, including non-public credit information, concerning its clients and prospective clients. If you do not want such information to be shared, you must write to the Director of Compliance, Barclays Bank PLC, 200 Park Avenue, New York, NY 10166.

*Confirm Signature Page for 1135557B / 1135549B*

5

Schedule A to the Confirmation dated as of March 29, 2006
Re: Reference Number 1135557B / 1135549B

| PERIOD START DATE | PERIOD END DATE | NOTIONAL (In USD) |
|---|---|---|
| 29-Mar-06 | 25-Apr-06 | -0- |
| 25-Apr-06 | 25-May-06 | 66,513,000 |
| 25-May-06 | 25-Jun-06 | 66,513,000 |
| 25-Jun-06 | 25-Jul-06 | 66,513,000 |
| 25-Jul-06 | 25-Aug-06 | 66,513,000 |
| 25-Aug-06 | 25-Sep-06 | 66,513,000 |
| 25-Sep-06 | 25-Oct-06 | 66,513,000 |
| 25-Oct-06 | 25-Nov-06 | 66,513,000 |
| 25-Nov-06 | 25-Dec-06 | 66,513,000 |
| 25-Dec-06 | 25-Jan-07 | 66,513,000 |
| 25-Jan-07 | 25-Feb-07 | 66,513,000 |
| 25-Feb-07 | 25-Mar-07 | 66,513,000 |
| 25-Mar-07 | 25-Apr-07 | 66,513,000 |
| 25-Apr-07 | 25-May-07 | 66,513,000 |
| 25-May-07 | 25-Jun-07 | 66,513,000 |
| 25-Jun-07 | 25-Jul-07 | 66,513,000 |
| 25-Jul-07 | 25-Aug-07 | 66,513,000 |
| 25-Aug-07 | 25-Sep-07 | 66,513,000 |
| 25-Sep-07 | 25-Oct-07 | 66,513,000 |
| 25-Oct-07 | 25-Nov-07 | 66,513,000 |
| 25-Nov-07 | 25-Dec-07 | 66,513,000 |
| 25-Dec-07 | 25-Jan-08 | 66,513,000 |
| 25-Jan-08 | 25-Feb-08 | 66,513,000 |
| 25-Feb-08 | 25-Mar-08 | 66,513,000 |
| 25-Mar-08 | 25-Apr-08 | 66,513,000 |
| 25-Apr-08 | 25-May-08 | 66,513,000 |
| 25-May-08 | 25-Jun-08 | 66,513,000 |
| 25-Jun-08 | 25-Jul-08 | 66,513,000 |
| 25-Jul-08 | 25-Aug-08 | 66,513,000 |
| 25-Aug-08 | 25-Sep-08 | 66,513,000 |
| 25-Sep-08 | 25-Oct-08 | 66,513,000 |
| 25-Oct-08 | 25-Nov-08 | 66,513,000 |
| 25-Nov-08 | 25-Dec-08 | 66,513,000 |
| 25-Dec-08 | 25-Jan-09 | 66,513,000 |
| 25-Jan-09 | 25-Feb-09 | 66,513,000 |
| 25-Feb-09 | 25-Mar-09 | 66,513,000 |
| 25-Mar-09 | 25-Apr-09 | 66,513,000 |
| 25-Apr-09 | 25-May-09 | 66,513,000 |

| | | |
|---|---|---|
| 25-May-09 | 25-Jun-09 | 66,513,000 |
| 25-Jul-09 | 25-Jul-09 | 66,513,000 |
| 25-Jul-09 | 25-Aug-09 | 66,513,000 |
| 25-Aug-09 | 25-Sep-09 | 66,513,000 |
| 25-Sep-09 | 25-Oct-09 | 66,513,000 |
| 25-Oct-09 | 25-Nov-09 | 65,257,582 |
| 25-Nov-09 | 25-Dec-09 | 63,814,675 |
| 25-Dec-09 | 25-Jan-10 | 62,401,287 |
| 25-Jan-10 | 25-Feb-10 | 61,009,430 |
| 25-Feb-10 | 25-Mar-10 | 59,648,609 |
| 25-Mar-10 | 25-Apr-10 | 58,318,493 |
| 25-Apr-10 | 25-May-10 | 57,018,384 |
| 25-May-10 | 25-Jun-10 | 55,747,599 |
| 25-Jun-10 | 25-Jul-10 | 54,505,468 |
| 25-Jul-10 | 25-Aug-10 | 53,291,340 |
| 25-Aug-10 | 25-Sep-10 | 52,104,577 |
| 25-Sep-10 | 25-Oct-10 | 50,944,556 |
| 25-Oct-10 | 25-Nov-10 | 49,810,669 |
| 25-Nov-10 | 25-Dec-10 | 48,698,332 |
| 25-Dec-10 | 25-Jan-11 | 47,583,803 |
| 25-Jan-11 | 25-Feb-11 | 46,415,825 |
| 25-Feb-11 | 25-Mar-11 | 45,274,141 |
| 25-Mar-11 | 25-Apr-11 | 44,160,266 |
| 25-Apr-11 | 25-May-11 | 43,073,527 |
| 25-May-11 | 25-Jun-11 | 42,013,269 |
| 25-Jun-11 | 25-Jul-11 | 40,978,849 |
| 25-Jul-11 | 25-Aug-11 | 39,969,644 |
| 25-Aug-11 | 25-Sep-11 | 38,985,043 |
| 25-Sep-11 | 25-Oct-11 | 38,024,451 |
| 25-Oct-11 | 25-Nov-11 | 37,087,285 |
| 25-Nov-11 | 25-Dec-11 | 36,172,980 |
| 25-Dec-11 | 25-Jan-12 | 35,280,982 |
| 25-Jan-12 | 25-Feb-12 | 34,410,750 |
| 25-Feb-12 | 25-Mar-12 | 33,561,758 |

