**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------------- x
                           :
In re:                             :      Chapter 11
                           :
AMERICAN HOME MORTGAGE HOLDINGS,       :      Case No. 07-11047 (CSS)
INC., *et al.,*[1]
                           :
             Debtors.          :      (Jointly Administered)
                           :
                           :      **Re: D.I. 9899, 9900, 9914**
-------------------------------------------------------------------- x

**PLAN TRUSTEE'S OMNIBUS
OBJECTION TO THE ALVAREZ PLEADINGS**

Steven D. Sass, as liquidating trustee (the "<u>Plan Trustee</u>") for the Plan Trust established

pursuant to the *Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February*

*18, 2009* (the "<u>Plan</u>") in connection with the chapter 11 cases of the above-captioned debtors and

debtors-in-possession (the <u>Debtors</u>")[2], submits this objection (the "<u>Objection</u>") to the (I) *Motion*

*of Gil Quentin Alvarez for an Order to file an Additional Late Proof of Claim* [Docket No. 9899]

(the "<u>Additional Late Claim Motion</u>"), (II) *Motion for Sanctions against Debtor American Home*

*Mortgage* [Docket No. 9900] (the "<u>Sanctions Motion</u>"), and (III) *Motion of Gil Quentin Alvarez*

*for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. 503* [Docket No. 9914]

(the "<u>Administrative Claim Motion</u>", and together with the Additional Late Claim Motion and

---

[1]    The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("<u>AHM Investment</u>"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("<u>AHM Acceptance</u>"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("<u>AHM SV</u>"), a Maryland corporation (7267); American Home Mortgage Corp. ("<u>AHM Corp.</u>"), a New York corporation (1558); American Home Mortgage Ventures LLC ("<u>AHM Ventures</u>"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("<u>Homegate</u>"), a New York corporation (7491); and Great Oak Abstract Corp. ("<u>Great Oak</u>"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

[2]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

        

the Sanctions Motion, the "Alvarez Pleadings"), and requests an order denying the Alvarez Pleadings.  In support of this Objection, the Plan Trustee respectfully represents as follows:

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), in that it is a matter concerning the administration of the Debtors' estates.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief sought herein are sections 502(b) and 503 of the Bankruptcy Code and Bankruptcy Rules 3003 and 3007.

## BACKGROUND

### *Alvarez's Loan*

The Plan Trustee's records reflect that on March 11, 2005, Alvarez executed a promissory note in the principal amount of $272,800, loan number 769615 (the "Loan"), with American Home Mortgage Corp. ("AHM Corp").  The note is secured by a mortgage on the property located at 542 Mount Argyll Court, Apopka, Florida 32712 (the "Property").  The Loan has a fixed interest rate of 5.75% over 30 years.

On March 22, 2005, the Loan was sold to Wells Fargo Bank, NA, or an affiliate thereof ("Wells"), and the Loan was not repurchased by the Debtors.

### *The Debtors' Bankruptcy*

#### General Background

On August 6, 2007 (the "Petition Date"), each of the above-captioned debtors and debtors-in-possession (the "Debtors") filed with this Court a voluntary petition for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code").  Each Debtor operated its business and managed its properties as a debtor in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

The Plan was confirmed under section 1129 of the Bankruptcy Code by order dated February 23, 2009 [D.I. 7042] (the "Confirmation Order").  The Plan became effective on November 30, 2010 (the "Effective Date").

Pursuant to the Plan, as of the Effective Date, a plan trust (the "Plan Trust") was established and all of the Debtors' assets, causes of action, claims, rights and interests, succeeded, transferred and vested in the Plan Trust.  Steven D. Sass is the duly appointed Plan Trustee for the Plan Trust.  The Plan Trustee is vested with the rights, powers and benefits set forth in the Plan, Confirmation Order and Plan Trust Agreement.

**General Bar Date**

By order dated October 30, 2007 (the "Bar Date Order"), the Bankruptcy Court established January 11, 2008 at 4:00 p.m. (prevailing Eastern Time) as the last date and time for the filing of proofs of claim for prepetition claims in these chapter 11 cases (the "General Bar Date").  Pursuant to the Bar Date Order, the Bankruptcy Court required that "any entity holding a prepetition claim against the Debtors [was required to] file a proof of claim …on or before January 11, 2008."  Bar Date Order, ¶ 5.  In addition, the Bar Date Order states that any entity which failed to abide by the Bar Date Order "shall not be treated as a creditor for purposes of voting upon, or receiving distributions under, any chapter 11 plan or plans in these chapter 11 cases in respect of that claim."  Bar Date Order, ¶ 15.

On or about November 6, 2007, the Debtors' court-approved claims and noticing agent, Epiq Bankruptcy Solutions, LLC (the "Claims Agent" or "Epiq") (a) mailed a Bar Date Notice Package (including a copy of the Bar Date Notice and a Proof of Claim Form) to all known entities holding potential pre-petition claims and their counsel (if known), all parties that have

requested notice in these cases, all equity holders, all indenture trustees, the Office of the United States Trustee and all taxing authorities for the jurisdictions in which the Debtors conducted business; and (b) published the Bar Date Notice in the <u>Dallas Morning Star</u>, <u>Saint Louis Post-Dispatch</u>, and the  national edition of <u>The New York Times</u>.

**Administrative Bar Date**

The Plan provides that: "requests for payment of Administrative Claims must be Filed and served…no later than (a) thirty (30) days after a notice of the Effective Date is filed with the Bankruptcy Court and served." <u>Plan</u>, Art. 3(B)(2).  On the Effective Date, the Debtors filed the Notice of (I) Occurrence of the Effective Date of the Plan; (II) Deadlines to File Administrative Claims, Professional Claims, Rejection Damages Claims, and Subordination Statements, and to Submit Invoices for Indenture Trustee Expenses; and (III) Appointment of Borrower Information Ombudsperson [Docket No. 9519] (the "<u>Effective Date Notice</u>").  The Effective Date Notice clearly provides that requests for payment of Administrative Claims were to be filed and served no later than Wednesday, January 5, 2011 (the "<u>Administrative Bar Date</u>").  The Effective Date Notice further states that "any Holder of a Class 1C(1) or 2C(1) Claim asserting that it holds a Senior Unsecured Claim must file and serve upon the Plan Trustee and the applicable Indenture Trustee(s) for Subordinated Trust Preferred Claims against the applicable Estate(s) a Subordination Statement by no later than Wednesday, January 5, 2011 (the "<u>Subordination Statement Bar Date</u>")."  The Effective Date Notice was served on Alvarez.  <u>Affidavit of Service</u>, 116 (attached, in relevant part, as **Exhibit A**).

