## Exhibit A

### Loan Application

**FILED UNDER SEAL**

## Exhibit B

**Payment Option ARM Disclosure**

Board of Governors of the Federal Reserve System
Federal Deposit Insurance Corporation
National Credit Union Administration
Office of the Comptroller of the Currency
Office of Thrift Supervision

# Interest-Only Mortgage Payments and Payment-Option ARMS
# Are They For You?

Owning a home is part of the American dream. But high home prices may make the dream seem out of reach. To make monthly mortgage payments more affordable, many lenders offer home loans that allow you to (1) pay only the interest on the loan during the first few years of the loan term or (2) make only a specified minimum payment that could be less than the monthly interest on the loan.

Whether you are buying a house or refinancing your mortgage, this information can help you decide if an interest-only mortgage payment (an I-O mortgage) - or an adjustable-rate mortgage (ARM) with the option to make a minimum payment (a payment-option ARM) - is right for you. Lenders have a variety of names for these loans, but keep in mind that with I-O mortgages and payment-option ARMs, you could face

*   **payment shock.** Your payments may go up a lot - as much as double or triple - after the interest-only period or when the payments adjust.

In addition, with payment-option ARMs you could face

*   **negative amortization.** Your payments may not cover all of the interest owed. The unpaid interest is added to your mortgage balance so that you owe more on your mortgage than you originally borrowed.

Be sure you understand the loan terms and the risks you face. And be realistic about whether you can handle future payment increases. If you're not comfortable with these risks, ask about another loan product.

## What is an I-O mortgage payment?

Traditional mortgages require that each month you pay back some of the money you borrowed (the principal) plus the interest on that money. The principal you owe on your mortgage decreases over the term of the loan. In contrast, an I-O payment plan allows you to pay only the interest for a specified number of years. After that, you must repay both the principal and the interest.

Most mortgages that offer an I-O payment plan have adjustable interest rates, which means that the interest rate and monthly payment will change over the term of the loan. The changes may be as often as once a month or as seldom as every 3 to 5 years, depending on the terms of your loan. For example, a 5/1 ARM has a fixed interest rate for the first 5 years; after that, the rate can change once a year (the "1" in 5/1) during the rest of the loan. More information on ARMs is available in the Federal Reserve Board's *Consumer Handbook on Adjustable Rate Mortgages*.

The I-O payment period is typically between 3 and 10 years. After that, your monthly payment will increase - even if interest rates stay the same - because you must pay back the principal as well as the interest. For example, if you take out a 30-year mortgage loan with a 5-year I-O payment period, you can pay only interest for 5 years and then both principal and interest over the next 25 years. Because you begin to pay back the principal, your payments increase after year 5.

## What is a payment-option ARM?

A payment-option ARM is an adjustable-rate mortgage that allows you to choose among several payment options each month. The options typically include

Board of Governors of the Federal Reserve System
Interest-Only Mortgage Payments and Payment-Option ARM's
Wolters Kluwer Financial Services · VMP ®-12 (0611)    Page 1 of 8    11/06
Doc # 946642/Image: 1012-1.prn  App# 0001350490

- ◆ **a traditional payment of principal and interest** (which reduces the amount you owe on your mortgage). These payments may be based on a set loan term, such as a 15-, 30-, or 40-year payment schedule.

- ◆ **an interest-only payment** (which does not change the amount you owe on your mortgage).

- ◆ **a minimum (or limited) payment** (which may be less than the amount of interest due that month and may not pay down any principal). If you choose this option, the amount of any interest you do not pay will be added to the principal of the loan, increasing the amount you owe and increasing the interest you will pay.

**Interest rates.** The interest rate on a payment-option ARM is typically very low for the first 1 to 3 months (2%, for example). After that, the rate usually rises to a rate closer to that of other mortgage loans. Your monthly payments during the first year are based on the initial low rate, meaning that if you only make the minimum payment, it may not cover the interest due. The unpaid interest is added to the amount you owe on the mortgage, resulting in a higher balance. This is known as *negative amortization*. Also, as interest rates go up, your payments are likely to go up.

**Payment changes.** Many payment-option ARMs limit, or cap, the amount the monthly minimum payment may increase from year to year. For example, if your loan has a payment cap of 7.5%, your monthly payment won't increase more than 7.5% from one year to the next (for example, from $1,000 to $1,075), even if interest rates rise more than 7.5%. Any interest you don't pay because of the payment cap will be added to the balance of your loan.

Payment-option ARMs have a built-in recalculation period, usually every 5 years. At this point, your payment will be recalculated (lenders use the term *recast*) based on the remaining term of the loan. If you have a 30-year loan and you are at the end of year 5, your payment will be recalculated for the remaining 25 years. **The payment cap does not apply to this adjustment.** If your loan balance has increased, or if interest rates have risen faster than your payments, your payments could go up a lot.

**Ending the option payments.** Lenders end the option payments if the amount of principal you owe grows beyond a set limit, say 110% or 125% of your original mortgage amount. For example, suppose you made minimum payments on your $180,000 mortgage and had negative amortization. If the balance grew to $225,000 (125% of $180,000), the option payments would end. Your loan would be recalculated and you would pay back principal and interest based on the remaining term of your loan. It is likely that your payments would go up significantly.

# What do you need to ask when shopping for an I-O mortgage or a payment-option ARM?

Use the Mortgage Shopping Worksheet to compare different loan products. Ask lenders or brokers about the details of their loans and about the different loan options they offer. And don't be afraid to make lenders and brokers compete with each other by letting them know you are shopping for the best deal. Look for a mortgage that allows you to buy the house and continue to afford the payments, even if payments go up over time.

