IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------- x    Chapter 11
In re:                                             :
                                                   :    Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE                             :
HOLDINGS, INC., a Delaware corporation, et al.,¹   :    Jointly Administered
                                                   :
        Debtors.                                   :    Ref. D.I. 9628
                                                   :
                                                   :
-------------------------------------------------- x
```

## PLAN TRUST'S OBJECTION TO CITIMORTGAGE, INC.'S MOTION FOR AN ORDER ALLOWING AND DIRECTING PAYMENT OF ITS ADMINISTRATIVE EXPENSE CLAIM

Steven D. Sass, as liquidating trustee (the "Plan Trustee") for the Plan Trust established pursuant to the *Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009* (the "Plan") in connection with the Chapter 11 cases of the above-captioned debtors (the "Debtors"),² objects (the "Objection") to the *Motion for an Order Allowing and Directing Payment of Administrative Expense Claim* filed by CitiMortgage, Inc. ("CMI") on January 5, 2011 [D.I. 9628] (the "Admin Request"). In support of this Objection, the Plan Trustee states as follows:

### PRELIMINARY STATEMENT³

1.    CMI's Admin Request seeks indemnification for attorneys' fees and costs pursuant to certain executory Loan Servicing Agreements that were assumed and assigned to the Purchaser of the Debtors' Servicing Business in April 2008. The Sale Order that approved the assumption and assignment of these Loan Servicing Agreements provided CMI a procedural mechanism for asserting cure claims in connection with the Loan Servicing Agreements. To wit,

---

¹ The Debtors in these cases, are: American Home Mortgage Holdings, Inc.; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; AHM SV, Inc. f/k/a American Home Mortgage Servicing, Inc. ("AHM SV"); American Home Mortgage Corp.; American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc.; and Great Oak Abstract Corp.

² Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

01: 11474171.1                    066585.1001

"seller" cure claims relating to acts or omissions of the Debtors prior to the "economic" closing

of the sale on November 16, 2007 (after which point the Debtors continued to run the Servicing

Business for the sole economic benefit and risk of the Purchaser), could be asserted solely

against a Cure Escrow established for that purpose. "Purchaser" cure claims relating to acts or

omissions of the Debtors in the period between the "economic" closing and the "legal" closing of

the sale on April 11, 2008 (at which point the Loan Servicing Agreements were assumed and

assigned to the Purchaser), could be asserted against the Debtors but were payable, ultimately, by

the Purchaser.

      2.    The fees and costs at issue in the Admin Request were incurred during the

Purchaser's cure period, and were timely asserted by CMI as a Purchaser Cure Claim in

accordance with the Sale Order. Following litigation with the Purchaser, CMI settled for a

nominal sum, and expressly waived any right to assert further Purchaser-period cure claims

against the Purchaser *or the Debtors*. Thereafter, notwithstanding such waiver, CMI re-asserted

its Purchaser Cure Claim against the Debtors as an administrative expense request under

§ 503(b).

      3.    It is simply not possible for any claims arising under the Loan Servicing

Agreements to be payable by the Debtors' estates independently as an administrative expense.

To the extent CMI's claims arose prior to the economic closing of the sale of the Servicing

Business, the claims would constitute Seller Cure Claims payable exclusively from the Cure

Escrow. To the extent CMI's claims arose between the economic and final closings, they are

payable by the Purchaser. It appears from the nominal settlement that the Purchaser may have

convinced CMI that the amounts set forth in CMI's Purchaser Cure Claim actually arose during

the "seller" cure period. If that is the case, then CMI's proper remedy is to seek to amend its

timely filed Seller Cure Claims and seek recovery from the Cure Escrow as required by the Sale

---

[3] Capitalized terms in this Preliminary Statement have the meanings ascribed to them elsewhere in the Objection.

