IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------- x
In re:                                                         :
                                                               :
AMERICAN HOME MORTGAGE                                          :
HOLDINGS, INC., a Delaware corporation, et al.,[1]             :
                                                               :
        Debtors.                                               :
                                                               :
------------------------------------------------------------- x

Chapter 11

Case No. 07-11047 (CSS)

Jointly Administered

**Ref. D.I. 9640**

## PLAN TRUST'S OBJECTION TO THE REQUEST OF AMERICAN HOME MORTGAGE SERVICING, INC., FORMERLY KNOWN AS AH MORTGAGE ACQUISITION CO., INC., FOR ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM

Steven D. Sass, as liquidating trustee (the " Plan Trustee") for the Plan Trust established pursuant to the *Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009* (the "Plan") in connection with the Chapter 11 cases of the above-captioned debtors (the "Debtors"),[2] objects (the "Objection") to the *Request of American Home Mortgage Servicing, Inc., Formerly Known as AH Mortgage Acquisition Co., Inc., for Allowance and Payment of an Administrative Expense Claim* [D.I. 9640] filed on January 5, 2011 (the "Admin Request").  In support of this Objection, the Plan Trustee states as follows:

## PRELIMINARY STATEMENT[3]

1.      While appearing simple on its face, the Admin Request seeks extraordinary relief that would require this Court (i) to rewrite the terms of an APA and sale that were approved almost four years ago, and (ii) to disregard the terms of a global settlement

---

[1]      The Debtors in these cases, are: American Home Mortgage Holdings, Inc.; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; AHM SV, Inc. f/k/a American Home Mortgage Servicing, Inc. ("AHM SV"); American Home Mortgage Corp.; American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc.; and Great Oak Abstract Corp.

[2]      Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

[3]      Capitalized terms in this Preliminary Statement have the meanings ascribed to them elsewhere in the Objection.

between the Debtors and the Purchaser that released the very type of claims asserted in the

Admin Request.

2.      It appears the Purchaser has been obtaining services from Iron Mountain, a

counterparty to a contract assumed and assigned to the Purchaser, for over two years while

making only partial (and, seemingly, minimal) payments and blaming unpaid amounts on the

Debtors' estates.   With Iron Mountain asserting an administrative claim against the Plan Trust to

recover the unpaid amounts, thus putting the issue before this Court for resolution, the Purchaser

has prepared its own administrative claim painting the Purchaser as the involuntary custodian of

documents belonging to the Debtors' estates, and requesting all of the Purchaser's costs on

account of such documents be passed through to the Plan Trust.  This claim does not stand up to

scrutiny, however, as the Purchaser makes no attempt to square it with the plain language of the

APA, the Sale Approval Order, or the Global Settlement, none of which support the Purchaser's

assertion that it has any claim against the Debtors or the Plan Trust relating to the Iron Mountain

contract assumed by the Purchaser.

## BACKGROUND

**A.      General Background**

3.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (the "Bankruptcy Code").  The Debtors had ceased all or substantially all

business operations other than their mortgage loan servicing business (the "Servicing Business")

prior to the Petition Date.  Between the Petition Date and the Plan Effective Date (as hereinafter

defined), each Debtor managed its properties as a debtor in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' cases have been consolidated

for procedural purposes only and are being jointly administered pursuant to an order of this

Court.

*The Servicing Sale*

4.    On the Petition Date, the Debtors filed an emergency motion [D.I. 11] (the "Sale Motion") (i) to authorize the sale of the assets used in their Servicing Business, including the assumption and assignment of certain executory contracts, and (ii) to establish bidding procedures in connection therewith.

5.    On September 21, 2007, the Debtors filed a motion [D.I. 865] (the "Stalking Horse Motion") to approve a form of Asset Purchase Agreement (as subsequently amended, the "APA") by and among certain Debtors (the "Sellers") and stalking-horse bidder American Home Mortgage Servicing, Inc. f/k/a AH Mortgage Acquisition Co., Inc. (the "Purchaser").

6.    On September 25, 2007, the Court entered an order [D.I. 937] (the "Sale Procedures Order") granting the Sale Motion and the Stalking Horse Motion as to the proposed bidding procedures.

