IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x
In re:                                                        :
                                                              :
AMERICAN HOME MORTGAGE                                        :
HOLDINGS, INC., a Delaware corporation, et al.,¹             :
                                                              :
          Debtors.                                            :
                                                              :
------------------------------------------------------------- x
```

Chapter 11

Case No. 07-11047 (CSS)

Jointly Administered

**Ref. D.I. 4828, 6460, 9636 & 9637**

## PLAN TRUST'S OMNIBUS OBJECTION TO IRON MOUNTAIN INFORMATION MANAGEMENT, INC.'S (I) PURCHASER CURE CLAIM AND (II) REQUESTS FOR ALLOWANCE AND PAYMENT OF ADMINISTRATIVE EXPENSES

Steven D. Sass, as liquidating trustee (the " Plan Trustee") for the Plan Trust established pursuant to the *Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009* (the "Plan") in connection with the Chapter 11 cases of the above-captioned debtors (the "Debtors"),² objects (the "Objection") to (i) the *Notice of Iron Mountain Information Management, Inc.'s Interim Cure Claim* [D.I. 4828] filed on June 25, 2008 (the "Purchaser Cure Claim"), and (ii) *Iron Mountain Information Management, Inc.'s Second Motion to Compel Payment of Administrative Expenses* [D.I. 6460] filed on October 25, 2008, *Iron Mountain Information Management, Inc.'s Request for Allowance and Payment of Administrative Expenses (Hardcopy)* [D.I. 9636] and *Iron Mountain Information Management, Inc.'s Request for Allowance and Payment of Administrative Expenses (Data)* [D.I. 9637] filed on January 5, 2011 (collectively, the "Admin Requests").  In support of this Objection, the Plan Trustee states as follows:

---

[1]    The Debtors in these cases, are: American Home Mortgage Holdings, Inc.; American Home Mortgage Investment Corp.; American Home Mortgage Acceptance, Inc.; AHM SV, Inc. f/k/a American Home Mortgage Servicing, Inc. ("AHM SV"); American Home Mortgage Corp.; American Home Mortgage Ventures LLC; Homegate Settlement Services, Inc.; and Great Oak Abstract Corp.

[2]    Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

## PRELIMINARY STATEMENT[3]

1.      The Admin Requests filed on January 5, 2011, are the latest in the very confusing back-and-forth between Iron Mountain and the Debtors' estates in an attempt to resolve accounts that should have been closed out over three years ago.  Although set forth in greater detail below, the essential facts are as follows.  The Debtors had multiple accounts with Iron Mountain, two of which were governed by a contract that was assumed and assigned to the purchaser of the Debtors' Servicing Business, effective April 11, 2008.  From and after this date, the Sale Approval Order specifically excused the Debtors from further liability under the contract pursuant to section 365(k) of the Bankruptcy Code.  The Sale Approval Order contained a process for resolving cure claims asserted on account of Assumed Contracts, whereby "Seller" cure claims arising prior to the "economic close" of the sale transaction on November 16, 2007 (after which point the Debtors operated the Servicing Business for the economic benefit of the Purchaser) would be paid from a Cure Escrow, and "Purchaser" cure claims arising in the interim period between the "economic closing" on November 16, 2007, and the "legal closing" on April 11, 2008, would be paid by the Purchaser.

2.      Iron Mountain did not assert a Seller cure claim in accordance with the Sale Approval Order, but asserted its Purchaser Cure Claim, which covered (erroneously) (i) contracts that were not assumed and assigned to the Purchaser, and (ii) amounts arising prior to the Interim Period for which the Purchaser is responsible.  For reasons unknown to the Plan Trustee, the Purchaser has not objected to the Purchaser Cure Claim.[4]

3.      In its Admin Requests, Iron Mountain asserts amounts alleged to be due under (i) accounts that were not assumed and assigned to the Purchaser, for which there are no outstanding amounts due and owing, and (ii) accounts that were assumed and assigned to the

---

[3]      Capitalized terms in this Preliminary Statement have the meanings ascribed to them elsewhere in the Objection.

[4]      The Purchaser has objected to other Purchaser Cure Claims.  [*See* D.I. 6114 & 7248.]

