## Exhibit A

**Sale Approval Order (w/o Exhibits)**

CERTIFIED:
AS A TRUE COPY:
ATTEST:
DAVID D. BIRD, CLERK
U.S. BANKRUPTCY COURT
BY:
Deputy Clerk

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------------ x

In re:                                                     :   Chapter 11
                                                           :
AMERICAN HOME MORTGAGE                                      :   Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.,[1]         :
                                                           :   Jointly Administered
        Debtors.                                           :
------------------------------------------------------------ x   **Docket Ref: 11, 674, 865 & 937**

**ORDER PURSUANT TO SECTIONS 105, 363, 364, 365, AND 503(b) OF THE
BANKRUPTCY CODE, AND RULES 2002, 4001, 6004, 6006, 7062, 9007, AND 9014 OF
THE FEDERAL RULES OF BANKRUPTCY PROCEDURE (A) APPROVING (i) THE
SALE OF THE DEBTORS' MORTGAGE SERVICING BUSINESS FREE AND CLEAR
OF LIENS, CLAIMS AND INTERESTS, (ii) THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED
THERETO, AND (B) GRANTING CERTAIN RELATED RELIEF**

This matter coming on to be heard on the Emergency Motion of the Debtors for

Orders: (A) (i) Approving Sale Procedures; (ii) Scheduling a Hearing to Consider Sale of

Certain Assets Used In the Debtors' Loan Servicing Business; (iii) Approving Form and Manner

of Notice Thereof; and (iv) Granting Related Relief; and (B) (i) Authorizing the Sale of Such

Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests; (ii) Authorizing and

Approving Purchase Agreement Thereto; (iii) Approving the Assumption and Assignment of

Certain Executory Contracts and Unexpired Leases Related Thereto; and (iv) Granting Related

Relief [**Docket No. 11**] (the "Servicing Sale Motion") and the subsequent Motion of the Debtors

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax
identification number, are: American Home Mortgage Holdings, Inc., (6303); American Home Mortgage
Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland
corporation (1979); American Home Mortgage Servicing, Inc., a Maryland corporation (7267); American
Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware
limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and
Great Oak Abstract Corp., a New York corporation (8580). The address for all of the Debtors is 538
Broadhollow Road, Melville, New York 11747, except for AHM Servicing, whose address is 4600 Regent
Blvd., Suite 200, Irving, Texas 75063.

for Order Pursuant to Sections 105(a), 363, 364, 365, and 503(b) of the Bankruptcy Code and Rules 2002, 4001, 6004, 6006, 7062, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (A) Approving Revised Procedures for the Sale of the Debtors' Mortgage Servicing Business; (B) Approving Certain Protections for the Stalking Horse Bidder in Such Sale; (c) Directing that Certain Notices of Such Sale and Deadline be Given; and (D) Authorizing, on an Interim Basis, the Debtors to Grant Certain Liens and Other Protections for the Purchaser's Collateral Effective After the Initial Closing **[Docket No. 865]** (the "Revised Sale Procedures Motion" and collectively, with the Servicing Sale Motion, the "Motion") of the above-captioned debtors (collectively, the "Debtors") for entry of an order:

(a)     Approving that certain Asset Purchase Agreement dated as of September 25, 2007 (a copy of which is annexed hereto as Exhibit A-1 and a copy of all related schedules and exhibits having been filed with the Revised Sale Procedures Motion) (as amended from time to time, and including all schedules, exhibits, and attachments thereto, including the Ancillary Agreements (as such term is defined therein) to be entered into by and among the parties as contemplated therein, collectively, the "APA"[2]) by and among AH Mortgage Acquisition Co., Inc. ("Purchaser"[3]), American Home Mortgage Investment Corp. ("AHM Investment"), American Home Mortgage Corp. ("AHM Corp."), and American Home Mortgage Servicing, Inc. ("AHM Servicing") (each of AHM Investment, AHM Corp. and AHM Servicing, a "Seller");

(b)     Authorizing (i) the sale, in accordance with the APA and this Order (the "Sale") of all of the Sellers' and the Debtors' (to the extent required by the APA) right, title and

---

[2]     Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the APA.

[3]     "Purchaser" as used herein also includes, where applicable, any assignee or designee of Purchaser as provided for in the APA.

interest in the business (whether existing now or at or before the Final Closing) of providing servicing for residential mortgage loans or other extensions of credit secured by a Lien on real property of a borrower (the "Servicing Business") and the Purchased Assets to the Purchaser free and clear of all Claims, Liens, and interests other than the Assumed Liabilities and the Permitted Liens (collectively, such Claims, Liens, and interests other than the Assumed Liabilities and the Permitted Liens, the "Interests"), with such Interests transferring and attaching to the proceeds of the sale with the same validity and priority as such Interests had in the Purchased Assets immediately prior to the sale; and (ii) (a) to the extent any Assumed Contract is determined to be an executory contract within the meaning of section 365 of the Bankruptcy Code, the assumption by the Sellers and the assignment to the Purchaser of the Assumed Contracts pursuant to section 365 of the Bankruptcy Code, or (b) to the extent any Assumed Contract is determined not to be an executory within the meaning of section 365 of the Bankruptcy Code, the assignment and transfer free and clear of all Interests, except as otherwise provided in this Order, to the Purchaser of the Assumed Contracts pursuant to section 363 of the Bankruptcy Code with such Interests transferring and attaching to the proceeds of the sale with the same validity and priority as such Interests had in the Purchased Assets immediately prior to the sale; and

        (c)     Granting certain related relief.

        The Court having entered an order on August 9, 2007 **[Docket No. 113]** authorizing certain procedures with respect to an auction (the "Auction") for the Servicing Business, and having entered a subsequent order on September 25, 2007 **[Docket No. 937]** (the "Sale Procedures Order") approving, among other things, certain revised sale procedures, bid protections (the "Revised Sale Procedures"), and notice of the Sale and the hearing to consider the approval of the Sale (the "Sale Hearing") and approving, on an interim basis, the Debtors'

authority to grant liens on the Purchaser's Collateral (as such term is hereinafter defined) after the Initial Closing; other than the offer set forth in the APA, there were no acceptable bids for substantially all of the Purchased Assets, and accordingly, no Auction for the Servicing Business was held; the Purchaser having been determined by the Sellers to have submitted the highest or best bid for the Purchased Assets; the Sellers and the Purchaser having executed the APA appended hereto as Exhibit A; the Sale Hearing having commenced on October 15, 2007; all interested parties having been afforded an opportunity to be heard with respect to the Motion and all relief related thereto; objections having been filed by Wells Fargo Bank, N.A.; Deutsche Bank National Trust Company; The Bank of New York; U.S. Bank National Association; Citibank, N.A., CitiMortgage, Inc., GMAC Mortgage LLC and Residential Funding Company, LLC, in their respective capacities, (collectively, the "Certain Objectors") and the Debtors and the Certain Objectors having agreed that the Assumed Contracts set forth on Exhibit C annexed hereto (the "Stipulated Servicing Agreements") are stipulated to be executory contracts within the meaning of section 365 of the Bankruptcy Code and shall be assumed by the Sellers and assigned to the Purchaser pursuant to section 365 of the Bankruptcy Code; and the Court having reviewed and considered (i) the Motion, (ii) any objections thereto, and (iii) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing;

IT IS HEREBY FOUND AND DETERMINED THAT:[4]

A.    **Jurisdiction and Venue.** The court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28

---

[4]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

U.S.C. § 157(b)(2)(A). Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B. **Statutory Predicates.** The statutory predicates for the relief sought in the Motion are sections 105(a), 363, 364(c), 365, and 503(b) of title 11, United States Code (as amended, the "Bankruptcy Code"), as supplemented by Rules 2002, 4001, 6004, 6006, 7062, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). The consummation of the transactions contemplated by the APA and this Order (collectively, the "Transactions") is legal, valid and properly authorized under all such provisions of the Bankruptcy Code and Bankruptcy Rules, and all of the applicable requirements of such sections and rules have been complied with in respect of the Transactions.

C. **Notice.** Proper, timely, adequate, and sufficient notice of the Motion, the Auction, the Sale Hearing, the APA, and this Order has been provided in accordance with sections 105(a), 363, 364(c), 365, and 503(b) of the Bankruptcy Code and Rules 2002, 4001, 6004, 6006, 9007, and 9014 of the Bankruptcy Rules and in compliance with the Revised Sale Procedures. Such notice is good, sufficient, and appropriate under the particular circumstances, and no other or further notice of the Motion, the Auction, the Sale Hearing, the APA, and this Order is or shall be required.

