# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------- x   Chapter 11
In re:                                                   :
                                                         :   Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                    :
a Delaware corporation, et al.,¹                         :   Jointly Administered
                                                         :    Ref/ Docket No. 10184, 10183 & 10182
                                          Debtors.       :
                                                         :
------------------------------------------------------- x
```

## Claimant's Post Trial Brief Administrative Claims Numbered including Related Objections 9692, 9693, 10870, 10875, 10887, 10148, and 10182

1.

Comes now Claimant, Hussain Kareem, enters his **Post Trial Brief for Administrative Claims** for the trial held before this Honorable Court on November 18, 2011.  Throughout this brief, the Claimant shall quote excerpts from the transcript made by the court reporter to establish verbal testimonies along with the exhibits which supports his assertions entered into records that are a part of the Chapter 11 Proceedings.   The Claimant asserts his positions on outstanding issues to be determined as follows:

---

¹    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

2.

## Relevant Factual Background

A. In May 2006, Mr. Kareem applied for a cash-out refinance on his home through American Home Mortgage Corp. (d/b/a American Brokers Conduit a wholly owned subsidiary of American Home Mortgage Holdings, Inc., hereinafter referred to as AHMH)[2].

B. On July 7, 2006, Mr. Kareem closed on his loan (the "Kareem Loan") in the amount of $159,200.00. The Kareem Loan was secured by the property located at 2197 Carlysle Creek Drive, Lawrenceville, Georgia, 30044 (the "Kareem Property"). AHM SV, a subsidiary of AHMH, was the original loan servicer of the Kareem Loan [account number 001350490].

C. On July 28, 2006, the Kareem Loan was deposited into a securitization trust entitled AHMA 2006-3 [(the " Mortgage-Backed-Security Trust" (MBST)].[3] AHM SV was retained as the sub-servicer for the MBST.

---

[2] The loan transaction was known as a "limited cash-out" that less than $2500.00 was taken out of the equity of his home. The primarily purpose of the transaction was for rate and terms. "American Business Conduit" was a brand name used by American Home Mortgage Corp. to originate the loan. Later, AHMC acted as the Sponsor and Depositor of the MBST under a planned Prospectus and Pooling and Servicing Agreement (See Exhibit 100 Securitization Chart). This trust no longer exists and failed to be become a statutory entity.

[3] During a U.S. HUD, Department of RESPA investigation for transfer of notice violation, American Home Mortgage Servicing',Inc. "the New Loan Servicer" revealed that the Mortgage-Backed -Security Trust was AHM 2006-3. This has been confirmed by a Securitization audit through Bloomberg and the Security and Exchange Commission database (see Exhibits 100- 100 D). The facts are materially significant due to binding contract covenants under Section 20 of the Security Deed (See Exhibit B) and by Federal law which provided that it is mandatory for the Lender to notify Mr. Kareem within 30 days. Under 12 USC §2605 (a-c) and under 24 C.F.R.3500.21(d) the transfer of Master Servicer should have been made. The underlying Note has an electronic CUSIP No. 0660265UAA8. Therefore the instrument was changed into a shareable stock certificate undisclosed to the Mortgagor.

D. On or about September 7, 2007, AHMH and companies entered into Chapter 11 Dissolution and insolvency proceedings in the U.S. Bankruptcy Court for the District of Delaware. On October 30, 2007, the Bankruptcy Court entered an order (the "Servicing Sale Order" under the Asset Purchase Agreement (APA) approving the Debtors' sale (the "Sale") of the mortgage servicing business to AH Mortgage Acquisition Co.[4], Inc. (now known as American Home Mortgage Servicing, Inc., "AHMSI") [D.I. 1711]. Following the final closing of the Sale on April 11, 2008, the AHMSI, the purchaser, started servicing Kareem Loan under the APA. The knowledge of the APA sale was confirmed at trial[5].

E. In January 2011, Mr. Kareem filed two (2) separate proof of claim in these chapter 11 cases, which are identified by the claims agent as claims 10870 and 10875. Subsequently, Kurtzman Carson Consultants ("KCC") (not the claims agent retained in these cases) forwarded a proof of claim it received from Mr. Kareem to Epiq

---

[4] AH Mortgage Acquisition Co., the purchaser of asset from the Bankruptcy Court, conveniently changed or adopted the "New" name of AHMSI, but its registration is in California. This helped formulate a deceptive plan or aided in the confusion as to the real origin for AHMSI and their rights to service Mr. Kareem's loan. There existed the pretext that AHMSI was the original AHM SV the subsidiary of AHMH undergoing bankruptcy proceedings. This issue was brought up in the U.S. District Court for the Southern District of Texas, in which the Honorable Judge Wurlein (see Doc. No. 13 Order in Case No3:10-CV-00762-B) who sought clarity before moving to transfer the case. Upon confirmation that AHMSI was a separate company, the lawsuit continued against AHMSI and MERS by transferring the case into the Northern District of Texas. Mr. Kareem had never received a notice that AHMH had entered into a judicial proceedings as required under Section 22 of the Security Instrument.
[5] See Exhibit 200 Asset Purchase Agreement Schedule (excerpted)

Solutions, which was provided a claims number of 10887 (together

with claims numbered 10870 and 10875, the "Kareem Claims").

