## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

------------------------------------------------------- x

In re:

AMERICAN HOME MORTGAGE HOLDINGS, INC.,
a Delaware corporation, et al.,

                Debtors.

------------------------------------------------------- x

Chapter 11

Case No. 07-11047 (CSS)

Jointly Administered
Ref/ Docket No. 10184, 10183 & 10182

# CLAIMANT'S POST TRIAL BRIEF:
# TABLE OF CONTENT FOR EXHIBITS

I.     **Exhibit 100** Securitization  Report  & Chart of AHMA 2006-3

II.    **Exhibit 100-B** Bloomberg Screen view of loan no. 001345090 in AHMA 2006-3 Pool of Assets.

III.   **Exhibit 100-C** AHMA 2006-3 Excerpted Prospectus Key Terms

IV.    **Exhibit 100-D** Affiliated Business Arrangement Disclosure

V.     **Exhibit 200-** Asset Purchase Agreement Schedule Excerpted 2.1(b)(ii) Contracts not Provided by Seller (relevant to AHMSI)

VI.    **Exhibit 300 Form 15** Termination Filed with Security & Exchange Commission on January 29, 2007

VII.   **Exhibit 400 APR Disclosure Test** APR WIN ver. 6.2.0 Calculation

VIII.  **Exhibit A-** Adjustable Rate Note (endorsed version)

IX.    **Exhibit  B-** Security Deed

X.     **Exhibit C-** Rescission Demand Notice dated Oct. 18, 2008

XI.    **Exhibit D-** RESPA Investigation Letter Case No. 09-1699

XII.   **Exhibit D2-** AHMSI Legal Department Response to RESPA Investigation

XIII.  **Exhibit D3-** RESPA  Servicing Disclosure

XIV.   **Exhibit G-** Final Truth-In-Lending

Prospectus supplement dated July 27, 2006 (to prospectus dated April 21, 2006)

**$1,682,386,000**
**(Approximate)**

 AMERICAN HOME MORTGAGE

**American Home Mortgage Assets Trust 2006-3**
**Issuing Entity**

**American Home Mortgage Servicing, Inc.**
**Servicer**

**American Home Mortgage Corp.**
**Sponsor**

**American Home Mortgage Assets LLC**
**Depositor**

**American Home Mortgage Assets Trust 2006-3,**

**Mortgage-Backed Pass-Through Certificates, Series 2006-3**

---

**You should consider carefully the risk factors beginning on page S-16 in this prospectus supplement.**

---

**The Trust**

The trust will consist primarily of a pool of adjustable-rate mortgage loans which may be subject to negative amortization, divided into three loan groups. The trust will issue twenty-six classes of certificates, twenty-two of which are offered under this prospectus supplement.

**Credit Enhancement**

The offered certificates will have credit enhancement in the form of:

- subordination provided to the group I, group II and group III senior certificates by the Class M Certificates, and provided to the Class M Certificates by each class of Class M Certificates with a lower payment priority; and

- excess interest and overcollateralization.

The LIBOR certificates, other than the Class III-A-1-1 Certificates, will also have the benefit of a cap contract.

*Exhibit 100*

LEGAL INVESTMENT

ERISA CONSIDERATIONS
    ERISA Considerations While the Swap Account is in Existence
    ERISA Considerations After Termination of the Swap Account

GLOSSARY

ANNEX I

SCHEDULE A

## SUMMARY OF PROSPECTUS SUPPLEMENT

    The following summary is a brief description of the important features of the certificates and does not contain all of the information that you should consider in making your investment decision. To understand all of the terms of the offered certificates, read carefully this entire prospectus supplement and the entire accompanying prospectus. A glossary is included at the end of this prospectus supplement. Capitalized terms used but not defined in the glossary at the end of this prospectus supplement have the meanings assigned to them in the glossary at the end of the accompanying prospectus.

| | |
|---|---|
| Issuing Entity | American Home Mortgage Assets Trust 2006-3. |
| Title of Series | Mortgage-Backed Pass-Through Certificates, Series 2006-3. |
| Cut-off Date | July 1, 2006. |
| Closing Date | On or about July 28, 2006. |
| Depositor | American Home Mortgage Assets LLC. |
| Sponsor | American Home Mortgage Corp. |
| Originator | American Home Mortgage Investment Corp., or an affiliate thereof. |
| Master Servicer | Wells Fargo Bank, N.A. |
| Servicer | American Home Mortgage Servicing, Inc. |
| Trustee | Citibank, N.A. |
| Custodian | Deutsche Bank National Trust Company. |
| Swap Provider | Deutsche Bank AG. |
| Cap Counterparty | Swiss Re Financial Products Corporation. |
| LPMI Insurer | Triad Guaranty Insurance Corporation. |
| Distribution Dates | Distributions on the offered certificates will be made on the 25th day of each month, or, if such day is not a business day, on the next succeeding business |

Exhibit 100



Loan Search

Search for Non-Agency residential loans by characteristics. Either Loan Number or original amount needs to be provided to perform a search.

**Loan Number**    `0001350490`

Origination date

Zip Code

2) Export

| Loan Number | Issuer | Series | Group | Status | Orig Balance | Zip |
|---|---|---|---|---|---|---|
| 1) 0001350490 | AHHA | 06-3 | 03 | | 159,200 | 30044 |

Australia 61 2 9777 8600 Brazil 5511 3048 4500 Europe 44 20 7330 7500 Germany 49 69 9204 1210 Hong Kong 852 2977 6000
Japan 81 3 3201 8900    Singapore 65 6212 1000    U.S. 1 212 318 2000    Copyright 2011 Bloomberg Finance L.P.
SN 529794 CDT    GMT-5:00 H264-216-0 05-Nov-2011 12:03:53

## Exhibit "100-C": Excerpts from AHMA 2006-3 Prospectus: Key Terms

The Claimant Mr. Kareem, offers by the preponderance of evidence found in the Edgar's Database for public viewing under the Security and Exchange Commission website, the Prospectus from the American Home Mortgage Assets Trust 2006-3 which contained his loan. The prospectus supports the Claimants assertions for a denial of The *Plan Trustee's* "naked claims allegations" attempted that Mr. Kareem was negligent of his duty to the note and to AHMSI at trial by the following reasonable preemptive facts.

