**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| -------------------------------------------------------------- x | Chapter 11 |
| In re: | : |
| | : Case No. 07-11047 (CSS) |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., | : |
| a Delaware corporation, et al., | : Jointly Administered |
| | :  Ref/ Docket No. 9692, 10148, 10183 & 10132 |
| Debtors. | : |
| -------------------------------------------------------------- | : |
| | x |

## CLAIMANT'S POST TRIAL  REPLY BRIEF:

## TABLE OF CONTENT FOR EXHIBITS

I.     **Exhibit 500**-Delaware's Secretary of State Registration of American Home Mortgage Asset Trust (AHMA) 2007-SD2 (active)

II.     **Exhibit 600-** Waiver of Borrower's Rights

III.    **Exhibit 700-** Global Mortgage Inc. Revoked License 2/02/07

IV.     **Exhibit 800-** America Home Mortgage Corp. Lender License Withdrawn 09/05/07

V.     **Exhibit 900**-  Loan Mod Forensics Compliance Findings on Global Mortgage and AHM Corp.

VI.     **Exhibit 1000- Verfication by Walter Fordham on Compliance Findings.**

VII.   **Exhibit 1100- Titan Lenders Corp. Press Release Deploys Mavent Compliance Console.**

VIII.  **Exhibit 1200**- Order to Cease and Desist Citing OCGA 7-1-242

IX.     **Exhibit D3**- RESPA  Servicing Disclosure dated 7/07/06

Delaware.gov | Text Only                                    Governor | General Assembly | Courts | Elected Officials | State Agencies

✖ Photo: Featured Delaware Photo

**Exhibit 500**

## Department of State: Division of Corporations

**HOME**
About Agency
Secretary's Letter
Newsroom
Frequent
Questions
Related Links
Contact Us
Office Location

**SERVICES**
Pay Taxes
File UCC's
Delaware Laws
Online
Name Reservation
Entity Search
Status
Validate
Certificate
Customer Service
Survey

**INFORMATION**
Corporate Forms
Corporate Fees
UCC Forms and
Fees
Taxes
Expedited
Services
Service of Process
Registered Agents
Get Corporate
Status
Submitting a
Request  How to
Form a New
Business Entity
Certifications,
Apostilles &
Authentication of
Documents

Frequently Asked Questions   View Search Results

| Entity Details |
| --- |

### THIS IS NOT A STATEMENT OF GOOD STANDING

| File Number: | **4351362** | Incorporation Date / Formation Date: | **05/14/2007** (mm/dd/yyyy) |
| --- | --- | --- | --- |
| Entity Name: | **AMERICAN HOME MORTGAGE ASSETS TRUST 2007-SD2** | | |
| Entity Kind: | **STATUTORY TRUST** | Entity Type: | **GENERAL** |
| Residency: | **DOMESTIC** | State: | **DE** |

### REGISTERED AGENT INFORMATION

| Name: | **WILMINGTON TRUST COMPANY** | | |
| --- | --- | --- | --- |
| Address: | **RODNEY SQUARE NORTH 1100 N. MARKET STREET** | | |
| City: | **WILMINGTON** | County: | **NEW CASTLE** |
| State: | **DE** | Postal Code: | **19890** |
| Phone: | **(302)636-6543** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ⦿ Status ○ Status,Tax & History Information  [ Submit ]

[ Back to Entity Search ]

To contact a Delaware Online Agent click here.

site map   |   about this site   |   contact us   |   translate   |   delaware.gov

# Entity Details

| | | | |
|---|---|---|---|
| File Number: | 4351362 | Incorporation Date / Formation Date: | 05/14/2007 (mm/dd/yyyy) |
| Entity Name: | AMERICAN HOME MORTGAGE ASSETS TRUST 2007-SD2 | | |
| Entity Kind: | STATUTORY TRUST | Entity Type: | GENERAL |
| Residency: | DOMESTIC | State: | DE |
| Status: | GOOD STANDING | Status Date: | 05/14/2007 |

## TAX INFORMATION

| | | | |
|---|---|---|---|
| Last Annual Report Filed: | NO REPORTS ON FILE | Tax Due: | $ 0.00 |
| Annual Tax Assessment: | $ 0.00 | Total Authorized Shares: | 0 |

## REGISTERED AGENT INFORMATION

| | | | |
|---|---|---|---|
| Name: | WILMINGTON TRUST COMPANY | | |
| Address: | RODNEY SQUARE NORTH 1100 N. MARKET STREET | | |
| City: | WILMINGTON | County: | NEW CASTLE |
| State: | DE | Postal Code: | 19890 |
| Phone: | (302)636-6543 | | |

## FILING HISTORY (Last 5 Filings)

| Seq | Document Code | Description | No. of pages | Filing Date (mm/dd/yyyy) | Filing Time | Effective Date (mm/dd/yyyy) |
|---|---|---|---|---|---|---|
| 1 | 0102B | Register Statutory Trust | 1 | 05/14/2007 | 11:57 | 05/14/2007 |

Back to Entity Search

To contact a Delaware Online Agent click here.

GEORGIA

GRANTOR:   Hussain Kareem

LENDER:   American Brokers Conduit

DATE OF SECURITY DEED:   July 7, 2006



*Exhibit 600*

# WAIVER OF BORROWER'S RIGHTS

BY EXECUTION OF THIS PARAGRAPH, GRANTOR EXPRESSLY: (1) ACKNOWLEDGES THE RIGHT TO ACCELERATE THE DEBT AND THE POWER OF ATTORNEY GIVEN HEREIN TO LENDER TO SELL THE PREMISES BY NON-JUDICIAL FORECLOSURE UPON DEFAULT BY GRANTOR WITHOUT ANY JUDICIAL HEARING AND WITHOUT ANY NOTICE OTHER THAN SUCH NOTICE AS IS REQUIRED TO BE GIVEN UNDER THE PROVISIONS HEREOF; (2) WAIVES ANY AND ALL RIGHTS WHICH GRANTOR MAY HAVE UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES, THE VARIOUS PROVISIONS OF THE CONSTITUTION FOR THE SEVERAL STATES, OR BY REASON OF ANY OTHER APPLICABLE LAW TO NOTICE AND TO JUDICIAL HEARING PRIOR TO THE EXERCISE BY LENDER OF ANY RIGHT OR REMEDY HEREIN PROVIDED TO LENDER, EXCEPT SUCH NOTICE AS IS SPECIFICALLY REQUIRED TO BE PROVIDED HEREOF; (3) ACKNOWLEDGES THAT GRANTOR HAS READ THIS DEED AND SPECIFICALLY THIS PARAGRAPH AND ANY AND ALL QUESTIONS REGARDING THE LEGAL EFFECT OF SAID DEED AND ITS PROVISIONS HAVE BEEN EXPLAINED FULLY TO GRANTOR AND GRANTOR HAS BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH COUNSEL OF GRANTOR'S CHOICE PRIOR TO EXECUTING THIS DEED; (4) ACKNOWLEDGES THAT ALL WAIVERS OF THE AFORESAID RIGHTS OF GRANTOR HAVE BEEN MADE KNOWINGLY, INTENTIONALLY AND WILLINGLY BY GRANTOR AS PART OF A BARGAINED FOR LOAN TRANSACTION; AND (5) AGREES THAT THE PROVISIONS HEREOF ARE INCORPORATED INTO AND MADE A PART OF THE SECURITY DEED.

READ AND AGREED BY GRANTOR:



Signed, Sealed and delivered in the presence of:

_____    _____ (Seal)
                                             Hussain Kareem              -Grantor

_____    _____ (Seal)
                                                                         -Grantor

_____    _____ (Seal)
                                                                         -Grantor

Notary Public                                _____ (Seal)
                                                                         -Grantor

# CLOSING ATTORNEY'S AFFIDAVIT

Before the undersigned attesting officer personally appeared the undersigned closing attorney, who, having been first duly sworn according to law, states under oath as follows:

In closing the above loan, but prior to the execution of the Deed to Secure Debt and "Waiver of the Borrower's Rights" by the Borrower(s), I reviewed with and explained to the Borrower(s) the terms and provisions of the Deed to Secure Debt and particularly the provisions thereof authorizing the Lender to sell the secured property by a nonjudicial foreclosure under a power of sale, together with the "Waiver of Borrower's Rights" and informed the Borrower(s) of Borrower's rights under the Constitution of the State of Georgia and the Constitution of the United States to notice and a judicial hearing prior to such foreclosure in the absence of a knowing, intentional and willing contractual waiver by Borrower(s) of Borrower's rights. After said review with and explanation to Borrower(s), Borrower(s) executed the Deed to Secure Debt and "Waiver of Borrower's Rights."

Based on said review with and explanation to the Borrower(s), it is my opinion that Borrower(s) knowingly, intentionally and willingly executed the waiver of Borrower's constitutional rights to notice and judicial hearing prior to any such nonjudicial foreclosure.

Sworn to and subscribed before me          Hussain Kareem

                                                                         on the date set forth above.

Notary Public                                               Closing Attorney

# FORECLOSURE CLOSING DISCLOSURE

**O.C.G.A. Section 7-1-1014(3) requires that we inform you that if you fail to meet any condition or term of the documents that you sign in connection with obtaining a mortgage loan you may lose the property that serves as collateral for the mortgage loan through foreclosure.**

_____    _____
Hussain Kareem

Ga Mortgage Licensee Search - Search by Name, Sort by Name

EXHIBIT TOO

**19642  Global Mortgage of Delaware, Inc.**
**Broker dba : Global Mortgage, Inc.**
14440 Myer Lake Circle
Clearwater, FL 33760-2813

    **Subject to Consent Agreement**
    **Eff Date: 02-07-2007**
**Reason: 7-1-1002; 7-1-1013(1)(2)(6)(11);**
    **7-1-1006;7-1-1004**

**Broker license**
**REVOKED 02-07-2007**

Other DBA's List

**19642  Global Mortgage of Delaware, Inc.**
**Broker** 14440 Myer Lake Circle
Clearwater, FL 33760-2813

    **Subject to Consent Agreement**
    **Eff Date: 02-07-2007**
**Reason: 7-1-1002; 7-1-1013(1)(2)(6)(11);**
    **7-1-1006;7-1-1004**

**Broker license**
**REVOKED 02-07-2007**

Other DBA's List

**22108**  Global Mortgage Financial Group, Inc.
**Broker dba : Global Mortgage Financial Group Inc**
6568 Cobia Circle
Boynton Beach, FL 33437

**Broker license**
**EXPIRED 07-01-2009**

Other DBA's List

**22108  Global Mortgage Financial Group, Inc.**
**Broker** 6568 Cobia Circle
Boynton Beach, FL 33437

**Broker license**
**EXPIRED 07-01-2009**

Other DBA's List

**19067  Global Mortgage Group, Inc. (SC)**
**Lender** 669 Marina Drive Suite A3
Charleston, SC 29492

**Lender license**
**EXPIRED 07-01-2007**

Other DBA's List

**7455   Global Mortgage, Inc.**
**Broker** 5161 Brook Hollow Parkway Suite 200A
Norcross, GA 30093

**Broker license**
**EXPIRED 07-01-2001**

Other DBA's List

**22009  Global Mortgage Lenders, LLC**
**Broker** 911 Duluth Highway Suite D3275
Lawrenceville, GA 30043

**Broker license**
**EXPIRED 10-02-2008**

**No additional
dba names.**

https://dbfweb.dbf.state.ga.us/cgi-bin/WebMB.exe/NameName

Exhibit 800

# Department of
# Banking & Finance
*"Safeguarding Georgia's Financial Services"*

**Information as of 03/27/2012 6:13:12 PM**

Back

## Your selection criteria was : name contains 'American Brokers Con'

License name, dba name, or primary contact name appear in bold if the criteria you selected found a match in that name type.

