## EXHIBIT F

**Claim #10276 (including Claim #8707)**

B 10 (Official Form 10) (04/10)

| UNITED STATES BANKRUPTCY COURT DISTRICT OF DELAWARE | PROOF OF CLAIM |
| --- | --- |

| Name of Debtor:  American Home Mortgage Corp. | Case Number:<br>07-11047 (CSS); 07-11051 |
| --- | --- |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| Name of Creditor (the person or other entity to whom the debtor owes money or property):<br>CIFG Assurance North America, Inc. | ☒ Check this box to indicate that this claim amends a previously filed claim. |
| --- | --- |
| Name and address where notices should be sent:    CIFG Assurance North America, Inc.<br>850 Third Ave, 10th Floor, New York, New York 10022, Attn: Michael Knopf<br>and Sarah Lieber<br>Telephone number: 212-909-0425    Email address: m.konopf@cifg.com<br>s.lieber@cifg.com | Court Claim Number: __8707__<br>*(If known)*<br><br>Filed on: __January 11, 2008__ |
| Name and address where payment should be sent (if different from above):<br><br><br>Telephone number: | ❑ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>❑ Check this box if you are the debtor or trustee in this case. |

| | |
| --- | --- |
| 1. Amount of Claim as of Date Case Filed:    $ 22,886,446<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☒ Check this box if claim includes interest or other charges in addition to the principal amount of claim. Attach itemized statement of interest or charges. | 5. **Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.**<br><br>Specify the priority of the claim. |
| 2. Basis for Claim:  __Indemnification (See Attached)__<br>(See instruction #2 on reverse side.) | ❑ Domestic support obligations under 11 U.S.C. §507(a)(1)(A) or (a)(1)(B). |
| 3. Last four digits of any number by which creditor identifies debtor: _____<br><br>3a. Debtor may have scheduled account as: _____<br>(See instruction #3a on reverse side.) | ❑ Wages, salaries, or commissions (up to $11,725*) earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| 4. **Secured Claim** (See instruction #4 on reverse side.)<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:  ❑ Real Estate  ❑ Motor Vehicle  ❑ Other<br>Describe:<br><br>Value of Property:$_____ Annual Interest Rate___%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $_____ Basis for perfection: _____<br><br>Amount of Secured Claim: $_____ Amount Unsecured: $_____ | ❑ Contributions to an employee benefit plan – 11 U.S.C. §507 (a)(5).<br><br>❑ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>❑ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8). |
| 6. **Credits:** The amount of all paym[...] this proof of claim.<br><br>7. **Documents:** Attach redacted cop[...]y notes, purchase orders, invoices, itemized statements[...]urity agreements. You may also attach a summary. At[...]ction of a security interest. You may also att[...]" on reverse side.)<br><br>DO NOT SEND ORIGINAL DOCU[...]ED AFTER SCANNING.<br><br>If the documents are not available, please explain: | ❑ Other – Specify applicable paragraph of 11 U.S.C. §507 (a)(__).<br><br>**Amount entitled to priority:**<br><br>$_____<br><br>*Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |

Filed: USBC - District of Delaware
American Home Mortgage Holdings, Inc., Et Al.
07-11047 (CSS)        0000010926

| Date:<br>9/26/2011 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>Sarah Lieber, Director and Deputy General Counsel | FOR COURT USE ONLY<br><br>SEP 26 2011 |
| --- | --- | --- |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ BANKRUPTCY SOLUTIONS, LLC

### ADDENDUM TO SUPPLEMENTARY PROOF OF CLAIM OF CIFG ASSURANCE NORTH AMERICA, INC. AGAINST AMERICAN HOME MORTGAGE CORP.

1.     CIFG hereby supplements Proof of Claim No. 8707 asserted by CIFG Assurance North America, Inc. ("CIFG") against American Home Mortgage Corp. ("AHMC") and certain of its affiliated debtors (collectively, the "Debtors") on or about January 11, 2008 (the "Proof of Claim").

2.     CIFG's Supplementary Proof of Claim seeks contractual, statutory or common law indemnification and/or reimbursement and/or damages from Debtors in an amount not less that $22,886,446 plus interest at the Late Payment Rate.[1]

### A.    **Background**

3.     On January 11, 2008, CIFG asserted claims against AHMC in respect of the AHMIT 2006-2 Transaction. CIFG is the insurer of the Class V-A Securities issued under the Transaction. Pursuant to the Policy, CIFG insures the full and timely payment of regularly scheduled interest and the final payment of principal on the Securities.

4.     In its Proof of Claim, CIFG asserted (i) claims against AHMA under the Transaction Documents for fees, costs and expenses (including, but not limited to, attorneys fees and costs) incurred in connection with administering, monitoring and preserving rights thereunder, (ii) contingent claims against AHMC under the Insurance and Indemnity Agreement for indemnification and/or reimbursement, and (iii) contingent

---

[1] Abbreviated and capitalized terms not otherwise defined herein shall have the meaning ascribed to them in CIFG's Proof of Claim. The claims set forth herein and in CIFG's Proof of Claim arise from or relate to the Transaction Documents, as defined in the Proof of Claim, and documents ancillary thereto. The Transaction Documents are too voluminous to attach. Upon information and belief, copies of the Transaction Documents are in the possession of Debtors. They may also be obtained from counsel to CIFG upon written request of a party in interest.

claims against AHMIC under the Indemnification Agreement for indemnification and/or reimbursement. (Proof of Claim at ¶ 5.)

5.      CIFG also expressly and fully reserved its rights, including the right to amend and/or supplement its Proof of Claim in all respects to assert additional, supplementary and/or amended proofs of claim, including claims against AHMC or any of the Debtors based on violation of federal and state securities laws, common law fraud, misrepresentation, unjust enrichment, and the imposition of constructive trusts or equitable liens on some or all of the AHMC's or Debtors' assets, to the extent that AHMC or any of the other Debtors, the Debtors' affiliates, or their respective officers, agents or representatives have acted or failed to act or have taken or take positions inconsistent with the covenants, representations and warranties, contained in the various Transaction Documents. (Proof of Claim at ¶ 9.)

**B.      Supplementary Proof of Claim**

6.      CIFG incorporates the allegations contained in the Proof of Claim as if set forth fully herein, and states as follows:

7.      Since 2007, CIFG has incurred $22,886,446 in losses arising out of or relating to Debtors', including AHMC's and AHMS's, breaches of the representations and warranties contained in Section 2.01 of the Insurance and Indemnity Agreement and in the Operative Documents[2], and arising out of or relating to untrue statements of

---

[2] "Operative Documents" is defined in Section 1.01 of the Insurance and Indemnity Agreement as the "Insurance [and Indemnity] Agreement, the Notes, the Indenture, the Servicing Agreement and the Trust Agreement."

material fact and/or omissions contained in the Offering Documents[3] under the AHMIT

2006-2 Transaction. (See **Schedule 1** hereto.)

      8.     Pursuant to Section 3.04 of the Insurance and Indemnity Agreement,

AHMC agreed to reimburse and indemnify CIFG for these amounts. Specifically, in

Section 3.04 of the Insurance and Agreement, AHMC and certain other Debtors agreed:

> Indemnification. (a) In addition to any and all of the Class V-A
> Note Insurer's rights of reimbursement, indemnification,
> subrogation and to any other rights of the Class V-A Note Insurer
> pursuant hereto or under law or in equity, the Sponsor [AHMC]
> agrees to pay, and to protect, indemnify and save harmless, the
> Class V-A Note Insurer . . . from and against, any and all claims,
> losses, liabilities (including penalties), actions, suits, judgments,
> demands, damages, costs or expenses (including reasonable fees
> and expenses of attorneys, consultants and auditors and reasonable
> costs of investigations) of any nature arising out of or relating to
> the breach by the Sponsor or the Depositor [AHMS] of any of the
> representations or warranties made by it contained in Section 2.01
> or arising out of or relating to the transactions contemplated by the
> Operative Documents by reason of:
>
> (i) any omission or action (other than of or by the Class V-A Note
> Insurer or the Underwriter) in connection with the offering,
> issuance or delivery of the Class V-A Notes by the Depositor,
> other than those covered by subparagraph (v) below;
>
> (ii) the misfeasance or malfeasance of, or gross negligence or theft
> committed by, any director, officer, employee or agent of the
> Sponsor or the Depositor, in connection with any Transaction
> arising from or relating to the Operative Documents;
>
> (iii) the violation by the Sponsor or the Depositor of any federal or
> state law, rule or regulation, or any judgment, order or decree
> applicable to it, which violation reasonably could result in a
> material adverse change as described in clause (i) of the definition
> of Material Adverse Change;
>
> (iv) the breach by the Sponsor or the Depositor of any
> representation, warranty, or covenant under any of the Operative

---

[3] "Offering Documents" is defined in Section 1.01 of the Insurance and Indemnity Agreement as "the Base
Prospectus, dated April 21, 2006 and the Prospectus Supplement ["ProSupp"], dated June 30, 2006 . . . in
respect of the Notes."

Documents or the occurrence, in respect of the Sponsor or the Depositor, under any of the Operative Documents of any "Event of Default"; or

(v) any untrue statement or alleged untrue statement of a material fact contained in the Offering Document or any omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; *provided, however,* that this Section 3.04(a)(v) does not cover the Class V-A Note Insurer Information or the Underwriter Information.

9.     In Section 2.01 of the Insurance and Indemnity Agreement, AHMC

AHMS expressly represented and warranted to CIFG the accuracy, as of the Closing

Date, of the information contained in the Operative Documents and of other material

information relating to the HELOC Mortgage Loans, the Sponsor or the Depositor.

Specifically, Section 2.01 states:

> Representations and Warranties of the Sponsor and the Depositor.
> Each of the Sponsor and Depositor represents and warrants to the Class V-A Note Insurer as of the Closing Date, as follows:
>
> \* \* \* \*
>
> (i) *Accuracy of Information.* Neither the Operative Documents nor other material information relating to the HELOC Mortgage Loans, the Sponsor or the Depositor (collectively, the "Documents"), as amended, supplemented or superseded, furnished to the Class V-A Note Insurer in writing or in electronic form by the Sponsor or the Depositor in connection with the Transaction contains any statement of a material fact which was untrue or misleading in any material respect when made. . .
>
> \* \* \* \*
>
> (j) *Compliance With Securities Laws.* The offering of the Class V-A Notes complies in all material respects with the requirements of the Securities Act and the regulations thereunder. Without limiting the foregoing, the Offering Document does not contain any untrue statement of a material fact and does not omit to state a material

fact necessary to make the statements made therein, in light of the
circumstances under which they were made, not misleading . . .
* * * *

(k) *Operative Documents.* Each of the representations and
warranties of the Sponsor and the Depositor contained in the
applicable Operative Documents is true and correct in all material
respects and each of the Sponsor and the Depositor hereby makes
each such representation and warranty to, and for the benefit of,
the Class V-A Note Insurer as if the same were set forth in full
herein.

(Insurance and Indemnity Agreement at § 2.01.)

10.    In turn, in the Offering Documents and in other information provided by

Debtors to CIFG, AMHC, AMHS and/or Debtors represented certain critical criteria

concerning the characteristics of the mortgage loans underlying the Securities. Among

other things, AMHC, AMHS and/or Debtors represented that the mortgage loans backing

the Class V-A Securities were underwritten in accordance with prudent underwriting

standards that ensured a borrower could repay the loan and had certain characteristics

including but not limited to specified loan-to-value ratios and owner-occupancy statistics.

(See, e.g., ProSupp at S-56-58),

11.    Upon information and belief, these representations and others contained in

the Offering Documents and Operative Documents and in other information provided by

Debtors to CIFG were false and/or misleading in a material respect.

12.    By way of just some examples, as detailed in the securities fraud

complaint filed in the Unites Stated District Court for the District of Massachusetts

("Mass. Mutual Complaint", attached as **Schedule 2** hereto), loan level analysis

conducted by plaintiff Massachusetts Mutual Life Insurance Co. ("Mass. Mutual") has

revealed that despite clear representations in the AHMIT 2006-2 ProSupp concerning the

5

the weighted average combined loan-to-value ("CLTV") ratios of the mortgage loans underlying the Securities, the underlined actual CLTV ratios for the collateral loans were much higher than represented:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average CLTV of the Collateral Loans | 76.44% (Group I)<br>82.02% (Group II)<br>83.40% (Group III)<br>95.52% (Group IV)<br>91.38% (Group V) | 99.91% (Group I)<br>112.96% (Group II)<br>99.55% (Group III)<br>110.42% (Group IV)<br>107.01% (Group V) |
| Percentage of Collateral Loans with CLTV of Greater than 90% | 3.22% (49 loans)<br>(Group I)<br>36.22% (224 loans)<br>(Group II)<br>37.35% (374 loans)<br>(Group III)<br>76.69% (2,537 loans)<br>(Group IV)<br>57.17% (451 loans)<br>(Group V) | 34.30% (273 loans)<br>(Group I)<br>46.52% (259 loans)<br>(Group II)<br>45.99% (427 loans)<br>(Group III)<br>80.90% (2,692 loans)<br>(Group IV)<br>65.34% (586 loans)<br>(Group V) |

(See Mass. Mutual Compl. at ¶¶ 157-160.)

13.    Consequently, 37% of the loans tested by Mass. Mutual were shown to have appraisals that were inflated by 10% or more, and 39% of the loans tested had CLTVs that were 10 or more points higher than was represented. Again, these results demonstrate that the material representations contained in the Operative Documents, the Offering Documents and in other information provided by Debtors to CIFG concerning the loan statistics were false.

14.    Like the CLTV characteristics, the loan-level analysis conducted by Mass. Mutual reveals that the owner occupancy rates — another material criterion effecting the risk profile of the Securities — represented in the AHMIT 2006-2 Operative Documents,

the Offering Documents and in other information provided by Debtors to CIFG was

false:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 543 loans (65.58%) (Group I) | 454 loans (54.83%) (Group I) |
| | 326 loans (69.96%) (Group II) | 292 loans (62.66%) (Group II) |
| | 604 loans (65.94%) (Group III) | 527 loans (57.53%) (Group III) |
| | 2,124 loans (60.43%) (Group IV) | 1,849 loans (52.60%) (Group IV) |
| | 823 loans (95.25%) (Group V) | 713 loans (82.52%) (Group V) |

(Mass. Mutual Compl. at ¶ 192.)

15.    In light of the breaches of the representations and warranties contained in

Section 2.01 of the Insurance and Indemnity Agreement and in the Operative Documents,

and the untrue statements of material fact and/or omissions contained in the Offering

Documents and in other information provided by Debtors to CIFG under the AHMIT

2006-2 Transaction, CIFG is entitled to reimbursement and indemnification from AHMC

in an amount no less than $22,813,177 plus interest at the applicable rate.

**Reservation of Rights and Notice**

16.    This Supplemented Proof of Claim is filed with a full reservation of rights,

including the right to amend and/or supplement this Supplemented Proof of Claim in all

respects, to assert additional, supplementary and/or amended proofs of claim based on

events, information and/or documents obtained through discovery or otherwise and with

full reservation of the rights and/or claims of CIFG against any party other than AHMC. Actions may be taken by third parties subsequent to filing of this claim which may result in further claims under the Transaction Documents, and all of such claims are hereby reserved.

17.    In addition to the claims asserted herein, CIFG may be entitled to be reimbursed for its fees, costs and expenses incurred in connection with the administering, monitoring and preserving of its rights under the Transaction Documents. CIFG reserves the right to assert any and all claims against AHMC (including those asserted herein) as priority administrative expense claims pursuant to 11 U.S.C. §§ 503(b) and 507, except to the limited extent waived by CIFG under the Order of the Court in this case dated December 14, 2007.

18.    The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies, waiver of any past, present or future defaults or events of default, or a waiver of limitation of any rights, remedies, or claims of CIFG.

19.    CIFG reserves its right to assert claims against other affiliated entities of AHMC, including the other Debtors, should it become evident that such parties are the proper parties, under principles of law or equity. In addition, CIFG reserves any rights of setoff and/or recoupment it may have in connection with the claims asserted in this Proof of Claim.

20.    All notices concerning this Proof of Claim shall be sent to:

> CIFG Assurance North America
> 850 Third Ave, 10th Floor
> New York, NY 10022
> Attn: Michael Knopf and Sarah Lieber



**LOSS SUMMARY**

| | | |
|---|---|---|
| **POLICY #** | | CIFGNA-1041 |
| **DEAL NAME** | | AHM 2006-2 5A |

| | | |
|---|---|---|
| **CLAIM PAYMENTS** | **As of 9/30/2011** | 12,507,922 |
| **LAE PAYMENTS** | **As of 9/30/2011** | 421,417 |
| **PRE-PAID CLAIMS*** | **As of 9/30/2011** | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS**** | | 6,074,225 |
| | | 22,886,446 |

*As permitted under the Transaction Documents, CIFG pre-paid certain claims (detailed below) for purposes of , among other things, efficiency, risk and asset management.

** Anticipated Future Claim Payments are calculated by discounting the anticipated loss cash flows (future claim payments of both principal and interest) using a long term rate (3.30%) for all maturities.

CIFG calculates Anticipated Future Claim Payments on a credit by credit basis using loss or claim payment scenario forecasts appropriate to the particular asset class or transaction. For asset classes where there is transparency in the underlying collateral, CIFG uses the Intex cash flow engine to generate multiple loss scenarios. The loss scenarios are applied to the underlying collateral of each structured finance deal from which CIFG has guaranteed one or more bonds. The collateral cash flow shortfalls are allocated in accordance with the transaction indenture which results in a loss to the CIFG guaranteed bond.

The RMBS Securities (Home Equity Lines of Credit (HELOCs), closed end second mortgages (CES), and first lien alt-A and subprime mortgage transactions) in CIFG's portfolio are aged, meaning that we have a substantial history of performance metrics from which to construct each transaction's future forecast. The most critical of these metrics are the Conditional Default Rate (CDR), the Loss Severity (LS), and the voluntary prepayment rates (VCPR).

