**Jon M. Egan**, OSB 00246
Oregonlawyer@hotmail.com
**Jon M. Egan, PC**
240 Sixth Street
Lake Oswego, OR 97034-2931
Telephone: (503) 697-3427
Fax: (503) 697-3427
Attorney for Plaintiff

# UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, *et al.,* | Case No. 07-11047 (CSS) Jointly Administered |
| Debtors. | |

**ZOA NIELSEN'S RESPONSE TO PLAN TRUST'S OBJECTION TO CLAIM 8932, and ALTERNATIVE REQUESTS TO CERTIFY CLASS AND/OR COLLECTIVE PROOF OF CLAIM, GRANT FULL OR PARTIAL SUMMARY JUDGMENT and/or LIFT AUTOMATIC STAY FOR LIQUIDATION IN OREGON DISTRICT COURT**

Plaintiff/Claimant Zoa Nielsen submits the following Response to the Plan Trustee's objection to claim 8932. Ms. Nielsen also hereby requests that the Court certify her claim as a class and/or collective claim; grant her full or partial summary judgment on any issues that the Court deems to have been adequately established; and/or lift the automatic stay to allow her claim to be liquidated in Oregon District Court, where discovery and litigation of this matter were already underway when Defendant/Debtor American Home Mortgage Corp. ("AHM") filed its bankruptcy petition. As the Plan Trustee acknowledges, discovery was not finished when AHM's bankruptcy petition was

filed. Ms. Nielsen is therefore not in possession of all of the documents she would need in order to precisely calculate even her own damages, let alone those of the other putative class and/or collective members. However, such damages will be susceptible to simple arithmetic computation once the additional discovery is obtained. Ms. Nielsen provides herewith a Declaration of facts pertinent to this case, as well as the Declaration of Jon M. Egan authenticating documents produced by AHM in discovery. Ms. Nielsen hereby requests that if this Court intends to liquidate Ms. Nielsen's claims itself instead of sending the case back to the District of Oregon (wither individually or on a collective or class basis), she be allowed to pursue the additional discovery required to precisely calculate her damages (and those of the other putative class and collective members, if applicable) prior to the final evidentiary hearing to determine the validity of her claim and its amount as of the petition date.

## I.   THE COURT SHOULD GRANT CLAIMANT SUMMARY JUDGMENT ON HER INDIVIDUAL CLAIMS

The Plan Trustee alleges in various ways that Ms. Nielsen's claim must fail due to a lack of specificity. *See, e.g.*, Objection at pp. 15–16, ¶ 38 ("Nielsen has failed to provide any information or documentation with respect to (a) the amount of straight time and overtime that she allegedly worked without compensation, (b) the amount of time that she worked for which she alleges she was paid less than the applicable minimum wage, (c) the amount of any such deficiencies or (d) the amount of deductions which she alleges were wrongfully taken from her compensation."); at p. 2, ¶ 3 (Ms. Nielsen's claim "lacks any documentation or information to support such claims, which claims are not reflected on the Debtors' books and records. As such, Nielsen has failed to met [sic] her burden of proof and her claim should be disallowed."); and at p. 16, ¶ 40 ("Without providing sufficient information for the Plan Trustee to reconcile the Nielsen Claim

against the Debtors' books and records, the Nielsen Claim fails to satisfy the requirements for a proof of claim.").

The burden of proof with respect to a proof of claim "rests initially, and ultimately, with the claimant who must allege *facts sufficient to support their claim*." *In re Gates*, 214 B.R. 467, 472 (Bankr. D. Md. 1997) (italics added, internal quotations and citation omitted). But the facts sufficient to support a wage claim are not the same as the facts required to support a standard contract claim. An employee is not required to allege specific hour or dollar amounts to support a wage-and-hour claim. The Plan Trustee's objections demonstrate a fundamental misunderstanding of the evidentiary burdens and legal application of both Oregon and federal wage-and-hour law. As discussed below, Ms. Nielsen's claims are entitled to *prima facie* validity.

## A. Evidentiary Burdens in Wage-and-Hour Cases

In wage-and-hour claims, employees have an initial burden of showing that they performed work for which they were not properly compensated. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 686, 66 S.Ct. 1187, 90 L. Ed. 1515 (1946). This burden is light; the United States Supreme Court has ruled that "[w]hen the employer has kept proper and accurate records, the employee may easily discharge his burden by securing the production of those records." *Id.* at 687.

29 C.F.R. § 516.2(a)(7) requires an employer to keep records of all hours worked on each workday by each employee. When the employer fails to do so, the employee will be allowed to use reasonable estimations to calculate her damages. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688, 66 S Ct 1187, 90 L Ed 1515 (1964). Similarly, O.R.S. 653.045 requires the employer to keep records of all hours worked by each employee. "In cases where an employee's inability to prove damages arises from an employer's inadequate records, the employer should not be allowed to avoid a statutory

wage claim because the claimant's evidence lacks the exactness of measurement that would be possible if the employer had kept the records required by law." *Wells v. Carlson*, 78 Or. App. 536, 542 (1986), *citing Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688, 66 S Ct 1187, 90 L Ed 1515 (1964).

Where the employer fails to keep the required records, the court applies a burden shifting analysis to determine hours worked. In the first instance, an employee need only establish "that he has in fact performed work for which he was improperly compensated and [produce] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson, supra*, 328 U.S. at 687–88. The burden then shifts to the employer "to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Id.* In the event that the employer fails to sustain this burden, the court may award damages to the employee, "even though the result be only approximate." *Id.*

Ms. Nielsen has sworn under oath, both in her deposition and in the attached Declaration, that she and the other Loan Officers worked more than 40 hours in each of their workweeks of employment with AHM, including in workweeks for which they were never paid anything at all. AHM has offered no evidence to contradict that testimony. AHM cannot offer such evidence, because it chose to ignore its statutory duty to track the Loan Officers' time. There is no way the Plan Trustee can "reconcile the Nielsen Claim against the Debtors' books and records" (Objection at p. 16, ¶ 40), because AHM never kept any such books and records. Because AHM did not keep any time records, the Loan Officers will be allowed to establish their damages at trial as a matter of just and reasonable inference. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688, 66 S Ct 1187, 90 L Ed 1515 (1964).

Furthermore, the use of representative samples to determine lost wages is appropriate even where there are no records at all. For example, in *McLaughlin v. DialAmerica Mktg., Inc.,* 716 F.Supp. 812 (D.N.J.1989), *aff'd Donovan v. DialAmerica Mktg., Inc.,* 935 F.2d 1281 (3rd Cir. 1991), the court approved damages for 350 non-testifying home workers (purported independent contractors), based on the testimony of 43 witnesses, all of whom were paid piecework for each subscriber telephone number located. There was variability among the class as to the number of pieces of work they accepted, the time they took to complete their assignments, and the fact that the employer did not keep track of hours worked. Nevertheless, representative testimony of the time required to process cards and work habits enabled the court to make findings as to the non-testifying witnesses and to determine hours worked as a matter of "just and reasonable inference." *Id.* at 825 (citing *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 687, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946)). *See also McLaughlin v. Ho Fat Seto,* 850 F.2d 586, 589 (9th Cir.1988) *cert. denied,* 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989) (five garment workers testified about unreported work performed on Saturdays and before and after scheduled work hours—their testimony established a *prima facie* case that the 23 non-testifying employees worked unreported hours).

Because AHM ignored its statutory duty to keep time records for the Loan Officers' employment, it cannot hide behind the absence of those records to support an objection to this claim. Ms. Nielsen offers herewith the evidence in her possession to establish her own claims to damages in the underlying case. Her counsel was in the process of gathering further evidence to support both her own and the collective and class members' claims when the Oregon case was stayed due to AHM's bankruptcy filing (for example, Ms. Nielsen's last paycheck was May 10, 2007, but AHM only produced pay records through August 10, 2006). Perhaps the best course of action would be for this

Court to lift the stay currently in place and allow the parties to complete the process of discovery and liquidating this claim in Oregon District Court.

## B. Oregon State and Federal FLSA Minimum Wage Claims

The Plan Trustee makes the following objection to Ms. Nielsen's minimum wage claims:

> Per the Debtors' books and records, Nielsen was paid $23,788.85 during the Priority Period prior to her termination on April 20, 2007. Applying the 2007 minimum wage of $5.15 per hour to the days that Nielsen was employed during the Priority Period (and assuming 8 hour work days), Nielsen was paid $21,440.45 in <u>excess</u> of the then applicable minimum wage during the Priority Period.

