**Jon M. Egan**, OSB 00246
Oregonlawyer@hotmail.com
J**on M. Egan, PC**
240 Sixth Street
Lake Oswego, OR 97034-2931
Telephone: (503) 697-3427
Fax: (503) 697-3427
Attorney for Plaintiff

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, *et al.,* | Case No. 07-11047 (CSS) Jointly Administered |
| Debtors. | |

I, the undersigned, hereby declare and say:

1. I am the Plaintiff in the matter of *Nielsen et al. v. American Home Mortgage Corp.*, USDC No. 06-CV-1161-AA. I make the following statements based upon my own personal knowledge and am competent to testify thereto.

2. I began my employment with Defendant American Home Mortgage Corp. ("AHM") on or about January 19, 2005.

3. AHM provides mortgages.

4. My title was "Mortgage Loan Officer," often referred to simply as "Loan Officer," or "LO."

5. As an Mortgage Loan Officer for AHM, my primary job was to originate or sell

and process mortgage loans. I did not customarily or regularly make sales calls on customers at their homes or places of employment. I worked at more than one AHM office and observed and communicated with the other Loan Officers daily, so I know that this was true of the other Loan Officers as well. Almost all of our sales activities took place through telephone and e-mail communications, either at AHM's office, our home offices or on our cellular telephones. I rarely, if ever, met a customer outside the office, and never at their home or place of business. Between 90% and 95% of my time was spent in the office, and that is where all of my client files were kept. The time that I did spend working outside the office was almost exclusively for general networking with potential referral sources, not for sales calls with clients. It is both more comfortable for the client and much more efficient to intake and process their information in the office. After that office meeting, the rest of the process is handled over the phone and via email or fax.

6. The other Loan Officers and I were not given specific mandatory schedules, but it was generally expected that we would be in the office unless we had a specific reason to be out or were excused for the day (we only had a certain number of days per year that we could be excused from the office). In addition to that general expectation, we were specifically required to be present for certain obligations in the AHM office, such as staff meetings, sales training, and the Hour of Power, where we were required to make 100 cold calls to prospective clients from the office.

7. At AHM, I was paid twice monthly via a two-tiered commission structure. I was to receive 60% of the commissions I earned for AHM. If my monthly loan sales exceeded $1,500,000.00, I was to receive 70% of the commissions I earned for

AHM that month, retroactive to the beginning of the month. To my knowledge, all of the over 3,000 Mortgage Loan Officers employed by AHM around the country were paid on a similar two-tiered commission basis. All of the Loan Officers that I have talked to were paid on a 100% commission basis—none of us received any pay besides commissions, so in weeks or pay periods where no loans closed, we got paid nothing.

8. I and the other Mortgage Loan Officers were paid twice per month, neither of which fell at the end of the month (usually they fell on the 10th and the 25th). More often than not, when I would exceed the $1,500,000.00 threshold for commissions in a month, I would not be paid my correct stepped-up commission for that month, when that commission payment was due. I believe that this was partially caused by the system (if a Mortgage Loan Officer exceeded their monthly threshold after the second payday but before the end of the month, the commission step-up was often never noted or paid), and partially due to corporate bureaucracy and incompetence. Sometimes, after pointing out the discrepancy to AHM and spending hours trying to get it straightened out, I would receive the extra commission payment after much delay. Other Mortgage Loan Officers also experienced difficulty receiving their proper commission payments correctly and on time.

9. I and most other Mortgage Loan Officers regularly worked more than 40 hours per week for AHM. None of us were ever paid time and one half premium pay for overtime hours.

10. Neither I nor the other Mortgage Loan Officers were ever paid any money for weeks in which we performed work but earned no commissions. During the first

      six months of my employment, for example, I received no pay whatsoever during 8 of the 12 pay periods.

11. Fees, such as for home appraisals, were routinely deducted from my commissions and those of other Mortgage Loan Officers.  This was done without obtaining my or the other Mortgage Loan Officers' prior written approval or even informing us of the amount of the fees that would be deducted ahead of time.  The fees would be indicated only as a total deduction on our pay stubs, without any indication of which loan they had come from or the amounts making up that total.  The fee amounts charged by my branch for different programs, for example, were not divulged to me for the first year and a half I worked for AHM.

12. I terminated my employment with AHM on or about April 20, 2007.

13. I did not receive my final pay until May 10, 2007.  To my knowledge, such delays in receiving final pay are common at AHM.

14. AHM did not keep records of my or the other commissioned employees' time. I do not know of any records that I or AHM kept that would indicate how long I worked in a given day or workweek, what tasks I performed, or where they were performed.

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 24, 2012.

                                                      */s/ Zoa Nielsen*

                                                      Zoa Nielsen