# EXHIBIT C

## CLAIM #10447

01:13144613.3

**UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF DELAWARE**
American Home Mortgage Claims Processing Center
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re:<br>American Home Mortgage Holdings, Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 07-11047 (CSS)<br>Jointly Administered |
| --- | --- |
| Name of Debtor Against Which Claim is Held<br>American Home Mortgage Corp. | Case No. of Debtor<br>07-11051 |

Filed: USBC - District of Delaware
American Home Mortgage Holdings, Inc., Et Al.
07-11047 (CSS)          0000010447

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**Name and address of Creditor : (and name and address where notices should be sent if different from Creditor)**

Countrywide Bank, F.S.B.
Attn: Kathleen Conte
4500 Park Granada - MS: CH-20
Calabasas, California 91302

Telephone number: 818-225-3234
Email Address:    Kathleen_Conte@Countrywide.Com

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

**Account or other number by which creditor identifies debtor:**

Check here if this claim:
☐ replaces  ☑ amends a previously filed claim, dated: 1/14/08

**1. Basis for Claim**
☐ Goods sold
☐ Services performed
☐ Money loaned
☐ Personal injury/wrongful death
☐ Taxes
☑ Other   See Exhibit _____ (explain)

☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
☐ Wages, salaries, and compensation (fill out below)

Last Four Digits of your SS#: ____ ____ ____ ____
Unpaid compensation for services performed
from _____ to _____
        (date)          (date)

**2. Date debt was incurred:**
March 2006 - Current

**3. If court judgment, date obtained:**
N/A

**4. Total Amount of Claim at Time Case Filed:** $ _____ + $15,751,633.51 + _____ = $15,751,633.51
                    (unsecured nonpriority)    (secured)    (unsecured priority)    (Total)
If all or part of your claim is secured or entitled to priority, also complete Item 5 or 7 below.
☑ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☑ Check this box if your claim is secured by collateral (including a right of setoff).
Brief Description of Collateral:
☐ Real Estate      ☐ Motor Vehicle
☑ Other   Partial Security - Exhibit A
Value of Collateral: $ Unknown
Amount of arrearage and other charges at time case filed included in secured claim, if any: $ Unkown

**6. Unsecured Nonpriority Claim:** $ _____
☐ Check this box if: a) there is no collateral or lien securing your claim, or b) your claim exceeds the value of the property securing it, or if c) none or only part of your claim is entitled to priority.

**7. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $ _____
Specify the priority of the claim:
☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(1).
☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).
☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).
☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).
☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(____).

*This Space is For Court Use Only*

**8. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**9. Supporting Documents:** *Attach copies of supporting documents*, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien.
**DO NOT SEND ORIGINAL DOCUMENTS.** If the documents are not available, explain. If the documents are voluminous, attach a summary.

**10** Date-Stamped Copy: To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

**FILED / RECEIVED**
AUG 1 1 2008
EPIQ BANKRUPTCY SOLUTIONS, LLC

| Date<br>August 8, 2008 | Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any): *Kathleen Conte, EVP* |
| --- | --- |

*Penalty for presenting fraudulent claim:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.

# EXHIBIT A

## EXHIBIT A
## ADDENDUM TO PROOF OF CLAIM

### General Statements Applicable to Proof of Claim

This Proof of Claim is limited to the prepetition claims of Countrywide Bank, FSB, formerly Countrywide Bank, N.A. (including all of its affiliates, divisions, subsidiaries and operating entities) ("CWB") against the estate of American Home Mortgage Corp. ("AHM"), which arose as set forth below. Countrywide may also hold postpetition claims against the Debtor's estates and reserves the right to amend or otherwise supplement this Proof of Claim or to take any other action in connection therewith.

1. CWB specifically reserves its right to file a claim or request for payment pursuant to Section 503(b) or Section 507(a) of the Bankruptcy Code, and generally to make requests for payment of administrative expenses.

2. In executing and filing this Proof of Claim (this "Claim"), CWB does not waive any right to any security held by it or for its benefit or any right to claim specific assets or any right of setoff, recoupment, counterclaim or similar right that CWB has or may have against debtor AHM, its affiliates, or any other person or persons, and expressly reserves such rights.

3. As of the date of this Claim, the automatic stay under Section 362 of the Bankruptcy Code has prevented CWB from realizing upon the value of its collateral.

4. CWB has not, nor may it be deemed to have, waived any right of election under Section 1111(b) of the Bankruptcy Code, but hereby reserves all of its rights and remedies thereunder.

5. Nothing in this Claim constitutes a waiver of any rights of CWB or an election of remedies with respect to the matters described in this Claim or with respect to CWB's rights to assert claims against non-debtors, whether such claims against non-debtors arise under, arise in or are related to AHM's Chapter 11 proceedings.

6. CWB reserves the right to amend and/or supplement this Claim in any respect including the right to assert this Claim against affiliates of AHM whether or not such affiliates are also debtors in these proceedings.

7. All relevant documents, not otherwise attached hereto as Exhibits, will be made available upon request by the Bankruptcy Court, AHM or any other party-in-interest entitled to receive such documents.

8. CWB reserves the right to object to the Bankruptcy Court's subject matter jurisdiction.

9.      This Claim shall serve as a claim against affiliates of AHM whether or not such affiliates are also debtors in these proceedings, as and to the extent such affiliates are individually, jointly and/or severally liable to CWB on this Claim.

## Introduction

CWB and AHM are parties to the Mortgage Loan Purchase and Servicing Agreement dated March 14, 2006, including all amendments (the "2006 Agreement"), pursuant to which CWB agreed to purchase from time to time, certain mortgage loans identified in the related Purchase Confirmations (as that term is defined in the 2006 Agreement). A true and correct copy of the 2006 Agreement (exclusive of all amendments) is attached to this Claim as Exhibit B.

CWB and AHM are parties to the Mortgage Loan Purchase and Interim Servicing Agreement dated April 27, 2007, including all amendments (the "2007 Agreement" and collectively, with the 2006 Agreement, the "Purchase Agreements"), pursuant to which CWB agreed to purchase from time to time, certain mortgage loans identified in the related Purchase Confirmations (as that term is defined in the 2007 Agreement), including all servicing rights relating thereto. A true and correct copy of the 2007 Agreement (exclusive of all amendments) is attached to this Claim as Exhibit C.

Pursuant to the Purchase Agreements, AHM is obligated to repurchase loans sold by AHM to CWB under the Purchase Agreements under certain identified circumstances (such repurchase obligations, the "Repurchase Obligations").

Pursuant to the Purchase Agreements, AHM is obligated to indemnify and hold CWB harmless against all costs, damages, losses and claims incurred by CWB in connection with AHM's breach of its representations, warranties and obligations under the Purchase Agreements (such indemnification and hold harmless obligations, the "Indemnification Obligations")

## Claims

Pursuant to this Claim, CWB asserts any and all claims, rights or remedies CWB may have, either directly or indirectly, against AHM, arising as a matter of law or equity, based upon, relating to, or arising under or on account of any and all unpaid amounts owed by AHM to CWB, including under the Purchase Agreements, as of the Petition Date and thereafter, including, without limitation, attorneys' fees, expenses and costs.

More specifically, attached to this Claim as <u>Exhibit D</u> are CWB's detailed loan level detailed analysis of certain claims arising under the Purchase Agreements as of May 31, 2008, including without limitation, the following:

| | |
|---|---|
| Early Payment Defaults | $ 12,048,639.63 |
| Premium Recapture Claims | $      87,385.42 |
| Other Credit Breach Claims | $   3,540,585.11 |
| Remittance Shortages | $      75,023.35 |

Total to Date:  $ 15,751,633.51

This Claim is, and is filed as, a claim in an amount that will not be less than $15,751,633.51 and a claim in an amount yet to be determined for additional liabilities, losses, damages, fees, costs and other amounts and claims payable under the Purchase Agreements. This Claim is, and is filed as, a secured claim to the extent that the value of the collateral securing this Claim and, to the extent that such collateral is insufficient to satisfy this Claim, as an unsecured Claim.

The amount of this Claim is comprised of at least the following:

A.      A substantial portion of the Repurchase Obligations and Indemnification Obligations under the Purchase Agreements for which CWB believes AHM will ultimately be liable to CWB have not been formally calculated and/or asserted by CWB or may otherwise be contingent and/or unliquidated. These amounts include early payment default, premium recapture, shortage of remittances due, and other loan representation and warranty breaches, such as inadequate verification of employment, unverified or misrepresentation of employment, insufficient mortgage/housing rating, undisclosed liabilities, unsupported income and other credit or underwriting criteria that are unable to be determined or confirmed. Currently, CWB asserts that not less than $15,751,633.51 in Repurchase Obligations are currently owed by AHM to CWB. CWB reserves all rights to amend this Claim to assert additional Repurchase Obligations and Indemnification Obligations, which CWB believes will exceed $25 million.

B.      The amount of fees, costs and other amounts payable to CWB under the Purchase Agreements is currently estimated to be $500,000. A detailed calculation of these fees and costs shall be provided upon request.

In addition to the foregoing, CWB reserves its right to assert unsecured priority claims under Sections 503(b) and 507(a)(2) of the Bankruptcy Code for all liabilities, losses or damages related to AHM's failure to properly segregate and remit to CWB all payments received by AHM or otherwise payable to CWB on account of loans CWB previously purchased from AHM under the Purchase Agreements (such payments, the "CWB Payments"). CWB asserts that the CWB Payments constitute the property of CWB and do not constitute (and have never constituted) the property of AHM or its bankruptcy estate.

In addition to the foregoing, if AHM rejects the Purchase Agreements pursuant to Section 365 of the Bankruptcy Code, CWB reserves its right to assert additional claims against AHM for all actual and reasonably foreseeable consequential damages arising under, on account of and/or relating to such rejection.

## Collateral

The Purchase Agreements provides that CWB is entitled to setoff, including by withdrawal or debit of funds of AHM deposited or held in the "Over/Under Account" identified in the Purchase Agreements (the "Over/Under Account"), any amounts owed by CWB to AHM against any amounts owed by AHM to CWB under the Purchase Agreements or any other agreement between AHM and CWB.

CWB asserts all contractual, statutory and common law rights of setoff with respect to property of AHM held or owing by CWB (or any of its affiliates) to or for the account of AHM, including, without limitation, all of AHM's funds in the Over/Under Account and any and all amounts payable by CWB to or for the account of AHM under the Purchase Agreements or any other agreement between CWB and AHM.

## Supplemental Amounts

CWB has credited indebtedness described herein with pre-petition receipts from the Debtor (if any). No postpetition payments have been made. Accordingly, the prepetition amount has not diminished since the Petition Date. The amount of the indebtedness changes on a daily basis depending on the amounts of the expenses, losses, attorneys' fees (if any) and interest thereon.

This Proof of Claim is made without prejudice to the filing by CWB of additional proofs of claim or amending the instant Proof of Claim with respect to any other indebtedness or liability of the Debtor to CWB, including without limitation, any additional claims for interest, fees, losses or expenses that may be allowed by law or by the pleadings and documents described above, and any claims which may have arisen after the filing of the Debtor's petition pursuant to 11 U.S.C. §§ 503(b) and 507(a)(1). CWB further reserves the right to make such additional proofs of claim or amendments should it elect to do so in the future.

To the extent any portion of this Proof of Claim is allowable against the Debtor's estate as an administrative expense, CWB hereby asserts that such amounts should be so treated.

# EXHIBIT B

## MORTGAGE LOAN PURCHASE AND SERVICING AGREEMENT

This Mortgage Loan Purchase and Servicing Agreement is dated and effective as of March 14, 2006 (the "Agreement"), between American Home Mortgage Corp., having an address at 538 Broadhollow Road, Melville, New York 11747 (the "Seller"), and Countrywide Bank, N.A., having an address at 225 West Hillcrest Drive, Thousand Oaks, California 91360 (the "Purchaser").

### R E C I T A L S

The Seller desires to sell and transfer to the Purchaser from time to time, and the Purchaser desires to purchase from the Seller from time to time, certain mortgage loans identified in a Purchase Confirmation (as defined below) executed by the Seller and the Purchaser. This Agreement is intended to set forth the terms and conditions by which the Seller shall transfer and the Purchaser shall acquire such mortgage loans.

The Seller and the Purchaser acknowledge that the Seller shall use its affiliate, American Home Mortgage Servicing, Inc., to subservice such mortgage loans acquired by the Purchaser in accordance with this Agreement.

In consideration of the promises and the mutual agreements and undertakings set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE I

### DEFINITIONS

Unless the context requires otherwise, all capitalized terms used herein shall have the meanings assigned to such terms in this Article I unless defined elsewhere herein. Any capitalized term used or defined in a Purchase Confirmation that conflicts with the corresponding definition set forth herein shall supersede such term.

**Adjustable Rate Mortgage Loan**:  Any Mortgage Loan in which the related Mortgage Note contains a provision whereby the Mortgage Interest Rate is adjusted from time to time in accordance with the terms of such Mortgage Note.

**Agencies**:  Both Fannie Mae and Freddie Mac.

**Agreement**:  This Mortgage Loan Purchase and Servicing Agreement, including all exhibits and supplements hereto, and all amendments hereof.

**ALTA**:  The American Land Title Association or any successor thereto.

**Appraised Value**:  With respect to any Mortgage Loan, the value of the related Mortgaged Property based upon the lesser of (i) the appraisal made for the originator at the time of origination of the Mortgage Loan or (ii) the purchase price of the Mortgaged Property at the time of origination of the Mortgage Loan, with respect to a Refinanced Mortgage Loan in which the Mortgagor purchased the related Mortgaged Property twelve (12) months or more prior to the origination date of such refinanced Mortgage Loan, such value is based solely upon the appraisal made at the time of origination of such refinanced Mortgage Loan.

**ARM**:  An Adjustable Rate Mortgage Loan.

**Assignment of Mortgage**:  An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

1

**Balloon Mortgage Loan**:  Any Mortgage Loan wherein the Mortgage Note matures prior to full amortization and requires a final and accelerated payment of principal.

**Business Day**:  Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan institutions in the State of California or New York, are authorized or obligated by law or executive order to be closed.

**Cash Liquidation**:  Recovery of all cash proceeds by the Seller with respect to the termination of any defaulted Mortgage Loan other than a Mortgage Loan which became an REO Property, including all Primary Mortgage Insurance Proceeds, Other Insurance Proceeds, Liquidation Proceeds, Condemnation Proceeds and other payments or recoveries whether made at one time or over a period of time which the Seller deems to be finally recoverable, in connection with the sale or assignment of such Mortgage Loan, trustee's sale, foreclosure sale or otherwise.

**Cash-Out Refinancing**:  A Refinanced Mortgage Loan the proceeds of which were in excess of the principal balance of any existing first mortgage on the related Mortgaged Property and related closing costs, and were used to pay any such existing first mortgage, related closing costs and subordinate mortgages on the related Mortgaged Property.

**Combined-Loan-to-Value Ratio or CLTV**:  With respect to any Mortgage Loan as of any date, the fraction, expressed as a percentage, the numerator of which is the sum of (a) the original principal balance of the Mortgage Loan, plus (b) the unpaid principal balance of any Senior Mortgage Loan and related subordinate mortgage loan or loans secured by the Mortgaged Property, and the denominator of which is the Appraised Value of the related Mortgaged Property.

**Closing**:  The consummation of the sale and purchase of each Mortgage Loan Package.

**Closing Date**:  The date on which the purchase and sale of the Mortgage Loans constituting a Mortgage Loan Package is consummated, as set forth in the Trade Confirmation and Purchase Confirmation.

**Code**:  The Internal Revenue Code of 1986, as it may be amended from time to time or any successor statute thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto.

**Commission:** The United States Securities and Exchange Commission.

**Condemnation Proceeds**:  All awards or settlements in respect of a taking of an entire Mortgaged Property by exercise of the power of eminent domain or condemnation.

**Conventional Mortgage Loan**:  A Mortgage Loan that is not insured by the FHA or guaranteed by the VA.

**Convertible Mortgage Loan**:  Any Adjustable Rate Mortgage Loan that contains a provision whereby the Mortgagor is permitted to convert the Mortgage Loan to a fixed-rate mortgage loan in accordance with the terms of the related Mortgage Note.

**Credit Score**:  The credit score of the Mortgagor provided by Fair, Isaac & Company, Inc. or such other organization providing credit scores at the time of the origination of a Mortgage Loan.  If two credit scores are obtained, the Credit Score shall be the lower of the two credit scores. If three credit scores are obtained, the Credit Score shall be the middle of the three credit scores.

**Custodial Account**:  The separate account or accounts created and maintained pursuant to this Agreement with respect to the Mortgage Loans, which shall be an Eligible Account.

2

**Custodial Agreement**:  The agreement, if any, executed by the Seller, the Purchaser and the Custodian governing the retention of the originals of each Mortgage Note, Mortgage, Assignment of Mortgage and other Mortgage Loan Documents, in a form reasonably acceptable to the Custodian, the Purchaser and the Seller.

**Custodian**:  Treasury Bank, N.A., a division of Countrywide Bank, N.A., or its successor in interest or assigns, or any successor to the Custodian under the Custodial Agreement, as therein provided.

**Cut-off Date**:  With respect to each sale and purchase of a Mortgage Loan Package as contemplated hereunder, the cut-off date as set forth in the related Purchase Confirmation.

**Depositor:**  The depositor, as such term is defined in Regulation AB, with respect to any Securitization Transaction.

**Determination Date**:  The fifteenth (15th) day of the month of the related Remittance Date or if such fifteenth (15th) day is not a Business Day, the Business Day immediately following such fifteenth (15th) day.

**Due Date**:  The day of the month on which a Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

**Due Period**:  With respect to each Remittance Date, the period commencing on the second day of the month preceding the month of the Remittance Date and ending on the first day of the month of the Remittance Date.

**Eligible Account**:  An account or accounts (i) maintained with the Seller or a parent, affiliate or subsidiary of the Seller provided the deposits of such entity are fully insured by the FDIC up to the related limits, (ii) maintained with a depository institution the short term debt obligations of which are rated by Standard & Poor's Ratings Group in one of its two (2) highest rating categories at the time of any deposit therein, or (iii) maintained with a national or state chartered bank provided that it maintains a rating by Standard & Poor's Ratings Group in the four (4) highest rating categories for short term debt obligations.

**Escrow Account**:  An account or accounts maintained by the Seller, or the Seller's predecessor in interest, maintained for the deposit of Escrow Payments received in respect of one or more Mortgage Loans.

**Escrow Payments**:  The amounts held in Escrow Accounts which include amounts being held for payment of taxes, assessments, water rates, mortgage insurance premiums, fire and hazard insurance premiums and other payments required to be escrowed by the Mortgagor pursuant to any Mortgage Loan.

**Exchange Act:** The Securities Exchange Act of 1934, as amended.

**Event of Default**:  Any one of the conditions or circumstances enumerated in <u>Section 7.1</u> of this Agreement.

**Fannie Mae**:  The Federal National Mortgage Association or any successor thereto.

**FDIC**:  The Federal Deposit Insurance Corporation, or any successor thereto.

**FFIEC**:  The Federal Financial Institutions Examination Council or any successor thereto.

3

**FHA**: The Federal Housing Administration.

**FICO Score**: A credit score developed by the Fair Isaac Credit Organization.

**Fixed Rate Mortgage Loan**:  Any Mortgage Loan wherein the Mortgage Interest Rate set forth in the Mortgage Note is fixed for the term of such Mortgage Loan.

**Freddie Mac**:  The Federal Home Loan Mortgage Corporation, or any successor thereto.

**Ginnie Mae or GNMA**:  The Government National Mortgage Association or any successor organization.

**Gross Margin**:  With respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which amount is added to the Index in accordance with the terms of the related Mortgage Note to determine the Mortgage Interest Rate for such Mortgage Loan.

**Hard Prepayment Charge**: With respect to a Prepayment Charge, any Prepayment Charge that is not subject to any exceptions pursuant to the terms of the related Mortgage Note.

**Hazardous Substances**:  Any substances, materials or waste that are regulated under applicable federal, state or local laws or regulations or that are classified as hazardous or toxic under federal, state or local laws or regulations.

**HMDA**: The Home Mortgage Disclosure Act, as amended.

**HUD**: The Department of Housing and Urban Development or any successor thereto.

**Index**:  With respect to each Adjustable Rate Mortgage Loan, the Index shall mean the rate per annum of the security instrument as set forth in the related Mortgage Note.

**Initial Rate Cap**:  With respect to each Adjustable Rate Mortgage Loan and the first Interest Adjustment Date after the Origination Date, a number of percentage points per annum that is set forth in the related Mortgage Loan Schedule and in the related Mortgage Note, which is the maximum amount by which the Mortgage Interest Rate for such Mortgage Loan may increase (without regard to the Maximum Mortgage Interest Rate) or decrease (without regard to the Minimum Mortgage Interest Rate) on such Adjustment Date from the Mortgage Interest Rate in effect immediately prior to such Adjustment Date.

**Interest Adjustment Date**:  With respect to each Adjustable Rate Mortgage Loan, the date on which an adjustment to the Mortgage Interest Rate on a Mortgage Note becomes effective.

**Lender Paid Mortgage Insurance Policy or LPMI Policy**:  A policy of mortgage guaranty insurance issued by a Qualified Insurer in which the owner or servicer of the Mortgage Loan is responsible for the premiums associated with such mortgage insurance policy.

**Lifetime Mortgage Interest Rate Cap**:  With respect to each Adjustable Rate Mortgage Loan, the absolute maximum Mortgage Interest Rate payable for an Adjustable Rate Mortgage Loan, above which the Mortgage Interest Rate shall not be adjusted, as provided in the related Mortgage Loan Schedule.

**Liquidation Proceeds**:  Amounts, other than Primary Mortgage Insurance Proceeds, Condemnation Proceeds and Other Insurance Proceeds, received by the Seller in connection with the liquidation of a defaulted Mortgage Loan through trustee's sale, foreclosure sale or otherwise, other than

4

amounts received following the acquisition of an REO Property pursuant to <u>Section 4.13</u> of this Agreement.

**Loan-to-Value Ratio** or **LTV**:  With respect to any Mortgage Loan, the ratio of the original outstanding principal amount to the Appraised Value of the Mortgage Loan.

**LPMI Loan**: A Mortgage Loan covered by a Lender Paid Primary Mortgage Insurance Policy as of the related Cut-off Date.

**LPMI Rate**: With respect to each LPMI Loan, the portion of the Mortgage Interest Rate as set forth on the related Mortgage Loan Schedule, which shall be used to pay the premium due on the related Lender Paid Primary Mortgage Insurance Policy.

**Maximum Mortgage Interest Rate**:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the maximum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be increased on any Interest Adjustment Date.

**MERS**:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor thereto.

**MERS System**:  The system of recording transfers of mortgages electronically maintained by MERS.

**MIN**:  The mortgage identification number issued to each Mortgage Loan registered with MERS on the MERS® System.

**Minimum Monthly Payment**:  With respect to a Pay Option ARM Mortgage Loan, the minimum Monthly Payment calculated in accordance with the terms of the related Mortgage Note.

**Minimum Mortgage Interest Rate**:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the minimum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be decreased on any Interest Adjustment Date.

**MOM Loan**:  A Mortgage Loan that was registered on the MERS® System at the time of origination thereof and for which MERS appears as the record mortgagee on the related Mortgage, solely as nominee for the originator of such Mortgage Loan, and its successors and assigns, at the origination thereof.

**Monthly Advance**:  The aggregate of the advances made by Seller on any Remittance Date pursuant to <u>Section 5.3</u> of this Agreement.

**Monthly Payment**:  The scheduled monthly payment on a Mortgage Loan as set forth in the related Mortgage Note.

**Mortgage**:  The mortgage, deed of trust or other such instrument securing a Mortgage Note, which creates a first or second lien, as applicable, on an unsubordinated estate in fee simple in real property securing the Mortgage Note or a first or second lien, as applicable, upon a leasehold estate of Mortgagor, as the case may be.

**Mortgage File**:  The file containing the Mortgage Loan Documents, all other documents in connection with the origination of a particular Mortgage Loan, all appraisals and/or appraisal reviews and/or any property valuations relating to a Mortgaged Property, and all documents, files and other information reasonably necessary to service the Mortgage Loans.

5

**Mortgage Interest Rate**:  The annual rate at which interest accrues on any Mortgage Loan, exclusive of any primary mortgage insurance, as adjusted from time to time in accordance with the provisions of the related Mortgage Note, if applicable.

**Mortgage Loan**:  A mortgage loan identified in the Mortgage Loan Schedule which is sold pursuant to this Agreement, which Mortgage Loan includes without limitation the Mortgage Loan Documents, the Mortgage File, the Monthly Payments, Principal Prepayments, any related Escrow Accounts, any related Custodial Accounts and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan, excluding the Servicing Rights related thereto.  Unless the context requires otherwise, any reference to the Mortgage Loans in this Agreement shall refer to the Mortgage Loans constituting a Mortgage Loan Package.

**Mortgage Loan Documents**:  The following documents pertaining to any Mortgage Loan:

(a)  The original Mortgage Note bearing all intervening endorsements, endorsed "Pay to the order of _____" and signed in the name of the Seller by an authorized officer;

(b)  The original Assignment of Mortgage for each Mortgage Loan in blank   (except for Mortgage Loans registered with the MERS System);

(c)  The original Mortgage with evidence of recording thereon (except for MOM Loans, evidence of the related MIN);

(d)  The originals of all intervening assignments of mortgage with evidence of recording thereon (except for Mortgage Loans registered with the MERS System, in which case, the originals of all intervening assignments of mortgage  with  evidence  of  recording  thereon prior to the intervening assignment to MERS, if any); and

(e)  The original mortgagee title insurance policy and any endorsements thereto.

**Mortgage Loan Package**:  The Mortgage Loans sold to the Purchaser pursuant to a Purchase Confirmation.

**Mortgage Loan Remittance Rate**:  With respect to each Mortgage Loan, the interest rate payable to the Purchaser on each Remittance Date which shall equal the Mortgage Interest Rate less the applicable Servicing Fee and any pool insurance policy premiums, if applicable.

**Mortgage Loan Schedule**:   With respect to each Mortgage Loan Package, the schedule of Mortgage Loans included therein and made a part of the related Purchase Confirmation, which schedule shall include, the following information with respect to each Mortgage Loan: (1) the Seller's Mortgage Loan identifying number; (2) the Mortgagor's first and last name; (3) the street address of the Mortgaged Property including the city, state and zip code; (4) a code indicating whether the Mortgaged Property is owner-occupied, a second home or investor property; (5) the type of Mortgage Loan (i.e. Fixed Rate Mortgage Loan, Adjustable Rate Mortgage Loan, (6) the applicable lien (first lien Mortgage Loan or second lien Mortgage Loan); (7) a code indicating document style (i.e. full, alternative, or reduced); (8) a code indicating the type of residential dwelling constituting the Mortgaged Property; (9) a code indicating the purpose of the loan (i.e., purchase financing, Rate/Term Refinancing, Cash-Out Refinancing); (10) the original principal amount of the Mortgage Loan; (11) the Mortgage Interest Rate at origination; (12) the Mortgage Interest Rate as of the Cut-off Date; (13) the date on which the first Monthly Payment was due on the Mortgage Loan; (14) the stated maturity date; (15) the amount of the Monthly Payment at origination; (16) the original months to maturity; (17) the Origination Date of the Mortgage Loan and the remaining months to maturity from the Cut-off Date, based on the original amortization schedule; (18) the last Due Date on which a Monthly Payment was actually applied to the unpaid Stated Principal Balance; (19) the Mortgage

6

Interest Rate in effect immediately following the Cut-off Date; (20) the Stated Principal Balance of the Mortgage Loan as of the Cut-off Date; (21) the amount of the Monthly Payment as of the Cut-off Date; (22) the sales price of the Mortgaged Property, if applicable, the Appraised Value, the Loan-to-Value Ratio, and Combined Loan-to-Value Ratio at origination; (23) the current Appraised Value and Updated LTV, if applicable; (24) the Credit Score; (25) a code indicating whether or not the Mortgage Loan is the subject of Primary Mortgage Insurance Policy or LPMI and the name of the related insurer; (26) the interval between Interest Adjustment Dates (daily, monthly, quarterly, semi-annually, annually, etc.); (27) with respect to any Adjustable Rate Mortgage Loan, the first Interest Adjustment Date after the Origination Date, the Gross Margin, the Initial Rate Cap, the Periodic Mortgage Interest Rate Cap, the Lifetime Mortgage Interest Rate Cap, the next Interest Adjustment Date following the Cut-off Date, the Index, the Minimum Mortgage Interest Rate, the Maximum Mortgage Interest Rate and whether such Adjustable Rate Mortgage Loan is a Convertible Mortgage Loan; (28) a code indicating whether or not each Mortgage Loan has a Prepayment Charge and if so, the amount and duration of such penalty and whether such Prepayment Charge is a Hard Prepayment Charge or Soft Prepayment Charge; (29) the debt-to-income ratio; (30) a code indicating whether the Mortgage Loan is a Balloon Loan; (31) a code indicating whether the Mortgage Loan is registered on MERS and, if so, the corresponding MOM or MIN, as applicable; (32) with respect to a LPMI Loan, the LPMI Rate; (33) any available HMDA data; (34) with respect to each Mortgage Loan, the unpaid principal balance of any mortgage loans secured by the related Mortgaged Property, if available; (35) the Mortgagor's social security number; and (36) any other information pertaining to such Mortgage Loan as may be reasonably requested by the Purchaser. With respect to the Mortgage Loans in the aggregate in each Mortgage Loan Package, the related Mortgage Loan Schedule attached to the related Purchase Confirmation shall set forth the following information, as of the related Cut-off Date: (1) the number of Mortgage Loans; (2) the current principal balance of the Mortgage Loans; (3) the weighted average Mortgage Interest Rate of the Mortgage Loans; and (4) the weighted average maturity of the Mortgage Loans. In addition, the information set forth in the Mortgage Loan Schedule relating to the Mortgage Interest Rate, Periodic Mortgage Interest Rate Cap and Lifetime Mortgage Interest Rate Cap with respect to any PMI Loan, as applicable, is exclusive of the PMI Rate.

**Mortgage Note**:  The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

**Mortgaged Property**:  The real property or leasehold estate, if applicable, securing repayment of the debt evidenced by a Mortgage Note.

**Mortgagor**:  The obligor on a Mortgage Note.

**Net Escrow Payments**:  Escrow Payment balances remaining after advances by the Seller for taxes and insurance to the extent documented under a detailed statement provided to the Purchaser.

**Other Insurance Proceeds**:  Proceeds of any title policy, hazard policy, pool policy or other insurance policy covering a Mortgage Loan, other than the Primary Mortgage Insurance Policy, if any, to the extent such proceeds are not to be applied to the restoration of the related Mortgaged Property or released to the Mortgagor in accordance with the procedures that the Seller would follow in servicing mortgage loans held for its own account.

**OCC**:  The Office of the Comptroller of the Currency or any successor thereto.

**Origination Date**:  The date on which a Mortgage Loan funded.

**OTS**:  The Office of Thrift Supervision or any successor thereto.

**Pass-Through Transfer**:  The sale or transfer of some or all of the Mortgage Loans to a trust to be formed as part of a publicly or privately traded, rated or unrated mortgage pass-through, pay-through or other mortgage-backed securities transaction.

**Payment Adjustment Date**:  As to each Mortgage Loan, the date on which an adjustment to the Monthly Payment on a Mortgage Note becomes effective.

**Pay Option ARM Mortgage Loan**:  Any Mortgage Loan identified in the Transaction Documents as an ARM that lets Mortgagors choose one of various different payments each month which may include, but not be limited to, a Minimum Monthly Payment, an interest-only payment, full principal and interest amortized over thirty (30) years, or full principal and interest amortized over fifteen (15) years.

**Periodic Mortgage Interest Rate Cap**:  With respect to each Adjustable Rate Mortgage Loan, the provision of a Mortgage Note which provides for an absolute maximum amount by which the Mortgage Interest Rate therein may increase or decrease on an Interest Adjustment Date above the Mortgage Interest Rate previously in effect, equal to the rate set forth in the related Mortgage Loan Schedule, if applicable.

**Person**:  Any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

**PMI Loan**:  Each Mortgage Loan with either an LTV at origination or a current LTV (based on current market value and amortization) greater than eighty percent (80.00%) or any Mortgage Loan that is covered by a Primary Mortgage Insurance Policy as of the related Cut-off Date.

**Prepayment Charge**:  With respect to any Mortgage Loan, any prepayment penalty or premium thereon payable in connection with a principal prepayment on such Mortgage Loan pursuant to the terms of the related Mortgage Note.

**Prepayment Interest Shortfall Amount**:  With respect to any Mortgage Loan that was subject to a Principal Prepayment in full or in part during any Due Period, which Principal Prepayment was applied to such Mortgage Loan prior to such Mortgage Loan's Due Date in such Due Period, the amount of interest (net of the related Servicing Fee) that would have accrued on the amount of such Principal Prepayment during the period commencing on the date as of which such Principal Prepayment was applied to such Mortgage Loan and ending on the day immediately preceding such Due Date, inclusive.

**Primary Mortgage Insurance Policy**:  A policy of primary mortgage guaranty insurance issued by a Qualified Insurer, providing coverage at least equal to the level of coverage required by the Agencies at the time the related Mortgage Loan was originated if such Mortgage Loan was to be eligible for sale to, and securitization by, either Fannie Mae or Freddie Mac.

**Primary Mortgage Insurance Proceeds**:  Proceeds of any Primary Mortgage Insurance Policy.

**Principal Prepayment**:  Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, including any prepayment penalty or premium thereon, which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

**Principal Prepayment Period**:  As to any Remittance Date, the calendar month preceding the month of distribution.

**Purchase Confirmation**:  Those certain purchase confirmations substantially in the form of Exhibit D attached hereto, executed by the Seller and the Purchaser in connection with the purchase and sale of each Mortgage Loan Package, which sets forth the terms relating thereto

8

including a description of the related Mortgage Loans (including the Mortgage Loan Schedule), the Purchase Price Percentage for such Mortgage Loans, the Closing Date, the Cut-off Date and the Servicing Fee Rate.

**Purchase Price**: The purchase price to be paid by the Purchaser for the Mortgage Loans which, unless otherwise specified in the Purchase Confirmation, shall equal the product of (a) the Purchase Price Percentage, times (b) the Stated Principal Balance of the Mortgage Loans.

**Purchase Price Percentage**: With respect to the Mortgage Loans constituting each Mortgage Loan Package, the purchase price percentage set forth in the related Purchase Confirmation.

**Purchase Proceeds**: The purchase proceeds to be paid by the Purchaser for the Mortgage Loans constituting each Mortgage Loan Package, as set forth in a funding schedule in the form of Exhibit A hereto.

**Purchaser**: Any entity which purchases the Mortgage Loans pursuant to this Agreement or its successor in interest or any successor or assignee of the Purchaser under this Agreement as herein provided. Unless the context requires otherwise, all references to "Purchaser" in this Agreement shall be deemed to include such Purchaser's successors in interest, assignees or designees.

**Qualified Insurer**: An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided, approved as an insurer by the Agencies and whose claims paying ability is rated in the two highest rating categories by the Standard & Poor's Ratings Group or Moody's Investors Service with respect to primary mortgage insurance and in the two highest rating categories by Best's with respect to hazard and flood insurance.

**Rate/Term Refinancing**: A Refinanced Mortgage Loan, the proceeds of which are limited to the sum of the unpaid principal balance (including all prepaid items), points, the amount required to satisfy any subordinate liens that are more than one year old (if the borrower plans to satisfy them), and other funds for the borrower's use (as long as the amount does not exceed 2% of the principal amount of the new mortgage or $2,000).

**Reconstitution**: Any Pass-Through Transfer, Securitization Transaction or Whole Loan Transfer.

**Reconstitution Agreements**: Any of the agreement or agreements entered into by the Purchaser and/or certain third parties, and if necessary the Seller, on the Reconstitution Date or Dates with respect to any or all of the Mortgage Loans conveyed hereunder, in connection with a Whole Loan Transfer or a Pass-Through Transfer as set forth in Section 4.19.

**Reconstitution Date**: The date or dates on which any or all of the Mortgage Loans purchased pursuant to this Agreement shall be reconstituted as part of a Whole Loan Transfer or a Pass-Through Transfer pursuant to Section 4.19.

**Refinanced Mortgage Loan**: A Mortgage Loan the proceeds of which were not used to purchase the related Mortgaged Property.

**Regulation AB**: Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release

9

(Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

**Regulation AB Information & Certification Provisions:**  Sections 4.1, 4.3(c), 4.4, 4.5 and 4.6 of this Agreement.

**REMIC:**  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

**REMIC Provisions:**  Provisions of the federal income tax law relating to a REMIC, which appear at Section 860A through 860G of Subchapter M of Chapter 1, Subtitle A of the Code, and related provisions, and regulations, rulings or pronouncements promulgated thereunder, as the foregoing may be in effect from time to time.

**Remittance Date:**  The eighteenth (18th) day of any month, beginning with the eighteenth (18th) day of the month next following the month in which the Cut-off Date occurs, or if such eighteenth (18th) day is not a Business Day, the first Business Day immediately preceding such eighteenth (18th) day.

**REO Account:**  The account created and maintained pursuant to Section 4.13 of this Agreement, which account shall be an Eligible Account.

**REO Disposition:**  The final sale by the Seller of any REO Property.

**REO Property:**  A Mortgaged Property acquired by the Seller on behalf of the Purchaser as described in Section 4.13 of this Agreement.

**Repurchase Price:**  With respect to any Mortgage Loan, a price equal to the sum of (a) the product of (i) the Stated Principal Balance of the Mortgage Loan at the time of repurchase, and (ii) the greater of par or the Purchase Price Percentage (subject to any buyup or buydown adjustments as contemplated in the Trade Confirmation), plus (b) interest on such Stated Principal Balance at the Mortgage Loan Remittance Rate from the last date through which interest has been paid and distributed to the Purchaser to the date of repurchase, plus (c) any outstanding escrow advances and any outstanding servicing advances or other amounts paid by the Purchaser on account of out-of-pocket expenditures, including, without limitation, reasonable fees and costs, with respect to such Mortgage Loan, plus (d) any costs and damages that may be assessed to the Purchaser due to the Mortgage Loan being found to violate a predatory/abusive lending law.

**Sarbanes Certification:**  The certification required by Rules 13a-14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of 2002) on behalf of an asset-backed issuer with respect to a Securitization Transaction.

**Securities Act:**  The Securities Act of 1933, as amended.

**Securitization Transaction:**  Any transaction involving either (i) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (ii) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

**Segment(s):**  One or more segments of Mortgage Loans (each, a "Segment") comprising the segment(s) of Mortgage Loans set forth in the related Mortgage Loan Schedule, whether individually or in the aggregate, as applicable.

10

**Seller Information:** As defined in Section 6.19.

**Senior Mortgage Loan:** Any loan that is senior or equal in priority to the Mortgage Loan and which is secured by the same Mortgaged Property as the Mortgage Loan.

**Servicer:** As defined in Section 4.19(c)(iii).

**Servicing Advances:** All customary, reasonable and necessary "out of pocket" costs and expenses incurred in the performance by the Seller of its servicing obligations, including, but not limited to, the cost of (i) the preservation, restoration and protection of the Mortgaged Property, (ii) any enforcement or judicial proceedings, including foreclosures, (iii) the management and liquidation of the REO Property and (iv) compliance with the obligations under Section 4.8 of this Agreement.

**Servicing Fee:** With respect to each Mortgage Loan, the amount of the annual fee the Purchaser shall pay to the Seller, which shall, for a period of one full month, be equal to one-twelfth of the product of (a) the Servicing Fee Rate and (b) the Stated Principal Balance of such Mortgage Loan. Such fee shall be payable monthly, computed on the basis of the same principal amount and period respecting which any related interest payment on a Mortgage Loan is computed. The obligation of the Purchaser to pay the Servicing Fee is limited to, and the Servicing Fee is payable solely from, the interest portion of such Monthly Payment collected by the Seller, or as otherwise provided under Article IV hereof. Subject to the foregoing, and with respect to each Mortgage Loan, the Seller shall be entitled to receive its Servicing Fee through the disposition of any related REO Property or the date on which title reverted to the Purchaser, as the case may be, and the Servicing Fee payable with respect to any REO Property shall be based on the Stated Principal Balance of the related Mortgage Loan at the time of foreclosure.

**Servicing Fee Rate:** With respect to any Mortgage Loan, the rate per annum set forth in the applicable Trade Confirmation and/or the Purchase Confirmation.

**Servicing File:** With respect to each Mortgage Loan, the file retained by the Seller consisting of originals of all documents in the Mortgage File or copies of such documents maintained on microfilm which are not delivered to the Purchaser or the Custodian and copies of the Mortgage Loan Documents.

**Servicing Criteria:** The "servicing criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

**Servicing Officer:** Any officer of the Seller involved in, or responsible for, the administration and servicing of the Mortgage Loans whose name appears on a list of servicing officers furnished by the Seller to the Purchaser upon request, as such list may from time to time be amended.

**Servicing Rights:** With respect to each Mortgage Loan, any and all of the following: (a) all rights to service the Mortgage Loans; (b) any payments or monies payable or received for servicing the Mortgage Loans; (c) any late fees, assumption fees, penalties or similar payments with respect to the Mortgage Loans (excluding prepayment penalties unless otherwise set forth in the related Transaction Documents); (d) all agreements or documents creating, defining or evidencing any such Servicing Rights and all rights of the Seller thereunder, including, but not limited to, any clean-up calls and termination options; (e) Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto; (f) all accounts and other rights to payments related to any of the property described in this paragraph; (g) possession and use of any and all Mortgage Files pertaining to the Mortgage Loans or pertaining to the past, present, or prospective servicing of the Mortgage Loans; and (h) all rights, powers and privileges incident to any of the foregoing.

**Soft Prepayment Charge:** With respect to a Prepayment Charge, any Prepayment Charge that is subject to exceptions pursuant to the terms of the related Mortgage Note.

11

**Stated Principal Balance**:  With respect to each Mortgage Loan as of any date of determination: (i) the unpaid principal balance of the Mortgage Loan at the Cut-off Date after giving effect to payments of principal due on or before such date, whether or not received, minus (ii) all amounts previously distributed to the Purchaser with respect to the related Mortgage Loan representing payments or recoveries of principal or advances in lieu thereof.

**Static Pool Information:** Static pool information as described in Item 1105(a)(1)-(3) and 1105(c) of Regulation AB.

**Subcontractor:** Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122(d) of Regulation AB with respect to Mortgage Loans under the direction or authority of the Seller or a Subservicer.

**Subservicer:** Any Person appointed by the Seller who services Mortgage Loans on behalf of the Seller or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by the Seller under this Agreement or any Reconstitution Agreement that are identified in Item 1122(d) of Regulation AB.

**Third-Party Originator:** Each Person that originated Mortgage Loans acquired by the Seller.

**Trade Confirmation**:  A letter agreement executed by the Seller and the Purchaser prior to the applicable Closing Date confirming the terms of a prospective purchase and sale of a Mortgage Loan Package.

**Transaction Documents**:  The Trade Confirmation, the Purchase Confirmation, and this Agreement.

**Updated Loan-to-Value Ratio**:  With respect to any Mortgage Loan, the outstanding principal balance of such Mortgage Loan as of the date of determination divided by the value of the related Mortgaged Property as determined by a recent appraisal of the Mortgaged Property.  Such appraisal shall be in a form acceptable to Fannie Mae and Freddie Mac.

**VA**:  The Department of Veterans Affairs.

**Whole Loan Transfer**:  The sale or transfer by the Purchaser of some or all of the Mortgage Loans in a whole loan format.

## ARTICLE II

## SALE OF THE MORTGAGE LOANS

**Section 2.1    Agreement of Sale; Possession of Mortgage Files.**  The Seller does hereby sell, convey, transfer and assign to the Purchaser on the related Closing Date all right, title and interest in and to the Mortgage Loans, the Mortgage Loan Documents, and the Mortgage Files relating to the Mortgage Loans, all in accordance with the terms and conditions set forth herein.  It is understood that subject to the terms and conditions of this Agreement, the Seller shall retain all right, title and interest in and to the Servicing Rights and shall service the Mortgage Loans in accordance with the terms and conditions set forth herein. Upon sale of the Mortgage Loans, the ownership of each Mortgage Loan, the Mortgage Loan Documents, and the Mortgage Files related to the Mortgage Loans shall be vested in the Purchaser, and the ownership of all records and documents with respect to the Mortgage Loans prepared by or which come into the possession of the Seller shall immediately vest in the Purchaser and shall be retained and maintained, in trust, by the Seller at the will of the Purchaser in a custodial capacity only.  The contents of each Mortgage File not delivered to the Purchaser or a Custodian are and shall be held in trust by the Seller for the benefit of the Purchaser as the owner hereof and the Seller's possession of the contents of each Mortgage File so retained is at the will of the Purchaser for the sole purpose of servicing the related Mortgage Loan, and such retention and possession by the Seller is in a custodial capacity only.  Each Mortgage File shall be segregated from the other books and records of the Seller and shall be appropriately marked to clearly reflect the sale of the related Mortgage Loan to the Purchaser and the ownership of each Mortgage Loan by the Purchaser.  The Seller shall release its custody of the contents of any Mortgage File only in accordance with the written instructions from the Purchaser.

**Section 2.2    Payment of the Purchase Proceeds.**  On the related Closing Date, the Purchaser shall pay to the Seller the Purchase Proceeds by wire transfer in immediately available funds to the account designated by the Seller.  Upon completion of the wire transfer to the Seller's designated account, the Purchaser shall own the Mortgage Loan Package, free and clear of any lien or encumbrance whatsoever.

**Section 2.3 Entitlement to Payment on the Mortgage Loans.**  The Purchaser shall be entitled to (a) all scheduled principal due after the Cut-off Date; (b) all other recoveries of principal collected after the related Cut-off Date, except for (i) recoveries of principal collected after the related Cut-off Date and prior to the related Closing Date that are reflected in the Mortgage Loan Schedule, and (ii) all scheduled payments of principal due on or before the related Cut-off Date; and (c) all payments of interest due on or after the related Cut-off Date on the Mortgage Loans, net of interest at the Servicing Fee Rate.  All payments and remittances on the Mortgage Loans received by the Seller after the related Closing Date and payable to the Purchaser shall be paid promptly to the Purchaser in accordance to the terms set forth in Article V.

**Section 2.4    Examination of Mortgage Loan Documents by the Purchaser.**  Prior to each Closing Date, the Purchaser shall have the right to review the Mortgage File for each Mortgage Loan in a Mortgage Loan Package and, based on its review, decline to purchase any Mortgage Loan which the Purchaser, in its sole discretion, determines not to be in compliance with each of the representations and warranties contemplated hereby or which is otherwise unsatisfactory to the Purchaser in its reasonable discretion.  It is expressly understood by the parties that the Purchaser is purchasing the Mortgage Loans for the express purpose of  either (a) reselling such Mortgage Loans to a subsequent purchaser, including, but not limited to, a whole loan investor or (b) securitizing the Mortgage Loans, and, as such, the Purchaser's right to decline to purchase any of the Mortgage Loans as contemplated above may be directly influenced by the requirements of any securitization if the Mortgage Loans are determined not to be in compliance with each of the representations and warranties contemplated hereby.  The Seller agrees to deliver or make available to the Purchaser a complete Mortgage File for each Mortgage Loan on or before such date as may be reasonably requested by the Purchaser.  The fact that the Purchaser has conducted or has failed to conduct any partial or complete examination of the Mortgage Files shall not affect the Purchaser's right to demand repurchase or to avail itself of any other remedy available hereunder. Notwithstanding anything contained herein to the contrary, should there be a material adverse change in the characteristics of the Mortgage Loans remaining in a Mortgage Loan Package after the exclusion or rejection of one or more Mortgage Loans by the Purchaser as contemplated above, the

13

Purchaser may, in its sole discretion, elect not to purchase the remaining Mortgage Loans and the Purchaser shall have no liability therefor.

Section 2.5    **Delivery of Mortgage Loan Documents**.  At least two (2) Business Days prior to each Closing Date, the Seller shall deliver the Mortgage Loan Documents with respect to each Mortgage Loan in a Mortgage Loan Package to the Purchaser or a bonded custodian (the "Custodian") and, in the case of the latter, shall cause the Custodian to deliver to the Purchaser a custodian's certification pursuant to which the Custodian certifies to the Purchaser that (i) with respect to each Mortgage Loan, it has in its possession originals of each of the Mortgage Loan Documents, (ii) all of the Mortgage Loan Documents appear on their face to be genuine originals or copies, as applicable, and (iii) upon the Purchaser's wiring of the Purchase Proceeds to the Seller, that the Custodian shall hold the Mortgage Loan Documents with respect to each Mortgage Loan in trust for the Purchaser and will, subsequent thereto, act only in a manner consistent with the Purchaser's instructions with respect thereto.  In the event that any of the Mortgage Loan Documents set forth in clauses (c) through (e) of the definition of Mortgage Loan Documents in Article I have not been delivered to the Purchaser in the time specified above (the "Missing Documents") either because such Missing Documents have not been returned by the applicable public recording office with respect to items (c) and (d), or because the final original title policy has not yet been issued by the title company with respect to item (e), then the Seller shall deliver to the Purchaser certified true and correct copies of the same and shall further deliver the originals of any such Missing Documents promptly upon its receipt thereof, but in no event later than ninety (90) days from the related Closing Date.  If the Seller fails to deliver any of the Missing Documents relating to a Mortgage Loan within the time specified above, the Seller shall, upon written request from the Purchaser, repurchase such Mortgage Loan in accordance with Section 3.3.

Section 2.6    **Conditions to Closing**.  The Purchaser's obligations hereunder are subject to the fulfillment of the following conditions precedent.  In the event that any of the conditions set forth below are not satisfied, the Purchaser shall not have any obligation to purchase any of the Mortgage Loans in a Mortgage Loan Package or to pay the Purchase Proceeds as contemplated hereunder and shall instead be entitled, in its sole discretion, to terminate this Agreement in its entirety as it relates to such Mortgage Loan Package.

(a)  Each of the representations and warranties made by the Seller hereunder shall be true and correct in all material respects as of the related Closing Date and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement.

(b)  The Seller shall have delivered to the Purchaser all of the Mortgage Loan Documents in accordance with Section 2.5 with respect to each Mortgage Loan in a Mortgage Loan Package.

(c)  Each of the terms and conditions set forth herein which are required to be satisfied on or before each Closing Date shall have been satisfied unless waived by the prejudiced party(ies).

(d)  The Seller shall have delivered to the Purchaser on or before each Closing Date the following documents:

(1)  a fully executed Agreement;

(2)  an executed Purchase Confirmation in the form of Exhibit D relating to such Closing;

(3)  the Mortgage Loan Schedule, which shall include, without limitation, the Stated Principal Balance of each Mortgage Loan;

(4)  an executed Funding Schedule, in the form of Exhibit A hereto;

(5)  an Officer's Certificate, in the form of Exhibit B hereto;

14

(6)  an executed Authorized Signatories Agreement, in the form of <u>Exhibit C</u> hereto;

(7)  an executed Custodial Agreement, if applicable; and

(8)  such other documents related to the purchase and sale of the Mortgage Loans as the Purchaser may reasonably request.

(e)  The document specified in subsection (d)(1) shall only be required with respect to the initial Closing Date.  Notwithstanding the foregoing, the Seller shall provide an Officer's Certificate on or before the initial Closing Date and every year thereafter.

**Section 2.7**  **Record Title**.  Record title to each Mortgage and the related Mortgage Note shall be transferred by the Seller to the Purchaser.  The Seller shall, with respect to any Mortgage Loan not registered with the MERS System, at the option of the Purchaser, either (i) prepare and cause to be recorded the Assignment of Mortgage for each Mortgage Loan in a Mortgage Loan Package and shall, promptly upon its receipt of each original recorded Assignment of Mortgage from the applicable recording office, deliver the same to the Purchaser, or (ii) prepare and deliver to the Purchaser an original Assignment of Mortgage in blank, in each case, within the time and in the manner specified in <u>Section 2.5</u>.  The Seller shall bear the cost and expense related to (i) providing all Assignments of Mortgages and endorsements of Mortgage Notes for any transfer of record title required hereunder with respect to the obligations of the Mortgage Notes and the underlying security interest related to each Mortgage Loan, (ii) recording title of the Mortgage Loans, and (iii) causing the MERS System to reflect the Purchaser as the owner of the Mortgage Loans.

With respect to any Mortgage Loan in a Mortgage Loan Package registered with the MERS System, the Seller shall, on each Closing Date, take all actions necessary to cause the MERS System to reflect the Purchaser as the beneficial owner of the Mortgage Loans consistent with the terms of this Agreement.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

**Section 3.1**  **Representations and Warranties Respecting the Seller**.  The Seller represents, warrants and covenants to the Purchaser that, as of each Closing Date:

(a)  The Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and is qualified to transact business in and is in good standing under the laws of each state where a Mortgaged Property is located or is otherwise exempt under applicable law from such qualification or is otherwise not required under applicable law to effect such qualification and no demand for such qualification has been made upon the Seller by any state having jurisdiction and in any event the Seller is or will be in compliance with the laws of any such state to the extent necessary to insure the enforceability of each Mortgage Note and the sale of the Mortgage Loans and Servicing Rights as contemplated by this Agreement;

(b)  The Seller has the full power and authority to perform, and to enter into and consummate, all transactions contemplated by this Agreement.  The Seller has the full power and authority to hold each Mortgage Loan and to sell each Mortgage Loan;

(c)  Neither the acquisition or origination of the Mortgage Loans by the Seller or the sale of the Mortgage Loans to the Purchaser, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Seller's certificate

15

of incorporation or bylaws or result in a material breach of any legal restriction or any agreement or instrument to which the Seller is now a party or by which it is bound, or constitute a material default or result in an acceleration under any of the foregoing, or result in the violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject;

(d) The Seller is an approved seller/servicer for the Agencies, in good standing with each such agency, and is a mortgagee approved by the Secretary of HUD pursuant to sections 203 and 211 of the National Housing Act. No event has occurred, including but not limited to, a change in insurance coverage, which would make the Seller unable to comply with Fannie Mae, Freddie Mac or HUD-eligibility requirements or which would require notification to the Agencies or HUD. The Seller is a member of MERS in good standing, and is current in the payment of all fees and assessments imposed to the Seller by MERS and has complied in all respects with the rules and procedures of MERS;

(e) The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement. Seller is solvent and the sale of the Mortgage Loans will not cause Seller to become insolvent. The sale of the Mortgage Loans is not undertaken with the intent to hinder, delay or defraud any of Seller's creditors;

(f) There is no action, suit, proceeding, investigation or litigation pending or, to the best of the Seller's knowledge, threatened, which either in any one instance or in the aggregate, if determined adversely to the Seller, would adversely affect the sale of the Mortgage Loans to the Purchaser, or the Seller's ability to perform its obligations under this Agreement;

(g) No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of or compliance by the Seller with this Agreement or the terms of the Mortgage Loans, the delivery of the Mortgage Files to the Purchaser and the sale of the Mortgage Loans to the Purchaser or the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the related Closing Date;

(h) Neither the Agreement nor any statement, report or other document furnished or to be furnished by the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact or omits to state a material fact necessary to make the statements contained herein or therein not misleading;

(i) The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes, the Mortgages and/or the Servicing Rights by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect and applicable to this transaction;

(j) Seller acknowledges and agrees that the Servicing Fee shall be treated by the servicer, for accounting and tax purposes, as compensation for the servicing and administration of the Mortgage Loans pursuant to this Agreement;

(k) Seller has determined that the disposition of the Mortgage Loans pursuant to this Agreement will be afforded sale treatment for tax and accounting purposes; and the sale of each Mortgage Loan shall be reflected on Seller's balance sheet and other financial statements as a sale of assets by Seller;

(l) Seller has not dealt with any broker, investment banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loans;

16

(m) The consideration received by Seller upon the sale of such Mortgage Loans pursuant to this Agreement constitutes fair consideration and reasonably equivalent value for the Mortgage Loans;

(n) This Agreement, assuming due authorization, execution, and delivery by the Purchaser, constitutes a valid, binding, and enforceable obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by (i) bankruptcy, insolvency, liquidation, receivership, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights, or (ii) general principles of equity, and all the requisite corporate action has been taken by Seller to make this Agreement valid and binding upon Seller in accordance with the Agreement's terms;

(o) The Seller shall be deemed to represent to the Purchaser and to any Depositor, as of the date on which information is first provided to the Purchaser or any Depositor under Section 4.3(c) that, except as disclosed in writing to the Purchaser or such Depositor prior to such date: (i) the Seller and any Subservicer is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other securitization due to any act or failure to act of the Seller or any Subservicer; (ii) neither Seller nor any Subservicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; (iii) no material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Seller or any Subservicer as servicer has been disclosed or reported by the Seller or any Subservicer; (iv) no material changes to the Seller's or any Subservicer's, as applicable, policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreement for mortgage loans of a type similar to the Mortgage Loans have occurred during the three-year period immediately preceding the related Securitization Transaction; (v) there are no aspects of the Seller's or any Subservicer's financial condition that could have a material adverse effect on the performance by the Seller or any Subservicer of its servicing obligations under this Agreement or any Reconstitution Agreement; (vi) there are no material legal or governmental proceedings pending (or known to be contemplated) against the Seller, any Subservicer or any Third-Party Originator; and (vii) there are no affiliations, relationships or transactions relating to the Seller, any Subservicer or any Third-Party Originator with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AB; and

(p) Any Subservicer servicing the Mortgage Loans is an approved seller/servicer for the Agencies, in good standing with each such agency, and is a mortgagee approved by the Secretary of HUD pursuant to sections 203 and 211 of the National Housing Act. No event has occurred, including but not limited to, a change in insurance coverage, which would make any Subservicer unable to comply with Fannie Mae, Freddie Mac or HUD-eligibility requirements or which would require notification to the Agencies or HUD. Each Subservicer is a member of MERS in good standing, and is current in the payment of all fees and assessments imposed to such Subservicer by MERS and has complied in all respects with the rules and procedures of MERS.

**Section 3.2    Representations and Warranties Regarding Individual Mortgage Loans**. With respect to each Mortgage Loan in the related Mortgage Loan Package, the Seller represents and warrants to the Purchaser that as of each Closing Date:

(a)    The information set forth in the Mortgage Loan Schedule, the Transaction Documents, and in each Mortgage File is complete, true and correct;

(b)    All payments required under the terms of the Mortgage Note to be made on or prior to the Closing Date have been made; the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the Mortgaged Property subject to the Mortgage, directly or indirectly, for the payment of any amount required under the Mortgage Loan. With respect to any Mortgage Loan identified on the related Mortgage Loan

17

Schedule as a secured by a second lien or a subordinate lien, all payments required to be made by the Mortgagor upon any mortgage loan that is senior or equal in priority to such Mortgage Loan and which is secured by the same Mortgaged Property as such Mortgage Loan has been made. There has been no delinquency of thirty (30) days or more in any payment by the Mortgagor thereunder during the last twelve (12) months. None of the Mortgagors is deceased and no Mortgage Loan is subject to any pending litigation, foreclosure, bankruptcy, insolvency, or reorganization proceeding. Notwithstanding the foregoing, with respect to any Mortgage Loan for which the Monthly Payment with a Due Date in the month of the related Closing Date has not been made, the Purchaser has nonetheless agreed to purchase such Mortgage Loan, provided, however, that if such Monthly Payment is not received by the Purchaser, whether from the Mortgagor directly or forwarded by the Seller if the Mortgagor has submitted the payment to the Seller, within thirty (30) days of the related Due Date, the Seller shall be deemed to have breached this warranty and representation with respect to such Mortgage Loan and such breach shall further be deemed to materially and adversely affect the value of such Mortgage Loan and the Purchaser's interest therein, and the Seller shall, at the Purchaser's option and not later than five (5) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price notwithstanding anything contained herein to the contrary. Nothing contained in this Section 3.2(b) shall in any way limit any other rights of the Purchaser as provided hereunder;

(c)     There are no delinquent taxes, water charges, sewer rents, assessments, insurance premiums, leasehold payments, including, to the best of the Seller's knowledge, assessments payable in future installments, or other outstanding charges affecting the related Mortgaged Property;

(d)     The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which are in the Mortgage File and have been or will be recorded, if necessary to protect the interests of the Purchaser, and which have been delivered to the Purchaser, all in accordance with this Agreement. The substance of any such waiver, alteration or modification has been approved by the primary mortgage guaranty insurer, if any, and by the title insurer, to the extent required by the related policy, and its terms are reflected on the Mortgage Loan Schedule. No Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the primary mortgage insurer, if any, and title insurer, to the extent required by the policy, and which assumption agreement is part of the Mortgage File and the terms of which are reflected in the Mortgage Loan Schedule, if executed prior to the related Closing Date;

(e)     The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(f)     All buildings upon, or comprising part of, the Mortgaged Property are insured by an insurer acceptable to the Agencies against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located and in an amount that is the lesser of the outstanding principal balance of the Mortgage Loan (or, in the case of any Mortgage Loan that allows for negative amortization or is an ARM with a potential for negative amortization, the original principal amount of such Mortgage Loan, plus the maximum possible increase in such original principal amount due to negative amortization) and all Senior Mortgage Loans, if any, or the replacement cost of the Mortgaged Property, and such insurer is licensed to do business in the state where the Mortgaged Property is located. All such insurance policies (collectively, the "hazard insurance policy") contain a standard mortgagee clause naming the Seller, its successors and assigns as mortgagee and all premiums thereon have been paid. If upon origination of the Mortgage Loan, the Mortgaged Property was, or was subsequently deemed to be, in an area identified in the Federal Register by the Federal Emergency Management Agency as having

18

special flood hazards (and such flood insurance has been made available), which require under applicable law that a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration (or any successor thereto) be obtained, such flood insurance policy is in effect which policy conforms to the requirements of the Agencies. The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at Mortgagor's cost and expense and, on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at Mortgagor's cost and expense and to obtain reimbursement therefor from the Mortgagor. Each Mortgage Loan has in place a fully-paid life of loan flood certification from a Fannie Mae or Freddie Mac approved vendor, assigned in care of the Purchaser, which provides for notification to the Purchaser of changes in designated flood areas which would affect such Mortgage Loan;

(g)     Any and all requirements of any federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures including, without limitation, the Real Estate Settlement Procedures Act of 1974, as amended, consumer credit and privacy protection, predatory and abusive lending, equal credit opportunity or disclosure laws applicable to the Mortgage Loan have been complied with in all material respects;

(h)     The Mortgage has not been satisfied, canceled, subordinated, or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission;

(i)     The Mortgage is a valid, existing and enforceable first lien or second lien, as specified in the related Mortgage Loan Schedule, on the Mortgaged Property, including all improvements on the Mortgaged Property, if any, subject only to (a) the lien of current real property taxes and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording being acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and which do not adversely affect the Appraised Value (as defined in clause (i) of such definition) of the Mortgaged Property, (c) if a second lien, any first mortgage loan secured by the Mortgaged Property, and (d) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property. The Seller has full right to sell and assign the Mortgage to the Purchaser;

(j)     The Mortgage Note and the related Mortgage are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as the enforceability thereof may be limited by (i) bankruptcy, insolvency, liquidation, receivership, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights, or (ii) general principles of equity;

(k)     All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan transaction and to execute and deliver the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties;

(l)     The proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(m)     The Seller is the sole owner and holder of the Mortgage Loan and the related Servicing Rights and is the custodian of the related Escrow Account, if applicable. As of the related Closing Date, the Mortgage Loan is neither assigned nor pledged, and the Seller has good and

marketable title to each Mortgage Loan, and has full right to transfer and sell the Mortgage Loan to the Purchaser free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest and has full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign each Mortgage Loan to the Purchaser pursuant to the terms of this Agreement;

(n)    All parties which have had any interest in the Mortgage, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (a) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (b) (i) organized under the laws of such state, or (ii) qualified to do business in such state, or (iii) a federal savings and loan association or national bank having principal offices in such state, or (iv) not deemed to be doing business in such state under applicable law;

(o)    The Mortgage Loan is covered by an ALTA lender's title insurance policy acceptable to the Agencies, issued by a title insurer acceptable to the Agencies and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring (subject to the exceptions contained in (i)(a), (b) and (c) above) the Seller, its successors and assigns as to the first priority or second priority lien of the Mortgage, as applicable, in the original principal amount of the Mortgage Loan (or, in the case of any Mortgage Loan that allows for negative amortization or is an ARM with a potential for negative amortization, the original principal amount of such Mortgage Loan, plus the maximum possible increase in such original principal amount due to negative amortization) and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage Note and/or Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein. The Seller is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

(p)    There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration;

(q)    There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to or equal with, the lien of the related Mortgage;

(r)    All improvements which were considered in determining the Appraised Value (as defined in clause (i) of said definition) of the related Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property;

(s)    Each Mortgage Loan was originated by a savings and loan association, savings bank, commercial bank, credit union, insurance company, or mortgage banking company which is supervised and examined by a federal or state authority, or by a mortgage originator approved by the Secretary of Housing and Urban Development pursuant to Sections 2.03 and 2.11 of the National Housing Act;

(t)    The origination, servicing and collection practices with respect to each Mortgage Note and Mortgage including, without limitation, the establishment, maintenance and servicing of the Escrow Accounts and Escrow Payments, if any, since origination, have been

conducted in all respects in accordance with the terms of the Mortgage Note and in compliance with all applicable laws and regulations and, unless otherwise required by law or a Fannie Mae or Freddie Mac standard, in accordance with the proper, prudent and customary practices in the mortgage origination and servicing business. With respect to the Escrow Accounts and Escrow Payments, if any, all such payments are in the possession or under the control of the Seller and there exists no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. No escrow deposits or Escrow Payments or other charges or payments due the Seller have been capitalized under any Mortgage or the related Mortgage Note. All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal law and the terms of the related Mortgage Note. Any interest required to be paid pursuant to state and local law has been properly paid and credited;

(u)    The Mortgaged Property is free of material damage and waste and there is no proceeding pending for the total or partial condemnation thereof;

(v)    The Mortgage and related Mortgage Note contains customary and enforceable provisions to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security intended to be provided thereby, including, (a) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (b) otherwise by judicial foreclosure. There is no other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage. The Mortgagor has not notified the Seller and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Soldiers and Sailors Civil Relief Act of 1940;

(w)    The Mortgage Note is not and has not been secured by any collateral except the lien of the applicable Mortgage;

(x)    The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan application by an appraiser who meets the minimum requisite qualifications of the Agencies for appraisers, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to the Agencies, with such riders as are acceptable to the Agencies; such appraisal was conducted in compliance with all applicable laws and regulations and in accordance with the proper, prudent and customary practices in the appraisal business and represents the fair market value of the Mortgaged Property at the time of origination of the related Mortgage Loan;

(y)    In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(z)    No Mortgage Loan contains a permanent or temporary "buydown" provision;

(aa)    The Mortgagor has executed one or more statements to the effect that the Mortgagor has received all disclosure materials required by applicable law with respect to the making of the Mortgage Loan. The Seller shall maintain all such statements in the Mortgage File;

(bb)    No Mortgage Loan was made in connection with (a) the construction or rehabilitation of a Mortgaged Property or (b) facilitating the trade-in or exchange of a Mortgaged Property;

21

(cc)    If any Mortgage Loan is indicated in the Transaction Documents as having a Primary Mortgage Insurance Policy, such policy provides coverage in an amount at least equal to that which would be required by the Agencies if such Mortgage Loan was being delivered for sale to, and securitization by, each Agency.    In addition, and regardless if indicated in the Transaction Documents, each Mortgage Loan with either an LTV at origination or a current LTV (based on current market value and amortization) greater than eighty percent (80.00%) and will be subject to a Primary Mortgage Insurance Policy which provides coverage in an amount at least equal to that which would be required by the Agencies if such Mortgage Loan was being delivered for sale to, and securitization by, each Agency.    With respect to any Mortgage Loan which allows negative amortization, such Primary Mortgage Insurance Policy shall contain provisions to cover the potential negative amortization of such Mortgage Loan.  All provisions of any Primary Mortgage Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid.  Any Mortgage subject to any such Primary Mortgage Insurance Policy obligates the Mortgagor thereunder to maintain such insurance and to pay all premiums and charges in connection therewith.  The Mortgage Interest Rate for the Mortgage Loan is exclusive of any such insurance premium;

(dd)    The Mortgaged Property is lawfully occupied under applicable law and all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities;

(ee)    No action has been taken or failed to be taken, no event has occurred and no state of facts exists or has existed on or prior to the related Closing Date (whether or not known to the Seller on or prior to such date) which has resulted or will result in an exclusion from, denial of, or defense to coverage under any Primary Mortgage Insurance Policy (including, without limitation, any exclusions, denials or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured) whether arising out of actions, representations, errors, omissions, negligence or fraud of the Seller, the related Mortgagor or any party involved in the application for such coverage, including the appraisal, plans and specifications and other exhibits or documents submitted therewith to the insurer under such insurance policy, or for any other reason under such coverage, but not including the failure of such insurer to pay by reason of such insurer's breach of such insurance policy or such insurer's financial inability to pay;

(ff)    The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located, and with respect to any Mortgage Loan registered with the MERS® System, the Seller has complied in all respects with the rules and procedures of MERS in connection with the transfer to the Purchaser of the beneficial rights as registered by the MERS® System, as of the Closing Date of such Mortgage Loans;

(gg)    Any future advances made to the Mortgagor prior to the related Closing Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first lien or second lien priority, as applicable, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to the Agencies. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(hh)    If the Mortgaged Property is a condominium unit or a planned unit development, such condominium or planned unit development project meets the eligibility requirements of the Agencies;

22

(ii)    The Mortgage Note and Mortgage are on forms acceptable for sale and securitization to either of the Agencies;

(jj)    The Mortgaged Property is located in the state indicated on the Mortgage Loan Schedule, and consists of a single parcel of real property with a detached single family residence erected thereon, or an individual condominium unit in a structure of four stories or less ("Low Rise Condo"), or an individual condominium unit in a structure of more than four stories ("High Rise Condo") if located in a metropolitan where such structures are typical, or a 2-4 family dwelling or an individual unit in a planned unit development, and no Mortgaged Property is a mobile home, manufactured dwelling, cooperative housing unit, mixed use, commercial property, or condominium unit used as a hotel, subject to a time share agreement or similar arrangement;

(kk)    The Seller has no knowledge of any circumstances or conditions with respect to the Mortgage, the Mortgaged Property, the Mortgagor, the Mortgage File or the Mortgagor's credit standing that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value or marketability of the Mortgage Loan;

(ll)    The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder;

(mm)    The Seller has no knowledge of any circumstances existing that could reasonably be expected to adversely affect the value or the marketability of any Mortgaged Property or Mortgage Loan or to cause the Mortgage Loans to prepay during any period materially faster or slower than the mortgage loans of similar characteristics originated by the Seller generally;

(nn)    Each Mortgage Loan is covered by a valid and transferable tax service contract with Transamerica, or such other vendor as may be reasonably acceptable to the Purchaser, which may be assigned without the payment of any fee by the Purchaser;

(oo)    Each Mortgage Loan requires monthly payments sufficient to fully amortize the original principal balance of the Mortgage Loan over the original term of the Mortgage Loan as set forth in the related Mortgage Note and each monthly payment is due on the first day of each month. Unless indicated in the Mortgage Loan Schedule otherwise, no Mortgage Loan has negatively amortized nor shall any Mortgage Loan have any negative amortization after the related Closing Date and with respect to such Mortgage Loans identified on the related Mortgage Loan Schedule as having negative amortization excluding Pay Option ARM Mortgage Loans, the related Mortgage Note requires a Monthly Payment which is sufficient during the period following each Interest Adjustment Date, to fully amortize the outstanding principal balance as of the first day of the period over the then remaining term of such Mortgage Note and to pay interest at the related Mortgage Interest Rate. With respect to Pay Option ARM Mortgage Loans, the related Mortgage Note requires a Monthly Payment which is a minimum monthly payment, an interest-only payment, full principal and interest amortized over thirty (30) years, or full principal and interest amortized over fifteen (15) years, and in each case, such Monthly Payment is in accordance with the related Mortgage Note. With respect to any Pay Option ARM Mortgage Loan, as of any Interest Adjustment Date, the Mortgagor is and was provided with any and all disclosures and amortization schedules required by applicable law. No Pay Option ARM Mortgage Loan has an Updated LTV as of the Closing Date equal to or greater than 25%, and no Mortgage Loan or Mortgage Note allows for an Updated LTV equal to or greater than 25%. Except for any initial fixed term as indicated in the Mortgage Loan Schedule, the Mortgage Interest Rate for each Adjustable Rate Mortgage Loan adjusts annually in accordance with the related Mortgage Note. With respect to each Adjustable Rate Mortgage Loan, on each Interest Adjustment Date, the Mortgage Interest Rate shall be adjusted to equal the Index plus the Gross Margin (rounded up or down to the nearest 0.125%), subject to the Periodic Mortgage Interest Rate Cap and the Lifetime Mortgage Interest Rate Cap as set forth in the respective Mortgage Note and the Mortgage Loan Schedule. None of the Adjustable Rate Mortgage Loans contain a provision allowing the

23

Mortgagor to convert the Mortgage Note from an adjustable rate mortgage loan to a Fixed Rate Mortgage Loan. With respect to any Mortgage Loan which has been converted from an Adjustable Rate Mortgage Loan into a Fixed Rate Mortgage Loan, such conversion was done in strict accordance with the terms of the related Mortgage Note. Unless otherwise set forth on the related Mortgage Loan Schedule, no Mortgage Loan is a Balloon Mortgage Loan. The principal and interest due on each Mortgage Loan is calculated pursuant to the standard amortization (30/360 day interest accrual) method;

(pp)    Each Mortgage Loan conforms to, and at the time of origination was underwritten in accordance with, the credit underwriting guidelines as indicated in the Trade Confirmation and/or Purchase Confirmation;

(qq)    As of the related Closing Date, the Seller shall have received neither actual nor constructive notice that either a Mortgage Loan will be paid in full (whether by virtue of a demand statement or otherwise) or that any Mortgagor has elected to convert the related Convertible Mortgage Loan into a Fixed Rate Mortgage Loan in accordance with the terms of the related Mortgage Note;

(rr)    None of the Mortgage Loans are (a) subject to or in violation of the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), (b) classified as "high cost," "covered," "high risk home", "threshold," or "predatory" loans under any other applicable state, federal or local law, including any predatory or abusive lending laws (or similarly classified loans using different terminology under a law imposing heightened scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees) or (c) in violation of any state or local law or ordinance similar to HOEPA;

(ss)    No Mortgage Loan contains provisions pursuant to which Monthly Payments are (a) paid or partially paid with funds deposited in any separate account established by the Seller, the Mortgagor, or anyone on behalf of the Mortgagor or (b) paid by any source other than the Mortgagor or contains any other similar provisions which may constitute a "buydown" provision. The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature; none of the Mortgage Loans is currently subject to a completion escrow and with respect to each Mortgage Loan which was subject to a completion escrow, all appropriate forms were delivered and are contained in the Mortgage File, including, without limitation, Agency Form 442;

(tt)    Each Mortgage Loan which is an "equity loan" within the meaning of Section 50(a)(6), Article XVI of the Texas Constitution complies with all applicable Texas state laws and regulations;

(uu)    No error, omission, misrepresentation, identity theft, any incident or action which would give rise to a claim or alleged claim of identity theft, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Mortgagor, Seller or any other person, including, without limitation, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan; no predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the borrower to repay and the extension of credit which has no apparent benefit to the borrower, were employed in the origination of the Mortgage Loan;

(vv)    [Reserved];

(ww)    No Mortgage Loan which is a "home loan" as defined in the Georgia Fair Lending Act (the "Act") was originated, brokered, solicited, processed, placed, negotiated, or offered

on or after October 1, 2002 and prior to March 7, 2003, and no Mortgage Loan is a "high-cost home loan" as defined in the Act;

(xx)    No Mortgage Loan is a "high-cost home loan" as defined in i.) Part 41 of the General Regulations Banking Board of New York and Section 6-L of the New York State Banking Law, or ii.) Chapter 360.100 of the Kentucky Revised Statutes, or iii.) the New Jersey Home Ownership Security Act of 2002, or iv.) the Arkansas Home Loan Protection Act, or v.) the Utah High Cost Home Loan Act, or vi.) the Massachusetts Regulations (Mass. Regs. Code tit. 209, §§ 32.01 et. seq. and §§40.01 et. seq.);

(yy)    No Mortgage Loan is a "high cost home mortgage loan" as defined in the Massachusetts Predatory Home Loan Practices Act of 2004;

(zz)    Each Mortgage Loan constitutes a qualified mortgage under with Section 860G(a)(3)(A) of the Code and the REMIC Provisions;

(aaa)   There is no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue; there is no violation of any environmental law, rule or regulation with respect to the Mortgage Property; and nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property;

(bbb)   The Mortgaged Property is free of contamination from Hazardous Substances, and no amount of any Hazardous Substance has been disposed of or identified on, under or at the Mortgaged Property in violation of any federal, state or municipal law, regulation or standard, and at the time of origination, the Mortgage Loans satisfied the Fannie Mae guidelines regarding environmental hazards as set forth in Part XI, Chapter 3, Section 307 of the Fannie Mae Sellers' Guide;

(ccc)   None of the proceeds of the Mortgage Loan were used to finance single-premium credit insurance policies by the Seller;

(ddd)   With respect to each Mortgage Loan that has a prepayment penalty feature, each such prepayment penalty is enforceable and each prepayment penalty is permitted pursuant to federal, state and local law.  No Mortgage Loan will impose a prepayment penalty for a term in excess of five years from the date such Mortgage Loan was originated;

(eee)   The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "living trust" and such "living trust" is in compliance with Fannie Mae guidelines for such trusts.  Either the Mortgagor is a natural person or the related co-borrower or guarantor is a natural person;

(fff)   With respect to any ground lease to which a Mortgaged Property may be subject:  (A) the Mortgagor is the owner of a valid and subsisting leasehold interest under such ground lease; (B) such ground lease is in full force and effect, unmodified and not supplemented by any writing or otherwise; (C) all rent, additional rent and other charges reserved therein have been fully paid to the extent payable as of the related Closing Date; (D) the Mortgagor enjoys the quiet and peaceful possession of the leasehold estate; (E) the Mortgagor is not in default under any of the terms of such ground lease, and there are no circumstances which, with the passage of time or the giving of notice, or both, would result in a default under such ground lease; (F) the lessor under such ground lease is not in default under any of the terms or provisions of such ground lease on the part of the lessor to be observed or performed; (G) the lessor under such ground lease has satisfied any repair or construction obligations due as of the related Closing Date pursuant to the terms of such ground lease; (H) the execution, delivery and performance of the Mortgage do not require the consent (other than those consents which have been obtained and are in full force and effect) under, and will not contravene any provision of or cause a default under, such ground lease; (I) the term of such

lease does not terminate earlier than the maturity date of the Mortgage Note; (J) the ground lease term extends, or is automatically renewable, for at least five years beyond the maturity date of the related Mortgage Loan; (K) the Purchaser has the right to cure defaults on the ground lease; (L) the mortgagee is given at least thirty (30) days' notice of any default and an opportunity to cure the defaults under the ground lease or to take over the Mortgagor's rights under the ground lease; (M) the ground lease does not contain any default provisions that could give rise to forfeiture or termination of the ground lease except for the non-payment of the ground lease rents; and (N) the ground lease provides that the leasehold can be transferred, mortgaged and sublet an unlimited number of times either without restriction or on payment of a reasonable fee and delivery of reasonable documentation to the lessor;

(ggg)   As of the related Closing Date, the sale or transfer of the Mortgage Loan by the Seller complies with all applicable federal, state, and local laws, rules, and regulations governing such sale or transfer, including, without limitation, the Fair and Accurate Credit Transactions Act ("FACT Act") and the Fair Credit Reporting Act, each as may be amended from time to time, and the Seller has not received any actual or constructive notice of any identity theft, fraud, or other misrepresentation in connection with such Mortgage Loan or any party thereto;

(hhh)   Except as provided for in the related Transaction Documents, the CLTV for each Mortgage Loan was not, at the time of origination, and is not, on the Closing Date, in excess of ninety percent (90%);

(iii)    No Mortgage Loan has a FICO Score less than 620;

(jjj)    No Mortgage Loan is considered to be a "subprime" loan as determined or defined by the OCC or the FFIEC, and no Mortgagor is considered to be a "subprime" borrower as determined or defined by the OCC or the FFIEC;

(kkk)   No Mortgage Loan is subject to an escrow holdback arrangement;

(lll)    [Reserved];

(mmm)   Each insurance policy related to a Mortgage Loan and the Mortgaged Property including, but not limited to, primary mortgage insurance, flood insurance, hazard insurance, and title insurance is valid and remains in full force and effect, and each such policy was issued by an insurer acceptable to the Agencies and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring the Seller, its successors and assigns;

(nnn)   The Seller has complied with all applicable anti-money laundering laws and regulations, including, without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws; and

(ooo)   Each Mortgage Loan has an original Mortgage Note in the Mortgage File, and no Mortgage File contains a lost note affidavit in lieu thereof.

**Section 3.3     Remedies for Breach of Representations and Warranties**.  The representations and warranties set forth in <u>Sections 3.1</u> and <u>3.2</u> shall survive the sale of the Mortgage Loans to the Purchaser and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or

26

failure to examine any Mortgage File. Furthermore, the absence of the Seller in either the chain of title or endorsement shall in no way limit the Purchaser's recourse against the Seller as provided in this Section3.3 for a breach of one or more of the Seller's representations and warranties made herein.

Upon discovery by either the Seller or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value, the marketability or enforceability of one or more of the Mortgage Loans or the Purchaser's interest therein, the party discovering such breach shall give prompt written notice to the other. The Seller shall have a period of sixty (60) days from the earlier of the discovery of a breach by the Seller or the receipt by the Seller of notice of a breach within which to correct or cure such breach. If any such breach cannot be corrected or cured, as determined by the Purchaser, in its reasonable discretion, within such sixty (60) day period, the Seller shall, at the Purchaser's option and not later than sixty (60) days after its discovery or its receipt of notice of such breach, repurchase such Mortgage Loan at the Repurchase Price. In the event that a breach shall involve any representation or warranty set forth in Section 3.1 and such breach cannot be cured, within sixty (60) days of the earlier of either discovery by or notice to the Seller of such breach, all of the Mortgage Loans materially and adversely affected by such breach shall, at the Purchaser's option, be repurchased by the Seller at the Repurchase Price. Any repurchase of a Mortgage Loan(s) pursuant to the foregoing provisions of this Section 3.3 shall be accomplished by wire transfer of immediately available funds on the repurchase date to an account designated by the Purchaser.

At the time of repurchase, the Purchaser and the Seller shall arrange for the reassignment of the repurchased Mortgage Loan to the Seller and the delivery to the Seller of any documents held by the Purchaser or its custodian relating to such Mortgage Loan. The Seller shall, simultaneously with such reassignment, give written notice to the Purchaser that such repurchase has taken place.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Sections 3.1 or 3.2 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Seller to the Purchaser or by the Purchaser to the Seller, (ii) failure by the Seller to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Seller by the Purchaser for compliance with the relevant provisions of this Agreement.

**Section 3.4** **Indemnification of the Purchaser**. In addition to the repurchase obligations set forth in Section 3.3, the Seller shall defend and indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, judgments and any related costs including, without limitation, reasonable and necessary legal fees, resulting from any claim, demand, defense or liability based upon or arising out of originating, purchasing, receiving, processing, funding or servicing any Mortgage Loan, serviced by Seller or any Subservicer, or from any assertion based on, grounded upon or resulting from a breach or alleged breach of any of the Seller's representations and warranties contained in this Article III. Without limiting in any way the repurchase obligations of the Seller set forth in Section 3.3 and indemnification obligations of the Seller set forth in this Section 3.4, the Purchaser shall have the right to offset from any amount it owes or is otherwise required to pay to the Seller hereunder or under any other agreement with the Seller any amount that the Seller owes or is otherwise required to pay to the Purchaser hereunder or under any other agreement with the Purchaser. In addition to the obligations of the Seller set forth in this Article III, the Purchaser may pursue any and all remedies otherwise available at law or in equity, including, but not limited to, the right to seek damages.

**Section 3.5** **Prepayment and Conversion Protection**. In the event that any of the Mortgage Loans are (i) paid in full or (ii) converted to a Fixed Rate Mortgage Loan, in either case, within ninety (90) days of the related Closing Date, or (iii) subject to a breach of the representation set forth in Section 3.2(qq), the Seller shall, with respect to each such Mortgage Loan, pay to the Purchaser the product of (a) the positive difference, if any, between the Purchase Price Percentage

(subject to any adjustments as contemplated in the Transaction Documents) and 100%, times (b) the unpaid principal balance of such Mortgage Loan at the time such Mortgage Loan is paid in full or converted, as applicable (the "Premium Recapture Amount"). In the event any Mortgage Loan is paid in full after the related Cut-off Date and on or prior to the related Closing Date, the Seller shall, in addition to the Premium Recapture Amount, pay the Purchaser the accrued interest paid by the Purchaser for such Mortgage Loan. Nothing contained in this Section 3.5 shall in any way limit the rights of the Purchaser to all collections and recoveries of principal and interest received or applied to any Mortgagor's account and the Seller's obligation to remit such recoveries of principal and interest to the Purchaser as provided in Section 2.3. The rights conferred to the Purchaser under this Section 3.5 shall be in addition to those rights conferred to the Purchaser under Section 3.2(b), the Trade Confirmation and/or the Purchase Confirmation.

Section 3.6    Payment Default Protection.  If the first, second or third Monthly Payment with a Due Date subsequent to the Closing Date is not received by the Purchaser, whether from the Mortgagor directly or forwarded by the Seller if the Mortgagor has submitted the payment to the Seller, by the last day of the month in which such payment is due, the Seller shall, at the Purchaser's option and not later than five (5) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price.  The rights conferred to the Purchaser under this Section 3.6 shall be in addition to those rights conferred to the Purchaser under Section 3.2(b), the Trade Confirmation and/or the Purchase Confirmation.

Section 3.7    Post-Closing Appraisal Review.  Without in any way limiting or affecting any rights and remedies of the Purchaser, including, without limitation, the remedies accorded the Purchaser under Section 3.3 of this Agreement, the Purchaser shall have the right at its own expense, within thirty (30) days after the related Closing Date, or the date on which the appraisal in the Mortgage File relating to the Mortgaged Property is received by the Purchaser from the Seller, whichever is later, to obtain an appraisal, broker's price opinion, drive-by appraisal or any other comparable valuation measure with respect to any Mortgaged Property (collectively, the "Review Appraisal").  If the value of a Mortgaged Property, as determined by the Review Appraisal, is less than the value of the appraisal in the Mortgage File by (i) ten percent (10%) or more for a Mortgage Loan with an original LTV of less than or equal to eighty percent (80%) or (ii) five percent (5%) or more for a Mortgage Loan with an original LTV of greater than eighty percent (80%), the Purchaser may, at the Purchaser's sole option, notify the Seller of the variance by providing the Seller with a copy of the Review Appraisal.  Upon the Purchaser giving such notice of the variance to the Seller, the Seller shall repurchase the Mortgage Loan at the Repurchase Price not later than ten (10) Business Days after the Seller's receipt of such notice from the Purchaser.

Section 3.8    Post-Closing Examination of Mortgage Loans.  As may be indicated in the related Purchase Confirmation, the parties may agree that the Purchaser shall have the right, after the Closing Date, to review the Mortgage File (and such other documents) for each Mortgage Loan in a Mortgage Loan Package and, based on its review, request the Seller to repurchase any Mortgage Loan which the Purchaser, in its sole discretion, determines not to be in compliance with each of the representations and warranties contemplated in the Transaction Documents or which is otherwise unsatisfactory. With respect to any Mortgage Loan reviewed by the Purchaser on a post-closing basis which the Seller is obligated to repurchase from the Purchaser hereunder, the Seller shall, within five (5) Business Days of the Purchaser's request therefor, repurchase any such Mortgage Loan at the Repurchase Price.


## ARTICLE IV

### SERVICING OF THE MORTGAGE LOANS

Section 4.1    The Seller to Act as Servicer.  The Seller, as independent contract servicer, shall service and administer Mortgage Loans sold pursuant to this Agreement in strict accordance with all federal, state and local laws, the terms of this Agreement and, to the extent not

inconsistent herewith, the servicing standards of the Agencies, and the Seller shall have full power and authority, acting alone, to do or cause to be done any and all things in connection with such servicing and administration which the Seller may deem necessary or desirable and consistent with the terms of this Agreement.

Consistent with the terms of this Agreement, the Seller may waive, modify or vary any term of any Mortgage Loan or consent to the postponement of strict compliance with any such term or in any manner grant indulgence to any Mortgagor if in the Seller's reasonable and prudent determination such waiver, modification, postponement or indulgence is not materially adverse to the Purchaser; provided, however, that the Seller shall not permit any modification with respect to any Mortgage Loan that would decrease the Mortgage Interest Rate, defer or forgive the payment thereof or of any principal or interest payments, reduce or increase the outstanding principal amount (except for actual payments of principal or negative amortization as set forth in the related Mortgage Note), make future advances or extend the final maturity date on such Mortgage Loan without the Purchaser's consent. With the written consent of the Purchaser which shall not be unreasonably withheld, the Seller may permit forbearance or allow for suspension of Monthly Payments in either case for up to one hundred and eighty (180) days if the Mortgagor is in default or the Seller determines in its reasonable discretion that default is imminent and if the Seller determines that granting such forbearance or suspension is in the best interest of the Purchaser. In the event that any such modification, forbearance or suspension as permitted above allows the deferral of interest or principal payments on any Mortgage Loan, the Seller shall include in each remittance for any month in which any such principal or interest payment has been deferred (without giving effect to such modification, forbearance or suspension) an amount equal to, as the case may be, such month's principal and one (1) month's interest at the Mortgage Loan Remittance Rate on the then unpaid principal balance of the Mortgage Loan and shall be entitled to reimbursement for such advances only to the same extent as for Monthly Advances made pursuant to Section 5.3. Without limiting the generality of the foregoing, the Seller shall continue, and is hereby authorized and empowered to execute and deliver on behalf of itself, and the Purchaser, all instruments of satisfaction or cancellation; provided, however, the Seller shall obtain the Purchaser's prior written approval of any partial or full release, discharge and all other comparable instruments, with respect to the Mortgage Loans and with respect to the Mortgaged Property.      In  servicing  and administering the Mortgage Loans, except as otherwise specifically provided herein, the Seller shall employ procedures which are consistent with the Fannie Mae and Freddie Mac standards and guidelines, including collection procedures and providing HMDA data as required by the Agencies.

The Servicing File retained by the Seller pursuant to this Agreement shall be appropriately identified in the Seller's computer system to clearly reflect the sale of the Mortgage Loans to the Purchaser. The Seller shall release from its custody the contents of any Servicing File retained by it only in accordance with the terms of this Agreement.

**Section 4.2    Collection of Mortgage Loan Payments.** Continuously from the related Closing Date until the principal and interest on all Mortgage Loans is paid in full, the Seller will proceed diligently to collect all payments due under each Mortgage Loan when the same shall become due and payable and shall, to the extent such procedures shall be consistent with this Agreement and the terms and provisions of any related Primary Mortgage Insurance Policy, follow such collection procedures as it follows with respect to mortgage loans comparable to the Mortgage Loans and held for its own account.

**Section 4.3    Realization Upon Defaulted Mortgage Loans.** The Seller shall use commercially reasonable efforts, consistent with the procedures that the Seller would use in servicing loans for its own account, to foreclose upon or otherwise comparably convert the ownership of properties securing such of the Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments pursuant to Section 4.1. In determining the delinquency status of any Mortgage Loan, the Seller will use delinquency recognition policies as described to and approved by the Purchaser, in its reasonable discretion, and shall revise these policies as reasonably requested by the Purchaser from time to time in order to comply with Regulation AB. The Seller shall use commercially reasonable efforts to realize

upon defaulted Mortgage Loans in such manner as will maximize the receipt of principal and interest by the Purchaser, taking into account, among other things, the timing of foreclosure proceedings. It is understood and agreed that the Purchaser may provide the Seller with instructions in connection with any foreclosure proceedings which the Seller shall follow.  The foregoing is subject to the provisions that, in any case in which Mortgaged Property shall have suffered damage, the Seller shall not be required to expend its own funds toward the restoration of such property unless it shall determine in its discretion (i) that such restoration will increase the proceeds of liquidation of the related Mortgage Loan to the Purchaser after reimbursement to itself for such expenses, and (ii) that such expenses will be recoverable by the Seller through Primary Mortgage Insurance Proceeds, Other Insurance Proceeds or Liquidation Proceeds from the related Mortgaged Property, as contemplated in <u>Section 4.5</u>.  The Seller shall notify the Purchaser in writing of the commencement of foreclosure proceedings.  Such notice may be contained in the reports prepared by the Seller and delivered to Purchaser pursuant to the terms and conditions of this Agreement.  In such connection, the Seller shall be responsible for all costs and expenses incurred by it in any such proceedings; provided, however, that it shall be entitled to reimbursement thereof from the related Mortgaged Property, as contemplated in <u>Section 4.5</u>. Notwithstanding the foregoing, the Seller shall obtain the prior written approval of the Purchaser prior to foreclosing on the property at a loss to the Purchaser.

**Section 4.4    <u>Establishment of Custodial Accounts; Deposits in Custodial Accounts</u>**.  The Seller shall segregate and hold all funds collected and received pursuant to each Mortgage Loan separate and apart from any of its own funds and general assets and shall establish and maintain one (1) or more Custodial Accounts, in the form of time deposit or demand accounts which accounts shall be Eligible Accounts.  Written evidence of the creation of such Custodial Account(s) shall be provided to the Purchaser by the Seller upon the request of the Purchaser.

The Seller shall deposit in the Custodial Account on a daily basis, and retain therein the following payments and collections due after the related Cut-off Date:

(i)  all payments on account of principal, including Principal Prepayments, on the Mortgage Loans;

(ii)  all payments on account of interest on the Mortgage Loans adjusted to the Mortgage Loan Remittance Rate;

(iii)  all proceeds from a Cash Liquidation;

(iv)  all Primary Mortgage Insurance Proceeds and Other Insurance Proceeds including amounts required to be deposited pursuant to <u>Sections 4.8, 4.10 and 4.11</u>, other than proceeds to be held in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or released to the Mortgagor in accordance with the Seller's normal servicing procedures, the loan documents or applicable law;

(v)  all Condemnation Proceeds affecting any Mortgaged Property which are not released to the Mortgagor in accordance with the Seller's normal servicing procedures, the loan documents or applicable law;

(vi)  any Monthly Advances;

(vii)  all proceeds of any Mortgage Loan repurchased in accordance with <u>Sections 3.3 and 3.4</u>;

(viii) any amounts required to be deposited by the Seller pursuant to <u>Section 4.10</u> in connection with the deductible clause in any blanket hazard insurance policy such deposit shall be made from the Seller's own funds, without reimbursement therefor;

(ix)  the Prepayment Interest Shortfall Amount, if any, for the month of distribution, such

deposit shall be made from the Seller's own funds, without reimbursement therefor;

(x) any amounts required to be deposited by the Seller in connection with any REO Property pursuant to Section 4.13; and

(xi) any other amounts required to be deposited in the Custodial Account pursuant to this Article IV.

The foregoing requirements for deposit in the Custodial Account are exclusive, it being understood and agreed that, without limiting the generality of the foregoing, payments in the nature of late payment charges and assumption fees, to the extent permitted by Section 4.16, need not be deposited by the Seller in the Custodial Account. Any interest paid on funds deposited in the Custodial Account by the depository institution shall accrue to the benefit of the Seller and the Seller shall be entitled to retain and withdraw such interest from the Custodial Account pursuant to Section 4.5(iii).

Section 4.5    Permitted Withdrawals From the Custodial Account. The Seller may, from time to time, withdraw from the Custodial Account for the following purposes:

(i) to make payments to the Purchaser in the amounts and in the manner provided for in Section 5.1;

(ii) to reimburse itself for Monthly Advances, the Seller's right to reimburse itself pursuant to this subclause (ii) being limited to amounts received on the related Mortgage Loan (or to amounts received on the Mortgage Loans as a whole in the event that said Monthly Advance is made due to a shortfall in a Monthly Payment made by a Mortgagor entitled to relief under the Soldiers' and Sailors' Civil Relief Act of 1940) which represent Late Collections (net of the related Servicing Fees) respecting which any such advance was made it being understood that, in the case of such reimbursement, the Seller's right thereto shall be prior to the rights of the Purchaser, except that, where the Seller is required to repurchase a Mortgage Loan, pursuant to Section 3.3 and 3.4, the Seller's right to such reimbursement shall be subsequent to the payment to the Purchaser of the repurchase price pursuant to such section and all other amounts required to be paid to the Purchaser with respect to such Mortgage Loans; provided that, the Seller may reimburse itself from any funds in the Custodial Account for Monthly Advances which it has determined are nonrecoverable advances or if all funds with respect to the related Mortgage Loan have previously been remitted to the Purchaser;

(iii) to reimburse itself for unreimbursed Servicing Advances and any unpaid Servicing Fees, the Seller's right to reimburse itself pursuant to this subclause (iii) with respect to any Mortgage Loan being limited to related proceeds (or to amounts received on the Mortgage Loans only in the event that said Monthly Advance is made due to a shortfall in a Monthly Payment made by a Mortgagor entitled to relief under the Soldiers' and Sailors' Civil Relief Act of 1940) from Cash Liquidation, Liquidation Proceeds, Condemnation Proceeds, Primary Mortgage Insurance Proceeds and Other Insurance Proceeds; provided that the Seller may reimburse itself from any funds in the Custodial Account for Servicing Advances and Servicing Fees if all funds with respect to the related Mortgage Loan have previously been remitted to the Purchaser;

(iv) to pay to itself as servicing compensation (a) any interest earned on funds in the Custodial Account (all such interest to be withdrawn monthly not later than each Remittance Date), and (b) the Servicing Fees from that portion of any payment or recovery as to interest with respect to a particular Mortgage Loan;

(v) to pay to itself with respect to each Mortgage Loan that has been repurchased pursuant to Section 3.3 all amounts received thereon and not distributed as of the date on which the related repurchase price is determined;

(vi) to clear and terminate the Custodial Account upon the termination of this Agreement; and

(vii) to reimburse itself for any amounts deposited in the Custodial Account in error.

**Section 4.6    Establishment of Escrow Accounts; Deposits in Escrow Accounts.**  The Seller shall segregate and hold all funds collected and received pursuant to each Mortgage Loan which constitute Escrow Payments separate and apart from any of its own funds and general assets and shall establish and maintain one (1) or more Escrow Accounts which accounts shall be Eligible Accounts, in the form of time deposit or demand accounts.  Written evidence of the creation of such Escrow Account(s) shall be provided to the Purchaser by the Seller upon the request of the Purchaser.

The Seller shall deposit in the Escrow Account or Accounts on a daily basis, and retain therein, (i) all Escrow Payments collected on account of the Mortgage Loans, for the purpose of effecting timely payment of any such items as required under the terms of this Agreement, and (ii) all Other Insurance Proceeds which are to be applied to the restoration or repair of any Mortgaged Property.  The Seller shall make withdrawals therefrom only to effect such payments as are required under this Agreement, and for such other purposes in accordance with Section 4.8.  The Seller shall be entitled to retain any interest paid on funds deposited in the Escrow Account by the depository institution other than interest on escrowed funds required by law to be paid to the Mortgagor and, to the extent required by law, the Seller shall pay interest on escrowed funds to the Mortgagor notwithstanding that the Escrow Account is non-interest bearing or that interest paid thereon is insufficient for such purposes, and such interest amounts shall be non-reimbursable to the Seller.

**Section 4.7    Permitted Withdrawals From Escrow Account.**  Withdrawals from the Escrow Account may be made by the Seller (i) to effect timely payments of ground rents, taxes, assessments, water rates, mortgage insurance premiums, Primary Mortgage Insurance Policy premiums, if applicable, and comparable items, (ii) to reimburse the Seller for any Servicing Advance made by the Seller with respect to a related Mortgage Loan but only from amounts received on the related Mortgage Loan which represent late payments or collections of Escrow Payments thereunder, (iii) to refund to the Mortgagor any funds as may be determined to be overages, (iv) for transfer to the Custodial Account in accordance with the terms of this Agreement, (v) for application to restoration or repair of the Mortgaged Property, (vi) to pay to the Seller, or to the Mortgagors to the extent required by law, any interest paid on the funds deposited in the Escrow Account, (vii) to reimburse itself for any amounts deposited in the Escrow Account in error, or (viii) to clear and terminate the Escrow Account on the termination of this Agreement.

**Section 4.8    Payment of Taxes, Insurance and Other Charges; Maintenance of Pool Insurance Certificate and Primary Mortgage Insurance Policies; Collections Thereunder.**  With respect to each Mortgage Loan, the Seller shall maintain accurate records reflecting the status of ground rents, taxes, assessments, water rates and other charges which are or may become a lien upon the Mortgaged Property and the status of primary mortgage insurance premiums and fire and hazard insurance coverage and shall obtain, from time to time, all bills for the payment of such charges, including renewal premiums and shall effect payment thereof prior to the applicable penalty or termination date and at a time appropriate for securing maximum discounts allowable, employing for such purpose deposits of the Mortgagor in the Escrow Account which shall have been estimated and accumulated by the Seller in amounts sufficient for such purposes, as allowed under the terms of the Mortgage or applicable law.  To the extent that the Mortgage does not provide for Escrow Payments, the Seller shall determine that any such payments are made by the Mortgagor at the time they first become due or within applicable grace periods.  The Seller shall follow customary servicing procedures to ensure the protection of the lien position of the Mortgage.  The Seller assumes full responsibility for the timely payment of all such bills and shall effect timely payments of all such bills irrespective of the Mortgagor's faithful performance in the payment of the same or the making of Escrow Payments and shall make advances from its own funds to effect such payments.

The Seller will maintain in full force and effect, a Primary Mortgage Insurance Policy conforming in all respects to the description set forth in Section 3.2(cc), issued by an insurer described

in that Section, with respect to each Mortgage Loan for which such coverage is herein required. Such coverage will be maintained until the Loan-to-Value Ratio or the Updated Loan-to-Value Ratio of the related Mortgage Loan is reduced to 80% or less in the case of a Mortgage Loan having a Loan-to-Value Ratio at origination in excess of 80%. The Seller will not cancel or refuse to renew any Primary Mortgage Insurance Policy in effect on the related Closing Date that is required to be kept in force under this Agreement unless a replacement Primary Mortgage Insurance Policy for such cancelled or nonrenewed policy is obtained from and maintained with an insurer that is Fannie Mae or Freddie Mac approved. The Seller shall not take any action which would result in non-coverage under any applicable Primary Mortgage Insurance Policy of any loss which, but for the actions of the Seller would have been covered thereunder. In connection with any assumption or substitution agreement entered into or to be entered into pursuant to Section 4.16, the Seller shall promptly notify the insurer under the related Primary Mortgage Insurance Policy, if any, of such assumption or substitution of liability in accordance with the terms of such policy and shall take all actions which may be required by such insurer as a condition to the continuation of coverage under the Primary Mortgage Insurance Policy. If such Primary Mortgage Insurance Policy is terminated as a result of such assumption or substitution of liability, the Seller shall obtain a replacement Primary Mortgage Insurance Policy as provided above.

No mortgage pool insurance policy is in effect as of the related Closing Date and the Seller shall not be required to take into consideration the existence of any such policy for the purposes of performing its servicing obligations hereunder, notwithstanding anything else contained in this Agreement to the contrary. If the Purchaser shall at any time after the related Closing Date notify the Seller in writing of its desire to obtain any such pool policy, the Purchaser and the Seller shall thereafter negotiate in good faith for the procurement and servicing of such policy.

**Section 4.9    Transfer of Accounts.** The Seller may transfer the Custodial Account or the Escrow Account to a different depository institution from time to time provided that such Custodial Account and Escrow Account shall at all times be Eligible Accounts. The Seller shall promptly provide notification of any such transfer to the Purchaser and the Master Servicer.

**Section 4.10    Maintenance of Hazard Insurance.** The Seller shall cause to be maintained for each Mortgage Loan fire and hazard insurance with extended coverage as is customary in the area where the Mortgaged Property is located in an amount which is equal to the greater of (i) the maximum insurable value of the improvements securing such Mortgage Loan or (ii) the unpaid principal balance of the Mortgage Loan, and in any event, in an amount such that the proceeds thereof shall be sufficient to prevent the Mortgagor and/or the Mortgagee from becoming a co-insurer. If the Mortgaged Property is in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards and such flood insurance has been made available, the Seller will cause to be maintained a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration (or any successor thereto) with a generally acceptable insurance carrier, in an amount representing coverage not less than the least of (i) the unpaid principal balance of the Mortgage Loan, (ii) the maximum insurable value of the improvements securing such Mortgage Loan or (iii) the maximum amount of insurance which is available under the Flood Disaster Protection Act of 1973, as amended. The Seller shall also maintain on the REO Property, fire and hazard insurance with extended coverage in an amount which is at least equal to the maximum insurable value of the improvements which are a part of such property, liability insurance and, to the extent required and available under the Flood Disaster Protection Act of 1973, as amended, flood insurance in an amount as provided above. Any amounts collected by the Seller under any such policies other than amounts to be deposited in the Escrow Account and applied to the restoration or repair of the Mortgaged Property or REO Property, or released to the Mortgagor in accordance with the Seller's normal servicing procedures, shall be deposited in the Custodial Account, subject to withdrawal pursuant to Section 4.5. It is understood and agreed that no earthquake or other additional insurance need be required by the Seller or the Mortgagor or maintained on property acquired in respect of the Mortgage Loan, other than pursuant to such applicable laws and regulations as shall at any time be in force and as shall require such additional insurance. All such policies shall be endorsed with standard mortgagee clauses with loss payable to the Seller and shall provide for at least thirty days prior written notice of any cancellation, reduction in the amount or material change in coverage to the Seller. The Seller shall not interfere with

33

the Mortgagor's freedom of choice in selecting either his insurance carrier or agent, provided, however, that the Seller shall not accept any such insurance policies from insurance companies unless such companies are acceptable to Fannie Mae or Freddie Mac and are licensed to do business in the state wherein the property subject to the policy is located.

Section 4.11    Maintenance of Mortgage Impairment Insurance Policy.  In the event that the Seller shall obtain and maintain a blanket policy issued by an issuer that has an A.M. Best rating of A:V or better insuring against hazard losses on all of the Mortgage Loans, then, to the extent such policy provides coverage in an amount equal to the amount required pursuant to Section 4.10 and otherwise complies with all other requirements of Section 4.10, it shall conclusively be deemed to have satisfied its obligations as set forth in Section 4.10, it being understood and agreed that such policy may contain a deductible clause, in which case the Seller shall, in the event that there shall not have been maintained on the related Mortgaged Property or REO Property a policy complying with Section 4.10, and there shall have been a loss which would have been covered by such policy, deposit in the Custodial Account the amount not otherwise payable under the blanket policy because of such deductible clause.  In connection with its activities as servicer of the Mortgage Loans, the Seller agrees to prepare and present, on behalf of the Purchaser, claims under any such blanket policy in a timely fashion in accordance with the terms of such policy.  Upon request of the Purchaser, the Seller shall cause to be delivered to the Purchaser a certified true copy of such policy and shall use its best efforts to obtain a statement from the insurer thereunder that such policy shall in no event be terminated or materially modified without thirty (30) days' prior written notice to the Purchaser.

Section 4.12    Fidelity Bond; Errors and Omissions Insurance.  The Seller shall maintain, at its own expense, a blanket Fidelity Bond and an errors and omissions insurance policy, with broad coverage provided by an insurer rated A or better by A.M. Best on all officers, employees or other persons acting in any capacity with regard to the Mortgage Loan in handling funds, money, documents and papers relating to the Mortgage Loan.  The Fidelity Bond and errors and omissions insurance shall be in the form of the Banker's Blanket Bond and shall protect and insure the Seller against losses, including forgery, theft, embezzlement, fraud, errors and omissions and negligent acts of such persons.  Such Fidelity Bond shall also protect and insure the Seller against losses in connection with the failure to maintain any insurance policies required pursuant to this Agreement and the release or satisfaction of a Mortgage Loan without having obtained payment in full of the indebtedness secured thereby.  No provision of this Section 4.12 requiring the Fidelity Bond and errors and omissions insurance shall diminish or relieve the Seller from its duties and obligations as set forth in this Agreement.  The minimum coverage under any such Fidelity Bond and insurance policy shall be at least equal to the corresponding amounts acceptable to Fannie Mae or Freddie Mac.  Upon request of the Purchaser, the Seller shall cause to be delivered to the Purchaser a certificate of insurance of the Fidelity Bond and insurance policy and shall use its best efforts to obtain a statement from the surety and the insurer that such Fidelity Bond or insurance policy shall in no event be terminated or materially modified without thirty (30) days' prior written notice to the Purchaser.   The Seller shall notify the Purchaser within five (5) business days of receipt of notice that such Fidelity Bond or insurance policy will be, or has been, materially modified or terminated.

Section 4.13    Title, Management and Disposition of REO Property.  In the event that title to the Mortgaged Property is acquired in foreclosure or by deed in lieu of foreclosure, the deed or certificate of sale shall be taken in the name of the Person (which may be the Seller for the benefit of Purchaser) designated by Purchaser, or in the event such Person is not authorized or permitted to hold title to real property in the state where the REO Property is located, or would be adversely affected under the "doing business" or tax laws of such state by so holding title, the deed or certificate of sale shall be taken in the name of such Person or Persons as shall be consistent with an Opinion of Counsel obtained by the Seller from an attorney duly licensed to practice law in the state where the REO Property is located.  Any Person or Persons holding such title (other than Purchaser) shall acknowledge in writing that such title is being held as nominee for the benefit of Purchaser.

The Seller shall, manage, conserve, protect and operate each REO Property solely for the purpose of its prompt disposition and sale.  The Seller shall either itself, or through an agent

34

selected by the Seller, manage, conserve, protect and operate the REO Property in accordance with Customary Servicing Procedures. The Seller shall cause each REO Property to be inspected promptly upon the acquisition of title thereto and shall cause each REO Property to be inspected at least quarterly thereafter or more frequently as required by the circumstances. The Seller shall make or cause to be made a written report of each such inspection. Such reports shall be retained in the Servicing File and copies thereof shall be forwarded by the Seller to Purchaser within five (5) days of Purchaser's request therefor. The Seller shall attempt to sell the same (and may temporarily rent the same) on such terms and conditions as the Seller deems to be in the best interest of Purchaser. With respect to each REO Property, the Seller shall segregate and hold all funds collected and received in connection with the operation of the REO Property separate and apart from its own funds or general assets and shall establish and maintain an REO Account for the REO Properties in the form of a non-interest bearing demand account which shall be an Eligible Account, unless an Opinion of Counsel is obtained by the Seller to the effect that the classification as a grantor trust for federal income tax purposes of the arrangement under which the Mortgage Loans and the REO Properties is held will not be adversely affected by holding such funds in another manner. The Seller shall deposit or cause to be deposited, on a daily basis in the REO Account all revenues received with respect to the REO Properties and shall withdraw therefrom funds necessary for the proper operation, management and maintenance of the REO Properties, including the cost of maintaining any hazard insurance pursuant to Section 4.10 hereof and the fees of any managing agent acting on behalf of the Seller. The Seller shall not be entitled to retain interest paid or other earnings, if any, on funds deposited in the REO Account. On or before each Determination Date, the Seller shall withdraw from the REO Account and deposit into the Custodial Account the net income from the REO Properties on deposit in the REO Account. Purchaser shall, at its option, upon notice to the Seller, have the right to market any REO Property.

The Seller shall use its best efforts to dispose of the REO Property as soon as possible and shall sell such REO Property in any event within one (1) year after title to such REO Property has been obtained, unless the Seller determines, and gives an appropriate notice to Purchaser, that a longer period is necessary for the orderly liquidation of such REO Property. If a period longer than one (1) year is permitted under this Agreement and is necessary to sell any REO Property, the Seller shall report monthly to Purchaser as to the progress being made in selling such REO Property. In any event, however, the Seller shall dispose of any REO Property acquired before the end of the third (3rd) calendar year following the calendar year in which the related REO Property was acquired, unless such requirement is waived by Purchaser.

Each REO Disposition shall be carried out by the Seller at such price and upon such terms and conditions as the Seller deems to be in the best interest of the Purchaser; provided, however, the Seller shall not dispose of an REO Property at a loss to the Purchaser without the prior written consent of the Purchaser. If, as of the date title to any REO Property was acquired by the Seller, there were outstanding unreimbursed Servicing Advances, Monthly Advances or Servicing Fees with respect to the REO Property or the related Mortgage Loan, the Seller, upon an REO Disposition of such REO Property, shall be entitled to reimbursement for any related unreimbursed Servicing Advances, Monthly Advances and Servicing Fees from proceeds received in connection with such REO Disposition. The proceeds from the REO Disposition, net of any payment to the Seller as provided above, shall be deposited in the REO Account and shall be transferred to the Custodial Account on the Determination Date in the month following receipt thereof for distribution on the succeeding Remittance Date in accordance with Section 5.1.

The Seller shall prepare and file all reports in accordance with, and as required by, the Code.

**Section 4.14    Notification of Adjustments**. With respect to each Mortgage Loan that is an adjustable rate mortgage loan, Seller shall adjust the Mortgage Interest Rate on the related Interest Adjustment Date and shall adjust the Monthly Payment on the related Payment Adjustment Date in compliance with the requirements of applicable law and the related Mortgage and Mortgage Note. If, pursuant to the terms of the Mortgage Note, another index is selected for determining the Mortgage Interest Rate because the original index is no longer available, the same index will be used

with respect to each Mortgage Note which requires a new index to be selected, provided that such selection does not conflict with the terms of the related Mortgage Note. Seller shall execute and deliver any and all necessary notices required under applicable law and the terms of the related Mortgage Note and Mortgage regarding the Mortgage Interest Rate and the Monthly Payment adjustments. Seller shall promptly upon written request thereof, deliver to the Purchaser such notifications and any additional applicable data regarding such adjustments and the methods used to calculate and implement such adjustments. Upon the discovery by Seller or the Purchaser that Seller has failed to adjust a Mortgage Interest Rate or a Monthly Payment pursuant to the terms of the related Mortgage Note and Mortgage, Seller shall immediately deposit in the Custodial Account from its own funds the amount of any interest loss caused the Purchaser thereby without reimbursement therefor.

### Section 4.15    [Intentionally Left Blank]

### Section 4.16    Assumption Agreements.  The Seller will, to the extent it has knowledge of any conveyance or prospective conveyance by any Mortgagor of the Mortgaged Property (whether by absolute conveyance or by contract of sale, and whether or not the Mortgagor remains or is to remain liable under the Mortgage Note and/or the Mortgage), exercise its rights to accelerate the maturity of such Mortgage Loan under any "due-on-sale" clause to the extent permitted by law; provided, however, that the Seller shall not exercise any such rights if (i) the Purchaser has consented in writing to such conveyance or prospective conveyance, (ii) the Seller is prohibited by law or the terms of the Mortgage Note from doing so, or (iii) if the Seller's exercise of such rights would impair or threaten to impair any recovery under the related Primary Mortgage Insurance Policy, if any.  If the Seller reasonably believes it is unable under applicable law to enforce such "due-on-sale" clause, the Seller will enter into an assumption agreement with the Person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed, pursuant to which such Person becomes liable under the Mortgage Note and, to the extent permitted by applicable state law, the Mortgagor remains liable thereon.  Where an assumption is allowed pursuant to this Section 4.16, the Seller, with the prior written consent of the Purchaser and the primary mortgage insurer, if any, is authorized to enter into a substitution of liability agreement with the person to whom the Mortgaged Property has been conveyed or is proposed to be conveyed pursuant to which the original Mortgagor is released from liability and such person is substituted as Mortgagor and becomes liable under the related Mortgage Note.  Any such substitution of liability agreement shall be in lieu of an assumption agreement.

In connection with any such assumption or substitution of liability, the Seller shall follow the underwriting practices and procedures employed by the Seller for mortgage loans serviced by the Seller for its own account.  With respect to an assumption or substitution of liability, the Mortgage Interest Rate borne by the related Mortgage Note, the term of the Mortgage Loan and the outstanding principal amount of the Mortgage Loan shall not be changed.  The Seller shall notify the Purchaser that any such substitution of liability or assumption agreement has been completed by forwarding to the Purchaser or its designee the original of any such substitution of liability or assumption agreement, which document shall be added to the related Mortgage File and shall, for all purposes, be considered a part of such Mortgage File to the same extent as all other documents and instruments constituting a part thereof.

Notwithstanding the foregoing paragraphs of this Section or any other provision of this Agreement, the Seller shall not be deemed to be in default, breach or any other violation of its obligations hereunder by reason of any assumption of a Mortgage Loan by operation of law or any assumption which the Seller may be restricted by law from preventing, for any reason whatsoever.  For purposes of this Section 4.16, the term "assumption" is deemed to also include a sale of the Mortgaged Property subject to the Mortgage that is not accompanied by an assumption or substitution of liability agreement.

### Section 4.17    Satisfaction of Mortgages and Release of Mortgage Files.  Upon the payment in full of any Mortgage Loan, the Seller will immediately notify the Purchaser or Custodian, as the case may be, which notice shall include a statement to the effect that all amounts received in

connection with such payment are deposited in the Custodial Account pursuant to Section 4.4 and shall request delivery to it of the portion of the Mortgage File held by the Purchaser.  Upon receipt of such notice and request, the Purchaser or its designee shall within five (5) Business Days release or cause to be released the related Mortgage Loan Documents to the Seller and the Seller shall prepare and process any satisfaction or release.    No expense incurred in connection with any instrument of satisfaction or deed of reconveyance shall be chargeable to the Custodial Account.

In the event the Seller satisfies or releases a Mortgage without having obtained payment in full of the indebtedness secured by the Mortgage or should it otherwise prejudice any right the Purchaser may have under the mortgage instruments, the Seller, upon written demand, shall remit to the Purchaser the then unpaid principal balance of the related Mortgage Loan by deposit thereof in the Custodial Account. The Seller shall maintain the Fidelity Bond insuring the Seller against any loss it may sustain with respect to any Mortgage Loan not satisfied in accordance with the procedures set forth herein.

From time to time and as appropriate for the service or foreclosure of a Mortgage Loan, including for the purpose of collection under any Primary Mortgage Insurance Policy, the Purchaser shall, upon request of the Seller and delivery to the Purchaser or Purchaser's designee of a servicing receipt signed by a Servicing Officer, release or cause to be released the portion of the Mortgage File held by the Purchaser or its designee to the Seller. Such servicing receipt shall obligate the Seller to return the related Mortgage documents to the Purchaser when the need therefor by the Seller no longer exists, unless the Mortgage Loan has been liquidated and the Liquidation Proceeds relating to the Mortgage Loan have been deposited in the Custodial Account or the Mortgage File or such document has been delivered to an attorney, or to a public trustee or other public official as required by law, for purposes of initiating or pursuing legal action or other proceedings for the foreclosure of the Mortgaged Property either judicially or non-judicially.  Upon receipt of notice from the Seller stating that such Mortgage Loan was liquidated, the servicing receipt shall be released by the Purchaser to the Seller.

**Section 4.18    Servicing Compensation**.    As compensation for its services hereunder, the Seller shall be entitled to withdraw from the Custodial Account or to retain from interest payments on the Mortgage Loans the amounts provided for as the Seller's Servicing Fees.  Additional servicing compensation in the form of assumption fees, as provided in Section 4.16, and late payment charges or otherwise shall be retained by the Seller to the extent not required to be deposited in the Custodial Account.  The Seller shall be required to pay all expenses incurred by it in connection with its servicing activities hereunder and shall not be entitled to reimbursement therefor except as specifically provided for.

**Section 4.19    Whole Loan Transfers or Pass-Through Transfers**.    The Seller and the Purchaser agree that with respect to some or all of the Mortgage Loans, the Purchaser may effect either one or more Whole Loan Transfers, and/or one or more Pass-Through Transfers.

(a)    With respect to each Whole Loan Transfer entered into by the Purchaser, the Seller agrees:

(i)    to cooperate reasonably with the Purchaser and any prospective purchaser with respect to all reasonable requests;

(ii) to execute, at the Purchaser's reasonable discretion, an assignment, assumption and recognition agreement in such form as is mutually agreed upon by the Purchaser, the Seller and the successor purchaser of some or all of the Mortgage Loans, pursuant to which the Seller shall recognize the successor purchaser as the owner of the Mortgage Loans and covenant to service the Mortgage Loans on behalf of the successor purchaser in accordance with the terms and conditions of this Agreement, and which such Mortgage Loans will be assigned to the successor purchaser subject to the representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans and itself; and

(iii) to restate on the Reconstitution Date, (a) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Seller itself, (b) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans if the Reconstitution Date occurs within ninety (90) days of the applicable Closing Date, and (c) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans as of the related Closing Date if the Reconstitution Date occurs ninety (90) days after such Closing Date.

(b)    The Purchaser and the Seller agree that in connection with the completion of a Pass-Through Transfer, the Seller shall:

(i)    provide the Purchaser with a certificate of a duly appointed officer of Seller that restates as of the Reconstitution Date (a) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Seller itself, (b) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans if the Reconstitution Date occurs within ninety (90) days of the applicable Closing Date, (c) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans as of the related Closing Date if the Reconstitution Date occurs ninety (90) days after such Closing Date, and (d) together with any additional representations and warranties which may be reasonably required to be made by it in connection with the Pass-Through Transfer;

(ii)  if the Seller is required to be a party to any of the Reconstitution Agreements, execute any Reconstitution Agreement in such form as is mutually agreed to by the Purchaser and the Seller, within a reasonable period of time, but in no event shall such time exceed ten (10) Business Days after mutual agreement between the Purchaser and the Seller as to the terms thereof;

(iii) provide to any master servicer or trustee, as applicable, and/or the Purchaser any and all publicly available information and appropriate verification of information which may be reasonably available to the Seller, whether through letters of its auditors and counsel or otherwise, as the Purchaser, trustee or a master servicer shall reasonably request as to the related Mortgage Loans;

(iv) agree to service the Mortgage Loans in accordance with the requirements of the Pass-Through Transfer, including, without limitation, servicing the Mortgage Loans in accordance with the requirements of the applicable Agency if the Pass-Through Transfer is to an Agency, or servicing the Mortgage Loans in accordance with the requirements of the private label securitization if the Pass-Through Transfer is to a private label securitization, provided that such servicing requirements are standard and customary and do not impose undue hardship or expense upon the Seller;

(v)    provide all other assistance reasonably requested by the Purchaser in connection with effectuation and completion of the Pass-Through Transfer; and

(vi)    in connection with each Pass Through Transfer, the Seller shall provide the Purchaser and any prospective purchaser, in form and substance reasonably satisfactory, all information, statements, reports and certifications reasonably necessary to comply with the final rules promulgated by the Securities and Exchange Commission related to asset-backed securities (Release Nos. 33-8518; 34-50905) (as such rules may be amended or modified from time to time). The parties shall mutually agree to such other modifications and enter into such amendments to this Agreement as may be necessary to comply with any rules promulgated by the Securities and Exchange Commission and any interpretations thereof by the staff of the Securities and Exchange Commission.

With respect to any Pass-Through Transfer, the Purchaser shall be entitled to include in any disclosure document any information provided by the Seller, and the Seller acknowledges and

38

agrees that the related investors will be permitted to rely on such information. In addition, the Seller shall indemnify the Purchaser and its affiliates for any untrue statement of any material fact contained in such information, or the omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading. If the Purchaser reasonably determines that the Seller is required to be a party to any Reconstitution Agreement, the Seller shall execute such Reconstitution Agreement in such form as is reasonably agreed to by the Purchaser and the Seller, within a reasonable period of time, but in no event shall such time exceed ten (10) Business Days after mutual agreement between the Purchaser and the Seller as to the terms thereof.

(c)    In connection with any Securitization Transaction, the Seller shall (x) within five Business Days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or, as applicable, cause each Third-Party Originator and each Subservicer to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (i), (ii), (iii) and (v) of this Section 4.19(c), and (y) as promptly as practicable following notice to or discovery by the Seller, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in paragraph (iv) of this Section 4.19(c).

(i)    If so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding (x) the Seller, as originator of the Mortgage Loans, or (y) each Third-Party Originator, and (z) as applicable, each Subservicer, as is requested for the purpose of compliance with Items 1103(a)(1), 1105, 1110, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

(A)    the originator's form of organization;

(B)    a description of the originator's origination program and how long the originator has been engaged in originating residential mortgage loans, which description shall include a discussion of the originator's experience in originating mortgage loans of a similar type as the Mortgage Loans; information regarding the size and composition of the originator's origination portfolio; and information that may be material, in the good faith judgment of the Purchaser or any Depositor, to an analysis of the performance of the Mortgage Loans, including the originators' credit-granting or underwriting criteria for mortgage loans of similar type(s) as the Mortgage Loans and such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1110(b)(2) of Regulation AB;

(C)    a description of any material legal or governmental proceedings pending (or known to be contemplated) against the Seller, each Third-Party Originator and each Subservicer; and

(D)    a description of any affiliation or relationship between the Seller, each Third-Party Originator, each Subservicer and any of the following parties to a Securitization Transaction, as such parties are identified to the Seller by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

(1) the sponsor;
(2) the depositor;
(3) the issuing entity;
(4) any servicer;
(5) any trustee;
(6) any originator;
(7) any significant obligor;
(8) any enhancement or support provider; and
(9) any other material transaction party.

(ii)    If so requested by the Purchaser or any Depositor on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(c) of Regulation AB,, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide) to the extent reasonably available to the Seller, Static Pool Information with respect to the mortgage loans (of a similar type as the Mortgage Loans, as reasonably identified by the Purchaser as provided below) originated by (x) the Seller, if the Seller is an originator of Mortgage Loans, and/or (y) each Third-Party Originator. Such Static Pool Information shall be prepared by the Seller (or Third-Party Originator) on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(a)(1)-(3) of Regulation AB. To the extent that there is reasonably available to the Seller (or Third-Party Originator) Static Pool Information with respect to more than one mortgage loan type, the Purchaser or any Depositor shall be entitled to specify whether some or all of such information shall be provided pursuant to this paragraph. The content of such Static Pool Information may be in the form customarily provided by the Seller, and need not be customized for the Purchaser or any Depositor. Such Static Pool Information for each vintage origination year or prior securitized pool, as applicable, shall be presented in increments no less frequently than quarterly over the life of the mortgage loans included in the vintage origination year or prior securitized pool. The most recent periodic increment must be as of a date no later than 135 days prior to the date of the prospectus or other offering document in which the Static Pool Information is to be included or incorporated by reference. The Static Pool Information shall be provided in an electronic format that provides a permanent record of the information provided, such as a portable document format (pdf) file, or other such electronic format reasonably required by the Purchaser or the Depositor, as applicable.

Promptly following notice or discovery of a material error in Static Pool Information provided pursuant to the immediately preceding paragraph (including an omission to include therein information required to be provided pursuant to such paragraph), the Seller shall provide corrected Static Pool Information to the Purchaser or any Depositor, as applicable, in the same format in which Static Pool Information was previously provided to such party by the Seller.

If so requested by the Purchaser or any Depositor, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide), at the expense of the requesting party (to the extent of any additional incremental expense associated with delivery pursuant to this Agreement), such agreed-upon procedures letters of certified public accountants reasonably acceptable to the Purchaser or Depositor, as applicable, pertaining to Static Pool Information relating to prior securitized pools for securitizations closed on or after January 1, 2006 or, in the case of Static Pool Information with respect to the Seller's or Third-Party Originator's originations or purchases, to calendar months commencing January 1, 2006, as the Purchaser or such Depositor shall reasonably request. Such letters shall be addressed to and be for the benefit of such parties as the Purchaser or such Depositor shall designate, which may include, by way of example, any Sponsor, any Depositor and any broker dealer acting as underwriter, placement agent or initial purchaser with respect to a Securitization Transaction. Any such statement or letter may take the form of a standard, generally applicable document accompanied by a reliance letter authorizing reliance by the addressees designated by the Purchaser or such Depositor.

(iii)    If so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the Seller, as servicer of the Mortgage Loans, and each Subservicer (each of the Seller and each Subservicer, for purposes of this paragraph, a "Servicer"), as is requested for the purpose of compliance with Items 1108 of Regulation AB. Such information shall include, at a minimum:

(A)    the Servicer's form of organization;

40

(B)    a description of how long the Servicer has been servicing residential mortgage loans; a general discussion of the Servicer's experience in servicing assets of any type as well as a more detailed discussion of the Servicer's experience in, and procedures for, the servicing function it will perform under this Agreement and any Reconstitution Agreements; information regarding the size, composition and growth of the Servicer's portfolio of residential mortgage loans of a type similar to the Mortgage Loans and information on factors related to the Servicer that may be material, in the good faith judgment of the Purchaser or any Depositor, to any analysis of the servicing of the Mortgage Loans or the related asset-backed securities, as applicable, including, without limitation:

(1)    whether any prior securitizations of mortgage loans of a type similar to the Mortgage Loans involving the Servicer have defaulted or experienced an early amortization or other performance triggering event because of servicing during the three-year period immediately preceding the related Securitization Transaction;

(2)    the extent of outsourcing the Servicer utilizes;

(3)    whether there has been previous disclosure of material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Servicer as a servicer during the three-year period immediately preceding the related Securitization Transaction;

(4)    whether the Servicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; and

(5)    such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1108(b)(2) of Regulation AB;

(C)    a description of any material changes during the three-year period immediately preceding the related Securitization Transaction to the Servicer's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreements for mortgage loans of a type similar to the Mortgage Loans;

(D)    information regarding the Servicer's financial condition, to the extent that there is a material risk that an adverse financial event or circumstance involving the Servicer could have a material adverse effect on the performance by the Seller of its servicing obligations under this Agreement or any Reconstitution Agreement;

(E)    information regarding advances made by the Servicer on the Mortgage Loans and the Servicer's overall servicing portfolio of residential mortgage loans for the three-year period immediately preceding the related Securitization Transaction, which may be limited to a statement by an authorized officer of the Servicer to the effect that the Servicer has made all advances required to be made on residential mortgage loans serviced by it during such period, or, if such statement would not be accurate, information regarding the percentage and type of advances not made as required, and the reasons for such failure to advance;

(F)    a description of the Servicer's processes and procedures designed to address any special or unique factors involved in servicing loans of a similar type as the Mortgage Loans;

(G)    a description of the Servicer's processes for handling

41

delinquencies, losses, bankruptcies and recoveries, such as through liquidation of mortgaged properties, sale of defaulted mortgage loans or workouts; and

(H)    information as to how the Servicer defines or determines delinquencies and charge-offs, including the effect of any grace period, re-aging, restructuring, partial payments considered current or other practices with respect to delinquency and loss experience.

(iv)    If so requested by the Purchaser or any Depositor for the purpose of satisfying its reporting obligation under the Exchange Act with respect to any class of asset-backed securities, the Seller shall (or shall cause each Subservicer and Third-Party Originator to) (A) notify the Purchaser and any Depositor in writing of (x) any material litigation or governmental proceedings pending against the Seller, any Subservicer or any Third-Party Originator and (y) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Seller, any Subservicer or any Third-Party Originator and any of the parties specified in clause (D) of paragraph (i) of this Section 4.19(c) (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, and (B) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or relationships.

(v)    In addition to such information as the Seller, as servicer, is obligated to provide pursuant to other provisions of this Agreement, if so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the performance or servicing of the Mortgage Loans as is reasonably required to facilitate preparation of distribution reports in accordance with Item 1121 of Regulation AB. Such information shall be provided concurrently with the monthly reports otherwise required to be delivered by the servicer under this Agreement, commencing with the first such report due not less than ten Business Days following such request.

(d)    All of the Mortgage Loans, including those Mortgage Loans that are subject to a Pass-Through Transfer or a Whole Loan Transfer, shall continue to be subject to this Agreement, and with respect thereto, this Agreement shall remain in full force and effect. Notwithstanding the foregoing, with respect to any Mortgage Loan subject to a Reconstitution Agreement, the servicing provisions set forth in such Reconstitution Agreement shall govern the servicing of such Mortgage Loan to the extent such terms contradict the servicing provisions set forth in this Agreement, including, but not limited to, the servicing provisions of Article IV. In no event shall a Whole Loan Transfer or a Pass-Through Transfer be deemed to relieve the Seller of its obligations as set forth in Article III hereof nor to increase the Seller's liabilities, duties, obligations, or responsibilities as set forth in this Agreement.

Section 4.20    Consultation with Seller and Transfer of Servicing Rights to Purchaser. With respect to any Mortgage Loan that is sixty (60) days or more delinquent, the Seller acknowledges and agrees that the Purchaser shall have the right to consult with the Seller and propose certain action, including, without limitation, any proposal to commence foreclosure proceedings or to accept a deed-in-lieu of foreclosure. With respect to any Mortgage Loan that is ninety (90) days or more delinquent, the Seller acknowledges and agrees that the Purchaser shall, in its sole discretion, have the right to transfer the servicing duties and responsibilities for such Mortgage Loan. In the event the Purchaser exercises the foregoing right, the Seller shall transfer and assign all of its servicing rights related to such Mortgage Loan to the Purchaser. Upon such transfer and assignment, the Purchaser shall reimburse the Seller for its Servicing Fee, any outstanding and unreimbursed Servicing Advances, and any other outstanding, unreimbursed fee and cost of the Seller with respect to such Mortgage Loan in relation to such servicing transfer in accordance with Section 4.5. The Seller shall not be released of any responsibility or liability incurred while servicing such Mortgage Loan, through and including the effective date of such servicing transfer, unless and to the extent expressly stated in writing by the Purchaser.

42

**Section 4.21. Use of Subservicers and Subcontractors.** The Seller shall not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of the Seller as servicer under this Agreement or any Reconstitution Agreement unless the Seller complies with the provisions of paragraph (a) of this Section 4.21. The Seller shall not hire or otherwise utilize the services of any Subcontractor, and shall not permit any Subservicer to hire or otherwise utilize the services of any Subcontractor, to fulfill any of the obligations of the Seller as servicer under this Agreement or any Reconstitution Agreement unless the Seller complies with the provisions of paragraph (b) of this Section 4.21.

(a)    It shall not be necessary for the Seller to seek the consent of the Purchaser or any Depositor to the utilization of any Subservicer. The Seller shall cause any Subservicer used by the Seller (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of this Section 4.21 and with Sections 4.19(c)(iii), 5.6, 5.12, 6.1(b), 6.2, 6.5 and 6.6 of this Agreement to the same extent as if such Subservicer were the Seller, and to provide the information required with respect to such Subservicer under Section 4.19(c)(iv) of this Agreement. The Seller shall be responsible for obtaining from each Subservicer and delivering to the Purchaser and any Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 5.6, any assessment of compliance and attestation required to be delivered by such Subservicer under Section 5.12 and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 5.12 as and when required to be delivered.

(b)    It shall not be necessary for the Seller to seek the consent of the Purchaser or any Depositor to the utilization of any Subcontractor. The Seller shall promptly upon request provide to the Purchaser and any Depositor (or any designee of the Depositor, such as a master servicer or administrator) a written description (in form and substance reasonably satisfactory to the Purchaser and such Depositor) of the role and function of each Subcontractor utilized by the Seller or any Subservicer, specifying (i) the identity of each such Subcontractor, (ii) which (if any) of such Subcontractors are "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, and (iii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (ii) of this paragraph.

As a condition to the utilization of any Subcontractor determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Seller shall cause any such Subcontractor used by the Seller (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of Sections 5.12 and 6.1 of this Agreement to the same extent as if such Subcontractor were the Seller. The Seller shall be responsible for obtaining from each Subcontractor and delivering to the Purchaser and any Depositor any assessment of compliance and attestation required to be delivered by such Subcontractor under Section 5.12, in each case as and when required to be delivered.

## ARTICLE V

## DISTRIBUTIONS

**Section 5.1    Distributions.** On each Remittance Date, the Seller shall distribute to the Purchaser (i) all amounts credited to the Custodial Account as of the close of business on the preceding Determination Date, net of charges against or withdrawals from the Custodial Account pursuant to Section 4.5, plus (ii) all Monthly Advances, if any, which the Seller is obligated to distribute pursuant to Section 5.3, minus (iii) any amounts attributable to Principal Prepayments received after the related Principal Prepayment Period, and (iv) any amounts attributable to Monthly Payments collected but due on a Due Date or Dates subsequent to the preceding Determination Date. It is understood that, by operation of Section 4.4, the remittance on the first Remittance Date is to include principal due after the Cut-off Date through the preceding Determination Date plus interest, adjusted to the Mortgage Loan Remittance Rate collected through such Determination Date exclusive of any portion thereof allocable

to the period prior to the Cut-off Date, with the adjustments specified in (ii), (iii) and (iv) above.

Section 5.2    Statements to the Purchaser. Not later than five (5) Business Days following any given calendar month of activity, the Seller will furnish to the Purchaser via any electronic medium a monthly report detailing such monthly activity, in a form reasonably acceptable to the Purchaser.

The Seller shall prepare and file any and all tax returns, information statements or other filings required to be delivered to any governmental taxing authority or to the Purchaser pursuant to any applicable law with respect to the Mortgage Loans and the transactions contemplated hereby. In addition, the Seller shall provide the Purchaser with such information concerning the Mortgage Loans as is necessary for the Purchaser to prepare its federal income tax return as the Purchaser may reasonably request from time to time.

Section 5.3    Monthly Advances by the Seller. Not later than the close of business on the Business Day preceding each Remittance Date, the Seller shall deposit in the Custodial Account an amount equal to all payments not previously advanced by the Seller, whether or not deferred pursuant to Section 4.1, of principal (due after the Cut-off Date) and interest not allocable to the period prior to the Cut-Off Date, adjusted to the Mortgage Loan Remittance Rate, which were due on a Mortgage Loan and delinquent at the close of business on the related Determination Date.

The Seller's obligation to make such advances as to any Mortgage Loan will continue through the earliest of: (i) the last Monthly Payment due prior to the payment in full of the Mortgage Loan, (ii) the Remittance Date prior to the Remittance Date for the distribution of any Liquidation Proceeds, Other Insurance Proceeds or Condemnation Proceeds which, in the case of Other Insurance Proceeds and Condemnation Proceeds, satisfy in full the indebtedness of such Mortgage Loan, and (iii) the Remittance Date prior to the date the Mortgage Loan is converted to REO Property. In no event shall the Seller be obligated to make an advance under this Section 5.3 if at the time of such advance it deems such advance to be nonrecoverable. If the Seller determines that an advance is nonrecoverable, the Seller shall deliver to the Purchaser an Officer's Certificate of the Seller evidencing such determination.

Section 5.4    Real Estate Owned Reports. Together with the statement furnished pursuant to Section 5.2, with respect to any REO Property, the Seller shall furnish to the Purchaser on request a statement covering the Seller's efforts in connection with the sale of such REO Property and any rental of such REO Property incidental to the sale thereof for the previous month, together with an operating statement free of cost. Such statement shall be in form and substance reasonably acceptable to the Purchaser and shall be accompanied by such additional information as the Purchaser shall reasonably request.

Section 5.5    Liquidation Reports. Upon the foreclosure sale of any Mortgaged Property or the acquisition thereof by the Purchaser pursuant to a deed-in-lieu of foreclosure, the Seller shall submit to the Purchaser a liquidation report with respect to such Mortgaged Property which report may be included with any other reports prepared by the Seller and delivered to the Purchaser pursuant to the terms and conditions of this Agreement. Such report shall be in form and substance reasonably acceptable to the Purchaser.

Section 5.6    Annual Statement as to Compliance. On or before March 1 of each calendar year, commencing in 2007, the Seller shall deliver to the Purchaser and any Depositor a statement of compliance addressed to the Purchaser and such Depositor and signed by an authorized officer of the Seller, to the effect that (i) a review of the Seller's activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under this Agreement and any applicable Reconstitution Agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such review, the Seller has fulfilled all of its obligations under this Agreement and any applicable Reconstitution Agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if

44

there has been a failure to fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof.

**Section 5.7    Annual Servicing Report.** On or before March 15, 2007 and March 1st of each year thereafter, beginning in the year following the Closing Date, the Seller at its expense shall deliver to the Purchaser a certificate signed by a senior officer of the Seller which states that such officer has reviewed certain documents and records relating to the Seller's servicing of mortgage loans of the same type as the Mortgage Loans pursuant to this Agreement or servicing agreements substantially similar to this Agreement, and that, on the basis of such an examination, such officer is of the opinion that the Seller's servicing has been conducted in compliance with the Agreement or such servicing agreements examined pursuant to this Section 5.7, except for (i) such exceptions as such officer shall believe to be immaterial, and (ii) such other exceptions as shall be set forth in such certificate ("Annual Servicing Report").

**Section 5.8    Purchaser's Right to Examine Seller's Records.** After executing a confidentiality agreement, the Purchaser shall have the right to examine and audit upon reasonable notice to the Seller, during business hours or at such other times as might be reasonable under applicable circumstances, any and all of the books, records, documentation or other information of the Seller, or held by another for the Seller or on its behalf or otherwise, which relates to the performance or observance by the Seller of the terms, covenants or conditions of this Agreement. The Seller shall provide to the Purchaser and any supervisory agents or examiners representing a state or federal governmental agency having jurisdiction over the Purchaser, including but not limited to OTS, FDIC and other similar entities, access to any documentation regarding the Mortgage Loans in the possession of the Seller which may be required by any applicable regulations. Such access shall be afforded without charge, upon reasonable request, during normal business hours and at the offices of the Seller, and in accordance with the federal government, FDIC, OTS, or any other similar regulations.

**Section 5.9    Seller Shall Provide Information as Reasonably Required.** The Seller shall furnish to the Purchaser, such periodic, special or other reports, information or documentation, whether or not provided for herein, as shall be necessary, reasonable or appropriate in respect to the Purchaser, or otherwise in respect to the Mortgage Loans and the performance of the Seller under this Agreement, including any reports, information or documentation reasonably required to comply with any regulations regarding any supervisory agents or examiners of the Purchaser all such reports or information to be as provided by and in accordance with such applicable instructions and directions as the Purchaser may reasonably request in relation to the performance of the Seller under this Agreement. The Seller agrees to execute and deliver all such instruments and take all such action as the Purchaser, from time to time, may reasonably request in order to effectuate the purpose and to carry out the terms of this Agreement.

**Section 5.10    Financial Statements.** The Seller hereby authorizes the Purchaser, in connection with a sale of the Mortgage Loans, to make available to prospective purchasers copies of any publicly available Consolidated Statement of Operations of the Seller prepared by or at the request of the Seller for the most recently completed three (3) fiscal years for which such a statement is available, as well as a Consolidated Statement of Condition at the end of the last two (2) fiscal years covered by such Consolidated Statement of Operations. Alternatively, if the Seller does not itself have a Consolidated Statement of Operations or a Consolidated Statement of Condition, but is a subsidiary of a publicly held parent company which does have such statements, the Seller will make available to the Purchaser a copy of any publicly available Consolidated Statement of Operations and Consolidated Statement of Condition of the parent company, which set forth a consolidating statement of the financial condition of the Seller. The Seller will also make available to the Purchaser any comparable interim statements to the extent any such statements have been prepared by the Seller or its parent, as the case may be (and are available to its stockholders or the public at large). The Seller, if it has not already done so, agrees to promptly furnish upon request to the Purchaser copies of the statements specified above.

After executing a confidentiality agreement and upon reasonable notice, a prospective

45

purchaser shall have the right and the Seller also agrees to make available during normal business hours a knowledgeable financial or accounting officer for the purpose of answering questions respecting recent developments affecting, directly or indirectly, the Seller's ability to perform under this Agreement and to permit such prospective purchaser upon reasonable notice and during normal business hours to inspect the Seller's servicing facilities for the purpose of satisfying such prospective purchaser that the Seller has the ability to service the Mortgage Loans in accordance with the terms of this Agreement.

### Section 5.11    Sarbanes-Oxley Certification.

A.    For so long as the Mortgage Loans are being serviced by Seller as part of a securitization transaction and a certificate with respect to such servicing is required to be furnished by Purchaser or an agent of the Purchaser under the Sarbanes-Oxley Act of 2002, as amended, and any rules and regulations promulgated thereunder ("Sarbanes-Oxley Act"), an officer of Seller (herein, also, "Servicer"), on or before March 15, 2007 and March 1st of each year thereafter (or if not a Business Day, the immediately preceding Business Day), shall execute and deliver an officer's certification in compliance with the Sarbanes-Oxley Act to the related master servicer and the related depositor (each referred to herein as "Purchaser's Agent") for the benefit of such Purchaser's Agent and its officers, directors and affiliates, certifying as to the following matters:

(i)    I have reviewed the annual statement of compliance ("Annual Statement of Compliance") prepared by Servicer, and the annual independent public accountant's servicing report made in accordance with the *Uniform Single Attestation Program for Mortgage Bankers* ("Annual Independent Public Accountant's Servicing Report"), which have been furnished to Purchaser's Agents pursuant to this Agreement and any subsequent servicing agreement related thereto or the Mortgage Loans (collectively, "Servicing Agreement");

(ii)    Based on my knowledge, the information in the Annual Statement of Compliance, the Annual Independent Public Accountant's Servicing Report, and all final servicing reports prepared by Servicer and delivered to Purchaser's Agent pursuant to the Servicing Agreement relating to the servicing of the Mortgage Loans, taken as a whole, does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading as of the last day of the period covered by such statements or reports;

(iii)    Based on my knowledge, the servicing information required to be provided to the Purchaser's Agent by the Servicer under the Servicing Agreement has been provided to Purchaser's Agent;

(iv)    I am responsible for reviewing the activities performed by the Servicer under the Servicing Agreement and based upon the review required by the Servicing Agreement, and except as disclosed in the Annual Statement of Compliance and the Annual Independent Public Accountant's Servicing Report submitted to the Purchaser's Agent, the Servicer has, as of the last day of the period covered by the Annual Statement of Compliance fulfilled its obligations under the Servicing Agreement; and

(v)    I have disclosed to the Purchaser's Agent's certified public accountants all significant deficiencies relating to the Servicer's compliance with the minimum servicing standards in accordance with a review conducted in compliance with the *Uniform Single Attestation Program for Mortgage Bankers* or similar standard as set forth in the Servicing Agreement.

B.    The Servicer shall indemnify and hold harmless the Purchaser's Agent and its officers, directors, agents and affiliates from and against any losses, damages, penalties, fines, forfeitures, reasonable legal fees and related costs, judgments and other costs and expenses arising out of or based upon a breach by the Servicer or any of its officers, directors, agents or affiliates of its obligations under this Section 5.11 or the negligence, bad faith or willful misconduct of the Servicer in connection therewith.

C.    It is acknowledged and agreed that each Purchaser's Agent shall be an express third party beneficiary of the provisions of this Section 5.11 and shall be entitled independently to enforce the provisions of this Section 5.11 with respect to any obligations owed to such entity as if it were a direct party to this Agreement.

### Section 5.12. Report on Assessment of Compliance and Attestation.

(a)    On or before March 1 of each calendar year, commencing in 2007, the Seller shall:

(i)    deliver to the Purchaser and any Depositor a report (in form and substance reasonably satisfactory to the Purchaser and such Depositor) regarding the Seller's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be addressed to the Purchaser and such Depositor and signed by an authorized officer of the Seller, and shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit F hereto delivered to the Purchaser concurrently with the execution of this Agreement;

(ii)    deliver to the Purchaser and any Depositor a report of a registered public accounting firm reasonably acceptable to the Purchaser and such Depositor that attests to, and reports on, the assessment of compliance made by the Seller and delivered pursuant to the preceding paragraph. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act;

(iii)    cause each Subservicer, and each Subcontractor determined by the Seller pursuant to Section 4.21(b) to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, to deliver to the Purchaser and any Depositor an assessment of compliance and accountants' attestation as and when provided in paragraphs (a) and (b) of this Section 5.12; and

(iv)    if requested by the Purchaser or any Depositor not later than February 1 of the calendar year in which such certification is to be delivered, deliver to the Purchaser, any Depositor and any other Person that will be responsible for signing a Sarbanes Certification a certification in the form attached hereto as Exhibit E.

The Seller acknowledges that the parties identified in clause (a)(iv) above may rely on the certification provided by the Seller pursuant to such clause in signing a Sarbanes Certification and filing such with the Commission. Neither the Purchaser nor any Depositor will request delivery of a certification under clause (a)(iv) above unless a Depositor is required under the Exchange Act to file an annual report on Form 10-K with respect to an issuing entity whose asset pool includes Mortgage Loans.

(b)    Each assessment of compliance provided by a Subservicer pursuant to Section 5.12(a)(i) shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit F hereto delivered to the Purchaser concurrently with the execution of this Agreement or, in the case of a Subservicer subsequently appointed as such, on or prior to the date of such appointment. An assessment of compliance provided by a Subcontractor pursuant to Section 5.12(a)(iii) need not address any elements of the Servicing Criteria other than those specified by the

47

Seller pursuant to <u>Section 4.21</u>.

## ARTICLE VI

### CERTAIN COVENANTS

**Section 6.1**     **Additional Indemnification by the Seller; Third Party Claims**.

(a)     The Seller shall indemnify the Purchaser and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees, and expenses that the Purchaser may sustain in any way related to the failure of the Seller to perform its duties and service the Mortgage Loans in strict compliance with the terms of this Agreement. The Seller and the Purchaser shall immediately notify the other if a claim is made upon such party by a third party with respect to this Agreement or the Mortgage Loans. Upon the prior written consent of Purchaser, which consent shall not be unreasonably withheld, the Seller shall assume the defense of any such claim and pay all expenses in connection therewith, including counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or the Purchaser in respect of such claim. The Purchaser promptly shall reimburse the Seller for all amounts advanced by it pursuant to the preceding sentence except when the claim is in any way related to the Seller's indemnification pursuant to <u>Section 3.4</u>; or the failure of the Seller to service and administer the Mortgage Loans in strict compliance with the terms of this Agreement.

(b)     The Seller shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction; each broker dealer acting as underwriter, placement agent or initial purchaser, each Person who controls any of such parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing and of the Depositor, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i)(A) any untrue statement of a material fact contained in any information, report, certification, accountants' letter or other material provided in written or electronic form under the Regulation AB Information and Certification Provisions of this Agreement by or on behalf of the Seller, or provided under the Regulation AB Information and Certification Provisions of this Agreement by or on behalf of any Subservicer, Subcontractor or Third-Party Originator (collectively, the "Seller Information"), or (B) the omission to state in the Seller Information a material fact required to be stated in the Seller Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, by way of clarification, that clause (B) of this paragraph shall be construed solely by reference to the Seller Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Seller Information or any portion thereof is presented together with or separately from such other information;

(ii) any failure by the Seller, any Subservicer, any Subcontractor or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under the Regulation AB Information and Certification Provisions of this Agreement, including any failure by the Seller to identify pursuant to <u>Section 4.21(b)</u> any Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB; or

48

(iii) any breach by the Seller of a representation or warranty set forth in <u>Section 3.1(o)</u> or in a writing furnished pursuant to <u>Section 6.6</u> and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Seller of a representation or warranty in a writing furnished pursuant to <u>Section 6.6</u> to the extent made as of a date subsequent to such closing date.

In the case of any failure of performance described in clause (b)(ii) of this <u>Section 6.1</u>, the Seller shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain the information, report, certification, accountants' letter or other material not delivered as required by the Seller, any Subservicer, any Subcontractor or any Third-Party Originator.

**Section 6.2    Merger or Consolidation of the Seller**.  The Seller will keep in full effect its existence, rights and franchises as a corporation under the laws of the state of its incorporation except as permitted herein, and will obtain and preserve its qualification to do business as a foreign corporation in each jurisdiction in which such qualification is or shall be necessary to protect the validity and enforceability of this Agreement, or any of the Mortgage Loans and to perform its duties under this Agreement.

Any Person into which the Seller may be merged or consolidated, or any corporation resulting from any merger, conversion or consolidation to which the Seller shall be a party, or any Person succeeding to the business of the Seller, shall be the successor of the Seller hereunder, without the execution or filing of any paper or any further act on the part of any of the parties hereto, anything herein to the contrary notwithstanding; provided, however, that the successor or surviving Person shall be an institution whose deposits are insured by FDIC or a company whose business is the origination and servicing of mortgage loans, unless otherwise consented to by the Purchaser, which consent shall not be unreasonably withheld, shall be qualified to service mortgage loans on behalf of Fannie Mae or Freddie Mac and shall satisfy the requirements of <u>Section 7.4</u> with respect to the qualifications of a successor to the Seller.

As a condition to the succession to the Seller or any Subservicer as servicer or subservicer under this Agreement or any Reconstitution Agreement by any Person (i) into which the Seller or such Subservicer may be merged or consolidated, or (ii) which may be appointed as a successor to the Seller or any Subservicer, the Seller shall provide to the Purchaser and any Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Purchaser and any Depositor of such succession or appointment and (y) in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, all information reasonably requested by the Purchaser or any Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to any class of asset-backed securities.

**Section 6.3    Limitation on Liability of the Seller and Others**.  Neither the Seller nor any of the officers, employees or agents of the Seller shall be under any liability to the Purchaser for any action taken or for refraining from the taking of any action in good faith pursuant to this Agreement, or for errors in judgment; provided, however, that this provision shall not protect the Seller or any such person against any breach of warranties or representations made herein, or failure to perform its obligations in strict compliance with any standard of care set forth in this Agreement, or any liability which would otherwise be imposed by reason of any breach of the terms and conditions of this Agreement.  The Seller and any officer, employee or agent of the Seller may rely in good faith on any document of any kind prima facie properly executed and submitted by any Person respecting any matters arising hereunder.  The Seller shall not be under any obligation to appear in, prosecute or defend any legal action which is not incidental to its duties to service the Mortgage Loans in accordance

with this Agreement and which in its opinion may involve it in any expenses or liability; provided, however, that the Seller may, with the consent of the Purchaser, undertake any such action which it may deem necessary or desirable in respect to this Agreement and the rights and duties of the parties hereto. In such event, the legal expenses and costs of such action and any liability resulting therefrom shall be expenses, costs and liabilities for which the Purchaser will be liable, the Seller shall be entitled to be reimbursed therefor from the Purchaser upon written demand.

Section 6.4     **The Seller Not to Resign**. The Seller shall not assign this Agreement or resign from the obligations and duties hereby imposed on it except by mutual consent of the Seller and the Purchaser or upon the determination that its duties hereunder are no longer permissible under applicable law and such incapacity cannot be cured by the Seller. Any such determination permitting the resignation of the Seller shall be evidenced by an Opinion of Counsel to such effect delivered to the Purchaser which Opinion of Counsel shall be in form and substance reasonably acceptable to the Purchaser. No such resignation shall become effective until a successor shall have assumed the Seller's responsibilities and obligations hereunder in the manner provided in Section 7.4.

Section 6.5     **No Transfer of Servicing**. The Seller acknowledges that Purchasers act in reliance upon the Seller's independent status, the adequacy of its servicing facilities, plant, personnel, records and procedures, its integrity, reputation and financial standing and the continuance thereof. Without in any way limiting the generality of this Section and Section 4.21, the Seller shall not either assign this Agreement or the servicing hereunder or delegate its rights or duties hereunder or any portion thereof, or sell or otherwise dispose of all or substantially all of its property or assets, without the prior written approval of the Purchaser, which consent may not be unreasonably withheld. In connection with any such proposed assignment or delegation, the Seller shall provide to the Purchaser and any Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Purchaser and any Depositor of such succession or appointment and (y) in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, all information reasonably requested by the Purchaser or any Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to any class of asset-backed securities.

Section 6.6.     **Confirmation of Certain Representations and Warranties of the Seller**. If so requested by the Purchaser or any Depositor on any date following the date on which information is first provided to the Purchaser or any Depositor under Section 4.19(c), the Seller shall, within three Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in Section 3.1(o) or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

## ARTICLE VII

### TERMINATION OF SERVICING

Section 7.1     **Termination Due to an Event of Default**.

(a)     In case one or more of the following Events of Default by the Seller shall occur and be continuing:

(i)   any failure by the Seller to remit to the Purchaser any payment required to be made under the terms of this Agreement which continues unremedied for a period of three (3) Business Days after the date upon which written notice of such failure, requiring the same to be remedied, shall have been given to the Seller by the Purchaser; or

(ii)  failure on the part of the Seller duly to observe or perform in any material respect any other of the covenants or agreements on the part of the Seller set forth in the

50

Agreement or in the Custodial Agreement, if any, which continues unremedied for a period of thirty (30) days after the date on which written notice of such failure, requiring the same to be remedied, shall have been given to the Seller by the Purchaser or by the Custodian, if any; or

(iii) a decree or order of a court or agency or supervisory authority having jurisdiction for the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings, or for the winding-up or liquidation of its affairs, shall have been entered against the Seller and such decree or order shall have remained in force undischarged or unstayed for a period of sixty (60) days; or

(iv) the Seller shall consent to the appointment of a conservator or receiver or liquidator in any insolvency, bankruptcy, readjustment of debt, marshalling of assets and liabilities or similar proceedings of or relating to the Seller or of or relating to all or substantially all of its property; or

(v) the Seller shall admit in writing its inability to pay its debts generally as they become due, file a petition to take advantage of any applicable insolvency or reorganization statute, make an assignment for the benefit of its creditors, or voluntarily suspend payment of its obligations; or

(vi) the Seller ceases to be approved by either Fannie Mae or Freddie Mac as a mortgage loan seller/servicer for more than thirty (30) days; or

(vii) the Seller attempts to assign its right to servicing compensation hereunder or the Seller attempts, in violation of this Agreement, to sell or otherwise dispose of all or substantially all of its property or assets or to assign this Agreement or the servicing responsibilities hereunder or to delegate its duties hereunder or any portion thereof; or

(viii) the Seller ceases to be (a) licensed to service first lien residential mortgage loans in each jurisdiction in which a Mortgaged Property is located and such licensing is required, or (b) qualified to transact business in any jurisdiction where it is currently so qualified, but only to the extent such non-qualification materially and adversely affects the Seller's ability to perform its obligations hereunder; or

(ix) the Seller fails to meet the eligibility criteria set forth in Section 6.2; or

(x) any failure by the Seller, any Subservicer, any Subcontractor or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under the Regulation AB Information and Certification Provisions of this Agreement, or any breach by the Seller of a representation or warranty set forth in Section 3.1(o) or in a writing furnished pursuant to Section 6.6 and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Seller of a representation or warranty in a writing furnished pursuant to Section 6.6 to the extent made as of a date subsequent to such closing date; or

(xi) any failure by the Seller, any Subservicer or any Subcontractor to deliver any information, report, certification or accountants' letter when and as required under Section 5.6 or 5.12, including (except as provided in Section 7.1(c))any failure by the Seller to identify pursuant to Section 4.21(b) any Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, which continues unremedied for ten calendar days after the date on which such information, report, certification or accountants' letter was required to be delivered;

then, and in each and every such case, so long as an Event of Default shall not have been remedied,

the Purchaser, by notice in writing to the Seller may, in addition to whatever rights the Purchaser may have at law or equity to damages, including injunctive relief and specific performance, terminate all the rights and obligations of the Seller under this Agreement and in and to the Mortgage Loans and the proceeds thereof.  On or after the receipt by the Seller of such written notice, all authority and power of the Seller under this Agreement, whether with respect to the Mortgage Loans or otherwise, shall pass to and be vested in the successor appointed pursuant to Section 7.4.  Upon written request from the Purchaser, the Seller shall prepare, execute and deliver, any and all documents and other instruments, place in such successor's possession all Mortgage Files, and do or accomplish all other acts or things necessary or appropriate to effect the purposes of such notice of termination, whether to complete the transfer and endorsement or assignment of the Mortgage Loans and related documents, or otherwise, at the Seller's sole expense.  The Seller agrees to cooperate with the Purchaser and such successor in effecting the termination of the Seller's responsibilities and rights hereunder, including, without limitation, the transfer to such successor for administration by it of all cash amounts which shall at the time be credited by the Seller to the Custodial Account, REO Account or Escrow Account or thereafter received with respect to the Mortgage Loans.

(b)  The Purchaser may waive any default by the Seller in the performance of its obligations hereunder and its consequences.  Upon any such waiver of a past default, such default shall cease to exist, and any Event of Default arising therefrom shall be deemed to have been remedied for every purpose of this Agreement.  No such waiver shall extend to any subsequent or other default or impair any right consequent thereon except to the extent expressly so waived.

(c)  The occurrence of any Event of Default set forth in Section 7.1(a)(x) or 7.1(a)(xi) also constitutes an event of default with respect to the Seller under any applicable Reconstitution Agreement, and, except as provided in the immediately following paragraph, shall entitle the Purchaser or Depositor, as applicable, in its sole discretion to terminate the rights and obligations of the Seller as servicer under this Agreement and/or any applicable Reconstitution Agreement without payment (notwithstanding anything in this Agreement or any applicable Reconstitution Agreement to the contrary) of any compensation to the Seller; provided that to the extent that any provision of this Agreement and/or any applicable Reconstitution Agreement expressly provides for the survival of certain rights or obligations following termination of the Seller as servicer, such provision shall be given effect.  The Seller shall promptly reimburse the Purchaser (or any designee of the Purchaser, such as a master servicer) and any Depositor, as applicable, for all reasonable expenses incurred by the Purchaser (or such designee) or such Depositor, as such are incurred, in connection with the termination of the Seller as servicer and the transfer of servicing of the Mortgage Loans to a successor servicer pursuant this Section 7.1(c).

Notwithstanding the immediately preceding paragraph, neither the Purchaser nor any Depositor shall be entitled to terminate the rights and obligations of the Seller pursuant to this Section 7.1(c) if a failure of the Seller to identify a Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB was attributable solely to the role or functions of such Subcontractor with respect to mortgage loans other than Mortgage Loans.

**Section 7.2     Termination Without Cause**.  The Purchaser may, at its sole option, terminate any rights the Seller may have hereunder, without cause, upon thirty (30) days prior written notice.  Any such notice of termination shall be in writing and delivered to the Seller as provided in Section 8.1 of this Agreement.  In the event of such termination, the Seller shall be entitled to a fee equal to the then current fair market price of the Servicing Rights related to such Mortgage Loans subject to such termination, in an amount to be negotiated in good faith and mutually agreed upon by the Purchaser and the Seller.

**Section 7.3     Termination**.  The respective obligations and responsibilities of Seller shall terminate with respect to any Mortgage Loan Package upon the first to occur of: (i) the later of the final payment or other liquidation (or any advance with respect thereto) of the last Mortgage Loan or the disposition of all REO Property in such Mortgage Loan Package and the remittance of all funds due hereunder, or (ii) by mutual consent of Seller and the Purchaser in writing, or (iii) as otherwise provided

in the Transaction Documents, including, but not limited to, as set forth in <u>Section 7.2</u> above.

**Section 7.4    <u>Successor to the Seller</u>**.    Prior to termination of the Seller's responsibilities and duties under this Agreement pursuant to Subsection 7.3(ii), the Purchaser shall (i) succeed to and assume all of the Seller's responsibilities, rights, duties and obligations under this Agreement with respect to the Mortgage Loans, or (ii) appoint a successor having a net worth of not less than $25,000,000 and which shall succeed to all rights and assume all of the responsibilities, duties and liabilities of the Seller under this Agreement prior to the termination of the Seller's responsibilities, duties and liabilities under this Agreement. In connection with such appointment and assumption, the Purchaser shall make such arrangements for the compensation of such successor out of payments on Mortgage Loans as it and such successor shall agree.    In the event that the Seller's duties, responsibilities and liabilities under this Agreement should be terminated pursuant to the aforementioned Sections, the Seller shall discharge such duties and responsibilities during the period from the date it acquires knowledge of such termination until the effective date thereof with the same degree of diligence and prudence which it is obligated to exercise under this Agreement, and shall take no action whatsoever that might impair or prejudice the rights or financial condition of its successor. The resignation or removal of the Seller pursuant to the aforementioned Sections shall not become effective until a successor shall be appointed pursuant to this Section and shall in no event relieve the Seller of the representations and warranties made pursuant to <u>Sections 3.1, 3.2, or 3.3</u> and the remedies available to the Purchaser thereunder, it being understood and agreed that the provisions of such <u>Section 3.1, 3.2 or 3.3</u> shall be applicable to the Seller notwithstanding any such resignation or termination of the Seller as servicer of the Mortgage Loans.

Any successor appointed as provided herein shall execute, acknowledge and deliver to the Seller and to the Purchaser an instrument accepting such appointment, whereupon such successor shall become fully vested with all the rights, powers, duties, responsibilities, obligations and liabilities of the Seller, with like effect as if originally named as a party to this Agreement and the Custodial Agreement, if any. Any termination of the Seller as servicer of the Mortgage Loans pursuant to <u>Section 7.1 or 7.3</u> shall not affect any claims that the Purchaser may have against the Seller arising prior to any such termination or resignation.

The Seller shall timely deliver to the successor the funds in the Custodial Account, REO Account and the Escrow Account and the Mortgage Files and related documents and statements held by it hereunder and the Seller shall account for all funds.  The Seller shall execute and deliver such instruments and do such other things all as may reasonably be required to fully and definitely vest and confirm in the successor all such rights, powers, duties, responsibilities, obligations and liabilities of the Seller and which are mandated by RESPA and the regulations promulgated thereunder. The successor shall be required to make arrangements at the time of transfer of the servicing responsibilities to the successor servicer to reimburse the Seller for amounts the Seller actually expended pursuant to this Agreement (provided that the Seller shall provide the successor servicer with written evidence of such amounts) which the successor is entitled to retain hereunder and which would otherwise have been recovered by the Seller pursuant to this Agreement but for the appointment of the successor servicer.

## ARTICLE VIII

## <u>MISCELLANEOUS</u>

**Section 8.1    <u>Notices</u>**.  All demands, notices and communications required to be provided hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, postage prepaid, and return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i)    if to the Seller:

American Home Mortgage Corp.

538 Broadhollow Road
Melville, New York 11747
Attention: Robert F. Johnson, Jr., Executive Vice President

With a copy to:

American Home Mortgage Corp.
538 Broadhollow Road
Melville, New York 11747
Attention: Alan B. Horn, General Counsel


(ii)   if to the Purchaser:

Countrywide Bank, N.A.
4500 Park Granada
Mail Suite CH-20
Calabasas, California 93102
Attn: Kathleen Conte, Executive Vice President

With copy to:

Countrywide Bank, N.A.
225 West Hillcrest Drive
Thousand Oaks, California  91360
Attn:  General Counsel

or such other address as may hereafter be furnished to the other party by like notice.  Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

**Section 8.2    Intention of the Parties**.  Pursuant to this Agreement, the Purchaser is purchasing, and the Seller is selling the Mortgage Loans and not a debt instrument of the Seller or any other security.  Accordingly, the Seller and the Purchaser shall each treat the transaction for federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans. The Purchaser shall have the right to review the Mortgage Loans and the related Mortgage Loan Files to determine the characteristics of the Mortgage Loans which shall affect the federal income tax consequences of owning the Mortgage Loans and the Seller shall cooperate with all reasonable requests made by the Purchaser in the course of such review.

**Section 8.3    Exhibits**.  The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

**Section 8.4    General Interpretive Principles**.  For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a)   the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b)   accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c)   references herein to "Sections," "Subsections," "Paragraphs," and other

54

Subdivisions without reference to a document are to designated Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d)   reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e)   the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f)   the term "include" or "including" shall mean without limitation by reason of enumeration.

**Section 8.5      Reproduction of Documents**.   This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process.   The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement, facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**Section 8.6      Further Agreements**.   The Seller shall execute and deliver to the Purchaser and the Purchaser shall execute and deliver to the Seller such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

**Section 8.7      Execution of Agreement**.   This Agreement may be executed simultaneously in any number of counterparts.   Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.   This Agreement shall be deemed binding when executed by both the Purchaser and the Seller.   Telecopy signatures shall be deemed valid and binding to the same extent as the original.

**Section 8.8      Successors and Assigns**.   This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective permitted successors and assigns of the Seller and the successors and assigns of the Purchaser.   This Agreement shall not be assigned, pledged or hypothecated by the Seller without the consent of the Purchaser, which such consent shall not be unreasonably withheld.   This Agreement may be assigned, pledged or hypothecated or otherwise transferred or encumbered in whole or in part by the Purchaser without the consent of the Seller.   If the Purchaser assigns all of its rights as the Purchaser hereunder, the assignee of the Purchaser, upon notification to the Seller, will become the "Purchaser" hereunder.

**Section 8.9      Severability Clause**.   Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any relevant jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction.   To the extent permitted by applicable law, the parties hereto waive any provision of law, which prohibits or renders void or unenforceable any provision hereof.

**Section 8.10      Costs**.   The Purchaser shall pay any commissions due its salesmen and the legal fees and expenses of its attorneys and expenses of its custodian.   All other costs and

expenses incurred in connection with the transfer and delivery of the Mortgage Loans, including recording fees and the Seller's attorney's fees, shall be paid by the Seller.

        **Section 8.11**    <u>Attorneys' Fees</u>.  If any claim, legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement or because of a dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that claim, action or proceeding, in addition to any other relief to which such party may be entitled.

        **Section 8.12**    <u>Governing Law</u>.   This Agreement shall be governed by and interpreted in accordance with the laws of the State of California applicable to agreements entered into and wholly performed within said jurisdiction.

        **Section 8.13**    <u>Survival</u>.  All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement.  It shall not be a defense in any action by the Purchaser against the Seller arising out of a breach of the Seller's covenants, agreements, representations and warranties made herein that the Purchaser knew or should have known of the existence of the related breach of such covenants, agreements, representations and warranties.

        **Section 8.14**    <u>Entire Agreement</u>.  This Agreement and the Trade Confirmation constitutes the entire understanding between the parties hereto and supersedes any and all prior or contemporaneous oral or written communications with respect to the subject matter hereof, all of which communications are merged herein.  It is expressly understood and agreed that no employee, agent or other representative of the Seller or the Purchaser has any authority to bind such party with regard to any statement, representation, warranty or other expression unless said statement, representation, warranty or other expression is specifically included within the express terms of this Agreement or the Trade Confirmation.  Neither this Agreement nor the Trade Confirmation shall be modified, amended or in any way altered except by an instrument in writing signed by both the parties hereto.

        **Section 8.15**    <u>Confidentiality</u>.  The Seller and the Purchaser hereby acknowledge and agree that this Agreement shall be kept confidential and its contents will not be divulged to any party without the other party's consent except to the extent that it is appropriate for the Seller or the Purchaser to do so in working with or reporting to legal counsel, auditors, taxing authorities or other governmental agencies.

        Notwithstanding any other express or implied agreement to the contrary, the parties agree and acknowledge that each of them and each of their employees, representatives, and other agents may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to any of them relating to such tax treatment and tax structure, except to the extent that confidentiality is reasonably necessary to comply with U.S. federal or state securities laws.  For purposes of this paragraph, the terms "tax treatment" and "tax structure" have the meanings specified in Treasury Regulation section 1.6011-4(c)

        **Section 8.16**    <u>No Solicitation</u>.  From and after the related Closing Date, the Seller agrees that it will not take any action or cause any action to be taken by any of its employees, agents or affiliates, or by any independent contractors acting on the Seller's behalf, to solicit in any manner whatsoever any Mortgagor for any purpose, including, without limitation, to prepay or refinance a Mortgage Loan.  It is understood and agreed by the Seller and the Purchaser that all rights and benefits relating to the solicitation of any Mortgagors shall be transferred to the Purchaser pursuant hereto on the related Closing Date and the Seller shall take no action to undermine these rights and benefits.  Promotions undertaken by the Seller, or by any affiliate of the Seller, which are directed to the general public at large (including, without limitation, mass mailing based on commercially acquired mailing lists, newspaper, radio and television advertisements), shall not constitute solicitation under this <u>Section 8.16.</u>

(SIGNATURE PAGE FOLLOWS)

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

**COUNTRYWIDE BANK, N.A.,**
the Purchaser

By: _____

Kathleen Conte
Executive Vice President

**AMERICAN HOME MORTGAGE CORP.,**
the Seller

By: _____

Alan Horn
Executive Vice President and General Counsel

**EXHIBIT A**

FORM OF FUNDING SCHEDULE

**COUNTRYWIDE BANK, N.A.**

**Funding Schedule**

_____

**Closing Date [_____]**

The Purchase Proceeds due to the Seller for the Mortgage Loans is calculated as follows:

| | | |
|---|---|---|
| 1) | Aggregate Principal Balance of Mortgage Loans as of [CUT-OFF DATE]: | $[AMOUNT] |
| 2) | Purchase Price Percentage: | [PERCENTAGE]% |
| 3) | Purchase Price Proceeds: | $[AMOUNT] |
| 4) | Accrued Interest @ [xxx]%: | $[AMOUNT] |
| 5) | Total Purchase Proceeds (Item 3 + Item 4): | $[AMOUNT] |

Pursuant to the Purchase Agreement, the Seller hereby instructs the Purchaser to wire the Purchase Proceeds to the account designated below on the date hereof:

[WIRE INSTRUCTIONS]

Agreed to and Accepted by:

_____          COUNTRYWIDE BANK, N.A.

By: _____          By: _____
    Name:                                  Name
    Title:                                 Title:


CB Internal        _____

                   _____

                   _____

                   _____

**EXHIBIT B**

FORM OF OFFICER'S CERTIFICATE

I, _____, hereby certify that I am a duly elected _____ of _____, a _____ corporation (the "Company"), and further certify on behalf of the Company as follows:

1. Attached hereto are true and correct copies of the Certificate of Incorporation and Bylaws of the Company as in full force and effect on the date hereof.

2. Each person who, as an officer or attorney-in-fact of the Company, signed (a) the Mortgage Loan Purchase and Servicing Agreement (the "Purchase Agreement") dated as of _____, by and between the Company and Countrywide Bank, N.A., and (b) any other document delivered prior hereto or on the date hereof in connection with the sale and servicing of Mortgage Loans in accordance with the Purchase Agreement was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact.

3. Set forth below is the name, title and specimen signature of the person who has been duly elected and qualified to serve in the capacity set forth opposite his or her name:

| Name | Title | Signature |
|------|-------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

, and the signatures of such persons appearing on such documents are their genuine signatures.

4. All of the representations and warranties of the Company contained in Article III of the Purchase Agreement were true and correct in all material respects as of the date of the Purchase Agreement and are true and correct in all material respects as of the date hereof.

5. The Company has performed all of its duties and has satisfied all of the material conditions on its part to be performed or satisfied prior to the Closing Date pursuant to the Purchase Agreement.

All capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Seller.

Dated: _____, 200_

By: _____
Its: _____

I, _____, Secretary of _____, hereby certify that _____ is a duly elected, qualified and acting _____ of _____ and that the signature appearing above is his or her genuine signature.

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated: _____, 200_

By: _____
Its: _____

60

## EXHIBIT C

FORM OF AUTHORIZED SIGNATORIES AGREEMENT

### AUTHORIZED SIGNATORIES AGREEMENT

This Authorized Signatories Agreement is dated and effective as of _____, 200_, between [SELLER], (the "Seller"), and Countrywide Bank, N.A. (the "Purchaser").

### RECITALS

A.  The Seller has sold, or proposes to sell, to the Purchaser those certain mortgage loans identified on Exhibit A hereto (the "Mortgage Loans").

B.  To facilitate the transfer and assignment of the Mortgage Loans from the Seller to the Purchaser, the Seller has agreed to appoint specific individuals employed by the Purchaser as authorized signatories (collectively, the "Authorized Signatories") pursuant to a certain Appointment of Authorized Signatories, the form of which is attached as Exhibit B hereto, for the sole and exclusive purposes of executing allonge note endorsements ("Endorsements") and/or executing mortgage assignments or beneficial interests in deeds of trust or similar Instruments ("Assignments"), as applicable, relating to the Mortgage Loans.

In consideration of the promises and the mutual agreements and undertakings set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  The Seller hereby authorizes the Authorized Signatories to execute the Endorsements and/or Assignments, as applicable, relating to the Mortgage Loans.

2.  The Purchaser agrees that the execution of the Endorsements and/or Assignments by the Authorized Signatories will be performed with due care.

3.  Other than the authorization granted herein, the Purchaser agrees that the Authorized Signatories will take no other action in the name of the Seller.

IN WITNESS WHEREOF, the parties have duly executed this Authorized Signatories Agreement as of the date first above written.

[SELLER],
the Seller

By: _____
       Name:
       Title:

COUNTRYWIDE BANK, N.A.,
the Purchaser

By: _____
       Kathleen Conte
       Executive Vice President

**Exhibit A**
**To**
**Authorized Signatories Agreement**

Mortgage Loan Schedule

(attached)

**Exhibit B**
**To**
**Authorized Signatories Agreement**

FORM OF APPOINTMENT OF AUTHORIZED SIGNATORIES

Pursuant to the authority granted me by a vote of the Board of Directors of [SELLER] dated as of [DATE], I hereby appoint the individuals listed below for the sole and exclusive purpose of executing allonge note endorsements and/or executing mortgage assignments or beneficial interests in deeds of trust or similar instruments, as applicable, relating to mortgage loans sold, or to be sold, by [SELLER], as identified on Exhibit A of that certain Authorized Signatories Agreement dated as of [DATE], by and between [SELLER] and Countrywide Bank, N.A.

[SELLER],

By: _____
     Name:
     Title:

Dated: _____, 200_.

**AUTHORIZED SIGNATORIES:**

| | | | |
|---|---|---|---|
| Adele Tharpe | Allen Kalust | Amy Hamlin | Amy Millett |
| Angeles Medina | Cherie Hagen | Christine Armendariz | Craig Anderson |
| Deanna Burns | Edward Gerovian | Heidi Smalley | Icela Lopez |
| Jacqui Prey | Janet Palomino | Jill Manderfield | Jordan Cohen |
| Judith Moore | Kevin Meyers | Laura Villasenor | Mark Acosta |
| Mark Wong | Mary Beth Pitstick | Mercedes Judilla | Mike Vestal |
| Nicole Walden | Paul Lindemann | Pauline Casillas | Richard L. Wilson |
| Robin Dolatowski | Ron Pisapia | Sandra Fennell | Sheri Solum |
| Sophie Hooper | Susan Hahn | Terry Stallings | Tony Meschyan |
| Tracy Schreiner | Yolanda Diaz | Lynn Sumner | Michael K. Henderson |
| Michael W. Schloessmann | | | |

63

**EXHIBIT D**

FORM OF PURCHASE CONFIRMATION

[COUNTRYWIDE LETTERHEAD]

[DATE]


**[SELLER]**
[STREET ADDRESS]
[CITY, STATE AND ZIP]
Attn: [CONTACT, TITLE]

Re:     Purchase Confirmation

Gentlemen and Ladies:

This purchase confirmation (the "Purchase Confirmation") between Countrywide Bank, N.A. (the "Purchaser") and [SELLER] (the "Seller") sets forth our agreement pursuant to which the Purchaser is purchasing, and the Seller is selling, on a servicing-retained basis, those certain mortgage loans identified in <u>Exhibit A</u> hereto and more particularly described herein (the "Mortgage Loans").

The purchase, sale and servicing of the Mortgage Loans as contemplated herein shall be governed by that certain Mortgage Loan Purchase and Servicing Agreement dated as of [DATE], between the Purchaser and the Seller (as amended herein and otherwise, the "Agreement"). By executing this Purchase Confirmation, each of the Purchaser and the Seller again makes, with respect to itself and each Mortgage Loan as of the related Closing Date or such other date as indicated in the Agreement, as applicable, all of the covenants, representations and warranties made by each such party in the Agreement, except as the same may be amended by this Purchase Confirmation.

All exhibits hereto are incorporated herein in their entirety. In the event there exists any inconsistency between the Agreement and this Purchase Confirmation, the latter shall be controlling notwithstanding anything contained in the Agreement to the contrary. All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

1.  <u>Assignment and Conveyance of Mortgage Loans</u>. Upon the Purchaser's payment of the Purchase Proceeds in accordance with Section 2.2 of the Agreement, the Seller shall sell, transfer, assign and convey to the Purchaser, without recourse, but subject to the terms of this Purchase Confirmation and the Agreement, all of the right, title and interest of the Seller in and to the Mortgage Loans, excluding the Servicing Rights relating thereto.

2.  <u>Defined Terms</u>. As used in the Agreement, the following defined terms shall have meanings set forth below, with respect to the related Mortgage Loan Package.

    a.  <u>Closing Date</u>: [DATE].

    b.  <u>Cut-off Date</u>: [DATE].

    c.  <u>Purchase Proceeds</u>: With respect to each Mortgage Loan set forth in <u>Exhibit A</u> hereto, the sum of (a) the product of (i) the unpaid principal balance of the Mortgage Loan at the Cut-off Date after giving effect to payments of principal due on or before such date, whether or not received, and (ii) a Purchase Price Percentage of [          %], and (b) accrued interest at a rate equal to the Mortgage Interest Rate less the Servicing Fee Rate, from the Cut-off Date

64



through the day prior to the Closing Date, inclusive.]

    d.  <u>Servicing Fee Rate</u>: Retained and serviced by Seller for a servicing fee of ____.

3.  <u>Description of Mortgage Loans</u>: Each Mortgage Loan complies with the specifications set forth below in all material respects.

    a.  Loan Type:  Each Mortgage Loan is a Conventional Mortgage Loan and a [Adjustable Rate] [Balloon] [Convertible] [Fixed Rate] Mortgage Loan.

    [b.  Index: On each Interest Adjustment Date, the applicable index rate shall be a rate per annum equal to [the weekly average yield on U.S. Treasury securities adjusted to a constant maturity of one year, as published by the Board of Governors of the Federal Reserve System in Statistical Release No. H.15] [the average of interbank offered rates for six-month U.S. dollar denominated deposits in the London market (LIBOR), as published [in the Wall Street Journal] [by Fannie Mae] [the 11th District Cost of Funds as made available by the Federal Home Loan Bank] [the weekly average yield on certificates of deposit adjusted to a constant maturity of six months as published by the Board of Governors of the Federal Reserve System in Statistical Release No. H.15 or a similar publication].

    c.  Lien Position:  Each Mortgage Loan is secured by a perfected [first] [second] lien Mortgage.

    d.  Underwriting Criteria: Each Mortgage Loan conforms to the underwriting criteria as set forth in the Trade Confirmation dated [              ], between the parties.

[4.  <u>Additional Stipulations Regarding Mortgage Loan Package</u>.

    a.  <u>Post-Closing Appraisal Review</u>.  In addition to any rights afforded the Purchaser in the Agreement, the Purchaser shall have the right, within thirty (30) days after the Closing Date, or the date on which the appraisal in the Mortgage File relating to the Mortgaged Property is received by the Purchaser from the Seller, whichever is later, to obtain an appraisal, broker's price opinion, drive-by appraisal or any other comparable valuation measure with respect to any Mortgaged Property (collectively, the "Review Appraisal").  If the value of a Mortgaged Property, as determined by the Review Appraisal, is less than the value of the appraisal in the Mortgage File, then the Purchaser may, at the Purchaser's sole option, notify the Seller of the variance by providing the Seller with a copy of the Review Appraisal.  Upon the Purchaser giving such notice of the variance to the Seller, the Seller shall repurchase the Mortgage Loan at the Repurchase Price not later than five (5) Business Days after the Seller's receipt of such notice from the Purchaser, unless the Seller obtains a Second Review Appraisal as defined in, and pursuant to, the following.

In the event the Seller is notified of a variance by the Purchaser which requires the Seller to repurchase a Mortgage Loan as provided herein and the Seller disputes the value of the Mortgaged Property as determined by the Review Appraisal, the Seller may, at its sole cost and expense, and within ten (10) Business Days of receipt of such notice from the Purchaser, obtain a second review appraisal ("Second Review Appraisal") of the Mortgaged Property provided that the Seller (i) gives the Purchaser written notice of its intent to obtain a Second Review Appraisal within five (5) Business Days of receipt of such notice from the Purchaser, and (ii) provides the Purchaser with a true and complete copy of the Second Review Appraisal.  If the value of the Mortgaged Property, as determined by the Second Review Appraisal, confirms the Seller's obligation to repurchase the Mortgage Loan as provided herein, the Seller shall repurchase the Mortgage Loan at the Repurchase Price not later than five (5) Business Days after receipt of the Second Review Appraisal or such other date as may be agreed to by the Purchaser.  If the value of the Mortgaged Property, as determined by the Second Review Appraisal, indicates that the Seller is not required to repurchase the Mortgage Loan, the Seller shall be relieved of its obligation to repurchase the Mortgage Loan

pursuant to this Section 3.7 provided that the Purchaser approves the Second Review Appraisal, which such approval may not be unreasonably withheld. If the Purchaser does not approve the Second Review Appraisal, the Seller shall remain obligated to repurchase the Mortgage Loan not later than five (5) Business Days after receipt of the Second Review Appraisal or such other date as may be agreed to by the Purchaser.

b.  Missing and Deficient Documents. Pursuant to Section 2.5 of the Agreement, the Seller is required to deliver to the Purchaser the Mortgage Loan Documents at least two (2) Business Days prior to the Closing Date. The Seller and the Purchaser acknowledge that as of the Closing Date, with respect to the Mortgage Loans identified in Exhibit B hereto, the Seller has not delivered the related Mortgage Loan Documents in accordance with Section 2.5 (the "Missing Documents") or, with respect to certain other Mortgage Loans also identified in Exhibit B hereto, certain Mortgage Loan Documents and/or Mortgage Files are deficient and/or incomplete for reasons detailed in Exhibit B (the "Deficient Documents").

In consideration of the Purchaser's agreement to purchase the Mortgage Loans identified in Exhibit B hereto on the Closing Date notwithstanding the foregoing, the Seller shall deliver such Missing Documents to the Purchaser and cure such Deficient Documents to the satisfaction of the Purchaser within the time period specified in Exhibit B. In the event that the Seller fails to comply with the requirements of the foregoing sentence, the Seller shall, upon written notice from the Purchaser, repurchase any such Mortgage Loan at the Repurchase Price within five (5) Business Days after the Seller's receipt of such written notice. The fact that the Purchaser decides not to require the Seller to repurchase any such Mortgage Loan where the Seller may otherwise be required to repurchase such Mortgage Loan hereunder shall not affect the Purchaser's right to demand repurchase of such Mortgage Loan or to avail itself of any other rights and remedies available to it under the Agreement. Nothing contained herein shall be deemed to waive any rights, remedies or privileges of the Purchaser including, without limitation, the remedies accorded the Purchaser under Sections 3.3 and 3.4.

c.  Post-Closing Due Diligence Review. The Seller and the Purchaser acknowledge that as of the Closing Date, with respect to of the Mortgage Loans identified in Exhibit C hereto (the "Post-Closing Due Diligence Review Mortgage Loans"), the Purchaser has not had an opportunity to review any of the Mortgage Files and otherwise complete its due diligence on the Post-Closing Due Diligence Review Mortgage Loans. The parties agree that the Purchaser shall have the right to review the Mortgage File for each Post-Closing Due Diligence Review Mortgage Loan within sixty (60) days of the latter of the Closing Date or the Purchaser's receipt of the Mortgage File from the Seller and, based on its review, request the Seller to repurchase any Post-Closing Due Diligence Review Mortgage Loan which the Purchaser determines not to be in compliance with the representations and warranties contained in the Agreement or is otherwise unsatisfactory based upon the Purchaser's due diligence findings. With respect to any such Post-Closing Due Diligence Review Mortgage Loan identified by the Purchaser pursuant to the preceding sentence, the Seller shall, within five (5) Business Days of the Purchaser's request therefore, repurchase such Post-Closing Due Diligence Review Mortgage Loan at the Repurchase Price. The fact that the Purchaser decides not to require the Seller to repurchase any such Post-Closing Due Diligence Review Mortgage Loan where the Seller may otherwise be required to repurchase such Post-Closing Due Diligence Review Mortgage Loan hereunder shall not affect the Purchaser's right to demand repurchase of such Post-Closing Due Diligence Review Mortgage Loan or to avail itself of any other rights and remedies available to it under the Agreement. Provisions of the Agreement not expressly amended hereby shall remain in full force and effect without change or modification. Nothing contained herein shall be deemed to waive any rights, remedies or privileges of the Purchaser including, without limitation, the remedies accorded the Purchaser under Sections 3.3 and 3.4 of the Agreement.

d.  Obligation to fulfill Commitment Amount. The Seller and the Purchaser hereby acknowledge and agree that the aggregate unpaid principal balance of the Mortgage Loans to be sold by the Seller to the Purchaser on the Closing Date is less than the Commitment Amount set

forth in the Trade Confirmation.  In recognition of the foregoing, the Seller and the Purchaser agree as follows:  the Seller shall sell to the Purchaser additional Mortgage Loans in order to fulfill the Commitment Amount (as approved by the Purchaser, the "Approved Post-Closing Mortgage Loans").  The Seller shall sell such Approved Post-Closing Mortgage Loans to the Purchaser on a date to be mutually agreed to by the Seller and the Purchaser.  The purchase price to be paid by the Purchaser for the Approved Post-Closing Mortgage Loans shall be calculated in a manner consistent with the Trade Confirmation; provided, however, that the Purchase Price Percentage used in the foregoing calculation shall be reduced by an amount, such amount to be reasonably determined by the Purchaser, to adjust for the spread loss for each day following the Closing Date until the purchase of the Approved Post-Closing Mortgage Loans is consummated.

Notwithstanding anything contained herein to the contrary, it is understood and agreed by the Seller that in the event the aggregate unpaid principal balance of the Approved Post-Closing Mortgage Loans, when added to the aggregate unpaid principal balance of the Mortgage Loans purchased by the Purchaser on the Closing Date, is less than the commitment amount as set forth in the Trade Confirmation, the Seller shall remain obligated to pay the Purchaser the pair-out fee on the related shortfall amount.  Nothing contained herein shall be deemed to waive any rights, remedies or privileges of the Purchaser contained in the Trade Confirmation and the Agreement including, without limitation, the remedies accorded the Purchaser under Sections 3.3 and 3.4 of the Agreement.]

Kindly acknowledge your agreement to the terms of this Purchase Confirmation by signing in the appropriate space below and returning this Purchase Confirmation to the undersigned. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

COUNTRYWIDE BANK, N.A.                    [SELLER]


By: _____          By: _____
      Kathleen Conte                                   Name:
      Executive Vice President                      Title:

67

**Exhibit A to Purchase Confirmation**

Mortgage Loans

(attached)

[Exhibit B to Purchase Confirmation

Mortgage Loans with Missing/Deficient Documents

(attached)

**Exhibit C to Purchase Confirmation**

Post-Closing Due Diligence Review Mortgage Loans

(attached)]



**EXHIBIT E**

**FORM OF ANNUAL CERTIFICATION**

Re:     The [            ] agreement dated as of [    ], 200[ ] (the "Agreement"),
        among [IDENTIFY PARTIES]

I, _____, the _____ of [NAME OF SELLER], certify to [the Purchaser], [the Depositor], and the [Master Servicer] [Securities Administrator] [Trustee], and their officers, with the knowledge and intent that they will rely upon this certification, that:

(1)     I have reviewed the servicer compliance statement of the Seller provided in accordance with Item 1123 of Regulation AB (the "Compliance Statement"), the report on assessment of the Seller's compliance with the servicing criteria set forth in Item 1122(d) of Regulation AB (the "Servicing Criteria"), provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the registered public accounting firm's attestation report provided in accordance with Rules 13a-18 and 15d-18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all servicing reports, officer's certificates and other information relating to the servicing of the Mortgage Loans by the Seller during 200[ ] that were delivered by the Seller to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee] pursuant to the Agreement (collectively, the "Servicing Information");

(2)     Based on my knowledge, the Servicing Information, taken as a whole, does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in the light of the circumstances under which such statements were made, not misleading with respect to the period of time covered by the Servicing Information;

(3)     Based on my knowledge, all of the Servicing Information required to be provided by the Seller under the Agreement has been provided to the [Depositor] [Master Servicer] [Securities Administrator] [Trustee];

(4)     I am responsible for reviewing the activities performed by the Seller as servicer under the Agreement, and based on my knowledge and the compliance review conducted in preparing the Compliance Statement and except as disclosed in the Compliance Statement, the Servicing Assessment or the Attestation Report, the Seller has fulfilled its obligations under the Agreement in all material respects; and

(5)     The Compliance Statement required to be delivered by the Seller pursuant to the Agreement, and the Servicing Assessment and Attestation Report required to be provided by the Seller and by any Subservicer or Subcontractor pursuant to the Agreement, have been provided to the [Depositor] [Master Servicer]. Any material instances of noncompliance described in such reports have been disclosed to the [Depositor] [Master Servicer]. Any material instance of noncompliance with the Servicing Criteria has been disclosed in such reports.

<div style="text-align:center">[NAME OF SELLER]</div>

By:_____
            Name:
            Title:
            Date:



## EXHIBIT F

## SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by [the Seller] [Name of Subservicer] shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria":

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| **General Servicing Considerations** | | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the mortgage loans are maintained. | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | |
| **Cash Collection and Administration** | | |
| 1122(d)(2)(i) | Payments on mortgage loans are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of over collateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | |

| | | |
|---|---|---|
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | |

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| | **Investor Remittances and Reporting** | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of mortgage loans serviced by the Servicer. | X |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X |
| | **Pool Asset Administration** | |
| 1122(d)(4)(i) | Collateral or security on mortgage loans is maintained as required by the transaction agreements or related mortgage loan documents. | X |
| 1122(d)(4)(ii) | Mortgage loan and related documents are safeguarded as required by the transaction agreements. | X |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X |
| 1122(d)(4)(iv) | Payments on mortgage loans, including any payoffs, made in accordance with the related mortgage loan documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related mortgage loan documents. | |
| 1122(d)(4)(v) | The Servicer's records regarding the mortgage loans agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's mortgage loans Changes with respect to the terms or status of an obligor's mortgage loans (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized | X |




| Reference | Criteria | |
|---|---|---|
| | personnel in accordance with the transaction agreements and related pool asset documents. | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a mortgage loan is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent mortgage loans including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for mortgage loans with variable rates are computed based on the related mortgage loan documents. | X |

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's mortgage loan documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable mortgage loan documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related mortgage loans, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | X |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | X |

| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | |

[NAME OF SELLER OR SUBSERVICER]


By:_____
      Name:
      Title:
      Date:

76

# EXHIBIT C

## MORTGAGE LOAN PURCHASE AND INTERIM SERVICING AGREEMENT

This Mortgage Loan Purchase and Interim Servicing Agreement is dated and effective as of April 27, 2007 (the "Agreement"), between American Home Mortgage Corp., having an address at 538 Broadhollow Road, Melville, New York 11747 (the "Seller"), and Countrywide Bank, FSB, having an address at 4500 Park Granada, Calabasas, California 91302 (the "Purchaser").

### R E C I T A L S

The Seller desires to sell and transfer to the Purchaser from time to time, and the Purchaser desires to purchase from the Seller from time to time, certain mortgage loans identified in a Purchase Confirmation (as defined below) executed by the Purchaser and the Seller, including all servicing rights relating thereto (as defined herein, the "Mortgage Loans"), upon such terms set forth below.

In consideration of the promises and the mutual agreements and undertakings set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### ARTICLE I

### DEFINITIONS

Unless the context requires otherwise, all capitalized terms used herein shall have the meanings assigned to such terms in this Article I unless defined elsewhere herein. Any capitalized term used or defined in a Purchase Confirmation that conflicts with the corresponding definition set forth herein shall supersede such term.

**Accrued Interest**: With respect to each Mortgage Loan, accrued interest, due and payable in accordance with the terms of the respective Mortgage Note, on the Stated Principal Balance of such Mortgage Loan, at a rate equal to the Mortgage Interest Rate as to each Mortgage Loan, from the date through which interest has last been paid through to one (1) day prior to the related Closing Date.

**Adjustable Rate Mortgage Loan or ARM**: Any Mortgage Loan in which the related Mortgage Note contains a provision whereby the Mortgage Interest Rate is adjusted from time to time in accordance with the terms of such Mortgage Note.

**Agencies**: Both Fannie Mae and Freddie Mac.

**Agreement**: This Mortgage Loan Purchase and Interim Servicing Agreement, including all exhibits and supplements hereto, and all amendments hereof.

**ALTA**: The American Land Title Association or any successor thereto.

**Appraised Value**: With respect to any Mortgage Loan, the value of the related Mortgaged Property based upon the lesser of (i) the appraisal made for the originator at the time of origination of the Mortgage Loan or (ii) the purchase price of the Mortgaged Property at the time of origination of the Mortgage Loan, with respect to a Refinanced Mortgage Loan in which the Mortgagor purchased the related Mortgaged Property twelve (12) months or more prior to the origination date of such Refinanced Mortgage Loan, such value is based solely upon the appraisal made at the time of origination of such Refinanced Mortgage Loan.

**Assignment of Mortgage**: An assignment of the Mortgage, notice of transfer or equivalent instrument in recordable form, sufficient under the laws of the jurisdiction wherein the related Mortgaged Property is located to reflect the sale of the Mortgage to the Purchaser.

1

**Balloon Mortgage Loan**: Any Mortgage Loan wherein the Mortgage Note matures prior to full amortization and requires a final and accelerated payment of principal.

**Business Day**: Any day other than (i) a Saturday or Sunday, or (ii) a day on which banking and savings and loan Institutions in the State of California or New York, are authorized or obligated by law or executive order to be closed.

**Cash-Out Refinancing**: A Refinanced Mortgage Loan the proceeds of which were in excess of the principal balance of any existing first mortgage on the related Mortgaged Property and related closing costs, and were used to pay any such existing first mortgage, related closing costs and subordinate mortgages on the related Mortgaged Property.

**Combined-Loan-to-Value Ratio or CLTV**: With respect to any Mortgage Loan as of any date, the fraction, expressed as a percentage, the numerator of which is the sum of (a) the original principal balance of the Mortgage Loan, plus (b) the unpaid principal balance of any Senior Mortgage Loan and related subordinate mortgage loan or loans secured by the Mortgaged Property, and the denominator of which is the Appraised Value of the related Mortgaged Property.

**Closing**: The consummation of the sale and purchase of each Mortgage Loan Package.

**Closing Date**: With respect to each sale and purchase of a Mortgage Loan Package, as contemplated hereunder, the closing date on which the purchase and sale of the Mortgage Loans constituting a Mortgage Loan Package is consummated, as set forth in the related Trade Confirmation and Purchase Confirmation.

**Code**: The Internal Revenue Code of 1986, as it may be amended from time to time or any successor statute thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto.

**Commission:** The United States Securities and Exchange Commission.

**Conventional Mortgage Loan**: A Mortgage Loan that is not insured by the FHA or guaranteed by the VA.

**Convertible Mortgage Loan**: Any Adjustable Rate Mortgage Loan that contains a provision whereby the Mortgagor is permitted to convert the Mortgage Loan to a fixed-rate mortgage loan in accordance with the terms of the related Mortgage Note.

**Credit Score**: The credit score of the Mortgagor provided by Fair, Isaac & Company, Inc. or such other organization providing credit scores at the time of the origination of a Mortgage Loan. If two credit scores are obtained, the Credit Score shall be the lower of the two credit scores. If three credit scores are obtained, the Credit Score shall be the middle of the three credit scores.

**Custodial Account**: The separate account or accounts created and maintained pursuant to this Agreement with respect to the Mortgage Loans, which shall be an Eligible Account.

**Custodian**: Treasury Bank, a division of Countrywide Bank, FSB, or its successor in interest or assigns, or any successor to the Custodian

**Cut-off Date**: With respect to each sale and purchase of a Mortgage Loan Package as contemplated hereunder, the cut-off date as set forth in the related Purchase Confirmation.

**Depositor**: The depositor, as such term is defined in Regulation AB, with respect to any Securitization Transaction.

2

**Due Date**: The day of the month on which a Monthly Payment is due on a Mortgage Loan, exclusive of any days of grace.

**Eligible Account**: An account or accounts (i) maintained with the Seller or a parent, affiliate or subsidiary of the Seller provided the deposits of such entity are fully insured by the FDIC up to the related limits, (ii) maintained with a depository institution the short term debt obligations of which are rated by Standard & Poor's Ratings Group in one of its two (2) highest rating categories at the time of any deposit therein, or (iii) maintained with a national or state chartered bank provided that it maintains a rating by Standard & Poor's Ratings Group in the four (4) highest rating categories for short term debt obligations.

**Escrow Account**: An account or accounts maintained by the Seller, or the Seller's predecessor in interest, maintained for the deposit of Escrow Payments received in respect of one or more Mortgage Loans.

**Escrow Payments**: The amounts held in Escrow Accounts which include amounts being held for payment of taxes, assessments, water rates, mortgage insurance premiums, fire and hazard insurance premiums and other payments required to be escrowed by the Mortgagor pursuant to any Mortgage Loan.

**Exchange Act:** The Securities Exchange Act of 1934, as amended.

**Fannie Mae**: The Federal National Mortgage Association or any successor thereto.

**FDIC**: The Federal Deposit Insurance Corporation, or any successor thereto.

**FFIEC**: The Federal Financial Institutions Examination Council or any successor thereto.

**FHA**: The Federal Housing Administration.

**FICO Score**: A credit score developed by the Fair Isaac Credit Organization.

**Fixed Rate Mortgage Loan**: Any Mortgage Loan wherein the Mortgage Interest Rate set forth in the Mortgage Note is fixed for the term of such Mortgage Loan.

**Freddie Mac**: The Federal Home Loan Mortgage Corporation, or any successor thereto.

**Ginnie Mae or GNMA**: The Government National Mortgage Association or any successor organization.

**Gross Margin**: With respect to each Adjustable Rate Mortgage Loan, the fixed percentage amount set forth in the related Mortgage Note which amount is added to the Index in accordance with the terms of the related Mortgage Note to determine the Mortgage Interest Rate for such Mortgage Loan.

**Hard Prepayment Charge**: With respect to a Prepayment Charge, any Prepayment Charge that is not subject to any exceptions pursuant to the terms of the related Mortgage Note.

**Hazardous Substances**: Any substances, materials, hazardous wastes or solid wastes that are or become regulated under applicable federal, state or local laws or regulations or that are classified as hazardous or toxic under federal, state or local laws or regulations, including, without limitation, the Comprehensive Environmental Response Compensation and Liability Act, the Resource Conservation and Recovery Act of 1976.

3

**HMDA**:  The Home Mortgage Disclosure Act, as amended.

**HUD**:  The Department of Housing and Urban Development or any successor thereto.

**Index**:  With respect to each Adjustable Rate Mortgage Loan, the Index shall mean the rate per annum of the security instrument as set forth in the related Mortgage Loan Schedule with respect to each Segment.

**Initial Purchaser**:  Countrywide Bank, FSB.

**Initial Rate Cap**:  With respect to each Adjustable Rate Mortgage Loan and the first Interest Adjustment Date after the Origination Date, a number of percentage points per annum that is set forth in the related Mortgage Loan Schedule and in the related Mortgage Note, which is the maximum amount by which the Mortgage Interest Rate for such Mortgage Loan may increase (without regard to the Maximum Mortgage Interest Rate) or decrease (without regard to the Minimum Mortgage Interest Rate) on such Adjustment Date from the Mortgage Interest Rate in effect immediately prior to such Adjustment Date.

**Interest Adjustment Date**:  With respect to each Adjustable Rate Mortgage Loan, the date on which an adjustment to the Mortgage Interest Rate on a Mortgage Note becomes effective.

**Interim Servicing Period**:  With respect to each Mortgage Loan Package, the period commencing with the related Closing Date and ending with the related Servicing Transfer Date.

**Lender Paid Mortgage Insurance Policy or LPMI Policy**:  A policy of mortgage guaranty insurance issued by a Qualified Insurer in which the owner or servicer of the Mortgage Loan is responsible for the premiums associated with such mortgage insurance policy.

**Lifetime Mortgage Interest Rate Cap**:  With respect to each Adjustable Rate Mortgage Loan, the absolute maximum Mortgage Interest Rate payable for an Adjustable Rate Mortgage Loan, above which the Mortgage Interest Rate shall not be adjusted, as provided in the related Mortgage Loan Schedule and the related Mortgage Note.

**Loan-to-Value Ratio or LTV**:  With respect to any Mortgage Loan, the ratio of the original outstanding principal amount to the Appraised Value of the Mortgage Loan.

**LPMI Loan**:  A Mortgage Loan covered by a Lender Paid Primary Mortgage Insurance Policy as of the related Cut-off Date.

**LPMI Rate**:  With respect to each LPMI Loan, the portion of the Mortgage Interest Rate as set forth on the related Mortgage Loan Schedule, which shall be used to pay the premium due on the related Lender Paid Primary Mortgage Insurance Policy.

**Maximum Mortgage Interest Rate**:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the maximum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be increased on any Interest Adjustment Date.

**MERS**:  Mortgage Electronic Registration Systems, Inc., a corporation organized and existing under the laws of the State of Delaware, or any successor or assign thereto.

**MERS System**:  The electronic system of recording transfers of mortgages electronically maintained by MERS.

4

**MIN**:  The mortgage identification number issued to each Mortgage Loan registered with MERS on the MERS® System.

**Minimum Monthly Payment**:  With respect to a Pay Option ARM Mortgage Loan, the minimum Monthly Payment calculated in accordance with the terms of the related Mortgage Note.

**Minimum Mortgage Interest Rate**:  With respect to each Adjustable Rate Mortgage Loan, a rate that is set forth on the related Mortgage Loan Schedule and in the related Mortgage Note and is the minimum interest rate to which the Mortgage Interest Rate on such Mortgage Loan may be decreased on any Interest Adjustment Date.

**MOM Loan**:  A Mortgage Loan that was registered on the MERS® System at the time of origination thereof and for which MERS appears as the record mortgagee on the related Mortgage, solely as nominee for the originator of such Mortgage Loan, and its successors and assigns, at the origination thereof.

**Monthly Payment**:  The scheduled monthly payment on a Mortgage Loan as set forth in the related Mortgage Note.

**Mortgage**:  The mortgage, deed of trust or other such instrument securing a Mortgage Note, which creates a first lien or second lien, as specified in the related Mortgage Loan Schedule, on an unsubordinated estate in fee simple in real property securing the Mortgage Note or a first or second lien, as applicable, upon a leasehold estate of Mortgagor, as the case may be.

**Mortgage File**:  The file containing the Mortgage Loan Documents, all other documents in connection with the origination of a particular Mortgage Loan, all appraisals and/or appraisal reviews and/or any property valuations relating to a Mortgaged Property, and all documents, files and other information reasonably necessary to service the Mortgage Loans.

**Mortgage Interest Rate**:  The annual rate at which interest accrues on any Mortgage Loan, exclusive of any primary mortgage insurance, as adjusted from time to time in accordance with the provisions of the related Mortgage Note, if applicable.

**Mortgage Loan**:  A mortgage loan identified in the Mortgage Loan Schedule which is sold pursuant to this Agreement, which Mortgage Loan includes without limitation the Mortgage Loan Documents, the Mortgage File, the Monthly Payments, Principal Prepayments, any related Escrow Accounts, any related Custodial Accounts, the Servicing Rights and all other rights, benefits, proceeds and obligations arising from or in connection with such Mortgage Loan.  Unless the context requires otherwise, any reference to the Mortgage Loans in this Agreement shall refer to the Mortgage Loans constituting a Mortgage Loan Package.

**Mortgage Loan Documents**:  The following documents pertaining to any Mortgage Loan:

(a)  The original Mortgage Note bearing all intervening endorsements, endorsed "Pay to the order of _____" and signed in the name of the Seller by an authorized officer;

(b)  The original Assignment of Mortgage for each Mortgage Loan in blank (except for Mortgage Loans registered with the MERS System);

(c)  The original Mortgage with evidence of recording thereon (except for MOM Loans, evidence of the related MIN);

(d)  The originals of all intervening assignments of mortgage with evidence of recording thereon (except for Mortgage Loans registered with the MERS System, in which case, the originals of all

intervening assignments of mortgage with evidence of recording thereon prior to the intervening assignment to MERS, if any); and

(e) The original mortgagee title insurance policy and any endorsements thereto.

**Mortgage Loan Package**: The Mortgage Loans sold to the Purchaser pursuant to a Purchase Confirmation and identified on a Mortgage Loan Schedule.

**Mortgage Loan Schedule**: With respect to each Mortgage Loan Package, the schedule of Mortgage Loans included therein and made a part of the related Purchase Confirmation, which schedule shall include, the following information with respect to each Mortgage Loan: (1) the Seller's Mortgage Loan identifying number; (2) the Mortgagor's first and last name; (3) the street address of the Mortgaged Property including the city, state and zip code; (4) a code indicating whether the Mortgaged Property is owner-occupied, a second home or investor property; (5) the type of Mortgage Loan (i.e. Fixed Rate Mortgage Loan, Adjustable Rate Mortgage Loan, (6) the applicable lien (first lien Mortgage Loan or second lien Mortgage Loan); (7) a code indicating document style (i.e. full, alternative, or reduced); (8) a code indicating the type of residential dwelling constituting the Mortgaged Property; (9) a code indicating the purpose of the loan (i.e., purchase financing, Rate/Term Refinancing, Cash-Out Refinancing); (10) the original principal amount of the Mortgage Loan; (11) the Mortgage Interest Rate at origination; (12) the Mortgage Interest Rate as of the Cut-off Date; (13) the date on which the first Monthly Payment was due on the Mortgage Loan; (14) the stated maturity date; (15) the amount of the Monthly Payment at origination; (16) the original months to maturity; (17) the Origination Date of the Mortgage Loan and the remaining months to maturity from the Cut-off Date, based on the original amortization schedule; (18) the last Due Date on which a Monthly Payment was actually applied to the unpaid Stated Principal Balance; (19) the Mortgage Interest Rate in effect immediately following the Cut-off Date; (20) the Stated Principal Balance of the Mortgage Loan as of the Cut-off Date; (21) the amount of the Monthly Payment as of the Cut-off Date; (22) the sales price of the Mortgaged Property at origination; (23) the Appraised Value at origination; (24) the Loan-to-Value Ratio at origination; (25) Combined Loan-to-Value Ratio at origination; (26) the current Appraised Value and Updated LTV, if applicable; (27) the Credit Score; (28) a code indicating whether or not the Mortgage Loan is the subject of Primary Mortgage Insurance Policy or LPMI and the name of the related insurer; (29) the interval between Interest Adjustment Dates (daily, monthly, quarterly, semi-annually, annually, etc.); (30) with respect to any Adjustable Rate Mortgage Loan, the first Interest Adjustment Date after the Origination Date; (31) with respect to any Adjustable Rate Mortgage Loan, the Gross Margin; (32) with respect to any Adjustable Rate Mortgage Loan, the Initial Rate Cap; (33) with respect to any Adjustable Rate Mortgage Loan, the Periodic Mortgage Interest Rate Cap; (34) with respect to any Adjustable Rate Mortgage Loan, the Lifetime Mortgage Interest Rate Cap; (35) with respect to any Adjustable Rate Mortgage Loan, the next Interest Adjustment Date following the Cut-off Date; (36) with respect to any Adjustable Rate Mortgage Loan, the Index; (37) with respect to any Adjustable Rate Mortgage Loan, the Minimum Mortgage Interest Rate; (38) with respect to any Adjustable Rate Mortgage Loan, the Maximum Mortgage Interest Rate; (39) whether an Adjustable Rate Mortgage Loan is a Convertible Mortgage Loan; (40) a code indicating whether or not each Mortgage Loan has a Prepayment Charge and if so, the amount and duration of such penalty and whether such Prepayment Charge is a Hard Prepayment Charge or Soft Prepayment Charge; (41) the debt-to-income ratio; (42) a code indicating whether the Mortgage Loan is a Balloon Loan; (43) a code indicating whether the Mortgage Loan is registered on MERS and, if so, the corresponding MOM or MIN, as applicable; (44) with respect to a LPMI Loan, the LPMI Rate; (45) any available HMDA data; (46) with respect to each Mortgage Loan, the unpaid principal balance of any mortgage loans secured by the related Mortgaged Property, if available; (47) the Mortgagor's social security number; (48) the Interest Rate in effect as of the Closing Date; (49) the amount of the Monthly Payment as of the Cut-off Date; (50) recast term; (51) negative amortization percentage; (52) State Principal Balance as of the Cut-off Date; (53) code indicating whether a Mortgage Loan has been converted; and (54) any other information pertaining to such Mortgage Loan as may be reasonably requested by the Purchaser. With respect to the Mortgage Loans in the aggregate in each Mortgage Loan Package, the related Mortgage Loan Schedule attached to the related Purchase Confirmation shall set forth the following information, as of the related Cut-off Date: (1) the number of

6

Mortgage Loans; (2) the current principal balance of the Mortgage Loans; (3) the weighted average Mortgage Interest Rate of the Mortgage Loans; and (4) the weighted average maturity of the Mortgage Loans. In addition, the information set forth in the Mortgage Loan Schedule relating to the Mortgage Interest Rate, Periodic Mortgage Interest Rate Cap and Lifetime Mortgage Interest Rate Cap with respect to any PMI Loan, as applicable, is exclusive of the LPMI Rate.

**Mortgage Note**: The note or other evidence of the indebtedness of a Mortgagor secured by a Mortgage.

**Mortgaged Property**: The real property or leasehold estate, if applicable, securing repayment of the debt evidenced by a Mortgage Note.

**Mortgagor**: The obligor on a Mortgage Note.

**Net Escrow Payments**: Escrow Payment balances remaining after advances by the Seller for taxes and insurance to the extent documented under a detailed statement provided to the Purchaser.

**OCC**: The Office of the Comptroller of the Currency or any successor thereto.

**Origination Date**: The date on which a Mortgage Loan funded.

**OTS**: The Office of Thrift Supervision or any successor thereto.

**Pass-Through Transfer**: The sale or transfer of some or all of the Mortgage Loans to a trust to be formed as part of a publicly or privately traded, rated or unrated mortgage pass-through, pay-through or other mortgage-backed securities transaction.

**Payment Adjustment Date**: As to each Mortgage Loan, the date on which an adjustment to the Monthly Payment on a Mortgage Note becomes effective.

**Pay Option ARM Mortgage Loan**: Any Mortgage Loan identified in the Transaction Documents as an ARM that lets Mortgagors choose one of various different payments each month which may include, but not be limited to, a Minimum Monthly Payment, an interest-only payment, full principal and interest amortized over thirty (30) years, or full principal and interest amortized over fifteen (15) years.

**Periodic Mortgage Interest Rate Cap**: With respect to each Adjustable Rate Mortgage Loan, the provision of a Mortgage Note which provides for an absolute maximum amount by which the Mortgage Interest Rate therein may increase or decrease on an Interest Adjustment Date above the Mortgage Interest Rate previously in effect, equal to the rate set forth in the related Mortgage Loan Schedule, if applicable.

**Person**: Any individual, corporation, partnership, joint venture, association, joint-stock company, trust, unincorporated organization or government or any agency or political subdivision thereof.

**PMI Loan**: A Mortgage Loan with either an LTV at origination greater than eighty percent (80.00%) or any Mortgage Loan that is covered by a Primary Mortgage Insurance Policy as of the related Cut-off Date.

**Prepayment Charge**: With respect to any Mortgage Loan, any prepayment penalty or premium thereon payable in connection with a principal prepayment on such Mortgage Loan pursuant to the terms of the related Mortgage Note.

**Primary Mortgage Insurance Policy**: A policy of primary mortgage guaranty

7

insurance issued by a Qualified Insurer, providing coverage at least equal to the level of coverage required by the Agencies and the Rating Agencies at the time the related Mortgage Loan was originated if such Mortgage Loan was to be eligible for sale to, and securitization by, either Fannie Mae or Freddie Mac.

**Principal Prepayment**: Any payment or other recovery of principal on a Mortgage Loan which is received in advance of its scheduled Due Date, which is not accompanied by an amount of interest representing scheduled interest due on any date or dates in any month or months subsequent to the month of prepayment.

**Purchase Confirmation**: Those certain purchase confirmations substantially in the form of Exhibit D attached hereto, executed by the Seller and the Purchaser in connection with the purchase and sale of each Mortgage Loan Package, which sets forth the terms relating thereto including a description of the related Mortgage Loans (including the Mortgage Loan Schedule), the Purchase Price Percentage for such Mortgage Loans, the Closing Date, the Cut-off Date and the Servicing Transfer Date.

**Purchase Price**: The purchase price to be paid by the Purchaser for the Mortgage Loans (including the Servicing Rights related thereto) with regard to each Mortgage Loan or Segment of each Mortgage Loan Package, as applicable, which, unless otherwise specified in the Purchase Confirmation, shall equal the product of (a) the Purchase Price Percentage, times (b) the Stated Principal Balance of the Mortgage Loans.

**Purchase Price Percentage**: With respect to the Mortgage Loans constituting each Mortgage Loan Package, the purchase price percentage set forth in the related Purchase Confirmation.

**Purchase Proceeds**: The sum of (a) the Purchase Price and (b) Accrued Interest, to be paid by the Purchaser for the Mortgage Loans constituting each Mortgage Loan Package, as set forth in a funding schedule in the form of Exhibit A hereto.

**Purchaser**: Any entity which purchases the Mortgage Loans pursuant to this Agreement or its successor in interest or any successor or assignee of the Purchaser under this Agreement as herein provided. Unless the context requires otherwise, all references to "Purchaser" in this Agreement shall be deemed to include such Purchaser's successors in interest, assignees or designees.

**Qualified Insurer**: An insurance company duly qualified as such under the laws of the states in which the Mortgaged Properties are located, duly authorized and licensed in such states to transact the applicable insurance business and to write the insurance provided, approved as an insurer by the Agencies and the Rating Agencies and whose claims paying ability is rated in the two highest rating categories by the Standard & Poor's Ratings Group or Moody's Investors Service with respect to primary mortgage insurance and in the two highest rating categories by Best's with respect to hazard and flood insurance.

**Rate/Term Refinancing**: A Refinanced Mortgage Loan, the proceeds of which are limited to the sum of the unpaid principal balance (including all prepaid items), points, the amount required to satisfy any subordinate liens that are more than one year old (if the borrower plans to satisfy them), and other funds for the borrower's use (as long as the amount does not exceed 2% of the principal amount of the new mortgage or $2,000).

**Rating Agencies**: Moody's and S&P.

**Reconstitution**: Any Pass-Through Transfer, Securitization Transaction or Whole Loan Transfer.

8

**Reconstitution Agreements**:  Any of the agreement or agreements entered into by the Purchaser and/or certain third parties, and if necessary the Seller, on the Reconstitution Date or Dates with respect to any or all of the Mortgage Loans conveyed hereunder, in connection with a Whole Loan Transfer or a Pass-Through Transfer as set forth in Section 4.3.

**Reconstitution Date**:  The date or dates on which any or all of the Mortgage Loans purchased pursuant to this Agreement shall be reconstituted as part of a Whole Loan Transfer or a Pass-Through Transfer pursuant to Section 4.3.

**Refinanced Mortgage Loan**:  A Mortgage Loan the proceeds of which were not used to purchase the related Mortgaged Property.

**Regulation AB**: Subpart 229.1100 – Asset Backed Securities (Regulation AB), 17 C.F.R. §§229.1100-229.1123, as such may be amended from time to time, and subject to such clarification and interpretation as have been provided by the Commission in the adopting release (Asset-Backed Securities, Securities Act Release No. 33-8518, 70 Fed. Reg. 1,506, 1,531 (Jan. 7, 2005)) or by the staff of the Commission, or as may be provided by the Commission or its staff from time to time.

**Regulation AB Information & Certification Provisions**:  Sections 4.3(c), 4.4, 4.5, 4.6 and 4.7 of this Agreement.

**REMIC**:  A "real estate mortgage investment conduit" within the meaning of Section 860D of the Code.

**REMIC Provisions**: Provisions of the federal income tax law relating to a REMIC, which appear at Section 860A through 860G of Subchapter M of Chapter 1, Subtitle A of the Code, and related provisions, and regulations, rulings or pronouncements promulgated thereunder, as the foregoing may be in effect from time to time.

**Repurchase Price**:  With respect to any Mortgage Loan, a price equal to the sum of (a) the product of (i) the unpaid principal balance of the Mortgage Loan at the time of repurchase, and (ii) the Purchase Price Percentage (subject to any buyup or buydown adjustments as contemplated in the Transaction Documents), plus (b) interest on such unpaid principal balance at the Mortgage Interest Rate from the last date through which Interest has been paid and distributed to the Purchaser to the date of repurchase, plus (c) any outstanding escrow advances and any outstanding servicing advances or other amounts paid by the Purchaser on account of out-of-pocket expenditures, including, without limitation, reasonable fees and costs, with respect to such Mortgage Loan, plus (d) accrued and unpaid charges and fees, plus (e) any costs and damages that may be assessed to the Purchaser due to the Mortgage Loan being found to violate a predatory/abusive lending law.

**Sarbanes Certification**:  The certification required by Rules 13a-14(d) and 15d-14(d) under the Exchange Act (pursuant to Section 302 of the Sarbanes-Oxley Act of 2002) on behalf of an asset-backed issuer with respect to a Securitization Transaction.

**Securities Act**:  The Securities Act of 1933, as amended.

**Securitization Transaction**:  Any transaction involving either (i) a sale or other transfer of some or all of the Mortgage Loans directly or indirectly to an issuing entity in connection with an issuance of publicly offered or privately placed, rated or unrated mortgage-backed securities or (ii) an issuance of publicly offered or privately placed, rated or unrated securities, the payments on which are determined primarily by reference to one or more portfolios of residential mortgage loans consisting, in whole or in part, of some or all of the Mortgage Loans.

9

**Segment(s)**:  One or more segments of Mortgage Loans (each, a "Segment") comprising the segment(s) of Mortgage Loans set forth in the related Mortgage Loan Schedule, whether individually or in the aggregate, as applicable.

**Seller Information**:  As defined in Section 6.18.

**Senior Mortgage Loan**:  Any loan that is senior or equal in priority to the Mortgage Loan and which is secured by the same Mortgaged Property as the Mortgage Loan.

**Servicer:** As defined in Section 4.3(c)(iii).

**Servicing Criteria**: The "servicing criteria" set forth in Item 1122(d) of Regulation AB, as such may be amended from time to time.

**Servicing Rights**:  With respect to each Mortgage Loan, any and all of the following: (a) all rights to service the Mortgage Loans; (b) any payments or monies payable or received for servicing the Mortgage Loans; (c) any late fees, assumption fees, Prepayment Charges, penalties or similar payments with respect to the Mortgage Loans; (d) all agreements or documents creating, defining or evidencing any such Servicing Rights and all rights of the Seller thereunder, including, but not limited to, any clean-up calls and termination options; (e) Escrow Payments or other similar payments with respect to the Mortgage Loans and any amounts actually collected with respect thereto; (f) all accounts and other rights to payments related to any of the property described in this paragraph; (g) possession and use of any and all Mortgage Files pertaining to the Mortgage Loans or pertaining to the past, present, or prospective servicing of the Mortgage Loans; and (h) all rights, powers and privileges incident to any of the foregoing.

**Servicing Transfer Date**:  With respect to each sale and purchase of Mortgage Loans as contemplated hereunder, the servicing transfer date as set forth in the related Purchase Confirmation, or such other date as the Purchaser may select upon reasonable notice to the Seller.

**Soft Prepayment Charge**:  With respect to a Prepayment Charge, any Prepayment Charge that is subject to exceptions pursuant to the terms of the related Mortgage Note.

**Stated Principal Balance**:  With respect to each Mortgage Loan, the unpaid principal balance of the Mortgage Loan at the Cut-off Date.

**Static Pool Information:** Static pool information as described in Item 1105(a)(1)-(3) and 1105(c) of Regulation AB.

**Subcontractor:** Any vendor, subcontractor or other Person that is not responsible for the overall servicing (as "servicing" is commonly understood by participants in the mortgage-backed securities market) of Mortgage Loans but performs one or more discrete functions identified in Item 1122(d) of Regulation AB with respect to Mortgage Loans under the direction or authority of the Seller or a Subservicer.

**Subservicer:** Any Person appointed by the Seller who services Mortgage Loans on behalf of the Seller or any Subservicer and is responsible for the performance (whether directly or through Subservicers or Subcontractors) of a substantial portion of the material servicing functions required to be performed by the Seller under this Agreement or any Reconstitution Agreement that are identified in Item 1122(d) of Regulation AB.

**Third-Party Originator:** Each Person that originated Mortgage Loans acquired by the Seller.

**Trade Confirmation**:  A letter agreement executed by the Seller and the Purchaser prior to the applicable Closing Date confirming the general terms and conditions of a prospective

transaction contemplated herein and identifying certain loan characteristics of the Mortgage Loans constituting the Mortgage Loan Package to be purchased hereunder.

**Transaction Documents**: The Trade Confirmation, the Purchase Confirmation, and this Agreement.

**Updated Loan-to-Value Ratio**: With respect to any Mortgage Loan, the outstanding principal balance of such Mortgage Loan as of the date of determination divided by the value of the related Mortgaged Property as determined by a recent appraisal of the Mortgaged Property. Such appraisal shall be in a form acceptable to the Agencies.

**VA**: The Department of Veterans Affairs.

**Whole Loan Transfer**: The sale or transfer by the Purchaser of some or all of the Mortgage Loans in a whole loan format.

## ARTICLE II

## SALE OF THE MORTGAGE LOANS

**Section 2.1    Agreement of Sale**. On each Closing Date, the Seller does hereby agree to sell, convey, transfer and assign to the Purchaser all right, title and interest in and to the Mortgage Loans, the Mortgage Loan Documents, and the Mortgage Files relating to the Mortgage Loans and the Servicing Rights related thereto, all in accordance with the terms and conditions set forth herein. The Seller confirms that its agreement to sell, convey, transfer and assign to Purchaser the Mortgage Loans as provided in this Agreement shall occur automatically each time it enters into a Purchase Confirmation with the Purchaser and accepts payment from the Purchaser as provided herein. On and after each Closing Date, the Seller shall hold the Mortgage Loan Documents and Mortgage Files in trust for the Purchaser and shall act only in accordance with the terms of this Agreement and the Purchaser's instructions with respect thereto.

**Section 2.2    Payment of the Purchase Proceeds**. On the related Closing Date, the Purchaser shall pay to the Seller the Purchase Proceeds, less any applicable deductions, by wire transfer in immediately available funds to the account designated by the Seller. Upon completion of the wire transfer to the Seller's designated account, the Purchaser shall own the Mortgage Loans and the Servicing Rights, free and clear of any lien or encumbrance whatsoever.

**Section 2.3 Entitlement to Payment on the Mortgage Loans**. The Purchaser shall be entitled to all collections and recoveries of principal and interest received or applied to any Mortgagor's account on or after the related Cut-off Date. All payments and remittances on the Mortgage Loans received by the Seller after the related Closing Date and payable to the Purchaser shall be paid promptly to the Purchaser in accordance to the terms set forth in Article IV or Article V, as applicable.

**Section 2.4    Examination of Mortgage Loan Documents by the Purchaser**. Prior to each Closing Date, the Purchaser shall have the right to review the Mortgage File for each Mortgage Loan in a Mortgage Loan Package and, based on its review, decline to purchase any Mortgage Loan which the Purchaser, in its sole discretion, determines not to be in compliance with each of the representations and warranties contemplated hereby or which is otherwise unsatisfactory to the Purchaser in its reasonable discretion. It is expressly understood by the parties that the Purchaser is purchasing the Mortgage Loans for the express purpose of either (a) reselling such Mortgage Loans to a subsequent purchaser, including, but not limited to, a whole loan investor or (b) securitizing the Mortgage Loans, and, as such, the Purchaser's right to decline to purchase any of the Mortgage Loans as contemplated above may be directly influenced by the results of such subsequent purchaser's own due diligence on the Mortgage Loans or the requirements of any securitization if the

11

Mortgage Loans are determined not to be in compliance with each of the representations and warranties contemplated hereby. The Seller agrees to deliver or make available to the Purchaser a complete Mortgage File for each Mortgage Loan on or before such date as may be reasonably requested by the Purchaser. The fact that the Purchaser has conducted or has failed to conduct any partial or complete examination of the Mortgage Files shall not affect the Purchaser's right to demand repurchase or to avail itself of any other remedy available hereunder. Notwithstanding anything contained herein to the contrary, should there be a material adverse change in the characteristics of the Mortgage Loans remaining in a Mortgage Loan Package after the exclusion or rejection of one or more Mortgage Loans by the Purchaser as contemplated above, the Purchaser may, in its sole discretion, elect not to purchase the remaining Mortgage Loans and the Purchaser shall have no liability therefor.

Section 2.5    **Delivery of Mortgage Loan Documents**. At least two (2) Business Days prior to each Closing Date, the Seller shall deliver the Mortgage Loan Documents with respect to each Mortgage Loan in a Mortgage Loan Package to the Purchaser, the Custodian or a bonded third party custodian (the "Third Party Custodian") and, in the case of the latter, shall cause the Third Party Custodian to deliver to the Purchaser a custodian's certification pursuant to which the Third Party Custodian certifies to the Purchaser that (i) with respect to each Mortgage Loan, it has in its possession originals of each of the Mortgage Loan Documents, (ii) all of the Mortgage Loan Documents appear on their face to be genuine originals or copies, as applicable, and (iii) upon the Purchaser's wiring of the Purchase Proceeds to the Seller, that the Third Party Custodian shall hold the Mortgage Loan Documents with respect to each Mortgage Loan in trust for the Purchaser and will, subsequent thereto, act only in a manner consistent with the Purchaser's instructions with respect thereto. In the event that any of the Mortgage Loan Documents set forth in clauses (c) through (e) of the definition of Mortgage Loan Documents in Article I have not been delivered to the Purchaser in the time specified above (the "Missing Documents") either because such Missing Documents have not been returned by the applicable public recording office with respect to items (c) and (d), or because the final original title policy has not yet been issued by the title company with respect to item (e), then the Seller shall deliver to the Purchaser certified true and correct copies of the same and shall further deliver the originals of any such Missing Documents promptly upon its receipt thereof, but in no event later than one hundred eighty (180) days from the related Closing Date. If the Seller fails to deliver any of the Missing Documents relating to a Mortgage Loan within the time specified above, the Seller shall, upon written request from the Purchaser, repurchase such Mortgage Loan in accordance with Section 3.3.

Section 2.6    **Conditions to Closing**. The Purchaser's obligations hereunder with respect to each Mortgage Loan Package are subject to the fulfillment of the following conditions precedent. In the event that any of the conditions set forth below are not satisfied, the Purchaser shall not have any obligation to purchase any of the Mortgage Loans in a Mortgage Loan Package or to pay the Purchase Proceeds as contemplated hereunder and shall instead be entitled, in its sole discretion, to terminate this Agreement in its entirety as it relates to such Mortgage Loan Package.

(a) Each of the representations and warranties made by the Seller hereunder shall be true and correct in all material respects as of the related Closing Date and no event shall have occurred which, with notice or the passage of time, would constitute a default under this Agreement.

(b) The Seller shall have delivered to the Purchaser or the Custodian all of the Mortgage Loan Documents in accordance with Section 2.5 and a complete Mortgage File with respect to each Mortgage Loan in a Mortgage Loan Package.

(c) Each of the terms and conditions set forth herein which are required to be satisfied on or before each Closing Date shall have been satisfied unless waived by the prejudiced party(ies).

(d) The Seller shall have delivered to the Purchaser on or before each Closing Date the following documents:

(1) a fully executed Agreement;

12

(2) an executed Purchase Confirmation in the form of Exhibit D relating to such Closing;

(3) the Mortgage Loan Schedule, which shall include, without limitation, the Stated Principal Balance of each Mortgage Loan;

(4) an executed Funding Schedule, in the form of Exhibit A hereto;

(5) an Officer's Certificate, in the form of Exhibit B hereto;

(6) an executed Authorized Signatories Agreement, in the form of Exhibit C hereto; and

(7) such other documents related to the purchase and sale of the Mortgage Loans as the Purchaser may reasonably request.

(e) The documents specified in subsections (d)(1), d(5) and (d)(6) shall only be required with respect to the initial Closing Date, unless Purchaser subsequently requests the Seller to re-execute such documents. Notwithstanding the foregoing, the Seller shall provide an Officer's Certificate on or before the initial Closing Date and every year thereafter, if requested by the Purchaser.

**Section 2.7      Record Title.** With respect to each Mortgage Loan, record title to each Mortgage and the related Mortgage Note shall be transferred by the Seller to the Purchaser. The Seller shall, with respect to any Mortgage Loan not registered with the MERS System, at the option of the Purchaser, either (i) prepare and cause to be recorded the Assignment of Mortgage for each Mortgage Loan in a Mortgage Loan Package and shall, promptly upon its receipt of each original recorded Assignment of Mortgage from the applicable recording office, deliver the same to the Purchaser, (ii) prepare and deliver to the Purchaser an original Assignment of Mortgage in blank, in each case, within the time and in the manner specified in Section 2.5, or (iii) with respect to any Mortgage Loan registered with the MERS System, the Seller shall, at its sole cost and expense on or prior to the Closing Date, cause the MERS System to reflect that such Mortgage Loans have been assigned to the Purchaser as the sole owner of the beneficial rights related to the Mortgage Loans and the Servicing Rights related thereto. The Seller shall bear the cost and expense related to (A) providing all Assignments of Mortgages and endorsements of Mortgage Notes for any transfer of record title required hereunder with respect to the obligations of the Mortgage Notes and the underlying security interest related to each Mortgage Loan, (B) recording title of the Mortgage Loans, including, but not limited to, recording fees and fees for title policy endorsements and (C) causing the MERS System to reflect the Purchaser as the owner of the Mortgage Loans and the Servicing Rights.

**ARTICLE III**

**REPRESENTATIONS AND WARRANTIES**

**Section 3.1      Representations and Warranties Respecting the Seller.** The Seller represents, warrants and covenants to the Purchaser that, as of each Closing Date:

(a) The Seller is duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and is qualified to transact business in and is in good standing under the laws of each state where a Mortgaged Property is located or is otherwise exempt under applicable law from such qualification or is otherwise not required under applicable law to effect such qualification and no demand for such qualification has been made upon the Seller by any state having jurisdiction and in any event the Seller is in compliance with the laws of any such state to the extent necessary to insure the enforceability of each Mortgage Note and the sale of the Mortgage Loans and Servicing Rights as contemplated by this Agreement;

13

(b) The Seller has the full power and authority to perform, and to enter into and consummate, all transactions contemplated by this Agreement. The Seller has the full power and authority to hold each Mortgage Loan and to sell each Mortgage Loan and the Servicing Rights;

(c) Neither the acquisition or origination of the Mortgage Loans by the Seller, the sale of the Mortgage Loans or the Servicing Rights to the Purchaser, the consummation of the transactions contemplated hereby, nor the fulfillment of or compliance with the terms and conditions of this Agreement, will conflict with or result in a breach of any of the terms, conditions or provisions of the Seller's certificate of incorporation or bylaws or result in a material breach of any legal restriction or any agreement or instrument to which the Seller is now a party or by which it is bound, or constitute a material default or result in an acceleration under any of the foregoing, or result in the material violation of any law, rule, regulation, order, judgment or decree to which the Seller or its property is subject;

(d) The Seller is an approved seller/servicer for the Agencies, in good standing with each such agency, and is a mortgagee approved by the Secretary of HUD pursuant to sections 203 and 211 of the National Housing Act and any Person that has or currently is servicing the Mortgage Loans is an approved seller/servicer for the Agencies in good standing with each such agency. No event has occurred, including but not limited to, a change in insurance coverage, which would make the Seller unable to comply with Fannie Mae, Freddie Mac or HUD-eligibility requirements or which would require notification to the Agencies or HUD. The Seller is a member of MERS in good standing, is current in the payment of all fees and assessments imposed to the Seller by MERS and has complied in all respects with the rules and procedures of MERS;

(e) The Seller does not believe, nor does it have any reason or cause to believe, that it cannot perform each and every covenant contained in this Agreement. Seller is solvent and the sale of the Mortgage Loans will not cause Seller to become insolvent. The sale of the Mortgage Loans and the Servicing Rights related thereto is not undertaken with the intent to hinder, delay or defraud any of Seller's creditors;

(f) There is no action, suit, proceeding, investigation or litigation pending or, to the best of the Seller's knowledge, threatened, which either in any one instance or in the aggregate, if determined adversely to the Seller, would materially and adversely affect the sale of the Mortgage Loans or the Servicing Rights to the Purchaser, or the Seller's ability to perform its obligations under this Agreement;

(g) No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by the Seller of or compliance by the Seller with this Agreement or the terms of the Mortgage Loans, the delivery of the Mortgage Files to the Purchaser, the sale of the Mortgage Loans and the Servicing Rights to the Purchaser or the consummation of the transactions contemplated by this Agreement, or if required, such consent, approval, authorization or order has been obtained prior to the related Closing Date;

(h) Neither the Agreement nor any statement, report or other document furnished or to be furnished by the Seller pursuant to this Agreement or in connection with the transactions contemplated hereby contains any untrue statement of material fact made by the Seller or Seller omits to state a material fact necessary to make the statements contained herein or therein not misleading;

(i) The consummation of the transactions contemplated by this Agreement are in the ordinary course of business of the Seller, and the transfer, assignment and conveyance of the Mortgage Notes, the Mortgages and/or the Servicing Rights by the Seller pursuant to this Agreement are not subject to the bulk transfer or any similar statutory provisions in effect and applicable to this transaction;

14

(j)   Reserved;

(k)   Seller acknowledges and agrees that it shall treat the disposition of the Mortgage Loans pursuant to this Agreement as a sale for tax and accounting purposes; and the sale of each Mortgage Loan shall be reflected on Seller's balance sheet and other financial statements as a sale of assets by Seller;

(l)   Seller has not dealt with any broker, investment banker, agent or other person that may be entitled to any commission or compensation in connection with the sale of the Mortgage Loans;

(m)   The consideration received by Seller upon the sale of such Mortgage Loans pursuant to this Agreement constitutes fair consideration and reasonably equivalent value for the Mortgage Loans;

(n)   All the requisite corporate action has been taken by Seller to make this Agreement valid and binding upon Seller in accordance with the Agreement's terms.  When executed and delivered by Seller, this Agreement will constitute a legal, valid, binding, and enforceable obligation of the Seller, enforceable against it in accordance with its terms except as the enforceability thereof may be limited by (i) bankruptcy, insolvency, receivership, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights, or (ii) general principles of equity;

(o)   The Seller shall be deemed to represent to the Purchaser and to any Depositor, as of the date on which information is first provided to the Purchaser or any Depositor under <u>Section 4.3(c)</u> that, except as disclosed in writing to the Purchaser or such Depositor prior to such date: (i) the Seller and any Subservicer is not aware and has not received notice that any default, early amortization or other performance triggering event has occurred as to any other securitization due to any act or failure to act of the Seller or any Subservicer; (ii) neither Seller nor any Subservicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; (iii) no material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Seller or any Subservicer as servicer has been disclosed or reported by the Seller or any Subservicer; (iv) no material changes to the Seller's or any Subservicer's, as applicable, policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreement for mortgage loans of a type similar to the Mortgage Loans have occurred during the three-year period immediately preceding the related Securitization Transaction; (v) there are no aspects of the Seller's or any Subservicer's financial condition that could have a material adverse effect on the performance by the Seller or any Subservicer of its servicing obligations under this Agreement or any Reconstitution Agreement; (vi) there are no material legal or governmental proceedings pending (or known to be contemplated) against the Seller, any Subservicer or any Third-Party Originator; and (vii) there are no affiliations, relationships or transactions relating to the Seller, any Subservicer or any Third-Party Originator with respect to any Securitization Transaction and any party thereto identified by the related Depositor of a type described in Item 1119 of Regulation AB; and

(p)   Any Subservicer servicing the Mortgage Loans is an approved seller/servicer for the Agencies, in good standing with each such agency, and is a mortgagee approved by the Secretary of HUD pursuant to sections 203 and 211 of the National Housing Act.  No event has occurred, including but not limited to, a change in insurance coverage, which would make any Subservicer unable to comply with Fannie Mae, Freddie Mac or HUD-eligibility requirements or which would require notification to the Agencies or HUD.  Each Subservicer is a member of MERS in good standing, and is current in the payment of all fees and assessments imposed to such Subservicer by MERS and has complied in all respects with the rules and procedures of MERS.

**Section 3.2      Representations and Warranties Regarding Individual Mortgage Loans**.  With respect to each Mortgage Loan in the related Mortgage Loan Package, and unless

otherwise indicated in the related Trade Confirmation and/or Purchase Confirmation, the Seller represents and warrants to the Purchaser that as of each Closing Date and as of the related Servicing Transfer Date (unless a specific date is referenced in a representation and warranty below, in which case such date shall apply):

(a)   The information set forth in the Mortgage Loan Schedule, the Transaction Documents, the information provided pursuant to Section 5.2 and Section 5.3 as of the related Servicing Transfer Date, and in each Mortgage File is complete, true and correct in all material respects;

(b)   All payments required under the terms of the Mortgage Note to be made on or prior to the Closing Date have been made; the Seller has not advanced funds, or induced, solicited or knowingly received any advance of funds from a party other than the owner of the Mortgaged Property subject to the Mortgage, directly or indirectly, for the payment of any amount required under the Mortgage Loan. With respect to any Mortgage Loan identified on the related Mortgage Loan Schedule as secured by a second lien or a subordinate lien, all payments required to be made by the Mortgagor upon any mortgage loan that is senior or equal in priority to such Mortgage Loan and which is secured by the same Mortgaged Property as such Mortgage Loan has been made. There has been no delinquency of thirty (30) days or more in any payment by the Mortgagor thereunder during the last twelve (12) months. To the best of Seller's knowledge, none of the Mortgagors is deceased and no Mortgage Loan is subject to any pending litigation, foreclosure, bankruptcy, insolvency, or reorganization proceeding. Notwithstanding the foregoing, with respect to any Mortgage Loan for which the Monthly Payment with a Due Date in the month of the related Closing Date has not been made, the Purchaser has nonetheless agreed to purchase such Mortgage Loan, provided, however, that if such Monthly Payment is not received by the Purchaser, whether from the Mortgagor directly or forwarded by the Seller if the Mortgagor has submitted the payment to the Seller, by the last day of the month in which such payment is due, the Seller shall be deemed to have breached this warranty and representation with respect to such Mortgage Loan and such breach shall further be deemed to materially and adversely affect the value of such Mortgage Loan and the Purchaser's interest therein, and the Seller shall, at the Purchaser's option and not later than five (5) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price notwithstanding anything contained herein to the contrary. Nothing contained in this Section 3.2(b) shall in any way limit any other rights of the Purchaser as provided hereunder;

(c)   There are no delinquent taxes, water charges, sewer rents, assessments, insurance premiums, leasehold payments, including, assessments payable in future installments, or other outstanding charges affecting the related Mortgaged Property or adversely affecting the lien of the Mortgage;

(d)   The terms of the Mortgage Note and the Mortgage have not been impaired, waived, altered or modified in any respect, except by written instruments which are in the Mortgage File and have been or will be recorded, if necessary to protect the interests of the Purchaser, and which have been delivered to the Purchaser, all in accordance with this Agreement. The substance of any such waiver, alteration or modification has been approved by the primary mortgage guaranty insurer, if any, and by the title insurer, to the extent required by the related policy, and its terms are reflected on the Mortgage Loan Schedule. No Mortgagor has been released, in whole or in part, except in connection with an assumption agreement approved by the primary mortgage insurer, if any, and title insurer, to the extent required by the policy, and which assumption agreement is part of the Mortgage File and the terms of which are reflected in the Mortgage Loan Schedule, if executed prior to the related Closing Date;

(e)   The Mortgage Note and the Mortgage are not subject to any right of rescission, set-off, counterclaim or defense, including the defense of usury, nor will the operation of any of the terms of the Mortgage Note and the Mortgage, or the exercise of any right thereunder, render the Mortgage unenforceable, in whole or in part, or subject to any right of rescission, set-off,

16



counterclaim or defense, including the defense of usury and no such right of rescission, set-off, counterclaim or defense has been asserted with respect thereto;

(f)      All buildings upon, or comprising part of, the Mortgaged Property are insured by a Qualified Insurer against loss by fire, hazards of extended coverage and such other hazards as are customary in the area where the Mortgaged Property is located and in an amount that is the lesser of the outstanding principal balance of the Mortgage Loan (or, in the case of any Mortgage Loan that allows for negative amortization or is an ARM with a potential for negative amortization, the original principal amount of such Mortgage Loan, plus the maximum possible increase in such original principal amount due to negative amortization) and all Senior Mortgage Loans, if applicable, or the replacement cost of the Mortgaged Property and all Senior Mortgage Loans, if any.  All such insurance policies (collectively, the "hazard insurance policy") contain a standard mortgagee clause naming the originator or Seller, its successors and assigns as mortgagee and all premiums thereon have been paid.  If upon origination of the Mortgage Loan, the Mortgaged Property was, or was subsequently deemed to be, in an area identified in the Federal Register by the Federal Emergency Management Agency as having special flood hazards (and such flood insurance has been made available), which require under applicable law that a flood insurance policy meeting the requirements of the current guidelines of the Federal Insurance Administration (or any successor thereto) be obtained, such flood insurance policy is in effect which policy conforms to the requirements of the Agencies and the Rating Agencies.  The Mortgage obligates the Mortgagor thereunder to maintain all such insurance at Mortgagor's cost and expense and, on the Mortgagor's failure to do so, authorizes the holder of the Mortgage to maintain such insurance at Mortgagor's cost and expense and to obtain reimbursement therefor from the Mortgagor.  Each Mortgage Loan has in place a fully-paid life of loan flood certification from a Fannie Mae or Freddie Mac approved vendor, assigned in care of the Purchaser, which provides for notification to the Purchaser of changes in designated flood areas which would affect such Mortgage Loan, and each Mortgage Loan is covered by a flood map tracking system which identifies changes in designated flood areas;

(g)      Any and all requirements of any federal, state or local law including, without limitation, usury, truth in lending, real estate settlement procedures including, without limitation, the Real Estate Settlement Procedures Act of 1974, as amended, consumer credit and privacy protection, predatory and abusive lending, equal credit opportunity or disclosure laws applicable to the Mortgage Loan have been complied with in all material respects;

(h)      The Mortgage has not been satisfied, canceled, subordinated, or rescinded, in whole or in part, and the Mortgaged Property has not been released from the lien of the Mortgage, in whole or in part, nor has any instrument been executed that would effect any such release, cancellation, subordination or rescission;

(i)      The Mortgage is a valid, existing and enforceable first lien or second lien, as specified in the related Mortgage Loan Schedule, on the Mortgaged Property, including all improvements on the Mortgaged Property, if any, subject only to (a) the lien of current real property taxes and assessments not yet due and payable, (b) covenants, conditions and restrictions, rights of way, easements and other matters of the public record as of the date of recording being acceptable to mortgage lending institutions generally and specifically referred to in the lender's title insurance policy delivered to the originator of the Mortgage Loan and which do not adversely affect the Appraised Value (as defined in clause (i) of such definition) of the Mortgaged Property, (c) if a second lien, any first mortgage loan secured by the Mortgaged Property, and (d) other matters to which like properties are commonly subject which do not materially interfere with the benefits of the security intended to be provided by the Mortgage or the use, enjoyment, value or marketability of the related Mortgaged Property. The Seller has full right to sell and assign the Mortgage to the Purchaser;

(j)      The Mortgage Note and the related Mortgage are genuine and each is the legal, valid and binding obligation of the maker thereof, enforceable in accordance with its terms, except as the enforceability thereof may be limited by (i) bankruptcy, insolvency, liquidation,

17

receivership, moratorium, reorganization or other similar laws affecting the enforcement of creditors' rights, or (ii) general principles of equity;

(k)    All parties to the Mortgage Note and the Mortgage had the legal capacity to enter into the Mortgage Loan transaction and to execute and deliver the Mortgage Note and the Mortgage, and the Mortgage Note and the Mortgage have been duly and properly executed by such parties;

(l)    The proceeds of the Mortgage Loan have been fully disbursed and there is no requirement for future advances thereunder and any and all requirements as to completion of any on-site or off-site improvement and as to disbursements of any escrow funds therefor have been complied with. All costs, fees and expenses incurred in making or closing the Mortgage Loan and the recording of the Mortgage were paid, and the Mortgagor is not entitled to any refund of any amounts paid or due under the Mortgage Note or Mortgage;

(m)    The Seller is the sole owner and holder of the Mortgage Loan and the related Servicing Rights and is the custodian of the related Escrow Account, if applicable. As of the related Closing Date, except for any assignment or pledge which will be satisfied and released prior to or simultaneously with the sale of the related Mortgage Loan to the Purchaser pursuant to this Agreement, the Mortgage Loan is neither assigned nor pledged, and as of the time each Mortgage Loan was presented for sale to the Purchaser through the related Closing Date, such Mortgage Loan was never assigned or pledged to Countrywide Warehouse Lending or any other affiliate of the Purchaser. The Seller has good and marketable title thereto, and has full right to transfer and sell the Mortgage Loan and the related Servicing Rights, and has full right to transfer and sell the Mortgage Loan and the related Servicing Rights to the Purchaser free and clear of any encumbrance, equity, lien, pledge, charge, claim or security interest and has full right and authority subject to no interest or participation of, or agreement with, any other party, to sell and assign each Mortgage Loan and the related Servicing Rights to the Purchaser pursuant to the terms of this Agreement;

(n)    All parties which have had any interest in the Mortgage, whether as mortgagee, assignee, pledgee or otherwise, are (or, during the period in which they held and disposed of such interest, were) (a) in compliance with any and all applicable licensing requirements of the laws of the state wherein the Mortgaged Property is located, and (b) (i) organized under the laws of such state, or (ii) qualified to do business in such state, or (iii) a federal savings and loan association or national bank having principal offices in such state, or (iv) not deemed to be doing business in such state under applicable law;

(o)    The Mortgage Loan is insured by an ALTA lender's title insurance policy acceptable to the Agencies and the Rating Agencies, issued by a title insurer acceptable to the Agencies and the Rating Agencies and qualified to do business in the jurisdiction where the Mortgaged Property is located , insuring (subject to the exceptions contained in (i)(a), (b) and (c) above) the Seller, its successors and assigns as to the first priority or second priority lien of the Mortgage, as applicable, in the original principal amount of the Mortgage Loan (or, in the case of any Mortgage Loan that allows for negative amortization or is an ARM with a potential for negative amortization, the original principal amount of such Mortgage Loan, plus the maximum possible increase in such original principal amount due to negative amortization) and against any loss by reason of the invalidity or unenforceability of the lien resulting from the provisions of the Mortgage Note and/or Mortgage providing for adjustment in the Mortgage Interest Rate and Monthly Payment. Additionally, such lender's title insurance policy affirmatively insures ingress and egress, and against encroachments by or upon the Mortgaged Property or any interest therein. The Seller is the sole insured of such lender's title insurance policy, and such lender's title insurance policy is in full force and effect and will be in full force and effect upon the consummation of the transactions contemplated by this Agreement. No claims have been made under such lender's title insurance policy, and no prior holder of the related Mortgage, including the Seller, has done, by act or omission, anything which would impair the coverage of such lender's title insurance policy;

18

(p)    There is no default, breach, violation or event of acceleration existing under the Mortgage or the Mortgage Note and no event which, with the passage of time or with notice and the expiration of any grace or cure period, would constitute a default, breach, violation or event of acceleration, and the Seller has not waived any default, breach, violation or event of acceleration;

(q)    There are no mechanics' or similar liens or claims which have been filed for work, labor or material (and no rights are outstanding that under law could give rise to such lien) affecting the related Mortgaged Property which are or may be liens prior to or equal with, the lien of the related Mortgage;

(r)    All improvements which were considered in determining the Appraised Value (as defined in clause (i) of said definition) of the related Mortgaged Property lay wholly within the boundaries and building restriction lines of the Mortgaged Property, and no improvements on adjoining properties encroach upon the Mortgaged Property;

(s)    Each Mortgage Loan was originated by a savings and loan association, savings bank, commercial bank, credit union, insurance company, or mortgage banking company which is supervised and examined by a federal or state authority, or by a mortgage originator approved by the Secretary of Housing and Urban Development pursuant to Sections 203 and 211 of the National Housing Act;

(t)    As of the Closing Date, the origination practices with respect to each Mortgage Note and Mortgage, have been conducted in all respects in accordance with the terms of the Mortgage Note and in compliance with all applicable laws and regulations and, unless otherwise required by law or a Fannie Mae or Freddie Mac standard, in accordance with the proper, prudent and customary practices in the mortgage origination business. The servicing and collection practices with respect to each Mortgage Note and Mortgage including, without limitation, the establishment, maintenance and servicing of the Escrow Accounts and Escrow Payments, if any, since origination to and including the related Servicing Transfer Date, have been conducted in all respects in accordance with the terms of the Mortgage Note and in compliance with all applicable laws and regulations and, unless otherwise required by law or a Fannie Mae or Freddie Mac standard, in accordance with the proper, prudent and customary practices in the mortgage origination and servicing business. With respect to the Escrow Accounts and Escrow Payments, if any, all such payments are in the possession or under the control of the Seller and there exists no deficiencies in connection therewith for which customary arrangements for repayment thereof have not been made. No escrow deposits or Escrow Payments or other charges or payments due the Seller have been capitalized under any Mortgage or the related Mortgage Note. All Mortgage Interest Rate adjustments have been made in strict compliance with state and federal law and the terms of the related Mortgage Note. Any interest required to be paid pursuant to state and local law has been properly paid and credited;

(u)    The Mortgaged Property is free of material damage and waste and there is no proceeding pending for the total or partial condemnation thereof;

(v)    The Mortgage and related Mortgage Note contain customary and enforceable provisions to render the rights and remedies of the holder thereof adequate for the realization against the Mortgaged Property of the benefits of the security intended to be provided thereby, including, (a) in the case of a Mortgage designated as a deed of trust, by trustee's sale, and (b) otherwise by judicial foreclosure. There is no homestead or other exemption available to the Mortgagor which would interfere with the right to sell the Mortgaged Property at a trustee's sale or the right to foreclose the Mortgage. The Mortgagor has not notified the Seller and the Seller has no knowledge of any relief requested or allowed to the Mortgagor under the Servicemembers Relief Act of 2003, as amended;

(w)    The Mortgage Note is not and has not been secured by any collateral except the lien of the applicable Mortgage on the related Mortgaged Property;

19

(x)     The Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the approval of the Mortgage Loan application by an appraiser who meets the minimum requisite qualifications of the Agencies for appraisers, duly appointed by the originator, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan; the appraisal is in a form acceptable to the Agencies, with such riders as are acceptable to the Agencies; such appraisal was conducted in compliance with all applicable laws and regulations and in accordance with the proper, prudent and customary practices in the appraisal business and represents the fair market value of the Mortgaged Property at the time of origination of the related Mortgage Loan;

(y)     In the event the Mortgage constitutes a deed of trust, a trustee, duly qualified under applicable law to serve as such, has been properly designated and currently so serves and is named in the Mortgage, and no fees or expenses are or will become payable by the Purchaser to the trustee under the deed of trust, except in connection with a trustee's sale after default by the Mortgagor;

(z)     Except as otherwise specified in the related Purchase Confirmation or Trade Confirmation, no Mortgage Loan contains a permanent or temporary "buydown" provision;

(aa)    The Mortgagor has executed one or more statements to the effect that the Mortgagor has received all disclosure materials required by applicable law with respect to the making of the Mortgage Loan. The Seller shall maintain all such statements in the Mortgage File;

(bb)    No Mortgage Loan was made in connection with (a) the construction or rehabilitation of a Mortgaged Property or (b) facilitating the trade-in or exchange of a Mortgaged Property;

(cc)    If any Mortgage Loan is indicated in the Transaction Documents or the Mortgage Loan Schedule as having a Primary Mortgage Insurance Policy, such policy provides coverage in an amount at least equal to that which would be required by the Agencies and the Rating Agencies if such Mortgage Loan was being delivered for sale to, and securitization by, each Agency. In addition, and regardless if indicated in the Transaction Documents, each Mortgage Loan with either an LTV at origination or a current LTV (based on current market value and amortization) greater than eighty percent (80.00%) is and will be subject to a Primary Mortgage Insurance Policy which provides coverage in an amount at least equal to that which would be required by the Agencies and Rating Agencies if such Mortgage Loan was being delivered for sale to, and securitization by, each Agency. With respect to any Mortgage Loan which allows negative amortization, such Primary Mortgage Insurance Policy shall contain provisions to cover the potential negative amortization of such Mortgage Loan. All provisions of any Primary Mortgage Insurance Policy have been and are being complied with, such policy is in full force and effect, and all premiums due thereunder have been paid. Any Mortgage subject to any such Primary Mortgage Insurance Policy obligates the Mortgagor thereunder to maintain such insurance and to pay all premiums and charges in connection therewith. The Mortgage Interest Rate for the Mortgage Loan is exclusive of any such insurance premium;

(dd)    The Mortgaged Property is lawfully occupied under applicable law and all inspections, licenses and certificates required to be made or issued with respect to all occupied portions of the Mortgaged Property and, with respect to the use and occupancy of the same, including but not limited to certificates of occupancy, have been made or obtained from the appropriate authorities;

(ee)    No action has been taken or failed to be taken, no event has occurred and no state of facts exists or has existed on or prior to the related Closing Date (whether or not known to the Seller on or prior to such date) which has resulted or will result in an exclusion from, denial of, or defense to coverage under any Primary Mortgage Insurance Policy (including, without limitation, any

20

exclusions, denials or defenses which would limit or reduce the availability of the timely payment of the full amount of the loss otherwise due thereunder to the insured) whether arising out of actions, representations, errors, omissions, negligence or fraud of the Seller, the related Mortgagor or any party involved in the application for such coverage, including the appraisal, plans and specifications and other exhibits or documents submitted therewith to the insurer under such insurance policy, or for any other reason under such coverage, but not including the failure of such insurer to pay by reason of such insurer's breach of such insurance policy or such insurer's financial inability to pay;

(ff)     The Assignment of Mortgage is in recordable form and is acceptable for recording under the laws of the jurisdiction in which the Mortgaged Property is located, and with respect to any Mortgage Loan registered with the MERS® System, the Seller has complied in all respects with the rules and procedures of MERS in connection with the transfer to the Purchaser of the beneficial rights as registered by the MERS® System, as of the Closing Date, and the Servicing Rights as registered by the MERS® System, as of the Servicing Transfer Date, of such Mortgage Loans;

(gg)     Any future advances made to the Mortgagor prior to the related Closing Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first lien or second lien priority, as applicable, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to the Agencies. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(hh)     If the Mortgaged Property is a condominium unit or a planned unit development, such condominium or planned unit development project meets the eligibility requirements of the Agencies;

(ii)     The Mortgage Note and Mortgage are on forms acceptable for sale and securitization to either of the Agencies;

(jj)     The Mortgaged Property is located in the state indicated on the Mortgage Loan Schedule, and consists of a single parcel of real property with a detached single family residence erected thereon, or an individual condominium unit in a structure of four stories or less ("Low Rise Condo"), or an individual condominium unit in a structure of more than four stories ("High Rise Condo") if located in a metropolitan area where such structures are typical, or a 2-4 family dwelling or an individual unit in a planned unit development as defined by Fannie Mae, and no Mortgaged Property is a mobile home, manufactured dwelling, cooperative housing unit, log home, mixed use, commercial property, or condominium unit used as a hotel, subject to a time share agreement or similar arrangement.  All condominium units are warrantable by Fannie Mae and Freddie Mac;

(kk)     The Seller has no knowledge of any circumstances or conditions with respect to the Mortgage, the Mortgaged Property, the Mortgagor, the Mortgage File or the Mortgagor's credit standing that can reasonably be expected to cause private institutional investors to regard the Mortgage Loan as an unacceptable investment, cause the Mortgage Loan to become delinquent, or adversely affect the value of the Mortgage Loan;

(ll)     The Mortgage contains an enforceable provision for the acceleration of the payment of the unpaid principal balance of the Mortgage Loan in the event that the Mortgaged Property is sold or transferred without the prior written consent of the mortgagee thereunder;

(mm)     The Seller has no knowledge of any circumstances existing that could reasonably be expected to adversely affect the value of any Mortgaged Property or Mortgage Loan or

to cause the Mortgage Loans to prepay during any period materially faster or slower than the mortgage loans of similar characteristics originated by the Seller generally;

(nn)    Each Mortgage Loan is covered by a valid and transferable tax service contract with Transamerica, or such other vendor as may be reasonably acceptable to the Purchaser, which may be assigned without the payment of any fee by the Purchaser;

(oo)    Each Mortgage Loan requires monthly payments sufficient to fully amortize the original principal balance of the Mortgage Loan over the original term of the Mortgage Loan as set forth in the related Mortgage Note and each monthly payment is due on the first day of each month. Unless indicated in the Mortgage Loan Schedule otherwise, no Mortgage Loan has negatively amortized nor shall any Mortgage Loan have any negative amortization after the related Closing Date and with respect to such Mortgage Loans identified on the related Mortgage Loan Schedule as having negative amortization excluding Pay Option ARM Mortgage Loans, the related Mortgage Note requires a Monthly Payment which is sufficient during the period following each Interest Adjustment Date, to fully amortize the outstanding principal balance as of the first day of the period over the then remaining term of such Mortgage Note and to pay interest at the related Mortgage Interest Rate. With respect to Pay Option ARM Mortgage Loans, the related Mortgage Note requires a Monthly Payment which is a minimum monthly payment, an interest-only payment, full principal and interest amortized over thirty (30) years, or full principal and interest amortized over fifteen (15) years, and in each case, such Monthly Payment is in accordance with the related Mortgage Note. With respect to any Pay Option ARM Mortgage Loan, as of any Interest Adjustment Date, the Mortgagor is and was provided with any and all disclosures and amortization schedules required by applicable law. No Pay Option ARM Mortgage Loan has an Updated LTV as of the Closing Date equal to or greater than 90%, and no Mortgage Loan or Mortgage Note allows for an Updated LTV equal to or greater than 125%. Except for any initial fixed term as indicated in the Mortgage Loan Schedule, the Mortgage Interest Rate for each Adjustable Rate Mortgage Loan adjusts annually in accordance with the related Mortgage Note. With respect to each Adjustable Rate Mortgage Loan, on each Interest Adjustment Date, the Mortgage Interest Rate shall be adjusted to equal the Index plus the Gross Margin (rounded up or down to the nearest 0.125%), subject to the Periodic Mortgage Interest Rate Cap and the Lifetime Mortgage Interest Rate Cap as set forth in the respective Mortgage Note and the Mortgage Loan Schedule. None of the Adjustable Rate Mortgage Loans contain a provision allowing the Mortgagor to convert the Mortgage Note from an adjustable rate mortgage loan to a Fixed Rate Mortgage Loan. With respect to any Mortgage Loan which has been converted from an Adjustable Rate Mortgage Loan into a Fixed Rate Mortgage Loan, such conversion was done in strict accordance with the terms of the related Mortgage Note. Unless otherwise set forth on the related Mortgage Loan Schedule, no Mortgage Loan is a Balloon Mortgage Loan. The principal and interest due on each Mortgage Loan is calculated pursuant to the standard amortization (30/360 day interest accrual) method;

(pp)    Each Mortgage Loan conforms to, and at the time of origination was underwritten in accordance with, the credit underwriting guidelines as indicated in the Trade Confirmation and/or Purchase Confirmation;

(qq)    As of the related Closing Date, the Seller shall have received neither actual nor constructive notice that either a Mortgage Loan will be paid in full (whether by virtue of a demand statement or otherwise) or that any Mortgagor has elected to convert the related Convertible Mortgage Loan into a Fixed Rate Mortgage Loan in accordance with the terms of the related Mortgage Note;

(rr)    None of the Mortgage Loans are (a) subject to or in violation of the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), (b) classified as "high cost," "covered," "high risk home", "threshold," or "predatory" loans under any other applicable state, federal or local law, including any predatory or abusive lending laws (or similarly classified loans using different terminology under a law imposing heightened scrutiny or additional legal liability for residential mortgage loans having high interest rates, points and/or fees) or (c) in violation of any state or local



law or ordinance similar to HOEPA;

(ss)    Except as otherwise specified in the related Purchase Confirmation, no Mortgage Loan contains provisions pursuant to which Monthly Payments are (a) paid or partially paid with funds deposited in any separate account established by the Seller, the Mortgagor, or anyone on behalf of the Mortgagor or (b) paid by any source other than the Mortgagor or contains any other similar provisions which may constitute a "buydown" provision.    The Mortgage Loan is not a graduated payment mortgage loan and the Mortgage Loan does not have a shared appreciation or other contingent interest feature; none of the Mortgage Loans is currently subject to a completion escrow and with respect to each Mortgage Loan which was subject to a completion escrow, all appropriate forms were delivered and are contained in the Mortgage File, including, without limitation, Agency Form 442;

(tt)    Reserved;

(uu)    No error, omission, misrepresentation, identity theft, any incident or action which would give rise to a claim or alleged claim of identity theft, negligence, fraud or similar occurrence with respect to a Mortgage Loan has taken place on the part of the Mortgagor, Seller or any other person, including, without limitation, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan or in the application of any insurance in relation to such Mortgage Loan; no predatory or deceptive lending practices, including, without limitation, the extension of credit without regard to the ability of the borrower to repay and the extension of credit which has no apparent benefit to the borrower, were employed in the origination of the Mortgage Loan;

(vv)    Any agreement with any servicer of the Mortgage Loans provides for the termination of the servicer on or prior to the related Servicing Transfer Date without the payment of any termination fee or other expense by the Purchaser;

(ww)    Each Mortgage Loan that is subject to the Georgia Fair Lending Act ("Act") (i) complies with all of the provisions thereof and any regulations promulgated thereunder; (ii) is not a high cost mortgage loan, as defined in the Act; (iii) if a refinance of a home mortgage loan, as defined in the Act, within five (5) years of its origination, (a) provided a reasonable, tangible, net benefit, as defined in the Act, to the Mortgagor, and (b) includes documentation in the Mortgage File of such tangible, net benefit received by the Mortgagor, and (c) the Seller did not make the loan ("Prior Loan") that was refinanced by the Mortgage Loan unless so disclosed on the Mortgage Loan Schedule; and (v) that is a "home loan" as defined by the Act, was not originated, brokered, solicited, processed, placed, negotiated, or offered on or after October 1, 2002 and prior to March 7, 2003;

(xx)    No Mortgage Loan is a "high-cost home loan" or "high cost home mortgage loan" as defined in i.) Part 41 of the General Regulations Banking Board of New York and Section 6-L of the New York State Banking Law, or ii.) Chapter 360.100 of the Kentucky Revised Statutes, or iii.) the New Jersey Home Ownership Security Act of 2002, or iv.) the Arkansas Home Loan Protection Act, or v.) the Utah High Cost Home Loan Act, or vi.) the Massachusetts Regulations (Mass. Regs. Code tit. 209, §§ 32.01 et. seq. and §§40.01 et. seq.);

(yy)    No Mortgage Loan is a "high cost home mortgage loan" as defined in the Massachusetts Predatory Home Loan Practices Act of 2004;

(zz)    Each Mortgage Loan constitutes a qualified mortgage under with Section 860G(a)(3)(A) of the Code and the REMIC Provisions;

(aaa)    There is no pending action or proceeding directly involving the Mortgaged Property in which compliance with any environmental law, rule or regulation is an issue; there is no violation of any environmental law, rule or regulation with respect to the Mortgage Property; and

23



nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation constituting a prerequisite to use and enjoyment of said property;

(bbb)    The Mortgaged Property is free of contamination from Hazardous Substances, and no amount of any Hazardous Substance has been disposed of or identified on, under or at the Mortgaged Property in violation of any federal, state or municipal law, regulation or standard, and at the time of origination, the Mortgage Loans satisfied the Fannie Mae guidelines regarding environmental hazards as set forth in Part XI, Chapter 3, Section 307 of the Fannie Mae Sellers' Guide;

(ccc)    None of the proceeds of the Mortgage Loan were used to finance single-premium credit insurance policies by the Seller;

(ddd)    With respect to each Mortgage Loan that has a prepayment penalty feature, each such prepayment penalty is enforceable and each prepayment penalty is permitted pursuant to federal, state and local law.   No Mortgage Loan will impose a prepayment penalty for a term in excess of five years from the date such Mortgage Loan was originated;

(eee)    The Mortgagor is one or more natural persons and/or trustees for an Illinois land trust or a trustee under a "living trust" and such "living trust" is in compliance with Fannie Mae guidelines for such trusts.   Either the Mortgagor is a natural person or the related co-borrower or guarantor is a natural person;

(fff)    With respect to any ground lease to which a Mortgaged Property may be subject:  (A) the Mortgagor is the owner of a valid and subsisting leasehold interest under such ground lease; (B) such ground lease is in full force and effect, unmodified and not supplemented by any writing or otherwise; (C) all rent, additional rent and other charges reserved therein have been fully paid to the extent payable as of the related Closing Date; (D) the Mortgagor enjoys the quiet and peaceful possession of the leasehold estate; (E) the Mortgagor is not in default under any of the terms of such ground lease, and there are no circumstances which, with the passage of time or the giving of notice, or both, would result in a default under such ground lease; (F) the lessor under such ground lease is not in default under any of the terms or provisions of such ground lease on the part of the lessor to be observed or performed; (G) the lessor under such ground lease has satisfied any repair or construction obligations due as of the related Closing Date pursuant to the terms of such ground lease; (H) the execution, delivery and performance of the Mortgage do not require the consent (other than those consents which have been obtained and are in full force and effect) under, and will not contravene any provision of or cause a default under, such ground lease; (I) the term of such lease does not terminate earlier than the maturity date of the Mortgage Note; (J) the ground lease term extends, or is automatically renewable, for at least five years beyond the maturity date of the related Mortgage Loan; (K) the Purchaser has the right to cure defaults on the ground lease; (L) the mortgagee is given at least thirty (30) days' notice of any default and an opportunity to cure the defaults under the ground lease or to take over the Mortgagor's rights under the ground lease; (M) the ground lease does not contain any default provisions that could give rise to forfeiture or termination of the ground lease except for the non-payment of the ground lease rents; and (N) the ground lease provides that the leasehold can be transferred, mortgaged and sublet an unlimited number of times either without restriction or on payment of a reasonable fee and delivery of reasonable documentation to the lessor;

(ggg)    As of the related Closing Date, the sale or transfer of the Mortgage Loan by the Seller complies with all applicable federal, state, and local laws, rules, and regulations governing such sale or transfer, including, without limitation, the Fair and Accurate Credit Transactions Act ("FACT Act") and the Fair Credit Reporting Act, each as may be amended from time to time, and the Seller has not received any actual or constructive notice of any identity theft, fraud, or other misrepresentation in connection with such Mortgage Loan or any party thereto;

24

(hhh)   If the Mortgage Loan is a second lien, the CLTV was not, at the time of origination, and is not, on the Closing Date, in excess of one hundred percent (100%) for each Mortgage Loan that has a first lien non negative amortization mortgage loan; the CLTV was not, at the time of origination, and is not, on the Closing Date, in excess of ninety percent (90%) for each Mortgage Loan that has a first lien negative amortization Mortgage Loan with a maximum negative amortization percent of one hundred fifteen percent (125%); and the CLTV was not, at the time of origination, and is not, on the Closing Date, in excess of eighty-five percent (85%) for each Mortgage Loan that has a first lien negative amortization Mortgage Loan with a maximum negative amortization percentage greater than one hundred fifteen percent (125%).

(iii)   . Except as otherwise specified in the related Purchase Confirmation, if the Mortgage Loan is a first lien negative amortization loan, the CLTV was not, at the time of origination, and is not, on the Closing Date, in excess of ninety (90%).  If the Mortgage Loan is a first lien non negative amortization loan, the CLTV was not, at the time of origination, and is not, on the Closing Date, in excess of one hundred percent (100%);

(jjj)   Except as otherwise specified in the related Purchase Confirmation, no Mortgage Loan has a FICO Score less than 620;

(kkk)   No Mortgage Loan is considered to be a "subprime" loan as determined or defined by the originator's guidelines or the Agencies' guidelines, and no Mortgagor is considered to be a "subprime" borrower as determined or defined by the originator's guidelines or the Agencies' guidelines. To the best of Seller's knowledge, no Mortgage Loan is considered to be a "subprime" loan as determined or defined by the OCC, OTS or the FFIEC, and no Mortgagor is considered to be a "subprime" borrower as determined or defined by the OCC, OTS or the FFIEC;

(lll)   No Mortgage Loan is subject to an escrow holdback arrangement;

. (mmm) Except as otherwise specified in the related Purchase Confirmation, no Mortgage Loan has an unpaid principal balance in an amount equal to or greater than One Million Dollars ($1,000,000.000);

(nnn)   Each insurance policy related to a Mortgage Loan and the Mortgaged Property including, but not limited to, primary mortgage insurance, flood insurance, hazard insurance, and title insurance is valid and remains in full force and effect, and each such policy was issued by an insurer acceptable to the Agencies and qualified to do business in the jurisdiction where the Mortgaged Property is located, insuring the Seller, its successors and assigns in compliance with the originator's underwriting guidelines;

(ooo)   The Seller has complied with all applicable anti-money laundering laws and regulations, including, without limitation the USA Patriot Act of 2001 (collectively, the "Anti-Money Laundering Laws"); the Seller has established an anti-money laundering compliance program as required by the Anti-Money Laundering Laws, has conducted the requisite due diligence in connection with the origination of each Mortgage Loan for purposes of the Anti-Money Laundering Laws, including with respect to the legitimacy of the applicable Mortgagor and the origin of the assets used by the said Mortgagor to purchase the property in question, and maintains, and will maintain, sufficient information to identify the applicable Mortgagor for purposes of the Anti-Money Laundering Laws. No Mortgage Loan is subject to nullification pursuant to Executive Order 13224 (the "Executive Order") or the regulations promulgated by the Office of Foreign Assets Control of the United States Department of the Treasury (the "OFAC Regulations") or in violation of the Executive Order or the OFAC Regulations, and no Mortgagor is subject to the provisions of such Executive Order or the OFAC Regulations nor listed as a "blocked person" for purposes of the OFAC Regulations.  Further, Seller has established an anti-money laundering compliance program and with respect to the Anti-Money Laundering Laws, has (i) developed internal policies, procedures and controls reasonably designed to prevent it from being used for money laundering or the financing of terrorist activities, (ii)

designated a compliance officer, (iii) implemented an ongoing employee training program, and (iv) developed an independent audit function to test the compliance program. Seller is in all material respects in compliance with the implementing regulations promulgated and administered by the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), and has established an OFAC compliance program. Seller continues to maintain sufficient information to identify the applicable Mortgagor as required by Anti Money Laundering Laws;

(ppp)   Each Mortgage Loan has an original Mortgage Note in the Mortgage File, and no Mortgage File contains a lost note affidavit in lieu thereof;

(qqq)   There is no pending action or proceeding directly involving any Mortgaged Property in which compliance with any environmental law, rule, or regulation is an issue; and, nothing further remains to be done to satisfy in full all requirements of each such law, rule or regulation containing a prerequisite to use and enjoyment of said property;

(rrr)   The Mortgagor has executed one or more statements to the effect that the Mortgagor has received all disclosure materials required by applicable law with respect to the making of the Mortgage Loan. The Seller shall maintain all such statements in the Mortgage File;

(sss)   This Agreement constitutes a valid transfer and assignment to the Purchaser of all right, title and interest of the Seller in and to the Stated Principal Balances with respect to the applicable Mortgage Loans and all monies due or to become due with respect thereto;

(ttt)   There is no hazard loss draft outstanding that affects the related Mortgaged Property;

(uuu)   Each Mortgage Loan is in compliance with all requirements and trade stipulations set forth in the related Transaction Documents, and the characteristics of the related Mortgage Loan Package as set forth in the related Trade Confirmation and the related Purchase Confirmation are true and correct in all material respects;

(vvv)   No Mortgage Loan secured by a Mortgaged Property located in Texas is a cash out loan, and no Mortgage Loan is an "equity loan" within the meaning of Section 50(a)(6), Article XVI of the Texas Constitution;

(www)   No selection procedure reasonably believed by the Seller to be adverse to the interests of the Purchaser was utilized in selecting the Mortgage Loans;

(xxx)   Any future advances made to the Mortgagor prior to the related Closing Date have been consolidated with the outstanding principal amount secured by the Mortgage, and the secured principal amount, as consolidated, bears a single interest rate and single repayment term. The lien of the Mortgage securing the consolidated principal amount is expressly insured as having first or second lien priority, as specified in the related Mortgage Loan Schedule, by a title insurance policy, an endorsement to the policy insuring the mortgagee's consolidated interest or by other title evidence acceptable to the Agencies. The consolidated principal amount does not exceed the original principal amount of the Mortgage Loan;

(yyy)   The Mortgaged Property is located in the District of Columbia or one of the fifty states in the United States;

(zzz)   For each Mortgage Loan, the related Mortgage File contains each of the documents and instruments specified to be included therein as contemplated in this Agreement;

(aaaa)  There is no secondary financing for any first lien home equity line of credit or closed-end second liens;

(bbbb)  No Mortgagor is a foreign national;

(cccc)  There are no property inspection waivers, stated value Mortgage Loans or property inspections that were used to determine the value of the Mortgaged Property; and

(dddd)  Each Mortgagor was qualified at the note rate for each Fixed Rate Mortgage Loan, and for each Adjustable Rate Mortgage Loan, each Mortgagor was qualified at the fully indexed rate.

**Section 3.3    Remedies for Breach of Representations and Warranties**.  The representations and warranties set forth in Sections 3.1 and 3.2 shall survive the sale of the Mortgage Loans to the Purchaser and shall inure to the benefit of the Purchaser, notwithstanding any restrictive or qualified endorsement on any Mortgage Note or Assignment of Mortgage or the examination or failure to examine any Mortgage File.  Furthermore, the absence of the Seller in either the chain of title or endorsement shall in no way limit the Purchaser's recourse against the Seller as provided in this Section 3.3 for a breach of one or more of the Seller's representations and warranties made herein.

Upon discovery by either the Seller or the Purchaser of a breach of any of the foregoing representations and warranties which materially and adversely affects the value, the marketability or enforceability of one or more of the Mortgage Loans or the Purchaser's interest therein, the party discovering such breach shall give prompt written notice to the other.  The Seller shall have a period of sixty (60) days from the earlier of the discovery of a breach by the Seller or the receipt by the Seller of notice of a breach within which to correct or cure such breach.  If any such breach cannot be corrected or cured, as determined by the Purchaser, in its reasonable discretion, within such sixty (60) day period, the Seller shall, at the Purchaser's option and not later than sixty (60) days after its discovery or its receipt of notice of such breach, repurchase such Mortgage Loan at the Repurchase Price.  In the event that a breach shall involve any representation or warranty set forth in Section 3.1 and such breach cannot be cured, within sixty (60) days of the earlier of either discovery by or notice to the Seller of such breach, all of the Mortgage Loans materially and adversely affected by such breach shall, at the Purchaser's option, be repurchased by the Seller at the Repurchase Price.  Any repurchase of a Mortgage Loan(s) pursuant to the foregoing provisions of this Section 3.3 shall be accomplished by wire transfer of immediately available funds on the repurchase date to an account designated by the Purchaser.

At the time of repurchase, the Purchaser and the Seller shall arrange for the reassignment of the repurchased Mortgage Loan to the Seller and the delivery to the Seller of any documents held by the Purchaser or its custodian relating to such Mortgage Loan. The Seller shall, simultaneously with such reassignment, give written notice to the Purchaser that such repurchase has taken place.

Any cause of action against the Seller relating to or arising out of the breach of any representations and warranties made in Sections 3.1 or 3.2 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by the Purchaser or notice thereof by the Seller to the Purchaser or by the Purchaser to the Seller, (ii) failure by the Seller to cure such breach or repurchase such Mortgage Loan as specified above, and (iii) demand upon the Seller by the Purchaser for compliance with the relevant provisions of this Agreement.

**Section 3.4    Indemnification of the Purchaser**.  In addition to the repurchase obligations set forth in Section 3.3, the Seller shall defend and indemnify the Purchaser and hold it harmless against any losses, damages, penalties, fines, forfeitures, judgments and any related costs including, without limitation, reasonable and necessary legal fees, resulting from any claim, demand,

27

defense or liability based upon or arising out of originating, purchasing, receiving, processing, funding or servicing any Mortgage Loan, serviced by Seller or any Subservicer, or from any assertion based on, grounded upon or resulting from a breach or alleged breach of any of the Seller's representations and warranties contained in this Article III. Without limiting in any way the repurchase obligations of the Seller set forth in Section 3.3 and indemnification obligations of the Seller set forth in this Section 3.4, the Purchaser shall have the right to offset from any amount it owes or is otherwise required to pay to the Seller hereunder or under any other agreement with the Seller any amount that the Seller owes or is otherwise required to pay to the Purchaser hereunder or under any other agreement with the Purchaser. In addition to the obligations of the Seller set forth in this Article III, the Purchaser may pursue any and all remedies otherwise available at law or in equity, including, but not limited to, the right to seek damages.

**Section 3.5    Prepayment and Conversion Protection.** In the event that any of the Mortgage Loans are (i) paid in full or (ii) converted to a Fixed Rate Mortgage Loan, in either case, within ninety (90) days from the related Closing Date, or (iii) subject to a breach of the representation set forth in Section 3.2(qq), the Seller shall, with respect to each such Mortgage Loan, pay to the Purchaser the product of (a) the positive difference, if any, between the Purchase Price Percentage (subject to any adjustments as contemplated in the Transaction Documents) and 100%, times (b) the unpaid principal balance of such Mortgage Loan at the time such Mortgage Loan is paid in full or converted, as applicable (the "Premium Recapture Amount"). In the event any Mortgage Loan is paid in full after the related Cut-off Date and on or prior to the related Closing Date, the Seller shall, in addition to the Premium Recapture Amount, pay the Purchaser the accrued interest paid by the Purchaser for such Mortgage Loan. Nothing contained in this Section 3.5 shall in any way limit the rights of the Purchaser to all collections and recoveries of principal and interest received or applied to any Mortgagor's account and the Seller's obligation to remit such recoveries of principal and interest to the Purchaser as provided in Section 2.3. The rights conferred to the Purchaser under this Section 3.5 shall be in addition to those rights conferred to the Purchaser under Section 3.2(b), the Trade Confirmation and/or the Purchase Confirmation.

**Section 3.6    Payment Default Protection.** If the first, second or third Monthly Payment with a Due Date subsequent to the related Closing Date is not received by the Purchaser, whether from the Mortgagor directly or forwarded by the Seller if the Mortgagor has submitted the payment to the Seller, by the last day of the month in which such payment is due, the Seller shall, at the Purchaser's option and not later than five (5) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price. The rights conferred to the Purchaser under this Section 3.6 shall be in addition to those rights conferred to the Purchaser under Section 3.2(b), the related Trade Confirmation and/or the related Purchase Confirmation.

**Section 3.7    Post-Closing Appraisal Review.** Without in any way limiting or affecting any rights and remedies of the Purchaser, including, without limitation, the remedies accorded the Purchaser under Section 3.3 of this Agreement, the Purchaser shall have the right at its own expense, within thirty (30) Business Days after the related Closing Date, or the date on which the appraisal in the Mortgage File relating to the Mortgaged Property is received by the Purchaser from the Seller, whichever is later, to obtain an appraisal, broker's price opinion, drive-by appraisal or any other comparable valuation measure with respect to any Mortgaged Property (collectively, the "Review Appraisal"). If the value of a Mortgaged Property, as determined by the Review Appraisal, is less than the value of the appraisal in the Mortgage File by (i) ten percent (10%) or more for a Mortgage Loan with an original LTV of less than or equal to eighty percent (80%) or (ii) five percent (5%) or more for a Mortgage Loan with an original LTV of greater than eighty percent (80%), the Purchaser may, at the Purchaser's sole option, notify the Seller of the variance by providing the Seller with a copy of the Review Appraisal. Upon the Purchaser giving such notice of the variance to the Seller, the Seller shall repurchase the Mortgage Loan at the Repurchase Price not later than fifteen (15) Business Days after the Seller's receipt of such notice from the Purchaser.

**Section 3.8    Post-Closing Examination of Mortgage Loans.** As may be indicated in the related Purchase Confirmation, the parties may agree that the Purchaser shall have

28

 

the right, after the Closing Date, to review the Mortgage File (and such other documents) for each Mortgage Loan in a Mortgage Loan Package and, based on its review, request the Seller to repurchase any Mortgage Loan which the Purchaser, in its sole discretion, determines not to be in compliance with each of the representations and warranties contemplated in the Transaction Documents or which is otherwise unsatisfactory. With respect to any Mortgage Loan reviewed by the Purchaser on a post-closing basis which the Seller is obligated to repurchase from the Purchaser hereunder, the Seller shall, within fifteen (15) Business Days of the Purchaser's request therefor, repurchase any such Mortgage Loan at the Repurchase Price.

## ARTICLE IV

### INTERIM SERVICING OF THE MORTGAGE LOANS

**Section 4.1    General.** The Mortgage Loans will be purchased by the Purchaser and sold by the Seller on a servicing-released basis and the purchase of the Mortgage Loans by the Purchaser shall, for all purposes, include all Servicing Rights relating thereto. From the related Closing Date to the Servicing Transfer Date, the Seller shall interim service the Mortgage Loans in strict accordance with all federal, state and local laws, the terms of this Agreement and, to the extent not inconsistent herewith, the servicing standards of the Agencies. The Seller shall segregate and hold all funds collected and received pursuant to each Mortgage Loan separate and apart from any of its own funds and general assets and shall establish and maintain one (1) or more Custodial Accounts, in the form of time deposit or demand accounts which accounts shall be Eligible Accounts. In addition, during the Interim Servicing Period, the Seller shall not allow any partial release or waive, modify or vary any term of any Mortgage Loan or consent to the postponement or in any manner grant indulgence to any Mortgagor including, but not limited to, permitting any modification with respect to any Mortgage Loan that would decrease the Mortgage Interest Rate, defer or forgive the payment thereof or of any principal or interest payments, reduce the outstanding principal amount (except for actual payments of principal), make future advances or extend the final maturity date on any Mortgage Loan without the Purchaser's prior written consent. Without limiting the generality of the foregoing, the Seller shall not take, or fail to take, any action which would result in the Purchaser's interest in the Mortgage Loans being adversely affected. It is expressly understood by the Seller that, during the Interim Servicing Period, the Purchaser is purchasing the Mortgage Loans for the express purpose of either (a) reselling such Mortgage Loans to a subsequent purchaser, including, but not limited to, a whole loan investor or (b) securitizing the Mortgage Loans, and, as such, the Seller agrees to comply with all reasonable requests of the Purchaser made prior to the related Servicing Transfer Date in order to effectuate the foregoing including, without limitation, any request for information or documentation in connection with any Mortgage Loan which the Purchaser deems is necessary to carry out the foregoing including, without limitation, all HMDA data required by the Agencies.

**Section 4.2    Reporting and Remittance.** Within five (5) Business Days following the conclusion of each calendar month reporting and remittance cycle occurring during the Interim Servicing Period (each, a "Reporting Cycle"), if any, the Seller shall forward to the Purchaser with respect to the Mortgage Loans a full set of tapes and a trial balance as of the end of each such Reporting Cycle, which tapes and trial balance shall include information relating to all payment and other activity on the Mortgage Loans. With respect to any payments of principal or interest (including all Principal Prepayments) and Prepayment Charges received, or applied to any Mortgagor's account, by the Seller during the Interim Servicing Period (or prior to the Closing Date, if any such payments were not reflected in the calculation of the Purchase Proceeds), the Seller shall remit to the Purchaser all such payments of principal and interest on the Mortgage Loans no later than the fifth (5th) Business Day of the month following the conclusion of each Reporting Cycle and, with respect to the month in which the related Servicing Transfer Date occurs, no later than the fifth (5th) Business Day thereafter.

**Section 4.3    Whole Loan Transfers or Pass-Through Transfers.** The Seller and the Purchaser agree that with respect to some or all of the Mortgage Loans, the Purchaser may



effect either one or more Whole Loan Transfers, and/or one or more Pass-Through Transfers.

(a)     With respect to each Whole Loan Transfer entered into by the Purchaser, the Seller agrees:

(i)   to cooperate reasonably with the Purchaser and any prospective purchaser with respect to all reasonable requests;

(ii)  to execute, at the Purchaser's reasonable discretion, an assignment, assumption and recognition agreement in such form as is mutually agreed upon by the Purchaser, the Seller and the successor purchaser of some or all of the Mortgage Loans, pursuant to which the Seller shall recognize the successor purchaser as the owner of the Mortgage Loans and covenant to service the Mortgage Loans on behalf of the successor purchaser in accordance with the terms and conditions of this Agreement, and which such Mortgage Loans will be assigned to the successor purchaser subject to the representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans and itself; and

(iii)  to restate on the Reconstitution Date, (a) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Seller itself, (b) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans if the Reconstitution Date occurs within ninety (90) days of the applicable Closing Date, and (c) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans as of the related Closing Date if the Reconstitution Date occurs ninety (90) days after such Closing Date.

(b)     The Purchaser and the Seller agree that in connection with the completion of a Pass-Through Transfer, the Seller shall:

(i)   provide the Purchaser with a certificate of a duly appointed officer of Seller that restates as of the Reconstitution Date (a) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Seller itself, (b) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans if the Reconstitution Date occurs within ninety (90) days of the applicable Closing Date, (c) all representations and warranties made by the Seller pursuant to this Agreement with respect to the Mortgage Loans as of the related Closing Date if the Reconstitution Date occurs ninety (90) days after such Closing Date, and (d) together with any additional representations and warranties which may be reasonably required to be made by it in connection with the Pass-Through Transfer;

(ii)  if the Seller is required to be a party to any of the Reconstitution Agreements, execute any Reconstitution Agreement in such form as is mutually agreed to by the Purchaser and the Seller, within a reasonable period of time, but in no event shall such time exceed ten (10) Business Days after mutual agreement between the Purchaser and the Seller as to the terms thereof;

(iii) provide to any master servicer or trustee, as applicable, and/or the Purchaser any and all publicly available information and appropriate verification of information which may be reasonably available to the Seller, whether through letters of its auditors and counsel or otherwise, as the Purchaser, trustee or a master servicer shall reasonably request as to the related Mortgage Loans;

(iv) agree to service the Mortgage Loans in accordance with the requirements of a Securitization Transaction or Pass-Through Transfer, including, without limitation, servicing the Mortgage Loans in accordance with the requirements of the applicable Agency if the Pass-Through Transfer is to an Agency, or servicing the Mortgage Loans in accordance with the requirements of the private label securitization if the Pass-Through Transfer is to a private label securitization, provided that such servicing requirements are standard and customary and do not impose undue hardship or

30

expense upon the Seller;

(v)    provide all other assistance reasonably requested by the Purchaser in connection with effectuation and completion of the Pass-Through Transfer; and

(vi)    in connection with each Pass Through Transfer, the Seller shall provide the Purchaser and any prospective purchaser, in form and substance reasonably satisfactory, all information, statements, reports and certifications reasonably necessary to comply with the final rules promulgated by the Securities and Exchange Commission related to asset-backed securities (Release Nos. 33-8518; 34-50905) (as such rules may be amended or modified from time to time). The parties shall mutually agree to such other modifications and enter into such amendments to this Agreement as may be necessary to comply with any rules promulgated by the Securities and Exchange Commission and any interpretations thereof by the staff of the Securities and Exchange Commission.

With respect to any Pass-Through Transfer, the Purchaser shall be entitled to include in any disclosure document any information provided by the Seller, and the Seller acknowledges and agrees that the related investors will be permitted to rely on such information. In addition, the Seller shall indemnify the Purchaser and its affiliates for any untrue statement of any material fact contained in such information, or the omission to state therein a material fact required to be stated therein or necessary to make the statements therein, in the light of the circumstances in which they were made, not misleading. If the Purchaser reasonably determines that the Seller is required to be a party to any Reconstitution Agreement, the Seller shall execute such Reconstitution Agreement in such form as is reasonably agreed to by the Purchaser and the Seller, within a reasonable period of time, but in no event shall such time exceed ten (10) Business Days after mutual agreement between the Purchaser and the Seller as to the terms thereof.

(c)    In connection with any Securitization Transaction, the Seller shall (x) within five Business Days following request by the Purchaser or any Depositor, provide to the Purchaser and such Depositor (or, as applicable, cause each Third-Party Originator and each Subservicer to provide), in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, the information and materials specified in paragraphs (i), (ii), (iii) and (v) of this Section 4.3(c), and (y) as promptly as practicable following notice to or discovery by the Seller, provide to the Purchaser and any Depositor (in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor) the information specified in paragraph (iv) of this Section 4.3(c).

(i)    If so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding (x) the Seller, as originator of the Mortgage Loans, or (y) each Third-Party Originator, and (z) as applicable, each Subservicer, as is requested for the purpose of compliance with Items 1103(a)(1), 1105, 1110, 1117 and 1119 of Regulation AB. Such information shall include, at a minimum:

(A)    the originator's form of organization;

(B)    a description of the originator's origination program and how long the originator has been engaged in originating residential mortgage loans, which description shall include a discussion of the originator's experience in originating mortgage loans of a similar type as the Mortgage Loans; information regarding the size and composition of the originator's origination portfolio; and information that may be material, in the good faith judgment of the Purchaser or any Depositor, to an analysis of the performance of the Mortgage Loans, including the originators' credit-granting or underwriting criteria for mortgage loans of similar type(s) as the Mortgage Loans and such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1110(b)(2) of Regulation AB;

(C)    a description of any material legal or governmental

31

proceedings pending (or known to be contemplated) against the Seller, each Third-Party Originator and each Subservicer; and

(D) a description of any affiliation or relationship between the Seller, each Third-Party Originator, each Subservicer and any of the following parties to a Securitization Transaction, as such parties are identified to the Seller by the Purchaser or any Depositor in writing in advance of such Securitization Transaction:

(1) the sponsor;
(2) the depositor;
(3) the issuing entity;
(4) any servicer;
(5) any trustee;
(6) any originator;
(7) any significant obligor;
(8) any enhancement or support provider; and
(9) any other material transaction party.

(ii) If so requested by the Purchaser or any Depositor on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(c) of Regulation AB,, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide) to the extent reasonably available to the Seller, Static Pool Information with respect to the mortgage loans (of a similar type as the Mortgage Loans, as reasonably identified by the Purchaser as provided below) originated by (x) the Seller, if the Seller is an originator of Mortgage Loans, and/or (y) each Third-Party Originator. Such Static Pool Information shall be prepared by the Seller (or Third-Party Originator) on the basis of its reasonable, good faith interpretation of the requirements of Item 1105(a)(1)-(3) of Regulation AB. To the extent that there is reasonably available to the Seller (or Third-Party Originator) Static Pool Information with respect to more than one mortgage loan type, the Purchaser or any Depositor shall be entitled to specify whether some or all of such information shall be provided pursuant to this paragraph. The content of such Static Pool Information may be in the form customarily provided by the Seller, and need not be customized for the Purchaser or any Depositor. Such Static Pool Information for each vintage origination year or prior securitized pool, as applicable, shall be presented in increments no less frequently than quarterly over the life of the mortgage loans included in the vintage origination year or prior securitized pool. The most recent periodic increment must be as of a date no later than 135 days prior to the date of the prospectus or other offering document in which the Static Pool Information is to be included or incorporated by reference. The Static Pool Information shall be provided in an electronic format that provides a permanent record of the information provided, such as a portable document format (pdf) file, or other such electronic format reasonably required by the Purchaser or the Depositor, as applicable.

Promptly following notice or discovery of a material error in Static Pool Information provided pursuant to the immediately preceding paragraph (including an omission to include therein information required to be provided pursuant to such paragraph), the Seller shall provide corrected Static Pool Information to the Purchaser or any Depositor, as applicable, in the same format in which Static Pool Information was previously provided to such party by the Seller.

If so requested by the Purchaser or any Depositor, the Seller shall provide (or, as applicable, cause each Third-Party Originator to provide), at the expense of the requesting party (to the extent of any additional incremental expense associated with delivery pursuant to this Agreement), such agreed-upon procedures letters of certified public accountants reasonably acceptable to the Purchaser or Depositor, as applicable, pertaining to Static Pool Information relating to prior securitized pools for securitizations closed on or after January 1, 2006 or, in the case of Static Pool Information with respect to the Seller's or

32

Third-Party Originator's originations or purchases, to calendar months commencing January 1, 2006, as the Purchaser or such Depositor shall reasonably request. Such letters shall be addressed to and be for the benefit of such parties as the Purchaser or such Depositor shall designate, which may include, by way of example, any Sponsor, any Depositor and any broker dealer acting as underwriter, placement agent or initial purchaser with respect to a Securitization Transaction. Any such statement or letter may take the form of a standard, generally applicable document accompanied by a reliance letter authorizing reliance by the addressees designated by the Purchaser or such Depositor.

        (iii)     If so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the Seller, as servicer of the Mortgage Loans, and each Subservicer (each of the Seller and each Subservicer, for purposes of this paragraph, a "Servicer"), as is requested for the purpose of compliance with Items 1108 of Regulation AB. Such information shall include, at a minimum:

        (A)     the Servicer's form of organization;

        (B)     a description of how long the Servicer has been servicing residential mortgage loans; a general discussion of the Servicer's experience in servicing assets of any type as well as a more detailed discussion of the Servicer's experience in, and procedures for, the servicing function it will perform under this Agreement and any Reconstitution Agreements; information regarding the size, composition and growth of the Servicer's portfolio of residential mortgage loans of a type similar to the Mortgage Loans and information on factors related to the Servicer that may be material, in the good faith judgment of the Purchaser or any Depositor, to any analysis of the servicing of the Mortgage Loans or the related asset-backed securities, as applicable, including, without limitation:

        (1)     whether any prior securitizations of mortgage loans of a type similar to the Mortgage Loans involving the Servicer have defaulted or experienced an early amortization or other performance triggering event because of servicing during the three-year period immediately preceding the related Securitization Transaction;

        (2)     the extent of outsourcing the Servicer utilizes;

        (3)     whether there has been previous disclosure of material noncompliance with the applicable servicing criteria with respect to other securitizations of residential mortgage loans involving the Servicer as a servicer during the three-year period immediately preceding the related Securitization Transaction;

        (4)     whether the Servicer has been terminated as servicer in a residential mortgage loan securitization, either due to a servicing default or to application of a servicing performance test or trigger; and

        (5)     such other information as the Purchaser or any Depositor may reasonably request for the purpose of compliance with Item 1108(b)(2) of Regulation AB;

        (C)     a description of any material changes during the three-year period immediately preceding the related Securitization Transaction to the Servicer's policies or procedures with respect to the servicing function it will perform under this Agreement and any Reconstitution Agreements for mortgage loans of a type similar to the Mortgage Loans;

        (D)     information regarding the Servicer's financial condition, to the extent that there is a material risk that an adverse financial event or circumstance involving the Servicer could have a material adverse effect on the performance by the

Seller of its servicing obligations under this Agreement or any Reconstitution Agreement;

(E)    information regarding advances made by the Servicer on the Mortgage Loans and the Servicer's overall servicing portfolio of residential mortgage loans for the three-year period immediately preceding the related Securitization Transaction, which may be limited to a statement by an authorized officer of the Servicer to the effect that the Servicer has made all advances required to be made on residential mortgage loans serviced by it during such period, or, if such statement would not be accurate, information regarding the percentage and type of advances not made as required, and the reasons for such failure to advance;

(F)    a description of the Servicer's processes and procedures designed to address any special or unique factors involved in servicing loans of a similar type as the Mortgage Loans;

(G)    a description of the Servicer's processes for handling delinquencies, losses, bankruptcies and recoveries, such as through liquidation of mortgaged properties, sale of defaulted mortgage loans or workouts; and

(H)    information as to how the Servicer defines or determines delinquencies and charge-offs, including the effect of any grace period, re-aging, restructuring, partial payments considered current or other practices with respect to delinquency and loss experience.

(iv)    If so requested by the Purchaser or any Depositor for the purpose of satisfying its reporting obligation under the Exchange Act with respect to any class of asset-backed securities, the Seller shall (or shall cause each Subservicer and Third-Party Originator to) (A) notify the Purchaser and any Depositor in writing of (x) any material litigation or governmental proceedings pending against the Seller, any Subservicer or any Third-Party Originator and (y) any affiliations or relationships that develop following the closing date of a Securitization Transaction between the Seller, any Subservicer or any Third-Party Originator and any of the parties specified in clause (D) of paragraph (i) of this Section 4.3(c) (and any other parties identified in writing by the requesting party) with respect to such Securitization Transaction, and (B) provide to the Purchaser and any Depositor a description of such proceedings, affiliations or relationships.

(v)    As a condition to the succession to the Seller or any Subservicer as servicer or subservicer under this Agreement or any Reconstitution Agreement, other than in connection with the transfer of servicing to the Purchaser or its designee on the related Servicing Transfer Date as contemplated by this Agreement, by any Person (A) into which the Seller or such Subservicer may be merged or consolidated, or (B) which may be appointed as a successor to the Seller or any Subservicer, the Seller shall provide to the Purchaser and any Depositor, at least 15 calendar days prior to the effective date of such succession or appointment, (x) written notice to the Purchaser and any Depositor of such succession or appointment and (y) in writing and in form and substance reasonably satisfactory to the Purchaser and such Depositor, all information reasonably requested by the Purchaser or any Depositor in order to comply with its reporting obligation under Item 6.02 of Form 8-K with respect to any class of asset-backed securities.

(vi)    In addition to such information as the Seller, as servicer, is obligated to provide pursuant to other provisions of this Agreement, if so requested by the Purchaser or any Depositor, the Seller shall provide such information regarding the performance or servicing of the Mortgage Loans as is reasonably required to facilitate preparation of distribution reports in accordance with Item 1121 of Regulation AB. Such information shall be provided concurrently with the monthly reports otherwise required to be delivered by the

34

servicer under this Agreement, commencing with the first such report due not less than ten Business Days following such request.

(d)     All of the Mortgage Loans, including those Mortgage Loans that are subject to a Pass-Through Transfer or a Whole Loan Transfer, shall continue to be subject to this Agreement, and with respect thereto, this Agreement shall remain in full force and effect.  Notwithstanding the foregoing, with respect to any Mortgage Loan subject to a Reconstitution Agreement, the servicing provisions set forth in such Reconstitution Agreement shall govern the servicing of such Mortgage Loan to the extent such terms contradict the servicing provisions set forth in this Agreement, including, but not limited to, the servicing provisions of Article IV.  In no event shall a Whole Loan Transfer or a Pass-Through Transfer be deemed to relieve the Seller of its obligations as set forth in Article III hereof nor to increase the Seller's liabilities, duties, obligations, or responsibilities as set forth in this Agreement.

Section 4.4. Use of Subservicers and Subcontractors.  The Seller shall not hire or otherwise utilize the services of any Subservicer to fulfill any of the obligations of the Seller as interim servicer under this Agreement or any Reconstitution Agreement unless the Seller complies with the provisions of paragraph (a) of this Section 4.4. The Seller shall not hire or otherwise utilize the services of any Subcontractor, and shall not permit any Subservicer to hire or otherwise utilize the services of any Subcontractor, to fulfill any of the obligations of the Seller as servicer under this Agreement or any Reconstitution Agreement unless the Seller complies with the provisions of paragraph (b) of this Section 4.4.

(a)     It shall not be necessary for the Seller to seek the consent of the Purchaser or any Depositor to the utilization of any Subservicer, provided, however, that (i) such Subservicer shall have a net worth equal to at least Twenty-Five Million Dollars ($25,000,000.00), (ii) be approved servicer by the Agencies, (iii) Purchaser shall have responsibility or liability for any costs, expenses or fees of the Subservicer,  and (iv) Seller acknowledges and agrees that Seller shall be responsible for any acts of the Subservicer as if Seller performed such acts themselves.  Purchaser acknowledges that Seller intends to utilize American Home Mortgage Servicing, Inc. as a Subservicer and Seller acknowledges that American Home Mortgage Servicing, Inc. meets the requirements of this Section 4.4(a). The Seller shall cause any Subservicer used by the Seller (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of this Section 4.4 and with Sections 4.3(c)(iii), 4.5, 4.6, 4.7, 6.18 and 6.19 of this Agreement to the same extent as if such Subservicer were the Seller, and to provide the information required with respect to such Subservicer under Section 4.3(c)(iv) of this Agreement. The Seller shall be responsible for obtaining from each Subservicer and delivering to the Purchaser and any Depositor any servicer compliance statement required to be delivered by such Subservicer under Section 4.5, any assessment of compliance and attestation required to be delivered by such Subservicer under Section 4.7 and any certification required to be delivered to the Person that will be responsible for signing the Sarbanes Certification under Section 4.8 as and when required to be delivered.

(b)     It shall not be necessary for the Seller to seek the consent of the Purchaser or any Depositor to the utilization of any Subcontractor, provided, however, that (i) such Subcontractor shall have a net worth equal to at least Twenty-Five Million Dollars ($25,000,000.00), (ii) be an approved servicer by the Agencies, (iii) Purchaser shall have responsibility or liability for any costs, expenses or fees of the Subcontractor,  and (iv) Seller acknowledges and agrees that Seller shall be responsible for any acts of the Subcontractor as if Seller performed such acts themselves. The Seller shall promptly upon request provide to the Purchaser and any Depositor (or any designee of the Depositor, such as a master servicer or administrator) a written description (in form and substance reasonably satisfactory to the Purchaser and such Depositor) of the role and function of each Subcontractor utilized by the Seller or any Subservicer, specifying (i) the identity of each such Subcontractor, (ii) which (if any) of such Subcontractors are "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, and (iii) which elements of the Servicing Criteria will be addressed in assessments of compliance provided by each Subcontractor identified pursuant to clause (ii) of this paragraph.

35

As a condition to the utilization of any Subcontractor determined to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, the Seller shall cause any such Subcontractor used by the Seller (or by any Subservicer) for the benefit of the Purchaser and any Depositor to comply with the provisions of Sections 4.7 and 6.18 of this Agreement to the same extent as if such Subcontractor were the Seller. The Seller shall be responsible for obtaining from each Subcontractor and delivering to the Purchaser and any Depositor any assessment of compliance and attestation required to be delivered by such Subcontractor under Section 4.7, in each case as and when required to be delivered.

      Section 4.5     Annual Statement as to Compliance. On or before March 10th (with a five (5) day grace period, no later than March 15th) of each calendar year, commencing in 2008, the Seller shall deliver to the Purchaser and any Depositor a statement of compliance addressed to the Purchaser and such Depositor and signed by an authorized officer of the Seller, to the effect that (i) a review of the Seller's activities during the immediately preceding calendar year (or applicable portion thereof) and of its performance under this Agreement and any applicable Reconstitution Agreement during such period has been made under such officer's supervision, and (ii) to the best of such officers' knowledge, based on such review, the Seller has fulfilled all of its obligations under this Agreement and any applicable Reconstitution Agreement in all material respects throughout such calendar year (or applicable portion thereof) or, if there has been a failure to fulfill any such obligation in any material respect, specifically identifying each such failure known to such officer and the nature and the status thereof.

      Section 4.6     Reserved.

**Section 4.7 Report on Assessment of Compliance and Attestation.**

      (a)     On or before March 10th (with a five (5) day grace period, no later than March 15th) of each calendar year, commencing in 2008, the Seller shall:

      (i)     deliver to the Purchaser and any Depositor a report (in form and substance reasonably satisfactory to the Purchaser and such Depositor) regarding the Seller's assessment of compliance with the Servicing Criteria during the immediately preceding calendar year, as required under Rules 13a-18 and 15d-18 of the Exchange Act and Item 1122 of Regulation AB. Such report shall be addressed to the Purchaser and such Depositor and signed by an authorized officer of the Seller, and shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit F hereto delivered to the Purchaser concurrently with the execution of this Agreement;

      (ii)     deliver to the Purchaser and any Depositor a report of a registered public accounting firm reasonably acceptable to the Purchaser and such Depositor that attests to, and reports on, the assessment of compliance made by the Seller and delivered pursuant to the preceding paragraph. Such attestation shall be in accordance with Rules 1-02(a)(3) and 2-02(g) of Regulation S-X under the Securities Act and the Exchange Act;

      (iii)     cause each Subservicer, and each Subcontractor determined by the Seller pursuant to Section 4.4(b) to be "participating in the servicing function" within the meaning of Item 1122 of Regulation AB, to deliver to the Purchaser and any Depositor an assessment of compliance and accountants' attestation as and when provided in paragraphs (a) and (b) of this Section 4.7; and

      (iv)     if requested by the Purchaser or any Depositor not later than February 1 of the calendar year in which such certification is to be delivered, deliver to the Purchaser, any Depositor and any other Person that will be responsible for signing a Sarbanes Certification a certification in the form attached hereto as Exhibit E.

36

The Seller acknowledges that the parties identified in clause (a)(iv) above may rely on the certification provided by the Seller pursuant to such clause in signing a Sarbanes Certification and filing such with the Commission. Neither the Purchaser nor any Depositor will request delivery of a certification under clause (a)(iv) above unless a Depositor is required under the Exchange Act to file an annual report on Form 10-K with respect to an issuing entity whose asset pool includes Mortgage Loans.

(b)    Each assessment of compliance provided by a Subservicer pursuant to Section 4.7(a)(i) shall address each of the Servicing Criteria specified on a certification substantially in the form of Exhibit F hereto delivered to the Purchaser concurrently with the execution of this Agreement or, in the case of a Subservicer subsequently appointed as such, on or prior to the date of such appointment. An assessment of compliance provided by a Subcontractor pursuant to Section 4.7(a)(iii) need not address any elements of the Servicing Criteria other than those specified by the Seller pursuant to Section 4.4.

## ARTICLE V

### TRANSFER OF SERVICING RIGHTS

**Section 5.1    Transfer of Servicing.** The Seller agrees to act reasonably, in good faith and in accordance with all applicable laws and regulations and to do all things necessary to effect the transfer of the Servicing Rights to the Purchaser on the related Servicing Transfer Date including, without limitation, complying with all instructions provided by the Purchaser relating to the transfer of the Servicing Rights. With respect to each Mortgage Loan registered with the MERS® System, the Seller shall, by the Servicing Transfer Date, cause the MERS® System to reflect the Purchaser as the sole owner of the Servicing Rights related to such Mortgage Loans and shall designate the Custodian as the new document custodian of the Mortgage Loan Documents with respect to such Mortgage Loans. All costs and expenses associated with the transfer of the Servicing Rights to the Purchaser shall be paid by the Seller.

**Section 5.2    Obligations of the Seller Prior to the Servicing Transfer Date.** Without limiting the generality of Section 5.1, the Seller shall take, or cause to be taken, the following actions with respect to the Mortgage Loans prior to the related Servicing Transfer Date (or within such time as may otherwise be specified below) in order to effect the transfer of the Servicing Rights to the Purchaser on the related Servicing Transfer Date:

(a)    Preliminary Test Tape. On or prior to the related Closing Date, the Seller shall forward to the Purchaser a preliminary test tape (including master file, escrow file, payee file, ARM master file, ARM history, all HMDA data required by the Agencies, name, address, and telephone number of first lien holder and loan number of first lien with respect to any second lien Mortgage Loans, etc.) containing all of the Mortgage Loans as of the date mutually agreed upon by the Seller and the Purchaser. The preliminary test tape shall include all field descriptions and record layouts;

(b)    Notice to Hazard Insurers. The Seller shall inform by written notice all hazard insurance companies and/or their agents of the transfer and request a change in the loss payee mortgage endorsement clause to the Purchaser's name. The Seller shall provide the Purchaser with a copy of the notification letter and an officer's written certification that all hazard insurance companies have been notified by an identical letter;

(c)    Notice to Mortgage Insurance Companies. The Seller shall inform by written notice all mortgage insurance companies providing any Primary Mortgage Insurance Policy of the change in insured's name on each such policy to the Purchaser's name. The Seller shall provide the Purchaser with a copy of one notification letter and an officer's written certification that all such mortgage insurance companies have been notified by an identical letter;

(d)    Tax Service Contracts.    The Seller shall have obtained a life of loan, transferable real estate tax service contract with a tax service company reasonably acceptable to the Purchaser on all of the Mortgage Loans and shall assign all such contracts to the Purchaser or, in the alternative, the Seller shall notify the Purchaser as to any Mortgage Loans for which it has not procured the requisite contract and shall pay to the Purchaser a fee for each such Mortgage Loan equal to the fee or premium that is customarily charged for each such contract, as determined by the Purchaser in its reasonable discretion;

(e)    Flood Certifications.    The Seller shall have obtained a life of loan, transferable flood certification contract for each Mortgage Loan and shall assign all such contracts to the Purchaser or, in the alternative, the Seller shall notify the Purchaser as to any Mortgage Loans for which it has not procured the flood certification referenced above and shall pay to the Purchaser a fee for each such Mortgage Loan equal to the fee that is customarily charged for each such contract, as determined by the Purchaser in its reasonable discretion;

(f)    Notice to Mortgagors.    The Seller shall, no later than fifteen (15) days prior to the related Servicing Transfer Date, inform in writing all Mortgagors of the change in servicer from the Seller to the Purchaser, all in accordance with applicable law.  The Seller shall obtain the Purchaser's approval of the form of such notifications prior to their mailing.  The Seller acknowledges that the Purchaser's review of this notice shall not be a review for statutory or regulatory compliance purposes, and that the Seller shall have the sole responsibility for such compliance.  The Seller shall provide the Purchaser with a copy of one notification letter and an officer's written certification that all Mortgagors have been notified by an identical letter;

(g)    Payment of Real Estate Taxes.    The Seller shall make or cause to be made all payments of all real estate taxes on the Mortgage Loans which (i) will be delinquent on or prior to the related Servicing Transfer Date, (ii) are required to be paid within thirty (30) days after the related Servicing Transfer Date to receive a discount, or (iii) will be delinquent within thirty (30) days after the related Servicing Transfer Date.  If tax bills have not been received by the Seller by the related Servicing Transfer Date on any Mortgage Loans subject to this subsection, the Seller shall obtain and pay all tax bills subsequent to the related Servicing Transfer Date and the Purchaser will promptly reimburse the Seller upon receipt from the Seller of documentation evidencing such payment.  On non-impounded accounts, the Seller shall ensure that all taxes which would otherwise be delinquent by the related Servicing Transfer Date, if not paid by such date, have been paid.  With respect to each of the Mortgage Loans which do not have an impound or escrow account maintained for the payment of taxes and insurance, the Seller shall hold harmless and indemnify the Purchaser against any and all costs, expenses, penalties, fines, damages and judgments of whatever kind arising from the Seller's failure to pay, or cause to be paid, any delinquent taxes or tax penalties outstanding as of the related Servicing Transfer Date;

(h)    Payment of Insurance Premiums.    The Seller shall pay all hazard and flood insurance and Primary Mortgage Insurance Policy premiums required to be paid prior to the Servicing Transfer Date or within thirty (30) days after the Servicing Transfer Date on all impounded accounts relating to the Mortgage Loans and shall ensure that all premiums required to be paid prior to the Servicing Transfer Date by the Mortgagors on non-impounded accounts have been paid.  With respect to any Mortgage Loan subject to force-placed insurance, the Seller shall maintain such insurance, which shall be in full force and effect through thirty (30) days after the Servicing Transfer Date.  With respect to each of the Mortgage Loans which do not have an impound or escrow account maintained for the payment of taxes and insurance, the Seller shall hold harmless and indemnify the Purchaser against any and all costs, expenses, penalties, fines, damages and judgments of whatever kind arising from the Seller's failure to ensure that the related Mortgagor is maintaining adequate insurance coverage on the Mortgaged Property at all times prior to the Servicing Transfer Date in accordance with the terms of the any document contained in the Mortgage File or any applicable law or regulation including, without limitation, adequate flood insurance coverage for all Mortgaged Properties located within an "A" or "V" flood hazard area;

(i)     ARM Adjustments.  With respect to each Adjustable Rate Mortgage Loan whose index value for any Interest Adjustment Date is available on or prior to the related Servicing Transfer Date, the Seller shall make all such adjustments and shall inform the related Mortgagors of such adjustments;

(j)     Notice to Sub-servicers.  On or prior to the related Closing Date, the Seller shall inform by written notice all sub-servicers who perform servicing obligations with respect to the Mortgage Loans of the sale of the Mortgage Loans, to the Purchaser and of the transfer of the Servicing Rights to the Purchaser on the related Servicing Transfer Date. The Seller shall provide the Purchaser with a copy of the notification letter and an officer's certification that all sub-servicers have been notified by an identical letter; and

(k)     Mortgage Loans in Litigation.  On or prior to the related Servicing Transfer Date, the Seller shall (i) deliver written notification to the Purchaser of any Mortgage Loan in litigation (including, without limitation, bankruptcy and foreclosure proceedings) as of the Servicing Transfer Date, including in such written notification the names and addresses of all parties involved in such litigation and all documents related to such litigation, (ii) if requested by the Purchaser, notify the clerk of the court and all counsel of record involved in such litigation that ownership of such Mortgage Loan has been transferred to the Purchaser, and (iii) if requested by the Purchaser, cooperate with the Purchaser and cause the filing of appropriate court documents to substitute the Purchaser's attorney for the Seller's attorney and remove the Seller as a party to the litigation and substitute the Purchaser as the real party in interest.

**Section 5.3    Obligations of the Seller after the Servicing Transfer Date.** Without limiting the generality of Section 5.1, the Seller shall take, or cause to be taken, the following actions with respect to the Mortgage Loans within three (3) Business Days following the related Servicing Transfer Date (or within such time as may otherwise be specified below):

(a)     Tape.  The Seller shall furnish to the Purchaser all available computer or like records requested by the Purchaser reflecting the status of payments, balances and other pertinent information with respect to the Mortgage Loans as of the related Servicing Transfer Date (including, without limitation, (i) master file, (ii) escrow file, (iii) payee file, which includes comprehensive tax and insurance information identifying payee, payee address, next payment due date, next amount payable and policy number/parcel number, (iv) ARM master file, (v) ARM history, (vi) name, address, and telephone number of first lien holder and loan number of first lien with respect to any second lien Mortgage Loans, and (vii) all HMDA data required by the Agencies).  Such records shall include magnetic tapes reflecting all computer files maintained on the Mortgage Loans and shall include hard copy trial balance reports as specifically requested by the Purchaser;

(b)     Mortgage File.  If the Seller has not already done so, the Seller shall have forwarded a complete Mortgage File with respect to each Mortgage Loan;

(c)     Accounting Reports.  The Seller shall furnish to the Purchaser copies of all accounting reports relating to the Mortgage Loans as of the related Servicing Transfer Date including, without limitation, a trial balance and reports of collections, delinquencies, prepaids, curtailments, escrow payments, escrow balances, partial payments, partial payment balances and other like information with respect to the Mortgage Loans;

(d)     Other Documentation.  The Seller shall provide the Purchaser any and all further documents reasonably required by the Purchaser in order to fully transfer to the Purchaser possession of all tangible evidence of the Servicing Rights and escrow, impound and trust funds transferred hereunder;

(e)     Transfer of Escrow Funds and Other Proceeds.  The Seller shall transfer to the Purchaser, by wire transfer to the account designated by the Purchaser, an amount equal to the

sum of (i) the Net Escrow Payments, (ii) all undistributed insurance loss draft funds, (iii) all unapplied funds received by the Seller, (iv) all unapplied interest on escrow balances accrued through the related Servicing Transfer Date, (v) all buydown funds held by the Seller as of the related Servicing Transfer Date, (vi) all funds received and posted by the Seller but not yet distributed to the Purchaser and (vii) all other amounts held by the Seller with respect to the Mortgage Loans as of the related Servicing Transfer Date for which the Seller is not entitled to retain (collectively, the "Escrow Proceeds"). The Seller shall provide all necessary supporting documentation to enable the Purchaser to promptly apply all unapplied funds. Within five (5) Business Days following the Purchaser's receipt of the Escrow Proceeds, the Seller and the Purchaser shall resolve any discrepancies between the Seller's accounting statement and the Purchaser's reconciliation with respect thereto. No later than ten (10) Business Days following the related Servicing Transfer Date, the Seller or the Purchaser, as the case may be, shall transfer to the other, by wire transfer to the designated account, any amounts to which the other party is entitled; and

(f)     Mortgage Payments Received After Servicing Transfer Date. The Seller shall promptly forward to the Purchaser any payment received by it after the related Servicing Transfer Date with respect to any of the Mortgage Loans, whether such payment is in the form of principal, interest, taxes, insurance, loss drafts, insurance refunds, etc., in the original form received, unless such payment has been received in cash or by the Seller's lock box facility, in which case the Seller shall forward such payment in a form acceptable to the Purchaser. The Seller shall notify the Purchaser of the particulars of the payment, which notification shall set forth sufficient information to permit timely and appropriate processing of the payment by the Purchaser.

## ARTICLE VI

### MISCELLANEOUS

Section 6.1     Notices. All demands, notices and communications required to be provided hereunder shall be in writing and shall be deemed to have been duly given if mailed, by registered or certified mail, postage prepaid, and return receipt requested, or, if by other means, when received by the other party at the address as follows:

(i)   if to the Seller:

American Home Mortgage Corp.
538 Broadhollow Road
Melville, New York 11747
Attention: Robert F. Johnson, Jr., Executive Vice President

With a copy to:

American Home Mortgage Corp.
538 Broadhollow Road
Melville, New York 11747
Attention: Alan B. Horn, General Counsel

(ii)  if to the Purchaser:

Countrywide Bank, FSB
4500 Park Granada
Mail Suite CH-20
Calabasas, California 93102
Attn: Kathleen Conte, Executive Vice President



With copy to:

Countrywide Bank, FSB
225 West Hillcrest Drive
Thousand Oaks, California 91360
Attn: General Counsel

or such other address as may hereafter be furnished to the other party by like notice. Any such demand, notice or communication hereunder shall be deemed to have been received on the date delivered to or received at the premises of the addressee (as evidenced, in the case of registered or certified mail, by the date noted on the return receipt).

Section 6.2 **Intention of the Parties**. Pursuant to this Agreement, the Purchaser is purchasing, and the Seller is selling the Mortgage Loans and not a debt instrument of the Seller or any other security. Accordingly, the Seller and the Purchaser shall each treat the transaction for federal income tax purposes as a sale by the Seller, and a purchase by the Purchaser, of the Mortgage Loans and the Servicing Rights. The Purchaser shall have the right to review the Mortgage Loans and the related Mortgage Loan Files to determine the characteristics of the Mortgage Loans which shall affect the federal income tax consequences of owning the Mortgage Loans and the Servicing Rights and the Seller shall cooperate with all reasonable requests made by the Purchaser in the course of such review.

Section 6.3 **Exhibits**. The exhibits to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement.

Section 6.4 **General Interpretive Principles**. For purposes of this Agreement, except as otherwise expressly provided or unless the context otherwise requires:

(a) the terms defined in this Agreement have the meanings assigned to them in this Agreement and include the plural as well as the singular, and the use of any gender herein shall be deemed to include the other gender;

(b) accounting terms not otherwise defined herein have the meanings assigned to them in accordance with generally accepted accounting principles;

(c) references herein to "Sections," "Subsections," "Paragraphs," and other Subdivisions without reference to a document are to designated Sections, Subsections, Paragraphs and other subdivisions of this Agreement;

(d) reference to a Subsection without further reference to a Section is a reference to such Subsection as contained in the same Section in which the reference appears, and this rule shall also apply to Paragraphs and other subdivisions;

(e) the words "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular provision; and

(f) the term "include" or "including" shall mean without limitation by reason of enumeration.

Section 6.5 **Reproduction of Documents**. This Agreement and all documents relating thereto, including, without limitation, (a) consents, waivers and modifications which may hereafter be executed, (b) documents received by any party at the closing, and (c) financial statements, certificates and other information previously or hereafter furnished, may be reproduced by any photographic, photostatic, microfilm, micro-card, miniature photographic or other similar process. The parties agree that any such reproduction shall be admissible in evidence as the original itself in any judicial or administrative proceeding, whether or not the original is in existence and whether or not such reproduction was made by a party in the regular course of business, and that any enlargement,



facsimile or further reproduction of such reproduction shall likewise be admissible in evidence.

**Section 6.6** **Further Agreements**. The Seller shall execute and deliver to the Purchaser and the Purchaser shall execute and deliver to the Seller such reasonable and appropriate additional documents, instruments or agreements as may be necessary or appropriate to effectuate the purposes of this Agreement.

**Section 6.7** **Execution of Agreement**. This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument. This Agreement shall be deemed binding when executed by both the Purchaser and the Seller. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

**Section 6.8** **Successors and Assigns**. This Agreement shall bind and inure to the benefit of and be enforceable by the Seller and the Purchaser and the respective permitted successors and assigns of the Seller and the successors and assigns of the Purchaser. This Agreement shall not be assigned, pledged or hypothecated by the Seller without the consent of the Purchaser, which such consent shall not be unreasonably withheld. This Agreement may be assigned, pledged or hypothecated or otherwise transferred or encumbered in whole or in part by the Purchaser without the consent of the Seller. If the Purchaser assigns all of its rights as the Purchaser hereunder, the assignee of the Purchaser, upon notification to the Seller, will become the "Purchaser" hereunder.

**Section 6.9** **Severability Clause**. Any part, provision, representation or warranty of this Agreement which is prohibited or which is held to be void or unenforceable shall be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any relevant jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction as to any Mortgage Loan shall not invalidate or render unenforceable such provision in any other jurisdiction. To the extent permitted by applicable law, the parties hereto waive any provision of law, which prohibits or renders void or unenforceable any provision hereof.

**Section 6.10** **Costs**. The Purchaser shall pay any commissions due its salesmen, any and all costs incurred by the Purchaser, its employees or agents in connection with the due diligence evaluation of the Mortgage Loans, including but not limited to, the assessment of the credit, compliance or value of such Mortgage Loans, and the legal fees and expenses of its attorneys and expenses of its custodian. All other costs and expenses incurred in connection with the transfer and delivery of the Mortgage Loans, including shipping fees related to the credit files, recording fees, fees for the title policy endorsements and continuations and the Seller's attorney's fees, shall be paid by the Seller.

**Section 6.11** **Attorneys' Fees**. If any claim, legal action or any arbitration or other proceeding is brought for the enforcement of this Agreement or because of a dispute, breach, default or misrepresentation in connection with any of the provisions of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorneys' fees and other costs incurred in that claim, action or proceeding, in addition to any other relief to which such party may be entitled.

**Section 6.12** **Governing Law**. This Agreement shall be governed by and interpreted in accordance with the laws of the State of New York applicable to agreements entered into and wholly performed within said jurisdiction.

**Section 6.13** **Survival**. All covenants, agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement. It shall not be a defense in any action by the Purchaser against the Seller arising out of a breach of the Seller's covenants, agreements, representations and warranties made herein that the Purchaser knew or should have

known of the existence of the related breach of such covenants, agreements, representations and warranties.

**Section 6.14    Conflicts between Transaction Documents**. In the event of any conflict, inconsistency or ambiguity between the terms and conditions of this Agreement and either the Trade Confirmation or Purchase Confirmation, the terms of the Trade Confirmation or Purchase Confirmation, as the case may be, shall control.   In the event of any conflict, inconsistency or ambiguity between the terms and conditions of the Trade Confirmation and the Purchase Confirmation, the terms of the Purchase Confirmation shall control.

**Section 6.15    Entire Agreement**. This Agreement, the Trade Confirmation and the Purchase Confirmation constitute the entire understanding between the parties hereto with respect to a Mortgage Loan Package and supersedes any and all prior or contemporaneous oral or written communications with respect to the subject matter hereof, all of which communications are merged herein.  It is expressly understood and agreed that no employee, agent or other representative of the Seller or the Purchaser has any authority to bind such party with regard to any statement, representation, warranty or other expression unless said statement, representation, warranty or other expression is specifically included within the express terms of this Agreement, the Trade Confirmation or the Purchase Confirmation.   Neither this Agreement, the Trade Confirmation nor the Purchase Confirmation shall be modified, amended or in any way altered except by an instrument in writing signed by both the parties hereto.

**Section 6.16    Confidentiality**.  The Seller and the Purchaser hereby acknowledge and agree that this Agreement shall be kept confidential and its contents will not be divulged to any party without the consent of the other parties hereto except to the extent that it is appropriate for such party to do so in working with its directors, officers, employees, authorized representatives or reporting to legal counsel, auditors, taxing authorities or other governmental agencies.

Notwithstanding any other express or implied agreement to the contrary, the parties agree and acknowledge that each of them and each of their employees, representatives, and other agents may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the transaction and all materials of any kind (including opinions or other tax analyses) that are provided to any of them relating to such tax treatment and tax structure, except to the extent that confidentiality is reasonably necessary to comply with U.S. federal or state securities laws.   For purposes of this paragraph, the terms "tax treatment" and "tax structure" have the meanings specified in Treasury Regulation section 1.6011-4(c)

**Section 6.17    No Solicitation**.  From and after the related Closing Date, the Seller agrees that it will not take any action or cause any action to be taken by any of its employees, agents or affiliates, or by any independent contractors acting on the Seller's behalf, to solicit in any manner whatsoever any Mortgagor for any purpose, including, without limitation, to prepay or refinance a Mortgage Loan.   It is understood and agreed by the Seller and the Purchaser that all rights and benefits relating to the solicitation of any Mortgagors shall be transferred to the Purchaser pursuant hereto on the related Closing Date and the Seller shall take no action to undermine these rights and benefits.  The Seller shall not sell the name of any Mortgagor to any person or entity.

**Section 6.18    Additional Indemnification by the Seller; Third Party Claims**.

(a)    The Seller shall indemnify the Purchaser and hold it harmless against any and all claims, losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments, and any other costs, fees and expenses that the Purchaser may sustain in any way related to the failure of the Seller to perform its duties and service the Mortgage Loans in strict compliance with the terms of this Agreement.  The Seller and the Purchaser shall immediately notify the other if a claim is made upon such party by a third party with respect to this Agreement or the Mortgage Loans. Upon the prior written consent of Purchaser, which consent shall not be unreasonably withheld, the Seller shall assume the defense of any such claim and pay all expenses in connection therewith,

including counsel fees, and promptly pay, discharge and satisfy any judgment or decree which may be entered against it or the Purchaser in respect of such claim. The Purchaser promptly shall reimburse the Seller for all amounts advanced by it pursuant to the preceding sentence except when the claim is in any way related to the Seller's indemnification pursuant to Section 3.4; or the failure of the Seller to service and administer the Mortgage Loans in strict compliance with the terms of this Agreement.

(b)    The Seller shall indemnify the Purchaser, each affiliate of the Purchaser, and each of the following parties participating in a Securitization Transaction: each sponsor and issuing entity; each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction; each broker dealer acting as underwriter, placement agent or initial purchaser, each Person who controls any of such parties or the Depositor (within the meaning of Section 15 of the Securities Act and Section 20 of the Exchange Act); and the respective present and former directors, officers, employees and agents of each of the foregoing and of the Depositor, and shall hold each of them harmless from and against any losses, damages, penalties, fines, forfeitures, legal fees and expenses and related costs, judgments, and any other costs, fees and expenses that any of them may sustain arising out of or based upon:

(i)(A) any untrue statement of a material fact contained or alleged to be contained in any information, report, certification, accountants' letter or other material provided in written or electronic form under the Regulation AB Information and Certification Provisions of this Agreement by or on behalf of the Seller, or provided under the Regulation AB Information and Certification Provisions of this Agreement by or on behalf of any Subservicer, Subcontractor or Third-Party Originator (collectively, the "Seller Information"), or (B) the omission or alleged omission to state in the Seller Information a material fact required to be stated in the Seller Information or necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided, by way of clarification, that clause (B) of this paragraph shall be construed solely by reference to the Seller Information and not to any other information communicated in connection with a sale or purchase of securities, without regard to whether the Seller Information or any portion thereof is presented together with or separately from such other information;

(ii) any failure by the Seller, any Subservicer, any Subcontractor or any Third-Party Originator to deliver any information, report, certification, accountants' letter or other material when and as required under the Regulation AB Information and Certification Provisions of this Agreement, including any failure by the Seller to identify pursuant to Section 4.4(b) any Subcontractor "participating in the servicing function" within the meaning of Item 1122 of Regulation AB; or

(iii) any breach by the Seller of a representation or warranty set forth in Section 3.1(o) or in a writing furnished pursuant to Section 6.19 and made as of a date prior to the closing date of the related Securitization Transaction, to the extent that such breach is not cured by such closing date, or any breach by the Seller of a representation or warranty in a writing furnished pursuant to Section 6.19 to the extent made as of a date subsequent to such closing date.

In the case of any failure of performance described in clause (b)(ii) of this Section 6.18, the Seller shall promptly reimburse the Purchaser, any Depositor, as applicable, and each Person responsible for the preparation, execution or filing of any report required to be filed with the Commission with respect to such Securitization Transaction, or for execution of a certification pursuant to Rule 13a-14(d) or Rule 15d-14(d) under the Exchange Act with respect to such Securitization Transaction, for all costs reasonably incurred by each such party in order to obtain the information, report, certification, accountants' letter or other material not delivered as required by the Seller, any Subservicer, any Subcontractor or any Third-Party Originator.

44



**Section 6.19**    <u>Confirmation of Certain Representations and Warranties of the Seller</u>.  If so requested by the Purchaser or any Depositor on any date following the date on which information is first provided to the Purchaser or any Depositor under <u>Section 4.3(c)</u>, the Seller shall, within three Business Days following such request, confirm in writing the accuracy of the representations and warranties set forth in <u>Section 3.1(o)</u> or, if any such representation and warranty is not accurate as of the date of such request, provide reasonably adequate disclosure of the pertinent facts, in writing, to the requesting party.

**Section 6.20**    <u>Applicability</u>.  Sections 3.1(o)(i)-(v), <u>Sections 4.3(c)(iii), (v)</u> and <u>(vi)</u>, <u>Sections 4.4</u>, <u>Section 4.5</u> and <u>Section 4.7</u> are applicable only if the Seller will (directly or through a Subservicer) service the Mortgage Loans for any period, including the interim period, following a Securitization Transaction.

<p align="center">(SIGNATURE PAGE FOLLOWS)</p>

IN WITNESS WHEREOF, the Seller and the Purchaser have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the date first above written.

**COUNTRYWIDE BANK, FSB,**
the Purchaser


By: _____
       Kathleen Conte
       Executive Vice President


**AMERICAN HOME MORTGAGE CORP.,**
the Seller


By: _____
       Name:
       Title:

**EXHIBIT A**

FORM OF FUNDING SCHEDULE

**COUNTRYWIDE BANK, FSB**

**Funding Schedule**

**Closing Date [_____]**

The Purchase Proceeds due to the Seller for the Mortgage Loans is calculated as follows:

| | | |
|---|---|---|
| 1) | Aggregate Principal Balance of Mortgage Loans as of [CUT-OFF DATE]: | $[AMOUNT] |
| 2) | Purchase Price Percentage: | [PERCENTAGE]% |
| 3) | Purchase Price Proceeds: | $[AMOUNT] |
| 4) | Accrued Interest @ [xxx]%: | $[AMOUNT] |
| 5) | Total Purchase Proceeds (Item 3 + Item 4): | $[AMOUNT] |

Pursuant to the Agreement, the Seller hereby instructs the Purchaser to wire the Purchase Proceeds to the account designated below on the date hereof:

[WIRE INSTRUCTIONS]

Agreed to and Accepted by:

_____                COUNTRYWIDE BANK, FSB

By: _____         By: _____
    Name:                                                Name
    Title:                                                 Title:

CB Internal        _____

                _____

                _____

                _____

47

**EXHIBIT B**

FORM OF OFFICER'S CERTIFICATE

I, _____, hereby certify that I am a duly elected _____ of _____, a _____ corporation (the "Company"), and further certify on behalf of the Company as follows:

1.  Attached hereto are true and correct copies of the Certificate of Incorporation and Bylaws of the Company as in full force and effect on the date hereof.

2.  Each person who, as an officer or attorney-in-fact of the Company, signed (a) the Mortgage Loan Purchase and Interim Servicing Agreement (the "Agreement") dated as of _____, by and between the Company and Countrywide Bank, FSB, and (b) the related Purchase Confirmation (the "Purchase Confirmation"), by and between the Company and Countrywide Bank, FSB, and (c) any other document delivered prior hereto or on the date hereof in connection with the sale and servicing of Mortgage Loans in accordance with the Agreement and/or Purchase Confirmation was, at the respective times of such signing and delivery, and is as of the date hereof, duly elected or appointed, qualified and acting as such officer or attorney-in-fact.

3.  Set forth below is the name, title and specimen signature of the person who has been duly elected and qualified to serve in the capacity set forth opposite his or her name:

| Name | Title | Signature |
|------|-------|-----------|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

, and the signatures of such persons appearing on such documents are their genuine signatures.

4.  All of the representations and warranties of the Company contained in Article III of the Agreement and/or Purchase Confirmation were true and correct in all material respects as of the related Closing Date.

5.  The Company has performed all of its duties and has satisfied all of the material conditions on its part to be performed or satisfied prior to the Closing Date pursuant to the Agreement and/or Purchase Confirmation.

All capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Agreement.

IN WITNESS WHEREOF, I have hereunto signed my name and affixed the seal of the Company.

Dated: _____, 200_       _____

                                     By: _____
                                     Its: _____

I, _____, Secretary of _____; hereby certify that _____ is a duly elected, qualified and acting _____ of _____ and that the signature appearing above is his or her genuine signature.

IN WITNESS WHEREOF, I have hereunto signed my name.

Dated: _____, 200_       _____

                                     By: _____
                                     Its: _____

48

**EXHIBIT C**

FORM OF AUTHORIZED SIGNATORIES AGREEMENT

<u>AUTHORIZED SIGNATORIES AGREEMENT</u>

This Authorized Signatories Agreement is dated and effective as of _____, 200_, between [SELLER], (the "Seller"), and Countrywide Bank, FSB (the "Purchaser").

<u>RECITALS</u>

A. The Seller has sold, or proposes to sell from time to time, to the Purchaser certain mortgage loans including the servicing rights related thereto (the "Mortgage Loans") in accordance with terms and conditions of that certain Mortgage Loan Purchase and Interim Servicing Agreement dated [INSERT] by and between the Seller and the Purchaser (the "Agreement").

B. To facilitate the transfer and assignment of the Mortgage Loans from the Seller to the Purchaser under the Agreement, the Seller has agreed to appoint specific individuals employed by the Purchaser as authorized signatories (collectively, the "Authorized Signatories") pursuant to a certain Appointment of Authorized Signatories, the form of which is attached as <u>Exhibit A</u> hereto, for the sole and exclusive purposes of preparing and executing allonge note endorsements ("Endorsements") and/or preparing and executing mortgage assignments or beneficial interests in deeds of trust or similar instruments ("Assignments"), as applicable, with respect to the Mortgage Loans.

In consideration of the promises and the mutual agreements and undertakings set forth herein, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. The Seller hereby authorizes the Authorized Signatories to prepare and execute Endorsements and/or Assignments, as applicable, relating to the Mortgage Loans sold by the Seller to the Purchaser under the Agreement. Such authority shall include the authority to record and/or file such Endorsements and Assignments with all applicable governmental recording agencies and any private electronic systems, including, without limitation, the MERS® System.

2. The Purchaser agrees that the preparation and execution of the Endorsements and/or Assignments by the Authorized Signatories will be performed with due care.

3. Other than the authorization granted herein, the Purchaser agrees that the Authorized Signatories will take no other action in the name of the Seller.

4. The authority granted by the Seller to the Purchaser herein shall be in full force and effect and shall apply with respect to any Mortgage Loan sold by the Seller to the Purchaser under the Agreement.

5. The Seller will provide Purchaser with a Secretary's Certificate that authenticates that the Seller's Board of Directors has taken the necessary corporate action to allow the appointment of and grant the authorizations to the Authorized Signatories as permitted herein, which such corporate action shall be in the form of board resolution substantially in the form of <u>Exhibit B</u> attached hereto.

IN WITNESS WHEREOF, the parties have duly executed this Authorized Signatories Agreement as of the date first above written.

**[SELLER],**

50

the Seller

By:_____
Name:
Title:

**COUNTRYWIDE BANK, FSB,**
the Purchaser

By:_____
Name:
Title:

**Exhibit A**
**To**
**Authorized Signatories Agreement**

Mortgage Loan Schedule

(attached)



**Exhibit B**
**To**
**Authorized Signatories Agreement**

FORM OF APPOINTMENT OF AUTHORIZED SIGNATORIES

Pursuant to the authority granted me by a vote of the Board of Directors of [SELLER] dated as of [DATE], I hereby appoint the individuals listed below for the sole and exclusive purpose of executing allonge note endorsements and/or executing mortgage assignments or beneficial interests in deeds of trust or similar instruments, as applicable, relating to mortgage loans sold, or to be sold, by [SELLER], as identified on Exhibit A of that certain Authorized Signatories Agreement dated as of [DATE], by and between [SELLER] and Countrywide Bank, FSB

[SELLER],

By: _____
      Name:
      Title:

Dated: _____, 200_.

**AUTHORIZED SIGNATORIES:**

| | | | |
|---|---|---|---|
| Adele Tharpe | Allen Kalust | Amy Hamlin | Amy Millett |
| Angeles Medina | Cherie Hagen | Christine Armendariz | Craig Anderson |
| Deanna Burns | Edward Gerovian | Heidi Smalley | Icela Lopez |
| Jacqui Prey | Janet Palomino | Jill Manderfield | Jordan Cohen |
| Judith Moore | Kevin Meyers | Laura Villasenor | Mark Acosta |
| Mark Wong | Mary Beth Pitstick | Mercedes Judilla | Mike Vestal |
| Nicole Walden | Paul Lindemann | Pauline Casillas | Richard L. Wilson |
| Robin Dolatowski | Ron Pisapia | Sandra Fennell | Sheri Solum |
| Sophie Hooper | Susan Hahn | Terry Stallings | Tony Meschyan |
| Tracy Schreiner | Yolanda Diaz | Lynn Sumner | Michael K. Henderson |
| Michael W. Schloessmann | | | |

**EXHIBIT D**

FORM OF PURCHASE CONFIRMATION

[COUNTRYWIDE LETTERHEAD]

[DATE]

**[SELLER]**
[STREET ADDRESS]
[CITY, STATE AND ZIP]
Attn: [CONTACT, TITLE]

Re:    Purchase Confirmation

Gentlemen and Ladies:

This purchase confirmation (the "Purchase Confirmation") between Countrywide Bank, FSB (the "Purchaser") and [SELLER] (the "Seller") sets forth our agreement pursuant to which the Purchaser is purchasing, and the Seller is selling, on a servicing-released basis, those certain mortgage loans identified in <u>Exhibit A</u> hereto and more particularly described herein (the "Mortgage Loans").

The purchase, sale and servicing of the Mortgage Loans as contemplated herein shall be governed by that certain Mortgage Loan Purchase and Interim Servicing Agreement dated as of [DATE], between the Purchaser and the Seller (as amended herein and otherwise, the "Agreement"). By executing this Purchase Confirmation, each of the Purchaser and the Seller again makes, with respect to itself and each Mortgage Loan as of the related Closing Date or such other date as indicated in the Agreement, as applicable, all of the covenants, representations and warranties made by each such party in the Agreement, except as the same may be amended by this Purchase Confirmation.

All exhibits hereto are incorporated herein in their entirety. In the event there exists any inconsistency between the Agreement and this Purchase Confirmation, the latter shall be controlling notwithstanding anything contained in the Agreement to the contrary. All capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Agreement.

1.  <u>Assignment and Conveyance of Mortgage Loans</u>. Upon the Purchaser's payment of the Purchase Proceeds in accordance with Section 2.2 of the Agreement, the Seller shall sell, transfer, assign and convey to the Purchaser, without recourse, but subject to the terms of this Purchase Confirmation and the Agreement, all of the right, title and interest of the Seller in and to the Mortgage Loans, including the Servicing Rights relating thereto.

2.  <u>Defined Terms</u>. As used in the Agreement, the following defined terms shall have meanings set forth below, with respect to the related Mortgage Loan Package.

    a.  <u>Closing Date</u>: [DATE].

    b.  <u>Cut-off Date</u>: [DATE].

    c.  <u>Purchase Proceeds</u>: With respect to [the Mortgage Loans] [each Mortgage Loan] [the Mortgage Loans in each Segment], and as set forth in <u>Exhibit A</u> hereto, the sum of (a) the product of (i) the Cut-off Date Balance of [such Mortgage Loan] [such Mortgage Loans] [such Segment], and (ii) the purchase price percentage set forth in <u>Exhibit A</u> hereto for such

54

Mortgage Loan] [Mortgage Loans] [Segment], and (b) accrued interest owing to the Seller on the Stated Principal Balance of the Mortgage Loans at a rate equal to the weighted average Mortgage Interest Rate of such Mortgage Loans, from the Cut-off Date through the day prior to the Closing Date, inclusive.   [accrued interest owing to the Seller on the Stated Principal Balance of each Mortgage Loan at a rate equal to the Mortgage Interest Rate of each such Mortgage Loan, from the date through which interest has last been paid (as of the Cut-off Date) through the day prior to the Closing Date, inclusive; provided, however, with respect to those Mortgage Loans for which interest has been paid through a date beyond the Closing Date, such accrued interest owing to Seller shall be reduced by the amount of interest accruing on the Stated Principal Balance of each such Mortgage Loan at a rate equal to the Mortgage Interest Rate of such Mortgage Loan, from the Closing Date to the day prior to the interest paid through date for such Mortgage Loan, inclusive.] [accrued interest owing to the Purchaser on the Mortgage Loans based on the scheduled principal balance as of the first day of the month preceding the Cut-off Date at a rate equal to the weighted average Mortgage Interest Rate of such Mortgage Loans, from the Closing Date through the thirtieth (30th) day of the month in which the Closing Date occurs, inclusive.]

d.  Servicing Transfer Date: [DATE]

3.  Description of Mortgage Loans:  Each Mortgage Loan complies with the specifications set forth below in all material respects.

a.  Loan Type:  Each Mortgage Loan is a Conventional Mortgage Loan and a [Adjustable Rate] [Balloon] [Convertible] [Fixed Rate] Mortgage Loan.

[b.  Index: On each Interest Adjustment Date, the applicable index rate shall be a rate per annum equal to [the weekly average yield on U.S. Treasury securities adjusted to a constant maturity of one year, as published by the Board of Governors of the Federal Reserve System in Statistical Release No. H.15] [the average of interbank offered rates for six-month U.S. dollar denominated deposits in the London market (LIBOR), as published [in the Wall Street Journal] [by Fannie Mae] [the 11th District Cost of Funds as made available by the Federal Home Loan Bank] [the weekly average yield on certificates of deposit adjusted to a constant maturity of six months as published by the Board of Governors of the Federal Reserve System in Statistical Release No. H.15 or a similar publication].

c.  Lien Position:  Each Mortgage Loan is secured by a perfected [first] [second] lien Mortgage.

d.  Underwriting Criteria: Each Mortgage Loan conforms to the underwriting criteria as set forth in the Trade Confirmation dated [                    ], between the parties.

[4.  Additional Stipulations Regarding Mortgage Loan Package.

a.  Prepayment [and Conversion] Protection.  In addition to the any rights afforded the Purchaser in the Agreement, in the event that any of the Mortgage Loans are (i) paid in full [or (ii) converted to a fixed-rate mortgage loan, in either case,] on or prior to [DATE], or [(iii)] subject to a breach of the representation set forth in Section 3.2(qq) of the Agreement, the Seller shall, with respect to each such Mortgage Loan, pay to the Purchaser the product of (a) the positive difference, if any, between the Purchase Price Percentage (subject to any buyup or buydown adjustments as contemplated [in the Trade Confirmation]) and 100%, times (b) the unpaid principal balance of such Mortgage Loan at the time such Mortgage Loan is paid in full [or converted, as applicable] (the "Premium Recapture Amount").   In the event any Mortgage Loan is paid in full after the Cut-off Date and on or prior to the Closing Date, the Seller shall, in addition to the Premium Recapture Amount, pay the Purchaser the Accrued Interest paid by the Purchaser for such Mortgage Loan.  Nothing contained in Section 3.5 of the Agreement shall in any way limit the rights of the Purchaser to all collections and recoveries of principal and interest received or applied to any Mortgagor's account and the

Seller's obligation to remit the such recoveries of principal and interest to the Purchaser as provided in Section 2.3.]

b.  Payment Default Protection.  In addition to any rights afforded the Purchaser in the Agreement, if the [first Monthly Payment with a Due Date subsequent to the Closing Date][first Monthly Payment due under the Mortgage Note] is not received by the Purchaser, whether from the Mortgagor directly or forwarded by the Seller if the Mortgagor has submitted the payment to the Seller, [by the last day of the month in which such payment is due][within [INSERT] ([INSERT] days of its related Due Date], the Seller shall, at the Purchaser's option and not later than five (5) Business Days after receipt of notice from the Purchaser, repurchase such Mortgage Loan at the Repurchase Price.  The rights conferred to the Purchaser under this Section 3.6 shall be in addition to those rights conferred to the Purchaser under Section 3.2(b).]

c.  Post-Closing Appraisal Review.  In addition to any rights afforded the Purchaser in the Agreement, the Purchaser shall have the right, within thirty (30) days after the Closing Date, or the date on which the appraisal in the Mortgage File relating to the Mortgaged Property is received by the Purchaser from the Seller, whichever is later, to obtain an appraisal, broker's price opinion, drive-by appraisal or any other comparable valuation measure with respect to any Mortgaged Property (collectively, the "Review Appraisal").  If the value of a Mortgaged Property, as determined by the Review Appraisal, is less than the value of the appraisal in the Mortgage File, then the Purchaser may, at the Purchaser's sole option, notify the Seller of the variance by providing the Seller with a copy of the Review Appraisal.  Upon the Purchaser giving such notice of the variance to the Seller, the Seller shall repurchase the Mortgage Loan at the Repurchase Price not later than five (5) Business Days after the Seller's receipt of such notice from the Purchaser, unless the Seller obtains a Second Review Appraisal as defined in, and pursuant to, the following.

In the event the Seller is notified of a variance by the Purchaser which requires the Seller to repurchase a Mortgage Loan as provided herein and the Seller disputes the value of the Mortgaged Property as determined by the Review Appraisal, the Seller may, at its sole cost and expense, and within ten (10) Business Days of receipt of such notice from the Purchaser, obtain a second review appraisal ("Second Review Appraisal") of the Mortgaged Property provided that the Seller (i) gives the Purchaser written notice of its intent to obtain a Second Review Appraisal within five (5) Business Days of receipt of such notice from the Purchaser, and (ii) provides the Purchaser with a true and complete copy of the Second Review Appraisal.  If the value of the Mortgaged Property, as determined by the Second Review Appraisal, confirms the Seller's obligation to repurchase the Mortgage Loan as provided herein, the Seller shall repurchase the Mortgage Loan at the Repurchase Price not later than five (5) Business Days after receipt of the Second Review Appraisal or such other date as may be agreed to by the Purchaser.  If the value of the Mortgaged Property, as determined by the Second Review Appraisal, indicates that the Seller is not required to repurchase the Mortgage Loan, the Seller shall be relieved of its obligation to repurchase the Mortgage Loan pursuant to this Section 3.7 provided that the Purchaser approves the Second Review Appraisal, which such approval may not be unreasonably withheld.  If the Purchaser does not approve the Second Review Appraisal, the Seller shall remain obligated to repurchase the Mortgage Loan not later than five (5) Business Days after receipt of the Second Review Appraisal or such other date as may be agreed to by the Purchaser.

d.  Missing and Deficient Documents.  Pursuant to Section 2.5 of the Agreement, the Seller is required to deliver to the Purchaser the Mortgage Loan Documents at least two (2) Business Days prior to the Closing Date.  The Seller and the Purchaser acknowledge that as of the Closing Date, with respect to the Mortgage Loans identified in Exhibit B hereto, the Seller has not delivered the related Mortgage Loan Documents in accordance with Section 2.5 (the "Missing Documents") or, with respect to certain other Mortgage Loans also identified in Exhibit B hereto, certain Mortgage Loan Documents and/or Mortgage Files are deficient and/or

incomplete for reasons detailed in <u>Exhibit B</u> (the "Deficient Documents").

In consideration of the Purchaser's agreement to purchase the Mortgage Loans identified in <u>Exhibit B</u> hereto on the Closing Date notwithstanding the foregoing, the Seller shall deliver such Missing Documents to the Purchaser and cure such Deficient Documents to the satisfaction of the Purchaser within the time period specified in <u>Exhibit B</u>. In the event that the Seller fails to comply with the requirements of the foregoing sentence, the Seller shall, upon written notice from the Purchaser, repurchase any such Mortgage Loan at the Repurchase Price within five (5) Business Days after the Seller's receipt of such written notice. The fact that the Purchaser decides not to require the Seller to repurchase any such Mortgage Loan where the Seller may otherwise be required to repurchase such Mortgage Loan hereunder shall not affect the Purchaser's right to demand repurchase of such Mortgage Loan or to avail itself of any other rights and remedies available to it under the Agreement. Nothing contained herein shall be deemed to waive any rights, remedies or privileges of the Purchaser including, without limitation, the remedies accorded the Purchaser under Sections 3.3 and 3.4.

e.  <u>Post-Closing Due Diligence Review</u>. The Seller and the Purchaser acknowledge that as of the Closing Date, with respect to of the Mortgage Loans identified in <u>Exhibit C</u> hereto (the "Post-Closing Due Diligence Review Mortgage Loans"), the Purchaser has not had an opportunity to review any of the Mortgage Files and otherwise complete its due diligence on the Post-Closing Due Diligence Review Mortgage Loans. The parties agree that the Purchaser shall have the right to review the Mortgage File for each Post-Closing Due Diligence Review Mortgage Loan within thirty (30) days of the latter of the Closing Date or the Purchaser's receipt of the Mortgage File from the Seller and, based on its review, request the Seller to repurchase any Post-Closing Due Diligence Review Mortgage Loan which the Purchaser determines not to be in compliance with the representations and warranties contained in the Agreement or is otherwise unsatisfactory based upon the Purchaser's due diligence findings. With respect to any such Post-Closing Due Diligence Review Mortgage Loan identified by the Purchaser pursuant to the preceding sentence, the Seller shall, within fifteen (15) Business Days of the Purchaser's request therefore, repurchase such Post-Closing Due Diligence Review Mortgage Loan at the Repurchase Price. The fact that the Purchaser decides not to require the Seller to repurchase any such Post-Closing Due Diligence Review Mortgage Loan where the Seller may otherwise be required to repurchase such Post-Closing Due Diligence Review Mortgage Loan hereunder shall not affect the Purchaser's right to demand repurchase of such Post-Closing Due Diligence Review Mortgage Loan or to avail itself of any other rights and remedies available to it under the Agreement. Provisions of the Agreement not expressly amended hereby shall remain in full force and effect without change or modification. Nothing contained herein shall be deemed to waive any rights, remedies or privileges of the Purchaser including, without limitation, the remedies accorded the Purchaser under Sections 3.3 and 3.4 of the Agreement.

f.  <u>Obligation to fulfill Commitment Amount</u>. The Seller and the Purchaser hereby acknowledge and agree that the aggregate unpaid principal balance of the Mortgage Loans to be sold by the Seller to the Purchaser on the Closing Date is less than the Commitment Amount set forth in the Trade Confirmation. In recognition of the foregoing, the Seller and the Purchaser agree as follows: the Seller shall sell to the Purchaser additional Mortgage Loans in order to fulfill the Commitment Amount (as approved by the Purchaser, the "Approved Post-Closing Mortgage Loans"). The Seller shall sell such Approved Post-Closing Mortgage Loans to the Purchaser on a date to be mutually agreed to by the Seller and the Purchaser. The purchase price to be paid by the Purchaser for the Approved Post-Closing Mortgage Loans shall be calculated in a manner consistent with the Trade Confirmation; provided, however, that the Purchase Price Percentage used in the foregoing calculation shall be reduced by an amount, such amount to be reasonably determined by the Purchaser, to adjust for the spread loss for each day following the Closing Date until the purchase of the Approved Post-Closing Mortgage Loans is consummated.

Notwithstanding anything contained herein to the contrary, it is understood and agreed by the Seller that in the event the aggregate unpaid principal balance of the Approved Post-Closing Mortgage Loans, when added to the aggregate unpaid principal balance of the Mortgage Loans purchased by the Purchaser on the Closing Date, is less than the commitment amount as set forth in the Trade Confirmation, the Seller shall remain obligated to pay the Purchaser the pair-out fee on the related shortfall amount. Nothing contained herein shall be deemed to waive any rights, remedies or privileges of the Purchaser contained in the Trade Confirmation and the Agreement including, without limitation, the remedies accorded the Purchaser under Sections 3.3 and 3.4 of the Agreement.]

Kindly acknowledge your agreement to the terms of this Purchase Confirmation by signing in the appropriate space below and returning this Purchase Confirmation to the undersigned. Telecopy signatures shall be deemed valid and binding to the same extent as the original.

COUNTRYWIDE BANK, FSB                    [SELLER]

By: _____       By: _____
    Kathleen Conte                        Name:
    Executive Vice President              Title:

**Exhibit A to Purchase Confirmation**

Mortgage Loans

(attached)

[Exhibit B to Purchase Confirmation

Mortgage Loans with Missing/Deficient Documents

(attached)

**Exhibit C to Purchase Confirmation**

Post-Closing Due Diligence Review Mortgage Loans

(attached)]



**EXHIBIT E**

**FORM OF ANNUAL CERTIFICATION**

Re:    The [               ] agreement dated as of [    ], 200[ ] (the "Agreement"),
among [IDENTIFY PARTIES]

I, _____, the _____ of [NAME OF
SELLER], certify to [the Purchaser], [the Depositor], and the [Master Servicer] [Securities Administrator]
[Trustee], and their officers, with the knowledge and intent that they will rely upon this certification, that:

(1)    I have reviewed the servicer compliance statement of the Seller provided in accordance
with Item 1123 of Regulation AB (the "Compliance Statement"), the report on assessment of the Seller's
compliance with the servicing criteria set forth in Item 1122(d) of Regulation AB (the "Servicing Criteria"),
provided in accordance with Rules 13a-18 and 15d-18 under Securities Exchange Act of 1934, as
amended (the "Exchange Act") and Item 1122 of Regulation AB (the "Servicing Assessment"), the
registered public accounting firm's attestation report provided in accordance with Rules 13a-18 and 15d-
18 under the Exchange Act and Section 1122(b) of Regulation AB (the "Attestation Report"), and all
servicing reports, officer's certificates and other information relating to the servicing of the Mortgage
Loans by the Seller during 200[ ] that were delivered by the Seller to the [Depositor] [Master Servicer]
[Securities Administrator] [Trustee] pursuant to the Agreement (collectively, the "Servicing Information");

(2)    Based on my knowledge, the Servicing Information, taken as a whole, does not contain
any untrue statement of a material fact or omit to state a material fact necessary to make the statements
made, in the light of the circumstances under which such statements were made, not misleading with
respect to the period of time covered by the Servicing Information;

(3)    Based on my knowledge, all of the Servicing Information required to be provided by the
Seller under the Agreement has been provided to the [Depositor] [Master Servicer] [Securities
Administrator] [Trustee];

(4)    I am responsible for reviewing the activities performed by the Seller as servicer under
the Agreement, and based on my knowledge and the compliance review conducted in preparing the
Compliance Statement and except as disclosed in the Compliance Statement, the Servicing Assessment
or the Attestation Report, the Seller has fulfilled its obligations under the Agreement in all material
respects; and

(5)    The Compliance Statement required to be delivered by the Seller pursuant to the
Agreement, and the Servicing Assessment and Attestation Report required to be provided by the Seller
and by any Subservicer or Subcontractor pursuant to the Agreement, have been provided to the
[Depositor] [Master Servicer]. Any material instances of noncompliance described in such reports have
been disclosed to the [Depositor] [Master Servicer]. Any material instance of noncompliance with the
Servicing Criteria has been disclosed in such reports.

[NAME OF SELLER]

By:_____
     Name:
     Title:
     Date:



## EXHIBIT F

## SERVICING CRITERIA TO BE ADDRESSED IN ASSESSMENT OF COMPLIANCE

The assessment of compliance to be delivered by [the Seller] [Name of Subservicer] shall address, at a minimum, the criteria identified as below as "Applicable Servicing Criteria":

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| | **General Servicing Considerations** | |
| 1122(d)(1)(i) | Policies and procedures are instituted to monitor any performance or other triggers and events of default in accordance with the transaction agreements. | |
| 1122(d)(1)(ii) | If any material servicing activities are outsourced to third parties, policies and procedures are instituted to monitor the third party's performance and compliance with such servicing activities. | |
| 1122(d)(1)(iii) | Any requirements in the transaction agreements to maintain a back-up servicer for the mortgage loans are maintained. | |
| 1122(d)(1)(iv) | A fidelity bond and errors and omissions policy is in effect on the party participating in the servicing function throughout the reporting period in the amount of coverage required by and otherwise in accordance with the terms of the transaction agreements. | |
| | **Cash Collection and Administration** | |
| 1122(d)(2)(i) | Payments on mortgage loans are deposited into the appropriate custodial bank accounts and related bank clearing accounts no more than two business days following receipt, or such other number of days specified in the transaction agreements. | |
| 1122(d)(2)(ii) | Disbursements made via wire transfer on behalf of an obligor or to an investor are made only by authorized personnel. | |
| 1122(d)(2)(iii) | Advances of funds or guarantees regarding collections, cash flows or distributions, and any interest or other fees charged for such advances, are made, reviewed and approved as specified in the transaction agreements. | |
| 1122(d)(2)(iv) | The related accounts for the transaction, such as cash reserve accounts or accounts established as a form of over collateralization, are separately maintained (e.g., with respect to commingling of cash) as set forth in the transaction agreements. | |

| | | |
|---|---|---|
| 1122(d)(2)(v) | Each custodial account is maintained at a federally insured depository institution as set forth in the transaction agreements. For purposes of this criterion, "federally insured depository institution" with respect to a foreign financial institution means a foreign financial institution that meets the requirements of Rule 13k-1(b)(1) of the Securities Exchange Act. | |
| 1122(d)(2)(vii) | Reconciliations are prepared on a monthly basis for all asset-backed securities related bank accounts, including custodial accounts and related bank clearing accounts. These reconciliations are (A) mathematically accurate; (B) prepared within 30 calendar days after the bank statement cutoff date, or such other number of days specified in the transaction agreements; (C) reviewed and approved by someone other than the person who prepared the reconciliation; and (D) contain explanations for reconciling items. These reconciling items are resolved within 90 calendar days of their original identification, or such other number of days specified in the transaction agreements. | |

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| Reference | Criteria | |
| | **Investor Remittances and Reporting** | |
| 1122(d)(3)(i) | Reports to investors, including those to be filed with the Commission, are maintained in accordance with the transaction agreements and applicable Commission requirements. Specifically, such reports (A) are prepared in accordance with timeframes and other terms set forth in the transaction agreements; (B) provide information calculated in accordance with the terms specified in the transaction agreements; (C) are filed with the Commission as required by its rules and regulations; and (D) agree with investors' or the trustee's records as to the total unpaid principal balance and number of mortgage loans serviced by the Servicer. | X |
| 1122(d)(3)(ii) | Amounts due to investors are allocated and remitted in accordance with timeframes, distribution priority and other terms set forth in the transaction agreements. | X |
| 1122(d)(3)(iii) | Disbursements made to an investor are posted within two business days to the Servicer's investor records, or such other number of days specified in the transaction agreements. | |
| 1122(d)(3)(iv) | Amounts remitted to investors per the investor reports agree with cancelled checks, or other form of payment, or custodial bank statements. | X |
| | **Pool Asset Administration** | |
| 1122(d)(4)(i) | Collateral or security on mortgage loans is maintained as required by the transaction agreements or related mortgage loan documents. | X |
| 1122(d)(4)(ii) | Mortgage loan and related documents are safeguarded as required by the transaction agreements. | X |
| 1122(d)(4)(iii) | Any additions, removals or substitutions to the asset pool are made, reviewed and approved in accordance with any conditions or requirements in the transaction agreements. | X |
| 1122(d)(4)(iv) | Payments on mortgage loans, including any payoffs, made in accordance with the related mortgage loan documents are posted to the Servicer's obligor records maintained no more than two business days after receipt, or such other number of days specified in the transaction agreements, and allocated to principal, interest or other items (e.g., escrow) in accordance with the related mortgage loan documents. | |
| 1122(d)(4)(v) | The Servicer's records regarding the mortgage loans agree with the Servicer's records with respect to an obligor's unpaid principal balance. | X |
| 1122(d)(4)(vi) | Changes with respect to the terms or status of an obligor's mortgage loans Changes with respect to the terms or status of an obligor's mortgage loans (e.g., loan modifications or re-agings) are made, reviewed and approved by authorized | X |

| | | Applicable Servicing Criteria |
|---|---|---|
| | personnel in accordance with the transaction agreements and related pool asset documents. | |
| 1122(d)(4)(vii) | Loss mitigation or recovery actions (e.g., forbearance plans, modifications and deeds in lieu of foreclosure, foreclosures and repossessions, as applicable) are initiated, conducted and concluded in accordance with the timeframes or other requirements established by the transaction agreements. | X |
| 1122(d)(4)(viii) | Records documenting collection efforts are maintained during the period a mortgage loan is delinquent in accordance with the transaction agreements. Such records are maintained on at least a monthly basis, or such other period specified in the transaction agreements, and describe the entity's activities in monitoring delinquent mortgage loans including, for example, phone calls, letters and payment rescheduling plans in cases where delinquency is deemed temporary (e.g., illness or unemployment). | X |
| 1122(d)(4)(ix) | Adjustments to interest rates or rates of return for mortgage loans with variable rates are computed based on the related mortgage loan documents. | X |

| Servicing Criteria | | Applicable Servicing Criteria |
|---|---|---|
| **Reference** | **Criteria** | |
| 1122(d)(4)(x) | Regarding any funds held in trust for an obligor (such as escrow accounts): (A) such funds are analyzed, in accordance with the obligor's mortgage loan documents, on at least an annual basis, or such other period specified in the transaction agreements; (B) interest on such funds is paid, or credited, to obligors in accordance with applicable mortgage loan documents and state laws; and (C) such funds are returned to the obligor within 30 calendar days of full repayment of the related mortgage loans, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xi) | Payments made on behalf of an obligor (such as tax or insurance payments) are made on or before the related penalty or expiration dates, as indicated on the appropriate bills or notices for such payments, provided that such support has been received by the servicer at least 30 calendar days prior to these dates, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xii) | Any late payment penalties in connection with any payment to be made on behalf of an obligor are paid from the servicer's funds and not charged to the obligor, unless the late payment was due to the obligor's error or omission. | X |
| 1122(d)(4)(xiii) | Disbursements made on behalf of an obligor are posted within two business days to the obligor's records maintained by the servicer, or such other number of days specified in the transaction agreements. | X |
| 1122(d)(4)(xiv) | Delinquencies, charge-offs and uncollectible accounts are recognized and recorded in accordance with the transaction agreements. | X |

| | | |
|---|---|---|
| 1122(d)(4)(xv) | Any external enhancement or other support, identified in Item 1114(a)(1) through (3) or Item 1115 of Regulation AB, is maintained as set forth in the transaction agreements. | |

[NAME OF SELLER OR SUBSERVICER]


By:_____
     Name:
     Title:
     Date:

# EXHIBIT D

**Countrywide Bank claims as of 5/31/08**
**Portfolio acquired from American Home**

| Description | Total Amount |
|---|---|
| Early Payment Default | $          12,048,639.63 |
| Premium Recapture claims | $               87,385.42 |
| Other credit breach claims | $            3,540,585.11 |
| Remittance shortages | $               75,023.35 |
| **Totals:** | **$          15,751,633.51** |

Notes:
Figures do not include interest accrual
All premium was factored off of the original purchased UPB
Chargeoff figures are net of recoveries
However, chargeoff figures include misc. deferred amounts

| LPSA dated | Trade Confirm dated | Purchase Confirmation dated | Closing Date | Premium Recapture protection | EPD protection |
|---|---|---|---|---|---|
| 3/14/2006 | 12/27/2005 | 3/14/2006 | 3/14/2006 | 3 months | 3 months |
| 3/14/2006 | 12/30/2005 | 3/14/2006 | 3/14/2006 | 3 months | 3 months |
| 3/14/2006 | 3/20/2007 | 3/30/2007 | 3/30/2007 | 3 months | 3 months |
| 4/27/2007 | 3/20/2007 | 4/27/2007 | 4/27/2007 | 3 months | 3 months |
| 3/14/2006 | 3/20/2007 | 4/30/2007 | 4/30/2007 | 3 months | 3 months |
| 4/27/2007 | 3/20/2007 | 5/18/2007 | 5/18/2007 | 3 months | 3 months |
| 4/27/2007 | 4/12/2007 | 5/18/2007 | 5/18/2007 | 3 months | 3 months |
| 4/27/2007 | 4/12/2007 | 6/8/2007 | 6/8/2007 | 3 months | 3 months |
| 4/27/2007 | 5/3/2007 | 6/21/2007 | 6/21/2007 | 3 months | 3 months |

lousing rating/undisclosed liabilities

| UPB at Time of CHL Purchase | CHL Purchase Date | First Due CHL Date | Issue Created Date | Loan Status as of 5/31/08 | Current Int. Paid to Date as of 5/31/08 | Current Principal Balance as of 5/31/08 | Purchase Price | Premium | Chargeoff amount | Claim Amount | Subtotals: |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 45,952.14 | 4/27/2007 | 5/1/2007 | 4/27/2007 | Current | 5/1/2008 | 45,571.49 | 102.6296570 | 1,208.38 | - | 46,779.87 | |
| 586,903.38 | 3/14/2006 | 3/1/2006 | 3/14/2006 | Delinquent | 2/1/2007 | 613,516.41 | 101.4243600 | 8,359.62 | 315,105.00 | 936,981.03 | |
| 931,803.94 | 3/14/2006 | 4/1/2006 | 3/14/2006 | Paid off | Paid off | - | 100.9623360 | 8,967.08 | - | 8,967.08 | |
| 861,791.79 | 3/14/2006 | 4/1/2006 | 3/14/2006 | Delinquent | 1/1/2007 | 887,252.13 | 100.9623360 | 8,293.33 | 318,633.42 | 1,214,178.88 | |
| 60,106.38 | 3/14/2006 | 4/1/2006 | 3/14/2006 | Delinquent | 2/1/2007 | 61,165.04 | 100.9623360 | 578.43 | 30,989.22 | 92,732.69 | |
| 729,001.22 | 3/14/2006 | 4/1/2006 | 3/14/2006 | Delinquent | 9/1/2006 | 742,465.99 | 100.9623360 | 7,015.44 | 491,464.13 | 1,240,945.56 | 3,540,585.11 |
| 41,304.61 | 6/21/2007 | 7/1/2007 | 7/1/2007 | Delinquent | 10/1/2007 | 40,914.63 | 103.0670538 | 1,266.83 | 42,377.01 | 84,558.47 | |
| 12,588.61 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Current | 5/1/2008 | 12,000.93 | 102.6296570 | 331.04 | - | 12,331.97 | |
| 30,736.40 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Current | 5/1/2008 | 29,818.95 | 102.6296570 | 808.26 | - | 30,627.21 | |
| 44,000.00 | 4/27/2007 | 5/1/2007 | 7/1/2007 | Current | 5/1/2008 | 43,816.45 | 102.6296570 | 1,157.05 | - | 44,973.50 | |
| 44,478.69 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Current | 5/1/2008 | 44,185.55 | 102.6296570 | 1,169.64 | - | 45,355.19 | |
| 75,950.28 | 4/27/2007 | 5/1/2007 | 7/1/2007 | Current | 5/1/2008 | 65,136.62 | 102.6296570 | 1,997.23 | - | 67,133.85 | |
| 92,433.05 | 4/27/2007 | 5/1/2007 | 7/1/2007 | Current | 5/1/2008 | 91,523.00 | 102.6296570 | 2,430.67 | - | 93,953.67 | |
| 26,480.83 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Current | 5/1/2008 | 26,220.18 | 102.6296570 | 696.35 | - | 26,916.53 | |
| 42,680.28 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Current | 5/1/2008 | 42,241.33 | 102.6296570 | 1,122.34 | - | 43,363.67 | |
| 66,707.44 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Current | 5/1/2008 | 66,126.73 | 102.6296570 | 1,754.18 | - | 67,880.91 | |
| 73,968.97 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Current | 6/1/2008 | 73,505.73 | 102.6296570 | 1,945.13 | - | 75,450.86 | |
| 34,461.30 | 4/27/2007 | 5/1/2007 | 7/1/2007 | Current | 6/1/2008 | 33,355.95 | 102.6296570 | 906.21 | - | 34,262.16 | |
| 77,800.00 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 4/1/2007 | 77,800.00 | 102.6296570 | 2,045.87 | 80,072.66 | 159,918.53 | |
| 103,969.41 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 4/1/2007 | 103,969.41 | 102.6296570 | 2,734.04 | 107,009.36 | 213,712.81 | |
| 130,000.00 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 4/1/2007 | 130,000.00 | 102.6296570 | 3,418.55 | 133,805.54 | 267,224.09 | |
| 146,944.65 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 4/1/2007 | 146,944.65 | 102.6296570 | 3,864.14 | 151,237.48 | 302,046.27 | |
| 18,744.02 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 5/1/2007 | 18,737.98 | 102.6296570 | 492.90 | 19,285.18 | 38,516.06 | |
| 53,228.26 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Delinquent | 5/1/2007 | 53,206.33 | 102.6296570 | 1,399.72 | 54,758.42 | 109,364.47 | |
| 57,880.98 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Delinquent | 6/1/2007 | 57,842.40 | 102.6296570 | 1,522.07 | 59,529.57 | 118,894.04 | |
| 29,983.61 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 7/1/2007 | 29,933.70 | 102.6296570 | 788.47 | 30,803.45 | 61,525.62 | |
| 31,483.67 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Delinquent | 7/1/2007 | 31,433.93 | 102.6296570 | 827.91 | 32,346.49 | 64,608.33 | |
| 78,968.61 | 4/27/2007 | 5/1/2007 | 7/1/2007 | Delinquent | 8/1/2007 | 78,837.83 | 102.6296570 | 2,076.60 | 81,130.09 | 162,044.52 | |
| 65,976.47 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 9/1/2007 | 65,855.55 | 102.6296570 | 1,734.95 | 67,772.43 | 135,362.93 | |
| 89,967.03 | 4/27/2007 | 5/1/2007 | 7/1/2007 | Delinquent | 9/1/2007 | 89,797.61 | 102.6296570 | 2,365.82 | 92,410.83 | 184,574.26 | |
| 50,559.90 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 11/1/2007 | 50,414.15 | 102.6296570 | 1,329.55 | - | 51,743.70 | |
| 51,956.43 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 11/1/2007 | 51,816.56 | 102.6296570 | 1,366.28 | - | 53,182.84 | |
| 36,232.64 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Delinquent | 2/1/2008 | 35,965.32 | 102.6296570 | 952.79 | - | 36,918.11 | |
| 94,959.08 | 4/27/2007 | 5/1/2007 | 6/1/2007 | Delinquent | 2/1/2008 | 94,530.44 | 102.6296570 | 2,497.10 | - | 97,027.54 | |
| 39,000.00 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Delinquent | 3/1/2008 | 38,864.58 | 102.6296570 | 1,025.57 | - | 39,890.15 | |
| 74,901.56 | 6/21/2007 | 7/1/2007 | 7/1/2007 | Current | 5/1/2008 | 73,106.68 | 103.0670538 | 2,297.27 | - | 75,403.95 | |
| 87,634.81 | 6/21/2007 | 7/1/2007 | 8/1/2007 | Current | 5/1/2008 | 86,972.73 | 103.0670538 | 2,687.81 | - | 89,660.54 | |
| 9,993.62 | 6/21/2007 | 7/1/2007 | 9/1/2007 | Current | 6/1/2008 | 9,897.60 | 103.0670538 | 306.51 | - | 10,204.11 | |
| 30,386.91 | 6/21/2007 | 7/1/2007 | 7/1/2007 | Delinquent | 6/1/2007 | 30,386.91 | 103.0670538 | 931.98 | 31,503.65 | 62,822.54 | |
| 39,423.49 | 6/21/2007 | 7/1/2007 | 7/1/2007 | Delinquent | 6/1/2007 | 39,423.49 | 103.0670538 | 1,209.14 | 40,870.22 | 81,502.85 | |
| 79,956.00 | 6/21/2007 | 7/1/2007 | 7/1/2007 | Delinquent | 6/1/2007 | 79,956.00 | 103.0670538 | 2,452.29 | 82,892.24 | 165,300.53 | |
| 55,973.18 | 6/21/2007 | 7/1/2007 | 9/1/2007 | Delinquent | 8/1/2007 | 55,918.88 | 103.0670538 | 1,716.73 | 57,968.03 | 115,603.64 | |
| 70,613.04 | 6/21/2007 | 7/1/2007 | 9/1/2007 | Delinquent | 12/1/2007 | 70,409.57 | 103.0670538 | 2,165.74 | - | 72,575.31 | |
| 50,960.22 | 5/18/2007 | 6/1/2007 | 7/1/2007 | Current | 5/1/2008 | 50,463.61 | 103.0816290 | 1,570.40 | - | 52,034.01 | |
| 24,980.51 | 5/18/2007 | 6/1/2007 | 6/1/2007 | Current | 5/1/2008 | 24,724.99 | 103.0816290 | 769.81 | - | 25,494.80 | |
| 62,170.50 | 5/18/2007 | 6/1/2007 | 6/1/2007 | Current | 5/1/2008 | 61,534.44 | 103.0816290 | 1,915.86 | - | 63,450.30 | |
| 43,959.58 | 5/18/2007 | 6/1/2007 | 7/1/2007 | Current | 6/1/2008 | 43,405.06 | 103.0816290 | 1,354.67 | - | 44,759.73 | |
| 58,216.49 | 5/18/2007 | 6/1/2007 | 7/1/2007 | Current | 6/1/2008 | 56,968.60 | 103.0816290 | 1,794.02 | - | 58,762.62 | |
| 51,969.17 | 5/18/2007 | 6/1/2007 | 7/1/2007 | Delinquent | 6/1/2007 | 51,938.11 | 103.0816290 | 1,601.50 | 53,738.02 | 107,277.63 | |
| 157,902.73 | 5/18/2007 | 6/1/2007 | 7/1/2007 | Delinquent | 11/1/2007 | 157,585.38 | 103.1281250 | 4,939.39 | - | 162,524.77 | |
| 98,956.20 | 5/18/2007 | 6/1/2007 | 7/1/2007 | Delinquent | 1/1/2008 | 98,547.49 | 103.1281250 | 3,095.47 | - | 101,642.96 | |
| 89,788.13 | 6/8/2007 | 8/1/2007 | 9/1/2007 | Current | 6/1/2008 | 88,977.66 | 103.2304895 | 2,900.60 | - | 91,878.26 | |
| 47,730.58 | 6/8/2007 | 6/1/2007 | 6/1/2007 | Delinquent | 12/1/2007 | 47,516.95 | 103.2304895 | 1,541.93 | - | 49,058.88 | |
| 370,045.99 | 3/14/2006 | 4/1/2006 | 6/1/2006 | Paid off | Paid off | - | 100.9623360 | 3,561.09 | 22,888.51 | 26,449.60 | |
| 461,536.00 | 3/30/2007 | 5/1/2007 | 6/1/2007 | Delinquent | 5/1/2007 | 463,872.04 | 105.2337610 | 24,155.69 | 106,646.68 | 594,674.41 | |
| 240,425.47 | 3/14/2006 | 4/1/2006 | 5/1/2006 | Delinquent | 8/1/2007 | 252,328.01 | 100.9623360 | 2,313.70 | 154,096.03 | 408,737.74 | |
| 1,002,834.64 | 3/14/2006 | 4/1/2006 | 4/1/2006 | Delinquent | 5/1/2007 | 1,050,928.18 | 100.9623360 | 9,650.64 | 627,529.91 | 1,688,108.73 | |
| 232,754.50 | 3/14/2006 | 4/1/2006 | 3/1/2006 | Current | 5/1/2008 | 247,491.70 | 100.9623360 | 2,239.88 | - | 249,731.58 | |
| 308,070.80 | 3/14/2006 | 4/1/2006 | 3/1/2006 | Delinquent | 3/1/2008 | 328,494.09 | 100.9623360 | 2,964.68 | - | 331,458.77 | |
| 214,106.16 | 3/14/2006 | 4/1/2006 | 5/1/2006 | Delinquent | 4/1/2008 | 229,856.17 | 100.9623360 | 2,060.42 | - | 231,916.59 | |

Page 1 Of 2

C:\Documents and Settings\wchipman\Local Settings\Temporary Internet Files\OLK8D\06 05 08 to KC for updated American Home claims with borrower names removed xls

| UPB at Time of CHL Purchase | CHL Purchase Date | First Due CHL Date | Issue Created Date | Loan Status as of 5/31/08 | Current Pd (Paid to) Date as of 5/31/08 | Current Principal Balance as of 5/31/08 | Purchase Price | Premium | Chargeoff Amount | Claim Amount | Subtotals |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 380,947.07 | 3/14/2008 | 4/1/2008 | 4/1/2008 | Current | 5/1/2008 | 404,137.94 | 101.4243600 | 9,426.06 | - | 409,563.90 | 12,048,638.83 |
| 119,369.34 | 3/14/2008 | 4/1/2008 | 4/1/2008 | Current | 5/1/2008 | 124,024.36 | 101.4243600 | 2,754.91 | - | 126,830.35 | |
| 271,484.92 | 3/14/2008 | 4/1/2008 | 4/1/2008 | Current | 5/1/2008 | 287,116.44 | 101.4243600 | 3,956.92 | - | 291,563.36 | |
| 131,604.04 | 3/14/2008 | 4/1/2008 | 4/1/2008 | Current | 5/1/2008 | 727,145.37 | 101.4243600 | 3,954.47 | - | 735,863.84 | |
| 840,559.50 | 3/14/2008 | 4/1/2008 | 5/1/2008 | Delinquent | 12/1/2007 | 692,023.71 | 101.4243600 | 9,123.87 | - | 701,147.58 | |
| 339,229.80 | 3/14/2008 | 4/1/2008 | 4/1/2008 | Delinquent | 12/1/2007 | 360,531.35 | 101.4243600 | 4,831.98 | - | 365,363.34 | |
| 215,485.28 | 3/14/2008 | 4/1/2008 | 5/1/2008 | Delinquent | 2/1/2008 | 214,269.30 | 101.4243600 | 2,939.09 | - | 217,208.39 | |
| 778,677.72 | 3/14/2008 | 4/1/2008 | 5/1/2008 | Delinquent | 2/1/2008 | 859,030.81 | 101.4243600 | 11,691.17 | - | 870,721.98 | |
| 503,655.67 | 3/14/2008 | 4/1/2008 | 5/1/2008 | Delinquent | 4/1/2008 | 574,074.75 | 101.4243600 | 7,416.03 | - | 581,490.69 | |
| 240,653.57 | 3/14/2008 | 4/1/2008 | 4/1/2008 | Paid off | Paid off | | 101.4243600 | 3,427.77 | - | 3,427.77 | |
| 200,000.00 | 4/30/2007 | 5/1/2007 | 5/1/2007 | Current | 5/1/2008 | | 105.2669560 | 10,532.19 | - | 10,532.19 | |
| 113,226.25 | 4/30/2007 | 6/1/2007 | 4/7/2007 | Delinquent | 11/1/2007 | 318,182.65 | 105.2655960 | 16,234.30 | - | 334,397.05 | |
| 95,959.31 | 4/27/2007 | 5/1/2007 | 5/24/2007 | Paid off | Paid off | | 102.6296570 | 2,523.40 | - | 2,523.40 | |
| 19,249.21 | 4/27/2007 | 6/1/2007 | 6/21/2007 | Paid off | Paid off | | 103.0010538 | 578.08 | - | 598.08 | |
| 24,857.88 | 6/21/2007 | 7/1/2007 | 7/11/2007 | Paid off | Paid off | | 103.0010538 | 760.97 | - | 780.97 | |
| 46,179.01 | 6/21/2007 | 6/1/2007 | 7/13/2007 | Paid off | Paid off | | 103.0010538 | 1,416.34 | - | 1,416.34 | |
| 24,986.34 | 6/21/2007 | 7/1/2007 | 9/7/2007 | Paid off | Paid off | | 103.0010538 | 766.34 | - | 766.34 | |
| 84,893.43 | 6/21/2007 | 8/24/2007 | 8/24/2007 | Paid off | Paid off | | 103.0010538 | 2,603.73 | - | 2,603.73 | |
| 43,000.00 | 4/27/2007 | 8/1/2007 | 8/9/2007 | Paid off | Paid off | | 103.0819290 | 1,325.10 | - | 1,325.10 | |
| 54,572.72 | 4/27/2007 | 6/1/2007 | 6/21/2007 | Paid off | Paid off | | 103.0010538 | 1,674.04 | - | 1,674.04 | |
| 200,000.00 | 5/16/2007 | 6/1/2007 | 6/14/2007 | Paid off | Paid off | | 103.0915090 | 6,183.26 | - | 6,183.26 | |
| 49,854.39 | 5/16/2007 | 6/1/2007 | 8/24/2007 | Paid off | Paid off | | 103.0915090 | 1,540.64 | - | 1,540.64 | |
| 54,935.71 | 8/9/2007 | 8/1/2007 | 8/7/2007 | Paid off | Paid off | | 103.2304585 | 1,774.69 | - | 1,774.69 | |
| 49,719.68 | 5/8/2007 | 9/1/2007 | 9/13/2007 | Paid off | Paid off | | 103.2304585 | 1,573.88 | - | 1,573.88 | |
| 72,531.09 | 4/27/2007 | 9/1/2007 | 9/25/2007 | Paid off | Paid off | | 102.6296570 | 1,861.92 | - | 1,861.92 | |
| 48,755.71 | 4/27/2007 | 6/1/2007 | 6/6/2007 | Paid off | Paid off | | 102.6296570 | 1,282.11 | - | 1,282.11 | |
| 42,345.73 | 4/27/2007 | 8/1/2007 | 7/10/2007 | Paid off | Paid off | | 102.6296570 | 1,113.66 | - | 1,113.66 | |
| 71,300.00 | 4/27/2007 | 6/1/2007 | 6/13/2007 | Paid off | Paid off | | 102.6296570 | 1,874.95 | - | 1,874.95 | |
| 167,412.53 | 4/27/2007 | 6/1/2007 | 6/20/2007 | Paid off | Paid off | | 102.6296570 | 4,406.21 | - | 4,406.21 | |
| 48,863.91 | 4/27/2007 | 6/1/2007 | 6/6/2007 | Paid off | Paid off | | 102.6296570 | 1,285.31 | - | 1,285.31 | |
| 73,289.97 | 4/27/2007 | 7/11/2007 | 7/11/2007 | Paid off | Paid off | | 102.6296570 | 1,928.72 | - | 1,928.72 | |
| 113,628.35 | 4/27/2007 | 7/1/2007 | 7/12/2007 | Paid off | Paid off | | 102.6296570 | 2,989.64 | - | 2,989.64 | |
| 78,207.91 | 4/27/2007 | 7/1/2007 | 7/13/2007 | Paid off | Paid off | | 102.6296570 | 2,061.00 | - | 2,061.00 | |
| 45,750.00 | 4/27/2007 | 7/1/2007 | 7/30/2007 | Paid off | Paid off | | 102.6296570 | 1,203.07 | - | 1,203.07 | |
| 99,182.40 | 4/27/2007 | 5/1/2007 | 5/4/2007 | Paid off | Paid off | | 102.6296570 | 2,609.45 | - | 2,609.45 | |
| 87,200.00 | 4/27/2007 | 5/1/2007 | 5/15/2007 | Paid off | Paid off | | 102.6296570 | 2,293.96 | - | 2,293.96 | |
| 48,249.08 | 4/27/2007 | 6/1/2007 | 5/25/2007 | Paid off | Paid off | | 102.6296570 | 1,269.60 | - | 1,269.60 | |
| 74,505.94 | 4/27/2007 | 6/1/2007 | 5/31/2007 | Paid off | Paid off | | 102.6296570 | 1,970.53 | - | 1,970.53 | |
| 23,454.24 | 4/27/2007 | 6/1/2007 | 4/26/2007 | Paid off | Paid off | | 102.6296570 | 616.77 | - | 616.77 | |
| 69,672.77 | 4/27/2007 | 6/1/2007 | 5/25/2007 | Paid off | Paid off | | 102.6296570 | 1,831.72 | - | 1,831.72 | |
| 19,911.68 | 5/16/2007 | 9/1/2007 | 9/19/2007 | Paid off | Paid off | | 103.0915090 | 613.60 | - | 613.60 | |
| 30,426.05 | 5/16/2007 | 7/1/2007 | 7/6/2007 | Paid off | Paid off | | 103.0915090 | 937.59 | - | 937.59 | |
| 181,623.88 | 5/16/2007 | 7/1/2007 | 7/16/2007 | Paid off | Paid off | | 103.0915090 | 5,609.30 | - | 5,609.30 | |
| 49,561.25 | 5/16/2007 | 7/1/2007 | 7/22/2007 | Paid off | Paid off | | 103.0915090 | 1,539.31 | - | 1,539.31 | |
| 32,511.58 | 5/8/2007 | 7/1/2007 | 7/9/2007 | Paid off | Paid off | | 103.0915090 | 1,003.45 | - | 1,003.45 | |
| 35,747.78 | 5/16/2007 | 5/1/2007 | 5/18/2007 | Paid off | Paid off | | 103.0815090 | 1,101.61 | - | 1,101.61 | |
| 79,832.62 | 6/8/2007 | 7/1/2007 | 7/24/2007 | Paid off | Paid off | | 103.1204465 | 2,582.21 | - | 2,582.21 | |
| 62,198.25 | 5/8/2007 | 7/8/2007 | 7/8/2007 | Paid off | Paid off | | 103.0204865 | 1,913.44 | - | 1,913.44 | |
| 65,890.59 | 6/21/2007 | 7/1/2007 | 7/16/2007 | Paid off | Paid off | | 103.0010538 | 2,020.90 | - | 2,020.90 | |
| 22,913.92 | 6/21/2007 | 6/1/2007 | 6/26/2007 | Paid off | Paid off | | 103.0010538 | 702.78 | - | 702.78 | |
| 84,953.87 | 6/21/2007 | 6/1/2007 | 6/6/2007 | Paid off | Paid off | | 103.0010538 | 2,605.57 | - | 2,605.57 | |
| 39,831.91 | 6/21/2007 | 7/1/2007 | 7/6/2007 | Paid off | Paid off | | 103.0010538 | 1,221.67 | - | 1,221.67 | |
| 53,758.07 | 6/21/2007 | 7/1/2007 | 7/19/2007 | Paid off | Paid off | | 103.0010538 | 1,658.38 | - | 1,658.38 | |
| 25,006.68 | 6/21/2007 | 7/1/2007 | 7/20/2007 | Paid off | Paid off | | 103.0010538 | 766.97 | - | 766.97 | |
| 235,000.00 | 4/30/2007 | 7/1/2007 | 7/13/2007 | Paid off | Paid off | | 101.6473640 | 3,871.26 | - | 3,871.26 | |
| 28,300.00 | 5/8/2007 | 6/1/2007 | 6/7/2007 | Paid off | Paid off | | 103.1204905 | 874.46 | - | 874.46 | |
| 45,568.62 | 4/27/2007 | 6/1/2007 | 6/7/2007 | Paid off | Paid off | | 102.6296570 | 1,198.30 | - | 1,198.30 | |
| 29,238.05 | 4/27/2007 | 5/1/2007 | 5/1/2007 | Paid off | Paid off | | 102.6296570 | 769.80 | - | 769.80 | |
| | | | | | | **12,057,544.67** | | **3,288,863.57** | **3,288,863.57** | **15,676,610.16** | **87,385.42** |
| | | | | | | | | | | | **15,676,610.16** |

C:\Documents and Settings\wilym\Local Settings\Temporary Internet Files\OLK6\DOI6 05 08 to KC for updated American Home claims with borrower names removed.xls

Claims, Loan Acctng

| nt | Bal Type | Deal # | closing Date | Description |
|---|---|---|---|---|
| 3.31 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| .74 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| .20 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| 5.92 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| .85 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| .03 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| 3.05 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| 2.55 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| .44 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| 3.84 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| .47 | Payment | 2007-03-186 | 4/27/2007 | Interim servicing payment not remitted by American Home |
| .95 | Payoff | 2007-03-186 | 4/27/2007 | Payoff remittance due Countrywide Bank |
| 3.35 | | | | |

# EDWARDS ANGELL PALMER&DODGE LLP

919 North Market Street  Wilmington, DE  19801  302.777.7770  *fax* 302.777.7263  eapdlaw.com

William E. Chipman, Jr.
302.425.7124
*fax* 888.325.9552
wchipman@eapdlaw.com

August 8, 2008

Epiq Bankruptcy Solutions, LLC
Attn:  American Home Mortgage Claims Processing
757 Third Avenue, 3rd Floor
New York, NY  10017

      Re:    In re:  *American Home Mortgage Holdings, Inc., et al.*
             Case No. 07-11047 (CSS)

Dear Madame or Sir:

Enclosed please find two copies of an amended Proof of Claim of Countrywide Bank, F.S.B.
Please return one time-stamped copy in the self-addressed, stamped envelope provided.

Very truly yours,

William E. Chipman, Jr.

WEC/rrj
Enclosures

From:  Origin ID: ZWIA  (302)777-7770
William E. Chipman, Jr., Esquire
Edwards Angell Palmer & Dodge LLP
919 North Market Street
Suite 1500
Wilmington, DE 19801



Ship Date: 08AUG08
ActWgt: 2 LB
System#: 9820571/INET8061
Account#: S *********

CLS03380 8/21/24

Delivery Address Bar Code



SHIP TO: 9999999999          BILL SENDER

**Epiq Bankruptcy Solutions, LLC**
**Attn: American Home Mortgage**
**Claims Processing**
**757 Third Avenue, 3rd Floor**
**New York, NY 10017**

Ref #    301920-0005
Invoice #
PO #
Dept #    77777



TRK#
0201      7919 3852 2283

MON - 11AUG          A1
**PRIORITY OVERNIGHT**

10017
NY-US
EWR

# SB OGSA



---

**After printing this label**:
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning**: Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic valueof the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $500, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.