## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| AMERICAN HOME MORTGAGE HOLDINGS, *et al.*,[1] | Case No. 07-11047 (CSS) |
| Debtors. | (Jointly Administered) |
| | Response Deadline: March 29, 2013 at 4:00 p.m. (ET)<br>Hearing Date: April 23, 2013 at 11:00 a.m. (ET) |
| | **Related Docket Numbers: 9625 and 10757** |

### REPLY OF COUNTRYWIDE BANK, F.S.B. AND COUNTRYWIDE HOME LOANS, INC. TO PLAN TRUST'S OBJECTION TO ADMINISTRATIVE CLAIMS ASSERTED BY COUNTRYWIDE BANK, F.S.B. AND COUNTRYWIDE HOME LOANS, INC. [D.I. 10757]

Countrywide Bank, F.S.B. ("Countrywide Bank") and Countrywide Home Loans, Inc. ("Countrywide Home" and with Countrywide Bank, "Countrywide"), by and through their undersigned counsel, hereby file this reply (the "Reply") to the Plan Trust's *Objection to Administrative Claims Asserted By Countrywide Bank, FSB and Countrywide Home Loans, Inc.* [D.I. 10757] (the "Objection"). In support of this Reply, Countrywide respectfully states as follows:

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. ("AHM Holdings"), a Delaware corporation (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York Corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580). The address for all of the Debtors is P.O. Box 10550, Melville, New York 11747.

EAST\55440171.2

# I.
# BACKGROUND

1.      On August 6, 2007 (the "Petition Date"), the Debtors commenced these cases (the "Cases") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.      On February 23, 2009, the Court entered an order [D.I. 7042] (the "Confirmation Order")[2] confirming the *Amended Chapter 11 Plan of Liquidation of the Debtors Dated February 18, 2009* [D.I. 7029] (the "Plan").

3.      The Plan went effective on November 30, 2010 (the "Effective Date"), *see* D.I. 9519, and the Plan Trust (as defined in the Plan) was established.  Under the terms of the Plan, Steven D. Sass was appointed the Plan Trustee (as defined in the Plan).  See Confirmation Order at 25, ¶17. The Plan Trustee succeeded to certain of the Debtors' rights in accordance with the Plan, including, but not limited to, objecting to and settling proofs of claim. *See* Plan at Art. 8, Sec. F.3.(b) (vesting power in Plan Trustee); Plan at Art. 8, Sec. F.5.(c)(2) (giving Plan Trustee specific power to settle claims).

4.      Countrywide timely filed proofs of claim numbers 10847, 10848, 10849, 10850 and 10851 (the "Administrative Expense Proofs of Claim") and the related *Application of Countrywide for Allowance of Administrative Expenses* [D.I. 9625] (the "Administrative Expense Claims Application" and with the Administrative Expense Proofs of Claim, the "Administrative Expense Claims") in January 2011.[3] The Administrative Expense Claims assert (i) claims for losses arising from loans that Countrywide acquired from the Debtors after the Petition Date, and (ii) claims for losses resulting from Triad Guaranty Insurance Corp.'s

---

[2]      The Confirmation Order was amended on June 23, 2009 [D.I. 7555], but that amendment is not relevant to the issues raised in the Objection.

[3]      The Administrative Expense Claims Application was filed independently on the docket of the Cases and attached to each of the Administrative Expense Proofs of Claim as the exhibit in support thereof.

EAST\55440171.2

("Triad") successful action to rescind mortgage insurance contracts with the Debtors insuring loans that Countrywide acquired from the Debtors.

5.      On February 1, 2013, the Plan Trust filed the Objection, in which it requested disallowance of each of the two types of claims asserted by the Administrative Expense Claims. With respect to the claims in connection with post-petition loan acquisitions, the Plan Trust states that Countrywide did not acquire loans from the Debtors post-petition for which any damages would be entitled to administrative status. With respect to the claims associated with the potential rescission of mortgage insurance contracts, the Plan Trust's position is that the Court's dismissal of the litigation commenced by Triad in this Court (the "Triad Litigation") renders this portion of the Administrative Expense Claims moot. *Triad Guar. Ins. v. Am. Home Mortg. Inv. Corp. (In re Am. Home Mortg. Holding)*, 477 B.R. 517 (Bankr. D. Del. 2012).

