IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------------- x
In re:
:
:    Chapter 11
:
:    Case No. 07-11047 (CSS)
AMERICAN HOME MORTGAGE HOLDINGS, INC.,
a Delaware corporation, et al.,[1]
:
:    Jointly Administered
:
Debtors.
:    **Obj. Deadline: December 5, 2013 at 4:00 PM (ET)**
:    **Hr'g Date:  December 12, 2013 at 10:00 AM (ET)**
---------------------------------------------------------------------- x

## PLAN TRUSTEE'S MOTION FOR AN ORDER (I) ENFORCING SERVICING SALE ORDER AND ASSET PURCHASE AGREEMENT; (II) COMPELLING REIMBURSEMENT OF FORECLOSURE PROFESSIONAL COSTS; AND (III) GRANTING RELATED RELIEF

Steven D. Sass, as liquidating trustee (the "Plan Trustee") for the Plan Trust established pursuant to the *Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009* (the "Plan") in connection with the chapter 11 cases of the above-captioned debtors and debtors-in-possession ("AHM" or the "Debtors"), seeks entry of an order, pursuant to section 105 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), (i) enforcing the terms of the *Order Pursuant to Sections 105, 363, 364, 365, and 503(b) of the Bankruptcy Code, and Rules 2002, 4001, 6004, 6006, 7062, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (a) Approving (i) the Sale of the Debtors' Mortgage Servicing Business Free and Clear of Liens, Claims and Interests, (ii) the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto, and (b) Granting Certain Related Relief.* [D.I. 1711] (the "Servicing Sale Order") and related Asset

---

[1] The Debtors in these cases, along with the last four digits of each Debtors' federal tax identification number, are: AHM Holdings (6303); American Home Mortgage Investment Corp. ("AHM Investment"), a Maryland corporation (3914); American Home Mortgage Acceptance, Inc. ("AHM Acceptance"), a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.) ("AHM SV"), a Maryland corporation (7267); American Home Mortgage Corp. ("AHM Corp."), a New York corporation (1558); American Home Mortgage Ventures LLC ("AHM Ventures"), a Delaware limited liability company (1407); Homegate Settlement Services, Inc. ("Homegate"), a New York corporation (7491); and Great Oak Abstract Corp. ("Great Oak"), a New York corporation (8580).  The address for all of the Debtors is 224 Sherwood Road, Farmingdale, NY 11735.

01:14246058.7

1

Purchase Agreement [D.I. 931] (as subsequently amended, the "APA," attached hereto as Exhibit A); (ii) compelling Homeward Residential Holdings, Inc. (f/k/a American Home Mortgage Servicing, Inc. and AH Mortgage Acquisition Co., Inc.) ("Purchaser")[2] to reimburse the Plan Trustee for Foreclosure Professional Costs (defined below), or pay directly to the Foreclosure Professional (defined below) if such amounts remain unpaid, as applicable, made on behalf of Purchaser; and (iii) granting related relief (the "Motion"). In support of this Motion, the Plan Trustee represents as follows:

## PRELIMINARY STATEMENT[3]

1. Certain services rendered by ordinary course foreclosure professionals (the "Foreclosure Professionals") were made solely for the economic benefit of the Purchaser, and their fees and expenses (the "Foreclosure Professional Costs") are required to be paid by the Purchaser. Following the Final Closing of the Servicing Sale, the Purchaser failed to fund certain of these outstanding costs. As a result, the Debtors were forced to incur administrative expenses and pay the court-approved Foreclosure Professional fees and expenses out-of-pocket (the "Foreclosure Professional Costs"). The attempts by the Debtors, and later the Plan Trustee, to resolve the issue consensually have been largely ignored by the Purchaser. As set forth in further detail herein, the Plan Trustee seeks Court intervention to enforce the terms of the Servicing Sale Order and APA and compelling immediate payment of the outstanding Foreclosure Professional Costs of not less than $1,262,098.96.

