## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
-------------------------------------------------------------- x
In re:                                                          :   Chapter 11
                                                                :
AMERICAN HOME MORTGAGE                                           :   Case No. 07-11047 (CSS)
HOLDINGS, INC., a Delaware corporation, et al.¹,                :
                                                                :   Jointly Administered
      Debtors.                                                  :
                                                                :   Obj. Deadline: December 9, 2014 at 4:00 PM (ET)
-------------------------------------------------------------- x   Hr'g Date: December 16, 2014 at 10:00 AM (ET)
```

### PLAN TRUSTEE'S MOTION FOR AN ORDER PURSUANT TO §§ 105 AND 1142 OF THE BANKRUPTCY CODE (I) AUTHORIZING FIRST DISTRIBUTION TO HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS AND (II) GRANTING RELATED RELIEF, INCLUDING CLARIFICATION OF THE PLAN AND ENFORCEMENT OF CERTAIN PLAN PROVISIONS AND COURT ORDERS

Steven D. Sass, as liquidating trustee (the "Plan Trustee") for the trust (the "Plan Trust") established pursuant to the Amended Chapter 11 Plan of Liquidation of the Debtors Dated as of February 18, 2009 (the "Plan")² in connection with the chapter 11 cases of the above-captioned debtors (the "Debtors"), hereby moves (the "Motion") this Court, pursuant to Articles 14(A)(8) 14(A)(12), and 14(P) of the Plan and sections 105(a) and 1142 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), for entry of an order (i) authorizing the Plan Trustee to make an interim distribution to holders of Allowed General

---

¹ The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: American Home Mortgage Holdings, Inc. (6303); American Home Mortgage Investment Corp., a Maryland corporation (3914); American Home Mortgage Acceptance, Inc., a Maryland corporation (1979); AHM SV, Inc. (f/k/a American Home Mortgage Servicing, Inc.), a Maryland corporation (7267); American Home Mortgage Corp., a New York corporation (1558); American Home Mortgage Ventures LLC, a Delaware limited liability company (1407); Homegate Settlement Services, Inc., a New York corporation (7491); and Great Oak Abstract Corp. , a New York corporation (8580).  The mailing address for all of the Debtors is: AHM Liquidating Trust, P.O. Box 10550, Melville, New York 11747.

² All terms used but not defined herein shall have the meaning ascribed to such terms under the Plan.

01:16084886.8

Unsecured Claims, and (ii) granting related relief, including clarification of the Plan and

enforcement of certain Plan provisions and Court orders, all as discussed further below.  In

support of this Motion, the Plan Trustee relies on the declarations of Steven D. Sass and Scott

Martinez attached as Exhibits B and C hereto, respectively.  In further support of this Motion, the

Plan Trustee respectfully represents as follows:

## JURISDICTION AND STATUTORY AUTHORITY

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157

and 1334, and the *Amended Standing Order of Reference* dated February 29, 2012, from the

United States District Court for the District of Delaware.  In addition, Article 14(A)(12) of the

Plan, which was incorporated by reference in the Court's order confirming the Plan [D.I. 7042]

(the "Confirmation Order"), provides that the Court shall retain post-confirmation jurisdiction

"to issue orders in aid of execution, implementation, or consummation of the Plan."  (Plan Art.

14(A)(12); *see* Conf. Ord. ¶ 68).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This

is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Court may enter a final order

consistent with Article III of the United States Constitution.

2.      The statutory bases for the relief sought herein are sections 105(a) and

1142 of the Bankruptcy Code.

## BACKGROUND

**A.      General Background**

3.      On August 6, 2007 (the "Petition Date"), each of the Debtors filed with

this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  Between the

Petition Date and the Plan Effective Date (as hereinafter defined), each Debtor operated its

business and managed its properties as a debtor in possession pursuant to sections 1107(a) and

1108 of the Bankruptcy Code.  The Debtors' cases have been consolidated for procedural

purposes only and are being jointly administered pursuant to an order of this Court.

4.      On February 23, 2009, the Court entered the Confirmation Order.  The

Plan became effective on November 30, 2010 (the "Plan Effective Date").

5.      Pursuant to the Plan, as of the Plan Effective Date, the Plan Trust was

established, which succeeded to all of the Debtors' assets, causes of action, claims, rights and

interests.  Steven D. Sass is the duly appointed Plan Trustee and, in this capacity, is vested with

the rights, powers, and benefits set forth in the Plan, Confirmation Order, and Plan Trust

Agreement.

6.      Since his appointment, the Plan Trustee has overseen the liquidation and

monetization of Plan Trust Assets, the payment or other resolution of substantially all secured,

administrative, and priority claims ("S/A/P Claims") payable under the Plan, and the litigation or

other resolution of substantially all general unsecured claims payable under the Plan.[3]  As stated

in the most recently filed post-confirmation quarterly summary report as of September 30, 2014

[D.I. 11038], the Plan Trust holds approximately $43 million in cash and cash equivalents.

**B.      The Stipulated Asset Allocation**

7.      A central feature of the Plan was its global settlement of intercompany

claims and other potential inter-Estate disputes by means of a Stipulated Asset Allocation, which

---

[3]  On or about January 11, 2008, Edward Abram, Jr. filed a proof of claim on behalf of himself and similarly-situated putative class and collective members asserting various claims against certain of the Debtors for purported violations of the Fair Labor Standards Act and the state wage and hour laws of various states ("Claim No. 8936").  Claim No. 8936 has been resolved in principle by the parties pursuant to that certain *Term Sheet for the Resolution of Class/Collective Claim No. 8936*, dated October 18, 2013, which settlement is subject to final documentation and approval of this Court.  The Plan Trust anticipates filing a motion seeking preliminary and final approval of the settlement of Claim No. 8936 in the near term.  All amounts required to be distributed on account of Claim No. 8936 under the terms of the settlement have been reserved by the Plan Trust.

permits the Plan Trustee to divide the proceeds of the liquidation of any Plan Trust Asset between the respective Estates in accordance with a pre-set formula. (*See generally* Plan Art. 6). The underlying premise of the Stipulated Asset Allocation was that, so long as the Estates agreed upon and stipulated to (i) the residual value of the Assets being contributed by each Estate to the Plan Trust (i.e., gross asset value, net of S/A/P Claims payable by such Estate), and (ii) the percentage share of Plan Trust Operating Expenses that should be borne by each Estate, it would be possible for the Estates to share in the proceeds of all Plan Trust Assets while at the same time respecting entity separateness.

