**ANDREAS NOTTEBOHM**
**TESS NOTTEBOHM**
90 Sidney Court
San Rafael, CA 94903
Telephone: (415) 479-1448
Email: tessnottebohm@comcast.net

Plaintiffs in Pro Per

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| )<br>In re: )<br>AMERICAN HOME MORTGAGE HOLDINGS, INC., )<br>a Delaware corporation, et al., )<br>    Debtors )<br>                       )<br>ANDREAS NOTTEBOHM and TESS NOTTEBOHM, )<br>    Plaintiffs )<br>)<br>)<br>)<br>)<br>)<br>Vs. )<br>AMERICAN HOME MORTGAGE HOLDINGS, INC., )<br>a Delaware corporation, et al., )<br>    Defendants )<br>)<br> | Chapter 11<br>Case No. 07-11047<br><br><br><br><br>**ADVERSARY<br>COMPLAINT FOR<br>INJUNCTIVE RELIEF<br>DECLARATORY RELIEF<br>DAMAGES, AND FOR<br>SUCH OTHER RELIEF<br>AS IS APPROPRIATE** |

Plaintiffs, ANDREAS NOTTEBOHM and TESS NOTTEBOHM, respectfully represent and complain as follows:

## PRELIMINARY ALLEGATIONS

1.    This Court has jurisdiction over this matter and proceedings pursuant to 28 U.S.C. §§ 157(a), (b)(2)(I) (core proceeding), 1334(b) and 11 U.S.C. § 523(a).

 **ORIGINAL**

2.      Pursuant to Bankruptcy Rule 7008, Plaintiffs, ANDREAS NOTTEBOHM and TESS NOTTEBOHM (hereinafter "Plaintiffs" or "Plaintiffs/Debtors") declare that this action is a core proceeding brought under and pursuant to the authority contained in 28 U.S.C. §§ 157(B)(2)(I) and (J), and further, requests the above-entitled Court to make a final order or judgment in the proceeding.

3.      Venue is properly laid in the United States Bankruptcy Court for the District of Delaware by the authority contained in 28 U.S.C. §§ 1408 and 1409(a).

4.      Plaintiffs, ANDREAS NOTTEBOHM and TESS NOTTEBOHM are natural persons, and were, until approximately June 29, 2012, the fee owners of that certain real property situate in the City of San Rafael, County of Marin, State of California, and commonly known as 90 Sidney Court (hereinafter the "Subject Property").

5.      Defendant, HOMEWARD RESIDENTIAL, INC., a California Corporation, formerly known as AMERICAN HOME MORTGAGE SERVICING, INC.(hereinafter "HOMEWARD RESIDENTIAL"), is a full-service mortgage banking enterprise, providing a wide array of lending, servicing and ancillary real estate solutions including correspondent and warehouse lending; subservicing and special servicing; as well as REO and asset management services.

6.      Plaintiffs are informed and believe, and thereon allege that at all relevant times AMERICAN BROKERS CONDUIT (hereinafter "ABC") is a New York corporation and a subsidiary of Defendant AMERICAN HOME MORTGAGE HOLDINGS, INC., a Delaware corporation, and or their Successors in Interest, and makes and/or arranges for loans, secured by real property, and did so for Plaintiffs herein.  Because of the unity of interest between Defendants AMERICAN HOME MORTGAGE HOLDINGS, INC.,  HOMEWARD RESIDENTIAL, INC., AMERICAN HOME MORTGAGE SERVICING, INC., and AMERICAN BROKERS CONDUIT, they will be collectively referred to as "AMERICAN HOME MORTGAGE."  Any reference to one shall include the other entities herein referenced.

7.      Plaintiffs are informed and believe, and thereon allege, that defendant American Home Mortgage Servicing, Inc. (AHMSI) is an affiliate of AHMSI TRUST and is a corporation, mortgage broker, lender, debt collector and mortgage servicing company whose principal place of business is conducted as American Home Mortgage Servicing Inc., 4600 Regent Blvd, Suite 200, Irving, Texas 75063-1730. Defendant AHMSI conducts business in Arizona, currently

services Plaintiff NOTTEBOHMS loan and originated the loan as a wholesale broker in concert with defendant American Brokers Conduit, Inc.

8.      DEUTSCHE NATIONAL TRUST COMPANY AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2007-2 MORTGAGE BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-2 (hereinafter "DEUTSCHE BANK") is a business entity of unknown organization, and upon information and belief is a wholly owned entity of DEUTSCHE BANK SECURITIES INC., a Delaware Corporation, and is, upon information and belief, the Successor in interest to AMERICAN HOME MORTGAGE and/or AMERICAN HOME MORTGAGE SERVICING, INC., and as such is bound by the contracts and agreements which they made.  Furthermore, DEUTSCHE NATIONAL TRUST COMPANY TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2007-2 MORTGAGE BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-2 (hereinafter "DEUTSCHE BANK") is, upon information and belief, the trustee for the collateralized debt obligation trust which may be the owner of the beneficial interest under the Deed of Trust. DEUTSCHE MORTGAGE SECURITIES, INC., is, upon information and belief, a New York Corporation, which is affiliated with DEUTSCHE NATIONAL TRUST COMPANY AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2007-2 MORTGAGE BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-2 to the extent that they are inseparable and constitute one entity for all purposes hereunder, and shall hereinafter be collectively referred to as "DEUTSCHE BANK."

9.      Defendant, AMERICAN HOME MORTGAGE INVESTMENT CORP. ("AHMI"), a Maryland Corporation, was structured as a real estate investment trust (REIT) that was focused on earning net interest income from self-originated loans and mortgage-backed securities, and through its taxable subsidiaries, from originating and servicing mortgage loans for institutional investors.  Mortgages were originated through the company's employees as well as through mortgage brokers and purchased from correspondent lenders and were serviced at the company's servicing center in Irving, Texas.