7

**Barclays Bank PLC**
<u>**Proof of Claim – Swap Agreement**</u>

Case No. 07-11048
<u>**American Home Mortgage Investment Corp.**</u>

<u>**EXHIBIT "B"**</u>

**BARCLAYS BANK PLC**
200 Park Ave.
New York, NY 10166

August 2, 2007

VIA TELECOPIER,
HAND DELIVERY
AND ELECTRONIC MAIL

American Home Mortgage Investment Corp.
538 Broadhollow Road
Melville, NY 11747
Alan B. Horn, General Counsel
Fax: (800) 209-7276

Re:    Notice of Early Termination
       Notice of Set-off

Ladies and Gentlemen:

Reference is made to the 1992 ISDA Master Agreement (the "Master Agreement") dated as of March 13, 2006 between American Home Mortgage Investment Corp. ("Counterparty") and Barclays Bank PLC ("Barclays"). All capitalized terms not otherwise defined in this notice shall have the meanings assigned to them in the Master Agreement.

We hereby give notice that one or more Events of Default have occurred and are continuing under the Master Agreement, including without limitation (i) an Event of Default under Section 5(a)(vi) (*Cross Default*) of the Master Agreement as a result of the existence of one or more "Events of Default" under, and as defined in, the Second Amended and Restated Credit Agreement dated as of August 10, 2006 among the Counterparty, the other Borrowers party thereto, Bank of America, N.A., as the Administrative Agent and the other Lenders from time to time party thereto, and (ii) an Event of Default under Section 5(a)(vii) (*Bankruptcy*) of the Master Agreement as a result of Counterparty being unable to pay its debts.

Pursuant to Section 6(a) (*Right to Terminate Following Event of Default*) of the Master Agreement, Barclays hereby designates August 2, 2007, being a date not more than 20 days from the date of this letter, as the Early Termination Date in respect of all outstanding Transactions.

In addition, we hereby notify you that Barclays is exercising its right under Section 6(f) of the Master Agreement to set off any amounts payable by it to Counterparty under the Master Agreement against the Counterparty's unsatisfied obligations, including without limitation "Margin Deficit", existing under, and as defined

in, that Master Repurchase Agreement dated as of February 8, 2006 (together with all annexes, confirmations and schedules thereto, and as the same have been amended, supplemented and otherwise modified as of the date first written above, collectively, the "**MRA**") between Counterparty and our affiliate, Barclays Capital Inc. ("**BCI**").

On or as soon as reasonably practicable following the Early Termination Date, Barclays will provide you with a statement in accordance with Section 6(d)(i) (*Statement*) of the Master Agreement specifying the payments due in relation to the Early Termination Date.

In accordance with Section 12(a) (*Effectiveness*) of the Master Agreement, this notice is being sent by courier during normal business hours and will be deemed effective today.

This notice shall be governed by and construed in accordance with New York law.

Counterparty is further notified that (i) Barclays has certain rights and remedies under applicable law and the Master Agreement, (ii) all such rights and remedies are hereby reserved and no such rights have been waived, abandoned, discontinued or in any other manner precluded from exercise, and (iii) the failure to exercise any such right or remedy shall not constitute (or be deemed to constitute) any waiver, abandonment, discontinuation or other preclusion of the exercise thereof or of any other right or remedy of Barclays.

Very truly yours,

BARCLAYS BANK PLC

By: _____
Name:    Mark Manski
Title:    Director

Cc:    Alan Kaplan, Deputy General Counsel, Americas

2