*Alvarez Claim No. 10384*

On March 25, 2008, Alvarez filed a motion for leave to file a late proof of claim in these chapter 11 cases [Docket No. 3466] (the "<u>Initial Late Claim Motion</u>").  In the Initial Late Claim Motion, Alvarez asserted that "upon telephoning the office of the bankruptcy clerk in March of

4

2008; [Alvarez] was advised that the final date for filing a proof of claim in this cause [sic] was January 11, 2008, and the time for filing claims has expired as a general rule." Initial Late Claim Motion, ¶3. Subsequently, on April 28, 2008, Alvarez filed a proof of claim asserting a general unsecured claim against AHM Corp. in the amount $47,618.50, which has been designated as claim number 10384 ("Claim No. 10384") (attached as **Exhibit B**). Claim No. 10384 is comprised of $30,806 in "unlawful additional interest" Alvarez alleges he was forced to pay as a result of the additional .50% added to the interest rate of his Loan at closing as well as $16,812.50 in attorneys' fees. Additionally, Claim No. 10384 asserts that AHM Corp. violated TILA and RESPA and "engaged in Misrepresentation, Fraud and Negligence in their commercial interaction with Creditor."

On September 8, 2008, the Debtors filed a reservation of rights stating that while they did not agree with many of the assertions in Alvarez's motion, they consented to deem Claim 10384 as timely filed [Docket No. 5610]. On October 10, 2008, the Court entered an order deeming Claim No. 10384 timely filed and directing the Debtors and Alvarez to work together to resolve Claim No. 10384 in a manner satisfactory to both parties [Docket No. 6219] (the "October 2008 Order").

### *Alvarez Subordination Statement and the March 9, 2011 Hearing*

Based on the Effective Date Notice, Alvarez submitted a subordination statement on January 5, 2011 requesting that the claims of various parties, including the Defendants, be subordinated to Claim No. 10384 as a result of alleged misconduct relating to the Loan transaction [Docket No. 9646] (the "Subordination Statement"). On February 1, 2011, the Plan Trustee filed his Objection to Subordination Statements [Docket No. 9748] (the "Subordination Objection"), including Alvarez's Subordination Statement. In the Subordination Objection, the Plan Trustee argued that because Alvarez's claim did not assert a claim for Senior Debt and/or

Senior Indebtedness, it was not entitled to the benefit of subordination set forth in any Subordination Trust Preferred Indentures. <u>Subordination Obj.</u>, ¶ 11.

On March 9, 2011, a hearing was held on the Subordination Statement and Subordination Objection (the "<u>Subordination Hearing</u>"). Alvarez appeared at the Subordination Hearing to reiterate many of the points raised in both Claim No. 10384 and the Subordination Statement. At the Court's direction, counsel to the Plan Trustee attempted to resolve Alvarez's claims by allowing Claim No. 10384 as filed. However, Alvarez represented on the record that, despite Claim No. 10384 being allowed in full as filed, he now believes he is entitled to "an administrative priority claim because of the misconduct committed by the debtors." <u>Subordination Hearing Tr.</u> at 34, lines 1-2 (attached as **Exhibit C**). The Court informed Alvarez "I don't believe you're entitled to anything else and I don't see how it gets any better for you." <u>Subordination Hearing Tr.</u> at 33, lines 10-11.

### *Alvarez Adversary Proceeding*

On March 28, 2011, Alvarez filed the *Adversary Proceeding to Subordinate Claims, For Declaratory and Other Relief* [Adv. Docket No. 1] (the "<u>Complaint</u>") instituting an adversary proceeding against AHM Corp., Wells Fargo N.A., and Michael Strauss. The Complaint asserts a litany of causes of action against the Defendants, including AHM Corp. In response to the Complaint, on April 27, 2011, the Plan Trustee filed the *Motion to Dismiss Adversary Proceeding Complaint as it Pertains to American Home Mortgage Corp.* [Adv. Docket No. 12].

The majority of claims asserted against AHM Corp. are based on alleged pre-petition conduct by AHM Corp. relating to the Loan transaction. Alvarez alleges that AHM Corp. "assured [Alvarez] that they would obtain a 5.25% fixed rate and 'lock it in'," but on the day of closing Alvarez was "ambushed with a higher interest rate of 5.75% rather than the one that the Debtor had originally represented." <u>Complaint</u>, ¶ 13, 14. Alvarez alleges that despite "knowing

6

full well the misconduct associated with the mortgage, [AHM Corp.] sold the mortgage to…Wells Fargo Home Mortgage.  The transfer became effective May 1, 2005." Complaint, ¶ 17.  Additionally, Alvarez asserts, *inter alia*, that the Defendants, including AHM Corp., "embarked upon a pattern of deceit and fraud by fabricating different accounts and scenarios all in order to deprive the Movant of his rights under the TILA and RESPA, and, failed to provide Movant with the information he requested in order to hinder his access to justice and to wrongfully appropriate excess interest to which they were not entitled to." Complaint, ¶ 20.

Several claims are based on alleged post-petition conduct by the Debtors and/or Plan Trustee relating to the resolution of Claim No. 10384.  Effectively, Alvarez asserts, *inter alia*, that the Debtors: (1) mislead Alvarez with respect to the status of the Debtors' D&O insurance policies and the Debtors' ability to "cover their unlawful action against the Plaintiff," (2) the Debtors' failure to comply with the October 2008 Order, and (3) the Debtors' "arrogant offer [] that Plaintiff accept about one percent of his claim." Complaint, ¶ 38, 42, 47.

These same alleged facts asserted in the Complaint form the basis of the relief requested in the Alvarez Pleadings.