# Mortgage Shopping Worksheet

(See the *Consumer Handbook on Adjustable Rate Mortgages* to help you compare other ARM features and *Looking for the Best Mortgage* to help you compare other loan features.

|  | *Example* |
| --- | --- |
| Name of lender or broker & contact information | *ABC Mortgage Co.* *800-123-4567* |
| Mortgage amount | *$180,000* |
| Loan description | *Payment-option ARM; 1-month introductory rate; 30-year term* |
| Is this an I-O payment or a payment-option ARM? | *Payment-option ARM* |

# Mortgage Shopping Worksheet - continued

|  | Example |
|---|---|
| If different payment options are available, what are the options? | 1. First year's minimum payment based on initial interest rate<br><br>2. Interest-only payment based on rate after adjustment<br>3. Fully amortizing payment based on 30-year term |
| What is the full term of the mortgage? | 30 years |
| How long is the option period? | The loan will be recalculated (recast) every 5 years. Payment options are available every month except (1) when loan is recast every 5 years, (2) when balance is 125% of original loan, or (3) if you fall more then 60 days behind in your payments. |
| What is the initial interest rate? | 1.6% |
| For a payment-option ARM, how long does the initial interest rate apply? | 1 month |
| What will the interest rate be after the initial rate? | 6.4% |
| How often can the interest rate adjust? | Monthly |
| What is the periodic interest rate cap? | 2% per year |
| What is the overall interest rate cap? | 6% lifetime cap<br>(maximum interest rate is 12.4%) |
| How often will the monthly payments adjust? | Annually |
| What is the payment cap? | 7.5% per year;<br>does not apply to recalculation every 5th year |
| Can this loan have negative amortization? | Yes |
| Is there a limit to how much the balance can grow before the loan will be recalculated? | Up to 125% of original amount borrowed<br>(loan will be recalculated if balance grows to $255,000) |
| Is there a prepayment penalty if I end this mortgage early by refinancing or selling my home? | Yes |
| How much is the penalty? | 3% of amount borrowed in 1st year ($5,400), down to 1% of amount borrowed in 3rd year ($1,800); no prepayment penalty after year 3 |
| What will my monthly payments be for the first year of the loan? | $630 |
| Does this include taxes and insurance? Homeowner's association fees? | No |
| What is the most my minimum monthly payment could be after 12 months? | $677 (based on 7.5% cap) |
| What is the most my minimum monthly payment could be after 24 months? | $728 (based on 7.5% cap) |
| What is the most my minimum monthly payment could be after 36 months? | $783 (based on 7.5% cap) |

VMP ®-12 (0611)

Doc # 946644/Image: 1012-3.prn  App# 0001350490

# Mortgage Shopping Worksheet - continued

| | Example |
|---|---|
| What is the **most** my minimum monthly payment could be after **48** months? | $2,491 (based on recalculation of the loan when balance is $225,000) |
| What is the **most** my minimum monthly payment could be after **60** months (5 years)? | $2,491 (based on recalculation of the loan after 4 years) |
| What would my minimum monthly payment be after **60** months (5 years) **if the interest rate stays the same?** | $1,308 (based on recalculation of the loan after 5 years) |
| What are the fees and charges due at closing on this loan? | See good faith estimate |

# When might an I-O mortgage payment or a payment-option ARM be right for you?

Despite the risks of these loans, an I-O mortgage payment or a payment-option ARM might be right for you if the following apply:

- you have modest current income but are reasonably certain that your income will go up in the future (for example, if you're finishing your degree or training program),

- you have sizable equity in your home and will use the money that would go toward principal payments for other investments, or

- you have irregular income (such as commissions or seasonal earnings) and want the flexibility of making I-O or option ARM minimum payments during low-income periods and larger payments during higher-income periods.

# When might an I-O mortgage payment or a payment-option ARM not make sense?

Interest-only or option-ARM minimum payments may be risky if you won't be able to afford the higher monthly payments in the future. For example, suppose you are in the market for a home and can afford a monthly payment of about $1,100. Depending on the interest rate, with a traditional 30-year, fixed-rate mortgage, you might expect to get a $180,000 mortgage. A lender or broker could offer you an I-O mortgage payment of $1,100 monthly that might enable you to get a $215,000 mortgage - and, therefore, a more expensive house. But keep in mind that your payments could go up because of interest rate increases when the I-O period ends, or when the loan is recalculated. Your $1,100 monthly payment could jump to $1,340 or more. If you cannot reasonably expect to make this larger payment when the time comes, you might want to think about a different type of loan.

VMP ®-12 (0811)

Doc # 946645/Image: 1012-4.prn  App# 0001350490

# Mortgage Shopping Worksheet

Use this worksheet to compare mortgages.

| | Mortgage 1 | Mortgage 2 |
|---|---|---|
| Name of lender or broker & contact information | | |
| Mortgage amount | | |
| Loan description | | |
| Is this an I-O payment or a payment-option ARM? | | |
| If different payment options are available, what are the options? | | |
| What is the full term of the mortgage? | | |
| How long is the option period? | | |
| What is the initial interest rate? | | |
| For a payment-option ARM, how long does the initial interest rate apply? | | |
| What will the interest rate be after the initial rate? | | |
| How often can the interest rate adjust? | | |
| What is the periodic interest rate cap? | | |
| What is the overall interest rate cap? | | |
| How often will the monthly payment adjust? | | |
| What is the payment cap? | | |
| Can this loan have negative amortization? | | |
| Is there a limit to how much the balance can grow before the loan will be recalculated? | | |
| Is there a prepayment penalty if I end this mortgage early be refinancing or selling my home? | | |
| How much is the penalty? | | |
| What will my monthly payments be for the first year of the loan? | | |
| Does this include taxes and insurance? Homeowner's association fees? | | |
| What is the most my minimum monthly payment could be after 12 months? | | |

VMP ®-12 (0611)

Doc # 946646/Image: 1012-5.prn  App# 0001350490

| | | |
|---|---|---|
| What is the most my minimum monthly payment could be after **24 months**? | | |
| What is the most my minimum monthly payment could be after **36 months**? | | |
| What is the most my minimum monthly payment could be after **48 months**? | | |
| What is the most my minimum monthly payment could be after **60 months (5 years)**? | | |
| What would my minimum monthly payment be after **60 months (5 years) if the interest rate stays the same**? | | |
| What are the fees and charges due at closing on this loan? | | |

# What are the alternatives to I-O mortgage payments and payment-option ARMs?

If you are not sure that an I-O mortgage payment or a payment-option ARM makes sense for you, there are several other alternatives you could consider.