      066585.1001

Order. Of course, this may prove impossible, given that the bar date for asserting Seller Cure Claims was almost four years ago and the vast majority of the Cure Escrow has been distributed in accordance with the Sale Order. But if so, it is all the more reason the Admin Request should be denied. The Sale Order did not contemplate that unsuccessful cure claimants would get a second chance by asserting a § 503(b) administrative claim, nor is it fair to the Debtors' estates or creditors to permit that. The Admin Request should be denied.

## BACKGROUND

### A.    General Background

4.    On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtors had ceased all or substantially all business operations other than their mortgage loan servicing business (the "Servicing Business") prior to the Petition Date. Between the Petition Date and the Plan Effective Date (as hereinafter defined), each Debtor managed its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of this Court.

*The Servicing Sale and Cure Escrow*

5.    On the Petition Date, the Debtors filed an emergency motion [D.I. 11] (the "Sale Motion") to authorize the sale of the assets used in the Servicing Business, including the assumption and assignment of certain executory contracts.

6.    On August 27, 2007, the Debtors filed a notice of potential executory contracts to be assumed and assigned in connection with the sale of the Servicing Business [D.I. 403] (as subsequently modified and supplemented, the "Initial Cure Notice"). Among the contracts identified in the Initial Cure Notice were contracts relating to the servicing or sub-

servicing of mortgage loans owned by securitization trusts for which CMI acted as Master

Servicer (the "Loan Servicing Agreements"). In the Initial Cure Notice, the Debtors estimated a

$0 cure amount for each of the Loan Servicing Agreements.

      7.     On September 13, 2007, CMI filed an objection [D.I. 740] to the Sale

Motion and the Initial Cure Notice (as subsequently amended and supplemented, the "Sale

Objection"), which, among other things, reserved rights as to (i) the proposed $0 cure amounts

for the Loan Servicing Agreements and (ii) adequate assurance of future performance by the

prospective purchaser of the Servicing Business. On September 20, 2007, CMI supplemented its

Sale Objection [D.I. 855], proposing that a reserve be established for the payment of cure claims

in connection with the assumption and assignment of the Loan Servicing Agreements.

      8.     On September 21, 2007, the Debtors filed a motion [D.I. 865] (the

"Stalking Horse Motion") to approve a form of Asset Purchase Agreement (as subsequently

amended, the "APA") by and among certain AHM Investment, AHM Corp., and AHM SV (the

"Sellers") and American Home Mortgage Servicing, Inc. (f/k/a AH Mortgage Acquisition Co.,

Inc.) (the "Purchaser").

      9.     On September 25, 2007, the Court entered an order [D.I. 937] (the "Sale

Procedures Order") granting the Sale Motion and the Stalking Horse Motion as to the proposed

bidding procedures. That day, the Debtors filed an executed Asset Purchase Agreement [D.I.

931] (as subsequently amended, the "APA") between the Sellers and the Purchaser. The APA

contemplated a two-step closing: first, an "economic" close, at which the Purchaser would tender

the purchase price and after which the Sellers would continue to operate the Servicing Business

in the ordinary course for the benefit and risk of the Purchaser, using working capital to be

provided by the Purchaser (the "Initial Closing"); and second, a "legal" close, at which legal title

to the assets of the Servicing Business would vest in the Purchaser and which would be the

effective date of assumption and assignment of any executory contracts and unexpired leases (the

"Final Closing"). The APA provided that the amount, if any, necessary under § 365 of the Bankruptcy Code to cure any defaults arising under the Assumed Contracts between the Initial Closing and the Final Closing (such amount, the "Purchaser's Cure Amount") would be the responsibility of the Purchaser.

10.    The Court held a five-day evidentiary hearing (the "Sale Hearing") on October 15-19, 2007, to consider approval of the Sale Motion and the APA. At the Sale Hearing the Debtors adduced evidence (i) in support of the $0 proposed cure amounts set forth in the Initial Cure Notice, and (ii) of adequate assurance of future performance by the Purchaser.