7.    On October 30, 2007, following a five-day evidentiary hearing (the "Sale Hearing"), the Court entered an order [D.I. 1711] (the "Sale Approval Order") granting the Sale Motion, approving the APA, and authorizing the assumption and assignment pursuant to section 365 of the Bankruptcy Code of each of the Assumed Contracts (as defined in the APA).[4]

8.    To provide for the prompt payment of sale consideration to the Sellers while at the same time providing the Purchaser time to obtain necessary licensure to operate the Servicing Business, the APA contemplated a two-step closing: first, an "economic" close, at which the Purchaser would tender the Purchase Price (as defined in the APA) and after which the Sellers would continue to operate the Servicing Business in the ordinary course for the benefit and risk of the Purchaser, using working capital to be provided by the Purchaser (the "Initial

---

[4]    A copy of the Sale Approval Order, without exhibits, is attached hereto as Exhibit A.  Attached hereto as Exhibit B is the APA as approved by the Sale Approval Order, omitting schedules other than Schedule 2.1(b)(i) (discussed below) and the various amendments to the APA, which are not relevant to this Objection.

Closing"); and second, a "legal" close, at which legal title to the Purchased Assets (as defined in

the APA) would vest in the Purchaser and which would be the effective date of assumption and

assignment of any executory contracts and unexpired leases (the "Final Closing").

9.      The APA further contemplated that, as between the Sellers and the

Purchaser: (i) the aggregate amount necessary under section 365 of the Bankruptcy Code (a) to

cure any defaults under Assumed Contracts (as defined in the APA) arising prior to entry of the

Sale Approval Order (as defined in the APA) (such amount, the "Initial Cure Amount") and

(b) to cure any defaults under Assumed Contracts arising after entry of the Sale Approval Order

but before the Initial Closing (such amount, the "Interim Cure Amount"), would be the

responsibility of the Sellers; and (ii) the amount, if any, necessary under section 365 of the

Bankruptcy Code to cure any defaults arising under the Assumed Contracts between the Initial

Closing and the Final Closing (such amount, the "Purchaser's Cure Amount") would be the

responsibility of the Purchaser.

10.     Among other things, the Sale Approval Order provided that a reserve of

$10 million (the "Cure Escrow") would be established for the payment of the Sellers' Cure

Claims, which includes (i) the Initial Cure Amount, (ii) the Interim Cure Amount, and (iii) any

reasonable out-of-pocket costs and expenses (a) incurred by a counterparty to an Assumed

Contract as a result of the assumption and assignment of such contract to the Purchaser *and*

(b) chargeable under the Assumed Contract (such costs/expenses, "Transfer Costs").  (Id. ¶¶ 32-

39.)  The Sale Approval Order expressly reserved the rights of the Debtors and the Committee to

object to any Sellers' Cure Claims.  (Id. ¶ 35.)  The Sale Approval Order provided further that

that the Purchaser "shall fund and be liable to the Debtors for the Purchaser's Cure Amount."

(Id. ¶ 36.)

11.     The Initial Closing under the APA occurred on November 16, 2007, at or

about which time the Cure Escrow was established and funded as required by the Sale Approval

Order.  The Final Closing occurred on April 11, 2008, at which time the Assumed Contracts

were assumed and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code

(Sale App. Ord. ¶¶ 26, 28-44), and the Sellers were relieved of any further liability with respect

to any Assumed Contracts pursuant to section 365(k) (id. ¶ 42).

### The Chapter 11 Plan

12.    The Plan was confirmed under section 1129 of the Bankruptcy Code on

February 23, 2009 (the "Confirmation Date").  The Plan became effective on November 30,

2010 (the "Plan Effective Date").

13.    Pursuant to the Plan, as of the Plan Effective Date, a plan trust (the "Plan

Trust") was established and all of the Debtors' assets, causes of action, claims, rights and

interests, succeeded, transferred and vested in the Plan Trust.  Steven D. Sass is the duly

appointed Plan Trustee for the Plan Trust.  The Plan Trustee is vested with the rights, powers and

benefits set forth in the Plan, Confirmation Order and Plan Trust Agreement, including the rights

of the Debtors and the Committee to object to claims for Sellers' Cure Amounts payable from

the Cure Escrow.