Purchaser, for which all obligations are either the responsibility of the Purchaser or the Cure

Escrow.  The Plan Trustee requests that the Court hold Iron Mountain to its evidentiary burden

with respect to the Admin Requests.  However, even assuming *arguendo* the validity of Iron

Mountain's claims with respect to accounts that were assumed and assigned to the Purchaser,

they are not properly allowable as administrative expenses because, after April 11, 2008, there

was no longer any "transaction with the estate" that could give rise to administrative liability,

and (ii) prior to April 11, 2008, any claims of Iron Mountain would have been governed by the

cure process set forth in the Sale Approval Order (meaning, Iron Mountain's claims would be

payable either from the Cure Escrow or the Purchaser, as applicable).

4.      In an effort to bring this matter to a final conclusion, the Plan Trustee

hereby objects both to the Admin Requests and to the Purchaser Cure Claim.

## BACKGROUND

### A.      General Background

5.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11

U.S.C. §§ 101-1532 (the "Bankruptcy Code").  The Debtors had ceased all or substantially all

business operations other than their mortgage loan servicing business (the "Servicing Business")

prior to the Petition Date.  Between the Petition Date and the Plan Effective Date (as hereinafter

defined), each Debtor managed its properties as a debtor in possession pursuant to

sections 1107(a) and 1108 of the Bankruptcy Code.  The Debtors' cases have been consolidated

for procedural purposes only and are being jointly administered pursuant to an order of this

Court.

### *The Servicing Sale*

6.      On the Petition Date, the Debtors filed an emergency motion [D.I. 11] (the

"Sale Motion") (i) to authorize the sale of the assets used in their Servicing Business, including

3

the assumption and assignment of certain executory contracts, and (ii) to establish bidding

procedures in connection therewith.

7.      On September 21, 2007, the Debtors filed a motion [D.I. 865] (the

"Stalking Horse Motion") to approve a form of Asset Purchase Agreement (as subsequently

amended, the "APA") by and among certain Debtors (the "Sellers") and stalking-horse bidder

American Home Mortgage Servicing, Inc. f/k/a AH Mortgage Acquisition Co., Inc. (the

"Purchaser").

8.      On September 25, 2007, the Court entered an order [D.I. 937] (the "Sale

Procedures Order") granting the Sale Motion and the Stalking Horse Motion as to the proposed

bidding procedures.

9.      On October 30, 2007, following a five-day evidentiary hearing (the "Sale

Hearing"), the Court entered an order [D.I. 1711] (the "Sale Approval Order") granting the Sale

Motion and approving the APA.[5]  To provide for the prompt payment of sale consideration to the

Sellers while at the same time providing the Purchaser time to obtain necessary licensure to

operate the Servicing Business, the APA contemplated a two-step closing: first, an "economic"

close, at which the Purchaser would tender the Purchase Price (as defined in the APA) and after

which the Sellers would continue to operate the Servicing Business in the ordinary course for the

benefit and risk of the Purchaser, using working capital to be provided by the Purchaser (the

"Initial Closing"); and second, a "legal" close, at which legal title to the Purchased Assets (as

defined in the APA) would vest in the Purchaser and which would be the effective date of

assumption and assignment of any executory contracts and unexpired leases (the "Final

Closing").

10.     The APA further contemplated that, as between the Sellers and the

Purchaser: (i) the aggregate amount necessary under section 365 of the Bankruptcy Code (a) to

---

[5]        A copy of the Sale Approval Order, without exhibits, is attached hereto as Exhibit A.

cure any defaults under Assumed Contracts (as defined in the APA) arising prior to entry of the

Sale Approval Order (as defined in the APA) (such amount, the "Initial Cure Amount") and

(b) to cure any defaults under Assumed Contracts arising after entry of the Sale Approval Order

but before the Initial Closing (such amount, the "Interim Cure Amount"), would be the

responsibility of the Sellers; and (ii) the amount, if any, necessary under section 365 of the

Bankruptcy Code to cure any defaults arising under the Assumed Contracts between the Initial

Closing and the Final Closing (such amount, the "Purchaser's Cure Amount") would be the

responsibility of the Purchaser.