D. **Opportunity to Object.** A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested Persons, including the following: (i) the Office of the United States Trustee; (ii) the Purchaser; (iii) the official committee of unsecured creditors appointed in these cases (the "Committee"); (iv) the administrative agent (the "Administrative Agent"), on behalf of itself and certain lenders (the "Pre-Petition Secured Lenders") under the Pre-Petition Credit Agreement (as such term is

defined in the Revised Sale Procedures Motion]; (v) all Persons known to have expressed an interest in the Purchased Assets; (vi) Persons that properly filed a notice of appearance and request for services of papers in these cases pursuant to Bankruptcy Rule 2002 as of the date of the notice of the Revised Sale Procedures Motion; (vii) all non-Debtor parties to any agreement being assigned or otherwise conveyed to the Purchaser pursuant to the APA (the "Counterparties"); (viii) the Certain Objectors; and (ix) all creditors of the Debtors.

E. **Sale Process Properly Conducted.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing; and (ii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the Servicing Business and conducted the sale process with respect thereto (the "Sale Process") in compliance with the Sale Procedures Order and in a manner that afforded a full, fair, and reasonable opportunity for any Person to make a higher or better offer to purchase the Purchased Assets. The Sale Process was conducted in compliance with the Sale Procedures Order, and in a non-collusive, fair, and good faith manner.

F. **Non-Collusive, Arm's Length, Good Faith Transactions.** The APA was negotiated, proposed and entered into by the Sellers and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions. Neither the Debtors, their insiders and Affiliates, nor the Purchaser or any of its insiders and Affiliates have engaged in any conduct that would cause or permit the APA or any part of the Transactions to be avoided under section 363(n) of the Bankruptcy Code. The Purchaser is a good faith purchaser under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.

G. **Highest or Best Offer; Best Interests of the Debtors' Estates.** The Debtors have demonstrated that the APA constitutes the highest or best offer for the Purchased Assets

and the Servicing Business. The Sale of the Servicing Business and the Purchased Assets

pursuant to the Sale Process and the Revised Sale Procedures, including without limitation the

timing with respect to the Sale and the consummation of the Transactions, is in the best interests

of the Debtors' estates for the benefit of all creditors and other parties in interest. Failure to sell

the Purchased Assets pursuant to the terms and provisions of the APA and this Order would

adversely affect the Debtors' estates.

　　　　H. **Fair and Adequate Consideration.** The consideration provided by the

Purchaser pursuant to the APA is fair and adequate and constitutes reasonably equivalent value

and fair consideration under the Bankruptcy Code and under the laws of the United States, any

state, territory, possession, thereof and the District of Columbia.

　　　　I. **Best Interests of the Debtors' Estates.** The Sellers have demonstrated that

consummation of the Transactions is an exercise of their sound business judgment and serves the

best interests of the Debtors, their creditors, their estates, and other parties in interest.

　　　　J. **Assets Being Transferred.** Each item of the Purchased Assets constitutes

alienable property of the estate of at least one Seller or one of its Affiliates, and the Sellers shall

have authority to transfer or cause to be transferred such Purchased Assets as provided in the

APA. The Servicing Agreements being transferred to the Purchaser pursuant to the APA consist

solely of enforceable contracts for providing servicing, subservicing or master servicing for

Mortgage Loans. As used in this Order, "Other Agreements" means any right, obligation,

representation, covenant or agreement (i) contained in an agreement identified on schedule 1.1(j)

to the APA that is not related to (a) collections with respect to, or the administration or servicing

or subservicing or master servicing of, or reporting in respect of, Mortgage Loans, (b) servicing

fees or ancillary income, (c) the disbursement of collections with respect to Mortgage Loans, (d)

payment of expense associated with the administration, servicing or subservicing or master servicing of Mortgage Loans (in each case, regardless of whether such Other Agreement arises from, or is memorialized in, the same writing as a Servicing Agreement), or (e) any obligation required to be made under a Servicing Agreement in the nature of an Advance or any obligation to pay compensating interest in respect of Mortgage Loans, or (ii) that relates to mortgage loan origination, mortgage loan sales or credit enhancement of securities backed by Mortgage Loans (and not credit enhancement relating to a specific Mortgage Loan) (regardless of whether such Other Agreement arises from, or is memorialized in, the same writing as a Servicing Agreement). The Servicing Agreements (a) do not include any Other Agreements, regardless of whether such Other Agreements arise from, or are memorialized in, the same writing as the Servicing Agreements, and (b) to the extent any Servicing Agreement arises from, or is memorialized in, one or more writings which include an Other Agreement, such Servicing Agreement is severable from any Other Agreements. The Purchaser has no Liability under any Other Agreement. Nothing in the APA or this Order shall have any effect on any Other Agreement or any claims related thereto against the Debtors, and the rights, if any, of all parties against the Debtors in respect of Other Agreements are reserved. The rights, if any, of parties against the Debtors in respect of Other Agreements are not the subject matter of the Sale Hearing are expressly reserved; provided, however, that no party to an Other Agreement may proceed against the Purchaser's Collateral. The Servicing Agreements identified on Exhibit B annexed hereto (collectively, the "Exhibit B Servicing Agreements") will be assumed and assigned or transferred by the Debtors to the Purchaser in their entirety. The Purchaser shall have no Liability under any Other Agreement. No delay or failure of performance under or in respect of any Other Agreement will (i) affect any right of the Purchaser, or any obligation of any other

party, under any Assumed Contract (including, without limitation, any Servicing Agreement) or (ii) permit, result in or give rise to any setoff, delay, deferral, defense, recoupment, Claim, counterclaim, default or other impairment of the right to receive any payment or otherwise to enforce any other right under any Assumed Contract (including, without limitation, any Servicing Agreement).

K. **Cure; Adequate Assurance**. The Debtors have (i) by establishing the Cure Escrow (as defined *infra*), cured or demonstrated their ability to cure any default with respect to any act or omission that occurred prior to the Initial Closing under any of the Assumed Contracts, within the meaning of section 365(b)(1)(A) of the Bankruptcy Code or section 363 of the Bankruptcy Code, and (ii) provided the Cure Escrow to compensate any party for actual pecuniary loss, if any, to such party resulting from a default arising from any acts or omissions that occurred prior to the Initial Closing under any of the Assumed Contracts, within the meaning of section 365(b)(1)(B) of the Bankruptcy Code or section 363 of the Bankruptcy Code. The Purchaser has demonstrated its ability to satisfy its obligation with respect to the Purchaser's Cure Amount (as defined *infra*) and provided adequate assurance of its future performance of and under the Assumed Contracts, within the meaning of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code or section 363 of the Bankruptcy Code.

L. **Purchaser is Not a Successor of Any Debtor.** No common identity of incorporators, directors, or stockholders exists between the Purchaser and any Debtor. The Purchaser is not purchasing all of the Sellers' assets and is not holding itself out to the public as a continuation of any Debtor. The Purchaser is not a successor of any Debtor.

M. **Necessity of Order; Necessity of Transactions.** The Purchaser would not have entered into the APA and would not consummate the Transactions without all of the relief

provided for in this Order (including the provisions that the transfer of the Purchased Assets to Purchaser be free and clear of all Interests and that such Interests will attach to certain proceeds of the Sale or be satisfied solely from the Cure Escrow and/or the Purchaser's Cure Amount, if any, as provided in this Order). The consummation of the Transactions pursuant to this Order and the APA is necessary for the Debtors to maximize the value of their estates for the benefit of all creditors and other parties in interest. The Purchaser has agreed to this Transaction with the intent of purchasing the Servicing Business and does not and would not agree to assume anything other than the Assumed Liabilities.

N. **Satisfaction of Bankruptcy Code Section 363(f)(1) through (5).** The Sellers may sell the Purchased Assets free and clear of all Interests because, in each case, one or more of the standards set forth in section 363(f)(1)–(5) of the Bankruptcy Code has been satisfied. Those Persons with Interests in the Purchased Assets who did not object, or who withdrew their objections, to the Sale are deemed to have consented pursuant to sections 363(f)(2) of the Bankruptcy Code. Those Persons with Interests in the Purchased Assets who did object fall within one or more of the other subsections of sections 363(f) of the Bankruptcy Code, and their Interests in the Purchased Assets are adequately protected by having their Interests, if any, attach to the proceeds of the Sale attributable to the property against or in which they assert an Interest (or to the extent applicable, having a right to assert a claim against the Cure Escrow). With respect to parties to Other Agreements who objected to the Sale, their rights, if any, against the Debtors (except with respect to the Purchaser's Collateral) with respect to such Other Agreements are reserved. The rights, if any, of parties against the Debtors (except with respect to the Purchaser's Collateral) in respect of Other Agreements are not the subject matter of the Sale Hearing and are expressly reserved.