Each of the Kareem Claims asserts a secured claim in the amount

of $200,000 and an unsecured claim in the amount of $50,000

against AHM Holdings.[6]

F.   On January 20, 2011, Mr. Kareem filed his *Motion for Entry of*

*Administrative Claim with Brief in Support* [D.I. 9692] (the "First

Administrative Claim Motion") requesting allowance of an

administrative claim.  In the Kareem Motion, Mr. Kareem requests

allowance of an administrative claim in the amount of $19,175.71,

exclusive of interest, but he did not waive his right to interests. The

19, 175.71 represented the amount of known payments that he

made to others, in which he questioned the legitimacy of AHMSI's

servicing rights.

G.   On or about August 12, 2011, Mr. Kareem filed his *Motion for*

*Judgment as a Matter of Law of Administrative Claim Entered* [D.I.

10148] (the "Second Administrative Claim Motion, and together with

the First Administrative Claim Motion, the "Kareem Motions").  The

---

[6] Mr. Kareem duly filed a notice into the court with an Exhibit showing U. S. Postal Service Delivering delays. That the winter storm in Delaware created delays in delivering the first notice. How documents were forwarded to Kurtzman Carson Consultants ("KCC") is unknown. The Certificate of Service on the Documents do not support that Mr. Kareem sent anything to KCC. Exhibits show that both claims were the post marked dates prior to January 11th, 2011. The second Claims was sent as an attempt to confirm that the claim had been received and to get an acknowledgement that the documents were not mishandled due to the bar date of January 2, 2011.

claims arise from the contract breaches associated with actions done

by AHMH.


3.

### Proceedings at Trial

The above factual background has been confirmed during the course

of conversations by the law firm of YOUNG CONAWAY STARGATT &

TAYLOR, LLP, counsel for The Plan Trustee and at trial. No objections

were raised to the validity surrounding the factual information formulating

the controversies by the impairment of the instrument into the MBST by the

hands of AHMH.  The extraneous activities affected Mr. Kareem's

mortgage  accumulation of failures included  failure to disclose the Loan

Servicer  under the RESPA Servicing Disclosure  and under RESPA 12 USC

2605 (a-c) , contract breaches under express covenant terms of the Note and

Security Instrument[7].   AHMH and its conglomerate of companies,

hereinafter are referred to as, "AHMH and Companies" were responsible

and remains responsible to MR. Kareem's mortgage.

In fact, the information about the MBST was first thought to be

AHWL- 2006-3. Testimonies at trial were provided by Ms. Eileen Wanerka,

---

[7] See Exhibit D3- RESPA Servicing Disclosure. AHMH and companies did not complete their disclosure to Mr. Kareem about who would retain the servicing rights to his loan. The "open-ended" question with respect to servicing Mr. Kareem's loan remained unfulfilled. The APA agreement did not resolve the servicing right issues as witnessed by Exhibit 200 Contracts Not Provided by Seller affecting the securitization servicing agreements. The Plan Trustee offered no objections when this fact was raised at trial on page 34 lines (1-24), page 35 lines (17-25) page 36 lines (1-13) and page 39 lines (1-23).

the AHM Liquidating Trust Director of Claims Administration, and a former

employee of "AHMH and companies", corrected and confirmed that the

proper named trust for the securitization of the Real Estate Mortgage

Investment Conduit was AHMA 2006-3[8]. Whereas, the MBST was one of

the investment offerings that "AHMH and companies" actively set up and

deposited their own pool of mortgages into it. The Prospectus clearly

defines that "AHMH and companies" made themselves obligators for the

asset recovery and significant performances to help to induce the investors to

participate in their MBST offerings[9]. Tax credits were used to offset any

losses passed through to the investors, therefore, mitigating any damages by

any individual mortgage. The AHMA 2006-3 pool is known to have

contained Mr. Kareem's loan and confirmed by Bloomberg financial data[10].

3.

Significantly, the above admission of the factual background comes

with the knowledge that the *Plan Trustee* had full awareness that Mr.

Kareem's had action to bring about restitution, offset or set-off  against

third parties, namely Mortgage Electronics Registration Systems, Inc.

---

[8] See Transcript page 127 lines 15-24 for Ms. Wanerka's testimony.
[9] Affiliated parties to AHMA 2006-3 Trust were Deutsche Bank National Trust Co., who served as the Underwriter and Custodian, while Deutsche Bank AG served as the Swap Provider under the MBST Prospectus and Pooling and Servicing Agreement (PSA). Wells Fargo Bank, N.A. served as the Master Servicer, Citibank, N.A. served as the Trustee, under the said Prospectus and PSA registered through the Security and Exchange Commission.(See Exhibit100 and Prospectus data  pages1, 6, 20, and 21). See Exhibit "100" on page 21 of 375 entered  found under 10248 Section 37  and attached hereto.
[10] Also see Exhibit 100 B Bloomberg screen shot375 entered  found under 10248 Section 37  and attached hereto, containing Mr. Kareem's loan number, loan amount and zip code.

7

(MERS) and AHMSI. He had commenced action in the U.S. District for the

Northern District of Texas, Case No. 3:10-CV-00762 after receiving a Right

to Sue Letter from the Office of RESPA due to a Transfer of Loan Service

Violation ( see Exhibit D[11]).  Additionally, *The Plan Trustee* and Counsel

had full awareness of the occurrence of the action by the Department of

H.U.D. Office of RESPA investigation on of loan servicing violation Under

12 RESPA 2605 et seq.  and the subsequent litigation in the Northern

District Court.  At no time did AHMH, *the Plan Trustee*, or counsel enter

into the action to clarify any misunderstanding or to explain relevant

contractual rights or to explain the APA which could have settled the issues

being contested[12]. Their collective action can only be described as aiding and

abetting in the confusion or harm that Mr. Kareem was experiencing.