At all times relevant to the AHMA 2006-3 Trust were actions to have been taken by its administrators which are described as follows (See Exhibit 100 Pages 1-375) excerpted here for the relevant parts:

a. **Trust:** "The trust will consist primarily of a pool of adjustable-rate mortgage loans which may be subject to negative amortization, divided into three loan groups.."

b. **The Issuing Entity**: "the depositor will establish a trust with respect to the Series 2006-3 Certificates, pursuant to a pooling and servicing agreement dated as of the cute-off date for the depositor, the master servicer and the trustee. On the closing date, the depositor will deposit the mortgage loans .....into the issuing entity."

c. **The Originator:** (See Exhibit 100 Page 12 of 375) "All of the mortgage loans were originated by American Home Mortgage Investment Corp. or an affiliate thereof **(emphasis added)**[1].

d. **The Mortgage Loans:** "The mortgage Loans will be divided into three loans groups with characteristics as follows (See Exhibit 100, pages 12-14 of 375 for definitions):

---

[1] American Brokers Conduit is a subsidiary under American Home Mortgage Investment Corp. AH Acquisition Inc. the predecessor to AHMSI, was never the affiliate to the trust. In fact, Schedule 2.1 (b)(1)- Contracts not Provided by the Seller Under Section 2.1 (b)(1) and Form 15 filing suggests that AHMSI could not participate in the servicing activities with respect to Mr. Kareem's loan under DB Structured Products, Inc. and ACE Securities Corp. and acknowledged by Wells Fargo Bank, N.A, named counter parties for the Servicing Agreement dated as of June 29, 2007 found on page B-82- B-83 **(emphasis added)**.

**Exhibit "100-C": Excerpts from AHMA 2006-3 Prospectus: Key Terms**

    e.  **Loan Group III**: The mortgage loans in group I are comprised of mortgage loans that do not require the payment of a prepayment penalty …"

    f.  **Removal and Substitution of a Mortgage Loan:** "If the custodian finds that any mortgage loan is defective on its face due to a breach of representation and warranties with respect to that loan made, … the trustee… will notify originator of such defect, The originator must then correct or cure the defect within such period …(90 days), provide to trustee with a substitute mortgage loan (if within two years of the closing date) provided that , if such defect would cause ..the loan to be a "qualified mortgage" as defined in Section 860 G(a) (3) of the Internal Revenue Code.."

  g.  **The Rate and Timing of Principal Distributions on Certificates…** (See page 25 of 375): "AHMC will be required to purchase mortgage loans from the Issuing Entity in the event certain breaches of representations and warranties occur and have not been cured. In addition AHMC has the option to purchase mortgage loans that become 90 days or more delinquent…"

  h.  **The Mortgage Pool** (See page 25 of 375):" All of the mortgage loans were originated by American Home." **(emphasis added).**

      *Loan Group III*- ( see page 36 of 375) None of the mortgage loans had a first Due Date prior to April 1, 2006 or after September 1, 2006, or had a remaining term to maturity of less than 356 months (***this calculates that the cut-off date or entry into the pool has to be within (4) months of its origination date*** **(emphasis added)**[2].

---

[2] The accumulation of the above facts are significant to established that Mr. Kareem's loan fits the full description and intent for "AHMH and companies" to securitized his loan and their failure to disclose to him the Master Servicer and Note Holder/Custodian. Essentially, AHMC became the guarantor, endorser and took over his obligation for the  per terms of Covenant Section 9. of the Adjustable Rate Note. The Plan Trustee is foreclosed from trying to shift any missed payments by Mr. Kareem was the source of default. "AHMH and Companies" defaulted and breached the contract *ab initio*. He is, presumptively, entitled to his recovery.

**Exhibit "100-C": Excerpts from AHMA 2006-3 Prospectus:
Key Terms**

The Cut-off date establishes the time that Mr. Kareem's loan was to be deposited into the trust and the possession to be held by The Custodian through the Trustee CitiBank, N.A. This is relevant to illustrate that subsequent a action contradicts by any claim that MERS transferred the Note and Security Deed to CitiBank, N.A. on or before January 25, 2010. MERS was never a part of the trust actors. Even if MERS had consent to do such, then the terms of the trust were broken.

## AFFILIATED BUSINESS ARRANGEMENT DISCLOSURE

| | | | |
|---|---|---|---|
| Lender: | American Brokers Conduit | Loan No.: | 0001350490 |
| Address: | 225 Town Park Drive Suite 450 | | |
| | Kennesaw, GA 30144 | Base Loan Amount: | 159,200.00 |
| Applicant(s): | Hussain Kareem | Total Loan Amount: | 159,200.00 |
| | | Type of Loan: | Conventional |
| Property | 2197 Carlysle Creek Drive | Date Prepared: | June 29, 2006 |
| Address: | Lawrenceville, GA 30044 | Rate: 1.900% | Term: 360 mos |

Exhibit "100-D"

This is to give you notice that American Brokers Conduit has a business relationship with Homegate Settlement Services, Inc., who may provide flood determination and appraisal services for customers of American Brokers Conduit. Homegate Settlement Services, Inc. is a wholly owned subsidiary of American Home Mortgage Corp. The cost of providing these services are described on your Good Faith Estimate. Because of this relationship, this referral may provide American Brokers Conduit financial or other benefit.

THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICES PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND BEST RATE FOR THESE SERVICES.

I/we have read this disclosure form and understand that the lender is referring me/us to purchase the settlement service(s) described above and may receive financial or other benefit as result of this referral.