| |=Broker| | |=Processor| | |=Lender| | |=Registrant| | |=Not a valid license|

**LIC#**
**14650**
**Lender**

**LICENSEE**
American Home Mortgage Corp.
dba : **American Brokers Conduit**
538 Broadhollow Road
Melville, NY 11747

**CONTACTS**

**Lender license**
**WITHDRAWN 09-05-2007**

**LISTS**

Other DBA's List

Back

3/27/2012 8:46 PM

1 of 1

*Exhibit 900*

| APR | | |
|---|---|---|
| Review: | | PASS |
| Disclosed APR: | | 7.014000% |
| Calculated APR: | | 7.0839% |
| Difference: | | (0.0699%) |

| Finance Charges | | |
|---|---|---|
| Review: | | FAIL |
| Disclosed Finance Charges: | | $ 248,209.24 |
| Calculated Finance Charges: | | $ 252,868.06 |
| Difference: | | ($ 4,658.82) |

**Calculation data**

| Jurisdiction | Finance Charge Amount | Financed Amount | APR | Days of Prepaid Interest | Daily Prepaid Interest Amount |
|---|---|---|---|---|---|
| FED | $ 252,868.06 | $ 156,415.72 | 7.0839% | 20 | $ 8.29 |

| Fees Included | Paid By | Paid To | Amount |
|---|---|---|---|
| Loan Origination Fee: | Borrower | Originator | $ 350.24 |
| Processing Fee: | Borrower | Originator | $ 495.00 |
| Tax Related Service Fee: | Borrower | Lender | $ 92.00 |
| Flood Certification Fee: | Borrower | Lender | $ 19.00 |
| Commitment (Rate Lock) Fee: | Borrower | Lender | $ 480.00 |
| Broker Fees: | Borrower | Originator | $ 1,000.00 |
| Prepaid Interest: | Borrower | Lender | $ 168.04 |
| Attorney's Fees: | Borrower | Provider | $ 100.00 |
| Courier Fee: | Borrower | Provider | $ 45.00 |
| Courier Fee: | Borrower | Provider | $ 15.00 |
| Recording Service Fee: | Borrower | Provider | $ 20.00 |
| **Total Fees:** | | | **$ 2,784.28** |

| Fees Excluded | Paid By | Paid To | Amount |
|---|---|---|---|
| GA Residential Mortgage Act Per Loan Fee: | Borrower | Lender | $ 6.50 |
| Yield Spread Premium/Rebate: | Lender | Originator | $ 507.00 |
| Insurance Premium - Hazard: | Borrower | Lender | $ 614.00 |
| Title Examination: | Borrower | Provider | $ 150.00 |
| Title Insurance: | Borrower | Provider | $ 719.02 |
| Tax Status Research Fee: | Borrower | Provider | $ 15.00 |
| Doc Tax Stamps/Transfer Taxes - State: | Borrower | Provider | $ 478.50 |
| Recording Fees-Mortgage/Deed of Trust: | Borrower | Provider | $ 70.00 |
| Filing Fees: | Borrower | Provider | $ 50.00 |
| **Total Fees:** | | | **$ 2,700.02** |

**TILA MDIA Disclosure**

**Disclosed Payment Summary**

**TILA-Right of Rescission**   Result: PASS

Loan Disbursement Date:   2006-07-12

*Page 2 of 5*

Exhibit 900

| Right To Cancel Expire Date: | 2006-07-11 | |
| Right to Cancel Signed Date: | 2006-07-07 | |

## TILA-Payment

| Payment Date | |
| --- | --- |
| LTV Drop Date. | N/A |
| Sum of Payments: | $ 409,383.78 |

### Payment Stream Worksheet

#### Calculated Data

| Number of Payments | Date | Payment Amount |
| --- | --- | --- |
| 42 | 2006-09-01 | $580.51 |
| 317 | 2010-03-01 | $1,210.39 |
| 1 | 2036-08-01 | $1,208.73 |

## High Cost ( FED ) Second Pass    Result: PASS

Federal Total Loan Amount: $156,415.72

| APR Result | | Fee Result | |
| --- | --- | --- | --- |
| Limit Rate: | 13.1300% | Fee Limit: | $ 12,513.26 |
| Loan Rate: | 7.0839% | Loan Fees: | $ 2,616.24 |
| Difference: | 6.0461% | Difference: | $ 9,897.02 |

| Fees Included | Paid By | Paid To | Amount |
| --- | --- | --- | --- |
| Loan Origination Fee : | Borrower | Originator | $ 350.24 |
| Processing Fee : | Borrower | Originator | $ 495.00 |
| Tax Related Service Fee : | Borrower | Lender | $ 92.00 |
| Flood Certification Fee : | Borrower | Lender | $ 19.00 |
| Commitment (Rate Lock) Fee : | Borrower | Lender | $ 480.00 |
| Broker Fees : | Borrower | Originator | $ 1,000.00 |
| Attorney's Fees : | Borrower | Provider | $ 100.00 |
| Courier Fee : | Borrower | Provider | $ 45.00 |
| Courier Fee : | Borrower | Provider | $ 15.00 |
| Recording Service Fee : | Borrower | Provider | $ 20.00 |
| **Total Fees:** | | | **$ 2,616.24** |

| Fees Excluded | Paid By | Paid To | Amount |
| --- | --- | --- | --- |
| GA Residential Mortgage Act Per Loan Fee : | Borrower | Lender | $ 6.50 |
| Yield Spread Premium/Rebate : | Lender | Originator | $ 587.00 |
| Prepaid Interest : | Borrower | Lender | $ 168.04 |
| Insurance Premium - Hazard : | Borrower | Lender | $ 614.00 |
| Title Examination : | Borrower | Provider | $ 150.00 |
| Title Insurance : | Borrower | Provider | $ 718.02 |
| Tax Status Research Fee : | Borrower | Provider | $ 15.00 |
| Doc Tax Stamps/Transfer Taxes - State : | Borrower | Provider | $ 478.50 |
| Recording Fees-Mortgage/Deed of Trust : | Borrower | Provider | $ 70.00 |
| Filing Fees : | Borrower | Provider | $ 50.00 |
| **Total Fees:** | | | **$ 2,868.06** |

Page 3 of 5

*Exhibit 900*

| High Cost ( GA ) Second Pass | Result: PASS |
|---|---|

**Federal Total Loan Amount: $156,415.72**

| APR Result | |
|---|---|
| Limit Rate: | 13.1300% |
| Loan Rate: | 7.0839% |
| Difference: | 6.0461% |

| Fee Result | |
|---|---|
| Fee Limit: | $ 7,820.79 |
| Loan Fees: | $ 3,213.24 |
| Difference: | $ 4,607.55 |

| Fees Included | Paid By | Paid To | Amount |
|---|---|---|---|
| Loan Origination Fee : | Borrower | Originator | $ 350.24 |
| Processing Fee : | Borrower | Originator | $ 495.00 |
| Tax Related Service Fee : | Borrower | Lender | $ 92.00 |
| Flood Certification Fee : | Borrower | Lender | $ 19.00 |
| Commitment (Rate Lock) Fee : | Borrower | Lender | $ 480.00 |
| Broker Fees : | Borrower | Originator | $ 1,000.00 |
| Yield Spread Premium/Rebate : | Lender | Originator | $ 597.00 |
| Attorney's Fees : | Borrower | Provider | $ 100.00 |
| Courier Fee : | Borrower | Provider | $ 45.00 |
| Courier Fee : | Borrower | Provider | $ 15.00 |
| Recording Service Fee : | Borrower | Provider | $ 20.00 |
| **Total Fees:** | | | **$ 3,213.24** |

| Fees Excluded | Paid By | Paid To | Amount |
|---|---|---|---|
| GA Residential Mortgage Act Per Loan Fee : | Borrower | Lender | $ 6.50 |
| Prepaid Interest : | Borrower | Lender | $ 158.04 |
| Insurance Premium - Hazard : | Borrower | Lender | $ 614.00 |
| Title Examination : | Borrower | Provider | $ 158.00 |
| Title Insurance : | Borrower | Provider | $ 719.02 |
| Tax Status Research Fee : | Borrower | Provider | $ 15.00 |
| Doc Tax Stamps/Transfer Taxes - State : | Borrower | Provider | $ 478.50 |
| Recording Fees-Mortgage/Deed of Trust : | Borrower | Provider | $ 70.00 |
| Filing Fees : | Borrower | Provider | $ 50.00 |
| **Total Fees:** | | | **$ 2,271.06** |

| Higher-Priced (FED) Review | Result: PASS |
|---|---|

| Higher-Rate Review | Result: PASS |
|---|---|

| HOEPA Review | Result: PASS |
|---|---|

| State Rules Review | Result: FAIL |
|---|---|

**Message:**The System could not complete its State Rules Review because of an issue with the Licensing Reviewer (LIC).

| Review Status: | FAIL |
|---|---|
| Rule: | Mavent Message(10000009) |

*Page 4 of 5*

Exhibit 900

## License Review - Lender    Result: **FAIL**

**Message:** A Georgia Residential Mortgage Act license or registration is needed to make or broker loans on and after July 1, 2009 secured by a 1-4 unit primary dwelling. (Ga. Code 7-1-1000(17), (20), (21); 7-1-1001(a)(2.1)) A Georgia Residential Mortgage Act license or registration is needed to make or broker loans before July 1, 2009 secured by a 1-4 unit dwelling. (Ga. Code 7-1-1000(9), (12), (13); 7-1-1001(2.1))

| Review Status: | FAIL |
| --- | --- |
| License Review: | License Review - Lender ( LIC ) |

## License Review - Broker    Result: **FAIL**

**Message:** A Georgia Residential Mortgage Act license or registration is needed to make or broker loans on and after July 1, 2009 secured by a 1-4 unit primary dwelling. (Ga. Code 7-1-1000(17), (20), (21); 7-1-1001(a)(2.1)) A Georgia Residential Mortgage Act license or registration is needed to make or broker loans before July 1, 2009 secured by a 1-4 unit dwelling. (Ga. Code 7-1-1000(9), (12), (13); 7-1-1001(2.1))

| Review Status: | FAIL |
| --- | --- |
| License Review: | Lender Is FNB/FSB or > 4 Units or Non-Primary |

## Geocode Data    Result: **PASS**

| | | | |
| --- | --- | --- | --- |
| Address 1: | 2197 Carlysle Creek Dr | Latitude: | 33.951946 |
| Address 2: | | Longitude: | -84.075204 |
| City: | Lawrenceville | CBSA Number: | 12060 |
| County: | Gwinnett County | CBSA Division: | |
| State: | GA | Census Tract: | 0505.34 |
| Zip Code: | 30044-2274 | Match Code: | S80 |
| State FIPS: | 13 | Location Quality Code: | AS0 |
| County FIPS: | 135 | Score: | 1.9925000 |

## Making Home Affordable Enterprise Rules Review    Result: **PASS**

## LO Compensation (TILA) Review    Result: **PASS**

## Service Info    Result: **WARNING**

| | |
| --- | --- |
| Mavent Transaction ID: | 01480317090001350490618184882012032721500540 |
| Service Code: | DI-ComplianceReview-MHA |
| Received: | 2012-03-27  21: 50: 05: 460 |
| Returned: | 2012-03-27  21: 47: 37: 535 |

| Service | Status |
| --- | --- |
| ARM Mapper | PASS |
| Geocode | PASS |
| SDS Prepayment Penalty Plan | PASS |
| Index Review | PASS |
| Perform Mortgage Calculations | WARNING |

**Message:** The (20060707) Application Date provided in this loan file occurs on the same day as the (20060707) Consummation Date.

©2001 - 2012 Mavent Inc.