**CLAIM PAYMENTS**

| DATE | CLAIM |
|---|---|
| 10/25/2007 | 160,619 |
| 11/25/2007 | 22,316 |
| 12/25/2007 | 261,947 |
| 8/25/2008 | 39,652 |
| 9/25/2008 | 3,130,147 |
| 10/27/2008 | 261,622 |
| 11/25/2008 | 329,655 |
| 1/25/2009 | 254,958 |
| 2/25/2009 | 214,838 |
| 3/25/2009 | 5,533 |
| 4/25/2009 | 1,350,979 |
| 5/25/2009 | 494,698 |
| 6/25/2009 | 1,022,593 |
| 7/25/2009 | 123,662 |
| 8/25/2009 | 54,150 |
| 10/25/2009 | 489,812 |

REMY ©

 **CIFG** | The Value Within

## LOSS SUMMARY

**POLICY #**                               CIFGNA-1041
**DEAL NAME**                           AHM 2006-2 5A

| | | |
|---|---|---:|
| **CLAIM PAYMENTS** | As of 9/30/2011 | 12,507,922 |
| **LAE PAYMENTS** | As of 9/30/2011 | 421,417 |
| **PRE-PAID CLAIMS*** | As of 9/30/2011 | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS**** | | 6,074,225 |
| | | 22,886,446 |

| | |
|---|---:|
| 11/25/2009 | 256,057 |
| 12/25/2009 | 54,071 |
| 1/25/2010 | 33,642 |
| 2/25/2010 | 201,120 |
| 3/25/2010 | 475,805 |
| 4/25/2010 | 609,937 |
| 5/25/2010 | 20,395 |
| 6/25/2010 | 297,869 |
| 8/25/2010 | 115,516 |
| 9/25/2010 | 8,422 |
| 11/25/2010 | 210,940 |
| 12/25/2010 | 64,992 |
| 1/25/2011 | 305,772 |
| 2/25/2011 | 426,705 |
| 3/25/2011 | 117,784 |
| 4/25/2011 | 189,614 |
| 5/25/2011 | 34,549 |
| 6/25/2011 | (69,099) |
| 6/25/2011 | 43,161 |
| 8/25/2011 | 802,334 |
| 9/25/2011 | 91,154 |
| | 12,507,922 |

**LOSS ADJUSTED EXPENSES PAYMENTS**

| DATE | CLAIM | TYPE |
|---|---:|---|
| 10/15/2007 | 3,792 | ATTORNEY FEE |
| 10/19/2007 | 23,170 | ATTORNEY FEE |
| 10/19/2007 | 10,000 | ATTORNEY FEE |
| 11/2/2007 | 3,438 | ATTORNEY FEE |
| 11/9/2007 | 4,673 | ATTORNEY FEE |
| 11/9/2007 | 29,116 | ATTORNEY FEE |
| 1/11/2008 | 30,889 | ATTORNEY FEE |
| 1/11/2008 | 92,393 | ATTORNEY FEE |
| 3/24/2008 | 3,038 | ATTORNEY FEE |
| 3/24/2008 | 26,035 | ATTORNEY FEE |
| 3/24/2008 | 54,016 | ATTORNEY FEE |
| 4/24/2008 | 28,911 | ATTORNEY FEE |
| 11/13/2008 | 3,453 | ATTORNEY FEE |
| 5/29/2009 | 20,068 | ATTORNEY FEE |

 **CIFG** | The Value Within

## LOSS SUMMARY

**POLICY #**        CIFGNA-1041
**DEAL NAME**        AHM 2006-2 5A

| | | |
|---|---|---:|
| **CLAIM PAYMENTS** | **As of 9/30/2011** | 12,507,922 |
| **LAE PAYMENTS** | **As of 9/30/2011** | 421,417 |
| **PRE-PAID CLAIMS*** | **As of 9/30/2011** | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS**** | | 6,074,225 |
| | | 22,886,446 |

| Date | Amount | Type |
|---|---:|---|
| 7/16/2009 | 90 | RECOVERY SERVICES |
| 8/11/2009 | 256 | RECOVERY SERVICES |
| 9/30/2009 | 4,158 | RECOVERY SERVICES |
| 10/29/2009 | 148 | RECOVERY SERVICES |
| 11/18/2009 | 128 | RECOVERY SERVICES |
| 1/31/2010 | 6,728 | RECOVERY SERVICES |
| 2/28/2010 | 6,406 | RECOVERY SERVICES |
| 3/31/2010 | 70 | RECOVERY SERVICES |
| 3/31/2010 | 6,896 | RECOVERY SERVICES |
| 4/22/2010 | 4,945 | RECOVERY SERVICES |
| 5/24/2010 | 9,680 | RECOVERY SERVICES |
| 5/28/2010 | 8,500 | OTHER |
| 6/24/2010 | 3,140 | RECOVERY SERVICES |
| 7/28/2010 | 3,543 | RECOVERY SERVICES |
| 8/26/2010 | 5,049 | RECOVERY SERVICES |
| 9/15/2010 | 4,853 | RECOVERY SERVICES |
| 10/13/2010 | 1,978 | RECOVERY SERVICES |
| 11/15/2010 | 1,972 | RECOVERY SERVICES |
| 12/15/2010 | 222 | RECOVERY SERVICES |
| 1/10/2011 | 300 | OTHER |
| 1/10/2011 | 590 | OTHER |
| 1/24/2011 | 1,242 | RECOVERY SERVICES |
| 2/23/2011 | (750) | RECOVERY SERVICES |
| 3/21/2011 | 2,396 | RECOVERY SERVICES |
| 4/18/2011 | 3,077 | RECOVERY SERVICES |
| 6/13/2011 | 4,723 | RECOVERY SERVICES |
| 6/27/2011 | 6,733 | RECOVERY SERVICES |
| 7/25/2011 | 588 | ATTORNEY FEE |
| 8/31/2011 | 763 | ATTORNEY FEE |
| | 421,417 | |

### PRE-PAID CLAIM PAYMENTS

| DATE | CLAIM |
|---|---:|
| 7/15/2009 | 90,423 |
| 7/17/2009 | 1,123,605 |
| 10/9/2009 | 125,325 |
| 11/30/2009 | 14,112 |
| 11/30/2009 | 136,902 |

REMY ©

 **CIFG** The Value Within     **LOSS SUMMARY**

**POLICY #**                                                      CIFGNA-1041
**DEAL NAME**                                                    AHM 2006-2 5A

| | | | |
|---|---|---|---|
| **CLAIM PAYMENTS** | **As of 9/30/2011** | | 12,507,922 |
| **LAE PAYMENTS** | **As of 9/30/2011** | | 421,417 |
| **PRE-PAID CLAIMS*** | **As of 9/30/2011** | | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS**** | | | 6,074,225 |
| | | | 22,886,446 |

| | |
|---|---|
| 12/1/2010 | 1,489,434 |
| 2/4/2011 | 667,395 |
| 8/11/2011 | 99,257 |
| 8/23/2011 | 136,429 |
| | 3,882,882 |

**ANTICIPATED CLAIM PAYMENTS**

| DATE | CLAIM |
|---|---|
| 10/25/2011 | 85,070 |
| 11/25/2011 | 204,983 |
| 12/25/2011 | 89,144 |
| 1/25/2012 | 191,740 |
| 2/25/2012 | 90,068 |
| 3/25/2012 | 178,558 |
| 4/25/2012 | 89,388 |
| 5/25/2012 | 166,616 |
| 6/25/2012 | 88,603 |
| 7/25/2012 | 155,436 |
| 8/25/2012 | 87,864 |
| 9/25/2012 | 144,330 |
| 10/25/2012 | 86,515 |
| 11/25/2012 | 136,553 |
| 12/25/2012 | 83,451 |
| 1/25/2013 | 128,125 |
| 2/25/2013 | 82,414 |
| 3/25/2013 | 118,167 |
| 4/25/2013 | 81,060 |
| 5/25/2013 | 113,459 |
| 6/25/2013 | 76,100 |
| 7/25/2013 | 106,261 |
| 8/25/2013 | 76,037 |
| 9/25/2013 | 98,571 |
| 10/25/2013 | 73,300 |
| 11/25/2013 | 93,923 |
| 12/25/2013 | 69,892 |
| 1/25/2014 | 89,825 |
| 2/25/2014 | 67,063 |

REMY ©

 **CIFG** | The Value Within          **LOSS SUMMARY**

**POLICY #**                                                CIFGNA-1041
**DEAL NAME**                                            AHM 2006-2 5A


| | | |
|---|---|---:|
| **CLAIM PAYMENTS** | As of 9/30/2011 | 12,507,922 |
| **LAE PAYMENTS** | As of 9/30/2011 | 421,417 |
| **PRE-PAID CLAIMS\*** | As of 9/30/2011 | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS\*\*** | | 6,074,225 |
| | | 22,886,446 |


| | |
|---|---:|
| 3/25/2014 | 81,443 |
| 4/25/2014 | 66,305 |
| 5/25/2014 | 79,673 |
| 6/25/2014 | 61,595 |
| 7/25/2014 | 74,850 |
| 8/25/2014 | 61,030 |
| 9/25/2014 | 70,520 |
| 10/25/2014 | 60,088 |
| 11/25/2014 | 66,365 |
| 12/25/2014 | 56,439 |
| 1/25/2015 | 65,025 |
| 2/25/2015 | 54,523 |
| 3/25/2015 | 59,346 |
| 4/25/2015 | 55,292 |
| 5/25/2015 | 57,879 |
| 6/25/2015 | 50,942 |
| 7/25/2015 | 58,013 |
| 8/25/2015 | 49,284 |
| 9/25/2015 | 54,623 |
| 10/25/2015 | 49,733 |
| 11/25/2015 | 52,522 |
| 12/25/2015 | 47,989 |
| 1/25/2016 | 49,751 |
| 2/25/2016 | 46,293 |
| 3/25/2016 | 48,274 |
| 4/25/2016 | 44,714 |
| 5/25/2016 | 46,853 |
| 6/25/2016 | 43,260 |
| 7/25/2016 | 44,944 |
| 8/25/2016 | 41,788 |
| 9/25/2016 | 43,194 |
| 10/25/2016 | 40,349 |
| 11/25/2016 | 41,483 |
| 12/25/2016 | 38,943 |
| 1/25/2017 | 39,844 |
| 2/25/2017 | 37,572 |
| 3/25/2017 | 38,272 |
| 4/25/2017 | 36,236 |
| 5/25/2017 | 36,765 |

REMY ©

 **LOSS SUMMARY**

| | |
|---|---|
| **POLICY #** | CIFGNA-1041 |
| **DEAL NAME** | AHM 2006-2 5A |

| | | |
|---|---|---|
| **CLAIM PAYMENTS** | **As of 9/30/2011** | 12,507,922 |
| **LAE PAYMENTS** | **As of 9/30/2011** | 421,417 |
| **PRE-PAID CLAIMS\*** | **As of 9/30/2011** | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS\*\*** | | 6,074,225 |
| | | 22,886,446 |

| | |
|---|---|
| 6/25/2017 | 34,935 |
| 7/25/2017 | 35,318 |
| 8/25/2017 | 33,670 |
| 9/25/2017 | 33,929 |
| 10/25/2017 | 32,441 |
| 11/25/2017 | 32,593 |
| 12/25/2017 | 31,246 |
| 1/25/2018 | 31,310 |
| 2/25/2018 | 30,087 |
| 3/25/2018 | 30,076 |
| 4/25/2018 | 28,963 |
| 5/25/2018 | 28,888 |
| 6/25/2018 | 27,873 |
| 7/25/2018 | 27,746 |
| 8/25/2018 | 26,816 |
| 9/25/2018 | 26,646 |
| 10/25/2018 | 25,793 |
| 11/25/2018 | 25,587 |
| 12/25/2018 | 24,802 |
| 1/25/2019 | 24,568 |
| 2/25/2019 | 23,844 |
| 3/25/2019 | 23,586 |
| 4/25/2019 | 22,916 |
| 5/25/2019 | 22,640 |
| 6/25/2019 | 22,018 |
| 7/25/2019 | 21,729 |
| 8/25/2019 | 21,151 |
| 9/25/2019 | 20,851 |
| 10/25/2019 | 20,312 |
| 11/25/2019 | 20,005 |
| 12/25/2019 | 19,501 |
| 1/25/2020 | 19,190 |
| 2/25/2020 | 18,718 |
| 3/25/2020 | 18,405 |
| 4/25/2020 | 17,962 |
| 5/25/2020 | 17,648 |
| 6/25/2020 | 17,231 |
| 7/25/2020 | 16,919 |
| 8/25/2020 | 16,525 |

REMY ©

 **CIFG** | The Value Within          **LOSS SUMMARY**

**POLICY #**                                          CIFGNA-1041
**DEAL NAME**                                     AHM 2006-2 5A

| | | |
|---|---|---:|
| **CLAIM PAYMENTS** | As of 9/30/2011 | 12,507,922 |
| **LAE PAYMENTS** | As of 9/30/2011 | 421,417 |
| **PRE-PAID CLAIMS*** | As of 9/30/2011 | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS**** | | 6,074,225 |
| | | 22,886,446 |

| | |
|---|---:|
| 9/25/2020 | 16,216 |
| 10/25/2020 | 15,844 |
| 11/25/2020 | 15,538 |
| 12/25/2020 | 15,187 |
| 1/25/2021 | 14,886 |
| 2/25/2021 | 14,553 |
| 3/25/2021 | 14,257 |
| 4/25/2021 | 13,941 |
| 5/25/2021 | 13,650 |
| 6/25/2021 | 13,389 |
| 7/25/2021 | 13,131 |
| 8/25/2021 | 12,878 |
| 9/25/2021 | 12,628 |
| 10/25/2021 | 12,382 |
| 11/25/2021 | 12,140 |
| 12/25/2021 | 11,902 |
| 1/25/2022 | 11,668 |
| 2/25/2022 | 11,437 |
| 3/25/2022 | 11,209 |
| 4/25/2022 | 10,986 |
| 5/25/2022 | 10,765 |
| 6/25/2022 | 10,548 |
| 7/25/2022 | 10,335 |
| 8/25/2022 | 10,125 |
| 9/25/2022 | 9,918 |
| 10/25/2022 | 9,714 |
| 11/25/2022 | 9,514 |
| 12/25/2022 | 9,317 |
| 1/25/2023 | 9,123 |
| 2/25/2023 | 8,932 |
| 3/25/2023 | 8,744 |
| 4/25/2023 | 8,559 |
| 5/25/2023 | 8,377 |
| 6/25/2023 | 8,197 |
| 7/25/2023 | 8,021 |
| 8/25/2023 | 7,848 |
| 9/25/2023 | 7,677 |
| 10/25/2023 | 7,509 |
| 11/25/2023 | 7,344 |

 **CIFG** | The Value Within          **LOSS SUMMARY**

**POLICY #**                                                    CIFGNA-1041
**DEAL NAME**                                                   AHM 2006-2 5A

| | | |
|---|---|---|
| **CLAIM PAYMENTS** | **As of 9/30/2011** | 12,507,922 |
| **LAE PAYMENTS** | **As of 9/30/2011** | 421,417 |
| **PRE-PAID CLAIMS*** | **As of 9/30/2011** | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS**** | | 6,074,225 |
| | | 22,886,446 |

| | |
|---|---|
| 12/25/2023 | 7,181 |
| 1/25/2024 | 7,021 |
| 2/25/2024 | 6,864 |
| 3/25/2024 | 6,709 |
| 4/25/2024 | 6,557 |
| 5/25/2024 | 6,407 |
| 6/25/2024 | 6,260 |
| 7/25/2024 | 6,115 |
| 8/25/2024 | 5,972 |
| 9/25/2024 | 5,832 |
| 10/25/2024 | 5,694 |
| 11/25/2024 | 5,558 |
| 12/25/2024 | 5,425 |
| 1/25/2025 | 5,293 |
| 2/25/2025 | 5,164 |
| 3/25/2025 | 5,038 |
| 4/25/2025 | 4,913 |
| 5/25/2025 | 4,790 |
| 6/25/2025 | 4,669 |
| 7/25/2025 | 4,551 |
| 8/25/2025 | 4,434 |
| 9/25/2025 | 4,319 |
| 10/25/2025 | 4,207 |
| 11/25/2025 | 4,096 |
| 12/25/2025 | 3,987 |
| 1/25/2026 | 3,880 |
| 2/25/2026 | 3,775 |
| 3/25/2026 | 3,671 |
| 4/25/2026 | 3,569 |
| 5/25/2026 | 3,469 |
| 6/25/2026 | 3,371 |
| 7/25/2026 | 3,275 |
| 8/25/2026 | 3,180 |
| 9/25/2026 | 3,087 |
| 10/25/2026 | 2,995 |
| 11/25/2026 | 2,905 |
| 12/25/2026 | 2,817 |
| 1/25/2027 | 2,730 |
| 2/25/2027 | 2,644 |

REMY ©

 **LOSS SUMMARY**

**POLICY #**      CIFGNA-1041
**DEAL NAME**      AHM 2006-2 5A

| | | |
|---|---|---|
| **CLAIM PAYMENTS** | **As of 9/30/2011** | 12,507,922 |
| **LAE PAYMENTS** | **As of 9/30/2011** | 421,417 |
| **PRE-PAID CLAIMS*** | **As of 9/30/2011** | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS**** | | 6,074,225 |
| | | 22,886,446 |

| | |
|---|---|
| 3/25/2027 | 2,561 |
| 4/25/2027 | 2,478 |
| 5/25/2027 | 2,397 |
| 6/25/2027 | 2,318 |
| 7/25/2027 | 2,240 |
| 8/25/2027 | 2,163 |
| 9/25/2027 | 2,088 |
| 10/25/2027 | 2,014 |
| 11/25/2027 | 1,941 |
| 12/25/2027 | 1,870 |
| 1/25/2028 | 1,800 |
| 2/25/2028 | 1,731 |
| 3/25/2028 | 1,664 |
| 4/25/2028 | 1,598 |
| 5/25/2028 | 1,533 |
| 6/25/2028 | 1,469 |
| 7/25/2028 | 1,407 |
| 8/25/2028 | 1,345 |
| 9/25/2028 | 1,285 |
| 10/25/2028 | 1,226 |
| 11/25/2028 | 1,168 |
| 12/25/2028 | 1,111 |
| 1/25/2029 | 1,055 |
| 2/25/2029 | 1,000 |
| 3/25/2029 | 946 |
| 4/25/2029 | 894 |
| 5/25/2029 | 842 |
| 6/25/2029 | 791 |
| 7/25/2029 | 741 |
| 8/25/2029 | 693 |
| 9/25/2029 | 645 |
| 10/25/2029 | 598 |
| 11/25/2029 | 552 |
| 12/25/2029 | 507 |
| 1/25/2030 | 463 |
| 2/25/2030 | 420 |
| 3/25/2030 | 378 |
| 4/25/2030 | 337 |
| 5/25/2030 | 297 |

REMY ©

**CIFG** | The Value Within          **LOSS SUMMARY**

**POLICY #**                                        CIFGNA-1041
**DEAL NAME**                                    AHM 2006-2 5A


| | | |
|---|---|---|
| **CLAIM PAYMENTS** | **As of 9/30/2011** | 12,507,922 |
| **LAE PAYMENTS** | **As of 9/30/2011** | 421,417 |
| **PRE-PAID CLAIMS*** | **As of 9/30/2011** | 3,882,882 |
| **ANTICIPATED FUTURE NPV CLAIM PAYMENTS**** | | 6,074,225 |
| | | 22,886,446 |


| | |
|---|---|
| 6/25/2030 | 257 |
| 7/25/2030 | 219 |
| 8/25/2030 | 181 |
| 9/25/2030 | 145 |
| 10/25/2030 | 110 |
| 11/25/2030 | 78 |
| 12/25/2030 | 52 |
| 1/25/2031 | 30 |
| 2/25/2031 | 21 |
| 3/25/2031 | 14 |
| 4/25/2031 | 7 |
| | 6,851,459 |

REMY ©

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | Civil Action No. |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| GOLDMAN SACHS MORTGAGE COMPANY; GOLDMAN, SACHS & CO., INC.; AMERICAN HOME MORTGAGE SECURITIES LLC; AMERICAN HOME MORTGAGE ASSETS LLC; BEAR STEARNS ASSET BACKED SECURITIES I LLC; J.P. MORGAN SECURITIES LLC; BARCLAYS CAPITAL INC.; UBS SECURITIES LLC; MICHAEL STRAUSS; STEPHEN A. HOZIE; THOMAS M. MCDONAGH; ALAN B. HORN; JOSEPH T. JURKOWSKI, JR.; MATTHEW E. PERKINS; SAMUEL L. MOLINARO, JR.; and THOMAS F. MARANO, | |
| Defendants. | |

Plaintiff Massachusetts Mutual Life Insurance Company ("MassMutual"), by and through

its attorneys, brings this action against Goldman Sachs Mortgage Company ("GSMC"); Bear

Stearns Asset Backed Securities I LLC; American Home Mortgage Securities LLC; and

American Home Mortgage Assets LLC (collectively, the "Depositors"); Goldman, Sachs & Co.,

Inc.; J.P. Morgan Securities LLC (as successor-in-interest to Bear, Stearns & Co. Inc.); Barclays

Capital Inc.; and UBS Securities LLC (collectively, the "Underwriters"); and Michael Strauss;

Stephen A. Hozie; Thomas M. McDonagh; Alan B. Horn; Joseph T. Jurkowski, Jr.; Matthew E.

Perkins; Samuel L. Molinaro, Jr.; and Thomas F. Marano (collectively, the "Officer

Defendants"), and alleges as follows:

### NATURE OF ACTION

1.      This action arises out of the sale of certain residential mortgage-backed securities

(the "Certificates") to MassMutual.  The Certificates were sold pursuant to public filings and

offering materials that contained untrue statements and omissions of material facts, in violation

of the Massachusetts Uniform Securities Act, Mass. Gen. Laws ch. 110A, § 410.

2.      The mortgage loans underlying the Certificates were originated by non-party

American Home Mortgage Investment Corp. ("AHM"), or an affiliate thereof.  Prior to its

bankruptcy, AHM was ranked by the <u>National Mortgage News</u> as the nation's 10th largest

residential mortgage lender.  The company employed a sales force of 2,450 loan officers and

account executives lending through over 550 retail and wholesale loan production offices located

in 47 states and the District of Columbia.  By the end of 2006, the aggregate principal amount of

AHM's total loan originations was approximately $58.9 billion, up substantially from $12.2

billion in 2002.

3.      Unlike all other top-10 lenders, which were large commercial banks or entities

with big parents, AHM was a non-bank mortgage lender.  It lacked alternative income streams,

1

such as consumer deposits, and was dependent upon its loan volumes to generate fees and maintain its standing with creditors and stock market investors. To fund residential mortgage loans, AHM typically borrowed funds from a short-term revolving warehouse credit facility. To pay off its warehouse lenders, AHM then sold its residential mortgage loans to Sponsors, which securitized the loans. AHM frequently retained the servicing rights for the loans to generate additional fees.