Objection at pp. 16–17, ¶ 41 (underlining in original). Contrary to the Plan Trustee's stated assumption, Ms. Nielsen worked more than 8 hours per day. Further, she alleges both Oregon state and federal FLSA minimum wage violations, which have different minimum wage rates. The federal minimum wage rate was $5.15 through July 23, 2007, and $5.85 from July 24, 2007 through the petition date of August 6, 2007. The Oregon minimum wage rate was $6.50 through 2002, $6.90 in 2003, $7.05 in 2004, $7.25 in 2005, $7.50 in 2006 and $7.80 through the petition date of August 6, 2007. Next, her claims are not limited to the priority period—she has nonpriority claims for the remainder of the statute of limitations period. Finally, the wage-and-hour laws at issue in this case measure violations on a workweek basis; they do not allow averaging out high workweeks and low workweeks. If an employee is paid nothing for a given workweek, then that is a minimum wage and/or overtime violation, regardless of how much they are paid for previous or subsequent workweeks.

### 1. Workweek Basis

"[F]ederal minimum wage violations are calculated on a workweek basis."

*McElmurry, Karen Mrazek v. U.S. Bank Nat. Ass'n*, CV 04-642-HU, 2005 WL 2492932

(D. Or. Oct. 7, 2005). *See also* U.S. D.O.L. Wage-Hour Opinion Letters No. 125 (Aug. 14, 1962) ("Section 6(b) of the Act . . . is applicable on a workweek basis and requires payment of the prescribed minimum wages to each employee who 'in any workweek' is employed in a covered enterprise.") and FLSA 2005-44, 2005 DOL WH LEXIS 58 at *3 (October 24, 2005); *Takacs v. A.G. Edwards & Sons, Inc.*, 444 F. Supp. 2d 1100, 1113–14 (S.D. Cal. 2006); *Brock v. Carrion, Ltd.*, 332 F. Supp. 2d 1320, 1325 (E.D. Cal. 2004); *Marshall v. Sam Dell's Dodge Corp.*, 451 F. Supp. 294, 301-03 (N.D.N.Y. 1978) ("The defendants may see this rationale as applicable only to workers with annual incomes in the minimum wage range. However, in the period with which we are dealing even the better paid salesman with a family would be hard pressed if he were obliged to suffer a few weeks at less than minimum wages. Plaintiff has shown that at least four of defendants' salesmen failed to receive the minimum wage during periods of nine to twelve consecutive weeks. This is the precise danger which the Fair Labor Standards Act sought to meet."); 29 CFR §§ 776.4, 778.103–778.104, 778.322, 778.324, 783.43; Dept. of Labor Field Office Handbook, Section 30b05. Oregon minimum wage violations are also calculated on a workweek basis. Or. Admin. R. 839-020-0082(2).

## 2. Minimum Wage Calculations (to date)

As previously noted, Ms. Nielsen is not in possession of the last nine months (approximately) of her pay records. However, the calculations of minimum wage damages are simple and can be performed on the pay records when they are received from AHM. Even in the records that she does have, several minimum wage violations are obvious. For example, she was paid $0 in several semi-monthly pay periods (the paychecks dated 2/10/05, 3/10/05, 3/25/05, 4/25/05, 5/10/05, 5/25/05, 6/24/05,

7/25/05, 2/24/06, on Bates[1] pages 1, 3, 4, 6–8, 10, 12 and 26, respectively). In several

other pay periods, she was paid something, but not enough to equal the minimum wage

(the paychecks dated 11/25/05, 1/25/06, 4/25/06, 8/10/06, Bates pages 20, 24, 30 and

37, respectively). *See also* Bates page 39, a consolidated Earnings Statement that shows

these payments through August of 2006. With the records and information available at

the current time, the following damages can be deduced:

| Pay Date | Period End | Dys | Gross Pay | Hrs | $/hr | Real Hrs | Fed MW | Liq Dam | OR MW | OR Owed | Int |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/10/05 | 1/31/05 | 16 | $0.00 | 86.67 | $0.00 | 114.29 | $5.15 | $588.57 | $7.25 | $828.57 | $185.30 |
| 3/10/05 | 2/28/05 | 13 | $0.00 | 86.67 | $0.00 | 92.86 | $5.15 | $478.21 | $7.25 | $673.21 | $145.91 |
| 3/25/05 | 3/15/05 | 15 | $0.00 | 86.67 | $0.00 | 107.14 | $5.15 | $551.79 | $7.25 | $776.79 | $165.49 |
| 4/25/05 | 4/15/05 | 15 | $0.00 | 86.67 | $0.00 | 107.14 | $5.15 | $551.79 | $7.25 | $776.79 | $159.55 |
| 5/10/05 | 4/30/05 | 15 | $0.00 | 86.67 | $0.00 | 107.14 | $5.15 | $551.79 | $7.25 | $776.79 | $156.68 |
| 5/25/05 | 5/15/05 | 15 | $0.00 | 86.67 | $0.00 | 107.14 | $5.15 | $551.79 | $7.25 | $776.79 | $153.80 |
| 6/24/05 | 6/15/05 | 15 | $0.00 | 86.67 | $0.00 | 107.14 | $5.15 | $551.79 | $7.25 | $776.79 | $148.06 |
| 7/25/05 | 7/15/05 | 15 | $0.00 | 86.67 | $0.00 | 107.14 | $5.15 | $551.79 | $7.25 | $776.79 | $142.12 |
| 11/25/05 | 11/15/05 | 15 | $43.00 | 86.67 | $0.40 | 107.14 | $5.15 | $508.79 | $7.25 | $733.79 | $112.00 |
| 1/25/06 | 1/15/06 | 15 | $15.00 | 86.67 | $0.14 | 107.14 | $5.15 | $536.79 | $7.50 | $788.57 | $108.50 |
| 2/24/06 | 2/15/06 | 15 | $0.00 | 86.67 | $0.00 | 107.14 | $5.15 | $551.79 | $7.50 | $803.57 | $104.62 |
| 4/25/06 | 4/15/06 | 15 | $222.24 | 86.67 | $2.07 | 107.14 | $5.15 | $329.55 | $7.50 | $581.33 | $67.08 |
| 8/10/06 | 7/31/06 | 16 | $764.20 | 86.67 | $6.69 | 114.29 | | | $7.50 | $92.94 | $8.27 |
| | | | | | | | | $6,304.40 | | $9,162.70 | $1,657.38 |

In this chart, "Dys" indicates the number of days in a given pay period; "Hours" is the

number of hours listed for the pay period by AHM in Ms. Nielsen's pay stubs; "Fed MW"

is the federal minimum wage rate in effect at the time of the pay period; and "OR MW"

is the Oregon minimum wage rate in effect at the time of the pay period. Obviously,

AHM was both assuming and averaging, assigning Ms. Nielsen 86.67 hours for each pay

period, regardless of its length. We know that is not accurate, for two reasons. First, Ms.

---

[1] Exhibit 1 to the Declaration of Jon M. Egan is made up of excerpts from the document discovery produced by AHM in the District of Oregon case. Each page is Bates-stamped "AHM000[n]," with [n] indicating the Bates number following the leading zeroes. In the text of this Response memorandum, each of the pages of this exhibit will be referred to by the significant digits of the sequential Bates number (*i.e.*, without the leading zeroes). For example, the page Bates-stamped "AHM000001" will be referred to simply as "Bates page 1".

Nielsen worked 50 hours per week, not 40. Second, the pay periods were different lengths. We will use a more accurate measure of the number of hours in a given pay period, by multiplying 50/7 times the number of days in the pay period to get the number in the "Real Hrs" column of the chart. This is arrived at because, given the discovery to date, we know that Ms. Nielsen testified in her deposition that she worked from 8 a.m.–6 p.m. or 8:30 a.m.–6:30 p.m. daily. That works out to 10 hour per weekday, 50 hours per workweek.

To calculate the FLSA liquidated damages for a given pay period, we multiply the federal minimum wage rate times the number of hours in the pay period, subtracting any gross wages that were paid. The total liquidated damages due is $6,304.40.