## II.
## PRELIMINARY STATEMENT

6.      Countrywide's Administrative Expense Claims represent a significant potential liability for the Plan Trust and, in recognition of certain developments in these Cases and the discussions with the Plan Trust after the filing of the Administrative Expense Claims, in this Reply Countrywide now seeks allowance of its Administrative Expense Claims in an amount lower than originally requested. For the reasons set forth in this Reply, Countrywide withdraws its Administrative Expense Claims in connection with the Triad Litigation. With respect to its remaining Administrative Expense Claims, Countrywide now requests allowance on an administrative priority basis of claims in the amount of $1,733,047.13, in satisfaction of the Debtors' obligations with respect to losses that Countrywide has already incurred from loans acquired from the Debtors after the Petition Date, and maintenance by the Plan Trustee of a reserve for any additional losses on account of loans acquired from the Debtors after the Petition

Date, in the aggregate principal amount of such loans, $18,090,471.58, until these loans are paid in full or as otherwise agreed between the Plan Trustee and Countrywide or ordered by the Court.

### III.
### THE AGREEMENTS AND LOAN PURCHASES

7.      Both before and after the Debtors filed the Cases, Countrywide acquired mortgage loans from Debtor AHM Corp. in the ordinary course of their respective businesses, under loan purchase agreements and addenda, as amended, supplemented or modified.   Certain of these documents are identified on and attached in Appendix I to Countrywide's Reply to Pre-Petition Claims Objection and on the Debtors' Amended Schedule G [D.I. 1824] (the "Countrywide Purchase Agreements").   Under the Countrywide Purchase Agreements, at Countrywide's option, AHM Corp. was required to repurchase loans, or pay damages, if AHM Corp. breached certain representations.

8.      Following the Petition Date, Countrywide and AHM Corp. continued to engage in different types of transactions, which, during the post-petition time period, consisted of three broad categories:   (a) direct purchases of standardized or "commoditized" loans (e.g., those acceptable to the Federal National Mortgage Association (Fannie Mae) or the Federal Home Loan Mortgage Corporation (Freddie Mac)) to be delivered over time, (b) negotiated purchases of other loans to be delivered over time, which consisted of portfolios of loans with either specified or unspecified terms, and (c) assignment of trades, called "AOT".[4]   Countrywide's loan

---

[4]      Investopedia defines an "assignment of trade" as "a transaction used primarily in the mortgage-backed securities (MBS) to be announced (TBA) market, where the obligation to fulfill an existing forward trade is assigned by one of the counterparties to a third party."  See  http://www.investopedia.com/terms/a/assignment_of_trade.asp. In other words, if AHM Corp. agreed to sell a fixed amount of specific mortgages (e.g., 30 year loans at a fixed rate) at a future date to a financial buyer like Bear Stearns, AHM Corp. could assign its obligation to sell and deliver loans in that trade to Countrywide who then became obligated to deliver the promised mortgages on the date

- 4 -

acquisitions from AHM Corp. after the Petition Date were bulk transactions involving pools of loans, which were agreed to post-petition and then delivered over an identified period. The terms of the Countrywide Purchase Agreements continued to govern each type of transaction that occurred post-petition and established the framework in which Countrywide and the Debtors entered into purchase and sale transactions, subject to agreements for Countrywide to acquire particular loans from the Debtors post-petition.