---

[2] On December 27, 2012, Ocwen Financial Corp. completed its merger pursuant to that certain Merger Agreement by and among Ocwen, O&H Acquisition Corp., Homeward Residential, and WL Ross & Co. LLC, pursuant to which O&H Acquisition Corp. merged with and into Homeward Residential, with Homeward Residential continuing as the surviving corporation and becoming a wholly-owned subsidiary of Ocwen.

[3] Capitalized terms are defined *infra*, and, if not defined, shall have the meaning ascribed to such terms in the APA.

01:14246058.7

**JURISDICTION AND VENUE**

2.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and pursuant to paragraphs 21 and 70 of the Servicing Sale Order.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases and this Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicate for the relief requested herein is section 105 of the Bankruptcy Code.

**BACKGROUND**

**A.      General Background**

3.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors had ceased all or substantially all business operations other than their mortgage loan servicing business (the "Servicing Business") prior to the Petition Date.

4.      The Plan was confirmed under § 1129 of the Bankruptcy Code on February 23, 2009 and became effective on November 30, 2010.

**B.      Sale of the Debtors' Servicing Business**

5.      On the Petition Date, the Debtors filed an emergency motion [D.I. 11] (the "Sale Motion") to authorize the sale (the "Servicing Sale") of the assets used in their Servicing Business.  Following a five-day evidentiary hearing (the "Sale Hearing"), on October 30, 2007, the Court entered the Servicing Sale Order approving the Sale Motion and the APA.

6.      Because the Purchaser did not yet have the requisite state servicing licenses, the APA contemplated a two-step closing: first, an "economic" close, at which the Purchaser would tender the Purchase Price (as defined in the APA) and after which the Debtors would continue to operate the Servicing Business in the ordinary course for the benefit and risk

01:14246058.7

3

of the Purchaser, using working capital to be provided by the Purchaser (the "Initial Closing"); and second, a "legal" close, at which legal title to the Purchased Assets (as defined in the APA) would vest in the Purchaser and would be the effective date of assumption and assignment of any executory contracts and unexpired leases (the "Final Closing"). (See APA, § 2.7.) The Initial Closing occurred on November 16, 2007 and the Final Closing occurred on April 11, 2008. Upon the Final Closing, the Purchaser purchased the Debtors' Servicing Business, including the Debtors' Servicing Rights (as defined in the APA) and related obligations.

**C.      Payment of Foreclosure Professionals as Ordinary Course Professionals**

7.      Following the Petition Date, the Debtors filed a motion [D.I. 192] (the "OCP Motion") for an order authorizing the employment of certain ordinary-course professionals, including, Foreclosure Professionals. The Court entered an Order dated September 7, 2007 [D.I. 643] (the "OCP Order"), which established procedures (the "OCP Procedures") governing the retention, compensation, and reimbursement of expenses of, among others, the Foreclosure Professionals.

8.      Shortly after the implementation of the OCP Order, the Debtors determined that the requirements in the OCP Procedures created barriers to repayment of Foreclosure Professional Costs. In particular, both industry practice and the established course of dealing with most Foreclosure Professionals could not be maintained under the imposition of the OCP Procedures because the timing for the submission of invoices and the authority to remit payment was delayed.

9.      In an attempt to alleviate the issue, on December 14, 2007, the Debtors filed their *Debtors' Motion for an Order Modifying Existing Procedures for the Compensation and Reimbursement of Expenses of Certain Foreclosure Professionals Utilized in the Ordinary*

*Course, Nunc Pro Tunc to the Petition Date* [D.I. 2389] (the "First Modification Request"). The First Modification Request largely sought to exclude Foreclosure Professionals from the OCP Procedures. The Debtors believed that the requested modifications would reflect the economic realities following the Initial Closing (i.e., that the Foreclosure Professional Costs were to be borne by the Purchaser, rather than the Debtors' estates). The Court denied the First Modification Request without prejudice. *See* 1/4/08 Tr. 51-52; D.I. 2886.