   8. The Plan's Stipulated Asset Allocation, however, contains a scrivener's error, in that it requires the Plan Trustee to divide the liquid assets of the Plan Trust between the Estates in proportions totaling 100.01%. This was the result of a rounding error when the financial analysis underlying the Stipulated Asset Allocation (which had expressed percentages to the $n$-th decimal point) was conformed to the drafting conventions of the Plan (which expressed percentages in the hundredths). This rounding error can be remedied by expressing the percentages in the thousandths, as illustrated in the following table:

| Estate | Plan % Share | Corrected % Share |
|---|---|---|
| AHM Holdings | 30.67% | **30.670%** |
| AHM Investment | 15.18% | **15.182%** |
| AHM Acceptance | 12.68% | **12.676%** |
| AHM SV | 3.27% | **3.270%** |
| AHM Corp. | 37.30% | **37.299%** |
| AHM Ventures | 0.43% | **0.425%** |
| Homegate | 0.11% | **0.109%** |
| Great Oak | 0.37% | **0.369%** |
| **TOTAL** | 100.01% | **100.000%** |

The Plan Trustee proposes to distribute Plan Trust Assets among the Estates in accordance with the "Corrected % Share" column in the preceding table, subject to the relief requested with respect to solvent Estates, which is discussed below.

**C.       Solvent Estates**

9.       At present, there are no unpaid, Allowed Claims against the Great Oak Estate.  And there is only one unpaid Allowed Claim against the AHM Ventures Estate,[4] which would be paid in full from the proposed initial distribution.

10.       The Plan provides for the payment of interest "calculated as of the Petition Date at a rate to be determined by the Bankruptcy Court" on any Allowed Unsecured Claims that are paid in full from a particular Estate.  (Plan Art. 9(D)(2)).  As discussed below, the Plan Trustee proposes to pay post-petition interest on the Zurich Claim of 4.83% per annum, which was the federal judgment rate in effect as of the Petition Date.

11.       The Plan is silent as to what happens to cash in an Estate (i) after all Allowed General Unsecured Claims are paid in full, with interest, or (ii) if there are no Allowed General Unsecured Claims.  As discussed below, the Plan Trustee proposes that any cash balances in the AHM Ventures and Great Oak Estates be reallocated to the other Estates pro rata in the proportions set forth in the Stipulated Asset Allocation, as illustrated in the following table:

---

[4]  Specifically, Zurich American Insurance Company et al. (collectively, "Zurich American Insurance") filed claim #9141 (the "Zurich Claim"), which was allowed by stipulation in the amount of $63,103 [D.I. 7488].

| Estate | Corrected % Share of All Plan Trust Assets | % Share of AHM Ventures/Great Oak Assets |
|---|---|---|
| AHM Holdings | 30.670% | **30.915%** |
| AHM Investment | 15.182% | **15.304%** |
| AHM Acceptance | 12.676% | **12.777%** |
| AHM SV | 3.270% | **3.296%** |
| AHM Corp. | 37.299% | **37.598%** |
| Homegate | 0.109% | **0.110%** |
| **TOTAL** | 99.206% | **100.000%** |

## D.   Distributions to Wholly-Owned Non-Debtor Subsidiaries

12.     Non-debtors American Home Securities, LLC, AHM SPV III, LLC, AHM

SPV I, LLC, and Melville Reinsurance Corp. (collectively, the "Non-Debtor Subsidiaries") are

(or were) wholly-owned by Debtors AHM Holdings, AHM Investment, and AHM Corp., as

applicable.  On the Debtors' schedules of assets and liabilities, Non-Debtor Subsidiaries were

scheduled as having approximately $50 million in the aggregate of unsecured, non-priority

claims (collectively, the "Non-Debtor Subsidiary Claims"), as set forth in the table below:

| Estate | Non-Debtor Subsidiary | Total Claim Amount |
|---|---|---|
| AHM Investment | American Home Securities, LLC | $2,650,000 |
| AHM Investment | AHM SPV III, LLC | $24,196,644 |
| AHM SV | AHM SPV I, LLC | $7,642,241 |
| AHM Corp. | AHM SPV I, LLC | $14,114,859 |
| AHM Corp. | Melville Reinsurance Corp. | $1,356,873 |
| | **TOTAL** | **$49,960,617** |

13.     The Non-Debtor Subsidiary Claims were not scheduled as contingent,

unliquidated, or disputed, and, as a result, are presently "Allowed" under the Plan.  (*See* Plan Art.

I(A) (definition "Allowed")).  However, there are a number of legal and practical difficulties

with making distributions on Non-Debtor Subsidiary Claims at this time. First, the Plan Trustee

has been unable to validate all of the Non-Debtor Subsidiary Claims based on the Debtors' books

and records, and, as a result, may seek leave of the Court to amend the schedules at a later date.

Second, American Home Securities, LLC and Melville Reinsurance Corp. have been dissolved

in accordance with Delaware and Vermont state law, respectively; thus, any distribution to those

Non-Debtor Subsidiaries would presumably go unclaimed and revert to the Plan Trust in

accordance with the Plan. Third, given that the other Non-Debtor Subsidiaries are wholly owned

by the Plan Trust, it is possible that distributions on their Non-Debtor Subsidiary Claims would

simply be returned to the Plan Trust as equity distributions. For these reasons, the Plan Trustee

proposes to treat the Non-Debtor Subsidiary Claims as "Disputed Claims" for purposes of the

initial distribution to general unsecured creditors, and to reserve any distributions that would

otherwise have been made on account of such claims pending further order of the Court.

### E.    Treatment of BofA Syndicate Claims

14.    Under the BofA/Committee Settlement Stipulation [D.I. 3699] and the

BofA Global Settlement Stipulation [D.I. 5308 & 5333], BofA as Administrative Agent agreed,

among other things, (i) to release its lien upon, and waive any right to receive a distribution from

proceeds of, certain REO properties (the "Designated REO Assets"), and (ii) to cap the Allowed

amount of the Pre-Petition Secured Parties' unsecured claims against each of the applicable

Debtors at the lesser of $50 million or 50% of the actual amount of the Deficiency Claim (as

defined in the stipulation). To effectuate the parties' agreement regarding Designated REO

Assets, the Plan provides that distributions on account of the BofA Syndicate Unsecured Claim

shall be made out of "BofA Syndicate Net Distributable Assets" (Plan Art. 4(G)(2)), which

exclude any proceeds of Designated REO Assets (see id. Art. 1(A) (definitions of "BofA Syndicate Net Distributable Assets" and "Designated REO Assets")).

15.     All of the Designated REO Assets have now been liquidated, with the net liquidation proceeds totaling $7,675,950. The proceeds of Designated REO Assets are commingled with other cash of the Plan Trust, but are identifiable and traceable as an accounting matter. In accordance with the Plan, the amount of these proceeds will be excluded from the calculation of BofA Syndicate Net Distributable Assets for the applicable Estates.