10.      Founded in 1987 in New York City, Defendant, AMERICAN HOME MORTGAGE INVESTMENT CORP., became a publicly traded on NASDAQ in September 1999. The company moved its corporate headquarters to Melville, NY in 2000. Since its beginning as American Home Mortgage Holdings, Inc., it was engaged only in the origination

and servicing of mortgages. Following its acquisition of Apex Mortgage Capital in December 2003, the Company became a REIT and changed its name to American Home Mortgage Investment Corp., the new parent company of American Home Mortgage Servicing, Inc., American Brokers Conduit and Homeward Residential, Inc., and moved from NASDAQ to NYSE.  Defendant, AMERICAN HOME MORTGAGE INVESTMENT CORP., has made numerous acquisitions since 1999 including Marina Mortgage of Irvine, CA, First Home Mortgage of Mt Prospect, IL, Columbia National of Columbia, MD, and retail branches from Principal Residential Mortgage, Waterfield Financial, Irwin Mortgage, and 86 Washington Mutual offices.  In December 2003, the company moved its listing from NASDAQ to NYSE, under the new ticker symbol, AHM.

11.    Plaintiffs are informed and believe, and thereon allege that at all relevant times AMERICAN BROKERS CONDUIT (hereinafter "ABC") was a wholly owned and operated subsidiary of Defendant, AMERICAN HOME MORTGAGE INVESTMENT CORP., and at all times relevant hereto, made and arranged for loans, secured by real property, and did so for Plaintiffs herein.

12.    Plaintiffs are informed and believe, and thereon allege that at all relevant times HOMEWARD RESIDENTIAL, INC., (hereinafter "HOMEWARD") was a wholly owned and operated subsidiary of Defendant, AMERICAN HOME MORTGAGE INVESTMENT CORP., and at all times relevant hereto, made and arranged for loans, secured by real property, and did so for Plaintiffs herein.

13.    Because of the unity of interest between HOMEWARD RESIDENTIAL, INC., AMERICAN HOME MORTGAGE SERVICING, INC., and AMERICAN BROKERS CONDUIT, and their parent company, Defendant, AMERICAN HOME MORTGAGE INVESTMENT CORP., they will be collectively referred to as "AHMI."  Any reference to one shall include the other entities herein referenced, and the action of any one of these named entities shall be deemed to have been approved, authorized and ratified by Defendant, AMERICAN HOME MORTGAGE INVESTMENT CORP., and the actions of any one of these named entities, i.e., HOMEWARD RESIDENTIAL, INC., AMERICAN HOME MORTGAGE SERVICING, INC., and AMERICAN BROKERS CONDUIT, are deemed to have been approved, authorized, and ratified by Defendant, AMERICAN HOME MORTGAGE INVESTMENT CORP.

14.    AMERICAN HOME MORTGAGE HOLDINGS, INC., on behalf of itself and its various wholly owned subsidiaries, including, AMERICAN HOME MORTGAGE INVESTMENT CORP AMERICAN BROKERS CONDUIT HOMEWARD RESIDENTIAL, INC., and AMERICAN HOME MORTGAGE SERVICING, INC., on August 6, 2007, filed for Chapter 11 bankruptcy protection in Wilmington Delaware federal court, on August 6, 2007, being Case No. 07-11047.

15.    DEUTSCHE BANK AMERICAS HOLDING CORP., operates as a bank holding company through its subsidiaries offers personal and commercial banking services. Deutsche Bank Americas Holding Corp. was formerly known as Deutsche Bank North America Holding.

16.    DEUTSCHE NATIONAL TRUST COMPANY AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2007-2 MORTGAGE BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-2, is, upon information and belief, a wholly owned subsidiary of Defendant DEUTSCHE BANK AMERICAS HOLDING CORP.

17.    DEUTSCHE NATIONAL TRUST COMPANY AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2007-2 MORTGAGE BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-2, is, upon information and belief, the trustee for the collateralized debt obligation trust which may be the owner of the beneficial interest under the Deed of Trust.

18.    DEUTSCHE MORTGAGE SECURITIES, INC., like DEUTSCHE NATIONAL TRUST COMPANY AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2007-2 MORTGAGE BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-2, is upon information and belief, a wholly owned subsidiary of Defendant DEUTSCHE BANK AMERICAS HOLDING CORP. to the extent that they are inseparable and constitute one entity for all purposes hereunder, and shall hereinafter be collectively referred to as "DEUTSCHE BANK."

19.    WELLS FARGO BANK, NATIONAL ASSOCIATION (hereinafter "WELLS FARGO"), provides personal and commercial banking services, as well as loan products.  In the midst of the worst foreclosure crisis in history, the U.S. Department of the Treasury launched the Affordable Modification Program (HAMP) in 2009 to help millions of distressed homeowners avoid foreclosure. In addition to the nearly the $25 billion 'TARP' money which the Department of the Treasury provided to Defendant WELLS the Treasury Department provided economic

incentives to Wells Fargo and other banks to encourage them to provide reasonable mortgage modification options to millions of homeowners.  Defendant WELLS FARGO took this money and refused and continues to refuse to assist homeowners such as Plaintiffs herein, and thus has committed a fraud on the general public.

20.     OCWEN MORTGAGE SERVICING, INC. is a wholly owned and operated subsidiary of Defendant OCWEN FINANCIAL CORPORATION, which functions as a mortgage servicing company and did so for all defendants herein.

21.     OCWEN FINANCIAL CORPORATION("OCWEN"), and private equity firm WL Ross & Co. LLC., entered into an agreement in or about 2008, whereby Defendant OCWEN FINANCIAL CORPORATION acquired Homeward Residential Holdings, Inc., including its various residential mortgage loan servicing and origination operating subsidiaries, for approximately $588 million in cash and $162 million in Ocwen convertible preferred stock.