### *The Additional Late Claim Motion*

On the same day, Alvarez also filed the *Motion for an Order to File an Additional Late Proof of Claim* [Docket No. 9899] (the "Additional Late Claim Motion").  In the Additional Late Claim Motion, Alvarez argues that "[i]t would be in the best interest of justice if the proof of claim attached hereto be filed in the bankruptcy so that Movant may proceed to prosecute his claim in accordance to the law and express desire of the Debtors/Defendants."[3] Additional Late

---

[3]    Notably, no proof of claim was filed as an attachment to the Additional Late Claim Motion.  However, on March 28, 2011,  Alvarez separately filed a proof of claim with Epiq designated as Claim No. 10901.  Accordingly, the Plan Trustee will assume that Claim No. 10901 is the additional proof of claim referenced in the Additional Late Claim Motion.

7

Claim Motion, ¶ 39. Alvarez further states that the additional late claim "would have been filed in 2008 had the Debtors not lied to Movant into believing that they would work in good faith to resolve this claim or had they not prevaricated that they did not have D&O polices to settle Movant's claim." Id. The additional late claim is filed in the amount of $341,600 against "American Home Mortgage," which is comprised of an alleged secured priority[4] claim in the amount of $341,000 and an alleged general unsecured claim in the amount of $600 (the "Additional Late Claim") (attached as **Exhibit D**).

**The Sanctions Motion**

Alvarez also filed the *Motion For Sanctions Against Debtor, American Home Mortgage* [Docket No. 9900] (the "Sanctions Motion"). In the Sanctions Motion, Alvarez requests that the Court "impose on AHM monetary sanctions and other non-monetary relief as this Court deems appropriate pursuant to its inherent authority to sanction abusive litigants coming before the Court and pursuant to 11 U.S.C. section 105(a)." Sanctions Motion, ¶ 17.

**Administrative Claim Motion**

Subsequently, on April 4, 2011, Alvarez filed the *Motion for Allowance of Administrative Expense Claim Pursuant to 11 U.S.C. 503* [Docket No. 9914] (the "Administrative Claim Motion"). In the Administrative Claim Motion, Alvarez asserts that (1) Claim No. 10384 is entitled to administrative expense priority under section 503 of the Bankruptcy Code as a result of (a) the post-petition negotiations regarding Claim No. 10384, and (b) the benefits received by the Debtors as a result of their alleged post-petition conduct relating thereto, or alternatively, that (2) Claim No. 10384 should be elevated to administrative priority status because the claim was caused by a post-petition tort of the Debtors and/or Plan Trustee.

---

[4]    Alvarez asserts his claim is entitled to priority under section 507(a)(7) of the Bankruptcy Code.

## OBJECTION

I.    **Alvarez's Administrative Claim Motion Should be Denied**

A.    **Alvarez's Administrative Claim Motion is Time-Barred**

Alvarez provides no legitimate basis for his failure to adhere to the deadlines set forth in the Plan, Confirmation Order and Effective Date Notice. Accordingly, the Administrative Claim Motion should be denied as Alvarez fails to meet the appropriate standard for filing a late proof of claim.

In the Third Circuit, claims bar dates are deadlines to which creditors must strictly adhere. See In re Trump Taj Mahal Assocs., 156 B.R. 928, 936 (Bankr. D.N.J. 1993) ("The well-established law of this Circuit is that bar dates for filing Proofs of Claim are strictly construed."). A bar date is critically important to the administration of a successful chapter 11 case because it

> serves the important purpose of enabling parties to a bankruptcy case to identify with reasonable promptness the identity of those making claims against the bankruptcy estate and the general amount of the claims, a necessary step in achieving the goal of successful reorganization . . . . *Thus, a bar order does not "function merely as a procedural gauntlet," . . . but as an integral part of the reorganization process.*

In re Keene Corp., 188 B.R. 903, 907 (Bankr. S.D.N.Y. 1995) (emphasis added) (quoting First Fidelity Bank, N.A. v. Hooker Invs., Inc. (In re Hooker Invs., Inc.), 937 F.2d 833, 840 (2d Cir. 1991)) (citations omitted). Indeed, a bar date is akin to a statute of limitations and must be strictly construed. See Berger v. Trans World Airlines, Inc. (In re Trans World Airlines, Inc.), 96 F.3d 687, 690 (3d Cir. 1996) (noting that bar date means "a 'drop-dead date' that bars all prepetition claimants who received the required notice."); In re The Grand Union Co., 204 B.R. 864, 871 (Bankr. D. Del. 1997) ("In short, the claims bar date operates as a federally created

statute of limitations, after which the claimant loses all of her rights to bring an action against the debtor.").

For cause shown, a bankruptcy court "may extend the time within which proofs of claim or interest may be filed." Fed. R. Bankr. P. 3003(c)(3). Read in conjunction with Rule 9006(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Bankruptcy Rule 3003(c)(3) permits an act to be done after the deadline has expired "where the failure to act was the result of excusable neglect." Trump Taj Mahal, 156 B.R. at 936.

The claimant, however, bears the burden of demonstrating excusable neglect by a preponderance of the evidence. See, e.g., Jones v. Chemetron Corp., 212 F.3d 199, 205 (3d Cir. 2000) (citing Trump Taj Mahal, 156 B.R. at 936); In re Cable & Wireless USA, Inc., 338 B.R. 609, 613 (Bankr. D. Del. 2006). Further, to preserve the integrity of the bankruptcy system and the claims administration process, courts consistently have held that permission to file late proofs of claim should not be granted lightly. Trump Taj Mahal, 156 B.R. at 936.

The United States Supreme Court held that the following four factors are relevant in considering whether a movant has demonstrated that its neglect is excusable:

> (a)  the length of the delay and its potential impact on judicial proceedings;
>
> (b)  the reason for the delay, including whether it was within the reasonable control of the movant;
>
> (c)  whether the movant acted in good faith; and
>
> (d)  the danger of prejudice to the debtor;

Pioneer Inv. Servs. Co. v. Brunswick Assocs., L.P., 507 U.S. 380, 395 (1993); see also In re O'Brien Envtl. Energy, Inc., 188 F.3d 116, 125–126 (3d Cir. 1999) (analyzing the Pioneer factors to determine excusable neglect); In re Balt. Marine Indus., 344 B.R. 407, 417 (Bankr. D. Md. 2006) (applying Pioneer factors to a late-filed motion for allowance and payment of an

administrative expense claim).  A review of these factors indicates that the relief sought by Alvarez in the Administrative Claim Motion should be denied.