◆  Find out if you qualify for a community housing program that offers lower interest rates or reduced fees for first-time homebuyers, making home ownership more affordable.

◆  Consider a fixed-rate mortgage or a fully amortizing ARM. Shop around for terms and features that fit your needs and your budget.

◆  Take more time to save for a larger down payment, reducing the amount you need to borrow and making your mortgage payments more affordable.

◆  Look for a less expensive home. Once you build up equity, you could buy a more expensive home.

# What should I keep in mind when it comes to an I-O mortgage payment or a payment-option ARM?

◆  Both types of loans can be flexible and allow you to make lower monthly payments during the first few years of the loan. You can repay some of the principal at any time to help keep future payments lower.

◆  Neither loan may be the right choice if the attraction of an initial smaller monthly payment leads you to take out a larger mortgage than you will be able to afford when the interest-only period ends or when the option payments are recalculated.

◆  Eventually you will have to pay back the principal you borrowed, plus any amounts added to the principal as negative amortization.

◆  You will have lower monthly payments only during the first few years. You will have larger payments later – and you will need to have the income to cover those larger payments.

Also, note that

◆  with an adjustable-rate mortgage, interest-only and option ARM monthly payments can increase, even during the I-O-payment or option period.

◆  by making I-O or minimum payments, you will not be building equity in your home by paying down the principal on the loan, even though you are making monthly payments. The equity in your home may increase if the market value of your home increases, but the equity could also go down if the market value of your home goes down.

◆  with payment-option ARMs, you may be adding to the amount you owe on your mortgage if you pay less than the full interest owed each month.

VMP ®-12 (0811)

Doc # 946647/Image: 1012-6.prn  App# 0001350490

# Glossary

## Adjustable-rate mortgage (ARM)

A mortgage that does not have a fixed interest rate. The rate changes during the life of the loan in line with movements in an index rate, such as the rate for Treasury securities or the Cost of Funds Index.

## Amortizing loan

Monthly payments are large enough to pay the interest and reduce the principal on your mortgage.

## Cap, interest rate

A limit on the amount your interest rate can increase. Interest caps come in two versions:
- periodic caps, which limit the interest-rate increase from one adjustment period to the next, and
- overall caps, which limit the interest-rate increase over the life of the loan. By law, virtually all ARMs must have an overall cap.

## Cap, payment

A limit on how much the monthly payment may change, either each time the payment changes or during the life of the mortgage. Payment caps do not limit the amount of interest the lender is earning, so they may lead to negative amortization.

## Equity

The difference between the fair market value of the home and the outstanding mortgage balance.

## Good faith estimate

The Real Estate Settlement Procedures Act (RESPA) requires your mortgage lender to give you a good faith estimate of all your closing costs within 3 business days of submitting your application for a loan, whether you are purchasing or refinancing a home. The actual expenses at closing may be somewhat different from the good faith estimate.

## Index

The index is the measure of interest-rate changes that the lender uses to decide how much the interest rate on an ARM will change over time. No one can be sure when an index rate will go up or down. Some index rates tend to be higher than others, and some change more often. You should ask your lender how the index for any ARM you are considering has changed in recent years, and where the index is reported.

## Interest

The price paid for borrowing money, usually given in percentages and as an annual rate.

## Margin

The number of percentage points the lender adds to the index rate to calculate the ARM interest rate at each adjustment.

## Negative amortization

Occurs when the monthly payments do not cover all the interest owed. The interest that is not paid in the monthly payment is added to the loan balance. This means that even after making many payments, you could owe more than you did at the beginning of the loan.

## Prepayment penalty

Extra fees that may be due if you pay off the loan early by refinancing your home. These fees may make it too expensive to get out of the loan. If your loan includes a prepayment penalty, be aware of the penalty you would have to pay. Ask the lender if you can get a loan without a prepayment penalty, and what that loan would cost.

## Principal

The amount of money borrowed or the amount still owed on a loan.

# For More Information

Additional information about interest-only mortgages and payment-option ARMs is available on the Federal Reserve Board's web site at www.federalreserve.gov/pubs/mortgage_interestonly/default.htm.

See also these sites:

*Looking for the Best Mortgage - Shop, Compare, Negotiate*
(at www.federalreserve.gov/pubs/mortgage/mortb_1.htm)

*Consumer Handbook on Adjustable Rate Mortgages*
(at www.federalreserve.gov/pubs/arms/arms_english.htm)

*A Consumer's Guide to Mortgage Settlement Costs*
(at www.federalreserve.gov/pubs/settlement/default.htm)

Partners Online Mortgage Calculator
(at www.frbatlanta.org/partnerssoftwareonline/dsp_main.cfm)

## This information was prepared in consultation with the following agencies and organizations:

Center for Responsible Lending

Consumer Federation of America

Consumer Mortgage Coalition

Consumers Union

Credit Union National Association

Federal Deposit Insurance Corporation

Federal Reserve Bank of New York

Federal Trade Commission

Financial Services Roundtable

Freddie Mac

National Consumers League

Office of the Comptroller of the Currency

Office of Thrift Supervision

Rutgers Cooperative Extension

University of Illinois Cooperative Extension

VMP ®-12 (0611)

Doc # 946649/Image: 1012-8.prn  App# 0001350490

<u>Illustration 1</u>

**Important Facts About Interest-Only and Payment Option Mortgages**

Whether you are buying a house or refinancing your mortgage, this information can help you decide if an interest-only mortgage or a payment option mortgage is right for you. These mortgages can be complicated. If you do not understand how they work, you should not sign any loan contracts, and you might want to consider other types of loans.