11.    Prior to the conclusion of the Sale Hearing, the Debtors (in consultation with the Official Committee of Unsecured Creditors (the "Committee"), Bank of America, N.A., as Administrative Agent ("BofA"), and the Purchaser) and CMI resolved the Sale Objection by agreement in principle upon certain language to be included in the proposed sale order, including a stipulation that the Loan Servicing Agreements were executory contracts assumed and assigned to the Purchaser pursuant to § 365 of the Bankruptcy Code.[4]

12.    On October 23, 2007, the Court issued a bench ruling approving the Sale Motion and APA. At a follow-up hearing to consider the proposed form of order approving the sale, the Court ruled further that the evidence at the Sale Hearing was "overwhelming" that there had been "no material change in the actual performance of the [Servicing Business]" during the bankruptcy cases. (10/25/07 Hr'g Tr., D.I. 1793 at 86:1-5, 17-19.)

13.    The Court entered an order [D.I. 1711] (the "Sale Order") approving the Sale Motion and the APA on October 30, 2007. The Sale Order provided that the Loan Servicing Agreements were executory contracts subject to assumption and assignment pursuant to section 365 of the Bankruptcy Code. (Sale Ord. at 4.) The Sale Order provided further that a

---

[4] One of the legal issues in dispute at the Sale Hearing was whether the Loan Servicing Agreements were executory contracts subject to section 365 of the Bankruptcy Code (which CMI had asserted) or non-executory contracts subject only to section 363 of the Bankruptcy Code (which the Debtors had asserted).

reserve of $10 million (the "Cure Escrow") would be established for the payment of the "Sellers'

Cure Amount," which includes (i) the Initial Cure Amount, (ii) the Interim Cure Amount, and

(iii) any reasonable out-of-pocket costs and expenses (a) incurred by a counterparty to an

Assumed Contract as a result of the assumption and assignment of such contract to the Purchaser

*and* (b) chargeable under the Assumed Contract (such costs/expenses, "Transfer Costs"). (Id.

¶¶ 32-39.) The Sale Order provided that the Sellers' Cure Amount "shall constitute all amounts

owed, if any, with respect to defaults relating to the Assumed Contracts relating to acts or

omissions that occurred prior to the Initial Closing." (Id. ¶ 35.) The Sale Order provided further

that that the Purchaser "shall fund and be liable to the Debtors for the Purchaser's Cure

Amount." (Id. ¶ 36.)

14.     The Initial Closing under the APA occurred on November 16, 2007, at or

about which time the Cure Escrow was established and funded as required by the Sale Order.

The Sale Order required the Debtors, following the Initial Closing, to file and serve a schedule of

proposed cure amounts, if any, for defaults under Assumed Contracts during the period between

the entry of the Sale Order and the Initial Closing (the "Interim Period Cure Schedule"). The

Debtors timely filed the Interim Period Cure Schedule on November 26, 2007 [D.I. 2166], and

proposed a cure amount of $0 relating to the Loan Servicing Agreements. Thereafter, CMI

timely filed its *Cure Claim and Objection for the Period Prior to Entry of that Certain Sale*

*Order* [D.I. 2226] (as amended by D.I. 2236, the "Initial Cure Claim"), and *Interim Period Cure*

*Claim and Objection to Debtor's Interim Period Cure Schedule* [D.I. 2466] (the "Interim Cure

Claim"), in which CMI sought reimbursement of $116,933.50 of attorneys' fees and $2,204.65

of costs incurred by CMI on account of alleged breaches under the Loan Servicing Agreements

prior to the Initial Closing.

15.     The Final Closing occurred on April 11, 2008. On May 9, 2008, the Court

entered an order establishing a bar date for the assertion of Purchaser Cure Amounts [D.I. 4021].