## B.    The Iron Mountain Accounts

14.    Prior to the Petition Date, the Debtors contracted with Iron Mountain

Information Management, Inc. (collectively with its affiliated entities, "Iron Mountain") for the

provision of document and data storage, and document shredding services, at various locations

around the country.  The Debtors and Iron Mountain maintained several accounts (collectively,

the "Iron Mountain Accounts"), including, but not limited to the account numbered

04421.0M070K (the "M070K Account") based in Baltimore, Maryland.

15.    The Debtors' records indicate that the M070K Account was one of several

accounts governed by that certain Customer Agreement dated as of November 1, 2001, by and

between Iron Mountain and Columbia National, Incorporated (the "CNI Customer Agreement").

The CNI Customer Agreement had been assumed by one or more of the Debtors in connection with their 2002 acquisition of Columbia National, Incorporated. The M070K Account was a hard-copy document storage account utilized by the Servicing Business.

16.     On September 25, 2007, the Debtors filed an executed copy of the APA [D.I. 931]. Section 2.1(b) and Schedule 2.1(b)(i) of the APA identified the CNI Customer Agreement as an "Assumed Contract." On information and belief, the APA schedules were prepared by individuals who are now employees of the Purchaser.

17.     In January 2008, the Debtors made a payment they believed resolved all amounts then due and owing under Iron Mountain Accounts that had been utilized by the Debtors through the end of 2007. Thereafter, the Debtors utilized only certain of the Iron Mountain Accounts (not including the M070K Account), for which the Debtors were invoiced, and paid Iron Mountain, in the ordinary course. The Debtors' corporate offices did not receive any invoices from Iron Mountain with respect to the M070K Account.

18.     Around the time of the Final Closing in April 2008, the Purchaser shipped some documents from Iron Mountain's Maryland facility (at which the M070K Account was based) to the Purchaser's place of business in Irving, Texas. Following the Final Closing, the Debtors did not request or authorize any services to be performed by Iron Mountain with respect to the M070K Account.

19.     On May 9, 2008, the Court entered an order establishing a bar date for the assertion of Purchaser Cure Amounts [D.I. 4021]. In accordance with this order, on May 19, 2008, the Debtors timely filed a schedule of proposed cure amounts for defaults under Assumed Contracts during the period between the Initial Closing and the Final Closing [D.I. 4084] (the "Purchaser Cure Schedule"). The Purchaser Cure Schedule proposed a cure amount of $0 for the CNI Customer Agreement.

20.    On June 25, 2008, Iron Mountain objected to the Purchaser Cure Schedule [D.I. 4828] (the "Iron Mountain Cure Claim"), asserting a cure claim in the amount of $211,654.84, of which $88,628.41 related to the M070K Account.[5]  To date, the Purchaser has not objected to the Iron Mountain Cure Claim, though it has objected to other claims asserting Purchaser Cure Amounts.  [*See* D.I. 6114 & 7248.]

C.    **The First Purchaser Admin Request and Global Settlement**

21.    On May 23, 2008, the Purchaser filed a motion for allowance of an administrative expense claim of approximately $17 million for alleged breaches of the APA [D.I. 4233] (as subsequently amended by D.I. 5495, the "First Purchaser Admin Request"). Thereafter, the Debtors and the Purchaser engaged in discovery and settlement discussions spanning almost two years before agreeing to a global resolution of the First Purchaser Admin Request *and other open issues between the parties*[6] by means of a Release and Settlement Agreement dated as of March 16, 2010 (the "Global Settlement"), which was approved by order of this Court on May 11, 2010 [D.I. 8844] (the "Settlement Approval Order").[7]

22.    The Global Settlement contained a broad release from the Purchaser in favor of the Sellers and their successors (including particularly, the Plan Trust and the Plan Trustee)

> from *any and all* judgments, executions, actionable matters, causes of action, claims, counterclaims, demands, rights (including rights of offset and set-off), suits, debts and sums of money, obligations, duties, liabilities, injuries, damages, losses, compensation, costs, expenses (including, without limitation, attorneys' fees), of every name, kind or nature whatsoever whether claimed to be against person entity or property, in law or in equity, whether such claims are presently known or unknown, direct or indirect, fixed or contingent, which [Purchaser] has ever had, or now has, or which [Purchaser] may claim to have against [the

---

[5]    The Iron Mountain Cure Claim asserted amounts relating to other Iron Mountain Accounts as well, which amounts are not germane to the Admin Request but are addressed in the Plan Trust's objection to the Iron Mountain Cure Claim filed contemporaneously herewith.