   11. Among other things, the Sale Approval Order provided that a reserve of

$10 million (the "Cure Escrow") would be established for the payment of the Sellers' Cure

Claims, which includes (i) the Initial Cure Amount, (ii) the Interim Cure Amount, and (iii) any

reasonable out-of-pocket costs and expenses (a) incurred by a counterparty to an Assumed

Contract as a result of the assumption and assignment of such contract to the Purchaser *and*

(b) chargeable under the Assumed Contract (such costs/expenses, "Transfer Costs").  (Id. ¶¶ 32-

39.)  The Sale Approval Order expressly reserved the rights of the Debtors and the Committee to

object to any Sellers' Cure Claims.  (Id. ¶ 35.)  The Sale Approval Order provided further that

that the Purchaser "shall fund and be liable to the Debtors for the Purchaser's Cure Amount."

(Id. ¶ 36.)

   12. The Initial Closing under the APA occurred on November 16, 2007, at or

about which time the Cure Escrow was established and funded as required by the Sale Approval

Order.

   13. The Final Closing occurred on April 11, 2008, at which time the Assumed

Contracts were assumed and assigned to the Purchaser pursuant to section 365 of the Bankruptcy

Code (Sale App. Ord. ¶¶ 26, 28-44), and the Sellers were relieved of any further liability with

respect to any Assumed Contracts pursuant to section 365(k) (id. ¶ 42).

*The Chapter 11 Plan*

14.    The Plan was confirmed under section 1129 of the Bankruptcy Code on February 23, 2009 (the "Confirmation Date").  The Plan became effective on November 30, 2010 (the "Plan Effective Date").

15.    Pursuant to the Plan, as of the Plan Effective Date, a plan trust (the "Plan Trust") was established and all of the Debtors' assets, causes of action, claims, rights and interests, succeeded, transferred and vested in the Plan Trust.  Steven D. Sass is the duly appointed Plan Trustee for the Plan Trust.  The Plan Trustee is vested with the rights, powers and benefits set forth in the Plan, Confirmation Order and Plan Trust Agreement, including the rights of the Debtors and the Committee to object to claims for Sellers' Cure Amounts payable from the Cure Escrow.

**B.    The Iron Mountain Accounts and Claims**

16.    Prior to the Petition Date, the Debtors contracted with Iron Mountain Information Management, Inc. (collectively with its affiliated entities, "Iron Mountain") for the provision of document and data storage, and document shredding services, at various locations around the country.  The Debtors and Iron Mountain maintained several accounts (collectively, the "Iron Mountain Accounts"), including, but not limited to (i) the accounts numbered 55243.021501 (the "215 Account") and 04421.0M070K (the "M070K Account" and, together with the 215 Accounts, the "Servicing Accounts") based in Baltimore, Maryland, and (ii) the accounts numbered 55112.002030 and 55112.062388 (collectively, the "Corporate Accounts").[6]

17.    The Debtors' records indicate that the Servicing Accounts were governed by that certain Customer Agreement dated as of November 1, 2001, by and between Iron Mountain and Columbia National, Incorporated (the "CNI Customer Agreement").  The CNI Customer Agreement had been assumed by one or more of the Debtors in connection with their

---

[6]  The remaining Iron Mountain Accounts consisted primarily of shred accounts and hard-copy document storage accounts for branch locations throughout the country.

2002 acquisition of Columbia National, Incorporated.  The 215 Account and the M070K

Account were, respectively, a tape data storage account and a hard-copy document storage

account utilized by the Servicing Business.

18.     The Corporate Accounts were both tape data storage accounts utilized by

the Debtors' corporate offices in Melville, New York.

19.     On September 10, 2007, the Debtors filed a notice [D.I. 674] (the "Initial

Cure Notice") identifying Iron Mountain as a potential counterparty to a contract to be assumed

and assigned in connection with the proposed sale of the Servicing Business, and proposing a

cure amount of $0.

20.     On September 19, 2007, Iron Mountain objected to the Initial Cure Notice

[D.I. 815] on the basis that the notice did not specifically identify the contract(s) subject to

assumption and assignment.  Iron Mountain also asserted prepetition cure amounts of $93,081.48

in the aggregate relating to various accounts *other than* the Servicing Accounts.  The objection

did not identify the Servicing Accounts or provide proposed cure amounts with respect thereto.