O. **Satisfaction of Section 365.** Upon the establishment and funding of the Cure Escrow and subject to the Purchaser's obligation with respect to the payment of the Purchaser's Cure Amount, if any, (as such term is hereinafter defined), all of the requirements of sections 363, 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption and the assignment or transfer by the Debtors to the Purchaser of each of the Assumed Contracts. The amount of the Cure Escrow is sufficient to satisfy the requirements of sections 363 and 365(b) of the Bankruptcy Code with respect to the Sellers' Cure Amount.

P. **Certain Provisions Unenforceable.** Any provision in an Assumed Contract that prohibits, restricts or conditions the assignment or transfer or allows any Person to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment or transfer of such Assumed Contract, constitutes an anti-assignment provision. To the extent any Assumed Contract contains an anti-assignment provision, such provision shall be deemed null and void for purposes of the assumption and assignment or transfer by the Debtors to the Purchaser of the Assumed Contracts. Based on the terms and approval of the Supplemental Stipulation and Agreement Among the Debtors, AH Mortgage Acquisition Co., Inc. and Fannie Mae [Docket No. 1544] (the "Supplemental Stipulation"), any provision in an Assumed Contract that allows any Person to terminate any Assumed Contract due to the fact that one or more of the Sellers is not a qualified servicer under any FNMA guidelines shall be unenforceable against the Debtors or the Purchaser and of no force and effect with respect to the Debtors or the Purchaser. Except as provided herein, any anti-assignment provision in an Assumed Contract shall remain effective to the extent enforceable under, and in accordance with, applicable law in respect of a reassignment or retransfer of such Assumed Contract after the assignment thereof to Purchaser. Any cross-

default or similar provision (including, without limitation, any indemnity or any provision regarding the application of funds in a specified order (a "Waterfall Provision"), to the extent it relates to a contract that is not an Assumed Contract) in an Assumed Contract that alters or creates a right to alter rights or obligations of the Debtors, their successors or assigns (including the Purchaser) under an Assumed Contract as a result of an act or omission of the Debtors, their successors or assigns (other than the Purchaser) under or in respect of another contract shall be null and void and of no force and effect.

Q. **Applicability of Anti-Assignment Provisions to Certain Contracts.** Solely with respect to contracts that are not Purchased Assets, this Order is without prejudice to (but shall not expand) the right of non-Debtor parties to, or express third party beneficiaries of, such contracts (which are not Purchased Assets) to assert that any provision of such contract is not an anti-assignment provision.

R. **No Impairment of Non-Executory Contracts.** Notwithstanding anything else to the contrary in this Order, with respect to any Assumed Contract that is not an executory contract within the meaning of section 365 of the Bankruptcy Code, other than the Initial Cure Amount, if any, which will be satisfied solely from the Cure Escrow, there are (x) no material uncured defaults or breaches under such agreements that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the date of the entry of this Order, and (y) no Claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including without limitation, any right of recoupment) with respect to such Assumed Contract, that relate to any acts or omissions that occurred prior to the date of the entry of this Order. The amount of the Cure Escrow is sufficient to satisfy any Claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, without limitation, any right of recoupment) with respect to

Assumed Contracts, that relate to any acts or omissions that occurred prior to the Initial Closing. For the avoidance of doubt, (i) there are no defaults relating to acts or omissions that occurred prior to the Initial Closing other than those that will be satisfied from the Cure Escrow and (ii) no Other Agreement is an Assumed Contract.

S. **No Unfair Discrimination.** The Assumed Contracts being assigned or transferred to the Purchaser and the Assumed Liabilities are an integral part of the APA and, accordingly, the assumption and assignment or transfer of the Assumed Contracts to the Purchaser and the assumption by the Purchaser of the Assumed Liabilities is reasonable, enhances the value of the Sellers' estates and does not constitute unfair discrimination.

T. **Due Authorization; Valid Transfer.** The Sellers and the Debtors have full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and no further consents or approvals are required for the Sellers and the Debtors to consummate the Transactions, except as otherwise set forth in the APA. The transfer of the Purchased Assets to the Purchaser pursuant to the APA and this Order will be a legal, valid, binding, and effective transfer and will vest the Purchaser with all right, title, and interest of the Sellers and the Debtors (to the extent required by the APA) to the Purchased Assets.

U. **Personally Identifiable Information.** The Transactions pursuant to the APA and this Order are consistent with the provisions of section 363(b)(1) of the Bankruptcy Code. Additionally, (i) the privacy policy given by Debtors to homeowners does not prohibit the sale contemplated under the APA and (ii) the sale is consistent with the privacy policy given by the Debtors to homeowners.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

## Approval and Authorization

1.      The Motion is granted as set forth herein. All objections to the entry of this Order or the relief provided herein that have not been withdrawn, waived, rendered moot, or settled, and all reservations of rights included therein (to the extent such reservations are inconsistent with the relief ordered herein) are hereby overruled on their merits.

2.      Pursuant to sections 105(a), 363(b), 364, 365 and 503(b) of the Bankruptcy Code, the Transactions, the APA, the First Amendment to Asset Purchase Agreement annexed hereto as Exhibit A-2, the Dispute Escrow Agreement, substantially in the form annexed hereto as Exhibit A-3, and the Cure Escrow Agreement, substantially in the form annexed hereto as Exhibit A-4, are hereby approved. Distributions out of the Cure Escrow (as defined *infra*) shall be subject to procedures proposed by the Debtors (which shall be consistent with this Order) by motion on appropriate notice (including, without limitation, on notice to counsel to the Certain Objectors) and approved by further Order of the Court. From and after the date hereof, each Seller shall act in accordance with the terms of the APA and any other documents executed by the Sellers in connection with the Transactions, and is hereby authorized to take such steps as are necessary to comply with the provisions of the APA. The Sellers and the Debtors (to the extent required under the APA) are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement the Transactions, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and this Order. The Sellers and the Debtors (to the extent required under the APA) are authorized to take all further actions as may be reasonably

necessary for the purpose of assigning, transferring, granting, conveying, and conferring to the Purchaser or reducing to the Purchaser's possession the Purchased Assets, or as may be necessary or appropriate to the performance of their obligations as contemplated by the APA and this Order; provided, however, that these authorizations and directions shall not be construed as expanding or otherwise modifying the Sellers' obligations under the APA.

### Transfer of Assets Free of All Interests

3.     Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the Purchased Assets shall be transferred to the Purchaser as required under the APA, and such transfer shall be free and clear of all Interests arising prior to such transfer, with all such Interests to attach to the proceeds of the Sale ultimately attributable to the property against or in which the holder of an Interest claims or may claim an Interest, in the order of their priority, with the same validity, force, and effect which they now have, subject to any claims and defenses the Sellers may possess with respect thereto.

4.     Notwithstanding anything to the contrary in this Order or the APA, to the extent any of the Purchased Assets consist of an interest in a consumer credit transaction subject to the Truth in Lending Act or an interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations), the Purchaser shall remain subject to the same claims and defenses that are related to such consumer credit transaction or such consumer credit contract to the same extent as the Purchaser would be subject to such claims and defenses of the consumer if such interest had been purchased at a sale not under section 363 of the Bankruptcy Code, as provided for in section 363(o) of the Bankruptcy Code.

5.     Notwithstanding anything to the contrary in this Order or elsewhere, it shall be a condition to the Initial Closing that (x) the Net Proceeds (as defined in section

4.1(a)(v) of the APA) shall be paid at the Initial Closing to the Administrative Agent by depositing such Net Proceeds directly into an account specified by the Administrative Agent in writing, which Net Proceeds shall be paid and applied in the manner set forth in the Cash Collateral Order, regardless of whether the Termination Date (as defined in the Cash Collateral Order) has occurred, and (y) in no event shall such payment to the Administrative Agent be less than the Minimum Net Proceeds (as set forth in section 8.2(e) of the APA). Such condition may only be waived by the Administrative Agent, in its sole discretion, and any such waiver must be in writing and executed prior to the Initial Closing. Notwithstanding the foregoing and in accordance with the express terms of the Supplemental Stipulation, (i) the Purchaser shall directly pay Fannie Mae the amounts provided in Paragraph 1(c) of the Supplemental Stipulation from the Purchase Price at the Initial Closing; and (ii) the disposition of the Unresolved Amount (as defined in the Supplement Stipulation) shall be subject to the terms of the Supplemental Stipulation.

6.    Notwithstanding anything to the contrary in this Order or elsewhere, as a condition to the Initial Closing, the Initial Closing Date Mortgage Loan Schedule which the Sellers deliver to the Purchaser pursuant to the APA must include Mortgage Loans serviced pursuant to Servicing Agreements (which are not Disputed Servicing Agreements) with an unpaid principal balance of not less than $38 billion. Such condition may only be waived by the Purchaser, in its sole discretion, in accordance with the terms of the APA.