Their collective action can only be described as aiding and abetting in the

confusion or the intent to harm Mr. Kareem by suppressing vital

information.  If AHMSI and AHMH had legitimate business reasons, in

which Mr. Kareem believes they do not have such bona fide rights to their

conduct, then both of the companies may at least be guilty gross negligence

for suppressing the facts surrounding an asset belonging to Mr. Kareem.

---

[11] see Exhibit "D:  HUD Right to Sue Letter Dated September 22, 2009 entered  found under 10248 Section 37  and attached hereto.

[12] Exhibit 200 RESPA Servicing Disclosure under Servicing Transfer Estimates Section 1. shows that AHMH declared we are able to service your loan and we haven't decided whether to service your loan were boxes checked. Clearly, the RESPA disclosure was meant for AHMH to abide by the contractual and legal requirement to inform Mr. Kareem about any loan servicer affecting his loan. This is inferred to apply to the knowledge about the  Master Loan Servicer, Wells Fargo Bank, who took over the Loan Servicer role as of  July 27, 2006. This was a failure under the contract *ab initio.*

4.

Counsel for the *Plan Trustee*, provided information at trial and by way of cross examinations of Ms. Eileen Wanerka, the expert witness, in which the preponderance of evidence show, if taken as true, validates the Claims brought into this proceeding. Therefore, Claimant lists and reasserts his Counts of Damages as enumerated below:

1. **Count 1- Breach of Contract-**

   a. Failure to disclose when AHMH had entered into judicial insolvency proceedings affecting, among other things, the Loan Servicing rights. AHMH had a "good-faith" obligation found under the applicable law and under sections 20-22 of the Security Agreement[13].

   b. Failure to disclose conversion of the instrument from a promissory note into a Stock Certificate. Such conversion changed the function and jurisdiction of the Note including the Mortgagor and Mortgagee relationship [see OCGA §11-9-102(64)][14].

---

[13] Under Georgia's Commercial Code §11-1-203 it provides, *"Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement"*. See Contract requirement of notification under Security Deed page 12 of 14 entered found under 10248 Section 37.

[14] Under OCGA §11-9-102(64) provides: *"Promissory note" means an instrument that evidences a promise to pay a monetary obligation, does not evidence an order to pay, and does not contain an acknowledgment by a bank that the bank has received for deposit a sum of money or funds."* AHMH can't have its cake and eat it, too. They must avail themselves of their responsibility to Mr. Kareem for their impairment of the instrument. There is a common understanding under equity and reasonable care, that if AHMH is supplied with grapes and saw fit to take the grapes and press them into wine, then AHMH cannot go back and reclaim the grapes from the supplier. In the instant matter, once the instrument was impaired, it is lost forever. The new purpose under the

c. The unjust enrichment claim made against AHMH was unopposed at trial. The Note had been impaired through the endorsement by Lisa Furco's, former Assist Secretary for "AHMH and Companies" for accommodation[15]. The endorsement clearly made AHMH an obligor under the contract terms. If the AHMA 2006-3 had any claims of default by their investors, then their claims would arise under AHMH's obligation under the Note by their act of endorsement. Such action by the Mortgagee should have discharged *Mr. Kareem's Loan Obligation* (see Covenant Section 9 Obligations of Persons under the Note) contained in the Adjustable Rate Note.

d. Failure to maintain communications under "giving notice" under the Contract Covenants Sections 8 of the Adjustable Rate Note and 15 of the Security Instrument , respectively. This

---

Securitization Prospectus was to serve as a stream of income and tax benefits for the certificate stockholders. Effectively, AHMH and companies changed the terms of the promissory note by their securitization actions.

[15] See Exhibit "A" Adjustable Rate Rider on page 6 of 6 entered under 10248 Section 37, Lisa Furco's endorsement signature. On page 5of 6, Covenant Section 9. **Obligations of Persons under this Note** provides, "*If more than one person signs this Note, including the promise to pay the full amount and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this note is also obligated to do things. Any person who takes over these obligations including the obligations of a guarantor, surety, or endorser of this note is also obligated to keep all of the promises made in this Note.*" The action of endorsement by AHMH led them to take over the obligation of Mr. Kareem for purposes of depositing the instrument into the MBST.

requirement under the contract is very restrictive and the language quite clear and "black and white".

2. **Count 2- Breach of Fiduciary Duty**- with respect to an instrument under OCGA §11-3-307[16], whereas, AHMH contributory inactions by failing to communicate led to contract torts by-

A. Allowing third parties to continue to falsely bill without providing full reconciliation on conflicting account numbers. The alteration change in account numbers has been maintained by Mr. Kareem as a material alteration of the instrument under OCGA §11-3-407[17].

---

[16]Under OCGA §11-3-307 provides, (1) "Fiduciary" means an agent, trustee, partner, corporate officer or director, or other representative owing a fiduciary duty with respect to an instrument; and

(2) "Represented person" means the principal, beneficiary, partnership, corporation, or other person to whom the duty stated in paragraph (1) of subsection (a) of this Code section is owed. (ii) Taken in a transaction known by the taker to be for the personal benefit of the fiduciary;

[17] Under O.C.G.A. §11-3-407 provides, "Alteration (a) "Alteration" means (i) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party; or (ii) an unauthorized addition of words or numbers or other change to an incomplete instrument relating to the obligation of a party. (b) Except as provided in subsection.