_____                    _____
Hussain Kareem

_____                    _____

DOC #:942832/ No Image / Rev. 10/04  APPL #:0001350490

Exhibit-200

**Schedule 2.1(b)(ii)**
**Contracts Not Provided**

[SEE ATTACHED]

## Schedule 2.1(b)(ii) - Contracts not Provided by Seller Under Section 2.1(b)(i)

| Name of Counterparty | Type of Agreement | Agreement |
|---|---|---|
| Banc of America Leasing | Assigned Lease | Copier Lease |
| De Lage Landen Financial Services | Assigned Lease | Copier Lease |
| Xerox | Assigned Lease | Fax Machine Lease |
| Aegon USA Real Estate Services | Servicing Agreement | Loan Sale and Servicing Agreement with Aegon USA Real Estate Services |
| CitiMortgage Inc. | Servicing Agreement | Loan Sale and Servicing Agreement with CitiMortgage Inc. |
| Comm. First Bank of Charleston | Servicing Agreement | Loan Sale and Servicing Agreement with Comm. First Bank of Charleston |
| Community Development Admin Foreclosures | Servicing Agreement | Loan Sale and Servicing Agreement with Community Development Admin Foreclosures |
| Connecticut Housing Finance | Servicing Agreement | Loan Sale and Servicing Agreement with Connecticut Housing Finance |
| DB Structured Products, Inc. and ACE Securities Corp. and acknowledged by Wells Fargo Bank, N.A. | Servicing Agreement | Assignment, Assumption and Recognition Agreement, dated as of June 29, 2007, among DB Structured Products, Inc., as Assignor, ACE Securities Corp., as Assignee, and American Home Mortgage Servicing, Inc., as Servicer, and acknowledged by Wells Fargo Bank, N.A., as Master Servicer |
| EMC Mortgage Corporation | Servicing Agreement | Term Sheet, dated as of March 28, 2006, between EMC Mortgage Corporation and American Home Mortgage Corp. |
| EMC Mortgage Corporation and U.S. Bank, National Association, not individually but solely as trustee for the holders of Bear Stearns Asset Backed Securities I Trust 2007-AC1, Asset-Backed Certificates, Series 2007-AC1 | Servicing Agreement | Assignment, Assumption and Recognition Agreement, made as of January 30, 2007, among EMC Mortgage Corporation (the "Assignor"), U.S. Bank, National Association, not individually but solely as trustee for the holders of Bear Stearns Asset Backed Securities I Trust 2007-AC1, Asset-Backed Certificates, Series 2007-AC1 (the "Assignee"), American Home Mortgage Corp. (the "Company") and American Home Mortgage Servicing, Inc. (together, the "Servicer") |
| Frankenmuth Credit Union | Servicing Agreement | Loan Sale and Servicing Agreement, dated as of May 18, 2005, by and among American Home Mortgage Corp. American Home Mortgage Servicing, Inc., and Frankenmuth Credit Union |
| HSBC Mortgage Corporation | Servicing Agreement | Loan Sale and Servicing Agreement with HSBC Mortgage Corporation |
| Merrill Lynch | Servicing Agreement | Loan Sale and Servicing Agreement with Merrill Lynch |
| Mutual Savings Bank | Servicing Agreement | Loan Sale and Servicing Agreement Mutual Savings Bank |
| Old National Bank | Servicing Agreement | Loan Sale and Servicing Agreement with Old National Bank |
| Phoenix Founders Inc. | Servicing Agreement | Loan Sale and Servicing Agreement with Phoenix Founders Inc. |
| Principal Bank | Servicing Agreement | Loan Sale and Servicing Agreement with Principal Bank |
| Residential Funding Corp. | Servicing Agreement | Loan Sale and Servicing Agreement with Residential Funding Corp. |
| State Farm Life Insurance Company | Servicing Agreement | Loan Sale and Servicing Agreement with State Farm Life Insurance Company |
| Union Labor Life Insurance Company | Servicing Agreement | Loan Sale and Servicing Agreement with Union Labor Life Insurance Company |
| United Services Credit Union Asheville | Servicing Agreement | Loan Sale and Servicing Agreement with United Services Credit Union Asheville |

Schedule 2.1(b)(ii) - Contracts not Provided by Seller Under Section 2.1(b)(i)

| Name of Counterparty | Type of Agreement | Agreement |
|---|---|---|
| Wachovia Bank | Servicing Agreement | Loan Sale and Servicing Agreement with Wachovia Bank |
| Washington Mutual | Servicing Agreement | Loan Sale and Servicing Agreement with Washington Mutual |
| Wells Fargo Corp. Tr. Services | Servicing Agreement | Loan Sale and Servicing Agreement with Wells Fargo Corp. Tr. Services |
| D.W. Consulting, Inc | Software Contract | Contract for consulting services- LSAMS development |
| PGF Solutions, Inc. Technology Systems Consulting | Software Contract | Contract for consulting services- LSAMS development |
| Softlanding Software | Software Contract | Contract for software for managing code versions on AS400 |
| Accurint | Vendor Agreement | Skip Trace |
| E-Oscar | Vendor Agreement | Credit Bureau |
| EQUIFAX | Vendor Agreement | Credit Reporting |
| EXPERIAN | Vendor Agreement | Credit Reporting |
| Mortgage Contracting Services | Vendor Agreement | Property Inspections |
| Pitney Bowes - PSI Presort Services | Vendor Agreement | Postage Services |
| Western Union | Vendor Agreement | Payment Delivery |
| ZC Sterling Insurance Agency, Inc. | Vendor Agreement | Tax Outsource Vendor |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

Exhibit 200

## Schedule 2.1(b)(i) - Vendor Contracts

| Name of Vendor | Agreement |
|---|---|
| Trans Union LLC | Pricing Addendum, dated as of December 8, by and between Trans Union LLC and American Home Mortgage Corp. |
| Trans Union LLC | Data Furnishers Reporting Agreement, dated as of January 10, 2007, by and between Trans Union LLC and American Home Mortgage Corp. |
| Webb/Mason, Inc. | Customer Agreement, dated as of October 1, 2005, by and between Webb/Mason, Inc. and American Home Mortgage Corp. |
| Western Union | MISSING |
| XO Communications Services, Inc. | XO Service Order Agreement, dated as of June 29, 2006, by and between XO Communications Services, Inc. and American Home Mortgage Corp. |
| ZC Sterling Insurance Agency, Inc. | MISSING |

http://webmaila.juno.com/webmail/new/21?folder=Inbox&uniqMsgI...