Page 5 of 5

Exhibit 900



# LOAN MOD FORENSICS

| | | |
|---|---|---|
| **Customer:** | No Predatory Lending (0148031709) | **Review Status:** **FAIL** |
| **Loan ID:** | 0001350490 | **Review Date:** 2012-03-27 |
| **Review ID:** | 01480317090001350490618184882012 0327215005460 | **State:** GA |
| **Location:** | Main | |
| **Borrower:** | Hussain Kareem | |

**Loan Status: FAIL**

| High Cost | Higher Priced | TILA | State Rules | License | NMLS | OFAC | HMDA | GSE | Enterprise Rules | Other |
|---|---|---|---|---|---|---|---|---|---|---|
| PASS | PASS | FAIL | FAIL | FAIL | Not Requested | Not Requested | Not Requested | Not Requested | PASS | WARNING |

## Request Summary          Result: FAIL

| | | | | |
|---|---|---|---|---|
| **Borrower:** | Hussain Kareem | | **Seller:** | |
| **Reviewed by:** | Trained Mavent Operator | | **Originator:** | Global Mortgage |
| **Location:** | Main | | **First Group:** | |
| **Loan ID:** | 0001350490 | | **Second Group:** | |
| | | | **Third Group:** | |
| | | | | |
| **Address 1:** | 2197 Carlyale Creek Drive | | **Lien Position:** | 1 |
| **Address 2:** | | | **Occupancy Type:** | Primary |
| **City:** | Lawrenceville | | **Property Type:** | SFR Detached |
| **County:** | | | **Mortgage Type:** | Conventional |
| **State:** | GA | | **FHA Section:** | |
| **Zip Code:** | 30044 | | **Transaction Type:** | Cash Out Refinance |
| | | | **Origination Type:** | Wholesale |
| | | | **Documentation Type:** | Full Documentation |
| | | | **Appraised Price:** | $ 159,200.00 |
| | | | **Sales Price:** | $ 0.00 |
| | | | **Loan Amount:** | $ 159,200.00 |
| | | | **As-Is Value:** | $ 0.00 |
| | | | **After-Improved Value:** | $ 0.00 |
| | | | **Total Rehabilitation Cost:** | $ 0.00 |

## TILA-Tolerance          Result: FAIL

**Message:**The disclosed finance charge ($248,209.24) is ($4,658.82) below the actual finance charge ($252,868.06). For rescission after initiation of foreclosure, the Truth in Lending Act considers the disclosed finance charge inaccurate if it is more than $35 below the actual finance charge. (15 USC Sec. 1635(i)(2)).

**Message:**The disclosed finance charge ($248,209.24) is ($4,658.82) below the actual finance charge ($252,868.06). The Truth in Lending Act considers the disclosed finance charge inaccurate if it is more than $100 below the actual finance charge. (12 CFR Sec. 226.18(d)(1)).

**Message:**The disclosed finance charge ($248,209.24) is less than the actual finance charge ($252,868.06) by ($4,658.82). For rescission purposes, the Truth in Lending Act considers the finance charge inaccurate if it is understated by more than half of 1% of the note amount ($796.00) or $100, whichever is greater. (12 CFR Sec. 226.23(g)).

Page 1 of 5

Exhibit 1000

## Verification of Compliance Audit Findings

### By Walter Fordham, Certified Mavent Compliance Auditor

### For: Hussain Kareem, Mortgagor
### 2197 Carlysle Creek Drive
### Lawrenceville, GA 30044

### General Mortgage Loan Information:

Loan number: 0001350490                    Date of Origination Closing: 07/06/2006
Loan Type: 12-Month Treasury Adjustable Rate Mortgage      Amortization Period: 30 years
Loan Transaction Type: Refinance

### Nationwide and State License Certifications Check:

Lender/Mortgagee: American Home Mortgage Corp., d/b/a American Brokers Conduit, Melville, NY
GA Banking & Finance License No: 14560      Status: Withdrawn As of 9/05/2007
Originator or Broker: Global Mortgage Delaware, Inc., Clearwater, FL
GA Banking & Finance License No: 19642      Status: Revoked As of 2/7/2007
Comments: See Published Reasons for Revocation Under Georgia's Banking Codes Violation Report (Addendum)

### Verification Pursuant to 28 U.S.C. §1746 (2)

I, Walter Fordham, the undersigned, swear that I am older than 18 years if age, competent, law abiding, and I am in good standings. I verify under the penalty of perjury that the foregoing is true and correct under the applicable federal code 28 U.S.C. §1746(2), as follows:

1.  I am a certified operator who reviewed the underlying documents which were known to matched to the transaction described above encompassing the refinance and subject property inclusive of the following: H.U.D. Settlement Statement, the Adjustable Rate Mortgage Note, the TILA Disclosure Statement, the 5- Year Fixed Payment 12 Month MTA Index Power ARM Disclosure and the Loan Application.

2.  The documents were sufficient for the Mavent System to conduct an independent assessment for lender compliance. The scope of the determination utilizes applicable federal and state regulatory standards, applicable statutes and licensing requirements.

3.  The Mavent System and its reports have achieved one of the highest rating credentials and its service is known as a leader in the mortgage industry for compliance audits. Fannie Mae, major top ten banks and other governmental agencies have found Mavent to comply with their

requirements on lending audits. The system and its software tools speaks for themselves (see Attached Press releases).

4. My company is No Predatory Lending with a Customer No. 0148031709. We performed the audit on March 27, 2012.

5. Overall, the Lender and the Broker/originator failed the compliance audit test when the data was applied from the underlying documents contained in section 1 above. I am very accustomed to running these tests for I have done these types of audits for more than 5 years.

6. Specific areas of failure came from, TILA requirements, State Rules requirements, and License requirements. There were other warnings posted from the test.

7. In my opinion, the underlying loan was determined by Mavent System to be a predatory loan. Accordingly it failed to past the thresholds required for lending practice standards, required disclosures and direct applicable laws cited by the compliance audit.

8. The results are contained in the reported contemporaneously attached to this verification containing our name, Customer Number, the mortgagor information, loan number and subject property address as stated above.

9. This verification was made to reflect the facts that the Mavent System findings were based on data derived from the documents, that enough data was sufficient to commence the test and the results reflects the findings relevant to the transaction, the applicable disclosures and applicable laws, statutes and regulations for both federal and the State of Georgia.

10. Some aspects of the Mavent test were not requested; therefore, the report reflects these factors in its findings, as "Not Requested".

I, Walter Fordham, the undersigned, verify the above statements are true, correct and made with personal knowledge to the best of my beliefs.

Executed to Support the Report Made on March 27, 2012

Walter Fordham, Licensed Operator
2 Ravina Drive, Suite 500
Atlanta,GA 30346
(Direct) 404-671-9555 ext. 812
walter@nopredatorylending.com

Attachments:
Loan MOD Forensics Report Containing Mavent Findings
Press Release: Titan Lenders Corp. Deploys Mavent Compliance Console (MC2)
Revocation Under Georgia's Banking Code Violations Report

Exhibit 1100



**Media Contact:**     Kerri Milam
                       Titan Lenders Corp
                       404.378.0850
                       kerri@depthpr.com

## Titan Lenders Corp. Deploys Mavent Compliance Console (MC2).

*Partnership Enables Comprehensive, Low Cost Mortgage Loan Compliance Review*

**(July 24. 2007) IRVINE, Calif.** -- Mavent Inc., a provider of automated regulatory compliance solutions to the mortgage industry's largest originators and investors, announced today a partnership with Denver-based Titan Lenders Corp., a closing, post closing and mortgage fulfillment outsource services provider.

Enabled by its Cerberyx web-based technology platform, Titan Lenders Corp. can submit its client loan data for quality control and due diligence to the Mavent Compliance Console (MC2) for review with:

* Truth in Lending Act (TILA) calculations, tolerances and right of rescission analysis
* Home Ownership Equality Protection Act (HOEPA)
* State and local high cost thresholds
* State consumer credit laws (beyond high cost)
* Lender and broker licensing
* The approved Fannie Mae points and fees test

MC2 is the front-end, Web-based interface to the Mavent Expert System, a comprehensive automated system that submits loan data for reviews against nearly 300 legislative acts, roughly 200 license types, and the rules and regulations of over 60 regulatory authorities.

"Minimizing compliance risk is a fact of life for lenders and investors alike; requiring in-house expertise and resources is often times impractical for most small to mid-sized lenders," said Mary Kladde, founder and CEO of Titan Lenders Corp. "By utilizing Mavent's MC2 portal, Titan Lenders Corp. gives its clients access to the same sophisticated tool used by the industry's largest institutions, at the same low cost per review."

"Titan's veteran management is committed to providing its clients unsurpassed quality, improved efficiency and cost-reducing services," said Louis Pizante, CEO of Mavent. "Titan's relationship with Mavent is a noteworthy example of this commitment. Our partnership will enable Titan's clients to focus on growing their business while remaining confident that they are originating and purchasing compliant loans, in a manner that is cost effective."

Exhibit 1100

**About Mavent Inc.**

Mavent Inc. is a leading provider of automated regulatory compliance solutions to the mortgage industry's largest originators and investors, as well as medium and small-size institutions. The company is the developer of the patent-pending Mavent Expert System, a comprehensive automated solution that submits loan data for reviews against nearly 300 legislative acts, roughly 200 license types, and the rules and regulations of over 60 regulatory authorities. The Mavent system can be accessed through the front end, Web-based Mavent Compliance Console (MC2) or fully integrated through an organization's loan origination system (LOS). Mavent's legal reviews are jointly developed and supported by Mavent's in-house Legal Team and its network of nationally recognized consumer credit law firms - which includes Hudson Cook, Buckley Kolar and Pierce Atwood.

Mavent's clients include some of the most prominent institutions in the industry, including Fannie Mae, Citimortgage, National City Mortgage Corp., First Franklin (a subsidiary of Merrill Lynch Bank & Trust Co., FSB.), GreenPoint Mortgage (a subsidiary of Capital One Financial Corp.), Credit Suisse, Ocwen Financial Corp., AmTrust Bank and HomeLoanCenter (a division of LendingTree). For more information on Mavent, visit the company Web site at www.mavent.com.

**About Titan Lenders Corp.**

Founded in 2007 by acknowledged industry expert Mary Kladde, Titan Lenders Corp. is a Denver, Colorado provider of **mortgage back office** outsource services. Titan was created to meet the mortgage industry's increasing demand for a variable cost solution to managing closing, post closing and **mortgage fulfillment** processes without maintaining personnel or an investment in technology infrastructure. Titan enables mortgage bankers, brokers and investors to decrease risk, increase closing capacity, reduce errors and protect loan profitability by outsourcing process-intensive back office functions while focusing on productive origination strategies. Focused on delivering business process improvement to mortgage lenders through its time-tested and proven back office methodologies, Titan Lenders Corp. emphasizes attentive customer service and the use of its powerful technology to accommodate its customers' unique mortgage lending business objectives.

Titan Lenders Corp. intelligent processes are driven by its proprietary technology, Cerberyx, co-developed with eSys Technologies, Rochester, NY (www.esystechnologies.com). Cerberyx is the evolution of a software technology application developed to replace manual processes required to manage the lender's participation in closing and post-closing functions. As a business solution, the software was developed in the practical laboratory of a closing and post-closing division servicing multiple lenders, investors, and lending business channels. It addresses the needs of all users in the transaction - accountability, visibility, efficiency and ease of use - while never losing sight of the end goal: loan salability.

For more information about Titan Lenders Corp., mortgage fulfillment and outsourced back-office mortgage operations, contact Mary Kladde at mary.kladde@titanlenderscorp.com.