4.      The Sponsors for five of the six securitizations at issue in this case were non-parties American Home Mortgage Acceptance, Inc. and American Home Mortgage Corp. The Sponsor for the remaining securitization at issue was defendant GSMC. For each securitization, the Sponsor purchased AHM loans, which it then bundled and sold to a Depositor for securitization.

5.      The Depositors for the six securitizations at issue were defendants American Home Mortgage Securities LLC, American Home Mortgage Assets LLC, and Bear Stearns Asset Backed Securities I LLC. Each Depositor purchased the mortgage loans from a Sponsor and created a trust to sell interests in the loans to investors, including MassMutual, in the form of Certificates.

6.      To market and sell the Certificates, the Sponsors and Depositors used Goldman, Sachs & Co., Inc., Bear, Stearns & Co. Inc., Barclays Capital Inc., and UBS Securities LLC as Underwriters. These Underwriters, like the Sponsors and Depositors, had a fundamental legal obligation to undertake due diligence on the loans underlying the Certificates and to make accurate disclosures about the credit quality and characteristics of the loans.

7.      In marketing the Certificates to MassMutual, the Sponsors, Depositors, and Underwriters represented that the loans backing the securities were underwritten in accordance

with prudent underwriting standards that ensured a borrower could repay the loan. These defendants also represented that the loans had certain characteristics, including specified loan-to-value ratios and owner-occupancy statistics.

8.    These representations were material to MassMutual's decision to purchase the Certificates. Unlike the Sponsors, Depositors, and Underwriters, MassMutual did not have access to loan files to verify the representations. MassMutual therefore depended on these defendants to ensure that the information presented to it and other investors was true and accurate.

9.    In reality, however, the loans backing the Certificates deviated substantially from what was represented to MassMutual. To originate as many loans as possible to generate fees, AHM had abandoned underwriting guidelines, often issuing loans to borrowers regardless of their ability to repay. For example, in an email sent to its loan officers nationwide, AHM's Senior Vice President of Product and Sales Support in California had encouraged loan officers to make a variety of loans that were inherently risky and extremely susceptible to delinquencies and default, stating: "At AHM we pride ourselves on having a loan for virtually any borrower, regardless of whether or not they have the ability to verify their income Assets or Employment history." Guidelines issued by the company in an internal "Credit Update" likewise had admonished loan officers to "Obtain the least amount of documentation required" and "Always accept copies of documents vs. originals (Gov't loans excluded)."

10.    Similarly, to obtain an ever-growing volume of loans to securitize and sell to investors, the Sponsors and Depositors disregarded underwriting guidelines, often acquiring in bulk loans that had been issued to borrowers regardless of the borrowers' ability to repay. The loans had been issued on the basis of overstated incomes, inflated appraisals, false verifications

3

of employment, and exceptions to underwriting criteria that had no proper justification. Former AHM employees told Newsday that the pressure from senior executives to "becom[e] the nation's top mortgage bank created such pressure to resell loans" that loan documents were not "thoroughly scrutinized to ensure their validity." Instead, "the focus was always on reselling the loans, not evaluating how risky they might be." According to one former AHM District Manager, managers were "told to ignore the issues which should not be ignored, such as the borrower's ability to repay, and just sell these programs."

11.     The Certificates that MassMutual purchased now qualify as junk. In most of the six securitizations in which MassMutual purchased Certificates, more than 25% of the loans backing the securities have now defaulted, have been foreclosed upon, or are delinquent. The defaults, foreclosures, and delinquencies have reached as high as 44% in one securitization. A subsequent forensic analysis commissioned by MassMutual has demonstrated that the representations about the loans were materially false. Under the Massachusetts Uniform Securities Act, MassMutual is entitled to rescind its purchase of these securities and/or recover appropriate damages.

## PARTIES

### A.     Plaintiffs

12.     Plaintiff MassMutual is a Massachusetts mutual life insurance company with its principal place of business in Springfield, Massachusetts. Founded in 1851, MassMutual is a leading, diversified financial services organization providing life insurance, disability income insurance, long-term care insurance, annuities, retirement and income products, investment management, mutual funds, and trust services to individual and institutional customers.

4

**B.**    **Sponsor Defendant**

13.    Defendant GSMC is a New York limited partnership with its principal place of

business in New York, New York.  GSMC, an affiliate of Goldman, Sachs & Co., purchases

first- and subordinate-lien residential mortgage loans for investment, securitization, or sale.

GSMC served as the Sponsor for one of the six securitizations at issue in this action:  the

American Home Mortgage Assets Trust ("AHMAT") 2006-1 securitization.

**C.**    **Depositor Defendants**

14.    Defendant American Home Mortgage Securities LLC ("AHM Securities") is a

Delaware limited liability company with its principal place of business in Melville, New York.

At all relevant times, AHM Securities was a wholly owned subsidiary of AHM.  AHM Securities

was the Depositor for three of the six securitizations at issue in this action:  the American Home

Mortgage Investment Trust ("AHMIT") 2006-1, AHMIT 2006-2, and AHMIT 2007-2

securitizations.

15.    Defendant American Home Mortgage Assets LLC ("AHM Assets") is a Delaware

limited liability company with its principal place of business in Melville, New York.  At all

relevant times, AHM Assets was a wholly owned subsidiary of AHM.  AHM Assets was the

Depositor for two of the six securitizations at issue in this action:  the AHMAT 2006-1 and

AHMAT 2006-2 securitizations.

16.    Defendant Bear Stearns Asset Backed Securities I LLC ("BSABS") is a Delaware

limited liability company with its principal place of business in New York, New York.  At all

relevant times, BSABS was a wholly owned subsidiary of The Bearn Stearns Companies, Inc.

("BSI").  Pursuant to a Merger Agreement effective May 30, 2008, BSI merged with a wholly

owned subsidiary of JPMorgan Chase & Co. ("JPMorgan Chase").  On information and belief,

5

BSABS is now a subsidiary of JPMorgan Chase. BSABS was the Depositor for one of the six

securitizations at issue in this action: the AHMIT 2005-4 securitization.

**D.    Underwriter Defendants**

17.    Defendant Goldman, Sachs & Co., Inc. ("Goldman Sachs") is a New York

corporation with its principal place of business in New York, New York. Goldman Sachs is an

affiliate of GSMC. Goldman Sachs was the Underwriter that sold Certificates to MassMutual in

one of the six securitizations at issue in this action: the AHMAT 2006-1 securitization. As the

Underwriter, Goldman Sachs conducted due diligence on the underlying mortgage loans and

participated in the drafting and dissemination of the offering materials pursuant to which the

Certificates were sold to MassMutual.

18.    Defendant J.P. Morgan Securities LLC is a Delaware limited liability company

with its principal place in New York, New York. J.P. Morgan Securities LLC is the successor-

in-interest to J.P. Morgan Securities Inc., which converted to a limited liability company on or

about September 1, 2010. J.P. Morgan Securities Inc. and its successor-in-interest, J.P. Morgan

Securities LLC, are referred to herein as "J.P. Morgan Securities."

19.    J.P. Morgan Securities is the successor-in-interest to Bear, Stearns & Co. Inc.

("Bear Stearns"), which merged with J.P. Morgan Securities on or about October 1, 2008. Bear

Stearns was, at all relevant times, a wholly owned subsidiary of BSI. Bear Stearns was the

Underwriter that sold Certificates to MassMutual in three of the six securitizations at issue in this

action: the AHMIT 2005-4, AHMIT 2006-1, and AHMIT 2007-2 securitizations. As the

Underwriter, Bear Stearns conducted due diligence on the underlying mortgage loans and

participated in the drafting and dissemination of the offering materials pursuant to which the

Certificates were sold to MassMutual.

6

20.    Defendant Barclays Capital Inc. ("Barclays") is a Connecticut corporation with its principal place of business in New York, New York. Barclays was the Underwriter that sold Certificates to MassMutual in one of the six securitizations at issue in this action: the AHMIT 2006-1 securitization. As the Underwriter, Barclays conducted due diligence on the underlying mortgage loans and participated in the drafting and dissemination of the offering materials pursuant to which the Certificates were sold to MassMutual.

21.    Defendant UBS Securities LLC ("UBS") is a Delaware limited liability company with its principal place of business in Stamford, Connecticut. UBS was the Underwriter that sold Certificates to MassMutual in two of the six securitizations at issue in this action: the AHMAT 2006-1 and AHMIT 2006-2 securitizations. As the Underwriter, UBS conducted due diligence on the underlying mortgage loans and participated in the drafting and dissemination of the offering materials pursuant to which the Certificates were sold to MassMutual.

E.    **Officer Defendants**

22.    Defendant Michael Strauss is an individual residing in Medford, New York. He was, at all relevant times, the Chairman, Chief Executive Officer, and President of AHM. He was also the President and Chief Executive Officer of AHM Securities and AHM Assets. Strauss signed registration statements for five of the six securitizations at issue in this action: the AHMAT 2006-1, AHMIT 2006-1, AHMAT 2006-2, AHMIT 2006-2, and AHMIT 2007-2 securitizations. On April 28, 2009, the United States Securities and Exchange Commission ("SEC") charged several top executives of AHM, including Strauss, with violating various antifraud provisions of the federal securities laws. In its complaint, the SEC alleged that Strauss caused AHM to issue public statements that misleadingly omitted the fact that AHM originated a large percentage of mortgage loans without verifying the borrower's income. Strauss ultimately paid $2.2 million in restitution and a $250,000 fine in order to settle the SEC's case against him.

7

23.     Defendant Stephen A. Hozie is an individual residing in Plano, Texas. He was, at all relevant times, the Chief Financial Officer, Principal Accounting Officer, and Executive Vice President of AHM. He was also Treasurer and Executive Vice President of AHM Securities and AHM Assets. Hozie signed registration statements for five of the six securitizations at issue in this action: the AHMAT 2006-1, AHMIT 2006-1, AHMAT 2006-2, AHMIT 2006-2, and AHMIT 2007-2 securitizations. On April 28, 2009, the SEC charged several top executives of AHM, including Hozie, with violating various antifraud provisions of the federal securities laws. As with Strauss, the SEC alleged that Hozie caused AHM to issue public statements that misleadingly omitted the fact that AHM originated a large percentage of mortgage loans without verifying the borrower's income. Hozie settled the action against him by agreeing to a $225,001 fine and accepting a five-year suspension barring him from appearing or practicing before the SEC as an accountant.

24.     Defendant Thomas M. McDonagh is an individual residing in Garden City, New York. McDonagh was, at all relevant times, Chief Operating Officer, Chief Investment Officer, and Executive Vice President of AHM. He was also a Manager and Executive Vice President of AHM Assets, and a Director and Executive Vice President of AHM Securities. McDonagh signed registration statements for five of the six securitizations at issue in this action: the AHMAT 2006-1, AHMIT 2006-1, AHMAT 2006-2, AHMIT 2006-2, and AHMIT 2007-2 securitizations.

25.     Defendant Alan B. Horn is an individual residing in Lynbrook, New York. Horn was, at all relevant times, General Counsel, Corporate Secretary, and Executive Vice President of AHM. He was also a Manager, Secretary, and Executive Vice President of AHM Assets, and a Director, Secretary, and Executive Vice President of AHM Securities. Horn signed registration

8

statements for five of the six securitizations at issue in this action: the AHMAT 2006-1, AHMIT

2006-1, AHMAT 2006-2, AHMIT 2006-2, and AHMIT 2007-2 securitizations.

26.    Defendant Joseph T. Jurkowski, Jr. is an individual residing in New York, New

York. Jurkowski was, at all relevant times, a Managing Director of Bear Stearns (now J.P.

Morgan Securities) and a Vice President of BSABS. He signed the registration statement for one

of the six securitizations at issue in this action: the AHMIT 2005-4 securitization.

27.    Defendant Matthew E. Perkins is an individual residing in New York, New York.

Perkins was, at all relevant times, the co-head of the Asset-Backed Securities Group at Bear

Stearns. He was also the President (Principal Executive Officer) and a Director of BSABS. He

signed the registration statement for one of the six securitizations at issue in this action: the

AHMIT 2005-4 securitization.

28.    Defendant Samuel L. Molinaro, Jr. is an individual residing in New Canaan,

Connecticut. Molinaro was, at all relevant times, the Chief Financial Officer, Executive Vice

President, and a Director of Bear Stearns. He was also the Treasurer (Principal Financial and

Accounting Officer) and a Director of BSABS. He signed the registration statement for one of

the six securitizations at issue in this action: the AHMIT 2005-4 securitization.

29.    Defendant Thomas F. Marano is an individual residing in Madison, New Jersey.

Marano was, at all relevant times, a senior managing director and the global head of mortgage

and asset-backed securities at Bear Stearns. Marano was also a Director of BSABS. He signed

the registration statement for one of the six securitizations at issue in this action: the AHMIT

2005-4 securitization.

**F.    Relevant Non-Parties**

30.    *American Home Entities*. AHM originated the mortgage loans underlying the

Certificates. In August 2007, AHM and certain of its subsidiaries filed for Chapter 11

9

bankruptcy protection in the United States Bankruptcy Court for the District of Delaware. AHM is now in the process of liquidating pursuant to an Amended Chapter 11 Plan of Liquidation, which was confirmed by the bankruptcy court on February 23, 2009.

31.     American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a subsidiary of AHM, was the Sponsor for four of the six securitizations at issue:  the AHMIT 2005-4, AHMIT 2006-1, AHMIT 2006-2, and AHMIT 2007-2 securitizations.  Like AHM, AHM Acceptance filed for bankruptcy protection and is now in the process of liquidating.

32.     American Home Mortgage Corp. ("AHM Corp."), a subsidiary of AHM, was the Sponsor for one of the six securitizations at issue:  the AHMIT 2006-1 securitization.  Like AHM, AHM Corp. filed for bankruptcy protection and is now in the process of liquidating.

33.     *The Trusts*.  The Certificates for each securitization relevant to this action were issued by a trust established by one of the Depositors.  The six issuing trusts (collectively, the "Trusts") were:  AHMIT 2005-4; AHMAT 2006-1; AHMIT 2006-1; AHMAT 2006-2; AHMIT 2006-2; and AHMIT 2007-2.

34.     At all relevant times, the defendants and/or relevant non-parties committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this Complaint.  Any allegations about acts of corporate defendants mean that those acts were committed through their officers, directors, employees, agents, and/or representatives while those individuals were acting within the actual or implied scope of their authority.

## JURISDICTION AND VENUE

35.     This Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

10

36.     This Court has personal jurisdiction over the defendants by virtue of their securities sales and/or control over securities sales to MassMutual in Massachusetts.

37.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391, because substantial events giving rise to this Complaint took place in Massachusetts.

## SUBSTANTIVE ALLEGATIONS

## I.      THE MARKET FOR RESIDENTIAL MORTGAGE-BACKED SECURITIES

38.     In the 1980's and 1990's, mortgage originators followed a traditional model for originating mortgage loans.  Under the traditional model, they either held the mortgage loans they provided to borrowers through the terms of the loans, or sold the mortgage loans to governmental agencies Federal Home Loan Mortgage Corporation ("Freddie Mac") and Federal National Mortgage Association ("Fannie Mae").

39.     Loans held by mortgage originators were typically conservative, first-lien loans to prime borrowers because the originator would profit if the borrower made timely interest and principal payments, but would bear the loss if the borrower defaulted and the property value was insufficient to repay the loan.  As a result, the originator had economic incentives to establish the creditworthiness of the borrower and the true value of the underlying property by appraising it fairly before issuing the mortgage loan.

40.     Loans sold to Fannie Mae and Freddie Mac were also conservative loans to prime borrowers because the loans had to meet specific guidelines for sale.  By law, Fannie Mae and Freddie Mac can purchase only those mortgage loans that conform to certain regulatory guidelines.  These loans are known in the industry as conforming loans, and are historically the most conservative loans with the lowest rates of delinquency and default.  Mortgage loans that fail to meet the regulatory guidelines are known in the industry as non-conforming loans.

11

41.     In the 1980's and 1990's, Fannie Mae and Freddie Mac securitized the loans they purchased from mortgage originators and sold the securities backed by the loans, referred to as residential mortgage-backed securities, to investors. Investors in these early mortgage-backed securities were provided protections not only because the underlying loans conformed to strict regulatory guidelines, but also because Fannie Mae and Freddie Mac guaranteed that investors would receive timely payments of principal and interest. Because Fannie Mae and Freddie Mac were perceived as being backed by the federal government, investors viewed the guarantees as diminishing credit risk, if not removing it altogether.

42.     In the early 2000's, the demand for securities backed by mortgage loans increased. Private financial institutions stepped in to meet the demand by originating an ever-growing number of non-conforming loans for private securitizations. These non-conforming loans included loans based on reduced documentation, loans issued to subprime borrowers, and adjustable loans where the interest rate increases after a period of time. By 2001, $240 billion in residential mortgage-backed securities were issued through private securitizations. By 2006, that amount had increased by almost five times – to $1.033 trillion.

43.     AHM took advantage of this exploding demand for mortgage-backed securities by originating large volumes of residential mortgage loans in an attempt to grow its share of the loan origination market, boost its fee revenue, and meet defendant Strauss' stated goal of becoming the nation's top mortgage bank. In 2003, AHM was the nation's 25th largest residential mortgage lender. It held a national market share of 0.56%, based on its origination of approximately $21.7 billion in residential mortgage loans during that year. By the end of 2006, AHM was the nation's 10th largest residential mortgage lender. Its national market share had

increased to 2.22%, bolstered by a whopping $58.9 billion in residential mortgage loan
originations during that year alone.

44.    GSMC, the Sponsor for one securitization at issue, dramatically increased its
securitization of residential mortgage loans during this same period, growing the volume of
prime mortgage loans it securitized from $0.4 billion in 2001 to $16.8 billion in 2005. By the
end of 2005, GSMC had sponsored the securitization of over $100 billion in residential mortgage
loans, including prime, subprime, and Alt-A loans, among others.

45.    BSABS, the Depositor for one securitization at issue, experienced similar
exponential growth. It was formed in 2004 to take advantage of the growing boom in residential
mortgage securitizations. By mid-2007, less than three-and-a-half years after its formation,
BSABS had been involved in the issuance of securities backed by residential mortgage loans in
excess of $81.79 billion.

II.    **THE SECURITIZATION PROCESS**

46.    To create residential mortgage-backed securities, such as the Certificates
purchased by MassMutual, a process known as mortgage securitization is used. Mortgage loans
are acquired from mortgage originators and pooled together, with securities constituting interests
in the cash flow from the mortgage pools then sold to investors. The securities are also referred
to as mortgage pass-through securities because the cash flow from the pool of mortgages is
passed through to the securities holders when payments are made by the underlying mortgage
borrowers.

47.    Each securitization involves several entities that perform distinct tasks. The first
step in creating a residential mortgage-backed security, such as the Certificates, is the acquisition
by the Depositor of an inventory of mortgage loans. In this case, each of the Depositors acquired

13

the mortgage loans from the Sponsors, which were responsible for acquiring various loans originated by AHM.

48.     The Depositor then securitizes the pool of loans by forming one or more mortgage pools with the inventory of loans, and creating tranches of interests in the mortgage pools with various levels of seniority.  Interests in these tranches are then issued by the Depositor (who serves as the Issuer) through a trust in the form of bonds, or certificates.

49.     Each tranche has a different level of purported risk and reward, and, often, a different credit rating.  The most senior tranches often receive the highest investment grade rating (triple-A).  Junior tranches, which usually have lower ratings, are more exposed to risk, but offer higher potential returns.  The most senior tranches of securities will be entitled to payment in full before the junior tranches.  Conversely, losses on the underlying loans in the asset pool – whether due to default, delinquency, or otherwise – are allocated first to the most subordinate or junior tranche of securities, then to the tranche above that.  This hierarchy in the division of cash flows is referred to as the flow of funds or waterfall.

50.     The Depositor works with one or more of the nationally recognized credit-rating agencies to ensure that each tranche of the mortgage-backed securities receives the rating desired by the Depositor (and Underwriter).  Once the asset pool is securitized, the certificates are issued to one or more Underwriters (typically Wall Street banks), who resell them to investors, such as MassMutual.