To calculate the Oregon minimum wages due for a given pay period, we multiply the Oregon minimum wage rate times the number of hours in the pay period, subtracting any gross wages that were paid. The total is $9,162.70. Oregon statutory prejudgment interest is 9% simple (noncompounding) interest, accruing daily from each payday through the date of the bankruptcy petition. As of the August 6, 2007 bankruptcy petition filing, prejudgment interest equals $1,657.38.

To calculate the Oregon minimum wage penalty, we multiply 30 days times 8 hours per day times the final pay rate. ORS 652.150. For commission employees with no contractual hourly pay rate, the final pay rate is calculated as the total pay over the employee's final 12 months, divided by the number of hours worked over that same period. Ms. Nielsen was paid $89,834.60 in gross wages over the last 12 months for which we have records, and she worked 2,607.14 hours over that period, making a final

wage rate of $34.46 per hour.[2]    $34.46 * 8 hrs/day * 30 days = $8,269.71 in penalty wages due. The penalty accrued on the first payday with a minimum wage violation, which was 2/10/05. Oregon statutory prejudgment interest is 9% simple (noncompounding) interest, accruing daily. As of the August 6, 2007 bankruptcy petition filing, prejudgment interest on the Oregon penalty equals $1,849.47.

### C.  Oregon State and Federal FLSA Overtime Claims

The Plan Trustee claims that Ms. Nielsen cannot possibly have overtime claims:

> Given the amount of this excess compensation, it is simply impossible for Nielsen to have worked sufficient hours above the standard 40 hour work week so as to not have been appropriately compensated for any such purported overtime. For example, while the Nielsen Claim does not assert how many hours she allegedly worked without overtime compensation, assuming that Nielsen never took a day off during the Priority Period, she would have had to have worked sufficient hours to earn at least $376 in overtime compensation each and every single day during her employment in the Priority Period.

Objection at p. 17, ¶ 41. As discussed above, overtime is measured on a workweek basis, not averaged over time. Further, the Plan Trustee is assuming that Ms. Nielsen's regular rate of pay for overtime purposes equals the federal minimum wage. It doesn't. For commissioned employees, their regular rate for a given workweek or semimonthly pay period equals the commission for that period divided by the number of hours worked during the period (but in no event less than the applicable minimum wage). A nonexempt employee who earns high commissions has a high regular rate of pay, and vice versa. The same employee can have different regular rates from week to week, if her commissions vary. Examining the records currently available for Ms. Nielsen yields the following breakdown:

---

[2] Of course, this rate will change when we have the information for Ms. Nielsen's actual final 12 months. Her hourly rate will probably rise, as she tended to sell more loans as time went on. The increase in hourly rate will increase the amount of her penalty wages.

| Pay Date | Period End | Gross Pay | Hours | Real Hrs | Fed Reg Rt | OR Reg Rt |
|----------|------------|-----------|-------|----------|------------|-----------|
| 2/10/05 | 1/31/05 | $0.00 | 86.67 | 114.2857 | $5.15 | $7.25 |
| 2/25/05 | 2/15/05 | $2,702.16 | 86.67 | 107.1429 | $25.22 | $25.22 |
| 3/10/05 | 2/28/05 | $0.00 | 86.67 | 92.85714 | $5.15 | $7.25 |
| 3/25/05 | 3/15/05 | $0.00 | 86.67 | 107.1429 | $5.15 | $7.25 |
| 4/8/05 | 3/31/05 | $1,390.06 | 86.67 | 114.2857 | $12.16 | $12.16 |
| 4/25/05 | 4/15/05 | $0.00 | 86.67 | 107.1429 | $5.15 | $7.25 |
| 5/10/05 | 4/30/05 | $0.00 | 86.67 | 107.1429 | $5.15 | $7.25 |
| 5/25/05 | 5/15/05 | $0.00 | 86.67 | 107.1429 | $5.15 | $7.25 |
| 6/10/05 | 5/31/05 | $1,047.33 | 86.67 | 114.2857 | $9.16 | $9.16 |
| 6/24/05 | 6/15/05 | $0.00 | 86.67 | 107.1429 | $5.15 | $7.25 |
| 7/8/05 | 6/30/05 | $4,628.99 | 86.67 | 107.1429 | $43.20 | $43.20 |
| 7/25/05 | 7/15/05 | $0.00 | 86.67 | 107.1429 | $5.15 | $7.25 |
| 8/10/05 | 7/31/05 | $3,599.70 | 86.67 | 114.2857 | $31.50 | $31.50 |
| 8/25/05 | 8/15/05 | $3,647.63 | 86.67 | 107.1429 | $34.04 | $34.04 |
| 9/9/05 | 8/31/05 | $6,663.19 | 86.67 | 114.2857 | $58.30 | $58.30 |
| 9/23/05 | 9/15/05 | $2,135.30 | 86.67 | 107.1429 | $19.93 | $19.93 |
| 10/7/05 | 9/30/05 | $3,469.07 | 86.67 | 107.1429 | $32.38 | $32.38 |
| 10/25/05 | 10/15/05 | $3,601.00 | 86.67 | 107.1429 | $33.61 | $33.61 |
| 11/10/05 | 10/31/05 | $12,059.98 | 86.67 | 114.2857 | $105.52 | $105.52 |
| 11/25/05 | 11/15/05 | $43.00 | 86.67 | 107.1429 | $5.15 | $7.25 |
| 12/9/05 | 11/30/05 | $5,020.89 | 86.67 | 107.1429 | $46.86 | $46.86 |
| 12/23/05 | 12/15/05 | $3,418.54 | 86.67 | 107.1429 | $31.91 | $31.91 |
| 1/10/06 | 12/31/05 | $7,327.78 | 86.67 | 114.2857 | $64.12 | $64.12 |
| 1/25/06 | 1/15/06 | $15.00 | 86.67 | 107.1429 | $5.15 | $7.50 |
| 2/10/06 | 1/31/06 | $3,818.00 | 86.67 | 114.2857 | $33.41 | $33.41 |
| 2/24/06 | 2/15/06 | $0.00 | 86.67 | 107.1429 | $5.15 | $7.50 |
| 3/10/06 | 2/28/06 | $5,900.12 | 86.67 | 92.85714 | $63.54 | $63.54 |
| 3/24/06 | 3/15/06 | $5,680.14 | 86.67 | 107.1429 | $53.01 | $53.01 |
| 4/10/06 | 3/31/06 | $6,272.81 | 86.67 | 114.2857 | $54.89 | $54.89 |
| 4/25/06 | 4/15/06 | $222.24 | 86.67 | 107.1429 | $5.15 | $7.50 |
| 5/10/06 | 4/30/06 | $4,055.94 | 86.67 | 107.1429 | $37.86 | $37.86 |
| 5/25/06 | 5/15/06 | $4,650.95 | 86.67 | 107.1429 | $43.41 | $43.41 |
| 6/9/06 | 5/31/06 | $3,827.98 | 86.67 | 114.2857 | $33.49 | $33.49 |
| 6/23/06 | 6/15/06 | $1,801.35 | 86.67 | 107.1429 | $16.81 | $16.81 |
| 7/10/06 | 6/30/06 | $4,830.74 | 86.67 | 107.1429 | $45.09 | $45.09 |
| 7/25/06 | 7/15/06 | $2,220.75 | 86.67 | 107.1429 | $20.73 | $20.73 |
| 8/10/06 | 7/31/06 | $764.20 | 86.67 | 114.2857 | $6.69 | $7.50 |
| 8/25/06 | 8/15/06 | $2,035.63 | 86.67 | 107.1429 | $19.00 | $19.00 |