### IV.
### SUMMARY OF ADMINISTRATIVE EXPENSE CLAIMS REQUESTED IN THIS REPLY

9.       As noted, the Administrative Expense Claims consisted of two distinct claims. First, the Administrative Expense Claims assert a contingent claim for damages in the event that Triad, the insurer of loans that Countrywide acquired from the Debtors, was successful in its attempt to rescind its mortgage insurance contracts with the Debtors. In light of the Court's dismissal of the Triad Litigation (which was not appealed), and the fact that the Triad Litigation is not being pursued in another venue, Countrywide is willing to withdraw the portion of the Administrative Expense Claims relating to its contingent claim for damages in connection with the Triad Litigation for failure of the contingency.

10.       Second, the Administrative Expense Claims address the losses that Countrywide has incurred and continues to incur from loans acquired by Countrywide through post-petition transactions with the Debtors. For a period of time after the Petition Date, in a continuation of their prior relationship, Countrywide acquired loans from the Debtors in the ordinary course of

---

specified to Bear Stearns. AHM Corp. would then have a period after the trade to deliver equivalent loans to Countrywide to make up for those that Countrywide delivered in accordance with the AOT.

their respective businesses.[5]  Countrywide's Administrative Expense Claims request allowance, on a priority basis, of all obligations on account of Countrywide's acquisitions of loans from the Debtors that were acquired post-petition, including, but not limited to, repurchase obligations, and all other losses post-Petition Date that arose and continue to arise under the loan purchase agreements between Countrywide and the Debtors.

11.    At the time of its filing of the Administrative Expense Claims Application, Countrywide had found evidence of an acquisition of approximately $460 million worth of loans from the Debtors that occurred post-petition, and included this transaction among its Administrative Expense Claims.    *See* Administrative Expense Claims Application ¶ 10. Countrywide now realizes that the $460 million transaction was asserted in error and withdraws any claims for damages for repurchase or other obligations with respect to that transaction as part of its Administrative Expense Claims.

12.    Countrywide does, however, assert Administrative Expense Claims with respect to transactions that did close post-petition.  In the letter to counsel dated February 3, 2012, a copy of which was attached as Exhibit E to the Objection (the "February 2012 Letter"), Countrywide identified for the Plan Trustee 167 loans that it acquired from the Debtors post-petition.  Of those 167 loans, 79 have been paid in full by the borrower and Countrywide is no longer exposed to any liability for which it would pursue claims for losses against the Debtors. With respect to the remaining 88 loans acquired from the Debtors post-petition (the "Outstanding

---

[5]      The relationship between Countrywide and the Debtors prior to the Petition Date is described in the *Reply of Countrywide Bank, F.S.B. and Countrywide Home Loans, Inc. to Plan Trust's Objection Pursuant to Bankruptcy Code Section 502(b) and Bankruptcy Rule 3007 to Claims #10447 and #10477 Filed by Countrywide Bank, F.S.B. and Countrywide Home Loans, Inc.* that Countrywide filed on March 26, 2013 [D.I.10796] (the "Reply to Pre-Petition Claims Objection").  Countrywide's Administrative Expense Claims addressed in this Reply relate solely to its post-Petition Date acquisitions of loans from the Debtors.  To the extent, however, that it is determined to be appropriate, by order of this Court or otherwise, Countrywide intends that claims asserted as Countrywide Claims (as defined in the Reply to Pre-Petition Claims Objection) shall be construed as Administrative Expense Claims and claims asserted as Administrative Expense Claims shall be construed as Countrywide Claims.

Post-Petition Loans"), however, Countrywide continues to assert its Administrative Expense Claims. Countrywide has already incurred losses with respect to certain of the Outstanding Post-Petition Loans, and further damages may arise until all Outstanding Post-Petition Loans are paid in full. Accordingly, Countrywide proposes that it have an allowed administrative claim in the amount of $1,733,047.13, which equals its current aggregate losses arising from certain of the Outstanding Post-Petition Loans, as set forth on Exhibit 1 to this Reply,[6] which Countrywide shall be entitled to receive in cash, consistent with the terms of the Plan. *See* Plan at Art. 3, Sec. B.1. Further, Countrywide requests that the Plan Trustee be required to maintain a reserve for payment of any additional losses on account of the Outstanding Post-Petition Loans in the amount of $18,090,471.58, which is the potential liability for the remaining Outstanding Post-Petition Loans, until the Outstanding Post-Petition Loans are paid in full or as otherwise agreed between the Plan Trustee and Countrywide or ordered by the Court.