10. On February 7, 2008, the Debtors filed their *Debtors' Motion for an Order Modifying Existing Procedures for the Compensation and Reimbursement of Expenses of Certain Foreclosure Professionals and Real Estate Brokers Utilized in the Ordinary Course and Granting Limited Nunc Pro Tunc Relief* [D.I. 2899] (the "Second Modification Request"). The Second Modification Request sought to (i) allow Foreclosure Professionals to invoice fees and expenses on a particular loan in the aggregate, rather than attempting to separate such invoices by the month the services were rendered and fees incurred, (ii) eliminate the 20% holdback for Monthly Fee Applications for Foreclosure Professionals who exceeded the cap under the OCP Procedures, and (iii) waive the requirement that Foreclosure Professionals wait 15 days after month's end to file the fee application. The Court approved the Second Modification Request on February 14, 2008 [D.I. 2985]. While the revised procedures in the Second Modification Request alleviated some of the time-lag associated with payment of Foreclosure Professional Costs, the overlay of the OCP Procedures, even as modified, left certain invoices destined to be payable at a date later than industry custom.

11. As a result, certain Foreclosure Professional Costs remained outstanding at the time of the Final Closing. The Debtors continued to submit approved fee applications to the Purchaser for direct payment from the Purchaser, but had no way of knowing whether such

payments were being made given their lack of access to the Servicing Business records.

12. One Foreclosure Professional, Adorno & Yoss, filed an objection to confirmation of the Plan due to its failure to receive $283,180.26 (the "A&Y Claim") in unpaid fees and expenses. Pursuant to paragraph 46 of the confirmation order [D.I. 7042], the Debtors and Adorno & Yoss were required to work together to seek payment of Adorno & Yoss's fees and expenses from the Purchaser. Following the combined efforts of both parties to provide the Purchaser with loan-level detail as requested, the Purchaser still did not make payment, and the Debtors were forced to pay Adorno & Yoss the full $283,180.26 (the "A&Y Payment").

13. Additionally, on August 21, 2009, this Court entered an order which required the Debtors to pay Northwest Trustee Services, Inc. ("NWTS") the amount of $378,038.32 (the "NWTS Payment") for certain expenses that the Debtors' had disputed as being incurred pre-petition. [D.I. 7972]. As discussed in the related opinion, the Court determined that, although the foreclosure actions may have *commenced* pre-petition, the Debtors did not become obligated to pay NWTS until the *resolution* of the foreclosure action. See D.I. 6485 at 16. In accordance with the Court's order, on August 31, 2009, the Debtors made the NWTS Payment by wire.

14. Even as of the Debtors' final fee hearing, certain Foreclosure Professionals indicated that many invoices remained outstanding – totaling $600,880.38. These Foreclosure Professionals' final fee applications, which included the unpaid invoices, were approved on May 6, 2011 [D.I. 9983] (the "FP Fee Order"). Given the Purchaser's earlier refusal to pay previous Foreclosure Professional Costs without detailed loan-level information, the Plan Trustee requested that each Foreclosure Professional must provide an accounting (each, an "Accounting") of all outstanding balances by AHM loan number or subject property address.

The requirement to submit an Accounting was included in the FP Fee Order.

15. To date, Accountings have been received by each of the Foreclosure Professionals and provided to the Purchaser. With the Foreclosure Professionals pressing for payment, the Plan Trustee completed a review of such Accountings based on the information available and negotiated the execution of certain releases and assignments of rights from these Foreclosure Professionals to the Debtors. To that end, the Debtors paid the outstanding Foreclosure Professional Costs in the aggregate amount of $461,091.71 to (i) the Law Offices of Alan Weinreb, PLLC, (ii) Robert J. Hopp & Associates, LLC, (iii) NWTS, and (iv) Law Offices of Daniel C. Consuegra. While the the Plan Trustee is generally satisfied with sufficiency of information in the Accounting provided by Codilis & Associates, P.C., Codilis has yet to execute a release and assignment of rights which affirms the amounts in the Accounting. As a result, the asserted $65,582.63 has not yet been paid. Samuel I. White provided an Accounting in the amount of $74,206.04, but the Plan Trustee raised concerns regarding the information provided and the firm has not yet provided an updated Accounting.