16.     With respect to the BofA Syndicate Unsecured Claim, the Plan Trustee is reviewing data and documentation provided by BofA as Administrative Agent regarding the application of the proceeds of collateral to the BofA Syndicate Secured Claim, so as to determine the deficiency amount that will be allowed under the BofA Global Settlement Stipulation. If the Plan Trustee is unable to make this determination prior to the initial distribution to general unsecured creditors, the Plan Trustee proposes to treat the BofA Syndicate Unsecured Claim as a "Disputed Claim" for distribution purposes under the Plan, and reserve for it based upon the $50,000,000 maximum amount allowable under the BofA Global Settlement Stipulation.

**F.     Distributions on Subordinated Trust Preferred Claims**

17.     Debtors AHM Holdings and AHM Investment were obligated on certain subordinated trust-preferred securities issued by certain non-debtor, special-purpose entities (such obligations, the "Subordinated Trust Preferred Claims," as defined in the Plan). The indentures governing such securities (the "Subordinated Trust Preferred Indentures," as defined in the Plan) contained provisions subordinating the securities in right of recovery to any "Senior Debt" or "Senior Indebtedness" (as applicable) (defined by the Plan as "Senior Unsecured Claims"). The indentures also contained provisions requiring the applicable Debtors to

reimburse the Indenture Trustees under certain circumstances, though it was unclear whether these reimbursement obligations were also subject to the subordination provisions applicable to the securities themselves.

18. The Plan gave effect to the contractual subordination of the Subordinated Trust Preferred Claims by (i) classifying them separately from other unsecured claims against AHM Holdings and AHM Investment, and (ii) establishing a process by which other creditors could assert their claims were Senior Unsecured Claims entitled to the benefits of the subordination provisions in the Subordinated Trust Preferred Indentures. (*See* Plan Art. 4(I)).[5] The Plan also resolved any dispute with the Indenture Trustees regarding the priority of their reimbursement obligations, by providing that the first $254,451 and $245,549 distributed on account of Subordinated Trust Preferred Claims against AHM Holdings and AHM Investment, respectively, would go toward payment of reasonable Indenture Trustee Expenses invoiced to the Plan Trust after the Plan Effective Date, with the Indenture Trustees sharing pro rata in each Estate based on the total Subordinated Trust Preferred Claims represented by each Indenture Trustee. (*See id.* Art. 4(I)(3)).

19. Following the Plan Effective Date, (i) Law Debenture Trust Company of New York ("Law Debenture") timely submitted invoices for Indenture Trustee Expenses in the amount of $320,652.08 relating to the Baylis Trust I, Baylis Trust II, Baylis Trust IV, and Baylis Trust V transactions, and (ii) Wilmington Trust Company ("Wilmington Trust") timely submitted invoices for Indenture Trustee Expenses in the amount of $390,572.24 relating to the Baylis Trust III, Baylis Trust VI, Baylis Trust VII, and Baylis Trust VIII transactions. Because the invoiced Indenture Trustee Expenses exceed the $254,451 and $245,549 amounts set forth in

---

[5] The BofA Syndicate Unsecured Claim was deemed to constitute a "Senior Unsecured Claim" for purposes of these procedures. (Plan Art. 4(H)(3)).

the Plan vis-à-vis the Estates of AHM Holdings and AHM Investment, the Indenture Trustees

will share those amounts pro rata in proportion to the relevant Allowed Subordinated Trust

Preferred Claims they represent against each Estate.  (*See* Plan Art. 4(I)(3)).  Below is a table of

the relevant Allowed Subordinated Trust Preferred Claims represented by each of the Indenture

Trustees vis-à-vis the Estates of AHM Holdings and AHM Investment, and the resulting payout

for each Indenture Trustee from the first distributions on Allowed Subordinated Trust Preferred

Claims in each Estate:

| AHM Holdings | | | | |
|---|---|---|---|---|
| Indenture Trustee | SPE Issuer | Allowed Claims Represented | Pro Rata % | Payment Amount |
| Law Debenture | Baylis Trust II | $52,746,454 | 17.12% | $43,573.70 |
| | Baylis Trust IV | $52,696,336 | 17.11% | $43,532.30 |
| | Baylis Trust V | $51,986,698 | 16.88% | $42,946.07 |
| Wilmington Trust | Baylis Trust III | $62,401,845 | 20.26% | $51,549.99 |
| | Baylis Trust VI | $31,181,335 | 10.12% | $25,758.82 |
| | Baylis Trust VII | $20,787,893 | 6.75% | $17,172.82 |
| | Baylis Trust VIII | $36,215,222 | 11.76% | $29,917.30 |
| | | | Total | $254,451.00 |

| AHM Investment | | | | |
|---|---|---|---|---|
| Indenture Trustee | SPE Issuer | Allowed Claims Represented | Pro Rata % | Payment Amount |
| Law Debenture | Baylis Trust I | $52,746,454 | 31.56% | $77,501.38 |
| Wilmington Trust | Baylis Trust III | $62,401,845 | 37.34% | $91,688.23 |
| | Baylis Trust VI | $31,181,335 | 18.66% | $45,815.34 |
| | Baylis Trust VII | $20,787,893 | 12.44% | $30,544.05 |
| | | | TOTAL | $245,549.00 |

As illustrated in the foregoing table, the anticipated aggregate payment to Law Debenture from

both Estates will be $207,553.45, and the anticipated aggregate payment to Wilmington Trust

from both Estates will be $292,446.55.

20.    Following the Plan Effective Date, Sovereign Bank FSB timely filed a Subordination Statement in accordance with the Plan asserting that its claim #8530 (the "Sovereign Claim") against AHM Investment constituted a Senior Unsecured Claim.[6]  The Sovereign Claim was subsequently allowed as a general unsecured claim against AHM Investment in the amount of $13,191,373.58 [D.I. 10092 and Exh. A].  The Plan Trustee does not dispute that the Sovereign Claim is a Senior Unsecured Claim entitled to the benefits of the subordination provisions of the Subordinated Trust Preferred Indentures.