22.     WELLS FARGO BANK, NATIONAL ASSOCIATION (hereinafter "WELLS FARGO"), provides personal and commercial banking services, as well as loan products.  In the midst of the worst foreclosure crisis in history, the U.S. Department of the Treasury launched the Affordable Modification Program (HAMP) in 2009 to help millions of distressed homeowners avoid foreclosure. In addition to the nearly the $25 billion 'TARP' money which the Department of the Treasury provided to Defendant WELLS the Treasury Department provided economic incentives to Wells Fargo and other banks to encourage them to provide reasonable mortgage modification options to millions of homeowners.  Defendant WELLS FARGO took this money and refused and continues to refuse to assist homeowners such as Plaintiffs herein, and thus has committed a fraud on the general public.

23.     Defendant OCWEN FINANCIAL CORPORATION("OCWEN"), and private equity firm WL Ross & Co. LLC., entered into an agreement in or about 2008, whereby Defendant OCWEN FINANCIAL CORPORATION acquired Homeward Residential Holdings, Inc., including its various residential mortgage loan servicing and origination operating subsidiaries, for approximately $588 million in cash and $162 million in Ocwen convertible preferred stock.

24.     Plaintiffs are informed and believe, and thereon allege that at all relevant times MERSCORP, INC. dba MORTGAGE ELECTRONIC REGISTRATION SYSTEM is a wholly owned subsidiary of MERSCORP HOLDINGS, INC. (hereinafter collectively "MERS").

25.    MERSCORP HOLDINGS, INC. ("MERS") is an electronic registry and clearinghouse established to track ownership or changes thereof, servicing rights in mortgages, corporate names and mergers. Due to the inherent cost of public registry associated with numerous and multiple transfers of loan pools and their change of ownership interest in the secondary mortgage market, MERS eliminates this expense contrary to public policy and state regulatory conveyance devices established in conventional lending practices. This entity is an assignee by virtue of its disclosed status as a "Nominee for Lender, its Successors or Assigns," and is needed for just adjudication.

26.    It is the Plaintiffs' understanding that any work out of the current situation involving the foreclosure on the Subject Property necessitates the active participation of OCWEN. Furthermore, OCWEN has aided and abated Defendants, and each of them, in perpetrating fraudulent schemes to unfairly deny modifications for homeowners such as Plaintiffs TESS NOTTEBOHM and ANDREAS NOTTEBOHM. More specifically, during the attempts by the Plaintiffs to obtain a modification, the Defendants, and each of them, intentionally failed to disclose the status of OCWEN with respect to the transaction. Believing that it was Defendant DEUTSCHE BANK who had authority to negotiate a modification, the Plaintiffs attempted to negotiate with the attorneys for DEUTSCHE BANK, in good faith, while the Defendants, and each of them were fully aware of the futility of this endeavor, but continued this ruse to jeopardize the Plaintiffs and to obtain title to the Subject Property through fraud and deceit.

27.    On or about December 11, 2006, Plaintiffs closed their loan with Defendant ABC, evidenced by a Promissory Note and Deed of Trust. The Deed of Trust identified Defendant ABC as the "beneficiary," and MORTGAGE ELECTRONIC REGISTRATION SYSTEM, INC. ("MERS") AS THE NOMINEES OF Defendant ABC.

28.    In early 2007, Defendant HOMEWARD, along with all its affiliate entities, including Defendant ABC and Defendant AMERICAN HOME MORTGAGE SERVICING, INC., filed for protection under the Bankruptcy Code in the U.S. Bankruptcy Court for the District of Delaware pursuant to Chapter 11. That matter is still pending.

29.     On or about January 28, 2010, an Assignment of Deed of Trust was recorded with the Marin County Recorder by MERS assigning the Deed of Trust to Defendant AMERICAN HOME MORTGAGE SERVICING, INC., which was still under the protection of the Bankruptcy Court since early 2007; however, OCWEN FINANCIAL CORPORATION("OCWEN"), and private equity firm WL Ross & Co. LLC., entered into an agreement in or about 2008, whereby OCWEN FINANCIAL CORPORATION acquired Homeward Residential Holdings, Inc., including its various residential mortgage loan servicing and origination operating subsidiaries, for approximately $588 million in cash and $162 million in Ocwen convertible preferred stock. Hence the Defendant DEUTSCHE BANK never held interest in the Deed of Trust and was without authority to conduct a foreclosure sale.

30.     On or about June 29, 2012, DEUTSCHE BANK, acquired title to the Subject Property at a foreclosure sale.

31.     The said acquisition by DEUTSCHE BANK, was contrary to law, *ultra vires*, and therefore void and voidable by Plaintiffs NOTTEBOHM.

32.     As a result of the illegal foreclosure by Defendants DEUTSCHE BANK and their agents, employees, and duly authorized representatives, the NOTTEBOHMS are entitled to have this Court declare the foreclosure sale void and to order title be invested in the NOTTEBOHMS as of June 29, 2012.

33.     Plaintiffs are informed, believe, and allege, that DOES 1 through 20, inclusive, are securitized trusts, equity funds, collateralized debt obligations (CDO), CDO underwriters, CDO trustees, hedge funds or other entities that acted as additional lenders, loan originators and are assignees to the Loan. Plaintiffs will seek leave of Court to replace the fictitious names of these entities with their true names when Plaintiffs discover their names.

34.     AHMSI HOMEWARD RESIDENTIAL, and MERS, collectively conspired to intentionally mishandle large amounts of foreclosures moving through the court system, including that of Plaintiffs herein. Allegations included foreclosures being processed with missing or questionable paperwork (including paperwork showing proper chain of title on the part of the investment bank), falsifying dates and other information in foreclosure documents and

"robo-signing," the practice of paying under-qualified personnel to sign hundreds or thousands of foreclosure documents a day, often without properly reviewing the documents.

35.     DEUTSCHE BANK did not have clear title when it commenced foreclosure proceedings against Plaintiffs herein.

36.     The lack of clarity in chain of Plaintiffs' title  is resultant from the lenders' decision to rely on a third entity--often, Mortgage Electronic Registration Systems (MERS)--to hold title nominally, in an effort to enable the buying and selling of mortgage liabilities without registration of changes of ownership with local governments. This practice has drawn wide criticism by several of the states who have objected and even sued over this practice.