First, Alvarez's knowledge of the Debtors' chapter 11 cases dates back to March 25, 2008 when he filed the Initial Late Claim Motion - over three years ago.  More importantly, Alvarez had actual knowledge of the Administrative Bar Date.  In the Subordination Statement, Alvarez plainly states: "This Subordination Statement is submitted in response to the Order of the Bankruptcy Court issued by the Honorable Christopher S. Sontchi, dated November 30, 2010.  The Order directs claimants to file Subordination Statements no later than January 5, 2010 (the "Subordination Statement Bar Date")."  Subordination Statement, ¶ 1.  Thus, while Alvarez seems to confuse the Effective Date Notice with an order of the Court, it is clear that the document referenced in the Subordination Statement is the Effective Date Notice.  Therefore, it is unquestionable that Alvarez was aware of the deadline to file administrative claims.  Given the length of Alvarez's knowledge of the Debtors' cases and his actual knowledge of the Administrative Bar Date, Alvarez's delay in filing the Administrative Claim Motion is inexcusable.

Second, Alvarez provides no reason for the delay in filing the Administrative Claim Motion.  In fact, Alvarez does not even acknowledge that the Motion is late-filed.  Moreover, the result for the delay was entirely in Alvarez's control.  Instead of filing an administrative claim after receiving the Effective Date Notice, Alvarez chose to file the Subordination Statement. Nowhere in the Subordination Statement did Alaverz assert he was entitled to an administrative claim.  Accordingly, as the reason for the delay was entirely within Alvarez's control, and because Alvarez's only reason in filing the Administrative Claim Motion was because he was being denied the relief requested in the Subordination Statement and learned that Claim No.

10384 would be entitled to a 1% distribution under the Plan, the reason for Alvarez's delay in filing the Administrative Claim Motion is inexcusable.

Three, as stated above, Alvarez's decision to file the Administrative Claim Motion comes only after learning that Claim No. 10384 would be entitled to an approximately 1% distribution under the Plan.  It was only then that Alvarez determined he was entitled to "an administrative priority claim because of the misconduct committed by the debtors."  Subordination Hearing Tr. at 34, lines 1-2.  Alvarez filed the Administrative Claim Motion asserting unsubstantiated post-petition conduct which Alvarez hopes will result in the elevation of his claim to administrative priority status.  However, the Administrative Claim Motion, which is entirely premised on the same facts set forth in Claim No. 10384 - that is, pre-petition conduct - is nothing more than an unfair attempt to circumvent both the terms of the Plan and the priority scheme established in the Bankruptcy Code.  Alvarez is simply attempting to receive payment in full on his general unsecured claim.  Therefore, the Late Administrative Claim is not the result of good faith error.

Four, the potential prejudice to the Debtors' estates, and their creditors, is significant. Allowing Alvarez to now pursue a late administrative claim, in contravention of the Confirmation Order which specifically provides the deadline to file such claims, will undoubtedly open the floodgates for other parties to file late administrative claims, leaving the Plan Trustee unable to calculate reserves and make distributions pursuant to the Plan.  Indeed, the Plan Trustee's ability to effectuate the terms of the Plan hinge on his ability to quantify administrative and other claims and provide creditors with the appropriate allocation of the estates' assets.

The Third Circuit's discussion in the American Classic Voyages case is instructive on this point:

Applying the first and second *Pioneer* factors, we conclude that Debtors will be prejudiced by exposure to a late claim and that the length of the delay would have a substantial impact on the bankruptcy proceedings. [The late claim was filed] two days after Debtors filed their Joint Plan of Liquidation with the Bankruptcy Court. A policy that would allow proof of claims at that late date would have disrupted Debtors' reorganization.

Thousands of individual claims are outstanding against Debtors; the sheer scale presents a formidable problem of management. The strict bar date provided by the Bankruptcy Court was intended, in part, to facilitate the equitable and orderly intake of those claims. Debtors argue, with some persuasive effect, that, in view of the large number of post-bar date claims filed, allowing appellant to file late might 'render the bar order meaningless.' Debtors allege, upon information and belief, that other prospective claimants have filed late claims for a total value of almost $ 5 million, and that counsel for both Debtors and the Official Committee of Unsecured Creditors continue to receive numerous inquiries from prospective claimants. In the context of this massive bankruptcy proceeding, [movant's] late claim would be prejudicial. (citations omitted)

In re Am. Classic Voyages Co., 405 F.3d 127, 133-34 (3d Cir. 2005).

The current circumstances are similar to, if not more egregious than, those in American Classic Voyages. Here, over 10,000 claims have been filed against the Debtors. See id. at 133 ("Thousands of individual claims are outstanding against the Debtors; the sheer scale presents a formidable problem of management."). Just like in American Classic Voyages, the strict bar dates here were intended, in part, to facilitate the equitable and orderly intake of those claims. Additionally, if Alvarez is permitted to file a late administrative claim, other creditors or unsecured claimants will undoubtedly come forward arguing that they too should be entitled to an administrative expense claim despite their failure to comply with the deadlines set forth in the Confirmation Order. Beyond effectively nullifying the Administrative Bar Date and drowning the Debtors and their counsel in a sea of motions to file late administrative claims, the allowance of Alvarez's Administrative Claim could also significantly dilute the projected distribution to the

Debtors' unsecured creditors.    Accordingly, in the context of this massive bankruptcy proceeding, granting Alvarez's Administrative Claim Motion would be prejudicial.

Indeed, numerous other courts have condemned attempts to extend the bar date for creditors who received actual notice, because of the prejudice to debtors and the orderly progress of their reorganization efforts, as well as the unfairness towards other creditors who timely filed and due process concerns.    As one court in this Circuit has explained,

> Tinkering with an established bar date may raise due process claims of parties who have timely filed claims by originally-established bar dates, since it gives late filers a second bite at an apple which is likely to be less than fully satisfying, and thus effect unfair diminution of the timely filer's share of a distribution.