**Interest-Only Mortgages** allow you to pay only the interest on the money you borrowed for the first few years of the mortgage (the "interest-only period").

**If you pay only the amount due, then at the end of the interest-only period:**
- You will still owe the original amount you borrowed.
- Your monthly payment will increase because you must pay back the principal as well as interest. Your payment could increase even more if you have an adjustable rate mortgage ("ARM") and interest rates increase.

**Payment Option Mortgages** allow you to choose among several payment options each month during the first few years of the loan (the "option period"). The option period will end earlier than scheduled if the amount you owe grows beyond a set limit—for example, 110% or 125% of your original mortgage amount.

**During the option period, the payment options usually include:**
- A payment of principal and interest, which reduces the amount you owe over time.
- An interest-only payment, which does not reduce the amount you owe.
- A minimum payment, which may be less than the interest due that month. *If you choose this option, any unpaid interest will increase the amount you owe.*

**At the end of the option period, depending on what payment options you chose:**
- You could owe substantially more than the original amount you borrowed.
- Your monthly payment could increase significantly because:
  - You may have to start paying back principal, as well as interest.
  - Unpaid interest may have increased the amount you owe.
  - Interest rates may have increased (if you have an ARM).

**Additional Information**

▶**Home Equity**—If you make interest-only payments, your payments are not building home equity. And, if you make only the minimum payment on a payment option mortgage, you may be losing home equity. This may make it harder to refinance your mortgage or to obtain funds from selling or refinancing your home.

▶**Prepayment Penalties**—Some mortgages require you to pay a lump-sum prepayment penalty if you sell your home or refinance during the first few years of the loan. You should find out if your mortgage has a prepayment penalty, how it works, and how much it could be.

▶**No Doc/Low Doc Loans**—"Reduced documentation" or "stated income" loans usually have higher interest rates or other costs compared to "full documentation" loans that require you to verify your income and assets.

Illustration 2

# SAMPLE MORTGAGE COMPARISON
*(Not actual loans available)*

Sample Loan Amount $200,000 – 30-Year Term – Interest Rates For Example Purposes Only

| | Traditional Fixed Rate Mortgage (7%) | 5-Year Interest-Only ARM (initial rate 7%; maximum rate 12%) | Payment Option ARM (rate in 1st month 2%; variable rate after 1st month (starting at 7%); maximum rate 12%) |
|---|---|---|---|
| **REQUIRED MONTHLY PAYMENTS** | | | |
| Years 1-5 | $1,331 | $1,167 | $739–$987 (increasing annually) |
| Year 6 – if rates don't change | $1,331 | $1,414 | $1,565 |
| Year 6 – if rates rise 2% | $1,331 | $1,678 | $1,859 |
| Year 8 – if rates rise 5% | $1,331 | $2,094 | $2,319 |
| **EFFECT ON LOAN BALANCE AND HOME EQUITY** | | | |
| After 5 Years, How Much Will You Owe? | $188,263 | $200,000 | $221,486 |
| After 5 Years, How Much Home Equity Have Your Loan Payments Built? | $11,737 | $0 | *NEGATIVE $21,486* |

## Exhibit C

**HUD-1 Statement**

**FILED UNDER SEAL**

## **Exhibit D**

## **Adjustable Rate Note**

**FILED UNDER SEAL**

## Exhibit E

**Adjustable Rate Rider**

**FILED UNDER SEAL**

## Exhibit F

**Security Deed**

BK46756PG0425

Return To:
American Brokers Conduit
520 Broadhollow Road
Melville, NY 11747

FILED AND RECORDED
CLERK SUPERIOR COURT
GWINNETT COUNTY, GA

06 JUL 17 PM 2:00

TOM LAWLER, CLERK

Prepared By:
Margaret Smith
225 Town Park Drive
Suite 450
Kennesaw, GA
30144

GEORGIA CLOSING ASSOCIATES, INC.
3815 Presidential Parkway, Suite 100
ATLANTA, GEORGIA 30340

——————— [Space Above This Line For Recording Data] ———————

## SECURITY DEED

MIN 100024200013504903

GEORGIA INTANGIBLE TAX PAID

$ _478.50_

TOM LAWLER
SUPERIOR COURT GWINNETT
COUNTY, GEORGIA

**DEFINITIONS**

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated July 7, 2006 ,
together with all Riders to this document.
**(B) "Borrower"** is Hussain Kareem

Borrower is the grantor under this Security Instrument.
**(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the grantee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DOC #:323091          APPL #:0001350490

GEORGIA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3011 1/01

-6A(GA) (0005)
    UM31 9905.02
Page 1 of 16          Initials: _____

VMP MORTGAGE FORMS - (800)521-7291

*H.K.*

0114539

*50*

BK46756PG0426

**(D) "Lender"** is American Brokers Conduit

Lender is a Corporation
organized and existing under the laws of   State of New York
Lender's address is  538 Broadhollow Road, Melville, NY  11747

**(E) "Note"** means the promissory note signed by Borrower and dated   July 7, 2006
The Note states that Borrower owes Lender   One Hundred Fifty Nine Thousand Two                Dollars
Hundred and No/100
(U.S. $159,200.00             ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than  August 1, 2036
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | ☐ Condominium Rider | ☐ Second Home Rider |
| ☐ Balloon Rider | ☐ Planned Unit Development Rider | ☐ 1-4 Family Rider |
| ☐ VA Rider | ☐ Biweekly Payment Rider | [X] Other(s) [specify] |
| | | Waiver of Borrower's Rights |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used