6

In accordance with this order, on May 19, 2008, the Debtors timely filed a schedule of proposed

cure amounts for defaults under Assumed Contracts during the period between the Initial Closing

and the Final Closing [D.I. 4084] (the "Purchaser Cure Schedule").  The Purchaser Cure

Schedule proposed a cure amount of $0 for the Loan Servicing Agreements.  Thereafter, CMI

filed its *Combined: (1) Statement of Cure Amount for Period Between Initial Closing and Final*

*Closing; and (2) Objection to Debtors' Proposed Purchaser's Cure Amounts* [D.I. 4738] (the

"Purchaser Cure Claim"), seeking reimbursement of $102,113.50 of attorneys' fees and

$9,469.35 of costs incurred by CMI on account of alleged defaults under the Loan Servicing

Agreements between the Initial Closing and the Final Closing.  CMI did not assert a Transfer

Cost claim.

### The Chapter 11 Plan

16.    The Plan was confirmed under section 1129 of the Bankruptcy Code on

February 23, 2009 (the "Confirmation Date").  The Plan became effective on November 30,

2010 (the "Plan Effective Date").

17.    Pursuant to the Plan, as of the Plan Effective Date, a plan trust (the "Plan

Trust") was established and all of the Debtors' assets, causes of action, claims, rights and

interests, succeeded, transferred and vested in the Plan Trust.  Steven D. Sass is the duly

appointed Plan Trustee for the Plan Trust.  The Plan Trustee is vested with the rights, powers and

benefits set forth in the Plan, Confirmation Order and Plan Trust Agreement.

B.    **The Purchaser Cure Claim Litigation and Settlement**

18.    On April 8, 2009, the Purchaser objected to CMI's Purchaser Cure Claim

[D.I. 7248][5] on the grounds that CMI had failed to identify any default arising under the Loan

---

[5] Purchaser Cure Claims constitute § 365 cure claims assertable against the Debtors because the assumption and assignment of the Loan Servicing Agreements to the Purchaser did not occur, legally, until the Final Closing. However, the Purchaser is the real economic party in interest to all Purchaser Cure Claims because it is obligated to "fund and be liable to the Debtors for all amounts owed" with respect to Purchaser Cure Claims. (Sale Ord. ¶ 36.) Accordingly, the Purchaser has taken the lead in resolving Purchaser Cure Claims throughout this case. [*See, e.g.*, D.I. 6114 & 7248.]

Servicing Agreements resulting from acts or omissions that occurred during the period from the Initial Closing through the Final Closing that could give rise to a Purchaser's Cure Claim under the Sale Order.  Following discovery from CMI, the Purchaser concluded that the alleged acts or omissions underlying the Purchaser Cure Claim related to the Debtors' alleged failure to deliver required documents prior to the Initial Closing. [D.I. 8012 at ¶ 4.]  In response to the Purchaser's argument that the underlying breaches of the Loan Servicing Agreements occurred, if at all, prior to the Initial Closing, CMI took the position that the Loan Servicing Agreements imposed continuing obligations post-Initial Closing to remedy prior defaults, which obligations were continually breached post-Initial Closing.  As stated by CMI's counsel on the record of the September 8, 2009, hearing on a related discovery motion:

> [W]ith respect to these missing documents, [CMI]'s position . . . is that that's a service[r]'s obligation . . . to go out and help obtain the missing documents.  That's part of a servicing function, recognized throughout the industry, shouldn't be a big fuss with it.  Clearly, there's a problem with the missing documents that predates this particular servicer's arrival on the scene, such that on . . . the day after the [Initial Closing], we couldn't turn around and say ["A]h-hah, gotcha, there's all these missing documents, there's a default, et cetera.["]  But with the passage of time, there is an obligation for the servicer to step up and help us retrieve those documents, locate those documents in its files, et cetera.  And that's the nub of our gripe.

(Hr'g Tr. 9/8/09 at 30:2-16.)