[6]    In the Admin Request, the Purchaser refers to the Global Settlement as settling the First Admin Request. While this is statement is true, it is incomplete.  The Global Settlement resolved all claims between the parties— known and unknown, including contingent claims—subject to limited, specific carve-outs.

[7]    A copy of the Settlement Approval Order is attached hereto as Exhibit C.

Sellers/Plan Trust], *arising from or relating to the APA, the Sale Approval Order, or any agreement or transaction contemplated by the APA or the Sale Approval Order*, other than those claims *specifically identified* on Exhibit C [to the Global Settlement]. . .

(Global Sett. § 5(a) (emphasis added).)  Exhibit C to the Global Settlement contained limited carve-outs for claims arising after the execution of the agreement, claims of the Debtors for enforcement of Iron Mountain's obligation to fund Purchaser Cure Amounts, and certain specific claims of the parties under the APA.

23.    In the Settlement Approval Order, the Court retained jurisdiction with respect to the implementation, interpretation or enforcement of the Settlement Agreement.

**D.    Competing Admin Requests Relating to M070K Account**

24.    In September 2010 Iron Mountain contacted the Debtors regarding outstanding payments on the M070K Account because the Purchaser was not paying ongoing invoices on that account in full (though the Purchaser was using the account and paying some invoices thereunder).  According to Iron Mountain, the Purchaser had taken the position that unpaid amounts were the responsibility of the Debtors because the documents stored under the M070K Account belonged to the Debtors.  For the next few months, the Debtors, Iron Mountain, and the Purchaser conferred with respect to allegedly open invoices under the M070K Account. The Debtors disputed the Purchaser's assertions that the documents stored under the M070K Account belonged to the Debtors, and that services performed by Iron Mountain with respect to the M070K Account had been at the direction of (or had benefited) the Debtors such that the Debtors would have any liability to the Purchaser for amounts it paid to Iron Mountain. Additionally, the Debtors advised the Purchaser that any potential indemnification claim of the Purchaser against the Debtors had been settled by the Global Settlement.

25.    On January 5, 2011, Iron Mountain filed a request for payment of alleged administrative expenses with respect to the M070K Account [D.I. 9636], in the amount of $473,527.57, plus continuing interest, fees and costs, which had not been paid by the Purchaser.

The alleged charges on the M070K Account relate to invoices dated December 31, 2007, through November 30, 2010, which fall within either the Purchaser's cure period or the post-Final Closing period.

26.     Also on January 5, 2011, the Purchaser filed its Admin Request, seeking indemnification for any amounts it may be required to pay to Iron Mountain on account of the M070K Account.

## **OBJECTION**

27.     Section 503 of the Bankruptcy Code accords administrative expense priority to claims representing "actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A).  To be considered an actual, necessary cost and expense of preserving the estate, a claim "must arise from a transaction with the debtor-in-possession and the consideration supporting the claimant's right to payment must be beneficial to the debtor-in-possession in the operation of the business."  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999) (internal citation omitted).

28.     In order to hold administrative expenses to a minimum and to maximize the value of the bankruptcy estate, section 503(b) is narrowly construed.  See In re Bernard Techs., Inc., 342 B.R. 174, 177 (Bankr. D. Del. 2006).  Accordingly, the movant under section 503(b)(1)(A) carries a "heavy burden of demonstrating that the costs and fees for which it seeks payment provided an actual benefit to the estate and that such costs and expenses were necessary to preserve the value of the estate assets."  Id. (quoting Calpine, 181 F.3d at 533); see In re Unidigital, Inc., 262 B.R. 283, 288 (Bankr. D. Del. 2001) ("Claimants who seek payment ahead of other unsecured claims bear the burden of establishing that their claim qualifies for priority status.").  Movant must prove its entitlement to an administrative expense claim against the Debtors by a preponderance of the evidence.  See Bernard Techs., 342 B.R. at 177.