21.     On September 25, 2007, the Debtors filed an executed copy of the APA

[D.I. 931].  Section 2.1(b) and Schedule 2.1(b)(i) of the APA identified the CNI Customer

Agreement as an "Assumed Contract."  On September 26, 2007, the Debtors filed a notice of

entry of the Sale Procedures Order [D.I. 957] that, among other things, advised parties to

contracts with the Debtors (i) to obtain a copy of the APA and its schedules and exhibits, to

review them carefully, and to consult with their counsel regarding their rights, and (ii) that the

Sale Approval Order would establish the amount of cure claims for Assumed Contracts through

the date of entry of the Sale Approval Order.

22.     Iron Mountain did not participate in the Sale Hearing to establish its

asserted cure claims, and it did not object to approval of the APA or entry of the Sale Approval

Order.  The Sale Approval Order (i) authorized the assumption and assignment of the CNI

Customer Agreement to the Purchaser, effective as of the Final Closing (Sale App. Ord. ¶¶ 28-44), and (ii) fixed at $0 the cure amount with respect to any defaults under the CNI Customer Agreement occurring prior to entry of the Sale Approval Order (id. ¶ 33 and Sched. I).

23.    The Sale Approval Order required the Debtors, following the Initial Closing, to file and serve a schedule of proposed cure amounts, if any, for defaults under Assumed Contracts during the period between the entry of the Sale Approval Order and the Initial Closing (the "Interim Period Cure Schedule").  The Debtors timely filed the Interim Period Cure Schedule on November 26, 2007 [D.I. 2166], and proposed a cure amount of $0 relating to the CNI Customer Agreement.  Iron Mountain did not object to the Interim Period Cure Schedule.

24.    On December 20, 2007, Iron Mountain filed a motion to compel payment of administrative expenses [D.I. 2465] (the "Motion to Compel") consisting of $140,208.99 in postpetition invoices (through December 17, 2007) under the Iron Mountain Accounts, plus interest of $2,878.21 and fees of $3,000.

25.    On January 7, 2008, the Debtors wired Iron Mountain $128,471.07 as partial payment of Iron Mountain's asserted administrative claim, subject to reservations of certain rights.  The amounts not paid by the Debtors were disputed, primarily on the basis that they were recurring charges on shred and hard-copy document storage accounts that were no longer being utilized by the Debtors, and did not represent actual services performed on behalf of, or that provided any benefit to, the Debtors' estates.

26.    Following the January 2008 payment, the Debtors utilized only the Corporate Accounts, for which the Debtors were invoiced, and paid Iron Mountain, in the ordinary course.  The Debtors' corporate offices did not receive any invoices from Iron Mountain with respect to any other Iron Mountain Accounts.

27.     Around the time of the Final Closing in April 2008, the Purchaser shipped some documents from Iron Mountain's Maryland facility (at which the Servicing Accounts were based) to the Purchaser's place of business in Irving, Texas.  Following the Final Closing, and with the possible exception of the Debtors' retrieval of certain data tapes in April 2010 relating to the 215 Account, the Debtors did not request or authorize any services to be performed by Iron Mountain with respect to the Servicing Accounts.

28.     On May 9, 2008, the Court entered an order establishing a bar date for the assertion of Purchaser Cure Amounts [D.I. 4021].  In accordance with this order, on May 19, 2008, the Debtors timely filed a schedule of proposed cure amounts for defaults under Assumed Contracts during the period between the Initial Closing and the Final Closing [D.I. 4084] (the "Purchaser Cure Schedule").  The Purchaser Cure Schedule proposed a cure amount of $0 for the CNI Customer Agreement.

29.     On June 25, 2008, Iron Mountain objected to the Purchaser Cure Schedule [D.I. 4828], asserting a cure claim in the amount of $74,939.40 for the period between the Initial Closing and Final Closing (a "Purchaser Cure Amount" under the Sale Approval Order), with a "total cure claim" of $211,654.84, on account of amounts allegedly due and payable under *all* Iron Mountain Accounts through June 4, 2008, as set forth more particularly in the following table:

| Accounts | Prepetition Invoices | Postpetition Invoices | Total |
|----------|---------------------|----------------------|-------|
| 215 Account | $4,930.78 | $5,710.70 | $10,641.48 |
| M070K Account | $23,316.82 | $65,311.59 | $88,628.41 |
| Other | $65,773.31 | $46,611.64 | $112,384.95 |
| Totals | $94,020.91 | $117,633.93 | $211,654.84 |

Iron Mountain did not specify in its objection which Iron Mountain Accounts it believed were associated with the CNI Customer Agreement that was assumed and assigned to the Purchaser.