7.    In the event that the Debtors are required to return any overpayment of the Purchase Price in accordance with the provisions of Section 4.1(c) of the APA (the "Overpayment"), the Administrative Agent and the Pre-Petition Secured Lenders under the Pre-Petition Credit Agreement shall return an amount equal to such Overpayment within 10 business

days of receiving a written notice and certification by a senior officer of the Sellers that the Sellers are obligated, pursuant to section 4.1(c) of the APA, to repay that portion of the Purchase Price set forth in such certification.

        8.      The Dispute Escrow Agreement, substantially in the form annexed hereto as Exhibit A-3, and the Cure Escrow Agreement, substantially in the form annexed hereto as Exhibit A-4, and the identity of the Dispute Escrow Agent and the escrow agent under the Cure Escrow Agreement shall each be satisfactory to the Sellers, the Purchaser, Administrative Agent and the Committee.

        9.      All amounts required to be paid to the Administrative Agent pursuant to the APA (including, without limitation, all amounts required to be paid to the Administrative Agent under sections 4.3(b) and 4.4 of the APA) shall be paid by depositing such Net Proceeds directly into an account specified by the Administrative Agent in writing and shall be paid and applied in the manner set forth in the Cash Collateral Order, regardless of whether the Termination Date (as defined in the Cash Collateral Order) has occurred.

### Granting of Liens to Purchaser to Secure Sellers' Obligations

        10.      Upon the payment of the Purchase Price at the Initial Closing, and to secure the timely performance of the obligations of the Sellers to the Purchasers under the APA, the Purchaser shall have and is hereby granted a valid, binding, enforceable, and perfected (a) first priority security interest in and lien on all (i) the Purchased Assets, of every kind or type whatsoever, tangible, intangible, real, personal and mixed, whether now owned or existing or hereafter acquired or arising and regardless of where located, whether within the United States or in other locations, and all cash and cash equivalents earned in connection with the Servicing Business from and after the Initial Closing until the later of the Final Closing or the payment of

the Reconciliation Payment; and (ii) all proceeds, products, rents and profits, whether tangible or intangible, of any of the foregoing, including proceeds of insurance covering any or all of the foregoing, and any and all tangible or intangible property resulting from the sale, exchange, collection, or other disposition of any of the foregoing, or any portion thereof or interest therein, and the proceeds thereof (collectively, (i) and (ii), the "Purchaser's Collateral") that is not encumbered by a Permitted Lien; and (b) security interest in and lien on the Purchaser's Collateral that is immediately junior to any Permitted Lien. The liens arising pursuant to the foregoing sentence shall not be released until the earliest of (a) the Final Closing, (b) the Termination Date and (c) the Purchaser's written consent; except that with respect to any Disputed Servicing Agreement that is designated an Excluded Contract as provided in the APA, the liens arising pursuant to the foregoing sentence shall be automatically released upon such designation, and the Administrative Agent's lien and security interest in such Excluded Contract shall automatically reattach upon such designation. Notwithstanding the foregoing, if any Permitted Lien is voided, extinguished, or determined not to be valid, the liens granted to the Purchaser pursuant to this paragraph shall, notwithstanding anything to the contrary in section 551 of the Bankruptcy Code, be deemed first priority liens without any further action by the Debtors, the Purchaser, or the Court. For the avoidance of doubt, notwithstanding anything to the contrary herein, the Purchaser shall not have, and nothing herein shall be construed as granting the Purchaser a security interest in or lien on any (i) proceeds of the Sale, (ii) proceeds of Collateral (as defined in the Cash Collateral Order) received by the Sellers on or before the Initial Closing Date but not paid to the Administrative Agent as of the Initial Closing Date (which proceeds of Collateral shall be held in trust and segregated for the benefit of the Administrative Agent and paid to the Administrative Agent in the manner set forth in the Cash

Collateral Order, regardless of whether the Termination Date (as defined in the Cash Collateral Order) has occurred), (iii) assets of the Sellers that are not being purchased by the Purchaser pursuant to the APA (except as otherwise provided in clauses (a)(i) and (a)(ii) of the first sentence of this paragraph), or (iv) any other assets of the Debtors used in the Servicing Business not being purchased by the Purchaser, in accordance with the terms of the APA.

11.     Notwithstanding anything to the contrary in this Order or elsewhere, the Administrative Agent's security interests in and liens on all amounts in the Dispute Escrow, the Cure Escrow and the Deposit Escrow shall continue as provided in the Cash Collateral Order, subject to paragraph 2 of the Dispute Escrow Agreement, paragraph 2 of the Cure Escrow Agreement and paragraph 2 of the Deposit Escrow Agreement and regardless of whether the Termination Date (as defined in the Cash Collateral Order) has occurred.

12.     Except as provided herein, without the Purchaser's express written consent, (a) the above-described liens on and security interests granted to the Purchaser in the Purchaser's Collateral shall not (i) be subject to any lien or security interest that is avoided and preserved for the benefit of the Sellers' estates as a result of an avoidance action under Chapter 5 of the Bankruptcy Code, or (ii) be subordinated to or made pari passu with any other lien or security interest pursuant to section 364(d) or otherwise, and (b) no liens other than Permitted Liens shall be granted in or with respect to the Purchaser's Collateral.

13.     After the Initial Closing and prior to the earlier of the Final Closing and the Termination Date, the Debtors shall not in any way prime or otherwise adversely affect the liens in the Purchaser's Collateral granted under this Order by granting a subsequent lender or other Person a superior or pari passu lien or other Interest (other than Permitted Liens) pursuant to section 364(d) of the Bankruptcy Code, or otherwise.

14.     After the Initial Closing, this Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Purchaser's liens upon the Purchaser's Collateral, without the necessity of filing or recording any financing statement, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction, or the taking of any other action to validate or perfect such liens or security interests in the Purchaser's Collateral or to entitle the Purchaser to the priorities granted herein. The Purchaser shall not be required to file any financing statements, mortgages, notices of lien or similar instruments in any jurisdiction or filing office, or to take any other action in order to perfect the Purchaser's liens and security interests granted by or pursuant to this Order.

15.     Any provision of any lease or other license, contract, or other agreement that requires the consent or approval of one or more Persons, or requires the payment of any fees or obligations to any Person, in order for any of the Sellers to pledge, grant, or otherwise perfect the Purchaser's Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code and shall have no force and effect.

16.     After the Initial Closing, should the Purchaser, in its sole discretion (but not as a requirement hereunder), from time to time choose to file financing statements, mortgages, notices of lien, or similar instruments, or take any other action to validate or perfect any security interests or liens granted herein, the Debtors and their officers are hereby directed to execute any such documents or instruments as the Purchaser may reasonably request, and all such documents and instruments shall be deemed to have been filed or recorded at the time and on the date of the Initial Closing.

17.     After the Initial Closing, the Purchaser may, in its discretion, file a copy of this Order as a financing statement or mortgage with any recording officer designated to file

financing statements or with any registry of deeds or similar office in any jurisdiction in which the Purchaser's Collateral is located and, in such event, the applicable filing or recording officer or registrar is authorized to file or record such copy of this Order.

18.     After the Initial Closing and prior to the earlier of the Final Closing and the Termination Date, neither the Purchaser's Collateral nor the Purchaser shall be subject to surcharge, pursuant to sections 105(a) or 506(c) of the Bankruptcy Code or otherwise, by any of the Debtors or any other party, and no such consent shall be implied from any action, inaction, or acquiescence by the Purchaser, including but not limited to the continued funding of the Sellers' ongoing operations by the Purchaser, provided, however, that the Debtors may use the Purchaser's Collateral to pay the disbursements set forth in the Budget (as defined in the APA) that were properly and actually incurred by the Debtors prior to the Final Closing Date; provided further, however, that all rights of the Administrative Agent under the Cash Collateral Order are hereby preserved.

19.     In no event shall the Purchaser be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Purchaser's Collateral.

20.     The Purchaser's security interest in and lien on the Purchaser's Collateral may be assigned to one or more lenders with respect to the Financing without further order of the Court, and shall be fully enforceable by such Persons as if originally granted to them.