See *Teel v. Trust Co. Bank*, 216 Ga. App 493,(1995)  (b) of this Code section, an alteration fraudulently made discharges a party whose obligation is affected by the alteration unless that party assents or is precluded from asserting the alteration.." Also see, 282 S.E.2d 355, (1981) *Davidson v. Citizens & Southern National Bank*

... argue that **under OCGA § 11-3-407** (1) (b), this constituted a material and fraudulent **alteration**, thereby discharging them **under** subsection (2 ... bank's argument, having been executed ancillary to a note, the guaranty agreements in issue are negotiable **instruments**. ...

11

B. Acquiescence on communications by responding in a

reasonable time of written notices received from the Mortgagor

C. Renunciation and abandonment by seeking to enforce the note

under. OCGA §11-3-604 provides any act of abandonment or

renunciation discharges the obligation. In the instant action,

AHMH is not seeking to enforce a claim against the Mortgagor.

They have abandoned their interests in the Note, as a matter of

law.

---

Ms. Wanerka testified that AHMSI changed the account numbers see Page 128 (lines 16-25 and page 129 (lines 1-3) in the transcript.

Mr. Kareem asserts by example of contributory negligence by AHMH and through *The Plan Trustee* by the fact that the seller entered into an Asset Purchase Agreement (APA) on or about September 25, 2007, with AHMSI (see Exhibit B2, Doc. No. 10273). Under **APA's Article IV- Purchase Price; Adjustments; Allocations, subsection (b)** provided;

*"Within the 30 –day period following the date of the Initial Closing Date, Purchaser (AHMSI) shall have the right to dispute the amounts set forth in the Initial Closing Date Report as the Initial Closing Service Balance (and the subtotal of the outstanding principal balance of all Mortgage Loans ….)"*

The above clause would maintain that AHMSI would have had the opportunity to supply a reconciliation report for Mr. Kareem in his Northern District Court action and provided him the source of such accounting data. As noted in Mr. Kareem's Pleadings in his Northern District Court Case, AHMSI has failed to honor all of his requests under applicable laws for a debt validation, request for accounting or any detailed reconciliation report. A verified reconciliation report remains hidden from him. AHMH has had knowledge of these tortuous actions and remained silent. His account number has always been the original account number. It was altered by AHMSI while setting up their data base activity, as testified at trial by Ms. Eileen Wanerka (See page 128 lines (16-25) and page 129 lines (1-3)of transcript). There is no business or accounting justification for an account number change without consent from the Mortgagor, as a matter of law.

3. **Unfair and Deceptive Business Practices** applicable under

Georgia laws OCGA §10-1-372 creating confusion was

demonstrated at trial by-

    a.   Knowingly allowing third-parties relationships to make claims

        against Mr. Kareem of an impaired promissory note endorsed

        by AHMH. By AHMH's actions of converting the Note into a

        stock certificate and deposited into AHMA 2006-3.

    b.   Assigning MERS as an unlawful fiduciary to administer

        properties and a note under OCGA §7-1-242[18]. MERS was and

---

[18] Under The O.G.C.A. § 7-1-242 statute provides:

(a). No corporation, partnership, or other business association may lawfully act as a fiduciary in this state except:

(1) A financial institution authorized to act in such capacity pursuant to the provisions of Georgia law;

(2) A trust company;

(3) A national bank or a state bank lawfully doing a banking business in this state and authorized to act as a fiduciary under the laws of the United States or another state;

(4) A savings bank or savings and loan association lawfully doing a banking business in this state and authorized to act as a fiduciary under the laws of the United States or another state;

(5) Attorneys at law licensed to practice in this state, whether incorporated as a professional corporation or otherwise;

(6) An investment adviser registered pursuant to the provisions of 15 U.S.C. Section 80b-3 or Chapter 5 of Title 10, provided this exception shall not authorize an investment adviser to act in any fiduciary capacity subject to the provisions of Title 53, relating to wills, trusts, and the administration of estates; or

(7) A securities broker or dealer registered pursuant to the provisions of 15 U.S.C. Section 78o or Chapter 5 of Title 10 acting in such fiduciary capacity incidental to and as a consequence of its broker or dealer activities.

(8) A nonprofit corporation. ......

(b) (2) Administering real or tangible personal property located in Georgia or elsewhere. For the purposes of this paragraph, "administer" means to possess, purchase, sell, lease, insure, safekeep, manage, or otherwise oversee;

Whereas, MERS does not meet the legal definition of a fiduciary for purposes on being on a Security Instrument without being properly licensed as such. Even if MERS had

13

remains an unregistered corporation in Georgia. MERS was and

maintains itself as an electronic database provider. The MERS

corporate structure does not fit the legal definition of as

"fiduciary" to act in any capacity with respect to a financial

instrument or administering a property.  The code is very

specific and AHMH knew or should have known of MERS's

inability to act or represent any legal standing with respect to

the security instrument. Consequently, MERS entered into

Georgia Land Records a falsified Assignment of the Note and

Mortgage on or about Jan. 25th, 2010 under the power it

received from AHMH to Citibank, NA, as Trustee for AHMA

2006-3 Certificate series.  This action was unconscionable and a

direct result of AHMH breach of contract by impairing the

instrument with MERS[19].