Exhibit 300

```
<DOCUMENT>
<TYPE>15-15D
<SEQUENCE>1
<FILENAME>v063519_15-15d.txt
<TEXT>
```

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

FORM 15

CERTIFICATION AND NOTICE OF TERMINATION OF REGISTRATION UNDER SECTION
12(g) OF THE SECURITIES EXCHANGE ACT OF 1934 OF SUSPENSION OF DUTY TO FILE
REPORTS UNDER SECTIONS 13 AND 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934.

Commission File Number          333-131641-03
                        ------------------------------------------

American Home Mortgage Assets Trust 2006-3
--------------------------------------------------------------------------
(Exact name of registrant as specified in its charter)

538 Broadhollow Road, Mellville, N. Y. 11747
--------------------------------------------------------------------------
(Address, including zip code, and telephone number, including area code,
of registrant's principal executive offices)

Class I-A-1, Class I-A-2-1, Class I-A-2-2, Class I-A-3, Class II-A-1-1,
Class II-A-1-2, Class II-A-2, Class II-A-3-1, Class II-A-3-2,
Class III-A-1-1, Class III-A-1-2, Class III-A-2, Class III-A-3-1,
Class III-A-3-2, Class M-1, Class M-2, Class M-3, Class M-4, Class M-5,
Class M-6, Class M-7, Class M-8
--------------------------------------------------------------------------
(Title of each class of securities covered by this Form)

None
--------------------------------------------------------------------------
(Titles of all other classes of securities for which a duty to file reports
under section 13(a) or 15(d) remains)

Please place an X in the box(es) to designate the appropriate rule
provision(s) relied upon to terminate or suspend the duty to file reports:

Rule 12g-4(a)(1)(i)    [ ]        Rule 12h-3(b)(1)(i)    [X]
Rule 12g-4(a)(1)(ii)   [ ]        Rule 12h-3(b)(1)(ii)   [ ]
Rule 12g-4(a)(2)(i)    [ ]        Rule 12h-3(b)(2)(i)    [ ]
Rule 12g-4(a)(2)(ii)   [ ]        Rule 12h-3(b)(2)(ii)   [ ]
                                  Rule 15d-6             [X]

Approximate number of holders of record as of the certification or notice
date:     70
          ----------

Pursuant to the requirements of the Securities Exchange Act of 1934
American Home Mortgage Assets Trust 2006-3 has caused this
certification/notice to be signed on its behalf by the undersigned duly
authorized person.

Date:   January 29, 2007          By: /s/  Karen Schluter
        -----------------------       ------------------------------------
                                      Karen Schluter
                                      Vice President

11/11/2011 5:31 PM

http://w :bmaila.juno.com/webmail/new/21?folder=Inbox&uniqMsgI...

Instruction: This form is required by Rules 12g-4, 12h-3 and 15d-6 of the General Rules and Regulations under the Securities Exchange Act of 1934. The registrant shall file with the Commission three copies of Form 15, one of which shall be manually signed. It may be signed by an officer of the registrant, by counsel or by any other duly authorized person. The name and title of the person signing the form shall be typed or printed under the signature.

Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB control number.

```
</TEXT>
</DOCUMENT>
```

11/11/2011 5:31 PM

Sensitive Information

## APRWIN - Version 6.2.0

Exhibit 400

## APR Disclosure Documentation

Prepared By:          Cherry Tree Audit Services
Date:                 11/11/2011
Borrower's Name:      Hussain Kareem
Account Number:       001350490
Name of Lender:       Amercian Business Conduit
Original Creditor:    Amercian Home Mortgage Corp.

## Loan Information - Original Input

| | |
|---|---|
| Amount Financed: | $159,200.00 |
| Disclosed (Estimated) APR: | 7.0100 % |
| Disclosed Finance Charge: | $248,209.24 |
| Loan Secured by Real Estate or Dwelling: | No |
| Loan Date Earlier than 9/30/95: | No |

Payment Frequency:       Monthly (Installment Loan)

## Disclosure Information - Output

| | |
|---|---|
| Amount Financed: | $159,200.00 |
| FINANCE CHARGE: | $221,153.58 |
| Total of Payments: | $380,353.58 |
| ANNUAL PERCENTAGE RATE: | 6.3354 % |

** VIOLATION **   APR is overstated by:                    0.6746 %

** VIOLATION **   Finance Charge is overstated by:       $27,055.66

| Payment Stream | Payment Amount | Number of Payments | Whole Unit Periods | Odd Days |
|---|---|---|---|---|
| 1 | $580.51 | 44 | 1 | 0 |
| 2 | $1,119.02 | 316 | 45 | 0 |
| 3 | $1,200.82 | 1 | 361 | 0 |



*Exhibit A*

## ADJUSTABLE RATE NOTE

### FIRST FIVE YEAR FIXED PAYMENT – 12MTA

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. BECAUSE MY INTEREST RATE WILL CHANGE MORE FREQUENTLY THAN MY MONTHLY PAYMENT, AND BECAUSE THERE ARE LIMITATIONS ON MY MONTHLY PAYMENT INCREASES, THE AMOUNT OF MY MONTHLY PAYMENT MAY NOT FULLY PAY THE INTEREST THAT ACCRUES. AS A RESULT, THE PRINCIPAL AMOUNT I MUST REPAY COULD BE LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __110.000%__ OF THE ORIGINAL AMOUNT (OR $ __175,120.00__ ). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| __July 7, 2006__ | __ATLANTA__ | __Georgia__ |
|---|---|---|
| | (City) | (State) |