*Exhibit 1200*

# Department of Banking and Finance

*2990 Brandywine Road, Suite 200*
*Atlanta, Georgia 30341-5565*

*Sonny Perdue*
*Governor*

*770-986-1633*
*www.gadbf.org*

*David G. Sorrell*
*Commissioner*

**January 5, 2004**

**Via U.S. Certified Return Receipt #7002 3150 0003 8020 5882
and Facsimile 770-988-8300**

Mr. Londzell Hardy
Officers, Directors and Employees
"First Liberty Savings and Credit Union"
1950 Spectrum Circle
Suite 400-3009
Marietta, Georgia 30067

**RE:    Order to Cease and Desist**

Dear Mr. Hardy, Officers, Directors and Employees:

Since we did not hear from you by Monday, January 5, 2004, we are enclosing the Order to Cease and Desist (Order) as referenced in our letters of December 19 and December 29, 2003.  The Order is effective January 5, 2004.

Sincerely,

Grace M. Lurry, CFE, CEM
Deputy Commissioner for Supervision
Phone:  (770) 986-1646
Fax:    (770) 986-1654

mj

Enclosure

cc:    National Credit Union Administration
       Credit Union National Association
       Georgia Credit Union Affiliates
       Federal Deposit Insurance Corporation
       Federal Reserve Board
       Georgia Secretary of State
       Georgia Office of Attorney General
       Mr. Bo Fears

*Cover Page*

*Exhibit 1200*

# FINANCIAL INSTITUTION ORDER TO CEASE AND DESIST

The Department of Banking and Finance of the State of Georgia ("Department") has the authority pursuant to O.C.G.A. Section 7-1-91(d) and O.C.G.A. Section 7-1-5 to issue a Cease and Desist Order to any financial institution which has violated any law of this state or any order or regulation of the Department, to any financial institution which is conducting business in an unsafe or unauthorized manner, or to any person or corporation conducting business as a financial institution without authority under Chapter I of Title 7 of the Official Code of Georgia. On December 19 and December 29, 2003, this Department sent a letter to Mr. Londzell Hardy, Officers, Directors and Employees, "First Liberty Savings and Credit Union" ("First Liberty"), informing First Liberty of these concerns and requesting immediate action.

First Liberty is in violation of Georgia Statute and conducting a business in an unauthorized manner as follows:

First Liberty is a company that, according to documentation obtained by the Georgia Department of Banking and Finance, is providing financial services from at least one address in Georgia – 1950 Spectrum Circle, Suite 400-3009, Marietta, Georgia 30067761. This documentation indicates that First Liberty may be conducting a banking or credit union business in Georgia without authority, which is in violation of O.C.G.A. Section 7-1-241.

- First Liberty, by use of the words "Credit Union," purports to be either a state chartered credit union, a federally chartered credit union, or a credit union chartered by a foreign country. The Department has found no evidence that First Liberty is either state or federally chartered. If First Liberty is a credit union chartered and located in a foreign country this credit union has not been authorized pursuant to O.C.G.A. Section 7-1-713 to conduct business in Georgia as an international agency or representative office.

- First Liberty is not authorized pursuant to O.C.G.A. Section 7-1-242 to act lawfully as a corporate fiduciary in the State of Georgia or authorized to conduct a banking business in this state. First Liberty does not meet one of the corporate fiduciary exceptions contained under O.C.G.A. Section 7-1-242.

Therefore the Georgia Department of Banking and Finance, pursuant to O.C.G.A. Section 7-1-91 and 7-1-5, **does hereby Order First Liberty Savings & Credit Union, its successors and assigns and the officers, employees and directors thereof, to Cease and Desist violations of Georgia Law and the conduct of business in an unsafe or unauthorized manner and to take the following actions:**

1) First Liberty shall immediately cease indicating in any internet website, marketing materials, signage, correspondence, or legal documentation

that could reach Georgia consumers that it is a credit union, and that it is authorized to do business in Georgia.

2) First Liberty shall cease using the name "Credit Union", "Bank", "Banking Company", "Banker", "Banking House" or any similar terminology in the above materials, in reference to activities conducted in the State of Georgia.

3) First Liberty shall not conduct a banking business unless it demonstrates that it is authorized to conduct a banking business in accordance with the provisions of federal or state law. O.C.G.A. Section 7-1-241 specifies that only a state chartered bank, a national bank, a federally chartered thrift, credit union or other agency otherwise authorized by Georgia Law may do a banking business in this state.

4) First Liberty shall not provide financial products or services to the citizens of this State by any delivery system, to include the internet, or other electronic access to financial products or services or alternative methods of delivery which differ from geographically based banking without the authorization of the Georgia Department of Banking and Finance, pursuant to O.C.G.A. Section 7-1-241(c).

5) If First Liberty is a credit union chartered or licensed in a foreign country, this foreign corporation shall not transact a banking business or maintain an office in this State for carrying on such business or any part thereof without the authorization of this activity by the Department in accordance with Section 7-1-713 of the Code of Georgia.

6) **Representatives of First Liberty shall respond to the Department by January 12, 2004, indicating the actions taken regarding compliance with the provisions of this Order. The Department may take further legal action through the State Attorney General as authorized by law.**

The above provisions are effective on the date of issuance of this Order.

## MORTGAGE ORDER TO CEASE AND DESIST

Pursuant to Section 7-1-1018 of the Georgia Residential Mortgage Act, the Georgia Department of Banking and Finance hereby orders First Liberty Savings & Credit Union to cease and desist from engaging in mortgage brokerage activities without a valid license or pursuant to an applicable exemption in violation of O.C.G.A. Section 7-1-1002.

*Exhibit J200*

This part of the Order shall be final thirty days from the date of issuance, per O.C.G.A. Section 7-1-1018. However, if First Liberty Savings & Credit Union provides the Department with evidence of a valid license or applicable exemption within this thirty-day period, the Department may rescind this mortgage part of the Order. Should you have any questions concerning mortgage activities, please contact Carol J. Grafman, Assistant Attorney, at (770) 986-1648.

January 5, 2004
Date

David G. Sorrell, Commissioner
State of Georgia Department of Banking and Finance

# RESPA SERVICING DISCLOSURE



Lender: American Brokers Conduit
225 Town Park Drive, Suite 450
Kennesaw, GA 30144

**NOTICE TO FIRST LIEN MORTGAGE LOAN APPLICANTS: THE RIGHT TO COLLECT YOUR MORTGAGE LOAN PAYMENTS MAY BE TRANSFERRED. FEDERAL LAW GIVES YOU CERTAIN RELATED RIGHTS. IF YOUR LOAN IS MADE, SAVE THIS STATEMENT WITH YOUR LOAN DOCUMENTS. SIGN THE ACKNOWLEDGMENT AT THE END OF THIS STATEMENT ONLY IF YOU UNDERSTAND ITS CONTENTS.**

Because you are applying for a mortgage loan covered by the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. Section 2601 et seq.) you have certain rights under that Federal law.

This statement tells you about those rights. It also tells you what the chances are that the servicing for this loan may be transferred to a different loan servicer. ``Servicing'' refers to collecting your principal, interest and escrow account payments, if any. If your loan servicer changes, there are certain procedures that must be followed. This statement generally explains those procedures.

**Transfer Practices and Requirements**

If the servicing of your loan is assigned, sold, or transferred to a new servicer, you must be given written notice of that transfer. The present loan servicer must send you notice in writing of the assignment, sale or transfer of the servicing not less than 15 days before the effective date of the transfer. The new loan servicer must send you notice within 15 days after the effective date of the transfer. The present servicer and the new servicer may combine this information in one notice, so long as the notice is sent to you 15 days before the effective date of transfer. The 15 day period is not applicable if a notice of prospective transfer is provided to you at settlement. The law allows a delay in the time (not more than 30 days after a transfer) for servicers to notify you, upon the occurrence of certain business emergencies.

Notices must contain certain information. They must contain the effective date of the transfer of the servicing of your loan to the new servicer, and the name, address, and toll-free or collect call telephone number of the new servicer, and toll-free or collect call telephone numbers of a person or department for both your present servicer and your new servicer to answer your questions. During the 60-day period following the effective date of the transfer of the loan servicing, a loan payment received by your old servicer before its due date may not be treated by the new loan servicer as late, and a late fee may not be imposed on you.

**Complaint Resolution**

Section 6 of RESPA (12 U.S.C. Section 2605) gives you certain consumer rights, *whether or not your loan servicing is transferred.* If you send a ``qualified written request'' to your servicer, your servicer must provide you with a written acknowledgment within 20 Business Days of receipt of your request. A ``qualified written request'' is a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number, and the information regarding your request. Not later than 60 Business Days after receiving your request, your servicer must make any appropriate corrections to your account, or must provide you with a written clarification regarding any dispute. During this 60-Business Day period, your servicer may not provide information to a consumer reporting agency concerning any overdue payment related to such period or qualified written request.

A Business Day is any day in which the offices of the business entity are open to the public for carrying on substantially all of its business functions.

**Damages and Costs**

Section 6 of RESPA also provides for damages and costs for individuals or classes of individuals in circumstances where servicers are shown to have violated the requirements of that Section.

**Servicing Transfer Estimates**

1. The following is the best estimate of what will happen to the _____ servicing of your mortgage loan:

[X] We may assign, sell or transfer the servicing of your loan while the loan is outstanding. We [X] able to service your loan and we [ ] will [ ] will not [X] haven't decided whether to service your loan.

OR

[ ] We do not service mortgage loans, [and] and we have not serviced mortgage loans in the past three years. We [ ] presently intend to assign, sell or transfer the servicing of your mortgage loan. You will be informed about your servicer.

[ ] We assign, sell or transfer the servicing of some of our loans while the loan is outstanding depending on the type of loan and other factors. For the program you have applied for, we expect to:

[ ] sell all of the mortgage servicing [ ] retain all of the mortgage servicing

[ ] assign, sell or transfer _____ % of the mortgage servicing

2. For all the first lien mortgage loans that we make in the 12-month period after your mortgage loan is funded, we estimate that the percentage of mortgage loans for which we will transfer servicing is:

_____ [0 to 25%] or [NONE]     _____ 26 to 50%     X  51 to 75%     _____ [76 to 100%] or [ALL]

This estimate [ ] does [X] does not include assignments, sales or transfers to affiliates or subsidiaries. This is only our best estimate and it is not binding. Business conditions or other circumstances may affect our future transferring decisions.

3. [ ] We have previously assigned, sold, or transferred the servicing of federally related mortgage loans.

OR

[X] This is our record of transferring the servicing of the first lien mortgage loans we have made in the past:

| Year | Percentage of Loans Transferred | (Rounded to nearest quartile - 0%, 25%, 50%, 75%, or 100%) |
|------|---------------------------------|------------------------------------------------------------|
| 2003 | 75%-100% % | |
| 2004 | 50%-75% % | |
| 2005 | 50%-75% % | |

This information [ ] does [X] does not include assignments, sales or transfers to affiliates or subsidiaries.

June 28, 2006                          American Brokers Conduit
Date                                   Present Servicer or Lender

**ACKNOWLEDGMENT OF MORTGAGE LOAN APPLICANT**

I/We have read this disclosure form, and understand its contents, as evidenced by my/our signature(s) below. I/We understand that this acknowledgment is a required part of the mortgage loan application.