51.     Because the cash flow from the loans in the mortgage pool of a securitization is the source of funds to pay the holders of the securities issued by the trust, the credit quality of the securities depends primarily on the credit quality of the loans in the mortgage pool, which often includes thousands of loans.  Detailed information about the credit quality of the loans is

14

contained in the loan files developed and maintained by the mortgage originators when making

the loans. For residential mortgage loans, such as the loans that backed the Certificates

purchased by MassMutual, each loan file normally contains documents including the borrower's

application for the loan, verification of income, assets, and employment, references, credit

reports, and an appraisal of the property that will secure the loan and provide the basis for other

measures of credit quality, such as loan-to-value ratios, and occupancy status. The loan file

should also include notes from the person who underwrote the loan describing the loan's

purported compliance with underwriting guidelines, and documentation of compensating factors

that justified any departure from those standards.

52.    Investors do not have access to the loan files. Instead, the Sponsor, Depositor,

and Underwriter are responsible for gathering and verifying information about the credit quality

and characteristics of the loans that are deposited into the trust, and presenting this information in

the registration statements, prospectuses, and prospectus supplements (collectively, the "Offering

Materials") prepared for potential investors. This due diligence process is a critical safeguard for

investors and a fundamental legal obligation of the Sponsor, Depositor, and Underwriter.

III.    **MASSMUTUAL'S PURCHASES OF THE CERTIFICATES**

53.    MassMutual purchased the Certificates between September 2005 and April 2007.

MassMutual made the following purchases of Certificates, representing a total investment of

more than $175 million, from the following entities:

| Asset | Full Name of Offering | Purchase Price | Sellers |
|---|---|---|---|
| AHMIT 2005-4, Classes 1A1 and 3A1 | AHMIT 2005-4, Mortgage-Backed Grantor Trust Certificates, Series 2005-4 | $43,500,000.00 | AHM Acceptance (Sponsor)<br><br>BSABS (Depositor)<br><br>Bear Stearns (Underwriter) |
| AHMAT 2006-1, Class 2A1 | AHMAT 2006-1, Mortgage-Backed Pass-Through Certificates, Series 2006-1 | $47,305,000.00 | GSMC (Sponsor)<br><br>AHM Assets (Depositor)<br><br>Goldman Sachs (Underwriter) |
| AHMIT 2006-1, Class 12A1 | AHMIT 2006-1, Mortgage-Backed Notes, Series 2006-1 | $65,000,000.00 | AHM Acceptance (Sponsor)<br><br>AHM Securities (Depositor)<br><br>Bear Stearns Barclays (Underwriters) |
| AHMAT 2006-2, Class 2A1 | AHMAT 2006-2, Mortgage-Backed Pass-Through Certificates, Series 2006-2 | $14,995,755.00 | AHM Corp. (Sponsor)<br><br>AHM Assets (Depositor)<br><br>UBS (Underwriter) |

| Asset | Full Name of Offering | Purchase Price | Sellers |
|---|---|---|---|
| AHMIT 2006-2, Classes 4M4 and 4M3 | AHMIT 2006-2, Mortgage-Backed Notes, Series 2006-2 | $1,994,732.83 | AHM Acceptance (Sponsor) <br><br> AHM Securities (Depositor) <br><br> UBS (Underwriter) |
| AHMIT 2007-2, Class 2A | AHMIT 2007-2, Mortgage-Backed Notes, Series 2007-2 | $2,995,890.31 | AHM Acceptance (Sponsor) <br><br> AHM Securities (Depositor) <br><br> Bear Stearns (Underwriter) |
| | | | |
| TOTAL | | $175,791,378.10 | |

## IV.  DEFENDANTS' ABANDONMENT AND DISREGARD OF DISCLOSED UNDERWRITING STANDARDS TO FACILITATE SALE OF LOW-QUALITY LOANS TO INVESTORS

### A.  Defendants' Representations That Underwriting Standards Were Consistently Followed

54.     The fundamental basis upon which residential mortgage-backed securities are valued is the ability of the borrowers to repay the principal and interest on the underlying loans and the adequacy of the collateral for those loans. If the borrowers cannot pay, and the collateral is insufficient, the securities experience losses. For this reason, the underwriting standards and practices of the mortgage originator that issued the loans backing the certificates, and the representations in the Offering Materials regarding those standards, are critically important to the value of the securities, and to investors' decisions to purchase the securities.

17

55.    AHM and its subsidiaries originated the mortgage loans underlying the six

securitizations at issue. Each loan was purportedly underwritten according to a set of

underwriting guidelines, which are specified criteria that the mortgage loans must meet

depending upon the individual loan program and circumstances of each mortgage loan. In

general, the underwriting guidelines stipulated what documentation was required to be included

in the mortgage loan files for each loan product (which may include, depending upon the loan

product, verifications of income, assets, closing funds and payment histories, among others) and

criteria for eligibility, including tests for debt-to-income ("DTI") and combined loan-to-value

("CLTV") ratios.

56.    In their Offering Materials, defendants represented to investors, including

MassMutual, that the securitized loans were underwritten according to meaningful underwriting

standards. As detailed below, for each securitization, defendants made specific representations

about AHM's underwriting standards and/or the Sponsor's standards.

### (1)    AHMIT 2005-4

57.    The Prospectus Supplement for the AHMIT 2005-4 securitization assured

investors that AHM consistently applied prudent underwriting standards:

> The mortgage loans have been purchased or originated, underwritten and
> documented in accordance with the guidelines of Fannie Mae, Freddie
> Mac, the Federal Housing Administration (FHA), the Department of
> Veterans Affairs (VA), the US Department of Agriculture Guaranteed
> Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines
> of specific private investors, and the non-conforming or Alt-A
> underwriting guidelines established by American Home. Conforming
> conventional loans must generally be approved by the Desktop
> Underwriter and Loan Prospector automated underwriting systems of
> Fannie Mae and Freddie Mac. FHA and VA loans are generally approved
> by these same automated underwriting systems.

58.    The Prospectus Supplement also promised investors that the loans were

underwritten based on a borrower's ability and willingness to repay:

18

> American Home's underwriting philosophy is to weigh all risk factors
> inherent in the loan file, giving consideration to the individual transaction,
> borrower profile, the level of documentation provided and the property
> used to collateralize the debt. Because each loan is different, American
> Home expects and encourages underwriters to use professional judgment
> based on their experience in making a lending decision. American Home
> underwrites a borrower's creditworthiness based solely on information
> that American Home believes is indicative of the applicant's willingness
> and ability to pay the debt they would be incurring.

59.    The Prospectus Supplement further represented that, even for non-conforming

loans, AHM verified information provided by a borrower or required the borrower to have

sufficient compensating factors that justified reduced verification:

> The non-conforming loans are generally documented to the requirements
> of Fannie Mae and Freddie Mac in that the borrower provides the same
> information on the loan application along with documentation to verify the
> accuracy of the information on the application such as income, assets,
> other liabilities, etc. Certain non-conforming stated income or stated asset
> products allow for less verification documentation than Fannie Mae or
> Freddie Mac require. Certain non-conforming Alt-A products also allow
> for less verification documentation than Fannie Mae or Freddie Mac
> require. . . . Alt-A products with less verification documentation generally
> have other compensating factors such as higher credit score or lower loan-
> to-value requirements.

60.    The Prospectus Supplement represented that credit reports were obtained for all

borrowers to analyze credit risk:

> American Home obtains a credit report that summarizes each borrower's
> credit history. The credit report contains information from the three major
> credit repositories, Equifax, Experian and TransUnion. These companies
> have developed scoring models to identify the comparative risk of
> delinquency among applicants based on characteristics within the
> applicant's credit report. A borrower's credit score represents a
> comprehensive view of the borrower's credit history risk factors and is
> indicative of whether a borrower is likely to default on a loan. Some of
> the factors used to calculate credit scores are a borrower's incidents of
> previous delinquency, the number of credit accounts a borrower has, the
> amount of available credit that a borrower has utilized, the source of a
> borrower's existing credit, and recent attempts by a borrower to obtain
> additional credit.

19

61.    To ensure a borrower's ability to repay, the Prospectus Supplement represented

that AHM typically accepted only those borrowers with credit scores of 580 and above:

> The minimum credit score allowed by American Home non-
> conforming loan guidelines for these loans is 620 and the average
> is typically over 700. For American Home Alt-A products, the
> minimum credit score is generally 580.

62.    The Prospectus Supplement also represented that the loan underwriters closely

scrutinized the prospective borrower's housing payment history and monthly debt payments:

> In addition to reviewing the borrower's credit history and credit score,
> American Home underwriters closely review the borrower's housing
> payment history. . . . Underwriters may give consideration to borrowers
> who have demonstrated an ability to carry a similar or greater housing
> expense for an extended period.  In addition to the monthly housing
> expense the underwriter must evaluate the borrower's ability to manage all
> recurring payments on all debts, including the monthly housing expense.
> When evaluating the ratio of all monthly debt payments to the borrower's
> monthly income (debt-to-income ratio), the underwriter should be aware
> of the degree and frequency of credit usage and its impact on the
> borrower's ability to repay the loan.  For example, borrowers who lower
> their total obligations should receive favorable consideration and
> borrowers with a history of heavy usage and a pattern of slow or late
> payments should receive less flexibility.

63.    The Prospectus Supplement pledged to investors that any deviation from

underwriting guidelines was supported by sufficient compensating factors:

> American Home realizes that there may be some acceptable quality loans
> that fall outside published guidelines and encourages "common sense"
> underwriting.  Because a multitude of factors are involved in a loan
> transaction, no set of guidelines can contemplate every potential situation.
> Therefore, each case is weighed individually on its own merits and
> exceptions to American Home's underwriting guidelines are allowed if
> sufficient compensating factors exist to offset any additional risk due to
> the exception.

### (2)    AHMAT 2006-1

64.    The Prospectus Supplement for the AHMAT 2006-1 securitization assured

investors that AHM consistently applied prudent underwriting standards:

> The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the Department of Veterans Affairs (VA), the US Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home.  Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac.  FHA and VA loans are generally approved by these same automated underwriting systems.

65.    The Prospectus Supplement also represented that the loans were underwritten

based on a borrower's ability and willingness to repay:

> The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt.  Because each loan is different, the Originator expects and encourages underwriters to use professional judgment based on their experience in making a lending decision.  The Originator underwrites a borrower's creditworthiness based solely on information that the Originator believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

66.    The Prospectus further represented that underwriting standards were applied to

ensure a borrower's ability to repay and the sufficiency of the collateral:

> The underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan. . . . The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses.

21

67.    The Prospectus Supplement represented that, even for non-conforming loans,

AHM verified information provided by a borrower or required the borrower to have sufficient

compensating factors that justified reduced verification:

> The non-conforming loans are generally documented to the requirements
> of Fannie Mae and Freddie Mac in that the borrower provides the same
> information on the loan application along with documentation to verify the
> accuracy of the information on the application such as income, assets,
> other liabilities, etc.  Certain non-conforming stated income or stated asset
> products allow for less verification documentation than Fannie Mae or
> Freddie Mac require.  Certain non-conforming Alt-A products also allow
> for less verification documentation than Fannie Mae or Freddie Mac
> require. . . . Alt-A products with less verification documentation generally
> have other compensating factors such as higher credit score or lower loan-
> to-value requirements.

68.    The Prospectus Supplement represented that credit reports were obtained for all

borrowers to analyze credit risk:

> One or more credit reports on each applicant from national credit reporting
> companies generally will be required.  The report typically contains
> information relating to credit history with local and national merchants
> and lenders, installment debt payments and any record of defaults,
> bankruptcies, repossessions, or judgments.
>
> \*        \*        \*        \*        \*        \*        \*        \*        \*        \*
>
> The Originator obtains a credit report that summarizes each borrower's
> credit history.  The credit report contains information from the three major
> credit repositories, Equifax, Experian and TransUnion.  These companies
> have developed scoring models to identify the comparative risk of
> delinquency among applicants based on characteristics within the
> applicant's credit report.  A borrower's credit score represents a
> comprehensive view of the borrower's credit history risk factors and is
> indicative of whether a borrower is likely to default on a loan.  Some of
> the factors used to calculate credit scores are a borrower's incidents of
> previous delinquency, the number of credit accounts a borrower has, the
> amount of available credit that a borrower has utilized, the source of a
> borrower's existing credit, and recent attempts by a borrower to obtain
> additional credit.

22

69.    To ensure a borrower's ability to repay, the Prospectus Supplement represented

that AHM typically accepted only those borrowers with credit scores of 580 and above:

> The minimum credit score allowed by the Originator nonconforming loan
> guidelines for these loans is 620 and the average is typically over 700. For
> American Home Alt-A products, the minimum credit score is generally
> 580.

70.    GSMC, as the Sponsor of the AHMAT 2006-1 securitization, specifically

promised in the Prospectus Supplement that it had conducted reviews of AHM to ensure

compliance with underwriting guidelines:

> Prior to acquiring any mortgage loans, GSMC will conduct a review of the
> related mortgage loan seller.  GSMC's review process consists of
> reviewing select financial information for credit and risk assessment and
> underwriting guideline review, senior level management discussion and
> background checks.  The scope of the loan due diligence will depend on
> the credit quality of the mortgage loans.
>
> The underwriting guideline review considers mortgage loan origination
> processes and systems.  In addition, such review considers corporate
> policy and procedures relating to HOEPA and state and federal predatory
> lending, origination practices by jurisdiction, historical loan level loss
> experience, quality control practices, significant litigation and material
> investors.

71.    The Prospectus also promised investors that the Depositor (AHM Assets) had

reviewed the underwriting information to confirm compliance with underwriting standards:

> The depositor will acquire mortgage loans utilizing re-underwriting
> criteria which it believes are appropriate, depending to some extent on the
> depositor's or its affiliates' prior experience with the Seller and the
> servicer, as well as the depositor's prior experience with a particular type
> of mortgage loan or with mortgage loans relating to mortgaged properties
> in a particular geographical region.  A standard approach to re-
> underwriting is to compare loan file information and information that is
> represented to the depositor on a tape with respect to a percentage of the
> mortgage loans the depositor deems appropriate in the circumstances.

72.    Finally, the Prospectus Supplement assured investors that any deviation from

underwriting guidelines was supported by sufficient compensating factors:

> The Originator realizes that there may be some acceptable quality loans
> that fall outside published guidelines and encourages "common sense"
> underwriting. Because a multitude of factors are involved in a loan
> transaction, no set of guidelines can contemplate every potential situation.
> Therefore, each case is weighed individually on its own merits and
> exceptions to the Originator's underwriting guidelines are allowed if
> sufficient compensating factors exist to offset any additional risk due to
> the exception.

### (3)    AHMIT 2006-1

73.    The Prospectus Supplement for the AHMIT 2006-1 securitization assured

investors that AHM consistently applied prudent underwriting standards:

> The mortgage loans have been purchased or originated, underwritten and
> documented in accordance with the guidelines of Fannie Mae, Freddie
> Mac, the Federal Housing Administration (FHA), the Department of
> Veterans Affairs (VA), the US Department of Agriculture Guaranteed
> Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines
> of specific private investors, and the non-conforming or Alt-A
> underwriting guidelines established by American Home.  Conforming
> conventional loans must generally be approved by the Desktop
> Underwriter and Loan Prospector automated underwriting systems of
> Fannie Mae and Freddie Mac.  FHA and VA loans are generally approved
> by these same automated underwriting systems.

74.    The Prospectus Supplement also represented that the loans were underwritten

based on a borrower's ability and willingness to repay:

> The Originator's underwriting philosophy is to weigh all risk factors
> inherent in the loan file, giving consideration to the individual transaction,
> borrower profile, the level of documentation provided and the property
> used to collateralize the debt.  Because each loan is different, the
> Originator expects and encourages underwriters to use professional
> judgment based on their experience in making a lending decision.  The
> Originator underwrites a borrower's creditworthiness based solely on
> information that the Originator believes is indicative of the applicant's
> willingness and ability to pay the debt they would be incurring.

75.    The Prospectus further represented that underwriting standards were applied to

ensure a borrower's ability to repay and the sufficiency of the collateral:

> The underwriting standards to be used in originating the mortgage loans
> are primarily intended to assess the creditworthiness of the mortgagor, the

24

> value of the mortgaged property and the adequacy of the property as
> collateral for the mortgage loan. . . . The primary considerations in
> underwriting a mortgage loan are the mortgagor's employment stability
> and whether the mortgagor has sufficient monthly income available (1) to
> meet the mortgagor's monthly obligations on the proposed mortgage loan
> (generally determined on the basis of the monthly payments due in the
> year of origination) and other expenses related to the home (including
> property taxes and hazard insurance) and (2) to meet monthly housing
> expenses and other financial obligations and monthly living expenses.

76.     The Prospectus Supplement represented that, even for non-conforming loans,

AHM verified information provided by a borrower or required the borrower to have sufficient

compensating factors that justified reduced verification:

> The non-conforming loans are generally documented to the requirements
> of Fannie Mae and Freddie Mac in that the borrower provides the same
> information on the loan application along with documentation to verify the
> accuracy of the information on the application such as income, assets,
> other liabilities, etc.  Certain nonconforming stated income or stated asset
> products allow for less verification documentation than Fannie Mae or
> Freddie Mac require.  Certain non-conforming Alt-A products also allow
> for less verification documentation than Fannie Mae or Freddie Mac
> require. . . . Alt-A products with less verification documentation generally
> have other compensating factors such as higher credit score or lower loan-
> to-value requirements.

77.     The Prospectus Supplement further represented that credit reports were obtained

for all borrowers to analyze credit risk:

> One or more credit reports on each applicant from national credit reporting
> companies generally will be required.  The report typically contains
> information relating to credit history with local and national merchants
> and lenders, installment debt payments and any record of defaults,
> bankruptcies, repossessions, or judgments.
>
> *     *     *     *     *     *     *     *     *     *
>
> The Originator obtains a credit report that summarizes each borrower's
> credit history.  The credit report contains information from the three major
> credit repositories, Equifax, Experian and TransUnion.  These companies
> have developed scoring models to identify the comparative risk of
> delinquency among applicants based on characteristics within the
> applicant's credit report.  A borrower's credit score represents a

> comprehensive view of the borrower's credit history risk factors and is
> indicative of whether a borrower is likely to default on a loan. Some of
> the factors used to calculate credit scores are a borrower's incidents of
> previous delinquency, the number of credit accounts a borrower has, the
> amount of available credit that a borrower has utilized, the source of a
> borrower's existing credit, and recent attempts by a borrower to obtain
> additional credit.

78.     To ensure a borrower's ability to repay, the Prospectus Supplement represented

that AHM typically accepted only those borrowers with credit scores of 580 and above:

> The minimum credit score allowed by the Originator nonconforming loan
> guidelines for these loans is 620 and the average is typically over 700. For
> American Home Alt-A products, the minimum credit score is generally
> 580.

79.     The Prospectus also promised investors that the Depositor (AHM Securities) had

reviewed the underwriting information to confirm compliance with underwriting standards:

> The depositor will acquire mortgage loans utilizing re-underwriting
> criteria which it believes are appropriate, depending to some extent on the
> depositor's or its affiliates' prior experience with the Seller and the
> servicer, as well as the depositor's prior experience with a particular type
> of mortgage loan or with mortgage loans relating to mortgaged properties
> in a particular geographical region. A standard approach to re-
> underwriting is to compare loan file information and information that is
> represented to the depositor on a tape with respect to a percentage of the
> mortgage loans the depositor deems appropriate in the circumstances.

80.     Finally, the Prospectus Supplement assured investors that any deviation from

underwriting guidelines was supported by sufficient compensating factors:

> The Originator realizes that there may be some acceptable quality loans
> that fall outside published guidelines and encourages "common sense"
> underwriting. Because a multitude of factors are involved in a loan
> transaction, no set of guidelines can contemplate every potential situation.
> Therefore, each case is weighed individually on its own merits and
> exceptions to the Originator's underwriting guidelines are allowed if
> sufficient compensating factors exist to offset any additional risk due to
> the exception.

26

### (4)    AHMAT 2006-2

81.    The Prospectus Supplement for the AHMAT 2006-2 securitization assured

investors that AHM consistently applied prudent underwriting standards:

> The mortgage loans have been purchased or originated, underwritten and
> documented in accordance with the guidelines of Fannie Mae, Freddie
> Mac, the Federal Housing Administration (FHA), the Department of
> Veterans Affairs (VA), the US Department of Agriculture Guaranteed
> Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines
> of specific private investors, and the non-conforming or Alt-A
> underwriting guidelines established by American Home. Conforming
> conventional loans must generally be approved by the Desktop
> Underwriter and Loan Prospector automated underwriting systems of
> Fannie Mae and Freddie Mac. FHA and VA loans are generally approved
> by these same automated underwriting systems.