At 50 hours per week, 10 of those hours are overtime. Therefore, overtime is earned at a rate of 10/7 hours per day. Multiplying that times the number of days in each pay period yields the following damages:

| Pay Date | Period End | Days in Pay Pd | FLSA Reg Rate | FLSA Liq Dam | OR Reg Rt | OR OT | OR Intrst |
|---|---|---|---|---|---|---|---|
| 2/10/05 | 1/31/05 | 16 | $5.15 | $58.86 | $7.25 | $82.86 | $18.53 |
| 2/25/05 | 2/15/05 | 15 | $25.22 | $270.22 | $25.22 | $270.22 | $59.43 |
| 3/10/05 | 2/28/05 | 13 | $5.15 | $47.82 | $7.25 | $67.32 | $14.59 |
| 3/25/05 | 3/15/05 | 15 | $5.15 | $55.18 | $7.25 | $77.68 | $16.55 |
| 4/8/05 | 3/31/05 | 16 | $12.16 | $139.01 | $12.16 | $139.01 | $29.13 |
| 4/25/05 | 4/15/05 | 15 | $5.15 | $55.18 | $7.25 | $77.68 | $15.95 |
| 5/10/05 | 4/30/05 | 15 | $5.15 | $55.18 | $7.25 | $77.68 | $15.67 |
| 5/25/05 | 5/15/05 | 15 | $5.15 | $55.18 | $7.25 | $77.68 | $15.38 |
| 6/10/05 | 5/31/05 | 16 | $9.16 | $104.73 | $9.16 | $104.73 | $20.32 |
| 6/24/05 | 6/15/05 | 15 | $5.15 | $55.18 | $7.25 | $77.68 | $14.81 |
| 7/8/05 | 6/30/05 | 15 | $43.20 | $462.90 | $43.20 | $462.90 | $86.63 |
| 7/25/05 | 7/15/05 | 15 | $5.15 | $55.18 | $7.25 | $77.68 | $14.21 |
| 8/10/05 | 7/31/05 | 16 | $31.50 | $359.97 | $31.50 | $359.97 | $64.44 |
| 8/25/05 | 8/15/05 | 15 | $34.04 | $364.76 | $34.04 | $364.76 | $63.95 |
| 9/9/05 | 8/31/05 | 16 | $58.30 | $666.32 | $58.30 | $666.32 | $114.35 |
| 9/23/05 | 9/15/05 | 15 | $19.93 | $213.53 | $19.93 | $213.53 | $35.91 |
| 10/7/05 | 9/30/05 | 15 | $32.38 | $346.91 | $32.38 | $346.91 | $57.14 |
| 10/25/05 | 10/15/05 | 15 | $33.61 | $360.10 | $33.61 | $360.10 | $57.71 |
| 11/10/05 | 10/31/05 | 16 | $105.52 | $1,206.00 | $105.52 | $1,206.00 | $188.53 |
| 11/25/05 | 11/15/05 | 15 | $5.15 | $55.18 | $7.25 | $77.68 | $11.86 |
| 12/9/05 | 11/30/05 | 15 | $46.86 | $502.09 | $46.86 | $502.09 | $74.90 |
| 12/23/05 | 12/15/05 | 15 | $31.91 | $341.85 | $31.91 | $341.85 | $49.82 |
| 1/10/06 | 12/31/05 | 16 | $64.12 | $732.78 | $64.12 | $732.78 | $103.53 |
| 1/25/06 | 1/15/06 | 15 | $5.15 | $55.18 | $7.50 | $80.36 | $11.06 |
| 2/10/06 | 1/31/06 | 16 | $33.41 | $381.80 | $33.41 | $381.80 | $51.03 |
| 2/24/06 | 2/15/06 | 15 | $5.15 | $55.18 | $7.50 | $80.36 | $10.46 |
| 3/10/06 | 2/28/06 | 13 | $63.54 | $590.01 | $63.54 | $590.01 | $74.78 |
| 3/24/06 | 3/15/06 | 15 | $53.01 | $568.01 | $53.01 | $568.01 | $70.03 |
| 4/10/06 | 3/31/06 | 16 | $54.89 | $627.28 | $54.89 | $627.28 | $74.71 |
| 4/25/06 | 4/15/06 | 15 | $5.15 | $55.18 | $7.50 | $80.36 | $9.27 |
| 5/10/06 | 4/30/06 | 15 | $37.86 | $405.59 | $37.86 | $405.59 | $45.30 |
| 5/25/06 | 5/15/06 | 15 | $43.41 | $465.10 | $43.41 | $465.10 | $50.23 |
| 6/9/06 | 5/31/06 | 16 | $33.49 | $382.80 | $33.49 | $382.80 | $39.93 |
| 6/23/06 | 6/15/06 | 15 | $16.81 | $180.14 | $16.81 | $180.14 | $18.17 |
| 7/10/06 | 6/30/06 | 15 | $45.09 | $483.07 | $45.09 | $483.07 | $46.69 |
| 7/25/06 | 7/15/06 | 15 | $20.73 | $222.08 | $20.73 | $222.08 | $20.64 |
| 8/10/06 | 7/31/06 | 16 | $6.69 | $76.42 | $7.50 | $85.71 | $7.63 |
| 8/25/06 | 8/15/06 | 15 | $19.00 | $203.56 | $19.00 | $203.56 | $17.37 |
| | | | | **$11,315.49** | | **$11,601.32** | **$1,690.64** |

FLSA Liquidated damages are calculated as the FLSA regular rate, times 10/7 overtime

hours per day, times the number of days in the pay period. The total liquidated damages

over the period covered by the chart (which, remember, does not include the entire

period of employment) is $11,315.49.

The Oregon overtime due is calculated as the Oregon regular rate, times 10/7 overtime hours per day, times the number of days in they pay period. The total is $11,601.32. Oregon statutory prejudgment interest is 9% simple (noncompounding) interest, accruing daily from each payday through the date of the bankruptcy petition. As of the August 6, 2007 bankruptcy petition filing, prejudgment interest equals $1,690.64.

The Oregon overtime penalty is calculated identically to the minimum wage penalty, equaling $8,269.71. The penalty accrued on the first payday with an overtime violation, which was 2/10/05. Oregon statutory prejudgment interest is 9% simple (noncompounding) interest, accruing daily. As of the August 6, 2007 bankruptcy petition filing, prejudgment interest equals $1,849.47.

**D. Other claims**

The remaining claims that were not specifically discussed by the Plan Trustee are outlined below.

**1. Oregon Breach of Contract and Unpaid Wages Claims**

Ms. Nielsen knows that she did not receive all of the commissions owing to her at the time of her termination. However, AHM has thus far refused to produce the pay records that would enable her to quantify that claim. Ms. Nielsen asks that the Court send this case back to the Oregon District so that we can liquidate these claims.

**2. Oregon Wrongful Deduction Claims**

Oregon Revised Statute § 652.610(3) prohibits the deduction of any amount from an employee's wages unless the deduction is "required by law" or the employee has voluntarily consented to it in writing. Wages include commissions. *Hekker v. Sabre Construction Co.*, 265 Or 552, 559–60, 510 P2d 347 (1973) ("wages" means

compensation for services, including compensation in the form of commissions). Thus, no deduction may be made from an employee's commission unless it is "required by law" or the employee has voluntarily consented to it in writing.

AHM made deductions from its Loan Officers' commissions for (among other things) home appraisal costs. The Loan Officers could sometimes add those costs to a loan, but they were often not told ahead of time what the costs would be. Many loans therefore closed without the borrower having paid for the appraisal. Those appraisal costs were deducted from the Loan Officers' commissions. AHM also deducted appraisal costs from Loan Officers' commissions for loans that did not close. These deductions are not "required by law," nor did the employees voluntarily consent to them in writing. AHM's employee handbook does not even mention them among the deductions that it takes from employees' paychecks:

> **Deductions**
> There are certain deductions we are required to take from an employee's payroll by law. The payroll stub itemizes deductions made from an employee's gross earnings. Federal or state laws require that we make deductions for Social Security, Federal Income Tax, where applicable, State Income Tax and State disability Insurance, and any other legally mandated taxes, court ordered wage garnishments or deductions. In addition, there may be deductions for benefit items that have been authorized by the employee.

Exhibit 1 to the Declaration of Jon M. Egan, at the unnumbered Bates page between Bates pages 245 and 253. Various deductions appear on the Loan Officers' pay stubs as "Appraisal Fees" (see Bates page 38, for example), as "Home Buyers Market" (see Bates pages 9, 11, 13, 15, 17, 19, 21, 23, 25, 27, 29, 31, 32, 35 and 37), and as "Marketportal Lo" (see Bates pages 20, 22, 25, 27, 29, 31, 33, 35 and 37). For each unlawful deduction, an employee is entitled under Oregon law to the return of the unlawfully deducted amount, plus a penalty of $200 or the amount of the deduction, whichever is greater. ORS 652.615.