## V.
## THE RELIEF COUNTRYWIDE REQUESTS

13.    In the Administrative Expense Claims, Countrywide asserts all claims that it may have in connection with loans acquired after the Petition Date from AHM Corp. under the Countrywide Purchase Agreements irrespective of the type of transaction involved. Countrywide now requests (i) immediate allowance and payment of its Administrative Expense Claims in the amount of $1,733,047.13, which represents its current losses arising from the Outstanding Post-Petition Loans, and (ii) maintenance by the Plan Trustee of a reserve for any additional losses on account of the Outstanding Post-Petition Loans in the amount of

---

[6]    Two of the loans for which losses appear on Exhibit 1 to this Reply were included in the calculation of Countrywide's allowed EPD/Breach Claims (as defined in the Reply to Pre-Petition Claims Objection) under the EPD/Breach Claims Protocol (as defined in the Reply to Pre-Petition Claims Objection) and, to the extent that the amounts set forth on Exhibit 1 are allowed as part of Countrywide's Administrative Expense Claims, Countrywide will deduct the amount calculated for such loans under the EPD Breach Claims Protocol from its EPD/Breach Claims.

- 7 -

$18,090,471.58, which represents the potential losses with respect to the Outstanding Post-Petition Loans, until the Outstanding Post-Petition Loans are paid in full or as otherwise agreed between the Plan Trustee and Countrywide or ordered by the Court. Countrywide further requests that, with respect to the Outstanding Post-Petition Loans, the Objection to the Administrative Expense Claims be overruled.

**VI.**
**ARGUMENT**

A.    **Countrywide Continued To Enter Into Loan Trades With the Debtors Following the Petition Date and Is Entitled To Allowance and Payment of Administrative Expense Claims For Losses Related To the Loans That It Acquired Post-Petition**

14.    Countrywide identified a number of loans that it acquired in transactions after the Petition Date and asserts Administrative Expense Claims with respect to the Outstanding Post-Petition Loans.

15.    Specifically, Countrywide identified 167 loans that it acquired from the Debtors post-petition, with a total principal amount of approximately $39.9 million.[7]   Countrywide communicated its findings to the Plan Trustee, both with respect to the $460 million transaction that initially had been identified and with respect to the transactions that actually closed post-petition. *See* February 2012 Letter.

16.    As acknowledged above, of those 167 loans, 79 have been paid in full by the borrower and Countrywide no longer asserts any claims for damages for repurchase or other obligations with respect to those 79 loans as part of its Administrative Expense Claims.

17.    With respect to the 88 Outstanding Post-Petition Loans, Countrywide continues to assert its Administrative Expense Claims. The aggregate principal amount of the Outstanding Post-Petition Loans at the time of purchase was approximately $20.4 million. As detailed on

---

[7]    A spread sheet detailing the 167 loans acquired post-petition was attached to the February 2012 Letter.

EAST\55440171.2

Exhibit 1 to this Reply, Countrywide has already incurred losses of $1,733,047.13 with respect to

8 of the Outstanding Post-Petition Loans. Additionally, with respect to the remaining 80

Outstanding Post-Petition Loans, Countrywide could have further losses until such time as they

are paid in full, up to the aggregate principal amount of such loans of $18,090,471.58.[8]

18.    For each Outstanding Post-Petition Loan, Countrywide confirmed that the

transaction occurred post-petition, by retrieving and analyzing its internal systems data with

respect to individual loan numbers that were acquired in AOT trades and direct and negotiated

loan purchases from the Debtors. Countrywide was able to connect these loan numbers to dates

and amounts of wires from Countrywide to the Debtors, because each wire confirmation (with

the associated Federal Reference Number) listed the loan numbers to which the payment related.[9]