16. On December 21, 2012, in a final effort to resolve this matter without court intervention, the Plan Trustee sent a demand letter (the "Demand Letter") for direct payment of outstanding foreclosure balances and reimbursement of the Foreclosure Professional Costs borne by the Debtors' estates. Despite representations that the information was being reviewed and that a prompt response was forthcoming, the Plan Trustee has yet to receive any response to its Demand Letter.

**RELIEF REQUESTED**

17. By this Motion, the Plan Trustee respectfully requests an order of this Court that (i) enforces the terms of the Servicing Sale Order and APA, (ii) requires direct

payment from the Purchaser to the applicable Foreclosure Professional of $139,788.67 to satisfy outstanding Foreclosure Professional Costs, (iii) requires Purchaser to reimburse the Plan Trustee for the Foreclosure Professional Costs in the amount of not less than $1,122,310.29, and (iv) grants related relief.

## BASIS FOR RELIEF REQUESTED

18. It is well-established that bankruptcy courts have the inherent authority to enforce compliance with their lawful orders. E.g., Formtech Indus., LLC v. Magna Powertrain USA, Inc. (In re FormTech Indus., LLC), 439 B.R. 352, 357 (Bankr. D. Del. 2010) (quoting Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 (2009)) (holding that "the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"). The Servicing Sale Order itself retained "jurisdiction to (a) interpret, construe, and enforce the provisions of the APA (and all related documents, amendments, waivers, consents, or other agreements in connection therewith) and this Order in all respects, and (b) hear and determine any matter or dispute arising from implementation of this Order." Servicing Sale Order, ¶ 70. Additionally, the FP Fee Order expressly preserved the Plan Trustee's rights for "setoff, recoupment, reimbursement, repayment and other rights with respect to any Foreclosure Professionals fees and expenses either previously paid or to be paid by the Debtors or the Plan Trust . . . against any third party, including without limitation [the Purchaser]." FP Fee Order, 2.

19. Moreover, "[t]he Supreme Court has long recognized that bankruptcy courts are courts of equity that apply equitable principles in the administration of bankruptcy proceedings." In re Kaiser Aluminum Corp., 456 F.3d 328, 339 (3d Cir. 2006) (citing Local Loan Co. v. Hunt, 292 U.S. 234, 240 (1934)). "Thus, the bankruptcy courts have broad authority to act in a manner that will prevent injustice or unfairness in the administration of bankruptcy estates." Id. at 340 (citing Pepper v. Litton, 308 U.S. 295, 307-08 (1939)). Further, section

01:14246058.7

8

105(a) of the Bankruptcy Code "authorize[s] the bankruptcy court . . . to fashion such orders as are required to further the substantive provisions of the Code." Joubert v. ABN AMRO Mortg. Group, Inc. (In re Marianne Joubert), 411 F.3d 452, 455 (3d Cir. 2005) (quoting In re Morristown & Erie R.R. Co., 885 F.2d 98, 100 (3d Cir. 1990)). "The broad authority conferred by this section of the Code provides 'teeth' to the equitable powers of the bankruptcy court." Cuevas-Segarra v. Contreras, 134 F.3d 458, 459 (1st Cir. 1998) (citing Noonan v. Secretary of Health and Human Servs. (In re Ludlow Hosp. Soc., Inc.), 124 F.3d 22, 27 (1st Cir. 1997)).