21.    JPMorgan Chase Bank, National Association and J.P. Morgan Securities LLC (collectively, "JPMC") also timely filed a Subordination Statement, asserting their claims #7969, #8248, #8258, #8261, #8262, #8383, and #8396-#8399 constituted Senior Unsecured Claims.[7]  However, JPMC's claims #7969, #8248, #8258, #8262, #8383, and #8396-#8399 were subsequently disallowed under settlements with the Plan Trustee [D.I. 10258 & 10342], and the remaining claim #8261 was allowed only against debtor AHM Corp. [D.I. 10342], and thus is not a Senior Unsecured Claim eligible to receive the benefit of subordination under the Plan. (*See* Plan Art. 1(A) ("Senior Unsecured Claim" definition, limiting status to claims in Classes 1C(1)-(2) and 2C(1)-(2)) and Art. 2(A) (table of classified claims, indicating Class 1C(1)-(2) and 2C(1)-(2) are claims against AHM Holdings and AHM Investment, respectively)).

22.    At present, the Senior Unsecured Claims against AHM Investment consist only of the Sovereign Claim and the BofA Syndicate Unsecured Claim, both of which will share pro rata in all distributions upon Allowed Subordinated Trust Preferred Claims against AHM

---

[6]  The Subordination Statement also referenced a claim against AHM SV; however, claims against AHM SV are not entitled to participate in the Subordinated Trust Preferred Claim distributions under the Plan.  (*See generally* Plan Art. 4(I)).

[7]  Other Subordination Statements were filed, but disputed by the Plan Trustee.  The Court sustained the Plan Trustee's objection to these Subordination Statements on March 9, 2011 [D.I. 9824].

Investment in excess of the $245,549 that is due to the Indenture Trustees. The BofA Syndicate Unsecured Claim is the only Senior Unsecured Claim against AHM Holdings, so it will receive, once determined and allowed (see paragraph 16 above), all distributions upon Allowed Subordinated Trust Preferred Claims against AHM Holdings in excess of the $254,451 that is due to the Indenture Trustees.

## G.      Undeliverable and Uncashed Distributions

23.      The Plan permits the Plan Trustee to make distributions by mailing checks to Holders of Allowed Claims. (Plan Art. 9(E) & (G)). Article 9(H) of the Plan (governing undeliverable distributions) provides that if a distribution is returned "for lack of a current address for the Holder [of an Allowed Claim] or otherwise, the Plan Trustee shall file with the Bankruptcy Court the name, if known, and last known address of the Holder and the reason for its inability to make payment." (*Id.* Art. 9(H)). If the distribution still cannot be made after 90 days thereafter, that distribution and any further distribution to the holder of the Allowed Claim

> shall be distributed to the Holders of Allowed Claims in the appropriate Class or Classes, and the Allowed Claim shall be deemed satisfied and released, with no recourse to the Plan Trust, the Plan Trustee or the Plan Trust Assets, to the same extent as if payment or distribution had been made to the Holder of the Allowed Claim.

(*Id.*)

24.      Section 3.13 of the Plan Trust Agreement provides that if distributions to holders of Beneficial Interests in the Plan Trust is not claimed within six months after the distribution date,

the holders of Beneficial Interests theretofore entitled to such unclaimed distributions shall cease to be entitled thereto and the unclaimed distributions for each such holders [*sic*] shall then be distributed on a Pro Rata basis to the Holders of Allowed Claims who have received and have claimed distributions and who are otherwise entitled to further distributions hereunder.

(Plan Tr. Agmt. § 3.13(b)).

25.    On or about October 15, 2013, the Plan Trustee began making distributions under the Plan to holders of Allowed Priority Claims by mailing checks in accordance with Articles 9(E) and (G) of the Plan.[8]  Of these distributions (the "Priority Distributions"), approximately (i) 206 checks with net payments totaling $220,200 were returned as undeliverable for lack of a current address or otherwise (the "Undeliverable Distributions"), and, (ii) as of October 15, 2014, 205 checks with net payments totaling $147,012 have not been cashed or otherwise presented for collection (the "Uncashed Distributions").[9]  On September 3, 2014, the Plan Trustee filed a *Notice of Undeliverable Distributions* [D.I. 11030] including the name and last known address of the claimants to whom the Undeliverable Distributions were directed.  If these Undeliverable Distributions cannot be delivered before December 2, 2014, the Plan Trustee intends to allocate the underlying funds to the respective Estates in accordance with the Stipulated Asset Allocation.  With respect to Uncashed Distributions, the Plan Trustee proposes to treat these checks as "unclaimed distributions" within the meaning of Section 3.13 of the Plan Trust Agreement, stop payment on them, and allocate the underlying funds to the respective Estates in accordance with the Stipulated Asset Allocation.

---

[8]  As noted in note 3, *supra*, the Plan Trustee has reserved all distributions to be made under the pending settlement of Claim No. 8936.

[9]  As these Priority Distributions were on account of employee wages, the Plan Trust made required tax withholdings and payroll deductions prior to disbursing the funds.

**H.    Missing W-9 Forms**

26.    The Plan Trustee is required to file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) (Plan Tr. Agmt. § 3.7), which requires the Plan Trustee to have taxpayer identification numbers for the beneficiaries of the Plan Trust. *See* 26 U.S.C. § 6034A(a)(1) & Treas. Reg. § 1.671-4(a) (requiring trustee to file a separate statement with the trust's tax return for each beneficiary receiving a distribution in a tax year). Failure to comply with IRS reporting requirements could lead to penalties that would be payable from the corpus of the Plan Trust to the detriment of general unsecured creditors.

27.    The Plan Trustee has sent numerous requests to Holders of Allowed Claims to provide their taxpayer identification number on an IRS Form W-9. To date, a number of Holders have not remitted executed Forms W-9. The Plan Trustee will keep trying to obtain those forms prior to the initial distribution to unsecured creditors, but failing that, as discussed below, the Plan Trustee proposes to treat these Claims as "Disputed Claims" and to reserve any distributions that would otherwise have been made on account of such Claims (the "Missing W-9 Distributions") pending receipt of executed Forms W-9 or further order of the Court.

**I.    Foreclosure Professionals' Fees**

28.    On May 6, 2011, the Court entered an order [D.I. 9983] (the "Fee Order") approving the final fee applications for certain of the foreclosure professionals retained in these chapter 11 cases, subject to each professional providing the Plan Trustee "an accounting (an 'Accounting') of all paid and outstanding balances by AHM loan number or subject property address." (Fee Ord. at 2; *see id.* ("*upon the submission of an Accounting*, the Plan Trustee is authorized to remit payment to the Foreclosure Professionals *for outstanding amounts supported by the Accounting*" (emphasis added))).

29.     The purpose of the Accounting was to determine how much of the amounts approved as part of the final fee application process remained outstanding, given that certain amounts had previously been paid by the Debtors and/or the purchaser of the Debtors' servicing business. All of the foreclosure professionals other than Samuel I. White, P.C. (the "White Firm") provided a sufficient Accounting to support the amounts claimed as outstanding and, accordingly, were paid.