37.     As mortgage-backed securities grew in volume during the 1980s, it became self-evident that a mechanism was needed for the mortgages placed into those securities. The underlying problem is that a mortgage loan transferred into an MBS (Mortgage-Backed Security) must become "bankruptcy remote" from the originating lender. That is, in the event the originating lender collapsed (as ultimately happened in the 2007 financial crisis to many such lenders), MBS investors demanded some kind of protection to ensure that the lender's own creditors could not "avoid" (in bankruptcy terms, rollback) the transfer of the loans into the MBS as fraudulent conveyances and suck them back into the lender's bankruptcy estate. The easiest way to create such protection is to simply convey the loan for consideration through three or four entities before it reaches the MBS. As noted above, each of those conveyances had to be recorded with the relevant recorder or land registry. With each loan requiring three or four assignments, and hundreds of mortgage loans going into each MBS, the result was that recorders were flooded with assignments, and investment banks found themselves choking on paperwork and recorders' fees. MERS fixed this problem in that most standard loan documents were changed to name MERS as the nominal beneficiary or mortgagee of record. This enabled lenders and investors to transfer mortgages without recording assignments in local recorders' offices and in turn avoided having to pay recording fees.

38.     Ideally, assuming a loan is properly paid back on time, a MERS loan needs only two documents to be recorded: the original mortgage or deed of trust naming MERS, and a reconveyance of the mortgage or deed of trust back to the borrower (thus merging legal and equitable title). If all entities along the way are MERS members, then all intermediate transfers between those points are tracked only on MERS, and the entity that holds the loan at the end merely records the reconveyance as an agent for MERS. (Notice how MERS is *both* an agent for the original lender and then the final lender acts as an agent for MERS; this is why MERS' critics frequently attack it as "two-faced.") If the borrower defaults, the loan servicer will record an assignment on behalf of MERS to the real party in interest (i.e., an investment bank in its capacity as trustee for a MBS) and initiate foreclosure. Whereas before MERS that last assignment would always have been recorded at the time the MBS was created, MERS enabled banks to avoid having to record it unless and until (1) foreclosure became necessary or (2) the loan was sold by the MBS trustee to an entity outside of the MERS System. If the loan performs to the very end, the assignment never needs to be recorded.

39.     MERS primary function is to act as a document custodian.  Major players in the mortgage lending industry created MERS to simplify the process of transferring mortgages by avoiding the need to re-record liens and more importantly, to avoid paying recording fees for each assignment.

40.     MERS at all times relevant hereto was the trustee for Defendant AMERICAN BROKERS CONDUIT under Deed of Trust.

41.     Defendants, and each of them, upon information and belief, obtained title to the Subject Property from MERS without valid consideration. No Defendant herein at any time relevant hereto was the owner of the Deed of Trust and the Promissory note, and thus, did not have the right to act against the right, title and interest of the Plaintiff herein.  As such, said defendants foreclosure was *ultra vires* and void and voidable.

42.     Plaintiffs are informed and believe, and thereon allege that the original lender, Defendant ABC, would enter the loan in the MERS system, and thereafter sell the loan to their "warehouse lender."

43.     Plaintiffs are informed and believe, and thereon allege that at all relevant times OCWEN obtained title to the Subject Property from Defendant HOMEWARD RESIDENTIAL and MERS without valid consideration. Neither Defendant HOMEWARD RESIDENTIAL nor MERS, at any time relevant hereto was the owner of the Deed of Trust and the Promissory note, and thus, did not have the right to act against the right, title and interest of the Plaintiffs herein. As such, said defendants foreclosure was *ultra vires* and void and voidable.

44.     DEUTSCHE BANK filed an unlawful action against Plaintiffs herein, ANDREAS NOTTEBOHM, TESS NOTTEBOHM, in Marin County (California) Superior Court Action No. CIV 1203560, entitled *DEUTSCHE BANK NATIONAL TRUST COMPANY AS TRUSTEE FOR AMERICAN HOME MORTGAGE ASSETS TRUST 2007-2 MORTGAGE BACKED PASS-THROUGH CERTIFICATES, SERIES 2007-2 v. ANDREAS NOTTEBOHM and TESS NOTTEBOHM, and DOES 1-100, inclusive*, (hereinafter the "UD Action") in order to obtain possession of the Subject Property.

45.     At the time that DEUTSCHE BANK commenced the *UD Action* it did not have valid title, but was acting in concert with defendants herein to illegally and wrongfully deprive Plaintiff herein of title.

46.     DEUTSCHE BANK  acquired the Subject Property at foreclosure sale; however because of the defects inherent in the MERS transfers, the status of Defendant DEUTSCHE BANK  can be no greater than that of its predecessor in interest.

47.     MERS is named in the DOT as a beneficiary, solely as the "nominee" of Defendant HOMEWARD RESIDENTIAL, holding only legal title to the interests granted Defendant HOMEWARD RESIDENTIAL under the DOT.

48.     Such language confers no economic benefit on Defendant MERS.

49.     Because MERS has no financial interest in the Note, it will suffer no injury if the Note is not paid and will realize no benefit if the DOT is foreclosed.  Thus, Defendant MERS cannot satisfy the requirements of constitutional standing.

50.     DEUTSCHE BANK   and MERS "stand in the shoes" of the assignor (MERS) taking only those rights and remedies the assignor would have has.

51.     Defendants, and each of them, upon information and belief, obtained title to the Subject Property from MERS without valid consideration. No Defendant herein at any time relevant hereto was the owner of the Deed of Trust and the Promissory note, and thus, did not have the right to act against the right, title and interest of the Plaintiffs herein.  As such, said defendants foreclosure was *ultra vires* and void and voidable.

52.     At all times herein mentioned, each of the said defendants participated in the doing of acts hereinafter alleged to have been done by the named defendants and furthermore, the defendants and each of them, were the agents, servants, and employees of each of the other defendants as well as the agents of all defendants and at all times herein mentioned were acting within the course and scope of said agency and employment.