In re Sacred Heart Hosp. of Norristown, 177 B.R. 16, 23-24 (Bankr. E.D. Pa. 1995); see also In re Musicland Holding Corp., 362 B.R. 644, 655 (Bankr. S.D.N.Y. 2007) (noting "the irony of…extending the bar date for the benefit of those who sat on their rights . . . at the expense of the vigilant creditors who observed the bar date," and that it is "unfair to permit 'a second bite at the apple for those creditors who received notice of the bankruptcy filing and of the Claims Bar Date, and who chose not to file.'"); In re FirstPlus Fin., Inc., 248 B.R. 60, 73 (Bankr. N.D. Tex. 2000) ("[A] creditor who has received actual notice of the claims bar date, and who does not file a proof of claim, is barred and has no claim.").

Under the factors set forth by the Supreme Court in Pioneer, Alvarez has not demonstrated excusable neglect, and thus, should not be permitted to assert a late-filed administrative claim in contravention to deadline established in the Plan, Confirmation Order and Effective Date Notice.    Accordingly, the Administrative Claim Motion should be denied.

**B.** **Alvarez's Administrative Claim is Not Entitled To Administrative Expense Priority Under Section 503 of the Bankruptcy Code.**

*i* *Alvarez's Administrative Claim Motion is Premised on Alleged Pre-Petition Conduct.*

14

Even if Alvarez's Administrative Claim Motion was timely filed, it is premised on alleged pre-petition conduct. Accordingly, it would not be entitled to administrative priority as a matter of law. See In re Pinnacle Brands, Inc., 259 B.R. 46, 51 (Bankr. D. Del. 2001) (denying administrative expense status to a claim because it was "not premised on any post-petition contract or transaction between Debtors and [claimant]."); In re New Century TRS Holdings, Inc., 2011 Bankr. LEXIS 1186, *10-11 (Bankr. D. Del. Apr. 11, 2011) (same).

Section 503 of the Bankruptcy Code accords administrative expense priority to claims representing "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). To be considered an actual, necessary cost and expense of preserving the estate, a claim "must arise from a transaction with the debtor-in-possession and the consideration supporting the claimant's right to payment must be beneficial to the debtor-in-possession in the operation of the business." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999) (internal citation omitted).

In order to hold administrative expenses to a minimum and to maximize the value of the bankruptcy estate, section 503(b) is narrowly construed. In re Bernard Techs., Inc., 342 B.R. 174, 177 (Bankr. D. Del. 2006). Accordingly, the movant under section 503(b)(1)(A) carries a "heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets." Id. (quoting Calpine, 181 F.3d at 533); see In re Unidigital, Inc., 262 B.R. 283, 288 (Bankr. D. Del. 2001) ("Claimants who seek payment ahead of other unsecured claims bear the burden of establishing that their claim qualifies for priority status."). Movant must prove its entitlement to an administrative expense claim against the Debtors by a preponderance of the evidence. Bernard Techs., 342 B.R. at 177.

15

Alvarez's Administrative Claim Motion, effectively Claim 10384 restated, is premised on the pre-petition Loan transaction with AHM Corp. Accordingly, while Alvarez has been involved in the Debtors' chapter 11 cases post-petition insofar as he has discussed resolution of Claim No. 10384 with counsel to the Debtors and/or Plan Trustee, the asserted liability that is the basis of the Administrative Claim Motion arose entirely pre-petition. See New Century TRS Holdings, 2011 Bankr. LEXIS 1186 at *10-11 (holding that a claimant was not entitled to administrative expense status where the claim arose out of a mortgage loan and the debtors' sale or transfer of the loan and the servicing rights thereto, all of which occurred pre-petition). Moreover, the allegations underlying the Administrative Claim Motion clearly are not an "actual" or "necessary" costs of preserving the estate. See id. (holding that a claim asserting liability arising out of pre-petition loan transaction clearly did not provide any "actual" or "necessary" benefit to the estate).

Therefore, as the Administrative Claim Motion is premised on pre-petition liability that did not provide any benefit to the Debtors' estates, Claim No. 10384 cannot be accorded administrative expense priority under section 503(b)(1)(A). See Calpine, 181 F.3d at 532-533; Pinnacle Brands, 259 B.R. at 51.

### ii    Reading Doctrine

Alvarez argues, alternatively, that he is entitled to administrative expenses priority under section 503 of the Bankruptcy Code because his claim was "caused by a post-petition tort of the debtor." Alvarez cites the doctrine set forth in Reading Co. v. Brown, 391 U.S. 471 (1968), to support his position.

In Reading, the Supreme Court held that damages arising from a post-petition tort committed by a debtor are entitled to administrative expense status. See Id. at 485 (holding that damages resulting from a fire caused by receiver's negligence were administrative expenses).

16

Lower courts have applied the <u>Reading</u> doctrine to victims of post-petition torts committed by a debtor-in-possession or trustee.  <u>See</u> <u>In re Hayes Lemmerz Int'l Inc.</u>, 340 B.R. 461, 480 (Bankr. D. Del. 2006) (holding that equipment lessor was entitled to administrative claim for damages arising from conversion of lessor's property);  <u>In re Atlantic Container Corp.</u>, 133 B.R. 980, 992 (Bankr. N.D. Ill. 1991) ("By failing to repair and maintain the Premises, the [debtor] and the Trustee may have spared the estate substantial amounts of money which could then have been used for other purposes, such as paying employees and trade vendors in an attempt to reorganize.").

Here, Alvarez has failed to allege tortious post-petition conduct under any recognized theory of liability.  Alvarez asserts that counsel to the Debtors and/or Plan Trustee acted in bad faith in connection with settlement of Claim No. 10384.  First, Alvarez fails to provide any evidence to support his claims that the Debtors and/or Plan Trustee mislead Alvarez with respect to the status of the Debtors' insurance policies or the Debtors' ability to "cover their unlawful action against the Movant."  <u>Administrative Claim Motion</u>, ¶ 29.  Moreover, the Debtors and/or Plan Trustee had no duty to advise Alvarez with respect to any claims he believes he may have against their insurance policies.