DOC #:323092              APPL #:0001350490

Initials:

-6A(GA) (0005)              Page 2 of 14              Form 3011  1/01

BK46756PG0427

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(Q) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS, with power of sale, the following described property located in the

County                                                        of  Gwinnett                                                    :
       [Type of Recording Jurisdiction]                                         [Name of Recording Jurisdiction]
     SEE EXHIBIT A AS ATTACHED HEREIN AND  MADE A PART HEREOF

Parcel ID Number:  7037 613                                    which currently has the address of
2197 Carlysle Creek Drive                                                                          [Street]
Lawrenceville                                           [City] , Georgia          30044   [Zip Code]
("Property Address"):

      TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

      BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

DOC  #:323093                     APPL #:0001350490                Initials: _____          Form 3011  1/01

-6A(GA)  (0005)                        Page 3 of 14

BK46756PG0428

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower

shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10



BK 4 6 7 5 6 PG 0 4 3 0

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to

BK 4 6 7 5 6 PG 0 4 3 1

the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying

BK 46756 PG 0432

reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

BK46756PG0433

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

DOC  #:323099                    APPL  #:0001350490                Initials: _A. K_                    Form 3011  1/01

@ -6A(CA)  (0005)                        Page 9 of 14

BK46756PG0434

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

BK 4 6 7 5 6 PG.0 4 3 5

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

BK46756PG0436

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

DOC #:323102                APPL #:0001350490

-6A(GA) (0005)                  Page 12 of 14            Initials: HK            Form 3011  1/01

BK46756PG0437

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Waiver of Homestead. Borrower waives all rights of homestead exemption in the Property.

25. Assumption Not a Novation. Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

26. Security Deed. This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

Initials: _H.K._

DOC #:323103
-6A(GA) (0005)

APPL #:0001350490
Page 13 of 14

Form 3011  1/01

BK46756PG0438

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

_____ (Seal)
Hussain Kareem           -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

_____ (Seal)
                         -Borrower

STATE OF GEORGIA,    DeKalb                    County ss:
Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

_____
Notary Public
State of Georgia

_____ County

DOC #:323104          APPL #:0001350490
-6A(GA) (0005)        Page 14 of 14          Form 3011  1/01

BK46756PG0439

EXHIBIT "A"

ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 37 OF THE 7TH
DISTRICT, OF GWINNETT COUNTY, GEORGIA, AND BEING LOT 68, BLOCK A OF CARLYSLE,
UNIT FOUR, AS PER PLAT RECORDED IN PLAT BOOK 75, PAGE 97 OF GWINNETT COUNTY,
GEORGIA, WHICH PLAT IS INCORPORATED HEREIN AND MADE A PART HEREOF BY
REFERENCE.

*H.K.*

BK46756PG0440

GEORGIA

GRANTOR: Hussain Kareem

LENDER: American Brokers Conduit

DATE OF SECURITY DEED: July 7, 2006

## WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:



Signed, Sealed and delivered in the presence of:

_____     _____ (Seal)
                                      Hussain Kareem                -Grantor

_____     _____ (Seal)
                                                                    -Grantor

_____     _____ (Seal)
                                                                    -Grantor

                                     _____ (Seal)
Notary Public                                                       -Grantor

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower(s) rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with and explanation to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me          Hussain Kareem

_____                    _____ on the date set forth above.

_____                    _____
Notary Public                                        Closing Attorney

## FORECLOSURE CLOSING DISCLOSURE

O.C.G.A. Section 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.

_____          _____
Hussain Kareem

_____          _____

BK46756PG0441

## ADJUSTABLE RATE RIDER

### FIRST FIVE YEAR FIXED PAYMENT - 12MTA

THIS ADJUSTABLE RATE RIDER is made this 7th day of July, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to American Brokers Conduit (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

2197 Carlysle Creek Drive, Lawrenceville, GA 30044

(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. BECAUSE MY INTEREST RATE WILL CHANGE MORE FREQUENTLY THAN MY MONTHLY PAYMENT, AND BECAUSE THERE ARE LIMITATIONS ON MY MONTHLY PAYMENT INCREASES, THE AMOUNT OF MY MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A RESULT, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN 110.000% OF THE ORIGINAL AMOUNT (OR $ 175,120.00 ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

Interest will be charged on unpaid Principal until the full amount has been paid. I will pay interest at a yearly rate of 1.900 % until July 31, 2006 , and the initial monthly payment provided for in the Note will be based on this rate. Commencing August 1, 2006 , I will pay interest at a yearly rate of 6.832 %. Thereafter, the interest rate I will pay may change in accordance with Section 4 of the Note.

Section 4 of the Note provides for changes in the interest rate and monthly payment as follows:

Page 1 of 5                                    AHM-2032R(Multi) (01/06)

Document # 944929/ Image: 944929.prn  App# 0001350490

*H.K.*

BK46756PG0442

### 4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

#### (A) Change Dates

The interest rate I will pay may further change on the _____1st_____ day of
September, 2006_____, and on that day every month thereafter. Each such date
on which my interest rate could change is called a "Change Date".

#### (B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-
Month Average, determined as set forth below, of the annual yields on actively traded United
States Treasury Securities adjusted to a constant maturity of one year as published by the Federal
Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)"
(the "Monthly Yields"). The Twelve-Month Average is determined by adding together the
Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of the date 15 days before each Change Date is
called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index which is based
upon comparable information. The Note Holder will give me notice of this choice.