19.     On February 18, 2010, the Court approved a stipulation between CMI and the Purchaser [D.I. 8594] (the "Stipulation") by which the Purchaser accepted $5,000 in full satisfaction of its Purchaser Cure Claim, and "waive[d] all rights it may have, if any, to assert any additional Purchaser's Cure Amounts against the Debtors and/or [the Purchaser] in connection with the Assumed Contracts." (Stip. ¶ 1(c).)  Additionally, CMI reserved all rights against the Debtors or against the Cure Escrow "*other than* Purchaser's Cure Amounts." (Id. ¶ 5 (emphasis added).)  Since its entry into the Stipulation, however, CMI has not sought to amend its Initial Cure Claim or Interim Cure Claim.

## C.   **The Admin Request**

20.    Notwithstanding the Stipulation resolving the Purchaser Cure Claim, CMI filed the Admin Request, seeking reimbursement of the very same professionals' fees and costs set forth in the Purchaser Cure Claim, less the $5,000 paid by the Purchaser pursuant to the Stipulation. As the basis for recovery of these amounts as an administrative expense, CMI asserts the same legal theory it had asserted in its Purchaser Cure Claim, i.e., that CMI incurred attorneys' fees and costs during the period between the Initial and Final Closings as a result of the Debtors' alleged breaches of the Loan Servicing Agreements.

### OBJECTION

## I.    The Claims Asserted in the Admin Request are<br>    "Purchaser Cure Claims" that Were Expressly Waived by CMI

21.    As noted above, in the Stipulation, CMI "waive[d] all rights it may have, if any, to assert any additional Purchaser's Cure Amounts against the Debtors and/or [the Purchaser] in connection with the Assumed Contracts." (Stip. ¶ 1(c).) Given that the claims asserted in the Admin Request against the Debtors are factually and legally identical to the claims asserted in the Purchaser Cure Claim, the Admin Request plainly asserts claims that were previously waived by CMI. For this reason alone, the Admin Request should be denied in its entirety.

## II.    At Best, the Claims Asserted in the Admin Request are<br>    Seller Cure Claims Payable Exclusively from the Cure Escrow

22.    The only possible way to reconcile the Admin Request with the Stipulation is that CMI is now abandoning its "continuing breach" theory of liability and taking the position asserted by the Purchaser, i.e., that the alleged breaches of the Loan Servicing Agreements giving rise to the claims asserted in the Admin Request actually occurred prior to

the Initial Closing, during the "seller" cure period.[6] If this is the case, then the Admin Request

should be denied as a matter of law for two reasons.

23.     <u>First</u>, the Sale Order is painstakingly clear that Seller Cure Claims are

payable *exclusively* from the Cure Escrow, providing:

> (i)     "For the avoidance of doubt, [] there are no defaults relating to acts
> or omissions that occurred prior to the Initial Closing other than those that will be
> satisfied from the Cure Escrow . . . ." (Sale Ord. ¶ R.)

> (ii)    "At the Initial Closing, $10,000,000 from the Purchase Price shall
> be placed into escrow . . . *in full satisfaction of the Sellers' Cure Amount*." (<u>Id.</u>
> ¶ 32 (emphasis added).)

> (iii)   "[A]ll payments on account of and related to the Sellers' Cure
> Amount *shall be limited to and satisfied from the Cure Escrow* . . . ." (<u>Id.</u> ¶ 35
> (emphasis added).)

> (iv)    "Upon the establishment and funding of the Cure Escrow . . . ,
> each Counterparty is hereby forever barred, estopped and permanently enjoined
> from asserting against the Debtors . . . any . . . default, breach or Claim, or
> pecuniary loss . . . arising under or relating to an Assumed Contract existing as of
> the Final Closing (or earlier assignment or transfer, as the case may be) . . . ." (<u>Id.</u>
> ¶ 46.)

> (v)     "Except to the extent asserted against the Cure Escrow, no Person
> shall assert . . . any defaults, breaches . . . Liabilities, [or] Interests . . . under or
> with respect to any Purchased Assets (including, without limitation, an Assumed
> Contract), with respect to any act or omission that occurred prior to the Initial
> Closing . . . ." (<u>Id.</u> ¶ 47.)