29.     Purchaser recites the basic standard for approval of an administrative

expense under section 503(b)(1), but then baldly asserts that it "has a claim against the Sellers"

for any amounts Purchaser owes to Iron Mountain on account of the M070K Account.  (Admin

Req. ¶ 16.)  Though not entirely clear from the Admin Request, Purchaser's reasoning appears to

be as follows: (i) the M070K Account covers the storage of documents purchased by the

Purchaser, *as well as* documents owned by the Debtors; (ii) the CNI Customer Agreement

governing the M070K Account was only "partially" assumed by the Purchaser, as to those

documents purchased by the Purchaser, but not as to any documents owned by the Debtors, and

(iii) if Purchaser is held liable to Iron Mountain for the storage of the Debtors' records, this

storage somehow constitutes a "transaction" between the Purchaser and the Debtors' estates that

benefited the estates so as to give rise to administrative liability under section 503(b)(1) of the

Bankruptcy Code.  Each of these premises (all of which are necessary to sustain the Purchaser's

argument) is fatally flawed.  Additionally, and irrespective of the merits of the Purchaser's

argument, the indemnification claims asserted in the Admin Request fall squarely within the

global release of claims against the Debtors to which the Purchaser agreed in the Global

Settlement.  Accordingly, the Admin Request should be denied, without prejudice to the Plan

Trust's rights to seek damages for breach of the Global Settlement on account of the Purchaser's

wrongful prosecution of released claims.

I.      **The Documents Stored Under the M070K Account Belong to the Purchaser**

30.     Purchaser provides no facts or legal analysis to support its assertion that

any documents under the M070K Account belong to the Debtors.  Nor indeed could it, because

any documents stored pursuant to the CNI Customer Agreement assumed by the Purchaser are

plainly "Books and Records" that constitute "Purchased Assets" under the APA.  (See APA

§ 1.1; 2.1(b)(i) & (d).)  As defined in the APA, "Books and Records" means "all books, ledgers,

files, reports, plans, records, manuals and other materials (in any form or medium) Related to the

Business *or directly relating to the Purchased Assets, and the Assumed Liabilities*." (Id § 1.1

(emphasis added).)  The "Purchased Assets" defined in the APA included all "Books and

Records that are not Excluded Assets" as well as all rights and benefits under Assumed Contracts

(including the CNI Customer Agreement).  (Id § 2.1(b)(i) & (d).)  None of the "Excluded

Assets" set forth in the APA encompass documents stored pursuant to the M070K Account.  (See

id. § 2.2.)

      31.    In Section 2.11 of the APA the Purchaser expressly acknowledged that it

had "conducted an independent inspection and investigation of . . . all [] matters relating to or

affecting the Purchased Assets as [it] deemed necessary or appropriate" and that it would "accept

the Purchased Assets on the Final Closing Date 'AS IS' and 'WHERE IS.'"  (APA § 2.11.)

Against this backdrop, the Purchaser's assertion that documents it admits were stored pursuant to

the CNI Customer Agreement assumed and assigned to the Purchaser somehow constitute

property of the Debtors is untenable.  If the Purchaser had not intended to purchase these

documents, it was incumbent upon the Purchaser, following its "independent inspection and

investigation," to identify these documents as Excluded Assets.  It did not do so.  The Court

should not now permit the Purchaser to rewrite the APA to its liking more than three years after

the Final Closing, after Iron Mountain and the Debtors had been operating under the reasonable

assumption that the APA meant what it said, and provided for the sale to the Purchaser of all the

"Books and Records" being stored pursuant to the CNI Customer Agreement and an assumption

by the Purchaser of all obligations under such agreement.

## II.    Purchaser Did Not "Partially" Assume the CNI Customer Agreement—Such Assumption Was *Cum Onere*

      32.    The Purchaser suggests in a footnote that it only "partially" assumed the

CNI Customer Agreement, because it "did not obtain all rights" thereunder.  (Admin Req. at 6

n.3.)  Because the assumption and assignment was only "partial," the Purchaser asserts that the

Debtors were not relieved of liability to Iron Mountain pursuant to section 365(k) of the

Bankruptcy Code.  This argument overlooks the plain language of both the APA and the Sale

Approval Order.