30.     On October 17, 2008, the Court approved a stipulation [D.I. 6275] between the Debtors and Iron Mountain resolving the Motion to Compel and outstanding payments for all services performed by Iron Mountain between the Petition Date and December 17, 2007.  Iron Mountain was subsequently paid $7,500 pursuant to the stipulation and, accordingly, withdrew the Motion to Compel [D.I. 6479].

31.     On October 24, 2008, Iron Mountain filed a second motion to compel payment of administrative expenses [D.I. 6460] (the "Second Motion to Compel") consisting of $170,585.51 in postpetition invoices (from December 18, 2007, through September 22, 2008), plus interest and fees and costs of $3,000, under various Iron Mountain Accounts.  Of the total alleged postpetition invoices and interest, (i) $52,464.36 relate to the Corporate Accounts and (ii) $10,177.67 related to the 215 Account and $94,651.72 related to the M070K Account,[7] though it is unclear how much of these alleged amounts relate to the period after the Final Closing (after which the Debtors were relieved of any liability pursuant to the Sale Approval Order and Bankruptcy Code § 365(k)).  The Plan Trustee believes the remaining $13,291.76 of alleged invoices and interest asserted in the Second Motion to Compel represent recurring charges under shred accounts and hard-copy document storage accounts that were not used by the Debtors post-petition.

32.     On December 29, 2008, Iron Mountain filed an objection to the Debtors' proposed chapter 11 plan [D.I. 6778], reiterating the claims set forth in the Second Motion to Compel, and demanding a "cure" payment of $23,316.82 for prepetition invoices under the M070K Account.

33.     Iron Mountain did not press its objection in connection with confirmation of the Plan.  Under the Plan and Confirmation Order, all executory contracts that were not

---

[7] Iron Mountain also asserted, again, that prepetition invoices totaling $4,930.78 and $23,316.82 remained unpaid under the 215 Account and M070K Account, respectively.  The Second Motion to Compel did not seek payment of these amounts as administrative expenses, however.

previously assumed by the Debtors were rejected as of the Confirmation Date pursuant to

section 365 of the Bankruptcy Code.  (Plan Art. 11A; Conf. Ord. ¶ 34.)  Apart from the CNI

Customer Agreement, the Debtors did not assume, or assume and assign, any executory contracts

with Iron Mountain.

   34. For several months prior to the administrative bar date of January 5, 2011,

the Debtors, Iron Mountain, and the Purchaser conferred with respect to allegedly open invoices

under the Iron Mountain Accounts (and in particular, the M070K Account).  The Debtors

advised Iron Mountain that they believed all amounts legitimately due and owing to Iron

Mountain had been paid and that remaining charges related to shred accounts and hard-copy

storage accounts that had not been used by the Debtors post-petition, or to accounts that had been

assumed by the Purchaser.  On or about November 18, 2010, the Debtors specifically advised

Iron Mountain that all Iron Mountain Accounts should be suspended and terminated immediately

(without prejudice to the Debtors' assertion that the accounts had been, or should have been,

terminated previously).  The Debtors also advised Iron Mountain that, apart from the transfer of

any tapes and microfiche to the Debtors' corporate offices in Melville, New York, they were

unaware of any services authorized or requested by the Debtors under any Iron Mountain

Accounts after the Final Closing.

   35. On January 5, 2011, Iron Mountain filed requests for payment of alleged

administrative expenses with respect to (i) the 215 Account [D.I. 9637], in the amount of

$17,139.85, plus continuing interest, fees and costs; and (ii) the M070K Account [D.I. 9636], in

the amount of $473,527.57, plus continuing interest, fees and costs.  The alleged charges on the

215 Account relate to invoices dated February 29, 2008, through March 31, 2010, each of which

would fall within the Purchaser's cure period under the Sale Approval Order (running from the

Initial Closing to the Final Closing), or the post-Final Closing period.  The alleged charges on the

M070K Account relate to invoices dated December 31, 2007, through November 30, 2010,

which similarly fall within the Purchaser's cure period or the post-Final Closing period.