### Use of Purchaser's Cash Collateral

21.     Following the Initial Closing, without the Purchaser's written consent, none of the cash and cash equivalents included in the Purchaser's Collateral (the "Purchaser's Cash Collateral") shall be used to (a) pay administrative expenses payable under Sections 328, 330, and 331 of the Bankruptcy Code (or similar provisions) (collectively, "Professional Fees")

other than Professional Fees (x) (i) pursuant to the *Order Pursuant to Sections 105(a), 327, 328 and 330 of the Bankruptcy Code and Bankruptcy Rule 2014 Authorizing the Employment of Professionals Utilized in the Ordinary Course of the Debtors' Business Nunc Pro Tunc to Petition Date* [Docket No. 643] (the "OCP Order") or (ii) pursuant to another Order of the Court otherwise approving the retention of a professional to perform foreclosures for the Servicing Business or other servicing related services for the Servicing Business, as provided for in the Budget, or (y) allowed by Final Order of the Court with respect to matters relating exclusively to (i) the Business as it is operated after the Initial Closing or (ii) the Purchaser's Collateral as it exists after the Initial Closing, provided, that (A) the actions giving rise to such Professional Fees must accrue primarily in the ordinary course of the Servicing Business or for the benefit of the Purchaser, (B) the Purchaser shall receive at least 20 days prior notice of any deadline to object to the allowance or payment of such Professional Fees and shall be deemed to have standing to object to such allowance or payment, (C) all applications for allowance or payment of such Professional Fees shall separately identify all Professional Fees sought to be paid from the Purchaser's Collateral, and provide time records and other information reasonably requested by Purchaser to demonstrate that the payment of such fees is authorized pursuant to this paragraph, and (D) no Professional Fees, even if allowed by the Court, shall be paid from the Purchaser's Collateral except in accordance with the Budget; or (b) make any payments outside the Ordinary Course of Business, provided, however, that the Purchaser's Cash Collateral may be used to pay the fees payable pursuant to 28 U.S.C. § 1930(a)(6) to the Clerk of this Court owing by AHM Servicing and arising on and after the Initial Closing and prior to the earlier of the Final Closing or the Termination Date.

## Implementation

22.     Upon the Initial Closing, each Person is authorized and directed to execute such documents and take all other actions as provided in the APA as may be necessary to effectuate this Order and evidence the release of any Interests in the Purchased Assets as provided herein, as such Interests may have been recorded or may otherwise be evidenced. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including, without limitation, recordation of this Order.

23.     All Persons that are presently, or on the Final Closing Date (or such earlier date as permitted by the APA) may be, in possession of any of the Purchased Assets are hereby directed to surrender possession of each of the Purchased Assets to the Purchaser on the Final Closing Date (or such earlier date as permitted by the APA), unless otherwise agreed by the Purchaser.

24.     Any Servicing Agreement (excluding those identified on Exhibit B annexed hereto) memorialized in the same writing as an Other Agreement (such writing, a "Multi-Agreement Document") is hereby severed and deemed reformed to become a separate, independently enforceable agreement. Any provision of a Multi-Agreement Document that would allow any Person to terminate, recapture, impose any penalty, or modify any term or condition upon such reformation is void and of no force and effect. No delay or failure of performance under or in respect of any Other Agreement will (i) affect any right of the Purchaser, or any obligation of any other party, under any Assumed Contract (including, without limitation, any Servicing Agreement) or (ii) permit, result in or give rise to any setoff, delay, deferral, defense, recoupment, Claim, counterclaim, default or other impairment of the right to

receive any payment or otherwise enforce any right under any Assumed Contract (including, without limitation, any Servicing Agreement). To the extent any Multi-Agreement Document provides that a Person's consent is required for reformation, such consent requirement shall have no force and effect. Nothing in this Order or in such reformation shall affect any substantive provisions of an Other Agreement. Any indemnity, Waterfall Provision, or other provision, to the extent it relates to an Other Agreement, is not part of an Assumed Contract.

25.    This Order (a) shall be effective as a determination that, on the Final Closing Date (or such earlier date as permitted by the APA), all Interests of any kind or nature whatsoever existing with respect to the Purchased Assets (or such Assumed Contract, if applicable), or with respect to any act or omission that occurred prior to the Final Closing (or such earlier date as permitted by the APA) have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected, subject to the establishment and the funding of the Cure Escrow and the Purchaser's obligation to the Debtors with respect to the payment of the Purchaser's Cure Amount, if any, and (b) shall be binding upon and shall govern the acts of all Persons including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of such assets or other property interests.

26.    Upon the Final Closing (or such earlier date as permitted by the APA), this Order shall be construed and shall constitute for any and all purposes a full and complete general

assignment, conveyance, and transfer of the Sellers' and their Affiliates' interests in the

Purchased Assets (or such Assumed Contract, if applicable) and a bill of sale transferring good

and marketable title in the Purchased Assets (or such Assumed Contract, if applicable) to the

Purchaser. Each and every federal, state, and local governmental agency, quasi-agency, or

department is hereby directed to accept any and all documents and instruments necessary and

appropriate to consummate the Transactions.

      27.    Prior to the Final Closing, the APA and any related agreements,

documents, or other instruments may be modified, amended, or supplemented by the parties

thereto, in a writing signed by all parties and in accordance with the terms thereof, without

further order of the Court, provided, however, that (a) any such modification, amendment, or

supplement does not have a material adverse effect on the Debtors' estates; and (b) five (5)

business days prior written notice is given to the counsel to (i) the Administrative Agent, and (ii)

the Committee. Notice of any modification, amendment or supplement to the APA will be filed

by the Debtors with the Court.

### Provisions With Respect to Assumed Contracts

      28.    Each Assumed Contract shall be assumed and assigned or transferred by

the Debtors to, and remain in full force and effect for the benefit of, the Purchaser in accordance

with its terms, notwithstanding any provision in any such Assumed Contract that prohibits,

restricts, or conditions such assignment or transfer; provided, however, whether or not an

Assumed Contract is executory within the meaning of section 365 of the Bankruptcy Code, the

transfer and assignment or the assumption and the assignment shall be subject to the provisions

of this Order with respect to establishing the Cure Escrow for the payment of the Cure Amounts,

if any, to the Counterparties to such Assumed Contracts.

29.    Any provision in an Assumed Contract that prohibits, restricts or conditions the assignment or transfer or allows any Person to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment or transfer of such Assumed Contract, constitutes an anti-assignment provision. To the extent any Assumed Contract contains an anti-assignment provision, such provision shall be deemed null and void for purposes of the assumption and assignment or transfer by the Debtors to the Purchaser of the Assumed Contracts. Based on the terms and approval of the Supplemental Stipulation, any provision in an Assumed Contract that allows any Person to terminate any Assumed Contract due to the fact that one or more of the Sellers is not a qualified servicer under any FNMA guidelines shall be unenforceable against the Debtors or the Purchaser and of no force and effect. Except as provided herein, any anti-assignment provision in an Assumed Contract shall remain effective to the extent enforceable under, and in accordance with, applicable law in respect of a reassignment or retransfer of such Assumed Contract after the assignment thereof to Purchaser. Any cross-default or similar provision (including, without limitation, any indemnity or Waterfall Provision, to the extent it relates to a contract that is not an Assumed Contract) in an Assumed Contract that alters or creates a right to alter rights or obligations of the Debtors, their successors or assigns (including the Purchaser) under an Assumed Contract as a result of an act or omission of the Debtors, their successors or assigns (other than the Purchaser) under or in respect of another contract shall be null and void and of no force and effect.

30.    Pursuant to the terms of the APA, the Stipulated Servicing Agreements shall be (i) assumed by the Debtors and assigned to the Purchaser within the meaning of section 365 of the Bankruptcy Code as of the Final Closing (or earlier assignment or transfer, as the case

may be) to the extent such Servicing Contracts constitute Exhibit B Servicing Agreements or (ii) severed from the Other Agreements, if applicable, and such Stipulated Servicing Agreements shall be assumed by the Debtors and assigned to the Purchaser within the meaning of section 365 of the Bankruptcy Code.

31.     With respect to Servicing Agreements that require, with respect to assignment that (i) the successor have Fannie Mae or Freddie Mac approval to service mortgage loans, (ii) the successor have a fidelity bond and/or errors and omissions insurance consistent with such requirements as set forth in the Supplemental Stipulation, and/or (iii) rating agencies have issued letters that would satisfy the requirements in the Servicing Agreements for such letters from the rating agencies for the Purchaser to qualify as a successor servicer ((i) through (iii) collectively, the "Contractual Conditions"), the Debtors may assume and assign or transfer to the Purchaser once the Contractual Conditions, if any, in such Servicing Agreements have been satisfied or waived by the Counterparties.

32.     At the Initial Closing, $10,000,000 from the Purchase Price shall be placed into escrow (the "Cure Escrow") (pursuant to the Cure Escrow Agreement) in full satisfaction of the Sellers' Cure Amount.

33.     For each Assumed Contract, the cure amounts set forth on Schedule I to this Order and the liquidated cure amount, if any, filed by DB Structured Products, Inc., ZC Real Estate Tax Solutions Limited, Securities Connections, Inc. or a Certain Objector (as designated on Schedule I to this Order) within thirty (30) days of the entry of this Order (collectively, the "Initial Cure Amount") shall represent the maximum amounts owed or claimed to be owed with respect to defaults relating to such Assumed Contract related to acts or omissions that occurred prior to the date of the entry of this Order. To the extent DB Structured Products, Inc., ZC Real

Estate Tax Solutions Limited, Securities Connections, Inc. or a Certain Objector does not file a separate liquidated cure claim as provided above, the maximum amount owed to DB Structured Products, Inc., ZC Real Estate Tax Solutions Limited, Securities Connections, Inc. or a Certain Objector shall be the amount set forth on Schedule I to this Order.