c.   Failing to adequately disclose that the Monthly Treasury

Adjustable Rate Note contract performance would or could

---

standing, then AHMH's insolvency would have changed or altered or canceled MERS ability to act as AHMH's sole agency. Did AHMH permit MERS to assign over to CITIBANK, as Trustee, the NOTE and Security Deed on Jan. 25, 2010 into Georgia's Land Records? Georgia Law requires only executors or administrators to act on behalf of a deceased mortgagee (See OCGA §44-14-181). Plaintiff has argued in the Northern District Court that only this court or the *Plan Trustee* could have given MERS that right.

[19] Under OCGA §7-1-845 expressly provides. "Miscellaneous felonies; when punished as misdemeanors

(a) Any person or corporation, including any financial institution or its directors, officers, agents, or employees, who shall perform the following acts or deeds shall be guilty of a felony:

(3) Willfully engages in the business of:

(B) A trust company in violation of Code Section 7-1-242;"

yield a negative amortization. The inadequate disclosure

provided a violation or questionable net tangible benefits under

Georgia's finance law[20].

4. **Count 4-Breaches under their Prospectus and Pooling and**

**Servicing Agreement for AHMA 2006-3 Mortgaged Backed**

**Security Trust** affecting Mr. Kareem's contract status by–

A. Known failures to perform under a buy-back of "unrecoverable

asset" as a duty of the Depositor under the securitization

agreements.

B. Knowingly failing to give notice that the AHMA 2006-3

Certificates is not a statutory entity go to against Mr. Kareem's

---

[20] At trial, Ms. Eileen Wanerka testified that the note started at a teaser rate around 2.0% but, could rise as high as 9.95% and a maximum negative amortization of 110% of value. She stated that she could not determine if this would have been confusing to the average "mortgagor" or homeowner. Also, she stated that she was not employed as a lending compliance officer. She could not factually determine if the loan was in compliance under applicable banking and finance laws (see Page 139 lines (1-14) from the transcript). Under Georgia's Fair Lending Act O.C.G.A. §7-6A-4. GFLA statute defines "Flipping" a home loan; costs and fees as follows:
"(a) No creditor may knowingly or intentionally engage in the unfair act or practice of "flipping" a home loan. Flipping a home loan is the consummating of a high-cost home loan to a borrower that refinances an existing home loan that was consummated within the prior five years when the new loan does not provide reasonable, tangible net benefit to the borrower considering all of the circumstances including, but not limited to, the terms of both the new and refinanced loans, the cost of the new loan, and the borrower's circumstances.

In the instant action, Mr. Kareem testified at trial that he was confused about the loans performance during the admission phase of the trial to determine admissible content for cross examination. Apparently, the negative amortization would deprived him of a net tangible benefit in preserving his equity accumulation. He did not have this feature in his previous mortgage. Surely, the negative amortization and the rate potentially rising up to 9.95% did not benefit his search for a stable low interest rate loan.

estate (See Exhibit Form 15 filing)[21]. In fact, the entity does not

exists under either New York State's or Delaware State's

statutory requirements for trusts.

C. There exists the material issue of fact if AHMSI retained all the

servicing rights which would include Mr. Kareem's Loan. The

APA Schedule 2.1(b)(ii)-Contracts not Provided by Seller

Under Section 2.1(b)(1) found on page B-82 of Doc. No.

10273 shows that DB Structured Products, Inc. and ACE

Securities Corp. and Acknowledged by Wells Fargo Bank,

N.A., where American Home Mortgage Servicing, Inc., as

Servicer, and Wells Fargo was the Master Servicer, dated as of

June 29, 2007 was not given over to AHMSI (**emphasis**

**added**). **Apparently, AHMSI had no rights to bill Mr.**

**Kareem!**

D. Knowingly and impairing the promissory note by conversion of

instrument into stock certificate and assigning MERS as its

nominee to the Security Instrument.

5. **Count- 5 Failure to meet its "good faith obligation' under**

**UCC §11-1-203** and under applicable Georgia's Commercial

Code by-

---

[21] See Exhibit 300 Form 15 entered into the U.S. Securities and Exchange Commission found in Section 37 and attached hereto.

A. Failure to give timely response to the Rescission Demand Notice when received. It was negligent for AHMH to forward over to the Loan Servicer for them to respond. AHMH had the duty to deliver to the Assignee for their consideration of any liability under the notice[22]. The question of deceit comes to be answered with respect to AHMH's motivation by the following: Was AHMSI the Assignee with potential liability or who was the Note Holder with potential liability? The Custodian of the MBST?

B. Failure to give RESPA Transfer of Notice under applicable law and under terms of Covenant Section 20 of the Security Instrument contract.

### 5.

### Court Action Did Not Include AHMH or its Subsidiaries

Notwithstanding that Mr. Kareem has entered into this case seeking damages, the Claimant has been asserting his rights against known misconduct of the alleged successors-in-interests. They are not successors-in-interests to AHMH. The other entities were made business affiliates of AHMH and agents after the loan closing. AHMH had full knowledge of their intent to allow the third parties affiliates to continue to pursue

---

[22] See Exhibit "C" Rescission Demand Notice addressed to Michael Straus received by AHMH on or about Oct 21, 2008. At trial, Ms. Eileen Wanerka testified that the Rescission Demand Notice was forwarded over to AHMSI to respond (see page 131 lines 5-20 from the transcript). Whereas, AHMH elected not to give any direct response. The *Plan Trustee* elected not to respond, too. She also testified that Michael Strauss, the former CEO was believed to have resigned at the time that the Rescission Demand Notice was received from Mr. Kareem.