__2197 Carlysle Creek Drive, Lawrenceville, GA  30044__

(Property Address)

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ __159,200.00__ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "Principal"), plus interest, to the order of the Lender. The Lender is __American Brokers Conduit__ . I will make all payments under this Note in form of cash, check or money order. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

### 2. INTEREST

Interest will be charged on unpaid Principal until the full amount has been paid. I will pay interest at a yearly rate of __1.900%__ until __July 31, 2006__ , and the initial monthly payment provided for in Section 3(B) of this Note will be based on this rate (the "Initial Rate"). Commencing __August 1, 2006__ , I will pay interest at a yearly rate of __6.832%__ (the "Subsequent Rate"). Thereafter, the interest rate I will pay may change in accordance with Section 4 of this Note. The interest rate required by this Section 2 and Section 4 of this Note is the interest rate I will pay both before and after any default described in Section 7(B) of this Note.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will pay Principal and interest by making payments every month. In this Note, unless otherwise specified "payment" refers to the Principal and interest payment only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.

I Will make my monthly payments on __1st__ day of each month beginning on __September , 2006__ . I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied to interest before Principal. If, on __August 1, 2036__ , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date".

I will make my monthly payments at PO Box 660029, Dallas, TX  75266-0029 , or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments

Each of my monthly payments until the first Payment Change Date will be in the amount of U.S.$ __580.51__, unless adjusted at an earlier time under Section 4(H) of this Note.

(C) Payment Changes

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the Principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

4. INTEREST RATE AND MONTHLY PAYMENT CHANGES

(A) Change Dates

The interest rate I will pay may further change on the __1st__ day of __September__, __2006__, and on that day every month thereafter. Each such date on which my interest rate could change is called a "Change Date."

(B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H. 15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as the 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding _____ __Two and 400 Thousandths__ percentage points __2.400__ % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

(D) Interest Rate Limit

My interest rate will never be greater than __Nine and 950 Thousandths__ _____ percentage points __9.950__ % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

(E) Payment Change Dates

Effective commencing __September 1, 2011__, (the "First Payment Change Date") and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate that will become effective one month prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date. My payments can change at any time, before or after the First Payment Change Date or any Payment Change Dates under Section 4(H) of this Note.

DOC #:944867                          APPL #:0001350490                     Rev 1/27/06
                                      Page 2 of 6                         AHM-2032N(MULT) (0106)

*H.K.*

(F) Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amounts of my new monthly payment, beginning with a Payment Change Date following the First Payment Change Date under Section 4(E), will be limited to 7 ½% more or less than the amount I have been paying. This payment cap applies only to the principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument.

(G) Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization

Since my initial monthly payment will be based on the Initial Rate, which may be different than the Subsequent Rate, my initial monthly payment could be less or greater than the amount of the interest portion (the "Interest Portion") of the monthly principal and interest payment that would be sufficient to repay the unpaid Principal I owe in full on the Maturity Date in substantially equal payments. Additionally, since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the Interest Portion. For each month that the monthly payment is less than the Interest Portion, the Note Holder will subtract the monthly payment from the amount of the Interest Portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the Interest Portion, the Note Holder will apply the excess towards a principal reduction of the Note.

(H) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to _____110.000%___ of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that __110.000%__ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 ½% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the Maturity Date at the interest rate in effect one month prior to the payment due date in substantially equal payments.

(I) Required Full Monthly Payment

On the ___Five_____ anniversary of the due date of the first monthly payment, and on that same day every __Five_____ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

(J) Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

(K) Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial Prepayment of unpaid Principal.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment". When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will apply all of my prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes.

*H.K.*

my partial prepayment may have the effect of reducing the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit, and (b) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in an amount permitted and otherwise in accordance with Applicable Law in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of _____15_____ calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be __5.000__ % of my overdue payment of Principal and interest. I will pay this late charge promptly but only once for each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given to Borrower).

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by Applicable Law. Those expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless Applicable Law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

*H.I.*

any notice that must be given to me under this Note will be given by delivering it or by mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

### Transfer of the Property or a Beneficial Interest in Borrower.

If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay

these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12. MISCELLANEOUS PROVISIONS

In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

### WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____(Seal)        _____(Seal)
Hussain Kareem                    -Borrower                                   -Borrower

_____(Seal)        _____(Seal)
                                  -Borrower                                   -Borrower

_____(Seal)        _____(Seal)
                                  -Borrower                                   -Borrower

_____(Seal)        _____(Seal)
                                  -Borrower                                   -Borrower

DOC #:944871                    APPL #:0001350490

Page 6 of 6                                      AHM-2032N(MULT) (0106)

PAY TO THE ORDER OF

WITHOUT RECOURSE
BY: AMERICAN BROKERS CONDUIT

LISA TURCO
ASST. SECRETARY

**RESPA SERVICING DISCLOSURE**

Lender: American Brokers Conduit
225 Town Park Drive, Suite 450
Kennesaw, GA 30144

**NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS. IF YOUR LOAN IS MADE, SAVE THIS STATEMENT WITH YOUR LOAN DOCUMENTS. SIGN THE ACKNOWLEDGMENT AT THE END OF THIS STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.**

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2601 et seq.) you have certain rights under that Federal law.

This statement tells you about those rights. It also tells you what the chances are that the servicing for this loan may be transferred to a different loan servicer. "Servicing" refers to collecting your principal, interest and escrow account payments, if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains those procedures.

**Transfer Practices and Requirements**

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The new loan servicer must also send you notice within 15 days after the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15 day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the occurrence of certain business emergencies.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

**Complaint Resolution**

Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, *whether or not your loan servicing is transferred.* If you send a "qualified written request" to your servicer, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A "qualified written request" is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and the information regarding your request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day in which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

**Damages and Costs**

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section.