*Hussain Ka* _____ 7/07/06

Applicant    Hussain Kareem                Date        Applicant                                  Date

Applicant                                  Date        Applicant                                  Date

1001 9501.02

/\~ -552R  (9908)     DOC #:64301          VMP MORTGAGE FORMS - (800)521-7291                     12/94
APPL #:0001350490

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------------- x   Chapter 11
In re:                                                        :
                                                              :   Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE HOLDINGS, INC.,                        :
a Delaware corporation, et al.,[1]                            :
                                                              :   Jointly Administered
                                                              :    Ref/ Docket Nos.9692, 10148, 10183 & 10182
                              Debtors.                        :
                                                              :
------------------------------------------------------------- x
```

### Claimant's Post Trial Brief  Reply To Plan Trust's Answer and Plan Trustee's Omnibus Objections

1.

Comes now Claimant, Hussain Kareem his **Post Trial Brief Reply to the above entitled caption for Administrative Claims** on the evidentiary trial held before this Honorable Court on November 18, 2011.

2.

### Clarification of Facts Contained from the Testimonies

There appears to be genuine disputes on the certain key interpretations about the factual testimonies made at the evidentiary hearing and the

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM InvestWne ent"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 538 Broadhollow Road, Melville, New York 11747.

subsequent cross-examinations from the live witnesses. Factually, there were only two persons who testified, Mr. Kareem and Ms. Wanerka. What became apparent from Ms. Wanerka's testimonial, that her sole reliance was on her ability to make database queries from records, reports, and documents purportedly maintained from the computer systems once-owned by the Debtors. There was no first-hand knowledge of any transaction. In as much, Ms. Wanerka could not confirm, verify or swear to the following:

1. That the Debtor's data base had never been corrupted, never lost data or never was the information compromised, changed, destroyed or altered due to system crashes, or electrical brown-outs or electrical black-outs.

2. Ms. Wanerka could not certify that documents were sent and delivered by either first class mail, certified mail, priority mail or that the delivery of key disclosures or examples were received by Mr. Kareem. On many of occasions, the examples never required a sign-off  by the borrower. It is therefore questionable about the compliance of AHMH and companies to make said disclosures. The explanations or examples were never proven that Mr. Kareem, the borrower, thoroughly understood finance, the performance features of the "Power MTA Adjustable Rate Note." Nor were there any proof that a telephone or in-person interview verified a review the program features to Mr. Kareem.

3

3. Ms. Wanerka could not certify that an average borrower could fully understand the loan features which performed recasting calculations. As explained in court by face to face discussions, each recast involved adjusting the interests rate and the calculated effects of the minimum or normal payments made, then applying results to the balance due on the loan or its effect on the equity of the home. The loan had great potential for negative amortization. Mr. Kareem was rate sensitive,  so the start rate was extremely attractive inducement.  The benefit from the hearing was a through demonstration by cross examination of the loan feature,  above and beyond the advertised "low" interest rate. The payment option selections had a direct affect on negative amortization on the ultimate payoff balance owned on the Note.

4. The low "teaser" rate was explained by Ms. Wanerka, if selected, actually worked against any net-tangible benefit over a fix-interest-rate payment. Mr. Kareem questioned if the finance charge was accurate. He submitted Exhibited 400 APR Disclosure Test, APR WIN version 6.2.0 calculation   at the day of the hearing. The test is featured from the website of the Office of Comptroller of currency for APR tests.

5. Ms. Wanerka testified that she was not a compliance officer, so she was not able to verify many legal compliance issues related to the MTA disclosures applicable to either Federal or State Laws.

6. Ms. Wanerka testimony was construed limited to the only documents scanned into the data base systems and what she thought should have happen with those documents, as a standard business practice of the AHMH loan originations. Wiz Sentinel Reports were generated and believed to be an accurate in-house software system, purportedly showed that TILA compliance, high-costs tests and other lending compliances passed on the loans offered. Whereas, any communications with respect to the mortgage, compliance testing results performed by AHMH would have been shared solely or made through AHMH's authorized broker channel.  Global Mortgage was identified as an authorized broker who originated the loan for AHMH on Mr. Kareem's Loan. AHMH leveraged or communicated solely through third-party relationships established by AHM Corp.  Even when direct communications were made to AHM Corp. by Mr. Kareem, those communications were passed on to AHMSI to address and answer.

7. Ms. Wanerka testified that she had no knowledge of any compliance issues affecting Global Mortgage, but she confirmed

that she had knowledge of the broker's authorization from AHMH

and companies list of approved brokers.

3.

### Summary of Claimant's Testimony

Whereas, Mr. Kareem testified from his personal knowledge, first-hand actions, beliefs and his attempt to tendered AHMH to rescind his loan. He stated affirmatively that he was seeking a lower interest rate and lower payments as his primary objective. He got a teaser-rate that changed monthly and produced negative amortization.  He testified that he was confused by the performance and complexity of the MTA Adjustable Rate Note. He testified that he felt that AHMH lending practices were deceptive and predatory.

He made several attempts to rescind the loan under applicable TILA right of action, because of his belief that the loan was predatory, deceptive and high costs, in that he could end of paying more by loosing equity.  His several attempts to rescind has been acknowledged by the Plan Trustee. Those attempts of written communications occurred on or about the dates of August 26, 2008, February 24, 2009 and September 27, 2009, respectively[2].

---

[2] The Plan Trustee's Post Trial Answering Brief… Ominbus Objections cites their knowledge of Rescission Demands on Page 6, Tr. 58-59  pursuant to the Court admitting certain party admissions regarding such facts. However, it is factually determinable if AHMSI, the Loan Servicer by acquisition, could unilaterally respond to the borrower Mr. Kareem on AHMH behalf. Mr. Kareem had no contract with AHMSI and AHMSI never referenced

4.

## Relevance of Testimonial Facts to Legal Discussions

The Claimant asserts his positions on outstanding issues to be determined by this Court, where he believes that the Plan Trustee has conceded or where there remains no factual basis to dispute the preponderance of facts from evidentiary hearing, as follows:

On July 7, 2006, Mr. Kareem closed on his loan (the "<u>Kareem Loan</u>") in the amount of $159,200.00.   The required RESPA Servicing Disclosure (see Exhibit D3) made by AHMH and companies was incomplete and not in compliance with the applicable RESPA law.   It is a reasonable presumption that in order for AHMH companies to have been in full compliance with the RESPA law, an update should have come by way of a full disclosure on the underlying question, "who would service Mr. Kareem's Loan (**emphasis supplied**)?

Inspecting the RESPA Servicing Disclosure Exhibit D3, the section entitled,  "Servicing Transfer Estimates", reveals that the following boxes were checked off  (indicated by X marks) as applicable to Mr. Kareem's Loan  that reads in  the following way:

*X- We may assign, sell or transfer the servicing of your loan while the loan is outstanding . X-We are able to service your loan and*

---

their authority to answer the TILA rescission matter as representing the interest of the Assignee or the AHMA 20063 REMIC Trust.

we  X- *haven't decided whether to service your loan* (**Emphasis**

**Added**)[3].

A.    On or about July 28, 2006, as confirmed in testimonies  at trial,  the

Kareem Loan was deposited or sold into a securitization trust entitled

AHMA 2006-3 [(the REMIC or  " Mortgage-Backed-Security Trust"

(MBST)].[4] AHM SV was retained as the sub-servicer for the MBST.

The Trust was dissolved on January 29, 2007, as noted by the

Securities and Exchange Commission records and prior to any

Bankruptcy Proceedings.[5]

If the timeline is considered true, then, Mr. Kareem has a prima

facie claim for an unenforceable instruments by abandonment and by

---

[3] At some reasonable time, AHMH would have been required by law to let Mr. Kareem know about the long-term servicing of a loan servicer of his loan. Also, contractually, the knowledge of the loan servicer or the need to provide a notification of change of loan servicer was made a part of Section 20 of the Security Deed (See in Exhibit B submitted with Claimant's Post Trial Brief).

[4] During a U.S. HUD, Department of RESPA investigation for transfer of notice violation, American Home Mortgage Servicing[3], Inc. "the New Loan Servicer" the beneficiary form the APA, revealed that the Mortgage-Backed -Security Trust was AHM 2006-3. This has been confirmed by a Securitization audit through Bloomberg and the Security and Exchange Commission database (see Exhibits 100- 100 D submitted with Claimant's Post Trial Brief). The facts are materially significant due to binding contract covenants under  Section 20 of the Security Deed (See Exhibit B submitted with Claimant's Post Trial Brief) and by Federal law which provided that  it is mandatory for the Lender to notify Mr. Kareem within 30 days.  Under 12 USC §2605 (a-c) and under 24 C.F.R.3500.21(d) the transfer notice to the Master Servicer, Wells Fargo, should have been made known to Mr. Kareem. The underlying Note has an electronic CUSIP No. 0660265UAA8. Therefore the instrument was changed into a shareable stock certificate undisclosed to the Mortgagor.

[5] See Exhibit 300 Form 15 termination filed with the Securities and Exchange Commission on January 29, 2007. Delaware Secretary of State records shows no active trusts registered under the AHMA 2006-3. The only active trust registered is American Mortgage Assets Trust 2007-SD-2 (See Exhibit 500).

8

renunciation under Georgia Commercial Code §11-3-604[6]. AHMH is not claiming the instruments and the AHMA 2006-3 does not exist statutorily to proceed in any court an action against Mr. Kareem. This begs the Honorable Court to consider that holders of a stock certificate have no individual right of action against a homeowner for any reason without a registered Statutory Trust to represent their common interests.

B.        Therefore, Mr. Kareem's stated damages are clear with respect to the full value of his instrument lien upon his estate. AHMH should wrap-up and conclude their engagement with Mr. Kareem by giving equity.  The loan has been satisfied by accommodation and they should give him his release of lien obligation with respect to the AHMH transaction and consideration received.  His property title should not be encumbered by an Entity undergoing dissolution that has admittedly been satisfied or paid off. For the lien to show that AHMH may potentially have a future claim or not to account for their full satisfaction is harmful to Mr. Kareem. Testimonies by and through the Plan Trustee has confirmed the veracity of this matter.

C.        Mr. Kareem engaged in no contract with other parties with respect to the underlying instrument. Therefore, the failure by AHMH

---

[6] Under Georgia's Commercial Code affecting negotiable instruments, OCGA §11-3-604 provides in relevant parts. Discharge by cancellation or renunciation
(a) A person entitled to enforce an instrument, with or without consideration, may discharge the obligation of a party to pay the instrument (ii) agreeing not to sue or otherwise renouncing rights against the party by a signed writing

9

through the Plan Trustee to issue the release of lien obligation is unreasonable. The matter appears to be a simple to resolve. His purpose by entering his proof of claim was for recoupment, restitution, set-off and to clear his land title as the results of AHMH failed administrative actions. He is seeking the amount required to balance the books against the Note and to give "notice to all the world" that $159,000.00 no longer remains outstanding to AHMH and companies.

Evidence shows that AHMH made an administrative filing the Securities and Exchange noticing the termination of AHMA 2006-3. It would presume to follow that AHMH had full knowledge and responsibility for their administrative actions. Therefore, AHMH should not concern themselves with AHMA 2006-3 rights, which presumably has been settled by this court through Citibank, N.A. adversarial proceeding against the debtors-in-possession.