82.    The Prospectus Supplement also represented that the loans were underwritten

based on a borrower's ability and willingness to repay:

> The Originator's underwriting philosophy is to weigh all risk factors
> inherent in the loan file, giving consideration to the individual transaction,
> borrower profile, the level of documentation provided and the property
> used to collateralize the debt. Because each loan is different, the
> Originator expects and encourages underwriters to use professional
> judgment based on their experience in making a lending decision. The
> Originator underwrites a borrower's creditworthiness based solely on
> information that the Originator believes is indicative of the applicant's
> willingness and ability to pay the debt they would be incurring.

83.    The Prospectus further represented that underwriting standards were applied to

ensure a borrower's ability to repay and the sufficiency of the collateral:

> The underwriting standards to be used in originating the mortgage loans
> are primarily intended to assess the creditworthiness of the mortgagor, the
> value of the mortgaged property and the adequacy of the property as
> collateral for the mortgage loan. . . . The primary considerations in
> underwriting a mortgage loan are the mortgagor's employment stability
> and whether the mortgagor has sufficient monthly income available (1) to
> meet the mortgagor's monthly obligations on the proposed mortgage loan
> (generally determined on the basis of the monthly payments due in the
> year of origination) and other expenses related to the home (including
> property taxes and hazard insurance) and (2) to meet monthly housing
> expenses and other financial obligations and monthly living expenses.

27

84.    The Prospectus Supplement represented that, even for non-conforming loans,

AHM verified information provided by a borrower or required the borrower to have sufficient

compensating factors that justified reduced verification:

> The non-conforming loans are generally documented to the requirements
> of Fannie Mae and Freddie Mac in that the borrower provides the same
> information on the loan application along with documentation to verify the
> accuracy of the information on the application such as income, assets,
> other liabilities, etc. Certain non-conforming stated income or stated asset
> products allow for less verification documentation than Fannie Mae or
> Freddie Mac require. Certain non-conforming Alt-A products also allow
> for less verification documentation than Fannie Mae or Freddie Mac
> require. . . . Alt-A products with less verification documentation
> generally have other compensating factors such as higher credit score or
> lower loan-to-value requirements.

85.    The Prospectus Supplement further represented that credit reports were obtained

for all borrowers to analyze credit risk:

> One or more credit reports on each applicant from national credit reporting
> companies generally will be required. The report typically contains
> information relating to credit history with local and national merchants
> and lenders, installment debt payments and any record of defaults,
> bankruptcies, repossessions, or judgments.
>
> *        *        *        *        *        *        *        *        *        *
>
> The Originator obtains a credit report that summarizes each borrower's
> credit history. The credit report contains information from the three major
> credit repositories, Equifax, Experian and TransUnion. These companies
> have developed scoring models to identify the comparative risk of
> delinquency among applicants based on characteristics within the
> applicant's credit report. A borrower's credit score represents a
> comprehensive view of the borrower's credit history risk factors and is
> indicative of whether a borrower is likely to default on a loan. Some of
> the factors used to calculate credit scores are a borrower's incidents of
> previous delinquency, the number of credit accounts a borrower has, the
> amount of available credit that a borrower has utilized, the source of a
> borrower's existing credit, and recent attempts by a borrower to obtain
> additional credit.

28

86.    To ensure a borrower's ability to repay, the Prospectus Supplement represented that AHM typically accepted only those borrowers with credit scores of 580 and above:

> The minimum credit score allowed by the Originator nonconforming loan guidelines for these loans is 620 and the average is typically over 700. For American Home Alt-A products, the minimum credit score is generally 580.

87.    The Prospectus also promised investors that the Depositor (AHM Assets) had reviewed the underwriting information to confirm compliance with underwriting standards:

> The depositor will acquire mortgage loans utilizing re-underwriting criteria which it believes are appropriate, depending to some extent on the depositor's or its affiliates' prior experience with the Seller and the servicer, as well as the depositor's prior experience with a particular type of mortgage loan or with mortgage loans relating to mortgaged properties in a particular geographical region. A standard approach to re-underwriting is to compare loan file information and information that is represented to the depositor on a tape with respect to a percentage of the mortgage loans the depositor deems appropriate in the circumstances.

88.    Finally, the Prospectus Supplement assured investors that any deviation from underwriting guidelines was supported by sufficient compensating factors:

> The Originator realizes that there may be some acceptable quality loans that fall outside published guidelines and encourages "common sense" underwriting. Because a multitude of factors are involved in a loan transaction, no set of guidelines can contemplate every potential situation. Therefore, each case is weighed individually on its own merits and exceptions to the Originator's underwriting guidelines are allowed if sufficient compensating factors exist to offset any additional risk due to the exception.

(5)    **AHMIT 2006-2**

89.    The Prospectus Supplement for the AHMIT 2006-2 securitization assured investors that AHM consistently applied prudent underwriting standards:

> The mortgage loans have been purchased or originated, underwritten and documented in accordance with the guidelines of Fannie Mae, Freddie Mac, the Federal Housing Administration (FHA), the Department of Veterans Affairs (VA), the US Department of Agriculture Guaranteed Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines

of specific private investors, and the non-conforming or Alt-A underwriting guidelines established by American Home. Conforming conventional loans must generally be approved by the Desktop Underwriter and Loan Prospector automated underwriting systems of Fannie Mae and Freddie Mac. FHA and VA loans are generally approved by these same automated underwriting systems.

90.    The Prospectus Supplement also represented that the loans were underwritten based on a borrower's ability and willingness to repay:

The Originator's underwriting philosophy is to weigh all risk factors inherent in the loan file, giving consideration to the individual transaction, borrower profile, the level of documentation provided and the property used to collateralize the debt. Because each loan is different, the Originator expects and encourages underwriters to use professional judgment based on their experience in making a lending decision. The Originator underwrites a borrower's creditworthiness based solely on information that the Originator believes is indicative of the applicant's willingness and ability to pay the debt they would be incurring.

91.    The Prospectus further represented that underwriting standards were applied to ensure a borrower's ability to repay and the sufficiency of the collateral:

The underwriting standards to be used in originating the mortgage loans are primarily intended to assess the creditworthiness of the mortgagor, the value of the mortgaged property and the adequacy of the property as collateral for the mortgage loan. . . . The primary considerations in underwriting a mortgage loan are the mortgagor's employment stability and whether the mortgagor has sufficient monthly income available (1) to meet the mortgagor's monthly obligations on the proposed mortgage loan (generally determined on the basis of the monthly payments due in the year of origination) and other expenses related to the home (including property taxes and hazard insurance) and (2) to meet monthly housing expenses and other financial obligations and monthly living expenses.

92.    The Prospectus Supplement represented that, even for non-conforming loans, AHM verified information provided by a borrower or required the borrower to have sufficient compensating factors that justified reduced verification:

The non-conforming loans are generally documented to the requirements of Fannie Mae and Freddie Mac in that the borrower provides the same information on the loan application along with documentation to verify the

accuracy of the information on the application such as income, assets, other liabilities, etc. Certain non-conforming stated income or stated asset products allow for less verification documentation than Fannie Mae or Freddie Mac require. Certain non-conforming Alt-A products also allow for less verification documentation than Fannie Mae or Freddie Mac require. . . . Alt-A products with less verification documentation generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

93.    The Prospectus Supplement further represented that credit reports were obtained

for all borrowers to analyze credit risk:

One or more credit reports on each applicant from national credit reporting companies generally will be required. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions, or judgments.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

The Originator obtains a credit report that summarizes each borrower's credit history. The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report. A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit.

94.    To ensure a borrower's ability to repay, the Prospectus Supplement represented

that AHM typically accepted only those borrowers with credit scores of 580 and above:

The minimum credit score allowed by the Originator nonconforming loan guidelines for these loans is 620 and the average is typically over 700. For American Home Alt-A products, the minimum credit score is generally 580.

31

95.    The Prospectus also promised investors that the Depositor (AHM Securities) had

reviewed the underwriting information to confirm compliance with underwriting standards:

> The depositor will acquire mortgage loans utilizing re-underwriting
> criteria which it believes are appropriate, depending to some extent on the
> depositor's or its affiliates' prior experience with the Seller and the
> servicer, as well as the depositor's prior experience with a particular type
> of mortgage loan or with mortgage loans relating to mortgaged properties
> in a particular geographical region.  A standard approach to re-
> underwriting is to compare loan file information and information that is
> represented to the depositor on a tape with respect to a percentage of the
> mortgage loans the depositor deems appropriate in the circumstances.

96.    Finally, the Prospectus Supplement assured investors that any deviation from

underwriting guidelines was supported by sufficient compensating factors:

> The Originator realizes that there may be some acceptable quality loans
> that fall outside published guidelines and encourages "common sense"
> underwriting.  Because a multitude of factors are involved in a loan
> transaction, no set of guidelines can contemplate every potential situation.
> Therefore, each case is weighed individually on its own merits and
> exceptions to the Originator's underwriting guidelines are allowed if
> sufficient compensating factors exist to offset any additional risk due to
> the exception.

**(6)    AHMIT 2007-2**

97.    The Prospectus Supplement for the AHMIT 2007-2 securitization assured

investors that AHM consistently applied prudent underwriting standards:

> The mortgage loans have been purchased or originated, underwritten and
> documented in accordance with the guidelines of Fannie Mae, Freddie
> Mac, the Federal Housing Administration (FHA), the Department of
> Veterans Affairs (VA), the US Department of Agriculture Guaranteed
> Rural Housing Program (GRH), Ginnie Mae, the underwriting guidelines
> of specific private investors, and the non-conforming or Alt-A
> underwriting guidelines established by American Home.  Conforming
> conventional loans must generally be approved by the Desktop
> Underwriter and Loan Prospector automated underwriting systems of
> Fannie Mae and Freddie Mac.  FHA and VA loans are generally approved
> by these same automated underwriting systems.

32

98.    The Prospectus Supplement also represented that the loans were underwritten

based on a borrower's ability and willingness to repay:

> The Originator's underwriting philosophy is to weigh all risk factors
> inherent in the loan file, giving consideration to the individual transaction,
> borrower profile, the level of documentation provided and the property
> used to collateralize the debt.  Because each loan is different, the
> Originator expects and encourages underwriters to use professional
> judgment based on their experience in making a lending decision.  The
> Originator underwrites a borrower's creditworthiness based solely on
> information that the Originator believes is indicative of the applicant's
> willingness and ability to pay the debt they would be incurring.

99.    The Prospectus further represented that underwriting standards were applied to

ensure a borrower's ability to repay and the sufficiency of the collateral:

> The underwriting standards to be used in originating the mortgage loans
> are primarily intended to assess the creditworthiness of the mortgagor, the
> value of the mortgaged property and the adequacy of the property as
> collateral for the mortgage loan. . . . The primary considerations in
> underwriting a mortgage loan are the mortgagor's employment stability
> and whether the mortgagor has sufficient monthly income available (1) to
> meet the mortgagor's monthly obligations on the proposed mortgage loan
> (generally determined on the basis of the monthly payments due in the
> year of origination) and other expenses related to the home (including
> property taxes and hazard insurance) and (2) to meet monthly housing
> expenses and other financial obligations and monthly living expenses.

100.    The Prospectus Supplement represented that, even for non-conforming loans,

AHM verified information provided by a borrower or required the borrower to have sufficient

compensating factors that justified reduced verification:

> The non-conforming loans are generally documented to the requirements
> of Fannie Mae and Freddie Mac in that the borrower provides the same
> information on the loan application along with documentation to verify the
> accuracy of the information on the application such as income, assets,
> other liabilities, etc.  Certain non-conforming stated income or stated asset
> products allow for less verification documentation than Fannie Mae or
> Freddie Mac requires.  Certain non-conforming Alt-A products also allow
> for less verification documentation than Fannie Mae or Freddie Mac
> requires. . . .  Alt-A products with less verification documentation

33

generally have other compensating factors such as higher credit score or lower loan-to-value requirements.

101.    The Prospectus Supplement further represented that credit reports were obtained

for all borrowers to analyze credit risk:

> One or more credit reports on each applicant from national credit reporting companies generally will be required. The report typically contains information relating to credit history with local and national merchants and lenders, installment debt payments and any record of defaults, bankruptcies, repossessions, or judgments.

> \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

> The Originator obtains a credit report that summarizes each borrower's credit history. The credit report contains information from the three major credit repositories, Equifax, Experian and TransUnion. These companies have developed scoring models to identify the comparative risk of delinquency among applicants based on characteristics within the applicant's credit report. A borrower's credit score represents a comprehensive view of the borrower's credit history risk factors and is indicative of whether a borrower is likely to default on a loan. Some of the factors used to calculate credit scores are a borrower's incidents of previous delinquency, the number of credit accounts a borrower has, the amount of available credit that a borrower has utilized, the source of a borrower's existing credit, and recent attempts by a borrower to obtain additional credit.

102.    To ensure a borrower's ability to repay, the Prospectus Supplement represented

that AHM typically accepted only those borrowers with credit scores of 620 and above:

> The minimum credit score allowed by the Originator nonconforming loan guidelines for these loans is 620 and the average is typically over 700. For Originator's Alt-A products, the minimum credit score is generally 620.

103.    The Prospectus also promised investors that the Depositor (AHM Securities) had

reviewed the underwriting information to confirm compliance with underwriting standards:

> The depositor will acquire mortgage loans utilizing re-underwriting criteria which it believes are appropriate, depending to some extent on the depositor's or its affiliates' prior experience with the Seller and the servicer, as well as the depositor's prior experience with a particular type of mortgage loan or with mortgage loans relating to mortgaged properties

34

> in a particular geographical region. A standard approach to re-
> underwriting is to compare loan file information and information that is
> represented to the depositor on a tape with respect to a percentage of the
> mortgage loans the depositor deems appropriate in the circumstances.

104.    Finally, the Prospectus Supplement assured investors that any deviation from

underwriting guidelines was supported by documented compensating factors:

> The Originator realizes that there may be some acceptable quality loans
> that fall outside published guidelines and encourages "common sense"
> underwriting. Because a multitude of factors are involved in a loan
> transaction, no set of guidelines can contemplate every potential situation.
> Therefore, each case is weighed individually on its own merits and
> exceptions to the Originator's underwriting guidelines are allowed if
> sufficient compensating factors exist to offset any additional risk due to
> the exception.

**B.    Defendants' Abandonment and Disregard of Underwriting Standards to
Generate a Large Volume of Loans for Securitization and Sale to Investors**

105.    Defendants' representations about the applicable underwriting practices were

false. The securitization process incentivized the Sponsors, Depositors, and Underwriters to

abandon or disregard underwriting standards so that they could originate and purchase huge

volumes of low-quality loans for securitization, regardless of a borrower's ability to repay.

106.    As the private residential mortgage-backed securities market expanded, the

traditional "originate to hold" model morphed into the "originate to distribute" model. Under the

"originate to distribute" model, mortgage companies, such as the Sponsors and Depositors, did

not hold the mortgage loans to maturity. Rather, they purported to shift the risk of loss to the

investors who purchased an interest in the securitized pool of loans.

107.    The new distribution model was highly profitable for the Sponsors, Depositors,

and other mortgage companies. By securitizing and selling mortgage loans to investors through

underwriters, mortgage companies received immediate payment for the loans, shifted the loans

off their books, and were able to issue or purchase more loans. The securitization process

35

enabled the mortgage companies to earn most of their income from transaction and loan-servicing fees. Because the mortgage companies did not have to bear the risk of loss, they had an unchecked incentive to originate or purchase more and more loans to feed into the securitization machine.

108.   The Attorney General for the Commonwealth of Massachusetts explained this unchecked incentive in her investigation into the subprime mortgage industry:

> Historically, the vast majority of home mortgages were written by banks which held the loans in their own portfolios, knew their borrowers, and earned profit by writing good loans and collecting interest over many years. Those banks had to live with their "bad paper" and thus had a strong incentive to avoid making bad loans. In recent years, however, the mortgage market has been driven and funded by the sale and securitization of the vast majority of loans. Lenders now frequently make mortgage loans with the intention to promptly sell the loan and mortgage to one or more entities. . . . The lenders' incentives thus changed from writing good loans to writing a huge volume of loans to re-sell, extracting their profit at the front end, with considerably less regard to the ultimate performance of the loans.

109.   Ben Bernanke, Chairman of the Federal Reserve Bank, also explained the incentive to abandon underwriting standards in Congressional testimony:

> When an originator sells a mortgage and its servicing rights, depending on the terms of the sale, much or all of the risks are passed on to the loan purchaser. Thus, originators who sell loans may have less incentive to undertake careful underwriting than if they kept the loans. Moreover, for some originators, fees tied to loan volume made loan sales a higher priority than loan quality. This misalignment of incentives, together with strong investor demand for securities with high yields, contributed to the weakening of underwriting standards.

110.   To take advantage of the exploding market for residential mortgage-backed securities, the Sponsors abandoned the disclosed underwriting guidelines to originate or acquire as many loans as possible for securitization.

111.   Similarly, the Depositors and Underwriters disregarded the disclosed underwriting guidelines and failed to conduct adequate due diligence so that they could purchase

as many loans as possible for securitization. These defendants conducted due diligence on an expedited basis, with a very small percentage of the loan pool receiving any review.

112.    Unbeknownst to MassMutual, and contrary to the representations in the Offering Materials, the loans underlying all securitizations at issue had been issued to borrowers by AHM regardless of their ability to pay. The loans were often issued on the basis of overstated incomes, inflated appraisals, false verifications of employment, or exceptions to underwriting criteria that had no proper justification. The underlying origination practices were in blatant disregard of the disclosed underwriting standards, and any semblance of reasonable and prudent underwriting.

113.    To grow market share, AHM's senior management imposed intense pressure on its underwriters to approve mortgage loans, and the incentive commission structure was designed to encourage a high volume of closed loans, rather than scrutiny of loan quality and underwriting. For example, an internal presentation called "Incentive Compensation" discussed new compensation features to be implemented in 2005. Per the company's new rules, underwriters were required to approve a certain minimum number of loans – five per day and 100 per month – in order to qualify for incentive compensation. Loan "Validators" and "Closers" were similarly paid by volume, with a minimum of closed loans (18 and 80, respectively) required in order to qualify for bonuses.

114.    According to a former AHM Executive Vice President who worked at the company from 1999 through April of 2007, AHM's underwriting practices became increasingly lax during the 2005 to 2007 time frame. This resulted in AHM granting an ever-increasing number of loans to people unlikely to repay them. According to this former employee, AHM "followed Countrywide" (a competitor) in offering "fast and sleazy products" that had very questionable underwriting requirements and were of low quality. A former AHM Wholesale

Account Executive who worked at AHM from January 2005 through July 2007 stated that at AHM "anybody could buy a house with zero percent down and no proof of ability to pay it [the loan] back." A former AHM Senior Underwriter described the company as making "liar poker loans" in which a borrower could state any level of income or assets and be approved for a loan.

115.    An October 2005 AHM "Credit Update" outlined the company's conscious decision to promote increasingly lax underwriting standards. Under the heading "Guideline Interpretation," the presentation set forth 30 pages of revised credit factors that made clear that AHM's underwriting guidelines were to be relaxed substantially or rendered essentially meaningless in order to allow the company to make loans to high-risk borrowers. Specifically, on each page, AHM set forth the previous "interpretation" of the underwriting guidelines under a heading entitled "What We Observed in [Our] Prior History" alongside the new "interpretation" under a heading entitled "Where We Are Now." These new interpretations included:

- not requiring verification of income sources on stated income loans;

- reducing the required documentation for self-employed borrowers; and

- broadening the acceptable use of second and third loans to cover the full property value.

116.    That same document also set forth AHM's "Quality Control Philosophy" regarding its lending practices. As that document made clear, underwriters and loan officers were to adhere to a philosophy that "Very few things are actually NIQ's [Not Investment Quality]" when making and approving loans.

117.    An internal "Risk Management Update" presentation from October 2005 also reflected a similar loosening of underwriting standards for the company's loans, including:

- permitting borrowers with no housing history;

- reducing the time period for which the borrower's credit history was reviewed;

- decreasing the required lapse time since the borrower was in bankruptcy or credit counseling; and

- reducing the acceptable debt-to-income ratios.

118.   AHM's abandonment of reasonable underwriting practices was so complete that an internal AHM email sent on November 2, 2006, from Steve Somerman, an AHM Senior Vice President of Product and Sales support in California, stated that the company would make a loan to virtually any borrower, regardless of the borrower's ability to verify his or her income, assets, or even employment. Somerman's email concluded with the instruction that AHM's "objective" in making loans was to "approve virtually every borrower loan profile." According to a former branch manager of AHM's San Antonio, Corpus Christi, Houston (the Woodlands), and South Texas branches, between April 2003 and October 2006, Somerman stressed to AHM employees on calls relating to the company's loan products that AHM did not want to see documentation concerning borrowers' income or creditworthiness – it just wanted to make the loans.