As previously discussed, AHM has not produced all of Ms. Nielsen's pay records in discovery. However, for both Ms. Nielsen and the other putative class members, damages under the statute are susceptible to simple arithmetic computation from the employer's pay records. The records produced to date show the following deduction damages for Ms. Nielsen:

| Pay Date | Period End | HBM | Mktptl LO | App Fee | Int | Plty | Int |
|---|---|---|---|---|---|---|---|
| 6/10/05 | 5/31/05 | $350.00 | | | $67.92 | $350.00 | $67.92 |
| 7/8/05 | 6/30/05 | $200.00 | | | $37.43 | $200.00 | $37.43 |
| 8/10/05 | 7/31/05 | $200.00 | | | $35.80 | $200.00 | $35.80 |
| 9/9/05 | 8/31/05 | $275.00 | | | $47.19 | $275.00 | $47.19 |
| 10/7/05 | 9/30/05 | $200.00 | | | $32.94 | $200.00 | $32.94 |
| 11/10/05 | 10/31/05 | $200.00 | | | $31.27 | $200.00 | $31.27 |
| 11/25/05 | 11/15/05 | | $32.00 | | $4.88 | $200.00 | $30.53 |
| 12/9/05 | 11/30/05 | $275.00 | | | $41.02 | $275.00 | $41.02 |
| 12/23/05 | 12/15/05 | | $32.00 | | $4.66 | $200.00 | $29.15 |
| 1/10/06 | 12/31/05 | $200.00 | | | $28.26 | $200.00 | $28.26 |
| 2/10/06 | 1/31/06 | $200.00 | $61.50 | | $34.95 | $261.50 | $34.95 |
| 3/10/06 | 2/28/06 | $255.00 | $56.50 | | $39.48 | $311.50 | $39.48 |
| 4/10/06 | 3/31/06 | $275.00 | $89.00 | | $43.35 | $364.00 | $43.35 |
| 5/10/06 | 4/30/06 | $650.00 | $336.50 | | $110.19 | $986.50 | $110.19 |
| 6/9/06 | 5/31/06 | | $351.40 | | $36.65 | $351.40 | $36.65 |
| 7/10/06 | 6/30/06 | $200.00 | $347.80 | | $52.95 | $547.80 | $52.95 |
| 8/10/06 | 7/31/06 | $200.00 | $347.80 | | $48.76 | $547.80 | $48.76 |
| 8/25/06 | 8/15/06 | | | $475.00 | $40.52 | $475.00 | $40.52 |
| | | **$3,680.00** | **$1,654.50** | **$475.00** | **$738.24** | **$6,145.50** | **$788.36** |

The deductions for Home Buyers Market are labeled "HBM," those for Marketportal Lo are labeled "Mktptl LO," and those for Appraisal fee are labeled "App Fee" in the chart. The first "Int" column indicates the interest on the unauthorized deduction amount itself, while the second "Int" column indicates the interest on the statutory penalty amount.

The total unauthorized deductions over the period covered by the chart (which, remember, does not include the entire period of employment) is $5,809.50. Oregon statutory prejudgment interest is 9% simple (noncompounding) interest, accruing daily

from each payday through the date of the bankruptcy petition. As of the August 6, 2007 bankruptcy petition filing, prejudgment interest equals $738.24.

The 652.615 penalties for the period covered by the chart total $6,145.50. Oregon statutory prejudgment interest is 9% simple (noncompounding) interest, accruing daily from each payday through the date of the bankruptcy petition. As of the August 6, 2007 bankruptcy petition filing, prejudgment interest equals $788.36.

### 3. Oregon Unpaid Wages Upon Termination Claim

Ms. Nielsen terminated her employment with AHM on or about April 20, 2007. She gave more than 48 hours' notice, so her final pay was due on April 20, 2007. She did not receive her final pay until May 10, 2007. Further, her final paycheck did not contain "all wages earned and unpaid at the time of discharge," so she is entitled to a penalty. ORS 652.140, 652.150. The Oregon unpaid wages upon termination penalty is calculated identically to the minimum wage and overtime penalties, equaling $8,269.71. The penalty accrued on April 20, 2007. Oregon statutory prejudgment interest is 9% simple (noncompounding) interest, accruing daily. As of the August 6, 2007 bankruptcy petition filing, prejudgment interest equals $220.22.

## II.  THE COURT SHOULD CERTIFY FLSA COLLECTIVE AND RULE 23 CLASS PROOFS OF CLAIM

Despite the Plan Trustee's opposition, "[t]he vast majority of courts conclude that class proofs of claim are permissible in a bankruptcy proceeding." *See, e.g.*, Judge Walrath's opinions in *In re United Companies Fin. Corp.*, 276 B.R. 368, 371–72 (Bankr. D. Del. 2002) and *In re Kaiser Group Int'l, Inc.*, 278 B.R. 58, 62 (Bankr. D. Del. 2002) (citing cases). Rule 7023 of the Federal Rules of Bankruptcy Procedure expressly allows class certification in adversary actions, by incorporating Rule 23 of the Federal Rules of Civil Procedure. Fed. R. Bankr. P. 7023. Rule 9014 expands that Rule to contested

matters, at the court's discretion. "The court may at any stage in a particular matter direct that one or more of the rules in Part VII shall apply." Fed. R. Bankr. P. 9014.

The Plan Trustee objects that "class actions can interfere with the uniform application of bankruptcy bar dates by preserving the claims of class members who failed to assert claims within the time limits applicable to similarly situated creditors." Objection at p. 6, ¶ 18. However, the filing of a class claim before the bar date preserves the claims of those who are asserted to be members of the class. *In re Kaiser Group Int'l, Inc.*, 278 B.R. 58, 63–64 (Bankr. D. Del. 2002) ("The Debtors also argue that we should consider whether it is appropriate to give class members an opportunity to participate in the class if they did not file proofs of claim before the bar date. The Debtors argue this gives class members an extension of the time within which to file a claim. The Claimant, however, did file the class proof of claim before the bar date. If the class claim is certified, then the claims of all the members of the class are incorporated in the proof of claim that was timely filed. This is inherent in class actions. For example, the filing of a class action tolls the statute of limitations otherwise applicable to all class members in their individual capacities. The Debtors are not prejudiced by this, since the Debtors had notice of the existence of the class claim before the bar date.").

When AHM filed its bankruptcy petition, Ms. Nielsen was in the process of gathering the discovery necessary to establish that her claims were entitled to class and/or collective treatment. That discovery was not completed before the case was stayed. Ms. Nielsen presents herewith the information that was gathered before the stay was imposed. If the Court deems the claims suitable for class and/or collective treatment, it should so rule, followed by a lifting of the stay to liquidate the claims in the District of Oregon. If the Court deems that insufficient evidence has been presented to date, it should lift the stay so that Ms. Nielsen can complete the discovery necessary to make a

full showing on that issue in the District of Oregon.

## A.  Ms. Nielsen's FLSA Claims Should Be Certified as Collective Claims

Ms. Nielsen requests that the Court certify her FLSA claims as collective claims per

29 U.S.C. § 216(b) and to approve notice to be sent to the following putative class

members:

> All current and former AHM loan officer employees who were classified as
> exempt for work performed or pay received in the United States on or after
> August 14, 2003.

It should first be noted that FLSA claims are certified as opt-in collective actions under

29 USC § 216(b), not opt-out class actions under Fed. R. Civ. P. 23. The procedural

requirements of Rule 23 do not apply to FLSA collective actions. FLSA collective actions

require only that the employees are "similarly situated." The Trustee's objections to

collective certification based on Rule 23 are therefore inapposite.

The Plan Trustee asserts that notice of the ability to file a proof of claim has already

been sent to the employees and ex-employees of AHM. Plan Trustee's Objection at p. 2,

¶ 1 ("Even if such application had been made, it should be denied because the proposed

class was never certified pre-petition and the putative class members have already

received actual or constructive notice of the Debtors' bankruptcy cases and bar date

established by this Court."). However, the purposes of the bankruptcy notice and Ms.

Nielsen's proposed FLSA collective notice are different. The purpose of collective notice

is to effectuate the FLSA's collective action provisions by advising similarly situated

collective members of the allegations against the employer and their right to join and

collectively prosecute this case for unpaid minimum wages, overtime wages and

liquidated damages. Most of the putative collective members are not aware of their

rights or of the employer's violations of those rights. The Court should therefore

authorize such notice. Because there is sufficient evidence at this stage of the collective

action that potential collective members are similarly situated, Plaintiff's request to conditionally certify this collective action should be granted.