19.    The Outstanding Post-Petition Loans are within the scope of Countrywide's

Administrative Expense Claim. The Plan Trust's attempts to argue otherwise are at odds with

the plain language of the Administrative Expense Claims Application, and its suggestion that

Countrywide would need to amend its claims to include any transactions that were not

specifically identified in the Administrative Expense Claims Application is misplaced. *See*

Objection at 3, n. 4. The Administrative Expense Claims Application requests allowance and

payment of administrative expenses for, among other things, all damages to which Countrywide

is entitled under any Countrywide Purchase Agreements, applicable law, or otherwise, including,

---

[8]    With respect to its request for maintenance of a reserve for the losses that Countrywide may incur at a later date, Countrywide notes that, under the terms of the Plan, the Plan Trustee is empowered to fund reserves for, among other things, administrative claims. *See* Plan at Art. 9, Sec. B.2. Consistent with the dealings between Countrywide and the Debtors under the Countrywide Purchase Agreements, the maximum liability for acquired loans is the principal amount at the time of purchase, and this is the amount that Countrywide proposes for the reserve. If the Plan Trustee does not agree that this is the appropriate amount of the reserve for the Administrative Expense Claims that remain pending, Countrywide is willing to meet and confer or engage in mediation with the Plan Trustee, or will discuss scheduling and discovery if the Plan Trustee's preferred course is litigation.

[9]    Countrywide has not attached the numerous wire confirmations, but reserves the right to supplement this Reply as necessary to support its claims, and is prepared to produce the wire confirmations on request of the Court or the Plan Trustee.

- 9 -

but not limited to, damages, attorneys' fees, and costs and expenses resulting from post-petition breaches of the Countrywide Purchase Agreements.[10]   Countrywide's Administrative Expense Claims Application asserted all of Countrywide's losses arising from its post-petition transactions with the Debtors whether then identified or later identified.

**B.    Countrywide Is Entitled to Administrative Priority For Its Contractual Losses Relating to the Outstanding Post-Petition Loans Under 28 U.S.C. § 959**

20.    The Countrywide Purchase Agreements, as they had prior to the commencement of the Cases, provided the parameters of the relationship between the Debtors and Countrywide, and their rights and obligations post-petition.   The Debtors continued to be bound by their obligations under the Countrywide Purchase Agreements with respect to loans that Countrywide acquired following the Petition Date, including, without limitation, their obligations to repurchase or pay damages to Countrywide in the event of defaults with respect to the acquired loans.[11]   Under 28 U.S.C. § 959, a debtor-in-possession or trustee that operates its business post-petition is liable for its acts or transactions in carrying on the business, and must comply with otherwise applicable state law, including contract law, and the losses caused by any breaches by the debtor-in-possession or trustee are entitled to administrative expense status.[12]

---

[10]    Further, while Countrywide filed copies of certain Countrywide Purchase Agreements with the Administrative Expense Claims Application, it specifically reserved its rights to identify additional Countrywide Purchase Agreements and to include administrative expenses arising under any additional Countrywide Purchase Agreements as part of the administrative expenses for which it sought allowance. *See* Administrative Expense Claims Application at 3, n. 3.

[11]    The Plan seems to account for this reality, in providing that administrative claims incurred post-petition by a Debtor in the ordinary course of its business shall be paid or performed in accordance with the terms and conditions of the transaction and any agreements relating thereto, or as otherwise agreed by the Plan Trustee and the holder of the administrative claim. *See* Plan at Art. 3, Sec. B.1.

[12]    "[D]ebtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. Such actions shall be subject to the general equity power of such court so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury." 28 U.S.C. § 959.