20. This Court entered the Servicing Sale Order under sections 105(a), 363, 364, 365, and 503(b) of the Bankruptcy Code and, now, is being asked to enforce it by compelling the Purchaser's performance under the Servicing Sale Order and the APA.

21. "Under general contract principles, parties are bound by the provisions of contracts that they have signed, unless they can show special circumstances that would relieve them of their contractual obligations." Chamois v. Countrywide Home Loans, 02 Civ. 95502003, U.S. Dist. LEXIS 23202, at *7 (S.D.N.Y. Dec. 29, 2003) (citing Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 845 (2d Cir. 1987)). "Under New York law, the initial interpretation of a contract is a matter of law for the court to decide." S-Devonshire, LLC v. Devonshire Campus, LLC, 13-Civ-3934, 2013 U.S. Dist. LEXIS 106481, at *13-14 (S.D.N.Y. July 24, 2013) (quoting Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002)) (internal citations omitted); APA, § 11.10 (stating that the APA is governed by New York law). "[I]f the court finds that the contract is not ambiguous it should assign the plain and ordinary meaning to each term and interpret the contract without the aid of extrinsic evidence . . . ." Id. (citing Int'l Multifoods Corp., 309 F.3d at 83) (internal citations omitted). As set forth below, the unambiguous and plain language of the APA provides that the Purchaser

is obligated to pay the Foreclosure Professional Costs and reimburse the Debtors' estates for such amounts incurred and/or made on its behalf.

22.     Foreclosure Professional Costs are "advances" required to be made under the relevant Servicing Agreements.  For example, under the Servicing Agreement (the "Servicing Agreement") dated March 30, 2007 for the American Home Mortgage Investment Trust 2007-1, the servicer is required to foreclose upon properties securing any mortgage loans that come into and continue to default (Agr., § 3.13(a)) and the servicer is "responsible for all other costs and expenses incurred by it in any such proceedings. . . ." (Id., § 3.13(c)).  "All customary, reasonable necessary 'out of pocket' costs and expenses incurred in connection with a default, delinquency or other unanticipated event in the performance by the Servicer of its servicing obligations, including . . . the cost of . . . (ii) any enforcement or judicial proceedings, including foreclosures and any expenses incurred in relation to any such proceedings that result from the Mortgage Loan being registered on the MERS® System, (iii) the management and liquidation of any REO Property, (iv) compliance with the obligations under Sections 3.10, 3.11, 3.13 of the Servicing Agreement…." is defined as "Servicing Advances."  Agr., § 1.01; Indenture Agreement dated March 30, 2007, Appendix A.

23.     Under the APA, when the Purchaser acquired the Servicing Rights, it also assumed the obligations to pay the outstanding servicing advances (i.e., the Foreclosure Professional Costs).  The Purchased Assets are, among other things, "…all of Sellers' Servicing Rights and rights to receive Servicing Fees…."  (APA, § 2.1(a))  "Servicing Rights" expressly include "… all right, title and interest of Sellers in and to… (iv) the rights with respect to, *and obligations to make*, any advances[4] required pursuant to any Servicing Agreement…."  (APA, §

---

[4]     While the word "advances" is used here generally and should be construed to its broadest extent, the term "Advances" is defined in the APA to mean "…with respect to each Servicing Agreement, including any Disputed

1.1 "Servicing Rights".) [Emphasis added].

24. The only "Servicing Rights" obligations that the Purchaser is not responsible for are pre-Initial Closing obligations, unless those pre-Initial Closing obligations are "Purchased Assets" or "Assumed Liabilities". (Id.) As such, all post-Initial Closing Foreclosure Professional Costs fall squarely within the Purchasers requirement to pay or reimburse the Sellers. In addition, because the Foreclosure Professional Costs constitute Purchased Assets (*i.e.*, the obligation to make any advances required under any Servicing Agreement (See APA § 2.1)) or Assumed Liabilities ("obligations of Sellers as servicer, subservicer or master servicer arising under any Servicing Agreement…" (APA § 1.1 "Assumed Liabilities")), the Purchaser is responsible for such costs whenever and however they arise, without limitation by time period or otherwise.