30.     The Accounting provided by the White Firm did not comply with the Fee Order because it failed to match up amounts claimed as outstanding against invoices that had previously been included in the White Firm's fee applications. Without this information, the Plan Trustee is unable to determine what amount, if any, of the claimed fees and expenses were actually approved by the Court, much less the amount that remains outstanding. The White Firm acknowledged the deficiency in its Accounting and indicated it would send a revised Accounting. However, this revised Accounting has not been provided despite several requests by the Plan Trust. As discussed below, the Plan Trustee requests that the Court disallow the outstanding fees and expenses requested by the White Firm unless it responds with the requested information on or before the December 9, 2014, objection deadline for this Motion.[10]

## J.     Interim Distribution on Account of Allowed Unsecured Claims

31.     The Plan authorizes the Plan Trustee to make interim distributions on account of Allowed General Unsecured Claims, subject to Plan Oversight Committee approval, provided that the Plan Trust retains (i) sufficient reserves for Plan Trust Operating Expenses, Disputed S/A/P Claims and Unsecured Claims, and (ii) "amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Plan Trust Assets during liquidation, and to

---

[10]  To be clear, the Plan Trustee is not seeking disgorgement of any amounts previously paid—only disallowance of amounts still outstanding, for failure to comply with the Fee Order.

satisfy other liabilities or expenses incurred by the Plan Trust in accordance with th[e] Plan or the Plan Trust Agreement." (Plan Art. 9(A)(2)).

32.    Subject to the approval of the Plan Oversight Committee, the Plan Trustee proposes to make an interim distribution to Holders of Allowed General Unsecured Claims (the "Initial GUC Distribution"),[11] and to reserve the remainder of the Plan Trust's assets pending a final distribution.  The ultimate distribution amount is not yet determined, and will be at the discretion of the Plan Trustee in consultation with the Plan Oversight Committee, and subject to appropriate reserves for Disputed Claims.  At present, the Plan Trustee anticipates distributing (or reserving, as applicable) approximately $20 million.

## RELIEF REQUESTED

33.    By this Motion, the Plan Trustee seeks entry of an order, substantially in the form of the proposed order attached as Exhibit A hereto (the "Proposed Order"), (i) authorizing the Plan Trustee to make the Initial GUC Distribution, and (ii) granting related relief, including the following:

- authorization and direction, for purposes of the Stipulated Asset Allocation from now on, to allocate the Plan Trust Assets among the respective Estates in accordance with the "Corrected % Share" column in the table in paragraph 8 above;

- authorization and direction to treat the BofA Syndicate Unsecured Claim as a "Disputed Claim" for purposes of the Initial GUC Distribution, and to reserve for it based upon the $50,000,000 maximum amount allowable under the BofA Global Settlement Stipulation;

- a determination that the rate of post-petition interest payable on the Zurich Claim is 4.83% per annum;

- authorization and direction to reallocate cash that is allocated under the Stipulated Asset Allocation to the Great Oak and AHM Ventures Estates (the latter, after payment of the Zurich Claim, with interest) to the other Estates in accordance with the "% Share of AHM Ventures/Great Oak Assets" column in the table in paragraph 11 above;

---

[11]  Information regarding the Allowed General Unsecured Claims against each Estate is available on the claims agent's website at http://dm.epiq11.com/AHM/Claim.

- authorization and direction to treat the Non-Debtor Subsidiary Claims as "Disputed Claims" for purposes of the Initial GUC Distribution, and to reserve any distributions that would otherwise have been made on account of such claims pending further order of the Court;

- authorization and direction to treat $7,675,950 of the Plan Trust's cash as Designated REO Assets that will not be distributed on account of the BofA Syndicate Unsecured Claim (except indirectly, as a result of the distribution mechanics applicable to Subordinated Trust Preferred Claims);

- authorization and direction to make the first $254,451 and $245,549 in distributions on account of Allowed Subordinated Trust Preferred Claims against AHM Holdings and AHM Investment, respectively, to the Indenture Trustees in the proportions indicated in the table in paragraph 19 above;

- authorization and direction to allocate the remaining distributions on account of Allowed Subordinated Trust Preferred Claims against (I) AHM Holdings, to the BofA Syndicate Unsecured Claim, and (II) AHM Investment, 20.88% to the Sovereign Claim and 79.12% to the reserve for the BofA Syndicate Unsecured Claim, provided that if the Allowed BofA Syndicate Unsecured Claim is later determined to be less than $50,000,000, then the percentages will be adjusted and the Holder of the Sovereign Claim will receive a supplemental distribution from amounts that had been reserved on account of the BofA Syndicate Unsecured Claim;

- authorization and direction to allocate the funds underlying any Undeliverable Distributions that remain undeliverable as of December 2, 2014, to the respective Estates in accordance with the Stipulated Asset Allocation;

- a determination that distributions made by check that are not cashed or otherwise presented for collection are "unclaimed distributions" subject to section 3.13 of the Plan Trust Agreement, and, accordingly, authorization and direction to stop payment on the Uncashed Distributions and allocate the underlying funds to the respective Estates in accordance with the Stipulated Asset Allocation;

- authorization and direction to treat any Claims for which the Holder has not submitted an IRS Form W-9 as "Disputed Claims" for purposes of the Initial GUC Distribution, and to reserve any Missing W-9 Distributions pending receipt of Forms W-9;

- a determination that the Missing W-9 Distributions are "otherwise undeliverable" within the meaning of Article 9(H) of the Plan, so that the failure to provide a Form W-9 within 90 days after the Plan Trustee files and serves a notice of his inability to make the Missing W-9 Distributions will result in (i) such distributions reverting to the Plan Trust and being reallocated to the Estates in accordance with the Stipulated Asset Allocation and (ii) disallowance and expungement of the underlying Claims; and

- disallowance of the unpaid balance of the administrative claims of the White Firm, for failure to provide a sufficient Accounting as required by the Fee Order.

## BASIS FOR RELIEF REQUESTED

34.    Section 1142(a) of the Bankruptcy Code provides that "any entity organized . . . for the purpose of carrying out the plan shall carry out the plan and shall comply with any orders of the court." 11 U.S.C. § 1142(a).  Section 1142(b) of the Bankruptcy Code provides that "the court may direct . . . any necessary party to execute or deliver or to join in the execution or delivery of any instrument required to effect a transfer of property dealt with by a confirmed plan, and to perform any other act . . . that is necessary for the consummation of the plan." 11 U.S.C. § 1142(b).  In addition, § 105(a) of the Bankruptcy Code provides, in pertinent part, that the Court may "issue any order, process or judgment that is necessary or appropriate to carry out the provisions of th[e Bankruptcy Code]." 11 U.S.C. § 105(a).