53.     At all times mentioned herein, the acts and omissions of the various defendants, and each of them, concurred and contributed to the various acts and omissions of the other defendants in proximately causing the injuries and damages as herein alleged.

54.     At all times herein alleged, Plaintiffs, in their dealings with Defendants and each of them, acted under legal right or in a good faith belief in the existence of a legal right.

55.     At all times herein alleged Plaintiffs acted in good faith and with clean hands in engaging in the acts, conduct or courses of action herein alleged.  Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the facts herein alleged.  By virtue of Defendants' concealment and misrepresentations to Plaintiffs, Plaintiffs could not and did not discover Defendants' actions.

56.     Plaintiffs' conduct at all times relevant hereto was entirely proper, diligent and in good faith.

57.     Defendants, and each of them, are individually sued as participants and aiders and abettors in the wrongful activities complained of herein, and the liability of each arises from the fact that each has engaged in all or part of the improper acts, plans, schemes or transactions, which operated a fraud against the Plaintiff who are informed and believe and thereon allege that at all times relevant hereto, the defendants, and each of them, had actual knowledge of the acts and conduct complained of herein and participated in the furtherance of the fraudulent acts as

more fully set forth.  Defendants, and each of them, have participated as members of the conspiracy or acted in furtherance of it, or aided or assisted in carrying out the fraudulent purposes alleged in this Complaint.

58.     On or about November 5, 2009, a Notice of Default was filed with the County Recorder in Marin County, California.

59.     On or about January 28, 2010, an Assignment of Deed of Trust was recorded in Marin County, California, by MERS, fraudulently back dated to October 26, 2009, allegedly transferring the beneficial interest in the Plaintiffs' DOT to Defendant AHMS.

60.     On or about March, 2012, a *Notice of Trustee's Sale* was filed with the Marin County Recorder.  The Trustee's Sale was held and the Subject Property was purchased by DEUTSCHE BANK.

61.     At all times mentioned herein, the acts and omissions of the various Defendants, and each of them, concurred and contributed to the various acts and omissions of the other defendants in proximately causing the injuries and damages as herein alleged.

62.     At all times herein alleged, Plaintiffs, in their dealings with her dealings with Defendants, and each of them, acted under legal right or in a good faith belief in the existence of a legal right.

63.     At all times herein alleged Plaintiffs acted in good faith and with clean hands in engaging in the acts, conduct or courses of action herein alleged.

62.     Plaintiffs' conduct at all times relevant hereto was entirely proper, diligent and in good faith.

65.     Plaintiffs' communications with Defendants, and each of them, demonstrated a pattern of conduct, course and dealing by Defendants which repeated itself with disturbing regularity:  Plaintiffs were unable to establish continuity with one individual who was knowledgeable about the Plaintiffs' application, and had some authority to actually assist the Plaintiffs by providing useful information.  While they were able to make telephonic contact with Defendant AMERICAN HOME MORTGAGE INVESTMENT CORPORATION, calls would be regularly and randomly transferred to other persons within Defendant's organization.  Often during the process of transferring calls, information would be lost thereby requiring the Plaintiffs to continually start anew; documentation would be requested, and then claimed by Defendant AMERICAN HOME MORTGAGE INVESTMENT CORPORATION to have been

lost, misplaced or never sent. In response, Plaintiffs would once again re-transmit the requested information, only to be required to start the process from the beginning, yet another time. Additionally, Plaintiffs' believe, that they were being provided erroneous information by representatives of Defendant AMERICAN HOME MORTGAGE INVESTMENT CORPORATION. The clear inference from the pattern and course of conduct in which Defendants, and each of them, engaged, was solely intended to result in the denial of any application for modification by Plaintiffs and for Defendants to wrongfully obtain title to the detriment of the Plaintiff.

66.     One of the most significant obstacles imposed by the Defendants, and each of them, was their refusal to respond to written requests by the Plaintiffs for information which the Defendants, and each of them, were required under law to provide. One desired result by this intentional and willful refusal of Defendants, and each of them to make required disclosures, was that the Plaintiffs would be unable to address the basis on which a refusal for modification was made.

67.     By their actions, as aforesaid, Defendant AMERICAN HOME MORTGAGE INVESTMENT CORPORATION and OCWEN on behalf of themselves and on behalf of all other Defendants herein who they represent, demonstrated a pattern of practice which was solely designed to frustrate applicants, such as Plaintiffs herein, and provide manufactured grounds to arbitrarily and capriciously deny loan modification applications.

68.     Plaintiffs, on numerous occasions, sought to obtain from Defendant AMERICAN HOME MORTGAGE INVESTMENT CORPORATION and OCWEN the protocols and formula under which evaluated applications for modifications. Defendant refused to provide the Plaintiffs with any guidelines which they utilized, despite repeated efforts by the Plaintiff to obtain same.

69.     The actions of the Defendant AMERICAN HOME MORTGAGE INVESTMENT CORPORATION, and OCWEN as aforesaid, demonstrate a course of conduct by Defendant, on behalf of themselves and on behalf of all other Defendants herein who they represent to frustrate any and all attempts by these Plaintiffs to seek modification.

70.     California has been one of the states hit hardest by the foreclosure crisis. California had the highest number of foreclosures in the United States for 2009. RealtyTrac reports that the number of total California properties with foreclosure filings in 2009was

632,573.  This represents a nearly 21% increase over 2008 and a 153% increase from 2007.  In the first quarter of 2010, California posted the nation' fourth highest foreclosure rate; during that period, California accounted for 25% of the nation's total foreclosure activity.  With this in mind, the Congress of the United States has passed historic legislation as evidenced by the Emergency Economic Stabilization Act of 2008 (hereinafter "The Act").  As envisioned, this legislation the legislation will take steps to ensure that troubled homeowners receive help in addition to troubled financial institutions.  The Act will require the Secretary of the Treasury to provide assistance to homeowners when acquiring mortgages and mortgage backed securities.  In particular the legislation will attempt to achieve the following:  (1) encouraging the servicers of the underlying mortgages to take advantage of the Hope for Homeowners Program or other available programs to minimize foreclosures; (2) coordinating with other federal agencies that hold mortgages to identify opportunities to acquire particular mortgage –backed securities that may "unlock" the loan modifications for underlying mortgagors; (3) where permissible to permit bona fide tenants who are current on their rent to remain in their homes under the terms of the lease; and (4) require the Secretary of the Treasury to request that loan servicers servicing the mortgage loans to avoid preventable foreclosures, to the greatest extent possible.  Upon any request arising under existing investment contracts, the Secretary of the Treasury shall consent, where appropriate, to reasonable requests for loss mitigation measures, including term extensions, rate reductions, principal write downs, increases in proportion of loans within a trust or other structure allowed to be modified, or removal of other limitation on modifications.