At no time were the Debtors or Plan Trustee in violation of the October 2008 Order.  The October 2008 Order simply directed the parties to "work together in good faith to resolve Mr. Alvarez's claim in a manner that is satisfactory to both parties."  There was no time limitation placed on resolving Claim No. 10384 and there was no unilateral responsibility imposed on the Debtors to resolve Alvarez's claim in a manner satisfactory to him alone.  Negotiations between the parties merely reached an impasse in 2008, and, due to the size and complexity of these chapter 11 cases, were not revisited by the parties until just prior to the Subordination Hearing.

During that interim period, the Debtors never objected to Claim No. 10384, and are still in the process of reviewing and resolving general unsecured claims. Moreover, prior to the Subordination Hearing, counsel to the Plan Trustee left Alvarez two messages on his home answer machine which Alvarez did not respond to. Finally, when Alvarez and counsel to the Plan Trustee conferred in the hallway at the Subordination Hearing, the Plan Trustee consented to the exact relief Alvarez was requesting by Claim No. 10384 – a general unsecured claim in the amount of $47,618.50 against AHM Corp. Accordingly, while it is unfortunate that general unsecured creditors like Alvarez will only be entitled to an approximately 1% distribution[5] - a result Alvarez is clearly unhappy with - allowing a claim as filed is not a post-petition tort.

Finally, it should be noted that Alvarez asserts that "[f]undamental fairness requires that Movant's claim takes precedence [sic] over others." Administrative Claim Motion, ¶ 59. However, fundamental fairness requires quite the opposite result. In the Debtors' chapter 11 cases, Borrower Claims such as the one asserted by Alvarez will receive a pro rata distribution under the terms of the Plan. However, after discovering this, Alvarez instead attempts to receive more than he is entitled to by filing multiple pleadings--all asserting the same facts, but alternate relief. Fundamental fairness and the priority scheme set forth in section 507 of the Bankruptcy Code require that Alvarez be paid on a equal basis with other general unsecured creditors such as himself, not ahead of them. Unidigital, 262 B.R. 283.

## II.    Alvarez's Additional Late Claim Motion Should be Denied

### A.    Alvarez's Additional Late Claim is Barred by the Bar Date Order

Alvarez's Additional Late Claim, filed three years after the General Bar Date, is barred by the Bar Date Order.

---

[5]    Alvarez mischaracterizes the 1% distribution on Claim No. 10384 as an "offer" by the Plan Trustee, when instead, the 1% distribution is a fact under the terms of the Plan.

As set forth more fully above (see Infra I.A) and incorporated herein, claims bar dates are deadlines to which creditors much strictly adhere.  See In re Trump Taj Mahal Assocs., 156 B.R. 928, 936 (Bankr. D.N.J. 1993).  However, read in conjunction with Bankruptcy Rule 9006(b), Bankruptcy Rule 3003(c)(3) permits a bankruptcy court to extend the time within which proofs of claim may be filed when "the failure to act was the result of excusable neglect."  Id. Accordingly, as Alvarez has failed to establish excusable neglect under the standard set forth in Pioneer, Alvarez's Additional Late Claim should be denied.

First, as stated above, Alvarez's knowledge of the Debtors' chapter 11 cases dates back over three years.  Furthermore, Alvarez had actual knowledge of the General Bar Date back in March 2008 when he filed the Initial Late Claim Motion.  Subsequently, on April 28, 2008, Alvarez filed Claim No. 10384.  At that time, only two months following the General Bar Date, the Debtors' consented to deem Claim No. 10384 as timely filed.  However now, over three years after both the General Bar Date and the time that Alvarez was on actual notice thereof, Alvarez filed the Additional Late Claim.  While the Debtors consented to allow Claim No. 10384 in early 2008, that one-time consent was not a free pass for Alvarez to file pre-petition claims against the Debtors' indefinitely without regard to the General Bar Date.  Accordingly, given the three year delay between the General Bar Date (and the filing of Claim No. 10384) and the filing of the Additional Late Claim Motion, Alvarez's delay is inexcusable.

Second, Alvarez's sole allegation regarding his delay is untenable.  Alvarez asserts that the Additional Late Claim "would have been filed in 2008 had the Debtors not lied to Movant into believing that they would work in good faith to resolve this claim or had they not prevaricated that they did not have D&O policies to settle Movant's claim."  Additional Late Claim Motion, ¶ 39.  Yet, Alvarez also states that "it is the basis of this unlawful sale of a

fraudulent and negligently obtained mortgage that this additional proof of claim is filed." Additional Late Claim Motion, ¶ 7.  Thus, even assuming all of his post-petition allegations are true, Alvarez fails to explain why he neglected to file a secured priority claim based upon the pre-petition Loan transaction when he filed Claim No. 10384.  Clearly, it was only after discovering the amount of the distribution Claim No. 10384 is entitled to under the Plan that Alvarez decided to file the Additional Late Claim Motion.  Accordingly, as the reason for the delay was entirely within Alvarez's control, and because Alvarez has failed to explain why the Debtors' alleged post-petition conduct would result in a three year delay in filing a secured priority claim based upon a pre-petition Loan transaction, Alvarez's delay in filing the Additional Late Claim is inexcusable.

Third, as with his Administrative Claim Motion, Alvarez's decision to file the Additional Late Claim comes only after learning that Claim No. 10384 would be entitled to an approximately 1% distribution under the Plan.  To that end, Alvarez has provided no supporting documentation which would substantiate a secured priority claim against the Debtors in the amount of $341,600.  The Additional Late Claim is clearly not the result of good faith error, and is nothing more than a claimant's last ditch attempt to receive a greater distribution than other similarly situated creditors.

Fourth, as stated more fully above and incorporated herein, the prejudice to the Debtors' estates and its creditors is substantial.  If Alvarez's Additional Late Claim is allowed three years after the General Bar Date, other parties who have already filed general unsecured claims and are unhappy with the distributions established in the Plan will come forward asserting priority and/or secured claims against the Debtors' estates.  Such a result would leave the Plan Trustee unable to make distributions under the Plan and would further dilute distributions to unsecured creditors.