#### (C) Interest Rate Change

Before each Change Date, the Note Holder will calculate my new interest rate by adding
Two and 400 Thousandths_____ percentage points
2.400_____ % ("Margin") to the Current Index. The Note Holder will then round the result of
this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits
stated in Section 4(D) below, this rounded amount will be my new interest rate until the next
Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will
be determined. The new Margin will be the difference between the average of the old Index for the
most recent three year period which ends on the last date the Index was available plus the Margin
on the last date the old Index was available and the average of the new Index for the most recent
three year period which ends on that date (or if not available for such three year period, for such
time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

#### (D) Interest Rate Limit

My interest rate will never be greater than _____9.950_____% ("Cap"), except that following
any sale or transfer of the property which secures repayment of this Note after the first interest rate
Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points
greater than the interest rate in effect at the time of such sale or transfer.

#### (E) Payment Change Dates

AHM-2032R(Mult) (01/06)

Document # 944930/ Image: 944930.prn  App# 0001350490

H.K.

BK46756PG0443

Effective commencing _September 1st, 2011_____, (the "First Payment Change Date") and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected Principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate that will become effective one month prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date. My Payments can change at any time, before or after the First Payment Change Date or any Payment Change Dates under Section 4(H) of the Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date following the First Payment Change Date under Section 4(E), will be limited to 7 ½% more or less than the amount I have been paying. This payment cap applies only to the Principal Payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated**

**Amortization**

Since my initial monthly payment will be based on the Initial Rate, which may be different than the Subsequent Rate, my initial monthly payment could be less or greater than the amount of the interest portion (the "Interest Portion") of the monthly principal and interest payment that would be sufficient to repay the unpaid Principal I owe in full on the Maturity Date in substantially equal payments. Additionally, since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the Interest Portion. For each month that the monthly payment is less than the Interest Portion, the Note Holder will subtract the monthly payment from the amount of the Interest Portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the Interest Portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed a maximum amount equal to __110.000%__ of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that __110.000%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the Maturity Date at the interest rate in effect one month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___Five___ anniversary of the due date of the first monthly payment, and on that same day every ___Five___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in the amount of my

Page 3 of 5                                        AHM-2032R(Mult) (01/06)

Document # 944931/ Image: 944931.prn  App# 0001350490

*H. K.*

BK46756PG0444

monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

**(K) Failure to Make Adjustments**

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid "Principal."

## B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower.  As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.  If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this

Page 4 of 5

AHM-2032R(Mult) (01/06)

Document # 944932/ Image: 944932.prn  App# 0001350490

*H. K.*

BK46756PG0445

Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

_____ (Seal)          _____ (Seal)
Hussain Kareem          -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                    -Borrower

_____ (Seal)          _____ (Seal)
                        -Borrower                                    -Borrower

Page 5 of 5                              AHM-2032R(Mult) (01/06)

Document # 944933/ Image: 944933.prn  App# 0001350490

## Exhibit G

**Final Truth-in-Lending Statement**

**FILED UNDER SEAL**

**Exhibit H**

**Fixed Payment ARM Disclosure**

## 5 YEAR FIXED PAYMENT 12-MONTH MTA INDEX POWER ARM DISCLOSURE

Loan #:        0001350490

Date:  July 7, 2006

This disclosure describes the features of an Adjustable Rate Mortgage (ARM) program you are considering. The interest rate and payment of this loan may each change during the term of this loan. THIS LOAN ALLOWS FOR NEGATIVE AMORTIZATION. Information on other ARM programs available from the lender will be provided upon request. This disclosure is not a commitment on the part of the lender to make a loan to you.

### HOW YOUR INTEREST RATE AND PAYMENT ARE DETERMINED

- A fixed initial Interest Rate will apply until the last day of the month in which your loan closes, and will be the interest rate that is used to establish the amount of your initial monthly payment. A subsequent fixed Interest Rate will apply commencing on the first day of the immediately following month. Once the subsequent Interest Rate period ends, your Interest Rate will be an adjustable rate. Your initial Interest Rate may not be equal to the Fully Indexed Rate, which is the index (the "Index") plus the fixed amount of percentage points (the "Margin") that are used to make rate adjustments once your Interest Rate becomes an adjustable rate. Ask us about our current Interest Rate and Margin.

- If your initial Interest Rate is an amount that is lower than the Fully Indexed Rate, this is called a "Discounted Rate". If your Initial Interest rate is a Discounted Rate, because the initial monthly payment will be determined using the Initial Interest Rate and your first adjusted payment will be determined using an adjustable rate that is based on the Index plus Margin, your first adjusted payment may increase even if the Index decreases or remains the same. If your initial Interest Rate is an amount that is higher than the Fully Indexed Rate, this is called a "Premium Rate". If your initial Interest Rate is a Premium Rate, because the initial monthly payment will be determined using the Initial Interest Rate and your first adjusted payment will be determined using an adjustable rate that is based on the Index plus Margin, your first adjusted payment may decrease even if the Index remains the same or increases. The adjustable rate that is used to determine your first adjusted payment may be higher or lower than the subsequent Interest Rate. Ask us for the amount of our current discounts and premiums. (As described in the section below entitled "Increase in Principal Balance (Negative Amortization)", your principal balance can increase. An increase in the principal balance could result in higher monthly payments. )

- Commencing with the first adjustment to your subsequent Interest Rate, your Interest Rate will be based on the Index plus the Margin. The Index is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. This information may be available in your library, or you may write to the Board of Governors, Publication Services, Washington, DC 20551.

- Except for the change from the initial Interest Rate to the subsequent Interest Rate, the effective date of a change in the Interest Rate is a "Change Date". The most recent Index figure available as of 15 days before each Change Date is called the "Current Index". If the Index is no longer available, the Lender or other Note Holder will choose a new Index and a new Margin to result in a rate similar to the rate in effect at that time which is based upon comparable information. The Note Holder will give you notice of this choice.