24.     <u>Second</u>, CMI did not assert (and to date, has not asserted) the amounts set

forth in its Admin Request as part of its Initial Cure Claim or Interim Cure Claim.  This is

significant because the Sale Order expressly provides that "[t]he Initial Cure Amount and the

Interim Cure Amount . . . shall constitute all amounts, if any, owed with respect to defaults

relating to the Assumed Contracts relating to acts or omissions that occurred prior to the Initial

Closing . . . ." (Sale Ord. ¶ 35.)  In other words, it is an adjudicative fact that all amounts that

could possibly be owed to CMI as a result of defaults under the Loan Servicing Agreements prior

---

[6] If CMI still believes that the alleged breaches of the Loan Servicing Agreement giving rise to the claims asserted
in the Admin Request occurred during the post-Initial Closing, pre-Final Closing period on a "continuing breach"
theory, then *a fortiori* the Admin Request asserts a "Purchaser Cure Amount" in violation of the Stipulation.

to the Initial Closing are already subsumed within CMI's Initial and Interim Cure Claims. Thus,

to the extent the claims set forth in the Admin Requests arise from alleged defaults under the

Loan Servicing Agreements occurring prior to the Initial Closing, they are *res judicata* by virtue

of the Sale Order. To overcome this, CMI would have to get relief from the applicable

provisions of the Sale Order or seek leave to amend its Initial and/or Interim Cure Claims. And

even then, CMI would be entitled only to proceed against the Cure Escrow. In no event would it

be entitled to an administrative claim against the Debtors' estates.

III.    **At Any Rate, CMI Cannot Meet the Standard for**
        **Allowance of an Administrative Expense under § 503(b)**

       25.    Section 503 of the Bankruptcy Code accords administrative expense

priority to claims representing "actual, necessary costs and expenses of preserving the estate."

11 U.S.C. § 503(b)(1)(A). To be considered an actual, necessary cost and expense of preserving

the estate, a claim "must arise from a transaction with the debtor-in-possession and the

consideration supporting the claimant's right to payment must be beneficial to the debtor-in-

possession in the operation of the business." Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re

O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999) (internal citation omitted).

       26.    In order to hold administrative expenses to a minimum and to maximize

the value of the bankruptcy estate, § 503(b) is narrowly construed. In re Bernard Techs., Inc.,

342 B.R. 174, 177 (Bankr. D. Del. 2006). Accordingly, the movant under § 503(b)(1)(A) carries

a "heavy burden of demonstrating that the costs and fees for which it seeks payment provided an

actual benefit to the estate and that such costs and expenses were necessary to preserve the value

of the estate assets." Id. (quoting Calpine, 181 F.3d at 533); see In re Unidigital, Inc., 262 B.R.

283, 288 ("Claimants who seek payment ahead of other unsecured claims bear the burden of

establishing that their claim qualifies for priority status."). CMI must prove its entitlement to an

administrative expense claim against the Debtors by a preponderance of the evidence. Bernard

Techs., 342 B.R. at 177. The Plan Trustee reserves the right to hold CMI to this burden, but does not believe CMI will be able to meet it.

### A. CMI Must Establish a Post-Petition Default under the Loan Servicing Agreements

27.     Even assuming *arguendo* that a post-petition default under a prepetition contract could satisfy the "transaction with the estate" requirement for allowance of an administrative expense, which the Plan Trustee does not concede, the essential breaches of the Loan Servicing Agreements CMI complains of occurred prepetition when loans were sold by the Debtors without complete documentation (commonly referred to as a "trailing documents" issue). To establish a *post*-petition breach, CMI would have to prevail on a "continuing breach" theory, which would require there to be an affirmative, ongoing obligation of the Debtors to remedy the prepetition breach, such that the failure to remedy post-petition would constitute an independent post-petition breach. But it is not at all clear from the provisions of the Loan Servicing Agreements cited by CMI that this is the case. (See Admin Req. at ¶ 26.) For instance, CMI refers to obligations "to deliver final recorded documents" and "to maintain a file, containing the documents CMI specified, with respect to each loan." But if the time for delivery of the documents or the assembly of the file occurred prepetition, at which time the Debtors failed to perform as required by the contract, it does not necessarily follow that the post-petition Debtors' failure to remedy the defective performance prepetition constitutes an independent, post-petition breach of contract. To evaluate the viability of CMI's "continuing breach" theory, the Plan Trustee would ultimately need more facts concerning the timing and nature of the alleged breaches, and more specific analysis from CMI of the contractual provisions it asserts were violated.[7] In the meantime, the Plan Trustee reserves the right to hold CMI to its ultimate burden of establishing a "transaction with the estate."