33.    The APA specifically identifies "all rights and benefits under" the

Assumed Contracts as "Purchased Assets."  (APA § 2.1(b)(i).)  Additionally, the APA

specifically identifies as "Assumed Liabilities" any "obligations of Sellers under any . . .

Assumed Contract . . . after the assignment thereof to Purchaser at the Final Closing."  (Id.

§ 1.1.)  As additional consideration for the Purchased Assets, the Purchaser expressly agreed to

"assume and discharge or perform when due in accordance with their respective terms and

subject to the respective conditions thereof, the Assumed Liabilities."  (Id. § 2.5.)

34.    Because the Purchaser was assuming the Assumed Contracts *cum onere*,

the Sale Approval Order—appropriately—relieved the Sellers of further liability under the

Assumed Contracts pursuant to section 365(k) of the Bankruptcy Code.  (Sale App. Ord. ¶ 42.)

This effectuated a novation by operation of law, substituting the Purchaser for the Sellers for all

intents and purposes under the CNI Customer Agreement.  See Am. Flint Glass Workers Union

v. Anchor Resolution Corp., 197 F.3d 76, 80-81 (3d Cir. 1999) (explaining operation of

§ 365(k)).  The Purchaser does not cite the Sale Approval Order, but cites to Anchor Resolution,

apparently to suggest that the Court may reconsider whether the Sale Approval Order's section

365(k) decree really novated the CNI Customer Agreement.  While it is true that the Anchor

Resolution court overturned a bankruptcy court's application of section 365(k), it did so *on*

*appeal* by the party against whom the novation was sought to be enforced.  Here, in stark

contrast, the Purchaser *affirmatively consented* to the Court's grant of section 365(k) relief to the

Debtors in the Sale Approval Order, and now seeks to collaterally attack such order *in this very*

*Court* because, strategically, it now suits the Purchaser to assert it only took a "partial"

assignment of the CNI Customer Agreement instead of a *cum onere* assignment to which section

365(k) applied. The Court should not permit the Purchaser to wiggle out of its bargained-for rights and responsibilities vis-à-vis Iron Mountain and the Debtors' estates.

### III. Any Indemnification Claims of the Purchaser Against the Debtors Were Released by the Global Settlement

35. Even if the Purchaser could assert a colorable claim for indemnification from the Plan Trust for amounts the Purchaser ends up paying to Iron Mountain, such claim was plainly released by the Global Settlement, which covered all claims, known or unknown, and including contingent claims, arising prior to the execution of the Global Settlement in March 2010. The Purchaser does not even attempt to argue otherwise in its Admin Request. Indeed, the only reference to the Global Settlement is a brief statement in the background section, describing the Global Settlement only as having resolved the First Purchaser Admin Request. Thus, in essence, the Purchaser is asking this Court to permit it to retrade substantially not only on the APA, but also on the Global Settlement. The Court should hold the Purchaser to the benefits and burdens of the bargain it struck in the Global Settlement.

### RESERVATION OF RIGHTS

36. The Debtors and the Plan Trust have expended significant resources in informal discovery, negotiations, and motion practice with Iron Mountain and the Purchaser, primarily (if not exclusively) as a result of the Purchaser's wrongful refusal to honor its commitments to Iron Mountain under the CNI Customer Agreement and to the Debtors and Plan Trust under the APA and Global Settlement. The Plan Trustee reserves all rights to seek an award of damages for breach of the APA and/or the Global Settlement, and to otherwise request an award of fees and costs from this Court against the Purchaser.

01: 11447818.4                                066585.1001

## **CONCLUSION**

For the foregoing reasons, the Plan Trustee requests that this Court deny the

Admin Request and grant the Plan Trustee such other and further relief as is just and proper.

Dated: December 12, 2011
      Wilmington, Delaware

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

*/s/ Patrick A. Jackson*
Sean M. Beach (No. 4070)
Margaret Whiteman Greecher (No. 4652)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street - 17th Floor
P.O. Box 391
Wilmington, Delaware  19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

HAHN & HESSEN LLP
Mark S. Indelicato
Edward L. Schnitzer
Joseph Orbach
488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400

*Co-Counsel to the Plan Trustee*