## **OBJECTION**

### I.    **The Admin Requests Should be Denied**

36.    Section 503 of the Bankruptcy Code accords administrative expense

priority to claims representing "actual, necessary costs and expenses of preserving the estate."

11 U.S.C. § 503(b)(1)(A).  To be considered an actual, necessary cost and expense of preserving

the estate, a claim "must arise from a transaction with the debtor-in-possession and the

consideration supporting the claimant's right to payment must be beneficial to the debtor-in-

possession in the operation of the business."  Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re

O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 532-33 (3d Cir. 1999) (internal citation omitted).

37.    In order to hold administrative expenses to a minimum and to maximize

the value of the bankruptcy estate, section 503(b) is narrowly construed.  In re Bernard Techs.,

Inc., 342 B.R. 174, 177 (Bankr. D. Del. 2006) (Walrath, J.).  Accordingly, the movant under

section 503(b)(1)(A) carries a "heavy burden of demonstrating that the costs and fees for which

it seeks payment provided an actual benefit to the estate and that such costs and expenses were

necessary to preserve the value of the estate assets."  Id. (quoting Calpine, 181 F.3d at 533); see

In re Unidigital, Inc., 262 B.R. 283, ("Claimants who seek payment ahead of other unsecured

claims bear the burden of establishing that their claim qualifies for priority status.").  Movant

must prove its entitlement to an administrative expense claim against the Debtors by a

preponderance of the evidence.  Bernard Techs., 342 B.R. at 177.

### A.    **The Plan Trust is not Liable for Amounts Arising Post-Final Closing under Accounts Governed by the CNI Customer Agreement Assigned to the Purchaser**

38.    To the extent that the Admin Requests seek payment under the Servicing

Accounts governed by the CNI Customer Agreement for services provided post-Final Closing,

such claim must be denied.  Pursuant to the Sale Approval Order, any cure costs that arose post-Final Closing on contracts which were assumed and assigned to the Purchaser, were solely the responsibility of the Purchaser and the Debtors were relieved of liability pursuant to section 365(k) of the Bankruptcy Code.  (Sale App. Ord. ¶¶ 26, 28-44.)  Accordingly, Iron Mountain cannot successfully assert any administrative claims against the estates relating to Post-Final Closing services under the CNI Customer Agreement.

39.      Even if the Sale Approval Order did not provide an absolute bar to the Admin Requests, Iron Mountain is not able to meet its burden that it entered into a post-petition transaction with the estates, and that it provided the estates with any benefit, with respect to post-Final Closing services.  As described above, the Debtors did not request or authorize Iron Mountain to perform any services with respect to the Servicing Accounts after the Final Closing. Accordingly, there was no transaction with the estates and, contrary to the conclusory statements in the Admin Requests, no demonstrable benefit inured to the estates as a result of purported services performed by Iron Mountain.

**B.      No Amounts are Due and Owing under the Accounts governed by the CNI Customer Agreement for the Pre-Initial Closing Period**

40.      To the extent that the Admin Requests seek payment under the CNI Customer agreement for services provided Pre-Initial Closing, such claim must be denied. Pursuant to the Sale Approval Order, any cure costs on contracts which were assumed and assigned as part of the Sale, which arose Pre-Initial Closing, were fixed pursuant to the Initial Cure Notice and the Interim Period Cure Schedule.  (Sale App. Ord. ¶ 33 and Sched. I.)  As Iron Mountain did not file an Initial Cure or Interim Cure claim, this Court fixed the cure costs owed by the Debtors at $0.  Accordingly, Iron Mountain cannot successfully assert any administrative

claims against the estates relating to Pre-Final Closing services under the CNI Customer

Agreement.[8]

C.    **Amounts Arising Post-Initial Closing, Pre-Final Closing under Accounts Governed by the CNI Customer Agreement Are Subject to the Sale Approval Order's "Purchaser Cure" Process**

41.    To the extent that the Admin Requests seek payment under the CNI

Customer agreement for services provided during the post-Initial Closing, pre-Final Closing

period, such claims should be denied, either as duplicative of the Purchaser Cure Claim (to the

extent of any overlap) or as late-filed (to the extent of any new claims not timely asserted in the

Purchaser Cure Claim).  The proposed resolution of the Purchaser Cure Claim is discussed

further below.