           34.     No later than five (5) business days after the Initial Closing, the Debtors shall serve by overnight courier on each Counterparty, with a copy to counsel, if known, a schedule (the "Interim Period Cure Schedule") setting forth the proposed cure amount, if any, with respect to the Assumed Contract to which such Counterparty is a party related to acts or omissions that occurred between the date of this Order and the Initial Closing. Unless an objection to the proposed cure amount for an Assumed Contract set forth in the Interim Period Cure Schedule is filed and served by the Counterparty to such Assumed Contract within thirty (30) days from the date of service of the Interim Period Cure Schedule, such Counterparty will be deemed to have consented to the cure amount set forth in the Interim Period Cure Schedule for such Assumed Contract, and be forever barred from objecting thereto in the future with respect to any cure amounts or defaults arising from acts or omissions that occurred prior to the Initial Closing. The Debtors shall respond to reasonable requests for information from Counterparties for the sole purpose of calculating the Interim Cure Amount (as defined in the APA). Any Counterparty that intends to request that the Sellers pay a Transfer Cost Claim (as defined *infra*) with respect to any Assumed Contract to which it is the Counterparty pursuant to paragraph 39 of this Order must file and serve a good faith estimate of such reasonable and necessary costs within thirty (30) days of the entry of this Order. The amounts, if any, payable to such Counterparty pursuant to paragraph 39 shall not exceed such good faith estimate. Any Person who does not file and serve a good faith estimate of its Transfer Cost Claim within the

30-day period set forth above shall be forever barred from asserting a Transfer Cost Claim. All Setoff Claims (as defined *infra*) with respect to any Assumed Contract must be filed by the Counterparty to such Assumed Contract and served within thirty (30) days of the entry of this Order. Any Person who does not file and serve a Setoff Claim within such 30-day period shall be forever barred from asserting a Setoff Claim.

       35.     The Initial Cure Amount and the Interim Cure Amount (together with all amounts payable in respect of Transfer Cost Claims and Setoff Claims, the "Sellers' Cure Amount") shall constitute all amounts owed, if any, with respect to defaults relating to the Assumed Contracts relating to acts or omissions that occurred prior to the Initial Closing; provided, however, that the maximum amount of the Sellers' Cure Amount shall be $10,000,000; and provided, further, that all payments on account of and related to the Sellers' Cure Amount shall be limited to and satisfied from the Cure Escrow; and provided, further, that the Debtors, the Committee and the Administrative Agent shall have the right to object to any Sellers' Cure Amount, including, but not limited to, those asserted by any Certain Objector (as designated on Schedule I to this Order) and such Sellers' Cure Amount shall be deemed disputed and may only be allowed pursuant to further Order of the Court. In the event an objection to a Sellers' Cure Amount is filed by the Debtors, the Committee or the Administrative Agent, the procedures for resolving such Sellers' Cure Amount shall be established by a further Order of the Court. In the event the undisputed or allowed Sellers' Cure Amount with respect to all Assumed Contracts exceeds the funds available in the Cure Escrow for the payment thereof (which in no event shall exceed $10,000,000), the right of a Counterparty to an Assumed Contract to assert a general unsecured claim against the Debtors (but not against the Purchaser) with respect to the difference

between the pro rata Sellers' Cure Amount paid by the Debtors to such Counterparty and the allowed Sellers' Cure Amount with respect to such Assumed Contract is preserved.

36.    Subject to the APA, the Purchaser shall fund and be liable to the Debtors for all amounts owed, if any, with respect to defaults arising under the Assumed Contracts with respect to acts or omissions occurring during the period from the Initial Closing until the Final Closing (the "Purchaser's Cure Amount"). As between the Debtors and the Counterparties to the Assumed Contracts, pursuant to the requirements of section 365(b)(1) of the Bankruptcy Code or otherwise, the Debtors are and remain liable to pay or otherwise satisfy the Sellers' Cure Amount, if any, from the Cure Escrow, and the Purchaser's Cure Amount, if any, to Counterparties under Assumed Contracts; provided, however, all payments on account of and related to the Sellers' Cure Amount shall be limited to and satisfied from the Cure Escrow and upon the Debtors' receipt of the Purchaser's Cure Amount, the Debtors shall earmark and segregate such funds. Subject to further Order of the Court, the Debtors shall promptly pay any undisputed Purchaser's Cure Amount to the respective Counterparty. Notwithstanding the foregoing and for the avoidance of doubt, the Purchaser shall, in accordance with the terms of the APA, fund and be liable to the Debtors for the Purchaser's Cure Amount. No Person shall be entitled to exercise or assert any right of setoff, recoupment or any defense that arose from any act or omission that occurred prior to the Initial Closing, against any amounts due by such Person to (a) the Sellers on and after the Initial Closing but prior to the Final Closing, or (b) the Purchaser on and after the Initial Closing. All such rights of setoff, offset and/or recoupment, to the extent established pursuant to the terms of this Order (individually a "Setoff Claim" and collectively, the "Setoff Claims"), shall (i) constitute a Sellers' Cure Amount, (ii) be paid

exclusively from the funds in the Cure Escrow, and (iii) be governed by and resolved in accordance with the procedures set forth in paragraphs 33-35 of this Order.

37.    Cash shall be released from the Cure Escrow in accordance with the terms of the Cure Escrow Agreement, which are incorporated herein by reference.

38.    After the establishment and funding of the Cure Escrow in accordance with the terms of this Order and the payment to a Counterparty of its applicable portion of the Sellers' Cure Amount from the Cure Escrow in accordance with the terms of this Order and the Cure Escrow Agreement, Sellers shall have no further Liability to a Counterparty with respect to such Counterparty's Assumed Contract other than Sellers' obligation to perform such duties under such Assumed Contract that arise from acts or omissions that occurred after the Initial Closing but prior to the assignment or transfer of such Assumed Contract to the Purchaser; provided, however, that after the establishment of the Cure Escrow, no Liability for any Sellers' Cure Amount may be satisfied from the Purchased Assets or Purchaser's Collateral. Other than the Purchaser's obligation with respect to the payment of the applicable Purchaser's Cure Amount, if any, to the Debtors, the Purchaser shall have no Liability to a Counterparty with respect to such Counterparty's Assumed Contract other than the Purchaser's obligation to perform such duties under such Assumed Contract that arise from acts or omissions that occurred on and after the assignment or transfer of such Assumed Contract to the Purchaser.

39.    Except as otherwise provided in the APA, notwithstanding anything to the contrary herein, there shall be no rent accelerations, assignment fees, increases, or any other fees or costs charged to the Purchaser or the Sellers as a result of the assumption and assignment or transfer to the Purchaser of an Assumed Contract pursuant to the provisions of this Order, except for reasonable out of pocket costs and expenses incurred by a Counterparty as a result of such

assumption and assignment or transfer and chargeable under the Assumed Contracts (the "Transfer Costs"), which Transfer Costs, to the extent the Sellers are obligated to pay such Transfer Costs, shall be (a) to the extent allowed, paid solely out of the Cure Escrow, and (b) subject to challenge by the Debtors, the Administrative Agent and the Committee on any grounds whatsoever, including that such costs and expenses constitute an unenforceable restraint on assignment under applicable provisions of the Bankruptcy Code. To the extent a Counterparty asserts that the Sellers are liable for any unpaid Transfer Costs, such Counterparty must within ten (10) business days after the filing and service of a notice of the occurrence of the Final Closing, file and serve on the Debtors, the Committee and the Administrative Agent a claim for the alleged amount of such Transfer Costs, which amount shall not exceed the good faith estimate provided to the Debtors pursuant to paragraph 34 of this Order (a "Transfer Cost Claim"). Upon the filing and service of such Transfer Cost Claim, such Transfer Cost Claim shall become a Sellers' Cure Amount and shall be governed and resolved by the procedures set forth in paragraphs 33-35 of this Order. Except as otherwise provided in the APA, in no event shall the Purchaser have any liability for, and no Purchaser Collateral shall be used to pay, any such Transfer Costs.

40.    All defaults and all other obligations or Liabilities under any Assumed Contract arising or accruing prior to the date of the assignment or transfer to the Purchaser shall be deemed cured or satisfied upon payment by the Sellers of the Sellers' Cure Amount and the Purchaser's Cure Amount, and, without limiting the foregoing, no effect shall be given to any default of the type set forth in section 365(b)(2) of the Bankruptcy Code, or the type of default concerning an unexpired lease of real property described in section 365(b)(1) of the Bankruptcy

Code whether or not such Assumed Contract is an executory contract within the meaning of section 365 of the Bankruptcy Code.