17

payments against his property. Even after AHMH had endorsed the note and had impaired the instruments, AHMH aided and abetted by their silence[23].

**6.**

AHMH failed to adhere to binding performances under the contracts. Insolvency proceedings does not shield their performance failures. The insolvency proceedings settled the issue that AHMH stopped performing under the contract[24]. Equally applicable under the circumstances is the legal definition for secured creditors in Georgia under OCGA 7-6A-2(6)[25]. Georgia's banking and finance statute expressly provides that assignees or purchasers or not the Creditor in a home loan transaction. This law would make it questionable for AHMA 2006-3 or AHMSI to maintain any standing with respect to Mr. Kareem's mortgage to pursue an acceleration foreclosure remedy.

**7.**

## UNREBUTTED CONTRACT FAILURES

---

[23] At trial in the instant action, it was confirmed that the  (See Exhibit 100 D) shown by counsel for the Affiliated Business Disclosure did not reference any of the parties engaged in the securitization AHMA 2006-3.  Apparently, AHMH had prior knowledge of its plans to deposit Mr. Kareem's mortgage into AHMA 2006-3. There is every reason to believe that the mortgage was deposited within 21 days. Therefore, the action was done with prior knowledge and before Mr. Kareem signed at closing. AHMH and companies failed to disclose AHMA 2006-3's affiliation is another preponderance of evidence for breach of contract by failure to disclose.

[24] Under Georgia's law on mortgagee's OCGA 44-14-181, deceased mortgagees can only maintain proceeding against the Mortgagor by the executor or administer. Thus, under the applicable law would prohibit others from staking their interests claim.

[25] Statute provides, "....creditor shall not include a person who is an attorney providing legal services in association with the closing of a home loan. A creditor shall not include: (A) a servicer; (B) an assignee; (C) a purchaser; or (D) any state or local housing finance agency or any other state or local governmental or quasi-governmental entity".

Claimant enumerates non-rebutted failures at trial that AHMH breached the contract includes, but are not limited to the following:

1. Contractual Performance Covenants by AHMH to the Note or Security Instrument were suspended. Examples: Giving of Notice to Borrower under Section 8 of the Note and Section 15 of the Security Instrument. Under applicable Georgia contract laws, judicial review of contract covenants construction are imperative[26].

2. Under Section 22 of the Security Instrument, when AHMH commenced into a judicial proceeding , without notifying the Borrower. The contract expresses that this failure would be a direct a violation of under section 15 and under Section 8 of the Promissory Note. (See Exhibit B Security Deed).

3. AHMH failed to communicate, evidence and admissions shows that they received the TILA Rescission Demand Notice, but elected not to respond within the 20 days required under Federal Law. AHMH made no attempt to unwind the transaction and return the borrower to his *status quo ante*. This unwinding procedure is settled under TILA 15 U.S.C. §§1635 through 1641, so that, the borrower can tender the payoff.

---

[26] Under OCGA 13-8-54 provides, Judicial construction of covenants
(a) A court shall construe a restrictive covenant to comport with the reasonable intent and expectations of the parties to the covenant and in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement.
(b) In any action concerning enforcement of a restrictive covenant, a court shall not enforce a restrictive covenant unless it is in compliance with the provisions of Code Section §13-8-53; provided, however, that if a court finds that a contractually specified restraint does not comply with the provisions of Code Section §13-8-53, then the court may modify the restraint provision and grant only the relief reasonably necessary to protect such interest or interests and to achieve the original intent of the contracting parties to the extent possible.

4.  AHMH's employee, LISA FURCO endorsed the note on the face of the instrument, constituting an accommodation endorsement and cause for discharge of the maker's debt obligation[27].

5.  AHMH never disclosed that securitization would bind the property over to another Note Holder, a Custodian of the Mortgage-Backed-Security Trust (MBST) or that the instrument would be used in an unauthorized manner.

6.  AHMH never disclosed or noticed that the Master Servicer of the MBST was not a subsidiary of itself. This represented a material change in the loan servicer. The deceit occurred upon entry of the loan into the Pooling and Servicing Agreement as noted by counsel on or about July 28, 2006. This was within 21 days of closing. This was apparently an anticipated undertaking and may constitute a RESPA transfer notice violation[28]. As of July 28, 2006, The Master servicing function was not held by AHMH or its entities.

---

[27] See *Bank of the University v. Tuck*, 101 Ga. 104, 111 (28 SE 168), where the action was between a bank, as pledgee of a note which had been indorsed to it by the payee, and the maker, the court reiterated: "*It [the bank] being a pledgee for value of the note, and the money having confessedly not been paid to it, but to the original payee, it follows that to excuse the maker from liability to the pledgee, he is bound to prove the agency of the person to whom he paid the money, and the competency of that person for and on behalf of the bank to receive it.*"[emphasis applied]

At trial, ot was confirmed that Lisa Furco was a known employee of AHMH at the time that the note was endorsed. No objection was raised.