**Servicing Transfer Estimates**

1. The following is the best estimate of what will happen to the _____ servicing of your mortgage loan:

[X] We may assign, sell or transfer the servicing of your loan while the loan is outstanding. We [ ] able to service your loan and we [ ] will [ ] will not [X] haven't decided whether to service your loan.

OR

[ ] We do not service mortgage loans, [ ] and we have not serviced mortgage loans in the past three years. We presently intend to assign, sell or transfer the servicing of your mortgage loan. You will be informed about your servicer. [ ]

[ ] We assign, sell or transfer the servicing of some of our loans while the loan is outstanding depending on the type of loan and other factors. For the program you have applied for, we expect to:

[ ] sell all of the mortgage servicing          [ ] retain all of the mortgage servicing
[ ] assign, sell or transfer _____% of the mortgage servicing

2. For all the first lien mortgage loans that we make in the 12-month period after your mortgage loan is funded, we estimate that the percentage of mortgage loans for which we will transfer servicing is:

_____ [0 to 25%] or [NONE]   _____ 26 to 50%   ___X___ 51 to 75%   _____ [76 to 100%] or [ALL]

This estimate [ ] does [X] does not include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3. [ ] We have previously assigned, sold, or transferred the servicing of federally related mortgage loans.

OR

[X] This is our record of transferring the servicing of the first lien mortgage loans we have made in the past:

| Year | Percentage of Loans Transferred | (Rounded to nearest quartile - 0%, 25%, 50%, 75%, or 100%) |
|------|---------------------------------|------------------------------------------------------------|
| 2003 | 75%-100% % | |
| 2004 | 50%-75% % | |
| 2005 | 50%-75% % | |

This information [ ] does [X] does not include assignments, sales or transfers to affiliates or subsidiaries.

June 28, 2006                                    American Brokers Conduit
Date                                                        Present Servicer or Lender

**ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT**

I/We have read this disclosure form, and understand its contents, as evidenced by my/our signature(s) below. I/We understand that this acknowledgment is a required part of the mortgage loan application.

_Hussain Ka___ 7/07/06
Applicant   Hussain Kareem                Date        Applicant                          Date

Applicant                          Date        Applicant                          Date

UPD1 9501.03
^~-552R (9908)      DOC #:64301
                   APPL #:0001350490        VMP MORTGAGE FORMS - (800)521-7291        12/94


Exhibit "D3"

BK4673OFOU42J

Return To:
American Brokers Conduit
520 Broadhollow Road
Melville, NY 11747

*FILED AND RECORDED*
*CLERK SUPERIOR COURT*
*GWINNETT COUNTY, GA*

06 JUL 17 PM 2:00

TOM LAWLER, CLERK

Prepared By:
Margaret Smith
225 Town Park Drive
Suite 450
Kennesaw, GA
30144

GEORGIA CLOSING ASSOCIATES, INC.
3815 Presidential Parkway, Suite 100
ATLANTA, GEORGIA 30340

*Exhibit B*

————————————— [Space Above This Line For Recording Data] —————————————

## SECURITY DEED

MIN 100024200013504903

GEORGIA INTANGIBLE TAX PAID
$ 478.50

TOM LAWLER
SUPERIOR COURT GWINNETT
COUNTY, GEORGIA

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated July 7, 2006
together with all Riders to this document.
(B) **"Borrower"** is Hussain Kareem

Borrower is the grantor under this Security Instrument.
(C) **"MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the grantee under this Security Instrument.** MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

DOC #:323091                          APPL #:0001350490

GEORGIA -Single Family- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          Form 3011 1/01

-6A(GA) (0005)
Page 1 of 14    UM31 9905.02          Initial: _____

VMP MORTGAGE FORMS - (800)521-7291

0114539

$50

**(D) "Lender"** is American Brokers Conduit

Lender is a Corporation
organized and existing under the laws of  State of New York
Lender's address is  538 Broadhollow Road, Melville, NY  11747

**(E) "Note"** means the promissory note signed by Borrower and dated   July 7, 2006
The Note states that Borrower owes Lender   One Hundred Fifty Nine Thousand Two
Hundred and No/100                                                                                    Dollars
(U.S. $159,200.00            ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than   August 1, 2036
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [X] Other(s) [specify] |
| | | Waiver of Borrower's Rights |

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by
any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property;
(iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or
condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the
Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its
implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time,
or any additional or successor legislation or regulation that governs the same subject matter. As used

DOC #:323092                    APPL #:0001350490

Initial: _H. K._

-6A(CA) (0005)                  Page 2 of 14                    Form 3011  1/01

BK46756PG042

in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS, with power of sale, the following described property located in the

County                                              of    Gwinnett
       [Type of Recording Jurisdiction]              [Name of Recording Jurisdiction]
SEE EXHIBIT A AS ATTACHED HEREIN AND   MADE A PART HEREOF

Parcel ID Number:  7037 613                     which currently has the address of
2197 Carlysle Creek Drive                                                  [Street]
Lawrenceville                          [City] , Georgia      30044  [Zip Code]
("Property Address"):

    TO HAVE AND TO HOLD this property unto MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
    BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

DOC  #:323093            APPL #:0001350490

                                                               Initials: _H.V._

⊕ -6A(GA) (0005)                Page 3 of 14                    Form 3011  1/01

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower

shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10

days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to

BK46756P60491

the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property (as set forth below). Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying

reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, making repairs, replacing doors and windows, draining water from pipes, and eliminating building or other code violations or dangerous conditions. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

DOC  #:323100                          APPL #:0001350490

Initials: *H. V.*

-6A(GA) (0005)                         Page 10 of 14                          Form 3011 1/01

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a

notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

DOC  #:323102                    APPL #:0000135O490

Initials: _HK_

-6A(GA) (0005)                   Page 12 of 14                    Form 3011  1/01

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale granted by Borrower and any other remedies permitted by Applicable Law. Borrower appoints Lender the agent and attorney-in-fact for Borrower to exercise the power of sale. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law. Lender, without further demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Lender determines. Lender or its designee may purchase the Property at any sale.