D.  As acknowledged, AHMH was given consideration by the evidence of their endorsement indicating " Pay to the Order of American Business Conduit" signed by Lisa Furco ( a former employee) on the Note (see Exhibit A submitted in Claimant's Post Trial Brief on February 10, 2012). This was not an action for indorsement in blank[7] that is now

---

[7] Blacks Law Dictionary 6th Edition defines Blank indorsement as,"One made by the mere writing of the indorser's name on the back of the note or bill, without mention of the name of any person in whose favor the indorsement is made, but with the implied

being alleged by the Plan Trustee. This was clearly an action done by

AHMH and companies for endorsement for accommodation under the

applicable law[8] and to receive satisfaction.

E.   On or about January 5th, 2011, Mr. Kareem filed two (2) separate proof

of claim in these chapter 11 cases, which are identified by the claims

agent as claims 10870 and 10875.   Each of the Kareem Claims asserts

a secured claim in the amount of $200,000 and an unsecured claim in

the amount of $50,000 against AHM Holdings is undisputed as

administrative claims. Above, Mr. Kareem sets forth his reasons for

validity for the claim. Bankruptcy rules defines that the Proof of Claim

is valid unless the Debtors prove otherwise. The Debtors have entered

no such proof.

F.   On January 20, 2011, Mr. Kareem filed his *Motion for Entry of*

*Administrative Claim with Brief in Support* [D.I. 9692] (the "First

Administrative Claim Motion") requesting allowance of an

administrative claim.   In the Kareem Motion, Mr. Kareem requests

allowance of an administrative claim in the amount of $19,175.71,

exclusive of interest, but he did not waive his right to interests. The 19,

175.71 represented the amount of known payments that he over paid to

---

understanding that any lawful holder may fill in his own name above the indorsement if
he so chooses."

[8] Blacks Law Dictionary 6th Edition defines Accomodation indorsement as. "one made by
the third party person without any consideration, but merely for the benefit of the holder
of the instrument, or to enable the maker to obtain money or credit on it (**emphasis
supplied).**

others. AHMSI has suspended invoicing MR. Kareem as he has he questioned the legitimacy of AHMSI's servicing rights, accounting reconcilement of the record and other servicing practices. At the evidentiary hearing, significant testimonies were made by Ms. Wanerka that AHMSI changed the original account number. AHMSI apparently proceeded to bill Mr. Kareem on the "altered" account number. [9] AHMSI actions appear to be unilateral,  unless AHMH gave permission to AHMSI to change the instrument's account number.

G.  Mr. Kareem's claim for unjust enrichment arises from the failure to reconcile or validate the debt arose and the unilateral action by AHMSI to change his account number. The assertion of alteration finds adequate support under Georgia's Commercial Code OCGA §11-3-407[10]. The change appears to conform to unlawful alteration of an instrument account number regardless of the excuses purported by the Plan Trustee.

5.

**Legal Discussion Failures By Plan Trustee's Arguments**

---

[9] Absurdly, AHMSI has made tax claims against the altered account number 31256902 which is a separate cause of action from the instant action. There are no underlying instruments that were created to support that account number.
[10] Under OCGA §11-3-407. Alteration provides in relevant parts,
(a) "Alteration" means (i) an unauthorized change in an instrument that purports to modify in any respect the obligation of a party;
(b) Except as provided in subsection (c) of this Code section, an alteration fraudulently made discharges a party whose obligation is affected by the alteration unless that party assents or is precluded from asserting the alteration...

### *Indorsement in Blank versus Indorsement by Accommodation*

The Plan Trustee has invented a "wild explanation" for the endorsement signature by Lisa Furco displayed on the face of the instrument. Their statements fail and they have provided no proof for their defenses.  As noted in the above foot notes 6 and 7, the legal definitions does not fit the set of actions done by AHMH and companies, with respect to the instruments. For purposes of legal clarity, the Claimant shows how the applicable definition on indorsement and laws favors the claimant, as reasoned below:

### *Indorsement in Blank Fails to Provide Reasonable Presumption*

If we adopted the strict legal definition of "indorsement in blank" is found in Black's Law Dictionary. According to the definition, it would be unreasonable for the instrument to be "indorsement in blank" because clearly, it was not indorsed by signature on the "back (side) of the Instrument". Contrarily, the instrument shows that it is endorsed on the face (front of the instrument) just under the signature of the Borrower. Whereas, legally and technically, the transaction made by AHMH cannot be reasonably described as a transaction  done by "indorsement in blank".

An example of "indorsement in blank" would be an action to transfer a car title from one owner to another for the purpose of future registration or proof ownership through the Department of Motor Vehicle. Whereas, the seller endorses the instrument on the back and the new owner may endorse it

13

above the seller's signature or transfer it to another. This is a classic cause of action by example for "indorsement in blank" transaction. In the instant action, the MBST compensated in-full the depositor (AHMH) for the notes or mortgages to be sold and held as an performing asset through an indorsement on the face of the instrument. Hence, the words, "pay to the order of" is an act to receive consideration.

6.

### *Accommodation Indorsement Provides Reasonable Presumption*

By adopting the definition of "accommodation endorsement" from Black's Law Dictionary, we find the role of each party and their relative relationship and who benefitted from the transaction. Firstly, Accommodation must have a third party. That third party receives **<u>no</u> <u>consideration</u>** from the transaction. This perfectly describes Mr. Kareem status (**emphasis added**). Presumptively, AHMH solely benefitted from the transaction not Mr. Kareem. The Note Holder at the time was American Business Conduit, the subsidiary of AHMH who benefitted in-full either by receiving cash or credit. This perfectly describes AHMH and companies role to the transaction and their business objective.

Additionally, under Section 9 Obligations Under the Note found in the Adjustable Rate Note (See Exhibit A), the section clearly indicates that by any persons signing the Note fully obligates themselves under the terms, to pay in full the obligation whether they are surety or endorser. This is

apparently a more precise explanation of the action done by the Note Holder involving the negotiation with the Trustee as prescribed in the pooling and servicing agreement. Notes were required to be endorsed and the depositor was compensated under the Securitization process. AHMH and companies were obligated deliver the mortgages "free and clear" from the depositor claim of ownership and to act as surety to the Trustee under the REMIC terms.[11]

The above factual background has not been denied during the course of the trial or by post- trial answers provided by counsel for The Plan Trustee. The Plan Trustee is not denying that AHMH benefitted from Mr. Kareem's Mortgage or that they didn't receive consideration for their loans by the securitization. Thus, AHMH was fully satisfied. Therefore, AHMH has abandoned and renounced any interest in recovery from Mr. Kareem's Mortgage. Mr. Kareem maintains his right to discharge from AHMH.

7.

**Plan Trustee's Arguments fails against Claimants Demands**

---

[11] See page 18 of 375 in the Prospectus that requires the sub servicer [AHM SV].. "to make delinquent payments of scheduled interests and principal on mortgage loans. .. If the servicer fails to make any required advances, the Master Servicer, as successor servicer may be obligated to do so". This clause presupposed that even if AHMSI took over the loan servicing role of AHM SV, then an amended Prospectus or PSA would have had to reflect the change and reported through the SEC, so that, a "new" servicer was declared to investors. Since the ORDER allowing APA was not authorized until about April 1, 2008, then AHMSI could not have been replaced into the loan servicing role, because the trust no longer existed per the termination filing of AHMA 2006-3 (**emphasis**). Additionally, the APA agreement did not resolve the servicing right issues as witnessed by Exhibit 200-**Contracts Not Provided by Seller** (submitted with Claimant's Post Trial Brief) affecting the securitization servicing agreements.

*Doctrine of Preclusion Fails*

I.     The Plan Trustee have made a conserted effort to try and deflect the claims by trying to establish a basis for res judicata or collateral estoppel. In the instant action, it simply does not work. However, the four threshold elements that The Plan Trustee are trying to convince the court that exists for preclusion does not exists at all.

Whereas, the Plan Trustee presumptions are flawed as stated sequentially below:

A.  Element (1) requires that *the identical issues were previously adjudicated* fails. Reasons supported are cited below:

B.  The defendants in the Texas Case were AHMSI, MERS and the executives of the respective firms. AHMH nor the Plan Trustee were involved in the litigation. None of those parties are being represented in the instant action. Although, there may be tangential discussions on the residual effect from actions done by AHMH and companies, the right of action arose in the Texas action,  came from a RESPA transfer of notice investigation made by HUD. HUD has not invested AHMH. All correspondence was directed at AHMSI. HUD gave a right to sue letter to Mr. Kareem to establish a cause of action. AHMSI failed to prove that they had the service rights when HUD investigated their service authority. Never did

16

AHMSI purport that their right came from the APA agreement emanating from this court (emphasis added). Testimonies from this cause of action confirms that no such transfer service notification was given by neither AHMH nor AHMSI.

C. The Texas action had causes for FDCPA, Request for Accounting, wrongful foreclosure, and false assignment recordations of instruments into Georgia's land records. These are not the identical issues argued before this court nor was testimony directed at those ancillary actions.

AHMH negligence actions may have given rise to the other third-parties action, but the current action has its own merits.

D. Element (2) requires that the actions were litigated and settled. Claimant has pursued his due process rights with the U.S. Fifth Circuit Court of Appeals. There are solid grounds for success and reversal. Therefore, the issue of litigation in that action is not settled. Even if the Fifth Circuit rules adverse to Mr. Kareem, AHMH was not a party to the action. Therefore, Element (2) fails as a basis to grant the Plan Trustee relief.

E. Element (3) does not comply because Elements (1) and (2) are inapplicable. Any decision would be mutually exclusive of the Claimants rights in this action.

F.        Element (4) fails because AHMH was never represented in the Texas

action. Therefore, regardless of the Fifth Circuit Court of Appeals rulings, its

jurisdiction did not cover AHMH as a party and it would not encompass the

contract matters related between the loan origination, compliance issues, and

broker defaults.

G.        Besides, under Georgia's law on contracts provides, "A plaintiff may

pursue any number of consistent or inconsistent remedies against the same person or

different persons until he shall obtain a satisfaction from some of them." (Emphasis

supplied).  OCGA §9-2-4. See Saunders, Stuckey & Mullis, Inc. v. Citizens Bank & Trust

Company, (265 Ga. 453), (458 SE2d 337), (1995). Also see, Supreme Court of Georgia's

ruling in Beiter v. Decatur Fed. S & L Assn., 222 Ga. 516, 518 (2) (150 SE2d 687)

(1966) "Right to recover unsecured claims".

Accordingly, Mr. Kareem is well within his legal rights to pursue his

remedies to protect his estate, homestead and interests in multiple forums

until he receives satisfaction. It is reasonable for this court to presume that

multiple parties injured Mr. Kareem in different ways[12].

---

[12]    Under Georgia law, damages are compensated 'Whether such damages as are here
sued for arise by reason of a tort or the breach of a contract, they are given to the injured
party as compensation for the injury sustained. (Cits.) . . .' [Cit.]" *England v. Ga.-Fla.
Co.*, 198 Ga. App. 704, 706 (2) (402 SE2d 783) (1991). " ' "Damages are given as
compensation for the injury done." There can be but one satisfaction of the same damage
or injury." ' [Cit.]" *Nannis Terpening &c. v. Mark Smith Constr. Co.*, 171 Ga. App. 111,
113 (1) (318 SE2d 89) (1984).

8.

## II. **Evidentiary Record is Complete as alleged by the Plan Trustee has fatal flaws.**

The Plan Trustee wants to rush to conclusion on the evidence, when the key witness, Ms. Wanerka, left many unanswered questions of fact as noted above in this reply sections 2 through 4 entitled *"Clarification of Facts Contained from Testimonies"* and *"Relevance of Testimonial Facts to Legal Discussions"*. Claimant enters his final supporting evidence to support his earlier statements and submission into the record that predatory lending and breach of contract were factual claims brought into this action.