119.   Ultimately, AHM's loan origination and underwriting practices were so suspect that in a 2010 report, the Officer of the Comptroller of the Currency, United States Department of Treasury, identified AHM as the 10th worst subprime lender in the entire nation, based on the delinquency rates of the mortgages it originated in the 10 metropolitan areas with the highest rates of delinquency.

**C.     Widespread Defaults That Confirm the Abandonment and Disregard of Underwriting Standards**

120.   The poor performance of the mortgage loans underlying the Certificates provides additional evidence that the representations about origination and underwriting practices were

39

false. Even though the Certificates purchased by MassMutual were supposed to be long-term,

stable investments, just years after their issuance, a substantially high percentage of the mortgage

loans backing the Certificates have defaulted, have been foreclosed upon, or are delinquent,

resulting in massive losses to the Certificateholders, including MassMutual. The following table

contains the most recent performance data available for the loan pools:

| Transaction | Number of Loans in Pool at Closing | Number of Current Loans in Pool | Number of Loans Liquidated or Foreclosed Upon | Number of Loans in Default or Delinquent | % of Loans Liquidated, Foreclosed Upon, in Default or Delinquent |
|---|---|---|---|---|---|
| AHMIT Series 2005-4 | 10,764 | 2,947 | 2,100 | 217 | 21.53% |
| AHMAT Series 2006-1 | 2,889 | 859 | 791 | 71 | 29.84% |
| AHMIT Series 2006-1 | 5,209 | 1,479 | 1,302 | 122 | 27.94% |
| AHMAT Series 2006-2 | 3,022 | 939 | 942 | 87 | 34.05% |
| AHMIT Series 2006-2 | 6,589 | 1,632 | 2,073 | 156 | 33.83% |
| AHMIT Series 2007-2 | 5,944 | 2,128 | 2,416 | 247 | 44.80% |

121.    Defaults are usually caused by a large and unexpected disruption to a borrower's

income. In a properly underwritten pool of loans, one would not expect to see such a large spike

of defaults occurring shortly after origination, because it is unlikely that many borrowers would

all incur a sudden and unexpected change to their repayment ability so soon after purchasing a

home. Indeed, economic studies have confirmed that high default rates early in a loan's life are

highly correlated with loans that were not properly underwritten. This makes sense – when

borrowers are put in loan products they cannot actually afford, they quickly and predictably fall

behind on their payments.

122.    Not only have the loans backing MassMutual's Certificates experienced

extraordinary rates of default, but the Certificates' ratings have also significantly deteriorated.

Many of MassMutual's investments initially received the highest possible Standard & Poor's rating – AAA – which has historically represented an expected loss rate of less than .05%. This is the same rating typically given to bonds backed by the full faith and credit of the United States government, such as treasury bills. According to S&P's whitepaper, "Understanding Standard & Poor's Rating Definitions," a AAA rating represents an "extremely strong capacity to meet its financial commitments."

123.    Because of the high delinquency and default rates, among other things, however, the Certificates have been downgraded, as can be seen in the following table:

| Certificate | Original S&P Rating | Current S&P Rating | Original Moody's Rating | Current Moody's Rating |
|---|---|---|---|---|
| AHMIT Series 2005-4, Class 1A1 | AAA | AA | Aaa | Caa2 |
| AHMIT Series 2005-4, Class 3A1 | AAA | BB | Aaa | Caa3 |
| AHMAT Series 2006-1, Class 2A1 | AAA | CCC | Aaa | Ca |
| AHMIT Series 2006-1, Class 12A1 | AAA | AAA | Aaa | Caa2 |
| AHMAT Series 2006-2, Class 2A1 | AAA | BBB+ | Aaa | Caa2 |
| AHMIT Series 2006-2, Class 4M3 | BBB+ | D | Baa1 | No Rating[1] |
| AHMIT Series 2006-2, Class 4M4 | BBB | D | Baa2 | No Rating |
| AHMIT Series 2007-2, Class 2A | AAA | D | Aaa | C |

124.    The poor performance of the loan pools and the rapidly dropping credit ratings of the Certificates have caused a massive decline in the market values of the Certificates. According to the most recent data, the Certificates should be worth approximately $76 million, but their market value is substantially lower – approximately $41 million.

125.    The economic downturn cannot explain the abnormally high percentage of defaults, foreclosures, and delinquencies observed in the loan pools. Loan pools that were

---

[1] This Certificate has been entirely written off due to losses and has no effective rating.

41

properly underwritten and contained loans with the represented characteristics would have

experienced substantially fewer payment problems and substantially lower percentages of

defaults, foreclosures, and delinquencies. The poor performance of the mortgage loans

underlying MassMutual's Certificates is itself evidence that the loans were improperly

underwritten, and that the representations about origination and underwriting practices were

false.

## V.    MISREPRESENTATIONS ABOUT APPRAISALS AND LOAN-TO-VALUE RATIOS REVEALED BY A FORENSIC REVIEW OF THE MORTGAGE LOANS

### A.    Appraisal and LTV Testing

126.    MassMutual commissioned a forensic review of the mortgage loans underlying

the Certificates to determine whether the characteristics of the mortgage loans, as represented in

the Offering Materials, were accurate.

127.    As part of the forensic review, data relating to the collateral loans underlying each

of the securitizations was gathered from multiple public sources, including assessor, DMV,

credit, and tax records, as well as proprietary sources such as loan servicing, securitization, and

mortgage application records. The data relating to individual mortgage loans was then compared

to the representations made in the Offering Materials.

128.    The forensic review tested the appraised values and loan-to-value ratio ("LTV")

of each property, as represented in the Offering Materials, through an industry-standard

automated valuation model ("AVM").

129.    The LTV is the ratio of a mortgage loan's original principal balance to the

appraised value of the mortgaged property. This ratio was material to MassMutual and other

investors because higher ratios are correlated with a higher risk of default. A borrower with a

small equity position in a property has less to lose if he or she defaults on the loan. There is also

42

a greater likelihood that a foreclosure will result in a loss for the lender if the borrower fully leveraged the property. LTV is a common metric for analysts and investors to evaluate the price and risk of mortgage-backed securities.

130.    For each of the loans reviewed, the underlying property was valued by an industry-standard AVM. AVMs are routinely used in the industry as a way of valuing properties during prequalification, origination, portfolio review, and servicing. AVMs have become ubiquitous enough that their testing and use is specifically outlined in regulatory guidance and discussed in the Dodd-Frank Act. AVMs rely upon similar data as in-person appraisals— primarily county assessor records, tax rolls, and data on comparable properties. AVMs produce independent, statistically-derived valuation estimates by applying modeling techniques to this data. The AVM that MassMutual used incorporates a database of 500 million mortgage transactions covering ZIP codes that represent more than 97% of the homes, occupied by more than 99% of the population, in the United States. Independent testing services have determined that this AVM is the most accurate of all such models.

131.    For purposes of MassMutual's forensic review, a retrospective AVM was conducted for each loan to calculate the value of the underlying property at the time each loan was originated. The inputs for each calculation included, *inter alia*, (1) any subsequent sale prices of the target property, (2) sale prices and appraisals of comparable properties in the neighborhood, and (3) changes in home price indices over time.

132.    Applying the AVM results to the available data for the loans underlying the Certificates shows that the appraised values given to the properties were often significantly higher than what the properties were actually worth. This affected the LTV ratios by decreasing the actual value of the properties relative to the loan amounts, which increased the overall ratios.

43

This overvaluation affected numerous statistics in the Offering Materials, as described in detail

for each transaction in the next section (Section V.B).

**B.    Specific Misrepresentations in the Offering Materials.**

**(1)    AHMIT 2005-4**

133.    The underlying loans in the AHMIT 2005-4 securitization were split into five

groups.  The Prospectus Supplement represented that the weighted average LTV ratio or

combined loan-to-value ratio ("CLTV") of the mortgage loans was 75.94% for Group I, 92.82%

for Group II, 72.59% for Group III, 76.43% for Group IV, and 73.39% for Group V.[2]  It also

represented that only 187 Group I mortgage loans, 1,823 Group II mortgage loans, 84 Group III

mortgage loans, 78 Group IV mortgage loans, and 12 Group V mortgage loans would have an

LTV or CLTV above 90%, which was 5.04% of the Group I collateral pool, 61.22% of the

Group II collateral pool, 3.99% of the Group III collateral pool, 2.40% of the Group IV collateral

pool, and 0.69% of the Group V collateral pool.

134.    Additionally, the Offering Materials represented that appraisals were conducted

on every mortgaged property in accordance with the Uniform Standards of Professional

Appraisal Practice and then reviewed for accuracy:

> Every American Home mortgage loan is secured by a property that has
> been appraised by a licensed appraiser in accordance with the Uniform
> Standards of Professional Appraisal Practice of the Appraisal
> Foundation. . . .  In addition, each appraisal is reviewed for accuracy and
> consistency by an American Home underwriter or a mortgage insurance
> company contract underwriter.

135.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the LTV and CLTV ratios discussed

above.  MassMutual's forensic review revealed that these representations were false.  The true

---

[2]  The ratio for the Group II loans refers to the CLTV ratio, while the ratios for the other loan groups refer
to the LTV ratio.

LTV or CLTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV or CLTV of the Collateral Loans | 75.94% (Group I)<br>92.82% (Group II)<br>72.59% (Group III)<br>76.43% (Group IV)<br>73.39% (Group V) | 90.33% (Group I)<br>102.24% (Group II)<br>91.44% (Group III)<br>82.21% (Group IV)<br>92.37% (Group V) |
| Percentage of Collateral Loans with LTV or CLTV of Greater than 90% | 5.04% (187 loans)[3]<br>(Group I)<br>61.22% (1,823 loans)<br>(Group II)<br>3.99% (84 loans)<br>(Group III)<br>2.40% (78 loans)<br>(Group IV)<br>0.69% (12 loans)<br>(Group V) | 28.75% (664 loans)<br>(Group I)<br>69.68% (2,206 loans)<br>(Group II)<br>22.56% (298 loans)<br>(Group III)<br>15.52% (455 loans)<br>(Group IV)<br>18.75% (164 loans)<br>(Group V) |

136.    In total, 36% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 23% of the loans tested had LTVs that were 10 or more points higher than was represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

137.    The Sponsors, Depositors, and Underwriters had full access to the appraisal records and all data relating to the collateral loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV, CLTV, and appraisal representations.

---

[3] The percentages shown are based on the total outstanding principal balance of the loans.

45

Based on these defendants' involvement in originating and securitizing the loans and conducting

due diligence, they knew that the estimations of the properties' values bore no reasonable

relationship to the actual data and characteristics of the properties. They therefore knew that the

estimations of the properties' values were unjustified, unreasonable, and inaccurate.

138.    Indeed, the evidence shows that, contrary to the representations in the Offering

Materials, the appraisals for the underlying loans were not conducted in accordance with the

Uniform Standards of Professional Appraisal Practice. Rather than being based on market data

of sales of comparable properties, logical analysis, and professional judgment, AHM's appraisals

were based upon predetermined, inflated values demanded by loan brokers eager for volume. A

former AHM Vice President from March 2003 through May 2007 recounted the problem of

appraisal fraud at AHM, noting that the company's loan officers pressured appraisers to come up

with the "right number," *i.e.*, an inflated number the loan officers wanted to justify a loan (or a

larger loan). For example:

- the owner of a small Midwest residential real estate appraisal firm in Illinois, utilized by AHM in over 100 transactions, stated that the company's mortgage brokers would call him and say, "I need this number." He was frequently threatened: "Either give us this home value or you will never do business for us again."

- Similarly, an independent appraiser from Florida approved by AHM was told by the company's brokers, "We need this number, or you will never work for us again." In order to stay in business, she gave the valuations its brokers and lenders demanded, even if it required driving twenty miles away for a "comparable" sale.

- Another independent appraiser from California who worked with AHM stated that its loan officers demanded inflated numbers from him. Lenders told him to either give them the numbers that they wanted, or the appraiser would be "done" and blackballed by every lender doing business in the state. In some cases, this appraiser valued houses for $100,000.00 more than they were worth in areas so bad that he would merely drive by and take pictures of the house.

46

### (2)    AHMAT 2006-1

139.    The Prospectus Supplement for the AHMAT 2006-1 securitization represented that the weighted average LTV ratio of the mortgage loans was 75.01%. It also represented that only 89 mortgage loans would have an LTV above 90%, which was 2.23% of the collateral pool.

140.    Additionally, the Offering Materials represented that appraisals were conducted on every mortgaged property in accordance with the Uniform Standards of Professional Appraisal Practice and then reviewed for accuracy:

> Every American Home mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. . . . In addition, each appraisal is reviewed for accuracy and consistency by an American Home underwriter or a mortgage insurance company contract underwriter.

141.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above. MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 75.013% | 100.24% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 2.23% (89 loans) | 29.47% (851 loans) |

142.    In total, 51% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 43% of the loans tested had LTVs that were 10 or more points higher than

47

was represented. These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly (and so consistently upward) from the true values of the appraised

properties.

143.    The Sponsors, Depositors, and Underwriters had full access to the appraisal

records and all data relating to the collateral loans, along with an affirmative obligation to

conduct due diligence to verify the accuracy of the LTV and appraisal representations. Based on

these defendants' involvement in originating and securitizing the loans and conducting due

diligence, they knew that the estimations of the properties' values bore no reasonable

relationship to the actual data and characteristics of the properties. They therefore knew that the

estimations of the properties' values were unjustified, unreasonable, and inaccurate.

144.    Indeed, as set forth above, the evidence shows that, contrary to the representations

in the Offering Materials, the appraisals for the underlying loans were not conducted in

accordance with the Uniform Standards of Professional Appraisal Practice. Instead, they were

based upon predetermined, inflated values demanded by loan brokers.

(3)    **AHMIT 2006-1**

145.    The underlying loans in the AHMIT 2006-1 securitization were split into three

groups. The Prospectus Supplement represented that the weighted average LTV ratio of the

mortgage loans was 75.35% for Group I, 75.49% for Group II-C, and 71.94% for Group II-NC.

It also represented that only 284 Group I mortgage loans, 16 Group II-C mortgage loans, and

zero Group II-NC mortgage loans would have an LTV above 90%, which was 4.08% of the

Group I collateral pool, 2.07% of the Group II-C collateral pool, and 0% of the Group II-NC

collateral pool.

146.    Additionally, the Offering Materials represented that appraisals were conducted on every mortgaged property in accordance with the Uniform Standards of Professional Appraisal Practice and then reviewed for accuracy:

> Every American Home mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal Foundation. . . . In addition, each appraisal is reviewed for accuracy and consistency by an American Home underwriter or a mortgage insurance company contract underwriter.

147.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above. MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 75.35% (Group I)<br>75.49% (Group II-C)<br>71.94% (Group II-NC) | 94.25% (Group I)<br>83.31% (Group II-C)<br>88.64% (Group II-NC) |
| Percentage of Collateral Loans with LTV of Greater than 90% | 4.08% (284 loans)<br>(Group I)<br>2.07% (16 loans)<br>(Group II-C)<br>0% (0 loans)<br>(Group II-NC) | 26.11% (1,175 loans)<br>(Group I)<br>16.90% (121 loans)<br>(Group II-C)<br>18.21% (32 loans)<br>(Group II-NC) |

148.    In total, 47% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 41% of the loans tested had LTVs that were 10 or more points higher than was represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

149.    The Sponsors, Depositors, and Underwriters had full access to the appraisal records and all data relating to the collateral loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations. Based on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no reasonable relationship to the actual data and characteristics of the properties. They therefore knew that the estimations of the properties' values were unjustified, unreasonable, and inaccurate.

150.    Indeed, as set forth above, the evidence shows that, contrary to the representations in the Offering Materials, the appraisals for the underlying loans were not conducted in accordance with the Uniform Standards of Professional Appraisal Practice. Instead, they were based upon predetermined, inflated values demanded by loan brokers.

### (4)    AHMAT 2006-2

151.    The Prospectus Supplement for the AHMAT 2006-2 securitization represented that the weighted average LTV ratio of the mortgage loans was 75.47%. It also represented that only 196 mortgage loans would have an LTV above 90%, which was 4.43% of the collateral pool.

152.    Additionally, the Offering Materials represented that appraisals were conducted on every mortgaged property in accordance with the Uniform Standards of Professional Appraisal Practice and then reviewed for accuracy:

> Every American Home mortgage loan is secured by a property that has been appraised by a licensed appraiser in accordance with the Uniform Standards of Professional Appraisal Practice of the Appraisal

Foundation. . . . In addition, each appraisal is reviewed for accuracy and consistency by an American Home underwriter or a mortgage insurance company contract underwriter.

153.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the LTV ratios discussed above. MassMutual's forensic review revealed that these representations were false. The true LTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average LTV of the Collateral Loans | 75.47% | 92.40% |
| Percentage of Collateral Loans with LTV of Greater than 90% | 4.43% (196 loans) | 30.46% (953 loans) |

154.    In total, 53% of the loans tested were shown to have appraisals that were inflated by 10% or more, and 45% of the loans tested had LTVs that were 10 or more points higher than was represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

155.    The Sponsors, Depositors, and Underwriters had full access to the appraisal records and all data relating to the collateral loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the LTV and appraisal representations. Based on these defendants' involvement in originating and securitizing the loans and conducting due

51

diligence, they knew that the estimations of the properties' values bore no reasonable

relationship to the actual data and characteristics of the properties. They therefore knew that the

estimations of the properties' values were unjustified, unreasonable, and inaccurate.

156. Indeed, as set forth above, the evidence shows that, contrary to the representations

in the Offering Materials, the appraisals for the underlying loans were not conducted in

accordance with the Uniform Standards of Professional Appraisal Practice. Instead, they were

based upon predetermined, inflated values demanded by loan brokers.

### (5)    AHMIT 2006-2

157. The underlying loans in the AHMIT 2006-2 securitization were split into five

groups. The Prospectus Supplement represented that the weighted average CLTV ratio of the

mortgage loans was 76.44% for Group I, 82.02% for Group II, 83.40% for Group III, 95.52% for

Group IV, and 91.38% for Group V. It also represented that only 49 Group I mortgage loans,

224 Group II mortgage loans, 374 Group III mortgage loans, 2,537 Group IV mortgage loans,

and 451 Group V mortgage loans would have a CLTV above 90%, which was 3.22% of the

Group I collateral pool, 36.22% of the Group II collateral pool, 37.35% of the Group III

collateral pool, 76.69% of the Group IV collateral pool, and 57.17% of the Group V collateral

pool.

158. Additionally, the Offering Materials represented that appraisals were conducted

on every mortgaged property in accordance with the Uniform Standards of Professional

Appraisal Practice and then reviewed for accuracy:

> Every American Home mortgage loan is secured by a property that has
> been appraised by a licensed appraiser in accordance with the Uniform
> Standards of Professional Appraisal Practice of the Appraisal
> Foundation. . . . In addition, each appraisal is reviewed for accuracy and
> consistency by an American Home underwriter or a mortgage insurance
> company contract underwriter.

159.    These representations regarding appraisals were material to MassMutual and

other investors because they signaled the reliability of the CLTV ratios discussed above.

MassMutual's forensic review revealed that these representations were false.  The true CLTV

ratios for the collateral loans were actually much higher than represented, as shown in the chart

below:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average CLTV of the Collateral Loans | 76.44% (Group I)<br>82.02% (Group II)<br>83.40% (Group III)<br>95.52% (Group IV)<br>91.38% (Group V) | 99.91% (Group I)<br>112.96% (Group II)<br>99.55% (Group III)<br>110.42% (Group IV)<br>107.01% (Group V) |
| Percentage of Collateral Loans with CLTV of Greater than 90% | 3.22% (49 loans) (Group I)<br>36.22% (224 loans) (Group II)<br>37.35% (374 loans) (Group III)<br>76.69% (2,537 loans) (Group IV)<br>57.17% (451 loans) (Group V) | 34.30% (273 loans) (Group I)<br>46.52% (259 loans) (Group II)<br>45.99% (427 loans) (Group III)<br>80.90% (2,692 loans) (Group IV)<br>65.34% (586 loans) (Group V) |

160.    In total, 37% of the loans tested were shown to have appraisals that were inflated

by 10% or more, and 39% of the loans tested had CLTVs that were 10 or more points higher than

was represented.  These results not only demonstrate that the loan statistics in the Offering

Materials were false, but also that the representations relating to appraisal practices were false.