Section 16(b) of the FLSA (29 U.S.C. § 216(b)) provides for "similarly situated" employees to proceed collectively in pursuit of wages unlawfully withheld. In order for an employee to opt in to the lawsuit and become a party plaintiff, that employee must file a written consent to sue. 29 U.S.C. § 216(b). The Court authorizes judicial notice to collective members in order to inform them of the action and give them an opportunity to participate by opting in. *Doe v. Advanced Textile Corp.*, 214 F.3d 1058, 1064 (9th Cir. 2000); *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 169–70, 107 L.Ed.2d 480, 110 S.Ct. 482 (1989). The Supreme Court has stated that allowing notice to similarly situated employees facilitates judicial economy by "avoiding a multiplicity of duplicative suits and setting cutoff dates to expedite disposition of the action." *Id.* at 172.

The "similarly situated" threshold of § 216(b) is much less stringent than the Fed.R.Civ.P. 23 standard. *See Daggett v. Blind Enters.*, 1996 U.S. Dist. LEXIS 22465, *17 (D.Or. 1996), citing *Church v. Consolidated Freightways, Inc.*, 137 F.R.D. 294, 305 (N.D.Cal. 1991). In fact, the Eleventh Circuit has determined that "the 'similarly situated' requirement of § 216(b) is more elastic and less stringent than the requirements found in Rule 20 (joinder) and Rule 42 (severance)." *Daggett*, *supra*, 1996 U.S. Dist. LEXIS at *17, citing *Grayson v. K Mart Corp.*, *supra*, 79 F.3d 1086, 1996 WL 132102 at *6. The mechanism of a collective action under § 216(b) provides a more efficient alternative to the filing and consolidation of a number of small, separate claims. *Daggett*, *supra*, 1996 U.S. Dist. LEXIS at *17. Therefore, the positions and claims of the employees need only be similar, not identical:

> Employees may be similarly situated without being identically situated. The evident purpose of the Act is to provide one law suit in which the claims of different employees, different in amount but all arising out of the

same character of employment, can be presented and adjudicated,
regardless of the fact that they are separate and independent of each other.
In such instances, where liability is denied by the employer, there are
certain questions of both law and fact which are common to all employees
engaged in the same character of work. . . . It is in accordance with sound
public policy to provide for the determination of such common questions,
depending as to each employee upon the same identical facts, in one
litigation instead of many independent suits.

*Id.* at \*17–\*18, citing *Shain v. Armour & Co.*, 40 F.Supp. 488, 490 (W.D. Ky. 1941).

"Finally, it is well settled that the existence of certain individual claims or defenses does

not preclude the conditional certification of an FLSA collective action." *Sexton v.*

*Franklin First Fin., Ltd.*, 08-CV-04950 JFB ARL, 2009 WL 1706535, \*8 (E.D.N.Y. June

16, 2009).

Ms. Nielsen is similarly situated to the putative collective members. This is because

all of AHM's Loan Officers were victims of the same misclassification. As previously

discussed, Ms. Nielsen has not had the opportunity to complete the first round of

written discovery in her case against AHM, let alone take depositions of corporate

representatives regarding company-wide policies. Even given the written discovery

available to us today, however, we can see that these wage-and-hour violations were not

unique to Ms. Nielsen.

For example, Bates pages 66–68 are AHM's official Loan Officer Position

Description, listing the Loan Officers' duties and noting their FLSA Status as "Exempt."

Bates page 85 is AHM's New Hire form, which provides the following information

regarding Ms. Nielsen's new Loan Officer position:

| | |
|---|---|
| Job Title: | Loan Officer |
| Functional Position Title: | Loan Officer |
| Overtime/Exempt/Hourly: | Exempt |
| … | |
| Is New Hire an LO? | Yes |
| Is It a Standard Agreement? | Yes |
| … | |
| Salary | 0 Annually |

…
Comm. Sales Position                    Yes—No Draw

We can therefore see from this New Hire form that the standard Loan Officer agreement

is a commissioned sales position, with $0 annual salary and no draw.

Similarly, we can tell from the Employee Handbook that all commissioned

employees were treated alike. For example, on Bates page 241, full-time commissioned

employees are given their own Employee Category:

> Full Time — Commissioned Employee
> An employee who primarily works in a sales capacity, and who is eligible for
> substantial commission.

Notably, there is no difference in Employee Category depending on whether a position is

an inside sales or an outside sales position. If an employee is eligible for commissions,

they are treated as exempt.

Similarly, all employees are expected to work standard hours:

> Generally, employees are expected to work between the hours of 8:30am and
> 5:30pm at 40-hour per week locations (with 8 paid hours and one unpaid lunch
> hour).
> …
> Employees who seek to work hours other than the standard hours for their
> location should make a request to their supervisor. Requests may be honored
> based on their supervisor's discretion and to the extent that granting the request
> does not infringe on the Company's ability to perform its work. Please note that
> employees interacting with consumers will usually be required to work during
> their location's standard hours.

Bates page 243. No exception is listed for commissioned employees. Employees are

expected to be in the office, and attendance is considered "extremely important":

> ATTENDANCE
> The success of the Company depends upon the cooperation and commitment of
> each member of our team. Therefore, an employee's attendance and punctuality
> are extremely important. If you are absent, your fellow employees must bear the
> burden of your absence. Your responsibility to the Company and your fellow
> employees requires good attendance.
> All employees should be at their work place and ready to work at their scheduled
> starting time. Give yourself enough time to put away your coat, food and personal
> articles prior to your starting time.

Bates page 244. This emphasis on attendance is underscored by the "time away" policy for full-time commissioned employees:

> VACATION
> Only full-time non-exempt, **full-time commissioned (time away as described below)**, and full-time exempt employees and part-time employees working a minimum of 30 hours per week (excluding Assistant Vice President's and above) are eligible for vacation benefits described. Effective January 1, 2003, American Home Mortgage's vacation benefits will be as follows:
> Only employees hired on or before June 30th of any year will be eligible for vacation during that calendar year.
> Each January employees (provided they are eligible in accordance with the first paragraph of this section) will receive vacation time as outlined below:
> - Two weeks per year        1-5 years of service
> - Three weeks per year      6-10 years of service
> - Four weeks per year       10 years of service
>
> **Full-time commissioned employees will be eligible for time away from the office consistent with the service schedule above and will be paid commission but not vacation pay.**

Bates page 245 (emphasis added). The fact that full-time commissioned employees are eligible for a limited amount of "time away from the office" per year indicates that they are expected to be *in* the office for the remainder of the year. Likewise, the instructions for exempt employees regarding AHM's eTime timekeeping system support the expectation that the Loan Officers would perform their work from the office:

> ***Exempt Employees:***
> All Exempt Employees must use eTime to indicate if they were at work or out by logging into eTime once during days they are in the office. Exempt employees must also indicate their use of paid days off (i.e. vacation, sick / personal, jury or bereavement) and when they are away on business (noted in eTime as a travel day).
> Employees in the exempt category are expected to punch in at least *one* time per day unless a vacation day, sick/personal, travels days, etc. occurs.

Bates page 253 (emphasis in original).

AHM admits that it did not keep and does not have any records of how many hours any commissioned employee worked, how many of those were in or out of the office, what the employees were doing when they were out of the office, or whether any particular sale was made in or out of the office. The only record that provided even a

glimpse into the application process was the Uniform Residential Loan Application, HUD form 1003, which had check boxes where the interviewer checked whether the loan application was taken by face-to-face interview, by mail, over the phone or over the internet. But that form only describes *how* the application was made, *not where*. It doesn't specify whether the contact was in AHM's office, at the customer's home or place of business, or anywhere in between. And even those forms likely do not exist anymore, since the Plan Trustee petitioned the Court for permission to destroy all of AHM's paper loan documents. In short, AHM has absolutely no documentary or other evidence to show that the Loan Officers as a group, or indeed that ANY given Loan Officer, was exempt from the minimum wage and overtime provisions of the law. Because that same lack of records applies to all of the employees, it cannot be a basis for denying class or collective certification.