21.    If, in its post-petition transactions, a debtor breaches its contractual obligations, it is generally liable for damages as it would have been outside of the context of bankruptcy proceedings.[13]    Section 959 of title 28 allows parties who have been harmed by actions taken by a debtor-in-possession in furtherance of its business to seek redress, irrespective of the automatic stay.  *See e.g., Haberern v. Lehigh & N. E. Ry. Co.*, 554 F.2d 581, 585 (3d Cir. 1977) ("Directing overwork and withholding a pension are clearly acts of the receiver "in carrying on the business" of the railroad and, thus, come within the permission to sue granted by 28 U.S.C. § 959(a)."); *accord Matter of Investors Funding Corp. of New York, IFC Collateral Corp.*, 547 F.2d 13, 16 (2d Cir. 1976) (finding that "a court action against reorganization trustees relating to business activities of the bankrupt carried on by the trustee may proceed unless the bankruptcy court, exercising sound discretion, finds that the action would embarrass, burden, delay or otherwise impede the reorganization proceedings").

22.    The post-petition transactions between the Debtors and Countrywide created obligations with respect to the sale and acquisition of the Outstanding Post-Petition Loans, under parameters set forth in the Countrywide Purchase Agreements, and while the Debtors were entitled to continue to do business, they are accountable for such obligations.  Section 959 of title 28 makes it clear that the Bankruptcy Code does not permit the Debtors to avoid accountability for damages caused by their business activities in the sale of the Outstanding Post-Petition Loans, simply because they were conducted post-petition.

---

[13]    The Plan Trust suggests that, assuming Countrywide did incur losses on account of post-petition transactions that are within the scope of the claims made in the Administrative Expense Claims Application, such losses would only be allowed as general unsecured claims. *See* Objection at 3, n. 4.  Countrywide disputes this contention for many of the reasons set forth in this Reply, however, Countrywide respectfully submits that if this is the issue the Plan Trust wants to litigate, additional discovery and briefing is necessary and the parties will need to meet and confer over a schedule to permit that discovery and briefing.

**C.    Section 503(b) of the Bankruptcy Code Provides An Independent Basis For Allowance of Countrywide's Administrative Expense Claims For Its Losses Arising From Loans Acquired From the Debtors Post-Petition**

23.    If the Plan Trust's intent is to argue that Countrywide should have to qualify for administrative expenses under section 503(b) of the Bankruptcy Code, Countrywide is willing to engage in this fact-intensive analysis and implement a schedule for discovery and hearing.  Thus reserving all rights to fully brief these issues, for purposes of this Reply, Countrywide notes that post-petition performance by a debtor of its obligations under a pre-petition contract can give rise to a claim entitled to priority under section 507(a)(2) of the Bankruptcy Code, as administrative expenses under section 503(b)(1)(A) of the Bankruptcy Code, which grants such priority to claims stemming from "the actual, necessary costs and expenses of preserving the estate."[14]

24.    While the Bankruptcy Code does not define costs and expenses that should be treated as "actual" or "necessary" for the preservation of the estate, courts in the Third Circuit have generally followed the two-pronged test set forth in *Calpine Corporation v. O'Brien Environmental Energy, Inc. (In re O'Brien Environmental Energy, Inc.)*, 181 F.3d 527, 532-33 (3d Cir. 1999).  The Court in *O'Brien* held that a debt qualifies as an administrative expense if it (1) arose from a transaction with the bankruptcy estate and (2) directly and substantially benefited the estate.  *Id.*

25.    This Court has held that, when the debtor-in-possession or trustee elects, post-petition, to continue to receive the benefits of a pre-petition contract, it gives rise to an administrative expense.  *See, e.g. In re Smurfit-Stone Container Corp.*, 425 B.R. 735, 741

---

[14]    As noted in the Administrative Expense Claims Application, Countrywide asserts that the Countrywide Purchase Agreements are non-executory and thus breaches caused by post-petition performance under these non-executory contracts entitle Countrywide to allowance of administrative expenses.  To the extent that the Countrywide Purchase Agreements were to be construed by the Court as executory contracts, then any benefits to the Debtors' estates post-petition and pre-rejection of the Countrywide Purchase Agreements should also be afforded administrative expense status.