25. Put simply, allowing the Purchaser to avoid payment for the cost of operating the Servicing Business while receiving the economic benefit of the Servicing Business's operations would deny the Debtors the benefit of their bargain and force the Debtors' estates and their creditors to bear these costs as an administrative expense.[5] The Debtors', and later the Plan Trustee's, numerous attempts to provide all requested information sought by the Purchaser and ultimately receive reimbursement have been rebuffed. As such, the Plan Trustee believes that an order compelling the immediate payment, or repayment, of the outstanding Foreclosure Professional Costs is necessary and appropriate under the circumstances since such

---

Servicing Agreement, the aggregate outstanding amount that as of any date of determination has been advanced directly by Sellers from their own funds or funds borrowed by Sellers from a third party… in connection with servicing Mortgage Loans in accordance with the terms of such Servicing Agreement, including with respect to principal, interest, Taxes, insurance premiums and other advances made pursuant to the applicable Servicing Agreement…." (APA § 1.1 "Advances".) The Plan Trustee believes that proper reference is to the particular servicing agreements, but the argument has equal weight using the defined term under the APA.

[5] Notably, enforcing the Servicing Sale Order and terms of the APA should not ultimately harm the Purchaser, who may seek reimbursement from the ultimate owner of the loan. As the servicer of the related loans, the Purchaser is the only party in the unique position to know the current owner of the loans for which to seek reimbursement.

relief is clearly and unambiguously required under the Servicing Sale Order and APA.

## RESERVATION OF RIGHTS

26.     All setoff, recoupment, reimbursement, repayment, equitable and contractual subrogation and other rights of the Plan Trustee with respect to any foreclosure professional fees and expenses either previously paid or to be paid by the Debtors or the Plan Trustee are fully reserved against any third party, including without limitation, securitization trusts, securitization trustees, indenture trustees, and other successor owners and/or servicers of the loans for which the aforementioned fees and expenses were incurred.

## NOTICE

27.     Notice of this Motion will be provided to: (i) the United States Trustee for the District of Delaware; (ii) counsel to the Purchaser; (iii) counsel to Homeward Residential; (iv) counsel to the Plan Oversight Committee; and (v) all parties that have requested notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein, the the Plan Trustee submits that no other or further notice is required.

*Remainder of Page Left Blank By Intention*

01:14246058.7

12

**CONCLUSION**

WHEREFORE, the Plan Trustee respectfully requests that the Court enter an order, substantially in the form attached hereto, (i) enforcing the terms of the Servicing Sale Order and APA, (ii) requiring direct payment from the Purchaser to the applicable Foreclosure Professional of $139,788.67 to satisfy outstanding Foreclosure Professional Costs, (iii) requiring Purchaser to reimburse the Plan Trustee for the Foreclosure Professional Costs in the amount of not less than $1,122,310.29, and (iv) granting such other relief as may be determined by the Court.

| | |
|---|---|
| Dated: November 14, 2013<br>Wilmington, Delaware | YOUNG, CONAWAY, STARGATT & TAYLOR, LLP<br><br>*/s/ Margaret Whiteman Greecher*<br>Sean M. Beach (No. 4070)<br>Margaret Whiteman Greecher (No. 4652)<br>Rodney Square<br>1000 North King Street<br>Wilmington, DE 19801<br>Telephone: (302) 571-6600<br>Facsimile: (302) 571-1253<br><br>-and-<br><br>HAHN & HESSEN LLP<br>Mark S. Indelicato<br>Edward L. Schnitzer<br>488 Madison Avenue<br>New York, New York 10022<br>Telephone: (212) 478-7200<br>Facsimile: (212) 478-7400<br><br>*Co-Counsel to the Plan Trustee* |