35.    These statutory provisions are borne out in the Plan, which requires the Plan Trust to "execute such documents, and take such other actions, as are necessary to effectuate the transactions provided for in th[e] Plan" (Plan Art. 14B), and expressly contemplates that the Court may enter

> an order directing any Person to execute or deliver or to join in the execution and delivery of any instrument or document reasonably necessary or reasonably appropriate to effect a transfer of properties dealt with by th[e] Plan, and to perform any other act . . . that is *reasonably necessary or reasonably appropriate for the consummation of the Plan.*

(*Id.* Art. 14(P) (emphasis added)).  To the latter end, the Plan's retention of jurisdiction provision specifically authorizes the Plan Trustee to "seek orders of the Bankruptcy Court approving the sale, transfer, assignment or other disposition of Plan Trust Assets *as appropriate to facilitate such transactions,*" (*id.* Art. 14(A)(8) (emphasis added)), and reserves in this Court the jurisdiction "to issue orders in aid of execution, implementation, or consummation of the Plan" (*id.* Art. 14(A)(12)).

36.     As noted above, the Plan Trustee is authorized to make an interim distribution to Holders of Allowed General Unsecured Claims provided that the Plan Trust retains (i) sufficient reserves for Plan Trust Operating Expenses, Disputed S/A/P Claims and Unsecured Claims, and (ii) "amounts reasonably necessary to meet contingent liabilities, to maintain the value of the Plan Trust Assets during liquidation, and to satisfy other liabilities or expenses incurred by the Plan Trust in accordance with th[e] Plan or the Plan Trust Agreement." (Plan Art. 9(A)(2)).  The proposed Initial GUC Distribution is proper.  For the reasons discussed below, the relief requested in this Motion will facilitate the making of this distribution, and is thus reasonably necessary or reasonably appropriate for the consummation of the Plan as contemplated by sections 105(a) and 1142 of the Bankruptcy Code and Article 14 of the Plan.

## I.     Correction of the Stipulated Asset Allocation

37.     In order to determine how much of the Plan Trust's assets to distribute to unsecured creditors of each Estate, the Plan Trustee must apply the Stipulated Asset Allocation. However, due to the scrivener's error discussed above, this is literally impossible.  Thus, as a threshold matter, the Court should authorize and direct the Plan Trustee to apply the Stipulated Asset Allocation as it would have appeared in the Plan but for the scrivener's error.  This proposed correction to the Stipulated Asset Allocation does not affect the substantive rights of any parties, but rather is necessary in order to render the Plan workable and to carry out the intent of the parties and the Court, which was to allocate assets based on the financial analysis underlying the Stipulated Asset Allocation.  Accordingly, the Plan Trustee submits that such relief is implicitly authorized by sections 105(a) and 1142 of the Bankruptcy Code insofar as it is necessary and appropriate for the consummation of the Plan.  *Cf. McGuffin v. Barman (In re BHB Enters., LLC)*, Adv. Pro. No. 97-80227-W, 2006 Bankr. LEXIS 3254, *9-14 (Bankr. D.S.C.

Nov. 7, 2006) (holding correction of scrivener's error in judgment eight years after judgment was entered was appropriate where correction of the error would "ensure that the Court's purpose is fully implemented").

## II.    Approval of Distribution Mechanics

38.    The provisions of the Plan and Plan Trust Agreement relating to Designated REO Assets, Subordinated Trust Preferred Claims, and undeliverable and unclaimed distributions are all self-effectuating.  However, in the interest of full disclosure, and to provide parties in interest an opportunity to be heard with respect to the proposed distribution methodology, the Plan Trustee believes it appropriate to seek approval of the same, as contemplated by the Plan.  In addition, there are some practical and legal issues presented by the Initial GUC Distribution that are not clearly spelled out in the Plan, including the rate of post-petition interest payable by a solvent Estate, what to do with excess cash in an Estate after payment of all Allowed Claims (if any), and whether (and if so, how) to go about making distributions to dormant Non-Debtor Subsidiaries with no current management.  The relief requested in the Motion on these and other issues pertaining to distribution mechanics will facilitate the Initial GUC Distribution and, accordingly, is proper under sections 105(a) and 1142 of the Bankruptcy Code.

39.    Designated REO Assets.  The Plan provides for distributions to most general unsecured creditors, including holders of Subordinated Trust Preferred Claims, to be made from the "Net Distributable Assets" of each Estate.  (Plan Art. 4(G)(2), (I)(2), & (J)(2)). Net Distributable Assets comprise all cash less any necessary reserves.  (*Id.* Art. 9(C)).  The Plan provides for distributions on the BofA Syndicate Unsecured Claim to be made from the "BofA Net Distributable Assets" (*id.* Art. 4(H)(2)), which are defined as Net Distributable Assets other

than proceeds of Designated REO Assets (*id.* Art. 9(C)). As noted above, $7,675,950 of the Plan Trust's commingled cash represents proceeds of Designated REO Assets. This amount will be excluded from the calculation of BofA Net Distributable Assets for purposes of determining the amount distributable to the BofA Syndicate Unsecured Claim. However, this amount will be included in the calculation of Net Distributable Assets for purposes of determining the amount distributable to other general unsecured claims, including the Subordinated Trust Preferred Claims.[12] The Proposed Order's finding as to the amount of proceeds of Designated REO Assets will facilitate distributions by fixing one of the key variables to the distribution calculation.

40.    <u>Subordinated Trust Preferred Claims</u>. As noted above, the Plan provides for payment to first be made on account of the Indenture Trustee Fees up to $254,451 and $245,549 from the general unsecured distributions upon Subordinated Trust Preferred Claims against AHM Holdings and AHM Investment, respectively. (*See* Plan Art. 4(I)(3)). Because the Indenture Trustees have submitted invoices in excess of these amounts, the Plan provides they must share pro rata in proportion to the Subordinated Trust Preferred Claims they represent. (*Id.*). The table in paragraph 19 above breaks down the anticipated payments to the Indenture Trustees in accordance with the Plan. As also noted above, the Plan provided that the BofA Syndicate Unsecured Claim against AHM Investment and AHM Holdings was entitled to the benefits of the subordination provisions in the Subordinated Trust Preferred Indentures, and included a process by which other creditors could assert similar rights. (*See* Plan Art. 4(I)). As a result of this process, the Sovereign Claim against AHM Investment was determined to be entitled to the benefits of the subordination; accordingly, the Sovereign Claim and the BofA

---

[12] While the BofA Syndicate Unsecured Claim will not receive any distributions directly from the Designated REO Assets under the Plan, it will do so indirectly insofar as it is entitled to a portion of the distributions attributable to Allowed Subordinated Trust Preferred Claims.