  71. Plaintiffs fully understand and acknowledge that it not mandatory that lenders and their servicing agents, such as Defendants herein, modify each and every loan, but do assert that the good faith requirement of fundamental fairness is applicable and that in the present situation, Defendants, and each of them, demonstrated their refusal to apply good faith standards when evaluating the Plaintiffs' application for modification.  That such actions by Defendants, and each of them, as aforesaid, constitute sufficient grounds to seek setting aside the Trustee's Sale, restoring the title to the Subject Property to the Plaintiffs, and compelling Defendants, and each of them, to comply with the statutory requirement that it assist the Plaintiffs, in good faith, to avoid foreclosure.

  72. Plaintiffs are "consumers" as defined in the Federal Truth in Lending Act (15 U.S.C. §§ 1601 et seq.) and Regulation Z (12 C.F.R. 226.23).

73.     Plaintiffs are informed and believe, and thereon allege that all Defendants herein are considered "creditors" with regard to the secured loan that is the subject of this action, as defined in the Federal Truth in Lending Act (15 U.S.C. §§ 1601 et seq.) and Regulation Z (12 C.F.R. 226.23).

74.     When communicating and contacting the Plaintiffs, Defendants, and each of them, were the agents and principals of each other, acting within the scope and course of that agency, and did so for the benefit of each other.

75.     Defendants, and each of them, had knowledge of, agreed to, and intended a common objective or course of action that resulted in damages to Plaintiffs.

76.     Any applicable statutes of limitation have been tolled by Defendants' continuing, knowing and active concealment of the facts alleged herein.  By virtue of Defendants' concealment and misrepresentation to Plaintiffs, Plaintiffs could not and did discover Defendants' actions.

77.     In the alternative, Defendants should be estopped from relying on any statutes of limitations.  Defendants owed Plaintiffs an affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such duty.  Finally, Defendants' conduct is not barred by any statutes of limitation because Defendants' conduct constitutes an ongoing violation of Plaintiffs' rights, which continues to the present.

II.     **PLAINTIFFS' FIRST CAUSE OF ACTION AGAINST DEFENDANTS HOMEWARD RESIDENTIAL, INC.,  AMERICAN HOME MORTGAGE SERVICING, INC., AMERICAN BROKERS CONDUIT, AMERICAN HOME MORTGAGE INVESTMENT CORP., FOR DECLARATORY RELIEF**

78.     Plaintiffs incorporate herein by reference paragraphs 1 through 77, above, as though fully set forth herein.

79.     It is irrefutable that the Deed of Trust is transferred by assignment, as was the case in this matter.  More specifically, on or about January 28, 2010, an Assignment of Deed of Trust was recorded with the Marin County Recorder by MERS assigning the Deed of Trust to Defendant AMERICAN HOME MORTGAGE SERVICING, INC.

80.    Prior to the rise of credit default swaps and large scale securitization, a lender who purchased a loan typically received both the note and the Deed of Trust. This is no longer the practice because under the current practice, securitizing parties do not need or care about the Deed of Trust. Plaintiffs' contend that where the Deed of Trust does not follow the Note this is a nullity.

81.    The beneficiary of a secured transaction must be the obligee (usually the payee of the note) otherwise the Deed of Trust in its favor is meaningless. This means when MERS is named as the beneficiary, as is the case in the present matter, the Deed of Trust is meaningless, hence, there is no encumbrance, and more significantly, no authority to foreclose.

82.    This usually occurs relatively quickly when the note is transferred into the trust and the Deed of Trust stays with the originator. At that point the Deed of Trust becomes meaningless. This is proven the moment the servicer (or whoever) creates an assignment using MERS or the originator (either one not having any interest in the note or Deed of Trust, that is to say they are not the real beneficiaries.

83.    Under California law, the Substitution of Trustee is important because all the beneficiaries must sign the Substitution of Trustee, or fifty percent (50%) of the beneficiaries must sign the Substitution of Trustee in a securitized transaction.  Accordingly, in light of the fact that MERS signed the Substitution of Trustee, the consequence of this means the Substitution of Trustee is ineffective because the legislative intent was that the real beneficiaries would sign.

84. Defendant DEUTSCHE BANK, pursuant to UCC 3-104 (e) is not a
a holder in due course of the NOTTEBOHMS' promissory notes when they are pooled in securitization.

85.    Plaintiffs' contend that the Defendants herein cannot demonstrate that the beneficial interest under Plaintiffs' Deed of Trust was among the assets OCWEN acquired from Defendant HOMEWARD in the Bankruptcy Court in Delaware.

86.     Plaintiffs' assert that either Does 1-5 or OCWEN, securitized and sold Plaintiffs' Deed of Trust to Doe 15.  Subsequent to that event, DEUTSCHE BANK  no longer held the beneficial interest under the Deed of Trust, and Plaintiffs' would further assert that the result of this was that DEUTSCHE BANK , lost the power to foreclose since the power rests solely with the beneficiary.

87.     Plaintiffs' are informed and believe, and thereon allege, that their deed of trust was securitized to a specific mortgage backed security trust before OCWEN acquired any assets from Defendant HOMEWARD in 2008, and therefore, DEUTSCHE BANK  lacked the authority to foreclose.