In the context of a massive bankruptcy proceeding, allowing late filed claims can be particularly prejudicial as it can result in opening the floodgates to numerous late filed claims, which affects both distributions under the Plan and the efficient administration of the Debtors' cases.

Accordingly, as the Debtors' one-time consent to late filed Claim No. 10384 was not a free pass for Alvarez to file pre-petition claims against the Debtors' indefinitely, and because Alvarez has not demonstrated excusable neglect under <u>Pioneer</u> for filing the Additional Late Claim three years after he had actual knowledge of the General Bar Date, the Additional Late Claim Motion should be denied.

      **B.**      **Alvarez's Additional Late Claim is a "New Claim" that Cannot Amend Claim No. 10384 Three Years After the Bar Date.**

To the extent that the Additional Late Claim is considered an amendment of Claim No. 10384, case law supports the conclusion that the Additional Late Claim is a "new claim" that does not properly amend Claim No. 10384 three years after the Bar Date.

Amendments to proofs of claim are freely allowed when the purpose is "to cure a defect in the claim as originally filed, to describe the claim with greater particularity or to plead a new theory of recovery on the facts set forth in the original claim." <u>In re Kolstad</u>, 928 F.2d 171, 175 (5th Cir. 1991) (citations omitted), <u>cert. denied</u>, 502 U.S. 958 (1991); <u>see also</u> <u>In re Edison Brothers Stores, Inc.</u>, 2002 Bankr. LEXIS 1228, at *9 (Bankr. D. Del, May 15, 2002). However, such amendments are allowed "only where the original claim prompted notice to the court of the existence, nature, and the amount of the claim." <u>Edison Brothers Stores</u>, 2002 Bankr. LEXIS 1228, at *10. Moreover "[b]ar dates…are not to be vitiated by amendments, and the courts must ensure that the amendments do not introduce wholly new grounds of liability." <u>Highlands Ins. Co. v. Alliance Operating Corp. (In re Alliance Operating Corp.)</u>, 60 F.3d 1174, 1175 (5th Cir. La. 1995) (citing <u>Kolstad</u>, 928 F.2d at 175). Accordingly, a post-bar date proof of claim

        

amendment should be "scrutinized closely to ensure that the amendment is genuine rather than the assertion of an entirely new claim." Edison Brothers Stores, 2002 Bankr. LEXIS 1228, at *11 (citations omitted).

Many courts, including those in the Third Circuit, have concluded that "[a]mendments are generally disallowed where a claimant attempts to change the nature of the proof of claim." Edison Brothers Stores, 2002 Bankr. LEXIS 1228, at *12; see also Alliance Operating Corp., 60 F.3d at 1175 (citations omitted) ("[A]mendments to proofs of claim that change the nature of the claim from an unsecured status to a priority status set forth a new claim."); In re Walls & All, Inc., 127 B.R. 115, 118 (W.D. Pa. 1991) ("Amending a claim to change status from unsecured to sixth place priority changes the nature of the proof of claim and therefore must be disallowed."); In re Metro Transportation Co., 117 B.R. 143, 148 (E.D. Pa. 1990). As the court explained in Metro Transportation,

> The nature of a priority claim is much different from that of a general unsecured claim. Reclassifying the claim as priority impacts the debtor's Plan and the distributions to be paid to the other creditors under the Plan. This situation is therefore different from those in which amendments have been permitted to increase the amount the claim when the post-bar date events have resulted in a larger, but otherwise unchanged debt. Id.

For example, in Walls & All, the debtors and claimant bank were parties to a membership agreement, whereby the bank agreed to honor credit cards and debit cards of MasterCard and Visa cardholders, and to act as a local depository. 127 B.R. at 116. Prior to the bar date, the creditor bank filed a $66,062.29 general unsecured claim for charge-backs to debtor for refunds advanced by the bank on credit card sales which were later credited by the bank to debtor's customers' accounts, pursuant to a membership agreement. Id. Then, one month following the bar date, the bank moved to amend its proof of claim in order to assert priority status on the $66,062.28 claim. Id at 117. The bank claimed that since the time it had filed its original proof

of claim it had completed its analysis of the amounts charged back and determined that its claim was entitled to priority status under §507(a)(6). Id. Following the trustee's objection, the Court held that the bank did not suggest that any post-bar-date event occurred which necessitated the reclassification of the claim, as opposed to amount and "[i]f the claim deserved priority, it deserved it at the time that [it] field its first proof of claim." Id. (quoting Metro Transportation, 127 B.R. at 148) (citations omitted). Additionally, the court considered certain equitable factors and determined that prejudice would result if the bank was permitted to alter its status from unsecured to priority, in part because "if the amendment were allowed, the trustee would be forced to incur additional expenses and would have to spend excessive amounts of time and effort in filing an objection to [the bank's] amended proof of claim, resulting in a significant waste of estate assets." Id. at 119.

Here, Alvarez seeks permission to file the Additional Late Claim in the amount of $341,600 which he asserts is both entitled to priority status under section 507(a)(7) of the Bankruptcy Code and is secured up to $341,000, or the purchase price of the Property. However, in the Additional Late Claim Motion, Alvarez plainly acknowledges that "[i]t is the basis of this unlawful sale of a fraudulent and negligently obtained mortgage that this additional proof of claim is filed." Additional Late Claim Motion, ¶ 7. Additionally, while Alvarez includes the same diatribe of alleged post-petition conduct (also the basis of his Late Administrative Claim and Sanctions Motion) in the Additional Late Claim Motion, he does not assert how or why any of these alleged post-bar-date events necessitated reclassification of his claim to priority and/or secured status. See Walls & All, 127 B.R. at 118.

Accordingly, to the extent the Additional Late Claim is considered an amendment of Claim No. 10384, it should be deemed a "new claim" barred by the General Bar Date.

23

Moreover, for the reasons set forth above (see Infra II.A), Alvarez has not demonstrated excusable neglect under Pioneer. Thus, the Additional Late Claim as an amendment of Claim No. 10384 should be denied.