- Commencing with the first Change Date, the Interest Rate will equal the Index rate plus the Margin, rounded to the nearest one-thousandth of one percentage point (0.001), unless your interest rate "caps" limit the amount of change in the Interest Rate on a Change Date.

- Your initial payment will be based on the initial Interest Rate on the loan, the loan amount and the term of the loan. When your payment changes, your new payment will be based on the Interest Rate (calculated by adding the Index plus Margin, and rounding to the nearest one-thousandth of one percentage point (0.001)), loan balance, and remaining loan term, unless the payment "cap" limits the amount of the change in the payment.

### HOW YOUR INTEREST RATE CAN CHANGE

On the due date of your first monthly payment, your Interest Rate will become an adjustable rate and may change on that date and on the same date each month thereafter. On each Change Date, your Interest Rate will be equal to the sum of the Current Index plus the Margin, subject to the following limits:

- Your Interest Rate will be rounded to the nearest one-thousandth of one percentage point (0.001).

- Your Interest Rate over the life of the loan (the "Lifetime Interest Rate Cap") cannot exceed 9.95% for Primary and Second Homes, 10.35% for Investment Properties and 10.55% for our Lender Paid PMI Programs.

- There are no limits on decreases to your Interest Rate, except that the minimum Interest Rate will never fall below the Margin disclosed in your Note.

Commencing with the change from the initial Interest Rate to the subsequent Interest Rate, your monthly payment may not be sufficient to pay in full the interest and principal that is due. Please see the "Increase in Principal Balance (Negative Amortization)" section below.

*H. K.*

**HOW YOUR PAYMENT CAN CHANGE**

- Your monthly payment may increase or decrease substantially over the life of the loan.

- Your monthly payment may change beginning with the due date of the 61st monthly payment and then may change every 12 months thereafter.

- The monthly payment amount will be established by calculating the amount necessary to pay the loan off (principal and interest) at the maturity date in substantially equal monthly installments of principal and interest, based on the projected outstanding principal balance of your loan, the remaining term and the Interest Rate that will become effective one month prior to the date that the payment changes, on the assumption that the Interest Rate used to calculate your payment will remain in effect throughout the remaining loan term. However, there is a 7.5% limit to the increase or decrease in the payment change over the previous payment, except for the first scheduled payment adjustment, and every fifth scheduled payment adjustment thereafter, when no limit will be applied. Additionally, if your loan balance would otherwise exceed 110% of the original loan balance (the "Principal Balance Limitation"), the monthly payment immediately will be adjusted to fully amortize the loan over the then remaining life of the loan, at the applicable Interest Rate in substantially equal payments, without regard to the 7.5% limitation and whether or not your monthly payment is otherwise scheduled to change. This payment amount will be in effect until the next regularly scheduled payment change date, subject to the Principal Balance Limitation.

- You will be notified in writing of an adjustment in the Interest Rate at least once a year, and of each change in the monthly payment at least twenty-five (25) days before the due date of a payment at a new level. The notice will contain information about your Interest Rate, payment amount and loan balance.

If the monthly payment is not sufficient to cover the interest due, the difference will be added to your loan amount and will accrue additional interest. This is called "deferred interest" or "negative amortization." Please see the "Increase in Principal Balance (Negative Amortization)" section below.

**INCREASE IN PRINCIPAL BALANCE (NEGATIVE AMORIZATION)**

The principal balance on your loan can increase even though you are making the required minimum monthly payments. This is called "deferred interest" or "negative amortization", which may occur as follows:

- If the initial Interest Rate that is used to establish your initial monthly payment is lower than the subsequent Interest Rate, which applies commencing on the first day of the month immediately following the month in which your loan closes, the initial monthly payment will be insufficient to pay the interest that is accruing.

- Because your initial monthly payment, subject to the Principal Balance Limitation, is not scheduled to change until the due date of your 61st monthly payment, and because your Interest Rate will become an adjustable rate on the due date of your first monthly payment and may change monthly commencing on that date and on the same date of each month thereafter, the initial monthly payment may be insufficient to pay the interest that is accruing.

- Following the first scheduled payment change on the due date of your 61st monthly payment, further scheduled payment changes will occur every twelve months thereafter, subject to the Principal Balance Limitation. Thus, even if your monthly payment adjusts to an amount that will pay the interest that is accruing at the time, once the Interest Rate changes the adjusted monthly payment may be insufficient to pay the interest that accrues. Additionally, except for the initial scheduled payment change and each fifth scheduled payment change thereafter, and subject to the Principal Balance Limitation, the monthly payment may not be increased by more than 7.5% from the previous payment amount. This cap may keep the monthly payment below the amount that is necessary to fully pay the interest that is accruing.

If the interest due on your loan for a month is more than the required monthly payment, the entire payment will be applied to interest and any unpaid interest will be added to the loan balance. The interest for the next month is then calculated on the new increased loan balance. Please see the "Payment Options" section below.

**ACCELERATED AMORTIZATION**

"Accelerated Amortization" may occur if the Interest Rate decreases in those months that the Interest Rate changes but the payment does not change or if the payment is not adjusted to an amount based on the decreased Interest Rate due to the 7.5% Payment Cap when the payment changes at each twelve-month interval. "Accelerated Amortization" means you may pay more per month than what is required to pay off the loan in the remaining term. Therefore, you may possibly pay the loan off earlier than the original maturity of the loan.

**PAYMENT OPTIONS**

In addition to the minimum monthly payment, you have two other options in making your payment. You may make a fully amortizing payment that is a payment that pays all the interest owed for the month plus principal or you may also choose to make a monthly "interest-only" payment. The fully amortizing payment and the interest-only payment options are available only if the payment amount is greater than the minimum monthly payment. An interest-only payment amount will cover the full interest costs for that month; therefore, no additional (deferred) interest will be added to your loan balance. Your principal balance will not be increased or reduced. An interest-only payment is allowed until a fully amortizing payment is required as described above.