---

[7] CMI's alternative argument that the Admin Request is supportable under the cash management order entered by the Court suffers from the same problem, insofar as that order only provided for

## B. CMI Must Establish a Benefit to the Estate

28.    Even assuming *arguendo* CMI could establish that the post-petition failure to remedy a prepetition breach concerning documents constituted an independent, post-petition breach of the Loan Servicing Agreements that constituted a "transaction with the estate" for § 503(b) purposes, CMI would still need to establish that the consideration supporting CMI's right to payment was beneficial to the Debtors in the operation of the Servicing Business.  CMI focuses on the Loan Servicing Agreements themselves as the consideration supporting CMI's right to payment, and reasons that, because the Loan Servicing Agreements benefited the Debtors' estates by being sold to the Purchaser, CMI has established the requisite benefit to the estate.  This reasoning is flawed.

29.    The classic example of a transaction with the estate that benefits the estate is a vendor who provides goods or services to the estate post-petition, which goods and services serve as the consideration supporting the vendor's right to payment for purposes of the § 503(b) analysis.  CMI, by way of contrast, is not a vendor and did not provide anything to the estate post-petition.  The Loan Servicing Agreements were entered into prepetition, and the loans whose "trailing documents" are now at issue were sold by the Debtors on a servicing-retained basis prepetition, in exchange for payment of the purchase price prepetition.  On the Petition Date, the Debtors' estates inherited both the Loan Servicing Agreements and the servicing rights with respect to loans, but thereafter, the estates did not receive any consideration from CMI.  All consideration underlying the Loan Servicing Agreements was received by the Debtors prepetition, and post-petition, CMI's role with respect to the loans at issue has been Master Servicer.  CMI points to nothing in its Admin Request that would suggest any consideration flowed from CMI to the Debtors post-petition that provided a benefit to the Debtors' estates

---

indemnification of counterparties on an administrative basis to the extent such indemnification was required by the applicable loan servicing agreements.  Thus, it would likewise be necessary to determine when the alleged breach triggering the indemnification obligation occurred.

sufficient to award an administrative claim.  Thus, without more, the Admin Request should fail

under § 503(b).

## RESERVATION OF RIGHTS

30.    The Plan Trustee reserves the right to amend or supplement this Objection

in response to information obtained through discovery or additional development of the legal

issues by CMI.

## CONCLUSION

For the foregoing reasons, the Plan Trustee requests that this Court deny the

Admin Request and grant the Plan Trustee such other and further relief as is just and proper.

Dated: November 4, 2011          YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
      Wilmington, Delaware

                                              */s/ Patrick A. Jackson*
                                              Sean M. Beach (No. 4070)
                                                Patrick A. Jackson (No. 4976)
                                              The Brandywine Building
                                                1000 West Street - 17th Floor
                                              P.O. Box 391
                                              Wilmington, Delaware  19899
                                              Telephone: (302) 571-6600
                                              Facsimile: (302) 571-1253

                                              -and-

                                              HAHN & HESSEN LLP
                                              Mark S. Indelicato
                                              Edward L. Schnitzer
                                              488 Madison Avenue
                                              New York, New York 10022
                                              Telephone: (212) 478-7200
                                              Facsimile: (212) 478-7400

                                              *Co-Counsel to the Plan Trustee*