D.    **There are No Amounts Due and Owing under any Other Accounts**

42.    To the extent the Admin Requests (specifically, the Second Motion to

Compel) included amounts arising under the Corporate Accounts post-petition, any such

amounts were paid by the Debtors in the ordinary course of business, and there are no post-

petition unpaid obligations on the Corporate Accounts.  To the extent that Iron Mountain

misapplied post-petition payments on the Corporate Accounts to prepetition amounts owed in

violation of the automatic stay, or incorrectly applied those payments to accounts under the

control of the Purchaser, the Plan Trust reserves all rights.

43.    For Iron Mountain Accounts other than the Corporate Accounts, which

were not used by the Debtors post-petition and are governed by contracts that were rejected by

the Debtors pursuant to the Plan, Iron Mountain cannot meet its burden of proving a post-petition

"transaction with the estates."  Nor can Iron Mountain prove that any services which may have

---

[8]    If the Court were inclined to permit Iron Mountain to assert claims under the CNI Customer Agreement that arose prior to the Initial Closing despite Iron Mountain's failure to file Initial and Interim Cure claims, the Plan Trust would request that such amounts be allowed as Seller's Cure Claims payable solely from the Cure Escrow, and not as administrative claims payable by the Plan Trust.

been provided with respect to these accounts benefited the Debtors' estates, despite Iron

Mountain's conclusory assertions to the contrary.

## II.    The Purchaser Cure Claim, to the Extent Allowed, Should be Limited to Amounts Arising During the Purchaser's Cure Period under the Servicing Accounts

44.    To the extent that Iron Mountain's Purchaser Cure Claim is valid, such

cure amount would necessarily be limited to (i) the Servicing Accounts governed by the CNI

Customer Agreement assumed and assigned to the Purchaser, and (ii) amounts that arose

between the Initial Closing and the Final Closing.  As the Purchaser is obligated to reimburse the

Debtors for a Purchaser Cure Claim pursuant to the APA and Sale Approval Order, and the

Purchaser is the entity that has control over the documents, personnel and other means to

evaluate validity of Purchaser Cure amount asserted by Iron Mountain, the Purchaser is the real

party in interest with respect to the Purchaser Cure Claim, and certainly is the entity in the best

position to challenge such Claim.  While the Plan Trust reserves right to hold Iron Mountain to

its burden on proving the validity of the Purchaser Cure Claim, the Plan Trust requests that any

order granting the Purchaser Cure Claim direct the Purchaser to pay Iron Mountain directly, to

avoid the unnecessary step of requiring Plan Trust to pay Iron Mountain and then requiring

Purchaser to reimburse Plan Trust.[9]

## CONCLUSION

For the foregoing reasons, the Plan Trustee requests that this Court deny the

Admin Requests and the Purchaser Cure Claim and grant the Plan Trustee such other and further

relief as is just and proper.

---

[9] The liability of the Purchaser to the Debtors for Purchaser Cure Claims was specifically carved out of the global settlement that the Debtors entered into with the Purchaser [D.I. 8844], which settlement is discussed more fully in the objection by the Plan Trust to the administrative claim filed by the Purchaser, filed concurrently herewith.

Dated: December 12, 2011
      Wilmington, Delaware

YOUNG, CONAWAY, STARGATT & TAYLOR, LLP

*/s/ Patrick A. Jackson*
Sean M. Beach (No. 4070)
Margaret Whiteman Greecher (No. 4652)
Patrick A. Jackson (No. 4976)
The Brandywine Building
1000 West Street - 17th Floor
P.O. Box 391
Wilmington, Delaware  19899
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

HAHN & HESSEN LLP
Mark S. Indelicato
Edward L. Schnitzer
Joseph Orbach
488 Madison Avenue
New York, New York 10022
Telephone: (212) 478-7200
Facsimile: (212) 478-7400

*Co-Counsel to the Plan Trustee*

16