41.     Following the assignment or transfer to the Purchaser as provided herein, the failure of the Sellers or the Purchaser to enforce at any time prior to the Final Closing Date (including a failure at any time prior to the Petition Date), one or more terms of any Assumed Contract shall not be a waiver of such terms or conditions, and shall not diminish (including by allegations with respect to prior course of conduct, prior dealings, or otherwise) the Purchaser's right as assignee (including, without limitation, as transferee) to enforce every term and condition of any Assumed Contract as written.

42.     Pursuant to section 365(k) of the Bankruptcy Code, the Sellers shall be relieved from any further liability with respect to an Assumed Contracts after an assignment to the Purchaser pursuant to the provisions hereof.

43.     For the avoidance of doubt, so long as $10,000,000 shall have been placed into the Cure Escrow as provided in Paragraph 32 above, then the Assumed Contracts may be assumed and assigned or transferred by the Debtors to the Purchaser in accordance with the terms of the APA (subject to the Purchaser's obligation to the Debtors with respect to the Purchaser's Cure Amount) whether or not any funds in the Cure Escrow shall have been paid to the Counterparties in respect of the Sellers' Cure Amount and whether or not any funds shall have been paid to the Counterparties in respect of the Purchaser's Cure Amounts at or prior to, or in connection with, such assignment and assumption or transfer; provided, however, that the Purchaser shall be liable to the Debtors for the Purchaser's Cure Amount. Upon the Debtors' receipt of the Purchaser's Cure Amount, if any, the Debtors shall earmark and segregate such

funds. Subject to further Order of the Court, the Debtors shall promptly pay any undisputed Purchaser's Cure Amount to the respective Counterparty

44.    The Assumed Contracts shall be treated in accordance with this Order, regardless of whether such Assumed Contracts are "assumed and assigned" or instead are "transferred" to the Purchaser.

### Injunction

45.    After the Initial Closing, except for Persons entitled to enforce Assumed Liabilities and Permitted Liens, all Persons (including, but not limited to, the Debtors and/or their respective successors (including any trustee), creditors, employees, unions, former employees and shareholders, and administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) holding Interests against or in the Purchased Assets or Purchaser's Collateral or against the Debtors in respect of the Purchased Assets or the Purchaser's Collateral of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing any Interests of any kind or nature whatsoever against the Purchaser or any Affiliate of the Purchaser or any of their respective property, successors and assigns, or the Purchased Assets or Purchaser's Collateral, as an alleged successor or on any other grounds, it being understood that nothing herein shall affect the rights of the Administrative Agent with respect to (i) the payment of the proceeds of the Sale as required in Paragraph 9 of this Order, (ii) proceeds of Collateral (as such term is defined in the Cash Collateral Order), if any, received by and in possession of the Sellers on or before the Initial Closing Date but not paid to the Administrative Agent as of the Initial Closing Date

(which proceeds of such Collateral shall be held in trust and segregated for the benefit of the Administrative Agent and paid to the Administrative Agent in the manner set forth in the Cash Collateral Order, regardless of whether the Termination Date (as defined in the Cash Collateral Order) has occurred), or (iii) assets of the Debtors that are not Purchased Assets or Purchaser's Collateral; provided, however, that the foregoing shall not limit any rights of the Debtors against the Purchaser (or any Affiliate of the Purchaser or any of their respective property, successors and assigns, or the Purchased Assets or Purchaser's Collateral) under the APA or any Ancillary Agreement. Any exercise or assertion of any right of setoff, recoupment or any defense that arose from any act or omission that occurred prior to the Initial Closing, against any amounts due by such Person to (a) the Sellers on and after the Initial Closing but prior to the Final Closing, or (b) the Purchaser on and after the Initial Closing is hereby prohibited and enjoined.

46.    Upon the establishment and funding of the Cure Escrow and subject to the Purchaser's obligation with respect to the payment of the Purchaser's Cure Amount, if any, to the Debtors, and the assignment or transfer to the Purchaser as set forth herein, each Counterparty is hereby forever barred, estopped, and permanently enjoined from asserting against (a) the Purchased Assets or the Purchaser's Collateral, the Purchaser, its Affiliates or their respective property any setoff, defense, recoupment, Claim, counterclaim or default asserted or assertable against, or otherwise delay, defer or impair any rights of the Purchaser with respect to the Purchased Assets with respect to an act or omission of, the Debtors, or (b) the Debtors, the Purchased Assets or the Purchaser's Collateral, the Purchaser or its Affiliates any assignment fee, default, breach or Claim, or pecuniary loss or condition to assignment or transfer, arising under or related to an Assumed Contract existing as of the Final Closing (or earlier assignment or transfer, as the case may be), or arising by reason of the Final Closing (or

earlier assignment or transfer, as the case may be), provided, however, that nothing in this Order shall affect any Person's rights, if any, against the Debtors (except with respect to the Purchaser's Collateral) in respect of the Other Agreements. Nothing in this paragraph shall affect a party's right to assert any setoff, defense, recoupment, Claim, counterclaim or default against the Purchaser arising under Assumed Contracts (including, without limitation, the Servicing Agreements) that arise, if any, from an act or omission of the Purchaser on or subsequent to a transfer of such Assumed Contract to the Purchaser; provided, however, no delay or failure of performance under or in respect of any Other Agreement will (i) affect any right of the Purchaser, or any obligation of any other party, under any Assumed Contract (including, without limitation, any Servicing Agreement) or (ii) permit, result in or give rise to any setoff, delay, deferral, defense, recoupment, Claim, counterclaim, default or other impairment of the right to receive any payment or otherwise to enforce any other rights under any Assumed Contract (including, without limitation, any Servicing Agreement).

47.    Except to the extent asserted against the Cure Escrow, no Person shall assert, and the Purchaser, the Purchased Assets, and Purchaser's Collateral shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including, without limitation, any right of recoupment), Liabilities, Interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Purchaser or the Debtors, or any obligation of any other party, under or with respect to, any Purchased Assets (including, without limitation, an Assumed Contract), with respect to any act or omission that occurred prior to the Initial Closing or with respect to any Other Agreement or any obligation of Debtors that is not an Assumed Liability.

### Exculpation of Liability

48.     Except for the Purchaser's obligations arising under the APA and this

Order and the Assumed Liabilities expressly assumed by the Purchaser pursuant to the APA, the

transfer of the Purchased Assets to the Purchaser (including the assignment or transfer to the

Purchaser of the Assumed Contracts) will not subject the Purchaser or any of its Affiliates to any

Liability arising, or with respect to acts or omissions occurring, prior to the Final Closing under

the laws of the United States, any state, territory, or possession thereof, and the District of

Columbia, based, in whole or in part, directly or indirectly, in any theory of law or equity,

including, without limitation, any theory of successor or transferee liability.  Without limiting the

generality of the foregoing, (a) the Purchaser shall not be liable for any Interests in or against the

Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor or

vicarious liability of any kind or character whether known or unknown as of the Final Closing,

now existing or hereafter arising, whether fixed or contingent, with respect to the Debtors or any

obligations of the Debtors hereunder or under the APA arising prior to the Final Closing,

including, but not limited to, liabilities (i) on account of any taxes arising, accruing, or payable

under, out of, in connection with, or in any way relating to the Debtors' operations prior to the

Final Closing, and (ii) based on any theory of antitrust, environmental, successor, or transferee

liability, labor law, de facto merger or substantial continuity; (b) (i) except as expressly provided

in the APA, Purchaser shall have no obligation to pay wages, bonuses, severance pay, benefits

(including, without limitation, unemployment benefits and contributions or payments on account

of any under-funding with respect to any and all pension plans), or any other payment to

employees of the Sellers, (ii) except as expressly provided in the APA, Purchaser shall have no

obligation for the cessation of any of the Sellers' operations, dismissal by the Sellers of

employees, or termination by the Sellers of employment or labor agreements, and (iii) except as expressly provided in the APA, (A) Purchaser shall have no liability with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan, practice, or program to which any of the Sellers are a party (including, without limitation, arising from or related to the rejection or termination of any such agreement), (B) Purchaser shall in no way be deemed a party to or assignee of any such agreement, practice, or program, (C) no employee of Purchaser shall be deemed in any way covered by or a party to any such agreement, practice, or program, and (D) all parties to any such agreement, practice, or program are hereby enjoined from asserting against Purchaser any and all Claims arising from or relating thereto or interfering with the Purchaser's title to or use and enjoyment of the Purchased Assets; (c) under no circumstances shall the Purchaser be deemed a successor of or to the Sellers for any Interest against or in the Sellers or the Purchased Assets of any kind or nature whatsoever; and (d) the Purchaser shall have no Liability under any Other Agreement.