[28] Under 24 C.F.R.  § 3500.21. Mortgage servicing transfers;

(a) Definitions. As used in this section: *Master servicer* means the owner of the right to perform servicing, which may actually perform the servicing itself or may do so through a subservicer.

*Subservicer* means a servicer who does not own the right to perform servicing, but who does so on behalf of the master servicer.

*Mortgage servicing loan* means a federally related mortgage loan, as that term is defined in § 3500.2, subject to the exemptions in § 3500.5, when the mortgage loan is secured by a first lien.

20

7. All of the above AHMH breaches occurred before any payment concerns were raised with respect to Mr. Kareem. These concerns are mere attempts to divert the court from the real causation and impairments made by AHMH.

8. Counsel tried to tie the assertions against AHMH and the *Plan Trustee* as preclusionary issues with respect to AHMH. This is untrue, because the U.S. District Judge in the Northern District of Texas did not allow AHMH to be brought in as a party of interest (See Exhibit Order 13 from the case 3:10 CV 00762-B) and the Plaintiff amended his petition not to prosecute AHMH. The District case for all practical purposes is moot on the issue of AHMH.

9. Predatory lending claims that the negative amortization product caused deceptive trade acts, failure on Annual Percentage Rate calculation and questionable alteration of the account numbers were entered into the record but remains largely unrebutted . The Disclosure and Loan performance were not accurately described by

---

Debtors are not exempted under 24 C.F.R. § 3500.21 (d) [which provides in relevant part] Notices of Transfer; loan servicing The following transfers are not considered an assignment, sale, or transfer of mortgage loan servicing for purposes of this requirement **if there is no change in the payee, address to which payment must be delivered, account number,** or amount of payment due: and under subsection,

(C) Transfers between master servicers, where the subservicer remains the same.. In the instant action, Claimants espouses that the above exemptions do not apply for reasons opined:

1. The subservicer, the "New" AHMSI owned by AH Mortgage Acquisition Co., is not the same legal entity as AHM SV, the original subservicer under the Prospectus and PSA. There is no evidence that the MBST filed a change with the SEC to this effect. In fact, the MBST filed a Form 15 to the SEC showing that the MBST ceased to exist (See Exhibit 300).

2. The Loan number and addressed of location did change as mentioned above. The original loan number remains not referenced by the Loan Servicer (See Exhibit D2).Notwithstanding the above, HUD investigation issued a right to sue on this violation. AHMSI never sought to oppose, vacate or amend the RESPA findings issued by Ivy Jackson (See Exhibit D Letter RESPA Case No. 09-1699).

AHMH as required under applicable laws (See APR WIN 6.2.0 APR Calculation done through the Office of Comptroller of Currency).[29] As stated at trial, Ms. Eileen Warneka was not a compliance officer. Therefore any of her opinions about the validity of "in-house" test results for high cost loan cannot be considered factual. Besides, she demonstrated that she had no knowledge of Georgia's Banking and Finance statutes on high cost loans (see page 141 lines (21-25) from the transcript).

### 8.

It is not conjecture that the Holder of the Note should have been the Custodian of the MBST (See Exhibit 100 Securitization Chart). AHMH had responsibility and first-hand knowledge to convey to the Mortgagor this fact upon receiving a claim for rescission under the contract terms. To go silent is illegal and breaks the contract terms. The failure to give notice is a determinable issue of fact.

### 9.

### Loan Servicing Rights: Duty of Payor/Maker to Know who is the Lawful Payee

Counsel for AHMH want to paint the picture of loan payment default as the causation for this and other actions pursued by Mr. Kareem. Mr. Kareem has found torts by the Lender's action. The lender can hide behind and not disclose their back door dealings at their discretion. However there

---

[29] Claimant is prepared for more of an in-depth forensic audit findings relevant to all issues at hand. The independent audit would supports the findings applicable under TILA and RESPA for violations and potential securities violations. Suffice to say that the Securitization affiliates have also entered their breach of contract against AHMH and the *PlanTrustee* during these dissolution proceedings. AHMH are not choir boys. The preponderance of evidence shows a plethora of wrong doings.

is a limit to their failure to disclose. When their action creates a conflict of interests or violations under applicable laws, then they must be held accountable. In a relevant case law, *C. W. Groover v. Erick Peters* 231 Ga. 531 (1973), 202 S.E.2d 413, the Georgia Supreme Court opined :

"*that the borrower must be as careful in repaying the debt as the lender presumptively was in making the loan.*"

The relatively simple decision follows:

"*The maker of a negotiable note and security deed must determine at the time of payment whether the payee is the holder of the instrument or the authorized agent of the holder in order to protect himself against liability for double payment. If the original grantee has assigned the instrument to another, who is a holder in due course, the burden rests with the maker to determine same and pay only the holder or his authorized agent... The long and short of the matter is that the borrower must be as careful in repaying the debt as the lender presumptively was in making the loan.*" [emphasis added].

Thus, by the precedent ruling, it is inferred that every borrower in the state of Georgia should be entitled to question and demand from the transferee, assignee and servicers, the necessary documents, data, and evidence of their affiliations and relationships. Prudence requires the payor/maker to meet the requirements for "the borrower must be as careful in repaying the debt as the lender presumptively was in making the loan!" [30]

---

[30] It is well settled that payment of a promissory note to a person not in possession of it is at the peril of the payer. Eastern Acceptance Corporation v. Henry, D.C. Mun.App., 62 A.2d 309, citing Davis v. Casey, 70 App.D.C. 27, 103 F.2d 529. To this rule there is an exception when "the conduct and course of dealings of the holder are such as to engender in the mind of the payer a justifiable belief that the payee or the party receiving the money is the agent of the holder for that purpose." Sherrill v. Cole, 144 Okl. 301, 291 P. 54, 55.[2] This exception was recognized in Davis v. Casey, supra, but there it was held that there was no "holding out of agency which might have misled the defendants." [70

Mr. Kareem only exercised his prudence by inquiring and raising all of his rights to dispute his contractual rights in a lawful and rightful manner under the applicable laws.