Lender shall convey to the purchaser indefeasible title to the Property, and Borrower hereby appoints Lender Borrower's agent and attorney-in-fact to make such conveyance. The recitals in the Lender's deed shall be prima facie evidence of the truth of the statements made therein. Borrower covenants and agrees that Lender shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it. The power and agency granted are coupled with an interest, are irrevocable by death or otherwise and are cumulative to the remedies for collection of debt as provided by Applicable Law.

If the Property is sold pursuant to this Section 22, Borrower, or any person holding possession of the Property through Borrower, shall immediately surrender possession of the Property to the purchaser at the sale. If possession is not surrendered, Borrower or such person shall be a tenant holding over and may be dispossessed in accordance with Applicable Law.

23. **Release.** Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. **Waiver of Homestead.** Borrower waives all rights of homestead exemption in the Property.

25. **Assumption Not a Novation.** Lender's acceptance of an assumption of the obligations of this Security Instrument and the Note, and any release of Borrower in connection therewith, shall not constitute a novation.

26. **Security Deed.** This conveyance is to be construed under the existing laws of the State of Georgia as a deed passing title, and not as a mortgage, and is intended to secure the payment of all sums secured hereby.

DOC #:323103
-6A(GA) (0005)

APPL #:0001350490
Page 13 of 14

Initials: _H.V._

Form 3011  1/01

BK467S6P6U49B

BORROWER ACCEPTS AND AGREES to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

IN WITNESS WHEREOF, Borrower has signed and sealed this Security Instrument.

_Hussain Kareem_ _____ (Seal)
Hussain Kareem                     -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

_____ (Seal)
                                   -Borrower

STATE OF GEORGIA,      DeKalb                    County ss:
Signed, sealed and delivered in the presence of:

_____
Unofficial Witness

_____  _____ County
Notary Public
State of Georgia

S. M. STEPHENS
NOTARY
My Comm. Exp.
May 3, 2009
PUBLIC
GWINNETT COUNTY, GEORGIA

DOC #:323104              APPL #:0001350490

-6A(GA) (0005)           Page 14 of 14              Form 3011  1/01

EXHIBIT "A"


ALL THAT TRACT OR PARCEL OF LAND LYING AND BEING IN LAND LOT 37 OF THE 7TH
DISTRICT, OF GWINNETT COUNTY, GEORGIA, AND BEING LOT 68, BLOCK A OF CARLYSLE,
UNIT FOUR, AS PER PLAT RECORDED IN PLAT BOOK 75, PAGE 97 OF GWINNETT COUNTY,
GEORGIA, WHICH PLAT IS INCORPORATED HEREIN AND MADE A PART HEREOF BY
REFERENCE.


*H.K.*

GEORGIA

GRANTOR:   Hussain Kareem

LENDER:   American Brokers Conduit

DATE OF SECURITY DEED:   July 7, 2006

## WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NONJUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:



Signed, Sealed and delivered in the presence of:

_____ (Seal)
Hussain Kareem                -Grantor

_____ (Seal)
                             -Grantor

_____ (Seal)
                             -Grantor

Notary Public

_____ (Seal)
                             -Grantor

## CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with and explanation to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me   Hussain Kareem                                   on the date set forth above.

_____                              _____
Notary Public                                            Closing Attorney

## FORECLOSURE CLOSING DISCLOSURE

O.C.G.A. Section 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.

_____                              _____
Hussain Kareem

_____                              _____



RECEIVE
OCT 3 0 2008
RESEARCH DEPT

THIS IS NOT A PUBLIC
COMMUNICATION
Notice to Agent is Notice to Principle
Notice to Principle is Notice to Agent
Applicable to all successors and assigns
Silence is Acquiescence/Agreement/Dishonor
This is self-executing contract.

DATE: Oct. 18, 2008

Hussain L Kareem, without prejudice
2197 Carlysle Creak Dr
Lawrenceville, GA 30044

Sent Certified Mail # 7008 #00 0091 2243 0907

Re: Rescission Demand Notice

With proof of service to:
Michael Strauz, CEO individually and
American Home Mortgage, Inc., AHMSI, and ET AL
538 Broadhollow Rd.
Melville, NY 11747

OCT 21 2008

0031256902

RE: Alleged Loan # 1001350490 Property Address: 1927 Carlysle Creek Drive , GA 30044

Dear Sir:
In response to my most recent letters from you dated 07/08/2008 regarding my property, I am rescinding your alleged Loan Number 1001350490, as related to the above subject property. You, your bank and your Servicing Company, AHMSI, have received my Affidavit of Non-Response for Debt Validation and my Affidavit Of Security Deed illegally respectively (see Exhibits), pursuant to , but not limited, to my rights under the Fair Debt Collection Practices Act (FDCPA), and the Uniform Commercial Code (UCC), State Commercial Code, Contract Law, Fair Credit Billing Act (FCBA) and the State of Georgia Statutes O.C.G.A. § 44-14-236 and O.C.G.A. § 9-13-27, respectively. You and your interested parties are in default and dishonor. You will have to cease and desist from any collection activities. My rights should not allow you as a debtor, under Federal Bankruptcy protection, Chapter 11, Case No. 07-11047 (CSS) from adhering to the Federal Rescission Demand.

Furthermore, please be advised that I am exercising my rights under Regulation Z of the Truth In Lending Act (TILA) to rescind my mortgage loan transaction (Reg. Z §§ 224.15(a)(2), 226.23(a)(2), Official Staff Commentary §226.23(a)(2)-1) and 15 U.S.C. §1635(b).