9.

## Issue of Compliance Supports *Ab Initio* Breach of Contract Claim

In testimonies made by Ms. Wanerka, much dialogue and cross-examinations purported that AHMH and Companies loan origination followed lending guidelines. Mr. Kareem countered showing that he had obtained a findings from the OCC.gov website where the Annual Percentage Rate calculation was not in compliance (See Exhibit 400 submitted by Claimant in his Post Trial Brief). If this matter is settled to be favorable for Mr. Kareem, then the opposition is more than just a mere allegation.

10.

*Claimants Additional Proofs of Predatory Lending by AHMH*

1.    Claimant submits his Mavent Systems Compliance Report findings

and Verification ( See Exhibits  900-Loan MOD Forensic, 1000-

Verification by No Predatory Lending Auditor/Operator, 1100-Press Release

on Mavent Systems known as a Lending Industry Compliance Leader).

The report speaks for itself. The independent report substantiates that

AHMH loan was engaged in predatory lending directing affecting Mr.

Kareem's Loan. The summary of failures from the compliance audit are as

follows:

    a.  The TILA- Tolerance failed for the12-month MTA adjustable rate.

       The finance charge was $4,658.82 below the actual finance

       charged over the life of the loan. This is a cause of failure under

       12 U.S.C. §1635 (i)(2) and under 12 CFR §226.23(g)

    b.  State Rules Review: Lender and Broker results failed. The Lender

       and broker were required a Georgia Residential Mortgage Act

       License or Registration is needed to make or broker loans before

       July 1. 2009 secured by a 1-4 unit dwelling (Ga. Code 7-1-

       1000(9). (12), (13) ; 7-1001(2.1). Noticeably, Global Mortgage

       license was revoked on 02-07-2007. There was an apparent

ongoing investigation prior to the full revocation. Whereas, a suspension or Cease and Desist Order may have been rendered prior to the revocation.  Significantly, the full Revocation of Global Mortgage license occurred within 7 months of Mr. Kareem's loan origination (emphasis supplied).

c.  The audit failures rejects any of AHMSI's contention that Mr. Karem had no legal basis for his attempt to rescind the loan or the liabilities from the toxic loan being passed on to the Assignees under 15 USC 1641 et seq.

## 11.

### *Cause for Acquiescence Supported Claim*

Mr. Kareem has maintained that AHMH and companies preliminary tort springss from its failure to do its "good faith obligation". Since the record shows and concedes that Mr. Kareem engaged in written communiqués under the instrument terms for giving notice and under applicable law, it was unreasonable for AHMH never to respond to him. This charge of tort is supported under Georgia's Evidence and Acquiescence Law expressed under OCGA§ 24-4-23, which provides the following:

> *"In the ordinary course of business, when good faith requires an answer, it is the duty of the party receiving a letter from another to answer within a reasonable time. Otherwise he is presumed to admit the propriety of the acts mentioned in the letter of his correspondent and to adopt them."*

Relevant Georgia's case law on acquiescence expresses, "…*a waiver of rights by failing to perform in a timely by acquiescence, makes it clear of intent.*" "*Under Georgia law, failure to respond to a business letter may raise a presumption that the recipient admits "the propriety of the acts mentioned in the letter."See* Stronghaven, Inc. v. Ingram, (252 Ga. App. 124), (555 SE2d 49), (2001), Pearson v. George, Georgia Supreme Court, Id."

12.

### AHMH established Fiduciary Relationship at Closing

The Plan Trustee believes that AHMH had no fiduciary duty toward Mr. Kareem. However, contrarily, AHMH established a fiduciary relationship by their requirement that the borrower sign the Waiver of Borrower Rights ( See Exhibit 600). This instrument gave the lender a fiduciary role as Attorney-in- Fact representation with its Grantor. Although, in most circumstances there would be no breach of fiduciary duty, the exception is made when the relationship has an express Power of Attorney agency agreement between the two parties.

The agency/fiduciary role is supported under OCGA §10-6-4. The law is well settled as it provides, "*Fiduciaries may convey by attorneys in fact. Executors, administrators, guardians, conservators, and trustees are authorized to sell and convey property by attorneys in fact in all cases where they may lawfully sell and convey in person*"[13].

In the instant action, the Waiver of Borrower Rights expressly provided the Lender (AHMH ) with duty and care of a fiduciary[14]. Conversely, Claimant shows that

---

[13] "As a fiduciary, appellee acquired a number of legal duties in relation to appellants. Among these duties were the duty to avoid potential conflicts of interest and the duty to give full and fair disclosure in a timely manner of all known things adversely affecting the appellant beneficiaries' rights in the subject matter of the dealings". See Powell v. Thorsen, 253 Ga. 572, 574 (3) (322 SE2d 261); Ringer v. Lockhart see also Spratlin, Harrington & Thomas v. Hawn, 116 Ga. App. 175 (2) (156 SE2d 402); 3 AmJur2d, Agency, 272.

[14] "The relationship of principal and agent arises whenever one person, either expressly or by implication, authorizes a person to act for him or subsequently ratifies the act of the other". OCGA 10-6-1. "The principal is bound by the acts of his agent, acting within the scope of his authority". OCGA 10-6-4; Puckett v. Reese, 203 Ga. 716, 725 (48 SE2d 297). "Questions regarding the existence of agency and the extent of the agent's authority

the Plan Trustee has failed to consider implied the fiduciary relationship expressed in the loan transaction.

13.

### *Impairment of the Instrument; Deceptive Business Practices with MERS relationship*

The Plan Trustee purports that the courts have accepted the premise of what MERS can or cannot do as a mere nominee for the Lender. Claimant hopes that the Plan Trustee is not relying on mere court rulings, as there as many rulings against MERS as those that have gone favorable. The rulings are specific questions of law and mostly the matters are not settled. Even recently, Delaware's Attorney General Beau Biden has brought suit against MERS in the Delaware state court actions for torts.

Specifically, the Plan Trustee has all but conceded that MERS cannot act as a fiduciary for AHMH in Georgia under OCGA §7-1-242. Furthermore, how can there be two fiduciaries when AHMH is under the fiduciary care by the Plan Trustee?

There are eight threshold requirements under the Georgia law in which MERS could qualify as a fiduciary to AHMH and companies. They are that MERS would have to be a licensed financial institution, a federal savings and loans, an investment advisor, a non-profit agency, a law firm, or as an investment broker. But, MERS is not a corporate entity meeting the criteria established under Georgia's law (Emphasis). It was therefore, AHMH's due diligence that caused a faulty to placement of MERS in a role or capacity that was unlawful and thus impaired the security instrument.

We are only asking this court to determine that if MERS were an unlawful fiduciary for AHMH, then did the action by AHMH impair the security deed instrument by placing MERS on the instrument? The Claimant believes the answer is yes. Just as, AHMH has a duty to meet all other banking compliances, this was yet another compliance issue of fact [15].

In the most recent case, in the U.S. Bankruptcy Court for the Eastern District of New York, In Re: Ferrell L. Agard, Case No. 810-77338 –REG, the court through the Honorable Judge Robert Grossman opined (by excerpts) that the MERS 's membership business model,

---

are generally for the trier of fact." Renfroe v. Warren-Hawkins &c. Post No. 523, <u>157 Ga. App. 614 (278 SE2d 414)</u>.

[15] In 2004, Georgia Department of Banking & Finance delivered a Order Cease and Desist to First Liberty Savings and Credit Union. Among the concerns were the failing of First Liberty to qualify under OCGA 7-1-242 ( See Exhibit 1200 Letter From Banking and Finance signed by Commissioner David Sorrell).

*"According to MERS, the principal/agent relationship among itself and its members is created by the MERS rules of membership and terms and conditions, as well as the Mortgage itself. However, none of the documents expressly creates an agency relationship or even mentions the word "agency." MERS would have this Court cobble together the documents and draw inferences from the words contained in those documents."*

Judge Grossman rejected MERS's arguments, saying that mere membership in MERS does not provide "agency" rights to MERS, and agreeing with the Supreme Court of Kansas that ruled,

*"The parties appear to have defined the word [nominee] in much the same way that the blind men of Indian legend described an elephant -- their description depended on which part they were touching at any given time."*

*"The Court believes this analysis is necessary for the precedential effect it will have on other cases pending before this Court".* In the scathing opinion, Judge Grossman variously labeled MERS's positions as *"stunningly inconsistent"* with the facts, *"absurd, at best",* and *"not supported by the law".*

### 14.
### In Summary of other Plan Trustee's Failed Arguments

The subject of securitization and contractual breach under the express terms are not new to this court and the ongoing proceedings.  The Plan Trustee wants to act as though none of the issues are germane to Mr. Kareem or to his contract. Whereas, there were ongoing servicing issues under RESPA, title transfer issues, contract issues, accounting issues resulting from the securitization process that AHMH and companies set up. Mr. Kareem wishes that he was not the accommodated party where the aftermath of AHMH administrative actions affected him. He suffered by the mistakes or failures deployed by AHMH.

The Prospectus clearly defines that "AHMH and companies" made themselves obligators for the asset recovery and significant performances to

help to induce the investors to participate in their MBST offerings[16]. Tax credits were used to offset any losses passed through to the investors, therefore, mitigating any damages by any individual mortgage. The AHMA 2006-3 pool is known to have contained, at one time, Mr. Kareem's loan and confirmed by Bloomberg financial data[17].

If AHMA 2006-3 exists, then who and where is the registered agent? There is a failure under the law and contract for that entity not to identify themselves or to resolve any of Mr. Kareem's consumer concerns. The Plan Trustee makes unreasonable arguments for denials and no arguments with respect to equity and right of recoupment. It has not been proven that AHMSI is the servicer for AHMA 2006-3.

15.

**Summary of Counts Proven by the Preponderance of Evidence and Supported by Applicable Laws**

**Mr. Kareem maintains his Damage Counts as enumerated below**

**Count 1 -  Breach of Contract-**

---

[16] Affiliated parties to AHMA 2006-3 Trust were Deutsche Bank National Trust Co., who served as the Underwriter and Custodian, while Deutsche Bank AG served as the Swap Provider under the MBST Prospectus and Pooling and Servicing Agreement (PSA). Wells Fargo Bank, N.A. served as the Master Servicer, Citibank, N.A. served as the Trustee, under the said Prospectus and PSA registered through the Security and Exchange Commission.(See Exhibit 100 and Prospectus data pages 1, 6, 20, and 21 submitted with Claimant's Post Trial Brief). See Exhibit "100" on page 21 of 375 entered found under 10248 Section 37 (submitted with Claimant's Post Trial Brief).

[17] Also see Exhibit 100 B Bloomberg screen shot 375 entered found under 10248 Section 37 (submitted with Claimant's Post Trial Brief), containing Mr. Kareem's loan number, loan amount and zip code.

a. Failure to disclose when AHMH had entered into judicial insolvency proceedings affecting, among other things, the Loan Servicing rights. AHMH had a "good-faith" obligation found under the applicable acquiescence law and under sections 20-22 of the Security Agreement[18].

b. Failure to disclose conversion of the instrument from a promissory note into a Stock Certificate. Such conversion changed the function and jurisdiction of the Note including the Mortgagor and Mortgagee relationship.

c.   The unjust enrichment claim made against AHMH to receive consideration and not discharge Mr. Kareem's loan. The Note had been satisfied by endorsement by Lisa Furco's, former Assist Secretary for "AHMH and Companies" for accommodation[19].   The endorsement clearly made AHMH an obligor under the contract terms. Such action by the Mortgagee should have discharged *Mr. Kareem's Loan Obligation* (see Covenant Section 9 Obligations of Persons under the Note) contained in the Adjustable Rate Note.

---

[18] Under Georgia's Commercial Code §11-1-203 it provides, *"Every contract or duty within this title imposes an obligation of good faith in its performance or enforcement"*. See  Contract requirement of notification under Security Deed  page 12 of 14 entered found under 10248 Section 37.

[19] See Exhibit "A" Adjustable Rate Rider on page 6 of 6 entered under 10248 Section 37, Lisa Furco's endorsement signature. On page 5of 6, Covenant Section 9. **Obligations of Persons under this Note** provides, *"If more than one person signs this Note, including the promise to pay the full amount and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this note is also obligated to do things. Any  person who takes over these obligations including the obligations of a guarantor,  surety, or endorser of this note is also obligated to keep  all of the promises made in this Note."* The action of endorsement by AHMH led them to take over the obligation of Mr. Kareem for purposes of depositing the instrument into the MBST.