Independent appraisers following proper practices would not systematically generate appraisals

that deviate so significantly (and so consistently upward) from the true values of the appraised

properties.

161.    The Sponsors, Depositors, and Underwriters had full access to the appraisal

records and all data relating to the collateral loans, along with an affirmative obligation to

conduct due diligence to verify the accuracy of the CLTV and appraisal representations. Based

on these defendants' involvement in originating and securitizing the loans and conducting due

diligence, they knew that the estimations of the properties' values bore no reasonable

relationship to the actual data and characteristics of the properties. They therefore knew that the

estimations of the properties' values were unjustified, unreasonable, and inaccurate.

162.    Indeed, as set forth above, the evidence shows that, contrary to the representations

in the Offering Materials, the appraisals for the underlying loans were not conducted in

accordance with the Uniform Standards of Professional Appraisal Practice. Instead, they were

based upon predetermined, inflated values demanded by loan brokers.

### (6)    AHMIT 2007-2

163.    The underlying loans in the AHMIT 2007-2 securitization were split into two

groups. The Prospectus Supplement represented that the weighted average CLTV ratio of the

mortgage loans was 80.10% for Group I and 96.42% for Group II. It also represented that none

of the Group I mortgage loans and one of the Group II mortgage loans would have an CLTV

above 100%, which was 0% of the Group I collateral pool and 0.02% of the Group II collateral

pool.

164.    Additionally, the Offering Materials represented that appraisals were conducted

on every mortgaged property in accordance with the Uniform Standards of Professional

Appraisal Practice and then reviewed for accuracy:

> Every American Home mortgage loan is secured by a property that has
> been appraised by a licensed appraiser in accordance with the Uniform
> Standards of Professional Appraisal Practice of the Appraisal
> Foundation. . . . In addition, each appraisal is reviewed for accuracy and

54

consistency by an American Home underwriter or a mortgage insurance company contract underwriter.

165.    These representations regarding appraisals were material to MassMutual and other investors because they signaled the reliability of the CLTV ratios discussed above. MassMutual's forensic review revealed that these representations were false. The true CLTV ratios for the collateral loans were actually much higher than represented, as shown in the chart below:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Weighted Average CLTV of the Collateral Loans | 80.10% (Group I)<br>96.42% (Group II) | 100.04% (Group I)<br>105.19% (Group II) |
| Percentage of Collateral Loans with CLTV of Greater than 100% | .02% (1 loans)<br>(Group I)<br>0% (0 loans)<br>(Group II) | 25.58% (651 loans)<br>(Group I)<br>40.44% (1,110 loans)<br>(Group II) |

166.    In total, 43% of the loans tested had CLTVs that were 10 or more points higher than was represented. These results not only demonstrate that the loan statistics in the Offering Materials were false, but also that the representations relating to appraisal practices were false. Independent appraisers following proper practices would not systematically generate appraisals that deviate so significantly (and so consistently upward) from the true values of the appraised properties.

167.    The Sponsors, Depositors, and Underwriters had full access to the appraisal records and all data relating to the collateral loans, along with an affirmative obligation to conduct due diligence to verify the accuracy of the CLTV and appraisal representations. Based

55

on these defendants' involvement in originating and securitizing the loans and conducting due diligence, they knew that the estimations of the properties' values bore no reasonable relationship to the actual data and characteristics of the properties. They therefore knew that the estimations of the properties' values were unjustified, unreasonable, and inaccurate.

168.   Indeed, as set forth above, the evidence shows that, contrary to the representations in the Offering Materials, the appraisals for the underlying loans were not conducted in accordance with the Uniform Standards of Professional Appraisal Practice. Instead, they were based upon predetermined, inflated values demanded by loan brokers.

## VI.   **MISREPRESENTATIONS ABOUT OWNER-OCCUPANCY STATISTICS REVEALED BY THE FORENSIC REVIEW**

### A.   **Owner-Occupancy Testing**

169.   The forensic review commissioned by MassMutual also tested the accuracy of the representations of owner occupancy in the Offering Materials.

170.   Owner-occupancy statistics were material to MassMutual and other investors because high owner-occupancy rates would have made the Certificates safer investments than Certificates backed by second homes or investment properties. Homeowners who reside in mortgaged properties are less likely to default than owners who purchase homes as investments or second homes and live elsewhere.

171.   MassMutual's forensic review tested the accuracy of the representations of owner occupancy in the Offering Materials. To determine whether a given borrower actually occupied the property as claimed, MassMutual investigated tax information for the loans. One would expect that a borrower residing at a property would have the tax bills sent to that address, and would take applicable tax exemptions available to residents of that property. If a borrower had his or her tax records sent to another address, that is evidence that the borrower was not actually

residing at the mortgaged property. If a borrower declined to make certain tax exemption

elections that depend on the borrower living at the property, that also is evidence the borrower

was living elsewhere. MassMutual also reviewed: (1) borrower credit records, because one

would expect that people have bills sent to their primary address. If a borrower was telling

creditors to send bills to another address, even six months after buying the property, that is

evidence the borrower was living elsewhere; (2) property records, because it is unlikely that a

borrower lives in any one property if in fact that borrower owns multiple properties. It is even

more unlikely that the borrower resides at the mortgaged property if a concurrently owned

separate property did not have its own tax bills sent to the property included in the mortgage

pool; and (3) records of other liens, because if the property was subject to additional liens but

those materials were sent elsewhere, that is evidence the borrower was not living at the

mortgaged property. If the other lien involved a conflicting declaration of residency, that too

would be evidence that the borrower did not live in the subject property.

172.    If a property fails more than one of the above tests, that is strong evidence the

borrower did not in fact reside at the mortgaged property. As described more fully in the next

section (Section VI.B), the results of MassMutual's loan-level analysis of true owner-occupancy

rates on the mortgage loans underlying its Certificates show that, despite the prospectus

representations, a much higher percentage of borrowers did not occupy the mortgaged properties

than was represented.

**B.    Specific Misrepresentations in the Offering Materials.**

**(1)    AHMIT 2005-4**

188.    The Offering Materials for the AHMIT 2005-4 securitization represented that

1,526 of the Group I Mortgage Loans, 3,082 of the Group II Mortgage Loans, 807 of the Group

III Mortgage Loans, 2,084 of the Group IV Mortgage Loans, and 764 of the Group V Mortgage

Loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent

loan-level analysis, however, 16.90% of the Group I Mortgage Loans, 15.64% of the Group II

Mortgage Loans, 20.42% of the Group III Mortgage Loans, 15.07% of the Group IV Mortgage

Loans, and 14.14% of the Group V Mortgage Loans reported to be owner-occupied failed

multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 1,526 of the

Group I loans, 3,082 of the Group II loans, 807 of the Group III loans, 2,084 of the Group IV

loans, and 764 of the Group V loans being owner occupied, as represented in the Offering

Materials, only 1,268 of the Group I loans, 2,600 of the Group II loans, 642 of the Group III

loans, 1,770 of the Group IV loans, and 656 of the Group V loans were:

| | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 1,526 loans (62.26%)[4] (Group I) | 1,268 loans (51.73%) (Group I) |
| | 3,082 loans (98.25%) (Group II) | 2,600 loans (82.88%) (Group II) |
| | 807 loans (68.68%) (Group III) | 642 loans (54.64%) (Group III) |
| | 2,084 loans (67.42%) (Group IV) | 1,770 loans (57.26%) (Group IV) |
| | 764 loans (83.96%) (Group V) | 656 loans (72.09%) (Group V) |

### (2)    AHMAT 2006-1

189.    The Offering Materials for the AHMAT 2006-1 securitization represented that

1,929 of the underlying mortgage loans were for primary residences, *i.e.* owner-occupied

properties. In MassMutual's subsequent loan-level analysis, however, 16.22% of the mortgage

loans reported to be owner-occupied failed multiple tests for owner occupancy. Thus, as shown

---

[4]  The percentages shown are based on the total number of loans in the relevant mortgage pool.

58

in the chart below, instead of 1,929 of the loans being owner occupied, as represented in the Offering Materials, only 1,616 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 1,929 loans (66.77%) | 1,616 loans (55.94%) |

### (3)    AHMIT 2006-1

190.    The Offering Materials for the AHMIT 2006-1 securitization represented that 2,872 of the Group I Mortgage Loans, 521 of the Group II-C Mortgage Loans, and 173 of the Group II-NC Mortgage Loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 17.20% of the Group I Mortgage Loans, 12.93% of the Group II-C Mortgage Loans, and 20.93% of the Group II-NC Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 2,872 of the Group I loans, 521 of the Group II-C loans, and 173 of the Group II-NC loans being owner occupied, as represented in the Offering Materials, only 2,378 of the Group I loans, 454 of the Group II-C loans, and 137 of the Group II-NC loans were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 2,872 loans (67.39%) (Group I) 521 loans (68.19%) (Group II-C) 173 loans (94.54%) (Group II-NC) | 2,378 loans (55.80%) (Group I) 454 loans (59.42%) (Group II-C) 137 loans (74.86%) (Group II-NC) |

### (4)    AHMAT 2006-2

191.    The Offering Materials for the AHMAT 2006-2 securitization represented that 2,170 of the underlying mortgage loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 16.59% of the mortgage loans reported to be owner-occupied failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 2,170 of the loans being owner occupied, as represented in the Offering Materials, only 1,810 were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 2,170 loans (71.81%) | 1,810 loans (59.89%) |

### (5)    AHMIT 2006-2

192.    The Offering Materials for the AHMIT 2006-2 securitization represented that 543 of the Group I Mortgage Loans, 326 of the Group II Mortgage Loans, 604 of the Group III Mortgage Loans, 2,124 of the Group IV Mortgage Loans, and 823 of the Group V Mortgage Loans were for primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level analysis, however, 16.39% of the Group I Mortgage Loans, 10.43% of the Group II Mortgage Loans, 12.75% of the Group III Mortgage Loans, 12.95% of the Group IV Mortgage Loans, and 13.37% of the Group V Mortgage Loans reported to be owner-occupied failed multiple tests for owner occupancy. Thus, as shown in the chart below, instead of 543 of the Group I loans, 326 of the Group II loans, 604 of the Group III loans, 2,124 of the Group IV loans, and 823 of the Group V loans being owner occupied, as represented in the Offering

60

Materials, only 454 of the Group I loans, 292 of the Group II loans, 527 of the Group III loans,

1,849 of the Group IV loans, and 713 of the Group V loans were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 543 loans (65.58%) (Group I) | 454 loans (54.83%) (Group I) |
|  | 326 loans (69.96%) (Group II) | 292 loans (62.66%) (Group II) |
|  | 604 loans (65.94%) (Group III) | 527 loans (57.53%) (Group III) |
|  | 2,124 loans (60.43%) (Group IV) | 1,849 loans (52.60%) (Group IV) |
|  | 823 loans (95.25%) (Group V) | 713 loans (82.52%) (Group V) |

### (6)    AHMIT 2007-2

193.    The Offering Materials for the AHMIT 2007-2 securitization represented that

2,137 of the Group I Mortgage Loans and 2,083 of the Group II Mortgage Loans were for

primary residences, *i.e.* owner-occupied properties. In MassMutual's subsequent loan-level

analysis, however, 14.97% of the Group I Mortgage Loans and 15.89% of the Group II Mortgage

Loans reported to be owner-occupied failed multiple tests for owner occupancy. Thus, as shown

in the chart below, instead of 2,137 of the Group I loans and 2,083 of the Group II loans being

owner occupied, as represented in the Offering Materials, only 1,817 of the Group I loans and

1,752 of the Group II loans were:

|  | As Represented in the Offering Materials | Actual Values Per Forensic Review |
|---|---|---|
| Number of Loans Covering Primary Residences | 2,137 loans (73.21%) (Group I) | 1,817 loans (62.25%) (Group I) |
|  | 2,083 loans (68.86%) (Group II) | 1,752 loans (57.92%) (Group II) |

61

VII.    **LIABILITY OF THE SPONSORS, DEPOSITORS, UNDERWRITERS, AND TRUSTS AS SELLERS OF SECURITIES TO MASSMUTUAL**

194.    The entities that qualify as sellers of securities under the Massachusetts Uniform Securities Act are the Sponsors (AHM Acceptance, AHM Corp., and GSMC), Depositors (AHM Assets, AHM Securities, and BSABS), Underwriters (Goldman Sachs, Bear Stearns, Barclays, and UBS), and Trusts. Each of these is primarily liable for misrepresentations in the Offering Materials under Massachusetts General Laws, Chapter 110A, Section 410(a)(2).

195.    AHM Acceptance, AHM Corp., and GSMC, as Sponsors for one or more of the six securitizations at issue, collected the mortgage loans that were pooled together in the securitization, and then sold, transferred, or otherwise conveyed title to those loans to the Depositors. The Sponsors were involved in the preparation of the Offering Materials that were used to solicit purchases of the Certificates, and were identified as Sponsors or Sellers in the Prospectuses and Prospectus Supplements. The Sponsors earned revenue based on the sales of the Certificates to investors, including MassMutual.

196.    As the Depositors for one or more of the six securitizations at issue, AHM Assets, AHM Securities, and BSABS purchased the pooled mortgage loans from a Sponsor. The Depositors then sold, transferred, or otherwise conveyed the mortgage loans to the Trusts, which held the loans as collateral for the Certificates. The Depositors were involved in the preparation of the Offering Materials that were used to solicit purchases of the Certificates, and were identified as Depositors in the Prospectuses and Prospectus Supplements. In addition, the Depositors were responsible for registering the offerings with the SEC. The Depositors earned revenue based on the sales of the Certificates to investors, including MassMutual.

197.    The Trusts issued the Certificates that were sold to investors, including MassMutual. The Trusts were agents of the Depositors created for the sole purposes of holding the pools of mortgage loans and issuing the Certificates for sale to the investors.

198.    The Sponsors, Depositors, and Trusts used the Underwriters (Goldman Sachs, Bear Stearns, Barclays, and UBS) to market and sell the Certificates. The Underwriters were responsible for underwriting and managing the sale of Certificates, including screening the mortgage loans for compliance with the appropriate underwriting guidelines. The Underwriters profited from the sales of the Certificates.

199.    The Sponsors, Depositors, Underwriters, and Trusts successfully solicited MassMutual's purchases of the Certificates at issue. The Underwriters transferred title in the Certificates to MassMutual.

VIII.    **LIABILITY OF THE SPONSOR, DEPOSITORS, AND OFFICER DEFENDANTS AS CONTROL PERSONS**

**GSMC**

200.    Defendant GSMC, as the Sponsor for one securitization at issue (the AHMAT 2006-1 securitization), had day-to-day control over AHM Assets, as the Depositor, and, through the Depositor, the related Trust. GSMC acquired and selected the loans that would be securitized and determined the terms under which those loans were sold to the Depositor and then to the Trust. GSMC also determined and approved the structure of the securitization and the manner in which the Depositor and the Trust sold the related Certificates, and controlled the disclosures made in connection with the securitization.

**AHM Assets**

201.    AHM Assets, as the Depositor for two of the securitizations at issue (the AHMAT 2006-1 and AHMAT 2006-2 securitizations), had day-to-day control over the related Trusts.

63

AHM Assets created these Trusts and used them as agents to hold the pools of underlying mortgage loans and issue the Certificates for sale to the investors. AHM Assets formed the pools of mortgage loans underlying the Certificates, and determined the tranches of interests in the pools and their various levels of seniority. AHM Assets then transferred the pools to the Trusts, which had no discretion or control over the mortgages in the pool. AHM Assets also controlled the disclosures made in connection with the securitizations and registered the offerings of the Certificates with the SEC.

**AHM Securities**

202.    AHM Securities, as the Depositor for three of the securitizations at issue (the AHMIT 2006-1, AHMIT 2006-2, and AHMIT 2007-2 securitizations), had day-to-day control over the related Trusts. AHM Securities created these Trusts and used them as agents to hold the pools of underlying mortgage loans and issue the Certificates for sale to the investors. AHM Securities formed the pools of mortgage loans underlying the Certificates, and determined the tranches of interests in the pools and their various levels of seniority. AHM Securities then transferred the pools to the Trusts, which had no discretion or control over the mortgages in the pool. AHM Securities also controlled the disclosures made in connection with the securitizations and registered the offerings of the Certificates with the SEC.

**BSABS**

203.    BSABS, as the Depositor for one of the securitizations at issue (the AHMIT 2005-4 securitization), had day-to-day control over the related Trust. BSABS created this Trust and used it as an agent to hold the pools of underlying mortgage loans and issue the Certificates for sale to the investors. BSABS formed the pools of mortgage loans underlying the Certificates, and determined the tranches of interests in the pools and their various levels of seniority.

64

BSABS then transferred the pools to the Trust, which had no discretion or control over the mortgages in the pool. BSABS also controlled the disclosures made in connection with the securitization and registered the offering of the Certificates with the SEC.

### Michael Strauss

204.    As the Chairman, Chief Executive Officer, and President of AHM, Straus masterminded and led AHM's strategy of abandoning underwriting guidelines to originate huge volumes of loans to grow market share. As the President and CEO of both AHM Securities and AHM Assets, Strauss was involved in the day-to-day affairs of each of these primary violators. Strauss also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following five securitizations:

> AHMAT 2006-1
> AHMIT 2006-1
> AHMAT 2006-2
> AHMIT 2006-2
> AHMIT 2007-2

### Stephen Hozie

205.    As the Chief Financial Officer, Principal Accounting Officer, and Executive Vice President of AHM, Hozie was intimately involved in the finances of AHM and worked with Strauss to lead AHM's strategy of abandoning underwriting guidelines to originate huge volumes of loans to grow market share. As Treasurer and Executive Vice President of both AHM Securities and AHM Assets, Hozie was involved in the day-to-day financial and business affairs of each of these primary violators. Hozie also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following five securitizations:

> AHMAT 2006-1
> AHMIT 2006-1
> AHMAT 2006-2
> AHMIT 2006-2

AHMIT 2007-2

**Thomas McDonagh**

206.     At all relevant times, McDonagh served as a Director and Executive Vice

President of AHM Securities and a Manager and Executive Vice President of AHM Assets.  In

those capacities, McDonagh was involved in the day-to-day business affairs of each of these

primary violators.  McDonagh also had control over the securitizations at issue, as evidenced by

his signature on the registration statements for the following five securitizations:

> AHMAT 2006-1
> AHMIT 2006-1
> AHMAT 2006-2
> AHMIT 2006-2
> AHMIT 2007-2

**Alan Horn**

207.     At all relevant times, Horn served as a Director, Secretary, and Executive Vice

President of AHM Securities and a Manager, Secretary, and Executive Vice President of AHM

Assets.  In those capacities, Horn was involved in the day-to-day business and legal affairs of

each of these primary violators.  Horn also had control over the securitizations at issue, as

evidenced by his signature on the registration statements for the following five securitizations:

> AHMAT 2006-1
> AHMIT 2006-1
> AHMAT 2006-2
> AHMIT 2006-2
> AHMIT 2007-2

**Joseph T. Jurkowski, Jr.**

208.     As a Managing Director of Bear Stearns and a Vice President of BSABS,

Jurkowski was involved in the day-to-day business affairs of these primary violators.  Jurkowski

66

also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following securitization:

AHMIT 2005-4

**Matthew E. Perkins**

209.    As co-head of the Asset-Backed Securities Group at Bear Stearns during the relevant period, Perkins was intimately involved in and controlled Bear Stearns' securitizations. As President and a Director of BSABS, Perkins was involved in the day-to-day business affairs of this primary violator. Perkins also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following securitization:

AHMIT 2005-4

**Samuel L. Molinaro, Jr.**

210.    As the Chief Financial Officer, Executive Vice President, and a Director of Bear Stearns and the Treasurer and a Director of BSABS, Molinaro was involved in the day-to-day business and financial affairs of these primary violators. Molinaro also had control over the securitizations at issue, as evidenced by his signature on the registration statements for the following securitization:

AHMIT 2005-4

**Thomas F. Marano**

211.    As a Senior Managing Director and head of the Mortgage-Backed Securities, Asset-Backed Securities, and Commercial Mortgage-Backed Securities Departments at Bear Stearns (now J.P. Morgan Securities) during the relevant period, Marano had intimate knowledge of and control over Bear Stearns' securitizations, and exercised control over this primary violator. As a Director of BSABS, Marano was also involved in the day-to-day business affairs

67

of this primary violator. Marano also had control over the securitizations at issue, as evidenced

by his signature on the registration statements for the following securitization:

AHMIT 2005-4

## IX.    J.P. MORGAN SECURITIES' LIABILITY AS SUCCESSOR-IN-INTEREST TO BEAR STEARNS

212.    Bear Stearns was, at the relevant time, a wholly owned subsidiary of BSI.

Pursuant to a merger agreement effective May 30, 2008, JPMorgan Chase acquired the assets

and operations of BSI and its subsidiaries, including Bear Stearns. On or about October 1, 2008,

J.P. Morgan Securities merged with Bear Stearns, and the surviving entity was renamed J.P.