The Court should also consider the effect of the statute of limitations on the putative FLSA collective members' claims. Unlike for Rule 23 class actions, the filing of an FLSA collective action does not toll the statute of limitations for the putative collective members. Each employee's statute of limitations continues to run until she files a formal written consent to join the suit with the Court. Bankruptcy filing by the employer tolls the statute. As the claim filing deadline for this bankruptcy has passed, many putative collective members currently have live FLSA claims that are valid if they are allowed to join Ms. Nielsen's claim, but which will be immediately extinguished if they are not. Considering that these employees are not even aware that they have these claims, it is only fair to inform them of that fact and give them the option to opt in. *See, e.g.*, *In re Bus. Info. Co., Inc.*, 81 B.R. 382, 386 (Bankr. W.D. Pa. 1988) ("As the filing of the bankruptcy tolls the statute, those violations occurring [during the statute of limitations period] remain actionable. In the last five years since [the plaintiff] initiated suit, none

of these other ten (10) employees has made any attempt or shown any interest in filing a similar complaint; nor does it appear likely that any of these people will do so, *unless and until* the appellate court affirms the jury verdict. If the bankruptcy case is dismissed, the statute of limitations will again begin to run, and by the time the appeal is decided, a substantial portion of the actionable violations will have been lost to these possible claimants who have determined to sit upon their rights.").

**B.  Ms. Nielsen's Oregon State Claims Should Be Certified as Class Claims**

Ms. Nielsen requests that the Court certify the following Rule 23 class for her Oregon state-law claims:

> All current and former AHM loan officer employees who were classified as exempt for work performed or pay received in Oregon on or after August 14, 2000.

The Plan Trustee discusses only the Fed. R. Civ. P. 23(b)(3) requirements of superiority and predominance. Ms. Nielsen will therefore not spend an inordinate amount of time briefing the Rule 23(a) requirements. It should be noted at the outset that the Plan Trustee relies heavily on cherry-picked New York and Second Circuit authority for his opposition to Ms. Nielsen's claim. Delaware and the Third Circuit are not nearly so harsh in their treatment of class claims in bankruptcy.

The elements of class certification are discussed in turn below.

**1.  Rule 23(a)**

Rule 23(a) states:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). Thus, Rule 23(a) requires a showing of: (1) numerosity; (2)

commonality; (3) typicality; and (4) adequacy of representation. *See, e.g., Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 613, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Johnston,* 265 F.3d at 183. Ms. Nielsen's proposed class meets these requirements.

## a) Numerosity

The requirement of numerosity does not require that joinder be impossible but instead dictates that joinder of all the parties is impracticable when the procedure would be "inefficient, costly, time-consuming, and probably confusing." *Ardrey v. Federal Kemper Ins. Co.,* 142 F.R.D. 105, 111 (E.D.Pa.1992). A court may make "common sense assumptions" in order to support the finding of numerosity. *Snider v. Upjohn Co.,* 115 F.R.D. 536, 539 (E.D.Pa.1987) (*quoting Wolgin v. Magic Marker Corp.,* 82 F.R.D. 168, 171 (E.D.Pa.1979)).

Here, the class is comprised of at least 56 members.[3] While it would not be impossible to adjudicate each claim separately, class certification offers the benefit of adjudicating common issues once. It thus avoids the cost and time inherent in 56-plus separate hearings on the same issues or the procedural burden of requiring joinder of these separate claims and objections. The numerosity requirement has been met in this case.

## b) Commonality

Rule 23(a)(2) requires a showing of the existence of "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). This "threshold of commonality is not high." *In re School Asbestos Litig.,* 789 F.2d 996, 1010 (3d Cir.1986). All class members need not share identical claims; "factual differences among the claims of the putative

---

[3] See Exhibit 2 to the Declaration of Jon M. Egan, listing the 56 Loan Officer employees at Oregon AHM offices at the time the search was performed. Note that these printouts provide only a snapshot in time of the Loan Officer population—over a six-year statute of limitations period, with significant turnover, the number of Loan Officers in the class is significantly higher than the 56 employees who were there at this time.

class members do not defeat certification." *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). "The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Id.* at 56; *Krell v. Prudential Ins. Co. of Am.* (*In re Prudential Ins. Co. of Am. Sales Practices Litig. Agent Actions*), 148 F.3d 283, 310 (3d Cir.1998).

In this case the claimants assert that all members of the class were damaged by their misclassification as exempt employees, wrongful deductions from their pay, and AHM's failure to pay wages, minimum wages, overtime, and wages earned and unpaid upon termination. This satisfies the threshold issue of whether the claims share common questions of law or fact.

### c) Typicality

The typicality requirement of Rule 23(a)(3) and the adequacy of representation requirement in Rule 23(a)(4) are designed to assure that the interests of the unnamed class members will be adequately protected by the named class members. *See, e.g., General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 449 (3d Cir.1977).

Rule 23(a)(3) requires that "the claims or defenses of the class representative parties be typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Typicality entails an inquiry into whether "the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Weiss v. York Hosp.,* 745 F.2d 786, 810 (3d Cir.1984); *Eisenberg,* 766 F.2d at 786. "The typicality requirement is designed to align the interests of the class and the class representatives so that the latter will work to benefit the entire class through the pursuit of their own goals." *Prudential,* 148 F.3d at 311; *see also Baby Neal,* 43 F.3d at 57. Much like

commonality, the typicality requirement does not mandate that all class members share identical claims. *See Baby Neal,* 43 F.3d at 56.

The claims that Ms. Nielsen advocates for herself are similar to the claims of the class members and are typical of victims of AHM's improper practices. Ms. Nielsen's claims arise from the same course of conduct and are based on the same legal theories as those of the class members she seeks to represent. The typicality requirement is met here.

### d) Adequacy of Representation

Rule 23(a)(4) requires that "the representative party will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). A class has adequate representation if (1) counsel for the named plaintiffs is qualified, experienced, and generally able to conduct the suit, and (2) the class representative's interests are not antagonistic to those of the unnamed members of the class. *See, e.g., Prudential,* 148 F.3d at 312; *Lewis v. Curtis,* 671 F.2d 779, 788 (3d Cir.1982); *First Interregional,* 227 B.R. at 368–69.

Counsel for Ms. Nielsen is experienced in litigating these sorts of wage-and-hour actions and as such will promote the interests of the class. Additionally, Ms. Nielsen has no conflict of interest that would negate her representation of the entire class. Ms. Nielsen and the class members have similar claims against AHM. Therefore, Ms. Nielsen will adequately represent the class.

### 2.  Rule 23(b)

Once an action satisfies the prerequisites of Rule 23(a), a claimant must establish that it meets one of the three elements of Rule 23(b). In this case, Ms. Nielsen seeks certification of the class claim under Rule 23(b)(3), which states:

> An action may be maintained as a class action if the prerequisites of

subdivision (a) are satisfied, and in addition:
* * * * * *
(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

Contrary to the Plan Trustee's objection, class treatment of Ms. Nielsen's claim is superior to any viable alternatives presently existing, and common issues predominate over any issues that would pertain only to individual claims.

### a) Superiority

The Plan Trustee alleges that the "superiority of the class action vanishes when the 'other available method' is bankruptcy, which consolidates all claims in one forum and allows claimants to file proofs of claim without counsel and at virtually no cost." Objection at p. 13, ¶ 32. If the Plan Trustee had, prior to the closing of the claim filing period, notified all of the putative class and collective members of the existence of an ongoing case asserting that their rights under the FLSA and Oregon wage-and-hour statutes had been violated, and what those alleged violations were, his objection might carry more weight. One of the injustices remedied by class and collective certification is to notify the putative members that their rights may have been violated, and how. Otherwise, they may never know. In the present case, no notice has gone out to those putative members, so they may still not know of the potential violations of their rights. The bankruptcy procedures followed by the Plan Trustee to date do not remedy that injustice, and class treatment is the only way to fix it.

Further, the claim that the putative class and collective members could submit proofs of claim without counsel is somewhat disingenuous, given the Plan Trustee's virulent opposition to Ms. Nielsen's claim (which, by definition, is identical to those of the absent class members). One of the benefits of class treatment is that the putative members are assigned counsel and another party to both look out for their rights and to bear the burden of potential litigation. If we were to ask most people on the street whether they would voluntarily submit a claim to a Delaware court, for which they may or may not be required to appear and/or to pay for their attorney's appearance at one or more hearings and/or a trial, when they know that they don't have any documents that would prove the claim (or even what the claim is), with the potential outcome of such a claim uncertain at best, I am sure that we would not get many takers. Through class treatment, these employees are able to vindicate their rights while avoiding many of the fears associated with a lack of information regarding the legal process and its potential outcomes.