(Bankr. D. Del 2010) ("Courts in this district have consistently held that administrative expense priority is available to contract parties when the debtor enjoys the benefits of the contract pending an assumption or rejection."); *Goody's Family Clothing, Inc. v. Mountaineer Property Co. II, LLC (In re Goody's Family Clothing, Inc.)* 401 B.R. 656 (D.Del 2009) (upholding the bankruptcy court's grant of administrative expense to a landlord where debtor continued to occupy leased premises post-petition).

26.     Countrywide was not obligated to acquire, and the Debtors were not obligated to sell, any loans by virtue of the Countrywide Purchase Agreements, however, Countrywide and the Debtors chose to continue to do business under the Countrywide Purchase Agreements post-petition as they had done in the ordinary course prior to the Petition Date.  The agreement as to particular loan acquisitions, and the pricing and other terms for such loans, were the subject of additional documentation entered into in connection with the post-petition closings of acquisitions.  Countrywide's obligations to acquire the Outstanding Post-Petition Loans and pay the agreed purchase price, and the Debtors' obligations to make the Outstanding Post-Petition Loans available and fulfill its obligations under the Countrywide Purchase Agreements with respect to the Outstanding Post-Petition Loans, therefore did not exist until after the Petition Date.  Those obligations of the Debtors are triggered by the losses that Countrywide has incurred or will incur in connection with the Outstanding Post-Petition Loans.

27.     Returning then to the *O'Brien* test, the Debtors' obligations to make Countrywide whole from its losses related to the Outstanding Post-Petition Loans arose from transactions with the bankruptcy estates and since they were post-petition transactions, any claims arising under the documents governing the acquisition of the Outstanding Post-Petition Loans satisfy the first factor for administrative priority.  With respect to the second factor, the Plan Trust has not raised

- 13 -

the question of whether the Outstanding Post-Petition Loans benefited the Debtors' estates.[15] The fact that the Debtors and Countrywide voluntarily continued to close loan transactions following the filing of the Cases would suggest that the Debtors, as they had pre-petition, determined that the sale of the Outstanding Post-Petition Loans to Countrywide was of benefit to their estates.  To the extent that the Plan Trust wishes to contest this, Countrywide is willing to engage in a process that will enable the Court to make a determination of this fact-intensive inquiry.

## VII.
## RESERVATION OF RIGHTS

28.    Countrywide reserves its rights to submit additional information in support of the Administrative Expense Claims, including, but not limited to, submitting more evidence with respect to the Outstanding Post-Petition Loans acquired from the Debtors, and otherwise responding to any additional objections the Plan Trust might make to the Administrative Expense Claims and submitting additional information on the Administrative Expense Claims if the Plan Trust would rather litigate its Objection.

*[Remainder of Page Intentionally Left Blank.]*

---

[15]    The Objection suggests that the Plan Trust considers section 503(b) to be the operative statute, but the Plan Trust did not address the application of the statute in detail, including whether it questions the benefit to the estates, given its position that there were no post-petition transactions to which section 503(b) would apply.  See Objection at ¶ 39.

## VIII.
## CONCLUSION

29.     Countrywide respectfully requests that this Court overrule the Plan Trust's Objection to the extent necessary to grant as an administrative expense any unpaid obligations and losses that arose after the Petition Date on account of, or breaches of documents governing, Countrywide's acquisition of the Outstanding Post-Petition Loans from the Debtors, through immediate allowance of Countrywide's Administrative Expense Claims in the amount of $1,733,047.13, and maintenance by the Plan Trustee of a reserve in the amount of $18,090,471.58 for Countrywide's pending Administrative Expense Claims, and grant Countrywide such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated:  March 29, 2013
Wilmington, Delaware

**DLA PIPER LLP (US)**

/s/ Michelle E. Marino
Stuart M. Brown (DE 4050)
R. Craig Martin (DE 5032)
Michelle E. Marino (DE 4577)
919 N. Market Street, 15th Floor
Wilmington, DE 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@dlapiper.com
       craig.martin@dlapiper.com
       michelle.marino@dlapiper.com

*Counsel to Countrywide Bank, F.S.B. and
Countrywide Home Loans, Inc.*