Syndicate Unsecured Claim will share pro rata, in proportion to their allowed amounts (20.88% and 79.12%, respectively),[13] in any distributions upon Subordinated Trust Preferred Claims from the AHM Investment Estate, and the BofA Syndicate Unsecured Claim, once determined and allowed (see paragraph 16 above), will be entitled to all distributions on Subordinated Trust Preferred Claims from the AHM Holdings Estate, in each case after the payment of the Indenture Trustee Fees. The Proposed Order's approval of the breakdown of Indenture Trustee Fee payments and the respective amounts of Subordinated Trust Preferred Claim distributions to be allocated to the Sovereign Claim and the BofA Syndicate Unsecured Claim will facilitate distributions by fixing key variables to the distribution calculation.

41.    Undeliverable Distributions. As noted above, the Plan provides a procedure for the reversion of undeliverable distributions to the Plan Trust. (Plan Art. 9(H)). The Plan Trustee has complied with this procedure with respect to 206 Priority Distributions that were returned as undeliverable by filing a notice of the same on the docket of these chapter 11 cases. [D.I. 11030]. If these distributions remain undeliverable by December 2, 2014, the undeliverable Priority Distributions will revert to the Plan Trust under the Plan. (Plan Art. 9(H)). The Proposed Order's decrees regarding the same will facilitate distributions by removing any doubt as to the Plan Trustee's right to allocate these undeliverable distributions among the Estates in accordance with the Stipulated Asset Allocation. The Proposed Order will also facilitate a later, final distribution by providing that claims for which Priority Distributions were returned as undeliverable are disallowed, expunged, and entitled to no further distribution under the Plan.

---

[13] These percentages assume allowance of the BofA Syndicate Unsecured Claim in the amount of $50,000,000. If the actual Allowed amount of that claim is lower, the percentages will be adjusted and the Holder of the Sovereign Claim will receive a make-up distribution from amounts previously reserved on account of the BofA Syndicate Unsecured Claim.

42.    Uncashed Distributions. As noted above, the Plan Trust Agreement provides for the automatic reversion of "unclaimed" distributions to the Plan Trust after 180 days. (Plan Tr. Agmt. § 3.13(b)). The Plan Trustee notes that this 180 day period corresponds to the period after which a bank is no longer obligated to honor a check. See U.C.C. § 4-404 (bank no longer obligated to honor check six months after issuance). The Plan Trustee submits that the Uncashed Distributions are "unclaimed" within the meaning of section 3.13 of the Plan Trust Agreement, particularly given that they are no longer enforceable against the Plan Trust's bank. However, because checks, once issued, could conceivably be presented for collection at any time,[14] the only way to effectuate the reversion of the unclaimed distributions to the Plan Trust under the Plan Trust Agreement would be for the Plan Trustee to stop payment on the checks. The Proposed Order's decree authorizing the same will facilitate distributions by removing any doubt as to the Plan Trustee's right to allocate these unclaimed distributions among the Estates in accordance with the Stipulated Asset Allocation. The Proposed Order will also facilitate a later, final distribution by providing that claims for which Priority Distributions were unclaimed are disallowed, expunged, and entitled to no further distribution under the Plan. And while the reversion of unclaimed distributions to the Plan Trust under the Plan Trust Agreement is self-effectuating and does not require prior notice to claimants, the Plan Trustee will await entry of the Proposed Order to stop payment of the checks, and will serve the affected claimants with this Motion, thus providing them an opportunity to respond or, alternatively, to deposit or cash their checks in response to this Motion.

43.    Post-Petition Interest Payable on Zurich Claim. The Plan provides for the payment of interest "calculated as of the Petition Date at a rate to be determined by the

---

[14]   While a bank is not *obligated* to honor a stale check, it is generally *permitted* to do so. See U.C.C. § 4-404 and Official Comment.

Bankruptcy Court" on any Allowed Unsecured Claims that are paid in full from a particular

Estate. (Plan Art. 9(D)(2)). Under the Bankruptcy Code's distribution scheme, where post-

petition interest is payable, it is "at the legal rate from the date of the filing of the petition." 11

U.S.C. § 726(a)(5). However, neither the Bankruptcy Code nor its legislative history provides a

definition of the "legal rate." *In re Coram Healthcare Corp.*, 315 B.R. 321, 346 (Bankr. D. Del.

2004). Most courts conclude that the "legal rate" is the federal judgment rate. *Id.* In *Coram*,

this Court held that the federal judgment rate is the minimum rate of interest payable on claims

against solvent estates, but that the facts of a given case may require a higher rate of interest. *In*

*re Washington Mutual, Inc.*, 442 B.R. 314, 358-59 (Bankr. D. Del. 2011) (citing *Coram*, 315

B.R. at 346). The federal judgment rate in effect as of the Petition Date was 4.83% per annum,[15]

and the Plan Trustee is unaware of any facts or circumstances that would support an award of a

higher interest rate on the Zurich Claim. Accordingly, the Court should determine that 4.83%

per annum is the appropriate rate of interest payable on the Zurich Claim.

   44. <u>Excess Cash in Solvent Estates</u>. The Plan does not address specifically

what happens to excess cash in an Estate after payment of all Allowed Unsecured Claims (if any)

with post-petition interest. However, the spirit of the Plan, which was clearly embodied in the

Stipulated Asset Allocation, is that all assets of individual Debtors' Estates are deemed to be

assets of the Plan Trust that are allocated among the Estates in accordance with their global

settlement of intercompany issues. Against this backdrop, the Plan Trustee submits that it is

most appropriate for any excess cash at an Estate after payment in full of all Allowed Claims

with post-petition interest, to be re-allocated among the remaining Estates in proportion to their

respective shares under the Stipulated Asset Allocation as indicated in the table in paragraph 11

---

[15] See http://www.uscourts.gov/FormsAndFees/Fees/PostJudgmentInterestRates.aspx and
http://www.federalreserve.gov/releases/h15/20070806/ (last visited Oct. 22, 2014).

above.[16]  Accordingly, the Court should authorize and direct the Plan Trustee to allocate excess

cash from the AHM Ventures and Great Oak Estates among the other Estates on this basis.