88.     Plaintiffs further assert that they have standing to challenge an assignment of their note and deed of trust if the defect asserted would *void* the assignment, which they claim in accord with the holding contained in *Glaski v. Bank of America, N.A.* (2013) 218 Cal.App.4th 1079,and  *Reinagel v. Deutsche Bank National Trust Co.* (5th Cir. 2013) ___ F.3d ___ [2013 WL 3480207 at p. 3].

89.     The Plaintiffs, by the allegations herein asserted, have demonstrated that this action is a proper subject of declaratory relief, and that an actual controversy exists involving justiciable questions relating to the Plaintiffs and Defendants rights or obligations.

90.     A controversy currently exists between the parties.  Plaintiffs contend that the foreclosure was void and/or voidable, and that AMERICAN HOME MORTGAGE HOLDINGS, INC., was without authority to CONVEY THE Plaintiffs' Deed of Trust, and that the foreclosure, sale for the reason above stated was invalid, whereas the Defendants would contest this theory.

91.     In order for the resolution of this dispute, the Court must declare and determine the rights of the parties hereto.

**III.    PLAINTIFFS' SECOND CAUSE OF ACTION AGAINST DEFENDANT HOMEWARD RESIDENTIAL FOR NEGLIGENT MISREPRESENTATION**

92.     Plaintiffs incorporate herein by reference paragraphs 1 through 77, above, and paragraphs 79 through 91 of the First Cause of Action, inclusive, as though fully set forth herein.

93.     When the Plaintiffs first began to encounter financial hardships they approached the lender, Defendant ABC about the possibility of a loan modification.

94.     Plaintiffs submitted various documentation in response to requests from Defendant ABC.  They did so with the good faith and reasonable belief that Defendant ABC, as the original lender, was the legal entity entrusted with the ability to negotiate a modification.

95.     In or about 2007, Defendant HOMEWARD filed for Chapter 11 protection in the United States Bankruptcy Court for the District of Delaware.  Defendant ABC, as a wholly owned subsidiary of Defendant HOMEWARD, was made a part of the filing, as were all other HOMEWARD affiliates, including Defendants, HOMEWARD RESIDENTIAL, INC., a California Corporation, formerly known as AMERICAN HOME MORTGAGE SERVICING, INC., AMERICAN BROKERS CONDUIT, and AMERICAN HOME MORTGAGE INVESTMENT CORP., a Maryland Corporation.

96.     OCWEN FINANCIAL CORPORATION("OCWEN"), and private equity firm WL Ross & Co. LLC., entered into an agreement in or about 2008, whereby OCWEN FINANCIAL CORPORATION acquired Defendant HOMEWARD along with its various residential mortgage loan servicing and origination operating subsidiaries, including Defendant ABC, for approximately $588 million in cash and $162 million in Ocwen convertible preferred stock.

97.     At no time did HOMEWARD advise the Plaintiffs that the only entity with authorization to negotiate a loan modification was OCWEN, despite a duty to so disclose this fact which was known to them.

98.     The net effect of this willful and/or negligent misrepresentation caused the Plaintiffs to continue their negotiations with a party, i.e., DEUTSCHE BANK, who had no authority.  Had the Plaintiffs known the true state of affairs, i.e., that OCWEN, was the only entity authorized to negotiate a modification, they would not have misspent their time, efforts and funds on a fool's errand.  While the Defendants sent Plaintiffs on this pointless endeavor of negotiating with an entity without authority, Plaintiffs, had the truth been disclosed, could have directed their efforts to a productive resolution.

99.    Plaintiff TESS NOTTEBOHM, growing weary of the lack of meaningful response from any of the Defendants, directly contacted WELLS FARGO. To her great surprise, a senior Vice President at Wells Fargo responded, by correspondence dated September 30, 2013, advising that the only entity with authority over the Plaintiffs' loan was OCWEN. This was the very first time the Plaintiffs became aware of this situation.

100.    Defendant HOMEWARD, DEUTSCHE BANK and OCWEN, in acting as hereinbefore stated made a material misrepresentation to the Plaintiffs.

101.    Defendant HOMEWARD, DEUTSCHE BANK and OCWEN, in acting as hereinbefore stated did so with full knowledge of the falsity of the representation that DEUTSCHE BANK was authorized to assist the Plaintiffs, and did so with the intent to defraud.

102.    Defendant HOMEWARD, in acting as hereinbefore stated did so with full knowledge that the Plaintiffs, ANDREAS NOTTEBOHM and TESS NOTTEBOHM, would justifiably rely on the representation that DEUTSCHE BANK was authorized to assist the Plaintiffs, when in fact it had no such authority.

103.    Defendant HOMEWARD in making the representations as above stated, asserted facts which were not true despite the fact that each of these Defendants had no reasonable basis for believing them to be true.

104.    At all times herein relevant, Defendant HOMEWARD, possessed superior knowledge or special information regarding the subject matter of the representation than the Plaintiffs, and the Plaintiffs were so situated that they reasonably rely upon such supposed superior knowledge or special information.

105.    As a direct and proximate result of the actions the Defendant HOMEWARD as herein described, Plaintiffs have suffered damages in an amount to be proven at trial.

106.    The actions by the Defendant HOMEWARD, as hereinbefore stated, demonstrate a conscious choice of a course of action with knowledge of the serious danger to the Plaintiffs.

107.    The actions by the Defendant HOMEWARD, as hereinbefore stated demonstrated "intentional," "willful," or "conscious" wrongdoing, and as such involves more than "inadvertence, incompetence, unskillful ness, or a failure to take precautions" but rather

rises to the level of a "conscious choice of a course of action with knowledge of the serious danger to Plaintiffs.

108.    Such actions by the Defendant HOMEWARD, were willful, wanton, malicious, and oppressive and were undertaken with an intent to injure Plaintiffs, and justify the award of exemplary and punitive damages against Defendant HOMEWARD.