### III.    Alvarez's Motion for Sanctions Should be Denied

Neither the Debtors, Plan Trustee, nor their counsel have engaged in sanctionable conduct. In the Sanctions Motion, Alvarez asserts that the Court "should impose on AHM monetary sanctions and other non-monetary relief as this Court deems appropriate pursuant to its inherent authority to sanction abusive litigants coming before the Court, and pursuant to 11 U.S.C. section 105(a)." Sanctions Motion, ¶ 17. However, as Alvarez fails to substantiate a finding of bad faith by the Debtors, Plan Trustee or their counsel, the Sanctions Motion should be denied.

### A.    Alvarez's Fails to Meet the Appropriate Standard for Sanctions

Courts have the inherent power to impose sanctions, particularly "when statutes or rules prove inadequate to remedy misconduct." Miller v. Cardinale (In re Deville), 361 F.3d 539, 551 (9th Cir. 2004). The inherent powers of the bankruptcy court are derived from section 105 of the Bankruptcy Code, which provides in relevant part, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). Accordingly, "a federal court, acting under its inherent authority, may impose sanctions against litigants or lawyers appearing before the court so long as the court makes a specific finding that they engaged in bad faith conduct." Leonard v. Luedtke (In re Yorkshire LLC), 540 F.3d 328, 332 (5th Cir. 2008) (citing cases); see also Gwynn v. Walker (In re Walker), 532 F.3d 1304, 1309 (11th Cir. 2008) ("To impose sanctions under these inherent powers, the court first must find bad faith.").

24

"A finding of bad faith is warranted where an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent.  A party also demonstrates bad faith by delaying or disrupting the litigation or hampering enforcement of a court order."  Byrne v. Nezhat, 261 F.3d 1075, 1121 (11th Cir. 2001); see also Hayes v. Genesis Health Ventures, Inc. (In re Genesis Health Ventures, Inc.), 362 B.R. 657, 662 (D. Del. 2007) (citing Fellheimer, Eichen & Braverman P.C. v. Charter Technologies, Inc., 57 F.3d 1215, 1224-1225 (3d Cir. 1995) (the "Bankruptcy Court retains the inherent power to award sanctions in order to enforce decorum and redress vexatious litigation.").

Here, aside from Alvarez's mischaracterized facts and conclusory allegations of misconduct, Alvarez has failed to substantiate a finding of bad-faith by the Debtors, Plan Trustee or their counsel.

### i        The D&O Policies

Alvarez's allegations with respect to the Debtors' directors and officers policies are both unsubstantiated and irrelevant.  First, Alvarez provides no evidence, other than his own statements, that the Debtors and/or Plan Trustee mislead Alvarez with respect to the status of the Debtors' insurance policies or the Debtors' ability to "cover their unlawful action against the Movant."  Sanctions Motion, ¶ 8.  Moreover, the Debtors and/or Plan Trustee had no duty to advise Alvarez with respect to any claims he believes he may have against their insurance policies.  Finally, the fact that the Debtors had certain D&O insurance policies and that they funded the settlement of the *In re: American Home Mortgage Securities Litigation*, Case No. 07-MD-1898 (TCP) with the proceeds of these policies is simply irrelevant to Alvarez's asserted claims.

### ii        October 2008 Order

25

The Debtors and/or Plan Trustee were never in violation of the October 2008 Order and did not refuse to negotiate or resolve Claim No. 10384 at any time.  The October 2008 Order only provides for the parties to "work together in good faith to resolve Mr. Alvarez's claim in a manner that is satisfactory to both parties."  Following entry of the Order, the parties had several discussions regarding the resolution of Claim No. 10384.  When Alvarez and the Debtors were unable to reach a resolution that was satisfactory *to both parties* at that time, negotiations temporarily stalled.  However, during the interim period, Alvarez did not reach out to the Debtors or Plan Trustee regarding Claim No. 10384 and the Debtors (and/or Plan Trustee) never refused to continue discussions with Alvarez nor objected to Claim 10384.  Furthermore, the Plan Trustee continues to review and resolve general unsecured claims in these chapter 11 cases.  Accordingly, any perceived delay in the resolution of Claim No. 10384 is due solely to the size and complexity of the Debtors' cases, and not the result of the Debtors' and/or Plan Trustee's bad faith conduct.

### iii       Subordination Hearing

At the Subordination Hearing, when the Court was presented with the same facts provided in the Sanctions Motion, the Court directed the parties to step out in the hall and resolve Claim No. 10384.  Subordination Hearing Tr., at 19, lines 9-10.  Counsel to the Plan Trustee conferred with Alvarez, and in an attempt to resolve Alvarez's claims, agreed to allow Claim No. 10384 as filed.  Alvarez mischaracterizes the 1% distribution on Claim No. 10384 as an "offer," when instead, counsel to the Plan Trustee was merely stating a fact under the terms of the Plan.  Accordingly, while it is accurate that Alvarez would be entitled to an approximately 1% distribution on his claim, the same distribution all other similarly situated creditors are entitled to receive, allowing a creditor's claim as filed does not give rise to a finding of bad faith under any standards.

## <u>CONCLUSION</u>

WHEREFORE, the Plan Trustee respectfully requests that this Court enter an Order (i)

denying the relief requested in the Alvarez Pleadings and (iv) granting any further relief that the

Court deems just and proper.

Dated: Wilmington, Delaware`
      May 4, 2010

                                    Young Conaway Stargatt & Taylor, LLP

                                    */s/ Margaret Whiteman Greecher*
                                    Sean M. Beach (No. 4070)
                                    Margaret Whiteman Greecher (No. 4652)
                                    The Brandywine Building
                                    1000 West Street, 17th Floor
                                    Wilmington, Delaware 19801
                                    Telephone:    (302) 571-6600
                                    Facsimile:    (302) 571-1253

                                    -and-

                                    HAHN & HESSEN LLP
                                    Mark S. Indelicato
                                    Edward L. Schnitzer
                                    Alison M. Papalexis
                                    488 Madison Avenue
                                    New York, New York 10022
                                    Telephone:    (212) 478-7200
                                    Facsimile:    (212) 478-7400

                                    *Co-Counsel for the Plan Trustee*