*H. K.*

**INITIAL AND MAXIMUM INTEREST RATE AND PAYMENT**

a. **Discounted Rate Example:** On a 30 year loan with an initial Interest Rate of 1.90% (equal to an Index of 3.478 plus a 2.40% Margin, minus a 3.978 % discount, rounded to the nearest 0.001 percentage point), the maximum amount that the Interest Rate can rise under this program is 8.05 percentage points if the Lifetime Interest Rate Cap is 9.950%, 8.45 percentage points if the Lifetime Interest Rate Cap is 10.350%, and 8.65 percentage points if the Lifetime Interest Rate Cap is 10.550%. Your monthly payment in this example can rise as shown in the following table:

| Loan Term In Years | Initial Payment | Month Maximum Interest Rate Reached | 9.950% Maximum Payment | Month Maximum Payment Reached | Lifetime Interest Rate Cap 10.350% Maximum Payment | Month Maximum Payment Reached | 10.550% Maximum Payment | Month Maximum Payment Reached |
|---|---|---|---|---|---|---|---|---|
| 30 | $ 36.46 | 2nd | $ 96.77 | 21st | $ 100.05 | 19th | $ 101.38 | 19th |
| 40 | $ 27.76 | 2nd | $ 92.44 | 18th | $ 96.29 | 17th | $ 98.26 | 17th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

30 Year Term: $60,000 divided by $10,000 = 6; 6 × $ 36.46 = $ 218.76
40 Year Term: $60,000 divided by $10,000 = 6; 6 × $ 27.76 = $ 166.56

This example is based on an initial Interest Rate in effect in January 2006, and a Margin and discount we have used recently; your initial Interest Rate, Margin and discount may be different. Ask us for our current Interest Rate, Margin and discount.

b. **Fully Indexed Rate Example:** On a 30 year loan with an initial Interest Rate of 5.878 % (equal to an Index of 3.478 plus a 2.40 % Margin, rounded to the nearest 0.001 percentage point ), the maximum amount that the Interest Rate can rise under this program is 4.072 percentage points if the Lifetime Interest Rate Cap is 9.950%, 4.472 percentage points if the Lifetime Interest Rate Cap is 10.350%, and 4.672 percentage points if the Lifetime Interest Rate Cap is 10.550%. Your monthly payment in this example can rise as shown in the following table:

| Loan Terms In Years | Initial Payment | Month Maximum Interest Rate Reached | 9.950% Maximum Payment | Month Maximum Payment Reached | Lifetime Interest Rate Cap 10.350% Maximum Payment | Month Maximum Payment Reached | 10.550% Maximum Payment | Month Maximum Payment Reached |
|---|---|---|---|---|---|---|---|---|
| 30 | $59.17 | 2nd | $ 97.82 | 38th | $ 100.78 | 34th | $ 102.17 | 32nd |
| 40 | $54.17 | 2nd | $ 93.23 | 32nd | $ 96.56 | 29th | $ 98.35 | 28th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

30 Year Term: $60,000 divided by $10,000 = 6; 6 × $59.17 = $ 355.02
40 Year Term: $60,000 divided by $10,000 = 6; 6 × $ 54.17 = $ 325.02

This example is based on an initial Interest Rate in effect in January 2006, and a Margin we have used recently; your initial Interest Rate and Margin may be different. Ask us for our current Interest Rate and Margin.

c. **Premium Rate Example:** On a 30 year loan with an initial Interest Rate of 6.00% (equal to an Index of 3.478 plus a 2.40% Margin, plus a .122% premium, rounded to the nearest 0.001 percentage point ), the maximum amount that the Interest Rate can rise under this program is 3.950 percentage points if the Lifetime Interest Rate Cap is 9.950%, 4.35 percentage points if the Lifetime Interest Rate Cap is 10.350%, and 4.55 percentage points if the Lifetime Interest Rate Cap is 10.550%. Your monthly payment in this example can rise as shown in the following table:

| Loan Terms In Years | Initial Payment | Month Maximum Interest Rate Reached | 9.950% Maximum Payment | Month Maximum Payment Reached | Lifetime Interest Rate Cap 10.350% Maximum Payment | Month Maximum Payment Reached | 10.550% Maximum Payment | Month Maximum Payment Reached |
|---|---|---|---|---|---|---|---|---|
| 30 | $59.96 | 2nd | $97.85 | 39th | $100.87 | 35th | $102.29 | 33rd |
| 40 | $55.02 | 2nd | $93.30 | 33rd | $96.68 | 30th | $ 98.50 | 29th |

To see what your payment would be for your loan amount, divide your loan amount by $10,000; then multiply the monthly payment by the resulting amount. For example, the monthly payment for a loan amount of $60,000 would be:

30 Year Term: $60,000 divided by $10,000 = 6; 6 × $59.96 = $359.76
40 Year Term: $60,000 divided by $10,000 = 6; 6 × $55.02 = $330.12

_____ (Seal)       _____ (Seal)
Hussain Kareem          Borrower                             Borrower

_____ (Seal)       _____ (Seal)
                        Borrower                             Borrower

_____ (Seal)       _____ (Seal)
                        Borrower                             Borrower

_____ (Seal)       _____ (Seal)
                        Borrower                             Borrower

AHM-1019D (0106)

5 Year Fixed Payment 12 MTA ARM Disclosure

Doc # 944951   Image 944951.prn        Page 4 of 4        App #: 0001350490

## Exhibit I

### Right to Rescind Notice

**FILED UNDER SEAL**