### Superpriority Status for Claims Under the APA Against Sellers

49.     As protection to the Purchaser following the payment of the Purchase Price at the Initial Closing, any Reconciliation Payment payable to Purchaser pursuant to Section 6.2(b) or 6.2(e) of the APA shall have the status of an allowed superpriority administrative expense claim against the Sellers with priority over all administrative expense claims and unsecured claims against the Sellers, including any adequate protection-related claims and any administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, to the extent permitted by applicable law, provided, however, that such superpriority claim shall be immediately junior in right of payment to claims arising under the DIP Financing Agreement and

the Order approving such Agreement; and provided further, that notwithstanding the foregoing, any Reconciliation Payment payable by the Sellers to the Purchaser shall be payable exclusively out of cash arising out of the operation of the Servicing Business after the Initial Closing and through the Final Closing.

50.    Without limiting, modifying, or reducing the foregoing, the payment of the superpriority claim, if any, described in the foregoing paragraph shall be in cash at the time and manner as provided in the APA, without further order of the Court. The obligation to pay any such amount in full in cash when due shall not be discharged, modified, enjoined, or otherwise affected by any plan of reorganization or liquidation for any Seller, or the conversion of any Seller's case to a case under chapter 7 of the Bankruptcy Code.

### Section 363(m) Protections

51.    The Purchaser is hereby granted all of the protections afforded by section 363(m) of the Bankruptcy Code.

### Binding Effect

52.    The terms and provisions of the APA and this Order shall be binding in all respects upon, and shall inure to the benefit of, each of the Debtors, their estates, and their creditors, shareholders and other parties in interest, the Purchaser, and its affiliates, successors and assigns, and shall be binding in all respects upon any affected third parties including, but not limited to, all Counterparties and Persons asserting Interests in the Purchased Assets, in all cases notwithstanding any subsequent appointment of any trustee(s) or similar party under any chapter of the Bankruptcy Code, as to which trustee(s) or similar party such terms and provisions likewise shall be binding.

53.    No obligation of the Debtors under the APA or this Order, nor rights or claims (as such term is defined in section 101 of the Bankruptcy Code) of the Purchaser arising

under or relating to the APA or this Order, shall be discharged, modified, enjoined, or otherwise affected by any plan confirmed in these cases (a "Plan") for any Debtor, or any liquidation of any Debtor pursuant to chapter 7 of the Bankruptcy Code.

54.     Nothing contained in any Plan or any order of this Court confirming a Plan or issuing any other order in these cases (including any order entered after any conversion of any case to one under chapter 7 of the Bankruptcy Code) (a "Subsequent Order") shall alter, conflict with or derogate from the provisions of the APA or this Order. Notwithstanding any language in any Plan or Subsequent Order, no such Plan or Subsequent Order will be construed to alter, conflict with, or derogate from the provisions of the APA or this Order.

55.     The Debtors' chapter 11 cases shall not be closed, and a final decree shall not be issued, prior to the earlier of (a) September 30, 2008 or (b) the date that is 60 days after the earlier of the Final Closing or the Termination Date.

## Miscellaneous Provisions

56.     The objections filed by Fannie Mae [Docket Nos. 716, 717, and 1043] to the Sale are resolved based upon the Debtors' and the Purchaser's entry into the Supplemental Stipulation. In the event of a conflict between the express terms of the Stipulation (as defined in the Supplemental Stipulation) as modified by the Supplemental Stipulation and the terms of this Order or APA, the Stipulation as modified by the Supplemental Stipulation shall govern. The Mortgage Selling and Servicing Contracts between Fannie Mae and the Debtors are not "Assumed Contracts" or "Servicing Agreements"; instead the transfer of the Fannie Mae servicing rights to the Purchaser shall be governed by the terms of the Stipulation as modified by the Supplemental Stipulation.

57.     Except for the obligations hereunder or under an Assumed Contract of a Counterparty with respect to an Assumed Contract, the entry of this Order shall not subject a trustee, indenture trustee, master servicer, securities administrator, back-up servicer or financial institution serving in a similar capacity who is a party to, or express third party beneficiaries of, an Assumed Contract or any of their employees or agents to any liability of any kind or character whether known or unknown arising under the laws of the United States, any state, territory, or possession thereof, and the District of Columbia, based in whole or in part, directly or indirectly, in any theory of law or equity, including, without limitation, any breach of duty by reason of entry of this Order and the effect or any provision hereof; provided, however, that the foregoing shall not limit any rights of the Debtors or the Purchaser.

58.     The Purchaser shall provide the Debtors with monthly written reports regarding the status of the Purchaser's state licensing progress, progress with respect to obtaining approval from Fannie Mae, and progress with respect to obtaining letters from rating agencies, with the first such report to be delivered within one calendar month after the Initial Closing Date and such obligation to terminate upon the earlier of (i) the Final Closing Date and (ii) the Purchaser having obtained all the necessary state licenses, Fannie Mae approval, and no downgrade letters from the applicable rating agencies (the "Monthly Status Reports"). The Monthly Status Reports shall include a certification by the Purchaser to the effect that the information provided in such report is accurate and that the Purchaser continues to proceed in a commercially reasonable manner to obtain any remaining necessary state licenses. Upon written request to counsel for the Debtors, the Debtors shall provide the Monthly Status Reports to a trustee, indenture trustee, master servicer, securities administrator, back-up servicer or financial institution serving in a similar capacity that is party to an Assumed Contract.

59. The Debtors and Purchaser acknowledge that Security Connections, Inc. ("SCI") has asserted that it has recouped $140,344.14 (the "Asserted $140,344.14 Recoupment") due for Services (as defined in SCI's objection to the Motion [Docket No. 1046]) against pre-paid Third Party Expenses (as defined in the SCI's objection to the sale Motion). Notwithstanding anything else to the contrary in this Order (i) the sale pursuant to the APA of the Debtors' claim, if any, to pre-paid Third Party Expenses shall be subject to, and not be free and clear of, SCI's Asserted $140,344.14 Recoupment, if valid; and (ii) Debtors will pay, and continue to pay, SCI's post-petition invoices for post-petition Services and pre-paid Third Party Expenses when due in the ordinary course, including, but not limited to, SCI's invoices to be issued for Services incurred in October 2007 and for estimated Third Party Expense for November; provided, however, that, prior to the Initial Closing, the Debtors shall not be required to advance Third Party Expenses to the extent such advance would cause the undistributed balance of pre-paid Third Party Expense as of the Initial Closing (and after the Asserted $140,344.14 Recoupment) to be more than $220,000, and provided further, however, that, from and after the Initial Closing, the Debtors shall not be required to advance Third Party Expenses to the extent such advance would cause the undistributed balance of pre-paid Third Party Expense to be more than $130,000. If SCI's Asserted $140,344.14 Recoupment is challenged (provided, however, that neither the Debtors not the Purchaser shall challenge such recoupment if, as of the Initial Closing, the undistributed balance of the pre-paid Third-Party Expenses is, after such recoupment, not less than $220,000 and Debtors have complied with this paragraph) and such challenge is successful, SCI shall have an allowed setoff claim pursuant to section 553 of the Bankruptcy Code of $140,344.14 against the Cure Escrow.

60.     Solely with respect to contracts that are not Purchased Assets, this Order is without prejudice to (but shall not expand) the right of non-Debtor parties to, or express third party beneficiaries of, such contracts (which are not Purchased Assets) to assert that any provision of such contract is not an anti-assignment provision.

61.     The provisions of the APA and this Order may be specifically enforced in accordance with the APA notwithstanding the appointment of any chapter 7 or chapter 11 trustee.

62.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

63.     Following the Initial Closing, the automatic stay in effect in the Debtors' cases shall remain in effect with respect to the Purchased Assets until the earlier of (a) the termination of the APA pursuant to its terms, or (b) the Final Closing.

64.     The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

65.     To the extent of any conflict between or among the express terms or provisions of the APA, the Dispute Escrow Agreement, the Cure Escrow Agreement and this Order, the terms and provisions of this Order shall govern.

66.     All of the provisions of this Order are non-severable and mutually dependent.

67.     The paragraph and other headings used in this Order are for ease of reference only, and shall not have any substantive or interpretive import.

68.    This Order may only be modified upon notice and pursuant to a further Order of this Court, provided that if such modification is adverse to Purchaser, such modification shall be subject to the approval of Purchaser, in its sole discretion.

### Final and Appealable Order

69.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

### Retention of Jurisdiction

70.    This Court shall retain jurisdiction to (a) interpret, construe, and enforce the provisions of the APA (and all related documents, amendments, waivers, consents, or other agreements in connection therewith) and this Order in all respects, and (b) hear and determine any matter or dispute arising from the implementation of this Order.

Dated: October 30, 2007
      Wilmington, Delaware

Christopher S. Sontchi
UNITED STATES BANKRUPTCY JUDGE