## 10.
## Misdirecting Default Toward Claimant

Claimant fully incorporated in paragraphs 1 through 9, supra.

Counsel has made statements that alleges that the Mortgagor missed or delinquent payments are the source of his own damages. Counsel opined from excerpted statement to this court, with the obvious intent to divert blame the Mortgagor for the liability of his contract breaches. The relevant excerpted statement was made by counsel and is repeated, as follows:

*"In or about July 2008, Mr. Kareem ceased making timely payments on the Kareem Loan. Upon information and belief, no payments have been made on the Kareem loan for months commencing July 1, 2009 to present."*[31]

Claimant feels that the above statement is inaccurate and counsel has not presented a preponderance of evidence to come to a legal conclusion on the issue. In fact, such statement runs counter to Georgia's Supreme Court opinion on the obligations of the payor to the payee and related applicable case law.

---

App.D.C. 27, 103 F.2d 534.] [emphasis added]. In the instant matter, the benefit of such payments would not go to the Note Holder or Original Creditor.

[31] At trial held on Nov. 18, 2011, Mr. Kareem testified that he has not been billed or invoiced in several months. At issue, are the remaining facts with respect to billing under a falsified account number. There is no applicable law that provides that a Debtor or Mortgagor must accept any unverified account number for billing purposes. Contrarily, this is inapposite of the applicable Supreme Court ruling made in C. W. Groover v. Erick Peters and known billing practices.

11.

## Lending Practices not addressed completely At Trial; Causes for Predatory Lending Practices:

On Nov. 18, 2011, the day of the trial, Claimant filed his pleadings into this Court below. Now, enumerates by documents tendered to him, more potential defaults and violations made by AHMH as, follows:

1. The Office of the Comptroller of Currency APR calculator Apr WIN – Version 6.2.0 finds that the APR was overstated. A more extensive independent audit is forthcoming. The findings points to the fact that federally required disclosures given to Mr. Kareem were inaccurate (See Exhibit 400 APR Disclosure Documentation).

2. Because the Product offered was a Negative Amortization with an Interest only option payment plan. The Truth-in Lending Disclosure supplied at closing did not properly account for the pay-option scenarios given to Mr. Kareem. AHMH did not project to Mr. Kareem any worst case scenario with the Pay Option Loan Product.  Counsel provided  examples or samples ( See Exhibits G-G4 Final Truth-In-Lending Statement, illustration 1 & 2)  purportedly included and signed by him on  07/07/06. Specifically, Borrower notices that the Arabic numerals by his signature are not of his hand writing and may constitute an alteration.

3. The "new" Loan Servicer, AHMSI, gave the Borrower a Copy of the Note whereas the on page 6 of 6, Lisa Furco of American Business Conduit endorsed the note[32].

4. The loan application, disclosures and the closing were apparently conducted on the same day. Noticeably, the interest rate of 1.9%  was promised on the face of the loan application and Lindel Strong of

---

[32] See footnote 10 Id.

Global Mortgage never signed to witness the loan application a broker compliance issue raised at trial (See page 137 lines (1-15) from transcript.

5. The Right to Cancel (See Exhibit H) is a typed-in and not hand written [inconsistent] with other documents noticeably hand dated. Claimant raised his issue of authentication of these documents for reasons asserted. The cited flaws would be questions of RESPA settlement breaches.

6. Presenting documents to the Borrower and then having them signed on the same day, may be considered a predatory lending practice. There must be an excusable reason that these documents were not advanced to the borrower at least 72 hours prior to closing.

12.

## Relief Sought

For reasons fully incorporated above paragraphs 1 through 11, including citation of authorities contain herein, Claimant has demonstrated his legal basis to support that his loan was discharged, impaired and that AHMH aided in creating a "cloud" to harm him by their dilatory and deceptive business practices[33].

Claimant believes at trial, AHMH damages were made apparent and that there are at minimum of actual damages of $19,000.00 by way payments made after the impairment of the instrument were made.

---

[33] O.C.G.A. §10-1-372 When trade practices are deceptive; common-law and other remedies unaffected
(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.
(b) In order to prevail in an action under this part, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

Claimant incorporates his loan contract value, credit reporting harms, and the costs to maintain lengthy litigation to somewhat justify his administrative claim sought for a balance of $231,000.00

Tort damages are available for wrongful foreclosure attempts under the applicable tort laws under OCGA 51-12-5.1.

Claimant opposes any dismissal of claims, as there are genuine issues of fact that should favor of the Claimant.

Claimant seeks for AHMH to issue a "Satisfaction and Release of Lien Obligation" against his property to quiet the title lien. There has been evidence to show that AHMH enriched themselves by depositing the note, continued to service the note, impaired it and now they are resisting the Mortgagor's rights for off-set.

**EXECUTED THIS DAY ON FEBRUARY 10, 2012**

/S/

Hussain Kareem, Pro Se

27