FAILURE of the Lender to take necessary and appropriate action to reflect the fact that the security interest was automatically terminated by the rescission within twenty (20) days of creditor's receipt of the rescission notice, is a violation of 15 USC 1635(b);Reg.Z15(d)(2),226.23(d)(2), ( also see "Ameriquest Mortgage Company Mortgage Lending Practices Litigation," M.D.L. No. 1715, Lead Case No. 05-cv07097 (N.D.Ill.)

Therefore, my demand is for you to uphold the all the laws and statues cited and to comply with this rescission demand notice, immediately. Please forward to me a complete accounting of all payments that I have made toward the promissory note. Non compliance shall result in our pursuit of all civil and criminal remedies against all parties, with prejudice.

Sincerely,

Hussain Kareem
All Rights Reserved.

Notary

James T. Owens

JAMES T. OWENS
MY COMMISSION EXPIRES
JAN. 7
2012
GWINNETT CO., GEORGIA
NOTARY PUBLIC

APP 0174



**U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT**
WASHINGTON, D.C. 20410-8000



OFFICE OF HOUSING

September 22, 2009

Hussain Kareem
2197 Carlysle Creek Drive
Lawrenceville, GA 30044

Subject:  RESPA Case Number FR-09-1699

Dear Hussain Kareem:

Thank you for your letter concerning certain problems you have experienced in the transfer of servicing of your loan with American Home Mortgage Servicing, Inc.(AHMSI). HUD's Office of RESPA and Interstate Land Sales administers the Real Estate Settlement Procedures Act, more commonly called RESPA.  A RESPA fact sheet is enclosed.

You sent a qualified written request to the lender explaining the problem.  Please note that lenders do not have an obligation to explain why they have sold the servicing of your loan. You should have received a notice of the transfer of your loan servicing at least 15 days before the effective date of the transfer from your old servicer and no later than 15 days after the effective date of the transfer from your new servicer. HUD's office of RESPA further inquired to AHMSI regarding their alleged failure to provide you with proper notification.  AHMSI's response to this inquiry is enclosed. Unfortunately, HUD has no penalty if the lenders fail to give timely notice.  If you sustained damages, however, you may be able to recover them in court. Please consult with an attorney for further legal advice.

Under RESPA, the servicer has 60 business days in which to respond to a qualified written request.  If your servicer fails to comply with the complaint resolution process set out in Section 6 of RESPA, you could sue for money damages.  We are unable to sue for damages on behalf of an individual.  This office generally does not get involved in disputes over payments but would become involved if the lender failed to comply with Section 6's provisions.  Please let us know if your servicer fails to correct the problem to your satisfaction.  We will then be able to better monitor this servicer for future compliance with our regulatory requirements.

We hope your letter brings about the results you desire. Should you have any questions concerning this matter, please contact Kevin L Stevens at (202) 708-0502.

Sincerely,

Exhibit G
FINAL

## TRUTH-IN-LENDING DISCLOSURE STATEMENT
### (THIS IS NEITHER A CONTRACT NOR A COMMITMENT TO LEND)

| LENDER OR LENDER'S AGENT: | American Brokers Conduit<br>225 Town Park Drive Suite 450<br>Kennesaw, GA  30144 | ☐ Preliminary    ☒ Final<br><br>DATE: 07/07/06<br>LOAN NO.:<br>Type of Loan  Conventional<br>APP NO.:0001350490 |
|---|---|---|
| BORROWERS: | Hussain Kareem | |

ADDRESS:    2197 Carlysle Creek Drive
CITY/STATE/ZIP:Lawrenceville, GA  30044
PROPERTY:   2197 Carlysle Creek Drive
            Lawrenceville, GA 30044

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. |
|---|---|---|---|
| 7.014  % | $ 248,209.24 | $ 155,929.22 | $ 404,138.46 |

**PAYMENT SCHEDULE**

| NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE BEGINNING | NUMBER OF PAYMENTS | AMOUNT OF PAYMENTS | WHEN PAYMENTS ARE DUE MONTHLY BEGINNING |
|---|---|---|---|---|---|
| 44 | $580.51 | September 1, 2006 | 115 | $1,198.08 | May 1, 2010 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**DEMAND FEATURE:** ☒ This loan does not have a Demand Feature.    ☐ This loan has a Demand Feature as follows:

**VARIABLE RATE FEATURE:**
☒ This Loan has a Variable Rate Feature. Variable Rate Disclosures have been provided to you earlier.

**SECURITY:** You are giving a security interest in the property located at:     2197 Carlysle Creek Drive
                                                                                 Lawrenceville, GA 30044

**ASSUMPTION:** Someone buying this property  ☐ cannot assume the remaining balance due under original mortgage terms
☒ may assume, subject to lender's conditions, the remaining balance due under original mortgage terms.

**FILING / RECORDING FEES:**    $

**PROPERTY INSURANCE:** ☒ Property hazard insurance in the amount of $  159,200.00  with a mortgagee clause to the lender
is a required condition of this loan. Borrower may purchase this insurance from  any insurance company acceptable to the lender.
Hazard insurance  ☐ is  ☒ is not available through the lender at an estimated cost of  N/A  for a  year term.

**LATE CHARGES:**  If your payment is more than  15  days late, you will be charged a late charge of  5.000  % of the overdue payment.

**PREPAYMENT:**   If you pay off your loan early, you
☐ may  ☒ will not  have to pay a penalty.
☐ may  ☒ will not  be entitled to a refund of part of the finance charge.

See your contract documents for any additional information regarding     late payment, default, required repayment in full before scheduled date,    and prepayment refunds and
conditions.                                                                                                                       penalties.
a means estimate

I/We hereby acknowledge reading and receiving a complete copy of this disclosure.

_Hussain K_____  7/7/06 _____    _____
Hussain Kareem          BORROWER / DATE                    BORROWER / DATE

_____            _____
                        BORROWER / DATE                    BORROWER / DATE