26

d. Failure to maintain communications under "giving notice" under the Contract Covenants Sections 8 of the Adjustable Rate Note and 15 of the Security Instrument , respectively. This requirement under the contract is very restrictive and the language quite clear and "black and white".

**Count 2- Breach of Fiduciary Duty**- with respect to an instrument under OCGA §11-3-307[20], whereas, AHMH contributory inactions by failing to communicate or acquiescence led to contract torts by-  AHMH and companies.

A. Acquiescence on communications by responding in a reasonable time of written notices received from the Mortgagor

B. Renunciation and abandonment by seeking to enforce the note under. OCGA §11-3-604 provides any act of abandonment or renunciation discharges the obligation. In the instant action, AHMH is not seeking to enforce a claim against the Mortgagor. They have abandoned their interests in the Note, as a matter of law.

---

[20]Under OCGA §11-3-307 provides, (1) "Fiduciary" means an agent, trustee, partner, corporate officer or director, or other representative owing a fiduciary duty with respect to an instrument; and

(2) "Represented person" means the principal, beneficiary, partnership, corporation, or other person to whom the duty stated in paragraph (1) of subsection (a) of this Code section is owed. (ii) Taken in a transaction known by the taker to be for the personal benefit of the fiduciary;  As cited above, the Waiver of Borrower's Rights gave an expressed agency relationship between borrower and lender.

**Count 3-Unfair and Deceptive Business Practices** applicable under

Georgia laws OCGA §10-1-372 creating confusion was demonstrated at trial

by-

a.    Knowingly allowing third-parties relationships to make claims

against Mr. Kareem of an impaired security instrument.

b.    Assigning MERS as an unlawful fiduciary to administer properties

and a note under OCGA §7-1-242[21]. MERS was and remains an unregistered

---

[21] Under The O.G.C.A. § 7-1-242 statute provides:

(a). No corporation, partnership, or other business association may lawfully act as a fiduciary in this state except:

(1) A financial institution authorized to act in such capacity pursuant to the provisions of Georgia law;

(2) A trust company;

(3) A national bank or a state bank lawfully doing a banking business in this state and authorized to act as a fiduciary under the laws of the United States or another state;

(4) A savings bank or savings and loan association lawfully doing a banking business in this state and authorized to act as a fiduciary under the laws of the United States or another state;

(5) Attorneys at law licensed to practice in this state, whether incorporated as a professional corporation or otherwise;

(6) An investment adviser registered pursuant to the provisions of 15 U.S.C. Section 80b-3 or Chapter 5 of Title 10, provided this exception shall not authorize an investment adviser to act in any fiduciary capacity subject to the provisions of Title 53, relating to wills, trusts, and the administration of estates; or

(7) A securities broker or dealer registered pursuant to the provisions of 15 U.S.C. Section 78o or Chapter 5 of Title 10 acting in such fiduciary capacity incidental to and as a consequence of its broker or dealer activities.

(8) A nonprofit corporation. .....

(b) (2) Administering real or tangible personal property located in Georgia or elsewhere. For the purposes of this paragraph, "administer" means to possess, purchase, sell, lease, insure, safekeep, manage, or otherwise oversee;

Whereas, MERS does not meet the legal definition of a fiduciary for purposes on being on a Security Instrument without being properly licensed as such. Even if MERS had standing, then AHMH's insolvency would have changed or altered or canceled MERS ability to act as AHMH's sole agency. Did AHMH permit MERS to assign over to CITIBANK, as Trustee, the NOTE and Security Deed on Jan. 25, 2010 into Georgia's Land Records? Georgia Law requires only executors or administrators to act on behalf of

corporation in Georgia. MERS was and maintains itself as an electronic database provider. The MERS corporate structure does not fit the legal definition of as "fiduciary" to act in any capacity with respect to a financial instrument or administering a property.  This fiduciary role conflicts with the Plan Trustee's role.

c.     Failing to adequately disclose that the Monthly Treasury Adjustable Rate Note contract performance would or could yield a negative amortization.

d.     Failing to inadequately disclose finance charges.

e.     Failing to provided net tangible benefit under Georgia's finance law.

f.     Failing to maintain a licensed good standing broker in Georgia as discovered by an independent industry compliance Mavent Systems Audit[22].

---

a deceased mortgagee. Under Georgia's law on mortgagee's OCGA §44-14-181, deceased mortgagees can only maintain proceeding against the Mortgagor by the executor or administer. Thus, under the applicable law would prohibit others from staking their interests claim or to administer documents without the Plan Trustee's permission.

[22] At trial, Ms. Eileen Wanerka testified that she was not employed as a lending compliance officer with her former employee AHMH. She could not factually determine if the loan was in compliance under applicable banking and finance laws (see Page 139 lines (1-14) from the transcript).  Claimant had to submit his own Audit findings into the instant action pursuant to the right of determining facts are supported and  not mere allegations.
Net Tangible benefit is a quintessential part of Georgia's refinance law. Under Georgia's Fair Lending Act O.C.G.A. §7-6A-4.  GFLA statute defines  "Flipping" a home loan; costs and fees as follows:
"(a) No creditor may knowingly or intentionally engage in the unfair act or practice of "flipping" a home loan. Flipping a home loan is the consummating of a high-cost home loan to a borrower that refinances an existing home loan that was consummated within the prior five years when the new loan does not provide reasonable, tangible net benefit to the borrower considering all of the circumstances including, but not limited to, the terms of both the new and refinanced loans, the cost of the new loan, and the borrower's

**Count 4-Breaches under their Prospectus and Pooling and Servicing**

**Agreement for AHMA 2006-3 Mortgaged Backed Security Trust**

affecting Mr. Kareem's contract status by–

A. Known failures to perform under a buy-back of "unrecoverable asset" as a duty of the Depositor under the securitization agreements or its rule as the servicer.

B.      Knowingly failing to give notice that the AHMA 2006-3 Certificates is not a statutory entity go to against Mr. Kareem's estate (See Exhibit Form 15 filing)[23]. In fact, the entity does not exists under either New York State's or Delaware State's statutory requirements for trusts.

C.      There exists no material evidence that AHMSI retained servicing rights which would include Mr. Kareem's Loan.  Under the APA Schedule 2.1(b)(ii)-, specific restrictions applied to AHMSI. Whereas, Contracts not Provided by Seller Under Section 2.1(b)(1) found on page  B-82 of Doc. No. 10273, expressly shows that DB Structured Products, Inc. and ACE Securities Corp. and Acknowledged by Wells Fargo Bank, N.A., where

---

circumstances.

Relevance to the instant action: Mr. Kareem testified at trial that he was confused about the loans performance during the admission phase of the trial to determine admissible content for cross examination.  Apparently, the negative amortization would deprived him of a net tangible benefit in preserving his equity accumulation and the finance charge was understated. He did not have the potential negative amortization feature in his previous mortgage. Surely, the negative amortization and the rate potentially rising up to 9.95% did not benefit his search for a stable low interest rate loan. Global Mortgage was found to be in violation of lending practices in Georgia affecting Mr. Kareem's brokered loan.

[23] See Exhibit 300 Form 15 entered into the U.S. Securities and Exchange Commission found in Section 37 (submitted in Claimant's Post Trial Brief).

American Home Mortgage Servicing, Inc., (AHM SV) as Servicer, and

Wells Fargo was the Master Servicer, dated as of June 29, 2007 was not

given over to AHMSI (**emphasis added**). The court record establishes that

AHMSI had no rights to bill Mr. Kareem.

**Count- 5 Failure to meet its "good faith obligation' under UCC §11-1-203** and under applicable Georgia's Acquiescence Law by-

A. Failure to give timely response to the Rescission Demand Notice when received.[24].

B. Failure to give RESPA Transfer of Notice under applicable law and under terms of Covenant Section 20 of the Security Instrument contract.

16.

**Court May Determine Damages Rendered**

Notwithstanding that Mr. Kareem has entered into this case seeking damages, the Claimant has been asserting his rights against known misconduct by the principal AHMH. OCGA §9-2-4 allows him to seek his remedies. This is not preclusionary pleading, but a direct petition against the sole principal. The Honorable Court is left as the trier of fact in the instant action.

Claimant requests fact finding under Fed. R. Civ. P. Rule 52 on the outcome.

---

[24] See Exhibit "C" (submitted in Claimant's Post Trial Brief) Rescission Demand Notice addressed to Michael Straus received by AHMH on or about Oct 21, 2008. At trial, Ms. Eileen Wanerka testified that the Rescission Demand Notice was forwarded over to AHMSI to respond (see page 131 lines 5-20 from the transcript). Whereas, AHMH elected not to give any direct response. The *Plan Trustee* elected not to respond, too.

AHMH failed to adhere to binding performances under the contracts. Insolvency proceedings does not shield their performance failures. The insolvency proceedings settled the issue that AHMH stopped performing under the contract[25].

17.

## Misdirecting Default Toward Claimant

Claimant fully incorporated in paragraphs 1 through 16 , supra. Counsel has made statements that alleges that the Mortgagor missed or delinquent payments are the source of his own damages. Counsel opined from excerpted statement to this court, with the obvious intent to divert blame  the Mortgagor for the liability of his contract breaches.

## Relief Sought

For reasons fully incorporated above , including citation of authorities contain herein, Claimant has demonstrated his legal basis to support that  his loan was discharged, impaired and that he was harmed. AHMH actions were dilatory and deceptive practices[26].

AHMH damages are confirmed for Breach of Contract and failure to rescind. There are at minimum of actual damages of $19,000.00. Mr.

---

[26] O.C.G.A. §10-1-372 When trade practices are deceptive; common-law and other remedies unaffected
(a) A person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he:
(12) Engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.
(b) In order to prevail in an action under this part, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

Kareem made payments until he challenged the false accounting and AHMSI suspended billing him.

Claimant incorporates his loan contract value, credit reporting harms, and the costs to maintain lengthy litigation justifies his administrative claim balance of $231,000.00. AHMH administration has failed him giving him equity.

Tort damages are available for negligence and acquiescence under applicable Georgia law for treble amount.

Claimant objects to and moves this court to strike Jose Colon's Affidavit and the Magistrate Judge Order. These documents violate the Motion In Limine Order by this court. This is a mere attempt to prejudice this court.

Claimant seeks for AHMH to issue a "Satisfaction and Release of Lien Obligation" against his property to quiet the title lien from the impaired security instrument. There has been  much undisputed evidence to show that AHMH enriched themselves by depositing the note,  and now they are resisting the Mortgagor's right for off-set.

Claimant turns to this Honorable Court for common law equity and Judgment as a Matter of Law.


**EXECUTED THIS DAY ON OR ABOUT MARCH 27, 2012**

Hussain Kareem, Pro Se

**404-0907-0177 (Phone Line)**

33

## CERTIFICATE OF SERVICE

I, the undersign, certify that on or about March 27, 2012 I filed the foregoing document with the opposing counsel filed electronically with electronic signature and by certified mail, prepaid first class mail without using the electronic email of the counsel *to the following:*

Counsel for Debtors:
**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Margaret Whiteman Greecher
Rodney Square
1000 North King Street
Wilmington, DE 19801
P 302.571.6753
F 302.576.3416
mgreecher@ycst.com Counsel for the Plan Trustee:


**HAHN & HAESSEN LLP**
Mark S. Indelicato
Edward L. Schnitzer
488 Madison Avenue
New York, N.Y. 10022
Tel: (212) 478-7200
**The Plan Trustee:**
Steven D. Stass
AHM Liquidating Trust
P.O. Box 10550
Melville, NY 11747

Mathis K. Wright, President
NAACP CHAPTER #5160
P.O. BOX 1296
AMERICUS, GA 31709

**EXECUTED THIS DAY ON
MARCH 27, 2012**

/S/

Hussain Kareem, Pro Se
2197 Carlysle Creek Drive
Lawrenceville, GA 30044
404-907-0177: Phone Line

34