Morgan Securities.

213.    In a June 20, 2008 press release, JPMorgan Chase described the merger of J.P.

Morgan Securities and Bear Stearns, and stated its intent to assume Bear Stearns and its debts,

liabilities, and obligations:

> Following completion of this transaction, Bear Stearns plans to
> transfer its broker-dealer subsidiary Bear, Stearns & Co. Inc. to
> JPMorgan Chase, resulting in a transfer of substantially all of Bear
> Stearns' assets to JPMorgan Chase. In connection with such
> transfer, JPMorgan Chase will assume (1) all of Bear Stearns' then-
> outstanding registered U.S. debt securities; (2) Bear Stearns'
> obligations relating to trust preferred securities; (3) Bear Stearns'
> then-outstanding foreign debt securities; and (4) Bear Stearns'
> guarantees of then-outstanding foreign debt securities issued by
> subsidiaries of Bear Stearns, in each case, in accordance with the
> agreements and indentures governing these securities.

214.    Similarly, JPMorgan Chase's 2008 Annual Report described the transaction as a

merger:

> On October 1, 2008, J.P. Morgan Securities Inc. merged with and
> into Bear, Stearns & Co. Inc., and the surviving entity changed its
> name to J.P. Morgan Securities Inc.

215.    The old Bear Stearns website redirects customers to J.P. Morgan Securities' website.

216.    J.P. Morgan Securities was fully aware of the pending claims and potential claims against Bear Stearns when it consummated the merger.

217.    J.P. Morgan Securities has further evinced its intent to assume Bear Stearns' liabilities by paying to defend and settle lawsuits brought against Bear Stearns.

218.    As a result of the merger with Bear Stearns, J.P. Morgan Securities is the successor-in-interest to Bear Stearns and is liable for the wrongful conduct alleged herein of Bear Stearns.

### FIRST CAUSE OF ACTION
#### (Primary Violations of the Massachusetts Uniform Securities Act)

219.    MassMutual incorporates by reference and realleges each and every allegation as set forth above in paragraphs 1 through 218 as if fully set forth herein.

220.    Under Massachusetts General Laws, Chapter 110A, Section 410(a)(2), any person who "offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading," is liable to the purchaser of the security.

221.    The Sponsors (defendant GSMC, as well as AHM Acceptance and AHM Corp., although not named as defendants because of their bankruptcy), Depositors (defendants AHM Securities; AHM Assets; and BSABS), Underwriters (defendants Goldman Sachs; Bear Stearns; Barclays; and UBS), and Trusts (although not named as defendants) qualify as sellers of the Certificates because they issued, marketed, and/or sold the Certificates to the public for their own financial benefit.

222.   The Sponsors, Depositors, Underwriters, and Trusts offered to sell and sold the Certificates to MassMutual in the State of Massachusetts.

223.   The Sponsors, Depositors, Underwriters, and Trusts offered and sold the Certificates to MassMutual by means of false and misleading statements of material fact and omissions of material facts necessary to make the statements made not misleading.

224.   As set forth in more detail in paragraphs 54 to 193 above, the public statements of the Sponsors, Depositors, Underwriters, and Trusts in the Offering Materials were materially false and misleading because, among other things, they misrepresented the underwriting standards applicable to the mortgage loans backing the Certificates, misrepresented the LTV and appraisal information for the loans, and misrepresented the owner-occupancy information for the loans.

225.   MassMutual did not know, and in the exercise of due diligence could not have known, of the untruths and omissions.

226.   J.P. Morgan Securities, as successor-in-interest to Bear Stearns, is liable for the damages caused by this primary violator.

227.   MassMutual will elect its remedy before the entry of judgment.  For each Certificate, MassMutual will seek statutory damages, including interest, or will make or arrange a tender before entry of judgment.

### SECOND CAUSE OF ACTION
### (Joint and Several Liability Under the Massachusetts Uniform Securities Act)

228.   MassMutual incorporates by reference and realleges each and every allegation as set forth above in paragraphs 1 through 227 as if fully set forth herein.

229.   Under Massachusetts General Laws, Chapter 110A, Section 410(b), "[e]very person who directly or indirectly controls a seller liable under subsection (a), every partner,

officer, or director of such a seller, [and] every person occupying a similar status or performing

similar functions" is liable jointly and severally with and to the same extent as the seller.

230.    As set forth above, the Sponsors (defendant GSMC, as well as AHM Acceptance

and AHM Corp., although not named as defendants because of their bankruptcy), Depositors

(defendants AHM Securities; AHM Assets; and BSABS), Underwriters (defendants Goldman

Sachs; Bear Stearns; Barclays; and UBS), and Trusts (although not named as defendants) are

liable as sellers under subsection (a).

231.    Defendant GSMC is jointly and severally liable to the same extent as the primary

violators because it controlled one or more primary violators, including their operations and the

securitizations at issue.

232.    Defendant AHM Assets is jointly and severally liable to the same extent as the

primary violators because it controlled one or more primary violators, including their operations

and the securitizations at issue.

233.    Defendant AHM Securities is jointly and severally liable to the same extent as the

primary violators because it controlled one or more primary violators, including their operations

and the securitizations at issue.

234.    Defendant BSABS is jointly and severally liable to the same extent as the primary

violators because it controlled one or more primary violators, including their operations and the

securitizations at issue.

235.    Defendant Strauss is jointly and severally liable to the same extent as the primary

violators because he was an officer of one or more primary violators and controlled their

operations, including the securitizations at issue.

71

236.    Defendant Hozie is jointly and severally liable to the same extent as the primary violators because he was an officer of one or more primary violators and controlled their operations, including the securitizations at issue.

237.    Defendant McDonagh is jointly and severally liable to the same extent as the primary violators because he was an officer and director of one or more primary violators and controlled their operations, including the securitizations at issue.

238.    Defendant Horn is jointly and severally liable to the same extent as the primary violators because he was an officer and director of one or more primary violators and controlled their operations, including the securitizations at issue.

239.    Defendant Jurkowski is jointly and severally liable to the same extent as the primary violators because he was an officer of one or more primary violators and controlled their operations, including the securitizations at issue.

240.    Defendant Perkins is jointly and severally liable to the same extent as the primary violators because he was an officer and director of one or more primary violators and controlled their operations, including the securitizations at issue.

241.    Defendant Molinaro is jointly and severally liable to the same extent as the primary violators because he was an officer and director of one or more primary violators and controlled their operations, including the securitizations at issue.

242.    Defendant Marano is jointly and severally liable to the same extent as the primary violators because he was a director of one or more primary violators and controlled their operations, including the securitizations at issue.

## PRAYER FOR RELIEF

WHEREFORE MassMutual prays for relief as follows:

1.      On the first cause of action, for primary violations of the Massachusetts Uniform

Securities Act, relief in the form of damages and/or statutory recovery upon

tender;

2.      On the second cause of action, for joint and several liability under the

Massachusetts Uniform Securities Act, relief in the form of damages and/or

statutory recovery upon tender; and

3.      Such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Pursuant to Federal Rule of Civil Procedure 38(b), MassMutual hereby demands a trial

by jury on all issues triable by jury.

DATED:  May 5, 2011

EGAN, FLANAGAN AND COHEN, P.C.

By:      /s/  Edward J. McDonough Jr.
         Edward J. McDonough Jr. (SBN 331590)
         Egan, Flanagan and Cohen, P.C.
         67 Market Street, P.O. Box 9035
         Springfield, Massachusetts  01102
         Telephone:  (413) 737-0260
         Fax:  (413) 737-0121


MASSACHUSETTS MUTUAL LIFE
INSURANCE COMPANY

By:      /s/  Bernadette Harrigan
         Bernadette Harrigan (SBN 635103)
         Assistant Vice President & Counsel
         Massachusetts Mutual Life Insurance Company
         1295 State Street
         Springfield, Massachusetts  01111
         Telephone:  (413) 788-8411
         Fax:  (413) 226-4268

73

Of counsel:

QUINN EMANUEL URQUHART &
    SULLIVAN, LLP

      Philippe Z. Selendy
      Jennifer J. Barrett
      51 Madison Avenue, 22nd Floor
      New York, New York 10010
      Telephone:  (212) 849-7000
      Fax:  (212) 849-7100

      A. William Urquhart
      Harry A. Olivar, Jr.
      Molly Stephens
      865 South Figueroa Street, 10th Floor
      Los Angeles, California 90017
      Telephone:  (213) 443-3000
      Fax:  (213) 443-3100



CIFG Assurance North America, Inc.
850 Third Avenue, 10th Floor
New York, NY 10022
T 212.909.3939
F 212.909.3959
www.cifg.com

**VIA HAND DELIVERY**

September 26, 2011

EPIQ Bankruptcy Solutions
Attn: American Home Mortgage Claims Processing
757 Third Avenue, 3rd Floor
New York, NY 10017

Dear Sir or Madam:

Enclosed for filing please find an executed original plus two copies of CIFG Assurance North America, Inc.'s Supplementary Proof of Claim.

Please stamp each of the enclosed copies to acknowledge filing of the Supplementary Proof of Claim and return the copies to the undersigned in the enclosed pre-addressed stamped envelope.

Sincerely,

Sarah E. Lieber
Deputy General Counsel

Enclosures

cc: Michael Knopf, Esq.



EPIQ SYSTEMS

Inbound Date & Time: 9/26/2011 3:14:45 PM
Recepient          Persaud, Tony
Client —           ahm
Client — other

EPIQ1083

Sarah Lieber
CIFG Assurance North America, Inc.
850 Third Avenue, 10th Fl
New York, NY 10022

EPIQ Bankruptcy Solutions
Attn: American Home Mortgage Claims Processing
757 Third Avenue, 3rd Floor
New York, NY 10017

<table>
<tr><td colspan="2">

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE
American Home Mortgage Claims Processing Center
FDR Station, P.O. Box 5076
New York, NY 10150-5076

</td><td>

**PROOF OF CLAIM**

</td></tr>
</table>

| In Re: | Chapter 11 |
|---|---|
| American Home Mortgage Holdings, Inc., et al. | Case No. 07-11047 (CSS) |
| Debtors. | Jointly Administered |

Filed: USBC - District of Delaware
American Home Mortgage Holdings, Inc., Et Al.
07-11047 (CSS)        0000008707

| Name of Debtor Against Which Claim is Held | Case No. of Debtor |
|---|---|
| American Home Mortgage Corp. | 07-11051 |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

THIS SPACE IS FOR COURT USE ONLY

**Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)**

Creditor:                    Notices should be sent to Creditor and:

CIFG Assurance North America, Inc.    King & Spalding LLP
825 Third Avenue                1185 Avenue of the Americas
6th Floor                    New York, NY 10036
New York, NY 10022                Attn: Barry N. Seidel
Attn: Michael Knopf                Attn: Stefanie J. Greer

☑ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

**Telephone number:** (212) 909-0419    **Tel. number:** (212) 556-2100
**Email Address:** m.knopf@cifg.com    Email: sjgreer@kslaw.com

**Account or other number by which creditor identifies debtor:**
N/A

**Check here if this claim:**
☐ replaces      ☐ amends a previously filed claim, dated: _____

| 1. **Basis for Claim** | |
|---|---|
| ☐ Goods sold | ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a) |
| ☐ Services performed | ☐ Wages, salaries, and compensation (fill out below) |
| ☐ Money loaned | |
| ☐ Personal injury/wrongful death | Last Four Digits of your SS#: ___  ___  ___  ___ |
| ☐ Taxes | Unpaid compensation for services performed |
| ☑ Other  See Attached Rider        (explain) | from _____ to _____ |
| | (date)                (date) |

| 2. **Date debt was incurred:** | 3. **If court judgment, date obtained:** |
|---|---|
| From and After June 30, 2006 | |

4. **Total Amount of Claim at Time Case Filed:** $ See Attached Rider + _____ + See Attached Rider = _____
                        (unsecured nonpriority)    (secured)    (unsecured priority)    (Total)
   If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
   ☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

5. **Secured Claim.**
   ☐ Check this box if your claim is secured by collateral (including a right of setoff).
   Brief Description of Collateral:
   ☐ Real Estate    ☐ Motor Vehicle
   ☐ Other _____
   Value of Collateral: $ _____
   Amount of arrearage and other charges at time case filed included in
   secured claim, if any: $ _____

7. **Unsecured Priority Claim.**
   ☑ Check this box if you have an unsecured priority claim
   Amount entitled to priority $ See Attached Rider
   Specify the priority of the claim:
   ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
   ☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
   ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
   ☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
   ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
   ☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(___).

6. **Unsecured Nonpriority Claim:** $ See Attached Rider
   ☑ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

8. **Credits:** The amount of all payments on this proof of claim has been credited and deducted for the purpose of making this proof of claim.

9. **Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
   **DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

10. Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

THIS SPACE IS FOR COURT USE ONLY

**FILED / RECEIVED**

JAN 1 1 2008

EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): |
|---|---|
| 1/11/2008 | Michael S. Knopf  Managing Director and Vice President |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

In re American Home Mortgage Corp.
Case No. 07-11051
United States Bankruptcy Court for the District of Delaware

### ATTACHMENT TO PROOF OF CLAIM OF CIFG ASSURANCE NORTH AMERICA, INC. AGAINST AMERICAN HOME MORTGAGE CORP.

1.     The following constitutes a brief summary of the claims held by CIFG Assurance

North America, Inc. ("CIFG") against American Home Mortgage Corp. ("AHMC") and certain

of its affiliated debtors (collectively, the "Debtors").

### A.     The AHMIT 2006-2 Transaction

2.     CIFG is the insurer of American Home Mortgage Investment Trust 2006-2,

Mortgage-Backed Notes, Series 2006-2, Class V-A (the "Securities"), which are collateralized

by a pool of prime quality home equity lines of credit that were sold to American Home

Mortgage Investment Trust 2006-2, a Delaware statutory trust (the "Trust"), and was serviced by

American Home Mortgage Acceptance, Inc. ("AHMA") until January 11, 2008 (the "AHMIT

2006-2 Transaction").   Deutsche Bank National Trust Company serves as the indenture trustee

for the Trust (the "Trustee").

3.     The following documents govern the AHMIT 2006-2 Transaction, and are the

basis for CIFG's claims against the Debtors (as may be amended from time to time, collectively,

the "Transaction Documents"):[1]

- Indemnification Agreement dated as of June 30, 2006, among CIFG, American Home Mortgage Investment Corp. ("AHMIC"), UBS Securities LLC, Goldman, Sachs & Co., Lehman Brothers Inc. and Greenwich Capital Markets, Inc. (the "Indemnification Agreement");

---

[1]     The Transaction Documents are too voluminous to attach. Copies of the Transaction Documents will be made available to any party in interest upon written request and payment of duplicating costs. Upon information and belief, the Debtors have copies of each of the Transaction Documents in their possession or control.

1

- HELOC Servicing Agreement dated as of June 30, 2006, among American Home Mortgage Investment Trust 2006-2, Deutsche Bank Trust Company Americas, AHMA and GMAC Mortgage Corporation (the "Servicing Agreement");

- Indenture dated as of June 30, 2006, among American Home Mortgage Investment Trust 2006-2, Wells Fargo Bank, N.A. and Deutsche Bank Trust Company Americas;

- Mortgage Loan Purchase Agreement dated as of June 30, 2006, among AHMA and American Home Mortgage Securities LLC ("MLPA");

- Financial Guaranty Insurance Policy (CIFG NA-1041) issued by CIFG, effective as of June 30, 2006 (the "Policy"); and

- Insurance and Indemnity Agreement dated as of June 30, 2006, among CIFG, AHMC and American Home Mortgage Securities LLC ("Insurance and Indemnity Agreement").

4.     Pursuant to the Policy, CIFG insures the full and timely payment of regularly scheduled interest and the final payment of principal on the Securities. Under the Transaction Documents, to the extent CIFG makes any payments on account of principal or interest on the Securities, CIFG is subrogated to the rights and remedies available to the Trustee under the Transaction Documents. Accordingly, CIFG hereby asserts any and all claims against the Debtors that have been asserted or that will be asserted by the Trustee, as detailed in the proofs of claim which have been filed or may be filed by the Trustee. Without limiting the foregoing, such claims include claims arising from:

- AHMA's obligation to repurchase mortgage loans, in excess of $1.7 million under the MLPA and certain of the other Transaction Documents;

- AHMA's failure to deposit over $2.2 million of collections on HELOC Mortgage Loans into the appropriate accounts as required upon the occurrence of a "Rapid Amortization Event" under the Transaction Documents, and the improper diversion of such collections to fund new draws on such loans, under the Servicing Agreement, the MLPA, the Indenture and certain other Transaction Documents.

2

- AHMA's breaches of the Servicing Agreement;

- Servicing transfer costs that have been or may be incurred by the Trust under the Servicing Agreement; and

- AHMA's failure to fund draws under home equity lines of credit under the MLPA and certain of the other Transaction Documents.

5.    In addition to its subrogation rights, CIFG hereby asserts:  (i) claims against AHMA under the Transaction Documents for fees, costs and expenses (including, but not limited to, attorneys fees and costs) incurred in connection with administering, monitoring and preserving rights thereunder, (ii) contingent claims against AHMC under the Insurance and Indemnity Agreement for indemnification and/or reimbursement, and (iii) contingent claims against AHMIC under the Indemnification Agreement for indemnification and/or reimbursement.

**B.    Reservation of Rights and Notice**

6.    This Proof of Claim is filed with a full reservation of rights, including the right to amend and/or supplement this Proof of Claim in all respects, to assert additional, supplementary and/or amended proofs of claim based on events, information and/or documents obtained through discovery or otherwise and with full reservation of the rights and/or claims of CIFG against any party other than AHMC.  Actions may be taken by third parties subsequent to filing of this claim which may result in further claims under the Transaction Documents, and all of such claims are hereby reserved.

7.    CIFG reserves the right to assert any and all claims against AHMC (including those asserted herein) as priority administrative expense claims pursuant to 11 U.S.C. §§ 503(b) and 507, except to the limited extent waived by CIFG under the Order of the Court in this case

3

dated December 14, 2007. CIFG asserts an administrative claim for misapplication of funds arising from or related to the occurrence of a "Rapid Amortization Event" after the commencement of the Debtors' bankruptcy cases.

8. CIFG also reserves the right to file a separate proof of claim (or amend this and/or any subsequent claim) against AHMA related to the transition of the servicing for the AHMIT 2006-2 Transaction to GMAC Mortgage Corporation.

9. CIFG issued the Policy and the Insurance and Indemnity Agreement in express reliance on certain covenants, representations and warranties contained in the various Transaction Documents. To the extent that AHMC or any of the other Debtors, the Debtors' affiliates, or their respective officers, agents or representatives have acted or failed to act or have taken or take positions inconsistent with these covenants, representations and warranties, CIFG has or may have claims against these parties for violation of federal and state securities laws, common law fraud, misrepresentation, unjust enrichment, and the imposition of constructive trusts or equitable liens on some or all of the AHMC's or the other Debtors' assets. CIFG reserves the right to supplement or amend this Proof of Claim to include such claims.

10. The filing of this Proof of Claim is not intended and should not be construed to be an election of remedies, waiver of any past, present or future defaults or events of default, or a waiver of limitation of any rights, remedies, or claims of CIFG.

11. CIFG reserves its right to assert claims against other affiliated entities of AHMC, including the other Debtors, should it become evident that such parties are the proper parties, under principles of law or equity. In addition, CIFG reserves any rights of setoff and/or recoupment it may have in connection with the claims asserted in this Proof of Claim.

4

12.     All notices concerning this Proof of Claim shall be sent to:

CIFG Assurance North America, Inc.
825 Third Avenue, 6th Floor
New York, NY 10022

Attn:   Michael Knopf, Esq.

-with a copy to-

King & Spalding LLP
Counsel to CIFG Assurance Corporation
1185 Avenue of the Americas
New York, New York 10036

Attn:   Barry N. Seidel, Esq.
        Stefanie J. Greer, Esq.

5