Finally, the bar date for filing claims is now passed. The only way that the absent putative class and collective members can vindicate their rights is through the certification of Ms. Nielsen's claim. The filing of Ms. Nielsen's class action was reported in the media, and some of those class members may have refrained from filing their own claims based upon that knowledge. Both in terms of Justice and judicial economy, it is always better to gather everyone inside the tent and address the crowd than to walk down the line and explain to them one at a time that their tickets are not valid.

**b) Predominance**

Fed.R.Civ.P. 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members". The only two individual issues noted by the Plan Trustee are the amount of damages and *de*

*minimis* considerations:

> Individual issues pervade Nielsen's claims. Each employee would need to individually demonstrate how much straight and overtime work was allegedly uncompensated. *See Bradley v. Networkers Int'l LLC,* 2009 Cal. App. Unpub. LEXIS 963, at *32–31 (Cal. App. 4th Dist. Feb. 5, 2009) ("to accurately determine the entitlement and amount of overtime pay ... [would] requir[e] numerous mini-trials on the factual issues"). Additionally, the Court would be required to determine how much of each employee's unpaid time was for *"de minimis* work," which need not be compensated. *Lindow v. United States,* 738 F.2d 1057, 1063 (9th Cir. 1984); *see In re Bally I,* 402 B.R. at 622.

Objection at p. 15, ¶ 36. Neither the amount of damages nor *de minimis* considerations defeat class certification.

Even apart from the lack of burden on employees to precisely identify their damages in wage claims, differences between class members' damages will not usually defeat class certification. *See, e.g., Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988); *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984); *Gilmer v. Alameda-Contra Costa Transit Dist.*, C 08-05186 CW, 2011 WL 5242977, *7 (N.D. Cal. Nov. 2, 2011) ("Specifically, AC Transit contends that the collective action process will prevent it from disputing the actual amount of individual drivers' split-shift travel. As explained earlier, AC Transit does not have such individualized records, and neither do Plaintiffs. AC Transit bears the burden of maintaining records of its employees' hours worked and failure to do so opens the door to assessing damages by a reliable but approximate method. *Anderson,* 328 U.S. at 687–88."). Moreover, in the present case, most of the damages available to the class members are penalty damages, set by statute in a fixed amount and calculable according to simple arithmetic formulas.

Nor does a potential *de minimis* defense defeat certification. *Gilmer v. Alameda-Contra Costa Transit Dist.*, C 08-05186 CW, 2011 WL 5242977, *8 (N.D. Cal. Nov. 2, 2011) ("Contrary to AC Transit's assertion, it may pursue a de minimis defense in the

context of a collective action. Indeed, it has mounted such a defense through its cross-motion that it is entitled to judgment as a matter of law that no Plaintiff can recover for certain claimed time that it argues is de minimis. Furthermore, Plaintiffs' expert has made clear that he can easily modify the damages calculation to remove claims for particular days in which a Plaintiff is owed for fewer than ten minutes of unpaid travel time.").

Though it was not raised by the Plan Trustee, Ms. Nielsen has briefed the issue of the potential outside sales exemption for the convenience of the Court, as it is the only potential issue in this case that some courts in other cases have noted sometimes involves individual considerations. However, the majority of courts (and especially those cases in which all of the employees were the victims of common, written corporate policies) have held that the mere presence of an affirmative defense such as the outside sales exemption does not defeat certification. *In re Taco Bell Wage & Hour Actions*, 1:07CV1314 LJO DLB, 2012 WL 5932833, *6 (E.D. Cal. Nov. 27, 2012) ("Claims alleging that a uniform policy consistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment."). This is especially true when the defendant admits that it has no records by which it could possibly meet its evidentiary burden to prove that exemption.

## III.  ALTERNATIVE REQUEST TO LIFT STAY AND ALLOW OREGON DISTRICT COURT TO LIQUIDATE CLAIM

This Court has the power to decide many issues in this case. However, Ms. Nielsen respectfully notes that we do not currently have the information necessary for this Court to do so properly. The most just, speedy and inexpensive way to resolve this case will be for this Court to certify the collective and class proof of claim and then send the case back to the District of Oregon for a jury to liquidate its amount. *In re: Pilgrim's Pride*

*Corporation et al.*, 2009 WL 1103225, No. 408BK45664 (Bkrtcy. N.D. Tex. Feb. 25, 2009), 2009 WL 1135483 (Feb. 25, 2009) and 2009 WL 1135513 (March 3, 2009) is worth examining, as it shares many aspects of the current case. Prior to the debtor's petition in that case, there had been 13 different FLSA collective actions filed against it, some (but not all) of which had been consolidated via MDL procedures in the District of Arkansas. The South Carolina plaintiffs moved the Northern District of Texas Bankruptcy Court for relief from the automatic stay, to allow their case to proceed to liquidation via judgment in the South Carolina District Court. The moving plaintiffs represented employees in that state as well as North Carolina, Georgia, Alabama and Florida, alleging that the debtor failed to pay them overtime for time spent donning and doffing protective gear before and after their shifts. As in the present case, the debtor in *Pilgrim's Pride* objected that defending the FLSA case (including completing discovery and preparing for trial) would consume significant resources of the debtors' estates at the expense of other creditors. The Bankruptcy Court overruled the debtors' objection, granting the moving plaintiffs relief from the stay for purposes of proceeding to liquidate the claim in the South Carolina District Court, through judgment only (*i.e.*, no collection efforts were to be undertaken). That is precisely the result the present Court should arrive at as well.

## IV.   MS. NIELSEN HAS MET EVERY DEADLINE IN THIS CASE

The Plan Trustee sprinkles vague references throughout his objection as to the amount of time that has gone by without Ms. Nielsen having taken some action or other. Ms. Nielsen has met every deadline imposed upon her in this case. A timely filed proof of claim is deemed allowed unless a party in interest objects. § 502(a). Ms. Nielsen timely filed her proof of claim on January 11, 2008. Article 10.B. of the active liquidation plan provides that, "Unless otherwise provided in this Plan or by order of the

Bankruptcy Court, any objections to Claims or Interests by the Plan Trustee will be filed and served not later than 1 year after the later of (i) the Effective Date or (ii) the date such Claim is filed, provided that the Plan Trustee may request (and the Bankruptcy Court may grant) extensions of such deadline, or of any Bankruptcy Court approved extensions thereof, by filing a motion with the Bankruptcy Court without any requirement to provide notice to any party, based upon a reasonable exercise of the Plan Trustee's business judgment." The Effective Date of the Plan was November 30, 2010, making the deadline for objecting to claims November 30, 2011. No objection was filed against Ms. Nielsen's claim until December 4, 2012, over a year later. No notices of any extensions were ever served on Ms. Nielsen or her attorney, nor were there any requests for documentation or additional information (or indeed any communication whatsoever) from the Plan Trustee during that time. Further, defense counsel Jackson Lewis has throughout the bankruptcy provided periodic updates to the Oregon District Court on the case's status, and nothing has ever been filed or otherwise communicated to Ms. Nielsen or her counsel that any action was required whatsoever. Unless and until the Plan Trustee actually filed an objection, Ms. Nielsen was within her rights to assume that her claim had simply been accepted.

## V.    NOTICE

Ms. Nielsen's counsel has provided notice of this response to: (a) the Plan Trustee; (b) the U.S. Trustee; and (c) all persons who have filed a request for notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002. Due to the nature of the relief requested, Ms. Nielsen respectfully submits that no further notice of this response is required.

## VI.    CONCLUSION

WHEREFORE, Zoa Nielsen respectfully requests that the Court overrule the Plan

Trust's objection; certify Ms. Nielsen's proof of claim on a class and collective basis;

grant full or partial summary judgment on any issues that the Court deems to have been

established as a matter of law; and send the remainder of the case back to the District of

Oregon (where Chief Judge Aiken has already dealt with the issues and partial

discovery) for completion of discovery and liquidation of the claim.


Dated: December 27, 2012
Lake Oswego, Oregon

JON M. EGAN, P.C.

*/s/ Jon M. Egan*

_____
JON M. EGAN, OSB # 002467
(503) 697-3427
Attorney for Plaintiff/Claimant Zoa Nielsen
Telephone: (503) 697-3427
Facsimile: (866) 311-5629
Jegan@eganlegalteam.com