      45.    <u>Non-Debtor Subsidiary Claims</u>.  As noted above, there are a number of

legal and practical difficulties with making distributions on Non-Debtor Subsidiary Claims at

this time.  First, the Plan Trustee has been unable to validate all of the Non-Debtor Subsidiary

Claims based on the Debtors' books and records, and, as a result, may seek leave of the Court to

amend the schedules at a later date.  Second, American Home Securities, LLC and Melville

Reinsurance Corp. have been dissolved in accordance with Delaware and Vermont state law,

respectively; thus, any distribution to those Non-Debtor Subsidiaries would presumably go

unclaimed and revert to the Plan Trust in accordance with the Plan.  Third, given that the other

Non-Debtor Subsidiaries are wholly owned by the Plan Trust, it is possible that distributions on

their Non-Debtor Subsidiary Claims would simply be returned to the Plan Trust as equity

distributions.  For these reasons, the Plan Trustee proposes to treat the Non-Debtor Subsidiary

Claims as "Disputed Claims" under the Plan for purposes of the Initial GUC Distribution, and to

---

[16]  Because AHM Ventures and Great Oak were wholly-owned subsidiaries of AHM
Holdings and AHM Corp., respectively, a possible alternative would be to allocate excess cash
from the AHM Ventures and Great Oak Estates to the AHM Holdings and AHM Corp. Estates,
respectively, as akin to an equity distribution.  However, the Plan Trustee submits that this would
be inconsistent with Article 9(K) of the Plan, which provided for the cancellation of all existing
equity in each of the Debtors and for the Plan Trustee to be deemed the sole stockholder of each
of the Debtors.

reserve any distributions that would otherwise have been made on account of such claims pending further order of the Court.[17]

46.  <u>Reserving for the BofA Syndicate Unsecured Claim</u>.  Under the BofA Global Settlement Stipulation, the BofA Syndicate Unsecured Claim is capped at a maximum amount of $50,000,000, subject to downward adjustment in certain circumstances depending on the actual application of proceeds of collateral to the secured debt.  As noted above, the Plan Trustee has not yet obtained sufficient information from BofA as Administrative Agent to determine the proper Allowed amount of the BofA Syndicate Unsecured Claim.  While the Plan Trustee is hopeful he will obtain this information prior to the hearing on this Motion, which would obviate this particular request for relief, he is also reluctant to hold up interim distributions to other creditors while the proper amount of the BofA Syndicate Unsecured Claim is determined.  Accordingly, the Plan Trustee proposes to treat the BofA Syndicate Unsecured Claim as a "Disputed Claim" under the Plan for purposes of the Initial GUC Distribution.[18]

### III.    Missing W-9 Distributions

47.    As noted above, the Plan Trustee is required to file returns for the Plan Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a) (Plan Tr. Agmt. § 3.7), which requires the Plan Trustee to have taxpayer identification numbers for the

---

[17]  The deadline to object to claims under the Plan has been extended by the Court to March 23, 2015 [D.I. 11029], subject to the Plan Trustee's right to seek further extensions.  If the Plan Trustee is unable to reconcile the Non-Debtor Subsidiary Claims with the Debtors' books and records he may seek to object to those Claims (or, in the alternative, to amend the Debtors' schedules).  Accordingly, even if the Non-Debtor Subsidiary Claims are not "Disputed" under the Plan, strictly speaking, *treating* them as such is consistent with the spirit of the Plan. (*See* Plan Art. 1(A) (defining "Disputed" to encompass filed Claims during the period where they remain subject to challenge)).

[18]  Although the BofA Syndicate Unsecured Claim was allowed by Court order, it was allowed in an amount to be determined; thus, the Plan Trustee submits that it can be treated as a "Disputed Claim" under the Plan, as the amount remains subject to dispute.

beneficiaries of the Plan Trust. *See* 26 U.S.C. § 6034A(a)(1) & Treas. Reg. § 1.671-4(a)

(requiring trustee to file a separate statement with the trust's tax return for each beneficiary

receiving a distribution in a tax year). Failure to comply with IRS reporting requirements could

lead to penalties that would be payable from the corpus of the Plan Trust to the detriment of

general unsecured creditors. Accordingly, the Plan Trustee submits it is in the interest of the

Plan Trust and its beneficiaries to treat any Claims on account of which the Plan Trustee has not

receive an IRS W-9 as "Disputed Claims" under the Plan for purposes of the Initial GUC

Distribution, and to reserve the Missing W-9 Distributions pending receipt of Forms W-9 from

the Holders of such Claims.

## IV.    Enforcement of the Fee Order

48.    As noted above, the Fee Order conditioned the Plan Trust's obligation to

pay the foreclosure professionals upon their provision of a loan-level Accounting, by AHM loan

number or property address. (Fee Ord. at 2). The purpose of the Accounting was to determine

how much of the amounts approved as part of the final fee application process remained

outstanding, given that certain amounts had previously been paid by the Debtors and/or the

purchaser of the Debtors' servicing business.

49.    The Fee Order was entered more than three years ago, but the White Firm

has yet to provide a sufficient Accounting, despite several requests by the Plan Trust. Given the

White Firm's non-compliance with the Fee Order, the Plan Trustee submits that its claim for

professionals' fees should be disallowed if a meaningful Accounting is not provided in response

to this Motion. Such relief is permitted in light of the Court's inherent power to enforce its own

orders, and its general equitable powers under section 105(a) of the Bankruptcy Code. Such

relief will also facilitate distributions by obviating the Plan Trustee's continued maintenance of a reserve on account of the White Firm's claim.

## NOTICE

50.    Notice of the Motion has been provided to (i) the United States Trustee for the District of Delaware, (ii) the Plan Oversight Committee, (iii) the Indenture Trustees, (iv) Bank of America, N.A., (iv) Sovereign Bank FSB, (v) JPMC, (vi) claimants to whom Undeliverable Distributions and Uncashed Distributions were directed (at their last known addresses), (vii) the White Firm, (viii) Zurich American Insurance, (ix) the Manager of AHM SPV I, LLC and AHM SPV III, LLC; and (x) those parties requesting notice pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested herein and the terms of the Plan, the Plan Trustee submits that no other or further notice is necessary.

## **CONCLUSION**

WHEREFORE, the Plan Trustee respectfully requests entry of an order substantially in the form of the Proposed Order, (i) authorizing the Plan Trustee to make the Initial GUC Distribution, (ii) granting related relief set forth in paragraph 33 above, and (iii) granting the Plan Trustee such other and further relief as this Court deems just and proper.

Dated:    Wilmington, Delaware
          November 24, 2014

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Patrick A. Jackson*

Sean M. Beach (No. 4070)
Margaret Whiteman Greecher (No. 4652)
Patrick A. Jackson (No. 4976)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Telephone: (302) 571-6600
Facsimile: (302) 571-1253

-and-

HAHN & HESSEN LLP
Mark S. Indelicato
Edward L. Schnitzer
488 Madison Avenue
New York, New York  10022
Telephone:  (212) 478-7200
Facsimile: (212) 478-7400

*Counsel for the Plan Trustee*