## IV.    PLAINTIFFS' THIRD CAUSE OF ACTION AGAINST DEFENDANT HOMEWARD RESIDENTIAL FOR CIVIL CONSPIRACY

109.    Plaintiffs incorporate herein by reference paragraphs 1 through 77, above, paragraphs 79 through 91 of the First Cause of Action, and paragraphs 93 through 108 of the Second Cause of Action inclusive, as though fully set forth herein.

110.    The LENDER DEFENDANTS have not undertaken the above practices and activities in isolation, but instead have done so as part of a common scheme and conspiracy, which also may have included CDO underwriters, hedge funds and others who acted as additional lenders, loan originators and/or assignees to the Loan.

112.    All of the practices described herein are the component parts of the LENDER DEFENDANTS larger scheme designed to maximize their profits, both from the loans themselves and from packaging the loans into their CDO trusts to make money from the secondary market for mortgage-backed securities.

113.    Each LENDER DEFENDANTS and all members of the conspiracy, with knowledge and intent, agreed to the overall objective of the conspiracy, agreed to commit wrongful acts to obtain money from Plaintiffs and actually committed such acts.

114.    Indeed, for the scheme described above to be successful, each LENDER DEFENDANTS and other members of the conspiracy had to agree to enact and utilize the same devices and tactics against Plaintiffs.

115.    Numerous common facts and similar activities, reflecting the above reality and implying the existence of a conspiracy, exist among all of the LENDER DEFENDANTS and other members of the conspiracy. Upon information and belief, these facts and activities include, (i) statements made to Plaintiffs by defendant ABC (authorized by defendant AHMSI and

AHMSI TRUST) that the LENDER DEFENDANTS will obtain the "best loan" for the borrower; (ii) the utilization of standardized sales manuals by AHMSI and AHMSI authorized brokers; (iii) the utilization of a commission structure, instituted by ABC, AHMSI and AHMSI TRUST, that encouraged and resulted in borrowers being driven to subprime loans when they were qualified to receive better loans and terms; and (iv) the inclusion by ABC, AHMSI and AHMSI TRUST brokers of certain closing fees payable to ABC, AHMSI and AHMSI TRUST affiliates, which may have been significantly higher than those charged by other companies.

116.    At minimum, the LENDER DEFENDANTS conducted and implemented the conspiracy by, with and through each other, as well as through others involved in marketing and originating AHMSI mortgage loans.

## V.      PLAINTIFFS' FOURTH CAUSE OF ACTION AGAINST DEFENDANT HOMEWARD RESIDENTIAL FOR INJUNCTIVE RELIEF

117.    Plaintiffs incorporate herein by reference paragraphs 1 through 77, above, paragraphs 79 through 91 of the First Cause of Action, paragraphs 93 through 108 of the Second Cause of Action, and paragraphs 110 through 113 of the Third Cause of Action inclusive, as though fully set forth herein.

118.    By the actions described above and as further set forth herein, Plaintiffs, ANDREAS NOTTEBOHM and TESS NOTTEBOHM, face grave and irreparable harm by eviction from their home. In addition, Plaintiffs has a strong likelihood of prevailing on the merits. Plaintiffs respectfully requests that this Court grant a temporary restraining order and permanent injunctive relief pursuant to FRCP 65(b) and 65(a) to enjoin all defendants from evicting Plaintiffs during the pendency of this action.

**WHEREFORE**, Plaintiffs, ANDREAS NOTTEBOHM and TESS NOTTEBOHM, pray for judgment against HOMEWARD RESIDENTIAL, INC., a California Corporation, formerly known as AMERICAN HOME MORTGAGE SERVICING, INC., AMERICAN BROKERS CONDUIT, AMERICAN HOME MORTGAGE INVESTMENT CORP., a Maryland Corporation, as follows:

1. For compensatory damages according to proof at trial;

2. For general damages according to proof at trial;

3. For prejudgment interest;

4. To enjoin the Defendants during the pendency of this action or until further notice from the Court from removing Plaintiff from the Subject Property, selling the Subject Property or in conveying the Subject Property during the pendency of this action;

5. For Order of the Court setting aside the Trustee's Sale of the Subject Property;

6. Issue a declaratory judgment that the Defendants' actions have violated state law, and further declaring the following:

   a. Plaintiffs at no time surrendered the property.
   b. Plaintiffs at no time undertook any action which would evidence their intent to surrender the Subject Property, including by way of illustration and not in limitation, indicate either verbally or in writing her intent to surrender the Subject Property, turn over keys , contract with any organization "whose primary business is advising people who have decided to leave their homes regarding how to extend the foreclosure process and avoid their contractual obligations to mortgagees or beneficiaries."

   c. The Trustee's Sale was invalid and the sale should be enjoined.
   d. That Defendant herein has legitimate title to the Subject Property and therefore the sale was invalid and should be rescinded and title vested in the Plaintiff;

7. For award of punitive damages;

8 . The award of treble damages pursuant to the Elder Abuse Statute;

9. For costs of suit herein incurred;

10. For reasonable attorney fees; and

11. For such other and further relief as the court may deem proper.

Dated:  December 1, 2014


_____
ANDREAS NOTTEBOHM
Plaintiff in Pro Per

_____
TESS NOTTEBOHM
Plaintiff in Pro Per

## VERIFICATION

I, ANDREAS NOTTEBOHM, hereby declare as follows:

I am the Plaintiff in the above-captioned matter. I have read the foregoing Verified Complaint, and I verify that all the allegations contained therein are true, except as to those matters that are based on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct, and executed on this 1st day of December, 2014, at San Rafael, California.

ANDREAS NOTTEBOHM

## VERIFICATION

I, TESS NOTTEBOHM, hereby declare as follows:

I am the Plaintiff in the above-captioned matter.  I have read the foregoing Verified Complaint, and I verify that all the allegations contained therein are true, except as to those matters that are based on information and belief, and as to those matters, I believe them to be true.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct, and executed on this 1st day of December, 2014, at San Rafael, California.


_____
TESS NOTTEBOHM